Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services LLC,          Case No.   29-CA-261755

and

Gerald Bryson,

An Individual.

_____

_____

Place: Brooklyn, New York (via Zoom Videoconference)

Dates: March 29, 2021

Pages: 1 through 38

Volume: 1

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

In the Matter of:

AMAZON.COM SERVICES LLC,　　　　　Case No.　29-CA-261755

and

GERALD BRYSON,

　　　　　　　An Individual.

The above-entitled matter came on for hearing via Zoom videoconference, pursuant to notice, before **BENJAMIN W. GREEN**, Administrative Law Judge, at the National Labor Relations Board, Region 29, 2 Metro Tech Center, 5th Floor, Brooklyn, New York 11201, on **Monday, March 29, 2021, 10:05 a.m.**

Exhibit E, Motion to Try Petition on Hearing Record

1                           **APPEARANCES**

2       **On behalf of the General Counsel:**

3           **EVAMARIA COX, ESQ.**
            **MATTHEW JACKSON, ESQ.**
4           NATIONAL LABOR RELATIONS BOARD - REGION 29
            Two Metro Tech Center, 5th Floor
5           Brooklyn, NY 11201
            Tel. (718)765-6172

6
        **On behalf of the Respondent/Employer:**
7
            **CHRISTOPHER J. MURPHY, ESQ.**
8           MORGAN, LEWIS & BOCKIUS, LLP.
            1701 Market Street
9           Philadelphia, PA 19103-2901
            Tel. (215)963-5601
10
            **NICOLE BUFFALANO, ESQ.**
11          MORGAN, LEWIS & BOCKIUS, LLP.
            300 South Grand Avenue, 22nd Floor
12          Los Angeles, CA 90071
            Tel. (213)612-7443
13
            **KELCEY PHILLIPS, ESQ.**
14          MORGAN, LEWS & BOCKIUS, LLP.
            1111 Pennsylvania Avenue Northwest
15          Washington, DC 20004
            Tel. (202)739-5455
16
        **On behalf of the Charging Party:**
17
            **FRANK KEARL, ESQ.**
18          MAKE THE ROAD NEW YORK
            161 Port Richmond Avenue
19          Staten Island, NY 10302
            Tel. (929)265-7692
20
        **In-House Counsel for Amazon:**
21
            **KRISTIN LAROSA, ESQ.**
22

23

24

25



1                                    <u>**EXHIBITS**</u>

2

3    <u>**EXHIBIT**</u>                              <u>**IDENTIFIED**</u>        <u>**IN EVIDENCE**</u>

4    **General Counsel:**

5       GC-1(a) through GC-1(j)                    6                  6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit E, Motion to Try Petition on Hearing Record

1                          **PROCEEDINGS**

2          JUDGE GREEN:  Okay.  So on the record.  This is Zoom video

3    trial for the National Labor Relations Board in Amazon.com

4    Services, LLC, and Gerald Bryson, case 29-CA-261755.  The

5    Administrative Law Judge is Benjamin W. Green.

6          Would counsel like to state their appearances for the

7    record, beginning with the General Counsel?

8          MS. COX:  Yes, Your Honor.  Evamaria Cox, counsel for the

9    General Counsel.

10         JUDGE GREEN:  Okay.

11         MR. JACKSON:  And Matthew A. Jackson, also counsel for the

12   General -- acting General Counsel.

13         JUDGE GREEN:  And for the Charging Party, Mr. Bryson.

14         MR. KEARL:  Frank Kearl, Make The Road New York,

15   representing Charging Party.

16         JUDGE GREEN:  Thank you.  And for the Respondent.

17         MS. BUFFALANO:  Nicole Buffalano, Los Angeles office of

18   Morgan Lewis.

19         MR. MURPHY:  And Christopher J. Murphy, Philadelphia

20   office of Morgan, Lewis & Bockius.

21         JUDGE GREEN:  And do we also -- is -- is Ms. Larusa --

22   LaRosa making an appearance?

23         MR. MURPHY:  I think we should note her for the record.

24         Kristin, do you want to unmute and -- and enter your

25   appearance?



# Exhibit E, Motion to Try Petition on Hearing Record

1     MS. LAROSA:  Good morning, this is Kristin LaRosa, counsel

2    for Amazon.

3     JUDGE GREEN:  Okay.  Thank you very much.  And -- and

4    Ms. Phillips, not -- not making an appearance?

5     MR. MURPHY:  My apologies, yeah.

6     MS. PHILLIPS:  Kelcey Phillips, with the Respondents,

7    Washington, D.C. office of Morgan, Lewis, and Bockius.

8     JUDGE GREEN:  Okay.  Great.  Thank you.  Okay.  And it

9    looks like we have the formal papers prepared.  I saw them -- I

10   saw them online.  It was informed by an opportunity in -- in

11   formal papers?

12    MR. MURPHY:  Be -- before we begin, Judge, there's some

13   other nonparties.  Can we just know who -- who they -- who they

14   are, and in particular there's a telephone number that's dialed

15   in?

16    JUDGE GREEN:  And so that is probably the court reporter,

17   correct?

18    THE COURT REPORTER:  That's correct, Judge.

19    JUDGE GREEN:  Okay.  So that's the back-up telephone for

20   the court reporter, and she also has -- is dialing in through

21   the computer.  So let's see who we got here.  Now, these are

22   not appearances, but we have -- we have Chris Smith, who we --

23   I believe we already talked with.  Grace Astra (phonetic), who

24   is from The New York Times, Leah Say (phonetic); do we know

25   Ms. Say is?



1        MS. SAY:  Yes, this is Leah.  I'm with Amazon.

2        JUDGE GREEN:  Okay.  Great.  It looks like we have -- hold

3    on -- Peter Landell (phonetic).

4        MR. LANDELL:  Yeah, I'm from the New York State Attorney

5    General's Office, just here to sit in.

6        JUDGE GREEN:  Okay.  Great.  Okay.  And that is the whole

7    group.

8        The order -- has Respondent had an opportunity view the

9    formal papers?

10       MR. MURPHY:  Yeah.  I'm --

11       JUDGE GREEN:  Okay.  Okay.  And would the -- would the

12   General Counsel like to introduce GC-1?

13       MS. COX:  Yes, Your Honor.  I've shown a copy of the

14   formal papers to the Respondent and to the Charging Party.  And

15   at this time, I'm for admission of Board Exhibit -- General

16   Counsel's Exhibit GC-1(a) through GC-1(j), which is the formal

17   papers and index describing the formal papers.

18       JUDGE GREEN:  Any objection?

19       MS. BUFFALANO:  No objection.

20       JUDGE GREEN:  Okay.  So GC-1 is admitted.

21   **(General Counsel Exhibit Number 1(a) through 1(j) Received into**

22   **Evidence)**

23       JUDGE GREEN:  Now, aside from subpoena matters, do we have

24   any other preliminary matters that we have to deal with?

25       MS. COX:  Yes, Your Honor.



1        JUDGE GREEN:  Okay.

2        MS. COX:  I'm going to need to amend the complaint.

3        JUDGE GREEN:  Okay.

4        MS. COX:  So pursuant to Section 102.17 of the rules and

5    regulations of the National Labor Relations Board, to amend the

6    complaint, paragraph 5, as set forth in the notice of intent to

7    amend, the complaint and notice of intent to amend are General

8    Counsel's Exhibit GC-1(d) and -- and GC-1(i), respectively.

9    I'm moving to amend the complaint to read 5(a), on or about

10   March 25th, 2020, during Respondent's morning manager's

11   meeting, Bryson engaged in protected concerted activity by

12   advocating with a group of coworkers for greater COVID-19

13   protections, and by raising concerns about potential COVID-19

14   exposure.

15        5(b), on or about March 30th, 2020, during a demonstration

16   at the JFK8 facility, Bryson engaged in protected, concerted

17   activity by protesting with coworkers.  Respondent's failure to

18   provide greater COVID-19 safety protection -- protections to

19   employees.

20        5(c), on or about April 6th, 2020, during a demonstration

21   at the JFK8 facility, Bryson engaged in protected, concerted

22   activity by protesting the coworkers.  Respondent's failure to

23   provide greater COVID-19 safety protection to employees.

24        JUDGE GREEN:  Okay.  I take it that the Respondent has had

25   an opportunity to view that notice and intend to amend the



1    complaint?

2        MR. MURPHY:  Yeah.

3        JUDGE GREEN:  Okay.  And any objection to the amendment?

4        MS. BUFFALANO:  No objection.

5        JUDGE GREEN:  Okay.  And I take it, Mr. Kearl, you have no

6    objection?

7        MR. KEARL:  No objection, Your Honor.

8        JUDGE GREEN:  Okay. Thank you very much.  So the complaint

9    is so amended.

10       Anything else, Ms. Cox?

11       MS. COX:  Respondents agreed to amend paragraph 4 of the

12   answer to admit Mr. Grabowski as a supervisor and agent of

13   Respondent.

14       MR. MURPHY:  Yeah.  So -- so Judge, if I if I may, Ms. Cox

15   is correct, we would be amending -- we would be amending

16   paragraph 4 of the complaint to -- to admit that Tyler

17   Grabowski was a supervisor for purposes of Section 2(11) of the

18   Act and an agent of the Respondent for purposes of Section

19   2(13) of the Act.

20       JUDGE GREEN:  Okay.

21       MR. MURPHY:  We can't hear you.

22       JUDGE GREEN:  Can you hear me now?

23       MR. MURPHY:  Yes.

24       JUDGE GREEN:  Okay.  All right, very good.

25       MR. MURPHY:  So the answer is so amended.  We -- we -- can



# Exhibit E, Motion to Try Petition on Hearing Record

1    we discuss when -- our answer to the amendment that comes from

2    the General Counsel just offered without an objection, what --

3    when -- when we need to file that?

4         JUDGE GREEN:  Just file within 14 days.

5         MR. MURPHY:  Okay.  Thank you.

6         JUDGE GREEN:  Okay.  So anything other than -- anything

7    else, other than the subpoena matter?

8         MS. COX:  Nothing from General Counsel.

9         JUDGE GREEN:  Okay.  So I just want to get an update on --

10    on how we're doing with the subpoenaed records, and we've

11    reached some agreements on -- on the outstanding requests.

12    Well, for -- for instance, how's it going to work?

13         Let me ask the General Counsel.  Do you have any kind of

14    time deadline set, or is this just going to be production of

15    documents on a rolling basis as Amazon reviews the -- you're

16    not mute.

17         MS. COX:  Sorry about that.

18         JUDGE GREEN:  That's all right.  You can keep it off.

19    Each -- each party should have one of their attorney -- I mean,

20    Mr. Kearl can do whatever he wants, but the General Counsel and

21    Respondent should have one person off mute.

22         MS. COX:  I'll just ask everybody to ignore my background

23    noise from my apartment.

24         JUDGE GREEN:  Okay.

25         MS. COX:  So as I was saying, I propose a subpoena


www.escribers.net | 800-257-0885

1    paragraphs 1, 7, and 8 to be produced by April 5th, 2020 (sic).

2    Respondents agreed to this date.  I -- I propose April 17th,

3    2020 (sic) as the date for subpoena paragraph 19.  Respondent

4    did not agree.  And I proposed April 26, 2021 for the

5    production of paragraph 16, 17 and 18.  And Respondent did not

6    agree.  And also, Respondent did not produce any documents

7    today in agreement with our agreement to produce paragraphs 9

8    through 15 of the subpoena.

9        JUDGE GREEN:  Okay.  So I'm sorry, it was April 7th was --

10   was -- was which -- which paragraphs?

11       MS. COX:  April 5th.

12       JUDGE GREEN:  April 5th.

13       MS. COX:  Paragraphs 1, 7, and 8.

14       JUDGE GREEN:  Okay. And that's the one they may have an

15   agreements on?

16       MS. COX:  Yes.

17       JUDGE GREEN:  Okay.  So let's look now at the documents.

18   There are 15.

19       MR. MURPHY:  I'm having a little trouble -- I'm having a

20   little trouble hearing you, Judge, you're --

21       JUDGE GREEN:  Am I coming in and out?

22       MR. MURPHY:  Yeah.  You're -- you're better now.

23       JUDGE GREEN:  All right.  Yeah, go ahead.

24       MR. MURPHY:  Yeah.  So we -- we are -- we're prepared to

25   produce the document responses to paragraphs 1, 7, 8, and 9



# Exhibit E, Motion to Try Petition on Hearing Record

1    through 15 by April 5th, and -- and we believe that we can get

2    a substantial amount of those responsive documents into the

3    hands of the counsel for the General Counsel by the end of the

4    day on Wednesday.  That -- that --

5        MS. COX:  Your Honor --

6        JUDGE GREEN:  Okay.

7        MR. MURPHY:  Okay.  And -- and then with respect to the

8    other, the dates more remote, what -- what we would prefer to

9    do is to -- is to address the -- the production related to

10   paragraphs 16 through 18, which generally have to do with the

11   disciplines before going to the -- the documents that -- that

12   may be responsive to paragraph 19.

13       In other words, we'd like to swap the order of those.  And

14   with respect to the discipline documents, the 16th or 18th,

15   counsel for the General Counsel provided a discrete set of

16   search terms, which we are prepared to use to apply to, you

17   know, those documents.  And -- and -- and our-- our expectation

18   is, as we've said to you previously, that-- that, given that we

19   relied only on-- on documentation from -- from JFK8 in -- in

20   making the decisions that are at issue, we would hope that

21   those documents, when provided to counsel for the General

22   Counsel, will -- will satisfy it.

23       And -- and so I guess what our -- what our suggestion is,

24   is we prefer to do this in an incremental way, and only -- and

25   only do a monumental task if -- if it's unavoidable.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  All right.  So I actually understood the

2    agreement to be that the documents would be produced on a

3    rolling basis as the -- as the Respondent would view them.  So

4    I was really kind of expecting that the documents would be

5    produced kind of on a weekly basis to the extent that they were

6    available, and -- and hoping that at some point, you know, if

7    you -- it -- the earlier they're -- they're produced, the

8    earlier you get to the point where the General Counsel can say,

9    I don't need any.  And particularly starting with the documents

10   at JFK8, and hoping that that's enough.  And it -- does that

11   not work for you all?

12       MR. MURPHY:  It works for us.

13       MS. COX:  Your Honor, if I may?  I just want to go back a

14   moment to something Mr. Murphy said.  He mischaracterized our

15   position.  We did not provide search terms for paragraph 16.

16   Paragraph 16 has specific terms related to the discipline.

17   So --

18       JUDGE GREEN:  You want to use those terms?  For 16, you --

19   you asked for documents related to a specific type of --

20       MS. COX:  Exactly.

21       JUDGE GREEN:  Okay.  So I mean, those are -- so that's --

22   I mean, those are the terms.

23       MS. COX:  Right.  And yes, it was our understanding that

24   documents would be produced on a weekly basis, today being the

25   start of the production, then April 5th, we -- I explained to



1   Mr. Murphy we were skipping April 19 -- I'm sorry, April 12th,

2   because it was burdensome for Respondent, and we would continue

3   on April 19th and then continue again on April 26th.  We have

4   no issue in swapping the April -- the production of

5   disciplinary documents, 16, 17 and 18 for April 19th and

6   paragraph 19 for April 26th.

7       JUDGE GREEN:  Okay.  You know, if I remember correctly --

8   sorry, that's why we do this by -- by video rather than in

9   person.  If it was in person, you'd all be diving for the exits

10  while I cough.  So am I correct that 1 is looking at

11  organizational charts, and 7, we're looking at the owner's

12  manual?  So this shouldn't take a long time to produce and a

13  long time to review, right?

14      MR. MURPHY:  Correct.

15      JUDGE GREEN:  Okay.

16      MR. MURPHY:  And -- and Your Honor, we're -- we're

17  agreeing to produce those documents no later than April 5th,

18  and -- and we expect, you know, by -- by the middle of the

19  week, right?  And I would also thank counsel for the acting

20  General Counsel for acknowledging the burden of -- of this

21  production and review on -- on Amazon.  So yeah, we're --

22  we're -- I think we're well poised to -- to meet every, you

23  know, expectation --

24      JUDGE GREEN:  Okay.

25      MR. MURPHY:  -- that counsel for the acting General



Exhibit E, Motion to Try Petition on Hearing Record

1    Counsel has.

2    JUDGE GREEN:  Okay.  Okay.  I think -- I think we're

3    situated to go forward.  If you run into problems, we have a

4    month and you can contact me.  Just reach out to me by email if

5    we have to, you know, if we have to deal with anything by

6    conference call, we -- we can do it again.  Again, you know,

7    start -- start with JFK8, and, youknow, the sooner you get --

8    you produce, the sooner the Respondent produces it, the sooner

9    the General Counsel can say that's enough.

10    MS. COX:  Correct.  But Your Honor, if I may, today was

11    supposed to be the production of paragraphs 9 through 15.

12    Yesterday, Respondent decided unilaterally that those documents

13    would be produced April 5th.  And it's a blatant breach of our

14    agreement and it's an attempt to thwart and delay this process.

15    Those documents should have been produced today.  That was the

16    agreement that we have verballyand inwriting, that Respondent

17    wrote on March 6th -- 16th on an email, on which you were

18    copied.  They're saying that they were in agreement --

19    JUDGE GREEN:  They understand, but --

20    MS. COX:  -- to opening the record today for the

21    production of documents that are not at issue.

22    JUDGE GREEN:  Okay.  Let me just ask the Respondent.

23    So what's the status of those documents?

24    MR. MURPHY:  Well, so frankly, there was a subsequent

25    email from -- from Ms. Cox, indicating that documents would be



Exhibit E, Motion to Try Petition on Hearing Record

1    produced on April 5th, and we interpreted that as applying to

2    all the documents that we're -- that we're talking about.  If

3    Ms. Cox has a different interpretation of that, then we're

4    prepared to produce those in a couple of days, Judge, and --

5    and it's, frankly a tempest in a teapot.

6         JUDGE GREEN:  Right.  No, I agree.  So it's -- so you can

7    get it in a couple of days.  Do it in a couple of days.

8    There's no -- that's -- there's not going to be any remedy here

9    other than that.

10        And what -- what do you want?  Sanctions?  This is -- this

11   is -- if they can get it to you in a couple of days, that's --

12   that's going to have to do.

13        MS. COX:  No, Your Honor.  I think there should be some

14   consequence here for their bad faith.

15        MR. MURPHY:  Oh, come on.

16        MS. COX:  Refusing to --

17        JUDGE GREEN:  I don't know that we have bad faith here.

18   And what would be a consequence to you?

19        MS. COX:  The consequence would be either produce all the

20   documents by the end of the week, and agree to a call with our

21   technology counsel, which we've been asking to discuss search

22   terms in accordance with your order, and Respondent is

23   refusing.

24        JUDGE GREEN:  Okay.  Well, that's an entirely different

25   subject.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MR. MURPHY:  Judge, that's --

 2        JUDGE GREEN:  Yeah.  So 9 through 15, just produce it

 3   in -- if you can do it in a couple of days.

 4        MR. MURPHY:  Okay.

 5        JUDGE GREEN:  Is there some kind of issue -- you should be

 6   consulting regarding search terms, including the IT, you know,

 7   the Board IT.  Is there any problem with that?

 8        MR. MURPHY:  We -- well, so we're happy for the counsel

 9   for -- the counsel for the acting General Counsel to propose

10   search terms for us to consider.  We're not -- we don't think

11   it's our position to propose search terms, then counsel for the

12   General Counsel telling her what we think might be there or

13   what words might be useful to search on.  They should propose

14   them to us, Judge.

15        With respect to paragraph 16, the terms that they want us

16   to look at, we're going to look at.  And we would be reasonable

17   and flexible with respect to the other paragraphs, as well.

18   And as I said in writing to Ms. Cox, if it becomes necessary

19   for one e-discovery attorney to talk to another e-discovery

20   attorney, we're happy to have those conversations.  We just

21   don't see the need for it at this point when search terms

22   haven't even been provided.

23        MS. COX:  Your Honor, if I may.  Federal Rules of Civil

24   Procedure 26(f) and the Sedona Principles require that

25   Respondent have a conversation with General Counsel regarding
```



1     the search terms.  Specifically 6(b) of the Sedona Principles

2     say it is bad faith a responding party cannot unilaterally

3     demand the requesting party to submit proposed search terms.

4          It would be us just stabbing in the dark.  They've already

5     been searching for paragraphs 9 through 15.  It makes no sense

6     that they need additional proposals from us.  We're happy, we

7     want to narrow the search with them and work with them, but we

8     also want some information.  What have they done so far?  What

9     search terms have they used?  And then, therefore, we can

10    respond in kind if we think there's anything else that needs to

11    be included.

12         JUDGE GREEN:  I mean, have searches already been done for

13    9 through 15?  I mean, there's nothing wrong with disclosing

14    what you've already done.

15         MR. MURPHY:  Right.  So first thing we'd say is those are

16    rules and/or principles that apply under the Federal Rules of

17    Civil Procedure in a discovery proceeding, right.  And this is

18    not a discovery process.  This is a document production

19    process.  So we're happy to do whatever's necessary in order to

20    deliver documents that are relevant, probative, and not

21    unnecessarily burdensome or intrusive on the Respondent.

22         I just don't know at this point that we're in a position

23    to, you know, engage in the Sedona Principles.  If after -- if

24    in the next week or so, after counsel for the General Counsel

25    sees what's produced, and after we search on the search terms

18

1    in paragraph 16 there's a need for further engagement, we're

2    happy to do that.  We just think it's sort of the cart before

3    the horse at the moment, Your Honor.

4        JUDGE GREEN:  Just so you know, I mean, the Board does

5    use -- they do reference and use --

6        MR. MURPHY:  I understand.

7        JUDGE GREEN:  -- the Sedona Principles, and they do use

8    discovery principles as guidance, even though we don't have

9    pretrial discovery.  So what I do want is a good-faith exchange

10   and dialogue between the parties to try and get this

11   information with the most efficient way and with the least

12   amount of burden.

13       I can't really tell you what exactly what I'd want because

14   I guess I don't really know exactly what the problem is, other

15   than to say, you know, the parties should be discussing at an

16   early -- this week, you should be discussing the best way to go

17   about getting these documents.  The General Counsel should be

18   proposing terms if you have questions about what the Respondent

19   has done.  The Respondent should answer in good faith.

20       MR. MURPHY:  We will do that.

21       JUDGE GREEN:  Okay.

22       MS. COX:  Your Honor, if I may, can I ask Respondent to

23   give a reason?  I know they said that there was some email that

24   made them believe that documents weren't due today.  Can you

25   tell me what email that is or what in that email gave you that



19

1   understanding?  Because to me, this request --

2       JUDGE GREEN:  We've already gone through that.  It's on

3   the record, and I'm hoping that that's not going to be a

4   problem.  It sounds like those documents, 9 through 15, that's

5   ones that are issued, right?  It sounds like those are going to

6   be produced in two days.

7       MS. COX:  Yeah.  But, Your Honor, the reason given to the

8   General Counsel was because we amended in two allegations.

9   It's just disingenuous.  These allegations have nothing to do

10  with these documents.  They're completely unrelated, and from

11  the beginning it's just showing bad faith.  We've been

12  requesting calls since the first week we met.  I mean, it's

13  just too late.

14      JUDGE GREEN:  I understand that, but the way we're

15  resolving this is that documents are going to be produced in a

16  couple of days.  That's how we're resolving it.

17      Anything else we need to do?

18      MS. COX:  Yes, Your Honor.  I'd like to talk about these

19  Connecticut facilities that are yet to be identified by

20  Respondent.  They've named a location, the State of

21  Connecticut.  I have no clue as to where these facilities are

22  located.  Respondent has not provided me that information.

23      JUDGE GREEN:  Okay.  So yes, please provide the specific

24  location of these facilities.

25      MR. MURPHY:  Okay.



# Exhibit E, Motion to Try Petition on Hearing Record

1        JUDGE GREEN:  You can take it from there.

2        MS. COX:  I just want to say, also, that you know, I've

3   identified five facilities that I know of.  Each facility is

4   over a 100 miles away.  BDL3, BDL5, BDL1, BDL6, BDL2, and to

5   date, I have no information as to whether those facilities are

6   in the same regional -- the same region as JFK8.  And Your

7   Honor, quite frankly, we're allowing Respondent just to choose,

8   cherry-pick whatever facilities they want to produce documents

9   from.  And as a subpoenaed party --

10       JUDGE GREEN:  Let me stop you.  And let me ask,

11  Mr. Murphy, this is a question that we had during the

12  conference call.  Do we have a sense for request 16 through 18,

13  which are the investigatory and disciplinary records, do we

14  have any sense of a ballpark figure of how many documents would

15  be responsive at JFK8?

16       MR. MURPHY:  Judge, the short answer is no.  There's a lot

17  of disciplines, and it would depend on how many counsel for the

18  General Counsel, based on the search terms and which of those

19  they wanted to review.  You know, if we got into the personnel

20  files, obviously, the number of documents multiplies, you know,

21  exponentially pretty quickly.

22       So yeah, so we'll have a much better handle on that as

23  soon as we run those search terms, which I've indicated we're,

24  you know, prepared to do.

25       JUDGE GREEN:  Let me ask you, though, so I take it these



Exhibit E, Motion to Try Petition on Hearing Record                     21

1    are -- the disciplines are all like product.  And is there no

2    way to just identify -- run a search for a specific type of

3    disciplinary form to just get -- not to review them, just to

4    get a figure as to how many there are?

5         MR. MURPHY:  That's what -- so, Judge, look.  You know,

6    we've had a lot of exchange with counsel for the General

7    Counsel, you know, through correspondence.  I was not

8    anticipating that this would be a forum, you know, to

9    relitigate all of that.  But what we've agreed is that

10   whichever -- that whatever of this -- when the search terms are

11   run, whichever documents return hits, what we'll -- and I may

12   not be speaking, you know, precisely in the terminology, but

13   whatever disciplines have those terms, we'll produce the

14   discipline.  And then counsel for the General Counsel can

15   review it and say, I'm not interested in that one.  That one

16   I'd like to see more information on.  That's where we are.

17        JUDGE GREEN:  Okay.  But are you talking about doing a

18   word search to try to identify certain types of conduct?  Or

19   are you just talking about a word search that will identify any

20   discipline?

21        MR. MURPHY:  No.  We're talking about -- in the universe

22   of -- let's talk about JFK8, Your Honor.  So if you take a look

23   at subpoena request 16, I believe, we are going to run a search

24   of JFK8 disciplines to include the terms provided by counsel

25   for the General Counsel.  Cursing, abusive, profane, harassing,



Exhibit E, Motion to Try Petition on Hearing Record

22

1   and vulgar language.  And I assume, although I don't know, that

2   that will return some set of disciplines that include those

3   terms or analogous to those kinds of terms.  We'll provide that

4   to counsel for the General Counsel and at that point, she can

5   tell us if any of those she wants additional information on.

6        JUDGE GREEN:  Understood.  But the General Counsel has

7   asked for just all disciplines.  That was 16.

8        Am I right, Ms. Cox?  17 was just a request for all

9   disciplines?

10       MS. COX:  Yes, Your Honor.

11       JUDGE GREEN:  And so -- and the question is can -- you

12  know, can Amazon electronically identify that through a search,

13  just there is a -- I assume there's an electronic disciplinary

14  form that's filled out.

15       MS. COX:  There is.

16       JUDGE GREEN:  And my guess, also, is that they could

17  probably just do a search with -- fairly easily, that

18  identifies all those forms for a particular facility at a

19  particular time.  Maybe I'm wrong, but I guess I at least

20  wouldn't be surprised if they could do that.

21       MR. MURPHY:  Okay.

22       JUDGE GREEN:  And if they could, that's what I'd like --

23  I'd like the number.  I don't need you to review them.  I just

24  want to know how many documents we're dealing with.  And then

25  we have a better understanding of how we go forward with regard



Exhibit E, Motion to Try Petition on Hearing Record 23

1    to scope.

2    MR. MURPHY:  Okay.  We can provide that information to

3    counsel for the General Counsel in writing, by the end of the

4    day on Wednesday.

5    JUDGE GREEN:  Okay.  And --

6    MS. COX:  Your Honor, if I may, we've been talking about

7    his since March 1st, since the subpoena issued.  It's now three

8    weeks later.  We still don't know how many documents we're

9    talking about, Your Honor, because of replete delay.  Why does

10    it have to be until Wednesday?

11    JUDGE GREEN:  Okay.

12    MS. COX:  Today is the opening of this hearing.

13    JUDGE GREEN:  Okay.  So we're going to get it on

14    Wednesday, and that's going to be fine.  And you know --

15    MS. COX:  Your Honor --

16    JUDGE GREEN:  -- that's how we're going to proceed.

17    MS. COX:  -- I understand --

18    JUDGE GREEN:  And just to be clear -- I'm sorry.  Just so

19    we're clear, the order is, is that the General Counsel gets

20    three facilities.  That is the current order.  It's three

21    facilities.  I don't care which one they are.  They can be the

22    two in Connecticut plus JFK8, there can be two others.  And

23    that's, at the very least, how we're going to start, and

24    particularly, we're going to start with production in JFK8.

25    All we need here is a random representative sample of



Exhibit E, Motion to Try Petition on Hearing Record
24

1    instances where employees engaged in conduct similar to that of

2    Mr. Bryson.  And that can be 20 documents; that can be 100

3    documents.  It doesn't have to be 1,000 documents.  It really

4    doesn't have to be 100 document.  The GC doesn't get -- you

5    don't get points for volume.  You know, the size of the sample

6    really isn't that important.

7         You want to know that you can say, yeah, all right, I'm

8    fairly confident Respondent dealt with individuals who engaged

9    in analogous conduct in this way.  And that's what we're

10   looking for.  And if we can get that from JFK8, great.  Let's

11   just get it from JFK8.  If it requires more, we'll get it from

12   the additional two.  I really doubt that we're going to need

13   more than that.  And should it come to that, okay, you can get

14   back to me, which is the reason why I'd like this production to

15   go as quickly as possible on a weekly basis.  And two days away

16   is not going to kill anybody.  Then that's how we're going to

17   proceed on 16 through 18.

18        Anything else we need to deal with on the subpoena?

19        MS. COX:  Yes, Your Honor.  I just want to raise this case

20   that you cited in your order for the proposition that if

21   personnel decisions are made or approved above the local

22   facility, I have some evidence that was produced during the

23   investigation, it's an email.  I've redacted it that I can show

24   today, that a regional loss prevention manager was involved in

25   the investigation into Bryson's alleged misconduct on April



Exhibit E, Motion to Try Petition on Hearing Record

```
1    6th.

2        A witness submitted a statement to the regional loss

3    prevention manager at the manager's request.  A review of the

4    LinkedIn profile of this regional loss prevention manager is

5    based out of Baltimore, Maryland.  And under the Federal Rules

6    of Civil Procedure, it's their obligation to negotiate in good

7    faith and identify which regional facilities fall with JFK8.

8    Whether it's the Baltimore facility, Connecticut, or some other

9    geographic scope.  Right now --

10       JUDGE GREEN:  So respectfully, what we have is -- right,

11   we have a regional manager taking some kind of statements.  Do

12   we know whether that regional manager made the decision?

13       MS. COX:  We don't, Your Honor.

14       JUDGE GREEN:  Okay.  So we're going to deal with three

15   facilities.  That's what we're going to deal with.

16       MS. COX:  I understand, and we want to negotiate around

17   which facilities those are.  We want to make sure that --

18       JUDGE GREEN:  Okay.

19       MS. COX:  -- those facilities include the state -- they

20   have the same regional management structure.  I have no idea if

21   Connecticut shares the same regional management structure --

22       JUDGE GREEN:  Okay.  So --

23       MS. COX:  -- as JFK8.

24       JUDGE GREEN:  -- that is fine.  That's fine.  You can -- I

25   don't care which other two you use.
```



26

1    MR. MURPHY:  Well, Judge, the counsel for the General

2    Counsel asked for the other facilities in the region with JFK8.

3    We told her which ones those are, where they are, and they

4    share operational and HR management.  Now, you know, that was

5    the ask.

6    JUDGE GREEN:  I understand, but then they changed it to

7    common management, which is entirely ambiguous and not helpful.

8    But if you have a certain person, and you know, you want to

9    know what that manager's jurisdiction is, then yeah, have a

10   conversation about it.  It's not going to kill you to say what

11   that person's jurisdiction is.  Which, you know, which

12   facilities they cover, and whether you might want to have the

13   two facilities be within the jurisdiction of that manager.

14   This really shouldn't be that difficult.

15   MS. COX:  No, it should not.  Respondent's response to us,

16   we should subpoena those documents.  It's ridiculous.  I mean,

17   just a cursory search -- what their regional common management

18   structure is.

19   JUDGE GREEN:  So we're not doing that.  Right.  That's why

20   it's a problem, by the way.  We're not getting into that, but

21   okay.  If you have one person, and you want to know that -- you

22   have a manager, you want to know what that person's regional

23   jurisdiction is and pick two facilities within that

24   jurisdiction, fine.  Let's not make this more difficult than it

25   is.  Can we do that?



# Exhibit E, Motion to Try Petition on Hearing Record

```
1         MS. COX:  Your Honor --

2         JUDGE GREEN:  And I'm speaking to Respondent.  I'm asking

3    if you can.

4         MR. MURPHY:  So I don't know what the facilities are or

5    where they are or whatever.  You know, we've been pretty --

6    we've been pretty consistent that the decision to -- the

7    decisions that are at issue were based on comparators from

8    JFK8.  That ought to be the focus.

9         MS. COX:  It is.

10        MR. MURPHY:  JFK8 is a fulfillment center.  It's in a

11   region with two other operational fulfillment centers.  It

12   seems that those ought to be the other facilities that are

13   rolled up in the three facility, you know, search limit.  I

14   don't know what other facilities, you know, Ms. Cox might be

15   thinking about or where they are or what kind they are, but

16   we'd have a conversation about it, Your Honor.

17        JUDGE GREEN:  Aright.  Exactly.  I absolutely expect the

18   General Counsel to get enough documents from JFK8 to be

19   satisfied that they have a representative sample.  But maybe

20   not.  You know, maybe not.  It's thousands of -- it's what,

21   10,000 employees?  I would expect that that --

22        MS. COX:  5,000.

23        JUDGE GREEN:  -- will produce a sufficient showing.  But

24   maybe it won't.  And okay, so we need to identify two different

25   facilities.  Just have a conversation about it.  And you know,
```



Exhibit E, Motion to Try Petition on Hearing Record

28

1    if there's an issue regarding this one guy who was involved,

2    have a -- manager who's involved, have a conversation about it.

3    See if it results in two facilities other than in Connecticut.

4       MS. COX:  Your Honor, if you cite a case, <u>NLRB V. United</u>

5    <u>Aircraft Corporation</u>, and it stands for the proposition that a

6    person or corporation being investigated cannot be placed in a

7    position of giving only such information as he or it may choose

8    to offer, which is exactly what's happening here, Your Honor.

9    We're not having conversations.  Respondent is choosing,

10   cherry-picking facilities over 100 miles away.  There are

11   fulfillment centers ten miles away.

12      JUDGE GREEN:  Like I said, you can pick any facilities you

13   want.  I don't care which facilities you pick.  And have a --

14   you know, have a good-faith conversation about it, including

15   about this manager who was involved.  You want to do it now, we

16   can do it right now.  You know, it seems like this is something

17   that the parties should be able to handle on their own, but do

18   you have questions for Mr. Murphy now about the facilities?

19      MR. MURPHY:  Yeah, Judge.  It's unlikely that I'd be able

20   to respond in detail about these facilities.

21      JUDGE GREEN:  Okay.

22      MR. MURPHY:  Other than having identified the two

23   fulfillment centers that are in the region with JFK8.  I don't

24   know what else you want me to say about that.

25      MS. COX:  Your Honor --



1   MR. MURPHY:  If they're going to ask me about other

2   facilities, I'm not prepared to respond to that.  But --

3   MS. COX:  Your Honor --

4   MR. MURPHY:  -- I'd be happy to have the conversation, you

5   know --

6   MS. COX:  -- this is the precise answer we get all the

7   time, and this is exactly why we want technology counsel

8   involved and other representatives involved.

9   JUDGE GREEN:  You can have whoever you want involved.  You

10  can have whoever you want involved.

11  MS. COX:  Well, Your Honor, I can never get an answer as

12  to specifics.  Where are things located?  How many employees

13  are we talking about?  What kind of facilities are we talking

14  about?  It's very difficult to work with someone if you don't

15  get any specific information.

16  JUDGE GREEN:  Yeah, just --

17  MS. COX:  It's always 10,000; 7,000; 17,000.

18  JUDGE GREEN:  -- let me ask you, Ms. Cox, what exactly is

19  your concern?  I mean, you really want -- I mean, really what

20  you want are you want a representative sample of JFK8 employees

21  who have engaged in similar conduct, and you want to look at

22  that and see if those people have been treated the same or

23  differently as Mr. Bryson.

24  MS. COX:  Yes.

25  JUDGE GREEN:  You'd prefer it if you have enough at JFK8.



# Exhibit E, Motion to Try Petition on Hearing Record

1    Frankly, you'd like to have the same division, same supervisor,

2    same manager, really.  The narrower it is, the better.  And you

3    just want to have enough, right?  So I guess my question is,

4    I'm a little at a loss to understand what you think you're

5    going to get from facilities other than JFK8?  I mean, the fact

6    that a manager took a statement doesn't mean that the decisions

7    are being made at the regional level regarding discipline.

8        And to do some kind of huge, you know, investigation or

9    dialogue regarding this in order to get documents, which are

10   likely to be redundant, is probably not going to be that

11   helpful.  I mean, what exactly are you looking for?  What is

12   your ideal two other facilities?

13       MS. COX:  Your Honor, I don't have ideal other facilities.

14   All I know is that there are facilities that are closer.

15       JUDGE GREEN:  Okay.

16       MS. COX:  And based on proximity, the likelihood of them

17   sharing common regional managers is greater than a facility in

18   Connecticut 100 miles away.  And so if these regional managers

19   are involved in any way in disciplining on the local level,

20   then it's going to be more probative to have documents that

21   fall within the same region --

22       JUDGE GREEN:  Okay.

23       MS. COX:  -- as opposed to documents from a facility

24   outside of the region.  I understand that they've represented

25   Connecticut is within the same --



1    JUDGE GREEN:  Okay.

2    MS. COX:  -- region, but when I substantiate --

3    JUDGE GREEN:  All right.  So there are what regional human

4    resource managers?

5    MS. COX:  There are -- you can check just by Googling job

6    postings -- regional human resources managers; regional loss

7    prevention managers; regional workplace health and safety

8    managers; area managers; and other managers -- regional

9    managers at its facility.  They have a regional management

10   structure.  It's clear.  Why we can't get information about it

11   is unclear.

12   JUDGE GREEN:  Okay.  And is that not coming in the

13   organizational charts that are supposed to be showing up in two

14   days?

15   MS. COX:  I don't believe that is.  The organization chart

16   is for JFK8.  And I have to say -- so we asked Amazon what

17   facilities are in the region with JFK8, and we got an answer.

18   And we related that answer to counsel for the General Counsel.

19   The fact that she doesn't -- the company can be organized in

20   whichever way it organizes itself, Your Honor.

21   JUDGE GREEN:  Okay.  Right.  So do you not have like a

22   human resource structure?  Does Amazon not have a human

23   resource structure with, you know, a national human resources

24   vice-president and --

25   MS. COX:  I don't know.  Although, I presume, in some



1    fashion, the answer is yes.

2        JUDGE GREEN:  Okay.  And probably there's a regional human

3    resources management manager or manager team that has

4    responsibility for JFK8.  We could probably identify who that

5    is.  It might be this person who sent this email that we're

6    discussing.  And then we asked that person, you know, do you

7    have jurisdiction for any other facilities?  Yes, two are in

8    Connecticut; three are in New Jersey.  Okay.  Pick two of

9    those.  It shouldn't be that hard.

10       MR. MURPHY:  It's not, Your Honor.  And we'll happily have

11   that conversation with Ms. Cox.

12       JUDGE GREEN:  Okay.  Anything else?

13       MS. COX:  The last thing, Your Honor, is in your order,

14   you propose that General Counsel -- or that the parties consult

15   to come up with search terms for paragraph 17, and that wasn't

16   my recollection of our conference call.  So I just wanted to --

17       JUDGE GREEN:  You know, well, 17 is all the disciplines.

18       MS. COX:  Right.

19       JUDGE GREEN:  That's what I was just talking about with

20   Mr. Murphy before.  We're trying to get -- we're trying to see

21   if Amazon can just identify disciplinary forms within these

22   three facilities, whatever the other two facilities are.  My

23   guess is they can.  Yeah, but that won't require -- I don't

24   think that'll require search terms.

25       MS. COX:  Exactly.



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  It will just require an identification of

2   the disciplinary form.

3      MS. COX:  But Judge, your order -- my reading of it is

4   that we're required to consult over the search terms in

5   paragraph 17.

6      JUDGE GREEN:  I understand.  I'm telling you -- I'm

7   telling you, you don't.

8      MS. COX:  Okay.

9      JUDGE GREEN:  You don't.  As far as I understand Mr. --

10   you know, Mr. Murphy's going to go back and see if they can

11   identify all the disciplines at JFK8, and then you'll wait and

12   see if -- and then maybe they'll do the same thing -- they'll

13   do the same thing with regard to the other two facilities, if

14   that turns out to be necessary.

15      MS. COX:  Okay.  And Your Honor, I just want to request,

16   again, that to the extent that you can, that you would order

17   Respondent to consult with technology counsel before the end of

18   this week to come up with whatever search terms we need to

19   discuss, if any at all.

20      JUDGE GREEN:  You can have whoever you want on that

21   call -- call, calls, whichever.  I mean, I assume the substance

22   of -- I mean, the substance of the search terms is going to be

23   something that you and Mr. Jackson come up with.  I'm not

24   really sure what IT has to contribute, but if you want them on

25   the call, you can have them on the calls.



1    MS. COX:  Well, Your Honor, with regard to paragraph 19,

2    we -- I mean, quite frankly, it's regarding Bryson's PCA, like,

3    we don't know what is it that -- what kind of -- we'll do our

4    best to discuss, but you know, this is information that's -- we

5    are prepared to discuss paragraph 19.  Our position is there's

6    really not much to discuss regarding paragraph 18.

7    JUDGE GREEN:  That's great.

8    MS. COX:  But with regard to paragraph 19, it's, you know,

9    it's a very specific interview, so it's difficult to, you know,

10   come on.

11   JUDGE GREEN:  Well, it's specific, but listen, you would

12   agree, I take it, that the vast majority of documents that

13   could contain documents that are relevant and responsive to 19,

14   that the vast majority of those documents are not going to

15   contain any relevant material.

16   It's going to be a gazillion emails and other documents

17   that contain nothing of use.  And so we want to target the

18   documents that contain something about the protected concerted

19   activity, if any, of Bryson.  And so if you're dealing with a

20   large company, it's -- you know, it makes it not entirely easy.

21   You're going to have lots and lots of documents, and you have

22   to come up with some way of targeting the documents that your

23   client that you want relevant -- you know, that are -- you want

24   and that are going to be relevant.

25   MS. COX:  Your Honor --



1       JUDGE GREEN:  I can't tell you how to do that.

2       MS. COX:  -- I understand, but this company is

3    sophisticated and has way more technical expertise than any of

4    us.

5       JUDGE GREEN:  It's a -- we're talking about word searches.

6    It's not --

7       MS. COX:  Correct.

8       JUDGE GREEN:  -- I don't know that it's a technical issue.

9    It's an issue of coming up with identifying documents like

10   you're doing a Boolean Westlaw search.

11      MS. COX:  Exactly.

12      JUDGE GREEN:  Except for the factual documents.  And yeah,

13   if you want -- you should have -- yes, you should have a

14   dialogue with the Respondent, but really, that is going to come

15   from you.  I mean, you have to think about what, you know, what

16   words you think will best target Mr. Bryson's PCA.  And that's

17   your job.  Okay.  Anything else?

18      MR. MURPHY:  Your Honor, I just have one thing, and I

19   think I might even classify it as a housekeeping issue.  But

20   when we do go on the record with testimony, there's likely to

21   be a fair amount of words that a fair number of people, if not

22   almost everybody, find to be highly offensive in one way or

23   another.  And our plan is not to use the words as such, but to

24   use --

25      JUDGE GREEN:  Okay.



36

```
 1        MS. COX:  Yeah.  I don't know if you have a preference or

 2    a practice with respect to that?

 3        JUDGE GREEN:  Yes.  I don't have any problem with using N

 4    word.

 5        MR. MURPHY:  Okay.

 6        JUDGE GREEN:  You know, if that's the word, you can use N

 7    word.

 8        MS. COX:  Okay.  Thank you.

 9        JUDGE GREEN:  So May 4th, I still technically have a trial

10    date on May 4th in another matter.  I still expect it to

11    settle.  I'm going to give them another week or so to see if it

12    settles.  If it doesn't, you know, I might have to -- we might

13    have to be off on May 4th, which would mean May 3rd and then

14    continuing May 5th.  I'll give you as much notice as possible

15    if that's going to be the case.

16        Do you want to make opening statements now?  Or do you

17    want to make opening statements later?

18        MS. COX:  Later.

19        JUDGE GREEN:  Okay.  And I take it same from Mr. Murphy?

20        MR. MURPHY:  Yes.

21        JUDGE GREEN:  You don't have to, but let me tell you that

22    you can submit opening statements in writing if you would like.

23    Do you know whether there's going to be a sequestration order

24    request?

25        MS. COX:  I'd say yes, Your Honor.
```



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Okay.  Okay.  And the only thing else I'll

2   tell you is that to the extent you're having verbal

3   conversation regarding the production of subpoenaed documents,

4   I mean, please do try to confirm in writing, in email, so we

5   have documentation of what's being requested by the General

6   Counsel and what's being done by the Respondent.

7      And unless we have anything else, I'm going to close the

8   record today, and we can move on.

9      MS. COX:  No.  Nothing else from General Counsel.

10      MR. MURPHY:  Nothing, Your Honor.  Thank you.

11      JUDGE GREEN:  Okay.  So very good.  So we'll go off the

12   record, and I will be issuing you all a Zoom invite sooner

13   rather than later this time, for May 3rd.

14   **(Whereupon, the hearing in the above-entitled matter was**

15   **recessed at 10:55 a.m. until Monday, May 3, 2021 at 9:30 a.m.)**

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record   138

1  **CERTIFICATION**

2  This is to certify that the attached proceedings before the

3  National Labor Relations Board (NLRB), Region 29, Case Number

4  29-CA-261755, Amazon.com Services LLC, and Gerald Bryson, at

5  the National Labor Relations Board, Region 29, 2 Metro Tech

6  Center, 5th Floor, Brooklyn, New York 11201, on Monday, March

7  29, 2021, 10:05 a.m., was held according to the record, and

8  that this is the original, complete, and true and accurate

9  transcript that has been compared to the reporting or

10 recording, accomplished at the hearing, that the exhibit files

11 have been checked for completeness and no exhibits received in

12 evidence or in the rejected exhibit files are missing.

13

14

15

16  _____

17  MICHELLE MORALES

18  Official Reporter

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services LLC,          Case No.    29-CA-261755

        Employer/Respondent,

and

Gerald Bryson,

        An Individual.

_____

_____

Place: Brooklyn, New York (via Zoom videoconference)

Dates: April 12, 2021

Pages: 1 through 32

Volume: 1

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



Exhibit E, Motion to Try Petition on Hearing Record

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

| | |
|---|---|
| In the Matter of:<br><br>AMAZON.COM SERVICES LLC,<br><br>        Employer/Respondent,<br><br>and<br><br>GERALD BRYSON,<br><br>        An Individual. | Case No.   29-CA-261755 |

The above-entitled matter came on for hearing via Zoom

videoconference, pursuant to notice, before **BENJAMIN GREEN**,

Administrative Law Judge, at the National Labor Relations

Board, Region 29, Two Metro Tech Center North, 5th Floor,

Brooklyn, New York, 11201, on **Monday, April 12, 2021, 4:02 p.m.**

Exhibit E, Motion to Try Petition on Hearing Record

1                          A P P E A R A N C E S

2    On behalf of the Charging Party:

3        FRANK KEARL, ESQ.
         MAKE THE ROAD NEW YORK
4        161 Port Richmond Avenue
         Staten Island, NY 10302
5        Tel. (929)265-7692

6    On behalf of the Employer/Respondent:

7        CHRISTOPHER J. MURPHY, ESQ.
         MORGAN, LEWIS & BOCKIUS, LLP
8        1701 Market Street
         Philadelphia, PA 19103
9        Tel. (215)963-5601

10       NICOLE BUFFALANO, ESQ.
         MORGAN, LEWIS & BOCKIUS, LLP
11       300 South Grand Avenue
         22nd Floor
12       Los Angeles, CA 90071
         Tel. (213)612-7443

13
         KELCEY PHILLIPS, ESQ.
14       MORGAN, LEWIS & BOCKIUS, LLP
         1111 Pennsylvania Avenue, NW
15       Washington, DC 20004
         Tel. (202)739-5455

16
     On behalf of the General Counsel:
17
         EVAMARIA COX, ESQ.
18       MATTHEW JACKSON, ESQ.
         DAVID GASTON, ESQ.
19       NATIONAL LABOR RELATIONS BOARD, REGION 29
         Two Metro Tech Center North
20       5th Floor
         Brooklyn, NY 11201
21       Tel. (718)765-6172

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1                    <u>P R O C E E D I N G S</u>

2        JUDGE GREEN:  So are we on the record?

3        THE COURT REPORTER:  Yeah, we are.

4        JUDGE GREEN:  Oh, okay.

5        All right.  So thank you very much.  It's April 12th --

6    April 12th, 2021, and we're -- we are on the record for a

7    conference call.  This is not a trial date.  So we're here to

8    discuss the subpoena and the production of documents.

9        Let me just start off by clarifying two things very

10   quickly.  So as I indicated in the -- in the email I sent the

11   other day, the temporal scope of the subpoena has not been

12   revoked.  So it's -- we're dealing with the time periods that

13   are in the subpoena.  And second, at least as of right now,

14   subpoena paragraph 17, as far as I understand it, is a request

15   for all discipline in JFK8 and it was with -- it was -- as

16   modified by the General Counsel, it was for disciplinary

17   records in -- in facilities with common management.  And what I

18   determined was that it was going to be restricted to three

19   facilities, JFK8 -- K8 and two more that the -- that the

20   General Counsel designated.  And from what I can understand

21   from -- from reading that email of the parties, was that the --

22   the two additional facilities that the General Counsel

23   designated were EWR4 and BDL3.

24       Now, 17 was all disciplines.  And if I understood

25   correctly, it's -- the -- the Respondent has identified 13,101



Exhibit E, Motion to Try Petition on Hearing Record

1    disciplines at JFK8 alone.  Is that correct?

2        You're on -- I think you might be on mute, Mr. Murphy.

3        No, you're not on mute.  You're not here?

4        MR. MURPHY:  You know what?

5        JUDGE GREEN:  Now we can hear you -- we can hear you.

6        MR. MURPHY:  Yeah.  So -- so you are correct.  There were

7    13,000 unique disciplines at -- at JFK8.  And with respect to

8    paragraph 16, we ran the -- the terms embedded in -- in request

9    16 and came up with the -- the 34 hits that we're in the

10   process of producing to Ms. Cox's office.

11       And with respect to paragraph -- if I may, Judge?  `

12       JUDGE GREEN:  Yeah, yeah.  Go ahead.

13       MR. MURPHY:  Yeah, yeah.  With respect to paragraph 17,

14   Ms. Cox proposed a set of 31 terms.

15       JUDGE GREEN:  Okay.

16       MR. MURPHY:  And -- and -- and we responded on the 7th

17   saying that we thought 31 was too many, too broad.  We proposed

18   12 and we ran those 12 against the JFK disciplines and came up

19   with 11 -- 1,095 hits.

20       JUDGE GREEN:  Right.  I saw that.

21       MR. MURPHY:  Right.  And -- and -- and we asked Ms. Cox to

22   indicate whether that was acceptable or not.  We never heard

23   back.  Since then, we've run the JFK8 disciplines against all

24   31 search terms and those additional search terms generated

25   another 1,300 or so hits.  Now -- now, a lot of those were



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    related to the term or word "age", because that's in the word

2    "manage" or "manager", et cetera.  Right.  So there was a lot

3    of hits that -- that probably are not responsive.  But -- but

4    there's 2,400 hits on those terms.

5         And so you know, hopefully -- we still haven't heard from

6    Ms. Cox, whether narrowing it to 12 or narrowing it in some

7    other way would be acceptable.  But -- but that's something

8    we're prepared to do.

9         And before I move off this, Judge, you know, I -- I

10   interpreted that order, that -- that last phrase in your order,

11   that temporal -- however you phrased it, to mean the time of

12   the events in question.  And if I interpreted that improperly,

13   I -- I own that mistake.  And -- and we produced the only other

14   org chart that we've been able to identify to date this

15   afternoon.  So Ms. Cox has -- has all of the documents.  So --

16        JUDGE GREEN:  All right.  Okay.  I mean just so -- just so

17   I can clarify, with regard to the organization charts, what I

18   had in mind was that there would be a chart or charts which lay

19   out the positions -- positions, perhaps -- the higher -- the --

20   the corporate structure of the -- of the company.  And it

21   wouldn't need to be the individual people.  You'd be able to

22   look at and say, you know, there'd be a personnel file that

23   says, human resource manager, regional, has, you know, engaged

24   in an investigation, and you'd be able to take that position

25   and look at the chart and see where that person fits in within

escribers

www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    the -- the corporate structure.  That's what I had in mind.

2    And -- and it would be -- you would need it throughout the

3    period, if it changed.  I don't know that it would have changed

4    during the -- during the one-year period.  But you would need

5    it for -- you know, if it changed at some point, yeah, I mean,

6    produce the -- the charts to the extent they changed.  It

7    sounds like that has been produced.

8        MS. COX:  No, Your Honor, that's not my understanding.

9        JUDGE GREEN:  So what -- what -- what is your

10   understanding, Ms. Cox?

11       MS. COX:  So this period that Mr. Murphy is referring to

12   as the time period contemplated by the amended complaint has

13   not been specified.  I don't know what period we're talking

14   about, if I may, Mr. Murphy?

15       MR. MURPHY:  Okay.  Sorry.

16       MS. COX:  Also today, the chart I got says this chart is

17   as of 4/7/20.  I -- I still don't know what period we're

18   talking about and where the 2019 charts are.  The -- the

19   petition to -- I'm sorry, the subpoena covers May 1st, 2019

20   through April 30th, 2020.  I don't know what portion of that

21   time period these charts cover, if any at all.  These charts

22   have new man -- pictures of people's faces, and it says new

23   managers.  It does not say as of what date.  I have -- I don't

24   have the information that's requested in the subpoena.

25       MR. MURPHY:  Your Honor -- Your Honor, the -- the request



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    was for organizational charts during the period in time.

2    Our -- our search to date -- well, you're shaking your head but

3    that's -- that's what the subpoena says.  And -- and so I --

4    we -- we produced the -- the two org charts that we have, and

5    there -- there are over 100 individuals on -- on each of them,

6    most of them in front -- or front-line supervisory positions.

7    If -- I've invited the counsel for the General Counsel to

8    identify the individuals that we'd like -- that she'd like us

9    to create an org chart for.  I mean, we -- we've produced

10   what's requested.  We don't -- we don't have anything else.

11       JUDGE GREEN:  Okay.

12       MR. MURPHY:  So --

13       JUDGE GREEN:  Just Ms. Cox, if you can help me understand

14   how you plan to use these charts.  It's -- am I right that

15   you -- you're looking for some kind of discrepancy in the --

16   the way that the company dealt with Mr. Bryson?

17       MS. COX:  Yes.

18       JUDGE GREEN:  Meaning somebody -- I don't know, somebody

19   who -- who got involved who is not normally involved, or

20   something along those lines?

21       MS. COX:  Your Honor, we want to be able to identify

22   decision makers in discipline.

23       JUDGE GREEN:  Right.  Okay.  So --

24       MS. COX:  Especially with regard to Mr. Bryson's --

25       JUDGE GREEN:  Okay.  So basically -- I mean, to the extent



1    that you're going to -- you're going to want to know who's done

2    what, don't you need the discipline and the personnel files

3    before you really know whether it's a problem?  I mean, you're

4    going to either -- you're either going to -- you're going to

5    look at the personnel files, you're going to look at the

6    discipline, you might have questions, this per -- who's this

7    person?  What did they do?  What was their position?  At which

8    point you look at the organizational charts.  If you don't find

9    them -- somehow don't find them on the organizational chart,

10   you -- you'd be asking that of either Mr. Murphy, or if you

11   have to, a witness.  I mean, that's how this is going to go,

12   right?

13        MS. COX:  Sure.  But that doesn't mean that I'll be able

14   to identify who was involved in discipline in 2019 without the

15   org charts from 2019.

16        JUDGE GREEN:  Okay.

17        MR. MURPHY:  I mean, I could just ask, but --

18        JUDGE GREEN:  Okay.  But if -- if somebody were to ask at

19   Amazon, who knew about the organizational charts, like, let's

20   say a human resources manager, would they say -- if I asked, do

21   you have any other organizational charts other than the two

22   that have been produced, would the answer be no?

23        MR. MURPHY:  Are you asking me, Judge?

24        JUDGE GREEN:  Yeah.

25        MR. MURPHY:  Yes.  The answer would be no.



1    JUDGE GREEN:  Okay.  I mean, then I'm not sure what else

2  we can do on that.  You can certainly -- you know, you might --

3  the -- the General Counsel might have questions, you might have

4  questions and concerns once you get the discipline and once you

5  get the personnel files.  But it's hard for me to understand

6  how that's a problem now.

7    MS. COX:  The problem, Judge, is that aside -- this org

8  chart is only one example of Respondent not complying with the

9  subpoena.

10    JUDGE GREEN:  Okay.  So let's move on.

11    MS. COX:  This is just among others.

12    JUDGE GREEN:  Okay.  So let's move on.  So -- all right,

13  well, that was only -- you know, I -- I was reading through the

14  emails and I was trying to gather what the problems were.  That

15  seemed to be one of them and the other seemed to be this, you

16  know, analogous conduct, you know, disparate/consistent

17  treatment documents, that seems to be the other big issue.  So

18  we've got 13,000 disciplines at JFK8, arguably 40 -- 35 to

19  40,000 if you include the two additional facilities.  That's  a

20  lot of disciplines.

21    MS. COX:  Yes, I'm aware, Judge.

22    JUDGE GREEN:  31 -- you've asked for search terms -- I

23  mean, if you've asked for search terms that apparently produced

24  about 2,400 disciplines.  Is -- is there a problem with that?

25  Does that -- I mean, is that -- is that not what you want?

Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:  Your Honor, what I want and what we've been

2    requesting since at least March 15th, 2021, is that Respondent

3    confer with us to collaborate with us, to learn -- to -- to

4    talk about these search terms and to talk about the

5    discrepancies already in the documents that have been produced.

6    We lack confidence in whatever documents have been produced

7    already.  A lot of these documents are out of range covered

8    by -- out of the date range covered by the subpoena.  We've

9    already talked about the org chart -- org charts that were

10   produced for an unspecified period, few responsive documents

11   for the disciplines, few responsive documents for the

12   investigations and deliberations as to -- into Mr. Bryson's

13   discharge, and Respondent continues to -- and the formal

14   production --

15   JUDGE GREEN:  Right.  So let me -- okay.  So let me

16   just -- the investigation -- am -- am I right, that that's

17   going to be in the personnel files, right?  That's going to

18   be -- you're going to -- you're going to get a bunch of

19   disciplines and you're going to decide, these are analogous,

20   these -- this group is -- subset is analogous.  Let's say it's

21   100.  Then you're going to get the personnel files and the

22   personnel files should have documents which reflect

23   investigations.  Am I -- am I right about that?  Let me ask the

24   Respondent?

25   MR. MURPHY:  Yes.  We're -- we're going to -- we're going



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    to produce the documents that are -- the personnel files and --

2    and investigative documents, related investigative materials,

3    et cetera, everything that's covered by the subpoena.  I would

4    say this, that that -- that's material related to paragraph 16,

5    17, and 18.  We -- there's a -- we agreed that that production

6    would be due on March 19th, next Monday.  Right?  So -- so

7    we're in the -- we're in the middle of rolling that out, Judge.

8         And I would also just note that in -- that in Ms. -- that

9    in Ms. Cox's letter to you, she raised two issues, one having

10   to do with the org chart and one having to do with conferring.

11   And -- and we're -- we're perfectly willing to confer.  I --

12   I -- I sent -- I left a voicemail message for Ms. Cox on

13   Thursday afternoon at 1:50 p.m.  I've -- I've not yet received

14   a -- a responsive call.  We're ready, willing, and able to

15   talk.

16        What we didn't want to do was have a substantive

17   conversation about paragraph 19 until we had a thorough

18   understanding of what the scope of their search terms were.

19   And -- but -- but if that helps move this forward, we're

20   perfectly willing to have a conference with -- with Ms. Cox and

21   whoever else she wants to have on the phone.

22        JUDGE GREEN:  And what -- okay.

23        MS. COX:  Your Honor --

24        JUDGE GREEN:  I guess -- I -- so here's the thing.  You

25   know, as I indicated in the email, I can't actually make you



Exhibit E, Motion to Try Petition on Hearing Record

1    talk to each other. You know, I can't -- I can't do that.

2    That's not something I can do. I can schedule a trial --

3    hearing dates and you can put on a custodian of records. You

4    know, I mean, that's -- that's an option, if we absolutely have

5    to do that. And frankly, I'd like to do that sooner rather

6    than later if we're going to. Just because I'd like May 3rd

7    and -- and forward to be -- to be on the merits. And I'd like

8    the subpoena stuff to be done before that. So would I prefer

9    it to be, you know, just good faith, informal discussions

10   between counsel? It doesn't -- it's only a single discharge

11   case. It's not -- you know, it's -- I know it's Amazon. But

12   this -- this isn't a world shaking case.

13       MS. COX: Your Honor --

14       JUDGE GREEN: It should be -- this should be -- you know,

15   this shouldn't be all that difficult. You know, disparate

16   treatment, consistent treatments documents are produced in --

17   in every discrimination case we have. It really shouldn't be

18   this difficult.

19       MS. COX: Your Honor, if I may. Just to clarify, Mr.

20   Murphy specifically said in our -- in his email to me that he

21   does not need to confer with us and wanted us to continue to

22   narrow the search terms for paragraphs 17 and 19. I've

23   conferred with our technology counsel, David Gaston. This is

24   inappropriate. We've done everything that we can and

25   Respondent is just not being cooperative. Our view is also



Exhibit E, Motion to Try Petition on Hearing Record

53

1  that May 3rd should only be for the purposes of presenting

2  witnesses and not having to deal with all these issues.  But

3  Respondent's refusal to confer and to address the deficiencies

4  and the problems with the production is not going to allow us

5  to just move forward with witnesses on May 3rd.  And I --

6      JUDGE GREEN:  Let me ask you -- let me ask you, what --

7  what questions do you have?  I mean, are there questions that

8  we can deal with now?

9      MS. COX:  Yes.

10     JUDGE GREEN:  Okay.  What -- what -- what questions do you

11 have?

12     MS. COX:  So I'll hand it over to Mr. Gaston.

13     MR. GASTON:  Afternoon, Your Honor.  My name is Dave

14 Gaston.  I am lead technology counsel coming on behalf of the

15 counsel for the acting General Counsel.

16     Can you hear me clearly, sir?

17     JUDGE GREEN:  Yes.

18     MR. GASTON:  Excellent.

19     So the issue at hand is a fundamental one of search and

20 collection.  What we have here is a scenario where we are

21 treating this like -- this case like it's happened in 2015,

22 2000.  We are thinking that, you know, search terms are going

23 to be sufficient to correctly and -- and accurately aggregate

24 what we're looking for.

25     I know for a fact that Amazon, as well as many other large



Exhibit E, Motion to Try Petition on Hearing Record

1     organizations, Facebook, Google, they use their own internal

2     system.  They don't use email exclusively.  And so in this

3     circumstance, Amazon uses something called Amazon Chime.  You

4     can go on yourself, Your Honor, and find how this tool works.

5     You can get a sample of it on Amazon.com.  I have done this

6     myself.  Boolean searches do not seem to be native to that.

7     Also, other searches that would -- might get a video or some

8     other sort of unusual evidence that would stand outside of a

9     standard email is not going to be anticipated in that.

10          Until we have a technical expert from Amazon or someone

11    representing Amazon who has the necessary technical expertise,

12    we cannot proceed with confidence that the searches that -- and

13    for instance, Mr. Murphy mentioned that, you know, we gave

14    searches and he selected the ones he liked.  That's certainly

15    one method, but it's not a method that is consistent with

16    what's in our bench book, which says there's a -- a duty for a

17    reasonable and diligent search.  That reasonable, diligent

18    search will require someone informed about the documents

19    themselves.  And Your Honor, that's not us.

20          And -- and so it's a dual thing.  One, we need to learn

21    about the technology.  We need to know what systems are in

22    place.  We know it's more than email.  We just don't know how

23    deep this goes.  And secondly --

24          JUDGE GREEN:  Okay, but -- all right.  Let me just -- let

25    me just interrupt you.  So what we're dealing with primarily

Exhibit E, Motion to Try Petition on Hearing Record    75

```
 1    right now is discipline.  My understanding is that discipline
 2    are issued and kept electronically.  Now, I don't know in what
 3    form.  I -- but my understanding is, is that they're kept
 4    electronically, and it's my understanding that a -- a search,
 5    word search, can be done of those disciplines by Amazon.  Am --
 6    am I wrong about that?
 7         MR. GASTON:  Your Honor, we have no -- we have no
 8    knowledge.  We don't know for sure.  And certainly what I've
 9    seen --
10         JUDGE GREEN:  Well --
11         MR. GASTON:  -- would not be indicative of a word search.
12         JUDGE GREEN:  Okay.  But --
13         MS. COX:  Your Honor, if I may?
14         JUDGE GREEN:  Okay.  I mean, let me ask -- let's -- let's
15    ask Mr. Murphy.  Is that -- does that -- can you do a word
16    search of the disciplines?
17         MR. MURPHY:  Yes.  And that -- and that's what we've done.
18         JUDGE GREEN:  Okay.  And so -- all right, so --
19         MS. COX:  Your Honor, if I may?
20         MR. MURPHY:  Let me -- and let me just say this, Judge.
21    If -- if -- if the counsel for the General Counsel wants to
22    have a conversation of the sort that Mr. Gaston is -- is
23    referencing, we're -- we're happy to do it.  I -- I can
24    represent to you, that -- you know, that the -- the -- the
25    search that's been done, is -- is been -- has been done in good
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1    faith thoroughly, and we've produced documents that -- that

 2    we've -- that we've uncovered, and we're going to continue to

 3    do that.

 4        JUDGE GREEN:  Right.  And so -- and just so I can add to

 5    that, the truth is, is that these -- these types of matters

 6    rely on the good faith of counsel.  They do.  I mean, and that

 7    goes back to before there was electronic discovery.  You have

 8    counsel who goes to the human resources directors and to pool

 9    the personnel files and see what's in there.  And that's what's

10    done.  You know, it's not -- we don't go seize the personnel

11    files, as an agency.  That's not what we do.

12        I mean, so unless you have some real reason to be

13    concerned that -- about the representation of counsel, it's

14    hard for me to understand why there's a problem.

15        MR. GASTON:  Your Honor --

16        MS. COX:  Well, Your Honor --

17        MR. GASTON:  Your Honor, I'd be -- certainly I would ask

18    to get to allow comfort of that observation that you made, that

19    we would minimally be able to speak to someone who could have

20    that information.  Not just --

21        JUDGE GREEN:  Well, you can.  You absolutely can.  If you

22    have to, you can put on -- somebody on the stand.  I mean, you

23    have --

24        MS. COX:  That's right.

25        JUDGE GREEN:  -- subpoena power, and -- and the custodian
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    of records is under subpoena.  And the -- and the -- you know,

2    the custodian -- or really it's -- in these days, it's really

3    often more custodians of record.  I mean, if you have to do --

4    go with -- go that route, then go that route and --

5        MR. GASTON:  Yes, Your Honor.

6        JUDGE GREEN:  -- call -- call somebody and ask them

7    questions.  But I kind of think you're making a bit much of --

8    you know, you're questioning the representation of counsel

9    where I don't see there's any basis for doing it.

10       MS. COX:  But Your Honor, counsel has not produced these

11   documents.  They have not produced the under -- there are 35

12   disciplines that are responsive to paragraph 16.  We got a

13   chart with little tiny blurbs of those disciplines with

14   redacted employee names.  That is not complying with the

15   subpoena.  The 35 disciplines should be turned over.

16       JUDGE GREEN:  Yeah, yeah.  Absolutely.  Absolutely.  Turn

17   over the 35 disciplines.  Turn over -- turn over the

18   organizational charts that you have.  Absolutely, that should

19   be turned over.  I didn't realize it hadn't been.

20       MR. MURPHY:  Look, the org charts have been turned over.

21   The disciplines are in process.  They're due on the 19th, Your

22   Honor.  That was the schedule that was agreed to.  And we're

23   going to produce them on a rolling basis, right?  I really

24   don't understand why this is -- why we're having this wide

25   ranging inquiry on a --



Exhibit E, Motion to Try Petition on Hearing Record   58

```
 1        JUDGE GREEN:  Okay.

 2        MR. MURPHY:  -- bunch of discovery issues --

 3        MS. COX:  The -- the -- the 19th is --

 4        JUDGE GREEN:  The other thing, and let me just -- let me

 5   just add one thing.  As of right now -- I just -- I want this

 6   to be clear.  As of right now, the subpoena -- subpoena

 7   paragraph number 17 is producible in -- in full.  Meaning right

 8   now about 40,000 disciplines are under subpoena.  I -- it's

 9   hard for me to imagine that the General Counsel really wants

10   that.  Because I don't see that you'd be able --

11        MS. COX:  No.

12        JUDGE GREEN:  -- to go through them.

13        MS. COX:  No, we didn't say that.

14        JUDGE GREEN:  Okay.  So -- okay.  So -- and you're --

15   you're certainly entitled to do -- you're certainly entitled to

16   do word searches.  And if you have questions -- if you have

17   questions -- yeah, I mean, okay.

18        So I'd -- I'd urge the parties to confer, including

19   conferring with -- with -- with information, some kind of

20   information expert.  I don't know if it's information counsel

21   on the part of Amazon, but somebody who understands technically

22   how these searches are done.  And if that doesn't satisfy you,

23   then you can call them as witnesses.  You know, you can call --

24   you can call somebody as a custodian of records.

25        MS. COX:  Well, that's -- that's what we're proposing,
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Your Honor.  We'd like to call the custodian of records this

2    week --

3       JUDGE GREEN:  Oh.

4       MS. COX:  -- and ask them questions about the documents,

5    how they were gathered, how they were searched, so we can have

6    an understanding for the future production.

7       And we would also like to resolve the problems with the

8    production so far that have been -- not been produced in native

9    format, have not been organized in any specific way,

10   inconsistent with paragraph K -- the definitions and

11   instruction section of paragraph K of the subpoena.  We need to

12   confer with Respondent.

13      JUDGE GREEN:  Okay.  (Indiscernible, simultaneous

14   speech) -- do you want --

15      MS. COX:  Respondent says in an email that they don't see

16   a need to confer with us.

17      JUDGE GREEN:  Okay.  So -- listen, we can -- we can -- you

18   can schedule a time right now.  We can set ano -- we can set a

19   trial date for Friday.  You can set a trial date for Friday to,

20   if necessary, put on a custodian of records.

21      MS. COX:  That should be fine for me.

22      MR. MURPHY:  Judge --

23      MS. COX:  I just have to double check my schedule.

24      MR. MURPHY:  If I may?  If I may?

25      We're -- we're -- were -- we are ready, willing, and able



1     to confer with counsel for the General Counsel.  We -- we --

2     at -- the last week and -- and the week before, both Ms.

3     Buffalano and I were engaged on a full-time basis and -- and

4     our availability was very limited.  What we -- what we were

5     pushing back on in terms of the call was the call with

6     technology counsel on -- on what I understood to be the issues

7     having to do with paragraph 19.  We -- we are on schedule --

8          JUDGE GREEN:  That's fine.  I -- I just -- I'm reluctant

9     to just hang up and not have -- not have a date set for

10    possibly taking the testimony of a custodian.  Just because,

11    for one thing, my schedule gets very -- gets very tight after

12    April 21st -- well, really, as of April 21st onward, I -- I'm

13    pretty much booked.  And so if we're going to -- if we're going

14    to have to do it, we are looking at either -- I think it's

15    either this Friday or next Monday.  Am I right?  Next Monday --

16         MR. MURPHY:  Well, Judge --

17         MS. COX:  Either day works for me.

18         JUDGE GREEN:  And still on Tuesday.

19         MR. MURPHY:  Judge, why -- why don't -- why don't you

20    direct the parties to have a conversation to see if these

21    issues can be resolved?

22         MS. COX:  Mr. Murphy, the judge has directed --

23         JUDGE GREEN:  (Indiscernible, simultaneous speech) --

24         MS. COX:  -- and -- and we haven't conferred since --

25         JUDGE GREEN:  Why don't we get a time --



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:  -- March 15th, we keep on having the same

2    discussion (indiscernible, simultaneous speech) --

3    JUDGE GREEN:  That's fine.  But why don't we get a time

4    now?  Get a time now.  Schedule it now.

5    MR. MURPHY:  For what, to confer?

6    JUDGE GREEN:  Yes.

7    MR. MURPHY:  I -- I'm available after the phone call.

8    MS. COX:  I'm available after the phone call, and

9    hopefully someone with knowledge of the documents is available

10   after the phone call as well.

11   JUDGE GREEN:  You understand, Mr. Murphy, that they seem

12   to have questions concerning the -- you know, the technical --

13   the program that's used to contain and search these

14   disciplines.

15   MS. COX:  Yes, Your Honor.  Because a lot of the documents

16   that were produced were copied and pasted from other sources,

17   and we have no idea what those sources are, where those

18   documents came from.  We have no idea of the date of creation,

19   the author of those documents.  It's -- it's just not

20   responsive to the subpoena.

21   JUDGE GREEN:  Well, I mean, you had a representation from

22   counsel that the documents have been searched.  I mean, you --

23   you want more details.  That's what you want.

24   MS. COX:  Exactly.

25   JUDGE GREEN:  I don't have any problem if you -- if you



Exhibit E, Motion to Try Petition on Hearing Record

1    want more details.

2         But you understand, Mr. Murphy, that that's what they

3    want.  So you got somebody?

4         MR. MURPHY:  I -- I -- I'm sorry, Judge?

5         JUDGE GREEN:  Do you have somebody, or you want to do this

6    tomorrow?

7         MR. MURPHY:  Well, I -- I think there's two issues.  One

8    is -- one is the issue, it -- you know, the relatively, I hate

9    to use this term, but like, you know, mundane or run of the

10   mill issues that -- that -- that are addressed in the emails

11   between counsel, which I'm -- I'm -- I'm perfectly willing to

12   address now.  If there -- if there are issues about more --

13   like, like, for example, what -- what the status of the

14   production of the personnel files is?  There was an email from

15   Ms. Cox pointing out certain other issues about format, which

16   we're in the process of -- of resolving.  Those kinds of

17   things, we -- we can take off the -- off the list now.  If

18   there are -- if there are other kinds of -- of technical

19   issues, I'd -- I'd have to -- I'm -- I'm obviously not that

20   guy, right?  So yeah --

21        JUDGE GREEN:  Right, so that's the point.  I mean, they --

22   as far as I'm -- as I understand, and the General Counsel

23   correct me if I'm wrong, you want some kind of detailed

24   assurance that -- that the disciplines are actually being

25   searched?



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:  Yes.

2    MR. MURPHY:  They are.

3    JUDGE GREEN:  That's what -- that's what the General

4    Counsel wants.

5    MS. COX:  And the disciplines themselves.  I understand

6    Mr. Murphy says they're not due until the 19th.  I agree.

7    That -- that's for the final -- the total final.  That doesn't

8    mean paragraph 16.  There's 35 disciplines.  There's no reason

9    why those 35 disciplines can't be produced.

10   JUDGE GREEN:  Yes, this should -- yes, that should be

11   produced.  They should be produced.

12   MS. COX:  Before the 19th; they have them already.

13   JUDGE GREEN:  Right, but let's identify the person that

14   you want on this call.  You -- you want somebody who will

15   basically be able to tell -- tell Mr. Gaston, really, because

16   he's the expert, that will be able to convince Mr. Gaston that

17   the disciplines are being searched, using the word terms.

18   Like, you seem to be questioning that, right?

19   MR. GASTON:  That's accurate, Your Honor.  That is

20   accurate, Your Honor.

21   JUDGE GREEN:  Okay.

22   MR. GASTON:  My concerns are the systems are not

23   necessarily compatible with the searches as they are designed,

24   and -- and -- and up to date applied.

25   JUDGE GREEN:  Okay.  So who at Amazon would know about



Exhibit E, Motion to Try Petition on Hearing Record

1    that?

2        MR. MURPHY:  To be quite honest with you, Judge, I -- I

3    don't have any idea.  I'd -- I'd have to inquire and -- and --

4    and we could talk --

5        JUDGE GREEN:  Okay.  So really you're going to have to do

6    this quick though.  Because --

7        MR. MURPHY:  We will.

8        JUDGE GREEN:  -- if it's not going to -- if it's not going

9    to be done informally, I -- I do want to get back on the record

10   and have it done formally.  I -- I don't think I would

11   necessarily take a huge amount of time to have a custodian of

12   records testify, but --

13       MR. MURPHY:  Right.  So -- so look, we're -- as I've

14   indicated, we're -- we're prepared to have, you know, that

15   conversation.  We've been -- we've been willing to have it

16   since last Thursday.  It hasn't happened.  So let -- let's do

17   it now and we'll report back.

18       JUDGE GREEN:  Okay.  So please find out -- find out who

19   would know what Mr. Gaston wants.  And let's identify that

20   person and -- and try to -- try to have a call with that person

21   tomorrow.

22       MR. MURPHY:  Well, yeah, so -- it may be -- it may take a

23   day or two, Judge, honestly, right?

24       JUDGE GREEN:  Okay.  I mean, I just -- I don't want it

25   to -- I don't want it to seep into the end of the week.



Exhibit E, Motion to Try Petition on Hearing Record 25

```
 1      MR. MURPHY:  Okay.

 2      JUDGE GREEN:  Yeah.

 3      MR. MURPHY:  We'll have -- well, as I said, I think

 4  there's two levels of conversation.  There's the conversation

 5  that I think I can have with Ms. Cox about run of the mill

 6  discovery issues.  And then there's a different kind of

 7  conversation that I can't be a -- that I can't do --

 8      JUDGE GREEN:  Right.  As far as I understand, I don't

 9  think they have really any questions for you.

10      Am I right about that, Mr. Cox -- Ms. Cox?

11      MS. COX:  That's correct, Your Honor.

12      JUDGE GREEN:  Right.  I don't think they have any

13  questions for you, Mr. Murphy.  You know --

14      MR. MURPHY:  Okay.

15      JUDGE GREEN:  -- I think that their questions are for --

16  are for -- I think it's going to end up being the same.  I

17  think that the -- I think that the result of it is going to be

18  that the searches are being done of the disciplines.  But, hey,

19  listen, I'm not a technical person either.

20      MR. MURPHY:  Yeah.  Me neither.  But -- but I do -- for

21  example, there's some question about whether certain documents

22  were produced.  And -- and I -- I think it would be useful to

23  have a conversation with Ms. Cox about those.

24      MS. COX:  Yes, that is correct.

25      MR. MURPHY:  I'm -- I'm ready, willing, and able --
```



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Okay.

2      MR. MURPHY:  -- to have that conversation.  Of course, you

3   know --

4      MS. COX:  You know, it's -- it's disingenuous for you to

5   say that because I've been asking since March 15th for you to

6   confer with us.  And just because Thursday you called me

7   doesn't mean that you've been ready, willing, and able to

8   confer.  Especially because you haven't called whoever has

9   knowledge about these documents to be present on this call.  So

10  you know, I really -- I take issue with you reiterating that.

11  That's just not factually correct.

12     MR. MURPHY:  Okay.  So here -- so here's the bottom line.

13  When this call is over, will you take a call from me?

14     MS. COX:  Absolutely.

15     MR. MURPHY:  Okay.  Then let's -- let's start with that,

16  Judge.

17     JUDGE GREEN:  Okay, very good.

18     MS. COX:  Your Honor, just if I -- one other issue.  I

19  mean, there's -- I just want to get from Respondent.  Are you

20  claiming that all the documents responsive to 1 -- paragraph 1,

21  7 through 15 have been produced to date?  Is that your

22  position?

23     MR. MURPHY:  You know what?  I -- I -- I'm not going to

24  let you cross-examine me on the record.  I'd like to look at

25  what's -- what's -- what's covered and what's been produced --



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MS. COX:  Well, look --

 2        MR. MURPHY:  -- and then I could --

 3        MS. COX:  -- you say you've been -- no, you say you've

 4   been --

 5        MR. MURPHY:  What do you mean no?

 6        MS. COX:  -- complying with our -- our schedule.  You were

 7   supposed to produce --

 8        MR. MURPHY:  Judge, come on.

 9        MS. COX:  -- these arg -- these documents by April 6th.

10   So I want to understand if the documents you produced on April

11   6th are responsive to paragraph 1 and 7 through 15 of our

12   subpoena?

13        MR. MURPHY:  As -- as I said, I'm not going to answer that

14   without looking at the subpoena request and what -- and what --

15   and what's been produced so far.  I'm happy to have that

16   conversation with you.  I really am.

17        JUDGE GREEN:  Right.  Ultimately -- ultimately, Ms. Cox,

18   you are probably going to have to be questioning the custodian

19   of records.

20        MS. COX:  I understand that, Judge.

21        JUDGE GREEN:  That -- that's probably going to happen.

22   And push comes to shove, that's -- that's what happens in these

23   cases.

24        MS. COX:  Okay.

25        JUDGE GREEN:  Now, let me just -- let me just ask Mr.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    Kearl.  I have the Respondent's petition to revoke the Charging

2    Party's subpoena.  So was there not a witness fee?  Was

3    there -- was there no witness fee served with the -- provided

4    with the -- with the subpoena?

5        MR. KEARL:  There was not, Your Honor.  And I'm -- I'm

6    prepared to just request an additional subpoena.

7        JUDGE GREEN:  Okay.

8        MR. KEARL:  My understanding is the fact that the same

9    person had already been subpoenaed by General Counsel, that

10   there would not be a -- a duplicate fee that would be given to

11   that person for delivering the documents.  I'm happy to --

12   to -- to submit an additional request for a subpoena to you.

13       JUDGE GREEN:  You do have to -- you do have to provide the

14   fee.  There's no -- I mean, there's no travel allowance.

15   There's no travel.  We're all at home.  But -- but you do need

16   to provide the fee.

17       Now, for the remainder of the petition to revoke, can you

18   get me -- can you get me a -- a response?

19       MR. KEARL:  Yes, Judge.  Yes, Your Honor.  My

20   understanding was that I had -- had five days from receipt, so

21   my -- my five --

22       JUDGE GREEN:  Okay.  That's fine.  That's fine.

23       MR. KEARL:  -- (indiscernible, simultaneous speech) the

24   moment.

25       JUDGE GREEN:  Okay, very good.



Exhibit E, Motion to Try Petition on Hearing Record                    69

1        Does anybody have anything else while we are here?

2        MS. COX:  Judge, I just want to get an assurance from

3   Respondent that they will comply with organizing the subpoena,

4   as -- as -- organizing the production in accordance with the

5   subpoena paragraph K in the definitions and instructions.

6        MR. MURPHY:  With regard to what request?  All requests?

7        MS. COX:  Yes, all re -- all the requests.

8        JUDGE GREEN:  Okay.  Does -- is the -- you know, is it

9   going to be subpoena -- you know, paragraph 1, these documents,

10   paragraph 2, these documents.  That's what she's talking about.

11        MS. COX:  Yes.

12        MR. MURPHY:  Oh, I -- I mean, we'll do that.  I -- I -- I

13   was not under the impression that you had directed us or

14   ordered us to comply with the instructions that were --

15        JUDGE GREEN:  I -- I --

16        MR. MURPHY:  -- attached to the subpoena.

17        JUDGE GREEN:  -- it wasn't really a subject in the

18   petition.

19        MR. MURPHY:  Exactly.

20        JUDGE GREEN:  It wasn't -- it wasn't an issue.

21        MR. MURPHY:  Right.

22        JUDGE GREEN:  But yeah, I mean, that's the way production

23   should generally be.

24        MR. MURPHY:  Okay.  Then --

25        MS. COX:  Yeah.


www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

```
 1          MR. MURPHY:  -- then as I said, I'm happy to have this

 2     conversation with Ms. Cox.  And I'm -- I'm certain we can work

 3     out most, if not all of these issues.

 4          MS. COX:  And I just want to say one last thing, that the

 5     documents that -- that have been produced, don't indicate to us

 6     who deliberated and who investigated Mr. Bryson's discipline.

 7     And if we're unable to come to some agreement or understanding

 8     on that, we will be issuing a supplemental subpoena seeking

 9     additional documents, so.

10          JUDGE GREEN:  Okay.  Okay.

11          MS. COX:  Okay.

12          MR. MURPHY:  All right.

13          MS. COX:  All right.  So I guess I'll call you right after

14     this.

15          JUDGE GREEN:  Okay.

16          MR. MURPHY:  I'm actually --

17          JUDGE GREEN:  And if -- if these conversations do not

18     prove to productive, get back to me sooner rather than later

19     regarding a trial date, and we'll just -- we'll call the

20     custodian and we'll -- we'll (indiscernible, simultaneous

21     speech).

22          MS. COX:  Your Honor, can we -- can we hold the 19th?  Can

23     we hold Monday, the 19th for the --

24          JUDGE GREEN:  I actually would like to hold the 19th.

25          MS. COX:  Thank you.
```



Exhibit E, Motion to Try Petition on Hearing Record                          71

```
 1        JUDGE GREEN:  I mean, I -- I -- as a -- as a backdrop
 2   date, that would be helpful, to have that date as -- you know,
 3   the -- if we absolutely have to, to have the custodian.
 4        MS. COX:  That is our preference, Your Honor, to call the
 5   custodian and just ask the questions.
 6        JUDGE GREEN:  Okay.  But frankly, I'd rather you get
 7   the -- the answers sooner rather than later.  Like, I'd rather
 8   you get the answers tomorrow.  If it helps.
 9        MS. COX:  Your Honor, I think I've lost confidence in --
10   in us being able to get anywhere --
11        JUDGE GREEN:  You know, I don't -- I don't see that
12   really.  I really don't see that in the emails.  I -- I don't
13   see a basis for that.  And -- and it doesn't hurt to try.
14        MS. COX:  Okay.
15        JUDGE GREEN:  Okay.  All right.  Thank you very much.
16   I'll be hearing from you.
17        MS. COX:  Thank you, Judge.
18        MR. MURPHY:  Thank you.
19        MS. COX:  Have a good day.  Thank you.
20        MR. MURPHY:  Eva, will you call me in the office?
21   (Whereupon, the hearing in the above-entitled matter was closed
22   at 4:40 p.m.)
23
24
25
```



Exhibit E, Motion to Try Petition on Hearing Record

1              **C E R T I F I C A T I O N**

2     This is to certify that the attached proceedings before the

3     National Labor Relations Board (NLRB), Region 29, Case Number

4     29-CA-261755, in the Matter of Amazon.com Services LLC and

5     Gerald Bryson, an Individual, held via Zoom videoconference at

6     the National Labor Relations Board, Region 29, Two Metro Tech

7     Center North, 5th Floor, Brooklyn, New York 11201, on April 12,

8     2021, at 4:02 p.m. was held according to the record, and that

9     this is the original, complete, and true and accurate

10    transcript that has been compared to the reporting or

11    recording, accomplished at the hearing, that the exhibit files

12    have been checked for completeness and no exhibits received in

13    evidence or in the rejected exhibit files are missing.

14

15

16

17    _____

18    BARRINGTON MOXIE

19    Official Reporter

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services LLC,      Case No.   29-CA-261755

       Employer/Respondent,

and

Gerald Bryson,

       An Individual.

_____

_____

Place: Brooklyn, New York (via Zoom videoconference)

Dates: April 19, 2021

Pages: 33 through 92

Volume: 2

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



# Exhibit E, Motion to Try Petition on Hearing Record

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

| | |
|---|---|
| In the Matter of: | |
| AMAZON.COM SERVICES LLC, | Case No.   29-CA-261755 |
|       Employer/Respondent, | |
| and | |
| GERALD BRYSON, | |
|       An Individual. | |

The above-entitled matter came on for hearing via Zoom

Videoconference, pursuant to notice, before **BENJAMIN W. GREEN**,

Administrative Law Judge, at the National Labor Relations

Board, Region 29 Two Metro Tech Center, 5th Floor, Brooklyn,

New York 11201, on **Monday, April 19, 2021, 12:14 p.m.**

Exhibit E, Motion to Try Petition on Hearing Record

```
1                    A P P E A R A N C E S

2    On behalf of the Charging Party:

3        FRANK KEARL, ESQ.
         MAKE THE ROAD NEW YORK
4        161 Port Richmond Avenue
         Staten Island, NY 10302
5        Tel. (929)265-7692

6    On behalf of the Employer:

7        CHRISTOPHER J. MURPHY, ESQ.
         MORGAN, LEWIS & BOCKIUS LLP
8        1701 Market Street
         Philadelphia, PA 19103-2901
9        Tel. (215)963-5601

10       NICOLE BUFFALANO, ESQ.
         MORGAN, LEWIS & BOCKIUS LLP
11       300 South Grand Avenue, 22nd Floor
         Los Angeles, CA 90071
12       Tel. (213)612-7443

13       JASON J. RANJO, ESQ.
         MORGAN, LEWIS & BOCKIUS LLP
14       502 Carnegie Center
         Princeton, NJ 08540
15       Tel. (609)919-6669

16   On behalf of the General Counsel:

17       EVAMARIE COX, ESQ.
         MATTHEW JACKSON, ESQ.
18       DAVID K. GASTON, ESQ.
         NANCY REIBSTEIN, ESQ.
19       NATIONAL LABOR RELATIONS BOARD
         Two Metrotech Center, 5th Floor
20       Brooklyn, NY 11201
         Tel. (718)765-6172

21

22

23

24

25
```



Exhibit E, Motion to Try Petition on Hearing Record

1                             E X H I B I T S

2

3       EXHIBIT                              IDENTIFIED      IN EVIDENCE

4       General Counsel:

5          GC-2                                   59

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit E, Motion to Try Petition on Hearing Record

1                    P R O C E E D I N G S

2        JUDGE GREEN:  Okay.  So we're on the record.  This is day

3    two and it's April 19th, 2021.

4        We reconvened on the record in order to deal with some

5    subpoena issues.  The original reason for coming on -- for

6    scheduling this date was for the General Counsel to -- to

7    question the Respondent's custodian of records for purposes of

8    subpoena B11-B-U-G-M-I-X.  And I'll -- I'll let the Respondent

9    explain this particular circumstance with regard to the

10   custodian of record.  But it's my understanding that the

11   custodian is not available.  We're going to try to have a

12   discussion to see what the ramifications of that are and

13   whether we can't resolve this anyway.

14       So I -- I know you just went into it Mr. Murphy, off the

15   record, but why -- why don't you again explain your position

16   regarding the two -- the availability of the custodian of

17   records.

18       MR. MURPHY:  Sure.  So when -- when the issue of this call

19   came up last -- last, you know, I got to my email off, Judge,

20   or I'm going to keep getting dings.  My apologies.

21       JUDGE GREEN:  No problem.

22       MR. MURPHY:  I think if I do that, I won't be able to hear

23   the proceedings, so I'll -- there may be some it -- pings from

24   time to time.  I apologize.  So as -- as I was saying when --

25   when we -- when we learned last week that there was likely to



Exhibit E, Motion to Try Petition on Hearing Record

1   be a hearing today involving the examination of a custodian of

2   documents, we inquired of Amazon who would be the appropriate

3   person, or an appropriate person to address those issues.  A

4   particular person was identified to us, and -- and we

5   subsequently learned that a day or two later that that person

6   was on vacation returning tomorrow.

7       There -- there -- we -- we had asked or you had

8   directed -- I frankly don't recall, Judge, that the Counsel for

9   the General Counsel provide sort -- sort of a set or list of --

10  of areas of inquiry so that we could, you know, cabin the

11  examination but -- but -- but also, you know, make it

12  efficient.  I don't believe that we've ever gotten that

13  information.  So long story short, we -- we don't have a

14  custodian of record available today.  So I -- would you like me

15  to continue with what I explained off the record?

16      JUDGE GREEN:  No.  I think that's -- I think that's --

17  that's okay for now.

18      MR. MURPHY:  Thank you.

19      JUDGE GREEN:  Ms. -- Ms. Cox, would you like to -- I mean,

20  would you like to comment on that or -- or wait until later or

21  you know?

22      MS. COX:  No, I'll wait until later.

23      JUDGE GREEN:  Okay.  So let's try and -- let's try and

24  just to the extent we can right now, let's try to have a

25  conversation.  Maybe it'll be Mr. Gaston and -- and Mr. Ranjo.



Exhibit E, Motion to Try Petition on Hearing Record

1    You know, if you've got questions now, Mr. Gaston, regarding

2    the -- the subpoena of records, the search, the production, you

3    know, maybe you can ask them now.

4        MR. GASTON:  We did have a conversation on Friday, so I

5    don't want to be repetitive.  I can -- I guess, ask one primary

6    question, Mr. Ranjo.  Did you actually work in the actual

7    collection of the documents at Amazon?

8        MR. RANJO:  Thank you.  I will -- just to -- just to

9    clarify for the record, and I think I explained this on -- in

10   the call on Friday.  My experience of the relevant issues is

11   having litigated this case and -- and other employer managed by

12   Amazon.  As a corporate representative on any particular

13   technical or factual issues for Amazon, I don't have access --

14   direct access to Amazon systems.  I've never personally

15   performed a search for any of Amazon systems directly.

16       What -- why I'm here today is to try to help you

17   understand, from my perspective, how I've -- I've obtained

18   information in the past, including in this case, and my

19   understanding of how that process works from -- from Amazon.

20   And so you're requesting -- your question, Mr. Gaston, is it --

21   it's kind of decision.

22       I did not personally search any of Amazon's systems

23   directly for any documents in connection with this case.  I

24   have requested information from this case.  I've spoken to

25   Amazon representatives in my efforts to gather information and



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

79

1   documents responsive to your requests.  I have an understanding

2   about how that process works based on what Amazon

3   representatives have -- have told me.

4       And -- and I'm happy to answer any specific questions you

5   might have with that in mind.

6       MR. GASTON:  At this point, Your Honor, I think I -- we

7   had a good call earlier and I think that's all the information

8   I can -- from Mr. Ranjo that I can use right now, I think.  The

9   custodian of records would have performed the searches that Mr.

10  Ranjo describes.  It would be the next individual I would like

11  to speak with to understand the search methodology, the systems

12  used and productions, thus far.  So I have no more questions

13  for Mr. Ranjo.

14      MR. RANJO:  And just to clarify before we get off -- I

15  mean, I can talk to you about what was requested.  I can even

16  tell you mechanically or definitively, you know, the specific

17  systems that might be out there.  I can tell you, generally and

18  to the best of my knowledge of those systems, but as far as

19  attempted the last part -- it, it's not going to be me.  And I

20  don't know if the custodian of the records is -- is that person

21  or I guess, you know.

22      JUDGE GREEN:  Well, so -- I mean, that's what we would

23  want from the custodian of records.  Normally, it's not that we

24  go through to identify a custodian of records.  It -- in -- in

25  a situation where there's an electronic search, it's -- it can



Exhibit E, Motion to Try Petition on Hearing Record

1  be a little more difficult.  Do you have the name of the person

2  who actually ran the -- the searches that have been done so

3  far?

4    MR. RANJO:  Well, there are different searches that have

5  been requested, it depends on what search you're inquiring

6  about.

7    JUDGE GREEN:  Was it through different people for

8  different searches?

9    MR. RANJO:  It could have been, yes.  And -- and I may not

10  have been directly involved in the particular search.  Some --

11  some I was directly involved and some I wasn't.  So I only know

12  if you -- you give me the specifics.

13    JUDGE GREEN:  Okay.  Yeah.  I -- I don't -- I don't want

14  to go there.  Okay.  So here -- here's the thing.  So we --

15  in -- in most cases, you know, we get to the day of the trial.

16  The Respondent produces that subpoenaed documents.  The

17  attorney answers questions regarding those -- those documents.

18  And if the General Counsel doesn't, you know, isn't entirely

19  satisfied, they call the custodian of records.  It's -- it's

20  common to call the custodian of records in these cases.

21    Here, we've got the advantage of a -- of a month prior to

22  the start of taking testimony on the merits.  And it would be

23  helpful to deal with the subpoena first and the merits second.

24  When you're -- when you're dealing with that at the same time,

25  as I'm sure all of you know, it's a pain.  You know, it can --



Exhibit E, Motion to Try Petition on Hearing Record

41

1 it can be difficult.  And also there is some advantage to the

2 Respondent to producing the custodian early in the sense that

3 if there is some problem with or some defect with the search,

4 it can be cured.  It's much harder to cure it if the General

5 Counsel has already planned on a significant portion of the

6 case.  Then, they're in a much stronger position to argue

7 prejudice with regard to any sanctions.  Whereas, if you, you

8 know, if you determine in discussing the matter with the

9 custodian or records that there is some defect, that can be

10 cured before you even get to the General Counsel's case.

11   You know, if -- if the Respondent, you know, simply

12 doesn't think that there's anybody other than this person who

13 is on -- on vacation, so be it.  I mean, let me ask you, are

14 they available tomorrow afternoon?  Does the General Counsel

15 still have questions for them?

16   MS. COX:  Yes, Judge.  We do.

17   JUDGE GREEN:  Is -- is that the person -- it's not

18 sounding to me like that's necessarily the person who did the

19 searches, though.

20   MR. MURPHY:  Right.  So Judge, may I?

21   JUDGE GREEN:  Yes.

22   MR. MURPHY:  So -- so look, we've -- we've both done these

23 examinations many times.  Like, we're -- how -- how are these

24 documents stored?  Where are they kept?

25   JUDGE GREEN:  Right.



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1      MR. MURPHY:  It's part of the narrative, right?  I mean,

2    that's -- that's noncontroversial.  It sounds to me like the

3    questions that Mr. Gaston has -- and by the way, Mr. Gaston, if

4    I'm mispronouncing your name, let me know.  I apologize.

5        It sounds to me like the questions that Mr. Gaston has

6    are -- are -- are technical and -- and relate to the -- this --

7    the operation of the systems, which is not, you know, that

8    doesn't jive with my understanding of -- of -- of what the

9    custodian of records does.  So -- and that -- so that's why we

10   like to have a set of -- of questions.  So if they -- if they

11   want some computer guy, some technical person, like this is how

12   the systems work, then I think we're entitled to know that.

13   And -- and I -- I'm not sure that's the custodian of record.

14   But these are -- these are things we can -- these are things we

15   can work through.

16       JUDGE GREEN:  So I would say, like I've said before, you

17   know, the -- the custodian, it's not necessarily one

18   individual.  But what -- what you're looking for from the

19   custodian is somebody who can explain how the documents were

20   found.  How they were searched.  How they were produced.  And

21   so I -- I don't think that the, you know, I'm not asking the

22   General Counsel to give specific questions.  But I -- I do

23   think that, you know, there does need to be a communication in

24   order to identify who the proper custodian is.

25       It might be an IT person, it might be an IT person who is



# Exhibit E, Motion to Try Petition on Hearing Record

1    not the person who conducts the searches.  It might be the

2    person who conducted the searches; it might be both.  It might,

3    you know, you might have more than one person conducting the

4    searches for one.  I just -- I'd like to determine now, if at

5    all possible, who that is and when we can get to them.  Like,

6    I've said, you know, we have a month, but I have very limited

7    time after -- after tomorrow.  Frankly, even tomorrow is now

8    becoming somewhat difficult.  You know, do we have somebody

9    who, like, say at 2:00 tomorrow could come and -- and testify

10   and answer the questions that the General Counsel has?

11        MR. MURPHY:  We -- we, I mean, honestly, Judge, we just

12   don't -- I can't represent that to you.  You know, I -- I

13   can't -- and -- and again, I don't know what the commitments

14   and -- right?  I mean, everybody's working here.

15        JUDGE GREEN:  Let me -- okay.  Let me -- why don't we --

16   why don't we try to find -- why don't we try to understand more

17   from the General Counsel who -- who you want.  Can -- can you

18   tell us that?

19        MS. COX:  Yes, Judge Green.  I want the person who

20   searched and collected these documents.  And a person who can

21   explain to me -- for example, we've talked about -- briefly,

22   we've mentioned these disciplines.  So far what Respondent has

23   largely produced is charts that are PDFs of Excel spreadsheets.

24   Some of which are completely illegible, and I have to zoom in

25   400 percent to be able to read the document.  So from my view,



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    it would be important to put the person on who created this

2    chart if this is what Respondent wants us to accept, which we

3    do not agree to accept a chart.  But in the event -- if this is

4    the case, we want to know how this chart was created, where the

5    information is pulled from, and how the search was conducted to

6    create this chart.  That's just one example of many issues that

7    we have.

8        JUDGE GREEN:  Okay.  So to the Respondent, do -- do you

9    know who this -- this would be?

10       MR. MURPHY:  So I -- I can shed -- I -- I mean, so we

11   produced these charts and they were described accurately

12   despite Ms. Cox.  The charts themselves were PDFs were

13   created -- we created those, the PDFs.  They -- they are pdfs

14   of spreadsheets.  And the -- all of the data in the

15   spreadsheet, except for the personally identifying information

16   is identical to that which is in the spreadsheet itself.  So

17   the PDF and the spreadsheet are the same except for personal

18   information.  The PDF is searchable.

19       If there's some question or concern about the format of

20   it, we can work on that.  But -- but -- it's -- it -- but, as

21   we tried to explain on -- on a number of occasions to the

22   counsel for the General Counsel -- and let me just give you an

23   example.  Mr. Bryson, has a -- has a discipline form that tells

24   him that, you know, what he did and what the sanction is.

25   That's in his personnel file.  In the spreadsheet, there is

Exhibit E, Motion to Try Petition on Hearing Record 85

1    identical verbiage.  If you were to find Mr. Bryson and read

2    over to where the description of the discipline is, it's --

3    it's verbatim, the same.

4        JUDGE GREEN:  Okay.  And though -- that's searchable

5    that -- that -- that chart --

6        MR. MURPHY:  Correct.

7        JUDGE GREEN:  -- is searchable.

8        MR. MURPHY:  Correct.

9        JUDGE GREEN:  By -- by -- is it searchable by just, like,

10   one word at a time?

11       MR. MURPHY:  Correct.

12       JUDGE GREEN:  You know, the -- okay.  One word at a time.

13       MR. MURPHY:  You know what, now you're getting me out over

14   my speech.

15       JUDGE GREEN:  Okay.

16       MR. MURPHY:  Yeah.  It -- yeah.

17       JUDGE GREEN:  So -- okay.  So we don't necessarily know if

18   it's fully searchable, if you can use wildcards, but it's

19   somewhat searchable.

20       MR. MURPHY:  Right.

21       JUDGE GREEN:  We could, at the very least, look for one

22   work at a time.

23       MR. MURPHY:  So -- so what we've produced, if I can, so

24   you if you read -- if you'll recall, just to give you an

25   example.  There were 13,000- some odd individuals beneath this



Exhibit E, Motion to Try Petition on Hearing Record    46

1    heading.  We -- we've -- we've culled those down by applying

2    paragraph 16 terms, and paragraph 17 terms.  So instead of

3    13,000 there's a much smaller number.  The -- and -- and as we

4    said to the counsel for the General Counsel any -- any of those

5    that they want to see -- because they're potential comparators,

6    let us know and we'll produce that information.

7        JUDGE GREEN:  Okay.  So they can find it in the chart.

8    They can do searches in the chart, and then you can produce the

9    discipline, I mean a full form that will be easier to see?

10       MR. MURPHY:  Yes.

11       MS. COX:  Your Honor?

12       JUDGE GREEN:  Okay.  Let me just ask you, Ms. Cox, is --

13   my understand is that we've got -- like, just dealing with

14   JFK8.  We've got 13,000 -- about 13,000 plus discipline total,

15   2,400 that are responsive to the search terms that you've asked

16   for.

17       MS. COX:  No, Your Honor.

18       JUDGE GREEN:  No?

19       MS. COX:  The -- the number has changed.  It might have

20   been --

21       JUDGE GREEN:  Oh, okay.

22       MS. COX:  -- 2,495 to 1,593 now.

23       JUDGE GREEN:  Right.

24       MS. COX:  And Your Honor, if I may, the chart that I have

25   appears to have duplicates.  And there's no way of me even



Exhibit E, Motion to Try Petition on Hearing Record 77

1   verifying if there are 1,500 disciplines on this chart.  For

2   example, I can show you right now.  I have one discipline

3   regarding bus stops and it's on pages 23, pages 30, pages 70,

4   pages 84.  And it appears to be the same discipline.  I -- I --

5   without an Excel spreadsheet to help me understand what's

6   duplicate or just the -- the discipline itself, I just don't

7   know what I have, Your Honor.  And that's --

8        JUDGE GREEN:  Let me ask you --

9        MS. COX:  -- largely the problem.

10        JUDGE GREEN:  -- let me -- okay.  Let me ask you about the

11   spreadsheet.  So it was converted from the spreadsheet to a

12   PDF.  Is the -- is the original -- is the native format in

13   Excel for these -- for this spreadsheet?

14        MR. MURPHY:  Yes.

15        MS. COX:  No.

16        JUDGE GREEN:  Well, okay.  I mean, Excel's better, right,

17   because you can do a data search?  You can do a data search

18   of -- in order of Excel, right?  Okay.  So I mean, it sounds to

19   me like the one -- it would be -- it would be better to have

20   the Excel spreadsheet -- the Excel spreadsheet program that

21   then PDF.  In the sense that the General Counsel will be able

22   to manipulate that.  They can -- they can search it by, you

23   know, date, person.

24        MS. COX:  Your Honor, can I just say one other thing?

25        JUDGE GREEN:  Yes, go ahead.



Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  I mean, the -- the issue that I have with having

2  to pluck out these disciplines, is essentially me telling the

3  Respondent what our case is.  I mean, it's -- it's the same as

4  letting them choose whatever disciplines they think are

5  relevant.  And then, us showing them which ones we -- we plan

6  on using.  They should just produce the 1,500 disciplines.  I

7  mean, that's responsive to paragraph 17.

8      JUDGE GREEN:  Okay.  So you want the 1,500 disciplines?

9      MS. COX:  We've asked for the discipline forms themselves

10  and disciplines from the other two facilities.

11      MR. MURPHY:  And -- and Judge, we've -- we've -- we've

12  advised Counsel for the General Counsel that it that's what she

13  wants, it's going to be a massive waste of time, but -- but

14  we'll do it.

15      JUDGE GREEN:  Okay.

16      MR. MURPHY:  The challenge is -- is that it will take

17  weeks, months to do that.

18      JUDGE GREEN:  Okay.  So I don't know how long it's going

19  to take.  I -- you know, I mean, what -- what is -- what is

20  going to take all the time?  Is it your opinion -- it shouldn't

21  take that long to review 1,500 disciplines.  I -- you know --

22  it --

23      MR. MURPHY:  It -- right.  So Judge, here's -- here's --

24  here's the disconnect.  The disciplines can only be reviewed

25  by -- the -- the discipline form, right, can only be reviewed



Exhibit E, Motion to Try Petition on Hearing Record    89

1    by accessing the personnel file.  By -- by having a person

2    review the personnel file, identify the discipline form, and

3    copy it to a PDF.

4        So the information in our -- in one of our emails, and if

5    it's not -- yeah, so if you -- the email that we sent you

6    summarizing the project, item number 2.

7        JUDGE GREEN:  I do have it.

8        MR. MURPHY:  Okay.  So it, you know, and for the record

9    I'll -- I'll be just brief.  We confirmed our written advice

10   that "discipline forms" you seek cannot be generated or

11   extracted from the discipline reports we have.

12       MS. COX:  Your Honor, if I may.

13       MR. MURPHY:  Right now, I'm --

14       JUDGE GREEN:  Right now I'm asking -- I don't have that.

15   I don't have -- you're talking about the email.  This is an

16   email.  I don't actually have that.  That's not --

17       MR. MURPHY:  Oh, I'm sorry.  I sent it to you this

18   morning.  And --

19       JUDGE GREEN:  Right now, I think I might have printed out

20   the wrong thing.

21       MR. MURPHY:  Oh, can I -- I -- I might be able to share

22   it.

23       MS. COX:  Can I just say, Your Honor --

24       JUDGE GREEN:  Yes.

25       MS. COX:  -- those representations, the custodian of the



1    record should verify.  We ask --

2         JUDGE GREEN:  Yeah.  Listen, I'm -- I'm going to get to

3    that.  I mean, you -- you are the -- here's the thing, the

4    General Counsel is going to have an opportunity to -- to

5    question the custodian of records.  That -- that's going to

6    happen.  Really, none of us have any -- we don't have any say

7    in that, you know.

8         The custodian of records is -- is subject to being called.

9    You know, I -- we designated today.  I would have liked it to

10   have been done today.  We don't have that person, so

11   unfortunately, we have to make other arrangements.  But soon --

12   sooner or later, that is going to happen.

13        MS. COX:  Judge, I mean, an alternative could be, provide

14   the Excel spreadsheet and/or just produce just the whole

15   personnel file.  I mean, I don't know how else to resolve this

16   issue.  It -- the -- the Excel spreadsheet is just the start.

17   But eventually, I mean, we need the documents.  They're not --

18   the Excel spreadsheet is not made in format.  That is not how

19   Respondent maintains discipline forms, in Excel spreadsheets.

20        MR. MURPHY:  We've never said that.

21        MS. COX:  Okay.

22        JUDGE GREEN:  Yeah.  Okay.  So I see, okay.  Yeah, I

23   didn't see that -- I didn't see this.

24        MR. MURPHY:  You know, so -- and -- and I -- and I -- I'm

25   not cured for the -- it looks like you're sharing that screen,



Exhibit E, Motion to Try Petition on Hearing Record                                     51

1    Judge.  So it's paragraph -- it's paragraph 2.  And you know,

2    each -- it says each discipline form you seek must be extracted

3    manually.  That is the personnel file of the employee for whom

4    you seek the discipline form must be downloaded from Amazon and

5    reviewed by a reviewer.  The reviewer then identifies the

6    discipline form or forms and copies it to a pdf format for

7    review quality control and production.

8         As we advised under separate cover, this process is labor

9    and time intensive.  For example, we estimate that the split of

10   the forms for JFK8, EWR4, and DBL3 would take more than 1,000

11   hours of review or attorney time.  Assuming a 40-hour work

12   week, this would take more than 25 hours -- 25 weeks to

13   complete.  I mean, that's -- this is where we are.  This --

14   this 100 percent taxable and it's -- I don't think counsel for

15   the General Counsel wants to call it custodian of records to

16   determine, be my guest.

17        It doesn't change that -- it doesn't change the mechanism

18   by which the actual discipline forms need to be extrapolated.

19   The information on the discipline forms is in the ADAPT

20   spreadsheet.

21        JUDGE GREEN:  Okay.  So -- so a couple of things.  You

22   know, it sounds like there are 1,500 -- well, maybe there'll be

23   4,500 disciplines that are responsive to the search terms if we

24   look at all three.  That's what we're looking at, right?

25        MS. COX:  Yes, Judge.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1          MR. MURPHY:  Yeah.  More or less.

2          JUDGE GREEN:  You know, here's the thing, Ms. Cox, that

3     ultimately, you'll be able to call the custodian of records and

4     you'll be able to question the custodian about the production.

5     If the -- if it turns out that the Respondent's answer is

6     correct and that it will take all this time to produce it, I'm

7     not saying you won't be able to get it.  Because it doesn't

8     seem to me -- well, I -- 5,000 -- I mean, at the very least it

9     seems to me that 1,500 is -- is very doable.  But you don't get

10    it, you know, you don't get that in little sections if the --

11    if the Respondent's explanation for the manner of the

12    production is reasonable.

13         So if it turns out that this is correct, and it'll take

14    weeks to produce the -- produce the documents, you don't end up

15    getting banned in those remedies and you do have to spend, you

16    know, time.  You might have to delay the proceedings

17    significantly.  I -- I, you -- you do have to, I -- you know, I

18    think that you do have to consider whether to -- how much to --

19    you really care about disclosing your case.  I mean, sooner or

20    later, you are going to identify disciplines that you want to

21    be considered comparable.

22         You know, whether that happens early or later, before the

23    hearing or after the hearing, that's -- I'm not sure that

24    that's -- I mean, it's up to you, it's your case.  But I'm not

25    sure that that's a really important strategic consideration.



Exhibit E, Motion to Try Petition on Hearing Record

93

```
 1    You know, that the -- that the Respondent will have access to

 2    the documents that they -- that you think are comparable, which

 3    seems to be your concern.  Anyway, those are considerations.

 4         And as far as, Your Honor, to the Respondent, you know,

 5    the process of -- of a GC getting Bannon Mills sanctions is --

 6    is ongoing and you know, each time the Respondent really fails

 7    to comply with an order or does not, you know, participate or

 8    cooperate in the production of documents, it -- it puts you

 9    more at risk.  Now, the fact that the -- that the Respondent

10    didn't make somebody, like an IT person or the person who

11    actually ran these spreadsheets available before now.  Does

12    that put you significantly at risk?  No, it probably doesn't.

13         If you have the custodian of records present on the day

14    that we were -- designated -- that we had designated for

15    calling that person, that -- that is a bigger issue.  And, you

16    know, that becomes more of a problem and places the Respondent

17    at greater risk of sanctions.  We -- we do need to get the

18    custodian or custodians.  And it's important to get them in a

19    timely manner.  And so --

20         MR. MURPHY:  Judge, we're willing -- we're willing to do

21    that.

22         JUDGE GREEN:  But I haven't heard -- I really haven't

23    heard a time frame for that.  Like, we can't do it today and as

24    far as I understand, we can't do it tomorrow.

25         MR. MURPHY:  Well, I -- I don't -- I don't know that it's
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
1    reasonable to do it tomorrow because the person's returning

2    from vacation and -- and we don't know -- I mean, if we need

3    somebody to talk about the personnel files, I mean, that's --

4    that's --

5         JUDGE GREEN:  It sounds like the person -- it sounds like

6    the people need more time.  Are the -- are the people who did

7    these -- the search for the documents that have been identified

8    so far.  That -- am I right?  That's who -- who the General

9    Counsel wants?

10        MS. COX:  Yes, Judge.  And it's not just the disciplines.

11   Like I said, there's a lot of issues.  If I -- if we had -- I

12   would like to go for the subpoena.  I -- I Bates stamped it to

13   admit it into evidence today and just talk about at least

14   our -- our -- some of our general issues.

15        JUDGE GREEN:  Okay.

16        MS. COX:  First -- first and foremost being, I don't know

17   what documents are responsive to what.  To date, I don't -- I

18   don't -- Respondent has not identified for paragraphs, I

19   believe, 7 through 15, what documents are responsive.  So

20   that's -- I would -- perhaps we can do at least that much

21   today.

22        MR. MURPHY:  Okay.  So -- so my -- my understanding,

23   and -- and I -- I -- I wasn't the person that actually produced

24   the documents.  My understanding is that the documents that

25   were produced in the first batch, more or less, Bates stamped,
```



Exhibit E, Motion to Try Petition on Hearing Record

1   ordered consistent with the numbers of the paragraphs.  What

2   we -- what we have indicated to Ms. Cox is that we would

3   prepare a -- a key, for lack of a better term, that would map

4   the documents into the paragraphs.  I believe that's going to

5   be transmitted today.

6        JUDGE GREEN:  Okay.  Okay.  So that's -- that's the first

7   issue.  It sounds like that would -- that would work.  So

8   you're identify they're -- they're Bates stamped? The -- the --

9        MR. MURPHY:  Yes, sir.

10       JUDGE GREEN:  Okay.  What's been produced is Bates

11  stamped?

12       MR. MURPHY:  Correct.

13       JUDGE GREEN:  And you're going to identify which Bates

14  stamps documents go with which subpoena request?

15       MR. MURPHY:  By range, yes.

16       JUDGE GREEN:  Okay.  So next.

17       MS. COX:  Can I just ask, so Chris, are you saying that

18  there's only one person who did the search for this whole

19  subpoena or are you saying that multiple people?

20       MR. MURPHY:  So I -- I'm -- I mean, I'm not -- I'm not the

21  person to answer that question.  You know, I -- I don't know

22  whether it was one or more than one.  I think Jason indicated

23  the same, so I -- I don't know how -- how the searches were

24  technically executed.  Jason, do you want to speak to that?

25       MR. RANJO:  Yeah.  I will.  There are multiple people --



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

56

1    there were multiple people who pulled information at our

2    request.  And that depends on which specific request we're

3    talking about.  I mean, and when we're talking about the

4    custodian of records being the person who pulled the documents,

5    it's really a person with -- within Amazon who has a username

6    and password and access to this document.  And so it would

7    depend on which documents you're referring to and which

8    facility you're referring to.

9        MS. COX:  Okay.  Well, I haven't gotten anything from any

10   of the facilities other than JFK8.  So when I'm speaking, I'm

11   only referring to JFK8.  And I understand --

12       MR. RANJO:  And we -- we have spreadsheets for the other

13   facility, so those are -- that's -- that's kind of what I'm

14   referring to there.

15       MS. COX:  I understand.  But again, you know, from -- from

16   our point of view, the charts are not the disciplines, the

17   underlying disciplines and they're not responsive.  So you

18   know, from our point of view, there hasn't been a response.

19       JUDGE GREEN:  Okay.  I mean, just understand that -- am I

20   correct that the spreadsheet has -- it has the information --

21   the substantive information that's in the discipline.  I -- I

22   understand that it's not the discipline, but am -- am I right

23   that it has the -- it has the information?  The person who's

24   been disciplined, when, what -- whether it was --

25       MS. COX:  So -- Judge Green, I'm sharing my screen.  This



is what I have for 1,500 disciplines. I cannot read this document. I cannot print this document.

JUDGE GREEN: Okay.

MS. COX: Okay?

JUDGE GREEN: So that's not real -- that's not --

MS. COX: It's not responsive, Your Honor. It's not responsive.

JUDGE GREEN: Is there any way that -- is there any way the Respondent can, you know, make that actually legible.

MR. MURPHY: Well, it's --

JUDGE GREEN: So -- so I mean, if it were -- if it were in a -- also if it were in a -- I would imagine if it's in an Excel spreadsheet program, it would be legible.

MS. COX: Yes.

MR. MURPHY: Yeah. And -- and -- and we'll look into our ability to produce it in -- in -- in an Excel format. My understanding is that there's -- there's challenges with redacting the -- the person identifying information. So in an Excel sheet, Judge, you may know this -- I -- I know a little bit, you can hide columns before you print. So and my understand -- although I'm not certain, it is my understanding is that's how these were produced. That the -- the PDFs. It's just I -- I don't know whether we can redact.

JUDGE GREEN: Well, you can -- okay. So you can -- this is just -- this is a just a tool, really. I mean, this is --



Exhibit E, Motion to Try Petition on Hearing Record

1   this document is just a tool to identify relevant documents or

2   documents that are going to be used as exhibits.  You can --

3   you can -- it's -- you can delete columns.  You know, I mean,

4   you can just -- you can remove columns, you can remove rows,

5   you can remove cells.  It's just a tool, it's not like that's

6   going to be going into evidence.  I -- you know, I don't think

7   that that's going to be going into evidence.  It's just -- it's

8   just a -- it's just a tool that the Respondent and the General

9   Counsel could use to identify the documents that are ultimately

10  going to be tying them to an exhibit.

11      So if you are concerned about certain information in the

12  Excel -- in that Excel spreadsheet, I don't see any problem in

13  you just removing it.

14      MR. MURPHY:  All right.  We'll -- we'll -- we'll explore

15  that and -- and get back to Ms. Cox by the end the day.

16      JUDGE GREEN:  Okay.

17      MS. COX:  But Judge, I just want to be clear.  This chart,

18  that I -- that I just showed, is Respondent's saying allegedly

19  to paragraph 17.  With regard to paragraph -- we should go

20  through the subpoena, if you -- you know, respectfully, if you

21  have the time, I would really appreciate it.  Paragraph 16 --

22      JUDGE GREEN:  Proceed.

23      MS. COX:  Okay.  Let me just --

24      JUDGE GREEN:  Go ahead.

25      MS. COX:  So I -- I uploaded it to SharePoint, I



Exhibit E, Motion to Try Petition on Hearing Record

1    circulated it to Respondent this morning.  I think that

2    everybody should have a copy.  Judge, I don't know how to get

3    you a copy.  Should I email it to you or?

4        JUDGE GREEN:  Yes, email me.

5        MS. COX:  Okay.

6        JUDGE GREEN:  I -- what are we looking at?

7        MS. COX:  So the subpoena that we issued on March 1st,

8    2020.

9        JUDGE GREEN:  All right.  I have a copy of it.

10       MS. COX:  Okay.  Excellent.  So I marked it as GC-2.

11   **(General Counsel Exhibit Number 2 Marked for Identification)**

12       MS. COX:  I'd like to enter it, Your Honor.

13       JUDGE GREEN:  Okay.  Any objection to entering the

14   subpoena as GC-2?

15       MR. MURPHY:  No.  Other -- other than that -- with the

16   stipulation -- I'm not -- to -- to the extent that anybody on

17   behalf of the Respondent talks about what's happening.  This

18   isn't testimony under oath.  Right?  We're -- we're -- we're --

19       JUDGE GREEN:  No, it's just that -- yeah, it's just the

20   stipulation, it's regarding the admissibility of the document.

21       MR. MURPHY:  Yeah.

22       JUDGE GREEN:  We're -- we're not, you know, we're not

23   authenticating it through a witness.  We're -- we're agreeing

24   to its authentication among counsel.

25       MR. MURPHY:  Right.  And as -- and as -- and if -- if



1    we're asked questions about it, and we respond to them, as Mr.

2    Ranjo said, we're not authorized, you know, by the corporation

3    to speak on its behalf if --

4         JUDGE GREEN:  Yeah.  You haven't been sworn, and it --

5    you -- these -- the attorneys haven't been sworn and they're

6    not -- I'm not accepting this as factual testimony.

7         MR. MURPHY:  Thank you very much.

8         JUDGE GREEN:  Okay.

9         MS. COX:  Okay.  So Your Honor, with respect to paragraph

10   1, Respondent identified two documents that are responsive.

11   With respect to paragraphs 2 to 5, as you know, we've

12   withdrawn -- I'm sorry, 2 through 6.  We've withdrawn those

13   paragraphs.  Paragraph 7, Respondent labeled one document

14   identifying it as responsive.  I don't know if there are any

15   other documents responsive to paragraph 7.

16        JUDGE GREEN:  Paragraph 7 is --

17        MS. COX:  The rules.

18        JUDGE GREEN:  Sorry.  Hold on.  I just lost my, my

19   subpoena here.

20        MS. COX:  It's work rules, work guidelines, and terms and

21   conditions of employment pertaining to employee conduct and/or

22   misconduct applicable to nonsupervisory, nonmanagerial

23   associates at JFK8 for that --

24        JUDGE GREEN:  Is that not the owner's manual?

25        MS. COX:  That is the owner's manual.  It's the only



1    document that was --

2        JUDGE GREEN:  So the owner's manual should have been

3    produced in its entirety.  Was it not?

4        MS. COX:  It was produced in its entirety.

5        JUDGE GREEN:  Okay.  I'm sorry -- so what's the -- what's

6    the issue?

7        MS. COX:  I don't know if there are any other documents

8    responsive to this paragraph.

9        JUDGE GREEN:  All right.  Okay.  Okay.

10       MS. COX:  So I'm -- I'm --

11       JUDGE GREEN:  I -- it was my understand that there wasn't.

12   I -- I -- but, you know, that's fine.

13       MS. COX:  Well, Your Honor --

14       JUDGE GREEN:  So you don't know if there's something else

15   that's responsive to 7?

16       MS. COX:  I don't -- I don't and perhaps a custodian can

17   answer that question for me or Respondent can tell me what

18   Bates stamps are responsive to paragraph 7, if anything other

19   than the owner's manual.

20       JUDGE GREEN:  Okay.

21       MS. COX:  Paragraph 8, documents showing Respondent

22   distributed to its employees including Gerald Bryson and

23   Dimitra Evans, if they received Respondent's work rules, work

24   guidelines, terms and conditions of employment.  I don't know

25   what -- what documents are responsive to paragraph 8.



Exhibit E, Motion to Try Petition on Hearing Record

1   So if Mr. Murphy can tell me what's turned over -- what

2   they've turned over, that'd be helpful for me.

3       JUDGE GREEN:  Okay.

4       MR. MURPHY:  So -- sure, I -- I mean, I can do that.  I

5   can do 7 and 8, Judge.  So 7 is the owner's manual like you

6   said.

7       JUDGE GREEN:  All right.

8       MR. MURPHY:  8 and we've -- we've provided the personnel

9   files of Ms. -- the complete personnel files of Ms. Evans and

10  Mr. Bryson which contain all of those documents.

11      MS. COX:  Okay.  Can you -- can you identify what Bates

12  stamp numbers are responsive to 8 and 9?  I don't know what

13  numbers are responsive to the personnel files either.

14      MS. BUFFALANO:  The personnel files are --

15      MR. MURPHY:  Thank you, Nicole.

16      MS. BUFFALANO:  -- 8 through 168.

17      MS. COX:  Which one pertains to Gerald Bryson and which

18  one to Ms. Evans?

19      MR. MURPHY:  Judge, I -- I wanted to say that, like, a

20  quick perusal of these documents makes it pretty much self-

21  evident what they are and who they relate to.

22      MS. COX:  That's not --

23      MR. MURPHY:  When you -- when you come to the W-4 for Mr.

24  Bryson, and his benefit elections, and all that sort of stuff,

25  that's personnel file.



Exhibit E, Motion to Try Petition on Hearing Record

```
1        MS. COX:  No, Mr. Murphy.

2        MR. MURPHY:  And when it -- and when it switches over to

3   Ms. Evans, that's Ms. Evan's personnel file.

4        MS. COX:  No.  I don't know if you've looked at the

5   production, but they're -- the documents are -- are mixed in.

6   There are documents from Ms. Evans file right next to documents

7   from Mr. Bryson's file.  I don't know what's what.

8        MS. BUFFALANO:  Yeah, we'll get the --

9        JUDGE GREEN:  Okay, so --

10        MS. BUFFALANO:  -- we can send --

11        JUDGE GREEN:  I'm sorry.  No, what I was going to -- I was

12   just going to ask if you know. Do you -- you know?

13        MS. BUFFALANO:  I am looking at a list right now that --

14   and -- and we can just send -- we'll just send it to you.

15        JUDGE GREEN:  Which document?

16        MS. BUFFALANO:  So like which personnel file.

17        JUDGE GREEN:  Okay.

18        MS. COX:  Okay.  So paragraph 10.  These are documents

19   memorializing exact words that you use by -- used by or conduct

20   engaged in by Gerald Bryson on April 6th, which resulted in

21   Respondent issuing a discipline set forth below, his discharge

22   April 17th.  I just want to know what Respondent turned over in

23   response to paragraph 10.

24        MR. MURPHY:  We -- we -- we've already gone over this.

25   We -- we -- we produced the various witness statements.
```



Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  Okay.

2      MS. BUFFALANO:  And it's based on Facebook Live.

3      MR. MURPHY:  And the video.

4      MS. COX:  Okay.  So I didn't know that the Facebook Live

5   video is responsive to paragraph 10.  Also, you know, I -- I

6   don't -- this document contemplates an internal decision-making

7   document not -- not witness statements.  In any event, is there

8   anything else responsive to paragraph 10 other than the

9   Facebook Live video and statements?

10     MR. MURPHY:  Well, to be -- to be -- to be quite honest

11  with you, if -- if you're considering paragraph 10 to include a

12  deliberative-type stuff, I -- I -- I don't think we interpreted

13  it in that way.  We interpreted to be the individuals who saw

14  or heard what happened and wrote it down.

15     MS. COX:  Okay.  Is there -- is it your representation

16  that there's no additional documents responsive to paragraph 10

17  other than the Facebook Live video and the witness statements?

18     MR. MURPHY:  Based on our interpretation of our paragraph,

19  yes.

20     MS. COX:  Paragraph 11, these are the disciplines on --

21     MR. MURPHY:  In the personnel files.

22     MS. COX:  Please identify the Bates stamp numbers for

23  paragraph 11.

24     MR. MURPHY:  Judge, I don't think -- excuse me.  But

25  Judge, I don't think we need to identify the individual



Exhibit E, Motion to Try Petition on Hearing Record

1    personnel -- the individual disciplines when they're included

2    in the -- in the personnel files.  It would have -- it would

3    have been appropriate to produce the personnel file in hard

4    copy on the day of the hearing.

5         JUDGE GREEN:  Right.  So when are you -- are you planning

6    to give -- I thought that -- that the Respondent was going to

7    send Ms. Cox the document with the -- with the Bates stamp

8    range for each paragraph.  Am -- am I right about that or not?

9         MR. MURPHY:  Yes.

10        JUDGE GREEN:  Okay.  But you didn't -- you're not

11   necessarily breaking these down between 11-A or B?  Or -- or do

12   you have that information?  Do -- do you have it?

13        MR. MURPHY:  No, the -- well, it's the personnel files

14   that are responsive to 11.

15        JUDGE GREEN:  Okay.  So documents reflecting the -- so I'm

16   sorry.  Is -- is the question -- what's your question regarding

17   this again, Ms. Cox?

18        MS. COX:  What documents are responsive to paragraph 11-A

19   and 11-B in the personnel file?

20        JUDGE GREEN:  Meaning which personnel file did you find it

21   in?

22        MR. MURPHY:  I -- I -- I think what she wants, Judge, is

23   let's assume the personnel files go from 1 to 100 and 100 to

24   200.

25        JUDGE GREEN:  Right.



Exhibit E, Motion to Try Petition on Hearing Record 66

1      MR. MURPHY:  Ms. Cox wants us to tell us -- wants us to

2 tell her Bates 50, 52, and 53, and Bates 146, 149, and 174.

3      JUDGE GREEN:  Okay.  And do you have that?

4      MR. MURPHY:  Do we?  I -- I -- I -- I don't know.  I -- I

5 don't know, but as -- but -- but I'm not sure that we are

6 required to provide that -- we've provided the personnel files.

7 If you're -- if you're telling us that we should provide, you

8 know, pinpoint cites, in essence, we'll do that.  I -- that's

9 not been my experience in the past.

10      JUDGE GREEN:  Okay.

11      MS. COX:  But, Your Honor, paragraph K of the subpoena

12 does require that they provide -- they organize these documents

13 for us to know what's responsive to each paragraph.  We talked

14 about that the last time we were on a call with them.

15      JUDGE GREEN:  I'm sorry.  Is it -- is it 11-A and B.

16 It's -- it -- I mean, I think Mr. Murphy, what he indicated is,

17 it's going to be obvious.  That if it's -- if it's -- if it's a

18 disciplinary action taken against Gerald Bryson, document's

19 going to say --

20      MS. COX:  Yes,

21      JUDGE GREEN:  -- disciplinary action taken against Gerald

22 Bryson.

23      MS. COX:  Yes.

24      JUDGE GREEN:  And the same for Dimitra Evans.

25      MS. COX:  Yes.



# Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Okay.  And we're going to have -- we're

2   going to have a general Bates range for paragraph 11, so that's

3   going to get you basically to where you want to go.  And then,

4   you look at the documents and you take a look at whether it's

5   Mr. Bryson or Evans.

6      MS. COX:  Judge, we --

7      JUDGE GREEN:  That's not --

8      MS. COX:  Ms. Buffalano represented that Bates 8 through

9   168 are the personnel files, but still hasn't said which ones

10   are for Evans, which ones are for Bryson.  And I understand

11   that it should look -- it should be -- appear self-explanatory.

12      JUDGE GREEN:  No, no, I -- personnel files -- so personnel

13   files are actually different.  Personnel files are actually

14   different and in the sense that you wouldn't necessarily look

15   at a document and know that one came from the personnel files

16   of Mr. Bryson and Ms. -- Ms. -- it's Ms. Evans, right?

17      MS. COX:  Yes.

18      MR. MURPHY:  Ms., yeah.

19      JUDGE GREEN:  Ms. -- so yes.  That -- that should be

20   identified, but discipline is different.  I mean, a

21   disciplinary form will, on its face, say which -- which person

22   is being disciplined.

23      MS. COX:  Yes.

24      JUDGE GREEN:  It'll say it's either Bryson or Evans.  So

25   yeah, I mean if it -- so if -- yeah, the Respondent should



# Exhibit E, Motion to Try Petition on Hearing Record

1    identify personnel files if they're, you know, personnel files.

2    That's not what I'm seeing for 11.  11's not personnel files,

3    right, it's disciplines?

4        MS. COX:  No.  It's the disciplines, yes.

5        JUDGE GREEN:  Right.

6        MS. COX:  So you're saying it's sufficient for them to

7    identify the personnel files and I can figure out what the

8    disciplines are from there?  That's fine, Your Honor.  I'll

9    move on.  So for paragraph 12, documents including but not

10   limited to human resource memorandums, handwritten notes,

11   investigative reports, or any personnel statements, written

12   statements, written communication with witnesses,

13   communications between Respondent's supervisors and agents

14   showing investigations conducting by Respondent involving --

15   I'm sorry -- including documents showing the identities of

16   those participate -- participated in the investigation, the

17   substance of the investigations and the investigatory find --

18   findings.  For 12-A it's Gerald Bryson, 12-B is Dimitra Evans.

19   I have no documents responsive to paragraph 12-A or 12-B.  So I

20   just need Respondent to identify those documents for me.

21       MR. MURPHY:  Sure.  So first -- first of all, and -- and I

22   should have said this at the onset, there's going to be some

23   set of documents that are either attorney/client privilege or

24   work product documents are kept.  And -- and we're preparing a

25   log of those.  And -- and -- and -- and some of those may be



Exhibit E, Motion to Try Petition on Hearing Record

1    responsive -- some or all of these requests.  And -- and -- and

2    I raise it now because, you know, some of those fall within

3    paragraph 12, no surprise, right?  But my understanding is

4    that -- is that we -- we -- we -- we have, you -- you know,

5    I -- I say, I'm -- I'm just not sure about this one, Judge, I

6    think we've produced that material.  I -- I'd like to talk

7    before I may an affirmative representation.

8        JUDGE GREEN:  no, that's fine.  And I think we're just --

9        MR. MURPHY:  Yeah.

10       JUDGE GREEN:  -- looking for the date range.  I -- I don't

11   mind going through this exercise if we can -- we can knock it

12   out now.  I don't mind that the parties having such problems,

13   but either you know or you don't.  And if you don't, it's my

14   understanding that they -- they perhaps a Bates stamps range is

15   going to provided.  But they'll --

16       MR. MURPHY:  So we -- we'll -- we'll circle back on number

17   12.

18       JUDGE GREEN:  Okay.

19       MS. COX:  Okay.  Number 13 is those documents including

20   but not limited to notes memorizing conversation, electronical

21   communications, emails, text messages, videos, photographs,

22   memoranda, digital and/or written recording of personnel

23   statements considered by Respondent and relied upon by

24   Respondent for below, 13-A Gerald Bryson suspension; B, Gerald

25   Bryson discharge; C, Dimitra Evans written warning.  I don't



Exhibit E, Motion to Try Petition on Hearing Record

1    have any documents responsive to 13.

2        MR. MURPHY:  Well, you -- you, yeah.  I -- I -- and again,

3    my -- my short answer would be the same as it was with respect

4    to 12.  But for 13, I mean, we've produced videos that were, in

5    fact, considered.  We've produced the witness statements.  I

6    mean, we've produced a range of materials there, Your Honor,

7    that are responsive to that.

8        MS. COX:  Your Honor, if Respondent represented that there

9    is a chart of disciplines that they considered and were relied

10   upon, I want to know if that chart is, in fact, responsive to

11   paragraph 13.

12       MR. MURPHY:  I -- what -- what I -- what I - what I -- and

13   I don't know if this what Ms. Cox is talking about that -- but

14   we've -- we've represented that -- that the 26 separate

15   comparators were considered.  And -- and -- and those, I

16   believe, all of those personnel files have been produced as

17   part of a larger production.

18       MS. COX:  They have not.  They're still nine missing.

19       MR. MURPHY:  There's what?

20       MS. COX:  Nine missing.

21       MR. MURPHY:  Nine what?

22       MS. COX:  Disciplines and personnel files missing.

23       MR. MURPHY:  Okay.  And -- and honestly, if you could tell

24   us who those nine are, we'll -- we'll produce them.

25       MS. COX:  So other than the charts and the video



Exhibit E, Motion to Try Petition on Hearing Record

1    statement, were there any other documents responsive to

2    paragraph 13?

3        MR. MURPHY:  Well, as -- as I said, I -- I -- I'm going to

4    have to give you the same answer I gave you with respect to

5    paragraph 12.  And I -- I just don't know if you have the full

6    set.  Some of them are probably on -- on a privilege log.  But

7    we -- we can look at that, and we'll get back to you and if you

8    can provide us with the names of the nine people who are

9    missing and we'll look into this chart that you're referring

10   to.  I -- you're not referring to the charts that the

11   disciplines appear on, right?

12       MS. COX:  Yes, I am.  Rather producing all statements, my

13   understanding is in an email by Ms. Phillips, that you all

14   looked at a chart containing disciplines in making this

15   decision.  That's my understanding, and I'm looking to get your

16   representation on the record of this chart with 26 disciplines

17   is responsive to paragraph 13-A through C.  And I want to know

18   that, you know, it's different than A and B.  So you know, if

19   there's nothing responsive to C, I mean, I need to know that

20   too.

21       MR. MURPHY:  And I mean, I -- so I -- I -- I don't --

22   unless Nicole knows about the -- the chart that -- that Ms. Cox

23   is referring to.  We'll, you know, have -- have to look into it

24   and -- and get back.

25       JUDGE GREEN:  Okay.  Ms. Buffalano, do you have anything



Exhibit E, Motion to Try Petition on Hearing Record

1    to add?

2        MS. BUFFALANO:  I think, you know, we can take this off-

3    line and just send over like Chris suggested, a key, that

4    identifies the paragraphs that documents are responsive to

5    because I --

6        JUDGE GREEN:  I understand.  I understand that.  I'm

7    not -- I'm not looking to belabor this -- this stuff.  It

8    sounds to me like that's how this is going to -- it's going to

9    work.  I just -- while I've got you here, because the parties

10   seem to be having problems in coordinating.  I -- I'd like to

11   go through it.  Normally I wouldn't, quite frankly.  But okay,

12   that's fine.  So we'll move on from 13 -- 14.

13       MS. COX:  All right.

14       COURT REPORTER:  And Judge, I'm sorry to interrupt, this

15   is your Court reporter.

16       JUDGE GREEN:  Yes.

17       COURT REPORTER:  Ms. Cox, your -- your -- your audio is

18   coming in and out a little bit.  I don't know if anybody is

19   getting that?

20       JUDGE GREEN:  Yeah.  I've noticed.

21       MS. COX:  Yeah.  Sorry about that.

22       COURT REPORTER:  Yeah.

23       JUDGE GREEN:  It's been basically -- and I've -- I've been

24   able basically been able to make out what you're saying.  It

25   hasn't been dramatic.



Exhibit E, Motion to Try Petition on Hearing Record

1      COURT REPORTER:  It -- it has --

2      JUDGE GREEN:  And if somebody doesn't understand what

3   she's saying, you know, please speak up.

4      COURT REPORTER:  Yeah, it hasn't been too bad, but just so

5   that you're aware, it is happening.

6      MS. COX:  Okay.  I may call in to remedy that if it

7   continues.

8      JUDGE GREEN:  Okay.

9      MS. COX:  Thank you.  Paragraph 15.  Such electronic

10  documents including but not limited to video recordings, social

11  media posts, emails, text messages, audio recordings, and

12  photographs showing or describing the April 6th incident --

13  2020 incident underlying disciplines set forth below, including

14  documents or notes reflecting the circumstances and dates under

15  which such recordings, social media posts, emails, text

16  messages, audio recordings and photographs were accessed,

17  obtained, maintained.  15-A is for Gerald Bryson's discharge,

18  15-B is for Dimitra Evans' written warning.

19      MS. BUFFALANO:  And those are 185 to 187.

20      MS. COX:  And the second portion of this paragraph 15

21  requests documents or notes reflecting the circumstances and

22  dates under which these recordings were -- were accessed.  Are

23  there any responsive documents to that portion of the request?

24      MS. BUFFALANO:  There are not.

25      MS. COX:  Paragraph 16, during the period covered in the



1    subpoena, documents showing disciplinary actions including

2    discharges, suspensions, written and oral warnings issued to

3    employees at Respondent's JFK8 facility.

4        COURT REPORTER:  I think she's frozen.

5        MR. MURPHY:  That may be fortuity, Your Honor.

6        COURT REPORTER:  Yeah.  Definitely froze.

7        JUDGE GREEN:   So if you can hear us, Ms. Cox, maybe you

8    can call in with your phone and we can -- we can hear you.  I

9    don't know that we have to have your video feed.  There's 19

10   request -- right?  Yeah.  Hold on.

11       COURT REPORTER:  Okay. It's back.

12       MS. COX:  I'm going to call in.  I'm very sorry about

13   that.

14       JUDGE GREEN:  No, it's okay.  It happens.

15       MS. COX:  Just give me one moment, please.

16       JUDGE GREEN:  You can call in, and just mute your -- your

17   video.

18       MS. COX:  Okay, Judge Green.

19       JUDGE GREEN:  You have to mute this -- the video, the

20   one -- the one that you're -- the -- the computer, you have to

21   mute, if you're going to use the phone.

22       MS. COX:  It is muted.

23       COURT CLERK:  Yeah.

24       JUDGE GREEN:  Okay.

25       MS. COX:  I still did that.  Okay.



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  All right.

2      MS. COX:  All right.  Now it should be -- can you all hear

3  me?

4      JUDGE GREEN:  Yes.

5      MS. COX:  Okay.  I'm sorry.  I believe I skipped

6  paragraph -- I skipped paragraph 14?

7      JUDGE GREEN:  No, I do -- I thought we were up to 15.

8      MS. COX:  Okay.  Paragraph 15, no, I think we're up to

9  paragraph 16, Judge.  So --

10      JUDGE GREEN:  That's correct.  That -- that's correct.  I

11  think we kind of got 15, yes.  Okay.

12      MS. COX:  So during the period covered by the subpoenas,

13  I --

14      JUDGE GREEN:  So these are the --

15      MS. COX:  -- documents -- yes.

16      JUDGE GREEN:  Okay.

17      MS. COX:  Including off -- I'm sorry.  I'm just going to

18  leave the video, so you don't have the noise.

19      JUDGE GREEN:  Okay.

20      MS. COX:  And be on the call.  Okay.  I'm very sorry.

21  Okay. Paragraph 16.  For cursing, use of profane, harassing, or

22  vulgar language including on and off-duty examples, together

23  with the personnel files for each disciplined employee showing

24  other disciplines for that employee.  So for this, can

25  Respondent tell me what they've produced in response to this



1    paragraph so far?

2        MS. BUFFALANO:  198 to 213.

3        MS. COX:  And those are 32 disciplines for JFK8, correct?

4        MS. BUFFALANO:  Yes.

5        MS. COX:  With personnel files?

6        MS. BUFFALANO:  The -- the personnel files start at 1 --

7    416 and they end at 1307.

8        MS. COX:  Okay.  Have on and off-duty examples been

9    searched?

10       MS. BUFFALANO:  All discipline was searched.  We didn't

11   look -- there was no -- there's no, like, delimitation between

12   on-duty and off-duty in the Amazon's record.  So whatever

13   existed --

14       MS. COX:  Okay.

15       MS. BUFFALANO:  -- it was in the narrative would be where

16   that would be located.  We have not searched specifically for

17   anything like that.

18       MS. COX:  Okay. For EWR4, the chart that you all provided

19   indicates that there's 105 disciplines issued at EWR4, and

20   then, the chart you all provided for BDL3 are 46 disciplines.

21   I just want to reiterate that we don't consider the charts

22   responsive.  These are very few disciplines which is different

23   than paragraph 17 where the chart is 1,500.  But these

24   documents we're requesting the full personnel file and each

25   individual discipline issued at these facilities.



# Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  Yeah.  And you know, maybe there's some

2    discussion we need to have about prioritizing if that's -- you

3    know, if there's something that you want before you want

4    something else because these -- it does take time. Like, when

5    we talk about, you know, the -- the -- actually, when we talk

6    about going into the personnel file and pulling up the

7    discipline and then, clicking into the discipline which are not

8    named by date or anything else.

9        The person doing that indicated that it took her four and

10   half minutes to do each one.  I don't know how long it takes to

11   transfer the personnel file and save it and then, the

12   investigative files are taking a very long time to search as

13   well.  And it's not because there's like a database that it's

14   having a hard time searching.  I think it's because there are

15   various places that these things could be housed.  So it's

16   just -- it's time consuming.

17       So we are on all of these things, and we are working on

18   all of these things.  It's just not, you know, pressing a

19   button and popping it out.  Just so you know.

20   MS. COX:  Can you -- so I know we're talking about these

21   different paragraphs, but can you all identify who's done the

22   search for each paragraph.  So this way we have a better idea

23   of who we can call as a custodian?

24   MS. BUFFALANO:  So sitting here right now, I don't know.

25   And I tell you this has been operating, like, you know, it


www.escribers.net | 800-257-0885

1   typically would where we go to one particular client contact

2   and we say we need this.  And then, they make it happen, right?

3   And so in terms of -- we don't have any contact with anybody

4   who is directly searching.  So the answer to the question is we

5   have to find out, obviously, but we don't know the answer to

6   that question right now.

7       MS. COX:  Okay.  But my question is when you do find out,

8   can you tell me who did the search for each of these paragraphs

9   so that this way we can narrow down who worked -- exactly who

10  we're calling and what they're going to be -- what paragraph

11  each person is going to be talking about?

12      MS. BUFFALANO:  I mean, I think what would make sense is

13  if you told us, you know, we're going to call someone on these

14  particular paragraphs and then we'll graft, you know, find out

15  who that particular person is.

16      MS. COX:  Well, if I have to go through the whole

17  subpoena, I'm going to have to know all of the individuals

18  who -- that conducted these searches, but we can continue to

19  talk about that.  I also want to note that some of these charts

20  that have been provided, there's a redaction in the summary.

21  There are redactions of -- of things that employees have said.

22  And there's also redactions of names of managers.  The -- the

23  redaction -- these don't need to be redacted.  Especially

24  manager names who were involved in discipline.

25

# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  So -- okay.  So yeah, well I -- my

2    understanding from the papers is one of the things that General

3    Counsel was looking into was, you know, how management --

4    whether management -- different managers were involved in the

5    discipline of Bryson versus other individuals who engaged in

6    comparable conduct.  So -- so we would -- it'd be based on

7    that, they would want the names of managers.  Is -- is there

8    some reason why -- why specific managers were redacted?

9    MR. MURPHY:  To -- to be honest, I'm not -- I'm not aware

10   of -- of why or how that happened.  I mean, if -- if Ms. Cox

11   can identify a couple of examples, we can look into it.  And

12   if -- and if there was things that were redacted that shouldn't

13   have been redacted, we'll rectify that.  But right now, I -- I

14   don't have any specific idea of what she's talking about.

15   JUDGE GREEN:  Okay.

16   MS. COX:  I will give you -- I will give you examples.

17   JUDGE GREEN:  You know what, Ms. Cox, why don't you

18   just -- you know, if you're -- you -- why don't you just --

19   you're going to go through the documents and -- and identify

20   those portions that you want unredacted.  It sounds like the

21   Employer didn't do in -- intentionally or at least, they don't

22   understand why -- why it was done.  So they need to just do

23   that and they'll -- send it over to them, and they'll --

24   they'll un-redact it.  I don't -- in other words, I don't know

25   if there's a point of just giving an example -- an example at



Exhibit E, Motion to Try Petition on Hearing Record

1   this particular time.

2       MS. COX:  I'm sorry.  Can you repeat what you just said,

3   Judge?

4       JUDGE GREEN:  I don't know that there's any point in

5   really just going through it to find examples at this

6   particular time.

7       MS. COX:  Right.  No, I'll do that off the record.

8       JUDGE GREEN:  Okay.

9       MS. COX:  Okay.  As far as paragraph 17, during the period

10  covered by the subpoena, documents showing disciplinary actions

11  including discharges, suspensions, written and oral warnings

12  issued to employees at Respondent's JFK8 facility and its

13  regional facility within which JFK8 is located together with

14  the personnel file of each disciplined employee showing other

15  disciplines to that employee.  And we've already gone over

16  this, but Respondent produced a chart that you all have seen

17  with tiny letters.

18       And you know, General Counsel does not accept the chart as

19  responsive.  We're requesting the discipline from JFK8 in

20  addition to the disciplines for EWR4 and in response as well

21  from BDL3.  I think a good starting point for further

22  conversations about -- that paragraph and providing the Excel

23  spreadsheets that have been discussed.  And just the personnel

24  files as opposed to going out and pulling out the individual

25  documents.



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. MURPHY:  Your Honor, it's getting -- and we'll do it,

2    but -- but it's -- it's going to be a massive undertaking, a --

3    a massive undertaking.  So -- because we can't -- we need to

4    review the files obviously before they're produced.  So you

5    know, we're -- and if - if -- and I don't know -- and I don't

6    know all the numbers off the top of my head.

7        All I know is it's 1,593 at JFK8 and -- and -- and you've

8    assumed there's a -- a similar proportion at the other places.

9    So to give those 4,500 is -- is going to take weeks.  Literally

10   weeks, and -- and you know, and -- and as I said, we'll --

11   we'll do it.  But there's -- there's not enough time and -- and

12   May 3rd to do it.  It's -- it's just a simple fact.

13       JUDGE GREEN:  Okay.

14       MS. COX:  Okay.

15       JUDGE GREEN:  I mean, listen, Ms. -- Ms. Cox, you are

16   going to make a strategic decision.  You know, I don't think

17   anybody can make that for you.  You know, you're going to have

18   to make a strategic decision whether you want -- whether you

19   want the Respondent to go through this process.

20       I mean, I -- I, you know, what you said, you know, you

21   can -- you can question the custodian of record regarding it.

22   But if the custodian of records comes back and says what Mr.

23   Murphy has said, you know, I'm not -- you're going to have to

24   decide how you want to proceed.  I mean, the region has to

25   decide a little bit on how they want to proceed.



Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  I understand that, Judge.  And we will -- we

2  will make that determination.  Ms. Buffalano referenced

3  prioritizing these documents earlier.  I think a simple way to

4  keep working at this is with regard to paragraph 16, we've

5  gotten 32 disciplines.

6      It's been a month, you know, we've gotten 32 disciplines

7  with personnel files.  There are 105 at EWR4 and 46 at BDL3.

8  All those disciplines and their personnel files should be

9  produced.  105 and 46 are not anywhere near 1,593 documents.

10  So I -- I just want to say that.  It's -- the -- that's

11  where -- those disciplines should be produced.  I mean, I don't

12  know how long that's going to take, but --

13      MR. MURPHY:  We'll -- we'll -- we'll produce --

14      MS. COX:  -- they should be working on this.

15      MR. MURPHY:  -- if -- if -- if Ms. Cox wants those

16  personnel files for the -- for the paragraph 16 hits at BDL4 --

17  at BDL 3 and DWL -- DWR4, we'll provide those.

18      MS. COX:  Right.  And -- right, but -- okay.  Paragraph

19  18, I have no responsive documents; and paragraph 19, I have no

20  responsive documents.  I'm sorry, paragraph 18 is the

21  investigations conducted in connection with the disciplinary

22  action in paragraph 17, and the identities of those who

23  participated in the investigation, plus the -- and the

24  findings.  And paragraph 19 relate to Mr. Bryson's protected

25  concerted activity from March 1st, 2020 to April 30th, 2020,



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    documents mentioning, or discussing, or pertaining to Charging

2    Party's discussions with employees or discussions with --

3        MR. MURPHY:  No, no.  I don't think you need to read the

4    whole -- I don't think you need to read the whole paragraph

5    into the record.  You know, we -- we --

6        JUDGE GREEN:  Yeah, right.  So -- so where are we on 18

7    and 19?

8        MS. COX:  On 18, we have nothing.  And on 19, we have

9    nothing.

10       JUDGE GREEN:  Okay.

11       MS. BUFFALANO:  So as Chris -- I'm sorry, I'll jump in

12   Chris.  As Chris said, we're going to -- we're going to produce

13   privilege log.  There are documents that will be responsive to

14   18 that are privileged and we're producing documents today

15   that -- as well that are responsive to 18.  And those will be

16   identified when we send them over to you.  Chris you can --

17       MR. MURPHY:  Yeah, and then -- and then we'll turn -- I'm

18   sorry.

19       MS. BUFFALANO:  I -- I'm sorry.  I just said jump -- you

20   can jump in on 19.

21       MR. MURPHY:  Oh, I -- I thought I heard somebody else

22   speaking.  No?  Okay.  So on -- on paragraph 19, we -- we had a

23   discussion about -- about that on Friday night, Judge.  The

24   email that we sent to you, it had an attachment to it, that

25   showed work that we had done.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1        JUDGE GREEN:  Yeah, I think that's what I ended up
 2   printing out.  I think I just ended up printing out that and I
 3   missed the actual email.
 4        MR. MURPHY:  Yeah.  Right.  So -- so that -- that
 5   attachment shows the work that we had done on paragraph 19.  We
 6   discussed what we did and why we did it with the counsel for
 7   the General Counsel.  We indicated -- we indicated that we're
 8   willing to do additional term searches with respect to the
 9   custodians that we currently possess and/or we would consider
10   adding additional custodians if the counsel for the General
11   Counsel wanted to do that.  I -- I think that's where it sits
12   at the moment.
13        MS. COX:  Yes, Your Honor.  I think we'll be adding
14   additional custodians and additional search terms to the
15   already -- the -- the hit list that Respondent has produced.
16        JUDGE GREEN:  Okay.  Okay.  So is that it for now?  That's
17   it for now.
18        MS. COX:  Yes, Judge.
19        JUDGE GREEN:  Well, what we really need to figure out
20   is -- we have the facility in today -- or custodian; when can
21   do that?  You know, really, quite frankly, that's more about me
22   than it is about you.
23        MR. MURPHY:  Judge, it sounds like Ms. Cox wants a
24   custodian for each discrete paragraph.  I mean, is that what
25   we're really going to do?
```



1    JUDGE GREEN:  So honestly, I don't -- it -- it's -- it's

2    hard to know -- it's hard to know what custodians.  I think the

3    GC is going to want them until they get more documents.  Am --

4    am I right about that?

5    MS. COX:  Yes, Judge.  And identification on what has

6    already been produced.  At -- at the start of --

7    JUDGE GREEN:  Right.

8    MS. COX:  -- this call I said, we don't know what they

9    produced from 7 to 15.  So therefore, that should give

10   Respondent an idea of what we'd be asking the custodian about.

11   JUDGE GREEN:  Right.  And just -- just so you know, you

12   know, the more that the -- and trust parties talk.  I know it

13   can be a pain in the ass to have these conversations, but the

14   more that you talk and the more that the parties are satisfied

15   that the documents have been properly searched and produced,

16   the less likely you have to produce any custodian.

17   MS. COX:  Exactly.

18   JUDGE GREEN:  Now, here's the -- the problem is really my

19   schedule.  So realistically, I don't know that I have anything

20   until April 29th, and even that is a little problematic,

21   actually.  The 26th, may -- maybe.  So if we -- if we have to

22   do -- deal with it -- if -- if we have to call the custodian of

23   records, I think we're going to have to try and do on April

24   26th.

25   MS. COX:  That works for me, Judge.



1      JUDGE GREEN:  I -- I'm afraid to ask how it's going with

2  the Charging Party's subpoena.

3      MR. MURPHY:  We're filing a petition to revoke that

4  tomorrow night or you know, sometime tomorrow. You know, I --

5  I -- okay.  I'll keep my cotter dry on that for the moment.

6      JUDGE GREEN:  Okay.

7      MR. MURPHY:  Yeah.  The 26th?

8      JUDGE GREEN:  Yeah.

9      MR. MURPHY:  I mean, let -- let -- I got -- I -- I mean

10  that works for me.  I don't know about Nicole and we'll --

11  we'll certainly -- if we could -- if we could know from the

12  General Counsel, you know, who they want and what paragraphs

13  they -- they -- they want, we can certainly work with that --

14  and -- and we can see what we can do.

15      MS. COX:  Well, if you identify who is the custodian for

16  each paragraph, I'll tell you --

17      MR. MURPHY:  Yeah.

18      MS. COX:  -- which custodian I want.

19      MR. MURPHY:  Well, we already told you we're not going to

20  do that.  We -- we'd -- we'd like it -- we'd like you to let us

21  know which paragraphs you want to examine someone about and

22  we'll produce someone.

23      JUDGE GREEN:  Let me ask you, I mean, does the -- does

24  the -- the Respondent not know who did the searches for each

25  paragraph?  I mean -- I mean how -- how difficult would that be



# Exhibit E, Motion to Try Petition on Hearing Record

1    to find out?  I feel like you should know that.  And I feel

2    like that shouldn't really be too difficult to find out.

3        MR. MURPHY:  Well, I --

4        JUDGE GREEN:  And if you do know that, then really you

5    should produce that to the -- to the General Counsel.

6        MR. MURPHY:  Well, I -- I -- I mean, I'm not -- I'm not

7    sure that -- that we're obligated to identify, you know,

8    custodians if -- if -- we're entitled to appoint a custodian

9    and if -- if the counsel for the General Counsel tells us what

10   they want, what there is they want to inquire about, we'll --

11   we'll provide an -- an appropriate individual.

12       JUDGE GREEN:  Okay.

13       MS. COX:  Well, first of all, Mr. Murphy --

14       MR. MURPHY:  And I'll --

15       MS. COX:  -- I'm going to need documents from you.  I'm

16   also going to need you to identify which documents are

17   responsive to what subpoena paragraph, and I don't understand

18   why you can't just tell us that -- I -- I don't understand why

19   you can't tell us.

20       MR. MURPHY:  Right.  We're -- we're going to -- we're

21   going to provide a key. Right?  We've been over that.  The --

22   with -- with respect to the custodians, you know, it -- it a

23   designate.  We're entitled to designate who that person is.

24   Now, I'm not -- I'm not sure that you are.

25       JUDGE GREEN:  I mean, technically you're probably right



1    about that.

2        MR. MURPHY:  I am technically right.  The custodian -- the

3    custodian of records is -- you know, it's not named.  It's not

4    an identified person and it's somebody that the Respondent gets

5    to pick.  But the subpoena -- the subpoenaed party to gets to

6    pick.

7        JUDGE GREEN:  I'm just saying, I feel like this could be

8    easier.  I don't want --

9        MR. MURPHY:  Let me -- let me -- let me put -- let me put

10   it to you this way, Judge.  How does the identity of the

11   custodian, in advance, help the counsel for the General

12   Counsel?  It -- it doesn't.

13       JUDGE GREEN:  Yeah, well, yeah.  That's probably true.

14   Yeah.  That's probably true, you know, but just try to get on

15   the --

16       MR. MURPHY:  Well, Judge --

17       JUDGE GREEN:  -- try to get on the same page in terms of

18   knowing -- I just -- I don't want to get to the 26th and have

19   the wrong person on the stand.

20       MR. MURPHY:  If counsel for the General Counsel what --

21   what -- what -- what areas they want and what paragraphs they

22   want, we'll have a person that can testify to that.

23       MS. COX:  Judge Green.  Judge Green.  Respondent has

24   represented on this call that multiple people performed

25   multiple searches.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  I understand.  I understand.  But the point

2    is, is that, let's say that we get to the 26th, right?  And you

3    say -- you tell them, I want the -- you know, I -- I want the

4    person who did the -- I want each person to be prepared to

5    testify regarding the search that they did.  Let's just say

6    hypothetically, I really hope it doesn't come to that.  But

7    let's say hypothetically, that happens.

8        Did they -- you know, you say you call custodian of

9    records and the -- for paragraph 1, and they group -- you know,

10   they'd say, okay, that's John Smith (phonetic).  And we go.

11   You know, I mean that -- that is how, this is -- you know this

12   could go.

13       MS. COX:  Okay.

14       JUDGE GREEN:  And -- and I think there's -- it probably

15   won't mean anything to you if they say it's John Smith in

16   advance.  You know, it -- it -- we just have to make sure that

17   they know -- that they know who it is that they need to have

18   available.

19       MS. COX:  Okay, Judge.

20       MR. GASTON:  Your Honor, can I speak for a moment?

21       JUDGE GREEN:  Yes.

22       MR. GASTON:  Perhaps the roles and responsibilities might

23   be more informative than the specific identity.  That's it.

24       JUDGE GREEN:  Yeah.  So that is probably correct.  That --

25   that is probably correct.  That, you know, you have to be on



Exhibit E, Motion to Try Petition on Hearing Record

1    the same page as to the type of person it is who -- well, the

2    person who did it, you know.  But maybe if it's, you know, if

3    there's some technical questions, the type of person who would

4    know.

5         Okay.  So is there anything else we have to deal with?

6    We're -- we're going to -- I'm -- we're going to schedule it

7    for April 26th.  Please reserve April 26th.  You generally know

8    that that's -- that's what we're going to do on -- on that

9    date.  I'm hoping that it's -- it won't be much because the

10   General Counsel will get what they need to get in the interim.

11   And I'll be waiting on the petition to revoke the Charging

12   Party's replacement subpoena.

13        MR. MURPHY:  I -- I do have one personal thing, Your

14   Honor.  I'm -- I'm scheduled to have my second vaccine on --

15        JUDGE GREEN:  Congratulations.

16        MR. MURPHY:  -- Thursday -- yeah, thank you.  On -- On --

17        JUDGE GREEN:  It wasn't particularly fun, I got to tell

18   you.

19        MR. MURPHY:  Yeah, well, so I had the first one a couple

20   of weeks ago.  And I had a sore arm for a week or so, but so

21   I'm supposed to have the second one on May -- Thursday, May

22   6th.

23        JUDGE GREEN:  Okay.

24        MR. MURPHY:  And I'm -- I'm not -- and again, if the type

25   of -- the one I'm having, a number of people have had



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    difficulties with it, including my wife.  So I'm -- I'm

2    doubtful about my availability for the 6th and the 7th.

3        JUDGE GREEN:  Okay.  So listen, does any -- does anybody

4    have a problem -- I'll tell you right now that that's, you

5    know, that's a legitimate reason for -- for postponing a day or

6    two.  You know, I think we have to be prepared to be off

7    those -- those two days, if -- if -- I think we have to be

8    prepared to be off those two days.

9        MR. MURPHY:  Thank you, Judge.

10       JUDGE GREEN:  Anything else?

11       MS. COX:  Judge, I just want to -- I -- I mentioned this

12   briefly on our last call, Judge.  That General Counsel attorney

13   would issue a Counsel Ranjo a subpoena.  And that should be

14   going out and may have gone out today.

15       JUDGE GREEN:  Okay.  Okay.  Fine, so we can go off the

16   record.

17   **(Whereupon, the hearing in the above-entitled matter was**

18   **recessed at 1:36 p.m. until Monday, April 26 at 9:00 a.m.)**

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1          **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 29, Case Number

4    29-CA-261755, Amazon.com Services LLC and Gerald Bryson, An

5    Individual, held at the NATIONAL LABOR RELATIONS BOARD, REGION

6    29, TWO METROTECH CENTER, 5TH FLOOR, Brooklyn, New York 11201,

7    on April 19, 2021, at 12:14 p.m. was held according to the

8    record, and that this is the original, complete, and true and

9    accurate transcript that has been compared to the reporting or

10   recording, accomplished at the hearing, that the exhibit files

11   have been checked for completeness and no exhibits received in

12   evidence or in the rejected exhibit files are missing.

13

14

15

16   _____

17   MICHELLE MORALES

18   Official Reporter

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services LLC,          Case No.   29-CA-261755

      Employer/Respondent,

and

Gerald Bryson,

      An Individual.

_____

_____

Place: Brooklyn, New York (via Zoom videoconference)

Dates: April 26, 2021

Pages: 93 through 232

Volume: 3

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



Exhibit E, Motion to Try Petition on Hearing Record

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

In the Matter of:

AMAZON.COM SERVICES LLC,                        Case No.      29-CA-261755

                Employer/Respondent,

and

GERALD BRYSON,

                 An Individual.

The above-entitled matter came on for hearing via Zoom

Videoconference, pursuant to notice, before **BENJAMIN W. GREEN**,

Administrative Law Judge, at the National Labor Relations

Board, Region 29 Two Metro Tech Center, 5th Floor, Brooklyn,

New York 11201, on **Monday, April 26, 2021, 11:04 a.m.**

Exhibit E, Motion to Try Petition on Hearing Record

1                           A P P E A R A N C E S

2       On behalf of the Charging Party:

3           FRANK KEARL, ESQ.
            MAKE THE ROAD NEW YORK
4           161 Port Richmond Avenue
            Staten Island, NY 10302
5           Tel. (929)265-7692

6       On behalf of the Employer:

7           CHRISTOPHER J. MURPHY, ESQ.
            JENNIFER MOTT WILLIAMS, ESQ.
8           MORGAN, LEWIS & BOCKIUS, LLP
            1701 Market Street
9           Philadelphia, PA 19103-2901
            Tel. (215)963-5601
10
            NICOLE BUFFALANO, ESQ.
11          MORGAN, LEWIS & BOCKIUS LLP
            300 South Grand Avenue, 22nd Floor
12          Los Angeles, CA 90071
            Tel. (213)612-7443
13
            KELCEY J. PHILLIPS, ESQ.
14          MORGAN, LEWIS & BOCKIUS LLP
            1111 Pennsylvania Ave. NW
15          Washington, DC 20004-2541
            Tel. (202)739-5455
16
        On behalf of the General Counsel:
17
            EVAMARIA COX, ESQ.
18          MATTHEW JACKSON, ESQ.
            DAVID GASTON, ESQ.
19          NANCY REIBSTEIN, ESQ.
            NATIONAL LABOR RELATIONS BOARD
20          Two Metrotech Center, 5th Floor
            Brooklyn, NY 11201
21          Tel. (718)765-6172

22

23

24

25



1

<u>I N D E X</u>

2

3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Hillary Volk | 98 | 110 | 112,120 145 | 114,119 | 145 |
| Tyler Grabowski | 149,179 181 | 184,194 | | | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1                     P R O C E E D I N G S

 2           JUDGE GREEN:  Okay.  So this is Benjamin Green, the

 3     administrative law judge in the matter of Amazon.com Services,

 4     LLC, 29-CA-261755.  It's April 25th -- 26th at 11:00.  And

 5     we're back on the record.  And the purpose of today -- there's

 6     a couple of purposes, I suppose.  But the primary purpose is to

 7     allow the General Counsel to call the custodian of records for

 8     subpoena duces tecum B-1-1-B-U-G-M-I-X.

 9           Is there anything we want to do or nee -- I should say,

10     need to do before we get to that?

11           MS. COX:  Not from General Counsel, Your Honor.

12           JUDGE GREEN:  Okay.  And we know who's going to be called?

13           MS. COX:  I'm not certain.

14           JUDGE GREEN:  Okay.

15           MS. WILLIAMS:  Your -- Your Honor, this is Jennifer Mott

16     Williams for the Employer.  Hillary Volk will be called for a

17     portion of this, as well as Tyler, who you -- I do believe

18     you've spoken to both of them thus far.

19           JUDGE GREEN:  I understand.  What's Tyler's last name?

20           MS. WILLIAMS:  Tyler, can you spell your last name for

21     them so that they can get it down correctly?

22           MR. GRABOWSKI:  It's Grabowski, G-R-A-B-O-W-S-K-I.

23           JUDGE GREEN:  Thank you.

24           And Ms. Williams, have -- I don't think we've got your

25     appearance for the record.  So could you just state your
```



Exhibit E, Motion to Try Petition on Hearing Record

1    appearance for the record?

2         MS. WILLIAMS:  Yes, Your Honor.  My name is Jennifer Mott

3    Williams.  I am with Morgan Lewis.  I'm an eData lawyer who is

4    here on behalf of the Employer.

5         JUDGE GREEN:  Okay.  Thank you.

6         So unless we have any -- any -- anything else, I'd like to

7    just start.

8         So Ms. Cox, would you like to -- to call your first

9    witness?  Do we know who the -- do we have -- do we care who

10   the first person is, whether it's Ms. Volk or Mr. Grabowski?

11        MS. COX:  Well, Your Honor, I would like to select whoever

12   conducted the -- the search and collected the documents.  I'm

13   not sure who that person is at this point.

14        MS. WILLIAMS:  Your Honor, I believe it depends upon which

15   request we are speaking about, and so that is why we actually

16   have two witnesses.  So if we are referring to -- I do not know

17   which one Ms. Cox would like to start with.  But if she is

18   wanting to start with 12 and 14, that would be Ms. Volk.  If

19   she is referring to 16 or 17, then that would be Mr. Grabowski.

20   So I'm not sure which way she wanted to start.  But that --

21   that is what these two individuals are here for.  They're here

22   for different -- different pieces of this.

23        JUDGE GREEN:  Okay.

24        MS. COX:  Okay.  I'll start with 12 and 14.

25        JUDGE GREEN:  Okay.  So that's Ms. Volk.



# Exhibit E, Motion to Try Petition on Hearing Record

1    So Ms. Volk, could you raise your right hand?

2    Whereupon,

3                        **HILLARY VOLK**

4    having been duly sworn, was called as a witness herein and was

5    examined and testified as follows:

6        JUDGE GREEN:  Okay.  And are you alone in the room?

7        THE WITNESS:  I am.

8        JUDGE GREEN:  Okay.  And please just don't have any

9    communication with somebody who's not on the call by -- by

10   advice, like a phone.  And also please don't refer to documents

11   that aren't necessarily shown -- that aren't shown to you by

12   counsel.  Okay?  Now, could you state and spell your na -- your

13   full name for the record?

14       THE WITNESS:  Hillary Volk, H-I-L-L-A-R-Y V-O-L-K.

15       JUDGE GREEN:  Thank you.  Okay.  Ms. Cox is going to have

16   some questions for you.

17       Anytime, you're ready, Ms. Cox.

18                    **DIRECT EXAMINATION**

19   Q    BY MS. COX:  Good morning, Ms. Volk.  Thank you for being

20   here with us today.  Can you please tell me your occupation and

21   title?

22   A    Certainly.  I'm a director with the project management

23   group at Consilio.

24   Q    And what is Consilio?

25   A    Consilio is a legal services firm.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And have you been designated by Amazon as custodian of the

2    records for purposes of this hearing?

3    A    I have.

4    Q    Okay, I want to ask you, as part of your duties as

5    custodian of the records, were you asked or directed to search

6    for documents responsive to paragraph 14 of the subpoena?  Do

7    you -- have you seen the subpoena, ma'am?

8    A    I have.

9    Q    I can -- I can show you a copy, just give me one moment,

10   if I can find it myself.  Okay.  Oops, I'm sorry.  Okay.  Are

11   you able to see my screen?

12   A    I am.

13   Q    Okay.  So paragraph 14 is documents including but not

14   limited to memoranda notes memorializing conversations,

15   electronic communications, emails, text messages, internal

16   communications by and between and among Respondent's managers,

17   supervisors, and agents discussing or pertaining to

18   Respondent's deliberations regarding whether to issue

19   discipline (indiscernible, simultaneous speech) --

20        MS. WILLIAMS:  Ms. Cox?

21        MS. COX:  Yes?

22        MS. WILLIAMS:  I apologize for interrupting.  That is not

23   the document we are currently seeing on our side.  All we're

24   seeing is a supportive feedback document.

25        MS. COX:  A what document?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MS. WILLIAMS:  It says supportive feedback document.

 2        MS. COX:  I'm sorry.  Give me one moment.  So let's try

 3   this one more time.

 4   Q    BY MS. COX:  Can you see the subpoena document now?

 5   A    Yes.

 6   Q    Okay.  Respondent's deliberations regarding whether to

 7   issue discipline and, if so, the type of discipline to the

 8   following employees for their conduct on April 6th, a) Gerald

 9   Bryson, b) Dimitra Evans.  Ms. Volk, I'm just going to ask you,

10   as I go through these questions, to speak louder.  I think,

11   because your phone -- you dialed in with your phone, it's a

12   little bit difficult for me to hear you.

13   A    Is that better?

14   Q    Yes, that's better.  So I'm sorry.  Did you say that you

15   did see this subpoena?

16   A    I have, yes.

17   Q    Okay, great.  So I just wanted to get a sense of who

18   directed you to conduct this search.

19        MS. WILLIAMS:  Objection, Your Honor.  To the extent that

20   this goes beyond what is going to be.  If it is just who, that

21   is fine.  But the actual directions that may have come from

22   counsel, we would claim work product and attorney client

23   privilege over the specifics spoken.

24        JUDGE GREEN:  Okay.  So far, the only question we have is

25   who.  So for your answer, just limit it to that and don't offer
```



Exhibit E, Motion to Try Petition on Hearing Record

1    any explanation as to the communication itself.

2    A    That was under direction from counsel.

3    Q    BY MS. COX:  Which counsel?

4    A    It was -- there were a couple of people who had asked.  I

5    can look it up.  Apologies.  I -- we have a number of folks on

6    this project who've given directions from time to time.

7         JUDGE GREEN:  So we have another question?

8         MS. COX:  Sure.

9    Q    BY MS. COX:  I'm not going to ask you to divulge

10   communications, as your counsel directed.  But I want to know

11   what was the -- what were you told was the purpose of the

12   search, generally?

13        MS. WILLIAMS:  Objection, Your Honor.  To the extent that

14   this calls for work product information.

15        JUDGE GREEN:  Right.  So that could be a communication

16   with counsel.

17        But you can ask what -- what -- what's Ms. Volk's

18   understanding of the purpose is without getting into the

19   communication with led -- which led to that understanding.

20   Q    BY MS. COX:  Okay.  Ms. Volk, what was the -- what was

21   your understanding of the purpose of the search?

22   A    I don't think that the objective is generally shared with

23   project managers.  We have directions for what they're

24   searching for.  Typically, that would be, you know, search

25   terms or date ranges or something along those lines.  But the



Exhibit E, Motion to Try Petition on Hearing Record

1    objective itself is generally not something that is -- we're

2    not partners in that part of it.

3    Q    So what were the date ranges that you were told?

4    A    I don't know them -- I don't know them all off the top of

5    my head.  May I -- may I look them up?  I have them on a --

6         JUDGE GREEN:  How did you -- how did you know the date

7    ranges?  Did you get that from the subpoena or did somebody

8    tell you?

9         THE WITNESS:  The date ranges were within the request from

10   counsel.

11        JUDGE GREEN:  Okay.  Thank you.

12   Q    BY MS. COX:  And -- I'm sorry.  Do you have the name of

13   the person who directed you to conduct the search?

14   A    Give me just one second.  I'll -- is it okay -- is it

15   permissible for me to look that at the email?

16        JUDGE GREEN:  Well, Don't -- let's not do that now.

17        THE WITNESS:  Yeah.

18        JUDGE GREEN:  She doesn't know.  That's what her -- that's

19   what her answer was.

20        THE WITNESS:  Yeah.

21   Q    BY MS. COX:  Okay.  What was your understanding about what

22   to do with the documents that came up in your search?

23   A    I created a search term report which I provided to

24   counsel.

25   Q    And for the documents requested in 14 that I read to you



Exhibit E, Motion to Try Petition on Hearing Record

1    earlier, deliberations, can you tell me where these types of

2    documents would be kept and in what form?

3        MS. WILLIAMS:  Objection, Your Honor.  This is beyond what

4    this particular witness is -- this particular witness is here

5    to testify as to what she searched and how she searched.  She

6    is not here to testify as to the information currently being

7    requested.

8        MS. COX:  Your Honor, I'm asking her if she conducted the

9    search, she would know where these documents were kept.  I'm

10   just asking her simply where the documents are kept.

11       JUDGE GREEN:  That is overruled, but -- that is overruled,

12   the objection.  But let's not have it be a compound question,

13   so -- so let's get the first part of that first.

14       MS. COX:  Okay, Judge.

15   Q    BY MS. COX:  These documents in paragraph 14, where are

16   they kept?

17   A    So my portion of this begins when I get the collected

18   documents transferred via FTP or on a drive.  So as to their

19   origination location at Amazon, I do not know.

20   Q    So who gave you FTP documents or drives from Amazon?

21   A    Collections resources that I partner with.

22   Q    Was there a person that gave you drives from Amazon?

23   A    I think this was via FTP and it was Tim Brainerd.

24   Q    So -- so is it your understanding that Tim Brainerd

25   collected the documents responsive to paragraph 14 of the



1    subpoena.

2    A    Yes.

3    Q    So once you received these documents from Mr. Brainerd,

4    can you tell me what the file -- what types of files you

5    received?  I'm sorry if you've already done so.

6    A    These were from email, so from PSTs, from Chime and from

7    laptops.

8    Q    Can you repeat the last one again?  I'm sorry.

9    A    Laptop -- laptop computers.

10   Q    Oh, okay.  Okay.  Did you use any software to conduct

11   these searches?

12   A    We did.  We used a dtSearch index with -- which is within

13   our Relativity tool.

14   Q    What did you do in connection with searching for these

15   documents in ADT?

16   A    ADT?

17   Q    Yeah.  Is that what you just said, ADT search index?

18   A    No.  Pardon me, dtSearch index.  So we use a dtSearch

19   index.  Pardon me.

20   Q    Okay.  I'm sorry.  So --

21   A    No, it's okay.

22   Q    So what did you do in connection with searching, using

23   this dtSearch index?

24   A    So the dtSearch index will take terms if you have defined

25   a document set, so that is where I put the date ranges into the



Exhibit E, Motion to Try Petition on Hearing Record

1    document set.  And then the terms can be run against the

2    document set.

3    Q    Were you given those terms to search in the dtSearch

4    index?

5    A    I was.

6    Q    Who gave you the terms to search in the dtSearch index?

7    A    Temple (phonetic).

8    Q    Do you recall which counsel gave you the terms to search?

9    A    It would have been in the same email that the process

10   started with.  So it would have been the same counsel who we're

11   discussing in the earlier question.

12   Q    Okay.  Do you recall what term you searched or were in

13   those -- that email to search?

14   A    Not specifically, no.

15   Q    Okay.  So from what you've told me, I'm gathering that you

16   did not conduct the original search, correct?  From -- you got

17   documents from Amazon.  They conducted a search.  You received

18   those documents, correct?

19   A    I -- I received the document --

20        MS. WILLIAMS:  Objection.  Mischaracterizing the prior

21   testimony.  But go ahead.

22        MS. COX:  I'm trying to understand, Ms. Williams.

23        JUDGE GREEN:  I mean, it's she -- okay.  So it's

24   overruled, I actually had the same question.

25   A    So I searched the documents that I received.  But I



Exhibit E, Motion to Try Petition on Hearing Record

1    cannot -- I can't tell you how it is that the documents --

2    whether there was previous searching or otherwise, I'm just not

3    aware.

4    Q    Okay.

5         MS. COX:  Your Honor, I'm not sure that Ms. Volk is the

6    custodian that we are looking for.  We're looking for the

7    person who collected the documents at Amazon from the start.

8         JUDGE GREEN:  Okay.  I -- I think she's probably one of

9    the people, but she might not be all of the people.

10        So let me just ask you, Ms. Volk, real quick.  So you

11   received a data set, basically, correct?  And then you -- you

12   did word searches on that data set; am I right about that?.

13        THE WITNESS:  That's correct.

14        JUDGE GREEN:  And off the top of your head, you don't

15   recall which words --- which words you used to search that data

16   set?

17        THE WITNESS:  Off the top of my head, no.

18        JUDGE GREEN:  Okay.  But would that be in a document

19   somewhere or would we have access to that somewhere?  Would

20   you -- more correctly, would you have access to it?

21        THE WITNESS:  Certainly.

22        JUDGE GREEN:  Okay.  So.  Is that something you could

23   access quickly as of now or no?

24        THE WITNESS:  Probably.  Yes.  I have one wrinkle, though.

25        JUDGE GREEN:  Okay.



1       THE WITNESS:  I am not -- I'm not on my VPN.

2       JUDGE GREEN:  Okay.

3       THE WITNESS:  And because my VPN and --

4       JUDGE GREEN:  Okay.

5       THE WITNESS:  -- Zoom don't always work well together, so

6   I would need someone to pull it for me who can get on to it.

7   We are -- we have secure systems.  So I'm not able to pull it

8   when I'm not on VPN.  Does that make sense?

9       JUDGE GREEN:  Yes.

10      MS. COX:  Your --

11      JUDGE GREEN:  Ms. -- Ms. Cox, do want -- do want that

12  or -- I don't want to step on your toes here.  Do you want

13  that, or do you not?

14      MS. COX:  I do, Your Honor.

15      JUDGE GREEN:  Okay.

16      MS. WILLIAMS:  Your -- Your Honor, and -- and to the

17  extent it helps, I believe that shortly before this, because we

18  figured this might be the case, it would be hard for Ms. Volk

19  to remember all these terms, I believe my cocounsel actually

20  forwarded the letter to Ms. Cox --

21      JUDGE GREEN:  Okay.

22      MS. WILLIAMS:  -- and to you that would list the search

23  terms so that that could be something that everyone could refer

24  to.

25      JUDGE GREEN:  Let me -- I just go that.  My internet was



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   down this morning, so I'm --- I'm a little bit behind.  But

2   that's this memorandum summarizing Respondent's response to

3   counsel for the acting General Counsel's subpoena duces tecum;

4   is that the document we're talking about?

5       MS. WILLIAMS:  Yes, Your Honor.

6       JUDGE GREEN:  Okay.  And Ms. Cox, have you had an

7   opportunity to see that memo or no?

8       MS. COX:  Barely, Your Honor.

9       JUDGE GREEN:  Okay.

10      MS. COX:  But I do have a question for Ms. Volk.  I just

11  want to go back one moment.

12  Q   BY MS. COX:  Mr. Brainerd, is he an employee of Amazon

13  or -- is he an employee of Amazon, to your knowledge?

14  A   He is not.  He --

15  Q   Okay.  Go ahead.

16  A   He is a Consilio employee.

17  Q   So the email you're referring to that you got directions

18  from is from counsel at Morgan Lewis right?

19  A   That's correct.

20  Q   Okay.  And -- I'm sorry.  Can you remind me again what Mr.

21  Brainerd's -- he just gave you the files, the FTP or the

22  drives; is that right?

23  A   That's correct.

24  Q   Okay.  Thank you.  Do you know where Mr. Brainerd got

25  those files from -- I'm sorry -- who he got those fires --



Exhibit E, Motion to Try Petition on Hearing Record

1    files from?

2    A    I do not.

3    Q    Okay.

4        JUDGE GREEN:  So do we -- so I think what Ms. Cox is

5    saying is that she really needs to know who collected the data

6    set, which was the subject of the -- of the word search, so she

7    knows that that's the proper data set that was searched.  So do

8    we know who that is?  I'm sorry.  Yeah, this was for Ms.

9    Williams.

10        MS. WILLIAMS:  Your Honor, I believe if I can ask some

11    clarifying questions to Ms. Volk, it may help a little bit.

12        JUDGE GREEN:  Okay.

13        MS. WILLIAMS:  Because I think she might be taking things

14    as to what she personally knows.  But I think she knows a

15    little bit more of this picture that might help with this, if I

16    might ask a few questions.  And I don't want to step on --

17        JUDGE GREEN:  I mean, let me just ask, Ms. Cox, are you

18    done with this?  Is that basically why -- what you wanted to

19    know about 14?

20        MS. COX:  No, Your Honor.  I -- I -- I want the

21    appropriate custodian to be presented, the person who did the

22    initial data search.

23        JUDGE GREEN:  I mean in terms of questions you have for

24    Ms. Volk.  Okay.

25        So Ms. Williams, why don't you go ahead and ask --



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. WILLIAMS:  Sure.

2    JUDGE GREEN:  -- ask some questions?

3                        **CROSS-EXAMINATION**

4    Q    BY MS. WILLIAMS:  So Ms. Volk, I want to ask you a couple

5    of questions.  So Consilio actually had indivi -- does

6    Consilio -- you actually have individuals that sit inside

7    Amazon for purposes of eDiscovery for Amazon?

8    A    We do, we do.

9    Q    And is Tim Brainerd one of those individuals?

10   A    He is.

11   Q    And so if Amazon receives a request for records, is Mr.

12   Brainerd typically -- he -- he has access directly to Amazon

13   email Chime systems?

14   A    That's correct.

15   Q    And so if I send an email to you, while you may not pull

16   it, someone at the Consilio team goes directly into Amazon's

17   systems and pulls records?

18   MS. COX:  Objection, Your Honor.  She's leading.

19   JUDGE GREEN:  Overruled.  I'm going to allow some of this.

20   We're really trying to get some clarity here, and I'm going to

21   allow it.

22   A    That's correct.

23   Q    BY MS. WILLIAMS:  So you personally did not go in and

24   perform the searches --

25   A    I did.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1   Q    Pardon me -- pulled the collection.  But you performed --

 2   A    I did not.

 3   Q    -- the searches -- did you perform the searches?

 4   A    That's exactly right.  I did perform the searches.

 5   Q    And Mr. Brainerd is the one who collects the information

 6   and provides it to you?

 7   A    That's correct.

 8   Q    Did anyone -- to your knowledge, does anyone at Amazon go

 9   in and actually pull the information?

10   A    I don't know.

11   Q    Is that your understanding that Mr. Brainerd is the only

12   one at Consilio that sends the records --

13        MS. COX:  Objection.  Asked and answered?

14        JUDGE GREEN:  (Indiscernible, simultaneous speech).

15   A    Apologies.  I don't -- I don't know what question I'm

16   being asked.

17   Q    BY MS. WILLIAMS:  Oh, I'm so sorry.  Is it your

18   understanding that Mr. Brainerd at Consilio is the only one who

19   pulled the records you were searching for paragraph 14 that

20   we're discussing?

21        MS. COX:  Objection, Your Honor.

22        JUDGE GREEN:  Overruled.

23   A    Yes, that's my understanding.

24        JUDGE GREEN:  Okay.  So I'm not sure that -- that really

25   moves us forward all that much.  Am I right that -- that, Ms.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    Cox, you still want the person who collected that data set?

2         MS. COX:  Yes, Your Honor.

3         JUDGE GREEN:  Okay.  And that would be Ms. -- I mean, it

4    seems as though that would be Mr. Brainerd.

5         MS. COX:  That's what it looks like, Judge.

6         JUDGE GREEN:  That's -- that was the purpose of

7    clarifying.  Where is Mr. Brainerd?  You know, is he somebody

8    we have access to?

9         MS. WILLIAMS:  I am not sure if we have access to him at

10   this very minute.  I'm trying --

11        JUDGE GREEN:  Right.

12        MS. WILLIAMS:  -- to send an email to him and -- and try

13   to reach him.

14        JUDGE GREEN:  Okay.  So why don't you try to start the

15   process of tracking him down?

16        Ms. Cox, do you have any more questions for Ms. Volk or

17   no?

18        MS. COX:  Your Honor, I just want to understand what her

19   part in this.  So my understanding is that she conducted -- she

20   plugged in some search terms into a data set.

21                        **REDIRECT EXAMINATION**

22   Q    BY MS. COX:  Is there anything else, Ms. Volk, that you --

23   that was your part in this -- in this search?

24   A    No.  That's -- that's largely it,

25   Q    And you got those search terms from someone else, from



1    counsel --

2    A    That's correct.

3    Q    -- and you have an email -- okay.

4        JUDGE GREEN:  Okay.  And we -- I'm right that we have a

5    representation from counsel, Mr. Murphy, and the memorandum,

6    which says what those -- we -- at least, it's a representation

7    from counsel as to what those word search -- searches were --

8    what those words were; that's what's in the memo?

9        MR. MURPHY:  That's -- that's correct, Judge.  I would

10   defer to Ms. Williams who actually signed that.  But I

11   transmitted it because I had your email address handy.

12       JUDGE GREEN:  Okay.  All right.

13   Q    BY MS. COX:  Ms. Volk, did you put any charts together for

14   paragraph -- in response to paragraph 14 of the subpoena?

15   A    I did not.  No.

16   Q    Okay, okay.  And let me see --

17       MS. WILLIAMS:  May I --

18       JUDGE GREEN:  What is that?

19       MS. WILLIAMS:  I was going to clarify one thing that --

20   based upon that, because I'm not sure when she said charts, if

21   that would -- if she would include a search term hit report and

22   chart because I believe she testified earlier she -- she

23   prepared that.

24       MS. COX:  No, that wasn't what I was referring to.  Thank

25   you, though.  I do want to show her the subpoena just one more



Exhibit E, Motion to Try Petition on Hearing Record

1   time to see if perhaps showing her the subpoena will refresh

2   her recollection of the search terms that she may have used.

3          Okay.  Can you all see my screen?

4          JUDGE GREEN:  Yes.

5   Q    BY MS. COX:  Okay.  So Ms. Volk, does paragraph 14 refresh

6   your recollection at all of any search terms you may have used?

7   A    It did not.  I'm sorry.

8   Q    Okay.

9          MS. COX:  Okay.  I think that's all I have, Your Honor.

10          JUDGE GREEN:  Okay.  Well, do you have any questions --

11          MS. WILLIAMS:  If I may -- if I may, I was going to show

12   Ms. Volk a copy of what we filed this morning to see if that

13   refreshes her recollection of what search terms she used.

14          JUDGE GREEN:  Okay.  Let me -- let me ask Mr. Kearl first

15   if he has any questions.

16          MR. KEARL:  I do have a couple of questions, Your Honor.

17                    **RECROSS-EXAMINATION**

18   Q    BY MR. KEARL:  Ms. Volk, in a search term -- in the

19   documents that you had available to you, are all of these

20   documents date-stamped within the subset?

21   A    They are, yes.

22   Q    So a Chime message would be date stamped.  Do you know if

23   that date stamp refers to the date of a message being sent or

24   to the date that the data set is pulled from Amazon's files?

25   A    That would be the date of the message being sent --



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And for --

2    A    -- not the date of the collection.

3    Q    Okay.  And so when you're running a search for a series of

4    dates, the date set is -- is targeted to the date of creation

5    of these messages; is that correct?

6    A    That's correct.

7    Q    Okay.  When you -- when you run a search that has the W/2-

8    5, for example.  What does that refer to?

9    A    That's a proximity.  So what that's asking the -- the

10   database to return is, in your example, 2/5, a word.  It's

11   asking for you to return or survey -- the processor to return

12   anything that is within five words of that -- pardon me -- five

13   characters within that target word, whatever's on the other

14   side of it.

15   Q    So it's a character count, not a word count?

16   A    It's a -- it's a word count, apologies.  It's changed.

17   The -- the way that we used to do it is a little different, so

18   yes, it's a word count.  So within five is a word count, so

19   within --

20   Q    Okay.

21   A    -- within a sentence, for example.

22   Q    And so if I were to send -- and do you understand what --

23   can you explain what a Chime message is based on your

24   understanding?

25   A    Yeah.  So a Chime message -- Chime is a communication



1    tool, something along the lines of like a Skype or Teams that

2    has integrated chats, video calling, voice calling, and file

3    sharing.  So a message is a piece of that.

4    Q    Is it fair to say it's similar to a text message that I

5    would get on a phone?

6    A    It can be.

7    Q    Okay.  So if I were to send two subsequent text messages

8    to another person, would the -- how would the fact that there

9    are separate messages interact with the fact that I've got this

10   W/5 or W/25 search term?

11   A    So I'm pausing because the -- the way that we break up

12   Chime messages has changed.  So I may need to provide a couple

13   of different possibilities.  So right now and for the last --

14        MS. WILLIAMS:  And Julie (sic), I would just ask you

15   not -- not to speculate here --

16        THE WITNESS:  Okay.

17        MS. WILLIAMS:  -- what -- what you know.

18        THE WITNESS:  So -- so should I answer, for example, right

19   now, if we were to search a time, what would happen?

20   Q    BY MR. KEARL:  At the time that you performed the search

21   is the time that I would like to know.

22   A    So Chime messages are chopped into 24-hour increments.  So

23   to the extent that that proximity search, that within five, was

24   applicable within both, you know, a two -- two segments of --

25   let's say, a thread went on for a few days.  If it was



Exhibit E, Motion to Try Petition on Hearing Record

1    applicable to multiple days, both of those days' worth of Chime

2    messages would return.  If it was only applicable to one

3    segment, just that segment would come back.

4    Q    Okay.  Help me understand this.  If I send a message --

5    so -- so I'm going to use an example from the memorandum.  So

6    for example, we have a search term here.  And I'm going to

7    simplify.  I'm not going to use all of the or string.  But for

8    example, Bryson w/2-5 protest.  Is what you're saying, if I

9    were to send a message that said Bryson at 11 p.m. on Sunday

10   and then the following day were to send the next message that

11   said protest, would your search turn capture the Bryson w/2-5

12   protest in that instance?

13   A    I don't think so, if protest and Bryson are on different

14   days.

15   Q    Would it capture it if Bryson and protest were in separate

16   messages?  So I send one message that says Bryson and then the

17   subsequent message three minutes later has protest, would those

18   two terms be captured, provided there was not more than 24

19   words between those two terms?

20   A    Yes, they would.

21   Q    Would it capture -- if I were to send Bryson and then

22   three minutes later the person that I was messaging responded

23   with protest and there was not 24 words between those two,

24   would that capture those two terms.

25   A    It would, yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q     Okay.  And is that the same sort of Boolean logic for

2    other types of data within these sets that -- that relate to

3    correspondence or messages between parties?

4    A     I need a clarifying question (indiscernible, simultaneous

5    speech) --

6          MS. WILLIAMS:  Objection.  Vague.

7    Q     BY MR. KEARL:  So for example, two separate email messages

8    between two separate individuals, if -- if one had Bryson and

9    the other had protest in a response, would that be captured, or

10   is it just within a single message when I go outside of the

11   Chime message searches that you're performing?

12   A     So --

13         MS. WILLIAMS:  And I'll object to vague.

14         Are you referring to emails, for example?  I just want

15   to --

16         MR. KEARL:  Yes.

17         JUDGE GREEN:  So I think -- am I -- am I correct that

18   referring to basically everything that's not Chime, so emails,

19   texts, anything that's not Chime, because you're asking whether

20   it was --

21         MR. KEARL:  Yes.

22         JUDGE GREEN:   -- the same way as Chime?

23         MR. KEARL:  Yeah.  Ms. -- Ms. Volk testified earlier to

24   the fact that the data set that she had included things like

25   calls, emails.  She included a broader category beyond just the



Exhibit E, Motion to Try Petition on Hearing Record

1    Chime messages.

2    Q    BY MR. KEARL:  And so I'm curious about if these Boolean

3    terms have similar logic when it comes to other messages beyond

4    Chime.

5    A    It does.  Yes.

6         MR. KEARL:  Okay.  I don't have any other further

7    questions.

8         JUDGE GREEN:  Okay.  So Ms. Williams, do you have any

9    questions for Ms. Volk?

10        MS. WILLIAMS:  Yes, Your Honor.

11                          **RECROSS-EXAMINATION**

12   Q    BY MS. WILLIAMS:  So Ms. Volk, book I am going to see if I

13   can share with you a copy of what we filed today that lists

14   some various things and ask you about that.  And let me know if

15   you see -- do you now see a memorandum -- let me -- that said

16   memorandum summarizing Respondent's response to counsel for the

17   acting General Counsel subpoena duces tecum?

18   A    I do.

19   Q    I am scrolling down so that you can see this -- this lists

20   some information here.  And I'm going to let you -- I'm going

21   to scroll when you tell me to, but let you read that to see if

22   this refreshes your recollection of -- of what you did for

23   purposes of responding to request 14 -- pardon me -- paragraph

24   14.

25   A    Yes, this looks familiar.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    I'm going to keep scrolling so you can keep seeing sort of

2    the rest of this.

3    A    Yes.  This looks -- this does look familiar.

4    Q    And when you were discussing the dtSearch and Boolean

5    search terms earlier, would these be example of those types of

6    Boolean proximity searches?

7    A    They are, yes.

8    Q    And do you have any reason to doubt that these are the

9    searches that you ran?

10   A    I don't, no.

11   Q    Do you have any reason to doubt that this is the time

12   period for which you ran the searches?

13   A    No.  The time period looks accurate, now that I'm -- now

14   that I'm seeing it.

15        MS. WILLIAMS:  I don't have any other questions at this

16   time, Your Honor.

17        JUDGE GREEN:  Okay.  So Ms. Cox, are you done?

18        MS. COX:  No, judge.  I just have a few questions.

19        JUDGE GREEN:  Okay.

20                    **FURTHER REDIRECT EXAMINATION**

21   Q    BY MS. COX:  So I'm sort of still unclear.  So you did not

22   conduct the initial search.  So what was your job -- once you

23   got this data; what was your job?

24   A    So this data was received and was processed through

25   Consilio utilizes a processing tool called Nuix.  Nuix



Exhibit E, Motion to Try Petition on Hearing Record

1    deduplicates and MIME type filters, or it takes out any system

2    files or other files that are not generally user-created

3    content.  And then deduplicates the data so that it's -- you

4    have -- you have a single per-family copy, so that you don't

5    have a glut of records to manage.

6        Once the data is deduplicated, then it is loaded into a

7    Relativity environment.  Relativity is a review tool -- an

8    eDiscovery review tool.  And within that Relativity environment

9    is where the searches are conducted.  And you know, the data is

10   at that point available for review.

11   Q    What do you mean when you say user-created content?

12   A    I'll give you an example.

13   Q    Thank you.

14   A    So if you respond to a -- an email on your telephone from

15   an iPhone, oftentimes, Apple will attach a, I think it's an ICI

16   (phonetic) document or something.  It's a -- it's a funny

17   little, very small document that just sort of comes along with

18   your email message.  So that if someone on the other side was

19   receiving your message on a computer, they would see that you

20   have a little attachment that came along with your email.

21       Generally, I think we -- we see these things so frequently

22   that we disregard them.  But that is an example of nonuser

23   created content.  It would, for all intents and purposes, not

24   be something that would generally be considered to be part of a

25   response for a relevant population.  And so anything that is



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    of, for example, you know, that particular file, a bin file,

2    for example, oftentimes gets passed around or is within a

3    collection of documents that gets called out, because it's --

4    there isn't any content in it that users have created.

5    Q    Okay.  So after the file is loaded into Relativity -- I'm

6    sorry.  Did you load those files into Relativity; is that part

7    of your job?

8    A    It is not.

9    Q    Okay.  So whose job was it to load the files that you

10   deduplicated into Relativity?

11   A    I don't know specifically who would have done it.  It

12   would have been someone on the processing team.

13   Q    Is it fair to say that that was your job, to deduplicate

14   the data that was given to you?

15   A    Yes, yes.

16       MS. WILLIAMS:  Objection, Your Honor.

17   A    Yes.  (Indiscernible simultaneous speech).

18       MS. COX:  What's the objection?

19       MS. WILLIAMS:  I think -- I think that mischaracterizes

20   what she's -- what she said she has done.

21       JUDGE GREEN:  I do, too.  But it's just a question.

22       So you can answer the question.

23   A    No, I do not deduplicate the data.

24   Q    BY MS. COX:  Okay.  So -- so what is your job?  I'm sorry.

25   I'm -- this is -- I'm not asking to be difficult.  I'm asking



Exhibit E, Motion to Try Petition on Hearing Record

1    because I don't speak this language.

2    A    So in -- in this world, a project manager handled the post

3    processed actions that are taken to data and preparing it for

4    review or for further analytics or whatever it happens to be.

5    So our role really begins when the data is received.  But we

6    don't actually have access to the data unless it is processed

7    and deduplicated and loaded into our review tool.

8    Q    Okay.  What do you mean when you say processing?

9    A    Processing is done via Nuix.  So it takes all of the

10   files, it deduplicates them, and it runs MIME type filtering

11   against a common list called a deNIST list.  So it's all files

12   that some agency somewhere has decided for all eDiscovery users

13   is this sort of kept list of files that are generally system

14   files.  And so it runs within this Nuix processing engine.  It

15   deduplicates, it runs a MIME type filter, and it also compares

16   all of the contents against this deNIST list and pulls it all

17   out and suppresses it with the end goal of cleaning the data up

18   as much as possible to make it usable.

19   Q    Okay.  And so what did you do with the documents that you

20   processed for, I'm sorry, lack of a better term?

21   A    What did I do with the documents?

22   Q    Yes.

23   A    Well, once they're loaded into Relativity, then at that

24   point they sit, waiting for further direction.

25   Q    Okay.  Do you recall when you got docu -- the data set



# Exhibit E, Motion to Try Petition on Hearing Record

1   from Mr. Brainerd?

2   A    I do not.

3   Q    Okay.  Do you recall when you put the documents into

4   Relativity or the data set into Relativity?

5   A    I do not.

6   Q    Okay.

7        MS. COX:  Your Honor, can I have a moment just to consult

8   with cocounsel and --

9        JUDGE GREEN:  Off the record.

10  (Off the record at 11:50 a.m.)

11       JUDGE GREEN:  And Ms. Cox, do you have any more questions

12  from Ms. Volk?

13       MS. COX:  Yes, Judge.  I just have a few to -- to end.

14                 **RESUMED FURTHER REDIRECT EXAMINATION**

15  Q    BY MS. COX:  So Ms. Volk, do you recall how many documents

16  you put into Relativity?

17  A    Off the top of my head, no, I don't.

18  Q    Do you recall when you put those documents into

19  Relativity?

20  A    I do not.

21  Q    Ms. Volk, is there anything that would help you refresh

22  your recollection on the number of documents?

23  A    Sure.  I could go -- pardon me.  I could check my records.

24  Q    Okay.  And same for the date, would your records help you

25  refresh your recollection on when you put those documents into



1    Relativity?

2    A    Certainly.

3    Q    You also testified that after you put the documents in

4    Res -- Relativity, that you were awaiting instructions; do you

5    recall when you awaiting those instructions?

6    A    To clarify, do you mean when I received those

7    instructions?

8    Q    No.  What -- yes.  Yes, I do.  I'm sorry.  You're right.

9    A    That's okay.  I -- I did.  It -- March 15th was the

10   initial request for searching.

11   Q    Okay.  And what were the instructions that you got around

12   March 15th?

13        MS. WILLIAMS:  Objection, Your Honor.  To the extent this

14   calls for the work product of counsel.

15        JUDGE GREEN:  Okay.  So --

16   Q    BY MS. COX:  What was your general understanding, Ms.

17   Volk?

18   A    To search records with terms and a date range.

19   Q    Okay.  I guess I'm asking you now, after you put the

20   documents in Relativity, you were awaiting instructions, right?

21   A    That's correct.

22   Q    Okay.  So what were -- do you recall when you were

23   awaiting those instructions?

24   A    Meaning, do I recall at what point -- March 15th, I

25   received the instructions.  At what point I had the documents



Exhibit E, Motion to Try Petition on Hearing Record

 1    and was awaiting the instructions; is that what you mean?

 2    Q    After you put the documents in Relativity, you were

 3    awaiting instructions.  What was the date; do you remember?

 4    A    I don't -- I don't know.

 5    Q    Okay.  Do you recall from whom you got instructions?

 6    A    Yes, I did.  So Lynn Foley Jefferson.

 7    Q    Say again.

 8    A    Lynn Foley Jefferson.

 9    Q    Who is Lynn Foley Jefferson?

10    A    She is a colleague at the law firm.

11    Q    A colleague where?

12    A    She -- she works at the law firm.

13    Q    Morgan Lewis?

14    A    Yes.

15    Q    Okay.  So I want to show you a document.  Do you see my

16    screen.

17    A    I do.

18    Q    Okay.  So this is the -- what is this?

19         MS. WILLIAMS:  Objection, Your Honor, on foundation.  But

20    go ahead.

21         JUDGE GREEN:  Okay.

22    A    It appear -- it appears to be an email.

23    Q    BY MS. COX:  Okay.  Can you tell me what this -- what

24    these -- this -- I'm not even sure what to call this, this file

25    path, what this means after the firm?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    It does have a name.  And apologies.  It's not coming to

2    me at the moment.  But it is essentially a path that connects

3    to where those -- where this particular email came from.  It's

4    kind of -- kind of a reference point.

5    Q    Okay.  And it has an attachment, right; you see that?

6    A    Um-hum.

7    Q    Okay.

8    A    I do.

9    Q    So this is the one document that was responsive to the

10   search for paragraph 14 and the attachment, right?

11        MS. WILLIAMS:  Objection, Your Honor.  I think that

12   mischaracterizes the production made by Amazon.

13        JUDGE GREEN:  I mean, you've answered the question, so you

14   can answer this question.  Just let me ask you.  Is this being

15   used to refresh your recollection or -- is that what it's being

16   used for?

17        MS. COX:  Your Honor, I'm trying to establish that this is

18   the only document responsive to paragraph 14, this email and

19   this attachment that's being hel -- withheld for privilege.

20        JUDGE GREEN:  Okay, do you want to mark it -- do you want

21   to mark it?  You know, if it's just being used to refresh

22   recollection, we don't have to mark it.  But if it's actually

23   going to be used as -- as an exhibit, then we should mark it as

24   an exhibit.

25        MS. COX:  I'm not going to enter it, Judge.  I'm just --



Exhibit E, Motion to Try Petition on Hearing Record

1    I'm just -- I want her to -- to let me know if this is all

2    that's responsive to paragraph 14.

3        JUDGE GREEN:  Okay.

4        MS. WILLIAMS:  And Your Honor, we would object to asking

5    this witness this question.  I don't think that's what she's

6    here to testify to today.  But we'll allow the question to

7    proceed.

8    A    I don't know.

9    Q    BY MS. COX:  Okay.  Let's see if there's anything else.

10   Okay.

11       JUDGE GREEN:  So let me just ask you, Ms. Cox.  You're

12   trying to -- maybe the question is subject to stipulation.

13   You're saying that that's the only document you received in

14   response to paragraph 14 and it was privileged?

15       MS. COX:  Yes, Judge.

16       JUDGE GREEN:  Okay.  And does the Respondent stipulate to

17   that?

18       MS. BUFFALANO:  No.  This is Nicole.  I'm looking --

19   Nicole Buffalano.  I'm looking at the chart that we provided

20   Ms. Cox, and I believe there's another document, 184.

21       MS. COX:  Yes, 184 is the one that's being withheld for

22   privilege.

23       JUDGE GREEN:  So there's the email and then there's the

24   184, which is being withheld for privilege.  So what --

25   basically, the emails were produced, but the attachment wasn't?



# Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  That's my understanding, Judge.

2      JUDGE GREEN:  We all agreed on that?

3      MS. BUFFALANO:  Let me -- let me double-check that.  I

4  don't think that's the case.

5      JUDGE GREEN:  Okay.

6      MS. COX:  Oh, Judge, I also want to ask that the email

7  that Ms. -- that Ms. Volk referred to earlier as containing the

8  instructions that would help her refresh her recollection that

9  it be produced and redacted.  I understand there might be some

10  attorney-client privilege there.  But we're asking it to be

11  produced and redacted so we understand what date Ms. Volk got

12  her instructions to search for these documents.

13      JUDGE GREEN:  Okay.  I think it would be helpful for that

14  document to be produced in the manner that Ms. Cox indicated.

15      MS. BUFFALANO:  And I just want to confirm that we

16  produced 184 on April 12th.

17      JUDGE GREEN:  Okay.  And was that the only -- that

18  document that you just saw on the screen, the email and, I

19  think it was an attachment that was withheld for privilege,

20  that was the only -- that's the Respondent -- that's your

21  understanding that that was the only two documents that were

22  produced in response to paragraph 14 of the subpoena?

23      MS. BUFFALANO:  That's right.

24      JUDGE GREEN:  Okay.

25      MS. BUFFALANO:  And we'll produce -- so obviously, there's



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    privileged documents, a number of privileged documents, and

2    we'll produce the log.

3        JUDGE GREEN:  Okay.

4    Q    BY MS. COX:  So Ms. Volk, you don't recall how many

5    documents in Relativity when you -- when you got the

6    documents -- when you put the documents in?

7    A    I do not.

8        MS. COX:  Okay.  All right.  So any documents that would

9    help refresh your recollection on the number of documents would

10   be helpful for us as well.

11       MS. WILLIAMS:  Your Honor, we would object.  What counsel

12   has actually collected versus what counsel has produced is

13   delving into work product at this point.  So we would object to

14   the extent that they're asking how many documents were

15   collected versus how many were pro --

16       MS. COX:  Judge Green, I -- I -- I respectfully disagree.

17   Those documents, we're not asking for work product.  We're --

18   this is not conducted by attorneys.  What we're asking for is

19   to understand whether Respondent conducted a good faith,

20   reasonable search.  And we believe that the dates and the --

21   the -- whatever the instructions generally were would be --

22   would go directly to answer that question.

23       JUDGE GREEN:  Can the parties just -- is it possible for

24   the parties to just get on board with this and not have this be

25   an issue where we're dealing with it through a witness?  You're



# Exhibit E, Motion to Try Petition on Hearing Record

1  talking about the number of pages in the original data set and

2  the date that it was -- am I right, first of all, that the

3  number of pages in the -- in the total data set, that's what

4  you're looking for?  The set that was searched, that's what you

5  want?

6     MS. COX:  Well, first, I want the person who conducted the

7  initial search, Mr. Brainerd, and then --

8     JUDGE GREEN:  I understand.  I understand.  And it's my

9  understanding that the Respondent is working on making that

10 person available, and that per -- you know, maybe, Mr. Brainerd

11 could testify to how many pages were in the data set that he

12 produced.  But can't we just agree -- can't we just -- is this

13 a national secret?  Do the -- you know, is it going to be

14 difficult for the parties to agree on how many pages that was?

15    MR. KEARL:  It is.

16    MS. WILLIAMS:  Your Honor, I think we can try to work

17 together.  I think so.  We're starting to see that -- we feel

18 like this is becoming a discovery-on-discovery process.  We're

19 not dealing anymore with the merits of the matter.  It's what I

20 typically refer to as discovery on discovery, where I don't

21 know if -- if there's something that they think we haven't

22 searched or haven't done.  I have not seen that.

23    I apologize.  I've just now sort of come on board to this

24 case.  So if there's something that counsel wants to point me

25 to, I'm happy to look into that.  But my concern is that we're



# Exhibit E, Motion to Try Petition on Hearing Record

1    going as far afield from the merits.  And especially, when my

2    understanding is that there's supposed to be a hearing on this

3    case pretty soon.  And trying to do everything that Amazon is

4    being requested to do in a matter of a month is just not

5    feasible, typically, in this type of situation.  So I'm not

6    sure where we go from here.

7         JUDGE GREEN:  Let's just be clear what we're doing here.

8    So what we're trying to determine -- and really, this is --

9    this might be something that the Respondent might want to do as

10   much as the General Counsel want to do, is to establish how the

11   search was conducted, whether it was reasonable, whether it was

12   conducted in good or bad faith.  And so we do -- we do want

13   some basic information about what data was produced when, how

14   much, how long it took.  That is the type of information we're

15   looking for.

16        And okay.  I mean, you know, the number of pages in the

17   original data set, I guess that's -- that's part of that.  I

18   would, you know -- would much rather that information flow

19   freely between the parties.  It's hard for me to understand why

20   that would be particularly difficult to do.

21        MS. BUFFALANO:  So can I just jump in?  I think the

22   problem -- there's two problems here, as far as I can tell.

23   One is that this kind of, like sort of, discovery process that

24   we've gotten into is sort of abnormal in terms of a pre-hearing

25   subpoena document production.

# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Correct.  That is correct.

2    MS. BUFFALANO:  And we are here because I think in large

3    part, you know, we have been trying to answer these questions,

4    but I don't think -- I think the reason why the counsel for the

5    General Counsel wants a witness is because, for whatever

6    reason, I don't think that our answers have been satisfactory,

7    right?

8    JUDGE GREEN:  Okay.

9    MS. BUFFALANO:  So I'm going to come back to you.  I -- I

10   think part of this is just understanding the process.  And I

11   completely understand, Ms. Cox -- I worked for the Board, I've

12   never seen anything like this.  I'm like totally lost in terms

13   of what the discovery process is.  And what Hillary is

14   testifying to today is that process.  And it's something that

15   I'm not familiar with, and we're generally not familiar with

16   here.

17       So I think it's important to understand that when you're

18   looking for ESI, this is the process.  This is a process that

19   every company in the country who deals with a lot of litigation

20   and has a previous lot of documents does.  They go to a

21   e-discovery company who manages that process for them.  So

22   you're going to get another witness on the stand who's going to

23   say, I followed my normal practice, and I pulled chimes, emails

24   and laptops for these five custodians, and we present -- we

25   provided this, you know, in writing earlier today.



# Exhibit E, Motion to Try Petition on Hearing Record

1    And then he sticks it into a database, and then Ms. Volk

2    waits for instruction where she -- she got the instruction from

3    Lynn Foley Jefferson, who, by the way, is a paralegal who

4    manages for Morgan Lewis, is sort of the communicator on the

5    discovery issues.  And so she will then communicate with Ms.

6    Volk and say, here's what you're searching.  Ms. Volk will

7    search that, dumps into a database, and then at that point, we,

8    the counsel, will go through the documents and figure out what

9    is and what isn't responsive to that search.

10   And so that's a -- that is normal.  And I -- I understand

11   that none of us are used to this, but that is what happened.

12   And I'll tell you, we did -- Chris and I did what -- what would

13   normally happen in a case like this, which is to go in our file

14   and go, here are all the documents that we have from the

15   client, like which of these are responsive, and we produce

16   those.  And those were the documents that you came back to us

17   and said these aren't native because you were looking for the

18   ESI, and what we gave you was what we had in our files, which

19   was a PDF.

20   So just -- I just want to make sure everybody is clear on,

21   you know, sort of where we've come from is we try to follow the

22   normal sort of Board pre-hearing subpoena document, responsive

23   process and produce to you everything we had in our files.

24   Understanding you guys also want ESI.  We're doing everything

25   we can to make that happen, too.



# Exhibit E, Motion to Try Petition on Hearing Record

1      But that process is lengthy, right.  So you understand it

2  takes a week to get records from each custodian.  So I know we

3  haven't talked about paragraph 19 yet, but we're still working

4  on that because I think it was last Monday or Tuesday, we got

5  from counsel for General Counsel, five additional custodians,

6  takes a week to get their data, then we run the search terms.

7      Then it gets returned to us and we have to look at the

8  documents.  So I just want to make sure we sort of understands

9  where we're coming from.  In terms of being able to resolve

10  these issues off the record, we would love to do that, but I

11  just feel like what we're met with at every turn is we don't

12  believe you.  We want to talk to a witness.  And so that's why

13  we're here today, you know, dealing with it this way.

14      JUDGE GREEN:  Right.  But that's not -- that's not that

15  uncommon.

16      MS. COX:  Your Honor --

17      JUDGE GREEN:  You know, the one advantage -- in the normal

18  ULP case -- so the attorneys -- there's the production of the

19  subpoenaed records and the attorneys discuss what it is and how

20  it was found and -- and either the General Counsel is satisfied

21  or not, and if the General Counsel's not satisfied, they put on

22  a custodian records and they ask questions about it.

23      It's often not -- it's often not that -- well, that's the

24  process.  That -- that often happens.  And that actually

25  happens while the ULP case is being tried on the merits.  So



# Exhibit E, Motion to Try Petition on Hearing Record

1    you're doing it at the same time.  It's this horrible process

2    of trying the case on the merits and also dealing with the

3    subpoenaed discovery issue.

4         In this case, we've actually created, where none existed,

5    a process for pre-trial discovery and we've given ourselves a

6    month to do it.  I did not expect it to be kind of this

7    granular in terms of disputes.  And there does seem to be a

8    level of suspicion on the part of the Board, the GC, which I

9    guess I'm a little surprised about, but I can't stop them from

10   calling the custodian of records.  Which includes people who

11   do, you know, who do the electronic search.  And so to the --

12   you know, in -- in an attempt to understand how that's done and

13   whether it's done properly, which is where we got -- that's how

14   we got here.

15        MS. BUFFALANO:  And this type of production, Judge, would

16   take, you know, in civil litigation, which is sort of what

17   we've moved ourselves into here which is what we --

18        JUDGE GREEN:  I understand.

19        MS. BUFFALANO:  Months.

20        JUDGE GREEN:  I understand, and I -- that's the world in

21   which we live.  You know, that is the Board.  I'm not, you

22   know -- there's no process for pre-trial discovery.

23        MS. BUFFALANO:  But it's not bad faith.  I mean, I think

24   that's the point that I think needs to be discussed.

25        JUDGE GREEN:  I under -- I understand.



1    MS. BUFFALANO:  It's not bad faith.

2    JUDGE GREEN:  But that -- that that's -- I mean, the

3    General Counsel is basically challenging that, and this is the

4    process that you go through in order to resolve it.  I need

5    this --

6    MS. BUFFALANO:  Yes.

7    JUDGE GREEN:  You know, if it's -- if that's going to be

8    an issue, I need to resolve it on record evidence.

9    MS. COX:  And that's right, Judge, and I think that's why

10   we're here.  We can't accept Respondent's, you know, conclusory

11   assertions of good faith, you know, to establish a --

12   JUDGE GREEN:  Well, I think it's more than conclusory.

13   And -- and I -- I think that you can.  I mean, you can, to the

14   extent you're getting a fairly detailed explanation as to how

15   this works.  I don't think you are forbidden from saying, okay.

16   Having said that, I'm not the GC here, so you can -- you know,

17   you can keep putting on -- on custodians.

18   MS. BUFFALANO:  Your Honor --

19   JUDGE GREEN:  We've got another one in the -- you've got

20   another one in the box.

21   Let me -- let me ask Ms. Volk one question, and it -- it

22   concerns how long it took you to do this -- to your -- your

23   part of the search for paragraph 14.  And I'm not talking about

24   time that you spent waiting for instructions, I'm just talking

25   about the time you actually spent working.  Do you have a -- do

Exhibit E, Motion to Try Petition on Hearing Record

1    you know how long that took to give?

2        THE WITNESS:  Sure.  So I would say it probably took me a

3    couple of hours.  I don't recall whether there was back and

4    forth on behalf of the syntax of the search.  They're

5    oftentimes is.  So you know, when I receive instructions for

6    what to search into this search terms or the, you know, search

7    criteria itself, generally, you know, we'll -- we'll look over

8    it and ensure that everything is in order in terms of the

9    syntax and that the searches will run appropriately.

10       There's often time to come back and forth to try to get to

11   the right terms that they're looking for, if there's some

12   tactical errors or what have you, right.  I don't recall in

13   this situation whether there was much in the way that.  I don't

14   think there was.

15       So generally, it's a, you know, four or five hours, it

16   runs and then their -- their reports are available.

17       JUDGE GREEN:  Okay.  Thank you.

18       MS. BUFFALANO:  Hillary, can I -- can I clarify something,

19   though?  That's just the searching.  Do you know how long it

20   takes to collect the documents, put them into Nuix, process

21   them to then make them searchable, typically?

22       MS. COX:  Objection.

23       MS. BUFFALANO:  Maybe not just even in this instance, but

24   just typically.

25       MS. COX:  There's no foundation.  If they didn't do that



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    work, how would she know?

 2         JUDGE GREEN:  I'm sorry -- I'm sorry, what was -- let

 3    me -- first of all, let me just -- before that.

 4         Ms. Cox, were you done?

 5         MS. COX:  Judge Green, my regional attorney, has been

 6    trying to interject, so GC is not done yet.

 7         JUDGE GREEN:  Okay.  So Ms. Reibstein is making an

 8    appearance in the case?

 9         MS. REIBSTEIN:  Yes, Your Honor.

10         JUDGE GREEN:  Okay.  Okay.  So this is Nancy Reibstein,

11    regional attorney, Region 29, correct?

12         MS. REIBSTEIN:  Correct.

13         JUDGE GREEN:  Making an appearance.  Okay.  So what would

14    you -- what -- what would you like to interject?

15         MS. REIBSTEIN:  Yeah, I just wanted to clarify.  You know,

16    I think we all knew before coming here today that General

17    Counsel wanted to question a custodian of the records who could

18    provide some factual basis, as -- as you mentioned, so that we

19    could assure ourselves, like how the search was done, what

20    search terms.

21         It's surprising to me that Respondent produced a witness

22    who didn't even do the initial search, knowing what the purpose

23    of the - the proceeding was today.  That would have been, you

24    know, productive, and -- and I think obvious as to what -- what

25    we wanted.  So any kind of, like, confusion and -- and -- and,
```

Exhibit E, Motion to Try Petition on Hearing Record

1    you know, could -- could have been avoided.

2         And you know, in terms of, you know, whether we think

3    there's bad faith or not, you know, it's like trust -- trust,

4    but verify.

5         With respect to the paragraph that we were just looking

6    at, we received one document.  That one document that had no

7    information on it.  This was a paragraph about Respondent's

8    deliberations and its determinations whether or not to

9    discipline people, and how -- and what sort of discipline to

10   meet up.

11        It's not intuitive, it's not inherently believable that

12   there was one document that doesn't say anything.  So

13   therefore, we wanted to question the witness who did the

14   search.  I -- I think that's, you know, eminently reasonable.

15        The other thing is -- the other thing that I'm concerned

16   about is that it seems to me that Respondent has unilaterally,

17   on its own, determined that -- that documents were -- you know,

18   withheld documents based on some privilege.

19        They decided what was privileged.  I don't know what

20   privilege, and they did not just turn over documents to us.

21   And they don't get to unilaterally decide what's privileged or

22   what kind of privilege a document might fall under and not turn

23   it over to us.  And they have --

24        JUDGE GREEN:  Okay.  But they have to produce a privilege

25   log.



Exhibit E, Motion to Try Petition on Hearing Record

1      MS. REIBSTEIN:  But they have not, Your Honor.  The

2  subpoena was served --

3      JUDGE GREEN:  Okay.  I understand.

4      MS. REIBSTEIN:  The subpoena was served on March 1st.

5  They have not, as of this date, the 26th of April, produced a

6  privilege log.  And there is ample Board law that holds that

7  they have waived any claim to privilege by failing to timely

8  produce a privilege log.

9      That -- that -- that ship has sailed.  There's -- there's

10  a lot of Board law holding that by not -- they've had months,

11  and withholding these documents, unilaterally deciding on their

12  own, it -- it's -- it's not believable that there was one

13  document responsive to this paragraph about their deliberations

14  to terminate -- to terminate Mr. Bryson and how they discipline

15  Ms. Evans.  And they -- they've waived any claim to privilege

16  at this point.

17      JUDGE GREEN:  Okay.  So -- so --

18      MS. WILLIAMS:  Your Honor, if I may respond?

19      JUDGE GREEN:  So yes, you -- you can, but here's the

20  thing -- I'm going to allow you to respond.  But what I really

21  want to do today, what I real -- there's -- there's time for

22  arguments about that.  And that's argument.  What I really want

23  to do today is get on and off the record with -- and -- and

24  have whatever custodians we need to testify, testify.

25      I want to create a record, to the extent we need it, which



Exhibit E, Motion to Try Petition on Hearing Record

1    will allow me to determine whether there has been a -- a proper

2    compliance with the subpoena.  And I'm going to allow you to do

3    it.  But please, let's keep this to a minimum for now so we

4    can -- we can build the record, the factual record.  Okay.  So

5    with that said, would Respondent like to replay?

6         MS. WILLIAMS:  Yes, Your Honor.  I will keep this brief.

7    First of all, when we refer to the initial search, I think

8    there may be some confusion between the parties as to that.

9    And the reason I say that is, when we refer to search and the

10   e-discovery context, we are referring to the DT searching, the

11   actual application of search terms, which is what Ms. Volk did

12   and why she is here.

13        Typically, when we're talking about what Mr. Brainerd did,

14   that is what we typically refer to as collection and in the

15   e-discovery process that we do a parallel.  And so I think

16   there may be some confusion there; the identification

17   collection, as opposed to the actual search.

18        So that is why Ms. Volk is here testifying on search

19   because she is the one who actually ran the searches.  And I'm

20   happy to discuss with her how this typically worked.  But if

21   that is not going to be helpful, we -- we can -- we'll go to

22   that line of questioning, Your Honor.

23        MR. KEARL:  Your Honor --

24        MS. WILLIAMS:  As far as -- as far as unilateral

25   withholding, I would tend to disagree with that.  I think



# Exhibit E, Motion to Try Petition on Hearing Record

1    that's what happens all the time.  Parties are allowed to

2    unilaterally withhold something if it is privileged, whether it

3    is work product or attorney-client.  There is a privilege log

4    that is being prepared.  I believe that my -- my colleague,

5    Nicole, mentioned that earlier, that that was forthcoming to

6    the Government.

7        But I think the idea that this is going to be an

8    instantaneous thing is part of the issue here, because it is

9    not something instantaneous or dealing with the kind of records

10   and the kind of volume that we're dealing with here being

11   requested and with how much information that there can be as

12   far as requests like this.  And so I -- I will leave it at that

13   because I believe both counsel wanted to speak.

14       MS. REIBSTEIN:  Okay.  But you know, the subpoena was

15   issued to --

16       JUDGE GREEN:  So let me just -- let me just stop you.  Let

17   me just stop you.  Just -- first of all, it is correct that --

18   that -- that the subpoenaed party gets to unilaterally decide

19   which documents privileged; that is true.  And they -- they're

20   required to put it into a privilege log.  And there is a legal

21   procedure for dealing with privilege logs.

22       Part of the problem may be that this -- this whole

23   concept, which is we've done this and it's not common, as Ms.

24   Buffalano mentioned.  The idea that we were going to go on the

25   record and trigger the production of documents on a rolling

# Exhibit E, Motion to Try Petition on Hearing Record

1  basis was perhaps ill defined by me, including the -- including

2  the -- the time deadlines for the production of -- of privilege

3  log.

4      You know, I think what we discussed, what I had in mind,

5  and I think I've mentioned this on the record, was that the,

6  you know, the Employer, on a weekly basis, would produce those

7  subpoenaed documents, which it had found that week and with it

8  a privilege log.  That's what I had -- I had in mind.  I don't

9  think that that's what actually happened, and I'm not sure I

10  articulated it as well as I could have in giving the party's

11  guidance in how this should proceed.

12      But, that -- that -- so here's where we are, having said

13  that, I'd like to move on to any additional testimony

14  regarding -- from -- from the custodian, over custodians of

15  records that we -- we need.  And let's knock that out, and if

16  we need to have additional argument on what the legal

17  consequences of that are, we could do it after.  So with that,

18  I actually interrupted people.

19      Ms. Cox, I think was done with her questioning of Ms.

20  Volk.

21      Does Mr. Kearl have any questions from Ms. Volk?

22      MR. KEARL:  Not at this time, Your Honor.

23      JUDGE GREEN:  Okay.

24      Does the Respondent have any additional questions for Ms.

25  Volk?



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. WILLIAMS:  (Audio interference) --

2                    **RECROSS-EXAMINATION**

3    Q    BY MS. WILLIAMS:  Ms. Volk, I just wanted to clarify a

4    couple of things that I think testified about earlier.  I know

5    you mentioned that information is processed in Nuix.  Do search

6    terms typically get run before information is processed in

7    Nuix?

8    A    No, not typically.

9    Q    How long have you been in the e-discovery industry doing

10   this for clients?

11   A    Ten years.

12   Q    And is Amazon the only client that you do this for?

13   A    No.

14   Q    And was there anything about this process, based upon your

15   experience, that seemed abnormal or unusual as far as the

16   processing and searching?

17   A    No.  This is completely typical.

18   MS. WILLIAMS:  Thank you, Your Honor.  We have no other

19   questions of the witness.

20   JUDGE GREEN:  Okay.  And would -- Okay.  So Ms. Cox, what

21   would you like to do now?

22   MS. COX:  I just, I'm not sure that Ms. Volk answered my

23   questions earlier; that seemed to be that there was some

24   confusion.

25                  **FURTHER REDIRECT EXAMINATION**



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MS. COX:  So I just want to just make clear that I was

2    asking when she got her initial instructions to conduct the

3    search.

4    A    March 15th.

5    Q    Okay.  When did you put the documents in relativity?

6    A    I do not recall.

7    Q    How many documents did you put in relativity?

8    A    I don't recall off the top of my head.

9    Q    And is there a document that would help refresh your

10   recollection?

11   A    Certainly.

12   Q    What is that document?

13        JUDGE GREEN:  Hold on.  It's not whether it would refresh

14   the recollection, it's just whether there's a document which

15   shows that.

16   Q    BY MS. COX:  Okay.  What is the document?

17   A    Probably a processing export summary.

18        JUDGE GREEN:  Okay.

19   Q    BY MS. COX:  You have it handy?

20   A    I don't.  I can't pull it without being on my GPS.

21        JUDGE GREEN:  Okay.  So I'd -- I'd ask the Respondent to

22   produce that document to the extent, you know, any redacted,

23   that's fine, but produce that document to the General Counsel.

24        MS. COX:  And --

25        MS. WILLIAMS:  Your Honor, would -- would counsel be able,



Exhibit E, Motion to Try Petition on Hearing Record

1    or would -- would the Government accept a stipulation as to the

2    number of documents, rather than producing the full processing

3    log?

4    Q    BY MS. COX:  How long is the processing log?

5    A    It is -- it's a pretty detailed log about everything that

6    was processed, probably two, three pages.  I'm -- I'm not sure

7    off the top of my head.

8    Q    We would like the --

9    A    It can be quite -- it could be quite lengthy.

10   MS. COX:  All right.

11   JUDGE GREEN:  Well, let me ask that --

12   MS. COX:  To the incentive, it is not long.  We would like

13   the document produced.

14   JUDGE GREEN:  Okay.

15   MS. WILLIAMS:  And Your Honor, we'd object to the extent

16   we may request the ability to redact that document.

17   JUDGE GREEN:  You do.  You have it.  Yes, you have.

18   MS. COX:  I'm sorry, I don't understand.

19   JUDGE GREEN:  It's going to be redacted to the extent

20   necessary.

21   MS. COX:  Okay.  And the same with the email to Ms. Volk,

22   with the instructions to commence the search.

23   Q    BY MS. COX:  Okay.  Ms. Volk, so when did you get your

24   second instructions after the documents were out of relativity;

25   do you recall?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    The second instruction was March 18th.

2    Q    Okay.  And how did you receive that instruction?  Was it

3    by email?  Do you know?

4         MS. COX:  Judge, we'd like that email produced as well,

5    redacted to the extent necessary.

6         JUDGE GREEN:  Okay.  So please produce that as well.

7         MS. COX:  And I believe those are the extent of our

8    questions, Judge.

9         JUDGE GREEN:  Okay.  Thank you very much, Ms. Volt.

10   We're -- you're -- you're free to go.

11        Let's go off the record.

12   (Off the record at 12:48 p.m.)

13        JUDGE GREEN:  And Mr. Grabowski, can you hear me?  Can

14   you -- can you start your video feed?  There you are.  There

15   you are.

16        Okay.  So Ms. Cox, you're calling Mr. -- Mr. Grabowski.

17        Mr. Grabowski -- we're back -- back -- are we back on the

18   record?

19        THE COURT REPORTER:  Yes, we are.

20        JUDGE GREEN:  Okay.  So raise your right hand.

21   Whereupon,

22                           **TYLER GRABOWSKI**

23   having been duly sworn, was called as a witness herein and was

24   examined and testified, telephonically as follows:

25        JUDGE GREEN:  Okay.  Thank you.  And are you alone in the



Exhibit E, Motion to Try Petition on Hearing Record

1    room?

2        THE WITNESS:  Yes.

3        JUDGE GREEN:  Okay.  So please don't communicate with

4    anybody during your testimony by some other device.  And please

5    don't refer to documents that are not shown to you on the

6    screen by counsel, okay?

7        THE WITNESS:  Okay.

8        JUDGE GREEN:  And please state and spell your name for the

9    record.

10       THE WITNESS:  Tyler Grabowski, T-Y-L-E-R

11   G-R-A-B-O-W-S-K-I.

12       JUDGE GREEN:  Okay.  Thank you.  And Ms. Cox is going to

13   have some questions for you.

14       Any time you're ready, Ms. Cox.

15                          **DIRECT EXAMINATION**

16   Q    BY MS. COX:  Good afternoon, Mr. Grabowski.  Thank you for

17   being here today.  Can you please tell us what your occupation

18   is and your title?

19   A    I am a senior human resource business partner at Amazon.

20   Q    And you have been designated by Amazon as custodian of the

21   records for purposes of this hearing, correct?

22   A    Yes.

23   Q    Okay.  And you collected documents responsive to paragraph

24   16 of the subpoena?  Let me show it to you, I'm sorry.  Give me

25   one moment.



1  A    I have it.

2  Q    Okay.  So they do collect documents, responsive to

3  paragraph 16 of the subpoena?

4  A    Yes.

5  Q    Okay.  Who directed you to -- to search for those

6  documents, the disciplines?

7  A    A member of the Amazon legal team.

8  Q    Do you recall the name of the person that requested you to

9  search?

10  A    Yes.

11  Q    What's the name of that person?

12  A    Kristin LaRosa.

13  Q    Do you recall when you were directed to conduct the

14  search?

15  A    It was sometime in the past month.

16  Q    Meaning April 20 -- I'm sorry, April 2021?

17  A    Late March or early April 2021.

18  Q    I'm sorry, you may have said this earlier, but did you

19  collect documents or any other paragraphs responsive to the

20  subpoena?

21  A    So let me take a look at it real quick.  The only sections

22  I've looked at previously were 16 and 17.

23  Q    Okay.  Is that what you're looking at right now is the

24  subpoena?

25  A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And without disclosing any confidentiality, can you

2    tell me what you were told was the purpose of the search?

3    A    I don't remember.

4    Q    What were you told to search for?

5    A    Feedback records from a designated time frame.

6    Q    What do you mean by feedback records?

7    A    So feedback would be any type of documented conversation

8    between a leadership team and an hourly employee.

9    Q    And do you recall when -- on what date you began to search

10   for these documents?

11   A    The -- the same time frame; I think it was late March

12   early -- sometime in the past month, late March, April 2021.

13   Q    Okay.  So Mr. Grabowski, I'm going to ask you moving

14   forward, just to look at whatever documents I put on my screen

15   and --

16   A    Uh-huh.

17   Q    -- if I need you to -- so this way you don't -- I can -- I

18   can see you while you're testifying.  Thank you.  Okay.  So

19   these documents, paragraphs 16, requesting disciplines, where

20   are they normally kept?

21   A    In Adapt.

22   Q    Okay.  What is Adapt.

23   A    An Amazon system for documenting and tracking feedback.

24   Q    And is Adapt an electronic system?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And can you tell me, is that the only system that Amazon

2    uses to maintain discipline?

3    A    The documentation, like of the actual feedback, yes.

4    Q    When you say "feedback", are you referring to disciplines?

5    A    Yes.  So the reason I say "feedback" is there is both

6    positive and constructive that are both documented in Adapt.

7    Q    Okay.  Disciplines that are not positive or constructed,

8    are they -- or feedback, are they maintain in a different

9    location?

10   A    No.

11   Q    Okay.  So are you saying that all disciplines are

12   maintained and Adapt?

13   A    For hourly employees, yes.

14   Q    Okay.  Now, can you tell me, what facilities you -- you

15   conducted a search for in response to paragraph 16?

16   A    EWR4, JFK8, and BDL3

17   Q    And do you recall what date you began searching for JFK8

18   disciplines?

19   A    Late March and April of 2021.

20   Q    What about for EWR4?

21   A    That one was more recent.  So sometime in April of 2021.

22   Q    What about BDL3?

23   A    Same as EWR4, April 2021.

24   Q    Give me one second.

25        MS. COX:  Judge, can I go off the record for a moment?



1    JUDGE GREEN:  Off the record.

2    (Off the record at 12:58 p.m.)

3                    **RESUMED DIRECT EXAMINATION**

4    Q    BY MS. COX:  I'm sorry.  So you were saying that you

5    more -- more recently began searching for EWR4?

6    A    Yes, that would be in April of 2021.

7    Q    Okay.  Did you use any software to conduct the searches

8    for paragraph 16?

9    A    Adapt.

10   Q    Is Adapt the system that you searched or is it the system

11   that you used to search?

12   A    Adapt has its own reporting built into the website.

13   Q    Can you explain how that works?

14   A    So on the main page, there's a -- an option to click

15   reporting on the top.  When you click reporting, it'll bring up

16   a page that has every single time -- it's like a baseline

17   example.  It says -- in the search bar, it says warehouse and

18   then has semicolon and it defaults to this building in Phoenix.

19   I believe that's where the program started but you can then

20   change it to any type of site or multiple sites by putting a

21   comma in between the location.  And then you can select a time

22   frame.  So it either has relative time frames where you can put

23   last day, the last month, last three months, last quarter, last

24   year.  Or you can choose absolute and choose a start and end

25   date.  And then when you click the search bar, it essentially



Exhibit E, Motion to Try Petition on Hearing Record                                154

1    brings up a table in the web browser that outlines all of the

2    information in the format that was provided with an option to

3    export it to Excel.

4    Q    Okay.  Now, when you say "website", can you tell me what

5    website you're referring to?

6    A    Adapt.

7    Q    So Adapt is a website and a search tool as well?

8    A    So Adapt is a website where employees have their -- their

9    profiles where any type of disciplinary is documented and in

10   that website is a reporting function.

11   Q    Okay.  So are the disciplines sortable by date range?

12   A    If you export it to Excel, you can filter it and sort it

13   by date.

14   Q    So prior to being exported, can you -- I -- I believe you

15   testified that you can select a time period.  Is that right?

16   A    Oh.  Yes, that is correct.

17   Q    So can you limit the Adapt searches for a one-year period?

18   A    You can select the specific dates, yes.

19   Q    Okay.  But it covers one year?

20   A    Yes.  Or greater --

21   Q    Okay.  I'm sorry.  Say again?

22   A    Or greater or less.  It's --

23   Q    Okay.

24   A    -- really, whatever.

25   Q    Okay.  Is the discipline sortable by type or searchable by



# Exhibit E, Motion to Try Petition on Hearing Record

1       type of discipline?

2       A    That I'm not sure.

3       Q    Okay.  I can give you example.  For example, behavioral

4       discipline -- like, search only behavioral disciplines versus

5       search only safety disciplines, search only time off past

6       disciplines.  Is that possible, to choose the type of

7       disciplines?

8       A    I have not searched for that, so I'm not sure.

9       Q    Okay.  Can filters be combined to target disciplines by,

10      for example, date, type of facility, and other -- other

11      filters?

12      A    I know that once it's in Excel form, I've filtered it like

13      that before.  But prior to exporting to Excel, I'm not sure.

14      Q    Okay.  Did you use search terms for paragraph 16?

15      A    Paragraph 16 is the same one that we've been talking

16      about?

17      Q    Yeah.  Do you need me to show the document?  I can -- give

18      me one moment and I'll pull it up for you.

19      A    Thank you.

20      Q    Of course.  Okay.  Can you see my screen?

21      A    Yes.

22      Q    Okay.  So I'm talking about paragraph 16.  So just take a

23      minute, read it, let me know when you're done.

24      A    That's good.  I can read it.

25      Q    So did you use search terms for paragraph 16?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Just the warehouse location.

2    Q    Okay.  Do you recall whether you searched for off- and on-

3    duty examples?

4    A    What do you mean by that?

5    Q    So paragraph 16 is asking for disciplines, including on

6    and off-duty examples.

7    A    Uh-huh.

8    Q    And I'm asking if that was part of your search.  You see

9    here?  It says including on and off-duty examples.

10   A    Uh-huh.  The search was conducted for all feedback during

11   its designated time frame for that location.

12   Q    Okay.  Do you recall what the time frame was?

13   A    I believe it was May 1st, 2019 through April 30th, 2020.

14   Q    Okay.  So other than Adapt, is there any other place where

15   employee discipline would be maintained?

16   A    Not for feedback records or conversations.

17   Q    Are there any other management systems that you searched

18   ris -- for paragraph 16 -- document management systems?

19   A    Yes.

20   Q    What were the other systems that you searched?

21   A    Exact.

22   Q    Did you search anything else?

23   A    OnBase.

24   Q    Say again?

25   A    OnBase.



# Exhibit E, Motion to Try Petition on Hearing Record

1   Q    OnBase?

2   A    Yes.

3   Q    Okay.  What is Exact?

4   A    An investigation tracking system.  Another website that

5   Amazon uses.

6   Q    It's an investigation tracking system?

7   A    Yes.

8   Q    And what is OnBase?

9   A    It's a system for employee personnel files.

10  Q    Do you recall when you conducted the search on Exact for

11  paragraph 16?

12  A    In the last month.

13  Q    And do your recall when you conducted the search for

14  OnBase for paragraph 16?

15  A    I'm sorry.  Can you please repeat the question?

16  Q    Yeah.  I was asking if you recalled when you conducted the

17  search on the base (sic) system for paragraph 16?

18  A    OnBase?

19  Q    Yeah.  OnBase.

20  A    Okay.  Yeah, it was the same time frame.  In the past

21  month.

22  Q    Can you spell OnBase for me?

23  A    It's one word and it's O-N-B-A-S-E.

24  Q    Okay.  Thank you.  So I want to talk about OnBase a little

25  bit.  Are personnel files stored on OnBase?



# Exhibit E, Motion to Try Petition on Hearing Record

1  A    Yes.

2  Q    Okay.  Are dis -- employee disciplinary records -- can

3  they also be found on OnBase -- in OnBase?

4  A    No.

5  Q    Okay.  Can you explain to me how a search on -- on OnBase

6  works?

7  A    So you can go into the system and search an employee ID

8  and either select all employee type -- or like, employment file

9  types or narrow it down based on a specific category and then

10  press search.

11  Q    What are those categories that you can narrow by?

12  A    I wouldn't be able to accurately say all of them.  There

13  is a good number of them.

14  Q    Can you give me examples of some?

15  A    It would be any type of document that an employee signs or

16  acknowledges.  So like, different policies or different things

17  that they're onboarded with, investigative notes, witness

18  statements, drug and alcohol acknowledgement form, termination

19  letters.  Really anything that is a document that the employee

20  would need to sign, acknowledge -- anything regarding their

21  employment or anything that the site would upload.

22  Q    Do employees sign and acknowledge disciplines?

23  A    They have the ability to digitally acknowledge it.

24  Q    And if -- okay.  And if an employee digitally acknowledges

25  a discipline, does it go into OnBase in the personnel file?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    Okay.  Can personnel files be sorted by date range in

3    OnBase?

4    A    Within the employee's individual file, yes.

5    Q    What about personnel files generally?

6    A    In OnBase?

7    Q    Yeah.

8    A    So OnBase, you would need to pull individual employees by

9    using their employee ID.

10   Q    Where do you get the employee IDs from?

11   A    It -- it honestly depends.  I mean, there's multiple

12   systems that have employee IDs.

13   Q    So when you conducted the search for paragraph 16, where

14   did you get employee IDs from?

15   A    The Excel spreadsheet that came from Adapt.

16   Q    Okay.  Can you explain to me whether you created search

17   terms for paragraph 16?

18   A    No.

19   Q    So you did not create search terms?

20   A    I searched for warehouse IDs for a certain time frame but

21   that was it.

22   Q    Okay.  So I want to talk a little bit about the -- so

23   are -- I just want to make sure I'm understanding this.  So you

24   searched for all disciplines within a time frame and exported

25   it into an Excel spreadsheet.  Is that what you're saying?



1   A    Correct.

2   Q    Okay.  And then for specific disciplines, were you

3   involved in searching for specific type of disciplines?  For

4   certain types on conduct, is what I'm asking.

5   A    Certain types or like, specific individuals?

6   Q    Spec -- specific types of conduct.  Did you search for,

7   for example, fighting?  Were you involved in searching for

8   specific type of discipline?

9   A    (No audible response).

10   Q    Okay.

11   A    I pulled the feedback history for a specific time frame

12   for those three buildings into an Excel sheet.

13   Q    Okay.  Okay.  So I do want to show you a document, just to

14   get some understanding about a -- a little more about Adapt.

15   So let me just show you -- give me a moment, I'm sorry.  Okay.

16   Can you see my screen?

17   A    Yes.

18   Q    Okay.  This is a -- tell me what this is.

19   A    A feedback document.

20   Q    Okay.  So it's a one-page document, right?  So can you

21   explain --

22        JUDGE GREEN:  Can you see the screen now that you had to

23   put it at greater than arms' length so they could see there was

24   nothing in front of you?  Can -- can you pull it back so you

25   can read?



Exhibit E, Motion to Try Petition on Hearing Record

1          THE WITNESS:  Can I move my computer closer?

2          JUDGE GREEN:  Yeah, if it'd be easier for you.  If that's

3     okay with --

4          MS. COX:  I'll zoom --

5          JUDGE GREEN:  Ms. Cox.

6          MS. COX:  I'll zoom in for him so he can see it.

7          THE WITNESS:  Thank you.

8          MS. COX:  There you go.  Can you see now?

9          THE WITNESS:  Yes.

10         MS. COX:  All right.

11    Q    BY MS. COX:  So can you tell me what this -- what this

12    file path means?

13    A    It's a URL that likely would bring you to this feedback

14    document.

15    Q    Okay.  Are these folders within Adapt?

16    A    I don't know.

17    Q    Okay.  Give me one second.  Sorry.  All right.  So I have

18    another document I want to show you.  Okay.  Sorry.  I'm not

19    very good at this.  All right.  Can you see my screen?

20    A    Yes.

21    Q    Okay.  So this is some documents that were produced in

22    response to paragraph 16.  Okay.  Can you see it?

23    A    No.  Now I can.

24    Q    Better?  Okay.  So let me just start by asking you, when

25    you pulled these documents, did it have these -- these black



1    boxes on it?

2    A    I didn't pull these documents.

3    Q    Okay.  Are you familiar with -- with these barcodes at the

4    bottom of these documents?

5    A    No.

6    Q    Okay.  Do you know what these barcodes are used for?

7    A    No.

8    Q    Okay.  Do you know what this file path means?

9    A    No.

10   Q    Okay.  So just to be clear, you're saying that you didn't

11   pull any documents.  You only created a report.  Am I

12   understanding that right?

13   A    I pulled the Excel report of feedback for the three

14   buildings.

15   Q    Okay.  And then who did you give those reports to?

16   A    The Amazon legal team and Morgan, Lewis.

17   Q    Okay.  And do you recall when you gave those -- those

18   reports to Amazon's legal team?

19   A    Sometime in the past month.

20   Q    Do you recall when you gave those reports to Morgan,

21   Lewis?

22   A    Same time frame.

23   Q    Okay.  Do you recall how long it took you to conduct the

24   search for JFK8 disciplines?

25   A    The Adapt Excel file?



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Yes.  How long did it take you to search -- create that

2    document?

3    A    Maybe 15 minutes.

4    Q    Okay.  And what about EWR4?  How long did it take you to

5    create that Excel spreadsheet?

6    A    Probably same time frame, 10, 15 minutes.

7    Q    And what about BDL3?  How long did it take you to create

8    that Excel spreadsheet?

9    A    I pulled the EWR4 and the BDL one together from the same

10   file.

11   Q    Okay.  And how long did it take you to create that Excel

12   spreadsheet for both of those facilities?

13   A    About 10 to 15 minutes to get both.

14   Q    Okay.  So I just want to -- for clarification, can you

15   tell me if I can search for a discipline without searching a

16   personnel file?

17   A    What do you mean by that?

18   Q    So does Adapt only contain the disciplines?

19   A    It would be discipline and then also positive feedback if

20   there's positive coachings in there.

21   Q    Okay.  Does Adapt have anything else in it -- or -- or any

22   other types of files maintained in Adapt?

23   A    No, the --

24        MS. WILLIAMS:  I'm going to object to the extent this goes

25   beyond the scope of the requested documents.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Overruled.  Answer.

2    Q    BY MS. COX:  Mr. -- Mr. Grabowski, I was asking what other

3    types of documents are maintained in Adapt, besides positive

4    feedback, discipline, and I believe you said co -- coachings?

5    A    Uh-huh.  So coaching would fall under the -- the feedback

6    scope.  Adapt is a performance management system.

7    Q    Okay.  Okay.  And what's -- I just want to take another

8    step back with you because I don't think I'm clear on what

9    Exact is.  What -- so what's the difference between Exact,

10   Adapt, and OnBase?

11   A    OnBase would be all personnel files.  Adapt would be

12   performance management, either feedback, positive, negative,

13   any type of disciplinary action.  And Exact is where you would

14   host information related to witness statements, documents,

15   anything collected during the course of an investigation, which

16   then may lead to feedback that would be entered in Adapt.

17   Q    In Exact or Adapt?

18   A    Feedback.

19   MS. COX:  Oh.  I got it.  I withdraw.  I'm sorry.  I got

20   it.

21   Q    BY MS. COX:  Okay.  So what do you mean by performance

22   management system?

23   A    It's where any type of, like, feedback -- performance

24   management feedback is located.  So both productivity, quality,

25   overall actual performance in an employee's path, as well as



Exhibit E, Motion to Try Petition on Hearing Record

1    any behavioral or attendance feedback.

2    Q    Okay.  Now I want to talk a little bit about these Excel

3    spreadsheets that we've been mentioning.  Okay.  So you also

4    conducted the search for paragraph 17, right?

5    A    Can we please pull it up?

6    Q    Yes.  Give me one moment.

7    A    Thank you.

8    Q    Of course.  Okay.  All right.  Can you see paragraph 17?

9    I'll zoom it for you.

10   A    That's perfect where it is.

11   Q    Okay.  Just take a minute, read it, and let me know when

12   you're done.

13   A    I'm done.

14   Q    Okay.  So did you conduct the search for paragraph 17

15   related to all disciplines for JFK8 and other facilities?

16   A    Yes, the Excel file.

17   Q    Okay.  Now -- so did you create that Excel spreadsheet?

18   A    I exported it right from Adapt.  It exports in that table.

19   Q    Okay.  So what systems did you search for documents

20   responsive to paragraph 17?  I'll -- I'll show you again if you

21   need to see it.

22   A    So we're referring to the actual, like, personnel files or

23   like, documents regarding the feedback, not just the Excel

24   file.

25   Q    Did you -- I'm asking you what systems you searched for



1    documents responsive to paragraph 17.

2    A    Adapt.

3    Q    Okay.  Did you conduct a search for personnel files?

4    A    Partially.

5    Q    What do you mean by partially?

6    A    Out of a list of names that was provided, split it up

7    between myself and a member of my team.  It was a pretty

8    lengthy time ask.

9    Q    Okay.  How many personnel files did you search for?

10   A    I don't remember.

11   Q    Who was the other person that you split the list up with?

12   A    Christina Stone.

13   Q    And who is Christina Stone?

14   A    A member of my team.

15   Q    Are you talking about HR?

16   A    Yes.

17   Q    Okay.  Do you recall when you conducted the search for

18   personnel files -- or partial search for personnel files?

19   A    In the past month.  So April 2021.

20   Q    Do you recall what facilities you searched personnel files

21   for?

22   A    Only JFK8.

23   Q    And what system did you use to search for personnel files

24   at JFK8?

25   A    OnBase and Exact.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    So -- I'm sorry.  So are you saying that personnel files

2    are also maintained on Exact?

3    A    No, but information leading to disciplinary action could

4    be.

5    Q    Okay, so did you conduct a search for investigative

6    documents responsive to the subpoena, as well?

7    A    Partially.

8    Q    Okay.  We'll get back to that.  Okay, so as far as the

9    JFK8 search that you did in response to paragraph 17 of the

10   subpoena, can you tell me if you created search terms?

11   A    I did not.

12   Q    Did you use search terms?

13   A    No.

14   Q    Were searched terms given to you at any point?

15   A    Not that I recall.

16   Q    Okay, so I'm going to show you an Excel spreadsheet that

17   was produced in response to the subpoena.  You just have to

18   bear with me again a moment.  But before I get there, can you

19   tell me who gave you names to search, personnel files, who gave

20   you the names of the personnel files to search for?

21   A    I don't remember.

22   Q    Okay, so I'm showing you, now -- hopefully, you'll be able

23   to see my screen.  Thank you for being with me.  Okay.  Can you

24   see my screen?

25   A    I -- I can see it; I can't read it.



Exhibit E, Motion to Try Petition on Hearing Record

1  Q    Yeah, let me try to -- okay, so this is a -- an Excel

2  spreadsheet.

3  A    Um-hum.

4  Q    I'm just going to scroll so you can see how many

5  disciplines are on here.  Is this the type of Excel spreadsheet

6  that you created in response to paragraph 17?

7  A    It looks like the same, like, format, the same columns,

8  the same information that would be in there.

9  Q    Okay.

10  A    The only difference is the -- the top bar is colored gray.

11  Q    Okay.

12  A    Which, it just looks like some formatting.

13  Q    Give me one moment.  I think I'm pulling up the wrong one.

14  I'm sorry.  My apologies.  Okay, I think I have the right one

15  now.  Yes, okay.  So I'm showing you now the correct Excel

16  spreadsheet that is responsive to paragraph 17.  Okay, so you

17  can see it says at the bottom -- and if you can't see -- hold

18  on.  No, I keep showing you the same one.  I'm sorry.

19        JUDGE GREEN:  Let me just ask -- I guess this is for Ms.

20  Cox.  The one you're showing now with 1,593 entries --

21        MS. COX:  Yes.

22        JUDGE GREEN:  Is it your understanding that that was the

23  result of a word search and that was not just all of the

24  disciplines at JFK8?

25        MS. COX:  Judge, my understanding is that these



# Exhibit E, Motion to Try Petition on Hearing Record

1    disciplines are a response to a word search, yes.

2         JUDGE GREEN:  Okay, and that there was -- there was -- was

3    there produced an Excel spreadsheet that just had all of the

4    disciplines at JFK8?.

5         MS. COX:  This is that spreadsheet, yes.

6         JUDGE GREEN:  Okay, and that would be in the several --

7    over 10,000?

8         MS. COX:  No, Judge.

9         JUDGE GREEN:  Okay.  That was not -- there was no

10   production of such a spreadsheet?

11        MS. COX:  No.

12        JUDGE GREEN:  Okay.

13        MS. COX:  I just want to make sure that you all can see

14   this is supposed to say 1,594.  I'm not sure you can see it

15   on -- okay.

16   Q    BY MS. COX:  All right, so this spreadsheet, you're

17   saying, is the same one you provided, and you're saying these

18   columns look different to you?  I'll try to zoom it for you.

19   A    Oh, no, those are the same columns.  I didn't realize that

20   the information was taken out for the employee ID, employee

21   name, employee login.

22   Q    Okay, so yes, so it says "employee ID, employee status,

23   type, manager name, login ID, warehouse, source type", meaning

24   behavioral safety, "status level, created date, created by,

25   updated by, feedback".  And then, there are these "areas of



Exhibit E, Motion to Try Petition on Hearing Record

1    development", and "details, incident details, incident date",

2    so on and so forth.

3        Okay, so Mr. Grabowski, does this spreadsheet look like

4    the one that you gave counsel, Morgan, Lewis counsel, aside

5    from the two columns missing?

6    A    It has the same information.

7    Q    Okay.

8    A    But it would be hard to say, just based on I don't know

9    how much data is -- is in this, what time frame it's from.  But

10   that is what an Adapt export looks like.

11   Q    Okay, so this information was extracted from Adapt?

12   A    Yes.

13   Q    So to your knowledge, do these individual lines represent

14   individual disciplines?

15   A    Yes.

16   Q    Okay.  Do you -- do you know or have any reason to believe

17   that, other than these two columns, that this -- that this

18   spreadsheet might have been edited or altered in any way?

19   A    It looks like there's three columns.

20   Q    Right, so aside from these three columns, do you have any

21   reason to believe that this spreadsheet might have been edited

22   or altered in any way?

23   A    No.

24   Q    Okay, so -- so I want you to look at the first entry here.

25   And the date is 2019, May 2nd, May 2nd; you see that?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    Okay, so I'm going to just do a little search so you can

3    see.  It looks like this -- I'm sorry.  I need a minute again.

4    This entry is identical to one other entry.  Give me one

5    moment.

6         MS. COX:  Can I just go off the record one moment, Judge?

7         JUDGE GREEN:  Off the record.

8    (Off the record at 1:39 p.m.)

9         JUDGE GREEN:  And not that I want to disrupt Mr. Cox --

10   Ms. Cox's examination.  But I believe Mr. Murphy indicated that

11   he might offer some explanation as to what was done in -- in --

12   with regard to these spreadsheets?

13        MR. MURPHY:  Yes.  Thank you, Judge.  May I?

14        JUDGE GREEN:  Yes.

15        MS. COX:  Judge, may I have the witness testify first, and

16   then Mr. Murphy can provide his explanation after we're done?

17        JUDGE GREEN:  Okay.  Well, is this going to take long, Mr.

18   Murphy?  I mean, I think the purpose of this is to -- is to see

19   if we can short circuit some of the testimony by virtue of

20   stipulation.  So go ahead, Mr. Murphy.

21        MR. MURPHY:  Okay, thank you.  So Tyler those reports --

22   I'm going to call them reports; I don't know the technical

23   term.  He ran those reports with the disciplines from JFK8,

24   EWR4 and BDL3.  He transmitted them to us and -- and to counsel

25   for Amazon.  And -- and in our office, we -- we ran two sets of



Exhibit E, Motion to Try Petition on Hearing Record

1    search terms against all of those reports.

2        The -- the -- the first set we used was the paragraph 16

3    terms.  There's seven terms, curse, vulgar abuse, et cetera, in

4    the body of the request itself.  We -- we -- we did that.  I

5    don't recall the numbers specifically, but my recollection is

6    that, with respect to -- with respect to JFK8, it was in the

7    range of 36 or so hits, ballpark.

8        We -- we then -- after conferring with counsel for the

9    General Counsel, they provided us a list of 31 terms to be used

10   for paragraph 17.  And we ran those terms, those 31 terms

11   against the -- the reports from JFK8, EWR4 and BDL3.  And that

12   search, that report, resulted in the 1,593 discipline reports

13   that Ms. Cox was showing to Mr. Grabowski.  He -- he didn't do

14   that work.  We did that internally using support staff here.

15       JUDGE GREEN:  Okay.  Did the -- did the -- did -- the

16   spreadsheet that came to you, did that have -- to Mr. Murphy.

17   Did that have 13,000 disciplines?

18       MR. MURPHY:  Yes.  The original -- the original cut

19   which -- which -- which Tyler described had -- for JFK8, had

20   13,000.  My recollection is that, for EWR4, it was a little bit

21   more than that, and -- and BDL3 was less than that.  I don't

22   remember the specific numbers, but.

23       JUDGE GREEN:  Okay, and so -- oh, so the search -- so the

24   word search, the 31-termed word search, that was for all three

25   facilities or just JFK8?



1      MR. MURPHY:  We -- we've done it on all three.  But the

2  document that Mr. Cox was showing Mr. Grabowski, that was for

3  JFK8.

4      JUDGE GREEN:  Okay, and that resulted in 1,594?

5      MR. MURPHY:  3.

6      JUDGE GREEN:  3, okay.  Okay, thank you very much.

7      MR. MURPHY:  Yeah, thank you.

8      MS. COX:  Can I just ask Mr. Murphy when the 30 -- the

9  search for the 32 hits responsive to JFK8 was done, the date?

10     MR. MURPHY:  Boy, I -- I -- I don't know that off the top

11 of my head.  I'm sorry.

12     MS. COX:  Okay.

13 Q    BY MS. COX:  Mr. Grabowski, did you -- after counsel ran a

14 search on the spreadsheet, did you have any role in going and

15 looking for those 32 disciplinary forms?

16 A    I'm not sure if it was -- there was one specific --

17 Q    Did you collect 32 or 36 discipline forms at any point

18 during this last two months?

19 A    There was a list that was provided to counsel, which, the

20 list was then narrowed and sent back.  Those ones were the

21 documents that I discussed earlier that Christina Stone and I

22 reviewed.

23 Q    Okay, but those documents that you reviewed, were they

24 personnel files or something else?

25 A    It was the back records from Adapt, and then anything from



Exhibit E, Motion to Try Petition on Hearing Record

1    the Exact or personnel files that may have supplemented it.

2    Q    Okay, so after counsel gave you the list, you conducted

3    the search for feedback; when did you conduct the search?

4    A    In the past month.

5    Q    Okay, do you recall when you gave a disciplinary, or I'm

6    sorry, the feedback documents back to counsel, after you and

7    Christina Stone completed your partial search?  Do you recall

8    when you gave the -- the results back?

9    A    It was sometime in the past month, but I don't know the

10   specifics.

11   Q    Okay.  Did you also provide personnel files to counsel

12   after the terms were narrowed?

13   A    I'm sorry, can you please repeat that?

14   Q    Yeah.  Did you also provide personnel files to counsel

15   after they narrowed those -- those -- narrowed the search?

16   A    Is that different than the -- the question that was just

17   asked about going through the list?

18   Q    Yeah, because I asked you about feedback just now, and

19   now, I'm asking you about personnel files.  Unless I made an

20   error, that's -- that -- that was my intention.  My first

21   question was:  after counsel narrowed down the search to 36

22   hits, did you provide feedback documents to counsel?

23   A    So the feedback documents would be what is outlined in the

24   Excel file.

25   Q    Right.  Did you provide a actual physical or electronic



Exhibit E, Motion to Try Petition on Hearing Record

1     version, a document, a PDF, or something, to counsel?

2     A     I don't believe so.

3     Q     Okay, what about personnel files that you and Ms. Stone

4     searched for?  Did you ever provide the actual personnel file

5     to counsel?

6     A     Yeah, so that's what I thought you were asking the first

7     time; that is what we did.  We took the list and pulled

8     information pertaining to it in our personnel files and then

9     sent it back.

10    Q     Okay, and you did that within the last month?

11    A     Yes.

12    Q     Okay, thank you.  Now, I'll get back to this Excel

13    spreadsheet.  So I was showing you the spreadsheet with the

14    1,593 disciplines for JFK8, right.  So I was asking you to look

15    at this first entry.  Oops, excuse me.

16          Okay, so this first entry, I told you before, was May 2nd,

17    2019.  Now, I've filtered this document, and I want you to look

18    at line -- let me try to zoom it -- line 500.  If you look at

19    the dates, do you see the dates there, May 2nd, 2019?

20    A     Yes.

21    Q     Okay.  Do you see this day, too, May 2nd, 2019?

22    A     Yes.

23    Q     Okay, so now, look at the -- the body of this.  I'll try

24    to give a -- put a little spotlight so you can follow my

25    cursor.  Okay, so you see this here?



Exhibit E, Motion to Try Petition on Hearing Record

1    A     Um-hum.

2    Q     Just take a -- take a second; read it to yourself?

3    A     Okay.

4    Q     Okay, so these entries are exactly the same, right?

5    A     Yes, it appears so.

6    Q     Okay, but they appear on this spreadsheet as numbers 2 and

7    500, right?

8    A     Yes.

9    Q     Okay, so I'm going to do the same, so you can take a look

10   at it, with the next entry.  This entry is May 7th, 2019.

11   Okay, so we have these two, number 353 and 1224; do you see the

12   date on this, May 7th --

13   A     7.

14   Q     -- 2019.  And then, for this entry, May 7 -- I'm sorry --

15   May 7th, 2019.  Now, take a look at the body of this document

16   starting here, 4/24/19, and then you can read starting 4/24/19.

17   Let me know when you're done?

18        JUDGE GREEN:  At some point, are we just going to ask

19   why -- why this is the case, why there would be redundant

20   entries?

21        MS. COX:  We will, Your Honor.

22        JUDGE GREEN:  Is there some reason why we need to have him

23   read to document to determine that they're redundant?

24        MS. COX:  I just want to be clear that there's nothing

25   I've done to this document and that -- that these -- these



# Exhibit E, Motion to Try Petition on Hearing Record

1    entries are, in fact, duplicates.

2    JUDGE GREEN:  Okay.  Well, why don't we accept your

3    representation to that effect as true, why don't you ask a

4    question about it?

5    MS. COX:  Okay.

6    Q   BY MS. COX:  So Mr. Grabowski, is there any reason why

7    these entries would be duplicated on this spreadsheet?

8    A   I'm not sure.

9    MS. COX:  So just so you know, Your Honor, I mean, there

10    are about -- this -- this document has got 45 percent, 35 to 45

11    percent, duplicate entries.  So this number of 1,593 is

12    completely inaccurate.  It doesn't represent the number of

13    disciplines that Respondent claims are responsive to paragraph

14    17 of the subpoena.

15    JUDGE GREEN:  But why do we care?

16    MS. COX:  Judge, because Respondent has been asking us to

17    rely on these charts and not accept the underlying --

18    JUDGE GREEN:  Yeah, but there's nothing being -- there's

19    nothing being -- not being disclosed here.  So I take it that

20    it would not be particularly hard to do data searches and order

21    an Excel spreadsheet so that it's fairly easy to find the --

22    the duplicates.  And I don't know how that hurts you, so

23    there's less -- so the -- so the -- the word search has

24    produced less documents.  Well, how does that hurt you?  The --

25    the -- the word search produced the documents that it produced.



# Exhibit E, Motion to Try Petition on Hearing Record

1    I don't understand why that's prejudicial in any way.

2        MS. COX:  Well, Judge, because -- because the -- the

3    Respondent's representation that this, the request, is

4    overburdensome and needs to be further narrowed --

5        JUDGE GREEN:  Well, but that ship has sailed.  We're

6    not -- we're not dealing with -- I've already denied the --

7    the -- the petition to revoke.  That's not what we're

8    litigating here.  So and I think the parties should understand

9    what we're litigating here.  We're not litigating whether the

10   petition -- we're not relitigating the petition to revoke.

11       What we're doing is, we're establishing a record that, in

12   the event of nonproduct -- of nonproduction or incomplete

13   production, I'm -- and -- and pending a potential motion for

14   banning those sanctions, that I'm in a position to rule on

15   that.  That's what we're looking at here.

16       MS. COX:  Yes, Judge.  And I believe that these duplicate

17   entries go to a bad faith search, Judge.

18       JUDGE GREEN:  Okay.

19       MS. COX:  They're not -- it's not a reasonable inclusion

20   search with 100 percent --

21       JUDGE GREEN:  That's fine.  I -- that's fine.  I do not --

22   I do not agree, respectfully.  I -- I don't -- I don't mean

23   to -- to interrupt you, but I don't agree and -- but you can

24   make that argument.  You can certainly make that argument, but

25   in the meantime, let's -- let's move on.



# Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:   Okay.   Give me one moment, judge.   Okay.

2    Q    BY MS. COX:   So, Mr. Grabowski, did you ever deduplicate

3    this Excel spreadsheet?

4    A    No.

5    Q    Did anyone direct you to deduplicate this Excel

6    spreadsheet?

7    A    No.

8    Q    Is it possible to retrieve the individual feedback or

9    discipline documents without entering a personnel file?

10   A    If we wanted the individual feedback, we would go employee

11   by employee in Adapt.

12   Q    So you don't have to access the personnel file to retrieve

13   a disciplinary document?

14   A    The -- like, the documents from the Excel sheet?

15   Q    Yes, those individual documents, where would you retrieve

16   it from?

17   A    Adapt.

18   Q    Is it in the personnel file?

19   A    No.

20   MS. COX:   Okay.   I don't know if Mr. Gaston has any

21   questions.

22   MR. GASTON:   Just one question.

23                        **DIRECT EXAMINATION**

24   Q    BY MR. GASTON:   You mentioned three different systems,

25   OnBase, Adapt, and Exact; are those the sum total of the



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   systems that would have the personnel information?  And I use

2   that term in the broadest sense; I don't want to narrow it

3   to -- I know it's been a specialized term over the course of

4   this examination.  Is -- are those the three systems that would

5   have personnel information that would be potentially

6   responsive?

7   A    There is honestly so many different systems at Amazon that

8   have employee information; that's why there's specific places

9   for each information.

10  Q    I see, and based on that statement, could you share how

11  you selected three -- these three systems and not any others?

12  A    So Adapt would be any type of feedback or disciplinary

13  action, which is what we were looking into.

14       And then, Exact would be the system that houses

15  investigative notes that would lead up to different types of

16  disciplinary action, if an investigation was necessary based on

17  the allegation.  And then, OnBase is what was used in years

18  prior to Exact being established.

19       So the Exact investigation system is relatively new at

20  Amazon.  It has not been there in the entire tenure that I've

21  been employed.  And previously, investigative notes or witness

22  statements that would lead up to disciplinary action would be

23  uploaded to an employee's personnel file in OnBase.

24       So in looking for what the exact disciplinary action is

25  and what information would have been compiled in leading up to



# Exhibit E, Motion to Try Petition on Hearing Record

1    that disciplinary action, those are the systems they would be

2    stored --

3    Q    Okay, and this is for 00 only for hourly employees; did I

4    understand that correctly?

5    A    So Adapt is for hourly employees to -- to document the

6    disciplinary action, yes.

7    Q    Okay, so nonhourly employees are not even part of this

8    landscape that you've set forth?

9    A    They have OnBase and Exact.  Like, they -- they can be

10   tracked in those two systems, but the Adapt system is solely

11   for the purpose of hourly employees.

12        MR. GASTON:  Okay.  That's all I have to now.  Thank you.

13                    **RESUMED DIRECT EXAMINATION**

14   Q    BY MS. COX:  Mr. Grabowski, so as I understand it, you've

15   turned over 30 -- around 30 to 36 disciplines to Respondent

16   counsel, and personnel files; have you turned over any

17   documents -- actual underlying documents responsive for BDL3?

18   A    No.

19   Q    Have you turned over any responsive documents for --

20   sorry, the other one is -- EWR4?

21   A    No.

22        MS. COX:  Okay.  Judge Green, may I just go off the record

23   and consult with counsel --

24        JUDGE GREEN:  You want to go --

25        MS. COX:  In a breakout room?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1         JUDGE GREEN:  Okay.  Off the record.

 2    (Off the record at 2:08 p.m.)

 3         THE COURT REPORTER:  Back on the record.

 4              RESUMED DIRECT EXAMINATION

 5    Q    BY MS. COX:  Okay, so Mr. Grabowski, you testified earlier

 6    that you turned over, sometime this month, 32 or 36 feedback

 7    documents and personnel files, along with Ms. Stone, to

 8    Respondent counsel.  I just want to ask you a few more

 9    questions about that.

10         So the forms from the feedback documents from Adapt can be

11    exported, right?

12    A    They can be exported, like in the Excel format?

13    Q    No, in -- in showing the document itself, the underlying

14    document.

15    A    Yes.

16    Q    Okay, and you did that?

17    A    No.

18    Q    Okay.  So who -- I'm sorry, I don't understand, then, what

19    you did with Ms. Stone.  So who -- who actually exported the

20    documents, not the chart, from -- from Adapt?

21    A    I don't know.

22    Q    Okay.  With regard to the personnel files that and Ms.

23    Stone searched in OnBase -- so did you -- so -- so those

24    personnel files were able to be exported, right?

25    A    Yes.
```



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    Okay.  And you exported tho -- some of those personnel
 2    files from JFK8?
 3    A    Ms. Stone and I went through both of them.  I don't
 4    remember exactly.  So I know that we were looking through the
 5    list, and not all feedbacks would have something documented or
 6    investigative notes based on what the feedback is, so I -- I
 7    can't say for sure if I actually exported all of them.  I know
 8    that the two of us started going through the list, but she did
 9    compile the majority of it.
10    Q    Did you ex -- did you export any personnel files from
11    onboard -- or OnBase, I'm sorry?
12    A    For this specific request?
13    Q    For JFK -- the 32 to 36 disciplines responsive to
14    paragraph 16 for JFK8.
15    A    I don't remember.
16    Q    Okay.  So do you know if Ms. Stone exported the personnel
17    files from OnBase responsive to paragraph 16?
18    A    Yes.
19    Q    Have you ever -- have you ever exported a personnel file
20    from OnBase in your years of employment?
21    A    Yes, and that's why I can't remember if I did for this
22    specific request just based on the number of requests that come
23    in, but yes, I have.
24    Q    And how long does it take to export a personnel file from
25    OnBase?
```



Exhibit E, Motion to Try Petition on Hearing Record                           184

1    A    I'm sorry.  If you could just give me one second there is

2    a -- all right, sorry about that.

3         MS. COX:  That's okay.  I'll withdraw the question.  I

4    don't have anything else, Judge.

5         JUDGE GREEN:  Okay.  Anything from Mr. Kearl?

6         MR. KEARL:  Yes, Your Honor.

7                        **CROSS-EXAMINATION**

8    Q    BY MR. KEARL:  Mr. Grabowski, do the -- the three systems

9    we've been talking about, the OnBase, Adapt, and Exact systems,

10   do those have data for all seasonal and full-time employees at

11   Amazon?

12   A    Yes.

13   Q    So if I were a -- it wouldn't matter if I was a seasonal

14   employee at Amazon or a full-time employee, any performance

15   documents, feedbacks, investigatory documents would all be

16   captured by those three systems?

17   A    Yes.

18   Q    Is there an appeals process for disciplinary documents at

19   Amazon?

20   A    For certain levels of feedback, yes.

21   Q    And in the event that there is a -- an appeal and a

22   writeup is subsequently removed or changed, how is that

23   reflected in the Adapt system?

24   A    The status would be changed from completed to exempted.

25   Q    And when you ran your reports for these processes, did you



Exhibit E, Motion to Try Petition on Hearing Record

1    include -- did you limit your search by completed or exempted

2    in any way?

3    A    I believe it was the first time I ran it was completed,

4    and then I believe the next time I ran it was all inclusive.

5    Q    Okay.  And was that a part of the instructions that you

6    were given initially in running these searches?

7    A    Yes.

8    Q    Okay.  And so just -- just to be clear, so the first time

9    you ran this report and -- and you were get -- there were

10   13,000 results, that was a -- that was a completed-only

11   process; is that correct?

12   A    I don't know how many rows the Excel file had.

13   Q    But the first -- the first time you ran the search was

14   the -- was the only completed and nonexempted?

15   A    Yes.

16   Q    And then the second time you ran the search that was both

17   completed and exempted, what other -- what other changes were

18   there that you made to the search -- the -- the broad terms of

19   the search parameters?

20   A    So the first time the file was pulled, it was all feedback

21   for the JFK location, and then the Excel file was filtered for

22   completed prior to the sending to the team.  The team then

23   asked to broaden the search to not just completed for all

24   feedback, so the raw feedback for JFK every level status was

25   exported and sent.



# Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Okay.  So -- so -- okay.  And do you remember the -- the

2   approximate dates of these two searches or the amount of time

3   that -- between the two searches that you ran?

4   A    I honestly don't remember.

5   Q    You don't remember.  Okay.  And is there any way to delete

6   disciplinary records such that it would not show up as exempted

7   but would remove the file altogether?

8   A    No.

9   Q    Okay.  And so I -- I -- my understanding is in the Adapt

10  system the feedback that is -- that is recorded are these

11  documents similar to the document that Ms. Cox showed earlier,

12  the -- the supportive feedback document.  Can you tell me a

13  little bit about the kinds of documents that are housed in the

14  Exact and OnBase systems?

15  A    Yeah.  So Exact is for investigative tracking.  So you

16  have the ability to tie employees directly to a case that's

17  created of all levels:  hourly, salary, any type of employee,

18  and note there involvement in the case, whether they're the one

19  that made the allegation or a witness or the person that the

20  claim is against, as then -- as well as any details, and then

21  if there are witness statements collected from parties during

22  the investigation, they would be uploaded to the case, and then

23  with an outcome or the type of feedback, whether it was

24  substantiated or not substantiated, what was delivered or like,

25  what -- what the company would be proceeding with would be



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    documented in the Exact case, along with all investigative

2    notes before closing it out.

3         And then in the OnBase system --

4    Q    Before -- before you start OnBase, if you -- if I may

5    interject.  So when you export data from Exact, are you

6    filtering by case number or by employee number or are you able

7    to do both?

8    A    You can search for whichever you prefer.

9    Q    And are you able to similarly limit the search by dates

10   and facilities as you are when it -- within Adapt?

11   A    You might be able to.  I'm not sure.  The only way that

12   I've ever filtered it is by looking for a specific employee by

13   searching their employee ID.

14   Q    Okay.  And in the course of your searches related to the

15   subpoena in question, were you given specific cases to search

16   for or were you given specific employee numbers to search for?

17   A    So it would be the Excel file that was sent back with 30-

18   so-odd names on it with a specific employee, and then as you

19   saw in the Excel file, when you scroll over, it has the details

20   of the incident, so we'd be looking for the specific employee

21   and the situation that was being outlined in the Excel sheet.

22   So if there's a date that the feedback was delivered, we're

23   looking for the investigation that happened that led to that

24   feedback.

25   Q    Okay.  And when you run that search -- so hypothetically,



Exhibit E, Motion to Try Petition on Hearing Record

1    if there is an employee that is on that list of 36, if they

2    were involved in a disciplinary action and there was another

3    employee who submitted a witness statement, would that witness

4    statement have been captured in the search that you ran in the

5    Exact system?

6    A    Yes, so if it was pertaining to the same Exact case, which

7    it'd be a case is what would lead to a certain level of

8    feedback or disciplinary action.  So if we're referring to the

9    list that we search for and the outcome was X feedback,

10   anything in that investigation, statements from different

11   employees that led to that situation, would be captured in the

12   same Exact case number, which could also be located by

13   searching any employee that was involved or tied to the case.

14   Q    Okay, so searching for a single employee on a case will --

15   will generate results for all other information related to that

16   same case in Exact?

17   A    If you go into the case number.  So for example, I search

18   my employee ID in the Exact system.  What it's going to do is

19   then come up with a list of Exact case numbers, have a -- like,

20   a column that has case numbers, a column that has the

21   involvement in it, whether it's claimant or witness, and then

22   it has the date the case was created and the status of it, if

23   it's open, closed, and if you click that case, then it will

24   pull up all of the information you're looking for with witness

25   statements, details, outcomes, substantiated, not



Exhibit E, Motion to Try Petition on Hearing Record

1    substantiated, and who else was involved.

2    Q    So when you ran this report, you searched for the name

3    of -- or the number of the work -- the employee.  You found the

4    date that corresponded with that case number.  You opened that

5    case number, and then you exported all of the documents that

6    were asa -- that were associated with that case number for the

7    32 or 36 cases?

8    A    So that is the process that Christina followed, yes.

9    Q    Okay, and what -- what format of outputs was generated by

10   Exact from that system?

11   A    That I'm not sure.

12   Q    Do you know what kinds of output are able to be exported?

13   A    Yes.

14   Q    What kinds of -- what kinds of files are able to be

15   exported from that process?

16   A    So you can export witness statements or you can export a

17   case summary.

18   Q    Okay.  And -- and -- and are you also able to export an

19   Excel document that has all the information, similar to the

20   Adapt's reports that you ran in Excel?

21   A    I don't believe so.

22   Q    Okay.

23   A    So the witness statements would export in PDFs and so

24   would the case summary.

25   Q    And do you have to -- so what -- how long would it take



# Exhibit E, Motion to Try Petition on Hearing Record

1    you to export documents for a single case?

2    A    It can vary based on employee -- I mean, depends how many

3    cases the employee has to go in and locate it then export it.

4    Q    Well, but just a single -- so if -- if we were to look up

5    your employee ID, let's say there's five cases, we select one

6    case, and we export all the documents related to that, how long

7    does that process take, roughly?

8    A    Five, ten minutes.

9    Q    Okay.  And the -- so let's now shift over to OnBase.  Can

10   you tell me a little bit about the kind of documents that are

11   housed in the OnBase system?

12   A    So it's any type of employee personnel documents.  A lot

13   of the most basic stuff ties to when employees are first

14   onboarded.  So you have their terms of employment.  You have

15   policy acknowledgement forms, anything that they had to

16   electronically or digitally sign upon being hired, and then if

17   there's policy updates or different documents that are pushed

18   to them through their employment, they'll have access to what's

19   called their MYDOCS portal, which is essentially their version

20   of OnBase in their employee portal.  They can see all the

21   documents they've acknowledged or signed in their tenure.  If

22   there is a termination letter, it would be in there.  And then

23   this site also has the opportunity to upload documentation

24   pertaining to that employee.  So prior to Amazon creating the

25   Exact system because, as I mentioned earlier, like in my Amazon



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    tenure, we didn't -- we haven't always had Exact, so it did

 2    come, I would say, probably in the last two years.  Prior to

 3    that, witness statements and investigative notes would be

 4    uploaded to OnBase.

 5    Q    Were there any -- in your searches related to this

 6    subpoena, did you perform any searches in the OnBase system?

 7    A    That's where Christina Stone would've looked.

 8    Q    Okay.  And -- and in terms of exporting documents from

 9    that, is it similar to Exact where you can export the PDF

10    documents, but not an Excel document?

11    A    That is correct.

12    Q    And how long would it take you to export a single

13    employee's records from the OnBase system?

14    A    I would say similar to Exact, five to ten minutes.  It --

15    it can be longer depending on different factors:  how many

16    times the employee's worked for Amazon, how long the employee's

17    worked for Amazon.  So if an employee gets rehired, they

18    maintain the same employee ID, so if someone gets rehired,

19    you're now looking at duplicate terms of employment,

20    termination summary, acknowledgement of every policy, so the

21    larger the file, the more time it takes to export it.

22    Q    Okay.  But is it fair to say that the five-to-ten-minute

23    range is roughly how long it would take per -- per record?

24    Okay.

25    A    Yes.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And -- and remind me, did you say that you -- you did not

2    recall the dates that you -- you and your team member performed

3    the searches in Exact and OnBase?

4    A    I would say that it was in within the last month, but I

5    don't remember the specific dates.

6    Q    Okay.  And you received specific instructions to search

7    those databases as well?

8    A    I don't remember.

9    Q    Okay.  And just who did -- who -- did you ultimately make

10   the decision to -- to identify the relevant database systems

11   within Amazon or was that someone else that decided that Adapt,

12   OnBase, and Exact were the three?

13   A    I don't remember.

14   Q    Okay.  You -- but it might have been you, but it might've

15   been somebody else?

16   A    Yeah, so if, like, I'm looking at in my Amazon knowledge

17   what is relevant and like, where information will be housed

18   relevant to those, like, those are the one -- the three systems

19   that come to mind, but I cannot recall if someone were to --

20   had given me that guidance.

21       MR. KEARL:  Okay.  Okay.  And then, ju -- just one last

22   question.  I -- I ju -- know Judge we spoke about the duplicate

23   information.

24   Q    BY MR. KEARL:  Are -- it -- you know, in terms of

25   exporting documents, have you seen duplicative results being



Exhibit E, Motion to Try Petition on Hearing Record

1    spit out of Adapt while running these searches and exporting

2    them in Excel?

3    A    No.

4        MR. KEARL:  Okay.  And Judge, if I -- if I may also just

5    say that you stated earlier that it was no longer a relevant

6    matter, but as of today, I still have not received any delivery

7    of documents from my last subpoena, which is identical to the

8    subpoena that was served on the 30th of March.  This was served

9    on the 13th.  There was your order on the 15th instructing

10   Respondents to deliver materials that were also responsive to

11   General Counsel's subpoena dated March 1st, and so the -- to --

12   to the extent that there still is a petition to revoke that has

13   not been ruled on and to the extent that my client and --

14   and -- you know, his attorney have not actually seen any di --

15   discovery documents, the -- the duplicative nature of -- or

16   the -- the -- the duplicative results and the assertation that

17   the volume of information is so great that information cannot

18   be produced is still -- is still relevant, especially where

19   it -- as concerns the subpoena that -- that I had -- I had

20   served.

21       JUDGE GREEN:  Okay.  So if we have enough time today,

22   we're going to get to that -- that matter, the issue of the

23   Charging Party's outstanding subpoena, so put a pin in that.

24   I -- I still don't think that the duplicates are going to be

25   significant with regard to that petition to revoke, but anyway,



# Exhibit E, Motion to Try Petition on Hearing Record

1   let -- let's -- let's move on.  So is that your -- is that --

2   are you done, Mr. -- Mr. Kearl?

3       MR. KEARL:  That is the extent of my questions, Your

4   Honor.  Thank you.

5       JUDGE GREEN:  Anything from the Respondent?

6                    **CROSS-EXAMINATION**

7   Q    BY MS. WILLIAMS:  Our thank you for hanging -- hanging

8   through this.  Wanted to make sure I understood a couple of

9   things from you.  So did you pull any personnel files for this

10  matter?

11  A    A Excel file for the three sites, yes, and then for

12  individual employees, I remember I began going through the list

13  with Christina, but I don't remember exactly who pulled what.

14  Q    So you may have pulled some of them, you just didn't pull

15  all of them?

16  A    Yes.  I know for a fact that Christina pulled the majority

17  of them, based on the time of the day the request came in.  She

18  worked on it on a Saturday to finish it off and get me the rest

19  of the documents.

20  Q    And about how long does it take you to -- to download a

21  personnel file?

22  A    Five, ten minutes.

23  Q    And did you pull anything from the Exact system that we

24  talked about earlier?

25  A    Pertaining to this, no.  I think all of the Exact ones



Exhibit E, Motion to Try Petition on Hearing Record

1    came from Christina.  I don't think that they're -- I don't

2    recall finding an Exact or having an Exact case for the ones

3    that I searched.

4    Q    Did you, though, search to see if there was anything

5    either in Adapt or Exact to see if there was anything for those

6    individuals?

7    A    Yes.

8    Q    And how long does it typically take to search in Exact to

9    see if there is something for an individual or not?

10   A    I would say searching for it probably similar, like five,

11   ten minutes to go in and then find the information that

12   you're -- you're looking for, and then more time if we're

13   looking to export it, get it to PDF.

14   Q    And I know earlier there was some discussion about whether

15   the status had changed on a discipline.  Did you give counsel

16   everything that showed both statuses in the system?

17   A    Yes.

18   Q    Did you duplicate any information, as far as you were

19   aware, when you pulled information from the Adapt system?

20   A    No.

21   Q    Could there be duplicative information in the Adapt system

22   if, for example, more than one person is receiving discipline

23   for the same incident?

24        MS. COX:  Objection, Your Honor.  Calls for speculation.

25        JUDGE GREEN:  Overruled.



# Exhibit E, Motion to Try Petition on Hearing Record

1    A     So there could be duplicative information, but it would --

2    not all of the lines would be duplicate because it would be a

3    different employee receiving the feedback.

4    Q     BY MS. WILLIAMS:  So other than the employee, you might

5    have the same description for a disciplinary record?

6          MS. COX:  Objection --

7    A     Yes.

8          MS. COX:  -- Your Honor.  If I'm -- Ju -- Judge,

9    respectfully, if I'm not allowed to put in any evidence of the

10   number of duplicates, I'm -- I just object to Respondent

11   explaining away the duplicates.

12         JUDGE GREEN:  I -- I can tell you I'm -- I'm completely

13   unimpressed by the duplicates as evidence of a problem with

14   regard to compliance with the subpoena.

15         MS. WILLIAMS:  We'll -- we'll -- we'll move on, Your

16   Honor.  Your Honor, if I may have just a brief three minutes to

17   confer with my colleagues, and then I think we'll -- we'll wrap

18   it up.

19         JUDGE GREEN:  Okay, so off the record.

20   (Off the record at 2:48 p.m.)

21         JUDGE GREEN:  Any more questions from the Respondent?

22         MS. WILLIAMS:  No, Your Honor, not at this time.

23         JUDGE GREEN:  Okay.  And any follow up from the General

24   Counsel?

25         MS. COX:  No, Judge.



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  You -- Mr. Kearl?

2    MR. KEARL:  No, Judge.

3    JUDGE GREEN:  Okay.  Thank you very much, Mr. -- I'm

4  sorry, I -- I -- I forgot your last name, and I was --

5    THE WITNESS:  Grabowski.

6    JUDGE GREEN:  -- and (indiscernible, simultaneous speech).

7  Grabowski.  Grabowski.  Okay.

8    Let me ask the Respondent this before we move on just so

9  it's -- it's fresh in my head.

10    So for paragraph 14, do we know whether -- whether a

11  search would've been done of the Exact system?  Is that

12  where -- is that where the -- the writ -- the company would've

13  looked for deliberative documents or do you not know?

14    MR. MURPHY:  Are -- are you asking the witness, Judge?

15    JUDGE GREEN:  No, no, no.  I -- he's released.

16    MR. MURPHY:  Oh, okay.

17    JUDGE GREEN:  Yeah, I didn't think he really -- it's my

18  understanding that he doesn't know anything about paragraph 14.

19    MR. MURPHY:  Okay, yeah, he just --

20    JUDGE GREEN:  Oh.

21    MR. MURPHY:  -- glanced back up there.

22    JUDGE GREEN:  Right.  So -- but am I -- is that what we're

23  looking at with -- with Tom (sic) Brainerd is maybe he -- he

24  would've done a search for deliberative documents in -- in the

25  Exact system?



Exhibit E, Motion to Try Petition on Hearing Record

1       MR. MURPHY:  Yeah, to -- to be -- to be honest, Judge, you

2   know, we -- we asked that certain things be produced and --

3   and -- and done, but I -- I can't speak to those --

4       JUDGE GREEN:  Okay.

5       MR. MURPHY:  -- directly.  I -- I do know that there are a

6   number of documents that will be on the privilege log that

7   relate to paragraph 14.

8       JUDGE GREEN:  Okay.  Okay.

9       MS. BUFFALANO:  Yeah, I would just add we -- we have the

10  Exact file.  That's what we have in our possession, and when I

11  said earlier that we went in to our own documents, right, like

12  our case file, and then sent -- sent them all of those

13  documents that were not privileged that were related

14  deliberations --

15      MR. MURPHY:  Right.

16      MS. BUFFALANO:  -- that's what we had.  And then what we

17  supplemented with was the Consilio search which was the ESI, so

18  emails, laptop materials, and Chime.  So we had already that

19  file and we produced what was not privileged from that and then

20  supplemented.  So basically, like, do we really have any --

21  everything or are there emails, you know, that we didn't have

22  or whatever that case may be.  So that's what we actually did.

23      JUDGE GREEN:  Okay.  So Ms. Cox, what would you like to do

24  next, if anything.

25      MS. COX:  Judge Green, I just want to address a little --



Exhibit E, Motion to Try Petition on Hearing Record

1    a few housekeeping matters and give Mr. Gaston an opportunity

2    to just make a statement.  As far as housekeeping goes, you

3    know, Ms. Volk made representations about there being an email

4    where she got her directions to --

5         JUDGE GREEN:  I think there are two emails.

6         MS. COX:  -- two, yes, Judge -- sometime in March, so I

7    just want to ask for those -- reiterate that we're requesting

8    those emails.  If they could be produced by end of day, that

9    would be -- that would be our -- our preference.  Also asking

10   for the Relativity printout that Ms. Volk testified to and a --

11   if -- if Your Honor have the time and were able to reach Mr.

12   Tim Brainerd, if we could call him today, that would be our --

13        JUDGE GREEN:  Oh, I would love to get Mr. Brainerd today,

14   if -- because I really don't want -- I -- I don't really have

15   much time before the -- the -- the trial on the merits.  Do we

16   know where -- do we --

17        MS. WILLIAMS:  I have --

18        JUDGE GREEN:  -- know where he --

19        MS. WILLIAMS:  -- not heard anything as far as that's

20   concerned yet, Your Honor.

21        JUDGE GREEN:  Okay.  Okay.  When will we know?  Do we have

22   any way of knowing where he is and what's being done to locate

23   him?  I assume you have to speak to him a little bit about

24   what's going on before he hits the stand.  Do you know?  I

25   mean, do we have any sense of what the time frame is for

1    finding him and how long it would take to get him up to speed

2    and --

3        MS. WILLIAMS:  I -- I -- I'm happy to -- to send an email,

4    Your Honor.  I haven't been trying to communicate with anyone

5    during the hearing, so let me --

6        JUDGE GREEN:  Okay.

7        MS. WILLIAMS:  -- send him that email right now.

8        JUDGE GREEN:  Okay.

9        MS. COX:  Judge Green, just one final housekeeping matter.

10   The privilege log, I -- I want to know when we should expect to

11   have it.

12       MS. BUFFALANO:  We plan to send it today by the end of the

13   day.

14       JUDGE GREEN:  Okay.

15       MR. GASTON:  You -- Your Honor, may I make a brief

16   statement?

17       JUDGE GREEN:  Yes.

18       MR. GASTON:  To the extent that there have been some

19   representations about the discovery process only having sort of

20   one flow by a couple of individuals, I wanted to make sure I

21   identified myself also as a discovery professional and make

22   clear that my silence to those comments was not an endorsement,

23   in particular the separation of the concept of the

24   discretionary part of collection, including, but not limited

25   to, search.  It could be searched.  It could be delineating



Exhibit E, Motion to Try Petition on Hearing Record

1    date ranges.  We've -- we've heard a lot of them already just

2    now, so picking the systems, all that kind of stuff.  So I just

3    wanted to make sure that, on the record, you know, my silence

4    was not taken as an endorsement of separating the concept of

5    search as being part of a collection.  It all can flow

6    together.  You can do a whole mailbox.  You can search for what

7    you want for first, just one example.  I just wanted to put

8    that out there and respond if there's any questions on that

9    point.

10       JUDGE GREEN:  Okay.  I --

11       MR. GASTON:  Thank you, Your Honor.

12       JUDGE GREEN:  -- I -- okay.  So let me ask the Respondents

13   this.  It's a -- it's -- it's a question that's kind of been

14   floating around in my brain since we've been going through this

15   process.  You know, Amazon is a very large company and Morgan

16   Lewis is a large law firm, and seems like Consilio is a pretty

17   large company, as well.  What, if anything, is to stop the

18   company from just throwing more personnel at this -- at this

19   discovery problem in order to alleviate some of the -- in order

20   to do it faster, in order to get it done faster than a couple

21   of months?

22       MS. WILLIAMS:  Your Honor, there are a few issues when

23   we're talking about -- if we're talking about, for example,

24   pulling email in Chime.  That is something where, unless -- I

25   know there was complaints a minute ago about duplication.



Exhibit E, Motion to Try Petition on Hearing Record

1   If you want to deduplicate everything, you're going to

2   have to pull it off first to deduplicate it.  You can't just

3   pull it piecemeal individually.  So when we're looking at

4   things like that, it's not something where just necessarily

5   throwing more bodies is going to work because you've got to

6   then take it all, put it all into Nuix and wait to be able to

7   then deduplicate against itself.  Now, if --

8        JUDGE GREEN:  Okay.

9        MS. WILLIAMS:  -- for example --

10       JUDGE GREEN:  Is --

11       UNIDENTIFIED SPEAKER:  Yeah.  Go ahead.

12       JUDGE GREEN:  I was going to say, is there a logjam

13   somewhere?  You know, is -- is -- -- is -- what -- is the

14   problem here that the -- that the company wants -- wants all

15   the reviews done by, you know, one or two counsel?  And is

16   that -- does that cause the logjam or -- or is this something

17   that could be resolved?

18       MS. WILLIAMS:  No, Your Honor.  This is -- this

19   is -- unfortunately, is just something that takes time.

20   Someone has to go in to the system, which we talked about.

21   That's why I think they want (indiscernible, simultaneous

22   speech).

23       JUDGE GREEN:  Okay.  So it's not -- okay.  So it's not

24   necessarily the -- the legal review.  It's -- it's really the

25   mechanics of actually finding the documents and producing the



Exhibit E, Motion to Try Petition on Hearing Record

1  documents (indiscernible, simultaneous speech).

2     MS. WILLIAMS:  It -- it -- it is all of the above, Your

3  Honor.  There is time that needs to be allotted for counsel to

4  review.  But just throwing more bodies onto it is not

5  necessarily going to solve that first piece of it, trying to

6  actually get the documents out of systems, make them

7  searchable, make sure that you can run the searches, load them,

8  allow someone to look at them to decide what's responsive or

9  not responsive.

10     JUDGE GREEN:  Okay.  And I guess that's what I don't 100

11  percent understand, is that -- let's say instead of having Ms.

12  Stone and Ms. -- Mr. Grabowski --

13     MS. WILLIAMS:  Grabowski.

14     JUDGE GREEN:  -- doing what they did, having ten people

15  doing what they did.

16     MS. WILLIAMS:  And I think we would have to -- first of

17  all, I'll -- I'll have to find out the ten people, but also

18  make sure who all has access to the systems to pull the

19  information --

20     JUDGE GREEN:  Okay.

21     MS. WILLIAMS:  -- displayed.

22     JUDGE GREEN:  I mean, that would be a breeze, then.  Okay.

23  That would be -- okay.

24     MS. WILLIAMS:  Mr. Grabowski and -- and everyone has been

25  pulling them.  It's getting someone access to be able to pull



Exhibit E, Motion to Try Petition on Hearing Record

1    that.

2         JUDGE GREEN:  Okay.  Okay.  So for now, that's all we

3    can -- that's all we can do, as far as I can tell, with regard

4    to the custodians of record; unless, Ms. Cox, you want to tell

5    me otherwise.  We have Mr. Brainerd, which sounds like he's a

6    natural person to call for -- for 14.  And my guess is, is that

7    we're going to get, kind of, testimony that's -- that's closer

8    to what we just got from -- in than we -- we got from Ms. Volk.

9    But we don't have him in -- in hand right now.

10        MS. COX:  Judge Green, if I may.  Can we take a lunch

11   break, and have Respondent contact Mr. Brainerd and see if we

12   can put him on today?

13        JUDGE GREEN:  Yes.

14        MS. COX:  Okay.

15        JUDGE GREEN:  Yes.  Why don't we -- why don't we come back

16   here at -- why don't we return at 4 and see where -- where --

17   where we stand.  Okay.  Why don't we do that?  I have a couple

18   of questions about the Charging Party's subpoena issue, but

19   that -- that can wait.  So let's -- are we off the record?

20   I -- I don't even remember whether -- I think we're -- I think

21   we're on the record.  Off the record if we're -- if we're on.

22   (Off the record at 3:06 p.m.)

23        JUDGE GREEN:  Back on the record.

24        MS. WILLIAMS:  I know Ms. Cox has asked us to please put

25   on Mr. Brainerd.  I do want to note that he does technically



Exhibit E, Motion to Try Petition on Hearing Record

1    work for Consilio. So we also need to try to notify Council

2    for Consilio. So we also need to try to notify counsel for

3    Consilio as well, just so everyone is aware.

4        MS. COX: Okay. Ms. Williams, I just want -- for

5    clarification purposes, I know you represented that you haven't

6    contacted Mr. Brainerd during this hearing. But have there

7    been any attempts during this hearing to contact Mr. Brainerd

8    and/or Consil -- Consilio counsel?

9        MS. WILLIAMS: I believe some people are trying to do

10   that. I -- I -- I have -- I am not fully aware of what all the

11   response has been to that. I haven't been following the email

12   communications, but I know people have been trying to contact

13   him

14       JUDGE GREEN: Well, listen it -- just do your best. You

15   know, if we -- if we have to, you know, we can end up

16   litigating this at the same time we're litigating on the

17   merits. That is what actually generally happens in these

18   cases. It's -- you know, it's no fun for anybody. It would be

19   better if it were knocked out now. But if we have to, we have

20   to. So we'll either -- either we'll have Mr. --

21       MS. WILLIAMS: What if we can't have him?

22       JUDGE GREEN: -- either we'll have Brainerd, and -- which

23   sounds unlikely, but maybe. And if not, I'll have a couple of

24   questions about the Charging Party subpoena issue and -- at

25   4:00.



# Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  And Your Honor, may we -- may we release Mr.

2  Grabowski?

3      JUDGE GREEN:  Yes.

4      MS. COX:  I think he stayed on because he wasn't sure if

5  he could be released.

6      JUDGE GREEN:  Yes, I'm sorry.  Mr. Grabowski, you're --

7  you're free to go.

8      THE WITNESS:  Thank you.

9      MS. COX:  Thank you.

10  (Off the record at 3:08 p.m.)

11      JUDGE GREEN:  All right.  So we're back on the record.  I

12  apologize we're -- we're -- we were discussing off the record

13  the Respondent's request to postpone the hearing.  I had issued

14  an order rejecting that request.  The Respondent has requested

15  reconsideration based on an order directing hearing and notice

16  of hearing on objections, which was issued in 10-RC-269250.

17  And I was asking the General Counsel for their position on the

18  on the -- on the Respondent's renewed request for a

19  postponement of the hearing.

20      MS. COX:  So Judge, as I was saying, we -- we oppose the

21  postponement request.  You know, I -- Respondent is overlooking

22  that Mr. Bryson has been out of work for over a year.  This --

23  the complaint in this case issued December 22, 2020.

24  Respondent knew of this case before the objections hearing.

25      There's nothing that would stop Respondent from letting



# Exhibit E, Motion to Try Petition on Hearing Record

1    Region 10 know that they're unavailable next week, or -- and

2    also, there's nothing that stops Respondent from having another

3    attorney assigned to deal with the Region 10 matter, or even

4    our case, quite frankly.

5          And moreover, Judge, you've already given us the day off

6    for March 7th, for Mr. -- for Mr. Murphy's vaccination date.

7    So I don't even see it as a con -- a conflict.  And there would

8    be no need to postpone this case.

9          JUDGE GREEN:  Okay.  So -- and what's -- what is

10   the -- what is the Respon -- who -- who's actually trying the R

11   case?

12         MR. MURPHY:  Hey, it's -- it's Mr. Murphy.  So I suspect

13   it will be a joint effort, as the -- our case hearing was, and

14   the tally of the ballots.  I don't know if you've had a chance

15   to look at the order, but they're -- and from the (audio

16   interference), appear there's -- there's in -- in the

17   neighborhood of, like, 16 or 18 separate objections.  And so

18   you know, as I said, Ms. -- Ms. Buffalano and I have been part

19   of that process for -- for months now.

20         And -- and it's -- and it's not, as Ms. Cox suggests, plug

21   and play, either in -- either in that case or -- or this one.

22   So -- so -- so you know, that's the nature of our involvement

23   in that case.  You know, I -- I hear what Ms. Cox says about

24   the -- the timing in this case -- the -- the -- up until one

25   night of March, the timing was entirely in the hands of -- of



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    the General Counsel.

2         I think the proceedings today, (indiscernible) for a -- a

3    postponement here so that -- so that -- that -- the -- these

4    pre-hearing issues, or collateral issues can get resolved in

5    a -- in a meaningful way so we don't have to drag people out

6    from whatever they're doing when they don't even work for the

7    Respondent in the course of an afternoon.

8         And -- and -- and -- and were perfectly willing to

9    participate in a -- in a weekly phone call with -- with you.

10   It may not be Nicole and I.  It may be Ms. Williams, or -- or

11   other people involved on the discovery side, but -- but -- but

12   we're happy to do that.

13        And I -- I -- I think that -- that, frankly, this hearing

14   may -- the record, anyways, may -- may -- may benefit from

15   that, too.  So we'd ask you to kindly, you know, respect the

16   professional commitments that Ms. Buffalano and I have, and --

17   and -- and to postpone the hearing for a reasonable period of

18   time.

19        MS. COX:  Mr. Murphy, can you tell me the -- the attorneys

20   that are working on the Region 10 case besides you and Ms.

21   Buffalano?

22        MR. MURPHY:  Well, I -- I -- I mean -- I -- I -- I will if

23   Judge Green asks me to.  I'm -- I'm not -- I'm not sure what

24   the purpose of the question is.  You know, you -- you could go

25   on the docket if you wanted to and see whose appearances have



1    been entered.  But -- but it -- it's -- it's a number of

2    people, no doubt about it.

3        The case is enormous.  And -- and -- and -- and

4    it's -- and it's in the nature of an all-hands-on deck

5    proposition.  And -- and -- and myself, and Ms. Buffalano, and

6    a number of other people have significant knowledge bases,

7    and -- and time invested in that matter.

8        And it's, frankly, naive to suggest, as you have, that we

9    can, you know, be -- that -- that we're plug and play, and can

10   re -- and can be replaced by another person that knows nothing

11   of the case, nothing of the client, nothing of the parties.  It

12   just doesn't work like that.

13       MS. COX:  Well, Chris, I think Judge Green asked you, and

14   you haven't answered, that's why I'm -- I'm asking.

15       MR. MURPHY:  I'm sorry.  Did -- did you, Judge?

16       MS. COX:  I believe he did.

17       JUDGE GREEN:  I -- I -- I'm -- I was interested in your

18   involvement, and -- and who was going to be the lead on

19   the -- on the R case.

20       MR. MURPHY:  Yeah.  So I -- I -- I think that probably

21   Harry Johnson will be the lead on -- on the R case.

22   There -- there -- there'll be several other people involved,

23   David Broderdorf, myself, Nicole Buffalano, Geoff Rosenthal.

24       JUDGE GREEN:  Okay.  So here's -- here's the -- the -- I

25   guess, coming out on this.  I -- I really still am not inclined



Exhibit E, Motion to Try Petition on Hearing Record

1    to postpone the case.  It's been -- it's been long scheduled

2    since March.  Arrange -- specific arrangements were made to

3    open the record, and then delay the trial on the -- on the

4    merits until May 3rd.

5        I think, although you didn't really know the -- the trial

6    schedule for -- for the R case, the -- the general time frame

7    for that was somewhat predictable in the sense that we had some

8    idea of when that tally of ballots would know that

9    would -- that the hearing would have to be at least 15 days

10   after the tally of ballots in the hearing.

11       And you know, to the extent that there was going -- that

12   there would potentially be a conflict, it was somewhat

13   predictable.  And I think the Respondent should have made

14   arrangements for that.  And also, it -- it -- it sounds like

15   it's likely to be an extremely long delay, because the R case

16   is very large, as Respondent's counsel indicates.

17       And you know, it sounds like this case would have to be

18   not entirely re-prepped, largely re-prepped by the parties.

19   And while I understand that that's an important matter, the R

20   case, you know, this case does involve a discharge, and that

21   case does not.  I mean, that R case obviously involves a lot

22   more employees.

23       But this is an important case that had a significant

24   impact on one employee.  And so I'm really inclined to go

25   forward.  I -- you know, I -- I don't have any-- I -- I don't



Exhibit E, Motion to Try Petition on Hearing Record

1  have any problem if the Respondent wants to file a special

2  appeal of it.

3      You know, I would suggest that you do it sooner, rather

4  than later of -- of the denial of the -- the -- of the

5  postponement request.  You know, you might also want to get in

6  touch with Region 10 and ask them if they are going to put

7  off -- you know, put off the R case, somewhat.

8      MR. MURPHY:  I can tell you that -- that there was a --

9  some discussion of a postponement to the Union request of the

10  17th of May.  We -- we indicated that we would not oppose a

11  postpone to May 7th, and -- and the Region went ahead and

12  marked it for the 17th, was the date that they had originally

13  identified.  So --

14      JUDGE GREEN:  They're -- so they're -- the -- the -- the

15  Union asked for the -- the -- the Petitioner asked for the

16  17th, and they insisted on the -- the Region insisted on the

17  7th?

18      MR. MURPHY:  That's correct.

19      JUDGE GREEN:  Okay.  I mean, I -- I -- I understand that

20  that -- that reflects the -- the Region's eagerness, but it

21  also seems like, given where we are in this case, that a mutual

22  request for reconsideration of the trial date in that R case

23  might be a good thing to do.  I think we -- we would be done by

24  the 17th.

25      So if the Petitioner wants the 17th, and the Respondent



# Exhibit E, Motion to Try Petition on Hearing Record

1    wants the 17th, and it's going to -- it would conflict with the

2    with the -- with this case to go on the 7th, I'm not sure why

3    the -- why Region 10 would be insistent on May 7th.

4         MR. MURPHY:  (Audio interference).  You know not --

5    notwithstanding what -- what you said about the -- the -- the

6    timing of the R case, and -- and -- and maybe the objections

7    hearing was inevitable.  You know, we -- we had planned to

8    split up the objections by topic, and -- and -- you know,

9    not -- not to talk too much about what our strategy had been,

10   but that that was the plan.

11        And you know, I -- I don't know how long -- I don't know

12   how long that R case will take.  But you know, as -- as I said,

13   I think there's a salutary effect to be had on -- on this case

14   in terms of the presentation of the evidence.  And I understand

15   that it's a -- that -- that Mr. Bryson has -- has been

16   terminated, allegedly, you know, illegally.

17        And -- and -- and you know, that's -- that's an important

18   matter.  But you know, we -- we would -- we would respectfully

19   ask that -- that this matter be continued at -- to -- to -- to

20   A, allow Ms. Buffalano to continue to represent our client in

21   that -- in that other matter.

22        And B, to allow the production of documents in this case

23   to -- to continue.  And -- and -- and these discovery related

24   issues to be sorted out, or -- or -- dropped, as the case may

25   be.  So you know, that -- that -- that's our request.



Exhibit E, Motion to Try Petition on Hearing Record

1    And -- and -- and we hope that you'll see fit to grant it.

2        MS. COX:  Your Honor, may I (indiscernible/simultaneous

3    speech).

4        JUDGE GREEN:  I -- I don't -- I really don't -- if --

5    if -- if the General Counsel wanted to put the case off pending

6    the receipt of subpoenaed documents, you know, I would

7    certainly grant that.  But that's really for the -- the General

8    Counsel to decide.  You know, it's not something that can be

9    imposed on the General Counsel, strategically.

10       If they want to go forward in the absence of -- of the

11   subpoenaed records, and without assurance that there's going to

12   be any other remedy for noncompliance, or you know, not full

13   compliance -- not full production, I should say, I'm just not

14   going to impose that on the -- on the General Counsel.

15       You know, I'm -- I'm inclined to -- I really -- I'm -- I'm

16   strongly inclined to keep this -- the trial schedule, which has

17   been which in -- in -- which has been on the calendar for a

18   long time.  Again, I -- I -- I think that, you know, you may

19   want to file a special appeal.  I have no problem with that.

20       And I certainly think you would want to get back in touch

21   with Region 10, because I simply don't -- I simply don't

22   understand the -- I -- the -- the concept that the -- that the

23   Union Petitioner is -- is willing to go on the 17th, and

24   they're insisting on going on the 7th, despite that it

25   conflicts with this case.  That just doesn't make sense to me.



Exhibit E, Motion to Try Petition on Hearing Record

1          MS. COX:  Well, Judge, I want to ask Mr. Murphy if Region

2     10 knows about our case.  They may not know.  Mr. Murphy, have

3     you --

4          JUDGE GREEN:  Well --

5          MS. COX:  -- let Region 10 know about this case?

6          JUDGE GREEN:  -- I mean, I would expect some -- you know,

7     I know we just got this.  I would expect some coordination

8     on -- actually, on the -- on the GC side.  You know, I do think

9     that it's worth a call from the -- you know, from Region 29 to

10    Region 10, potentially involving the -- the acting GC, to find

11    out what the -- what the acting GC's priorities are in this

12    situation.

13         MS. COX:  Your Honor, I'm happy to call the Region.  But

14    you know, it's not clear that Mr. Murphy, or anyone, notified

15    Region 10, hey, we've had this complaint out since December,

16    and this trial date, please schedule --

17         JUDGE GREEN:  I understand.

18         MS. COX:  -- please -- please schedule around that

19    (indiscernible, simultaneous speech).

20         JUDGE GREEN:  Well, then -- I'm keeping -- I'm keeping the

21    trial date, and I'm -- I'm denying the motion respectfully.

22         MS. COX:  Thank you, Your Honor.

23         JUDGE GREEN:  And that's where we're -- that's where we're

24    at right now.  You know, if something -- if you -- if you deal

25    with Region 10, if you deal with the acting GC, and -- and you



# Exhibit E, Motion to Try Petition on Hearing Record

1   want -- you know, some development happens, which you think

2   changes the dynamic, then -- then let me know.

3        In the meantime, I would like to move on.  And it sounds

4   like we don't have -- we don't have Mr. Brainerd, and it sounds

5   like the GC doesn't have anything more that they want to do

6   today as far as putting the case on the -- on the record,

7   putting the custodian -- custodian -- or custodians of -- of

8   the records --

9        MS. COX:  That's correct, Judge.  Yes.

10       JUDGE GREEN:  -- on the stand.  Okay.  So I just have a

11   couple of questions about the -- the Charging Party subpoena.

12       MS. COX:  Judge, could I just take one step back?  So I

13   know we're talking about Mr. --  we've talked about Mr.

14   Brainerd, do we know when he will be available?

15       JUDGE GREEN:  Do we know when he will be available?

16       MS. WILLIAMS:  I'm sorry, Your Honor.  This -- I'm trying

17   to get back off -- on.  No, Your Honor, at this point, we are

18   not sure.  We need to check with Consilio and see when we can

19   get him and make him available.

20       JUDGE GREEN:  Am I right that this -- Ms. Cox, it's

21   unlikely to be too long an examination with -- with -- Mr.

22   Brainerd?

23       MS. COX:  Judge, if he's the right person, I don't -- I

24   don't think it would be too long.  It sounds like he is, but I

25   can't tell until I call him.



www.escribers.net | 800-257-0885

1    JUDGE GREEN:  Okay.  So I sort -- I have a conflict,

2    basically, the rest of the week.  So there's really not much I

3    can do, except for tomorrow.  And it doesn't sound like we have

4    him for tomorrow, which means that that's probably going to be

5    what we're going to have to deal with first thing on May 3rd.

6    Yeah, I don't -- I don't see any other way around that.

7        MR. MURPHY:  Excuse me, Your Honor.  Just somewhat

8    relatedly.  You had -- or you had, several weeks ago, indicated

9    that you had a conflict -- or potential conflict on May 4th.

10       JUDGE GREEN:  I do not.  I -- that's true.  I do not.

11   That is resolved.  And so --

12       MR. MURPHY:  Okay.

13       JUDGE GREEN:  -- yeah.  So Mr. -- Mr. Kearl, can

14   you -- can you help me out with this -- five -- you know,

15   your -- your most recent subpoena, I believe the contested

16   paragraphs are 5, 9, 11 through 14, and 19(b) and (c); 5 and

17   19, I -- I -- I kind of -- I --  you know, I -- I understand

18   them on the -- on the -- on the papers.

19       I guess I'm a little confused about 9 and 11 through 14.

20   You know, generally, when you're looking at disparate

21   treatment, you're looking to compare peop -- you know,

22   the -- the -- just the alleged discriminatee who allegedly

23   engaged in protected concerted activity, and people who have

24   not engaged in protected concerted activity.

25       And when you're looking at people who -- when you're



1   comparing just a bunch of people who engaged in protected

2   concerted activity, that -- that usually comes up in a

3   different way.  Usually, that comes up from the respondent in

4   the sense that the respondent says, listen, we knew that these

5   other five people engaged in the same exact conduct, but

6   nothing happened to them; therefore, you know, there's -- you

7   know the -- the -- it's not -- you know, it's not

8   discrimination with regard to the Charging Party.

9        I'm -- I'm -- I'm a little bit confused as to why you

10  would want that information regarding -- you know, it -- it

11  seems like comparison information regarding Christian Smalls

12  and Derrick Palmer.

13       MR. KEARL:  And Your Honor, so the -- so the protected

14  activity that was engaged in, in the period in question,

15  the -- the three sort of lead booker organizers during that

16  period were Christian Smalls, Derrick Palmer, and Gerald

17  Bryson.

18       And insofar as Respondent's response to those workers was

19  somewhat uniform, you know, in terms of dates of disciplinary

20  action, kinds of disciplinary action, I -- I think that it

21  would be relevant to the case at hand to have documents

22  relating to investigations and disciplines of those workers who

23  were engaged in the same concerted protected activity.

24       JUDGE GREEN:  Okay.  Okay.  So basically, it's your --

25  it's your theory, and perhaps this is shared by Ms. -- Mx. Cox,



Exhibit E, Motion to Try Petition on Hearing Record

1    that the evidence is going to show that all three of these, or

2    even four of these, individuals -- well, three of these

3    individuals, were disciplined in the same manner because they

4    all engaged in similar protected concerted activity?

5        MR. KEARL:  Yes, Your Honor.  And furthermore, I think

6    there might be relevant documents that refer to, for example,

7    Christian Smalls and the other workers, or -- and his group

8    that, you know, the -- the search terms that have been

9    performed so far in the -- in the records.

10       You know, Mr. Bryson's records, for example, might not

11   have that relevant information, but there -- there could be

12   very -- you know, very relevant information about the

13   Respondent's, you know, animus against the organizing work, as

14   well as strategy around the -- the response to the group of

15   worker organizers in the documents that are requested in the

16   subpoena.

17       JUDGE GREEN:  Okay.

18       MR. MURPHY:  Judge?

19       JUDGE GREEN:  Yes, sir.

20       MR. MURPHY:  May I?  So with -- with -- with respect to

21   the -- the paragraphs that you just highlighted, you -- you

22   know, it seems as though -- that the objective here is, sort

23   of, lit -- litigate a couple of many cases in -- in the General

24   Counsel's larger case regarding Mr. Bryson.

25       You know, we -- we just don't -- don't -- I mean, I



Exhibit E, Motion to Try Petition on Hearing Record

1    understand both of those men are going to testify.  They'll be

2    able to tell their stories.  You -- you know, we -- we don't

3    dispute they engaged in activities on the -- on the 25th,

4    and -- and -- 30th.

5        And you know -- so that -- that -- that information

6    doesn't advance the General Counsel's case.  In fact, as we --

7    as we argued, it expands it.  And -- and we're going to -- at

8    least going to end up with -- with -- with a couple of mini

9    trials about what happened to those gentlemen, and -- and --

10   and why it happened, which I don't think, necessarily, sheds

11   any light on the -- the way in which the company responded to

12   Mr. Bryson's activities on -- on April 6th.

13       So we -- we would ask that -- that, you know, revoke

14   the -- the subpoena, at least with respect to those paragraphs,

15   for those reasons.  The -- the other thing is that, you know,

16   we've -- we've argued that -- that these documents would be

17   useful to the -- Mr. Smalls, Mr. Palmer, and -- and/or counsel

18   in a number of other matters that are not directly related to

19   this one, but in which those gentlemen are adverse to Amazon --

20   and -- and including Mr. Flowers (phonetic), who's named in one

21   of the paragraphs.

22       And -- and so you know, we've -- we've asked for the

23   imposition of -- of a protective order; Mr. Kearl has resisted

24   that.  And -- and -- and we really can't see any legitimate

25   basis on -- on which, first of all, that -- that discovery in



Exhibit E, Motion to Try Petition on Hearing Record

1      those other matters ought not to take place in those cases.

2          This -- this is not the forum to advance those interests.

3      And you know, the -- both of the gentlemen did not file

4      charges.  They -- they certainly had the opportunity to, and

5      chose not to do it.  They're advancing other claims in other

6      forums.

7          And -- and -- and as I said, these -- these materials

8      would be, you know, extremely useful to them.  And it --

9      it's -- it's not appropriate to permit the -- the Board's

10     procedures to be used here to advance interests elsewhere.  So

11     we would ask you to deny the -- or revoke the subpoena, for

12     that basis as well.

13         JUDGE GREEN:  Let me ask Ms. Cox about it -- this, because

14     that -- that -- that is the problem here.  You know, you end up

15     having two -- effectively, two additional discriminatees.  And

16     you -- you -- now you're -- now you're litigating three.

17         So I -- I don't know if those people have been discharged,

18     but three discrimination matters instead of one.  Is that -- is

19     that your intention?  Is that the GC's intention, to pursue,

20     you know, that type of evidence that these three individuals

21     were treated the same, and therefore that's evidence of

22     retaliation?

23         MS. COX:  Judge Green, we're permitted to put on evidence

24     that sheds light on background, and even if they're not

25     named -- they're not com -- they're not allegations that are



Exhibit E, Motion to Try Petition on Hearing Record

1   named in the complaint, then our intention is to put on

2   evidence that would provide you with the background context

3   of -- of Mr. Bryson's discharge.

4        JUDGE GREEN:  So yes.  So yes, you intend to, essentially,

5   put on evidence regarding adverse actions that -- that occurred

6   to these two additional individuals --

7        MR. KEARL:  Judge --

8        JUDGE GREEN:  -- with the idea of saying that they were

9   treated -- that they've all treated the same?

10       MS. COX:  Yes, Judge.

11       JUDGE GREEN:  Because they engaged in similar protected

12  concerted activity?

13       MR. MURPHY:  And -- and Judge (audio interference) to our

14  request for a postponement here.  If we're going to have these

15  two mini trials, we're -- we're not -- we're not --

16       MS. WILLIAMS:  Chris, I think you're going to have to

17  speak up.

18       JUDGE GREEN:  Mr. -- Mr. Murphy, you were fading --

19       MR. KEARL:  Yeah.  I think we're having a problem with the

20  audio.

21       JUDGE GREEN:  You were fading.

22       MR. MURPHY:  Oh, really?  Can you hear me now?

23       JUDGE GREEN:  Yes.

24       MR. MURPHY:  I -- I apologize.  I don't know what

25  happened.  So if -- if -- Your Honor, if we're going to have



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1  two mini trials here with respect to Mr. Smalls and -- and --

2  Mr. Palmer, you know, we -- we -- we would request the

3  postponement in order to conduct an investigation in order to

4  respond to whatever evidence the counsel for the General

5  Counsel and/or Mr. Kearl intend to put on with that.

6      Those things have not been part of the case, and -- and

7  you know, it's -- aside from the interest with respect to any

8  discovery that you -- that you might order, we -- we need -- we

9  need a reasonable opportunity to prepare on our own to defend

10  against any claims that might be made.

11     MS. REIBSTEIN:  Your Honor, may I respond, please?  We're

12  not -- there are no additional allegations.  We -- we don't

13  have to disclose, at this point, what evidence we're putting

14  on.  And you know, we -- we're not having multiple trials here.

15  There -- there -- the allegations are -- are in the complaint.

16  And the evidence that we put on, you know, to --

17     JUDGE GREEN:  I'm trying to find out if it's relevant.

18  And -- and -- and -- and worth it.  But -- okay.  That's fine.

19  I -- I -- I -- I got it.  I'm -- I'm not going to rule right

20  now.  I -- I believe I'm going to issue a -- a -- a written

21  order on the -- on the petition to revoke, hopefully, tomorrow.

22     MR. KEARL:  Judge -- Judge, if I -- if I can also just

23  weigh in and -- and say that, you know, the Respondent was

24  fully aware of the fact that these workers were engaged

25  together.  There are comments in the press.  Every single news



# Exhibit E, Motion to Try Petition on Hearing Record

1    article related to Mr. Bryson almost -- almost without fail,

2    also mentions these other workers.  So to claim that these

3    workers are somehow brand-new information to Respondent is a

4    mischaracterization.

5        You know, it -- it's -- I -- I -- I -- I think it -- I

6    think it would be fair to say that -- that Respondent is well

7    aware.  Whether or not, you know, Mr. Murphy, and -- and the

8    rest of counsel, have necessarily prepared for it or not, I

9    can't say.  But these other workers have been engaged in the

10   collected -- you know, in the -- in the protective activity

11   together from -- from day one.

12       And -- and furthermore, insofar as, like, the existence of

13   other cases -- you know, I mean, apart from, you know, the fact

14   that I have nothing to do with some of these cases that are

15   mentioned, I -- I feel like the fact that there are other cases

16   shouldn't have any bearing on whether or not I'm actually doing

17   my ethical job to zealously advocate for my client.

18       I'm a little insulted that the assumption would be that

19   I'm going fishing, you know, when I'm actually trying to

20   represent my client, who was terminated over a year ago during

21   a pandemic where the largest and virtually only employer hiring

22   in the borough is the company that fired him.

23       So the fact that he's caring for, you know, his children

24   and his grandchildren out of his savings account, and then --

25   and then to turn around and say that the other two workers who

Exhibit E, Motion to Try Petition on Hearing Record

1    were directly involved, who were physically present and

2    directly addressing Respondent during the protests, and -- and

3    the -- the -- the -- the -- you know, the meetings that were --

4    that are named in the complaint and the alleged complaint, I

5    think just does a disservice to the -- to the fact that this --

6    this evidence is like -- this information is just, like,

7    clearly available.

8         And -- and any amount of cooperation would bring you into

9    the sphere of these other workers names.  And so it's not so

10   much secondary -- secondary hearings that are going on.  But to

11   the extent that these workers' experiences, actions, and

12   Respondent's response to the -- the collective action that all

13   of these workers were engaged in is relevant.

14        I think it's -- it's without question that this

15   information is relevant.  Furthermore, the documents requested

16   in paragraphs 11 through 14 are not just related to the

17   disciplinary reactions of Respondent, but also to internal

18   memorandum notes, documents pertaining to communications

19   between management of Respondent about these workers.  And

20   insofar as it absolutely --

21        JUDGE GREEN:  This reminds me of something which I wanted

22   to ask.  Paragraph 11 talks about transfers and promotions, as

23   well as discipline.  Is -- is there some reason why you need

24   the transfers and promotions?

25        MR. KEARL:  I -- just have a complete picture of



1    their -- of their employment record for the same reason that

2    we've ask for it in, you know, Mr. Bryson and Ms. Evans' case.

3    You know, and -- and -- the -- the request of information for

4    those separate paragraphs are not -- but they are severable.

5    So insofar as that is not relevant, it does not necessarily

6    mean that the information requested in '12, '13, and '14 are

7    similarly unnecessary.

8        JUDGE GREEN:  Okay.  In 5, the -- the discrimination,

9    harassment, retaliation complaints forms, you're -- are you

10   just looking for those for JFK 8?

11       MR. KEARL:  For JFK 8 on a single day.  It's my

12   understanding that Respondent has a very, very specific process

13   for filing these complaints.  And insofar as -- some of these

14   documents should be produced as part of other paragraphs, as

15   relate to Mr. Bryson, if they, in fact, exist.

16       But furthermore, they would be relevant to the -- you

17   know, the discriminatory treatment of my client if other

18   workers were clearly following the same path where my work --

19   my client did not have similar documentation.

20       JUDGE GREEN:  So -- so I -- so -- and that -- this is

21   paragraph 5.  I thought you were looking for those documents

22   for a fairly long time period.

23       MR. KEARL:  JFK 8, on the -- the date of April 6th, which

24   was the date that the -- Mr. Bryson allegedly violated a policy

25   and was subsequently --



# Exhibit E, Motion to Try Petition on Hearing Record

1        JUDGE GREEN:  Oh.  Okay.

2        MR. KEARL:  It's a very related request.

3        JUDGE GREEN:  Okay.

4        MR. MURPHY:  Judge, just one -- one more one from me, please.

5   So I -- I -- I just need to make sure that you understand the

6   evolution of this case.  When Mr. Bryson was fired, he fired --

7   he filed a charge.  The charge was investigated.  In the -- in

8   the course of the investigation, we were not asked about any

9   activity that Mr. Smalls, or Mr. Palmer, or -- or Mr. -- or --

10  or -- yeah, Palmer and Smalls, or Flowers, had engaged in.

11       It wasn't part of this case when the complaint issued.  It

12  wasn't part of the case until the counsel for the General

13  Counsel moved to amend to add allegations relating to the 25th

14  and the 30th of March.  I think those alle -- that -- that

15  amended motion was made somewhere around March 23rd.

16       We didn't oppose it, then we admitted that he engaged in

17  that -- in that activity on those days, denying the legal

18  conclusion that it was PCA.  So you know, the -- the -- the --

19  Palmer and Smalls, their -- their involvement in this case is

20  extremely recent when you look at the -- when you look at the

21  evolution of the case and -- and what we were asked to do, what

22  issues were put into play, and -- and the investigation that we

23  performed.

24       So again, if -- if we're going to litigate the bona fides

25  of -- of their treatment and their disciplines, we -- we need

Exhibit E, Motion to Try Petition on Hearing Record

1    additional time to prepare to do that.  We -- we have not done

2    that.  And -- and it -- and it's -- and it's, frankly unfair to

3    have us be prepared -- to try to be prepared to do that as

4    early as Monday.  It -- it -- it's -- it's -- it's not

5    reasonably something that can be done in that period of time.

6        MS. COX:  Your Honor, we -- we're not litigating any other

7    cases.  In another -- in an ordinary case, the trial would

8    start, counsel for Respondent would have no idea what evidence

9    we were putting on.  And they would -- we would put on our

10   case; they would put on their case.

11       We were put in this position now of -- of, like, kind of

12   being forced to disclose some of our trial strategy, which

13   ordinarily doesn't happen.  I know that Mr. Murphy, you know,

14   really, really, really wants this postponement indefinitely.

15   But you know, the fact that he just got a little window

16   into -- into some evidence that we might put in is not a basis

17   for postponing this.

18       JUDGE GREEN:  I can tell you --

19       MR. MURPHY:  So we don't want -- we want -- a -- a -- a

20   postpone indefinitely.  We -- we want -- we want a postponement

21   so that -- that -- Mr. Kearl talked about his ethical

22   obligations.  We have an ethical obligation to Amazon and in

23   that other matter.  We want an opportunity to discharge that

24   ethical obligation.  And -- and we would like the litigation of

25   this case to be reasonably normal, not -- not -- not the -- the



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    way that it's been conducted with -- with, frankly, you know,

2    the Regional attorney on -- on the line and -- and -- and

3    speaking on a regular basis.  You know -- well, there's a lot

4    of people here --

5         JUDGE GREEN:  (Indiscernible, simultaneous speech).

6         MR. MURPHY:  -- doing this a lot -- a long time an -- and

7    that's not a normal case.  So --

8         MR. KEARL:  Judge, I -- I can also say that -- that as of

9    March 30th, (indiscernible, simultaneous speech) --

10        JUDGE GREEN:  I'm sorry.  Let me stop you all.  Let me

11   just stop you all. I -- let me just stop you all because I --

12   I've -- I've actually -- I've -- I've heard enough.  Just to

13   give you -- I mean, I'm going to issue a written order, but

14   just to -- to understand where I'm -- where I'm coming out on

15   this.

16        I -- I -- I do think that a protective order is -- is --

17   you know, generally, a protective order is -- is issued upon

18   good cause.  And it -- it depends on the confidentiality

19   interest of -- of the -- of the records.  I -- I do think that

20   a protective order is probably justified in this case with

21   regard to personnel records, including discipline.

22        You know, we're dealing with a lot of documents by neutral

23   nonparty employees, and I -- I don't think it's fair to have

24   those be really open to broad disclosure.  It's a protective

25   order.  You'll be able to use it for the -- for -- certainly



# Exhibit E, Motion to Try Petition on Hearing Record

1    those documents for the -- for the trial.

2        But I think that that -- I think that that type of

3    protective order is probably appropriate here.  You know, with

4    regard to 9 through 14, you know -- you know, it's -- it's a

5    broad discovery standard.  And you know, the -- the -- the

6    bottom line is, is that in -- in all -- I mean, I'm -- I'm

7    going to think about it, actually, before I issue the order.

8        But it's hard to say that these documents are not -- are

9    not relevant, although I don't think documents regarding

10   transfers and promotions are relevant.  But the documents are

11   probably relevant within -- you know, within the framework of

12   our standard as it pertains to subpoenaed records.

13       And so I don't know -- you know, I don't really think that

14   I'm in a position to deny that on the grounds of -- of rele --

15   relevance.  I -- I am loathed to effectively have a trial

16   regarding two additional employees.  But you know, with regard

17   to the petition to revoke, that's probably -- comes within

18   the -- within the gamut of -- of relevance, those documents.

19       You know, and I understand that the Respondent has,

20   essentially, made yet -- you know, yet another request for a

21   postponement.  But I'm -- I'm not -- I'm not going to grant

22   that request on the basis of the request for information

23   related to Mr. Smalls and Mr. Palmer.

24       That's where we're at.  I'm going to issue an order, and

25   I'm going to try to issue an order tomorrow.  And I -- you



1    know, I would just suggest to you that to the extent you want

2    to do anything on the motion to postpone, try -- you know, if

3    there's a special appeal, try to do it as soon as possible.

4        MR. MURPHY:  And Judge, so assuming you're going to do

5    what you said you're going to do, and -- we proceed on the 3rd,

6    what -- how -- what -- what is your expectation in terms of us

7    producing any documents that -- that -- that might be covered

8    by the subpoena?  And don't forget, the counsel for the General

9    Counsel has -- has a -- I think a 99 paragraph, and some

10   paragraph request, in the queue right behind this.

11       JUDGE GREEN:  So -- okay.  You know, I can address that a

12   little bit.  The petition to revoke, and -- and a request for

13   sanctions for nonproduction are two completely different

14   things.  So we have a broad standard of discovery.  And it's

15   hard -- it's hard to establish the documents are -- are overly

16   broad and burdensome for purposes of subpoena revocation.

17       That doesn't necessarily mean that if the Respondent

18   doesn't show up with the documents that the General Counsel, or

19   subpoenaed -- subpoenaing party is necessarily entitled to some

20   form of sanctions.  You know, there are other factors.  There

21   are -- there's willfulness.  There's whether the search has

22   been reasonable or unreasonable, whether it's in good faith or

23   bad faith, whether there's prejudice.

24       And you know, the -- the General Counsel should be mindful

25   that.  It's not like -- you know, it's not as though if -- if



Exhibit E, Motion to Try Petition on Hearing Record

1    the Respondent shows up, and not every document has been

2    produced, that there's necessarily going to be inferences, that

3    there's going to be Bannon-Mills remedies.

4        That's not at all necessarily the case.  We're going to

5    have to deal with that as it moves forward.  And that's

6    something that the General Counsel should consider in

7    determine -- in their determination as to whether they want to

8    go forward.

9        You know, I'm not -- all I can tell you is I haven't --

10   you know, I haven't granted any Bannon-Mills remedies.  And you

11   know, that's something that's -- that's a different issue

12   than -- than the -- the revocation issue, and we'll deal with

13   that as the time comes.  Is there anything else we have to do

14   on the record today?

15       MS. BUFFALANO:  We have one off the record item, but

16   nothing more, nothing more for on the record.

17       MS. COX:  Nothing from the General Counsel.

18       JUDGE GREEN:  All right.  So let's go off the record.

19   **(Whereupon, the hearing in the above-entitled matter was**

20   **recessed at 4:47 p.m. until Monday, May 3, 2021 at 10:00 a.m.)**

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1                    **C E R T I F I C A T I O N**

2     This is to certify that the attached proceedings, via Zoom

3     videoconference, before the National Labor Relations Board

4     (NLRB), Region 29, Case Number 29-CA-261755, Amazon.com

5     Services LLC and Gerald Bryson, held at the National Labor

6     Relations Board, Region 29, Two Metro Tech Center, 5th Floor,

7     Brooklyn, New York 11201, on April 26, 2021, at 11:04 a.m. was

8     held according to the record, and that this is the original,

9     complete, and true and accurate transcript that has been

10    compared to the reporting or recording, accomplished at the

11    hearing, that the exhibit files have been checked for

12    completeness and no exhibits received in evidence or in the

13    rejected exhibit files are missing.

14

15

16

17    _____

18    BARRINGTON MOXIE

19    Official Reporter

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services, LLC,          Case No.   29-CA-261755

      Employer/Respondent,

and

Gerald Bryson,
      An Individual.


_____

_____


Place: Brooklyn, New York (via Zoom videoconference)

Dates: May 3, 2021

Pages: 233 through 392

Volume: 4

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 276 of 2171 PageID #: 328

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

| | |
|---|---|
| In the Matter of: | |
| AMAZON.COM SERVICES, LLC, | Case No.    29-CA-261755 |
| Employer/Respondent, | |
| and | |
| GERALD BRYSON, | |
| An Individual. | |

The above-entitled matter came on for hearing, via Zoom
Videoconference, pursuant to notice, before **BENJAMIN W. GREEN**,
Administrative Law Judge, at The National Labor Relations
Board, Region 29, Two Metro Tech Center North, 5th Floor,
Brooklyn, New York 11201, on **Monday, May 3, 2021, 10:00 a.m.**

Exhibit E, Motion to Try Petition on Hearing Record

1                    A P P E A R A N C E S

2    On behalf of the Charging Party:

3         FRANK KEARL, ESQ.
          MAKE THE ROAD NEW YORK
4         161 Port Richmond Avenue
          Staten Island, NY 10302
5         Tel. (929)265-7692

6    On behalf of the Employer:

7         CHRISTOPHER J. MURPHY, ESQ.
          JENNIFER MOTT WILLIAMS, ESQ.
8         RICHARD ROSENBLATT, ESQ.
          MORGAN, LEWIS & BOCKIUS, LLP
9         1701 Market Street
          Philadelphia, PA 19103-2901
10        Tel. (215)963-5601

11        NICOLE BUFFALANO, ESQ.
          MORGAN, LEWIS & BOCKIUS, LLP
12        300 South Grand Avenue, 22nd Floor
          Los Angeles, CA 90071
13        Tel. (213)612-7443

14        KELCEY J. PHILLIPS, ESQ.
          MORGAN, LEWIS & BOCKIUS, LLP
15        1111 Pennsylvania Avenue, NW
          Washington, DC 20004
16        Tel. (202)739-5455

17   On behalf of the General Counsel:

18        EVAMARIA COX, ESQ.
          MATTHEW JACKSON, ESQ.
19        DAVID GASTON, ESQ.
          NANCY REIBSTEIN, ESQ.
20        THE NATIONAL LABOR RELATIONS BOARD, REGION 29
          Two Metro Tech Center, 5th Floor
21        Brooklyn, NY 11201
          Tel. (718)765-6172
22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1                        I N D E X

2

3    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE

4    Timothy Brainerd      289    319,328   335        344

5    Frank Kearl           346    367       385        387

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1                         <u>E X H I B I T S</u>

2

3      <u>EXHIBIT</u>                            <u>IDENTIFIED</u>      <u>IN EVIDENCE</u>

4      **General Counsel:**

5          GC-3                                   348              349

6          GC-4                                   352              355

7          GC-5                                   355              356

8          GC-6                                   361              363

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          JUDGE GREEN:  Okay, so on the record.  We're back in the

3     matter of Amazon.com Services, LLC, 29-CA-261755.  The

4     administrative law judge is still Benjamin Green.

5          As indicated, we have a courtroom deputy today.  That's

6     Ms. Alisa Jones.

7          Okay.  So today was designated as the first day that we

8     were actually going to take evidence on the merits, as opposed

9     to dealing with subpoena related issues, but we have some

10    subpoena related issues still outstanding.

11         Before we get to that -- before we get to that, is there

12    anything else we -- we have to do?

13         MR. MURPHY:  Judge, Chris Murphy again, for the

14    Respondent.

15         JUDGE GREEN:  Yes.

16         MR. MURPHY:  Again, just a couple of housekeeping matters.

17    When we were last on the record in this context, at the end of

18    March, there was a motion granted to -- for the counsel for the

19    acting General Counsel to file an amended complaint, and the

20    formal papers were introduced at that time.  I just wanted to

21    make sure that our second amended answer, which was filed on

22    April 6th, is -- is -- is included.

23         JUDGE GREEN:  So Ms. Cox, do -- do you know whether the

24    amended answer is included in the formal papers?

25         MS. COX:  Judge, it's not in the formal papers, but I'll



Exhibit E, Motion to Try Petition on Hearing Record

1  introduce it today.  How do you -- I have to amend the formal

2  papers.

3       JUDGE GREEN:  Okay.  So that's one.  We give -- you know,

4  we -- if there are certain documents that have to be amended

5  into the formal papers, including the -- the second amended

6  answer, we can do that.

7       Anything else before we get to the subpoena related

8  issues?

9       MR. MURPHY:  I -- I -- I just wanted to talk about exhibit

10  management and posting and sharing, and at least --

11       JUDGE GREEN:  Okay.

12       MR. MURPHY:  -- let you know what our intention is.  So

13  our -- our -- our intention is to -- before a cross or direct

14  examination, we're going to have the relevant documents

15  uploaded into SharePoint, so they'll be available for the

16  parties to pull down from there, but as the presentation

17  actually goes, and we weren't sure if there was going to be

18  someone in Mrs. -- in Ms. Jones' role, but we have a technician

19  who will load those videos up into the Zoom itself so that

20  everyone will be able to see the documents --

21       JUDGE GREEN:  Okay.

22       MR. MURPHY:  -- in -- in the midst of the presentation.

23       JUDGE GREEN:  That -- that's great, if you've prepped for

24  that, that's great.  You know, the parties can do it however

25  they want.  You know, Ms. Jones is here to help with that, if

Exhibit E, Motion to Try Petition on Hearing Record

1    necessary --

2         MR. MURPHY:  Yeah.

3         JUDGE GREEN:  -- but if you've prepped for it, for

4    somebody else to do it, that's fine.

5         MR. MURPHY:  Yeah, and I think frankly once a, you know,

6    reasonable number of documents get in the record, we -- we

7    probably will ask Ms. Jones to just, you know, load up --

8         JUDGE GREEN:  Okay.

9         MR. MURPHY:  -- exhibit whatever, okay?

10        MS. COX:  Judge Green, how do you want the documents to be

11   sent to Ms. Jones?  Can we do it by email?

12        JUDGE GREEN:  You can.  She does have access, I bel -- she

13   does have access to SharePoint.  So she should be able to get

14   it in SharePoint if -- if -- if you upload it there.  If we

15   have problems with that, she's also, you know,

16   Alyssa.Jones@nlrb.gov.

17        MS. COX:  Thank you.

18        JUDGE GREEN:  So anything else before we proceed to the

19   subpoena matters?

20        MS. COX:  Nothing from the General Counsel.

21        JUDGE GREEN:  Okay, all right.  So the two things that are

22   outstanding are the -- we have the motion, the General

23   Counsel's motion with regard to the privilege log and the

24   outstanding petition to revoke the General Counsel's second

25   subpoena.



# Exhibit E, Motion to Try Petition on Hearing Record

1    Let me first ask, you know, I have the -- I have the

2   papers with regard to the petition to revoke; I don't have

3   anything from the Respondent with regard to the privilege log.

4   Would you like to be heard on that, with -- with respect to the

5   letter that I received on Friday from the General Counsel?

6    MR. MURPHY:  Your -- Judge Green, yes, we would.  Richard

7   Rosenblatt, who's online, I believe, will be handling that for

8   the Respondent.

9    JUDGE GREEN:  Okay, so Mr. Rosenblatt, if you could

10   just -- just state your appearance for the record on behalf of

11   the Respondent.

12    MR. ROSENBLATT:  Thank you, Your Honor.  Richard

13   Rosenblatt of Morgan, Lewis & Bockius, on behalf of Amazon.

14    MR. MURPHY:  Thank you.

15    JUDGE GREEN:  Thank you.  So you received the letter, I

16   take it, from the General Counsel with regard to the privilege

17   log and the requests therein, and that you are going to respond

18   to that?

19    MR. ROSENBLATT:  Yes, Your Honor.  Thank you very much.

20   If I may, we did receive a letter late Friday, and as you might

21   expect, we were focused on preparing for -- for the hearing

22   today, and that's why we didn't submit a response, but we would

23   like to take the opportunity to -- to respond.

24    We will address the merits, or lack thereof, with the

25   Region's argument, but first we just want to address some



Exhibit E, Motion to Try Petition on Hearing Record

 1    preliminary points.

 2         As an initial matter, their challenge to the assertion of

 3    the privilege is premature.  And there's a clear and obvious

 4    reason for that.  The Region knows that when the substantive

 5    evidence on the merits actually rolls into this case, their

 6    case is going to disintegrate because of the Charging Party's,

 7    frankly, vile behavior directed at a coworker.  They know that

 8    Your Honor is going to be scratching your head about how the

 9    Region could be pursuing a case on behalf of the Charging Party

10    who directed slurs to a coworker, and -- and all of this is

11    undisputed.

12         And you'll find out in the evidence, and you'll -- you'll

13    also understand why I'm going into a little bit of the facts,

14    so you understand the context of the privilege, that he -- he

15    called her a drug addict, a gutter B word, and the D word, that

16    is pejorative for a gay woman, and that's only some of them.

17         So where does this come in -- where does this privilege

18    issue come in, in the context of all of that?  It's a sideshow.

19    They're -- they're complaining about the velocity of the

20    document production and the challenges to the privilege, or the

21    privilege assertion, and -- and there's an old saying, and I'm

22    sure -- sure you've heard it many times before.  If you don't

23    have the facts, argue the law.  If you don't have the law,

24    argue the facts.  And if you don't have the facts or the law,

25    pound the table.  But in this day and age of electronic



Exhibit E, Motion to Try Petition on Hearing Record

1    discovery, what you actually end up seeing is you don't have

2    the facts or the law, you see the concoction of arguments about

3    discovery deficiencies and privilege issues.  It's a known

4    tactic, and it is on full display, right here, right now.

5         This is an important issue, Your Honor.  The

6    attorney/client privilege is a sacred privilege in the law.

7    It's intended to ensure that clients and attorneys can have a

8    full and frank conversation about legal matters.  And if we

9    start having to disclose communications between clients and

10   counsel, or otherwise for the purposes of obtaining and giving

11   legal advice, there would be a chilling effect on those

12   communications, and certainly on putting anything in writing,

13   for fear that those communications would be made public, and

14   potentially distorted.

15        For this reason alone, we just ask Your Honor to pay --

16   to -- to -- to tread very carefully here.  Dealing with

17   privilege issues on a ambush motion on a Friday night before a

18   Monday hearing is not the way to deal with privilege.

19        Let's start with the issue of -- the first issue, from our

20   perspective is that the Region's argument is just woefully

21   premature.  If the Region had real questions about the law,

22   which, by the way, we sent on April 26th, a full week before

23   today's hearing.  If -- if they wanted -- if they had real

24   questions about it, as opposed to wanting to use it as a

25   sideshow to distract from Mr. -- or the Charging Party's



1    undeniably vile behav -- behavior, what most attorneys would

2    have done would have been to reach out to us to explain what

3    they perceived to be deficiencies.

4         For example, they would've asked the simple question that

5    they asked in their letter, are any of the persons identified

6    on our privilege log third parties?  We would've had no problem

7    telling them at that point that none of these people are third

8    parties, but they didn't bother asking.  That issue would've

9    been off the table.  No would've -- no one would have --

10   would've had to have argued about it, and Your Honor, you

11   wouldn't have to be sitting here dealing with it, when

12   everybody wants to get to the testimony.  But they didn't want

13   to resolve the issue, or give us a chance to explain our

14   position, because that wouldn't have helped with the filing of

15   an ambush brief, and this sideshow we're -- we're dealing with.

16        But there's a more fundamental argument as to why their

17   challenges to the privilege assertion are premature.  As the

18   evidence on the merits, and I've given you some of the

19   indication of what that evidence will be, rolls in into this

20   case, and while we won't be disclosing the contents of the

21   actual attorney/client communications, the evidence will

22   reflect a very deliberative process of evaluating the facts and

23   seeking legal guidance surrounding what obviously was a

24   situation that presented thorny legal issues around an

25   associate engaging in vile, non-PCA activity in the context of



# Exhibit E, Motion to Try Petition on Hearing Record

1    also engaging in a demonstration in the parking lot that the

2    Region contends is PCA.

3         Until then, Your Honor, you would not have the testimony

4    that contextualizes the privileged communications, such that

5    you can make even a remotely informed decision about the

6    application of the privilege in that context.

7         And we've been in civil litigation.  I know you've heard

8    this many times in this case already.  I know you heard it last

9    week on the hearing.  We would've had months, and months, and

10   months, we probably, in my experience, because I do a lot of

11   civil litigation, six months to a year to produce what we're

12   doing here today.  You would have a fulsome record in which to

13   evaluate challenges to the privilege.  That, of course, is not

14   the situation that we are in here.

15        It should seem quite apparent to the Region, and will

16   become very obvious to Your Honor, that any business, any

17   business that is paying attention, would seek legal guidance in

18   the midst of what was this obviously thorny legal issue, with

19   the -- the non-PCA conduct in the context of a demonstration

20   which is now claimed to be PCA.

21        In factual context, it will be obvious that these

22   privileged communications fit well within the deliberative

23   process, and there will be no doubt their privilege, and

24   there'll be no need for any further discussion about the topic,

25   let alone having us to cross the bridge, which, I'm confident



Exhibit E, Motion to Try Petition on Hearing Record

1    that Your Honor doesn't want to cross, I would think the Region

2    doesn't want to cross, and we certainly don't want to cross,

3    whether Your Honor actually has the privilege, has -- has --

4    has the authority to make the determinations about the

5    privilege and to compel production with regard to privileged

6    documents.  No one -- no one wants to deal with the issue right

7    now, if we can avoid it, of whether the Region is going to have

8    to -- if -- if -- if we're going to require the Region to go to

9    the District Court.  We don't know what we would do, but we

10   don't think anybody should have to make that decision at this

11   point, because it's just premature.

12        Turning to the merits of their challenge, the first

13   argument they make is that the log is late.  The log is not

14   late.  If anything, the log was early.  You know, there are --

15   the parties talked last week about the fact that typically,

16   document production in a -- a Board ULP hearing such as this,

17   doesn't even start until the first day -- it's certainly not

18   required until the first day, and correspondingly, nor would

19   be -- there would be a -- a privilege log that's required

20   before the first day.

21        For some reason, you know, unbeknownst to us, the Region

22   seems to believe that it's entitled to preferential treatment

23   in this case.  No one has explained to us why that is.

24   Nonetheless, we've already produced, I believe, I've -- I've

25   lost count because I think we even produced more stuff this



Exhibit E, Motion to Try Petition on Hearing Record

1    morning, but I think as of last night, it was somewhere around

2    4,000 pages of documents and counting, which, in my experience

3    before the Board, that's a awful lot of information.  And that

4    required a lot of culling of stuff that was nonresponsive

5    because again, this world of electronic discovery, you -- you

6    start wide, then you start whittling down, and it takes a lot

7    of time.

8        We've been telling the Region and Your Honor for at least

9    a month that there was no conceivable way that we could meet

10   all of these document demands by May 3rd.  We're trying, and

11   we're working on it, and I have a veritable army of lawyers and

12   e-data personnel assisting with the project.

13       And while in a utopian world, we would've completed the

14   process with a snap of our fingers; that, of course, is not the

15   world in which any of us are living, particularly in the

16   context of a pandemic.  We live in a world where we have said

17   time and again that this is -- if this were civil lita --

18   litigation, that this would take months, and months, and

19   months.  And if the document production takes months, and

20   months, and months, the production of the privilege log takes

21   even longer, because you have to get the documents.  You --

22   you've got to have them harvested by your e-data people.  They

23   got to have them transmitted, they're searched, they're

24   reviewed, and they're redacted.  And then there's a

25   corresponding produ -- produ -- preparation of a privilege log,



Exhibit E, Motion to Try Petition on Hearing Record

1    but that takes longer because there's an extra step.  We've got

2    to consult with our client, because (audio interference) can't

3    always be assured that we know what communications are

4    attorney/client privilege or are not.  And so we had to build

5    in that extra step, and we worked hard to do that.  And again,

6    we've already produced a log a week before this hearing was

7    scheduled to start.  And we will supplement that, as our

8    production efforts continue.

9         And the log is a typical privilege log that's routinely

10   used in litigation.

11        JUDGE GREEN:  So let me just -- let me just jump in a

12   little bit here.  I -- I have a couple of questions.  I don't

13   know if the -- it's proper for -- to be asked of you or one of

14   the other lawyers who's been on the case longer.

15        So how many documents are we dealing with?  The privilege

16   log, how -- how many documents are claimed to be privileged, as

17   in number of pages, not just number of documents?

18        MR. ROSENBLATT:  I cannot tell you the number of pages.

19   If I remember correctly, it's somewhere in the 30, maybe, if

20   I'm remembering correctly, somewhere around 36 documents, but

21   that -- that doesn't mean we were only looking at 36 documents.

22   Obviously, we have this massive production.

23        JUDGE GREEN:  No, no, I understand.  So -- I understand.

24   So if -- this isn't -- this isn't hundreds of pages, right?

25   This is --



# Exhibit E, Motion to Try Petition on Hearing Record

1    MR. ROSENBLATT:  It's 55 pages, Your Honor; it's just a

2  rough --

3    JUDGE GREEN:  Okay, all right.

4    MR. ROSENBLATT:  As -- as -- as it stands.

5    JUDGE GREEN:  Okay, and -- and you were talking about the

6  log being late.  Let -- let me just ask the Respondent about

7  this.  You know, I -- I guess the question is, there were

8  certain paragraphs of the -- of the subpoena that had privilege

9  log -- privileged documents that -- privileged documents were

10  responsive.  And I think those include, we established on the

11  record in prior days, 12, 14, and 18.  I think that 12 and 14

12  were subject to production on April 6th, and 18 was subject to

13  production on April 19th.

14    I guess my -- my first question is, why wasn't the

15  privilege log produced at the same time that the documents were

16  produced.

17    MR. ROSENBLATT:  Your Honor, as is typical with a

18  privilege log, there's still determinations to be made about

19  certain documents that require consultation with our clients,

20  to make certain assessments of that.

21    JUDGE GREEN:  Okay.

22    MR. ROSENBLATT:  And we can't do it prematurely because we

23  run a serious risk of waiver.  So what we do is we work with

24  our client and we provide the privilege log.  But if I may,

25  Your Honor, the --



Exhibit E, Motion to Try Petition on Hearing Record

1        JUDGE GREEN:  So let me just -- I just -- I just -- I'm

2    sorry, I just -- I want to -- I do want to deal with these

3    issues a little bit on a ruling basis so we've got log is late,

4    so I just want to -- I just want to deal with that.

5        You know, as -- as far as I can tell, I -- I wouldn't

6    really call the log late.  It's -- it -- you know, I -- I said

7    this the last time we met.  You know, this is probably

8    certainly somewhat my fault, in that I did not designate

9    specific dates for the production of the privilege log.  Now, I

10   did say in my March 24th order that the log should be produced

11   on March 29th, or as soon thereafter as is possible.  It's not

12   100 percent clear to me that it was produced as soon as

13   possible, but you know, I'm really not inclined to find a

14   waiver of the privilege abs -- with abs -- absent specific

15   dates that I designated that were missed.

16       You know, we discussed the privilege log a bit on April

17   19th.  At that point, nobody, including me, jumped up and said,

18   you -- you should've had it in a month ago, or you should've

19   had it in -- you have to have it in today.  So I'm not going to

20   find a waiver and require production on the basis of a

21   failure -- failure of timeliness.

22       I will say that the problem we have now is that I -- it --

23   it seems to me as though the privilege log could've been

24   produced earlier, at least with regard to certain documents.

25   Yes, maybe there -- maybe you -- do you -- you know, you go



Exhibit E, Motion to Try Petition on Hearing Record

1    through documents, you find those ones that are subject to

2    production and those that are arguably privileged, and you go

3    through a process of confirming that the privileged documents

4    are in fact privileged with your client.  But certainly for the

5    ones -- for -- from documents responsive to paragraphs 12 and

6    14, it seems as though it could've been done earlier and okay,

7    I'm not going to find a waiver on that basis, but what it's

8    done, the -- the late production of the log, is that it's

9    really taken (indiscernible) largely out of the arsenal, as far

10   as a potential remedy, in the event that there are other issues

11   with this privilege log.

12       You know, it's -- we're now -- understand that this

13   isn't -- this isn't exactly like a normal NLRB case where this

14   is the first day of the trial.  This is not the first day of

15   the trial.  The first day of the trial was March 29th, and in

16   most situations, the documents and the privilege log should've

17   been produced on that day.  We -- we've carved out an extra

18   month so that the Respondent would have addit -- additional

19   time, and the General Counsel would have additional --

20   addition -- the Respondent would have additional time to

21   produce the documents, and the General Counsel would have

22   additional time to review it.  But now we've got a -- you know,

23   we -- we're dealing with a privilege log that I believe the --

24   the amended one came in on the 29th, which was the last workday

25   before the date that we're supposed to go on the -- on the

# Exhibit E, Motion to Try Petition on Hearing Record

1   record and deal with evidence on the merits.  And it's much

2   harder for me now to say, well, I don't need an in-camera

3   review, just -- just amend the privilege log again and cure any

4   deficiencies.  Now, you know, we're potentially looking at an

5   in-camera review instead if the privilege log is problematic.

6       So let's -- let's move on to the additional assertions

7   with regard to that, that the General Counsel made in their

8   letter to me on Friday.

9       MR. ROSENBLATT:  Absolutely, and I guess I just respond

10  and then roll into that by saying, you know, I think that the

11  Region will be hard pressed to demonstrate any harm, but more

12  importantly, there's nothing to cure.

13      There -- this -- this privilege log was a typical

14  privilege log that is used routinely in litigations.  I can

15  assure you that we didn't create some special log just to use

16  in this case.  It identifies the senders and the recipients of

17  the communications.  It identifies the purpose of the

18  communication, identifies the dates of the communications, and

19  you know, again, they could have -- if there was some

20  deficiency, they could've asked us what don't they understand.

21      You know, I point out that, you know, one of the thing --

22  I already pointed out one thing that they said, well, they

23  don't know if there's any third parties.  Well, that -- I --

24  I've resolved that for them, and they could've known about that

25  a while ago, could've a week ago.



# Exhibit E, Motion to Try Petition on Hearing Record

1    Secondly, they ask about, you know, they say something

2    about job titles.  Well, I point out that I think it's Exhibit

3    3 to their opposition to the petition to revoke the second

4    subpoena that they -- they've attached Exhibit 3, has a long

5    list of -- of personnel, including their job titles.  So they

6    could've looked at that, and if there was anything else that

7    they needed to -- to look at, then they would've been able to

8    ask us the simple question as to what more they needed.

9         The other thing to point out is that the Region's lawyers

10   are quite capable.  They're obviously capable.  They're --

11   they're doing -- you know, they're -- they're -- they're

12   effective advocates.  But the only way that they cannot discern

13   the application of the privilege here, being -- is by burying

14   their heads in the sand and ripping this log out of the context

15   of everything that either they know or should know about this

16   case.

17        And I've -- I've already mentioned this before, but again,

18   it's -- I think it's worth repeating is, you know, we have this

19   Charging Party who engages in horrific conduct, calling a

20   coworker, over a megaphone, slurs that we can only abbreviate

21   to the first letter.  It shouldn't come as any surprise to the

22   Region that discussions would have been undertaken about these

23   events with counsel, and as I've said before, when the evidence

24   comes in, to provide the context that Your Honor would need

25   to -- one, for them to evaluate whether they really think it's



Exhibit E, Motion to Try Petition on Hearing Record

1    appropriate to challenge the -- the assertion of privilege, or

2    two, for you to evaluate it.  I think the evidence will be

3    clear.

4        The next point is that the Region seems to be turning the

5    privilege somewhat on its head, by asking us basically to tell

6    them what the discussion was about, in order for them to

7    evaluate the assertion of the privilege.  Well, we are not

8    required to disclose the substance of the communications in

9    order to assert the privilege.  That's fairly fundamental.

10   That entire argument, again, turns the privilege on its head.

11   It's basically, tell us what you said, so we can decide for

12   ourselves whether it's privileged.  Obviously, that is not the

13   test, even remotely.

14       So you know, if they think that, you know, some revised

15   log would help them, I mean, I don't think that they need any

16   of this today.  Tell us -- they -- they can ask us to do that.

17   Why they didn't before, I don't know, and I don't know what

18   more we can provide to them, but that seems to me that there'd

19   be abundant opportunity, and -- and we shouldn't be told, Your

20   Honor, that it's too late, when they skipped the step of

21   telling us it was deficient before Friday night.  I mean, why

22   should we be --

23       JUDGE GREEN:  Yeah, but when was the -- when was the log

24   actually produced?

25       MR. ROSENBLATT:  Monday, a week ago.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  So April 26th?

2    MR. ROSENBLATT:  Yeah.

3    UNIDENTIFIED SPEAKER:  For that last month --

4    MR. ROSENBLATT:  Yes.  So we shouldn't be told that you

5    know, we -- we're late, when they could've asked these

6    questions, and I think we could've resolved at least some of

7    them.

8        Turning to the specific objections that they assert,

9    there's really only three of them.  The first one is that there

10   are certain emails on the privilege log that are dated April

11   5th.

12   JUDGE GREEN:  Yeah, let's skip over that because that's

13   not -- I'm not --

14   MR. ROSENBLATT:  Because I -- yeah, I think we could all

15   agree that --

16   JUDGE GREEN:  -- that's not a basis for -- for dealing

17   with -- for finding the log deficient.

18   MR. ROSENBLATT:  Right, the date of an attorney/client

19   communication doesn't affect its -- its status as privilege.

20   The second is the attachments.  They make the argument that we

21   have to identify the attachments to the emails, but that's just

22   flat wrong.  Some of those attachments may not be by themselves

23   privileged.  And if they are relevant and responsive, we have

24   produced them or -- those we will have -- we have produced.

25   But identifying what the attachments are in the context of what



Exhibit E, Motion to Try Petition on Hearing Record

1   is otherwise a privileged communication, effectively reveals

2   part of the communication that is for the purposes of -- of

3   obtaining or giving legal advice.  So we don't have to say,

4   hey, we were in the context of communicating with a -- one of

5   the business people, the lawyers or the business people

6   communicating with the lawyer, and they've attached certain

7   documents because that reveals the content of the

8   communication, at least in part.  Again, I want to emphasize,

9   there may be documents that are attachments that we have

10  produced independently of that, or certainly would be

11  producing, and you know, they'll get that.  They just don't get

12  to -- to find out what we decided that -- what we were taking

13  about with our clients.

14      And then they talk about -- the final challenge is that

15  certain of the communications don't specifically identify, and

16  these are, I believe, emails, that they don't specifically

17  identify attorneys.  But it's well settled that communications

18  between and amongst nonlawyers, for the purposes of furthering

19  legal advice, or for legal determine -- to determine that

20  the -- the business' final determination regarding, for

21  example, an employment decision that -- upon which legal has or

22  will be opining, that that communication is privileged.

23      So while the Region wants to make much of the fact that a

24  few communicat -- communications do not have a lawyer's name on

25  it, that's hardly indicative of, and hardly proves that absence

1    of a privilege.  And in fact, if you look at the privilege log

2    and the timing of some of these communications, you will see

3    that they are in close conjunction with communications with the

4    lawyers.

5         And so, you know, I think it's one, apparent if you look

6    at the -- you know, if you're not burying your head in the sand

7    and you're looking at the asser -- the privilege

8    identifications or assertions in the context of the log, it

9    will also become apparent in the context of the evolution of

10   the case, which takes me back to what I have -- what I -- where

11   I pretty much started off, and that is that again, all of this

12   is premature.

13        If we were in civil litigation, and I recognize we are

14   not, but the Court -- the -- Your Honor would have a full

15   record.  I mean, they cite what they call to be black letter

16   law with regard to the privilege.  But if you actually look at

17   the cases that they cite, all of which are litigation matters,

18   you will see situations where a federal court, by the way, has

19   said that a -- a party asserting privilege has waived the

20   privilege because they waited, like, a year, even though there

21   was a scheduling order, and promises made that kept on being

22   breached for, like, a year.  We have been saying to Your Honor

23   over, and I've heard Mr. Murphy ask you over and over, and over

24   again, should we ask for, you know, adjournment of the trial

25   and -- and you put the Region to a question.  I was on, and I

# Exhibit E, Motion to Try Petition on Hearing Record

1    heard it, and that is, do you want documents or do you want to

2    try this case, knowing full well, and you -- you -- you put

3    this out there for them, knowing full well that if they want to

4    proceed today, then they're going to have to deal with the

5    challenges that we are facing with document production and hear

6    our corresponding issue regarding the privilege log.

7            And so they've made their choice.  And what we're

8    suggesting to you is, let's just, you know, they want to go to

9    trial, we're now prepped and ready to go.  We have witnesses

10   lined up.  We're ready to put them on, and if you hear those

11   witnesses, you will be in a much better position at that point

12   to evaluate the assertion of the privilege, and frankly, you

13   know, if -- if you -- if you decide that, you know, you want to

14   do an in-camera review, you would -- that -- that can come down

15   the path when you have the context from which you can make a

16   determination, again, you know, if we decide that, you know --

17   that's a, you know, that from our litigation position, that

18   that's an appropriate thing to do, as opposed to forcing the

19   Region to -- to go to federal court, which we don't have a

20   position on at this point, but you know, we don't think anybody

21   needs to cross that bridge at this point, because the right

22   answer is, let's get on with the case, let's develop the

23   record, and then everybody, both the Region, Your Honor, can

24   then look at this in context.

25           JUDGE GREEN:  Well, let me ask Ms. Cox, what's your plan



# Exhibit E, Motion to Try Petition on Hearing Record

1    for today, you know, regardless of subpoena documents and

2    subpoena issues, do -- do you have -- do you have witnesses

3    that you want to get on and off today?

4         You're on mute, sorry.

5         MS. COX:  Sorry.  Your Honor, we want to call Tim Brainerd

6    today and we also asked -- we plan on recalling Tyler

7    Grabowski, and we asked Respondent to make him available today

8    and tomorrow.

9         JUDGE GREEN:  Okay.  So you're still dealing with subpoena

10   related witnesses?  You -- you're not planning on putting on --

11   you're not planning on putting on witnesses directly related to

12   the merits of the case, as indirectly related to the merits of

13   the case?

14        MS. COX:  Later -- later in the week, Judge.

15        JUDGE GREEN:  Okay.

16        MR. MURPHY:  And Your -- Your Honor, Your Honor, before --

17   before you move on, it's Mr. Murphy.  I just want to clarify,

18   so you -- the counsel for the General Counsel would seek to

19   recall Mr. Grabowski to question him further about document

20   related issues?  My -- my recollection was that he was excused

21   at the hearing last week, at -- and -- and we had understood

22   that he was going to be called by Ms. Cox as a substantive

23   witness in her case perhaps pursuant to Rule 611(c).

24        JUDGE GREEN:  Yeah, but she -- right, I mean, if she wants

25   to call him again, she can call him again.  You know, I would



# Exhibit E, Motion to Try Petition on Hearing Record

1    hope that that would be both subpoena matters and -- and any

2    other additional 611(c) she wants to do so we don't have to

3    keep calling Mr. Grabowski back to the stand.

4        So okay, let me -- let me discuss with the parties where

5    I'm at, as far as this privilege log issue, you know, I spent

6    more time than I really cared for looking at privilege log

7    cases over the last three days, and as far as I can tell, there

8    is a problem with the privilege log.  It does not have job

9    titles, and as the General Counsel pointed out in their letter,

10   CNN America, 336 NLRB 891, indicates that the privilege log

11   should have titles, and I would imagine that that's because

12   under Upjohn for the attorney/client privilege to apply, the

13   substance of the communication must relate to the employee's

14   work duties.  And so that's -- that's a preliminary problem.

15       Second of all, the substance of the description, while I

16   don't necessarily know that it requires much more than what was

17   in this privilege log, obtaining legal advice regarding Gerald

18   Bryson is in the nature of it's -- it's a legal conclusion

19   almost exclusively.  So for example, it doesn't say related to

20   the legality of the discharge of Mr. Bryson, or related to the

21   legality of the -- of the discipline of Mr. -- discharge or you

22   know, whether Mr. Bryson engaged in protective concerted

23   activities, some kind of factual basis that would essentially

24   echo an element -- a legal element of the case, but allow the

25   reader to say okay, yeah, that seems like it's -- it's

# Exhibit E, Motion to Try Petition on Hearing Record

1   really -- it's legal advice, it's -- it's -- it's privileged.

2   You know, I found a couple of cases, Chemtech Royalty

3   Associates, L.P. v. United States, 2009, WL 854358, citing

4   United Investors Life Insurance Company v. Nationwide Life

5   Insurance Company, 233 F.R.D. 483, and it says privilege log

6   entries that state the documents -- that state the documents

7   concerned legal advice lack sufficient information for the

8   Court or other parties to determine the applicability of the

9   privilege.  And so you know, that's what these -- this log did.

10  And it seems like it didn't have to do much more, but it seems

11  as though under, I guess most federal precedent, it should've

12  done a little more.

13  Same with the attachments, you know, and -- and -- and I

14  understand that these cases aren't entirely uniform because

15  there are a lot of, you know, there's a lot of discovery cases

16  out there in the federal system, but you know, I did find the

17  case, in the application of Chevron Corp., 2013, WL 11241413.

18  It says, second, even if the Court has found that the present

19  emails themselves were privileged, federal courts generally

20  expect that attachments, like earlier strings in email

21  correspondence, need to be treated separately and logged as

22  such.

23  (Audio interference) It -- it -- it is certainly true

24  that, an -- an attorney does not have to be the one who is

25  communicating with a client in order for that communication to



Exhibit E, Motion to Try Petition on Hearing Record

1   be privileged.  The -- the attorney can designate somebody to

2   conduct an investigation on their behalf; however, that

3   generally requires some additional information in the privilege

4   log, and I -- you know, what I found was, it's called Nadeau,

5   N-A-D-E-A-U W-E-L-A-T-H Counsel -- Welath Counsel, 2018,

6   Toledo, 2981748, where the Court found that the privilege log

7   was deficient, and it noted that neither the identity of the

8   attorneys, nor the date of the instructions to investigate, or

9   any affidavits regarding the fact or details of care -- of

10  Counsel's instructions, or the primary purpose of the

11  investigation have been provided.  So it seems that at the very

12  least, the name of the attorney who provided the instruction

13  should've been provided.

14      And so as far as I can tell, and I'm not a magistrate,

15  even though I've kind of been put in the position and acting as

16  one in this case, it seems to me that based on federal law, as

17  it pertains to, privilege logs that the privilege log was

18  deficient, and I -- I -- I fully understand that the -- that

19  the NLRB's process is much more compressed than the normal

20  discovery process; however, we all know the context.  You know,

21  I -- I did discuss on -- on the record, it was -- it was in --

22  in -- with regard to the production of subpoenaed records.  But

23  what I -- what I said was, you know, if you find out early that

24  there's a problem with the production, it gives you more of an

25  opportunity to cure.  And -- and the same goes for the


www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    privilege log.  If you -- if you find out early that there's a

2    problem with the privilege log, if you produce it early, it

3    gives it -- it gives you more of an opportunity to cure.  And

4    we don't really have that opportunity here.

5        So frankly, I don't want to an in-camera review.  I don't,

6    you know, I think it's -- it's disfavored because I'm the

7    treater of fact and I would prefer not to see documents, except

8    to the extent they are exhibits and entered into the record.

9    I -- I -- frankly, I think that the General Counsel -- you

10   know, oftentimes the General Counsel will ask for a -- an in-

11   camera review, and they don't necessarily think through --

12   think it through strategically.  Those are documents that the

13   judge is going to see that they haven't seen, and they can't

14   respond to.  And that's not always such a good thing.

15       So what I'm inclined to do, listen, you know, we're --

16   today is the day that we're supposed to really start this --

17   this hearing in earnest.  The -- the Respondent has a number of

18   lawyers.  If -- if the Respondent can go back today and -- and

19   cure what I've described as deficiencies with -- with this

20   privilege log and produce the privilege log tonight, so -- so

21   be it.  But if that is not -- can't be done, then really I'm

22   going to have to do an in-camera review, because I don't -- I

23   don't want to hold this process up any further.

24       So that's where I'm coming out.  We have -- we have -- we

25   have evidence that -- we have evidence that's ready to go on --



Exhibit E, Motion to Try Petition on Hearing Record

1    on the record right now.  I don't want to delay that process.

2    I'm -- you know, I'm not going to be able to do the in-camera

3    inspection right now, even if I wanted to, so listen, if a --

4    if the -- if the Respondent can send somebody back to redo this

5    privilege log, and I -- again, I don't know that it requires

6    much -- much change, you know, job titles shouldn't be that

7    difficult.  The name of the attorney who instructed the -- the,

8    you know, the investigation, that shouldn't be difficult.  A

9    little more -- a little more information regarding the nature

10   of these communications, that shouldn't be all that difficult.

11   So if -- if you want to take a crack at it, do it -- do it now,

12   you know, get started now, and then tell me where we stand at

13   the end of the day.

14       MR. ROSENBLATT:  That's fine, Your Honor.  We -- we can do

15   that and you know, I -- I -- at the end of the day, I wouldn't

16   be surprised if no matter what we provide, the Region will not

17   agree, but you know, as I've said before, you'll -- you'll make

18   that judgment, and you also need to make the judgment, as you

19   tread carefully around the attorney/client privilege, as to

20   whether this is the right time to make that -- that -- that

21   judgment, because as I've said before, as the case comes in,

22   all of this will be absolutely apparent.

23       And the cases that Your Honor cited, I can't say that

24   I've -- I've read all of them, but I know the law enough to

25   know that in the context of civil litigation, all of those

# Exhibit E, Motion to Try Petition on Hearing Record

1   decisions are made based upon fulsome records, cases that have

2   been going on with scheduling orders, and promises being made

3   as to when things are going to be delivered, that are, as you

4   point out, far different procedurally than what we're

5   confronting here with an -- with -- with a Respondent who has

6   said time and time again that we're doing our best, but we

7   can't -- we can't commit to this.

8        In those other cases, you know, there were commitments,

9   and there were promises, and they were reasonable because you

10  have, you know, sometimes, you know, months and years of

11  litigation before these determinations get made.  But we -- we

12  will -- we're already working on our team, taking another look

13  at the log, and we will try to get something over to the Region

14  by tonight, and hopefully that will solve the problem.

15       JUDGE GREEN:  Okay.

16       MS. COX:  Your Honor, if I may be heard?

17       JUDGE GREEN:  Yes.

18       MS. COX:  So with regard -- a few -- a few points of

19  clarification.  There are not 55 documents in the privilege

20  log, there are 36 documents in the privilege log.

21       JUDGE GREEN:  No, that's -- it's 36 documents, 55 pages,

22  if I -- if I understood correctly.

23       MS. COX:  Okay.  Also, your order required that the

24  documents be produced on March 29th or sometime there --

25  shortly thereafter.  There were promises made in this case,



Exhibit E, Motion to Try Petition on Hearing Record

1    which I did put into my motion, on and off the record by Ms.

2    Buffalano, that the -- that the privilege log would be produced

3    April 14th, it would be produced April 19th.

4        JUDGE GREEN:  I understand, I understand.  But that, you

5    know, it -- it wasn't -- I get that, and I'm -- and I'm mindful

6    of that.  I did read that.  And I think that that -- that is a

7    factor in me being not entirely patient with the Respondent, in

8    terms of giving them time to -- to cure; however, it wasn't 100

9    percent clear to me that the parties understood those to be a

10   hard deadline, or just a representation by the -- by the

11   Respondent that they're going to voluntarily produce the

12   documents on such and such day.  You know, I -- I heard it.

13   I -- I factored that in, but I -- I just -- that's not going to

14   change my decision on whether to -- to order the disclosure of

15   the documents and waiver of the privilege.

16       MS. COX:  Judge Green, the -- the log also doesn't have a

17   BCC column.  The ju -- the log also doesn't have any

18   description as to whether in-house counsel is being -- is being

19   consulted with for a business or a legal purpose.  There's --

20       JUDGE GREEN:  And so -- just let me -- let me stop you,

21   you know.  That is true, it doesn't -- and that's -- that is

22   largely why something like consulted with -- during legal

23   advice is -- is somewhat problematic.  There was a business

24   decision to discharge -- discipline and discharge Mr. Bryson.

25   And we have just a conclusion that this communication was --



# Exhibit E, Motion to Try Petition on Hearing Record

1    was legal advice.  We need a little more.  So in order to

2    establish that this wasn't -- this wasn't a communication

3    regarding the business decision.  This was actually legal

4    advice.  As I indicated, and I've looked at a number of

5    privilege laws, and frankly, they do require more, but they

6    don't require that much more.

7        MR. ROSENBLATT:  Your Honor.

8        JUDGE GREEN:  And -- okay.

9        MS. COX:  Judge --

10       MR. ROSENBLATT:  I mean I --

11       MS. COX:  -- I'm not finished.

12       JUDGE GREEN:  Yeah, let -- let Ms. Cox go.

13       MR. ROSENBLATT:  I'm sorry.

14       JUDGE GREEN:  I mean, Ms. Cox, understand that I have your

15   papers.  I've -- I've read it carefully, I really did.  And I'm

16   not changing -- I -- I -- if you're asking for some specific

17   change to my order, why don't -- why don't you tell me what you

18   want?

19       MS. COX:  Well, first, Judge, I just object to you

20   providing additional time to cure based on all the facts laid

21   out in the -- in the motion.  And aside from that, Judge,

22   there's other ways to cure.  If they want to redact the

23   documents and provide them, they can do that.  But this -- what

24   they've done to this point is just unacceptable, and we want an

25   in-camera inspection, bottom line.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay, understood.  I -- I'm -- my order

2    stands.  We're going to give the Respondent a day to attempt to

3    fix the privilege log and then it might not, at which point,

4    we -- I might very well have to do an in-camera inspection.  So

5    that is -- that is the privilege log.

6        Next, we have to deal with the General Counsel's second

7    subpoena.  So does everybody have -- have it -- someone there?

8        MS. COX:  Yes, Judge.

9        JUDGE GREEN:  Okay, so --

10       MR. MURPHY:  Yes, Your Honor.

11       MS. COX:  Judge Green, can you just clarify what date and

12   time the privilege -- the cured privilege log must be produced?

13       JUDGE GREEN:  Today, by the end -- by midnight.

14       MS. COX:  Thank you.

15       JUDGE GREEN:  So I'm -- I'm correct that certain subpoena

16   requests -- subpoena requests have been withdrawn, and this is

17   subpoena B11CBQMIN?

18       MS. COX:  Yes, Judge.

19       JUDGE GREEN:  Okay, so I have 3, 4, I don't think there is

20   a paragraph 5, 20, 21, 25, and 26 have been withdrawn, right?

21       MS. COX:  And -- an additional -- and 28 through 30.

22       JUDGE GREEN:  28 through 30, okay.  I did not know that.

23   Okay.  It -- it seems to me as though paragraph 6, 7, 9 through

24   14, and 29, the Respondent would consider to be redundant in

25   the sense that those documents should -- would they -- should



Exhibit E, Motion to Try Petition on Hearing Record

1    they have existed, would've been found and produced in response

2    to paragraphs 12 to 14 of the original subpoena; am I -- am I

3    right about that?

4         MR. MURPHY:  Your Honor, hey, Mr. Murphy.  You -- you were

5    a little quick there, and I didn't catch all the paragraphs --

6         JUDGE GREEN:  Okay.

7         MR. MURPHY:  -- that you listed.  My apologies.

8         JUDGE GREEN:  So I have 6, 7, 9 to 14, and 29 -- or well,

9    29 is actually --

10        MR. MURPHY:  29's withdrawn, right.

11        JUDGE GREEN:  Right.  So am -- am I right -- am I right,

12   is -- is the Respondent of the position that those documents

13   have been produced?

14        MR. MURPHY:  Yeah, so -- so 6 and 7 are -- are looking

15   for, you know, notes of meetings and such like that.  So Ama --

16   Amazon has a proprietary system, Chime, that -- that it uses in

17   lieu of Zoom, or WebEx, or anything like that.  So we've

18   harvested and analyzed all of the materials that would be

19   covered.  Custodians are being added.  Document review is

20   continuing.  But to date -- to date -- everything that we've

21   reviewed to date, has been produced.

22        JUDGE GREEN:  Okay.

23        MR. MURPHY:  I can't affirmatively represent that there

24   might not be other things that will come down the pipeline.

25   Those would've been included in our production for 12 and 14.



Exhibit E, Motion to Try Petition on Hearing Record

1       JUDGE GREEN:  Okay.  So I -- I -- I've looked at the

2    papers, and -- and as far as I can tell, the -- the remain --

3    the remaining requests are -- are relevant, you know, I -- I --

4    I have a question about paragraphs 1 and 2; 19, 22, 23, 24, and

5    27 appear to me to be relevant and subject to production; 15

6    and 16 seem to be relevant and subject to production, given the

7    document that was attached to the General Counsel's opposition

8    as Exhibit C.

9       For paragraph 17, however, I -- I'm limiting it to docu --

10    at least in -- initially to documents for JFK 8, as opposed to

11    the other two facilities.  I think we've learned during the

12    course of this process that the number of documents available

13    at one of these very large facilities is -- is numerous, and

14    you know, disciplinary reports, for example, I have one

15    facility is -- appears to be sufficient for the General

16    Counsel's purposes.  I -- I was always skeptical of the --

17    the -- the relevance and usefulness of -- of disciplinary

18    records at the other two facilities.  I granted it because of

19    the Board's very broad standard of relevance, and reluctance to

20    squash documents because they -- they are burdensome, but at

21    least for the time being, I -- I'm limiting 17 to JFK 8.

22       With regard to 1 and 2, you know, I -- I just -- I guess I

23    just -- I have a question for the General Counsel, you know.

24       MS. COX:  Can you go back one moment, Judge?  So you

25    said --



# Exhibit E, Motion to Try Petition on Hearing Record

 1      JUDGE GREEN:  Yes.

 2      MS. COX:  -- 17 is limited to JFK 8; what about 18?

 3      JUDGE GREEN:  Oh.

 4      MS. COX:  Did you say both?  I didn't -- I didn't hear.

 5      JUDGE GREEN:  No, I'm not -- J -- JFK 18, that's been

 6   produced, right?  That -- the cat's out of the bag on that one.

 7   So no, I'm not -- we're only -- wait, am I right?  What -- what

 8   is 18?  I'm sorry.  Let me look.

 9      MS. COX:  18 is the global workplace incident management

10   reports regarding referencing harassment by any employee at

11   JFK.

12      JUDGE GREEN:  Yes, I'm sorry.  So yes, so 17 and 18 are

13   currently limited.  You're right, are currently limited to

14   JFK 8.

15      MS. COX:  Okay.

16      JUDGE GREEN:  1 and 2, I -- you know, I'm just trying to

17   understand.  When you're trying to -- in these cases, when

18   you're looking at the investigation and who conducted it and

19   who made decisions to, you're often looking at whether there

20   was a rush to judgment, whether you have, you know, no

21   investigation, and somebody who generally doesn't have

22   authority to discipline or discharge.  They -- they -- they

23   rush to discharge somebody because there's this knee jerk

24   reaction, negative reaction to protect a concerted activity.

25   It -- you know, the -- the names in the global work --



Exhibit E, Motion to Try Petition on Hearing Record

1   workplace incident management reporting template, if I'm

2   correct, those are -- those are just people who received

3   noticed, were -- were designated as people who would see --

4   received notice of what was going on with regard to the

5   discharge.  It seems like a lot of people, and I -- I just -- I

6   wondered where the -- where the Region's going with it.

7       MS. COX:  Well, Judge, to date, we still don't know who

8   made the decision to terminate Mr. Bryson, and these

9   individuals appear to have been -- participated, consulted, or

10  involved in his discharge.

11      JUDGE GREEN:  Okay.

12      MS. COX:  And for those reasons --

13      JUDGE GREEN:  All right, so listen.  I'm going to order

14  the production of 1 and 2 as well.

15      MR. MURPHY:  But -- Your Honor?

16      JUDGE GREEN:  Yes.

17      MR. MURPHY:  If -- I mean, if we need to identify these

18  individuals, we'll do -- if you're ordering us to do that,

19  we'll do it.  I suggest that a lot of them are identified on

20  that exhibit to the counsel for the General Counsel's

21  opposition to the petition to revoke.

22      JUDGE GREEN:  Well, I mean, it -- it -- I think that

23  the -- the subpoena, as it pertains to those individuals, which

24  is 1 and -- it's really 1 and 2, because 3 and 4 have been

25  withdrawn, and 6 and 7 have already been produced --



Exhibit E, Motion to Try Petition on Hearing Record

1       MR. MURPHY:  Okay.

2       JUDGE GREEN:  -- so it's really 1 and 2.

3       MR. MURPHY:  Okay.

4       JUDGE GREEN:  And what they're looking for is additional

5  information regarding job duties and the -- the jurisdiction of

6  these individuals with regard to the facility.

7       So I don't know.  I -- you know, so --

8       MR. MURPHY:  So -- so we'll -- we'll --

9       JUDGE GREEN:  -- I don't know if there is -- if they -- if

10  the General Counsel already has that information; it doesn't

11  sound like they do.

12      MR. MURPHY:  Yeah, so you know, we'll -- we'll identify

13  their positions.  It's just that -- that the way the request is

14  worded, right, documents that show job duties,

15  responsibilities, I mean, so take for example, Bradley Campbell

16  (phonetic).  Documents that show his responsibility or

17  authority, that -- that may be another, like, massive search

18  for anything in --

19      JUDGE GREEN:  I understand.  So do you have job

20  descriptions?  Do you just have a -- do you have a general job

21  description for -- for --

22      MR. MURPHY:  To -- to be quite honest, Your Honor, I don't

23  know the answer to that question.

24      JUDGE GREEN:  Okay.

25      MR. MURPHY:  We'll find that out and report, but -- but



Exhibit E, Motion to Try Petition on Hearing Record

1   if -- if you are looking for, or ordering us to produce

2   documents that are in the nature of a job description, rather

3   than 50,000 documents that show Judge Green making a

4   decision --

5   JUDGE GREEN:  This is where -- so this is where -- this is

6   where cooperation with the parties -- between the parties can

7   help.  I -- I don't know why a job description would not be

8   sufficient to the General Counsel.  So I would suggest that you

9   find those first, give them to the General Counsel, and if

10  that's sufficient to the General Counsel, so be it.  And if

11  it's not, we'll have to deal with it.  But it seems to me as

12  though a job description would go a long, long way.

13  So if we don't have anything else in the -- in the way of

14  a preliminary matter, I -- we can finally, in this case, get on

15  to opening statements, which basically we -- we haven't had

16  yet.

17  MR. ROSENBLATT:  My apologies, Judge Green.  I do have one

18  other -- one other matter, but if -- if --

19  JUDGE GREEN:  Okay.

20  MS. COX:  I'm sorry.  I just saw -- Judge, did you address

21  paragraph 8?

22  JUDGE GREEN:  Did I address paragraph 8?

23  MS. COX:  Documents showing the names and job titles of

24  individuals on Respondent's workplace incident management team

25  having responsibilities or authority at JFK 8?



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Yes.  So -- so yes, I'm ordering that

2    produced.

3    MS. COX:  Okay, I'm sorry.

4    JUDGE GREEN:  I think I did miss that.

5    MS. COX:  Just give me one moment, Judge.  Okay.  Did you

6    discuss paragraph 22?

7    JUDGE GREEN:  Yeah, 22 is relevant and subject to produce.

8    MR. MURPHY:  Yeah, Your Honor, if -- if I may?

9    JUDGE GREEN:  Yes.

10   MR. MURPHY:  Mr. Curlesh (phonetic) appears in the videos

11   that have been produced to counsel for the General Counsel,

12   and -- and we'd be happy to point him out.  I -- I -- I -- I

13   hope that moots the need to produce some sort of --

14   JUDGE GREEN:  So if I understood this request, it's --

15   it's essentially asking for documents determining when Mr.

16   Curlesh was at the facility on April 6th --

17   MS. COX:  Yes, Judge.

18   JUDGE GREEN:  -- essentially to find out whether he was in

19   a position to see what happened.

20   MS. COX:  Yes, Judge.

21   JUDGE GREEN:  So if you have, whatever, a time card,

22   record, or, you know, whatever you got.

23   MR. MURPHY:  Okay.

24   MS. COX:  And Judge, can you -- can we have the parties

25   agree to a date certain for some of these documents?  I mean,



# Exhibit E, Motion to Try Petition on Hearing Record

 1    they shouldn't be too difficult.  For example, the policies for

 2    number 19, this is something that should be handy.  Paragraph

 3    8, I mean, some of these should be pretty straightforward, so

 4    at least some, or all, if we can get dates certain so we can

 5    avoid the confusion that we've gone through with the last

 6    subpoena.

 7         MR. MURPHY:  Judge, maybe we could have an off-the-record

 8    conversation with the counsel for the General Counsel and --

 9    and to see how she wants us to handle these, especially in

10    light of the fact of all the other review and production that

11    we're currently doing.

12         JUDGE GREEN:  So as far as I can tell, and correct me if

13    I'm wrong here.  The -- the -- the one it seems like that's

14    go -- the two that are going to be more time consuming are 17

15    and 18, which is basically another disparate treatment search

16    of comparators.  We're back to that, where it's just, you know,

17    oh, the door was opened by this -- this document that perhaps,

18    you know, these are -- these are comparators, so the rest does

19    seem fairly straightforward.

20         Do you have any sense of how long it's going to take to --

21    to produce this stuff?  Who do you have?  Do you have somebody

22    working in the background on this stuff?

23         MR. MURPHY:  Somebody?  Yes.  There are -- there are a

24    number of -- of people like that as Mr. Rosenblatt suggested.

25    Yeah, so as I said, I mean, I -- I -- I'd like to talk off the



1    record with Ms. Cox.  I'm sure that we can come up with a time

2    frame in which we will produce those.  And -- and we'll be

3    happy to report it to you.

4          JUDGE GREEN:  Okay, so --

5          MR. MURPHY:  I just -- I just can't say right now, Judge,

6    that --

7          JUDGE GREEN:  Yeah, that's fine.  Just -- just remind me,

8    Ms. Cox, at some point during the day to address the time frame

9    for production.

10         MS. COX:  Okay, Judge.  I mean, ultimately, we would

11   prefer to just get an order from you on the production.

12   Because we've proved --

13         JUDGE GREEN:  I understand.  We already had that problem

14   with regard to the privileged lives.

15         MS. COX:  Exactly.

16         JUDGE GREEN:  Okay.  So we're -- we're going and try and

17   get a date, a date certain, but we're not going to do that

18   right now.

19         MS. COX:  And Judge Green, can we also, you know,

20   Respondent has made some representations that a lot of

21   documents responsive to paragraph 6 and 7, paragraphs, I

22   believe it was --

23         MR. MURPHY:  Which subpoena are you referring to?

24         JUDGE GREEN:  No, I feel she's talking about the documents

25   that are redundant with the original.



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:  Yes.

2    JUDGE GREEN:  And it's 6, 7, 9 to 14.  You know, I

3    really -- as far as I can tell, the Respondent is -- has

4    already made a representation that they believe that these

5    documents would've been found and produced in response to the

6    previous subpoena.  I don't -- you know, I don't know that we

7    need to spend any more time on that.

8    MS. COX:  Well, Judge, I just wanted -- there are other

9    subpoena paragraphs that no documents have been produced for a

10   first subpoena.  So I did want to go back and go through some

11   of those subpoena paragraphs.

12   MR. MURPHY:  Judge, if -- if we're -- frankly, I had not

13   anticipated that we would be essentially engaging in some sort

14   of accounting on the subpoena.  It was that --

15   JUDGE GREEN:  Yeah, I -- yeah.  We're -- we're not going

16   to do that on subpoena 1.  We're not going to do that now on

17   subpoena 1.  You know, you've got -- it sounds like you're

18   putting on witnesses to address the -- the -- the production

19   with regard to the first subpoena, so.  What --

20   MS. COX:  Only with regard to one paragraph, Judge.

21   JUDGE GREEN:  Okay.

22   MS. COX:  Or two paragraphs, 12 and 14.

23   JUDGE GREEN:  Okay.

24   MS. COX:  But there are no documents produced responsive

25   to paragraph 19.  I have no documents produced responsive to



Exhibit E, Motion to Try Petition on Hearing Record

1 paragraph 17.  I understand that Respondent thinks charts are

2 responsive, but they're not.  And I want to know whether

3 everything has been provided, especially on the duplicates, the

4 ones that they're calling duplicates?

5 JUDGE GREEN:  So I would very much like the parties to

6 come to in agreements.  There shouldn't be any dispute

7 regarding what was produced and what was not produced.  And I

8 would like that on the record and they -- to the extent we can

9 get it on the record and the nature of the stipulation.  I -- I

10 would like that.  But I don't want to -- I don't want to go

11 through it just now in -- in a random and unplanned way.  I

12 would like the parties to sit down and specifically discuss

13 what was produced and when.  And if it can be put in the record

14 in writing that would be great.  You know, if it has to come

15 in -- you know, it can be a document prepared by the parties.

16 If we need emails, we can put in -- we can accept emails.  But

17 I -- I'd like the parties to have a discussion regarding that

18 before we deal with it now on the record.

19 MS. COX:  Judge Green, I understand your position and I

20 respect it.  But we do have a right to make our record in order

21 to monitor evidentiary sanctions.  And unless we put our -- put

22 these representations on the record, how will we know whether

23 to ask (indiscernible, simultaneous speech)?

24 JUDGE GREEN:  Yeah, except it's not a -- your

25 representation -- and right now, I'm dealing with this with



1    Region 29 in two trials at the same time.  And I -- I think

2    there's a misunderstanding as to how this works.  The General

3    Counsel's representation is just a -- it's just a

4    representation.  It's not record evidence.  What we need is a

5    stip.  We need a -- we need stipulations and agreements.  And

6    we should be able to get that for the vast majority of this

7    information.  And if we can't get that, we can probably get it

8    through emails, essentially.  Because the production in this

9    context, in the Zoom context, it's been done electronically.

10   And so there shouldn't really be any dispute.  You just

11   standing up and representing the General Counsel is not --

12   you're not a witness.  And you're -- you're not providing

13   evidence as to what was produced and what was not produced.

14   It's really not that helpful.

15       MS. COX:  Exactly, Judge.  We don't want to make those

16   representations.  We want Respondent to make representations on

17   it.

18       JUDGE GREEN:  I understand.  But the -- but --

19       MS. COX:  What (indiscernible, simultaneous speech) --

20       JUDGE GREEN:  I understand.

21       MS. COX:  -- what doesn't exist.

22       JUDGE GREEN:  I'm asking you to -- I understand that

23   you've been frustrated with the nature of the communication

24   with the other side.  But I'm asking you to take one crack for

25   the specific purpose of identifying what was produced in



# Exhibit E, Motion to Try Petition on Hearing Record

1    response to the documents, whether we can get agreements with

2    regard to that and -- and get it on the record in a more

3    efficient and understandable way.

4         Okay, so next.  The --

5         MR. KEARL:  Yes, Judge Green, if I may?  I had a question

6    regarding my subpoena and the production of documents.

7         JUDGE GREEN:  Okay.

8         MR. KEARL:  So as of your order from last Tuesday

9    regarding the subpoena B-1-1, C-9, GVF-7, which is identical in

10   form to the subpoena that was originally served on March 30th.

11   You ordered, you know, almost complete production of documents.

12        As of Friday evening, I started to receive some documents.

13   But there are a number of documents in the production key that

14   has been produced, but have been withheld.  And it's my

15   understanding that some of these documents have already been

16   produced to General Counsel.  I do not understand why those

17   documents are currently being withheld.

18        And as of today, I have not received any production for

19   paragraphs 1, 2, 3, 4, 5, 6, 10, 12, 13, except for a little

20   bit of production on 13-d, 14, 15, 17, 18, 19, 20, 21, 22, 23,

21   and 24.  And I'm just curious if these are documents that I'm

22   going to be receiving sometime soon?  I'm also curious why

23   documents are being withheld that have been shared with General

24   Counsel?  And you know, I -- I also just wanted to, you know,

25   raise the fact that you were clear that there was a limit to



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    the protective order in terms of these documents?  But opposing

 2    counsel continues to request that I negotiate a -- an

 3    independent, you know, agreement relating -- relating those.

 4    And I think at this point, and certainly the fact that we are

 5    more than a month out from the original service of this

 6    document, I think considering Bannon-Mills sanctions is

 7    appropriate in this matter.

 8         JUDGE GREEN:  Okay.  So may I -- well, the protective

 9    order is the protective order.  And -- and certainly the

10    parties are under no obligation to bring anything more than

11    what was limited -- with more than the disclosure that was

12    limited by virtue of that protective order.

13         Let me just ask quickly.  You know, Mr. Murphy, can you

14    give us an update on what's going on with getting your --

15         MR. MURPHY:  Sure.  Sure.  So -- so first of all, as Mr.

16    Rosenblatt said, we have almost a literal army of people who

17    are pulling, culling, reviewing, producing documents.  Okay?

18    Mr. -- Mr. Kearl's subpoena -- again, no one's reached out to

19    us except Ms. Cox on the 28th with certain priorities.  And I

20    believe with respect to those priorities, we've delivered on --

21    on much, if not all of them.  No -- no one's reached out to us

22    and said we really need paragraph X or Y or Z.  We'll -- we'll

23    certainly, you know, consider those.  Mr. Kearl's subpoena is,

24    again, logically in -- in process.  We didn't -- we didn't move

25    it ahead of anything that we were doing with respect to the
```

Exhibit E, Motion to Try Petition on Hearing Record

1    first General Counsel's.

2        JUDGE GREEN:  Can you get -- is there some reason why he's

3    not getting certain documents that were responsive to those

4    subpoenas?

5        MR. MURPHY:  So -- so we were going to phrase today a

6    request that you reconsider paragraph 3 of the -- of your

7    order, in which you granted the partial protective order.  And

8    then, if you look, if you want to -- and in particular, we were

9    going to ask you to extend the protective order to cover

10   records that are not personnel documents.  And to cover those

11   documents -- those -- those other documents that were already

12   provided to Counsel for the General Counsel.  And by the way,

13   to the extent they're relevant for trial prep, I -- I certainly

14   believe, you know, based on my understanding of how the process

15   goes, that those have been available to the Charging Party and

16   his counsel.  He may not physically possess them, but he's had

17   full access to them.

18       We -- we would ask that the -- that the protective order

19   be modified and extended to cover all the documents that were

20   provided to counsel for the General Counsel.  We -- we -- we

21   recognize what you say in footnote 3, but we just -- we don't

22   really see what the corresponding interest is in -- in being

23   able to disclose those documents without -- without limit,

24   when -- when they have been produced in -- in this case for --

25   for a limited purpose.



Exhibit E, Motion to Try Petition on Hearing Record

1    So we would ask you to extend the -- modify and extend the

2    protective order.

3    JUDGE GREEN:  Okay.  And I'm going to deny that request.

4    And you might want to refer to the Bench book which talks about

5    protective orders extensively and that they're needed.  You

6    know, you need to show good cause and they're not -- they're

7    not granted as a matter of course with regard to that -- with

8    regard to documents that do not have some kind of

9    confidentiality interest.

10   You know, in this case, we actually, we don't even -- with

11   personnel records, we don't have the employees here to make

12   the -- make the request.  I think it's somewhat self-evident

13   that -- that employees wouldn't want their disciplinary and

14   personnel records disclosed.  But I'm going to -- I'm going to

15   limit it to that.  And so I'm going to deny that request and

16   confirm the protective order.

17   I -- I'm not sure I -- so I -- I had the -- the question I

18   was asking was, is there some reason why -- why Mr. Kearl

19   hasn't received the documents that have been produced to the

20   General Counsel?

21   MR. MURPHY:  He -- he has, except with respect for those,

22   Your Honor.

23   JUDGE GREEN:  Oh, I see.  Okay.

24   MR. KEARL:  That's -- that's not true, Your Honor.  I have

25   not received the organizational chart in paragraph 1.  I have



Exhibit E, Motion to Try Petition on Hearing Record

1    not received deliberation documents that relate to my own

2    client, in terms of his termination.  And furthermore, I just

3    want to say, that all of these disciplinary documents, all of

4    the names and identifying information have been redacted.  So

5    there is no personal identifying information, even in those

6    documents.  So I mean, at this point, I don't know why I

7    haven't received any of them and they show up in the -- the --

8    the production notes -- the production key, as withheld with no

9    justification as to why they're withheld.  And the order is

10   clear from -- from the 27th of last month.  And this is a

11   subpoena that they have had in their hands for over a month at

12   this point.

13        MR. MURPHY:  Yeah, my -- my understanding, Judge, is that

14   everything that was produced to the counsel for the General

15   Counsel, that was not a -- a personnel document, let me -- let

16   me state that the other way.

17        Everything that was a personal document has been produced,

18   other documents have not.  And if there are particular things

19   that -- that Mr. Kearl believes have been withheld or omitted,

20   I -- I'm presently not aware of that, but would be happy to

21   discuss that with him.

22        JUDGE GREEN:  Okay.  So this is an example of what I was

23   discussing in terms of process.

24        So yes, I would like the parties to reach an agreement

25   regarding what was produced and not was produced.  If we



Exhibit E, Motion to Try Petition on Hearing Record

1    absolutely have to, it can be litigated.  And it would have to

2    be litigated and become, one, would be to introduce emails.

3    But for the General Counsel's case and the Charging Party's

4    case, you know, it's -- Mr. Kearl did not object.  One -- one

5    possibility is that the General Counsel can call Mr. Kearl with

6    regard to alleged nonproduction personal subpoenas to the

7    extent that Mr. Kearl is -- is aware of production and

8    nonproduction with regard to both -- with all of the subpoenas

9    at issue in this case.

10        But let's see if -- I'm going tell you, Mr. Kearl, the

11   same thing I just told Ms. Cox, which is, take a -- take a

12   crack at seeing if we can get this stipulated to as to what was

13   produced, what was not produced.  And if we can't, we'll have

14   to litigate it.

15        MR. KEARL:  And with all due respect, Judge Green, I

16   have -- I immediately following their order.  I sent a number

17   of emails to opposing counsel (indiscernible, simultaneous

18   speech) --

19        JUDGE GREEN:  I understand.  And the -- the -- what we end

20   up doing here might just be a dump of a bunch of emails in the

21   record.  It's -- showing what was produced and what was not

22   produced.  And that might be it, that might be what we -- we --

23   we deal with.  But we do have to get that on the record.  You

24   know, to the extent that the Respondent is saying that they

25   produced it and the -- and the Charging Party is saying it was



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    not -- not produced.  I have to have some record basis for

2    making that determination.  Okay?

3         MS. COX:  Judge Green?

4         JUDGE GREEN:  Yes?

5         MS. COX:  Since this seems to be an issue for both the

6    Charging Party and the General Counsel, I want to ask for you

7    to order a date by which Respondent has to tell us what's been

8    produced and if any other responsive documents are forthcoming,

9    or if no documents are produced, this way, again, there's no

10   confusion.

11        MR. MURPHY:  And -- and Judge, we're happy to have a

12   conversation after the close of the hearing today and -- and --

13   and come to that understanding.  But let's get on with the

14   trial of the case.

15        JUDGE GREEN:  Okay.  Let's go --

16        MR. MURPHY:  Let's put the evidence here.

17        JUDGE GREEN:  So let's --

18        MS. COX:  I'm just asking for a date to ensure --

19        MR. MURPHY:  Yeah.

20        JUDGE GREEN:  All right.

21        MS. COX:  I agree we should talk.

22        JUDGE GREEN:  So just do it after the record is closed

23   today, okay?

24        MS. COX:  Right.  I'm -- I'm asking for you to order a

25   date by which Respondent is being challenged by Charging Party.



# Exhibit E, Motion to Try Petition on Hearing Record

1     MR. MURPHY:  Yeah, I'm just -- I'm confirming and

2     directing the parties to have a discussion after the close of

3     the hearing today.

4     MR. KEARL:  And -- and in the events, Judge Green, that

5     Respondent continues to show, you know, this gross disrespect

6     for Charging Party, who has rights in the course of this

7     proceeding, at that point, will you be, you know, potentially

8     to be considering Bannon-Mills sanctions for this?

9     JUDGE GREEN:  Yes.  And the whole purpose of -- the

10    testimony of the custodian of records, the whole discussion,

11    that's what ultimately this is about.  I don't see -- I don't

12    enforce subpoenas, that -- that's a District Court process.

13    The only thing I can do is give sanctions.  And that's what I

14    can do.  But as I've said before, and I guess I have to say

15    again, it's a process.  It's a process of producing relevant

16    evidence on that issue and getting it in the record.  It could

17    be stips.  It could be emails.  It could be testimony.  That's

18    the process.  It's not just attorney stands up represents they

19    haven't received documents and I give sanctions.  That's not

20    the process.

21    MR. MURPHY:  Yeah.  And just let me say, the decisions

22    that we made have had nothing to do with respect or lack of

23    respect for -- for the Charging Party.  It's -- it's been

24    entirely related to positions to protect interest of our

25    client.  That's it.  So we're ready to go, Judge.



# Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Okay.  So would the parties like to make

2   opening statements, or at least the General Counsel?

3      MS. COX:  Judge Green, we're going to make our opening

4   statement after the custodian is called.

5      JUDGE GREEN:  Okay.

6      MR. JACKSON:  Judge?  Well, so --

7      JUDGE GREEN:  You know what?  I'm going to allow that.  I

8   understand it's -- it's extremely unusual.  But I'm -- I'm

9   going to allow it.

10      So do you want to call the next -- a witness?

11      MR. JACKSON:  Yes, Your Honor, I'll take it from here.

12      This is Matthew Jackson.  Counsel for the General Counsel,

13   or the Acting General Counsel calls Tim Brainerd.

14      JUDGE GREEN:  Okay.  Thank you Mr. Brainerd.  Can you --

15   can you hear us?

16      MR. BRAINERD:  I can.

17      JUDGE GREEN:  Okay.  So raise your right hand.

18   Whereupon,

19                          **TIMOTHY BRAINERD**

20   having been duly sworn, was called as a witness herein and was

21   examined and testified, telephonically as follows:

22      JUDGE GREEN:  Okay.  And are you alone in the room?

23      THE WITNESS:  I am.

24      JUDGE GREEN:  Okay.  And please don't use any other device

25   to communicate with any -- anyone, only be -- only communicate



# Exhibit E, Motion to Try Petition on Hearing Record

1    with the attorney who are -- who are talking to you or with me.

2    Also, please don't refer to any materials that are not shown to

3    you by one of the -- one of the attorneys or -- or myself.

4    Just -- just rely, unless directed otherwise, just rely on

5    what -- what we show you, okay?

6         THE WITNESS:  I understand.

7         JUDGE GREEN:  Now, please -- please state and your spell

8    your name, your full name for the record.

9         THE WITNESS:  Timothy Brainerd, T-I-M-O-T-H-Y.  Brainerd,

10   B-R-A-I-N-E-R-D.

11        JUDGE GREEN:  Okay.  Thank you very much.

12        So Mr. Jackson, whenever you are ready.

13                         <u>**DIRECT EXAMINATION**</u>

14   Q    BY MR. JACKSON:  Good morning, Mr. Brainerd, thank you for

15   taking the time to join us today.

16   A    You're welcome.

17   Q    For whom are you currently employed?

18   A    Consilio, Inc.

19   Q    And in connection with your job with Consilio, do you

20   perform work with Amazon.com Services LLC?

21   A    I do.

22   Q    Have you collected any data or documents for Amazon in

23   connection with any subpoenas issued in this case?

24   A    I have.

25   Q    Have you been designated by Amazon as a custodian of



1    records for the purposes of this hearing?

2    A    I have.

3         MR. JACKSON:  All right, Your Honor, I would ask at this

4    time for leave to use leading questions, if I feel it's

5    necessary, because Mr. Brainerd is an adverse witness aligned

6    with Respondent?

7         JUDGE GREEN:  Granted.

8    Q    BY MR. JACKSON:  Now, Mr. Brainerd, Amazon has designated

9    you as the custodian of records for General Counsel Exhibit 3,

10   which has been admitted into evidence, which is the first

11   subpoena that the counsel for the General Counsel issued.  Are

12   you familiar with that?

13   A    I can't see what you're showing.

14   Q    All right.  Let me bring it up.  Okay.

15        MR. JACKSON:  Let me ask, does everybody have a copy of

16   this document?  Because I don't see it in the server.

17        MS. COX:  Judge Green, I believe it's in SharePoint.  I

18   think it's General Counsel's Exhibit 2.

19        MR. JACKSON:  2, okay, it's 2.  You're right, it's 2.

20   Pardon me.

21        JUDGE GREEN:  That's okay.

22        MR. JACKSON:  All right.  I have a copy of it that I can

23   share with you, I believe.  I don't believe it's the one that's

24   marked for identification in this case.  But this is the same

25   document I'll represent.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    BY MR. JACKSON:  So this, you know, I have it up on the

 2    share screen.  Can you see it, Mr. Brainerd?

 3    A    I can.

 4    Q    Okay.  And I'm going to scroll through it a bit.  It's the

 5    subpoena number B-1-1BUGMIX.  It contains -- let me just go

 6    quickly the instructions, but to the documents produced

 7    section, it contains 19 paragraphs requesting documents, some

 8    of which include subparagraphs.  Are you familiar with this

 9    document, Mr. Brainerd?

10    A    I have viewed it, yes.

11    Q    And you were responsible for searching it and collecting

12    documents responsive to paragraph 12 of this subpoena, correct?

13    A    I do not conduct searches.  I conduct collections.

14    Q    Okay.  Can you describe what the difference is?

15    A    One involves collecting documents.  The other involves

16    searching documents.

17    Q    Okay.  Okay.  So I'll rephrase my question then.  Were you

18    responsible for collecting documents responsive to paragraph 12

19    of this subpoena?

20    A    I was.

21    Q    Okay.  And you were also responsible for collecting

22    documents responsive to paragraph 14 of the subpoena, correct?

23    A    Yes.

24    Q    Okay.  Okay.  And were you responsible for searching --

25    excuse me.  Were you responsible for collecting documents
```



1    responsive to any other paragraphs of this subpoena?

2    A    No, not that I'm aware of.

3    Q    Okay.  Now, can you -- I am a bit confused about the

4    difference between searching and collecting.  Can you provide

5    an example of what -- what a search might entail and what

6    collection might entail?

7    A    I do not conduct searches, so I cannot speak on that

8    behalf.  But I can comment on as collecting documents is

9    retrieving documents.  For example, like, a PST, from a server.

10   Q    And do you have any idea what a search is?

11   A    Again, that's -- that's not my responsibility.

12        JUDGE GREEN:  Okay.  That wasn't really the question.  The

13   question is, do you know what a search is?

14        THE WITNESS:  I know what a search is.

15        JUDGE GREEN:  Okay.  So you want to answer the question?

16   Q    BY MR. JACKSON:  What is your understanding of what a

17   search is?

18   A    Searching on specific key terms.

19   Q    And what -- in terms of collection, you said you -- can

20   you tell us what again you do in terms of collection?

21   A    With regards to PSTs, we run a PowerShell, and we

22   extract -- we export the data out from the prospective

23   servers --

24   Q    Do you tran --

25   A    -- exchange servers.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Do you transfer it at that point?

2    A    Once we have verified and audited it to confirm that the

3    sizes are correct, we then transfer it to an S3 bucket for

4    release to the project managers at Consilio.

5    Q    Okay.  So what is a PST?

6    A    It is an email container file.

7    Q    Okay.  And you mentioned S3 bucket.  What is that?

8    A    It is similar to a SFTP

9    Q    What's an SFTP?

10   A    File -- safe file transfer protocol.

11   Q    Do you know who conducted the search for documents

12   responsive to paragraph 12 of the subpoena in evidence as GC-2?

13   A    Hillary Volk.

14   Q    And can you describe the process that you followed in

15   terms of collecting documents responsive to paragraph 12?

16   A    So specific to PSTs, we ran a PowerShell and exported the

17   data out from the servers, exchange servers.

18   Q    And can you tell us what a PowerShow (sic) is?  Is that

19   S-H-O-W, PowerShow?

20   A    PowerShell.

21   Q    Shell.

22   A    S-H.

23   Q    And what is a PowerShell?

24   A    It is a mechanism for exporting out data from the exchange

25   server that was given to us to utilize by Amazon's IT



Exhibit E, Motion to Try Petition on Hearing Record

1    department.

2    Q    So correct me if have this wrong, but you're saying that

3    your role was to extract documents from a server and then place

4    them into a separate S3 bucket, I believe you said, for --

5    A    That's correct.

6    Q    -- for Amazon's IT folks to then do something else with

7    it; is that correct?

8         MS. WILLIAMS:  Objection, Your Honor.  Mischaracterizes

9    his testimony.

10        MR. JACKSON:  I'm asking if -- I'm asking if -- I'm asking

11   him to correct me if I'm wrong.

12   A    That is -- that's not what I -- that is incorrect.

13   Q    BY MR. JACKSON:  Can you tell me how it is incorrect?

14   A    What I stated was, we use a PowerShell that was given to

15   us by Amazon's IT to export out data from the exchange server.

16   From there, it is transferred from a staging folder on Amazon's

17   network to the S3 bucket.  The Amazon's IT does not touch it.

18        JUDGE GREEN:  Let me ask a question, and feel free to me

19   that you'd rather not tell me at this time.  But am I right

20   that really what we're trying to get from this witness is,

21   we're trying to find out whether the documents that were

22   ultimately searched by Ms. Volk was a proper underlying data

23   set that would've included documents potentially responsive to

24   the subpoena?

25        MR. JACKSON:  Yes, Your Honor.  And I also want to



Exhibit E, Motion to Try Petition on Hearing Record

 1    understand the process by which Mr. Brainerd followed, which I

 2    think he's explaining.

 3            JUDGE GREEN:  Okay.

 4    Q    BY MR. JACKSON:  Did anyone direct you to collect

 5    documents responsive to paragraph 12?

 6    A    Yes.

 7    Q    Who directed you?

 8    A    Kelcey Phillips from Morgan, Lewis.

 9    Q    And on what date did you begin the process of collecting

10    documents responsive to paragraph 12?

11    A    Our first collection request was received March 26th,

12    2021.

13    Q    Do you know whether a search had already been conducted by

14    that date?

15    A    Not that I was aware of.

16    Q    Does a collection have to take place before a search can

17    be performed?

18    A    Yes.

19    Q    How did you identify the servers to collect data from?

20    A    Our PowerShell script automatically identifies the

21    custodian.  And then, from there, the custodian's exported off

22    of the regional server form.

23    Q    Were you provided a list of custodians?

24    A    Yes.

25    Q    Do you recall which custodians were on that list?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Our first six custodians were Shianna Donaldson

2    (phonetic), Jeff Gilbertdiffer (phonetic), Christopher Urso

3    (phonetic) -- I can't remember the other three, but those were

4    part of the first collection request.

5    Q    So there were six --

6    A    Frankly -- there were six initially, correct.  That's

7    correct.

8    Q    Okay, sir.  Where does Amazon maintain documents that were

9    subject to your collection for this subpoena?

10        MS. WILLIAMS:  Objection, Your Honor, to the extent it

11   exceeds the scope of this.  Go ahead, Tim.

12        JUDGE GREEN:  Overruled.

13        THE WITNESS:  With regards to Chime and PSTs, they're our

14   servers.

15   Q    BY MR. JACKSON:  Okay.  Do the servers have a name?

16   A    Depending on where the custodian's located, it is on the

17   USA East server or the U.S. West server.

18   Q    And you -- I just want to make sure the record's clear.

19   The files that are housed on these servers include PSTs and

20   Chimes?

21   A    No.  PS -- they're separate servers.

22   Q    Separate servers for PSTs and separate servers for Chimes;

23   is that right?

24   A    Yes.

25   Q    What about any other type of documents?  Are there -- do



1    they have a separate server for other types of documents?

2    A    I was only requested to collect PSTs and Chimes.

3    Q    Are you familiar with something called Exact?

4         MS. WILLIAMS:  Objection, Your Honor.  That's not what

5    this witness is here to testify to.  He's here to testify to

6    what he collected, not what was collected for other portions of

7    the subpoena request.

8         JUDGE GREEN:  Overruled.

9    Q    BY MR. JACKSON:  Are you familiar with something called

10   Exact?

11   A    No.

12   Q    So your collection in response to paragraph 12 did not

13   include any collection of Exact files, correct?

14   A    I was only directed to collect PST and Chime logs.

15   Q    And what do you mean by Chime logs?  What is that?

16   A    Chime is a service used by Amazon for instant messaging

17   and videoconferencing, similar to Teams or Zoom.

18   Q    And does the log contain all of the communications in a

19   certain thread?

20   A    Yes.

21   Q    And PSTs are emails, correct?

22   A    Yes.

23   Q    Who provided you with the list of six custodians initially

24   to search -- excuse me -- to collect records for?

25   A    We were directed to collect the six custodians on March



Exhibit E, Motion to Try Petition on Hearing Record

1   26th, 2021 by Kelcey Phillips.

2   Q    And at some point, you said --

3        MR. JACKSON:  Well, strike that.

4   Q    BY MR. JACKSON:  You said that that was the initial six.

5   Were there others identified at some subsequent period after

6   March 26th?

7   A    There were additional collection requests at the month of

8   April.

9   Q    Do you recall how many custodians in total you collected

10  data for in response to paragraph 12 of the subpoena?

11  A    26 total PST and Chime logs -- custodian Chime -- excuse

12  me.  There were 26 PST and 26 Chime logs brought up for the

13  custodians.

14  Q    Now, you testified that Chime logs contain chats; is that

15  correct?

16  A    That's correct.

17  Q    And can you describe what a chat is in terms of Chime?

18  A    It's similar to what you would see on Teams, if you're

19  familiar with that service.

20  Q    So it's a series of written communications exchanged back

21  and forth between two or more people; is that correct?

22  A    That's correct.

23  Q    Do Chime logs contain any other information other than the

24  chats?

25  A    Each Chime contains the messages as well as the members in



Exhibit E, Motion to Try Petition on Hearing Record

1   those messages.  And attachments are included as well.

2   Q    Do Chime logs contain any videos?

3   A    No.

4   Q    What about phone calls?

5   A    No.

6   Q    Are you aware of any other multimedia that might be

7   contained in a Chimes log?

8   A    Pre -- I said there are attachments contained within a

9   Chime log.

10  Q    Okay, thank you.  I was just clarifying I understand that.

11  You know, one other question:  Do -- are you aware whether

12  Chimes has any video or phone features?

13  A    They do.

14  Q    Are the videos, phone, phone calls, other multimedia --

15  are records of those in Chimes somewhere else other than the

16  logs that you're referencing?

17  A    They should all be contained within there.  As far as

18  actual videos, though, those are not included.

19  Q    Oh, I see.  So records of the existence of a video might

20  be included; is that correct?

21  A    That is correct.

22  Q    And same with phone calls -- if someone made a phone call,

23  it might appear on the Chime log; is that correct?

24  A    If they're using the Chime phone service, yes.

25  Q    Thank you.  Now, I believe just a few minutes ago you



Exhibit E, Motion to Try Petition on Hearing Record

1    listed a number of custodians.  Can you tell us how many

2    custodians in total you collected data for in response to

3    paragraph 12?

4    A    We collected a total of 26 custodians.

5    Q    Thank you.  Do you know how those individuals were chosen?

6    A    No.

7         MS. WILLIAMS:  Objection, Your Honor, to the extent it

8    calls for work product.

9         JUDGE GREEN:  Okay.  And then, we got the answer, which is

10   no, so I'll allow that.

11   Q    BY MR. JACKSON:  And for each custodian, you -- you were

12   collecting only PSTs and Chime logs?

13   A    Yes.

14   Q    Aside from Chimes and emails, are you aware of any other

15   (audio interference) that Amazon uses to col -- communicate

16   internally?

17   A    Can you please repeat the question?  You cut out.

18   Q    Excuse me.  Aside from emails and Chimes, are you aware of

19   any other systems Amazon uses to communicate internally?

20   A    No, I'm not aware.

21   Q    Now, these servers that you collected data from -- do you

22   know which devices for each custodian would -- would be housed

23   on that server?  So in other words, do you know whether

24   different devices for each custodian would all be housed on the

25   server that you collected the data from?



Exhibit E, Motion to Try Petition on Hearing Record

1       MS. WILLIAMS:  Objection, Your Honor, vague.

2       JUDGE GREEN:  Okay.  If Mr. Brainerd understands the

3   question, he can answer.

4       THE WITNESS:  I don't understand what you're asking.

5   Q    BY MR. JACKSON:  Okay.  Let me provide an example.

6   Shinea -- for Shianna, I believe, Donaldson was one of the

7   custodians you mentioned.  Let's say Ms. Donaldson had used her

8   laptop computer and two different cell phones to -- to send

9   emails and Chimes.  With the servers that you are collecting

10  from or had collected from -- would they necessarily include

11  communications sent or received on a -- any of those devices?

12  A    The servers would include all Chime logs regardless of

13  what --

14  Q    Regard --

15  A    -- regardless of where it was sent from.

16  Q    Understood, thank you.  And what about emails?  Would the

17  servers pick up emails from different devices?

18  A    It would.

19  Q    Amazon uses Chimes to conduct virtual or video meetings,

20  correct?

21  A    That's correct.

22  Q    Does Amazon also use Zoom?

23  A    Zoom is not an approved use by internal resources.

24  Q    Would your collection of data include records of Zoom

25  video meetings if such things existed?



# Exhibit E, Motion to Try Petition on Hearing Record

1  A   Zoom is not an Amazon tool.  If a custodian received an

2  invitation, it would -- it would show up in their PST.

3  Q   Okay.  So with regard to Chimes meetings, Chimes video

4  meetings -- well, first of all, is the Chimes video meetings --

5  is that to your knowledge the only Amazon-approved video or

6  virtual meeting function?

7  A   That's correct.

8  Q   And if there were such a meeting on Chimes, there would

9  usually be some kind of electronic data, such as a meeting

10  invitation generated that would document or memorialize the

11  existence of this kind of meeting; is that correct?

12     MS. WILLIAMS:  Your Honor, we're -- we're going to object

13  to the scope of these questions.  It appears that we're going

14  far field from what Mr. Brainerd actually did in this case

15  and -- and what he was asked to do, which is to search for

16  things.

17     MR. JACKSON:  Okay.

18     JUDGE GREEN:  Overruled.  I'm going to allow some of this.

19  We're -- we're trying to get an understanding of the context

20  and -- and where information is kept.  To the extent that Mr.

21  Brainerd knows, I'm going to allow questioning regarding it.

22  Q   BY MR. JACKSON:  So Mr. Brainerd, I'll remind you.  The

23  question is:  If there is a Chimes meeting, then there's

24  typically some kind of electronic data that's generated that

25  would memorialize the existence of the meeting; is that right?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I think that your question falls under searching.  And I

2    conduct collections.

3    Q    So you don't know?

4    A    I don't know.

5    Q    Did you look at any of the data that you collected?

6    A    I only verify sizes; I do not look at the data.

7    Q    Were you requested or directed by any person to withhold

8    for any reason documents responsive to paragraph 12?

9         MS. WILLIAMS:  Objection, Your Honor, to the extent that

10   this would call for work product.

11        JUDGE GREEN:  Well, is -- is it work product or is it an

12   attorney/client communication?

13        MS. WILLIAMS:  It would actually probably be both, Your

14   Honor.  But to the extent that Counsel's requested him to do

15   certain things for purposes of this case, it would be work

16   product as well.

17        JUDGE GREEN:  Okay.  So for purposes of this question, Mr.

18   Brainerd, can you -- can you initially answer the question

19   without -- with -- without referencing any -- any communication

20   with Counsel in -- in the first respect?  If you had

21   communications that were not -- not with Counsel, you can

22   answer that.

23        THE WITNESS:  Can you please repeat the question?

24   Q    BY MR. JACKSON:  Okay.  Were you directed or requested by

25   anyone to withhold documents responsive to paragraph 12?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    Do you understand what happens with the documents you've

3    collected after you have finished your collection work?

4         MS. WILLIAMS:  Objection, Your Honor.  This calls for

5    speculation.

6         JUDGE GREEN:  Okay.  If he knows, he can -- he can testify

7    to it.  If he doesn't know it, he can say so.

8         THE WITNESS:  Can you please repeat the question?

9    Q    BY MR. JACKSON:  Do you understand what happens to the

10   data you've collected after you have finished your collection

11   work?

12   A    Again, I only conduct collections.

13   Q    So you don't understand what happens next in the process?

14   A    I transfer it to Consilio's PMs and they release it to

15   processing.

16   Q    And what does PM mean?

17   A    Project manager.

18   Q    And that was Hillary Volk in this instance, correct?

19   A    Yes, that is correct.

20   Q    Do you know whether all documents responsive to paragraph

21   12 of the subpoena had been produced to counsel for the acting

22   General Counsel?

23        MS. WILLIAMS:  Objection, Your Honor.  That exceeds the

24   scope of what this witness can testify to.

25        MR. JACKSON:  Okay.



Exhibit E, Motion to Try Petition on Hearing Record

1       JUDGE GREEN:  I'm going to overrule it.  I'm pretty sure I

2   know what the answer's going to be, but do you understand the

3   question?

4       THE WITNESS:  Can you please repeat the question?

5   Q    BY MR. JACKSON:  Do you know whether all documents

6   responsive to paragraph 12 have been produced to counsel for

7   the acting General Counsel?

8   A    I don't know.

9   Q    Okay.  Now, you testified earlier that you also were

10  responsible for collecting documents or data responsive to

11  paragraph 14 of the subpoena that's in evidence as a General

12  Counsel exhibit; is that correct?

13  A    That's correct.

14  Q    And who directed you to search for documents responsive to

15  paragraph 14?

16  A    I do not conduct searches; I conduct collections.

17  Q    It's -- forgive me.  Who directed you to collect documents

18  responsive to paragraph 14?

19  A    Kelcey Phillips sent the initial col -- collection request

20  on March 26th, 2021.

21  Q    Was it at the same time as the -- her request for

22  collection in response to paragraph 12?  Did those requests

23  come simultaneous?

24  A    We were only directed to collect custodians' PSTs and

25  Chimes.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Right.  I'm asking about the timing.  Was it at the same

2   time that you were directed to collect documents responsive to

3   paragraph 12 that you were directed to collect documents

4   responsive to paragraph 14?

5   A    Yes.

6   Q    Did Ms. Phillips provide you with custodians to collect

7   data from in response to paragraph 14?

8   A    Yes.

9   Q    Do you recall which custodian she directed you to collect

10  data from on March 26th regarding paragraph 14?

11  A    The same six custodians.

12  Q    Okay.  And then, later, you were directed to collect

13  additional custodians; is that right?

14  A    We had conducted multiple collection requests over the

15  month -- month of April specific to this matter.

16  Q    Okay.  In total, how many custodians did you collect data

17  from in regard to paragraph 14?

18  A    26.

19  Q    Were they the same 26 that you collected data from in

20  regard to paragraph 12?

21  A    Yes, that is correct.

22  Q    And did the collection in response to paragraph 14 -- was

23  that limited to PSTs and Chime logs as it was in paragraph 12?

24  A    Yes, that's correct.

25  Q    Did you collect any data apart from the server, so data



1    that might have been housed separately on a device, on one of

2    the custodian's devices?

3    A    We were only directed to collect PST and Chime logs by

4    Counsel.

5    Q    From the server; is that correct?

6    A    We were -- again, we were only directed to collect PST and

7    Chime logs from Counsel.

8    Q    Okay.  So you were not directed to collect data that might

9    not be housed on the servers that might live on a particular

10   custodian's device; is that correct?

11   A    We were not directed to.

12   Q    I understand, thank you.  Now, the custodians that you

13   searched, the 26 -- do you know whether these individuals are

14   Amazon officials?

15   A    We give the --

16        MS. WILLIAMS:  Objection, Your Honor.  That calls for a

17   legal conclusion in asking whether they are officials of

18   Amazon.

19        MR. JACKSON:  Whether they're Amazon employees.

20        JUDGE GREEN:  Okay.

21        THE WITNESS:  We do not conduct searches.  We conduct -- I

22   conduct collections.

23   Q    BY MR. JACKSON:  Okay.  I'll rephrase the question.  Do

24   you know whether the 26 custodians that Counsel identified for

25   you to collect data from -- do you know whether they are all



Exhibit E, Motion to Try Petition on Hearing Record

1    Amazon employees?

2    A    All 26 were -- are Amazon employees.

3    Q    Do you know whether all 26 have responsibilities at JFK8?

4        MS. WILLIAMS:  Objection, Your Honor.  This exceeds the

5    scope of what this witness is here to testify to.

6        JUDGE GREEN:  Okay.  So just to clarify, I'm not 100

7    percent sure what you're talking about when you -- when you say

8    that.  This --

9        MS. WILLIAMS:  Your Honor --

10        JUDGE GREEN:  -- this is -- this is -- we are now in May,

11    at May 3rd.  This is no longer the time when we're dealing with

12    subpoena-related matters.  We're now -- we're on the -- the

13    record and dealing with subpoena matters and the merits.  And

14    I'm actually hopeful that to the extent the General Counsel is

15    calling witnesses pursuant to 611(c) that it would -- that the

16    questioning would be for everything, not just what relates to

17    the subpoena, but any questions to ask regarding the merits of

18    the case so we don't have to have that person come back and

19    testify again.

20        MS. WILLIAMS:  Your -- Your Honor, this witness is not

21    here, though, to testify about the merits.  He was specifically

22    designated --

23        JUDGE GREEN:  Okay.  Well --

24        MS. WILLIAMS:  -- to testify on the servers.

25        JUDGE GREEN:  -- he can testify -- yeah, he can test -- he



# Exhibit E, Motion to Try Petition on Hearing Record

1   can testify about anything that's relevant.  So I'm not -- I'm

2   just -- for purposes of going forward, I'm not limiting his

3   testimony.  And -- and I'll give you a standing objection to --

4   to the -- to the extent that you want to object to questions

5   that fall outside a certain subject.  But I'm -- I'm denying

6   that -- that standing objection and allowing ample and relevant

7   questions.

8       MS. WILLIAMS:  Yes.  Yes, Your Honor.  We would like a

9   standing objection to the extent that this seeks information

10  related to the relevance of the merits.

11      JUDGE GREEN:  Okay.

12      MS. WILLIAMS:  We would like to state for the record that

13  Mr. Brainerd is only here to testify as to what he collected

14  for purposes of responding to the subpoena.

15      JUDGE GREEN:  Okay.  You have that standing objection.

16  And it's rejected.  Okay.  So go ahead.

17  Q    BY MR. JACKSON:  All right.  Mr. Brainerd, my question

18  was:  Do you know whether the custodians you searched for have

19  responsibilities or authorities at the JFK8 facility?

20  A    I do not conduct searches; I conduct collections.

21  Q    Excuse me.  I'll rephrase the question.  Do you know

22  whether the custodians for whom you collected data have

23  responsibility or authorities at JFK8?

24  A    I do not know.

25  Q    Do you know anything about the duties or authorities of



Exhibit E, Motion to Try Petition on Hearing Record

1    the custodians for whom you collected data?

2    A    No.

3    Q    So let me just make sure I understand.  If any of the 26

4    custodians for whom you collected data sent or received a

5    message that did not go through Amazon's server, that would not

6    be included in your collection; is that correct?

7    A    We were only directed to collect from -- we were only

8    directed to collect PST and Chime logs.

9    Q    That existed on the Amazon -- on one of two Amazon

10   servers, correct?

11   A    That is correct.

12   Q    And when you collect from Chimes or when you collect PST

13   emails, do you collect the entire account for the custodian?

14   A    Specific to PSTs, yes, we collect the entire account.  For

15   Chime logs we date restrict --

16   Q    Okay.  What --

17   A    -- as directed by Counsel.

18   Q    Okay.  Can you -- do you recall the date restrictions that

19   you had for paragraph 12?

20   A    For our first collection request on March 26th, 2021 from

21   Kelcey Phillips, she directed us to limit the Chime log to

22   March 25th of 2020 to April 17th, 2020.  Our standard rule is

23   to go a little bit outside that by five days, so we collected

24   from March 20th, 2020 to April 22nd, 2020.

25   Q    And is that the same for paragraph 14?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    Does this -- does the dataset available in these

3    servers -- or in these accounts for the custodian -- do they

4    include Microsoft Word documents that may have been prepared?

5    A    Our collection grabs everything available on the PSTs --

6    on the exchange server or the Chime log server.

7    Q    Do you know if Word documents that are prepared are housed

8    on the server?

9    A    Again, we grab everything that is available.

10   Q    Yeah.  I'm just trying to get at whether if someone

11   created a Word document -- whether that would exist if it

12   hadn't been sent by an email or by a Chimes.

13   A    I'm confused by your question.

14   Q    Okay.  Let's go back with Ms. Donaldson because her name

15   is just standing out in my mind right now.  If Ms. Donaldson

16   created on her Amazon-issued laptop a Word document but didn't

17   send it via Chimes or didn't send it via email, would your

18   collection pick that document up?

19   A    We were not directed to collect laptops.  We were only

20   directed to collect PST and Chime logs.

21   Q    But if an email was sent with a Word document, would that

22   appear on the server?

23   A    Attachments are included as -- if they are available.

24   Q    And does that include all -- all types of attachments, you

25   know, regardless of the file type?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    That is correct.

2   Q    And I believe -- again, you know, I want to make sure the

3   record's clear and I'm a bit confused on some of these points.

4   So just humor me for a bit, Mr. Brainerd.  So you -- you

5   testified earlier that a Chimes log will record the existence

6   of a phone call that was made through Chimes; is that correct?

7   A    Yes.

8   Q    And if the call was made through some other system other

9   than Chimes, it would not be recorded on the server; is that

10  correct?

11  A    Again, we were only directed to collect PST and Chime

12  logs.

13  Q    Yeah, I understand that.  But do you know whether -- the

14  question is:  Do you know whether a -- a phone call made from

15  a -- outside of the Chime system -- would that be recorded in

16  the server?

17  A    No.

18  Q    It would not be, correct?

19  A    Again, we were only directed to collect PST and Chime

20  logs.

21  Q    So again, a phone call made outside of the Chime system

22  would not be recorded in the server from which you collected

23  data; is that correct?

24  A    That is correct.

25  Q    Mr. Brainerd, what system did you use to collect PST



Exhibit E, Motion to Try Petition on Hearing Record

1   files?

2   A    As I stated earlier, we use a PowerShell.

3   Q    I see, the PowerShell.  And is PowerShell the name of the

4   system?  Is that made by a company?

5   A    PowerShell is a script writing service, as far as I'm

6   aware.

7   Q    So that's the name of the service, PowerShell?

8   A    Yes.  It's available on all Microsoft Office machines.

9   Q    Okay.  Is it a Microsoft product to your knowledge?

10  A    I don't know.

11  Q    Can you describe what the scripts capture?

12  A    All PST files contained on the exchange servers for a

13  specific custodian.

14  Q    Do the scripts also capture Chimes?

15  A    No, that is captured through a separate system as they are

16  stored on separate servers.

17  Q    What system captures Chimes?

18  A    There's a web-based user interface that we utilized to

19  export out Chime logs.

20  Q    And does it have a name?

21  A    Bastfit (phonetic) and it's specifically developed for my

22  team and other IT individuals.

23  Q    Okay.  Are the Chime logs exported in full or is it

24  limited in some way?

25  A    As I stated earlier, we date restricted at the direction



Exhibit E, Motion to Try Petition on Hearing Record

1    of counsel.

2    Q    Aside from the date restrictions, were there any other

3    limitations on the Chimes logs that you pulled?

4    A    No.

5    Q    And I think I also know the answer to this, but I'll ask

6    again:  With respect to paragraph 14, were you directed to

7    withhold any documents?

8    A    No.

9    Q    Are you familiar with the documents that were ultimately

10   produced to counsel for the General Counsel in response to

11   paragraph 14?

12   A    I am not.

13        MR. JACKSON:  Your Honor, may I request a five-minute

14   recess?

15        JUDGE GREEN:  Yes.  Off the record for five minutes.

16   (Off the record at 12:16 p.m.)

17        JUDGE GREEN:  Okay.  So we are back on the record.

18        Does the General Counsel have anything more for this

19   witness?

20        MR. JACKSON:  Just a couple more questions, Your Honor.

21   Thank you.

22        JUDGE GREEN:  Okay.

23                    **RESUMED DIRECT EXAMINATION**

24   Q    BY MR. JACKSON:  So Mr. Brainerd, do you -- you're the

25   custodian Amazon designated for paragraphs 12 and 14 of the



Exhibit E, Motion to Try Petition on Hearing Record

1    subpoena we've been discussing, correct?

2    A    That's correct.

3    Q    Did anyone else other than yourself collect data

4    responsive to either of these paragraphs?

5    A    For the initial request, all the -- the PSTs and the Chime

6    logs were collected by me.

7    Q    Right.  I'm asking you:  To your knowledge, you know, as

8    the custodian responsible for the -- this subpoena response, at

9    least this portion of it, did anyone else collect data?

10   A    Specific to PST and Chime logs?  Can you please be more

11   specific?

12   Q    Did anyone else collect any data in any form from anywhere

13   in the universe responsive to paragraphs 12 or 14?

14   A    Specific to -- the only -- we -- my team was only directed

15   to collect PST and Chime logs.  And if PST -- if a PST had

16   failed, we escalate it to IT as -- as such.

17   Q    What do you mean "if a PST had failed"?  What does that

18   mean?

19   A    So depending on which server it is coming from, the

20   PowerShell is better scripted for exporting off of the U.S.

21   West server.  The IT team uses the same PowerShell to export

22   off of the U.S. East server as well.  They just have more

23   direct access into it.

24   Q    And when you say a PST might fail, what does that mean?

25   A    Due to size it can take -- it'll -- due to the size of a



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   PST it can fail.

2   Q    Okay.  And what happens --

3   A    It can fail to export.  It can fail to export.

4   Q    What happens when a PST fails to export?  How do you

5   address that situation?

6   A    We escalate it to one of our partners in IT and that IT

7   partner exports it out for us.

8   Q    Okay.  And did that occur in response to your collection

9   regarding paragraphs 12 or 14?

10  A    There was a custodian that did take longer to export and

11  it required an escalation.

12  Q    Which custodian was that?  Do you recall?

13  A    I believe it was Zachary Mark (phonetic) and Linda

14  (phonetic) -- I can't remember her last name.

15  Q    Okay.  And after the -- well, I guess I -- I still don't

16  have my question answered.  Can you tell us whether any other

17  collection occurred other than the work you have described for

18  us today?

19       MS. WILLIAMS:  Objection, Your Honor, to the extent that

20  this witness is only here to talk about what he did.  He is not

21  here to testify about what others may have done.

22       MR. JACKSON:  Well, Your Honor, Amazon designated this

23  person as a custodian of records.  So I think he should be

24  prepared to talk about what was done in response to these

25  paragraphs.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Mr. Brainerd, do you understand?  Do you

2    know -- do you know what other people did other than you with

3    regard to this collection or not?

4    THE WITNESS:  I don't know.

5    JUDGE GREEN:  Okay.

6    Q    BY MR. JACKSON:  Okay.  Now, you mentioned an initial

7    collection.  Was there a subsequent collection?

8    A    As stated previously, there was -- a -- the first

9    collection request came in on March 26th, 2021 by Kelcey

10   Phillips.  There were subsequent collections throughout the

11   month of April.

12   Q    I see.  Do you recall the dates of those subsequent

13   collections?

14   A    April 6th was the next one.  And then, there was other

15   dates throughout the month.

16   Q    Throughout the month of April 2021?

17   A    That is correct.

18   Q    Do you recall how many additional collections you

19   performed?

20   A    We collected a total of 26 custodians.

21   Q    Oh, I see.  I see.  You did additional collections as more

22   custodians were directed to you by counsel?

23   A    That is correct.

24   Q    Okay.  And do you recall how many rounds of collection you

25   did?



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
1    A    There were five.

2    Q    Five, okay.  And aside from March 26th and April 6th, do

3    you recall any of the other dates?

4    A    Like I said, it was throughout the month of April.

5    Q    Do you recall when the last one you did was?

6    A    End of April.

7    Q    You don't recall the date?

8    A    I don't want to -- I -- I can't recall.

9    Q    Okay.  Just one other questions about PSTs, emails:  Are

10   you familiar with something in an email called a list serve?

11   A    No.

12   Q    You don't know what a list serve is?

13   A    I conduct collections, so I don't know what that is.

14   Q    Okay.  Is it true that any email that any of the 26

15   custodians received or sent would appear in the server if it

16   went through the Amazon system regardless of if it was sent to

17   or received by some broader list that included the individual?

18   A    Can you please clarify the question?

19   Q    Yeah.  So if a -- I'm going to stick with Ms. Donaldson.

20   If Ms. Donaldson was part of a list that was just identified as

21   just, you know, just for hypothetical purposes, Amazon

22   supervisors.  And she received an email through that list, not

23   directly -- not directed specifically to her, but through that

24   list.  Would that appear in the server for her account?

25        MS. WILLIAMS:  Objection, form and speculation.
```



Exhibit E, Motion to Try Petition on Hearing Record

```
1        JUDGE GREEN:  Okay.  So sustained.  Can you -- can you --

2        THE WITNESS:  I didn't understand that.

3        MR. JACKSON:  All right.

4        MR. MURPHY:  Mr. Green, I couldn't hear what you -- what

5   you said.  I apologize.

6        JUDGE GREEN:  I just said -- I asked -- I sustained the

7   objection and asked that the question be rephrased.

8        MR. JACKSON:  Okay.  No, I'll withdraw the question.  And

9   no further questions, Your Honor.

10       JUDGE GREEN:  Okay.  Does Mr. Kearl have any questions for

11  Mr. Brainerd?

12       MR. KEARL:  I do, Your Honor.  I just have a few.

13                      CROSS-EXAMINATION

14  Q    BY MR. KEARL:  Hello, Mr. Brainerd.  Did you have any

15  communications with anyone at Amazon about what documents might

16  be responsive to paragraphs 12 or paragraph 14?

17  A    I only conduct collections; I don't collect searches.

18  Q    Right.  So did you have any communications with anyone at

19  Amazon about which documents might be responsive to paragraphs

20  12 and 14 as re -- regarded your collection of documents?

21       MS. WILLIAMS:  Objection, Your Honor, to the extent that

22  this calls for attorney/client communications and work product.

23       JUDGE GREEN:  Okay.  Please don't -- don't answer the

24  question to the extent you're disclosing communication with

25  counsel, but if you can answer the question without doing that,
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    you can answer the question.

2         THE WITNESS:  Can you please repeat the question?

3    Q    BY MR. KEARL:  So did you have any communications with

4    anyone at Amazon about what documents might be responsive to

5    paragraphs 12 and 14 in the course of your collection of

6    documents?

7    A    I don't conduct searches; I just conduct collections, so

8    no.

9    Q    No, okay.  Did you know the parameters of the PowerShell

10   that you were given by Amazon's IT department?

11   A    Can you please rephrase the question?

12   Q    So you -- you said you were given a PowerShell by Amazon's

13   IT department; is that right?

14   A    A PowerShell script, yes.

15   Q    A PowerShell script.  From the PowerShell script, were you

16   able to discern the scope of the documents that were included

17   in that PowerShell script?  Or was it just sort of a closed

18   universe?  This is the doc -- this is the document?  You know,

19   this is the -- the universe that you can collect documents

20   from?

21   A    Can you please clarify the question?

22   Q    Yeah.  So I'm trying to understand this PowerShell.  You

23   receive a PowerShell script.  From that PowerShell script, are

24   you able to discern what the scope of documents within that

25   PowerShell are?  Or is it just sort of, like, you're inside


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    this PowerShell script and you don't know anything about what

2    might exist outside of it?

3    A    We -- the PowerShell grabs all the custodian doc -- PSTs.

4    Q    And Chime logs?

5    A    No.  Like I stated earlier, Chime is on a separate server.

6    Q    Oh, separate server, okay.  And that's not called a

7    PowerShell?

8    A    No, we use a web-based user interface to export out Chime

9    logs.

10   Q    Okay.  And when you -- when did you receive the -- the

11   PowerShell?  You -- you said that you initially collected

12   documents I believe on March 26th of 2021.  Is that the same

13   time that you received the PowerShell script?

14   A    The PowerShell script's been around for a little bit.

15   Q    Okay.  So when -- when did you receive the PowerShell

16   script?

17        MS. WILLIAMS:  Objection, Your Honor, to the extent that

18   this goes beyond the work product even in this case.

19        JUDGE GREEN:  Overruled.

20        THE WITNESS:  Can you please repeat and rephrase the

21   question?

22   Q    BY MR. KEARL:  Yeah.  So I know that you did your first

23   collection from the PowerShell script on March 26th of 2021.

24   Can you tell me when you received the PowerShell script

25   initially?



1    A    Sometime in 2019.  We've been using the script for -- for

2    a while.

3    Q    Okay.  So this is the same script that you've had.  There

4    wasn't a specific script for the collection of documents that

5    you performed for the case-at-hand?

6    A    No.

7    Q    Okay.  Are there PowerShell scripts outside of the realm

8    of the email documents?  For example, do you know of PowerShell

9    scripts that exist for OnBase or Exact or Adapt systems at

10   Amazon?

11   A    I was not asked to collect that.  I was only asked to

12   collect PST and Chime logs.

13   Q    Okay.  Does that -- are you aware of PowerShell scripts

14   for these other databases?

15   A    Again, that -- that's outside of my scope.

16        JUDGE GREEN:  No.  Mr. -- Mr. -- Mr. Brainerd, just --

17   unless I -- unless I sustain an objection to the question, just

18   answer the question.

19        THE WITNESS:  Can you please repeat?

20   Q    BY MR. KEARL:  Yes.  So are you aware of PowerShell

21   scripts that interact with other database systems, such as

22   Adapt or Excel or OnBase?

23   A    Not that I'm aware.

24   Q    Okay.  And is it a PowerShell script that you use to

25   collect documents from the Chime logs?  Or is it called



1    something else?

2    A    Like I said before, we use a web-based user -- user

3    interface to export out Chime logs.

4    Q    Okay.  So that's all -- all webbed -- based?  Are -- are

5    you aware of any webbed -- based documents or web-based systems

6    to collect information from other Amazon databases, such as

7    Adapt or Exact or OnBase?

8    A    No.  We were only directed to collect PST and Chime logs.

9    Q    Right.  I understand that you were only directed to

10   collect.  I'm asking if you are aware of other systems that

11   interact with these other databases that Amazon has.

12   A    No, I'm not aware.

13   Q    Okay.  Do you know who from Amazon's IT department set up

14   the PowerShell in 2019?

15   A    Jon Adams.

16   Q    Don Adams?

17   A    Jon, J-O-N, Adams.

18   Q    And apart from the escalation that you mentioned earlier,

19   did you have any communication with anyone from Amazon about

20   the collection that you performed?

21       MS. WILLIAMS:  Objection.  We would just ask that the

22   witness only answer yes or no and not describe any

23   communications that would be work product or attorney/client

24   privileged.

25       JUDGE GREEN:  That -- that's fine for now.



# Exhibit E, Motion to Try Petition on Hearing Record

1       THE WITNESS:  Can you please repeat the question?

2    Q    BY MR. KEARL:  Yes.  Apart from the escalation that you

3    mentioned earlier, did you have any communication with anyone

4    from Amazon about the collection that you performed?

5    A    No.

6    Q    You did not have any communications with anyone from

7    Amazon about the collection you performed apart from the

8    escalation that you did?

9    A    We were only directed to collect the PST and chains -- we

10   were directed by counsel to collect the PST and Chime logs.

11   Q    Okay.  So -- so it's fair to say that you did not

12   communicate with Amazon; you -- you communicated with Counsel

13   in the course of the collection of documents?

14       MS. WILLIAMS:  Objection --

15       THE WITNESS:  Yes.

16       MS. WILLIAMS:  -- to the extent that this is calling for

17   work product -- attorney/client communication.

18       THE WITNESS:  Yes.

19       JUDGE GREEN:  All right.  I think that -- I -- I -- I

20   think that that's acceptable.

21       MR. KEARL:  Okay.

22       JUDGE GREEN:  So overruled and he answered.

23       MR. KEARL:  Okay.  Did --

24       JUDGE GREEN:  But let's not get further in it -- into it.

25   Q    BY MR. KEARL:  Did the PowerShell script that you were



1    operating with include any physical documents or scans -- scans

2    of physical documents?

3    A    We were only directed to collect PST and Chime logs, which

4    are electronic documents.

5    Q    Within the PST and Chime logs are -- do scanned documents

6    exist within that record?

7    A    I don't know.

8    Q    Okay.  Are you aware of any other database where scanned

9    documents are stored by Amazon?

10   A    I don't know.

11   Q    Okay.

12        MR. KEARL:  Okay.  I have no further questions.

13        JUDGE GREEN:  Okay.

14        Does the -- does the Respondent have any questions for --

15   for Mr. Brainerd?

16        MS. WILLIAMS:  We do, Your Honor, but given the fact that

17   Mr. Brainerd has been on the record for some time now, we were

18   going to ask to see if we could take a lunch break.  We will

19   not communicate with Mr. Brainerd during that time, but we're

20   going to ask for a lunch break.

21        JUDGE GREEN:  Okay.  So let's take a lunch and come back

22   at 1:45.

23        THE WITNESS:  What time is that PST?

24        JUDGE GREEN:  Oh, so that's 10:45.

25        THE WITNESS:  Okay.  Thank you, Your Honor.



1    (Off the record at 12:44 p.m.)

2    JUDGE GREEN:  Okay.  And before we begin with Respondent's

3    examination of Mr. Brainerd, the General Counsel, I understand

4    from an off-the-record comment, would like to make a statement

5    in response to Ms. Buffalano's comments earlier.

6    MS. COX:  Thank you, Judge.

7    Earlier, Ms. Buffalano alluded to the General Counsel

8    being on a fishing expedition and has based this comment in

9    just theory.  And it's completed unsupported.  There is no

10   reason for Amazon to believe that the Region is conspiring with

11   any other office in the country who's investigating the char --

12   the charges levied against Amazon throughout the country.

13   The reason why we're here today is not a fishing

14   expedition, Judge.  The reason we're here today is because

15   Amazon has dragged on this proceeding, feigning not to know

16   what search terms to use.  They've had a clear strategy, and

17   delaying production, requesting indefinite postponements of

18   this case.  And the only thing we can do to -- to see whether

19   they've conducted a good faith and reasonable search is put on

20   custodians.  That's the only thing that's happening here, is we

21   are conduct -- we are questioning the witnesses within our

22   right, to make sure that they have complied with their legal

23   obligation to respond to your order and produce documents in

24   this case and no other case.

25   JUDGE GREEN:  Okay.



Exhibit E, Motion to Try Petition on Hearing Record

1      MS. BUFFALANO:  May I be heard, Your Honor?

2      JUDGE GREEN:  Yes.  Hold on.

3      Just so -- just so you know -- and I -- I hope this is

4   clear, putting on custodians is not the only thing you could

5   do.  You know, I think I've mentioned this several times.  But

6   it -- it was one option, it's one option of many, but it's not

7   the only thing you can do.  And honestly, you know, do we need

8   a -- do we need to go into this further?  I'm -- I'm really not

9   that interested.  You know, I -- I overruled the objection.

10  I -- I don't -- you know, I just feel like it's -- it's

11  posturing the rest of it.  And it's not going to help me decide

12  the case.

13     MS. BUFFALANO:  I just want to be --

14     JUDGE GREEN:  You know, if you really want to be heard,

15  Ms. Buffalano, it's fine.  But I'm not, you know, I mean,

16  nothing the General Counsel just said is going to affect how

17  I'm making rulings on this case.

18     MS. BUFFALANO:  And I -- I completely appreciate that.  I

19  just wanted to say, if -- I mean, if that's the case, then why

20  can we agree that we'll keep the portions of this record that

21  relate to how the documents were obtained, or what technologies

22  are used with respect to the document, will be subject to a

23  protective order and will remain confidential, and won't be,

24  you know, used in other proceedings.

25     JUDGE GREEN:  I -- yeah, I'm -- I don't -- I don't see to



1    what extent there's actually a confidentiality interest.

2    That's -- and I -- that -- that's a requirement in order to

3    grant a protective order.  So let's move on.  Let's move on to

4    Respondent's questioning of Mr. Brainerd, so we don't have to

5    keep  him any longer than absolutely necessary.

6         You ready, Mr. Brainerd?

7         THE WITNESS:  I am, Judge.

8         JUDGE GREEN:  Okay.  Thank you very much.

9         So any time you're ready, Ms. Williams.

10        MS. WILLIAMS:  Thank you, Your Honor.

11                         **CROSS-EXAMINATION**

12   Q    BY MS. WILLIAMS:  Mr. Brainerd, how many gigabytes of data

13   did you collect for this matter?

14   A    700 -- over 740 gigabytes of data.

15   Q    And how long does it normally take to collect just one

16   custodian's PST file?

17   A    It really depends on the size and what server it's being

18   exported from.

19   Q    Do you have an average of how long it would normally take?

20   A    Our best guess -- our best estimate, is it can take

21   anywhere between a day to one week to obtain one custodian.

22   Q    One day to one week, you said?

23   A    Yeah, it's going to be --

24   Q    Sorry, I'm just having trouble hearing.

25   A    No worries.



Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  Objection.  That's not what he said.  He said a

2  day.

3      THE WITNESS:  I said one day to one week.

4      JUDGE GREEN:  Okay.

5  Q   BY MS. WILLIAMS:  How long does it take to get one

6  custodian's Chime records?

7      MS. COX:  Objection, Your Honor.

8      MR. JACKSON:  Question, Your Honor?  Yeah, objection, Your

9  Honor.  You know, I'm going to object on the grounds of

10  relevance.  The amount of time it takes to -- for custodian's

11  files to be exported, I'm not sure how that's relevant to

12  Respondent's compliance with the subpoena.

13      MS. WILLIAMS:  Your Honor, they're objecting and

14  complaining that we've taken too long.

15      JUDGE GREEN:  Right.

16      MS. WILLIAMS:  And that's what we're trying to establish

17  how long it takes.

18      JUDGE GREEN:  Right.  I mean, if you want to -- if you

19  want to state that you're not -- that the -- that the General

20  Counsel isn't going to make an argue of noncompliance based on

21  it's taking too long, then you can say that, and that would

22  probably not be the need for Respondent to put on this type of

23  testimony.  But that's my understanding of what you've been

24  arguing, that this all is taken the Respondent too long.  No?

25      MR. JACKSON:  Yes.  That's part of it.  But --



Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 373 of 2171 PageID #: 435

1    JUDGE GREEN:  Okay.  So how is this not relevant to that?

2    MR. JACKSON:  Well, it's not relevant insofar as the --

3    the amount of time it takes.  I mean, Respondent -- we're on

4    record that this search for a subpoena that was issued on March

5    1st began on the 26th, Your Honor.  I mean, there's a whole

6    host of delay here involved.  And --

7    JUDGE GREEN:  Okay.  Overruled.

8    Q    BY MS. WILLIAMS:  Mr. Brainerd, how long does it take to

9    export just one custodian's Chime records?

10   A    It can take up to 24 hours.  And again, it depends on the

11   size.  Sometimes it can take longer, up to a week as well.

12   Q    And because we had a break, I just want to ask, how many

13   custodians total did you collect for this matter?

14   A    26 total custodians.

15   Q    Now, I know we mentioned -- or you testified, I think, to

16   some information being collected on March 26th.  Was there

17   information that was collected for another matter that was made

18   available to Counsel?

19   A    There was another -- there was another matter that was

20   made available to Counsel.  But we did not provide that data.

21   Q    Did you actually collect that data though?

22   A    I did collect that data back in 2020.

23   Q    When you collect data, I know you mentioned earlier that

24   there are some documents -- or pardon me, two custodians, I

25   apologize for not remembering who they were, that you had to



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    escalate.  Do you go and verify the results for those when you

2    ask for those to be recollected?

3    A    I do.  And that's how I knew they had -- were in --

4    exported incorrectly.

5    Q    How do you verify results?

6    A    We have access to a web-based collab report that refreshes

7    every 24 hours, giving the size of the PST on the exchange

8    server.

9    Q    So that report shows the size of how many emails are on

10   the server for a given individual?

11   A    Not the total number of documents, but the total size in

12   gigabytes or megabytes.  It's depending on the size.

13   Q    Now, I believe there was also some testimony about the

14   collection tools that were used here.  Do you collect for any

15   cases other than this particular case for Amazon?

16   A    I do.

17   Q    Have you used these tools before for other cases?

18   A    I have.

19   Q    When you go to collect from the user interface, do you

20   have to put any specific parameters, or how does that work when

21   you use the user interface for Chime?

22   A    We input the custodian.  And if at the direction of

23   Counsel, we put in a date range.

24   Q    And you mentioned a date range, I know earlier you

25   mentioned a specific date range that was used, were there any



Exhibit E, Motion to Try Petition on Hearing Record

1   other date ranges that you used at other points in time in the

2   case?

3   A    There were.

4   Q    Do you recall what those other date ranges were?

5        UNIDENTIFIED SPEAKER:  (Audio interference) --

6   A    Yes, I do recall.  It was --

7        JUDGE GREEN:  Okay, and how is done?

8        MS. WILLIAMS:  I'm -- I'm sorry, Your Honor, I'm getting

9   feedback here from --

10       THE WITNESS:  Your Honor, you're on -- you're on mute.

11       MR. JACKSON:  We -- we can't hear you, Your Honor.

12       JUDGE GREEN:  I don't know where that that additional

13  sound is coming from.  Just everybody, if you're not

14  participating, please keep your -- your sound on mute.  Okay,

15  let's try that again.

16       THE WITNESS:  Can you please repeat the question?

17       MS. WILLIAMS:  Sure.

18  Q    BY MS. WILLIAMS:  So were there any other date ranges you

19  searched for purposes of this matter, or entered it for this

20  matter?

21  A    Yes, there were.  The initial date range request was March

22  25th, 2020 to April 17th, 2020.  The next collection -- the

23  following collect -- collection request expanded the date range

24  to March 1st of 2020 to April 30th, 2020.  We exported February

25  25th, 2020 to May 5th, 2020 to give a five-day range -- a five



Exhibit E, Motion to Try Petition on Hearing Record

1    days before and after to be considered for this.

2    Q    Was there a different date range used for the other

3    documents that were made available before the March 26th

4    search?

5    A    No, not that I'm aware of.

6    Q    You also testified about some attachments, I believe,

7    earlier when Mr. Jackson was questioning you.  If you pull

8    emails from the server, does it automatically also pull the

9    attachments to those emails?

10   A    It does.  It does pull the attachments.

11   Q    If there is a record that has been scanned, a PDF for

12   example, that is attached to an email, will it pull that?

13   A    Yes, it will.

14   Q    If there is a video that is attached to an email, will it

15   pull that?

16   A    Yes, it will.

17   Q    Switching over to Chime's, if there is a scanned record

18   that is attached in a Chime chat, will it pull that?

19   A    Yes, it will.

20   Q    What about if there is a video file, or an image file,

21   will it pull that?

22   A    Yes, it will.

23   Q    I believe there was also some testimony about mobile

24   devices at the time.  Do you know, is there a Chime app that

25   can be used on a mobile device?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    There is a Chime app that can be used on a mobile device.

2    Q    So if someone at Amazon has the Chime app on their mobile

3    device, and they chat via that Chime app, is that going to be

4    pulled in the information that you pulled from the servers?

5    A    It will be pulled from the information from the servers.

6    Q    So someone can't use the Chime app independently from what

7    goes through the servers?

8    A    That is correct.

9    Q    And I know earlier you also, when you were speaking about

10   emails, you talked about the collection of emails.  Do you

11   collect everything for the email for someone?  Is there

12   anything that you don't collect for someone?

13   A    We collect everything that's available to us on the

14   exchange server.

15   Q    Are you able to verify the results of what you pull from

16   the exchange server to see if there are any errors or issues?

17   A    I am able to verify.

18   Q    And did you do that here for the 26 custodians?

19   A    I did.

20   Q    Do you have any reason to believe that there is something,

21   whether it is an email or a Chime, that was not collected for

22   these 26 custodians?

23   A    No.

24        MS. WILLIAMS:  Your Honor, if we could just have a short

25   three-minute break --



# Exhibit E, Motion to Try Petition on Hearing Record

1        JUDGE GREEN:  Off the record.

2        MS. WILLIAMS:  -- for me to verify?

3        JUDGE GREEN:  Yes.

4        MS. WILLIAMS:  Thank you.

5   (Off the record at 2:02 p.m.)

6        JUDGE GREEN:  Okay.  So back on the record.  And whenever

7   you're ready, Ms. Williams.

8        MS. WILLIAMS:  Mr. Brainerd, I want to thank you again for

9   taking the time to speak with us today.  At this time, we do

10  not have any further questions for you.

11       JUDGE GREEN:  Okay.  Anything else from the General

12  Counsel?  You're muted.

13       MR. JACKSON:  Yes, Your Honor.  Thank you.

14                    **REDIRECT EXAMINATION**

15  Q    BY MR. JACKSON:  So Mr. Brainerd, just help us understand

16  because I am a bit confused, a bit out of my depth here.

17  But -- so hopefully you can help me and hopefully the judge

18  understand a little bit better.  So when you say it takes up to

19  one week to pull records from a custodian, what is involved in

20  that process?  Are you actually working on anything during that

21  one-week period?

22  A    We're exporting the PST from the server.  Sometimes it

23  takes little -- a little bit longer due to the size.

24  Q    Okay.  And what -- what is involved in that process?

25  A    We run a PowerShell script over the PST on the exchange



Exhibit E, Motion to Try Petition on Hearing Record

1    server and again, it -- it depends on the size.  It just takes

2    a little bit longer.

3    Q    Okay.  And isn't it true that multiple PowerShells can be

4    run on multiple custodians simultaneously?

5         MS. WILLIAMS:  Objection, Your Honor.  Exceeds the scope

6    of what he was testifying to.

7         JUDGE GREEN:  Overruled.

8         THE WITNESS:  Can you please repeat the question?

9    Q    BY MR. JACKSON:  Isn't it true that multiple PowerShell

10   scripts can be run on multiple custodians simultaneously?

11   A    That's true.

12   Q    And you said that this can take up to a week for a

13   custodian.  Do you remember how long it took in this case

14   actually?

15   A    We received the first collection request on Friday, March

16   26th.  And we released it to the PMs for processing, that

17   following Monday.

18   Q    And you mentioned collecting data for another matter back

19   in 2020 and that it somehow relates to the current search.

20   What matter were you referring to then?

21        MS. WILLIAMS:  Objection, Your Honor, to extent this calls

22   for the work product of another case.

23        JUDGE GREEN:  It's overruled.  I -- you know, I -- I think

24   this can be answered without -- without going into the

25   privileged material.



# Exhibit E, Motion to Try Petition on Hearing Record

1    THE WITNESS:  Can you please repeat the question?

2    Q    BY MR. JACKSON:  Yes.  What is the matter that you

3    testified previously to that you had run PowerShell scripts for

4    in 2020 that related to this matter?

5    MS. WILLIAMS:  Same objection, Your Honor.

6    JUDGE GREEN:  Okay.  Overruled.

7    THE WITNESS:  It was the NYAG matter.

8    Q    BY MR. JACKSON:  Is that the New York Attorney General?

9    A    In our records, we titled it as NYAG.

10   Q    Do you know that that stands for New York Attorney

11   General?

12   A    I do now.

13   Q    I see.  All right.  And just can you help me understand,

14   what it re -- what is involved in running a PowerShell script?

15   What exactly do you do?

16   A    I create a text file.  And the text file contains name,

17   comma, destination, comma, and whether or not we're requesting

18   Chimes.  And then below that, we put the custodian names with

19   the destination folder and we put yes or no to indicate whether

20   or not we'll be using IT to assist us in the collection of

21   Chimes.  We put the same -- put the name and we can do -- run

22   simul -- we can run multiple scans at the same time.  And that

23   is what we did here.  We put the name of the six custodians

24   first, put the destination, we designated all of them as no

25   because we were -- because I was running collections for the



Exhibit E, Motion to Try Petition on Hearing Record

1    Chimes myself.

2    Q    Okay.  And once you do that, then the server does the rest

3    of the work?

4    A    The PowerShell script does the work.

5    Q    I understand.  Okay.

6         MR. JACKSON:  One -- one moment, Your Honor.

7    Q    BY MR. JACKSON:  Okay.  Mr. Brainerd, you said that the

8    scripts that you ran following the directions you received on

9    March 26th took one week.  Is that correct?

10   A    That's not what I said.

11   Q    Okay.

12   A    I said we received the collection request on March 26th,

13   2021.  I submitted the request that same day.  We delivered

14   both the Chimes and PSTs that following Monday.

15   Q    How long did it take for the PowerShell script to complete

16   in that instance?

17   A    It was received on a Friday and we delivered it on a

18   Monday.  So about one business day.

19   Q    Okay.  Now what about the -- you said that there was a

20   direction you received on April 6th to run additional

21   custodians.  Did you run the PowerShell script on April 6th?

22   A    I did.

23   Q    Can you tell us how long it took to run the scripts for

24   those additional custodians on April 6th?

25   A    I do not recall.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  Do you recall the next time that you received a

2    subsequent set of custodians to run PowerShell scripts for, how

3    long it took to complete those PowerShell scripts?

4    A    On this collect rec -- request, we submitted them the same

5    day we received them and then there were two custodians that

6    required further escalation, which took a few days longer.

7    Q    Okay.  So for the two that didn't require the escalation,

8    how long did those take?

9    A    I do -- I do not recall.

10   Q    And --

11   A    One to -- one to two business days.

12   Q    I see.  Thank you.  And for the ones that required

13   additional assistance, how long did that take?

14   A    It was more -- more than two business days.

15   Q    Okay.  Is the PowerShell script you use in connection with

16   this case?  Or was this specific to the -- the collection of

17   documents in response to the subpoena?

18        MS. WILLIAMS:  Objection, Your Honor.  I think that that's

19   a vague question.

20        JUDGE GREEN:  So I guess I kind of have an idea as to what

21   the assumption is.  The respondent -- if that -- excuse me.  So

22   if Mr. Brainerd can answer it.  Do you understand the question?

23        THE WITNESS:  Can you please clarify what you're asking?

24   Q    BY MR. JACKSON:  Okay.  Do you run the same PowerShell

25   script whenever you're collecting data?  Or do you design one



Exhibit E, Motion to Try Petition on Hearing Record

1    specifically for each collection that you undertake?

2    A    We create a new text file --

3        MS. WILLIAMS:  Your Honor, I believe that exceeds the

4    scope of the area of the inquiry that we were asking about.

5        JUDGE GREEN:  Overruled.

6        THE WITNESS:  Can you please repeat it one more time?

7    Q    BY MR. JACKSON:  Yes.  So again, the overall question is,

8    did the searches -- PowerShell scripts you ran for this case,

9    were they generic or were the specifically designed for this

10   case?  And you said you didn't understand that question, so I

11   asked instead, do you design a PowerShell script for each

12   collection that you undertake?

13       MS. WILLIAMS:  Same objection.

14       JUDGE GREEN:  Overruled.

15       THE WITNESS:  No, we do not create a new PowerShell script

16   every time.  We create a new text file which we then run with

17   the PowerShell, specific to that custodian, specific to that

18   destination.

19   Q    BY MR. JACKSON:  Was the PowerShell script you ran in

20   connection with this subpoena designed or created in 2019?

21   A    I was initially created in 2019.

22   Q    But none of these events happened in 2019.  How could

23   something that was created in 2019 be used for -- how could

24   something be -- be created in 2019 for events that didn't occur

25   yet?



Exhibit E, Motion to Try Petition on Hearing Record

1        MS. WILLIAMS:  Objection.  You're argue -- argue --

2    argumentative.

3        MR. JACKSON:  I'll withdraw the question.

4        JUDGE GREEN:  So it -- it's --

5        MR. JACKSON:  I'll withdraw the question.  I'll withdraw

6    the question.

7    Q    BY MR. JACKSON:  Mr. Brainerd, are Chimes and emails the

8    only communication systems used at Amazon?

9    A    Yes.

10       MR. JACKSON:  No further questions.

11       JUDGE GREEN:  Okay.  Mr. Kearl?

12       MR. KEARL:  Yes.

13                    **REDIRECT EXAMINATION**

14   Q    BY MR. KEARL:  So when -- when you refer to this text

15   file, that's a .txt file.  Is that correct?

16   A    That's correct.

17   Q    And that file is -- how long did it take you to create the

18   .txt file to run the -- with the PowerShell scripts in the case

19   at hand?

20   A    For this -- for the first six custodians, a few minutes.

21   Q    Okay.  And then for the remaining 20 custodians?

22   A    Same answer.  A few minutes.

23   Q    Okay.  And once you completed this, you ran the process,

24   you say you delivered to the destination.  Are you referring to

25   like a file folder somewhere?  What is the destination?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Destination network drive.

2    Q    The destination network drive.  And that destination

3    network drive is something that is -- then that's passed on to

4    the next person in your team.  Is that correct?

5    A    No.  We run --

6    Q    What happens then?

7    A    We export out the data.  It goes to a destination folder.

8    We then ex -- we then transfer that data to the S3 bucket and

9    we release it to the project managers for processing.

10   Q    Okay.  And -- and at some point down the chain is when the

11   actual search takes place on the documents that you've

12   collected?

13   A    That's correct.  I don't conduct those searches, just the

14   collections.

15   Q    Right.  So -- and you don't recall the specific date that

16   you delivered the documents to the destination file and then to

17   the (audio interference) S3 for the project managers for the --

18   the -- the 26 custodians?

19   A    It was over the -- the first collection -- like I said

20   before, the first collection request was received on March

21   26th, 2021.  We then -- that first collection we were able to

22   deliver the following Monday.  The subsequent collections were

23   delivered throughout the month of April to the project manager

24   team for processing.

25   Q    Okay.  And then who -- do you -- who gave you the list of



Exhibit E, Motion to Try Petition on Hearing Record

1    custodians to search?

2    A    I do not conduct searches.  I conduct collections.

3    Q    I apologize.  It's a little confusing because opposing

4    counsel used search a few times and you were able to answer.

5    So the -- the collection that you've performed, who gave you

6    the names to -- of custodians to include in the .txt file?

7    A    Kelcey Phillips from Morgan, Lewis.

8    Q    And the same for all 26 custodians?  The same person

9    delivered -- gave you the -- the names for all 26 custodians,

10   Kelcey Phillips?

11   A    Somebody from Morgan Lewis delivered it but Kelcey

12   Phillips was our main point of contact throughout the month

13   April for collection of these 26 custodians.

14   Q    Okay.  So in -- in total, between March 26th, when you

15   initially received the request for the six custodians, and

16   couple days after April 6th, when you received the remaining

17   custodians, that was the entire duration of your collection

18   process for this case?

19   A    For this case, yes.

20   Q    Okay.  And just one final question.  Did you -- sorry --

21   did you speak at all to Counsel during the lunchbreak or any of

22   the breaks during the course of this hearing?

23   A    I did not.

24   Q    Okay.

25        MR. KEARL:  No further questions.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay.  Ms. Williams, you have anything

2  following that?

3    MS. WILLIAMS:  Just one quick question, Your Honor, based

4  upon what Mr. Brainerd just said.

5                    **RECROSS-EXAMINATION**

6  Q    BY MS. WILLIAMS:  Mr. Brainerd, I think you mentioned that

7  you thought April 6th was the last date of collection.  Ha --

8  have you performed any other collections in the month of April

9  for this matter, later in the month of April?

10 A    I have.

11 Q    And when in the month of April would those have been?

12 A    Throughout the duration of the whole month.  There are --

13 there are five different collection requests.

14 Q    And so when you were testifying a moment ago to the March

15 26th and the April 6th, were those the only collection requests

16 or were there others?

17 A    There was one in Ap -- March -- March 26th.  And there

18 were four throughout the month of April.

19 Q    Do you know how long it takes to actually process

20 documents to then make them searchable?

21 A    I do not.

22 Q    And I know earlier you were asked about the collection of

23 multiple individuals' documents at one time.  Are you -- are

24 there any constraints on that, as far as how many individuals

25 or how much data can be collected at one time through the



Exhibit E, Motion to Try Petition on Hearing Record

1    pipeline?

2    A    There are.  There -- you can only export out a couple of

3    custodians at a time.  However, if you submit more than one, it

4    goes in sequential order.

5    Q    So if you're submitting something and someone else is

6    submitting something, will it just put it in a queue?  Is

7    that -- is that what you're saying?

8    A    Yes, it'll put it in a queue.

9    Q    So if somebody is submitting something for another matter

10   at the same time, can if affect your queue of documents?

11   A    It can.

12        MS. WILLIAMS:  No further questions at this time.

13        JUDGE GREEN:  Okay.  Does -- does the General Counsel have

14   any follow-up on those specific questions?

15        MR. JACKSON:  No, Your Honor.

16        JUDGE GREEN:  Mr. Kearl?

17        MR. KEARL:  No, Your Honor.

18        JUDGE GREEN:  Okay.  Thank you very much.  So you're free

19   to go, Mr. Brainerd.

20        THE WITNESS:  Thank you.

21        JUDGE GREEN:  Okay.  So what do we have next?

22        MS. COX:  Judge Green, we're going to call Frank Kearl.

23        JUDGE GREEN:  Okay.  Okay.  Please raise your right hand.

24   Whereupon,

25                           **FRANK KEARL**



Exhibit E, Motion to Try Petition on Hearing Record

1    having been duly sworn, was called as a witness herein and was

2    examined and testified, telephonically as follows:

3        JUDGE GREEN:  You don't have to spell your name for the

4    record since you've made an appearance.  Just don't communicate

5    with anybody else and -- and don't refer to anything that's not

6    shown to you by Counsel unless directed otherwise.

7                            **DIRECT EXAMINATION**

8    Q    BY MS. COX:  Mr. Kearl, who do you represent in this

9    matter?

10       JUDGE GREEN:  Hold on just one moment.  We didn't lose Ms.

11   Williams, did we?

12       MS. COX:  No.

13       MS. WILLIAMS:  No, Your Honor, I just went off because I

14   wasn't questioning.

15       JUDGE GREEN:  Oh.  Okay.  All right.

16       THE WITNESS:  I represent the Charging Party, Gerald

17   Bryson.

18   Q    BY MS. COX:  Within your capacity as his counsel, did you

19   make any subpoena requests in this case?

20   A    I did, yes.  I submitted a total of -- I -- I served a

21   total of three subpoenas.

22   Q    Can you tell me when you served the first subpoena?

23   A    The first subpoena was served on March 29th, 2021.

24   Q    And who did you serve it on?

25   A    I served it on the custodian of records of Amazon.com



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Services, LLC.

 2    Q    Okay.  When did you serve the second subpoena?

 3    A    The second subpoena was served on March 30th, 2021.

 4    Q    And who was it served on?

 5    A    The same party, custodian of records, Amazon.com Services,

 6    LLC.

 7    Q    And when did you serve the third subpoena?

 8    A    I believe the ser -- third subpoena was served on April

 9    13th, 2021.

10    Q    And can you tell me the reason the subpoena -- the first

11    subpoena was re-served?

12    A    Yeah.  So the initial subpoena served on the 29th was

13    defective on-face because the opening of the hearing

14    necessitated requesting a blank subpoena from the -- the ALJ in

15    the case.  And then on the 30th, a subsequent subpoena was

16    served following the receipt of a subpoena that was requested

17    from the ALJ in this matter, Judge Green.  And -- however, that

18    subpoena was not served with the $40 witness fee.  And then an

19    identical subpoena, down to the -- down to the -- the letter

20    was served on the 13th of April with the $40 witness fee.

21    Q    Just to clarify --

22         JUDGE GREEN:  It does -- not to -- not to interrupt too

23    long.  But just to make this most efficient, to the extent the

24    parties -- a party would like to put in the or -- any of the

25    subpoena orders, you can do that and that might be able to cut
```



Exhibit E, Motion to Try Petition on Hearing Record

1    down on some of the background that we need to go through with

2    the witness.

3        MS. COX:  Okay, Judge.  I believe I have the subpoena that

4    you served on April 13th, 2021.  I'll show it to you and I will

5    put it in in a moment.  Give me one moment.

6        JUDGE GREEN:  So is this going to be marked as a General

7    Counsel exhibit?

8        MS. COX:  Yes, Judge.

9    Q    BY MS. COX:  Mr. Kearl, can you see my screen?

10   A    Yes, I can.

11   Q    It is -- what is this document that I'm showing you?

12   A    This is the subpoena that I served, B1- -- B-1-1C9GVF7.

13   That was served on April 13th.

14   Q    Okay.  Is --

15       JUDGE GREEN:  This is going to be -- I'm sorry but can we

16   just identify this before we talk about it?  Is this going to

17   be GC-3?

18       MS. COX:  Yes, Judge.  This is GC-3.

19       JUDGE GREEN:  Okay.

20   Q    BY MS. COX:  So is the subpoena you were just testifying

21   to?

22   A    Yes, it is.

23   Q    Okay.

24       MS. COX:  So I'm going to move for admission of GC-3.

25       JUDGE GREEN:  Any objections to the document?



Exhibit E, Motion to Try Petition on Hearing Record

```
1        MR. JACKSON:  No objection.

2        JUDGE GREEN:  Okay.  GC-3 is admit -- is admitted.

3    (General Counsel Exhibit Number 3 Received into Evidence)

4        MS. WILLIAMS:  No objection.

5    Q    BY MS. COX:  Mr. Kearl, were any of these subpoenas

6    different in substance?

7    A    The first subpoena was marginally different from the

8    second and third.  But that subpoena was withdrawn.  The second

9    and third subpoenas served on March 30th and April 13th were

10   identical.

11   Q    So this is the third subpoena that was properly served,

12   right?

13   A    That is correct.

14   Q    Okay.  Let me just --

15       MS. COX:  Judge Green, do you want me to email these?  I'm

16   sorry, I'm -- I'm not really prepared for submitting this.  Is

17   Ms. Jones still on?  No?

18       JUDGE GREEN:  She is.

19       MS. JONES:  Yes, I'm here.

20       JUDGE GREEN:  Okay.

21       MS. COX:  Okay.

22       MS. JONES:  Yes.

23       MS. COX:  Should I be emailing this to all the parties,

24   Judge?

25       JUDGE GREEN:  Sure.  I think everybody has a copy of the
```



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    subpoena but yes.  Yes, just --

 2         MS. COX:  Okay.

 3         JUDGE GREEN:  -- yeah.

 4         MS. COX:  And then upload it in SharePoint at the end?

 5         JUDGE GREEN:  Yeah.

 6         MS. COX:  Thanks.  Judge, do you mind if I -- if I email

 7    this after I'm done asking the questions?

 8         JUDGE GREEN:  Everybody have a copy of the subpoena handy?

 9         MR. MURPHY:  Your Honor, if you could give us a minute.

10         JUDGE GREEN:  Okay.

11         MS. COX:  I can -- I'll just keep that up.

12         MR. MURPHY:  Okay, Judge.  I have it.

13         JUDGE GREEN:  Okay.

14         MR. MURPHY:  Thank you.

15    Q    BY MS. COX:  Mr. Kearl, did you have any communication

16    with Counsel about the subpoena?

17    A    I did, yes.

18    Q    Okay.  Do you recall when your first communication was?

19    A    I believe the first communication was the service of

20    the -- the document to Counsel on the 13th with the document

21    attached.

22    Q    Okay.  And -- okay.  And did Counsel reply?

23    A    I did not receive -- I do not believe I received a -- a

24    reply to that email on -- on the day of.

25    Q    Do you recall who you emailed on the 13th?
```



# Exhibit E, Motion to Try Petition on Hearing Record

1   A    Yes, it was Mr. Murphy, Ms. Buffalano, and Ms. Phillips.

2   Q    Okay.  Did -- I'm sorry.  This subpoena, what -- what --

3   what documents did you include?  Do you recall where you --

4   where you --

5   A    Yeah, so I --

6   Q    Go ahead.

7   A    I -- I used the -- the subpoena that was served on March

8   the 1st by the -- the General Counsel and modeled most of the

9   requests one-to-one off of that.  There were a few documents

10  that had been withdrawn from the initial request.  And so I

11  used those paragraphs for additional information such that the

12  subsequent paragraphs would align so that when we're discussing

13  paragraph 17, for example, it's the same paragraph.  But then

14  there were so -- also some additional paragraphs that I added,

15  20 through -- through the end were added in addition to those

16  documents that were requested by the General Counsel.

17  Q    So is your testimony that this subpoena is substantially

18  the same as General Counsel's subpoena issued on March 1st?

19  A    Yes.  The -- the other thing I did was I added additional

20  parties in some of these other paragraphs as subsections.  So

21  in addition to Gerald Bryson's and Dimitra Evans' documents, I

22  also requested documents for Derrick Palmer, Christian Smalls,

23  and Jordan Flowers (phonetic).

24  Q    Okay.  And do you recall when the ALJ ordered documents

25  and General Counsel's subpoena to be produced?



1    A    Yes.  The initial order, I believe, came on April 14th.

2    It was following a conversation that had been had -- and it was

3    basically saying that to the extent that any of the documents

4    were the same between this subpoena and the General Counsel

5    subpoena from March 1st, those documents shall be produced.

6    Q    Okay.  So I'm going to -- I'll come back to this subpoena.

7    I'll show you a communication.  So Mr. Kearl, did you have any

8    communication with Respondent Counsel about the judge's order?

9    A    I did, yes.  The Friday after I had served this subpoena

10   on the 13th, I emailed opposing counsel requesting production

11   of documents that were identical to the documents that had been

12   produced for General Counsel's -- per General Counsel's email.

13   And was told that that was not going to be -- they were not

14   going to be produced until a decision had been made and an

15   order of an issue related to their petition to revoke this

16   particular subpoena.

17   Q    Okay.  So I'm showing you what I'm going to pre-mark or

18   identify as GC-4.  Take a look at this document.  Do you

19   recognize this document?

20   A    Yes, I do.  This is an email that I sent, or it's part of

21   an email chain, but this particular email was the email that I

22   sent on the 23rd following the April 15th order.

23   Q    Okay.  Sorry, I didn't realize if there was any chain --

24   okay.

25   A    And it starts from here, I believe.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And did Respondent reply?

2    A    Yes.  I got a response saying that they would not produce

3    the materials until the petition to revoke had been ruled on.

4    Q    Right.  I'm sorry.  You did testify to that.  And let me

5    see.  Did you ever have a call with Respondent about the

6    production?

7    A    We did not.  I had initially requested a call in my first

8    email.  And when it became clear that opposing party -- or

9    opposing counsel was unwilling to deliver any documents until

10   the petition to revoke, I didn't feel it was necessary.  We had

11   scheduled a call for 4:00 that afternoon, but my grandmother

12   had passed away that afternoon, and so I took some time off at

13   the end of that day.  So I canceled the call at 4.

14   Q    Okay.  I see that here.  So do you recall your next

15   communication with Respondent counsel?

16        JUDGE GREEN:  Yeah, sorry, let me just ask.

17        Is there any reason why -- I mean, I understand maybe

18   you'd want Mr. Kearl to auth -- to authentic these documents,

19   not that I would imagine there's going to be any dispute

20   regarding -- regarding their authenticity.  You know, is there

21   some reason why we just can't get the documents without the

22   blow-by-blow testimony?

23        I -- I don't -- to a great extent, Mr. Kearl's testifying

24   in what's in the emails.  I really don't -- don't need that.  I

25   can just read the emails, especially, because it's a matter



Exhibit E, Motion to Try Petition on Hearing Record

1    that we're all intimately familiar with.  I'm happy to take the

2    emails.  I think -- you know, I was waiting to get this.  I

3    think it's -- it's useful for the purposes of dealing with any

4    subpoena dispute.  But I just don't know that we have to go

5    through this process of email by email, when I can just read

6    them.

7         MS. COX:  Judge, it's just a few emails.  And I'll be

8    quick.

9         JUDGE GREEN:  Okay.

10   Q    BY MS. COX:  So do you recall Respondent's response to

11   your request to produce documents pursuant to the judge's

12   order?

13   A    Yes.  The response was that they were still reviewing the

14   order from the day before.  And they requested that I sign an

15   additional protective order beyond the protective order in the

16   judge's order from earlier in that week.

17   Q    Okay.

18        MS. COX:  At this time, Your Honor, General Counsel moves

19   for admission of GC-4.

20        JUDGE GREEN:  Any objection?

21        MR. MURPHY:  No objection, Your Honor.  But can they

22   please be provided by Counsel, so -- so that we'll have them?

23        MS. COX:  Yes.

24        MR. MURPHY:  Okay.  And that would be in advance of the

25   cross-examination, if possible, right?



# Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  Absolutely.

2      MR. MURPHY:  Okay.

3      **(General Counsel Exhibit Number 4 Received into Evidence)**

4      Q      BY MS. COX:  Okay.  So Mr. Kearl, did you have any further

5      communication with Respondent about producing documents

6      requested in your subpoena?

7      A      After my email on Thursday afternoon, or early evening,

8      after the order was issued, the next email that I got on the

9      matter was at, I believe, 5:46 p.m. on Friday.  And it was an

10     email from Ms. Phillips delivering -- or -- or alerting me to

11     the fact that there were documents available to download

12     through the Morgan, Lewis server.

13     Q      Okay.  And I'm sorry, what date did you -- do you recall

14     what date that was?

15     A      That was this past Friday.  So that would've been the -- I

16     think, that's the 30th.

17     Q      Okay.  And did Ms. Phillips email you?

18     A      She emailed me.  And I also received a link where I could

19     download documents from the Morgan, Lewis server, which I

20     subsequently did.

21     Q      Okay.  So I'm just going to show you an email that -- just

22     give me one moment.  Okay.  Mr. Kearl, do you see my screen

23     here?

24     A      Yes.

25     Q      Okay.  Is this the email that you just testified to at --



Exhibit E, Motion to Try Petition on Hearing Record

1   I'm sorry, this is not the email you just testified to.

2   A    No, I believe -- I believe this is the correct chain.

3   They were responses to my initial service.  And so here is the

4   Friday -- I'm sorry, it was 5:49 p.m. email.  And then, if you

5   scroll up, you'll see the additional two document deliveries

6   that took place over the weekend.

7   Q    So you --

8   A    So there's one from April 30th there.

9   Q    So you received documents on the 30th and on May 2nd?

10  A    On May 2nd and then this morning.

11  Q    Okay.

12       MS. COX:  So at this time, Your Honor, General Counsel

13  moves for admission of GC-5.

14       JUDGE GREEN:  Any objection?

15       MR. MURPHY:  No objection.

16       JUDGE GREEN:  Okay.  GC-5 is admitted.

17  **(General Counsel Exhibit Number 5 Received into Evidence)**

18  Q    BY MS. COX:  Okay.  So Mr. Kearl, I want to go through the

19  subpoena with you that I previously showed you.  Please tell me

20  when you see my screen.  I'm sorry.  Okay.

21       JUDGE GREEN:  So this is going back to GC-3?

22       MS. COX:  Yes, Judge.

23  Q    BY MS. COX:  All right.  So this is GC-3.  Mr. -- Mr.

24  Kearl, did you get a production key with this subpoena?  I'm

25  sorry, with the -- the subpoena production?



# Exhibit E, Motion to Try Petition on Hearing Record

 1    A    Yes, each individual production had its own production

 2    key.

 3    Q    Okay.  Do you recall what was produced in -- without

 4    looking at the production key, do you remember what was

 5    produced responsive to paragraph 1?

 6    A    Nothing.

 7    Q    Do you recall what was produced pre -- in response to

 8    paragraph 2?

 9    A    Nothing.

10    Q    Do you recall what was produced in response to paragraph

11    3?

12    A    Nothing.

13    Q    Do you recall what was produced in response to paragraph

14    4?

15    A    Nothing.

16    Q    Do you recall what was produced in response to paragraph

17    5?

18    A    Nothing.

19    Q    Do you recall what was produced in response to paragraph

20    6?

21    A    I believe nothing.

22    Q    Do you recall what was produced in response to paragraph

23    7?

24    A    Yes.  I believe paragraph 7, in addition to a handful of,

25    sort of like, one or two-page employee documents, there was



1    also a document called the "Owner's Manual", which looks like

2    the employee handbook, that was dated from 2017.

3    Q    Is that the correct date of the "Owner's Manual" in effect

4    during the incident underlying this case?

5    A    My understanding is that there was at least a revision as

6    of 2019.  But I'm not sure if there was one between that

7    revision and the events that took place in March and April of

8    2020.

9    Q    Did you get any documents responsive to paragraph 8?

10   A    I did get documents related to paragraph 8, yes.

11   Q    Did you get documents responsive to paragraph 9?

12   A    I got some documents related to par -- subparagraphs a and

13   b.  And I did not receive documents for c and d, I don't

14   believe.

15   Q    Okay.  Did you get documents responsive to paragraph 10?

16   A    I did not.

17   Q    Did you get documents responsive to paragraph 11?

18   A    For paragraph 11-a, I received some disciplinary actions

19   and positive feedback writeups.  For paragraph 11-b, I received

20   some disciplinary actions, positive feedback, and then, also

21   information about a transfer that took place.  I did not

22   receive any documents -- oh, that's not true.  I did receive

23   documents related to 11-c and 11-d, as of this morning.

24   Q    Okay.  Did you receive documents responsive to paragraph

25   12?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Oh, and I will say that documents related to paragraphs

2    11-c and d were only the -- there was no information about

3    transfers or promotions.  It was just disciplinary actions

4    and -- and feedback reports.

5    Q    Okay.

6    A    Paragraph 12, I did not receive any documents.

7    Q    Okay.  Did you receive documents responsive to paragraph

8    13?

9    A    I did not.

10   Q    Did you receive documents responsive to paragraph 14?

11   A    I did not.

12   Q    Did you receive documents responsive to paragraph 15?

13   A    I did not.

14   Q    Did you receive documents responsive to paragraph 16?

15   A    I received a few Excel documents.  And there was a

16   smattering of PDF documents as well for JFK8, EWR4, and BDL6, I

17   believe is the other facility.  And I will say there was --

18   there was a document that I received that was purportedly

19   responsive to one of the earlier paragraphs related to the --

20   Mr. Bryson's discharge.  But it was a PDF document that was

21   ille -- illegible and the pages didn't correspond to each

22   other, so there was no way to actually see what information was

23   on which line and related to which particular line.  I can't

24   remember exactly which paragraph it was supposed to be

25   responsive to.  But it was not a useful document.



1 Q Okay.  Did you receive any documents responsive to

2 paragraph 17?

3 A I did receive an Excel -- an Excel spreadsheet, and then

4 some PDF documents of the disciplinary actions.

5 Q Did you receive documents responsive to paragraph 18?

6 A I don't believe I did.  I do not believe I did.

7 Q I want to take a step back a moment.  You said earlier

8 that a document wasn't useful.  Can you tell me why it wasn't

9 it useful?

10 A Yeah.  So it was clearly a PDF version of an Excel sheet.

11 The formatting of the PDF was not done in a way that resulted

12 in a legible document.  So there were -- in addition to the

13 text being incredibly small, any row that extended beyond say

14 four or five cells, was then spit to a subsequent page.  But

15 the order of the pages was such, and there was no -- no lines.

16 So you couldn't actually tell, you know, if I'm row 12 of the

17 first page, where on page 8 or 16 that same employee's records

18 were.  So it was -- it was impossible to use in a meaningful

19 fashion outside of some, you know, involved, you know, data

20 archeology, which I don't know how I would -- how I would do.

21 Q Mr. Kearl, did you receive any documents responsive to

22 paragraph 19?

23 A I did not.

24 Q Did you -- did you receive documents responsive to

25 paragraph 20?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I did not.

2    Q    Did you receive documents responsive to paragraph 21?

3    A    I did not.

4    Q    Did you receive documents responsive to paragraph 22?

5    A    I did not.

6    Q    Did you receive documents responsive to paragraph 23?

7    A    I did not.

8    Q    Did you receive documents responsive to paragraph 24?

9    A    I did not.

10   Q    Is it your understanding that the General Counsel received

11   documents responsive to some of these subpoena paragraphs in

12   General Counsel's subpoena?

13   A    Yes.  And I -- I believe that those documents which have

14   Bate (sic) stamps on them were included in the list.  I

15   received a PDF document that just had "document withheld" for

16   all of those.  And on the production log, it just said

17   "withheld" with no further explanation for a large number of

18   documents.  But I believe General Counsel received and were

19   responsive to other paragraphs in the subpoena.

20   Q    And so Mr. Kearl, I'm showing you what I'm identifying as

21   General Counsel's Exhibit 6.  Is this the document that you

22   just testified to?

23   A    Yes.  This, I believe is the -- the production on Friday

24   evening, so April 30th.

25   Q    And it's a four-page document, correct?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    That's correct.  And for all of these documents that have

2   "withheld", there is a corresponding PDF that just says

3   "document withheld", or something to that extent.

4   Q    Okay.  Did you receive an updated version of this

5   production key?

6   A    So each production of documents had its own production

7   key.  Some of them, I believe that the -- the May 2nd

8   production and this morning's production, were both

9   specifically related to documents from the other two

10  facilities, the PDFs of the production.  The -- the

11  disciplinary documents as well as, I believe, there was some

12  Excel files in there as well.  But there were also withheld

13  documents among the production log for those two productions.

14  Q    Okay.  Do you recall around what time on Friday you

15  received documents?

16  A    Yeah, it was about, I believe, 5 -- 5:46 or :49 p.m. on

17  Friday.

18  Q    And do you recall what time you received documents

19  yesterday?

20  A    I do not remember exactly.  But I believe it was in the

21  afternoon, because I -- I -- it wasn't until about 5 p.m. that

22  I was able to sit down and open the documents and start to go

23  through and see what I had gotten.

24  Q    So on Friday, it was after business hours, right?

25  A    It was at -- it was, you know, if 6 p.m. is the end of



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    business hours, there was about 11 or 12 minutes before the end

2    of business hours.

3    Q    And Sunday's not a business day, right?

4    A    I try to keep it not a business day.

5    Q    What time did you receive documents this morning; do you

6    recall?

7    A    I want to say it was around 8:30.  But the -- the date

8    stamps on the exhibit, with the email exchange with Ms.

9    Phillips, would have the exact times that those documents were

10   received.

11   Q    Okay.

12        MS. COX:  And at this time, Your Honor, General Counsel

13   moves for admission of GC-6.

14        JUDGE GREEN:  6 is what's on the screen right now?

15        MS. COX:  Yes.

16        MR. MURPHY:  No objection, Your Honor.

17        JUDGE GREEN:  Okay.  GC-6 is admitted.

18   **(General Counsel Exhibit Number 6 Received into Evidence)**

19   Q    BY MS. COX:  Mr. Kearl, has your case been hampered by not

20   getting documents?

21   A    Absolutely.

22   Q    How so?

23   A    Well, I do not have an army at my disposal to put towards

24   this work.  And insofar as Amazon is a very large and

25   sophisticated company that knows how to create records of



Exhibit E, Motion to Try Petition on Hearing Record

1    everything that happens in that facility, having access to

2    those records is very important to proving a case like the one

3    that I -- where I'm representing, Charging Party, where needing

4    to prove things like animus, through communications, as well as

5    just for treatment through having, you know, other -- other

6    information about other workers who were terminated.  It makes

7    incredibly difficult to prepare and proceed with a case without

8    timely production of -- of these documents.

9    Q    And have you been hampered by getting documents on the eve

10   of trial?

11   A    Yes.  I was hoping to get a good night's sleep last night,

12   but I spent a lot of time combing through Excel documents and

13   PDFs that were delivered that afternoon.

14       MS. COX:  Judge, can I go off the record?

15       JUDGE GREEN:  Off the record.

16   (Off the record at 2:58 p.m.)

17       JUDGE GREEN:  Okay.  Let's go back on the record.

18                    **RESUMED DIRECT EXAMINATION**

19   Q    BY MS. COX:  At any time offer you an explanation for the

20   documents that were withheld?

21   A    No.

22   Q    Did Respondent's counsel at any time offer you an

23   explanation for the documents that were produced to the General

24   Counsel, but not to you?

25   A    No.



1    Q    Did Respondent give any reason for not producing the

2    documents?

3    A    Aside from this morning when they requested a

4    reconsideration of the protective order, I have not gotten

5    any -- I do not believe I received any justification for the

6    refusal to produce documents other than the point at which

7    they -- before the order came out, when they said they were

8    going to wait on a decision on the petition to revoke.

9    Q    Did Respondent tell you at any time that they encountered

10   problems producing the documents?

11   A    Outside of the you know, the last couple of weeks where

12   we've been in this same Zoom space and we've heard complaints,

13   I have not received anything specifically related to my

14   subpoena.

15   Q    Did Respondent ever contact you for any clarification on

16   documents?

17   A    I don't believe they didn't, no.  There was communication

18   immediately following the service of the second subpoena where

19   we had a -- I had a phone conversation with Mr. Murphy.  And

20   then there was a subsequent email exchange concerning the

21   withdrawal of the initial subpoena.  But -- but that was the

22   extent of it.

23        MS. COX:  Okay.  Nothing further.

24        JUDGE GREEN:  Okay.  So you're going to send the

25   Respondent the document that was submitted?



# Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  Yes, Judge.

2      JUDGE GREEN:  Okay.  Mr. Murphy, do you have any sense of

3  how long you'll -- you'll need?

4      MR. MURPHY:  I'm not -- I'm not quite sure, Judge.  You

5  know, we just continue with the unusual pattern of this case,

6  you know, at -- and you know, it's very clear to us that the

7  counsel for the General Counsel is doing everything possible

8  under the sun to avoid getting to the merits of this case.  You

9  know, where -- where it seems as though we're litigating a case

10  about production and sanctions.  And I -- I would like -- I

11  really want -- how about 3:30?  Does that sound reasonable?

12     JUDGE GREEN:  Okay.

13     MS. COX:  Judge, if I may, the reason this is happening is

14  because Respondent wants us to go into a hearing blindfolded

15  and without documents and it's just completely inappropriate.

16  And Mr. Kearl is entitled to documents for his client.  And the

17  General Counsel is entitled to the documents pursuant to your

18  order.  That's what this is all about and nothing more, Judge.

19     MR. MURPHY:  Yeah, so --

20     JUDGE GREEN:  So --

21     MR. MURPHY:  -- Judge, you know, the record's pretty clear

22  that -- that we -- we -- we move for a postponement on a number

23  of occasions.  And as Mr. Rosenblatt said, you put it to the

24  counsel for the General Counsel and Mr. Kearl.  Do you want to

25  proceed or not?  And they were both unequivocal.  They wanted



1    to go forward.  And we're here.  We're ready to get to the

2    merits of this case and end the sideshow.  Let's -- let's talk

3    about what the Charging Party did and the reasons for the

4    termination decision.  And -- and leave this stuff where it

5    began as a tempest in a teapot.

6        JUDGE GREEN:  Okay.  In the --

7        MR. MURPHY:  But we'll be back --

8        JUDGE GREEN:  -- meantime, we're -- we're waiting on --

9    we're waiting on cross of Mr. Kearl.  So have you sent the

10   exhibits over to the Respondent?  So why don't you do that.

11   And we'll be off until 3:30.

12       MR. MURPHY:  Thank you.

13       JUDGE GREEN:  Thank you.

14   (Off the record at 4:01 p.m.)

15       JUDGE GREEN:  Okay.  All right.  So are we ready for

16   cross?

17       MR. MURPHY:  I think so, Your Honor.

18       JUDGE GREEN:  Okay.  So any time you're ready.

19       MR. MURPHY:  Thank you.

20                        **CROSS-EXAMINATION**

21   Q    BY MR. MURPHY:  Good afternoon, Mr. Kearl.  How are you

22   today?

23   A    Okay.

24   Q    Good thing.  So just have a couple of questions about

25   your -- your testimony.  First of all, you've -- you've



Exhibit E, Motion to Try Petition on Hearing Record

1    participated as Counsel for the Charging Party in all of the on

2    the record proceedings in this case today, correct?

3    A    That's correct.

4    Q    And you participated in the hearing on the record on April

5    26, correct?

6    A    That is correct.

7    Q    And at that hearing, you, and the counsel for the General

8    Counsel were given the specific option by the ALJ either to

9    postpone this case or to proceed on the record today, correct?

10       MS. COX:  Objection.  It's a mischaracterization.

11       MR. MURPHY:  Judge, it's a -- it's a question.

12       JUDGE GREEN:  Let's -- I'm going to overrule that.  I

13   mean, we -- we have it on a transcript.  We were all there.

14   But go ahead.  Go ahead.  Let's -- let's finally move through

15   this fairly quickly since we're all familiar with what happened

16   on April 26th.

17       MS. COX:  Okay.

18   Q    BY MR. MURPHY:  And you -- you and the counsel for the

19   acting General Counsel were given the option to postpone the

20   case or to proceed today, correct?

21   A    In addition to a lot of other conversation on the issue,

22   that was one of the decisions that was -- that was presented,

23   yes.

24   Q    Okay.  And both you and the counsel for the Acting General

25   Counsel opted to proceed today, correct?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    So when you were reviewing the subpoenas that you served,

3    you indicated you'd served three.

4    A    Yes, that's correct.

5    Q    And the first two were defective; isn't that right?

6    A    Yes.

7    Q    Do you recall Amazon filing a petition to revoke the

8    second defective subpoena, the one that was served without the

9    required witness fee?

10   A    Yes.  Five days after service, the petition to revoke was

11   submitted.

12   Q    Okay.  And -- and do you recall what date that was

13   submitted on?

14   A    I'd have to look at a calendar.  It was five days after

15   the 30th.  So I believe it was that following Tuesday, if I'm

16   not incorr -- incorrect.

17   Q    Okay.

18   A    I'd have to look at a calendar.

19   Q    All right.  So if I was to represent you that that

20   happened on April 6th, 2021, does that sound about right?

21   A    That sounds about right.

22   Q    Okay.  And did that -- did you read that petition to

23   revoke?

24   A    I did.

25   Q    In addition to the argument about the witness fee, do you



Exhibit E, Motion to Try Petition on Hearing Record

1    recall Amazon raising a request or presenting a request for an

2    appropriate protective order to cover any documents in the

3    event that the petition -- I'm sorry, that the subpoena was

4    enforced in whole or part?

5    A    I do recall that, yes.

6    Q    Okay.  So -- so you knew at least from early April that --

7    that Amazon was seeking a -- a protective order in connection

8    with any documents that -- that you subpoenaed and -- and that

9    were required to be produced, right?

10   A    Yes, I was aware of that -- that desire.

11   Q    Mr. Kearl, you worked for Make the Road New York?

12   A    Yes.

13   Q    And are -- are you -- what's the nature of your

14   relationship to Make the Road New York?  Are you an employee or

15   have some other capacity?

16   A    I am a staff attorney for Make the Road New York.

17   Q    And do you represent Mr. Bryson in -- in your -- in -- in

18   some individual capacity or do you represent him as a staff

19   attorney for Make the Road New York?

20       MS. COX:  Objection, Your Honor.  This exceeds the -- the

21   scope of direct, Your Honor.

22       JUDGE GREEN:  Yeah, I -- I -- I don't really see the need

23   for it, so sustained.

24       MR. MURPHY:  I would note, Judge, that we just went

25   through many hours of testimony where there seemed to be



Exhibit E, Motion to Try Petition on Hearing Record

1    little, if any, constraints on the questions that were posed

2    either by counsel for the --

3        JUDGE GREEN:  Well --

4        MR. MURPHY:  -- General Counsel.

5        JUDGE GREEN:  -- what we're -- okay.  So what -- what

6    we're -- we're.  Listen, what we're trying to get to the extent

7    we have to litig -- litigate the issue of subpoena production,

8    you know, that's what we're -- that's what we're dealing with

9    here.  I'm surprised that we have to deal with that, but that's

10   what we seem to be dealing with here.  And -- and primarily, it

11   was Mr. Kearl's testimony to what he received and what was not

12   received.  You know, I would think that that would be subject

13   to a stipulation agreement between the parties, but apparently

14   it's not.  So really, I mean, that's what we're after in this

15   part of the --

16       MR. MURPHY:  I -- I -- I under --

17       JUDGE GREEN:  -- hearing.

18       MR. MURPHY:  -- I understand.  I understand, Judge.  It is

19   cross-examination.  And you know, you have previously had a --

20   had a -- as you described it yourself a pretty broad definition

21   of relevance.  And -- and I have you know, one or two

22   questions.  I just --

23       JUDGE GREEN:  Okay.

24       MR. MURPHY:  -- and then --

25       JUDGE GREEN:  Yeah.



# Exhibit E, Motion to Try Petition on Hearing Record

1    MR. MURPHY:  -- I'll be moving on.

2    JUDGE GREEN:  Go ahead.

3    MR. MURPHY:  Thank you, very much.

4  Q    BY MR. MURPHY:  So do you -- do you represent Mr. Bryson

5  either individually or through Make the Road New York; is that

6  right, Mr. Kearl?

7    MS. COX:  Objection.  Attorney-client privilege.

8    MR. MURPHY:  Judge, it's not -- the fact of the

9  representation is not privileged.

10    JUDGE GREEN:  Yeah, so you can ask.

11  A    Can you repeat the question?

12  Q    BY MR. MURPHY:  Sure.  Do you -- you represent Mr. Bryson

13  either indi -- in some individual capacity or through Make the

14  Road New York; is that right?

15  A    Yes.

16  Q    And how long has your representation of -- when did your

17  representation of Mr. Bryson start?

18  A    I don't recall the exact date, but it was in, I believe,

19  April of 2020.

20  Q    Does -- do you or Make the Road New York represent either

21  Christian Smalls in any matter related to Amazon and his

22  employment in Amazon?

23    MS. COX:  Objection, Your Honor.

24    JUDGE GREEN:  Sustained.  I'm really not interested in

25  getting into this aspect of it.  I understand where you're



Exhibit E, Motion to Try Petition on Hearing Record

1    going with it.  And I've indicated in the prior order that I

2    really don't think it's relevant.

3         MR. MURPHY:  Yeah.  Yeah, I'm -- Your Honor, I'm -- I'm

4    actually not heading in that direction.

5         JUDGE GREEN:  Yep.

6         MR. MURPHY:  I'm trying to see if there's any claim -- if

7    there's any claim of -- of prejudice here.  The materials that

8    Mr. Kearl is seeking, he may have obtained through some

9    collateral source.

10        JUDGE GREEN:  I -- I don't see how that's relevant.  So

11   sustained.

12   Q    BY MR. MURPHY:  Mr. Kearl, have you or your client met

13   with representatives of Region 29 to prepare for this case?

14   A    Not in person, but we have had virtual meetings, yes.

15   Q    And how many have you had?

16        MS. COX:  Objection, Your Honor, this is irrelevant to

17   whether he got documents or not.

18        JUDGE GREEN:  It really is.  It's really not moving the

19   ball forward.  You know, I mean, it --

20        MR. MURPHY:  Your Honor, it -- that it was -- there was

21   as -- well --

22        JUDGE GREEN:  It's not what -- it's not what's being

23   litigated here.  I mean, it's crazy that we actually have to

24   litigate this issue, but we -- we are.  And the issue is what

25   was produced, what was not produced, whether it was produced



# Exhibit E, Motion to Try Petition on Hearing Record

1    in -- in, you know, in good faith, reasonably, whether --

2    whether reasonable searches were done, whether there was

3    prejudice.  I mean, that's what we're dealing with here.

4         MR. MURPHY:  Right.  So Judge, the question goes to the

5    issue of prejudice, because there -- there -- there were

6    communications, including by you, relating to the counsel for

7    the General Counsel sharing.

8         JUDGE GREEN:  Okay.

9         MR. MURPHY:  -- materials, right?

10        JUDGE GREEN:  Okay.  Overruled.  Yeah, go ahead.

11   Q    BY MR. MURPHY:  Mr. Kearl.

12   A    Can you repeat the question?

13   Q    Sure.  The -- I -- I think the question was, when was the

14   first time that you met with counsel for the General Counsel

15   for trial preparations?

16   A    I did sometime after the filing of the complaint, but I

17   don't recall the exact date.

18   Q    Okay.  And on how many subsequent occasions have you met

19   with representatives of counsel for the General Counsel for

20   trial preparations?

21        MS. COX:  Objection, Your Honor.  If he wants to ask him

22   if he's seen documents, he can ask him that, but not how many

23   times we've met and what we've prepped or what -- what we did

24   in prep.

25        MR. MURPHY:  I didn't -- I didn't ask that.  I asked how



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    many times.

2        JUDGE GREEN:  Okay.  Overruled.

3    A    I don't recall an exact number, but there were several

4    times.

5    Q    BY MR. MURPHY:  And in those -- in those prep sessions,

6    did representatives of the counsel for the General Counsel

7    share with you or show to you documents related to this case in

8    any way?

9    A    There were documents that were displayed via screen share,

10   but that was the extent of my ability to see them.

11   Q    So you -- you were provided access to them for trial prep

12   purposes and with your client present; is that correct?

13   A    Insofar as I have access to your office right now, I have

14   the ability to see the documents that were shared on the

15   screen, but no further ability to search, scroll through.  We

16   didn't review any of the documents outside of what was on my

17   screen being shared by the -- the -- the General Counsel's

18   Office.

19   Q    And -- and did you ask the counsel for the General Counsel

20   to -- to perform any of those tasks for you to search for

21   certain items, to scroll through certain documents, to provide

22   some sort of a shared access to them, such as we're using

23   today?

24   A    On occasion, I would ask for a document to be scrolled

25   down or up, but when you're dealing with thousands of pages of



Exhibit E, Motion to Try Petition on Hearing Record

1  documents, the ability to actually look at the materials -- it

2  was not provided.  And quite honestly, we didn't have time to

3  do a complete audit of production through the screen shares

4  features of Zoom in -- in order for me to be able to prepare

5  for this meeting or this hearing.

6  Q    Okay.  Could you describe for me the -- the systems or --

7  or programs that -- that you used to review documents with

8  counsel for the General Counsel?

9       MS. COX:  Objection, Your Honor.  The issue is not whether

10  he reviewed them, Judge.  The issue is whether he received

11  them.

12      JUDGE GREEN:  Okay.  I'm going to -- I'll allow it.

13  A    I was able to see -- my entire interaction with these

14  documents was through the screen share feature of the Zoom

15  meeting application.

16  Q    BY MR. MURPHY:  Did you suggest any other platform or

17  sharing technology for a review of the documents?

18  A    I had an active subpoena and was requesting those

19  documents myself.  I did not request documents to be sent to me

20  if that's what you're suggesting.

21  Q    That's -- that's not what I'm suggesting.  I'm -- I'm

22  asking if you suggested some other sort of sharing technology

23  other -- other than just the share screen function of Zoom?

24  A    I do not have access to other applications for meetings

25  that we I -- use Zoom.  And so that's what I have.  I don't



1    have other technology at my fingertips that would enable me to

2    do anything more than a screenshare.

3    Q    The subpoena that you served, the third subpoena, the one

4    that was not defective, Amazon filed a petition to revoke that

5    subpoena, correct?

6    A    That is correct.

7    Q    And that -- that petition to revoke was filed on or about

8    April 20th, does that sound right to you?

9    A    It was five days after the service of the subpoena, so

10   I'm -- I'm not sure what date that would be.  But it's in that

11   range.

12   Q    Okay.  And that petition to revoke, did that include a

13   request for a protective order?

14   A    It did.

15   Q    Okay.  So Amazon in -- in -- in its petition to revoke

16   filed on April 6th, requested a protective order and in its

17   petition to revoke filed on April 20th, requested a protective

18   order, correct?

19   A    Aside from not being able to verify those dates, that is

20   correct.

21   Q    Okay.  Can we -- I -- I think we've uploaded some

22   documents to the -- the SharePoint, the SharePoint system.  Is

23   Amazon's petition to revoke filed on April 20th in -- in there,

24   Ms. Jones?

25       MS. JONES:  Let me get -- let me see.  I can -- hold on



# Exhibit E, Motion to Try Petition on Hearing Record

1    for one second.

2         JUDGE GREEN:  Is this in Respondent's exhibits?

3         MR. MURPHY:  I'm sorry, Your Honor.

4         JUDGE GREEN:  Would this be in Respondent's exhibits'

5    file?

6         MR. MURPHY:  I think it should be.

7         JUDGE GREEN:  I'm not seeing any in there.

8         MS. COX:  Your Honor, there's -- there's no exhibits in at

9    all.  There's no exhibits at all for the Respondent.

10        MR. MURPHY:  Okay.  Thank -- thank you, Ms. Jones.

11        MS. JONES:  You're welcome.

12        MR. MURPHY:  Judge, can we go off the record for one

13   second, please?

14        JUDGE GREEN:  Yeah, off the record.

15        MR. MURPHY:  Thank you.

16   (Off the record at 4:16 p.m.)

17        JUDGE GREEN:  So back on the record.  Do we have Ms. Cox?

18   Yep, there we go.

19        MR. MURPHY:  Okay.  Ms. Jones, could you kindly go into

20   the SharePoint Respondent's exhibits and load the first

21   document, 2021.04.20, you see that?

22        MS. JONES:  This one right here?

23        MR. MURPHY:  Okay.

24        THE COURT REPORTER:  You have to give it -- you have to

25   give the exhibit a name is what it --



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Yeah.  So this will be R-1.

2    THE COURT REPORTER:  -- give it 1 or 2.

3    MR. MURPHY:  This will be R-1.  Right, it's not marked,

4    unfortunately.

5    **(Respondent Exhibit Number 1 Marked for Identification)**

6    THE COURT REPORTER:  Oh, okay.  That's going to be a

7    problem.  You have to --

8    MS. JONES:  Okay.

9    THE COURT REPORTER:  -- you have to put a number on your

10   exhibits when you send them in, so I know what's what.

11   JUDGE GREEN:  I know.  But I -- I take it that these were

12   kind of hurriedly -- hurriedly prepared.  So we're going to

13   have to fix the -- you know, the identification to them later.

14   MS. JONES:  Is this is -- right here?

15   MR. MURPHY:  Yes, it is, ma'am.  Thank you, very much.

16   MS. JONES:  Okay.

17   THE COURT REPORTER:  So that would be Respondent 1?

18   MR. MURPHY:  Yes -- yes, sir.  Okay.

19                    <u>**RESUMED CROSS-EXAMINATION**</u>

20   Q   BY MR. MURPHY:  Mr. Kearl, I -- I give you the opportunity

21   to scroll through this if you chose to but can you -- do

22   recognize this as a Respondent's petition to revoke the -- I'm

23   sorry, that's the wrong -- yes, it is, the Respondent's

24   petition to revoke the active subpoena in this matter?

25   A   This looks -- this looks like the petition to revoke, yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.

2         MR. MURPHY:   I move the -- the admission of Respondent's

3    Exhibit 1, Your Honor.

4         JUDGE GREEN:   Any objection?

5         MS. COX:   No objection.

6         JUDGE GREEN:   R-1 is admitted.

7    **(Respondent Exhibit Number 1 Received into Evidence)**

8    Q    BY MR. MURPHY:   Mr. Kearl, is it your contention that --

9    that Amazon should have produced documents while its motion for

10   a protective order was pending with the ALJ?

11   A    It's my belief that the Respondent had an obligation to

12   begin preparing documents upon service but did not need to

13   serve documents until an order related to this petition to

14   revoke was issued.

15   Q    And do you have General Counsel 3 in front of you, by any

16   chance?  That's --

17   A    I do not.

18   Q    -- that's the actual subpoena which was taken -- that you

19   issued.

20   A    I can pull it up on my computer if you like, but I don't

21   have it in front of me at the moment.

22        MR. MURPHY:   It's not in the General Counsel's SharePoint?

23        MS. COX:   Yes.

24        MR. MURPHY:   So that -- can -- could you red General

25   Counsel's 3, please?



Exhibit E, Motion to Try Petition on Hearing Record

```
1        MS. JONES:  3?

2        MR. MURPHY:  Yes, ma'am.

3        MS. JONES:  Okay.  All right.

4        MR. MURPHY:  Thank you, very much.

5    Q    BY MR. MURPHY:  Mr. Kearl, that's -- that's the cover

6    letter to the subpoena that's at issue here, General Counsel 3,

7    correct?

8    A    That looks like the cover letter, yes.

9    Q    Okay.  I -- I -- so you went through this subpoena in

10   response to questions from Ms. Cox.  And -- and -- and you

11   identified a number of -- number of paragraphs for which you

12   indicated you had received nothing, correct?

13   A    That's correct.

14   Q    Okay.  So do -- do you know -- or how would you know what,

15   if anything, is responsive to these paragraphs?

16   A    Well, the production key that was provided each of the

17   times that I received documents had a column that said which

18   paragraphs were responsive -- those documents were responsive

19   to.  And there were -- between the numbers, 1 and 24, how many

20   paragraphs there are.  There were not -- not very many numbers

21   represented.

22   Q    Okay.  So -- so -- and -- all you really know is that

23   nothing has been produced to date, correct?

24   A    Well, I know that there were documents that said withheld.

25   And I was able to confer and had seen in the course of
```



Exhibit E, Motion to Try Petition on Hearing Record

1    preparation one or two documents on -- you know, during our

2    hearings as well.  It appeared to me like there were documents

3    that were being withheld that didn't show up on the privilege

4    log.  And so I was unable to see them.

5    Q    Okay.  So did you -- with respect to the paragraphs that

6    you've received nothing for, you -- you -- and -- and for which

7    nothing has been produced to the counsel for the General

8    Counsel, you don't know whether there are, in fact, any

9    documents that are responsive, right?

10   A    No, that is not true.

11   Q    When your subpoena was enforced on the 27th, it -- did --

12   did you anticipate that the requests that are contained therein

13   would -- would -- would go to the front of the queue to use a

14   term that was used earlier today?

15   A    My belief was that the documents that were responsive to

16   both my subpoena and the General Counsel subpoena served on

17   March 1st had already been delivered and produced to the

18   General Counsel's Office would be produced insofar as they had

19   already been processed and had already gone through all of the

20   attorney review before going to the General Counsel's Office.

21   Q    Okay.  And -- and you -- and you've received all of those

22   documents except for what -- what is a nonpersonnel record,

23   correct?

24   A    I do not know the answer to that question.

25   Q    Okay.



# Exhibit E, Motion to Try Petition on Hearing Record

1    MR. MURPHY:  Ms. -- Ms. Jones, could you load -- could you

2    load the -- the document in Respondent's exhibits labeled April

3    14 Green Email?  They may have a different name.  Let me

4    refresh my browser.

5    MS. JONES:  This -- is it this here?

6    MR. MURPHY:  Yes, it is, ma'am.  Yes.  Ms. Jones, I'm just

7    going to ask -- well, Your Honor, I would move the admission of

8    this email string.  I'm -- I'm happy to let

9    THE COURT REPORTER:  So this is R-2.

10   **(Respondent Exhibit Number 2 Marked for Identification)**

11   MR. MURPHY:  Thank you.  And --

12   JUDGE GREEN:  Any object -- any objection.  Let me -- let

13   me ask.

14   MS. COX:  Judge, this is irrelevant.

15   JUDGE GREEN:  Well, I'm going to admit it.

16   MR. MURPHY:  And frankly -- frankly, it seems to me that

17   the party's correspondence is what's likely to be most relevant

18   to this issue.

19   JUDGE GREEN:  And I'm a little surprised that you're not

20   just putting it all in.  But go ahead.  I'm admitting R- -- I'm

21   admitting R-2.

22   **(Respondent Exhibit Number 2 Received into Evidence)**

23   MR. MURPHY:  Ms. Jones, could you load the email that's

24   labeled April 28th Chris email?

25   Q    BY MR. MURPHY:  And Mr. Kearl, I'd -- I'd offer you the


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    opportunity to scroll through this if you'd like.

2        MR. MURPHY:  But I would offer this, Your Honor, as

3    Respondent's 3.

4        MS. COX:  No objection.

5        JUDGE GREEN:  Okay.  So R-3 is admitted.

6    **(Respondent Exhibit Number 3 Received into Evidence)**

7        MR. MURPHY:  And then -- and then finally, I'd -- I'd

8    request that all of the subpoenas and -- and related documents,

9    petitions to revoke, orders thereon, oppositions thereto, be --

10   be made part of the record.  And -- and we can submit those.

11   And you know, when we get a chance over the next day or so.

12   That -- that should be nonobjectionable.

13       JUDGE GREEN:  Yeah, so when we -- we'll deal with it when

14   the time comes.  I -- I -- I'm -- tend to admit that.  But is

15   there any objection to that Ms. Cox?

16   Q    No objection, Judge.

17       JUDGE GREEN:  Okay.  So we'll deal with that when -- when

18   those documents are available.

19       MR. MURPHY:  Thank you.  Can we go off the record for a

20   second, Your Honor?

21       JUDGE GREEN:  Yes.  Off the record.

22   (Off the record at 4:29 p.m.)

23       MR. MURPHY:  Nothing further, Judge.

24       JUDGE GREEN:  Okay.  Thank you.  Any -- anything more from

25   the GC?



# Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:  Just a few questions, Judge.  And I also want to

2    introduce the order -- two of the orders.  Give me one second.

3    Just a second, I can show on my own.

4    MR. MURPHY:  Your -- Your Honor, we have no objection to

5    orders you've -- you've entered in this case being made part of

6    the record.

7    JUDGE GREEN:  Right.  I -- I think that maybe we should

8    put all these in in one batch, so we know where they are, maybe

9    as a joint exhibit -- as joint exhibits, the orders, the

10   petitions, the oppositions.

11   MS. COX:  Okay.

12   JUDGE GREEN:  Unless you have some questions you want to

13   ask based on it, but okay.  Go ahead.

14   MS. COX:  Just -- just a few questions for Mr. Kearl.

15                    **REDIRECT EXAMINATION**

16   Q   BY MS. COX:  Mr. Kearl, you had -- Amazon asked you some

17   questions about your ability to view file -- view documents

18   during prep.  Were you able to create exhibits through the --

19   the screen (audio interference)?

20   A   I was not, no.

21   JUDGE GREEN:  I think Ms. Cox just -- let's go off the

22   record for a moment.

23   (Off the record at 4:33 p.m.)

24                **RESUMED REDIRECT EXAMINATION**

25   Q   BY MS. COX:  Mr. Kearl, you were asked some questions



1    about viewing documents on screen during prep.  Were you able

2    to create exhibits from using the screen share option?

3    A    I was not, no.

4    Q    Were you able to talk to your client confidentially

5    without the board present?

6    A    I was not --

7         MR. MURPHY:  Objection, leading.

8         JUDGE GREEN:  Overruled.

9    A    No, I was not.

10   Q    BY MS. COX:  Were you able to make notes on the -- the

11   documents you intended to use?

12   A    No, I was not.

13   Q    Were you able to conduct legal research based on the

14   documents you saw?

15   A    To a limited degree, but not -- not really.

16   Q    Were you able to formulate a strategy with the -- the

17   screenshare option you were given?

18   A    It was  difficult, I think, as evidenced by the use of

19   Zoom in the course of this conversation.  It was difficult to

20   do so in -- in the time that was available.

21   Q    How much time in a given session were you able to view

22   documents?

23   A    A couple minutes.  No more.  Most of my time was spent

24   watching my client and working with him.

25        MS. COX:  I have nothing further, Judge.



Exhibit E, Motion to Try Petition on Hearing Record

1       Oh, I actually do.  One -- one other one.  I'm sorry.

2   Q   BY MS. COX:  Did the ALJ grant a protective order?

3   A   Yes, there was a limited protective order.

4       JUDGE GREEN:  So we have that -- we're going (audio

5   interference) the record.

6       MS. COX:  That was my only question, Judge.

7       JUDGE GREEN:  Okay.  Anything from Mr. Murphy?

8       MR. MURPHY:  Just very briefly, Your Honor.

9                   **RECROSS-EXAMINATION**

10  Q   BY MR. MURPHY:  Mr. Kearl, you -- you -- you said you

11  weren't able to talk confidentially at -- confidentially --

12  confidentially with your client.  Aren't -- aren't there any

13  number of ways that you could have worked around that by going

14  into a separate Zoom room or used a -- a telephone call with

15  him to -- to communicate with him out of the hearing of the

16  counsel for the General Counsel?

17  A   Not really while continuing to have access to the document

18  that I was viewing on the share screen.

19  Q   Okay.  And -- and there was no restriction placed on your

20  ability to take notes about any of the documents that you were

21  shown; was there?

22  A   Not that I'm aware of.

23      MR. MURPHY:  Nothing further.

24      JUDGE GREEN:  Okay.  Thank you.  So it sounds like we're

25  done for the day; am I right?



# Exhibit E, Motion to Try Petition on Hearing Record

1      MR. MURPHY:  We'd like to open, Judge.

2      MS. COX:  Is Mr. Grabowski available?

3      MR. MURPHY:  We got to have openings, right?

4      JUDGE GREEN:  Oh, you want to -- you want to give an

5   opening statement?

6      MR. MURPHY:  Yeah, I mean, you  -- you indicated yourself

7   at the outset that it was unusual not to have openings.  And --

8   and -- and here we are.  And it sounds like --

9      JUDGE GREEN:  Let's just -- so --

10     MR. MURPHY:  -- counsel for the General Counsel wants to.

11     JUDGE GREEN:  -- let's just ask.  Let me -- let me ask a

12  little bit.  We've -- we've got a few minutes here.  It's

13  the -- it's the General Counsel's intent to pull Mr. Grabowski

14  with regard to the subpoena issue or -- or --

15     MS. COX:  All issues, Judge.

16     JUDGE GREEN:  All issues.  Okay.  So that's just going to

17  be a standard 611 statement.

18     MS. COX:  Yes.

19     JUDGE GREEN:  Do you want to -- so I mean, do you want to

20  give an opening statement?

21     MS. COX:  We wait --

22     JUDGE GREEN:  It sounds like this is going to be a --

23  he's -- he's alleged there's a -- as a -- as a -- as a

24  supervisor, it sounds like this is going to be substantive

25  testimony.  If we're going to get into -- to testimony on the



Exhibit E, Motion to Try Petition on Hearing Record

1    merits, I actually would like to hear an opening -- the

2    openings.

3        MS. COX:  Okay.

4        JUDGE GREEN:  It doesn't have to be this minute.  It could

5    be tomorrow morning if you --

6        MS. COX:  That's my preference, Judge.

7        JUDGE GREEN:  Okay.  Fine.  Would the Respondent like to

8    go first now.

9        MS. COX:  We have the --

10       JUDGE GREEN:  Or do you want to -- or -- or do want to

11   wait for -- I mean, you don't have to give it -- you don't have

12   to give an opening statement until the start of your case.  So

13   you could do it now if you want to jump the gun.  You could do

14   it tomorrow morning after Ms. Cox, or you could do it at the

15   beginning of your case.

16       MR. MURPHY:  Yeah, I think we'll wait and go after counsel

17   for the General Counsel --

18       JUDGE GREEN:  Okay.

19       MR. MURPHY:  -- tomorrow.  Let -- let me -- just give --

20   let me have a second to communicate about that.

21       JUDGE GREEN:  Okay.

22       MR. MURPHY:  Give me one second, Your Honor.

23       Yeah, we'll -- we'll -- we'll -- we'll make our opening

24   tomorrow morning after counsel for the General Counsel.

25       JUDGE GREEN:  Okay.  Okay.  So that's what we'll start on



# Exhibit E, Motion to Try Petition on Hearing Record

390

1    tomorrow.  Do you have -- is that -- do you have any other

2    witnesses tomorrow, Ms. Cox?  I'm not asking you to name them,

3    but do you have a sense of how many?

4        MS. COX:  Yes, Judge.  Well, it depends how long the

5    testimony goes with Mr. Grabowski, but  at least two others.

6        JUDGE GREEN:  Okay.  All right.  So we'll go off the

7    record for the -- the day and -- and resume tomorrow at 10.

8    (Off the record at 4:39 p.m.)

9        JUDGE GREEN:  Okay.  We're back on the record and the

10   Charging Party would like to make a motion.

11       MR. KEARL:  Yes, Your Honor, I'd like to make a motion for

12   sanctions.  In light of the recent testimony, it's clear that

13   the counsel for Respondent has failed to produce documents.

14   That failure to produce documents has nothing to do with needed

15   time to find documents, needed time to review documents.  It's

16   clearly just an attempt to prevent information from getting to

17   counsel for Charging Party in direct contravention of your

18   order.  And insofar as any adverse inferences can be made from

19   that failure to produce documents.  I would request -- I would

20   request that under (indiscernible).

21       JUDGE GREEN:  Okay.  Would the Respondent like to make a

22   response to that now or no?

23       MR. MURPHY:  No.

24       JUDGE GREEN:  Okay.  Are we done for the day?

25       MR. MURPHY:  Other than to set a time for a call about the



Exhibit E, Motion to Try Petition on Hearing Record

```
1    subpoena issues

2         JUDGE GREEN:  Okay.

3         MS. COX:  5:00, 10 minutes.

4         MR. MURPHY:  Why don't we -- it's 5:15 or 5:30, not a

5    little bit better, let people have a drink, stretch their legs.

6         MS. COX:  5:15.

7         MR. MURPHY:  Okay.  I don't think we need to do this on

8    the record.  Off the record for the day.

9         (Whereupon, the hearing in the above-entitled matter was

10   recessed at 4:48 p.m. until Tuesday, May 4, 2021 at 10:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Exhibit E, Motion to Try Petition on Hearing Record

1       <u>C E R T I F I C A T I O N</u>

2       This is to certify that the attached proceedings, via Zoom

3       videoconference, before the National Labor Relations Board

4       (NLRB), Region 29, Case Number 29-CA-261755, Amazon.com

5       Services, LLC and Gerald Bryson, held at the National Labor

6       Relations Board, Region 29, Two Metro Tech Center North, 5th

7       Floor, Brooklyn, New York 11201, on May 3, 2021, at 10:00 a.m.

8       was held according to the record, and that this is the

9       original, complete, and true and accurate transcript that has

10      been compared to the reporting or recording, accomplished at

11      the hearing, that the exhibit files have been checked for

12      completeness and no exhibits received in evidence or in the

13      rejected exhibit files are missing.

14

15

16

17      _____

18      BARRINGTON MOXIE

        Official Reporter
19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services LLC,          Case No.   29-CA-261755

      Employer/Respondent,

and

Gerald Bryson,

      An Individual.

_____

_____

Place: Brooklyn, New York (via Zoom videoconference)

Dates: May 4, 2021

Pages: 393 through 571

Volume: 5

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



Exhibit E, Motion to Try Petition on Hearing Record

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

| | |
|---|---|
| In the Matter of: | |
| AMAZON.COM SERVICES LLC, | Case No.   29-CA-261755 |
| Employer/Respondent, | |
| and | |
| GERALD BRYSON, | |
| An Individual. | |

The above-entitled matter came on for hearing, via Zoom
videoconference, pursuant to notice, before **BENJAMIN W. GREEN**,
Administrative Law Judge, at the National Labor Relations
Board, Region 29, Two Metro Tech Center North, 5th Floor,
Brooklyn, New York 11201, on **Tuesday, May 4, 2021, 10:04 a.m.**

escribers

www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1                                 A P P E A R A N C E S

2     On behalf of the General Counsel:

3           EVAMARIA COX, ESQ.
            MATTHEW JACKSON, ESQ.
4           DAVID GASTON, ESQ.
            NANCY REIBSTEIN, ESQ.
5           THE NATIONAL LABOR RELATIONS BOARD - REGION 29
            Two Metro Tech Center, 5th Floor
6           Brooklyn, NY 11201
            Tel. (718)765-6172
7
      On behalf of the Employer:
8
            CHRISTOPHER J. MURPHY, ESQ.
9           JENNIFER MOTT WILLIAMS, ESQ.
            RICHARD ROSENBLATT, ESQ.
10          MORGAN, LEWIS & BOCKIUS, LLP
            1701 Market Street
11          Philadelphia, PA 19103-2901
            Tel. (215)963-5601
12
            NICOLE BUFFALANO, ESQ.
13          MORGAN, LEWIS & BOCKIUS, LLP
            300 South Grand Avenue, 22nd Floor
14          Los Angeles, CA 90071
            Tel. (213)612-7443
15
            KELCEY J. PHILLIPS, ESQ.
16          MORGAN, LEWIS & BOCKIUS, LLP
            1111 Pennsylvania Avenue, NW
17          Washington, DC 20004
            Tel. (202)739-5455
18
      On behalf of the Charging Party:
19
            FRANK KEARL, ESQ.
20          MAKE THE ROAD NEW YORK
            161 Port Richmond Avenue
21          Staten Island, NY 10302
            Tel. (929)265-7692
22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1                              I N D E X

2

3        WITNESS             DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE

4        Tyler Grabowski       428     556

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 <u>**E X H I B I T S**</u>

2

3 <u>**EXHIBIT**</u>                              <u>**IDENTIFIED**</u>    <u>**IN EVIDENCE**</u>

4 **General Counsel:**

5    GC-7                                      437              453

6    GC-8                                      467              493

7    GC-9                                      502              509

8    GC-10                                     511              513

9    GC-11                                     515              519

10   GC-12                                     519              524

11   GC-13                                     524              525

12   GC-14                                     526              527

13   GC-15                                     527              529

14   GC-16                                     529              530

15   GC-17                                     531              532

16   GC-18                                     532              533

17   GC-19                                     535              536

18   GC-20                                     536              536

19   GC-21                                     536              538

20   GC-22                                     538         (Not Admitted)

21   GC-23                                     539              539

22   GC-24                                     540              540

23   GC-25                                     543              546

24   GC-26                                     546              547

25   GC-27                                     548              549



Exhibit E, Motion to Try Petition on Hearing Record

1       **E X H I B I T S** (Continued)

2

3       **EXHIBIT**                                    **IDENTIFIED**    **IN EVIDENCE**

4          GC-28                                          549              549

5          GC-29                                          551              551

6          GC-30                                          550              551

7          GC-31                                          551              551

8          GC-32                                          552              552

9          GC-35                                          552              553

10         GC-36                                          553              553

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    P R O C E E D I N G S

2          JUDGE GREEN:  Okay, so we're back on the record in the

3    Amazon.com Services LLC, case 29-CA-261755.  It's May 4th at

4    10:04.

5          So what we were going to start the day with our openings,

6    and would the General Counsel like to give an opening

7    statement?

8          MS. COX:  Before we begin, Judge, I wanted to discuss the

9    privilege log that was sent last night at 11:23 p.m.

10         JUDGE GREEN:  Okay.

11         MS. COX:  Judge, it's our position that the log is not

12    sufficiently cured.  The attachments are not described at all,

13    and the last emails that don't have Counsel attached, and just

14    simply say it's at the direction of Counsel, we renew our --

15    our request for those to be reviewed in camera; there's nine of

16    them.

17         JUDGE GREEN:  So are you saying that all of the -- all of

18    the entries are deficient, or are you saying just the last nine

19    are deficient?

20         MS. COX:  I'm saying the entries of the attachments that

21    were added, that are not described, are deficient and that is

22    several entries, about seven.

23         JUDGE GREEN:  Okay.

24         MS. COX:  And I'm also saying the last nine entries that

25    don't have Counsel on them are also deficient.



Exhibit E, Motion to Try Petition on Hearing Record

1       JUDGE GREEN:  Okay.  So we're -- we're down to 16 entries.

2   So I -- I don't have those.  I don't have the log, so I can't

3   tell.  Why don't you send it to me at your earliest

4   availability.

5       In the meantime, well, why don't I ask Mr. Rosenblatt, do

6   you want to respond to that?

7       MR. ROSENBLATT:  I'd love to, but I can't.  And this is

8   the first we're hearing about something.  In the normal course,

9   we would, and -- and granted, it was last night, Your Honor

10  said by midnight last night.  We beat that by, I don't know, 40

11  minutes or so.  We worked very hard on this.  We're happy to

12  have a meet and confer with the Region about it to see, you

13  know, specifically what line items they have problems with, and

14  to go back and figure out whether there's anything more to add.

15  But it seems, as it typical, it seems premature to be raising

16  these issues.  Let's, you know --

17      JUDGE GREEN:  Well, I don't think it's premature, you

18  know, I think that -- oops, let me -- it sounds like it --

19  there's no separate -- is there no separate entry for the

20  attachments?

21      MS. COX:  They're -- they -- they're not described, Judge.

22      MR. ROSENBLATT:  They are, Your Honor.  I mean, and --

23  and --

24      JUDGE GREEN:  Okay.

25      MR. ROSENBLATT:  -- you don't even have it yet, so why are



1    we here --

2        JUDGE GREEN:  Right, so right.  So okay.

3        MS. COX:  We're sending it.

4        JUDGE GREEN:  And -- and the -- the nine at the end, do

5    they not have the name of the -- the attorney who gave the

6    instruction to conduct the investigation?

7        MR. ROSENBLATT:  They do have -- they do have the name of

8    the attorney.

9        JUDGE GREEN:  Okay, all right.  So why don't we, since

10   there's a dispute about it, I -- I have to see the logs.  And

11   I -- I would like somebody to send them to me.  But in the

12   meantime, I would like to move on to the opening statements.

13   We've been talking a lot about this case without me actually

14   getting a whole lot of details about -- about it.  And I'd

15   actually like to hear the openings.

16       Ms. Cox, are you -- are you prepared to do an opening at

17   this time?

18       MS. COX:  Yes, Judge.

19       JUDGE GREEN:  Okay.

20       MS. COX:  On April 17th, 2020, Amazon discharged its

21   employee, Gerald Bryson, because he, in conjunction with his

22   coworkers, forcefully demanded that the company take workers'

23   health and safety, in the midst of a global pandemic, imploring

24   Amazon to implement basic safety protocols established by the

25   Centers for Disease Control and Prevention.



# Exhibit E, Motion to Try Petition on Hearing Record

1     Your Honor, it is important to remember what was happening

2     around the world, in our country, and particularly, in New York

3     City, during March and April 2020, when Bryson and his

4     coworkers, at the JFK8 fulfillment center in Staten Island, New

5     York, protested their working conditions.

6     On March 7th, 2020, New York State Governor, Andrew Cuomo,

7     declared a state of emergency to help New York contain the

8     spread of Coronavirus.  Very quickly, New York City became the

9     epicenter of the Coronavirus disease.

10    In early March 2020, the rate of infection went from

11    hundreds of cases a day to reports of thousands by the end of

12    March and into April 2020.  As infection rates increased, so

13    did the number of Coronavirus tests.  Hospitals were pushed to

14    capacity, some even resorting to using refrigerated trailers to

15    create makeshift morgues.  Many people were dying.

16    By March 22nd, 2020, all nonessential businesses in New

17    York were shut down.  There was little information on how the

18    virus is transmitted, who was at risk of infection, and what

19    the symptoms were.  We lived in fear.  We didn't leave our

20    homes.

21    While most businesses were forced to close, Amazon

22    remained open for business, and its employees at JFK8 were

23    expected to report to work.  These essential workers bravely

24    continued working in the midst of an accelerating public health

25    crisis, picking, packing, and shipping our orders, while we



Exhibit E, Motion to Try Petition on Hearing Record

1    remained at home, increasingly reliant on Amazon for our food,

2    personal health, and cleaning products.

3        Like many of us, JFK8 employees were also scared.  And

4    their working conditions inside the facility only augmented

5    their concerns.

6        Your Honor, you will hear testimony from JFK8 employees,

7    establishing that workers at JFK8 often performed their jobs

8    shoulder to shoulder, even though public health officials urged

9    everybody to socially distant -- distance.  And while Amazon

10   sourced and shipped -- shipped life-saving personal protective

11   equipment and cleaning supplies all over the world, the company

12   left its own essential workers vulnerable and unprotected,

13   without these items, or with only scarce amounts.

14       Quickly, the employees' fears about the virus spreading in

15   the -- in their workplace seemed to materialize.  The evidence

16   will show that during the week of March 23rd, 2020, JFK8

17   employees began to learn, by word of mouth, that there were

18   many positive cases at JFK8.

19       Like many of his colleagues, Mr. Bryson was understandably

20   scared for his health and safety, and that of his family, but

21   despite needing his job to help feed his family, Bryson and his

22   coworkers decided to demand safe and healthy working conditions

23   for all Amazon employees at JFK8.  It truly was a matter of

24   life and death.

25       The evidence will show that on March 25th, 2020, Bryson



Exhibit E, Motion to Try Petition on Hearing Record

1    and his coworkers interrupted a manager's meeting, to ask

2    managers what Amazon planned to do to keep them safe from

3    COVID-19.  The evidence will show that during this meeting,

4    Mr. Bryson spoke up about his fear of contracting COVID at

5    work, and bringing it home to his multigenerational household.

6         Amazon managers callously dismissed these employees'

7    concerns, and returned to their meeting, intent to resume

8    business as usual, even as a pandemic was raging all around

9    them.

10        Bryson and his colleagues refused to accept managers'

11   inaction.  Instead, they escalated their protected concerted

12   activities to compel Amazon to make meaningful changes.

13        The evidence will show that on March 30th, 2020, Bryson

14   and his coworkers initiated a protest outside of the JFK8

15   facility, demanding that Amazon shut down the JFK8 facility to

16   perform a deep cleaning, at Amazon had done at other facilities

17   where employees tested positive for COVID-19.  At the March

18   30th protest, Mr. Bryson became one of the public faces of the

19   safety battle brewing at JFK8.

20        The evidence will show that the media shook, and widely

21   circulated, pictures of Bryson engaged in protected concerted

22   activity.  It was also at this protest that Amazon fired

23   Christian Smalls, who along with Bryson and Derrick Palmer, was

24   one of the leaders of the employee protests for safe working

25   conditions, for allegedly violating Amazon's quarantine



Exhibit E, Motion to Try Petition on Hearing Record

1    directive.

2         The evidence will also show that Amazon subsequently

3    issued Mr. Palmer a final warning explicitly for his conduct in

4    engaging in protected concerted activities with Bryson.

5         Undaunted, the employees continued to press their

6    concerns.  On April 6th, 2020, Mr. Bryson and his coworkers

7    engaged in another protest in the JFK8 parking lot, to demand

8    that Amazon shut down the facility for cleaning.  It was at

9    this protest that the incident underlying Mr. Bryson's

10   termination occurred.

11        During the April 6th, protest, Mr. Bryson, who was off

12   duty and not scheduled to work, had an interaction, an

13   argument, with Amazon employee Dimitra Evans, who was on her

14   lunch break.

15        Respondent would have you believe that on April 6th, while

16   he was protesting Amazon's failure to keep employees safe,

17   Mr. Bryson engaged in misconduct that merited termination.

18   This is not true.  The evidence will show that Bryson, in the

19   heat of an urgent struggle to improve workplace safety, used

20   language toward a coworker that Amazon routinely condones, and

21   rarely punishes with termination.

22        Rather than forming a legitimate basis for discharge, Your

23   Honor will see that Amazon seized upon this situation to

24   retaliate against yet another leader of the employee protests,

25   and Respondents feigned shock and horror at Bryson's conduct



# Exhibit E, Motion to Try Petition on Hearing Record

1    will be revealed through the pretext that it is.

2        The evidence will establish classic disparate treatment,

3    in that Amazon clearly treated Mr. Bryson far more harshly than

4    numerous other employees who had altercations with coworkers,

5    thus laying bare the animus motivating the company's unlawful

6    termination.

7        With this evidence, the record in this case will compel

8    Your Honor to find that Amazon suspended and discharged Gerald

9    Bryson in retaliation for his protected concerted activities,

10    in violation of the National Labor Relations Act.

11        JUDGE GREEN:  Okay, thank you.

12        So does the -- does Mr. Kearl, did you have any opening

13    independent of the General Counsel or no?

14        MR. KEARL:  Yes, Your Honor, I do.

15        JUDGE GREEN:  Okay.  Whenever you're ready.

16        MR. KEARL:  This case is about Amazon, one of the largest

17    companies in the world, targeting and terminating an employee

18    for daring to speak out about unsafe work conditions.

19        To begin, I'd like to contextualize the events that took

20    place between March 23rd and April 6th, 2020, when COVID-19

21    became an acute crisis in New York.  Over those two weeks,

22    positive cases in New York climbed from around 20,000 to over

23    130,000, and deaths exploded from 157 to 4,774.

24        At this time, when New York City was entering into a

25    lockdown, Gerald Bryson and his colleagues were deemed



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    essential workers, and so they continued to report for work at

2    Amazon's JFK8 facility.  But Amazon failed to take even the

3    most basic steps to protect them from the virus.  These workers

4    were afraid for themselves and their families.  People were

5    dying out there, and they knew that the JFK8 facility was

6    dangerous.  It was impossible to maintain a safe physical

7    dist -- distance on the warehouse floor and in the break rooms.

8    The policies in place prevented workers from being able to wash

9    their hands or sanitize their work stations.  And Amazon's

10   managers were hiding the existence of positive cases involved.

11        And so together, Gerald Bryson and his colleagues raised

12   their voices to demand better, and Amazon responded with a

13   series of targeted disciplinary actions, including the

14   termination of Mr. Bryson.

15        On March 25th, 2020, Gerald Bryson and his colleagues

16   interrupted a manager's meeting at the JFK8 facility, to

17   express their concerns about their safety at work.  They asked

18   what was being done to make JFK8 safe, and were effectively

19   told to go back to work; we'll get back to you.

20        These workers were understandably frustrated, because a

21   day earlier, they learned, that there had been at least one

22   positive COVID-19 case in the facility, but the company was

23   only planning to notify the workers who needed to know about

24   it.

25        When a week of interrupting managers' meetings to try to





www.escribers.net | 800-257-0885

1    communicate directly with those running the building, proved

2    unsuccessful, Gerald Bryson and his colleagues next scheduled a

3    walkout of the JFK8 facility, on March 30th, 2020.

4        On the morning of March 30th, shortly before the protest,

5    Amazon sent out the first COVID-19 text message to its JFK

6    workers, alerting them to a positive case in the facility.

7    This was a worker that Mr. Bryson and his colleagues knew, and

8    they had known that she had tested positive after working in

9    the facility the week prior.  And Mr. Bryson and his colleagues

10   knew that Amazon had sat on this information for days.

11       The workers protested peacefully in the parking lot

12   outside of the JFK8 -- 8 facility on March 30th, and the media

13   amplified these workers' concerns about their story -- about

14   their safety.

15       Immediately following this protest, Christian Smalls, at

16   the time the leader of the group, was terminated.  Days later,

17   a memo leaked, notes from a meeting between Amazon's highest

18   levels of management, including Jeff Bezos.  These notes

19   included smears about Mr. Smalls, and sketched out plans to

20   mount a PR campaign to try to discredit and silence the worker

21   organizers.

22       Back in New York City, the COVID-19 conditions were

23   continuing to worsen, and JFK8 workers were still forced to

24   work without basic protections.  Amazon sent out at least one

25   new text message a day following the March 30th protest.  We



Exhibit E, Motion to Try Petition on Hearing Record

1   have additional confirmed cases of COVID-19 at the JFK8

2   facility.

3       So Gerald Bryson and his colleagues organized another

4   protest in the parking lot outside JFK8 on April 6th, 2020.

5   April 6th was a Monday, one of Gerald's days off, but he came

6   to the parking lot of the facility and took up the megaphone to

7   demand that Amazon protect its employees.  Determination of

8   Mr. Smalls had pushed him to step up as a leader, and he was

9   subsequently targeted and terminated by Amazon.

10      Amazon was aware that he was a worker leader.  We know now

11  of high-level Amazon mangers seeking legal advice about him as

12  early as April 5th, the day before the second protest.

13  Regional HR managers, corporate labor attorneys based in

14  Seattle, and even Amazon's worldwide HR transformations leader,

15  all taking about Gerald Bryson.

16      During the course of the protest, which lasted several

17  hours, there was a roughly three-minute-long argument with

18  another worker.  As will be shown over the course of this

19  trial, Amazon used this argument as pretext to terminate

20  another worker leader at JFK8.

21      Mr. Bryson was suspended on April 10th, and Derrick

22  Palmer, the other key organizer who had stepped up as a leader

23  following Mr. Smalls' termination, was given a final warn --

24  written warning on that same day.

25      On April 18th, 2020, Gerald was terminated, but there was



# Exhibit E, Motion to Try Petition on Hearing Record

1    no legitimate investigation into the matter by Amazon.  Gerald

2    didn't even get the opportunity to tell his side of the story,

3    or present his own witnesses.  Amazon put a target on Gerald's

4    back the instant he started speaking out about unsafe

5    conditions in JFK8, and for the last 389 days, Amazon has been

6    able to keep him out of the facility.

7      In the middle of a pandemic, Gerald Bryson was fired for

8    daring to demand that his employer follow the rules, and keep

9    people safe from a deadly virus.

10      We will get to see many examples of similar and worse

11    arguments and interactions at Amazon facilities that did not

12    result in termination, but the most obvious proof of Amazon's

13    discriminatory intent, is what happened to the other worker

14    involved in the argument on April 6th, 2020.

15      Despite starting the argument, escalating the argument,

16    using threatening gestures, and using discriminatory, racist,

17    abusive, and derogatory language, this other worker was not

18    terminated, but instead, got a promotion and a pay raise a few

19    short weeks later.

20      Mr. Bryson was terminated from Amazon because of his

21    engaged -- because of his engagement in protected concerted

22    activity for the mutual aid and protection of workers at JFK8.

23    Mr. Bryson's actions are protected under Section 7 of the

24    National Labor Relations Act.  Amazon's justifications for his

25    termination will fail to meet the standard for overcoming the

# Exhibit E, Motion to Try Petition on Hearing Record

1   inference of unlawful termination under Wright Line.

2       Therefore, Mr. Bryson is entitled to reinstatement to the

3   position he held at Amazon as of April 10th, 2020, complete

4   with all of the privileges and benefits of employment he had at

5   that time, as well as all other appropriate remedies under the

6   Act, to make him whole for this unlawful termination.  Thank

7   you.

8       JUDGE GREEN:  Thank you.

9       Okay, and for the Respondent, would you like to give your

10  opening now, or would you like to wait to the beginning of your

11  case?

12      MS. BUFFALANO:  We would like to give it now, Your Honor.

13      JUDGE GREEN:  Okay.  Anytime you're ready.

14      MS. BUFFALANO:  Okay.

15      Your Honor, there's no dispute here that the pandemic was

16  serious and severe, and there's no dispute that New York was

17  the epicenter, probably at the time of the incident.  There's

18  no dispute that Mr. Bryson engaged in demonstration activities

19  and other activities calling for the Amazon's -- the Amazon

20  facility at JFK8 in Staten Island to be shut down.

21      The issue isn't whether or not he was engaged in these

22  activities.  The issue is whether or not an employer should

23  have to put up with, at one -- one employee making vile and

24  disgusting and reprehensible comments, accusations, and words

25  to one another.



Exhibit E, Motion to Try Petition on Hearing Record

1    It -- I'm -- I'm very interested to hear that we have two

2    different versions here, right?  The General Counsel's theory

3    seems to be that there's disparate treatment, and the Charging

4    Party's theory seems to be that Mrs. -- Ms. Evans, the other

5    employee involved in this incident, engaged in the same kind of

6    misconduct, in the same kind of way, the same kind of vile and

7    disgusting terms.

8        I am interested to hear Counsel for the General Counsel's

9    theory, because at the time of the investigation, we were

10   informed by the Board agent that the issue was Ms. Evans, and

11   that Ms. Evans had been treated more leniently than Mr. Bryson.

12   So it appears that at this point, Counsel for the General

13   Counsel has taken the tens of thousands of disciplinary records

14   that were provided pursuant to a subpoena, pluck them entirely

15   out of context, relied solely on the very limited description

16   of the incident, and very limited description of each of the

17   incidents included in the feedback, and then relied on that for

18   disparate treatment.

19       To hear the Charging Party tell it, we're here because

20   these two employees, Mr. Bryson and Ms. Evans, got into an

21   altercation, he says initiated by Ms. Evans, and that the two

22   evenly or equally sort of cussed each other out.  Mr. Bryson

23   was fired, Ms. Evans wasn't, and in fact, sounds like she was

24   treated better than Mr. Bryson is the claim, and that the only

25   difference between the two of these individuals was that

Exhibit E, Motion to Try Petition on Hearing Record

1    Mr. Bryson had engaged in protected activity and Ms. Evans had

2    not.

3         And if those were the facts of this case, then we might

4    not be here today.  But the reality is that on April 6th,

5    outside of Amazon's JFK8 fulfillment center in Staten Island,

6    Mr. Bryson harassed, degraded, and abused Ms. Evans.

7         At the time of the incident, Mr. Bryson was one of two

8    individuals in the parking lot demonstrating.  He was calling

9    for Amazon to shut down the JFK8 facility.  He was angry at

10   Ms. Evans because she disagreed with him and his fellow

11   demonstrators' calls to shut down the facility.  This isn't

12   surprising.  The demonstration was occurring during the lunch

13   period, for the purpose of being able to speak to the broadest

14   audience at the time.  It's not surprising that employees

15   didn't agree with his position, and Ms. Evans was one of those

16   employees.

17        That made Mr. Bryson angry, and when he got angry, he

18   unleashed a tirade of callous, vile terms and accusations, that

19   included the N word, the C word, and the B word.  I can't even

20   repeat these words here because I'm not comfortable with that,

21   so I'm going to use abbreviations.  But Mr. Bryson used these

22   words, some of them more than once, some of them on a bullhorn,

23   and all of them in the parking lot of both of these employees'

24   workplace.  It's really hard to believe that the Board wants to

25   send the message that employers should tolerate this kind of

# Exhibit E, Motion to Try Petition on Hearing Record

1    conduct because the employee is demonstrating.

2         We urge you to see this case for what it is.  We have an

3    employee who was fired for horrific treatment of his coworker.

4    No employer or employee in a civilized society should be forced

5    to tolerate this kind of conduct.

6         In this case, there were five witnesses.  In addition to

7    Ms. Evans, and in many cases, Mr. Bryson also agreed with the

8    conduct reported by the witnesses, all of them said that while

9    standing 20 feet outside of the front door of Amazon's JFK8

10   fulfillment center, for two and a half minutes, Bryson screamed

11   into a bullhorn, to anyone that would listen, that Ms. Evans

12   was a C, an N, a B, a gutter B, a crack head, a crack head ass,

13   scum of the earth, a drug addict, she was addicted to fentanyl,

14   she had track marks up and down her arm, she was a junkie.  He

15   called her baby girl.  He chastised Amazon for hiring drug

16   addicts.  He asked bystanders to look at her eyes and to test

17   her, insinuating she was high.  He said she was stupid and

18   ignorant, and that she likely had no family and no home.

19        Surprisingly, there's really not a lot in dispute here.

20   On a Facebook Live video that was taken immediately after the

21   incident and posted on Bryson's attorney's Make the Road New

22   York's Facebook page, Mr. Kearl's law firm, and -- and this

23   video that was -- it was viewed by Amazon in real time right

24   after the exchange with Ms. Evans, Mr. Bryson admitted to the

25   incident with Ms. Evans.  He said that he really cursed that



# Exhibit E, Motion to Try Petition on Hearing Record

1     girl out.  He really cursed her out; that's what he said.

2         In both the Facebook Live video and in his interview with

3     Amazon during the investigation, Mr. Bryson admitted to calling

4     Ms. Evans a B.  And he admitted to doing it on a bullhorn.

5     Notably, he did deny using the N word because he says, in his

6     own words, as a black man, he never used that term, but this

7     claim was completely undermined by the Facebook Live video that

8     was posted immediately after the incident.  During that video,

9     Mr. Bryson used the term N, no less than four times in 20

10    seconds.  And it was so inappropriate that his colleague, Jay

11    Flowers, who also appeared in the video, apologized to viewers,

12    saying that Bryson shouldn't be going off like that, and asking

13    viewers to pardon Bryson's French.

14        It seems that everyone except Bryson recognizes that the

15    words that he uses are ugly, harmful, and abusive, and off

16    limits in a civilized society.

17        Although he admitted most of his abhorrent behavior,

18    you're going to see and hear two videos that surfaced while we

19    were preparing to litigate this case.  They were recorded by a

20    witness to the incident, and posted to Facebook.

21        These videos confirm what Bryson already admitted and the

22    witnesses described, and that is, he called Ms. Evans a crack

23    head, a crack head ass, and a gutter B several times, and told

24    her to shut up.  But what the video also does, is confirm the

25    callousness and recklessness with which he degraded and abused

Exhibit E, Motion to Try Petition on Hearing Record

1     her in front of coworkers and managers on a bullhorn.  The

2     words are bad, but what it was like to see it is -- is worse.

3     This was truly an upsetting incident.

4          During the investigation with Mr. Bryson, it was clear

5     that he did not have any regard for the severity of his

6     conduct, and he was not apologetic.  When questioned about the

7     incident, he didn't say things had gotten out of hand, or I

8     said things I wish I didn't, or I'm sorry and I won't do it

9     again, none of those things.  And in fact, during the

10    investigation, he continued to make inappropriate and

11    unacceptable comments about Ms. Evans.

12         When interviewed by his human resources department, he

13    stated, after admitting to be on a -- to say -- to calling

14    Ms. Evans a B on a bullhorn, or a -- a megaphone, he admitted

15    that Evans had wanted to call him -- what Evans wanted him to

16    call her the D word.  I will not say the word, but it is a

17    derogatory term for a gay woman.  This is what he said in his

18    interview about the incident.  He was hoping to get some credit

19    for resisting the urge to call Ms. Evans a derogatory and

20    disgusting name.

21         This is not the conduct of a person who understands

22    appropriate workplace communications, or how to appropriately

23    treat his coworkers.  And it's not the kind of person that

24    Amazon wants in its facility.

25         It is astonishing that the Board issued a complaint in a



Exhibit E, Motion to Try Petition on Hearing Record

1  case like this.  That the Board is choosing to advocate on

2  behalf of someone whose conduct was so vicious, and used terms

3  so reprehensible that I'm not comfortable saying them here.

4      It's important to recognize that neither the General

5  Counsel, nor the Charging Party's counsel, has said that

6  Bryson's conduct was acceptable, and I don't imagine they think

7  it is.  Instead, as Mr. Kearl said, it appears that if

8  Mr. Bryson was fired, so too, should've been Evans.

9      But the real theory here isn't necessarily that Bryson

10  wasn't a bad actor, but that both of them should've been fired,

11  or neither.  And the only difference is that Mr. Bryson engaged

12  in protected activities and that Ms. Evans didn't.

13      But that theory cannot be further from the truth, because

14  every single witness to this incident reported that Bryson

15  verbally attacked Evans.  Witnesses reported Bryson screaming

16  at her.  They described him as aggressive, belligerent, and

17  agitated.  Their words, he verbally assaulted her.  And they

18  noted that he continued his assault on her long after she went

19  inside.

20      Witnesses, rank and file employees, reported feeling bad

21  for Evans.  And aside from a few profanities, the witnesses

22  reported no similar conduct.  These are witnesses that had no

23  interest in fabricating a story, and they ran the gamut from,

24  there was a senior operations leader, an HR employee, a rank

25  and file employee, there were security officers.



# Exhibit E, Motion to Try Petition on Hearing Record

1    So why did this happen; what's the excuse?  On a Facebook

2    Live video, Mr. Bryson defended his actions, and he said that

3    it was Ms. Evans that pushed him to the limit.  She challenged

4    me, he said.  She challenged a man out here.  Apparently,

5    testing Bryson's manhood gave him free reign to de -- demean,

6    abuse, and mistreat Ms. Evans.

7        There's no question that his goal is to hurt her

8    personally because she disagreed with his calls to shut down

9    the facility.  And he hurt her the only way you could hurt

10   someone that you knew absolutely nothing about, based on what

11   he thought she looked like, gutter B, scum of the earth,

12   junkie, addict, C, N.

13       Whatever Bryson will now claim that Ms. Evans said during

14   the investigation, at worst, Mr. Bryson accused her of telling

15   him to shut -- shut the F up, F off and leave, and egg him on

16   during the incident, saying things like, what are you going to

17   do about it, or come and make me shut up.  But not a single

18   witness, and not even Bryson himself, suggested Ms. Evans said

19   anything worse than that.  No one reported that Ms. Evans said

20   any derogatory names to Mr. Bryson.  And to the extent you hear

21   testimony like that during this hearing, it is of suspect

22   credibility, in that Mr. Bryson had every opportunity to raise

23   it at the time of the incident, but he didn't.  And it also

24   isn't relevant to whether or not Evans should've received the

25   same discipline as Mr. Bryson because if Amazon didn't know


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    about it, then it couldn't have been considered at the time.

2        The witnesses for the Charging Party can argue until

3    they're blue in the face that Ms. Evans said equally bad

4    things, but it's not true.  No one reported she said anything

5    that the vast majority of us don't say on a fairly regular

6    basis.  Maybe not in a workplace setting, but she was

7    disciplined for the words that she used.  And not a single

8    person reported she said anything derogatory to Mr. Bryson.

9        Did she participate in the incident?  Yes.  Did she use

10   the F word and egg him on?  Probably.  But was there anything

11   to suggest that she called him any names based on his race, or

12   his gender, or his sexual orientation, or his perceived

13   socioeconomic status?  No, there isn't.

14       And given -- given what Bryson was saying to Ms. Evans in

15   front of all of her peers and managers on a megaphone,

16   Ms. Evans responding by telling him to shut the F up or come

17   and make me shut up, really seems to be relatively reasonable.

18   What she said is a far cry from attacking someone with a

19   bullhorn and calling them a B, a gutter B, a drug addict, a

20   junkie.

21       And as I said, Ms. Evans was disciplined for her part in

22   the incident, but she was appropriately disciplined based on

23   the relative severity of her misconduct.

24       Mr. Bryson, on the other hand, his conduct was intolerable

25   and unacceptable, and Amazon's standards of conduct prohibit



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    employees from using abusive, vulgar, and harassing language

2    against fellow associates.  And his comments to Ms. Evans were

3    all of those things.

4        In this kinds of case, as -- counsel for the General

5    Counsel and the Charging Party counsel points out, the Board

6    applies the well-known test described in Wright Line.  To prove

7    a prima facie case of discrimination under Wright Line, the

8    General Counsel has to prove that the employee was engaged in a

9    protected activity, the Employer knew about it, and that the

10   Employer had animus toward those activities.  Of course, even

11   if the prima facie cases met, the Employer hasn't violated the

12   Act if the Employer can prove it would've taken the same action

13   in the absence of any protected activity, and that's

14   overwhelmingly the case here.

15       No one's disputing that Mr. Bryson was engaged in a

16   demonstration, and no one's disputing that Amazon knew he had

17   engaged in other protest activities.  But Amazon welcomes

18   associate feedback, good and bad.  Amazon views all associate

19   feedback as constructive.  One way that this -- that these

20   kinds of complaints are -- are facilitated is through a voice

21   of the associate board, which is a white board that's posted at

22   all facilities, including JFK8, where associates can report,

23   post their questions, report their concerns, and get real-time

24   answers.  Amazon also has another program where they -- where

25   they push daily survey questions to associates about their work

1    experience.

2        Further undermining the can -- counsel for the General

3    Counsel's case that there was any animus in this case towards

4    Mr. Bryson as a result of his complaints is the investigation.

5    As Amazon's witness will testify, this is not a case where

6    Amazon seized on an opportunity to terminate Mr. Bryson because

7    they were upset with his activities.  This is a case where

8    Amazon conducted a thorough investigation, and decided

9    termination was appropriate, only after that thorough

10   investigation.

11       On April 6th, after the incident, Amazon took witness

12   statements from Ms. Evans and five witnesses.  Because

13   Ms. Evans had accused Mr. Bryson of threatening to shut her up,

14   the case was immediately referred, consistent with existing

15   practice, to the loss prevention group, so they could

16   appropriately consider whether this raised a workplace violence

17   issue.

18       After reviewing the witness statements and the facility

19   video, and watching the Facebook Live video, as I've mentioned

20   a few times during this opening, a member of Amazon's loss

21   prevention team recommended that the human resources team

22   continue its investigation into the incident, but it provided

23   its view of the incident, and loss prevention concluded that

24   based on the evidence, Bryson -- they rec -- were recommending

25   that Bryson be terminated for engaging in bullying and



Exhibit E, Motion to Try Petition on Hearing Record

1    harassing conduct.

2       At that point, Bryson was suspended pending investigation,

3    as is the case when loss prevention substantiates --

4    substantiates a workplace management issue.  His suspension was

5    paid, which was actually a benefit to him, given that he had

6    chosen not to work since March 21st, because he was taking

7    advantage of Amazon's policy of permitting associates to stay

8    home if they didn't feel comfortable coming to work, given the

9    pandemic.

10      The HR group did continue the investigation.  They

11   considered the witness statements, they viewed the videos.

12   There's video from the facility.  There's the Facebook Live

13   video.  They interviewed Mr. Bryson and they reinterviewed

14   Ms. Evans, once Mr. Bryson raised claims that Ms. Evans used

15   the F word in the interaction.

16      Amazon also looked at comparator data, and it was only

17   after all of this that Amazon came to the overwhelming

18   conclusion that Mr. Bryson had abused, demeaned, and harassed

19   Ms. Evans in a way that violated its standard of conduct,

20   prohibiting abusive, vulgar, and harassing language and

21   behavior.

22      As you'll hear over the course of this proceeding, the

23   witnesses and HR professionals involved in this investigation

24   haven't experienced much similar to this incident, where one

25   associate so brutally berates another with a bullhorn, but



Exhibit E, Motion to Try Petition on Hearing Record

1    you'll hear that Amazon has terminated other employees who

2    similarly used aggressive, vulgar, harassing, and abusive

3    language in violation of the standards of conduct.

4         Several associates have been fired at JFK8 for using

5    vulgar and derogatory language, including a single use of the N

6    word, and others during angry outbursts.

7         Evidence of consistent treatment, of course, undermines

8    the idea that Amazon somehow singled out Mr. Bryson for

9    termination because of his demonstration activities.  Amazon

10   would've terminated Mr. Bryson for gross conduct absent any of

11   the demonstration activities.

12        The Board has, in circumstances that are even less

13   egregious than these, upheld the termination of employees who

14   had engaged in other protected activities.  Just last year, in

15   Watco Transloading, for example, the Board upheld the

16   termination of an employee for calling a coworker gay, and an F

17   word, which is a derogatory word for gay men.  This was right

18   after the employee distributed union cards to his coworkers.

19        In another case, the Board upheld the termination of two

20   employees who were well-known union supporters during a failed

21   union campaign, because they left an envelope contain --

22   containing a picture of a Playboy centerfold for a coworker

23   with a note, to the wicked witch, don't you wish you looked

24   like this, you ugly beast?

25        In yet another case, the Board upheld the termination of



Exhibit E, Motion to Try Petition on Hearing Record

1   an employee who had supported the union during an organizing

2   campaign, including by using magic markers to write pro union

3   slogans on her arms, when she called three female coworkers

4   F'ing Bs.

5       In 99 cases out of 100, the regional office would've

6   dismissed this case, recognizing that Amazon has a

7   responsibility to eradicate harassment and abuse in its

8   workplace.

9       Whatever the forces at play that have led to the issuance

10  of a complaint here, Amazon welcomes the opportunity to prove

11  that Mr. Bryson's conduct warranted termination, and that his

12  termination was consistent with Amazon's policies, and that his

13  termination was consistent with the treatment of other

14  employees who engaged in similar misconduct, and that is what

15  we will do.

16      Because counsel for the General Counsel can't establish

17  that Amazon terminated Mr. Bryson for engaging in protected

18  activities, and because Amazon would've terminated Mr. Bryson

19  for his abusive behavior on April 6th, regardless of any

20  protected activities in which he allegedly engaged, the

21  complaint should be dismissed in its entirety.  Thank you.

22      JUDGE GREEN:  Okay, thank you.  Okay.  That was helpful.

23  All the openings were helpful.

24      So Ms. Cox, how would you like to proceed?  Would you like

25  to call Mr. Grabowski?



1        MS. COX:  Yes, Judge.

2        JUDGE GREEN:  Okay.

3        MS. COX:  Can we go off the record for a second so I can

4    just let him know?

5        JUDGE GREEN:  Yes, off the record.

6        MS. COX:  The other thing we didn't talk about was a

7    sequestration order, but we would like one.

8        JUDGE GREEN:  Okay.

9    (Off the record at 10:39 a.m.)

10        JUDGE GREEN:  Okay so why don't we go on the record, in

11    order to just deal with the sequestration order?  Are we on the

12    record?

13        THE COURT REPORTER:  Yeah, we are.

14        JUDGE GREEN:  Okay.

15        All right, so while we were off the record, the Respondent

16    indicated that the Respondent was requesting a sequestration

17    order and before I read my statement on that, that a

18    sequestration order will be in effect in this case, could the

19    parties designate a representative, if they want one, for

20    purposes of the sequestration order, beginning with the General

21    Counsel?

22        MS. COX:  We won't be designating anyone, Judge.

23        JUDGE GREEN:  How about the Charging Party, I mean,

24    Mr. Kearl for the Charging Party?

25        MR. KEARL:  Yes, I would like to designate Gerald Bryson,



Exhibit E, Motion to Try Petition on Hearing Record

1    but he will not be available today and that is not a problem.

2        JUDGE GREEN:  Okay.

3        And for the Respondent?

4        MS. BUFFALANO:  Can we get back to you?  We don't have

5    anybody right now that is on the line --

6        JUDGE GREEN:  Okay --

7        MS. BUFFALANO:  -- to -- represent --

8        JUDGE GREEN:  Yes, you can.

9        Okay, so a sequestration order is being issued in this

10   proceeding.  All people who expect to be called as witnesses in

11   this proceeding, with certain exceptions, may not be present

12   during the hearing whenever testimony is being taken.

13       The sequestration order also prohibits all witnesses from

14   discussing with any other witness or possible witness the

15   testimony they have already given or will get.  Likewise,

16   counsel for a party may not disclose who any witness the

17   testimony of any other witness.  Counsel may, however, inform

18   his/her own witness of the content of testimony given by an

19   opposing party's witness to prepare to rebut that testimony.

20   It is Counsel's responsibility to make sure that they and their

21   witness comply with the sequestration order.

22       Now, to the extent that there are exceptions, that really

23   deals with alleged discriminatees, but we don't have to deal

24   with that because Mr. Bryson is designated as Mr. Kearl's

25   representative.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
1          Could the parties please, you know, I -- I don't
2     necessarily know that any -- any witnesses will be trying to
3     get into the hearing room, but if for some reason they were to,
4     just please ask your witnesses, if they come into the hearing
5     room, to rename themselves -- themselves with their name and a
6     slash witness on it, so we can quickly determine that those --
7     that's a witness and there might be a sequestration order
8     issue.
9          MS. COX:  Can we identify the phone numbers, Judge?
10         JUDGE GREEN:  Yeah, so I was going to say that.  So for
11    the people who are -- who are -- who are in the hearing, the
12    virtual hearing room, but are not participating, please just
13    put your -- rename yourself with your name, and if you're
14    affiliated with one of the parties, your affiliation with the
15    par -- with that -- with the party.  If you're not affiliated
16    with the par -- with one of the parties, you can just put
17    nonparticipant observer.
18         Now I notice we have a 646 number and a 718 -- 8 number;
19    do we know who those two people are?  And --
20         MS. AHMAD:  Good morning, Your Honor.  My name is Zainab
21    Ahmad, I'm an attorney with Gibson Dunn and I'm affiliated with
22    Amazon.
23         JUDGE GREEN:  Okay.  And that was which number?
24         MS. AHMAD:  The 646 number.
25         JUDGE GREEN:  Oh, okay, very good.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    MS. DENERSTEIN:  And -- and Your Honor, this is Mylan

2    Denerstein.  I'm also affiliated with -- I'm with Gibson Dunn

3    and affiliated with Amazon, and I'm the 718 number.

4    JUDGE GREEN:  Okay, great.

5    Okay, so it -- you know, if you could, just -- just use

6    the rename function, if you know how to do that to just put --

7    put on your names and -- and your affiliation.

8    Okay, so.

9    MS. AHMAD:  Yeah, Gibson Dunn.

10   JUDGE GREEN:  Let's go off the record for just one minute.

11   (Off the record at 10:46 a.m.)

12   JUDGE GREEN:  Okay, great.

13   So Mr. Grabowski, I am going to swear you in again because

14   you're testifying on a different date, so let me swear you in.

15   Raise your right hand.

16   Whereupon,

17   **TYLER GRABOWSKI**

18   having been duly sworn, was called as a witness herein and was

19   examined and testified as follows:

20   JUDGE GREEN:  Okay.  And you're testifying in that room?

21   THE WITNESS:  Sorry, what was that?  It cut off.

22   JUDGE GREEN:  Are you alone in the room?

23   THE WITNESS:  Yes.  And then once we start I was going to

24   (audio interference).  Is that good?

25   JUDGE GREEN:  Yes.  So just recall, as I indicated the



www.escribers.net | 800-257-0885

1    last time you testified, don't just -- don't communicate with

2    anybody else via -- via a handheld device or otherwise, and

3    don't refer to documents that are not shown to you by counsel

4    unless you're directed to.

5        Okay, so Ms. Cox, any time you're ready.

6                          **DIRECT EXAMINATION**

7    Q    BY MS. COX:  Good morning, Mr. Grabowski.  How are you

8    today?

9    A    Good morning.  I'm good, thank you.  How are you?

10   Q    I'm doing fine, thank you.  Can you please state your name

11   for the record, or --

12       JUDGE GREEN:  We've already got -- we've already got that,

13   so.

14   Q    BY MS. COX:  Are you employed by Amazon?

15   A    Yes.

16   Q    When were you first hired by Amazon?

17   A    In July of 2017.

18   Q    Okay.  What -- what was your position when you were hired?

19   A    A senior human resources assistant.

20   Q    Did that change at any point?

21   A    Yes.

22   Q    When did it first change?

23   A    In April of 2019.

24   Q    And what was your position -- what did your position

25   become in April 2019?



# Exhibit E, Motion to Try Petition on Hearing Record

1   A     An L4 HR business partner.

2   Q     What is your current position at Amazon?

3   A     A senior HR business partner.

4   Q     When did you become a senior HR business partner?

5   A     In December of 2020.

6        MS. COX:  Your Honor, I request permission to examine this

7   witness 611(c), pursuant to 611(c).

8        JUDGE GREEN:  I actually froze and I did not hear the last

9   question.

10       MS. COX:  I just said Your Honor, I request permission to

11  examine this witness pursuant to Federal Rule 611(c).

12       JUDGE GREEN:  Okay, so as we determined this last time,

13  you are so authorized.

14  Q     BY MS. COX:  You work at JFK8 fulfillment center in Staten

15  Island, New York, right?

16  A     Yes.

17  Q     And have you always worked at JFK8?

18  A     No.

19  Q     Where did you work prior?

20  A     At EWR4.

21  Q     Have you worked at other facilities, other than EWR4?

22  A     Yes.

23  Q     What other facilities?

24  A     PHX5.

25  Q     Other than EWR4 and PHX5, have you worked at any other



Exhibit E, Motion to Try Petition on Hearing Record

1    facilities?

2    A    No.

3    Q    What dates or time frame did you work at EWR4?

4    A    From July of 2017 to September of 2018.

5    Q    EWR4 is located in New Jersey, right?

6    A    Yes.

7    Q    And PHX5 is an Amazon facility located in Arizona?

8    A    Yes.

9    Q    What dates did you work at PHX5, time frame?

10   A    June of 2016 to August of 2016.

11   Q    And the time that you spent at EWR4, July 2017 to

12   September 2018; were you in a human resources capacity?

13   A    Yes.

14   Q    Okay.  And same for PHX5, was also in a human resources

15   capacity, right?

16   A    Yes.

17   Q    Okay.  What days and hours do you work at JFK8 currently?

18   A    Monday through Friday, 10 a.m. to 8 p.m.

19   Q    Do you have an office?

20   A    A shared office.

21   Q    Who do you share an office with?

22   A    Other HR leadership members.

23   Q    And where is your office located?

24   A    In the main office.

25   Q    So I know you started out testifying that you went from



Exhibit E, Motion to Try Petition on Hearing Record

```
1    being a -- I'm sorry.  When you first -- when you were first
2    hired, you were a HR assist -- senior HR assistant, then you
3    went and you became a HR business partner, and then you became
4    a senior HR business partner; were each of those changes
5    promotions?
6    A    Yes.
7    Q    Okay.  As far as your testimony at EWR4, what was your
8    position there, your title, your job title?
9    A    A senior human resources assistant.
10   Q    Okay.  And I'm sorry, can you tell me what your title was
11   for PHX5?
12   A    That was human resource intern.
13   Q    Okay, I'm sorry.  I'm going to go back to your -- the
14   questions about the office.  You mentioned that you share an
15   office; who do you share an office with?
16        MS. BUFFALANO:  Objection to the relevance.
17        JUDGE GREEN:  Yeah, what's -- what's the relevance?
18        MS. COX:  Judge, I'm trying to get a sense of the layout
19   of the facility and who else is in HR.
20        JUDGE GREEN:  Why?
21        MS. COX:  I want to identify the persons involved in
22   Mr. Bryson's -- HR officials --
23        JUDGE GREEN:  Okay.
24        MS. COX:  -- that Mr. Bryson --
25        JUDGE GREEN:  I -- yeah, no, I -- I don't think we're
```



Exhibit E, Motion to Try Petition on Hearing Record

1   getting there.  So why don't we move on.  If you want to do

2   that, if you want to go to somehow, somebody who's -- get

3   evidence regarding people who were involved in Mr. Bryson's

4   adverse employment actions, you can do that, but these

5   questions aren't reasonably designed to do that.

6       MS. COX:  I'll move on.

7   Q    BY MS. COX:  So what are your current duties and

8   responsibilities?

9   A    So I manage members of the hourly HR team, and I oversee

10  projects that impact the day-to-day operations of our

11  operations team and employees.

12  Q    Who do you manage on the HR team?

13  A    Senior HR assistants.

14  Q    What are their names?

15  A    Towana Jackson (phonetic).

16      MS. BUFFALANO:  Just -- just hold on.  I'm going to object

17  to the relevance.

18      JUDGE GREEN:  Yeah, it's the same issue.

19      MS. COX:  Okay, Judge, I'll move on.

20      JUDGE GREEN:  You just -- you know, okay.  I mean, it's

21  really, as far as I can tell, the -- at least at this juncture,

22  there's really no need to get some broad understanding of who

23  is in the Respondent's HR department.  And maybe that'll --

24  we'll -- we'll find that out later, but I -- I really don't see

25  the relevance right now.



Exhibit E, Motion to Try Petition on Hearing Record

1       MS. COX:  Okay, so I'm going to move on to March and April

2   of 2020.

3   Q    BY MS. COX:  You worked at JFK8, right?

4   A    Yes.

5   Q    And remind me again what your title was in March and April

6   of 2020?

7   A    An HR business partner.

8   Q    And what hours and days did you work in March and April

9   2020?

10  A    I don't remember specifically.  I was working different

11  shifts during that time period.

12  Q    You just testified to your work duties being managing

13  members of HR team and oversee -- overseeing projects that

14  impact the operations; was there any change -- is that -- was

15  that your duties in March and -- and April 2020?

16  A    Yes.

17  Q    Okay, as a senior HR business partner, do you spend time

18  on the work -- workroom floor?

19  A    Yes.

20  Q    How often do you spend on the floor?

21      MS. BUFFALANO:  Objection to the relevance.

22      JUDGE GREEN:  What's the relevance?

23      MS. COX:  Judge, I'm trying to just set up a background

24  and get some information on the parties -- on the Respondent's

25  operation.



Exhibit E, Motion to Try Petition on Hearing Record

1       JUDGE GREEN:  Okay, sustained.

2   Q   BY MS. COX:  So what is the HR department responsible for?

3   A   For assisting employees and leadership teams with

4   different HR related functions.

5   Q   Can you give me some example of what HR-related functions

6   are?

7   A   It differs based on the level.

8   Q   How many levels are they -- are there?

9   A   Inside the building?

10  Q   No, you're saying your involvement differs based on levels

11  of employees, is that what you're say -- I -- I -- I'm sorry, I

12  don't -- I actually don't understand.  So as HR, tell me what

13  you assist employees with.

14  A   Any type of day-to-day functions, time off requests,

15  associate concerns, benefits.

16  Q   Are you involved with employee discipline?

17  A   Yes.

18  Q   And what makes you a senior HR person, just the term

19  senior?

20  A   I'm not sure I understand the question.

21  Q   You are -- your title changed from business partner to

22  senior HR business partner; what makes you a senior HR business

23  partner?  Is it years of experience?  Is it -- what is it?

24  A   Years of experience.

25  Q   And what does business partner mean?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    A partner to the business.

2    Q    Does being a -- a senior business partner, does that give

3    you more responsibilities at Amazon?

4    A    More responsibility than I previously had, yes.

5    Q    Now, how did -- how is it different; how are your

6    responsibilities now different?

7    A    I'm not sure what I'm comparing it to.

8    Q    To you being an HR business partner, to now being a senior

9    HR business partner.

10   A    The day-to-day functions are relatively similar.  It's

11   just the expectation in -- in scope of projects and impact.

12   Q    What does that mean, expectations and scope of project?

13        MS. BUFFALANO:  I'm going to object to the relevance.

14        JUDGE GREEN:  What's the relevance?

15        MS. COX:  I'm trying to understand his duties and

16   responsibilities, Judge, how they've changed.

17        JUDGE GREEN:  Why?  He's an -- he's an admitted

18   supervisor.

19        MS. COX:  Okay, Judge.

20   Q    BY MS. COX:  So in the HR department, you're versed in

21   Amazon's policies, correct?

22   A    There's a lot of different policies.  I would say there's

23   too many for me to be completely familiar with all of them.

24   Q    You're familiar with the discipline process?

25   A    Yes.



1    Q    You're familiar with the disciplinary policies?

2    A    Yes.

3    Q    You're familiar with work rules?

4    A    Yes.

5    Q    You're familiar with standards of conduct?

6    A    Yes.

7    Q    Okay.  So I'm going to show you an exhibit that I'm also

8    going to share with everybody via SharePoint.

9         MS. COX:  Is Ms. Jones here today?  Yes, she is.  Okay.

10        JUDGE GREEN:  So in SharePoint, which -- which exhibit is

11   this?

12        MS. COX:  I'm going to label it 7.

13        JUDGE GREEN:  Okay, is it -- is it in the General

14   Counsel's exhibit file, or is it somewhere else?

15        MS. COX:  I'm putting it in the --

16        JUDGE GREEN:  Oh, I see, you're --

17        JUDGE GREEN:  -- exhibit file right now.  Okay.  I'm

18   sorry.

19        Okay, Ms. Jones, can you show Mr. Grabowski the

20   organizational chart that's in SharePoint?

21        THE COURT DEPUTY:  Okay.  It's in the General Counsel's

22   exhibits?

23        MS. COX:  Yes.

24        THE COURT DEPUTY:  Okay.

25        JUDGE GREEN:  Okay.  So this is going to be marked as



1      General Counsel's Exhibit 7?

2          MS. COX:  Yes.

3          JUDGE GREEN:  Okay.  So on behalf of our court reporter

4      who has asked that documents be marked, please make every

5      attempt to mark exhibits in advance of showing them.  I

6      understand that if it's a rush, it can't always be done, but

7      let's try and do it.  You can just add a watermark to the

8      document in General Counsel's Exhibit 7 or Respondent's

9      Exhibit.

10         THE COURT DEPUTY:  I see 6, but I don't see 7.  You put it

11     in?

12         MS. COX:  I'm sorry, Ms. Jones.  I didn't label it, but I

13     will label it and --

14         THE COURT DEPUTY:  This organizational chart right here?

15         MS. COX:  Yes.

16         JUDGE GREEN:  Yes.

17         THE COURT DEPUTY:  Okay.

18         MS. BUFFALANO:  Ms. Cox, is it the production key or

19     the --

20         MS. COX:  It says the --

21         MS. BUFFALANO:  -- organizational chart.

22         THE COURT DEPUTY:  Okay.  Can you see it now?

23         MS. COX:  Yes.

24         THE COURT DEPUTY:  Okay.

25     Q   BY MS. COX:  Okay.  So Mr. Grabowski, I'm showing you a



1  chart that we are calling General Counsel's Exhibit 7.  I want

2  to go through the chart with you.  So it shows that the general

3  manager is Sai Kotha, right?

4  A    At the time this was created, yes.

5  Q    Do you know when this chart was created?

6  A    I don't know the specific date.

7  Q    Did you create it?

8  A    No.

9  Q    Do you know who created it?

10  A    I don't know specifically.

11  Q    Okay.  So was Mr. Kotha the general manager in April and

12  March -- March and April 2020?

13  A    Yes.

14  Q    Okay.  And he -- can you tell me what his duties and

15  responsibilities were in March and April 2020?

16       MS. BUFFALANO:  I'm going to object to the relevance.

17       MS. COX:  Judge, the --

18       JUDGE GREEN:  Okay.

19       MS. COX:  There's -- there's information that Mr. Kotha

20  was involved in the discipline of Mr. -- of Mr. Bryson.  And I

21  want to understand what Mr. Kotha's duties and responsibilities

22  were in March and April of 2020.

23       JUDGE GREEN:  Okay.  Overruled.

24  Q    BY MS. COX:  So what were Mr. Kosa -- Kotha's duties and

25  responsibilities in March and April 2020?



Exhibit E, Motion to Try Petition on Hearing Record

 1   A      He managed the building.

 2   Q      What does that mean?

 3   A      Oversee the operational team and partnerships with

 4   different support functions.

 5   Q      And does he partner with the HR team?

 6   A      He did when he was in this position.

 7   Q      How did you partner with the HR team?

 8   A      Various ways.

 9   Q      Can you give me examples?

10   A      Different employee escalations, people-leadership related

11   functions, people development, people initiatives.

12   Q      What do you mean by escalation functions?

13   A      Escalated associate concerns were issues involving

14   associates.

15   Q      Can you give me examples?

16   A      We have different ways that employees have mechanisms to

17   provide feedback to the site.  So looking at the information we

18   received, looking at opportunities that the site can use to

19   improve different employee functions, and then from like a

20   people development standpoint, meetings about the leadership

21   team and hourly associate population, different initiatives we

22   have in place.  And then from an escalation standpoint, if

23   there is escalated issues or events that happen at the site.

24   Q      So what's Mr. Kotha's -- what was Mr. Kotha's involvement

25   in escalation issues?



Exhibit E, Motion to Try Petition on Hearing Record

```
1    A    Reviewing them.

2    Q    Can you give me an example of an escalation issue that

3    Mr. Kotha would be involved in reviewing?

4    A    Behavioral issues, safety concerns, like building

5    impacting issues, like outside of people related, maybe if it's

6    something technical or mechanical, anything that is impacting

7    the function of the operation.

8    Q    Okay.  And how does Mr. Kotha review, you said employee --

9    I'm sorry, you said safety concerns; what was the first part?

10   A    Behavioral concerns.

11   Q    Yeah.  How does Mr. Kotha review behavioral concerns?

12        MS. BUFFALANO:  Objection.  He's not Mr. Kotha.  I don't

13   know how he would know how he reviews things.

14        JUDGE GREEN:  Right.  So to the extent you know him, you

15   have personal knowledge of Mr. -- what Mr. Kotha did, you can

16   answer it.  If you don't have -- if you don't know, if you're

17   speculating, then don't speculate.

18   A    Yeah.  Now, I know that, like, members of the HR

19   leadership team, my supervisor at the time could bring concerns

20   to him.  What he did with them, how he reviewed them, I don't

21   know.

22   Q    BY MS. COX:  So what kinds of concerns do your

23   supervisor -- did your supervisors bring to Mr. Kotha?

24   A    The same ones that I just mentioned.

25   Q    And what are they, again? Sorry.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Anything behavioral, if it's a safety related concern that

2    my team is aware of, any --

3    Q    Uh-huh.  Go ahead.

4    A    I was just going to say anything that's impacting the

5    building.

6    Q    And you don't know what Mr. Kotha does with those

7    concerns?

8    A    No.

9    Q    And do you know for what purpose, Mr. Kotha reviews,

10   the -- the concerns brought to him?

11   A    The purpose would be for decision making or next steps,

12   potential improvements, or gaps to close.

13   Q    So Mr. Kotha would be involved with decision making for

14   behavioral concerns?

15   A    Escalated ones, he could be.  Yes.

16   Q    Okay.  Can you give me an example of escalated --

17   escalating employee concerns?

18   A    Either something very severe or something that had already

19   gone through other levels of leadership.

20   Q    What's in an example of a severe type of concern?

21   A    I don't remember anything specifically that was brought to

22   his attention.

23   Q    It doesn't have to be specific.  I'm asking if there are

24   certain types of issues that are considered severe that would

25   be brought to Mr. Kotha's attention.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    It's something where each situation would be evaluated as
 2    a unique situation.
 3    Q    And you said that they could be escalated.  Who -- who
 4    would Mr. Kotha escalate concerns to?
 5         MS. BUFFALANO:  Objection.  Foundation.
 6         JUDGE GREEN:  Yeah.  We don't know if Mr. Kotha escalated
 7    concerns at all.  I think maybe you want to ask that question
 8    first.
 9    Q    BY MS. COX:  Did Mr. Kotha escalate concerns?
10    A    I don't know.
11    Q    So as a senior business -- HR business partner, you don't
12    know who Mr. Kotha would escalate concerns to?
13    A    I know who he could escalate to.  I don't know what he
14    does.
15    Q    Could -- who could he escalate concerns to?
16    A    It would be the same thing with any level of leadership.
17    You go to the next level.
18    Q    And what's the next level above Mr. Kotha?
19         THE WITNESS:  Could I pause for one second?  Something
20    just popped up on my screen.  I just want to click out of it,
21    so I can see the picture.  Sorry about that.
22         MS. COX:  That's okay.
23         THE WITNESS:  What was the question?
24    Q    BY MS. COX:  What is the level above Mr. Kotha?
25    A    A regional manager.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Who are the regional managers over at JFK8?

2         MS. BUFFALANO:  Object to the relevance of this.

3    Mr. Kotha, the General Counsel, indicated she believed he was

4    involved in the decision.  But I don't -- these -- this

5    regional manager situation, that doesn't seem like it has any

6    relevance.

7         MS. COX:  Mr. --

8         JUDGE GREEN:  What's the relevance?

9         MS. COX:  Judge Green, from the beginning, we've been

10   saying that there's evidence that this decision wasn't made at

11   the JFK8 local level.  And we know that a regional loss

12   prevention manager was involved.  And therefore, it is relevant

13   for the managers at the regional level above JFK8.

14        JUDGE GREEN:  Okay.  So how the -- yeah, how the -- the --

15   the particular discipline was handled may be relevant.  I don't

16   at all see how this advances the general counsel's case.  But

17   yeah, okay, it may be relevant.  But why aren't we just talking

18   about the way that Mr. Bryson's discipline was handled?  You're

19   saying that you think it's -- it is -- this is out of the

20   ordinary.  That's why you want -- want --

21        MS. COX:  In May, Judge --

22        JUDGE GREEN:  Okay.  Okay.

23        MS. COX:  -- they were probing for that information.

24   We're asking, what is the process generally?  And then we'll

25   get into it the process --



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        JUDGE GREEN:  So you don't know.  You're just -- you're

 2   just asking.  Okay?  So overruled.

 3   Q    BY MS. COX:  Who are the regional managers over at JFK8?

 4        MS. LIPTON:  Well, I have turned down the volume because

 5   I'm doing -- they got a bunch of documents.

 6        MS. COX:  Nancy, you're not --

 7        MS. LIPTON:  I'm going through a lot of stuff --

 8        MS. COX:  --  you're not muted.

 9        MS. LIPTON:  -- right now.

10        MS. COX:  Nancy, you're not muted.  Nancy, you're not

11   muted.

12        MS. LIPTON:  But we're starting.  I mean, we -- she

13   already started openings.

14        MS. COX:  My goodness.

15        JUDGE GREEN:  Hold on.  Just hold on.

16        MS. LIPTON:  (Simultaneous speech) --

17        MS. COX:  Nancy, you're not muted.

18        JUDGE GREEN:  This is Nancy who?

19        MS. LIPTON:  Yeah.  And some other people made some

20   other --

21        MS. COX:  Nancy.

22        MS. LIPTON:  And I think it was good.

23        JUDGE GREEN:  Ms. Lipton?

24        MS. COX:  Yes.

25        JUDGE GREEN:  Ms. Lipton, can you hear us?
```



Exhibit E, Motion to Try Petition on Hearing Record

```
 1          MS. COX:  You can't.  Can you just mute her, Judge?

 2          MS. LIPTON:  Just I had to --

 3          JUDGE GREEN:  I unfortunately --

 4          MS. LIPTON:  -- fix this --

 5          MS. COX:  All right.  There it is.

 6          JUDGE GREEN:  Oh, yeah.  Okay.  Hold on.  Yeah, okay.

 7   Sorry.  Yes.  Go ahead.

 8   Q    BY MS. COX:  Who are the regional managers above JFK8?

 9   A    Right now?

10   Q    In March and April 2020.

11   A    The regional operations manager was Anand Mehta.

12   Q    Okay.  Actually, let me just -- before we move on with

13   this chart, so I just want to make sure that this chart

14   accurately represents JFK8, so -- in March and April 2020.  So

15   under Mr. Kotha, there are six individuals in blue boxes,

16   right?

17   A    Yes.

18   Q    Those individuals report to Mr. Kotha?

19   A    I don't remember.

20   Q    So this person here, Chris Perez, do you see that, OB

21   Senior Ops Days?

22   A    Yes.

23   Q    What does OB stand for?

24   A    Outbound.

25   Q    And do you know who Chris Perez reports to?
```



# Exhibit E, Motion to Try Petition on Hearing Record

1  A    I believe it was Traci, but I don't remember.

2  Q    And by Traci, are you referring to the assistant general

3  manager listed here, Traci Weishalla?

4  A    Yes.

5  Q    And you see IB Senior Ops Days, Frank Lugo?

6  A    Yes.

7  Q    What does IB mean?

8  A    Inbound.

9  Q    And who does Mr. Lugo report to?

10  A    I don't remember, but I believe Traci.

11  Q    Now I'm looking at Sergiy Sushalskyy.  It says PCF; what

12  does PCF --

13  A    Pick, count, and floor help.

14  Q    And who does Mr. Sushalskyy report to?

15  A    I don't remember, but I believe Traci.

16  Q    And OB Senior Ops Nights, Deron Thompson; who does

17  Mr. Thompson report to?

18  A    I don't remember, but I believe Traci.

19  Q    IB Senior Ops Nights -- can you pronounce this name for

20  me?  Is it Maciej Curlej?

21  A    [Ma-chi].

22  Q    Maciej.  Thank you.  Who does Mr. Curlej report to?

23  A    I believe Traci.

24  Q    And the senior regional process engineer, Zachary Marc,

25  who does Mr. Marc report to?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I believe Traci.

2    Q    Are they on the same level, these six individuals in blue

3    boxes?

4    A    Yes.

5    Q    And what level are they on within Amazon's organization?

6         MS. BUFFALANO:  Objection to relevance.  I understand

7    this -- the idea that we want to know who was involved in

8    Mr. Bryson's termination and whether or not it followed the

9    normal chain.  But to go through and talk about each individual

10   here and what level they're at, first of all, what level

11   they're at doesn't matter.  It's where they are, who they

12   report to, and who reports to them.  But this is getting into

13   sort of a level of minutiae that I just don't understand how --

14        JUDGE GREEN:  So I -- I completely agree that this -- this

15   is backwards.  You know, if -- if you have -- if you have --

16   put on evidence as to what -- how Mr. Bryson was treated and

17   then you have some concerns that somebody else was -- was

18   treated differently, you know, it would be -- you can look at

19   those comparators.  But just doing this generically like this,

20   it just doesn't seem all that helpful.  Are you sure you want

21   to go through it this way?  I'm not saying it's not relevant,

22   but it just seems like an inefficient way to proceed.

23        MS. COX:  Judge Green, respectfully, we have a right to

24   put on our evidence the way we see fit.  And it's our position

25   that having a larger background context understanding before



Exhibit E, Motion to Try Petition on Hearing Record

1    asking the minutiae questions would be the most helpful and may

2    eliminate questions later on.  So I'd like to proceed with my

3    line of questioning, Judge.

4        JUDGE GREEN:  Okay, overruled.

5    Q    BY MS. COX:  Okay.  So, Mr. Grabowski, can you tell me

6    what PCF Sergiy Shishkele -- Sushalskyy, what is -- his job was

7    or his duties?

8    A    He was a senior operations manager.

9    Q    And what do senior operations managers do?

10   A    They oversee the operation.

11   Q    How do they oversee the operation?

12   A    I don't know the specifics.

13   Q    What about Mr. Zachary Marc; what are his job -- his

14   duties and responsibilities?

15   A    I don't know.

16   Q    What about Mr. Maciej Curlej; what are his jobs -- job

17   duties and responsibilities?

18   A    Managing the inbound nights team.

19   Q    And what does managing the inbound nights team involve?

20   A    Managing the operations managers that oversee the nights

21   team and the inbound functions.

22   Q    Okay.  Who reports to the operations managers?

23   A    Area managers.

24   Q    Okay.  So I want to show you the next page of this

25   document, if Ms. Jones could scroll down.  Are these the



1    operation -- I'm sorry -- the area managers that you just

2    referred to up here on the top row?

3    A    No.

4    Q    Okay.  Are the area managers on this chart?

5    A    Yes.

6    Q    Okay.  Can you tell me -- can you describe for me where on

7    this chart the operations managers are?

8    A    The gray boxes.

9    Q    Those are area managers?

10   A    Yes.

11   Q    Okay.  So the boxes above them, the yellow on the left and

12   the purple on the right, what are -- what are those managers;

13   they're just operations as well?

14   A    Those are operations managers.

15   Q    Okay.  What's the jobs of these operations managers below

16   Sergiy Sushalskyy?

17   A    They each manage their shift in that department.

18   Q    Okay.  So they're broken down by shifts?

19   A    Yes.

20   Q    Okay.  And so the area managers in the gray boxes report

21   to the -- the managers in the yellow and purple boxes, right?

22   A    Yes.

23   Q    Okay.  And what are the area managers' duties and

24   responsibilities?

25   A    They manage a team in that department on that shift.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And by team, do you mean employees?

2    A    Hourly associates.

3    Q    And Amazon refers to associate -- associates as em --

4    Amazon refers to its employees as associates, right?

5    A    The tier 1 and tier 3 hourly employees, yes.

6    Q    Okay.  You know former Amazon associate Gerald Bryson,

7    right?

8    A    Yes.  Okay.  So on page 2 of this chart, I have

9    Mr. Bertrand Price in the first gray box under Mr. Tom Castle.

10   Do you see him?

11   A    Yes.

12   Q    And Mr. Price was Gerald Bryson's supervisor or manager?

13   A    I don't remember.

14   Q    Can you tell me what BHD stands for at -- in Mr. Price's

15   title, PCF and BHD; do you see BHD?

16   A    Yes.  That means back half days.

17   Q    What are back half days?

18        MS. BUFFALANO:  Objection to the relevance.  We're now

19   getting into schedules.

20        JUDGE GREEN:  What's the relevance?

21        MS. COX:  I'm just trying to get clarification for the

22   record, Judge, what these shorthand titles and acronyms mean.

23        JUDGE GREEN:  Okay.  What does half back days mean?

24        THE WITNESS:  Me?

25        JUDGE GREEN:  Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1      THE WITNESS:  It's Wednesday, Thursday, Friday and

2   Saturday day shift.

3   Q    BY MS. COX:  And what is FHD?

4   A    Front half days.

5   Q    And what are the front half days?

6   A    Sunday, Monday, Tuesday and Wednesday.

7   Q    It shows us here that Mr. Price is under Tom Castle,

8   right?

9   A    Yes.

10  Q    Okay.  Now, I just want Ms. Jones to scroll to the next

11  page.

12      MS. COX:  One more down.  Another one.  I think,

13  Ms. Jones, it's longer than I thought.  Another one.  Okay.

14  Q    BY MS. COX:  So this portion of the chart shows a few

15  other departments:  safety, learning, finance, human resources.

16  You see that, right?

17  A    Uh-huh.

18  Q    Okay.  And currently, who do you report to?

19      MS. BUFFALANO:  Objection to the relevance.

20      JUDGE GREEN:  Overruled.

21  Q    BY MS. COX:  Currently, who do you report to?

22  A    Nei Ha (phonetic).

23  Q    Is she on this chart here as the second person on the

24  right purple?

25  A    Yes.



1   Q   Okay.  And does this mean that Nei Ha reports to HR Linda

2   Prisciandaro?

3   A   At that time.

4   Q   Okay.  So let's try to break it down.  So currently, you

5   report to Nei Ha and Nei Ha reports to who?

6   A   Janna Edwards.

7   Q   Okay.  And Ms. Edwards is not on this chart, right?

8   A   No.

9   Q   And what's Ms. Edwards's title?

10  A   Senior HR Manager.

11  Q   Okay.  Back in April 2020, who did you report to?

12  A   I don't remember.  But it was either Linda or Christine.

13  It switched right around that time.

14  Q   Okay.  All right.

15  A   I believe it was Christine.

16  Q   Okay.  And who does Christine Hernandez report to?

17  A   I don't remember.

18  Q   Okay.  Is there a regional team for human resources?

19  A   Yes.

20  Q   Who's the regional manager for HR?

21  A   Now or last year?

22  Q   We'll start with now and then I'll ask you last year.

23  A   Right now is Derek Atkinson.

24  Q   And what's his title?

25  A   Regional HR Manager.



www.escribers.net | 800-257-0885

1    Q    Okay.  And what about in April and March of 2020, who was

2    the regional manager for human resources?

3    A    Bradley Campbell.

4    Q    Okay.  And what was Mr. Campbell's title?

5    A    A regional HR Manager.

6    Q    Okay.

7         MS. COX:  General Counsel moves for admission of GC-7.

8         JUDGE GREEN:  Any objection?

9         MS. BUFFALANO:  No objection.

10        JUDGE GREEN:  GC-7 is admitted.

11   **(General Counsel Exhibit Number 7 Received into Evidence)**

12   Q    BY MS. COX:  So we've been talking a lot about regional

13   managers, regional -- different regional positions.  Can you

14   tell me what region the JFK8 facility falls into?

15   A    Right now, the New England region.

16   Q    Did it fall into a different region in April or March of

17   2020?

18   A    Yes.

19   Q    What region did it fall in April and March of 2020?

20   A    The northeast.

21   Q    Can you tell me what -- what other facilities fell in the

22   north each -- northeast region in April and March of 2020?

23   A    CLT4, RDU1, BDL3, BWI2, DCA1, and potentially EWR4.  I

24   don't remember.

25   Q    You said one earlier that I missed after -- so you said



1    BDL3, BWI2, CLT4, DCA1, potentially EWR4.  I missed one of

2    them.

3    A    RDU1.

4    Q    Can you say it again?  I'm sorry.

5    A    RDU1.

6    Q    Okay.

7    A    In Raleigh.

8    Q    In North Carolina?

9    A    Yes.

10   Q    And BDL3 is in Connecticut, right?

11   A    Yes.

12   Q    BWI2 is in Baltimore?

13   A    Yes.

14   Q    CLT4 is where?

15   A    Charlotte, North Carolina.

16   Q    DCA1 is where?

17   A    Baltimore.

18   Q    Okay.  Now we've talked about Anand Mehta and Bradley

19   Campbell as being regional managers for the northeast region in

20   April and March of 2020, right.  Who are the other regional

21   managers responsible for JFK8?

22   A    Right now, I don't know our regional safety manager, but

23   our regional loss prevention manager is Melissa.

24   Q    What about in April and -- March and April of 2020, who

25   were the regional safety managers and the regional loss



Exhibit E, Motion to Try Petition on Hearing Record

1    prevention manager?

2    A    Our regional loss prevention was Geoff.  And then -- I

3    don't remember his name for Safety.

4    Q    Okay.  Do you recall Geoff's last name?

5    A    Gilbert-Differ.

6    Q    Okay.  Other than the four individuals we named, are there

7    any other regional managers that have responsibilities over

8    JFK8 in March and April of 2020?

9    A    Not that I'm aware of.

10   Q    Okay.  So what -- what are the duties and responsibilities

11   of a Regional Manager Anand Mehta?

12   A    I don't know.

13   Q    Okay.  What are the duties and responsibilities of

14   regional loss prevention manager Jeff Gilbert-Differ in March

15   and April of 2020?

16   A    I don't know.

17   Q    What are the duties and responsibilities of the -- sorry,

18   I'm missing somebody here -- oh, regional HR Manager Bradley

19   Campbell in March and April 2020?

20   A    I don't know.

21   Q    So as an HR -- senior HR business partner, you -- you

22   don't know what the job duties and responsibilities of the

23   regional HR manager --

24        JUDGE GREEN:  Okay.  So he -- he just answered that.  And

25   really, this is stretching the bounds of relevance.  So let's



Exhibit E, Motion to Try Petition on Hearing Record

1    move on.

2        MS. COX:  Okay.

3    Q    BY MS. COX:  All right.  So I'm going to switch gears with

4    you now, and I'm going to talk to you about the Amazon's

5    owner's manual and guide to employment; are you familiar with

6    that document?

7        MS. BUFFALANO:  Before we do that if we're going switch

8    gears, do you mind if we take just five minutes to run to the

9    restroom?

10       JUDGE GREEN:  Yes.

11       Off the record for five minutes.

12       MS. BUFFALANO:  Thank you.

13   (Off the record at 11:40 a.m.)

14   Q    BY MS. COX:  Mr. Grabowski, before we go on to the owner's

15   manual, can you tell me what the role of the regional loss

16   prevention managers are with respect to JFK8?

17   A    They manage the onsite team.

18   Q    Who do they manage?

19   A    The sight loss prevention manager.

20   Q    And what kinds of issues do -- does loss prevention deal

21   with?

22   A    It varies.

23   Q    Can you give me some examples?

24   A    Theft, risk to person, personal safety, property safety,

25   harassment.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    So you said theft, risk to personal safety, harassment.

2    You said risk to property, too -- I'm sorry.

3    A    Yeah.

4    Q    And risk to property.  Okay.  All right.  So --so when you

5    say that the regional loss prevention manager manages the

6    onsite team, can you give me an example of how that management

7    plays out?

8    A    The onsite loss prevention manager reports to the regional

9    manager.

10   Q    What kinds of things does the regional -- I'm sorry -- the

11   site loss prevention manager report to the regional loss

12   prevention manager?

13   A    I don't know.

14   Q    Okay.  So -- but you do know that the site loss prevention

15   deals with risks to property, theft, risk to -- to persons and

16   harassment; do all harassment complaints go to the loss

17   prevention team -- the site loss prevention team?

18   A    Not every single one.

19   Q    How -- how is it decided which ones go and which ones

20   don't go to the site loss prevention team?

21   A    General harassment would go to the loss prevention team.

22   And then, typically, sexual harassment cases would be handled

23   by the HR team.  But there are instances in which loss

24   prevention is looked into those as well.

25   Q    Okay.  When you say general harassment, what do you mean



1    by that?

2    A    Harassing behavior outside of sexual harassment.

3    Q    Okay.  So there's a difference between general harassment,

4    sexual harassment?

5         JUDGE GREEN:  Is that a question?

6         MS. COX:  Yes.

7    Q    BY MS. COX:  So there's a difference between the two?

8    A    Yes.

9    Q    Okay.  What's -- what's gener -- can you tell me what

10   general harassment is?

11   A    Continuous or escalated unwanted behavior.

12   Q    Like, what kinds of unwanted behavior?

13   A    It varies.

14   Q    Could you give me an example?

15   A    I guess, like -- either like escalated, like -- or

16   repeated follow-up with an individual.

17   Q    And that means -- are you saying something that happens on

18   more than one occasion?

19   A    It doesn't necessarily need to happen on more than one

20   occasion.  It can.

21   Q    So what do you mean when you say continuous?

22   A    Something that continues to happen.

23   Q    Okay.  And then when you say escalated, what does that

24   mean?

25   A    The severity of something.



1  Q    And how is severity determined?

2  A    Evaluating situations on a case-by-case basis, using high

3  judgment.

4  Q    Okay.  And you did talk a little earlier about escalation,

5  something I wanted to go back to.  Can you describe the steps

6  in the process for me on escalation?

7  A    You bring something to a higher level.

8  Q    Okay, where does it start and what is that thing or

9  something?

10  MS. BUFFALANO:  I'm going to object.  This question is

11  vague.  I don't know what he's supposed to answer.

12  JUDGE GREEN:  Yeah.  So if you know it. There are a

13  certain standard -- standard steps of escalation.  So an

14  incident happens, and if I take it, it's brought to from one

15  level to -- to another; is there some kind of standard levels

16  or are there not?

17  THE WITNESS:  So for certain types of incidents, there

18  could be different partners or different, I guess, teams that

19  need to be looped in.  But for other issues, if it's something

20  that gets brought to someone's attention, that's when that

21  leader or that person that it was brought to their attention

22  would evaluate the circumstances and determine what the

23  appropriate level needs to be handled that is.  Or if they're

24  unsure, then just going to the level above them to present the

25  information.



Exhibit E, Motion to Try Petition on Hearing Record

```
1        JUDGE GREEN:  Okay.

2   Q    BY MS. COX:  Okay.  So what are the certain types of

3   incidences that get escalated?

4   A    It varies.

5   Q    Can you give me an example?

6   A    It could be a safety concern, behavioral concern, any type

7   of concern where an employee has already reviewed or discussed

8   something with one level and would like it addressed or would

9   like to speak to someone at a higher level?

10  Q    Okay.  Okay.  So do you use your judgment and whether to

11  escalate an incident or not?

12  A    Yes.

13  Q    Okay.  So how do you learn of an incident?

14  A    There's different ways that it can be brought to my

15  attention.

16  Q    Can you tell me the ways that incidences can be brought to

17  your attention?

18  A    Either by members of my team, members of the leadership

19  team.  An associate can bring it to me themselves, can be

20  brought to my attention by a member of my HR leadership team, a

21  member of the operational leadership team at any level.  It can

22  be escalated to -- like, brought to the attention of the site

23  from outside of the site, if the employee expresses concerns,

24  aside from using one of the other methods that I mentioned.

25  Q    Okay.  So if an associate wants to bring a concern, what
```



Exhibit E, Motion to Try Petition on Hearing Record

1    does an associate do?

2    A    There's various mechanisms that they have for reporting

3    something.

4    Q    Can you tell me what the various mechanisms are?

5    A    We have a voice of the associates board where employees

6    can make comments or post questions to the senior leadership

7    team.  They can approach a member of the leadership team to

8    speak with them.  They can come directly to myself.

9         In their employee portal, they have a -- like, a certain

10   section where they can report concerns or escalations that go

11   to a centralized investigations team.  They have an ethics

12   hotline that they can call, if they don't feel comfortable

13   talking to someone on the site or -- or want to talk to someone

14   while they're off site, which then they can report either

15   anonymously or using their own information.  Or if an employee

16   sees something happening that they're not necessarily involved

17   in, they can bring it to the leadership team's attention and

18   the HR team's attention.

19   Q    When you say leadership team, who are you referring to?

20   A    The operations team, area managers, operations manager,

21   senior operations managers, the senior team in general, so

22   the -- like, the site safety manager, the site loss prevention

23   manager, the HR salaried team that has a team directly

24   reporting to them.

25   Q    Okay.  So in the chart you saw previously, it would be the



Exhibit E, Motion to Try Petition on Hearing Record

1    people in the blue, the people in the gray and people in the

2    yellow and the people in the purple, right?

3    A    I don't remember.

4         MS. BUFFALANO:  Objection -- yeah, okay.

5    Q    BY MS. COX:  Do you want me to show it to you again?

6         MS. BUFFALANO:  If you're going to ask him the question

7    again, yeah.

8         MS. COX:  Yeah, I will.

9    Q    BY MS. COX:  Okay.  So my question is whether any of the

10   people on this chart that I've designated by color would be

11   able to receive an employee complaint.  Just one sec.  You see

12   my screen?

13   A    Yes.

14   Q    So my question was whether an employee can bring just

15   reports of an incident to any of these people here, the blue

16   boxes, right?

17   A    Yes.

18   Q    Okay.  And then they can also bring concerns to these

19   individuals here in the yellow, right?

20   A    Yes.

21   Q    And then also these individuals here in the purple.

22   A    Yes.

23   Q    And all these people are considered senior operations

24   team, meaning the yellow, the purple and the blue?

25   A    No.



Exhibit E, Motion to Try Petition on Hearing Record

```
1    Q    Okay.  Can you tell me, it's just the people who are
2    identified as SR?
3    A    Yes.
4    Q    Okay.  So what's the difference between these senior
5    operations and these individuals here; why are these senior?
6    A    I'm not sure I understand the question,
7    Q    What makes this level of manager a senior?
8         MS. BUFFALANO:  I'm going to object to this.  Foundation.
9         JUDGE GREEN:  Okay.  Sustained.
10   Q    BY MS. COX:  Okay.  You're also saying that employees can
11   bring concerns to any of these area managers here in gray,
12   right?
13   A    Yes.
14   Q    Okay.  All right.  That was all I wanted to ask.  Okay,
15   so.  Okay.
16        So after an employee reports an incident on these
17   different mechanisms -- actually, let me let me ask you one
18   other -- let me go back again.
19        You mentioned a centralized investigative team, right?
20   A    Yes.
21   Q    Okay.  Who is on the centralized investigative team at
22   JFK8 in March and April of 2020?
23   A    No one.
24   Q    What is the centralized investigative team?
25   A    An investigations team that handles associate concerns or
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    escalations virtually across all of NACF.

2    Q     What is an NACF?

3          MS. BUFFALANO:  I'm going to object to this.  This is all

4    current.  This is not -- was not going on in 2020, so I don't

5    know how it's relevant to the --

6          JUDGE GREEN:  Sustained.

7    Q     BY MS. COX:  Okay.  So was there a workplace incident

8    management team at JFK8 in April and March of 2020?

9    A     Not a specific team.  The loss prevention team handles

10   those issues.

11   Q     Can you tell me who was the -- the site loss prevention

12   team in March and April of 2020?

13   A     I believe the loss prevention manager at the time was Kyla

14   Knapp.

15   Q     Okay.  Who else was on loss prevention in March and April

16   of 2020?

17   A     Henry Carvalho (phonetic).  And Stefan Stewdu (phonetic).

18   Q     Stefan -- can you spell the last -- do you know how to

19   spell the last name?

20   A     No.

21   Q     Okay.  Was anyone else on the site loss prevention team in

22   March and April of 2020?

23   A     Yes.

24   Q     Who else?

25   A     Robert Riverbury (phonetic).



Exhibit E, Motion to Try Petition on Hearing Record

1  Q    And of these individuals -- you might have told me this

2  already -- can you remind me who reports to Regional Loss

3  Prevention Manager Geoff Gilbert-Differ?

4  A    From JFK8, it would be Kyla Knapp.

5  Q    Okay.  So back to the escalation.  So after an incident is

6  reported, let's say there -- it's reported by -- coming to you.

7  Then what happens next?

8      MS. BUFFALANO:  I'm going to object to the time.  Like,

9  when is this occurring?

10 Q    BY MS. COX:  Okay.  So in March or April of 2020 if an

11 incident is a behavioral concern, is reported to you, what was

12 your next step?

13 A    Review the details of the incident or what was reported.

14 Q    Okay.  And is anybody else involved in that review?

15 A    It would depend.

16 Q    What does it depend on?

17 A    I guess the -- the substance of the initial complaint and

18 the specifics surrounding the of what was reported.

19 Q    Okay.  So what types of complaints would you involve other

20 HR individuals, for example?

21     MS. BUFFALANO:  I'm going to object to this.  The incident

22 that was involving Mr. Bryson; Ms. Evans was not reporting to

23 Tyler, so I don't think we need to spend the time figuring out

24 if it had been reported to Tyler, what process it would've gone

25 through.



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Yes.  And frankly, I think we already have

2   this testimony.  So sustained.

3   Q    BY MS. COX:  So if an incident is reported to -- let's

4   see -- if an incident is reported to someone on the -- can

5   incidents be reported directly to the regional loss prevention

6   manager?

7   A    I don't know.

8   Q    Do employees know who the regional loss prevention manager

9   is?

10  A    I don't know.

11  Q    So if a manager learns of an incident, who would a manager

12  report the incident to?

13  A    There's different people they could loop in.

14  Q    Okay.  So let's say a senior ops manager learns of an

15  incident; who would they loop in?

16  A    It depends what the incident is.

17  Q    So let's assume it involves a behavioral concerns; who

18  would they loop in?

19  A    HR.

20  Q    Okay.  And let's assume that you were looped in.  What

21  types of incidents would you talk with other HR managers about?

22       MS. BUFFALANO:  Objection.  Vague.

23       JUDGE GREEN:  Okay.  So here's my problem with this entire

24  line of questioning.  You've got Mr. -- the Respondent's

25  handling of Mr. Bryson.  You've got the Respondent's handling



Exhibit E, Motion to Try Petition on Hearing Record

1    of potentially similarly situated comparable employees, both of

2    which would arguably be relevant.

3        Generic questioning about what would happen in

4    hypothetical situations is really not helpful.  And it makes it

5    very difficult to understand the relevance.  And -- and I'm

6    really not interested in hearing more of it.  So why don't you

7    move on?

8        MS. COX:  Well, Judge Green, respectfully, I just want to

9    say that every organization has some guidelines by which they

10   go through processes.  And I'm trying to --

11       JUDGE GREEN:  I know.  But we're not getting -- we're not

12   getting that.  That's not what we're getting.  We're getting --

13   we're getting --

14       MS. COX:  I -- I understand.

15       JUDGE GREEN:  -- hypothetical situations that aren't going

16   to be relevant to this case.

17       MS. COX:  Okay, Judge.  I'll move on.

18       So I want to talk to you about the owner's manual and

19   guide to employment.  I've uploaded it in SharePoint, and I've

20   labeled it General Counsel's Exhibit 8.

21       Ms. Jones, can you show Mr. Grabowski that document?

22       THE COURT DEPUTY:  Sure.

23   Q    BY MS. COX:  So this is a 28-page document.  Do you

24   recognize this document?

25   A    Yes.



1    Q    Okay.  So as part of your responsibilities as senior HR

2    business partner, did you help draft this document?

3    A    No.

4    Q    Do you know who drafted it?

5         MS. BUFFALANO:  I'm going to object to the relevance.

6         JUDGE GREEN:  Do we care?

7         MS. COX:  I'm sorry, Judge?

8         JUDGE GREEN:  Why do we care who drafted it?  It --

9    it's -- it's -- are we all agreed that this is -- was in effect

10   nationwide during the relevant time period?  No?  Yes?

11        THE WITNESS:  Yes.

12        MS. COX:  Okay.  Thank you.

13   Q    BY MS. COX:  Are you -- as a senior HR business partner,

14   are you responsible for making sure that supervisors know the

15   guide to employment?

16   A    No.

17   Q    Okay.  Do you have any job responsibilities with respect

18   to the owner's manual and guide to employment?  This is very

19   big.  Any responsibilities with respect to the owner's manual?

20        JUDGE GREEN:  Okay, I mean, do -- do you understand the

21   question?  Do you use it?  How about we start with that.  Do --

22   Mr. Grabowski, do you use the owner's manual in the course of

23   your -- your job?

24        THE WITNESS:  Yes.  I mean, the -- the content in it, at

25   points in my job, yes, but --



Exhibit E, Motion to Try Petition on Hearing Record

1       JUDGE GREEN:   Okay.

2   Q    BY MS. COX:   Okay.   And it was in effect in March and

3   April of 2020, right?

4   A    I believe so.

5   Q    And it was in effect nationwide at every facility?

6   A    I don't know.   I believe so.

7   Q    And this owner's manual -- I'm sorry -- are you

8   responsible for making sure associates know the guide to

9   employment?

10  A    No.

11  Q    Okay.   Whose job is it to inform employees on the owner's

12  manual and guide to employment?

13  A    The ownership of the employee themselves.

14  Q    What does that mean?

15  A    When employees are hired, they are provided where to find

16  the relevant information to the terms of their employment.   If

17  they'd like to reference it, they have the ability and

18  ownership on themselves to review it.

19  Q    Okay.   Who provides them this document when they're hired?

20  A    When employees are hired, they go through a set of

21  virtual, I guess, electronic signatures and like, confirmation

22  and acknowledgement, just kind of acknowledging that they have

23  and know where to find this information.

24  Q    Okay.   If they have questions about it, who do they talk

25  to?



1    A    They can ask a member of the leadership team.

2    Q    And by member of leadership team, you mean all the senior

3    operations managers on the chart that we showed earlier?

4    A    Yes, and if there's something that the person gets asked

5    that they're not sure of, they can take partners with someone

6    else.

7    Q    And who else would that be?

8    A    Could be another member of the operations team, could be a

9    member of HR.  It really just depends on the situation.

10   Q    Okay.  So it's a fact that this was in effect in 2020,

11   right?

12   A    I believe so.

13   Q    Is that a yes or no, Mr. Grabowski?

14        MS. BUFFALANO:  Asked and answered.

15        JUDGE GREEN:  Sustained.

16   Q    BY MS. COX:  And it's a fact that the handbook applied

17   nationwide at every facility, right?

18        MS. BUFFALANO:  Asked and answered.

19        JUDGE GREEN:  Sus -- sustained.

20   Q    BY MS. COX:  And the manual applies to all Amazon

21   associates, right?

22        MS. BUFFALANO:  Asked and answered.

23        MS. COX:  It --

24        JUDGE GREEN:  Okay --

25        MS. COX:  -- wasn't answered.



1    JUDGE GREEN:  -- I'll allow -- I'll allow this one.

2   Q    BY MS. COX:  The owner's manual applies to all associates,

3   right?

4   A    I believe so.

5   Q    Does it apply to supervisors?

6   A    I believe so.

7   Q    Does it apply to managers?

8   A    I believe so.

9   Q    So you don't -- so you don't really know?

10  A    Not for sure.

11  Q    Okay.  Do you know who would know other than --

12       JUDGE GREEN:  You know what?  Can we just -- I'm sorry.

13  I -- I thought that this was -- there was no dispute regarding

14  this.  Can we just get a stipulation to the effect that this

15  owner's manual was in effect nationwide to all individuals

16  employed by Amazon during the period of March and April 2020?

17       MS. BUFFALANO:  I know that we produced two, so I just

18  have to confirm which one it is, and I also don't know that

19  it's true that it applies to all associates, as opposed to just

20  a particular business, but I -- we can -- we can figure that

21  out during a break, I'm sure.

22       JUDGE GREEN:  Okay.

23       MS. COX:  Okay.  Can -- can you also find out if it

24  applies to distribution centers around the country?

25       MS. BUFFALANO:  Okay.



1    MS. COX:  Ms. Buffalano?  I'm sorry?

2    MS. BUFFALANO:  Yeah, I'm so -- sorry, yeah.

3    MS. COX:  Thank you.

4    Q    BY MS. COX:  Okay, so this guide to employment contains

5    codes of conduct, right?

6    JUDGE GREEN:  Did you hear --

7    Q    BY MS. COX:  Mr. Grabowski?

8    JUDGE GREEN:  -- the question, Mr. Grabowski?

9    THE WITNESS:  No, I'm sorry.  What was that?

10   Q    BY MS. COX:  The guide to employment contains codes of

11   conduct, right?

12   A    Yes.

13   Q    So -- and the codes of conduct are workplace rules?

14   A    Yes.

15   Q    Okay.  And as part of your responsibilities as a senior

16   business partner, did you draft the codes of conduct?

17   A    No.

18   Q    Okay.  Do you know who drafted them?

19   A    No.

20   Q    Okay.  And you may not know this but I'll ask anyway.  The

21   code of conduct applies to all associates at JFK8, right?

22   A    I believe so.

23   Q    So you're the senior HR business partner and you don't

24   know if the codes of conduct applies to associates at JFK8;

25   that's your testimony?



# Exhibit E, Motion to Try Petition on Hearing Record

1      MS. BUFFALANO:  Objection.  Misstates the testimony.

2      JUDGE GREEN:  Okay, so sustained.  Let me just ask you,

3  Mr. Grabowski, your hesitance to say you're certain at -- that

4  the -- the code of conduct applies to all associates at JFK8,

5  do you know -- what -- what -- what -- why are you hesitant to

6  say that it applies to all associates?

7      THE WITNESS:  The -- the -- the standard of conducts do.

8  I can't say for sure the last time that I opened and went

9  through this document in its entirety, so I wouldn't

10  necessarily want to commit to something that's in here if I'm

11  not sure what's completely in.

12      JUDGE GREEN:  Okay.

13      THE WITNESS:  If we scroll through it, I would be

14  confident to confirm the material that's in there, but we're

15  looking at a 28-page document that I can't say in its entirety

16  what's in it.

17      MS. COX:  Mr. Grabowski, respectfully, I haven't asked you

18  questions about con -- the contents.  I'm just asking whether

19  it applies at JFK8.

20      MS. BUFFALANO:  But he's answering that question.

21      MS. COX:  He's answering "I believe so," ma'am.

22      MS. BUFFALANO:  No, I know, but -- but Judge Green asked

23  him why he --

24      JUDGE GREEN:  All right, so we just -- we -- we just

25  clarified that.  I -- I really don't think this is in dispute.



# Exhibit E, Motion to Try Petition on Hearing Record

1    I don't think it's something that the General Counsel has to

2    worry about.  If you're wor -- really worried about it after we

3    get a stipulation, we can circle back to it.  It's part of

4    the -- it's -- as far as I understand, it's part of that -- the

5    Respondent's defense that the -- the code of conduct applied to

6    employees at JFK8.

7        MS. COX:  Correct.

8    Q    BY MS. COX:  So Mr. Grabowski, the standards of -- of

9    conduct applied to associates at EWR4, right?

10       MS. BUFFALANO:  Objection.  Relevance.  Oh --

11       JUDGE GREEN:  (Audio interference).

12       MS. BUFFALANO:  Go ahead.

13       JUDGE GREEN:  All right, so overruled.  I mean, we're

14   going to -- I think we're going to stop this.  It applies to

15   everybody nation-wide.

16       MS. COX:  Okay.

17   Q    BY MS. COX:  So you mentioned protection of property

18   earlier.  You know that the codes of conduct protect Amazon's

19   property, right?

20   A    Yes.

21   Q    And you know that the codes of conduct help create a safe

22   workplace for employees, right?

23   A    Yes.

24   Q    And you know that they help Amazon create a workplace

25   where employees are free from harassment, right?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    Okay.  And the code of conduct makes clear to associate

3    what -- to associates what Amazon's expectations are and the

4    consequences they'll face for certain infractions, right?

5    A    It doesn't outline necessarily specifics, but it's -- it's

6    guidelines -- I mean, it's the -- if it -- there would be too

7    much information to list out every single potential infraction,

8    so there are guidelines to be used in evaluating and reviewing

9    different situations that may occur.

10   Q    Right, and those guidelines give employees understanding

11   of Amazon's expectations, right?

12   A    Yeah.

13   Q    Okay.  And those guidelines also give employees an

14   understanding of the consequences they may face for violating

15   the codes of conduct, right?

16        MS. BUFFALANO:  Asked and answered.

17        JUDGE GREEN:  Sustained.  Just so you know, I -- I've --

18   I've actually -- generally, I don't necessarily mind pointing

19   out parts of a document to the extent I haven't read the

20   document, but I actually have read the owner's manual standard

21   of conduct here.

22        MS. COX:  Judge, I'm getting there.

23        JUDGE GREEN:  Okay.

24   Q    BY MS. COX:  So Amazon issues employees supportive

25   feedback documents, right?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    Yes.

 2    Q    And there are supportive feedback documents for quality,

 3    right?

 4    A    Yes.

 5    Q    And what do quality feedback documents address?

 6         MS. BUFFALANO:  Objection.  Relevance.

 7         JUDGE GREEN:  What's the relevance?

 8         MS. COX:  Judge Green, there is a lot of documents we'll

 9    go through, and I want to make sure it's clear for everybody

10    the difference between the different feedbacks that Amazon

11    metes out.

12         MS. BUFFALANO:  Well, why?  This is behavioral.  I just

13    don't know -- understand what quality has to do with.

14         JUDGE GREEN:  Yeah, I would -- so I would be -- I would

15    think the quality would be specifically irrelevant to this

16    case.  You know, quality attendance, you know those are the

17    things that I would expect that we don't -- we don't need to

18    deal with.  Am I wrong about that?

19         MS. COX:  Well, Judge, some employees -- my understanding

20    is that some employees can be given coachings for quality or

21    productivity, and those can -- in a certain period can result

22    in termination, a behavioral outcome or consequence, so to me

23    these questions are relevant.

24         MS. BUFFALANO:  But that's not what happened here.

25         JUDGE GREEN:  Yeah, so --
```



1      MS. COX:  Well, we're going to be comparing to other

2   employees and --

3      JUDGE GREEN:  Well, other employees who had quality

4   deficiencies?

5      MS. COX:  No, who might have received prior coachings or

6   prior disc -- prior write-ups and ultimately were terminated

7   for --

8      JUDGE GREEN:  Okay, let's --

9      MS. COX:  -- behavioral --

10     JUDGE GREEN:  -- go -- let -- we -- I -- I'll allow it,

11  but let's try and move through it quickly.  I -- I don't see

12  the -- I -- I really don't see the -- the -- a lot of testimony

13  about quality feedback or other non-behavioral feedback is

14  going to be helpful, but if -- if you're only going to spend a

15  little bit of time on it, let's go through it.

16     MS. COX:  Okay.

17  Q    BY MS. COX:  So what do quality feedback documents

18  address?

19  A    All (audio interference) performance.

20  Q    What do you mean by that?

21  A    The quality or potential, I guess, defects that impact the

22  business in their day-to-day functions.

23  Q    Okay.  And there are supportive feedback documents for

24  productivity, right?

25  A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And what do productivity documents address?

2    A    Performance expectations.

3    Q    Okay.  And there are behavioral supportive feedback

4    documents as well, right?

5    A    Yes.

6    Q    And the behavioral supportive feedback document is a

7    discipline, right?

8    A    It would depend on the level.

9    Q    Okay.  Can you explain what you mean by that?

10   A    So the different levels of behavioral feedback are meant

11   to document and coach employees. When looking at, like, a

12   verbal coaching or a documented coaching, it's more so a

13   conversation about what happened and -- and what the

14   expectations are, and depending on what the situation is, it

15   could have the potential to escalate to a written warning.

16   Q    Okay.  And then -- so you mentioned a verbal and

17   documented coaching.  What other type of behavioral feedbacks

18   are there?

19   A    A first written warning, a final written warning, and

20   separation of employment.

21   Q    So are you saying that verbal and -- verbal coaching and a

22   documented coaching are not considered discipline?

23   A    I mean, depending on what the violation is or what type

24   it's classified under, it could progress to some type of

25   written warning, but the intention of it is more so to have a



Exhibit E, Motion to Try Petition on Hearing Record

1    conversation and outline what the behavior was and what the

2    expectations are.

3    Q    Okay.  So can you give me an example of when a verbal

4    coaching is escalated to, for example, a first written warning?

5         MS. BUFFALANO:  I'm going to object to the relevance.

6         JUDGE GREEN:  Yeah, overruled.  Overruled.  Let -- let me

7    just -- let me -- let me ask you, Mr. Grabowski, so if somebody

8    receives -- if an employee receives a -- a verbal warning --

9         THE WITNESS:  Uh-huh.

10        JUDGE GREEN:  -- for certain conduct and then engages in

11   the same conduct, would the fact that the person already

12   received a verbal rol -- warning be a factor in deciding

13   whether to give -- escalate and give a written warning?

14        THE WITNESS:  Yes, but after a verbal coaching, there is a

15   documented coaching.

16        JUDGE GREEN:  Okay.  So it would go verbal, document --

17   documented, written?

18        THE WITNESS:  First written, final, termination.

19        JUDGE GREEN:  Okay.  The verbal and documented are --

20   they're -- they're part of the progressive discipline?

21        THE WITNESS:  Yes, but typically used in less severe

22   situations.  So like when you're looking for -- just for an

23   example, like you're looking at standards of conduct, some type

24   of, like, behavioral incident, like harassment or workplace

25   violence could start the -- the back level higher whereas like



# Exhibit E, Motion to Try Petition on Hearing Record

1    a verbal coaching could be used when an employee works more

2    than 12 hours.  Amazon has a policy against working 12 hours.

3    You work more than 12 hours, you get a verbal coaching.  You do

4    it again, it becomes a documented coaching, so it takes --

5    that -- based on the severity, it can take re -- like

6    repetitive offenses to progress.

7        JUDGE GREEN:  Okay, I understand.  Thank you.

8    Q    BY MS. COX:  Okay.  Do -- I'm sorry.  So Amazon has a

9    policy that if an employee receives two final warnings or six

10   documented coachings in a 12-month period, they can be

11   terminated, right?

12       MS. BUFFALANO:  Objection to the foundation of this.  This

13   assumes facts not in evidence, and -- and really this is far

14   afield of the progressive discipline policy or establishing

15   whether or not they can put in their comparators and they are,

16   you know, coordinated on the progressive --

17       JUDGE GREEN:  So I -- I'm sorry.  Maybe I misheard the

18   question.  Can -- can you -- can you restate the question,

19   Ms. Cox?

20       MS. COX:  So the question was, isn't it true that Amazon

21   has a policy that states an employee who receives two final

22   warnings or six documented coachings in a 12-month period, they

23   will be terminated, right?

24       JUDGE GREEN:  Okay.  So overruled.

25       If you know, Mr. Grabowski.



Exhibit E, Motion to Try Petition on Hearing Record

```
1        THE WITNESS:  That's not the policy.

2    Q    BY MS. COX:  And what is the policy?

3    A    It's six written warnings, so not documented coachings.

4    It's six written warnings of any level or two final written

5    warnings, but those -- that policy that you're referencing is

6    pertaining to the productivity and quality standards.

7    Q    Okay.  So if an employee has productivity and quality

8    standard violations, that doesn't affect a -- a behavioral

9    feedback document or discipline that's meted out?

10   A    No, each type of feedback would progress in its own, so

11   even productivity and quality would not progress together.

12   Q    Okay.  So are you saying that behavioral feedback

13   progresses on its own, and then productivity progresses on its

14   own, and then quality progresses on its own?

15   A    Yes, but there's also different types of behavioral

16   incidents that would progress in itself.

17   Q    Okay, can you explain that to me?

18   A    We have behavioral attendance which is similar to what I

19   was saying earlier with, like, someone working over 12 hours or

20   not submitting their punches be -- like, throughout the day,

21   not clocking out for lunch, different attendance-related

22   issues.  Then there's behavioral time off-task, which is

23   specifically pertaining to time off-task EVAC, and then there's

24   other behavioral concerns outside of those two.

25   Q    And those are -- those would be like what?
```



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Anything behavioral outside of those two.

2    Q    Okay.  So everything else, pretty much.  Do you know what

3    the policy is for -- the progressive policy for the behavioral

4    concerns?

5    A    It differs based on the situation, or I guess, what the

6    offense is and the severity of it.

7    Q    Okay.  So were you trained on the codes of conduct and

8    discipline that Amazon metes out for associate infractions?

9    A    I've reviewed them.  I wouldn't necessarily say that I had

10   training specific to it.

11   Q    Okay.  Do you train anyone from HR on the work rules or

12   the codes of conduct?

13   A    Me personally, no.

14        THE COURT REPORTER:  Could I just ask whoever is not

15   participating to mute themself, please?  I'm getting a lot of

16   background noise from somebody.  I don't know who it is.

17   Q    BY MS. COX:  So let's see.  So as a senior HR business

18   partner, you're involved in the discipline of employees, right?

19   A    I can be.

20   Q    Okay.  And you conduct seek-to-understand conversations

21   with employees?

22   A    I can.

23   Q    Have you ever conducted a seek-to-understand?

24   A    Yes.

25   Q    Okay.  And a seek-to-understand is a conversation between



483

1    a supervisor or HR or loss prevention and an employee in which

2    employees identify information to Amazon about what Amazon

3    should consider prior to issuing discipline, right?

4    A     The purpose of a seek-to-understand conversation is to

5    answer any questions and get all facts or information that the

6    employee would like to provide pertaining to the incident.

7    Q     And who's -- and it's typically an employee and HR, right?

8    A     It depends on the situation.

9    Q     And how do you determine who's involved in a

10   seek-to-understand conversation?

11   A     It depends on what the situation is and -- and like, I

12   guess, the -- the substance of it and who needs to be involved.

13   Q     So you don't have any guidelines that help you determine

14   whether someone other than yourself needs to be involved in a

15   seek-to-understand?

16   A     So if it's a safety concern, we would loop in safety.

17   There's certain specific incidents from a loss prevention

18   standpoint that they have outlined where their team needs to be

19   looped into, and then if there's anything that I have questions

20   or concerns or I feel it should be handled at a higher level,

21   would then escalate from an HR side.

22   Q     And you involve the employee's supervisor in the

23   seek-to-understand conversations?

24   A     It depends.

25   Q     What does it depend on?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    What the situation is.  I mean, if it's something where

2    HR's conducting some type of investigation, then typically, the

3    supervisor is not looped in until the investigation is

4    complete, keeping all confidential information with those who

5    need to know at the time.

6    Q    So if there's no investigation pending, then a supervisor

7    is involved in the seek-to-understand?

8    A    I'm not sure I understand the question.

9    Q    Well, you just testified that if there's an HR

10   investigation the supervisor is not looped in until the

11   investigation is complete, right?

12   A    There -- sometimes the supervisor might be aware of it or

13   they might be the ones that bring it to our attention

14   themselves, but they're not typically, like, involved in every

15   single conversation with each of the witnesses, the

16   documentation of those conversations until the investigation is

17   concluded and there -- the -- the findings are there along with

18   the potential level of discipline.

19   Q    When -- so you're saying that a -- a supervisor is not

20   involved until the end of the investigation for a

21   seek-to-understand?

22   A    it depends on the situation. So when we have safety

23   incidents, like a manager is the one that conducts it.  If it's

24   a behavioral incident, then typically, the -- at this point

25   last year, the HR team would be the one conducting the



# Exhibit E, Motion to Try Petition on Hearing Record

1  conversations and gathering all the facts, and if it's

2  something where we need to loop loss prevention in based on

3  those standards, then we would loop their team into the

4  seek-to-understand conversations, but it's not something where

5  the supervisor is typically present for the seek-to-understand

6  conversations in an investigation.

7  Q    Okay.  So -- so you're involved in decisions to discharge

8  employees, right?

9  A    It depends on the situation, the shift that the employee's

10  on and the severity of the issue.

11  Q    But generally, if you get notice of an incident and you're

12  investigating it, you're involved in the decision to -- to

13  discharge the employee, right?

14  A    It would depend on the situation and the severity.

15  Q    Okay.  So on what situations are you involved in dis --

16  the decisions to discharge employees?

17  A    It would be situations that my team or the senior HRAs

18  investigate that is not something that it is, I guess,

19  cut-and-dry and there is potentially, like unique facts that

20  they want to review or discuss with myself.

21  Q    Okay.  So have you ever been involved in decisions to

22  discharge?

23  A    I've been involved the recommendations.

24  Q    Okay.  So you would agree that a recommendation is some

25  level of involvement in the decision to discharge, right?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    Okay.  So who at the regional level is involved in

3    decisions to discipline employees?

4    A    It really depends on the situation.

5    Q    Okay.  Can you give me an example of a decision where

6    regional level -- the regional level managers were involved?

7    A    Anything that the site would need to escalate once it's

8    already at the -- I guess the top level within the site.

9    Q    Okay.  And who's the top level in the site?

10   A    For HR, it's the senior HR manager.

11   Q    And who is that?  Who is the senior HR manager at the site

12   in April and March 2020?

13   A    We didn't have one.

14   Q    Who was acting as the site HR manager in April and March

15   of 2020?

16   A    Christine Hernandez.

17   Q    Okay.  So in April and March of 2020, when a discipline is

18   escalated, who at the regional level is involved with that

19   escalation?

20        MS. BUFFALANO:  Asked and answered.

21        JUDGE GREEN:  Well, it -- it --

22        MS. BUFFALANO:  She just asked the question.

23        JUDGE GREEN:  It -- it -- it was asked.  I'm not 100

24   percent sure it was answered.  Mr. Grabowski, do you know or --

25   you -- you indicated that it depends?



Exhibit E, Motion to Try Petition on Hearing Record

1      THE WITNESS:  It does depend on the situation.  I mean,

2  similar to those that happen within the site level, it would

3  depend on the situation and who needs to be looped in.  If it's

4  a loss prevention issue, then we're looking at looping in the

5  regional loss prevention manager.  If it's something that at

6  the site would typically be handled by the HR team

7  investigating it, then we would loop in the regional HR

8  partner.  And once an investigation is completed, if it's being

9  conducted or decisions are being made at level, then you would

10  typically loop in a regional ops partner with the

11  recommendation.

12  Q     BY MS. COX:  So there are regional operations -- that's

13  Mr. Anand Mehta that you -- that you testified to earlier -- in

14  March and April of 2020?

15  A     Yes.

16  Q     Okay.  Okay.  So the steps would be, in March and April of

17  2020, Ms. Hernandez.  And then it would go to, I believe you

18  testified Bradley Campbell.  And then -- and/or regional loss

19  prevention manager, Mr. Differ, if loss prevention needs to be

20  looped in, right?  And then above the regional loss prevention

21  level, can discipline get ex -- escalated further up?

22  A     If it needs to.

23  Q     Okay.  Let's assume it needs to.  Where does it go?

24  A     I don't know.

25  Q     Okay.  So you would agree that disciplining employees is a



1    serious matter, right?

2    A    Yes.

3    Q    And that's because employees' livelihood, their ability to

4    support themselves and their family, is a stake, right?

5         MS. BUFFALANO:  Objection.  Relevance.

6         JUDGE GREEN:  Okay.  Yeah.  Sustained.

7    Q    BY MS. COX:  Okay.  So -- so I think we already

8    established this, but you were involved investigations of

9    disciplinary matters, right?

10   A    I can be.

11   Q    Have you ever been involved in investigations of

12   disciplinary matters?

13   A    Yes.

14   Q    Okay.  Does anyone direct you when to begin an

15   investigation?

16   A    They can.

17   Q    Okay.  Let's -- who -- who are the individuals who have

18   the authority to instruct you to begin an investigation?

19   A    Someone that's above me.

20   Q    And that would be -- or have you ever been directed by

21   anybody above you to -- to begin an investigation?

22   A    Yes.

23   Q    Okay.  Who gave you instruction to begin an investigation?

24   A    I'm sorry, that cut out in the middle of the question.

25   Can you please repeat it?



Exhibit E, Motion to Try Petition on Hearing Record

1   Q     Yeah.  Who has given you instructions to begin an

2   investigation?

3   A     HR managers in the past.

4   Q     And that would be people like Ms. Hernandez?

5   A     Ms. Hernandez and Ms. Prisciandaro prior to Ms. Hernandez

6   being my manager.

7   Q     Okay.  Other than Christine Hernandez and Linda

8   Prisciandaro, have you ever gotten instructions from anyone

9   else to begin an investigation?

10  A     Not that I recall.

11  Q     Do you ever tell HR personnel to -- to begin

12  investigations?

13        MS. BUFFALANO:  Relevance.

14        JUDGE GREEN:  What's the relevance?

15        MS. COX:  Judge Green, I'm learning the process of

16  Amazon's -- what Amazon does after the get complaints.

17        JUDGE GREEN:  Okay.  So that -- that really is something

18  that should be done in the investigation of the case.  To the

19  extent we have some relevance -- and I -- you know, I -- I

20  found the -- the -- the questioning regarding progressive

21  discipline to be useful.  But this type of generic questioning

22  without having information regarding Mr. Bryson other similarly

23  situated employees, it's very difficult to understand the

24  relevance.  And it's really not that useful.  It's just -- you

25  know, the time to do this -- if you really have concerns about



1    understanding Amazon's -- Amazon's HR structure, the time to do

2    that is really not at trial.  So can -- can we -- can we move

3    it alone -- along?  I -- I'm not saying I won't let you come

4    back to it if it -- if it turns out that it's relevant.  But

5    it's -- you know, it -- it's really difficult to determine

6    whether this is relevant or not.

7         MS. COX:  Judge Green, respectfully, I want to disagree

8    with you.  I -- I will follow your instruction but I do want to

9    disagree with you to the extent that, you know, Respondent is

10   not compelled to answer these questions during the

11   investigation.  The subpoenaed materials don't answer these

12   questions and, in fact, you directed us to ask questions

13   about -- you know, put someone on and ask them questions about

14   the -- the structure and the organization.  And that -- that's

15   exactly what we're doing.  We need to know these -- this

16   information before making arguments that somehow, you know,

17   perhaps a process wasn't followed.

18        JUDGE GREEN:  Yeah, I -- I've -- I've heard enough on this

19   line right now.

20        MS. COX:  Okay.  I'll move on, Judge.

21        MS. BUFFALANO:  Are we going to take a -- is this, like, a

22   good time for a -- a natural break because it's almost 1:00?

23        MS. COX:  I mean, that's fine with me.

24        JUDGE GREEN:  Okay.  So let's -- let's come back at -- at

25   2:00.  By the way, has anybody been hearing -- off the record.



Exhibit E, Motion to Try Petition on Hearing Record

1    (Off the record at 12:54 p.m.)

2        JUDGE GREEN:  Okay.  So Mr. Grabowski, Ms. Cox has some

3    more questions for you.

4        MS. COX:  Yeah.  Just trying to pull up the manual.  Okay.

5    Can you all see my screen?

6        THE WITNESS:  Yes.

7        MS. COX:  Okay.

8                    **DIRECT EXAMINATION (RESUMED)**

9    Q    BY MS. COX:  So -- so Amazon has different classes of

10   conduct, grouping them into categories of seriousness, right?

11   In the code of conduct?

12       MS. BUFFALANO:  You mean the standards of conduct?

13       MS. COX:  I believe it's the code -- oh -- standards of

14   conduct, yes.

15   Q    BY MS. COX:  You see this document on my screen, page 28?

16   A    Yes.

17   Q    Okay.  So there are two categories.  There's category 1.

18   And category 1 violations are extremely serious and may result

19   in termination, right?

20   A    Yes.

21       MS. BUFFALANO:  The document speaks for itself.

22       JUDGE GREEN:  Okay.  I'll allow it.

23   Q    BY MS. COX:  And the category 2 violations are less

24   serious.  And it says that they're "considered serious and

25   generally result in corrective action," right?



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  So do you have -- do you have -- I can see

2    it.  I -- I've read it.  Can -- do you have some -- some

3    questions that you want to ask about this rather than just

4    going through what it says?

5    MS. COX:  No, Judge.  I just wanted Mr. Grabowski to

6    confirm to that this is -- this is exactly what the code of

7    conduct says.  It's --

8    JUDGE GREEN:  Okay.  Well, we -- all right.  We don't need

9    him to do that.

10   MS. COX:  Okay.

11   Q    BY MS. COX:  And now I'll show you page 25 of this

12   document.  This is the workplace harassment policy, right?

13   A    Yes.

14   Q    And it's on two separate pages, 25 and 26?  You see that,

15   right?

16   A    Yes.

17   Q    Okay.  And sexual harassment is defined separately from

18   workplace harassment, right?

19   A    Yes.

20   Q    Okay.  And sexual harassment is broken down into

21   subsections?

22   MS. BUFFALANO:  The document speaks for itself.

23   JUDGE GREEN:  Yeah.  So if you have some questions that

24   you want to ask based on -- on your drawing his attention

25   certain provisions, you can do that.  But we don't need to



Exhibit E, Motion to Try Petition on Hearing Record      493

1    confirm -- we don't need him just to confirm what's in the

2    document.

3        MS. COX:  Okay.  General Counsel moves for admission of

4    GC-8 at this time.

5        MS. BUFFALANO:  No objection.

6        JUDGE GREEN:  Any -- okay.  So GC-8 is admitted.

7    **(General Counsel Exhibit Number 8 Received into Evidence)**

8        MS. COX:  Okay.

9    Q    BY MS. COX:  So I want to turn your attention to the

10   suspension of Mr. Bryson.  You called Mr. Bryson on April 10th

11   to tell him he was suspended, right?

12   A    I called Mr. Bryson on the 10th and had a conversation

13   with him and part of that included the suspension, yes.

14   Q    Thank you.  Who told you to call him?

15   A    I don't remember specifically if someone told me to call

16   him or it was part of the investigation that I was conducting.

17   Q    Were you FaceTiming, able to see him or was it just a

18   regular phone call?

19   A    It was over the phone.

20   Q    You made the decision to suspend Mr. Bryson?

21   A    I don't remember who made the decision to spend --

22   suspend.  But it is something that, whenever there is excessive

23   or -- excessive behavior or potential risk to having someone

24   onsite based on allegations, the standard practice is to -- is

25   to suspend that employee pending investigation.  At which



1    point, they're fully paid for the time that is missed while the

2    investigation is being conducted.

3    Q    Did you have any conversations or communications with

4    anyone in preparation for this call?

5    A    Yes.

6    Q    Okay.  Who did you talk to, to prepare for the call with

7    Mr. Bryson?

8    A    I don't remember if I talked to anyone in person, but I

9    remember sending emails about the questions that I was going to

10   ask.

11   Q    Okay.  So you didn't make the decision to suspend him,

12   right?

13   A    Not that I remember.

14   Q    When was the decision to suspend Mr. Bryson made?

15   A    I don't remember a specific date.

16   Q    So -- so have you ever in your time as HR senior business

17   partner made decisions to suspend employees?

18   A    Typically the decision is made in partnership, depending

19   on what the situation specifically is?

20   Q    How about -- have you ever made the decision

21   independently?

22   A    I can't say there's a specific incident that I recall

23   doing that.

24   Q    Have you ever made a final decision to terminate someone?

25   A    Typically the decision is made in partnerships.  So if



Exhibit E, Motion to Try Petition on Hearing Record

1    there was an investigation that HR conducted, there'd be a

2    recommendation based on the findings of it, which would

3    typically then be presented to an operations team or an

4    operations partner as feedback is typically delivered by the

5    operational leaders.

6    Q    So who typically makes recommendations to terminate at

7    JFK8?

8    A    Depends on the situation.

9    Q    If it involves an argument between employees, who makes

10   the decision to -- the final decision to terminate?

11   A    The recommendation could come from either HR or loss

12   prevention, depending on the involvement in the investigation.

13   But then it would be in partnership and the operations team

14   would be looped in as well.

15   Q    And when you say HR, are you talking about the JFK's human

16   resources team?

17   A    I'm sorry.  Can you please repeat that?

18   Q    Yeah.  When you say HR, loss prevention, are you talking

19   about the HR team at JFK8?

20   A    For the decision making, yes, unless the situation has

21   been escalated.

22   Q    Have you ever been involved -- prior to the pandemic, have

23   you ever been involved with a situation that has been escalated

24   above JFK8?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

```
1    Q    Okay.  What do you recall in that regard?

2    A    Her name was Jennifer and she was an employee on our

3    dayshift and I was the dayshift HR business partner at the

4    time.  And I remember that there were -- there was, like,

5    consistent behavior of her, like, verbally questioning or,

6    like, making comments -- inappropriate comments allegedly to

7    her peers, allegations of her making inappropriate, like

8    comments or remarks and, like, kind of verbally attacking her

9    leadership team.  And that one, I know, had gone up the

10   escalation chain and involved people such as our site HR

11   manager.

12        Which I know earlier I had referenced that there were

13   investigations that -- or situations in which and HR manager

14   would have someone else, like an HR business partner

15   investigate.  This is one of the ones that kind of sticks out

16   to me just because of the employee and, like, the situation

17   itself was kind of all over the place.  She would just, like,

18   storm into the office at her will or she would say whatever she

19   wanted to the leadership team and it did -- I don't remember

20   the specifics because it was probably almost two years ago.  I

21   think it was like the fall of 2019.  But it did go outside of

22   the building in terms of who was involved or who was tracking

23   on the situation.

24   Q    Okay.  And who did it go to outside of the building?

25   A    I believe the regional HR manager and the regional
```



Exhibit E, Motion to Try Petition on Hearing Record

1    operations manager.

2    Q    And you made the decision to -- I'm sorry.   You

3    recommended that Jennifer be terminated?

4    A    I didn't make a recommendation in that.   It was being

5    discussed at a higher level than myself.

6    Q    Okay.   So in -- in Jennifer's situation, who made the

7    recommendation to terminate?   Do you recall?

8    A    I don't recall.   In that situation, I had been asked by my

9    HR manager at the time, Linda Prisciandaro, to speak with the

10   employee.   I remember gathering statements and I remember

11   passing them on to my HR manager at the time.

12   Q    And then your HR manager looped in regional HR and

13   regional loss prevention?

14   A    I don't -- I don't remember loss prevention being

15   involved.

16   Q    I thought you just testified that it went outside the

17   building to regional HR and regional loss prevention.

18   A    Regional -- I thought I said that it was regional HR and

19   regional and regional operations.

20   Q    Okay.   Thank you for clarifying.   So in that dis -- in

21   that -- in Jennifer's situation, who made the final decision to

22   terminate her?

23   A    I don't know.

24   Q    Okay.   You also called Mr. Bryson to tell him he was

25   terminated, right?



Exhibit E, Motion to Try Petition on Hearing Record

```
1   A    I called him, yes, with one of our senior operations

2   partners.

3   Q    What time did you call him?

4   A    I don't remember.

5   Q    And you made the decision to fire Mr. Bryson?

6   A    No.

7   Q    Who was involved in the deliberations to fire Mr. Bryson?

8   A    I don't know.

9   Q    Who made the final decision to fire Mr. Bryson?

10  A    I don't know.

11  Q    So who communicated to you that you should call Mr. Bryson

12  to fire him?

13  A    I don't remember.

14  Q    After you fired him, who did you report to?

15  A    I believe I sent something to Christin Hernandez and

16  potentially Bradley Campbell as well.  But I don't remember

17  specifics.

18  Q    And you took notes on the call when you terminated

19  Mr. Bryson, right?

20  A    I wrote a summary of the conversation afterwards.

21  Q    Correct.  And who did you give that summary to?

22  A    I don't remember.

23  Q    Okay.

24       MS. COX:  Can we go off the record for a moment, Judge?

25       JUDGE GREEN:  Off the record.
```



Exhibit E, Motion to Try Petition on Hearing Record

1   (Off the record at 2:20 p.m.)

2   Q    BY MS. COX:  (Audio begins mid-sentence) -- recall if

3   senior training manager at Amazon, Shannon Wilson, was involved

4   in the decision to terminate Mr. Bryson?

5   A    I don't know.

6   Q    Do you recall if Human Resources Director Allyson Hoffman

7   was involved in the decision to terminate Mr. Bryson?

8   A    I don't know.

9   Q    Do you recall if worldwide HR transformation leaders,

10  operations, and Customer Service Manager Rob Joseph was

11  involved in the decision to terminate Mr. Bryson?

12  A    I don't know.

13  Q    Do you recall If Employee Relations Manager Elliot Jones

14  was involved in the decision to terminate Mr. Bryson?

15  A    I don't know.

16  Q    Do you recall if regional director of operations at

17  Amazon, Ryan Smith, was involved in the decision to terminate

18  Mr. Bryson?

19  A    I don't know.

20  Q    Do you recall if director of northeast operations at

21  Amer -- at Amazon, Anand Mehta, was involved in the decision to

22  terminate Mr. Bryson?

23  A    I don't know.

24  Q    Do you recall if the director of worldwide corporate

25  international communication and executive, Kelly Chessman, was



Exhibit E, Motion to Try Petition on Hearing Record

1   involved in the decision to terminate Mr. Bryson?

2   A    I don't know.

3   Q    Do you recall if the vice president of -- of North America

4   customer fulfillment worldwide real estate, worldwide business

5   transformation manager, Maureen Midgley was involved in the

6   decision to terminate Mr. Bryson?

7   A    I don't know.

8   Q    Do you recall if --

9        JUDGE GREEN:  Mr. Grabowski, do you -- do you know who was

10  involved in the decision to terminate Mr. -- Mr. Bryson?

11       THE WITNESS:  No.

12       JUDGE GREEN:  Okay.  So let's not go through each and

13  every name.

14       MS. COX:  Judge Green, his -- his testimony was that he

15  couldn't recall.  And I'm looking to jog his recollection.

16       JUDGE GREEN:  Okay.

17       MS. COX:  I only have a few more.

18       JUDGE GREEN:  I think his testimony was he doesn't know.

19       Do -- is it -- is this something, Mr. Grabowski, that you

20  knew at some point?

21       THE WITNESS:  No.

22       JUDGE GREEN:  Okay.

23  Q    BY MS. COX:  Do you recall if Loss Prevention Manager

24  Brian Reichart was involved in the deliberations to terminate

25  Mr. Bryson?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I don't know.

2    Q    Do you recall if Employee Relations Manager Milly

3    Gutierrez was involved in the deliberations to terminate

4    Mr. Bryson?

5         JUDGE GREEN:  Okay.  So let's first -- let's first find

6    out whether Mr. Grabowski knows who was involved, ever knew who

7    was involved in the deliberations to terminate Mr. Bryson?

8         THE WITNESS:  I don't know.

9         JUDGE GREEN:  Okay.  do you think you ever knew, and this

10   is something that you forgot, or is this something that just --

11   you're confident you never knew?

12        THE WITNESS:  No, I'm confident that I didn't know.  I

13   collected the information in the investigation and -- and

14   passed it on.  I don't know who was in the decision making

15   process.

16        JUDGE GREEN:  Okay.  Thank you.

17   Q    BY MS. COX:  Okay.  So who asked you to collect

18   information regarding Mr. Bryson's -- in Mr. Bryson's

19   disciplinary action?

20   A    Initially, Christine Hernandez informed me that there was

21   an incident that had happened.  And she wanted me to follow up

22   with associate Dimitra Evans to see if she was okay.

23   Q    Okay.  So the answer is Christine Hernandez, right?

24   A    Can you please restate the question?

25   Q    So I'm asking if your answer is Christine Hernandez?



# Exhibit E, Motion to Try Petition on Hearing Record

```
1    A     The question before that.

2    Q     No, I -- I think I got the answer.  I just wanted to make

3    sure I heard it right.

4    A     Okay.

5    Q     All right.  So I'm going to show you another document.

6    This'll be General Counsel's Exhibit 9. It is Mr. Bryson's

7    feedback termination -- or termination feedback, I should say.

8          MS. COX:  Okay.  So it should be available on SharePoint

9    for everybody to see.

10         Ms. Jones, would you mind accessing GC-9?

11         THE COURT DEPUTY:  Sure.

12         MS. COX:  Thank you.

13         THE COURT DEPUTY:  Okay.  Here you go.

14         MS. COX:  Okay.

15   Q     BY MS. COX:  Mr. Grabowski, do you know who makes the

16   decision to terminate anyone at JFK8 for behavioral issues?

17   A     It's typically a -- a partnership, depending on who was in

18   the -- who was included in the investigation, or the findings.

19   Q     Okay.  So -- I'll just move on.  Okay.  I think you

20   testified earlier that the partnership would be with loss

21   prevention or -- loss prevention or another group, right,

22   safety?

23   A     If it was a safety incident, then yes, the safety team --

24   Q     Okay.

25   A     -- would typically be involved in the recommendation.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  Okay.  So I'm showing you this, it's a one-page

2    document.  It's Mr. Bryson's supportive feedback document,

3    behavioral determination.  Can you read it to yourself and let

4    me know when you're done?

5    A    Would it be possible to zoom in a little bit?

6         MS. COX:  Ms. Jones will do it for you.  Just this -- the

7    details of current incident specific concern section.

8         THE COURT DEPUTY:  Is that good enough?

9         THE WITNESS:  That's good.  Thank you.

10        THE COURT DEPUTY:  You're welcome.

11        THE WITNESS:  I've read it.

12   Q    BY MS. COX:  Okay.  So the first part of this section,

13             "The following feedback pertains to Amazon standards

14             of conduct, abusive, vulgar, harassing language to a

15             supervisor, fellow associate, vendor, is prohibited

16             and classified as category 2 violation of the

17             standards of conduct.  Harassment is unwanted conduct

18             that affects one's dignity at work, it is personally

19             offensive and creates an intimidating, hostile,

20             degrading, humiliating, or offensive work

21             environment."

22        That section I just read is boiler prate -- boilerplate

23   language, right?  All category 2 disciplines have this

24   boilerplate language in the feedback document?

25   A    Category 2 feedbacks would have, I guess the -- like the



Exhibit E, Motion to Try Petition on Hearing Record

1    specific part that it's referencing.  So each category in the

2    standards of conduct breaks it out into some of the examples

3    that fall under that.  And the feedback template would follow

4    which portion it's referencing specifically, or were

5    referencing with the violation.

6    Q    Correct.  And I'm -- I'm sorry, we didn't get to go

7    through the category 1 and 2.  But yes, you're right.  So

8    category 2 has a subsection.  And the subsection reads, "The

9    following feedback, abusive, a vulgar, harassing language to a

10   supervisor, fellow associate, or vendor, is prohibited and

11   classified as category 2."

12        That's -- that's one of the subsections, right?  And the

13   rest of it is boilerplate?

14        MS. BUFFALANO:  The rest of what?

15        MS. COX:  The rest of the paragraph.

16        MS. BUFFALANO:  In the feedback document?

17        MS. COX:  Yeah.  So I'll just highlight it.  Oh no, I

18   don't know if I can.

19        JUDGE GREEN:  It's -- I think, since Ms. Jones has shared

20   it --

21        MS. COX:  Okay.

22        JUDGE GREEN:   -- you can request control.

23        MS. COX:  Yeah.  I just did.

24        THE COURT DEPUTY:  Okay.  I just gave you control.

25        MS. COX:  Thank you.



Exhibit E, Motion to Try Petition on Hearing Record

1      THE COURT DEPUTY:  You're welcome.

2      MS. COX:  Now, if I can figure out how to use the

3  annotation.

4  Q    BY MS. COX:  Okay.  So what you're saying, Tyler, is that

5  this language here abu -- from the start of this, "abusive,

6  vulgar, harassing" to the -- to this period here, "language to

7  a supervisor, fellow associate, or vendors prohibited and

8  classified as a category 2."  That -- that's a subsection of

9  category 2, right?

10 A    Yes.

11 Q    Okay.  And the rest of this is --

12     MS. BUFFALANO:  It's not highlighting.  Yeah, just so you

13 know.

14     MS. COX:  It's all -- it's an arrow.  I don't have the

15 highlight option.  So it's --

16     MS. BUFFALANO:  Mine's not doing that.  I don't -- I don't

17 know if Tyler's is; mine isn't.

18     THE WITNESS:  Mine's not.

19     MS. COX:  You don't see an arrow?

20     THE WITNESS:  Yeah, I see an arrow, but it's just slow.

21     MS. BUFFALANO:  The arrow is not moving.

22     MS. COX:  Okay.

23     JUDGE GREEN:  You should be able to -- you know, shade it.

24 It's like a highlighted before --

25     MS. BUFFALANO:  Or you could just highlight sentences,



Exhibit E, Motion to Try Petition on Hearing Record

1   right, like, the first sentence, the second sentence, might

2   help -- might work?

3        MS. COX:  Okay.  Well, that's fine.

4        MS. BUFFALANO:  Because shading will be hard for the court

5   reporter.

6        MS. COX:  Okay.

7   Q    BY MS. COX:  Well, look, so the point is, I understand.

8   You're saying that all of this is boilerplate, except for this

9   last sentence here, right?  "On 4/6/2020, you were reported to

10  be in violation of this policy by making vulgar and derogatory

11  comments toward another employee."  Right?

12       MS. BUFFALANO:  I think that mischaracterizes the

13  testimony.

14       MS. COX:  Okay.  So --

15       JUDGE GREEN:  Well, it's just a question.  He can answer

16  the question.

17       THE WITNESS:  What is "boilerplate"?  I'm sorry, I'm not

18  familiar with that term.

19  Q    BY MS. COX:  Boilerplate language, that's either pulled

20  from, for example in this case, the owner's manual or some

21  other source.

22  A    Yes.

23  Q    When this form is created, how do you put the information

24  into this form?

25  A    In Adapt, when you go to log an incident, it gives you two



Exhibit E, Motion to Try Petition on Hearing Record

1    sections, one, that says "details," one that says "areas of

2    improvement."  And you type in, or copy and paste in, the

3    information that you would like.  And then once it's created,

4    it transposes it into this format.

5    Q    Okay.  Are there check boxes in Adapt that help you create

6    this form?

7    A    There's two boxes, one for "details" and one for "areas of

8    improvement" that are text boxes.

9    Q    Okay.  Thank you.  So with respect to Mr. Bryson's

10   conduct, the only thing this document says is, "On 4/6/2020,

11   you were reported to be in violation of this policy by making

12   vulgar and derogatory comments toward another employee."

13   Right?

14   A    Yes.

15   Q    Okay.  It doesn't specify what exactly Bry -- Bryson said

16   that was vulgar, does it?

17   A    No.

18   Q    It doesn't specify what exactly Bryson said -- Bryson said

19   that was harassing, does it?

20   A    No.  All of that information would be in the investigative

21   file.

22   Q    Okay.  So are you saying, for all disciplines, the reasons

23   are only contained in investigative files?

24   A    Typically, we look to outline a high level, and then, have

25   the specifics outlined in witness statements in the



Exhibit E, Motion to Try Petition on Hearing Record

1    investigative file.

2    Q    Okay.  So the kind of harassment referred to here is not

3    sexual harassment, right?

4    A    No.

5    Q    Right.  You would agree that there's no mention of sexual

6    harassment?

7    A    No.

8    Q    So you wouldn't agree that there's no mention of sexual

9    harassment?

10   MS. BUFFALANO:  The document speaks for itself.

11   MS. COX:  Okay.

12   JUDGE GREEN:  Sustained.

13   Q    BY MS. COX:  So you agree that threats are not mentioned

14   in this document, right?

15   A    Yes.

16   Q    Okay.  So you also agree that there's no reference to

17   discrimination in this document, right?

18   MS. BUFFALANO:  The document speaks for itself.

19   JUDGE GREEN:  Sustained.  We sustained.  We really -- we

20   don't need this.

21   MS. COX:  Okay.  All right.  So at this time, Your Honor,

22   General Counsel moves for admission of GC-8 (sic).

23   MS. BUFFALANO:  We're -- I think we're on 9.

24   JUDGE GREEN:  Yeah, that's 9.

25   MS. COX:  I'm sorry, I label -- I mislabeled it.



# Exhibit E, Motion to Try Petition on Hearing Record

1       MS. BUFFALANO:  And no objection.

2       JUDGE GREEN:  Okay.  So GC-9 is admitted.

3    **(General Counsel Exhibit Number 9 Received into Evidence)**

4    Q    BY MS. COX:  Mr. Grabowski, do you know of the existence

5    of a executive summary in Mr. Bryson's case?

6    A    Now, I do.

7    Q    What do you mean by that?

8    A    I don't recall it specifically from the time of the

9    incident.  But I did see it while preparing for this.

10   Q    Okay.  What is an executive summary?

11   A    It's typically a summary that provides an overview of an

12   incident, or a summary of findings.

13   Q    Okay.  What does "executive" mean?

14   A    I don't know the specific meaning in this, in the

15   executive summary term, like, what it's before there.

16   Q    Have you heard of executive summaries in other disciplines

17   that you've been involved in?

18   A    Yes.

19   Q    Okay.  So in those cases, what did you understand

20   "executive" to refer to?

21       MS. BUFFALANO:  Asked and answered.  He doesn't know what

22   executive means in this context, he said.

23       JUDGE GREEN:  Okay.  Still as I -- well, I'll -- I'll

24   overrule it.

25       Do -- do you know what "executive" meant?



Exhibit E, Motion to Try Petition on Hearing Record

1    THE WITNESS:  I don't know what it's referring to in -- in

2    like the executive summary.  I know that we were putting

3    together summaries, typically to put, like, high-level overview

4    of what happened or facts and findings of a case.  I don't know

5    if the executive portion of it had a specific meaning or.

6    MS. COX:  Okay.

7    JUDGE GREEN:  Okay.

8  Q    BY MS. COX:  Do you know who executive refers to?

9    MS. BUFFALANO:  Assumes facts not in evidence.

10    JUDGE GREEN:  I don't want to -- okay, I also think that

11    this was just answered.

12    MS. COX:  No, Judge.  I asked him what "executive" refers

13    to.  And then I'm asking him now, "who," if it refers to

14    anyone?  A specific group of people, or a person?

15    JUDGE GREEN:  Okay.  You can answer.

16    THE WITNESS:  I don't know that it refers to a specific

17    group of people.  In executive summaries that have been

18    prepared in the past, or that I've worked on, I can't say that

19    they're all designated for the same person or same group of

20    people or same level.  So I don't -- I don't know that it's

21    specific -- specifically pertains to a specific group that will

22    be receiving the summary.

23  Q    BY MS. COX:  What do you know about executive summaries?

24    MS. BUFFALANO:  Vague.  What are -- what is --

25    JUDGE GREEN:  Sustained.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MS. COX:  I mean, Judge, it's -- okay.

 2        JUDGE GREEN:  What?

 3        MS. COX:  Okay.

 4   Q    BY MS. COX:  Have you ever created an executive summary

 5   for other cases?

 6   A    Yes.

 7   Q    Okay.  And did anyone participate with you in creating

 8   that document?

 9   A    There's been various situations in which I've worked on

10   executive summaries.  I don't remember the specific, but -- any

11   of them.

12   Q    Okay.  So I also want to show you what's been pre-marked

13   for identification.  I guess, this is now GC-10.  All right.

14   So it should be now -- it's Ms. Evans' feedback termin --

15   her -- her write-up.

16        MS. COX:  Okay.  Ms. Jones, can you show the wit -- the

17   witness GC-10?

18        THE COURT DEPUTY:  Sure.

19   Q    BY MS. COX:  Actually, Mr. Grabowski, before I ask you

20   about this document, I wanted to take a step back.  Who created

21   the termination feedback document in Mr. Bryson's case?

22   A    I create -- sorry.  I created it in Adapt.

23   Q    Okay.  And --

24        THE COURT DEPUTY:  Okay, there's GC-10.

25        MS. COX:  I'm sorry, I didn't hear you, Ms. Jones.
```



Exhibit E, Motion to Try Petition on Hearing Record

1      THE COURT DEPUTY:  This is GC-10.

2      MS. COX:  Okay.

3   Q    BY MS. COX:  And also for Mr. Bryson's termination

4   feedback document, who told you to do that?

5   A    I don't remember.

6   Q    Okay.  Did you -- did anybody review the termination

7   feedback, Gerald Bryson's termination feedback document, before

8   you delivered it?

9   A    Yes.

10  Q    Who reviewed it?

11  A    I believe I generated it -- or like, typed up the details

12  of it and emailed it to Bradley and Christine.

13  Q    Okay.  And Bradley is the regional HR manager in April and

14  March of 2020?

15  A    Yes.

16  Q    And Christine is the JFK8 HR manager, right?  That you --

17  yeah.

18  A    During April and March of 2020, yes.

19  Q    Okay.  Now, this is Ms. Evans' feedback document.  And

20  this document says that -- that,

21          "These behaviors are violation of Amazon standards of

22          conduct, inappropriate language or behavior, and is

23          considered a category 2 violation.  It is found that

24          you used inappropriate language while engaging

25          another employee in the parking lot on 4/6/20."



# Exhibit E, Motion to Try Petition on Hearing Record

1      Right?

2    A    Yes.

3    Q    Okay.  And did you create this document?

4    A    Yes.

5    Q    Okay.  Who told you to create this document?

6    A    I don't remember.

7    Q    Did anybody review it before it was delivered to

8    Ms. Evans?

9    A    I don't remember.

10   Q    I guess I should ask you, did you deliver this document to

11   Ms. Evans?

12   A    I was present in the room while the supervisor delivered

13   it.

14   Q    And that would be the person listed up here, Calvin Chen?

15   A    No.

16   Q    Okay.  Who was the supervisor that delivered this feedback

17   document with you?

18   A    At the bottom of the page, Sherman Lyerly (phonetic).

19   Q    Okay.

20        MS. COX:  All right.  I'm going to move for admission of

21   GC-10.

22        MS. BUFFALANO:  No objection.

23        JUDGE GREEN:  Okay.  So GC-10 is admitted.

24   **(General Counsel Exhibit Number 10 Received into Evidence)**

25        MS. COX:  Okay.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MS. COX:  So I want to show you another document.  Hang

2    on one sec.

3         JUDGE GREEN:  You know what?  Let's just go -- I need to

4    go off the record for five minutes, okay?

5         MS. COX:  Okay.

6         JUDGE GREEN:  All right.  Off the record.

7    (Off the record at 2:52 p.m.)

8         JUDGE GREEN:  Okay.  So back on the record.

9         THE COURT REPORTER:  We are.

10   Q    BY MS. COX:  So Mr. Grabowski, I showed you before

11   Ms. Evans' first written warning, right?

12   A    Yes.

13   Q    Okay.  And you testified that in preparation for this

14   case, you reviewed the executive summary for -- for

15   Mr. Bryson's termination, right?

16   A    I was shown it, yes.

17   Q    Okay.  And -- and you know that Ms. Evans was recommended

18   to receive a final warning, right?

19   A    In the executive summary, yes.

20   Q    Okay.  And you know that the executive summary also

21   compared 26 cases to Mr. Bryson's misconduct, right?

22   A    Yes.

23   Q    Okay.  So I'm going to show you some documents that Amazon

24   relied on in making its decision to terminate Mr. Bryson for

25   his April 6th conduct.  So give me one second.  I'm going to --



1     okay.  I'm going to show you what I'm marking as GC-10.

2          MS. BUFFALANO:  11.

3          MS. COX:  11, I'm sorry.  Okay.  I'm actually just going

4     to share my screen.  And I will upload it.

5     Q    BY MS. COX:  Let me -- so it's now in next run -- and I'm

6     sharing my screen.  Okay.  Do you see the document?

7     A    Yes.

8     Q    Okay.  So I'm going to go to page 2 of 14.  I'm sorry,

9     it's actually this page here.  So this employee was issued a

10    final written, you see that, right?  And it's -- it says that

11    on 2/15/2018, he brought a weapon on premises.  And that Amazon

12    specifically prohibits use or possession of a weapon, right?

13         JUDGE GREEN:  Would we be able to --

14         MS. BUFFALANO:  (Simultaneous speaking) --

15         MS. COX:  I'm sorry?

16         MS. BUFFALANO:  The document speaks for itself.  It says

17    what it says.

18         JUDGE GREEN:  Okay.  I -- overruled.

19    Q    BY MS. COX:  Okay, so I want to turn your attention to

20    page 2 of this document.  And this is a termination, right?

21    A    Would we be able to zoom in?  I can't read it.

22    Q    I'm sorry.

23    A    Or maybe hide the sidebar.

24    Q    Here we go.  So it says that this person -- well,

25    initially this person got a first written, a final warning for



Exhibit E, Motion to Try Petition on Hearing Record

1    bringing a weapon on the premises, right?

2         MS. BUFFALANO:  Do you want to use a Bates number or

3    something, because it's very, very unclear in the record.

4         MS. COX:  It's GC-11, Bates number 783 to 796, and this

5    individual also got a termination for sexual jokes or sexually

6    explicit language, right?

7         MS. BUFFALANO:  Judge, I -- I don't know how he's supposed

8    to understand what he's looking at, so we're saying this is a

9    termination, right?  And there's just a bunch of scrolling.  So

10   I don't know how he's supposed to identify what is -- what is a

11   termination?

12        JUDGE GREEN:  All right.  So listen.  There's really no

13   need to have him con -- have the witness confirm what's in the

14   document.  If -- if you feel the need for me to know something

15   about the document, you can say this is represented on the

16   record.  And it'll either be, you know, if -- if you think it's

17   something I need to know going forward for purposes of

18   additional taking of testimony.

19        MS. COX:  Okay, Judge.  Well, I was going to show him --

20        JUDGE GREEN:   And then it -- what's your plan here?  I --

21   I -- I assume you're just doing this for my benefit, right?

22   You're not -- you don't need him -- you don't need him to tell

23   you what's in the document?  But presumably you want somebody

24   to know something about this document at this time?

25        MS. COX:  Yes, Judge.  These are the comparators that



1    Amazon used in determining to discipline Mr. Bryson.

2        JUDGE GREEN:  Okay, that's fine, but that's -- so that's

3    fine.  So that's fine if there's something you -- you feel that

4    you need to represent regarding the document just -- just say

5    it.

6        MS. COX:  Okay.

7    Q    BY MS. COX:  So this termination is for sexual harassment,

8    right?  And there's no allegation that Bryson engaged in sexual

9    harassment?

10   A    That's correct.

11       MS. COX:  Okay, I'll move for admission of GC-11.

12       MS. BUFFALANO:  And this is not what you're representing.

13   783 to 796 on my log is someone's personnel file.

14       MS. COX:  And this -- this is the entire employee's

15   personnel file.  If you want me to go through the quality

16   review.  Mr. -- Mr. Grabowski testified that these productivity

17   issues have nothing to do with behavior earlier today.  So I

18   mean, we could go through it because people -- this -- this

19   person got a lot of different discipline.

20       MS. BUFFALANO:  Okay, you -- you said this is one of --

21   this is the 26 disciplines that we relied on.  So that's what I

22   understood this document to be.  But it's -- that's not what

23   this document is.

24       MS. COX:  This is one of the 26 comparators that Amazon --

25   that I will submit the charge that Amazon relied upon when



1    making their decision to terminate Mr. Bryson.  And this

2    employee had a prior -- brought a -- a knife or a makeshift

3    weapon to work and got a final warning or fired.

4        JUDGE GREEN:  So.  Right.  So, okay --

5        MS. BUFFALANO:  Okay, but you don't know what the weapon

6    was, so that's fine.

7        JUDGE GREEN:  Okay, so, no we don't want you to argue.

8    I'm sorry.  We don't need to argue the case here.  We're just

9    dealing with the admissibility of this document, right? So --

10       MS. BUFFALANO:  So I just want to know what it is.

11       JUDGE GREEN:  Right.  So I guess what there's some

12   confusion about is whether it was used by Amazon as a

13   comparator, but that's not really what we need for purposes of

14   determining its relevance for purposes.  It's -- it is a

15   comparator.  It is if it's going to be used by the GC as a

16   comparator whether it was used by -- by Respondent.  And so --

17   right.

18       MS. COX:  Judge Green, I'm going to introduce the charge

19   that Respondent created and laid out 26 disciplines, saying

20   that these are comparators to Mr. Bryson's misconduct.

21       MS. BUFFALANO:  No, I understand.  You're going to --

22   that -- that's fine, you can establish that.  So is there any

23   objection to GC-11?

24       MS. BUFFALANO:  No, I just wanted to know what it was.

25       JUDGE GREEN:  Okay, GC-11 is admitted.



Exhibit E, Motion to Try Petition on Hearing Record

1    **(General Counsel Exhibit Number 11 Received into Evidence)**

2        MS. COX:  I'm going to enter GC-12.  This is the chart

3    that Amazon produced, and it relied upon in making its decision

4    to terminate My. Bryson.

5        MS. BUFFALANO:  But I think we -- you know, Your Honor, we

6    can also stipulate to some of the stuff, I mean, if it's

7    documents we produced and I don't know, obviously documents

8    that Mr. Grabowski doesn't know anything about.  Why don't we

9    just have a conversation about what we can -- just to get --

10       JUDGE GREEN:  Yes, absolutely.  Absolutely so -- although,

11   you know, if -- if the General Counsel has them here.  Is that

12   what we're doing now?  Is -- is the General Counsel putting in

13   documents for purposes of disparate treatment?

14       MS. COX:  Yes, Judge.

15       JUDGE GREEN:  Okay, so.

16       MS. COX:  Okay, well, I'm offering GC-12.  I'm not -- the

17   witness doesn't know about this document, so I won't ask him.

18       JUDGE GREEN:  Do you want to do this?  Do you have do you

19   have multiple exhibits along these lines?

20       MS. COX:  Yes, Judge.

21       JUDGE GREEN:  Okay, so why don't you put them all into

22   the -- we'll go off the record.  Put them all into SharePoint.

23   The Respondent can look at them.  It sounds like they're not

24   going to -- they're not going to object at least to

25   authenticity.  And we could just put this all in at one time.



# Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  Okay.

2      JUDGE GREEN:  All right, so off the record.

3   (Off the record at 3:09 p.m.)

4   Q    BY MS. COX:  Mr. Grabowski, the feedback document I showed

5   you earlier, or one of them that I showed you earlier was for

6   bringing a weapon to work.  Do you remember that?

7   A    I remember you showing me.

8   Q    Okay.  And you would agree that bringing a weapon to work

9   is worse than calling somebody a bitch?

10      MS. BUFFALANO:  Objection.  There's no foundation here.

11   What is a weapon?  Like, we're talking about terms that no one

12   knows what the terms mean.

13      JUDGE GREEN:  Yeah, I -- I well, so, I -- I guess, you

14   know, I -- I to the extent that -- that Mr. Grabowski has some

15   experience with these things, I suppose you can -- you can try

16   to answer.  If you don't know, you don't know, so.

17      THE WITNESS:  That --

18      MS. COX:  I'm sorry.

19      THE WITNESS:  I was -- I was just going to say it would

20   be -- it would be difficult to, like compare anything without

21   knowing the specifics because kind of like what you mentioned

22   earlier, some of the feedbacks are broad, and without seeing

23   the investigative file or having conducted the investigation

24   myself and knowing the specific details, it'd be hard to

25   compare.



1    Q    BY MS. COX:  But the document I just showed you showed

2    that it was a violation of category 1, right?

3         MS. BUFFALANO:  You want to show him the document?  Do you

4    think -- I mean, I don't imagine you have a photographic

5    memory, but I would show him the document, please.

6         JUDGE GREEN:  What -- this is 12?

7         THE COURT REPORTER:  No, this is 11.

8         MS. COX:  Yes, it's 11.

9         JUDGE GREEN:  Okay.

10   Q    BY MS. COX:  Okay, so I'm showing you the document, can

11   you all see my screen now?

12        MS. COX:  Ms. Jones, can you show GC-11?

13        THE COURT DEPUTY:  Sure

14        MS. COX:  Thank you.

15        THE COURT DEPUTY:  Uh-huh.  Okay, so you have multiple

16   11 -- you have two 11s, so do you want GC-11 that has sexual

17   jokes and weapons or just --

18        MS. COX:  Yes.

19        THE COURT DEPUTY:  Okay.  Okay.

20   Q    BY MS. COX:  Okay, so Mr. Grabowski, can you see the

21   document?

22   A    Yes.

23   Q    And you see that it says it's a violation of category

24   1security infraction?

25   A    Which part of it again?



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    The details of current incident and specific concerns,

2   texting.

3   A    Yes.

4   Q    And category 1 violations are worse than category 2,

5   right?

6   A    They can be.

7   Q    So -- I mean, the owner's manual says that category 2 --

8   category 1 violations are extremely serious and termination may

9   result, right?

10  A    Yes.

11  Q    Okay.  You would agree that category 1 that's extremely

12  worse -- extremely serious is worse than a category 2

13  violation.  That says serious and generally result in

14  corrective action, right?

15  A    Looking at it as more like a base, then, yes.  But I think

16  each type of situation can be of either level category and then

17  have different levels of severity based on what it is.

18  Q    Okay.  And do you know what a weapon is?

19  A    Yes.

20  Q    What do you know a weapon to be?

21       MS. BUFFALANO:  Objection, relevance.

22       JUDGE GREEN:  Sustained.  So -- so I guess the question

23  is, as it's used in this document, General Counsel's 11, do --

24  do you know what it -- or specifically what a weapon would

25  refer to from the description here, or do you not?



# Exhibit E, Motion to Try Petition on Hearing Record

1       THE WITNESS:  No.

2    Q    BY MS. COX:  Okay, but you understand that a weapon is

3    something that can be used to harm another person, right,

4    physically?

5       MS. BUFFALANO:  Objection.  It's vague.  Relevance.  It's

6    not tied to anything.  Are you talking about this specifically?

7       MS. COX:  I'm talking generally of his knowledge of

8    weapons.

9       JUDGE GREEN:  Yeah, no, I really don't think we need this.

10      MS. COX:  Okay.

11      JUDGE GREEN:  If -- if you want to ask him questions about

12   this particular discipline and what it means, go -- go ahead.

13   I mean, I -- I think we all have a sense of what the word

14   weapon means.

15      MS. COX:  Okay.  All right, so I'm going to show you GC-12

16   now.  Ms. Jones, can you please pull that up?  I'm sorry, 12 is

17   the comparator charge.  So I move for admission of GC-12.

18      JUDGE GREEN:  Any objection?

19      MS. BUFFALANO:  To GC-12?

20      JUDGE GREEN:  Yes.

21      MS. COX:  Yeah.

22      MS. BUFFALANO:  Which is the -- the chart?

23      MS. COX:  Yes.

24      MS. BUFFALANO:  That's fine.  Do you want to use the Excel

25   though, so we can talk about it by row?



Exhibit E, Motion to Try Petition on Hearing Record

1        MS. COX:  No, because the -- the Excel doesn't show what

2   the final decision was.

3        MS. BUFFALANO:  Okay.  Let me -- all right.

4        THE COURT DEPUTY:  I have to make it bigger, you should

5   have the intention to read it.

6        MS. COX:  Well, we're not going to be using this document,

7   Ms. Jones, I'm sorry.  I -- I should have asked you to put up

8   GC-13.

9        JUDGE GREEN:  So okay, so -- you're saying that the --

10   that the PDF version that's in this GC-12, which was a PDF of

11   the Excel spreadsheet includes information that's not in the

12   Excel spreadsheet?

13        MS. COX:  Yes.

14        JUDGE GREEN:  Okay.  All right.  So for now, I'll admit

15   General Counsel's 12.

16   **(General Counsel Exhibit Number 12 Received into Evidence)**

17        JUDGE GREEN:  You know, we can decide later, I suppose,

18   whether we want to swap it out for the Excel spreadsheet.

19        MS. COX:  Okay.

20        THE COURT DEPUTY:  This is 13.

21        MS. BUFFALANO:  Okay, can you scroll down, Ms. Jones so I

22   could see the Bates stamp number on the right?  On the -- okay,

23   thank you.

24        MS. COX:  Okay, so this is another one of the comparators

25   that -- that -- Ms. Jones, can you type in the two of four



Exhibit E, Motion to Try Petition on Hearing Record

1    section, page 4 -- or go down to page 4 either way?

2    Q    BY MS. COX:  Okay, so this is a termination document,

3    right?  And you scroll down a little further.  And this is --

4    it's specific to -- it says the individual was harassing

5    another associate by telling him to suck his D-I-C-K, right?

6    Would you agree that -- and you -- would you agree that this

7    document is -- talks about sexual harassment and not any other

8    form of harassment?

9        MS. BUFFALANO:  The document speaks for itself.

10       JUDGE GREEN:  Overruled.

11   Q    BY MS. COX:  Okay, so Mr. Grabowski, would you agree that

12   this document mentioned sexual harassment and no other form of

13   harassment?

14   A    Yes.

15       MS. COX:  Okay, I'm going to move for admission of GC-13.

16       JUDGE GREEN:  Any objections?

17       MS. BUFFALANO:  No objection to the authentication or the

18   authenticity of the document.  We would object to the relevance

19   of any of this at this point.

20       JUDGE GREEN:  Okay, so I'm going to overrule the objection

21   and admit GC-13.

22   **(General Counsel Exhibit Number 13 Received into Evidence)**

23       MS. COX:  Okay, Ms. Jones, can you pull up GC-14 for me,

24   please?

25       MS. BUFFALANO:  Can you show me the Bates stamp number



Exhibit E, Motion to Try Petition on Hearing Record

1   just scroll down to the bottom right when you -- when you have

2   it up?  Okay.

3        MS. COX:  Okay, so this is GC-14, it's 1396 -- I'm sorry,

4   I didn't realize you were there.  Can scroll down to page 2?

5   Q    BY MS. COX:  And this is a termination, right?  You see

6   that at the top?  And this is a termination for placing a

7   heavy-duty sticker on another female's right thigh, right?

8   A    Yes.

9   Q    And this refers to sexual harassment, right?

10  A    Yes.

11  Q    And if you look at the areas of improvement, it's

12  considered a category 1 violation?

13       JUDGE GREEN:  So -- so I'm going to allow some questioning

14  about these documents to the extent that Mr. Grabowski is in HR

15  and he has some familiarity with -- with disciplines.  And, you

16  know, I'll allow some questioning regarding what he thinks

17  about these disciplines in comparison to -- to his experience

18  with them.  But we don't need we don't need confirmation from

19  him of what's in the documents.  If you want to -- if you want

20  to reference the document for purposes of asking him a

21  question, that's fine.  But whether it says category 1 or it

22  says category 2, we're going to be able to read that for

23  ourselves.

24  Q    BY MS. COX:  Okay, so Mr. Grabowski, would you agree that

25  touching another female's body is worse than calling somebody a



# Exhibit E, Motion to Try Petition on Hearing Record

1    drug addict?

2    A    I would say that they're both pretty severe, but yes.

3    Q    Okay.  Do you think touching another person's body is --

4    is worse than calling someone a bitch?

5    A    Yes.

6        MS. COX:  Okay, I'm going to move for admission of GC-14.

7        JUDGE GREEN:  Any objection?

8        MS. BUFFALANO:  Same as the last one.

9        JUDGE GREEN:  Okay.  So I'm going to overrule that

10   objection and admit GC-14.

11   **(General Counsel Exhibit Number 14 Received into Evidence)**

12       MS. COX:  Well, Ms. Jones, can you bring upGC-15 for me

13   please?  Okay, can you show me the Bates stamp number on the

14   bottom right-hand corner of the page?  Okay, thank you.  Okay.

15   Can you go back up to page 1?  Yeah.  All right, so.  A little

16   bit more to the top, Ms. Jones.

17   Q    BY MS. COX:  So this is a -- a termination for --

18       MS. COX:  Scroll down a little bit, Ms. Jones.

19   Q    BY MS. COX:  -- for approaching two associates.  And

20   making inappropriate remarks about items being capped; do you

21   see that?

22   A    It's a little hard to see with the sidebar covering it.

23   Would we be able to hide that?

24       THE COURT DEPUTY:  Is that -- can you see the whole thing?

25   Can you see it now?



Exhibit E, Motion to Try Petition on Hearing Record

1     THE WITNESS:  Yeah, it's a little small, but I can read

2     it.

3     Q    BY MS. COX:  Okay.  So this person was terminated for

4     making inappropriate remarks, sexual remarks on making welcome

5     suggestions regarding a product, right?  Would you agree that

6     making sexual comments toward associates is worse than telling

7     someone they look like they're on drugs?

8     MS. BUFFALANO:  I object to these kinds of questions.

9     What happened with Mr. Bryson wasn't that -- that there was one

10    statement.  So when Mr. Cox says, oh, we're comparing this

11    touching someone's body to calling someone a B, the incident

12    we're talking about is much bigger than that.  So it's not even

13    relevant to this issue about whether or not Mr. Bryson, you

14    know, more severe or less severe than the discipline that we're

15    looking at.  She's just asking if, like using one particular

16    word with -- you know, in spades is better or worse.  I just

17    don't see where that gets us.

18    JUDGE GREEN:  I -- I agree that it's certainly not

19    conclusive as a determination that the treatment of Mr. Bryson

20    was disparate, meaning it's not -- it's not at all clear from

21    the questions being asked that the conduct of these individuals

22    was worse than the conduct of Mr. -- Mr. Bryson.  But it's a

23    little piece of the puzzle.  I also don't know that

24    Mr. Grabowski was the decision maker regarding any of these,

25    including Mr. Bryson.  But he's in HR.  He deals with



# Exhibit E, Motion to Try Petition on Hearing Record

1      discipline.  We've got him here.  I'll -- I'll allow some of

2      this for what it's worth.

3      Q    BY MS. COX:  Okay, so is calling someone -- saying

4      somebody looks like they're on drugs the same as suggests --

5      making unwelcome suggestions regarding a product?

6      A    No, but that doesn't mean that either of them are

7      acceptable in the workplace.

8      Q    Okay.

9           MS. COX:  I'm going to move for admission of GC-15.

10          JUDGE GREEN:  Any objection?

11          MS. BUFFALANO:  Same as the last two.

12          JUDGE GREEN:  Okay, so I'm going to overrule the objection

13     and admit GC-15.

14     **(General Counsel Exhibit Number 15 Received into Evidence)**

15          MS. COX:  Ms. Jones, can you pull up to GC-16?  Okay, can

16     you scroll down to the Bates stamp number on the bottom right?

17     Okay, thank you.  So can you scroll back up to page 1?

18     Q    BY MS. COX:  Okay.  So Mr. Grabowski, this is a final

19     written warning.  And do you see in the incident, specific

20     concerns box that is for inappropriate comments on July 30th,

21     and it mentioned sexual harassment?

22     A    Yes.

23     Q    Okay, and that's a final written, right?

24     A    Yes.

25          MS. COX:  Ms. Jones, can you scroll down to page 2?



1    Q    BY MS. COX:  Okay.  And that same employee received a

2    termination, right?

3    A    Yes.

4    Q    Okay.  And determination was for, as you see in the

5    incident, specific concern, violation of unwelcome requests of

6    inappropriate content from another associate, right?

7    A    Yes

8    Q    And this is also a termination for sexual harassment?

9    A    Yes.

10   Q    Okay, so -- so in this case, there were two incidents of

11   sexual harassment before the one -- one prior incident of

12   sexual harassment before the employee was terminated, right?

13   A    Yes.

14        MS. BUFFALANO:  The documents speak for themselves.

15        JUDGE GREEN:  Okay.

16        MS. COX:  Okay, I'll move for admission of GC-16.

17        JUDGE GREEN:  Any objection?

18        MS. BUFFALANO:  Same as well, yes.

19        JUDGE GREEN:  All right, so I'm admitting GC Exhibit 16.

20   **(General Counsel Exhibit Number 16 Received into Evidence)**

21        MS. COX: Ms. Jones, can you pull up GC-17?

22        JUDGE GREEN:  And for purposes of going forward, I'm just

23   going to assume that the General Counsel -- that the Respondent

24   has the same relevance objections to all of these documents

25   which the General Counsel is putting in for comparative



Exhibit E, Motion to Try Petition on Hearing Record

1    purposes -- comparative purposes?

2         MS. COX:  Okay, Ms. Jones, can you scroll back up to page

3    1?

4    Q    BY MS. COX:  So this employee was terminated.  You see

5    that, right?

6    A    Yes,

7    Q    And the terminate -- prior to the termination, there was a

8    verbal coaching, right?

9    A    Yes.

10   Q    And there's also a documented coaching?

11   A    Yes.

12   Q    Okay.  And you see in the incident specific concerns

13   section that this employee was terminated for -- for multiple

14   things, including saying suck my D-I-C-K, blowing kisses at

15   peers, telling them that they love them, right?

16        MS. BUFFALANO:  Document speaks for itself.

17        MS. COX:  Okay.

18        JUDGE GREEN:  Do you have any questions about?

19        MS. COX:  Yes, Judge, whether --

20   Q    BY MS. COX:  Do you think telling an employee to --

21   blowing kisses at an employee and telling them to suck a D is

22   worse than calling someone a bitch?

23        MS. BUFFALANO:  Same objection.

24        JUDGE GREEN:  Okay.  Overruled.

25   Q    BY MS. COX:  Mr. Grabowski?  I didn't hear you.



1    A     No, I didn't answer.  I'm sorry.  Yes, I -- wait, can you

2    please repeat it?  You said is which one worse?

3    Q     Blowing kisses, telling someone to suck a D, is that worse

4    than calling someone a bitch?

5    A     Yes, but neither are acceptable.

6    Q     Okay.

7          MS. COX:  I'm going to move for admission of GC-17.

8          JUDGE GREEN:  Okay.  Assuming the same objection, I'm

9    going to admit General Counsel's Exhibit 17.

10   **(General Counsel Exhibit Number 17 Received into Evidence)**

11         MS. COX:  Okay.  Ms. Jones, can you pull up GC-18?  And

12   can you scroll down to the bottom right?  Okay.  Can you go to

13   page 3 of 15?

14   Q     BY MS. COX:  Okay.  This is also a termination for sexual

15   harassment, right?

16   A     Yes.

17   Q     A violation?

18   A     Can you please repeat that?  It cut out.

19   Q     And that's a category 1 violation?

20   A     Yes.

21   Q     Granted improvement required by associate?  Okay.  And

22   this is for grinding, one person touching another person's

23   body, right?

24   A     Yes.

25   Q     Okay.  Would you say touching another person's body is



# Exhibit E, Motion to Try Petition on Hearing Record

1  worse than telling them they look like drugs?  Telling them

2  that they look like they're on drugs?

3  A    Yes, but neither are acceptable.

4  Q    Okay.

5      MS. COX:  I'm going to move for admission of GC-18.

6      JUDGE GREEN:  Okay.  Assuming the same objection, General

7  Counsel's 18 is admitted.

8  **(General Counsel Exhibit Number 18 Received into Evidence)**

9      MS. BUFFALANO:  I'd also, Your Honor, just like to make

10  sure it's in the record that we don't agree that any of this

11  was relied on in terminating Mr. Bryson.  So when Ms. Cox makes

12  those representations, that's not --

13      JUDGE GREEN:  Okay.

14      MS. COX:  Judge, if I may, Respondent provided the

15  comparative chart that's GC-12, and they represented to us

16  specifically that these are the terminations among the 26

17  comparators.

18      JUDGE GREEN:  Right.  But you're going to put that in

19  evidence, right?  I'll be able to determine what was used by

20  the -- by the Respondent from the documents?

21      MS. COX:  Well, these are the documents underlying that

22  chart.

23      JUDGE GREEN:  Okay.  But I --

24      MS. COX:  Some of them, right?  And if you read the

25  executive summary, there were six that he actually looked at.



Exhibit E, Motion to Try Petition on Hearing Record

1    So it -- a chart of 26 --

2         JUDGE GREEN:  Okay.  But --

3         MS. COX:  -- was whittled down to six, so we're looking at

4    all the others that he didn't look at.

5         JUDGE GREEN:  The doc -- yeah.  The documents would be

6    relevant any way that would be relevant to, you know, a showing

7    of the comparator, you know, whether the -- whether the

8    Respondent relied on it or not, it would be arguably relevant

9    to the issue of depurative treatment.  And whether they did

10   rely on it or not, I -- I assume I'm going to have a document,

11   which tells me what they -- what the Respondent relied on.  I

12   believe that's -- that's in an -- some sort of email or

13   something, or it's in -- it's in -- it's a document that will

14   be in evidence.

15        MS. COX:  I hear you, I just wanted to make sure that that

16   representation is not, you know, part of the testimony.

17        MS. BUFFALANO:  It's GC-12, Judge.

18        JUDGE GREEN:  Okay.

19        MS. BUFFALANO:  And it says 26 that were relied on, not

20   six.

21        MS. COX:  Okay.  Ms. Jones, can you open up GC-20?

22        JUDGE GREEN:  Did we just skip over 19?

23        MS. COX:  Did we?

24        THE COURT DEPUTY:  I only see up to 19.  I don't see 20.

25   It's only 19.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
1        JUDGE GREEN:  That's correct.

2        MS. COX:  Okay.  20 to 24 are in an email.

3        UNIDENTIFIED SPEAKER:  I will upload them to SharePoint

4   now.  I now have access.

5        MS. COX:  Okay.

6        UNIDENTIFIED SPEAKER:  There's no Exhibit 19.  There's no

7   record with 18.

8        MS. COX:  Okay.  Ms. Jones, can you pull up 19?  I'm

9   sorry.

10        THE COURT DEPUTY:  Okay.  Sure.

11        MS. COX:  Can you show me the Bates stamp number on that?

12   Okay.  Can you go to page 37 of 40, please?  Okay.

13   Q    BY MS. COX:  And this is an employee's termination

14   document, and you see that it's a violation of category 1,

15   right?  This is for unwanted physical contact with the

16   physic -- with a female employee, right?

17        MS. BUFFALANO:  The document speaks for itself.

18        JUDGE GREEN:  Yeah.  Let's -- let's pick it up on this.

19        MS. COX:  Okay.

20        JUDGE GREEN:  You know, ultimately, you're just kind of

21   asking him -- you're doing all this to ask him whether one is

22   worse -- worse than another.  I'm not 100 percent what the --

23   what the utility of that is.  I'm allowing some of it, but

24   let's -- let's pick up the pace and just cut to the chase.

25        MS. COX:  Okay.  I'm going to move for admission of GC-19.
```



1       MS. BUFFALANO:  Same objection.

2       JUDGE GREEN:  Okay.  So GC-19 is admitted.

3  **(General Counsel Exhibit Number 19 Received into Evidence)**

4       MS. COX:  Ms. Jones, can you pull up GC-20?  Okay.  Can

5  you scroll down?  Thank you.  Can you go to page 1 of 19?  I'm

6  sorry, 1 of 25?  That's not right.  What's the number on this,

7  Ms. Jones?  I'm sorry.  Can you scroll down?  All right.  74.

8  Okay.  It's page 5 of 25.

9  Q    BY MS. COX:  So Mr. Grabowski, this is a termination for

10 sexual harassment for grabbing an employee's waist, and you see

11 that the person has a verbal coaching?

12 A    Yes.

13      MS. COX:  All right.  I'll move for admission of GC-20.

14      MS. BUFFALANO:  Same.

15      JUDGE GREEN:  GC-20 is admitted.

16 **(General Counsel Exhibit Number 20 Received into Evidence)**

17      MS. COX:  Okay.  Ms. Jones, can you pull up 21?  Okay.

18 Can you scroll down so I can see the Bates stamp number?  Thank

19 you.  Okay.  Can you go to page 3 of 20?

20 Q    BY MS. COX:  Okay.  So Mr. Grabowski, this is another

21 sexual harassment termination.  And it is for grabbing --

22      MS. COX:  I'm sorry, can you scroll up, Ms. Jones?

23 Q    BY MS. COX:  Okay.  So yes.  It is a termination and it's

24 going into a private place with another associate, such as

25 being grinded upon, another -- another one, a physical contact,



Exhibit E, Motion to Try Petition on Hearing Record

1    right?  And there's two documented coaching's on this one,

2    right?

3    A    Yes.  So one other thing that I just wanted to make a note

4    of, because we've been referencing it in each of these

5    documents that the documented coaching, or the verbal

6    coaching's that are listed on these documents does not

7    necessarily mean that it's pertaining to the same type of

8    incident.  It just means anything pertaining to behavioral.  So

9    the way that the Adapt system tracks is either performance

10   based like productivity or quality or behavioral, or behavioral

11   time on task, so on any one of those feedbacks, it's going to

12   show you how much feedback it received in the same category.

13        So this person could have received a documented coaching

14   for -- for having their hair down.  That's a behavioral

15   incident that would start at a -- a documented coaching, so the

16   person may have two documented coaching's.  They could have had

17   their hair down and they could have been on their cell phone on

18   the production floor.  And then they got this, but it's still

19   going to be outlined in that document.

20   Q    Okay.  Thank you, Mr. Grabowski.

21   A    So I think --

22        MS. COX:  Judge Green, I'm just going to move to strike.

23   I didn't -- there was no question pending.

24        JUDGE GREEN:  I'm not going to strike it, but you can move

25   on to the next question.



# Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:  Okay.  I'm going to move for admission of GC-21.

2    MS. BUFFALANO:  Same objection.

3    JUDGE GREEN:  Okay.  GC-21 is admitted.

4    **(General Counsel Exhibit Number 21 Received into Evidence)**

5    MS. COX:  Okay.  Can you pull up GC-22, please?  Thank

6    you.  It's page 1.

7    Q    BY MS. COX:  Okay.  So this is a termination for sexual

8    harassment, touching a female employee's breast, right?

9    MS. BUFFALANO:  The document speaks for itself.

10   JUDGE GREEN:  Sustained.

11   Q    BY MS. COX:  And you would agree that touching an

12   employee's breast is worse than calling her a bitch?

13   A    Yes, but neither are acceptable.

14   Q    And you would also agree that telling an employee they

15   look like they're on drugs is less -- is -- telling someone

16   they look like drug -- telling someone that they look like

17   they're on drugs is not the same as touching someone's breast?

18   A    Yes, but neither are acceptable.

19   JUDGE GREEN:  Let me just ask you, Ms. Cox, to the extent

20   that these are terminations, how do they advance your case?

21   You know, they were -- if they're all -- if they're both

22   terminations, how does that establish depurative treatment?

23   MS. COX:  Well, Judge, I'm going to get to some questions

24   about that.  It seems that Respondent chose terminations to

25   make this decision to terminate Mr. Bryson.



1       JUDGE GREEN:  Okay.

2       MS. COX:  And none of these -- none of this conduct is --

3   is the same.

4       MS. BUFFALANO:  And how would Mr. Grabowski, who doesn't

5   know anything about this spreadsheet and didn't put it together

6   help in any way with that?

7       JUDGE GREEN:  Yeah.  So -- well, we'll get to that when we

8   get to that.

9       MS. COX:  So I have two more to go, Judge.

10      JUDGE GREEN:  Okay.  I was just curious.

11      MS. COX:  Thank you.

12      Okay.  So let's pull up --

13  Q    BY MS. COX:  Okay.  So this is a termination for unwanted

14  physical advances to another associate, right?

15  A    Yes.

16  Q    And it's for sexual harassment?

17  A    Yes.

18  Q    And here, there's a verbal coaching, a final written, and

19  a documented coaching, right?

20  A    For behavioral concerns, yes.

21      MS. COX:  Okay.  I'm going to move for admission of GC-23.

22      MS. BUFFALANO:  Same objection.

23      JUDGE GREEN:  Yeah, so GC-23 is admitted.

24  **(General Counsel Exhibit Number 23 Received into Evidence)**

25      MS. COX:  And GC-24, please, Ms. Jones.  And page 2.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MS. COX:   Okay.   So Mr. Grabowski, this is a

2    termination for making unwanted physical contact with another

3    associate, right?

4    A    Yes.

5    Q    And it involves sexual harassment?

6    A    Yes.

7         MS. COX:   Okay.   I'm going to move for admission of GC-24.

8         MS. BUFFALANO:   Same objection.

9         JUDGE GREEN:   GC-24 is admitted.

10   **(General Counsel Exhibit Number 24 Received into Evidence)**

11   Q    BY MS. COX:   Okay.   So Mr. Grabowski, we just went through

12   13 of -- 14 of 26 disciplines that Amazon considered compared

13   to Bryson's conduct before terminating him, right?

14        MS. BUFFALANO:   Objection.   That assumes facts that are

15   not in evidence.

16        JUDGE GREEN:   Okay.   Sustained.   I don't -- I don't know

17   that we know that the -- that this witness knows that.

18   Q    BY MS. COX:   Mr. Grabowski, 50 percent of these

19   disciplines involved sexual harassment, right?   The ones we

20   just went through?

21        MS. BUFFALANO:   Objection.   There's no foundation.   50

22   percent of what disciplines?   He doesn't know what you're

23   talking about.

24        MS. COX:   All these disciplines are sexual harassment.

25        JUDGE GREEN:   You're talking about -- listen, I don't



1    think that's a fair question.  There's no -- let's --

2         MS. COX:  Okay.

3         JUDGE GREEN:  Let's move on.  I mean, you know, I -- I

4    don't know that he was keeping count.

5    Q    BY MS. COX:  Mr. Grabowski, Bryson didn't engage in sexual

6    harassment of Ms. Evans, right?

7    A    Not to my knowledge.

8    Q    There was no allegation that he touched Ms. Evans, right?

9    A    Not to my knowledge.

10   Q    There was no allegation that he grinded on Ms. Evans?

11   A    Not to my knowledge.

12   Q    There was no allegation that he did anything sexual in

13   nature to Ms. Evans, right?

14   A    No.

15   Q    And you know that no allegations were made against Bryson

16   for sexual gestures like blowing kisses, right?

17   A    Yes.

18   Q    And you know that during the April 6th incident,

19   Mr. Bryson remained in an area far away from Ms. Evans, right?

20   A    I don't know that.

21   Q    You investigated the incident, did you not?

22   A    Yes.

23   Q    And you were able to view certain cameras, right?

24   A    Not during the duration of the investigation.

25   Q    Okay.



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    I saw them in the past week.

2    Q    Okay.  But -- so you're aware that he never went near her,

3    right?

4    A    I think it would depend on what you mean by near; what

5    distance we're specifically referring to.

6    Q    He never came in contact with her body, right?

7    A    No.

8    Q    Okay.  So you would agree that these disciplines are not

9    at all anything like what Mr. Bryson did, right?

10   A    The --

11        MS. BUFFALANO:  That question is so unfair.

12        JUDGE GREEN:  Yeah.  Sustained.

13        MS. BUFFALANO:  We went through 13 disciplines.

14        JUDGE GREEN:  Sustained.

15        MS. COX:  That are all involving sexual harassment.

16        JUDGE GREEN:  No.  Sustained.

17        MS. COX:  Okay.  Judge, can I go off the record?

18        JUDGE GREEN:  Yes.

19        MS. COX:  Thank you.

20   (Off the record at 4:37 p.m.)

21        JUDGE GREEN:  So back on the record.

22        THE COURT REPORTER:  Okay.  Sure.

23        THE COURT DEPUTY:  Is it on -- I don't see it.

24        MS. COX:  It's on SharePoint.

25        THE COURT DEPUTY:  Okay.



# Exhibit E, Motion to Try Petition on Hearing Record

```
1        JUDGE GREEN:  It says GC-25, and then there's an

2   under-strike.

3        THE COURT DEPUTY:  It just popped up.  Thank you.

4   Q    BY MS. COX:  Okay.  Mr. Grabowski, I'm showing you GC-25.

5   I want to draw your attention to the last paragraph.

6        MS. COX:  It's all the way at the bottom, Ms. Jones.

7   Q    BY MS. COX:  Okay.  Can you read that to yourself?

8   A    I read it.

9   Q    Okay.  So this document shows that 26 case -- there were

10  26 cases at JFK that were considered similar to Mr. Bryson's

11  conduct, right?

12       MS. BUFFALANO:  Objection.  That mischaracterizes this

13  document, and the document speaks for itself.

14       JUDGE GREEN:  Okay.  So do we have an actual question

15  about something other than what's in the document?  I'm reading

16  it along with you.

17       MS. COX:  Right.

18  Q    BY MS. COX:  So my question is that there was some

19  confusion earlier about how many cases were relied upon.  You

20  reviewed this document, right?  And it says that Mr. Bryson's

21  conduct was bullying, similar to 26 disciplines, right?

22       MS. BUFFALANO:  Again, that assumes --

23       JUDGE GREEN:  I see it.

24       MS. BUFFALANO:  -- facts not in evidence.

25       JUDGE GREEN:  Yeah, I see it.
```



1        MS. BUFFALANO:  This is not -- it says six similar in the

2   nature, but this witness is not the witness -- he's just going

3   to read the document and tell you what it says.

4        JUDGE GREEN:  Right.  So we don't need that.

5        MS. COX:  And it's also saying harassing behavior, right?

6        JUDGE GREEN:  So we -- we really -- if you have a

7   question, you need to ask a question based on the document, I'm

8   happy to hear it.  If you just want to ask him to read what's

9   in the document, we don't need that.

10        MS. COX:  Okay.

11        JUDGE GREEN:  You want to tell me -- if you want to -- if

12   you want to tell me what you think the significance of it is,

13   I'm happy to hear it.

14        MS. COX:  Ms. Jones, can you scroll up to the top of the

15   document?  Okay.  A little more down.  Sorry.

16   Q    BY MS. COX:  So here it says legal, ER, regional

17   operations, senior ops, and HR leadership are aligned in the

18   termination of Gerald Bryson.  Who is legal in this document?

19        MS. BUFFALANO:  Objection.  Foundation.

20        MS. COX:  He reviewed it before he came here to testify.

21        JUDGE GREEN:  Okay.  Overruled.  If you -- if you know,

22   Mr. Grabowski.

23        THE WITNESS:  I don't know.

24        JUDGE GREEN:  Okay.

25   Q    BY MS. COX:  And who is ER?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    I don't know.

2   Q    And who is regional operations?

3   A    I don't know what you're referring to in this document.

4   Q    Do you know who senior operations is in this document?

5   A    No.

6   Q    HR leadership would have included you, no?

7   A    Not necessarily.  It could have been at an HRM, senior HRM

8   level.

9   Q    What is a senior HRM level?

10  A    HR manager.  Senior HR manager.

11  Q    And that's above JFK?

12  A    No, that's at JFK.

13  Q    Okay.  Do you know who wrote this document?

14  A    No.

15  Q    Do you know when this document was written?

16  A    No.

17  Q    Do you know who participated in writing the document?

18  A    No.

19  Q    You testified earlier that you investigated Mr. Bryson,

20  the incident underlying Mr. Bryson's termination, right?

21  A    Yes.

22  Q    And this recap -- I'm sorry, this executive summary

23  included your investigative recap, right?

24       MS. BUFFALANO:  Objection to foundation.  Like, what

25  investigative recap?



Exhibit E, Motion to Try Petition on Hearing Record

```
1        JUDGE GREEN:  Okay.  Yeah.  I don't know what that refers

2   to either.  Do you want to ask?

3        MS. COX:  Yeah.

4   Q    BY MS. COX:  So Mr. Grabowski, did you create an

5   investigative recap in Mr. Bryson's -- in the -- in the

6   investigation of Mr. Bryson's termination?

7   A    I don't remember creating a summary of the investigation

8   or conclusion of it.

9   Q    Okay.

10        MS. COX:  At this time, Your Honor, General Counsel moves

11   for GC-25.

12        JUDGE GREEN:  Any objection?

13        MS. BUFFALANO:  No.

14        JUDGE GREEN:  Okay.  So GC-25 is admitted.

15   (General Counsel Exhibit Number 25 Received into Evidence)

16        MS. COX:  Okay.  I'm just waiting for some more documents

17   to get uploaded into SharePoint.

18        UNIDENTIFIED SPEAKER:  Your Honor, they are -- we have 26

19   through 28 up.

20        MS. COX:  Okay.  Ms. Jones, can you show me 26, please?

21   Okay.  Thank you, Ms. Jones.

22   Q    BY MS. COX:  Okay.  So take a look at this document.  It's

23   page 1.  This is a first written warning, right?

24   A    Yes.

25   Q    It's a category 2?
```



# Exhibit E, Motion to Try Petition on Hearing Record

1   A      Yes.

2   Q      Saying "Shut the fuck up" and "bitch"?

3   A      Yes.

4   Q      Okay.  So -- so Amazon has disciplined employees with

5   first written warnings when they say things like "bitch,"

6   right?

7          MS. BUFFALANO:  The document speaks for itself.

8          JUDGE GREEN:  Sustained.

9          MS. COX:  Okay.  I'll move for admission of GC-26.

10         MS. BUFFALANO:  Same objection as the earlier personal

11   files.

12         JUDGE GREEN:  Okay.  So GC-26 is admitted.

13   **(General Counsel Exhibit Number 26 Received into Evidence)**

14         MS. COX:  Okay.  And can you pull up 20 -- 27?  And I

15   don't know the exact page for this, Ms. Jones.  Give me one

16   moment.

17         JUDGE GREEN:  So really, I -- I don't want a -- the same

18   confirmation of what's in the document.  I just -- I don't want

19   any more of that.  We've had that.  If you have a question

20   about what's in the document, I -- you can ask that question,

21   but let's not go through, is it a written warning?  Is it a

22   category 2?  Just confirming what's in the document.  We don't

23   need to do that anymore.

24         MS. COX:  Okay.  What Bates stamp number is this,

25   Ms. Jones?



1    THE COURT DEPUTY:  Can you see it?

2    MS. COX:  Yes, I can see it now.

3    THE COURT DEPUTY:  Okay.  Okay.  Okay.  Can you take it to

4    page -- I'm sorry, I can't -- Ms. Jones, can you just search

5    for the word "rug"?  Control F, rug?  Page 54.  I'm sorry.

6    THE COURT DEPUTY:  Okay.

7    MS. COX:  It's not 54.  Can you just do a key word search,

8    "rug"?

9    JUDGE GREEN:  It's on page 52.

10   MS. COX:  Thank you.

11   Q    BY MS. COX:  Okay.  So Mr. Grabowski, this is a documented

12   coaching for throwing a 30-pound rug across the floor and

13   yelling at associates.  So safe to say that Amazon does give

14   lesser discipline for throwing rugs or aggressive behavior at

15   work, right?

16   MS. BUFFALANO:  Objection.

17   JUDGE GREEN:  Okay.  Still -- I really don't want any more

18   of this.  I really don't want any more of this.  It says that

19   on the -- it says that on the face of the document.  We don't

20   need Mr. Grabowski to -- to confirm it.  We -- we've been going

21   through a lot of these.

22   MS. COX:  Okay.

23   JUDGE GREEN:  We want to ask a question about what's in

24   the document -- I've said this now numerous times, and I really

25   don't want to say it again.  If you have a question about



# Exhibit E, Motion to Try Petition on Hearing Record

1   what's in the documents, and then deal with these -- some

2   question, you can ask that, but I -- we're done with confirming

3   with Mr. Grabowski what the documents say.

4        MS. COX:  Okay.  I'm going to move for admission of GC-27.

5        JUDGE GREEN:  Okay.  Considering the same objection, GC-27

6   is admitted.

7   **(General Counsel Exhibit Number 27 Received into Evidence)**

8        MS. COX:  Okay.  Ms. Jones, can you pull up 28?  Okay.

9   And can you go to page -- sorry -- page 9?  Okay.

10  Q    BY MS. COX:  So Mr. Grabowski, this is a -- I'm sorry.

11       MS. COX:  You know what?  Ms. -- Ms. Jones, can you --

12  well, Judge, can I just move for admission of GC-28?  I won't

13  ask him any questions about it.

14       JUDGE GREEN:  Sure, okay.  Can -- GC-28 is admitted.

15  Respondent has the same objection.

16  **(General Counsel Exhibit Number 28 Received into Evidence)**

17       MS. COX:  Okay.  And I'm going to have you -- Ms. Jones,

18  can you open up -- I think I have something missing here.  Can

19  you open up GC-30?  I think you have to refresh, Ms. Jones.

20       MR. KEARL:  Are you skipping 29?

21       MS. COX:  I am.

22       MR. KEARL:  Okay.

23       MS. COX:  Should we talk about what's going to happen,

24  guys?  It's 5:00.  And I'm not, you know, suggesting that to

25  end here, but it looks like there's a -- a lot more of these.



Exhibit E, Motion to Try Petition on Hearing Record

```
1        JUDGE GREEN:  Yeah, listen.  We're starting a little late,
2   so we're going a little late each day.  You know, I'm
3   anticipating that we won't necessarily stop until 5:30 since
4   we're starting at 10.  So you know, I mean, it -- it's up to
5   you, General Counsel, about how you want to spend your time.
6        MS. COX:  I'll just keep going through these as quickly as
7   I can, Judge.
8        JUDGE GREEN:  Okay.  And --
9        MS. COX:  Can you -- sorry.  Go ahead.
10       JUDGE GREEN:  I mean, you know, to the extent they're all
11  the same and you're just putting them into evidence and relying
12  on them on their face, you can -- you know.
13       MS. COX:  I have a question about this one, Judge.
14       JUDGE GREEN:  Okay.
15       MS. COX:  Okay.  Can you go to page 4, Ms. Jones?
16  Q    BY MS. COX:  Okay.  So this is a final written warning.
17  And this one involves sexual orientation.  Do you see that?
18  A    Yes.
19  Q    Okay.  And it also says that the comments include
20  connecting child molestation to sex -- homosexuality, right,
21  offending coworkers?
22  A    Yes.
23  Q    So you would agree that Amazon takes comments about
24  homosexuality serious, right?
25  A    Yes.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And the face of this document makes clear that the

2    discipline is for making a comment of -- of homosexual (audio

3    interference) --

4         MS. BUFFALANO:  The document speaks for itself.

5         JUDGE GREEN:  Sustained.

6         MS. COX:  Okay.  I'll move for admission of GC-30.

7         MS. BUFFALANO:  Same objection.

8         JUDGE GREEN:  Okay.  GC-30's admitted.

9    **(General Counsel Exhibit Number 30 Received into Evidence)**

10        THE COURT DEPUTY:  This is 31.

11        MS. COX:  Yeah.  I'm not sure I'll talk about this one,

12   Ms. Jones.  Can you go back to 29?  And can you go to -- sorry.

13   It should be on page 4.  Okay.  So one second, Judge.  This is

14   not the one I thought.  Can you just -- I move for admission of

15   GC-29.

16        MS. BUFFALANO:  Same objection.

17        JUDGE GREEN:  GC-29 is admitted.

18   **(General Counsel Exhibit Number 29 Received into Evidence)**

19        MS. COX:  Okay.  Can you open up GC-31?  Okay, thank you.

20   Can you go to just page 1?  Scroll up.  Okay.  I'll move for

21   admission of GC-31.

22        MR. KEARL:  That's --

23        MS. BUFFALANO:  Same objection.

24        JUDGE GREEN:  GC-31 is admitted.

25   **(General Counsel Exhibit Number 31 Received into Evidence)**



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1        MS. COX:  GC-32.  Okay.

2        MS. BUFFALANO:  Is there a point where we can just

3    stipulate to these?

4    Q    BY MS. COX:  So Mr. Grabowski, this is a documented

5    coaching for a failure to report.  So isn't it true that

6    employees have a obligation to report incidences at work?

7        MS. BUFFALANO:  Objection, vague.

8        JUDGE GREEN:  Okay, sustained.

9    Q    BY MS. COX:  Mr. Grabowski, does the employee handbook

10   require that employees report unsafe working conditions?

11   A    I'm not sure.

12       MS. COX:  I'm going to move for admission of GC-32.

13       MS. BUFFALANO:  Same objection.

14       JUDGE GREEN:  Okay.  GC-32 is admitted.

15   **(General Counsel Exhibit Number 32 Received into Evidence)**

16       MS. COX:  Okay.  Can you open up GC-33?  Oh, I'm sorry.

17   This shouldn't have come in.  Can you close this out?  Thank

18   you.  Can you also delete it from SharePoint?  Thank you.

19       All right.  Can you open up GC-35?  Can you show me the

20   Bates number?  Okay, okay.  Can you go to page 6 of 38?  Okay.

21   Q    BY MS. COX:  So Mr. Grabowski, this is a --

22       MS. COX:  Can you scroll up, Ms. Jones?

23   Q    BY MS. COX:  Okay.  This is a final written warning for

24   sexual harassment.  So this document shows that an employee can

25   get a final written for sexual harassment, right?



# Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  Objection.  The document speaks --

2    JUDGE GREEN:  Sustained.

3    MS. BUFFALANO:  -- for itself.

4    MS. COX:  Okay.  I'm going to move for admission of GC-35.

5    MS. BUFFALANO:  Same objection.

6    JUDGE GREEN:  It's admitted.  GC-35 is admitted.

7    **(General Counsel Exhibit Number 35 Received into Evidence)**

8    MS. COX:  Can you admit -- actually, GC-36 please -- can

9    you open it?  Okay.  I'm going to move for admission of GC-36.

10   JUDGE GREEN:  The same objection from the Respondent --

11   GC-36 is admitted.

12   **(General Counsel Exhibit Number 36 Received into Evidence)**

13   MS. COX:  Okay.  And Ms. Jones, can you go back to the

14   employee handbook?  I think it's GC --

15   MR. KEARL:  8.

16   MS. COX:  -- 8, okay.  Can you go to page 25 please?

17   THE COURT DEPUTY:  Which exhibit is it -- the handbook --

18   is it?

19   MR. KEARL:  It's GC-8.

20   JUDGE GREEN:  Yeah, 8.

21   THE COURT DEPUTY:  Okay.

22   JUDGE GREEN:  There it is.

23   MS. COX:  On page 25 please -- okay.  All right.  So can

24   you scroll down please to -- I'm sorry.  It's on page 26.

25   Okay.  Keep going down -- up.  I'm sorry -- a little bit more.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MS. COX:  So this is a policy that I was referring to.

2    It requires employees report incidences of harassment, right?

3         MS. BUFFALANO:  The document speaks for itself.

4         MS. COX:  Okay.

5         JUDGE GREEN:  Yeah.  Do you have some question about it?

6    Q    BY MS. COX:  If an employee doesn't report an incident,

7    they can be -- they can be disciplined, right?

8         MS. BUFFALANO:  Asked and answered.

9         JUDGE GREEN:  Well, let me ask this, Mr. Grabowski.

10        Do you know offhand whether that's the policy?  Or if

11   you're going to respond, are you going to respond by reading

12   this document, and then, telling us what it says?

13        THE WITNESS:  I would respond by reading this and --

14        JUDGE GREEN:  Okay.  So --

15        THE WITNESS:  -- no, I don't.

16        JUDGE GREEN:  -- we don't want you to do that.  So do you

17   have any independent knowledge of what the note -- and whether

18   there's any notice requirement with regard to unsafe working

19   conditions or harassment?

20        THE WITNESS:  Yeah.  I can't say that I'm familiar with

21   any feedback that anyone's received for not reporting an

22   incident outside of, like a safety incident.

23        MS. COX:  Well, we just went through your discipline for

24   failure to report.  Okay.  Can you go to page 28, Ms. Jones?

25   Q    BY MS. COX:  I want to draw your attention to the



# Exhibit E, Motion to Try Petition on Hearing Record

1    second-to-last bullet point.  "Failure to report or remedy any

2    unsafe conditions, procedures, or behaviors -- a violation of

3    category 2" -- so -- so this document shows that an employee

4    can be disciplined for failing to report, right?

5        MS. BUFFALANO:  The document speaks for itself.

6        JUDGE GREEN:  Sustained.

7        MS. COX:  Okay.

8        JUDGE GREEN:  Really, I'm -- I'm having -- I'm having

9    trouble understanding why you're not understanding the problem

10   here.

11       MS. COX:  Judge, I mean, I am understanding.

12       JUDGE GREEN:  I don't think you are because you keep doing

13   it.

14       MS. COX:  Okay.  Judge, I will consult with the Region and

15   let you know how we will proceed.

16       JUDGE GREEN:  Okay.

17       MS. COX:  Thank you.

18       JUDGE GREEN:  Off the record.  How long do you want?

19       MS. COX:  Five minutes.

20       JUDGE GREEN:  Okay.  Off the record.

21   (Off the record at 5:16 p.m.)

22       JUDGE GREEN:  Okay.  So back on the record.

23       MR. KEARL:  We are.

24       MS. COX:  Mr. Green, I don't have questions at this time.

25   Mr. Kearl does.  I'm going to pass it over to him.  And I just



# Exhibit E, Motion to Try Petition on Hearing Record

1   want to make sure that you'll admit the discipline treatment

2   documents not to the ruling-ness (sic).

3       JUDGE GREEN:  As long as there's a stipulation to

4   authenticity, which -- it sounds like there is.

5       MS. COX:  Okay.  Is that -- is that the case,

6   Ms. Buffalano?

7       MS. BUFFALANO:  Yes.  Aren't they already admitted?  I

8   mean, we're happy to talk about more if there were additional.

9       MS. COX:  We have others.

10      MS. BUFFALANO:  Okay.  Yeah, we'll talk about that.

11      JUDGE GREEN:  Okay.  So Mr. Grabowski, Mr. -- Mr. Kearl is

12   going to have some questions for you.  He's the Charging

13   Party's attorney.

14                    **CROSS-EXAMINATION**

15   Q   BY MR. KEARL:  Hello, Mr. Grabowski.  Thank you for

16   bearing with us this evening.  I just have a few questions for

17   you.  First off, I want to clear something up on the record.

18   Mr. Bryson never came into contact with Ms. Evans on April 6th;

19   is that correct?

20   A   No physical contact that I'm aware.

21   Q   You testified earlier about the various sources of

22   complaints and concerns that you dealt with during the course

23   of your job.  Has a regional supervisor ever brought a

24   disciplinary concern to your attention?

25      MS. BUFFALANO:  Objection, the foundational -- I don't



1       know what a regional supervisor is.

2           JUDGE GREEN:  Yeah.  I was going to ask the same question.

3       Maybe you want --

4       Q    BY MR. KEARL:  Mr. Grabowski, you testified earlier to

5       regional HR supervisors that are above JFK8.  Have any regional

6       supervisors from non-JFK8 facilities ever brought disciplinary

7       matters to your attention?

8           JUDGE GREEN:  So I think the question is, who -- who

9       were -- who were regional supervisors?

10          MS. BUFFALANO:  I think they're managers.  Oh, but you can

11      ask him that.

12          JUDGE GREEN:  Yeah.  I'm ask --

13          THE WITNESS:  Yeah.

14          JUDGE GREEN:  -- do you know who regional supervisors are?

15          THE WITNESS:  So the regional HR manager would be the

16      manager that the senior-most HR manager at each site in the

17      region reports to.

18      Q    BY MR. KEARL:  Okay.  And so have you ever received any --

19      any -- has -- has any -- has anyone from one of those positions

20      ever brought disciplinary concerns to your attention?  Or have

21      they all come from people within the JFK8 facility?

22      A    Not that I can recall.

23      Q    Okay.  When you are performing an investigation, do you

24      take any notes during the course of investigations?

25      A    If it's something where the employee's not present or has



Exhibit E, Motion to Try Petition on Hearing Record

1    the ability to write a statement, then I take notes documenting

2    the conversation I have with them.

3    Q    When might an employee not be able to write a statement?

4    A    When a seek-to-understand conversation happens over the

5    phone.

6    Q    So in the event that there's a seek-to-understand

7    conversation on the phone, are -- there are -- no witness

8    statements are allowed for that employee; is that correct?

9    A    Typically, when we have phone seek-to-understand

10   conversations, we would document notes around.

11   Q    Okay.  And where do you keep these notes?  Are these

12   digital notes?

13   A    I've typed them up in my own cases in Microsoft Word.  And

14   then, like other witness statements or investigative notes that

15   would have been collected during the course of an

16   investigation, they would be uploaded to the investigative

17   file.

18   Q    And that investigative file lives in the Exact database;

19   is that correct?

20   A    They can live in Exact or OnBase.

21   Q    Okay.  And did -- do you have any handwritten notes during

22   the course of your investigations?  Or is it only the digital

23   notes that you write up in -- in Word?

24   A    They would just be digital.

25   Q    Okay.  You received training for the course of handling



Exhibit E, Motion to Try Petition on Hearing Record

1    complaints in your job; is that correct?

2    A    Earlier on in my career, yes.

3    Q    Yes.  And there's, like handbooks, things that you use, in

4    the course of an investigation that you -- that you can refer

5    back to?

6    A    Yes.

7    Q    Is there a form that an employee uses to report harassment

8    at Amazon?

9    A    There isn't a specific form.

10   Q    There's no form to report harassment at Amazon that's a

11   specific form?

12   A    Not specific to harassment that I'm aware of.  It would be

13   the same standard process where if an employee reports a

14   concern during this time frame, it would -- if it was something

15   where an employee documented it onsite, we would collect a

16   witness statement accounting their recollection of the

17   incident.

18   Q    Okay.  Do you deal with transfers and promotions within

19   the JFK8 facility?

20        MS. BUFFALANO:  Objection, relevance.

21        JUDGE GREEN:  What's the relevance?

22        MR. KEARL:  There are other folks that are related to this

23   case who have received transfers and promotions following the

24   course of this investigation.  And I'm curious if Mr. Grabowski

25   deals with transfers and promotions in the facility.



# Exhibit E, Motion to Try Petition on Hearing Record

```
1         JUDGE GREEN:  I don't understand what transfers and

2    promotions have to do with this case, which is why I actually

3    would invoke that portion of the subpoena that asks for

4    subpoena of records regarding transfers and promotions.  So

5    sustained.

6         MR. KEARL:  Okay.

7    Q    BY MR. KEARL:  Do you deal with pay raises?

8         MS. BUFFALANO:  Objection to relevance.

9         MR. KEARL:  Your Honor, Dimitra Evans received a

10   promote -- or a transfer and a pay raise following this

11   interaction.  And I'm curious if Mr. Grabowski deals with

12   transfers and promotions as relates to her treatment following

13   the interaction that took place on the 6th of April.

14        JUDGE GREEN:  Do you -- do you know how -- how soon after

15   this -- this incident that was -- I -- I -- do you know how

16   soon after this incident Ms. Evans received some kind of

17   positive employment action?

18        MR. KEARL:  My understanding is with -- within two months.

19        JUDGE GREEN:  Okay.  I -- I -- I really don't see that as

20   being relevant.

21        MR. KEARL:  Okay.

22   Q    BY MR. KEARL:  Okay.  So back to the 26 documents that you

23   were speaking about from the executive summary.  Were you a --

24   aware of the competitor list that was produced?

25   A    Not at the time of the investigation.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Do you know who pulls lists of competitors?

2         MS. BUFFALANO:  Objection.

3         JUDGE GREEN:  Overruled.

4         THE WITNESS:  No.  I'm not sure that there's a specific

5    individual that is designated to pull competitor lists.

6    Q    BY MR. KEARL:  Have you ever pulled a competitor list for

7    an investigation?

8    A    I pulled, like, exports from the Adapt files that come in

9    that Excel format and filtered for keywords.

10   Q    And who gave you the instruction to filter for those

11   keywords?

12   A    Well, I've done it for my own, like, knowledge in

13   different circumstances when evaluating recommendations.

14   Q    Okay.  So you -- you -- but has -- has anyone ever

15   instructed you to pull a competitor list in the course of an

16   investigation related to disciplinary actions?

17   A    I can't recall a -- a specific time, but I would say that

18   it's likely.

19   Q    Are you aware of any?  I'm not asking you to -- to

20   speculate.  I'm asking if you know of any instances that

21   competitors were pulled in the course of an investigation in

22   the course of your role as a senior HR business partner at

23   JFK8.

24   A    Not that I remember.

25   Q    Okay.  Did you prepare for testifying in this case?



1   A    Yes.

2   Q    What documents did you review in the course of your

3   preparation?

4        MS. BUFFALANO:  Objection.  How is this relevant?

5        MR. KEARL:  Your Honor --

6        JUDGE GREEN:  Who --

7        MR. KEARL:  -- I'm curious to know what documents were

8   reviewed in the course of the preparation for this so that I

9   can be aware of how relevant Mr. Grabowski is to the questions

10  that we're seeking related to the investigation.

11       JUDGE GREEN:  Okay.  So overruled.

12       THE WITNESS:  I reviewed different witness statements, an

13  Excel spreadsheet with different allegations, different emails,

14  and then, also like, the disciplinary documents pertaining to

15  the specific individuals involved in this case.

16  Q    BY MR. KEARL:  Were you given any specific instructions

17  about your testimony?

18  A    No.

19  Q    Is there a manual or document that explains a

20  seek-to-understand process?

21  A    Not that I am aware of.

22  Q    Is there a manual or document that explains how you're

23  supposed to conduct an inter -- investigation and enter those

24  investigatory materials into the Exact database or the OnBase

25  database?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    There is a virtual training that outlines how to use the

2    Exact investigative system and how you would go about logging

3    information into each category.

4    Q    Is there a manual ex -- that explains the escalation steps

5    that we -- that you testified to earlier today?

6    A    I know that the loss prevention team has a standard

7    document that outlines, like, what support functions or which

8    partners they, like, should be taken based on, like, a type of

9    incident, whether it's workplace violence, harassment, from

10   their end to who to partner with, but from an HR perspective.

11   It would be using high judgment to determine whether or not to

12   handle it at the level in which it was reported or to escalate

13   the situation.

14   Q    Okay.  So there is a document.  There is -- there is

15   information that explains that process and the steps that are

16   taken?

17   A    From the loss prevention perspective, there's a document

18   that outlines -- it's kind of, like a grid.  And it would say,

19   like, if this is workplace violence, then it'll say, include

20   HR, include like -- like an HR business partner or who would

21   have been loss prevention manager, whoever is supposed to be

22   involved in it.

23   Q    Okay.

24       MR. KEARL:  I have no further questions.  But with all due

25   respect, Judge Green, I -- I really -- I wish you would



# Exhibit E, Motion to Try Petition on Hearing Record

1    reconsider your -- the relevance of transfers and promotions

2    when one of the involved parties in the altercation received

3    both a -- a transfer to a beneficial department and a pay raise

4    following this action.  And the other was terminated despite

5    the fact that, even by Respondent's own documents, there was

6    recommended more -- more aggressive disciplinary steps were

7    recommended for the other party.  But if --

8        JUDGE GREEN:  So what are we going to do?  Are we going to

9    go through Ms. Evans' employment and -- and discuss everything

10   that's ever happened to her after the -- after the incident?

11   You know --

12       MR. KEARL:  No, I just --

13       JUDGE GREEN:  -- I have a serious -- listen.  I'll give it

14   some thought, but at this -- at this particular point, I'm --

15   I'm really not inclined to go -- go there.

16       MR. KEARL:  Okay.  I just had a series of questions for

17   Mr. Grabowski in his role as -- as an HR representative.  But I

18   will leave that for --

19       JUDGE GREEN:  Okay.  Well, how -- how long would that

20   take?

21       MR. KEARL:  Three minutes.

22       JUDGE GREEN:  Okay.  We'll do it as an offer of proof.

23   And you can do it as a part of the question and ans -- as

24   question and answer.  Please -- please move along quickly.

25       MR. KEARL:  Yeah.



# Exhibit E, Motion to Try Petition on Hearing Record

1   Q    BY MR. KEARL:  So do you deal with transfers and

2   promotions?

3   A    The HR team that -- or like, the hourly HR team handles,

4   like, the hourly transfer system.  And then, pay raises for

5   hourly employees are based on a step plan.  So for tier 1 and

6   tier 3 employees, which are our hourly associate population --

7   Q    Okay.  I'm going to stop you there in the interest of

8   time.  Do you know the process for applying for and

9   transferring to a new department within the facility?

10  A    Yes.

11  Q    Do disciplines have any bearing on an employee's ability

12  to transfer within the facility?

13  A    Yes.

14  Q    Are there some departments that are harder to transfer

15  into than others?

16  A    Potentially, based on preference, but it differs month to

17  month.

18  Q    Do you decide which transfers are allowed and which are

19  denied within the facility?

20  A    The senior operations team determines it based on the

21  labor plan and based on --

22  Q    So --

23  Q    -- tenure.  So when they're approving transfers, there's

24  no names attached to it specifically.  They look at how many

25  people can go from pick to pack or from pack to ship dock.  And



Exhibit E, Motion to Try Petition on Hearing Record

1     then, that information goes to the HR team to then approve.  If

2     they say five people can go from pick to pack, the internal

3     transfer system automatically lists the employees that applied

4     for that specific department by tenure.  And if they say five,

5     then you grant the first top five.  And it goes in the system.

6     And in order to pass someone, you would have to mark someone

7     above them ineligible to go down to someone that's lower on the

8     list based on tenure.

9     Q     Okay.  And is there a documented process that shows all of

10    that for each transfer?

11    A     We have --

12    Q     Okay, go ahead.

13    A     -- we have a reporting system that each month -- so at

14    this point last year was happening on a monthly basis and has

15    now switched to a biweekly basis, but the system and the

16    reporting will show who applied for which department which

17    month and whether it was granted or rejected, and then, if it

18    was granted, whether it was accepted or expired.

19    Q     And is this the same process that's used for transferring

20    workers into the COVID-19 safety positions and social

21    distancing team?

22    A     No.

23    Q     Okay.  Is there -- is there a process for determining who

24    gets moved to that team?

25          MS. BUFFALANO:  Wait.  Is this relevant?  I know you were



# Exhibit E, Motion to Try Petition on Hearing Record

1    allowing some questions, but I -- I just don't know if this is

2    relevant.

3        JUDGE GREEN:  Yeah.  So -- so what's the point?

4        MR. KEARL:  I have reason to believe that before Ms. Evans

5    was transferred to the ship dock position, she was also given

6    the ability to work on this safety social distancing team.

7    And -- and insofar as that is a -- a better work condition in

8    the facility, I believe it's relevant to the question of, you

9    know, what that process is and how she was selected for it.

10        JUDGE GREEN:  It's your theory that --

11        MS. BUFFALANO:  When was that?

12        JUDGE GREEN:  -- it's your theory that she basically

13    should have been disqualified for additional positive

14    employment actions after this incident?

15        MS. BUFFALANO:  Well --

16        MR. KEARL:  I believe that it's -- well in -- in addition

17    to believing that having the disciplinary action could have

18    negative bearing on her ability to transfer to that position, I

19    also think it is relevant and highly suspicious that this

20    worker would be selected for that in such short order after the

21    course of events, knowing how difficult it is to get those

22    positions.  And it -- it shape -- it goes toward showing

23    disposition.

24        JUDGE GREEN:  All right.  So we're doing this as an offer

25    of proof.  Okay.  Go -- go ahead.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MR. KEARL:  Okay.  So the COVID-19 social distancing

2    team -- is there a similar process?  You said there was not a

3    similar process for transferring.  Is there a process for

4    selecting who gets to be in that position?

5    A    So there are some positions on that team specifically,

6    some of them that deal with seated positions where employees,

7    like, put masks into bags -- into, like individual wrappers or

8    where they prepare other sanity -- sanitizing materials and

9    different roles along those lines.  And those were approved or

10   can be approved by temporary accommodations.

11        So if someone brings in medical documentation that

12   requests a seated position or something that has limited

13   lifting restrictions, employees do have the opportunity to be

14   placed in limited temporary light duty accommodations, which is

15   what they're referred to as.  I don't believe that all of the

16   employees on that team are in the temporary light duty program,

17   but aside from the temporary light duty program, I do not know

18   the specifics about how individuals go into that -- that team.

19   Q    Okay.

20        MR. KEARL:  No further questions.

21        JUDGE GREEN:  Okay.  So I'll consider the offer of proof.

22   I'm not going to rule on it now.

23        Is -- is the Respondent going to have any questions for

24   Mr. Grab -- Grabowski, like now or tomorrow?

25        MS. BUFFALANO:  We are going to reserve our question or



# Exhibit E, Motion to Try Petition on Hearing Record

1    sort of cross-exam of Mr. Grabowski until we call him on our

2    case in chief.

3        JUDGE GREEN:  As your case in chief, okay.  Fine, okay.  I

4    have not had an opportunity to look closely at the -- at the

5    privilege log.  We'll deal with that tomorrow at some point.

6    And with that, we're going to go --

7        MR. KEARL:  Your Honor -- Your Honor -- I apologize, Your

8    Honor.

9        JUDGE GREEN:  Okay.

10       MR. KEARL:  Just before you go off the record, can we have

11   some indication from Ms. Cox as to the -- what's going to

12   happen tomorrow?  We -- we have some lawyers who have some

13   conflicting obligations.  And we want to make sure that

14   everybody's here and ready to go.

15       JUDGE GREEN:  You're on mute.

16       MS. BUFFALANO:  You're on mute.

17       MS. COX:  I'm sorry.  I'm not sure what you mean by that.

18   We're presenting witnesses tomorrow.

19       MR. KEARL:  Right.  Are you -- are you -- are you prepared

20   to share with us who -- who they might be?

21       MS. COX:  No.

22       MR. KEARL:  Okay.  Then --

23       JUDGE GREEN:  Let me ask you -- let me ask you --

24       MR. KEARL:  -- then there may be some -- there may be some

25   delay, Your Honor, then.  You know, I don't know what all the



1    super secrecy's about, but --

2        JUDGE GREEN:  So you have different -- you have different

3    attorneys performing different functions here?

4        MR. KEARL:  That's cor -- that's correct.

5        JUDGE GREEN:  Right.  So I -- I guess the question is --

6    you know, we -- we've seen Ms. Williams deal with certain

7    witnesses.  Do you know what the nature of the witnesses are --

8    is?  Is it going to be subpoena stuff?  Is it going to be just,

9    you know, testimony on the merits?

10       MS. COX:  It's testimony on the merits, Judge.

11       JUDGE GREEN:  Does that help?

12       MR. KEARL:  Ever so mildly, Judge, but we'll deal with it.

13       JUDGE GREEN:  Okay, okay.  So we'll go off the record.

14   And we will be back on the record tomorrow at 10.

15   **(Whereupon, the hearing in the above-entitled matter was**

16   **recessed at 5:47 p.m. until Wednesday, May 5, 2021 at 10:00**

17   **a.m.)**

18

19

20

21

22

23

24

25



1                    **C E R T I F I C A T I O N**

2     This is to certify that the attached proceedings before the

3     National Labor Relations Board (NLRB), Region 29, Case Number

4     29-CA-261755, Amazon.com Services LLC, and Gerald Bryson, at

5     the National Labor Relations Board, Region 29, Two Metro Tech

6     Center North, 5th Floor, Brooklyn, New York 11201, on Tuesday,

7     May 4, 2021, 10:04 a.m., was held according to the record, and

8     that this is the original, complete, and true and accurate

9     transcript that has been compared to the reporting or

10    recording, accomplished at the hearing, that the exhibit files

11    have been checked for completeness and no exhibits received in

12    evidence or in the rejected exhibit files are missing.

13

14

15

16    _____

       BARRINGTON MOXIE

17
       Official Reporter
18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.Com Services, LLC,           Case No.    29-CA-261755

        Employer/Respondent,

and

Gerald Bryson,

        An Individual.

_____

_____

Place: Brooklyn, New York (via Zoom videoconference)

Dates: May 5, 2021

Pages: 572 through 824

Volume: 6

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



# Exhibit E, Motion to Try Petition on Hearing Record

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

| | |
|---|---|
| In the Matter of:<br><br>AMAZON.COM SERVICES, LLC,,<br><br>        Employer/Respondent,<br><br>and<br><br>GERALD BRYSON,<br><br>               An Individual. | Case No.    29-CA-261755 |

The above-entitled matter came on for hearing, via Zoom

videoconference, pursuant to notice, before **BENJAMIN W. GREEN**,

Administrative Law Judge, at the National Labor Relations

Board, Region 29, Two Metro Tech Center North, 5th Floor,

Brooklyn, New York 11201, on **Wednesday, May 5, 2021, 10:08 a.m.**

Exhibit E, Motion to Try Petition on Hearing Record

1                    A P P E A R A N C E S

2    **On behalf of the Charging Party:**

3        **FRANK KEARL, ESQ.**
         MAKE THE ROAD NEW YORK
4        161 Port Richmond Avenue
         Staten Island, NY 10302
5        Tel. (929)265-7692

6    **On behalf of the Employer:**

7        **CHRISTOPHER J. MURPHY, ESQ.**
         **JENNIFER MOTT WILLIAMS, ESQ.**
8        **RICHARD ROSENBLATT, ESQ.**
         MORGAN, LEWIS & BOCKIUS, LLP
9        1701 Market Street
         Philadelphia, PA 19103-2901
10       Tel. (215)963-5601

11       **NICOLE BUFFALANO, ESQ.**
         MORGAN, LEWIS & BOCKIUS, LLP
12       300 South Grand Avenue, 22nd Floor
         Los Angeles, CA 90071
13       Tel. (213)612-7443

14       **KELCEY J. PHILLIPS, ESQ.**
         MORGAN, LEWIS & BOCKIUS, LLP
15       1111 Pennsylvania Avenue, NW
         Washington, DC 20004
16       Tel. (202)739-5455

17       **ZAINAB N. AHMAD, ESQ.**
         GIBSON, DUNN
18       200 Park Avenue
         New York, New York 10166-0193
19       Email: zahmad@gibsondunn.com

20   **On behalf of the General Counsel:**

21       **EVAMARIA COX, ESQ.**
         **MATTHEW JACKSON, ESQ.**
22       **DAVID GASTON, ESQ.**
         **NANCY REIBSTEIN, ESQ.**
23       THE NATIONAL LABOR RELATIONS BOARD, REGION 29
         Two Metro Tech Center, 5th Floor
24       Brooklyn, NY 11201
         Tel. (718)765-6172

25



1                               <u>I N D E X</u>

2

3    <u>WITNESS</u>          <u>DIRECT</u>  <u>CROSS</u>   <u>REDIRECT</u>  <u>RECROSS</u>   <u>VOIR DIRE</u>

4    Derrick Palmer        591    525,722  625,641   634,641

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


www.escribers.net | 800-257-0885

1                          E X H I B I T S

2

3     **EXHIBIT**                              **IDENTIFIED**      **IN EVIDENCE**

4     **General Counsel:**

5       GC-37                                     580                 580

6       GC-38                                     580                 580

7       GC-39                                     580                 580

8       GC-40                                     580                 580

9       GC-41                                     580                 580

10      GC-42                                     580                 580

11      GC-43                                     580                 580

12      GC-44                                     580                 580

13      GC-45                                     580                 580

14      GC-46                                     580                 580

15      GC-47                                     580                 580

16      GC-48                                     680                 680

17      GC-49                                     684                 684

18      GC-50                                     808                 809

19      GC-66(a)                                  769            Not Admitted

20      GC-66(b)                                  771            Not Admitted

21

22    **Charging Party:**

23      CP-1                                      718                 722

24      CP-2                                      717                 722

25      CP-5                                      718                 719



1                 **E X H I B I T S   C O N T I N U E D**

2

3    **EXHIBIT**                                  **IDENTIFIED**       **IN EVIDENCE**

4

5    **Respondent:**

6      R-67                                          729                 730

7      R-70                                          792            Not Admitted

8      R-70(a)                                       792            Not Admitted

9      R-70(b)                                       792            Not Admitted

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1           P R O C E E D I N G S

2       JUDGE GREEN:  All right.  So we're back in the matter of

3   Amazon.com Services, LLC, case number 29-CA-261755.  It's May

4   5th, 2021.  And what does -- do we have anything that we -- we

5   need to take up before we start in with evidence?

6       MR. JACKSON:  Well, before we call our next witness, Your

7   Honor, General Counsel would like to move certain other

8   documents into evidence.  I've identified General Counsel's GC

9   Exhibits 37 through 47.  These, we contend, are evidence of

10  disparate treatment showing comparator employees who received

11  different treatment than Gerald Bryson did, engaging in

12  similar, if not more egregious conduct.  So -- and these are

13  documents culled from Respondent's production in response to

14  General Counsel's subpoena.  On that basis, we assert their

15  authenticity and we move for their admission.

16      MS. BUFFALANO:  We don't -- sorry.  Go ahead.

17      MR. JACKSON:  Go ahead, Nicole.

18      MS. BUFFALANO:  We -- we don't have any objection to the

19  authenticity, assuming -- I haven't clicked into any of these

20  documents, but they're labeled as Amazon Bates numbered

21  documents, so we wouldn't have any issue with the authenticity.

22  The only issue would be with respect to the relevance, at this

23  point, which hasn't been established by anyone.  And to the

24  extent that these are terminations, I don't know how a

25  termination would be a comparator for a termination, in any



# Exhibit E, Motion to Try Petition on Hearing Record

1    event.  And so we would object to the relevance on that basis

2    as well.

3        MR. JACKSON:  And Your Honor, I -- I would like to respond

4    to that objection.

5        JUDGE GREEN:  Okay.

6        MR. JACKSON:  Ms. Buffalano asserted it repeatedly

7    yesterday and again today.  And Your Honor, it's disingenuous

8    at best.  What, essentially, this objection amounts to is

9    Respondent is claiming that these documents are not relevant

10   because they lack the proper context to prove --

11       JUDGE GREEN:  Right.  So -- but I've already -- I've

12   already ruled multiple times that there is no question in my

13   mind that they're -- they're relevant.

14       MR. JACKSON:  But I -- I'd just like to point out for the

15   record something, Your Honor, if I may.

16       JUDGE GREEN:  Okay.

17       MR. JACKSON:  You know, it's -- it's -- it's like I said,

18   it's disingenuous at best for the Respondent to argue that

19   they're not relevant because they lack the proper context while

20   at the same time, they're withholding documents that would

21   provide that -- that context.  The General Counsel subpoenaed

22   records showing the investigation of these incidents and

23   Respondent, more than two months after the subpoena was served,

24   still has not produced them.  And now, they're claiming that

25   they're not relevant somehow because they lack the proper



1    context.  This is exactly the type of situation that Bannon-

2    Mills was (indiscernible, simultaneous speech) --

3        JUDGE GREEN:  Yeah, but I'm admitting it into evidence.

4    I'm admitting it.  You don't need a -- you don't need

5    sanctions.  I'm admitting it into evidence.  You -- you won.

6        MS. BUFFALANO:  And -- and can I, Judge Green, just

7    respond really briefly?

8        JUDGE GREEN:  Okay.  I mean, this really is much --

9        MS. BUFFALANO:  I -- I know.  I don't want to turn this

10   into --

11       JUDGE GREEN:  This is much ado about nothing.

12       MS. BUFFALANO:  I -- I agree.  But I just want to make

13   sure that the record is clear that we indicated to you several

14   times over the course of the last few weeks that the volume of

15   the production requested was such that we were not going to be

16   able to get you all of the documents that you needed by the

17   first day of this hearing, and potentially, by the last day of

18   this hearing.  We made that very clear to you.  And the judge

19   asked you, do you want to continue without the documents?  And

20   you chose to do that.  So this is not an incident -- this is

21   not an issue where we have not tried our absolute best to get

22   you everything.  As we've said multiple times, we have teams of

23   lawyers working on getting you these documents.  It just is a

24   inten -- time-intensive and labor-intensive process.  And you

25   will get these documents.  And we have told you that.  And --



Exhibit E, Motion to Try Petition on Hearing Record

1    and we have -- we have been transparent about this for weeks

2    now.  And so to the extent that you don't have documents and

3    you're proceeding without them, that's the choice that the

4    counsel for the General Counsel has made.

5        MR. JACKSON:  I think Respondent's conduct illustrates

6    their strategy of delaying and obfuscating the record further,

7    Your Honor.

8        JUDGE GREEN:  Okay.  The only thing that's delaying is

9    having this conversation when there's nothing actually in

10   dispute.  The -- the -- the -- I'm admitting the evidence.  I'm

11   admitting GC-37 to 47 over the Respondent's relevance

12   objection.  There's no need for sanctions.  And with regard to

13   this particular issue, I'm admitting the -- the evidence.  And

14   it's not even secondary evidence.  It's -- it's relevant.

15   It's -- it's appropriate.

16   **(General Counsel Exhibit Numbers 37 through 47 Received into**

17   **Evidence)**

18       JUDGE GREEN:  I do just have a -- I guess it would be a

19   question for -- do we have anything else?  Do you all have

20   anything else before I get to just a couple of things that I

21   want to deal with?

22       MR. JACKSON:  Yes, Your Honor, one thing from the GC.  Has

23   Your Honor had a opportunity to review the revised privilege

24   log that Amazon sent on Monday night?

25       JUDGE GREEN:  Right.  So I was going to say that's exactly



Exhibit E, Motion to Try Petition on Hearing Record

1    what I was going to take up next, so I guess this is -- do we

2    have Mr. Rosenblatt here, I -- I guess.  He is the keeper of

3    the privilege S1log for the Respondent.

4         MR. ROSENBLATT:  Yes, Your Honor.

5         JUDGE GREEN:  So am I right that the -- are the

6    attachments -- the attachments were attached to the email

7    that's above the attachment?

8         MR. ROSENBLATT:  That's exactly right, Your Honor.

9         JUDGE GREEN:  Okay.  And are you essentially -- are you

10   essentially relying on the description in the email in saying

11   that it's on the same basis the attachments are privileged?

12        MR. ROSENBLATT:  Yes, Your Honor.

13        JUDGE GREEN:  Okay.  And you've them -- you reviewed them

14   individually, and you're -- you're satisfied that the same

15   description is appropriate for the attachments?

16        MR. ROSENBLATT:  Yes, Your Honor.

17        JUDGE GREEN:  Not just because of the email that involved

18   that advice, but because of the attachments as well?

19        MR. ROSENBLATT:  No, the attachments thems -- the

20   attachments themselves are part of the communication as

21   described in the emails.

22        JUDGE GREEN:  Okay.

23        MR. ROSENBLATT:  So I wouldn't say if -- if there was a --

24   if the attachments were standing alone, I would not tell you

25   that by and of themselves the attachments are an attorney-



Exhibit E, Motion to Try Petition on Hearing Record

1    client communication.  But the fact that they are attached to

2    an attorney-client communication is essentially communicating

3    tho -- that is -- that -- that's part of the communication.  If

4    there are --

5         JUDGE GREEN:  Okay.  But -- so -- right.  So it --

6    understood.  But a document doesn't become subject to

7    nondisclosure by privilege just because it was at some point

8    attached to an email and sent to Counsel.  Right?  It might --

9    it -- it really does have to -- I mean, the -- the email with

10   the attachment might not be subject to disclosure, and I think

11   you addressed this last night.

12        MR. ROSENBLATT:  I did, I did.

13        JUDGE GREEN:  That the attachment has to have a separate

14   indicia of, you know, it may be work -- you know, work product

15   separate from the -- from the privileged communication.

16        JUDGE GREEN:  Right.

17        JUDGE GREEN:  And you're -- you're satisfied that the

18   same -- the same description in the email applies to those

19   attachments, or maybe they were produced?

20        MR. ROSENBLATT:  That -- that's what I was saying the

21   other day, Your Honor, is that if the attachments were separate

22   and not prepared solely for the purposes of this communication,

23   but are of inde -- independent responsiveness, then, yes, we

24   will -- we have produced or will -- will be producing -- well,

25   I -- I believe every one of the attachments has already been

# Exhibit E, Motion to Try Petition on Hearing Record

1   produced in sofar --

2        JUDGE GREEN:  Okay.

3        MR. ROSENBLATT:  -- as it was created separate from the

4   communication.

5        JUDGE GREEN:  Okay.  So that's that.  I'm -- I don't have

6   time --

7        MS. COX:  Judge Green, if I may?

8        JUDGE GREEN:  Yeah, go ahead.

9        MS. COX:  Judge Green, if the attachments have already

10  been produced, then those need to be identified.

11       JUDGE GREEN:  No, they actually don't.  Because that would

12  tend to -- it would tend to indicate something about the nature

13  of the communication, and so no.  You don't get that.

14       MS. COX:  Okay.  With regard to the description of the

15  attachment, it's not sufficient.  There has to be more detail

16  on the attachment itself.

17       JUDGE GREEN:  No.  But he's -- what he's saying is that

18  it's been disclosed.  It's been produced.

19       MS. COX:  It hasn't.  The attachment doesn't -- it doesn't

20  say.

21       JUDGE GREEN:  He's just made that representation.

22       MS. COX:  All right, Judge.

23       JUDGE GREEN:  Am I wrong, Mr. Rosenblatt?  I mean, I --

24  the --

25       MR. ROSENBLATT:  Just to be clear, what -- what I'm saying



Exhibit E, Motion to Try Petition on Hearing Record

1    is that the attachments themselves are things that would have

2    been prepared outside of the attorney-client communication --

3         JUDGE GREEN:  Right.

4         MR. ROSENBLATT:  -- so they may be producible, and I think

5    we did produce every single one of them.

6         JUDGE GREEN:  Okay.  Well, confirm that.  I mean, you

7    don't have to -- you don't have to tell the General Counsel

8    which ones they are.  You don't have to tell them that, but

9    just -- I -- I do need you to confirm that they were actually

10   produced so we don't have an issue with that.

11        MR. ROSENBLATT:  Yeah.  I am -- I will triple-check, but

12   I'm --

13        JUDGE GREEN:  Okay.

14        MR. ROSENBLATT:  -- about 99.999 percent sure they have

15   been --

16        JUDGE GREEN:  Okay.

17        MR. ROSENBLATT:  -- produced.

18        JUDGE GREEN:  And with regard to -- so I -- you know,

19   the -- the only other issue as far as I understood it was

20   these -- these emails which reflected investigation --

21   investigations at the direction of Counsel.  I'm not seeing --

22   you know, and -- and what I asked is for the -- the -- the

23   attorney to be identified.  And I -- I guess I'm not seeing --

24   I'm not seeing entries where the -- where counsel was not

25   identified.



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. ROSENBLATT:  I'm sorry, that -- that was not

2    identified?  Because every one of them --

3    JUDGE GREEN:  Right.  This is -- yeah, I don't -- I mean,

4    that's -- that's the objection.  I don't see it.  I mean, I --

5    it looks like counsel is identified in all these entries; am I

6    wrong?

7    MR. ROSENBLATT:  No.  That's ac -- that's perfectly

8    accurate.

9    MS. COX:  Judge Green, but the entries say at the

10   direction of counsel and the  --

11   JUDGE GREEN:  And it says which counsel, doesn't it or

12   is -- does it not say which counsel?

13   MS. COX:  No.  The -- the last nine of them we're saying

14   are not -- I'm sorry.  I'm a little distracted.  I'm saying

15   that the last nine or ten doesn't -- doesn't involve counsel.

16   The -- it's not --

17   JUDGE GREEN:  No.  I know, but that doesn't make -- render

18   it nonproducible.  Okay.  So -- all right.  So as of right now,

19   I -- I don't have a problem with this privilege log, and I'm

20   not directing an in-camera inspection.

21   The only other thing I have to deal with is I just -- I do

22   want to deal just briefly with this -- this issue that Mr.

23   Kearl raised at the end of the day yesterday, regarding the

24   transfer of Ms. Evans.  And I -- I -- I want to address it.

25   I'm not -- I'm not, at this time, overturning my determination.



# Exhibit E, Motion to Try Petition on Hearing Record

1    But I do want to explain why, because, you know, I think that

2    Mr. Kearl has the right to make a special appeal.  If you find

3    some law and you want to bring it to my attention, you can do

4    that.  And -- and I'd consider it in the nature of a motion for

5    reconsideration.  And at the very least, you know, at the start

6    of your case, we have some time.  You'll be able to make an

7    offer of proof.  But I -- I do want to address it a little bit

8    for the purposes of if you do want to take a special appeal.

9    So -- you know, every time we get into a different employment

10   action regarding a different individual, it does expand the

11   scope of litigation and it can expand it significantly.

12       You know, with regard to a transfer -- we started to get

13   into it yesterday, whether the transfer is desirable.  Then you

14   get into how many other people applied.  Who were those people?

15   Did those people have discipline?  Is there a policy regarding

16   consideration of -- of discipline with regard to transfers?  Is

17   there a practice?  It has the potential to significantly expand

18   the scope of litigation.

19       And -- and Mr. Murphy is right when he indicated with

20   regard to Mr. Smalls and Palmer that it does potentially

21   involve many litigate -- many trials.  And they're -- they're

22   not necessarily so many.  I was reluctant to get into the --

23   into the discharges of Mr. Smalls and Palmer, but those are at

24   least arguably part of the same immediate factual check

25   transaction, the same res gestae.  The transaction of Evans,

1    over a month after the discharge, and as far as I'm concerned,

2    is not -- you know, I think it -- it significantly expand the

3    scope of litigation and has only at -- at very best, a marginal

4    relevance.  So I'm -- I'm not -- you know, I'm not going to get

5    into it, that -- I'm not going to get into that, at least at

6    this time.

7        Now, it's my understanding that that's really something

8    that -- that Mr. Kearl on behalf of the Charging Party wants to

9    do in -- in putting on additional evidence in support of the

10   General Counsel's theory of the case.  And -- and we have some

11   time before Mr. Kearl has an opportunity to do that.  So if you

12   find some case law and you want to present it to me, you can.

13   If you want to take a special appeal, you can.  But in the

14   meantime, that's how I -- I'm going (audio interference).

15       MR. KEARL:  And can I just ask one clarifying question?

16       JUDGE GREEN:  Yes.

17       MR. KEARL:  Is that same determination for pay raises as

18   well?

19       JUDGE GREEN:  Yes.  Okay.  Is there -- is there anything

20   else we have to deal with before we start hearing from the --

21   the General Counsel's witnesses?

22       MR. KEARL:  Can we identify parties on the call?

23       JUDGE GREEN:  Sure.

24       MR. JACKSON:  And - and Your Honor, I'm sorry.  Before we

25   continue, could I just ask the people who are not actively



Exhibit E, Motion to Try Petition on Hearing Record

1    involved to mute themselves?  I see the 347-number coming up

2    and there's someone called Natalie.

3        JUDGE GREEN:  Well -- okay.  The 347 is the court

4    reporter.

5        MR. JACKSON:  Thank you.

6        JUDGE GREEN:  Okay.  And if I can remind everybody,

7    please, if you can, you know, you have the ability to rename

8    yourselves, renail -- re -- re -- rename your -- your --

9    yourselves.  Please just put your full name and if you're -- if

10   you're affiliated with a party, include the party.  If you're

11   not affiliated with the party, just say nonparticipant.

12       Just -- do we have any quest -- I mean, other than for

13   purposes of -- of enforcing the sequestration order, I don't

14   know that we have to identify people who are coming in the

15   room.  But if you have concerns about people -- we have

16   Natalie, do we know who Natalie is?  No?

17       Did we lose Natalie?  We might have lost Natalie.

18       MS. COX:  Member of the public.

19       JUDGE GREEN:  Okay.  Thank you.  Jeffrey Goldberg?

20       MR. GOLDBERG:  Yes.  Good morning, Your Honor.  I'm

21   counsel for Amazon, in-house.

22       JUDGE GREEN:  Okay.  I'm going to actually put you on my

23   list.  I actually have a separate spreadsheet for the

24   attorneys, them being very numerous in this case.

25       MR. SCHWARTZ:  Good morning, Your Honor.  Jason Schwartz



# Exhibit E, Motion to Try Petition on Hearing Record

1    of the Gibson Dunn firm, also counsel for Amazon.

2        JUDGE GREEN:  Okay.  Thank you.

3        MS. AHMAD:  Good morning, Your Honor.  I introduced myself

4    yesterday as the 646 number, but Zainab Ahmad, also with Gibson

5    Dunn and for Respondent.

6        JUDGE GREEN:  Okay.  And these aren't appearances, I'm

7    just -- I'm just doing this so I can have my list and be

8    familiar with who's in the courtroom.

9        MS. BUFFALANO:  Ms. Ahmad is going to enter an appearance

10   today, if you want to go ahead now.

11       JUDGE GREEN:  Ms. Ahmad -- Ms. Ahmad, would you like to

12   enter your appearance?

13       MS. AHMAD:  Yes, I would.  Thank you, Your Honor.

14       JUDGE GREEN:  Okay.  All right.  So we have that.  All

15   right.  I -- I -- does anybody have any concerns about anybody

16   else for purposes of the sequestration order?  If not, I think

17   we can leave everybody alone.

18       Okay.  So Ms. -- is it Mr. Jackson, are -- are you the one

19   who is going to put -- will you be -- are you putting on the

20   next witness?

21       MR. JACKSON:  Yes, I am.

22       JUDGE GREEN:  Are we ready to do that?

23       MR. JACKSON:  We are.

24       JUDGE GREEN:  Okay.  All right.  So I'm going to admit Mr.

25   Palmer into the virtual hearing room.



# Exhibit E, Motion to Try Petition on Hearing Record

1     Hello, Mr. Palmer.  Can you hear us?

2     MR. PALMER:  Yes.

3     JUDGE GREEN:  Okay.  Thank you very much.

4     MR. PALMER:  Okay.

5     JUDGE GREEN:  So Mr. Jackson, you're calling Mr. Palmer?

6     MR. JACKSON:  Yes, Your Honor.

7     General Counsel calls Derrick Palmer to the stand.

8     JUDGE GREEN:  Okay.

9     So Mr. Palmer, if you could raise your right hand.

10    Whereupon,

11                 **DERRICK PALMER**

12    having been duly sworn, was called as a witness herein and was

13    examined and testified, telephonically as follows:

14     JUDGE GREEN:  Okay.  And are you alone in the room?

15     THE WITNESS:  Yes.

16     JUDGE GREEN:  Okay.  And please just don't communicate

17    with anybody other than Counsel or me who may be asking you

18    questions, including don't talk -- don't communicate with

19    anybody by a -- by a phone or other handheld device.

20     THE WITNESS:  Okay.

21     JUDGE GREEN:  And also, don't -- don't refer to materials

22    other than those that are shown to you by Counsel or me, unless

23    we direct you to.  If we direct you to, then -- then you can.

24     THE WITNESS:  Okay.

25     JUDGE GREEN:  Okay.  Now, please, just -- just state and



Exhibit E, Motion to Try Petition on Hearing Record

1    spell your name for the record.

2        THE WITNESS:  Derrick Palmer, D-E-R-R-I-C-K, Palmer,

3    P-A-L-M-E-R.

4        JUDGE GREEN:  Thank you very much.

5        Okay.  Anytime you're ready, Mr. Jackson.

6        MR. JACKSON:  Thank you, Your Honor.

7                    **DIRECT EXAMINATION**

8    Q    BY MR. JACKSON:  Good morning, Mr. Palmer.  Thank you for

9    joining us today.

10   A    Good morning.

11   Q    Okay.  Now, for whom are you currently employed?

12   A    By Amazon, Inc.

13   Q    Okay.  We'll just call the company Amazon or the Company.

14   A    Okay.

15   Q    Okay.  What is your position with the company?

16   A    I'm a warehouse associate.

17   Q    Okay.  Do you work out of a particular Amazon facility?

18   A    Yes, JFK8 Amazon in Staten Island, New York.

19   Q    Okay.  And when did you first start working for Amazon?

20   A    July 24th, 2015.

21   Q    Throughout your employment with Amazon, did you always

22   work at the JFK8 facility?

23   A    No.  Originally, I worked at the EWR4 facility in

24   Robbinsville, New Jersey, and I transferred to JFK in October

25   of 2018.



Exhibit E, Motion to Try Petition on Hearing Record

1  Q    And have you worked at JFK8 since your transfer in October

2  of 2018?

3  A    Yes.

4  Q    All right.  I -- I'd like the record to reflect some

5  background information about the facility, JFK8, itself.  Can

6  you estimate approximately how big the JFK8 facility is?

7  A    I don't know the actual size.  I know that, like, if

8  you're, like, comparing to, like, football fields, I know you

9  can fit about, like, 15 football fields inside of it, so.

10  Q    Okay.  And are there multiple levels inside the facility?

11  A    Yes, there's four different levels.

12  Q    Okay.  And the 15 football fields, is that for each level?

13  A    No.  That would just be, like, the entire building.

14  Q    Okay.  Now, what -- what are -- what goes on on the

15  different levels of JFK8?

16  A    Well, like, different -- depending on which floor it is

17  will -- it'll tell you which department is going on, like, for

18  the 1st floor example, you have AFE1, you have picking going

19  on, you have counting going on, people working counting

20  inventory.  You have stowing as well, and those -- those are

21  the four.

22  Q    So that's -- that's what goes on in the 1st floor?

23  A    Yeah.

24  Q    All right.  You mentioned something called A-F-E; is that

25  A, as in apple, F, as in Frank, E, as in Eric?



# Exhibit E, Motion to Try Petition on Hearing Record

 1   A    Yes.

 2   Q    Okay.  AFE1, do you know what that is?

 3   A    Not specifically, but I know it's like a form of packing.

 4   Q    Okay.  And what is packing?

 5   A    Well, you know, I'm -- I'm in the pack singles department,

 6   so my job is to pack the box -- pack the -- the customer order

 7   inside the box, tape it up, and ship it out.  Now, AFE is a

 8   little different.  I'm not too familiar because I never worked

 9   in AFE, but I know it is a form of packing.

10   Q    Okay.  So you work now in packing.  Have you worked in

11   other departments?

12   A    I also worked in PCF, and PCF stands for pick, count,

13   floor help.  So it's basically like three departments kind of

14   combined into one.  Not all facilities do that same -- do that,

15   but yeah, I've done picking and counting.

16   Q    Picking and counting.  Okay.  And what is picking?

17   A    Picking, you're -- you're taking-- it's basically a

18   customer order.  And you're taking the customer order out of a

19   bin.  And the bin is attached to a robot.  The robots, they

20   transfer from each -- each associate.  So my job is to take

21   that, the actual customer order, out of the bin, place it

22   inside of a tote, press a button to make sure that's the

23   correct tote, and push it out.  And once I do that, it goes on

24   a conveyor belt, and then it goes to packing.  After that, it

25   gets packed and shipped out, so.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And you mentioned something called stowing; what is

2    stowing?

3    A    Stowing is where you're actually placing the customer

4    order item inside of the bin, which is attached to the robot.

5    Q    Okay.  And receiving, what is receiving?

6    A    Receiving is when the items come, like, off of the actual

7    truck.  So that's like the first process, so the items come off

8    the truck on a conveyor belt.  And the receiver, they take the

9    item off.  They put them -- put them on a -- on a -- not

10   totes -- them on pallets.  I'm sorry.  And they stack them all

11   up, and they wrap them.  Then they put them on a -- what do you

12   call that -- a -- a pallet jack.  It then gets sent to

13   different floors, depending on which floor needs the item.

14   Q    And how would you describe a pallet; what is a pallet?

15   A    It's like a brown wooden structure, and it holds items and

16   totes as well.

17   Q    Okay.  So if receiving is the first step in the process,

18   what's the second?

19   A    That would be stowing?

20   Q    Okay?  And what's the third step in the process?

21   A    That would be counting?

22   Q    And then what comes after counting?

23   A    Then packing.

24   Q    Okay.  And does anything come after packing?

25   A    Then shipping, and that's it.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    Okay.  Okay.  Now, what operations occur on the 2nd floor

 2    at JFK8?

 3    A    And that would be picking, counting, stowing.  Yeah,

 4    that's right.

 5    Q    And what operations occur on the 3rd floor of JFK8?

 6    A    That would be pack -- single pack, which -- which I'm at.

 7    AFE2, picking, counting, stowing.

 8    Q    And -- and the picking, counting, and stowing, and packing

 9    that occurs on the 2nd floor or the 3rd floor, is that, to your

10    knowledge, any way substantially different in nature from what

11    occurs on the 1st floor?

12    A    Well, the 1st floor, the AFE1 versus the AFE2, which is

13    actually on the 3rd floor, it's a little different.  Again, you

14    know, I'm -- I'm not too familiar with AFE.  But the picking,

15    the counting, and the stowing should be relatively the same.

16    Q    Okay.  And there are four floors; what operations exist on

17    the 4th floor?

18    A    That would be picking, counting, and stowing on the 4th

19    floor.

20    Q    And is the 4th floor picking, counting, and stowing, in

21    your estimation, any way materially different from what occurs

22    on the other floors?

23    A    No.  That's the same -- same process.

24    Q    Approximately how many employees work at the JFK8

25    facility?
```



Exhibit E, Motion to Try Petition on Hearing Record

1    A    So it would be around 5,000 associates.

2    Q    Are there different shifts?

3    A    Yes.  There's the RT shift, which is like a 12-hour shift,

4    three days -- three days, 12 hours.  There's night shift and

5    day shift as well.

6    Q    Does the facility operates 24 hours a day, seven days a

7    week?

8    A    Yes.

9    Q    Are there managers' offices at the facility?

10   A    Are the managers what?

11   Q    Are there man -- are there any managers?

12   A    Yes.

13   Q    Where -- where are the managers' offices?

14   A    They would be in the main office on the 1st floor, next to

15   Amcare.

16   Q    What's Amcare?

17   A    Amcare is where, like, if an employee gets injured, they

18   would go to Amcare to get the proper treatment.

19   Q    Okay.  Now, can you describe the main office physically

20   for us?  What's inside the main office?

21   A    First, when you -- when you first walk into the main

22   office, to the left-hand side would be the actual general

23   manager's office, which is, like, secluded from, you know, the

24   other offices.  Once you walk -- once you go straight ahead,

25   there's like a brown table.  And that's, you know, usually



Exhibit E, Motion to Try Petition on Hearing Record

1    where, like, the managers eat, you know, eat their donuts or

2    whatever, or they'll have, like, you know, small little

3    gatherings or discussions or whatever.  And then as you go --

4    you go straight, you'll have the cubicles where it would have,

5    like, little mini offices out in the open.  Then to your right-

6    hand side and left-hand side are small offices.  And then to

7    the back left corner would be the conference room.  Oh, I'm

8    sorry.  And the HR office is on the right-hand side.  It's --

9    it's part of those mini offices that I described.

10   Q    Is there also a general manager's office?

11   A    Yes, that's as soon as you walk in on the left-hand side.

12   Q    Oh, I think -- I think you said that.  I apologize.

13   A    That's fine.

14   Q    Okay.  Are employees permitted to -- well, I should say

15   are warehouse associates permitted to enter the management

16   main -- the main office?

17   A    Yes, they -- they are, at any time because Amazon has an

18   open-door policy where you're able to, you know, express your

19   frustrations or any -- any type of feelings that you have.  So

20   yeah.

21   Q    How do you -- how are you aware of this open-door policy?

22   A    That's -- well, you know, I was -- I was an ambassador.

23   And I just, you know, I've -- that's always something that I

24   have known just from working at Amazon.

25   Q    Is that something that managers have communicated to you?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yeah.   I mean, it's not like, you know, like, they tell

2    everyone that there's an open-door policy.   But like, me, you

3    know, I like -- I like to do my research, so I'm well aware of

4    the policy.

5    Q    I see.   You've researched Amazon's policies?

6    A    Yes.

7    Q    You said that you were an ambassador; what is an

8    "ambassador"?

9    A    Well, the ambassador's responsibility is basically,

10   training all of the new associates that come in.   So they're

11   actu -- like, the ambassador has a very important role, you

12   know, they -- like I said, they train all the new associates in

13   different process paths.   And they're literally, like, the

14   first person you really see when you become employed.   You have

15   the -- the learning trainers, which are, like, you know, the --

16   you know, level above the ambassadors.   You have the learning

17   trainers and you have the learning ambassadors.   And those are,

18   you know, we're like the welcoming -- welcoming crew, you could

19   say.

20   Q    Is there a parking lot outside of the JFK8 facility?

21   A    Yes.

22   Q    Okay.   Approximately how big is the parking lot.

23   A    Like, I don't know how -- I don't know how big it is, but

24   you know, there is an actual parking -- parking deck.   There's

25   a parking deck, actually, at JFK8.   That's before you enter.



# Exhibit E, Motion to Try Petition on Hearing Record

1    That's like, you know, on an off -- off the main road,

2    actually.  There's a parking deck with, like, four or five

3    different levels for people to park.  And then there's the

4    actual parking garage or you know, the -- the parking lot,

5    which is, like, from the one side of the facility to the other

6    it ex -- it extends.

7    Q    How far is the parking lot, or let's say, the beginning of

8    the parking lot from the entrance into the facility?

9    A    Man, it's pretty far.  About maybe 200 feet maybe, if I

10   were to guess.  I don't --

11   Q    Okay.

12   A    Yeah.

13   Q    Is the parking lot divided in any way?

14   A    Yes, there's like three different sections.  So like --

15   like let's say you're in the facility and you're walking out,

16   they have, you know, they have like a little side -- sidewalk

17   area.  And after that there's the -- you know, there's a

18   parking lane.  Then after that, there's like a -- like a

19   divider.  And on the divider, there's like a, like a bus stop,

20   kind of.  Like, you're able to sit down, like a bus -- bus

21   area.  I don't know why, because there's no busses going

22   through there.  But after that, then there's another -- there's

23   another lane, you know, a parking lane.  Then there's another

24   parking lane.

25   Q    Do you park your car in the lot?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    Do other warehouse associates park their cars in the lot?

3    A    Yes.

4    Q    Aside from warehouse associates, do you know who else uses

5    the parking lot?

6    A    Pretty much everyone; everyone that works at JFK8.

7    Q    Is JFK8 an Amazon fulfillment center?

8    A    Yes.

9    Q    Do you know what that means?

10   A    No.  I just know that a fulfillment center is larger than

11   the other centers like they have, like sort centers and

12   delivery stations.  So I know fulfillment centers are, like,

13   the large part of it.

14   Q    Okay.  Now, we spoke about the operations at different

15   departments earlier.  Are there supervisors in charge of each

16   department?

17   A    Yes.

18   Q    I want you to focus primarily on the period of March and

19   April 2020, because that's what relevant in this case.  Can you

20   tell us who was your direct supervisor in March and April 2020?

21   A    That would be Bertram Pryce.

22   Q    Okay.  And what department were you in at the time?

23   A    The PCF, pick, count, floor help department.

24   Q    And are familiar with the position processes assistant.  I

25   think it is?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    What's a process assistant?

3    A    Well, they're basically, like, right under the manager.

4    So that would, you know, if you're a regular associate like

5    myself, you're a tier 1.  A process assistant is a tier 3, so

6    it's like a, you know, you get promoted from tier 1 to tier 3.

7    So their responsibility is to basically staff, you know, make

8    sure that each -- each worker is at a specific station, and

9    they're doing the -- the function that they're supposed to be

10   doing.

11   Q    Okay.  Did you have a process assistant in March and April

12   2020?

13   A    Yes, I did.

14   Q    Who was that?

15   A    (Audio interference).

16   MR. JACKSON:  Well, I should rephrase the question because

17   I think it might be different.

18   Q    BY MR. JACKSON:  In March of 2020, who was your process

19   assistant?

20   A    That was Christian Smalls.

21   Q    And in April of 2020?

22   A    Who was that?  I believe it was Barbara Chandler.  I

23   believe she was the PA at the time.

24   Q    Okay.  Okay.  And did you work closely with your process

25   assistant when you were in the PCF division?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    In what ways do you work closely with your process

3    assistant?

4    A    Well, me, I -- I had a specific roll call process guide.

5    So a process guide is basically like a process assistant, like

6    you're doing their respon -- like, you're doing their job

7    responsibilities as well, like a extra eye on the floor.  But

8    the only difference is you're not getting paid the same as a

9    process assistant.  So it's like, you know, if you want to move

10   up, they give you that role, you know, so that you have the

11   experience.

12   Q    Okay.  Who were the other faci -- are you familiar with

13   any other supervisors at the facility in March and April 2020?

14   A    Supervisors as far as managers?

15   Q    Well, actually, let me clarify that.  So do you consider

16   Bertram Pryce a manager?

17   A    Yeah.

18   Q    Okay.  All right.  So I'll use the term manager instead.

19   Do you -- are you familiar with any other managers at the

20   facility in March and April 2020?

21   A    Yes.  Catherine Adams (phonetic), Ryan O'Leary, Mandi

22   Koplick (phonetic)?  I don't know, is it Mandi Kopit

23   (phonetic)?  I don't know.  No, no, Mandi Kumar, I'm sorry. Who

24   else?  Who else?  Those are the main ones I remember.  They

25   were all in my department, PCF.



www.escribers.net | 800-257-0885

1    Q    Okay.  Are you familiar with any other managers?

2    A    Not last name, but I know some from different departments,

3    like, Kevin (phonetic) from stow.  Who else?  Sherman, he's

4    from -- I think, at the time, I think he was in AFE.  That's --

5    that's the only one I could think of right now --

6    Q    Okay.

7    A    -- off the top of my head.

8    Q    Do the managers wear vests while on duty inside the

9    facility?

10   A    Yes, they do.

11   Q    What color vests do managers wear?

12   A    It's a green vest.  And like, they have, like, these red

13   stripes on the left and right side of the vest.

14   Q    Do it say --

15   A    Yeah.  On the back, it'll say operations.

16   Q    Okay.  And can you name which positions, which managerial

17   positions, wear those green vests with the red stripes?

18   A    That could be either an area manager or an -- a senior ops

19   manager.  Sometimes, a general manager wears that vest as well,

20   and assistant general manager, and operations, too.  Did I say

21   operations?

22   Q    You said senior operations managers.

23   A    Yeah, senior ops and ops, too.

24   Q    Oh, so there are senior operations managers and operations

25   managers?



Exhibit E, Motion to Try Petition on Hearing Record

1   A     Yes.

2   Q     Are there safety officials who work at the facility?

3   A     Yes.

4   Q     Okay.  What is your understanding of what the safety

5   officials do?

6   A     Well, they -- they pretty much walk the -- walk -- walk

7   the floor and make sure everyone's doing, like, you know,

8   everyone being safe, so to speak.  So like, if you're, you

9   know, making sure that you're not, like, bending over the wrong

10  way to pick up a box or something like that.  And they make

11  sure you're using your knees to squat -- and you know, you're

12  actually squatting.  That's -- that's their main role.

13  Q     Do the safety officials wear vests?

14  A     Yes, they wear a green vest and the stripes are gray on

15  the left and right side.

16  Q     Does it say anything on the safety officials' vests?

17  A     Yeah, it'll say safety on the back.

18  Q     Do safety officials typically work inside or outside of

19  the facility?

20  A     Inside.

21  Q     Are there human resources --

22        MR. JACKSON:  Excuse me.  Withdrawn.

23  Q     BY MR. JACKSON:  Do you know whether safety officials are

24  associates or are they managers?

25  A     That's really a tough question.  I mean, safety, they



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    have, like, tier 1 safety.  So like, if I wanted to volunteer

2    and do, like, you know, safety, I can do that.  But they also

3    have like a tier 3 or tier 4, I believe, level 4 safety as

4    well.

5    Q    Okay.  Are there any human resources or HR officials who

6    work at JFK8?

7    A    Yes.

8    Q    Do you know how many were working at JFK8 in March and

9    April 2020?

10   A    I'm not too familiar.  I think I would say probably, like,

11   12 in total if we're talking about night shift and day shift,

12   like, combined.  I will say that.

13   Q    Okay.  And do you recall any of their names?

14   A    I know Nikia Colon (phonetic), Tyler Grabowski, Christine

15   Hernandez, Linda -- I don't know her last name.  Who else?

16   That's all I can really think of.

17   Q    Are you familiar with someone named Christine Hernandez?

18   A    Yes.

19   Q    Who is she?

20   A    She was the HR manager at the time.

21   Q    Okay.  And what about Zachary Marc, are you familiar with

22   that individual?

23   A    Yes, he was a senior -- senior operations manager.

24   Q    Oh, he's in operations.  I understand.  Okay.  And do the

25   HR officials wear any kind of vests inside the facility?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes, they were purple vests.  And I believe it's, like,

2    gray stripes on the sides.

3    Q    Does it say anything on their vests?

4    A    Yeah, it'll say HR on the back.

5    Q    Okay.  Now, you mentioned different tiers.  Is it your

6    understanding that a certain tier elevates one to a supervisory

7    or managerial position?

8    A    Yeah, so --

9    Q    So which tier is the best?

10   A    Yeah, so the tier -- I know that the tier 1 would be me,

11   and the tier 3 would be like a process assistant or a --

12   noninven -- they noninventory, that's tier 3 as well.  Yeah, so

13   like -- yeah, you -- once you -- once you become a tier 3, it's

14   a supervisor role or -- yeah.

15   Q    Do tier 1 warehouse associates, are they required to --

16   wear vests inside the facility?

17   A    No.

18   Q    Okay.  Does Amazon -- did Amazon issue you a vest?

19   A    Yes.  They have -- they have machines where you're able to

20   get an orange vest, like a throw-away vest, if you want.

21   Q    But that's optional to wear that?

22   A    Yeah, optional.

23   Q    Okay.  Now, can you tell us who was the general manager of

24   the facility in March and April of 2020?

25   A    Sai Kotha.



1    Q    Okay.  Is that K-O-T-H-A?

2    A    Yes.

3    Q    Okay.  And was there only one general manager?

4    A    Yes.  That I'm aware of, yeah.

5    Q    And who is directly under the general manager?

6    A    Normally, it's the --  normally, it's the assistant

7    general manager.

8    Q    And why do you say "normally"?

9    A    Sometimes they won't have a assistant general manager.

10   Q    Okay.  Did they have an assistant general manager, as far

11   as you recall, in March and April of last year?

12   A    I don't know who the assistant general manager was at that

13   time.

14   Q    What is the function of the human resources officials who

15   work at JFK8 as far as you know?

16   A    Well, their job is to, like, help asso -- you know, help

17   associates if they have issues with clocking in or if they have

18   questions about, like leave of absences or you know, if they --

19   if they miss -- if a -- the associate has, like, a missing

20   punch or something like that, they can go to HR and do it.

21   Yeah, basically just any type of any -- anything of that

22   nature.

23   Q    If you wanted to make a complaint, where would you go?

24   Who would you report that to?

25   A    HR.  Yeah, they do that as well.  Sorry.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Are you familiar with a department within Amazon called

2    Loss Prevention.

3    A    Yes.

4    Q    What is the role of loss prevention as far as you

5    understand it?

6    A    Basically, securing Amazon.  So like, they're in charge of

7    watching the cameras to make sure anyone's, you know, I guess,

8    not stealing or something like that.

9    Q    Okay.  Do loss prevention officials typically work at

10   JFK8?

11   A    Yes.

12   Q    Do you know any of their names?

13   A    No.

14   Q    Do loss prevention officials wear a vest?

15   A    Yes.  They wear a green vest with, like, a blue stripe on

16   each side.

17   Q    Does it say anything on their vests?

18   A    It'll say loss prevention on the back.

19   Q    Have you have any interactions with loss prevention

20   officials?

21   A    No.

22   Q    Now, I just want to go back to something about HR.  You --

23   you mentioned that you would go to HR for a complaint.  What

24   kind of complaints might you go to HR for?

25   A    Well, like, let's say if you're having, like, an issue



Exhibit E, Motion to Try Petition on Hearing Record

1    with an associate or you know, a PA or a manager, you can fill

2    out a complaint.  It's actually -- it's an actual document, HR

3    document.  And after you're done filling it out, you give it HR

4    and it should be, like, it should be in your record for as long

5    as you work at Amazon.

6    Q    Okay.  All right.  Now, during March and April of 2020,

7    which days of the week and hours of the day did you typically

8    work?

9    A    I worked on Wednesday through Saturday, 7:15 to 5:45 p.m.

10   Q    7:15 a.m. to 5:45 p.m.?

11   A    Yes.

12   Q    Now, were you aware at that time, that the coronavirus, or

13   COVID-19 pandemic, was spreading in the New York City area?

14   A    Yes.

15   Q    What did you know about the spread of the coronavirus in

16   the New York area at the time?

17   A    Well, I knew that New York was pretty much the epicenter

18   of the coronavirus.  I know they had the most cases as, you

19   know, as I saw on television.  And you know, that people were

20   losing their lives and it was a deadly virus.  But we just --

21   you know, it was airborne.  We didn't -- we didn't know too

22   much about it; we just knew it was very deadly.

23   Q    Yeah, so what did you understand at that time about the

24   severity of the disease caused by coronavirus?

25   A    It was extremely severe, you know.  You know, people --



Exhibit E, Motion to Try Petition on Hearing Record

1    like I said before, people were losing their lives and it was

2    something that you can -- you can catch.  You can catch the

3    virus, and you can beat it, if you were, and -- but you can

4    bring it home to your family members, which was, like,

5    extremely scary, you know, for me, or you know, anyone --

6    anyone with a family.

7    Q    Did you know what the symptoms of COVID-19 were at that

8    time?

9    A    I know they were like flu-like symptoms.  Those were

10   possible symptoms, and loss of -- loss of smell.

11   Q    Okay.  Back in late March 2020, what did you understand

12   caused COVID-19 to spread?

13   A    Well, being around a lot of people, that's -- that's what

14   caused it to spread.  You know, not having, like, the masks.

15   Yeah, not -- you know, not being socially distanced.

16   Q    Did you believe at that time that COVID-19 could spread

17   by -- on surfaces?

18   A    Yes, like, I believe, on cardboard, I believe, plastic, if

19   I'm not mistaken.  No, I -- I believe it was cardboard, that I

20   knew that you can pass the virus on cardboard.

21   Q    Did you understand at that time that asymptomatic people

22   or people who did not appear to be sick could still carry the

23   virus and transmit it?

24   A    Yes.

25   Q    Did you know anything about how fast COVID-19 was



# Exhibit E, Motion to Try Petition on Hearing Record

1    spreading back in March 2020?

2    A    I just know it was extremely fast.

3    Q    And how did you know that?

4    A    Well, television, social media.  Yeah.

5    Q    Were you following the news regarding the coronavirus at

6    that time?

7    A    Yeah, because it was -- it was -- it was everywhere.  It

8    was like it was impossible to avo -- to avoid.  You know, I'm

9    at work and I'm hearing about coronavirus on TV, and you know,

10   on my phone.  I'm always on my phone, so I was through that as

11   well.

12   Q    Did employees at Amazon at the time, handle cardboard and

13   plastic?

14   A    Yes.

15   Q    In what ways did you handle cardboard or plastic?

16   A    Well, depending on which department you had or the

17   department you were in, you know, you are handling totes and

18   the totes are plastic.  And the cardboard boxes, if you're, you

19   know, whichever department you're handling cardboard boxes,

20   like, for example, pack.  You know, you're literally packing a

21   cardboard box.  You're putting an item, a customer's item,

22   inside of a cardboard box.  And you're sending it to someone

23   else.  And that same person from the -- after you send it, it

24   goes to shipping.  So that same person is touching that same

25   box. and then it's getting shipped out, so very alarming to me.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Do multiple people touch the cardboard and plastic items?

2    A    Yeah, absolutely.  Those same totes, all the totes that we

3    use to place the items -- the customer items in, are the same

4    totes that are in the facility now.  So the totes are getting

5    reused.  They're going through every department.  Yeah, so

6    it's -- it was scary, definitely.

7    Q    And were employees touching these items throughout their

8    shifts?

9    A    Yes.

10   Q    Now, I think you alluded to this, but did the spread of

11   the coronavirus cause you any concerns about your working

12   conditions at that time?

13   A    Oh, yeah.  Ab -- absolutely.  You know, first of all, you

14   know, there's -- and like I said, there's 5,000 associates,

15   number 1.  Number 2, we didn't have the masks and you know,

16   gloves, any type of protection.  And you know, in break times,

17   we were, like, packed together.  You know, people were side by

18   side without the masks for 30 minutes.  And you know, it was

19   very scary, like, we didn't -- people coming in and out.  So it

20   was just crazy, like, you can possibly, like you said, be

21   asymptomatic.  You can have the virus and not know and pass it

22   along to your family member, and that could be deadly for them.

23   You know, like, depending on if they have any, like, underlying

24   health conditions, you know, like if they have, like, cancer or

25   lupus or something, or AIDS or something.  If they were to



Exhibit E, Motion to Try Petition on Hearing Record

```
1    catch the virus, that's -- that could possibly be death.  So

2    very alarming, and yeah, very -- very scary time.

3    Q    Were you aware that the governor of New York State issued

4    an order in late March 2020, closing certain businesses?

5    A    Yes.

6    Q    Did the JFK facility close in late March 2020?

7    A    No.

8    Q    Are you familiar with the term "essential worker"?

9    A    Yes.

10   Q    What is an essential worker, as far as your understanding?

11   A    As far -- the essential worker is a worker who has to work

12   in, like -- well, let me rephrase that.  I know, like, for

13   example, like, a warehouse associate or an Amazon worker was

14   considered an essential worker.  Nurses, doctors, what else,

15   like, yeah.  Those are the main ones I know are essential

16   workers.

17   Q    Now, I want to talk a bit about the working conditions you

18   observed at that time among employees at JFK8.

19   A    Um-hum.

20   Q    Did certain employees inside the facility work very

21   closely to one another?

22   A    Yes.  Absolutely.

23   Q    All right.  Let's start with your job at that time, which

24   was in pack -- picking, correct?

25   A    Yeah.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Did you work closely -- did you work closely with other

2    employees, you know, in terms of physical proximity?

3    A    Well, like, it -- it really depends.  So like, let's say

4    if I'm picking, you know, each station would be like five to

5    ten feet away.  So not necessarily when -- when you're picking.

6    Counting is the same -- same thing because the counting -- the

7    stations are -- you're basically using the same stations, so to

8    speak.  So they're the same -- same proximity, five to ten

9    feet.  But like, there's -- there's a form of picking where

10   you're on a station called a -- a universal station.  So a

11   universal station, you have a "water spider", and the water

12   spider's responsibility is any -- any item that you put in the

13   tote and you push down as a picker, the -- the water spider's

14   responsibility is to take those totes, stack them, and put them

15   on a -- a dolly or a U-boat or whatever, and put them on the

16   conveyer belt.  So that's where the picker and the -- that's

17   where you have, like, close interaction with someone else, the

18   picker and the water spider.

19   Q    How do the water spider and the picker come into close

20   physical proximity?

21   A    Well, yeah, like I said, you have to -- the picker, once

22   they're done with the -- at the tote, and then once it's filled

23   up, they have to push it down on the conveyer belt.  But that

24   conveyer belt is con -- is on the actual station that you're

25   working at.  So the pick -- the -- the water spider gets very



Exhibit E, Motion to Try Petition on Hearing Record

1   close to the picker while they're picking to grab the tote.

2   Q    What about receiving, do employees in receiving work

3   closely to one another?

4   A    Yes, because one -- once the item is received off the

5   truck and it has like an actual conveyor belt.  And there's

6   multiple people grabbing those boxes and placing them on the

7   same pallet, so that, you know, the work gets to the stowers

8   faster.

9   Q    Okay.  So based on your observations, how closely would

10  you estimate people in receiving work relative to one another?

11  A    I would say, like, shoulder to shoulder, really.

12  Q    And -- and what about the water spider, how close does the

13  water spider work in relation to the pickers?

14  A    Well, do you mean a water spider for -- because there's a

15  water spider for the stow department, and there's a water

16  spider for picking.

17  Q    Okay.  So let's start with pick, because we've already

18  talked about that.  Well, how close does the water spider work

19  to employees who are engaged in picking?

20  A    It -- it would be, like, within six feet if you're

21  picking.

22  Q    Okay.  And then how about stowing, do employees work

23  closely to one another while they're stowing?

24  A    Yes.  You know, like, similar.  Like, the water spider for

25  stow and pick are similar, being that they have someone who is



Exhibit E, Motion to Try Petition on Hearing Record

1    manually giving them work or taking work from them.  So the

2    stower's responsibility is to place the boxes onto their

3    mini -- mini-belt that's on the stower's station, so that they

4    can be within six feet as well.

5    Q    Do employees in packing -- or -- or -- excuse me.  Did

6    employees at the time in packing work closely to one another?

7    A    That's a very interesting question.  Well, I mean, I

8    wasn't in pack at that time, so I wasn't really --

9    Q    Did you observe the packing operation at that time?

10   A    Yeah, I mean, it was pretty much the same.  I've been

11   there, like, a few times.  It's -- it was pretty much the same

12   setup, like, people would have their own station.

13   Q    Oh, same setup as picking?

14   A    No, no, no.  Like -- like, I mean, as far as, like, now,

15   compared to back then.  Like, the people would have their,

16   like, if you're packing your pack singles, you would have your

17   own station.  Now AFE is a little different.  AFE, they're,

18   like -- it's way more people, and they're all, like, on the

19   same line.  They have stations next to -- like, right next to

20   each other.  And there's no, like, there's no divider or

21   anything.  So it's like a whole bunch of work.  It's just boom,

22   boom, boom, boom, boom, right next to each other, shoulder to

23   shoulder.

24   Q    That's at AFE?

25   A    Um-hum.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Both AFE1 and AFE2?

2    A    Yeah.

3    Q    What about employees who work in shipping, do they work --

4    or at the time in March and April of last year, did they work

5    closely with one another?

6    A    Yes, they did.  Shoulder to shoulder, just as receive --

7    just as receive does, depending on what part of shipping you're

8    in.  Like, if you're doing something called palletizing, where

9    you're placing the items on the -- on the specific pallet so

10   that it can get, you know, get wrapped and loaded onto a

11   specific truck, then there was, like, at least four or five

12   people on each pallet trying to stack it up, so then one person

13   wraps it.  But you know, there's all these pallets that's in --

14   that's in palletizing, and they're all next to each other.  And

15   if there's four people on each pallet, depending on how many

16   pallets are there, that's a lot of people, you know, working in

17   the same zone without the proper protection, so.

18   Q    And you never worked in shipping; is that correct?

19   A    No.  I did -- I did one time, but not, like -- that wasn't

20   my actual department.

21   Q    Did you observe the operations in shipping?

22   A    Yeah.  That's what -- the palletizing part, I've done, and

23   also, like, loading the truck.  The trailer will probably be,

24   like, one or two people loading the trailer, at times.

25   Q    Have you ever worked in receiving a JFK8?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    But have you observed the operations in receiving?

3    A    Yes, yes.

4    Q    Did you ever work in stowing at JFK8?

5    A    No.

6    Q    Did you observe the operations in stowing?

7    A    Yeah, because -- you know, like I said earlier, the

8    stowers and the pickers and counters are all on the same floor.

9    So like -- like, one station could be picking and one of the

10   stations could be stow.

11   Q    Are you familiar with something called a stand-up?

12   A    Yeah.

13   Q    What's a "stand-up"?

14   A    A stand-up is basically like a meeting with the -- the

15   process assistant, the area manager, and all the associates

16   that's assigned to that manager.  And what they would do is

17   they would just discuss, like, any updates about -- about

18   the -- the department or you know, they'll -- they'll have like

19   the top pickers or top counters or whatever or stowers.  And

20   they'll have, like, a list of that.  And they'll just -- just

21   basically discussing -- or they're, like -- the -- that -- that

22   actually, what they would do, they'll be, like, the motivation

23   there.  Like, let's say if the -- the floor is not, you know,

24   they're not -- if people aren't performing well, they'll

25   motivate you, like, hey, you've got to get to this certain



Exhibit E, Motion to Try Petition on Hearing Record

1    number.  So yeah, that's all I know.

2    Q    Who -- who conducts the stand-ups?

3    A    It depends, like, sometimes it will be the area manager;

4    sometimes it'll be the process system.

5    Q    Wha -- are there different stand-ups for different

6    departments?

7    A    Yeah, there's a sta -- the stand-up for every department

8    really.

9    Q    How frequently do the stand-ups happen in the course of a

10   day -- or a shift, I should say?

11   A    Two times.  So one time before the shift starts -- well --

12   well, right in that shift, you know, the beginning of the shift

13   and also right after lunch time.

14   Q    And where do employees meet for the stand-ups?

15   A    It depe -- it -- it really depends.  Well -- well, there's

16   actually a stand-up area actually on each floor.  So depending

17   on what department they're -- they're in will determine which

18   stand-up they do.

19   Q    And how the people congregate during a stand-up?

20   A    What do you mean by that?

21   Q    Like, can you describe how people are -- how close people

22   are in physical proximity during the stand-ups?

23   A    Oh, okay.  Yeah.  The stand-up areas is everyone's pretty

24   much close together.  You know, sometimes it could be like --

25   like a hun -- a hundred people on one floor.  You know, there's



# Exhibit E, Motion to Try Petition on Hearing Record

1    a lot -- each manager has a lot of associates so.  Yeah.  It

2    could be up to 100 people definitely within six feet.

3    Q    Now, aside from stand-up, do managers approach employees

4    to -- to discuss things from time to time?

5    A    Yes, every now and then managers and process systems will

6    do something called coachings.  So like if a -- if a worker is

7    underperforming or if they're making like -- like, quality

8    errors, the manager or TA (phonetic) would go to them and --

9    and you know, pretty much direct them on how to do their

10   process, pack the correct way or to prevent them from making

11   any errors.

12   Q    And in those instances, how closely do the managers come

13   to the employees?

14   A    Oh, they -- well within six feet.  The -- the actual audit

15   or you know, the -- the auditor coaching, they can take -- they

16   can take from 5 to sometimes even 20 minutes, depending on, you

17   know, how much help the associate needs.  And what they'll do

18   is like if they're really not getting it, they'll actually pick

19   for then or count for them, like, right in front of them to

20   show them, hey, this is how you're supposed to do this

21   function.

22   Q    Now, in March 2020, does Amazon provide face masks to

23   employees?

24   A    No.

25   Q    In March 2020, did Amazon require employees to wear face



1    masks?

2    A    No.

3    Q    Did Amazon implement a policy requiring employees inside

4    the JFK facility to wear a face mask at any time before April

5    6th, 2020?

6    A    No.

7    Q    Did Amazon at some point after March begin providing face

8    masks?

9    A    Yeah, that would be maybe -- I believe April 10th maybe, I

10   believe.  Somewhere around that time.

11   Q    Okay.  And after the company began providing face masks,

12   did any manager or supervisor communicate a rule in policy to

13   you rega -- requiring people to wear the face mask?

14   A    Yeah.

15   Q    Okay.  How was that communicated?

16   A    They had like signs in -- inside the building.

17   Q    When did those signs come up?

18   A    I believe April 10th or after that.

19   Q    Now, back in March 2020, again before Amazon started

20   providing the free face masks, did you notice whether managers

21   were wearing face masks inside the facility?

22   A    Yeah, they -- they weren't wearing face masks.

23   Q    Did the company ever provide face shields or protective

24   eye coverings to to employees?

25   A    No.



Exhibit E, Motion to Try Petition on Hearing Record                        622

1    Q    Did the company at any time in March 2020 provide latex

2    gloves to employees?

3    A    No.

4    Q    Was there a time after March 2020 when Amazon began

5    providing latex gloves to employees?

6    A    In April.  So the same time they brought the masks in,

7    same -- same time they brought the gloves in.

8    Q    Before they started providing the free latex gloves -- or

9    actually, were they free?  Did you have to pay for them?

10   A    No, no, they were -- they were free.

11   Q    Okay.  I thought so.  So before they started providing the

12   free latex gloves, were employees were required to wear gloves

13   during their work?

14   A    No.

15   Q    Did Amazon require employees to wear gloves after they

16   began providing the free ones?

17   A    Yes.  Well, the gloves -- were -- were they required?  No,

18   the face masks were, but not the gloves.

19   Q    Those were not required?

20   A    Yeah.

21   Q    And do you know how many face masks were req -- were

22   provided?  Could you get one -- new one every day?

23   A    Yeah, they would have them, like, as soon as you walk in

24   after -- no, yeah, as you walk in, they would have the -- the

25   gloves and the masks in like totes -- the yellow totes.  And



Exhibit E, Motion to Try Petition on Hearing Record

1    they would stack the totes on top of each other.  So it would

2    be like four totes filled with the masks and gloves.

3    Q    All right.  Now, can you describe the ventilation or air

4    flow that existed inside the facility in March and April 2020?

5    A    Well, I mean, it wasn't -- it wasn't good at all, you

6    know, wasn't ventilated or anything.  So yeah.

7    Q    Were there any windows inside the facility?

8    A    There's windows, but they don't open at all.

9    Q    Where were the windows?

10   A    On the third floor by the third-floor breakroom and on the

11   first floor by the first-floor breakroom in like, by the locker

12   area.

13   Q    But you testified that those typically remain shut?

14   A    Yes.

15   Q    What about the doors leading outside of the facility?

16   A    I think --

17        MR. JACKSON:  I'll withdraw that for now.

18   Q    BY MR. JACKSON:  Were there windows on the second floor?

19   A    No, not that I'm -- not that I'm aware of.  No.

20   Q    And on the fourth floor?

21   A    No.

22   Q    And what about the doors leading outside of the facility?

23   Did those typically remain open or closed during March and

24   April 2020?

25   A    Closed.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    During March and early April 2020, did company management

2    or any manager inform you about any changes or improvements

3    Amazon was making to the ventilation inside the facility in

4    response to the pandemic?

5    A    No.

6    Q    Did Amazon have hand sanitizer readily available to

7    employees throughout the facility during that period?

8    A    Well, they had -- wait in -- in March we're talking about?

9    Q    In March and April 20- -- or March and the early part of

10   April.

11   A    No, not in March.  And April, it was -- it was in April,

12   yes.  But they -- like, they would have like hand sanitizer or

13   like a -- what's that -- the other spray they had?  It was like

14   another spray they had.  I don't know the actual name.  But

15   they would have it at -- they would put it in like a -- like a

16   brown box and it would be like the end of some workers'

17   stations.  So like, for -- for example, in picking, they would

18   have some at some stations, but it wouldn't be every station.

19   Now if you're counting, you would have to go to the pickers

20   and -- the pickers station and grab a hand sanitizer or a spray

21   to clean your station.

22   Q    Okay.  So is it true that -- you -- you did testified

23   before that in March of last year, 2020, there was no hand

24   sanitizer available?

25   A    No.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    Okay.  At -- and -- but in April, they began -- the

 2    company began providing the hand sanitizer?

 3    A    Um-hum.

 4    Q    That's -- do you recall --

 5    A    Yes.

 6    Q    -- when approximately?

 7    A    Oh, man, I just remember after April 10.

 8    Q    Okay.

 9    A    Yeah.

10    Q    And were employees expected to --

11         MR. JACKSON:  Or actually, I'll withdraw that.

12    Q    BY MR. JACKSON:  Was the sanitizer always full?

13    A    No.

14    Q    Sometimes it would be empty.  They had like these little,

15    like, sanitizer stations kind of.  But they would be like by

16    the water fountain.  So he would -- you know, it was pretty far

17    from your actual workstation.  So you have to like walk away

18    and you know, use the hand sanitizer.  Sometimes, it'd be

19    empty.  So, you'd have to go to like another part of the

20    building to get it.

21    Q    Did the company provide you with any guidance or

22    instruction on when or how to use the hand sanitizer?

23    A    No.

24    Q    Did the company provide employees at JFK8 with

25    disinfecting surface wipes in March of 2020?
```



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    Did they begin doing that in April of 2020?

3    A    Yes.

4    Q    Around the same time as the other changes?

5    A    Um-hum.  Yes.

6    Q    Did management provide you with any guidance on when or

7    how to use the sanitizing wipes?

8    A    No.

9    Q    After Amazon began providing the sanitizing wipes, were

10   they always readily available to employees?

11   A    Yeah, but I mean -- like I said, like, it wasn't at every

12   station.  Sometimes it will be empty wipes.  Like, the -- the

13   box will be empty wipes.  So you have to go to another station.

14   Q    Did management require employees to wipe down their -- the

15   equipment that they had used before another person was to use

16   the equipment?

17   A    No.  There will be times where, like, you know, like I

18   said before with picking and counting, it was shared --

19   sometimes we'll share the same station.  So like, if you're

20   picking, most likely you know count.  So they would flip you

21   from pick to count throughout the day.

22        And you can go -- like, let's say if I'm at one station

23   and I'm picking, I could get a message on my screen and say,

24   hey, go count on this station.  So there's -- there's no

25   instruction to clean the station when you switching process



Exhibit E, Motion to Try Petition on Hearing Record

1    patterns at all.  And you could be working at a station where

2    another person was told to go to a different station.  So it --

3    there -- there was no cleaning in between any of that, any of

4    those functions so.

5    Q    Oh, so you would work in multiple workstations throughout

6    the shift?

7    A    Yep.

8    Q    And other employees would switch stations as well?

9    A    Um-hum.  Yes.

10   Q    Now, were you aware of any so-called social distancing

11   requirements that essential businesses that remained open in --

12   in late March 2020 were supposed to follow?

13   A    In we're talking about Amazon or just businesses --

14   Q    Generally, are you aware of social distancing requirements

15   that businesses were supposed to follow if they remained open?

16   A    Yes.

17   Q    And what did you understand businesses were supposed to do

18   in terms of social distancing?

19   A    Well, I know that people were supposed to be not within

20   six feet of another person.

21   Q    Did Amazon implement any rules or changes in March 2020 to

22   help make it possible for employees at JFK8 to socially

23   distance?

24   A    Well, like the end of March, they will like, kind of, move

25   the tables away from each other.  But you know, there was no



# Exhibit E, Motion to Try Petition on Hearing Record

1    mask or gloves.  So there wasn't like a -- hey, you got to do

2    this.  You've got to do that.  It wasn't any specific social

3    distancing.  They didn't really describe how to socially

4    distance at all so.

5    Q    During March -- at any time during March 2020, did Amazon

6    communicate a social distancing policy to you?

7    A    No.

8    Q    Was there a cafeteria at the facility?

9    A    Yes.

10   Q    Were their food vendors at the cafeteria?

11   A    Yes.

12   Q    So during a typical meal break, about how many employees

13   would gather in the cafeteria?

14   A    In -- in the main breakrooms, the first floor had a lot --

15   had the most associates entering and leaving the cafeteria.

16   That could be hundreds at one time.

17   Q    Okay.  And so there are cafeterias on different floors?

18   A    Yes, on -- on the third floor, main breakroom.  It's

19   basically similar to the first-floor breakroom, except it's --

20   it's smaller.  But the same -- same layout pretty much.  And

21   there's like, I guess those -- those are the actual breakrooms

22   that I know of.  Oh, no, also on the first floor, there's like

23   a smaller breakroom.  That's by -- that's by the receiving dock

24   actually.  And that -- you know, that's very small breakroom

25   so.  But they have like, the food -- same food they have on the



Exhibit E, Motion to Try Petition on Hearing Record

1    first and third floor.

2    Q    Can you estimate how big approximately the large

3    breakroom -- the main breakroom on the first floor was?

4    A    Oh, man.  How big?  Probably like two -- I don't -- I

5    don't know honestly.  It's -- it's big, though.  It's very big.

6    Maybe 200 feet plus.  I don't know.

7    Q    Okay.  And what about the other breakroom on the first

8    floor?  Can you give us your best estimate about how big that

9    was?

10   A    That's -- that's small.  It's like -- man.  That's -- I

11   don't know how -- I don't know honestly.  It's really --

12   it's -- it's small, though.  It's very small.

13   Q    In proportion to the larger breakroom on the first floor,

14   half the size, a quarter of the size?

15   A    Be probably like one-tenth.  Yeah.

16   Q    During a typical meal break on your shift, how many people

17   gather in the smaller first-floor blake -- breakroom?

18   A    Be probably about 15 people.

19   Q    And can you give us your best estimate about how big the

20   breakroom on the third floor was?

21   A    That could be -- that could be 200 -- 200-plus associates

22   so.

23   Q    So I asked how big it was?  Is it --

24   A    Oh, I'm sorry.  How big?

25   Q    Yeah.



1    A    It's probably about half the size of the first-floor

2    breakroom -- main breakroom.

3    Q    And during a typical meal break, how many employees might

4    you see gathering in the third-floor break?

5    A    That could be 200 plus.

6    Q    Did employees sometimes gather, form lines around the food

7    vendors in the cafeteria?

8    A    Yes.

9    Q    Did Amazon require employees who were gathered in the

10   cafeteria to remain six feet apart from one another during

11   March of 2020?

12   A    No.

13   Q    Were there windows in the breakroom?

14   A    Yeah, but they're -- well, yeah, windows but they're

15   closed, closed windows.

16   Q    They remain -- they remain closed as -- as far as you

17   could recall?

18   A    Yes.

19   Q    What about in the cafeterias, the windows?

20   A    Yes.

21   Q    But they -- did they remain closed as well?

22   A    Yes.

23   Q    Did Amazon place posters around the facility in March of

24   2020 encouraging employees to stay home if they were sick?

25   A    No.



1    Q    Did Amazon place posters around the facility describing

2    how proper coughing or sneezing etiquette?

3    A    No.

4    Q    Were there any posters posted around the facility

5    describing upper hand hygiene?

6    A    None.

7    Q    To your knowledge, did Amazon make any significant changes

8    to procedures for sanitizing JFK8 facility during March of

9    2020?

10   A    No.

11   Q    What about during April 2020, did they make any changes to

12   sanitizing procedures?

13   A    No.  They just placed the -- the -- the wipes and hand

14   sanitizer stations in the building, but there was no

15   instruction or anything or how to use it.

16   Q    Are you aware of any -- excuse me.

17        MR. JACKSON:  I'll withdraw that.

18   Q    BY MR. JACKSON:  Are you aware of Amazon hiring anyone to

19   perform a deep cleaning of the facility during March of 2020?

20   A    No.

21   Q    What about during April 2020, are you aware of Amazon

22   performing a deep cleaning of the facility in April?

23   A    No.

24   Q    In March of 2020 -- well, did Amazon perform any deep

25   cleaning of the facility during March or April 2020?



Exhibit E, Motion to Try Petition on Hearing Record

1  A    No.

2  Q    All right.  Now, during March of 2020, was there any

3  downtime between employees shifts?

4  A    You're talking about from like day shift to night shift?

5  Q    Yeah.  Like, was there a break between that separated time

6  for the end of the one shift to the start of the next shift?

7  A    No.  So like, if I'm -- if it's 5:45 and I'm leaving,

8  they'll -- there would typically be someone waiting to use the

9  same station that I'm using that -- on the night shift.

10  Q    And in between shifts, in that period where there is a

11  changeover of the shifts, did employees come in close proximity

12  to one another?

13  A    Yes.

14  Q    How so?

15  A    Well, you know, like I said -- like, once I'm leaving the

16  station, the end of my shift, there's someone right there

17  waiting so (indiscernible).

18  Q    Do you know what time the night shift was?

19  A    No.  I just know that once I'm leaving, they're coming in.

20  So I don't know a specific time.

21  Q    Okay.  Now, during March of 2020, did Amazon implement any

22  pause or breaks between shifts that would enable the company to

23  sanitize the facility or the equipment between shifts?

24  A    No.

25  Q    And in April, did they implement that?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    During March or April -- oh, excuse me.  I'll do one at a

3    time.  During March of 2020, did Amazon ever ask you health-

4    screening questions about possible COVID-19 symptoms you might

5    be Experiencing?

6    A    No.

7    Q    During April, did Amazon begin asking you health-screening

8    questions about COVID-19 symptoms?

9    A    No.

10   Q    During March 2020, did Amazon ever ask you if you had

11   contacted anyone who had tested positive for COVID-19?

12   A    No.

13   Q    And then during April, did they ask you questions about

14   whether you had contact with someone who tested positive?

15   A    No.

16   Q    Now, you testified earlier about your serious concerns

17   about your working conditions in light of the pandemic.  Were

18   you the -- were you the only employee at JFK8 who had concerns

19   about your working conditions in that regard?

20   A    No.

21   Q    What makes you say that?

22   A    Well, you know, just interacting with other associates, a

23   lot of people were just saying, like, you know, this

24   coronavirus is very scary.  And we shouldn't -- we shouldn't be

25   here.  We shouldn't be at work.  And I -- you know, I said the



Exhibit E, Motion to Try Petition on Hearing Record

1   same thing.  You know, I was one of the few that was actually

2   vocal, you know, to management and you know the media about the

3   unsafe working conditions.  But you know, if you -- if we're

4   talking about people in general, you know, the building was

5   concerned about the coronavirus.  Just not -- just scared to

6   speak up, I would say.

7   Q    Can you estimate approximately how many of your coworkers

8   you spoke about this issue with?

9   A    Oh, man, probably about 50 a day.

10  Q    50 every day?

11  A    Yeah.

12  Q    Okay.  Now, you mentioned that most employees were not

13  vocal with their concerns; is that correct?

14  A    Yeah.  Yes.

15  Q    Aside from yourself, were there any other employees who

16  were vocal about their concerns?

17  A    Yes.  Myself, Christian Smalls, Gerald Bryson.  The ones I

18  could name of my head, yeah.

19  Q    And who -- who's Gerald Bryson?

20  A    Gerald Bryson, he was a -- a coworker of mine.  We were on

21  the same team.  So we had the same manager, Bertrand Price.

22  Q    Okay.  And who's Christian Smalls?

23  A    He is the process assistant on the same team with me and

24  Gerald.

25  Q    Did you and Gerald ever discuss your concerns about the



Exhibit E, Motion to Try Petition on Hearing Record

1      potential spread of COVID-19 at JFK?

2      A      Yes.

3      Q      Do you recall attending an employee fair hosted by Amazon

4      in March of 2020?

5      A      Yes, I do.

6      Q      Where was the fair held?

7      A      Well, as soon as you walk in the building, there's like a

8      Day 1 room, where like, the -- the new associates would go in.

9      And that room was held -- and that was used for a quote,

10     unquote, mini carnival, if you want to say.

11     Q      In what ways was it a mini carnival?  What makes you say

12     that?

13     A      Well, they had the -- the popcorn vendors in there and you

14     know, they had music playing.  You know, it was a lot of

15     people, you know, gathered around.  They had like -- you know,

16     eight -- like, those -- like, little stations.  So that, like,

17     if you're a worker, you wanted to sign up for something called,

18     like, affinity groups.  They're like different groups that do

19     like, you know, like, community work.

20             So they had affinity groups for black people, Latino

21     communi -- community, gay, lesbian, Asian, and like military --

22     military people, too.  And like they had like each little

23     station.  And they had like little -- you know, like, little,

24     like, bingo or something like that, like little prizes.  But --

25     and they had like little prizes you can win if you can join



Exhibit E, Motion to Try Petition on Hearing Record

1    these affinity groups.  So I guess they wanted people to join

2    them, maybe didn't have enough members.  But it was like -- it

3    was a big party there, you know, inside.

4         And then outside of that, they had like -- they had the

5    same people, and they had their blow horns and they were like

6    telling everyone to come inside.  They had a DJ, too.  So it

7    was like a -- you know, like a big party festival going

8    inside -- you know, actually inside of this room.  And like --

9    Q    Okay.

10   A    -- people --

11   Q    Go ahead.  Please finish.

12   A    No, no.  People were like -- like entering and leaving the

13   facility because they did it at the end of the shift -- end of

14   the day shift.  So like, the people that were coming in, they

15   were like the -- the safety people were encouraging them to go

16   in this room and sign up for these groups.  And the people that

17   were leaving, they were asking them as well.

18   Q    If you were entering or leaving the building, did you have

19   to go through the fair area -- or excuse me, yeah, the employee

20   fair area?

21   A    Yeah, like you couldn't miss it.  Like, you had to -- even

22   if you had like your headphones on, you be able to hear.  So,

23   like -- you know, like you were just -- like, tempted to go in

24   there and see what -- what -- what the fuss about so.  I -- you

25   know, that's how I got in.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And when you were in -- when you went in there that

2    day, did you observe how many -- approximately how many people

3    were there?

4    A    Oh, man.  Entering and leaving, I would say about 100 --

5    100 people.

6    Q    And how big was this room?

7    A    Small, like a -- like a one bedroom, like if it's -- how

8    do I describe this -- the size?  Like, a living room basically.

9    Yeah, the size of a living room or like a large bedroom.

10   Q    I thought -- well, did the employees share food at this

11   event?

12   A    Yeah, you know, they had someone working the concession

13   stand, the popcorn stand.  And they were like, you know,

14   digging a little shovel in there, putting the -- the popcorn in

15   the container and handing it to people.

16   Q    Um-hum.  Do you recall approximately when in March this

17   employee fair took place, the date?

18   A    I'm not sure the specific day.  I believe it was like

19   around March 18th if I'm not mistaken.

20   Q    And were you aware at that time of the danger posed by the

21   coronavirus?

22   A    Yes, I did.

23   Q    Was Gerald Bryson at the fair at the same time that you

24   were?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Did you discuss any concerns you had about the situation

2   with Gerald?

3   A    No, not at that time.

4   Q    Okay.  Did you at some point in March 2020 learn that a

5   person at JFK8 had tested positive for COVID-19?

6   A    In March 18th, you said?

7   Q    No, excuse me, at any time in March 2020, did you learn

8   about a COVID-positive test at the facility?

9   A    Yes, I believe it was March 27th or 26th.  No, no, no, the

10  24th is when I found out the word of mouth.  Not, you know,

11  there wasn't like an announcement or anything, but I did find

12  out the 27th that -- yeah, the 27th I found out that it was

13  like confirmed.  The 24th -- no, it -- well, the 24th and the

14  27th, really if that makes sense.

15  Q    Okay.  Sorry to shift gears, but I'm just going to do that

16  real quick.  Just to go back to the employee fair, you said you

17  didn't talk with -- well, actually, first of all, were you

18  concerned about the spread of the virus and those conditions at

19  the fair?

20  A    Yeah, I mean, there's a lot of people, no masks.  Yeah.

21  And it's tight room.  So yeah.  Definitely.

22  Q    So it -- attendees were not wearing face masks?

23  A    No.

24  Q    Did you -- was Christian Smalls there at the same time you

25  were?



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    Yes.

 2    Q    Did you mention your concerns about the virus spreading in

 3    those conditions to Christian?

 4    A    No.  No.

 5    Q    Okay.  All right.  Now, I want to go back now to your

 6    hearing about a positive COVID test --

 7    A    Um-hum.

 8    Q    -- among someone at the facility.  Okay.  Now, did -- how

 9    did -- how did you learn about that?

10    A    Well, March 24th I learned -- Christian told me that he

11    had heard about a case that an HR manager told him.

12    Q    Did he mention who specifically in management told him

13    about that?

14    A    No.

15    Q    Did Christian tell you anything at that time about how

16    Amazon intended to notify employees of the positive COVID case

17    at the facility?

18    A    Well, he was told that the managers would tell every

19    single associate.  Like, actually walking up to each associate

20    and telling them in person.  Mind you, this is a lot -- there's

21    thousands of workers in the facility so.  I don't know how that

22    would be possible, especially when people leave early and they

23    would just leave any -- any time they felt -- felt like it so.

24    What about people that left early?  So you know, so it's -- I

25    just didn't think that -- that way communication would be
```



Exhibit E, Motion to Try Petition on Hearing Record

1    effective at all.

2    Q    Okay.  Aside from the positive COVID case that

3    Christian -- Christian told you about on March 24th --

4    A    Um-hum.

5    Q    -- did you hear about any other positive COVID cases among

6    JFK8 employees during March 2020?

7    A    Yes.  On March 27th, Christian told me about a lady

8    testing positive that he knew.  That I knew, too.  You know, I

9    don't want to say her name but yeah.

10   Q    Yeah.  Did you have any close contact with any of the

11   individual -- individuals whom you heard from Christian had

12   tested positive?

13   A    Yes, and it's very alarming.  At the time, this person was

14   a -- a process assistant who worked with Christian and myself

15   because I was a process guide.  And you know, my manager,

16   Bertrand, Christian, and you know, the other process assistant

17   tested positive and myself.  You know, we all worked close

18   together.

19   Q    I -- and I do appreciate you keeping that individual's

20   confidentiality.

21   A    Yeah.

22   Q    Now -- well, bear with me for one moment.

23   A    Um-hum.

24   Q    Okay.  Did Amazon management notify you about any positive

25   COVID cases at the facility at any time during March 2020?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    Did you receive any text around that time from management

3    about positive --

4    A    No, I didn't.

5    Q    You don't recall receiving a text on about March 30th from

6    the company advising you about a positive case?

7    A    No.

8    Q    When was the first text message -- oh, excuse me.  Did you

9    get any text messages from Amazon regarding positive cases at

10   the facility?

11   A    Yes --

12        MS. AHMAD:  Objection.  Leading.

13   A    -- no, not in -- not in March or April.  It was like after

14   that.

15   Q    BY MR. JACKSON:  Aft -- after March or April?

16   A    Yeah.

17   Q    Okay.  And what do those texts say?

18   A    They were just saying we have a -- a positive case.  It

19   said either -- this either individuals or individual tested

20   positive for COVID-19.  And then, it'll say -- at the bottom,

21   it'll have a message saying, oh, we -- we implemented all these

22   new social distancing safety measures and stuff like that.

23   Q    Did the message you receive from Amazon advise you which

24   department or which floor the employee worked on who had tested

25   positive?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    Could you tell from the message you received, whether it

3    was sent to you personally or to a broader list of recipients?

4    A    I -- I believe it was a broader list of assis -- of

5    people.  Yeah.

6    Q    Okay.  Now, do you know whether Amazon closed off any

7    areas of the facility because of someone who had tested

8    positive for COVID-19?

9    A    No.

10   Q    Do you recall the company opening doors leading outside or

11   opening windows in a certain area because of a positive COVID

12   case?

13   A    No.  I mean, the windows -- you know, this -- there wasn't

14   even windows all throughout the facility, so no.

15   Q    And do you recall the company ever -- or did the company

16   ever clean areas of the facility because of a positive COVID

17   case?

18   A    I've seen them clean like one station, but not like an

19   entire area, no.

20   Q    And to your knowledge, Amazon does not close off any areas

21   of the facility in response to a positive case?

22   A    No.

23   Q    During late March of 2020, were you aware of any JFK8

24   employees whom the company placed under quarantine because the

25   employee had come in contact with someone who had tested



Exhibit E, Motion to Try Petition on Hearing Record

1    positive for COVID?

2    A    No.

3    Q    Do you know whether Christian Smalls was placed under

4    quarantine?

5    A    Well, I mean, if we're talking about -- yeah, yeah, you

6    can say that.  Yeah.  I don't know -- I -- I feel as though,

7    like the quarantine -- shouldn't to be like an official

8    document or something?  But I mean, yeah.  You can say that.

9    That one person is -- the only one that I know of.

10   Q    Okay.  And how do you know that Christian Smalls was

11   placed under so-called quarantine?

12   A    I was -- I was told by, I believe it was March 28th, a guy

13   named Zachary Marc was a senior ops, walks up to me and

14   Christian while we're sitting down in the -- the cafeteria.

15   And he says, hey, Chris, I would like to speak with you.  And

16   him and Chris walk away.  And then after that, five minutes

17   later, Chris tells me, hey, we've got to go.  I'm like, okay.

18   Quote, unquote, "Quarantine."  I said, okay.

19        So I asked Zach, I said, hey, what about me?  You know

20   because I -- I take Christian to work every day.  And Zach told

21   me, no, no, you're good.  You can come to work.  So I was like,

22   okay.  So what about -- you know, I was just concerned about

23   myself.  I was like, whatever.  That's what you're saying then

24   that's what it is.

25   Q    So you and Christian would drive into work in the same



Exhibit E, Motion to Try Petition on Hearing Record

1    car?

2    A    Yes.

3    Q    Did Amazon at that time place you under quarantine?

4    A    No.

5    Q    And you know, I think -- I want to just make sure your

6    testimony is clear.  Aside from your activities outside the

7    facility driving to work with Christian, did you come into

8    close contact with him inside of the facility?

9    A    I mean, I would -- you know, we were definitely close

10   together.  Yeah.

11   Q    Okay.  Did Amazon notify you around that time that you had

12   come into contact with someone who may have been exposed to

13   COVID-19?

14   A    No.

15   Q    Did the comp -- did Amazon's failure to notify you about

16   possible contact with someone who had potential exposure to the

17   virus cause you any concern about Amazon's handling of the

18   COVID-19 outbreak?

19   A    Yeah, I mean, it seems as though -- you know, I feel like

20   everyone was well aware of the severity of the coronavirus.

21   But inside of those Amazon doors where I was working, it was

22   almost as if it didn't exist.  So you know, I was very, very

23   concerned, you know, the fact is -- just -- just the fact that

24   we didn't have the proper protection, number one.

25        Number two, there was no real communication about positive



# Exhibit E, Motion to Try Petition on Hearing Record

 1    cases, or you know, how to social distance.  You know, there

 2    was no cleaning supplies at all.  So you know, I just felt like

 3    they were undermining the safety of not only myself or any

 4    family members that I would have, because I could potentially

 5    pass that virus onto them just by coming to work.

 6    Q    Did you discuss with any of your coworkers what actions

 7    you might take to address your concerns about COVID safety in

 8    the workplace?

 9    A    Yes.

10    Q    Who did you discuss that with?

11    A    Christian Smalls and Gerald Bryson.

12    Q    And when did you discuss what actions you could take in

13    response to the situation with Gerald and Christian?

14    A    Well, the actions we took were making sure that we came to

15    the facility March 25th, you know, in the beginning of the

16    shift to let other associates coming in or ask them, you know,

17    both, actually.  We asked the associates, hey, you guys hear

18    about the coronavirus case?  They said no.  And so we were

19    trying to tell them, like, hey, look, if you have any concerns,

20    come with me and Chris and Gerald.  We're going to go to the

21    main office and address those concerns.

22         You know, some people were scared to do it.  And you know,

23    others were you know, willing to do it.  So that's -- that's

24    what we did.  We gathered a group of 10 -- 10 to 12 associates

25    and we walked to the main office to address our concerns.



www.escribers.net | 800-257-0885

1    Q    How many people -- before -- before you went into the main

2    office, how -- how -- approximately, how many people did you

3    speak with about the positive case and your desire to confront

4    management about it?

5    A    Oh, man.  A lot, like, 50-plus people.  Yeah, so out of --

6    you know, there are so many people coming in and out.  It was

7    like impossible to stop everyone, you know, obviously.  But I

8    talked to about 50 people myself.  Christian talked to people

9    as well.  I don't know how many he talked to.

10   Q    Was Gerald involved in that effort as well?

11   A    Yeah, Gerald, too.

12   Q    Did he talk to people?

13   A    Yeah, he talked to people so.

14   Q    Did you observe how many Gerald talked to by any chance?

15   A    Probably about the same amount as me, around the same

16   amount but.

17   Q    Okay.  So I just want to confirm for the record.  Did you

18   walk in on a managers meeting at JFK8 to raise your concerns

19   about COVID on March 25th?

20   A    Yes.

21   Q    So where was the managers meeting taking place?

22   A    It was in the -- the main office.  They were like -- they

23   had the managers gathered around like a brown -- that brown

24   table that I was referring to earlier when you walk in.

25   Q    Okay.  And do you have to like walk into any -- aside from



Exhibit E, Motion to Try Petition on Hearing Record

1     the main office door, do you have to walk into the separate

2     door to get to that brown table area?

3     A     No.  As soon as you walk in the main -- main entrance,

4     it's right there.  I'm at the main office, it's right there.

5     Q     Now, you testified that there were about ten in your group

6     who -- who did this activity.

7     A     Yeah.

8     Q     Do you recall who -- who was in the group?

9     A     Myself, Christian Smalls, Gerald Bryson, Ashley

10    (phonetic), Angelique (phonetic).  There was two Giselle's.

11    The other people, I don't know their names.

12    Q     How did you know where and when the managers would be

13    meeting that day?

14    A     Oh, I didn't -- I didn't know at all.  You know, I -- I

15    just knew that they would be in the main office.  So yeah.

16    Q     Okay.  So approximately what time did you enter the main

17    office?

18    A     I believe it was around 8:30, 9:00.

19    Q     And were you on duty or on the clock at that time?

20    A     No, I mean, you know, those days -- the date -- well, that

21    day they were talking about, the 25th was my assigned day to

22    work, but I wasn't clocked in, and neither one -- neither were

23    any of the other people that was with us.

24    Q     Do you recall which managers were present in that brown

25    table area at the time you walked in?



1    A    I remember Sai Kotha, and Christine Hernandez, the HR

2    manager.

3    Q    Were there any others?

4    A    They were other managers.  But you know, when we walked

5    in, they walked away and went to their offices.

6    Q    I see.

7    A    Yeah.

8    Q    Okay.  Did any of the employees who walked into the main

9    office at that time say anything after you guys entered the

10   room?

11   A    No.

12   Q    I'm not sure if you heard my question.  Did any of the

13   group who you were with say anything when you went the room?

14   A    Oh, yeah.  I thought you meant the managers.  Yeah, yeah.

15   Yeah.  We all -- the associates that we came with, they spoke

16   including myself.

17   Q    All right.  Do recall who spoke first?

18   A    Christian Smalls spoke -- spoke first.

19   Q    Do you recall what Chris -- Christian said?

20   A    Well, he was basically saying, you know, the coronavirus

21   is you know, a deadly disease.  And you know, we're here

22   working without the -- the proper protection.  So you guys need

23   to clean the state -- clean the facility and shut it down until

24   you figure out the proper way to keep everyone safe.

25   Q    Did any of the -- well, at this point, there is only Sai



Exhibit E, Motion to Try Petition on Hearing Record

1    Kotha and Christine Hernandez present; is that correct?

2    A    Yes.

3    Q    Okay.  Did either of them respond to what Mr. Small said?

4    A    They was basic -- their response was that we're doing

5    everything we can right now.

6    Q    Did Christian say anything in response to that?

7    A    He's basically saying, no, that's -- that's not good

8    enough.  Like, you know, you have to actually do something, and

9    I don't agree that you doing everything that you can.

10   Q    Who said that they were doing everything they can in

11   response to Christian?

12   A    That was a Sai and Christine.

13   Q    Okay.  Now, when Christian responded that he didn't think

14   that they were doing everything they could, did either Sai or

15   Christine respond to that?

16   A    Well, then I -- I stepped in and said, you know, like,

17   people -- like, you know, we can pass this virus on to the --

18   to our family members.  So it's deadly.  You guys need to do

19   something about it.  And you know, they just kept saying, you

20   know, both of them, Sai, and Christine, oh, we're doing

21   everything we can.  So that was -- you know, that was their

22   basic response.

23   Q    You recall whether Gerald Bryson says anything during the

24   managers meeting -- well, during the time you walked into the

25   main office on March 25?



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

 1    A    Yes, he was saying -- you know, he has a son.  And he

 2    didn't want to pass this virus along to his son.  So y'all need

 3    to just shut the building down and clean it.

 4    Q    Did either Christine or Sai respond to Gerald's comment?

 5    A    Well, Sai said, you know, we're doing everything we can,

 6    Mr. Bryson.

 7    Q    He addressed Gerald by name?

 8    A    Yes.

 9    Q    Do you recall whether Sai or Christine addressed any of

10    the other employees in the group by name?

11    A    No -- well, Christian, too.

12    Q    So just Gerald and Christian, they addressed by name?

13    A    Um-hum.

14    Q    Now, when the -- when Christine and Sai told you guys that

15    they were doing everything they can, did they mention any

16    specific steps that they had taken?

17    A    No.

18    Q    Now, aside from you, Christian, and Gerald, do you recall

19    whether any other employees in your group spoke out during this

20    encounter?

21    A    Yes, Ashley spoke out as well.  And Jazel, with a J, you

22    know, there was -- there was Giselle with a G and Jazel with a

23    J.  How ironic.  But the Jazel with a J spoke.  And you know,

24    and Ashley, the same like you guys need to, basically saying,

25    you guys need to take this virus serious.  Like, if -- you



# Exhibit E, Motion to Try Petition on Hearing Record

1    know, they -- they felt as though if you know -- they were

2    saying like -- well, Ashley was saying that, oh, well, you

3    know -- what was Ashley saying -- she was saying, like, if you

4    guys, like management, if you guys were to catch it, then you'd

5    take it serious.  But until then, I -- they were basically

6    saying, like, if you guys catch it or someone in -- that you

7    know catch it, then you guys will treat it differently than --

8    than us catching it, like associate.

9    Q    And do you recall any of the manager's responses to these

10   comments?

11   A    At that point, it was like a lot of back and forth.  So we

12   all were kind of like, speaking our minds.  And you know,

13   Christine was basically -- Christine was just like, oh, you

14   know, we guys -- we all can't speak at one time.  So she was

15   trying to like, I guess, stop us from speaking.  But it was

16   like, you know, we have a whole -- yeah, a whole bunch of

17   people, whole bunch of associates.  You know, we haven't got

18   the masks and gloves.  And we just scared, you know.

19        So we didn't -- you know, I didn't -- I didn't agree with

20   that.  I didn't agree with her telling us we can't speak at one

21   time.  You're just going to listen.  You know, it's an open-

22   door policy.  We're there to express our emotions and emotions

23   were running extremely high at that point.

24   Q    Did either Christine or Sai say anything to you about

25   maintaining six feet of physical distance between yourself and



Exhibit E, Motion to Try Petition on Hearing Record

1    other people?

2    A    No.

3    Q    Were you standing at least six feet apart from other

4    people in your group at the time?

5    A    Yes.  Yes.

6    Q    Did anybody -- well, actually, how did the meeting end?

7    How did the -- how did the encounter end?

8    A    Well, Christine and -- no, no, Sai was like, oh, you know,

9    we're going to talk to the regional managers and see what we

10   can do.  And you know, Sai is the general manager, and the

11   regional managers, you know, control, like multiple buildings.

12   So he was saying, he's going to talk to them and see what

13   they're going to do.  And you know, we walked out and went back

14   to the cafeteria and we waited for a response from them.

15   Q    Okay.  How long did you wait there?

16   A    For ten hours, an entire shift.

17   Q    Ten hours.  Wow.  Okay.  And did anyone come and give you

18   a response during that time?

19   A    Oh, yeah, they came and said, you know, the regional --

20   you talked to the regional managers, but there -- you know,

21   there's -- like we said before, we done everything you can.

22   And, you know, shutting the building was not one of the

23   options.

24   Q    Okay.  Who -- who told that to you?

25   A    Chris -- Chris told me because the senior ops -- or one of



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    the managers came in and said, you know, that we're doing
 2    every -- we've done everything we can.  And we talked to the
 3    regional managers and there's nothing we can do.
 4    Q    Do you recall who told that to you?
 5    A    No.
 6    Q    Did that individual that -- it was a senior operations
 7    manager, correct?
 8    A    Yeah, it was -- he -- one of the -- one of the managers.
 9    It could be -- it could have been a senior amp -- senior
10    manager, senior ops, or regular ops.  I don't know what role
11    they had.  Yeah.
12    Q    Did that person tell you whom they had spoken to at the
13    regional level in regard to this concern?
14    A    No.
15    Q    Did they -- did this person explain to you why closing the
16    facility was not an option?
17    A    No.
18    Q    And were you off duty the entire time that you sat in the
19    cafeteria?
20    A    Yes.
21    Q    Did you walk into any other -- oh, excuse me, I'll
22    rephrase.  Did you enter the main office at any other times to
23    express your concerns about COVID?
24    A    Yes, March 26th and 27th as well.
25    Q    Okay.  And did you go into -- well, let's focus on March
```



Exhibit E, Motion to Try Petition on Hearing Record

1   26th first.   On March 26th, did you go into the main office to

2   express your concerns about COVID with any other employees?

3   A    Yes.

4   Q    About how many were in the group on March 26th?

5   A    This one was about 10 -- 10 or 12 associates.   And the

6   only one that I can -- that I remember was -- in that meeting

7   was Chris Smalls and Tristan Martinez (phonetic).

8   Q    Was Gerald Bryson with you on March 26th?

9   A    No.

10  Q    Can you described what occurred when you entered the main

11  office on March 26th with the group?

12  A    It was pretty much the -- you know, similar.   Like,

13  associates raising their concerns.   You know, a lot of -- you

14  know, a lot of emotions running throughout all the associates,

15  and myself included.   And it was basically the same response.

16  Like, you know, we're -- we're doing everything we can.   And

17  we'll talk to the regional managers again.   And that was that.

18  Q    Did -- do you recall which managers were present on March

19  26th when you entered?

20  A    I believe Zachary Marc was there.   I'm not sure who else.

21  There were -- there were other people.   I just don't remember

22  their names.

23  Q    Was Sai there?

24  A    Was -- no, not on -- not on the 26th.

25  Q    Okay.   What about Christine Hernandez?



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    Okay.  So this -- on March 26th, you addressed your

3    concerns with a different set of managers?

4    A    Um-hum.  Yes.

5    Q    Did any of the managers who were there on March 26th tell

6    you that you needed to remain six feet apart from other people?

7    A    No.

8    Q    And did you remain six feet apart from other people while

9    you were engaged in this activity?

10   A    Yes.

11   Q    So I want to talk about your activity on March 27th.  And

12   again, walking into the main office to raise concerns about

13   COVID.  Did you go in with anyone else on March 27th?

14   A    Yeah.  So what happened was you know, we had a group.

15   This was a -- the group was a little larger.  I think -- I

16   think it was about like 15 people at this time.  So we were all

17   walking in the office.  And you know, we were told to leave the

18   office.  So myself, Christian Smalls was one of -- was the

19   people that were there that I remember by name.  Well, yeah.

20   And --

21   Q    Do you recall if Gerald -- Gerald was with you at the

22   time?

23   A    No, he wasn't.

24   Q    He was not, okay.

25   A    So after we were told to leave the office, Christine and



# Exhibit E, Motion to Try Petition on Hearing Record

1    Sai had Christian in the general manager's office while the

2    rest of us were outside of the office.  You know, there's like

3    a big window, so you're able to see what's going on inside

4    the -- the office.  I believe the blinds were closed.  So I

5    couldn't see what was going on.  But we were -- we were all

6    sitting down at tables directly across from the main office in

7    like chairs.  We were sitting down in chairs at tables.

8    Q    Could you hear anything that Christine, Sai, and Gerald

9    were discussing?

10   A    No.

11        MS. AHMAD:  Objection, Your Honor.  Misstates the

12   testimony --

13        MR. JACKSON:  Excuse me.  Chris -- excuse me.

14        MS. AHMAD:  -- regarding Gerald.

15   Q    BY MR. JACKSON:  Chris -- excuse me.  Christine, Sai, and

16   Christian were discussing?

17   A    Yes.

18   Q    So no, you could not hear their conversation?

19   A    No.

20   Q    Okay.  At any time on March 27th, did any supervisor or

21   manager tell you to remain six feet apart from other people?

22   A    No.

23   Q    Did you, in fact, remain six feet apart from other people

24   when you -- when either when you walked -- well, I'll take it

25   one by time.  Did you remain six feet apart from other people



Exhibit E, Motion to Try Petition on Hearing Record

1    when you entered the main office on March 27th?

2    A    Yes.

3    Q    And what about when you went outside the main office and

4    sat at tables?  Did you sit six feet apart from other people?

5    A    Yes.

6    Q    Did Christian inform you about what he discussed with

7    Christine and Sai during --

8    A    No.

9    Q    -- the closed-door meeting?

10   A    No.

11   Q    Now, did you participate in a protest outside of the JFK8

12   facility on March 30th?

13   A    Yes.

14   Q    What kind of protest was it?

15   A    Well, the protest was outside in the parking lot.  It was

16   basically -- you know, we were raising concerns -- more

17   concerns about safety being that, you know, the week prior, we

18   didn't get the response that we wanted or lack of response,

19   really.  So we decided to take it to another level and protest

20   on our day off.

21   Q    I see.  Now, before we get into that, I forgot to ask you

22   one question.  So on March 26th, that was the second time you

23   went into the main office to address your COVID concerns.  Did

24   any of the managers tell you to wait?

25   A    To wait?



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Yeah, like, you -- you testified on March 25, Christine

2   told you to wait in the cafeteria.  Did anyone tell you to wait

3   on March 26th?

4   A    Oh, no.  No, we -- well, well, yeah.  No, yeah.  You mean

5   like waiting in the cafeteria like for --

6   Q    Yeah.

7   A    -- a response.  Yes, yes.  Yeah.

8   Q    Okay, did you do that?

9   A    Yeah, I went -- you know, me and the group, we went back

10  to the -- the cafeteria to sit down and wait for ten hours.

11  Q    So you waited there for ten hours until the end of your

12  shift?

13  A    Yeah.

14  Q    And did any -- on March 26th, did anyone -- any su --

15  manager speak with you or -- or follow up with you in regard to

16  your concerns you had raised?

17  A    No.

18  Q    So that time nobody came?

19  A    No.  This was -- I believe they talked to Christian.  I

20  think they call -- I believe they called him into the office

21  and told him, and then he came back and told us, like, hey,

22  yeah, there's nothing -- they said, you know, same thing that

23  they talked to regionals and nothing they can do.

24  Q    At any time on March 26 did any manager tell you that you

25  needed to remain six feet apart from other people?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    And what about on March 27th, did you remain in the --

3    inside the facility after Christian left his closed-door

4    meeting with Sai and Christine?

5    A    The 27th, like, in the cafeteria?

6    Q    Well, I'm asking.  So I believe your testimony was that

7    you entered the meeting with a group that included Christian --

8    A    Oh.

9    Q    -- and Sai and Christine asked to meet privately with

10   Christian and you waited --

11   A    Oh, yeah.

12   Q    -- at the tables.  So I'm asking, after Christian emerged

13   from that meeting, did you -- did you remain at the facility

14   after that?

15   A    Yes.

16   Q    Did you remain for the duration of your shift?

17   A    Yes.

18   Q    Okay.  And were you off the clock?  Were you on duty on

19   the 27th?

20   A    Yes, absolutely.

21   Q    And what about on 26th, too?  Did you clock in at any

22   point on the 26th?

23   A    No.

24   Q    So on the 27th, at any point when you were at the facility

25   on the 27th, did any supervisor or manager tell you that you



1    needed to remain six feet apart from other people?

2    A    No.

3    Q    Okay.  All right, now, we were beginning to discuss the

4    protest on March 30th that you participated in.

5         MS. AHMAD:  And Your Honor, I'm sorry to interrupt Mr.

6    Jackson, but if we're going to switch topics, is this a good

7    time for a quick break?

8         JUDGE GREEN:  Yes, absolute -- let's take a ten-minute

9    break.  So let's come back at 12:20.  Mr. -- Mr. Palmer,

10   just -- you -- you can get up, move around.  Just don't talk to

11   anybody about your testimony, okay --

12        THE WITNESS:  Okay.

13        JUDGE GREEN:  -- while we're off the record.  Okay, so off

14   the record.

15   (Off the record at 12:10 p.m.)

16        JUDGE GREEN:  And Mr. Pa -- Palmer, Mr. Jackson should

17   have some more questions for you.

18        THE WITNESS:  Okay.

19        MR. JACKSON:  Thank you, Your Honor.

20                    **RESUMED DIRECT EXAMINATION**

21   Q    BY MR. JACKSON:  Just want to make something -- make sure

22   something is clear on the record.  On March 25th did you at any

23   point clock in for duty?

24   A    No.

25   Q    And on March 26th did you at any point clock in for duty?


www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A     No.

 2    Q     And on March 27th at any point did you clock in for duty?

 3    A     No.

 4    Q     Okay.  So we were beginning to discuss the protest you

 5    engaged in on March 30th, 2020.  Why did you feel the need to

 6    engage in a protest that day?

 7    A     Well, you know, the reason why we did it on March 30th is

 8    because the week prior, you know, we raised our concerns, you

 9    know, we would -- you know, the 25th, 26th, and 27th.  That's

10    30 hours combined that we sat down and waited for the response.

11    Now, first of all, like, you know, the fact that we didn't have

12    the masks and gloves was one thing.  Then we raised the

13    concerns about, you know, our safety.  You guys did -- well,

14    not you guys -- Amazon at JFK8 took ten hours each day to

15    respond to us.

16          So you know, it -- we felt disrespected.  We felt as

17    though, like, you know, our safety was underminded (sic) and

18    you know, taking it to a whole another level, you know,

19    protesting was taking it to another level.  Like, okay, you

20    guys aren't going to listen to us, so we're going to -- we're

21    going to make it a big deal now because we tried to work with

22    them prior.  It's not like we just flat out protested.  You

23    know, we sat down in the cafeteria ten hours each day, and

24    that's -- that's, I think -- I think it's just disrespectful,

25    so that's the reason why.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1  Q    Did you have any specific actions that you wanted Amazon

2  to take that you were encouraging them to do through the

3  protest?

4  A    Well, just, you know, at least provide us with the proper

5  protective equipment we needed, you know, clean the facility,

6  and you know, shut it down for a few days.  Like, I'm talking

7  about a thorough cleaning, you know.  Like I said earlier, 15

8  football fields that can fit inside of JFK8, so that's a lot of

9  cleaning that you have to do.  That's not something you can

10  just do in a day.  Like, it's going to take -- it's going to

11  take a few days, and it's going to take a lot of people to do

12  that.  So that was -- that's what we wanted.

13  Q    Who organized the protest?

14  A    Christian Smalls and myself, as well.  You can say Gerald

15  organized as well.

16  Q    So how were you involved in organizing?

17  A    Well, what I did was I started a -- a chat on Instagram

18  with a bunch of Amazon workers with Christian Smalls included,

19  and we were just -- we were telling them, like, hey, look, you

20  know, the coronavirus is at -- you know, is in JFK8, and you

21  know, we're going to -- you know, we've -- we've been

22  undermined.  We went to them and we went to the management and

23  we told them that they need to do better, and we didn't get the

24  response we wanted, so we -- we're going to do a protest.

25       So we would -- asking them, like, hey, do -- if you



Exhibit E, Motion to Try Petition on Hearing Record

1    guys -- you know, appreciate it if you guys participated being

2    actual Amazon associates.  You know, most of them, you know,

3    were kind of -- were scared to do the protest, and others

4    showed up to do the protesters.

5    Q    So you organized through Instagram.

6    A    Yes.

7    Q    Did you in some way reach out to coworkers via Instagram?

8    A    Yes, it was a actual group chat, so like, any associates

9    that I had as friends on Instagram, you know, I -- I tagged

10   them all in -- in the group so that they can receive the

11   messages.

12   Q    And you said that Gerald was involved in planning or

13   organizing this protest?

14   A    Yeah.

15   Q    Can you describe what Gerald's role in -- was in planning

16   and/or organizing?

17   A    Well, he -- he informed other associates to attend as

18   well.  I believe it was through phone, like an actual phone

19   call.  You know, I'm not too sure, but I know that he informed

20   people to come, so that was his role.

21   Q    Do you know whether anyone notified Amazon management in

22   advance that there would be a protest that March 30th?

23   A    I'm not aware personally, but you know, when we got there,

24   everyone was outside, so --

25   Q    What do you mean everyone was outside when you got there?



Exhibit E, Motion to Try Petition on Hearing Record

```
1    A    Well, you know, like the -- the security people were
2    there.  So you know, there were people -- there were associates
3    in the -- the window in the third-floor breakroom, you know,
4    just watching.  People in the first-floor breakroom as well.
5    So I -- I feel like someone gave them the heads up that we
6    would be there.
7    Q    Did you recognize any of the people who were at the
8    windows watching?
9    A    No, I just -- you know, just associates.
10   Q    Okay, were they ma -- wearing any vests as far as you
11   recall?
12   A    No.
13   Q    And how many security personnel did you see when you
14   arrived on -- at the facility on March 30th?  Well, how many
15   security officials did you see outside the facility when you
16   arrived outside the facility?
17   A    I remember seeing two.  Maybe I -- I'm not sure if there
18   were more, maybe.  I -- I remember them as two.
19   Q    Are there normally security officials posted outside the
20   facility?
21   A    No, they're normally inside.
22   Q    Now, did any of your coworkers end up actually joining you
23   in the protest on March 30th?
24   A    A few workers that were outside -- you know, right outside
25   the entrance, some of them, you know, decided to, you know,
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    like, you know, stand by us.  I wouldn't say -- well, yeah,

2    yeah -- yeah, they -- they stood by us, like, they didn't say

3    anything, but you know, they were just -- they were just there

4    for support.

5    Q    Are you talking about workers who were on duty that day?

6    A    I -- I don't know.  Maybe they were -- I -- I don't know

7    if they were on duty, but they worked there.  They were -- they

8    worked -- I don't know if they were on the clock at that

9    specific time, but yeah.

10   Q    Okay.  Did anyone else engage in the protest through --

11   with you throughout the time that you were out there?

12   A    Yes.

13   Q    Who was it -- who -- which other people -- which other --

14   or I should ask specifically which other Amazon employees

15   engaged in the protest throughout the time you were there?

16   A    Christian Smalls, Gerald Bryson, Jordan Flowers, Jason

17   Anarro (phonetic), Mandi Velasco, and Hallie Rainwell

18   (phonetic).  Those are the names I remember off the top of my

19   head.

20   Q    Do you recall approximately how many were in the group of

21   protesters who remained throughout?

22   A    It was about 15.

23   Q    So where did you and the other protesters gather when you

24   first started this protest?

25   A    I would say by -- by, like, the -- the divider.  So like



# Exhibit E, Motion to Try Petition on Hearing Record

1    you have the -- that -- that bus area, the bus waiting area,

2    like, I guess that -- that area.

3    Q    Okay.

4    A    That's -- that's the second -- that would be like a second

5    lane in the parking lot.

6    Q    And were you off duty at the time?

7    A    Yes.

8    Q    Do you recall approximately what time you came out there?

9    A    I believe it was 11:00 a.m.

10   Q    Oh, and how did you notice that -- how did you identify

11   the two people you believe were security officials?  How did

12   you identify them as security officials?

13   A    Well, they had their green security vests on.

14   Q    Aside from these security officials, did you notice any

15   managers present in the area?

16   A    No.

17   Q    Did you notice -- is there a difference between security

18   and safety?

19   A    Yes.  Security is like a -- a third party, so they don't

20   technically work for Amazon, and safety does.

21   Q    Okay.  And the people in the green vests with the green

22   stripes, those are Amazon safety officials, correct?

23   A    Yes.

24   Q    Now, did you maintain at least six feet of physical

25   distance between yourself and other people while you engaged in



Exhibit E, Motion to Try Petition on Hearing Record

1    your protest?

2    A    Yes.

3    Q    Can you describe what you and your coworkers that day did

4    while you were participating in this protest?

5    A    Well, some of us had blowhorns, so we were pretty much,

6    you know, making our -- our -- our -- our presence known that,

7    you know, Amazon was undermining the safety of -- of not just

8    the people that are protesting but all the workers, I mean the

9    entire building, so we demanded that they shut down the

10   facility.

11   Q    Okay.  And when you say blowhorns, are you talking about

12   like megaphone kind of thing?

13   A    Yeah, megaphones.

14   Q    How many bullhorns or megaphones did you have in your

15   group?

16   A    Just two.  Myself and Christian had them.

17   Q    Okay.  And what did -- did you hear what Christian was

18   saying into the megaphone?

19   A    Oh, he was saying like how many cases -- how many cases do

20   you guys -- do you guys have as far as Amazon, and shut down --

21   y'all need to shut down JFK ASAP.

22   Q    And what did you say into your megaphone?

23   A    Just the same thing.  You know, that you shut the -- shut

24   the building down, how many cases do we have, and Amazon

25   doesn't care about our safety.



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Did any of the protesters carry signs?

2    A    Yes.

3    Q    Did you carry a sign?

4    A    Yes.

5    Q    What did your sign say?

6    A    I had a few signs.  One of them said treat your workers

7    like you do your customers.  Another one was saying sanitize

8    JFK8, shut down JFK8.  There was another one.  Alexa, please

9    shut down JFK8, and --

10    Q    What -- what's lex -- what is Alexa?

11    A    Oh, the -- the Amazon Alexa.  So it's like a -- the --

12    Alexa is used for multiple things, like you can -- it's like

13    a -- like a portable device that you put -- that you have in

14    your house and you can, like -- you can use it to set up your

15    lights.  Like, you can basically say, hey, Alexa turn the

16    lights off, or Alexa, turn the TV on, so it's like a -- I don't

17    know how to really describe it that well, but that's what

18    the --

19    Q    I understand.  Where did you get this idea about shutting

20    down the facility?

21    A    They shut -- Amazon shut down a facility in Queens,

22    actually, I believe a -- a few days prior to that for cleaning

23    or -- so I think -- I believe because of coronavirus, they shut

24    down one of the buildings.

25    Q    How did you learn that?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    Through the news.

2    Q    Did anyone else carry signs?

3    A    Christian carried one.  Jason did, Gerald, too, and Jordan

4    Flowers.

5    Q    Do you remember what any of their signs said?

6    A    I believe we all had the -- we had like similar signs

7    really.  I know -- I know Jordan had the treat your workers

8    like customers, so I know we were, like, exchanging signs.  We

9    didn't have too many signs, so we kind of, like, exchanged

10   them.

11   Q    Do you recall any management official having an

12   interaction with Christian Smalls at any time while you were

13   present in or around the facility on March 30th?

14   A    Well, not until after the protest was over.  After the

15   protest was over, we were across the street on the side where

16   MTA buses come, and we were, like, you know, about to walk

17   down -- walk to our cars and leave, and Zachary Marc, I don't

18   know where he came from, I -- seems though, he walked from,

19   like, the -- the entrance to the building or maybe he was

20   outside or something, I don't know, but I just remember seeing

21   him walk extremely fast towards the gate because the last

22   parking lot on Amazon's property has, like, a gate, so like, if

23   you go over that gate, you're officially, like, on public

24   grounds.

25        So like, he walks up to the gate, and he has his own



Exhibit E, Motion to Try Petition on Hearing Record

1    bullhorn and he's saying, oh, Christian Smalls violated this

2    quarantine policy, social distancing, and then we were all just

3    like -- you know, just puzzled as to why he said that, so we

4    were just, like, laughing at him, and then after that, he was

5    just -- he just walked right back inside or he left.

6    Q    Okay.

7    A    Yeah.

8    Q    All right, so you start -- you -- you testified that you

9    started around 11 a.m.  Do you recall what time your protest

10   activity finished?

11   A    I believe it was like 12 or 12:30 maybe or 1.

12   Q    Okay.  And how long after that did Zachary Marc approach

13   with his megaphone?

14   A    Oh, as soon as we were done.

15   Q    Okay.

16   A    As soon as we crossed the street to -- on the public

17   grounds by MTA, that's when he came running or speed walking.

18   Q    Okay.  And aside from Christian Smalls violated his

19   quarantine, do you remember anything else that Zachary Marc

20   said into the megaphone?

21   A    No.

22   Q    At any time while you were engaged in protest activity on

23   March 30th did you enter -- at any time did you enter the

24   facility, the JFK facility?

25   A    No.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Did you enter the -- inside the facility at any time on

2    March 30th at all?

3    A    No.

4    Q    Was there any media outlets present during the March 30th

5    protest?

6    A    Yes, they were located on the -- the public -- you know,

7    public -- public grounds on the other side of the black fence.

8    They were like literally right over the black fence and they

9    had the cameras out and stuff.  I believe it was NBC, ABC,

10   other local media as well.

11   Q    Did you speak with any of these media outlets that day?

12   A    Yeah -- yeah, I spoke to pretty much all of them.

13   Q    Did any of them record you on camera?

14   A    Yeah, I believe NBC did, and -- and I believe ABC as well.

15   Q    Do you know if you appeared on any of their broadcasts?

16   A    Yes, the NBC one I know for sure.

17   Q    Did you observe what Gerald Bryson was doing during the

18   March 30th protest?

19   A    Well, he -- he had his signs.  You know, he was just, you

20   know, doing -- echoing the same thing we did except he didn't

21   have a bullhorn, so he was saying -- he was saying, you know,

22   shut down JFK8, and also, he spoke to the media as well, so --

23   yeah, he spoke with the media, too, so that was his main role.

24   Q    Did you observe him speaking with media?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1  Q   Did you see Gerald featured on any media broadcasts

2  concerning this event?

3  A   Yeah, I -- I don't know which -- which one it was.  I

4  believe it was NBC, too, or ABC.  I'm not sure, but I know I

5  saw him on one of those.

6  Q   Do you recall what he said when he was pictured on those

7  broadcasts that you saw?

8  A   Basically saying, you know, shut -- they need to shut down

9  JFK8 and they need to clean it and that, you know, Amazon

10  doesn't care about our lives.

11  Q   Okay.  Now, is Christian Smalls still employed by Amazon?

12  A   No.

13  Q   How do you know his employment ended?

14  A   He was fired the same day on March 30th after the protest.

15  Q   And how did you learn of Christian Smalls termination?

16  A   He called me and told me.

17  Q   What did he tell you?

18  A   Well, he told me that Zachary -- Zachary Marc called him

19  and told him that he was -- that he was fired.

20  Q   Did Amazon issue you any discipline in connection with

21  your activity in walking into the main office to press your

22  concerns about COVID or participating in the protest on March

23  30th?

24  A   Yes.

25  Q   What kind of discipline did you receive?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A     I received a final writeup for violating social

2    distancing.  They said I violated social disting -- distancing

3    on the 25th, the 26th, 27th, and I violated social distancing

4    during the protest on March 30th.

5    Q     When were you issued this final warning?

6    A     April 10th.

7    Q     How did the company -- oh, excuse me -- how did Amazon

8    pre -- present the final warning to you?

9    A     Well, I was -- well, they -- Zachary Marc and Tyler

10   Grabowski presented the final to me.  We were located in the --

11   the conference room in the main -- in the main office and --

12   Q     How did you end up in the conference room on April 10th?

13   A     Oh, a manager named Mandi -- Mandi Kumar walked up to me

14   while I was working.  I was on the fourth floor, one of the

15   stations counting, doing an inventory, and she walked up to me

16   and said oh, they need you in the main office, and I was,

17   like -- I was, like, okay, fine.  So then I walked down to

18   the -- from the fourth floor all the way to the first floor in

19   the main office in this conference room.

20   Q     Okay.  And who was in the conference room when you

21   arrived?

22   A     Zachary Marc, the senior ops, and Tyler Grabowski, the HR

23   business partner.

24   Q     And how did the meeting begin?

25   A     Well, they were -- basic -- they -- both of them was --



# Exhibit E, Motion to Try Petition on Hearing Record

1   no, Zach spoke and he said, yeah, you know, we have social

2   distancing.  You know, we need to make sure that we stand six

3   feet away because of coronavirus, and I said, okay.  And they

4   said, okay, well, you know, we're -- we're give -- we're here

5   to give you a final writeup because you violated social

6   distancing.  I was just like -- I was puzzled.  I said, social

7   distancing, like, how did I -- when?

8        And they told me on those days on the -- the day, the same

9   days that I came to the office to raise concern about the lack

10  of PPE and the social distancing is when he said that I

11  violated, so -- and I was just -- I was puzzled.  I was -- you

12  know, I was upset, and I just -- I was so confused.  I was,

13  like, why -- why am I given -- why are you saying that I did

14  this, like, and -- and where is this policy that you said that

15  I violated because he said I violated social-distancing policy,

16  so you know, where -- where is that policy?

17  Q    Had you seen any -- or -- or had you seen any social-

18  distancing policy before you entered the conference room on

19  April 10th?

20  A    No.

21  Q    Did any manager speak with you about any social-distancing

22  policy before April 10th?

23  A    No.

24  Q    Okay.  Did you communicate that to Mr. Grabowski and Mr.

25  Marc?



1    A    Yes.

2    Q    What did you say?

3    A    Well, I said where is this policy.  I wasn't aware of any

4    social-distancing policy.  And he said, oh, well, no, we have

5    one, and I'm like, what do you mean, like, I don't -- I don't

6    understand.  And then I was also saying, like, okay, because

7    he -- he print -- he had -- he -- he had printed the actual

8    document out and gave it to me, so I -- you know, once he did

9    that, I was reading it.

10        I wanted to make sure that -- I wanted to read thoroughly

11   what they were trying to tell me, so they were saying that I

12   was told that I violated social distant.  It doesn't say who

13   told me, and I was just confused, like, where's the policy at

14   and who told me that I violated it?  And --

15   Q    Okay.

16   A    -- at first, Zachary said security, and then he was

17   saying, oh, security and loss prevention.  He was, like -- and

18   I'm, like, wait, security and loss prevention told me?  He was

19   like, well, loss prevention rolls under security, like

20   basically saying they're the same thing, and I'm saying no,

21   they're not because first of all, security's a third party.

22   Now, that I know, third party.  The -- you know, the third

23   party, the -- they don't work for Amazon, so security isn't

24   Amazon.  The loss prevention is Amazon.  Like I -- if I wanted

25   to apply for loss prevention, I can.



# Exhibit E, Motion to Try Petition on Hearing Record

```
1        So now there's holes in the story because you're saying --

2   the document is saying that I was told, but it doesn't say who

3   told me, and there's nothing about -- I was never presented

4   this social-distance policy.  So in my head, I felt as though

5   that I was being retaliated against for speaking out.

6   Q    Did you raise these issues directly with Mr. Marc and Mr.

7   Grabowski during your meeting?

8   A    Yes.

9   Q    Okay.  And what were they doing while you spoke?

10  A    Well, while they -- you know, while I was speaking, they

11  were typing rapidly back and forth.

12  Q    On what device?

13  A    On their keyboard.  On the -- they had a laptop with a

14  keyboard.

15  Q    So they each had laptops open?

16  A    Uh-huh, yes.

17  Q    Are you familiar with something called Chime?

18  A    Yes.

19  Q    What's Chime?

20  A    Amazon Chime's like a internal messaging system that

21  managers -- managers use, process systems use, problem solvers,

22  ambassadors.  You know, it's just -- it's a way of

23  communicating with -- with each other.

24  Q    What did you suspect Mr. Marc and Mr. Grup -- Mr.

25  Grabowski were doing while they were typing rapidly while you
```



Exhibit E, Motion to Try Petition on Hearing Record

1    spoke?

2    A    Well, you know, as I, you know, challenged them on what

3    they -- on -- on these policies and everything that I based --

4    they claimed I violated, it seemed as though, you know --

5    because when I'm asking them these questions, these specific

6    questions, I'm not getting a response, but instead, it's rapid

7    typing back and forth, so it almost seems as though they were

8    coaching each other on what to say to respond to me.

9    Q    Did -- was there a delay between you -- time you finished

10   speaking and the time they responded to you?

11   A    Yes, and very awkward silence, like -- like ten seconds,

12   and you know, I just -- I had -- it was just very weird, very

13   odd, and --

14   Q    Okay, now, are you aware of any aggressive discipline

15   policy?  Do you understand what I mean by that at Amazon?

16   A    Yeah, like -- like, what would be -- like, let's say if I

17   did something wrong, what would be my discipline that I would

18   get for that?

19   Q    Yeah, like are there different steps of disciplinary

20   action the company uses?

21   A    Yeah.  Yes, so --

22   Q    Can you describe what that is?

23   A    So first you would get like a verbal warning and then you

24   would get a documented coach; and then after that it would be a

25   first reading one; and then after that be a second reading one;



# Exhibit E, Motion to Try Petition on Hearing Record

1    and then you will receive a final writeup; which is what I

2    received without getting any of them prior, you know, without

3    them taking the proper steps.

4    Q    And how -- and how did you come to understand that this

5    was the policy at Amazon?

6    A    Well, multiple managers told me this; Bertram told me;

7    also old managers had told me from my other facility that

8    before.

9    Q    And before April 10th, had you received a first written

10   warning?

11   A    No.

12   Q    And before April 10th, had you ever received a second

13   written warning?

14   A    No.

15       MR. JACKSON:  Okay.  Now, Your Honor, I'm going to share

16   my screen and present the witness with a document that I have

17   identified as GC Exhibit 48.

18   Q    Now, Mr. Palmer, are you able to see the document on the

19   screen?

20   A    Yes.

21   Q    Do you know what it is?

22   A    Yes, this is the final written that they presented to me.

23   Q    Were you given a copy of this document?

24   A    Yes.

25   Q    When were you provided a copy of the document?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    During the meeting I requested that I get this.

2    Q    Did anyone ask you to sign the document?

3    A    Yes.

4    Q    Did you?

5    A    No, I didn't, because if you sign the document that's

6    basically you're agreeing to everything that they're saying in

7    there.  So I had told them I'm not signing it and the manager

8    didn't even sign it, so.

9    Q    Okay, now -- okay.  I zoomed in a little bit so we could

10   all see it better.  Now, on March 25, were you given any

11   instruction to social distance and give six feet between each

12   person?

13   A    No.

14   Q    Did you receive any discipline or any warning for -- did

15   you receive any discipline or any warning for your conduct on

16   March 25?

17   A    No.

18   Q    Okay.  I'm talking about on that date, on March 25 itself.

19   On March 25 itself, did you get any warning from any manager?

20   A    No.  You mean like, on March 25th did someone say, oh,

21   social distance?

22   Q    Yes.

23   A    No.

24   Q    And then on March 26, did any supervisor or manager give

25   you an instruction to social distance and provide six feet



1    between yourself and each person?

2    A    No.

3    Q    On March 27th, and on March 26th itself, did you receive

4    any kind of disciplinary warning?

5    A    No.

6    Q    On March 27th, did you receive any instruction from a

7    supervisor or manager to social distance and give six feet

8    between yourself and another person?

9    A    No.

10   Q    Now, when you -- it says that you came on site on March

11   30th, do you agree that you came on site on March 30th?

12   A    No, I mean, I was in the parking lot, I never entered the

13   facility at all.

14   Q    Okay.  At any time while you're in the parking lot on

15   March 30th, were you provided guidance to social distance and

16   remain six feet from others?

17   A    No.

18        MR. JACKSON:  I'll move for the admission of GC-48.

19        JUDGE GREEN:  Any objection?

20        MS. AHMAD:  No objection.

21        JUDGE GREEN:  GC-48 is admitted.

22   **(General Counsel Exhibit Number 48 Received into Evidence)**

23   Q    Okay, now you mentioned that -- well, is it true that

24   either Mr. Marc or Mr. Grabowski presented you with a document

25   purporting to be the social distancing policy at Amazon during



Exhibit E, Motion to Try Petition on Hearing Record

1    your meeting with them on April 10?

2    A    Yes.

3    Q    Was that document ready when you first entered the

4    meeting?

5    A    No.

6    Q    What do you -- what do you recall in that regard?  How was

7    the document presented to you?

8    A    Well, you know, after I demanded to see this social

9    distance policy, you know, like I said, once I -- once I

10   challenged them on what they said I did, you know, the typing

11   back and forth between Tyler Grabowski and Zachary Marc kept

12   going throughout the conversation.  Now, you know, I kept

13   saying I need to see the social distance policy, like where is

14   it, like print it out, and I said it seems like you're typing

15   it right now as we speak, because like I said, they were typing

16   back and forth.

17   Q    What -- what -- did either of them respond when you said

18   it seems like you're typing it right now as we speak?

19   A    No.

20   Q    Then what happened?

21   A    No, no, no, no.  Actually, I'm sorry, Tyler was like, oh,

22   no, I didn't want to interrupt you while you were talking.  I'm

23   like, all right, where -- where is this at?  Where is this

24   policy?  So then finally Tyler leaves the room and I'm guessing

25   he printed it out because he comes back into the room and



Exhibit E, Motion to Try Petition on Hearing Record

1    here's the social distancing policy that they said I violated,

2    and it's very vague and it didn't say anything, really.

3    Q    Did he hand you a copy of the -- did he hand you the

4    document?

5    A    Yes.

6    Q    Did you notice anything about the document at the time he

7    handed it to you?

8    A    You know, first of all, there was no date on it; it

9    didn't say when the -- the policy was implemented.  It doesn't

10   say, you know, what would happen if you were to violate this

11   policy, and it doesn't say anything about six feet social

12   distance.  It just says social distancing is important,

13   basically.  That's it.  So it seems as though that, like I

14   said, that they must have just typed this document out as we

15   were speaking and on -- like there was, like eight different

16   lines.  It was like, line one through eight.  And on line two,

17   there's -- it's completely blank.  So it seems, though, like

18   when I'm wait -- you know, I'm putting the pressure on them to

19   hand this policy out, they're just typing it right -- right

20   then and there.  And that he was under so much pressure that he

21   skipped a line while he -- skipped line two while he was making

22   it, so.

23       MR. JACKSON:  Okay.  I'm going to present the witness,

24   Your Honor, with a document that I've marked as Exhibit 49 and

25   share my screen so that we can all see it.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Do you see the document on your screen, Mr. Palmer?

2   A    Yes.

3   Q    Okay, now -- okay.  Was this the document that was

4   presented to you during your meeting on April 10th with Mr.

5   Marc and Mr. Grabowski?

6   A    Yes.

7   Q    Now, at the -- you said that it was Tyler Grabowski who

8   exited the room and came back with this document; is that true?

9   A    Yes.

10  Q    And then he handed it to you when he came back; is that

11  true?

12  A    Yes.

13  Q    Did you notice anything about how the paper felt when he

14  handed it to you?

15  A    Yeah, it was hot.  It's almost like -- it's like he

16  just -- like I knew he just printed it out because it was hot.

17  I know when a paper just printed out, it's always hot.  So

18  yeah.

19  Q    All right.  And had you ever seen this document before Mr.

20  Grabowski handed it to you?

21  A    No.

22  Q    Did anyone ever explained the contents of this document to

23  you before you met with Grabowski and Marc?

24  A    No.

25  Q    Were you aware of any social distancing requirements



1    Amazon had put into place before you had met with Marc and

2    Grabowski?

3    A     No.

4          JUDGE GREEN:  Just hold on one moment while we get Mr.

5    Palmer's camera situated.

6          THE WITNESS:  Yeah, I'm sorry, my iPad is dying, so I had

7    to put it on the charger.

8          JUDGE GREEN:  Okay.

9          MR. JACKSON:  Bear with me for one moment, Your Honor.

10         JUDGE GREEN:  Okay.

11   Q     Okay.  Did either Marc or Grabowski ask you to

12   acknowledge your receipt of this document?

13   A     To acknowledge what?  I'm sorry.

14   Q     Acknowledge the fact that you had received this policy?

15   A     No, they were just saying that I violated the policy.

16   That was it.

17         MR. JACKSON:  I'll move for the admission of GC-49.

18         JUDGE GREEN:  Any objection?

19         MS. AHMAD:  No objection.

20         JUDGE GREEN:  GC-49 is admitted.

21   **(General Counsel Exhibit Number 49 Received into Evidence)**

22   Q     Did at any point during your meeting with Grabowski and

23   Marc, did either of them ever explain exactly what you

24   supposedly had done to warrant this final warning?

25   A     Well, they said that I violated the social distancing on



# Exhibit E, Motion to Try Petition on Hearing Record

1    the 25th, 26th, 27th, and the 30th, you know, and I kept -- and

2    I kept asking them, I said, okay, so who -- who said that I did

3    this?  Who said that I violated?

4        You know, like I said before, Zachary Marc response was,

5    oh, security, and then I'm like, security, and then he's just

6    like, oh no, social security (sic) and loss prevention.  He's

7    like -- I'm like, wait, so both of them told me?  He's like,

8    oh, no, well, you know, loss prevention rolls under security.

9    And I'm just like, no, like, I've been with Amazon for a long

10   time.  I know security's third-party, you know, and I know loss

11   prevention is Amazon.

12       And you know, he was saying, oh, no, they are -- they

13   are -- they're the same thing.  And I'm just like, no, they're

14   not, like I know what I'm talking.  And then he was, you

15   know -- that was that he was saying, no, I'm going to print out

16   the write up and you're going to sign the write up just right

17   there, and I'm like, well, I'm not going to sign it, but you

18   can print it out for me because I need that.

19   Q    Did either Mr. Marc or Mr. Grabowski explain in detail in

20   what ways you supposedly violated the social distancing policy?

21   A    No, they just said I was told, and then when I asked them

22   who told me, he didn't say because basically when -- basically

23   when he said loss prevention or security, he was referring to

24   the 30th, March 30th.  The 25th and 26th and 27th, that would

25   have to have been a manager being that we were in the main



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    office.

2        So when I asked them who, he didn't have no answer.  So

3    if you tell me that I violated -- that I was told that I

4    violated social distancing by a loss prevention and security,

5    then who was the manager who told me?  And I didn't get no

6    answer. so you know, I have my own suspicions.

7    Q    Now, before you were called into this meeting with Marc

8    and Grabowski, did anyone from Amazon contact you to ask you

9    about your side of the story in this situation?

10   A    No.

11   Q    Was this the first time you were hearing about a possible

12   social distancing violation on April 10th?

13   A    Yes.

14   Q    Okay.  Now, did you participate in another demonstration

15   or protest outside the JFK facility on April 6th, 2020?

16   A    Yes, I did.

17   Q    And what was the purpose of that protest?

18   A    It was basically just a follow up of the March 30th

19   protest.  You know, Christian was fired on the 30th, as we all

20   know.  So we felt as though it's only right to do another

21   protest.  You know, we -- we were speaking -- we were raising

22   concerns about safety.  The 24th -- I mean, the 25th, 26th,

23   27th, got the (indiscernible), didn't get a response, or the --

24   the response we didn't want to hear.  Then, you know, we do a

25   protest on our days off and get retaliated against.  So we felt



Exhibit E, Motion to Try Petition on Hearing Record

1    as though we need to do another.

2    Q    Who organized this protest?

3    A    I did.

4    Q    And what did you do to organize?

5    A    Well, I went on social media and I, you know, we had a

6    flyer made, saying that we're doing another protest on April

7    6th.

8    Q    And did you distribute the flyer?

9    A    Well, someone made it for me.

10   Q    Okay?

11   A    Yeah, but I put it on my Instagram story.

12   Q    Oh, I see.

13   A    Yeah.

14   Q    It wasn't a physical piece of paper?  It was like a

15   digital player?

16   A    Yeah, a digital file.

17   Q    And you posted that on your Instagram?

18   A    Yes.

19   Q    Did you use the group that you had created on Instagram --

20   A    Yeah.

21   Q    -- to publicize this protest?

22   A    Yes.

23   Q    And what do you do on the group chat to publicize?

24   A    I just told them that we're doing the follow up protests

25   similar to March 30th and that, you know, you guys should join,



# Exhibit E, Motion to Try Petition on Hearing Record

1    and that was it.

2    Q    Did you let people outside of Amazon know about the April

3    6th protest in advance of the event?

4    A    Well, I mean, I -- I guess you can say that.  You know, I

5    put it on my Instagram story, so like I have followers who

6    don't -- who don't work for Amazon.  So anyone who was on my

7    Instagram had saw it.

8    Q    Did you invite any media?

9    A    I did.  There wasn't a lot of media there; actually it

10   was -- I don't think there was any media there.  So it was like

11   it wasn't as big as the March 30th.

12        MR. JACKSON:  Your Honor, can I take a brief recess?

13        JUDGE GREEN:  Yes, off the record for five minutes.  Thank

14   you.

15   (Off the record at 1:08 p.m.)

16        JUDGE GREEN:  So back on the record?

17        THE COURT REPORTER:  We are.

18   Q    BY MR. JACKSON:  We were talking about the protest on

19   April 6th.  Can you tell us approximately how many protesters

20   were involved in the event on April 6th?

21   A    Altogether, I would say five, myself, Gerald Bryson, Mandi

22   Velasco, Jordan Flowers (phonetic), and Christian Smalls made

23   an appearance as well.

24   Q    Okay, so Christian had been fired at that time, but aside

25   from Christian, were all these people Amazon employees?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    They're all warehouse associates, correct?  I mean, aside

3    from Christian who was a former process assistant; is that

4    correct?

5    A    Yes.

6    Q    Okay, now where did you and the other protesters gather at

7    the start of your protest?

8    A    The similar spot where we started at the March 30th, like,

9    by that the second lane, the second parking lane.

10   Q    And that's the part with the divider, with the benches?

11   A    Yes.

12   Q    And what did you do once you had gathered at that spot?

13   A    Well, I had the bullhorn, and you know, I was saying that

14   Amazon's undermining the safety of everyone, they need to shut

15   down -- they need to shut down the facility and clean it

16   properly.

17   Q    Okay.  Was -- did anyone else had a bullhorn or megaphone

18   at that time?

19   A    No, just myself.

20   Q    Did protesters in the group have any signs?

21   A    Did we have signs?  I think -- I don't -- I don't believe

22   we had signs for that.

23   Q    Okay.  So you weren't carrying a sign?

24   A    Oh, no.

25   Q    And you don't recall seeing anyone else carrying a sign?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Huh-uh.

2    Q    Okay.

3         JUDGE GREEN:  Just try to answer verbally, as in yes.

4         THE WITNESS:  Okay, sorry.

5         JUDGE GREEN:  So we can -- so we can get it on the -- on

6    the tape.

7         THE WITNESS:  All right.

8         MR. JACKSON:  Thank you, Judge.  Thank you.  I appreciate

9    that, Judge.

10   Q    BY MR. JACKSON:  So again, you did not carry a sign?

11   A    No.

12   Q    And you don't recall anyone else carrying a sign?

13   A    No.

14   Q    Did you maintain six feet of physical distance between

15   yourself and other people while you were engaged in the

16   protest?

17   A    Yes.

18   Q    Did other protesters do so as well?

19   A    Yes.

20   Q    You said Christian Smalls was in your group; did he

21   participate in the same area where you and the other protesters

22   were?

23   A    No, he was across the street on public private property

24   next to the bus stop.

25   Q    Do you know why he was there?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Just --  just to support -- support us.

2    Q    Yeah, I mean, but why didn't he come in to the same area

3    where you were?

4    A    Oh, he was already let go.  So if he were to, you know,

5    step on the public grounds, you know, he could've been arrested

6    or something.

7    Q    Do you mean step onto Amazon property?

8    A    Yeah.  I mean -- I'm sorry.  If he were to step onto

9    Amazon's property.  Yes.

10   Q    Okay, now you know what Christian was doing while he was

11   on the public street?

12   A    He was speaking with, I think there was like a few media

13   people, he was speaking with them.

14   Q    Did you see any --

15   A    He was with -- I think -- I think he was with his brother

16   or something like that, so.

17   Q    Okay.

18   A    Yeah.

19   Q    Do you know his brother's name?

20   A    No.

21   Q    Did you see any media outlets on the public street during

22   the April 6th event?

23   A    Yes, it was like very few.

24   Q    A few of them had been there on March 30th?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Do you recall any of the names of the media outlets who

2    were there on April 6th?

3    A    No.

4    Q    Did you leave the Amazon parking lot at some time during

5    the protest?

6    A    Yes, I did.

7    Q    Where did you go?

8    A    I walked to Christian, he was at -- he was on the MTA,

9    the -- at the bus stop, so I walked over to him and I was

10   speaking to him a little bit

11   Q    Okay.  Did you go there with anyone else?

12   A    No, I went by myself.

13   Q    Did you take the bullhorn or megaphone with you?

14   A    No, I actually gave it to Gerald Bryson.

15   Q    Do recall approximately what time you arrived or the end

16   of protest?

17   A    I believe it was around the same time.  I believe it was

18   like 11:00.

19   Q    Okay, and do you recall approximately how long you were

20   there before you left the area to go see Christian on the

21   public grounds?

22   A    Probably about 10 minutes, I'd say.

23   Q    And do you recall how long you spent outside Amazon

24   property, meeting with Christian?

25   A    That was probably about 5 to 10 minutes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.

2    A    Yeah.

3    Q    And what did you do after you finished the meeting with

4    Christian outside the property?

5    A    After that, I walked back to the area where Gerald and --

6    and Mandi were located.  Jordan Flowers was, you know, he was

7    like walking back and forth doing like a live broadcast.  I

8    believe Socialist Alternative.  I believe he was doing like a

9    live broadcast for them, or he -- either them or Make the Road

10   New York.  So he was like walking back and forth.  But I walked

11   back to Gerald and Mandi, where they were standing.

12   Q    Okay.  And how far was the public sidewalk area where you

13   can see Christian?  How far was that from the parking lot

14   divider where Gerald was?

15   A    How far?  Like -- like -- like, you're talking about

16   minute walking?

17   Q    Okay, yeah, in any way you can measure it.

18   A    Yeah, that was, like, about a five -- five-minute walk,

19   definitely, at least five-minute walk.

20   Q    So you have to walk five minutes to get there, five

21   minutes back, and then you spent about 5 or 10 minutes with

22   Christian?

23   A    Yes.

24   Q    And before you left the area, what were -- did you notice

25   what Gerald Bryson was doing?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Before I left the area?  No.

2    Q    Yeah.  Did you --

3    A    Well, I know -- no, I just -- I know he grabbed the

4    bullhorn, but I was, you know, walking away.  And you know, I

5    heard him say something, but you know, I just --

6    Q    Did you hear the things he said into the bullhorn?

7    A    Well, he was saying, like, you know, you need to shut JFK

8    down.  But you know, as -- as I'm walking away, you know, I

9    can't hear anything because it's just a bullhorn.

10   Q    Yeah.  So my next question was, could you hear what Gerald

11   was saying in the megaphone while you were outside the Amazon

12   property?

13   A    No.

14   Q    Did you observe any interaction that day in the parking

15   lot between Gerald and another JFK employee who opposed the

16   protest that you were engaged in?

17   A    No, because at that time I was walking away from the

18   protest.

19   Q    Okay.  I think you alluded to this, but I want to make

20   sure the record's clear.  Do you know whether anyone was

21   recording the events that took place during the protest on

22   April 6th?

23   A    Yes.  Yes.

24   Q    Who was recording as far as you know?

25   A    Mandi Velasco.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And you mentioned Jordan Flowers; was Jordan Flowers

2    recording as well?

3    A    Yeah, he was recording himself, you know, on the -- I

4    believe it was Make the Road New York or a Socialist

5    Alternative.  And he was recording himself, telling, you know,

6    telling the live of what was going on at the time.

7    Q    Do you know what a livestream is?

8    A    Yes.

9    Q    What's a livestream?

10   A    Livestream is when -- you know, it's basically a video of

11   the person or their surroundings, but it's in real time.  So

12   when they're recording that video, it's actually occurring at

13   the same time.

14   Q    And is it posted live somewhere?

15   A    Yes, it's posted live on Facebook.  Facebook usually has a

16   live.

17   Q    And was anyone making a livestream video of the protest on

18   April 6th?

19   A    Yes.  Mandi made a live video of the protest on Facebook

20   Live.

21   Q    And what about Jordan?  Was he also doing a livestream?

22   A    Yes.

23   Q    So you said Jordan was recording himself.  Do you know

24   what Mandi was recording?

25   A    Mandi was recording the actual process.



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1   Q    She was recording other people?

 2   A    Yes.

 3   Q    What time did your protests end on April 6th?

 4   A    I don't know the exact time, but it wasn't that long,

 5   probably like an hour.

 6   Q    So if you arrive there at 11, you were finished around

 7   noon?

 8   A    At like -- yeah, noon.

 9   Q    Did any manager or representative of Amazon ever speak

10   with you about your observations of any events that occurred

11   during the April 6th protest?

12   A    No.

13   Q    Are you familiar with an Amazon employee named Dimitra

14   Evans?

15   A    Dimitra Evans, no.

16   Q    All right.  Now, I want to just ask you about a different

17   subject, about your general observations during your work

18   experience at JFK.  Do -- based on your observations, do

19   employees at JFK sometimes use curse words or shop language at

20   the facility?

21   A    Yes.

22   Q    How often do you typically hear curse words or foul

23   language being used by employees at the facility?

24   A    Throughout the day, throughout our 10 -- a 10-hour shift,

25   I would hear it multiple times.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Every day?

2    A    Yeah, for the most part, yeah.

3    Q    Have you ever heard a manager curse words?

4    A    Yes.

5    Q    Have you ever heard a manager use a curse word during a

6    standup meeting?

7    A    Yes.

8    Q    Which managers do you recall using curse words?

9    A    Bertram Pryce, my old manager.  I've also heard, I

10   believe, Ryan -- Ryan O'Leary, use it as well.

11   Q    And do you recall any particular instances when you

12   observed this?

13   A    Like, the actual -- the day, or?

14   Q    Or -- or anything involving the circumstances of what

15   you -- you observed, can you describe anything in more detail?

16   A    Yeah, well, it's not as -- it's not like a -- cursing

17   like, you know, not really cursing at people.  But just like, I

18   remember one time I was at one of Ryan's standups, and the mic

19   was on.  He didn't realize it was on.  And he was talking to

20   the PA and he said "shit" through the mic, and everyone was

21   like, laughing.  It was like a little funny thing.

22   Q    Okay.  Do you call any other curse words that you heard a

23   manager say?

24   A    I've heard shit and damn, those two curse words.

25   Q    Have you ever heard any of your fellow associates call



Exhibit E, Motion to Try Petition on Hearing Record

1    each other any bad names or use curse words directed at one

2    another?

3    A    Yes, you know, like, there's been a few arguments, verbal

4    arguments between associates; so I've heard to curse words

5    being used.

6    Q    Do you recall any particular instances when you observed

7    this?

8    A    Well, 2019 I remember two pickers, you know, they were

9    arguing over stations, because we would always argue over

10   stations sometimes, because, you know, what -- what -- it will

11   be like one station that's closer to the breakroom.  So like,

12   you know, it was kind of like every man for himself before I

13   get as far as getting a station.

14        So it was these two ladies had gotten into an altercation

15   because one of them left their stuff at the station and they

16   went to -- they went on lunch.  When they came back and another

17   lady was there at the station.  And I don't -- I don't know,

18   maybe she didn't know if the -- if she didn't notice that the

19   other person's belongings were there.  But she was like, oh,

20   this is my station.  She was like, no, well, I'm here now.  So

21   they were just going back and forth.  And they said, the B word

22   to each other, and was like you need to leave the station now.

23   And you know, a manager -- the manager came I don't know his

24   name, but the manager came and told them, hey, guys, you guys

25   got to relax.  And one of them had to leave, one of them



Exhibit E, Motion to Try Petition on Hearing Record

1    stayed.

2    Q    Do you recall that one of these employees called the other

3    a bitch?

4    A    Yeah.  Yes.

5    Q    And did the other employee respond by calling the other

6    person a bitch?

7    A    Yes.

8    Q    Do you know whether either of these individuals were just

9    (indiscernible)?

10   A    To my knowledge, no.

11   Q    Do you recall their names?

12   A    No.

13   Q    Do you recall approximately when in 2019 this was?

14   A    It was like the end of 2019, like November.

15   Q    Were either these employees fired?  I mean, did you see

16   them subsequently at the facility?

17   A    No, I've seen them after that.  You know, it's hard to

18   tell who's -- you know, who's fired.  A lot of people come in

19   and out of the building, so.

20   Q    Yeah, but after this incident you observed, you did notice

21   that these --

22   A    Yeah.

23   Q    -- both of these individuals remained employed?

24   A    Yes.

25   Q    And you said a supervisor came and broke up the dispute;



Exhibit E, Motion to Try Petition on Hearing Record

1    is that correct?

2    A    Yes.

3    Q    Do you remember which one, which supervisor?

4    A    No.  No, I don't remember their name, but they were from

5    stow, because it was two -- two stowers having an argument; So

6    I'm assuming it was a stow manager.

7    Q    Okay.  Now, you said before you don't know who Dimitra

8    Evans is.  Do you know the person with whom Gerald Bryson got

9    into a verbal dispute during the April 6th protest?  Do you

10   know who that is, or recognize her?

11   A    Yeah, I see her all the time, you know, she's still

12   employed now.  I don't know her name though.  I don't, you

13   know, I don't know who she -- her actual name.  But I do know

14   that, you know, she's a -- she's in safety.  I don't know if

15   she's a tier one safety or tier three.  I'm assuming she's a

16   tier one safety. You know, there was an actual incident where I

17   was at my station, packing.

18       I was packing, you know, packing customer orders.  And

19   she walked up to me with a laptop.  And it was -- I noticed it

20   was the same lady that was arguing with -- with Gerald.  Now

21   once that happened, she was saying, oh, well, you know, you

22   need to sign up for these Zappos shoes, so Amazon is trying

23   to -- they're -- they're basically having like a deal where

24   they -- Amazon associates sign up for these safety shoes.  So

25   Amazon was trying to push people to get these shoes.



# Exhibit E, Motion to Try Petition on Hearing Record

1    And she was saying like -- like do you want these shoes?

2    And I was like, no it's okay, you know, like prior to that, a

3    few other safety people came to me and asked me the same thing,

4    and I told them no.  And then she told me that, well, you need

5    to -- you need to get them now while they're free because

6    they're going to be mandatory coming up, and I was just like

7    okay, and that was the only interaction I had with her.

8    Q    But you've seen her in other contexts; is that correct?

9    A    Yeah, so she was in my department that seems at one time.

10   Q    When was she in your department?

11   A    In the last year.

12   Q    Okay.  Do you know what department this woman was in as of

13   April 6th, 2020?

14   A    No.

15        MS. AHMAD:  Objection, Your Honor.  I think this whole

16   line of inquiry is designed to delve into the issues that Your

17   Honor ruled this morning would result in a mini trial and

18   therefore were not appropriate.

19        JUDGE GREEN:  Well, I was talking about the transfer

20   after -- after the fact; I don't think we're there yet.  So

21   overruled.  But are we done except --

22        MS. AHMAD:  Then a relevance objection then, because other

23   than that, I can't see the relevance of this.

24        JUDGE GREEN:  It sounds like we're done with this line; am

25   I right?



1    MR. JACKSON:  Your Honor, if I may ask some additional

2    questions, and if necessary, I'll make them as an offer of

3    proof.

4    JUDGE GREEN:  No, no, no.  This -- well, what is it?  Why

5    don't you tell me where you're going with this?

6    MR. JACKSON:  I want to know whether -- well, first of

7    all, I want to know --

8    Q    BY MR. JACKSON:  Mr. Palmer, do you -- in the interaction

9    where this woman spoke to you about Zappos shoes.  Was she

10   wearing a green vest with gray stripes?

11   A    It was just like a green -- a regular green vest.  It

12   didn't say safety on the back.  It was like one of -- it was

13   like similar to the throwaway orange vest that Amazon provides

14   for anyone, but except it was just green, so.

15   Q    Okay.  And what makes you think that she's -- works in

16   safety?

17   A    Because the safety people were the ones who were pushing

18   for the -- the Zappos shoes and they had the laptop and they

19   were showing -- they -- on the laptop, it was like examples of

20   different shoes that they had.  And she had the laptop with the

21   different shoes that Amazon had.  And --

22   Q    How do you know who -- I'm sorry you were saying

23   something?

24   A    Well and the fact that every safety person that came to me

25   had the same lines about, you know, signing up for the shoes.



Exhibit E, Motion to Try Petition on Hearing Record

1    So that's how I knew.

2    Q    Okay.  How do you know this woman, who've you identified

3    was the same person who had the altercation with Mr. Bryson if

4    you did not observe it?

5    A    Well, I was told this was the lady.  And also, you know,

6    in the live video, you can -- there's a live video that you can

7    see.  I mean, it's not too clear, but you know, the voice, you

8    can hear the person's voice.  And I was, you know, I was told

9    that this was the person who got into the argument.

10   Q    Did you watch the video?

11   A    Yes, I did.

12   Q    And did you recognize the woman in the video when you

13   watched it?

14   A    I mean, it's -- it's not too clear of a video, but you

15   know, like I said, the voice, you know, the voice matched

16   and -- and I was told that that was the lady.

17        MR. JACKSON:  Okay, no further questions, Your Honor.

18        JUDGE GREEN:  Okay, so why don't we break for lunch?

19        MR. JACKSON:  Your Honor, if I could ask if Mr. Kearl has

20   any questions, because I anticipate the Respondent will ask for

21   a break in advance of the cross-examination, so I don't think

22   it's an effective of time.

23        JUDGE GREEN:  Yeah, okay.  I mean, I would actually like

24   to.

25        Mr. Kearl, do you have questions?



# Exhibit E, Motion to Try Petition on Hearing Record

1    MR. KEARL:  I do have a very brief line of questions.

2    JUDGE GREEN:  Okay, let's finish up that -- that before we

3    break.

4    MR. KEARL:  Okay.  So I do not have access to SharePoint

5    at the moment, but I believe that Ms. Cox is going to upload

6    some documents to SharePoint that I would like to enter.

7                    **CROSS-EXAMINATION**

8    Q    BY MR. KEARL:  But before we get there, I just want to ask

9    one quick question about this, this final written warning that

10   you received.  So what does the final written warning mean to

11   you as an employee?

12   A    The final written warning is like the final straw,

13   basically.  Once you receive a final, you know, you're on your

14   last limb as far as employment at Amazon.  After the final,

15   that's it, your -- your job is -- is in jeopardy.  It's just

16   over, like you're pretty much fired after that.  So the fact

17   that I received the final notice is alarming to me being that I

18   didn't receive any, you know, I didn't receive a second

19   writeup, a first writeup, or documented coaching, verbal

20   warning, any of those.  So it's very severe.

21   Q    Okay, and did it create stress for you during the course

22   of your work at Amazon after receiving that?

23   A    Yes, absolutely.  Because, you know, after I received the

24   writeup then I was -- I was like heartbroken.  Like, you know,

25   like I've never -- I don't receive writeups; I never received



# Exhibit E, Motion to Try Petition on Hearing Record

1   at Amazon.  You know, I have a clean -- clean record and I've

2   worked Amazon for five plus years.  And you know, that's -- you

3   know, this final was weighing over my head.

4       So you know, after I received the final you know, I

5   remember days after that I had managers -- managers from all

6   different departments just watching me.  And it seemed as

7   though like I was a target and they were looking for anything

8   that I was doing in -- doing wrong to say, yeah, this is what

9   Derek was doing, we should just fire him.  That's what it

10  seemed like.  So the final was more severe for me.

11      MR. KEARL:  So I believe the documents are on SharePoint

12  and I'm going to now share a document, I believe we do not have

13  someone that has been appointed to do this, so there's no

14  problem with me sharing my screen?

15      JUDGE GREEN:  Sure, yes.

16      MR. KEARL:  Okay.

17  Q    BY MR. KEARL:  So Mr.  Palmer, let me know when you can

18  see my screen.

19  A    I see it.

20  Q    Okay.  Do you recognize this document?

21  A    Yes, it's a public nuisance case.

22  Q    A public nuisance case; and can you tell me how you know

23  about this case?

24  A    Well, my name is right there and I was the plaintiff on

25  this case.



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. KEARL:  Okay.  So I'd like to enter this -- I've

2    marked it as CP Exhibit 1.  I'd like to enter this as CP

3    Exhibit 1.

4    JUDGE GREEN:  Hold on just one moment.  So is there any

5    objection from -- first of all, has -- has the Respondent an

6    opportunity to see this document?

7    MS. AHMAD:  I'm generally familiar with it, Your Honor,

8    but I don't believe we have seen it before now, it's also a

9    lengthy document.  So I would actually ask how long Mr. Kearl's

10   line of questioning is because we would very much prefer to

11   take a short, at least, lunch break right now, because we've

12   been going for almost two hours again.

13   MR. KEARL:  It's very brief on this.  And I do believe

14   that this lawsuit -- Gibson, Dunn is counsel on this.

15   MS. AHMAD:  Yes, as I mentioned, we have seen it.  I'm not

16   sure whether or not we've seen it in the context of this

17   proceeding.

18   MR. KEARL:  Okay.

19   MS. AHMAD:  But again, I would if I could just get an

20   estimate because otherwise, Your Honor, you may really ask just

21   for a short lunch break, it doesn't have to be the full lunch

22   break before we come back.

23   JUDGE GREEN:  Well, I'm going to -- I'm going to I'm going

24   to allow Mr. Kearl to proceed at this time.  You don't need

25   to -- you know, you don't need to take a position on -- on the



Exhibit E, Motion to Try Petition on Hearing Record

 1  admissibility of this particular document if you -- if you

 2  really are not (indiscernible) seeing it in this context

 3  before.

 4      MS. AHMAD:  Okay.

 5      JUDGE GREEN:  You know, you can say -- you can say after

 6  lunch.

 7      MS. AHMAD:  That's fine with us.

 8      JUDGE GREEN:  Okay.

 9      MR. KEARL:  Okay.

10  Q    BY MR. KEARL:  And so just very quickly, I'm going to

11  direct your attention to page 10 of this document, where we

12  have guidelines that are described as minimum requirements

13  under the New York forward plan.  And so I -- in the interest

14  of time, I'm not going to force you to read through all of

15  these.  But we're just going to start at the top here.

16      Did Amazon, at the time that you were working between

17  March 25th, 2020 and April 6th, 2020, operate at less than 50

18  percent occupancy?

19  A    No.

20  Q    Did they implement policies to minimize sharing of objects

21  and talking of shared services?

22  A    No.

23  Q    Did they ensure that workstations were cleaned and

24  sanitized between shifts?

25  A    No.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Did they disinfect all portions of the facility following

2    an onsite positive test, wait 24 hours to begin disinfection

3    process and close off those parts of the facility undergoing

4    disinfection until the process is complete?

5    A    No.

6    Q    Okay, so there's a bunch of other ones here.  I'll let the

7    document speak for itself.  And I believe you testified to most

8    of it.

9         And then just real quick here, we have some CDC guidelines

10   that were released related to COVID-19 concerns, and I just

11   wanted to check in real quick.  Did Amazon reduce face-to-face

12   contact between employees during this period of time?

13   A    No.

14   Q    Did Amazon take steps to reduce transmission at the

15   workplace by reassigning tasks to maintain social distance of

16   six feet?

17   A    No.

18        MS. AHMAD:  Your Honor, could we have a clarification as

19   to what Mr. Kearl means by this time?  I'm not sure what time

20   period is being asked about.

21        MR. KEARL:  The time period is the same as the prior,

22   April -- or March 25th, 20th through April 6th, 2020.  During

23   that protected, concerted activity that we've been speaking

24   about.

25   Q    BY MR. KEARL:  Okay, so I am now going to and I believe to



Exhibit E, Motion to Try Petition on Hearing Record

1    be able to see this, I'm going to shift over to another

2    document that I'm not going to spend much time on; I've marked

3    it as CP Exhibit 2.  Do you recognize this document?

4    A    Yes.

5    Q    Okay, what is this document?

6    A    That should be the public nuisance case.

7    Q    This -- yes.  So this is -- this is the also from a

8    business case, this is your declaration?

9    A    Yes.

10   MR. KEARL:  And so I would like to submit this as CP

11   Exhibit 2.

12   JUDGE GREEN:  Okay, so you'll -- you'll get back to us

13   after lunch on this as well, Ms. Ahmad?

14   MS. AHMAD:  Yes, Your Honor.

15   JUDGE GREEN:  Okay.

16   MR. KEARL:  I have no questions.  I just want to enter it

17   into the record.  And there's a lot of information in here

18   contemporaneous with the filing of the lawsuit about what we've

19   been discussing today.

20   Q    BY MR. KEARL:  Next, I would like to call your attention

21   to this document I've labeled as Exhibit 3.  Do you recognize

22   this document?

23   A    Yes, I do.

24   Q    Okay, can you tell me what this document is?

25   A    This is about the, you know, the leaked memo with the



Exhibit E, Motion to Try Petition on Hearing Record

1    Amazon executives designing the plan to clear Chris Smalls'

2    name.

3         MR. KEARL:  Okay, and I believe this is also a self-

4    authenticating document.  And I'd like to move to put

5    Exhibit -- CP Exhibit 3 on the record.

6         JUDGE GREEN:  Any objections?

7         MS. AHMAD:  Same objection, Your Honor.

8         JUDGE GREEN:  Same?  Okay.

9         MS. AHMAD:  Thank you.

10        MR. KEARL:  Okay.

11   Q    BY MR. KEARL:  And can you identify the person in this

12   photograph?

13   A    It's Gerald Bryson.

14   Q    Okay, and can you tell me the date of this article?

15   A    It's April -- April 2nd, 2020?

16   Q    Okay, and are you aware of this memo that was released?

17   A    Yes, I am.

18   Q    Okay.  And I'm just going to call your attention to this

19   quote from the leaked memo here about making Mr. Smalls the

20   most interesting part of the story.  And then, I also will call

21   attention to the sort of headline grabbing part of this, which

22   is the calling Smalls not smart or articulate, to make him the

23   face of the entire Union organizing movement.  Do you know who

24   Mr. David Zapolsky is?

25   A    Yes, I believe that's one of Amazon's lawyers.



# Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Okay.  Have you ever had any conversation with David

2   Zapolsky?

3   A    No.

4   Q    Have you ever met Mr. David Zapolsky?

5   A    Never.

6   Q    Have you ever seen him at the JFK facility?

7   A    No.

8   Q    Okay.  Was he present during the protests on March 30th?

9        MS. AHMAD:  Objection.  Your Honor, the relevance of this

10  is strained at best.

11       JUDGE GREEN:  Overruled.

12       MS. AHMAD:  There's a article, I'm not sure what it's

13  being offered for.  Sounds like it's being offered for the

14  truth of the matter started, which is fine with me.

15       JUDGE GREEN:  I actually don't think it is being offered

16  for that; am I right?  It's basically being offered for --

17  for -- what is the reason why it's being offered?

18       MR. KEARL:  I believe it's relevant to showing the

19  company's animus against the protected, concerted activity that

20  Mr. Bryson participated in.  And it shows that people that were

21  in positions of power outside the JFK management structure were

22  paying attention to the employees at JFK as of as early as

23  April 2nd, 2020.

24       MS. AHMAD:  And again, Your Honor, all of that would only

25  be the case if, in fact, the quoted portion were true,



# Exhibit E, Motion to Try Petition on Hearing Record

1    demonstrate that it is --

2        JUDGE GREEN:  Right.

3        MS. AHMAD:  -- in fact, being offered for the truth of the

4    matter asserted.

5        JUDGE GREEN:  So -- right.  So you know, this isn't --

6    this isn't Mr. Zapolsky making a statement.  This is somebody

7    saying that Mr. Zapolsky made a statement.

8        MR. KEARL:  Yes.  And I believe Exhibit 4 will help shine

9    some extra light on that matter.

10       JUDGE GREEN:  All right.  Well, we're going to hold off on

11   ruling on the admissibility of these documents until after

12   lunch.

13       MR. KEARL:  Okay.

14   Q    BY MR. KEARL:  Next, I'm going to show you a document that

15   marked as CP Exhibit 4.  Do you recognize this document?

16   A    Yes.

17       MR. KEARL:  Okay.  And I move to admit CP Exhibit 4 into

18   the record.

19       JUDGE GREEN:  Okay, we're going to --

20       MS. AHMAD:  Your Honor, we have all the same objections

21   with respect to hearsay and of course, we'll reserve until

22   after lunch, but I think any line of questioning about what is

23   said in these articles that presumes that they are true is best

24   postponed until after Your Honor has ruled.

25       JUDGE GREEN:  Yeah.  I don't think we actually had any



# Exhibit E, Motion to Try Petition on Hearing Record

1  questioning about it.  I think we just had representations from

2  Mr. Kearl as to what was in the article.

3  Q    BY MR. KEARL:  I would just like to draw your attention to

4  the beginning of this, where Mr. Zapolsky released a statement

5  following the publication which read, "My comments were

6  personal and emotional.  I was frustrated and upset that Amazon

7  played with and endangered the health and safety of other

8  Amazonians.  I let my emotions draft my words and get the

9  better of me."

10      So the final document that I would like to share, I

11  believe, is also uploaded into the SharePoint.  So I'm going to

12  share my screen again.  Let me know when you can see it.  This

13  is a video.  Do you recognize this video?

14  A    Yes.

15  Q    Okay, can you tell me what this video is?

16  A    This is the mini carnival that I was speaking about

17  earlier.

18  Q    Okay.  And does this video accurately represent what was

19  happening in the course of the carnival?

20  A    Yes.

21      MR. KEARL:  Okay, so I have marked this as CP Exhibit 5.

22  I move for admission of CP-Exhibit 5.

23      MS. AHMAD:  Your Honor, we'll give our position after

24  lunch, we have not gotten to know this video and are not

25  familiar with it.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1         JUDGE GREEN:  Okay.

 2    Q    BY MR. KEARL:  And just real quick, Mr. Palmer, do you

 3    recognize this individual in the video?

 4    A    That's Gerald Bryson.

 5    Q    That's Gerald Bryson.  Okay, so I'm just going to -- I

 6    actually am going to un-share my screen and share it one last

 7    time with audio.  Let me know if you can hear this.

 8    (Audio played at 1:49 p.m., ending at 1:50 p.m.)

 9    Q    Okay, and just real quick before I let you go, you

10    testified earlier that there were multiple areas.  Did this

11    video depict one of those areas that the fair was taking place?

12    A    Yes.

13    Q    And there were other areas that the fair was taking place

14    in addition to that, right?

15    A    Yes.

16         MR. KEARL:  Okay.  Give me one second here, I believe

17    that's it.

18         JUDGE GREEN:  Mute.  Frank, you're muted.

19         MR. KEARL:  Yeah, sorry.

20    Q    One last very minor thing, you -- you mentioned that after

21    you received your final written warning, you felt that the

22    managers were watching you.  There was a target on your back.

23    Can you explain any specific examples that that took place?

24    A    Well, that was the first floor.  I was counting on the

25    first floor, I believe it was the south side of the facility, I
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    believe was around 9 -- 9-ish -- 9 in the morning.  There were

2    multiple managers just walking by, staring at me; managers from

3    stow, managers from pick, managers from pretty much all the

4    departments.  So I just -- it just felt weird that everyone was

5    staring at me as they're walking by.

6         And even Tom, you know, Tom Castle, who was my operations

7    manager at the time, he was walking by, and I -- I walked up to

8    him, I said, you know, it seems like everyone watching me,

9    like, what -- what's going on here.  He was like, oh, no, I'm

10   not watching you, I was just in the area, and I said okay, and

11   I went back to working, and I just felt the eyes still watching

12   me after I said that, so.

13        MR. KEARL:  Okay.  I have no further questions.

14        JUDGE GREEN:  Okay.  So let me just ask you, Mr. Kearl,

15   before we break.  You know, at one point you said you thought

16   that -- I think you were talking about -- we were talking about

17   the hearsay objection to CP-3, and you said CP-4 would shed

18   some light on it.  And I didn't see that CP-4 shed any light on

19   it.  You know, again, what is your assertion that -- that

20   what's your hearsay exception?  We don't have the authors of

21   these -- of these articles here to cross-examine.  So what

22   would -- what's your hearsay exception with regard to these --

23   these news articles.

24        MR. KEARL:  I can get back to you with a more specific

25   exception after the break.  But generally, taken together the



Exhibit E, Motion to Try Petition on Hearing Record

1    documents show that following the initial leak of the memo,

2    subsequent document, or confirmation of the -- the existence of

3    the memo, including acknowledgment of the fact that the

4    document was racially insensitive, was made by Mr. Zapolsky.

5        Including, I believe he claimed that he did not know the

6    race of Mr. Smalls before writing the document, which would

7    allude to the fact that he was aware of the fact that the

8    comments were -- were racially motivated.  I believe both

9    documents are able to be admitted under Rule 903, if I remember

10   correctly, as news articles that are self --

11       JUDGE GREEN:  No, they're authen -- yeah, they're self-

12   authenticating, but they're still hearsay, you know, unless you

13   have an exception.

14       MR. KEARL:  Okay, well, I --

15       JUDGE GREEN:  Well, we'll -- we'll deal with this after

16   the break.  So why don't we come back at 2.  Yeah, let's come

17   back to.  No, excuse me, 3.  2 would be a very short lunch.

18       MS. AHMAD:  Your Honor, that's fine.  Could I just ask for

19   two things before we go off the record first?  We ask the

20   counsel for the General Counsel to produce to us any Jencks

21   material for Mr. Palmer at this time.

22       MR. KEARL:  Yes.  Your Honor, I would like some

23   instruction on how to do this.  And forgive me if this was in

24   your original order concerning the Zoom hearing.  But I'm

25   concerned about emailing a copy of the board affidavit we



Exhibit E, Motion to Try Petition on Hearing Record

1    received from Mr. Palmer because that is supposed to be only

2    used for the purposes of this hearing.  So if Your Honor could

3    provide any suggestion as to how --

4         JUDGE GREEN:  Just email it, just email it or put it on

5    SharePoint.  But you know, there's an instruction that at the

6    end of the hearing parties -- the Respondent supposed to

7    destroy the affidavit.

8         MR. KEARL:  Okay.

9         JUDGE GREEN:  Delete the -- delete copies of the

10   affidavits from there.

11        MR. KEARL:  I will upload a copy of the affidavit to

12   Sharepoint.  And in addition, Ms. Ahmad, Jencks material that

13   we received from Mr. Palmer is CP Exhibit 2, I believe, the

14   declaration of Derek Palmer.

15        MS. AHMAD:  Thank you, Mr. Jackson.

16        And then, my final note before lunch, Your Honor, we'd ask

17   that you instruct Mr. Palmer that given that he continues to be

18   on the stand, he not discuss his testimony with anybody,

19   including his counsel and counsel for the General Counsel.

20        JUDGE GREEN:  Right.  So Mr. Palmer, you can do go ahead,

21   do whatever you want during the break, just don't discuss with

22   anybody your testimony of the subject matter of this -- this

23   case.  Okay?

24        THE WITNESS:  Yeah, absolutely.

25        MR. KEARL:  Can I also just clarify that you can turn your



Exhibit E, Motion to Try Petition on Hearing Record

1    video and sound off so that you don't feel like you're being --

2    JUDGE GREEN:  Yeah, right.  We're all going to be we're

3    all going to be -- right.  We're all turning off our sound and

4    video.

5    Okay, so off the record.

6    (Off the record at 1:55 p.m.)

7    JUDGE GREEN:  And do we have more clarification on the

8    Respondent's position regarding CP-1 through 5?

9    MS. AHMAD:  Yes, Your Honor, each of those exhibits

10   contains inadmissible hearsay.  The first is a complaint

11   file -- a complaint filed in a federal lawsuit filed by Mr.

12   Palmer in the Eastern District of Virginia.  The allegations

13   therein are purely hearsay; and I can't see any reason that

14   they would be admitted here other than for the truth of the

15   matter asserted therein.

16   The second exhibit is Mr Palmer's own declaration filed in

17   connection with that suit, which really strains logic because

18   we have Mr. Palmer here on the stand.  If there's any

19   information that counsel wishes to elicit from Mr. Palmer, they

20   may do so directly.  I don't see any reason they should be

21   permitted to admit his prior hearsay statements in relation to

22   his testimony today.

23   The remaining exhibits, as Your Honor noted, are news

24   articles which, authenticity aside, contain statements that are

25   purely hearsay, which counsel offers for the truth of the



1    matter, asserted the fact that one hearsay statement

2    pertains -- one hearsay statement in an article pertains to a

3    different hearsay statement, and a different article doesn't

4    bolster either of their admissibility concerns and in fact,

5    weakens it.

6        So for those reasons, we would object to all of Mr.

7    Kearl's exhibits being admitted.

8        JUDGE GREEN:  So Mr. Kearl, it all does appear to be

9    hearsay.

10       MR. KEARL:  I can respond regarding 3 and 4.

11       JUDGE GREEN:  I mean, 5 -- let me just say that 5 -- 5 I'm

12    admitting.   So CP-5 is admitted, that's the videotape.

13    **(Charging Party Exhibit Number 5 Received into Evidence)**

14       JUDGE GREEN:  1 through 4?

15       MR. KEARL:  So I'll start with 3 and 4.  I believe these

16    are not hearsay statements.  First, they meet -- they meet each

17    of -- the statements made meet each criteria under 801(d)(2).

18    This is an opposing party statement.  Additionally, these

19    statements are not presented for the truth of the matter

20    asserted.  This is a statement that demonstrates the existence

21    of Amazon's plan.  It shows deliberation and strategy in

22    furtherance of violating Amazon's employee rights under the

23    act.  And Zapolsky himself admitted that he said those words,

24    thus establishing that he said those words.

25       I'm not trying to present this evidence to show anything



Exhibit E, Motion to Try Petition on Hearing Record

1    about the intelligence of Mr. Smalls.  I'm merely presenting it

2    to show that the deliberations did, in fact, take place.

3        If you are unpersuaded by those arguments, I would also

4    like to say that the memo itself, meets section 803(2), excited

5    utterance.  Mr. Zapolsky himself in his apology, said that he

6    let his emotions draft his words.

7        Additionally, I believe this means the 807(1) residual

8    exception.  The statement is supported by sufficient guarantees

9    of trustworthiness after considering the totality of

10   circumstances under which it was made and evidence

11   corroborating the statement in the form of his of his

12   subsequent apology.

13       JUDGE GREEN:  Yeah, so the problem --

14       MS. AHMAD:  Your honor, the fact that all of Mr. Kearl's

15   arguments --

16       JUDGE GREEN:  Yeah, so let me just -- the problem here is

17   that the declarant is the is the author.  It's the author.

18   It's not Mr. Zapolsky.  So you don't have the author -- we

19   don't have the author here to cross-examine regarding what he

20   wrote.  This is what -- this is what the Court wrote, it's not

21   what Zapolsky said.  Zapolsky -- yeah, the Zapolsky alleged

22   statement is an admission, if it was -- if it wasn't the

23   subject of hearsay itself.

24       So and you know, I mean, the nuisance lawsuit.  We have

25   Mr. Palmer here, I don't know really what the purposes of



Exhibit E, Motion to Try Petition on Hearing Record

1    having it's essentially duplicate testimony of his desperation.

2    I mean, as of yet, there's nobody contesting his testimony

3    regarding -- regarding these matters.  So listen, this is what

4    I'm doing.  You know, I mean, I guess there's some argument as

5    to the 807 residual -- residual arguments.  But I'm not I'm not

6    going to allow 3 and 4.  I'm going to exclude CP-3 and 4, you

7    know.

8         MR. KEARL:  May I also just raise that Section 16 802(1)

9    of the bench book corroborated hearsay.  Hearsay evidence is

10   admissible in board proceedings if marginally probative in

11   force.

12        JUDGE GREEN:  But there's no corroboration yet.

13        MR. KEARL:  That the statement of has his own statement

14   attesting to --

15        JUDGE GREEN:  Yeah, but we don't -- that's not his

16   statement.  It's the author's state -- the author is saying

17   that he admitted it.  We don't have him saying that he admitted

18   it.  That's the author's presentation, that he admitted it.

19        MR. KEARL:  The -- okay.  Well, then in that case, I would

20   like to request a subpoena.

21        JUDGE GREEN:  Okay, granted.  Let -- let me -- you know,

22   when you -- when you issue it, send me the -- the number of the

23   subpoena and the date that it's served.

24        So now that, that could be an issue, I mean, what does

25   this -- does that memo -- do these notes fall within the scope



Exhibit E, Motion to Try Petition on Hearing Record

1   of the subpoena that already issued?  And has it been produced?

2       MR. KEARL:  It has not been produced and I believe it does

3   fall within the request.

4       JUDGE GREEN:  Okay, so that that actually raises another

5   issue I'm going to -- I'm going to with -- in that event, I'm

6   going to withhold a ruling on CP-3 and 4, because that

7   ultimately could result in the admissibility of the documents.

8   That is an example of a banned mills sanction.  I'll -- I'll

9   allow CP-1 and 2, for what it's worth.  I don't think it's

10  worth much, but I'll allow it for what it's worth -- what --

11  those -- those exhibits for what they're worth.

12  **(Charging Party Exhibit Numbers 1 and 2 Received into Evidence)**

13      JUDGE GREEN:  So we're ready to move on to cross-

14  examination.

15      Ms. Ahmad, are you ready?

16      MS. AHMAD:  I am, Your Honor.  Thank you.

17      JUDGE GREEN:  So Mr. Palmer, Ms. Ahmad is going to have

18  some questions for you on cross-examination.

19      THE WITNESS:  Okay.

20                      **CROSS-EXAMINATION**

21  Q   BY MS. AHMAD:  Good afternoon, Mr. Palmer.

22  A   Good afternoon.

23  Q   You've spoken at some length here about various protests

24  that you engaged in in March and April of 2020 with respect to

25  Amazon's workplace health and safety policies, right?



Exhibit E, Motion to Try Petition on Hearing Record

1   A   Yes.

2   Q   And you engaged in those protests together with other

3   people, some of whom you've named here today?

4   A   Yes.

5   Q   And the goal of those joint protests was to improve

6   working conditions at Amazon in your view, correct?

7   A   Yes.

8   Q   And you and you viewed the activity you were engaged in

9   with Christian Smalls, Gerald Bryson, and others as protected

10  concerted activity, correct?

11  A   Yes.

12  Q   And you thought that your participation in those

13  activities should be protected under the National Labor

14  Relations Act?

15      MR. JACKSON:  Objection.  Calls for legal conclusion.

16      JUDGE GREEN:  Well, Mr. Palmer, at the time, did you know

17  anything about the National Labor Relations Act and protected

18  concerted activity?

19      THE WITNESS:  No.

20      JUDGE GREEN:  Okay.  So then --

21      MS. AHMAD:  So Mr. --

22      JUDGE GREEN:  Go ahead.

23  Q   BY MS. AHMAD:  I just wanted to prove that, Mr. Palmer,

24  you said you weren't familiar with the NLRB at the time of

25  these protests?



1    A    Well, I do know that if you're protesting, your deals are

2    protected.  So that answers your question then, yes.

3    Q    Okay, and did you believe that you were protected under

4    those rules?  By protesting on your day off?

5    A    Yes.

6    Q    And so let's talk a little bit about the substance of what

7    you were protesting about.  If I understood you correctly, two

8    of your main concerns were that you wanted Amazon to enact and

9    enforce social distancing policies and you wanted them to

10   distribute masks to associates and require their use; is that

11   correct?

12   A    Yes, as well as cleaning the facility, too.

13   Q    Okay, in addition to cleaning the facility.  And I take it

14   that -- you testified this morning, I should say, that all of

15   these things were important to you because you felt that if

16   these measures were not undertaken, your lives and other

17   people's lives would be at risk, correct?

18   A    Yes.

19   Q    You thought it's social distancing was not enforced,

20   people's lives could be put at risk because COVID-19 would

21   spread?

22   A    Yes.

23   Q    And you thought that if people were not required to wear

24   masks, their lives could be put at risk because COVID-19 would

25   spread?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A     Yes.

 2    Q     And I think -- I believe you testified this morning that

 3    you personally, because of your concern, always socially

 4    distanced, right?

 5    A     Yes.

 6    Q     And you personally, because of your concerns, always wore

 7    masks in gatherings, when around other people?

 8          MR. KEARL:  Objection.

 9          MR. JACKSON:  Objection, misstates testimony.

10          JUDGE GREEN:  Okay, well --

11          MR. JACKSON:  There was no testimony to that effect.

12          MR. KEARL:  He never testified to that.

13          MS. AHMAD:  I'm happy to just ask him the question, Your

14    Honor.

15          JUDGE GREEN:  Okay.

16    Q     BY MS. AHMAD:  Mr. Palmer, given your views about mask.

17    Did you always wear masks when in gatherings with other people

18    during --

19          MR. JACKSON:  Objection, lacks foundation.

20    Q     -- the time period of March through April 2020?

21          MR. JACKSON:  Thank you.

22    A     What was that?  There was like an interruption, I didn't

23    know.

24    Q     All right, I was asking if in March and April 2020, you

25    always wore masks when in groups with other people?
```



# Exhibit E, Motion to Try Petition on Hearing Record

1        MR. KEARL:  Objection, relevance.

2        JUDGE GREEN:  What's the relevance?

3        MR. KEARL:  In groups of other people?  What is this --

4    what does this refer to?

5        JUDGE GREEN:  Overruled.

6        MS. AHMAD:  Your Honor, the --

7        JUDGE GREEN:  Overruled.  Go ahead.

8        THE WITNESS:  Me or?

9        JUDGE GREEN:  No -- yes, you.  If you remember the

10   question, go ahead you can answer.

11   A    To answer your question, I did not have a mask at the

12   March 30th protest, if that's what you're getting at.

13   Q    BY MS. AHMAD:  You did not have a mask at the March 30th

14   protest?

15   A    No, I wasn't provided a mask; so no, I didn't have one.

16   Q    Okay, and what about the April 6th protest, did you have a

17   mask?

18       MR. JACKSON:  Objection, I'm going to, again, object on

19   the basis of relevance.  Mr. Palmer was not disciplined for not

20   wearing a mask; he was disciplined, allegedly for some social

21   distancing violation.  So I don't see where this is relevant at

22   all.

23       JUDGE GREEN:  So what -- what is the relevance?

24       MS. AHMAD:  Your Honor, it is appropriate for us to probe

25   Mr. Palmer's credibility with respect to the health and safety



Exhibit E, Motion to Try Petition on Hearing Record

1    concerns that he testified to this morning, as well as respect

2    to his allegations.

3        MR. JACKSON:  And this line of questioning does nothing in

4    that regard, Your Honor.

5        JUDGE GREEN:  Yeah, it really doesn't.  You know, it

6    really doesn't, as far as I can tell.  So why don't we?

7        MS. AHMAD:  Your Honor, I'm happy to move on, but I -- I

8    would like to move on and demonstrate the relevance of this

9    line of questioning.  So let me --

10       MR. JACKSON:  Objection.  He was protesting outside the

11   facility, not -- that does not relate to health and safety

12   concerns inside the facility.

13       JUDGE GREEN:  The issue -- the issue here, I mean, listen,

14   we don't even have -- this is what -- okay, this -- this is

15   part of the problem, that we don't even have an allegation

16   regarding Mr. Palmer.  But setting that aside, if we did, the

17   issue, I suppose, would be whether he engaged in protected

18   concerted activity and whether he was disciplined for that or

19   for something else.  I -- I don't see how his wearing --

20   whether he wore a mask, has any relevance to either of those

21   two issues.

22       MS. AHMAD:  Your Honor, Mr. Palmer was questioned for

23   approximately two hours by the counsel for the General Counsel

24   about Amazon's workplace health and safety policies.

25       JUDGE GREEN:  Yeah.  Yeah, he was.



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. AHMAD:  So approximately two hours of questioning on

2    those topics before we got into anything relating to protected

3    concerted activity.  And it doesn't seem fair to not allow

4    Amazon to cross-examine him on those things.

5        JUDGE GREEN:  It -- it was.  It was.  But that actually is

6    not -- that is not what's at issue with the case.  And frankly,

7    that went on -- that went on a long time.  What that was useful

8    for, to the extent it was useful for anything, was his

9    background to understand the protected concerted activity.

10       It's not -- you know, the -- the health practices, the

11   health and safety practices of Amazon is actually not at issue

12   in this case.  It's only to the extent that employees discussed

13   it and protected concerted action regarding it.  And I'm -- I'm

14   just having a hard time understanding how whether he wore a

15   mask at a protest has any -- has any impact on that analysis.

16       MS. AHMAD:  Your Honor, what is at issue in this case, in

17   addition to what you pointed out, is whether Amazon harbored

18   any animus against Mr. Palmer, Mr. Bryson, and Mr. Smalls and

19   whether they retaliated against them for engaging in protected,

20   concerted activity.  And if the claims that they were raising

21   with respect to health and safety during that protected,

22   concerted activity were, in fact, baseless, it undermines the

23   notion that Amazon would retaliate against them for raising

24   them.

25       JUDGE GREEN:  No.  That's not -- no, that's not the law.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MS. AHMAD:  Let me ask you, Mr. Palmer, about March

2    30th, I think you said you didn't wear a mask, but you did

3    testify this morning that you socially distanced, correct?

4    A    Yes.

5    Q    Okay.  I'd like to show you Exhibit 67 if we can pull that

6    up.  Can I ask Mr. Faulk (phonetic) to help me here?  I don't

7    have SharePoint access.

8         MR. JACKSON:  Your Honor, or Ms. Ahmad, could we just

9    clarify what Exhibit 67 you're talking about, is this in a

10   different proceeding?

11        MS. AHMAD:  This is Respondent's 67 in this proceeding.

12   Should be marked in the SharePoint.

13        MR. JACKSON:  Oh, I see.  Okay, thank you.

14   Q    BY MS. AHMAD:  Mr. Palmer, do you recognize this?

15   A    Yes.

16   Q    And is this a photograph from the March 30th protest?

17   A    I believe so.

18   Q    And is that you on the left holding the white sign?

19   A    On the right side, yes,

20   Q    I'm sorry, you're right on the right that it is that Mr.

21   Smalls on the left holding the sign that says our health is

22   just as essential.

23   A    Yes, it is.

24   Q    And where are you located in this photograph with respect

25   to the JFK facility?



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1   A    This is outside in the parking lot by a handicapped

 2   parking spot.

 3   Q    Okay, so this is on the premises of JFK 8?

 4   A    Yeah, this is the parking lot.  Yes.

 5   Q    Okay, now let's look at Exhibit 68.

 6        MS. AHMAD:  Your Honor, first I'd move to admit Respondent

 7   67?

 8        JUDGE GREEN:  Any objection?

 9        MR. JACKSON:  No objection from the GC.

10        MR. KEARL:  No objection.

11        JUDGE GREEN:  Okay.  So R-67 is admitted.

12   (Respondent Exhibit Number 67 Received into Evidence)

13   Q    BY MS. AHMAD:  Mr. Palmer, I'm just directing your

14   attention to the photographs in this exhibit as opposed to the

15   text.  But looking at first at this top photograph, is that a

16   photograph of you at the same March 30th protest?

17   A    Yes.

18   Q    And is the facility behind you, JFK 8?

19   A    Yes, it is behind me.

20   Q    And is the person next to you holding the sign money come

21   and go wearing a mask that's underneath his chin, Gerald

22   Bryson.

23   A    That's Gerald -- it's hard to read the sign, but, yes,

24   that's him.

25   Q    And who is the person holding a pink sign to Mr. Bryson's
```



Exhibit E, Motion to Try Petition on Hearing Record

1    left?

2    A    That is Jordan Flowers.

3    Q    And are you within six feet of Mr. Bryson in this

4    photograph?

5         MR. KEARL:  Objection.  Relevance.

6         JUDGE GREEN:  Overruled.

7         THE WITNESS:  So I have to answer?

8         JUDGE GREEN:  Yes.

9         MS. AHMAD:  Yes.

10        JUDGE GREEN:  If you can tell.

11        THE WITNESS:  I mean, the picture -- I mean, it doesn't

12   say -- I mean, it doesn't tell me how long I've been around

13   them because, correct me if I'm wrong, isn't it 15 minutes you

14   have to be around someone to be considered close contact?  So I

15   mean, like I said --

16   Q    BY MS. AHMAD:  I didn't ask you that that, Mr. Bry -- Mr.

17   Palmer.  I asked you if you're within six feet of Mr. Bryson in

18   this photograph.

19   A    There's nothing to tell whether I was in six feet or not.

20   It's a picture.  It's not a video.  It's not in real time.  So

21   I can't say that I was six feet.

22   Q    Okay, but you --

23   A    Does it look close?

24   Q    I think you testified this --

25   A    Does it look close?  Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    I think you test --

2    A    But does it seem six feet?  I'm not sure.

3    Q    I think you testified this morning that you were certain

4    that you socially distanced throughout the whole protest; is

5    that correct?

6        MR. KEARL:  Objection.  Misstates the testimony.

7        JUDGE GREEN:  Sustained.

8    Q    BY MS. AHMAD:  Mr. Palmer, didn't you testify this morning

9    that you always maintained social distance at the --

10       MR. KEARL:  Okay.

11    Q    BY MS. AHMAD:  -- March 30th protest?

12       MR. KEARL:  Objection.  Misstates the testimony.

13       JUDGE GREEN:  Okay.  Let's not -- let's ask him -- let's

14    ask him a question.  If you're going to ask him about his

15    testimony, try and be accurate about what the testimony was.

16       MS. AHMAD:  Your Honor, I believe he did testify to that,

17    the March 30th protest --

18       MR. KEARL:  He testified very close --

19       MS. AHMAD:  -- was part of what he was disciplined for.

20       MR. KEARL:   -- very close to that.

21       JUDGE GREEN:  Mr. Palmer, did you --

22       MS. AHMAD:  Okay.

23       JUDGE GREEN:  Did you testify that you maintained social

24    distancing at the -- at the April 6th protest?

25       THE WITNESS:  Yes, I did.



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Okay.

2   Q   BY MS. AHMAD:  Okay.  And Mr. Palmer, can you tell me how

3   you define social distancing when you testified that you had

4   maintained it?

5   A   Well, within six feet for more than 15 minutes.  So after

6   15 minutes would be considered close -- close contact or social

7   distancing.  Correct me if I'm wrong on that.

8   Q   Mr. Palmer, I believe you're citing the standard for

9   contact tracing, but I'm asking you separately about social

10  distancing, meaning that --

11  A   Yes.

12  Q   -- when you understood that social distancing was a

13  policy, what did you understand that policy to mean?

14      MR. KEARL:  Objection.  Asked and answered.

15      JUDGE GREEN:  Overruled as far ask -- asked and answered.

16      THE WITNESS:  I understand what social distancing is.

17  Yes, I do.

18  Q   BY MS. AHMAD:  Okay.  Can you tell me what you understand

19  it to mean?

20  A   So like I said earlier, social distancing is when you're

21  not within six feet of another person.

22  Q   Okay, without regard to a time limit?

23  A   No.  The time limit, as far as I'm concerned, was always

24  15 minutes.

25  Q   You can -- you still work at Amazon, right?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    Yes, I do.

2   Q    And Amazon has now had a social distancing policy in place

3   for over a year, correct?

4   A    The social distancing policy that I'm aware of is the one

5   that was presented to me by Zachary Marc and Tyler Grabowski.

6   Q    Amazon has now had a social distancing policy in effect

7   for over a year, correct?

8        MR. JACKSON:  Objection.  Asked and answered.

9        JUDGE GREEN:  Overruled.  If you know.

10       MS. AHMAD:  I don't believe he did answer it, Your Honor.

11       THE WITNESS:  I know that they say they have a social

12   distancing policy, but have I seen it in person?  No, I have

13   not.

14   Q    BY MS. AHMAD:  Have you seen any effort to enforce social

15   distancing in the JFK8 facility over the past year?

16       MR. KEARL:  Objection.  Relevance.

17       JUDGE GREEN:  Overruled.

18       THE WITNESS:  Yeah, to some -- to some degree, yes.

19   Q    BY MS. AHMAD:  Okay.  And is -- what have you observed in

20   the JFK8 facility over the past year that enforces social

21   distancing?

22   A    Like the breakroom areas trying -- you know, putting

23   plastic in between tables.  And they have, like, a social

24   distancing crew that tells people what they're -- if they're

25   in, like, within six feet of someone.



Exhibit E, Motion to Try Petition on Hearing Record

1          MR. JACKSON:  I'm going to object based on --

2          MS. AHMAD:  Okay.

3          MR. JACKSON:  -- lack of foundation in terms of the time

4     frame we're talking about.

5          JUDGE GREEN:  Well, I think we --

6          MS. AHMAD:  Your Honor, I'm try --

7          JUDGE GREEN:  -- know what the time frame is, and I've

8     overruled that objection.

9          MR. JACKSON:  Well, Your Honor, she gave a very general

10    time frame -- I understand, the year -- in the past year.  It

11    doesn't have any relation to what may or may not have occurred

12    before or after Mr. Bryson was terminated.

13         JUDGE GREEN:  Understood.  Overruled.

14    Q    BY MS. AHMAD:  Mr. Bryson (sic), I believe you said that

15    the -- that the policy was not to be within six feet of each

16    other.  I may be misremembering the answer you just gave me,

17    but what I'm trying to understand from you is whether you

18    understand the rule -- the social distancing rules that Amazon

19    enforces and has enforced over the past year to be -- stay six

20    feet apart, period, or only -- you only need to stay six feet

21    apart if you're together for 15 minutes or less; which is it?

22    A    Well, I mean, to -- to answer your question, this social

23    distancing that you're referring to occurs in the breakroom

24    area.  Now, if we're talking about the floor, you know, the

25    main floor where you're working, there's no social distancing

1    being enforced at all.  So what exactly is social distancing as

2    far as Amazon is concerned, is what I'm trying to figure out.

3    Q    So --

4    A    Especially when there is no policy presented to me, except

5    for the one that was presented to me on April 10th, which was

6    very vague.  And I haven't been presented a actual social

7    distance policy since then.

8    Q    Have you observed within JFK8 that every other workstation

9    station has been shut down in the packing department to

10   facilitate social distancing over the past year?

11   A    No, that's not -- that's false.

12       MR. JACKSON:  Yeah, I'm also going to object.

13       MS. AHMAD:  Have you --

14       MR. JACKSON:  -- on relevance.  Again, we need --

15       MS. AHMAD:  Your Honor, we need to come to some agreed

16   upon definition of social distancing, or we have no idea what's

17   being testified here.

18       JUDGE GREEN:  Yeah, I'm going to -- I'm --

19       MS. AHMAD:  Mr. Palmer was given a warning --

20       JUDGE GREEN:  I'm going to allow some of this.

21       MR. JACKSON:  It's irrelevant, Judge, insofar as --

22       JUDGE GREEN:  I understand.

23       MR. JACKSON:  -- the -- these alleged --

24       JUDGE GREEN:  I've heard the --

25       MR. JACKSON:  -- social distancing measures occurred --



Exhibit E, Motion to Try Petition on Hearing Record

```
1         JUDGE GREEN:  I've heard the objection.

2         MR. JACKSON:  -- after Gerald Bryson's termination.

3         JUDGE GREEN:  I've heard the objection and --

4         MR. JACKSON:  Understood, Your Honor.

5         JUDGE GREEN:  -- I'm overruling it.

6    Q    BY MS. AHMAD:  Mr. Palmer, have you observed that Amazon

7    created three additional exits at JFK8 in order to reduce

8    crowding, to facilitate social distancing?

9    A    I know they have.  Yeah.  Yeah, they do.

10   Q    Okay.  Have you observed that Amazon has -- has created

11   within JFK8 several one-way walking areas along the Green Mile

12   in order to facilitate social distancing?

13   A    Yes.

14   Q    Have you observed that Amazon at -- at JFK8 employs social

15   distancing coaches who -- who stand around the areas where

16   people tend to gather, reminding everyone to social distance?

17   A    Yes.

18        MR. KEARL:  Objection.  Can we get some foundation of a

19   time frame here?

20        MS. AHMAD:  I'm talking about over the past year.

21        THE WITNESS:  Yes.

22   Q    BY MS. AHMAD:  Okay.  Have you observed that associates

23   start times have been staggered by Amazon at JFK8 in order to

24   reduce crowding at the beginning of shifts and facilitate

25   social distancing?
```



# Exhibit E, Motion to Try Petition on Hearing Record

 1          MR. KEARL:  Objection.

 2          THE WITNESS:  Yes.

 3          MR. JACKSON:  Time frame.

 4          JUDGE GREEN:  I think we've got the --

 5          MS. AHMAD:  I'm asking about --

 6          JUDGE GREEN:  We're dealing with the same time frame for

 7     all the questions.

 8          MR. KEARL:  So this is all within --

 9          MS. AHMAD:  Object, Your Honor.

10          MR. KEARL:  -- the year, correct?

11          MS. AHMAD:  Yes.

12          THE WITNESS:  Yes.

13     Q    BY MS. AHMAD:  Okay.  Have you observed that Amazon has

14     created additional satellite breakrooms at JFK8 in order to

15     facilitate social distancing?

16     A    Define satellite breakroom, please.

17     Q    More breakrooms than existed in February 2020.

18     A    Tables and chairs, yes.

19     Q    Okay.  And have you observed that the chairs in breakrooms

20     are zip tied to the tables in order to facilitate social

21     distancing?

22     A    I do know that the chairs are zip tied.  Do I agree that

23     they were used for social distancing?  No, I don't.  But I do

24     know that the chairs were zip tied.

25          JUDGE GREEN:  Okay.  So we've been through a lot of



Exhibit E, Motion to Try Petition on Hearing Record

1    questions like this.  Have we exhausted this line of

2    questioning?

3        MS. AHMAD:  Your Honor, we have in terms of the past year,

4    but I do have some more questions about social distancing

5    processes in place during March and April 2020, which were --

6        JUDGE GREEN:  Okay.  That's --

7        MS. AHMAD:  -- the subject of the testimony this morning.

8    Q    BY MS. AHMAD:  Okay.  So, Mr. Palmer, I think you

9    testified this morning that in March -- in March of 2020, you

10   did not observe or become aware of any social distancing rules

11   that Amazon put into place; is that correct?

12   A    Yes.

13   Q    Okay.  So are you aware that on Amazon -- I'm sorry, on

14   March 17th, Amazon implemented a three-foot social distancing

15   policy?

16   A    No.

17   Q    Are you aware that on March 20th, Amazon implemented a

18   six-foot social distancing policy?

19   A    No.

20   Q    Are you aware that between March 15th and March 22nd,

21   Amazon implemented -- Amazon suspended exit screening in order

22   to reduce crowding at the end of shifts and further social

23   distancing -- I'm sorry, enable social distancing?

24   A    Exit screenings meaning what?  Like security screens?

25   Q    Yes, security screenings upon leaving the facility.



www.escribers.net | 800-257-0885

1    A    I'm not -- I'm not sure of the actual day -- the date, but

2    they have done that.  Yes.

3    Q    Okay.  Are you aware that between March 15th and March

4    22nd, Amazon eliminated in-person stand-up meetings of the kind

5    you described this morning?

6    A    I don't know the specific date, but I do -- I don't know.

7    Yeah, like I said, I don't know a specific date, but yes, they

8    did eliminate the stand-up meetings.

9    Q    And are you aware that between March 15th and March 22nd,

10   Amazon extended regular break times from 15 to 20 minutes to

11   enable social distancing?

12   A    20 minutes, yes.  A 20-minute break, yes.

13   Q    And Mr. Palmer, has anyone at Amazon ever communicated to

14   you that social -- that staying more than six feet apart from

15   others in the facility is only important if you are near them

16   for more than 15 minutes?

17   A    Did anyone from Amazon communicate that?

18   Q    Yes.

19   A    No, that was -- like I said, you know, there was no --

20   nothing -- there's nothing written or anything.  You know, I go

21   on the CDC website and checked it myself.  So I had to do my

22   own research, if that answers your question.

23   Q    But do any of the signs that are up at JFK regarding

24   social distancing mention this 15-minute limit?

25   A    There was no signs in the facility at all.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Are you talking about in March of 2020, or the entire

2    time?

3    A    Yeah.  I'm talking about March --

4    A    So you've never seen a sign about social distancing?

5    Okay.  Have you ever seen a sign at Amazon about social

6    distancing that incorporates this 15-minute limit?

7    A    No.

8    Q    Okay.  And I believe you said that you had to educate

9    yourself on the CDCs website about what social distancing

10   means?

11   A    Um-hum.

12   Q    Is that correct?

13   A    Yes.

14   Q    Can we take a look at Exhibit 63, please?  Mr. Palmer, do

15   you recognize these materials on social distancing published by

16   the CDC on November 17th, 2020?

17   A    Yes, I see it.

18   Q    Okay.  I just want to take you through some portions of

19   it.  Under "What is social distancing," do you see that it

20   says, "Social distancing means keeping a safe space between

21   yourself and other people who are not from your household"?

22        MR. KEARL:  Objection.  This document is dated Sept --

23   November 17th, 2020.  There's no way to know if this was the

24   document that was being reviewed by Mr. Palmer at the time he

25   testified he was looking at these documents.



Exhibit E, Motion to Try Petition on Hearing Record

```
1        JUDGE GREEN:  Okay.  That -- that's true.  And I -- I

2   really don't want to have Mr. -- we went through this quite a

3   bit yesterday.  I don't want Mr. Palmer to be just reading the

4   documents and -- and regurgitating what it says.  Not to

5   mention the fact that this is --

6        MS. AHMAD:  I'm only ask --

7        JUDGE GREEN:  -- this is -- it is updated several months

8   after the time in question.

9        MS. AHMAD:  I'm only asking about it, Your Honor, because

10  Mr. Palmer gave the CDC guidance as the --

11       JUDGE GREEN:  No, I get it.

12       MS. AHMAD:  -- source for his understanding.

13       JUDGE GREEN:  I understand.  I understand that, but -- so

14  if you have questions -- if you have questions based on this

15  document, that's fine.  Just having him read what's in the

16  document, I didn't -- I can read it.  I'm not interested in

17  that.

18       MS. AHMAD:  Yes.

19  Q    BY MS. AHMAD:  Mr. Palmer, did you see on the CDC website

20  a definition of social distancing that included the 15-minute

21  time period you referenced?

22  A    Yes, at one point I did.  Yes.

23  Q    Okay.  So you saw on the CDC's website a definition of

24  social distancing that included 15 minutes?

25       MR. KEARL:  Objection.  Asked and answered.
```



Exhibit E, Motion to Try Petition on Hearing Record

```
 1           JUDGE GREEN:  Overruled.

 2           THE WITNESS:  Oh, my God.  Yes.

 3      Q    BY MS. AHMAD:  Okay.  Approximately, when did you see

 4      that?

 5      A    At the time that I told you in March.

 6      A    You looked at the CDC's website in March 2020 to gain an

 7      understanding of what social distancing meant?

 8      A    Yep.

 9      Q    Okay.  And you're sure that that's the time in which you

10      saw the 15-minute reference?

11           MR. KEARL:  Objection.  Asked and answered.

12           JUDGE GREEN:  Overruled.

13           THE WITNESS:  Yes.  You know, yes, around that time.  Yes.

14      Q    BY MS. AHMAD:  Okay.  I'd like to go back to discussing

15      the March 30th protest with you, Mr. Palmer, and to -- let's go

16      back to Exhibit 68.  And if we could go to the top of the

17      second page of this exhibit, please.  Mr. Palmer, is that you

18      again in the middle?

19      A    I know this is gone, but yes, I do.  Yes, I did.

20      Q    Okay.  And is that Mr. Bryson to your left?

21      A    Yes.

22      Q    And who is the person to your right?

23      A    Another protester.

24      Q    And were you within six feet of Mr. Bryson and the other

25      protester?
```



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. JACKSON:  Objection.  Calls for speculation.  The

2  witness can't -- there's no way for the witness to determine

3  from this photo whether he was, in fact, standing six feet from

4  any other person at this precise moment.

5    JUDGE GREEN:  Okay.  So if you can -- if you feel you can

6  tell, Mr. Palmer, you can answer.  And if you feel you don't

7  know, you can answer that.

8    THE WITNESS:  Yeah, you can't tell by this picture,

9  especially the angle that is presented.

10  Q    BY MS. AHMAD:  What do you recall, Mr. Palmer?  Do you

11  recall making an effort to stay six feet away from Mr. Bryson

12  at -- at this protest?

13  A    I said yes before, and I'm saying yes.

14    MR. KEARL:  Objection.  Asked and answered.

15    JUDGE GREEN:  Overruled.

16    THE WITNESS:  I said yes before, and I said yes -- I'm

17  saying yes again.  And -- and also this picture, this isn't

18  really a good picture to use because it's not showing the side

19  angle.  It was showing from the -- the front -- front to back,

20  so it's not -- can't reach the -- the site -- the photographer

21  that's filming, and the person that's in front of him with the

22  green vest on, you can't tell if he's six feet as well.  So

23  it's like -- it's kind of hard to tell.

24    MR. KEARL:  Your Honor, may --

25    MS. AHMAD:  So let's look at Exhibit 60.



# Exhibit E, Motion to Try Petition on Hearing Record

1    MR. KEARL:  May I raise another objection?  We have

2    requested in our subpoena paragraph seven, documents that show

3    policies, work rules, work guidance, or terms and conditions of

4    employment.  We did not receive any documents related to COVID-

5    19 safety or social distancing.  And so I ask that you strike

6    any sort of conversations with Mr. Palmer about the existence

7    or creation of those documents in light of the fact that they

8    have still not been produced.

9    JUDGE GREEN:  Okay.  I'm not going to do that at this --

10   at this moment.  I'll reserve ruling on all that and those

11   issues until I'm in a better position to decide them.

12   MS. AHMAD:  So can you please pull up Exhibit 69?

13   Q    BY MS. AHMAD:  And Mr. Palmer, again, I'm directing your

14   attention just to the photograph in this exhibit.  Is this also

15   a photograph from the March 30th protest?

16   A    Yes.

17   Q    Okay.  And is that you in the middle holding up the sign

18   that begins, Alexa?

19   A    Yes, it is.

20   Q    Okay.  And who is standing next to you?

21   A    To my left?  To my right?  Where --

22   Q    To your right.

23   A    That's a protester -- or I mean and -- and behind me is

24   Gerald Bryson and Jordan Flowers.

25   Q    Okay.  And do you believe that you were within six feet of



# Exhibit E, Motion to Try Petition on Hearing Record

1    the other protesters at the time this photograph was taken?

2    A    No.  You can't tell, because, again, this is another bad

3    picture I fail to use as an example.

4    Q    And I'd like to direct your attention to the sign that the

5    female protester to your right is holding.  "Our health is just

6    as essential."  Do you see that?

7    A    Yes, I do.

8    Q    And if we could go back now to Exhibit 67, please.  Is

9    that, "Our health is just as essential" the same sign that

10   Chris Smalls is holding in this photograph?

11         MR. JACKSON:  Objection.  Relevance.

12         JUDGE GREEN:  Overruled.  If you can tell.

13         THE WITNESS:  You know, it's very hard to see, but it

14   looks like the same one.

15   Q    BY MS. AHMAD:  Okay.  And I believe you testified that

16   this protest happened two days after Mr. Smalls was placed on

17   quarantine by Zach Marc, correct?

18   A    On March 30th was the day, yes.

19   Q    Yes.  And I think you said he was placed on quarantine on

20   Saturday, March 28th, when you were in the facility with him?

21   A    Yes.

22   Q    And I think you also testified that you were concerned at

23   this time about COVID-19 spreading on surfaces, shared services

24   such as cardboard, correct?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And that you didn't have enough signs at this

2    protest, which is why you had to share signs; is that correct?

3         MR. KEARL:  Objection.  Relevance.  What is the relevance

4    of whether these employees touched the same signs?  I don't

5    understand this line of questioning, Your Honor.

6         If Mr. Palmer doesn't -- isn't touching these signs, how

7    is he to be held accountable for the actions of other

8    protesters?

9         JUDGE GREEN:  Here is the problem.  Here's the problem.

10   That the General Counsel went into this type of thing at great

11   length in the direct examination.  It was -- it was actually

12   excessive.  So you went into the issue of whether it -- whether

13   it was a problem potentially for employees to touch

14   cardboard -- the same employees to touch cardboard, and that's

15   what the Respondent is -- is addressing here.

16        The truth is, is that it's really not help -- it wasn't

17   helpful on direct and it's not helpful now because it really

18   doesn't add any context or background to what ultimately

19   happened that is at least arguably relevant.

20        MR. KEARL:  Your Honor, if I can say that the testimony --

21        JUDGE GREEN:  Let me just ask you.  I mean, and I'm asking

22   this of the Respondent.

23        So you prove that he was -- that they were exchanging

24   cardboard signs.  How does that help you?

25        THE WITNESS:  Can I just say something?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        JUDGE GREEN:  No.  Actually, one moment, Mr. Palmer.

 2        THE WITNESS:  All right.

 3        JUDGE GREEN:  Just wait --

 4        THE WITNESS:  Okay.

 5        MS. AHMAD:  Your Honor, we are entitled to impeach Mr.

 6   Palmer's credibility.

 7        JUDGE GREEN:  So --

 8        MR. KEARL:  There's nothing in that (indiscernible,

 9   simultaneous speech) --

10        JUDGE GREEN:  It's -- it's --

11        MS. AHMAD:  It's simply that.  He's spent hours test --

12   I -- I believe that for Mr. Palmer to falsely state --

13        JUDGE GREEN:  Yeah.

14        MS. AHMAD:  -- a concern --

15        JUDGE GREEN:  Yeah, it's --

16        MS. AHMAD:  -- about touching shared surfaces of cardboard

17   without gloves, under direct questioning, and then to deny any

18   such concern under --

19        JUDGE GREEN:  Okay.

20        MS. AHMAD:  -- cross, a concern that he --

21        JUDGE GREEN:  It's impeach -- yeah.

22        MS. AHMAD:  -- said was shared by he and his fellow

23   protesters goes to his credibility.  It simply -- if he's going

24   to testify --

25        JUDGE GREEN:  Yeah.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1      MS. AHMAD:  -- for two hours about something relevant or

2   irrelevant, we shouldn't be precluded from using that testimony

3   to impeach his credibility where appropriate and to make our

4   own affirmative point.

5      JUDGE GREEN:  Yeah.  The problem is it's impeachment on a

6   collateral issue.  So it really is not that helpful.  Can you

7   move on to something else?  And maybe we'll -- we'll -- we'll

8   come back to this.  Just put a -- put a --

9      MS. AHMAD:  Yes, Your Honor.

10      JUDGE GREEN:  Put a pin in it, okay?

11      MS. AHMAD:  Yes, I will do so, Your Honor.  I would just

12   respectfully note that the collateral issue was -- was half, if

13   not more than half --

14      JUDGE GREEN:  I understand that.

15      MS. AHMAD:  -- of Mr. Palmer's testimony here --

16      JUDGE GREEN:  I understand that.

17      MS. AHMAD:  -- today on direct.

18      JUDGE GREEN:  I -- I understand that.

19      MS. AHMAD:  Okay, thank you.  Your Honor, can we take a

20   brief recess, because I don't -- I just realized I was a little

21   late in joining.  My camera wasn't working, that I don't --

22   believe we have an issue to discuss with respect to the Jencks

23   material that the counsel for the --

24      JUDGE GREEN:  Okay.

25      MS. AHMAD:  -- General Counsel provided us.



1      JUDGE GREEN:  So off the record.

2   (Off the record at 3:48 p.m.)

3      JUDGE GREEN:  You're on mute.  There we go.

4      MS. AHMAD:  Thank you.  Can we pull up Exhibit 109,

5   please?  I'm sorry, I meant 110.  Actually, if I could just

6   have a moment before Mr. Vulk -- I figured that out.

7   Q    BY MS. AHMAD:  Let's talk, Mr. Palmer, about the week of

8   March 23rd, 2020.  I believe you testified this morning that on

9   March 25th, 2020, you and a group of other associates went to

10  the management meeting at JFK8 to raise your concerns about

11  health and safety; is that correct?

12  A    Yes.

13  Q    And do you recall that March 25th was a Wednesday?

14  A    Was a Wednesday?  Yes.

15  Q    Um-hum.  Okay.  And I believe you told us earlier that

16  your weekly shift was Wednesday through Saturday; is that --

17  A    Yes.

18  Q    -- correct?

19  A    Yes.

20  Q    Okay.  And so the week of March 25th, did you work at all

21  between Wednesday and Saturday?

22  A    No, I did not.

23  Q    Did you work at all in the days prior?

24  A    Well, prior to the 25th?

25  Q    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes, I did.

2    Q    Did you work on the Monday or Tuesday?

3    A    The Tuesday was the 24th.  Yes, I did.  On Tuesday, I did.

4    Q    Okay.  And what about Monday, the 23rd?

5    A    No.

6    Q    Okay.  Do you recall if you worked that weekend prior,

7    Saturday the 21st, or Sunday the 22nd?

8    A    I --

9         MR. JACKSON:  Objection.  Relevance.

10        JUDGE GREEN:  What's the relevance?

11        MS. AHMAD:  Your Honor, Mr. Palmer testified at length

12   about the conditions at JFK8 in March of 2020.  Whether or not

13   he was at the facility able to observe them is fundamental to

14   the foundation of that testimony.

15        JUDGE GREEN:  Really, if we're going to go into whether he

16   was there every day, what days he was there?  No.  Overruled.

17   I mean, sustained.

18   Q    BY MS. AHMAD:  Mr. Palmer, I would just like to know

19   generally, how frequently did you go to work the last two weeks

20   of March 2020?

21        MR. JACKSON:  Objection.  Vague as to what she means by go

22   to work, because the witness testified that he was in the

23   building and didn't clock in, so it's vague.

24   Q    BY MS. AHMAD:  Mr. Palmer, how frequently did you clock in

25   to work during the last two weeks of March 2020?



1    A    Well, the 25th, 26th, 27th, 28th, I did not clock in.  The

2    week -- the week before that, I believe I was at work every

3    day.

4    Q    Does every day mean Wednesday through Saturday, or --

5    A    Oh, yeah, yeah.

6    Q    -- Sunday to Sunday?

7    A    Yeah, Wednesday to Saturday.

8    Q    Okay.  And when you were at JFK8 but not clocked in the

9    last week of March 2020, what areas of the facility were you

10   in?

11   A    You talking about the 25th, 26th, 27th, and 28th?

12   Q    Yes, if those are all the days that you were there and not

13   clocked in.

14   A    Oh, on the -- in the cafeteria.

15   Q    Okay.  And did you also go to the production -- the room

16   where the manager meeting happened?

17   A    I went to the main office.

18   Q    I'm sorry, the main office.  So on those days you went to

19   the cafeteria and the main office; is that correct?

20   A    Yes.

21   Q    Did you go to any other parts of the facility?

22   A    No.

23   Q    Okay.  So how can you say with such certainty, Mr. Palmer,

24   that there was no deep cleaning ever conducted at JFK8 on those

25   days?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MR. KEARL:  Objection.  Mis -- mischaracterizes the

 2   testimony.

 3        JUDGE GREEN:  Okay.  Overruled.

 4   A    What -- what day are you specifically talking about that I

 5   didn't see the cleaning people?  If I was there every day, like

 6   I answered, you know, the week before, then -- and I didn't see

 7   deep cleaning, then --

 8   Q    BY MS. AHMAD:  Well, first thing, we're talking about a

 9   facility that, in your words, is 15 football fields large,

10   correct?

11   A    Yes.

12   Q    And has four floors?

13   A    Yes.

14   Q    And the third week of March, you clocked in four days a

15   week, right?

16   A     Third week, yeah -- yes.

17   Q    And the fourth week of March you did not clock in, but you

18   were in the cafeteria and the management office, correct?

19   A    Yes.

20   Q    So based on that limited presence in JFK8 the last two

21   weeks of March, I'm asking you how you can be so certain that

22   there was never any deep cleaning done anywhere in the

23   facility?

24   A    Because I talk to every -- you know, I talk to a lot of

25   people, so -- everyone was saying there's no deep cleaning.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    And like you said, the week before, there was no deep cleaning

2    as well that -- that I was aware of.

3    Q    Okay.  So I think you told us -- I think you told us

4    earlier that there are thousands of people who work at JFK8,

5    right?

6    A    Yes.

7    Q    And how many of those thousands did you speak with with

8    respect to deep cleaning?

9        MR. KEARL:  Objection.  Relevance.

10       JUDGE GREEN:  Okay, so what is the relevance?  And -- and

11   let me just jump the gun on this.  So if you're trying to

12   establish that there -- there was some kind of deep cleaning or

13   that Mr. Palmer was mistaken about whether there was deep

14   cleaning, that is not going to impact whether it was protected

15   concerted activity.  So, I mean, do you really want to waste

16   your time on this?

17       MS. AHMAD:  Your Honor, if that is, in fact, the case,

18   that the -- that half of Mr. Palmer's testimony on direct

19   examination is not relevant to the questions Your Honor is

20   deciding, then we would ask that it be stricken.  But either --

21   we'll take either (indiscernible, simultaneous speech).

22       MR. JACKSON:  Your Honor, object to this -- we object to

23   this motion for strike.  We object to this motion to strike.

24   It is relevant in so far as it shows the basis of the employees

25   protected --



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        JUDGE GREEN:  Correct.

 2        MR. JACKSON:  -- concerted activity.

 3        JUDGE GREEN:  That's right.

 4        MR. JACKSON:  Why they were engaged in this activity?

 5        JUDGE GREEN:  I'll allow it.  You can go this route.

 6        MS. AHMAD:  Yes, but it --

 7        JUDGE GREEN:  If you want to -- if you want to make this

 8   argument to the Board, you -- you can make this argument to the

 9   Board.  Go ahead.

10        MS. AHMAD:   Thank you, Your Honor.

11   Q    BY MS. AHMAD:  Mr. Palmer, can you respond how many of the

12   thousands of employees at JFK8 you spoke with with respect to

13   deep cleaning?

14   A    Less than 1,000.

15   Q    More than 500.

16        MR. KEARL:  Objection, Your Honor.  As far as Ms. Ahmad --

17        JUDGE GREEN:  I'm going to allow it.  I think it's -- I

18   think the -- the argument over this is -- is -- is really more

19   time-consuming than it's worth, just let's get through it.

20        Go ahead.

21        MR. KEARL:  May I just object and say that -- that the

22   purpose of this is -- has no bearing on this case?  And I

23   believe that this is just an attempt to try to impeach this

24   witness and any subsequent testimony he may have in any other

25   cases against Amazon.  Ms. Ahmad is representing the --
```



# Exhibit E, Motion to Try Petition on Hearing Record

1       JUDGE GREEN:  All right.  I'm not going there.

2       MR. KEARL:  Okay.

3       JUDGE GREEN:  So go ahead.

4   A   What do you want us to --

5   Q   BY MS. AHMAD:  Do you think it's more than 500 employees?

6   A   No.

7   Q   About whether or not deep cleaning was conducted?  Did you

8   speak with more than 250 employees at JFK8 about whether or not

9   deep cleaning was conducted?

10  A   No.

11  Q   Did you speak with more than 200 employees?

12  A   No.

13  Q   Okay.  Do you have any estimate of how many employees you

14  spoke with about whether or not deep cleaning was conducted at

15  JFK8 during the last two weeks of March 2020?

16  A   At least 50.

17  Q   At least 50, okay.  So now, you had told us that you were

18  scheduled to work March 25th through 28th, but that you did not

19  clock in, right?

20  A   Yes.

21  Q   But you went to the facility anyway on each of those four

22  days, correct?

23  A   Yes.

24  Q   And on the 25th, the 26th, the 27th, you spent

25  approximately ten hours at JFK8?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    And how long did you spend there on the 28th -- the

3    Saturday?

4    A    It was relatively short; it was a few hours.

5    Q    Okay.  And I believe you testified this morning that you

6    were in fear for your and your family's lives when it came to

7    the poor health and safety conditions at JFK8, right?

8    A    Yes.

9    Q    Is that correct?  Okay.  And you were afraid, I believe --

10   were you afraid that COVID-19 was spreading inside the

11   facility?

12   A    Yes.

13   Q    Okay.  But nonetheless, you chose to spend more than 30

14   hours there not getting paid the -- the last week of March

15   2020, correct?

16        MR. KEARL:  Objection.  Relevance.  Objection.  Relevance.

17   He was not on the clock; he was not subject to the employment

18   policies that were being protested; he had the ability to wash

19   his hands; he didn't have time off task.  This is -- this is

20   completely irrelevant.

21        MS. AHMAD:  Your Honor, Mr. Kearl is simply testifying for

22   Mr. Palmer here.

23        MR. KEARL:  You're -- you're on your touch screen.

24        THE WITNESS:  All right.

25        JUDGE GREEN:  All right.



Exhibit E, Motion to Try Petition on Hearing Record

1       Can you restate the question?

2       MS. AHMAD:  Yes.  I was asking Mr. Palmer why, if he was

3   so afraid of contacting (sic) COVID-19 at JFK8, the last week

4   of March 2020, he chose voluntarily to spend more than 30 hours

5   at the facility during that time period?

6       JUDGE GREEN:  Okay, overruled.

7   A    Okay.  Well, like I said before, it took management ten

8   hours for each of those days to respond to us, number one.  We

9   wouldn't have stayed that long had it ta -- had it taken that

10  long.  And also, if I'm staying in the breakroom in one area,

11  then what -- what -- what -- what am I doing?  I'm just

12  stand -- I'm just sitting in one area.  I'm not running around,

13  I'm not on the production floor; I'm just sitting down.

14  Q    BY MS. AHMAD:  Mr. Palmer, I'm confused by your answer,

15  because I believe you told us this morning that the breakrooms

16  were very dangerous places, that there was hundreds of people

17  there and there was overcrowding, right?

18  A    Yes, but if -- if I'm --

19  Q    So --

20  A    -- sitting in the breakroom, you know, there's -- there --

21  there's -- there's 30-minute breaks, there's two 20-minute

22  breaks, so all those other hours I'm just sitting down.

23  Q    I don't understand your answer.  You were -- you were

24  there the whole time, right?

25  A    Yes, I was there the whole time.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay, and you said all the other hours you were just

2    sitting down.  What were you doing with -- when those breaks

3    happened?

4    A    Sitting down.  I just said that.

5    Q    Okay, so that you were in the facility during the time

6    periods where you say there was immense overcrowding because

7    hundreds of people on break poured in?

8    A    Yes.  Like I said, I wouldn't have been in the facility

9    for ten hours if it wasn't for management waiting till the end

10   of the day to give us an answer for those three days, which

11   accumulated to 30 hours.

12   Q    So you personally were in the facility within close

13   proximity to hundreds of people at the time, correct?

14   A    I was in the facility in the breakroom, yes, I was for

15   those --

16   Q    Okay.

17   A    -- days.

18   Q    And your te -- and your testimony is that management took

19   ten hours to come and get back to you every day?

20   A    Yes.

21        MR. KEARL:  Objection.  Asked and answered.

22        JUDGE GREEN:  Objection sustained.

23   Q    BY MS. AHMAD:  So between what --

24        JUDGE GREEN:  Okay.

25   Q    BY MS. AHMAD:  -- and what time?  What time did you enter



Exhibit E, Motion to Try Petition on Hearing Record

1    the production meeting?

2        MS. AHMAD:  I'm sorry, Your Honor.  I missed the

3    objection.

4        JUDGE GREEN:  That's all right.  He already answered.

5    It's okay.  So we have redundant testimony.  Go ahead.

6    Q    BY MS. AHMAD:  So approximately what time on March 25th

7    did you enter the management office?

8    A    It was around -- it was in the morning time, probably

9    like, 8 or 9:00.

10   Q    Okay, and approximately what time on March 25th did anyone

11   in your group, to your knowledge, first hear from management

12   what their response was?

13   A    At 5:45 p.m.

14   Q    And -- and on March 26th, approximately what time did you

15   enter the management meeting?

16   A    I just answered that.

17   Q    No, you answered it for March 25th.

18   A    No, you said 26th, but all right.  So 26 --

19   Q    I --

20   A    -- March 26th as at 8, 9:00 a.m.

21   Q    Now, I'm confused.  So was your prior answer about 8 or

22   9:00 and 5:45 for March 26th or 25th?

23   A    For both.  Yes, for both.

24   Q    So you have the same answer for both days?  You went in at

25   the same time and you heard from management both days at 5:45?



# Exhibit E, Motion to Try Petition on Hearing Record

1   A    Yes.

2   Q    Okay.  And on the Wednesday, March 25th, who from

3   management did you hear from at 5:45?

4   A    I don't remember the manager's name.

5   Q    Is it because you don't recall --

6   A    It was a -- a member -- of mana -- it was a me -- a member

7   of management.  It could have been a senior officer or it could

8   have been an area manager.

9   Q    I just want to understand if you don't know who the person

10  is or you can remember them, but you've forgotten their name?

11  A    I don't remember their name.

12  Q    Okay.  Was it someone you knew?

13  A    I -- no, I just said that I didn't know their name.  If I

14  knew them, I would know their name.

15  Q    So you don't -- okay, so someone you didn't know, on March

16  25th, from management, came in at 5:45 to give you management's

17  response, right?

18  A    Yes.

19  Q    And you're saying that between 8:30 and 5:45 on March

20  25th, you or no one -- and no one else in your group, to your

21  knowledge, int -- had any interactions with management about

22  the subject of your complaint?

23       MR. KEARL:  Objection.

24  A    You asked if --

25       MR. KEARL:  (Indiscernible).



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1     MR. JACKSON:  Yeah, and it -- and it calls for

2  speculation.  How is he going to testify about interactions

3  other people may have had?

4     JUDGE GREEN:  Sustained.

5     MS. AHMAD:  Your Honor, I understand that Mr. Palmer is

6  separately represented here, but the tag teaming of repetitive

7  objections is slowing us down, which is fine with me, I'm happy

8  to stay all night, but I do want to note that, because I can

9  see Your Honor wants to --

10     JUDGE GREEN:  Let me ask --

11     MS. AHMAD:  -- me just to move on.

12     JUDGE GREEN:  Let me just -- okay.  Let me just ask you, I

13  think we're getting an echo on your end, Ms. Ahmad.

14     Is anybody else hearing that?

15     MR. KEARL:  A little bit, Your Honor.

16     JUDGE GREEN:  You only have one device, right?  Yeah.  You

17  only have one device in -- in that room.  There's only one

18  device being -- accessing the -- the hearing from that room?

19     MS. AHMAD:  Are you speaking to me, Your Honor?

20     JUDGE GREEN:  Yes.

21     MS. AHMAD:  Yes.

22     JUDGE GREEN:  Okay.  All right.

23     MS. AHMAD:  Do you want me to -- I can try to use a

24  different audio source if that's the problem; it'll take me two

25  minutes --



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  If -- may -- maybe.

2    MS. AHMAD:  -- to try to do that.

3    JUDGE GREEN:  Maybe give that a -- give -- give that a

4    shot.  I don't want -- you know, it's not impossible to hear,

5    it's just a little distracting.

6    MS. AHMAD:  Sure, I'm happy to try that.  Give me a couple

7    of minutes if you want to go off the record.

8    JUDGE GREEN:  Okay.

9    Off the record.

10   (Off the record at 4:33 p.m.)

11   JUDGE GREEN:  Yeah, back on the record.

12   MS. AHMAD:  Okay.

13                    **RESUMED CROSS-EXAMINATION**

14   Q    BY MS. AHMAD:  All right, Mr. Palmer, let's go back to

15   March 25th.  During the time you were sitting in the breakroom

16   on March 25th, do you recall Zach Marc coming in to speak with

17   you and other members of your group about the concerns you

18   raised?

19   A    On the 25th -- March 25th?

20   Q    Yes.

21   A    No, I don't recall that.

22   Q    Okay, do you recall Chris Perez coming in to speak to your

23   group in the breakroom about the concerns you had raised?

24   A    I don't -- I don't recall.  No.

25   Q    Do you rem -- do you recall anyone from management coming



Exhibit E, Motion to Try Petition on Hearing Record

1    in to speak with you and other members of your group reminding

2    you to socially distance in the breakroom?

3    A     No.

4    Q     Let's speak about the meeting itself on the morning of

5    March 25th.  Can you remind me who from management you recall

6    being present at that time?

7    A     What, the meeting on the 25th?

8    Q     Yes.

9    A     It's Cristine Hernandez and Sai Kotha.

10   Q     You remember only two managers being present at that

11   meeting?

12   A     Yes.

13   Q     Do you recall Chris Perez being at that meeting?

14   A     No.

15   Q     Do you recall Zach Marc being at that meeting?

16   A     No.

17   Q     Do you recall Meghan Fitzgerald being at that meeting?

18   A     No.  Who is -- I don't know who that is.

19   Q     Do you recall the head of Workplace Health and Safety

20   being at that meeting?

21   A     The head of Workplace Safety?

22   Q     Workplace Health and Safety.

23   A     No, what -- what is that?  I don't know what that is.

24   Q     So I won't answer your question, Mr. Palmer, in the

25   interest of time, but I'm -- your -- it is your testimony that



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    there was only two people present at the management meeting on

 2    March 25th --

 3         MR. KEARL:  Objection.  Mis --

 4    Q    BY MS. AHMAD:  -- 2020?

 5         MR. KEARL:  Mischaracterization of the testimony.

 6         MS. AHMAD:  I'm seeking clarification, Your Honor.

 7         JUDGE GREEN:  Okay.  Overruled.

 8    A    Yes, that -- that I know of, yes.

 9    Q    BY MS. AHMAD:  Okay, so you only observed two people that

10    day in your group that --

11         MR. KEARL:  Objection.

12    Q    BY MS. AHMAD:  Remind me, how many --

13         MR. KEARL:  Mischaracterization of what he said.

14         JUDGE GREEN:  Okay.  Overruled.

15    Q    BY MS. AHMAD:  Remind me again, Mr. Palmer, how many

16    associates were your -- in your group at the time that you

17    entered that management office on March 25th?

18    A    Ten people.

19    Q    Okay.  And is there sufficient space in the management

20    office for 12 people to socially distance, meaning be more than

21    six feet apart from one another?

22    A    Yes.

23    Q    Do you recall on March 25th anyone at the meeting itself

24    instructing you and other members of your group to socially

25    distance?
```



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    Let's talk about March 26th.  And I think, again, you said

3    you first went into the production meeting around 8:30, 9:00,

4    and you then heard from management around 5:45 and not before,

5    correct?

6    A    Yes.

7    Q    And who is -- who from management was in the meeting when

8    you entered on March 26th?

9    A    I believe Zachary Marc was there at that time.

10   Q    Okay.  Was anyone else there from management?

11   A    Managers that I don't know -- don't know their names, no.

12   Q    Approximately how many managers were there?

13   A    I believe it was two.

14   Q    Does that mean Zachary Marc and one other, or Zachary Marc

15   and two others?

16   A    Yeah, two in total.

17   Q    Okay.  And how many people were in your group of

18   associates who went to meet with management that day?

19   A    I believe it was like, 10 or 12.

20   Q    Okay.  And do you recall Tyler Grabowski being there on

21   the morning of March 26th?

22   A    No.

23   Q    Do you recall Tyler Grabowski instructing you and other

24   members of your group to socially distance?

25   A    No.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And is it also your testimony that the management

2    office is big enough that 17 people can be inside of it

3    socially distanced?

4    A    17 people?

5    Q    I think you said 10 to 15 of yours, so using that 15

6    number, plus two managers, that's where I'm getting 17.  Is it

7    big enough for 17 socially distanced?

8    A    I mean, I didn't say 17.  I said 10 to 12 plus two

9    managers; that's not 17.

10   Q    Oh, is it big enough for 14 people to socially distance?

11   A    Yes.

12   Q    Is it big enough for 17 people to socially distance?

13        MR. KEARL:  Asked and answered?

14        MS. AHMAD:  I don't believe so.  I'm asking about 17.

15        MR. KEARL:  Objection.  Relevance.

16        MS. AHMAD:  It's -- I'm inclined to inquire about the size

17   of the --

18        JUDGE GREEN:  So overruled.  The last question, as far as

19   I understood, was about ten.

20        MS. AHMAD:  Yes.

21        JUDGE GREEN:  Okay, so go ahead, ask the question.

22   Q    BY MS. AHMAD:  Is it -- is the management office, Mr.

23   Palmer, big enough for 17 people to socially distance?

24   A    Yes.

25   Q    Okay.  And on March 26th, while you were in the breakroom,



Exhibit E, Motion to Try Petition on Hearing Record

1    did anyone from management come into the breakroom to meet with

2    you and other members of your group?

3    A     In the breakroom during the time we were there?

4    Q     Yes.

5    A     Yes.  I don't -- like I said, I don't remember the manager

6    who did, but yes, we were informed at 5:45 p.m., the end of the

7    shift.

8    Q     Did anyone come to speak with you before 5:45 p.m. from

9    management?

10   A     No.

11   Q     At any time on March 26th, did anyone from management come

12   into the breakroom to instruct you and remind -- to instruct

13   you to socially distance?

14   A     No.

15   Q     Okay.  And what about March 27th?  Approximately what time

16   did you enter the management office that day?

17   A     I believe it was around 8 -- 8 a.m., 9 -- 9:00.

18   Q     Okay.  And approximately how many people were in your

19   group of associates at the management meeting that day?

20   A     I believe it was about about like -- like, 15, I believe.

21   Q     Okay.  And how many people from management were at the

22   meeting that day?

23   A     Well, you know, like I said before, on the 27th, we

24   weren't in the break -- in the actual main office.  As we were

25   about to walk in, they told us not to be in there, and they



Exhibit E, Motion to Try Petition on Hearing Record

1   told us to sit down in the -- the area across from the main

2   office, and that's when Christian Smalls had the private

3   meeting with Sai and Christine Hernandez.

4   Q    And what reason -- who -- let me ask first, who told you

5   not to come into the main office and instead to wait outside

6   the general manager's office?

7   A    Christine.

8   Q    Okay.  And who else from management was present when

9   Christine gave you that instruction?

10  A    All I know is Christine.  Like I said, we didn't walk

11  inside.

12  Q    Do you recall seeing Tyler Grabowski in the management

13  office that day?

14  A    No.  Like I said, I didn't go inside of the office.

15  Q    And was your group able to socially distance while you

16  stood outside the mana -- the general manager's office?

17  A    Yes.

18  Q    I'd like to show you, Mr. Palmer, Exhibit 66(a).

19       MS. AHMAD:  If you could just zoom in a little bit.

20  Q    BY MS. AHMAD:  Is this the management office at JFK8, Mr.

21  Palmer?

22  A    Yes.

23  Q    Okay.

24  A    Yeah, that's it.

25  Q    And do you recognize yourself, sort of, third if you're



Exhibit E, Motion to Try Petition on Hearing Record

1      looking at the picture from the left?

2      A     No.  How can you identify me?

3      Q     So you don't recognize yourself?

4            JUDGE GREEN:  You want to blow up the picture a little

5      bit?

6            MS. AHMAD:  Yes, Mr. Vulk, if you wouldn't mind, that

7      would be helpful.

8      A     Are you kidding me?

9      Q     BY MS. AHMAD:  I'm not kidding you.

10     A     How can you tell this is me by --

11     Q     I'm asking you, Mr. Palmer.  I'm asking if you recognize

12     yourself.

13           JUDGE GREEN:  Yeah, if you don't know, you can say you

14     can't -- you can't identify yourself.

15     A     No, I can't identify myself.

16     Q     BY MS. AHMAD:  Okay.

17           MS. AHMAD:  And can we just go to the person in the yellow

18     vest?

19     Q     BY MS. AHMAD:  Do you recognize Tyler Grabowski, Mr.

20     Palmer?

21     A     No.  Well, who -- where?  To --

22     Q     I'm trying --

23     A     -- to my left?

24     Q     I'm asking if you recognize the person in the yellow vest

25     to be Tyler Grabowski?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Oh, no, because I can't see the person -- I can't see the

2    person's face, number one; I see behind him.  And the picture

3    is very blurry, so, no.

4    Q    Do you recognize the person in the brown sweater standing

5    just to the right of the person in the yellow vest?

6    A    No, because it looks very blurry, so no, I can't.

7    Q    All right.  Let's go now to Exhibit 66(b).

8         MS. AHMAD:  If we could zoom in on this one similarly,

9    please.  Thank you.

10   Q    BY MS. AHMAD:  Mr. Palmer, let me ask you now if you

11   recognize the person third from the left to be yourself?

12   A    No.  Again, the picture is very blurry, like I said

13   before, so you cannot identify myself -- or I cannot identify

14   myself, sorry.

15        MR. JACKSON:  Your -- Your Honor, I'm going to object to

16   this whole line of questioning and the use of this exhibit.  I

17   mean, there's no foundation as to when supposedly this was,

18   there's no authenticity about what this is supposed to

19   represent, and -- and the relevance of this is just -- it

20   escapes me, eludes me.

21        JUDGE GREEN:  Overruled.

22   Q    BY MS. AHMAD:  Mr. Palmer, do you -- in -- in this

23   exhibit, are you able to recognize the person in the yellow

24   vest?

25   A    No.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    In this exhibit, are you able to recognize the person in

2   the brown sweater right to the right of the person in the

3   yellow vest?

4   A    No.

5   Q    Okay.  And as far as you can tell, does the group in the

6   far right of the corner contain any of the associates who you

7   protested at the production meeting with on March 27th?

8   A    Again, this is -- this picture is extremely blurry, so I

9   can't identify anyone in this picture, to be honest with you.

10  Q    Okay.

11       MS. AHMAD:  All right.  We can take that down.  Thank you.

12       JUDGE GREEN:  Please try and get the -- the documents in

13  the -- in SharePoint before you use them.  I just -- it's much

14  easier for me personally and probably for other counsel to look

15  at it on our own computers rather than the share screen.

16       MS. AHMAD:  We certainly will, Your Honor.  I'm sorry.

17  I'm not a SharePoint guru, but --

18       JUDGE GREEN:  Yeah, right.  Okay.

19       MS. AHMAD:  -- our team can definitely do that.

20  Q    BY MS. AHMAD:  All right.  Now, you told us, Mr. Palmer,

21  that on, I believe it was April 10th, you received a final

22  written warning with respect to failing to socially distance

23  from Zach Marc and Tyler's Grabowski.  Do you recall that?

24  A    Yes.

25  Q    Okay.  And is it -- is it true -- was your testimony, in



Exhibit E, Motion to Try Petition on Hearing Record

1    fact, that never once before that meeting with Zach Marc and

2    Tyler Grabowski had you been informed by anyone at Ama -- by

3    anyone at Amazon management that social distancing was

4    required?

5    A    Yes.

6    Q    Okay.  And so at that meeting, I believe you said you were

7    surprised when Mr. Grabowski and Mr. Marc informed you that

8    there was a social distancing requirement at Amazon?

9    A    Yes.

10   Q    And I think you said you asked them who had told you --

11   had told you personally -- that social distancing was required,

12   right?

13   A    Yes.

14   Q    And do you remember Zach Marc telling you that he himself

15   had personally told you that multiple times during the week of

16   March 25th?

17   A    No.

18   Q    Do you recall Tyler Grabowski telling you that he himself

19   had personally told you that multiple times during the week of

20   March 25th?

21   A    No.

22   Q    And I believe you said Mr. Grabowski and Mr. Marc were

23   typing during your meeting?

24   A    Yes.

25   Q    Could you see what they were typing?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    And I believe you testified that when you asked for a copy

3    of the social distancing policy, Mr. Grabowski printed it and

4    brought it to you; is that correct?

5    A    Yeah, after multiple times of me asking, yes.

6    Q    Okay.  Multiple times over the course of that one meeting,

7    right?

8    A    Of that one meeting, yes.

9    Q    Okay.  And when he brought it to you from the printer, it

10   felt like a document that had just come off a printer?

11   A    Yes.

12   Q    Okay.  And that final written warning, Mr. Palmer, didn't

13   end your employment with Amazon; is that right?

14   A    No, I was still employed.

15   Q    Okay.  Did -- and it didn't change the amount Amazon paid

16   you, right?

17   A    No, it did not.

18   Q    Okay.  And in fact, that final written warning is no

19   longer even active today, correct?

20        MR. KEARL:  Objection.  Relevance.

21        JUDGE GREEN:  Overruled.

22        Do you know?

23   A    No, it's -- no, it's not there anymore.

24        JUDGE GREEN:  Okay.

25   Q    BY MS. AHMAD:   It's not there anymore, okay.  And you



Exhibit E, Motion to Try Petition on Hearing Record

1    haven't received any discipline since that final written

2    warning, right?

3    A    No.

4    Q    Okay.  But you've continued to speak out against Amazon's

5    health and safety policy since that time, right?

6    A    Yes, I have.

7    Q    In fact, I believe that you testified that after Mr.

8    Smalls was terminated, you made the decision to appear at the

9    April 6th protest, right?

10   A    Yes.

11   Q    And after you were warned for -- you received the final

12   written warning for social distance there on April 10th, you've

13   also attended many additional protests, right?

14   A    Yes.

15       MR. JACKSON:  Objection.  Relevance.  He's talking about

16   now events that probably happened far afield from when Mr.

17   Bryson was terminated or from when Mr. Palmer was issued his

18   final warning.

19       MR. KEARL:  Well, (indiscernible, simultaneous speech) --

20       MS. AHMAD:  Your Honor, this all bears on the question of

21   (indiscernible, simultaneous speech) that --

22       JUDGE GREEN:  So -- so this is -- this is exactly what I

23   was talking about when I was talking about how this typically

24   comes up.  The -- the way this comes up is that it's actually

25   the Respondent that puts on this type of witness and says,



Exhibit E, Motion to Try Petition on Hearing Record

1    listen, you know, they elicit this type of testimony.  So now

2    we've got it.  So overruled.

3    Q    BY MS. AHMAD:  Mr. Palmer, you said Mr. Grabowski and Mr.

4    Marc were typing during your meeting?

5    A    Yes.

6    Q    Could you see what they were typing?

7    A    No.

8    Q    And I believe you testified that when you asked for a copy

9    of the social distancing policy, Mr. Grabowski printed it and

10   brought it to you; is that correct?

11   A    Yeah, after multiple times of me asking.  Yes.

12   Q    Okay.  Multiple times over the course of that one meeting,

13   right?

14   A    Of that one meeting, yes.

15   Q    Okay.  And when he brought it to you from the printer it

16   felt like a document that had just come off a printer?

17   A    Yes.

18   Q    Okay.  And that final written warning, Mr. Palmer, didn't

19   end your employment with Amazon; is that right?

20   A    No, I was still employed.

21   Q    Okay.  Did -- and it didn't change the amount Amazon paid

22   you, right?

23   A    No, it did not.

24   Q    Okay.  And in fact, that final written warning is no

25   longer even active today, correct?



1        MR. KEARL:  Objection, relevance.

2        JUDGE GREEN:  Overruled.  Do you know?

3        THE WITNESS:  No.  It's -- no, it's just not there

4    anymore.

5        JUDGE GREEN:  Okay.

6    Q    BY MS. AHMAD:  It's not there anymore, okay.  And you

7    haven't received any discipline since that final written

8    warning, right?

9    A    No.

10   Q    Okay.  But you've continued to speak out against Amazon's

11   health and safety policy since that time, right?

12   A    Yes, I have.

13   Q    In fact, I believe that you testified that after Mr.

14   Smalls was terminated, you made the decision to appear at the

15   April 6th protest, right?

16   A    Yes.

17   Q    And after you were warned for -- you received a final

18   written warning for social distancing, though, on April 10th,

19   you've also attended many additional protests, right?

20   A    Yes.

21        MR. JACKSON:  Objection, relevance, because you're talking

22   about now events that probably happened far afield from when

23   Mr. Bryson was terminated from when Mr. Palmer was issued his

24   final warning.

25        JUDGE GREEN:  Well, protests --



1      MS. AHMAD:  Your Honor, this all bears on the question of

2  (indiscernible), that --

3      JUDGE GREEN:  So this is -- this is exactly what I was

4  talking about when I was talking about how this typically comes

5  up.  The -- the way this comes up is that it's actually the

6  Respondent that puts on this type of witness and says, listen.

7  You know, they elicit this type of testimony.  So now we've got

8  it.  So overruled.

9  Q    BY MS. AHMAD:  Mr. Palmer, is it correct that you, for

10  example, participated in an anniversary protest of the March

11  30th protest on -- at JFK8?

12  A    Anniversary on what -- what day?

13  Q    March 30th, 2021.

14  A    Yes.

15  Q    Okay.  And is it true that you and Mr. Smalls had set up a

16  tent outside the JFK8 facility where you hand out cards

17  advocating for the creation of an Amazon labor union?

18      MR. KEARL:  Objection, relevance.

19      JUDGE GREEN:  Overruled.  This is -- this is exactly --

20  this is exactly the issue that -- that we discussed, which is

21  that it's generally the Respondent who puts on these types of

22  witnesses and says, listen.  They engage in the same protected

23  activity, but they weren't fired.  That -- you asked for this.

24  This is exactly what you asked for and now you're getting it.

25      Overruled.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MS. AHMAD:  Mr. Palmer, can you tell us whether or not

2    you and Mr. Smalls set up a tent outside JFK8 where you handed

3    out cards advocating for the creation of an Amazon labor union?

4    A    Yes.

5    Q    And you've continued to speak out about Amazon to the

6    media, right?

7    A    Yes.

8    Q    Do you recall recently speaking with a reporter named

9    Candice Bernd from Truthout?

10   A    Yes.

11   Q    Okay.  Do you recall telling Ms. Bernd that you're no

12   longer worried about retaliation from Amazon?

13   A    Yes, I did.

14   Q    Okay.  And you've even sued Amazon in Federal court,

15   right?

16   A    In Federal court -- what -- what case are you -- are you

17   referring to?

18   Q    I'm talking about --

19   A    Or some --

20   Q    -- the complaint whose authenticity you verified on your

21   direct examination that you filed in Federal court.

22   A    Well, I mean, I have -- okay.  Which -- which lawsuit are

23   you pertain -- are you talking about though?  That's what I'm

24   asking.

25   Q    Have you sued Amazon multiple times?



1    A    Are you talking about the public nuisance case?  Is that

2    what you're talking about?

3    Q    Yes.  That was filed in Federal court according to the

4    complaint you put into evidence.

5    A    Yes.

6    Q    Okay.  And that complaint was dismissed from Federal

7    court, right?

8         MR. JACKSON:  Objection, relevance.  I mean, I could see

9    where Your Honor would accept testimony about --

10        JUDGE GREEN:  Yes, okay.

11        MR. JACKSON:  -- Amazon conduct and that sort of thing.

12        JUDGE GREEN:  Sustained.

13   Q    BY MS. AHMAD:  And after --

14        JUDGE GREEN:  Sustained.

15   Q    BY MS. AHMAD:  -- having filed suit against Amazon have --

16   after having advocated for the creation of an Amazon labor

17   union, after having engaged in multiple protests about Amazon's

18   workplace health and safety procedures, after having spoken to

19   numerous media outlets about your complaints with respect to

20   Amazon, you have not experienced any retaliation from Amazon

21   since -- since -- in -- in 2021; is that correct?

22   A    What is -- what -- what would be your definition of

23   retaliation?

24   Q    I'm asking you.  Do you believe that you have been

25   retaliated against by Amazon in connection with any of these



# Exhibit E, Motion to Try Petition on Hearing Record

1    activities?

2    A    Yes.

3    Q    Okay.  Which one?  Which activity do you believe you have

4    been retaliated in connection with?

5    A    With the union drive I do.

6    Q    Okay.  And what retaliation do you believe you experienced

7    from Amazon in connection with the union drive?

8    A    Well, last week when I came in -- when I came in at

9    around, like, 9:00 -- came -- came a little late.  I was -- I

10   was approached by a guy named Clem Hall.  And he -- he looked

11   as though he may have been a Tier I, you know, a regular social

12   like myself.  And he -- he walked up to me and he was asking me

13   about safety, about the boxes and why they -- you know, like do

14   they ever get piled up?  And I said yes.

15       And then, he also talked to -- talked to me about --

16   saying that, oh, well, I can get you promoted.  You know, I'm

17   actually a regional manager.  And I said, oh, okay.  He said, I

18   can pull some strings to get you promoted.  And I said, oh,

19   really?  So -- so then, what happened was:  I said, okay.  I'll

20   take -- I'll take your Chime down -- like, his Chime, you know,

21   login name.

22       I did that.  And I messaged him.  And I said, hi, this is

23   Derrick -- no response.  And he said that he's going to

24   Atlanta -- Atlanta facility today, which was a -- was that a

25   Wednesday?  Well, anyway, he said he'll be back the next day to



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    talk to me.  And he didn't come back the next day.

2         In fact, the next day I was isolated from my department to

3    pack singles.  I was placed on -- during some -- an actual job

4    duty called jam clearing.  But on this jam clear, I was -- it

5    was high.  It was a very high level.  It was, like, all the way

6    up to the ceiling -- was the area where as -- where I was

7    working in.  And I had to reach over -- one of my duties was to

8    reach over a yellow rail and push boxes down from a conveyor

9    belt because one of the rollers were jammed up.  And I was

10   basically isolated from the entire department.

11        Now, why would me, someone who's advocating for a union

12   drive, be isolated from my department?  Not only was it that

13   day, it was the day after; I was isolated again.  And I was

14   told that, you know, we have enough people for pack singles and

15   that we have another duty for you to be cleaning.  So I was

16   doing maintenance work, which isn't in my contract -- number

17   one.

18        Number two, I was cleaning up a dusty area.  They don't

19   know of any conditions that I have and that was very dangerous.

20   So that was two days in a row where I haven't even been in my

21   department where I was assigned to work.  So that will be my

22   definition of retaliation, if that answers your question.

23   Q    Who is Clem Hall?

24   A    Clem Hall is a regional manager for Amazon.

25   Q    Okay.  So -- and did I understand correctly that the sum



Exhibit E, Motion to Try Petition on Hearing Record

1    of substance of your conversation with Clem Hall is his

2    offering to help you get promoted?

3    A    Yes, he said he can pull strings to get me promoted.

4    Q    Okay.  Did he say anything else?

5    A    He said that he --  like I said, he going -- he's going to

6    Atlanta, another Amazon facility, and that he would be coming

7    back the next day to follow up with me.

8    Q    And you never heard from him again?

9    A    Nope.

10   Q    Okay.  Did you consider his offer to pull strings to get

11   you a promotion to be retaliation?

12   A    Yes, absolutely.

13   Q    How can the offer of -- of a promotion be retaliatory?

14   A    Because after five years, I didn't get any of those

15   offers.  And when you're involved in a lawsuit, if I get

16   promoted into a -- a Tier III, then technically, I can't -- I

17   can't sue Amazon.  So that would be grounds for them to

18   terminate me --

19   Q    According --

20   A    -- if they promote me.

21   Q    -- and I'm sorry.  Have you been promoted?

22   A    No.

23   Q    Have you ever heard from Clem Hall again?

24   A    No.

25   Q    What is the source of your knowledge that if you are a



Exhibit E, Motion to Try Petition on Hearing Record

 1    Tier III associate you can't sue Amazon?

 2    A    You can't.

 3    Q    According to what?

 4    A    I've heard -- I've heard about that.

 5    Q    You've heard from who?

 6    A    I've heard it.  I mean, you know, I don't have the direct

 7    proof but I -- I do know I heard from -- from people that if

 8    you -- if they -- if you try to promote -- if they try to

 9    promote you, then, they can just terminate you if you're suing

10    Amazon.

11    Q    You -- what people have you heard it from?

12    A    I've heard it from managers.

13    Q    Which managers?

14    A    I don't know.  I don't know their name, but I've heard it.

15    Like, it -- it's -- it's -- it's not -- you know, I don't know

16    if it's a -- like, a definite, but I've heard it, so I

17    wouldn't -- I -- I'm not going to take a promotion --

18    Q    Okay.  But -- and you have not --

19    A    -- if I don't even know if it's that way.

20    Q    -- and as -- you have not been officially offered a

21    promotion by Amazon, right?

22    A    No.

23    Q    Okay.  And when did this happen again?

24    A    This happened last -- I got to check the date, but it was,

25    like, last week.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Last week -- so the week of April 26th?

2    A    Yes, I believe so.

3    Q    Okay.

4         MS. AHMAD:  Judge, I'm almost done.  Can I just have

5    some -- a ten-minute break to --

6         JUDGE GREEN:  Yeah.

7         MS. AHMAD:  -- consult?  Thank you.

8         JUDGE GREEN:  Off the record.  We'll be back at 5:10.  So

9    same deal, Mr. -- Mr. Palmer:  You can walk around.  Just don't

10   talk to anybody about your testimony.

11        THE WITNESS:  Okay.

12        JUDGE GREEN:  Thank you.

13   (Off the record at 5:01 p.m.)

14        JUDGE GREEN:  So let's go back on the record.

15        THE COURT REPORTER:  We're on.

16   Q    BY MS. AHMAD:  Mr. Palmer, I wanted to ask you -- I'm

17   directing your attention again to the March 30th protest.  I

18   believe you testified earlier that at some point in time, Zach

19   Marc speed-walked out to your group and made an announcement;

20   is that right?

21   A    Yes.

22   Q    And he said in that announcement that Christian Smalls had

23   violated social distancing and violated his quarantine; is that

24   right?

25   A    He said he violated his quarantine.



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  Did he reference social distancing in that

2    announcement?

3    A    I believe so.

4    Q    Okay.

5    A    Yeah.

6    Q    And I think you testified earlier that your reaction was

7    that you were puzzled and you laughed at him; is that right?

8    A    Yes.

9         MR. JACKSON:  Objection.

10        JUDGE GREEN:  Overruled.

11   Q    BY MS. AHMAD:  And did others in your group have the same

12   reaction.

13   A    No.

14   Q    Okay.  So what was funny to you about the allegation that

15   Mr. Smalls was violating his quarantine?

16   A    Because it's just the fact that the -- you know, after the

17   protest is over, it's -- like, why are you coming over here

18   saying anything?

19   Q    But it didn't concern you at all that Mr. Smalls was on

20   quarantine, yet choose -- chose to be around other people?

21   A    No.

22   Q    It didn't concern you from a health perspective, for

23   example, that you might get COVID-19 from him and bring it home

24   to your family?

25   A    No.  I mean, what concerned me was the fact that he was



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    quarantined, but I wasn't quarantined.

2    Q    If you were concerned about that, why would you choose to

3    spend time with him?

4    A    Because I knew that there was an underlying reason for it.

5    I felt as though it was singling him out.

6    Q    So are you saying that you don't believe that Mr. Smalls

7    was, in fact, exposed to anybody who had COVID-19 at JFK8?

8    A    Not that I -- I don't feel -- I don't feel that way.

9    Q    You don't think he was exposed to anybody who had COVID-

10   19?

11        MR. KEARL:  Asked and answered.

12   Q    BY MS. AHMAD:  I want -- I'm just making sure I understand

13   what you said, Mr. Palmer.

14        JUDGE GREEN:  Yeah.

15        THE WITNESS:  No, I don't.

16        JUDGE GREEN:  Overruled.

17        THE WITNESS:  No, I don't.

18   Q    BY MS. AHMAD:  Okay.  What about the person you testified

19   about earlier, the woman who you didn't want to name who you

20   said you learned had COVID-19 on March 27th?  Do you recall

21   that?

22   A    Yes.

23   Q    Okay.  And is that woman also someone who sued Amazon with

24   you in the public nuisance lawsuit?

25        JUDGE GREEN:  Okay.  I mean, are we really going to, like,



Exhibit E, Motion to Try Petition on Hearing Record

1    try to identify this person?

2        THE WITNESS:  Yeah.  I'm not too --

3        MS. AHMAD:  I'm not -- I don't have to say her name, Your

4    Honor.  I just want to make sure I under --

5        JUDGE GREEN:  Yeah, there's -- yeah, you're effectively

6    identifying the person.

7        MS. AHMAD:  Your Honor, Mr. Palmer --

8        JUDGE GREEN:  Is there -- is there really a need -- need

9    for it?  What's -- what's the need?

10       MS. AHMAD:  Your Honor, I am -- I have not -- I was going

11   to ask this question to make sure that I was on the same page

12   as Mr. Palmer.  Mr. Palmer has named this person in the

13   declaration that his attorney submitted as an exhibit here.  So

14   her name is even in the record of this proceeding.  I

15   nonetheless am not trying to repeat it; I'm just trying to

16   un -- to make sure that I and Mr. Palmer are talking about the

17   same person since I don't have her name.  I'm trying to find

18   another --

19       MR. JACKSON:  Objection, relevance.

20       JUDGE GREEN:  Yeah.  Why -- why do we need it?

21       MS. AHMAD:  Because Mr. Palmer just testified that he

22   had -- he does not believe that Mr. Smalls was exposed to

23   someone with COVID-19 and both -- and who had COVID-19 at JFK8.

24   And he believes that Mr. Smalls was placed on quarantine to

25   single him out, which is part of the General Counsel's



# Exhibit E, Motion to Try Petition on Hearing Record

1    allegations regarding animus and retaliatory behavior.  And I'm

2    trying to probe the basis --

3        JUDGE GREEN:  Okay.  I'm not -- yeah.  I'm not seeing it.

4    And I -- and I'm -- I'm not going to allow questioning that's

5    intended to identify somebody who had COVID-19.

6    Q    BY MS. AHMAD:  Mr. Palmer, I have no -- no interest in the

7    identity of the person who has COVID-19.  But I would like to

8    know whether or not you believe --

9        MR. JACKSON:  Objection.  Your Honor sustained this

10   objection.

11       JUDGE GREEN:  Well, we haven't -- we -- we don't --

12       MS. AHMAD:  Say another question.

13       JUDGE GREEN:  Yeah.  I don't know that this is going to

14   be --

15       MR. JACKSON:  She has done that before, repeated the

16   question after you sustained the objection.  It's on the

17   record.

18       JUDGE GREEN:  So actually -- so let's --

19       MS. AHMAD:  Your Honor, respectfully, I have --

20       JUDGE GREEN:  -- let -- all right.  Yeah, let -- let's --

21       MS. AHMAD:  -- Counsel coming in --

22       JUDGE GREEN:  -- not get into that.  Because I don't see

23   that that's been happening.  So let's get the next question.

24       MS. AHMAD:  Well, Your Honor, can I also just ask that

25   objections wait until I'm done asking the question?



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Yeah.

2      MS. AHMAD:  It's difficult to face incoming double-fire.

3   Thank you.

4   Q    BY MS. AHMAD:  So Mr. Palmer, Mr. Smalls, you told us, was

5   placed on quarantine on March 28th, right?

6   A    Yes.

7   Q    And I believe you testified this morning that Mr. Smalls

8   told you he believed that he had been exposed to someone who

9   had COVID-19 at JFK8; is that correct?

10  A    When did I say that?  What -- what did you say?  Repeat

11  that.

12  Q    Do you remember Mr. -- did Mr. Smalls tell you on March

13  24th that he learned that someone at the facility has COVID-19?

14  A    On March 24th, yes, he told me.

15  Q    And did Mr. Smalls tell you on March 27th that he learned

16  that someone he had been in close contact with at the facility

17  had COVID-19?

18  A    Someone that he knows that -- that he knows was -- had

19  caught COVID, yes.

20  Q    Okay.  And did you also know the person and have you

21  all -- let me just ask if you had also been in contact with

22  that same person.  I'm not interested in their identity.

23  A    Well, you know, I felt that.  They -- you know, Amazon

24  didn't feel that way.

25  Q    Okay.  But Mr. Smalls believed that he had been in contact



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    with the person, right?

 2         MR. KEARL:  Objection.  He has no way to know what Mr.

 3    Smalls believes.

 4         MS. AHMAD:  What -- I'm asking him simply about what Mr.

 5    Smalls told him.  He's testified about numerous conversations

 6    with Mr. Smalls during his testimony here today.

 7         JUDGE GREEN:  Okay.  So with that clarification, do you

 8    understand the question?  Or do you need it to be repeated?

 9         THE WITNESS:  Well, it was -- she's asking me:  Did Mr.

10    Smalls know that he was in contact with this person?

11    Q    BY MS. AHMAD:  I'm asking you:  Did Mr. Smalls tell you

12    that he believed he had been in close contact with someone who

13    had COVID-19 at JFK8?

14    A    He said that he knows someone who had COVID.

15    Q    And --

16    A    I'm not saying he was -- I'm not saying he was in close

17    contact.  He said that he knows someone who he works with who

18    has COVID.

19    Q    You testified this morning that the person was a process

20    assistant who he worked closely with, right?

21    A    Yes.

22    Q    And do you remember testifying that the person was a

23    process assistant who you worked closely with as a process

24    guide?

25    A    Yes.
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And so when Mr. Smalls was placed on quarantine,

2    did he raise any question to you after that point in time about

3    whether he'd really been exposed to this process assistant?

4    A    No.

5    Q    Okay.  So Mr. Smalls never told you after being placed on

6    quarantine that he believed that he hadn't, in fact, been

7    exposed to somebody with COVID, right?

8    A    He didn't tell me that, no.

9    Q    Now, let's talk about April 6th, Mr. Palmer.  I believe

10   you said you attended a protest at JFK8 that day with

11   approximately five other people; is that right?

12   A    There was four of us that were on the Amazon ground --

13   five in total.  One was off the property.

14   Q    Okay.  And I'd like to show you Exhibit 70 if I can.  It

15   may be 70 or 70(a), Mr. Fulcan (phonetic).  I'm not sure but --

16        THE COURT REPORTER:  I'm waiting for it to be loaded to

17   SharePoint first.

18        MS. AHMAD:  Okay.  Sorry about the delay, Your Honor.  I

19   tried to --

20        JUDGE GREEN:  There it is.

21        MS. AHMAD:  This one's a little blurry.  Can we actually

22   have Exhibit 70(b), Mr. Fulcan?

23   Q    BY MS. AHMAD:  Mr. Palmer, do you recognize yourself in

24   this photograph?

25   A    Yes.



1  Q    And is this a photograph of you at JFK8 on April 6th,

2  2020?

3  A    I don't know if it was -- I don't know.  There's no date

4  there.  That's me outside of the Amazon facility.

5  Q    Do you recall --

6  A    I don't know the date.

7  Q    I'm sorry.  Go ahead.

8  A    No, I'm saying I don't know the date.  There's no date

9  there.

10  Q    Okay.  And do you recall speaking on a Facebook Live video

11  on April 6th that was being filmed by Jordan Flowers?

12  A    Did I?  I'm not sure.  Yeah.

13  Q    Yes?

14  A    Yes.

15  Q    Okay.  And you can take this down.  Thank you, Mr. Fulcan.

16  Q    BY MS. AHMAD:  Okay.  I think you testified that there

17  were two people filming Facebook Live videos that day, Jordan

18  Flowers and Mandi Velasco; is that right?

19  A    Yes.

20  Q    And where was Mandi filming?  What area of the parking lot

21  was Mandi filming in?

22  A    I believe the second part of -- the second lane of the

23  parking lot.

24  Q    Okay.  And was she carrying a sign?

25  A    Was she?  I'm not -- I'm not sure.  I don't remember.



# Exhibit E, Motion to Try Petition on Hearing Record

1   Q    And was she -- how was she recording the protest, on her

2   phone or on some other device?

3   A    It was a phone.

4   Q    And when -- was she standing near Mr. Bryson?

5   A    Yeah.  Yeah, she was.

6   Q    And do you remember if when -- at the point in time where

7   you handed the megaphone to Mr. Bryson and went to speak with

8   Mr. Smalls, Mandi was near Mr. Bryson?

9   A    Yes.

10  Q    Okay.  And do you recall where she was when you returned

11  from speaking with Mr. Smalls?

12  A    Should be the same area.

13  Q    And did you ever learn from Mandi whether she witnessed

14  the interaction between Mr. Bryson and the other woman on April

15  6th?

16  A    Well, I mean, she was recording the video, so.

17  Q    I see.  So Mandi recorded the video of that interaction?

18  A    Yes.

19  Q    And this was where Mr. Bryson was on the megaphone yelling

20  at the woman you said later spoke to you about Zappos shoes?

21       MR. KEARL:  Objection, Your Honor.  This is a video that I

22  do not believe has been produced to -- through the subpoena,

23  but it's clearly in paragraph 15.  And so insofar --

24       JUDGE GREEN:  I don't know.  Is this -- it sounds like

25  this was an employee who took the video.  I don't know if



Exhibit E, Motion to Try Petition on Hearing Record

1    Amazon has it.

2        MR. KEARL:  Well, they're -- they're showing exhibits that

3    are screenshots of the video I'm assuming.  It looks like

4    there's a little play button at the bottom.

5        JUDGE GREEN:  Is that what the video is from?

6        MS. AHMAD:  This is not from Mandi Velasco's video, Your

7    Honor, no.

8        JUDGE GREEN:  Okay.

9    Q    BY MS. AHMAD:  So Mr. Palmer, just to get the answer to

10   the question, Mandi filmed the interaction between Mr. Bryson

11   and the woman who you said you later spoke with about Zappos

12   shoes?

13   A    Yes.

14   Q    Okay.  And where did you see this video that Mandi filmed?

15   A    Facebook, Facebook Live.

16   Q    Okay.  Are you friends with her on Facebook?

17   A    Yes, I am.

18   Q    So did you watch it after the protest?

19   A    Yes.

20   Q    Okay.  And is it still posted on Facebook?

21   A    I don't know.

22   Q    Did Mandi ever give you a copy of the video?

23   A    No.

24   Q    And do you know if she's ever given anyone else a copy of

25   the video?



1      MR. KEARL:  Objection.

2      THE WITNESS:  How can I know that?

3      MS. AHMAD:  If you don't know, you don't know.  I asked

4   you if you knew, Mr. Palmer.

5      JUDGE GREEN:  So he -- he answered it.

6      MR. KEARL:  All right.  Can I just clarify?  Is this --

7   we're talking about Mandi's video or the photo of this?

8      JUDGE GREEN:  Yes, right?  We're talking about Mandi's

9   video?

10     MS. AHMAD:  Yes.

11     MR. KEARL:  And the photo is not from Mandi's video?

12  That's from a video that was produced?

13     JUDGE GREEN:  No, I don't know what that's from.  But

14  let's -- let's try and finish up with Mr. Palmer.

15     MS. AHMAD:  Yes, Your Honor.

16  Q    BY MS. AHMAD:  Have you ever seen -- did anyone show you

17  Mandi's video in your preparation for this case?

18  A    No.

19  Q    Okay.  Now, you said that you heard what had happened

20  between Mr. Bryson and this woman even though you weren't there

21  when it happened; is that right?

22  A    Yes.

23  Q    And can you --

24  A    To an extent.

25  Q    I'm sorry?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    To an extent.  I mean, you know, I don't know the --

2    the -- I didn't know the full details.

3    Q    Who did you hear about it from?

4    A    Mandi.

5    Q    Okay.  And what did Mandi tell you?

6    A    She said that Gerald had gotten into an argument with the

7    lady.  I said, okay.

8    Q    Did she give you any description of what Gerald had said

9    during that argument?

10   A    No.

11   Q    Did she give you any other description of what happened

12   during the argument?

13   A    No.

14   Q    Did you ever speak with anyone other than Mandi about what

15   happened during Gerald Bryson's argument?

16   A    No.

17   Q    Did you ever speak with Gerald Bryson himself about what

18   happened during that argument?

19   A    At the time, no, I didn't.

20   Q    Okay.  Have you spoken with him since that point in time?

21   A    Yeah, since the -- the protest from last year?  Yes.

22   Q    Yes.

23   A    Yes, I have.

24   Q    And have you spoken with him about what happened during

25   that argument?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Not in full detail, no.

2    Q    Have you spoken with him in some detail?

3    A    Yeah, just to -- just that he had an argument with a lady

4    who didn't agree with the protest.  That was it.

5    Q    Okay.  And did he tell you what happened during that

6    argument?

7    A    He said that he had an argument with a lady.  That's what

8    he told me.

9    Q    So he said she did not agree with the protest; is that

10   right?

11   A    Yes.

12   Q    And did he tell you anything about what he said to her?

13   A    No, just that they had an argument.

14   Q    Okay.  And you're aware that Amazon investigated Mr.

15   Bryson for his conduct on April 6th, right?

16        MR. KEARL:  Objection, vague.

17        JUDGE GREEN:  Okay, yeah.  If you know, you can answer.

18        THE WITNESS:  No, I don't.

19   Q    BY MS. AHMAD:  Are you aware that Amazon investigated Mr.

20   Bryson in connection with the altercation he had with this

21   woman on April 6th?

22   A    No.

23   Q    Okay.  Are you aware that Mr. Bryson was terminated from

24   Amazon?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Okay.  And did Mr. Bryson ever speak with you about the

2   fact that he'd been terminated from Amazon?

3   A    Well, I mean, there was a -- an article earlier that had

4   Gerald's name on it.  But yeah, he told me he was terminated.

5   Q    Okay.  Did he tell you why?

6        MS. COX:  Judge Green?

7        JUDGE GREEN:  Yes.

8        MS. COX:  Excuse me, Counsel.  I just want to object to

9   the use of this video that Amazon has and should have been

10  produced responsive to paragraph 15 of our subpoena.

11       JUDGE GREEN:  They don't have any video.  Without --

12  there's no video right now.

13       MS. COX:  They're bringing -- the photo is a picture of a

14  video.  It -- as Mr. Kearl pointed out, there is a play button

15  at the bottom of the photo.

16       JUDGE GREEN:  Okay.  We're not -- we're not dealing with

17  that right now.  So really, I just -- I want to finish with Mr.

18  Palmer so he can be done for the day.  We're not -- we don't

19  admit it.  That's not being offered.  It's really not being

20  discussed.  Let's --

21       MS. COX:  Okay.

22       JUDGE GREEN:  -- you know, we -- we can deal with that.

23  So let's deal with it later.

24  Q    BY MS. AHMAD:  Mr. Palmer, did Mr. Bryson tell you why he

25  was terminated from Amazon?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    What did he tell you about the reason he was terminated?

3    A    That he was fired for protesting on his day off.

4    Q    Did he mention at all the altercation he had with the

5    woman at that protest when he told you why he was terminated?

6    A    Well, he said that he had an argument with the lady.  And

7    he got -- he said ultimately he got fired for protesting on his

8    day off.  And he kept saying it.

9    Q    Now, you were asked, Mr. Palmer, about people using curse

10   words at work; do you recall that?

11   A    Yes.

12   Q    Okay.  And you spoke about some examples of Amazon

13   employees and managers using some curse words at work; do you

14   recall that?

15   A    Yes.

16   Q    Okay.  And I think you spoke about an interaction between

17   two female associates where they each called each other a

18   bitch; do you remember that?

19   A    Yes.

20   Q    You said you don't know who they are?

21   A    I don't know their names, no.

22   Q    Okay.  Is it that you've forgotten their names?  Or you

23   never knew their names?

24   A    I don't know their names.  I don't know them.

25   Q    Okay.  So do you have any knowledge as to whether any of



1    them -- either of them was ever disciplined in connection with

2    that exchange?

3    A    No.  You know, I saw them afterwards, but I don't know

4    about any write-up or anything, if that's what you're alluding

5    to.

6    Q    Yes, I -- I know you testified you knew that they were

7    both still employed.  I'm asking if you know that -- whether

8    they were disciplined with anything other than termination.

9    A    No, not that I'm aware.

10   Q    Okay.  Have you ever heard one employee at Amazon call

11   another a "gutter bitch"?

12   A    I've heard worse than that.

13   Q    I'm -- I'm just interested in whether you've heard that

14   term.

15   A    No.

16   Q    Okay.  Have you ever heard anyone at Amazon call -- any

17   employee at Amazon call another employee a "cunt"?

18   A    Yes.

19   Q    Okay.  And where did you hear that?

20   A    I heard that -- I don't know what year it was, but I

21   definitely heard it.  I -- I remember when I first started at

22   JFK8 I heard, you know, an argument about that.  And I heard

23   that word being used.

24   Q    What do you recall about the argument?

25   A    Well, I just remember two people were arguing.  One of



Exhibit E, Motion to Try Petition on Hearing Record

1    them called them a -- the "cunt" word, but it was, like, in --

2    it was, like, in a playful manner --

3    Q    Okay.

4    A    -- for that.

5    Q    Have you ever heard anyone call another employee that in

6    an angry manner?

7    A    No.

8    Q    Okay.  Have you ever heard anyone call another employee a

9    "dike" at work?

10   A    Yes.

11   Q    Okay.  And tell me about when you heard that.

12   A    I just hear that casually.  You know I don't remember the

13   actual, like, instant, and like, incident, but I've heard that

14   word being thrown around a few times actually.

15   Q    And when you say casually, do you mean jokingly or

16   seriously?

17        MR. JACKSON:  Objection.  How is he going to know --

18        JUDGE GREEN:  No.  No, overruled actually.

19        MR. JACKSON:  -- the speaker's stand on it?

20        JUDGE GREEN:  Overruled.

21        MR. JACKSON:  Okay, all right.

22   Q    BY MS. AHMAD:  Mr. Bryson (sic), when you say casually, do

23   you mean jokingly or seriously?

24        JUDGE GREEN:  If you don't -- if you don't know, you can

25   say so.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1           THE WITNESS:  What?  What was that?  I didn't hear.

 2      Q    BY MS. AHMAD:  Mr. Bryson (sic), what do you mean by

 3      casually?

 4           MR. JACKSON:  Objection.  This is not Mr. Bryson.

 5      Q    BY MS. AHMAD:  I'm sorry, Mr. Palmer.  I'm sorry.

 6           Mr. Palmer, what do you mean by casually?

 7      A    Like, just in the regular conversation I've heard that

 8      term.

 9      Q    Okay.  Have you heard it in the context of heated

10      arguments or just, like, regular conversation?  That's what I'm

11      trying to understand.

12      A    Oh, okay.  Yeah.  It's been, like, an argument, yes.  I've

13      heard that.

14      Q    Okay.  And have you -- do you know if anyone has ever been

15      disciplined for using that term?

16      A    Not that I know of.

17      Q    Okay.  So do you know for sure that no one has or you just

18      don't know?

19      A    I don't know if that person was disciplined for saying

20      "dike".  I don't know if that person was disciplined for saying

21      "cunt".  I don't know.

22      Q    Okay.  And have you ever heard one employee yell curses at

23      another employee over a megaphone?

24      A    Have I heard -- there -- there's no megaphones that

25      associates use --
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.

2    A    -- in -- in the workplace.

3    Q    Okay.  So is your answer, no, you've never heard that?

4    A    So no.

5         MS. AHMAD:  Judge, may I just have two minutes, go off the

6    record, consult with my client?  And I'm probably --

7         JUDGE GREEN:  Yeah.

8         MS. AHMAD:  -- wrapping up.

9         JUDGE GREEN:  Okay.  Off the record.

10   (Off the record at 5:35 p.m.)

11        JUDGE GREEN:  Back on the record.

12        MS. AHMAD:  Mr. Palmer, thank you for your time today.

13        And Your Honor, at this point I have no further questions

14   for Mr. Palmer.

15        JUDGE GREEN:  Okay.  So anything from the GC?

16        MR. JACKSON:  Yes, Your Honor.

17                        **REDIRECT EXAMINATION**

18   Q    BY MR. JACKSON:  All right.  Mr. Palmer, you were

19   questioned -- I'm having a lot of feedback here, but I'll try

20   to get -- power through it.

21        JUDGE GREEN:  So let me just see --

22        MR. JACKSON:  I think -- I think Barry -- if he can mute

23   his cell if that's possible, it would -- oh, no.  6:09 -- I can

24   just mute it.  We're okay.

25        JUDGE GREEN:  Yeah.  I just -- I just -- okay.



1    Q    BY MR. JACKSON:  All right.  Mr. Palmer, you were

2    questioned by Ms. Ahmad, the Amazon attorney, about certain

3    improvements Amazon supposedly made to address the COVID

4    outbreak over the course of the past year.  Now, did any of

5    these so-called improvements or any of the things that Ms.

6    Ahmad mentioned to you -- did any -- did any of those things

7    allay your concerns about your workplace safety before April

8    6th, 2020?

9    A    Okay.  What do you mean by allay?  What does that mean?

10   Q    Like -- like, reduced, or like, diminished your concerns

11   about your workplace safety?  Did any actions taken before

12   April 6th that Ms. Ahmad mentioned reduce your concerns?

13   A    No.

14   Q    Okay.  The kind of deep cleaning that you wanted Amazon to

15   perform at the facility -- would that require shutting down the

16   facility?

17        MS. AHMAD:  Objection, Your Honor.  This is the entire

18   line of questioning that the General Counsel got into, we

19   weren't allowed to get into on our cross, and now, is being

20   reintroduced on direct -- on redirect.

21        JUDGE GREEN:  So I -- yeah, I mean, I -- I think I did

22   ultimately allow it.  But -- but I mean, let me just ask.  Let

23   me just ask, because this is where we got into a problem to

24   begin with.  It -- it simply doesn't matter whether there was

25   deep cleaning or not to whether it -- whether the -- the



# Exhibit E, Motion to Try Petition on Hearing Record

1    Charging Party engaged in protected concerted activity.  And so

2    I -- we did end up getting it.  I mean, the -- the Respondent

3    seems to be ready to argue that, but -- and I -- and I'm --

4    they -- they can argue it before the Board, but that's not the

5    law.  So do you really want to go into this?

6        MR. JACKSON:  I'll withdraw the question.  Thank you, Your

7    Honor.

8    Q    BY MR. JACKSON:  All right.  Now, when you walked into the

9    main office on March 25th, were there more than two managers

10   present at the roundtable area at the moment you walked in?

11   A    Yes.

12   Q    Can you estimate how many managers were present at that

13   moment?

14   A    I believe it was about five managers.

15   Q    And only Sai and Christine stayed; is that correct?

16   A    Yes.

17   Q    Where did the other three or so managers go?

18   A    They walked into the other small offices that were located

19   inside the main office.

20   Q    Okay.  Thank you for the clarification.

21   A    No problem.

22   Q    Oh, and were the managers actually at that time that you

23   walked in -- were they standing six feet apart from one

24   another?

25   A    I mean, no, they -- they were very close, you know.  I



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    guess it's kind of hard to say if they were six feet, but they

2    were very close I'll say.

3    Q    Okay.  Were they wearing masks?

4    A    No.

5    Q    Okay.  Why did you stay inside the cafeteria on March 25,

6    26th, and 27?

7    A    I was awaiting a response from management to tell -- you

8    know, to tell us whether they would shut the building down or

9    what -- what actions they were going to take to make us feel

10   safe in the workplace.

11        MS. AHMAD:  Your Honor, asked and answered if we're going

12   down this line of questioning again.

13        MR. JACKSON:  It was not asked or answered.

14        JUDGE GREEN:  I thought it was but go -- go ahead.  You

15   know, listen.  I don't have a transcript.

16        THE WITNESS:  Yeah.  So -- oh, ask the -- ask the question

17   again.  I'm sorry.  What was --

18   Q    BY MS. AHMAD:  Yeah, no.  I -- I think you answered it.

19   But the question was:  Why'd you wait in the cafeteria on those

20   days?

21   A    Yeah.  So I was basically awaiting a response from

22   management to tell us what they were going to do.

23   Q    Did you feel it was important to get a response?

24   A    Yes, absolutely.

25   Q    Why did you feel it was important?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A     Well, you know, the severity of the virus -- you know,

2    people were dying.  Like, people were getting sick left and

3    right.  And New York was the epicenter at the time.  You know,

4    they had the most cases.  And the fact that we were inside this

5    large facility, you know, without the proper protection -- you

6    know, it was -- it was -- it was alarming.  So however long it

7    took to get a response was how long I was going to wait.

8    Q     Okay.  Now, the Amazon attorney, Ms. Ahmad, asked you

9    about a quote you had in a Truthout article.

10   A     Um-hum, yes.

11         MR. JACKSON:  Actually, if I could just -- I don't need to

12   go off the record.  I just want to upload something to

13   SharePoint, Your Honor.  Please just bear with me for a second.

14   Okay.  Now, I've just uploaded to SharePoint for the parties

15   and I'm going to share on my screen a document that I've

16   identified as GC Exhibit 50.  I didn't pre-mark it but I

17   will -- I will edit that later.

18   Q     BY MR. JACKSON:  Can you tell us, Mr. Palmer, if this is

19   the Truthout article that you testified about earlier?

20   A     Yes.

21         MR. JACKSON:  And bear with me for one second, Your Honor.

22   I'm going to stop my share just momentarily.  Hold on.  Okay.

23   Let me resume my share-screen.  Okay.

24   Q     BY MR. JACKSON:  Now, do you see on your screen here a

25   paragraph that begins, "at this point, Palmer says"?



# Exhibit E, Motion to Try Petition on Hearing Record

1   A   Yes.

2   Q   Is this the quote that you were testifying about earlier?

3   A   Yes.

4   MR. JACKSON:  Okay.  I'll move for the admission of GC-50.

5   JUDGE GREEN:  Any objection?

6   MS. AHMAD:  No objection, Your Honor.

7   JUDGE GREEN:  Okay.  So GC-50 is admitted.

8   **(General Counsel Exhibit Number 50 Received into Evidence)**

9   Q   BY MR. JACKSON:  Now, you're no longer afraid of

10  retaliation by Amazon.  Was there ever a point where you were?

11  A   Yes.

12  Q   When was that?

13  A   That was, you know, after I received my -- my final write-

14  up.

15  Q   I'm going to show you GC-50 again.  Will you read the

16  relevant portion of the article?

17  MS. AHMAD:  Your Honor, can he be more specific as to what

18  the relevant portion is?  I mean, Mr. Jackson has --

19  MR. JACKSON:  Yes, the paragraph -- the paragraph that

20  begins, "at this point, Palmer says".

21  Q   BY MR. JACKSON:  Can you read that out loud please, Mr.

22  Palmer?

23  A   Oh.  "At this point, Palmer says he's not worried about

24  further retaliation since he's already in the public spotlight

25  for speaking out against the company's attempt to punish him



1    for his organizing efforts."

2    Q    Okay.  And did you say something to that effect to a

3    reporter for Truthout?

4    A    Yes.

5    Q    Okay.  Oh, I have another question about your time in the

6    cafeteria.  Were you able to remain -- most of the time remain

7    six feet apart from other people during the 30 hours you spent

8    in the cafeteria between 20 -- March 25 and March 27?

9    A    Yes.

10   Q    And did you attempt to maintain at least six feet of

11   distance the entire time while you were in the cafeteria on

12   those days?

13   A    Yes.

14   Q    All right.  You testified about a situation you observed

15   in which you heard an employee call another employee a "dike"

16   during an argument.  Do you --

17   A    Yes.

18   Q    -- recall that testimony?

19   A    Yes.

20   Q    Do you -- do you recall seeing either of the individuals

21   involved in that argument remaining employed at JFK8 after you

22   observed the argument?

23   A    Yes.

24   Q    Do you believe that they were terminated because of that

25   argument?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    You testified that -- under questioning from Amazon's

3    attorney that you heard employees call each other things worse

4    than "gutter bitch".  Do you recall that testimony?

5    A    Yes.

6    Q    Okay.  Now, will you please tell us all of the things you

7    consider worse than "gutter bitch" that you recall employees

8    calling each other?

9    A    I feel like "piece of shit" is what I've heard.  I feel

10   like that's worse.

11   Q    Okay.  Let's start with that one.  With -- when do you --

12   can you tell us approximately when you heard an employee call

13   someone else a "piece of shit"?

14   A    Man -- every year that I've been with Amazon, from 2015

15   to -- to now I've heard that.

16   Q    And when you heard it, did you -- in your estimation, was

17   this said in a joking manner?  Or was this a serious comment?

18   A    No, this was serious.

19   Q    Okay.  And do you know if any supervisor or manager

20   observed any of these instances when you observed someone call

21   another employee a "piece of shit"?

22   A    The "piece of shit" part, no, but the -- the "cunt", I've

23   heard, you know, a manager -- a manager heard that.

24   Q    Okay.  So you don't know if a manager observed the same

25   interaction that you saw when someone called another employee a



Exhibit E, Motion to Try Petition on Hearing Record

1    "piece of shit"?

2         MS. AHMAD:  Objection, Your Honor.  Mischaracterized his

3    testimony.

4         THE WITNESS:  Wait.  We're -- we're --

5         JUDGE GREEN:  Okay.

6         MR. JACKSON:  Yes.

7         JUDGE GREEN:  So overruled.  I -- overruled.

8    Q    BY MR. JACKSON:  Yeah.  So my question, if you didn't

9    understand it, Mr. Palmer, was:  Do you know whether any

10   supervisor or manager observed the interaction that you

11   observed when an employee called another a "piece of shit"?

12   A    No, not for a "piece of shit".  No.

13   Q    Okay.  Do you recall any other slurs or bad names that any

14   employees called that were worse than "gutter bitch"?

15   A    Well, I -- I feel like "piece of shit" is the worst.  I've

16   heard -- there's so many terms.  Like, "African booty

17   scratcher".  I heard that.

18   Q    African what?

19   A    "African booty scratcher".  I've heard that.

20   Q    Okay.

21   A    That's an old term, but I've heard that at work.  I've

22   heard -- I mean, I -- there's so many.  It's -- it -- you know,

23   it's been so many years.  Like, I've heard every curse word you

24   can really think of on the floor.

25   Q    Okay.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1          MR. JACKSON:  No further questions, Your Honor.

 2          JUDGE GREEN:  Mr. Kearl, do you have anything?

 3          MR. KEARL:  Just very, very quickly, Your Honor.

 4                      RECROSS-EXAMINATION

 5     Q    BY MR. KEARL:  So just to clarify the record, did -- did

 6     anyone tell you about the existence of a social distancing

 7     policy at JFK8 before April 10th, 2020?

 8     A    No.

 9     Q    Okay.  And can you explain -- you said that the final

10     write-up was no longer on your record.  How long was the final

11     write-up on your record?

12     A    For 90 days.

13     Q    90 days.  And did it automatically leave your record?  Or

14     did someone remove it from your record?

15     A    It's supposed to be automatically removed after 90 days.

16     Q    Okay.  So you never had a conversation with someone where

17     they said they were going to take that down.  It was just timed

18     out?

19     A    No.

20     Q    Okay.  And over the course of those 90 days, you were on a

21     final written warning.  And so any subsequent write-up would

22     have resulted in your termination; is that correct?

23     A    Yes.

24     Q    Okay.  And were you subject to the policies of the -- the

25     time-off tasks and rate while you were off-duty in the
```



1    cafeteria during the days on the 25th, 26th, and 27th of May

2    2020 when you were waiting to hear back from managers?

3        MS. AHMAD:  Objection, Your Honor.  This is far beyond the

4    scope of cross.  These terms were never raised by me in my

5    cross-examination.

6        JUDGE GREEN:  Sorry.  Can you -- can you repeat the

7    question?

8        MR. KEARL:  Were you subject to policies of -- of -- that

9    you would normally be subject to while working on the floor,

10    such as rate and time-off tasks, while you were in the

11    cafeteria waiting for a response from managers on March 25th,

12    26th, and 27th of 2020?

13        MS. AHMAD:  Same objection, Your Honor.

14        JUDGE GREEN:  Yes.

15        MS. AHMAD:  It's far beyond the scope of cross-

16    examination.

17        JUDGE GREEN:  Yeah, okay.

18        MS. AHMAD:  He -- this goes right back into the health and

19    safety issues that we've taken off the table beyond the extent

20    to which they've already been inquired about.

21        JUDGE GREEN:  Honestly, I -- I -- I heard the question --

22        MR. KEARL:  I'll --

23        JUDGE GREEN:  -- twice and I still didn't understand it.

24    So I mean --

25        MS. AHMAD:  Your Honor, respectfully, I -- there are --



1    he's using terms of art, time-off tasks and productivities,

2    that have not been --

3         JUDGE GREEN:  Okay.

4         MS. AHMAD:  -- discussed once in Mr. Palmer's testimony,

5    certainly not on cross-examination, and therefore,

6    inappropriate as redirect, secondly, are simply not relevant to

7    the nature of the --

8         MR. KEARL:  I'll withdraw the question.  I'll withdraw the

9    question.

10        MS. AHMAD:  -- case, unless they -- and the issues.

11        MR. KEARL:  I'll withdraw the question.

12   Q    BY MR. KEARL:  Have there been any other comments that

13   Amazon has made to you or any other employees about the union

14   drive that's currently happening?

15        MS. AHMAD:  Objection.

16        JUDGE GREEN:  About a union drive?

17        MS. AHMAD:  Again, beyond the scope of cross-examination,

18   Your Honor.

19        MR. KEARL:  Ms. Ahmad asked Mr. Palmer if he had set up

20   out front to get signatures in the facility and whether or not

21   he feared retaliation.  And my question was whether or not in

22   the course of those efforts that Mr. Palmer was undertaking

23   there has been comments or statements made to other workers

24   about the efforts that Mr. Palmer was undertaking.

25        MS. AHMAD:  I didn't understand that's what union drive



Exhibit E, Motion to Try Petition on Hearing Record

1    meant, Your Honor.  I -- I agree that I did ask about that.

2         JUDGE GREEN:  Okay.

3         THE WITNESS:  To answer your question:  The first day when

4    we were setting up our tent, there was a guy -- I believe he

5    was a -- I don't know if he was a manager or not, but he was

6    from the other facility that's across the street from JFK8.

7    And he walked up to us.  And he said that we can't set up this

8    tent here because it's private property.

9         But we told him that it's public property because it's

10   the -- it's the MT -- it's the public road and MTA -- has a MTA

11   bus stop right next to it.  And he kept saying, no, no, no, no,

12   no.  You can't do that.  You can't -- you can't do any of that

13   here.  And we just said no.  Like, you're wrong.  Like, we can

14   do that.  So that was being told.  As far as the union

15   busting -- you know, there's been union busting going on in

16   JFK8.

17   Q    BY MR. KEARL:  Thank --

18   A    The unit sign said -- basically saying not to sign up --

19   telling workers not to sign up for the union because if they

20   do, then they can -- they can, like, lose their -- what do you

21   call that?  They'd lose their right to speak.  So yes.

22   Q    Okay.  And just to clarify, the photographs of you outside

23   the facility -- were you standing in that place for the

24   duration of the protest?  Or were you moving around throughout

25   the course of your time outside the facility?



Exhibit E, Motion to Try Petition on Hearing Record

```
1    A    I was moving around.

2    Q    So those photos represent a single moment in time during

3    those protests?

4    A    Yes.

5    Q    Okay.

6         MR. KEARL:  I do not believe I have any other questions.

7         MS. AHMAD:  Your Honor, I just have two to three

8    questions.

9         JUDGE GREEN:  Okay.

10                      RECROSS-EXAMINATION

11   Q    BY MS. AHMAD:  Mr. Palmer, you were asked by Mr. Jackson

12   about the March 25th meeting.  And I believe you testified that

13   when you entered the room, five managers were present, but they

14   left.  And -- and only Sai Kotha and Christine Hernandez

15   stayed; is that correct?

16   A    Yes.

17   Q    Okay.  Approximately how long after you entered the

18   production -- after you entered the management office on March

19   25th did all managers other than Sai Kotha and Christine

20   Hernandez leave?

21   A    Pretty much right after we walked in -- like, we walked in

22   and we, you know, gathered around.  And that's when they left.

23   Q    Was it before or after you began speaking about your

24   concerns?

25   A    This was before.
```



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Okay.  And I believe Mr. Jackson asked you on redirect

2   with res -- about the -- the interaction you heard between two

3   employees where the term "dike" was used; do you recall that?

4   A    Yes.

5   Q    And who were those employees involved in that interaction?

6   A    I just said I don't know their names.

7   Q    Do you know what departments they worked in?

8   A    I believe it was stow.

9   Q    Okay.  They both worked in stow?

10  A    Yes.

11  Q    Okay.  And do you remember seeing both of them at the

12  facility after the point in time of that interaction?

13  A    Yes.

14  Q    And I believe Mr. Jackson asked you about your comments to

15  Truthout.  Do you recall that?

16  A    Yes.

17  Q    And do you recall being asked about the quote where you

18  spoke about no longer fearing retaliation because you -- from

19  Amazon because you were in the public spotlight?

20  A    Yes, that's what I said.

21  Q    And I'm directing your attention back to March 30th of

22  2020.  Did you give an interview with NBC News that day?

23  A    I believe so, yes.

24  Q    Okay.  Was that interview broadcast?

25  A    Was it broadcast?



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Yes.

2    A    Yeah.  There -- there was an article about it.

3    Q    And did you speak to other media outlets that day?

4    A    Yes, I did.

5    Q    Okay.  And directing your attention now to April 6th of

6    2020, did you appear on Mr. Flowers' Facebook Live video?

7    A    I believe it was, like, a short appearance, yeah.

8    Q    And were you -- did you speak with other media outlets --

9    A    That day --

10   Q    -- on that day?  Yes.

11   A    That day, no.

12   Q    Okay.  Did you speak with other media outlets in March

13   2020?

14   A    Yeah, the -- didn't you just ask me that?

15   Q    I don't -- I was asking about if there were any other

16   incidences.  And I mean -- I'm sorry.

17        MS. AHMAD:  I'll withdraw that.

18   Q    BY MS. AHMAD:  And I'll ask about April 2020.  So other

19   than the March 30th interactions with media that you told me

20   about, did you speak with other media outlets in April 2020?

21   A    You're talking about April 6th or April in general?

22   Q    April 2020 in general.

23   A    I'm not sure.  Might -- might have been more.

24   Q    Okay.  Do you recall being interviewed by media outlets

25   about Mr. Smalls' termination shortly after it happened?



1    A    That I don't -- wait.  Right after he was fired?

2    Q    Within the following week or two.

3    A    I'm not -- I'm not sure honestly.  To be honest with you,

4    I'm not sure.

5         MS. AHMAD:  All right.  Your Honor, I have no further

6    questions.  Thank you.

7         JUDGE GREEN:  Okay.  Mr. Jackson?

8         MR. JACKSON:  Just one moment, Your Honor.

9                   **FURTHER REDIRECT EXAMINATION**

10   Q    BY MR. JACKSON:  Okay.  Mr. Palmer, these employees who

11   were engaged in the argument where the word "dike" was

12   exchanged do -- you don't know their names, correct?

13   A    No.

14   Q    Do you know them by sight?  Would you be able to identify

15   them?

16   A    Yeah, if I were to see -- if I were to see them again,

17   yeah.

18   Q    Okay.

19        MR. JACKSON:  No further questions.

20        JUDGE GREEN:  Mr. Kearl?

21        MR. KEARL:  Yes, since it seems to be such a point of

22   contention, I have one -- one final point I'd like to make.

23                  **FURTHER RECROSS-EXAMINATION**

24   Q    BY MR. KEARL:  So Mr. Palmer, I'm going to pull up this

25   Truthout news article one last time.  Is it true that your



Exhibit E, Motion to Try Petition on Hearing Record

1    quote here refers to further retaliation?

2    A    Yes.

3    Q    And can you read for me this last -- last para -- the last

4    sentence of your quote beginning with, "Smalls was already

5    fired"?

6         MS. AHMAD:  Your Honor, I don't understand why Mr. Palmer

7    would need to read into the record a document that has been

8    admitted.

9         JUDGE GREEN:  Wait.

10        MR. KEARL:  Your Honor, the --

11        JUDGE GREEN:  No, we're -- we're -- we're way past that --

12        MR. KEARL:  Okay.

13        JUDGE GREEN:  -- not to mention the fact that we've got

14   Mr. Palmer here to ask quest -- ask questions.

15        MR. KEARL:  Okay.

16        JUDGE GREEN:  We don't need to be reading about him in

17   news articles.

18        MR. KEARL:  Okay.  Just one last thing then.

19   Q    BY MR. KEARL:  Mr. Palmer, can you tell me -- just read to

20   yourself, this paragraph right -- right here that begins with

21   LTCIW (phonetic).  And can you explain to me if this tells

22   about another incident of retaliation that you experienced in

23   February of 2021?

24   A    That --

25        MS. AHMAD:  Your Honor, objection to the leading and



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1   introducing a new topic that was not asked about on cross or

2   re-cross.

3        JUDGE GREEN:  Sustained.

4        MR. KEARL:  Okay.  Well, okay.  Then, to the extent that

5   this article's already in the record, I -- I just encourage

6   you, Judge, to read it for full context and not accept the

7   mischaracterization that was presented.  No further questions.

8        JUDGE GREEN:  Okay.  All right, Mr. Palmer.  You are free

9   to go.  Thank you very much for your patience.

10       THE WITNESS:  All right.  Thank you.

11       JUDGE GREEN:  Okay.  So we're going to be done for today.

12   And we are off for -- we are off the 6th; we're off the 7th.

13   We're back on the 10th.  We're back on the 10th.  Does anybody

14   have any sense of where we are in this thing?  Why don't we go

15   off the record?

16   (Off the record at 6:08 p.m.)

17       JUDGE GREEN:  Okay.  So back on the record.  Okay.  And so

18   we -- we had a discussion regarding the schedule.  And it

19   appears that we are probably going to go straight through next

20   week from the 10th to the 14th.  And it's entirely possible

21   that we're going to have additional days into the week of May

22   17th.  And all parties are inclined to want that schedule, so

23   that's what we're going to do.

24       Okay.  Off the record.  We'll resume Monday, May 10th at

25   10:00.  Thank you very much.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1          MR. JACKSON:  Thank you, Your Honor.

2          MR. KEARL:  Thanks.

3          MS. AHMAD:  Thank you, Your Honor.

4          JUDGE GREEN:  Thanks.

5      **(Whereupon, the hearing in the above-entitled matter was**

6      **recessed at 6:12 p.m. until Monday, May 10, 2021 at 10:00 a.m.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1
### C E R T I F I C A T I O N

2
This is to certify that the attached proceedings, via Zoom

3
videoconference, before the National Labor Relations Board

4
(NLRB), Region 29, Case Number 29-CA-261755, Amazon.Com

5
Services, LLC, and Gerald Bryson, held at the National Labor

6
Relations Board, Region 29, Two Metro Tech Center North, 5th

7
Floor, Brooklyn, New York 11201,, on May 5, 2021, at 10:08 a.m.

8
was held according to the record, and that this is the

9
original, complete, and true and accurate transcript that has

10
been compared to the reporting or recording, accomplished at

11
the hearing, that the exhibit files have been checked for

12
completeness and no exhibits received in evidence or in the

13
rejected exhibit files are missing.

14

15

16

17
_____

18
BARRINGTON MOXIE

19
Official Reporter

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services LLC,          Case No.     29-CA-261755

        Employer/Respondent,

and

Gerald Bryson,

        An Individual.

_____

_____

Place: Brooklyn, New York (via Zoom videoconference)

Dates: May 10, 2021

Pages: 825 through 980

Volume: 7

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

Exhibit E, Motion to Try Petition on Hearing Record

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

In the Matter of:

AMAZON.COM SERVICES LLC,          Case No.      29-CA-261755

       Employer/Respondent,

and

GERALD BRYSON,

       An Individual.

The above-entitled matter came on for hearing via Zoom videoconference, pursuant to notice, before **BENJAMIN W. GREEN**, Administrative Law Judge, at the National Labor Relations Board, Region 29, Two Metro Tech Center North, 5th Floor, Brooklyn, New York 11201, on **Monday, May 10, 2021, 10:05 a.m.**

Exhibit E, Motion to Try Petition on Hearing Record

1                          A P P E A R A N C E S

2      On behalf of the Charging Party:

3          FRANK KEARL, ESQ.
           MAKE THE ROAD NEW YORK
4          161 Port Richmond Avenue
           Staten Island, NY 10302
5          Tel. (929)265-7692

6      On behalf of the Employer:

7          CHRISTOPHER J. MURPHY, ESQ.
           JENNIFER M. WILLIAMS, ESQ.
8          RICHARD ROSENBLATT, ESQ.
           MORGAN, LEWIS & BOCKIUS, LLP
9          1701 Market Street
           Philadelphia, PA 19103-2901
10         Tel. (215)963-5601

11         NICOLE BUFFALANO, ESQ.
           MORGAN, LEWIS & BOCKIUS, LLP
12         300 South Grand Avenue
           22nd Floor
13         Los Angeles, CA 90071
           Tel. (213)612-7443
14
           KELCEY J. PHILLIPS, ESQ.
15         MORGAN, LEWIS & BOCKIUS, LLP
           1111 Pennsylvania Avenue, NW
16         Washington, DC 20004
           Tel. (202)739-5455
17
           JASON SCHWARTZ, ESQ.
18         ZAINAB AHMAD, ESQ.
           GIBSON, DUNN & CRUTCHER LLP
19         200 Park Avenue
           New York, NY 10166-0193
20         Tel. (212)351-3893

21     On behalf of the General Counsel:

22         EVAMARIA COX, ESQ.
           MATTHEW JACKSON, ESQ.
23         NANCY REIBSTEIN, ESQ.
           NATIONAL LABOR RELATIONS BOARD, REGION 29
24         Two Metro Tech Center, 5th Floor
           Brooklyn, NY 11201
25         Tel. (718)765-6172



Exhibit E, Motion to Try Petition on Hearing Record

1                          I N D E X

2

3  | WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
   | --- | --- | --- | --- | --- | --- |
4  | Mandi Velasco | 841 | 896,900 | 953 | 958,960 | |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

escribers
www.escribers.net | 800-257-0885

1                    **E X H I B I T S**

2

3        **EXHIBIT**                    **IDENTIFIED**    **IN EVIDENCE**

4        **General Counsel:**

5           GC-51                          867              868

6           GC-52                          885              889

7           GC-53                          955              958

8

9        **Respondent:**

10          R-102                          903          Not Admitted

11          R-122                          931              934

12

13       **Charging Party:**

14          CP-3                           962              964

15          CP-4                           962              964

16          CP-6                           959          Not Admitted

17

18

19

20

21

22

23

24

25



1          P R O C E E D I N G S

2          JUDGE GREEN:  Okay, so we're back on the record in the

3     matter of Amazon.com Services, LLC, case 29-CA-261755.  It is

4     May 10th.  So I just want to confirm what the parties just

5     discussed off the record.  We are going to be off on Wednesday,

6     May 12th, 2021, and we may be stopping early on Monday, May

7     17th, 2021, as well, so everybody should be prepared for that.

8          So Ms. Cox, what do you have for us today?

9          MS. COX:  Judge Green, before we proceed with the witness,

10     I just want to -- I just want to mention that we received some

11     investigative files over the weekend that were produced in an

12     unusable manner.  They're heavily redacted.  They make it

13     exceedingly difficult to relate to the disciplines that have

14     been produced, and what has been produced is not fully

15     responsive.  It fails to include decision-maker communications

16     and deliberations, and that's with regard to paragraph 16 of

17     the first subpoena that issued on March 1st, 2021.

18          JUDGE GREEN:  So I thought investigative files was

19     paragraph 18, and --

20          MS. COX:  I'm sorry.

21          JUDGE GREEN:  Am I --

22          MS. COX:  It's actually --

23          JUDGE GREEN:  -- wrong about that?

24          MS. COX:  It's paragraph 18, Judge.

25          JUDGE GREEN:  And I thought deliberative documents was



1    paragraph 14.

2        MS. COX:  Deliberative documents regarding Bryson and

3    Evans is paragraph 14, but the investigative files as it

4    relates to other employees is paragraph 18.

5        JUDGE GREEN:  Okay.  So does the re -- would the

6    Respondent like to tell me a bit about that, what -- what

7    happened with regard to these -- these files that were produced

8    in response to subpoena paragraph 18 of the -- of the General

9    Counsel's original subpoena?

10       MS. BUFFALANO:  We have provided -- so we provided what is

11   in the investigative files.  To the extent that there are not

12   deliberative documents, then they -- we don't have them is my

13   understanding, and I'm happy to sort of double-check, but my

14   understanding is that what we've produced is everything that

15   exists in the investigative files.

16       JUDGE GREEN:  What about the redactions?

17       MS. BUFFALANO:  Well, my understanding is that the

18   redactions are similar -- you know, just similar information

19   that is redacted in the feedback themselves is what is redacted

20   in the investigative files.  Anything that would identify

21   witnesses or identify individual employees is redacted.

22       MR. SCHWARTZ:  Your Honor, I -- I apologize for

23   interrupting.  It appears that there's a witness in the room.

24       JUDGE GREEN:  Okay.

25       MS. COX:  That is correct, Judge.



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. SCHWARTZ:  Can we have that person excluded?

2    JUDGE GREEN: Yes, I will put that person in the waiting

3    room.

4    MR. SCHWARTZ:  Thank you, Your Honor.  Apologize for the

5    interruption.

6    JUDGE GREEN:  Who is it?

7    MS. COX:  It's Ms. Velasco.

8    JUDGE GREEN:  Ms. Velasco.  Okay, Ms. Velasco, I'm just

9    going to put you in the waiting room for a moment.  We'll --

10   somebody will contact you and we'll let you back in when it's

11   the appropriate time, okay?  So put in waiting room.  There she

12   goes.

13   Okay.  So I didn't -- I -- I didn't order redactions of

14   this sort.  That's not what I ordered.  What I ordered -- well,

15   I -- I ordered a -- well, I essentially issued a protective

16   order that said that this type of information should not be

17   disclosed to people other than counsel for the parties.  So to

18   the extent that the parties came up with some kind of agreement

19   regarding this, that's fine, but otherwise, I don't see that

20   these documents should be redacted.  What's the basis for

21   redacting them?

22   MS. BUFFALANO:  That we're going to end up with a record

23   full of identification of employees as witnesses to events, as

24   having been subjected --

25   JUDGE GREEN:  We can --



Exhibit E, Motion to Try Petition on Hearing Record

1       MS. BUFFALANO:  -- to --

2       JUDGE GREEN:  -- right --

3       MS. BUFFALANO:  -- questions --

4       JUDGE GREEN:  -- we can -- we can try to deal with that

5   for when we put the -- the documents into evidence, and again,

6   there's a protective order.  So this is not what I

7   contemplated, and it -- and it's -- it's not what should be

8   happening.  Documents shouldn't be redact -- if the General

9   Counsel agrees to it, I don't have any problem with that, but

10  it doesn't sound like they do.

11      MS. COX:  No, Judge.

12      JUDGE GREEN:  So documents should not be redacted to the

13  extent that they don't disclose employees' names.  That was

14  never the intent of the protective order, and it shouldn't be

15  done, and -- and to the extent that it hasn't been done, those

16  redactions -- redactions should be removed.

17      MS. BUFFALANO:  So can -- Ms. Cox, what if we identify to

18  the extent this is not clear the personnel files and/or

19  disciplines that are related to the investigative files?  Does

20  that --

21      MS. COX:  You --

22      MS. BUFFALANO:  -- resolve --

23      MS. COX:  At some --

24      MS. BUFFALANO:  -- the issue?

25      MS. COX:  No, it doesn't because to some extent, there --



Exhibit E, Motion to Try Petition on Hearing Record

1    that's been done, and there's a chart that identifies the Adapt

2    file and the investigative file but it is exceedingly confusing

3    when there's no name and I'm just going back and forth between

4    different numbers.

5        JUDGE GREEN:  Right.  To the extent that there might --

6    the General Counsel might need to know, okay, it's this person

7    in the investigation files and checking disciplines and

8    checking personnel file, all of which is -- is different, and

9    they may very well be cross-referencing.

10       Really, this shouldn't have been done.  There's no basis

11   for doing this, and really, you know, I -- I don't want to

12   spend a lot of time with it other than for the Respondent to

13   get rid of the redactions.  It -- it -- I -- I don't have a

14   problem -- the General Counsel may very well agree that, for

15   purposes of documents going on the record, they should be

16   redacted because generally the General Counsel is also

17   interested in protecting pra -- employees' confidentiality

18   concerns, but that -- that's different than producing

19   subpoenaed documents to the part -- to the subpoenaed party

20   with redactions.  So I really don't want to discuss it much

21   further.  Just -- just reproduce them without the redactions.

22       MS. BUFFALANO:  Do you -- okay.  And do you want a -- Ms.

23   Cox, is it everything?  Are there, like, certain things?

24       MS. COX:  So we will -- we can discuss off the record.

25   I'm -- you know, at this point, it's just been a huge



# Exhibit E, Motion to Try Petition on Hearing Record

1    hinderance to putting on our case, and it's lack of compliance

2    with the subpoena, quite frankly.  It's -- we -- we have no

3    objections to redactions of addresses, obviously, no objections

4    to redactions of phone numbers that are in these investigative

5    files, but anything that's not personally sensitive identifying

6    information, it's just our position that it should not be

7    redacted.

8         MS. BUFFALANO:  Yeah, okay.  Well, let's talk about it

9    during a break in terms of what -- whether it's everything or

10   whether there are certain things, but we can do that, I think,

11   at -- at a break or at lunch.

12        MS. COX:  We --

13        JUDGE GREEN:  Okay.

14        MS. COX:  -- anything that -- anything that's not

15   personally identifying information.

16        JUDGE GREEN:  So I think what she's basically saying is --

17   Ms. Cox is saying is that there shouldn't be a delay in doing

18   this.  It's already coming in af -- you know, after the date

19   contemplated.  You know, I -- I would urge the Respondents to

20   just do this quickly and not wait for further consultation with

21   the General Counsel.  Just do it.  Do it and let's get it done

22   with, and that -- that way we could -- we could deal with

23   confidentiality, the interests later to the extent we're --

24   we're possibly going to deal with how that -- that information

25   goes into the record, but -- but just for purposes of



# Exhibit E, Motion to Try Petition on Hearing Record

1    production pursuant to the subpoena, it really just -- we

2    should just get rid of these redactions and produce.

3        MS. BUFFALANO:  Okay.

4        MR. JACKSON:  Judge, can -- can you also order a date

5    certain when this should be done or at least a time certain?

6    You know, I think the pattern has been for Respondent to take

7    as much leeway as it can in -- in -- in terms of pushing the

8    envelope and in terms of hiding documents responsive to the

9    subpoenas, so I think it's really incumbent on Your Honor to --

10       JUDGE GREEN:  Yeah, so --

11       MR. JACKSON:  -- come up with a date.

12       JUDGE GREEN:  -- the answer to that, I'm sorry to say,

13   I -- I -- we had this discussion or I've thought about it

14   since -- since.  The problem here is that we don't know how

15   long this stuff takes.  We -- we don't know.  To the extent

16   that the Respondent does not produce documents and does not

17   have a reason for it, or produces documents that ha -- are

18   redacted and doesn't have a -- a proper reason for it, it puts

19   them at risk.  It puts them at risk of sanctions, and they --

20   they have a natural disincentive not to do it.  I -- I just --

21   I -- I just think it's -- it's a waste of -- it's a futile

22   effort to try and designate a specific day for these types of

23   things.  Do it as fast as possible.  I don't think that it

24   should take too long to -- to -- to unredact these documents.

25   Do it as fast as you can, for your own sake, you know.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MS. BUFFALANO:  Yeah, we hear you.  I would -- I would
 2   like -- obviously, I think the record does reflect this, but as
 3   Ms. Cox indicated, there is no, like, hiding the ball.  We did
 4   indicate which documents went with which documents, and so
 5   there was no effort to sort of hide anything except the
 6   identities and protect the confidentiality of the individuals
 7   involved in the incident, whether they were witnesses or
 8   victims or accusers or accused, right?  So I just think it's
 9   worth noting.
10        JUDGE GREEN:  Okay.
11        MR. JACKSON:  And Your Honor --
12        JUDGE GREEN:   (Indiscernible, simultaneous speech) --
13        MR. JACKSON:  -- it's also worth noting that that's no
14   small matter.  It effectively prevented the General Counsel
15   from being able to evaluate these documents in any meaningful
16   way, so it's no small matter that Ms. Buffalano seems to just
17   dismissively and flippantly dismiss.  You know, it's -- it's
18   basically handcuffed us with our hands behind our back, sir,
19   and you know, I think we are really showing another -- yet
20   another example of noncompliance with the subpoena that
21   warrants sanctions.
22        JUDGE GREEN:  Okay, so you often say -- talk about
23   sanctions, but you don't actually have any specific requests
24   for what those sanctions should be.  Let's move on.  Let's move
25   on.  What do we have today?
```



# Exhibit E, Motion to Try Petition on Hearing Record

```
1        MS. COX:  I'm calling Ms. Velasco, Judge Green.

2        JUDGE GREEN:  Okay.

3        MR. SCHWARTZ:  Your Honor, can we ask how many witnesses

4   are anticipated today?

5        JUDGE GREEN:  Do we know?

6        MS. COX:  Two, Judge.

7        JUDGE GREEN:  Okay.  By the way, who is that speaking?

8   Oh, that's --

9        MR. SCHWARTZ:  I --

10       JUDGE GREEN:  -- Mr. Schwartz.

11       MR. SCHWARTZ:  I apologize, Your Honor.  Jason Schwartz --

12       JUDGE GREEN:  Okay.

13       MR. SCHWARTZ:  -- on behalf of Amazon.

14       JUDGE GREEN:  I'm sorry.  I see you in the corner, there.

15       MR. SCHWARTZ:  Thank you.

16       JUDGE GREEN:  Okay.

17       MR. SCHWARTZ:  And -- and if I might ask, I -- I'm not

18  sure why it has to be the greatest mystery of the century, but

19  given that we're trying to prepare with multiple lawyers, can

20  we have the identity of the second witness who's expected to be

21  called today.  It doesn't seem to me it needs to be a huge

22  mystery.

23       MS. COX:  No, you cannot, Mr. Schwartz.

24       JUDGE GREEN:  Mr. Schwartz, are you --

25       MR. SCHWARTZ:  Your Honor, just for the -- the efficient
```



Exhibit E, Motion to Try Petition on Hearing Record

```
1    operation of the --

2         JUDGE GREEN:  Mr. Schwartz --

3         MR. SCHWARTZ:  -- proceedings, I -- I -- I don't --

4         JUDGE GREEN:  Right --

5         MR. SCHWARTZ:  -- understand --

6         JUDGE GREEN:  -- so I --

7         MR. SCHWARTZ:  -- why this needs to be an ambush, Your

8    Honor.

9         JUDGE GREEN:  Yeah, I mean, listen, the General Counsel

10   doesn't have to disclose.  It's my understanding that there are

11   two more witnesses for the General Counsel.  It's hard for me

12   to imagine that they're not going to put on the Charging Party

13   at some point, so I would be shocked if it wasn't the Charging

14   Party.

15        MR. SCHWARTZ:  Is -- is it still the General Counsel's

16   position that there are only two witnesses left in its case-in-

17   chief?

18        JUDGE GREEN:  Is that true?

19        MS. COX:  I don't have to make any represent --

20        JUDGE GREEN:  No, why don't you say it?

21        MS. COX:  Judge Green, because --

22        JUDGE GREEN:  Just say it.

23        MS. COX:  Yes, yes.

24        JUDGE GREEN:  Okay.

25        MR. SCHWARTZ:  Thank you --
```



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  So --

2      MR. SCHWARTZ:  -- Your Honor.

3      JUDGE GREEN:  -- are you with Morgan, Lewis or --

4      MR. SCHWARTZ:  Oh, no, with the -- with the Gibson Dunn

5      firm.

6      JUDGE GREEN:  Oh --

7      MR. SCHWARTZ:  Yeah.

8      JUDGE GREEN:  -- okay.  I just needed to --

9      MR. SCHWARTZ:  Thank --

10     JUDGE GREEN:  -- ask, yeah.

11     MR. SCHWARTZ:  -- you, sir.

12     JUDGE GREEN:  Thank you.  Thank you.

13     MR. JACKSON:  And Your Honor, I just want to clarify what

14     Ms. Cox just said.  To the extent that our current plan is to

15     call two more witnesses, that's correct, but we reserve the

16     right to call additional witnesses if there need -- if the

17     case --

18     JUDGE GREEN:  Understood.

19     MR. JACKSON:  -- (indiscernible, simultaneous speech).

20     Thank you.

21     JUDGE GREEN:  Understood, and -- and listen, as far as I

22     can tell, the subpoena issues are not going away any time soon,

23     and so am I right the General Counsel's not going to close?

24     The General Counsel's just done with witnesses for their case-

25     in-chief to the extent you understand that given what documents



1    you have.  Am I right about that?

2        MS. COX:  That is true -- that is correct, Your Honor.  We

3    may call additional witnesses given those subpoena issues.

4        JUDGE GREEN:  Okay.  That's where we stand.  Okay, so let

5    me let Ms. Velasco back into the room.

6        Okay, so Ms. Velasco, could you start your video so we can

7    see you?  Can you hear us?  Has to start video.  There we go.

8    Hello, Ms. Velasco.  Can you hear us?

9        MS. VELASCO:  Yes, I'm here.  I'm sorry.  Trying to --

10       JUDGE GREEN:  Okay.

11       MS. VELASCO:  -- set up -- my niece is home from her

12   school.  I'm trying to --

13       JUDGE GREEN:  Okay.

14       MS. VELASCO:  -- find a place where I'm not getting

15   interrupted by her.

16       JUDGE GREEN:  We understand that this is not that easy in

17   the age of --

18       MS. VELASCO:  No.

19       JUDGE GREEN:  -- home video trials.  Okay, so the General

20   Counsel is calling you as a witness, so could you please raise

21   your right hand?

22   Whereupon,

23                        **MANDI VELASCO**

24   having been duly sworn, was called as a witness herein and was

25   examined and testified, telephonically as follows:



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay, thank you very much.  So are you

2    currently alone in the room?

3    THE WITNESS:  Yes, I'm about to shut the door now.  Give

4    me one second.  Wait.

5    Sam, I'm in Mom's room, but please just try not to bother

6    me.  Okay.

7    JUDGE GREEN:  Okay.

8    THE WITNESS:  (Indiscernible, simultaneous speech) --

9    JUDGE GREEN:  So please -- please don't communicate with

10   anybody by a phone or other handheld device.  Just communicate

11   with those people who are asking you questions and talking to

12   you in this forum.  Also, please don't refer to any written

13   materials other than what's shown to you by counsel or if for

14   some reason somebody directs you to look at something, then --

15   then you can look at it, but otherwise, don't -- don't look at

16   anything else, okay?

17   THE WITNESS:  Okay.  Okay.

18   MR. MURPHY:  Judge Green, this is Mr. Murphy.  I'll be

19   handling this witness, at least on her direct.

20   JUDGE GREEN:  Okay.  Okay.  All right, so any time you're

21   ready, Ms. Cox.

22   MS. COX:  Okay.

23                          **DIRECT EXAMINATION**

24   Q    BY MS. COX:  Good morning, Ms. Velasco.  How are you

25   today?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Good morning.  I'm good.  How are you?

2    Q    Good, thank you.  Can you please state and spell your full

3    name for the record?

4    A    Mandi Velasco, M-A-N-D-I V-E-L-A-S-C-O.

5    Q    Okay.  Are you currently employed?

6    A    Yes.

7    Q    Who do you work for?

8    A    I work for Staten Island facility warehouse JFK8 Amazon.

9    Q    And what kind of facility is JFK8?

10   A    It's a facility -- Amazon warehouse shipping packages.

11   Q    And when did you start working for Amazon?

12   A    I started working for Amazon in 2018.

13   Q    And what job were you hired to do?

14   A    I was a single packer.

15   Q    What were your duties as a single packer?

16   A    We packed one item in a box to have it shipped to the

17   customer.

18   Q    And did your job change at any point?

19   A    Yes, it recently changed three months ago.

20   Q    What is your job now?

21   A    They call it light duty.

22   Q    And what are your duties on light -- on your light duty

23   assignment?

24   A    When I walk in, I log in to one of their laptops and we --

25   well, me, I am squaring off furniture to size it for boxes.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    And who is your direct supervisor?

 2    A    Tatiana (phonetic).

 3    Q    Do you know Tatiana's last name?

 4    A    Cruz (phonetic).

 5    Q    And do you know Ms. Cruz's title?

 6    A    She is an operations manager.

 7    Q    And what is your work schedule?

 8    A    My work schedule is Sunday through Wednesday.

 9    Q    And are there other work schedules at Amazon?

10    A    Yes.

11    Q    What are the other work schedules?

12    A    There is a Thursday through Saturday shift, a donut shift.

13    They have part-time shift and a flex.

14    Q    Okay.  Are you familiar with the term "back half"?

15    A    Yes.

16    Q    What does that mean?

17    A    Back half is the Thursday through Saturday shift.

18    Q    Okay, and are you familiar with the term "front half"?

19    A    Yes, that is my shift, the Sunday through Wednesday.

20    Q    Okay.  And you said a donut shift.  Can you tell me what

21    days the donut shift falls on?

22    A    They -- the donut is Monday, Tuesday, Thursday, Friday.

23    Q    Okay.  And what about the part-time schedule?

24    A    Part time is just Saturday and Sunday.

25    Q    And the flex schedule?
```



Exhibit E, Motion to Try Petition on Hearing Record

1   A    Flex is we get to pick which days and hours we can go in.

2   Q    Okay.  Now, what shift do you work?

3   A    I work the front-half shift.

4   Q    What are the hours?

5   A    7 a.m. to 5:45 p.m.

6        MS. COX:  Judge Green, I intend to question the witness on

7   the physical layout of the facility.  We've had some testimony

8   on this topic already.  If you think the prior testimony is

9   sufficient, then I -- I won't question the witness on this

10  topic.

11       JUDGE GREEN:  I do think that the prior testimony was

12  sufficient.  I think we -- we have enough of that to understand

13  what happened for purposes of background.

14       MS. COX:  Okay, thank you, Judge.

15  Q    BY MS. COX:  So in March and April 2020, did you know

16  about the spread of coronavirus or the COVID-19 pandemic?

17  A    Yes.

18  Q    Okay, what did you know about COVID-19 at the time?

19  A    At the time of it starting, all I knew that it was a

20  illness.

21       MR. MURPHY:  Ob -- object -- objection, Your Honor.  It --

22  if I may, we -- we had hours of testimony of this sort from --

23  from Mr. Palmer.  I don't -- I don't know if you consider that

24  to be sufficient or adequate to -- to -- to present or preserve

25  the issue or --



Exhibit E, Motion to Try Petition on Hearing Record

1     JUDGE GREEN:  Agreed.  So --

2     MR. MURPHY:  -- we need to have it from this witness --

3     JUDGE GREEN:  -- so agreed.

4     MR. MURPHY:  -- as well.

5     JUDGE GREEN:  So I -- I really don't want to get into more

6     background other than if it's something new that I need in

7     order to understand the protected concerted activity or the

8     disciplined issue.  We've had that, and we've had that in

9     spades.

10    MS. COX:  Judge Green, but this goes to the witness's

11    involvement in protected concerted activity, and it relates

12    directly to the employees' concerns at the warehouse.

13    JUDGE GREEN:  Well --

14    MR. MURPHY:  Your Honor --

15    JUDGE GREEN:  -- if they --

16    MR. MURPHY:  -- she can -- oh --

17    JUDGE GREEN:  Right --

18    MR. MURPHY:  -- I'm sorry.

19    JUDGE GREEN:  -- she can -- she can testify to -- first of

20    all, she's not a prot -- she's not a charging party or a

21    discriminatee.  It's -- we -- we just -- we really don't need

22    it un -- unless it is going to relate some way to what was

23    discussed with the Charging Party that made for -- made the

24    protected concerted activity, but just -- just generic

25    background, we -- we really don't need more of that.  Maybe --



1    maybe we'll find out that we do and we can come back, but

2    really, let's -- let's get to the protected concerted activity

3    and get right into it at this point.

4         MS. COX:  Judge Green, these are -- these are issues that

5    were discussed with her coworkers.

6         JUDGE GREEN:  Okay, so get to that.  Have the -- you know,

7    to ask her about the discussions.  If I don't understand

8    those -- those discussions, we can move backwards, but we've --

9    we've had a lot of this, and I -- I really don't want to rehash

10   it.

11        MS. COX:  Okay, I'll move on.  Thank you, Judge.

12   Q    BY MS. COX:  Did the spread of COVID cause you any

13   concerns about your working conditions?

14   A    Yes, it did.

15   Q    What were your concerns?

16   A    I was afraid of getting sick and possibly bringing it home

17   to my, at the time, three-year-old and my mother-in-law, who I

18   lived with at the time, which has her own health issues.

19   Q    Were you concerned -- I'm sorry -- I'm going to ask you

20   some questions about what it was like being a single packer in

21   2020.

22   A    Okay.

23        MR. MURPHY:  Your Honor, I have the same objection here.

24   She's --

25        JUDGE GREEN:  Sustained.



Exhibit E, Motion to Try Petition on Hearing Record

1      MR. MURPHY:  -- (indiscernible, simultaneous speech) --

2  Q   BY MS. COX:  During March and -- and early April 2020, did

3      you see anyone cleaning employee workstations at --

4      MR. MURPHY:  Objection --

5  Q   BY MS. COX:  -- JFK8?

6      MR. MURPHY:  -- Your Honor.

7      JUDGE GREEN:  Sustained.

8      MR. SCHWARTZ:  Your Honor --

9      MS. REIBSTEIN:  Your Honor, may I be heard, please?

10     JUDGE GREEN:  No.  This is Mrs. Cox's witness.

11     Do you -- do you have -- we've heard background.  We've

12     heard testimony regarding what the -- what the practice is,

13     what the safety protocols are at this facility.  We don't need

14     any more of that.  What we need is evidence regarding the

15     protected concerted activity.  We need evidence regarding the

16     adverse employment actions.  It -- it may be that I don't

17     understand something about that and we have to go back and get

18     some more background, but we've already got that background in

19     spades, and so what I want to do is get to the heart of this

20     case.  We -- we've already spent five days on the record, and

21     we really haven't gotten to the heart of the case.  This -- do

22     we have some testimony from this witness regarding the

23     protected activity of this Charging Party, the adverse

24     employment actions that were taken with regard to this Charging

25     Party?



# Exhibit E, Motion to Try Petition on Hearing Record

1    MS. REIBSTEIN:  Well, Your Honor, I'm sorry.  I -- I'm

2    on -- I'm --

3    MR. MURPHY:  Objection, Your Honor.

4    MS. REIBSTEIN:  I'm --

5    MR. MURPHY:  You've already --

6    MS. REIBSTEIN:  -- I'm -- I'm on the record --

7    MR. MURPHY:  You --

8    MS. REIBSTEIN:  -- and I have the right to speak, Your

9    Honor.

10   JUDGE GREEN:  Okay, go ahead, Ms. -- Ms. --

11   MR. MURPHY:  Your -- Your Honor --

12   JUDGE GREEN:  -- Reibstein.

13   MR. MURPHY:  -- I have -- I have to object.  I mean,

14   Ms. -- Ms. Cox, you've already indicated that she's handling

15   the witness.  You know, I --

16   MS. REIBSTEIN:  I -- I'm allowed to speak --

17   MR. MURPHY:  -- because this --

18   MS. REIBSTEIN:  -- when a cocounsel --

19   JUDGE GREEN:  All right, so --

20   MS. REIBSTEIN:  -- (indiscernible, simultaneous speech) --

21   JUDGE GREEN:  -- let's not get too hung up on this.

22   MS. REIBSTEIN:  So first of all, I don't know what the

23   objection was that was obstained (sic).  There was no valid

24   objection, and Your Honor, you're putting us in a position of,

25   you know, a -- a witness -- we -- we can't just jump in to a



Exhibit E, Motion to Try Petition on Hearing Record

1    precise sentence or two.  There is a story that Ms. Velasco

2    wants to --

3          JUDGE GREEN:  Yeah, we've heard --

4          MS. REIBSTEIN:  -- tell, and there's --

5          JUDGE GREEN:  -- we've heard it.

6          MS. REIBSTEIN:  -- some development, and there --

7          JUDGE GREEN:  Okay.

8          MS. REIBSTEIN:  -- there are some leeway allowed for some

9    questions to get her to the testimony that you want to hear.

10   We can't just, like, the drop-in from the sky to an exact

11   point.  There's some lead up, and -- and if Your Honor allow a

12   few questions to lead up -- as in every direct examination, if

13   you'd --

14         JUDGE GREEN:  No, we've -- we've --

15         MS. COX:  -- (indiscernible, simultaneous speech) --

16         JUDGE GREEN:  -- had -- we've had that testimony.

17         MS. REIBSTEIN:  This -- this is not just background to --

18   to -- to add cumulative evidence.  This is Ms. Velasco's story

19   to get her to the question.  It's just a few questions to get

20   her where she needs to be so that there is context.  It's a few

21   questions, Your Honor.  This is how --

22         JUDGE GREEN:  Okay.  We're going to --

23         MS. COX:  -- the testimony --

24         JUDGE GREEN:  -- we're going to --

25         MS. COX:  -- is developed.



1    JUDGE GREEN:  -- we're going to spend no more than five

2  minutes on it.  Go ahead.

3    MS. COX:  Thank you.

4    MR. MURPHY:  Your Honor, I -- I -- I have to object

5  that -- that with -- when the regional attorney gets on the

6  call af -- after not having entered with respect to this

7  witness, and -- and all of a sudden we're taking testimony of

8  matters that you have previously ruled out --

9    JUDGE GREEN:  Listen --

10    MR. MURPHY:  -- and -- and I don't want to --

11    JUDGE GREEN:  -- I'm trying to get --

12    MR. MURPHY:  -- I'm going to -- I'm going to -- I'm going

13  to -- look, I just wanted to be heard on that, so --

14    JUDGE GREEN:  Okay.  That's fine.

15    MR. MURPHY:  -- I'll -- five minutes.

16    JUDGE GREEN:  Okay.  It's 10:32.  Let's go.

17                    **RESUMED DIRECT EXAMINATION**

18  Q    BY MS. COX:  Ms. Velasco, do you recall learning about a

19  positive case at JFK8?

20  A    Yes.

21  Q    Approximately when did you learn?

22  A    At the beginning of March.

23  Q    And who did you learn it from?

24    MR. MURPHY:  Objection.

25  A    The --



Exhibit E, Motion to Try Petition on Hearing Record

```
1        MR. MURPHY:   Hearsay.

2        JUDGE GREEN:   Overruled.

3   Q    BY MS. COX:   Who -- who did you learn that there was a

4   positive case from?

5   A    We would get text messages from the facility letting us

6   know that there was positive cases.

7   Q    And what information was in the text messages?

8   A    It would only state that there was a positive case within

9   the building, on which days they received the positive case,

10  but nothing bigger than that.

11  Q    Did the text tell you the shift that the infected person

12  worked on?

13  A    No.

14  Q    The text tell you what department the infected person

15  worked on?

16  A    No, it didn't.

17  Q    In March 2020, how often were you getting these kinds of

18  notifications?

19  A    We were getting them every day to every other day.

20  Q    And did the information in the notification change at some

21  point?

22  A    Yes.

23  Q    How?

24  A    I believe it was maybe two months after they started the

25  notifications, they would send us the notification, but not put
```



Exhibit E, Motion to Try Petition on Hearing Record

1    a number on how many cases there were in the building.

2    Q    What do you mean when you say they wouldn't put a number

3    on how many cases in the building?

4    A    When they first started sending notifications about the

5    positive cases, they would say there was two positive cases in

6    the building, and then all of the sudden, they took the number

7    away and just said positive cases without letting us know,

8    exactly, how many in the building.

9    Q    Did you have concerns about the information that was being

10   provided?

11   A    Yeah.

12   Q    And what concerns did you have?

13   A    That we were having unknown cases within the building.  It

14   could have been one.  It could have been ten at a time, and

15   nobody knew.

16   Q    Did you ever discuss your COVID concerns with your

17   coworkers?

18   A    Yes.

19   Q    How often were you discussing your COVID concerns with

20   your coworkers?

21   A    At the very beginning, we -- everyone used to talk, and we

22   were all concerned on whether or not -- you know, who had it,

23   who didn't have it, where was the positive case within the

24   building?

25   Q    Are you familiar with Christian Smalls?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yeah.

2    Q    And who is Christian Smalls?

3    A    Christian Smalls, at the time of me meeting him, he was a

4    PA, a process assistant.

5    Q    And do you recall when you first met Christian Smalls?

6    A    Yeah.

7    Q    Do you recall the approximate month?

8    A    I believe it was in the end of March.

9    Q    And that's 2020, right?

10   A    Yes.

11   Q    Do you recall how you met Christian Smalls?

12   A    Yes.  I was walking down to what Amazon calls AmCare,

13   which is the nurse to -- I believe I was getting a Band-Aid,

14   and I saw him sitting in front of the main office.

15        MR. MURPHY:  Your Honor, I have to object at this point.

16        MS. COX:  What is the objection?

17        MR. MURPHY:  Well, first of all, we're up against the

18   five-minute time limit; and second of all, the conversations

19   about how she met Mr. Smalls and where frankly is irrelevant to

20   the Charging Party's engagement in protected concerted

21   activity.  Whatever Ms. Velasco may have done with -- with the

22   Charging Party in connection with any alleged protected

23   concerted activity -- and it's -- it's even further afield of

24   any adverse employment action that might have been taken

25   against the Charging Party.



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1        JUDGE GREEN:  I'm going to allow this -- is -- in the

 2   hopes that it somehow ties into the protected activity of -- of

 3   the protesters, I think which includes Mr. Bryson.

 4   Q    BY MS. COX:  Ms. Velasco, when you say "main office",

 5   what -- whose office is -- is -- whose office are you referring

 6   to?

 7   A    I'm not entirely sure whose it is, just the main office

 8   where, I guess, the higher-ups, ops -- operations managers, and

 9   HR, have their meeting.

10   Q    Okay.  When you met Christian Smalls, was he with anyone?

11   A    He was with a few other coworkers, and I didn't know who

12   they were.

13   Q    Do you recall any of the names that were -- of employees

14   that were with Mr. Smalls?

15   A    I believe the only coworker that I remember that was there

16   was Derrick.

17   Q    Do you know Derrick's last name?

18   A    Palmer.

19   Q    So after meeting Christian Smalls, did you do anything

20   related to your COVID concerns at Amazon?

21   A    Yes.  He was there for his COVID concerns, and I --

22        MR. MURPHY:  Objection.

23        JUDGE GREEN:  What's the objection?

24        MR. MURPHY:  The objection is she's testifying about

25   what -- what Mr. Smalls and why he did certain things.  There's
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    been no foundation, and obviously, you know, Mr. Smalls is

2    available to testify if we need this evidence.

3         JUDGE GREEN:  Okay.  Sustained.

4         MS. COX:  Judge Green, (indiscernible, simultaneous

5    speech) --

6         JUDGE GREEN:  We don't know -- listen.  We don't know why.

7         MS. COX:  Okay.  She has personal knowledge, Judge.  She

8    had multiple conversations with (indiscernible, simultaneous

9    speech).

10        JUDGE GREEN:  All right.  So you can ask them about that.

11   Go ahead.

12        MS. COX:  Exactly.  I'm getting there, Judge.

13   Q    BY MS. COX:  So -- so Ms. Velasco, after meeting Mr.

14   Smalls, did you do anything relating to your COVID concerns at

15   Amazon?

16   A    Yes, after meeting him and becoming involved with him and

17   his concerns, we all started getting together to take action

18   with Amazon, starting the protesting.

19   Q    Ms. Velasco, can I just take a step back with you a

20   moment?  Do you know what Christian Smalls and Derrick Palmer

21   and the other employees were doing at the management office?

22   A    I believe they were just raising their concerns on how

23   Amazon is --

24        MR. MURPHY:  Objection.  If she does -- if she doesn't

25   know, she doesn't know.



1     JUDGE GREEN:  Okay.

2     MS. COX:  She's testifying to what she knows.  She just

3  testified to what she knows.

4     JUDGE GREEN:  All right.  So Ms. Velasco, you can testify

5  to what you -- what heard them to say at -- at the meeting.

6     MR. MURPHY:  I would object to hearsay.

7     MS. COX:  It's not hearsay.

8     JUDGE GREEN:  Wait.  I don't think it's being offered for

9  its truth, so --

10    MS. COX:  Exactly.

11    JUDGE GREEN:  Let's -- let's go.  Do you mind -- do you

12  need the question again?

13  Q   BY MS. COX:  What did Christian Smalls tell you he was

14  doing at the manager's meeting?

15  A   Raising his concerns.

16  Q   At the office.  Okay.  Did he say anything specific?

17    MR. MURPHY:  Objection.  Hearsay.

18  A   That there were --

19    JUDGE GREEN:  Overruled.

20    MS. COX:  It's not a hearsay if we're not offering it --

21    JUDGE GREEN:  Okay.  It's overruled.

22    MS. COX:  -- for the truth of the matter asserted.

23  Q   BY MS. COX:  Go ahead, Ms. Velasco.

24  A   He was raising concerns on how Amazon wasn't being

25  transparent with cases.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  Did he say anything else?

2    A    No.

3    Q    Okay.  So after meeting with -- you -- so you mentioned

4    that you started discussing taking action together.  Were you

5    involved in planning any protests?

6    A    Yeah.

7    Q    How were you -- how did you plan?

8    A    We were text messaging.

9    Q    And do you know Gerald Bryson?

10   A    Yeah.

11   Q    Who is he?

12   A    He was a former coworker.

13   Q    Was Gerald Bryson on the group text?

14   A    No.

15   Q    Do you recall what was discussed in the group text?

16   A    We were discussing what's the best time and day to start

17   taking action and doing our protests.

18   Q    And did you all pick a -- a time?

19   A    Yeah.

20   Q    What time did you pick?

21   A    We always picked the afternoon time because that's

22   Amazon's lunch, so we would have the most coworkers being able

23   to walk out and see what we were doing.  And if they would like

24   to join, they were allowed to walk with us and join.

25   Q    And did you pick a day --



Exhibit E, Motion to Try Petition on Hearing Record

1 A  Yeah.  We always --

2 Q  -- to protest?

3 A  Um-hum.

4 Q  I'm sorry.

5 A  Yeah.  We always picked on a Wednesday because that's when

6 front half and back half are together, so it's the most workers

7 within the building.

8 Q  And I'm sorry.  I asked you -- okay.  Did you participate

9 in the planned protest at JFK8?

10 A  Yeah.

11 Q  Do you recall what you were protesting for?

12 A  We were protesting for Amazon being transparent with cases

13 and shutting down and cleaning the building.

14 Q  Where did the idea of shutting down come from?

15 A  Another warehouse -- I don't recall which warehouse, but

16 they shut down for two weeks and paid all their employees to

17 have their facility cleaned properly due to their very few

18 cases they had when we were within the hundreds.

19 Q  And what did you do when you protested?

20 A  We would hold signs, and I mainly just did recording with

21 my sign.  And all other coworkers who were in the protest were

22 able to speak.

23 Q  What do you mean when you say you did recordings?

24 A  I usually had the -- my phone in hand doing the live video

25 for everyone else in the world to see what we were doing.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Now, do you recall how many protests you participated in?

2    A    I believe I protested in three.

3    Q    And do you recall what month those protests took place in?

4    A    March and April.

5    Q    Do you recall when you first met Gerald Bryson in person?

6    A    In person?  I believe it was our fir -- second protest I

7    did is when I met who he was.

8    Q    Did you have any contact with Gerald Bryson before you met

9    him in person?

10   A    No.

11   Q    Did you know all the employees that were included on the

12   group text?

13   A    No.

14   Q    Did you know -- I'm sorry.  Let me move forward.  So did

15   you participate in a protest on April 6th, 2020?

16   A    Yes.

17   Q    Okay.  So I'm going to ask you questions about the April

18   6th protest.

19   A    Okay.

20   Q    Excuse me.  Do you recall what time you arrived?

21   A    I arrived afternoon, 12:00.

22   Q    Were you off-duty at the time?

23   A    Yes.

24   Q    And when you arrived, did you meet with any of your

25   coworkers?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A      Yes.

2    Q      Which coworkers did you meet with?

3    A      Gerald, Derrick, Chris, and there was a few others, but I

4    don't know their names exactly.

5    Q      So before April 6th, have you met Gerald Bryson?

6    A      Yes.

7    Q      Do you remember where you met Gerald Bryson before April

8    6th?

9    A      No.

10   Q      Where did you and your coworkers gather on April 6th?

11   A      We gathered near the bus stop and the parking garage.

12   Q      And where were you protesting on April 6th?

13   A      I was protesting in the front of the Amazon warehouse near

14   the main entrance.

15   Q      Was there a specific area in which you were protesting?

16   A      Yes.  In the front of the main entrance in between the

17   cars and the parking lot, the walkway.

18   Q      Where is the bus stop in relation to the facility

19   entrance?

20   A      It is more near the, I guess, main road to get in.

21   Q      Okay.  And about how many employees protest in --

22   protested in the parking lot?

23   A      Just me and Joe.

24   Q      Were security guards present during the protest?

25   A      Yes.


www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And where were the security guards standing during the

2    protest?

3    A    They were standing in the main entrance.

4    Q    About how many security guards were present?

5    A    Two.

6    Q    What is security's job?

7    A    They are --

8         MR. MURPHY:  Objection, Your Honor.

9         JUDGE GREEN:  What's the objection?

10        MR. MURPHY:  What's the basis for the witness testifying

11   about what the role of security is?

12        JUDGE GREEN:  Okay.  We -- Ms. Velasco, you can -- you can

13   explain that.

14   A    Okay.  So the security guards are mainly there to make

15   sure that we aren't walking in with any illegal items, guns, or

16   stealing anything on our way out.

17   Q    BY MS. COX:  Do you observe security officers do their

18   work?

19   A    Sometimes, I'll -- I'll watch what they do.

20   Q    Okay.  Were safety employees present during the protest?

21   A    I believe only one was standing outside during our

22   protest.

23   Q    And where were the safety employees -- the safety

24   employees standing?

25   A    Same area as the security, right in the front.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    About how many safety employees were present?

2   A    One.

3   Q    And what's safety's job?

4   A    Safety's job is -- I guess we could say nurse.  If we

5   have -- if an employee has an injury or not feeling well, we go

6   to them.

7   Q    Were employees protesting in other areas?

8   A    Yes.

9   Q    And what other areas were employees protesting in?

10  A    The bus stop, which is, I guess, off-property of the

11  Amazon.  They -- Chris was the one protesting at the bus stop

12  because he couldn't come on property.

13  Q    Were any other employees protesting in other areas?

14  A    Yeah.  There was a few other coworkers over at the bus

15  stop with Chris.

16  Q    Was Christian Smalls employed at that time?

17  A    No.

18  Q    And how did you -- do you know how his termination end --

19  how his employment ended?

20  A    Yes.

21  Q    How did it end?

22  A    Amazon fired him for social distancing after our very

23  first protest.

24  Q    Were you present at the -- the March 30th, 2020 protest?

25  A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Do you recall if you met Gerald at the protest at the

2    March 30th, 2020 protest?

3    A    No.

4    Q    Okay.  How did you learn that Christian Smalls was

5    terminated?

6    A    He messaged us and told us that Amazon sent him --

7         MR. MURPHY:  Objection.  Hearsay.

8         JUDGE GREEN:  Overruled.

9    Q    BY MS. COX:  Ms. Velasco, continue.  How did you learn

10   Christian Smalls was terminated?

11   A    He messaged me and a few other coworkers in the group

12   message, telling us that Amazon just sent him a message that he

13   was fired.

14   Q    Okay.  So you mentioned some individuals up -- present at

15   the bus stop.  Did anyone else participate in the protest off

16   the property?

17        MR. MURPHY:  Asked and answered, Your Honor.  This is the

18   third or fourth time this specific question --

19        MS. COX:  I said "anyone else".  It's a different

20   question.

21        JUDGE GREEN:  Okay.  Overruled.

22   Q    BY MS. COX:  Did anyone else participate in the protest

23   off the property?

24   A    Yeah.  I believe there was other -- what's the word --

25   other -- I'm not getting the word out, but like, Walmart



1    coworkers were there showing their support.  Nurses, I believe,

2    were there showing their support.

3    Q    Do you recall any supervisors, managers, or Amazon

4    representatives that were outside the facility on April 6th?

5    A    Yeah.  I believe --

6        MR. MURPHY:  Objection, Your Honor.  At what point in

7    time?  She said she entered the property and was there

8    protesting.  Her answer is limited to the time that she was off

9    the property, I presume.

10        JUDGE GREEN:  We're back to April 6th, right?

11        MS. COX:  Yes.  We're talking -- the -- all these

12    questions are about April 6th.

13        JUDGE GREEN:  Okay.  Okay.  I mean, I'll allow it.  I

14    mean, I'm assuming we're going to get some clarification at

15    some point as to what happened when.

16        MS. COX:  Yes.

17        JUDGE GREEN:  Okay.  Overruled.

18    Q    BY MS. COX:  Ms. Velasco, I asked you whether you recall

19    any supervisors, managers, Amazon representatives that were

20    outside the facility on April 6th during the protest.

21    A    Yeah.  There was, I believe, a operations manager standing

22    outside as well with safety and the security guard.

23    Q    You testified earlier that there was some Walmart

24    employees and nurses off the property.  Approximately how many

25    non-Amazon employees were involved?



1        MR. MURPHY:  Objection, Your Honor.  Relevance.

2        JUDGE GREEN:  What's the relevance?

3        MS. COX:  Judge Green, I'm setting the stage of the

4    incident in question.  I don't understand how this is not

5    relevant.

6        JUDGE GREEN:  Okay.  Overruled.

7    Q    BY MS. COX:  Ms. Velasco, my question was, approximately

8    how many non-Amazon employees were involved at the April 6th

9    protest?

10   A    I believe roughly around 10 to 15 other people were out

11   there.

12   Q    Do you recall if media was present?

13   A    I do not recall.

14   Q    Okay.  What were the employee demands on the April 6th

15   protest?

16   A    Our demands were to shut down the building and clean it.

17   Q    So do you recall the sign that you were holding, what it

18   said?

19   A    No.

20   Q    Do you -- what did you observe other employees doing

21   during the protest?

22   A    Other employees were --

23       MR. MURPHY:  Objection to the form, Your Honor.  Is she

24   referring to the protest on the property or the protest off the

25   property?  I just want to be specific here.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    BY MS. COX:   On the property, what did you observe

2   employees doing to protest?

3   A    To protest, it was just me and Gerald at the time on

4   property.

5   Q    And what was Gerald doing?

6   A    He was holding the megaphone and protesting and talking in

7   it about how many cases we have, questioning it, that we need

8   to shut the building down and clean it.

9   Q    During the April 6th protest, did Gerald Bryson have any

10  interaction with anyone?

11  A    Yes, he did.

12  Q    Ms. Velasco, I'm going to take another step back with you

13  a moment.   Was it unusual to see safety employees outside of

14  the Amazon warehouse?

15  A    No.

16  Q    Was it unusual to see security officers or security

17  employees outside of the warehouse?

18  A    No.

19  Q    Was it unusual to see operations managers outside of the

20  warehouse during the protest?

21  A    No.

22  Q    I'm sorry.   So I was beginning to ask you if, during the

23  April 6th protest, Mr. Bryson had an interaction.   Do you

24  remember how the parking lot looked at the time of the

25  interaction?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.  There was cars parked --

2    Q    I'm sorry.  Go ahead.

3    A    There was cars parked.  It was roughly empty with

4    employees at the time.

5    Q    Okay.  I'm going to show you a document that I've

6    pre-marked as Exhibit -- just give me one moment.

7         MR. MURPHY:  And excuse me one minute.  Could you give me

8    a second to -- are you going to -- is it on SharePoint, Ms.

9    Cox, or are you going to put it up there?  I just want to

10   know -- I'm not logged in there, so it may take me a second to

11   get there if you don't mind.

12        MS. COX:  Okay.

13        JUDGE GREEN:  So what number is it?

14        MS. COX:  Judge Green, it is Exhibit 51.

15        MR. MURPHY:  May I have one second, please?

16        I'm sorry, Ms. Cox.  You said 51?

17        MS. COX:  Yes.

18   Q    BY MS. COX:  Okay.  Ms. Velasco, can you see my screen?

19   A    Yes.

20   Q    Do you see the picture of the parking lot?

21   A    Yeah.

22        MS. COX:  Okay.  So just let the record reflect that this

23   is a two-page document.  It's a picture of the parking lot.

24   Q    BY MS. COX:  Okay.  So do you recognize this picture?

25   A    Yeah.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    What is it?

2    A    That is the Amazon warehouse.

3    Q    And do these pictures fairly and accurately show the

4    layout of the parking lot as it looked on April 6th, 2020?

5    A    Yes.

6    Q    Would using these pictures help you in explaining what

7    happened on April 6th?

8    A    Yeah.

9         MS. COX:  Okay.  At this time, Your Honor, General Counsel

10   moves for admission of GC-51.

11        MR. MURPHY:  No objection.

12        JUDGE GREEN:  GC-51 is admitted.

13   **(General Counsel Exhibit Number 51 Received into Evidence)**

14   Q    BY MS. COX:  Okay.  So Ms. Velasco, do you see the red

15   marker on my cursor?

16   A    Yes.

17   Q    Okay.  So using this picture, can you describe for me

18   where the bus stop is?

19   A    Bus stop?  Let's see.  Where are we?  Let's --

20        MR. MURPHY:  Objection to scrolling to it and placing the

21   cursor on it, Your Honor.  The -- let -- if she can describe

22   where it is, she doesn't need the assistance of the technology

23   to do so.

24        THE WITNESS:  And --

25        MS. COX:  Judge Green, this is completely background, and



www.escribers.net | 800-257-0885

1   she's already testified that she's been at this parking lot.

2   JUDGE GREEN:  Right.  So --

3   MS. COX:  She said it looks like --

4   JUDGE GREEN:  I take it this isn't going to be contested.

5   Can we try to move through this quickly?

6   MS. COX:  I mean, he's contesting it, Judge.

7   JUDGE GREEN:  I understand.  So let's just move on to the

8   testimony.  I'm overruling the objections to the extent that --

9   Q   BY MS. COX:  Okay.  So Ms. Velasco, is it -- is the

10   parking lot in this area here?

11   A   Yes.

12   Q   Okay.  I'm sorry.  The bus stop is this --

13   A   Yeah.

14   Q   -- area here?  Okay.  Now, you testified earlier that you

15   were protesting in the crosswalk.  Is this the crosswalk --

16   MR. MURPHY:  Objection.  Misstates her testimony.

17   Q   BY MS. COX:  -- that you're referring to?

18   MR. MURPHY:  That was not -- she did not testify to that.

19   MS. COX:  Yes, she did, Judge.

20   JUDGE GREEN:  Okay.

21   MS. COX:  In the crosswalk between the parked cars was her

22   testimony.

23   JUDGE GREEN:  Okay.  So overruled.

24   Q   BY MS. COX:  Is this the crosswalk that you're -- that you

25   referred to earlier?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    And was Gerald Bryson protesting with you in this area?

3    A    Yeah.

4    Q    Okay.  So you testified earlier that there were safety

5    employees in front of the warehouse.  Is this the front of the

6    warehouse, where it says "Amazon"?

7    A    Yes.

8    Q    And were the safety employees in the area between these

9    arches here?

10   A    Yes.

11        MR. MURPHY:  Objection.  Leading.

12        JUDGE GREEN:  Okay.

13        MS. COX:  Judge Green, he's -- it's not leading if it's

14   background information.

15        JUDGE GREEN:  It is -- I mean, it is leading.

16        Mr. Murphy, is this --

17        MS. COX:  (Indiscernible, simultaneous speech) --

18        JUDGE GREEN:  Is any of this going to be contested?

19        MR. MURPHY:  Well, I mean, I'd like to have the witness'

20   recollection about where the -- where these people were and

21   what they were doing before they're pointed out, you know,

22   and --

23        JUDGE GREEN:  Okay.

24        MR. MURPHY:  -- and identified by a leading question.

25        MS. COX:  She testified to it, Judge, just a moment ago.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay.  But you're -- okay.

2    MR. MURPHY:  I agree -- I agree with respect to the bus

3    stop, Your Honor.  We're drilling it a little more close here

4    to --

5    JUDGE GREEN:  Okay.  So that objection is overruled,

6    but -- okay.  Maybe you can do this a little less by leading

7    questions.

8    MS. COX:  Okay.  And then don't tell me to move on if I do

9    it that way.

10   Q    BY MS. COX:  So Ms. Velasco, can you tell me where the

11   safety employees were standing at the time of the interaction?

12   MR. MURPHY:  Objection to the --

13   A    Yes.

14   MR. MURPHY:  Objection.  Misstates the testimony.  She

15   said there was one safety employee present.

16   Q    BY MS. COX:  Ms. Velasco, can you tell me where the safety

17   employee was standing at the time of the interaction?

18   A    Yes.  They were standing in the first arch in front of the

19   doors.

20   Q    Okay.  Is this the first arch that you're referring to?

21   A    Yes.

22   Q    Okay.  Can you tell me where the -- the operations

23   managers were standing at the time of the interaction?

24   A    Also in the first arch.

25   Q    And that's this area here?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2         MR. MURPHY:  Yeah.  And because we're working with a -- an

3    image picture, can we get a clarification for the record that

4    the first arch is the area under the left edge of the overhang

5    in -- in front of the entrances to the JFK8 facility?

6         JUDGE GREEN:  Sure.  You can represent that.  This -- a

7    lot of this is probably not going to show up on the record.

8    It's really just for our benefit.  I think that the parties are

9    familiar with the layout.  I don't know that everything has to

10   be described specifically on the record unless there's really

11   some confusion about it, but sure.  That -- we can accept that

12   representation.

13   Q    BY MS. COX:  All right.  So using the cars on this -- in

14   this picture, can you tell me where you and Mr. Bryson were

15   when the interaction started?

16   A    Yes.  When it started, I was in the crosswalk between the

17   black and silver car.

18   Q    Is this the --

19   A    No, more over.

20        JUDGE GREEN:  So how about we ask:  How many cars from

21   the -- you know, the little island on the right?

22   Q    BY MS. COX:  Yeah, so (audio interference) --

23   A    Whoa.

24        THE COURT REPORTER:  One question at a time please.

25        MS. COX:  Who are you talking to, Mr. Moxie?



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1          THE COURT REPORTER:  I just --

 2          JUDGE GREEN:  Okay.  Let's move it.  Yeah.

 3     Q    BY MS. COX:  So Ms. Velasco, using the cars, how many --

 4     how many cars from the crosswalk -- this crosswalk here were

 5     you standing?

 6     A    Just one.  I was right in between the silver and that

 7     black one.

 8     Q    Okay.  Where was --

 9     A    Yes.

10     Q    -- where was Gerald Bryson at the time that the

11     interaction started?

12     A    He was, I want to say, right in front of the white van in

13     the crosswalk.

14     Q    Would you say the --

15     A    Yeah.

16     Q    -- it's --

17     A    Generally, right -- right there.

18     Q    Okay.  So forth from --

19          JUDGE GREEN:  Okay.  So that's four vehicles from the

20     island on the right?  Yes?

21          THE WITNESS:  Yeah.

22          JUDGE GREEN:  Okay.

23     Q    BY MS. COX:  Okay.  And around what time was the

24     interaction?

25     A    12, 12:20.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1  Q    And how long were you protesting in this area before the

2  interaction began?

3  A    Maybe about 20 minutes.

4  Q    And who did Gerald Bryson have the interaction with?

5  A    Another coworker.  I don't know her name.

6  Q    Can you describe the coworker?

7  A    She is a Caucasian male (sic), short hair, very skinny.

8  Q    Have you seen the --

9       JUDGE GREEN:  Did you say Caucasian male?

10      THE WITNESS:  I mean, female.  Sorry.

11      JUDGE GREEN:  Okay.

12 Q    BY MS. COX:  Have you seen the woman before?

13 A    Yes.

14 Q    How many times have you seen her?

15 A    Every day.

16 Q    Have you ever spoken to her?

17 A    No.

18 Q    At the time, did you know her name?

19 A    No.

20 Q    Did you learn her name at some point?

21 A    No.

22 Q    Okay.  So before the interaction began, what was Gerald

23 doing?

24 A    He was talking in the loudspeaker to safety that we should

25 shut down the building and clean it.



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Did you hear any response?

2    A    From safety, no.

3    Q    Did you hear a response from anywhere else?

4    A    Yes, the coworker.

5    Q    Okay.  What did you hear?

6    A    She responded to Gerald saying that the building is not

7    going to shut down because it's the only fucking job open, so

8    we should be appreciative.

9    Q    Can you describe the tone of her voice?

10   A    The tone was, I guess, aggressive.

11   Q    Did Gerald Bryson respond?

12   A    Yes.  Gerald started -- he was asking her where she was.

13   Q    Can you tell me what he said?

14   A    After her response, he said, where are you?  So I guess he

15   can have a more direct conversation with whoever was

16   responding.

17   Q    And after you heard -- after you heard the response, what

18   did you do?

19   A    I then started recording her.

20   Q    Okay.  Did you -- did you walk in her direction?

21   A    Yes.

22   Q    So using this picture, can you tell me which direction you

23   walked in, right or left?

24   A    To the right.

25   Q    And can you tell me when to stop my cursor --



Exhibit E, Motion to Try Petition on Hearing Record

```
1    A    Yes.

2    Q    -- when I reach the area that you walked to?

3    A    Yes.  Right -- yeah, right there.

4    Q    Okay, okay.

5         JUDGE GREEN:  So on the island?

6         THE WITNESS:  Yeah.

7    Q    BY MS. COX:  So did -- when you walked to that area, did

8    you see the woman?

9    A    Yeah.

10   Q    Can you tell me where she was?

11   A    She was sitting in front of the silver car on the

12   curbside.

13   Q    It's this area here?

14   A    Yes.

15   Q    Okay.  Did Gerald walk over to the area?

16   A    Yes.

17   Q    Okay.  Can you tell me where Gerald was in relation to you

18   and the woman?

19   A    He was right on the island on the red square.

20   Q    In this area here?

21   A    Yes.

22   Q    Okay.

23        JUDGE GREEN:  Okay.  So there are three red squares on

24   this island.  This is -- one's to the left.  One's to the

25   right.  And one's on the front.  It's the one on the left?
```



Exhibit E, Motion to Try Petition on Hearing Record

1    THE WITNESS:  Correct.

2    JUDGE GREEN:  Okay.

3    Q    BY MS. COX:  And what did you -- what did you -- what did

4    you see the woman doing?

5    A    I believe she was smoking a cigarette.

6    Q    Did Gerald say anything when he saw the woman?

7    A    Yeah.  After they engaged, going back and forth

8    questioning where each other were, Gerald said, you know, it's

9    not worth -- it's not worth $2 bringing it home to your loved

10   ones.

11   Q    So let me just take a step back with it -- with you, Ms.

12   Velasco.  So you said they were questioning each other.  Can

13   you tell me what the woman was saying at the time that Gerald

14   said where you -- where are you?

15   A    Yeah.  They were going back and forth, both saying, you

16   know, where are you at?  Where are you at -- until they

17   eventually seen each other.

18   Q    So was the woman repeating what Gerald was saying?

19   A    Gerald was saying, where you at?  And she said, I'm right

20   here.

21   Q    Okay.  Now, at the time that he was in this red square,

22   did he say anything else?

23   A    Yeah.  He told her that he doesn't have to say anything.

24   Q    Did Gerald ask her any questions?

25   A    No, he -- not he -- she asked him, you know, where did you



Exhibit E, Motion to Try Petition on Hearing Record

1    come from?

2    Q    Did Gerald respond?

3    A    Yes.  She -- he responded with, is this your first job?

4    Because it must be your first job because she sold her soul for

5    $2.

6    Q    Was there any cursing during this interaction?

7    A    Yes.

8    Q    So tell me -- tell me what was said.

9    A    After Gerald asked her, you know, this is your first job.

10   This must be your first job, because she sold her $2, he then

11   said, you know, you must have sold your $2 and called her a

12   bitch.

13   Q    Did the woman respond?

14   A    Yeah.  She responded with, this is going to be your last

15   job, and called Gerald a hoe.

16        MR. MURPHY:  I'm sorry.  I couldn't hear that, Your Honor,

17   I -- what -- what -- what he -- she said.

18        JUDGE GREEN:  Could you repeat that, Ms. Velasco?

19        THE WITNESS:  Yes.  After Gerald said that she sold her

20   soul for $2, she responded back to him stating that this was

21   going to be his last job and called him a hoe.

22   Q    BY MS. COX:  And what does a "hoe" mean?

23   A    Prostitute.

24   Q    Did the woman say anything about Gerald's background?

25   A    Yeah.  After her yelling that this was going to be his



# Exhibit E, Motion to Try Petition on Hearing Record

1    last job, Gerald then said just -- he said in response that her

2    mother was a hoe just to I guess lash back at her.  Then, she

3    goes, you know, go back to where you came from.  Go back to The

4    Bronx.

5    Q    And what did you take, "Go back to where you came from,"

6    to mean?

7    A    Considering Gerald is a colored male, I found that quite

8    racist for her to say.

9    Q    And what did you take, "Go back to The Bronx" to mean?

10   A    Because he was colored, she automatically thought he was

11   from The Bronx.

12   Q    And did Gerald respond to, go back to where you came from.

13   Go back to The Bronx?

14   A    Yes.  He brushed it off and laughed and said that he was

15   sorry that he was from right here, stating that he lived and is

16   from Staten Island.

17   Q    Did Gerald seem upset by the comment, go back to where you

18   came from.  Go back to The Bronx?

19        MR. MURPHY:  Objection.

20        THE WITNESS:  I think --

21        JUDGE GREEN:  Overruled.  If you could tell, Ms. Velasco,

22   you can -- you can testify.

23        THE WITNESS:  I believe it bothered him some to the point

24   where the argument kept going, but the tone of voice that he

25   responded back to her saying that he was sorry that he's from



Exhibit E, Motion to Try Petition on Hearing Record

1    here, he found it quite amusing that she just assumed he was

2    from The Bronx.

3    Q    BY MS. COX:  So can you tell me what happened next?

4    A    Yes.  After he stated that he was from here, he called her

5    a gutter bitch.

6    Q    Okay.  And did the woman respond?

7    A    Yes.  She then said, just like your mama.

8    Q    Okay.  Do you recall what happened after that?

9    A    After that incident, I believe she started lashing back.

10   She lashed at him stating if he wants to bring it that she'll

11   bring it.

12   Q    And do you recall how Gerald Bryson responded to, if you

13   want to bring it, I'll bring it?

14   A    Yeah.  I believe he -- he ignored -- he ignored that

15   completely.

16   Q    Did he say anything after she said, if you want to bring

17   it, I'll bring it?

18   A    Yeah.  He ignored the bring it part and said, you know,

19   we're out here fighting for you because you're too stupid and

20   ignorant to fight for yourself.

21   Q    Okay.  Based on what you saw, did anyone try to end this

22   interaction?

23   A    No.

24   Q    Okay.  And at some point, did you see Gerald walk away?

25   A    Yes.  He turned and walked away.



1    Q    Can you tell me which direction he walked in using this

2    picture that I have up, to the left or to the right?

3    A    To the right.  No, to the left.

4    Q    In this direction?

5    A    Yeah.

6    Q    Okay.  As he was walking, do you recall if he was saying

7    anything?

8    A    After he started walking away and saying, you know, we're

9    out here fighting for you because you're too stupid and

10   ignorant, she was talking back to him after that stating, you

11   know, that he is stupid and ignorant because he's the only one

12   out here protesting.

13   Q    Do you recall if she said anything else as Gerald Bryson

14   walked away?

15   A    No.  I think after that, Gerald then asked her if she had

16   any kids.

17   Q    Okay.  Did the woman respond?

18   A    I don't believe as of just yet she said anything.  Gerald

19   just asked her if she had any kids that she was going to bring

20   the virus home to because it wasn't worth $2 working there with

21   the virus.

22   Q    Do you recall drugs coming up during this interaction?

23        MR. MURPHY:  Objection, Your Honor.

24        JUDGE GREEN:  Overruled.

25        MR. MURPHY:  Leading.



Exhibit E, Motion to Try Petition on Hearing Record

```
1         MS. COX:  It's not leading.  It's giving her a topic.

2         JUDGE GREEN:  Yeah, it is.  Okay.  It is leading, but

3    it -- I'm going -- I'm going to allow it.

4    Q    BY MS. COX:  Do you recall drugs coming up during this

5    interaction?

6    A    Yeah.  Yes, I do.

7    Q    Who brought up drugs during this interaction?

8    A    Gerald did.

9    Q    What did Gerald say?

10   A    He called her a crackhead.

11   Q    Okay.  Did he say anything else?

12   A    I believe -- yeah, he called her a crackhead because of

13   the way she looked -- very skinny -- that, you know, safety

14   should start scanning the employees that they hire.

15   Q    What do you mean when you say scanning employees?

16   A    Drug testing.

17   Q    Okay.  Did Gerald say anything else to the safety

18   employees?

19   A    Safety, yes.  He just kept shouting that they should check

20   that woman, that they're not doing their job properly.  Amazon

21   is hiring anyone.

22   Q    Do you recall if the woman responded to Gerald's mention

23   of her drug use?

24        MR. MURPHY:  Objection to the form.  There's no -- there's

25   no evidence that -- that -- that -- that -- that the coworker
```



Exhibit E, Motion to Try Petition on Hearing Record

1    had used drugs or at -- at any point, let alone on April 6th.

2         JUDGE GREEN:  Okay.  And so I don't think that that was

3    implied.  We're just asking for what was said?

4         MS. COX:  Yes, Judge.

5    Q    BY MS. COX:  Ms. Velasco, do you rem -- do you recall if

6    the woman responded to Gerald's comments about her drug use?

7    A    No, she didn't.  I don't think she had any type of

8    response.

9    Q    Do you recall if anyone said "shut up" during this

10   interaction?

11   A    Yeah.

12   Q    Who said "shut up"?

13   A    The woman said "shut up" to Gerald, saying, are you going

14   to make me shut up?  And Gerald responded to her, saying, I'm

15   not going to make you shut up.  You should just shut up.

16   Q    Did you see -- at some point during this interaction, did

17   you see the woman get up from the curb?

18   A    Yeah.

19   Q    And what did you see the woman do after she got up?

20   A    Once she got up, instead of walking straight into the

21   building, she walked diagonally.

22   Q    Okay, give me one moment.  So can you use this white van

23   that's on this photograph to help describe the -- the way she

24   walked, whether it was in front of the van or behind the van?

25   A    Yeah.  So as she was sitting --



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  So just to clarify, I'm sorry.  Just to

2    clarify, we're talking about the -- the van parked near the

3    curb?

4    MS. COX:  Yes, Judge.

5    JUDGE GREEN:  Okay, sorry.

6    MS. COX:  That's fine.

7    THE WITNESS:  So she's sitting curbside where your red

8    cursor -- cursive (sic) is.  Instead of walking just straight

9    into the doors, she walked diagonally I guess to the front of

10   the white van.

11   Q    BY MS. COX:  In this direction?

12   A    Yeah.

13   Q    Okay.  So in front of the --

14   MR. MURPHY:  Can -- can we just have a representation as

15   to whether or not this is a photo from April 6th and whether or

16   not the white van was where it appears in the photo on April

17   6th?

18   THE WITNESS:  No.

19   JUDGE GREEN:  Well, do we know?  Are we dealing with --

20   are we -- I mean, I -- I'm assuming from all this questioning

21   that that's -- that's what the General Counsel intends, that

22   this is -- this is a -- a representation.  It's a photograph of

23   the facility and the cars on April 6th at the time of this

24   incident.  No?

25   MS. COX:  No, Judge.  This is just a demonstrative to help



# Exhibit E, Motion to Try Petition on Hearing Record

1    the witness testify to --

2         JUDGE GREEN:  Okay.

3         MS. COX:  -- where everything was.

4         JUDGE GREEN:  Okay.  I didn't realize that.  I thought you

5    would have told -- I thought when we were receiving testimony,

6    we were receiving testimony that she was actually between these

7    cars, that she was actually walking to that van.  So that's not

8    the case?

9         MS. COX:  No, Judge.

10        JUDGE GREEN:  Okay.  We're just using that for purposes of

11   establishing direction?

12        MS. COX:  Yes.

13        JUDGE GREEN:  Okay.

14   Q    BY MS. COX:  Okay.  So Ms. Velasco, how long did this

15   interaction last?

16   A    I believe it was only three to four minutes.  It wasn't

17   very long.

18   Q    Okay.  Bear with me a moment.  So I want to show you

19   what's been marked as General Counsel's Exhibit 52.

20        MR. MURPHY:  Your Honor, before she shows the witness

21   General Counsel 52, could we have a short break?  We've been on

22   the record for about an hour and a half.  And I would

23   appreciate that.

24        JUDGE GREEN:  Yes.  Five or ten minutes?

25        MR. MURPHY:  Thank you, Judge.



# Exhibit E, Motion to Try Petition on Hearing Record

1       JUDGE GREEN:  I mean, I'm asking you:  Five or ten?

2       MR. MURPHY:  Oh, five minutes is fine.

3       JUDGE GREEN:  Okay, five minutes.  Ms. -- Ms. Velasco --

4   off the record.

5   (Off the record at 11:26 a.m.)

6       JUDGE GREEN:  Can you hear us, Ms. Velasco?

7       THE WITNESS:  Yes.

8       JUDGE GREEN:  I think you -- yeah.  Okay.

9                   **RESUMED DIRECT EXAMINATION**

10  Q    BY MS. COX:  Okay.  So Ms. Velasco, I'm going to ask you

11  about the front of the warehouse.

12  A    Okay.

13  Q    You testified that the woman walked diagonally.  Can you

14  tell me how many doors are outside of the warehouse?

15      MR. MURPHY:  Objection to the form.  When you say outside,

16  do you mean doors leading into or out of the facility?

17      JUDGE GREEN:  Is that what you're talking about?  I

18  actually had the same question.

19      THE WITNESS:  Yes.

20      JUDGE GREEN:  Okay.

21  Q    BY MS. COX:  So Ms. Velasco --

22  A    There -- I believe there's ten.

23  Q    Okay.  And where do those -- those doors lead?

24  A    Directly into the building near security.

25  Q    Okay.  And when you enter the building, what's in that



Exhibit E, Motion to Try Petition on Hearing Record

1    area?

2    A    The turnstile doors to, then, scan in so they know that we

3    belong within the building, and then, security.

4    Q    Do all the doors lead to the same place?

5    A    Yes.

6    Q    Okay.  So I just want to show you what I've identified as

7    General Counsel's Exhibit 52.  Okay.  Please let me know if you

8    see my screen.

9    A    Yep.

10   Q    Okay.  Ms. Velasco, this is a video -- very short.  I'm

11   going to play it and ask you some questions about it.

12   A    Okay.

13   (Video played at 11:45 a.m., ending at 11:45 a.m.)

14   Q    BY MS. COX:  So Ms. Velasco, are these the two safety --

15   I'm sorry -- security employees that you testified to being

16   present?

17   A    Yes.

18        MR. MURPHY:  Objection, leading.

19        JUDGE GREEN:  Overruled.

20   Q    BY MS. COX:  And -- and can you tell me where Mr. Bryson

21   is in this video?

22   A    He is standing with the sign and the megaphone, talking.

23   Q    Is this Mr. Bryson here?

24   A    Yeah.

25   Q    Okay.  And the person with the blue vest -- what --



1   what -- what job or position does that person hold?

2   A    I believe -- I believe that that is social distancing.

3   Q    Okay.  And Ms. Velasco, do you see yourself in this video?

4   A    Yes.

5   Q    Where are you?

6   A    I have the blue sign in my hand.

7   Q    Okay.  And this is you here?

8   A    Yes.

9        JUDGE GREEN:  And so you're in the crosswalk?

10       THE WITNESS:  Yes.

11       MR. MURPHY:  And just so the record is clear, it's the

12  crosswalk between the cars as opposed to the crosswalk towards

13  the building, correct?

14       THE WITNESS:  Correct.

15  Q    BY MS. COX:  And Ms. Velasco, is this the woman that Mr.

16  Bryson had the interaction with?

17  A    Yes.

18       JUDGE GREEN:  I'm sorry.  I totally missed that.  Was

19  there --

20       MS. COX:  So I'm asking the witness whether this was the

21  woman who's walking diagonally that Mr. Bryson had the

22  interaction with.

23       JUDGE GREEN:  Okay.

24  Q    BY MS. COX:  And Ms. Velasco, what was your response?

25  A    Yes.



# Exhibit E, Motion to Try Petition on Hearing Record

1   Q    And she's wearing a gray sweatshirt, it looks like?

2   A    Yeah.

3   Q    Okay.  So Ms. Velasco -- so this -- so let me just pause

4   it for you one moment.  So the -- where does this door at the

5   bottom of your screen with the N-114 lead to?

6   A    They all lead to the same area.  Once you walk in the

7   first door, there is a second set of doors.

8   Q    Okay.  And from the place that the woman was sitting,

9   which entrance was the closest?

10  A    The one that's right here with the N-11.

11  Q    Thank you.

12       MS. COX:  At this time, Your Honor, General Counsel moves

13  for admission of GC-52.

14       JUDGE GREEN:  Any objection?

15       MR. MURPHY:  No objection, Your Honor.

16       JUDGE GREEN:  Okay.  So GC-52 is admitted.

17  **(General Counsel Exhibit Number 52 Received into Evidence)**

18  Q    BY MS. COX:  So Ms. Velasco, during this interaction, did

19  security come over to Mr. Bryson?

20  A    No.

21  Q    Did anyone from safety come over to Mr. Bryson during the

22  interaction?

23  A    No.

24  Q    Did anyone seem concerned?

25  A    No.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    After the woman went back inside, did anyone from security

2    come over to speak with Mr. Bryson?

3    A    No.

4    Q    After the woman entered the building, did anyone from

5    safety come to speak with Mr. Bryson?

6    A    No.

7    Q    After the interaction ended, did you stay in the area

8    where you were protesting?

9    A    Yes.

10   Q    How long did you stay in that area for?

11   A    I believe it was another ten minutes.

12   Q    In the time that you were there, did anyone from safety

13   come speak to you about the interaction?

14   A    No.

15   Q    Did anyone from security come speak to you?

16   A    No.

17   Q    On that day, did any supervisor or manager come speak to

18   you about the interaction?

19   A    No.

20   Q    Now, you testified earlier to some statements that were

21   made during the interaction.  You testified that the woman

22   said, "if you want to bring it, I'll bring it."  What did you

23   understand that to mean?

24   A    I took that as -- like, a challenge.  It could have

25   possibly been for fighting physically or just continue to make



# Exhibit E, Motion to Try Petition on Hearing Record

1    the argument more heated.

2    Q    At any time during the interaction, did Mr. Bryson say

3    anything to invite a physical fight?

4    A    No.

5    Q    During the interaction, did Mr. Bryson say anything to --

6    I'm sorry.  Did Mr. Bryson threaten to shut the woman up?

7    A    No.

8    Q    Did Mr. Bryson call the woman a cunt?

9    A    No.

10   Q    Did Mr. Bryson call the woman the N-word?

11   A    No.

12   Q    Did Mr. Bryson call the woman the word, N-I-G-G-A?

13   A    No.

14   Q    Did Mr. Bryson call the woman a dyke?

15   A    No.

16   Q    During the interaction, Mr. Bryson referred to $2 pay.  Do

17   you know what Mr. Bryson was referring to?

18   A    Yes.  Amazon gave us an extra $2 pay, I guess, to have us

19   continue working, thinking if they give us more money, we will

20   continue to come in the building with the virus -- just trying

21   to pay us off to do their work.

22   Q    Do you recall how long you received the $2 additional pay?

23        MR. MURPHY:  Objection, Your Honor.  Relevance.

24        JUDGE GREEN:  Overruled.

25   Q    BY MS. COX:  Ms. Velasco, my question was:  Do you recall



Exhibit E, Motion to Try Petition on Hearing Record

1    how long you received the $2 pay -- the additional 2?

2    A    I believe it was only two months.  It wasn't very long.

3    Q    And Ms. Velasco, I want to step back with you one moment

4    again.  At any time did anyone from -- any supervisor or

5    manager come over to speak to Mr. Bryson during the

6    interaction?

7    A    No.

8        MR. MURPHY:  Asked and answered.

9        JUDGE GREEN:  I don't think it was.  It's overruled.  Was

10   the answer "no"?

11       THE WITNESS:  Yeah.  No one came over.

12       JUDGE GREEN:  Okay.

13   Q    BY MS. COX:  After the interaction ended, did any

14   supervisor, manager, operations manager come over to speak to

15   you about the interaction?

16   A    No.

17   Q    Okay.  Are you aware that Amazon has a drug policy?

18   A    Yeah.

19       MR. MURPHY:  Objection, Judge.  That -- that -- relevance

20   here.

21       JUDGE GREEN:  So what is the relevance?

22       MS. COX:  Judge, Mr. Bryson made comments about the policy

23   of drugs.  And it's relevant to whether Amazon has a policy.

24       JUDGE GREEN:  No, it isn't.  The only reason I might need

25   this is if you think it -- it helps me understand the protected



1    activity, which I really don't think it does.

2    Q    BY MS. COX:  Did there come a time that you learned that

3    Mr. Bryson was fired?

4    A    Yeah.

5         MS. COX:  Judge Green, can I have a few minutes off the

6    record?

7         JUDGE GREEN:  Yes.  How long do you want?

8         MS. COX:  Actually, let's -- let's make it five minutes.

9         JUDGE GREEN:  Okay.  Off the record for five minutes.

10        Same deal, Ms. Velasco:  You can move around, just don't

11   talk to anybody about your testimony.  Okay?  Thank you.

12        Off the record.

13   (Off the record at 11:55 a.m.)

14        THE COURT REPORTER:  Sorry, Your Honor.

15        JUDGE GREEN:  Okay.  So do we have any more questions from

16   the General Counsel for Ms. Velasco?

17        MS. COX:  Yes, Judge.

18                    **RESUMED DIRECT EXAMINATION**

19   Q    BY MS. COX:  Okay.  Do you recall -- did there come a time

20   that you learned Mr. Bryson was fired?

21   A    Yes.

22   Q    Do you recall when that was?

23   A    I found out -- I believe it was a month after he actually

24   got fired.

25   Q    And how did you learn that Mr. Bryson was fired?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    Through our text message chat group.

2    Q    Before Mr. Bryson was fired, did any supervisor or manager

3    ever ask you any questions about the interaction between Bryson

4    and the woman?

5    A    No.

6    MS. COX:  Judge Green, I'd like to ask you to revisit your

7    ruling on the relevancy of the drug policy questions.  Amazon

8    does have a policy for -- of drug use and it's a category 2

9    violation if an employee doesn't -- fails to report a unsafe

10   working condition, so therefore, it's relevant to the

11   pretextual nature of his discharge.

12   JUDGE GREEN:  So listen.  I -- I can understand that you

13   wanted to ask Mr. Bryson why he made the comments regarding

14   drug use and whether he had an opportunity to explain that to

15   management, but I'm not sure -- I really don't understand why

16   you would want to do that with this witness.  I -- I -- I don't

17   really understand what you're saying.  You're -- you're saying

18   that he had some kind of obligation under the rules to report

19   what he perceived as drug use?  That's -- that's where we're

20   going with this?

21   MS. COX:  Yes, Judge.  He could have been --

22   JUDGE GREEN:  Okay.  So -- and -- and what makes -- I

23   mean, do we just have this drug policy somewhere?  Is there

24   some reason we have to --

25   MS. COX:  It's in --



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  -- deal with having Ms. Velasco testify to

2    it?

3    MS. COX:  -- it's in the owner's manual, Judge.

4    JUDGE GREEN:  Okay.  So why don't we just -- why don't we

5    just -- and we already have the owner's manual in evidence.  I

6    really don't see why we need this questioning.

7    MS. COX:  Okay, Judge.  I'll move on.

8    Q    BY MS. COX:  You testified that before the interaction

9    with the woman, you had seen her at the facility, right?

10   A    Yes.

11   Q    Do you recall what department you saw her working in?

12   A    Yes.  She worked in what Amazon calls AFE.

13   Q    And what is AFE?

14   A    It's pretty much what I do in single pack, but multiple

15   items in a box.

16   Q    Okay.  Do you know what floor AFE is on?

17   A    The third floor and the first floor.  There is two

18   sections of it.

19   Q    Okay.

20   MS. COX:  I think that's all I have at this time, Judge.

21   I just want a moment to confer.

22   JUDGE GREEN:  Okay.  Do you want me to put you in a break

23   room?

24   MS. COX:  Sure.

25   JUDGE GREEN:  Okay.  I'm going to open the same break



Exhibit E, Motion to Try Petition on Hearing Record

1    room.  So we'll take five minutes.  If you need longer, come

2    out and let us know.

3    (Off the record at 12:05 p.m.)

4        JUDGE GREEN:  Counsel, have any more questions for Ms.

5    Velasco?

6        MS. COX:  No further questions, Judge.

7        JUDGE GREEN:  Does the Charging Party have any questions?

8        MR. KEARL:  Yes, Judge, just a couple.

9        JUDGE GREEN:  Okay.  So Ms. Velasco, Mr. Kearl is going to

10   have some more questions for you.  Okay?

11                          **CROSS-EXAMINATION**

12   Q    BY MR. KEARL:  Hi, there, Ms. Velasco.  I just want to

13   clarify something on the record.  So you -- you testified that

14   you saw security and safety individuals out in front of the

15   JFK8 facility.  And I think there was some confusion.  Before

16   the pandemic, did you see security or safety or operations

17   managers stationed out in front of the JFK8 facility in this

18   same manner that they were on April 6th?

19   A    No.

20   Q    Okay.  And apart from the protests that you participated

21   in or witnessed during the pandemic, do you recall seeing

22   safety or security or operations managers stationed out in

23   front of the facility in a simil -- similar manner?

24   A    No.

25   Q    Okay.  And you testified that you saw this other woman



# Exhibit E, Motion to Try Petition on Hearing Record

1   pretty regularly in the facility; is that correct?

2   A    Yes.

3   Q    Okay.  And the -- she was, you believed, in the AFE

4   department; is that correct?

5        MR. MURPHY:  Objection, leading.

6        JUDGE GREEN:  Okay.

7        MR. KEARL:  It was on the record.

8        JUDGE GREEN:  Over -- overruled.

9   Q    BY MR. KEARL:  And did you continue to see her in the

10  facility up until today?  Or -- or had -- was there a point

11  that you stopped seeing her at the facility regularly?

12  A    She's still employed.  I see her every day.

13  Q    Okay.  Do you see her in the same capacity that you saw

14  her before?

15  A    No.  She's --

16       MR. MURPHY:  Objection, Your Honor.  We -- we -- this --

17  this whole line of testimony regarding the status change of

18  the --

19       JUDGE GREEN:  Yeah.  I'm -- sustained.  I'm going to --

20  Mr. Kearl, first of all, you know, you can -- when it comes to

21  your case, at this juncture, what I'm going to do is make you

22  give an offer of proof at that time.  But at this time, I'm

23  sustaining that objection.

24       MR. KEARL:  Okay.

25       JUDGE GREEN:  And you could take a special appeal.  You



# Exhibit E, Motion to Try Petition on Hearing Record

1     know, you could take a special appeal.

2          MR. KEARL:  And will -- will lack of production of

3     documents factor into that decision as well?  Judge, like, when

4     I make my -- when I make my order of proof --

5          JUDGE GREEN:  Oh.

6          MR. KEARL:  -- is that -- is that the time that I should

7     make the Bannon-Mills motion or --

8          JUDGE GREEN:  Well, it's -- well, you can make the Bannon-

9     Mills motion whenever you want.

10         MR. KEARL:  Okay.

11         JUDGE GREEN:  We're talking about -- we're talking about

12    my ruling regarding the transfer and the pay increase, which

13    apparently occurred with regard to Ms. Evans at some point

14    after Mr. Bryson's discharge.  That's what I was referring to.

15    And this is -- that's where I thought you were going with this.

16    Q    BY MR. KEARL:  And just to triple -- triply check that the

17    rec -- that the record is clear, Ms. Velasco, you're testifying

18    that you -- you didn't -- you did not recall seeing the

19    security, safety, and operations managers in front of the

20    facility in -- the way they were on April 6th on other days?

21         MR. MURPHY:  Objection, asked and answered.

22         MR. KEARL:  I'm just clarifying the record to make sure

23    that there wasn't a double --

24         MR. MURPHY:  You did.  You just asked the -- you asked the

25    question a minute ago.



# Exhibit E, Motion to Try Petition on Hearing Record

1  MR. KEARL:  I'm just making sure there's not a double-

2  record on the negative.

3  JUDGE GREEN:  Okay, overruled.

4  Q  BY MR. KEARL:  Okay.  So Ms. Velasco, I just want to

5  make -- make perfectly clear.  Is it correct for me to

6  characterize your prior testimony as:  Apart from the protests,

7  you did not see operations, security, and safety managers

8  stationed in front in the same way as you did on April 6th?

9  A  No.

10  MR. MURPHY:  Objection.  It's lead --

11  JUDGE GREEN:  It's -- it -- yeah, it is.  It's totally

12  redundant, but -- but let's go.  Let's not waste any more time

13  on it.

14  MR. KEARL:  Okay, okay.  No further questions.

15  JUDGE GREEN:  Okay.

16  MR. MURPHY:  Your Honor, could we have the witness' Jencks

17  statement, if any, please -- any Jencks materials?

18  MS. COX:  Yes.

19  MR. MURPHY:  And you -- you know, I'm -- I'm sorry, Ms.

20  Cox.  I didn't mean to speak over you.

21  MR. KEARL:  No.

22  JUDGE GREEN:  Do you want to take a lunch here?

23  MR. MURPHY:  Yeah, we do.  We do, Your Honor.  But before

24  we do, we -- we'd ask the counsel for the General Counsel about

25  the scope of her case.  And there was just a reference to Mr.



1    Kearl's case.  Can we ask Mr. Kearl if he intends to call one

2    or more witnesses?

3        MR. KEARL:  I -- de -- depending on the judge's decision

4    about the two exhibits related to the Christian Smalls memo,

5    apart from, you know, potentially needing to -- to subpoena Mr.

6    Zapolsky to clarify -- to overcome the hearsay objection, I did

7    not have any witnesses that I plan to call.

8        MR. MURPHY:  Okay, so -- so -- so no fact witnesses

9    immediately to follow the counsel for the General Counsel's

10   case?

11       MR. KEARL:  I do not plan on calling back witnesses, no.

12       MR. MURPHY:  Okay.  Thank you.

13       JUDGE GREEN:  Okay.  So why don't we go off the record

14   until 1:20?  So off the record.

15   (Off the record at 12:17 p.m.)

16       JUDGE GREEN:  So we will go back on the record.

17       THE COURT REPORTER:  We are.  What was that?

18       JUDGE GREEN:  Okay.

19       THE COURT REPORTER:  We are.

20       JUDGE GREEN:  Okay, all right.  So Ms. Velasco, we're

21   back.  And the Respondent's counsel is going to have some

22   questions for you on cross-examination.  Okay?

23       And anytime you're ready, Mr. Murphy.

24       MR. MURPHY:  Thank you, Your Honor.

25                        **CROSS-EXAMINATION**



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q     BY MR. MURPHY:   Good -- good afternoon, Ms. Velasco.   My

2    name's Chris Murphy.   I'm one of the attorneys representing

3    Amazon in this case.   How -- how are you this afternoon?

4    A     I'm good.   How are you?

5    Q     Good, thank -- I'm good, thank you.   Ms. Velasco, when you

6    testified in direct exam, did you have any notes or any

7    materials in -- in front of you?

8    A     No.

9    Q     Nothing up on a computer screen or anything like that?

10   A     No.

11   Q     Would -- would you mind just tipping your camera down so

12   we can get a look at what the area immediately behind you looks

13   like?

14   A     Oh, I'm sorry.   It's just my cell phone and a piece of

15   candy.

16   Q     And I do see some notes right there in your -- where your

17   right hand is.

18   A     None of that is mine.   I'm in my sister's bedroom.   It's

19   the only room that is quiet enough for me to do this.

20   Q     I -- I can appreciate that.   I can appreciate that.   Thank

21   you for doing that, by the way.

22   A     You're welcome.

23   Q     Before you testified today, did you review any materials

24   related to this case?

25   A     Yes.



1   Q    Why don't you tell me what you reviewed?

2   A    Just my affidavit, I've watched the video once or twice

3   just to recollect my memory of what exactly happened, since

4   this was almost a whole year ago now.

5   Q    And when you say the video, what -- what video are you

6   referring to?

7   A    The actual protest on April 6th.

8   Q    And was that the video that you were shown during your

9   direct examination?

10   A    Yes.

11   Q    You didn't review any other videos?

12   A    No.

13   Q    Did you meet with any representatives of the National

14   Labor Relations Board, Ms. Cox, for example, who asked you

15   questions this morning?

16   A    Yes, only Zoom meetings.

17   Q    Zoom meetings, okay.  And did you meet or speak directly

18   with -- with Mr. Bryson?

19   A    No.

20   Q    And how -- what about Mr. Smalls?  Have you spoken with

21   him in the last couple of months?

22   A    No, nothing about what I'm testifying for now.

23   Q    In -- in your direct examination, you were shown a -- an

24   overhead picture.

25   A    Yes.



1    Q    It was -- it was General Counsel Exhibit 51.  And -- and

2    it was a picture of -- a two-page document, right?  The one

3    picture was a picture of the front of the building and the

4    parking lot area.  And the other was a bigger, more remote --

5    A    Yes.

6    Q    -- or more -- more expansive picture.  Do you remember

7    that?

8    A    Yes.

9    Q    Okay.  The -- the -- the -- the picture, the first

10   picture, of General Counsel 51, the -- the area of the parking

11   lot, the -- that picture -- did that reflect the -- the number

12   of cars or the number of individuals who were present on April

13   6th, the -- the date you protested with Mr. Bryson?

14   A    No, it's not the exact amount of cars and everything.

15   That's just a general picture of -- to show the warehouse.

16   Q    Okay.  If I showed you a picture of that day, of that

17   area, would -- would -- you think you'd recognize it?

18   A    Yes.

19   Q    Okay.

20        MR. MURPHY:  Mr. Falk, can you load Respondent's Exhibit

21   102 in -- into SharePoint please?  And then, when that's done,

22   if you could share the screen, that would be great.  And I'd

23   like you not to run the video at this point, just tee it up

24   with -- so that it can be seen.

25        MR. FALK:  Okay, stand by.  Do you want me to wait until



1    it's fully uploaded into SharePoint?  Or just go ahead and

2    share the screen while it's uploading?

3         MR. MURPHY:  Judge, do you have a preference there?

4         MS. COX:  Judge, Green, if I may, I have a preference.

5         JUDGE GREEN:  Okay.

6         MR. MURPHY:  Then what -- I'm happy -- I'm happy to -- I'm

7    happy to follow Ms. Cox's preference here, Your Honor.

8         JUDGE GREEN:  Okay.

9         MS. COX:  Judge Green, I'd like to -- I'd like it to be

10   uploaded into SharePoint before it's shown.

11        MR. MURPHY:  No problem.

12        MS. COX:  Thank you.

13        MR. MURPHY:  Then, I'm going to go off video for one

14   second.

15        JUDGE GREEN:  Okay.

16        MR. MURPHY:  Apologies.  I need to grab a -- I need to

17   grab a better pen.  Sorry.

18        JUDGE GREEN:  Why don't we go off the record for a moment?

19   (Off the record at 1:54 p.m.)

20        JUDGE GREEN:  So Ms. Cox, have you man -- did you manage

21   to get the video?

22        MS. COX:  Yes, Your Honor.

23        JUDGE GREEN:  Okay.

24                    **RESUMED CROSS-EXAMINATION**

25   Q    BY MR. MURPHY:  Okay.  Ms. -- Ms. Velasco, can -- can you



Exhibit E, Motion to Try Petition on Hearing Record
1903

```
1    see the image that's on the shared screen right now?

2    A    Yes, yeah.

3    Q    Okay.  And do you recognize that as the parking lot of

4    JFK8 or I should say the area immediately in front of the

5    building at JFK8 on April 6th?

6    A    Yes.

7    Q    Okay.

8         MR. MURPHY:  And Mr. Falk, could you put a cursor on the

9    individual with the white sign please in the middle of the --

10   yes, right there.

11   Q    BY MR. MURPHY:  Ms. Velasco, do you see that cursor?

12   A    Yes, yes.

13   Q    Okay.  And that -- that's Mr. Bryson, correct?

14   A    Yes.

15   Q    Okay.

16        MR. MURPHY:  And could you move the cursor, Mr. Falk, to

17   the woman that's holding the blue sign?  Right there, okay.

18   Q    BY MR. MURPHY:  And -- and that's you, correct, Ms.

19   Velasco?

20   A    Correct.

21   Q    All right.

22        MR. MURPHY:  And then, how about moving forward, Mr. Falk,

23   to the woman that's sitting on the curbing of the --

24   Q    BY MR. MURPHY:  And that cursor right there -- that --

25   that's the coworker that Mr. Bryson had -- had a conflict with,
```



1    right?

2    A    Correct.

3    Q    Okay.  Do you know that person's name?

4    A    No.

5    Q    Do you know it today?

6    A    No.

7    Q    Can you identify anyone else in -- in this video?

8         MR. MURPHY:  Or -- and Mr. Falk, how about if you zoomed

9    in on the people standing in the yellow hatch -- hatching or

10   closest to the building?  Can you do that please?

11        MR. FALK:  I'm not sure if I can do that on a video.

12        MR. MURPHY:  Oh, okay.

13        MR. FALK:  Let me see -- let me see if I can.  Yeah, I

14   might be able to.  Well, yeah.  That's about all I can do.  I'm

15   sorry.

16        MR. MURPHY:  Okay.

17   Q    BY MR. MURPHY:  Can -- can you identify anyone else in

18   this video --

19   A    Yeah.

20   Q    -- Ms. Velasco?

21   A    In the yellow crosswalk in front of the building, the

22   person closest to the bottom of the screen -- blue vest -- I

23   believe that's a social distancing team employee.  And over to

24   the right there's someone in a vest.  I can't tell exactly what

25   color or stripe that is, but I believe it's green, so that



# Exhibit E, Motion to Try Petition on Hearing Record

1    would be safety.

2    Q    Right -- right there where Mr. Falk is moving his cursor?

3    A    Correct.

4    Q    Okay.  Do you know an operations manager named Maciej

5    Curlej by any chance?

6    A    No.

7    Q    Okay.

8         THE COURT REPORTER:  I'm going to need that name some --

9    sometime --

10        MR. MURPHY:  Yeah.

11        THE COURT REPORTER:  -- before the day is over with.

12        MR. MURPHY:  I -- I can -- I can spell it for you.  It's

13   M-A-C-I-E-J.  Last name C-U-R-L-E-J.

14        THE COURT REPORTER:  Thank you.

15        MR. MURPHY:  Okay.  Thank you, Mr. Falk.  You can remove

16   the -- the video from the screen.

17   Q    BY MR. MURPHY:  Ms. Velasco, when I -- when I asked you

18   what you had reviewed prior to testifying, you -- you said that

19   you had reviewed your affidavit, right?

20   A    Yes.

21   Q    So you -- you remember giving an affidavit to the NLRB in

22   connection with this case, right?

23   A    Correct.

24   Q    How many affidavits did you provide to the NLRB?

25   A    I believe it was just the one.



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    Just the one.  And do you remember when you gave or

 2    provided that affidavit to the NLRB?

 3    A    No, not exact date.

 4    Q    Can you -- do you have an approximate date?  Was it a week

 5    after April 6th?

 6    A    No.

 7    Q    Was it last week?

 8    A    I believe it was maybe two months.

 9    Q    Two months after?

10    A    Yeah, after -- I guess, yes.  I'm -- I don't recall

11    exactly when.  I just remember getting the phone call and

12    asking to help with his case.  And I said of course --

13    Q    Okay.

14    A    -- since it was my Live video.

15    Q    And if I told you that you gave the -- that you signed the

16    affidavit on July 22nd of 2020, would that sound about right to

17    you?

18    A    Yeah.

19    Q    Okay.  Now, that was much closer in time to the events of

20    April 6th than -- than today, right?

21    A    Yes.

22    Q    And -- and your recollection of what had occurred would

23    have been much clearer then than -- than it is, you know, more

24    an a year later, right?

25    A    Yes.
```



www.escribers.net | 800-257-0885

1    Q    And in that affidavit, you -- you told the NLRB everything

2    that you remembered that occurred on -- on April 6th; isn't

3    that right?

4    A    Yeah, yeah.

5    Q    And you told them everything that you remembered about the

6    protest and -- and what happened and who said what to whom,

7    correct?

8         MS. COX:  Objection, Your Honor, vague.

9         JUDGE GREEN:  I think she -- you can answer.  If you -- if

10   you don't think so, you can say no and explain why.

11   Q    BY MR. MURPHY:  You can go ahead and answer, Ms. Velasco,

12   if you can.

13   A    Can you repeat the question?

14   Q    Sure.  When -- when you gave the NLRB your affidavit, did

15   you tell them everything you remembered about the events of

16   April 6th?

17   A    Correct.

18   Q    And -- and did you tell them everything that you

19   remembered that Mr. Bryson said and did in his conflict with

20   his coworker?

21   A    Correct.

22   Q    And -- and did the tell the NLRB everything that you

23   recalled the coworker saying and doing with respect to Mr.

24   Bryson?

25        MS. COX:  Objection, Your Honor, compound -- said and did.



1    JUDGE GREEN:  Okay.  You want to repeat the question?

2    MR. MURPHY:  Sure.

3    Q    BY MR. MURPHY:  Did -- did you tell the NLRB everything

4    that you recalled the coworker saying to Mr. Bryson?

5    A    Yes.

6    Q    And do you recall telling the NLRB everything that the

7    coworker did to or at Mr. Bryson?

8    MS. COX:  Objection, Your Honor.

9    MR. KEARL:  Vague and --

10   JUDGE GREEN:  What's the objection?

11   MR. KEARL:  -- everything.

12   JUDGE GREEN:  I -- I understand.  So you know, you can

13   clarify on cross if you have questions on cross or Ms. Velasco

14   can testify to the question, but it's overruled.

15   Q    BY MR. MURPHY:  You can -- you can answer the question,

16   Ms. Velasco.

17   A    Can you repeat it please?

18   Q    Sure.  Did -- did you tell the NLRB everything that you

19   remembered that the coworker did to or at Mr. Bryson?

20   A    Yes.

21   MS. COX:  Objection, Your Honor, to or at -- compound.

22   JUDGE GREEN:  Overruled.

23   Q    BY MR. MURPHY:  Did you review the affidavit before you

24   signed it?

25   A    Yes.



Case 1:23-cv-01470-DG-SJB   Document 5-1   Filed 03/17/23   Page 957 of 2171 PageID #: 1509

1   Q    And if the affidavit didn't include something important,

2   you -- you would have added it at -- at the time you signed it,

3   right?

4       MR. KEARL:  Objection.  How was she supposed to know

5   what's important?

6       JUDGE GREEN:  Sustained.

7   Q    BY MR. MURPHY:  If the affidavit did not include something

8   that you had told the NLRB about the -- about the conduct on

9   April 6th, you would have made note of that and -- and added it

10  to the affidavit, correct?

11      MS. COX:  Objection, Your Honor, calls for conjecture.

12      JUDGE GREEN:  Overruled, if you know.

13  Q    BY MR. MURPHY:  Ms. Velasco?

14  A    Yes, I'm sorry.  Can you repeat the question?

15  Q    Sure.  The -- the things that you told the NLRB in your

16  telephone interview -- did they put all of them into the

17  affidavit that you signed?

18      MS. COX:  Objection --

19      THE WITNESS:  Yes.

20      MS. COX:  -- Your Honor.

21      JUDGE GREEN:  Overruled.

22      MS. COX:  How does she know what the NLRB did?

23      JUDGE GREEN:  It's in the affidavit, no?

24      MR. MURPHY:  Right.  I think she answered the question

25  "yes", Your Honor.



1       JUDGE GREEN:  Okay.

2   Q   BY MR. MURPHY:  In the interview with the NLRB, did you

3   tell the person -- and by the way, who was the person

4   interviewing you, if you recall?

5   A   I don't recall.

6   Q   Okay.  Did -- did you tell the person that -- that

7   interviewed you that you had recorded the events of April 6th?

8   A   I don't recall if that was mentioned, no.

9   Q   Okay.  So -- so you don't remember if the NLRB asked you

10  whether you had any video?

11  A   Correct.

12  Q   Did -- did -- did you tell the NLRB that part of your role

13  in the protest was to act as the recorder of them?

14  A   No.

15  Q   Why did you not tell the NLRB that you had acted as the

16  recorder of the protest on April 6th?

17  A   Well, that's --

18      MR. KEARL:  Objection, relevance.

19      JUDGE GREEN:  What's the objection?

20      MR. KEARL:  Relevance.

21      JUDGE GREEN:  Overruled.  If -- if -- overruled.  Let me

22  ask you, Ms. Velasco:  Was that -- was that your function at

23  the protest, to act as the recorder of the protest?

24      THE WITNESS:  It wasn't my function.  It was just what I

25  chose to do --



```
 1          JUDGE GREEN:  Okay.

 2          THE WITNESS:  -- because I'm not the one to speak out.

 3    Q    BY MR. MURPHY:  So you rec -- so you recorded the events

 4    of April 6th, correct?

 5    A    Correct.

 6    Q    And did Mr. Bryson know that you were recording the

 7    protest on April 6th?

 8    A    Yes.

 9          MS. COX:  Objection, Your Honor, to what Mr. Bryson knows.

10          JUDGE GREEN:  Okay.  I'll overrule it.

11    Q    BY MR. MURPHY:  Did Mr. Bryson -- do you know if Mr.

12    Bryson saw you taking video of -- of the protest on April 6th?

13          MS. COX:  Objection --

14          THE WITNESS:  Yes.

15          MS. COX:  -- Your Honor, to what Mr. Bryson saw.

16          JUDGE GREEN:  Okay.  I -- I guess the more appropriate

17    question is:  Do you know whether Mr. Bryson was in a position

18    to see you taking video of the protest?

19          THE WITNESS:  Yes.

20    Q    BY MR. MURPHY:  Did -- did -- did you tell anyone that you

21    had taken video of -- of the protest on April 6th?

22    A    No.  It's a Live video.

23    Q    Humor me here, Ms. Velasco.  Okay?  So when -- when you

24    say it's a Live video, does that mean you were broadcasting it

25    on Facebook Live?
```



1    MS. COX:  Objection, Your Honor --

2    THE WITNESS:  Yes.

3    MS. COX:  -- relevance.

4    JUDGE GREEN:  Overruled.

5    Q    BY MR. MURPHY:  Ms. -- Ms. Velasco, if -- if -- if Ms. Cox

6    is going to object to every question, could you just wait until

7    she makes her objection before you give your answer so that we

8    can hear it?

9    A    Yes.

10   Q    Okay?

11   JUDGE GREEN:  Right.  So if you hear an objection, wait

12   for me to rule on it.  If I sustain the objection, that means

13   you don't have to answer it.  If I overrule the objection, then

14   you can go ahead and answer.  And if, by that time, you -- you

15   need the question asked again, you can ask that the question be

16   asked again.

17   Q    BY MR. MURPHY:  I know you answered "yes" to the question,

18   but did -- just so the record's clear, do you remember what the

19   question was?

20   A    About the Live broadcast.

21   Q    Yes.  So -- so were -- did you broadcast the protest on

22   April 6th on -- on Facebook Live video?

23   A    Yes.

24   Q    Do you have your own Facebook Live video?  And -- and

25   again, apologies for my lack of technical expertise, but bear



1  with me.  Yeah.  That's the look I get at home frequently.  Do

2  you have your own Facebook Live video channel or account that

3  you use to broadcast?

4       MR. KEARL:  Objection --

5       MS. COX:  Objection, Your Honor --

6       MR. KEARL:  -- Your Honor.

7       MS. COX:  -- relevance.

8       JUDGE GREEN:  Okay.  So yeah.  I don't think we need to

9  know what accounts Ms. Velasco put --

10      MR. MURPHY:  I'm -- I'm not asking for her to -- I'm --

11  Your Honor, I'm -- I'm trying to --

12      JUDGE GREEN:  I understand.  You're just trying to

13  understand how a Live -- a Live video works, right?

14      MR. MURPHY:  Correct, um-hum.

15      JUDGE GREEN:  Okay.  So okay.  Ms. Velasco, why don't you

16  tell us how a Live video works?

17      THE WITNESS:  Okay.  It's just on Facebook.  You go on

18  Facebook and you click the "live" button.  That's really it.

19      JUDGE GREEN:  Okay.

20  Q    BY MR. MURPHY:  So the -- the -- the protest was -- was

21  streamed live on Facebook Live; is that -- is that right?

22  A    Yes.

23  Q    The entire protest?

24  A    Yes.

25  Q    From start to finish?



1    A    Yes.

2    Q    Okay.  Where is that video today, Ms. Velasco?

3    A    It's still on Facebook.

4    Q    Do you -- do you have it?

5    A    If I search for it on Facebook, yeah.

6    Q    And can you provide me a -- a -- a web address or --

7    MS. COX:  Objection, Your Honor.  Objection.  We've gone

8    way beyond the scope of direct.  Ms. -- Ms. Velasco --

9    JUDGE GREEN:  We absolutely have not.  So we absolutely

10    have not.  So you know, I was wondering where this video is and

11    whether we would get it.  It's -- you know, arrangements, I

12    take it, have not been made to produce it for the trial.  That

13    was not part of the GC's intention?

14    MS. COX:  No, Your Honor, not at this time.

15    JUDGE GREEN:  Okay.  Well --

16    MR. MURPHY:  Let's -- let's pro -- let's produce it and

17    play it, Judge.  Let's just get to the bottom of this.

18    JUDGE GREEN:  Yeah, so listen.  There's been no -- there's

19    been no subpoena, I take it, of Ms. Velasco.  And this video is

20    not under subpoena, but -- but why aren't we doing that?  Why

21    aren't we -- why aren't we playing this video?

22    MR. MURPHY:  You know the answer, Your Honor.

23    JUDGE GREEN:  Well --

24    MS. COX:  Are you asking me, Judge?

25    JUDGE GREEN:  Yeah.



1     MS. COX:  Judge, we reserve the right to use the video

2  when -- as we see fit.

3     JUDGE GREEN:  Okay.  So at some point, arrangements are

4  probably going to be made to -- to get that video.

5     Mr. Murphy, would you like a subpoena?

6     MR. MURPHY:  I would like a subpoena.

7     JUDGE GREEN:  Okay.  You're authorized to issue a subpoena

8  duces tecum.  Please when you -- when you serve it, send me the

9  date and the number.  But having said that -- having said that,

10  this video is obviously relevant.  And it should be produced.

11  And I -- I would ask that the General Counsel work with the

12  Respondent to produce it quickly so we don't have even more

13  delay in this case --

14     MR. MURPHY:  Yes.

15     JUDGE GREEN:  -- than we absolutely have to.

16     MS. COX:  Judge Green --

17     MR. MURPHY:  Your Honor -- Your Honor, I did -- I did ask

18  Ms. Cox to produce or provide any -- any video evidence in the

19  Region's possession.

20     JUDGE GREEN:  I assume it's not in the Region's possession

21  though, right?  It's not -- you don't -- it's just on Facebook.

22  Am I right about that?

23     MS. COX:  Judge Green, we don't have any obligation to

24  turn over anything.

25     JUDGE GREEN:  You do.  It's Jencks.  It's Jencks if you --



Exhibit E, Motion to Try Petition on Hearing Record

1    if you have it.

2         MS. COX:  Well --

3         JUDGE GREEN:  Do you have it?

4         MS. COX:  I do, Your Honor.

5         JUDGE GREEN:  Okay.  Then, it's supposed to be turned over

6    as Jencks material.  Hold on.  Hold -- hold on just one minute.

7    Off -- off the record.

8    (Off the record at 2:11 p.m.)

9         JUDGE GREEN:  So back on the record.  So -- so I'm -- I'm

10   wrong.

11        MR. MURPHY:  Yeah.

12        JUDGE GREEN:  The -- the video is not -- is not Jencks

13   material.

14        MS. COX:  Thank you, Judge.

15        JUDGE GREEN:  So listen.  It's not -- it's not going to be

16   produced right now.  That -- that's the truth.  So I guess we

17   should move on and we'll deal with the production of the video

18   after -- you know, after we're done with Ms. Velasco.

19        MR. MURPHY:  Your Honor, I don't know that -- how I can

20   complete the cross-examination of the -- of this witness

21   without having the video.  She -- she -- she took it.

22        MR. KEARL:  Judge, we've been forced -- we've been forced

23   to get into this case, had subpoenaed Respondent, and

24   Respondent continues to refuse to deliver the documents.

25        JUDGE GREEN:  That's irrelevant to this particular issue.



# Exhibit E, Motion to Try Petition on Hearing Record

1   This is -- this --

2   MR. KEARL:  Judge, I was -- I was served a subpoena on

3   Monday of last week asking for information.

4   JUDGE GREEN:  About -- why is that relevant to this issue

5   of the -- of the -- of the video?

6   MR. KEARL:  Be -- because Amazon, Respondent, could have

7   subpoenaed this information to -- from other parties --

8   MR. MURPHY:  I mean, we had --

9   MR. KEARL:  -- starting December 24th.

10   MR. MURPHY:  -- Judge, we had no idea who -- who --

11   whether video existed or who took it.

12   JUDGE GREEN:  Okay.

13   MR. KEARL:  That's not true, Your Honor.

14   MS. COX:  But --

15   JUDGE GREEN:  So here's the -- here's the bottom line:

16   We're not going to be done with this case without this video

17   being -- being entered into evidence if one of the parties

18   wants to enter it into evidence.  That's just the truth of the

19   situation.  So listen.  It's not going to happen now.

20   MR. MURPHY:  Your -- Your Honor, if -- if I may, may we

21   take -- may we -- may we go off the record for a few minutes?

22   We may -- now -- now that we know that it's on Facebook,

23   we're -- we're going to make an effort to locate it.  And if we

24   can locate it, we're going to play it.

25   JUDGE GREEN:  I don't think you're going to be able to do



1    that.  Ms. Velasco, I take it that the -- the video would not

2    be viewable from somebody who's not your friend on Facebook?

3        THE WITNESS:  No, anyone could view the video.  It's a

4    Live video.

5        JUDGE GREEN:  Oh, okay.

6        THE WITNESS:  It has viewers from all around the world.

7        JUDGE GREEN:  Okay.  Off the record.

8    (Off the record at 2:15 p.m.)

9        JUDGE GREEN:  Okay.  So let's go back on the record.  And

10   Mr. Murphy is going to have some additional questions for you,

11   Ms. Velasco.

12       THE WITNESS:  Okay.

13                    **RESUMED CROSS-EXAMINATION**

14   Q    BY MR. MURPHY:  Okay, Ms. Velasco.  Earlier in your cross-

15   examination, I asked you what video the NLRB had shown you in

16   prep.  And I -- I just want to make sure that --

17       MR. KEARL:  Objection, mis -- mischaracterization of the

18   question.  The question was:  What -- what video did you

19   review?

20       JUDGE GREEN:  Okay.

21   Q    BY MR. MURPHY:  Okay.  What -- I asked you earlier what

22   video you had reviewed.  Do you recall that question?

23   A    Yeah.

24   Q    And -- and I think that you indicated that you had

25   reviewed the video that you were shown in your direct



1    examination, which was the video along the main entrance of the

2    facility with no sound.  Was -- was that what you intended to

3    answer?

4    A    Correct.

5    Q    Okay.  You didn't intend to say that you had looked at

6    your Facebook Live video in preparation?

7    A    No, I watched that as well.

8    Q    Okay.  So it -- so when I asked you what video you had

9    looked at, you told me about one of them but not the other; is

10   that right?

11   A    Yes.

12   Q    Okay.  And I asked you about your -- I asked you about the

13   affidavit you had given to the NLRB.  Do you recall those

14   quest -- do you need a minute?

15   A    No.  I just had to close the window.

16   Q    All right.

17   A    Ice cream truck is out there.

18   Q    Lucky.

19   A    Yeah.

20   Q    So I had asked you some questions about the affidavit you

21   gave to the NLRB.  Do you recall those questions?

22   A    Not exactly, no.

23   Q    Okay.  You gave an affidavit to the NLRB, right?

24   A    Yep.

25   Q    And I asked you whether you remembered who -- who you had



Case 1:23-cv-01470-DG-SJB   Document 5-1   Filed 03/17/23   Page 968 of 3171 PageID #: 1020
922

1    spoken to or who had taken the affidavit.  And you indicated

2    that you didn't recall.  Do you remember that testimony?

3    A    Yeah, yeah.

4    Q    Okay.  One of the individuals on the -- in the video

5    screen is a woman named Evamaria Cox.  Do you see her on your

6    screen?  She has a blue background.

7    A    Yeah.

8    Q    Okay.  When you -- when you spoke with whomever from the

9    NLRB, was it a video call or was it just a telephone call?

10   A    For the affidavit?

11   Q    Yes, ma'am.

12   A    Just phone calls.

13   Q    Okay.  So it -- if -- if I told you that Evamaria Cox was

14   the person that took your affidavit at the NLRB, would that

15   refresh your recollection as to who did it?

16   A    Yes.

17        MS. COX:  Objection, Your Honor.  This is just if -- it's

18   hypothetical.

19        JUDGE GREEN:  I don't know that it's hypothetical, but

20   what's the relevance?  Why do we care?

21        MR. MURPHY:  Be -- because I'm -- I'm going to ask her --

22   well, she just said that it was Ms. -- her recollection was

23   refreshed that it was Ms. Cox.  And I have some -- I have some

24   questions about the affidavit and how it was taken.

25        JUDGE GREEN:  Okay.



# Exhibit E, Motion to Try Petition on Hearing Record

```
1    Q    BY MR. MURPHY:  So Ms. -- Ms. Velasco, during your

2    testimony today, you -- you quite freely acknowledge that you

3    recorded the events of April 6th, both in your direct

4    examination and your cross-examination.  Do you remember that?

5    A    Yes.

6    Q    When you spoke with Ms. Cox at -- at the NLRB, did she ask

7    you what you did at the protest on April 6th?

8    A    No, she only asked general questions about what happened

9    with Gerald.

10   Q    Okay.  So she never asked you what you did or what -- what

11   role you performed or what actions you took; is that right?

12        MS. COX:  Objection, Your Honor.  It's asked and answered.

13        JUDGE GREEN:  Overruled.

14   Q    BY MR. MURPHY:  You can answer that, Ms. Velasco.

15   A    Can you repeat the question?

16        MS. COX:  And compound -- Yes, Judge.  Objection,

17   compound.

18        JUDGE GREEN:  Okay.  I didn't hear that it was compound,

19   but do you want to ask it again or ask it in a way that perhaps

20   is not compound?

21        MR. MURPHY:  Sure.

22   Q    BY MR. MURPHY:  Did -- did -- did Ms. Cox ask you what you

23   did at -- at the protest on April 6th?

24   A    No.

25   Q    Did she ask you what actions you took, if any, at the
```



1    protest on April 6th?

2    A    No.

3    Q    Did you tell her that you recorded the protest on April

4    6th?

5    A    No.

6    Q    Why did you not tell her that?

7         MS. COX:  Objection, Your Honor, relevance.

8         JUDGE GREEN:  Overruled.  Were you asked, Ms. -- Ms.

9    Velasco, whether you recorded the incident?

10        THE WITNESS:  No, I was not asked.

11   Q    BY MR. MURPHY:  And -- and -- and why did you not share

12   that information with Ms. Cox?

13        MS. COX:  Objection, Your Honor, relevance.

14        JUDGE GREEN:  Overruled.

15        THE WITNESS:  At the time of being spoken to, I didn't

16   think that was something very important to mention.

17   Q    BY MR. MURPHY:  So --

18   A    I was being asked about Gerald and what happened.

19   Q    -- and so you didn't think that sharing information about

20   a video of the incident that you took was very important?

21        MS. COX:  Objection, Your Honor, asked and answered.

22        JUDGE GREEN:  Sustained.

23   Q    BY MR. MURPHY:  Why didn't you think that information

24   about a video that you had taken of the protest was important?

25        MS. COX:  Objection, Your Honor, asked and answered.



# Exhibit E, Motion to Try Petition on Hearing Record
1023

```
 1        JUDGE GREEN:  Overruled.

 2        MR. KEARL:  Objection, relevance.

 3        JUDGE GREEN:  Overruled.  Come on.  Let's move through

 4   this.

 5        MS. COX:  Your Honor, he's badgering the witness.

 6        MR. KEARL:  No, he's not.

 7        JUDGE GREEN:  He is absolutely not.

 8        MR. KEARL:  Oh, my God.

 9        JUDGE GREEN:  He's absolutely not badgering the witness.

10   Yeah.  We're trying to get some very basic information here.

11   It's not -- it's -- it's -- it's -- it's fine.  It's fine.  The

12   question is not objectionable.  Let's move through this

13   quicker.

14   Q    BY MR. MURPHY:  Can you answer the question, Ms. Velasco?

15   A    Can you please repeat it?

16   Q    Why did you not think it was important to tell Ms. Cox

17   that you had video of the protest on April 6th?

18   A    At the time, I didn't think it was relevant -- that that

19   information was really needed when it wasn't being asked of me.

20   Q    You have a Facebook page, correct?

21   A    Yes.

22   Q    And you post videos to that Facebook page, correct?

23   A    Yes.

24   Q    And the videos are public, meaning that anyone can go onto

25   your webpage and view those videos, correct?
```



Case 1:23-cv-01470-DG-SJB   Document 5-1   Filed 03/17/23   Page 972 of 3171 PageID #: 1024

1  A    Yes.

2  Q    The video that you shot of -- or took of the protest on

3  April 6th, 2020 -- that's visible today on your Facebook page,

4  correct?

5  A    Yes.

6      MR. MURPHY:  Your Honor, we -- I -- I want to show the

7  witness a -- a video.  Because of the size of the file, we're

8  only able at this moment to play it through the Facebook

9  interface.  What -- what -- what we're going to do when we have

10  time is download it, the entire video.

11      It's about an hour long, plus or minus and -- and -- and

12  make that an exhibit and -- and -- and also separately prepare

13  a -- a clip about eight or nine minutes of the video that

14  includes the interaction between Mr. Bryson and his coworker

15  and -- and mark that as a video -- as an exhibit as well.

16  But -- but for the moment, what we're going to do is -- is show

17  the video, ask the witness to identify it, and then -- and

18  then, play a eight-minute clip.  Okay?

19      JUDGE GREEN:  Is there any reason why we need anything

20  more than the clip?  Is that what -- how long the incident was?

21      MR. MURPHY:  Yes, Your --

22      MS. COX:  No, Your Honor.  No, it's not eight minutes

23  long.

24      JUDGE GREEN:  So it's shorter?

25      MS. COX:  Yes, Judge.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  All right.  Is there any reason why we need

2    anything more than the incident?

3    MR. MURPHY:  I -- I don't believe that we do, Judge.  The

4    only reason I was going to suggest that we put the -- the

5    entire video in is just so that no one could say that we

6    cherry-picked.

7    JUDGE GREEN:  Right, I understand.  But if the parties

8    reach an agreement on that, I don't think we need any more than

9    the incident.

10   MR. MURPHY:  Understood.  Could I -- just so I don't waste

11   any -- anybody's time, would -- would counsel for the General

12   Counsel be willing to share with me the -- the -- the clip

13   that -- or the -- or the passages that she believes are most

14   probative or relevant here?

15   MS. COX:  Mr. Murphy, the interaction ends when the woman

16   enters the facility.  That's -- that's the period of time

17   that's relevant.

18   MR. MURPHY:  Okay.  Well --

19   MR. KEARL:  And Your Honor, insofar as I'm also

20   representing a party in this hearing, I would like to also be

21   present for that conversation to make sure that it was not

22   edited shorter than -- than I think is relevant on the front

23   end of that video.

24   MR. MURPHY:  Yeah.

25   JUDGE GREEN:  So what is the -- what -- do we know where



1    it starts on the front end of the video?

2        MR. MURPHY:  Yeah.  We're going to -- we're going to play

3    an eight-minute clip, Your Honor for --

4        JUDGE GREEN:  Okay.

5        MR. MURPHY:  -- starting at 21 minutes and -- and ending

6    at 29 minutes.

7        MS. COX:  Judge, we object because the incident is less

8    than eight minutes.

9        MR. MURPHY:  Well, we'll see, right?  I mean, what's --

10   what's the big deal?  Let's play the video.

11       JUDGE GREEN:  Let me ask you -- let me ask you a question.

12   Is there some reason why we need to do this while Ms. Velasco

13   is here?  Do you have specific questions for Ms. Velasco based

14   on what's in --

15       MR. MURPHY:  I do.

16       JUDGE GREEN:  -- certain portions of the --

17       MR. MURPHY:  I -- I do indeed, Judge.

18       JUDGE GREEN:  Are you going to stop it at -- at certain

19   sections and ask questions?

20       MR. MURPHY:  I was going to let it play through and then

21   ask my questions.

22       JUDGE GREEN:  Okay.  So I'm 100 percent sure that that's

23   the best way to go about it.  If you've got specific questions

24   about specific portions of the video, it might be best to, you

25   know, as the questions as you go through.



1    MR. MURPHY:  Okay.  And let -- so -- so let me ask a

2    couple preparatory questions.

3    Q   BY MR. MURPHY:  Ms. -- Ms. Velasco, in addition to

4    recording and posting the video, did you also make comments

5    during the -- the -- the recording of the video itself?

6        MS. COX:  Object, You Honor, relevance.

7        JUDGE GREEN:  Overruled.  Do you understand the question,

8    Ms. Velasco?

9        THE WITNESS:  Yes.  I was just making sure everyone was

10   done.  Yeah, I made a few comments but written within the

11   video, not spoken on video.

12   Q   BY MR. MURPHY:  Okay.  And -- and you remember which parts

13   of the video you made comments about?

14   A   It was all throughout when I took video.  As other people

15   were commenting and joining within the video to watch, I was

16   answering through the comments instead of speaking and

17   interrupting everything else going on.

18   Q   Okay.  And do you remember making a comment with three

19   laughing faces at -- just at the time that Mr. Bryson called

20   his coworker a gutter bitch?  Do you remember that?

21       MS. COX:  Objection, Your Honor, her conduct is not at

22   issue in this case.  It's completely irrelevant.

23       JUDGE GREEN:  Okay.  So why do we need that?

24       MR. MURPHY:  Your -- Your Honor, we -- we need it to show

25   the impact of the video on observers and to identify the --



Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/23   Page 976 of 3171 PageID #: 930
1028

1    JUDGE GREEN:  Uh-huh.

2    MR. MURPHY:  -- the -- the -- the off -- the offensive

3  and -- and ridiculing nature of it as -- as indicated by the --

4  the -- the commentary that witness made or gave dur -- during

5  the actual playing of the video.

6    JUDGE GREEN:  So I -- I don't know that we need that from

7  her.  We're going to see it on the video, right?

8    MR. MURPHY:  Your Honor, you -- you allowed questions on

9  direct exam about Mr. Bryson's and -- and -- and the witness'

10  tone and tenor.

11    JUDGE GREEN:  Right.

12    MR. MURPHY:  I think that -- I -- I think the reaction

13  of -- of -- of this observer to those questions is -- is

14  relevant.

15    MS. COX:  Your Honor, if I may, she's a fact witness to

16  the event and she's allowed to testify to what she observed on

17  that day.

18    MR. MURPHY:  And she's allowed to testify as to the reason

19  that she made contemporaneous comments.

20    JUDGE GREEN:  Okay.  All right.  Go ahead.

21    MR. KEARL:  Can I ob -- object on relevance insofar as

22  Respondent seems to be alleging that Amazon did not see this

23  video at the time, they would have no way to make any

24  determination about Mr. Bryson based on the comments made by

25  Ms. Velasco on the video.



www.escribers.net | 800-257-0885

1      JUDGE GREEN:  So -- right.  This is -- this is my

2   hesitance.  I really don't see how this helps your case -- the

3   Respondent's case.  You know, the fact that Ms. Velas -- Ms.

4   Velasco's reaction to it just doesn't seem like it's going to

5   help you with it.

6      MR. MURPHY:  I -- I -- I'll move on then, Your Honor.

7      JUDGE GREEN:  Okay.

8      MR. MURPHY:  So could we play -- Mr. Falk, do you have the

9   Facebook Live video teed up and ready to go?

10      MR. FALK:  Yes.

11      MR. MURPHY:  I guess for identification purposes, we

12   should give it a number.  What -- what are we going to -- what

13   are we going to name this?  Mr. Falk, what number are we one,

14   do you know?

15      MR. FALK:  Oh.  I'm sorry.  I didn't know you were asking

16   me.

17      MR. MURPHY:  I'm sorry.

18      MR. FALK:  Okay.  Well, I know that --

19      MR. MURPHY:  Just put it at the end of what the list of --

20   of issue --

21      MR. FALK:  I think it's 122 maybe.

22      MR. MURPHY:  Okay.

23      MR. FALK:  Is that right?

24      MR. MURPHY:  Yeah, so we'll mark this for identification

25   as Respondent's Exhibit 122.



1    Q    BY MR. MURPHY:  Ms. Velasco --

2         MR. MURPHY:  Before you play it, Mr. Falk.

3    Q    BY MR. MURPHY:  Ms. Velasco, by -- by -- by looking at the

4    share screen here, can -- can you identify this video as the

5    video that you posted by using the Facebook Live video function

6    on April 6th, 2020?

7    A    Yes.

8    Q    Thank you.

9         MR. KEARL:  Your Honor, can we get the specific time code

10   of the start of this video that we're about to watch?

11        MR. MURPHY:  I think it's 21 minutes.  We're going to play

12   from 21 minutes to 29 minutes.

13        MR. FALK:  I have it right now at 20:55.

14        MR. KEARL:  Thank you.

15        MS. COX:  Judge Green, and we object to anything other

16   than whatever covers the incident at issue in this case.

17        JUDGE GREEN:  Okay.  Let's -- let's go.  Let's just do it.

18        MR. FALK:  Okay.  You want me to play it now?

19        MR. MURPHY:  Yes, please.

20        MR. FALK:  Okay.

21   (Video played)

22        JUDGE GREEN:  Tim?  Tim could you pause the video for a

23   second?  Is it -- is it -- is it possible to turn the volume up

24   internally?

25        MR. FALK:  Is it not -- I'm not sure.  I've got it all the



# Exhibit E, Motion to Try Petition on Hearing Record

1       way -- as loud as I can on my end.

2           JUDGE GREEN:  Okay.  All right.  Go ahead then, please.

3       Sorry to interrupt.

4           MS. COX:  Can you rewind it back a few seconds, Mr. Falk?

5           MR. FALK:  Sure.

6           MS. COX:  Thank you.

7       (Video resumes)

8           MR. FALK:  I think that was the 29-minute mark.

9           MR. MURPHY:  Thank you.  So Your Honor, we would move

10      the -- the admission of Respondent's Exhibit 122.

11          JUDGE GREEN:  Any objection?

12          MS. COX:  No objection, Your Honor.

13          JUDGE GREEN:  Okay.  So let's -- let's obviously put in

14      122 -- R-122 but can the parties come to some kind of agreement

15      as to that.  Is it -- are we going to just put in that clip?

16      Is that acceptable?

17          MS. COX:  Judge Green, I don't think it's necessary to put

18      in the part where he's discussing with her directly his

19      opinions.  After the woman goes inside, that's -- that's what

20      the woman reported about.  That's -- that's what's relevant in

21      this case.

22          JUDGE GREEN:  Does the Respondent admit that that's what

23      Mr. Bryson was discharged for, just the section when he was in

24      a direct exchange with Ms. Evans?

25          MR. MURPHY:  We do, Your Honor.  But we think the --



1  the -- the latter part of the video, where Mr. Bryson continues

2  to say -- to -- to make scurrilous remarks about drug use and

3  appearing like --

4  JUDGE GREEN:  Okay.

5  MR. MURPHY:  -- she's on --

6  JUDGE GREEN:  So -- all right.  So that's fine.  I -- I

7  don't think that there's any terrible harm in putting in this

8  eight-minute clip that we just saw.

9  **(Respondent Exhibit Number 122 Received into Evidence)**

10  MS. COX:  Judge Green, the -- beyond the two-minute --

11  however long, two, three-minute interaction is, it's just

12  completely after the fact.

13  JUDGE GREEN:  I get it.  I -- I get it.  Let's not argue

14  about it though.  We can -- we can all discuss that in -- in --

15  you can discuss that in the briefs.

16  MR. MURPHY:  Okay.  Mi -- Mr. Falk, you can take that

17  down.  Thank you.

18  Q  BY MR. MURPHY:  Ms. -- Ms. Velasco, so -- so you didn't

19  think that sharing that video with the NLRB in or around the

20  time you gave your affidavit was -- was important or relevant?

21  Is that your testimony?

22  MS. COX:  Ob -- objection, Your Honor.  Asked and

23  answered.

24  JUDGE GREEN:  Okay.  Sustained.  Let me ask you a

25  question.  Now, that we've seen that, is there any reason why



1  we actually had to have Ms. Velas -- Velasco come here and

2  testify at all?  We have the video.

3      MS. COX:  Judge Green, we have the right to put on our

4  case.  If we want to resume --

5      JUDGE GREEN:  I'm not asking you.  I'm sorry.  I'm

6  actually asking Mr. Murphy for purposes of whether we should

7  keep her any longer.  We have -- we have -- there's nothing to

8  discredit her over.  We have the video.

9      MR. MURPHY:  Yeah.  So you know, I had intended to get

10  into a little background which -- which she testified about.

11  But why don't -- give me -- give me five minutes and we'll see

12  if we can cut this down.  Okay?

13      JUDGE GREEN:  Okay.  Thank you.

14      MR. MURPHY:  Yeah.

15      JUDGE GREEN:  Okay.  Off the record.

16  (Off the record at 4:13 p.m.)

17      MR. MURPHY:  Judge, as I said, we're going to pare down

18  the scope of our -- our cross-examination as -- as you

19  suggested.  But before I jump back in, I -- I wanted to clarify

20  something I had said as we were exiting the record a few

21  minutes ago.  And that is that, in addition to the -- the --

22  the video evidence that we saw, you know, a number of other

23  factors weigh -- weighed into or were taken into account in --

24  in Mr. Bryson's discipline, in -- including his continuing

25  commentary.



Case 1:22-cv-01470-DG-SJB   Document 5-1   Filed 03/17/23   Page 982 of 3171 PageID #: 1036

1    MS. COX:  Objection, Your Honor.  Objection, Your Honor.

2    This is -- this is not the time and place for this.  It's for

3    the briefs.

4    MR. MURPHY:  I -- I just -- I

5    JUDGE GREEN:  Okay.  So --

6    MR. MURPHY:  I just wanted to make clear --

7    JUDGE GREEN:  That's fine.

8    MR. MURPHY:  I just wanted to make clear that -- that as

9    we exited the record, the question to me was --

10   JUDGE GREEN:  Right.

11   MR. MURPHY:  Right.  You remember.  And I just wanted to

12   make sure that there were other factors that were considered.

13   JUDGE GREEN:  Right.  So you're not admitting that it was

14   just -- that the -- that the Respondent's decision was

15   limited -- Respondent's decision to discharge Bryson was

16   limited to his comments directly to Ms. Evans before she went

17   in the building.  You're not saying that that was the only

18   reason.

19   MR. MURPHY:  That's correct.

20   JUDGE GREEN:  Okay.

21   MS. COX:  Judge Green, if I may, Mr. Murphy is not

22   currently under oath.  So I object to these representations

23   of --

24   JUDGE GREEN:  He's just stating that I -- I shouldn't

25   accept it as -- accept it as an admission.  So we have that



1    clarification and it's helpful.

2        MR. MURPHY:  Okay.  May I?

3        JUDGE GREEN:  Yes.  So Ms. Velasco, Mr. Murphy's going to

4    have some more questions for you.

5                  **RESUMED CROSS-EXAMINATION**

6    Q    BY MR. MURPHY:  Ms. Velasco, on your direct examination,

7    you were asked about Amazon's drug policy.  Do you recall that?

8        MS. COX:  Objection, Your Honor.  I wasn't permitted to

9    ask those questions.  It wasn't on direct.

10       JUDGE GREEN:  Okay.  That is correct.

11   Q    BY MR. MURPHY:  On -- on your direct exam, Ms. Velasco,

12   you -- you testified about certain test -- text messages you

13   received from -- from Amazon regarding positive COVID cases.

14   Do you recall that testimony?

15   A    Correct.

16   Q    I'm sorry?  I couldn't hear you.

17   A    Yes.

18   Q    Okay.  And -- and as -- as I recall it, one of your

19   concerns about those text messages was their lack of

20   specificity.  Do you recall that?

21   A    Yes.

22   Q    Isn't it the case that -- that Amazon provided those texts

23   in the way they did so as to protect associate confidentiality

24   so that employees or associates wouldn't be able to figure out

25   who might be positive and who might not be positive?



1    MS. COX:  Objection, Your Honor.  She has no knowledge as

2    to the reason why Amazon provided text messages in the way that

3    they did.

4    JUDGE GREEN:  Sustained.

5    Q    BY MR. MURPHY:  On -- on your direct exam, you -- you

6    testified that you played a role in -- in organizing various

7    protests.  Do you recall that testimony?

8    MR. KEARL:  Objection, mischaracterizes the testimony.

9    JUDGE GREEN:  Maybe you just want to ask her what she did.

10   MR. MURPHY:  Yeah.

11   Q    BY MR. MURPHY:  Did you -- did you -- did you -- did you

12   organize any protests that took place at JFK8?

13   A    Yes.

14   Q    And how -- and how did you do that?

15   A    Through messages.

16   Q    Was it through a group text or group chat?  Is -- is --

17   was that how you explained it in your direct exam?

18   A    Correct.

19   Q    And how many protests did you participate in the planning

20   of?

21   MS. COX:  Objection, Your Honor.  Relevance.

22   JUDGE GREEN:  What is the relevance?

23   MR. MURPHY:  Well, I think it go -- it goes to test her

24   credibility and her -- and -- and her testimony on -- on -- on

25   direct.  And it goes to the scope of -- of an -- of her



1    organizing the -- the -- rest under --

2        JUDGE GREEN:  Yeah, but that's another -- she's not a

3    Charging Party or discriminatee.

4        MR. MURPHY:  So you -- are you sustaining the objection,

5    Your Honor?

6        JUDGE GREEN:  Yes.

7        MR. MURPHY:  Just want to be sure.

8    Q    BY MR. MURPHY:  So the text -- the -- the group text that

9    you used, on how -- on how many occasions did you use it would

10   you say?

11       MS. COX:  Objection, Your Honor.  Relevance.

12       JUDGE GREEN:  Okay.  Overruled.  If you know.

13       THE WITNESS:  We spoke every -- every day.

14   Q    BY MR. MURPHY:  And did you do that before April 6th,

15   speak every day on the group chat?

16   A    Yes.

17   Q    And did you do it on April 6th, speak in the group chat?

18   A    Yes.

19   Q    And did you do it after April 6th in the group chat?

20       MR. KEARL:  Objection, relevance.

21       JUDGE GREEN:  Was Mr. Bryson on the -- on the group chat?

22   Do you know?

23       THE WITNESS:  No, I don't know.

24       JUDGE GREEN:  Okay.  So what's the relevance if he's not?

25       MR. MURPHY:  The -- the relevance is she testified that



1    she didn't learn that Mr. Bryson had been terminated for --

2    until two months -- my -- my recollection is after he was

3    terminated.

4        MS. COX:  No, Your Honor.  That wasn't her testimony.  Two

5    months was not her testimony.

6        MR. MURPHY:  One month then.

7        JUDGE GREEN:  Okay.  I don't see why we care.  Is there

8    some reason why we care when she learned about Mr. Bryson's

9    testimony (sic) other than that the General Counsel asked about

10   it?

11       MR. MURPHY:  It -- well, other than the General Counsel

12   asked about it and --

13       JUDGE GREEN:  Right.

14       MR. MURPHY:  And -- and I -- and I believe it also goes to

15   the failure to disclose the -- the video.  Let me just ask one

16   question.

17       JUDGE GREEN:  Can we get -- we have the video though.

18       MR. MURPHY:  And may I ask one or two questions and I'll

19   move on?

20       JUDGE GREEN:  Yeah.  Okay.  Go ahead.

21   Q    BY MR. MURPHY:  Did -- after April 6th, did you use the

22   group chat function to discuss activities at JFK8?

23   A    Yes.

24   Q    Was Mr. Bryson's termination discussed at any time in the

25   group chat?



Exhibit E, Motion to Try Petition on Hearing Record
1035

```
 1    A     No.

 2    Q     It was never mentioned in the group chat?

 3    A     No.

 4    Q     Was -- was Mr. Bryson one of the people most involved in

 5    organizing protests at JFK8?

 6          MR. KEARL:  Objection.

 7          MS. COX:  Objection, Your Honor.

 8          JUDGE GREEN:  What's the objection?

 9          MS. COX:  That -- how does she know the level of Mr.

10    Bryson's --

11          JUDGE GREEN:  If you know, Ms. -- Ms. --

12          MR. KEARL:  Also, objection, relevance.  Like how -- what

13    role he played as an organizer compared to other organizers has

14    no relevance.

15          JUDGE GREEN:  Okay.  Overruled.  Yes --

16    Q     BY MR. MURPHY:  You can answer the question, Ms. Velasco.

17    A     Can you repeat the question, please?

18    Q     Sure.  Was -- was Mr. Bryson a key or principal organizer

19    in the activities at JFK8 that you were involved in?

20    A     No.  He wasn't a key.

21    Q     And you don't recall if he was on the group chat that was

22    circulated to discuss activities at JFK8?

23          MS. COX:  Objection, Your Honor.  Asked and answered.

24          JUDGE GREEN:  Overruled.

25          THE WITNESS:  No, I don't recall because I don't have his
```



1    phone number directly saved into my phone.  So it's just a

2    whole bunch of phone numbers.  So I don't know who exactly I'm

3    speaking with.

4    Q    BY MR. MURPHY:  So -- so you're communicating about

5    protest activities at JFK8 to a group of people that you might

6    not know?  Is that your testimony?

7    A    Some who I know, so I don't know because we add others to

8    support.

9    Q    On April 6th, during the protest, did -- did -- did Mr.

10   Bryson know who you were?

11   A    Yes.

12   Q    Did Mr. Bryson ever approach you and ask you to provide

13   information or evidence about what he did on April 6th to

14   anyone associated with Amazon?

15        MS. COX:  Objection, Your Honor.

16        JUDGE GREEN:  Overruled.

17        THE WITNESS:  No.

18   Q    BY MR. MURPHY:  Did anyone involved with the protest

19   activities at JFK8 ever approach you and suggest that you

20   provide information to Amazon regarding Mr. Bryson's activities

21   on April 6th?

22   A    No.

23   Q    Did you offer to pro -- to provide either the video that

24   you recorded or any other information about the protest on

25   April 6th?



1       MS. COX:  Objection, Your Honor, relevance.

2       JUDGE GREEN:  Overruled.

3       MR. KEARL:  Objection, confusing.

4       JUDGE GREEN:  If you understand the -- the question, you

5    can answer it, Ms. Velasco.

6       THE WITNESS:  Can you repeat the question?

7       MR. MURPHY:  Sure.

8    Q    BY MR. MURPHY:  Did -- did you ever approach anyone and

9    offer -- offer or tell them that you had information regarding

10   Mr. Bryson's activities on April 6th?

11      MS. COX:  Objection, Your Honor, vague.  Anyone who?

12      MR. MURPHY:  Anyone.

13      JUDGE GREEN:  Overruled.

14      THE WITNESS:  No.

15   Q    BY MR. MURPHY:  Did -- did Christian Smalls ever tell you

16   that he had seen the video that you recorded on April 6th?

17      MS. COX:  Objection, relevance.

18      JUDGE GREEN:  What's the relevance of that?

19      MR. MURPHY:  The -- the rel -- the relevance goes to -- as

20   we'll see as the case develops -- Mr. Bryson in hi -- in his

21   interview indicates that there was a woman who witnessed the

22   entire event but he didn't know her name and that he was going

23   to track her down.  That's my recollection.  So Mr. Bryson was

24   right next to Ms. Velasco the -- the entire time and -- and --

25   and could have said you should talk to --



1       MS. COX:  Judge Green.

2       MR. MURPHY:  -- Ms. Velasco.

3       MS. COX:  Judge Green, the question was about Christian

4    Smalls and I don't see that's relevant to what --

5       JUDGE GREEN:  Right.  I -- I don't see why we care about

6    her conversations with Christian Smalls regarding this.  So

7    it's sustained.

8       MR. MURPHY:  Okay.

9    Q    BY MR. MURPHY:  After April 6th, 2020, have you ever had a

10   discussion with Gerald Bryson about his conduct on -- on that

11   date?

12   A    No.

13      MR. KEARL:  Objection, relevance.

14      JUDGE GREEN:  Overruled.

15   Q    BY MR. MURPHY:  In your -- in your direct examination, you

16   made a point of saying that Mr. Bryson walked away from the

17   area where his coworker was sitting on the curb.  Do you recall

18   that testimony?

19   A    Yes.

20   Q    And -- and you gave that testimony to -- to show that Mr.

21   Bryson tried to deescalate or end the interaction.  Isn't that

22   right?

23      MS. COX:  Objection, Your Honor.

24      MR. KEARL:  Objection.

25      JUDGE GREEN:  Sustained.



Exhibit E, Motion to Try Petition on Hearing Record
1043

1    Q    BY MR. MURPHY:  Why did you make a point of saying that

2    Mr. Bryson had walked away from the interaction with his

3    coworker?

4         MS. COX:  Same objection, Your Honor.

5         JUDGE GREEN:  Yeah.  Sustained.

6    Q    BY MR. MURPHY:  Did Mr. Bryson deescalate the in --

7    interaction with Ms. -- with his coworker by walking away?

8         MS. COX:  Objection, Your Honor, calls for a conclusion.

9         JUDGE GREEN:  Overruled.  If you know.  You know, if you

10   have -- if you -- if you know.

11        THE WITNESS:  Can you repeat the question?  I'm sorry.

12        MR. MURPHY:  Sure.

13   Q    BY MR. MURPHY:  Did Mr. Bryson deescalate the interaction

14   with his coworker by walking away as you testified?

15   A    Yes.  As he walked away, he was trying to deescalate it

16   but she kept mumbling as you can hear within the video.  So he

17   kept going back at her.

18   Q    Oh.  So she kept mumbling.  That -- and what did -- what

19   was she mumbling?

20   A    I don't recall exactly.  But it's all within the video.

21   Q    Okay.  And -- and you were -- you were closer to her than

22   Mr. Bryson was, correct?

23   A    Correct.

24   Q    And you -- you can't tell me what she was saying?

25   A    No.



www.escribers.net | 800-257-0885

1    MR. KEARL:  Objection, that's mis -- misrepresenting what

2    she said.

3    JUDGE GREEN:  Okay.  So we have the video, right?  We can

4    all make our own conclusions about what happened in the video.

5    I don't think we really need Ms. Velasco's commentary on it.

6    Q    BY MR. MURPHY:  Isn't -- isn't it true that as Mr. Bryson

7    walked away from Ms. -- from his coworker, he continued to

8    berate her on the megaphone?

9    MS. COX:  Objection, Your Honor.

10    JUDGE GREEN:  Okay.  Sustained.  Let's just rely on the

11    video.

12    Q    BY MR. MURPHY:  You said on direct that Mr. Bryson asked

13    if his coworker any kids that she might bring the -- a virus

14    home to.  Do you recall that testimony?

15    A    Yes.

16    Q    And you made of testifying on direct about how his

17    coworker crossed the street.  Do you recall that testimony?

18    A    Yes.

19    Q    You -- you made a point of stressing that she walked

20    diagonally instead of straight across.  Do you recall that?

21    MS. COX:  Objection to -- to the use of the word

22    "stressing," Your Honor.

23    JUDGE GREEN:  Yeah.  So the -- the -- the nature of these

24    questions that -- that she made a point and she stressed, I --

25    I don't think we have that in evidence.  I -- I don't think



1    that that is an assumption we can make.  If you want to ask her

2    about certain events, go ahead.  But I -- I don't think

3    you're -- you're properly characterizing the testimony and --

4    and she's not having an opportunity to respond to that.

5         MR. MURPHY:  Okay.

6    Q    BY MR. MURPHY:  You test -- you testified that Mr.

7    Bryson's coworker walked diagonally across the street, right?

8    A    Correct.

9    Q    And -- and -- and are you -- do you contend that she

10   walked diagonally so as to provoke Mr. Bryson?

11        MS. COX:  Objection, Your Honor.  It just calls for a

12   conclusion.

13        JUDGE GREEN:  Again, I don't know why we care what Ms.

14   Velasco thinks about it.  It's really what -- she wasn't a

15   decision maker, it's what Amazon thought about it.

16        MR. MURPHY:  Okay.

17   Q    BY MR. MURPHY:  When -- when do you recall learning that

18   Mr. Bryson had been terminated?

19        MS. COX:  Objection, Your Honor.  Asked and answered.

20        JUDGE GREEN:  Okay.  I don't think we got an answer to

21   that but --

22        MR. MURPHY:  I don't think so either.

23        JUDGE GREEN:  Okay.  Over -- overruled.

24        THE WITNESS:  I believe I learned he got fired -- it was

25   like a month or so later.



1    Q    BY MR. MURPHY:  And how did -- how did you learn that or

2    from who did you learn it?

3         MS. COX:  Objection, asked and answered.

4         JUDGE GREEN:  Overruled.

5         MR. KEARL:  Objection, relevance.

6         MS. COX:  And compound, Judge.

7         JUDGE GREEN:  Oh.  Okay.  I mean, listen, I completely

8    agree that it's -- it's not relevance.  But I also agree that

9    the General Counsel asked about it.  Is that why you're going

10   into this, just because the General Counsel asked about it?

11        MR. MURPHY:  In -- in part.  I also want to ask her

12   when -- when she learned -- well, let me ask that.

13   Q    BY MR. MURPHY:  When -- when you learned about Mr.

14   Bryson's termination, did -- did you go to anyone at Amazon and

15   say, I have information relevant to what occurred on April 6th?

16        MS. COX:  Objection, Your Honor.  He's asked this

17   question.

18        JUDGE GREEN:  Okay.  Okay.  I don't know that we got it

19   exactly like this.  Overruled.

20        MS. COX:  Okay.

21        THE WITNESS:  Can you repeat the question?

22   Q    BY MR. MURPHY:  Sure.  After you learned about Mr.

23   Bryson's termination, did -- did you go to anyone -- approach

24   anyone at Amazon and tell them that you had information

25   relevant to what occurred on April 6th?



1    A    No.

2         MR. MURPHY:  Can we go off the record for two minutes,

3    Judge?

4         JUDGE GREEN:  Yes.  Off the record.

5         MR. MURPHY:  Thank you.

6    (Off the record at 4:46 p.m.)

7         MR. MURPHY:  Hello, Ms. Vasque -- Velasco.  I just have a

8    couple more questions.

9                   **RESUMED CROSS-EXAMINATION**

10   Q    BY MR. MURPHY:  Is Gerald Bryson friends with you on

11   Facebook?

12   A    I believe he is.

13   Q    On April 6th, are you -- were you aware that other people

14   were taking videos of the protest?

15        MS. COX:  Objection, Your Honor, relevance.

16        JUDGE GREEN:  Overruled.

17        THE WITNESS:  No.

18   Q    BY MR. MURPHY:  Did you see any Amazon associates across

19   the street from you, taking videos?

20   A    No.

21   Q    Do you know a Jordan Flowers is?

22   A    Yes.

23   Q    Do you know whether Jordan Flowers was -- I don't know

24   what the -- what the verb is -- doing a -- a Facebook Live

25   video on April 6th?



Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 996 of 3171 PageID #: 1049

1    MS. COX:  Objection, Your Honor.  I -- we -- she never

2    tur -- testified to Jordan Flowers on direct and it's

3    irrelevant whether Mr. Flowers was doing a Facebook Live video.

4    JUDGE GREEN:  Okay.  Overruled.  Do you know, Ms. Velasco?

5    THE WITNESS:  No.  No, I don't know.

6    Q    BY MR. MURPHY:  You never saw a Facebook Live video posted

7    by Jordan Flowers dating from April 6th, 2020?

8    A    No.

9    Q    So you helped organize and then participated in the -- the

10   protest that occurred at JFK8 on March 30th, 2020, correct?

11   MR. KEARL:  Objection, asked and answered.

12   JUDGE GREEN:  Overruled.

13   THE WITNESS:  Yes.

14   Q    BY MR. MURPHY:  And you helped organize and then

15   participated in the protest that occurred at JFK8 on April 6th,

16   correct?

17   A    Yes.

18   Q    And that -- and during the protest on April 6th, 2020, you

19   stood in front of the Amazon warehouse entrance for more than

20   an hour, correct?

21   A    No.

22   Q    How long did you stand out there?

23   A    About a half hour --

24   Q    Okay.  You --

25   A    -- to 45 minutes.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    You would -- you would agree with that you stood out there

 2    as long -- at least as long as the -- the -- the video that you

 3    recorded, right?

 4    A    Correct.

 5         MR. KEARL:  Objection, long --

 6         JUDGE GREEN:  Overruled.

 7         MR. KEARL:  We haven't seen the whole video.  We've only

 8    seen eight minutes of it.

 9         JUDGE GREEN:  Okay.  So I think the -- the objection is

10    overruled.  And I think we got the answer but it was talk -- it

11    was spoken over.

12         MR. MURPHY:  I didn't hear the answer, I'm sorry, Your

13    Honor.

14         JUDGE GREEN:  Okay.

15    Q    BY MR. MURPHY:  Could you answer the question, Ms.

16    Velasco, please?

17    A    Can you replete it -- repeat it?  Sorry.

18    Q    Sure.  You -- you stook out in front of the JFK8 warehouse

19    for -- for at least as long as the -- the video that you

20    recorded that day, right?

21    A    Yes.

22    Q    And after engaging in those activities, Amazon has not

23    disciplined you for taking part in -- in any of that conduct,

24    have they?

25         MR. KEARL:  Objection, relevance.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Overruled.

2    THE WITNESS:  No.

3    MR. MURPHY:  Nothing further, Your Honor.

4    JUDGE GREEN:  Okay.  Does the GC have any redirect?

5    MS. COX:  Yes, Judge.  Just a couple questions but do you

6    mind if I just go off the record to get some water and be back

7    in about -- can you give, I don't know, ten minutes?

8    JUDGE GREEN:  Okay.

9    MS. COX:  Thank you.

10   JUDGE GREEN:  Off the record.

11   (Off the record at 5:08 p.m.)

12   JUDGE GREEN:  Okay.  So I believe Ms. Cox has some

13   additional questions for you Mr. -- Ms. Velasco.

14   THE WITNESS:  Okay.

15   MS. COX:  Ms. Velasco, I want to --

16   JUDGE GREEN:  I -- I'm sorry.  Are we on the record?

17   THE COURT REPORTER:  Yeah, we are but did Mr. Murphy say

18   at the end he didn't have any more questions?

19   MR. MURPHY:  Mr. Murphy did.

20   MS. COX:  Oh.  I'm sorry.

21   THE COURT REPORTER:  That's because we went off the

22   record, then we came back on.  My -- he didn't say so --

23   MR. MURPHY:  Oh.  He didn't?  Then -- then I'll say it

24   now, no further questions.

25   JUDGE GREEN:  Okay.



1     MS. COX:  Are we on the record?

2     JUDGE GREEN:  We are now on the record.

3     THE COURT REPORTER:  Yes, we are.

4     MS. COX:  Okay.

5                     **REDIRECT EXAMINATION**

6     Q    BY MS. COX:  So Ms. Velasco, I want to clarify you

7     testimony about meeting Gerald Bryson.  Did you meet Gerald

8     Bryson for the first time in-person on April 6th, 2020?

9     MR. MURPHY:  Objection, leading.

10    JUDGE GREEN:  Over -- okay.  I think we have this already.

11    Overruled.

12    THE WITNESS:  No.

13    Q    BY MS. COX:  Okay.  Before April 6th, when did you meet

14    Gerald Bryson?  Do you recall?

15    A    No, I do not recall.

16    Q    Okay.  Ms. Velasco, I want to ask you a few questions

17    about your -- your organizing activity.  Did you speak to

18    reporters in the month of March or April 2020?

19    MR. MURPHY:  Objection, way beyond the scope of the

20    direct -- of the -- of the cross.  I'm sorry, Your Honor.

21    JUDGE GREEN:  So it beyond the scope but I'll allow it if

22    you really, really want to do it.

23    MS. COX:  Judge, I have three questions and Mr. Murphy

24    asked her specifically about her organizing activities.  So I

25    don't -- I don't agree that it's beyond the scope of cross.



1    JUDGE GREEN:  Okay.  Overruled.

2    Q    BY MS. COX:  So Ms. Velasco, my question was, during March

3    and April 2020, did you speak to reporters?

4    A    No.

5    Q    During March and April of 2020, were you in the

6    newspapers?

7    A    No.

8    Q    During March and April of 2020, were you on television

9    regarding the protests at JFK8?

10   A    No.

11   Q    Can you speak up a little louder?

12   A    No.

13   Q    Okay.  I want to go back to the interaction between the

14   woman and Mr. Bryson.  Was there anything between you and the

15   woman that would block your view of her?

16   A    No.

17   Q    Did you see the woman look at you during the protest?

18   A    She looked in my direction but I'm not sure if it was

19   exactly at me.

20   Q    Were you holding up your phone the whole time to record

21   the protest?

22   A    Yes.

23   Q    So I want to go back to the video that the Amazon attorney

24   showed you and didn't ask you some questions about.  Do you

25   recall seeing the woman give Mr. Bryson the middle finger?



www.escribers.net | 800-257-0885

```
 1         MR. MURPHY:  Objection, Your Honor, the video show --

 2   shows exactly what happened between Mr. Bryson and his

 3   coworker.

 4         JUDGE GREEN:  So I'm not sure that the video would've

 5   necessarily shown that.  If you saw some -- if you saw

 6   something, Ms. Velasco, you testify to it.

 7   Q    BY MS. COX:  Do you recall seeing the woman give the

 8   middle finger to Mr. Bryson?

 9   A    No.  I don't recall.

10   Q    Do you recall the woman making any other hand gestures to

11   Mr. Bryson?

12   A    Not until the very end, she raises her hands.  But then

13   she walked into the building.

14   Q    Okay.  And what did you take her raising her hands to

15   mean?

16         MR. MURPHY:  Objection, Your Honor.

17         JUDGE GREEN:  Sustained.

18   Q    BY MS. COX:  Okay.  I just want to show you one other --

19   one moment, please, Ms. Velasco.  So I'm going to show you

20   what's been identified as General Counsel's Exhibit 53.

21         MS. COX:  Okay.  I believe that it is in SharePoint now

22   and accessible to all the parties.  I'm going to share my

23   screen momentarily.  Okay.  You -- excuse me.

24   Q    BY MS. COX:  Okay.  Ms. Velasco, can you see my screen?

25   A    Yes.
```



Exhibit E, Motion to Try Petition on Hearing Record

```
1    Q     Is this a representation of the interaction from a

2    different angle?

3    A     Yes.

4    Q     Okay.

5          MR. MURPHY:  I -- Your -- Your Honor, I -- I have to

6    object.  I mean, there's been no authentication of the video.

7          JUDGE GREEN:  Yeah.  So why don't you stop this, Ms. --

8    Ms. Cox.

9          MS. COX:  Judge Green, this video was produced in response

10   the paragraph --

11         JUDGE GREEN:  I can't hear you over the video.

12         MS. COX:  Oh.

13         MR. MURPHY:  I can't hear the video at all.

14         MS. COX:  Oh.

15         JUDGE GREEN:  Okay.  So what -- what are you doing with

16   this video?  What is this?

17         MS. COX:  I'm using it, Judge, to refresh her

18   recollection.

19         JUDGE GREEN:  Okay.  She never said she didn't -- she

20   didn't recall anything.  But do you want to put this in through

21   something?  I mean, you're just -- all you're doing is going to

22   ask her what -- what she's seeing in the video, right?

23         MS. COX:  Yes, Judge.  I believe she said --

24         JUDGE GREEN:  Okay.  So then do you want to put this video

25   into evidence and do you want to do it through the proper
```



Exhibit E, Motion to Try Petition on Hearing Record

1    witness who can authenticate it?

2        MS. COX:  Judge Green, this video was produced pursuant to

3    their subpoena -- to the subpoena.

4        JUDGE GREEN:  Okay.

5        MR. MURPHY:  Yeah, it -- it wasn't produced pursuant to

6    the subpoena.  It was produced because we intended to use it in

7    the case.

8        JUDGE GREEN:  Okay.  So either way --

9        MS. COX:  But Judge Green, paragraph --

10       JUDGE GREEN:  Either way.  So it's going to be

11   authentic -- it's authentic, right?  We have an agreement about

12   that?

13       MS. COX:  Yes, Judge.

14       JUDGE GREEN:  And it's going to be admissible.

15       MS. COX:  Yes, Judge.

16       JUDGE GREEN:  So we can -- so we can use it.

17       MS. COX:  That's our position, Judge.

18       JUDGE GREEN:  Does the Respondent have any problem with

19   that?

20       MR. MURPHY:  No.  No.

21       JUDGE GREEN:  Or are we good?

22       MR. MURPHY:  I -- I just --

23       JUDGE GREEN:  All right.

24       MR. MURPHY:  I don't know that she's -- all right.  Well,

25   go ahead.  I'll wait.


www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  No, that's fine.  I mean, we don't need

2    to -- we don't need to show it to Ms. Velasco.  We can all look

3    at it the same as her.  So GC-53 is admitted.

4    **(General Counsel Exhibit Number 53 Received into Evidence)**

5    MS. COX:  Okay.  Thank you.

6    Judge Green, I don't believe I have any other questions at

7    this time.  No, I don't believe I have any other questions at

8    this time.

9    JUDGE GREEN:  Okay.  Mr. Kearl?

10    MR. KEARL:  Yes, very briefly.

11    <u>**RECROSS-EXAMINATION**</u>

12    Q    BY MR. KEARL:  Ms. Velasco, when you posted the Facebook

13    Live video, do you recall if you added any hashtags to that

14    video?

15    A    Yes.

16    MR. MURPHY:  Objection, relevance.

17    JUDGE GREEN:  What's the relevance?

18    MR. KEARL:  The relevance, I think, points not only to the

19    fact that Counsel for Respondent was able to locate this video

20    within 15 minutes, but the fact that the hashtags are -- were

21    produced and helped search documents.  Makes it much more

22    likely that this document was publicly available and could've

23    been discovered through the course of investigation by Amazon.

24    JUDGE GREEN:  Okay.  Overruled.

25    Q    BY MR. KEARL:  Okay.  So Ms. Velasco, I'm going to share



Exhibit E, Motion to Try Petition on Hearing Record

1    my screen real quick.

2         MR. KEARL:  I believe the SharePoint has already been

3    updated.  I have labeled this CP Exhibit 6.

4    Q    BY MR. KEARL:  Can you see my screen?

5    A    Yes.

6    Q    Okay.  So can you recognize what this document is?

7    A    Yes.

8    Q    Okay.  And can you tell us what this document is?

9    A    That's my Live video.

10   Q    Okay.  And can you tell us -- well, the document speaks

11   for itself.  The -- the hashtags here and the date as well.

12   A    Yes.

13        MR. KEARL:  So I move enter CP-6 -- CP Exhibit 6.

14        JUDGE GREEN:  Actually, do you want to tell us what the

15   hashtags are, Ms. Velasco?

16        MR. KEARL:  Hold on one second.

17        THE WITNESS:  Just --

18        MR. MURPHY:  I think the hashtags are already on the --

19   the exhibit that was entered as the video, right?

20        JUDGE GREEN:  Okay.  All right.

21        MR. KEARL:  My understanding was that the video was going

22   to be an edited clip that was downloaded and not the Facebook

23   page itself.  So insofar as that would not show the hashtags,

24   I -- I would also like to enter CP-6 if it's all right.

25        JUDGE GREEN:  Okay.  And objection?



1      MR. MURPHY:  Nope.

2   Q   BY MR. KEARL:  Okay.  Ms. Velasco, can you let us know

3   what hashtags are added to this video?

4      MR. MURPHY:  Objection, speaks for itself.

5      MR. KEARL:  The Judge just asked me to do it.

6      JUDGE GREEN:  Yeah, I -- let me just ask her.  What --

7   what are the -- what are the hashtags?

8      THE WITNESS:  JFK8, which is our building; and

9   standupforwhatis -- whatweredoing, we're standing up for what

10  our rights are for to clean the building and shut it down.

11     MR. KEARL:  Okay.  I have no further questions.

12     JUDGE GREEN:  Mr. Murphy, you have anything else?

13     MR. MURPHY:  Give me one second, Judge.

14     JUDGE GREEN:  Okay.

15     THE COURT REPORTER:  Should we go off the record or --

16     JUDGE GREEN:  We can go off the record.

17  (Off the record at 5:34 p.m.)

18     JUDGE GREEN:  Back on the record.

19     MR. MURPHY:  Yeah.

20                    **RECROSS-EXAMINATION**

21  Q   BY MR. MURPHY:  Ms. -- Ms. Velasco, you were just asked

22  on -- on redirect by Ms. Cox whether you appeared in any press

23  or newspapers or -- or television.  And you indicated that you

24  had not.  Do you recall that testimony?

25  A   Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1  Q    Did you -- did you follow what was happening at -- at JFK8

2  in -- in -- in the -- any newspaper or online news sources or

3  anything like that?

4       MS. COX:  Objection, Your Honor, relevance.

5       JUDGE GREEN:  Overruled.

6  Q    BY MR. MURPHY:  You can answer the question, Ms. Velasco.

7  A    Okay.  Yeah, I would follow them.

8  Q    Yeah.

9  A    Whatever was popping up, I would make sure I was on top of

10 it since I was one doing protesting with Amazon.

11 Q    And do you recall reading articles online or in other

12 sources as early as April 23rd indicating that Mr. Bryson had

13 been fired by Amazon the previous week?

14      MS. COX:  Objection, Your Honor, relevance.

15      JUDGE GREEN:  Okay.  Overruled.

16      THE WITNESS:  No.

17 Q    BY MR. MURPHY:  So even though you -- even though you

18 followed the -- the reporting closely about JFK8 activities --

19 that's your testimony, right?

20      MS. COX:  Objection, Your Honor, to the use of the word

21 "closely."  She didn't testify to that.

22 Q    BY MR. MURPHY:  You fo -- you followed the -- the -- the

23 press and the reporting about activities at JFK8, right?

24 A    Yes, whatever I could find.

25 Q    And you said -- and I think you said you stayed on top of



Exhibit E, Motion to Try Petition on Hearing Record

1    it, right?

2    A    Yeah.

3    Q    And -- and is it your testimony then that you did read any

4    articles in or around late April or early May reporting that

5    Mr. Bryson had been fired?

6    A    Correct.

7    Q    Okay.

8    MR. MURPHY:  Nothing further.

9    JUDGE GREEN:  Okay.  Thank you, Ms. Velasco.  You're free

10   to go.

11   THE WITNESS:  Thank you so much.

12   MR. MURPHY:  Thank you very much.  Long day.

13   JUDGE GREEN:  Yes.  All right.  So I just -- before we go,

14   I -- I'd like to deal with -- briefly with the CP Exhibits 3

15   and 4.  It appears to me that those -- that the notes that are

16   referenced in those articles are responsive to the Charging

17   Party's subpoena paragraph 19B.  And I guess I'm asking the

18   Respondent whether those notes have been produced.

19   MR. SCHWARTZ:  Your Honor, Jason Schwartz on behalf of

20   Amazon.  Mr. Murphy, did you want to address that personally?

21   MR. MURPHY:  I -- I did not.  Go ahead.  I was going to

22   say that Jason Schwartz was going to step in and handle this.

23   MR. SCHWARTZ:  Judge Green, those notes have not been

24   produced.  As -- as you heard in the opening statements,

25   apparently the General Counsel and the Charging Party were



Exhibit E, Motion to Try Petition on Hearing Record    963

```
 1    going to present evidence about Mr. Smalls, which seemed to be
 2    a rabbit hole they were going to go down.  Mr. Smalls wasn't
 3    called and so the idea that we would then introduce these
 4    newspaper articles that in turn refer to a memorandum that has
 5    something to do with Mr. Smalls when the complaint was not
 6    amended to add him when he was called as a witness, and when he
 7    has absolutely nothing to do with Mr. Bryson, I think we're --
 8    we're really taking this proceeding quite far afield at that
 9    point, Your Honor.
10        MR. KEARL:  If I may, Your Honor?
11        MR. SCHWARTZ:  If Mr. -- if Mr. Smalls --
12        JUDGE GREEN:  No, it's all right.  So --
13        MR. SCHWARTZ:  If -- if I might finish, if Mr. Smalls --
14        JUDGE GREEN:  Okay.
15        MR. SCHWARTZ:  -- without being interrupted by Mr.
16    Kearl -- if -- if Mr. Smalls is going to appear and tell his
17    story, then that might place in context whether any of this --
18    whether this document has anything to do with Mr. Bryson's case
19    before Your Honor.
20        JUDGE GREEN:  So I am going to admit CP 3 and 4.  It seems
21    to me that the notes were responsive and were not produced.  So
22    I'm allowing it as secondary evidence.  Whether the notes are
23    ultimately produced or not, but we'll see what happens -- you
24    know, maybe the -- maybe the articles will be swapped out until
25    rendered relevant by the notes coming into evidence.  But for
```



1   now, I'm going to admit CP 3 and 4 for what they're worth.

2   **(Charging Party Exhibit Numbers 3 and 4 Received into Evidence)**

3       MR. SCHWARTZ:  Your -- Your Honor, if I might, CP 3 and 4

4   contain not only references to the supposed notes from Mr.

5   Zapolsky, but they contain a tweet from Sen. Bernie Sanders.

6   They contain out-of-court statements from Christian Smalls

7   about what supposedly happened to them.  You might recall, Mr.

8   Kearl attempted to testify as a witness in Mr. Palmer's --

9       JUDGE GREEN:  No, but I'm -- I'm only going to be --

10      MR. SCHWARTZ:  -- examination to read these articles.

11      JUDGE GREEN:  I'm going to be considering the references

12  to the notes.

13      MR. SCHWARTZ:  Understood, Your Honor, and -- and again, I

14  would say, without Mr. Smalls being called or any reference

15  whatsoever to what was promised in the openings, these notes

16  have nothing to do with anything in this proceeding.

17      JUDGE GREEN:  Listen, I'm not saying that they're earth-

18  shattering evidence, but I am saying that I'm going to admit

19  them for what they're worth.

20      MR. SCHWARTZ:  Understood, Your Honor.  Thank you.

21      JUDGE GREEN:  Okay, so, unless we have anything else,

22  we're going to go off the record for today, and --

23      MS. COX:  Judge Green --

24      JUDGE GREEN:  Yes?

25      MS. COX:  -- we have two issues.



1      JUDGE GREEN:  Okay.

2      MS. COX:  One being that we addressed earlier, and I

3  didn't -- didn't remember to raise another redaction issue.

4  I'm showing my screen.  We received this -- this document

5  that's heavily redacted, as you can see.  I'll -- do you see my

6  screen Judge Green?

7      JUDGE GREEN:  Yes.

8      MS. COX:  Okay.  And we're asking that this document be

9  unredacted and produced.

10     JUDGE GREEN:  This is the owner's manual?

11     MS. COX:  No, Judge.  This is the workplace incident

12 standard that we've requested in our second subpoena, pursuant

13 to paragraph 15, if I'm recalling correctly.

14     JUDGE GREEN:  Okay, and why was it redacted?

15     MS. BUFFALANO:  Yeah, now what --

16     MR. MURPHY:  We -- go ahead, Nicole.  Go ahead.

17     MS. BUFFALANO:  What we produced was what was relevant to

18 this proceeding, so this guide and document deals with all

19 differing levels and types of threats and the potential

20 responses by those who are responsible for the -- dealing with

21 those threats.  We excluded things that didn't matter here,

22 like active shooter issues, right?  Things that are not

23 relevant to this proceeding.  So we -- what we left is level 4

24 threats, which is what this case was -- and I'll tell you, Ms.

25 Cox, that we are -- were re-redacting -- I saw this email last



1    night -- to include -- it's -- it's called severity level.  So

2    severity levels 3 and 4, because those could potentially cover

3    this incident.  But severity levels 1 and 2 are not related to

4    this, so the process in terms of Amazon's response when there

5    is an incident that is severity level 1 or 2 just isn't

6    relevant to this proceeding, and it's not -- you know, there's

7    just no reason for it to be in the record.

8         MR. KEARL:  Judge --

9         MS. COX:  Judge --

10        MR. KEARL:  -- if I may be heard --

11        JUDGE GREEN:  Let me ask -- let me ask, is it -- is it the

12   Respondent's position that the unredacted portions are not

13   responsive to -- to the subpoena?

14        MS. BUFFALANO:  It's just -- they're not related to

15   this -- this proceeding at all.

16        JUDGE GREEN:  That's --

17        MS. BUFFALANO:  It's --

18        JUDGE GREEN:  -- a different issue.  What I'm asking is --

19   is did I --

20        MS. BUFFALANO:  You know --

21        JUDGE GREEN:  -- rule on it?  I don't even know -- I don't

22   know what paragraph we're talking about and whether I ruled on

23   it.

24        MS. COX:  You did, Judge.  It's paragraph 15 of the second

25   subpoena.  I can read it, if you permit.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay, so, if it's -- if it's responsive to

2    paragraph 15, and I did not revoke it, then it has to be

3    produced, and it -- it shouldn't be redacted.

4    MR. JACKSON:  Your Honor, this is illustrative --

5    JUDGE GREEN:  The boundaries --

6    MR. JACKSON:  -- of Respondent's treatment of Your Honor's

7    ruling.  Time and again, your -- the Respondent is showing

8    themselves to disregard and flout your rulings and just

9    unilaterally decide what it deems is relevant and what should

10   be produced.  That's not how this works, and Respondent should

11   face sanctions for it.

12   JUDGE GREEN:  Yeah, I mean --

13   MS. BUFFALANO:  If he --

14   JUDGE GREEN:  Okay.  You keep mentioning sanctions.  You

15   don't say what sanctions you want, and -- and as far as I'm

16   concerned, this -- the remedy here should be to un-redact the

17   document.

18   MR. KEARL:  Your Honor, this document also seems like it

19   is very responsive to paragraph 2 of my subpoena, but I have

20   not been given this document or anything else responsive to

21   paragraph 2, for that matter.

22   MS. BUFFALANO:  As far as I know, you've gotten everything

23   the General Counsel has gotten, but -- but, Your Honor.  This

24   is not a question --

25   MR. KEARL:  I should've gotten --



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  -- of us making decisions about what is

2    responsive and what isn't responsive.  This is a -- this is a

3    confidential document related to Amazon's response to threats

4    on site.  It could -- it is -- it -- this is a safety-related

5    issue for Amazon.  This contains confidential information.  We

6    are absolutely willing to share --

7        JUDGE GREEN:  That wasn't raised in the petition to

8    revoke, if I remember correctly.  It really -- if -- if you

9    were going to raise, you should've wrote -- raised it in the

10   position -- petition to revoke, and perhaps I would've revoked

11   it.  But I -- I didn't.

12       MS. BUFFALANO:  I -- I don't -- I don't know that --

13   whether or not that's the case, Your Honor.  But I mean, we're

14   happy to show it to you and have you say I agree that it is or

15   isn't relevant.  And I don't know that we knew what document

16   was being requested at the time that we looked at the subpoena

17   or understood what was being requested.

18       MR. JACKSON:  So you petitioned to revoke without

19   reviewing the subpoena?

20       JUDGE GREEN:  So Mr. Jackson, that's you?  You're not

21   on -- I couldn't hear you talking, because --

22       MR. JACKSON:  I know.  You -- you blocked.  You blocked

23   me, Judge.

24       JUDGE GREEN:  Oh, I -- okay.  Hold on.

25       I didn't know that that was possible.



1    MR. JACKSON:  I've been blocked all day, but it's fine.

2    No, I -- Judge, look.  There -- Your Honor keeps saying that

3    you -- you're not clear on what sanctions General Counsel is

4    seeking.  What we're seeking is that Respondent, after all this

5    time that they have been given to comply with these

6    subpoenas -- that they be prohibited from introducing or

7    eliciting evidence concerning matter which they can leave open.

8    JUDGE GREEN:  Yeah, but there's not anything that's being

9    offered yet.  The -- we're not -- we're not up to that.  We're

10   really not up to that.  And what -- okay, what is -- what is

11   this information and why is it confidential?

12   MS. BUFFALANO:  It's information regarding Amazon's

13   response to threatening activities at their facilities and on

14   their sites.  Who responds, how they respond, what the possible

15   responses are, and for items that are not relevant to this, we

16   shouldn't be forced to produce a document that --

17   JUDGE GREEN:  Okay, but why is that -- why do you -- why

18   do you care?  Why is that -- why is that confidential, that

19   it's -- that it's threatening activity?  I mean, isn't that

20   kind of what we're dealing with here, or -- or no?  I -- I

21   thought that that's really what you were saying this activity

22   was, no?

23   MS. BUFFALANO:  There is -- there are various -- it -- it

24   covers all of activity that -- that would put health and safety

25   of the site at risk.  Well, safety.



1    JUDGE GREEN:  May --

2    MS. BUFFALANO:  Safety.

3    JUDGE GREEN:  And -- and so are you saying that you're

4  not --

5    MS. BUFFALANO:  (Indiscernible, simultaneous speech).

6    JUDGE GREEN:  You're saying that this does not fall within

7  that category?

8    MS. BUFFALANO:  Yes, and as I said, so, there's -- so,

9  there's severity-level threats.  There's severity levels 1, 2,

10  3, and 4.  So what we have provided is everything related to

11  severity levels 1 and 2 -- or 3 and 4, which could encompass

12  this --

13    JUDGE GREEN:  Never mind.  Listen, it -- it's not -- this

14  is the same general subject matter.  It deals with the issue of

15  threatening activity on the site.  This is not really for you

16  to say this one applies and this doesn't.  That's really up to

17  the General Counsel.  If you really think that there's some

18  issue regarding confidentiality, then okay, we have a specific

19  document, and we could discuss a protected -- a protective

20  order with respect to this document.  And -- and I don't mind

21  doing that.

22    My problem with it -- a broader protective order is that

23  you really weren't articulating why there was a

24  confidentiality -- a confidentiality interest in the other

25  document.  But if you have a specific confidentiality interest



www.escribers.net | 800-257-0885

1  in this particular document, okay, we could apply a protective

2  order to it.  But that's not a reason to not produce it.

3      MS. BUFFALANO:  We did produce it, and I'm offering to

4  show it to you if you want to see it and see whether or not we

5  have --

6      JUDGE GREEN:  I don't really want to see it.  It's -- I --

7      MR. JACKSON:  Judge, they --

8      JUDGE GREEN:  I don't want to see it if it's not going

9  into evidence.

10     MR. JACKSON:  Amazon is obliged to respond to subpoena and

11  provide unreacted documents, period.  End of story.

12     JUDGE GREEN:  Right.  I -- I -- yeah.  I think that

13  that's -- I think that that's right.  Do you -- if you want a

14  protective order covering this document, I'll -- I'll order

15  that.

16     MS. BUFFALANO:  Okay.

17     JUDGE GREEN:  Okay.  And so, I'll order that in the

18  same -- it's the same protective order that applies to

19  personnel records, applies to this document.  Can just describe

20  it, Ms. Buffalano, so we know what we're talking about?

21     MS. BUFFALANO:  It's the workplace incident management

22  guide.

23     JUDGE GREEN:  Okay.

24     MR. KEARL:  And Judge, can you, I guess, reorder that this

25  be served pursuant to paragraph of my subpoena?  I have not yet



1   received this document.

2       JUDGE GREEN:  Okay.  I don't -- I -- I really don't have

3   your subpoena handy.  Like I said before, documents that are

4   responsive to -- to both subpoenas should be produced to both

5   parties.

6       MR. JACKSON:  Judge, could we get a clarification on when

7   Respondent is required to deliver these?  To me, it seems like

8   a simple un-redaction.  They --

9       JUDGE GREEN:  As soon as possible.

10      I'm going to guess that it is not going to be used, to the

11  extent that it's redacted.  I -- I'm -- I'm going to guess

12  that, but I'm giving you the benefit of the doubt, the General

13  Counsel, that it's up to you to determine that.  But you're

14  going to be subject to protective order regarding it.

15      MS. BUFFALANO:  And we may ask, Your Honor, for some of

16  this stuff, and I -- I'm -- I -- I sent an email earlier to Ms.

17  Cox about how we plan on dealing with the personnel files and

18  un -- un-redacted sort of things related to personnel files and

19  individuals' names and whether or not we ask for you to put

20  some of this stuff under seal.  I mean, the concern is not

21  just --

22      JUDGE GREEN:  Okay.

23      MS. BUFFALANO:  -- that people are using it.  You know,

24  the parties here will be used for -- for some other purpose

25  besides this hearing.  It's also that the public will be able



1 to access all of this information and --

2 JUDGE GREEN:  No, I know, and that's fine.  If you want

3 to -- if you want to ask me to do that, maybe we'll do that.

4 MS. BUFFALANO:  Okay.

5 MS. COX:  Judge Green, I have another issue I'd like to

6 raise.  I entered GC 53 today, and it was produced by Amazon on

7 May 1st, 2021, pursuant to paragraph 15 of the -- our subpoena

8 that was served on March 1st, 2021.  That paragraph asks for no

9 (sic) videos -- videos capturing the incident on April 6th,

10 2020.  It's Respondent's position that it was found in

11 preparation of -- for this hearing, and we have no information

12 whatsoever how this video was -- was obtained, and we intend to

13 call the custodian of the records for paragraph 15 to question

14 the custodian.  So if Respondent --

15 JUDGE GREEN:  Why do you care?  Let me ask you, why do you

16 care?  You have it.  You're using it.  Is there some -- is

17 there some reason you need to know this?

18 MS. COX:  Yes, Judge.  List -- Amazon represents that they

19 didn't have this video during their investigation, and I want

20 to understand how come they were able to find it May 1st, 2021,

21 but were unable to find it during the period in question.

22 JUDGE GREEN:  That -- I don't know --

23 MR. SCHWARTZ:  Your Honor, I -- I -- I would say that the

24 General Counsel is certainly not in a position to be

25 complaining about anybody producing videos, given the circus



1   that we saw today, where they tried to hide that directly

2   relevant evidence from us.

3      MS. COX:  Well, first off, Mr. Schwartz, I would ask you

4   to stop being condescending and using terms like "circus" in

5   this forum.

6      MR. SCHWARTZ:  Okay.

7      MS. COX:  Secondly -- secondly, Judge, if I may, I'd just

8   like to finish my statement.  We have a right to present our

9   case as we wish, and if we want to use that -- that video for

10  impeachment purp --

11     JUDGE GREEN:  Let me ask you -- I'm sorry.  I -- I

12  can't --

13     MS. COX:  We are allowed --

14     JUDGE GREEN:  Let me -- let me stop -- no.  Is this -- is

15  that -- is this going to be an issue that -- is -- is the

16  Respondent going to take up the issue of whether they had

17  this -- this video during the investigation?  Is that going to

18  be part of the defense?  If it's going to be part of the

19  defense, then okay, fine.  We can have the GC address it now,

20  rather than during the rebuttal, which probably serves you

21  better.

22     MS. BUFFALANO:  I don't understand the question.

23     JUDGE GREEN:  Yeah.  Yeah.  So it sounds to me, if I

24  understood the GC correct, she expects that part of the

25  Respondent's defense is going to be that you didn't have this



1    video during the investigation, therefore -- I don't know.

2    That's -- that's -- I -- am I right, Ms. Cox?  That's what

3    you're asserting?

4         MS. COX:  Yes, Judge.

5         JUDGE GREEN:  Okay.  So that's what she thinks.  Is she

6    right about that, that that's part of your defense, that you

7    didn't -- that Amazon didn't have this video during the

8    investigation?  And if that's the case, why don't we have the

9    GC address it now?

10        MS. BUFFALANO:  I don't think it's part of the defense,

11   Your Honor, because it would've been -- it would've helped

12   Amazon had they had --

13        MR. KEARL:  Wait --

14        MS. BUFFALANO:  -- the video during the investigation.  It

15   is positive for Amazon's case.  But no, they did not have the

16   video, unfortunately, at the time.

17        JUDGE GREEN:  Either way, if you think it's good for -- if

18   you think it's good for the -- the Respondent's case, why not

19   just let her do it?

20        MS. BUFFALANO:  I'm not sure what we're letting her do.  I

21   don't under -- I -- I think --

22        JUDGE GREEN:  She just wants to -- she wants to put on

23   the --

24        MR. MURPHY:  I --

25        JUDGE GREEN:  -- custodian of records to question him



1    regarding the production of this document.

2         MR. MURPHY:  Your Honor, if -- it's -- it's Mr. Murphy.

3    If -- if I -- I -- I've offered to discuss that document, that

4    video, and a couple of other ones off the record with Ms. Cox.

5         JUDGE GREEN:  Earlier.  No way.

6         MR. MURPHY:  And in an -- in -- in a effort to try to

7    resolve a nonissue, and -- and I would continue to make that

8    offer.

9         JUDGE GREEN:  Okay, so listen, it's still the General

10   Counsel's case.  The General Counsel can call whomever they

11   want, and then, there'll be objections.  I don't 100 percent

12   understand what the relevance is at this juncture, but if you

13   want to call somebody, okay.

14        MR. MURPHY:  Yeah.

15        JUDGE GREEN:  Go ahead and call --

16        MR. MURPHY:  We -- so --

17        JUDGE GREEN:  -- somebody, and the Respondent will just --

18        MR. MURPHY:  Judge, may -- may -- may -- may I make  --

19   may I make a representation about where the -- how the video

20   was obtained --

21        JUDGE GREEN:  Sure.

22        MR. MURPHY:  -- and -- and -- and -- and so, the -- the

23   video, GC 53, is -- is a -- is a part -- one of two videos that

24   were discovered in around mid-March of this year, after I spoke

25   with a non-Amazon witness.  And --



1       JUDGE GREEN:  Okay.

2       MR. MURPHY:  -- subsequently, that person contacted me and

3   said that -- that the conversation had refreshed her

4   recollection that she had these videos, and she provided them

5   to me.  I -- I did not and do not consider them to be

6   responsive to paragraph 15.  Nevertheless, I provided them to

7   counsel for the General Counsel, because we intended to use

8   them in this case.  That -- our -- our -- our need for them has

9   been superseded by the -- the introduction of the video that

10  the counsel for the General Counsel did everything possible to

11  keep under the rug today.  And the -- the -- the video shows

12  part of the document -- the video that was introduced from the

13  other side, from the -- from the --

14      JUDGE GREEN:  I understand.

15      MR. MURPHY:  Yeah.

16      JUDGE GREEN:  Great.

17      MR. MURPHY:  So -- so, that's how -- that's how the

18  documents -- that's how the videos were obtained.  It -- Amazon

19  never had them.  They -- they were -- they were presented to

20  me, and I gave them to counsel for the General Counsel.

21  That -- that -- end of story.

22      JUDGE GREEN:  Okay.

23      MS. COX:  You're the custodian of the records for this

24  video responsive to paragraph 15?

25      MR. MURPHY:  I -- I don't know that I'm the custodian of



Exhibit E, Motion to Try Petition on Hearing Record

1    the records.  I told you how I came to have them -- have them

2    and -- and -- and how I came to forward them to you.

3         MR. KEARL:  But you haven't told us who gave them to you,

4    which is certainly relevant to understanding whether or not

5    Amazon had access to these videos.

6         MR. MURPHY:  Yeah.  And we're --

7         MR. KEARL:  (Indiscernible, simultaneous speech) --

8         MR. MURPHY:  -- going to -- we're going to have a witness

9    testify about those videos.

10        MR. KEARL:  And is that witness the custodian of the

11   record?  I'm just trying to figure out --

12        MR. MURPHY:  I'm not -- I mean, you're using the term

13   "custodian of the record," so, the -- the -- if -- if --

14   there's no mystery here, right?  So the videos -- the videos

15   show Mr. Bryson engaging in verbal abuse of -- of his coworker.

16   They -- they -- they show it less well than the video that we

17   introduced into the record today, right?  So you -- you know,

18   so, I -- I -- I --

19        JUDGE GREEN:  Am I right -- am I right, Ms. -- Ms. Cox?

20   Basically, what you're saying is if -- if Amazon had this

21   video, they would've taken action against Ms. Evans.  And they

22   didn't, so it shows retaliatory intent.

23        MS. COX:  Or they did --

24        JUDGE GREEN:  That's --

25        MS. COX:  -- and they didn't discipline her in the same



1    way, and there have -- there's also been representation --

2         JUDGE GREEN:  That's what I mean.

3         MS. COX:  Yes.  And there's also been representations here

4    that Mr. Bryson said the N word, said the C word, called her a

5    dyke, and these videos don't show that.  So we want whoever --

6    whoever --

7         JUDGE GREEN:  Do you want to -- right.  So you want to put

8    on evidence that they had this.  They had this -- this

9    document -- this video --

10        MR. MURPHY:  There -- there is not such evidence, Your

11   Honor.

12        JUDGE GREEN:  I understand.  I understand.  We you're your

13   representation, and that would go at -- so, basically, what you

14   want is somebody to get on and tell you that, right?  You're

15   not going to accept Mr. Murphy's representation to that effect?

16        MR. MURPHY:  Why -- why would she?

17        JUDGE GREEN:  So listen, we're going to off the record,

18   and you can -- you can decide what you want to do, General

19   Counsel, and we'll take it from there.

20        MS. COX:  Thank you, Judge Green.

21        JUDGE GREEN:  Okay.  We're done.  We'll be back tomorrow

22   at 10:00.

23   **(Whereupon, the hearing in the above-entitled matter was**

24   **recessed at 5:58 p.m. until Tuesday, May 11, 2021 at 10:00**

25   **a.m.)**



Exhibit E, Motion to Try Petition on Hearing Record

1                 **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings, via Zoom

3    videoconference, before the National Labor Relations Board

4    (NLRB), Region 29, Case Number  29-CA-261755, Amazon.Com

5    Services, LLC, and Gerald Bryson, held at the National Labor

6    Relations Board, Region 29, Two Metro Tech Center North, 5th

7    Floor, Brooklyn, New York 11201, at 10:05 a.m. was held

8    according to the record, and that this is the original,

9    complete, and true and accurate transcript that has been

10   compared to the reporting or recording, accomplished at the

11   hearing, that the exhibit files have been checked for

12   completeness and no exhibits received in evidence or in the

13   rejected exhibit files are missing.

14

15

16

17

18   _____

19   BARRINGTON MOXIE

20   Official Reporter

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services, LLC,          Case No.   29-CA-261755

         Employer/Respondent,

and

Gerald Bryson,

         An Individual.

_____

_____

Place: Brooklyn, New York (via Zoom videoconference)

Dates: May 11, 2021

Pages: 981 through 1171

Volume: 8

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

| | |
|---|---|
| In the Matter of: | |
| AMAZON.COM SERVICES, LLC, | Case No.   29-CA-261755 |
| Employer, | |
| and | |
| GERALD BRYSON, | |
| An Individual. | |

The above-entitled matter came on for hearing via Zoom

Videoconference, pursuant to notice, before **BENJAMIN W. GREEN**,

Administrative Law Judge, at the National Labor Relations

Board, Region 29, Two Metro Tech Center North 5th Floor,

Brooklyn, New York 11201 on **Tuesday, May 11, 2021, 10:00 a.m.**

1                          A P P E A R A N C E S

2       On behalf of the Charging Party:

3           FRANK KEARL, ESQ.
            MAKE THE ROAD NEW YORK
4           161 Port Richmond Avenue
            Staten Island, NY 10302
5           Tel. (929)265-7692

6       On behalf of the Employer:

7           CHRISTOPHER J. MURPHY, ESQ.
            JENNIFER M. WILLIAMS, ESQ.
8           RICHARD ROSENBLATT, ESQ.
            MORGAN, LEWIS & BOCKIUS, LLP
9           1701 Market Street
            Philadelphia, PA 19103-2901
10          Tel. (215)963-5601

11          NICOLE BUFFALANO, ESQ.
            MORGAN, LEWIS & BOCKIUS, LLP
12          300 South Grand Avenue
            22nd Floor
13          Los Angeles, CA 90071
            Tel. (213)612-7443

14
            KELCEY J. PHILLIPS, ESQ.
15          MORGAN, LEWIS & BOCKIUS, LLP
            1111 Pennsylvania Avenue, NW
16          Washington, DC 20004
            Tel. (202)739-5455

17
            JASON SCHWARTZ, ESQ.
18          ZAINAB AHMAD, ESQ.
            GIBSON, DUNN & CRUTCHER LLP
19          200 Park Avenue
            New York, NY 10166-0193
20          Tel. (212)351-3893

21      On behalf of the General Counsel:

22          EVAMARIA COX, ESQ.
            MATTHEW JACKSON, ESQ.
23          NANCY REIBSTEIN, ESQ.
            NATIONAL LABOR RELATIONS BOARD, REGION 29
24          Two Metro Tech Center, 5th Floor
            Brooklyn, NY 11201
25          Tel. (718)765-6172



1

<u>I N D E X</u>

2

3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Gerald Bryson | 986 | 1073 | 1169 | | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

<u>E X H I B I T S</u>

2

3       <u>EXHIBIT</u>                           <u>IDENTIFIED</u>        <u>IN EVIDENCE</u>

4       **General Counsel:**

5          GC-54                              1011              1011

6          GC-55(a)                           1011              1013

7          GC-55(b)                           1014              1014

8          GC-56                              1015              1017

9          GC-57                              1018              1019

10         GC-58                              1019           Not Admitted

11         GC-62                              1045              1046

12         GC-63                              1046           Not Admitted

13         GC-64                              1072              1072

14

15      **Respondent:**

16         R-29                               1111              1114

17         R-123                              1103              1106

18

19

20

21

22

23

24

25



```
 1                    P R O C E E D I N G S

 2         JUDGE GREEN:  Okay.  So we're back in the matter of

 3   Amazon.com Services, LLC, case number 29-CA-261755.  It's May

 4   11th, 2021.

 5         And what do we have from the General Counsel today?

 6         MS. COX:  We're calling Gerald Bryson.

 7         JUDGE GREEN:  Now, I don't see him in the hearing room and

 8   I don't see him in the waiting room.

 9         MR. KEARL:  Judge, let me go double-check.  He's -- he's

10   in our office in the next room.  I emailed him the link, but

11   let me just go check and make sure he's got it and he's ready.

12         JUDGE GREEN:  Okay.  So back off the record.

13   (Off the record at 10:08 a.m.)

14         JUDGE GREEN:  Okay.  So let's go back on the record.  We

15   have Mr. Bryson and the General Counsel is calling Mr. Bryson.

16         So Mr. Bryson, could you raise your right hand.

17   Whereupon,

18                       GERALD BRYSON

19   having been duly sworn, was called as a witness herein and was

20   examined and testified, telephonically as follows:

21         JUDGE GREEN:  Thank you.  So please state and spell your

22   name for the record.

23         THE WITNESS:  Gerald Bryson, G-E-R-A-L-D, B-R-Y-S-O-N.  .

24         JUDGE GREEN:  Thank you.  And are you alone in the room?

25         THE WITNESS:  Yes.
```



Exhibit E, Motion to Try Petition on Hearing Record
1033

1    JUDGE GREEN:  Okay.  So please, just during your

2    testimony, don't communicate with anybody via a phone,

3    different phones or other handheld device.  Just communicate

4    with us on Zoom.  And also don't refer to any materials that

5    aren't shown to you on the screen unless you're directed

6    otherwise.  If you're directed otherwise, then you can look at

7    something.  Okay?

8    THE WITNESS:  Yes, sir.

9    JUDGE GREEN:  Okay.  Thank you very much.

10   So Ms. Cox, any time you're ready.

11                    **DIRECT EXAMINATION**

12   Q    BY MS. COX:  Good morning, Mr. Bryson.  How are you today?

13   A    I'm fine, Ms. Cox.  Thank you for asking.

14   Q    Can you show us your immediate area, make sure there are

15   no documents in front of you and you could tilt the camera.

16   And then we'll get started.  Okay.  Thank you.

17   A    You're welcome, ma'am.

18   Q    Are you currently employed?

19   A    No.

20   Q    Did you work for Amazon?

21   A    Yes.

22   Q    When did you start working for Amazon?

23   A    October 2018.

24   Q    And at what Amazon facility did you work?

25   A    I worked at JFK8 in Staten Island, New York.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    What was your job when you started working there?

2    A    I was in PCF, Pick Count Floor.  My job was to count.

3    Q    And how long did you work in PCF, Pick Count Floor?

4    A    From October of -- October of -- I worked Pick Count Floor

5    until July 2020.

6    Q    So from the start of your employment, October 2018 to July

7    2020?

8    A    Yes.  Well, yes, because it would have been '19 a year.

9    Yes.  Going into 2020 my second year unchanged.

10   Q    And what was your last job at Amazon?

11   A    Outbound ship dock.

12   Q    What were your duties as an outbound ship dock worker?

13   A    My duties at the time were to make sure that all the

14   rubber totes that Amazon uses throughout the building on

15   conveyor belts for their merchandise, that -- that they get

16   restacked through the destacker, and then I sent them into a

17   certain area where people have access to bring them back up to

18   the floors.

19   Q    What is a destacker?

20   A    A destacker is a machine that has four lanes that all the

21   totes come down to on the conveyor belt, and once they're

22   there, the stacker each lane, four lanes there's a stacker

23   that's stacking them up to 12 each, then they push them out.

24   And at that point, it's my job to take them off and put them in

25   a secured area, but a accessible area for anyone in the



1    building to use.

2    Q    And after --

3         THE WITNESS:  Begging your pardon, ma'am.  I'm having a

4    video -- I'm having a glitch here with my battery, I have to

5    see where my -- my power cord is in or out.

6         JUDGE GREEN:  Okay.

7         MR. KEARL:  Judge, is it all right if I go assist with

8    getting the power cord set up?

9         JUDGE GREEN:  Off the record.  Yes.

10   (Off the record at 10:20 a.m.)

11        JUDGE GREEN:  Okay.  So back on the record.

12   Q    BY MS. COX:  Mr. Bryson, I want to go back a moment.  When

13   did you begin working in outbound ship dock?

14   A    About -- about in March of 2021.

15   Q    Do you mean 2020?

16   A    I'm sorry.  2020.

17   Q    Other than working in PCF, Pick Count Floor and outbound

18   ship dock, did you work in any other department at Amazon?

19   A    No.

20   Q    Okay.  I'm sorry, let me -- so we were talking about your

21   work in outbound ship dock.

22   A    Yes.

23   Q    Who was your direct supervisor in outbound ship dock?

24   A    It was a new manager.  His name was Chris.  We had just

25   gotten familiar.  I'm not positive about his last name.  He was



Exhibit E, Motion to Try Petition on Hearing Record
1008

```
1    a new guy.

2    Q    Do you know what his title was?

3    A    Yes, he was a manager.  He was my -- he was my boss.

4    Q    What days did you work?

5    A    I worked back half, which is Wednesday to Saturday, 7:15

6    a.m. to 5:45 p.m.

7    Q    And about how many hours a week did you work?

8    A    40 hours a week.

9    Q    And what was your rate of pay?

10   A    $18.30.

11   Q    Do you recall when you were suspended?

12   A    Yes.

13   Q    Around what date did that occur?

14   A    April 10th.

15   Q    2020, right?

16   A    2020.

17   Q    Do you recall when you were terminated?

18   A    Yes.

19   Q    What date was that?

20   A    April 17th, 2020.

21   Q    Do you recall the last day that you worked before you were

22   fired?

23   A    Yes.

24   Q    What date was that?

25   A    March 28th, 2020.
```



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    And between the last day that you worked and your

 2    termination, did you take time off?

 3    A    Between the last day of work and termination.  No.  Yes, I

 4    took time off, I didn't go in.  No.  I was working at the end

 5    of the week.

 6    Q    Okay.  What kind of time off did you take?

 7    A    UPT.  We had unlimited UPT for the month of March, as well

 8    as I had over 40 hours UPT anyway.  But it was unlimited.

 9    So -- and that's what I used.

10    Q    What does UPT stand -- what does UPT mean?

11    A    Unpaid time.

12    Q    Okay.  And why did you take time off between the end of

13    March and your termination date?

14    A    Besides protesting, I just wanted to be there to make

15    minimum hours, to make a little money, but like I've stated

16    before, I was scared with the pandemic.  I didn't want to bring

17    anything home, so I tried to work about 25 hours a week just to

18    give myself a few dollars.

19    Q    And before April 2020, had you ever been disciplined for

20    your behavior?

21    A    No, ma'am.

22    Q    So I want to draw your attention to March of 2020.  Did

23    you have COVID concerns in March 2020?

24    A    Yes, ma'am.

25    Q    Did you talk to your coworkers about your COVID-19
```



Exhibit E, Motion to Try Petition on Hearing Record

1    concerns?

2    A    Yes.

3    Q    Which coworkers did you initially speak to about your

4    COVID-19 concerns?

5    A    Christian Smalls and Derrick Palmer.

6    Q    And who is Christian Smalls?

7    A    Christian Smalls was -- was the leader of our movement

8    right now.  But he was -- at the time he was my ex-boss from

9    PCF.

10   Q    And who is Derrick Palmer?

11   A    Derrick Palmer is also a friend.  When I first came to

12   Amazon, he is one of the ambassadors that taught me how to work

13   the different stations and stuff and what my job was.  And

14   we've been good friends ever since.

15   Q    During your employment, did you ever work on the same team

16   as Palmer and Smalls?

17   A    Yes.

18   Q    And who supervised the team that you worked with on Palmer

19   and Smalls?

20   A    Bertram Pryce.

21   Q    How long were you on the same team as Smalls and Palmer?

22   A    About eight months.

23   Q    Do you recall the time frame of that eight-month period?

24   A    Probably like July to the end of February, beginning of

25   March.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    When you say July, what year are you referring to?

2    A    I'm referring to -- we started in 20- -- 2020.

3    Q    And when you say February, what year are you referring to?

4    A    I'm referring to 2020.

5    Q    Okay.  So I just want to clarify.  What -- what team did

6    you work on with -- what department did you work in with Smalls

7    and Palmer?

8         MR. MURPHY:  That's been asked and answered.

9         MS. COX:  No, I asked what department he worked in.

10   Not -- before I asked the team.

11        JUDGE GREEN:  Okay.  Overruled.

12   Q    BY MS. COX:  I'm sorry, Mr. Bryson.  What department did

13   you work in with Smalls and Palmer?

14   A    Pick Count Floor.  PCF.

15   Q    Okay.  And I just want to clarify the dates.  Were you at

16   Pick Count Floor until July 2019?

17   A    No.  I was on Pick Count Floor until February of 2020.

18   Q    Okay.

19   A    The end of February going into March I switched.

20   Q    Okay.  Into outbound ship dock, right?

21   A    Yes, ma'am.

22   Q    Okay.  So did -- did you work in Pick Count Floor when you

23   first started at Amazon?

24   A    Yes.

25   Q    Okay.  So did you work at -- in Pick Count Floor from



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    October 2018 through February 2020?

 2    A     More or less, yes.  I worked for Pick Count Floor.  Yes.

 3    Q     Okay.  Do you recall -- I'm sorry.  So I'm going to go

 4    back to your initial conversations about COVID-19, okay?

 5    A     Yes.

 6    Q     Do you recall where you were when you spoke to Smalls and

 7    Palmer about COVID-19?

 8    A     Yes.

 9    Q     Where were you?

10    A     We were in the lobby of Amazon JFK8.  They were holding a

11    fair -- a carnival-type fair in the lobby.

12    Q     Okay.  And what location of the --

13          MS. COX:  I'm sorry.  I'll withdraw that.

14    Q     BY MS. COX:  Was the fair held in any other locations in

15    the warehouse?

16    A     Just in the lobby, but it was -- it was from the can --

17    what we call the candy store.  That's a room that they would

18    leave open with different types of little sweets and stuff

19    during the day, I guess, to give you a little sugar rush and

20    finish off the day or whatever.  But from the lot -- from the

21    candy store across the lobby to the locker room to the

22    lunchroom.  It's all one straight line, ma'am.

23    Q     Thank you.  Can you describe what you saw employees doing

24    at the fair?

25          A     Employees were playing the games that Amazon had set
```



1    up.  There were a lot of raffle contests.  What they did was

2    they gave us tickets during the day.  Like if we had good stats

3    or something like that, they gave us raffle tickets.  So you

4    could end up with anywhere from nine to ten raffle tickets, you

5    know, in the two days before.  And that's what they were using

6    at the fair.  So everybody was raffling, putting their raffle

7    tickets in for the different prizes that Amazon had sent it on

8    stage there, such as AI vacuum cleaner, a PlayStation 4,

9    numerous notebooks, you know, electronic stuff, you know.  And

10   people were putting in those tickets into the -- each boxes or

11   playing the games they had --

12   Q    Thank you.

13   A    -- and those things.

14   Q    Do you recall around what date the fair took place?

15   A    I would have to see -- that to be around March 15th to

16   17th, somewhere in there.

17   Q    Of 2020?

18   A    Yes, ma'am.

19   Q    Did the attendees at the fair wear face masks?

20   A    No, ma'am.

21   Q    Do you recall around what time you all attended the fair?

22   A    Yes, it was after our shift at 5:45.  But the shift -- the

23   earlier shift was also there.  They get out that 4:45.

24   Q    When you say 5:45, are you talking about --

25   A    PM.



Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 1042 of 2171 PageID #: 1094

```
1    Q    -- p.m.?

2    A    Yes, ma'am, p.m.

3    Q    And when you say the earlier shift, can you give me the

4    time that the earlier shift works?

5    A    Yes.  The earlier shift works at 6:15 to 4:45 p.m.  6:15

6    a.m. to 4:45 p.m.

7    Q    What did you and Smalls -- what did you, Smalls, and

8    Palmer discuss at the fair about your COVID-19 concerns?

9    A    Our concerns were -- were -- were high at that point

10   because there were are -- there -- there was no less than 1,000

11   people running past, bumping, trying to play the games, trying

12   to win a prize, trying to get something to eat, trying to get

13   popcorn.  And basically, our concerns were high at that time

14   because not only New York City, but the United States had

15   declared a pandemic.  And everybody was going about at Amazon

16   as business as usual.

17   Q    Did -- do you recall making any decisions at the fair

18   about raising your COVID-19 concerns?

19   A    Yes.

20   Q    Can you tell me what decision you all made that day?

21   A    We decided that we were going to start, you know,

22   protesting and -- minor protesting, like sitting out -- sitting

23   out in the lunchrooms, not going -- you know, not signing in.

24   You know, sitting there protesting more quiet -- quite -- you

25   know, peaceful.  But letting them know that, you know, we had
```



www.escribers.net | 800-257-0885

1    concerns.

2    Q    Other than sitting in the lunchroom, did you all make any

3    decisions to engage in other actions?

4    A    Yes.

5    Q    And what were the -- what was -- what were those other

6    actions?

7    A    We decided that if we got any -- didn't get a response in

8    the -- in the lunch, you know, from many of the managers for

9    doing what we were doing, that we were going to have to step it

10   up and -- and bring the fight to them at the office.  And

11   asked -- and asked them what the intentions were.

12   Q    Do you recall when you first raised the safety concerns,

13   the COVID safety concerns to management after the fair?

14   A    Yes.

15   Q    Around what date was that?

16   A    The -- the 25th.

17   Q    Are you talking about March?

18   A    25th of March.  It -- it was 9 a.m. in the morning.

19   Q    2020, right?

20   A    2020.

21   Q    And where were you when you raised concerns -- first

22   raised concerns on March 25th, 2020?

23   A    We were in the lunch room, but we were geared for 9:00 to

24   go to the manager's office -- head manager's office.

25   Q    And around what time did you arrive in the lunchroom on



Exhibit E, Motion to Try Petition on Hearing Record

1    March 25th, 2020?

2    A     Probably about 8:00 --

3    Q     And were you on the clock at that --

4    A     -- a.m.

5    A     -- time?

6    A     No, ma'am, I didn't clock in.  I came here strictly for --

7    to protest and see what they're going to do.

8    Q     Were you with anyone?

9    A     Yes, I was with Christian Smalls and Derrick Palmer and

10   numerous other employees that had concerns.

11   Q     And what were you doing in the lunchroom to raise

12   concerns?

13   A     They had even separated tables and stuff.  So they had --

14   basically they had Tom Castle, which is a level 6 manager.

15   They had him in the lunch room.  And he was running around and

16   like we would say to him, you know that the -- we're not six

17   feet apart.  Like, you got too many people at this table.  So

18   he started breaking the tables up towards the lunchroom and

19   making people sit farther apart, things, you know, to that

20   effect.

21   Q     Do you know Mr. Castle's title?

22   A     Level 6 manager.  He was over PCF.

23   Q     Did you speak with coworkers in the lunchroom about COVID

24   concerns?

25   A     Yes.


www.escribers.net | 800-257-0885

1   Q    And about how many employees did you speak with?

2   A    I -- I was -- I spoke with maybe myself, being in and out,

3   maybe 15, 20 employees.

4   Q    And do you recall what you discussed with the coworkers

5   that you spoke with?

6   A    Yes.  Our concerns basically were we had no protection.

7   And everybody wanted to know what was going to happen next,

8   what were they going to do to secure us, so to speak.

9   Q    Did you leave the cafeteria that morning?

10  A    Yes.

11  Q    And around what time did you leave the cafeteria?

12  A    About 9:00, a minute to 9, two minutes to 9.

13  Q    And did you raise concerns at the manager's office after

14  you left the cafeteria?

15  A    Yes.

16  Q    And around what time did you arrive in the manager's

17  office?

18  A    We arrived the ti -- in time for the 9 a.m. meeting.

19  Q    And whose office did you go to?

20  A    Sai -- Sai's off -- the general manager's office.

21  Q    What's the general manager's name?

22  A    Sai.

23  Q    Do you know Sai's last name?

24  A    I'm not sure.  I think it Kotha.  I'm -- I'm not sure.

25  It's been a while.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Did any of your coworkers attend the meeting in Mr.

2    Kotha's office?

3    A    Yes.

4    Q    Which coworkers attended the meeting?

5    A    Myself, Derrick Palmer, Christian Smalls, and numerous

6    other employees, maybe about 15, 20 employees after us.

7    Q    And were you on the clock at the time?

8    A    No.

9    Q    And when you arrived in Mr. Kotha's office, were managers

10   present?

11   A    Yes.

12   Q    About how many managers were present?

13   A    A lot of managers, numerous managers from all departments,

14   managers that are just ops managers, so to speak.  They just

15   call theirselves ops.  But the -- the whole office was full

16   with managers.

17   Q    Do you recall all the managers names that were present?

18   A    No.  I know a few.

19   Q    Can you tell me some of the names that you recall being

20   present?

21   A    Zach from Safety.  I believe, Christine, from safety.

22   Chris Perez, Sai, himself.  The ex -- I don't know his name,

23   but just before Sai took that position, there was another

24   general foreman, Chris -- I mean, general manager, his name was

25   Chris.  And the guy that was there was the head of HR.  He



1    might have got moved to ops, but he was a ex-HR head.  I

2    can't -- can't think of his name.

3    Q    Okay.  You mentioned Zach.  Do you know Zach's last name?

4    A    Marc -- Zachary Marc.

5    Q    And you mentioned, Christine.  Do you know Christine's

6    last name?

7    A    No, not offhand.

8    Q    Did the managers present have mask -- face masks on?

9    A    No ma'am.

10   Q    Were the managers physically distanced?

11   A    No.

12   Q    Do you recall which employees walked into the manager's

13   office first?

14   A    Yes.

15   Q    Who walked in first?

16   A    Christian Smalls.

17   Q    And who followed after him?

18   A    Followed by Derrick Palmer and myself.

19   Q    How long were you and the other employees part of this

20   meeting?

21   A    It was quick, maybe anywhere within a five-minute range.

22   Q    Did employees speak at this meeting?

23   A    Yes.

24   Q    Who spoke first from among the employees?

25   A    Christian Smalls.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    How did the meeting start?

2    A    When we entered, I believe, Sai was more susceptible to

3    yes, what can we do for you.  And Chris -- Christian at that

4    point said, yeah, what do you intend to do to keep us safe

5    during this pandemic?  We have no masks.  We have -- you know,

6    we have no gloves.  What do you intend to do?  What are your

7    intentions?

8    Q    Did anyone respond to Mr. Smalls?

9    A    Yeah, I do remember Christine kind of mouthing off at us,

10   telling us like we got a lot of nerve stepping in here and --

11   to that effect.

12   Q    Did anyone else speak from among the employees?

13   A    Yes, Sai -- Sai actually did more of the speaking at that

14   point for -- I mean, no, for the employees --

15   Q    Yeah.

16   A    -- Derrick Palmer then spoke.  And --

17   Q    What did Mr. --

18   A    -- he expressed --

19   Q    I'm sorry.  Go ahead.

20   A    He expressed his concerns the same as us all, basically,

21   what were their intentions.  I don't exactly remember

22   everything that Mr. Palmer said.

23   Q    Okay.  Did you speak at the meeting?

24   A    Yes.

25   Q    And what did you say?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I look -- I looked directly at Sai, and I said to my Sai,

2    Sai, do you realize that people are dying out here.  And we

3    don't know how or why.  We just know there's a virus and it's

4    killing people.  And he was like, yes, Gerald, I'm aware of

5    this.  And I was like, again, I said, I don't want to bring

6    this home to my family.  I have a grandson.  I have two

7    grandsons and a sun.  And I didn't want to bring it home to

8    them, to the kids.  And I -- and again, I was like, do you

9    realize how many people are dying right now, how many people

10   are suffering.  And he said, yes, Gerald, I'm aware.  Like,

11   I'll get back to you this afternoon.  That's how he told every

12   one of us actually.  He ended it, all of us even Christian dan

13   Derrick.  He said, I'll get back to you this afternoon.  Then

14   Derrick went, I'll get back to you this afternoon.  Then when I

15   spoke, I'll get back to you this afternoon, Gerald.

16   Q    So how did this meeting end?

17   A    It ended with him saying that.  And us having enough of

18   them just not doing anything.  And we -- we walked out.  You

19   know, being patronized to wait until the afternoon.

20   Q    During the meeting, did any manager present ask employees

21   to maintain six feet of social distance?

22   A    No.

23   Q    After you left the meeting, did you return to the

24   cafeteria?

25   A    Yes, briefly.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    How long did you stay?

2   A    Not too much longer.

3   Q    Did any other employees return to the cafeteria?

4   A    Christian -- Christian Smalls and Derrick Palmer, and the

5   other employees.  Some of them left with me.  Some of them went

6   to work.  Some stayed with them.

7   Q    Do you know why all Palmer and Smalls returned to the

8   lunchroom?

9   A    Yes, because they were still -- they -- they were still

10  going on.  They were still protesting, and they were figuring

11  out basically, you know, what we were going to do next, you

12  know, at that point.

13  Q    Before March 25th, 2020, had you ever interrupted a

14  manager's meeting with a group of your coworkers?

15  A    No.

16  Q    Other than March 25th, did you walk in on managers meeting

17  to raise COVID -- COVID concerns?

18  A    No.

19  Q    I just want to ask you a few questions about Mr. Sai

20  Kotha.

21  A    Yes.

22  Q    What do you know Mr. Kotha's duties to be?

23  A    As a general manager?

24  Q    Yes.

25       MR. MURPHY:  Objection, Your Honor.  What's -- what's the



www.escribers.net | 800-257-0885

1   basis for the witness' knowledge of testimony re -- regarding

2   the -- the duties of the general manager of the facility?

3       MS. COX:  Judge Green, he worked there for a year and a

4   half and had occasion to observe Mr. Kotha.

5       JUDGE GREEN:  Okay.  So to the extent you saw Mr. Kotha,

6   you personally saw Mr. Kopa (sic) performing his functions, you

7   can tell us what you saw him doing.

8   A    Mr. Kotha wasn't always in charge.  He will --

9       MR. MURPHY:  And -- and -- and -- and let -- let me just

10  interrupt.  The gentleman's last name is K-O-T-H-A, Kotha.

11      JUDGE GREEN:  Ko -- Kotha.

12      THE WITNESS:  Kotha.

13      JUDGE GREEN:  Okay.

14      MR. MURPHY:  Yeah.  Yeah, I was --

15      MS. COX:  Mr. Murphy, I just ask that you not interrupt

16  the witness.  You could have waited --

17      MR. MURPHY:  Okay.

18      MS. COX:  -- till he finished to correct him.

19      MR. MURPHY:  Thank you very much.

20      MS. COX:  Thank you.

21  Q    BY MS. COX:  Mr. Bryson, what did you observe Mr. Kotha

22  doing at JFK8?

23  A    Mr. Kotha was very quiet usually.  He didn't bother

24  anybody.  We had brief hi's, byes, li -- basically, that he was

25  more ops.  And that meant that he just could be anywhere, you



www.escribers.net | 800-257-0885

1    know.  And he actually filled in sometimes if a manager was out

2    or whatever like that.  But our -- our relationship was

3    basically a brief hi and bye, always subtle and we always had

4    pleasantries for each other so.

5    Q    So you know, Mr. Kotha, to be involved in disputes between

6    employees?

7    A    No.

8    Q    Do you know --

9        MR. MURPHY:  So object -- same objection as to what the

10   witness' knowledge of how -- how or when Mr. Kotha was involved

11   in interactions with employees.

12       JUDGE GREEN:  Right.  You know, what -- I'm just taking it

13   for what it's worth.  So he can --

14       MR. MURPHY:  Okay.  All right.

15       JUDGE GREEN:  I understand that he might not know -- be a

16   position to know what Mr. Kotha was doing all the time.

17   Q    BY MS. COX:  Mr. Bryson, to your knowledge, who resolved

18   disputes between employees?

19   A    HR.

20   Q    And when you say HR, who are you --

21   A    Human resources.

22   Q    And how do you know that human resources resolves disputes

23   between employees?

24   A    It was told to us straight out.  I mean, you know, when

25   you come in the door, you get your -- your briefings at your



1    orientation.  And disputes and things of that nature, it was

2    usually HR settling it.

3    Q    Now, I want to focus your attention on the -- on March

4    30th, 2020.  Did you participate in a protest outside of JFK8?

5    A    Yes.

6    Q    Who organized the March 30th protest?

7    A    Christian Smalls, Derrick Palmer, and myself.

8    Q    Did you tell any of your coworkers about the March 30th

9    protest?

10   A    Yes.

11   Q    About how many of your coworkers did you tell?

12   A    Anywhere, like, before 15 to 20 people.  You know, I -- I

13   was in and out of there, so I didn't see everybody all the time

14   at that point, but about 15 to 20 people.

15   Q    So where did you talk to your coworkers?

16   A    On the phone or before I left, you know, sometimes I was

17   seeing people out in the parking lot.  You know, I got around.

18   Q    On March 30th, did any of your coworkers from JFK8 end up

19   joining the protest?

20   A    Yes.

21   Q    And about how many Amazon employees participated in the

22   March 30th protest?

23   A    Give or take about 50.

24   Q    Do you recall what time the protests started?

25   A    Yes, about 11, 11:30 a.m.



1    Q    And do you recall around what time it ended?

2    A    About 1:30 -- between 1:30 and 2 p.m.

3    Q    Who were some of the employees that joined on March 30th?

4    A    Some of the employees like Mandi Velasco, Tristan

5    (phonetic).  They were a few people there.  There were quite a

6    few people.

7    Q    Did Mr. Palmer join on March 30th?

8    A    Yes.

9    Q    And Mr. Smalls join on March 30th?

10   A    Yes.  And also Jordan Flowers.

11   Q    Were you off duty at the time that you protested?

12   A    Yes.  It was my day off.

13   Q    And what were you protesting for?

14   A    We were protesting for better working conditions as far as

15   COVID-19.  We were asking for more gloves.  And we were asking

16   for masks.  And we were asking basically that they just shut

17   the building down and sanitize it, you know.  And we were

18   asking why we're shut down that employees be paid.

19   Q    What were you doing to protest?

20   A    Basically, we had signs, you know, with -- with different

21   slogans on them, and you know, pertaining to what's going on.

22   I mean, Amazon -- Mr. Bezos, himself was -- was making like 24

23   billion in two months.  And you know, yet and still, we didn't

24   have any the proper equipment to function there.

25   Q    So Mr. Bryson, I'd like to have you focus on what you



1    observed employees doing at the protest on March 30th.

2    A    Basically, employees were carrying signs protesting.  We

3    were giving a lot of interviews on the 30th.  Chris manned the

4    bullhorn.  And basically, we were letting the world know what

5    was going on at JFK8.  We spent a lot of time in front of news

6    cameras and reporters.

7    Q    Did anyone else man the bullhorn on March 30th, 2020?

8    A    On March 30, 2020?  Derrick Palmer.

9    Q    You use the bullhorn on March 30th?

10   A    No ma'am.

11   Q    Okay.  So you mentioned media being present.  Actually,

12   before I move forward.  So you mentioned that employees carried

13   signs?

14   A    Yes.

15   Q    Do you remember what some of the signs said?

16   A    Not exactly at this time, but I can tell you what they --

17   they were -- they were pertaining to the COVID infection and

18   that Amazon wasn't, you know, supplying the right medical and

19   safety needs to ensure that this doesn't -- didn't spread

20   amongst, you know, the employees at Amazon.  There were a lot

21   of people infected in Amazon, so that's where the --

22   Q    Okay.  So where were employees protests -- where were the

23   protesters standing on March 30th?

24   A    Majority of protesters besides the little that were inside

25   the parking lot in the walking area there, most of the



Exhibit E, Motion to Try Petition on Hearing Record

1    employees were outside on 5th Street by the bus stop.  That's

2    where all the news reporters were, cameramen.  So that's -- a

3    lot of employees where they're giving interviews and you know,

4    stressing their concerns.

5    Q    Is the bus stop -- I'm sorry.  Go ahead.

6    A    It's all right.

7    Q    Is the bus stop public property?

8    A    Yes.

9    Q    Okay.

10   A    You did say public, right?

11   Q    Yes, I did.

12   A    Yeah.  Yes.

13   Q    And the parking lot is Amazon's property, right?

14   A    Yes.  Yes.

15   Q    Okay.  So you mentioned that you spoke to media, right?

16   A    Yes.

17   Q    Where did you speak to the media?

18   A    I spoke to the media right there on -- on 5th Street

19   across from the bus stop, usually, right across from it.  Might

20   have been some, you know, grass or something right there.  And

21   they were interviewing us, and we were holding a lot of signs

22   and stuff at that point.

23   Q    Do you recall which news sources you spoke to on March

24   30th, 2020?

25   A    There was -- there were so many I can name a few.  But



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    like, CNET, CNN, NBC.  There were numerous -- there were

2    numerous online reporters and -- and -- and papers and things

3    like that there, you know, TV stations.  They were all there.

4    Q    Okay.  Did you give your name to the press?

5    A    Yes, I did.

6    Q    Okay.  I'm going to show you some documents, just bear

7    with me a moment.  The first document that I'm showing that's

8    uploaded into SharePoint as General Counsel's Exhibit --

9         MR. MURPHY:  Can I interrupt you for one second?  I got

10   bounced off of SharePoint.  I -- I need to log back in.  I -- I

11   don't know why that happens.  Give me one second.

12        MS. COX:  Sure.  Let me know when you're ready.

13        MR. MURPHY:  I will.

14        MS. COX:  Thank you.

15        THE COURT REPORTER:  We'll be on, 54?

16        MS. COX:  Yes, we are, Barry.

17        THE COURT REPORTER:  Okay.  Thanks.

18        MS. COX:  You're welcome.

19        JUDGE GREEN:  I'm not seeing 54.

20        MS. COX:  Judge, I've uploaded it.

21        JUDGE GREEN:  Ah, there it is.

22        MS. COX:  There were several others that I'm uploading

23   currently.  There should be GC-54, 55(a) and (b).  And then

24   through 50- -- through -- through 61 uploaded.

25        MR. MURPHY:  Okay.  I think I'm good to go.  Thank you.


www.escribers.net | 800-257-0885

1    MS. COX:  You're welcome.  I need a moment now.  I'm

2    sorry.

3        One of the files took longer than expected.  Okay.  Now,

4    I'm ready.  Okay

5    Q    BY MS. COX:  Okay.  Mr. Bryson, so I'm going to show you

6    General Counsel's Exhibit 54.  Please let me know when you see

7    my screen.  Can you see it?

8    A    Yes.

9    Q    Okay.  Is this a picture of you?

10   A    Yes.

11   Q    And is this dated March 30th, 2020?

12   A    Yes.

13   Q    Okay.

14       MS. COX:  Judge Green, this is a news article.  It's a

15   three-page document.  And I'm asking for admission of GC-54.

16       JUDGE GREEN:  Any objection.

17       MR. MURPHY:  No, sir.

18       JUDGE GREEN:  Then GC-54 is admitted.

19   **(General Counsel Exhibit Number 54 Received into Evidence)**

20       MS. COX:  Okay.

21   Q    BY MS. COX:  Mr. Bryson, can you see the other document

22   that's up on my screen currently?

23   A    No, it's not up there yet, ma'am.

24   Q    Okay.  Sorry.  Let me do this again.  So showing you GC-

25   55(a).  Do you see this document?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    And this is a video that's embedded into the article.  Is

3    that you there?

4    A    Yes, it is, ma'am.

5    Q    And the date on this is March 30- -- 31st, 2020?

6    A    Yes.

7    Q    At this time, Your Honor, General Counsel moves for

8    admission of General Counsel 50- -- 55(a).

9         JUDGE GREEN:  Any objection?

10        MR. MURPHY:  I'm -- I'm still -- still reading this.  If

11   you can give me one second.

12        MS. COX:  Absolutely.

13        MR. MURPHY:  Your -- Your Honor, I -- I -- I have -- I

14   have no objection to 54, 55, or other ones like this.  I'm

15   assuming they're being offered for the -- to demonstrate that

16   Mr. Bryson had achieved some level of notoriety related to his

17   protest activities.  And they're not being offered for the

18   truth of the matter, or -- or for the truth of any of the

19   hearsay statements other than perhaps the statements of Mr.

20   Bryson himself.

21        JUDGE GREEN:  That's what I was assuming.  And are we

22   right about that --

23        MR. MURPHY:  Okay.

24        JUDGE GREEN:  -- Ms. Cox.

25        MS. COX:  Yes, Judge.



Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 1060 of 2171 PageID #: 1313

1      JUDGE GREEN:  Okay.

2      MR. MURPHY:  And if you want to -- just one question about

3   the 55(a).  There -- it looks like there's a video link or

4   something in -- at the top of the article.

5      MS. COX:  Yes.  And 55(b) is that video.

6      MR. MURPHY:  Oh, okay.  All right.  All right.  So I

7   have -- I -- so based on the discussion that we just had, I

8   have no objection to 55(a).

9      MR. MURPHY:  Ms. Jones, can you help me?

10      JUDGE GREEN:  Okay.  So 55(a) is admitted.

11   **(General Counsel Exhibit Number 55(a) Received into Evidence)**

12      MS. COX:  Sorry, Judge.

13      JUDGE GREEN:  No, go ahead.

14      MS. JONES:  Yes.  Yes, Ms. Cox, I'm here.

15      MS. COX:  Can you help me with these exhibits, please?

16      MS. JONES:  Sure.

17      MS. COX:  Okay.  The next one is 55(b).

18      MS. JONES:  Okay.

19      MS. COX:  Okay.  We don't hear the sound, Ms. Jones.

20      MS. JONES:  Let me see.

21      MR. KEARL:  I think when you share it, there's a -- you

22   need to check a box at the bottom that says share sound.

23      MS. COX:  Okay.

24      MR. MURPHY:  Could we go off the record for a minute, Your

25   Honor, while this gets sorted out?



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Off the record.

2    (Off the record at 11:01 a.m.)

3    JUDGE GREEN:  You believe we -- so let me just -- let's go

4    back on the record.

5    MS. JONES:  Okay.  It's 54-B, right?

6    MS. COX:  55-B.

7    MS. JONES:  55-B.  Okay.

8    (Video played at 12:48 p.m., ending at 12:50 p.m.)

9    MS. COX:  Thank you, Ms. Jones.  Can you pull up -- I'm

10   sorry.  Your Honor, General Counsel moves for admission of GC-

11   55(b).

12   JUDGE GREEN:  Any objection?

13   MR. MURPHY:  No objection subject to the same

14   understanding.

15   JUDGE GREEN:  Okay.  GC-55(b) is admitted.

16   **(General Counsel Exhibit Number 55(b) Received into Evidence)**

17   MS. COX:  And Ms. Jones, can you pull up GC-56?

18   MS. JONES:  Okay.  Sure.  My SharePoint went out.  It

19   kicked me out.  I have to go back in it.  Hold on for one

20   second.

21   MS. COX:  Okay.

22   MS. JONES:  Okay.  Okay, so which one would you like

23   ma'am -- Ms. Cox?

24   MS. COX:  56, please.

25   MS. JONES:  Okay.  This is 56.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    BY MS. COX:  Okay.  Mr. Bryson, can you see the originally

2   published date, March 31st, 2020?

3   A    Yes.

4        MS. COX:  And Ms. Jones, can you scroll down to page 8,

5   please?

6        MR. MURPHY:  Can I have a minute to peruse this, please?

7        JUDGE GREEN:  Yes.

8        MR. MURPHY:  You want to go off the record?  Because I

9   don't know how long it's --

10       JUDGE GREEN:  Okay.  Off the record.

11   (Off the record at 11:54 a.m.)

12       JUDGE GREEN:  Okay.  So back on the record.

13       MS. COX:  I'm sorry.  So Ms. Jones -- yes.

14   Q    BY MS. COX:  Mr. Bryson, does that picture fairly and

15   accurately represent you on March 30th, 2020?

16   A    Yes, ma'am.

17       MS. COX:  And General Counsel moves for admission of

18   GC-56.

19       JUDGE GREEN:  Any objection?

20       MR. MURPHY:  Yeah.  Your Honor, I do have an objection to

21   this one.  It's a ten-page article or so, and -- and there's a

22   picture of Mr. Bryson on page 8.  I wasn't able to determine in

23   a quick read if he was quoted anywhere in the article, but

24   there's a lot of other matters in here involving other

25   employers and other issues in other parts of the country,


www.escribers.net | 800-257-0885

1   that -- that frankly just don't have anything to do with this

2   case.  I would have no objection to this exhibit coming in,

3   with the -- the page 1 to indicate its source, and -- and also

4   page 8 involving the picture of Mr. Bryson, but with respect to

5   the rest of it's -- it's not relevant.

6       JUDGE GREEN:  Okay.

7       MS. COX:  Judge Green?

8       JUDGE GREEN:  Yes.

9       MS. COX:  I'm sorry.  I was just going to say the -- the

10   exhibit should be offered in its com -- in its entirety and

11   we're only offering it to show that Mr. Bryson was, you know,

12   widely known by the media at that time.

13       JUDGE GREEN:  I understand, but to the extent it comes in,

14   then you have to -- you have to worry about what's going to

15   happen with it.  Are -- are you agreeing that those pages

16   are -- there's nothing wrong with the parties agreeing that

17   those pages are the only part of it that's relevant and that

18   those pages should come in.  You know, there's the rule of

19   completeness, but that really only implies if you need to --

20   you need the entire document in order to understand it.

21       MS. COX:  Well, Judge, I think you do.  That's what was

22   happening at -- at that time.

23       JUDGE GREEN:  No.  So I'm not taking these documents for

24   the -- what's written in the body of the article, that's

25   hearsay and --



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MS. COX:  I'm not --

 2        JUDGE GREEN:  -- that's not --

 3        MS. COX:  I'm not asking for that, Judge.

 4        JUDGE GREEN:  Okay.  So --

 5        MS. COX:  It's also -- it's under 902.

 6        JUDGE GREEN:  Okay.  So listen.  I'm going to admit it at

 7   the very least for pages 1 and 8.  I'll take a look at it

 8   later.

 9   (General Counsel Exhibit Number 56 Received into Evidence)

10        MS. COX:  Thank you, Judge.

11        MR. MURPHY:  Thank you, Judge.

12        MR. KEARL:  And Judge, insofar as Amazon has not produced

13   any communications relating to these documents, I feel like

14   it's safe to assume that they might have seen these.  Those

15   subpoena requests include communications related to both of the

16   documents, things like that.  We've not seen anything, and in

17   many of these articles Amazon actually makes statements

18   themselves.

19        JUDGE GREEN:  Okay.  So then I'll look for that as well.

20        MS. COX:  Okay.  Ms. Jones, can you bring up GC-57?

21        MS. JONES:  Okay.

22        MS. COX:  Judge Green, can we go off the record for a

23   moment?

24        JUDGE GREEN:  Off the record.

25   (Off the record at 11:15 a.m.)
```



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Okay.  Back on the record.

2      MS. COX:  Okay.  So Ms. Jones?

3      MS. JONES:  Yes?

4      MS. COX:  I think we're at GC-57?

5      MS. JONES:  Okay.

6   Q   BY MS. COX:  Okay.  So Mr. Bryson, you see the date March

7   30th, 2020?

8   A   Yes.

9   Q   And that's your picture there?

10  A   Yes.

11     MS. COX:  Ms. Jones, can you scroll down to the second

12  page?

13  Q   BY MS. COX:  And take a moment and read to yourself

14  what -- what that bold text says.

15  A   Okay.

16  Q   Okay.  Did you give that quote to the media?

17  A   Yes, I did.

18     MS. COX:  Okay.  At this time, Your Honor, General Counsel

19  moves for admission of GC-57.

20     JUDGE GREEN:  Any objection?

21     MR. MURPHY:  Same objection, Your Honor.  That the -- that

22  the -- the exhibit should be limited to the parts of the

23  picture and the statement that relate to Mr. Bryson.  The rest

24  is irrelevant and hearsay.

25     JUDGE GREEN:  Okay.  So that's page 1 and the quote on



Exhibit E, Motion to Try Petition on Hearing Record

1    page 2?

2         MR. MURPHY:  Um-hum.

3         JUDGE GREEN:  Okay.  I'm -- I'm tending towards just

4    accepting the documents subject to the understanding that I

5    stated rather than going back and have them redact it.  But

6    I'll -- I'll take a look.

7    **(General Counsel Exhibit Number 57 Received into Evidence)**

8         MS. COX:  Thank you, Judge.

9         Ms. Jones, can you pull up General Counsel's Exhibit 58?

10   Q    BY MS. COX:  Mr. Bryson, is that your picture there?  Mr.

11   Bryson, did you hear me?

12   A    Yes, I did.

13   Q    Is that your picture?

14   A    Yes, ma'am.  I said yes.

15   Q    Oh, I'm sorry.  I didn't hear you.  And do you see the

16   date on the top there?

17   A    Yes, ma'am.

18   Q    It's March 31st -- um-hum.

19   A    2020, 9:07 a.m.

20        MS. COX:  Okay.  At this time, Your Honor, General Counsel

21   moves for admission of GC-58.

22        MR. MURPHY:  Same objection, Your Honor.

23        JUDGE GREEN:  Okay.

24        MS. COX:  Judge, did you -- they're entered?

25        JUDGE GREEN:  I'm not -- I'm -- I'm going to take a look



Exhibit E, Motion to Try Petition on Hearing Record

1    at them before I admit them.

2         MS. COX:  Ms. Jones, can you pull up GC-59?

3         JUDGE GREEN:  They will be -- my understanding is that

4    they all will be admitted at least in part.

5         MS. COX:  Okay.  And Ms. Jones, can you scroll to page 14?

6    Q    BY MS. COX:  And Mr. Bryson, is this a picture of you on

7    March 30th, 2020?

8    A    Yes, ma'am.

9         MS. COX:  Ms. Jones, can you show the date of that article

10   on page 1?

11   Q    BY MS. COX:  And that's April 3rd, 2020?

12   A    Yes, ma'am.

13        MS. COX:  Okay.  Ms. Jones, can you pull up GC-60?  One

14   moment.  Can you scroll to page 9?

15   Q    BY MS. COX:  Mr. Bryson, is that a picture of you on March

16   30th, 2020?

17   A    Yes.

18   Q    And do you see the -- the words underneath the picture?

19   A    Yes.

20   Q    Is that a quote that you gave to the media?

21   A    Yes.

22        MS. COX:  Okay.  And the last one, Ms. Jones, is GC-61.

23   And is that you there --

24        MR. MURPHY:  Give me -- give me a second to catch up,

25   please.



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:  Sure.

2    MR. MURPHY:  Okay.

3    Q    BY MS. COX:  Mr. Bryson, is that a picture of you on the

4    first page there?

5    A    Yes, ma'am.

6    MS. COX:  And I -- Ms. Jones, can you scroll to the second

7    page to show the date on this document?

8    Q    BY MS. COX:  It's April 6, 2020, right?

9    A    Yes, ma'am.

10   MS. COX:  Okay.  At this time, Your Honor -- oh, you're

11   not -- I'm sorry.

12   JUDGE GREEN:  I understand your -- I understand your

13   moving for their admission, and I'm going to take a look and --

14   and rule on whether the entire documents will be admitted or

15   perhaps they require redaction.

16   MS. COX:  Okay.  Thank you, Judge.  Okay.  So --

17   MR. MURPHY:  And -- and just so the -- just so the record

18   is clear, I have that same objection for that one.  I hadn't --

19   I hadn't made it, but --

20   JUDGE GREEN:  right.

21   MR. MURPHY:  -- just so it's clear.  Sorry to interrupt.

22   MS. COX:  Thank you, Ms. Jones.

23   Q    BY MS. COX:  Mr. Bryson, I want to take you back to March

24   30th, 2020.  Did you see any managers during the protest?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Who did you see?

2    A    Zachary Marc.

3    Q    Do you recall seeing Zachary Marc having an interaction

4    with Christian Smalls?

5    A    Yes.

6    Q    What did you see?

7    A    Zachary walked to the end of the parking lot to the fence

8    right by 5th Street, and he called for Christian to come over

9    there.  I was doing the interview at the time, and when I was

10   finished I was told by Jordan Flowers that Christian Smalls was

11   terminated.

12        MR. MURPHY:  Objection.  Hearsay.

13        JUDGE GREEN:  Okay.  I'm going to admit it.

14   Q    BY MS. COX:  Okay.  Mr. Bryson, I want to focus your

15   attention now to April 6th, 2020.

16   A    Yes.

17   Q    Did you participate in a protest outside of JFK8?

18   A    Yes.

19   Q    Were you scheduled to work on April 6th?

20   A    No.  It's my day off.

21   Q    Do you recall what day of the week April 6th fell on?

22   A    Monday.

23   Q    Were you involved in planning the April 6th protest?

24   A    Yes.

25   Q    And did your role in planning change?


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.  I --

2         MR. MURPHY:  Objection to the form.

3         JUDGE GREEN:  Overruled.

4    Q    BY MS. COX:  Did your role change?

5    A    Yes.  I -- I took more of a front-line role being that

6    Christian was terminated and not allowed on the property.

7    Q    And how did you take a front-line role?

8    A    I was more involved with Derrick Palmer.  Between the both

9    of us, we were using the bullhorn in the front of the building

10   to express, you know, our concerns.

11   Q    Do you recall what time the protest started?

12   A    About 11 -- 11:30, somewhere in there.  About 11:30.

13   Q    AM, right?

14   A    Yes.  Yes, ma'am, a.m.

15   Q    Do you recall around what time the protest ended?

16   A    About 2.  Between 1:30, 2.

17   Q    And do you recall about how many Amazon employees

18   participated on April 6th?

19   A    Yes.  There were -- there were quite a few Amazon

20   employees.  It was about 50 employees, give or take again.

21        MR. MURPHY:  I'm sorry, I didn't hear that.  5-0 or 1-5?

22        THE WITNESS:  50.  5-0.

23        MR. MURPHY:  Okay.

24   Q    BY MS. COX:  Other --

25        MR. MURPHY:  Thank you.



Exhibit E, Motion to Try Petition on Hearing Record

```
1        MS. COX:  Sorry.

2   Q    BY MS. COX:  Other than Amazon employees, did anyone else

3   participate in the protest?

4   A    Yes.  Essential workers throughout New York City came to

5   support us.  That would be nurses, doctors, MTA workers.

6   Q    And about how many essential workers participated on April

7   6th, to -- to the best of your recollection?

8   A    Oh, there was definitely at least as much as the

9   employees.  It was about 50 workers out there, give -- give or

10  take.

11  Q    And in what area --

12  A    I believe.

13  Q    I'm sorry.

14  A    It might have been a little more.  We -- we were all in

15  the -- well, they were in the 5th Street zone by the bus stop.

16  Being that they're not employees, they couldn't step on the

17  property.

18  Q    And by "they" you mean the essential workers?

19  A    Yes, ma'am.

20  Q    And just for clarification, the bus stop is off the

21  property you said, right?

22  A    Yes.

23  Q    Okay.  Was there media present on April 6th?

24  A    Yes, ma'am.

25  Q    And in what location was the media?
```



Exhibit E, Motion to Try Petition on Hearing Record

1   A     5th -- 5th Street as well.

2   Q     Okay.  And the Amazon employees that were protesting, what

3   location did they protest in?

4   A     We -- we all protested in the -- in what I refer to as the

5   neutral zone, but it is a pathway probably 75 to 100 feet away

6   from the main building, and it's in the parking lot.  It

7   separates the cars in -- it's a pathway to the walkway to cross

8   over to the building.  A laddered pathway, I should say.

9   Q     Is the laddered pathway painted?

10  A     Yes.  It's painted white.

11  Q     Okay.  About how many employees protested in that

12  laddered, white, cross or pathway that you just testified to?

13  A     There was about six or seven of us going straight down the

14  line.  I was -- myself or Derrick Palmer was at the beginning.

15  Mandi Velasco stayed in our area, and the rest was sectioned

16  off, like, it's a huge parking lot so they were, like, down,

17  down.  Holding signs or, you know, saying slogans.

18  Q     Approximately how many --

19        MS. COX:  I'm sorry I'll withdraw that.

20  Q     BY MS. COX:  Did Christian Smalls participate in the

21  protest?

22  A     He did from 5th Street.  He wasn't allowed on the -- on

23  the property anymore, he was terminated.  But he was there.  He

24  was on 5th Street.

25  Q     During the April 6th protest, did you have any interaction



Exhibit E, Motion to Try Petition on Hearing Record

1    with anyone?

2    A    Yes.

3         MS. COX:  Let me see.  Ms. Jones, I'd like for you to show

4    the witness General Counsel's Exhibit -- I believe it's 53 --

5    no, it's not.  I'm sorry.  Give me one moment.

6         MS. JONES:  Okay.

7         MS. COX:  It's 51.  Okay.

8    Q    BY MS. COX:  All right.  So Mr. Bryson, this is a picture

9    of the JFK8 parking lot, right?

10   A    Yes.

11        MS. COX:  All right.  And so Ms. Jones, do you mind making

12   the screen bigger?  Okay.

13   Q    BY MS. COX:  So the -- the area that you were protesting

14   in was this crossway between the parked cars?

15        MR. MURPHY:  Why don't -- why don't we have -- objection.

16   Leading.  Why don't we have the witness tell us.

17        JUDGE GREEN:  I'm sorry.

18        MS. COX:  He just testified that he was protesting in the

19   laddered area.

20        MR. MURPHY:  Yeah.  So why don't --

21        MS. COX:  (Indiscernible).

22        MR. MURPHY:  Why don't we -- why don't we have the witness

23   tell us what he did?

24        JUDGE GREEN:  Okay.  Let's -- I think we should move

25   through it quickly, because we have a video of this.  So --



1          MS. COX:  Okay.  Okay, Judge.

2          JUDGE GREEN:  So I'm going to allow some leading

3     questions.

4          MS. COX:  Okay, Judge.

5          JUDGE GREEN:  To the extent we need it at all?

6          MS. COX:  I'm sorry, say again?

7          JUDGE GREEN:  To the extent we need it at all.  I mean,

8     you know, maybe there's some clarifying questions that you want

9     to ask, but we do have the video.  I mean, I understand we

10    have -- I think we have two videos, no?

11         MS. COX:  Yes, Judge, we do.  Okay.

12         So Ms. Jones, do you mind giving me control -- oh, I'm

13    sorry.  Here.  I think I can.

14         MS. JONES:  Okay.  I'll stop sharing mine.

15         MS. COX:  No, no.  You can -- you can keep it.

16         MS. JONES:  Okay.

17         MS. COX:  I can't seem to find the annotate.

18         MR. KEARL:  I believe it's at the top of the screen where

19    it says view options.  If you click the little carat annotate

20    is on there.

21         MS. COX:  Yeah.  But once she's sharing, it doesn't -- all

22    right.  I'll -- I'll share my screen.

23    Q    BY MS. COX:  Okay.  Mr. Bryson, can you see my screen?

24    A    Yes, ma'am.

25    Q    Do you see the picture?



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    Okay.  And I'm going to show you my mouse.  Can you see

3    the red dot?

4    A    Yes.

5    Q    Okay.  Can you use these parked cars to tell me where you

6    were protesting?  How many --

7    A    Yes, ma'am.

8    Q    How many cars from this area here were you protesting the

9    island?

10   A    Four or five from that -- that -- that island back, by the

11   white and red car.  I was in between the white and red car.

12   Q    On the --

13   A    On the left.

14   Q    Okay.

15   A    Yes, yes.

16   Q    One, two, three, four, five.

17   A    Yes.

18   Q    Okay.  Was anybody protesting with you?

19   A    Yes.  Mandi Velasco was standing to the right of me at

20   least four to six feet.  We were trying to keep distance.  You

21   know, we didn't want to look like we're out there and we're

22   asking for something that we're not doing.

23   Q    Okay.  Around what time did the interaction happen?

24   A    12:00, I believe.  That was lunch hour --

25   Q    And who did you -- who did you have the interaction with?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    There was a young woman who came out at 12:00.  I didn't

2   notice her until she made herself noticed.

3   Q    Had you seen the woman before?

4   A    Yes.  I have seen her in the building occasionally.  We

5   pass by.  We've never spoken.

6   Q    Did you know the woman's name at the time?

7   A    No, ma'am.

8   Q    Do you know the woman's name today?

9   A    No.

10  Q    Okay.  So before the interaction began, what were you

11  doing in this area?

12  A    I was in the area using the bullhorn, and I was addressing

13  my concerns to the safety man.

14  Q    And what were you saying?

15  A    I was -- we were asking him -- I started out asking him

16  how many infected today.  At the time, I wasn't getting any

17  response.  In other words, I'd say like, how many today, Mr.

18  Safety Man?  How many infected today?  How many right now?

19  Q    Did you say anything else?

20  A    Yes.  It came a point when I wasn't getting an answer,

21  that I started saying, you know -- you know, like -- I had

22  asked him, like, you don't have anything to say, you have --

23  you know, you guys had a lot to say when it came to Chris, you

24  know.  And I still wasn't getting any response.  So that's when

25  I started to tell him that I -- I expressed that the building



Exhibit E, Motion to Try Petition on Hearing Record

1    needed to be shut down and cleaned.  It needed to be cleaned

2    thorough -- thoroughly and -- and to do that, it needed to be

3    shut down.

4    Q    Did you hear any response?

5    A    Yes.

6    Q    What did you hear?

7    A    I hear -- well, when I first was saying it to him, talking

8    to the safety man, I heard, you know, why don't you get the

9    fuck out of here.  Excuse my French but that's what I heard.

10   And I paid it no mind and then that's when I asked him, I said

11   to the safety man that the building needed to -- to be shut

12   down.

13   Q    Okay.  Which direction did you hear the response from?

14   A    Oh.  I heard it to -- I -- I really didn't pay any mind

15   the first time when I heard get -- get the F out of here.  You

16   know what -- I didn't really pay it any mind.  I -- that's when

17   I said to the safety man that the building needed to be shut

18   down and then I got another response.

19   Q    What was the other response?

20   A    The other response as I said the building needs to be shut

21   down, that's how I said it and the response came out of

22   nowhere, they ain't going to shut it down, this is the only

23   fucking job open, so appreciate it.

24   Q    And which direction did you hear that comment from?

25   A    I heard that coming from the right of me.


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   Q   Okay.  What did you do after you heard that response?

2   A   I asked the person -- I was like, we -- I said we don't

3   have to appreciate something where we could ho -- something

4   home to our families and I immediately went into, where are you

5   at.  That's what I said, where are you at.

6   Q   Did you walk --

7   A   I -- yes --

8   Q   I'm sorry.  Did you --

9   A   Yes, ma'am.

10  Q   Go ahead.

11  A   Yes, ma'am.  I started -- when I first asked, where are

12  you at, I got a reply, where are you at.  And I could tell that

13  the voice was definitely coming from the right at me and I

14  started to follow the voice.

15  Q   Okay.  Where did -- which area did you walk to?

16  A   I walked to the right of where I was standing, facing the

17  building.

18  Q   And using this picture, can you tell me where you walked

19  to?

20  A   I walked towards the cross path to get the building, yes

21  ma'am.

22  Q   In this direction?

23  A   Yes.

24  Q   Okay.  And where did you stop?

25  A   Right there on the cro -- after the cross path, on the



Exhibit E, Motion to Try Petition on Hearing Record

```
1    other side of that gray car, right there.

2    Q    Okay.  Is it -- were you near this green patch of grass?

3    A    Yes.  Yes.  When I walked over, I noticed that the young

4    woman was sitting down on the side of the car and I, you know,

5    kept six feet distance as I said, we didn't want to, you

6    know -- you know, be out here saying keep six feet and we're

7    not, you know, doing it.  You know, so yeah, I -- I kept a

8    distance.

9    Q    And what did you see her doing?

10   A    I saw her sitting on the curb smoking a cigarette.

11   Q    And where was Mandi Velasco at this -- at this point?

12   A    Mandi -- if I was right there where the -- or little back,

13   I was right where the red van is, I was a little bit further

14   back.  But Mandi Velasco was in the grass at that time, right

15   there.  This little green patch, right in back.

16   Q    Behind you in this green patch of grass?

17   A    Yes.  Yes.  Yes, ma'am.

18   Q    Okay.

19   A    Yes, ma'am.

20   Q    So turning back to the moment that you saw the woman, did

21   you ask her any questions?

22   A    Yes.  I -- I said -- I said, you don't even have to be

23   over here, you don't have to say anything.  And I said --

24   after -- I went right into, is this your first job.  And I got

25   a reply.
```



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    What reply did you get?

2   A    This will be your last job.

3   Q    Did you ask the woman anything else.

4   A    Yes.  When I -- when she said that, I said, do you realize

5   that, you know, you're selling your selling your soul for $2

6   more.  And I -- and at that point, I said, $2, bitch.

7   Q    Did you ask the woman any questions about her background?

8   A    Yes, I -- I -- when I asked her -- the only thing I asked

9   her was, is this -- is this your first job.  I mean, you know,

10  like, is this your first job.  Like, why are you even saying

11  anything over here, is this your first job.  And she was like,

12  this is going to be your last job.  And then I said, you -- you

13  do realize that you're selling your -- your soul $2 more.  And

14  she just kept on saying, this will be your last job.  And

15  that's when I came, I said, $2, bitch.

16  Q    Okay.  After you called her a bitch, did she say anything

17  to you?

18  A    Yes.  She said, this will be your last job, hoe.

19  Q    Did you respond to that?

20  A    Yes.

21  Q    What did you say?

22  A    I said, your mother's a hoe.

23  Q    Okay.  Do you recall the woman saying anything else to

24  you?

25  A    Yes, right after -- as quick as I said, your mother's a



Exhibit E, Motion to Try Petition on Hearing Record

1    hoe, she said, what.  And it was hurting, I mean -- you know, I

2    did -- I was, like, caught off guard because she was like, why

3    don't go back to where you came from, go back to the Bronx, she

4    says.

5    Q    What did you take "go back to where you came from" to

6    mean?

7    A    Oh.  I -- I was really, like, caught off guard.  It was

8    racial statement.  I was, like, devastated on the inside but I

9    kept my composure and when she said that I -- I -- I -- I just

10   thought of, like, go back to the Bronx as like, you know, go

11   back to Africa.

12   Q    Okay.  Do -- did you respond to her comment, go back to

13   the Bronx, go back to where you came from?

14   A    Yes.

15   Q    What did you say?

16   A    I said, go back -- I said, go back to the Bronx.  I was

17   like, I'm from right here.  I was like, I'm -- I'm from right

18   here, gutter bitch.  That's what I said.

19   Q    Did you say anything else?

20   A    Yes.  In a last stage effort because I wasn't at there for

21   that.  I'm out there for the people an myself, like, we're

22   trying to do this together.  And so I gave a ditch -- I turned

23   around and, you know, I said to her -- I said, aren't you

24   scared you're going to bring this home to your kids, to your

25   family?  And -- and then I realized that she didn't have one, I



www.escribers.net | 800-257-0885

1    was like, oh, that's right, you must not have -- you must not

2    have kids but -- you must not even have a home, you look like

3    you sleep in the gutter.  And I called her a gutter bitch.  And

4    I walked away.  I said, we're done here, and I called her a

5    gutter bitch and I walked away.

6    Q    So after you walked away, do you remember what happened

7    next?

8    A    Yes.  She was like, bye.  And I was walking when was like,

9    bye, Felicia, like that.  You know, and I was like -- I was

10   like, when, you know, you have a family and you care for

11   somebody, then come back to me and talk.  And she was like,

12   bye-bye, trying to, you know, brush me off.  And basically

13   that.  I was -- just was, like, astounded.  At that point, I

14   was like, you know -- I was looking at her all that time and I

15   was like, you know, you look like you're on something, to be

16   honest.  Like, you look like you're on crack or something, your

17   eyes are dark and everything else, and the way she was

18   answering.  I -- I felt like that because -- you know, like she

19   was on something because, you know, crack, fentanyl, something,

20   because I just had lost a dear friend.  And that's the way they

21   used to act and -- and basically look, keep a hoodie on and

22   walk like that.

23   Q    Mr. Bryson, so was she -- were you saying anything as you

24   were walking away?

25   A    Yeah -- well, I -- yes.  I -- I just was telling her -- I



Exhibit E, Motion to Try Petition on Hearing Record

1    was like, she looks like she was high on the -- on something

2    and at that point, I was saying, you know, Amazon is just

3    letting anybody work here that they want.  You know, they --

4    you know, they're hiring crackheads now.

5    Q    Okay.  Did anyone say anything to provoke an argument?

6    A    Excuse me.

7         MR. MURPHY:  I'm sorry.  I didn't hear the question.  My

8    apologies.  Could you repeat that?

9    Q    BY MS. COX:  Did anyone -- did anyone say anything to

10   provoke an argument?

11   A    Yeah, she finished her -- her cigarette and instead of

12   walking, she was right there at the walkway to walk across, she

13   decided that she was going to walk -- walk diagonally, on a

14   slant, so she could pass my -- my way, in front of me.

15   Q    Okay.  When you say she's walking diagonally, can you

16   explain what you mean by that?

17   A    She was right there at the walkway where -- where the X

18   is, where the cursor is but she decided to come around the car

19   and walk straight on a diagonal pattern, past this van, so she

20   could be in front me, so I could see her.  In other words, she

21   was trying to antagonize me more.

22   Q    As she was walking, was she saying anything?

23   A    Yeah.  Yes, she was --

24   Q    What was she saying?

25   A    -- telling me smoke that crack, go ahead, smoke that



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    crack.  And I was saying to her -- I do remember saying to her,

 2    don't worry, baby girl, you know, we'll be here when -- you

 3    know, we'll still be here for you.  You know, it was, go ahead,

 4    do that crack or -- or -- or whatever you do, fentanyl,

 5    whatever you're doing, we'll still be here, you know, for you.

 6    You know, I remember saying that.  And all she kept on saying

 7    was, smoke that crack.  You know, and she was passing by and

 8    everything else.  And I --

 9    Q    Did you -- I'm sorry.

10    A    Go ahead.

11    Q    Did you direct any comments about drugs to the safety?

12    A    Yes, I did.

13    Q    What did you say?

14    A    I said, Mr. Safety Man -- I said, this girl is high, do

15    your job, test that woman.

16    Q    Okay.  So did anything else happen at the end of the

17    interaction?

18    A    Yes.  She was saying, they ain't going to do nothing,

19    ain't nobody listening to you.  And I -- and I -- and at that

20    time period, I told her -- I told her, you better shut up.

21    Q    Did she respond?

22    A    Yes.  She turned around and threw her arms out and told --

23    and said, make me shut up.

24    Q    Did you respond to that?

25    A    Yes.  I said -- at that time, I said, I'm not -- I'm not
```



1    going to make you do nothing.  I said, but you need to shut up.

2    Q    So at this point of the argument, where was she?

3    A    She was in front of the doors of the building.  But -- you

4    know, she was in front of the doors of the building actually

5    getting ready to enter and turned around when I said that and

6    told me to make her shut up.

7    Q    And where were you at the point that she was in front of

8    the building?

9    A    I was back in my neutral corner.

10   Q    What do you mean by that?

11   A    I was back where I was in front of the cars, the white car

12   and the burgundy car.

13   Q    In this area here?

14   A    Yes.  Also, I did forget one thing.  Earlier in the

15   argument that we had, when -- when I told her -- when I -- when

16   I said to her -- when I called her a gutter bitch, she -- she

17   did turn back around at that point and tell me my mother.  And

18   she at -- at that point, she, like, threw her arms out too,

19   even though I disregarded and told me, if you want to bring it,

20   I'll bring it.  And --

21   Q    Okay.  How long did this interaction last?

22   A    Probably, the whole thing, maybe three or four minutes.

23        MS. COX:  Ms. Jones, can you close out General Counsel

24   Exhibit 51?

25        MS. JONES:  Okay.  Sure.  51?



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:  Yeah, can you close it out.

2    MS. JONES:  Oh.  Okay.  Oh.  You were -- I believe this --

3    you were sharing this screen.  I wasn't sharing.

4    MS. COX:  Oh.  I'm sorry.

5    MS. JONES:  It's okay.  It's okay.

6    MS. COX:  Okay.

7    Q    BY MS. COX:  So Mr. Bryson, did you walk toward the woman

8    at any point during this interaction?

9    A    No.

10    Q    Did you walk toward her in the beginning of the

11    interaction?

12    A    No.

13    Q    Did you threaten to shut the woman up?

14    A    No.

15    Q    Do you recall the woman giving you the middle finger?

16    A    Not really.  I'm not sure.

17    Q    What did you understand "make me shut up" to mean?

18    A    Basically, she was telling me to come over and shut her

19    up.  You know, in other words, she was, you know, antagonizing

20    me for a confrontation of which I wasn't going for.  I'm a lot

21    smarter than that.  I'm not going to go approach a woman and

22    I'm not into batting -- battering women.

23    Q    Mr. Bryson, who said, "if you want to, bring it"?

24    MR. MURPHY:  That's been asked and answered.

25    THE WITNESS:  The young woman said that to me.



Exhibit E, Motion to Try Petition on Hearing Record

1       MR. MURPHY:  Objection.

2       JUDGE GREEN:  Okay.  So -- sustained.

3       MS. COX:  Okay.

4    Q  BY MS. COX:  What did you understand "bring it" to mean?

5    A  You know, bring the -- bring the noise.  I mean, you know,

6    bring the noise, bring it, let's do it, like, come on, whatever

7    you've got.  You know, like, "bring it" means get physical.

8    Q  Did you call the woman a cunt?

9    A  No.

10   Q  Did you call the woman the N-word during the interaction?

11   A  No.

12   Q  Did you call the woman a dyke during the interaction?

13   A  No.

14   Q  Did you use a variation of the N-word, like N-I-G-G-A,

15   during the interaction?

16   A  No.

17   Q  Do you use the N-word?

18   A  Yes.

19   Q  When you use it, who do you use it with?

20   A  Usually -- usually, my friends.  You know --

21   Q  Do you --

22   A  -- and we use the -- the variation.  We don't use the E-R.

23   It's more of an A and it's more of a friendly thing.  It's

24   not -- it's not meant to be harmful to anybody.

25   Q  What did it -- what did it appear her race was?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MR. MURPHY:  Objection, relevance.

 2        JUDGE GREEN:  Overruled.

 3    Q   BY MS. COX:  Mr. Bryson, my question was, what did it

 4    appear her race was?

 5    A   Her race was -- appeared to be Caucasian.

 6    Q   Did you make any comments about her race?

 7    A   No, ma'am.

 8    Q   Did you make any comments about her national origins?

 9    A   No, ma'am.

10    Q   Did you make any comments about her religion?

11    A   No, ma'am.

12    Q   Did you make any comments about her sexual orientation?

13    A   No, ma'am.

14    Q   Did you make any comments about her age?

15    A   No, ma'am.

16    Q   Did you make any comments about her gender identity?

17    A   No, ma'am.

18    Q   Did safety come over to you during the interaction?

19    A   No.

20    Q   Did security come over to you during the interaction?

21    A   No.

22    Q   Did any supervisor or manager come over to you during the

23    interaction?

24    A   No.

25    Q   Okay.  So I want to switch gears a little bit to what
```



# Exhibit E, Motion to Try Petition on Hearing Record

1   happened after the interaction.  Do you recall talking with

2   your coworkers about the interaction on April 6th?

3   A    Yes.

4   Q    Who do you recall speaking with?

5   A    Briefly, Derrick Palmer first because I was passing him

6   back the blow horn and I told him I had an interaction over

7   there.  You know, and then I proceeded down the end of the

8   parking lot to where Jordan Flowers was.

9   Q    Did you discuss the interaction with Mr. Flowers?

10  A    Yes.  Jordan Flowers was doing a live -- FB Live and --

11  Q    What do you mean when you say "FB Live"?

12  A    Facebook Live for media.  He was doing media coverage

13  through Facebook Live to let the people know what was going on

14  at Amazon.

15  Q    Okay.  And how soon after the interaction did you speak

16  with Jordan Flowers?

17  A    Probably within the next five minutes from the

18  interaction.  Like I said, he -- I had came down, he was doing

19  the interview.  And basically, he saw me there and I was, you

20  know, kind of grunting in the background, telling him what

21  happened without being on camera first.

22  Q    Mr. Bryson, who is Jordan Flowers?

23  A    Jordan Flowers is an employee of Amazon to this day.  He's

24  one of the protesters that helped one of four meet, Christian

25  Smalls, Derrick Flowers, Jordan -- I mean, Derrick Palmer,


www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Jordan Flowers.  It was us four that started this protest on
 2    JFK8.
 3    Q    Could anyone else hear your conversations with Jordan
 4    Flowers on April 6th?
 5    A    Yes.
 6    Q    Who else?
 7    A    The audience of Facebook Live.
 8    Q    And how do you know that the conversation was on Facebook
 9    Live?
10    A    Because Jordan informed me that we were live.
11    Q    And how long did the conversation last?
12    A    Pardon?
13    Q    How long did the conversation on Facebook Live last?
14    A    Oh.  It was going on well before I got there and it -- he
15    was still going well after I finished talking -- talking with
16    the audience myself.
17    Q    Okay.  Can you tell me how the conversation with Jordan on
18    the Facebook Live started?
19    A    Yeah.  As I walked over, he saw my face was in disgust a
20    little and you know -- and I was like, man, I just through some
21    mess up, you know, the other way.  And I was explaining to him
22    how this girl started with me, you know, she, you know, cursed
23    me first and had plenty to say to me first.  And I -- and I had
24    to say, I -- I'm not letting anybody do that to me.  So you
25    know, I had to do what I had to do.  It wasn't my proudest
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1  moment because I don't like to bicker with women.  I don't like

2  to bicker with anybody.  We're out there for a cause, I said,

3  but you know, in terms of -- nobody calls me a crackhead and

4  all that stuff and you're just going to do that, you know, and

5  get away with that.  And you know, I -- like I said, you know,

6  I gave her back what -- what she deserved, you know.

7  Q    So Mr. Bryson, I -- I'm going to ask you to do your best

8  to recall what you said during the Facebook Live.  Can you

9  recall if you said anything about the demonstration on the

10  Facebook Live?

11       MR. MURPHY:  Objection, leading.

12       JUDGE GREEN:  I think it's an open-ended question as to

13  what --

14       MR. MURPHY:  The first -- the first question was open-

15  ended.

16       JUDGE GREEN:  Okay.  Well, let's stick with that one.

17  Q    BY MS. COX:  Mr. Bryson, do you recall what you -- do you

18  recall talking about the demonstration on Facebook Live?

19  A    Yes.  I --

20  Q    What did you say about the demonstration on Facebook Live?

21  A    It started after I had said what I had said to Jordan and

22  you know, about the girl starting with me and stuff up there.

23  Basically, Jordan was trying to express to the audience how

24  Jeff Bezos and his board decided that they were going to make

25  Christian --



Exhibit E, Motion to Try Petition on Hearing Record

1144

1       MR. MURPHY:  Objection.  Hearsay.

2       JUDGE GREEN:  Okay.  Why do we need this?

3       MS. COX:  Judge Green, it's my understanding that

4   Respondent relied on Mr. Jordan Flowers' video in issuing

5   discipline to Mr. Bryson.

6       MR. MURPHY:  The que -- the question was what the Charging

7   Party said, Your Honor.

8       JUDGE GREEN:  Okay.  So I'm going to allow the -- I'm

9   going to the testimony to the extent it explains what was said

10  on Facebook Live, whether it be by Mr. Flowers or Mr. Bryson as

11  it sounds like it might've a conversation.  So I'm going to

12  allow that.

13      MR. MURPHY:  The Counsel for the General Counsel could

14  introduce the -- the video itself, Your Honor.

15      JUDGE GREEN:  They could.  Why aren't we doing that?  Are

16  we going to have the same thing -- are we going to have the

17  same thing as yesterday?

18      MS. COX:  It's on -- it's on SharePoint, Judge.  I was

19  getting to -- I was getting to that.  But we can go ahead and

20  have Ms. Jones pull General Counsel's Exhibit 62.

21      MR. MURPHY:  62 is not the Facebook Live video, Your

22  Honor.

23      MS. COX:  I'm sorry about that, Judge.  I've uploaded the

24  wrong video.

25      MR. MURPHY:  You could play this one.



Exhibit E, Motion to Try Petition on Hearing Record

1     MS. COX:  I have no problem with that.

2     JUDGE GREEN:  All right.  So do you want to keep this?  Is

3  this a new video or is the old -- the one we've already seen

4  and is already marked for ident -- marked as an exhibit?

5     MS. COX:  No, Judge.  This is a different video than what

6  was introduced.  This doesn't have sound.

7     JUDGE GREEN:  Okay.  So do you want to introduce this as

8  GC-62?

9     MS. COX:  Sure, Judge.

10    JUDGE GREEN:  Okay.  So any objection?

11    MR. MURPHY:  None, Your Honor.

12    JUDGE GREEN:  Okay.  GC-62 is admitted.

13    **(General Counsel Exhibit Number 62 Received into Evidence)**

14    MS. COX:  And I'm uploading General Counsel's Exhibit 63.

15  It's uploading, Ms. Jones.

16    MR. MURPHY:  It's -- I don't see it on SharePoint.

17    MS. COX:  It's uploading.

18    MR. MURPHY:  Oh.  Okay.

19    MS. COX:  Judge, can I have a five-minute recess?

20    JUDGE GREEN:  Off the record for five minutes, so we'll

21  back at 12:21.

22  (Off the record at 12:16 p.m.)

23    MS. COX:  And Judge, you moved 62 in, right?

24    JUDGE GREEN:  Yes.

25    MS. COX:  Okay.  Ms. Jones, can you pull up GC-62?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MS. JONES:

 2    Q    BY MS. COX:  Mr. Bryson, I'm going to go back for a moment

 3    to the interaction you had.  Okay.  Do you see this video on

 4    your screen?

 5    A    Yes.

 6    Q    Can you identify who you are in this video?

 7    A    Yes.  I'm the person walking back down the lane there.

 8    Q    And you have black clothes on and a --

 9    A    Yes.  Pink rag.

10    Q    Okay.  And who's the woman with the blue sign?

11    A    That's Mandi Velasco.

12    Q    And can you identify the woman you had the interaction

13    with?

14    A    Yes.  That's the young lady right there, sitting on the

15    curb behind the car, at the edge of the curb there.

16    Q    And what is she wearing?

17    A    She's wearing a gray sweat hoodie and blue jeans.

18    Q    Does this video show where the interaction began?

19    A    I guess, for the most part.

20        MS. COX:  Ms. Jones, can you re -- rewind the video to the

21    start of the video.  I'm sorry, Mr. Bryson, I should've asked

22    that first.

23        THE WITNESS:  Yeah.

24    Q    BY MS. COX:  Okay.  Is this where you were when the

25    interaction began, at this red square?
```



1    A    No.

2    Q    Oh.  And --

3    A    When the in -- when the interaction began, you -- you mean

4    by the whole thing, correct?

5    Q    I mean when you were chanting at the beginning to safety.

6    A    No, then.  That's not the beginning of the video.  I would

7    centered, probably more to the middle, to the -- the left --

8    well, the right, my right.

9    Q    Can you use -- use the cars that are there to tell us

10   where you were when the interaction began?

11   A    Somewhere -- somewhere --

12        MR. MURPHY:  Objection.  Objection.  I think she used the

13   term "interaction" and then the quest -- the answer was with

14   respect to the entire protest.  When you say "interaction,"

15   what, specifically, are you referring to?

16        MS. COX:  The interaction with the woman.

17        MR. MURPHY:  Thank you.

18   Q    BY MS. COX:  So Mr. Bryson, can you use the cars in the

19   video to tell us where you were when the interaction began.

20   A    I -- I would have to say probably about right there,

21   somewhere in that area.

22   Q    So near the white car that's in the video?

23   A    Yes.

24   Q    Okay.

25   A    Between -- yeah.  Yeah, around that area somewhat.



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1096 of 2171 PageID #: 1148

1     Q     Okay.  And do you see the people at the, sort of, bottom,

2     right-hand corner of the screen?  See the yellow vest?

3     A     Yes.

4     Q     Okay.  And what job is that person there doing?

5     A     Security.

6     Q     Okay.  And do you see the person with the blue screen --

7     the blue vest at the bottom of the screen?

8           MR. MURPHY:  I'm having trouble seeing this, Your Honor.

9           THE WITNESS:  Yeah, I can see her.  Yeah, that's the --

10          JUDGE GREEN:  Yeah, so I don't see any -- I have to tell

11    you, I don't see anybody.  Oh, there I see it.  Okay.  Just --

12    did you just see it, Mr. Murphy?

13          MR. MURPHY:  Pull it back -- Ms. Jones, would you mind

14    pulling that back just a tad?  So you --

15          MS. JONES:  Okay.  Sure.  Okay.

16          MR. MURPHY:  You're talking about that person right there

17    in the -- oh, good.  Good.  Good.

18          MS. COX:  Yes.

19          MS. JONES:  Sorry.  Sorry.

20          MR. MURPHY:  Yeah.

21          MS. JONES:  Right here?  I guess, is this --

22          THE WITNESS:  Security.

23          MR. MURPHY:  Okay.  Okay.  All right.

24          MS. COX:  Okay.  That's all I had for -- this is 62,

25    right?  Ms. Jones, is it -- is it still playing?  Or did you



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    restart it?  No, okay.

2         Can you pull up GC-53?  It's 5 -- 5-3, Ms. Jones.  I'm not

3    sure if I said 63, I'm sorry.

4         MR. MURPHY:  Wait.  53 or 63?

5         MS. COX:  53.

6         MR. MURPHY:  Oh.  Okay.

7         MS. COX:  5-3.

8         MR. MURPHY:  Sorry about that.

9         MS. COX:  No problem.

10   (Video recording plays)

11        MS. COX:  Ms. Jones, can you pause it?  Can you go back a

12   little bit, just like a few seconds?

13        JUDGE GREEN:  Listen, are we just going to look at this to

14   see if the -- if the -- Ms. Evans raised her middle finger?

15        MS. COX:  I'm going to ask him if he can identify the

16   gesture that she made, yes.

17        JUDGE GREEN:  Okay.  So we don't need that, with all due

18   respect.  We -- we -- we can all look at the video and

19   determine what it -- what it is.  We don't Mr. Bryson to

20   interpret the video in that regard.

21        MS. COX:  Okay.

22        JUDGE GREEN:  He didn't see it himself, so he's just

23   looking at the video like everybody else.

24        MS. COX:  Okay, Judge.

25   Q    BY MS. COX:  Mr. Bryson, did you see a security officer



1    pass in front of this video?

2         MR. MURPHY:  Objection.  In -- in front of this video?

3    What -- I -- I don't understand what that --

4         JUDGE GREEN:  Yeah, I'm not sure what means.

5    Q    BY MS. COX:  Mr. Bryson, did you see a security officer

6    pass in front of this camera?

7    A    Yes, briefly.

8    Q    Did any security officer come over to you?

9    A    No.

10   Q    All right.  What do you understand the middle finger

11   gesture to mean?

12        MR. MURPHY:  Objection, Your Honor.

13        JUDGE GREEN:  Sustained.

14        MS. COX:  Okay.  I'm going to move on to GC-63, this was

15   the Facebook Live conversation that you were testifying to.

16   And rather than have you testify --

17   Q    BY MS. COX:  Mr. Bryson, during the interaction, did you

18   remain -- I'm sorry.  Never mind.

19        MS. COX:  I'll withdraw that.  Can we go to GC-63?

20        Ms. Jones, can you forward it to 48 minutes and 21

21   seconds?

22        MR. MURPHY:  Could I -- could I have a little voir dire on

23   the -- on the exhibit?

24        JUDGE GREEN:  Just pause it for a moment.

25        MS. COX:  Judge Green, this is an ex -- this is produced



Exhibit E, Motion to Try Petition on Hearing Record

1    pursuant to their subpoena.

2        JUDGE GREEN:  Okay.

3        MR. MURPHY:  My --

4        JUDGE GREEN:  Well, I take it there's --

5        MR. MURPHY:  Oh.  Go ahead, Judge.

6        JUDGE GREEN:  There's no dispute as to auth --

7    authenticity.

8        MR. MURPHY:  I'm sorry, Judge.  We were talking over each

9    other.  I apologize.

10       JUDGE GREEN:  Okay.  You go ahead.

11       MR. MURPHY:  So my -- my -- my primary question is whether

12   this is the entire video that we produced to Counsel for the

13   General Counsel?

14       MS. COX:  Yes.

15       MR. MURPHY:  Okay.  And has the wit -- did -- has the

16   witness ever seen this before at preparation for this trial?

17       MS. COX:  You can ask the witness.

18       MR. MURPHY:  Okay.  Mr. Bryson --

19       THE WITNESS:  Yes, sir.

20       MR. MURPHY:  -- can you hear me?

21       THE WITNESS:  Yes, sir.

22       MR. MURPHY:  Okay.  My -- my name's Chris Murphy.  I --

23   I'm -- I'm an attorney for Amazon.

24       THE WITNESS:  How are you doing, Mr. Murphy?

25       MR. MURPHY:  I'm well, thank you.  Yeah.



1        MR. KEARL:  Excuse me, Your Honor.  Is this -- is this

2   voir dire or is this something for cross-examination?

3        JUDGE GREEN:  I don't know.  Is it voir dire or is it --

4        MS. COX:  That's up -- that's up to you, Judge.

5        MR. MURPHY:  I don't know.  We didn't -- we didn't --

6   yeah, we -- it's --

7        MS. COX:  It's not voir dire because voir dire would just

8   be about the contents of the documents, its creation, its

9   origin.

10        MR. KEARL:  This is the document that Mr. Murphy --

11        JUDGE GREEN:  Okay.  So do you have a question --

12        MR. KEARL:  (Indiscernible, simultaneous speech).

13        JUDGE GREEN:  All right.

14        MR. MURPHY:  So -- so what we did was exchange

15   pleasantries and I guess I -- I -- I shouldn't have done that

16   because that -- that unleashed a folly of unnecessary

17   interventions.  But my -- my question is -- is -- well, in --

18        MS. COX:  Well --

19        MR. MURPHY:  You know what, Judge --

20        MS. COX:  -- he asked that you wait until cross-

21   examination to ask it.

22        MR. MURPHY:  Fair enough.

23        JUDGE GREEN:  But that's --

24        MR. MURPHY:  Fair enough.

25        MS. COX:  Thank you.  Thank you so much.



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Let me ask this, though.  This is -- this

2    video is an hour and seven minutes long?

3    MS. COX:  Judge, we're only going to watch two minutes of

4    it.

5    JUDGE GREEN:  Okay.

6    MS. COX:  From 48:41 to 51:58.

7    MR. MURPHY:  Can you give me those --

8    MS. COX:  Yes.

9    MR. MURPHY:  -- those ranges again?  48 --

10   MS. COX:  48:41 to 51:58.

11   MR. MURPHY:  51:58.  48:41 to 51:58?  Okay.

12   MS. COX:  That's correct.

13   Ms. Jones, if it --

14   MS. JONES:  You want it to start at --

15   MS. COX:  Well, I was going to say it's -- if it allows

16   you to load 48:41, can you forward it?

17   MS. JONES:  So you don't want it at 44, you want it at

18   148?

19   MS. COX:  I'm sorry.  It's 48 minutes and 41 seconds.  So

20   you have to scroll quite a bit -- or click quite a bit.  Yeah,

21   just pull it -- yeah, so you see 41 -- 48:41.  Okay.  Getting

22   close.  Go back a little bit.  Okay.  Perfect.

23   MR. MURPHY:  Yeah, Your Honor, if they're going to play

24   the video, are they -- they ought to play the en -- the entire

25   period of the video in which Mr. Bryson is speaking.



www.escribers.net | 800-257-0885

1    MS. COX:  And what's that period, Mr. Murphy?

2    MR. MURPHY:  I think it is from around 49:43 to 55:52.

3    MR. KEARL:  So Judge, they were able to play a fraction of

4    video yesterday.  If he wants to play the rest of the video on

5    cross-examination, I don't have a problem with that.  But

6    insofar as we're presenting a case here --

7    JUDGE GREEN:  Okay.  You can -- yeah, you can play

8    whatever you want.

9    MS. COX:  Okay.  Thank you, Judge.  So yeah, Ms. Jones, if

10   you could just play it from 48:41.  No, that -- no, there's

11   perfect.  I'm sorry.  You're right.

12   (Video recording plays)

13   MS. COX:  Thank you.  Okay.

14   Q    BY MS. COX:  Mr. Bryson, did -- did you make those

15   comments in the video on April 6th?

16   A    Yes.

17   Q    Okay.  Did you -- do you -- did you hear yourself say --

18   MR. MURPHY:  Objection, he just testified that he made the

19   comments, Judge.  We don't -- we don't need to hear him testify

20   about whether he heard him say one thing or another.

21   JUDGE GREEN:  Is this leading to something else?

22   MS. COX:  Yes, Judge.

23   JUDGE GREEN:  Okay.  Overruled.

24   Q    BY MS. COX:  What does "she got me off point" mean?

25   MR. MURPHY:  Objection, Your Honor.


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1         JUDGE GREEN:  Overruled.  I mean -- overruled.

 2         THE WITNESS:  What I meant is that, you know, basically, I

 3    came out there to help everyone, to be part of a team to -- to

 4    help all of us as employees.  And you know, it was just

 5    staggering to see someone come out -- you know, an --

 6    another -- a fellow employee come out and challenge you like

 7    that.  You know?  That's all I meant by it was a little

 8    overwhelming or a little off point, you know.  I needed to go,

 9    you know, fall back and regroup.  I mean, you know, it was that

10    simple.

11    Q    And --

12    A    Nothing else to it.  No -- no violence to it, nothing.  I

13    mean, to regroup.  I mean, you know, somebody comes out there

14    and challenges you that you're trying to help and it was -- you

15    know, that's basically it.

16    Q    What does "pushed me to the limit" mean?

17         MR. MURPHY:  Objection, Your Honor.

18         JUDGE GREEN:  I'm going to allow it.  I'm going to allow

19    this.

20         THE WITNESS:  "Pushed me to the limit" basically meant

21    that she -- she pushed me to where I was ready to just -- I did

22    just what I did.  I walked away, hand it back over to Derrick

23    Palmer, and I walked down towards Jordan.  You know, just to

24    get some air, you know, calm down, reflect on what just

25    happened, you know, what -- how did it wrong because it
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    shouldn't have went wrong.  I mean, I shouldn't have had an

2    encount -- if anything, I should've had an encounter with a

3    representative of Amazon.  I wasn't looking to have an

4    encounter with a fellow employee.

5    Q    BY MS. COX:  Okay.

6    A    That's what I meant by that.

7    Q    Thank you.  In your conversation with Jordan on the

8    Facebook Live, did you use N-word?

9    A    Yes.

10   Q    Which -- did you --

11   A    Which variation?

12   Q    Yes, which variation did you use?

13   A    I used the A.  If I may be allowed to explained to those

14   that don't know.  Yes, that whole word, N-I-G-G-E-R, is a

15   bad --

16        MR. MURPHY:  Objection to this, Your Honor.  The en -- you

17   know, I'm not -- I'm not sure where looking forward to an -- an

18   explanation on the -- on the derivation the various word --

19   words associated with that highly offensive word.  It's just

20   some questions in it --

21        JUDGE GREEN:  If the General Counsel wants to ask -- there

22   wasn't a question.  But if the General Counsel wants to ask,

23   I'm -- I'm going to allow that.  Listen, I understand that what

24   Mr. Bryson currently explains about what he did and what he

25   said doesn't necessarily impact what Amazon did as far as an



1    adverse employment action.  But I'm -- I'm going to allow the

2    General Counsel some discretion in asking these types of

3    questions.

4    Q    BY MS. COX:  So Mr. Bryson, which variation of the N-word

5    did you use?

6    A    I used the A variation.

7    Q    And in what circumstances --

8         MS. COX:  I'll withdraw that.

9    Q    BY MS. COX:  Did you direct the N-word at anyone in your

10   conversation with Jordan?

11   A    No.

12   Q    How did you use it?

13   A    I was basically simplifying for the audience -- I have a

14   belief that sometimes, when you talk a lot -- when you're

15   talking and some people aren't still getting, you know, what's

16   happening, like he -- Jordan was expressing, oh, they tried to

17   make him seem uneducated, they tried to make him seem this,

18   they tried to make him seem nonarticulate, and basically, I

19   just rounded it off so even a -- a five-year old can understand

20   basically.  I mean, you know, basically, people, what they're

21   trying to do was make a him seem like a dumb nigga.

22   Q    And when you say "they," who are you referring to?

23   A    I'm referring to Amazon, Jess -- Jeff Bezos and his board

24   because that's what it -- they -- they -- they talked about it.

25   It got leaked out to us and you know, basically that.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.

2    A    We are all articulate and we took it offensive.

3    Q    Okay.  I just want to take one step back with you.  Did --

4    did you know if any Amazon warehouses had closed down in March

5    2020?

6    A    Yes.

7    Q    Which warehouse closed down?

8    A    The Queens facility closed down and -- for a week or two

9    and they gave it a thorough cleaning.  That's basically where

10   we got that idea.  We assumed that JFK8 was going to do the

11   same thing.

12   Q    And you mentioned in the argument that you used -- you

13   said $2 more.  Do you remember that?

14   A    Yes.

15   Q    What were you referring to?

16   A    Amazon appealed to the employees, tried to get them to --

17   to climb onboard, which most of them did, by offering $2 more

18   an hour during the pandemic.  So if you were making $18, you're

19   making $20 now.

20   Q    What does "climb onboard" mean?

21   A    Basically, they're trying to get everybody onboard of

22   their way of thinking.  Come on and work yourself to death,

23   don't worry about the virus, you're getting $2 more an hour.

24   Q    Okay.  Mr. Bryson, when you were hired, were you tested

25   for drugs?



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    Does Amazon randomly drug test employees?

3    A    Yes, at times, when it fits their needs, that's when they

4    do it.

5        MR. MURPHY:  Object -- objection, Your Honor, to this line

6    of questioning.  It goes back to, you know, where -- where the

7    Counsel for the General Counsel tried to go yesterday with

8    respect to the drug policy.  There -- there's no drug issue

9    here in this case.

10       MR. KEARL:  What's the objection?

11       MR. MURPHY:  It is irrelevant.

12       JUDGE GREEN:  Right.  You know -- right.  So I -- I'm

13   giving you some discretion to explain -- have Mr. Bryson

14   explain why he made certain conduct -- made certain comments.

15   So if you just want to ask him that, you can ask him that.  You

16   know, why did he make comments regarding Ms. Evans' drug --

17   alleged drug use.  You can ask him.

18       MR. MURPHY:  Okay.

19       MS. COX:  Okay.

20   Q    BY MS. COX:  Mr. Bryson, why did you make comments about

21   the woman's alleged drug use?

22   A    Basically, the young woman was sitting there on the curb,

23   basically -- I am -- I have a lot of familiarity with this type

24   of action.  She came out -- like, for her to jump out, she had

25   to be in a grumpy mood if she wasn't in a -- a plant.  Who goes



Exhibit E, Motion to Try Petition on Hearing Record

1    against somebody that's trying to help you get a better way of

2    life at your job?  Regardless, she was working there -- so --

3    working that day, so why she come out and just jump on me?

4    Q    Mr. Bryson -- I'm sorry.

5    A    Okay.  So --

6    Q    I -- I don't think you're answering my question.

7         MR. MURPHY:  Yeah, let him -- let him go, Your Honor.  Let

8    him answer the question.

9         JUDGE GREEN:  So -- yeah.

10        MS. COX:  Mr. -- Mr. Murphy, this is inappropriate.  You

11   don't have to --

12        JUDGE GREEN:  Well, actually --

13        MS. COX:  I don't need the comments.

14        JUDGE GREEN:  No, actually it is not.

15        MS. COX:  I don't need you laughing.

16        JUDGE GREEN:  It is not at all inappropriate.  You asked

17   the question and then you interrupted him halfway through.

18        MS. COX:  Okay.

19        JUDGE GREEN:  Okay?

20        MS. COX:  I'll move on, Judge.

21        JUDGE GREEN:  So it's not at all inappropriate.  Do you

22   have a question?

23        MS. COX:  No, Judge.  I'm going to move on.

24        JUDGE GREEN:  Okay.

25   Q    BY MS. COX:  Directing your attention to April 10th, 2020,



Exhibit E, Motion to Try Petition on Hearing Record

1     did you have a conversation with human resource representative

2     Tyler Grabowski?

3     A    Yes.

4     Q    Around what time did the conversation occur?

5     A    Somewhere between 11 a.m., 11:30, somewhere in there.  Or

6     12.

7     Q    12 noon?

8     A    Yes, ma'am.  It was between 11 and 12, somewhere in there.

9     Q    How did the --

10    A    AM.  AM.

11    Q    -- conversation occur?  I'm sorry.  How did the

12    conversation occur?

13    A    I got a phone call.  I was sitting in my living room,

14    answered the phone, it was Tyler.

15    Q    And how long did that conversation last?

16    A    I don't know, maybe three to five minutes.  Six minutes.

17    I don't know.  Somewhere in there.  So -- somewhere in there

18    because -- you know, I'm not sure -- it wasn't long at all.

19    Q    How did the conversation start?

20    A    I said, Hi Tyler, how are you.  He said, okay.  He said,

21    you got -- did you get into something with a young woman

22    outside?  And I said -- I said, yes.  I -- but I also made sure

23    to emphasize that she started it.  And he proceeded from there.

24    Q    When -- can you tell me what you said about her starting

25    it?



1   A    Yes, I told him, when he first asked me, I said, yes, she

2   told me to get the fuck out of here.  You know, I heard her but

3   I tried to ignore her but she told me to get the fuck out of

4   here.  And then I expressed to him, Tyler, this is my day off

5   and she's talking to me like that.  And I also expressed to him

6   that, you know, she told me to go back to the Bronx.

7   Q    And did Mr. Grabowski respond?

8   A    Yeah, he seemed to overlook all that and was more worried

9   about, you know, looking out for the woman.

10  Q    What did he say that made you think that?

11  A    He started to say, well -- he said, well Gerald, you

12  had -- she had -- she wrote a complaint against you and there

13  were witnesses outside, you know, that saw this in her behalf.

14  And I said -- at that point, I said, well, I had witnesses

15  outside too and she -- and he said, who.  And I decided not to

16  tell him that at that time because I was -- I feared for that

17  young woman's job.

18  Q    Okay.  Let's go back to the conversation that you were

19  having with Mr. Grabowski.

20  A    Yes.

21  Q    Try to do your best to recall what was said during that

22  call, okay?  So did Mr. Grabowski ask you about --

23       MR. MURPHY:  Objection, Your Honor, leading.

24       JUDGE GREEN:  Okay.  Do you have some -- do you -- do you

25  have a question?



1    MS. COX:  I'm asking it.

2    JUDGE GREEN:  Okay.  Go ahead.

3    MR. MURPHY:  It's a leading question.

4    JUDGE GREEN:  Well, we don't -- we haven't heard it yet.

5    MR. MURPHY:  Okay.

6    Q    BY MS. COX:  Did Mr. Grabowski ask you any questions about

7    what happened during the interaction?

8    A    Yes.

9    Q    What kinds of questions did he ask you?

10   A    He asked more along the lines -- he says -- once I stated

11   to Tyler that it was my day off and like I said, emphasized all

12   those things and that she started it and she cursed first at

13   me, he -- he proceeded to ask me, did you all her a cunt.  I

14   said --

15   Q    Did you respond?  Uh-huh.

16   A    I said, no, Tyler.  He said to me then -- and he said it

17   just like this, did you call her the N-word?  Like that and

18   I -- I kind of cracked up.  I said, Tyler, are you crazy, I'm

19   black, would I look like calling her the N-word?

20   Q    Okay.  Do you recall talking about anything else during

21   this conversation?

22   A    Yes.  He said to me -- he said that this -- he said that

23   it was going to have to be under review and there was going to

24   be an investigation and I was going to be suspended with pay --

25   I was going to be suspended with pay until they got to the



1    bottom of it.  At that time period, I -- I -- I went -- I said

2    again, Tyler, do you realize it's my day off, I was protesting,

3    it was my natural day off.  And he was, like, just bypassing

4    that, yeah, well, we're going to have to have an investigation,

5    she got witnesses.  He tried to pry me again for my witness or

6    who I thought -- because he said -- when he did say it to me, I

7    said -- I said, yeah, I believe it was recorded.  And --

8    Q    Did Mr. Grabowski respond?

9    A    Yes.  Oh, who recorded it?  Who was the person?  At that

10   point, I fell back because the way he was asking me, I felt

11   that that person's job would be in jeopardy too.  So I just,

12   like, bypassed it and said never mind.

13   Q    Okay.  Mr. Bryson, did -- do you recall if drugs came up

14   during this conversation?

15   A    Yes.  I told him that too.  I told him that that girl

16   needed to be tested.  I said -- I said, Tyler, I said, that

17   girl was clearly high, she had black rings under her eyes.  You

18   know, her eyes were dark and she's sunk over.  I was like, she

19   clearly looks like she's on drugs and she should be tested.

20   Q    Did Mr. Grabowski respond?

21   A    Yeah, he just started -- he just started telling me about

22   how there's going to be an investigation.  Mr. Grabowski

23   ignored everything I said to him.  It was more along -- he was

24   there to champion the young woman's cause.  And there was going

25   to be an investigation into it and they'll get back to me.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  So how -- how long -- I'm sorry.  I think I asked

2    you this already.  Okay.  So how did this conversation end?

3    A    This ended with him telling me that they were going to get

4    back to me and me saying to him, you know, all those things

5    again, you do realize this is my day off; Tyler, you do realize

6    she started first with me and -- and cursed me out and told me

7    go back to the Bronx, that was a racial statement.  And he

8    still bypassed it and said, yeah, we'll get back to you.

9    Q    Okay.  So the witness that you referred to having in the

10   conversation with Mr. Grabowski, who were you referring to?

11   A    The -- you're talking to -- as far as my witness?

12   Q    Yeah.  Who were you talking about?

13   A    Mandi Velasco.

14   Q    Okay.  So now during this April 10th call, did Mr.

15   Grabowski talk to you about Amazon standards of conduct?

16   A    No.

17   Q    Did Mr. Grabowski talk to you about Amazon's harassment

18   policy?

19   A    No.

20   Q    Did Mr. Grabowski ask you to write a statement about the

21   April 6th interaction?

22   A    No, ma'am.

23   Q    Did Mr. Grabowski tell you that you could present

24   witnesses?

25   A    No.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    Did Mr. Grabowski ask you if the woman called you any
 2    names?
 3    A    No.
 4    Q    Did Mr. Grabowski ask you any questions about the woman's
 5    conduct toward you?
 6    A    No.
 7    Q    So you previously testified that Mr. Grabowski told you
 8    there'd be an investigation, right?
 9    A    Yes.
10    Q    Did you do anything to prepare for that investigation?
11    A    Yes, I -- I tried to prepare myself for when I was going
12    to get a call.  And that call never came.
13    Q    What was the next call that you got from Mr. Grabowski?
14    A    The next call I got from Mr. Grabowski was on April 17th,
15    2020.
16    Q    Around what time?  I'm sorry.
17    A    About the same time, between 11, 12.
18    Q    And where you when you received the call?
19    A    In my living room.
20    Q    Was anyone else on the call?
21    A    No.
22    Q    How long did the conversation last?
23    A    Maybe the same, about --
24    Q    How did the conversation start?
25    A    Tyler -- I answered the phone, and he said, hey, Gerald,
```



1    and I said, yes.  He said, this is Tyler from -- from HR, and I

2    said, hi, how you doing, Tyler, and he said, yeah, we did our

3    investigation and it's concluded and we decided that we're

4    going to part ways with you.

5    Q    Did you respond to Mr. Grabowski's statement?

6    A    Yes, I was, like, part ways with me?  I said, Tyler, you

7    do realize that this woman started this?  She cursed at me

8    first, you know, and it's my day off.  Like, you do realize

9    that she told me go back to The Bronx and all that, and he just

10   seemed to just bypass all that and said to me, nevertheless, we

11   decided we're going to part ways with you.

12   Q    Did Mr. Grabowski give you a reason for your termination?

13   A    I asked for one, and that was -- he was getting ready to

14   hang up and I said, hold up, mis -- I said, hold up, Tyler.  I

15   was, like, can you at least tell me what are the grounds,

16   what -- what is this based on, you know, what am I charging,

17   and he said, bullying.

18   Q    When he gave you the reason, did you ask him any

19   questions?

20   A    Yeah, I -- well, I said, bullying?  How did I bully her?

21   I said, Tyler, she started with me first.  She yelled at me

22   several times first.  Twice she yelled at me first.  I said,

23   you do realize she told me to get the -- I -- I went through

24   all of that.  You do realize she told me the fuck out of here.

25   She told me go back to the Bronx.  You know, I -- I went



1    through all of that.  I said, you do realize, which I mainly

2    emphasized, I'm not working that day.  I was off.  It was my

3    day off, and --

4    Q    Okay.

5    A    -- he still, like, bypassed all of that and was like

6    nevertheless, we're going to terminate -- you know, we're going

7    to separate from you.  I was, okay.

8    Q    Okay.  So all of my -- my next questions are about the

9    April 17th call, okay?

10   A    Yes.

11   Q    Other than Mr. Grabowski, was anyone else on the call?

12   A    No.

13   Q    Did Mr. Grabowski or any other supervisor or manager talk

14   with you about Amazon's standards of conduct?

15   A    No.

16   Q    Did Mr. Grabowski or any other supervisor or manager talk

17   to you about Amazon's harassment policy?

18   A    No.

19   Q    Did Mr. Grabowski or any other supervisor or manager talk

20   to you about the GSO security management workplace standard?

21   A    No.

22   Q    Do you know what the GSO security management workplace

23   standard is?

24   A    No, we were never taught that.

25   Q    During the call, did Mr. Grabowski or anyone else mention



Exhibit E, Motion to Try Petition on Hearing Record

1    any policies that you violated?

2    A    No, not at all.

3    Q    Did Mr. Grabowski or anyone else ask you to sign documents

4    on the call?

5    A    No.

6    Q    Did Mr. Grabowski or anyone else mention Amazon's appeal

7    policy?

8    A    No.

9    Q    Did Mr. Grabowski tell you exactly what you did or said

10   that constituted bullying?

11   A    No.

12   Q    So after April 17th -- I'm sorry.  Did any other

13   supervisor contact you to ask you questions about the April 6th

14   interaction between the time that you were suspended and

15   terminated?

16   A    No.

17   Q    Did any other manager contact you to ask you questions

18   about April 6th between the time that you were suspended and

19   terminated?

20   A    No.

21   Q    Did any other human resource person contact you to ask you

22   questions about the April 6th incident between the time that

23   you were suspended and terminated?

24   A    No.

25   Q    So after you were terminated, did you receive a -- a



1    termination document?

2    A    Yes.

3    Q    And do you recall about when you received that?

4    A    I believe the next day or the day after I sent it to me it

5    led to my lawyer, to Frank.

6    Q    And do you recall how you received it?

7    A    Through email.

8         MS. COX:  Okay.  And I'm -- I believe it's already in

9    evidence.  So I -- I think, Judge Green, can I go off the

10   record for a moment?

11        JUDGE GREEN:  Off the record.

12   (Off the record at 1:19 p.m.)

13        JUDGE GREEN:  Any more from the General Counsel?

14        MS. COX:  Just two questions, Judge.

15        JUDGE GREEN:  Okay.

16                    **RESUMED DIRECT EXAMINATION**

17   Q    BY MS. COX:  So you testified that you received your

18   termination by email, right?  Mis -- Mr. Bryson, you're on

19   mute.

20   A    I'm sorry about that, Ms. Cox.

21   Q    Okay, so you testified that you received your termination

22   by email?

23   A    Yes.

24   Q    Okay, so I'm showing you what I've marked for

25   identification as General Counsel's Exhibit 64.  It's in



1    SharePoint.  Take a look at this document.  Is this the term --

2    termination letter that you received?

3    A    Yes.

4         MS. COX:  At this time, Your Honor, General Counsel moves

5    for admission of GC 64.

6         MR. MURPHY:  No --

7         JUDGE GREEN:  Is there --

8         MR. MURPHY:  -- objection, Your Honor.

9         JUDGE GREEN:  GC 64 is admitted.

10   **(General Counsel Exhibit Number 64 Received into Evidence)**

11   Q    BY MS. COX:  All right, and Mr. Bryson, I'm showing you a

12   second document.  Do you see it there?

13   A    Yes.

14   Q    You also received this document by email?

15   A    Yes.

16        MS. COX:  Okay.  This is already in evidence as GC 9.

17   Thank you --

18        JUDGE GREEN:  Okay.

19        MS. COX:  -- Mr. Bryson.  I have no further questions,

20   Judge.

21        JUDGE GREEN:  Okay, so are we going to break for lunch  --

22   we will break for lunch before we start with the

23   cross-examination.  Mr. Murphy, do you need any longer than

24   2:30?

25        MR. MURPHY:  Did -- I -- I -- so Mr. Kearl has no



Exhibit E, Motion to Try Petition on Hearing Record

1    questions, then, Judge?

2         JUDGE GREEN:  I'm sorry.  I'm --

3         MR. KEARL:  I will --

4         JUDGE GREEN:  -- I'm sorry --

5         MR. KEARL:  I will not have any questions, Judge Green.

6         JUDGE GREEN:  Okay.  My bad.

7         MR. MURPHY:  And I'd ask for the Jencks statement, as

8    well, or Jencks statements.

9         MS. COX:  I will upload it in SharePoint.

10        JUDGE GREEN:  Okay, so off the record.

11   (Off the record at 1:33 p.m.)

12        MR. MURPHY:  Your Honor, my cross-examination, right?

13        JUDGE GREEN:  Yes.

14        MR. MURPHY:  Okay.

15        JUDGE GREEN:  So --

16        MR. MURPHY:  Thank --

17        JUDGE GREEN:  -- let me just -- so Mr. Bryson, can you

18   hear us?  I think you have to take yourself off of mute.

19        THE WITNESS:  Yes, I can hear you, Your Honor.

20        JUDGE GREEN:  Okay, so thank you very much.  So the

21   Respondent's counsel is going to have some questions for you on

22   cross-examination, okay?

23        THE WITNESS:  Yes.

24                    **CROSS-EXAMINATION**

25   Q    BY MR. MURPHY:  Good afternoon, Mr. Bryson.  We exchanged



1     pleasantries earlier.  How you doing?

2     A     I'm good and yourself?

3     Q     Good, good.  During the lunch break, did you meet with or

4     speak with anyone?

5     A     No, sir.

6     Q     You testified on -- on direct that your last day of work

7     was March 28th, 2020; do you recall that testimony?

8     A     Yes, sir.

9     Q     Isn't it true that your last day of work was March 21st?

10    A     No, sir.  I went in on the 28th.

11    Q     Okay, and you went -- you punched in and worked and were

12    paid for the -- on the 28th?

13    A     Yes.

14    Q     You testif -- you testified on direct about unlimited UPT;

15    you remember that?

16    A     Yes, sir.

17    Q     And just refresh my recollection.  What does UPT stand

18    for?

19    A     Unpaid time.

20    Q     Unpaid time.  And am -- Amazon started the unlimited UPT

21    program in March of 2020, right?

22          MR. KEARL:  Objection, Your Honor.  I move for

23          Bannon-Mills no sanctions on this.  Respondent has

24    produced nothing in their documents that are about the UPT

25    policy, and in so far as they're now alleging that it was



1   created at a certain date, I feel like Responding Party should

2   be precluded from -- under cross -- under Bannon-Mills, the

3       cross-examination on this issue precluded from eliciting

4   any testimony on the issues.  They've failed to produce any

5   documentation related to this policy.

6       JUDGE GREEN:  Okay.  So I -- I understand that it was --

7   that it was going into on cross.  Is -- is there some reason

8   why the -- why the -- the policy wasn't produced in response to

9   the subpoena?

10      MR. MURPHY:  First of all, I don't -- I don't know if --

11  until Mr. Bryson went into it on direct, we had no idea that it

12  was going to come up, and -- and sitting here today, I don't

13  know whether there is a written policy, and -- and -- and I

14  don't know that it hasn't been produced.

15      JUDGE GREEN:  Okay.  So I'm going to allow it.  I don't

16  think it's -- it's going to be at all critical to the case but

17  go ahead.

18      MR. MURPHY:  Thank you.

19  Q   BY MR. MURPHY:  Mr. Bryson, isn't it true that the -- the

20  UPT program started in March of 2020?

21  A   I beg your pardon, sir.  You mean from the get, that's

22  when it started?

23  Q   I'm not -- well, why don't you tell me when it started?

24  A   There's always been the UPT.

25  Q   How about the unlimited UPT?



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   A     Unlimited UPT started in the pandemic.

2   Q     Okay, so in or around March of 2020?

3   A     Around -- yes, sir.

4   Q     Okay, and -- and did you understand the reason for

5   unlimited UPT to be to allow associates that weren't

6   comfortable coming to work to stay at home and not risk their

7   jobs?

8   A     Yes.

9         MR. KEARL:  Objection.

10        JUDGE GREEN:  Overruled.

11  Q     BY MR. MURPHY:  Mr. -- Mr. Bryson, you -- you talked about

12  a, for lack of a better term, meeting on March 25th in -- in

13  the manager's office that -- that you and some of your

14  coworkers participated in; do you recall that testimony?

15  A     Yes.

16  Q     Is it -- isn't it true that during that meeting and later

17  when members of your group were in the break room that Amazon's

18  managers advised you repeatedly to maintain a -- a -- a social

19  distancing area --

20        MS. COX:  Objection, Your Honor.

21  Q     BY MR. MURPHY:  -- between you?

22        MS. COX:  Compound.  At that time and later.

23        JUDGE GREEN:  Overruled.  Do you understand the question?

24  But you need it asked of you again.

25        THE WITNESS:  I need it asked again.



1    Q    BY MR. MURPHY:  Okay.  Mr. -- Mr. Bryson, at the meeting

2    on March 25th that you testified to on your direct in the

3    manager's office at JFK8 --

4    A    Yes.

5    Q    -- isn't it true that the managers advised you and your

6    coworkers to maintain social distancing while you were in that

7    office?

8         MR. JACKSON:  Your Honor, I'm going to object.

9         MR. MURPHY:  Wait, does Mr. -- Mr. Jackson and Ms. Cox

10   are -- are both objecting here for counsel for the General

11   Counsel?  I mean, it's enough that they're going -- one of

12   them's going to object to every question, Judge.  Why -- how

13   about if we --

14        JUDGE GREEN:  Yeah, I -- I really --

15        MR. MURPHY:  -- just pick one?

16        JUDGE GREEN:  -- I -- I want one attorney dealing with

17   each witness unless there's really some strong reason for it.

18   Is there some reason why -- why you're interjecting?  Isn't Ms.

19   Cox handling this witness?

20        MR. JACKSON:  Understood.  I'll allow Ms. Cox, then.

21        MS. COX:  Judge Green, we object.  Respondent should be

22   precluded from asking these questions.  They never provided the

23   COVID-19 social distancing policy.

24        JUDGE GREEN:  Okay.

25        MR. MURPHY:  Your -- Your Honor, I -- I don't -- I don't



1    think that that policy was -- was covered by any of the

2    subpoena paragraphs, the -- the many subpoena paragraphs in --

3    in -- in this case.

4        MS. COX:   Judge Green, it was covered by paragraph 7, work

5    rules, of subpoena 1 issued on March 1st, 2021.  So --

6        JUDGE GREEN:   Could I ask the parties a question, okay?

7    The Respondent's policies and practices with regard to COVID

8    safety or not at issue in this case.  They're not at issue.

9    Whether Mr. Bryson had a mistaken belief regarding what the

10   policies are or whether the protesters were hypocritical in how

11   they functioned, it is not going to impact whether they engaged

12   in protected concerted activity, and frankly, I thought that

13   the Respondent said er -- fairly early on in this case that it

14   was uncontested that the -- that the -- the Charging Party

15   engaged in protected concerted activity.  And so I'm wondering

16   why we care --

17       MS. COX:   Judge --

18       JUDGE GREEN:   -- other than -- and -- and I'm addressing

19   this really -- it's the Respondent now, but I'm addressing it

20   to both parties because I understand, I completely understand,

21   that the General Counsel has put on a very significant amount

22   of evidence in this regard, but that's -- that's a sunk cost.

23   We're -- we're never going to get that time back.  The question

24   is whether we should compound it by having additional testimony

25   on it.  So that's for Respondent, and I'm asking Respondent now



www.escribers.net | 800-257-0885

1    for --

2        MR. MURPHY:  Yeah, well -- well -- well, Judge, I'm -- I'm

3    reading between the lines that -- that you don't think it's --

4    it -- it's relevant to the issue in dispute, and if -- and if

5    that's --

6        JUDGE GREEN:  Correct.

7        MR. MURPHY:  -- your position --

8        JUDGE GREEN:  I don't.

9        MR. MURPHY:  -- then --

10       JUDGE GREEN:  I mean, I -- I think that the caselaw is

11   really quite clear.

12       MR. MURPHY:  Okay, then I -- I -- I think that there are

13   certain elements of my cross-examination that I can

14   eliminate --

15       JUDGE GREEN:  Okay.

16       MR. MURPHY:  -- and if you'd -- and if you give me five

17   minutes just to make sure that I'm squared away --

18       JUDGE GREEN:  Okay.

19       MR. MURPHY:  -- I -- I think we can save more than that,

20   and I would appreciate --

21       JUDGE GREEN:  Okay, off --

22       MR. MURPHY:  -- that.

23       JUDGE GREEN:  -- the record.

24       MS. COX:  Judge Green?

25       JUDGE GREEN:  What?  What do you want?  Go ahead.  Do you



 1    want to say something?

 2         MS. COX:  Are we on the record?

 3         JUDGE GREEN:  We are.

 4         MS. COX:  Yes.  Judge Green, the disciplines that have

 5    been produced show that employees were disciplined pursuant to

 6    the COVID-19 policy, and so in as far as we have disparate

 7    treatment arguments to make, we believe that the policy

 8    should've been produced.

 9         MR. MURPHY:  Judge, the -- the subpoena requested work

10    rules, right?  The COVID policy is not a work rule at -- at

11    any --

12         MS. COX:  But if an employee -- if an employee violates

13    it, they get disciplined, right?

14         MR. MURPHY:  But it's not a work rule.  It wasn't covered

15    by the subpoena, and -- and the -- and the Judge --

16         JUDGE GREEN:  So you're --

17         MR. MURPHY:  -- and -- and --

18         JUDGE GREEN:  -- so --

19         MR. MURPHY:  -- and -- and --

20         JUDGE GREEN:  Okay.  So let me just ask the -- the General

21    Counsel:  This re -- this concerns the discipline of Mr. Smalls

22    and Mr. Palmer, so we're litigating Mr. Smalls and Mr. Palmer

23    who are -- who are not charging parties, and you're trying to

24    establish that the -- that the adverse employment actions as it

25    pertained to them were pretextual and therefore it demonstrates

1    animus, and that animus will go towards your case with regard

2    to Bryson.  I -- I'm -- I'm asking; I'm not trying to be

3    difficult.  That's -- that's what your theory of this case is?

4        MS. COX:  Judge, we do believe that it shows animus, but

5    it does -- it -- we also believe that this is relevant to other

6    employees that were disciplined and what kind of discipline

7    those employees received, not just Palmer and Smalls.

8        JUDGE GREEN:  Okay, so this is what I'm going to do, then.

9    So I -- I really -- that's -- that's fine.  I'm not going to --

10   I'm not going to drag this -- this trial to a halt every time

11   we get a Bannon-Mills remedy request.  I'm just -- I'm not

12   going to do it.  I don't think it's an efficient function.

13   It's a ineffect -- efficient way to proceed.  I'm capable of

14   determining after the fact that certain evidence that comes in

15   will be disregarded and maybe even disallowed.  If I determine

16   that there -- that it is warranted as an evidentiary remedy

17   under the Bannon-Mills line of cases, and so if that's the way

18   we're going to go, what I'm -- what I'm inclined to do is just

19   allow Mr. Murphy to -- to conduct his cross-examination, and

20   I'm going to figure it out later.

21       MR. KEARL:  Would you like us to prepare sort of a running

22   list to present to you --

23       JUDGE GREEN:  Yes.

24       MR. KEARL:  -- out of the box.

25       JUDGE GREEN:  Yes, absolutely.  Yeah, absolutely.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1         MR. KEARL:  So -- so can we have like a general objection

 2    to preserve the ability to --

 3         JUDGE GREEN:  Yes.

 4         MR. KEARL:  -- do that?

 5         JUDGE GREEN:  You have a standing objection really, and I

 6    think that that kind of goes without saying.  I -- I -- you

 7    know, we've spent a lot of time on this subject, but, yes.

 8    Okay?  So so much for that.  We're not going to -- we're not --

 9    we're not going to save any time.  I'm -- I'm cutting it back,

10    Mr. Murphy, so go ahead.

11         MR. MURPHY:  Okay.

12                    RESUMED CROSS-EXAMINATION

13    Q    BY MR. MURPHY:  So Mr. Bryson, do you remember the last

14    question?

15    A    No, sir.  Repeat it, please.

16    Q    Sure.  At -- at the -- at the meeting that you attended in

17    the manager's office on March 25th, isn't it true that Amazon's

18    managers instructed you and your coworkers to maintain social

19    distancing?

20    A    No.

21    Q    And isn't it true that when you and your coworkers went to

22    the cafeteria, I believe, after the meeting that Amazon

23    managers instructed you in that location to maintain social

24    distancing?

25         MS. COX:  Objection, Your Honor.  He never testified to
```



1    being in the cafeteria after.

2         MR. MURPHY:  I think he did --

3         JUDGE GREEN:  (Indiscernible, simultaneous speech) --

4         MR. MURPHY:  -- but he may have called it the lunchroom,

5    but he testified that he went some -- went somewhere as a group

6    and he remained for a short period of time before he went home.

7    That was his testimony.

8         JUDGE GREEN:  Yeah --

9         THE WITNESS:  Okay.

10        JUDGE GREEN:  -- overruled.

11        THE WITNESS:  Say again, please.  Repeat the question

12   again.

13        MR. MURPHY:  Sure.

14   Q    BY MR. MURPHY:  Did -- is -- isn't it true that when you

15   were in the break room or the cafeteria or the lunchroom where

16   you and your coworkers went after meeting in the manager's room

17   that Amazon managers instructed you to maintain social

18   distancing?

19   A    No.  They got that from us.  Amazon knows nothing about

20   social distancing.  Everything they got they learned from --

21        MR. MURPHY:  Hey --

22   A    -- us as we told them.

23        MR. MURPHY:  -- Judge, could --

24        JUDGE GREEN:  Yeah, so Mr. Bryson --

25        MR. MURPHY:  -- you instruct the witness --



1      JUDGE GREEN:  -- please just --

2      MR. MURPHY:  Yeah.

3      JUDGE GREEN:  -- wait for the -- each question and just

4   answer the question and then wait for the next one, okay?

5      THE WITNESS:  All right.

6   Q    BY MR. MURPHY:  And -- and Mr. Bryson, did you attend the

7   protest at JFK8 on March 30th, 2020?

8   A    Yes.

9   Q    And -- and isn't it true that a -- a-- an Amazon manager

10  repeated social distancing warnings by using a -- a bullhorn or

11  a megaphone?

12  A    No.

13     MS. COX:  Objection, Your Honor.

14     JUDGE GREEN:  Overruled.

15  Q    BY MR. MURPHY:  And -- and Mr. Bryson, at that same

16  protest on -- on March 30th, is -- isn't it true that a marked

17  New York Police Department car drove around the parking lot

18  playing a pre-recorded message regarding social distancing?

19     MR. KEARL:  Objection.  Relevance.

20     JUDGE GREEN:  Overruled.  I'm right that the reason why

21  we're -- we're getting -- and this is for the Respondent --

22     MR. MURPHY:  Yeah, do you want -- you don't want to give

23  me five minutes, Judge, and just see if -- if -- whether we can

24  cut some of this.

25     JUDGE GREEN:  Yeah, I'm just -- I'm asking.  I mean, the



# Exhibit E, Motion to Try Petition on Hearing Record

```
1    reason why we're getting into this evidence of social

2    distancing is because of -- it's because of Palmer, right, Mr.

3    Palmer and -- and Mr. Smalls or maybe --

4         MR. MURPHY:  And it's -- and --

5         JUDGE GREEN:  -- it's just --

6         MR. MURPHY:  -- and it's because of the testimony on

7    direct examination regarding what occurred that day.

8         JUDGE GREEN:  Okay.  All right, off the record for five

9    minutes.

10   (Off the record at 3:04 p.m.)

11        MS. COX:  Judge Green?

12        JUDGE GREEN:  Yes.

13        MS. COX:  We just want some clarification on your

14   direction.  May we note on the record areas where Respondent

15   has not produced documents?

16        JUDGE GREEN:  Do we know -- do we know on the record?

17        MS. COX:  No, I'm asking you if we can note on the record.

18        JUDGE GREEN:  I -- I'd rather get through this now.

19   Really --

20        MS. COX:  So --

21        JUDGE GREEN:  -- I'd rather get through this now.

22        MS. COX:  Okay.

23        JUDGE GREEN:  And yes, we can, but -- yes, we can, but

24   let's do it later.

25        MS. COX:  So Judge, I don't understand.  Are you saying
```



Exhibit E, Motion to Try Petition on Hearing Record

1 that when we make our objections we should or should not

2 include our Bannon-Mills objection?

3     JUDGE GREEN:  You can note for the record that you're

4 making a Bannon-Mills objection to whatever evidence comes

5 in --

6     MS. COX:  Okay.

7     JUDGE GREEN:  -- but the chances are I'm -- I just -- I

8 don't want to stop, have everybody whip out their subpoenas and

9 try and get into a discussion of this while Mr. Bryson is on

10 the witness stand.  I just -- I -- you know, it's already

11 likely that he's going to be here for three days.  I just -- I

12 don't want to keep him here that long, and I just -- I don't

13 think it's an efficient way to proceed.  I think we should get

14 Mr. Bryson on and off as quickly as possible and then deal with

15 the ramifications of any evidence that comes in later.

16     MS. COX:  Thank you.

17     JUDGE GREEN:  But yes, you can certainly say, listen, I

18 object on Bannon-Mills and make a note of it and we can deal

19 with it later.

20     MS. COX:  Okay.

21     MR. MURPHY:  May I, Judge?

22     JUDGE GREEN:  Yes.

23     MR. MURPHY:  Okay, and -- and we're going to take your

24 direction and -- and skinny this down to the -- to the best we

25 can.



Exhibit E, Motion to Try Petition on Hearing Record

1    **RESUMED CROSS-EXAMINATION**

2    Q    BY MR. MURPHY:   So Mr. Bryson --

3    A    Yes.

4    Q    -- do you remember my last question?

5    A    No, could you please repeat it?

6    Q    I don't think there was one pending.   You attended the

7    protest on March 30th, right?

8    A    Yes.

9    Q    And -- and you indicated that you spent a fair amount of

10   time at that protest talking to the press; isn't that right?

11   A    Correct.

12   Q    And I -- I think your colleagues -- you said your

13   colleagues, Mr. Palmer and Mr. Smalls, were present as well on

14   the 30th?

15   A    Yes.

16   Q    And did they also spend some amount of time speaking to

17   the press?

18   A    Yes.

19   Q    In addition to speaking to the press, you and -- and Mr.

20   Palmer, though, both entered onto Amazon's property and

21   protested in front of the warehouse, correct?

22   A    Correct.

23        MS. COX:   Objection, Your Honor.   That was vague:   entered

24   in and in front.   I'm sorry.

25        MR. MURPHY:   Judge, these questions are perfectly



1    understandable.

2        JUDGE GREEN:  And so do you understand the question, Mr.

3    Bryson?

4        THE WITNESS:  Yes.

5        JUDGE GREEN:  Okay.  Overruled.

6    A    Yes.  Say again, we entered the premises.  We weren't the

7    only two that entered at --

8    Q    BY MR. MURPHY:  I'm sorry, you weren't the only two?

9    A    We weren't the only two there.

10   Q    Okay.  Other -- other colleagues, coworkers --

11   A    Yes.  Yes.  Other employees entered -- were --

12   Q    Thank you.

13   A    -- there, too --

14   Q    Thank you.

15   A    -- in the parking lot.

16   Q    Thank you.  Mr. Bryson, in -- in -- in preparation for

17   your testimony today, did you review any materials?

18   A    Sure, yes.

19   Q    Did you review the affidavit that you provided to the NLRB

20   on June 30th, 2020?

21   A    Yes.

22   Q    And did you review any videos?

23   A    Yes.

24   Q    Which videos did you review?

25   A    All the vid -- both videos.  I -- I was --



Exhibit E, Motion to Try Petition on Hearing Record

```
1    Q    You say --

2    A    -- there.

3    Q    -- both.  Can you identify them for me, please?

4    A    Yes, the -- the -- the video with me and a young woman

5    having the encounter and also Jordan Flower's video to Facebook

6    Live.

7    Q    At the time you gave the affidavit, you knew that there

8    was video of the entire incident with you and your coworker,

9    didn't you?

10   A    Yes.

11        MR. KEARL:  Objection.  Relevance.

12        JUDGE GREEN:  Overruled.

13   A    Yes.

14   Q    BY MR. MURPHY:  So on -- on June 30th, the date that --

15   that you gave your affidavit, you were aware that there was

16   vid -- a video of the full incident between you and your

17   coworker, correct?

18   A    Begging your pardon, sir, could you -- you said on June

19   30th.  We were protesting on June 30th.

20   Q    You -- did -- you gave your -- I -- I thought you just --

21   A    I mean, we were --

22   Q    -- agreed with me that -- I thought you just agreed with

23   me that you gave your affidavit --

24   A    I watched --

25   Q    -- to the NLRB --
```



1    A    -- videotape -- yes, I did, and I'm --

2    Q    Okay --

3    A    -- I'm --

4    Q    -- and at the --

5    A    Yes.

6    Q    -- time you gave the affidavit to the NLRB, you knew that

7    there was video of the full incident between you and your

8    coworker, right?

9    A    Yes.

10   Q    And when did you learn that there was such a video?

11   A    I knew from the very start.  I always --

12   Q    So you go on --

13   A     -- knew.  I was the one that made sure that she was

14   taping.

15   Q    Okay, Mr. -- Mr. Bryson, did you --

16   A    Yes.

17   Q    -- know that there was video of the entire incident on

18   April 6th, 2020?

19        MS. COX:  Objection, Your Honor.  Asked and answered.

20        JUDGE GREEN:  Overruled.

21   A    Did I know that -- could you repeat that because April 6th

22   is -- is the -- the -- in question.  I was there on April 6th.

23   Q    BY MR. MURPHY:  Okay, and on April 6th, did you know that

24   there was video of the entire incident?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record        1190

1    Q    And you knew on April 6th that Mandi Velasco was recording

2    the protest in front of JFK8, correct?

3         MS. COX:  Objection.

4    A    Yes.

5         MS. COX:  Asked and answered.

6         JUDGE GREEN:  Overruled.

7    Q    BY MR. MURPHY:  You can answer the question, Mr. Bryson.

8    A    I knew -- say it again, please, so I can hear it again.

9    Q    Sure.  On -- on April 6th, 2020, you knew that Mandi

10   Velasco was recording the protest taking place in front of

11   JFK8, right?

12   A    Yes.

13   Q    When you gave your affidavit to the NLRB on June 30th,

14   2020, did you advise whoever you spoke with that you had video

15   evidence of the entire incident?

16   A    Yes.

17   Q    Did you provide a copy of the video, that particular

18   video, to the NLRB at that time?

19   A    I -- I would assume so.  I -- I -- I provided it to my

20   lawyer, Frank Kearl.

21   Q    And do you know whether your a -- a -- attorney, Mr.

22   Kearl, provided the video to the NLRB.

23        MS. COX:  Objection, Your Honor.  Foundation.

24        MR. MURPHY:  I just gave the foundation.

25        MS. COX:  How would he know -- how would he know what Mr.



1    Kearl did with the NLRB?

2        JUDGE GREEN:  So do we -- I'm sorry, we had a -- we had

3    two -- I heard one of the objections of Ms. Cox.  I didn't hear

4    the objection of Mr. Kearl.

5        MR. KEARL:  The same objection.

6        JUDGE GREEN:  Okay.  So if you know, you can say --

7        THE WITNESS:  No.

8        JUDGE GREEN:  -- and if you don't know, you don't need to,

9    you know.

10       THE WITNESS:  I -- I don't know that -- I don't -- I'm not

11   aware of that -- what -- what Frank did at that point.

12   Q    BY MR. MURPHY:  Okay, but you told the person that

13   interviewed you at the NLRB that such a video existed, right?

14   A    I -- I don't -- I don't really recall, sir.  I -- I might

15   have.

16   Q    Mr. Bryson, you testified earlier about some sort of a --

17   a fair or a carnival, I think you might've used both words,

18   that -- that occurred at -- at the warehouse sometime in March

19   2020; do you remember that testimony?

20   A    Yes.

21   Q    And -- and I think at -- at the moment that you gave that

22   testimony, you couldn't recall the specific date of -- of the

23   fair or carnival; is -- is that right?

24   A    I kind -- it's March 15th, I believe.

25   Q    Okay.



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I believe it was somewhere in there.

2    Q    Okay.

3    A    That's what I said.

4    Q    If -- if I told you that it occurred on March -- on March

5    12th, would that refresh your recollection?

6    A    I'm not sure, sir.  I -- I don't recall March 12th.

7    Q    Mr. -- Mr. Bryson, do -- do you remember making any

8    handwritten changes to -- to the affidavit that was prepared

9    for you by the NLRB?

10   A    Yes.

11   Q    And prior to making those changes, did you review the

12   video taken by Mandi Velasco on April 6th, 2020?

13   A    I -- I don't understand the question.

14   Q    Sure.  You -- you remember the affidavit, right?

15   A    Correct.

16   Q    And you remember making handwritten changes to it,

17   correct?

18   A    Yes.

19   Q    And you initialed those handwritten changes, right?

20   A    Yes.

21   Q    And -- and before making those handwritten changes, did

22   you review the video that Ms. Velasco took on April 6th, 2020?

23   A    No, I didn't review it at that time.  I had been reviewed

24   the video several times before, though.  I had seen the video.

25   Q    And the things that you added to your affidavit by hand --



Exhibit E, Motion to Try Petition on Hearing Record

```
 1   A    Yes.

 2   Q    -- did you tell those to the Board agent that took the

 3   affidavit?

 4   A    What do you mean -- what do you mean?  I'm not

 5   understanding.

 6   Q    Sure.  So you -- you wrote some things into your

 7   affidavit, right?

 8   A    Yeah.

 9   Q    We've already agreed on that, okay.

10   A    Yes.

11   Q    Those things that you wrote in, did you tell those to the

12   Board agent during your interview?

13   A    My first interview?

14   Q    Yes.

15   A    No.  Some things were -- I remember as we go -- as time

16   went on a lot of things, sir.

17   Q    Okay.  So -- but I'm asking you about the changes that you

18   made to your affidavit.

19   A    Yes.

20   Q    Had you said those things to the Board agent during your

21   interview?

22   A    I think I -- I think I had to change it because I forgot,

23   you know, as I remembered, I added to it.

24   Q    As you remembered, you added to it; you only had a chance

25   to add to it one -- on one occasion, correct?
```



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1142 of 2171 PageID #: 1195

1      MR. KEARL:  Objection.  Relevance.

2      JUDGE GREEN:  Okay, so overruled.

3      So let me ask you Mr. Bryson, you had an additional call

4      with -- with the Board agents?

5      THE WITNESS:  Yes.

6      JUDGE GREEN:  Correct?  And then, were you given a chance

7      to review the -- the affidavit that was written up by that

8      Board agent?

9      THE WITNESS:  Yes.

10     JUDGE GREEN:  And then, at some point after the fact,

11     after that fact, you added the --

12     THE WITNESS:  Yes, yes.

13     JUDGE GREEN:  -- the changes?

14     THE WITNESS:  Yes, sir.

15     JUDGE GREEN:  Okay.

16     Okay, go ahead.

17     MR. MURPHY:  Okay.

18  Q  BY MR. MURPHY:  And you left -- you left the -- you

19     testified at length this morning about your interaction with

20     your coworker; do you remember that testimony?

21  A  I don't know which coworker you're referring to.

22  Q  The -- the -- the woman that you had the confrontation

23     with.

24  A  Okay, yes.

25  Q  That's the only -- that's the only interaction you



1    testified about to today, right?

2    A    Yeah, yes.

3    Q    Okay.

4         MR. KEARL:  (Indiscernible, simultaneous speech)

5    testimony.

6    Q    BY MR. MURPHY:  So when you gave the affidavit to the

7    NLRB, you left a lot of the testimony that you gave them this

8    morning out of the NLRB's affidavit, didn't you?

9    A    Yes.

10   Q    Did you understand at the time you gave the affidavit that

11   it was under oath?

12   A    Yes, and everything that I -- I -- I put initially on the

13   aff -- affidavit, and everything I said after it is 100 percent

14   the truth.

15   Q    So you -- so you told part of the truth to the NLRB and

16   the rest of the truth today, is that -- is that your testimony,

17   Mr. Bryson?

18        MS. COX:  Objection, Your Honor.  Just

19   mischaracterizing --

20        JUDGE GREEN:  So --

21        MS. COX:  -- this witness' testimony.

22        JUDGE GREEN:  -- sustained.

23   Q    BY MR. MURPHY:  Mr. Bryson, you didn't tell the NLRB the

24   whole story, did you?

25        MR. KEARL:  Objection.



1    THE WITNESS:  I told the NL -- I -- I -- I told the story

2    as I -- as I remembered it at the time, maybe -- and I

3    remembered things later on that I -- yes, everything that I

4    said, regardless whether I told them on that day or I said it

5    later, it's the absolute truth.

6    JUDGE GREEN:  Let me just say, Mr. Kearl, I think your --

7    your -- your audio is low -- is -- yeah, I'm kind of barely

8    hearing -- I'm kind of hearing objection, but --

9    THE WITNESS:  I think he has a mute on, I see a mute mic.

10   MR. KEARL:  Can you hear me?  Is that better?

11   JUDGE GREEN:  Yeah, that's better.  Yeah, that's better.

12   MR. KEARL:  Okay.

13   Q    BY MR. MURPHY:  So -- so you -- you didn't -- you didn't

14   put everything in the affidavit that you testified to today,

15   right?

16   A    No, sir.  I -- I put it -- I recalled more --

17   Q    That's a yes or -- that's a yes or no, Mr. Bryson.

18   A    Yes.

19   Q    (Indiscernible, simultaneous speech) --

20   A    Say again?

21   Q    Yeah, I said you didn't put everything in the affidavit

22   that you testified to today, did you?

23   A    No, I didn't.

24   Q    And as you just testified, you had an opportunity after

25   the affidavit was presented to you to add additional



1    information, correct?

2        MR. KEARL:  Objection.  Asked and answered, also

3    relevance.

4        JUDGE GREEN:  Overruled.

5        So Mr. Bryson, you can answer.

6        THE WITNESS:  I don't understand what he's saying again,

7    though.

8        JUDGE GREEN:  Okay.

9        THE WITNESS:  Can you repeat that please, Mr. Murphy?

10       MR. MURPHY:  Sure.

11   Q    BY MR. MURPHY:  Mr. Bryson, after you received the

12   affidavit from the NLRB, you had an opportunity to add to it --

13   to add information, to correct information, et cetera, right?

14   We've already talked about that, right?

15   A    Yes.

16   Q    Okay.  Could you look up, sir?  Do you mind?  Thank you.

17   And you -- you did not add all the information that you've

18   testified here today to your affidavit, did you?

19       MS. COX:  Objection, Your Honor.

20       MR. KEARL:  Objection.  Asked and answered.

21       MS. COX:  Asked and answered, Judge.

22       JUDGE GREEN:  Okay.  So sustained.

23   Q    BY MR. MURPHY:  Do -- do you remember any of the part --

24   things in particular that you left out of the affidavit, Mr.

25   Bryson?



1   A    I remembered more as -- as I went on.  It was -- it's a

2   year -- almost a year-and-a-half ago, as it is now, or a year.

3   Q    Okay.

4   A    Okay?  I remembered more as we go -- as we went on.

5   Q    Okay.

6   A    And I mean, that's the fairest thing I say.  Everything

7   I've said in the affidavit or after is the truth.

8   Q    So -- so your -- your memory improves as time goes on; is

9   that what you're telling me?

10       MR. KEARL:  Objection.  Mischaracterizes.

11       JUDGE GREEN:  Sustained.

12       MR. MURPHY:  I'll -- yeah.

13   Q    BY MR. MURPHY:  So Mr. Bryson, did -- did -- has your

14   recollection of the incident on April 6th improved as time has

15   gone by?

16   A    Not as time has gone by.  When I gave the testimony, I was

17   in the midst of a family crisis.  I gave it to the best of my

18   ability.  I remembered things that I left out as we were -- as

19   we went on, and I -- I put them there.  I mean --

20   Q    Okay.

21   A    -- it was -- it was the truth, I mean.

22   Q    And -- and -- and the things you remembered after giving

23   the affidavit, did you communicate those to the National Labor

24   Relations Board?

25       MS. COX:  Objection, Your Honor.



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1147 of 2171   PageID #:1199

1    MR. KEARL:  Objection, Your Honor.

2    MS. COX:  Asked and answered.

3    MR. MURPHY:  Not -- not asked and answered, Judge.

4    JUDGE GREEN:  Right, so overruled.

5    MR. KEARL:  And objection.  Relevance.

6    JUDGE GREEN:  Overruled.

7    Mr. Bryson, let me ask you.  Do you remember the things

8    that you did not include in the affidavit?

9    THE WITNESS:  I don't -- I -- I --

10   JUDGE GREEN:  Or do you not recall?

11   THE WITNESS:  I -- I -- I -- I don't recall right now,

12   Your Honor.

13   JUDGE GREEN:  Okay.

14   MR. MURPHY:  Okay.

15   THE WITNESS:  Everything, but what I can say is, whether I

16   add -- I said it from the beginning, or if it was added, it's

17   because it was the truth, you know.

18   MR. MURPHY:  Okay, thank you.

19   JUDGE GREEN:  Okay, thank you.

20   Q   BY MR. MURPHY:  Mr. Bryson, do you remember testifying on

21   direct about the manner in which the coworker that you had the

22   confrontation with crossed the street?

23   A   Yes.

24   Q   And -- and -- and I think your testimony generally was

25   that she crossed the street in a diagonal fashion?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    And -- and -- and isn't it true that you characterized her

3    crossing the street in a diagonal fashion as somehow

4    provocative or antagonistic to you?

5         MS. COX:  Objection, Your Honor.

6         JUDGE GREEN:  What's the objection?

7         MR. KEARL:  (Indiscernible, simultaneous speech) the

8    witness.

9         MS. COX:  That's -- that's not what he testified to, it

10   being provocative.

11        JUDGE GREEN:  Okay, that's true, he didn't testify to

12   exactly that.  Do you want to ask him about the incident,

13   rather than what he testified to?

14        MR. MURPHY:  Yeah.

15   Q    BY MR. MURPHY:  Do -- do -- do you -- do you recall

16   saying -- testifying --

17        MR. MURPHY:  strike that.

18   Q    BY MR. MURPHY:  You testified that your coworker crossed

19   the street on a diagonal to antagonize you; do you recall that

20   testimony, Mr. Bryson?

21   A    Yes.

22   Q    Mr. Bryson, do you remember stating in your affidavit

23   that -- that you gave to the NLRB, that, and -- and I'm quoting

24   here, the woman was moved into the warehouse by Amazon staff;

25   do you remember that?



1    A    Yes.

2         MR. MURPHY:  Judge, I'd like to mark the affidavit, if I

3    can, please.

4         MS. COX:  Judge Green, for what purpose?

5         MR. MURPHY:  To -- to introduce and to -- and to -- and to

6    show the contradictions between the direct testimony and the --

7    and the -- and the information in the affidavit.

8         MS. COX:  Objection.  Your Honor, there's nothing that has

9    been asked so far that contradicts the affidavit.

10        JUDGE GREEN:  What -- what is your objection?

11        MS. COX:  There's nothing that's --

12        JUDGE GREEN:  Is it relevance?  I mean, it's -- it's the

13   affidavit.  I haven't read it, but generally speaking, what's

14   in the affidavit is relevant to the case, that's why you take

15   the affidavit.  So is there some other objection, other than

16   relevance?

17        MS. COX:  Judge Green, I just don't see the reason why it

18   needs to go into evidence, it's not --

19        JUDGE GREEN:  Okay, overruled.  So mark it.

20        MR. MURPHY:  Mr. Falk, are you online?

21        MR. FALK:  Yes.

22        MR. MURPHY:  So you'll have to assist me here in going

23   into the -- into the -- of course I got kicked out.  Going

24   into -- into Sharepoint into the file that says Jencks

25   materials?  Let me know when you're there.  I got kicked out of



# Exhibit E, Motion to Try Petition on Hearing Record

1    Sharepoint, so I'm logging back in.

2        MR. FALK:  I'm in there.

3        MR. MURPHY:  And in the -- in the Jencks materials folder,

4    there should be an affidavit of Mr. Bryson?

5        MR. FALK:  Okay, give me one moment.

6        MR. MURPHY:  Yeah, I'm back in.

7        MR. KEARL:  Judge -- Judge Green, does -- does counsel for

8    the Respondent need to have a foundation or -- or show

9    contradiction in the testimony before being able to enter this

10   document?  Because I don't feel that has happened yet.

11       JUDGE GREEN:  Okay, so I'm -- I'm allowing -- he's marking

12   it right now.  I -- I will -- when he offers it, I will allow

13   you to object.

14       MR. MURPHY:  Okay, Mr. Falk, could you please turn to page

15   4 of the affidavit?

16       JUDGE GREEN:  What -- what exhibit number is this going to

17   be?

18       MR. MURPHY:  I think it's 123, Judge.

19   **(Respondent Exhibit Number 123 Marked for Identification)**

20       JUDGE GREEN:  Okay.

21       MR. MURPHY:  We're -- we're all out of order, here.

22       MR. FALK:  I'm going to share it in Acrobat; give me one

23   second.  Okay.

24       MR. MURPHY:  Okay, could you turn to page 4, please, Mr.

25   Falk?



1    Q    BY MR. MURPHY:  Okay, Mr. Bryson, would you read from line

2    8 through page 5, line 6?  And you can tell Mr. Falk when

3    you've finished reading this page.

4    A    "Facing each other, Mandi and I maintained a six-foot

5    social distance from each other.  Using the bullhorn, I was

6    asking her from" --

7         JUDGE GREEN:  Oh, I think -- are you asking --

8         MR. MURPHY:  No, read it to yourself, Mr. Bryson.  I -- I

9    apologize.

10        JUDGE GREEN:  Yeah, you can read it to yourself.

11   Q    BY MR. MURPHY:  Starting with Mandi and I.

12        How are you doing, Mr. Bryson?

13   A    Um-hum.  Okay.

14   Q    Okay.

15        MR. MURPHY:  Mr. Falk, can you advance it?

16        THE WITNESS:  Okay.  Okay.

17   Q    BY MR. MURPHY:  Okay.  So you've had a chance to -- to

18   read that excerpt of your affidavit, right, Mr. Bryson?

19   A    Yeah.

20   Q    Okay.  And there's -- there's nothing in there about any

21   of the drug-related comments that you made about your -- your

22   coworker, is there?

23   A    No.

24   Q    You -- you left out the -- the fact that you called her a

25   crack head, didn't you?



1    MR. KEARL:  Objection.  Misstates evidence.  I mean, he

2  never testified to calling her a crack head.

3    JUDGE GREEN:  Okay, I'm going to transcript.  You want to

4  ask the question?

5    MR. MURPHY:  Sure.

6  Q   BY MR. MURPHY:  Mr. Bryson, did you -- did you call your

7  coworker a crack head on April 6th?

8  A   Yes.

9  Q   Did you call her a crack whore?

10    MS. COX:  Objection.  He didn't use the word whore.

11    JUDGE GREEN:  The question.

12    THE WITNESS:  No.

13  Q   BY MR. MURPHY:  You didn't call her a crack whore?

14    MR. KEARL:  Your Honor, we have the video.  Do we need to

15  do this?

16    JUDGE GREEN:  Right, we do have the video.

17    MR. KEARL:  We have the video, and --

18    MR. MURPHY:  Okay, then, if -- then, let's admit the

19  affidavit --

20    MR. KEARL:  Yeah, absolutely.

21    MR. MURPHY:  -- and we can take it from there.

22    MR. KEARL:  No, absolutely.

23    MR. MURPHY:  All right, then I move the admission -- I

24  move the admission of Respondent 123.

25    MS. COX:  Objection, Your Honor.  This makes --



Exhibit E, Motion to Try Petition on Hearing Record

1       MR. MURPHY:  They want to have it both ways, Your Honor.

2       We -- we can't get the affidavit in, and we --

3       JUDGE GREEN:  Yeah, no -- go ahead.  You want to state

4       your objection for the record?  Go ahead.

5       MS. COX:  Yes, Judge.  Respondent hasn't established

6       inconsistencies.  Mr. Bryson testified that after he gave this

7       affidavit, he told the Board agent additional details.  That --

8       that doesn't make this statement inconsistent.

9       JUDGE GREEN:  Okay, overruled that there are no consis --

10      inconsistencies, you don't have to worry about it.  So G --

11      Respondent's 123 is admitted.

12      **(Respondent Exhibit Number 123 Received into Evidence)**

13      MR. KEARL:  Objection.  Hearsay, as well.

14      JUDGE GREEN:  Okay.

15      MR. MURPHY:  Hearsay?

16      JUDGE GREEN:  Overruled.  It's an admission of a party

17      opponent.

18  Q   BY MR. MURPHY:  Mr. Bryson, you said -- you said earlier

19      that your -- in your testimony, that you're not employed

20      currently; is that right?

21  A   Correct.

22  Q   How -- how are you supporting yourself, sir?

23      MR. KEARL:  Objection.  Relevance.

24      MS. COX:  Objection.  Relevance.

25      JUDGE GREEN:  Sustained.



1    Q    BY MR. MURPHY:  Is -- is any individual or organization

2    giving you money or any other form of support?

3         MR. KEARL:  Objection.  Relevance.

4         MS. COX:  Objection.  Relevance.

5         JUDGE GREEN:  What's the relevance?

6         MR. MURPHY:  Well, I'll -- I'll withdraw that question.

7         JUDGE GREEN:  Okay.

8         MR. MURPHY:  Your Honor.

9    Q    BY MR. MURPHY:  Mr. Bryson, are you soliciting donations

10   on a GoFundMe page?

11        MR. KEARL:  Objection.  Relevance.

12        JUDGE GREEN:  Yeah, what is the relevance of this?

13        MR. MURPHY:  This -- I -- I -- I -- well, let -- let me --

14   let me come at it a different way.

15   Q    BY MR. MURPHY:  Mr. Bryson, do you have a GoFundMe page?

16        MR. KEARL:  Objection.  Relevance.

17        MS. COX:  Objection.  Relevance.

18        MR. MURPHY:  Your -- Your Honor, the GoFundMe page is a --

19   is -- contains a statement written by Mr. Bryson, which I

20   believe is --

21        JUDGE GREEN:  Okay.

22        MR. MURPHY:  -- is relevant here.

23        JUDGE GREEN:  Okay.  Overruled.

24   Q    BY MR. MURPHY:  Mr. Bryson, do you -- do you have a

25   GoFundMe page?



1    A    Yes.  I made one a long time ago, but nobody funds it.

2    Q    Okay, so that's a yes, you have one, right?

3    A    Yes.

4    Q    And -- and on that statement -- and on that GoFundMe page,

5    you wrote a statement about what happened to you at Amazon, did

6    you not?

7    A    I don't recall because I haven't been to that page since I

8    made it.  We decided we weren't using it.

9    Q    Do you remember -- so -- so do you, sitting here today, do

10   you remember writing a statement that -- that's posted on your

11   GoFundMe page?

12   A    I don't recall, sir.  Again, because I don't use it.  We

13   made it up but we deci -- I had decided not to use it.  I've

14   never collected funds for it.  I don't do anything with it.

15   It's just there.

16   Q    Okay.  So I'm not sure that answers my question.  Do you

17   remember writing --

18   A    I don't recall.

19   Q    Okay.  So -- and so if I told you that on that -- on that

20   GoFundMe page, you said that Amazon terminated you based on

21   false charges; you don't recollect that?

22       MS. COX:  Objection, Your Honor.  He said he didn't

23   recall.

24       JUDGE GREEN:  Okay, so overruled.  So do you remember

25   that, Mr. Bryson?



Exhibit E, Motion to Try Petition on Hearing Record

1        THE WITNESS:  Pardon me, Judge?

2        JUDGE GREEN:  He's trying to refresh your recollection

3   with the question.

4        THE WITNESS:  Judge, can I be frank?  I made -- me and

5   Jordan Flowers both made a page a long time ago when this first

6   started.

7        UNIDENTIFIED SPEAKER:  My bad.  Sorry I missed your call

8   before, I was on a call.

9        MR. MURPHY:  Somebody's -- somebody's not on mute.

10       UNIDENTIFIED SPEAKER:  (Indiscernible, simultaneous

11   speech) --

12       MR. MURPHY:  Sorry about that.

13       THE WITNESS:  Okay, we made a page --

14       MS. COX:  Mr. Bryson, before you continue, there's some --

15       UNIDENTIFIED SPEAKER:  Sorry.

16       MS. COX:  Yeah, you're on --

17       UNIDENTIFIED SPEAKER:  Remember Pito (phonetic), my old

18   boss?

19       MR. MURPHY:  Somebody needs to go on mute.

20       MS. COX:  Okay.

21       JUDGE GREEN:  Sorry, I just muted them.

22       MR. MURPHY:  Thank you.

23       MS. COX:  Judge.

24       MR. MURPHY:  Thank you, Judge.

25       JUDGE GREEN:  No problem.



1    Q    BY MR. MURPHY:  I'm sorry, Mr. Bryson.  We --

2    A    Yeah.  As I stated, as I'm going to state again, we made

3    the pages, but we never collected any funds or really looked at

4    them like that.  I haven't seen that page in months.  I

5    actually meant to take -- take it down.  I have never taken

6    funds from it, nor do I remember what was put at the time on

7    it.

8    Q    Okay.

9    A    I don't -- I don't recall.

10   Q    Okay.

11        MR. MURPHY:  Mr. Falk, can you load Respondent R --

12   Respondent Exhibit 27 into Sharepoint?

13        MR. FALK:  Do you want me to display it on the screen?

14        MR. MURPHY:  Only after you've uploaded it to Sharepoint.

15   I think that's the protocol that we're going to use.

16        MR. FALK:  You said R, what number?

17        MR. MURPHY:  27.

18        MR. FALK:  Do you mean 29?

19        MR. MURPHY:  It's a GoFundMe page.  Hold on, let me take a

20   look.

21        Judge, can we go off the record for two minutes?

22        JUDGE GREEN:  Off the record.

23        MR. MURPHY:  Thank you.

24   (Off the record at 3:42 p.m.)

25   Q    BY MR. MURPHY:  Mr. Bryson, can you see the document



Exhibit E, Motion to Try Petition on Hearing Record

1    that's on your screen marked as Respondent's Exhibit 29?

2    A    Yes.

3    Q    Can you identify that document?

4    A    It's -- there's no picture or anything else.  I mean, I

5    don't see anything but a blank screen that says lead protest

6    organizer.

7         MR. MURPHY:  Can you make it a little larger, Mr. Falk,

8    please?

9         THE WITNESS:  It's not about the largeness.  There's no

10   picture there.

11        MR. MURPHY:  Okay, could you scroll down a little bit?

12   Just the -- just that first paragraph.

13   Q    BY MR. MURPHY:  Mr. Bryson, could you read that first --

14   the first paragraph right there, and let me know when you're

15   done reading it?

16   A    My name is Gerald Bryson --

17   Q    You don't have to read it out loud, Mr. Bryson.

18   A    Okay, I need it to scroll up some.

19   Q    So -- so -- yeah, go ahead.  Read the whole thing, if

20   you'd like to, Mr. Bryson.

21        MR. MURPHY:  Mr. -- Mr. Falk, what's your -- oh, never

22   mind.

23        THE WITNESS:  Okay.

24   Q    BY MR. MURPHY:  Mr. Bryson, you've -- you've had a chance

25   to read that?



Exhibit E, Motion to Try Petition on Hearing Record

```
1    A    Yes.

2    Q    Do you recognize this, page and the information on it as

3    your Go -- as part of your GoFundMe page?

4    A    Yes.

5    Q    And Mr. Bryson, if -- if you -- if you would, I'd like you

6    to take a look at -- can you --

7         MR. MURPHY:  Mr. Falk, can you highlight the lines that

8    start with fighting and unfairly?

9    Q    BY MR. MURPHY:  Okay, do you see the highlighted box, Mr.

10   Bryson?

11   A    Yeah.

12   Q    Okay, and -- and -- and in that text in the box, you

13   indicate that your job was taken away from you based on false

14   charges, correct?

15   A    Yes, correct.

16   Q    And what -- what -- what are those false charges?

17   A    The false charges that basically are I -- I was fired on

18   my day off, and you took -- a girl walked in the office and

19   told a -- a story that wasn't true.  And they -- they backed

20   that girl, and I was terminated.

21   Q    So you -- you've mentioned a couple of times in your

22   testimony today that -- that you were fired on your day off; do

23   you -- do you recall making those statements?

24   A    Yes.

25   Q    Is -- is -- do you believe that being on your day off
```



Exhibit E, Motion to Try Petition on Hearing Record

1   prevents you from being disciplined or -- or accountable for

2   the conduct you engage in on Amazon's property?

3       MR. KEARL:  Objection.  Relevance.

4       JUDGE GREEN:  So listen, I -- I allowed the General

5   Counsel to ask Mr. Bryson why he made the comments that he did,

6   and I -- I gave significant latitude in that regard, and I'm

7   going to extend the same latitude to Mr. Murphy.

8       THE WITNESS:  Say again, Mr. Murphy?

9   Q    BY MR. MURPHY:  Sure.  You -- you stated on a number of

10  occasions on your direct testimony, and again just now, that

11  you were fired while on -- for activity on your day off, right?

12  A    Yes.

13  Q    Okay.  Is it your position that while you're on your day

14  off, you're -- you're immune from discipline or -- or -- or

15  penalty for conduct that you engage in on Amazon's property?

16  A    Yes, I didn't do anything afoul to warrant that.

17  Q    Okay, all right.  Well, thank you.  And -- and I think you

18  said, too, that the -- your coworker, I -- I -- I -- I didn't

19  quite catch exactly what you said, but -- but she lied or made

20  up a story, is that -- is that your testimony?

21  A    My coworker?

22  Q    The woman -- the woman you got into a confrontation with.

23  A    According to Tyler Grabowski, yes.  I got that from

24  personnel.

25  Q    In -- in your -- in your GoFundMe page, you -- you say



Exhibit E, Motion to Try Petition on Hearing Record

1    that Amazon is the definition of modern day slavery; do you

2    remember writing that?

3    A    Yes.

4    Q    Can you explain that one for me?

5         MR. KEARL:  Objection.  Relevance.

6         JUDGE GREEN:  So yeah, with regard to this statement, if

7    you want to put it in, you can put it in, but I don't think we

8    need to get an explanation of what he said in the GoFundMe

9    page.

10        MR. MURPHY:  Okay.

11        Your Honor, I'd move the admission of Respondent's Exhibit

12   29.

13        JUDGE GREEN:  Any objection?

14        MS. COX:  No objection, Your Honor.

15        JUDGE GREEN:  Mr. Kearl?

16        MR. KEARL:  No objection.

17        JUDGE GREEN:  Okay.

18   **(Respondent Exhibit Number 29 Received into Evidence)**

19   Q    BY MR. MURPHY:  Mr. -- Mr. Bryson, do you contend that

20   Amazon fired you because you engaged in a protest on April 6th?

21   A    Say it again?

22   Q    Sure.  Do you contend that Amazon fired you because you

23   engaged in a protest on April 6th?

24   A    I believe that that's part of the reason.

25   Q    And what's the other part of the reason?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I -- I believe --

2         MR. KEARL:  It doesn't matter what Mr. Bryson thinks.

3         JUDGE GREEN:  Yes, agreed.  Sustained.  That's what --

4    that's what we're to determine.  That's what I'm here to

5    determine.

6    Q    BY MR. MURPHY:  Mr. Bryson, no Amazon representative ever

7    told you that you could not engage on prote -- in protest

8    activities on Amazon property, did they?

9         MR. KEARL:  Objection.

10        THE WITNESS:  No.

11        MR. KEARL:  Using double negatives.

12        MR. MURPHY:  Double negatives?  Come on, Judge.

13        JUDGE GREEN:  Yeah, so I think it was an understandable

14   question, and -- and really, objections like this do slow the

15   matter down, and we're worried about Mr. -- getting Mr. Bryson

16   out.

17        So if Mr. Bryson, if -- if you don't understand the

18   question, you can say you don't understand it, okay?

19        THE WITNESS:  Okay, sir.  I don't understand the question.

20        JUDGE GREEN:  Do you want to -- you want him to repeat

21   the -- the question?

22        THE WITNESS:  Yes, thank you.

23   Q    BY MR. MURPHY:  Mr. Bryson, no Amazon representative ever

24   told you that you could not engage in protest activities on

25   Amazon's property, did they?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    No.

2   Q    No Amazon representative ever told you that you couldn't

3   protest on the property on April 6th, 2020, did they?

4   A    No.

5   Q    And no Amazon representative ever told you that you

6   couldn't protest on the property on March 30th, 2020, did they?

7   A    No.

8   Q    And no Amazon representative ever told you that you

9   couldn't engage in protest activities, including entering the

10  manager's office, on March 20 -- on March 25th, 2020, did they?

11  A    No.

12  Q    Mr. Bryson, do you consider yourself to be a nice person?

13       MR. KEARL:  Objection.  Relevance.

14       MS. COX:  Objection, Your Honor.  Relevance.

15       JUDGE GREEN:  Sustained.

16  Q    BY MR. MURPHY:  Do you consider yourself to be someone who

17  respects other people?

18       MS. COX:  Objection.  Same.

19       MR. KEARL:  Objection.  Relevance.

20       JUDGE GREEN:  Okay, so what's the relevance of this

21  general question?

22       MR. MURPHY:  It -- well, you know what, I'll withdraw

23  those questions, Judge.

24       JUDGE GREEN:  Okay.

25  Q    BY MR. MURPHY:  Mr. Bryson, do you agree that -- that --



Exhibit E, Motion to Try Petition on Hearing Record

1    that employees should treat their coworkers with respect?

2         MS. COX:  Objection.  Calls for a conclusion.

3         MR. KEARL:  Objection.  Relevance.

4         JUDGE GREEN:  Okay.  Overruled.

5         MR. MURPHY:  I'll strike the question.

6         JUDGE GREEN:  I think we had testimony related to this on

7    direct.  So why don't you answer that question, Mr. Bryson?

8         MR. MURPHY:  Sure.

9    Q    BY MR. MURPHY:  Mr. Bryson, you -- you agree that

10   employees should treat their coworkers with respect, don't you?

11   A    Yes.

12   Q    And do -- do you agree that they should treat them, their

13   coworkers --

14        MR. MURPHY:  Strike that.

15   Q    BY MR. MURPHY:  Do you agree that employees should treat

16   their coworkers with dignity?

17   A    Yes.

18   Q    Do you believe that employees should treat their coworkers

19   in that fashion, even if they have opinions that -- that differ

20   from other coworkers?

21        MS. COX:  Objection.  Vague.  In that fashion.

22        JUDGE GREEN:  And that was the least -- and I think that

23   was the least vague question we got of that line.  Overruled.

24        THE WITNESS:  Repeat the question, please.  Repeat the

25   question, please?



1        MR. MURPHY:  Sure.

2   Q    BY MR. MURPHY:  Do -- do you believe that you should --

3   that -- that employees should treat their coworkers with

4   dignity and respect, even if those coworkers have opinions

5   different from other employees?

6   A    Yes.

7   Q    And do you agree that employees shouldn't verbally attack

8   coworkers based upon their opinions?

9        MS. COX:  Objection.  Hypothetical.

10       JUDGE GREEN:  Okay.  Sustained.

11  Q    BY MR. MURPHY:  Mr. Bryson?

12  A    Yes.

13  Q    Do you -- do you want other people to respect your points

14  of view?

15       MR. KEARL:  Objection.  Relevance.

16       JUDGE GREEN:  Okay.  Do you -- do you have -- you don't

17  have much of this, do you?

18       MR. MURPHY:  I don't.

19       JUDGE GREEN:  Okay.  Overruled.

20       THE WITNESS:  May you repeat that one again?

21       MR. MURPHY:  Sure.

22  Q    BY MR. MURPHY:  Do -- do -- do you want other people to

23  respect your -- your opinions or points of view?

24  A    Of course, yes.  They don't have to, it's their choice,

25  though.


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And do you agree that you should show other people,

2    including coworkers, the -- the same respect?

3        MS. COX:  Objection.  Asked and answered.

4        MR. KEARL:  Objection.  Asked and answered.

5        JUDGE GREEN:  Sustained.

6    Q    BY MR. MURPHY:  Mr. Bryson, in your protest activities on

7    March 25th, March 30th, and April 6th, you were expressing your

8    opinion of Amazon's response to the COVID challenge, correct?

9    A    That's not just my opinion, sir.  That's majority's

10   opinion.

11   Q    So -- so -- so what's -- so what's the answer to the

12   question then, yes or no?

13   A    Repeat the question again, because it was a trick question

14   kind of to me, you know?

15   Q    It was?

16   A    It -- it -- you know, I mean, all the -- if you ask any

17   Amazon worker, basically they are scared or not, if you give --

18   everybody's going to tell you the same thing.

19   Q    When you engaged in protest activities on March 25th,

20   March 30th, and April 6th, you -- you were expressing your

21   opinion or view on Amazon's response to the coronavirus,

22   correct?

23   A    Correct.

24   Q    And on any of those dates, no Amazon manager ever told you

25   that you didn't have the right to express those opinions, did



1    they?

2    A    Correct.

3    Q    On -- on April 6th, no one from Amazon told you to get off

4    the property, did they?

5         MR. KEARL:  Objection.  Relevance.

6         JUDGE GREEN:  Overruled.

7    Q    BY MR. MURPHY:  Mr. Bryson?

8    A    Yes.

9    Q    Do you remember the question?

10   A    Yes.  Nobo -- no --

11   Q    You can answer it.

12   A    No.

13   Q    No one said anything to you, right?

14   A    No.

15   Q    And -- and in that protest, you used a megaphone to

16   amplify your voice, correct?

17   A    Correct.

18   Q    And you carried signs that were critical of Amazon?

19   A    Yes.

20   Q    What did your sign say on April 6th, Mr. Bryson?

21   A    Money comes, money goes, you know, health is, you know, it

22   said something like, money comes, money goes, health -- your

23   health is important, in other words.  It was like, your health,

24   you know, you can't get your health back.

25   Q    So something like that, you don't quite remember it, but



Exhibit E, Motion to Try Petition on Hearing Record

1    something like that?

2    A    I remember it, basically I just told you what it was.  I'm

3    sure you could look at the film or any of the sketches and see

4    exact word for word verbatim, but I gave you the -- the

5    definition of what it was saying.

6    Q    And on April 6th, who -- who was protesting with you?

7    A    Derrick Palmer, Christian Smalls, Jordan Flowers, Mandi

8    Velasco, and a host of other employees.

9    Q    Any -- anyone else you can recall by name?

10        MS. COX:  Objection, Your Honor.  Relevance.

11        JUDGE GREEN:  Overruled.

12        THE WITNESS:  I mean, I know first names, such as Tristan,

13   George, I mean, it was a few people out there; it's been a long

14   time, Your Honor, I -- I don't remember everybody.  I haven't

15   been there in a while, quite a while.

16   Q    BY MR. MURPHY:  And so I -- I think you testified that

17   there were somewhere in the neighborhood of 50 Amazon

18   employees --

19   A    Yes.

20   Q    -- at that protest?

21   A    Yes.

22   Q    And -- and some of them entered into, or went on to

23   Amazon's premises, right?

24        MS. COX:  Objection.  Judge, I -- I just want

25   clarification.  Premises meaning inside the facility, or in the



Exhibit E, Motion to Try Petition on Hearing Record

1    parking lot?

2        MR. MURPHY:  He used -- he used the word premises, Judge,

3    in answering an earlier question, which is why I adopted it.

4    If we want to use property, I'm -- I'm fine with that, too.

5        JUDGE GREEN:  Okay.  So why don't we use property?

6        MS. COX:  Thank you.

7    Q    BY MR. MURPHY:  Mr. Bryson, did --

8    A    Yes, sir.

9    Q    -- some of the -- some of the protesters on March -- on

10   April 6th, went onto Amazon's property, right?

11   A    Yes.

12   Q    And who did that?

13   A    Just employees, nobody from outside protesters.

14   Q    Okay, and -- and who were the employees who did it?

15   A    Sir, I don't know all the emp --

16       MR. KEARL:  Objection to disclosing other employee

17   protected activity.  What's the -- what's the relevance of

18   this, other than --

19       MR. MURPHY:  Judge, they -- Judge, they -- in -- in his

20   direct examination, and -- and with respect to other employee

21   witnesses, they -- they asked, who was there?

22       JUDGE GREEN:  Yes.  They did, and -- and it was open -- it

23   was open union -- it was open protected activity at the

24   facility.  I -- I really don't have a problem with the

25   question.



Exhibit E, Motion to Try Petition on Hearing Record

1       THE WITNESS:  Okay, sir, can -- may I be able to answer

2   the question, you know, trying to explain how Amazon works but

3   I don't know everybody's name or?

4       JUDGE GREEN:  No, no, you don't have to -- if you are

5   asked, you -- you might be asked that on -- on redirect, but if

6   you don't --

7       MR. MURPHY:  Yeah.

8       JUDGE GREEN:  -- if you don't know people's names.

9       THE WITNESS:  No, I don't remember a lot of their names

10  now.  It's been a year.  I -- we only had a first name --

11  Amazon didn't even let us know each other's last names.  If you

12  looked at a tag, you can't tell whose last name is who.  They

13  had their own codes.

14      JUDGE GREEN:  Okay.

15  Q   BY MR. MURPHY:  So okay.  So -- so you -- you -- your --

16  you -- you had forgotten the names of some of your coworkers as

17  the last year has passed; is that right?

18  A   Yes, yes.  I mean, if I see them, like, I've seen them

19  recently during our -- our push for -- for union, you know,

20  then it kind of comes back, but I don't remember everybody

21  offhand.  It's --

22  Q   Okay.  So you went onto the property on -- on April 6th,

23  correct?

24  A   Yes.

25  Q   And when you went onto to the property, who went with you?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A     Derrick Palmer -- Derrick Palmer was there, Mandi was

 2    there already.  I went onto the -- actually, I went onto the

 3    property from 5th Street on my own.  Everybody else was already

 4    stationed.

 5    Q     So is -- is your testimony that you walked onto the --

 6    onto the property by yourself, and that other employees were

 7    already on the property?

 8    A     Yes, sir.

 9    Q     Okay.

10    A     I walked on -- I walked onto property (indiscernible,

11    simultaneous speech) --

12    Q     All right, that's -- I have -- you -- you answered the

13    question, Mr. Bryson.

14    A     Okay.

15    Q     And when -- when you came onto the property, did you have

16    the megaphone?

17    A     No.

18    Q     Who had the megaphone?

19    A     Derrick Palmer.

20    Q     And how did you get the megaphone?

21    A     Derrick Palmer passed it on to me.  He went outside for a

22    minute -- he left the area for a minute, and I took over.

23    That's the way we were doing it.

24    Q     And when he gave you the megaphone, where did that happen?

25    A     That happened just about, almost the same place as you saw
```



1    me when the video started.

2    Q    Okay.  And was Ms. Velasco in that area at that time as

3    well?

4    A    Yes.

5    Q    And Mr. Bryson, would you agree with me that your

6    interaction with your coworker on April 6th was an aggressive

7    one?

8         MS. COX:  Objection, Your Honor.

9    A    No.

10        JUDGE GREEN:  Overruled.

11   Q    BY MR. MURPHY:  You can answer the question, Mr. Bryson.

12   I thought I heard you say no.

13        JUDGE GREEN:  He did, he did.  He said --

14        THE WITNESS:  I said no.

15        MR. MURPHY:  Okay.

16   Q    BY MR. MURPHY:  So did you consider the conduct of your

17   coworker on April 6th to be aggressive?

18   A    Yes.

19   Q    So she was the aggressor and you were passive, is -- is

20   that how you would --

21   A    Yes.

22   Q    -- characterize your roles?  Okay.  Mr. Bryson, do you --

23   the -- the woman that you had the interaction with, you -- you

24   say that she made racial comments towards you; is that right?

25   A    Yes.



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And -- and what were those racial comments?

2    A    Go back where you came from.  Go back to the Bronx.

3    Q    Okay.  Any -- anything else other than that?

4    A    Racially?  Not that I recall at this time.  I think that's

5    more than enough, sir.

6    Q    Okay.

7    A    I mean, I'm just saying.

8    Q    So when you gave your affidavit to the NLRB, did you --

9    did you tell the Board agent that you considered the remark, go

10   back to where you came from, or go back to the Bronx, to be

11   racially motivated?

12   A    Yes.

13   Q    And did -- did the Board agent put that in your affidavit?

14        MS. COX:  Objection, Your Honor.

15        MR. KEARL:  The document speaks for itself.

16   Q    BY MR. MURPHY:  Okay, I'm going to represent to you that

17   it's not in the affidavit, Mr. Bryson.

18   A    I -- I understand that, sir.

19   Q    Okay.  So you didn't -- it's your affidavit, right?

20   A    Yeah.

21   Q    You -- you read it, you had a chance to make corrections

22   to it, right?

23   A    Yes.

24   Q    And you added things that you thought were important and

25   that had been left out in the original version, correct?



www.escribers.net | 800-257-0885

1   A    Yeah.

2        MR. KEARL:  Objection.  He thought was important?

3        MR. MURPHY:  He -- he answered the question yes.

4        THE WITNESS:  What I thought it was important.

5        MR. MURPHY:  And -- and -- and --

6        JUDGE GREEN:  Okay, so -- I'm sorry.  I've gotten over

7   talk for a minute.  Is -- is it -- let's get the next question.

8        MR. MURPHY:  Sure.

9   Q    BY MR. MURPHY:  When -- when you had a chance to add to

10  your affidavit, you did not add anything having to do with

11  racial commentary, did you, Mr. Bryson?

12  A    Sir, I remembered things that -- I remembered --

13  Q    That's a yes or -- that's a yes or no, Mr. Bryson.

14  A    Say again.

15  Q    Yeah.  When -- when you had a chance to add to your

16  affidavit, okay.

17  A    Yes.

18  Q    You did not add anything relating to racial commentary,

19  did you?

20       MR. KEARL:  Objection.  Relevance.

21       JUDGE GREEN:  This was asked by the General Counsel.  I --

22  you know, I understand that this is not the most -- it's really

23  not the most helpful line of questioning, but the General

24  Counsel asked about this very thing, so overruled.

25       THE WITNESS:  So say it again, please sir, one more time?



# Exhibit E, Motion to Try Petition on Hearing Record

```
1          MR. MURPHY:  Sure, Mr. Bryson.

2     Q    BY MR. MURPHY:  When you had a chance to review your

3     affidavit and add to it; you didn't add anything relating to

4     racial commentary made by your coworker, did you?

5     A    No.

6          MS. COX:  Objection, Your Honor.  I'm looking at his

7     affidavit, and it says go -- go back to where you came from, go

8     back to the Bronx.

9          THE WITNESS:  Go back to the Bronx.

10         MS. COX:  It's -- it's on page 4, lines 25 and 26.

11         JUDGE GREEN:  Okay, so we've got it.  So that's fine.  So

12    it's in the affidavit.

13    Q    BY MR. MURPHY:  I think you testified on direct that after

14    your coworker made that comment about going back to the Bronx,

15    you were immediately affected by it; do you recall that

16    testimony?

17    A    Yes.

18    Q    At any time on or after April 6th, did you ever file a

19    complaint with Amazon alleging that your coworker had ra --

20    made racia -- had made racially motivated comments to you?

21    A    No.

22         THE WITNESS:  Excuse me, Judge?

23         JUDGE GREEN:  Yes.

24         THE WITNESS:  Can I get five minutes, please?  I really

25    need to --
```



1        JUDGE GREEN:  Yes, yes.

2        THE WITNESS:  Thank you.

3        JUDGE GREEN:  Off the record.

4     (Off the record at 4:07 p.m.)

5        JUDGE GREEN:  You good, Mr. Bryson?

6        THE WITNESS:  Yes, sir.

7        JUDGE GREEN:  Okay, so back on the record.

8        MR. MURPHY:  Thank you, Judge.

9     Q    BY MR. MURPHY:  Mr. Bryson, you -- you testified on direct

10    examination about a -- a telephone call that you had with Tyler

11    Grabowski, and I think you said it happened on April 10th; do

12    you remember that testimony?

13    A    Yes.

14    Q    And I -- I think you testified that during that call,

15    among other things, you told Mr. Grabowski that your coworker

16    had made the go back to the Bronx statement; do you recall that

17    testimony?

18    A    Yes.

19    Q    And -- and you consider that to be a fairly significant

20    fact, do you not?

21    A    Excuse me?

22       MR. KEARL:  Objection.  Relevance.

23    Q    BY MR. MURPHY:  And do you -- do you consider that to be

24    significant in -- in -- in -- in causing in any way the

25    interaction with you and your coworker?



www.escribers.net | 800-257-0885

1    A    Do I -- do I consider it to be --

2         MR. MURPHY:  I'll -- I'll withdraw the question.

3    Q    BY MR. MURPHY:  So you told Ty -- you told Tyler Grabowski

4    about the go back to the Bronx remark in your interview?

5    A    Yeah.

6    Q    Okay.  And -- and -- and you considered that important

7    information for Tyler to have, did you not?

8    A    Yes.

9    Q    And -- and if it was important, you would've put it in

10   your affidavit that you gave to the NLRB, right?

11        MR. KEARL:  Objection.  Relevance.  Also misstates the

12   testimony.  Also, who's to say what Mr. Bryson thinks is

13   relevant to his affidavit to the Board?

14        MR. MURPHY:  The only -- all right.

15        JUDGE GREEN:  So we have the affidavit and we -- we have

16   the testimony.  Is there something --

17        MR. MURPHY:  Yep, I'll move on, Judge.

18        JUDGE GREEN:  Okay.

19   Q    BY MR. MURPHY:  Mr. Bryson, on April 6th, 2020, we --

20   we've already established that you engaged in protest

21   activities at the JFK8 facility, correct?

22   A    Yes.

23   Q    And what time did you arrive?

24   A    I don't exactly recall what time I arrived.  I could've

25   been there early and didn't move until time.  I don't remember



1    exactly what time I arrived.

2    Q    Okay.  Did you organize the protest?

3    A    No.

4    Q    Who did?

5    A    Christian Smalls.

6    Q    And -- and --

7         MS. COX:  Objection.  Which -- which protest are we

8    talking about here?

9         MR. MURPHY:  We're talking about April 6th, I'm sorry.

10        MS. COX:  Okay, thank you, Mr. Murphy.

11        THE WITNESS:  No, I didn't organize the protest.  I had a

12   lot to do with it, though.

13        MR. MURPHY:  Okay.

14   Q    BY MR. MURPHY:  And -- and -- and what -- what role did

15   Mandi Velasco play in organizing the protest?

16   A    I'm not sure.

17   Q    And when did you meet Mandi Velasco?

18   A    I officially met Mandi Velasco when we first started

19   having concerns.

20   Q    And -- and so did -- did you meet her before the meeting

21   in the manager's office on March 25th?

22   A    Yes.

23   Q    And did you ever communicate with her by telephone or

24   text?

25        MR. KEARL:  Objection.  Relevance.



1    JUDGE GREEN:  What's the relevance?

2    MR. MURPHY:  That -- there was testimony about this

3    yesterday, Your Honor.

4    JUDGE GREEN:  I know.  I know there was, but.

5    MR. MURPHY:  All right.

6    MS. COX:  But Judge, we also don't know on what topics.

7    JUDGE GREEN:  Right, so that's true, regarding -- you want

8    to ask it that way, regarding what?

9    MR. MURPHY:  Sure.

10   Q   BY MR. MURPHY:  Did you ever communicate with Ms. Velasco

11   by phone or text regarding protest activities?

12   A   No.

13   Q   Mr. Bryson, what time did you actually go onto Amazon's

14   property on April 6th, the protest day?

15   MS. COX:  Objection.  Asked and answered.

16   JUDGE GREEN:  Well, I think he didn't recall, right?  So

17   you still don't recall.

18   THE WITNESS:  I know we had -- I know this much.  It had

19   to be around 12, because that's when the young woman caught her

20   lunch break.  She was out on her lunch break.

21   JUDGE GREEN:  Okay.

22   Q   BY MR. MURPHY:  Okay, so you didn't -- you -- you hadn't

23   been on the -- on the Amazon much before that; is that what

24   you're -- is that what you're saying, Mr. Bryson?

25   A   Yes, not too much before that.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And you went on by yourself as you testified?

2    A    I walked to the area by myself.

3    Q    Okay.  And you were carrying a sign, but you did not have

4    the megaphone; is that right?

5    A    Correct.

6    Q    When -- when did you learn that Ms. Velasco was taking

7    video of the protest activities that day?

8    A    I saw her with my own two eyes.  I saw her taking videos.

9    She had been.

10   Q    As soon as you walked up into the area in front of JFK8,

11   you saw her recording the protest on her telephone; is that

12   right?

13   A    Yes.  Yes.

14   Q    Did you see anyone else taking video of the protest

15   activities or the interaction that you had with a coworker?

16   A    No.

17   Q    The entire time that you protested, you were almost

18   literally directly across from the entrance to JFK8, right?

19   A    Correct.

20   Q    And isn't it true that you staged the protest during the

21   associates' lunch or break periods?

22        MS. COX:  Objection, Your Honor.  I don't understand the

23   question, I'm sorry.

24        JUDGE GREEN:  Mr. Bryson, do you understand the question?

25        THE WITNESS:  No, I don't.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1            JUDGE GREEN:  Okay.

 2     Q     BY MR. MURPHY:  Yeah, did -- did -- were the protests

 3     carried out at -- at associate lunch or break periods?

 4     A     At associate --

 5     Q     At employ -- with -- were the protests --

 6     A     I mean --

 7     Q     -- conducted during employee lunch or break periods?

 8            MR. KEARL:  Objection.  Are we talking about April 6th

 9     here?

10            MR. MURPHY:  April 6th.  I'm only asking about April 6th.

11            THE WITNESS:  I'm still not really understanding what

12     you -- what you're -- I don't understand what you want me to

13     say to that.

14            MR. MURPHY:  I -- I want you to answer the question, Mr.

15     Bryson.

16            THE WITNESS:  That's not a -- that question is -- is out

17     there, no?

18            JUDGE GREEN:  I think we -- I think we got some testimony

19     that -- the woman who you had the interaction with was on her

20     lunch break; is that right?

21            THE WITNESS:  She was on her lunch break, yes.

22            JUDGE GREEN:  Okay, do you want to take it?

23     Q     BY MR. MURPHY:  Do you -- do you -- did you plan the

24     protest to coincide with employee lunch or break periods?

25            MR. KEARL:  Objection.  He said he didn't, like, plan the
```



1    protests.

2         JUDGE GREEN:  Okay.

3         MR. KEARL:  Facts not in --

4         JUDGE GREEN:  Do you -- do you know?  Do you know whether

5    the protest -- Mr. Bryson, do you know whether the protests

6    were planned to coincide with employee lunch breaks?

7         THE WITNESS:  I believe that, honestly speaking, Judge, I

8    believe that that just fell into place.  People already knew we

9    were protesting and people were already outside way before a

10   break, or a lunch, or you know, with us.  So I mean, you know,

11   that just happened to fall into, you know, our protest day.  We

12   started protesting.  People were out there before any break

13   time or -- or lunchtime, protesting with us.

14        JUDGE GREEN:  Okay.

15        MR. MURPHY:  Ms. Cox, just so I don't have to introduce a

16   different -- another copy of -- of an exhibit, can you remind

17   me which General Counsel exhibit is the video of the parking

18   lot on April 6th?

19        MS. COX:  There's two.

20        JUDGE GREEN:  I think it's 53.

21        MS. COX:  Yeah, there's two, though.  There's the side

22   view, and then there's the overhead view, which one?

23        MR. MURPHY:  The overhead view, the overhead view.

24        MS. COX:  Yeah, I think Judge Green is correct, that it

25   is --



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. MURPHY:  53?

2    MS. COX:  Correct.

3    MR. MURPHY:  Okay.

4    MR. MURPHY:  No, no.  Yes, yes.

5    MR. MURPHY:  53, okay.

6    Mr. Falk, could you load General Counsel 53, please?

7    MR. FALK:  Okay, I'm going to have to download that from

8    the Sharepoint first, before I can play it, so hold on a

9    second.

10   MR. MURPHY:  Okay.

11   MR. JACKSON:  And Mr. Murphy?  Yeah, I think this is the

12   wrong video.

13   MR. MURPHY:  Yeah, that's the wrong video.

14   MR. JACKSON:  I think -- I think the right number is 62,

15   Mr. Falk, 62.  GC 62.

16   MR. MURPHY:  Thank you, Mr. Jackson.

17   JUDGE GREEN:  So I had 62 as a Facebook Live.

18   MR. MURPHY:  And I want the -- oh, you know what?  Let's

19   just pick -- we could do --

20   JUDGE GREEN:  Oh, yeah.  Okay.  I -- I see.

21   MR. MURPHY:  That's what I want, yeah.

22   JUDGE GREEN:  Okay.

23   MR. MURPHY:  So what is this, General Counsel 62?

24   MR. FALK:  Yes.

25   MR. MURPHY:  Okay.  Thank you very much.



1    Q    BY MR. MURPHY:  Okay, Mr. Bryson, can you see this on your

2    screen, sir?

3    A    Yes, sir.

4    Q    Okay.  This is a document that -- or a video that Ms. Cox

5    asked you about earlier.  You -- you remember that testimony,

6    right?

7    A    Correct.

8    Q    I just have a quick question for you.

9    A    Yes?

10   Q    Well, actually, probably two.  There is a -- there's a --

11   an individual in that laddered area as you described it.  Off

12   to the right-hand side, just -- just above a white car.

13   A    I see.

14   Q    Do you see him?

15   A    Yes.

16   Q    That's -- that's Derrick Palmer, isn't it?

17   A    I'm not sure at this time.  It -- I'm really not sure at

18   this time who that is.

19   Q    Okay.  Derrick -- Derrick Palmer, when you walked up to

20   the front of JFK8, Derrick Palmer was there, right?

21   A    Correct.

22   Q    And he was using the megaphone to protest, correct?

23   A    Correct.

24   Q    And he handed the megaphone to you, correct?

25   A    Correct.



www.escribers.net | 800-257-0885

1   Q   And then he left the area, correct?

2   A   Correct.

3   Q   And -- and did, if you know, go to the bus station area,

4   or 5th Street area, as you've described it?

5   A   He walked down that way.  And I -- I didn't -- I didn't

6   keep tabs on him from that point.  Once I took the -- the

7   megaphone, I didn't keep tabs -- tabs on Mr. Palmer.

8   Q   Okay.  So you're not sure whether that's him or not?

9   A   No.

10   Q   Okay.  So -- and you -- in your direct examination, you

11   mentioned a number of other protestors spread out in front of

12   the facility.  I -- can you point them out for me?

13   A   They were spread out going down.  And they were on the

14   right-hand side where you can't see the building.  They were

15   down at the other end.

16   Q   When you say the "other end", sir, do you mean off the

17   right side of this picture, or off the left side of this

18   picture?

19   A   Off my right of this picture.

20   Q   So -- but you see the cursor, right?  So down -- down in

21   that direction where the cursor is?

22      MR. MURPHY:  Thank you, Mr. Falk.

23   A   Where's the cursor?  I don't see your cursor right now,

24   sir.  Okay.  Yeah, down that -- not down, like, in that area.

25   They were off to the right.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
1    Q    BY MR. MURPHY:  The right?

2    A    He wasn't -- to the right of your -- your cursor, go to

3    the right of where your cursor is.

4    Q    Straight to the right?

5    A    Not straight.  They were on the side.  You see the way

6    these people are up here?

7    Q    Okay.

8    A    In the front?

9    Q    Right.

10   A    There were people down the other end of the building.

11   Q    Protestors?

12   A    Yeah, there were protestors down there.  Yes, there was.

13   Q    But -- but they -- they were on this -- I'm going to call

14   that the yellow-laddered area.

15   A    Well, I don't know if they were in the yellow-laddered

16   area.

17   Q    Okay.

18   A    But I know they was, like, on the -- on the sidewalk over

19   that way, and down that way.

20   Q    Okay.

21   A    There was at -- there was at least two or three down that

22   way.

23   Q    Okay.  They're not -- they're not visible in the -- in the

24   picture right now?

25   A    No, they're not.  No.
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1  Q    And just to confirm, that's you carrying the white sign

2  with the pink do -- do-rag on your head?

3  A    Okay.  Yes.

4  Q    And -- and -- and that's Mandi Velasco with the blue sign

5  and the reddish-looking jacket or sweater?

6  A    Correct.

7  Q    Right?  And then, your coworker is sitting on the curb,

8  just down below, right?

9  A    What do you mean "my co --", oh, yeah.

10  Q    Yes.

11  A    That's the coworker.

12  Q    The -- the -- the person you had the confrontation with?

13  A    Yeah.

14  Q    And you -- you've -- you've said a number of times that

15  there was, you used the term "safety man" in your testimony; do

16  you remember that?

17  A    Yeah.

18  Q    Was -- was there a safety person out -- outside the

19  facility that day?

20  A    Yeah.

21  Q    And -- and what color vest does safety wear?

22  A    Yellow.

23  Q    Yellow?  Safety is yellow?

24  A    Yeah.  Well, I won't --

25  Q    Are you sure about that?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    Well -- well, managers are yellow and orange.

2   Q    Okay.

3   A    They yellow and orange.  He had a vest on.  And he was

4   standing on the other side.

5   Q    Okay.  And I'm -- I'm asking you if you're sure that --

6   that -- that safety wore yellow vests?

7   A    Well, yeah, at that time, yes.

8   Q    Okay.  So you're sure there was a safety person outside of

9   the facility that day?

10       MR. KEARL:  Objection.  Asked and answered.

11       JUDGE GREEN:  Okay.  Sustained.

12  A    Yes, there was a safety person.

13       JUDGE GREEN:  Okay.

14  A    Yeah.

15       JUDGE GREEN:  So if I sustain an objection, that means you

16  shouldn't answer.

17       THE WITNESS:  Oh, okay.

18       JUDGE GREEN:  If I -- if I overrule an objection, you --

19  you should.  That's fine.

20       THE WITNESS:  I had already said, you know.  That's why.

21  It's okay.  Sorry.

22  Q    BY MR. MURPHY:  Okay.  How -- how long had you been

23  protesting before the confrontation with your coworker started?

24  A    Just a few minutes.  I was up this way when that started.

25  Q    And I think you testified on direct that this -- this



1    particular video that's up on screen now didn't capture the

2    very beginning of the confrontation, correct?

3    A    Correct.

4    Q    And I think you testified that the confrontation lasted

5    for 30 minutes or so; is that what you said?

6    A    Yeah, give or take, yes.

7    Q    And I think you also indicated that you -- you didn't know

8    who she was.

9    A    Yes.  I still don't know her name.

10   Q    And on direct examination, you -- you testified that you

11   talked about the -- the interaction on a Facebook Live video

12   that was hosted by Jordan Flowers.  Do you remember that

13   testimony?

14   A    Yes.

15   Q    And -- and where -- where was -- and if you can use this

16   picture that's up the screen, Mr. Bryson, where -- where was

17   Mr. Flowers doing this Facebook Live video?

18   A    You -- you can't see the screen, but it would be far off

19   to the distance, going down this -- the ladder to the right of

20   me, and out towards the street, out towards the -- the back of

21   the parking lot.  It's not here.

22      MR. MURPHY:  So -- so Mr. Falk, if you wouldn't mind,

23   move -- move the cursor.  There's a -- there's -- there's,

24   like, a white-covered building in the upper right-ish corner of

25   that.  Nope, a little bit to your left, sir.  Right there.



Exhibit E, Motion to Try Petition on Hearing Record

1    The -- right there, that.

2    Q    BY MR. MURPHY:  Like, in that area.  Is that where -- is

3    that where he would have gone.  Is that where he -- I'm sorry,

4    not would've gone, is that where the Facebook Live video --

5    A    No.  No.

6    Q    -- we're speaking of?  Why don't -- where would you --

7    A    I don't --

8    Q    -- move the cursor?

9    A    I -- where would I move the cursor?  You would have to go

10   back.  We weren't in the exact -- we weren't in the parking

11   lot.  We were on the outside.

12   Q    So it was quite a walk then from -- from the --

13   A    We were on the -- we were over -- we started closer to

14   the -- we were on the grass on the outside.

15   Q    Okay.  And so how long --

16   A    Outside of right here.

17   Q    Okay.  And so how long of a walk was it from the area of

18   the protest in front of JFK8 to where Mr. Flowers was doing the

19   Facebook Live video?

20   A    Five minutes.

21        MS. COX:  Objection, Your Honor.  Relevance.

22        JUDGE GREEN:  Overruled.

23   A    Five minutes you give or take.  A walk down a few minutes

24   down the parking lot.  You get used to it after a while when

25   you work at Amazon running back and forth from the mile-long



1    building.

2    Q    BY MR. MURPHY:  Okay.  So -- what -- how -- how many

3    minutes, five, ten-minute walk?

4    A    No, no, no, no, no, no, a few minutes.  It doesn't take

5    that long to get down there.

6    Q    Okay.  So you -- and when you stopped protesting, your --

7    your coworker had already gone into the building, correct?

8         MR. KEARL:  Objection.

9         MS. COX:  Objection.

10        MR. KEARL:  Protesting?

11        MS. COX:  I --

12        MR. MURPHY:  Let -- let me -- let me reask the question.

13   Q    BY MR. MURPHY:  The protest activities that you engaged in

14   in front of J -- JFK8 on April 6th --

15   A    Um-hum?

16   Q    -- did you stop those at some point?

17        MS. COX:  Objection.  Vague.

18   A    No.  I -- I didn't stop protesting.

19        JUDGE GREEN:  Overruled.

20   A    If I was down the other end, and I wasn't in front of the

21   building, I was with the news, or I was -- I was with Jordan

22   with FB Live.  And I still answered before this question to

23   this stuff.  I was still in the area.

24   Q    BY MR. MURPHY:  Okay.  So at some point, you left the --

25   you left the area in which you appear on -- on this video,



1    correct, --

2    A    Yes.

3    Q    -- that's on the screen?  Okay.

4    A    Yes.

5    Q    And -- and when you left the area, had your -- had the

6    coworker that you had the confrontation with already gone into

7    the building?

8    A    Yeah.

9    Q    How many -- how many minutes before you left did she go

10   into the building?

11   A    I don't know.  I didn't count.

12   Q    Okay.  And after she went into the building, did you

13   continue to make derogatory comments about her or her drug use?

14        MR. KEARL:  Objection.  Derogatory?

15   A    Okay.

16        JUDGE GREEN:  You want to --

17        MR. MURPHY:  Yeah.

18        JUDGE GREEN:  I mean --

19        MR. MURPHY:  Yeah, I'll take the pejorative term out.

20        JUDGE GREEN:  Okay.

21   Q    BY MR. MURPHY:  After your coworker into the building, did

22   you continue to make comments about her or her alleged drug

23   use?

24        MR. KEARL:  Objection.  Relevance.

25        JUDGE GREEN:  What's the relevance?



Exhibit E, Motion to Try Petition on Hearing Record

1  MR. MURPHY: The relevance is, is it was part of the

2  course of conduct that was considered in --

3  JUDGE GREEN: Okay. Overruled.

4  MR. KEARL: And I would just, for the record, state Bannon

5  Mills Sanction here, insofar as we have not seen documents that

6  actually say that it was for this particular comment.

7  JUDGE GREEN: Okay.

8  Q    BY MR. MURPHY: Go ahead, Mr. Bryson.

9  A    Repeat the question again, please.

10 Q    Sure. After the coworker that you had the confrontation

11 with went into the building, you continued to make comments

12 about her and her alleged drug use before you left the area

13 immediately out front of JFK8, correct?

14 A    Correct.

15 Q    When -- when -- when you stopped the protest activities

16 immediately in front of JFK8, did you hand the megaphone off to

17 someone?

18 A    Yes.

19 Q    And who did you hand it off to?

20 A    Back to Derreck Palmer.

21 Q    And then you -- and then you walked away from the front of

22 JFK8 over to where Jordan Flowers was somewhere off in the

23 distance there; is that right?

24 A    Yes. Yes, sir.

25 Q    And prior -- prior to walking up to Mr. Flowers, did you



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record    147

1    know that he was doing a Facebook Live video?

2    A    More or less.

3         MR. KEARL:  Objection.  Relevance.

4    Q    BY MR. MURPHY:  And -- and when you --

5         JUDGE GREEN:  What's -- what's the -- what's the

6    relevance?  You know what?  Overruled.

7         Go ahead.

8    Q    BY MR. MURPHY:  Did you know that Mr. Flowers was -- was

9    hosting a Facebook Live video that day, Mr. Bryson?

10   A    Yes.  Yes.

11   Q    Now, do you remember stating on the Facebook Live video

12   that you really cursed out your coworker?

13   A    Yes.

14   Q    And Mr. Bryson, you -- you cursed her out because she --

15   she challenged you, right?

16        MR. KEARL:  Objection.

17   A    No.

18        MR. KEARL:  Calls for a conclusion, also speculation.

19        JUDGE GREEN:  Overruled.

20   A    No.

21   Q    BY MR. MURPHY:  Mr. Bryson, didn't you say on the Facebook

22   Live video, "Yeah, but she challenged me.  Like, you're going

23   to challenge a man out here."  Did you say that on the Facebook

24   video?

25   A    Yes.



1   Q    Mr. Bryson, isn't it true that you attacked your coworker,

2   because you couldn't deal with being challenged in public?

3        MR. KEARL:  Objection.

4        MS. COX:  Objection, Your Honor.

5        MR. KEARL:  Attacked?

6        JUDGE GREEN:  Overruled.

7   A    No, not at all.

8   Q    BY MR. MURPHY:  Why did you attack her then, Mr. Bryson?

9        MS. COX:  Objection, Your Honor.

10       MR. KEARL:  Objection.

11       JUDGE GREEN:  Okay.

12  A    I didn't attack her.

13       JUDGE GREEN:  So -- okay.  We got the response.

14  Q    BY MR. MURPHY:  Her -- her disagreement with you really

15  set you off, didn't it?

16  A    No.

17       MR. KEARL:  Objection.

18       JUDGE GREEN:  Overruled.

19  A    No.

20  Q    BY MR. MURPHY:  And Mr. Bryson, isn't it true that you

21  were angry that she was going to challenge your view of what

22  Amazon should do in public --

23  A    Yes.

24  Q    -- while you were engaging in a protest?

25  A    Definitely not, no.



1         MR. MURPHY:  Mr. Falk, -- give me one second.

2         Judge, do you happen to have handy, which is the Facebook

3    Live video, General Counsel, which exhibit?

4         JUDGE GREEN:  I actually had that wrong, but I think it's

5    63.

6         MR. MURPHY:  All right.  Let me take a quick look.

7         MS. COX:  Yes, that's it.

8         MR. MURPHY:  All right.  It's not chronological -- I mean,

9    numerical.  Okay.

10        Mr. Falk, could you load General Counsel Exhibit 63,

11   please?

12        MR. FALK:  Okay.  Yeah, I'm looking for it too.  Because I

13   see --

14        MR. MURPHY:  It's on --

15        MR. FALK:  -- 62, and there was 64.

16        MR. MURPHY:  It's on the third page.  Yeah, you got to go

17   to the next page.

18        MR. FALK:  Thank you.

19        MR. MURPHY:  Your Honor, actually, could we take -- could

20   we take a short break?

21        JUDGE GREEN:  Okay.

22        MR. MURPHY:  Thank you.

23        JUDGE GREEN:  How long?

24        MR. MURPHY:  Five minutes.

25        JUDGE GREEN:  How long?  Okay.



1     MR. MURPHY:  Five, yeah.

2     JUDGE GREEN:  Five minutes.  Off the record.

3     (Off the record at 4:38 p.m.)

4     JUDGE GREEN:  Let's go back on the record.

5     THE COURT REPORTER:  We are.

6     MR. MURPHY:  Mr. Falk, could you load General Counsel 63?

7     I think that's where we were when my audio went down.  And

8     could you -- could you queue it up to 51 minutes and 30

9     seconds, Mr. Falk?  And play until 52 minutes 10 seconds?

10    MR. FALK:  51:30?

11    MR. MURPHY:  51:30 to 52:10.

12    (Video played at 4:56 p.m., ending at 4:57 p.m.)

13    Q    BY MR. MURPHY:  Mr. -- Mr. Bryson, was that your voice on

14    the video in addition to Mr. Flowers?

15    A    Sure is.

16    Q    And how many minutes would you say had passed between the

17    time left the area in front of JFK8 where you were protesting

18    until you spoke on the Facebook Live video?

19    A    I don't recall.

20    Q    Five -- five minutes?

21    A    I don't recall.

22    Q    So you admitted on the Facebook Live video that you cursed

23    her out, right?

24    A    Yes.

25    MR. KEARL:  Objection.  The video speaks for itself.



1      THE WITNESS:  Um-hum.

2   Q   BY MR. MURPHY:  But is -- isn't it true, Mr. Bryson,

3   that -- that you went way beyond cursing here, didn't you?

4      MS. COX:  Objection --

5   A   No.

6      MS. COX:  -- Your Honor.

7   Q   BY MR. MURPHY:  You -- you tried --

8      JUDGE GREEN:  Okay.  What's the objection?

9      MS. COX:  He's just misstate -- mischaracterizing his

10  testimony.

11     JUDGE GREEN:  Okay.

12     MR. MURPHY:  I'm not characterizing his testimony at all.

13     JUDGE GREEN:  Well, you can ask the question.  And Mr.

14  Bryson can answer.

15     MR. MURPHY:  Yeah.

16  Q   BY MR. MURPHY:  You went way beyond just cursing out your

17  coworker, didn't you, Mr. Bryson?

18  A   No.

19  Q   You -- you -- you tried to humiliate her, didn't you?

20  A   No.

21     MS. COX:  Objection, Judge.

22     JUDGE GREEN:  Overruled.

23  Q   BY MR. MURPHY:  You -- you wanted to humiliate her in

24  public because she didn't agree with you; isn't that right?

25  A   No.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1      MS. COX:  Objection, Your Honor.

2      JUDGE GREEN:  Overruled.

3      MR. MURPHY:  Judge, at a certain point, you have to

4  admonish Counsel to -- to stop making frivolous objections.

5  And that -- that unnecessarily break up and -- and slow down

6  the pace of the hearing.

7      JUDGE GREEN:  So I don't know that they're frivolous,

8  initially.

9      But you -- really, you're -- you're making -- you are

10 making, kind of, the same objection over and over again,

11 despite the fact that I'm overruling it.  You know, if you want

12 to ask for a -- for a -- a standing objection on things, you

13 can ask for a standing objection on things.  But it -- but it

14 slowing the pace down.

15     MS. COX:  Understood, Judge.

16 Q   BY MR. MURPHY:  Mr. Bryson, why don't -- why don't you

17 tell me what it -- what it was you said to your coworker in

18 that interaction.  And -- and don't leave anything out, please.

19 A   I don't remember word for word verbatim.

20     MR. KEARL:  Objection.  You have the video, Your Honor.

21     JUDGE GREEN:  Yeah.  So we have the video.  I mean,

22 listen, the General Counsel did this as well.  We had the

23 video.  And we had the General Counsel putting on testimony

24 regarding what is in video evidence.  I don't understand why

25 the parties are insisting on doing this.  I'm really at a loss.



Exhibit E, Motion to Try Petition on Hearing Record

1    We have the videos.  We have documents.

2         MR. MURPHY:  Understood, Your Honor.

3         JUDGE GREEN:  And then we were having -- we were having

4    documents read into evidence.  It just seems like a waste of

5    time to me.

6    Q    BY MR. MURPHY:  Mr. Bryson, you said earlier in your

7    cross-examination, that -- that you treat people with dignity

8    and respect; do you remember that testimony?

9    A    Yes.

10   Q    And did -- did -- did you treat your coworker with dignity

11   and respect that day?

12        MS. COX:  Objection, Your Honor.  Calls for an opinion.

13        JUDGE GREEN:  Okay.  Sustained.

14   Q    BY MR. MURPHY:  Mr. Bryson, if someone had called you a

15   name -- offensive names on a bullhorn in front of your

16   coworkers at work, you would've reacted to that; wouldn't you

17   have?

18        MS. COX:  Objection, Your Honor.

19        MR. KEARL:  Objection.  Calls for speculation.

20        JUDGE GREEN:  Okay.  So sustained.

21        Listen, I allowed -- I allowed Mr. Bryson to testify on

22   direct regarding why he said what he said.

23        MR. MURPHY:  Your Honor, exactly.

24        JUDGE GREEN:  And -- and I -- I get that.  And -- what

25   you're asking for is really somewhat different.  You know, the



Exhibit E, Motion to Try Petition on Hearing Record

1    truth of the matter is that what Mr. Bryson thought about is of

2    limited utility.  What's more important is what Amazon thought

3    about it.  And you know, I've allowed some of this from Mr.

4    Bryson.  But I -- I really don't think we need to spend too

5    much more time on it.

6        MR. MURPHY:  Okay.

7    Q    BY MR. MURPHY:  Mr. Bryson, you said on your direct

8    examination that -- that you thought that the -- your coworker

9    was under the influence of drugs.  So do you recall that

10   testimony?

11   A    Yes.

12   Q    And -- and when you were asked about it, you indicated

13   that -- that the reason you thought she was, was because she

14   was -- I forget -- I think you said skinny and -- and -- and

15   grumpy.  Do you remember that testimony?

16       MS. COX:  Objection, Your Honor.

17       MR. KEARL:  And it misquotes.

18       MS. COX:  And that misstates the testimony.

19   Q    BY MR. MURPHY:  What were the reasons -- what were the

20   reasons that you said in your direct examination, Mr. Bryson,

21   for -- for your conclusion that your coworker was under the

22   influence of drugs?

23   A    Coworker -- my coworker, as you put it, I have a lot of

24   experience, you know, I've been around town, I'm 50-something

25   years' old, okay?  I've been around.  I've counseled.  I had a



1    friend that just passed from crack and fentanyl, right?  He was

2    doing the same exact thing she was, okay?  And when I -- when

3    you come out with a grumpy attitude in the morning, and you

4    couldn't even take a fellow coworker, that was basically in

5    your favor, fighting in your favor, you just come out the

6    warehouse and start attacking me?

7    Q    So that's -- that -- that's --

8    A    Had dark -- dark eyes, and her eyes were jet black with

9    bags underneath them.  That's why I said she needed to be

10   tested.

11   Q    So were you looking out for her best interest, Mr. Bryson;

12   is that your testimony?

13   A    I -- I --

14        MR. KEARL:  Objection.  Relevance.

15        JUDGE GREEN:  Okay.  Overruled.

16        So he's basically asking why you said what you said?

17        THE WITNESS:  And I told him why I said what I said, sir,

18   with all due respect, Judge.  He -- he -- he's asking.  And I

19   told him.  She was -- the way she was acting from the minute I

20   took the bullhorn, she was -- you know, there's a part on the

21   tape that's not even heard.  She's telling me, "Get the fuck

22   out of there."  You know?  And I ignored that.  I didn't say

23   nothing until she, you know, "This the only fucking job open

24   and you should appreciate it."  Then, I responded to her.  I

25   mean, basically, that she was sitting out there on the curb



1    with her head down, moping.  When we did talk, her eyes were

2    black.  She had -- that's why I said to the safety man, I said,

3    "Mr. Safety Man, do your job, test that woman."  Because she --

4    I mean, I don't know maybe that, or three weeks with no sleep,

5    either one, something was wrong there.  I've never went out

6    there to attack that woman.  I don't attack women.  And I --

7    and basically that.  I'm not a person that's going on the

8    aggression.  I'm not a aggressive person.  And all I asked her

9    was a simple question, even after she attacked me.  "Well,

10   don't you have family that you care about?"

11        MR. MURPHY:  Is there -- is there a -- I don't think

12   there's a question pending here, Judge.

13        THE WITNESS:  Well --

14        JUDGE GREEN:  Okay.  Well, there was, but --

15        THE WITNESS:  Well, he asked me what --

16        JUDGE GREEN:  But okay, I think we just got the answer.

17        MR. MURPHY:  Yeah.

18        THE WITNESS:  Yeah.

19   Q    BY MR. MURPHY:  Mr. Bryson, you called your coworker a

20   gutter bitch, right?

21   A    Yes.

22   Q    And you called her that twice?

23   A    Yes.

24   Q    Mr. Bryson, what -- what is a gutter bitch?

25   A    Basically, I asked her, did she have a home?



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    No, I'm asking you to define that term.

2    A    Well, basically, that's somebody that's in the streets.  I

3    mean, you know -- I mean, you know, it says it for itself.

4    It's self-explanatory.  You know, when you're telling --

5    Q    So it's a -- so it's a -- it's a pretty strong slur then,

6    is what you're telling me?

7         MS. COX:  Objection, Your Honor.

8         MR. KEARL:  Objection.

9         MS. COX:  Characterizing the testimony --

10   mischaracterizing the testimony.

11        MR. MURPHY:  Okay.

12        JUDGE GREEN:  Okay.  So --

13   Q    BY MR. MURPHY:  Mr. -- Mr. Bryson, do you remember

14   laughing at your coworker in -- in the midst of the

15   confrontation?

16   A    Laughing at my coworker in the midst of confrontation;

17   making gestures you mean, or -- or --

18   Q    No, I mean --

19   A    -- just being facetious?

20   Q    -- I mean, laughing.

21   A    What is a laugh?  I don't understand.  Like laughing.  Was

22   I cracking up laughing?

23   Q    Yes.

24   A    I don't think so.  No.

25   Q    Okay.  And -- and you were mocking her that confrontation;


www.escribers.net | 800-257-0885

Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1205 of 2171 PageID #: 58
Exhibit E, Motion to Try Petition on Hearing Record
1257

1    were you not?

2    A    Really.  She was mocking me.

3         MS. COX:  Objection, Your Honor.  Improper

4    characterization.

5         JUDGE GREEN:  I mean, there just questions.

6         THE WITNESS:  Yeah, I --

7         JUDGE GREEN:  But -- okay.

8         THE WITNESS:  I mean, she was mocking, me.

9    Q    BY MR. MURPHY:  She was mocking, you.  That's your

10   testimony?

11   A    She was mocking me.  The videos shows it.

12   Q    Okay.  All right.

13        MR. MURPHY:  Can you t-up -- Mr. Falk can you t-up

14   Respondent 122, please?  And I just want to play minutes 21 to

15   29.

16        MR. KEARL:  Can we get -- I'm not in SharePoint yet.  Can

17   we get some clarity on what this document is?  Is this

18   produced?

19        MR. MURPHY:  It's in -- it's in evidence.

20        MR. KEARL:  Is there like a bate -- a bate number you

21   could give me?

22        MR. MURPHY:  It's -- its' C -- it's the -- it's the videos

23   that came in yesterday, Mr. Kearl.  Nothing too sinister.

24        MR. KEARL:  Okay.  I'm just (audio interference) for

25   clarity --



1        JUDGE GREEN:  122.

2        MR. KEARL:  -- because I don't have SharePoint access.

3        MR. MURPHY:  122.  I -- I don't have it up, either.

4        JUDGE GREEN:  So this is -- this Ms. Velasco's video.

5        MR. MURPHY:  Yes.

6        JUDGE GREEN:  Okay.  Thank you.

7        MR. FALK:  This is the 8-minute clip.

8        MR. MURPHY:  Yes.

9        MR. FALK:  And do you want me to play it?

10        MR. MURPHY:  Yes, sir.

11        MR. FALK:  Okay.

12   (Video played at 5:07 p.m., ending at 5:08 p.m.)

13        MR. MURPHY:  Could you stop it -- could you stop it there

14   for a minute, Mr. Falk?

15   Q    BY MR. MURPHY:  Mr. Bryson, when -- when did you tell --

16   when did you ask Ms. Velasco if she was recording what was

17   going on?

18   A    When the -- when my fellow employee starting shouting

19   things at me, and I said -- basically then.

20   Q    Okay.

21        MR. MURPHY:  Go ahead, Mr. Falk.

22   (Video played at 5:08 p.m., ending at 5:09 p.m.)

23        MR. MURPHY:  Could you -- could you stop it for a minute,

24   Mr. -- Mr. Falk?  And -- and back it up ten seconds if you

25   would.  So I do have a question for Mr. Bryson.



1    Q    BY MR. MURPHY:  Mr. Bryson, did you tell Ms. Velasco to

2    move to the area of your coworker, and to video her?

3    A    No.

4    Q    Okay.

5         MR. MURPHY:  Go ahead, Mr. Falk.

6    (Video played at 5:10 p.m., ending at 5:11 p.m.)

7         MR. MURPHY:  You want to stop it right there, please?

8    Q    BY MR. MURPHY:  Mr. Bryson, I -- I heard you call her a --

9    a bitch before she used any language in your direction.  Do you

10   agree with me?

11   A    No.

12   Q    No?  Okay.  What did you hear?

13   A    She told me she -- the first thing she told me, which

14   isn't on tape, she told me to get the fuck out of here.  And

15   the second thing was, she said this is the only fucking job

16   open.  Appreciate it.

17   Q    That's not -- that's not directed to you.

18   A    Yeah, it is.

19        MR. KEARL:  Objection.

20        JUDGE GREEN:  Okay.  Let's not argue about what's on the

21   tape.

22        MR. MURPHY:  Okay.  Can you play the rest of the video,

23   please, Mr. Falk?

24   (Video played at 5:11 p.m., ending at 5:11 p.m.)

25        JUDGE GREEN:  Listen, is there some reason -- let's stop



Exhibit E, Motion to Try Petition on Hearing Record

1    the video, please.  Is there some reason we're playing it

2    again?  Do you have questions about certain sections of it?

3        MR. MURPHY:  I do, Your Honor.

4    Q    BY MR. MURPHY:  So -- so Mr. Bryson --

5    A    Yeah.

6    Q    -- you used a megaphone to amplify your voice from a very

7    close distance, and -- and used profanity, including a gutter

8    bitch in the direction of your coworker.  Did you not?

9        MR. KEARL:  Objection.  Very close distance.  Confusing.

10   Compounds.  The compound question.

11   Q    BY MR. MURPHY:  Mr. Bryson, did you use a megaphone to

12   amplify your voice and the curse words that you used towards

13   your coworker?

14   A    I was using the megaphone, period.  I didn't use it on --

15   just for her.

16   Q    Mr. Bryson, you - you knew right away that your -- that

17   your interaction with your coworker was -- was -- was

18   completely unacceptable, didn't you?

19       MS. COX:  Objection, Your Honor.

20       JUDGE GREEN:  Overruled.

21       THE WITNESS:  Re -- repeat that question, please?

22   Q    BY MR. MURPHY:  Yeah, you knew -- you knew right then and

23   there that your interaction with your coworker was completely

24   unacceptable --

25   A    No.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    -- from a behavioral perspective?

2    A    No.

3    Q    No?  Okay.  And you knew right then and there that -- that

4    you were going to be in disciplinary trouble with Amazon; did

5    you not?

6         MS. COX:  Objection, Your Honor.

7         JUDGE GREEN:  Yeah.  Overruled.

8         THE WITNESS:  No.

9    Q    BY MR. MURPHY:  You walked as we -- as we discussed, you

10   walked right off the protest over to Jordan Flowers on a

11   Facebook Live video, right?

12   A    I walked down the way.  It wasn't straight to him --

13   towards him, but I -- I ran into him.

14   Q    And -- and when you got to the Facebook Live video, you

15   said that you thought your coworker was a plant.  Do you

16   remember that?

17   A    Yes.

18   Q    And that -- and that Amazon had sent her out to provoke

19   you, right?

20   A    Yes.  I said Amazon has sent out a plant.

21   Q    Right.  And what -- what evidence do you have to -- to

22   show that your coworker was a plant of any sort?

23        MR. KEARL:  Objection.  Relevance.

24        JUDGE GREEN:  Overruled.

25        THE WITNESS:  Well, it -- it comes to the point being that



# Exhibit E, Motion to Try Petition on Hearing Record

1    I'm able to talk about freely, that I see this girl all the

2    time in the facility.  At least, you know, a few times here and

3    there.  We've never passed words.  We've never had a problem.

4    So an employee just comes out, sit on the curb besides, and

5    starting picking at the guy protesting.

6    Q    BY MR. MURPHY:  So -- so she disagreed with you; is that

7    right?

8    A    No, she didn't disagree with me.  She told me to shut the

9    fuck -- to get the fuck out of here, and then she told me

10   appreciate the fucking job.  You heard it.

11   Q    Okay.  So -- so she disagreed with you.

12   A    No, she didn't disagree with me --

13        MS. COX:  Objection.  Inter --

14        JUDGE GREEN:  Sustained.

15        MS. COX:  Thank you, Judge.

16        JUDGE GREEN:  Sustained.

17   Q    BY MR. MURPHY:  You -- you claimed she was a plant on

18   Facebook Live video, as -- as some sort of an excuse for your

19   conduct towards --

20        MS. COX:  Objection --

21        THE WITNESS:  No.

22        MS. COX:  -- Your Honor.  This is improper

23   characterization of Mr. Bryson's testimony.

24        MR. MURPHY:  I'm not -- Judge, I'm asking I'm questions.

25        JUDGE GREEN:  He's asking those questions.



Exhibit E, Motion to Try Petition on Hearing Record

1     THE WITNESS:  Repeat it again.  Even though I answered,

2     repeat it again.

3     Q    BY MR. MURPHY:  You -- you claimed on the Facebook Live

4     video that she was a plant, as an excuse for your unacceptable

5     conduct towards her, right?

6     A    No.  I claimed she was a plant because I thought she was a

7     plant.  There's nothing with conduct.  I have no problem with

8     that girl.

9     Q    You said you --

10    A    I'm 50-something years old.  I -- I have no problem with

11    people like that.  I don't fight.

12    Q    You -- you said --

13    A    I don't regret and I don't do any of that, so --

14    Q    You -- you said you felt overwhelmed by what you had done

15    to her, didn't you?

16    MS. COX:  Objection, Your Honor.  That's not what he said

17    on the video.

18    MR. MURPHY:  Judge --

19    MS. COX:  He said overwhelmed.  Not by what he had done.

20    You're mischaracterizing the video.

21    MR. MURPHY:  I'm -- I'm asking questions, Judge, on cross-

22    examination.

23    JUDGE GREEN:  Okay.  So overruled.

24    Q    BY MR. MURPHY:  C'mon, Mr. Bryson, you remember the

25    question.



1    A    No, I don't.

2    Q    You said you felt overwhelmed on the Facebook Live video.

3    Didn't you?

4    A    As a -- as a black man, representing our black culture, I

5    felt overwhelmed to have to go over there and -- and -- and --

6    and go through all of that for nothing with somebody that I'm

7    trying to help.  That's what I meant by that.

8    Q    Um-hum.  And -- and -- and on the Facebook Live video, you

9    didn't make any reference to any racial comments that your

10   coworker had made, did you?

11        MR. KEARL:  Objection.  Relevance.

12        JUDGE GREEN:  Overruled.

13        THE WITNESS:  What's the question?

14        MR. MURPHY:  Judge, this -- you know, this is approaching

15   the level of a parody at -- at this point.

16        JUDGE GREEN:  Okay.  Off the record.  Off the record.

17   (Off the record at 5:16 p.m.)

18        MS. COX:  Mr. Bryson, you're on mute.

19                    **RESUMED CROSS-EXAMINATION**

20   Q    BY MR. MURPHY:  Okay.  Mr. Bryson, you testified in direct

21   examination about a telephone call that you had with Tyler

22   Grabowski on -- on April 10th.  Do you remember that testimony?

23   A    Yes, sir.

24   Q    And in that -- in that call, or in that conversation,

25   did -- did Mr. Bryson use the term seek to understand?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MR. KEARL:  Objection.  Mr. Bryson?

 2        MR. MURPHY:  I'm sorry.  Mr. Grobowsky.  Sorry.

 3        THE WITNESS:  No.

 4   Q    BY MR. MURPHY:  Okay.  At that time, you knew you were

 5   being investigated, correct?

 6   A    On what day, sir?

 7   Q    April 10th, during the conversation with Mr. Grabowski.

 8   A    He was employed with me at that time I was -- that --

 9   that -- not that I was -- that there was going to be an

10   investigation.  Not --

11   Q    Okay.  Going to be an investigation.

12   A    Yes.

13   Q    Okay.  And -- and did you know at that time that you were

14   potentially subject to discipline?

15   A    No.  I got suspended --

16   Q    Oh, okay.  You answered the question.  And -- and during

17   that call, do you remember telling Mr. Grabowski that you don't

18   use the n-word because you're a black man?

19   A    That's not what I said.

20   Q    Okay.  What -- did you -- did you discuss use of the n-

21   word with Mr. Grobowski?

22   A    I -- I said Tyler, I'm black.  Like he girl that's

23   Caucasian.  Like and basically it was that.  That's what I

24   meant.

25   Q    Okay.  That's -- is that all -- is that all you said about
```



1   it?

2   A    Yes, sir.  He said did you use the -- had -- did you use

3   the n-word?  And I said, Tyler, I'm black.  Do I look like I

4   use the n-word or not?

5   Q    And immediately after that, do -- do you remember telling

6   him that -- that I'm quoting here, "I know that she wanted me

7   to make" --

8        MR. KEARL:  Objection.  Quoting from what?

9   Q    BY MR. MURPHY:  Did you say -- did you say to Tyler, quote

10  "I know she wanted me to make comments about her sexuality

11  because she is a dyke, and I did not go there."

12  A    I don't do stuff like that, man.  We didn't do all of

13  that.  I -- I -- what happened is --

14  Q    All right.  Is the answer no, Mr. Bryson?  You didn't say

15  that?

16  A    No.  I didn't do that.

17  Q    Because you don't do stuff -- you don't do stuff like

18  that; is that right?

19  A    Pardon?

20  Q    You don't do stuff like that; is that what you just --

21  A    Like what?  What stuff?

22  Q    Like you -- well, I don't know.  You used the word stuff.

23  Did --

24  A    No.  I --

25       MR. KEARL:  Objection.  Confusing question.



www.escribers.net | 800-257-0885

```
 1          THE WITNESS:  Yeah, you -- basically, sir --

 2          JUDGE GREEN:  Okay.

 3          THE WITNESS:  -- with all due respect, okay, I -- you

 4     asked me one question --

 5          MR. KEARL:  Objection --

 6          THE WITNESS:  -- and I told --

 7          MR. KEARL:  -- there's no --

 8          JUDGE GREEN:  Okay.  So let's -- let's hit the next

 9     question.

10     Q    BY MR. MURPHY:  In your conversation with Mr. Grabowski,

11     did you use the term "a dyke" in relation in any way to the

12     coworker you had a confrontation with.

13     A    No.

14     Q    You testified to a subsequent call with Mr. Grabowski on

15     April 17th; is that right?

16     A    Correct.

17     Q    And in that call, that's -- that's the one in which Mr.

18     Grobowski told you that you had been terminated; is that right?

19     A    Yes.

20     Q    In that call, did -- did you say to Mr. Grobowski anything

21     at all about video evidence or witnesses that you knew had

22     witnessed the incident?

23     A    No.

24          MR. MURPHY:  Nothing further, Your Honor.

25          JUDGE GREEN:  Okay.  Any redirect?
```



1    MR. KEARL:  Could we go into a room just very -- very --

2    like two minutes?

3    JUDGE GREEN:  Okay.  Okay, off the record.

4    (Off the record at 5:45 p.m.)

5    JUDGE GREEN:  Okay.  Take it from the General Counsel.

6    MS. COX:  Very short, Judge.

7                    **REDIRECT EXAMINATION**

8    Q    BY MS. COX:  Mr. Bryson, did you testify truthfully today?

9    A    Yes.

10   Q    Did you testify based on your memory of the events today?

11   A    Yes.

12   MS. COX:  And I think that's it, Judge.

13   JUDGE GREEN:  Mr. Kearl?

14   MR. KEARL:  No questions, Your Honor.

15   JUDGE GREEN:  Any follow up on that, Mr. Murphy?

16   MR. MURPHY:  Nope.

17   JUDGE GREEN:  Okay.  Mr. Bryson, you're free to go.

18   THE WITNESS:  Thank you, Your Honor.

19   JUDGE GREEN:  Okay.  Thank you.  So we're off tomorrow,

20   and we're returning on Thursday.  Does the General Counsel have

21   anything left, of what's going on with the General Counsel's

22   case?

23   MR. JACKSON:  Your Honor, as you know we contend that

24   there's been a -- a deficiency (indiscernible) compliance by

25   Amazon in this case.  There is a whole host of relevant records



Exhibit E, Motion to Try Petition on Hearing Record

1   the company has failed to produce.  Thus, far, more than two

2   months after the subpoena was served, and for that reason

3   General Counsel is not prepared to close our case-in-chief.

4   There may be the need to call additional witnesses to review

5   and question witnesses on documents that may yet to be produced

6   from Respondent.  So until we get substantially more compliance

7   with the document production requirement Respondent is

8   obligated to comply with, we're not prepared to close.

9        JUDGE GREEN:  Are the parties in agreement as to what's

10  missing?  I assume this was all done electr -- let's go off the

11  record.

12  **(Whereupon, the hearing in the above-entitled matter was**

13  **recessed at 5:54 p.m. until Thursday, May 13, 2021 at 10:00**

14  **a.m.)**

15

16

17

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record
1270

1       <u>C E R T I F I C A T I O N</u>

2       This is to certify that the attached proceedings, via Zoom

3       videoconference, before the National Labor Relations Board

4       (NLRB), Region 29, Case Number  29-CA-261755, Amazon.Com

5       Services, LLC, and Gerald Bryson, held at the National Labor

6       Relations Board, Region 29, Two Metro Tech Center North, 5th

7       Floor, Brooklyn, New York 11201, on May 11, 2021, at 10:00 a.m.

8       was held according to the record, and that this is the

9       original, complete, and true and accurate transcript that has

10      been compared to the reporting or recording, accomplished at

11      the hearing, that the exhibit files have been checked for

12      completeness and no exhibits received in evidence or in the

13      rejected exhibit files are missing.

14

15

16

17      _____

18      BARRINGTON MOXIE

        Official Reporter

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services, LLC,          Case No.   29-CA-261755

     Employer/Respondent,

and

Gerald Bryson,

     An Individual.

_____

_____

Place: Brooklyn, New York (via Zoom Videoconference)

Dates: May 13, 2021

Pages: 1172 through 1349

Volume: 9

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

Exhibit E, Motion to Try Petition on Hearing Record

<br/>

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

| | |
|---|---|
| In the Matter of:<br><br>AMAZON.COM SERVICES, LLC,<br><br>        Employer/Respondent,<br><br>and<br><br>GERALD BRYSON,<br><br>           An Individual. | Case No.      29-CA-261755 |

The above-entitled matter came on for hearing, via Zoom Videoconference pursuant to notice, before **BENJAMIN W. GREEN**, Administrative Law Judge, at the National Labor Relations Board, Region 29, Two Metro Tech Center North 5th Floor, Brooklyn, New York 11201, on **Thursday, May 13, 2021, 10:16 a.m.**

Exhibit E, Motion to Try Petition on Hearing Record

1                    A P P E A R A N C E S

2    On behalf of the Charging Party:

3        FRANK KEARL, ESQ.
         MAKE THE ROAD NEW YORK
4        161 Port Richmond Avenue
         Staten Island, NY 10302
5        Tel. (929)265-7692

6    On behalf of the Employer:

7        CHRISTOPHER J. MURPHY, ESQ.
         JENNIFER M. WILLIAMS, ESQ.
8        RICHARD ROSENBLATT, ESQ.
         MORGAN, LEWIS & BOCKIUS, LLP
9        1701 Market Street
         Philadelphia, PA 19103-2901
10       Tel. (215)963-5601

11       NICOLE BUFFALANO, ESQ.
         MORGAN, LEWIS & BOCKIUS, LLP
12       300 South Grand Avenue
         22nd Floor
13       Los Angeles, CA 90071
         Tel. (213)612-7443
14
         KELCEY J. PHILLIPS, ESQ.
15       MORGAN, LEWIS & BOCKIUS, LLP
         1111 Pennsylvania Avenue, NW
16       Washington, DC 20004
         Tel. (202)739-5455
17
         JASON SCHWARTZ, ESQ.
18       ZAINAB AHMAD, ESQ.
         GIBSON, DUNN & CRUTCHER LLP
19       200 Park Avenue
         New York, NY 10166-0193
20       Tel. (212)351-3893

21   On behalf of the General Counsel:

22       EVAMARIA COX, ESQ.
         MATTHEW JACKSON, ESQ.
23       NANCY REIBSTEIN, ESQ.
         NATIONAL LABOR RELATIONS BOARD, REGION 29
24       Two Metro Tech Center, 5th Floor
         Brooklyn, NY 11201
25       Tel. (718)765-6172



Exhibit E, Motion to Try Petition on Hearing Record

1

<u>I  N  D  E  X</u>

2

3

| <u>WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> | <u>VOIR DIRE</u> |
|---|---|---|---|---|---|
| Geoffrey Gilbert-<br>Differ | 1190 | 1302 | | | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

1  　　　　　　　　　　　**E X H I B I T S**

2

3  　**EXHIBIT**　　　　　　　　　　　　**IDENTIFIED**　　**IN EVIDENCE**

4  　**General Counsel:**

5  　　GC-65　　　　　　　　　　　　1177　　　　1187

6  　　GC-66　　　　　　　　　　　　1177　　Not Admitted

7  　　GC-67　　　　　　　　　　　　1178　　Not Admitted

8  　　GC-68　　　　　　　　　　　　1178　　Not Admitted

9  　　GC-69　　　　　　　　　　　　1178　　Not Admitted

10  　　GC-70　　　　　　　　　　　　1308　　　　1310

11  　　GC-71　　　　　　　　　　　　1311　　Not Admitted

12

13  　**Respondent:**

14  　　R-105　　　　　　　　　　　　1248　　Not Admitted

15  　　R-116　　　　　　　　　　　　1198　　　　1199

16  　　R-125　　　　　　　　　　　　1187　　Not Admitted

17

18

19

20

21

22

23

24

25



1          **P R O C E E D I N G S**

2          JUDGE GREEN:  Okay.  So we are back in a matter of

3    Amazon.com Services, LLC, case 29-CA-261755.  It's May 13th,

4    2021.  And during an off-the-record discussion, we established

5    that Mr. Kearl is not going to present any independent evidence

6    at this time.  And it sounds as though the General Counsel and

7    the Charging Party have nothing more to present at this time.

8          However, given that the production of subpoenaed documents

9    is ongoing, that might require the Charging Party and

10   the -- the General Counsel to resume their case, and -- and

11   neither is closing.  So also on -- in an off-the-record

12   discussion, I understood from Mr. Matthew Jackson that he has

13   something he wants to address regarding the subpoenaed records.

14   MR. JACKSON:  Thank you, Your Honor.  So before we proceed

15   any further, it's necessary to call your attention to another

16   very serious subpoena noncompliance issue on the part of the

17   Respondent here.  So very late in the day yesterday, Amazon

18   counsel sent counsel for the Acting General Counsel a series of

19   documents, it purports to be responsive to paragraph 19 of the

20   initial JC subpoena which, as you may recall, seeks production

21   of critically relevant information pertaining to internal

22   communications of the Respondent regarding employee protected,

23   concerted activities that Gerald Bryson was engaged in.

24         As I'm sure you also recall, Your Honor, just the other

25   day, admonished Respondent for redacting nonprivileged



1    materials from responsive documents it produced to the counsel

2    for the Active (sic) General Counsel, and specifically ordered

3    Amazon to produce the unredacted documents.

4        Your Honor's order was undeniably clear and premised on

5    the fact that Respondent cannot be permitted to unilaterally

6    decide what is and is not relevant and subject to production.

7    But despite your clear order, Judge, Respondent last night

8    produced a series of heavily redacted copies of what appeared

9    to be Chime messaging communications between Amazon officials,

10   responsive to paragraph 19 of the first subpoena.

11       So I'm going to share my screen at this time.  And I'm

12   going to mark for identification certain documents.  Just bear

13   with me for a moment.  Okay.  Now, I've just shared my screen,

14   sir.  This is a document that I've marked for identification as

15   General Counsel -- GC Exhibit 65.

16       It appears to be a Chime communication between Christine

17   Hernandez and Tyler Grabowski, dated 30th of March.  And as you

18   can see, Your Honor, it is almost entirely redacted.  I'm going

19   to mark for identification anoth -- GC Exhibit 66

20   **(General Counsel Exhibit Number 66 Marked for Identification).**

21       JUDGE GREEN:  I'm sorry.  I didn't realize -- I missed

22   that you marked that.  You marked that as GC-65?

23       MR. JACKSON:  6-5.  Correct, Your Honor.

24       JUDGE GREEN:  Okay.  Hold on just one moment.  Go ahead.

25       MR. JACKSON:  Thank you.  So now I'm going to share my



www.escribers.net | 800-257-0885

1    screen and again present Your Honor with document I've marked

2    for identification as GC Exhibit 66 -- 6-6.  This appears to be

3    another Chime communication between a person named Pooja Desai

4    and Christine Hernandez, dated March 25, 2020.

5         And as -- again, as I scroll through, Your Honor, you can

6    see that almost the entirety of the document is redacted.  I'm

7    going to share my screen again and present Your Honor with a

8    document I've marked as Exhibit 67.

9         It appears to be a Chime communication between Pooja Desai

10   and Christine Hernandez, dated April 7th, 2020.  And as I

11   scroll through the document you'll see that, again, almost the

12   entirety of the document is redacted.

13        JUDGE GREEN:  So let me ask you, are there more like this?

14        MR. JACKSON:  Yeah, I have two more.  If you don't need to

15   see them, then I -- I won't bother, but --

16        JUDGE GREEN:  I don't.  I don't need -- I don't need to

17   see them because I can't read them.

18        MR. JACKSON:  I under --

19        JUDGE GREEN:  But just going to put tags for -- those are

20   going to be 68 and 69?

21        MR. JACKSON:  So it's 6 -- GC-65 through 69.

22   I've -- they're uploaded into SharePoint, and I've marked them

23   for identification.

24        JUDGE GREEN:  Okay.  So 60 -- 68 is a chat with who?

25        MR. JACKSON:  68 is and a chat Pooja Desai --



1    JUDGE GREEN:  That's right.  That's good enough.

2    MR. JACKSON:  And then 69 -- 69 is a -- a chat between

3    Elliott Jones --

4    JUDGE GREEN:  Okay.

5    MR. JACKSON:  -- Milly Gutierrez, and Lisa Stowbridg

6    (sic), S -- excuse me, Strowbridg, S-T-R-O-W-B-R-I-D-G (sic).

7    JUDGE GREEN:  Okay?

8    MR. JACKSON:  So Your Honor, I -- I -- I -- I should say

9    that in conjunction with the production of these documents,

10   Amazon counsel sent us a letter explaining, in essence, that

11   they have unilaterally determined that the redaction portions

12   of these documents are not relevant in the case, without

13   further explanation.

14       And therefore -- and therefore, Amazon is not going to

15   produce them.  Judge, this is completely unacceptable and

16   stands in direct contravention of your explicit order.

17   (Indiscernible, simultaneous speech).

18   JUDGE GREEN:  Okay.  So do we have --

19   MR. JACKSON:  -- an unmistakable strategy here, Judge.

20   JUDGE GREEN:  -- do we have the Respondent's -- why -- why

21   is it redacted?

22   MS. BUFFALANO:  So we've -- you know, Mr. Jackson mentions

23   that we were instructed to produce unredacted personnel related

24   documents, right, which we did yesterday.  These are -- so let

25   me back up a step.  I think understanding what Chime is, is



1    probably kind of helpful.

2        Chime is like an instant message.  So there can be -- like

3    I have chimes on my computer right now, which is an instant

4    message with another person that goes on for months, right?  So

5    you may have one entry about one topic, and then the next entry

6    is about a different topic.

7        And -- and so when you're looking through the chimes,

8    there are things that are responsive and things that are not.

9    People talking about what they had for breakfast, for example,

10   is not responsive to the subpoena.  And we redacted it.

11   Anything that is responsive to the subpoena, we have provided.

12       And to suggest that we don't look at the subpoena and

13   provide what is responsive and relevant doesn't really make a

14   whole lot of sense, because otherwise we would just be giving

15   you every piece of paper that we touch.  I mean, this -- there

16   is an analysis of what is responsive to the subpoena and what

17   isn't.  And that is the analysis we did.

18       We did send a cover letter to the counsel for the General

19   Counsel explaining why we redacted, and the fact that what we

20   redacted were nonresponsive chimes related to other subject

21   matters.  And so that's what we did.  Of course, you know,

22   there's always an option of having you review them

23   and -- unredacted, and making decisions on those things.

24       But -- but understand, this is not a situation where we

25   have, like, a single email on a single topic and have redacted



Exhibit E, Motion to Try Petition on Hearing Record

1    certain portions of it.  This is an instant message

2    communication in which people are discussing things in multiple

3    subjects over weeks, several day -- I mean, most -- in these

4    instances over, you know, days and hours.  And they're on

5    completely separate topics.  And that's why they're redacted.

6        JUDGE GREEN:  Okay.

7        MR. JACKSON:  Your Honor, if I may respond.

8        JUDGE GREEN:  Okay.

9        MR. JACKSON:  Judge, the  subpoena is perfect -- the

10   subpoena that Your Honor enforced is perfectly clear.

11   Documents are to be produced -- responsive documents are to be

12   true -- produced -- responsive documents are to be produced in

13   their entirety.  And Your Honor should enforce that.

14       JUDGE GREEN:  No.  No.  I'm sorry.  Let me cut you off.

15   I'm sorry to cut you off.

16       MR. JACKSON:  Your Honor already enforced it.

17       JUDGE GREEN:  Let me just address this a little bit,

18   because I think we've had -- now this is -- this is now at

19   least a couple of days that we're dealing with this subject.

20   Okay?  So there's a difference between irrelevant and not

21   responsive, right?

22       So relevant has been decided.  I've determined that

23   certain subpoenaed document -- subpoena requests are reasonably

24   calculated to disclose relevant documents.  And stating that

25   certain documents are not relevant, should the Respondent do



Exhibit E, Motion to Try Petition on Hearing Record

1    that, and that's why they haven't been produced is not a

2    legitimate -- it's not a legitimate reason for nonproduction.

3        It's an inherently illegitimate reason for -- for

4    nonproduction.  That decision regarding relevance has already

5    been made.  And so to the extent that -- that I've heard

6    Respondent say that -- and I -- I have heard -- not -- not

7    here, but I've heard that in previous discussions, the

8    Respondent places itself in jeopardy.

9        If you're not -- if you're not producing responsive

10   documents, upon the claim that they are irrelevant, you are at

11   risk of remedies pursuant to the Bannon-Mills line of cases.

12   Okay?  So that's one subject.  Documents that are not

13   responsive are a different subject matter entirely.  And I -- I

14   think I addressed this somewhat on the record previously with

15   regard to emails and -- and messages.

16       It's not always clear to determine what's a complete

17   document.  I always think of a single email as a complete

18   document.  I don't necessarily think of an email chain as a

19   complete document.  I often think of that as multiple

20   documents.

21       These types of communications are --- they're -- they're

22   strange in the sense that they're a document, but they're also

23   in the nature of a conversation; and it's hard to know exactly

24   where they break up.  And it's probably harder with regard to

25   messages than it is with regard to emails.



www.escribers.net | 800-257-0885

1    And so to the extent that the Respondent is taking the

2    position that certain documents are not productive, and not

3    part of a single document, that -- that's not necessarily

4    an -- an illegitimate position to take.  And so it's entirely

5    possible that I'll have to review these -- these messages in

6    camera.  It's not a lot.  It sounds like -- it looks like there

7    are only five, and I may have to do that to determine what's

8    responsive and what's not responsive.

9        But I'm not going to do that now.  I'm sorry to keep

10   punting these -- these issues down the road, but I -- I want to

11   continue with the presentation of evidence to the extent we can

12   without getting bogged down in subpoena disputes, which I think

13   can be handled at a different time when we're not ready to take

14   testimony.  That's where I am on -- on this subject.

15       MR. JACKSON:  Judge, how -- how long is this going to go

16   on?  How many times are you going to let them do this?

17       JUDGE GREEN:  Do you know -- I mean, listen.  If you want

18   me to shut it down, I could shut down -- we can shut down the

19   hearing, and I can start getting into subpoena issues.  That is

20   something that's always an option for the General Counsel.

21       It's still your case.  If -- if you don't want the -- the

22   Respondent to proceed -- if you would prefer me to deal with

23   subpoenaed issues first, we can do that.  I -- I don't know

24   that we need to do that on the record, though.  I don't think

25   we have to sit here with people -- with everybody on the

# Exhibit E, Motion to Try Petition on Hearing Record

1    record.

2        We've got a lot of lawyers here on both sides.  I don't

3    think we have to sit here and have everybody wait for me to

4    rummage through subpoenas and the parties positions, which I

5    don't really have on paper yet.  So if that's what you want,

6    that's what you want; but it's probably going to involve a

7    postponement.

8        MR. JACKSON:  Judge, I -- I would just tell Your Honor

9    that if anything shows bad faith in complying with the

10   subpoena, it is this, deliberately defying your order.

11       JUDGE GREEN:  Not -- not this --

12       MR. JACKSON:  -- to conceal (indiscernible, simultaneous

13   speech) --

14       JUDGE GREEN:  -- I won't -- I -- I'm not --

15       MR. JACKSON:  -- (indiscernible, simultaneous speech)

16   information.

17       JUDGE GREEN:  I'm not saying no, in the sense that I've

18   heard -- I've heard -- the original redactions, and the -- and

19   the nonproduction of -- of the notes that were referenced in

20   the Charging Party's arti -- articles -- exhibits -- I think it

21   was Exhibits 3 to 4, yeah, it's -- it appears that the -- the

22   Respondent made a unilateral determination that those documents

23   were irrelevant after I already determined that those subpoena

24   paragraphs were reasonably calculated to the production of

25   subpoenaed records.  And that might result in -- in -- in



Exhibit E, Motion to Try Petition on Hearing Record

1    remedies.  Again, I'm not determining that right now.  But this

2    is slightly different.

3         MR. JACKSON:  I'm not sure I'm (indiscernible,

4    simultaneous speech) --

5         MS. BUFFALANO:  Your Honor --

6         MR. JACKSON:  --  I don't appreciate

7    the -- the -- (indiscernible, simultaneous speech).

8         JUDGE GREEN:  Because I'm not -- I don't know that these

9    documents are actually --

10        MR. JACKSON:  These are -- these are chats

11   that -- they're -- they're line editing chats

12   that -- (indiscernible, simultaneous speech).

13        JUDGE GREEN:  I understand.  But what's -- what's the full

14   document?  Is the document the entire year of -- if you have

15   a -- if you have a chance at last the entire year, and it -- it

16   covers many different subjects, is that a one document, or is

17   it many documents?  And is it -- is it responsive?

18        MR. JACKSON:  Your Honor, GC-65 covers a period of March

19   30th, from 6:00 a.m. -- 6:04 a.m. to March 30th, 6 p.m., not a

20   full year, not weeks.

21        MS. BUFFALANO:  Even so if it --

22        MR. JACKSON:  GC-66 covers a period of (indiscernible,

23   simultaneous speech) --

24        JUDGE GREEN:  Okay.  So how do you want me to --

25        MR. JACKSON:  -- 8:44 a.m. --



Exhibit E, Motion to Try Petition on Hearing Record

```
1        JUDGE GREEN:  -- proceed?

2        MR. JACKSON:  -- March 25 --

3        JUDGE GREEN:  Do you want to --

4        MR. JACKSON:  -- 11 p.m., not a full year.  They are

5   blind --

6        JUDGE GREEN:  Do you want to --

7        MR. JACKSON:  -- editing portions of the conversation.

8        JUDGE GREEN:  Okay.  Do you want to postpone --

9        MR. JACKSON:  -- to conceal the information.

10        JUDGE GREEN:  -- listen, I'll -- I'll look at them in

11   camera, if you want me to look at them in camera, and we'll

12   have a postponement.

13        MR. JACKSON:  Judge, we respectfully urge that you (audio

14   interference).  Enough is enough, Your Honor.  They

15   need -- (audio interference) Bannon-Mills to address anything.

16   It is --

17        JUDGE GREEN:  Okay.

18        MR. JACKSON:  -- just time obfuscation.

19        JUDGE GREEN:  So I --

20        MR. JACKSON:  We are asking, Your Honor --

21        JUDGE GREEN:  -- with all due respect, Mr. Jackson --

22        MR. JACKSON:  -- to draw an adverse inference -- excuse

23   me?

24        JUDGE GREEN:  I -- I've heard you.  I -- I've heard you.

25   I understand your position.  And I've stated how I'm going to
```



1     deal with it.  So you can decide, now, how you want me to

2     proceed.  Do you want me to -- do you want a delay, or

3     do -- and -- and have me take a look at these things?  Or do

4     you want to proceed with the Respondent's witnesses?

5          MR. JACKSON:  We're prepared to proceed, Your Honor.

6     Thank you.

7          JUDGE GREEN:  Okay.

8          MS. BUFFALANO:  Your Honor, I would like to mark the

9     letter that we sent to the counsel for the General Counsel and

10    have it admitted into evidence.

11    **(Respondent Exhibit Number 125 Marked for Identification)**

12         JUDGE GREEN:  Okay.  So that's going to be r --

13         MS. BUFFALANO:  It's going to be -- I'm sorry these are

14    out of order, but we pre-marked exhibits, so it's going to be

15    R-125.

16         JUDGE GREEN:  Okay.

17         MR. JACKSON:  And Judge, I'll move for the admission of

18    GC-65 through 69.

19         JUDGE GREEN:  Okay.  Hold on.  Let me just put -- R --

20    okay.  Okay.  So R-125 is -- and GC-65 through 69 is being

21    offered.  Is there any objection?

22         MS. BUFFALANO:  No.

23         JUDGE GREEN:  Okay.  So GC-65 is admitted.

24    **(General Counsel Exhibit Number 65 Received into Evidence)**

25         JUDGE GREEN:  Okay.  So that's that.  It sounds like we're



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1   ready to go.  Are we ready to go with the -- the Respondents
 2   witness?  I see Mr. Geoff Gilbert-Differ in the break -- in the
 3   waiting room.  Are -- are we ready to put him on as the next
 4   witness?

 5        MS. BUFFALANO:  We -- we are.

 6        JUDGE GREEN:  Okay.

 7        MS. BUFFALANO:  I don't -- I don't know if --

 8        JUDGE GREEN:  Okay.  It sounds like that's what we're
 9   ready to do.  So let me -- let me put Mr. Gilbert-Differ in the
10   main hearing room.  At.  I'm just waiting for Mr. Gilbert-
11   Differ's audio to connect.  There we go.

12        Can you hear us, Mr. Gilbert-Differ?

13        MR. GILBERT-DIFFER:  Yes, sir.

14        JUDGE GREEN:  Okay.  And we can hear you.  Okay.  So the
15   Respondent is calling Mr. Gilbert-Differ as its first witness.
16   Can you please raise your right hand?

17   Whereupon,

18                    GEOFFREY GILBERT-DIFFER

19   having been duly sworn, was called as a witness herein and was
20   examined and testified, telephonically as follows:

21        JUDGE GREEN:  Okay.  Thank you, very much.  So please
22   state and spell your name for the record.

23        THE WITNESS:  My name is Geoffrey Gilbert-Differ.  That's
24   G-E-O-F-F-R-E-Y.  Sir name, Gilbert's G-I-L-B-E-R-T, hyphen,
25   Differ, D-I, double F, E-R.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay.  Are you alone in the room today?

2    THE WITNESS:  I am.

3    JUDGE GREEN:  And that's good.  Please just -- don't

4    communicate with anybody by a phone, or a handheld device while

5    you're testifying.  And please don't refer to any documents

6    other than what's shown to you on the screen; or if you're

7    directed to look at a document, then you can look at a

8    document.  Okay?

9    THE WITNESS:  Understand.

10   JUDGE GREEN:  Okay.  So any time you're ready, Ms.

11   Buffalano.

12   MS. BUFFALANO:  Okay.  Thank you, Judge Green.  And -- and

13   Mr. Gilbert-Differ.

14   MR. JACKSON:  Excuse me, Judge.  I'm sorry to cut you off,

15   Ms. Buffalano, but is it possible for Mr. Differ to move his

16   video so that we could see his hands?

17   JUDGE GREEN:  See his hands?

18   MR. JACKSON:  Correct?

19   JUDGE GREEN:  You know what, we haven't been doing that.

20   And it doesn't really look like it's possible.  It would look

21   like it would require Mr. Gilbert-Differ to move back

22   considerably.  I didn't require that of the General Counsel's

23   witness, and I'm not requiring it now.

24   MR. JACKSON:  Okay.

25   MS. BUFFALANO:  Mr. Gilbert-Differ, make sure you don't



Exhibit E, Motion to Try Petition on Hearing Record

```
1    have anything on your desk, is the -- I'm sure you don't, but

2    just a heads up.

3                        DIRECT EXAMINATION

4    Q     BY MS. BUFFALANO:  Okay.  Good morning.  Thank you for

5    being here.  Do you currently work for Amazon?

6    A     I do.

7    Q     And what's your current position at Amazon?

8    A     I'm a regional loss prevention manager.

9    Q     And how long have you held your current position?

10   A     My current position, since April 2019.

11   Q     And what are your duties as a regional loss prevention

12   manager?

13   A     I oversee the loss prevention programs at a number of

14   facilities.  In this case, my present geographic scope is the

15   New Jersey and Delaware markets.  I specifically cover Amazon

16   robotic fulfillment centers and lead the combined efforts of

17   loss prevention programs at each of those facilities.

18   Q     And what about in March and April of 2020, what were

19   your -- the facilities that you were responsible for as the

20   regional loss prevention manager?

21   A     At that time, I was regional loss prevention manager for

22   large Amazon robotic sortable fulfillment centers in the north

23   east market that spanned the Connecticut through the North

24   Carolina areas; specifically, sites in Connecticut, New York,

25   New Jersey, Maryland, and North Carolina.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And was JFK8 one of the facilities where you have

2    responsibility as a regional loss prevention manager?

3    A    Yes.

4    Q    Okay.  And for what period of time were you responsible

5    for JFK8, as the regional loss prevention manager?

6    A    From March 15th, 2020, through until almost exactly the

7    same time in 2021, so a full year.

8    Q    And did you have -- were you with Amazon prior to April of

9    2019?

10   A    Yes, I was.

11   Q    And what was your prior position?

12   A    Immediately prior to the regional loss prevention manager,

13   I held the role of loss prevention manager, again, in a -- an

14   Amazon robotic sortable fulfillment centers.  Pre -- directly,

15   previously, in Maryland -- so the greater Baltimore area, where

16   I'm at two buildings consecutively.

17       Prior to that, Kansas City, Kansas.  And then prior to

18   that, Robbinsville, New Jersey.  Before a loss prevention

19   manager, I was a loss prevention specialist with Amazon working

20   at buildings in Pennsylvania and New Jersey.

21   Q    And when did you start working for Amazon?

22   A    July 2016.

23   Q    And in March and April of 2020, where did you work,

24   physically?

25   A    My office at that time was assigned to a building called



Exhibit E, Motion to Try Petition on Hearing Record

1    BWI2, located on Broening Highway in Baltimore.  However, as

2    the COVID pandemic increasingly impacted everywhere, yes, we

3    were increasingly located virtually.

4    Q    And what is your -- what's your professional background

5    prior to Amazon?

6    A    So prior to Amazon, I worked in law enforcement.  I was a

7    police officer in the UK for ten years.  Prior to that, I held

8    positions with a couple of other companies, and was also a

9    Royal Naval reservist.

10   Q    Thank you.  And are you familiar with the incident on

11   April 6th, between Gerald Bryson and Dimitra Evans?

12   A    I am.

13   Q    And what involvement, if any, did you have in the

14   investigation of that case?

15   A    Yes.  I jointly investigate about incidents with partners

16   from the JFK8 HR team.

17   Q    So can you tell us -- give us a little bit of background

18   on loss prevention?  What is loss prevention?  What does loss

19   prevention do?

20   A    So loss prevention is responsible for, I guess, broadly,

21   three presets.  Firstly, investigation of and mitigation of

22   physical threats to buildings, associates, or contractors who

23   work with us.

24        Secondly, we are responsible for inventory security; so

25   that can involve investigations into dishonest behaviors, which



Exhibit E, Motion to Try Petition on Hearing Record

1     would range through -- from, essentially, theft of inventory,

2     theft of noninventory, theft of personal property.  It would

3     also include investigations into embezzlement or fraud

4     internally.

5         And then, finally, we're also responsible for physical

6     security of facilities where Amazonians work.  So that is

7     contracting a physical security officer as management of that

8     account.  We also are responsible for a number of the physical

9     security systems which allow us to perform our function.

10    Q    Okay.  And when you say you're responsible -- or loss

11    prevention, is responsible for physical threats to the

12    building, and to associates, and to contractors, what does that

13    mean, exactly?

14    A    Yeah, it's a - it's a fairly broad scope.  Essentially,

15    anything, you know, starting with physical safety, that's the

16    most important element.  So essentially, anything that could

17    compromise the safety of any of the groups of individuals

18    you've named there, which does not specifically relate to

19    operational safety.

20        So how do we do our work?  How we do our work is, you

21    know -- and it's safe to say it's limited by our workplace

22    health and safety teams.  But frankly, anything else that might

23    compromise the safety of our associates of all (indiscernible).

24        Secondly, there's also the experiential element of that as

25    well.  So we are responsible, jointly with HR, and ensuring



Exhibit E, Motion to Try Petition on Hearing Record

1    that our workplaces are inclusive and safe, both in terms of

2    physical and feeling safe, and fundamentally destruction free

3    for our associates to perform their function on behalf of our

4    customers.

5    Q    Okay.  And I know you said you partner with HR

6    investigations; is that related to this -- this experimental

7    element, as you describe it, the responsibility for ensuring

8    the workplace is safe?

9    A    Almost every investigation that we undertake will, at some

10   point, require us to partner with our HR partners.  When it

11   comes to dishonesty, that tends to be later in the stages, once

12   we've built a good case.  However, when it comes to the

13   experiential of safety elements, that's as early as possible, a

14   partnership between us and HR, initiated by one or the other

15   depending how important (indiscernible) is.

16   Q    Okay.  So let me ask you -- to understand a little bit

17   more about when loss prevention would become involved in an

18   employee investigation, so what kinds of things you're looking

19   at when you're talking about ensuring a safe workplace in the

20   physical facility, and a distraction free envir1onment.  Like,

21   what kinds of conduct would come to you from -- or -- or would

22   you partner with HR on?

23   A    Yeah.  It's -- it's, again, a fairly broad scope at the

24   upper end of that.  And the most -- I guess, the least favored

25   one (indiscernible) of that, we're talking about physical



Exhibit E, Motion to Try Petition on Hearing Record

1    attacks, or physical confrontations.  At the very lowest, scope

2    in terms of risks, we would be looking at negative interactions

3    between associates.  So that could be, you know, heated words.

4    That could be threats.  That could be -- when I say threats,

5    that's direct, indirect, implied.  That could be hate or bias-

6    driven language, and anything, frankly, that sits in between

7    those, kind of, ends of the scale.

8    Q     How do issues of employee misconduct come to LP?

9    A     A number of ways, they can come to us.  So to list a few

10   of those, firstly, systematically, we have a ethics hotline

11   that's accessible to any associates anywhere in the world.  And

12   they can report others through that anonymously, which would

13   then be redirected to my teams.

14        Secondly, it may come directly from partners within the

15   building.  So an issue may be reported to an operational

16   leader, a safety team, HR team, who would then ensure we were

17   notified of that event.  And they come to us directly.

18        We have workspaces on the operational floor.  We have

19   clearly signposted office space.  So associates are free to

20   encourage them to come and potentially directly report to us.

21        Or finally, it may come to us through third-party security

22   being made aware of events along those lines.  There are a

23   number of other ways that could come to us, but those are a few

24   I can list.

25        MR. KEARL:  Your Honor, I would like to raise a standing



Exhibit E, Motion to Try Petition on Hearing Record

1    objection.  I don't want to continually disrupt Mr. Gilbert-

2    Differ's testimony, but I'm raising a standing objection on

3    Respondent presenting information on investigations to the

4    extent that they have not produced documents responsive to the

5    subpoena regarding such an investigation.

6         JUDGE GREEN:  Okay, hold on just one second.

7         So you have a standing objection in that regard.

8         MS. BUFFALANO:  Okay, and I'll just note, this is sort of

9    the unfortunate reality, where, you know, as we indicated last

10   night, we're working on several paragraphs responsive to the

11   remaining two subpoenas.  And this, you know, is unfortunately

12   one of them.  So you know, we could -- there's really only two

13   options, again.  One is to wait for the documents, and the

14   others to proceed.

15        JUDGE GREEN:  Okay, I think the General Counsel would like

16   you to proceed subject to their objections.

17        Am I right?

18        MR. JACKSON:  Yes, that's right.  I mean, our position is

19   that Respondent should be precluded from asking these.

20        JUDGE GREEN:  I understand.

21        MR. JACKSON:  But I understand Your Honor is not -- not

22   accepting that.

23   Q    BY MS. BUFFALANO:  Okay.  Mr. Gilbert-Differ, can you tell

24   us what loss prevention's role is once involved in an

25   investigation as a result of a report of it -- from the



1    evidence you just discussed?  What's -- what's loss

2    prevention's role?

3    A    It is going to vary from case to case.  At the highest

4    level, essentially, we are essentially assisting HR and

5    gathering information or building, you know, information around

6    an event.  Secondly, we're assisting them in reviewing such

7    information as potentially may already be available as it

8    becomes available through that evidence-gathering process.  And

9    finally, providing them with a recommendation based on our

10   assessment against security, codes of conduct, and a general

11   risk analysis.

12   Q    And generally, what, from your perspective, is HR's role

13   in those investigations in which you're partnered with them?

14   A    HR shares with us the -- the evidence-gathering

15   responsibility, and then in terms of the relationship.  But

16   once the evidence-gathering process is, you know, concluded,

17   fundamentally, HR the decision makers.  We provide advice, but

18   that's it.

19   Q    And you said you make a recommendation, or loss prevention

20   would make a recommendation.  What -- what do you mean?  What

21   is a recommendation?  What's -- what does that entail?

22   A    Yeah, so we will essentially recommend some next steps to

23   take at a given point in the process, typically when initial

24   evidence gathering is -- is complete or close to complete.  And

25   at that point, what we're recommending is firstly whether or



Exhibit E, Motion to Try Petition on Hearing Record

```
1    not we -- and by "we", I mean the investigating LP, the

2    professional -- find apparent breach of any of the security

3    standards of conduct, and secondly, recommended steps to

4    mitigate risk to other associates, other individuals working,

5    general public, or Amazon corporate.

6        MS. BUFFALANO:  Okay, and Mr. Falk, could you show us

7    Respondent Exhibit 116, please?  Are you out there?  Thank you.

8        MR. KEARL:  Can I have the corresponding Bates stamp for

9    this document?

10       MS. BUFFALANO:  Yeah.

11       Could you scroll down, Mr. Falk, please, to the bottom of

12   the page?  Well, that's helpful.  It looks like 6843; just give

13   me a second.  It is definitely not 6843.  Can you go down to

14   the second page?  Thank you.  Apologize.  That's what it says.

15   All right, it says 6843.

16       Let me know if that doesn't work, Mr. Kearl, for you to

17   locate.

18   Q    BY MS. BUFFALANO:  Mr. Gilbert-Differ, have you seen this

19   document before?

20   A    Yes.

21   Q    And what is this?

22   A    This is our global security organization's workplace

23   incident management guide.

24   Q    And does this document -- so we've been talking about, you

25   know, you're doing a review, and you're making determinations
```



# Exhibit E, Motion to Try Petition on Hearing Record

1   about the subject matter of which loss prevention is

2   responsible, and you've described that.  Does this document

3   give us any insight into the conduct that you're investigating

4   as loss prevention?

5   A    It does.

6   Q    And -- and can you sort of just explain to us how it does

7   that?

8   A    Yeah.  For this document, it goes through a number of

9   definitions and types of events that might fall within our

10  general workplace incident management response space.  It

11  provides indications around severity ratings and what those

12  mean.  It can also provide in here suggestions around steps to

13  take to mitigate risks.  Essentially, this is to empower our

14  organization across the globe to provide a unified response to

15  matters of workplace violence or related workplace incidents.

16       MS. BUFFALANO:  Okay, thank you.

17       And you can -- Mr. Falk, you can take this down.

18       The company moves for admission of Respondent's Exhibit

19  116.

20       MR. JACKSON:  No objection.

21       JUDGE GREEN:  Okay, so R-116 admitted.

22  **(Respondent Exhibit Number 116 Received into Evidence)**

23  Q    BY MS. BUFFALANO:  Okay, and does loss prevention, in your

24  recommendations, do they make recommendations regarding what

25  should or shouldn't happen with respect to any associate



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   involved in alleged prohibited conduct?

2   A     Yes, we do.

3   Q     Does loss prevention have the authority to issue

4   discipline?

5   A     No, we do not.

6   Q     What interim steps, if any, might be recommended by loss

7   prevention during an investigation?

8   A     So dependent on the -- the type of risk, there are a

9   number of options that we might recommend.  If we start the

10  victim, we might recommend a safety plan for the victim.  That

11  might include a change of shifts to move them away from the

12  risk or threat.  It might include changing locations.  It might

13  include support, you know, a supportive transfer request.

14         It might include simpler measures such as connecting them

15  with legal resources, connecting them with law enforcement.  It

16  may take out as far as escort to and from the vehicle,

17  facilitating a parking location close to a main entrance in

18  clear sight of cameras or security.

19         And then, then we move to persons of interest, potential

20  suspects, it may include steps to reduce their ability to

21  continue to present threats to other associates, or individuals

22  impacted, or indeed, the company.  So at the lowest levels,

23  that might include temporary removal of access to our

24  buildings.  At the upper levels, that might include, again,

25  partnering with law enforcement or others to -- to actively



1    protect us against threat.

2    Q    Okay, and when you say temporary removal of access to the

3    buildings, do you mean badge suspension?

4    A    I do.

5    Q    And what is the impact to the -- I'm going to use your

6    terminology, the person of interest.  What -- what is the

7    impact to them if -- if their badge is suspended?

8    A    The only real impact is it prevents them from moving past

9    an access control point -- at JFK8, that would be a

10   turnstile -- and into the production areas of the building.

11   Q    Okay.  Okay, so I want to talk to you about the April 6th

12   incident and your involvement in that specifically.  So you

13   testified that you were involved in the investigation earlier;

14   is that right?

15   A    That's correct.

16   Q    And around this time, March and April of 2020, was it

17   typical for you to be involved in an investigation like this?

18   A    Yes, it was.  Essentially, the issue we had specific to

19   JFK8 was that there was no loss prevention manager in role.  So

20   the loss prevention team did not have an onsite leader to head

21   up investigations.  So during that window, in fact, through

22   until September of that year, it was not unusual for me to be

23   involved in investigations.

24   Q    And how did you first become involved in the investigation

25   of the April 6th incident?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    I was notified very, very soon after the event -- I don't

2    remember a specific time -- by, I believe, Christine Hernandez,

3    so the HR manager, and then shortly after had a verbal

4    conversation with Maciej Curlej, the senior operations manager

5    who had witnessed the event.

6    Q    Okay, and you said that Christine Hernandez is the HR

7    manager at JFK8; is that right?

8    A    At that time, yes.

9    Q    And you mentioned Maciej Curlej; who is that?

10   A    The senior operations manager at that time for JFK8.

11   Q    Did Ms. Hernandez -- well, can you tell us what you recall

12   her telling you when she initially reported the incident to

13   you?

14        MR. KEARL:  Object -- I'd just like to object to this

15   question.  Again, insofar as this is a document that has not

16   been produced, I feel like the document would speak for itself,

17   so I --

18        MS. BUFFALANO:  Okay, let me ask him.

19   Q    BY MS. BUFFALANO:  How -- how did you -- how did Christine

20   communicate the incident to you?

21   A    I believe it was verbally.  I believe it's probably a

22   phone call in which she'd informed me that there had been some

23   form of event or incident between an associate on break and an

24   individual involved in the protest.

25        JUDGE GREEN:  Let me just tell Mr. Kearl I'm -- I'm



Exhibit E, Motion to Try Petition on Hearing Record                           1203

1    dealing with this as though you have a standing objection, as

2    well, along with Mr. Jackson.

3         MR. KEARL:  Okay, and I -- I don't mean to interrupt.  But

4    insofar as it's helpful to note on the record where those

5    objections are relevant for us subsequently, is it okay if I

6    just --

7         JUDGE GREEN:  So I have -- it's my understanding that the

8    Charging Party and General Counsel are objecting to all -- all

9    testimony regarding the Respondent's investigation.  So I don't

10   really think we need -- we need the specific objections.

11        MR. KEARL:  Okay.

12        JUDGE GREEN:  All right.

13   Q    BY MS. BUFFALANO:  Mr. Gilbert-Differ, did Ms. Hernandez

14   tell you who was involved in the incident at that -- during

15   that initial conversation?

16   A    No.  No, she did not.

17   Q    I know you said that -- I think you said you don't recall

18   exactly what time you learned about this.  Do you recall what

19   time the incident took place?

20        MR. JACKSON:  Objection.  Foundation.

21        JUDGE GREEN:  Overruled.

22   Q    BY MS. BUFFALANO:  If you know?  And you can answer, Mr.

23   Gilbert-Differ.

24   A    Okay, thank you.  I believe it was in the middle of the

25   day.  A specific time, though, I don't know.  I can't recall



1   that.

2   Q    Okay.  Do you recall about how long after the incident

3   occurred you learned about it?

4   A    It was certainly within the first hour after the incident

5   occurred and probably in the front half of that hour.  Beyond

6   that, honestly, I could not be more specific.

7   Q    What did you understand about why you were being alerted

8   to the incident?

9   A    That's fairly common.  So altercations, verbal, are

10  certainly sufficient to concern the senior operations manager,

11  are exactly the sort of things we would expect and encourage

12  our HR colleagues to report to us.  It may be that the incident

13  ends up not falling in the workplace incident management

14  standards of conduct, but we would rather know, assess, and

15  make that determination than not know and miss an opportunity

16  to support that kind of investigation.

17  Q    And so -- and that's my next question to you, is, is it

18  typical -- so I understand that you would rather know than not

19  know.  But is it typical for site HR to get you involved before

20  there's even any evidence of -- of any kind of what you're --

21  use your terminology, a WIM incident?

22  A    Yes.  Yeah, that is -- that is fairly common.  From our

23  perspective, this is a -- a partnership investigation.  The

24  earlier the two partners working on this together, the better.

25  Q    And why is that?  Why do you need to know?  Or why -- why



# Exhibit E, Motion to Try Petition on Hearing Record

1    is it, from an LP perspective, that you would want to know

2    before there's actually any actual evidence of a WIM event?

3    A    Yeah.  Certainly, in -- in -- in the worst-case scenarios,

4    which, you know, professionally, I tend to go to a lot and work

5    backwards.  In the worst-case scenarios, the earlier we are

6    able to take steps to mitigate risk, the better.

7         So you know, from our perspective, even at the point at

8    which there may be limited or no evidence, it's better that we

9    know that an event is under investigation and we lend support

10   to that investigation to get quickly to a point where we can

11   actually understand better what's happened, and if necessary,

12   make any next steps to protect any individuals who are party to

13   this.  So that's individuals directly involved, individuals

14   generally in our workplace, or any wider community risks.

15        The point is, I guess, that we don't know what we don't

16   know until we start the investigation.  The sooner we're in

17   that mix, the better, both in terms of the resourcing and a

18   risk management perspective.

19   Q    So what is human resources supposed to send to loss

20   prevention to consider?

21   A    Yeah.  It's essentially anything described within the

22   workplace incident management guide.  It's a very, very broad

23   band of potential issues.

24        So if we look at incidents involving, you know, one

25   individual threatening another or others, then anything from



1    harassing behavior, bullying behavior, all the way through to

2    direct threats or physical attack, in terms of individuals who

3    present a risk to themselves, it's anything from an individual

4    displaying generally concerning behaviors up to suicidality.

5         And in terms of external threats, it's anything from a

6    fairly low-level and innocuous type of comment made against

7    individuals working in our building, or potentially even the --

8    the business itself, all the way through to the -- the upper

9    levels of risk.

10        So it's an extremely broad band that we cover, and we

11   would ask HR to escalate anything within that space to us, or

12   frankly, anything they suspect may be within that space to us.

13   Q    Does -- from your perspective, does human resources know

14   what you've just described, in terms of what they're supposed

15   to alert loss prevention to?

16   A    Yes.

17   Q    And how do they know?

18   A    So we conduct at least quarterly trainings with our HR

19   partners at our facilities.  Typically, that's training with a

20   whole team, and it's essentially covering what it is we need to

21   be involved with, how to escalate to us if we're on site, what

22   to do if we're not, and essentially ensuring they understand,

23   again, the full broad band of -- of what we talk through, and

24   then the how-tos of getting assistance and support.

25   Q    And have you conducted those trainings?



1    A    I have at facilities in my time, yes.

2    Q    How often do you participate in them?

3    A    In my current role, not often.  It's much more typical for

4    that to be conducted by the site teams.  I believe the last

5    time I conducted a training to a partner audience on this would

6    have been Q3 last year at a facility in North Carolina where I

7    presented to an operations audience.

8    Q    Okay, and I'm going to direct your attention back to the

9    April 6th -- back to April 6th.  You received a call from

10   Christine in which she told you that there had been an

11   incident.  I believe that you said that you -- the next thing

12   you did was to talk to Maciej Curlej; is that right?

13   A    Yes.

14   Q    And how did you communicate with him?

15   A    Verbally.  I think in person.

16        MR. JACKSON:  I'm sorry, Judge.  I didn't hear that.

17        You said verbally and then what, sir, Mr. Differ?

18        JUDGE GREEN:  It kind of -- yeah, it kind of clicked out

19   for a second.  Can you repeat the answer?

20        THE WITNESS:  Yes, sir.

21        Yes, it was verbally.  I believe in person.

22   Q    BY MS. BUFFALANO:  Okay, and about how long after your

23   conversation or after you communicated with Christine did you

24   talk to Mr. Curlej?

25   A    It was very soon after, no more than 30 minutes.



www.escribers.net | 800-257-0885

1    Q    Do you remember where you met with him?

2    A    I do not, no.

3    Q    Were you on site that day at JFK8?

4    A    Yes.

5    Q    Can you tell us about the conversation that you had with

6    Mr. Curlej?

7    A    It was relatively brief, essentially, you know, what

8    happened, what do you remember hearing, and what did you do.

9    Q    Okay, and what -- can you tell us what he told you?

10    MR. KEARL:  Objection.  Hearsay.

11    MS. BUFFALANO:  We're -- at this point, we're just using

12    it to demonstrate, you know, the progression of things.

13    JUDGE GREEN:  Right.  Overruled.

14    Q    BY MS. BUFFALANO:  You can answer, Mr. Gilbert-Differ.

15    A    Thank you.  Mr. Curlej described that an individual

16    protesting -- and he described it as an individual wearing a

17    pink bandana -- had begun shouting at an associate who was out

18    on break.  Mr. Curlej believed there'd been an initial

19    conversation between the two, and then the individual in the

20    pink bandana had become increasingly abusive and offensive

21    towards that individual.

22    Mr. Curlej had then called the site general manager, Sai

23    Kotha, on his cell phone to alert them to the event.

24    MR. JACKSON:  Objection.  Hearsay.  I mean, or foundation.

25    I don't understand what -- the basis of this witness' testimony



Exhibit E, Motion to Try Petition on Hearing Record

1    about Mr. Curlej's phone calls.

2        JUDGE GREEN:  So overruled.

3    Q    BY MS. BUFFALANO:  Did he -- did -- in that conversation,

4    did Mr. Curlej tell you anything specifically about what he

5    heard either the individual participating in the

6    demonstration -- well, let me start there.  Did Mr. Curlej tell

7    you anything about -- specific about what he heard the

8    individual participating in the demonstration say during that

9    conversation?

10   A    I don't recall what he told me at that point,

11   specifically, in terms of language used between the two.  The

12   dynamic that I recall him describing was, essentially, the

13   individual involved in protests and the individual he described

14   as wearing the pink bandana had been, you know, discussing,

15   shouting through a bullhorn, about concerns that that group had

16   around the facility and the belief that it should be closed for

17   cleaning.

18       One individual on break, a female, had essentially shouted

19   back they disagreed on that, and they were, you know, glad they

20   had the opportunity to work.  And that had then devolved very

21   quickly with the individual in the pink bandana verbally

22   abusing the other.  I don't recall specific words that Mr.

23   Curlej shared with me then at this point, to be honest.

24       MR. JACKSON:  Objection to the extent it's offered for the

25   truth of the matters asserted by the witness.



1    JUDGE GREEN:  Right, so I'm not accepting it for the truth

2    of the -- the statements allegedly made by Curlej.  We don't

3    have Mr. Curlej here to testify.  I -- currently, I'm just

4    accepting it to the extent it explains his background, what Mr.

5    Gilbert-Differ did as a result of them.

6        MS. BUFFALANO:  And Your Honor, what the company knew, I

7    mean, the company's state of mind, right?  This whole

8    proceeding is about the company's litigation.

9        JUDGE GREEN:  Right, okay.

10       MS. BUFFALANO:  So this is what the company knew.  Okay.

11   Q    BY MS. BUFFALANO:  Mr. Gilbert-Differ, did you take a

12   statement from Mr. Curlej during your meeting with him?

13   A    I did not.

14   Q    What, if anything, did you do next in the investigation

15   after speaking with Mr. Curlej?

16   A    I reviewed facility video to attempt to identify this

17   event.

18   Q    What was the purpose -- so you said "to identify the

19   event".  What's the purpose of revealing the video?  Can you

20   just give us a little more?

21   A    It does a few things.  I think, first, we were looking for

22   corroboration that the event reported to tell us has occurred,

23   you know.  Yes, we trust our leaders, but in any investigation,

24   corroboration matters.  So we're looking to corroborate that

25   there is a clear event between two individuals.  Secondly, we



1    want to understand, you know, what the nonverbal dynamic of

2    this event looks like.  Video is great, but it doesn't capture

3    audio.  And thirdly, to help us to identify individuals who

4    could have been present and therefore seen the events and be

5    able to relate to us more context around it.

6    Q    How did you locate -- so how do you locate facility video?

7    A    You have to use a system called Security and Safety

8    Desktop; it's a Cisco-provided system available on my laptop

9    computer.  So essentially, I would use my laptop to access the

10   video facility and recordings and then work back through likely

11   areas that would show us a view of the event.

12   Q    Okay, and is that what you used to locate the facility

13   videos in this instance?

14   A    It is.

15   Q    And how many -- I'm assuming you found facility video of

16   the incident; is that right?

17   A    Yes.  Yes, I did.

18   Q    Is there -- how many views did you find?

19   A    I identified two views of this event.

20   Q    Okay.  Can you just describe them to us, like, what

21   they're -- what they're a view of?

22   A    Certainly.  So from conversation with Mr. Curlej, I was

23   aware that this event had taken place in the area immediately

24   around our building's main entrance, so two cameras that

25   identified this event for us.



1    The first one is located underneath the canopy, above our

2    main entrance, essentially looking out.  It shows a line across

3    the entrance doors, glass entrance doors, on the right-hand

4    side of the view.  And then, out towards the left of frame, it

5    shows you views of our parking lot.  It would also show you

6    pieces, like our parking structure in the distance, a then-

7    under construction building across the road, and specifically,

8    a fairly clear view of the area immediately between our

9    handicapped parking spaces, which is where this event, it turns

10   out, occurred in and around.

11   Q    And I'm just looking at the --

12   A    The second -- oh.

13   Q    Oh, I'm sorry; go ahead.

14   A    Sorry.  The second view was located again in the same

15   general area, higher up on our building, an external counter

16   mount -- external camera mounted higher up on our building, and

17   in this case, looking down on much the same space.  So again,

18   looking down, you can see a little of the canopy the second

19   camera is located under, and then out into the parking lot,

20   showing, again, the sort of areas I described.

21       MS. BUFFALANO:  Okay, thank you.

22       And I was just looking up, for Mr. Kearl, the Bates

23   numbers.  So Mr. Kearl, we're going to talk about Bates numbers

24   185 and 186.

25       Mr. Falk, can you show us General Counsel's Exhibit 52?



1      MR. FALK:  Okay.  One moment, please.

2      MS. BUFFALANO:  Thank you.

3   (Video played at 11:16 a.m., ending at 11:17 a.m.)

4      MS. BUFFALANO:  You can just -- you can just pause it,

5   please.  Okay.

6   Q    BY MS. BUFFALANO:  Mr. Gilbert-Differ, do you recognize

7   this video?

8   A    Yes, I do.

9   Q    And what is this?

10  A    Yeah, so this is the -- the first time view I described.

11  So what you're seeing, sort of right of frame, you can see a

12  door number, N-11, and then another number beyond that; I

13  believe it's N-1 -- 12.  So that is our glass main entrance, so

14  essentially, it gives you access into a public lobby in the

15  front of JFK8.

16      Off to the left of frame, you can see building that's

17  under construction.  And then, in the sort of immediate

18  foreground, the left-hand side, you can see handicapped parking

19  and a walkway in between that.  Far from the camera center

20  view, you can see a multistory parking structure.  And then, in

21  the foreground, you can see some individuals present in and

22  underneath the -- close to or underneath the canopy that covers

23  our main entrance.

24  Q    Okay.  And on the right here, I think you indicated these

25  are -- there are doors running all along the right side; is


www.escribers.net | 800-257-0885

1    that right?

2    A    That's correct.  They run close to where you can see a

3    wall.  That's -- that's roughly the, kind of, span of those

4    glass doors.

5    Q    Okay, and that -- is that the main entrance to the

6    facility?

7    A    It is.  This is the only entrance in and out of JFK8 for

8    pedestrian traffic.

9    Q    Okay, so what I would like to know, Mr. Gilbert-Differ, is

10   when you reviewed this video, how did it -- what -- what did

11   you take from it that aided you in your investigation?  So I

12   think the best way to do that is just to hit play, and you tell

13   us, based on the video, what it is that was --

14        MR. JACKSON:  Objection.  Leading.  Lacks foundation.

15        JUDGE GREEN:  Overruled.

16        MS. BUFFALANO:  Okay, so can press play, Mr. Falk.

17        And just tell us, Mr. Gilbert-Differ, when to stop.

18        THE WITNESS:  Certainly.

19   (Video played at 11:19 a.m., ending at 11:19 a.m.)

20        THE WITNESS:  We can just pause there for a second.

21        MS. BUFFALANO:  And let the record reflect we're at, I

22   think, seven seconds.  Can you confirm that, Mr. Falk?  A

23   little blurry on my end.

24        MR. FALK:  Yes.

25        MS. BUFFALANO:  Okay, thank you.



Exhibit E, Motion to Try Petition on Hearing Record

1    THE WITNESS:  Yeah, so I'd just like to quickly identify a

2    few individuals visible in the video here.  So you will see,

3    essentially center frame, a light post next to a trash can.

4    Just behind that is an individual in a high-visibility vest;

5    that is Maciej Curlej.  And then, to slightly left of Mr.

6    Curlej and closer to the camera, you can see three individuals

7    in different colored vests, so two in yellow vests and one in a

8    blue vest.  Those are third-party contractor security officers.

9    I can identify for you the individual closest to camera with

10   "security" visible on their vest is Paul Chierchio, and in the

11   blue vest is Kaydee Burtone.

12   MS. BUFFALANO:  Thank you.

13   You can press play, Mr. Falk.  Thank you.

14   (Video played at 11:20 a.m., ending at 11:20 a.m.)

15   THE WITNESS:  Can we pause here, please?

16   MS. BUFFALANO:  And let the record reflect that we're at

17   22 seconds.

18   And Mr. Falk, just let me know if I'm -- I'll -- I'll keep

19   doing this.  Just let me know if I'm wrong.

20   MR. FALK:  Okay, sounds good.

21   MS. BUFFALANO:  Thank you.

22   THE WITNESS:  Okay, so you're going to seeing an

23   individual in the -- in the essential walkway between

24   handicapped parking.  So presently, they're located behind a

25   dark-colored Honda just parked rows out.  That individual is



1   holding a bullhorn, and they are wearing a pink bandana,

2   carrying a white sign, and that is Gerald Bryson.

3   Q    BY MS. BUFFALANO:  Did you know -- when you were reviewing

4   the video initially on April 6th, did you know that that was

5   who he was?

6   A    On my initial view, I did not know that's who that was.

7        MS. BUFFALANO:  Okay, thank you.

8        Okay.  You can press play Mr. Falk, please.  Thank you.

9   (Video played at 11:21 a.m., ending at 11:21 a.m.)

10       THE WITNESS:  Okay.  We can see here that Mr. Bryson is

11  holding the bullhorn, and yeah, for the last few seconds has

12  been essentially looking off to left of view.  That is the

13  general area that I can tell you is where Mr. Evans is seated,

14  just for, kind of, spatial context here.

15       MS. BUFFALANO:  And let the record reflect we're at 31

16  seconds.

17       And you can press play, Mr. Falk.  Thank you.

18  (Video played at 11:22 a.m., ending at 11:22 a.m.)

19       THE WITNESS:  Okay.  I just want to show that, at this

20  point, you can see, paused here, that Maciej Curlej is already

21  on his cell phone.  We -- we've gotten only, really, as far as,

22  I think, 30 seconds in before Maciej was on his cell phone.

23  What I understand from what he told me at this point is this is

24  the point at which he was contacting the leader of the

25  facility, Sai Kotha, to escalate what was --



Exhibit E, Motion to Try Petition on Hearing Record

1       MR. JACKSON:  Objection.  Hearsay.

2       JUDGE GREEN:  Overruled.

3       MS. BUFFALANO:  Do you need me to response?  Okay.

4   And let the record reflect we are at 42 seconds.

5       MR. JACKSON:  Judge, I'm going to go to this entire

6   demonstration.  There's no question pending.  This is improper

7   questioning of a witness to have him --

8       MS. BUFFALANO:  The question is what --

9       MR. JACKSON:  -- narrate a video.

10  Q    BY MS. BUFFALANO:  All right.  What in the video you

11  consider in your investigation, which is exactly what we're

12  here to discuss?

13      JUDGE GREEN:  Right, so I -- right, so just know this

14  is -- that's fine.  This is I guess I'm going to give you the

15  same instruction that I gave the General Counsel, which is I

16  don't need to -- I don't need to just have what's in the video

17  repeated.  So it's really --

18      MS. BUFFALANO:  Right, and I don't think that's what

19  this -- this is doing.

20      JUDGE GREEN:  Okay.

21      MS. BUFFALANO:  Do you?

22      JUDGE GREEN:  I -- my mind is still out on the subject.

23      MS. BUFFALANO:  Well, I think, in -- within here, there

24  may be some things you already know, but there's a lot that you

25  don't know --



1       JUDGE GREEN:  Okay.

2       MS. BUFFALANO:  -- that we already learned.  And there's

3   five minutes of video, so it's not -- you know.

4       JUDGE GREEN:  Okay.

5       MS. BUFFALANO:  If you could press play, Mr. Falk.

6   (Video played at 11:24 a.m., ending at 11:24 a.m.)

7       THE WITNESS:  So what I could see in this video was that

8   the individual I now know to be Mr. Bryson was repeatedly kind

9   of coming back to, facing back towards, the general area Ms.

10  Evans was located.  From my perspective, while I was seeing

11  this kind of continued re-engagement between these two, this

12  view shows it less clearly, so you know, we can kind of come

13  back to that if we view the ultimate view at a later time.

14      But you can also see that Mr. Curlej has -- while he's

15  stepped back and away from the immediate event, he's now turned

16  around again to give himself, again, a clear view of what's

17  occurring.  So that -- that's what I'm interpreting as I'm

18  watching the video.

19      MS. BUFFALANO:  Okay, and let the record reflect we're at

20  48 seconds.

21      And you can press play, by Mr. Falk.

22  (Video played at 11:25 a.m., ending at 11:25 a.m.)

23      THE WITNESS:  So I just want to stop for a moment here.

24  Because here, we can see -- and you know, again, if you note it

25  for who is present, who may be able to tell us more about this,



# Exhibit E, Motion to Try Petition on Hearing Record

1    kind of, a couple of individuals, I think, are important.

2        The -- the primary person I want to just identify here is

3    the individual who has just stepped out of the doors furthest

4    from camera in a yellow vest.  It's a yellow and purple vest,

5    indicating to me that this was an HR team member.

6        Obviously, from a video interpretation perspective, that

7    is an important potential witness to identify and understand

8    what they saw, heard, and experienced.

9    Q    BY MS. BUFFALANO:  And do you know, sitting here, who that

10   person is?

11   A    That is Ms. Donaldson.

12   Q    Okay, thank you.

13       JUDGE GREEN:  I'm sorry; who was that?

14       MS. BUFFALANO:  Ms. Donaldson.

15       JUDGE GREEN:  Ms. -- okay.

16       MS. BUFFALANO:  Her first name is Shianna.

17       Okay, so you can go ahead and play, Mr. Falk.

18   (Video played at 11:26 a.m., ending at 11:26 a.m.)

19       THE WITNESS:  If we just pause for a moment here.

20       Another dynamic that became, you know, relevant to me in

21   terms of, you know, what is happening here, not just who's

22   present, but how are people coming across this situation,

23   reacting as it breaks.

24       So the two individuals who walked out of the closest door

25   to us in the dark blue polo shirts were wearing yellow



1    contractor badges.  Both of them are almost immediately drawn,

2    it appears, to Mr. Bryson and what's occurred.  You see them

3    sort of pause, look.  They spend almost all the time they're in

4    in this view with eyes upon this event.  For me, that's quite

5    relevant when I'm trying to interpret video of an audio --

6    largely audio event.  It's not just, you know, who's here, but

7    how are people present reacting to this.

8        MS. BUFFALANO:  And let the record reflect we're at 1

9    minute and 26 seconds.

10        You can press play, Mr. Falk.  Thank you.

11   (Video played at 11:27 a.m., ending at 11:27 a.m.)

12        THE WITNESS:  So again, Mr. Bryson is -- is moving to left

13   of screen.  And at this point, I'd like to pause because the

14   individual who has just walked into frame from the left-hand

15   side, and so center of the -- the roadway, as it were, close to

16   the silver vehicle with its rear end facing the camera, there's

17   an individual in a gray top and blue jeans.  That is --

18        MR. JACKSON:  Your Honor, objection.  Objection.  Again,

19   Your Honor, there's no question pending before the witness

20   here.

21        JUDGE GREEN:  At -- overruled.

22   Q    BY MS. BUFFALANO:  Go ahead, Mr. Gilbert-Differ?

23   A    And that -- and that was relevant to my interpretation

24   here because, at the points at which, you know, I've had the

25   conversation with, you know, initially, the flagging a



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   conversation, and then the conversation with Mr. Curlej, nobody

2   knew who this was.  And the video became very important in

3   identifying which associates had been, you know, subject to

4   this event.  So that is Ms. Donald -- Ms. Dimitra Evans walking

5   into frame now.  And from there on, I was very much watching

6   the dynamic between Ms. Evans and Mr. Bryson.

7        MS. BUFFALANO:  Okay, and let the record reflect we're at

8   1 minute and 34 seconds.

9        And you can press play, Mr. Falk.

10  (Video played at 11:29 a.m., ending at 11:29 a.m.)

11       THE WITNESS:  Now, if we can pause here, you were saying

12  that, during this, you know, video review, I'm seeing Ms. Evans

13  walking, at this point, from left of frame all the way across

14  to almost crossing the road completely.  She's very close to

15  those no-standing markings on the road, and -- and not -- the

16  head down, not looking up, not engaging.  But on the -- the

17  flip side of the interaction, I could see that the individual

18  in the pink bandana, who I now know to be Mr. Bryson, was

19  exclusively focused towards Ms. Evans.  You know, the bullhorn

20  and almost always pointed in her direction.

21       MR. KEARL:  Objection, Your Honor.  I --

22       THE WITNESS:  That was quite relevant.

23       MR. JACKSON:  That -- that is, like, a complete

24  mischaracterization of what we all just saw in the video.

25       JUDGE GREEN:  And you can point that out when it comes to



1    the briefs, but this Mr. Gilbert-Differ's testimony regarding

2    what he can see, so on, and what was important to him about it.

3    And you can get into that on -- on cross if you want.

4         MS. BUFFALANO:  And let the record reflect we're at 1:47

5    in the video.

6         And you can press --

7         MR. FALK:  1:42.

8         MS. BUFFALANO:  1:42, thank you.  And you can press play.

9    Thank you.

10   (Video played at 11:30 a.m., ending at 11:30 a.m.)

11        THE WITNESS:  And at this point, you know, 1:45, 1:46, we

12   start to say Ms. Evans waving hands generally towards the

13   individual in the pink bandana, but still generally working

14   towards the front entrance.

15        In terms of, you know, why is this relevant, well, just

16   remember, when I'm watching this video for the first time, I am

17   not yet sure that I know when the incident is occurring.  So

18   I'm trying to interpret what I'm seeing in video against an

19   audio report.

20        And secondly, I'm trying to understand the nonverbal

21   dynamics, so, again, you know, who's going where, who's doing

22   what, really matters, or at least my interpretation at this

23   very early stage in an investigation where we know very little

24   about what's occurred.

25        MS. BUFFALANO:  Okay, so you can press play, Mr. Falk.



Exhibit E, Motion to Try Petition on Hearing Record

1       And thank you, Mr. Gilbert-Differ.

2       (Video played at 11:31 a.m., ending at 11:31 a.m.)

3       THE WITNESS:  Okay.  At that point, you see quite a large

4       gesture from Ms. Evans, right arm spread, palms up generally

5       towards the individual in the pink bandana carrying the

6       bullhorn.  So when I'm trying to interpret what we're seeing in

7       the video, what I'm generally seeing is an individual, you

8       know, the individual with a bullhorn.  I'm generally starting

9       to characterize as this person is initiating.  And then, what

10      you're seeing with the individual in the gray shirt is a

11      responding type of reaction.  And that's what I'm seeing in

12      terms of the nonverbal communications on this earlier review of

13      the video.

14      So again, Ms. Evans does the large gesture and then turns

15      back towards the main entrance.  Please bear in mind, at this

16      point when I was initially doing this view, I don't know who

17      any of the individuals here are, with the exception of Mr.

18      Curlej.

19      MS. BUFFALANO:  And we're at, for the record, 1:59.

20      And you can press play Mr. Falk.  Thank you.

21      (Video played at 11:32 a.m., ending at 11:32 a.m.)

22      THE WITNESS:  So then, we're seeing Ms. Evans start to

23      approach one of the glass doors, starts to open it, and then

24      again turns back around.  So again, what we see in the next,

25      kind of, seconds or so, again, to me, appears to be, you know,



# Exhibit E, Motion to Try Petition on Hearing Record

1   responding to something that has been said.  And the person who

2   appears to be engaging where the, you know, interaction is

3   today is between the individual with the pink bandana carrying

4   the white sign and the bullhorn, Mr. Bryson, and towards Ms.

5   Evans, and Ms. Evans turning and reacting to something.

6        MS. BUFFALANO:  We are at 2:08 of the video.

7        You can press  play, Mr. Falk.  Thank you.

8   (Video played at 11:33 a.m., ending at 11:33 a.m.)

9        THE WITNESS:  Ms. Evans has let go of the door, starts to

10  step generally back.  Again, it's -- it's the wide arms and

11  palms-up gesture, and then finally at this point opens the door

12  and goes into the public lobby.

13       So in terms of trying to understand some of the dynamics

14  that this video is starting to tell me, you see a few things.

15  Mr. Curlej remains on the phone almost entirely through this

16  incident, from the first 30 seconds onwards.  We see Ms. Evans

17  apparently responding several times to something.  My

18  interpretation is, from something that the individual in the

19  pink bandana is saying.  And that obviously corroborates what

20  Mr. Curlej initially reported to us.  And then, seeing that

21  this interaction only really ending up being broken off by Ms.

22  Evans entering the facility, which is what we're seeing in this

23  video.

24  Q    BY MS. BUFFALANO:  And you -- thank you, Mr. Gilbert-

25  Differ.  You can -- is there anything else you can recall on



1    this video that, sort of, influenced your investigation or

2    ultimate recommendation in this case?  Should we keep -- my

3    question to you is, do we need to keep watching?  She goes

4    inside?

5    A    No, I think the point at which she goes inside is -- is a

6    good stopping point.

7         MS. BUFFALANO:  Okay, so you can take this exhibit down,

8    Mr. Falk.  Thank you.

9    Q    BY MS. BUFFALANO:  And does the video that you just

10   reviewed, does that fairly and accurately represent the

11   surveillance video that you watched of the -- the overhead

12   surveillance video on April 6th?

13   A    Yes, it does.

14   Q    And are there any alterations or deletions that you can

15   tell from the video you watched on April 6th of the overhang

16   and the video we just watched?

17   A    No.

18        MR. JACKSON:  Objection, Your Honor.  This -- are we

19   supposed to believe that there's only two minutes of video.

20   But there was no editing of the surveillance footage, and

21   there's just two minutes of video?

22        MS. BUFFALANO:  My question to him was whether there were

23   any additions or deletions within the time period that I'm

24   showing him.  And I can -- I mean, I'll ask him that question

25   if you are not clear.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1          JUDGE GREEN:  Okay.  We could ask him.

 2     Q    BY MS. BUFFALANO:  Mr. Gilbert-Differ, within the -- is

 3     there -- was there a prior -- was there video footage from the

 4     facility that was available that started before the video frame

 5     you just watched?  You're on mute, Mr. Gilbert-Differ.

 6     A    My apologies.  Yes, at that time, they would have been.

 7     Our video surveillance system typically retains for no less

 8     than 14 days, so there would have been, probably, no less than

 9     14 days of other footage going back from this incident at the

10     time at which I watched the video.  And they would be,

11     obviously, ongoing retention between which at the time this

12     incident occurred and the point at which I started reviewing

13     it.

14     Q    Okay, and --

15     A    Our video actively overrides on those retention frames.

16     Q    Okay, and so in terms of the video that we just watched,

17     which was about two and a half minutes long, was that two-and-

18     a-half-minute portion of the video the same two and a half

19     minutes that you watched on April 6th from the video footage

20     at -- on your computer?

21     A    Yes.  It took me a long time to identify this event.

22     Obviously, that requires watching more video than we have just

23     watched.  But once this video had been isolated and identified,

24     yes, this is exactly what I would have watched on the day.

25     Q    Okay.  With no additions or deletions within the two and a
```



Exhibit E, Motion to Try Petition on Hearing Record

1    half minutes that we just watched?

2    A    That is correct.

3    Q    Thank you.  Okay, and so the next thing I want to look at,

4    you've identified a second video into the parking lot.  That is

5    General Council's Exhibit 62.

6         MS. BUFFALANO:  Can you pull up General Counsel's Exhibit

7    62, Mr. Falk?

8         MR. FALK:  Sorry, that went to the wrong screen share

9    there.

10   Q    BY MS. BUFFALANO:  Okay, so Mr. Gilbert-Differ, do you

11   recognize this video?

12   A    I do.

13   Q    And is this the second video that you testified you

14   watched on April 6th related to the incident?

15   A    Yes, it is.

16   Q    Okay, so what I would like to do here is to have you

17   review the video with us and identify what in the video

18   factored into your investigation and your recommend -- ultimate

19   recommendation in this case.  So let us know when to stop.

20   A    So before we hit -- of course.  Before we hit play, just

21   to, I guess -- I -- I guess get a little scene setting here.

22   Again, you're looking at much of the same space.  So you see,

23   again, the building under construction.  In the background of

24   this video, you can see the walkway between our handicapped

25   parking spaces in the near foreground.  And then, in the



Exhibit E, Motion to Try Petition on Hearing Record

1    immediate foreground, you can see the same no-standing yellow

2    markings that we saw in the other video.

3        Right of frame between the words "no" and "standing",

4    "standing" on the sidewalk, right on the edge of the sidewalk,

5    in fact, you can see Mr. Curlej.  And then, if you look towards

6    the left of frame, sat down on the curb that's right beside the

7    silver vehicle in the handicapped parking space, you see Ms.

8    Evans.

9        Ms. Evans sat down on the curb in a kind of hunched

10   position, generally.  I believe, at this point, she was

11   smoking.  And then, on the sidewalk, so in between the two

12   white-striped walkways, you can again see the individual

13   wearing the pink bandana, carrying the white sign; that is Mr.

14   Bryson.  So that's really the scene setting, and -- and this is

15   the -- the best determination I can make by video of when this

16   incident started.

17   Q    And let me just direct your attention to the right side of

18   the screen.  There's what looks to be, like, a concrete roof;

19   what is that?

20   A    Okay, so yeah, the bottom-right corner of frame, you can

21   see the canopy.  So that is the canopy that the other view we

22   just watched; the cameras located underneath that.  So that's

23   kind of the -- the holistic scene, certainly, I guess.

24       MS. BUFFALANO:  Okay, perfect.

25       Okay, so if you could press play, Mr. Falk.



1    Q    BY MS. BUFFALANO:  And Mr. Gilbert-Differ, if you could

2    tell us what you see in this video that factored into your

3    investigation or your recommended ultimate recommendation in

4    this case?

5    (Video played at 11:40 a.m., ending at 11:41 a.m.)

6    A    So we can see that Mr. Bryson is generally walking towards

7    right of frame.  And for the first time, round about this

8    moment, you see, Ms. Evans head come up, and she appears to be

9    looking towards Mr. Bryson.  Mr. Bryson then turns, you know,

10   bullhorn is pointed directly at Ms. Evans.  And this was the

11   best determination I could make of when interaction between

12   these two started.

13        MS. BUFFALANO:  Okay, and let the record reflect we're at

14   9 seconds of General Counsel's 62.

15        And you can press play, Mr. Falk.  Thank you.

16   (Video played at 11:41 a.m., ending at 11:41 a.m.)

17        THE WITNESS:  We can see that -- again, you can start to

18   see there's potentially some interaction and exchange between

19   Ms. Evans and Mr. Bryson.  This was, again, obviously --

20   reviewing at the time, did not know who either of these

21   individuals were.  But this was becoming, you know, for me,

22   okay, we -- we have an interaction between an individual

23   engaged in protest and an associate on break, which is

24   obviously what the initial report to me was.

25        So here, you saw a general gesture from Ms. Evans towards



# Exhibit E, Motion to Try Petition on Hearing Record

1   Mr. Bryson, so left arm, loose gesture towards.  And then, Mr.

2   Bryson, you know, apparently responding, the bullhorn is

3   pointed directly, again, right in this frame, towards Ms.

4   Evans.  So it appears to be, at this point, this, you know,

5   verbal exchange.

6       MS. BUFFALANO:  Okay, and let the record reflect we're at

7   18 seconds.

8       You can press play, Mr. Falk, please.  Thank you.

9   (Video played at 11:42 a.m., ending at 11:42 a.m.)

10      THE WITNESS:  So again, you can see this apparent exchange

11  between the two.  You can see Ms. Evans initially generally

12  gestures with left hand towards Mr. Bryson, then make a

13  sweeping gesture towards the group in front with right arm.

14  The dynamic that appears to be emerging here was that we had

15  Ms. Evans disagree with Mr. Bryson on something.

16      MS. BUFFALANO:  Okay.  We are at 28 seconds.

17      You can press play, Mr. Falk.  Thank you.

18  (Video played at 11:43 a.m., ending at 11:43 a.m.)

19      THE WITNESS:  You can see here a left hand for Mr. Bryson

20  is again towards face, I believe, at this point, smoking.

21  Sorry, Ms. -- Ms. Evans' left hand is up towards her face, I

22  believe smoking again.  Mr. Bryson is continuing to, you know,

23  use his bullhorn.

24      Bullhorn is kind of swinging from left -- right to left

25  anywhere, or left to right, Mr. Bryson's right to left, during



www.escribers.net | 800-257-0885

1    this.  But over and over, started to say, and this becomes more

2    and more consistent through the video, where, increasing

3    periods of time, the bullhorn ends up directly pointing towards

4    Ms. -- Ms. Evans.  That became a pretty important dynamic to

5    me.

6        MS. BUFFALANO:  Okay.  Let the record reflect we are at 36

7    seconds into the video.

8        And you can press play, Mr. Falk.  Thank you.

9        THE WITNESS:  The -- I apologize.  The other piece I'd

10   just draw attention to is, at this point, Mr. Curlej just

11   stepped out of view underneath the canopy.  And you can just

12   about see, in the shadow, Ms. Bertone, a security officer,

13   standing center-bottom of the frame.

14       My apologies, sir.

15       MS. BUFFALANO:  Thank you.  Sorry about that.

16   (Video played at 11:44 a.m., ending at 11:44 a.m.)

17       THE WITNESS:  So for approximately six seconds right

18   there, we saw Mr. Bryson's loud-hailer, bullhorn, was again

19   directly facing towards Ms. Evans.  And Ms. Evans, is at this

20   point, wasn't responding, apparently, talking, or even looking

21   at Mr. Bryson, you know, essentially, at this point, sitting in

22   an apparent passive position.

23       MS. BUFFALANO:  Let the record reflect we're at 53

24   seconds.

25       You can press play, please, Mr. Falk.  Thank you.



Exhibit E, Motion to Try Petition on Hearing Record

1    (Video played at 11:45 a.m., ending at 11:45 a.m.)

2    THE WITNESS:  And again, yeah, you see some exchange

3    between the two, so an extended period of some seconds where

4    Mr. Bryson's loud-hailer or bullhorn is pointed directly

5    towards his Evans, and in this case, a kind of fairly loose

6    gesture, very, very small movement from Ms. Evans' left hand in

7    the general direction.

8    You see Ms. Evans is increasingly, you know, looking out

9    towards the group towards the right, which they face -- in the

10   video, is increasing lurking towards the main entrance.  And

11   Mr. Bryson continues to -- to use the loud-hailers around.

12   JUDGE GREEN:  So Mr. Gilbert-Differ, this is a very

13   detailed description of what's going on in the video, just

14   please, we have the video in evidence.  What we're looking for

15   is just whatever was significant to you at the time you watched

16   it.  Okay?

17   A    I -- I apologize.

18   MS. BUFFALANO:  I do believe that's what he's telling us.

19   JUDGE GREEN:  I -- I think for the most part, it is.  But

20   it's -- it's sometimes I think we're -- we're fading into just

21   kind of a play-by-play.

22   Q    BY MS. BUFFALANO:  Okay.  And -- and Mr. Gilbert-Differ,

23   if you could just tell us when you're pointing things out, how

24   that was important to you or why that was important to?  Thank

25   you.



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Certainly.  And I -- I apologize if it does come across as

2    a kind of narrative play-by-play.  That is I -- I regret to

3    say, very much how we do our video review.  We do look at this

4    in -- in very small detail.  We will play and play and play

5    again to try and draw out what we're seeing and understand as

6    much as the ver -- as the video will tell us.  And what do the

7    visuals tell us.  Particularly in events where audio is so

8    important.  It's pretty critical that we pick up on any NVCs,

9    or nonverbal communications, any small dynamics that help us to

10   better interpret what's event -- what occurring.  Yeah, I

11   apologize if it's -- it feels increasingly -- yeah, slow-paced

12   and -- and it was.  This is very much how the video review was

13   for me, very, very slow paced from the point at which the kind

14   of initial dynamics were identified.  And very much watching as

15   we are now, so watching a few seconds digesting, understanding,

16   interpreting, and then moving forwards again.

17   Q    Okay.  So Mr. Gilbert-Differ, if you wouldn't mind -- and

18   thank you for that.  If you wouldn't mind just keeping it to

19   what was important to you.  And I know you're attempting to do

20   that.  So thank you.  And we're at 1:07 in the video for the

21   record.

22        MS. BUFFALANO:  So Mr. Falk, if you wouldn't mind pressing

23   play.  Thank you.

24   (Video played)

25   A    So important to me watching this video here was over the



1    last some seconds again, it seems, Mr. Bryson walks towards

2    frame right, and then back towards frame left.  But over and

3    over and over, I was seeing that bullhorn coming back towards

4    Ms. Evans.  And at this point in the video, I'm seeing very,

5    very little from Ms. Evans going back.  So this is an apparent

6    shift in dynamic.

7    Q    BY MS. BUFFALANO:  Thank you.

8         MS. BUFFALANO:  And we're at 1:26 into the video.  You can

9    press play Mr. Falk.  Thank you.

10   (Video played)

11   A    At this point, we see Ms. Evans stand up and start to

12   walk.  And this is approximately the point at which Ms. Evans

13   comes into view on the video we previously watched.  So what we

14   are going to see from here on out is -- is very much what we've

15   already kind of talked to you on other video.

16   Q    BY MS. BUFFALANO:  Okay.  And so from your view, Mr.

17   Gilbert-Differ, there's nothing more on this video that we --

18   that impacted your decision?  Obviously, you can see Mr. Bryson

19   here, where you couldn't see him in the last view.  Would --

20   should -- should we keep going?

21   A    Certainly, in just a few seconds --

22        JUDGE GREEN:  So I'd rather -- if it's just to confirm --

23   if it's just going through this further to the extent it

24   confirmed what Gilbert -- what Mr. Gilbert-Differ thought about

25   what he saw on the original side video, I'm not sure that



1    there's any reason to do that.

2       MS. BUFFALANO:  Okay.  All right.  Thank you, Mr. Falk.

3    You can take down this exhibit.

4    Q    BY MS. BUFFALANO:  And Mr. Gilbert-Differ, you mentioned

5    when we were watching the first video that you were able to

6    identify Ms. Evans based on the video; is that right?

7    A    That's correct.

8    Q    And can you tell us how you did that with the video?

9    A    Yeah.  So in terms of identifying an individual, the

10   easiest way for us to do that quickly is via badge scans.  We

11   have badge readers located at various locations inside the

12   building.  But in this case, the most pertinent were the ones

13   located on our turnstiles.  So access badges.

14      Our access-badge system is very closely synced with our

15   video system.  So identifying this -- Ms. Evans in this case

16   was no more complex than simply watching an internal piece of

17   video until Ms. Evans presented a badge at a badge reader.  And

18   then interrogating that badge reader as to whose badge was

19   presented to it.  That identified Ms. Evans.

20   Q    And what do you do with that information, if anything?

21   A    Very quickly sent that forwards to our HR partners.  I

22   believe, at this point I was working with Tyler Grabowski.  So

23   I shared that identification with Tyler.

24   Q    And do you know how you communicated that to Tyler?

25   A    I don't remember.  No.



www.escribers.net | 800-257-0885

1    Q    Okay.  Do you know, Mr. Gilbert-Differ, who identified

2    the -- about 2:30 of each of those videos?  Who identified that

3    as --

4    A    Yeah, that was me.  That was me.  Yep.  I did.

5    Q    And in that second video we just watched, the parking lot

6    view, does the video that we just watched fairly and accurately

7    represent the 2:30 seconds, the corresponding 2:30 that you

8    watched on April 6th?

9    A    Yes, it does.

10   Q    And are there any alterations or deletions in that 2:30

11   that we just watched of the parking-lot view from the original

12   footage that you reviewed on April 6th?

13   A    No, there are not.

14   Q    And so you reviewed these two videos.  What is it --

15   what's your -- what's the outcome of the review of those two

16   videos?  You obviously identified Ms. Evans.  Did you reach any

17   other conclusions about what may or may not have happened at

18   that point in your investigation?

19   A    Yes, I certainly notified Tyler that Ms. Donaldson was

20   present.  Obviously, Ms. Donaldson working in the HR team was

21   somebody it would be important to quickly get an account from

22   as well, identify the witnesses that we spoke about from the

23   security team.  And that it'd be important to get a report from

24   them, as you know, contractors a slightly different process.

25   But yeah, we would like to get a report from them as to what



1   occurred from their perspective as well.

2   And then, in terms of the video, there was absolutely nothing

3   in the video that did not corroborate what had been initially

4   reported by Mr. Curlej.  You know, it very much supported his

5   initial quick summary to me of what he had seen and heard.  It

6   appeared to be borne out by what the video surveillance could

7   offer us.

8   Q   Okay.  Thank you.  And I'm about to move on to something

9   else.  Is it a good time to take a restroom break?

10   JUDGE GREEN:  Yes, thank you.  We're off the record for

11   five or ten minutes.

12   MS. BUFFALANO:  Ten would be great.

13   JUDGE GREEN:  Okay.  So we're off the record for ten

14   minutes.  Mr. Gilbert-Differ, just -- you can walk around.  You

15   can do whatever you want.  Just don't talk to anybody about

16   your testimony.  And we'll be back at -- in ten minutes.  Okay?

17   THE WITNESS:  Yes, sir.  Thank you.

18   JUDGE GREEN:  Thank you.

19   (Off the record at 11:53 a.m.)

20   MS. BUFFALANO:  I just wanted to make sure that General

21   Counsel's 52 and 62 had already been admitted.  And if not to

22   move for their admission.

23   JUDGE GREEN:  They are already admitted.

24   MS. BUFFALANO:  Okay.  Thank you.

25                        **RESUMED DIRECT EXAMINATION**



Exhibit E, Motion to Try Petition on Hearing Record

1    Q     BY MS. BUFFALANO:  Okay.  Mr. Gilbert-Differ, so we have

2    talked about the site video, your conversation with Mr. Curlej,

3    your conversation with Ms. Hernandez.  Is there anything else

4    that you did as part of your investigation, that you did or

5    looked at as part of your investigation?

6    A     So while I'm conducting these inquiries in parallel, my HR

7    partners are starting to obtain statements from various

8    individuals who were present.  So really, as they start to

9    bring those statements in as well, again, the review process of

10   those as well.  So that was my, kind of, second phase in the

11   investigation here.

12   Q     Okay.  Was there anything else that you looked at?

13   A     I don't believe so.  Just the -- oh, yeah, sorry, I

14   apologize.  It was.  So sometime later that day, a Facebook

15   Live video was flagged, which showed Mr. Bryson apparently

16   talking about this event.

17   Q     Okay.  And the Facebook Live video, where did you hear

18   about it?

19   A     I understand that I was -- I think that was provided to me

20   by HR.  HR had been provided with the link to it initially

21   because it was relevant to what they were looking at.

22   Q     Okay.  Do you remember who in HR gave you the link?

23   A     I don't.

24   Q     Do you remember how long after the incident you looked at

25   the Facebook Live video?



www.escribers.net | 800-257-0885

1    A    It was the same day as the incident.  I'm not sure how

2    many hours after.

3    Q    Okay.

4         MR. KEARL:  I just -- just wanted to make a Bannon-Mills

5    note there, we have not received any communication between HR

6    and Mr. Gilbert-Differ regarding the FB Live link.  But carry

7    on.

8         MS. BUFFALANO:  Thank you.

9    Q    BY MS. BUFFALANO:  Do you know how HR informed you of or

10   provided the link to you?

11   A    I don't.

12   Q    Okay.  All right.  So the entire video, are -- do you know

13   that it's an hour -- a little bit over an hour long?

14   A    Yes.

15   Q    Did you watch the whole thing or some portion of it?

16   A    Over the course of the investigation, some point, I did

17   watch every minute of it.  On the day itself, I believe, we

18   kind of focused on a particular window in -- in the -- in the

19   region of minutes 50 through 60, I believe, was -- was primary

20   focus to me at that point.

21   Q    Okay.

22        MS. BUFFALANO:  So Mr. Falk if you could pull up General

23   Counsel's Exhibit 63.

24        MR. FALK:  Okay.  One moment.

25        MS. BUFFALANO:  Thank you.  And in an effort to reduce the



Exhibit E, Motion to Try Petition on Hearing Record

1   amount of time we're spending on watching video, I'm going to

2   just ask you to play three clips, Mr. Falk.  I'm going to give

3   you the time now to make this faster.  And it's 49:40 to

4   50:37 --

5        MR. JACKSON:  Before we get into this, Judge --

6        MS. BUFFALANO:  Um-hum.

7        MR. JACKSON:  -- I'm -- I'm objecting to playing what's

8   already in evidence.  What -- what is the purpose of this line?

9   I'm -- I'm not even sure there are questions because you

10  permitted her to have the witness narrate a video.  I'm not

11  sure what the purpose of this demonstration is.

12       MS. BUFFALANO:  The --

13       JUDGE GREEN:  So it's the same as what it was the last

14  time, right?  We're -- we're ask -- we're asking Mr. Gilbert-

15  Differ what he thought was important about the Facebook Live

16  video.  Yes?

17       MS. BUFFALANO:  Yes.

18       MR. JACKSON:  So objection.  Leading.  She's directing him

19  instead of asking him what was important to him.

20       JUDGE GREEN:  Overruled.

21       MS. BUFFALANO:  It's an hour and seven minutes.

22       JUDGE GREEN:  Overruled.

23       MS. BUFFALANO:  Okay.

24       JUDGE GREEN:  Overruled.  Let's -- let's move through it.

25       MS. BUFFALANO:  Okay.  So the -- are you -- Mr. Falk, are



Exhibit E, Motion to Try Petition on Hearing Record

1    you ready for the timing?

2         MR. FALK:  Sure.  Go ahead.

3         MS. BUFFALANO:  Okay.  49:40 to 50:37, 51:25 to 52:09,

4    54:20 to 54:57.  And I'm just going to ask if the videos be

5    played.  And then, I'm going to ask Mr. Gilbert-Differ a couple

6    of questions.

7         MR. KEARL:  Your Honor, if that's the case, can I just

8    request that we play it from 49:40 to 54:27 without

9    interruption?  We don't know what's in those small gaps.

10        MS. BUFFALANO:  And if I may --

11        JUDGE GREEN:  Yeah.

12        MS. BUFFALANO:  -- it's just very long.

13        JUDGE GREEN:  I'm -- I'm sorry.  No.  We're -- we're going

14   to do it this way.

15        MR. FALK:  Are we ready to play?

16        MS. BUFFALANO:  Yes.

17        MR. FALK:  Okay.

18   (Video played)

19        MS. BUFFALANO:  And Mr. Falk, I'm just going to ask -- I'm

20   going to stop and ask Mr. Gilbert-Differ a question, so you can

21   just hang on one second.

22   Q    BY MS. BUFFALANO:  It's probably easier just to do it this

23   way, Mr. Gilbert-Differ.  Can you tell me what, if anything, on

24   that clip of Facebook Live video impacted your investigation or

25   your recommendation in this case?



Exhibit E, Motion to Try Petition on Hearing Record

```
1    A    Yeah, so certainly, that the primary piece that was really
2    relevant here was how, you know, contemporaneous it was with
3    the event itself.  It was very apparent from the background
4    that this is being filmed within this building's parking lot.
5    Here was the individual who had been involved in this event
6    between you know, Mr. Bryson, Ms. Evans, Mr. Bryson, himself,
7    talking specifically about a confrontation he'd gotten into
8    with a female.
9         During that initial brief clip that we just played that
10   you heard some of the language and some of the characterization
11   of that incident that it appeared Mr. Bryson was -- was having.
12   You know, this is how we were trying to understand from two
13   perspectives here.  Primarily here, I'm looking at what was Mr.
14   Bryson's take on it.  So the first thing that was pretty
15   critical for us was he characterized this happens as a plant.
16   You know, he characterized her not as a fellow associate with a
17   differing viewpoint, but as some sort of corporate stooge.  And
18   that was very concerning.  That was not what Ms. Evans was.
19   Ms. Evans was a tier 1 associate who's worked (indiscernible)
20   an extended period of time.  And that's it.
21        He talks about how they'd gotten into what he described as
22   initially a debate.  And then, you know, he started to talk in
23   such a way that it became apparent he felt this had gone too
24   far.  And it became apparent that he talked about, you know, he
25   described her on this video in extremely derogatory terms.
```



1    Talked about her as having the appearance of, quote/unquote, "a

2    junkie."  Talked about her as having the appearance of somebody

3    who was actively on drugs at the time they've had the

4    conversation.  He described her as the scum of the Earth.

5         And he seemed to characterize the indication between the

6    two of them as her in some way impugning him.  This is pretty

7    concerning from my perspective, both in terms of dynamic and in

8    terms of how Mr. Bryson's characterizing the event.  And the

9    one thing that we certainly didn't hear in this clip was any

10   kind of remorse, regret, or this may have gone too far, quite

11   the reverse.  Trust and believe, I think was the phrase he

12   used.  No, this was absolutely where he felt he should have

13   gone and what he felt he should have done.

14        JUDGE GREEN:  So let me -- let me just stop you.  Why

15   don't we do this -- this way.  Mr. Gilbert-Differ, you, sitting

16   here, have a recollection of viewing the video back on April

17   6th?  You recall doing that?

18        THE WITNESS:  Yes, sir.

19        JUDGE GREEN:  Okay.  Why don't you just tell us without

20   looking at the video, what you recall finding significant at

21   the time that you reviewed it?

22        MR. JACKSON:  Thank you, Judge.

23        THE WITNESS:  Yes, I think much of what I've just covered,

24   sir, including how he characterized Ms. Bry -- Ms. Evans.

25   There are -- there were future elements of the -- this video in



1    which he talked about potentially having gone too far.

2        And then further on in the video, a conversation emerged

3    between Jordan Flowers (phonetic), who I believe is the person

4    in the frame at the moment and Mr. Bryson.  Mr. Bryson

5    repeatedly used extremely abusive racial language.  I'm happy

6    to share exactly what that language was for the Court or if

7    you'd prefer to refer to the transcripts.  Obviously, I'm --

8        JUDGE GREEN:  Well, if you can recall, just testify what

9    you recall.  And if you can't recall it, then we can use the

10   video to refresh your recollection.

11   Q    BY MS. BUFFALANO:  And you could use the first letter if

12   you'd prefer, Mr. Gilbert-Differ, whatever you prefer.

13       JUDGE GREEN:  Correct.

14   A    Certainly.  So repeated use of the N-word was -- was a

15   characteristic of this video.  And that was, from my

16   perspective, pretty critical in terms of, you know, Mr.

17   Bryson's propensity to use language that, you know, most would

18   accept was extremely offensive.  And to describe Ms. Evans in

19   terms that are extremely offensive and to characterize her as

20   the scum of the Earth.  Mr. Bryson appeared to have taken this

21   entire episode as a -- you know, a personal insult, a personal

22   challenge.

23   Q    BY MS. BUFFALANO:  And do you recall anything else about

24   the video that was relevant to your investigation or impacted

25   on your ultimate recommendation?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yeah, so obviously there's always the risk of -- you know,

2    applying your own prism and your own standards here.  But what

3    I thought was a -- a very interesting element here was we

4    actually saw Mr. Flowers essentially, apologizing to the

5    virtual audience for Mr. Bryson's repeated use of the N-word as

6    though, it was becoming, for me, apparent that this was also

7    something that was very offensive to others who were hearing

8    this firsthand, even those not present -- present during the

9    initial altercation with Ms. Evans.

10   Q    Is there anything else that you can recall?

11   A    I think really when I sort of started to look, you know,

12   less in the evidence space and more in the risk space, there --

13   there's a potential risk emerging with this both in terms of

14   how Mr. Bryson is treating this event.  So you know, the zero

15   remorse, zero regrets is actually a fairly risky dynamic when

16   it comes to management of this type of threat.

17   And secondly, the -- the elements of this video that indicated

18   Mr. Bryson, you know, to some extent dehumanizing a fellow

19   associate.  So you know, essentially painting them with a more

20   corporate brush.  This is a plant.  This is a stooge.  That's

21   actually pretty concerning as well because that -- that is

22   potentially a step along a pathway to, you know, renewing or

23   even increasing a level of abuse, harassment, or worse.

24   Q    Is there anything else that you can recall Mr. Bryson

25   saying that impacted on your ultimate recommendation or concern



Exhibit E, Motion to Try Petition on Hearing Record

1    related to risk?

2    A    I would need to, you know, refresh myself on the video or

3    the transcript for any other --

4    Q    Okay.

5         MS. BUFFALANO:  Can you, Mr. Falk, can you show us the

6    second clip, 51:25 to 52:09, please?

7    (Video played)

8    Q    BY MS. BUFFALANO:  Okay.  Mr. Gilbert-Differ, does that

9    refresh your memory as to whether there was anything else Mr.

10   Burton said that you weighted into your risk analysis?  You're

11   on mute.

12   A    My apologies.  Yeah, this is pretty clear that Mr. Bryson

13   was characterizing the language he'd used with Ms. Evans as

14   cussing out.  You know, he stated that she cussed to him and

15   then he'd really cussed her out.  You know, he was in a state

16   of mind where he didn't think he wanted to be on camera because

17   of how -- how this had left him feeling.

18        MR. JACKSON:  Objection, Your Honor.  He's -- he's

19   characterizing what Gerald Bryson's state of mind was.  I mean,

20   is he a mind reader?  This is a --

21        JUDGE GREEN:  I'm just -- I'm just accepting this

22   testimony for what Mr. Gilbert-Differ's impressions are.  And

23   I'm not accepting it to determine what Mr. Bryson was actually

24   thinking at the time.  And that's how you should testify, Mr.

25   Gilbert-Differ, what you were thinking about it at the time.



1    THE WITNESS:  Thank you, sir.  And -- and in terms of --
2    you know, why that was why I was thinking that way, Mr. Bryson
3    at the start of that clip can be heard, you know, you need to
4    be over there with them.  You need to not be over here with me.
5    That is why.
6    Q    BY MS. BUFFALANO:  Okay.  And did you hear Mr. Bryson say
7    she -- she's out here, you know, questioning a man?  Did you
8    hear that comment?
9    A    I did.  I -- I think I spoke to that a little earlier
10    about how this was the perceived as a personal attack
11    (indiscernible, simultaneous speech) --
12    MR. JACKSON:  Objection.  Leading.
13    JUDGE GREEN:  Overruled.  We're -- we're dealing with -- I
14    mean, this is all -- this is all refreshing, recollection.  You
15    can go into in cross.  And -- and you can deal with it to the
16    extent that you want to address the credibility of this
17    witness.
18    Q    BY MS. BUFFALANO:  Okay.  You can finish answering Mr.
19    Gilbert-Differ.
20    A    Yes.  Thank you.  The -- the comment was around, you know,
21    being challenged as a man, I believe, or words to that effect.
22    Q    And did that have any impact on your sort of risk analysis
23    and ultimate recommendation?
24    A    You know, certainly our impressions at this point was that
25    this was two associates who disagreed on a point that was the



Exhibit E, Motion to Try Petition on Hearing Record

1    subject of the protest.  And that had been converted, you know,

2    in Mr. Bryson's apparent mind to, you know, the personal slight

3    on him.  That's a -- that's a quite risky dynamic when it comes

4    to potential future threat.

5    Q    Okay.

6         MS. BUFFALANO:  Okay.  Thank you.  And you can take the

7    video down.  I believe that the Facebook Live video is already

8    in evidence.  It's number 63.  But if not, Barry, if you could

9    let me know.

10        JUDGE GREEN:  Yeah, it -- it -- it's in evidence as 63.

11        MS. BUFFALANO:  Okay.  Okay.

12   Q    BY MS. BUFFALANO:  So you testified before we started

13   talking about the Facebook Live video, you testified to witness

14   statements that HR was gathering; is that right?

15   A    Yes, that's correct.

16   Q    And at some point, did you receive copies of those witness

17   statements?

18   A    I did, yes.

19   Q    Okay.

20        MS. BUFFALANO:  So if you could show us, Mr. Falk, Exhibit

21   105 -- Respondent's Exhibit 105.

22        MR. FALK:  Can you let me know the -- the Bate number of

23   this one?

24        MS. BUFFALANO:  Yeah, it's -- I think it's 1353.

25        MR. FALK:  Give me one second.



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. JACKSON:  I'm going to object to the use of these

2    documents to the extent they are used for the truth of the

3    matters asserted therein.  It is hearsay.  Okay.

4    JUDGE GREEN:  What were they?

5    MR. JACKSON:  Is that sustained?

6    JUDGE GREEN:  No, is it going to -- is it -- what's it

7    being used for?

8    MS. BUFFALANO:  It's being used to -- to -- to -- to

9    establish the company's investigation and what the company knew

10   and when they knew it and what the process was.

11   JUDGE GREEN:  Okay.  So it -- it -- it sounds like that

12   would fall -- other than the hearsay objection, the -- the GC

13   or the Charging Party have any other objection?  Like, would

14   this fall within you're Bannon-Mills objection?

15   MR. JACKSON:  It should fall within the Bannon-Mills

16   objection, Your Honor.

17   JUDGE GREEN:  It does.

18   MR. JACKSON:  Does not.  Does not.

19   JUDGE GREEN:  Okay.  So okay.  So I'm going to -- I'm

20   going to allow it -- the extended time hearsay.  I don't, you

21   know, I haven't read the whole thing, but it sounds like --

22   MS. BUFFALANO:  This is very standard stuff in Board

23   hearings.  The entire -- our entire case is to tell you what

24   happened.  And that is what we are doing.

25   JUDGE GREEN:  Right.  I understand.  In other words, this



Exhibit E, Motion to Try Petition on Hearing Record

1    isn't being offered -- we're not going to rely on this for --

2    to determine what happened in the parking lot. We know what

3    happened in the parking lot. That would be -- right, that

4    would be the truth of the matter. Okay. So overruled.

5        MR. JACKSON: And Judge, let me just clarify. I'm not

6    objecting to these particular documents because they were

7    produced. But again, we are objecting to the extent that

8    Respondent should be precluded from introducing or soliciting

9    evidence regarding its investigation to the extent that they

10   have not fully complied with producing all documents responsive

11   to paragraphs as the Charging Party subpoena and the General

12   Counsel subpoena relating to its investigation regarding price

13   and essence.

14       JUDGE GREEN: Okay. That's what I just asked you. So if

15   that's the case, then I will withhold ruling on this document

16   at this time.

17       MS. BUFFALANO: This document has a Bates number on it.

18   It was produced. We -- we have gone over with the General

19   Counsel that all documents have been produced. So I don't

20   know -- it is very -- it's difficult for me to figure out sort

21   of what the issue is. There are buckets of documents that have

22   not been produced in the two later subpoenas. That was

23   something we absolutely told you would happen. We were able to

24   rev up the machine and get out everything, I think, from the

25   first subpoena and certainly related to the investigation to



Exhibit E, Motion to Try Petition on Hearing Record

1   you, nothing is due and owing.  And so the idea that we're

2   talking about Bannon-Mills sanctions related to the

3   investigation doesn't make a lot of sense to me.

4       JUDGE GREEN:  So this is why I didn't want to deal with

5   this on the fly with each objection because it just -- it --

6   the trial grinds to a halt.  So you know, if -- if the -- if

7   the General Counsel has -- has the Bannon-Mills objection, so

8   be it.  I'll withhold ruling on the admissibility of the

9   document until such time as I can deal with that.

10      MR. JACKSON:  And Your Honor, this will be a standing

11  objection for all of these.

12      JUDGE GREEN:  Okay.  Well, you can tell me with regard to

13  the exhibits, you could just tell me.  Okay.  So I mean, you

14  have a standing objection.  But you know.  I'm always going to

15  ask you when -- when an exhibit is being offered, I'm going to

16  ask you whether you have an objection.  And you can say that

17  you have a Bannon-Mills objection.

18      MR. JACKSON:  Thank you.

19      JUDGE GREEN:  Okay.  Well, I'm going to make a note that

20  it was offered and no objection.  That right?  Well, let's

21  continue.

22      MS. BUFFALANO:  Okay.

23  Q   BY MS. BUFFALANO:  Mr. Gilbert-Differ, you can -- you can

24  see the exhibit -- exhibit -- Respondent's Exhibit 105 on the

25  screen?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    I can.  Yes.

 2    Q    And have you seen this document before?

 3    A    I have, yes.

 4    Q    And what is this document?

 5    A     This is an email from Tyler Grabowski to myself on which

 6    he provided his initial summary from the statements and a copy

 7    of each of the statements at that point in his possession.

 8    There -- there was also some reference to obtaining additional

 9    information from security account manager, Paul.

10    Q    Okay.  And it doesn't look like, Paul, the security

11    manager's statement is attached to this document; is that

12    right?

13    A    That is correct.

14    Q    Okay.  Do you know why that is?

15    A     I believe at the time that this email was sent, Paul was

16    no longer on site.  So his shift was over.  And we would be

17    looking to follow up with him the following day when he

18    returned to work.

19    Q    Okay.  And if you look at the -- so it's from Tyler

20    Grabowski, you can see that at the top.  And then, to Geoff

21    Gilbert-Differ, I assume that's your email address; is that

22    right?

23    A    That is correct.

24    Q    And it says sent for 4/6/2020 at 5:03 p.m.  Do you see

25    that?
```



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I do.

2    Q    Okay.  And does that sound right to you as to when you

3    received this batch or group of witness statements from Tyler

4    Grabowski?

5    A    It -- it -- it does that -- that fits with the timeline in

6    my head as well.

7    Q    Okay.

8         MS. BUFFALANO:  And I'm going to move for the admission of

9    Respondent's 105.

10        JUDGE GREEN:  Okay.  So I'm going to withhold -- as -- as

11   indicated before, I'm going to withhold ruling on it for now.

12        MS. BUFFALANO:  Okay.  And Mr. Falk, could you pull up

13   9 -- Exhibit 9?

14        So we'll start with Exhibit 9.  Okay.

15   Q    BY MS. BUFFALANO:  And is this -- have you seen this

16   document before?

17        MR. KEARL:  I'm sorry.  Can I get the Bates stamp for this

18   as well?

19        MS. BUFFALANO:  Oh, yes.  Sorry.

20        MR. KEARL:  Thank you.

21   Q    BY MS. BUFFALANO:  And Mr. Gilbert-Differ, have you seen

22   this before?

23        MS. BUFFALANO:  And you may need to -- yeah, thank you.

24   A    Yes, I've seen this before.

25   Q    BY MS. BUFFALANO:  Okay.  And is this one of those



1    statements that was attached to Respondent's Exhibit 105 that

2    Tyler sent to you on April 6th?

3    A    It is.  Yes.

4    Q    Okay.

5         MS. BUFFALANO:  And can you show me Respondent's 10,

6    please?  Okay.

7    Q    BY MS. BUFFALANO:  And have you seen this before?

8         MR. KEARL:  I'm sorry.  Can I get the Bates stamp on this?

9    Thank you.

10        MS. BUFFALANO:  I apologize, Mr. Kearl.  I don't know why

11   I keep forgetting.

12        If you, Mr. Falk, wouldn't mind just scrolling down

13   whenever we put up an exhibit to look at the Bates number, that

14   would be helpful.  Thank you.

15        JUDGE GREEN:  So --

16        MS. BUFFALANO:  Okay.

17        JUDGE GREEN:  -- we're going to get how many of these?

18        MS. BUFFALANO:  There's five of them, 9 through 13.  If we

19   were in person, I would show all of them at the same time --

20        JUDGE GREEN:  Right.

21        MS. BUFFALANO:  -- but.

22        JUDGE GREEN:  Okay.

23   Q    BY MS. BUFFALANO:  So let me ask you -- well, just tell me

24   who -- what this is, please, Mr. Gilbert-Differ?

25   A    Certainly.  This is a -- a statement from Dimitra Evans.



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  Related to the April 6th incident?

2    A    Yes.

3    Q    And this is attached -- was it attached to Tyler's April

4    6th email to you at 5:30, Respondent's Exhibit 105?

5    A    Yes.

6         MS. BUFFALANO:  And Mr. Falk, can you show us Respondent's

7    11?  And that's 172.  Thank you.

8    Q    BY MS. BUFFALANO:  And have you seen this one before?

9    A    I have, yes.

10   Q    And what is this one?

11   A    So this is a report from our security officers, Kaydee

12   Bertone and Jonathan Paria (phonetic) who are visible on the

13   video that we reviewed earlier regarding, again, the events of

14   the -- April 5th.

15   Q    And was this attached to Tyler's April 6th email to you in

16   evidence as Respondent's Exhibit 105?

17   A    I believe so, yes.

18   Q    Okay.

19        MS. BUFFALANO:  And can you show us Respondent's 12?

20   Thank you.

21        MR. KEARL:  I'm sorry.  I couldn't -- can you scroll down

22   again?  I can't -- you have to go.

23        MS. BUFFALANO:  173.

24        MR. KEARL:  Thank you.

25   Q    BY MS. BUFFALANO:  And Mr. Gilbert-Differ, have you seen



1    this document before?

2    A    I have, yes.

3    Q    And what is this?

4    A    This is a statement from Maciej Curlej regarding the event

5    on 6th of April.

6    Q    Okay.  And was this attached to Tyler's April 6th email to

7    you, Respondent's Exhibit 105?

8    A    Yes.

9    Q    Okay.  And there's just one more.  It's Respondent's 13,

10   175.

11   Q    BY MS. BUFFALANO:  And have you seen this document before,

12   Mr. Gilbert-Differ?

13   A    I have.  Yes.

14   Q    Okay.  And what is this?

15   A    This is a statement from Shaianna Donaldson, who is the HR

16   individual who was in the video we discussed earlier.  It

17   relates to the events on April 6th.

18   Q    Thank you.  And was this attached to Tyler Grabowski's

19   email to you on April 6th, Respondent's Exhibit 105?

20   A    Yes.

21   Q    Okay.

22        MS. BUFFALANO:  So if you could just put up a Respondent's

23   105 again, Mr. Falk, please?  Thank you.

24   Q    BY MS. BUFFALANO:  So Mr. Gilbert-Differ, you testified

25   that you believed Kaydee Bertone's witness statement to be



1   attached to the email that Tyler Grabowski sent to you on April

2   6th, this email we're looking at here.  Does looking at the

3   email refresh your recollection about whether Ms. Bertone's

4   statement was sent to you by Tyler via that email?

5   A    Yeah, I believe the document that we reviewed, which is

6   the -- the kind of joint report signed by both Kaydee and

7   Jonathan Paria is that document.

8   Q    Okay.  Thank you.  Okay.  You said there was -- you

9   mentioned another individual, Paul Chierchio, who you

10  identified also as a witness and -- and noted that he was --

11  had not yet provided a witness statement on April 6th.  Did he

12  ultimately --

13  A    Right.

14  Q    -- provide a witness statement in the investigation?

15  A    Yes, he did.

16  Q    And do you know when he did that?

17  A    I believe it was the following day.  That's my

18  recollection.

19  Q    And do you know who obtained his witness statement?

20  A    I believe both Tyler and I requested it from him.  So I

21  believe Tyler had sent a request.  And then I followed up with

22  a request the following morning, to the best of my

23  recollection.

24  Q    Okay.

25       MS. BUFFALANO:  So can you, Mr. Falk, put up Respondent's



1    8?  That's -- yeah, Bates 174.

2    Q    BY MS. BUFFALANO:  Mr. Gilbert-Differ, have you seen this

3    document before?

4    A    Yes, I have.

5    Q    Okay.  And what is this?

6    A    This is the statements from Paul Chierchio, account

7    manager, for (indiscernible) security and related to the events

8    on April 6th.

9    Q    Okay.  And let me ask you, does Paul work for Amazon?

10   A    No, he has not.

11   Q    Who does he work for?

12   A    At the time of this statement, he worked for the body

13   company, Metro One.

14   Q    Okay.  And -- and -- but Paul was -- at the time, on April

15   6th, specifically, Paul was working at JFK8, right?

16   A    Correct.  His assignment with Metro One was as the account

17   manager for JFK8 security team.

18   Q    Does Paul still work at JFK8?

19   A    He does not.  No.

20   Q    Does -- is he still working for Metro One assigned to an

21   Amazon account?

22   A    I don't believe he's still working for Metro One.  No.

23   And he is not, to my knowledge, assigned to an Amazon account

24   anywhere.

25   Q    Did you have any other communications with Paul, you know,



1    about the specifics of the April 6th incident aside from this

2    email Respondent's Exhibit 8?

3    A    Yes.  The -- I believe that morning, so April 7th, I sent

4    him Chime messages, primarily requesting this.  And then,

5    obviously, any identifications be included in there if he knew

6    them.

7    Q    And if you look at Respondent's Exhibit 8, it looks

8    like -- it looks like you forwarded this statement from Paul to

9    Tyler Grabowski; is that right?

10   A    That is correct.  Yes.

11   Q    And did you -- when you -- so -- so it sounds like then

12   you're -- you're saying since the only communications you had

13   with Paul Chierchio about the incident were through a -- a

14   Chime, you said a requested a statement from him.  And then,

15   this statement that he emailed to you.  Did you ever ask him

16   what he saw or heard, conduct an interview with him?

17        MR. JACKSON:  Objection.  Leading.

18        JUDGE GREEN:  Overruled.

19        MS. BUFFALANO:  I'm just asking if he did.  Thank you.

20        JUDGE GREEN:  Overruled.

21   Q    BY MS. BUFFALANO:  You can answer.

22   A    No, I don't believe I did.  I don't believe I've worked at

23   JFK8 on April 7th at all.  So I believe Chime is the only

24   communication I have at all about this.

25   Q    BY MS. BUFFALANO:  Okay.  And are there circumstance --



Exhibit E, Motion to Try Petition on Hearing Record

1    like, would it be typical for you to interview a third-party

2    contractor like Paul Chierchio?

3    A    Not for a witness statement.  No.  That would be fairly

4    unusual.  We would only conduct interviews with third party

5    contractors of any type in fairly unusual circumstances,

6    typically where they may be the subject of an investigation.

7    Many of those cases, we would follow a fairly different routine

8    in order to conduct those interviews than we would for internal

9    associates.

10   Q    Why is that?

11   A    Primarily, certainly with the relationship between loss

12   prevention and security to avoid issues of coemployment between

13   our companies.  But also because we are in a customer

14   relationship with this vendor and not a leading partnership as

15   it were.

16   Q    Did you contact, aside from Mr. Paul Chierchio, did you

17   contact any other witnesses to obtain statements?

18   A    I don't recall contacting any others.  No.

19        MR. JACKSON:  I'd just like to raise here, the Bannon-

20   Mills, the Chime messages referred to are still redacted.  So

21   we've not seen the full conversation between Mr. Gilbert-Differ

22   and Paul Chierchio.

23        MS. BUFFALANO:  You have all of the responses portion of

24   the communication.

25   Q    BY MS. BUFFALANO:  And why -- so you -- you asked Paul for



1    his statement.  Is there a reason that you did that?

2    A    Yep.  Paul was present throughout the event.  That was

3    clear from the video.  Paul was also, you know, the senior

4    security officer present during the event.  And -- and finally,

5    Paul's backgrounded prior to is wrong with Metro One, was with

6    a -- with -- with NYPD as a law enforcement officer.  So again,

7    somebody we knew would be, you know, potentially capable of

8    providing a -- a good witness account, professional account.

9    Q    Is there some reason that you collected it as opposed HR?

10   A    That's more typically the relationship with the

11   contractor.  So the -- you know, the group of the business to

12   whom they contract would take the lead on communications.  If I

13   use a different example just for illustration purposes, where

14   we have -- you know, if we had something similar with say, a

15   janitorial company and our procurement team would be the lead

16   point of contact from Amazon.  We have a contract with the

17   Metro One, so we are the lead point of contact with them.

18   Q    Okay.  And when you say we, you mean LP, loss prevention?

19   A    Correct, loss prevention.  Yes.

20   Q    Okay.  So can you --

21        MS. BUFFALANO:  Can we look at Respondent's 11?  Yeah.

22   Thank you.

23        That's 172, Mr. Kearl.

24   Q    BY MS. BUFFALANO:  Is -- who is Katie Bertone?

25   A    Katie Bertone, at this time, was a shift supervisor with



Exhibit E, Motion to Try Petition on Hearing Record

1   Metro One.

2   Q    And did you speak with Katie Bertone at all about the

3   incident?

4   A    I did not.  No.

5   Q    And can we look -- let me just ask you this instead of

6   going through each individual exhibit.  Did you speak with any

7   of the other witnesses who were -- whose witness statements

8   that you reviewed?  So Chris Urso, Dimitra Evans, Shaianna

9   Donaldson, did you speak with any of them about the incident,

10   personally?

11   A    I did not.  No.

12   Q    And you reviewed the witness statements as part of your

13   investigation instead of sort of walking through each

14   individual witness statement.  Can you tell us sort of what you

15   concluded based on the witness statements that you reviewed

16   about the incident that impacted on your investigation and on

17   your ultimate recommendation in this case?

18   A    So as a broad characterization of vendor's statements

19   tended to paint Ms. Evans as an individual who was victimized

20   in this event as a broad statement.  The statements tended to

21   indicate Mr. Bryson as the antagonist in these events.  The

22   statements aligned to effects of abusive, degrading, (audio

23   interference) Gerald Bryson to Ms. Evans.  Although, with the

24   witnesses, also with different words were recalled.

25   Specifically, were different words were used in their



1    statements.  There was generally a sense from some of these

2    and -- and in some cases explicit statement that they felt bad

3    for Mr. Evans as a result of what she was subjected to.

4    Q    Okay.

5         MS. BUFFALANO:  And I've got, Your Honor, probably like an

6    hour left.  I'm letting everyone know because 1:45 -- it's

7    12:45.  So I don't know if -- I'm happy to keep going.

8         MR. JACKSON:  (Indiscernible, simultaneous speech) --

9         JUDGE GREEN:  Okay.

10        MR. JACKSON:  -- continue.

11        JUDGE GREEN:  I'm sorry.  What was that?

12        MR. JACKSON:  I said we would prefer to continue until

13   she's done.

14        JUDGE GREEN:  Okay.

15        MS. BUFFALANO:  Okay.

16   Q    BY MS. BUFFALANO:  So Mr. Gilbert-Differ, you told us sort

17   of what you've done in your investigation so far, your reviewed

18   the witness statements, the videos, facility videos.  What's

19   the next step in you -- your sort of LP role here in the

20   investigation?  What's the next thing you do?

21   A    Yeah.  So at this point, what we have in front of us is

22   most of the evidence that can be quickly and effectively

23   gathered from essentially what's in our gift.  So the missing

24   piece of this puzzle, Mr. Bryson's opportunity to speak

25   directly with us.  However, Mr. Bryson had not been at work for



Exhibit E, Motion to Try Petition on Hearing Record

1    some time at this point.  He'd not been at work since mid to

2    late-March from my best recollection.  So it was not somebody

3    that it was going to be straightforward process for us to

4    obtain an interview from.  So at this point, my role is to

5    assess the information available to us at this point to allow

6    us to understand what we've got.  If and should Mr. Bryson

7    choose not to talk to us as would be his right.

8        So close together the investigation, in my case, interpret

9    the events as I best understood from the video, from the

10   Facebook Live, from statements.  Again, specifically on

11   workplace and management standards and our security standard of

12   conduct to understand what, if any, violations of those

13   standards I interpreted as being upheld by this evidence.  And

14   then, provide from there a recommendation to HR of what would

15   be, from my perspective, logical next steps.

16   Q    And how did you do that?  You put together your

17   recommendation.  You put together your sort of summary of the

18   facts.  And I know I'm summarizing what you said.  But how --

19   how -- is there a form that that takes?

20   A    Yes.  So that is put into writing in the form of a

21   workplace incident management notification.  Essentially, this

22   is a form I complete with all of what I've just laid out.  And

23   then, provide a recommended distribution list on top of any

24   others that may be, you know, included beyond my initial

25   recommendations, and send that to our global security



Exhibit E, Motion to Try Petition on Hearing Record                      265

1    operations center.  From there, it is reviewed, redacted, and

2    then circulated.

3    Q    Okay.  So let me show you -- I think it will help us to

4    look at it.

5         MS. BUFFALANO:  Can you show me Respondent's Exhibit 15,

6    Mr. Falk, please?  179, Mr. Kearl.  Okay.

7    Q    BY MS. BUFFALANO:  Do you recognize this document?

8    A    Yes, I do.  Yes, this is the workplace incident management

9    notification form that I completed relating to this event.

10   Q    Okay.  When did -- when was this document created?

11   A    I believe on 10th of April.

12   Q    Okay.  And how do you -- I know you said you -- you do

13   this form.  Like, how -- how do you do it?

14   A    Yep.  So it's a combination of free text and drop-down

15   fields.  This is a -- a global template -- a global standard

16   that we use.  In the top, is the -- is the individuals that I

17   recommend, or at least on our circulation that's related to

18   this event.  I then categorize the event as best I can against

19   what we'd seen during the events or interpreted as occurring

20   within the event.  We're on a general sort of time frame for

21   when the event occurred.  And then from there, I identified the

22   personnel involved, which is also down the screen from what we

23   see presently.

24   Q    Okay.  Let me -- let me stop you there.  Just start with

25   sort of the first section, which is contact.  So we've --



1   Braden Campbell, you've identified him.  He's senior -- he's a

2   regional senior HR manager.  Is that what that stands for?

3   A    Correct.  Yes.

4   Q    Okay.  And why was he identified as an individual to

5   receive this when notification?

6   A    So in my regional capacity, again, understanding in this

7   case if I had to step down to undertake actions, it would

8   probably normally have been undertaken by loss prevention

9   manager.  But in my regional capacity, I would typically be on

10  the distribution list for these types of events.  Braden is on

11  the distribution list because he and I provided regional

12  support to the same region.  He as the HR, and myself as loss

13  prevention.

14  Q    Okay.  And then, I see Christine Hernandez, already

15  identified her as HR manager.  Can you tell us why she's on the

16  distribution list?

17  A    Yes.  As -- as the senior representative of HR on the

18  site, she would be somebody that we would always include in

19  these -- in these circulations.

20  Q    Okay.  And Tyler Grabowski there, the HR business partner.

21  Why did you include him on the distribution list?

22  A    Tyler had been the primary point of contact for HR in

23  gathering the statements and other information that we sort of

24  discussed.  So Tyler was the -- the lead investigator, I guess,

25  for HR.



1   Q    Okay.  And then, there's Neha Viswanath, senior HR

2   business partner.  Why is she included on the distribution

3   list?

4   A    I believe at this time Neha was Tyler's line manager.  So

5   sitting in a -- and reporting to in between Christine and

6   Tyler.

7   Q    Okay.  And then you have JFK8 loss prevention.  I'm

8   guessing that's standard.

9   A    Correct.  That is standard.

10  Q    Okay.  And who's Brian Reichart, senior manager, loss

11  prevention.  Why is he on this list?

12  A    Brian Reichart is my manager.  He is typically also

13  included in all WIM circulation's workplace incident management

14  circulations.  And he is responsible for all Amazon robotics

15  sortable fulfillment centers on the east side of the country.

16  Q    Okay.  And then we have a Milly Gutierrez, principal

17  employee relations.  Why is she on the list?

18  A    At that time, Milly was the primary point of contact for

19  employee relations department for JFK8 amongst other buildings.

20  Q    Okay.  And so does she just receive this one WIM report or

21  does -- is -- is she on a -- is she included sort of on a wider

22  basis?

23  A    We do tend to include the employee relations on a wider

24  basis, not universal, but certainly a wider basis.

25  Q    Okay.  And why did you include her on this one?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Because of a number of dynamics with this particular

2    event, obviously one dynamic of that was that there was a

3    protest involving associates, which is something that is

4    certainly in -- in employee relations purview.  But also

5    because this event played out in front of a large number of

6    associates.  And therefore, potentially had a wider employee

7    relations impact as well.

8    Q    Okay.  And Traci Weishalla, I believe I'm pronouncing that

9    incorrectly, assistant general manager.  Can you tell us --

10   just as assistant general manager, can you tell us what she's

11   assistant general manager of?

12   A    Assistant general manager for JFK8.

13   Q    Okay.  And why is she on the distribution list?

14   A    As the essentially, second in command for the facility,

15   she would cover for Sai Kotha in any time that he was not

16   available.  And would therefore, typically be included in WIM

17   circulations and read in any personal matters that we circulate

18   with Sai Kotha as well.

19   Q    Okay.  And Anand Mehta, director of --

20   A    Anand Mehta.  Yes, I apologize.  Anand Mehta was again, my

21   peer, as it were, in terms of regional coverage.  So he also

22   supported the same region that I did.  In his case, leading as

23   the operations director.

24   Q    Okay.  And the last individual who received the report

25   looks like a lawyer; is that right?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    That's correct.

2    Q    Okay.  And are lawyers included on these reports

3    typically?

4    A    Again -- again, it's a similar dynamic with employee

5    relations.  Where there are potential issues, we will include

6    them to ensure that they are fully (indiscernible).

7    Q    Okay.  Okay.

8         MS. BUFFALANO:  So let's -- if you could just scroll down

9    a little bit?  I'd like to see the full general information

10   box.

11        MR. JACKSON:  Your Honor, before we go any further, I'm

12   going to assert a Bannon-Mills objection to the extent that

13   similar documents from other investigations that are responsive

14   to our subpoena were not produced.

15        MS. BUFFALANO:  They were all produced.

16        MR. JACKSON:  And -- and to strike testimony on this

17   issue.

18        JUDGE GREEN:  Yeah, so -- just so we're clear.  It's my

19   understanding the General Counsel in the Charging Party's

20   position that they essentially want me to strike Mr. Gilbert-

21   Differ's entire testimony as it relates, as far as I can tell,

22   almost exclusively to the investigation of this matter.  So you

23   don't have to tell me that you want certain testimony stricken

24   because I understand that you want all his testimony stricken.

25   Is this -- I'm sorry.  Was this offered?  Was -- was R-15



1    offered?

2         MS. BUFFALANO:  It will be.  Yeah.

3         JUDGE GREEN:  Okay.  But it's -- okay.  And then the

4    General Counsel is taking the position that this document, too,

5    should be rejected as a Bannon-Mills remedy.

6         MR. JACKSON:  Yes, Your Honor.

7         MS. BUFFALANO:  Even -- even though we produced it.

8         MR. JACKSON:  Yes, Your Honor.

9         JUDGE GREEN:  Okay.  So it's going to be the same for

10   all -- all of these.  I'm making notes on all of these that the

11   document has been ordered.  It's been -- there's been

12   abandonment of objection.  And I'm reserve -- reserving ruling

13   on it.

14        MS. BUFFALANO:  Okay.  So Mr. Falk, if you could scroll

15   down here so we can see the full general information box.

16   Thank you.  Okay.

17   Q    BY MS. BUFFALANO:  So you indicated, Mr. Gilbert-Differ

18   differ that there's this event category that you select the

19   drop down -- from a drop-down menu; is that right?

20   A    Correct.

21   Q    And is there -- is there a standard for how bullying is

22   defined?

23   A    Yes.  There -- there is a definition for bullying in the

24   workplace incident management support materials.

25   Q    Okay.



Exhibit E, Motion to Try Petition on Hearing Record

1        MS. BUFFALANO:  So can you show us, Mr. Falk, Exhibit 116?

2    Thank you.  And can you scroll to page 4-16.  Do you need the

3    number, Mr. Kearl?

4        MR. KEARL:  Yeah, that would be great.  Bates --

5        MS. BUFFALANO:  Okay.  6843.

6        MR. KEARL:  Thanks.  Yeah.

7        MS. BUFFALANO:  Okay.

8    Q    BY MS. BUFFALANO:  So I'm just going to direct your

9    attention here to the bottom of the page -- well, to about to

10   the middle of the page, the orange text that says behavioral

11   activity definitions and examples.  You see that?

12   A    I do.

13   Q    So do you see the sort of guideline description or

14   definition, however you want to describe it, for bullying here?

15   A    I do, yes.

16   Q    Okay.  And obviously, we can read it, but can you explain

17   to us what bullying is from the loss prevention perspective?

18       MR. KEARL:  Objection.  The document speaks for itself.

19       JUDGE GREEN:  Right.  So are you asking whether Mr.

20   Gilbert-Differ has some understanding of -- of the term

21   different than what's -- or --

22       MS. BUFFALANO:  (Indiscernible, simultaneous speech).

23       JUDGE GREEN:  -- or more extensive than what's on the

24   document?

25       MS. BUFFALANO:  Like a practical description, right, so we



1    see the definition for bullying, it's --you know --

2        JUDGE GREEN:  Okay.  So --

3        MS. BUFFALANO:  -- what does that mean?

4        JUDGE GREEN:  All right.  So overruled.  Your

5    understanding of the -- the term "bullying".

6        MR. KEARL:  Objection.  Relevance.  I mean, there's a

7    standard.

8        MS. BUFFALANO:  I --

9        JUDGE GREEN:  Okay. Overruled.

10   Q    BY MS. BUFFALANO:  You can go ahead and answer Mr.

11   Gilbert-Differ.

12   A    Thank you.  Yeah, I -- I think in -- in addition to what's

13   in here, it's really just, you know, filling in the blanks, so

14   by what means would somebody be intimidated, harassed, hurt, or

15   otherwise harmed?  Well, that can take the form of verbal

16   behavior.  That can take the form of physical behavior, that

17   can take -- you know, that could be a behavior that's conducted

18   in front of a large number of people, which would increase

19   the -- you know, obviously, the impressions of helplessness or

20   potentially, you know, increase the amount of humiliation

21   associated with it.  So I think really humiliation is the -- is

22   the only additional word that I would add to this definition

23   beyond the kind of practical ways in which any of these harms

24   could be caused.

25   Q    Okay, thank you.



1       MS. BUFFALANO:  And can you flip back to Respondent 15,

2   please?  Thank you.  And can you scroll down to the su -- the

3   summary of the incident?

4   Q    BY MS. BUFFALANO:  So can you take a look at that, Mr.

5   Gilbert-Differ?

6   A    Certainly.

7   Q    And let me know once you, you know, you're comfortable

8   with your familiarity with it.

9   A    Okay.  No, yeah.  Thank you.

10  Q    Okay.  Thank you.  And did you -- did you write this?

11  A    I did.

12  Q    And was this your summary or analysis of the incident,

13  based on all of the evidence that you reviewed that you

14  described here today?

15  A    Correct.  Yeah, but I would characterize this,

16  essentially, as an executive summary of the incident.

17  Q    And what did you conclude ultimately?

18  Q    Yeah, ultimately, I concluded that Ms. Evans had been

19  subject to bullying and harassment by Mr. Bryson.  I -- I just

20  want to point out one small feature of this form, which is that

21  one cannot select multiple options from a dropdown, only one,

22  which is why this form is categorized as bullying, but

23  accurately, our finding was bullying and harassment.

24  Q    Okay.  And why -- can you explain to us why you reached

25  that conclusion?



1    A    Yeah.  So that was based on the video review, and we

2    talked through it.  And it's obviously summarized in the second

3    statement of this.  And then, you know, taking the statements

4    and reports from individuals present as a whole, and finding --

5    you know, pulling out of that -- pieces that helped us to

6    interpret this event as accurately as possible.  I also

7    included in there a summary of the Facebook Live video and --

8    and some of the language that was used within that.  And at the

9    end of it, added that Mr. Bryson's badge had been suspended

10   pending further investigation.

11   Q    Okay.  And is there a definition of harassment in the WIM

12   guide?

13   A    Yes, there is.

14   Q    Can you -- since -- I don't think we need to flip back to

15   it -- can you explain to us how harassment is applied in terms

16   of the standard, the LP.

17   A    Yeah, absolutely.  So it's -- it's very similar in terms

18   some of the language around -- the language around bullying.

19   One of the -- the kind of key elements of harassment is that it

20   is either repeated behaviors or continuing behaviors.

21   Q    And what was repeated or continuing about this incident

22   that led you to the conclusion that it was harassment?

23   A    Well, that conclusion was based on the (indiscernible,

24   simultaneous speech) --

25        MR. KEARL:  Objection.  Leading.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay.  Overruled.

2    A    That determination was based on the length of this event,

3    two-and-a-half minutes, as best we could tell, largely, you

4    know, instigated and led by Mr. Bryson.

5    Q    BY MS. BUFFALANO:  And in reaching your conclusion that

6    Mr. Bryson had bullied and harassed Ms. Evans within the

7    definitions and -- you know, what you testified here today, and

8    what's included in the WIM guide that we've discussed.  Did you

9    rely on anything else that is not included in this summary of

10   incident?

11   A    Just -- just to clarify, Madam, in terms of the

12   investigation I've not already covered?

13   Q    I'm sorry, I missed that last part.

14   A    I'm just -- I apologize.  I'm just looking to clarify the

15   question.  Is that in terms of, you know, anything not included

16   in here as part of the investigation or anything not included

17   in here in my understanding of those -- those terms, "bullying

18   and harassment"?

19   Q    Yeah, so is there anything that's not in here -- so my

20   question is, did you conclude that Mr. Bryson had bullied and

21   harassed Ms. Evans based only on what is included here in this

22   summary of incident?

23   A    Yes, that is correct.

24   Q    Okay.  Can you tell me what the purpose of the WIM

25   notification is?



1    A    Yes, so primarily, it's to provide a wider audience of

2    understanding of the event. Yeah, we -- we typically do not

3    share widely investigations for confidentiality reasons.  So

4    when we get to a point that we are ready to share findings, as

5    we were at this point on the 10th of April, a -- a redacted

6    version of that is -- is then prepared for circulation with key

7    stakeholders and we've talked through who those were in terms

8    of the distribution list.  This is also, obviously, my

9    opportunity to share with that wider stakeholder audience who

10   are critically stakeholders, not just in what's happened, but

11   potentially, what next steps might be, and what my

12   recommendation is based on these findings.

13   Q    Where does the -- so the WIM notification obviously goes

14   to the individuals that are identified there at the top of this

15   document that we've already talked about.  Does it go into

16   anyone else or anywhere else?

17   A    I believe there's an additional distribution group as well

18   for certain severity incidents, so sev 3 and sev 2.  However,

19   that distribution is not controlled, populated, or visible to

20   me, so I can't comment on who would be in it, but I'm certainly

21   aware that it does exist.

22   Q    So what do you do with this WIM notification?  You've

23   completed it; what do you do with that?

24   A    Yeah, at -- at the very top of this form, so on page 1,

25   you'll see a small box in the top right-hand corner, which is a



1    hyperlink to send an email.  It's to our Global Security

2    Operation Center.

3    Q    Is completing a WIM notifi -- when do you complete WIM

4    notifications, like, in -- in what kind of cases?

5    A    Absolutely anything that falls within our definitions that

6    are laid out in the WIM guide.  So any event where our finding

7    is at the, you know, point of the investigation that we're

8    confident, and we know what we have.  At that point, we would

9    complete a WIM notification, though not necessarily always at

10   the end of an investigation.  These can potentially send -- be

11   sent out while we are still gathering and developing

12   information.  To some extent, that was the case here.  But we

13   do want it to be sent out at the point where we have some

14   reasonable understanding of what we believe has occurred.  So

15   the standard that we apply is really as soon as practicable,

16   under any event, within 24 hours of our investigation being

17   completed.

18   Q    Okay.  And you mentioned -- you said -- you -- you

19   mentioned that then, there is a -- what I heard was "sev 3 and

20   sev 2"; can you let us what sev 3 and sev 2 are?

21   A    Yeah, so this is a kind of cross bussling -- business

22   language that we use.  It's related to the severity of

23   incidents, a sliding scale from 5 to 1.  5 in an incident,

24   event, or defect that has no impact.  So we use a very similar

25   scale in a number of different spaces that the most obvious one



Exhibit E, Motion to Try Petition on Hearing Record

1   would be actually in an operation.  So if we use simply an

2   example, let's say a mechanical breakdown.  A mechanical

3   breakdown doesn't actually impact anyone's ability to work.  It

4   would be a low sev rating, which would be 5.  If a mechanical

5   breakdown impacted the ability of multiple buildings to

6   customers, it would get up to the highest severity rating, the

7   2 or 1.  Workplace incidents typically start at a severity 4.

8   There's nothing really that we could investigate that doesn't

9   have an impact on at least one person, which is the standard

10   for a severity 4.  So our severities tend to trend between

11   severity 1 up to severity -- severity 4, but severity 1 -- in

12   our case, severity 1 is some very terrible outcomes, you know,

13   very serious injury or death.

14       MS. BUFFALANO:  Okay.  And we would move to admit

15   Respondent's Exhibit 15.

16       JUDGE GREEN:  Okay.  We've already dealt with that.  It's

17   being offered, it's being objected to around the Bannon-Mills,

18   and I'm reserving ruling.

19       MS. BUFFALANO:  Okay.  Are we dealing with hearsay?

20       JUDGE GREEN:  So I mean, in case it isn't clear to

21   everybody, I -- from my previous comments, you know, unless the

22   video is somehow unclear, I'm going to be determining what

23   happened in the parking lot based on the videos and not on

24   what's in witnesses' statements.  But you know, so it's not --

25   it's not admissible for that, it's admissible as it's relevant



Exhibit E, Motion to Try Petition on Hearing Record

1   to the investigation to the extent it's not barred by a Bannon-

2   Mills remedy.

3       MS. BUFFALANO:  So Your Honor, I would just -- so I think

4   the -- one of the problems that has arisen, and I don't think

5   it's a problem at all, but I just think it's a little bit

6   unusual, is that we -- the company didn't have any video

7   (indiscernible, simultaneous speech).

8       JUDGE GREEN:  I understand.

9       MS. BUFFALANO:  And so --

10      JUDGE GREEN:  Right.  That's -- that's relevant to the

11  investigation and the decision, right?  That's -- that what

12  this would be relevant to and not objectionable on the basis of

13  hearsay.

14      MS. BUFFALANO:  Well -- well, right.  But I'm saying, you

15  know, in terms of what is important here and whether it is the

16  videos that actually show the incident or it is the, you know,

17  the investigation into the incident --

18      MR. KEARL:  Objection.  Your -- Your Honor, this something

19  for the papers.  This is not something that should be -- this

20  hasn't been established.

21      JUDGE GREEN:  Yeah --

22      MR. KEARL:  And Ms. Buffalano is testifying --

23      JUDGE GREEN:  So there's actually no dispute here.

24  There's no dispute here.  To the extent that there is a hearsay

25  objection that these wit -- witness statements are being



Exhibit E, Motion to Try Petition on Hearing Record

1   offered for their truth, they're -- they're not.  They're not

2   being offered for their truth; the truth being what happened in

3   the parking lot.  They're being offered -- correct me if I'm

4   wrong, Ms. Buffalano -- but they're being offered to the extent

5   it shows the investigation and decision-making process.  And

6   it's not -- it's not hearsay in that regard.

7        MS. BUFFALANO:  Except a record like this, we would offer

8   as a business record.  I mean, I understand your point --

9        JUDGE GREEN:  Okay.  I mean, okay.  That's -- that -- oh,

10  yeah, if there's an exception, that's fine.  You could state an

11  exception.  Do you care, though?  I mean, this is what I don't

12  understand.  Why does anybody care what the witnesses

13  statements say and what the witnesses say about what happened

14  in the parking lot?  We know what happened in the parking lot.

15  We have a video -- we have multiple videos of it.

16       MR. JACKSON:  Your Honor, I move to strike --

17       JUDGE GREEN:  But yeah, okay.  So there's --

18       MR. JACKSON:  I move to strike Ms. -- I'm sorry, Your

19  Honor, but I move to strike Ms. Buffalano's statements

20  regarding --

21       JUDGE GREEN:  No.

22       MR. JACKSON:  -- the videos --

23       JUDGE GREEN:  No.  That's ridiculous.  That's --

24       MR. JACKSON:  There's no evidence in that, sir.

25       JUDGE GREEN:  You can't strike her statements.



Exhibit E, Motion to Try Petition on Hearing Record

1       MS. BUFFALANO:  Oh.  Oh, except that we -- except that

2   we -- we asked you for the link for the video --

3       JUDGE GREEN:  Off the record.

4       MS. BUFFALANO:  -- and you would not give it to us.

5       JUDGE GREEN:  Off the -- off the record.  (Indiscernible,

6   simultaneous speech).

7       MS. BUFFALANO:  (Indiscernible, simultaneous speech)

8   evidence, and we do not have the video.

9       JUDGE GREEN:  This is -- this -- it shouldn't deteri --

10  this proceeding should not deteriorate in this --

11  (Off the record at 1:11 p.m.)

12      MS. BUFFALANO:  Mr. Gilbert-Differ, the judge is going to

13  give you some instruction.

14      THE WITNESS:  Thank you.

15      JUDGE GREEN:  So it's the same as I indicated before.  You

16  can move around, you can do whatever you want.  Just don't talk

17  to anybody about the case.  Okay?  Or about your testimony.

18      THE WITNESS:  I understand, Your Honor.

19      JUDGE GREEN:  Okay.  Thank you.

20      MS. BUFFALANO:  Thank you.

21  (Off the record at 1:14 p.m.)

22      MR. FALK:  Judge, I'm not sure if you saw, we just receive

23  a message from Chris Murphy asking for more time.

24      JUDGE GREEN:   We are back on the record.

25      MR. FALK:  Here we are.



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay.  So let's resume.

2    MS. BUFFALANO:  Okay.  Mr. Falk, can you put Respondent

3  15, please?

4    MR. FALK:  Did you say 115?

5    MS. BUFFALANO:  Just 15, sorry.

6    MR. FALK:  15.

7    MS. BUFFALANO:  1-5, yeah.

8    MR. FALK:  Okay.  Thank you.

9    THE COURT REPORTER:  Can we go off the record for one

10  second.

11    JUDGE GREEN:  Off the record.

12  (Off the record at 2:33 p.m.)

13    JUDGE GREEN:  Okay.  So we are back on the record.

14    MS. BUFFALANO:  Okay.  So Mr. Falk, you can show us

15  Respondent 15, please.  Thank you.

16    **RESUMED DIRECT EXAMINATION**

17  Q    BY MS. BUFFALANO:  Okay.  Mr. Gilbert-Differ, I just have

18  a couple more questions about this document.

19    First, is this document the WIM notification?  Is this

20  kept in the ordinary course of Amazon's business?

21  A    I believe it is retained by our Global Security Operations

22  Center in events where we create additional records, so case

23  management system, loss prevention.  We would potentially hang

24  a copy of that into the record, and then local storage, yes.

25  We typically store or I personally store workplace incident



1    notifications that I have created or sent.

2    Q    Okay.  And I think you already answered this, but is it --

3    it's regular practice to make this record, this WIM

4    notification?

5    A    Yes, every workplace incident -- well, should generate one

6    of these notifications.  Not every one of this notifications

7    will be circulated onwards.  So if our Global Security

8    Operations Center assigns a severity 4 to it, then it will not

9    be circulated, obviously.

10    MS. BUFFALANO:  Okay.  And can you scroll down, Mr. Falk,

11    please, to -- I think there was a recommendation on the next

12    page.  Okay.  So it is up there.

13    Q    BY MS. BUFFALANO:  Okay.  So under recommended next steps,

14    Mr. Gilbert-Differ, it looks like you recommended a seek to

15    understand, it says, to be conducted with site HR and Loss

16    Prevention.  Firstly, so let me stop here.  Can you tell what

17    "seek to understand" is?

18    A    Yes.  In this context, that would be attempts to have a

19    conversation to understand Mr. Bryson's perspective of this

20    event.

21    Q    Okay.  And then you also recommend underneath that, it

22    says, "Following review of available evidence, LP recommends

23    termination of employment."

24    MR. KEARL:  Objection.  Document speaks for itself.

25    JUDGE GREEN:  Yeah.  I'm -- I'm reading it as we speak.  .



Exhibit E, Motion to Try Petition on Hearing Record

1    But do you have a question about it?

2       MS. BUFFALANO:  Yeah.

3    Q    BY MS. BUFFALANO:  So you recommended termination of Mr.

4    Bryson based on -- it says "following review of available

5    evidence; is that right?

6    A    Correct.

7    Q    Okay.  And what did -- -- what does that mean, following

8    review of available evidence?

9    A    So this is a state we desire to achieve with a lot of our

10   investigations, which is, essentially, whether or not a person

11   of interest, so in this case, denoted by the acronym POI,

12   wishes to speak to us or provide us any kind of account.  We

13   assume the position to make a decision should that not happen.

14   In this case, should that not be achieved, my recommendation,

15   based on my assessment, was termination of employment.

16   Q    Okay.  And can you explain to us how you reached the

17   conclusion that termination was the appropriate course of

18   action based on the available evidence?

19   A    If I cannot realistically see an alternate disciplinary

20   method achieving what we really needed to as an outcome, which

21   was the safety -- the safe inclusive environment that we are

22   seeking to achieve for all of our associates.  In this case,

23   specifically, my concerns would rotate around Ms. Evans.

24      THE COURT REPORTER:  I need to go off the record.  I think

25   I'm having some audio issues.  I can hardly hear the parties,



1    so at this try and fix this for a second.

2         JUDGE GREEN:  Okay.  Off the record.

3    (Off the record at 2:39 p.m.)

4         JUDGE GREEN:  Okay.  So let's try this again.  Let's go on

5    the record.

6         UNIDENTIFIED SPEAKER:  Here we are.

7         JUDGE GREEN:  Take two.

8         MS. BUFFALANO:  Okay.

9                    **RESUMED DIRECT EXAMINATION**

10   Q    BY MS. BUFFALANO:  Okay.  Mr. Gilbert-Differ, when we left

11   off, we were talking about your recommendation in your WIM

12   notification that Mr. Bryson be terminated for bullying and

13   harassment.  And my question to you is, why did you recommend

14   termination as the appropriate, you know, penalty or remedy or

15   outcome in this case?

16   A    So in a case where it's judged that our workplace incident

17   management standard has been breached by an associate's

18   behavior, as was my findings in this case regarding Mr. Bryson,

19   then outcomes to the associate in terms of disciplinary action

20   range up to and including termination.  Specific to these

21   circumstances, termination was my recommendation because Mr.

22   Bryson had conducted this behavior towards Ms. Evans with no

23   real prior background.  This -- this had come with, really, no

24   lead up that we were aware of, no build up that emerged through

25   the investigation.  As far as we are, these two did not know



Exhibit E, Motion to Try Petition on Hearing Record

1    each other.  So in a very, very short window of time, this had

2    escalated in the way it had.  And the witness statements that

3    we had to rely on, and the video, supported that Mr. Bryson

4    that the presh -- chief initiator here.

5        In addition, this behavior had been conducted not just in

6    front of other associates, but interestingly, from -- in terms

7    of risk perspective, this had been conducted in front of the

8    senior operations manager, and this had been conducted in front

9    of members of security, and this had been conducted in front of

10   members of HR.  Mr. Bryson, feeling empowered to do this in

11   front of that group, in particular, for me was extremely

12   concerning.  That meant that I could see no reasonable

13   alternate steps that we could take that would prevent a

14   repetition of this behavior towards other associates.  So not

15   just Ms. Evans, but potentially other associates.  And Mr.

16   Bryson appeared by investigation to have felt slighted because

17   somebody disagreed with his views over how JFK8 should respond

18   to the COVID crisis.  And -- and from my perspective, that --

19   that's not a personal attack.  That is far from it, and yet

20   this was the outcome.

21       Mr. Bryson was on video shortly after this on a Facebook

22   Live video talking about this without apparent signs of

23   remorse.  From my perspective, it did not appear, at this point

24   in time, that Mr. Bryson was likely to, you know, desist from

25   these behaviors completely.  And that's really what we have to



www.escribers.net | 800-257-0885

1    achieve for our wider associate population, is individuals

2    coming to work with us, really have to understand that there's

3    a necessity to treat each other with respect, openness, and

4    inclusion.  Mr. Bryson had fallen far short of that standard,

5    and nothing in the investigation indicated any other way that

6    we might be able to prevent that from reoccurring.

7    Q    Okay.  Thank you, Mr. Gilbert-Differ.

8         MS. BUFFALANO:  I'm going to ask -- Mr. Falk, can you put

9    up -- well -- well, before we -- just before we do that, I -- I

10   know we've dealt with 15 as -- in terms of its admission.

11   We -- do you want to have us have a discussion around the

12   hearsay aspect of it now?  We'll -- we'll put in what we need

13   in order to argue business record exception and then we deal

14   with all of this later; is that what you prefer, Judge Green?

15        JUDGE GREEN:  I -- I don't know that there's going to be

16   any hearsay objection to this.  Let me ask, is there a hearsay

17   objection to R-15?

18        MR. KEARL:  I don't think so.

19        MR. JACKSON:  So long as its' not used for the truth of

20   the matter asserted, as Your Honor has indicated.

21        JUDGE GREEN:  Correct.  I mean --

22        MS. BUFFALANO:  Well, I mean --

23        JUDGE GREEN:  -- so --

24        MS. BUFFALANO:  -- so -- sorry.

25        JUDGE GREEN:  Go ahead.  Go ahead.  It -- it's -- I think



# Exhibit E, Motion to Try Petition on Hearing Record

1    that all of this -- all of the statements, 15, I guess, has a

2    description of the incident, right?  So all the witness

3    statements, plus -- plus R-15, if they were admitted for their

4    truth, it would be to establish what happened during the

5    incident, right?  But it doesn't matter because I have a video.

6    We have witness testimony.  We have witness statements.  The

7    witness statements might be business records, they might

8    present certain impressions or they might just be hearsay.

9    None of it matters because we have a video.  We have multiple

10   videos.  So I'm going to know what -- I know what happened in

11   the parking lot.  There's no issue regarding hearsay.  It could

12   be --

13        MS. BUFFALANO:  So --

14        JUDGE GREEN:  -- it could admissible.  It doesn't matter.

15   I'm going to be relying on the videos.

16        MS. BUFFALANO:  Okay.  And I would just say that we would

17   offer it for the truth of the matter asserted as a hearsay

18   obse -- exception.  And the reason is not because --

19        JUDGE GREEN:  Okay.

20        MS. BUFFALANO:  -- we do understand there's a video, but

21   there may be things that you can't hear in the video.  Like, I

22   understand --

23        JUDGE GREEN:  Okay.  That's fine.

24        MS. BUFFALANO:  -- see the whole video, but you may not be

25   able to hear the whole video.  And so we would -- we would want



# Exhibit E, Motion to Try Petition on Hearing Record

1    to offer it for both, to the extent there was a hearsay

2    exception, in this case, we believe that there is.  So if you

3    want to, I just know you're reserving -- so your ruling --

4         JUDGE GREEN:  Okay.  That's fine.  Okay.  But what's the

5    exception?  You're trying -- you have to establish a foundation

6    as a business record.

7         MS. BUFFALANO:  Right.  So I asked him, when we came back

8    on, whether or not this was kept in the ordinary course, it was

9    regular practice to make the record.  He testified that it was

10   done on April 10th, which was four days after the incident, and

11   that he, the person who had reviewed all of the records in the

12   case had created the -- the business record.  So I think the

13   evidence is already in.

14        JUDGE GREEN:  Okay.  Okay.  And any objection to that?

15        MR. JACKSON:  Yes, Your Honor.  I don't think it qualifies

16   as a business record under the Federal Rules of Evidence or

17   anything that's app -- applicable in this proceeding.  What

18   she's essentially saying is that we should believe the truth of

19   these statements based on Mr. Dofer's (sic) re -- recording of

20   other people's recording of an event that they see.  I mean,

21   that -- it's hearsay.

22        JUDGE GREEN:  I mean, listen, four days after, whether

23   that's -- that has immediate -- been recorded immediately

24   after, I don't know.  I'm -- I'm reserving ruling on it anyway,

25   so I'm reserving ruling on it.



1      MS. BUFFALANO:  Okay.  And I'll just say the witness

2   statements are also business records, so when you're business

3   record on a business record, then it meets the exception.

4      MR. JACKSON:  Objection.  Hearsay.  Hearsay, objection on

5   those statements as well, Judge.

6      JUDGE GREEN:  Okay.

7      MR. JACKSON:  They should not be not be considered by Your

8   Honor for the truth of the matter asserted.

9      JUDGE GREEN:  But -- because of -- because of what?  Why

10   are they -- well, they're -- okay.  The declarant is the

11   witness.  The witness whose -- witnesses who gave a statement,

12   they -- they're not in a re -- they don't have a regular

13   practice of reporting what they see, these types of incidents,

14   right?

15      MS. BUFFALANO:  (Indiscernible, simultaneous speech) --

16      MR. JACKSON:  No, they don't.

17      MS. BUFFALANO:  What'd you say?

18      MR. JACKSON:  You know the answer, Judge.

19      JUDGE GREEN:  Okay.  So that was actually for Ms.

20   Buffalano.  Okay.  That's all right.  Let's -- let's move on.

21   I'll take it under consideration.  I'm reserving ruling anyway.

22   I'm just going to reserve ruling.

23      MR. JACKSON:  Witness statements are not business records,

24   Judge.  You know that.

25      JUDGE GREEN:  Okay.  Let's -- let's move on.



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  Okay.  So can you -- Mr. Falk, can you put

2    on -- up Exhibit 14 -- Exhibit -- let me just double-check,

3    Exhibit 16, please?  Okay.  Let's try 14, I apologize.  I think

4    I may have -- that's what I was looking for, thank you.

5    Q    BY MS. BUFFALANO:  Okay.  Mr. Gilbert-Differ, have you

6    seen this document before?

7         MR. JACKSON:  And -- sorry, can I get the Bates stamp for

8    this?  The Bates number?  Thank you.

9    Q    BY MS. BUFFALANO:  Okay.  So Mr. Gilbert-Differ, have you

10   seen this document before?

11   A    I have, yes.

12   Q    Okay.  And what is this?

13   A    This is our Global Security Operations Center circulation

14   of what is largely an unchanged version of the WIM notification

15   submitted by me to them.

16   Q    Okay.  And this comes up --

17   A    Yeah, it contains (indiscernible, simultaneous speech).

18   Q    I'm sorry, go ahead.

19   A    Apologies.

20   Q    It -- it contains their severity rating based on the

21   information that we provided, and obviously, you know, local

22   (indiscernible) specific times are added in, address details,

23   et cetera, pieces that we don't include, and then some caveats,

24   appended, added to the record, so.

25   Q    All right.  Let me start with that last part, the -- did



1    you say "caveats added to the record"?

2    A    Yes.

3    Q    What did you mean by that?

4    A    So essentially, anything sent out by the global security

5    operation center tends to carry a caveat that this is interim

6    information only.  This is as we understand it, subjects

7    checked.

8    Q    Okay.  And you said -- so this comes from -- let me see,

9    GSOC@Amazon.com.  Is that the global security organization that

10   you've been referencing?

11   A    Yes, that's Global Security Operations Center,

12   specifically.

13   Q    Okay.  And that's where you submitted your -- you've

14   testified that you submitted your WIM notification?

15   A    Yes.

16   Q    Okay.  And so in the subject line, I see it says WIM sev

17   3, JFK8 harassment; do you see that?

18   A    Yes.

19   Q    Okay.  And can you tell me -- I think I know what WIM

20   means; can you tell us what WIM means?

21   A    Workplace incident management.

22   Q    Okay.  And that just refers to the incident itself?

23   A    Correct, yes.

24   Q    And what is the --

25        JUDGE GREEN:  Is this document -- is this document in



Exhibit E, Motion to Try Petition on Hearing Record

1    SharePoint?

2       MS. BUFFALANO:  Should be.  Oh, I don't have access to

3    SharePoint.  If -- if you don't see it in there, then I'm going

4    to gu -- say no.

5       JUDGE GREEN:  Does -- do -- does the General Counsel and

6    Mr. Kearl, do you have access?  Do you have the document?

7       MR. JACKSON:  It's in there now.

8       MR. KEARL:  I do have this document.

9       JUDGE GREEN:  I'm sorry, I missed it.  Which -- this is

10   marked as R which?

11      MR. FALK:  14.  It's in there now.

12      JUDGE GREEN:  Okay.

13      MS. BUFFALANO:  Thank you.  Thank you.  Sorry about that.

14   I thought those were all in there.

15   Q    BY MS. BUFFALANO:  Okay.  Mr. Gilbert-Differ, can you tell

16   us what the "sev 3" is?

17   A    Severity rating.  We described that earlier, the sliding

18   scale from 5 through 1.

19   Q    Okay.  So does that indicate that the severity level was

20   identified as a level 3?

21   A    Correct.

22   Q    Okay.  And it's -- all -- all of these designations, the

23   severity level 3, the WIM, this harassment, this is all done by

24   the sender, which is the GSOC@Amazon.com?

25   A    Correct, yes.  The operation center reads, reviews, and



1    then circulates with, potentially, any amendments they feel

2    appropriate.  So obviously, the classification in this case has

3    been changed to harassment from bullying.  I think we discussed

4    earlier that -- yeah, if we had the option to select both, we

5    would have.  So I totally understand it's in line with that

6    investigation.

7    Q    Okay.  And what's the purpose of the GSOC notification?

8    A    So this here is a redacted version of -- of the event with

9    pre-identified audiences, so essentially, an executive summary.

10   Q    Okay.  So it's a notification, it sounds like?

11   A    Correct.  Yes.

12        MS. BUFFALANO:  Okay.  I'm going to move for the admission

13   of Respondent's Exhibit 14.

14        JUDGE GREEN:  Any objection?

15        MR. KEARL:  Yes.  Bannon-Mills and hearsay.

16        JUDGE GREEN:  Okay.  So we're going to deal with it the

17   same way.  It's been offered, there's been a Bannon-Mills

18   objection.  I'm going to reserve ruling.

19        MS. BUFFALANO:  Okay.  And you can take this down, Mr.

20   Falk.  Thank you.

21   Q    BY MS. BUFFALANO:  Okay, Mr. Gilbert-Differ, the GSOC and

22   the WIN notifications that we looked at, both say, and you

23   pointed out earlier, that the person of interest, his badge has

24   been suspended pending further investigation.  I -- I

25   understand person of interest to be Mr. Gerald Bryson; is that



1    right?

2    A    That is correct.

3    Q    Okay.  And you indicated that you created the WIM

4    notification on April 10th, and in it, it  said the person of

5    interest's badge has been suspended.  Do you know when his

6    badge was suspended?

7    A    I don't know exactly, no.

8    Q    Okay.  Do you know who made the decision to suspend Mr.

9    Bryson's badge?

10   A    The final decision always sits with HR.  We'll make a

11   recommendation they're not obliged to follow.

12   Q    Okay.  And in this case, do you know who made the

13   recommendation from Loss Prevention?  Sorry, I don't mean to --

14   A    I believe I made a recommendation.  Sorry.

15   Q    Go ahead.

16   A    I -- I believe I made the recommendation, most likely, to

17   Tyler, amongst others.

18   Q    Okay.  And what's the typical -- I know you just sort of

19   described you make a recommendation, how does a badge typically

20   get suspended?  So how does this recommendation get made?

21   What's the -- what's the communication format?  How does

22   this -- how does this happen?

23   A    In almost all cases, we will recommend to HR, so it may

24   take the form of a WIM notification or we may have verbally

25   discussed shortly prior to that being sent and circulated.  HR



Exhibit E, Motion to Try Petition on Hearing Record

1    will then review and give a direction to our security team to

2    execute the change of status on a badge.

3    Q    Okay.

4    A    Or not, they don't want it.

5    Q    Does HR usually take Loss Prevention's recommendation?

6    A    More often than not, but certainly, not always.

7    Q    Okay.  What's the standard for determining when you would

8    recommend that a badge be suspended?

9    A    Essentially, where preventing continued access to persons,

10   people, places, is not desirable in terms of preventing

11   potential future repeat -- repetitions or prevention of future

12   potential escalation.

13   Q    And is that standard that you just described, is there,

14   like, any document that describes that standard?  Is that

15   something that's written down?

16   A    There's not.  There's a fairly straightforward reason for

17   this, which is that the existing WIM guidance has to bridge all

18   countries and all building and business types.  So in a

19   building like JFK8, suspension of badge is a direction that

20   makes sense in terms of preventing the escalation and

21   repetition piece.  But we also have business models across the

22   globe, across the North Americas, where that would make no

23   sense where if that access badge is maybe a nonissue.  So

24   hence, the language is contained within our WIM guide, but it's

25   not as explicit as if this happens, do this, because there are



Exhibit E, Motion to Try Petition on Hearing Record

1    plenty of all business types where such direction would make no

2    sense.

3    Q     And why did you recommend suspension of Mr. Bryson's badge

4    in this case?

5    A     Based on the -- the risk that I saw in this case, so --

6    you know, the rapid escalation of this case, no previous known

7    interactions between the two individuals involved, the clear

8    characterization of Mr. Bryson through the evidence as the

9    instigator or agitator of this event, the fact he had not

10   previously been on site for several days.  And ultimately,

11   probably the most critically for me, this event only ended when

12   and because Ms. Evans retreated inside the building.  So she

13   retreated beyond, you know, our turnstiles.

14        And from our perspective, a sensible protective step for

15   the remainder of our associate population that is employed at

16   JFK8, was to allow that (indiscernible) to come, essentially

17   the start point of the safe haven in the event of future

18   events.

19   Q     Okay.  And so as you said, the badge suspension would

20   prevent Mr. Bryson from entering beyond the gates; is -- is

21   that right?  That's what you just testified to?

22   A     That is correct, yes.

23   Q     Of the building, okay.  And so what -- obviously the

24   incident that -- on April 6th took place outside of the

25   facility.  So what risk did you see that existed that



Exhibit E, Motion to Try Petition on Hearing Record

1    suspending the badge would prevent --

2         MR. JACKSON:  Objection.  Asked and answered.

3         MS. BUFFALANO:  I'm asking whether or not there were

4    specific risks as opposed to sort of like a general -- I

5    don't --

6         JUDGE GREEN:  Overruled.

7    Q    BY MS. BUFFALANO:  You can go ahead and answer, Mr.

8    Gilbert-Differ.

9    A    So at the time of the event, Mr. Bryson had in his

10   possession somewhere an access badge to our facility.  This

11   event, as I have mentioned, escalated very, very quickly, and

12   it ended when Ms. Evans retreated inside the building.  But at

13   that point, there was actually nothing that would have

14   prevented Mr. Bryson physically from following Ms. Evans inside

15   of the building.  At that point, you know, we have to control

16   our controllables.  That that's a -- a big approach that we

17   take when it comes to managing the risk.  The controllable here

18   would be to remove that option for any future potential

19   incidents.

20   Q    In -- let me ask you this.  How often in cases where a WIM

21   has been sort of -- right, where you have concluded that a WIM

22   has been substantiated, and by you, I mean, loss prevention.

23   So where loss prevention substantiates a WIM -- well, how often

24   is an employee's badge suspended?

25   A    Within a fulfillment center environment, very, very often.



Exhibit E, Motion to Try Petition on Hearing Record

1    There are very few exceptions that I can think of without an

2    auditor.

3    Q    Can you tell us when a badge would not be suspended when a

4    WIM is substantiated?

5    A    Yeah.  There could be cases.  We talked a while back, I

6    appreciate now, about the full breadth of this, you know,

7    policy area.  This also includes areas around self-harm and

8    mental health.  So it may well be the case that simply because

9    an individual showed concerning behaviors, for instance, right,

10   behaviors out of their norm that caused concerns for others

11   around them and (audio interference) but actually outreach to

12   that individual, support for that individual could resolve that

13   issue and make this a nonissue.  Likewise, where, you know,

14   even at the higher end, you know, self -- self-harm, or

15   similar, the right approach may not be to exclude access to the

16   building but to access the building may end up actually being,

17   you know, a positive element to them individuals alone.  You

18   know, an ability to come and observe a -- a routine work

19   environment may actually be a positive and balancing element.

20   So you know, particularly when it comes to issues where mental

21   health is considered to be a main driving factor, no, we would

22   not always suspend.

23       We could also think of a couple of exception --

24   circumstances.  So one of the routines that we see frequently

25   when performing a center's launch, if we will employ away



1    teams.  So away teams are associates from another fulfilment

2    center somewhere of a similar type and design, that will travel

3    to a new launch facility to help support its start up.  To help

4    train new associates in the market where we may not have a

5    building that operates the same way but help them get up to

6    speed on our processes.

7        If we were to receive the complaints, say, from an away

8    team member about a new associate, after that away team

9    assignment had ended and these two may be separated by some

10   hundreds of thousands of miles, it may not be appropriate in

11   that case to suspend the badge.  But it is always going to be a

12   case-by-case determination.  There are, I think, intentionally

13   in our guidance, no absolutes in the guidance.  It really has

14   to be a case-by-case determination.

15   Q    Okay.  Is badge suspension considered from your

16   perspective disciplinary?

17   A    Absolutely not, no.

18   Q    Did you recommend suspension in this case because Mr.

19   Bryson had participated in a demonstration on March 30th?

20        MR. JACKSON:  Objection.  Leading.

21        THE WITNESS:  No.

22        JUDGE GREEN:  Overruled.

23   Q    BY MS. BUFFALANO:  Did you recommend suspension in this

24   case because Mr. Bryson participated in a demonstration on

25   April 6th?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    No.

2   Q    Did you recommend suspension of Mr. Bryson's badge because

3   he participated -- because he had appeared at a production

4   meeting on March 25th, a -- a meeting of management on March

5   25th --

6   A    No.

7   Q    -- 2020?

8   A    Absolutely not, no.

9   Q    Are you aware of any other reason that Mr. Bryson was

10  suspended aside from what you have testified to here today?

11  A    To my knowledge this is the exclusive reason the badge was

12  suspended.

13  Q    And what were your -- what was your involvement, if any,

14  in the investigation after you sent your WIM report?

15  A    I have no further involvement in the investigation beyond

16  that point.

17  Q    Okay.  Okay.

18       MS. BUFFALANO:  Can I just take one minute?

19       JUDGE GREEN:  Yes.  Off the record.

20  (Off the record at 3:45 p.m.)

21       MS. BUFFALANO:  I don't have any further questions for Mr.

22  Gilbert-Differ.

23       JUDGE GREEN:  Okay.  Is the General Counsel going to have

24  any questions on cross?

25       MR. JACKSON:  Yes.  Yes, I do, Judge.  Can I have a very



1    brief recess in which you set us up with a breakout room for

2    Mr. Kearl, Ms. Reibstein, Ms. Cox, and Ms. (Indiscernible) and

3    myself?

4         JUDGE GREEN:  Okay.  How long would you like?

5         MR. JACKSON:  Ten minutes.

6         JUDGE GREEN:  Okay.

7         MR. JACKSON:  Thank you, Judge.

8    (Off the record at 3:49 p.m.)

9                        **CROSS-EXAMINATION**

10   Q    BY MR. JACKSON:  Good afternoon, Mr. Gilbert-Differ.  My

11   name is Matthew Jackson.  I'm representing the National Labor

12   Relations Board General Counsel.  I have some questions for

13   you -- your testimony and your observations.  So first of all,

14   just help us understand a bit better your role in the company.

15   You are regional loss prevention manager, correct?

16   A    Correct.

17   Q    And you held that position in March and April of 2020,

18   correct?

19   A    Correct.

20   Q    All right.  In your role as regional loss prevention

21   manager, how many Amazon officials or employees report to you?

22   A    Report directly, at that time it would have been five, as

23   I was carrying two vacancies.  Indirectly, there's more.

24   Q    Okay.  So five direct reports under you?

25   A    Correct.



1    Q    Yeah.  And let's just focus not so much on the present but

2    let's look back a year ago to March and April of last year.

3    And if I'm asking you about a different period, I'll specify

4    that, okay.

5    A    Okay.

6    Q    All right.  So -- and can you estimate how many indirect

7    reports you have under you -- or had under you back at that

8    time?

9    A    I would estimate between 21 and 25.  Somewhere in that

10   ballpark.

11   Q    And how many facilities were you responsible at that time

12   for overseeing loss prevention program, as you put it?

13   A    Just seven.  Accurately six operational and one in launch

14   process.

15   Q    Would that include EWR4?

16   A    Yes.

17   Q    Did that include BDL3?

18   A    Yes.

19   Q    Now, it's true that you were assigned to have a role in

20   loss prevention at JFK8 starting March 15, 2020; is that

21   correct?

22   A    That is correct.

23   Q    Who assigned you to -- to that role for JFK8?

24        MS. BUFFALANO:  Objection to the relevance.

25        JUDGE GREEN:  What's the relevance?



 1       MR. JACKSON:  Well, I'm probing the witness to see what

 2   the nature of this assignment was and whether it was -- was

 3   potentially in response to employees protected concerted

 4   activities

 5       MS. BUFFALANO:  There weren't any in March of -- March 15,

 6   2015 (sic).  The first PCA in this case alleged to be March

 7   25th.

 8       JUDGE GREEN:  Okay.  Overruled.

 9   Q    BY MR. JACKSON:  Who assigned you to work at JFK8?

10   A    I don't recall it worked that way.  Essentially we mirror

11   how operations set themselves up.  So regions within workplace

12   health and safety, HR, loss prevention.  Potentially others but

13   certainly those groups.  Follow the operations Regional

14   Director alignments.  So in this case my Regional Director

15   became, and I've met her, and that therefore meant that I

16   covered the same buildings as that individual did.  So that the

17   realignments of regions on March 15th, we followed operations,

18   the building out of which I was based, which was in Baltimore,

19   Maryland now fell into the (indiscernible) region, which meant

20   I became (indiscernible) loss prevention (indiscernible).

21   Q    Okay.  But you testified that you started working remotely

22   at some time in response to the pandemic; is that true?

23   A    Yes.

24   Q    When did you begin -- and your -- and your remote office

25   location is in Baltimore, correct?



Exhibit E, Motion to Try Petition on Hearing Record   305

1    A    No.

2    Q    Where is it?

3    A    Pennsylvania.

4    Q    Pennsylvania, okay.  And when did you start working

5    remotely in Pennsylvania?

6    A    It would have been some point in mid to late March.

7    Honestly, I don't know the specific date.  It was a corporate

8    move across Amazon, which we were included, for individuals who

9    could work remotely, to do so while, you know, the impact of

10   COVID was better understood.

11   Q    I forgot to ask.  Your six facilities under your wing and

12   one in development. Those six operational facilities, how many

13   employees, approximately, rough estimate, are -- are there?

14   A    At its peak in 2020, we would have got up to 35,000 for

15   the total region.  So probably taking five or so off of that,

16   and maybe another six or seven or so off of that.  It would

17   have been in the 20- to 25,000 range, I would guess.

18   Q    Okay.  All right.  Now, you were at the JFK8 facility on

19   April 6th, 2020; is that correct?

20   A    I believe so, yes.

21   Q    You don't recall?

22   A    I believe I was there.

23   Q    Okay.  Why were you there?

24   A    for a couple of reasons.  Firstly, I was spending a lot

25   more time out of JFK8 and BWI2 than I was at any other facility


www.escribers.net | 800-257-0885

1    in my region because those two buildings both carried loss

2    prevention manager vacancies.  So over the course of, well

3    certainly for JFK8, March through September, I spent more time

4    there than I did at all the facilities under my oversight.

5    Q    But I thought you were working remotely.

6    A    Working remotely means officed remotely.  It doesn't mean

7    I never go to my facilities.

8    Q    You were aware on April 6th that employees had been

9    engaged in protests regarding Amazon's response to the

10   coronavirus; isn't that true?

11   A    Yes.

12   Q    You were aware that there had been a protest on March

13   30th, correct?

14   A    Yes.

15   Q    Okay.  Now, the -- the videos that you reviewed of the

16   April 6th incident involving Gerald Bryson and Dimitra Evans,

17   those videos had, like, time stamps on them that you could tell

18   what -- what the time was when the events were occurring; is

19   that correct?

20   A    To some point that's correct.  So the system that we used

21   to review -- so the overarching (indiscernible) system is

22   Vision, the application we use to review Vision is Security and

23   Safety Desktop.  Security and Safety Desktop does provide an

24   overlay of time and date stamp.  It also provides and overlay

25   of camera names and numbers.  So yes, you're correct.  When I



Exhibit E, Motion to Try Petition on Hearing Record

1   was reviewing, absolutely, it has a time and date stamp;

2   however, when I create a file out of that system, so when I

3   essentially snippet to create a file, in this case it's a CVA

4   style file, it is essentially rendered in such a way that it

5   can't be edited or tampered, at least not to someone of my

6   limited technical means.  Part of that wipes a lot of those

7   overlays.  It simply creates a -- a nontamperable version.

8        Unfortunately, yeah, time and date stamps are not part of

9   the underwritten system on Vision.  That they are part of the

10  overlay system for SASD.  And that makes sense when you

11  consider the -- this same system serves again a global

12  audience.  So the time and date stamp specific to JFK8 would

13  not be the same as the time and ate stamp, say, for a facility

14  in Oakland.  And likewise, if you go further across the globe

15  into different time zones, such time and date stamp would not

16  make sense.  And so I understand that's why it doesn't carry

17  it.

18  Q    But you can see the time and date stamp on the -- at the

19  time you were reviewing the document initially on April 6th,

20  correct?

21  A    Correct.

22  Q    Okay.  Can you tell us approximately how long after --

23  well, first of all, the event occurred starting approximately

24  12:45 p.m. on April 6th; isn't that correct?

25  A    I believe that's accurate, yes.



1    Q    Can you tell us approximately when you viewed the video on

2    April 6th?

3    A    It was within an hour of the incident occurring.

4    Q    And at the time -- and at the time that you reviewed that

5    video, you did not know that it was Gerald Bryson depicted in

6    the video; is that correct?

7    A    I did not know it was Gerald Bryson.  I did not know it

8    was Dimitra Evans.

9    Q    Are you sure that's your --

10   A    I wouldn't have said it otherwise, sir.

11   Q    Um-hum.  But you did know who Gerald Bryson was, correct?

12   A    No.  I've never personally met him.  His name has come to

13   my notice before but I could not have told you, this person is

14   Gerald Bryson.

15   Q    Okay.

16        MR. JACKSON:  I'm going to present the witness with a

17   document I've marked as GC Exhibit -- General Counsel Exhibit

18   GC-70, 7-0.  I'm going to share my screen to show everyone

19   that.

20   Q    BY MR. JACKSON:  Now, Mr. Gilbert-Differ, this is an email

21   that you sent to Christine Hernandez and Geoffrey -- excuse me,

22   Bradley Campbell on March 31st, 2020; isn't that correct?

23   A    Yes.

24   Q    And in this email you identify the man -- one of these

25   individuals pictured in this photo as Gerald Bryson; isn't that



Exhibit E, Motion to Try Petition on Hearing Record

```
1    correct?

2    A    Correct.

3    Q    And you identified the man on the very left as Gerald

4    Bryson, correct?

5    A    I provided a label to that effect.  I've got to tell it

6    was not me who identified Mr. Bryson or indeed any of them

7    individuals in that picture, I believe.

8    Q    I -- I'm not sure I understand your testimony.  You're

9    saying that you --

10   A    Okay.

11   Q    -- did not identify this person as Gerald Bryson even

12   though the email says that you did?

13   A    Yeah, I provided a label.  I've got to tell you it wasn't

14   me who looked at this photo and said, that's Gerald Bryson.

15   This is an email providing a summary of the discussions when

16   Mr. Bryson's identified, but no, I could not have identified

17   Mr. Bryson.

18        I did provide this email with him labeled but I've got to

19   tell you that's, again, you can see an individual who is mostly

20   covered by a mask, covered by a sign, and covered by a hat.  I

21   don't know from this picture what Mr. Bryson looks like.

22   Fortunately someone else in the facility did.

23   Q    Um-hum.  You see the man that you identified as Gerald

24   Bryson here is wearing a pink bandana; isn't that true?  Do you

25   see that?
```


www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    Honestly, I cannot see that from this picture.

 2    Q    Oh, you can't see that.  Okay.

 3    A    No.  If you can zoom in potentially, but --

 4    Q    Sure.

 5    A    -- (indiscernible, simultaneous speech) observation I'm

 6    seeing does not show --

 7    Q    Does that help?

 8    A    I see Mr. Bryson is wearing a gray hat.  There appears to

 9    be something pink underneath it.  But I can see the gray hat

10    clearer.

11    Q    Um-hum.

12         MR. JACKSON:  I'll move for the admission of GC-70.

13         JUDGE GREEN:  Any objection?

14         MS. BUFFALANO:  No objection.

15         JUDGE GREEN:  So GC-70 is admitted.

16    (General Counsel Exhibit Number 70 Received into Evidence)

17    Q    BY MR. JACKSON:  So you were aware that Gerald Bryson had

18    participated in a protest regarding Amazon's COVID response on

19    March 30th, correct?

20    A    Yes.  Mr. Bryson and others, correct.

21    Q    Um-hum.  And you're also aware that he participated in an

22    activity that involved walking in on a managers' meeting on

23    March 25th; isn't that right?

24    A    I understand that's the case, yes.

25    Q    And you knew that on April 6th, correct?
```



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I don't believe I knew Mr. Bryson walked in on the 25th.

2    That's come to my attention subsequently.  So no, at the time,

3    I was not aware he walked in March 25th.

4    Q    Okay.

5         MR. JACKSON:  I'm going to mark for identification a

6    different document that I'm going to use on my ShareScreen.

7    I've marked it for identification as GC Exhibit 71.

8    Q    BY MR. JACKSON:  All right.  Mr. Gilbert-Differ, I'm going

9    to scroll down to the second message on this document.  This is

10   an email that you sent to a Steffen Steudte and others on March

11   25th, 2020; isn't that correct?

12        MS. BUFFALANO:  Can you let us see the whole --

13        THE WITNESS:  Yes.

14        MS. BUFFALANO:  -- document?  He might not know what he's

15   looking at.

16        MR. JACKSON:  He answered the question.  Okay.

17        MS. BUFFALANO:  Okay.  Can you let him see the whole

18   document.  That --

19        THE WITNESS:  (Indiscernible, simultaneous speech) --

20        MS. BUFFALANO:  -- we're not playing, like, hide the ball

21   here.  Just show him the document.

22        MR. JACKSON:  I'm not playing any hide the ball.  He

23   answered the question.  He -- he had enough information to

24   answer the question.

25        MS. BUFFALANO:  Okay.  If you're going to ask him



Exhibit E, Motion to Try Petition on Hearing Record

1    questions about a document, he should be able to see it.

2         JUDGE GREEN:  All right.  Just show him the document.

3    Q    BY MR. JACKSON:  Is there anything else you would like to

4    see, Mr. Gilbert-Differ?

5    A    The entire document, please, sir.

6    Q    How would you like me to show it?  Direct me how you --

7    A    Well, if you saw the top -- if you saw the top and then

8    scroll down I can tell you.

9    Q    Tell me when you'd like me to scroll.

10   A    Yeah, you can go ahead.

11   Q    Tell me when to stop.  Tell me when to continue scrolling.

12   A    Yep.

13   Q    Tell me when to --

14   A    Keep going.  Stop there.  Okay.

15   Q    So --

16   A    Okay.  Thank you.  Can you scroll some more, please.

17   Q    Scroll more down?

18   A    Yes, please.

19   Q    More?

20   A    Yes, please.

21   Q    Tell me when to stop.

22   A    Keep going, sir.

23   Q    That's the end of the document.

24   A    Thank you.

25   Q    Okay.  Now, in this email, Steffan Steudte informed you



Exhibit E, Motion to Try Petition on Hearing Record

1    and several others --

2    A    Um-hum.

3    Q    -- that Gerald Bryson and other individuals were involved

4    in some kind of associated gathering onsite; isn't that

5    correct?

6    A    Yes.

7    Q    And that's in reference to these individuals walking in on

8    a management meeting that day; isn't that correct?

9    A    I can't tell that from this document, sir.

10   Q    Now, you applauded Steffan Steudte for his great work in

11   identifying these individuals; isn't that correct?

12        MS. BUFFALANO:  The document speaks --

13        THE WITNESS:  Yes.

14        MS. BUFFALANO:  -- for itself.

15   Q    BY MR. JACKSON:  So you did -- you did -- you -- you --

16   you did congratulate Mr. Steudte on his great work, correct?

17        JUDGE GREEN:  Okay.  So we got that.  So let's --

18        MR. JACKSON:  Okay.  I'll move on.

19   Q    BY MR. JACKSON:  And why did you thank him for his great

20   work?

21   A    Because he provided details of individuals involved in the

22   gathering on 3/25.

23   Q    And why was --

24   A    (Indiscernible, simultaneous speech) --

25   Q    -- this gathering -- why was this gathering important to a



# Exhibit E, Motion to Try Petition on Hearing Record

1    loss prevention manager like yourself?

2    A    So just to be clear and go back and finish answering the

3    original question you asked there, sir.  Mr. Steudte is -- is a

4    hourly associate working without a leader.  I'll be absolutely

5    honest.  I'm going to say thank you and good work for nearly

6    everything that group does until they get a permanent leader in

7    place so they feel the support and communicated with.  What was

8    your next question, please?

9    Q    No, I'm sorry.  You -- you thanked him for -- yeah, my

10   question was this.  Why was a regional loss prevention manager

11   like yourself interested in this associated gathering on March

12   25th?

13   A    Well, you can see, sir, that I'm  included on that as part

14   of a distribution list and not in the to -- oh, I apologize,

15   no, I am.  Can you scroll down so I can see the original email.

16   I'm looking at the wrong document here.  Thank you, okay.  So I

17   would imagine I'm included on this one because I'm Steffan's

18   line manager at this point.  He's sending details to

19   stakeholders and included the manager. He's also carbon copied

20   the rest of the LP team, so I would have got it twice.  And

21   he's also included all HR business partners and above

22   (indiscernible).

23   Q    And that's because Amazon was keeping track of the

24   employees who were engaged in this activity, correct?

25   A    Which activity, sir?  This --



1  Q    To check what?

2  A    -- email does not relate -- this -- this email doesn't

3  make clear what activity it relates to.  What activity do you

4  believe this relates to, sir?

5  Q    And you had no idea what it was relating to; is that your

6  testimony?

7  A    My testimony is this email seems to refer to associates

8  gathering onsite.  If you're telling me you believe this is

9  related to individuals walking --

10 Q    I'm asking you --

11 A    -- into our --

12 Q    -- sir --

13 A    -- facility --

14 Q    I'm asking you --

15 A    Okay.

16 Q    -- did you know what this was in reference to?

17 A    From the email, it says it's for associates gathering

18 onsite.  I --

19 Q    I am asking you --

20 A    -- assure you --

21 Q    -- if you knew --

22 A    -- (indiscernible, simultaneous speech) --

23 Q    -- what this was in reference to.

24       MS. BUFFALANO:  The witness is answering the --

25       JUDGE GREEN:  Okay.  Yeah, we got --



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  -- (indiscernible, simultaneous speech) --

2    JUDGE GREEN:  -- we got the question.  If you have a -- if

3    you have another question about that, or a follow-up question,

4    you can ask it.

5    MS. BUFFALANO:  I couldn't hear his answer.

6    Q    BY MR. JACKSON:  Do you know if -- do you know what this

7    March 25 associated gathering was in reference to?  Yes or no?

8    A    I don't know.  In this context, I don't know.  I assume it

9    is probably the production meeting you're referring to.

10    MR. JACKSON:  I'll move for the admission of GC-71.

11    JUDGE GREEN:  Any objection?

12    MS. BUFFALANO:  No objection.

13    **(General Counsel Exhibit Number 71 Received into Evidence)**

14    THE WITNESS:  Just to be clear, sir, did you want an

15    answer about whether or not we were keeping tabs on associates?

16    MR. JACKSON:  No, I'll withdraw that question.

17    Your Honor, just bear with me one moment.  I want to look

18    at a document real quick.  I'm sorry, can we just go off the

19    record for one minute?

20    JUDGE GREEN:  Off the record.

21    (Off the record at 4:24 p.m.)

22                    <u>**RESUMED CROSS-EXAMINATION**</u>

23    Q    BY MR. JACKSON:  All right.  The video evidence that you

24    reviewed on April 6th, were you able to zoom in?

25    A    The cameras don't have a specific zoom function.  The


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   video systems allows us to, you know, bring a particular box in

2   frame up a little better but with massive reduction in

3   resolution when we do so.  So there's a limited functionality

4   to perform a digital zoom, I guess, if you want to call it, but

5   no, the cameras themselves do not have a zoom function.

6   Q    Okay.  But you can zoom to a certain extent but it will

7   tamper with the resolution of the quality of the image; is that

8   correct?

9   A    Essentially, it's -- it's not really a zoom.  It's

10  essentially bringing a box in screen bigger, which is a little

11  different.  There really isn't any, you know, increase in focus

12  on an area really, just increases for my size one particular

13  piece of the picture.

14  Q    And you were able to observe the clothing that the man you

15  later identified as -- or you say you later identified as

16  Gerald Bryson was wearing, correct?

17  A    Yes.  The person I later identified as Gerald Bryson, yep.

18  Q    And you saw that he was wearing a pink bandana as you say,

19  correct?

20  A    Correct.

21  Q    And did you also observe he was wearing pink sneakers?

22  A    I don't recall that but it's possible.

23  Q    I'm going to show GC-70 again.  Mr. Gilbert-Differ, do you

24  see the -- the man who was identified in your email here as

25  Gerald Bryson as wearing pink sneakers?



1  A    Yes.  Yes, that is clear.

2  Q    Okay.  And you reviewed this email before you sent it; is

3  that correct?

4       MS. BUFFALANO:  Objection.  Reviewed.

5  Q    BY MR. JACKSON:  You read it?  You read it before you sent

6  it; is that right?

7  A    Yes.

8       JUDGE GREEN:  Meaning, did you look at the picture before

9  you sent it?

10      THE WITNESS:  Yes.

11      JUDGE GREEN:  Okay.

12 Q    BY MR. JACKSON:  And you looked at the information below

13 the picture before you sent it, correct?

14 A    Yes.

15 Q    So even if you had not actually yourself attached the

16 photo, you knew at the time you sent this email who Gerald

17 Bryson was; isn't that correct?

18      MS. BUFFALANO:  Objection.  I don't understand the

19 question.

20      JUDGE GREEN:  Overruled.

21      THE WITNESS:  It would be helpful for me if you can

22 clarify what you mean by "know".

23 Q    BY MR. JACKSON:  You knew that there was a man who owned

24 pink sneakers, who is identified in this picture, and his name

25 is Gerald Bryson?



Exhibit E, Motion to Try Petition on Hearing Record

```
1    A    Yes, that's accurate.

2    Q    Okay.  All right.  So you first learned about this

3    incident involving Bryson and Evans from Christine Hernandez;

4    is that right?

5    A    Verbally, yes, that's correct.

6    Q    Okay.  And how did she notify you?

7    A    Verbally.

8    Q    I'm sorry?

9    A    Verbally.

10   Q    Verbally.

11   A    She notified me.  Verbally, yes.

12   Q    Is that in -- in person?

13   A    I believe so.

14   Q    And you don't recall where you were when she notified you

15   in person?

16   A    I do.

17   Q    Was it inside the JFK8 facility?

18   A    Most likely.

19   Q    What did she tell you?

20   A    Well, I don't exactly recall.

21   Q    Do you recall anything about what she told you?

22   A    I understand that she relayed there being some form of

23   altercation between an individual conducting a protest and an

24   individual who was outside on break -- an associate out on

25   break.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Was anyone else present during this conversation?

2   A    I have no recollection of the conversation.  I have no

3   recollection that.

4   Q    Did you atten -- did you attempt to obtain a statement

5   from Ms. Hernandez?

6   A    No.  I could see that serving no invested benefit.

7   Q    Why did you think it was of no benefit?

8   A    Because she herself had not been witness to the event.

9   She had been notified it occurred.

10  Q    Oh, is that what she told you?

11  A    That's my understanding from the conversation, yes.  I

12  told you I don't recall exactly what the conversation was.

13  Q    Do you recall who she told you notified her of this

14  incident?

15  A    Yes, Maciej Curlej.

16  Q    And you're aware that Christine Hernandez knew who all the

17  protesters were outside the building that day; isn't that

18  right?

19       MS. BUFFALANO:  Objection.

20       THE WITNESS:  I --

21       JUDGE GREEN:  He -- he can answer, if you know.

22       THE WITNESS:  I don't know the answer to that.

23  Q    BY MR. JACKSON:  Okay.  So then you talked to Mr. Curlej,

24  correct?

25  A    Correct.



www.escribers.net | 800-257-0885

1    Q    I'm -- I'm sorry, before I go on to that.  Do you remember

2    approximately when you had your initial conversation with

3    Christine Hernandez?

4    A    I do not exactly, no.

5    Q    Did you ask Ms. Hernandez if she knew who the protesters

6    were?

7    A    I don't recall the conversation.  Bear in mind, Ms.

8    Hernandez was not to my knowledge a witness to the event.

9    Q    Okay.  And -- and I -- forgive me if I asked this already,

10   and I'll withdraw if I did.  Do you remember what time

11   approximately you spoke with Ms. Hernandez?

12   A    I do not know exactly, no.  My recollection is that that's

13   the conversation with Mr. Curlej and initial video review were

14   all within the first hour after the event.  Beyond that, I

15   really can't be more specific.

16   Q    All right.  So then you went on to speak with Mr. Curlej.

17   Do you remember where you spoke with Mr. Curlej?

18   A    I do not.

19   Q    Approximately how long after you spoke with Ms. Hernandez

20   did you speak with Mr. Curlej?

21   A    Again, it's within that same time window.  Beyond that, I

22   really can't speculate.

23   Q    And you don't recall -- I'm sorry.

24        MR. JACKSON:  Withdrawn.

25   Q    BY MR. JACKSON:  Was there anyone else present aside from



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    you and Mr. Curlej?

2    A    I don't recall.

3    Q    Was it inside an office?

4    A    Probably, but I couldn't tell you where.

5    Q    Did you take any notes --

6    A    An office --

7    Q    -- of this conver --

8    A    -- or a conference room, or something similar it would be,

9    but no, I don't recall which one or where.

10   Q    But it was inside the facility?

11   A    Yes.

12   Q    Was it inside the main suite of offices there inside the

13   facility?

14   A    I really don't recall.  Most of the offices are located in

15   roughly the same space in the building on a couple of floors,

16   so.  I mean, we could drop a pen on roughly where it was going

17   to be but that's about as good as it gets.

18   Q    When you worked at JFK8, where did you work?  Did you have

19   an office?

20        MS. BUFFALANO:  Objection.  That misstates the testimony.

21   He's never worked for JFK8.

22        MR. JACKSON:  I'm not sure if that -- I thought -- maybe I

23   misunderstood.

24   Q    BY MR. JACKSON:  Were you working at JFK8 on April 6th?

25   A    I'm not sure I understand the question, sir.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    During days when you were physically present, as part of

2    your duties as regional loss prevention manager, when you were

3    present at JFK8, where did you work?  Did you have an office?

4    A    I did not have an office, no.

5    Q    So -- okay.  Where did you work?

6    A    The straightforward answer to that is wherever there was

7    room.  And bear in mind, there was much less of that in a post-

8    COVID environment than prior to owing to social distancing.  So

9    it really was a case of anywhere I could do so safely and

10   distanced.

11   Q    All right.  Did you take any notes of your conversation

12   with Christine Hernandez on April 6th?

13   A    I don't believe so, no.

14   Q    Did you take any notes of your conversation with Cur --

15   with Mr. Curlej on April 6th?

16   A    Again, I don't believe so.

17   Q    So is it possible that you did?

18   A    I don't believe I did, sir, no.  It's possible, sure, but

19   I don't believe I did.

20   Q    Would they have been handwritten notes?

21   A    The notes I didn't take?

22   Q    Well, you said it's possible that they might exist.  So

23   I'm asking you, would they have been handwritten notes or did

24   you use some kind --

25        MS. BUFFALANO:  Okay.  I think --



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MR. JACKSON:  -- of (indiscernible, simultaneous

2    speech) --

3    A    (Indiscernible, simultaneous speech) --

4         MS. BUFFALANO:  Okay.  We're getting into a hypothetical

5    land.  The witness doesn't recall, Your Honor.

6         JUDGE GREEN:  You can ask him a leading question in order

7    to refresh his recollection if you want.

8    Q    BY MR. JACKSON:  So if there were notes, which you say you

9    don't believe there are, but if there were, where would they

10   be?

11   A    I don't believe there are notes, sir.  The reason I say

12   that is because we went through an extensive discovery process,

13   reviewed our files, reviewed our handwritten notes, such as

14   they listed, and any we found we turned over, but no, I didn't

15   find any, so they don't exist.

16   Q    Now, you knew from your very start of your involvement in

17   this situation that this was a verbal exchange between

18   employees; isn't that correct?

19   A    That was my understanding, yes.

20   Q    There was no physical violence involved in this incident,

21   correct?

22   A    Correct.

23   Q    Okay.  So after you spoke with Mr. Curlej, what was the

24   next step that you took in your investigation?

25   A    From there, I started a video review.



Exhibit E, Motion to Try Petition on Hearing Record — 1325

1    Q    And -- and again, at the time you started your video

2    review, you did not know who Dimitra Evans was, correct?

3    A    That's -- that's correct, yes.

4    Q    Have you been involved in any other investigations that

5    involved verbal altercations between employees?

6    A    Yes.

7    Q    What about at JFK8?  Any at JFK8?

8    A    I don't recall.  It's possible.

9    Q    You can't recall any specifics?

10   A    You just got to bear in mind, sir, I've got something like

11   15 facilities for Amazon over my time with them so it's highly

12   possible there was one at JFK8 that I was involved in but I

13   don't specifically recall it.  I have certainly dealt with

14   other altercations concerning associates over my five years

15   with Amazon.

16   Q    What about at BDL3, do you remember any investigations you

17   were involved in that pertained only to verbal interactions

18   between employees?

19   A    Again, it is possible.  I don't specifically recall.

20   Q    How about EWR4, do you recall any investigations involving

21   verbal altercations between employees that you were involved in

22   at EWR4?

23   A    It is more likely at EWR4 than any other building that I

24   currently cover, simply because I've been associated with that

25   building for almost four of my five years at Amazon in various



# Exhibit E, Motion to Try Petition on Hearing Record

 1   capacities.  So yes, it's possible, but do I specifically

 2   recall any?  No.

 3   Q    But you recall your investigation into this incident

 4   involving Gerald Bryson?

 5   A    Yes.  There's been a couple of events recently which have

 6   brought it to mind.

 7   Q    Which -- what are those events?

 8   A    This for starters.

 9   Q    Okay.  So did you review materials in advance of your

10   testimony today?

11   A    Yes.  The documents I believe that (indiscernible) of my

12   exhibits were provided by me, initially.  So yeah.

13   Q    Did you review any others, other than the ones that

14   have -- were shown to you while you testified on direct?

15   A    I don't think so, no.

16   Q    Verbal confrontations between employees are typically

17   handled by onsite managers; isn't that correct, not regional

18   managers like yourself?

19   A    No, that's not correct.  Sometimes there is no onsite

20   manager, in which case the regional is their only option.  That

21   was the case with two of my buildings at the time this

22   occurred.  So BWR2 in Baltimore, Maryland and JFK8 at Staten

23   Island, New York.  In addition, we do not have in any

24   facilities, or at least not at that time, sufficient staffing

25   to provide 24/7 cover, the buildings that run 24/7.  So in



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1375 of 2171 PageID #: 327
142)
Exhibit E, Motion to Try Petition on Hearing Record

1    those cases, I am either the first or second on-call person to

2    respond to breaking incidents outside of hours of coverage.  So

3    yes, we absolutely do, myself and my peers.

4    Q    So in the video that you reviewed of the April 6th

5    incident involving Mr. Bryson and Ms. Evans, you observed

6    individuals' body language; is that correct?

7        MS. BUFFALANO:  There were two videos.  Which one are you

8    talking about?

9    Q    BY MR. JACKSON:  Well, start with the first one that we

10   saw, which is the closer angle from the overhang.  Did you

11   observe individuals' body language in that video?

12   A    Yes.  As far as (indiscernible) absolutely.  I think we

13   talked of that at some length when we went through the video

14   earlier with apologies.

15   Q    Um-hum.  Yeah, you talked at length at Mr. Bryson's body

16   language but you didn't so much talk about others.  What about

17   the --

18   A    I apologize, sir, I don't agree with that characterization

19   at all.  We spent quite a lot of time talking (Indiscernible,

20   simultaneous speech) --

21       MR. JACKSON:  I'll withdraw the characterization.  I'll

22   withdraw the characterization.

23   Q    BY MR. JACKSON:  So did you happen to observe the body

24   language of the security guards who were -- who were witnessing

25   the incident?



1    A    I did.

2    Q    And isn't it true that none of them made any motion

3    towards Ms. Evans, correct?

4    A    That is correct, and exactly what I would hope to see.

5    Q    Okay.  And none of them made any effort to intervene in

6    the interaction; isn't that correct?

7    A    That is correct.  And again, exactly what I would hope to

8    see.  You have to understand our security officers are bound by

9    a fairly restrictive massive work order, which does prohibit

10   them from intervening between these events.  Now, that's not to

11   say that it never ever happened where life or a limb at risk,

12   and natural instincts I would overtake them.  But no, it's not

13   a desirable state from us, and they are prohibited from

14   (indiscernible) their master work order from doing so.

15   Q    And Mr. Curlej didn't make any motion to intervene,

16   correct?

17   A    Really depends on what you define as intervene.  So if you

18   mean by intervene fail to act, I would disagree with that

19   characterization.  If you mean he failed to step in between the

20   two parties, I would agree with that characterization.

21   Q    Okay.  He failed to step in between the parties.  He

22   failed to intervene to stop --

23   A    That I agree --

24   Q    -- what was going on; isn't that correct?

25   A    No, that's not correct.



www.escribers.net | 800-257-0885

1    Q     What did he --

2          MR. JACKSON:  Withdrawn.

3    Q     BY MR. JACKSON:  Are you familiar with something called

4    deescalation?

5    A     I apologize, I need you to clarify that just a little

6    better for me.

7    Q     Do you know what the term "deescalation" means?

8    A     Yes.

9    Q     What does that mean to you?

10   A     I think it's a self-evident word.  But in some way it

11   prevents an ongoing escalation.  So calm a situation and calm

12   (indiscernible), I guess.

13   Q     And none of the management -- none of the operations

14   managers or human resources officials who were present for the

15   incident attempted to deescalate; is that correct?

16         MS. BUFFALANO:  I'm going to object to the --

17         JUDGE GREEN:  Overruled.

18         MS. BUFFALANO:  -- characterization.

19         JUDGE GREEN:  Overruled.

20         THE WITNESS:  So if you're talking about active

21   deescalation, I agree.  But deescalation takes more than one

22   form.  I think you'd agree with that statement, sir.

23   Q     BY MR. JACKSON:  No one took any steps toward Bryson and

24   asked him to stop or move on, correct?

25   A     Not that I saw during the course of the video, no.  Now,



Exhibit E, Motion to Try Petition on Hearing Record

1    that's potentially in line with what I --

2    Q    Sir --

3    A    -- (indiscernible, simultaneous speech) --

4    Q    -- you answered the question.  It's a yes or no question,

5    and you answered it, and I'd like to move on.  All right.  Is

6    the ability to deescalate a situation relevant to determining

7    the severity of a situation or of an incident?

8         MS. BUFFALANO:  What do you think severe --

9         THE WITNESS:  I think --

10        MS. BUFFALANO:  -- is -- my apologies, Geoff.

11        What is severity?

12        MR. JACKSON:  I'll rephrase.

13   Q    BY MR. JACKSON:  According to the workplace incident

14   management guide, isn't it true that the (indiscernible) in

15   which a situation can be deescalated is relevant to the

16   severity level of the incident?  Yes or no?

17   A    So in terms of the final severity rating on our severity

18   rating scale; is that what you're asking, sir?

19   Q    I am asking whether that -- the ability to deescalate a

20   situation, that is a relevant factor in considering the

21   security risk assessment level in accordance with the workplace

22   incident management guide, correct?

23   A    I've read the document, and I can certainly see those

24   words within it.  I just need you to be aware, sir, that we

25   don't assign severity ratings.  Those severity ratings are



Exhibit E, Motion to Try Petition on Hearing Record

1    assigned by the Global Security Operations Center based on the

2    totality of our summary.  I think it's pretty important that we

3    don't assign over importance to any single line sentence or

4    phrase within that guide but as is.  You know, I think there

5    are (indiscernible) throughout the guide, you must take all of

6    the circumstances into consideration when you're assigning

7    classifications, severity, et cetera.  But as I say, sir, we

8    don't assign severity.  That is performed by the Global

9    Security Operations Center.

10   Q    So what you're saying is you -- so you're aware -- you're

11   familiar with the document.  I think you just said that

12   you're -- you're -- you're intimately familiar with the

13   workplace incident management guide, correct?

14   A    That's not what I said, sir.

15   Q    But you said you've read it and you're familiar with it,

16   correct?

17   A    Correct.

18   Q    And as part of your job is to work with this document,

19   correct?

20   A    Correct.

21   Q    Okay.  So what you're saying here is that you look at all

22   of the -- and -- and -- and you're aware that in terms of

23   assessing the risk assessment threat level, there are certain

24   factors that are considered under the workplace incident

25   management guide, correct?



1    A    Yes.

2    Q    And it's your testimony that each of those factors should

3    be considered in conjunction to determine what the severity

4    level of a threat is, correct?

5    A    It might be helpful if we could refer to the document,

6    sir.

7    Q    Sure.

8    A    I'm really concerned that we're choosing sentences in

9    isolation here and I'm not sure we're getting good context or

10   understanding or even necessary talking about --

11   Q    Sure --

12   A    -- the same(indiscernible, simultaneous speech) --

13   Q    -- I'll show you the -- I'll show you the specific portion

14   of the document I'm referencing.  So this is page 11 of the

15   workplace incident management.  That's inclusive of cover

16   pages, et cetera.  Let me see, is there a Bates stamp number

17   here.  No, I don't see one.  I apologize.  I don't think

18   there's an actual page number here.  But this is the portion

19   I'm referring to.  It --

20        JUDGE GREEN:  What exhibit number is it?

21        MR. JACKSON:  Yeah, I'm sorry this is Respondent 116.  So

22   this is page 11 of the PDF document that is entered as

23   Respondent 1 -- R-116.

24   Q    BY MR. JACKSON:  Okay.  So -- so the factors that

25   determine whether a severity -- well, first of all, severity



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    level 4 is the lowest risk of severity, correct?

 2    A    Correct.

 3    Q    Okay.  And the factors to consider in assigning that level

 4    of severity include no life safety risk, correct?

 5    A    Correct.

 6    Q    And it also includes verbal threats without additional

 7    indicators, correct?

 8         MS. BUFFALANO:  The document speaks for itself.

 9         JUDGE GREEN:  Okay.  I mean, I think that it -- at the

10    request of the witness, we just wanted to point to the specific

11    portion that Mr. Jackson was referring to.  Do you want to ask

12    the question again now that we know that, which I think --

13         MR. JACKSON:  Okay.  All right.

14    Q    BY MR. JACKSON:  So the incident involving Mr. Bryson and

15    Ms. Evans carried no life safety risk; isn't that correct?

16    A    None that we identified, yes.

17    Q    And there were no weapons involved, correct?

18    A    The same statement as before, again, yes, none that we --

19    we recognized or identified.

20    Q    And it was just the one-time behavior, correct?

21    A    Yes.  To our knowledge, this is the first time these two

22    have encountered each other.

23    Q    Okay.  And it involved what you -- you considered

24    harassment, correct?

25    A    Yes.
```



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    And it involved what you considered bullying, correct?

2   A    Correct.

3   Q    Okay.  And the incident involving Mr. Bryson and Ms. Evans

4   did not include --

5        MR. JACKSON:  I'm -- I'm sorry, withdraw that.

6   Q    BY MR. JACKSON:  The incident involving Mr. Evans and

7   Bryson did not include any assaults, correct?

8   A    Correct.  Again, none that we identified (indiscernible).

9   Q    In fact, based on what you saw, Mr. Bryson never -- never

10  left that laddered crosswalk area, correct?  He stayed there

11  the entire time, at least -- at least six feet away from Ms. --

12  probably more -- six feet -- more than six feet away from Ms.

13  Evans at all times, correct?

14  A    Correct.

15  Q    Okay.  And there were no physical injuries, correct?

16  A    Yes.  None reported or identified, correct.

17  Q    And there was -- you -- you observed no vandalism based on

18  your investigation, correct?

19  A    Correct.

20  Q    There were no bomb threats, correct?

21  A    Correct.

22  Q    Okay.  And you made the decision to assign a severity

23  level 3 to this incident, correct?

24  A    I think --

25       MS. BUFFALANO:  (Indiscernible, simultaneous speech) --



Exhibit E, Motion to Try Petition on Hearing Record

1   A    -- I've repeatedly testified, no, that I don't assign the

2   severity level rating to it.  I'm happy to talk about why I

3   align with that rating though.  I believe that rating is

4   probably accurate because of the third bullet point from the

5   end in sev level 3.  So if we look at that kind of reading in

6   columns -- third column over, third bullet point up, repeat or

7   ongoing.  And I believe at that point, yeah, I -- I'm more in

8   line with that assessment for this behavior than any of them.

9   Q    BY MR. JACKSON:  So even though none of the other factors

10  notified or listed under severity level 3 are present in this

11  incident, you decided to -- well, no, you didn't.  Well, I'm

12  sorry.  Who -- who decided to assign level 3 to this?

13  A    So again, as I've testified we sent this and you've seen

14  the document I sent.  There is no severity writing on it.  We

15  sent that to the regular security operation center to asses

16  based on this criteria inclusive to, but not exclusively this

17  criteria.  And they determine a severity level based on what

18  they seen in the report as a risk (indiscernible).

19  Q    And you agree with that?

20  A    I do, yes.  It's a moot point if I do.  Now, that, that

21  assignment is exclusively their function and not mine.  But

22  yeah, I agree with their assessment.

23  Q    I see.  Okay.

24  A    Can you explain the why's --

25  Q    There is no question pending.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    (Indiscernible, simultaneous speech) --

 2    Q    There's no question pending.  There's no question pending.

 3         MR. JACKSON:  Your Honor, if I may go off the record for

 4    one minute?

 5         JUDGE GREEN:  Off the record.

 6    (Off the record at 4:59 p.m.)

 7                    RESUMED CROSS-EXAMINATION

 8    Q    BY MR. JACKSON:  So when you were checking the video

 9    initially, you did not who Dimitra Evans was?  You did not know

10    who the woman in the gray, sitting on the stoop was, correct?

11    A    Correct.

12    Q    And you only discovered her identity by checking badge

13    swipes, correct?

14    A    Correct.

15    Q    When did you learn, through badge swipes, that the person

16    sitting on the stoop in the gray sweater was Dimitra Evans?

17    A    Within probably an hour of being secretary.

18    Q    How long after you reviewed the video, approximately?

19    A    Well, these activities are not exclusive to each other;

20    it's an inclusive process.  I need the video to be up and

21    running in order to identify through a badge swipe.  So it's

22    during the course of video review that I'm able to identify

23    this individual.

24    Q    Okay.  You credited the witness statements that you

25    received in this investigation, correct?  You believed them?
```



1    A    That's not quite how investigations work, or at least not

2    in my experience.  You treat each piece of evidence on its

3    merits.  You have to make an assessment of every piece of

4    evidence.  That's what my job was at this place.

5    Q    Okay.  And part of investigation is to ascertain all

6    relevant facts, correct?

7    A    As far as possible.

8    Q    As far as possible.  And that includes interviewing

9    witnesses who may have different perspectives on an event; is

10   that right?

11   A    In this investigation, the interviews of witnesses were

12   undertaken by HR.  It's a partnership investigation; we do this

13   together.

14   Q    But it's appropriate to conduct an investigation in a

15   manner that obtains all relevant information; wouldn't you

16   agree with that?

17   A    I'm not sure I understand the question, sir.

18   Q    Isn't it important during an investigation to obtain as

19   much relevant information as possible?

20   A    Yes.

21   Q    And that includes identifying potential witnesses and

22   speaking with them, correct?

23   A    In my case, yes.

24   Q    Okay.

25        MR. JACKSON:  I am going to show the witness what's been



1    admitted as GC-62.

2    Q    BY MR. JACKSON:  All right.  Now, Mr. Gilbert-Differ, you

3    didn't mention this on your direct testimony.  But do you see

4    that there's a person holding a blue sign in this shot?

5    A    Yes.

6    Q    And you saw that at the time you reviewed the video on

7    April 6th, correct?

8    A    Yes.

9    Q    And you made no effort to identify this person; isn't that

10   correct?

11   A    No, that's very incorrect.  We did.

12   Q    You identified her as Mandi Velasco; isn't' that correct?

13   A    No, that's incorrect.  We made attempts to identify this

14   individual, but were unsuccessful.  I still don't know who that

15   person is.

16   Q    And you say you worked with HR to -- well, isn't it true

17   that you worked with HR officials at JFK8 to identify who this

18   person was?

19   A    Yes, that's correct.

20   Q    Including Christine Hernandez?

21   A    I don't know if I reviewed the video with Christine.

22   Q    Okay.

23   A    I actually don't know if I did.  It could have been with

24   Tyler.  It was within -- with one of those two.  I don't know

25   which on specifically.



1   Q    One of those two.  I see.  Okay.

2   A    Correct.

3   Q    All right.  And you knew that there's --

4   A    I can tell you that -- I actually --

5   Q    There's no question pending, sir.  I'm --

6   A    -- remember I --

7   Q    -- there's no question pending, sir.  There's no question

8   pending, sir.

9   A    I apologize, sir.

10  Q    There's no question pending.

11  A    Can you repeat the question, sir?

12       JUDGE GREEN:  Okay.  So let him, if he's saying that

13  there's no question pending, just stop answering.  And if -- if

14  your attorney wants to follow up, she can -- she can ask the

15  question when it's her turn.

16       THE WITNESS:  Yes, Judge.

17  Q    BY MR. JACKSON:  All right.  So in part of your assessment

18  of the severity of this incident involved the number of

19  associates who were present; isn't that correct?

20  A    Correct.

21  Q    Did you attempt to identify any of those associates who

22  were present?

23  A    We did.

24  Q    Okay.  And did you find out who they were?

25  A    We were identifying -- able to identify some Amazonians



Exhibit E, Motion to Try Petition on Hearing Record

1  and who were present.  So obviously, we were aware of Maciej

2  Curlej and we were also able to identify Shianna Donaldson.  We

3  were also able to identify Christopher Urso and of course, we

4  were able to identify the security personnel.

5  Q    Okay.  Ms. Donaldson is an HR supervisor, correct?

6  A    I don't know if supervisor is the correct characterization

7  or if I don't know her job title at that time.

8  Q    Okay.  But she's an HR official; not a -- not a tier 1

9  associate, correct?

10  A    Correct.

11  Q    And Mr. Curlej is not a tier 1 associate, correct?

12  A    Correct.

13  Q    He's an operations managers; isn't that right?

14  A    Correct.  Senior operations manager.

15  Q    Senior operations manager.  And Mr. Urso is not a tier 1

16  associate, correct?

17  A    Correct.

18  Q    He's a production assistant, correct?

19  A    Correct.

20  Q    Okay.  In fact, the only tier 1 associate --

21       MR. JACKSON:  Withdrawn.

22  Q    BY MR. JACKSON:  Yeah, all right.  So the only tier one

23  associate who you spoke with or who HR spoke with before you

24  made your recommendation to terminate Gerald Bryson was Dimitra

25  Evans, herself, correct?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Correct.

2         MR. JACKSON:  I'm sorry.  Can we just go off the record

3    for one minute?

4    (Off the record at 5:08 p.m.)

5         MR. JACKSON:  Are we back on, Judge?

6         JUDGE GREEN:  Did we lose Mr. Kearl?  Okay.  Back on the

7    record.

8                      <u>**RESUMED CROSS-EXAMINATION**</u>

9    Q    BY MR. JACKSON:  You asserted repeatedly in your

10   testimony, that Gerald Bryson started this altercation; isn't

11   that correct?

12        MS. BUFFALANO:  Objection to the characterization.

13   Q    BY MR. JACKSON:  All right.  Isn't it true that you

14   believe that Gerald Bryson assert -- initiated this

15   altercation?

16   A    That's not a straightforward question, sir.  This

17   altercation, clearly initiated out of protest activity and an

18   individual voicing an altered view.  The point of which I -- I

19   categorize it as becoming an altercation, yes, was initiated by

20   Mr. Bryson.  But it is a more complex scenario than that simple

21   question might suggest.

22   Q    So you knew that it was Dimitra Evans who started the

23   engaging with Gerald Bryson; isn't that true?

24   A    That appeared to be the dynamic, yes.

25   Q    And you observed, from your review of the video, that



1    Dimitra Evans was making hand gestures toward Mr. Bryson,

2    correct?

3    A    Correct.  Well, obviously we see her mar -- her arm

4    moving.  I'm not sure if we can say what her hand is doing, but

5    yeah, her arm is moving.

6    Q    So she made gestures toward him with her arms, correct?

7    A    Yes, correct.

8    Q    And you did not see Gerald Bryson make any gestures

9    towards Evans with his arms, correct?

10   A    Well, they were a little full at the time.  He had a -- a

11   bullhorn in one hand and a sign --

12   Q    Yes or no question.

13        MS. BUFFALANO:  He's answering the question.

14        THE WITNESS:  No, because his hands had a bullhorn and a

15   siren in them.

16   Q    BY MR. JACKSON:  The answer is no.  I see.  Okay.  Now,

17   you mentioned HR partners who you worked with in this

18   investigation.  Who are those HR partners?

19   A    Initially, Christine; followed by Tyler.  And then,

20   obviously, my recommendation went to Christine, Tyler, and

21   Bradley Campbell.

22   Q    So when you say you sent it to the GSOC, that's Christine,

23   Tyler, and Bradley?

24   A    If you recall the workplace incident notification, I put a

25   recommended distribution list at the top of that, which



1    included those three; plus Nei Ha as well, who is also Tyler's

2    direct line manager.  Nei Ha, from my recollection's not

3    involved in this investigation.  Obviously, the other two were.

4    Q    Who made the final decision to discharge Gerald -- Gerald

5    Bryson?

6    A    I'm afraid I can't answer that question.  I was not part

7    of any hearing in that conversation.  My involvement ended

8    already 10th of April.

9    Q    Do you know who -- who Linda Piscadero(sic) is?

10   A    I don't know that name.

11   Q    Do you know Patel Desi (sic)?

12   A    Desi Patel?

13   Q    Desi Patel.

14   A    D-E-S-I?

15   Q    Yeah, D-E-S-I.

16   A    Desi, yep.

17   Q    Yeah.

18   A    Yeah.  I believe Desi was a member of the HR team at JFK8

19   at this time.

20   Q    Was she involved in the investigation to your knowledge?

21   A    Not in the elements I was dealing with.  I don't recall

22   any communication with Desi, myself.  It's possible, but I

23   don't recall it.  My -- my primary partner was Tyler Grabowski

24   who (indiscernible) the investigation.

25   Q    Do you know who Pooja Desai is?



1    A    Pooja, I believe, is another member of the HR team at

2    JFK -- or at least was, at that time.

3    Q    Do you know what her position was at the time?

4    A    No, I don't recall.

5    Q    Do you know if Pooja Desai was involved in the

6    investigation regarding Gerald Bryson?

7    A    No, I mean, it would be the same answer as before.  It's

8    entirely possible that HR used all the members of their team on

9    their side of the investigation.  But I don't believe, I

10   myself, worked with any of the individuals you've named outside

11   of the ones you've talked to already.

12   Q    Now, in your video review of the April 6th incident,

13   you  -- you observed Mr. Curlej using his phone, correct?

14   A    Yeah, that's a fair po -- appeared to be on the video.  It

15   certainly matched what he said he'd done.  So I would agree

16   with that.

17   Q    But you have no independent knowledge of what he was doing

18   with his phone, correct?

19   A    You mean outside of the video and outside of his own

20   account; is that what you're asking?

21   Q    Yes.

22   A    No.

23   Q    Well, all you saw on the video was him using a phone,

24   correct?

25   A    Or more accurately, holding a phone to his ear.  But yes.



1  Q    Yes, you're right.  Holding a phone to his ear; that's all

2  you saw, correct?

3  A    That's all the video can do for me, yes.

4  Q    And the only basis of your statement that he was speaking

5  with Sai Kotha was based on what Mr. Curlej told you, correct?

6  A    Yes.

7  Q    And in your video review, you observed Evans walking

8  towards the entrance of the facility, correct?

9  A    Correct.

10 Q    And you observed that she didn't walk straight in to the

11 facility.  She walked at diagonal; isn't that correct?

12 A    That is correct.

13 Q    And the diagonal which she walked, was the direction where

14 Gerald Bryson had moved, correct?

15 A    It's also the direction to the --

16 Q    Yes or no, sir.  Yes or no.  Answer the question, sir.

17 A    Yes, to both points.  Yes, it's the point to Mr. Bryson.

18 It's also the actual way in.

19 Q    So your testimony's that she could not have gone in in any

20 other way?

21 A    I believe at this time, for a period of time, we actually

22 had the term self-set in a single direction flow.  That was

23 later reversed.  But while we were trying to figure out how to

24 work safely through COVID, we limited tunnel functionality of

25 our turnstiles to provide in and out flow.



# Exhibit E, Motion to Try Petition on Hearing Record

1    Ms. Evans walks towards the turnstiles, or at least the

2    part of the entrance, where the turnstiles would actually let

3    her in.

4    Q    And as she was walking in, you observed her making a large

5    gesture, as you put it, with her arms, correct?

6    A    Yep, open arms; palms out, correct.

7    Q    All right.  And as she was about to go in, she turned

8    around and came back out; isn't that correct?

9    A    Yeah, I think took two or three steps toward holding the

10   door; then, released the door and went back in.

11   Q    Okay.  Have you ever seen any video with sound of that

12   interaction between Ms. Evans and Mr. Bryson?

13   A    I have not, no.

14   Q    Just bear with me for one moment.

15        MR. JACKSON:  Actually, Your Honor, can I -- can I take a

16   recess here, about ten minutes?

17        JUDGE GREEN:  Let -- let me ask the parties.  I'm

18   increasingly thinking that we are not going to get done with

19   Mr. Gilbert-Differ.  We had, you know, an extended lunch, which

20   was extended through nobody's fault, as a result of the

21   technical malfunction.  It's now 5:20.

22        Mr. Kearl, are you going to have some -- some cross?

23        MR. KEARL:  I'll likely have some cross, yes.  I -- I

24   don't know if it'll be, you know, incredibly long.  But I will

25   have some probably.



Exhibit E, Motion to Try Petition on Hearing Record

1       JUDGE GREEN:  Is there going to be any redirect -- I mean,

2 what I'm asking is, you know, maybe we should just break?

3       What's your position on that, Mr. Jackson?

4       MR. JACKSON:  I'm not opposed.

5       JUDGE GREEN:  What was that?

6       MR. JACKSON:  I said I'm not opposed.  I'm prepared to

7 continue today, but if, Your Honor, would like to break for the

8 day, that's fine with me.

9       JUDGE GREEN:  Frankly, I think we should.  If we -- if we

10 want to break here anyway, you know, it's going to be 5:30 and

11 I don't -- it doesn't really sound like we're necessarily that

12 close to ending.

13       So when we go off the record, and I apologize, Mr.

14 Gilbert-Differ.  We try to get people on and off in one day, we

15 really do.  Circumstances conspired against us today.

16       Can we be back here tomorrow at 10?

17       MR. JACKSON:  Yes, judge.

18       MR. KEARL:  Yes, Judge.

19       JUDGE GREEN:  Okay.  So unless anybody has any -- anything

20 they want to deal with now, we'll -- we'll -- we'll break for

21 the day.

22       MR. JACKSON:  Nothing to address, I believe, from the GC.

23 Unless, Ms. Cox concur with me.

24       JUDGE GREEN:  Okay.  All right.  Thank you very much.

25 I'll see you all tomorrow.


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1     MR. JACKSON:  Thanks, Judge.

2     MS. BUFFALANO:  Thank you.  Thanks, Judge.

3     (Whereupon, the hearing in the above-entitled matter was

4     recessed at 5:22 p.m. until Friday, May 14, 2021 at 10:00 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1        **C E R T I F I C A T I O N**

2   This is to certify that the attached proceedings, via Zoom

3   videoconference, before the National Labor Relations Board

4   (NLRB), Region 29, Case Number 29CA-261755 Amazon.Com Services,

5   LLC, and Gerald Bryson, held at the National Labor Relations

6   Board, Region 29, Two Metro Tech Center North, 5th Floor,

7   Brooklyn, New York 11201, on May 13, 2021, at 10:25 a.m. was

8   held according to the record, and that this is the original,

9   complete, and true and accurate transcript that has been

10  compared to the reporting or recording, accomplished at the

11  hearing, that the exhibit files have been checked for

12  completeness and no exhibits received in evidence or in the

13  rejected exhibit files are missing.

14

15

16                                          _____

17                                          BARRINGTON MOXIE

18                                          Official Reporter

19

20

21

22

23

24

25


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services LLC,          Case No.    29-CA-261755

       Employer/Respondent,

and

Gerald Bryson,

      An Individual.

_____

_____

Place: Brooklyn, NY (via Zoom Videoconference

Dates: May 14, 2021

Pages: 1350 through 1538

Volume: 10

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



Exhibit E, Motion to Try Petition on Hearing Record

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

### REGION 29

| | |
|---|---|
| In the Matter of:<br><br>AMAZON.COM SERVICES LLC,<br><br>      Employer/Respondent,<br><br>and<br><br>GERALD BRYSON,<br><br>      An Individual. | Case No.   29-CA-261755 |

The above-entitled matter came on for hearing, via Zoom Videoconference pursuant to notice, before **BENJAMIN W. GREEN**, Administrative Law Judge, at the National Labor Relations Board, Region 29, Two Metro Tech Center North, 5th Floor, Brooklyn, NY 11201, on **Friday, May 14, 2021, 10:04 a.m.**

Exhibit E, Motion to Try Petition on Hearing Record

1                            A P P E A R A N C E S

2    **On behalf of the Charging Party:**

3         **FRANK KEARL, ESQ.**
          MAKE THE ROAD NEW YORK
4         161 Port Richmond Avenue
          Staten Island, NY 10302
5         Tel. (929)265-7692

6    **On behalf of the Employer:**

7         **CHRISTOPHER J. MURPHY, ESQ.**
          **JENNIFER M. WILLIAMS, ESQ.**
8         **RICHARD G. ROSENBLATT, ESQ.**
          MORGAN, LEWIS & BOCKIUS, LLP
9         1701 Market Street
          Philadelphia, PA 19103-2901
10        Tel. (215)963-5601

11        **NICOLE BUFFALANO, ESQ.**
          MORGAN, LEWIS & BOCKIUS, LLP
12        300 South Grand Avenue, 22nd Floor
          Los Angeles, CA 90071
13        Tel. (213)612-7443

14        **KELCEY PHILLIPS, ESQ.**
          MORGAN, LEWIS & BOCKIUS, LLP
15        1111 Pennsylvania Avenue, NW
          Washington, DC 20004
16        Tel. (202)739-5455

17        **JASON SCHWARTZ, ESQ.**
          **ZAINAB N. AHMAD, ESQ.**
18        GIBSON, DUNN & CRUTCHER LLP
          200 Park Avenue
19        New York, NY 10166-0193

20   **On behalf of the General Counsel:**

21        **EVAMARIA COX, ESQ.**
          **MATTHEW JACKSON, ESQ.**
22        **NANCY REIBSTEIN, ESQ.**
          THE NATIONAL LABOR RELATIONS BOARD
23        Two Metro Tech Center North, 5th Floor
          Brooklyn, NY 11201
24        Tel. (718)765-6172

25


www.escribers.net | 800-257-0885

1

## I N D E X

2

3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| 4 Geoffrey Gilbert-<br> Differ | | 1354<br>1395 | 1415 | | |
| 5 | | | | | |
| Tyler Grabowski<br>6 (Recalled) | 1434 | | | | |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                **E X H I B I T S**

2

3   **EXHIBIT**                                 **IDENTIFIED**     **IN EVIDENCE**

4   **General Counsel:**

5     GC-73                           1371     Not Admitted

6

7   **Respondent:**

| Exhibit | Identified | In Evidence |
|---|---|---|
| R-8 | 1471 | Not Admitted |
| R-9 | 1458 | Not Admitted |
| R-11 | 1468 | Not Admitted |
| R-12 | 1460 | Not Admitted |
| R-13 | 1464 | Not Admitted |
| R-16 | 1483 | Not Admitted |
| R-17 | 1476 | Not Admitted |
| R-18 | 1487 | Not Admitted |
| R-19 | 1509 | Not Admitted |
| R-20 | 1512 | Not Admitted |
| R-21 | 1503 | Not Admitted |
| R-24 | 1519 | Not Admitted |
| R-99 | 1524 | 1525 |
| R-105 | 1474 | Not Admitted |
| R-126 | 1528 | Not Admitted |



1       **P R O C E E D I N G S**

2       JUDGE GREEN:  And Mr. Gilbert-Differ --

3       THE COURT REPORTER:  I believe we are.

4       JUDGE GREEN:  -- if you recall you're still -- okay.

5  Thank you.

6       Recall you're still under oath, and Mr. Jackson is going

7  to have some more questions for you on cross-examination, okay?

8       THE WITNESS:  Yes, Your Honor.

9       JUDGE GREEN:  Okay.  Thank you.

10                      **CROSS-EXAMINATION**

11  Q    BY MR. JACKSON:  Good morning, Mr. Gilbert-Differ.

12  A    Good morning.

13  Q    Did you speak with anyone last night -- between last night

14  and today about your testimony?

15  A    I did not.

16  Q    All right.  Okay.  You -- I just want to make sure I

17  understand a portion of your testimony from yesterday.  Is it

18  true that you believe that the security personnel and the

19  Amazon officials who were present and observing the interaction

20  between Mr. Bryson and Ms. Evans, do you believe that they did

21  the right thing by not intervening in the event; is that

22  correct?

23       MS. BUFFALANO:  I think that misstates the testimony.

24       MR. JACKSON:  I'm asking if that's correct or not.

25       JUDGE GREEN:  He can answer the question.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record    355

1    THE WITNESS:  Thank you.

2    A    So firstly, I -- I think we disagree on the

3    characterization of intervening.  Certainly, amongst the

4    individuals present, individuals did direct, invite, Ms. Evans

5    to enter the facility.  That is an effective intervention and

6    an effective de-escalation.

7    Q    BY MR. JACKSON:  Aren't the officials supposed to separate

8    and place the individuals involved in the altercation in

9    separate areas?

10   A    That is an option, it's not a requirement upon them.

11   Ultimately, at Amazon and regardless of whether it relates to

12   operational work or whether it relates to any other facet of

13   work, so in this case security, we never, ever, ask any

14   individual to do anything beyond what they feel safe and

15   comfortable doing.  So no, I don't disagree with the

16   individuals' decisions made not to physically intervene if they

17   didn't feel safe to do so.

18       MR. JACKSON:  Okay.  Judge, bear with me for a second

19   while I prepare a document.

20       JUDGE GREEN:  This is a new General Counsel's exhibit?

21       MR. JACKSON:  Yes, Judge.  And I'm just -- I'm marking it

22   and uploading it into SharePoint.

23       JUDGE GREEN:  Okay.  It would be helpful if the parties

24   did this beforehand.  What -- what number is it?

25       MR. JACKSON:  I understand, Judge.  But we just got this



1    document very recently, and the continued drips and drabs that

2    we're getting from the subpoena, so just humor me for a moment.

3        This is going to be GC-73.

4        MS. BUFFALANO:  Can you give us the Bates number?

5        MR. JACKSON:  Yes.  8094 through 8097.

6        MS. BUFFALANO:  Thanks.

7        UNIDENTIFIED SPEAKER:  (Indiscernible) 72?

8        JUDGE GREEN:  Yeah, 72 is the next one.  Is this 72?

9        MR. JACKSON:  Yeah, I'm going a bit out of order, again,

10   because we just got this document.

11       UNIDENTIFIED SPEAKER:  Okay.

12       MS. BUFFALANO:  I don't think we produced anything today,

13   did we?  Was it yesterday?

14       UNIDENTIFIED SPEAKER:  It was last night.

15       MR. JACKSON:  Yeah, after I had gone to sleep.

16       All right.  Okay.  The document's now up in SharePoint.

17   And I'm going to present, via shared screen a document that I

18   have marked for identification as GC-73.

19   Q    BY MR. JACKSON:  All right.  Mr. Gilbert-Differ, I want

20   you to read over the document, and tell me when you want me to

21   scroll.

22       JUDGE GREEN:  Let me ask, does the Respondent have it?

23   Because I'm not seeing it.

24       MS. BUFFALANO:  I have it.  I have it on my computer like

25   unlabeled, so I don't know --



1    JUDGE GREEN:  Okay.  All right.

2    MS. BUFFALANO:  I don't know --

3    JUDGE GREEN:  Go ahead.  I'll try and find it as we go

4    along.

5    Q    BY MR. JACKSON:  All right.  So Mr. Gilbert-Differ, have

6    you had a chance to read over the first page of the document?

7    MS. BUFFALANO:  Can I ask that you show him the whole

8    document, so he has some --

9    MR. JACKSON:  I'm asking him to tell me when to scroll, is

10   what I just asked him to do.

11   MS. BUFFALANO:  Thank you.

12   THE WITNESS:  Apologies.  It's difficult for me to tell on

13   this shared screen, is this the top of the document, sir?

14   MR. JACKSON:  It is.  I cannot scroll up any further.

15   THE WITNESS:  Understood, and just I've got a rough

16   understanding, what am I looking at?

17   MR. JACKSON:  This is a document that Amazon produced to

18   General Counsel pursuant to a subpoena.  It's Bates stamped

19   labeled -- Bates stamped number 8094.

20   THE WITNESS:  Understood, sir.  Do you know what this is?

21   MR. JACKSON:  I don't.  Do you?

22   MS. BUFFALANO:  Can you show him the whole document before

23   you ask him what it is because I -- I think --

24   MR. JACKSON:  Tell me when you would like me to scroll

25   down, Mr. Gilbert-Differ.



1     MS. BUFFALANO:  He doesn't know what the document is, so

2     he doesn't know --

3     MR. JACKSON:  So he can tell me -- he could tell me when

4     he would like me to scroll down, it's very simple.

5     MS. BUFFALANO:  He doesn't know there's another page.

6     MR. JACKSON:  Okay.  There are multiple pages.  Would you

7     like me to scroll down?  Are you finished with this page, is

8     what I asked you before?

9     THE WITNESS:  Yes, I'm finished with this page.

10    MR. JACKSON:  Okay, sir.  Here's the second page, 8095.

11    THE WITNESS:  Yes, continue please.

12    JUDGE GREEN:  This document is in the General Counsel's

13    exhibit file, marked as GC-73?

14    MR. JACKSON:  It is, Your Honor.  You know, in my rush to

15    get it in there I put it in the first set of pages, so on my

16    screen it's the very first one, on top of --

17    JUDGE GREEN:  Okay.

18    MR. JACKSON:  Oh, you know what -- you know what, you --

19    Judge, I -- I apologize.  You know what, I did something wrong

20    here.  I put it in the Respondent's folder.

21    JUDGE GREEN:  Okay.

22    MR. JACKSON:  Excuse me.

23    JUDGE GREEN:  All right.


25    But in the meantime, Mr. Gilbert-Differ, you can continue



# Exhibit E, Motion to Try Petition on Hearing Record

1  reviewing the document and let me know if you need me to scroll

2  it again.

3      THE WITNESS:  Yes, go ahead.

4      MR. JACKSON:  Okay.

5      THE WITNESS:  Yes, go ahead.

6      MR. JACKSON:  Okay.  That's the last one, the LP on-call

7  process.  The document that begins LP on-call process, that's

8  the last page in this exhibit.

9  Q   BY MR. JACKSON:  So Mr. Gilbert -- Mr. Gilbert-Differ, do

10 you recognize this document?

11 A   No.

12 Q   No.  Never seen it before?

13 A   I don't recognize it.

14 Q   Okay.

15 A   I don't know if I've ever seen it before, but

16 (indiscernible).

17 Q   Okay.  Are you familiar with this page that I have up on

18 the screen now, labeled 8095, that begins "what to do in the

19 event of an active workplace incident"?  Are you familiar with

20 these -- this order of operations or these policies or

21 guidelines?

22 A   I'm reading some of the information in here and actually

23 on other slides, this looks out of date.

24 Q   Okay.  What makes you say it's out of date?

25 A   Okay.  So on this line the out of date information is the



1    bottom line, GSCC no longer exists.  That has been replaced by

2    the Global Security Operations Center.

3    Q    What does GS --

4    A    Nor do I believe that's the correct telephone number for

5    them.

6    Q    I see.  What does GSCC stand for?

7    A    I believe, and you'll have to bear with me, because it's

8    been a few years now since that change was made, but I believe

9    this was the Global Security Control Center, a predecessor of

10   the Global Security Operations Center.

11   Q    And when did the Global Security Operations Center succeed

12   the Global Security Command Center?  Can you recall

13   approximately when that occurred?

14   A    I'd be speculating.  It's within my five-year tenure, but

15   I don't want to guess beyond that.  It's been some years.

16   Q    Been some years.  So to your knowledge, this -- this was

17   not in effect -- you can tell --

18        MR. JACKSON:  Actually, I'll -- I'll withdraw that.

19   Q    BY MR. JACKSON:  You can tell from looking at this

20   document that this was not in effect during April or March of

21   2020?

22   A    I don't know.  The problem that's this document, it

23   doesn't ring any bells for me, I don't recognize it.  I can

24   tell you that the data in it is out of date and would have been

25   out of date in March or April, 2020.



www.escribers.net | 800-257-0885

1    Q    Okay.  So as of March or April, 2020, it was not your

2    understanding that in the event of an active workplace -- well,

3    I'll -- I'll -- let me rephrase the question.

4         MR. JACKSON:  Excuse me, Judge.

5    Q    BY MR. JACKSON:  Is it your understanding that in March of

6    (sic) April, 2020, in the event of an active workplace

7    incident, an Amazon official was -- the first step was to

8    deescalate.  Is that your understanding of what the appropriate

9    conduct would be?

10   A    So this specifically relates to workplace violence.  Is

11   that what you're asking me about?

12   Q    Oh, in your opinion, this relates only to workplace

13   violence?

14   A    So the start -- could you go to the top slide please, sir?

15   Q    Sure.

16   A    Okay.  Bear in mind I'm trying to get some context from

17   this.

18   Q    Sure.

19   A    It appears that these do -- this document or series of

20   documents or whatever they are addresses the issue of workplace

21   violence.  Am I incorrect in that assumption?  But I have to

22   apologize, sir, this is your exhibit not mine.

23   Q    Yeah, I know and it's Amazon's document not mine.  And I

24   found it relevant when I looked at it this morning, so I -- I

25   decided I -- I might want to ask you some questions about it.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   You know, the source of this document, apparently your guess is

2   as good as mine.  But you know, the first page does reference

3   workplace violence.

4   A    Yes.

5   Q    Is your understanding that these steps do -- the steps

6   that appear on page 2 of GC-73 do not apply in a non-violent

7   situation?

8   A    If you look at some of the language in here that is

9   potentially the case.  But I'm guessing here.

10  Q    Okay.

11  A    If you look at the words like, physical involvement, if

12  you look at words like, combativeness, if you look at -- I

13  mean, that word repeats itself several times in this document.

14  Would you agree with that, sir?

15  Q    I'm not here to answer your questions, sir.

16       So let me ask you this, don't you think the first step

17  a -- an official should take during a verbal dispute between

18  people on Amazon property is to defuse the situation verbally?

19  Attempt to defuse the situation verbally?

20  A    Could you clarify what you mean by official, sir?

21  Q    Someone such as an operations manager or a human resources

22  official or security personnel?

23  A    I would not necessarily agree with that statement for all

24  of the people you just listed.

25  Q    But for some of them?



Exhibit E, Motion to Try Petition on Hearing Record

1    A     For some of them it's certainly a tactical option.

2    Q     It's an option, but not something that they should do?

3    A     If it's safe to do so, sure, try it.  If it's not safe to

4    do so or you don't feel safe doing it, don't.  That's our

5    golden rule.  Never do anything you don't feel safe doing.

6    There are always other options.

7         MR. JACKSON:  Judge, may I have a brief recess, go off the

8    record?

9         JUDGE GREEN:  Off the record.

10   (Off the record at 10:18 a.m.)

11   Q     BY MR. JACKSON:  Mr. Gilbert-Gifford, please answer yes or

12   no.  Is it the job of safety personnel hired by Amazon to

13   maintain individual safety on the property?

14   A     Can you define safety personnel, sir?

15   Q     Okay.  How about the folks from Metro One, I believe,

16   security who were on site on April 6th?

17   A     We would not define them as security as safety personnel.

18   We define them as security personnel, sir.

19   Q     Okay.  So is it not the job of safety personnel to --

20   excuse me, security personnel to maintain people's safety?

21   A     Yes, within the limits of their must work order, yes.

22   Q     Okay.  So that's a yes.  Now -- and isn't it appropriate

23   for an operations manager to help maintain individual's safety?

24   A     In our operational space that's an unqualified

25   responsibility.  We don't ship nonpackage unsafely.



1    Q    And what about -- okay.  So yes or no, if a security

2    personnel sees a threat unfolding before their eyes, it is

3    their job to do something to reduce the threat?

4    A    A security --

5    Q    It's a yes or no question, sir.  It's a yes or no

6    question.

7         JUDGE GREEN:  No, with all due respect, Mr. Jackson, I

8    don't see that as being a yes or no answer.

9         So if you want to withdraw the question and ask a

10   different question that might be a yes or no answer, you can do

11   that.  Otherwise, you can ask him and he can answer it

12   appropriately.

13   Q    BY MR. JACKSON:  Do you remember the question I asked?

14   A    If you wouldn't mind repeating, sir.

15   Q    If a security official sees a threat unfolding before

16   their eyes, isn't it his or her job to do something to reduce

17   the threat?

18   A    So the responsibility's on our security officers in the

19   case of a situation threatening an associate's safety is

20   primarily to observe it, and to report it.  Those are the

21   actions that we absolutely expect from them.

22        Beyond that, no, we don't mandate, in fact, our master

23   work order is fairly restricted in terms of physical

24   interventions that they can or cannot take.  They are extremely

25   limited in that respect.



# Exhibit E, Motion to Try Petition on Hearing Record

1    Now, the --

2    Q    The security does --

3    A    -- (indiscernible) beyond any common law responsibilities

4    to protect life and limb, of course.  But their actual

5    restrictions under our (indiscernible) extremely restricted.

6         You can also layer in, of course, these events that we're

7    discussing occurred at the start of the COVID pandemic, during

8    a period of which every person in our building, in fact, every

9    person, as I believe, in New York City at the time was expected

10   to maintain social distancing of no less than six feet from

11   another person.  So in terms of any --

12        JUDGE GREEN:  Okay.  So let me --

13   A    -- kind of --

14        JUDGE GREEN:  -- just -- let me just cut in for a moment.

15        So just for purposes of questioning, I think we knew from

16   what we've heard before that the answer to this was it depends

17   on the circumstances.

18        So Mr. Differ-Gilbert (sic), if you can answer yes or no

19   to a question that Mr. Jackson is asking that, say yes or no.

20   If you can't, you know, just say, no, I can't answer yes or no,

21   it depends on the circumstances, and we could take it from

22   there.  Either you'll get additional questioning or they'll ask

23   you to explain or -- or they won't.  The lawyers I'm -- I'm --

24        THE WITNESS:  Thank you, Judge.

25        JUDGE GREEN:  -- I mean.  Okay.  Thank you.



1   Q    BY MR. JACKSON:  Security's job is to reduce threats; is

2   that not right, yes or no?

3   A    I can't answer that question as a yes or no, sir.

4   Q    Okay.  And what about safety personnel, are there safety

5   personnel on site at JFK or were there on April 6th, 2020?

6   A    We have a workplace health and safety team.

7   Q    Okay.  And it's safety's job to reduce threats, correct?

8   A    Again, I can't answer that as a straight yes or no, sir.

9   Q    Don't you think it would be a reasonable step for

10  someone -- for a security or safety official, when they see a

11  threat unfolding before their eyes, to at the very minimum step

12  forward and without approaching or intervening physically, just

13  announce his or her presence, and say, hey guys, let's break it

14  up.

15       Let's move it along.  Don't you think that's a reasonable

16  step to take?

17       MS. BUFFALANO:  Asked and answered, like several times.

18       JUDGE GREEN:  So I think that the confusion we have here

19  is that you're really not defining what the threat is.  This is

20  a hypothetical, general threat.  Do you have more specific

21  questions?

22  Q    BY MR. JACKSON:  Yeah.  Let's talk about April 6th.  You

23  believe that Gerald Bryson posed a threat to individual's

24  safety; is that correct?

25  A    That was a concern when we started the investigation, yes,



Exhibit E, Motion to Try Petition on Hearing Record

1    sir.

2    Q    Okay.  So in a situation like that, wouldn't a reasonable

3    step for a security official or a safety personnel to step

4    forward and say, guys, break it up, move it along?

5         MS. BUFFALANO:  He's answered this question.

6    A    Specific to Mr. Bry --

7         JUDGE GREEN:  Yeah, overruled.  Let -- let's -- let's give

8    him a chance on this one.

9    A    Is this question specific to Mr. Bryson on April 6th, sir,

10   with apologies?

11   Q    BY MR. JACKSON:  Yes.

12   A    In that case, a verbal intervention would be likely

13   ineffective on account of Mr. Bryson carrying a bull horn.

14   Q    But you don't know that, do you?  You're -- you're

15   suspecting?  You're speculating, correct?

16   A    No --

17   Q    In fact, nobody --

18        MS. BUFFALANO:  Your Honor --

19   Q    BY MR. JACKSON:  -- nobody --

20        MS. BUFFALANO:  -- this is not a question.

21   Q    BY MR. JACKSON:  -- went over to do anything like this?

22        JUDGE GREEN:  Yes.  Okay.

23        MS. BUFFALANO:  He's asking the witness to speculate and

24   then telling the witness he's speculating.  He wasn't there.

25        JUDGE GREEN:  Right.  You know, let's ask questions



Exhibit E, Motion to Try Petition on Hearing Record

1    about -- you know, you could ask questions about what Mr.

2    Gilbert-Differ was thinking on April 6th because that -- that

3    is at issue.  And that was -- that was discussed at length

4    during direct examination.

5    Q    BY MR. JACKSON:  Security is permitted to give verbal

6    instructions to employees, correct?

7    A    Within strict limits, yes.

8    Q    And safety officials are permitted to give verbal

9    instructions to employees, correct?

10   A    Within limits, yes.

11   Q    Security officials are permitted to tell employees to stop

12   what they're doing, correct?

13   A    Within limits.

14        MS. BUFFALANO:  Well, that's very broad question.  Like

15   what's the -- that's very vague.

16        JUDGE GREEN:  Okay.  I mean, I guess the question is

17   ever -- in any circumstances, do security personnel have the

18   authority to tell employees to stop what they're doing?

19        THE WITNESS:  Only to request it (indiscernible).

20   Q    BY MR. JACKSON:  So Mr. Gilbert-Differ, you're not aware

21   that any security officials --

22        MR. JACKSON:  Well, excuse me, I'll withdraw the question.

23   Q    BY MR. JACKSON:  Isn't it true, Mr. Gilbert-Differ, that

24   no security official told Gerald Bryson or Ms. Evans to stop

25   what they were doing?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    I don't know the answer to that question, sir.

2   Q    But you found no evidence of that in your investigation,

3   correct?

4   A    Again, I don't know the answer to that question, sir.  I

5   don't believe --

6   Q    You don't know what you found in your investigation?

7        MS. BUFFALANO:  Can you let him answer the question?

8   A    I don't believe --

9        MS. BUFFALANO:  He's speaking over the witness is the

10   (indiscernible).

11       JUDGE GREEN:  All right.  I really think that that

12   answered the question.

13       MR. JACKSON:  All right.  I'm going to move on to a

14   different subject.

15   Q    BY MR. JACKSON:  Now, you collected a series of witness

16   statements in your investigation, correct?

17   A    This was passed to me by Tyler, who actually took them,

18   yes, sir.

19   Q    They weren't all passed to you by Tyler; isn't that right?

20   A    I don't think that's right.  Oh, I apologize.  One was

21   sent directly to me by Paul Chierchio.  The rest were collected

22   by Tyler, that is correct.

23   Q    Right, Paul Chierchio.  Paul Chierchio is one of the

24   security officials on site -- one of the third-party security

25   officials on site that day, correct?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    He was the account manager for the Metro One account at

2    Amazon JFK8.

3    Q    Okay.  And that is security official, correct?

4    A    We don't use the term security official, sir.  I know

5    you've used it a few times, but we don't use that term, sir.

6    Q    What do you call the people who work for Metro One?

7    A    Guards.

8    Q    Okay.  So Paul Chierchio was one of the guards on site

9    that day, correct?

10   A    Yes, that's correct.

11   Q    Okay.  And you had some communications with him on April

12   7th, the next day, correct?

13   A    Correct.

14   Q    Okay.

15        MR. JACKSON:  I'm going to mark for identification a

16   document I'm labeling as GC-72.

17        MS. BUFFALANO:  I think you're on 73.

18        MR. JACKSON:  No, I'm not.

19        JUDGE GREEN:  Yeah, so the last one was 7 -- was out of

20   order, 73, that was I guess the workplace violence document,

21   and then 72 is what we're going to see now.

22        MS. BUFFALANO:  Oh, okay.

23   Q    BY MR. JACKSON:  All right, Mr. Gilbert-Differ.  Let me

24   know when -- I'd like you to review the document, please let me

25   know when you'd like to scroll.



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes, you can scroll.

2    Q    Please let me know when you want me to continue scrolling.

3    A    Yes, go ahead, sir.  Yes, continue.  Yeah, continue, sir.

4         JUDGE GREEN:  Just give me one -- one second, okay?  Okay,

5    thank you.

6    Q    BY MR. JACKSON:  Would you like to see any more of the

7    document, Mr. Gilbert-Differ?

8    A    Please continue down, yes, thank you.

9    Q    That's -- that's the end.

10   A    Okay.

11   Q    I can't scroll any further.  Okay.  Do you recognize the

12   document?

13   A    Yes.

14   Q    And this is a Amazon Chime communication you had with Paul

15   Chierchio on April 7th, correct?

16   A    Yes.

17   Q    And it says it started at 6:07 a.m.; did you arrive at the

18   facility at 6:07 a.m. that day?

19        MS. BUFFALANO:  Objection.  Assumes facts not in evidence.

20        MR. JACKSON:  I'm asking him a question, Ms. Buffalano.

21        JUDGE GREEN:  Overruled.

22        THE WITNESS:  I don't think I was at the facility that

23   day, at least I don't recall being there.

24   Q    BY MR. JACKSON:  Yeah, I'm trying to make sense of the

25   timestamps here.  Did you arrive closer to 9 a.m. that day?



1    MS. BUFFALANO:  Objection.  He just said he wasn't there.

2    JUDGE GREEN:  Sustained.

3  Q    BY MR. JACKSON:  Wait, you didn't go to the facility at

4  all on April 7th?  I didn't hear that, I'm sorry.  Mr.

5  Gilbert-Differ?

6  A    I apologize, sir.  What was the question?

7  Q    Did you go to JFK8 at all on April 7th?

8  A    I don't think so.

9  Q    Okay.  Okay.  Do you recall when you initiated this Chime

10  communication with Paul Chierchio, approximately?

11    MS. BUFFALANO:  The document speaks for itself.

12    JUDGE GREEN:  The question is whether the document is

13  correct.  You can answer, Mr. Gilbert-Differ.

14    THE WITNESS:  I don't know.  I assume the timestamps are

15  correct.  It is also possible that there is a timestamp

16  differential between local time eastern and whatever is the

17  base time for Chime, but I -- I don't know enough about the

18  system to tell you what the base timestamp would be on it.

19  Q    BY MR. JACKSON:  Okay, I suspect the same thing, okay.  So

20  now, at the time you initiated this communication with Mr.

21  Chierchio, you knew that the protester are involved in the

22  argument you were involved in the argument you were

23  investigating was Gerald Bryson by then; is that correct?

24  A    Yes, I think I knew by that point, yeah.

25  Q    And you asked Chierchio to confirm that, correct?



1    A    No.

2    Q    Okay.  But Mr. Chierchio did -- did share with you his

3    knowledge of the identity of the protester, correct?

4         MS. BUFFALANO:  The document speaks for itself.

5         JUDGE GREEN:  Okay, do you have some kind of follow-up

6    question about that?

7         MR. JACKSON:  I do.

8         JUDGE GREEN:  Okay.

9         MR. JACKSON:  I do.

10        JUDGE GREEN:  Overruled.

11        THE WITNESS:  Yes.

12   Q    BY MR. JACKSON:  And he identified him as Gerald Bryson,

13   correct?

14   A    Yes.

15   Q    And he identified him as number 3 guy is Smalls' group?

16        MS. BUFFALANO:  Document speaks for itself.

17        JUDGE GREEN:  Okay, I'm going to assume that we're going

18   to get to a question that does not just confirm what's in the

19   document, so overruled.

20        MR. JACKSON:  Yeah, I have one other question after this

21   in this -- in this nature, and then we're going to go into more

22   specifics about his knowledge of this.

23        So --

24        THE WITNESS:  That's what the document states, yes.

25   Q    BY MR. JACKSON:  And he identified Derrick Palmer as the



Exhibit E, Motion to Try Petition on Hearing Record — 1374

```
1    number 2 guy in Smalls' group?

2    A    Can I ask you to scroll down, sir?

3    Q    Oh, yes.

4    A    I -- I don't see the name Palmer in the document, sir.

5    Q    Do you -- okay.  So did you know what Paul Chierchio was

6    talking about when he said number 3 guy in Smalls' group was

7    Gerald Bryson, and Derrick is number 2; did you understand what

8    that -- what he was referencing?

9    A    Yes.

10   Q    And he was talking about the group of employees led by

11   Christian Smalls, who were protesting Amazon's response to the

12   pandemic; isn't that right?

13   A    That was my understanding, yes.

14   Q    And you were aware that Amazon was tracking the employees

15   in "Smalls' group", correct?

16        MS. BUFFALANO:  Objection.  Vague.

17        JUDGE GREEN:  Okay, overruled.  If you know what it means,

18   you can answer it.

19        THE WITNESS:  I don't know what it means, sir.

20   Q    BY MR. JACKSON:  But you were aware that there was a list

21   of individuals in "Smalls' group", correct?

22   A    Again, I'm not sure I follow what you're asking here, sir.

23   Q    So you said you knew what he -- what Chierchio was talking

24   about when he made these references, so I'm asking you, you

25   knew that there was a list of individuals in "Smalls' group";
```



www.escribers.net | 800-257-0885

1    yes or no?

2    A    I think I need you to clarify what you mean by list, sir.

3    Q    Okay.  There were individuals, a series of individuals

4    identified to be -- by Amazon, to be members of "Smalls'

5    group"; yes or no?

6    A    Yeah, there were certainly individuals we were aware were

7    associating with Mr. Smalls, that we can agree on.

8    Q    And number 3 was, on that series of individuals, was

9    Gerald Bryson, correct?

10   A    Not my categorization, sir.  No, I'd say no.

11   Q    But you did know -- but you knew what Chierchio was taking

12   about?

13   A    In terms of a group, yeah.  In terms of the numbers, I

14   don't know if I'd agree with number 3.

15   Q    Okay.

16   A    I mean, to be fair, sir, we've been through some evidence

17   already where Mr. Bryson was identified.  I don't think we're

18   covering anything new, sir.  I don't agree with the number 3,

19   but then, this is Mr. Chierchio's writing, not mine.

20   Q    You understand -- all right, yeah.  Your testimony is

21   clear, thanks.

22   A    Okay.

23        JUDGE GREEN:  You know what, let me just jump in here

24   because it's actually not clear to me.  To the extent that Mr.

25   Palmer was -- was number 2 guy in the Smalls group and number 3



1      guy -- and Mr. Bryson was the number 3 guy; do you know what

2      that means?

3          THE WITNESS:  Yeah, I -- I think I know what Mr. Chierchio

4      was talking about, sir.  So I think it's -- it's worth bearing

5      in mind, by the time we got to April 6th, there's obviously

6      been a number of activities that are taking place within the

7      facility up until this point.

8          The majority of this activity, in terms of at least the

9      time, had actually taken place in the main break room, which is

10     immediately adjacent to where our security staff worked.  So

11     they work in our main entrance area, and there's a security

12     console where their -- the majority of their team are posted,

13     where Paul is almost always located.  And Mr. Smalls and the

14     group who'd been with him had repeatedly been either active in

15     the main break room soliciting associates, soliciting security

16     personnel, sharing their views on their concerns.  And they'd

17     also actually undertaken similar activity in the actuary around

18     the security desk.

19         So that is certainly my understanding of what Mr.

20     Chierchio is talking about.  I don't agree with his

21     characterization, but I certainly understand where it came from

22     because most of this was happening in his immediate work

23     vicinity, pretty much every day he was at work on the Monday

24     through Friday schedule.

25         JUDGE GREEN:  But in terms of Mr. Palmer being 2 -- number



Exhibit E, Motion to Try Petition on Hearing Record

1   2 and Mr. Bryson being number 3; would that reflect to what

2   extent they were active in -- in the protesting, meaning Mr.

3   Palm -- Mr. Smalls was most active, Mr. Palmer was at -- less

4   active, but more so than Mr. Bryson; is that how you understood

5   the numbering?

6       THE WITNESS:  I think that's where Mr. Chierchio is going

7   with it.

8       JUDGE GREEN:  Okay.

9       THE WITNESS:  But I certainly don't know if I would agree

10  with the characterization of Mr. Bryson.  I -- I would agree

11  with the characterization for Mr. Palmer for myself, but both

12  of these are Mr. Chierchio's characterizations, not mine.

13      JUDGE GREEN:  Okay, thank you.

14      THE WITNESS:  Yes, sir.

15  Q   BY MR. JACKSON:  So you asked Chierchio to provide a

16  statement of his observations regarding the interaction between

17  Bryson and Evans the previous day, correct?

18  A   Yes, sir.  I apologize, the -- the document's not on the

19  (indiscernible) if we're referring to that, but.

20  Q   Yeah, that is what I'm referring to, but can you -- you

21  just reviewed it; and you -- do you have any recollection of

22  your communication with Chierchio?

23  A   Yeah, I -- I believe you -- you're correct.  I asked him

24  for his account of what had occurred.

25  Q   Okay.



```
 1   A      Or words to that effect, at least.

 2   Q      And he offered to obtain additional witness statements?

 3   A      Mr. Chierchio offered to have other offices email their

 4   recollections of it.  I don't know if he was aware that some of

 5   that already happened.

 6   Q      I see.  And I'll show you the document again.

 7   A      Okay.

 8   Q      Okay, I'm just going to scroll up to the relevant portion.

 9   So after -- well -- and I think the document might not be so

10   clear, but I just want to make sure it's clear that you told

11   Mr. Chierchio to get additional witness statements "if it adds

12   value", correct?

13   A      Not strictly, sir, no.

14   Q      That's not what you replied to him?

15   A      There's a language difference here, I just want to sort

16   out here.  So when it comes to our third-party contractors, we

17   don't often obtain statements from them.  If -- if you look at

18   some of the verbiage on the actual statement forms, so I'll

19   draw your attention to the -- to the document from Ms. Evans,

20   some of that is extremely specific to Amazon associates, Amazon

21   employees.  Hence, we don't actually ask for a statement from

22   them as a third-party contractor, we ask for them to provide us

23   with a report.  And it's often in whatever format they choose

24   to present it to us.

25   Q      You asked for it -- well, no, that's not true.  You asked
```



1    for it in a specific form here; you asked for it in an email,

2    correct?

3        MS. BUFFALANO:  Document speaks for itself.

4        JUDGE GREEN:  Sustained.

5        MR. JACKSON:  Okay.

6    Q    BY MR. JACKSON:  You never received any other witness

7    statements or observations, I'm not sure what nomenclature you

8    are comfortable with, but you never received any other

9    individuals' observations from sources referred to by Mr.

10   Chierchio, correct?

11       MS. BUFFALANO:  Misstates the testimony.

12       MR. JACKSON:  I'm asking him a question, Ms. Buffalano.

13       JUDGE GREEN:  Yeah, overruled.

14       THE WITNESS:  I don't believe we did, no.  I think you

15   have all of the ones that we received.

16       MR. JACKSON:  Okay.

17   Q    BY MR. JACKSON:  Did you ever ask Chierchio if he was able

18   to obtain any other accounts from other witnesses?

19   A    Beyond what's in this communication, sir?

20   Q    Correct, yes.

21   A    No.

22   Q    Okay.  Now, I'm going to show you what's been admitted --

23   well, you know, not sure if it has been admitted -- which has

24   been identified as Respondent Exhibit 10, okay.  So we know

25   that you are familiar with this document, and you reviewed this



```
 1     in connection with your investigation, correct?  And let me

 2     know --

 3     A     Correct.

 4     Q     -- if you want me to scroll slowly.  Just let me know what

 5     you want me to do with it.

 6     A     Yes, sir, if we can just take it to the very top, it's

 7     cropped at the top.

 8     Q     Sure.

 9     A     Thank you.  Okay, we can scroll down.  We can continue,

10     sir.  And sir, just you know, to -- it'll stay on the previous

11     discussion we had, you'll see in the acknowledgement, the

12     specific words around Amazon, which is why I'm differentiating

13     between the different reports between Amazonians and

14     non-Amazonians; does that make sense, sir?

15     Q     No, it doesn't make sense, and there's no question

16     pending.  Do you want me to scroll?  What we are doing now is

17     making sure you can review the document.

18     A     I'll keep reading, thank you.  We can continue.  Okay,

19     continue, sir.  Okay.  Okay.

20     Q     Okay.

21           MR. JACKSON:  So Judge, I'm going to ask for a little bit

22     of leeway here, and this is going somewhere, I assure you, but

23     I do want to just make sure this witness understands the

24     contents of these documents, these witness statements.  So I am

25     going to ask for some leeway to question him about the contents
```



1    of that.

2         JUDGE GREEN:  Okay, but he just read it.

3         MR. JACKSON:  Okay, I -- I understand that.

4         JUDGE GREEN:  Okay, so I'm not guaranteeing that.  So

5    really, in this case --

6         MR. JACKSON:  All right.

7    Q    BY MR. JACKSON:  So Ms. Evans in her statement claimed

8    that Bryson init -- well, the person, she didn't know his name,

9    but the person you later identified as Bryson, initiated the

10   verbal interaction with her, correct?

11   A    Yes, that's a general characterization, yes.

12   Q    And Evans claimed that Bryson called her the N word,

13   correct?

14   A    Yes.

15   Q    And Evans did not say that security intervened and told

16   her to go inside, correct?

17   A    Yes.

18   Q    And Evans did not say that Bryson approached her in an

19   aggressive manner, correct?

20   A    Yes.

21   Q    Okay.  Now, I'm going to share with you a document that's

22   been identified as Respondent's Exhibit R-12.

23        JUDGE GREEN:  Can I just ask, is -- is the purpose of this

24   questioning to -- to establish what is not in these documents,

25   what the witnesses did not say in these documents, and are we



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1431 of 2171 PageID #: 382
1483
Exhibit E, Motion to Try Petition on Hearing Record

1    planning to go through each of the statements?  I'm asking.

2         MR. JACKSON:  The purpose of this line of questioning is

3    to establish that there were inconsistencies in these witness

4    statements.  It also goes to the credibility of the witness.

5    And I want -- I intend to ask him about his understanding of

6    these inconsistencies and his actions in response to it.

7         JUDGE GREEN:  Okay.  Let's move as quickly as possible to

8    the latter.  As -- as far as I can tell, that's the only thing

9    actually worth doing.

10        MR. JACKSON:  Okay.

11   Q    BY MR. JACKSON:  Now, this is the statement that was part

12   of your investigation that was submitted by Mr. Curlej,

13   correct?

14   A    Yes.

15   Q    Okay.  Now, if you'd like, please take a moment to review

16   it.

17   A    Thank you.  We can (indiscernible) document, sir.

18   Q    Would you like me to scroll down?

19   A    Yes, please.  And we can continue.

20   Q    That's the end.

21   A    Thank you.

22   Q    Okay.  So in his statement, Mr. Curlej confirmed that

23   Evans was the one who initiated a verbal confrontation with

24   Bryson, correct?

25   A    I don't think he specifically says that.



1    Q    Okay, do you see the part that says as the protesters were

2    publicizing, they -- I believe that means their opinions, that

3    the site should close down, Dimitra expressed her opposing

4    belief, and she commented to them that she is glad that Amazon

5    is remaining open and she needs/wants her job.  She continued

6    by saying that she need -- I believe that means needs -- her

7    job, and is glad that the site is open, and told the group of

8    protesters to leave if they don't want to work.  So given that

9    account from Mr. Cloree (phonetic) -- Curlej, isn't it true

10   that Curlej stated that Evans initiated the verbal exchange

11   with Bryson?

12        MS. BUFFALANO:  The document speaks for itself.

13        JUDGE GREEN:  Okay.  So do you see that section, Mr.

14   Gilbert-Differ?

15        THE WITNESS:  Yes, Judge.

16        JUDGE GREEN:  Okay.  (Indiscernible).

17   Q    BY MR. JACKSON:  And isn't it true that Evans initiated a

18   verbal exchange with Bryson?

19   A    Yes, the verbal exchange, I agree, yes, sir.

20   Q    Okay.  And that conflicted with Ms. Evans' account,

21   correct?

22   A    I don't know if that does conflict with the account, sir.

23   Q    All right, let's go back.

24   A    Wait.  To be clear, sir, I -- I agree with you.  There are

25   inconsistencies between various accounts, there are.  And if



1    that's where you wish to take the discussion, we can certainly

2    go there.

3    Q    Yes, that is where I wish to take the discussion.  I'd

4    like to review with you each of those inconsistencies, or many

5    of them, I should say.

6         JUDGE GREEN:  Okay, so that I don't want to do.  I'm not

7    interested -- I can read the -- the witness statements for

8    myself.  That -- that I don't -- I don't need.  If you have

9    questions about certain inconsistencies and you want to ask

10   what Mr. Gilbert-Differ thought about them at the time, go

11   ahead.  If he says he doesn't see the inconsistency, okay, then

12   do -- be as fast as you can in pointing it out.

13        MR. JACKSON:  I'll try to go as quickly as I can, Judge.

14   Q    BY MR. JACKSON:  So do you see Respondent 10 on the screen

15   again, Mr. Gilbert-Differ?

16   A    I do, sir.

17   Q    Okay.

18   A    What I don't see, sir, is the inconsistency you refer to.

19   Q    Okay.

20   A    I told him to go away.

21   Q    Do you see the sentence that says --

22   A    I don't think --

23   Q    -- excuse me.  Do you see the sentence that says, the guy

24   protester who was wearing a pink -- a pinkish do rag and

25   sneakers chimed in on my conversation with the lady security"?



1    And you testified before that Ms. Evans stated in her statement

2    that Mr. Bryson was the one who initiated the confrontation --

3    or -- or -- excuse me -- the -- the verbal exchange, I should

4    say.  So is it --

5         MS. BUFFALANO:  (Audio interference) the next sentence.

6    So this is just an unfair way --

7    A    Yes.

8         MS. BUFFALANO:  -- to question this witness about these

9    statements.

10   Q    BY MR. JACKSON:  Okay, when someone chimes in, what do you

11   say -- what do you take that to mean?

12        JUDGE GREEN:  Overruled.

13   A    So it is the next sentence, sir, that for me means there's

14   no inconsistency, right?  "Chimed in" has a fairly broad

15   definition.  In this case, the leeway I applied was an

16   individual with a bullhorn and shouting.  I -- I don't see a

17   particularly strong inconsistency here.  I don't seem his

18   evidence denying being the first one to address the other

19   directly.  That's not what I see, and this is, you know, my

20   interpretation.

21        JUDGE GREEN:  Thank you.

22   Q    BY MR. JACKSON:  All right, so you recognize that there

23   are inconsistencies, right?

24   A    Yes.

25   Q    Can you describe what those inconsistencies are?



1    A    Individually, no.  I apologize, not without actually

2    referencing the documents, no, I can't individually list the

3    inconsistencies all, sir.

4         MR. JACKSON:  So Judge, I think this calls for a review of

5    these inconsistencies.

6         JUDGE GREEN:  Okay, I didn't say no, but we just --

7         MR. JACKSON:  Okay.

8         JUDGE GREEN:  -- through -- went -- went through an

9    exercise where, frankly, you -- you were purported to point out

10   an inconsistency.  He told you that he didn't see one, and

11   frankly, I agree.  So do you have -- I mean, can -- can you

12   move faster?  Do you have a specific list of inconsistencies

13   that you would like to ask him about?

14   Q    BY MR. JACKSON:  Okay, do you recall that Mr. Curlej

15   stated that Bryson called Evans a cunt?

16   A    I do, sir.

17   Q    And isn't it true that no other witness statement you

18   collected had that observation, correct?

19   A    I apologize.  I believe I lost audio, sir.

20   Q    Isn't it true that no other witness statement you

21   collect -- collected referenced Bryson calling Evans a cunt?

22   A    I don't recall any other -- and -- and actually with the

23   documents in front of you, you're -- you're stating that for a

24   fact, so yeah.  That seems correct.

25   Q    And you recall that Curlej claimed that Bryson approached



1  Evans in, quote, what could be as perceived as aggressive

2  behavior, correct?

3  A    Yes.

4  Q    And nothing in -- you saw in the videos of the encounter

5  you -- you watched confirmed that Bryson approached Evans in an

6  aggressive manner, correct?

7  A    I did not see the two in any kind of close -- close

8  proximity, but the distance we were at, no, I don't think I

9  could characterize that one.

10  Q    So Bryson, in fact, did not approach Ms. -- Ms. Evans at

11  all, correct?

12  A    Correct, I don't think the two were ever in close, close

13  proximity.  At times he walks closer to her, but I -- I'm not

14  categorizing that as approaching.  Now, to your point earlier,

15  he walks up and down in the hallway.  That -- that seems to be

16  exactly -- yeah, the space in which she stays.

17  Q    In fact, Bryson moved in the opposite direction of Ms. --

18  where Ms. Evans was sitting, correct?

19  A    At times, and then back in the other direction, yeah.

20  Q    Okay.  Okay.  So you got two statements from Curlej and

21  Evans saying that Bryson used the N-word for Ms. Evans.  Isn't

22  it true that none of your other witnesses recalled that?

23  A    Best of my recollection, they are the only two who list

24  it, correct.  The only other place in which we'd heard that

25  language used was in the Facebook Live video directly by Mr.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Bryson himself.

2    Q    And he was not directing it at Ms. Evans, correct?

3    A    Not at that time, no, sir.

4    Q    And none of your witnesses who you -- from whom you

5    collected statements recalled that Bryson called Evans a dyke,

6    correct?

7    A    I don't recall which statements specifically listed that,

8    but I believe there was only one.

9    Q    You believe there was one?

10   JUDGE GREEN:  Okay, so --

11   A    I assume that's why you asked me, sir.  I apologize.

12   JUDGE GREEN:  -- so I think there's some confusion about

13   my -- my directions with regard to this and how it should

14   proceed, okay?  I can read for myself whether there's

15   inconsistencies in the witness statements.  If you want to ask

16   Mr. Gilbert-Differ about certain witness -- certain

17   inconsistencies and what he thought about it and what he may

18   perhaps did as a result of it, you can do that because that's

19   not in the documents, but in terms of just asking him what is

20   and is not in the documents, I don't need that.

21   MR. JACKSON:  Fine, Judge.

22   Q    BY MR. JACKSON:  Just one other question.  Do you recall

23   Paul Chierchio's email that -- that you got?  Do you remember

24   what was stated in that?

25   A    Specifically, no.  I'd need to refresh my memory.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Okay.  Okay, here's the top.  Let me know when you want me

2   to scroll.

3   A    Thank you.  You can scroll down, sir.  You can scroll

4   down, sir.

5        Thank you, yeah.  Okay.

6   Q    Okay.  So Chierchio stated that he intervened in the

7   argument and told Evans to go inside before she got up and

8   walked toward the building, correct?

9        MS. BUFFALANO:  The document speaks for itself.

10       MR. JACKSON:  Okay, fine.

11  Q    BY MR. JACKSON:  Did you see anything in the videos that

12  you reviewed that showed Mr. Chierchio approaching Evans?

13  A    No.

14  Q    All right, so given these inconsistencies in the witness

15  statements that you collected, don't you think it would've been

16  useful to obtain additional information about this incident?

17  A    Well, in a perfect place --

18       MS. BUFFALANO:  Objection.  Vague.

19  A    -- sir, I would love to have had --

20       MS. BUFFALANO:  All right, hold on, Geoff.  Objection.

21       JUDGE GREEN:  Okay, over --

22       MS. BUFFALANO:  Vague.

23       JUDGE GREEN:  -- ruled.  This is what we've been waiting

24  for.

25       MS. BUFFALANO:  You can go ahead.



Exhibit E, Motion to Try Petition on Hearing Record

1   A    I would've loved to have had more information about this

2   stuff -- this, then.

3   Q    BY MR. JACKSON:  Okay.  And you knew that there was a

4   female protester holding a blue sign in the video, correct?

5   A    Correct, correct.

6   Q    And you could see that she was the closest witness to

7   these events, correct?

8   A    Correct.

9   Q    And you knew that she --

10  A    (Indiscernible, simultaneous speech) --

11  Q    -- was recording -- excuse me, sir --

12  A    -- (indiscernible, simultaneous speech) --

13  Q    -- there's no -- you answered the question.  Mr.

14  Gilbert-Differ --

15  A    Yeah, sorry --

16  Q    -- you answer --

17  Q    -- can I correct my answer, sir?

18       JUDGE GREEN:  Listen -- yeah, if he wants to correct his

19  answer, he can correct his answer.  So go ahead, Mr.

20  Gilbert-Differ.

21  A    At times, yes, but not always.

22  Q    BY MR. JACKSON:  Okay.  And you knew that this person

23  holding the blue sign was recording a video, correct?

24  A    I did not know that.

25  Q    Don't you think that a complete investigation of this



1    matter would have included identifying that woman and finding

2    out what information she had?

3    A    A perfect investigation of this incident would've

4    identified that, and we tried and we failed.

5         MR. JACKSON:  Okay.  So you just spoke about a video that

6    you viewed of Mr. Bryson talking about the event after the

7    fact, correct?  Oh, well, excuse me.  You did view -- withdraw

8    the question.

9    Q    BY MR. JACKSON:  You did view a video of Mr. Bryson

10   talking about the incident after the fact, correct?

11   A    Yes.

12   Q    And you testified -- isn't it true that you testified

13   earlier yesterday that someone from HR provided you a link to

14   that video?

15   A    That's my best recollection.

16   Q    Okay.  And they must have provided it to you in writing

17   somehow, correct?

18   A    It could've been in writing.  It could've been in a

19   temporary share file.  It could've been a number of different

20   methodologies, fundamentally just anything electronic, most

21   likely.

22   Q    And no one orally told you how to access the link,

23   correct?

24   A    I don't recall, sir.

25   Q    That didn't happen, right?  No one orally told you what



# Exhibit E, Motion to Try Petition on Hearing Record

1    the web address was to access this link; that never happened,

2    right?

3         MS. BUFFALANO:  Asked and answered.

4    A    I don't recall, sir.

5         JUDGE GREEN:  Overruled.

6    Q    BY MR. JACKSON:  And how do you communicate with HR?

7    A    Chime messages, we've seen some of those, through email,

8    we've seen some of those, verbally, via telephone calls, and

9    yes, by share file drops as well.

10   Q    And what is this share file prompt?  Was it share file

11   prompt you're saying?

12   A    No, no, as in almost exactly what you were doing at the

13   moment, sir, with exhibits, something along those lines.  Share

14   files.  Yeah, that -- that's not a prompt.  A shared drive or

15   whatever you call it.

16        MR. JACKSON:  Your Honor, can I take a brief recess?

17        JUDGE GREEN:  Yes.  How long?

18        MR. JACKSON:  Five minutes.

19        JUDGE GREEN:  Okay.  Off the record for five minutes.

20   (Off the record at 11:26 a.m.)

21               **RESUMED CROSS-EXAMINATION**

22   Q    BY MR. JACKSON:  Mr. Gilbert-Differ, did you review a

23   transcript of the Facebook Live video depicting Gerald Bryson

24   speaking about the incident after the fact?

25        MS. BUFFALANO:  Vague and after --



Exhibit E, Motion to Try Petition on Hearing Record          393

1    A     Yeah, I've seen --

2          MS. BUFFALANO:  -- the fact.

3    A     -- that.  Sorry.

4          JUDGE GREEN:  Overruled.  I'm sorry, I didn't hear the

5    answer, and -- and Mr. Gilbert-Differ, if you hear an

6    objection, just wait before answering.  I'll either sustain the

7    objection, in which case you don't have to answer it, or I'll

8    overrule it, in which case you can answer, okay?  So I'm sorry,

9    I didn't -- I overruled the objection, but I didn't hear the

10   answer.

11   Q     BY MR. JACKSON:  Do you remember the question, sir?

12   Q     Could are repeat it, sir?

13   A     Did you review a transcript of the Facebook Live video

14   depicting Gerald Bryson discussing the incident between him and

15   Ms. Evans after the fact?

16   A     After the fact, yes.

17   Q     You reviewed a transcript of that video?

18   A     I have, yes.

19   Q     When did you review it?

20   A     Last few weeks.  Can't be more specific than that.

21   Q     Not before then?

22   A     I don't recall.  That's the most recent -- I really don't

23   recall if I've seen it before then.

24   Q     Do you know whether you -- anyone enhanced the audio on

25   that video?



```
 1        MS. BUFFALANO:  Objection.  Video?

 2   Q    BY MR. JACKSON:  The same video we were just describing.

 3   A    I have no --

 4        JUDGE GREEN:  Overruled.

 5   A    -- knowledge of that.

 6   Q    BY MR. JACKSON:  I'm sorry?

 7   A    I have no knowledge of anyone doing that.

 8   Q    Okay.  Now, you -- you believed that there was no other

 9   choice but to terminate Gerald Bryson, correct?

10   A    That was my recommendation, yes.

11   Q    And that was because he posed a threat; isn't that right?

12   A    Not just because of that, no.

13   Q    That was part of it, that he caused a -- that he posed a

14   threat?

15   A    In the broadest definition of the word, yes, that's a

16   small part of it.

17   Q    Isn't it true that there are instances in which Amazon

18   employees have threatened others and have not been terminated?

19   A    I don't know.

20   Q    Okay.  Isn't it true that there have been instances in

21   which Amazon employees have actually engaged in physical

22   violence and have not been terminated?

23   A    I can think of one instance with particularly specific

24   circumstances.  In that case, the individual, suffering a

25   psychotic episode, attacks two or three other associates and
```



Exhibit E, Motion to Try Petition on Hearing Record

```
1    was then restrained while they attempted to significantly harm

2    themselves by repeatedly smashing their head onto a concrete

3    floor.  In that case, the individuals who restrained that

4    person from further harming themselves were not terminated and

5    yes, they did use physical force on another person.

6    Q    And that's the only instance you're --

7    A    I can't --

8    Q    -- aware of?

9    A    -- think of any other example.  That I'm aware --

10   Q    Okay.

11   A    -- of, yes.

12        MR. JACKSON:  Okay.  All right, No further questions for

13   the witness.

14        JUDGE GREEN:  Okay.  Mr. Kearl, do you have any questions?

15        MR. KEARL:  I do, Your Honor, yes.

16                        CROSS-EXAMINATION

17   Q    BY MR. KEARL:  Hello, Mr. Gilbert-Differ.  Thank you for

18   bearing with us through this long process.  So I'd like to just

19   start -- termination is the most serious disciplinary

20   employment action that Amazon can take against an employee; is

21   that correct?

22   A    Yes, I can think of none more serious.

23   Q    Okay.  Did you feel a responsibility to fully understand

24   the incident before recommending termination for Mr. Bryson?

25   A    I did.  I believe I lived up to that.
```



1    Q    Okay.  Did you feel a responsibility to address the

2    inconsistencies in the witness statements and the videos before

3    submitting your suggestion for termination?

4    A    Can you clarify the question, sir?

5    Q    Yeah.  Did you feel a responsibility to try to resolve or

6    address the inconsistencies between witness statements and

7    between witness statements and video that you had reviewed

8    before submitting your suggestion for terminating Mr. Bryson?

9         MS. BUFFALANO:  This assumes facts that are not in

10   evidence if there was any inconsistencies in the video.

11        MR. KEARL:  Okay, and I'm happy to -- to -- to go through

12   this if we need to.  I -- it was an issue before, but I'm happy

13   to point out one --

14        MS. BUFFALANO:  You can ask him that question, and if

15   there were inconsistencies you can see --

16        JUDGE GREEN:  The video -- I -- I thought -- okay, I

17   thought the question was inconsistencies in the witness

18   state -- witnesses' statements, is that right?

19        MS. BUFFALANO:  He said and video.

20        MR. KEARL:  Okay, so between the witness statements or

21   between the witness statement and the video.  And I'm happy,

22   you know, if -- if there's an objection to this question, I'm

23   happy to point out such inconsistencies before proceeding, but

24   I just didn't want to further delay things.

25        JUDGE GREEN:  Yeah, so why don't we just ask Mr. Gilbert-



1    Differ.  Do you -- at the time that you were dealing with this

2    incident, do you recall thinking that there were

3    inconsistencies in the witnesses' statements?

4         THE WITNESS:  I do.

5         JUDGE GREEN:  Okay.  Do you want to take it from there,

6    Mr. --

7         MR. KEARL:  Yeah.

8         JUDGE GREEN:  -- Kearl?

9    Q    BY MR. KEARL:  So did you feel a responsibility to address

10   or resolve those inconsistencies before suggesting termination

11   for Mr. Bryson?

12   A    In terms of addressing/resolving, understanding them is

13   the primary fix, and actually, it's incredibly common to find

14   inconsistency between witness statements --

15   Q    Okay.  So -- but my question is --

16   A    -- because people recall or understand things --

17   Q    Mr. Gilbert-Differ, please.  My question is did you feel a

18   responsibility to understand these consistencies (sic) and to

19   understand how this consistencies might point to a different

20   set of facts than what were being presented before recommending

21   termination?

22   A    What specifically are you asking me here, sir?

23   Q    So for example, you have testified that Mr. Bryson was a

24   serious threat -- a serious risk at the -- on the 6th; is that

25   correct?



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1447 of 2171 PageID #: 1498

```
 1        MS. BUFFALANO:  Objection.  Misstates the testimony.

 2        JUDGE GREEN:  It's a question.  You can answer it.

 3   A    I don't think I used the word "serious" at any point, sir.

 4   I think that's your characterization, not mine.

 5   Q    BY MR. KEARL:  Okay.  So you identified Mr. Bryson as a

 6   threat on April 6th; is that correct?

 7   A    I recognized that the actions undertaken by Mr. Bryson

 8   threatened an individual's right to be at Amazon in an

 9   inclusive, safe, and secure environment.

10   Q    So is that a yes, you recognized him as a threat?

11        MS. BUFFALANO:  Asked and answered.

12   A    As far as just that --

13        JUDGE GREEN:  Overruled.

14   Q    BY MR. KEARL:  So it -- so -- so I'm going to -- okay.  So

15   did you feel a responsibility before recommending termination

16   to fully understand how inconsistencies in witness statements

17   might have painted a different picture of the threat that Mr.

18   Bryson posed to Amazon?

19   A    No, I -- I think there was actually a very consistent

20   picture --

21   Q    Thank you.

22   A    -- in terms of the threat.

23   Q    Did you notify the decision makers about this -- these

24   inconsistencies before sending your recommendation for

25   termination?
```



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Not shares with this process.  All of those documents were

2    available to the decision makers.  You know, I had made my

3    analysis, but I understood that the next step in this process

4    would be them making theirs.

5    Q    Okay, but you -- you had made up your mind before

6    submitting the WIM report that Mr. Bryson needed to be

7    terminated despite the fact that you didn't fully understand

8    what happened that day; is that correct?

9    A    Respectfully, I believe I fully understood as far as it

10   was possible with the evidence available to us between April

11   6th and April 10th.

12   Q    Okay.  So as far as the limited information that you had

13   available, which included two video recordings with no audio

14   and a handful of witness statements from management and

15   security officers, you felt like that was enough information

16   for you.  You didn't feel like you needed any further

17   information to determine that Mr. Bryson needed to be

18   terminated?

19        MS. BUFFALANO:  Objection to the characterization on the

20   list of evidence.

21        JUDGE GREEN:  Overruled.

22   A    So in possession of multiple video views and in possession

23   of multiple witness statements, no, I was sufficiently

24   confident we could make a recommendation.  We did, also, as I

25   testified, attempt to identify the other protester but were



1    unsuccessful in doing so.  Would've been --

2    Q    BY MR. KEARL:  I will --

3    A    -- great to get their account.

4    Q    -- I will get there in a second.

5    A    Unable to do that.

6    Q    Okay, thank you.  So did you take any steps to be aware of

7    and to disrupt your unconscious biases before arriving at that

8    conclusion?

9    A    Yes, I'll have --

10   MS. BUFFALANO:  Objection.  Vague.

11   A    -- to say --

12   JUDGE GREEN:  Okay.  Sustained.

13   MS. BUFFALANO:  (Audio interference).

14   MR. KEARL:  I -- I received a --

15   JUDGE GREEN:  It's not so much vague as --

16   MR. KEARL:  -- I received a document --

17   JUDGE GREEN:  -- that it is --

18   MR. KEARL:  I received a document 15 minutes ago from

19   Amazon responsive to the subpoena that says, "Key point, as the

20   investigator you must be aware of and disrupt your unconscious

21   biases", and so far as it's part of Amazon training materials,

22   I don't see how it's vague.

23   JUDGE GREEN:  Okay.  I think it did -- it assumed a fact

24   not in evidence, but go ahead.

25   Q    BY MR. KEARL:  So Mr. Gilbert-Differ, did you take any



Exhibit E, Motion to Try Petition on Hearing Record

1  steps to be aware of and to disrupt your unconscious biases

2  before arriving at your conclusion to recommend termination for

3  Mr. Bryson?

4  A    I'm actually proud to say I have undertaken training for

5  two consecutive years in interrupting unconscious bias.  Yes, I

6  believe I've met that standard.

7  Q    Okay.  You knew Mr. Bryson stayed onsite following the

8  incident on April 6th; is that correct?

9  A    If by onsite, protesting in the parking lot, yes.

10  Q    Okay.  Why was he not approached to get more information

11  about what happened that day?

12  A    Well, there are a few reasons for that.  Primarily, Mr.

13  Bryson was not on the clock.  Mr. Bryson was enjoying time off

14  and had chosen not to enter the facility while that was still

15  an option to him.  So I think we talked about this in my

16  original testimony.  We worked on the evidence that we could

17  quickly and safely obtain.  Please bear in mind that Mr. Bryson

18  was still exercising, as I understand, his First Amendment

19  right to protest --

20  Q    So --

21  A    -- also investigating and interviewing him around this

22  event, good, but then to say it was interrupting that or

23  preventing that.  I didn't want to do that, so on the day --

24  Q    You did --

25  A    -- no, Mr. Bryson's not approached.



www.escribers.net | 800-257-0885

1  Q    Okay, so do you think terminating him could've interrupted

2  that as well or was it just the interviewing him on the day of?

3       MS. BUFFALANO:  Objection.

4       JUDGE GREEN:  Overruled.

5  A    You're going to need to explain this question to me in --

6  Q    BY MR. KEARL:  Okay, so --

7  A    -- (indiscernible, simultaneous speech).

8  Q    -- you just said the reason that you didn't interview Mr.

9  Bryson on the day of is because you were concerned about

10 stepping on his First Amendment rights.  Do you think that

11 terminating him also might've potentially stepped on his First

12 Amendment rights?

13      MS. BUFFALANO:  Okay, this calls for a legal conclusion.

14      JUDGE GREEN:  Okay.

15      MR. JACKSON:  He's the one who raised the First --

16      JUDGE GREEN:  Yeah, overruled.

17 A    Can you repeat the question for me, sir?

18 Q    BY MR. KEARL:  Yeah.  So you -- you testified that the

19 reason that you didn't interview Mr. Bryson on the 6th about

20 the incident is because you were worried about stepping on his

21 First Amendment rights.  Do you feel that, like, terminating

22 him might have also stepped on his First Amendment rights; was

23 that a concern of yours at all?

24 A    I'm not sure how it would have.

25 Q    Okay.  So why did you -- why did you not suspend Mr.



Exhibit E, Motion to Try Petition on Hearing Record

1    Bryson's badge on the day of the 6th?

2    A    Because that is a decision taken jointly with HR, and as

3    you're aware, we were both in the process of investigating all

4    day --

5    Q    Okay.

6    A    -- and that day Mr. Bryson had not come inside the

7    facility nor attempted to do so.

8    Q    But you testified earlier that suspending a badge is not a

9    disciplinary action; do you recall that?

10   A    I do, and that's a correct statement.

11   Q    Okay, and as a loss -- as a regional loss prevention

12   manager, are you not in a position to recommend or to ask for

13   the suspension of a badge?

14   A    Yes, I -- I believe you've seen me make just a rec -- such

15   a recommendation in paperwork we've already reviewed.

16   Q    Okay, so you are able to recommend the suspension of a

17   badge.  Why did you not do it on the 6th of April for Mr.

18   Bryson?

19   A    Be -- because we were still seeking to understand what had

20   occurred.  You're aware --

21   Q    Okay.

22   A    -- we were still taking statements related to this event

23   on the 7th.

24   Q    Okay.  And you knew that the inci -- the individual with

25   the blue sign was on the site following the -- the incident; is



1    that correct?

2    A    Correct.

3    Q    Okay, and why did no one seek to identify her or get

4    information about her following the incident?

5    A    We did seek to identify her.

6    Q    Did anyone go out to her to -- to try to get her identity?

7    A    No.

8    Q    Okay.  And you testified earlier that one of the reasons

9    that this incident was so concerning was that Mr. Bryson and

10   Ms. Evans did not know each other, and if that -- if they had

11   known each other, would that have been a less serious incident

12   in your eyes?

13   A    No, it's just an additional fact --

14   Q    Okay.

15   A    -- for us to consider --

16   Q    Thank you.

17   A    -- and risk assess.  So for instance, individuals --

18   Q    You --

19   A    -- who've been in immediate --

20        JUDGE GREEN:  Okay, so --

21   Q    BY MR. JACKSON:  I -- I have my own --

22        JUDGE GREEN:   -- Mr. Gilbert-Differ -- just wait for the

23   next question.

24   Q    BY MR. KEARL:  You referred earlier to a master work order

25   when testifying about security personnel.  What is that master



1    work order?

2    A    It's essentially a contract between Amazon and a security

3    company --

4    Q    Okay.

5    A    -- for hourly contract arrangements.

6    Q    Okay, and -- and I believe you testified earlier that Mr.

7    Chierchio was like a site director or an account manager for

8    Metro One; is that correct?

9    A    Account manager, yes, sir.

10   Q    Account manager.  Is it fair to say that maintaining the

11   Amazon account was an important part of his job?

12   A    Yes.

13   Q    Okay.  And are you -- you're aware of a leaked memo where

14   Amazon said that their strategy was to sort of characterize Mr.

15   Smalls as part of the -- the -- you know, as part of the -- the

16   worker organizers; are you aware of the existence of that

17   document?

18   A    I vaguely recall some media reporting around something

19   along those lines.

20        MR. KEARL:  Okay.  Give me one second.  Can we go off the

21   record for two minutes while I review my notes?

22        JUDGE GREEN:  Off the record.

23   (Off the record at 12:00 p.m.)

24        MR. KEARL:  Okay, so I -- I just have one -- one final

25   question.  So earlier we looked at an email that you received



Exhibit E, Motion to Try Petition on Hearing Record    406

1    from Mr. Chierchio.  It was, I believe, at 10:24 a.m. on April

2    7th.  Do you recall that -- that document?  I can share it if

3    you'd like to see it again.

4    A    That would be helpful.  Thank you.

5    Q    Okay, give me one second.  And this is Exhibit --

6    Respondent Exhibit 8.

7         Do you recall this document?

8    A    Yes.

9    Q    Okay.  So -- and it's true that at -- at the time that you

10   received and reviewed this document, this email from Mr.

11   Chierchio, you had received all of the invest -- all of the

12   evidence that you used in your investigation; is that correct?

13   A    I don't actually recall the timeline here.

14   Q    Okay, so this is --

15   A    The email timestamps may.  I'd advise here I don't know

16   the answer to that question.

17        MR. KEARL:  Okay.  No further questions.

18        JUDGE GREEN:  Okay.  Mr. Gilbert-Differ, before I turn it

19   over to your attorney for some additional questions, I actually

20   have some questions for you.  I'm sorry there's no rest for the

21   weary here.

22        Am I correct that your involvement with this case -- with

23   this incident began on April 6 and largely ended on April 10th?

24        THE WITNESS:  Yes, sir.

25        JUDGE GREEN:  And April 10th is when you submitted your



Exhibit E, Motion to Try Petition on Hearing Record

1    WIM report?

2        THE WITNESS:  Yes, that is correct.

3        JUDGE GREEN:  And it -- was it your understanding that Mr.

4    Bryson was on unpaid leave during that entire period?

5        THE WITNESS:  I think that's correct.  I think he was

6    taking unpaid personal time during that window.  I don't know

7    for certain.

8        JUDGE GREEN:  Either -- in the sense of whether it was

9    unpaid or paid, it was your understanding that he was off from

10   work during that period?

11       THE WITNESS:  Yes, sir.

12       JUDGE GREEN:  Okay.  Now, you -- you've been asked a

13   couple of times about this -- this protester in -- with the

14   blue sign who was there with Mr. Bryson on April 6, and you

15   were asked about the reasons that you failed to contact -- or

16   can -- can you tell me what -- what efforts you made to contact

17   her?

18       THE WITNESS:  Yeah.  So we -- we initially showed video of

19   the event to -- I shared with Tyler and then asked if he could

20   see if anybody recognized.  There was no recognition, so my

21   understanding is that Tyler would've shared images from that

22   video with a wider HR group, but you know, no result came back

23   from that.  In addition, I was hopeful that the individual may

24   have come out of work to go and attend the protest and then

25   come back in subsequently, but I couldn't find that happening.



1    If they had done that, then obviously, we'd have been able to

2    identify through badge scans and follow up them -- with them

3    for the witness statement, but again, no success in that space,

4    but at that point, honestly, we were out of options, sir.

5        JUDGE GREEN:  Now, I'm right that it was -- it was Tyler

6    Grabowski who took all of the statements except for the one

7    that was emailed to you from -- by Mr. Chierchio; am I -- am I

8    right about that?

9        THE WITNESS:  That's what I believe, too, sir.

10        JUDGE GREEN:  And after Mr. Grabowski gave you the witness

11    statements, did you have any follow up with him regarding

12    discussion of the incident or discussing any inconsistencies in

13    the evidence or -- or whether you needed additional evidence?

14        THE WITNESS:  I don't have specific recollection of doing

15    it.  It's very likely that we did a phone call or potentially

16    even a Chime call regarding the investigation.  I -- I just

17    have no specific recollection of it at all.

18        JUDGE GREEN:  Okay.  So you don't recall what his

19    impression of the incident was?

20        THE WITNESS:  No, I don't.  My general, you know, remem --

21    membrances we were fairly aligned in what we saw as common

22    factors, and then obviously, the inconsistencies.  I really

23    don't have much recollection beyond that.  I -- I believe these

24    would be verbal conversations in that time window between 4/6

25    and 4/10.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay.  I just want to get a little

2    understanding of the jurisdiction of loss prevention as it

3    pertained to this particular matter.  To the extent that there

4    was a potential health threat that COVID-19 posed to employees,

5    was that something that -- that involved loss prevention?

6    THE WITNESS:  Yes, in limited ways, we supported the

7    organization during that window.  So loss prevention was

8    responsible for contact tracing where confirmed cases were

9    notified to Amazon.  We conducted video contact tracing for

10   those cases.  We would work with HR for any COVID leave of

11   absence, so if an individual, again, was either quarantined as

12   a result of close contact or quarantined as a result of a

13   positive test, then we would be partnering to suspend badges

14   and generally track cases through their sort of 14-day window

15   or beyond if necessary.  That was our involvement, sir.

16   JUDGE GREEN:  Okay.

17   THE WITNESS:  Apologies.  One more -- one more element.

18   During this window, we were also conducting what we called

19   social-distancing video audits, so essentially conducting

20   reviews of video of high-traffic areas at high-traffic times to

21   learn lessons about any social-distancing opportunities and

22   provide actions for our site teams.  So during the initial

23   response to COVID, that was also something we were doing.  That

24   process was then later taken by other teams and to some extent

25   automated, but for that window of time, we were doing it



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1  manual.

2  JUDGE GREEN:  Okay.  So to the extent that employees

3  raised complaints or concerns regarding their safety at -- with

4  regard to COVID-19, would those complaints that would go to

5  loss prevention as essentially being a threat to the employees

6  like any other threat?

7  THE WITNESS:  Specific to COVID-19, not so much.  It was

8  very much an attempt on our part to keep contact for

9  associates, either at close contact with others or who reported

10  cases with HERE, simply as given the single stream of

11  reporting.  What I did do on several occasions over the course

12  of 2020 was meet with associates who have concerns around some

13  of our COVID protocols.  So when the questions arose around

14  what we were doing with contact tracing, I actually did one-on-

15  one sessions with some associates who raised those concerns,

16  walked through the CDC guidance, walked through what that meant

17  for us, and how we conducted contact tracing in the Amazon

18  environment.

19  JUDGE GREEN:  Okay.  So but to the extent that there were

20  concerns raised by this group of employees at JFK8, that's not

21  something that would -- would have necessarily gone to you as

22  a -- or gone to loss prevention as something that loss

23  prevention would be involved in addressing?  Here are these

24  complaints.  We want you to be involved in addressing them.

25  THE WITNESS:  If they related to contact tracing, yes,



Exhibit E, Motion to Try Petition on Hearing Record

1   and -- and we were, but the majority of the -- the space around

2   contact tracing sat with HR, and the majority of our policy and

3   guidance came from our workplace health and safety team, so

4   they would be numbers 1 and 2, and then we would, you know,

5   partner if there were specific concerns, questions around

6   contact tracing.

7       JUDGE GREEN:  Okay.  And to the extent that -- that

8   complaints, public complaints, protests potentially would have

9   a public relations effect on the business, it posed a -- a

10  public relations threat to the business, is -- is that

11  something that loss prevention would be involved in addressing?

12      THE WITNESS:  Not -- not as a primary group, no.  That --

13  that's primarily handed by our PR departments.  The -- the only

14  overlap for us would be ensuring that our security officers

15  fully understood what they should and should not do to avoid PR

16  events, but no, outside of that, no, sir.

17      JUDGE GREEN:  Okay.  So when you were describing your

18  recommendation that Mr. Bryson be terminated -- I guess first

19  of all, it -- it -- that recommendation, am I right that --

20  that was -- that presumed that -- that there was no discussion

21  with Mr. Bryson that resulted in a reason not to terminate him;

22  am I right about that?

23      THE WITNESS:  Correct.  This is essentially provided in

24  the event that we are unable to or Mr. Bryson's unwilling to

25  connect with us.  Obviously, to your point, should the



# Exhibit E, Motion to Try Petition on Hearing Record

1    interview indicate something very differently, then no, the

2    organization is in no way bound by that decision. It would

3    certainly be revisited.

4        JUDGE GREEN: Okay. And I believe you indicated that one

5    of the reasons for your decision was that you perceived Mr.

6    Bryson's conduct as repeat or ongoing harassments; am I -- am I

7    right about that?

8        THE WITNESS: Yes, sir.

9        JUDGE GREEN: And that is a term -- you know, if you need

10   me to show it to you, I can, but I -- I believe that was a term

11   from the workplace incident management guide?

12       THE WITNESS: That's my recollection, too, sir, and the

13   definition, yes.

14       JUDGE GREEN: Okay. Do you know is there -- is there any

15   Amazon document or description of what specifically constitutes

16   repeat or ongoing harassment? Is that defined anywhere, you

17   know, in some sort of Amazon documents?

18       THE WITNESS: Not to my knowledge, sir. I have not seen

19   that.

20       JUDGE GREEN: Do you recall di -- discussing that with --

21   with Tyler Grabowski or anybody else from HR the issue of

22   whether what Mr. Bryson was doing constituted repeat or ongoing

23   harassment?

24       THE WITNESS: I don't recall having that discussion, sir.

25       JUDGE GREEN: Okay. You know, I -- I take it you're --



# Exhibit E, Motion to Try Petition on Hearing Record

1    you were law enforcement in -- in the UK?

2        THE WITNESS:  Yes, that's correct.

3        JUDGE GREEN:  And was it your impression at the time in --

4    in April of 2020 that harassment could be a legal term of art

5    in the sense that it could mean something specific with -- with

6    regard to a certain law?

7        THE WITNESS:  Yes, I did, and obviously, the challenge for

8    us is that the global document spans a significant range of

9    jurisdictions, so you know, the English and Welsh definition of

10   harassment would likely vary from those applied across multiple

11   states of the U.S. or indeed other areas where -- where we

12   operate.

13       JUDGE GREEN:  Okay.  And I'm just asking for your

14   understanding at the time on April -- it would've been April of

15   2020.  I'm not asking for you to make something up now.

16       THE WITNESS:  Yes, sir.

17       JUDGE GREEN:  But at that time did you think of -- I mean,

18   if you had to go and look up what repeat or ongoing harassment

19   was, what would you have done?  What would you have thought?

20       THE WITNESS:  So if I was specifically looking to

21   understand, you know, a legal application, I would likely have

22   consulted with our counsel or sought that advice from them.  If

23   we were looking for a common sense or you know, applicable

24   legal definition, could have consulted our HR colleagues or

25   alternatively, sourced through open source, potentially legal



1    dictionaries on how that was applied and then sort it -- yeah,

2    do we want -- are we comfortable with this definition, but that

3    would've been the -- the attempt at the various methodologies I

4    may have used.

5        JUDGE GREEN:  Okay.  And -- and the -- the reason why I'm

6    asking you is just because what -- what struck me was that it

7    seemed the incident on April 6 seemed like a single argument.

8    I was surprised to hear you say repeat or ongoing, and what I'd

9    like to ask you is what -- you know, what made you think that

10   that single argument was repeat or ongoing conduct?

11       THE WITNESS:  It's essentially because we had a in-person,

12   and then followed, a short time later, it's broadcast on an

13   online forum.  For me, that is twice that that language has

14   been used about an individual, or words to that effect had been

15   used about that individual.  And I think critically, you know,

16   getting away from individual words that were potentially used

17   or not used depending on different recollections or whatever,

18   the characterization of Ms. Evans by Mr. Bryson was extremely

19   unpleasant whichever way you cut it, and from my perspective

20   the reason that I would define it in the way you'd asked is

21   because of those two separate pieces:  one directly to Ms.

22   Evans with witnesses, and then a second to a potentially global

23   audience through social media.

24       JUDGE GREEN:  Okay.  Thank you.  So that's all I have for

25   Mr. Gilbert-Differ.  Does Respondent's counsel have any



Exhibit E, Motion to Try Petition on Hearing Record

1    redirect?

2         MS. BUFFALANO:  I do.  Can we take a couple minutes?

3         JUDGE GREEN:  Yes.  How long would you like?

4         MS. BUFFALANO:  Can we take ten?

5         JUDGE GREEN:  Yes.  So off the record for ten minutes.

6    We'll be back at 12:30.

7    (Off the record at 12:18 p.m.)

8         JUDGE GREEN:  Okay, thank you.  So anytime you're ready,

9    Ms. Buffalano.

10        MS. BUFFALANO:  Thank you.

11                   **<u>REDIRECT EXAMINATION</u>**

12   Q    BY MS. BUFFALANO:  Mr. Gilbert-Differ, I'm going to ask

13   you a few questions about the questions that you were asked by

14   Mr. Jackson and Mr. Kearl.  So you were asked some questions

15   about what -- about sort of when you knew about Mr. Bryson's

16   identity.  I'm going to ask you a couple of questions about

17   that.   On April 6, were you aware that an associate named

18   Gerald Bryson took part in a -- in appearing at a production

19   meeting on March 25th, 2020?

20   A    It's possible.  I honestly don't recall.  I think I've

21   seen an email from Steffan where his name was included, so

22   yeah.

23   Q    Okay.  Did you know what he -- so my question to you is --

24   well, let me ask you this:  were you aware on April 6th that an

25   associate named Gerald Bryson had taken part in appearing in a



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1  protest on March 30th, 2020?

2  A     Yes.  Yeah, I was.

3  Q     Okay.  And on April 6, 2020, could you have identified

4  Gerald Bryson by sight?

5  A     No, I could not.

6        MS. BUFFALANO:  And can you bring up -- Mr. Falk, can you

7  bring up Exhibit 7 -- General Counsel Exhibit 70 --

8        MR. FALK:  Sure.

9        MS. BUFFALANO:  -- please?  Thank you.

10 Q     BY MS. BUFFALANO:  Okay.  And did you know, Mr. Gilbert-

11 Differ, watching the facility video that you testified about

12 earlier, on April 6 that the person of interest, as we -- as

13 we've been calling him, was the person in this photo in General

14 Counsel's Exhibit 70 on the left?

15 A     I did not, no.

16 Q     Okay.  And while we're on this, let me just ask you a

17 couple of questions about this document.  So it looks like --

18 if you look at the top, it says sent 3/31/2020, 6:23 a.m.; you

19 see that?

20 A     I do, yes.

21 Q     Okay.  So it looks like this email was sent on 3/31.  The

22 subject line is "Known IDs 3/30/2020", so do you have any idea

23 of what the subject matter of this email is?

24 A     Yeah, this was individuals identified from Amazonians

25 taking place in -- taking part in the protest on 3/30.



# Exhibit E, Motion to Try Petition on Hearing Record

1   Q    And where are these photos from?

2   A    These were from a Vice article that ran on either 3/30 or

3   3/31 specifically about the protest and the Amazonians taking

4   part in.

5   Q    Do you know who identified -- so if you just scroll down a

6   little bit Mr. Falk.  Underneath this photo there is

7   identifications of various individuals.  Do you know who

8   identified these individuals?

9   A    Not each one of them.  I -- my -- my recollection -- a

10  little vague here, I apology -- with apologies.  I think some

11  of the individuals were actually named in the article.  I think

12  some of our HR team recognized some of these individuals.  I --

13  I think it's kind of a combination of those kinds of factors

14  that led to the identifications eventually.

15  Q    Okay.  So you put this email together; is that right?

16  A    Correct, yeah, I -- I pulled that together, agreed.

17  Q    And specifically with respect to this photograph, were

18  you -- did you zoom in on any of the photographs to sort of get

19  a better view of the attire of any of these individuals?

20  A    No, I mean, the -- these were essentially copy and paste

21  straight out of the article.

22       MS. BUFFALANO:  Okay.  Thank you.  And you can take this

23  down, Mr. Falk.  Is there -- I'm going to -- I'm going to

24  share -- let me drop something into -- well, let me ask you

25  this.  Mr. Falk, do you have a Verge article?



1    MR. FALK:  I probably do.  Do you know what exhibit number

2    it is?

3    MS. BUFFALANO:  No, it would've come to you this morning,

4    though.

5    MR. FALK:  Oh, no.  I didn't get anything this morning.

6    MS. BUFFALANO:  Okay.  Let me drop something into -- can

7    you tell me what exhibit number we're on, Mr. Falk?

8    MR. FARRELL:  Did we have a 1 -- well, let me -- give me a

9    second.  Let me see if I can find it.

10   MS. BUFFALANO:  All right.  I don't want to waste time.

11   Let me just keep moving.  Thank you.

12   UNIDENTIFIED SPEAKER:  I think the last one you put in was

13   14, since your numbers are all over the place, but -- the last

14   one --

15   JUDGE GREEN:.  Yeah, but --

16   MS. BUFFALANO:  I know I called.

17   MR. FARRELL:  And the last -- last exhibit I -- the last

18   exhibit I have is -- numerically is 125.

19   MS. BUFFALANO:  Okay, got it.  All right, I'm going to

20   keep moving.  Thank you, though.

21   Q    BY MS. BUFFALANO:  All right, can I ask you why you sent

22   this -- the email -- the 3/31 email to HR?  You're on mute Mr.

23   Gilbert-Differ.

24   A    My apologies.  Yeah, we -- we were keen to understand who

25   was concerned about what in our building specifically related



# Exhibit E, Motion to Try Petition on Hearing Record

1    to COVID and our response to it.

2    Q    Did you have any understanding or what was your

3    understanding of why human resources -- the human resources

4    individuals identified on the email wanted this information?

5    A    Essentially to allow them to follow up, right?  We've --

6    we've got individuals who feel very strongly about this to the

7    extent they're protesting.  That -- those are individuals we

8    need to understand fully what their concerns are.  Protest is a

9    great means of expressing how strongly you feel about

10   something, but it doesn't do a terrific job of explaining

11   necessarily the fine detail of your complaint and your

12   concerns.  So yeah, we wanted the opportunity to try and

13   address some of those issues if possible or at least understand

14   them better.

15   Q    Okay.  And let me show --

16       MS. BUFFALANO:  Can you, Mr. Falk, pull up GC's Exhibit

17   71, please?  And if you can just scroll just down to the bottom

18   for the -- yes, on this last email.

19   Q    BY MS. BUFFALANO:  Okay.  So do you -- and let me know if

20   you need to see more of this, Mr. Gilbert-Differ, to answer the

21   questions.  I'm going to ask you the same questions I asked you

22   on the last exhibit, which are do you know why Mr. -- what's

23   his name -- Stud -- I can't --

24   A    Steffan Steudte, yes, Steudte.

25   Q    Steudte, okay.  Do you know why he sent this email to Sy



1    Chosa (phonetic), Christine Hernandez, you, and the others --

2    I'll read through the list.  Do you know why he sent this

3    email?

4    A    I -- I do.  It's actually very similar reasons.

5    Essentially, these are the individuals who felt strongly enough

6    to want to come talk directly with management.  Social

7    distancing and the, you know, confined spaces fundamentally of

8    the office areas in JFK8 really meant that there wasn't a space

9    where this entire group could be sat down and talked to.  There

10   was nowhere physically big enough for us to do that with six-

11   feet distancing at that point we'd identified.  So the intent

12   again was to find out who felt strongly about this, and then

13   individually, what are they concerned about.  How can we

14   understand better what their concerns are?

15        MS. BUFFALANO:  I thank you.  You can take this exhibit

16   down, Mr. Falk.  Thank you.

17   Q    BY MS. BUFFALANO:  You were asked some questions about the

18   identification by GSO -- by GSOC of this incident as a sev-

19   level 3; do you remember those questions?

20   A    Yes, I do.

21   Q    Okay.  And can you -- I understand that your testimony was

22   overwhelmingly that you were not involved in setting the sev

23   level, but can you explain to us why sev-level 3 was -- or do

24   you agree with the decision of GSOC to assess this at sev-level

25   3?



1    MR. JACKSON:  Objection.  Relevance.

2    JUDGE GREEN:  Overruled.

3    Q    BY MS. BUFFALANO:  You can go ahead and answer.  I'm

4    sorry.

5    A    Okay.  Yeah, I -- I certainly agree with the -- with the

6    decision, and the reasons for that are -- are really on why did

7    we assign a sev 3, so yeah, the -- it seems under the table

8    that -- that assesses in-house some of these -- you know, how

9    some of these ratings may be made, but those guidelines are

10   inclusive, not exclusive.  Fundamentally, severity ratings

11   anywhere you go in an office or any type of severity rating you

12   look at are really looking at how many people are impacted,

13   and -- and in this event, it was determined, I believe, there

14   was an impact to some extent amongst the people, and then more

15   importantly, when we look specifically at the type of

16   harassment, you know, I understand why I -- I think it was

17   potentially categorized as a repeated/ongoing because I would

18   categorize it much the same way.

19   Q    Do you -- do you know where GSOC is located?

20   A    I believe they're located in the greater Phoenix area in

21   Arizona.

22   Q    Is GSOC it -- at JFK8?

23   A    No.

24   Q    And you -- the GSOC identifica -- well, let me ask you

25   this:  The G -- the GSOC rating, the sev level-3 rating, was



Exhibit E, Motion to Try Petition on Hearing Record

1     part of GSOC's assessment of the case that you received on --

2     and by email on April 11th; is that right?

3     A     Correct.  Yeah, it's their assessment based on the

4     notification form I sent them, and they exclusively got no

5     other information or evidence is shared with GSOC.

6     Q     And before that email was sent to you on April 11th from

7     GSOC, you didn't have any idea what sev level they were going

8     to assign to the case; is that right?

9          MR. JACKSON:  Objection.  Leading.

10         JUDGE GREEN:  Overruled.

11    Q     BY MS. BUFFALANO:  Okay, let me -- I'll ask it -- okay, go

12    ahead, Mr. Gilbert-Differ.

13    A     Based on my experience, I'd have expected probably a

14    severity 4 or severity 3.

15    Q     Okay, but did you know?

16    A     No, I didn't know.

17    Q     So was there any impact on your recommendations in the

18    case for next steps based on the sev level that was assigned by

19    GSOC?

20    A     Absolutely none.  No.

21    Q     The -- you were asked --

22         JUDGE GREEN:  Let's just -- can I just ask one question?

23    Did you make any recommendation after you got the April 11th

24    email or were you already done with your part of the incident?

25         THE WITNESS:  No, that was done, correct.



```
 1              JUDGE GREEN:  Okay.  Sorry.

 2      Q    BY MS. BUFFALANO:  You -- on -- on your cross-exam, you

 3   looked in -- at the -- at the facility video specifically under

 4   the overhang and were asked questions about whom you identified

 5   and you know, when and how; do -- do you remember that -- those

 6   questions?

 7      A    Yes, I do.

 8      Q    Okay.  And did you -- when you were reviewing the video in

 9   order to identify witnesses, did you intentionally avoid

10   identifying any witnesses?

11      A    Absolutely no -- not.

12      Q    Did you intentionally avoid identifying Tier 1 associates?

13      A    No.

14      Q    And you were asked some questions about Chris Urso, one of

15   the witnesses and -- and his position as a PA.  Do you remember

16   that testimony?

17      A    Yes.

18      Q    What -- what does PA stand for?

19      A    Process assistant.

20      Q    And -- okay.

21              MR. KEARL:  And I want to object.  There was no questions

22   about Chris Urso on cross.

23              JUDGE GREEN:  Overruled.

24      Q    BY MS. BUFFALANO:  Hold on.  And now I'm going to direct

25   your attention now to questions that you were asked relating to
```



1     de-escalation on April 6th during the incident.  I'm sure you

2     remember those questions, right, Mr. Gilbert-Differ?

3     A     I do.

4     Q     Okay.  Okay.  And so in your view, were any de-escalation

5     steps taken by any of the witnesses to the event on April 6th?

6     A     Yes.

7     Q     And what were those de-escalation steps?

8     A     And so the first piece an -- and I think it gets

9     overlooked a lot, is visible presence.  The presence of

10    operations leaders, HR professionals, and security is a de-

11    escalation step.  Particularly when those individual are

12    clearly front and center.  That is a de-escalation tactic.

13    Going back to my law enforcement days, policing presence was an

14    actual tactic that we would use as a de-escalation.  Physical

15    presence.  Nothing else.  No interaction beyond physically

16    being present.  That was there.  And they were present.  And

17    they were highly present when we left.  And this high visity --

18    visibility, that's the one pretty much all the time in the

19    facility.  They are well known to associates.  They know what

20    those vests mean.  The second piece that I believe occurred was

21    that one or more of the individuals present encouraged Ms.

22    Evans to walk inside the facility.

23          MR. KEARL:  Objection.  Speculation.

24          JUDGE GREEN:  I think we understand that.  Overruled.

25    A     And my reason for thinking that is because it specifically



Exhibit E, Motion to Try Petition on Hearing Record

1    states in Mr. Chierchio's statement.

2    Q    BY MS. BUFFALANO:   Okay.   And were there any other de-

3    escalation steps -- I'm sorry.   You didn't finish answering, so

4    I just want to make sure I got your full answer.

5    A    And then the final piece, I think, that was happening was

6    that Mr. Curlej was also taking appropriate steps to escalate

7    up his chain in line with what one would expect from a leader

8    about this event breaking, as well.   And that would potentially

9    allow us to continue to monitor and more importantly, should we

10   need to change approach wildly, then we could do that.   But no.

11   I deeply -- effective, the escalation tactics.   So their listed

12   because fundamentally, they worked, and this didn't escalate

13   beyond the verbal, like, stages.

14   Q    And let me ask you this.   What impact, if any, do any de-

15   escalation efforts taken by witnesses have on the actu -- on

16   the severity of the conduct that Mr. Bryson engaged in on April

17   6th?

18   A    I apologize, ma'am.   Would you care to just ask the

19   question one more time?

20   Q    Yeah.   Let me try and ask it in a less confusing way.   So

21   de-escalation efforts -- what's the purpose of -- of de-

22   escalating a situation?

23   A    Yeah.   So the intent is to either bring the situation back

24   down to a previous level.   You know, below one where -- where

25   we'd need to escalate.   So if can apply it in this instant, it



Exhibit E, Motion to Try Petition on Hearing Record — 426

1    would be Mr. Bryson protesting, Ms. Evans sitting quietly

2    outside.  The ultimate method that you -- of de-escalation --

3    you know, the other approach we could term a de-escalation is a

4    cession of the event completely.  This event required two

5    people, i.e. Ms. Evans and Mr. Brysons (sic) are present.  If

6    one or more of those people could be separated and moved away,

7    then the event should, in theory, end.

8    Q    Did de-escalation efforts change the events that already

9    happened?

10   A    Well, in terms of the -- the language used?

11   Q    I mean, like the things that already happened in the past.

12   If you de-escalate an activity -- an event, does it change what

13   has already happened?

14   A    Absolutely not.

15        MR. KEARL:  Objection.

16   A    What's been said is --

17        MR. KEARL:  Vagueness.

18        JUDGE GREEN:  I think it's absolutely self-evident.  You

19   know, we -- we know that it does not.

20   Q    BY MS. BUFFALANO:  Do any de-escalation efforts taken or

21   not taken affect, in any way, your recommendation that Mr.

22   Bryson be suspended pending investigation?

23   A    No.  The behaviors had already occurred that would --

24   would relate to that recommendation.

25   Q    And do the de-escalation efforts taken or not taken by the



Exhibit E, Motion to Try Petition on Hearing Record

1    witnesses, would that have any impact on your recommendation

2    that Mr. Bryson be terminated for the conduct that he engaged

3    in?

4    A    No.  Fundamentally, the witnesses are not responsible for

5    Mr. Bryson's behavior.  Mr. Bryson is.

6    Q    And you were asked a question on cross-examination by Mr.

7    Kearl about witness recollection and what that meant for sort

8    of the credibility of the investigation.  You started to sort

9    of explain what your views on witnesses providing

10   inconsistent -- having inconsistent memories of an event.  Can

11   you explain to us what you were going to say but were not

12   allowed to?

13   A    Yes.  Certainly.  Firstly, it's in no way shape, or form

14   unusual.  We see that with witnesses such as these, who are

15   essentially bystanders who will caught up in an event, or we

16   see it with professional witnesses who are intentionally biased

17   in a situation.  You get different versions of what they

18   recollect.  You know, whatever characterization we place around

19   this event, and there's no more -- no two doubt -- no doubts

20   there about the elements.  One, noisy.  A loudhailer was being

21   used.  It's a noisy event.  And the second piece is that

22   whichever particular words we can achieve agreement or

23   disagreement on, abusive language was certainly used.  Those

24   two are -- are pretty emotive triggers for individuals who are

25   present in a situation.  You know, in this case, caught up in a



www.escribers.net | 800-257-0885

 1    situation model, then they can abuse it.  And what will tend to
 2    happen, particularly when you get a lot of words exchanged, or
 3    in this case, you know, I suspect one side of it, we see a lot
 4    of language used.  What resonates with people is typically what
 5    they recall most.  What words are the most impactful for them?
 6    I apologize, because I'm going to use just a little of that
 7    language to illustrate.  Please bear with me for the foul
 8    language.  And I think Mr. Jackson, you focused on the word,
 9    "cunt."  For some people, that's an incredibly emotive word.
10    That's a very offensive word, and that's one that would stick.
11    For others, the racial abuse might be something that would
12    stick more.  Either way, whatever words were actually used were
13    certainly abusive.  That's going to result, I believe, in
14    differing testimony related to what they physically recall the
15    most.  It's what was most impactful to them.  We see this, and
16    I have physically, myself, seen this.  Not just, as I say,
17    it -- with witnesses and events such as this, and witnesses and
18    positions such as this.  But actually, in terms of
19    professionally, they're pulling law enforcement officers into
20    events.  Four or five officers deployed to an event, where the
21    language became critical to what was in -- what was at hand,
22    essentially, would nor land on exactly the same versions of
23    what was said.  And that's fine.  Because that's how people
24    are.  That's how people work and operate.  It's not incumbent
25    on us or anybody investigating used space to necessarily

1    resolve every single conflict between words used.  Frankly,

2    that's probably not achievable.  Because that's probably not in

3    the individual's recollection.  You may be very careful when

4    probing in this way, but you don't end up essentially

5    presenting a narrative to somebody.  No.  Frankly, as an

6    investigator, I would rather have the imperfect, but pristine,

7    accounts of what happened than some form of coached and cleaned

8    up and resolved narrative of what happened emotion from

9    statements.  Statements that differ around verbal abuse are

10   most likely real and are most likely related to that person's

11   recollection and experience of a pretty emotive event.  Where

12   you see an awful lot of consistency, I worry that you've lost

13   some of that.

14   Q    And thank you, Mr. Gilbert-Differ.  In the -- in terms of

15   the evidence collected and reviewed in this case, how does that

16   compare with sort of the amount or level of evidence collected

17   or reviewed in the typical case?  Is this typical?  Is there

18   more?  Is there less?  Sort of what's the -- how does this

19   compare with other investigations into, you know, altercations

20   between associates?

21   A    Yeah.  I -- I think, in terms of the number of witnesses,

22   this is typical of all this -- or maybe even on the higher side

23   of typical in terms of number of witnesses to the event.  You

24   know, it is more common that we may only have one or two

25   witnesses.  Sometimes in -- we have none.  In terms of the



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    video or views of this -- this event, having two different

 2    views of the event from our own facility cameras is frankly

 3    better than we're sometimes able to achieve in these

 4    investigations.  And then, having the Facebook live video is

 5    pretty unique.  I -- I don't think I can recall an

 6    investigation I've been involved in and there will have been

 7    hundreds where something quite like that is available to us, as

 8    well, and part of the investigation.

 9    Q    I'm going to direct your attention to a different topic,

10    now.  On the net, you were shown a Chime message between you

11    and Mr. Paul Chierchio.  Remember that?

12    A    I do.

13    Q    And do you recall you were asked some questions about

14    Paul's offer to get witness statements from other individuals.

15    Do you remember that?

16    A    I do.

17    Q    Let me know if you'd like to see the document again.  But

18    I'm going to ask you if you knew -- what -- what your

19    understanding was of whom Paul was offering to get statements

20    from?

21    A    My understanding of that was the other security officers

22    present during the event.

23    Q    And who were the other security officers present during

24    the event?

25    A    We had Kaydee Bertone and one other, whose name is
```



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    escaping me.  But it's signed on the bottom of Kaydee's reports

 2    to us.

 3    Q    So did you, in fact, receive witness statements from the

 4    other security officers who were witness to the event on April

 5    6th?

 6    A    Yeah.  We had received a joint document from Kaydee and

 7    that second security officer.  Actually, on the evening of --

 8    of the event itself.  So just to give a -- a -- a kind of

 9    rationale around why I believe that happened, so Paul was

10    assigned to day shift, and Kaydee was covering this event for

11    us on overtime, but actually assigned to lead the second shift,

12    as supervisor.  So you had one working from something along the

13    lines of 7 till 3, essentially, and the other one being

14    assigned to work a 3 till 11 or 3 till midnight or something

15    similar.  And I think it's quite likely that the point at which

16    Paul and I were messaging the early morning following, he ended

17    up being unaware that those had already been sent in.

18    Q    Okay.  You were asked some questions on cross-examination

19    about a transcript of the Facebook live video.  Do you remember

20    those questions?

21    A    Yes.

22    Q    Did you have a transcript of the Facebook live video

23    during the time of the investigation in April of 2020?

24    A    I don't think we did, no.

25    Q    Can you just give me a minute to make sure we don't have
```



1    anything else?

2        JUDGE GREEN:  Yes.  Off the record.

3    (Off the record at 1:01 p.m.)

4        MS. BUFFALANO:  Nothing further, Your Honor.

5        JUDGE GREEN:  Okay.  Any follow up on that from Mr.

6    Jackson?

7        MR. JACKSON:  Is it possible to take a lunch break at this

8    time?

9        JUDGE GREEN:  Sure.  So let's be back in an hour.

10       MR. JACKSON:  Thank you, Judge.

11       JUDGE GREEN:  2:05.

12   (Off the record at 1:05 p.m.)

13       JUDGE GREEN:  And does the General Counsel have any

14   recross for Mr. Gilbert-Differ?

15       MR. JACKSON:  No further questions, Judge.

16       JUDGE GREEN:  Mr. Kearl?

17       MR. KEARL:  No, Judge.

18       JUDGE GREEN:  Okay.  Thank you very much, Mr. Gilbert-

19   Differ.  We appreciate your time.  You're free to go.

20       THE WITNESS:  Thank you, Judge.

21       JUDGE GREEN:  So what else does the Respondent have for

22   us?

23       MS. BUFFALANO:  We can call our next witness.  Before we

24   do that, and I just want to talk to counsel for General

25   Counsel.  We had offered certain documents to sort of stipulate



Exhibit E, Motion to Try Petition on Hearing Record

1    into the record, as opposed to spending time putting them into

2    the record.  It might be helpful to know whether or not we're

3    going to get that done.  It -- is it -- can we hop into a

4    breakout room for just a minute?

5        JUDGE GREEN:  Sure.  Do we -- who wants to go into the

6    breakout room?

7        MS. BUFFALANO:  I think -- I mean, I would say me and

8    counsel for General Counsel.

9        And Mr. Kearl, if you'd like to join.

10       Send Chris there, too.  He's entertaining.  Thank you.

11       JUDGE GREEN:  Okay.  Hold on.

12   (Off the record at 2:08 p.m.)

13       JUDGE GREEN:  Okay.  So Mr. Grabowski, I am going to swear

14   you in again.  So raise your right hand.

15   Whereupon,

16                        **TYLER GRABOWSKI**

17   having been duly sworn, was called as a witness herein and was

18   examined and testified, telephonically as follows:

19       JUDGE GREEN:  Okay.  Thank you.  So same rules apply.  We

20   don't have to have you spell your name.  Just don't communicate

21   with anybody by phone or on a hand-held device.  And don't look

22   at documents, other than those that are shown to you or those

23   that you're directed to view, okay?

24       THE WITNESS:  Sounds good.  Thank you.

25       JUDGE GREEN:  Thank you.



Exhibit E, Motion to Try Petition on Hearing Record

1          **DIRECT EXAMINATION (RECALLED)**

2     Q     BY MS. BUFFALANO:   Okay.   Mr. Grabowski, I know that you

3     have testified before here in this hearing, and that you have

4     given some background as to who you are and what you -- what

5     your duties are and -- and, you know, who you are.   But I'd

6     like to sort of just do a little bit of background here to

7     refresh everybody on who you are.   So you work -- obviously,

8     you work for Amazon.   Can you give me your current position?

9     A     Senior HR business partner.

10    Q     How long have you held that role?

11    A     For the last six months.

12    Q     Okay.   So since about November last year?

13    A     December.

14    Q     And before that, you were -- what was your role?

15    A     An HR business partner.

16    Q     And how long did you hold that position?

17    A     Since April of 2019.

18    Q     And what'd you do before that?

19    A     I was a senior human resource assistant at Amazon.

20    Q     And when did you start -- how long did you hold that

21    position?

22    A     Since July of 2017.

23    Q     Was that your first position with Amazon?

24    A     I had an internship the year before, for about ten weeks.

25    Q     In HR?



Exhibit E, Motion to Try Petition on Hearing Record    1435

1    A    Yes.

2    Q    And at -- what are your duties as a senior HR VP?

3    A    So I manage the members of the hourly HR team, so the

4    senior human resource assistants.  I manage a portion of that

5    team, as well as just working on different functions that

6    impact the day-to-day operation, people-related aspects,

7    different HR-related metrics, driving engagement initiatives,

8    things related out of associate feedback to really better the

9    experience for both the associates and the operation.

10   Q    Okay.  And what -- HR VP?  How does that -- how does that

11   role differ?

12   A    So there can be different re -- like, roles and

13   responsibilities, based on, like, I guess, the shift that the

14   HR business partner is working.  So we have a -- a day shift HR

15   business partner, a night shift HR business partner, a swing HR

16   business partner, and there's different roles and

17   responsibilities that are tied to each one.  So day shift HR

18   business partner would manage the hourly day shift senior human

19   resource assistants, and typically monitors some of the people-

20   related metrics and reporting and different initiatives that

21   help impact the employee experience from that standpoint.  So

22   helping with employees in managing time-off options, lowering

23   attrition rates, increasing attendance.  From a night shift HR

24   business partner, typically they would manage the night shift

25   senior HR assistant, so the hourly night shift team, as well as



www.escribers.net | 800-257-0885

1    focusing on different, like, manager and talent development,

2    performance reviews for our leadership team, one-on-one

3    conversations.  And then, from, like, a swing HR business

4    partner role, which I'm currently in, some of the focuses are

5    in collecting employee feedback through our Voice of the

6    Associate Board, through our connections, through round tables

7    with our senior leadership team, taking trends and actions that

8    we're seeing as opportunities as a site to improve the

9    leadership team, improve the associate experience, and then

10   coming up with actions to then partner with the operation team

11   and driving things to promote a better experience for employees

12   at all levels.

13   Q    Okay.  And that's HR VP you're describing?

14   A    Yes.  Each of --

15   Q    Okay.

16   A    -- those was an HR business partner.

17   Q    Okay.  And just tell me what a -- HRAs do?

18   A    So the HR assistants manage the -- I guess, the daily

19   interactions with associates.  So they're helping with time

20   card review; they're helping with associate concerns that come

21   immediately to their attention; they're helping them walk

22   through time off, their self-service portals, benefits.  They

23   help support the operations team, so they support the area

24   managers, which is the role that directly manages the hourly

25   associates.  So each one of them -- each senior HR assistant on



1   each shift has their own department.  So inbound, outbound and

2   PCF, we have one HR assistant tied to each.  And they support

3   those managers in helping their associates or any concerns that

4   they might have.

5   Q    Okay.  And what, if any, responsibility do HR assistants

6   have for employee disciplinary investigations?

7   A    So HR assistants can be involved in taking in employee

8   concerns or conducting the investigation, in terms of

9   collecting witness statements, collecting all the -- the data

10  and facts surrounding the case.

11  Q    Okay.  And what about HR business partners?  What

12  responsibility, if they -- if any, do they have for employee

13  discipline?  Investigations?

14  A    So as an HR business partner, I can be involved either in

15  reviewing information that the team brings to my attention that

16  they might be unsure of presenting the facts and helping

17  determine next steps or other information that they need to

18  gather in their investigation, or in situations with escalated

19  associate concerns or complex facts, I could be involved

20  directly in conducting that investigation.

21  Q    Okay.  So as an HR VP, I want to ask you sort of about the

22  escalations first.  You identified some situations in which

23  cases might be escalated.  I -- I guess, first, tell us, what

24  does it mean for a case to be escalated?

25  A    So it could either be a concern that an employee has



Exhibit E, Motion to Try Petition on Hearing Record

1    already raised to a senior HR assistant or their area manager

2    and still had concerns that were going on, or it could be

3    something that had complex facts or just a unique situation.

4    Maybe something we don't see day-to-day, and like, in terms of

5    policy violation or I guess, the overall facts pertaining to

6    the case are unusual or unique.

7    Q    And what would happen to an escalated case?

8    A    I'm not sure I understand the question.

9    Q    So like, a -- typically you're say -- and if I'm

10   understanding you, probably typically an HR -- and HRIA is

11   doing a disciplinary investigation?

12   A    Yes.

13   Q    Okay.  But there -- so when a case is escalated, what does

14   that mean is happening to it?

15   A    It means that it's either being conducted or reviewed at a

16   higher level, based on some of the information in the case.

17   Q    Okay.  Okay.  And when you say higher level, who might do

18   that?

19   A    It really can -- can keep going up, depending on the case

20   or the facts or the -- the situation itself.  It could go from

21   an HRA to myself.  It could go from a business partner to an HR

22   manager.  And can really go up the chain of HR leadership,

23   depending on, I guess, how unique the facts or circumstances

24   are or what kind of guidance we need.

25   Q    So I wanted to just quickly switch gears and ask you --



# Exhibit E, Motion to Try Petition on Hearing Record

1    you mentioned that part of your duties were to engage

2    associates and -- and -- and -- and -- and assist in sort of

3    associate -- the associates exact process.  I just want to ask

4    you a question about that.

5    A     Okay.

6    Q     What kind of associate feedback processes are there?

7    A     So we have multiple mechanisms that employees have at

8    providing feedback, or I guess expressing their concerns.  So

9    we have a Voice of the Associate Board, which is an electronic

10   board where a feed sort of looks like a social media feed is

11   posted around the entire building where employees can post

12   comments, questions, concerns directly to the senior leadership

13   team of the building through their employee portal.  The

14   comments would then be posted on the feed, along with the

15   senior leadership's response to it.  So we have a way to track

16   that information, collect that, use it as trends, look at

17   common themes.  We also have birthday round tables and senior

18   team round tables, which are monthly round tables, where

19   employees can go and meet directly with the senior leadership

20   team, the general manager and the assistant general manager to

21   talk about what's going on, give feedback on what's working

22   well and not working well.  And we collect that information to

23   see how we can improve the associate experience.  We also have

24   daily meetings at 9 a.m. and 9 p.m., one for day shift and one

25   for night shift, Monday through Friday, where we bring

# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    employees -- we bring Tier 1 associates to the -- to a

 2    location, where we have the VOA board, the Voice of the

 3    Associate Board physically present, and we review topics that

 4    are coming up on there as trends and ask them questions, ask

 5    them if they have any additional feedback.  We note down that,

 6    we use that to, I guess, improve actions going forward.  And

 7    then, every single day, employees, when they sign into their

 8    station, get asked an anonymous question, called,

 9    "Connections."  So in connections, they're asked about their

10    leadership team, their experience, different policies and

11    procedures going on at Amazon, kind of like a multiple-choice

12    question.  And then, we get the anonymous results for the

13    building by manager, by department, and we can kind of see what

14    areas of opportunity we have, based on anonymous feedback that

15    employees are presenting to us so we can take that and then use

16    that to create actions as a leadership team.  Employees also

17    have the ability to submit concerns through their employee

18    portal to a centralized team outside of the site to have them

19    reviewed.  Trying to think of what else.  I think -- I think

20    that most -- that might cover a good portion of it.

21    Q    Okay.  And where can associates who have issues or

22    questions find representatives of HR.  You said HRAs sort of do

23    the day-to-day with Tier 1 associates?  Where can associates

24    find these HRAs?

25    A    So right at the main entrance.  Right when you walk in, we
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   have an HR -- a designated HR area on the production floor,

2   where we have HR desks in a line, where our team is staffed

3   throughout the day.  So looking at our HR team staffing, I have

4   hourly HR team members on site from 6:30 in the morning until

5   2:45 in the morning.  And at all times, when there's HR

6   staffing in the building, the hourly senior HRA team would be

7   staffed at that location right by the entrance to bring their

8   concerns, figure out anything -- like I mentioned, either like,

9   time-off, related benefits, self-service, anything regarding

10   their employment, questions or concerns that they might have,

11   if they want to escalate an issue or bring a -- bring something

12   to our attention that occurred that they witnessed or that

13   happened to them directly.  And then also, in the main office,

14   which is a little bit to the left when you walk in, into the

15   main office, there is an HR leadership office, where the HR

16   business partners are staffed throughout the day, and then

17   there's an HR manager office, where our HR managers are

18   throughout the day.

19   Q    Okay.  And just one question.  You mentioned the Voice of

20   the Associate Board.  Is that an actual physical board?

21   A    It used to be a physical board, but now it's a TV.  So now

22   it's like a -- if I had to estimate, probably, like, a 60-inch

23   TV that's posted in several locations in the building where it

24   has an electronic feed rolling through with all the comments

25   and the responses.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Where is that located?

2    A    There is one on the third floor right outside the main

3    break, so when employees are walking into the main break room.

4    There is another one right when you walk into the building.  If

5    you make a right to go towards what we call the mod, which is

6    an area that houses our inbound, pick, count, and floor health

7    employees.  Right on the walkway leading to that there is a

8    feed going.  And then I forget where the third one is.  It's

9    somewhere in the back of the breakroom, or in the back of the

10   building by the dock.

11   Q    Okay.  So now I'm going to switch gears, Mr. Grabowski.

12   And thank you.  I want to talk to you about how employee

13   misconduct is typically reported and investigated, and how

14   discipline is typically issued.  So we'll walk through this

15   slowly.  But how do reports of associate misconduct make their

16   way to HR?

17   A    Back in April of 2020, there was -- I mean, tons of

18   different mechanisms that are still consistent today.  I think

19   the one that's changed from last year to this year is that now,

20   in 2021, employees have the opportunity to report concerns

21   directly through their employee portal.  But for both

22   instances, at this point last year and then currently,

23   misconduct can come to the HR team either through the

24   leadership team; if someone on the leadership team witnesses

25   it; if another employee witnesses it and bring it directly to



1    the attention of a manager, a member of the leadership team, a

2    member of the HR team; if an employee that was impacted in a

3    situation brings it to the attention of one of those three,

4    their leadership team, their direct manager, the HR team.

5    There is an open-door policy and associates know where the main

6    office is.  So typically, if they can't find their leader, or

7    if they want to speak to someone higher up, they'll walk into

8    the main office and bring that to our attention.

9         We also have an anonymous hotline if employees don't feel

10   comfortable speaking to someone directly, and they want to call

11   it in, they can call in and report their concern, which the

12   site will then investigate.

13        And then there's other similar situations where employees

14   will write on the BOA board saying they want to speak to a

15   member of leadership.  And then someone from the operation or

16   HR leadership team will follow up with them.  But for the most

17   case it's either the person who's directly involved, or someone

18   who witnesses it, either another associate or a member of the

19   leadership team that see something happen, that then bring it

20   to the attention of HR or an escalated level of their

21   leadership, which eventually will make it to HR.

22   Q    Okay.  And you testified earlier that an HRA would

23   typically investigate -- most commonly investigate claims of

24   employee misconduct, unless the case is escalated, and then it

25   would be reviewed at a higher level; is that right?



1    A    Yes.

2    Q    How is it decided whether a particular case would be

3    investigated by an HRA, or whether it would escalated?

4    A    So it would typically be reviewed using high judgment by

5    the level that the case is initially reported.  So if we're at

6    looking at a site level, it can get brought to the attention of

7    a senior HRA, it can get brought to the attention of an HR

8    business partner, or an HR manager.  So if a senior HRA has a

9    case brought to their attention, it typically will loop their

10   HR business partner and say, hey, like, this is what happened,

11   or, like, this is what I'm going to begin investigating, at

12   which point, an HR business partner can use high judgment in

13   determining whether or not that's appropriate to be handled at

14   that level, or if there's escalated or potentially complex

15   issues based on the allegations, that it can be handled by an

16   HR business partner, or in other situations, some things will

17   get reported directly to an HR manager or a senior HR manager,

18   at which point, they'll review the facts and determine, should

19   this be handled at an HR business partner level, a senior HR

20   assistant level, or there's cases where I've seen at -- in my

21   time at Amazon, where they begin at an even higher level based

22   on some of the complex facts or the level that it's gone to and

23   they get investigated at an HR manager level.

24   Q    Okay.  Once it's decided -- so let's say an HR VP is going

25   to investigate a case, do you know how it's decided which HR VP



1   would get it?

2   A    It's typically assigned or taken on by the HR business

3   partner that correlates with the respective shifts of the

4   employee.  So we want to have someone who's going to have the

5   most opportunity to follow up with those employees, get the

6   details and facts, and collect the information.

7   Q    So in March, April 2020 time frame, how many HR VPs were

8   there?

9   A    It varied between, like, one and four.

10  Q    Okay.  And why did it vary?

11  A    Two different reasons:  One, we did have some change in

12  staffing, so at this point, or during that March, April period,

13  two of our HR business partners left the site and went to

14  different opportunities.  One moved into a New Jersey site,

15  actually two of them moved into New Jersey sites.  And then at

16  another period in time, there were two of the HR business

17  partners that were quarantined due to COVID for a two-week

18  period.

19  Q    Thank you.  Can other departments, aside from HR, be

20  involved in the investigation of employee misconduct?

21  A    Yes.

22  Q    And what departments would that be?

23  A    Typically it would be the safety team or loss prevention

24  team, depending on the details of the incident or the

25  circumstances.



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

154

```
1   Q     And under what circumstances would loss prevention be

2   involved?

3   A     Anything where there is potential risk of harm to an

4   individual, people, product; any behavior that is harassing or

5   abusive; typically anything involving violence, potential

6   violence, or harassing behavior.

7   Q     And how does LP become involved in an employee

8   investigation?

9   A     By being made aware of, I guess, whoever it was initially

10  reported to.  Sometimes we'll see a manager will be the first

11  one to be aware of a situation, and they'll go directly to LP,

12  or they'll go to the HR, at which point, that party would then

13  immediately loop the other party involved.  So if it comes to

14  HR and it's something that involves potential violence or

15  allegations of violence or harassment, the HR representative

16  would then loop the loss prevention department in and vice

17  versa.  If someone goes directly to loss prevention, they would

18  then reach out and loop the HR in.

19  Q     Okay.  So in cases that come to HR first, so say a case

20  came to you that involved, for example, a threat, when would

21  you involve LP in that investigation?

22  A     Immediately.

23  Q     Would you wait until you had evidence that there was an

24  actual threat made?

25  A     (Indiscernible) --
```



1    MR. JACKSON:  Objection.  Leading.

2    JUDGE GREEN:  Overruled.

3    Q    BY MS. BUFFALANO:  You can answer.

4    A    Can you please repeat the question?

5    Q    Yeah.  Would you -- my question is, would you wait until

6    you had sort of confirmed that a threat had been made?

7    A    No.  When we have allegations of potential violence, the

8    standard practice is to loop LP in immediately.  I mean,

9    they're responsible for, like, the protection of people and

10   product.  So if there's any risk to either of that, they get

11   looped in immediately.

12   Q    Okay.  And what if it was a case involving harassment?

13   A    We would loop the loss prevention team in, same as before.

14   When we're made aware of it, when the initial report is taken

15   in, we would want to loop loss prevention in.  Harassing

16   behavior would be classified similar to that of violence where

17   we're looking at the protection of people.

18   Q    Are you aware of any document that explains this?

19   A    No.

20   Q    What is -- so loss prevention is looped in.  What's their

21   role?

22   A    To help assist in an investigation and evaluate risk.

23   Q    What do you mean when you say risk?

24   A    I guess potential harm to themselves or another employee,

25   or, I guess, posing a risk to the building and having an



```
 1    individual in there, based on some of the circumstances
 2    outlined before with, like, safety of people and product, and
 3    like, if a situation occurs where it could potentially pose a
 4    risk to the well-being of others, loss prevention would be
 5    involved in it.
 6    Q    Okay.  And does loss prevention make recommendations in a
 7    case?
 8    A    Yes.
 9    Q    And what kind of recommendations do they make?
10    A    It would depend on, I guess, what step we're at in the
11    investigation and what kind of materials are collected.  But
12    they can make a recommendation to suspend an employee if we're
13    pending more information, they can make a recommendation on
14    some level of feedback based on what's substantiated up and
15    including separation of employment, or they can make a
16    recommendation that no action is needed if we were unable to
17    substantiate a case.
18    Q    Can loss prevention fire an associate?
19    A    No.
20    Q    Who typically makes decisions to fire associates?
21    A    It's typically a partnership based on those that are
22    involved in conducting the investigation, whether it's loss
23    prevention, HR, and safety.  And then ultimately that
24    recommendation would go to the operations team who oversees the
25    individuals.
```



1    Q    Okay.  Are you familiar with Gerald Bryson?

2    A    Yes.

3    Q    And are you familiar with Dimitra Evans?

4    A    Yes.

5    Q    And -- are you -- so are you familiar with them because

6    you were involved in the April 6th, 2020, investigation into

7    the incident?  Well, the investigation into the April 6th,

8    2020, incident between the two of them?

9    A    Yes.

10   Q    Can you tell us how you became involved in that

11   investigation?

12   A    I remember that Christine Hernandez, who was my HR manager

13   at the time, had come to me and told me that an incident

14   happened in the parking lot.  She didn't really provide much

15   detail, but she said that something happened to Dimitra Evans,

16   and that she asked if I could follow up as HR to see if the

17   employee was okay, or if there was anything that we could help

18   with.

19   Q    Did she say who the other person involved was?

20   A    I don't remember.

21   Q    Do you remember what time you talked to her?

22   A    I believe it was shortly after lunch somewhere, probably

23   between, like, 12:30 and 1:30, but I don't remember an exact

24   time.  I know it was shortly after our employee lunch period,

25   which is around that time.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And was it -- the conversation you had with Mr.

2    Hernandez, was it on April 6th?

3    A    Yes.

4    Q    Do you know -- or did Christine tell you where she got

5    this information?

6    A    Not that I remember.

7    Q    And what did you do after your conversation with

8    Christine?

9    A    I reached out to Ms. Evans' manager and asked if she could

10   come down to the main office so that I could speak with her.

11   Q    About how long after you talked to Christine did you call

12   Ms. Evans' manager?

13   A    Right after.

14   Q    And did Ms. Evans come down to your office -- or to the HR

15   office?

16   A    Yes.

17   Q    About how long after you called her manager did you think

18   she came down to your office?

19   A    It was relatively quick.  I don't remember an exact time,

20   but I would have to say probably like 15 minutes.  It was a

21   reasonable amount of time.

22   A    And where did you meet with her?

23   Q    So we went to an area across from the main breakroom that

24   had tables, because there wasn't any space in the main office,

25   and the individual offices, so we went to a space where there



Exhibit E, Motion to Try Petition on Hearing Record

1    were tables that allowed us to socially distance across from

2    the main office.

3    Q     Who was there during the conversation?

4    A     Myself and Ms. Evans.

5    Q     What did she tell you -- so can you tell us about the

6    conversation?

7    A     Yeah.  So I asked Ms. Evans, I told her that I was made

8    aware that something had happened to her during break and asked

9    her if she was okay.  And then she followed up with, like, by

10   saying, oh, yeah, the incident that happened in the parking

11   lot.  And mentioned something along the lines of him being

12   dumb, and that some guy in a pink do-rag had been making

13   comments at her as she was on her break smoking a cigarette.

14   Q     Did you ask her any questions?

15   A     I asked her what was said, and again, if she was okay.

16   And she mentioned that the individual in the pink do-rag was

17   using, like, vulgar language towards her and using a megaphone.

18   If I recall the specifics, she said that he used a megaphone to

19   call her a bitch.  And then he also called her the n-word,

20   which she seemed kind of confused about by saying that she

21   was -- she was white.  And I believe -- I believe she also said

22   that he called her the c-word and made references to her being

23   on drugs.

24   Q     Did she say anything else?

25   A     I know I talked to her about, like, how the situation



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   played out and how it ended, and she mentioned that the

2   security team was telling her to ignore him and to go inside,

3   and that after she'd finished smoking her cigarette she walked

4   away and went inside.

5   Q    Did you take any notes of your conversation with her?

6   A    I had her -- no, I didn't.  I had her write a statement of

7   her recollection of the events after we spoke.

8   Q    And were you -- how did she write her statement?  Like,

9   did you ask her to do it, and she came back with it, something

10  else?

11  A    So typically what I'll do, and what happen in this case,

12  is that I'll provide the statement to the employee, give them

13  the, like, the statement form and a pen and let them know that

14  I'll check back in on them in five or so minutes to give them

15  some time to write in privacy.  And that's what I did with Ms.

16  Evans.  And when I came back, she had finished writing her

17  statement.

18  Q    And what did you do when you got back and she had finished

19  writing her statement?

20  A    Read through it.

21       MS. BUFFALANO:  Okay.  Can you, Mr. Falk, show us

22  Respondent's Exhibit 10, please?

23       MR. FALK:  Yes.

24       MS. BUFFALANO:  Thank you.

25  Q    BY MS. BUFFALANO:  Okay.  So take a second to look at



Exhibit E, Motion to Try Petition on Hearing Record

1    this, Mr. Grabowski.  And I'm going to ask you a couple of

2    questions about it, so let me know when you're ready.

3    A    Okay.

4    Q    Excuse me.

5    A    Okay.  I read it.

6    Q    Okay.  And there is a second page.

7         Mr. Falk, would you mind scrolling, just so we can see the

8    whole document.

9    A    I read it.

10   Q    And is this the statement that Ms. Evans wrote that day on

11   April 6th when you met with her?

12   A    Yes.

13   Q    And this is a fair and accurate representation of the

14   statement that you saw on that day on April 6th; is that right?

15   A    Yes.

16   Q    Okay.  So you -- and you can just leave this up for a

17   minute Mr. Falk.  So you took the statement, you read, and then

18   what did you do?

19   A    Read through it, made sure it was aligned with the

20   conversation that Ms. Evans and I had.  And then Ms. Evans went

21   back to work.

22   Q    Okay.  If you look at this statement, and let me know if

23   you need another second to do that, but you'll see that there's

24   nothing specific in this statement related to references to her

25   being on drugs.  Would you agree with that?



1    A    Yes.

2    Q    Okay.  Did you recognize that when you read the statement

3    on April 6th in Ms. Evans' presence?

4    A    I can't recall specifically.  But I think that in looking

5    at this, she does reference slurs, so at the time, that could

6    have been, like, to my knowledge, what she was talking about in

7    terms of the drug references, in telling people, like, she had

8    mentioned that he was yelling to test her, that she looked like

9    she was on drugs, and that Amazon was hiring druggies.  And I

10   think at this point, she did capture in her statement that he

11   called her the n-word, he called her the b-word.  And when she

12   initially made the report, I in speaking to her, was checking

13   in on her the see if she was okay, and these were the first

14   details of the incident that were provided to me.  So at the

15   time, I didn't necessarily know how big of a part the drug

16   references played in the actual communication, and was looking

17   more along the lines of the severity and the vulgar abusive

18   language that was outlined with the b-word, the n-word.  But

19   then in conducting the investigation, we later invol -- or

20   later was, I guess, made aware that the drug references were

21   heard by multiple witnesses and played a big part.

22   Q    Okay.  And you also said one other note, off of a similar

23   note, is that you testified that Ms. Evans told you that Mr.

24   Bryson called her a C; is that right -- the c-word; is that

25   right?



Exhibit E, Motion to Try Petition on Hearing Record

455

1     A     Yes.   In our conversation, she mentioned that.

2     Q     Okay.   And it -- you would agree that it is not in Ms.

3     Evans' statement here?

4     A     Yes.

5     Q     Okay.   And did you -- when you read it, did you follow up

6     with her about that?   Did you ask her about it?

7     A     Similar to -- no, I did not.   But similar to the drug

8     references, to me the, like, making slurs and comments towards

9     me, it was captured in that, along with the other words that

10    she did specifically spell out, in terms of him calling her a B

11    and the n-word.

12    Q     Did you ask Mr. Evans to change anything in her statement

13    after she had written it?

14    A     No.

15    Q     Did you ask Ms. Evans whether there were any witnesses

16    present?

17    A     Yes.

18    Q     What did she say?

19    A     I remember her telling me that there were members of the

20    security team that were present.   So she knew Paul Chierchio --

21    Chier -- Chierchio by name.   and then mentioned a blond female,

22    which we latter identified as Kaydee Bertone.

23    Q     Was that the only conversa -- oh, and you can put this

24    down -- take this down now, Mr. Falk.   Thank you.

25          Mr. Grabowski, was that the only conversation that you had



www.escribers.net | 800-257-0885

1    with Ms. Evans that day?

2    A    No.

3    Q    Can you tell us when you spoke to her next?

4    A    Relatively soon after, she went back to work.  She came

5    back down to the office maybe 15 minutes after I had talked to

6    her and let me know that when she went back to work one of her

7    co-workers approached her and said, was the reason you were in

8    HR because of what happened outside, if so, I saw what happened

9    while I was on my break, and I can -- I can, like, testify or

10   write a witness statement accounting what I saw.

11        MR. JACKSON:  Objection.  Move to strike.  This is

12   hearsay.

13        MS. BUFFALANO:  It is.  It's -- you don't have to take it

14   for the truth in the matter.  This is just the investigation

15   that the company went through.

16        MR. JACKSON:  Okay.

17        JUDGE GREEN:  No.  You can answer.

18        THE WITNESS:  What was the question?

19   Q    BY MS. BUFFALANO:  Were you done?  I think you were done.

20   A    Yeah.  I was done.

21   Q    Okay.  And did she tell you -- oh, but I'm going to ask

22   you another question.  Did she tell you who that person was?

23   A    Yes.

24   Q    And who was it?

25   A    Christopher Urso.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Who's Christopher Urso?

2    A    He is a Tier 3 hourly associate in a process assistant

3    position at Amazon JFK.

4    Q    Do Tier 3 associates have any direct reports?

5    A    No.  They are hourly employees.

6    Q    Thank you.  So you -- your -- Ms. Evans comes back, she

7    gives you the name of another witness, what is the next thing

8    that you do in your investigation?

9    A    I reached out to Christopher's manager and asked if he

10   could come down to the HR office.

11   Q    About how long after Ms. Evans identified Mr. Ursa do you

12   think you reached out to his manager?

13   A    Right away.

14   Q    And did he come to your office that day?

15   A    Yes.

16   Q    Okay.  And I'm saying your office, I know that you don't

17   have an office.  Did he come down to see you in the --

18   A    The main office.  Yes.

19   Q    And about how long after you reached out to his manager do

20   you think that he came to see you?

21   A    Similar time frame Ms. Evans.  Probably about 15 minutes.

22   I remember it being relatively quick.

23   Q    Okay.  And did you take a witness statement from Mr. Urso?

24   A    Yes.

25   Q    Where did you meet with him?



```
 1    A      In the HR manager office.

 2    Q      Can you tell us about the conversation?

 3    A      Yeah.  So I -- when -- when Mr. Urso came down to the

 4    office, I asked him what he saw, or what he witnessed.  I had

 5    mentioned that I -- it was brought to my attention that he had

 6    witnessed an incident that occurred outside.  And Mr. Urso --

 7           JUDGE GREEN:  Let me ask you -- I'm sorry, let me just ask

 8    you.  Is there any reason why we need more than that in a

 9    conversation about what Mr. Urso witnessed?

10           MS. BUFFALANO:  Why don't we do this.  What if we put

11    up -- I mean, I think the idea is just to understand, like,

12    from the person.

13           JUDGE GREEN:  Like, the investigation?  Right.

14           MS. BUFFALANO:  That, and -- Tyler's the only person who

15    actually spoke to the witness.  So to, like, understand, like,

16    what their demeanor was in the conversation.  But I can do

17    that --

18           JUDGE GREEN:  Oh, okay.

19           MS. BUFFALANO:  -- another way.

20           JUDGE GREEN:  Okay.

21           MS. BUFFALANO:  And why don't we do this?  Let's make sure

22    clear a little bit.

23           Can you, Mr. Falk, put up Respondent's Exhibit 9, please?

24    Q      BY MS. BUFFALANO:  So take a look at this and tell me when

25    you've reviewed it.
```



Exhibit E, Motion to Try Petition on Hearing Record

1   A    I read it.

2   Q    So in your discussion with -- I mean, let me ask you

3   first.  What did you specifically ask -- ask Mr. Urso?

4   A    I told him that it was brought to my attention that he

5   witnessed something that occurred outside during break, and if

6   he could share the details of what happened.

7   Q    Okay.  And did he tell you anything in that conversation,

8   that you can recall, that is not in this witness statement?

9   A    No.

10  Q    Okay.  Can you tell us what Mr. Urso's demeanor was

11  during -- well, as he was recounting the incident?

12  A    He was, like, in shock that someone could talk to another

13  individual like that.  He said that the reason that he brought

14  it to -- or like, that he had to say something was because,

15  like, in hearing that, he would -- he just felt, like,

16  extremely bad for her.  He said that, like, she was being put

17  down in front of everyone else.  And he -- he just didn't

18  understand how an individual could talk to someone else like

19  that.

20  Q    Try --

21  A    He said it really bothered him.

22       MR. JACKSON:  Objection.  Relevance.

23       JUDGE GREEN:  Overruled.

24  Q    BY MS. BUFFALANO:  Do you have any -- Mr. Grabowski, do

25  you have any notes on this interview?



# Exhibit E, Motion to Try Petition on Hearing Record

1   A    No.

2   Q    Okay.  Do you remember whether you specifically asked Mr.

3   Urso whether he recalled what Ms. Evans recalled, the "N" word,

4   the "B" word, and the "C" word?

5   A    I would've asked him each of those, because I had been

6   aware of them by Ms. Evans at the time.  And just see if he

7   could -- or if he recalled hearing either of the things that

8   she alleged.

9   Q    Okay.  Do you remember --

10       MS. BUFFALANO:  And you can take this down, please.

11       Thank you so much, Mr. Falk.

12   Q    BY MS. BUFFALANO:  Okay.  So you -- did you obtain -- so

13   we've talked about Mr. Urso, did you obtain any other witness'

14   statements?

15   A    Yes.

16   Q    Do you remember from who?

17   A    Yes.  I got a statement from Shaianna Donaldson, Maciej

18   Curlej, Paul Chierchier -- Chierchio -- o, and Kaydee Bertone.

19   Q    Okay.  Thank you.  do you remember who you met with

20   after -- next, after Urso?

21   A    I believe it would've been Maciej or Shaianna.

22   Q    Okay.  All right, let me ask you first about your

23   conversation with Maciej, then.

24       MS. BUFFALANO:  Can you show me, Mr. Falk, please,

25   Respondent's Exhibit 12?



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MS. BUFFALANO:  Do you recognize this, Mr. Grabowski?

2    A    Yes.

3    Q    Okay.  And this is Maciej's statement submitted in the

4    investigation into the April 6th, 2020 incident?

5    A    Yes.

6         MR. KEARL:  Leading.

7         MS. BUFFALANO:  I'm sorry, did someone say something?

8         JUDGE GREEN:  Yep, somebody say something?

9         MR. KEARL:  Yeah.  I just objected to the leading

10   statement about what this document was.

11        MS. BUFFALANO:  I think this a preliminary matter at this

12   point.  But I'm happy to ask more.

13        JUDGE GREEN:  Overruled.

14   Q    BY MS. BUFFALANO:  Can you tell me how, Mr. Grabowski, how

15   did you come to take this statement from Mr. Curlej, or how did

16   you come to communicate with him about the incident?

17   A     I spoke to him in our senior operations office, in the

18   main office of the facility, about the correct action of the

19   events.

20   Q    Who else was at that meeting?

21   A    It was myself and Maciej.

22   Q    And I actually don't think I asked you that for Mr. Urso.

23   Can you tell me if anyone else was present at your -- when you

24   met with Mr. Urso?

25   A    There was not.  It was just myself and Mr. Urso.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  So if you can take a look at this email from Mr.

2    Curlej to you.  Can you tell me if there was anything in the

3    conversation you had with Mr. Curlej about the incident that is

4    not included here in this email?

5    A    No.

6    Q    Okay.  And did you take any notes of the conversation you

7    had with Mr. Curlej?

8    A    No.

9    Q    Can you tell us what Mr. Curlej's demeanor was when he was

10   just explaining what he witnessed to you?

11   A    I don't remember, specifically.

12   Q    Did Mr. Curlej provide a -- a statement to you while you

13   were sitting with him?  So this is Mr. Curlej's statement from

14   Monday, April 6th at 6:10 p.m. it looks like.  Is that when you

15   met with him?

16   A    No.  I met with him earlier in the day and he sent this

17   afterwards.

18   Q    And why didn't you take a statement from him like you did

19   with Urso and Evans?

20   A    So with Urso and Evans, they're hourly employees and not

21   in a leadership position, so they don't have access to their

22   Amazon email.  So we have them document it while they're in

23   person.  But with Maciej, and similar to some of the others

24   that were in -- I guess, interviewed during the investigation,

25   they do have access to their Amazon email, in which we can have



# Exhibit E, Motion to Try Petition on Hearing Record

1     it, like, time-stamped and have their signature on it

2     electronically.

3          JUDGE GREEN:  I'm sorry.  Can we go off the record for

4     just two minutes?  Off the record.

5     (Off the record at 3:09 p.m.)

6          JUDGE GREEN:  I'm -- I'm sorry.  I just -- I'm getting

7     some mis -- some noise in the -- in the house.  It sounds like

8     an alarm's going.  Off the record.

9     (Off the record at 3:11 p.m.)

10         JUDGE GREEN:  Give me one more.

11    (Off the record at 3:12 p.m.)

12         MS. BUFFALANO:  Okay.

13                    **RESUMED DIRECT EXAMINATION**

14    Q    BY MS. BUFFALANO:  Mr. Grabowski, how did you identify Mr.

15    Curlej as a witness to this event, or how'd you end up talking

16    to him?

17         MR. JACKSON:  Your Honor, at this point, I'd just like to

18    interpose and remind for the record that we have a standing

19    objection, Bannon-Mills grounds, to the extent that a complete

20    production of investigatory documents was not provided.

21         JUDGE GREEN:  Okay.  Understood.

22    Q    BY MS. BUFFALANO:  So Tyler, I'm going to ask you a

23    question again, unless you know what it was?

24    A    It was -- it was brought to my attention that he witnessed

25    the incident.  I believe Christine Hernandez was the one who



1     told me.

2     Q    Okay.  Okay.  Do you remember what -- who you talked to

3     next in your investigation after you talked to Maciej?

4     A    Shaianna.

5     Q    Okay.

6         MS. BUFFALANO:  Can you, Mr. Falk, put up Respondent's

7     Exhibit 13?

8     Q    BY MS. BUFFALANO:  Okay.  And have you seen this document

9     before, Mr. Grabowski?

10    A    Yes.

11    Q    And what is this?

12    A    This is Shaianna Donaldson's recollection of the events

13    from what she witnessed.

14        MR. KEARL:  Objection.  Insofar as, they're -- this

15    document is hearsay.

16        JUDGE GREEN:  Right.  So I'm not accepting any of the

17    witness' documents for the truth of what happened in the

18    parking lot.  They are hearsay.  I don't think they fall within

19    the business record exception.  But I'm, you know, but there is

20    an outstanding Bannon-Mills objection.  Otherwise, they're

21    going to be admissible as evidence of the investigation.

22    Q    BY MS. BUFFALANO:  Okay.  So can you tell us how you came

23    to identify Ms. Shaianna as person to interview in this

24    investigation?

25    A    It was brought to my attention, I believe, by Christine



1    Hernandez, yeah.

2    Q    Do you remember when you talked to Shaianna?

3    A    I don't know the exact time.  It was on the afternoon of

4    4/6/2020.

5    Q    Where'd you talk to her?

6    A    In the HR training room.

7    Q    Was anyone else there?

8    A    No.

9    Q    And if you take a look at her witness statement, can you

10   tell us whether or not she told you anything in your interview

11   with her that is not included in her witness statement?

12   A    They're not.

13   Q    And did she -- how did you come to get this Respondent's

14   Exhibit 13?

15   A    It was --

16   Q    When did she -- when did she do it?  How did you get it?

17   A    It was sent to me by Shaianna.

18   Q    Did you make any notes of your conversation with her?

19   A    No.

20   Q    And what was -- what was Ms. Donaldson's demeanor when she

21   was discussing the incident?

22        MR. JACKSON:  Objection.  Relevance.

23        JUDGE GREEN:  Overruled.

24        THE WITNESS:  So I could answer?

25        MS. BUFFALANO:  Oh, yes, I'm sorry.



1    JUDGE GREEN:  Yes.

2    A    She was -- she was animated and surprised at what had been

3    said.  Like, her -- when she was talking about it and she's,

4    like, like, "oh, the incident that happened in the parking

5    lot?"  And her eyes, like, widened.  And she was, like, she

6    was, like, "that was crazy.  Like, he was calling her a

7    crackhead.  He was calling her a druggie.  Like, I -- I was in

8    shock that someone would say that."  It just, like, stands out

9    to me how animated she was in recalling the events.

10   Q    BY MS. BUFFALANO:  Did you understand, based on what

11   you're describing, that how did you understand her to have

12   received it?  Like, it's hard to under -- just from what you're

13   saying, it's hard to, like, it seem -- understand whether she

14   was, like, happy about that, sad about, thought it was funny?

15   A    No.

16   Q    What was the --

17   MR. JACKSON:  Objection.  Calls for speculation.

18   JUDGE GREEN:  If you know?

19   A    Yeah, she was -- I mean, she was completely surprised and

20   like, not in a good way.  Like, it was, like, shock that

21   someone would talk to someone like that.  And if I'm recalling

22   correctly, I think that she said, like, her, like, mouth even

23   dropped when she -- when she saw it hap -- or heard what was

24   happening.

25   MR. JACKSON:  Objection.  Move to strike.  It's



www.escribers.net | 800-257-0885

1   speculative.  Lacks foundation.

2       JUDGE GREEN:  This is just -- I'm just accepting it as

3   from Mr. Grabowski's impression of what was said.  It's not

4   what -- what the witness herself thought about it really is not

5   going to be relevant.

6   Q   BY MS. BUFFALANO:  What did you ask Ms. Donaldson to put

7   into a witness statement?

8   A   What she witnessed and her recollection of the events that

9   happened while she was outside that day.

10  Q   Did you ask all the witnesses -- let me just ask you this.

11  Did you ask all the witnesses to do the same thing, what you

12  just described, or did you give them, sort of, different ideas

13  of what they should be recording in a witness statement?

14  A   No.  I asked them the same thing, their recollection of

15  the fact -- or like, their recollection of what the witnessed,

16  as well as the conversation that we had, which for each of the

17  individuals would've included the allegations that Ms. Evans

18  mentioned, or that the other witnesses mentioned in the

19  progression of the investigation.

20  Q   Okay.  And can you tell me --

21      MS. BUFFALANO:  No, I'll withdraw that.

22      Mr. Falk, you can take the -- the exhibit down.  Thank

23  you.

24  Q   BY MS. BUFFALANO:  Mr. Grabowski, who did you speak to

25  next in your investigation?



1    A    Kaydee Bertone.

2         MS. BUFFALANO:   And Mr. Falk, can you put up Respondent's

3    Exhibit 11, please?

4    Q    BY MS. BUFFALANO:   Okay.   So can you tell me how you came

5    to speak with Kaydee?

6    A    She was named as a witness by Ms. Evans.

7    Q    And when did you speak to her?

8    A    On April 6th.

9    Q    And where did you speak to her?

10   A    At the security area at the front of the building.

11   Q    Is that where she works?

12   A    Yes.

13   Q    Was anyone else there for your conversation?

14   A    No.

15   Q    Did you take notes of the conversation?

16   A    No.

17   Q    Can you take a second to look at this statement that is

18   Respondent's Exhibit 11?   And let me know when you've reviewed

19   it.

20   A    I finished.

21   Q    Okay.   So did you talk substantively with Ms. Bertone

22   about the incident when you met with her on April 6th?

23   A    Yes.

24   Q    And did Ms. Bertone say anything to you about the incident

25   that is not included here in her email to you?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    And did Ms. Bertone write this statement to you, like,

3    contemporaneous with your meeting with her?

4    A    What do you mean?

5    Q    Did she -- do you know when she -- well, she sent this

6    statement to you, it looks like from the email, at 7:46 p.m.

7    Is that when you met with her?

8    A    No.  I met with her earlier.

9    Q    Okay.  So she didn't give you a statement at the time you

10    met with her?

11    A    She said that she was going to type it up and send it to

12    me.

13    Q    Can you tell me what -- what Ms. Bertone's demeanor was

14    when she was describing the incident to you?

15    A    Surprised.  She mentioned that she felt bad for the

16    employee.  And -- yeah, that was -- that was about it.  She --

17    she was surprised and -- and didn't understand, like, how

18    someone could say that.  And she said that they were just, kind

19    of, guiding, like, the security team was advising her to go

20    inside.  And -- and she finished smoking her cigarette and --

21    and did just that.

22    Q    And when you say they were going -- that you didn't

23    understand -- she didn't understand how someone could say that,

24    you mean, how Mr. Bryson could say that, or Ms. Evans could say

25    that?



# Exhibit E, Motion to Try Petition on Hearing Record

```
1    A    How Mr. Bryson could say that.

2    Q    And when you said, she said that she felt bad for the

3    employee, was she talking about Mr. Bryson or Ms. Evans?

4    A    Ms. Evans.

5    Q    And why didn't you take a witness statement from Kaydee

6    Bertone, like, when you met with her?

7    A    Similar to the other members of leadership.  She has

8    access to her Amazon email, which would have a time stamp and

9    who it's from when she sends it.

10   Q    Okay.

11        MS. BUFFALANO:  And can you scroll down, Mr. Falk, just a

12   little bit?  Thank you.

13   Q    BY MS. BUFFALANO:  Do you see, Mr. Grabowski, underneath,

14   it says, "Kaydee Bertone, security server -- supervisor".  And

15   then, underneath that, it says, "Jonathan Paria, security

16   guard".  Do you see that?

17   A    Yes.

18   Q    Do you know who Jonathan Paria is?

19   A    One of the security guards.

20   Q    Do you understand that he was there on April 6th and

21   witnessed the incident?

22   A    No.

23        MR. JACKSON:  Objection.  Leading.

24        JUDGE GREEN:  Overruled.

25   Q    BY MS. BUFFALANO:  You can answer it, Tyler.
```



1    A    No.

2    Q    So you don't know, or you understand that he was not

3    there?

4    A    I have -- I -- I don't know.  I mean, it wasn't made aware

5    to me.  It wasn't brought to my attention.

6    Q    Okay.  So what's your understanding of why his name is

7    here at the bottom?

8    A    I don't know.

9    Q    Okay.  And whose statement do you understand this

10   Respondent's 11 to be?

11   A    Ms. Bertone.  It matches the recollection of the incident

12   that she conveyed as her memory of the event when I talked to

13   her.

14   Q    Okay.  So that leaves one statement, and according to the

15   list of individuals that you identified as having met with, and

16   that's Paul Chierchio; is that right?

17   A    Yes.

18   Q    Okay.  Do you recall any other witnesses besides the ones

19   that we've talked about and Paul that you interviewed?

20   A    No.

21   Q    Okay.  So let me show you Respondent's Exhibit 8.

22        MS. BUFFALANO:  Please, Mr. Falk?

23   Q    BY MS. BUFFALANO:  Okay.  Did you speak with Mr.

24   Chierchio?

25   A    Yes.



1   Q    When did you speak with him?

2   A    On April 7th, in the morning.

3   Q    Why didn't you speak with him on April 6th?

4   A    He had already left for the day when I went to the

5   security area.

6   Q    And when you went to the security area to talk to Ms.

7   Bertone?

8   A    Yes.  They both work in the same area.  And Ms. Bertone

9   was there, but Mr. Chierchio had left for the day.

10  Q    And where did you speak with Mr. Chierchio?

11  A    I believe at the security area.

12  Q    Did you talk to him substantly -- substantively about the

13  incident?

14  A    Yes.

15  Q    Okay.  And take a look at Respondent's Exhibit -- I think

16  we're on 9 -- 8, and tell me whether Mr. Chierchio said

17  anything to you in your conversation with him that is not

18  included here in his witness statement -- or in this email?

19  A    I'm good.

20  Q    Okay.  So did Mr. Chierchio say anything to you in your

21  conversation with him that is not included in his witness

22  statement here?

23  A    No.

24  Q    How did you come -- sorry.  That was no?

25  A    No.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q     How did you come to receive a -- this -- this statement of

 2    Mr. Chierchio?

 3    A     It was sent to me by Geoff Gilbert-Differ.

 4    Q     Did you ask Mr. Chierchio to send you a witness statement?

 5    A     Yes.

 6    Q     Okay.  But it looks like he didn't; is that right?

 7    A     No.  He mentioned that he had already sent it to Geoff,

 8    and that he would have Geoff send it to me.

 9    Q     Okay.  So the witness statements that you've looked at

10    today, are these the same witness statements that you reviewed

11    during the investigation of the April 6th incident?

12    A     Yes.

13    Q     And in each case where you have a witness statement that

14    was sent by email, so that's Kaydee Bertone, Paul Chierchio,

15    and Maciej Curlej, did you ask them to send you witness

16    statements?

17    A     Yes.

18    Q     And did you give the same instruction to them about what

19    you wanted them to tell you as you gave those that you met with

20    live?

21    A     Yes.

22    Q     Okay.

23          MS. BUFFALANO:  And you can take this down.  Thank you.

24          Okay.  I'm going to move on to the next topic.  Can we

25    take a five-minute bathroom break?
```



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Yes.

2      MS. BUFFALANO:  Very good.

3      JUDGE GREEN:  Off the -- off the record.

4   (Off the record at 3:29 p.m.)

5      JUDGE GREEN:  On the record.

6                 **RESUMED DIRECT EXAMINATION**

7   Q    BY MS. BUFFALANO:  Okay.  Mr. Grabowski, so you've taken

8   initial witness statements.  What's the next thing that you do

9   in your investigation?

10  A    I send the information to Christine Hernandez, Bradley

11  Campbell, and Geoff.

12  Q    Okay.  And is Geoff, Geoff Gilbert-Differ?

13  A    Yes.

14  Q    Okay.  And let's start there.

15     MS. BUFFALANO:  Can you, Mr. Falk, show us Respondent's

16  Exhibit 105?

17     MR. FALK:  And can you share the Bate (sic) numbers for

18  these documents?  The other ones I have, but.

19     MS. BUFFALANO:  1353 for this one.

20  Q    BY MS. BUFFALANO:  Okay.  So do you -- have you seen this

21  document before?

22  A    Yes.

23  Q    What is it?

24  A    This is my email to Geoff, outlining the individuals that

25  were mentioned as being involved.  What they -- like, how they



1    were involved.  And then, a summary of the events -- or a

2    summary of -- of the incident that happened.

3    Q    Okay.  And can you tell me why you sent this -- these

4    statements to Geoff Gilbert-Differ?

5    A    Because there was an alleged threat when Ms. Evans said

6    that Mr. Bryson mentioned, "come over here and I will make you

7    shut up."

8    Q    Okay.  And that's -- and you said evidence from Ms. Evans?

9    A    Yes.

10   Q    Okay.  And it looks like on -- if you look at the top of

11   this email, it says from grabtyleramazon.com (phonetic); is

12   that you?

13   A    Yes.

14   Q    And to ggeoffer@amazon.com (phonetic); is that Geoff

15   Gilbert-Differ?

16   A    Yes.

17   Q    Okay.  And then, there's a copy to JFK8-HRBP; do you see

18   that?

19   A    Yes.

20   Q    Who's that?

21   A    The HR leadership team.  So HR Business Partners, HR

22   managers, senior HR manager.

23   Q    Okay.  And why are they copied?

24   A    Just for visibility.

25   Q    Is that typical?



```
 1    A     Yes.  In situations where an HR business partner is

 2    conducting an investigation, that is a situation, like,

 3    mentioned earlier with complex facts, or that were -- were

 4    escalating, typically, we'll copy the entire HR leadership team

 5    for visibility and tracking.

 6    Q    Okay.  And the subject line, did you -- that's your -- you

 7    create -- your creation?  You authored it?

 8    A     Yes.

 9    Q    Okay.

10         MS. BUFFALANO:  And I think we've offered this on Geoff's,

11    and I think you reserved a decision on that.

12         JUDGE GREEN:  Let me see.

13         MS. BUFFALANO:  That's on --

14         JUDGE GREEN:  105?  Yes, I did.

15         MS. BUFFALANO:  Okay.

16         So you can take this down, Mr. Falk.  And if you wouldn't

17    mind putting up Respondent's Exhibit 17?

18         MR. FALK:  Okay.

19         MS. BUFFALANO:  Thank you.

20    Q    BY MS. BUFFALANO:  Okay.  So take a look at this document.

21         MR. FALK:  Can you share the -- the Bate (sic) number for

22    this as well?

23         MS. BUFFALANO:  Oh, yes.  1361.

24    Q    BY MS. BUFFALANO:  Okay.  So can you take a look at this,

25    Mr. Grabowski?
```



1    A    Yes.

2    Q    Okay.  And have you seen this document before?

3    A    Yes.

4    Q    And what is this?

5    A    Similar to the email that was sent to Geoff.  It's an

6    email to Bradley outlining the different members that were

7    involved in the situation that we spoke to in collecting

8    statements.  What their role was in the incident.  And then, a

9    summary of what was alleged.

10   Q    Okay.  And at the top, obviously this I from you, is that

11   right?

12   A    Yes.

13   Q    Okay.  And then it looks in the to line, like, Bra --

14   like, there's a Bradley Campbell; is that right?

15   A    Yes.

16   Q    Okay.  And I don't see Christine Hernandez on here; do

17   you?

18   A    Christine is part of the JFK8-HRBP (indiscernible).

19   Q    Yeah.  Got it.  Okay.  And can you tell us who Bradley

20   Campbell is?

21   A    He, at that time during March, April 2020 was the regional

22   HR manager of JFK8.

23   Q    And why did you send him the -- this email?

24   A    To review and for guidance.

25   Q    What did you understand -- at the time you sent his email,



1    what did you understand his role to be?

2    A    To review and make a recommendation based on the findings.

3    Q    Okay.  And was he goin -- he was going to make -- you said

4    based on the findings, who was going to make a decision on the

5    findings?

6    A    Oh, I'm not sure I understand the question.

7    Q    And so when you -- you said to me Bradley's role would be

8    to review and make a recommendation based on the findings.  I

9    guess, let me ask you this.  What did you mean when you said

10   the findings?

11   A    Like, the witness statements, what was substantiated,

12   the -- out of the allegations in speaking with each of the

13   witnesses.

14   Q    Okay.  And who was going to decide -- make the decision,

15   like, this was substantiated, or this wasn't substantiated?

16   A    I don't know.

17   Q    Okay.  But not you, sounds like.

18   A    No.

19   Q    Okay.  And do you -- is it -- understanding escalations

20   are all -- are you know, escalations, but is it your standard

21   practice to involve Mr. Campbell in the investigative process

22   of associate misconduct?

23   A    It's a standard practice to, I guess, communicate and

24   escalate situations with complex concerns or that we're looking

25   for guidance based on unique facts.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Do you know why this ca -- in this case, you were working

2    with Mr. Campbell?

3    A    The behavior, or I guess, like the situation involved

4    someone who was involved in a demonstration at the time that

5    the incident occurred.  And it wasn't something that we had

6    ever seen at this site level before where someone was involved

7    in an investigation or this kind of behavior and misconduct

8    while demonstrating in an activity.  And we know that -- I

9    mean, I know that there is like laws or guidance around what

10   can and can't be said and addressed.  So we wanted to make sure

11   that we were having it reviewed at a higher level.

12   Q    Okay.  Okay.

13        MS. BUFFALANO:  Let me -- and you can take this -- oh,

14   well, before you move on from this, I'm going to move for the

15   admission of Respondent's Exhibit 17.

16        JUDGE GREEN:  Any objection.

17        MR. JACKSON:  Yes, the Bannon-Mills objection.  And it's

18   also hearsay to the extent if used for the matter -- the truth

19   of the matter asserted.

20        JUDGE GREEN:  Okay.  So I agree that it's -- it's

21   hearsay -- it's hearsay to the extent that it -- it includes

22   witness accounts.  And there's no hearsay exception as a

23   business record.  I think that it will be relevant to the

24   investigation, but I'm reserving ruling pursuant to the

25   outstanding Bannon-Mills objections.



1  MS. BUFFALANO: So is it -- can we ask, Judge Green, what

2  the Bannon-Mills objection is? I'm not sure I understand.

3  JUDGE GREEN: So let me -- let me say it just to make sure

4  I -- I understand it correctly. As far as I know, the General

5  Counsel and the Charging Party are contending that the

6  Respondent has not produced investigation documents. I -- I

7  assume this is paragraph 18 of the original GC subpoena. And

8  to the -- to the -- these have all been produced. I take it,

9  these all have Bates numbers, correct? And these -- all these

10  documents have been produced. So to the extent I understand

11  the General Counsel's and the Charging Party's theory, it's

12  that not all the documents have been produced. And therefore,

13  none should be admitted on the same subject matter. Am I

14  correct about that, Mr. Jackson? You're on mute.

15  MR. JACKSON: That's correct, Your Honor. And we intend

16  to submit a written document to -- to Your Honor explaining our

17  position on that precisely.

18  JUDGE GREEN: Okay. And -- and -- and I'm going to have

19  some comments about it at the end of the day. But I'd rather

20  not do that while we have Mr. Grabowski, who's already been

21  here a couple of days already.

22  MS. BUFFALANO: Okay. And we'll -- at the end -- that

23  will be very helpful because of course, we've produced all of

24  the investigative documents. So what -- what exactly is

25  they've -- they're alleging we have not provided, I don't know.



Exhibit E, Motion to Try Petition on Hearing Record

1    But we can talk about that at the end of the day.

2        JUDGE GREEN:  Okay.

3        MS. BUFFALANO:  Okay.  Thank you.  Okay.  So you can take

4    this exhibit down, Mr. Falk.  Thank you.

5    Q    BY MS. BUFFALANO:  All right.  Mr. Grabowski, are you

6    aware that Mr. Bryson's badge was suspended?

7    A    Yes.

8    Q    Do you know who made the decision to suspend Mr. Bryson's

9    badge?

10   A    No.

11   Q    Were you involved in the decision to suspend Mr. Bryson's

12   badge?

13   A    No.

14   Q    Do you know what the typical process is to suspend a

15   badge -- an associate badge?

16   A    Well, typically if there's any ongoing investigation where

17   there's any potential risk to have an employee on site, so

18   similar to how I -- I mentioned earlier, there's any perceived

19   allegation -- or any allegations of perceived violence or like,

20   aggressive or harassing, where it's not, like, appropriate to

21   have an employee on site while the investigation is being

22   conducted, we would suspend the badge pending investigation,

23   where an employee is fully paid for any scheduled -- regular-

24   scheduled time that is missed as a result of the suspension.

25   Q    And are you typically -- like, are you involved on a --



1    are you typically involved in decisions of badge suspensions in

2    cases you investigate?  Like, are you --

3    A    (Indiscernible).

4    Q    -- you are you familiar with the process?

5    A    I mean, I think that the -- the badge suspension process

6    is kind of like, automatic or -- or like, second nature in

7    the -- in the sense that, like, if there is any, like,

8    perceived risk of having an employee on site interacting with

9    other individuals or any allegations of potential violence or

10   abusive behavior, we want to protect the safety and well-being

11   of our employees.  So it's -- it's a standard that we would

12   suspend the badge while we're conducting the investigation in

13   order to not necessarily negatively impact the -- the employee

14   that's being investigated.  We ensure that they're fully paid

15   for the time that is missed.

16   Q    And what's the trigger point?  So, like, you said, it's

17   somewhat automatic in certain cases.  Is the trigger, like,

18   it's a particular case or is it something else?

19   A    I'm -- I'm not sure, like, I understand.

20   Q    Okay.  Well, let me -- let me show you --

21        MS. BUFFALANO:  Can you show us Respondent's Exhibit 16,

22   Mr. Falk?  Sorry.  And thank you.

23   Q    BY MS. BUFFALANO:  Mr. Grabowski, have you seen this

24   document before?

25   A    Yes.



1    Q    And what is this?

2    A    This is an email I sent to the security team and loss

3    prevention team to suspend Mr. Bryson's badge.

4    Q    Okay.  So if you didn't make a decision or were involved

5    in the decision to suspend Mr. Bryson's badge, how did you come

6    to send this email?

7    A    I don't remember.  I mean, I don't know if it was

8    something where someone gave me the guidance or communicated it

9    to me.  But like I said, when -- when there is -- like, I'm --

10   I'm not sure who gave the guidance, but when there is a

11   situation where there is perceived risk to having an employee

12   on site, you would suspend them to protect the safety and well-

13   being of the rest of the employees.

14   Q    Okay.  Do you know why Mr. Bryson's badge was suspended in

15   this case?

16   A    I don't remember.

17   Q    Okay.

18   A    I mean, I -- I know there was a pending investigation

19   where there were alleged threats from Mr. Bryson to Ms. Evans

20   as well as abusive, vulgar, harassing language that was alleged

21   from Mr. Bryson to Ms. Evans.

22   Q    Okay.  And who -- like -- and I'm -- I'm not asking you a

23   specific person, but who typically makes the decision -- like,

24   who's actually deciding whether a badge gets suspended or not?

25   A    Could be HR, loss prevention.  Typically, it's made --



# Exhibit E, Motion to Try Petition on Hearing Record

1533

1     like, whoever's involved in conducting the investigation and

2     collecting the details.

3     Q     Okay.  Okay.  So in terms of -- I know you said you don't

4     remember who told you to send this email.  Do -- is there some

5     universe of people who are possible candidates for that

6     instruction?

7     A     It could have been Christine or Bradley or Jeff.  I think

8     the -- the three of those between HR and loss prevention is who

9     we were working with in communicating the witness statements,

10    the findings throughout the course of the investigation.  So I

11    would say that it was likely one of the three of them.

12    Q     Okay.  And is it -- so in this case, you were

13    investigating a case and someone -- one of the people you just

14    identified told you that the decision had been made to suspend

15    Mr. Bryson's badge.  Is that typical that you would be

16    investigating a case and then wouldn't be involved in the badge

17    suspension analysis or -- or the badge suspension portion of

18    the case?

19    A     I think it -- like, it depends on the situation, who's

20    evaluating and reviewing the material.  And in this case, we

21    had looped in.  Like Christine, Bradley, Jeff, were all aware

22    of the situation.  So I don't think that's uncommon that the

23    decision would have been made outside of myself.  I mean, in

24    this case, I was speaking to witnesses, collecting facts, but

25    passing the information along to higher levels for review.



Exhibit E, Motion to Try Petition on Hearing Record

1     Q     Okay.  And this -- so if you look at this email
2     Respondent's Exhibit 16, you see at the top, obviously, it's an
3     email from you and you identified that you send it to LP and
4     security.  I'm -- I'm guessing that JFK8 LP is the LP address;
5     is that right?
6     A     Yes.
7     Q     And JFK8 security at Amazon.com; who's that?
8     A     The security team.
9     Q     Okay.  And is like the people such as Paul Chierchio and
10    Kaydee Bertone, that security?
11    A     Yes.
12    Q     Okay.  And the date on it, April 10th, 2020 at 11:36 a.m.;
13    you see that?
14    A     Yes.
15    Q     Does that sound right to you in terms of when you sent
16    this email asking for Mr. Bryson's badge to be suspended?
17    A     Yes.
18    Q     Do you know when you received the instruction to have his
19    badge suspended?
20    A     I believe it was that same day.
21    Q     Do you know what Mr. Bryson's pay status was for the
22    period that he had his badge suspended?
23    A     It was fully paid for any of the scheduled shifts that
24    were missed.
25    Q     And was he actively working at that time?



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    Do you know why he wasn't working?

3    A    During March and April of 2020, during the onset of the

4    COVID-19 pandemic, Amazon put a pause on the attendance policy,

5    so that employees did not have to come to work if they did not

6    feel comfortable or safe, I guess, in being out and about.  So

7    they would not be held accountable for any scheduled days.  And

8    at that time, Mr. Bryson was taking full advantage of that

9    attendance policy pause.  So he had not been coming to work.

10   Q    And was he paid while he was out on this, you know, sort

11   of the leave as a result of the COVID pandemic?

12   A    No.

13   Q    Okay.

14        MS. BUFFALANO:  I'm going to move for the admission of

15   Respondent's Exhibit 16.

16        JUDGE GREEN:  Any objection.

17        MR. JACKSON:  Same Bannon-Mills objection, sir.

18        JUDGE GREEN:  Okay.  Same handling:  I'll reserve ruling.

19        MS. BUFFALANO:  Okay.  Mr. Falk, you can take this exhibit

20   down.  Thank you.

21   Q    BY MS. BUFFALANO:  Okay.  Do you know who communicated to

22   Mr. Bryson that his badge was being suspended?

23   A    I did.

24   Q    Okay.  And when was that conversation?

25   A    I don't remember the specific date, but it was in the same



Exhibit E, Motion to Try Petition on Hearing Record

1    conversation in which I conducted the seek-to-understand

2    conversation with Mr. Bryson.

3    Q    What's a seek-to-understand?

4    A    It's a conversation between a member of the leadership

5    team and an employee to gather facts or their account or their

6    side of a story of a certain incident.

7    Q    And so I think you said you don't recall the date; is that

8    right?

9    A    Yes.

10    JUDGE GREEN:  So Mr. Bryson, could you turn off your video

11    feed?  Thank you.

12    MS. BUFFALANO:  Okay.  So I'm going to ask, Mr. Falk, if

13    you could show us Respondent's Exhibit 18.  And this is 176,

14    177, Mr. Kearl.

15    Q    BY MS. BUFFALANO:  And Mr. Grabowski, take a look at this

16    document and tell me if this refreshes your recollection as to

17    when you met with Mr. Bryson and conducted this seek-to-

18    understand conversation.

19    A    Yes.

20    Q    And when was that?

21    A    April 10th.

22    Q    Okay.

23    MS. BUFFALANO:  You can take this down for a minute, Mr.

24    Falk.  We'll look at it in a few minutes.  Thank you.

25    Q    BY MS. BUFFALANO:  Can you tell us how you contacted Mr.



Exhibit E, Motion to Try Petition on Hearing Record

1    Bryson or came to communicate with him on April 10?

2    A    I called him over the phone.

3    Q    On like a cell phone -- like, on his cell phone?  I'm just

4    wondering what -- how you -- what the number was.

5    A    Whatever the personal number that Mr. Bryson had on file

6    with us at the time.

7    Q    Okay.  Did you reach him on the first try?

8    A    I believe so.

9    Q    Okay.  And can you tell us why you called him as opposed

10   to meeting with him in person?

11   A    At the time, as mentioned earlier, Mr. Bryson was not

12   actively coming to work for us to be able to speak with them on

13   site.

14   Q    Okay.  Okay.  And can you tell us sort of how the -- give

15   us -- like the conversation, how it began?  What you said --

16   A    I introduced myself as well as the operations team member,

17   Zachary Marc, and then the loss prevention specialist, Henry

18   Carbajal.  Explained who we were -- or noted who we were.  And

19   then mentioned to Mr. Bryson that we wanted to speak about an

20   incident that had occurred on the facility in the parking lot

21   on April 6th.  And wanted to ask some questions and get his

22   recollection of the event.

23   Q    What do he say to that?

24   A    Well, I don't remember specifically how he responded to

25   that, but he -- he was okay to talk and review the information.



Exhibit E, Motion to Try Petition on Hearing Record

1    And we went into some questions and got some information from

2    him.

3    Q    Okay.  So tell me before we move on, who -- who is -- I

4    think you said Henry Carbajal; is that right?

5    A    Yes.

6    Q    Okay.  And who's that?

7    A    A member of the loss prevention team.

8    Q    And why was Mr. Carbajal on the phone?

9    A    Loss prevention was looped in because of the alleged

10   threats that Ms. Evans had claimed that Mr. Bryson had said as

11   well as some of the harassing, vulgar, abusive language that

12   was alleged that Mr. Bryson had said.

13   Q    Is that common practice to have LP on the phone in a case

14   like that?

15   A    Yes.

16   Q    And what about -- I think you said, Zachary Marc; is that

17   right?

18   A    Yes.

19   Q    Who's that?

20   A    A member of the operations team.  At the time, was one of

21   our senior operations managers.

22   Q    Okay.  And is it common to have someone from operations on

23   a seek-to-understand call?

24   A    It depends or varies, I guess, based on the information

25   that we're looking to gather and the type of information.  And



1    I think at the time Mr. Marc was present because ultimately

2    operations plays a -- a role in the outcome or decision making

3    of any type of disciplinary action.

4    Q    Okay.  So let me show you what's been marked as

5    Respondent's Exhibit -- is that -- I apologize.

6        MS. BUFFALANO:  Is it 18?  Respondent's Exhibit 18?  Okay.

7    And can you, Mr. Falk, scroll down?  Okay.  And you can stop

8    here.

9    Q    BY MS. BUFFALANO:  And -- and Mr. Grabowski, tell me --

10   I'm going to show you this document.  So tell me if you want me

11   to like -- you know, if you want Mr. Falk to show you the whole

12   thing or how you want to see it that makes you comfortable

13   talking about it.

14   A    Um-hum.

15   Q    Let us know.  Or if you're good, you can tell us that,

16   too.

17   A    Yeah, I remember this document.  But could we -- could I

18   just take a second to read through it real quick?

19   Q    Yeah.

20       MR. FALK:  Do you want to start here or at the top of the

21   document?

22       THE WITNESS:  Start here.  That's good.  Thank you.

23       JUDGE GREEN:  Let me ask you.  Is -- is this -- are we

24   going to get more testimony regarding this conversation, phone

25   conversation with Mr. Bryson?



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  Well, he's going to tell us -- I'm going

2  to do similar to what I did with his witness statements.  Like,

3  I want to know what the -- so there's headlight -- there's

4  folding.

5    JUDGE GREEN:  You know what, I'd -- I'd rather actually --

6  this is actually a subject that it's in dis -- that might be in

7  dispute.  I'd rather get his testimony without having him read

8  what -- a summary of it.

9    MS. BUFFALANO:  Okay.

10    JUDGE GREEN:  He -- yeah.  I -- I -- yeah.  I'd rather get

11  a -- get his testimony without having -- reading a document

12  regarding what was said before he's testifying to that effect.

13  Okay?

14    MS. BUFFALANO:  Okay.  Okay.  Mr. Falk, thank you.

15  Q    BY MS. BUFFALANO:  All right.  So Mr. Grabowski, you told

16  us sort of how the conversation began.  Do you want to tell us

17  what your recollection is of the conversation?  What you said

18  to Mr. Bryson and what he said to you.

19  A    I walked him through a set lit of question -- or a set

20  list of questions that I had prepared based on what the other

21  witnesses and the victim had alleged in my prior conversations.

22  And walked through, I think, starting out his recollection of

23  how the incident played out, how the interaction started, what

24  was said from him to Ms. Evans, what was, if anything, said

25  back.  And then asking if there were any other witnesses or



# Exhibit E, Motion to Try Petition on Hearing Record

1    anyone that could recall his side of what had happened.

2    Q    So if we would just walk through them maybe.  What -- in

3    terms of it, what -- how the interaction started, what, if

4    anything, did he say about that?

5    A    He mentioned that there was -- there was someone that made

6    a comment while he was protesting.  Don't think -- I don't

7    think he -- I -- I think he said he didn't see them at first

8    and that they had made a comment about his mother, which

9    bothered him.  And then he started making comments about how

10   she looked like she was on drugs and that Amazon was hiring

11   druggies.  And he made mention -- I remember him mentioning

12   that he was peacefully protesting.  And the other individual

13   had engaged him in making a comment about the situation.  But

14   he had responded by saying that she looked like she was on

15   drugs.

16        And trying to remember specifically what was said.  I

17   think I remember asking him if he called her a bitch, which he

18   said he did.  And then I think I remember asking if he called

19   her the C word, which he denied.  I asked if he called her the

20   N-word, which he denied.  And then I asked if there was anyone

21   that he could recall that witnessed the situation.

22        And he mentioned that there was another female associate

23   that was with him in the parking lot and that if I -- he didn't

24   know who she was at the time, but if I gave him some time and

25   called back later, he would be able to identify her.  And then



Exhibit E, Motion to Try Petition on Hearing Record

1    I did call Mr. Bryson back later.  And he explained that he

2    wasn't able to identify who the individual was.

3    Q    Okay.  So just like, to back up a little bit on some --

4    some stuff that you said about the conversation.  Did you -- do

5    you recall him, Mr. Bryson, saying anything about the female

6    protester making any comments about his race?

7    A    No.

8    Q    About his -- about where he was from?

9    A    No.  Nothing along those lines were said.  As the

10   conversation was happening, I was taking notes directly on how

11   he was responding.  And -- I mean, Amazon takes any type of

12   racial comments extremely serious.  And if anything was

13   mentioned, it would have been outlined in my notes and we would

14   have taken action accordingly.

15   Q    Do you remember whether -- whether Mr. Bryson said

16   anything about other names that he could have called her but

17   didn't?

18   A    Yes.  So when talking to Mr. Bryson, he mentioned that --

19   he mentioned some of the comments that he had said.  Also

20   mentioned some of the comments that he hadn't said.

21        MR. KEARL:  Objection.  Relevance.

22        JUDGE GREEN:  Overruled.

23   Q    BY MS. BUFFALANO:  You can go ahead, Tyler.

24   A    So he mentioned some comments that he did say, like,

25   bitch.  And then he said comments that he didn't say, like, the



www.escribers.net | 800-257-0885

1   N-word or the C-word, saying that he doesn't talk like that.

2   And then he went in to say that he could tell that she wanted

3   him to say something about her sexuality because she's a dyke.

4   Q    What -- and did he say that?  Did he, like, say he said

5   that?

6   A    He said -- no, he said he didn't say that.  He wouldn't

7   say anything like that.  He said that -- and I was slightly, I

8   guess, confused on how he could tell that she wanted him to say

9   this.  But he said that she wanted him to -- he could tell if

10  she wanted him to say something about her sexuality.  But he

11  restrained himself and -- and -- and didn't say anything along

12  those lines to her, only on the phone with myself.

13  Q    Do you recall what, if anything, he said about using a

14  megaphone or a bullhorn?

15  A    Well --

16  Q    I don't know what the terminology may be.

17  A    I remember he said he was using it.  I don't remember

18  specifics around it.

19  Q    Okay.  What was his -- what was Mr. Bryson's demeanor

20  during the conversation when he was discussing the incident?

21       MR. KEARL:  Objection.  Foundation.  Speculation of the

22  phone call.

23       JUDGE GREEN:  Overruled.

24  A    He seemed, I guess, like, aggravated that like, this was

25  being brought to the attention.  He was questioning what was



Exhibit E, Motion to Try Petition on Hearing Record

1   going to happen with the other individual.  He was kind of

2   like, shifting blame, saying that Ms. Evans had done wrong and

3   what's going to happen to her.  I would say looking at like,

4   the whole conversation, lack of remorse or unapologetic in what

5   was --

6        MR. JACKSON:  Objection.  Lacks foundation.

7        JUDGE GREEN:  I'm only -- I'm only accepting it for his

8   impression of it as part of the investigation.  It's also --

9   overruled.

10   Q    BY MS. BUFFALANO:  You can finish your answer, Mr.

11   Grabowski.

12   A    I was -- that was me finishing it.

13   Q    Okay.  Thank you.

14        JUDGE GREEN:  And regardless, it's not hearsay.

15        MR. JACKSON:  I -- I -- I said, lacks foundation but.

16   Q    BY MS. BUFFALANO:  You say that Mr. Marcs (sic) say

17   anything on the call?

18   A    Not that I remember.

19   Q    How about Mr. Carbajal?

20   A    Not that I remember.

21   Q    Do you know about how long the conversation lasted?

22   A    Maybe ten minutes.  I -- I don't know for sure.  But it

23   was long enough for me to go through each of those questions

24   and -- and type the responses that were noted on -- on that

25   outline.



1    Q    Okay.  You -- you said earlier that you had notes.  That

2    was my next question.  What are your -- do you have handwritten

3    notes, typed notes?  What do your notes look like?

4    A    The -- the typed notes with the bolded question and answer

5    that you had displayed earlier was what I typed as Mr. Bryson

6    was speaking to me.  It's kind of, ask the question, and then

7    typed as -- exactly what he was saying to me.

8    Q    Okay.

9        MS. BUFFALANO:  So can you just open up Respondent's

10    Exhibit 18, Mr. Falk?  Thank you.

11    Q    BY MS. BUFFALANO:  Okay.  So what are these -- what is

12    this document, Tyler?  And specifically, the --

13        MS. BUFFALANO:  Is this the third page, Mr. Falk?  I think

14    it is, for this exhibit.

15        MR. FALK:  This is fourth page.

16        MS. BUFFALANO:  Okay.

17    Q    BY MS. BUFFALANO:  The fourth page of Exhibit 18.

18        MR. JACKSON:  Objection, Your Honor.  What's the purpose

19    of this?  You know, the witness already testified about his

20    recollections of this conversation.  Now we're going to review

21    his -- the document referencing the same conversation.  I -- I

22    don't see the purpose --

23        JUDGE GREEN:  All right.  So I mean, it seems like it's --

24    in the nature of collective bargaining notes.  And it's a --

25    it's a present-sense impression.  And therefore, you know, as I



Exhibit E, Motion to Try Petition on Hearing Record

1    indicate, it's not -- I really don't see that it's inadmissible

2    hearsay.

3    Q    BY MS. BUFFALANO:  Okay.  So Mr. Grabowski, can you tell

4    me what this document is?

5    A    This is the notes or like, question and answer that I

6    typed while having the conversation with Mr. Bryson.  The --

7    the bolded areas were prepared ahead of time.  And the unbolded

8    areas beneath it were the responses to the questions that I

9    asked in the seek-to-understand conversation.

10   Q    Okay.  So am I understanding correctly that the bold are

11   the questions you asked Mr. Bryson?

12   A    Yes.

13   Q    Okay.  And then, the unbolded is the answer from Mr.

14   Bryson?

15   A    Yes.

16   Q    Okay.  And when did you put -- when did you type the

17   unbolded portion?

18   A    As he was speaking to me, as he was responding, I was

19   typing it in real time.

20   Q    Okay.  And I would -- I would like to ask whether or not

21   you remember anything from your conversation that is not

22   included in this document?  So if you wouldn't mind just taking

23   a look -- a quick look at it and just make sure that it

24   doesn't -- it reflects the entirety of your conversation.

25        MR. JACKSON:  I'm going to object, Your Honor.  This is



1   not proper use of the document.

2       JUDGE GREEN:  Frankly, you know, to the extent that the

3   documents reflects -- and I think we have some foundation for

4   this.  The document reflects certain statements that Mr.

5   Grabowski doesn't recall now.  It's also probably a past

6   recollection recorded.  And so I'm going to allow this.

7   Q    BY MS. BUFFALANO:  Okay.  All right.  I'm -- I'm fine with

8   moving on.

9       MS. BUFFALANO:  And Mr. Falk, if you wouldn't mind taking

10  this down -- oh, you know what?  Leave us up for a second.  I

11  want to ask another question.  Can you -- we're going to move

12  to admit Respondent's Exhibit 18, pages 4 and 5.  And then

13  we'll talk about the earlier one.

14      MR. JACKSON:  Objection, Your Honor.

15      JUDGE GREEN:  Any objection.

16      MS. BUFFALANO:  Objection.  Respondent cannot selectively

17  choose which portions of a document want --

18      JUDGE GREEN:  Okay.  So you want the whole thing in?

19      MR. JACKSON:  Yes, please.

20      MS. BUFFALANO:  Okay.  Thank you.

21      MR. JACKSON:  And I object on hearsay and Bannon-Mills

22  grounds.

23      JUDGE GREEN:  Right.  So I'm addressing the hearsay

24  objection.  You're saying this -- okay.  And then, I'll do the

25  same thing with reserving ruling of Bannon-Mills objection.



1    MR. KEARL:  And Ms. Buffalano, and so long as this was

2    only produced to me in a series of like, JPEG images, can you

3    send me the PDF, the multi-page document for this one?

4    MS. BUFFALANO:  Yeah.  Absolutely.  And let me -- I don't

5    know anything about that.  So just let me know if there's

6    anything else that you need in a different format.  All right.

7    So --

8    MR. JACKSON:  I'm sorry.   No, I have another objection,

9    Your Honor.  May I voir dire on this document?

10   JUDGE GREEN:  Okay.

11   MR. JACKSON:  All right.  Mr. Falk, would you scroll to

12   the top?

13                    **VOIR DIRE EXAMINATION**

14   Q    BY MR. JACKSON:  Okay.  You see, Mr. Grabowski, there's

15   something listed under attachments?

16   A    Yes.

17   Q    Okay.  And one of the attachments is a word document and

18   another is a Microsoft Excel document, correct?

19   A    Yes.

20   Q    Okay.

21   MR. JACKSON:  So I object to the admission of this

22   document because it's incomplete.  These attachments should be

23   part of the exhibit.

24   MS. BUFFALANO:  Okay.

25   JUDGE GREEN:  There any objection to including the



1    attachments?  How big are they?  Do you want to see them first?

2        MR. JACKSON:  Yes.

3        MS. BUFFALANO:  It's -- it's coming up.  And I'm happy

4    to -- we're happy to show it to you now.  It's Exhibit 21,

5    which is -- let me see what Bates number.  I don't have that on

6    me.

7        JUDGE GREEN:  So R-21's going to -- is that -- is -- it

8    was already marked separately as -- as R-21, but it's the

9    attachment to R-18?

10        MS. BUFFALANO:  Yes.

11        JUDGE GREEN:  Okay.  So you intended to put it into

12    evidence?

13        MS. BUFFALANO:  Yes.

14        JUDGE GREEN:  Okay.

15        MS. BUFFALANO:  So if you show us your Respondent's 21,

16    then we can get the Bates number off the bottom of it.  I

17    apologize.  I don't have that at my fingertips.  Thank you.

18    1344.  Okay.  So do you want to go back and finish up voir

19    dire?  So if you -- if you don't mind flipping back to

20    Respondent 18.

21        JUDGE GREEN:  I think he's done with voir dire.

22        MS. BUFFALANO:  Okay.  Okay.  So just before we --

23        MR. JACKSON:  I'm sorry.  There's actually two attachments

24    here, right?  Is it -- is there a separate attachment?

25        MS. BUFFALANO:  One is the -- the notes that we just



Exhibit E, Motion to Try Petition on Hearing Record

1   looked at.  And the other is that allegations Excel

2   spreadsheet.

3       MR. JACKSON:  Oh.

4   Q   BY MR. JACKSON:  So Mr. Grabowski, is that correct that

5   the word document that's attached here is embedded into this

6   PDF that it is Respondent's 18?

7   A   It's the -- the notes that we just looked at.  So the

8   bolded question and answer is the investigation recap.  And

9   then the one that we just had up right now was the allegations

10  Excel sheet in a PDF one.

11  Q   Okay.  So the -- the Microsoft Word attachment appears at

12  page 4 and 5 of the document?

13      MR. JACKSON:  If you scroll down, Mr. Falk?

14  A   Yes.

15  Q   BY MR. JACKSON:  Okay.

16      MR. JACKSON:  So I have the same Bannon-Mills and hearsay

17  objections that I stated previously.  But otherwise, no.

18      JUDGE GREEN:  Okay.

19      MS. BUFFALANO:  Okay.  So if you can go to the top, Mr.

20  Falk.  All right.

21                   **RESUMED DIRECT EXAMINATION**

22  Q   BY MS. BUFFALANO:  So I want you, Tyler, Mr. Grabowski, to

23  take a look at the first three pages of this document and just

24  explain to us the email exchange of what's going on here, what

25  this communication is.



1    MS. BUFFALANO:  So if you could scroll down, Mr. Falk,

2    maybe scroll down to the first email message.  Okay.  All

3    right.

4    Q    BY MS. BUFFALANO:  So you see that?

5    MS. BUFFALANO:  So yeah, stop here.

6    Q    BY MS. BUFFALANO:  So there's a message on the second page

7    of Respondent's 18 starts, from Tyler, to Christine and

8    Bradley, sent Friday, April 10th, 2020 at 10:26 a.m.  Do you

9    see that?

10   A    Yes.

11   Q    Can you tell us what this communication is?

12   A    This is me sending information to Christine and Bradley on

13   the questions that I was going to ask Mr. Bryson.

14   Q    Okay.  What was the purpose of the email?

15   A    Just to make sure they were good with the questions that I

16   was going to ask.

17   MS. BUFFALANO:  And then if you go up, Mr. Falk, to the

18   next email in the chain.

19   JUDGE GREEN:  I'm sorry.  I missed the number of this

20   exhibit.

21   MS. BUFFALANO:  This one's 18.

22   JUDGE GREEN:  Oh, the -- we're still on 18.  Okay.  Never

23   mind.

24   MS. BUFFALANO:  We're on page 2.  Okay.

25   Q    BY MS. BUFFALANO:  And this is the second email here in a



1   string from Bradley Campbell to you and Christine Hernandez,

2   April 10th, 2020 at 1:06 p.m.  You see that?

3   A    Yes.

4   Q    Okay.  And what's that email?

5   A    It's -- it's Bradley just telling me to make sure I have,

6   like, outlined what each person recalled.

7   Q    Okay.  All right.

8        MS. BUFFALANO:  So you want to scroll up to the last top

9   email here.  All right.

10  Q    BY MS. BUFFALANO:  So Mr. Grabowski, can you tell us this

11  top email, page 1 of Respondent's Exhibit 18 from you to

12  Bradley Campbell and Christine Hernandez 4/10/2020 at 2:02 p.m.

13  Can you tell us about what this email is?

14  A    That's the attached conversation based on my question and

15  answers with Mr. Bryson as well as an Excel sheet outlining the

16  different allegations, and which of them were substantiated by

17  which witness.

18  Q    Okay.  And what is STU?

19  A    Seek to understand.

20  Q    Okay.  Since we're already looking at this document, let

21  me just ask you these questions now.

22       MS. BUFFALANO:  Can you take a look at Respondent's

23  Exhibit 21?  Okay.

24  Q    BY MS. BUFFALANO:  What -- what is the this?

25  A    This is a table breaking down the different allegations



Exhibit E, Motion to Try Petition on Hearing Record

1   that were mentioned during the course of the investigation as

2   well as the different members involved in the investigation

3   from the victim to the person of interest and all the witnesses

4   and which of the allegations each one of them recalled.

5   Q    And who created this document?

6   A    I did.

7   Q    Why?

8   A    I was asked to.

9   Q    Who asked you to do it?

10  A    I believe Bradley.

11  Q    Do you know why?  What's your understanding of why you

12  were asked to do it?

13  A    To have a quick visual representation of what was

14  substantiated by who without digging through seven pages of

15  witness documents.

16  Q    Thank you.  And -- and just to beat that dead horse, this

17  is an attachment to Respondent's Exhibit 18, that email at the

18  very top of Respondent's 18?  This is the -- one at -- the

19  second attachment, the Excel attachment; is that right?

20  A    Yes.

21  Q    Okay.  Thank you.

22       MS. BUFFALANO:  And Mr. Falk, you can take this one down.

23  Okay.  Did you ask Mr. Bryson for a written statement?

24  A    No.

25  Q    Why not?



1    A    He had not been coming on site to fill out, like, a

2    witness statement like the other hourly employees had.  And he

3    didn't have access to his Amazon email to have something that

4    would be, I guess, stamped with his Amazon signature.

5    Q    Okay.  You testified that in addition to having this

6    specific discussion with Mr. Bryson about the incident on April

7    6th, you also called him on April 10th to inform him that --

8    inform him that he was suspended pending investigation; is that

9    right?

10   A    I don't remember the specific date.  And if that's -- if

11   that's what it's showing in the emails, then I believe so.  But

12   I -- I can't remember.

13   Q    Okay.  No, I'm asking you.  Did you tell him that he was

14   suspended during this phone call?

15        MR. KEARL:  Objection.  Leading question.

16        JUDGE GREEN:  It's not contested; is it?  Overruled.

17   A    I believe that I would have told him while having a

18   conversation with him that he was suspended.  That's standard

19   typical practice is that when we complete a seek-to-understand

20   conversation, if the employee isn't already suspended, then we

21   would at that point suspend them.  And then, review an

22   evaluation of the findings.

23   Q    BY MS. BUFFALANO:  Okay.  So you don't recall the

24   specifics if you discussed that with him?

25   A    Right now, no.


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And was there anything that prevented Mr. Bryson

2    from submitting a written statement to you?

3    A    He wasn't coming on site.

4    Q    Okay.  But he could have emailed it, I presume?

5    A    I guess -- I guess, he could have sent an email.  But

6    the -- the difference between the statements collected through

7    emails in an investigation are typically from members that have

8    access to their Amazon email.  So it's -- has their Amazon

9    signature and time stamp on the email.  And then for our hourly

10   employees, we --

11        MR. KEARL:  This is speculation, Judge.

12        MR. FALK:  Judge, can you also let Ms. Cox back into the

13   room.  She got booted off of this and is in the waiting room, I

14   believe.

15        JUDGE GREEN:  So -- okay.  So overruled.  I -- I don't

16   think we're getting -- I don't think we're getting testimony

17   that's damaging to the GC.  Overruled.

18   Q    BY MS. BUFFALANO:  You want to finish or were you

19   finished?

20   A    I don't know where I was at.

21   Q    You were just telling us that people in an investigation

22   don't submit statements by email.

23   A    No.

24   Q    Okay.  Okay.  All right.  So you also testified that he,

25   Mr. Bryson, informed you that there -- he had a potential



1    witness.  Is that what you said?

2    A    Yes.

3    Q    Okay.  And that you were going to follow up -- he was

4    going to try and find out who it was.  And then, follow up --

5    you were going to follow up with him; is that right?

6        MR. KEARL:  Objection.  Mischaracterizes the testimony.

7        MS. BUFFALANO:  Okay.  I'll ask.

8    Q    BY MS. BUFFALANO:  Can you tell us again, Mr. Grabowski,

9    about the portion of the conversation where you discussed

10   potential witnesses with Mr. Bryson?

11   A    Mr. Bryson recalled a -- a female individual that was also

12   outside in the parking lot.  But he mentioned that he didn't

13   know what her name was and that if I gave him some time and

14   then got back to him, he would be able to identify who that

15   individual was.  I forget what the time was that we discussed.

16   But I remember calling Mr. Bryson back and him identifying that

17   he was -- wasn't able to find out who the individual was.  He

18   didn't know who she is.

19   Q    Okay.  Okay.  And so after you talked to Mr. Bryson,

20   what's the next thing that you did in the investigation?

21   A    Sent the information to Christine and Bradley.

22   Q    Did you interview anybody else after you spoke with Mr.

23   Bryson?

24   A    I followed up with Ms. Evans based on the information that

25   came up during my conversation with Mr. Bryson.



www.escribers.net | 800-257-0885

1    Q    Okay.  And why specifically -- what -- what specifically

2    about what Mr. Bryson said did you want to follow up with Ms.

3    Evans about?

4    A    I don't remember the specifics.  But I remember there was

5    information that he had mentioned or allegations against Ms.

6    Evans that I wanted to, like, speak to her and follow up with

7    her as I had not previously talked to her with the -- about the

8    new information that was brought to my attention.

9    Q    Okay.  So -- all right.  So you followed up with Ms.

10   Evans.  Do you recall when you spoke to her?

11   A    I don't.

12   Q    Did you take notes of your conversation with her?

13   A    Yes.

14   Q    Was anyone else present?

15   A    No.

16   Q    Did you talk to her in person, by phone?

17   A    In person.

18   Q    In person.  Okay.  And when did you talk to her?

19   A    What was that?

20   Q    I'm sorry.  Where did you talk to her?

21   A    In the HR manager office.

22   Q    Okay.  Can you tell us as best you can recollect about

23   your conversation with Ms. Evans, your -- your second

24   conversation with Ms. Evans?

25   A    Is it possible to see the investigation notes?  It's --



1    Q    Are you telling me you don't have a recollection siting

2    there of your conversation with her?  Okay.

3    A    I don't remember the specifics of it.

4    Q    Okay.

5         MS. BUFFALANO:  So if you could show us Respondent's

6    Exhibit 19, please, Mr. Falk.  Thank you.

7         MR. JACKSON:  Objection, Your Honor.  I'm not sure that

8    we've established that the witness does not have any

9    recollection of anything that he said with Ms. Evans.

10        MS. BUFFALANO:  All right.  Hang on a second, Mr. Falk.

11        JUDGE GREEN:  Well, that's what he testified to.

12        MR. JACKSON:  Okay.

13        MS. BUFFALANO:  Okay.  You can put it back up.  Thank you.

14   Q    BY MS. BUFFALANO:  All right.  Do you recognize this

15   document, Mr. Grabowski?

16   A    Yes.

17   Q    So what is this?

18   A    My conversation with Ms. Evans

19   Q    Okay.  And the -- this looks sort of formatting-wise

20   similar to the interview that you had with Mr. Bryson in that

21   there's bolded headings.  And then there is plain text.  Is

22   there a similar cadence here that the bold text is the

23   question, and the plain text is the answer?

24   A    Yes.

25   Q    And when did you record the responses that you were given



# Exhibit E, Motion to Try Petition on Hearing Record

1    by Mr. Evans?

2    A    While I was speaking with her.

3    Q    Okay.  So similar process to Ms. -- the conversation you

4    had with Mr. Bryson?

5    A    Yes.

6    Q    Okay.  And what did you do with these notes once you

7    had -- like, once you had met with Ms. Evans and you had the

8    notes, what did you do with them if anything?

9    A    Likely, sent them to Christine and Bradley.

10   Q    Okay.

11        MS. BUFFALANO:  So I'm going to move for admission of

12   Respondent's 19.

13        JUDGE GREEN:  I assume --

14        MR. JACKSON:  Objection.

15        JUDGE GREEN:  -- there's the same objections.  And I'm

16   going to treat them the same way.  So it's -- I'm going to

17   reserve the ruling.

18        MR. KEARL:  Yeah.  I also, just in terms of like, an email

19   that was just mentioned was also not produced and -- nor was

20   the native document.  This document was produced, but we don't

21   have it in its native form.  So we can't look at metadata to

22   see when it's created.

23        MS. BUFFALANO:  I don't know that to be true.  But if that

24   was an issue, someone could ask us for the native document

25   instead of jumping on it now.  We sent these documents -- I


www.escribers.net | 800-257-0885

1    think these were the first documents we sent in April -- like,

2    back in March -- like very early March.

3        MR. KEARL:  I did not get any documents in March for what

4    it's worth.  I didn't get these documents until we made an

5    issue of it on the 20- -- or on the third of -- of this month.

6    But I will -- anyway.

7        MS. BUFFALANO:  Okay.  Well, let -- just let me know

8    also -- I mean, if we're having this conversation very shortly.

9    We're going to have it.  But if there's anything you're missing

10   or need, please just let me know.  I'm not obviously in the

11   weeds on the production.

12       MS. BUFFALANO:  Okay.  So the email, if this helps, is

13   coming up next.  Does that help?

14       THE WITNESS:  Me?

15       MS. BUFFALANO:  No, Mr. Kearl because he said the email

16   was introduced was the first thing he said and the e-mails

17   coming up next.

18       THE WITNESS:  Okay.

19       THE WITNESS:  So I'm asking him what happened -- is

20   happening with this document.

21       MR. JACKSON:  GC also has a hearsay objection.

22       JUDGE GREEN:  So it's serve -- I'm reserving ruling.

23       MS. BUFFALANO:  Okay.  All right.  You can take this down,

24   Mr. Falk.  And could you show us Respondent 20?

25       UNIDENTIFIED SPEAKER:  So that noise is coming from.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  I don't see that anybody's unmuted who -- so

2    who shouldn't be.

3    Q    BY MS. BUFFALANO:  Okay.  So Mr. Grabowski if you could

4    take a look at this document.

5    A    I'm good.

6    Q    Okay.  And have you seen this before?

7    A    Yes.

8    Q    What is this?

9    A    An email from myself to Christine and Bradley with the

10   HRBP team copied on it attaching the outline that we just

11   reviewed my conversation with Ms. Evans.

12   Q    Okay.  So Respondent 19, the conversation notes with Ms.

13   Evans is the attachment to Respondent 20, this email?  Did you

14   answer?  I didn't hear it if you did.

15   A    Yes.  I thought you were just saying that.  Sorry.

16   Q    It's all right.  Okay.  And does this email refresh your

17   recollection on when it is that you met Ms. Evans?

18   A    Yes, the -- April 15th.  I mean, it would have been the

19   same day that I sent it.

20   Q    Okay.

21        MS. BUFFALANO:  Okay.  And I'm going to move for the

22   admission of Respondent's 20.

23        JUDGE GREEN:  So it's going to be the same issues.  I'm

24   going to overrule the hearsay objections and reserve ruling on

25   the Bannon-Mills.  I understand that with regard to any hearsay



1    objections, if you want to argue in your briefs that I should

2    ignore it, you can do that.  But we've still got the Bannon-

3    Mills on any -- on all of this investigative material.

4        MR. JACKSON:  And Your Honor, are you admitting R-19 for

5    the truth of the matter asserted.

6        JUDGE GREEN:  Yes.

7        MS. BUFFALANO:  Okay.  And you can take this down, Mr.

8    Falk.  I don't know how much time you want to spend having a

9    discussion this afternoon, Judge Green.  But this is a fair

10   stopping point.  We have some more to do, but sort of on

11   separate topics.

12       JUDGE GREEN:  So I -- I'd rather just -- I'd rather just

13   plow on through if you want to take a break.  I want to deal

14   with the subpoena stuff last.

15       MS. BUFFALANO:  Okay.

16       JUDGE GREEN:  I don't intend to spend a tremendous amount

17   of time on it.  I just want to -- I just want to give the

18   parties some of my thoughts on how it should proceed or could

19   potentially proceed.  But do you want to take a break here?

20       MS. BUFFALANO:  Yeah.  If we just have a couple of

21   minutes, maybe ten.

22       JUDGE GREEN:  Yeah.  Off the record for ten minutes.

23       MS. BUFFALANO:  Thank you.

24   (Off the record at 4:40 p.m.)

25       JUDGE GREEN:  Back on the record.



Exhibit E, Motion to Try Petition on Hearing Record

1          **RESUMED DIRECT EXAMINATION**

2      Q     BY MS. BUFFALANO:   Okay.   Mr. Grabowski, were you involved

3      in the decision to terminate Mr. Bryson?

4      A     Yeah.

5      Q     Were you involved in the decision to issue a first written

6      warning to Ms. Evans?

7      A     No.

8      Q     Do you know who ultimately made the decision that Mr.

9      Bryson would be terminated?

10     A     No.

11     Q     Do you know who ultimately made the decision that Ms.

12     Evans would receive the first written warning?

13     A     No.

14     Q     Do you know who delivered the termination notification to

15     Ms. Bry -- Mr. Bryson?

16     A     Yes.

17     Q     Who?

18     A     Sergiy Sushalskyy.

19     Q     Do you know how to spell that?

20     A     I don't know how to spell it.

21     Q     Okay.   All right.   Well, we'll get that.   And is that --

22     is that -- just him?

23     A     And myself.

24     Q     Okay.   And when was that -- when did that happen?

25     A     I don't remember the exact date.



1    Q    Okay.  And where was the con -- where did the conversation

2    take place?

3    A    Sergiy and myself were in the HR manager office, where we

4    called Mr. Bryson.

5    Q    Is it typical to have -- well, tell me who Sergiy

6    Sushalskyy is.

7    A    He is a member of the operations team in the PCF

8    department that Mr. Bryson was in.

9    Q    Is it typical that operations would be involved in a call

10   in which a termination decision is delivered to an employee?

11   A    Yes.  The operations team would be the ones that deliver

12   feedback to their teams.

13   Q    What do you mean when you say feedback?

14   A    Any type of (ends mid-sentence).

15        MS. BUFFALANO:  Okay.  So I'm going to -- can you show us,

16   Mr. Falk, General Counsel's Exhibit 9, please?

17        MR. FALK:  Sure, one moment.

18        MS. BUFFALANO:  Thank you.

19   Q    BY MS. BUFFALANO:  Okay, Mr. Grabowski, have you seen this

20   document before?

21   A    Yes.

22   Q    And what is this?

23   A    This is the termination document for Mr. Bryson.

24   Q    And so can you tell me, looking at this document, like,

25   what portions of this document -- well, tell me this, do you



1    know who offered this document or created it?

2    A    I created it in the system.

3    Q    Okay.  And so when you say, created it in the system, what

4    part -- what parts are you actually adding?

5    A    The emails of the current incident/specific concerns, and

6    the areas of improvement required by the associate.

7    Q    Okay.  And who told you to draft this document?

8    A    I believe it was Bradley or Christine.

9    Q    Do you remember what they told you about why Mr. Bryson

10   was being terminated?

11   A    I don't remember the specifics, but I know that it was for

12   a category 2 violation of vulgar and harassing communication to

13   another employee.

14   Q    How do you know that?

15   A    I was the one that generated the document based on my

16   conversations with Bradley and Christine.

17   Q    Okay.  So can you tell us -- so the conversation that you

18   had with Mr. Bryson, can you tell us about the conversation,

19   who spoke, and what they said?

20   A    So I started off the conversation, introduced myself,

21   confirmed that I was talking to Mr. Bryson, and then outlined

22   that we were following up on the investigation that I had

23   spoken with him previously about.  And that I was with Sergiy,

24   who was going to go over feedback document associated with the

25   findings of the investigation.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  And what happened next?

2    A    Then Sergiy went in and read through the document to Mr.

3    Bryson and outlined that it had resulted in separation of

4    employment.

5    Q    Okay.  And when you say, "read through the document", what

6    do you mean?

7    A    Go over the details of the current incident, the level of

8    feedback, the areas of improvement.

9    Q    And when you say that, you're referring to General

10   Counsel's Exhibit 8, details of current incident and areas of

11   improvement?

12   A    Yes.

13   Q    Okay.  So in your recollection, Sergiy read through those

14   two portions of this document?

15   A    Yes.

16        MR. JACKSON:  Did you say GC-8?

17        MS. BUFFALANO:  Yeah.

18        MR. JACKSON:  Okay.

19        MR. FALK:  It's 9.

20        MS. BUFFALANO:  Oh, I apologize, thank you.

21        MR. FALK:  And Sergiy's name's on here on the top if you

22   need the spelling.

23        MS. BUFFALANO:  Oh that's perfect, okay.  That will help,

24   Barry.

25   Q    BY MS. BUFFALANO:  Okay.  So Sergiy reads the details of



www.escribers.net | 800-257-0885

1   current incident and areas of improvement to Mr. Bryson.  Does

2   Sergiy or you say anything else aside from what you've already

3   testified to?

4   A     I mean, there was some conversation.  I remember Mr.

5   Bryson being confused about the level of feedback, and I

6   believe he asked what was happening to Ms. Evans and said that

7   she initiated the conversation and asked, like, does this mean,

8   I'm fired?  And then he asked for a copy of the document.

9   Q     Okay.  So when you say that Mr. Bryson expressed confusion

10  about the level of the discipline, what do you mean by that?

11  A     He seemed surprised that it was resulting in separation of

12  employment.

13  Q     Did he say why?

14  A     I don't remember.

15  Q     Okay.  But you do remember that he said that Ms. Evans

16  initiated the conversation with him?

17  A     Yes.

18  Q     Okay.  Okay.  And do you recall anything else aside from

19  what you've just described to us?

20  A     No.

21  Q     Okay.

22        MS. BUFFALANO:  I believe that this is an already

23  admitted.

24        JUDGE GREEN:  Yeah.  This is R-9.  No, this is GC-9.  Yes,

25  this is in.



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  Okay.  Thank you.

2    And Mr. Falk, if you can show us --

3    Q   BY MS. BUFFALANO:  well let me ask you, Mr. Grabowski, did

4    you -- are there notes of this conversation?

5    A    I typed a recap of the conversation.

6    MS. BUFFALANO:  Mr. Falk, can you show -- show us

7    Respondent's Exhibit 24?

8    Q   BY MS. BUFFALANO:  Okay.  So if you'd take a look at this

9    document, Mr. Grabowski, unless by any chance you have it.

10   A    Would we be able to scroll down just a little bit to see

11   the last part?  Thank you.  Thank you.

12   Q    What is this document?

13   A    This is an email summary I typed up, I believe, to outline

14   what -- like, what the conversation was.

15   Q    Okay.  Anyone that -- conversation which the termination

16   was delivered to My. Bryson?

17   A    Yes.

18   Q    Okay.  Okay.  And you created this document?

19   A    Yes.

20   Q    And then I move for admission of Respondent's Exhibit 24.

21   JUDGE GREEN:  Any objection?

22   MR. JACKSON:  Yes and no.

23   JUDGE GREEN:  I thought we were going to sneak one by you

24   there, Mr. Jackson.

25   MR. JACKSON:  Okay, Judge, actually, can -- can I just



www.escribers.net | 800-257-0885

1    take a brief five minute?

2        JUDGE GREEN:  Yes.  Off the record.

3    (Off the record at 5:04 p.m.)

4        JUDGE GREEN:  Mr. Jackson, was there something you wanted

5    to do?

6        MR. JACKSON:  No.  No, Judge, just abandon those

7    objections.

8        JUDGE GREEN:  Okay.  So you know what -- I was just going

9    to say I had just received another -- I've received like three

10   subpoena deliveries over the course of this hearing, and so I

11   just wanted to make sure that there was nothing in there that

12   was --

13       MR. JACKSON:  Okay.

14       JUDGE GREEN:  -- what I needed to deal with.  Let me

15   ask -- let me ask Mr. Grabowski, did you  -- we have R-19,

16   which was notes of your conversation with Ms. Evans?

17       I don't remember.  Did we -- did you look at those just

18   now?  Did you read them?

19       THE WITNESS:  I think so.

20       JUDGE GREEN:  Okay.  (Indiscernible, simultaneous speech)

21   I had.

22       THE WITNESS:  I -- I --

23       MS. BUFFALANO:  (Indiscernible, simultaneous speech) --

24       JUDGE GREEN:  Ms. Buffalano, here's -- here's what I'd

25   like to do.



1       Mr. Grabowski originally testified that he had no

2   recollection of that conversation, and then I admitted the --

3   that document -- well, to the extent that there's no Bannon-

4   Mills with regard to -- I overruled the hearsay objection.

5       I'm less confident about that then the notes as the

6   pertain to Ms. -- Mr. Bryson as Mr. Bryson is a party opponent.

7   Could you have him refresh Mr. -- Mr. Grabowski's recollection?

8   Could you have him testify to that meeting with Ms. Evan's?

9       MS. BUFFALANO:  Yeah.

10      It's Respondent's 19, Mr. Falk.

11  Q    BY MS. BUFFALANO:  All right.  So Mr. Grabowski, if you

12  want to take a look at this document and tell us if that

13  refreshes your recollection as to what your conversation with

14  Mr. Evans was on April 17th -- or 15th?

15  A    And is that the last question, how did the interaction

16  end?  Okay.  I'm good.

17  Q    Okay.  So does that refresh your recollection about your

18  conversation with Ms. Evans on April 15th?

19  A    To the extent of what's outlined here, yes.

20      JUDGE GREEN:  Now, having seen this, do you have any

21  better recollection of what happened?

22      THE WITNESS:  No.

23      JUDGE GREEN:  Do you think you can testify to the

24  conversation?

25      THE WITNESS:  No.  I really -- even after we miss outside



1    of what's noted in here, I don't remember anything specifically

2    from that conversation.

3         JUDGE GREEN:  All right.  Then we have what we have.

4         MS. BUFFALANO:  Okay.  Thank you.

5         You can take this down, Mr. Falk.  Thank you.

6    Q    BY MS. BUFFALANO:  All right.  So before we went off the

7    record, we were discussing the telephone call in which you and

8    Sergiy informed Mr. Bryson of the decision to terminate his

9    employment.  So I just have a couple more questions about that

10   conversation.  What if anything, during that conversation, did

11   Mr. Bryson say about the particular policy, that category 2

12   policy?  Did he say anything about it -- what he knew or didn't

13   know about it?

14   A    Not that I remember.

15   Q    Did Mr. Bryson say anything in that conversation about

16   whether or not he was on or off duty at the time of the

17   incident?

18   A    Not that I remember.

19   Q    Did Mr. Bryson tell you in that conversation, that Ms.

20   Evans had made a racist remark to him during the interaction?

21   A    No.

22   Q    And did Mr. Bryson receive a copy of his termination

23   notice as he requested?

24   A    Yes.

25   Q    How did he receive it?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    It was emailed -- the PDF version was emailed to him on

2    his personal email address.

3    Q    Okay.  And do you know the reason why Mr. Bryson's

4    termination -- employment was terminated?

5    A    For violating a category 2 offense for vulgar, harassing

6    language, and behavior towards another employee.

7    Q    Do you know what specifically about his conduct violated

8    that policy; why he was fired?

9    A    I don't know the specifics of what was substantiated that

10   lead to that determination.

11   Q    Let me show you -- so if you just take a look at General

12   Counsel's Exhibit 8, page 28.  Well, you know what, let's skip

13   that.  Just -- it's very late in the day.  Mr. Grabowski, do

14   associates -- are associates aware of the category 2 standards

15   of conduct including the policy that indicates that associates

16   cannot, you know, use abusive, harassing and vulgar language

17   against other associates?  Are they aware of that?

18   A    Employees have access to it.

19   Q    Okay.  How do they have access to it?

20   A    It's in the standards of conduct.

21   Q    Where is that?  Is that in the owner's manual?

22   A    Yes.

23   Q    Okay.  Are employees given access to owner's manual?

24   A    Yes.  And upon being hired they acknowledge that they have

25   access to it.



Exhibit E, Motion to Try Petition on Hearing Record

1     Q      Okay.

2            MS. BUFFALANO:  So Mr. Falk, if you could show us

3     Respondent's Exhibit 99?

4     Q      BY MS. BUFFALANO:  Okay.  Mr. Grabowski, what is this

5     document?

6     A      This is a form that employees digitally acknowledge that

7     they have access to those documents.

8     Q      Okay.  Including the owner's manual?

9     A      Yes.

10    Q      And can you show us the -- Mr. Falk, can you scroll all

11    the way up?

12    And who's acknowledgment is this?

13    A      That's Gerald Bryson's electronic signature.

14    Q      Does that indicate that he electronically signed this?

15    A      Yes.

16    Q      When would he have done that?

17    A      When he was hired.

18    Q      Where are -- where is the owner's manual available to

19    employees?

20    A      On Inside Amazon.

21    Q      When can they access it?

22    A      When they want to.

23           MS. BUFFALANO:  Okay.  I want to move for admission of

24    Respondent's Exhibit 99.

25           JUDGE GREEN:  Any objection?



1       MR. GRABOWSKI:  No objection.

2       MS. BUFFALANO:  And you can take this down, Mr. Faulk,

3  Thank you.

4       JUDGE GREEN:  So R-99 is admitted.

5  **(Respondent Exhibit Number 99 Received into Evidence)**

6  Q     BY MS. BUFFALANO:  And I'm going to assume that the

7  owner's manual is updated.  Is that -- is that accurate?

8  A     I'm not sure -- I missing the question.

9  Q     Does the owner's manual get updated from time-to-time?

10 A     Yes.

11 Q     Okay.  And since you've been working at Amazon since 2017,

12 has the category 2 requirement that employees refrain from

13 using vulgar, abusive or harassing language to one other

14 changed?

15 A     Not to my knowledge.

16 Q     Okay.  Can category 2 discipline resolve in -- well let me

17 ask you this, you testified last Tuesday -- or Monday -- that

18 there's generally a progressive discipline policy; is that

19 right?

20 A     Yes.

21 Q     And is the progressive discipline policy always followed

22 in terms of associate discipline?

23 A     No.  The -- I -- I mean the standards of conduct are used

24 as guidelines in situations, but the severity can differ

25 depending on the specifics and context of the incident.  So



1    while there is general guidance for what would typically result

2    in a certain level of feedback versus something else, that can

3    change or escalate based on the severity of the situation.

4    Q    Okay.  And so can employee be terminated on a first

5    offense for a category 1 offense?

6    A    Yes.

7    Q    Could an employee be issued a first written warning on a

8    first offense, for a category 1 offense?

9    A    I'm sorry, can you please repeat that?

10   A    Could an employee be issued written warning, for example,

11   for a first offense for a category 1 offense?

12   A    Yes.

13   Q    Could an employee be terminated on a first offense for a

14   category 2 case?

15   A    Yes.

16   Q    Can an employee be issued a written warning for a first

17   offense, for a category 2 case?

18   A    Yes.  All of this would depend on, like, the specific

19   details of the incident, the context, and kind of like I just

20   said before, the standards of conduct are meant as guidelines

21   and could outline generally or typically what level of feedback

22   or if feedback is warranted.  But everything is reviewed on a

23   case-by-case basis, and based on the severity of the incidents

24   could I guess, determine the level of disciplinary action.

25   Q    Okay.  And can you, Mr. Grabowski, can you think of any



www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    case that's similar to this case, without providing the

2    associates name?  You know, in your experience, in Human

3    Resources of Amazon, can you think of a case just like this

4    one?

5    A    There -- I mean, there's been other cases of like,

6    inappropriate -- inappropriate language and behavior, but

7    nothing that I can think of off the top of my head right now.

8    I mean, compared to other situations I've seen in my 3-1/2

9    years at Amazon were, like, this one almost doesn't compare to

10   others because of how vulgar and harassing the language used

11   was.  I mean, he was using a megaphone to, like, verbally

12   attack and assault someone using the B word, C word, N word,

13   using a megaphone outside in front of their peers.  I mean,

14   it's -- it's not comparable to other situations that are

15   typical.

16   Q    Thank you.  Last week in your testimony, you also

17   testified there was some discussion about a policy where, on if

18   an associate had six written warnings of any level or six

19   written warnings or two final written warnings then that could

20   result in term.  I just wanted to confirm the testimony you

21   gave last week.  Does that policy apply to behavioral

22   discipline?

23   A    A behavioral feedback has its own type of progression in a

24   sense that behavioral feedback would progress on something of

25   the same type, so it'll behavioral, attendance, behavioral



1    time-out tasks or just anything outside of those do classify as

2    behavioral.  It would progress in a rolling 12-month period.

3    So you wouldn't never see a situation where someone would get

4    six written warnings, because it would progress prior to

5    someone being able to get six written warnings.

6    Q    Okay.  So those -- that -- like, sort of formula doesn't

7    apply to behavioral?

8    A    It applies to the productivity and quality expectations in

9    performance management.

10   Q    Okay.  You were also asked some questions by the

11   Government last week about an employee receiving a final

12   written warning for first offense for social distancing.

13        MS. BUFFALANO:  So I'm going to show you -- ask Mr. Falk

14   to show you what's been marked as Respondent's Exhibit 126.

15        MR. KEARL:  Can you give us the Bates number for this?

16        MS. BUFFALANO:  This was not responsive to the subpoena,

17   so it wasn't produced.

18        MR. KEARL:  Okay.  Then objection, relevance.

19        MS. BUFFALANO:  When we were -- when he was on the stand

20   last week, there was -- there was questioning around final

21   written warning for Palmer and you all indicated or the

22   general -- I don't know who did -- but the General Counsel

23   indicated that part of their theory was that Mr. Palmer was

24   also discriminated against because of his protective activity

25   that was close to Bryson's, and for that reason, Mr. Bryson was



# Exhibit E, Motion to Try Petition on Hearing Record

1   discriminated against.  Or demonstrated animus generally, and

2   so this is a final written warning issued to another associate

3   uninvolved for a first social-distancing offense.

4        MR. KEARL:  Objection to -- so far as we have no

5   foundation of what facility this, anything like that.

6        MS. BUFFALANO:  And we haven't talked about the document,

7   yet.

8        JUDGE GREEN:  Okay.

9        MR. KEARL:  (Indiscernible, simultaneous speech) Bannon-

10  Mills, we've not actually seen the policy in question.

11       MS. BUFFALANO:  It wasn't subpoenaed.

12       JUDGE GREEN:  The social-distancing policy?

13       MR. JACKSON:  Social distancing policy?

14       MS. BUFFALANO:  Yes, the social-distancing policy was not

15  subpoenaed.  We talked about this last time.

16       JUDGE GREEN:  So here is what I don't want to do, because

17  we've -- we've been down this road before.  What I don't want

18  to do is bunch of testimony confirming what's in the

19  disciplines.

20       Is there some reason why this doesn't stand alone?

21       MS. BUFFALANO:  There's -- no.  I mean, I'm hap -- I'm

22  happy in -- in the earlier conversation we had with the

23  Charging Party and the counsel for the General Counsel was try

24  to avoid some of this stuff and just have everyone sort of

25  agree on disciplinary comparators.  This and it's -- there is


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record - 1530

1    a -- you'll see -- there's a first written that goes along --

2    coaching that goes along with this.  And -- and those two

3    documents I'm happy to just not talk about all.  But we got to

4    get them in, so.

5        MR. KEARL:  Also objection.  This is May 14th, 2020.  It's

6    after the date in -- the date that we were speaking about with

7    regards to the other worker happened in over a month before

8    this.

9        MS. BUFFALANO:  I appreciate that, but the policy just

10   went into effect at that point and so you know, it goes to the

11   weight obviously, I understand your argument.

12       JUDGE GREEN:  Okay.

13       MS. BUFFALANO:  (Indiscernible, simultaneous speech)

14   relevant.

15       MR. KEARL:  Okay.  The policy just went into effect in May

16   and was not in affect when Mr. Palmar was -- was disabled?

17       MS. BUFFALANO:  No, the policy went into effect in March.

18   So that he -- so there are comparators from beforehand.

19       JUDGE GREEN:  Yeah, that would go to weight.  But -- do we

20   have Bannon-Mills objection here?

21       MR. JACKSON:  Yes, Your Honor.

22       MR. KEARL:  I -- this has not been --

23       JUDGE GREEN:  Well --

24       MS. BUFFALANO:  These were not subpoenaed.

25       MR. JACKSON:  (Indiscernible, simultaneous speech) --



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Well, I don't know -- I don't know what --

2    that's the policy that I have that I have to --

3    MR. JACKSON:  Yeah, but the tapes disclose that this is

4    the policy (indiscernible, simultaneous speech).  Yes.

5    JUDGE GREEN:  So that's one of the reasons why I'm

6    reserving ruling on these things, because that's on the things

7    I don't know.  I -- I don't know offhand what's been

8    subpoenaed, what's been produced.  I mean, I've see the

9    subpoenas, but I don't have a perfect recollection of them.

10   They're lengthy.  I know --

11   MR. KEARL:  I can read for the 7 if it's helpful.  It's

12   very short.  Documents that showed policy --

13   JUDGE GREEN:  No -- no.  It's -- I'm just -- no.  I'm

14   going to deal with it later.  I'm reserving ruling on it.

15   MS. BUFFALANO:  Well, why -- does it make sense then to

16   break here --

17   JUDGE GREEN:  Yes.

18   MS. BUFFALANO:  -- figure out this problem -- and then --

19   okay.

20   JUDGE GREEN:  Yeah -- yes.  We will break here.  And we

21   can -- we can excuse Mr. Grabowski for the evening.

22   MS. BUFFALANO:  And Judge, can I just before -- and Mr.

23   Falk, you can take this down.

24   Before -- before he goes, I just want to let you know that

25   he is available Monday and we'll be back Monday.



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay.

2    MS. BUFFALANO:  We'll just have very -- hopefully, we can

3  solve most of our problems here and I don't have any more

4  questions for him, or very few.  And then he is turns into a

5  pumpkin Tuesday morning.  So we have him all day Monday.  I

6  said I had to leave early, but early is 4:30 Eastern, so

7  that --

8    JUDGE GREEN:  Okay.

9    MS. BUFFALANO:  So it shouldn't be an issue.  I would

10  assume we'd be done with him in that time, but I am just

11  letting you know now.

12    JUDGE GREEN:  Okay.  Gotcha.  So the upshot of that is Mr.

13  Grabowski's not available on Tuesday.  Okay.  I'm really hoping

14  we don't run over with him until Tuesday.

15    So Mr. Grabowski, you can -- you're excused.

16    MR. JACKSON:  Your Honor, would you remind the witness not

17  to speak with -- about his testimony with anyone over the

18  weekend?

19    JUDGE GREEN:  Yeah.  Don't -- don't speak to anybody about

20  your testimony.

21    THE WITNESS:  Okay.  Thank you.

22    MS. BUFFALANO:  Thank you, Tyler.

23    THE WITNESS:  Have a good night.

24    JUDGE GREEN:  So let's just talk briefly about the

25  subpoena situation.  The General Counsel is asserting that



Exhibit E, Motion to Try Petition on Hearing Record

1  documents were either not produced or not produced in time, and

2  that the search was not reasonable or was conducted in bad

3  faith, or that nonproduction was intentional.

4      And the Respondent contends that they're producing

5  documents as fast as they can.  And I don't know the answer to

6  that.  I don't -- I don't know.  I don't have that in front of

7  me.  I certainly don't have it in the record.  You know, just

8  to talk about Bannon-Mills.  It's an old case and they're a lot

9  of Bannon-Mills cases.  But the procedure and the burden is

10  actually not 100 percent clear from those -- those cases.  The

11  overall burden of establishing a violation is at -- is on the

12  GC.  But at the same time, you know, does the burden of

13  persuasion with regard to a Bannon-Mills issue switch to the

14  subpoenaed party, if the subpoenaed party shows up without

15  documents, given that the subpoenaed parties in a best position

16  to establish whether the search was conducted reasonably and in

17  good faith.

18      The cases as far as I can tell aren't clear on that

19  subjection and that's a limit you're going to want to look

20  into.  I've looked into it somewhat.  But you're going -- the

21  parties are going to want to look into it and probably tell me

22  what they think about it at some point.

23      At some point, the parties are probably going to have to

24  introduce their correspondence with regard to the production of

25  subpoenaed documents.  I haven't seen that.  It hasn't been

 1    entered into evidence.  That's probably the best way for me to

 2    figure out what's been -- what was produced when, what the

 3    explanations were regarding the matter.  At some point, I'm

 4    probably going to need to see that stuff.

 5        The GC -- you know, the GC can call more witnesses.  They

 6    haven't closed.  They can call more witnesses, they can recall

 7    Mr. Kearl regarding subpoenaed documents.  They can, you know,

 8    call more custodian records.

 9        But the Respondent might want to consider just putting on

10    a witness for yourselves to establish how the search was

11    conducted and that it was conducted with conducted reasonably.

12    This is a strategy issue, based on your understanding of the

13    cases.  But it's something that you would probably want to

14    consider.

15        But in the meantime, I'm not in a position to make -- I'm

16    simply not in a position to make the determinations that you're

17    asking me to make.  I don't know to what extent investigation

18    documents were produced.  And so therefore I don't -- I'm not

19    in a position to tell you that certain exhibits regarding the

20    investigation and other evidence regarding the investigation

21    should not be allowed.  I don't have that before me.  And

22    you're going to have to explain it to me for me to make a

23    decision on it.  And that's it.

24        That's all I have to say about it.  You know, if the

25    parties have something they want to discuss about it, I'm



Exhibit E, Motion to Try Petition on Hearing Record

1   willing to discuss it now, but it's been a long day.  So we

2   might want to just go off the record and have you all mull it

3   over.

4        MS. BUFFALANO:  Well, one question I have for you, Judge,

5   is in terms of the decision, is this something we're briefing

6   or is this something that you want us to -- I mean --

7        JUDGE GREEN:  So -- so you know, with regard to the

8   admissibility of documents, I would like to be able to make the

9   decision while we're at hearing.  You know, those types of

10  decisions are made at hearing.  Inferences, that's almost

11  certainly going to have to be briefed and no decision is going

12  to be made upon that -- those types of motions until I issue

13  the decision.

14       But with respect to the admissibility of documents and the

15  admissibility of other evidence, for example, CP-3 and 4, which

16  would otherwise be, in my opinion, inadmissible hearsay.  Those

17  were admitted.  Because the -- the notes were not produced.

18  And I -- I would really -- I would like to be able to make

19  those decisions at trial.

20       MS. BUFFALANO:  So you're telling me we're going to be

21  here for another week?

22       JUDGE GREEN:  I -- I don't know.  I really don't know.

23       MS. BUFFALANO:  Okay.

24       JUDGE GREEN:  You know, I mean, do you -- if you put on a

25  witness -- you know, how long would it take you to put on a



1  witness to testify regarding the search?

2      MS. BUFFALANO:  Have you been here?  Got all day -- I

3  mean, it's not what -- we're not going to have one person, but

4  I appreciate -- I do appreciate this because this is helpful

5  for us to plan and -- okay.

6      JUDGE GREEN:  You know, the -- the emails regarding the

7  production of documents, that should be pretty easy to enter,

8  right?  That's just one dump of documents into the record.  And

9  I can read them.  As much as I do not want to, I can read them.

10  You know, witnesses obviously would take longer.

11      MS. BUFFALANO:  Yeah, I think the problem will be the idea

12  that we haven't produced all of a particular kind of document,

13  for example, you know, the first time I'm hearing about this is

14  today, but that we haven't produced all the investigative

15  documents.  The concern -- you know, then it's a witness

16  because somebody has to say -- and there's probably several

17  witnesses.  Because there's going to be lots of different

18  places that we looked, right?  So it'd be some --

19      JUDGE GREEN:  I'm not saying -- I am not saying that you

20  have to do it -- at all.

21      MS. BUFFALANO:  I know.

22      JUDGE GREEN:  You know, if you -- go back read some cases,

23  you might just say no, we're not -- we're not doing that.  We

24  don't think they've established that there has been a bad faith

25  search and leave it at that.  But that's up to you.  That's up



Exhibit E, Motion to Try Petition on Hearing Record — 537

1    to you.

2         MS. BUFFALANO:  Okay.

3         JUDGE GREEN:  Why don't we go off the record.

4    **(Whereupon, the hearing in the above-entitled matter was**

5    **recessed at 5:35 p.m. until Monday, May 17, 2021 at 10:00 a.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1            **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings, via Zoom

3    videoconference before the National Labor Relations Board

4    (NLRB), Region 29, Case Number 29-CA-261755, Amazon.Com

5    Services, LLC, and Gerald Bryson, held at the National Labor

6    Relations Board, Region 29, Two Metro Tech Center North, 5th

7    Floor, Brooklyn, New York 11201, on May 14, 2021, at 10:00 a.m.

8    was held according to the record, and that this is the

9    original, complete, and true and accurate transcript that has

10   been compared to the reporting or recording, accomplished at

11   the hearing, that the exhibit files have been checked for

12   completeness and no exhibits received in evidence or in the

13   rejected exhibit files are missing.

14

15

16

17                                    _____

18                                    BARRINGTON MOXIE

19                                    Official Reporter

20

21

22

23

24

25



OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services LLC,          Case No.   29-CA-261755

        Employer/Respondent,

and

Gerald Bryson

        An Individual.

_____

_____

Place: Brooklyn, NY (via Zoom Videoconference)

Dates: May 17, 2021

Pages: 1539 through 1652

Volume: 11

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

AMAZON.COM SERVICES LLC,            Case No.    29-CA-261755

          Employer/Respondent,

and

GERALD BRYSON,

          An Individual.

The above-entitled matter came on for hearing, via Zoom videoconference, pursuant to notice, before **BENJAMIN W. GREEN**, Administrative Law Judge, at the National Labor Relations Board, Region 29, Two Metro Tech Center North, 5th Floor, Brooklyn, NY 11201, on **Monday, May 17, 2021, 10:14 a.m.**

Exhibit E, Motion to Try Petition on Hearing Record

1                    A P P E A R A N C E S

2    **On behalf of the Charging Party:**

3        **FRANK KEARL, ESQ.**
         MAKE THE ROAD NEW YORK
4        161 Port Richmond Avenue
         Staten Island, NY 10302
5        Tel. (929)265-7692

6    **On behalf of the Respondent:**

7        **CHRISTOPHER J. MURPHY, ESQ.**
         **JENNIFER MOTT WILLIAMS, ESQ.**
8        **RICHARD ROSENBLATT, ESQ.**
         MORGAN, LEWIS & BOCKIUS, LLP
9        1701 Market Street
         Philadelphia, PA 19103-2901
10       Tel. (215)963-5601

11       **NICOLE BUFFALANO, ESQ.**
         MORGAN, LEWIS & BOCKIUS, LLP
12       300 South Grand Avenue
         22nd Floor
13       Los Angeles, CA 90071
         Tel. (213)612-7443
14
         **KELCEY PHILLIPS, ESQ.**
15       MORGAN, LEWIS & BOCKIUS, LLP
         1111 Pennsylvania Avenue NW
16       Washington, DC 20004
         Tel. (202)739-5455
17
         **JASON SCHWARTZ, ESQ.**
18       **ZAINAB N. AHMAD, ESQ.**
         GIBSON, DUNN & CRUTCHER LLP
19       200 Park Avenue
         New York, NY 10166-0193
20
21   **On behalf of the General Counsel:**

22       **EVAMARIA COX, ESQ.**
         **MATTHEW JACKSON, ESQ.**
         **NANCY REIBSTEIN, ESQ.**
23       THE NATIONAL LABOR RELATIONS BOARD, REGION 29
         Two Metro Tech Center North
24       5th Floor
         Brooklyn, NY 11201
25       Tel. (718)765-6172



Exhibit E, Motion to Try Petition on Hearing Record

1                          I N D E X

2

3   WITNESS            DIRECT  CROSS   REDIRECT  RECROSS  VOIR DIRE

4   Tyler Grabowski     1557   1569     1625      1634
                               1612
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1                                    E X H I B I T S

2

3   EXHIBIT                                      IDENTIFIED        IN EVIDENCE

4   Charging Party:

5       CP-7                                        1612              1615

6       CP-8                                        1615              1617

7

8   Respondent:

9       R-26                                        1562              1565

10

11  General Counsel:

12      GC-74                                       1608              1610

13

14

15

16

17

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1                    P R O C E E D I N G S

2          JUDGE GREEN:  Okay.  So we're back on the record.  It's

3     May 17th, 2021.  It's the case of Amazon.com Services LLC, case

4     29-CA-261755.  And the parties have had some -- some

5     discussions off the record.

6          One is that the Respondent is proposing that we be off --

7     after today, we be off the rest of the week.  The Respondent is

8     apparently pretty close to finishing up the production of

9     subpoenaed documents and believes that they can finish up if

10    we're off Wednesday and Thursday in addition to being off

11    Tuesday and Thursday, which we had already planned, and then we

12    can proceed in a more efficient way beginning Monday, if that

13    is the schedule.

14         The second is that there was a discussion about my in --

15    potential in camera -- in camera review of subpoenaed documents

16    which were produced but redacted.  And at least right now, the

17    Respondent objects to the production in camera of such

18    documents, and the General Counsel is asking for such a review.

19    That's the second issue.

20         And I think we're going to table those issues for a

21    moment, and I -- as indicated also off the record, I'd like to

22    have a discussion brief -- briefly with the parties regarding

23    the proper standard that we're dealing with here.  As I

24    indicated off the record, on Friday, as far as I could tell,

25    the Respondent was putting on evidence that it held an honest



# Exhibit E, Motion to Try Petition on Hearing Record

1    belief that Mr. Bryson engaged in serious misconduct during his

2    altercation with Ms. Evans, even if the Respondent's knowledge

3    and understanding of that conduct was not necessarily entirely

4    accurate.  This got me thinking as to what the proper standard

5    is in this case.  It's -- you know, this type of mistaken

6    belief is a valid defense and the standard is Wright-Line if

7    the misconduct doesn't arise out of protected activity.

8         However, if the misconduct does aride (sic) out -- arise

9    out of protected activity, the standard is not Wright-Line.

10   The standard is the burden shifting analysis in NLRB v. Burnup

11   & Sims --

12        MR. MURPHY:  Right.

13        JUDGE GREEN:  -- which is 379 U.S. 21 (1964) case.  And

14   after herding -- hearing the evidence so far and after reading

15   a number of Burnup & Sims cases over the weekend, it's really

16   not clear to me that Burnum (sic) -- Burnup & Sims is not the

17   correct standard.

18        And I -- I'm raising this for a couple of reasons.  The

19   first is, I'm definitely going to want the parties to brief

20   this issue and -- and tell me which standard I -- I should be

21   using, but really perhaps more importantly at the moment, if --

22   if the standard is Burnup & Sims, as far as I can tell -- from

23   the General Counsel's perspective, the video tapes would be the

24   only evidence that we need.  I don't think anything else would

25   be relevant including all of the subpoena documents.  And you

 1    know, I understand that, you know from the -- I would imagine

 2    that from the Respondent's perspective, they're probably going

 3    to assert that the altercation is not -- did not arise out of

 4    protected activity, and that it's a Wright-Line standard.  And

 5    so I -- I don't know that this moves the ball for the

 6    Respondent that much, but if the GC thinks that the standard is

 7    Burnup & Sims, then okay, they still have an interest in

 8    addressing the Respondent's defense and there could be

 9    alternative theories, but you know, the Government also has an

10    interest in proceeding expeditiously in the most efficient way

11    with regard to these proceedings.  And -- and since we're --

12    we've been struggling, in my opinion, with that from the

13    beginning, I'd -- I'd like -- I guess I'd like to know what

14    the -- what the region's theory is regarding the standard, and

15    ask them to consider that if the -- if the position is that

16    it's Burnup & Sims, how -- how you're going to want to proceed

17    going forward, because I think it would dramatically change how

18    the Government proceeds with -- proceeds what they need in

19    order to address this case.  And it could potentially save

20    everybody a great deal of time and money.

21         And I know that's -- that's quite a mouth full at this

22    juncture, but I -- you know, it's something that I -- I started

23    to consider on Friday given how the -- how the record was

24    coming in, and as I contemplated it over the weekend, you know,

25    it just seemed to me that we might be making a whole lot -- a

1    whole lot more of this case then it has to be.  So that's it.

2         You know, I'm not expecting the parties to address that

3    now.  I -- I just -- it's something that I was thinking about,

4    and I'd like you to consider going forward and certainly to

5    address in the briefs at the end of the case.  Okay.

6         So with regard to the other -- listen, I guess I'm going

7    to let the Respondents talk about the -- the issue of the in-

8    camera documents, because it sounds like maybe you'll not

9    oppose; am I right about that?  Have you had an opportunity to

10   discuss it?

11        MR. MURPHY:  Well, I can't -- I can't make that

12   representation today.

13        JUDGE GREEN:  No, no.  I'm not -- yeah --

14        MR. MURPHY:  Yeah.

15        JUDGE GREEN:  I don't know whether --

16        MR. MURPHY:  Yeah.

17        JUDGE GREEN:  -- you will or won't.

18        MR. MURPHY:  Yeah.

19        JUDGE GREEN:  I'm just saying it's something you'll talk

20   about.

21        MR. MURPHY:  We'll certainly talk about it.  The next

22   tranche of documents to be produced will have some of the same

23   types of documents in them.  So this is -- you know, so it's

24   not just whatever -- whatever's been produced so far.  So we --

25   we do need to talk about it.  And -- but I do -- I do think



1    that there needs to be some sort of showing before the in-

2    camera review is ripe.  I mean, you know, the -- Mr. Jackson's

3    bandied --

4         JUDGE GREEN:  We'll here's the notes.

5         MR. MURPHY:  Mr. Jackson's bandied about bad faith and

6    all -- and all that, but I -- you know, there's -- I can say

7    that there's been no bad faith.  There's certainly been no

8    demonstration of it on the record, and I -- and I think you

9    need to show -- there needs to be some demonstration that --

10   that the -- that the message was cut off in the middle or

11   something like that.  I just don't think it's --

12        JUDGE GREEN:  Well, so here's my problem with that.

13        MS. REIBSTEIN:  Your Honor, they -- okay.

14        JUDGE GREEN:  My, my problem with that is, is that you --

15   we know that some of these Chimes are responsive, and we -- so

16   it's going to be very difficult to know what's the complete

17   document.  I'm really not going to be able to tell unless I see

18   that.  I don't know how we get around that.

19        MS. REIBSTEIN:  Your Honor, this -- they're not analogous,

20   what Mr. Murphy's raising; this is not like privilege where

21   there's something that, you know, we should not see.  As -- as

22   you're saying in -- you know, pages of redacted Chimes, there's

23   no way to know, as you're -- as you're saying, Your Honor,

24   like, which are the same conversations in which is a different

25   one.  And even if it is a different conversation that doesn't



1    pertain to this matter, it -- that's the same as getting a

2    bunch of disciplinary documents, and we go through them, and we

3    decide which ones we feel are relevant and which ones are not.

4    It's not --

5         MR. MURPHY:  Yeah, but this --

6         MS. REIBSTEIN:  -- we can't see them.

7         JUDGE GREEN:  Right, but I --

8         MS. REIBSTEIN:  Yeah, but --

9         JUDGE GREEN:  -- think what's important to distinguish is

10   that I'm not saying that these documents should necessarily be

11   produced to the General Counsel.

12        MS. REIBSTEIN:  Yeah, but well, here -- here's one example

13   for -- even though we don't need to make a showing, but there's

14   one.  I don't remember the document number.  Ms. Cox could

15   probably say.  There's a -- there's a long Chime.  The entire

16   thing is redacted except for smack in the middle, a photograph

17   of one of the protestors, Chris Smalls.  So it seems

18   inconceivable that the entire conversation, pages before and

19   pages below, do not pertain, and someone plunked a photo of a

20   protestor smack in the middle, so that's -- that's an example

21   of why Your Honor needs to see the entire --

22        JUDGE GREEN:  Yeah, I --

23        MS. REIBSTEIN:  -- unredacted --

24        JUDGE GREEN:  Right.

25        MS. REIBSTEIN:  -- Chimes to see where it starts and where



# Exhibit E, Motion to Try Petition on Hearing Record

1    it ends.

2        MR. JACKSON:  Your Honor, I would posit it that you can

3    tell from the face of these redacted documents that Respondent

4    has decided to line-item edit out certain portions of the Chime

5    messaging.  It's just a (audio interference) --

6        JUDGE GREEN:  Okay.  Right.  But the point is that's not

7    necessarily inappropriate in my opinion.  If they have the --

8    are of the position that certain portions are not responsive to

9    the document, they can take that -- not responsive to the

10   subpoena -- they -- I think that they can take that position in

11   here, but I probably need to review it. I really don't see any

12   way of not -- of avoiding an in-camera review here.

13       MR. MURPHY:  Your Honor --

14       JUDGE GREEN:  That's -- that's that, but I'm giving till

15   after lunch to think about it, and I'll issue an order then.

16       MR. MURPHY:  Yeah.  But Judge, not to further complicate

17   or belabor, but if the counsel for the General Counsel has

18   identified a subset of the Chimes that it believes -- for

19   example, the one with picture of Mr. Smalls, that somehow

20   suggest that it was -- that relevant -- or I should say

21   responsive parts of the communication were chopped off, I mean,

22   you know we would look closely at those, but just to -- to --

23   to provide them all with no similar kind of showing --

24       MS. REIBSTEIN:  (Audio interference).

25       MR. MURPHY:  But then again, you know, if the counsel for



# Exhibit E, Motion to Try Petition on Hearing Record

1    the General Counsel is willing to do that, we'll take a look at

2    it.  If they're not, we'll make a decision, Judge.

3        JUDGE GREEN:  Okay.

4        MR. MURPHY:  And we appreciate you giving us until after

5    lunch to do that.

6        JUDGE GREEN:  Okay.

7        MS. REIBSTEIN:  If we're willing to do what?  I'm not

8    clear.

9        MR. MURPHY:  So I -- I had I was suggesting that perhaps

10   you -- you would be in a position to identify some subset of

11   the Chimes that -- that you believe -- like the one you raised

12   with the picture of Mr. Smalls in it.

13       MS. REIBSTEIN:  No.  That was just an example of why the

14   concept doesn't work and why Your Honor is correct that the

15   only way to know is for him to see it, and that's our position.

16       JUDGE GREEN:  Okay.  So schedule -- let me just ask the

17   General Counsel, do you have a position now regarding the

18   schedule with regard to Mr. Murphy's request that we be off

19   Wednesday and Friday as well as Tuesday and Thursday?

20       MR. JACKSON:  Yes.  We oppose the request and wish to

21   proceed.

22       JUDGE GREEN:  Let me ask -- okay.  So let me ask, does

23   the -- does the Respondent have any -- you have additional

24   witnesses?  You've been willing to put on your case.  I guess

25   it's not going to impact you what's produced and what's not



1    produced.  Is there any reason why can't just continue with

2    your case-in -- case-in-chief?

3         MR.  MURPHY:  Well -- well, there is in that there's a

4    utility to call witnesses, you know, once and examine them once

5    as opposed to going back and forth, you know, and dragging this

6    hearing out into, you know, who knows what number of days or

7    weeks.  So -- so there's certainly an efficiency issue here,

8    and -- and believe me, I understand that you've repeatedly

9    asked the counsel for the General Counsel, you know, whether it

10   wants to proceed, but you know, we're -- Amazon is in this case

11   too, and -- and you know, we have interests.

12        And one of the interests is presenting this case in the

13   most efficient way, and frankly, you know, your raising the

14   issue of the -- or the concept of whether this is a Burnup &

15   Sims case as opposed to Wright-Line case, I think augurs

16   further for, you know, taking up two days and allowing not just

17   the production to be complete, but also for an understanding of

18   where this case is headed and whether all of the nonsense --

19   well, all of the discussion about subpoenaed materials and

20   production of subpoenaed materials and Bannon-Mills and

21   sanctions is, you know, just that:  discussion.  So I -- I

22   think there's --

23        JUDGE GREEN:  Okay.  Let me ask you --

24        MR. MURPHY:  I think there's a lot to -- okay.  I'm sorry.

25        JUDGE GREEN:  Let me ask the parties, if we went on



# Exhibit E, Motion to Try Petition on Hearing Record

```
1    Monday, how long would it take?  Do we know?

2        MS. REIBSTEIN:  Your Honor, I just -- we oppose this

3    for -- for a variety of reasons, you know, not the smallest of

4    which is that we have a number of people on this case who have

5    other professional commitments, our schedules.  You know, we --

6    we planned for this schedule, and it would be extremely

7    disruptive, you know, to change --

8        JUDGE GREEN:  So are you -- I mean, are people not

9    available next week?

10       MS. REIBSTEIN:  Well, we have -- we have other --

11       JUDGE GREEN:  Wait, what are we -- what are we -- I'm just

12   asking, because generally, I actually agree with Mr. Murphy on

13   this.  I do -- I do think that there is something to be said

14   for getting -- just getting this out of the way, getting the

15   production out of the way, having an opportunity for the -- for

16   the Government side to think about what they believe the

17   standard is and how to best proceed.  And it's not a -- we're

18   not talking about a lengthy delay; we're talking about a short

19   delay that could potentially make the rest of this case

20   quicker.

21       MS. REIBSTEIN:  So --

22       JUDGE GREEN:  And so if you've got some -- if you've got

23   some real problems as far as scheduling is concerned, yeah,

24   okay.  You know, you can tell me.  You don't have to

25   necessarily tell me right this second, but --
```



Exhibit E, Motion to Try Petition on Hearing Record

```
 1          MS. REIBSTEIN:  The other problem is that the -- you know,

 2    we don't have a lot of confidence in --

 3          MR. MURPHY:  Well, hold on.

 4          MS. REIBSTEIN:  -- representation that we're getting what

 5    we're getting.

 6          MR. MURPHY:  You know, Judge --

 7          MS. REIBSTEIN:  We get cases that --

 8          MR. MURPHY:  Judge --

 9          MS. REIBSTEIN:  No, no, no.

10          MR. MURPHY:  Judge, Judge.

11          MS. REIBSTEIN:  Please don't talk.

12          MR. MURPHY:  That -- that's just --

13          MS. REIBSTEIN:  Please don't talk over me.

14          MR. MURPHY:  That's -- Judge, that's just nonsense.  All

15    right?

16          MS. REIBSTEIN:  No.  It's not nonsense.

17          MR. MURPHY:  And that's been -- that's been a refrain

18    from --

19          MS. REIBSTEIN:  Mr. Murphy --

20          MR. MURPHY:  That's been a refrain --

21          MS. REIBSTEIN:  -- you spoke over me, sir.

22          MR. MURPHY:  -- from the get-go, Your Honor.

23          MS. REIBSTEIN:  Mr. Murphy, please --

24          MR. MURPHY:  And with absolutely no foundation -- no

25    factual basis whatsoever.
```


www.escribers.net | 800-257-0885

1    MS. REIBSTEIN:  Mr. Murphy --

2    JUDGE GREEN:  So I -- you know what --

3    MS. REIBSTEIN:  -- you interrupted me.

4    JUDGE GREEN:  My audio went out right as Mr. -- Ms.

5   Reibstein began to speak, so I actually missed that.

6    MS. REIBSTEIN:  An ordinary lesson.

7    JUDGE GREEN:  I missed that.

8    MS. REIBSTEIN:  I said -- what I said was, and I would

9   like to speak without interruption and -- and yelling --

10    MR. MURPHY:  Well, then don't cast -- don't cast

11   unjustified --

12    MS. REIBSTEIN:  Okay.

13    MR. MURPHY:  -- aspersions, unsubstantiated aspersions.

14    MS. REIBSTEIN:  Mr. Murphy.  Okay.  This -- this touched a

15   nerve I see, but that's okay.  So --

16    MR. MURPHY:  Yeah.

17    MS. REIBSTEIN:  What I was saying was, as we all know,

18   Your Honor, the production of documents has been

19   extraordinarily difficult, and you know, there've been

20   representation that we were going to get things and we didn't,

21   and there were inordinate delays, and things redacted, and

22   we -- there's not a lot of confidence that it's actually going

23   to move the ball.  And we --

24    JUDGE GREEN:  Yeah, but -- okay.

25    MS. REIBSTEIN:  -- think that we can -- we think that we



1    can -- we can get a lot accomplished and don't want to waste

2    these days.

3        JUDGE GREEN:  Yeah.  Right, so here's --

4        MS. REIBSTEIN:  And -- and as you've pointed out, Your

5    Honor, the production --

6        JUDGE GREEN:  Here's my point.  Here's the problem with

7    that, and I -- this is what I addressed on the record Friday is

8    that I -- there's -- I don't know.  You know, you're saying

9    that there's been all kinds of delays and yeah, it's been

10   taking a long time to get the production of documents, but I

11   don't -- I don't -- simply don't know whether the production

12   has been reasonable or unreasonable.  I don't have that in

13   front of me.  I don't have that in the record.  It's not

14   something I have.  It's something that the General Counsel has

15   said multiple times, but it's not something that has been

16   established before me.  And so, you know, we'd have to -- I

17   said that Friday that we're going to have to flesh that out.

18       MS. REIBSTEIN:  Your Honor, I --

19       JUDGE GREEN:  But I don't -- I really don't see that as a

20   basis for impacting the schedule one way or the other.

21       MS. REIBSTEIN:  Okay.  So we're -- we're going to be

22   filing a motion imminently, and you'll have everything laid out

23   before you so, you know, you could have time to review that

24   today and then we could, you know --

25       JUDGE GREEN:  Okay.  So in the meantime --



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. REIBSTEIN:  -- put on that presentation.  But as you

2    pointed out, Your Honor, their production of documents has

3    nothing to do with them taking the rest of this week to finish

4    their case.  It -- it doesn't make any sense.

5    MR. MURPHY:  Judge, if -- so here's the -- here's the

6    analysis.  If we proceed this week, all we're going to do is

7    end up in next week in an unsettled status with -- with the

8    counsel for the General Counsel deciding who, in addition, they

9    need to call or recall and us deciding who we need to call or

10   recall.

11   And so what we're suggesting is that we take the two days

12   off after today, so that -- so that not only can we get the

13   production done and take a look at whatever the standard might

14   be, but so that we can get organized so that the case

15   proceed -- and believe me, look, no one wants -- no one -- Ms.

16   Buffalano and I, and all the other people who are working on

17   this case, we have other professional and -- and personal

18   commitments and I -- and I recognize that -- that all the

19   lawyers on the other side do as well.  And so I think that

20   this, what we've suggested, best -- best response to those

21   other commitments and ease the case up in the best possible way

22   to proceed outside of proceeding on this really ad hoc basis

23   and so again, you know, we --

24   JUDGE GREEN:  Okay.  So let's -- let's -- let's move on

25   for today and we can discuss it maybe again after Mr.

# Exhibit E, Motion to Try Petition on Hearing Record

1     Grabowski.  I'd like the parties to actually talk about if they

2     have conflicts.

3         So I don't have a huge problem.  This case is going to

4     wrap up next week.  I simply don't have an issue with going

5     today and going next week.  I actually probably can't be here

6     on May 28th, which is the Friday.  But if that's all we're

7     talking about and it doesn't cause any huge disruption, I just

8     don't see it as being a problem, but maybe it is a problem for

9     certain people.  We have a lot of lawyers on this case,

10    including on the GC side.  So think about what your schedules

11    are, and we'll address the issue of scheduling today.  Okay?

12        So are we ready to continue with Mr. Grabowski?  And

13    that's -- okay.  So let me, let me admit Mr. Grabowski from the

14    waiting room.  Okay.

15        So Mr. Grabowski, just recall that you're still under oath

16    and the same rules apply regarding testimony.  Don't use a

17    hand-held device to talk to anybody.  Don't look at any

18    documents unless somebody directs you to do so, okay?

19        THE WITNESS:  Okay.

20        JUDGE GREEN:  Okay.  So whenever you would like to begin.

21    Whereupon,

22                        **TYLER GRABOWSKI**

23    having been previously sworn, was called as a witness herein

24    and was examined and testified, by video, as follows:

25                 **RESUMED DIRECT EXAMINATION**



1    Q    BY MS. BUFFALANO:  Okay.  So good morning, Mr. Grabowski.

2    Thanks for joining us again.  If you -- Mr. Falk, could pull up

3    Respondent's Exhibit 21, I want to start here.  Thank you.

4    Okay.  I just have a couple questions on this, Mr. Grabowski.

5    So you testified on Friday that you created this document, and

6    I just wanted to ask you a couple questions about how you did

7    it.  So --

8    A    Okay.

9    Q    There are columns across the top that indicate -- that

10   have names that correlate with individuals involved in this

11   incident; is that right?

12   A    Yes.

13   Q    And then there are checkmarks down the columns.  Can you

14   just explain to us what the checkmarks represent?

15   A    So the checkmarks were based on what each of the

16   individuals recalled witnessing during the event.

17   Q    Okay.  Based on what's in the first column on the left,

18   under allegation?

19   A    Yes.

20   Q    Okay.  And what -- like, so if we look at Evans, for

21   example, the second column in the document, what information

22   are the checkmarks based on?

23   A    The checkmarks are based on what she alleged that Mr.

24   Bryson said.

25   Q    Okay.  And that's in her witness statement and in her



1    seek-to-understand meeting?

2    A    Yes.

3    Q    Okay.  And then when we move to the next column,

4    Donaldson, what are the checkmarks based on for Ms. Donaldson?

5    A    What she recalled hearing Mr. Bryson saying, what she

6    spoke to me about and noted in her statement.

7    Q    Okay.  And the same thing for the rest of the individuals

8    identified:  Mr. Urso, Mr. Curlej, Ms. Bertone, Mr. Chierchio?

9    A    Yes.

10   Q    Okay.  And then, Mr. Bryson, he has some checkmarks here

11   and then comments in his column.  Can -- what is -- what are

12   his checkmarks and comment based on?

13   A    What he admitted to in the conversation with him.  In that

14   last part where Ms. Evans alleged that Mr. Bryson told her that

15   she would make him shut up, when I asked Mr. Bryson about it,

16   he said that he just told her to shut up, not that he would

17   make her shut up.

18   Q    Okay.  And this is just -- this is based on the statement

19   or on the seek-to-understand meeting that you had with him?

20   A    Yes.

21   Q    Okay.  And then the last column on the right, it says

22   validated on a Facebook Live broadcast; do you see that?

23   A    Yes.

24   Q    Did you watch a Facebook Live broadcast?

25   A    No.



Exhibit E, Motion to Try Petition on Hearing Record
1662

1    Q    Do you know -- like sitting here, do you know what this

2    Facebook Live broadcast refers to?

3    A    I know it refers to the broadcast that was being streamed

4    live while the event was going on, but to this day, I have not

5    seen it.

6    Q    And if you didn't watch the Facebook Live broadcast, how

7    did you fill out this column?

8    A    It's likely it was told to me, but I don't remember.  I

9    mean, someone had to have told me, because I haven't seen the

10   video.

11   Q    Okay.  Do you remember who that might have been?

12   A    I would say either Bradley or Christine.

13   Q    Okay.

14        MS. BUFFALANO:  And you can take down Respondent's Exhibit

15   21, Mr. Falk, thank you.

16   Q    BY MS. BUFFALANO:  Okay.  And Mr. Grabowski, does Amazon

17   have a policy with respect to employee appeals from termination

18   decisions?

19   A    Yes.

20   Q    What is that policy?

21   A    That employees that have been with the company for more

22   than 90 days are eligible to appeal final written warning or

23   termination documents to either site leadership or to an

24   appeals panel which would consist of both area managers and

25   hourly associates.



1    Q    Okay.  And what, if anything, did you say to Mr. Bryson
2    about his ability to appeal his termination?
3    A    I believe I told him that he was not eligible for the
4    appeal.
5    Q    And why is that?
6    A    Because there are certain aspects that are not appeals-
7    eligible and that's in anything that Amazon is legally required
8    to take action on, so anything involving violence, harassment,
9    drug or alcohol use.
10   Q    And which of those was present in this case?
11   A    Harassment.
12        MR. JACKSON:  Objection.  Hearsay.
13        JUDGE GREEN:  Overruled.
14   Q    BY MS. BUFFALANO:  And in what conversation did you inform
15   Mr. Bryson of this?
16   A    During the separation of employment conversation that
17   Sergiy had with Mr. Bryson.
18   Q    Okay.  Thank you.  Okay.  So I'm going to show --
19        MS. BUFFALANO:  Can you show us, Mr. Falk, Respondent's
20   Exhibit -- you know what, let me wait and do this last.  Hold
21   on a second.  Okay.
22   Q    BY MS. BUFFALANO:  So let me switch now to Ms. Evans.  I
23   want to ask you a couple of questions about Ms. Evans'
24   discipline.  Did you make the decision to issue Ms. Evans'
25   first written warning?



1    A    No.

2    Q    Do you know why she was issued a first written warning?

3    A    Aside from reading the feedback, no, and knowing like what

4    the actual feedback outlines.  I wasn't a part of the decision

5    making for it.

6    Q    Okay.  Thank you.  And I'm going to -- so in terms of the

7    policy that Ms. Evans violated, can you tell us, if you know

8    offhand what policy she violated?

9    A    Part of the standards of conduct; it was inappropriate

10   language and behavior, I believe.

11       MS. BUFFALANO:  Okay.  Can you show us, Mr. Falk, General

12   Counsel's Exhibit H?  You know what, can you -- I apologize.

13   Can you show us 26 first?

14       MR. FALK:  General Counsel 26 or --

15       MS. BUFFALANO:  Respondent.

16       MR. FALK:  -- Respondent 26.  Okay.

17       MS. BUFFALANO:  Apologies.

18       MR. JACKSON:  Objection.  Move to strike.  The witness

19   doesn't have foundation to testify about a document and a

20   decision that he testified he was not a part of.

21       MS. BUFFALANO:  Okay.  Let me ask another question, Judge.

22   And actually that may make sense because we may have to upload

23   26.

24   Q    BY MS. BUFFALANO:  Mr. Grabowski, do you know who

25   delivered Ms. Evans her first written warning?



Exhibit E, Motion to Try Petition on Hearing Record

1563

```
 1   A    Yes.

 2   Q    Who was that?

 3   A    Sherman Lylrely.

 4   Q    Who is that?

 5   A    An area manager in the department that Ms. Evans worked

 6   last year.

 7        MR. JACKSON:  Objection.  Same objection.  Lacks

 8   foundation.

 9   Q   BY MS. BUFFALANO:  Was anyone else there?

10        JUDGE GREEN:  Overruled.  Let me ask -- how did you, how

11   do you spell, is that Sherman Riley (phonetic)?

12        THE WITNESS:  Lylerly.  I think it's L-Y-L-E-R-L-Y.  It

13   should be on the document.

14        JUDGE GREEN:  Okay.

15   Q   BY MS. BUFFALANO:  Okay.  And was there anybody else at

16   that meeting?

17   A    Myself.

18   Q    Okay.

19        MS. BUFFALANO:  Looks like 26 isn't in.  So I'm going to

20   just put it into SharePoint quickly.

21        MR. FALK:  It's there now.

22        MS. BUFFALANO:  Oh, perfect.  Thank you.  Okay.

23   Q   BY MS. BUFFALANO:  Okay.  And have you seen this before,

24   Mr. Grabowski?

25   A    Yes.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And what is this?

2    A    The first written warning that Ms. Evans received as a

3    result of her involvement in the incident.

4    Q    Okay.  And you'll see -- in terms of -- so do you know who

5    created this document?

6    A    I believe I did.

7    Q    And what portions of the document do you complete -- or

8    did you complete?

9    A    The details of current incident and specific concerns, and

10   then the areas of improvement required by associate.

11   Q    Okay.  And in the details, it indicates that Ms. Evans --

12   her violations of the standards of conduct is inappropriate

13   language or behavior under category 2; is that right?

14   A    Yes.

15   Q    Okay.  And are you aware that inappropriate language or

16   behavior is not spelled out under category 2 of the standards

17   of conduct?

18   A    Yes.

19   Q    Okay.  And so do you -- have others -- is this sort of --

20   explain to me how inappropriate language or behavior works or

21   where it comes from if it's not explicitly described in

22   standards of conduct?

23   A    So the standards of conduct are used as a set of

24   guidelines and used as, like, a reference point.  And I believe

25   this stems from the vulgar or harassing language or behavior



1    towards a fellow associate or supervisor that's outlined in the

2    standards of conduct.

3    Q    And are other associates issued warnings for using

4    inappropriate language or behavior under the category 2

5    standards of conduct?

6    A    Yes.

7    Q    Okay.

8        MS. BUFFALANO:  And you can take this -- we're going to

9    move to admit Respondent's Exhibit 26.

10       JUDGE GREEN:  Any objection?

11       MR. KEARL:  No objection.

12       JUDGE GREEN:  R-26 is admitted.

13   **(Respondent Exhibit Number 26 Received into Evidence)**

14       MS. BUFFALANO:  Okay, you can take this down, Mr. Falk.

15       MS. REIBSTEIN:  The document's already in evidence.

16       JUDGE GREEN:  Okay.

17       MS. BUFFALANO:  Okay.

18       JUDGE GREEN:  But is it -- but is it -- okay.  All right.

19   It'll still -- it's in -- it's twice.

20   Q    BY MS. BUFFALANO:  Okay.  So Ms. Evans was issued a first

21   written for category 2 offense under the standards of conduct,

22   and Mr. Bryson was terminated for a category 2 offense under

23   the standards of conduct.  Why -- why the difference?

24   A    Yeah.  Based on the severity of the situation.

25       MR. KEARL:  Objection.  Lacks foundation.  He was not part



1   of the decision-making process.

2   JUDGE GREEN:  If that's so, you can -- did he -- why don't

3   you explain how you know that?

4   THE WITNESS:  I was part of the investigation that was

5   conducted, so I saw the behavior that witnesses recalled from

6   the event specifically, and then seeing the severity of what

7   Mr. Bryson said versus what Ms. Evans did is likely what lead

8   to the different levels of feedback.  But ultimately I was not

9   part of the decision-making process for either.

10   MR. KEARL:  Okay.

11   JUDGE GREEN:  So I mean, I'm not going to -- we have the

12   explanation; Mr. Kearl's point is made.

13   Q   BY MS. BUFFALANO:  Okay.  Mr. Grabowski, did you

14   investigate this incident or take any action related to the

15   incident or the investigation because Mr. Bryson participated

16   in a demonstration outside the facility on March 30th?

17   A   No.

18   Q   Did you investigate this incident or take any action

19   related to the incident or the investigation because Mr. Bryson

20   participated in a demonstrated outside the facility on April

21   6th?

22   MR. JACKSON:  Objection.

23   MR. KEARL:  That's leading.

24   MR. JACKSON:  Yeah, he also --

25   JUDGE GREEN:  Overruled.  This is just soliciting denials.


www.escribers.net | 800-257-0885

Case 1:22-cv-01479-RG-SJB Document 5-1 Filed 03/17/22 Page 1617 of 2171 PageID #: 1567 1669

1    It's allowed.

2    Q    BY MS. BUFFALANO:  Did you investigate --

3         MS. BUFFALANO:  Did we get the answer, Harry?

4    Q    BY MS. BUFFALANO:  Do you want to just give us the answer

5    again, Tyler, just in case?

6    A    No.

7    Q    And did you investigate this incident or take any action

8    related to the incident or the investigation because Mr. Bryson

9    participated in a meeting with -- a management meeting -- or

10   production meeting I think we've been calling it on March 25th?

11   A    No.

12   Q    Because of his relationship with Christian Smalls?

13   A    No.

14   Q    Because -- did you -- well, let me -- let me sort of ask

15   the whole question again.  Did you investigate this incident or

16   take any action related to the incident or the investigation

17   because Ms. Evans had been defending Amazon during the

18   incident?

19   A    No.

20   Q    Okay.  One -- one last topic, and this is a continuation

21   from last Friday.  So if you could show us Respondent's Exhibit

22   126 redacted.

23        MS. BUFFALANO:  And everyone who has access to SharePoint,

24   the unredacted version of this is what we looked at last

25   Friday.  But as we talked about, we want to put any



1    disciplinary documents in the record redacted, so the

2    unredacted version is available on SharePoint for you all to

3    open and look at, but the one we're going to look at publicly

4    here is the redacted version.

5         JUDGE GREEN:  Hold on just one moment while I take a look

6    at SharePoint.

7         MR. JACKSON:  Can I get the Bates -- the Bates number for

8    this as well?

9         MS. BUFFALANO:  It wasn't produced.  It is not -- it was

10   not part of the production that we agreed upon in terms of the

11   discipline.

12        MR. JACKSON:  Then objection.  Relevance.

13        JUDGE GREEN:  Overruled.

14        So I'm not seeing the document in SharePoint.  1-1-6 you

15   said?

16        MS. BUFFALANO:  1-2-6.

17        JUDGE GREEN:  126.  I see.

18        MS. BUFFALANO:  But you know, let's do this.  You can take

19   this down, Mr. Falk.  Let's do this.  We're going to have a --

20   I think we need to have a conversation later today -- maybe

21   after lunch about -- about these kinds of documents, like what

22   we would term comparator.  I think it actually, Judge Green,

23   goes along with our discussion earlier today.  Maybe all of

24   this is unnecessary.  So maybe, let's -- let's just put this to

25   the side for now and we'll come back to it if we need to.



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Okay.

2      MS. BUFFALANO:  So just give me one second.  I think -- I

3   think I'm finished with Mr. Grabowski, but let me just make

4   sure.  Can we take a minute off the record?

5      JUDGE GREEN:  Yeah.  Off the record.

6   (Off the record at 10:52 a.m.)

7      MS. BUFFALANO:  I have nothing further for this witness at

8   this time.

9      JUDGE GREEN:  Okay.  Will there be any cross from the

10  General Counsel?

11     MR. JACKSON:  Yes, Judge.

12     Your Honor, if I may just take ten minutes off the record?

13     JUDGE GREEN:  Sure.  Off the record.

14     JUDGE GREEN:  Okay.  Same deal, Mr. Grabowski.  You can --

15  you know, you can do whatever you want, just don't talk about

16  the case or your testimony with anybody, okay?

17     THE WITNESS:  Okay.  Thank you.

18  (Off the record at 10:55 a.m.)

19     JUDGE GREEN:  Okay.  So Mr. Grabowski, Mr. Jackson's going

20  to have some questions for you on cross-examination.

21                    **CROSS-EXAMINATION**

22  Q    BY MR. JACKSON:  Mr. Grabowski.

23  A    Good morning.

24  Q    I'm not sure the record is quite clear, so can you help

25  explain what a "seek-to-understand" is?



1    A    So a seek-to-understand is a conversation that typically a

2    member of leadership would have with an employee to understand,

3    from their perspective, what happened during a situation.  If

4    there's any information that was provided prior to the initial

5    conversation with the employee, we would bring that up,

6    reference that.  It's really just to gain clarity and details

7    and give an employee a -- a chance to voice their opinion or

8    speak on behalf of what happened.

9    Q    And would you agree that it's important to conduct a seek-

10   to-understand before making any determination on any

11   disciplinary actions?

12   A    I think it depends, based on the details.  A final

13   decision, you likely want to have all of the information at

14   hand.  But some situations, you'll see that you'll have details

15   substantiated through multiple witness account, that it's easy

16   to make a recommendation or some type of determination prior to

17   having that conversation because of what was already

18   substantiated.

19   Q    Okay.  Do you usually document seek-to-understand

20   meetings?

21   A    It depends.  So the conversations range frequently, so

22   sometimes they're documented, sometimes they're not, depending

23   on what the situation is.  I mean, seek-to-understand

24   conversations happen as regularly as daily between managers and

25   employees with situations as severe as investigations to as



1    minor as extended periods off the station and asking if there's

2    something we can help with.

3    Q    So are you saying that in a minor situation, you would not

4    necessarily document your seek-to-understand, but in a more

5    major investigation you should document your seek-to-

6    understand?

7    A    I think it really depends on the situation and the

8    specific facts involved, so it -- it can vary.  It'd be hard to

9    determine without knowing the -- I guess, the subject or the

10   substance of the conversation.

11   Q    Forgive me, but it's been a long weekend.  Did you testify

12   last Friday that you played no part in the decision to

13   terminate Gerald Bryson?

14   A    Yes.

15   Q    So you made no recommendation regarding what disciplinary

16   action Amazon should take with respect to Mr. Bryson?

17   A    No.

18   Q    You did not make any recommendation?

19   A    No.

20   Q    But it's true that at least you suggested to your

21   supervisors, what action should be taken in this instance; is

22   that correct?

23   A    I collected the investigation facts.  I spoke to the

24   witnesses, but the decision was made out of my hands.

25   Q    Okay.  All right.  Mr. Grabowski, I'm going to show you a



www.escribers.net | 800-257-0885

1    document that's been identified as Respondent's 18.

2    A    Okay.

3    Q    Can you see the document?

4    A    Yes.

5    Q    Okay.  I want to -- give me a moment while I get myself

6    together here.  Okay.  Now, I'm going to scroll down.  So I'll

7    ask you this, Mr. Grabowski, you sent an email with a list of

8    proposed questions to ask Gerald Bryson to Christine Hernandez

9    and Bradley Campbell; is that correct?

10   A    Yes.

11   Q    And Christine Hernandez and Bradley Campbell are your

12   supervisors in the HR department, correct?

13        MS. BUFFALANO:  Calls for a legal conclusion.

14        JUDGE GREEN:  I don't think so.  Overruled.

15   A    Christine Hernandez was my manager at the time, and

16   Bradley was the regional HR manager at the time.

17   Q    BY MR. JACKSON:  And you sent this email to them at 10:26

18   a.m. on April 10th, correct?

19   A    Yes.

20   Q    And you had not yet interviewed Gerald Bryson at the time

21   you sent this email to Ms. Hernandez and Mr. Campbell, correct?

22   A    No.

23   Q    That's correct that you had not spoken with Mr. Bryson at

24   that time?

25   A    Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And in fact, no one from Amazon who was investigating this

2    matter had spoken with Gerald Bryson at the time you sent this

3    email to obtain his version of the events; isn't that right?

4    A    Not to my knowledge.

5    Q    Now, I want you to read the entirety of your email to Ms.

6    Hernandez and Mr. Campbell.  And I'll scroll down as you do so,

7    and let me know when you want me to continue scrolling.

8    A    Okay.  You can scroll down.  Thank you.

9         I'm good.

10        I'm good.

11        I'm good.

12   Q    Okay, and I think that's the end of that particular email.

13   So I'll ask you this, Mr. Grabowski, in communicating your

14   proposed questions for Mr. Bryson to your supervisors, you

15   included, quote, potential feedback verbiage to be used in Mr.

16   Bryson's disciplinary document; isn't that correct?

17   A    Yes.

18   Q    And almost the exact same feedback language you suggested

19   to Mr. Hernandez and Mr. Campbell at that time was ultimately

20   included in the termination notice Amazon issued to Mr. Bryson,

21   correct?

22        MS. BUFFALANO:  The documents speak for themselves.

23        MR. JACKSON:  Your Honor -- Your Honor, I need to address

24   that objection.  It's been raised repeatedly.  It is not an

25   appropriate objection on cross-examination.  I'm eliciting an



1  admission from a party opponent.

2      JUDGE GREEN:  Well, you've got the admission because it's

3  in the document.  But if it's going to lead to an actual

4  question that we don't -- can't determine from the document,

5  then you can go ahead.  But try not to take too long with it.

6  Q    BY MR. JACKSON:  So Mr. Grabowski, you're aware that

7  almost the exact same language that you recommended or

8  suggested at least to Ms. Hernandez and Mr. Campbell ended up

9  appearing in Bryson's termination document; you're aware of

10  that?

11  A    Yes.

12      MR. JACKSON:  Just bear with me for a second, Your Honor.

13  I am just trying to sort through some documents here.

14  Q    BY MR. JACKSON:  Mr. Grabowski, isn't it true that in

15  preparing the -- well, first of all, you prepared Bryson's

16  termination document, correct?

17  A    In Adapt, yes.

18  Q    And isn't it true that in preparing that termination

19  document, you just copy and pasted from your recommendation --

20  oh, I don't know if I should call it a recommendation, but from

21  the statement you gave to Ms. Hernandez and Mr. Campbell on

22  April 10th; isn't that right?  You just copied and pasted it to

23  create the termination document?

24  A    I'm not sure if it's the exact verbiage without seeing the

25  document, but in generating feedback in Adapt, you paste and/or



1  type in the details of the incident and then the areas of

2  improvement, and then it generates the document for you.

3  Q    All right.  I'd like to show you Respondent 18 again, that

4  same email regarding your potential feedback verbiage.  Can you

5  see that, right here -- I'm not sure if you're seeing my arrow,

6  but do you see where it says, on 4/6, "You were reported to be

7  in violation of this policy"?  Do you see that portion of the

8  document?

9  A    Yes.

10  Q    And do you see that the numbers 4/6/2020 are highlighted;

11  do you see that?

12  A    Yes.

13  Q    Now, I want to show you another document that's been

14  admitted.  This -- this has been admitted as GC-25.  Are you

15  familiar with this document, Mr. Grabowski?

16  A    I was shown this document while preparing for this, but

17  prior to that, no.

18  Q    Okay.  Do you see that a highlight appears at the same

19  place on this document?

20      MS. BUFFALANO:  Objection.  Foundation.  Document speaks

21  for itself.

22      JUDGE GREEN:  Okay.  Is this leading somewhere?

23  Q    BY MR. JACKSON:  So you had no role in preparing this

24  document, Mr. Grabowski?

25  A    No.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    Okay.  Now -- okay.  Do you see the portion of the

 2    document that says, "After review and agreement with legal ER,

 3    regional operations, senior ops, and HR leadership, we are in

 4    alignment for the termination of AA Gerald Bryson and a final

 5    written warning for AA Dimitra Evans."  Do you see that

 6    portion?

 7    A    Yes.

 8    Q    Are you part of HR leadership?

 9    A    Yes.

10    Q    Okay.  So you were consulted in this decision; isn't that

11    correct?

12    A    No.

13         MR. JACKSON:  Okay.  Just bear with me for another moment,

14    Your Honor.  I've got to pull up something else.

15    Q    BY MR. JACKSON:  Okay.  So Mr. Grabowski, just a few

16    moments ago, you testified about a chart you prepared comparing

17    the different witness statements and what each witness was able

18    to corroborate; do you recall that?

19    A    Yes.

20    Q    Okay.  I'm going to show you that document again, which is

21    identified as Respondent 21.  Now, you testified that -- I want

22    you to focus on this allegation that Gerald called Dimitra a

23    cunt.  And you noted here that Dimitra Evans confirmed that; is

24    that correct?

25    A    Yes.
```



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    And you stated that she confirmed that in her witness

2   statement?

3   A    No.  When we were speaking about it earlier, we said that

4   all of the statements were noted either in the witness

5   statement or in the conversation with myself.

6   Q    In the seek-to-understand conversation, correct?

7   A    Yes.

8   Q    And you made no notes of that conversation; isn't that

9   right?

10  A    We have the witness statement that Dimitra wrote, but I

11  didn't take any notes of my own.

12  Q    And the word "cunt" does not appear in Ms. Evans witness

13  statement, correct?

14  A    The specific word does not, but she does outline that he

15  used slurs which, in our conversation, she did outline verbally

16  that she had been called a cunt.

17  Q    Um-hum.  There's no record anywhere in your investigative

18  file for this incident showing that Ms. Evans accused Bryson of

19  calling her cunt; isn't that right?  Yes or no.

20  A    Not the specific word.  In the statement, she does outline

21  slurs, and then in our conversation she said the word "cunt".

22  Q    But there's no record anywhere in your investigative file

23  showing that Evans accused Bryson of calling her a cunt, right?

24       JUDGE GREEN:  All right.  So we've done that a couple of

25  times now, so let's move on.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record
1590

1    Q    BY MR. JACKSON:  And in this chart that you prepared,

2    there's no reference to Bryson's use of the word "dyke"; isn't

3    that correct?

4    A    No.

5    Q    That's because none of your witnesses who you recall --

6    who formed the basis for your investigation told you that

7    Bryson used the word "dyke", isn't that right?

8    A    Mr. Bryson didn't use the word "dyke", or it was not

9    alleged that he used the word "dyke" during the incident.  The

10   word "dyke" was used in my seek-to-understand conversation with

11   Mr. Bryson when he said, I could tell she wanted me to make a

12   comment on her sexuality because she's a dyke, but I didn't go

13   there.  So in the seek-to-understand conversation, he noted

14   that he held back from saying that.

15   Q    I understand.  You had no basis to conclude that Bryson

16   called Ms. Evans a dyke, correct?

17   A    Not during the incident.

18        MR. JACKSON:  I apologize, Judge, I'm having a bit of a

19   hard time.  I have too many PDFs open at once.  Just give me a

20   moment.

21   Q    BY MR. JACKSON:  Mr. Grabowski, do you agree that when

22   conducting an investigation, it's important to make notes or

23   otherwise keep good records of the facts told to you by

24   witnesses?

25   A    I think it's important to make sure that we are noting it,


www.escribers.net | 800-257-0885

1   are aware of it, and it's documented, which is why we typically

2   collect the witness statements.  Or if we're unable to, then we

3   would take our own notes.

4   Q    So do you agree that it's important to take down all the

5   information that witnesses tell you during an investigation?

6   A    Yes.

7   Q    And it's important to take notes of conversations when

8   witnesses tell you information; isn't that right?

9        MS. BUFFALANO:  Asked and answered.

10       JUDGE GREEN:  Sustained.

11   Q    BY MR. JACKSON:  Now, at the time you were conducting your

12   investigation --

13       MR. JACKSON:  Actually, you know what, I'm going to

14   withdraw that for now.

15   Q    BY MR. JACKSON:  Let's go back to R-18.  I'm going to try

16   to share my screen, although it's been difficult for me so far

17   today, but.  All right.  Here's R-18.  Do you see Respondent's

18   18 again on your screen, Mr. Grabowski?

19   A    Yes.

20   Q    Okay.  Now, this is -- the first email on this exhibit is

21   a message from you to Bradley Campbell and Christine Hernandez,

22   copying JFK8-HRBP@amazon.com.  Do you see that -- that -- do

23   you agree that that -- that this email was sent on April 10th?

24   A    Yes.

25   Q    And you attached your chart summary outlining the



www.escribers.net | 800-257-0885

 1    different witnesses and the different allegations that were

 2    confirmed by the witnesses, correct?

 3    A    Yes.

 4    Q    So you -- who are -- who are the people in the JFK8-HRBP

 5    group?

 6    A    That's the site HR leadership team.  So that typically

 7    consists of the HR business partners and the HR manager.

 8    Q    Okay.  So you're in that group?

 9    A    Yes.

10    Q    Do you know the names of all the people in the group?

11    A    Yes.

12    Q    Can you tell us what they are?

13    A    Currently the members of the group are myself, Juan

14    Alvarez, Amanda Holder, Mike Tanelli, Neha Viswanath, Ana

15    Leonardi (phonetic), and Jenna Edwards.

16    Q    And what about in April of 2020?  Do you recall who was in

17    the group at that time?

18    A    I know between those, like, two-month span of March and

19    April, but it -- it -- it was changing frequently.

20    Q    Okay.  Was -- do you recall any of the names who were in

21    the group in March and/or April 2020?

22    A    The only two I know for sure that would have been in there

23    would have been Christine Hernandez and Neha Viswanath.  The

24    other ones were changing throughout that time period.

25    Q    Do you know who Pooja Desai is?



1    A    Yes.

2    Q    Who is she?

3    A    She is a senior HR business partner.

4    Q    And she was a senior HR business partner at JFK8 in March

5    and April 2020, correct?

6    A    No.

7    Q    Do you know where she worked in March and April 2020?

8    A    I don't know specifically when she transferred, but

9    sometime during that period, I believe at the end of March, she

10   transferred to a facility in New Jersey called LJA9.

11   Q    Okay.  So prior to that she was at JFK8?

12   A    Yes, as an HR business partner.  Not a senior HR business

13   partner.

14   Q    So you believe that after she transferred, she was no

15   longer part of that JFK8-HRBP list group?

16   A    I don't know.

17   Q    Who is Aashita Behal, A-A-S-H-I-T-A, last name, B-E-H-A-L?

18   Do you know who that person is?

19   A    Yes.

20   Q    Who is that?

21   A    She is currently an HR business partner at IGQ1.

22   Q    And she worked at -- she worked in HR at JFK8 in April

23   2020, correct?

24   A    Yes, as a senior HR assistant.

25   Q    Do you know whether Pooja Desai was part of the JFK8-HRBP



1    listserv in April 2020?

2         MS. BUFFALANO:  Asked and answered.

3         JUDGE GREEN:  Sustained.

4         MR. JACKSON:  Okay.  All right.  I'll move on to a

5    different subject.

6    Q    BY MR. JACKSON:  Now, at the time that you were conducting

7    your investigation of the incident involving Ms. Evans and Mr.

8    Bryson, you knew that Mr. Bryon was protesting with his

9    coworkers against what they perceived as Amazon's failure to

10   protect warehouse workers from COVID-19; is that correct?

11   A    I don't know that.

12   Q    You were aware that there was a protest going on April

13   6th; isn't that right?

14   A    Yes.

15   Q    You did not know the basis of the protest?

16   A    I'm not sure I understand the question.

17   Q    Did you know what the protestors were out there for?

18   A    I know generally it was about health and safety concerns

19   with the COVID-19 pandemic onset.

20   Q    Right.  And you saw their signs?  The protestors had

21   signs, correct?

22   A    Yes, they did have signs.

23   Q    And you saw the messages displayed on those signs,

24   correct?

25   A    I believe so.  I don't remember completely.



www.escribers.net | 800-257-0885

1    Q    And you knew that there was a similar protest the week

2    prior on March 30th, correct?

3    A    Yes.

4    Q    And you knew that protest was about workers' concerns

5    about Amazon's response to the COVID-19 pandemic, correct?

6    A    Yes.

7    Q    And you knew that -- on April 6th, you knew that Gerald

8    Bryson was part of a group of employees led by Christian

9    Smalls, who were advocating for greater COVID-19 protections;

10   isn't that right?

11   A    I don't know that I knew that at the time.  I know who

12   Gerald Bryson is today but don't know when that was brought to

13   my attention.

14   Q    Well, part of your job as an HR business partner in March

15   and April of 2020 included monitoring employee protest activity

16   at JFK8; isn't that right?

17   A    No, part of our job or -- is not monitoring employees.  We

18   don't monitor employee behavior.  We look out for employee

19   concerns.  We see what we can do to help employees who voice

20   concerns, so.

21   Q    You were aware that a group of employees had entered the

22   main office on March 25 in order to confront managers about

23   their concerns related to COVID-19, correct?

24   A    Yes.

25   Q    And you were aware that Gerald Bryson was among the group


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record
1668

1    of employees who entered the main office on May -- March 25 to

2    raise their COVID-19 concerns, correct?

3    A    I'm aware of that now.

4    Q    And you were aware at the time that employees were

5    featured in news articles in which their concerns about

6    Amazon's response to the pandemic was raised, correct?

7    A    I don't remember.

8    Q    Would you agree that your job duties included

9    communicating with other Amazon officials about employee

10   protest activity?

11   A    No.

12   Q    But you did communicate with other Amazon officials about

13   employees' protest activities; isn't that right?

14       MS. BUFFALANO:  Objection.  Official.

15       MR. JACKSON:  Okay.

16   Q    BY MR. JACKSON:  You did, in fact, communicate with other

17   members of HR leadership about employee protest activity,

18   correct?

19   A    I don't remember anything specific.  I mean, I know

20   that -- I mean, obviously, you mentioned there were the two

21   events that happened.  Part of HR's job and the leadership's

22   job is health and safety of employees maintaining

23   policies/procedures are being upheld.  So if it was something

24   that was impacted by that, I could see that being part of a

25   conversation or a discussion, but I don't remember anything



1   specific.

2   Q    You knew that Gerald Bryson was among the employees who

3   participated in the March 30th protest, correct?

4   A    I know that now, but I'm not sure when I was made aware of

5   that.

6   Q    And you knew that Mr. Bryson spoke with certain media

7   outlets about the reasons for his protest activity; isn't that

8   right?

9        MS. BUFFALANO:   Asked and answered.

10       JUDGE GREEN:   Overruled.

11       MR. JACKSON:   It hasn't been asked.

12       JUDGE GREEN:   Overruled.

13   Q    BY MR. JACKSON:   Mr. Grabowski, you knew that Mr. Bryson

14   spoke with certain media outlets about the reasons for his

15   protest activity, correct?

16   A    I don't know that, or at least not that I remember.

17   Q    On the day of the March 30th protest, you communicated

18   with Christine Hernandez about the protest; isn't that right?

19   A    I don't remember.

20   Q    Well, let me show you a document that might refresh your

21   recollection.

22   A    Thank you.

23   Q    Okay.  Now, extremely hard to decipher anything from this

24   document, but this is a timed communication between yourself

25   and Christine Hernandez on March 30th, 2020, correct?



1    A    Yes.

2    Q    And the only information that is not redacted from this

3    four-page document is a photograph of Christian Smalls engaged

4    in protest on March 30th; isn't that right?

5    A    Yes.

6    Q    Does this reflect -- refresh your recollection about you

7    communicating with Christine Hernandez about the March 30th

8    protest on the day it was happening?

9    A    A little bit, yes.

10   Q    Okay.  Do you know who Derrick Palmer is?

11   A    Yes.

12   Q    Is Derrick Palmer depicted in this photo?

13   A    No.

14   Q    Okay.  Now, so you sent this photo of Christian Smalls

15   engaged in protest on March 30th to Christine Hernandez,

16   correct?

17   A    Yes.

18   Q    Did you take the photo?

19   A    Yes.

20   Q    Can you describe what the contents of your communications

21   with Ms. Hernandez were reflected in this document?

22   A    I don't remember talking about anything specific.  I don't

23   even really know if that conversation is all -- is it all from

24   March 30th?

25   Q    I believe you could tell from the document itself.  Let's



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    look.
 2         You know, this keeps happening to me.  I can't -- here it
 3    is.  All right.  So --
 4    A    It is.
 5    Q    I believe that -- yes.  So this -- this conversation
 6    occurred entirely on March 30th, correct?  You can tell from
 7    the document?
 8    A    Yes, 6 a.m. to 6 p.m.
 9    Q    Okay.  Who told you to take this photo?
10    A    No one did.
11    Q    So you don't remember the contents of that conversation
12    you had with Ms. Hernandez?
13    A    So if I'm remembering right, I -- I don't know that there
14    was any context, like, right before or right after that picture
15    was sent.  It might have been a different conversation, but I
16    don't think -- if I recall correctly, we weren't speaking about
17    the picture or the event.
18         So when that picture was taken, I was walking the
19    building, just engaging with the employees, and at that time it
20    was lunch.  So the breakrooms were being utilized.  And during
21    that time period, we had members of leadership in the
22    breakrooms during lunch to encourage employees and enforce
23    social distancing because it was something where -- I don't
24    believe at the time we had our social distancing team
25    implemented.  So each break, there would be members of the
```



```
 1   leadership there.

 2        So I was in the third-floor breakroom.  And there were

 3   employees that were starting to gather near the windows just to

 4   kind of look at what was happening.  And after speaking to them

 5   and encouraging them to separate and social distance, I

 6   remember looking out the window and just seeing the parking lot

 7   had more people than we had I think seen in a break time just

 8   like spread out or, like, looking at what was happening.  And I

 9   think just with it being something out of the ordinary or

10   unusual, like, I took a picture and sent it to Christine.  But

11   I don't remember there being any context on that conversation

12   in the Chime messages or in person.  It was more so of, like, I

13   haven't seen anything like this in our parking lot before.

14   Took a picture and sent it.

15   Q    You -- you had never seen anything like the March 30th

16   protest; that's what you're saying?

17   A    I mean, like a group of individuals that spread out and,

18   like, I guess, watching.  And there were people on their phones

19   taking pictures in the parking lot from what I remember.  It

20   wasn't something that I had seen before.

21   Q    What other photos have you sent Christine Hernandez?

22   A    None that I specifically remember regarding either of

23   those days.

24   Q    Regarding anything?

25        MS. BUFFALANO:  Relevance.
```



1    JUDGE GREEN:  Sustained.

2    THE WITNESS:  Christine has been my --

3    MS. BUFFALANO:  Don't answer that, Tyler.

4    JUDGE GREEN:  So if I sustain an objection--

5    THE WITNESS:  Oh.

6    JUDGE GREEN:  -- don't answer it.

7    THE WITNESS:  Sorry about that.

8    MR. JACKSON:  Judge, I would just like to state the GC's

9    position on your ruling there.  I believe it's in error because

10   evidence regarding the unusual nature of Mr. Grabowski and Ms.

11   Hernandez's conduct reflect Respondent's animus.

12   JUDGE GREEN:  The question, as far as I understood it was,

13   have you ever sent any pictures to Ms. Hernandez about anything

14   ever, and that I'm sustaining.  The -- I think the -- the

15   answer actually was relevant and narrowed the question, but if

16   you have -- you have additional questions that are relevant to

17   this case, then I'll -- I'll hear it.

18   Q    BY MR. JACKSON:  Have you sent Christine Hernandez

19   pictures of employees engaged in other -- any other activity?

20   MS. BUFFALANO:  Objection.  Relevance.

21   JUDGE GREEN:  Sustained.  If you want to ask him about

22   protest activity or some other activity that's similar to this?

23   MR. JACKSON:  No, thank you, Judge.

24   Q    BY MR. JACKSON:  All right.  So I want to talk a little

25   bit about your findings in your investigation of the incident



www.escribers.net | 800-257-0885

1    involving Ms. Evans and Mr. Bryson.  During your investigation,

2    you learned that Ms. Evans initiated the verbal interaction

3    with Mr. Bryson, correct?

4    A    I believe that Ms. Evans was talking to a member of the

5    security team about how she didn't know an event was happening

6    outside, which is when Mr. Bryson then made a comment to her

7    regarding what she was talking about.

8    Q    Okay.  So --

9         MR. JACKSON:  Judge, I would ask you to direct the witness

10   to answer yes or no questions with yes/no.

11        JUDGE GREEN:  That was responsive.  It was not a --

12   Q    BY MR. JACKSON:  All right.  So --

13        JUDGE GREEN:  -- yes or no question --

14   Q    BY MR. JACKSON:  So --

15        JUDGE GREEN:  -- either.

16   Q    BY MR. JACKSON:  So your testimony, Mr. Grabowski, is that

17   you believe, based on your investigation, that it was Mr.

18   Bryson who initiated the verbal interaction with Evans,

19   correct?

20   A    I believe based on the investigation that Mr. Bryson was

21   the first one that made a comment towards Mr. Evans -- or

22   towards Ms. Evans in their interaction.

23   Q    And what is that based on?

24   A    The witness statements collected and speaking with the

25   individuals themselves.



Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 1641 of 2171 PageID #: 591
1693
Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Okay.  That's not exactly what you told Geoff Gilbert-

2   Differ, is it?

3   A    I don't remember what I told Geoff.

4   Q    Well, you told Geoff that Ms. Evans was outside smoking a

5   cigarette on her break while there were protesters making

6   comments about Amazon should close down.  Dimitra made a

7   comment speaking positive about Amazon, stating that it allowed

8   associates the opportunity to continue working and earning a

9   check.  So Dimitra Evans made a comment in response to Gerald

10  Bryson's protest and activity; isn't that correct?  That's what

11  you told Mr. Differ?

12       MS. BUFFALANO:  Do you want to show him the document?

13  This isn't a memory test.

14       JUDGE GREEN:  No, he -- he doesn't have to show him the

15  document, but you do have to tell us all what the document is.

16       MR. JACKSON:  Okay.  I'm -- I'm referring to Respondent's

17  105.

18  Q    BY MR. JACKSON:  Do you recall making that statement to

19  Geoff Gilbert-Differ?

20  A    No.

21  Q    Okay.  Please read the document and let me know if it

22  refreshes your recollection.

23  A    I read it.

24  Q    So isn't it true that Dimitra Evans initiated the verbal

25  interaction with Gerald Bryson?



1     A     I don't think that in that email I note or make reference

2     to who her comment was towards, whether it was Mr. Bryson or

3     the security guard.  From my recollection of the event, Ms.

4     Evans was speaking to a security guard, and Mr. Bryson had

5     overheard that.  But I mean, when -- when looking at the -- the

6     investigation and the disciplinary action, I -- I don't

7     necessarily think that who initiated it is relevant or impacted

8     the level of feedback.  I think we had witness testimony that

9     Mr. Bryson used vulgar, harassing, demeaning language towards

10    another employee.

11    Q     I understand your position.  Mr. Curlej -- the statement

12    you collected from Mr. Curlej also says that Dimitra Evans

13    initiated the conversation with Gerald Bryson, correct?

14    A     From who?

15    Q     Maciej Curlej.  I don't --

16    A     Oh.

17    Q     -- I'm having a hard time with his first name, but Mr.

18    Curlej.

19    A     I don't remember the specifics of Maciej's statement.

20    Q     Okay.  And Kaydee Bertone's statement also correctly

21    identified Dimitra Evans as the one who initiated the

22    conversation, correct?

23    A     I don't remember without seeing it.

24    Q     And Paul Chierchio's statement also correctly identified

25    Dimitra Evans as the one who initiated the verbal interaction



Exhibit E, Motion to Try Petition on Hearing Record

1    with Gerald Bryson, correct?

2    A    I don't remember without seeing the document.

3    Q    Isn't it true that Gerald Bryson told you that Ms. Evans

4    initiated the conversation by telling him to, quote, shut the

5    fuck up?

6    A    I don't remember.

7         MR. JACKSON:  Your Honor, could we go off the record for

8    five minutes?

9         JUDGE GREEN:  Off the record.

10   (Off the record at 12:02 p.m.)

11                   <u>**RESUMED CROSS-EXAMINATION**</u>

12   Q    BY MR. JACKSON:  Mr. Grabowski, Christine Hernandez was

13   the one who told you about the incident involving Ms. Evans and

14   Mr. Bryson, correct?

15   A    Ms. Hernandez told me that there was something that

16   happened to Ms. Evans outside and asked me to check up on her.

17   Q    And she directed you to investigate the matter, correct?

18   A    She directed me to follow up with Ms. Evans and see if she

19   was okay.  And then in my conversation with Ms. Evans, details

20   were brought up that initiated the investigation.

21   Q    So who determined to initiate an investigation?

22   A    I mean, based on the information that was brought to my

23   attention, I initiated the investigation.

24   Q    And at the time you conducted this investigation, you

25   communicated regularly with Ms. Hernandez, correct?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Yes.

2    Q    You spoke or exchanged messages with her on a daily basis;

3    isn't that correct?

4    A    Outside of the investigation, I exchange daily messages

5    with my supervisor.

6    Q    Multiple times per day you exchange messages with your

7    supervisor, correct?

8    A    Yes.

9    Q    And your communications with your supervisor included

10   information regarding the investigation, correct?

11   A    I don't know specifically, but I would believe so.

12   Q    Now, I believe you testified on Friday that you performed

13   the investigation in partnership with others; is that correct?

14   A    There were other departments that were looped into the

15   investigation, yes.

16   Q    Like loss prevention, right?

17   A    Yes.

18   Q    Any other departments?

19   A    The operations team was aware of the information.  I don't

20   remember which point they were looped in.  But aside from HR,

21   loss prevention, and operations, I don't believe there were

22   other departments involved.

23   Q    And what about specific people?  Isn't it true that you

24   performed the investigation and partnership with Christine

25   Hernandez?



1    A    Information was shared with Christine Hernandez as I

2    collected witness statements and talked to individuals

3    involved.

4    Q    And you performed the investigation in partnership with

5    Bradley Campbell, correct?

6    A    Information was shared with Bradley, similar to with

7    Christine.

8    Q    And you performed the investigation and partnership with

9    Geoff Differ -- Gilbert-Differ, correct?

10   A    Yes, information was shared with Geoff as I went about

11   talking to the various witnesses and collecting statements.

12   Q    And you performed your investigation and partnership with

13   Neha Viswanath, correct?

14   A    I don't remember Neha being involved.

15   Q    And you performed your investigation and partnership with

16   Milly Gutierrez, correct?

17   A    I don't remember sharing information with Milly.

18   Q    Do you know who Milly Gutierrez is?

19   A    Yes.

20   Q    She was the employee relations manager at the time,

21   correct?

22   A    I know she was on the employee relations team.  I don't

23   remember if she was our employee relations manager at the time.

24   Q    Okay.  And you performed your investigation in partnership

25   with JFK8 General Manager Sai Kotha, correct?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    I don't remember sharing details specifically with Sai.

2   Q    So you don't remember sharing with Sai, but you don't

3   recall whether you shared with Ms. Viswanath Or Ms. Gutierrez?

4   A    I -- I mean, I think it would be the same for all three.

5   I don't remember; I don't recall.  I know that I was sharing

6   information with Geoff, with Christine, and with Bradley.

7   Q    What about Anand Mehta?

8   A    I did not talk to Anand during this time about the

9   investigation.

10  Q    Is it true that in conducting this investigation, you did

11  not decide for yourself how to investigate?

12  A    I'm not sure I understand the question.

13  Q    You did not determine for yourself whom to get witness

14  statements from, correct?

15  A    For some of the witnesses I did, based on information that

16  was shared and speaking to individuals who they identified as

17  witnesses.  So I believe that would include Kaydee, Paul, and

18  Chris Urso.  And then there were other individuals that were

19  brought to my attention for all the members of the leadership

20  team.

21  Q    Who else was brought to your attention?

22  A    Shaianna Donaldson, Maciej Curlej.  I believe that's it.

23  Q    And who brought those people to your attention?

24  A    I believe it was Christine Hernandez.

25  Q    And you -- are you saying that you tracked down witnesses



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1647 of 2171 PageID #: 597
Exhibit E, Motion to Try Petition on Hearing Record
1599

1  based on the information that Dimitra Evans gave you initially?

2  A    Not tracked them down.  I --

3  Q    Okay, determined, located them?

4  A    There were individuals that were identified as witnesses

5  in Ms. Evans' statement.  So Paul and Kaydee and I reached out

6  to them to get further clarification on what they recalled from

7  the incident.  And then Chris Urso kind of brought himself to

8  the team's attention in saying that he witnessed it.

9  Q    Now, Ms. Evans only identified one witness by name in her

10  statement, correct?  That was Paul, right?

11  A    Yes.

12  Q    Okay.  So you had to do some investigation to find out who

13  the other witnesses she was referencing, correct?

14  A    I don't remember what specifically I did to identify her,

15  but to my knowledge, there is one blonde female security team

16  member, which is Kaydee.

17  Q    So somehow you found out who that blonde security member

18  was, correct?

19  A    Yes.

20  Q    And what about the -- now, Ms. Evans identified three men

21  and one lady.  Do you remember that?

22  A    No.

23  Q    You don't remember that?  Okay.  Let me show you a

24  document to refresh your recollection.

25  A    Thank you.



1   Q    Okay.  So here is -- I'm going to scroll to the top.  If

2   you want to read the whole thing, let me know, but I would like

3   to scroll down to the part I'm referencing.

4   A    If I could just read it real quick.  I could go through it

5   quick.

6   Q    Tell me when to scroll.

7   A    If you could please just scroll so it has the text box.  I

8   can get through it quickly.

9        I'm good.

10       Okay, I'm good.

11  Q    Does that refresh your recollection that Ms. Evans

12  identified three men and one lady as witnesses?

13  A    Yes.

14  Q    Okay.  So she gave you the name of one of the men, Paul,

15  who you later determined was Paul Chierchio, correct?

16  A    Yes.

17  Q    Okay.  And then you told us just a second ago that you

18  somehow determined that the blonde lady was Kaydee Bertone,

19  correct?

20  A    Yes.

21  Q    Okay.  Did you determine who the other two men that she

22  mentioned were?

23  A    I don't believe so, or not -- I don't remember

24  specifically who they would have been, or if we linked to that

25  to being any of the other witnesses that we talked to.



www.escribers.net | 800-257-0885

1    Q    And Ms. Evans also noted that there was a protest -- there

2    was a girl protesting who also witnessed the event.  Do you --

3    isn't that correct?

4    A    I don't remember.

5    Q    You don't remember what you just read?

6    A    I don't remember that part specifically.

7    Q    You asked Mr. Evans to write that statement that you just

8    viewed, correct, Respondent's 10?

9    A    Yes.

10   Q    Now, it's typical, during an investigation at Amazon, to

11   ask an employee suspected of misconduct to write and submit his

12   or her own statement regarding the incident in question,

13   correct?

14   A    It's -- yes, it's typical to collect a statement from the

15   individual.

16   Q    And you did not ask Gerald Bryson to write and submit his

17   own statement regarding the incident with Ms. Evans, correct?

18   A    Mr. Bryson had not been coming onsite at the time to fill

19   out a statement and submit it.

20   Q    You could have called him and asked him to do that,

21   correct?

22   A    I took notes for what he was saying while I was on the

23   phone with him.

24   Q    Well, you never asked him to come in and write his own

25   statement, correct?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    This was during the onset of a global pandemic, and Mr.

2    Bryson was taking advantage of an attendance policy clause that

3    didn't require him to be onsite.  So the last thing I would

4    want to do is have him come in and put himself in -- at -- at

5    what he perceived as potential risk due to an onset of a global

6    pandemic.

7    Q    You never asked him to email you a statement, right?

8    A    No.

9    Q    You never asked him to mail in a statement, correct?

10   A    No.

11   Q    And you had his phone number, I'm sure, right?

12   A    Yes.

13   Q    So he -- and you had his email address, correct?

14   A    Yes.

15   Q    Okay.  So you did eventually interview Mr. Bryson over the

16   phone, correct?

17   A    Yes.

18   Q    And before you called Bryson, Bradley Campbell emailed you

19   and told you to make sure that you address with Mr. Bryson each

20   of the alleged statements witnesses to the incident said Bryson

21   had made; isn't that right?

22   A    Yes.

23   Q    And you received that message, correct?

24   A    Was it in an email?

25   Q    Yes.  Yes, it was.  Do you --



Exhibit E, Motion to Try Petition on Hearing Record

1   A     Was that the email --

2   Q     -- want to see it?

3   A     Yes, please.

4   Q     Okay.  Let me show the witness Respondent's 18 -- R-18.

5   And the portion that I'm referring to appears at the second

6   message on this email chain.  Do you see what I'm referencing

7   now, Mr. Grabowski?

8   A     Yes.

9   Q     And you received that message, correct?

10  A     Yes.

11  Q     Do you agree that it was important to ask Mr. Bryson about

12  each of the statements he was alleged to have made?

13  A     Yes.

14  Q     And why was it important to do so?

15  A     As part of an investigation, we want to conduct that, seek

16  to understand the conversation, and get an employee's

17  recollection or account of different allegations that were made

18  against them.

19  Q     So you spoke with Mr. Bryson by phone on April 10th,

20  correct?

21  A     Yes.

22  Q     Do you recall approximately what time on the 10th you

23  called him?

24  A     I don't remember.

25  Q     And you testified previously that -- well, actually, let



1    me show you R-18 again.  It must have been after 1:06 p.m. that

2    you called Bryson, correct?

3    A    Yes.

4    Q    And it was between 1:06 p.m. and 2:02 p.m., correct?

5    A    Yes.

6    Q    Now, you testified previously that someone named Henry

7    Carbajal and someone named Zachary Marc were present on the

8    line during the phone conversation you had with Bryson,

9    correct?

10   A    Yes.

11   Q    And neither Mr. Carbajal nor Mr. Marc said anything during

12   the call, correct?

13   A    I believe so, yes.

14   Q    You never told Gerald Bryson that Carbajal and Marc were

15   on the phone, correct?

16   A    I did.

17   Q    Now, you made notes of the conversation which are included

18   in R-18, correct?  Do you want to see those notes?

19   A    I remember the notes.

20   Q    Okay.  And -- and as far as you recall, the conversation

21   consisted of you asking questions listed in -- in your summary

22   and Mr. Bryson providing answers to those questions, correct?

23   That was the conversation?

24   A    Yes.

25   Q    And you wrote down or summarized Bryson's answers as



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    faithfully as you could; is that right?

 2    A    I was typing them as he was speaking.

 3    Q    And you tried to get down what he was saying as best as

 4    you could; is that right?

 5    A    Yes.

 6    Q    Now, Bryson told you that Evans started an argument with

 7    him by telling him to, quote, shut the fuck up; isn't that

 8    right?

 9    A    I believe so.

10    Q    And Bryson told you that he walked away from Evans after

11    they started cursing at each other; isn't that correct?

12    A    I don't remember.

13    Q    And Bryson told you that it was Evans who told him, what

14    are you going to do about it; isn't that right?

15    A    I believe so, yes.

16    Q    In fact, you concluded from your investigation that it was

17    Evans who was the first to make the statement saying, quote,

18    make me shut up; isn't that right?

19    A    I don't -- I -- I don't think so.  I don't think that was

20    the first statement that was made.  I think the first statement

21    that was made was something along the lines of Ms. Evans

22    talking to a security guard about an event that was going on,

23    and that's how the interaction started.

24    Q    But you learned from your investigation that it was Evans

25    was the first one to bring up this idea of make me shut up,
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    right?

2    A    I don't remember.

3    Q    Okay.  Maybe your communications with Geoff Differ --

4    Gilbert-Differ will refresh your recollection.

5    A    Thank you.

6    Q    Okay.  So in summarizing the -- at least the initial

7    findings of your investigation, you told Mr. Gilbert-Differ

8    that the situation got the point at which Gerald told Dimitra

9    to shut up, to which she responded to him, make me.  That's

10   what you determined from your initial investigation, correct?

11   A    Yes.

12   Q    And when someone says, make me shut up, that is an

13   invitation to physical violence; isn't that right?

14   A    I think it could be.  It depends on the situation, on the

15   facts, on --

16   Q    So you don't know whether "make me shut up" is an

17   invitation to physical violence?

18   A    I don't know.

19   Q    I see.  Now, during your interview with Mr. Bryson on

20   April 10th, Bryson denied that he ever told Evans, come over

21   here and I will make you shut up, correct?  He denied that,

22   right?

23   A    Yes.

24   Q    While he admitted to calling her a bitch, right?

25   A    Yes.



1    Q    And he admitted to making comments about her drug use,

2    correct?

3    A    Yes.

4    Q    What Bryson actually told you was that when Evans incited

5    him to make her shut up, he responded by asking safety

6    personnel to take her inside; isn't that right?

7    A    I don't remember.

8    Q    Now, you testified on Friday that when you asked Bryson if

9    there were any witnesses, he told you that he needed time to

10   think about who the witness was; is that right?

11   A    No.  He said that he knew there was another female there,

12   and he needed time to identify who she was.  He said that

13   others that he was with knew who she was, and he would be able

14   to get her name if I gave him time.

15   Q    And you told Bryson that you -- you would call him back

16   later to follow up; is that right?

17   A    Yes,

18   Q    And you called him back later the same day on April 10th,

19   correct?

20   A    I don't remember the specifics, timing or date, but I did

21   call him back to see if he knew who the witness was.

22   Q    So you're saying you prepared your summary of your

23   conversation without following up with him on that point?

24   A    I typed the investigative notes based on our conversation

25   as he was responding to them to provide that information to



1    Christine and Bradley.  And then had Mr. Bryson been able to

2    identify a witness, there would have been a follow-up

3    conversation with X employee or X person was identified, and

4    this is the conversation that was had with them.

5    Q    Now, you later interviewed Ms. Evans for a second time on

6    April 15th, correct?

7    A    Yes.

8    Q    Now, before you interviewed Evans, you did not send a list

9    of proposed questions to Christine Hernandez and Bradley

10   Campbell, correct?

11   A    I don't remember.

12   Q    You don't remember if you did or you did not?

13   A    Yes.

14   Q    And you also did not suggest any potential feedback for --

15   for Ms. Evans; isn't that right?

16   A    Yes.

17   Q    Okay.  Now, let me show you another document.  And --

18   and -- and forgive me if I got this wrong, but you have no

19   current recollection about your second conversation with Ms.

20   Evans about this incident on April 15th, correct?

21   A    No.  Aside from the notes, I don't remember.

22   Q    So let me show you the notes.  These are in as -- well, no

23   they're not in, but they have been identified as Respondent's

24   Exhibit 19.  Now, can you tell us whether your notes here

25   reflect the questions you asked Ms. Evans and a summary of the



Exhibit E, Motion to Try Petition on Hearing Record

```
1    responses she gave you?

2    A    I remember that as I asked the bolded questions, it was

3    similar to the conversation I had with Mr. Bryson where I then

4    typed what she was saying as she was speaking.

5    Q    Okay.  So you did not ask Ms. Evans whether she told

6    Bryson to, quote, shut the fuck up; isn't that correct?

7    A    I don't remember.

8    Q    Well, let me ask you this.  If you spoke about it with Ms.

9    Evans, wouldn't it appear in your notes?

10   A    Yes.

11   Q    Okay.  So I'll ask my previous question again.  Isn't it

12   true that you did not ask Evans whether she told Bryson to,

13   quote, shut the fuck up?

14   A    Yeah, I -- I don't remember.  I know that -- like that

15   third question down, I don't know if I asked that question and

16   then, like, as she was speaking to me, the other part may have

17   come up, because it's a very, like similar question and she was

18   saying how -- like, her response is to reference shut up but

19   I -- I -- I don't really remember the specifics of the

20   conversation.

21   Q    All right.  On direct, you spoke a bit about the

22   suspension of Mr. Bryson's badge.  Do you remember that?

23   A    Yes.

24   Q    And you sent out a notification requesting that his badge

25   be suspended, correct?
```



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    Yes.

 2    Q    Who told you to do that?

 3    A    I don't remember.

 4    Q    Okay.  Do you recall getting a response to that request to

 5    have his badge suspended?

 6    A    Yes.

 7    Q    Who did you get a response from?

 8    A    Paul.

 9    Q    Paul Chierchio?

10    A    Yes.

11         MR. JACKSON:  Okay.  Your Honor, if I could just go off

12    the record for one minute, I need to do some SharePoint work.

13         JUDGE GREEN:  Off the record.

14    (Off the record at 12:42 p.m.)

15    Q    BY MR. JACKSON:  Mr. Grabowski, is there a document that

16    might refresh your recollection about who told you to suspend

17    Gerald Bryson's badge?

18    A    Not that I know of.

19         MR. JACKSON:  All right.  I'd like marked for

20    identification what I have uploaded in SharePoint at GC-74.

21    Q    BY MR. JACKSON:  Mr. Grabowski, please take a look at the

22    document and let me know if you'd like me to scroll.

23    A    Yes.  Can you please scroll?

24         That's the whole thing?  It's just that -- their response?

25    Q    Yes.  That's the end.  That's the end.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    A    Thank you.

2    Q    Okay.  This is -- the first email in this chain is an

3    email you sent to JFK8-LP@amazon.com, JFK8-security@amazon.com,

4    and JFK8-HR@amazon.com; correct?

5    A    Yes.

6    Q    And you sent that on April 10th, correct?

7    A    Yes.

8    Q    That was at 2:36 p.m., correct?

9    A    Yes.

10   Q    And that was after you had your phone conversation with

11   Gerald Bryson, correct?

12   A    Yes.

13   Q    Okay.  And the first email that appears in this document

14   is an email from Paul Chierchio to you, correct?

15   A    Yes.

16   Q    And that email was sent on April 13th, correct?

17   A    Yes.

18   Q    And you received the email, correct?

19   A    Yes.

20   Q    And -- and it was it -- by this email that Paul Chierchio

21   notified you that Bryson's badge had, in fact, been suspended,

22   correct?

23   A    Confirming it, yes.

24   Q    And it's Paul Chierchio's job to actually make sure that a

25   badge is suspended when HR requests it; isn't that right?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    It could be any member, from my understanding, of the

2    security team that can suspend the badges.

3    Q    And you received no prior notification that Gerald

4    Bryson's badge had actually been suspended, correct?

5    A    I don't remember.

6         MR. JACKSON:  I move for the admission of GC-74.

7         JUDGE GREEN:  Any objection?

8         MS. BUFFALANO:  No objection.

9         JUDGE GREEN:  GC-74 is admitted.

10   **(General Counsel Exhibit Number 74 Received into Evidence)**

11   Q    BY MR. JACKSON:  All right.  Mr. Grabowski, you testified

12   on Friday that Bryson's vulgar language was unlike anything you

13   had seen at JFK8.  Do you recall that?

14   A    Yes.

15   Q    Well, isn't it true that employees are frequently written

16   up for using vulgar language at JFK8?

17   A    I wouldn't necessarily say frequently.  It would depend

18   on, I guess, how often another time frame we're referring to.

19   It does happen occasionally, but I wouldn't necessarily say

20   it's something frequent.

21        MR. JACKSON:  Okay.  Judge, I think it's time to go off

22   the record and address something that Ms. Buffalano, I believe,

23   raised about records that should go on the screen here in the

24   Zoom platform, disciplinary records.  Judge, may we go off the

25   record to have a discussion?



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1        JUDGE GREEN:  Off the record.

 2   (Off the record at 12:49 p.m.)

 3        MR. JACKSON:  So during an off-the-record discussion, I

 4   expressed my intent to question Mr. Grabowski about certain

 5   documents, primarily for the purpose of establishing for the

 6   record evidence relating to Mr. Grabowski's credibility, as

 7   well as admissions about certain conduct that Amazon had

 8   disciplined employees for, and as well as for the -- the reason

 9   to clarify for the record that certain documents contain

10   information that is, in fact, relevant to these proceedings and

11   that the documents do reflect what they appear to reflect.

12        JUDGE GREEN:  Now -- okay.  So, go ahead.

13        MR. JACKSON:  I understand.  I just wanted to -- we had

14   that conversation off the record.

15        JUDGE GREEN:  Right.

16        MR. JACKSON:  I want it on the record.  So your ruling on

17   that is, sir?

18        JUDGE GREEN:  My ruling is that -- that exhibits will not

19   be read into evidence.  To the extent that you have -- you

20   have -- want to refer Mr. Grabowski to certain portions of the

21   document for the purpose of asking him questions regarding

22   matters other than what's in the exhibit, you can do that.  But

23   what we're not going to do is we're not going to be reading

24   exhibits into evidence.  We have the exhibits.  We have

25   transcripts.  We don't need exhibits in transcripts.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. JACKSON:  Okay.  Given that ruling, we will reserve

2    the admission of additional disciplinary documents when we

3    resume our case-in-chief, and I have no further questions for

4    Mr. Grabowski.

5    JUDGE GREEN:  Okay.  Anything from you, Mr. Kearl?

6    MR. KEARL:  Yes.  I have a -- a very brief line of

7    questions.  I'm about to email -- since I -- I don't have

8    SharePoint access, I'm about to email a couple of documents to

9    Mr. Jackson, to see if he can upload them.

10   MS. BUFFALANO:  Do you want to take a lunch break?

11   MR. KEARL:  I don't think it'll take me very long.  I have

12   a very short series of questions.  Happy to -- happy to take a

13   lunch break, but also in the interest of Mr. Grabowski's time,

14   I'm happy to continue right now.

15   JUDGE GREEN:  Okay.  So go ahead, if you like.

16   **CROSS-EXAMINATION**

17   Q    BY MR. KEARL:  Okay.  So Mr. Grabowski, I'm going to call

18   your attention to a document that I have pre-marked CP Exhibit

19   7.  Do you recognize this document?  It is a 46-page PowerPoint

20   presentation.  I can scroll through it.  I have a few specific

21   questions.  But I'm curious if this is a document that you are

22   familiar with?

23   A    I'm not familiar with this document.

24   Q    Okay.  Did you receive any training on conducting

25   investigations in the course of your time at Amazon?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    Yes.

2   Q    Okay.  And -- and what form did that training take?

3   A    There was a -- an in-person setting, where we went through

4   a course with the -- the same title, Conducting Effective

5   Investigations, in a classroom-style setting.

6   Q    Were there -- were there documents that you received as

7   part of that training?

8   A    I don't remember.  It --

9   Q    Was there a PowerPoint presentation in the --

10   A    There --

11   Q    -- course of that training?

12   A    There was -- there was a PowerPoint presentation that was

13   presented.  But it had to have been over 18 months ago that I

14   had this training.

15   Q    Okay.

16   A    Maybe two -- over two years ago.

17   Q    Okay.  So -- but you're not familiar with this -- this

18   document, is it possible that this document was the PowerPoint

19   presentation?

20   A    No.  At the time that I received the training, we didn't

21   have the Exact system.

22   Q    I see.  Okay.  So you've not been trained on

23   investigations in Exact?

24   A    I've been trained on how to use Exact, which is a system

25   where we, like, store the investigative material.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  But you --

2    A    Do --

3    Q    -- have not received this particular training?  Okay.

4    A    No.  But it's likely that this is a combination of the

5    training that I was given, plus how to document it in Exact.

6    Q    Okay.

7         MR. JACKSON:  If I may interject, just, Mr. Kearl, CP-7

8    and 8 are in SharePoint, for your information.

9         MR. KEARL:  Okay.  Thank you.

10        MS. BUFFALANO:  Thank you.

11   BY MR. KEARL:

12   Q    Insofar as this document was produced, and as responsive

13   to training materials, I'm going to move down to page 14 of

14   this document.  Did you receive any training about discussing

15   confidentiality and nonretaliation with witnesses in the course

16   of investigation, this fourth bullet point here?

17   A    Yes.

18   Q    Okay.  At any point in your conversation with Mr. Bryson,

19   did you notify him of the confidentiality and nonretaliation

20   provisions of your investigation?

21   A    I don't remember.

22   Q    Okay.  I am now going to take you to page 16, here.  And

23   I'm going to call your attention specifically to bullet point

24   4.  Were you trained on confronting inconsistencies in the

25   course of interviewing witnesses?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    Like what specifically about it?

2   Q    So in the course of your investigation, there were

3   inconsistencies and contradictions between witnesses.  At any

4   point, did you confront the witnesses, specifically, about the

5   contradictions or inconsistencies?

6   A    I don't remember.

7        MR. KEARL:  Okay.  I -- insofar as it is helpful, I move

8   for the admission of CP Exhibit 7.

9        MS. BUFFALANO:  No objections.

10       MR. KEARL:  Okay.

11       MR. JACKSON:  Judge Green, you're on mute.

12       JUDGE GREEN:  Okay.  CP-7 is admitted.

13  **(Charging Party Exhibit Number 7 Received into Evidence)**

14       MR. KEARL:  Okay.

15  Q    BY MR. KEARL:  And Mr. Grabowski, I'm now going to call

16  your attention to another document that has been pre-marked CP

17  Exhibit 8.  Do you recognize this document, or does this look

18  like something you might -- you might recognize, Mr. Grabowski?

19  A    Looks like a calendar invite.

20  Q    Right.  So this was a -- a calendar invite that was

21  created at 2:30 p.m. on the afternoon of April 6th for the

22  following morning, the 7th, at 6 a.m.  And your name is listed,

23  along with a large number of other folks.  And I'm just calling

24  to see, is this -- do you recall if this meeting actually took

25  place on the 7th?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I don't remember.

2    Q    Okay.  Do you have any reason to believe that it would not

3    have taken place if it had been scheduled?

4    A    No.

5    Q    Okay.  And in the course of meetings like this, are notes

6    taken?  Are there agendas?

7         MS. BUFFALANO:  I object.  There's a lawyer on this call,

8    and I have some concern about whether the discussions that

9    occurred on this call are privileged or not.  And so any notes

10   taken or documents distributed or discussed during this meeting

11   would likely be privileged as well.

12        JUDGE GREEN:  I think he can testify to whether they

13   exist.  Whether they're subject to production or not is a

14   different issue.

15        MR. KEARL:  And insofar as they don't appear in any

16   privilege log, I think that the emails might be appropriate, in

17   the event that they do.

18   Q    BY MR. KEARL:  So Mr. Grabowski, are -- in the course of

19   meetings such as this, are -- are notes taken?  Are there

20   agendas?

21   A    Not that I'm aware of.  I didn't -- wasn't responsible for

22   taking any notes.  I don't really remember.

23   Q    Are there agendas for meetings such as this?  The JFK8

24   touch-base meetings?

25   A    Not that I know of.



1    Q    Okay.

2         MR. KEARL:  Well, I move for admission of CP Exhibit 8.

3         JUDGE GREEN:  Any objection?

4         MS. BUFFALANO:  No objection.

5         JUDGE GREEN:  Okay.  So CP-8 is admitted.

6    **(Charging Party Exhibit Number 8 Received into Evidence)**

7    Q    BY MR. KEARL:  Okay.  And now I'd like to move back to --

8    there were a couple of phone calls that you made with Mr.

9    Bryson:  one of them on the 10th of April, and then another on

10   the 17th of April.  The 10th of April, you said that Mr.

11   Carbajal and Mr. Marc were on that call as well; is that

12   correct?

13   A    Yes.

14   Q    Okay.  And during the course of that call, were you in the

15   same room as those two individuals, or were they phoned in

16   remotely?

17   A    They were in the same room.

18   Q    In the same room.  And it's true that in the course of

19   this communication, you were also, you know, speaking with each

20   other via Chime message, to discuss the conversations that you

21   were having with Mr. Bryson; is that correct?

22   A    Not that I remember.

23   Q    And on the 17th, you were on the call with -- with Ser --

24   Sergiy -- I cannot remember his last name.

25   A    Sushalskyy.



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    Yes.  Is that correct?

 2    A    I'm sorry.  What was the question?

 3    Q    You were on the call -- he was also on the line.

 4    A    Yes.  He was in the same room, as well.

 5    Q    In the same room.  And -- and at that point, were you

 6    communicating with him via Chime message?

 7    A    Not that I remember.

 8    Q    And you testified that Ms. Evans used to work in PCF,

 9    and -- which implied that she no longer works in PCF.  Is she

10    still employed at Amazon?

11    A    She is still employed at Amazon.

12    Q    But she is no longer in PCF?

13    A    I don't remember her being in PC -- the PCF Department.

14    Q    Okay.

15    A    For some reason, I thought she was in AFE when this took

16    place.

17    Q    Okay.  So if she was in -- but -- but -- she is -- you

18    testify that she is no longer in the same department she was in

19    on April 6th, 2020, that correct?

20    A    Yes.

21    Q    Okay.  And what department is she in now?

22    A    The ship dock.

23    Q    Okay.  And -- and it's true that there is a -- a policy at

24    Amazon to report unsafe conditions or potential drug use by

25    other employees; is that correct?
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  Objection.  Relevance.

2    JUDGE GREEN:  Overruled.

3  A    We do have a policy and procedure for handling individuals

4  that we do believe are under the influence of drugs or alcohol.

5  Q    BY MR. KEARL:  Okay.  And on the 6th of April, did you ask

6  Ms. Evans if she was under the influence of drugs or alcohol?

7  A    I don't remember.  I don't think so.

8  Q    And is it possible for an employee to be disciplined if

9  they fail to report an unsafe condition in the workplace?

10    MS. BUFFALANO:  Objection.  Relevance.

11    JUDGE GREEN:  Overruled.

12  A    Employees do have the expectation that they report any

13  unsafe behavior or condition.

14  Q    BY MR. KEARL:  Okay.  So in the event that someone fails

15  to report something that they see is unsafe, such as a worker

16  who is on drugs, they would potentially face some sort of

17  disciplinary action for failing to, like, notify a supervisor?

18  A    I think the policy and someone being, like, potentially

19  under the influence are looking at two different circumstances.

20  No one's going -- like, someone wouldn't be -- receive

21  disciplinary action for failing to report someone on drugs.  I

22  mean, the policy and procedure for someone potentially being on

23  drugs is that they -- there is different behaviors or factors

24  that are observed by two members of the salary team without, I

25  guess, like, speaking to each other about it.  So it's, like,



Exhibit E, Motion to Try Petition on Hearing Record

1    under what would lead to someone reasonably being interpreted

2    as under the influence, whether it's, like, blood-shot eyes,

3    smeth (sic) of alcohol -- like, breath of alcohol, like smell

4    of alcohol or drugs.  Or like, just, like, out -- out of it,

5    like, spaced out.  Like, different things that could lead

6    someone to believe that someone was under the influence of

7    drugs, we would then initiate a conversation between HR and the

8    employee.

9        So the failure to report a safety incident is something

10   that could, I guess, potentially put other employees at risk of

11   harm.  So say, like, a dock door is, like, not TDR'd in, or

12   there's just something that is a safety violation or a safety

13   concern that is not reported.

14   Q    Okay.  And one final question.  One final round of

15   questions.  So the -- the call on the 17th, Sergiy was on the

16   call, and that is because he is the supervisor who oversees the

17   PCF department; is that right?

18   A    Yes.

19   Q    But it's true at that time that Mr. Bryson was in the

20   outbound ship dock; isn't that correct?

21   A    I don't know.

22   Q    Okay.  And --

23   A    And my understanding is that he would -- he was in the PCF

24   Department, in pick.

25   Q    Okay.  But the outbound ship dock is a different



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    department; isn't that correct?

2    A    Yes.

3         MS. BUFFALANO:  Objection.  Relevance.

4         JUDGE GREEN:  What's the relevance?

5         MR. KEARL:  Well, insofar as the policy is that the -- the

6    supervisor of the employee is supposed to be on the termination

7    call, the fact that the supervisor on the call on the 17th was

8    not, in fact, Mr. Bryson's supervisor, I think is -- is

9    relevant.

10        JUDGE GREEN:  Over -- okay.  Overruled.

11   Q    BY MR. KEARL:  So if, in fact, Mr. Bryson was in the

12   outbound ship dock, he would've had a different supervisor who

13   would have needed to be on that call on the 17th per Amazon

14   policy; is that correct?

15   A    So the Amazon policy doesn't dictate a specific person in

16   conducting the conversation.  Separation of employment

17   conversations are feedback.  Delivery is conducted by a member

18   of the Operations team.  So we do have members of the Operation

19   team step in to conduct feedback for others, if there's

20   something that's impacting one's ability to do so or based on

21   the situation.  But from my understanding, Mr. Bryson was in

22   the Pick department at this time during the separation of

23   employment, and Sergiy was the operations manager, senior

24   operations manager over the Pick, Count, And Floor Health

25   department.



www.escribers.net | 800-257-0885

1    Q    Oh.  But there is another supervisor who oversees the

2    outbound ship dock?

3         MS. BUFFALANO:  Objection to the relevance.

4         JUDGE GREEN:  Okay.  I'm sorry.  Overruled.

5    A    Yes.  There is a different manager that oversees PCF

6    compared to the ship dock.

7    Q    BY MR. KEARL:  Okay.

8         MR. KEARL:  I don't believe I have any further questions.

9         JUDGE GREEN:  Okay.  I just have a couple of questions for

10   you, Mr. Grabowski.  This will be quick.

11        THE WITNESS:  Uh-huh.

12        JUDGE GREEN:  Ms. Evans received a discipline for her part

13   in the altercation with Mr. Bryson; am I right?

14        THE WITNESS:  Yes.

15        JUDGE GREEN:  Okay.  And it was -- it was for using

16   inappropriate language, am I right about that, in her

17   conversation with Mr. Bryson?

18        THE WITNESS:  It was for inappropriate language and

19   behavior.

20        JUDGE GREEN:  Okay.  And what -- do you know what the

21   source of that information was?  On what basis did Amazon

22   conclude that she engaged in that activity?  Was it witness

23   statements or something else or do you not know?

24        THE WITNESS:  So I know it would have been from the

25   witness statements.  I know that at the time when whoever made



1    the decision was reviewing the witness statements that I

2    collected from the investigation, and that that was what the

3    determination, from -- from my understanding from Mr. Bryson

4    and Ms. Evans, was -- was based off of.

5        JUDGE GREEN:  Okay.  And we're talking about the witness

6    statements that you've seen in --

7        THE WITNESS:  Yes.

8        JUDGE GREEN:  -- connection with, oh, this case.  Okay.

9        Am I right that there is no right of appeal with regard to

10   a badge suspension?

11       THE WITNESS:  There is not.

12       JUDGE GREEN:  Okay.

13       THE WITNESS:  If -- if a badge is suspended, typically

14   it's -- the standard practice is it would be done if there's

15   some potential risk to having an employee on site based on

16   allegations, but we don't want it to have any negative impact

17   to an employee, especially if it is something where it doesn't

18   end up being substantiated.  So we make sure that employees are

19   fully paid during that time.

20       JUDGE GREEN:  Okay.  So -- and also, did I hear you

21   correctly that you indicated that there's no right of appeal

22   when Amazon is legally required to take certain action on

23   something, and that could include harassment.  Am I right about

24   that?

25       THE WITNESS:  Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1  JUDGE GREEN:  Okay.  So let me ask you just a couple of

2  questions.  And I want you to be careful because I'm not asking

3  you about any communication which you had with Counsel.

4  THE WITNESS:  Sorry.  Just give me one second.

5  JUDGE GREEN:  Okay.

6  THE WITNESS:  Sorry.  My dog just started barking.

7  JUDGE GREEN:  That's okay.  I have been having much the

8  same issue.

9  THE WITNESS:  Sorry about that.

10  JUDGE GREEN:  Okay.

11  THE WITNESS:  I couldn't hear -- I couldn't hear that last

12  part.  I apologize.

13  JUDGE GREEN:  No problem.  No problem.  So what I was

14  saying is I -- I -- I want you to be careful not to testify to

15  any communication you would had -- have -- you had with

16  Counsel.  In fact, try and just keep it to a yes, no, or I

17  don't know, because I don't want to accidentally get into that

18  type of testimony.

19  So do you know whether Amazon made a determination that

20  Mr. Bryson engaged in some form of harassment as the term is

21  legally defined under a particular law?

22  THE WITNESS:  I don't know.

23  JUDGE GREEN:  Okay.  Do you know if Amazon made a

24  determination that it was legally required to terminate Mr.

25  Bryson?



1        THE WITNESS:  I don't know.

2        JUDGE GREEN:  Okay.  Okay.  No further questions from me.

3    Is there going to be any -- any more from -- any redirect from

4    the Respondent?

5        MS. BUFFALANO:  We'll probably have just a little bit, but

6    I think it makes sense, and I apologize for this, Mr.

7    Grabowski, but I think it makes sense just to take a lunch

8    break so I can consult with --

9        JUDGE GREEN:  Yes.  Okay.  So we'll be off the -- off the

10   record for an hour.  I'm going to read this motion to

11   consolidate, and then we'll -- we'll talk about it after we

12   finish up with Mr. Grabowski.

13       MS. BUFFALANO:  Okay.  Thank you.

14       JUDGE GREEN:  Okay.  Thank you.

15   (Off the record at 1:34 p.m.)

16                    **REDIRECT EXAMINATION**

17   Q    BY MS. BUFFALANO:  Mr. Grabowski, I just have a few

18   questions for you about various things that you were asked on

19   cross-examination.  So I'm going to start with -- on -- on your

20   cross-examination, you were asked some questions about who

21   started the interaction:  was it Mr. Bryson or was it Ms.

22   Evans.  Do you remember those questions?

23   A    Yes.

24   Q    And from your perspective, in terms of the discipline

25   warranted, does it matter who started the interaction?



1    A    No.

2    Q    Why not?

3    A    Because who started it doesn't impact the behavior or the

4    actions of each of the individuals.

5    Q    And in this situation, specifically, what -- can you

6    explain to us why Mr. Bryson to -- why his conducted,

7    warranting termination, is not impacted by whether or not Ms.

8    Evans started it?

9         MR. KEARL:  Objection, Your Honor.  This lacks foundation.

10   This witness said he was not involved.

11        JUDGE GREEN:  Yeah.  So I -- I actually agree.  You know,

12   we might want to get this testimony, but it would probably come

13   from Mr. Campbell, or somebody else who actually participated

14   in the decision.

15        MS. BUFFALANO:  Okay.  I mean, Mr. Grabowski obviously

16   does this and also it -- writ -- drafted and delivered the

17   termination.  So I know he has, obviously, some -- he

18   understands why.

19        JUDGE GREEN:  I know, but it's -- I -- I get that, but --

20        MS. BUFFALANO:  Okay.

21        JUDGE GREEN:  -- he didn't, you know -- my understanding

22   is that he didn't make any recommendation in the adverse

23   employment action.  So it seems like we're wasting our time

24   with this testimony.

25        MS. BUFFALANO:  Okay.  I'll move on to the next topic.



Exhibit E, Motion to Try Petition on Hearing Record — 1627

1    Q    BY MS. BUFFALANO:  Do you -- so you were asked some

2    questions about whether Mr. Bryson was told that he could

3    submit a written statement when you spoke with him on April

4    10th.  Do you remember those questions?

5    A    Yes.

6    Q    Have you had telephone interviews with witnesses in cases

7    before -- and I'm -- I'm going to say, like, you know, persons

8    of interest because in this case, the conversation was with a

9    person of interest.  Have you had those conversations before in

10   an investigation on the phone?

11   A    Yes.

12   Q    What's your practice with respect to obtaining information

13   from that person when you're doing it on the phone?

14   A    If HR is the person that's conducting the investigation,

15   then they would take notes.  If it's something where Loss

16   Prevention is involved, either Loss Prevention or HR could take

17   notes on -- on the phone, but I have not, in my time at Amazon,

18   had a situation in which an investigation was conducted over

19   the phone where we requested that individual submit a

20   statement.  Every single one of them, notes were taken by the

21   site.

22   Q    Okay.  And in that conversation, it was your testimony

23   that Mr. Bryson had told you that there was a woman there with

24   him that he would try to find out the identity of; that's

25   right, right?



www.escribers.net | 800-257-0885

Case 1:22-cv-01479-DG-SJB  Document 5-1  Filed 03/17/22  Page 1678 of 2171 PageID #: 1628
1730

1  A    Yes.

2  Q    Okay.  And then -- and then, he says -- well, tell me

3  again, how do you decide when it is that you're going to follow

4  up with him to find out whether or not he found out the

5  identity of that woman?

6  A    Like, how do we determine (audio interference)?

7  Q    Are you confused by my question?  Do you want me to ask it

8  a different way?

9  A    Yes, please.

10 Q    Okay.  How did you decide when to call Mr. Bryson back to

11 see whether or not he had found out the identity of the woman

12 witness?

13 A    It was based on the amount of time that he directed me --

14 I asked him how much time he would need.  And I forget what the

15 specific time amount was, but he let me know, and then I did

16 follow up with him in that amount of time.

17 Q    Okay.  You just don't remember how much time that was,

18 sitting here?

19 A    No.

20 Q    Okay.  You were asked some questions about how this --

21      MS. BUFFALANO:  Well, strike that.  I'm going to strike

22 that.

23 Q    BY MS. BUFFALANO:  You were asked some questions about --

24 by Mr. Kearl, he showed you a PowerPoint presentation and

25 said -- asked you some questions about challenging



www.escribers.net | 800-257-0885

1     inconsistencies.  Do you --

2     A     Yes.

3     Q     -- remember that?

4     A     Yes.

5     Q     Okay.  And now in this investigation, do you -- or did you

6     view, sort of, the witness -- the different witness

7     recollections as inconsistencies?

8     A     No, not necessarily.  I don't think that it's uncommon in

9     investigations for witnesses to recall different, I guess,

10    allegations or -- or different comments being made, or

11    different actions, based on the amount of time that they were

12    present for the interaction or their proximity in relation to

13    it.  I think that what matters, at the end of the day, is that

14    every single one of the initial allegations that were made by

15    the victim were substantiated through one or more witness

16    accounts.

17    Q     Thank you.  I am going to ask you a couple of questions

18    about the drug policy that you were asked about.  You were

19    asked whether or not th -- I --

20          MS. BUFFALANO:  Strike that.

21    Q     BY MS. BUFFALANO:  What is required to test an individual

22    employee on-site under the drug policy?

23    A     Two --

24    Q     If you know -- if you know.

25    A     Yeah.  It's two -- or -- or -- yeah.  It's two members of



1    the salaried leadership -- like, two separate members of the

2    salaried leadership team that have a reasonable impression to

3    believe that the employee's under the influence.  So that would

4    be in identifying -- there -- there's different factors that

5    could lead to that.  So like, similar to what I mentioned

6    earlier.  Either some type of odor, some type of like, visual

7    appearance is off, like, the functioning, the response.

8    Different -- there's -- there's a checklist, actually, that --

9    where -- where you would have to note what the employee is

10   doing that seems off, and then if there's two leadership

11   members that identify or that believe this mers -- this person

12   is under the influence of drugs or alcohol, then a conversation

13   would be prompted between a member of the HR team and the

14   employee, to go through a set list of questions of any drugs or

15   alcohol that they may have consumed in the last 24 hours,

16   explain to them why they're there, and then proceed to the drug

17   or alcohol testing from there.

18   Q    And you engaged with Ms. Evans on April 6th when you

19   interviewed her, right?

20   A    Yes.

21   Q    How long did you talk to her that day?

22   A    I don't remember, specifically.  I'd say at least -- least

23   ten minutes, ten, 15 minutes.

24   Q    And that was the first time you met with her, 10 or 15

25   minutes?



1  A    Yes.

2  Q    Okay.  And then you talked to her a second time?

3  A    Yes.

4  Q    How long did you talk to her the second time?

5  A    Probably about five minutes.

6  Q    And in your interaction with her on April 6th, did you

7  have any reason to believe that she was under the influence of

8  drugs or alcohol?

9  A    No.

10      MS. BUFFALANO:  I apologize.  My phone's ringing.  Sorry.

11  This is -- audio through your computer, this is a risky run.

12  Q    BY MS. BUFFALANO:  Okay.  And if there is no -- do you

13  know whether there's an obligation to re -- for em -- coworkers

14  to report on one another's -- whether or not they believe that

15  someone's under the influence of drugs?  Like, is there an

16  obligation under the policy to report, if you think someone

17  else is on drugs?

18  A    Not that I am aware of.

19  Q    And how -- there is a provision in the drug policy that

20  indicates that reports from coworkers are possible, in terms of

21  building this -- what you called a reasonable -- it's

22  reasonable suspicion, right, that is required?

23  A    Yes, ma'am.  Uh-huh.

24  Q    And there's an indication that there --

25      MR. JACKSON:  Objection.  Leading.



1        JUDGE GREEN:  Overruled.

2    Q    BY MS. BUFFALANO:  -- that there are credible reports for

3    coworkers might go into that analysis; is that right?

4    A    Not that I'm aware of.

5    Q    Okay.  So you're not aware of coworker reports (audio

6    interference) are used?

7    A    No.

8    Q    Okay.  And if an -- if an employee was going to report

9    drug use of another employee, how would they do it?

10   A    I'm not sure.

11   Q    Okay.  Could they, do you think, do it through the ethics

12   hotline?

13   A    Yes.  I've seen --

14   Q    Would they --

15   A    -- that done before.

16   Q    Okay.  Could they do it by reporting -- walking up and

17   reporting it to -- on -- someone in Operations, an Operations

18   leader, someone in HR, an HR leader?

19        MR. JACKSON:  Objection.  Again, leading.

20        JUDGE GREEN:  Okay.  Sustained.  You can ask him how, you

21   know, what are the various ways that somebody can report drug

22   use.

23        MS. BUFFALANO:  Okay.

24   Q    BY MS. BUFFALANO:  Can you think of any other ways,

25   besides the ethics hotline that people might report, if they



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   thought a coworker was using drugs?

2   A    I mean, yeah, they could speak to a member of HR, a member

3   of leadership or safety.

4   Q    What about using a bullhorn to shout at a coworker outside

5   of a facility, in front of operations and security --

6        MR. JACKSON:  Objection.

7   Q    BY MS. BUFFALANO:  -- do you think that's a reasonable way

8   to report someone's --  is out --

9        MR. JACKSON:  Objection.  Argumentative.

10       MS. BUFFALANO:  I didn't --

11       JUDGE GREEN:  Well --

12       MS. BUFFALANO:  -- even finish the question.

13       JUDGE GREEN:  Right, but it was -- it was definitely

14   tending towards leading.

15       MS. BUFFALANO:  Yes.  But my question is that ow -- an

16   appropriate way to report it under the policy.

17       MR. JACKSON:  Objection.  Leading.

18       JUDGE GREEN:  Yeah.  I mean, you can ask, you know, based

19   on your underst --

20       Let me ask you, Mr. -- Mr. Grabowski.  Based on your

21   understanding at the time, in April of 2020, was Mr. Bryson's

22   conduct an appropriate way to report alleged drug use?

23       THE WITNESS:  No.

24   Q    BY MS. BUFFALANO:  Did you understand him to be reporting

25   alleged drug use?



1    A    No.

2         MS. BUFFALANO:  Okay.  Just give me one minute, if you

3    wouldn't mind.

4         JUDGE GREEN:  Off the record.

5    (Off the record at 3:01 p.m.)

6         JUDGE GREEN:  Back on the record.

7         MS. BUFFALANO:  I don't have anything further for this

8    witness, Judge.

9         JUDGE GREEN:  Okay.  Any recross from the -- the General

10   Counsel?

11        MR. JACKSON:  Yeah.  Just one question.

12                      **RECROSS-EXAMINATION**

13   Q    BY MR. JACKSON:  Mr. Grabowski, there's -- there's no

14   defined way that an employee can report a -- a drug abuse in

15   the workplace; is that correct?

16   A    No.

17   Q    You said it's appropriate to notify Safety personnel?

18   A    They can let a Safety personnel know, someone of Safety,

19   of leadership with HR.

20        MR. JACKSON:  Okay.  Your Honor, could I just get a five-

21   minute recess?

22        JUDGE GREEN:  Okay.  Off the record for five minutes.

23   (Off the record at 3:05 p.m.)

24        MR. JACKSON:  No further questions from the General

25   Counsel.



# Exhibit E, Motion to Try Petition on Hearing Record

1        JUDGE GREEN:  Anything from Mr. Kearl?

2        MR. KEARL:  No, Your Honor.

3        JUDGE GREEN:  Okay.  Thank you very much, Mr. Grabowski.

4    You're free to go.

5        THE WITNESS:  Thank you.

6        THE COURT REPORTER:  Hello, before he hangs up.

7        MS. REIBSTEIN:  I'm going to check a phone.

8        THE COURT REPORTER:  Mr. Grabowski, could you get --

9        JUDGE GREEN:  Did you hear?

10       THE COURT REPORTER:  -- me the last name of Juan and the

11   first name of Holder, and -- and Mike's last name?

12       THE WITNESS:  Tanelli.  T-A-N --

13       THE COURT REPORTER:  Mike.

14       THE WITNESS:  -- E-L-L-I.

15       THE COURT REPORTER:  That's Mike's last name?

16       THE WITNESS:  Yes.

17       THE COURT REPORTER:  Say that again?

18       THE WITNESS:  T-A-N-E-L-L-I.

19       THE COURT REPORTER:  And Mr. Holder's first -- first now.

20       THE WITNESS:  Amanda.  A-M-A-N-D-A.

21       THE COURT REPORTER:  And Juan's last name?

22       THE WITNESS:  Alvarez.  A-L-V-A-R-E-Z.

23       THE COURT REPORTER:  Thank you.

24       THE WITNESS:  Are we good?

25       MR. JACKSON:  Yes.



Exhibit E, Motion to Try Petition on Hearing Record — 1636

1    THE COURT REPORTER:  Yeah.  I will.

2    THE WITNESS:  Thank you.  Bye.

3    JUDGE GREEN:  Bye-bye.  Thank you.  Okay.  So let's -- I

4    have a whole host of questions after reading this motion to

5    consolidate.  I also noticed that we got the written Bannon-

6    Mills motion at the same time.  You know, maybe we can get Ms.

7    Reibstein here, since we do have the benefit of the regional

8    attorney because I've got -- got a number of questions.

9        So let me ask you, Ms. Reibstein, the logistics of this,

10   when -- how's it going to work, if it were to be consolidated?

11   Like, when would the hearing happen?  How would the hearing

12   happen?  Would it be by Zoom?  You know, what -- if it goes by

13   Zoom and we're on two different -- very different time -- you

14   know, time zones, ha -- how would that work?  What -- what

15   is -- what is contemplated here?

16   MS. REIBSTEIN:  Thank you, Your Honor.  What's

17   contemplated is that we finish up with this portion of the

18   case, and then schedule an adjourn date for the second portion

19   of the case, you know, allowing Respondent ample time to file

20   its answer and to prepare its defense of that piece.  And then,

21   we just continue as we are now on Zoom.  It's my understanding

22   that one of the attorneys from Region 19 will be one of the

23   cocounsel.  And we just continue as we are now.  But at -- at

24   an adjourn date to -- to handle that evidence.  It's different

25   witnesses and --



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Well, I'll get to that in a second because

2    I -- I've -- I've got questions about that as well.  But okay.

3    So we're talking about -- do we have any kind of idea about

4    when this would be happening?  June?  July?

5    MS. REIBSTEIN:  Yeah.  We'd ask for a June or July date.

6    JUDGE GREEN:  And in terms of how the -- the hearing would

7    go, we've got -- I would imagine, everybody on Pacific time,

8    except for me.  So what time do you contemplate the Zoom

9    hearings starting?

10   MS. REIBSTEIN:  We -- I -- we haven't come up with the

11   particular times.  I don't know that it necessarily will be on

12   Pacific time or -- or not.  I mean, we could just work that

13   out.

14   JUDGE GREEN:  Okay.  I mean, let me put it another way.

15   Do the -- do the attorneys for the parties expect to be

16   starting their case on -- at -- I don't know, 7:00 in the

17   morning, when Ms. Buffalano's been doing it?  But everybody.  I

18   mean, that's -- that's -- that's what we're talking about,

19   right?

20   MS. REIBSTEIN:  I'm not sure I understand.  My

21   understanding, I believe Ms. Buffalano was involved in the

22   Region 19 case.  So if she were -- I mean, I don't know who

23   they would assign as their counsel.  If it's Ms. Buffalano

24   and --

25   JUDGE GREEN:  Meaning that there -- I guess there are two



www.escribers.net | 800-257-0885

1   options.  Either we could st -- either we're starting at -- at

2   12, or whatever.  12 or 1 each day nu -- Eastern time, or we're

3   starting at 10.  But if we're starting at 10, then everybody

4   else is starting at 7, who's on the West Coast, right?  I mean,

5   am I wrong about this?  It seems logistically problematic.  No?

6       MS. REIBSTEIN:  I think it's workable.  I mean, it depends

7   on -- you know, if it -- if it's their -- if it -- if they have

8   the same counsel, well -- well, they're more or less on East

9   Coast time.

10      JUDGE GREEN:  Okay.  So -- and let me just make sure I

11  understand this.  So basically, it's -- it's the Region's idea

12  that -- or -- yeah, the region --

13      MS. REIBSTEIN:  Acting General Counsel's idea.

14      JUDGE GREEN:  Okay.  Well, that -- the discharge, as a

15  rule, implementation in the Seattle case will establish animus.

16  And that animus can be used in this case, as well as the

17  Seattle case.  Like, that's the reason for doing this.  That --

18  that's the reason.

19      MS. REIBSTEIN:  Correct.

20      JUDGE GREEN:  Okay.  So I mean, you don't think that the

21  Respondent's entitled to evaluative prepare for that before

22  they proceed in either case?

23      MS. REIBSTEIN:  Well --

24      JUDGE GREEN:  I mean, there again, what you're -- what

25  you're saying is that that -- that case is going to impact



1    and -- and provide evidence for this case.  So I mean, I'm not

2    sure how we justify making the Respondent go forward before

3    they have the -- an -- an opportunity to evaluate it.  And --

4    and it seems to me like they'd be entitled to a fairly lengthy

5    postponement in this one.

6        MS. REIBSTEIN:  Well, Your Honor, I mean, first there --

7    there's -- the motion to consolidate is before you.  You've not

8    ruled on it.  Our Ge -- General -- the acting General Counsel's

9    position is that you know, that the matters are sufficiently

10   distinct.  We could finish up with -- with this -- this set of

11   fact.

12       JUDGE GREEN:  Okay.  Right.

13       MS. REIBSTEIN:  And if -- and use --

14       JUDGE GREEN:  I get it.

15       MS. REIBSTEIN:  -- and use the --

16       JUDGE GREEN:  Okay.

17       MS. REIBSTEIN:  -- days that we have all agreed to be

18   available, and -- and then there will be a sufficient break --

19       JUDGE GREEN:  Okay.  So I can tell you that the answer to

20   that is going to be no.  It's -- there's going to be one or the

21   other.  It -- either it's going to be a consolidation and a

22   delay, or there's going to be no consolidation and no delay.

23   That -- those are the options here.  It is not going to be

24   consolidation and forcing the Respondent to go forward.

25   That -- that's not going to happen.  I -- you know, I -- I'd



www.escribers.net | 800-257-0885

1    also note that with regard to this -- this concept, and we've

2    already seen it somewhat in this case, because basically, the

3    General Counsel's making the same argument with regard to

4    Smalls and Palmer, which is that, you know, these additional

5    instances of unlawful discharge somehow add to, you know,

6    establish animus, and that animus can be used to -- to -- with

7    regard to the discharge of Bryson.  But you know, this goes

8    back to the whole issue of this -- whether this is an NLRB --

9    NLRB v. Burnup & Sims case because if that's the standard, then

10   it doesn't require the -- any independent showing of animus.

11   If the burd -- if the -- if the misconduct or the altercation

12   arose out of protective concern or activity, then there is no

13   requirement that the General Counsel establish independent

14   animus.  And the right-line defense is -- is different.  It's

15   not -- it's not used.  And so it's entirely possible that what

16   happened in Seattle will have no impact on this case, if the

17   standard is Burnup & Sims.  And -- and I'd ask the -- the --

18   the acting General Counsel to consider that before --

19   basically, requesting what is going to amount to a very

20   significant delay in this case, on a matter that -- that could

21   potentially -- I mean, I -- I think the Respondent would argue

22   against it -- but -- but could, potentially, decide -- decide

23   it entirely on a few video tapes.  You know, I -- I think that

24   that's something that has to be considered here.

25          MS. REIBSTEIN:  I -- I'd agree.  I agree, Your Honor.



Exhibit E, Motion to Try Petition on Hearing Record

1   You're -- I agree with you on that, but the problem is that,

2   you know -- you know, unless you tell us that you've decided

3   that, you know, Burnup & Sims is the standard, we --

4        JUDGE GREEN:  Well --

5        MS. REIBSTEIN:  -- present --

6        JUDGE GREEN:  Okay.

7        MS. REIBSTEIN:  -- evidence on both, and then there's the

8   question of what the board would decide.

9        JUDGE GREEN:  No, I get that.  I understand --

10       MS. REIBSTEIN:  That.

11       JUDGE GREEN:  -- I understand that.  It's not -- you know,

12   yeah.  At the end of the day, we're all trying to divine what

13   the board would do and we don't really know.  I'm just saying

14   that before you invest in a delay in this case, you know, I --

15   I would ask the -- the General Counsel to think about if it's

16   really worth it.  That's what I'm saying, you know.  And if I'm

17   correct, there's no -- there's really no interrelation of

18   fact -- of facts.  There's no -- and this isn't a situation

19   where, for example, Bryson was engaged in -- in protected

20   concerted activity with Costa (phonetic) and Cunningham

21   (phonetic).  This isn't a case where the employer made

22   discharge decisions regarding Brys -- Bryson, Coast, and

23   Cunningham at the same time.  It's not that.

24       MS. REIBSTEIN:  Well, there is, kind of, Your Honor.

25   Because the two discriminatees (sic) in Seattle, Ms. Costa and



1    Cunningham, They -- they were hosting -- or they organized and

2    were hosting a town hall across the country, where the

3    warehouse workers were going to present -- you know to inform

4    the tech workers of what was happening in their facilities and

5    the lack of -- you know, Amazon's failure to -- to protect them

6    from COVID.  That was supposed to be on the 10th, I believe.

7    It came off there --

8        JUDGE GREEN:  Were they --

9        MS. REIBSTEIN:  -- to -- but -- but Amazon cancelled that

10   town hall and -- and those two were fired on the 10th.  On the

11   same day that -- that Mr. Bryson was -- was suspended.

12       JUDGE GREEN:  Okay.

13       MS. REIBSTEIN:  So the -- there is some relationship in

14   the facts about what was happening, in terms of the protected

15   activity.

16       JUDGE GREEN:  Okay.  So that's interesting.  Now, I mean,

17   but I guess more importantly -- am I right that the evidence in

18   that case is not going to affect credibility of resolutions in

19   this one?  You know, ultimately, the board -- well, for the

20   most part, my decision is reviewable de novo.  At -- except for

21   credibilities, terminations.  You know, I mean, we -- we're not

22   going to have -- be in a situation, right, where you're asking

23   me to consider what happened in Seattle for purposes of making

24   credibility decision here, and vice versa.

25       Okay.  So I -- I just -- you know, it just so happens that



1    one of my -- one -- a Board case, with regard to one of my

2    decisions, it was -- what was it, Rav Trucking and Concrete

3    Express was just remanded from the DC circuit.  The board

4    decision was 369 NLRB number 36.  And the relevant portion was

5    footnote 2.  In that case, the board effectively consolidated

6    two different cases and considered one with regard to the

7    other.  They did it de facto.  They didn't do it formally.

8    They didn't consolidate it.  But they used the -- they used one

9    case to establish a violation in another case.  And I'm not

10   sure that the same thing couldn't happen here.  You know, if

11   I -- if I were to make a decision here and I were to say, okay,

12   there's no violation.  And both this and the Seattle case went

13   up to the board at the same time, I don't know that there's

14   anything from ta -- preventing the board from saying, okay,

15   well, we've looked at the Seattle case, and we think that

16   establishes facts which establish a violation in the Brooklyn

17   case.  So Green's overturned.  You know, I -- I -- I -- it's

18   not -- I'm not sure that there's really prejudice by not

19   consolidating.  So I guess the upshot here is -- I have issues.

20   I -- you know, I -- I have issues with this consolidation

21   request.  I think the logistics are a problem.  I don't think

22   the facts are consistently interrelated.  I think, more

23   importantly, the evidence in one case isn't going to affect

24   the -- affect -- affect the credibility determinations in the

25   other case.  I don't know that -- I really don't know that



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record 1746

1    given our -- what may be the standard, that animus in one case

2    will have any effect in the determination in this case.  And

3    ultimately, if they weren't -- cases weren't consoled --

4    nothing's stopping the board from effectively consolidating

5    and -- and acting upon them together, once they -- once they

6    get up there.  And if we do consolidate, we're going to get a

7    significant delay on a case that we're -- we're very close to

8    finishing.  And so I have problems with it.  And I -- I'm --

9    you know, I have to re -- I just got this and I -- I have to

10   read the cases that are cited in it, and we have to give the

11   Respondent an opportunity to respond.  But you know, this isn't

12   the type of slam dunk consolidation that happens before we get

13   to trial or before we get significantly through trial.

14       MS. REIBSTEIN:  Okay.  Would you like me to share your

15   concerns with the acting General Counsel?

16       JUDGE GREEN:  Yes.

17       MS. REIBSTEIN:  Okay.  I will do that.  Okay.  Your Honor,

18   what was footnote 2 in the case?

19       JUDGE GREEN:  It just -- that was -- that was the portion

20   in which the -- the board used one case as evidence in the

21   other case.

22       MS. REIBSTEIN:  Okay.

23       JUDGE GREEN:  They weren't consolidated, but the Board

24   just said, okay, well, we're using the ULBs in that case as

25   evidence of finding a violation in this case.



# Exhibit E, Motion to Try Petition on Hearing Record

1      MS. REIBSTEIN:  Okay.

2      JUDGE GREEN:  And it's just a fluke that it -- that's

3  coming, you know, it happened to be actually in the press at

4  the same time as this one.at the same time as this one.

5      MS. REIBSTEIN:  Okay.  I will take it --

6      JUDGE GREEN:  Okay.

7      MS. REIBSTEIN:  I'll reach out to the acting General

8  Counsel this afternoon.

9      JUDGE GREEN:  You know, if I had my druthers, what we

10 would do -- and -- and -- and now that we have -- you know, we

11 have -- we have a motion on bena -- Bannon-Mills, as well.  And

12 the Respondents -- at -- well, the General Counsel's asking me

13 not to -- basically, not to allow the Respondent to put on any

14 more evidence.  So I'm not sure that we want to rush the

15 Respondent in order to put on a bunch of evidence, when the

16 General Counsel's taking a position they shouldn't be allowed

17 to do it.  You know, if -- if I had my druthers, we would take

18 this week to deal with Bannon-Mills.  We would not consolidate.

19 We would fit -- as Mur -- as Mr. Murphy suggested, we would --

20 we would proceed on Monday to finish hopefully, by Wednesday of

21 next week.  You know, that's -- just -- just really, I mean,

22 having just received this -- these motions, that to me seems

23 the best way to go about doing this.

24     MS. REIBSTEIN:  Well, we had intended to call Christine

25 Hernandez, 611C.  So a Bannon-Mills motion wouldn't -- I mean,



# Exhibit E, Motion to Try Petition on Hearing Record

1    we could use Wednesday.  We had all stippled Wednesday.  A

2    Bannon-Mills motion --

3        JUDGE GREEN:  Yeah, but my -- my problem --

4        MS. REIBSTEIN:  -- wouldn't take you with that --

5        JUDGE GREEN:  Right.  My problem is that I really don't

6    feel as though I can force the Respondent to go forward, as

7    long as we have this motion to consolidate.  I just don't think

8    that's fair or viable.  I -- I don't -- I just -- I don't -- I

9    don't -- I don't see how -- that working that way.  So I mean,

10   I -- I think that the -- I think what we have to do here is

11   that the General -- the -- the Resp -- the Region should get

12   back with maybe Seattle and the acting General Counsel to

13   discuss this further.  We need to -- you know, I think in the

14   meantime, I'd like to hear from the Respondent.  I assume

15   you're opposing consolidation.  I guess I should have asked you

16   that from the start.

17       MR. MURPHY:  Are you -- are you asking me, Your Honor?

18       JUDGE GREEN:  Yeah.  Yes.

19       MR. MURPHY:  Yes.  We're -- yes, we're opposed.

20       JUDGE GREEN:  Okay.  So you know, how fast do you think

21   you can get me something in writing on that?

22       MR. MURPHY:  I -- I --

23       JUDGE GREEN:  I'm thinking Thursday.

24       MR. MURPHY:  Thursday?  We could do Thursday, close of

25   business.



1    JUDGE GREEN:  Okay.  That's good.  If we don't hear back

2    from the -- from the Region pulling it.

3    MR. MURPHY:  And then, and -- and then, Judge we -- and --

4    and I guess you know, I'm assuming that there may be special

5    appeals from whatever decision you make on that --

6    JUDGE GREEN:  I doubt -- I don't know.  I don't know.  I

7    mean, if the re -- if I -- if I refuse it -- well, I -- let me

8    put it this way.  I take it that if I grant it, there will be a

9    special appeal.

10   MR. MURPHY:  Yes.

11   JUDGE GREEN:  If I refuse it, we'll see.  We don't know

12   yet.

13   MR. MURPHY:  All right.

14   JUDGE GREEN:  I think what -- that's fair to say.

15   MR. MURPHY:  Okay.

16   JUDGE GREEN:  And we'll -- we'll deal with that when the

17   time comes.  In the meantime, I'm going to be looking this week

18   at Bannon -- at -- closely at the Bannon-Mills motion.

19   MR. MURPHY:  And you know what?  I apologize, Judge.  I

20   was just getting an email from -- well, you can see her typing,

21   Ms. Buffalano.  She -- she has those conflicts that she

22   identified.  Is there any way we can get till -- till Friday

23   to -- to respond on the motion to consolidate?

24   JUDGE GREEN:  Yes.

25   MR. MURPHY:  Thank you.



1    JUDGE GREEN:  Are you going to -- are -- are you -- do --

2    are you planning on -- on opposing the Bannon-Mills in writing,

3    or -- or no?

4    MR. MURPHY:  Yes, we are.

5    JUDGE GREEN:  Okay.

6    MR. MURPHY:  And I don't know what you'd -- well, what

7    you -- I mean, I don -- I don't know what your plan or outline

8    for that would be, but we'd -- we'd want more time than through

9    the end of the week on that.  Not even having --

10   MS. REIBSTEIN:  Well, I'm not

11   (Indiscernible, simultaneous speech) Your Honor, I mean --

12   MR. MURPHY:  Other than seeing -- other than judging it by

13   its length, Your Honor.  But --

14   JUDGE GREEN:  Yeah.  Okay.

15   MS. REIBSTEIN:  You've been angling for -- for delays for

16   a really long time.  You -- and also say that you have armies

17   of people working on this.  But you --

18   JUDGE GREEN:  Okay.  But that's -- there -- as long as

19   I'm -- as long as I'm letting the Respondent put on evidence,

20   then Bannon-Mills is -- it's not necessarily critical for them.

21   You know, I mean, I think that we could deal with the consol --

22   I -- what -- what's of -- what's of immediate importance is to

23   deal with the motion to consolidate and -- and deal with

24   whether we're going to be continuing with the case on Monday.

25   Because if the motion -- if the motion to consolidate is



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    granted, I do not envision continuing on Monday.  Or -- or for

 2    really -- it's going to take some time.  It's going to take

 3    some time for the Respondent to evaluate that case.  And I

 4    really don't have any concept of what the delay is going to be,

 5    but it's going to be a significant delay.  So I think we have

 6    to resolve that first, and then deal with the Bannon-Mills

 7    issues second.  And I think we can go forward with testimony,

 8    regardless -- as we've been doing already, regardless of

 9    whether we have a -- a final resolution of the Bannon-Mills

10    issue.  So the upshot is yeah, I mean, maybe Wednesday of next

11    week on the Bannon-Mills, but -- you know, I mean, if you

12    wan -- end up wanting more time, I don't think that's

13    necessarily a problem, as long as we can go forward on Monday.

14         MR. MURPHY:  Okay.

15         JUDGE GREEN:  That's it.

16         MR. KEARL:  I -- I would just like to say that I

17    haven't -- I would have the need next Wednesday to finish by 5

18    p.m. at the latest.  But --

19         JUDGE GREEN:  I'm making a note of it.  So I guess, if

20    anything happens.  Most notably, if -- if the Region decides,

21    or the Gener -- acting General Counsel decides that they are --

22    do not want to consolidate, you know, please let us know, and

23    obviously, that change -- changes matters dramatically.

24         MS. REIBSTEIN:  You -- you'll be the first to know, Judge.

25         JUDGE GREEN:  Okay.  And -- and in the meantime, I'd like
```



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1    people to -- I'd like people to reserve next week.  Keep --
 2    keep next week on the calendar, Monday to Wednesday.
 3         MR. MURPHY:  And Judge, if -- if we do complete our
 4    production this week, as we anticipate, that may impact our
 5    position on Bannon-Mills.
 6         JUDGE GREEN:  Okay.
 7         MR. MURPHY:  All right?
 8         JUDGE GREEN:  Okay.  All right.  Thank you --
 9         MS. COX:  Judge Green?
10         JUDGE GREEN:  -- very -- yes, go ahead.
11         MS. COX:  I'm sorry.  Before we go off, we asked the
12    Respondent to produce Christine Hernandez.  I understand that
13    depending on the consolidation, we may or may not proceed on
14    the 24th.  But in the even that we do proceed on the 24th, I
15    just want to ask again, Respondent never got back to me this
16    weekend, if they'll make her available or if we need a
17    subpoena.
18         MR. MURPHY:  Yeah, you should subpoena her.
19         MS. COX:  Okay.  Thank you.
20         MR. MURPHY:  Uh-huh.
21         MS. COX:  Judge Green, we need a subpoena.
22         JUDGE GREEN:  Yeah.  Okay.  So you're authorized to a
23    subpoena.  Does -- when you serve it, just send me the date of
24    service and the number.
25         MS. COX:  Thank you.
```



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. MURPHY:  And -- and Ms. Cox, we'll accept service of

2    that subpoena.

3    MS. COX:  Thank you.

4    JUDGE GREEN:  Okay.  So we'll -- we're going to be off the

5    record.

6    If people need me during the week for anything, you can

7    email me.  Okay.  Thank you.

8    **(Whereupon, the hearing in the above-entitled matter was**

9    **recessed at 3:40 p.m. until Monday, May 24, 2021 at 10:00 a.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1          **C E R T I F I C A T I O N**

2     This is to certify that the attached proceedings, via Zoom

3     videoconference, before the National Labor Relations Board

4     (NLRB), Region 29, Case Number 29-CA-261755, Amazon.Com

5     Services, LLC, and Gerald Bryson, held at the National Labor

6     Relations Board, Region 29, Two Metro Tech Center North, 5th

7     Floor, Brooklyn, New York 11201, at 12:36 p.m. was held

8     according to the record, and that this is the original,

9     complete, and true and accurate transcript that has been

10    compared to the reporting or recording, accomplished at the

11    hearing, that the exhibit files have been checked for

12    completeness and no exhibits received in evidence or in the

13    rejected exhibit files are missing.

14

15

16

17                                    _____

18                                    BARRINGTON MOXIE

19                                    Official Reporter

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services, LLC,          Case No.    29-CA-261755

                      Employer,

and

Gerald Bryson,

                Petitioner.

_____

_____

Place: Brooklyn, New York (Via Zoom Videoconference)

Dates: May 24, 2021

Pages: 1653 through 1771

Volume: 1

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

AMAZON.COM SERVICES, LLC,                    Case No.    29-CA-261755

                          Employer,

and

GERALD BRYSON,

                          Petitioner.

The above-entitled matter came on for hearing, via Zoom

videoconference, pursuant to notice, before **BENJAMIN GREEN**,

Hearing Officer, at the National Labor Relations Board, Region

29, Two Metro Tech Center North, 5th Floor, Brooklyn, NY 11201,

on **Monday, May 24, 2021 at 10:05 a.m.**

Exhibit E, Motion to Try Petition on Hearing Record

173)

1                        A P P E A R A N C E S

2    On behalf of the Employer:

3        CHRISTOPHER MURPHY, ESQ.
         JENNIFER MOTT WILLIAMS, ESQ.
4        RICHARD ROSENBLATT, ESQ.
         NICOLE BUFFALANO, ESQ.
5        KELCEY PHILLIPS, ESQ.
         MORGAN, LEWIS & BOCKIUS, LLP
6        300 South Grand Avenue
         22nd Floor
7        Los Angeles, CA 99071
         Tel. (213)612-7443
8        Email christopher.murphy@morganlewis.com
                 nicole.buffalano@morganlewis.com
9                kelcey.phillips@morganlewis.com

10       JASON SCHWARTZ, ESQ.
         ZAINAB AHMAD, ESQ.
11       GIBSON, DUNN
         200 Park Avenue
12       New York, NY 10166-0193
         Email zahmad@gibsondunn.com

13
     On behalf of the Petitioner:
14
         FRANKL KEARL, ESQ.
15       MAKE THE ROAD NEW YORK
         161 Port Richmond Avenue
16       Staten Island, NY 10302
         Tel. (929)265-7692
17       Email frank.kearl@maketheroadny.org

18

19

20

21

22

23

24

25



1

**I N D E X**

2

3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Bradley Campbell | 1719,1674 | | | | |
| | 1718 | | | | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   E X H I B I T S

2

| 3 | **EXHIBIT** | **IDENTIFIED** | **IN EVIDENCE** |
|---|---|---|---|
| 4 | **General Counsel:** | | |
| 5 | GC–109 | 1673 | 1673 |
| 6 | GC–110 | 1673 | 1673 |
| 7 | GC–111 | 1673 | 1673 |
| 8 | GC–112 | 1673 | 1673 |
| 9 | GC–113 | 1673 | 1673 |
| 10 | GC–52 | 1702 | |
| 11 | GC–62 | 1703 | |
| 12 | GC–8 | 1733 | |
| 13 | GC–28 | 1741 | |
| 14 | | | |
| 15 | **Respondent:** | | |
| 16 | R–9 | 1689 | |
| 17 | R–10 | 1690 | |
| 18 | R–11 | 1690 | |
| 19 | R–12 | 1690 | |
| 20 | R–13 | 1690 | |
| 21 | R–18 | 1693 | |
| 22 | R–19 | 1694 | |
| 23 | R–21 | 1695 | |
| 24 | R–27 | 1723 | 1727 |
| 25 | R–26 | 1747 | |



Exhibit E, Motion to Try Petition on Hearing Record

1                **P R O C E E D I N G S**

2          JUDGE GREEN:  All right.  So it's Amazon.com Services,

3      LLC, Case number 29-CA-261755, and it's May 21st -- oh, May

4      24th, 2021.  We're back on the record.

5          So I -- I -- you know, I -- I looked a little bit through

6      the -- actually, the opposition to the motion to amend.  I was

7      a little confused by it.  It sounds like the Respondent's

8      moving to amend to admit the PCA.  No?

9          MR. MURPHY:  That's correct, Your Honor.

10         JUDGE GREEN:  Okay.  So why would the Respondent -- the

11     General Counsel -- why would the General Counsel seek to oppose

12     that?

13         MR. JACKSON:  Judge, we don't oppose Respondent admitting

14     the obvious.  We oppose the -- the implications that were

15     alluded to in the -- in the motion, which Your Honor will see

16     once you get a chance to review it.  And I believe that this is

17     really a cynical ploy by this company to avoid, you know,

18     discovery of -- of relevant information --

19         JUDGE GREEN:  Okay.  That's --

20         MR. JACKSON:  -- regarding --

21         JUDGE GREEN:  No.  That's -- that's -- no.  No.  Listen.

22     To the extent we can make this matter more efficient and reduce

23     the number of disputes that we have to deal with, that's a good

24     thing; and to the extent that the Respondent's going to admit

25     certain facts is a -- is a good thing.  It's not -- you know,



1    and -- and listen.  I've read enough of the response to -- to

2    understand that the General Counsel is not taking the position

3    that this case is exclusively being litigated on the basis of

4    Burnup & Sims.  And -- and you're entitled.  You know, it's not

5    my position at this point to say what the General Counsel's

6    theories should be, and I have to let you litigate your

7    theories.

8        However, there is nothing stopping the Regional Director

9    or the acting General Counsel from saying if it is their belief

10   that this is a Burnup & Sims case and don't need to waste

11   anybody's time litigating anything else.

12       Now, maybe you're not doing that.  And okay, that's fine.

13   I'll let you litigate it under alternative theories -- Burnup &

14   Sims and Wright Line -- but this is something that the General

15   Counsel should be thinking about, which is whether we need to

16   spend more time on a case that has already spent -- that has

17   already involved a tremendous amount of litigation for a single

18   discharge, and a single discharge without a lot of dispute, so

19   that's that.

20       So I -- I haven't read enough of the amend -- of the

21   amended motion to amend.  I can't imagine that I would deny it,

22   but I would have to read on it before I rule on it one way or

23   the other.  Is there anything else?

24       MR. MURPHY:  Your Honor, you know, if -- if -- I mean, I

25   think the motion could be granted for the reasons you stated.



Exhibit E, Motion to Try Petition on Hearing Record

1    It would -- it would also streamline the testimony going

2    forward because we would have conceded that legal issue.

3         JUDGE GREEN:  Yeah.  But I can't -- like I said, I

4    can't -- I can't force the parties to just litigate this case

5    under Burnup & Sims.  If -- if -- and I didn't read enough -- I

6    didn't read enough of the motion to set -- to find out whether

7    that's what the Respondent actually wants.

8         MR. MURPHY:  If I may -- sorry to interrupt, Your Honor.

9         JUDGE GREEN:  Yeah.  Sure.

10        MR. MURPHY:  That's not -- that's not specifically stated

11   in our -- in our --

12        JUDGE GREEN:  Okay.

13        MR. MURPHY:  -- motion for relief to amend.  But that --

14   in -- in the other pleading that we filed this morning, that --

15   that is stated in -- in -- essentially in those terms.  And we

16   think it's appropriate for the counsel -- for the General

17   Counsel to say whether this is or is not a Burnup & Sims case.

18   And -- and if it's not, you know, tell us why because that --

19   that will facilitate the litigation of the case, as well.  You

20   know, I -- I -- I think that when we started this case, you

21   know, you made certain decisions based on an understanding

22   of -- of the facts that were likely to emerge, and one which we

23   sort of shared at the time.  And -- and the case has come in

24   very differently.  And -- and I think if we went in a -- in a

25   time machine back to mid-April when you were ruling on the

1    subpoenas and the Valasco video was part of the record, you'd

2    be making different decisions.  And -- and that -- and so you

3    know, if this is not a Burnup & Sims case, the General Counsel

4    should say so.  If -- if it is, they should say so, and --

5    and -- and we should stop with all the hidden ball tricks

6    and -- and -- and let's just litigate the case with two parties

7    that know what the legal theory is.

8         JUDGE GREEN:  Okay.  So let me just ask you.  I -- I

9    just -- do we only have Mr. Campbell today?  Is that the only

10   person we have?  I -- that's the only person we have, we're

11   thinking?

12        MR. MURPHY:  Yes, Your Honor.

13        JUDGE GREEN:  And is that the end of the Respondent's

14   case, or are you planning to put on more?

15        MR. MURPHY:  Well, in -- in some respects, it'll depend on

16   the resolution of --

17        JUDGE GREEN:  Okay.  All right.  So let me just ask you --

18        MR. MURPHY:  Are you asking me, Judge?

19        JUDGE GREEN:  Yeah.

20        MR. MURPHY:  I'm not --

21        JUDGE GREEN:  Yes.  I'm asking you.

22        MR. MURPHY:  Okay.  It's hard to tell because you're --

23        JUDGE GREEN:  Sorry.  I know.

24        MR. MURPHY:  Yeah.

25        JUDGE GREEN:  I know.  I --



1     MR. MURPHY:  There you go.  Thank you.

2     JUDGE GREEN:  Sorry.  I should look at the -- the other

3  screen.  I guess I assumed that the Respondent would take the

4  position that the -- the altercation did not arise out of or

5  during the protected concerted activity, which if you're -- if

6  you were successful in that regard, that would move the case to

7  Wright Line.

8     MR. MURPHY:  Uh-huh.

9     JUDGE GREEN:  However, if you are not going to argue that,

10  if you're going to stipulate to that, to the extent that the

11  General Counsel is going to stipulate, then -- then we are just

12  in Burnup & Sims territory.

13     MR. MURPHY:  Yeah.  We would -- we would make that

14  stipulation, Your Honor.

15     JUDGE GREEN:  Okay.  Sorry.  I've got to look back at the

16  book, which is on a different monitor, so it looks like I'm not

17  looking directly into the camera, which I'm not.

18     So given that -- I guess that -- that potential

19  stipulation, this is a stipulation that significantly

20  potentially advances the General Counsel's case.  And the

21  question is whether you would want to go this route, which is

22  basically the parties agree that this is a Burnup & Sims case,

23  and that -- that has been done before.  That is not -- that is

24  not a new option.  It is not required that the parties litigate

25  both Burnup & Sims and Wright Line.  And frankly, Burnup & Sims



1   is easier and will reduce the amount of time that's involved.

2       MR. JACKSON:  Your Honor, I would -- I don't know who

3   wants to address that.

4       JUDGE GREEN:  Yeah.

5       MR. JACKSON:  I would (indiscernible), Your Honor.  So you

6   know, frankly, we reserve the right to present theories of a

7   violation.  Your Honor, you know, ably explained that it -- it

8   is the General Counsel's right to pursue its case in the manner

9   in which we see fit, and we believe that it is appropriate to

10  advance evidence regarding both a Burnup & Sims analysis and a

11  Wright Line analysis because we do not know what standard the

12  Board will ultimately apply.

13      JUDGE GREEN:  Okay.  But -- but if -- if the -- if the

14  Respondent is admitting that this is a Burnup Sims case, and

15  this -- frankly, this is a Regional determination, maybe even a

16  GC determination.  And really, if we have Ms. Reibstein on the

17  call, Ms. Reibstein should be addressing it.  It's not a --

18  it's not a CGC issue.

19      Okay.  So if this is a -- if this is a Burnup & Sims case,

20  it dramatically eliminates much of what the -- what the General

21  Counsel has to prove; and therefore, the question is:  why?

22  Right?  Why?  Why are we -- why are we going to Wright Line?

23      I totally understand that if the Respondent's not willing

24  to concede that Wright Line does not apply.  That makes perfect

25  sense.  But if the -- if the -- if the Respondent is willing to



1    concede that Wright Line does not apply, it's hard to imagine

2    why we're wasting more time on it than we already have.

3         MS. REIBSTEIN:  Your Honor, it's not for -- for

4    Respondent's counsel to decide which standard applies.

5         JUDGE GREEN:  That's not -- that's really not an answer,

6    with all due --

7         MS. REIBSTEIN:  It -- it is an answer, Your Honor --

8         JUDGE GREEN:  No, it's not.

9         MS. REIBSTEIN:  -- because it -- it's up to the Board.

10        JUDGE GREEN:  It's not an answer.  We're looking for some

11   kind of -- we're just -- I'm not trying to put you in a box.

12   I'm not trying to say you can't do a certain thing.  I'm

13   looking for an explanation as to why a very long case should

14   not go even longer.

15        MS. REIBSTEIN:  Okay.  So I have several responses, Your

16   Honor, and I hope that they are satisfactory to you.  First,

17   as -- as we have said -- and this is not -- not going to

18   change -- we have an obligation to put on this case looking

19   forward to the possibility that we don't know what standard the

20   Board is going to apply, and we are not -- I -- I know that you

21   don't like to hear that, but we are not going to put on a case

22   of this length, which in -- in part, the -- the lay of the --

23        JUDGE GREEN:  This thing --

24        MS. REIBSTEIN:  Wait a minute.  The --

25        JUDGE GREEN:  No.  No.  You think that even though the



1    Respondent is admitting that Burnup & Sims applies and that

2    they won't raise the defense that the altercation did not arise

3    out of protected concerted activity, you still think under

4    those circumstances that there's a chance that the Board is

5    going to say this is a Wright Line case?

6        MS. REIBSTEIN:  Yes, I do.  Under this current

7    configuration of the Board, we -- we do not know, and I -- I --

8    you know, we are not going to put this in a position of, you

9    know, possibly having a remand years later to have to -- to

10   gear this up again when witnesses might not be available and

11   particularly at a time when we're almost done here.  We're well

12   into this case.  The Respondent has a witness or two.  We may

13   or may not have rebuttal.  We're almost done.  So it is not

14   streamlining anything.  I don't agree that it's streamlining

15   anything.  And when -- when you weigh the risk of the Board

16   disagreeing, the whisk -- the risk of a remand years down the

17   road, it -- it's not worth it.  We're almost done.

18       The other problem is that at this late stage of the game,

19   we still don't really know -- Respondent has still not made

20   clear -- and talk about like hiding the ball -- what exactly

21   they fired Mr. Bryson for.  There have been -- there -- there

22   are -- in -- in position statements and witness testimony and

23   documents, there are all sorts of reasons, shifting reasons,

24   piled on reasons.  We don't even know what --

25       JUDGE GREEN:  Yeah.  But you don't have to -- but all of



Exhibit E, Motion to Try Petition on Hearing Record

1665

1     that is only relevant to Wright Line.

2         MR. MURPHY:  Yeah.

3         JUDGE GREEN:  Okay.  Listen.  I -- listen.  I can stop

4     you.  I -- I'm not -- I -- it's my understanding that I can

5     stop you.  It makes no sense to me, but that's okay.  It

6     doesn't have to make sense to me.

7         MR. MURPHY:  Yeah.

8         JUDGE GREEN:  So -- so --

9         MR. MURPHY:  You're -- you're --

10        JUDGE GREEN:  Yeah.  Mr. Murphy, go ahead.

11        MR. MURPHY:  I apologize.  And I'll -- I'll be very, very

12    brief.  So you know, oh my gosh, did I just knock myself off

13    Zoom?

14        JUDGE GREEN:  No, no.  You're --

15        MR. MURPHY:  Hold on.  My screen -- the -- I -- my

16    screen -- apologies for that.  Let me see if I can -- sorry

17    about that.  Hit the wrong button.

18        JUDGE GREEN:  You're here.

19        MR. MURPHY:  So -- so -- so -- so first of all, Ms.

20    Reibstein never actually answered the question about why -- why

21    this isn't a Burnup & Sims case, but -- but I -- but I do

22    think, Judge, you have the authority to -- to -- you know, to

23    control the case and the presentation of the evidence.  You

24    know, there's some -- some really bold word cases here,

25    Indianapolis Glove and American Life Insurance and Accident



Exhibit E, Motion to Try Petition on Hearing Record

1    Company from -- you know, from the 50s and -- and into the 60s

2    that -- that talk about the authority that you have.

3         And -- and -- and further, earlier in the case, when we

4    were seeking to cross-examination -- cross-exam Mr. Palmer

5    on -- on this background stuff, you truncated that or urged us

6    to truncate it because you suggested that it was impeachment on

7    a collateral issue and wasn't very helpful.  And -- and -- and

8    we agreed, particularly the way that the -- that the case has

9    come in.  So you know, we're prepared to stipulate and litigate

10   this case solely on the basis of Burnup & Sim.

11        I get that you're not going to force the counsel for the

12   General Counsel to proceed in that manner, but we should at

13   least hear from them why it's not that.

14        JUDGE GREEN:  So I think we did hear, and we heard that

15   they are not of the position that it's not that.  As far as I

16   can understand, the General Counsel has made -- the General

17   Counsel believes that this is a Burnup & Sims case, but they

18   just can't rule out that it's not -- I -- that's how I

19   understand what's happening on the government side.  Now, how

20   you can't rule it out given the Respondent's position here is

21   something I do not at all understand, but that's where we are.

22        Let me ask you:  I think that either way -- I think that

23   either way, we would be getting testimony from Mr. Campbell

24   regarding --

25        MR. JACKSON:  You're correct about that.



# Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  -- regarding the investigation, the

2    decision.  I think that's relevant to both, so we've got him

3    here.  I would suggest we tee it up, and I'll take a look at

4    the cases you cite.  I'll take a look at them as soon as I have

5    an opportunity.

6        So I think that Mr. Campbell is in the room.  Mr.

7    Campbell, if you can hear me, can you -- there we go.  Thank

8    you.

9        MR. CAMPBELL:  Yeah, hi.  Good morning.

10       JUDGE GREEN:  Good morning.  So --

11       MS. COX:  Judge Green?

12       JUDGE GREEN:  Yes.

13       MS. COX:  Sorry.  Before we continue, we have a petition

14   to revoke issue of a witness that we subpoenaed for today,

15   Christine Hernandez.  Is that something we can deal with now,

16   or do you want to wait until we're done with Mr. Campbell?

17       JUDGE GREEN:  Is that something -- is Ms. -- is Ms.

18   Hernandez -- did you want her today, or did you want her

19   tomorrow?

20       MS. COX:  We wanted her today.

21       MR. MURPHY:  Well, Judge, I don't understand what the

22   theory is that -- that -- that they put aside the argument

23   trace and the petition to revoke, which you'll take up in due

24   course, but what's -- what's the theory by which the counsel

25   for the General Counsel gets to subpoena and present a witness



Exhibit E, Motion to Try Petition on Hearing Record

1   in the middle of our case in chief?

2       JUDGE GREEN:  So --

3       MR. MURPHY:  It's like they're --

4       JUDGE GREEN:  Let me -- let me just -- let me just address

5   that real quick.  So the -- the General Counsel enclosed there

6   were subpoena documents outstanding.  Those subpoena documents

7   could always result in a need to ask additional witnesses

8   additional questions.  And -- and I'm inclined to let the

9   General Counsel do that.

10      MR. MURPHY:  Yeah.  And we -- we have no -- you -- you've

11  made that ruling clear.  Their case is open.  But the question

12  is, is:  on what basis do they get to call a witness in the

13  middle of our case in chief?

14      JUDGE GREEN:  Well, they don't -- they don't -- I don't

15  think they have to, but wouldn't you rather have them do it

16  sooner rather than later?

17      MR. MURPHY:  We'd rather -- we'd rather put our case on,

18  Judge, and then have the counsel for the --

19      JUDGE GREEN:  Well --

20      MR. MURPHY:  -- General Counsel be in a position to

21  respond as appropriate to -- to the evidence we've presented.

22      JUDGE GREEN:  Yeah.  I mean, it's not exactly coming in

23  that way.  It's not -- it's not a rebuttal.  Listen, I don't

24  really have a problem if you -- if the -- if the Respondent

25  would like to put their people on first.  I just want to make



1    sure that everybody gets on as expeditiously as possible.

2    If -- if -- if we have to do Mr. -- Ms. Hernandez the day after

3    or Wednesday, I don't think that that -- I don't think that

4    harms or prejudices the General Counsel.  I think, if anything,

5    it's to the contrary that oftentimes respondents want to hear

6    the -- the full evidence come in from the General Counsel

7    before they put anything on.  But if you -- if you prefer to go

8    forward, I don't see any problem doing that.

9        MR. MURPHY:  Yeah.  I mean, we're -- we're ready to go.

10       JUDGE GREEN:  Okay.  So let's go.

11       MS. COX:  But, Judge, as a side issue, the petition to

12   revoke raises relevancy issues as to Ms. Hernandez's testimony.

13       JUDGE GREEN:  We're not there yet.  We haven't -- she's --

14   hasn't even been asked a question.  You know, I mean, to the

15   extent that there's a -- some kind of petition to revoke to the

16   extent that it -- the Respondent's taking the position that

17   Ms. Hernandez can't be called, that is going to be rejected if

18   that satisfies you.  Whether there is some kind of relevancy

19   issue, we'll find out, and there will be objections during the

20   course of her testimony.

21       MS. COX:  Thank you, Judge.

22       MR. KEARL:  And has there been any resolution on the

23   unredacted CHIMEs?  I know we were waiting --

24       MR. MURPHY:  Mr. Kearl, thank you very much for bringing

25   that up.  I apologize for not mentioning that at the outset,



Exhibit E, Motion to Try Petition on Hearing Record

1    Your Honor.  We are going to be taking a special appeal from

2    your ruling on the redaction/unredaction issue.

3         JUDGE GREEN:  Okay.  So just do it as soon as you can.

4         MR. MURPHY:  Yeah.  We're going to file it either tonight

5    or tomorrow morning.

6         JUDGE GREEN:  Okay.  That is fine.  You are entitled.

7         MR. KEARL:  And, sorry.  One last thing.  You had -- you

8    had said, also, Mr. Murphy, that the goal was to complete all

9    of the production of documents last week.  I got some

10   documents, but I believe there's still some outstanding

11   paragraphs.  Are we still waiting on some paragraph 19

12   documents?

13        MR. MURPHY:  Yeah.  So the -- so some of the paragraph 19

14   documents are addressed in -- in connection with the petition

15   to revoke, and I don't know if you've had a chance to review

16   the entire thing, but --

17        MR. KEARL:  I -- I have.  So the -- so the idea is that

18   now there's a petition to revoke on the order from over a month

19   ago?

20        MR. MURPHY:  I -- I wouldn't characterize it as that.  I

21   think we characterize it as a motion to reconsider, you know,

22   based -- based -- based on the developments in the case, and --

23   and the -- the -- the Burnup & Sims issue.  But --

24        MR. KEARL:  Okay.  So I can expect no further production

25   until that petition to revoke is resolved?



Exhibit E, Motion to Try Petition on Hearing Record

1    MR. MURPHY:  There is a footnote in the -- in the paper

2    that indicates that if -- if you and the counsel for the

3    general -- counsel for the acting General Counsel will accept

4    documents with the redactions that we would have proposed

5    independent of Judge Green's order, then we'll produce those

6    and -- and we can move on.  If -- if there's a intention on --

7    on your part or counsel for the acting General Counsel's part

8    to pursue unredactions consistent with the -- the last set,

9    then -- then I think we're going to go through the special

10   appeal process.

11   MR. KEARL:  I mean, I think absent seeing the redacted

12   documents, it's hard to take a position.  Would you be willing

13   to produce those documents so that we can --

14   MR. MURPHY:  You know what, before I -- I -- before I make

15   a commitment on that, let's -- if -- if -- if we can take a

16   short break, I can get that answer quickly.

17   JUDGE GREEN:  Okay.  Off the record.

18   (Off the record at 10:25 a.m.)

19   JUDGE GREEN:  Okay.  So just to confirm what was discussed

20   off the record, we don't have a resolution to that subpoena

21   issue.  The parties will take that up later.

22   I started to discuss what I was thinking during the break

23   regarding this issue regarding the -- the Respondent's motion

24   to amend the answer, and I just want to give the parties a

25   heads up as to where I am on the issue.



1        As far as I can tell, if the Respondent is willing to

2    admit that the altercation in question arose to of the

3    protected activity of Mr. Bryson, then that, essentially,

4    raises the prima facie elements of -- of a Wright Line case

5    satisfied.  You know, you have -- you have protected concerted

6    activity, you have knowledge, and you don't need animus or any

7    kind of nexus establishing animus.  So the prima facie case

8    will be satisfied, and I'm going to make my evidentiary rulings

9    accordingly.

10       I do think there is an issue regarding the second element

11   of Burnup & Sims, which has been the subject of some confusion,

12   I think, in the case law.  But I think that it can be -- the

13   second element or the second step can be described as whether

14   the Respondent had an honest, good-faith belief that Bryson

15   engaged in such serious misconduct as to warrant discharge.

16   And the -- the General Counsel is entitled to try to reply in

17   honest and good-faith belief.  And I suppose that that could --

18   you could get into things such as 15 reasons, disparate

19   treatment, and other -- other evidence designed to attack the

20   Respondent's decisions and establish that it was not an honest

21   and good-faith belief.  And so I'll -- I'll be making my

22   evidentiary rulings according with -- accordingly with regard

23   to that element as well.

24       Okay.  And so with that, and without further ado, why

25   don't we move on to Mr. Campbell?

```
1        MS. COX:  Judge Green, before we move forward -- I'm
2    sorry.  Two things:  one, I want to enter some documents into
3    evidence related to our Bandon-Mills motion.  The Bandon-Mills
4    motion itself is uploaded into -- I'm sorry -- in SharePoint as
5    General Counsel's 109.  We've also uploaded General Counsel's
6    110.  It's our email request for in camera inspection of GC
7    Exhibits 65 to 69.  GC 111 is your order of an in-camera
8    inspection of redacted documents on May 19th.  General
9    Counsel's 112 is your order on the redaction of subpoena
10   documents after in camera inspection on May 20th.  And General
11   Counsel's Exhibit 113 is your -- I'm sorry, is Respondent's
12   refusal to produce the documents on May 21st at 1:00 p.m.  So I
13   just -- I'm offering those documents.
14       JUDGE GREEN:  Any objection from the Respondent?
15       MR. MURPHY:  No objection, Your Honor, other -- other than
16   it sort of puts the cart before the horse, you know, our --
17   where we're going to take our special appeal and -- and proceed
18   from -- from there.  I also don't know that we need to have all
19   this stuff in the -- you know, I -- marked as exhibits, but
20   I -- I have no strong objection to that.
21       JUDGE GREEN:  Okay.  So I'll -- I'll -- I'll -- I'll admit
22   General Counsel's 109 to 113 into evidence.  I agree that I
23   don't know that you necessarily have to have them in the
24   record, but it doesn't -- it doesn't hurt.
25       (General Counsel Exhibit Numbers 109 through 113 Received into
```



1    **Evidence)**

2        MS. COX:  One other matter, Judge.  I just want to know if

3    we can identify who Brandon Diaz is.

4        MS. BUFFALANO:  Brandon Diaz is today's TSG reporter.

5        JUDGE GREEN:  Okay.

6        MS. BUFFALANO:  The individual -- the court reporting

7    service that's assisting us with exhibits.

8        MS. COX:  Thank you.  I have nothing further, Judge.

9        JUDGE GREEN:  Okay.  So shall we have Mr. Campbell pop --

10   pop back on?

11       Okay.  Mr. Campbell, thank you.  Sorry for the delay.  So

12   could you raise your right hand?

13   Whereupon,

14                       **BRADLEY CAMPBELL**

15   having been duly sworn, was called as a witness herein and was

16   examined and testified, telephonically as follows:

17       JUDGE GREEN:  Okay.  Thank you.  So please just don't use

18   a handheld device or otherwise communicate with people other

19   than through the Zoom conference.  Also, please don't refer to

20   documents other than what's shown you through Zoom, unless

21   you're directed otherwise, okay.

22       THE WITNESS:  Okay.

23       JUDGE GREEN:  Thank you very much.  Anytime you're ready.

24       MS. BUFFALANO:  Okay.

25                       **DIRECT EXAMINATION**



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MS. BUFFALLANO:  Mr. Campbell, good morning.

2    A.   Good morning.

3    Q.   Do you work for Amazon?

4    A.   Yes.

5    Q.   And what is your position?

6    A.   I'm -- I -- I currently lead human resources for a group

7    called central operations, but previously I was the senior

8    regional HR manager for our Amazon robotics fulfillment centers

9    in the northeastern U.S.

10   Q.   When did you take on your new role?

11   A.   In March of 2021.

12   Q.   And how long were you the senior regional HR manager --

13   were you a senior regional HR manager?

14   A.   For about five and a half of what -- about -- about five

15   years, I would say.  I had one other role where I was not, but

16   really from the time that I started at Amazon in 2014.

17   Q.   Okay.  And as the senior regional HR manager, did you have

18   responsibility for JFK8 around March and April 2020?

19   A.   Yes.

20   Q.   What period of time did you have responsibility for JFK8?

21   A.   I was the regional senior HR manager when the building

22   launched in late 2018 up until March of 2021.

23   Q.   And what are your -- what were your roles, written -- what

24   was your -- what were your responsibilities as the regional

25   senior HR manager?



1   A.    Primarily, my job is -- is leading the -- the strategy, if

2   you will, the -- the people strategy around human resources.

3   And then, actually, I led the teams that have the day-to-day HR

4   responsibilities at -- between seven and nine buildings,

5   depending on the role.  At this time, with JFK8, there were six

6   additional buildings with JFK8.

7   Q.    And at JFK8, is there anybody who -- anyone within the HR

8   department that reports directly to you?

9   A.    Yes.  The HR manager at the time, Christine Hernandez,

10  reported to me.

11  Q.    And did you work physically at JFK8 during the period of

12  time that you were the regional senior HR manager for that

13  building?

14  A.    Only due to travel infrequently three to four times a year

15  maybe.

16  Q.    Okay.  But you -- so you don't have an office there?

17  A.    No, I don't.

18  Q.    Okay.  And in your role as regional senior HR manager,

19  what responsibility, if any, did you have for the discipline of

20  associates, specifically at JFK8?

21  A.    Primarily, just through escalations.  Discipline --

22  disciplining some of our -- our upper-level leadership would

23  escalate immediately but only if a -- if a -- a case for

24  associate that were escalated may have had legal implications,

25  different partnerships had to be made, wouldn't come to my



1    attention.

2    Q.    Okay.  So in terms of sort of day-to-day discipline,

3    documented coachings, written warnings, final written terms,

4    are you involved in every one of those decisions?

5    A.    No, I'm not.

6    Q.    Okay.  And what involvement, if any, did you have in

7    Mr. Bryson's termination?

8    A.    In Mr. Bryson's termination, I oversaw the investigation,

9    and I actually made the final recommendation to operations for

10   discipline.

11   Q.    And why -- so you -- you indicated that cases come to you

12   that are escalations.  Why was Mr. Bryson's case escalated to

13   you?

14   A.    This particular case was escalated for a number of

15   reasons.  It happened publicly.  It happened in our parking

16   lot.  It happened in the middle of a demonstration.  Mr. Bryson

17   broadcast on Facebook Live.  There were several implications

18   just surrounding it in general that -- that brought it to my

19   attention.

20   Q.    So you said -- I want to just sort of parse a little bit

21   of that out.  So you said it occurred publicly in the parking

22   lot during a demonstration.  Why would that be reason for

23   escalation?

24   A.    Understanding all the rights around someone who is

25   protesting and making sure that we are making solid decisions



1    would have escalated it to my attention.

2    Q.    And so -- okay.  And what about Ms. Evans's written

3    warning?  Were you involved in that decision or recommendation?

4    What was your involvement, if any?

5    A.    Yes.  It was the same as with Mr. Bryson.

6    Q.    And when -- can you tell us when you first became involved

7    in the investigation into the April 6th incident?

8    A.    Yeah.  With this particular incident, it was -- it was

9    different because I was present as a -- I was -- I was a part

10   of a conversation when the actual incident was happening.  I

11   wasn't present on -- I wasn't present onsite.  But -- so I knew

12   about it as it was happening, so I immediately involved myself

13   actually and asked to be partnered via Christine and

14   Tyler Grabowski.

15   Q.    Okay.  Okay.  So can you tell us -- are you -- so you're

16   obviously familiar with the incident, right?

17   A.    Yes.

18   Q.    The one involving the investigation?  Give it to me again.

19   A.    Yes.

20   Q.    Okay.  Thank you.  And prior to making the decision, were

21   you familiar with Mr. Bryson -- or I'm sorry.  Prior to making

22   a recommendation and being involved in this incident, were you

23   familiar with him?

24   A.    No.  I was not.

25   Q.    And what about Ms. Evans?



Exhibit E, Motion to Try Petition on Hearing Record

1    A.   No.  I was not.

2    Q.   And in terms of your -- your participation in the

3    investigation, what did you do?  You said you oversaw the

4    investigation.  What did you actually do to oversee the

5    investigation?

6    A.   I was in frequent contact with Mr. Grabowski and

7    Ms. Hernandez.  We had multiple conversations about the

8    incidents.  I also reviewed all of the witness statements as

9    they came in.  I asked for further detail from that team so

10   that we were making an informed decision.  I may have

11   recommended going back for a conversation if we didn't feel

12   like the conversation -- if we didn't feel like we had all of

13   the information that we needed at the time.  I watched the

14   Facebook Live video.  I reviewed video of the site that was

15   taken from two of our security cameras.

16   Q.   Okay.  Okay.  And so you testified that you're -- you made

17   the recommendation to terminate Mr. Bryson around April 16th.

18        MS. COX:  Objection.  Leading.

19        MS. BUFFALANO:  I'm -- I'm --

20   Q.   BY MS. BUFFALANO:  I believe you testified to all of that?

21        JUDGE GREEN:  Okay.  Did -- I'm not sure that -- I

22   actually don't have a clue of that date, so --

23        MS. BUFFALANO:  Okay.  I apologize.

24   Q.   BY MS. BUFFALANO:  Do you recall when you made the

25   recommendation to terminate Mr. Bryson?



1    A.    Yes.

2    Q.    When was that?

3    A.    On April 16th.

4    Q.    Okay.  And -- and so I -- really, what I want to know now

5    is what is HR's role in recommending discipline, or how does

6    discipline actually get issued?  What is the role of -- of HR

7    and -- and what happens to that recommendation that you made?

8    A.    Yeah.  Our recommendation -- I mean, depend -- depending

9    on the severity, certainly it's HR's responsibility to make the

10   appropriate partnerships with legal and employee relations and

11   other partners that we may need in certain situations.  In most

12   instances, our -- our role is actually to review policy, review

13   cases that may have precedent in the site, and pull all of that

14   information together, fact-find, investigation the situation,

15   and then present those findings to our operations partner,

16   whoever that may be, honestly, depending on the level of the

17   associate, but general managers, your operations manager,

18   regional director.

19   Q.    Okay.  And then what does operations do with the

20   recommendation?

21   A.    Operations reviews our recommendation, and then

22   ultimately, they make the decision about if the -- if the

23   discipline is warranted.  There may be further conversation

24   because they may not be aligned or agree.  And certainly we

25   partner to -- to work through all of that, but ultimately, they



1    make a decision and then they actually -- operations would be

2    who invokes the discipline, if you will.  They'll have the

3    conversation, et cetera.

4    Q.   Who writes the actual -- what I'm going to call as the

5    feedback form or the discipline?  Who actually writes that?

6    A.   We -- it tends to be someone on my team, in HR, that's

7    going to draft the document.

8    Q.   Okay.  So I want to switch gears a little bit and just ask

9    you a couple of questions about Mr. Bryson's suspension.  Are

10   you aware that he was suspended pending investigation?

11   A.   Yes.

12   Q.   And I'm sorry, his -- his badge was suspended pending

13   investigation, more accurately.

14   A.   Yes, I am.

15   Q.   Do you know who made the decision to suspend his badge?

16   A.   I made the decision.

17   Q.   And can you tell us why you decided to suspend his badge?

18   A.   Sure.  We -- we only suspend the badge of any associate in

19   any investigation if we -- if we feel that there's a risk

20   involved possibly to -- to someone else involved in the

21   investigation, to the building itself, if you will.  We'll

22   partner with our loss prevention partners for that.  They're

23   certainly the experts in assessing risk and -- and

24   understanding that background.  And at the end of the day, we

25   don't suspend anyone without pay.  It's more to provide



1    ourselves the space, if you will, to conduct an investigation

2    with not additional -- without adding additional barriers and

3    noise to the situation, but so that we can speak with witnesses

4    throughout.

5         So in this particular case, our regional loss prevention

6    manager Geoff Gilbert-Differ actually recommended that we

7    suspend it.  I partnered with Geoff, and I made the decision to

8    suspend the badge.

9    Q.   Let me just ask you one question.  You said that when you

10   suspend someone's badge, you don't suspend without pay.  What

11   did you mean by that?

12   A.   Even when we suspend someone, we still pay them while they

13   are suspended.  They just can't access the airport.

14   Q.   So did you do any independent analysis of whether or not

15   there was a risk present when you made the decision to suspend

16   Mr. Bryson's badge?

17   A.   I did not.

18   Q.   And is that consistent with your typical practice?

19   A.   Typically, when the recommendation I would say is coming

20   from a loss prevention partner at the site, there may be more

21   conversation around is this is the right decision.  Where Geoff

22   is concerned, he's -- he's my partner and again, an expert on

23   the risk assessment, so he made the recommendation, and I took

24   the recommendation.

25   Q.   And when you say low -- the LPS site, what does that mean?



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    A.    Geoff also has a team onsite of loss prevention

2    supervisors and managers that support HR and operations onsite.

3    Q.    Okay.  So in terms of like a chain of command within loss

4    prevention, they're below Mr. Gilbert-Differ?

5          MS. COX:  Objection, Your Honor.  Counsel's testifying.

6    Q.    BY MS. BUFFALANO:  Okay.  Where -- let me ask this then.

7          MS. BUFFALANO:  I'm sorry.

8          JUDGE GREEN:  No, no.  Go ahead.  I -- I actually didn't

9    hear the rest of the question.  Do you want ask --

10         MS. BUFFALANO:  Okay.

11         JUDGE GREEN:   -- the question?

12   Q.    BY MS. BUFFALANO:  So in terms of the hierarchy of loss

13   prevention, when you say the LP at the site, how do they fit

14   into the LP organization, you know, vis-a-vis sort of Geoff

15   Gilbert-Differ?

16   A.    Sure.  We're aligned in operations and loss prevention and

17   HR very similarly, so Geoff would be my peer on a regional

18   level, and then of course he has a team that would be LP

19   manager, LP supervisors that are in the building as well.

20   Q.    Okay.  So can you just tell us like, LP supervisor and LP

21   manager, where they fall in the hierarchy?

22   A.    Sure.  So the LP manager would report to Geoff.  The LP

23   supervisor would report to the LP manager.  Not all sites have

24   exactly the same structure, but that's generally how it would

25   be.



1  Q.   Okay.  So when you're talking about -- just to close the

2  loop -- when you're talking about LP onsite, which specific

3  positions are you talking about?

4  A.   LP manager, LP supervisor.

5  Q.   Okay.  So in this case -- so you've testified that you did

6  not do an -- sort of independent analysis of the risk

7  assessment.  Do you agree with the -- with Geoff Gilbert-

8  Differ's recommendation to suspend Mr. Bryson's badge?

9  A.   I do.

10  Q.   And why?

11  A.   Primarily -- even in the -- we -- sorry.  Primarily, when

12  we were in that moment in time, we did not fully understand the

13  risk, and it was a -- it seemed to be a smarter decision, if

14  you will, to suspend his badge where he would still be paid

15  when we didn't know exactly based on how he might possibly come

16  back to retaliate against Ms. Evans, to the building itself.

17       His particular incident happened -- it was very, very

18  public in front of numerous associates who were on their lunch

19  break.  And even the initial conversations around the incident

20  described him as aggressive.  Adding all of that up, it wasn't

21  a risk -- it was in no way going to take a risk -- to -- to

22  risk the lives, if you will, of other thousands of people based

23  on just this one instance of behavior.

24  Q.   And when you say the risk, what do you -- what are the

25  potential risks that you consider would be concerned about



Exhibit E, Motion to Try Petition on Hearing Record

1    following an incident like this?

2    A.    Well, it may -- I'm not an expert to assess the exact

3    risk, but Mr. Bryson's behavior on that day on a bullhorn and

4    publicly, the risk was really him coming back and continuing

5    that kind of behavior in front of others, potentially continue

6    to threaten Ms. Bryson -- I'm sorry, Ms. Evans, and we didn't

7    know who else at that point.  All a badge suspension does is

8    really just -- the only thing that we have that would truly

9    keep parties separated, if you will.

10   Q.    Okay.  So did you agree to suspend Mr. Bryson's badge

11   because of his demonstration activities on March 30th?

12   A.    No.

13   Q.    Did you agree to suspend Mr. Bryson's badge because of his

14   demonstration activities on April 6th?

15   A.    No.

16   Q.    And did you agree to suspend Mr. Bryson's badge because he

17   appeared at a protection meeting on March 25th?

18   A.    No.

19   Q.    Last one.  Did you agree to suspend Mr. Bryson's badge

20   because he opposed Amazon's COVID-19 related practices or

21   policies and protocols?

22   A.    No.

23   Q.    All right.  So let's start -- I would like to just sort of

24   walk through what you reviewed in the course of your -- in the

25   course of sort of the investigation and in making your ultimate



Exhibit E, Motion to Try Petition on Hearing Record

1    recommendation in this case.  So you testified earlier -- why

2    don't you just run through, if you would, the -- what you

3    looked at in terms of making your ultimate recommendation in

4    this case?

5    A.   Sure.  I looked through five -- I believe it's five

6    witness statements that were there.  I also reviewed a Facebook

7    Live video that was streamed by Jordan Powers (phonetic

8    throughout).  I reviewed -- there were two camera angles,

9    actually, from the front of our building, no sound.  I reviewed

10   both of those.  In addition, I reviewed the "Do you seem to

11   understand" documents that followed conversations with Mr.

12   Bryson and Ms. Evans.  I also reviewed comparator cases for

13   JFK8, previous places where we had actually disciplined to some

14   level for harassment.

15       MS. COX:  Judge Green, I'm going to object to -- on a

16   Bannon Mills ground to any testimony about the disciplines

17   since Respondent produced redacted disciplines and those are at

18   issue in our motion.

19       MS. BUFFALANO:  We -- we've produced unredacted

20   discipline.  Is that -- are you, Ms. Cox, saying that we did

21   not produce unredacted discipline?

22       MS. COX:  There are some you did not produce, and your

23   redactions delayed the prosecution of this case and prejudiced

24   our case -- the presentation of our case as laid out in our

25   motion.



Exhibit E, Motion to Try Petition on Hearing Record
1798

1    JUDGE GREEN:  Okay.  So I can tell you that I was really

2    treating this testimony as though it was going to be subject in

3    its entirety to Bannon Mills objection, and I'm -- I'm taking

4    the standing objection in that regard.  I assumed you'd object

5    to testimony regarding the investigation.

6    MS. COX:  Yes, Judge.

7    JUDGE GREEN:  Okay.  So we've got that out there.

8    MS. COX:  Okay.

9    MS. BUFFALANO:  Okay.  Can I just ask that if there is

10   anything that has -- any disciplines that are not unredacted --

11   that are still redacted you let us know if they are because we

12   don't know.  I -- I -- I wouldn't know if there are any that

13   are still unredacted.  That certainly was not -- the goal was

14   to send unredacted discipline, so if there's anything that is

15   not unredacted, let us know, Ms. Cox.

16   MS. COX:  Okay.

17   MS. BUFFALANO:  Thank you.

18   Q.  BY MS. BUFFALANO:  All right.  So let's start with --

19   Mr. Campbell, let's start with the witness statements.  I'm

20   going to show you -- it's a little bit harder to do here on

21   Zoom, but I'm going to show you a few witness statements.

22   MS. BUFFALANO:  Mr. Diaz, if you wouldn't mind pulling up

23   Respondent's Exhibits 8 through 13, and I guess we'll just show

24   them sort of in succession.

25   MR. DIAZ:  Can I get the numbers again, please?



1       MS. BUFFALANO:  Yes.  8 through 13.

2       MR. DIAZ:  And just to confirm, Exhibit 8 looks to be an

3   email; is that correct?

4       MS. BUFFALANO:  No.  Hold on.  Are you looking in

5   Respondent?

6       MR. DIAZ:  Of the Respondent exhibits that I have, the

7   first numeral is 21.

8       MS. BUFFALANO:  Do -- can we go off the record for a

9   minute, Judge Green?

10      JUDGE GREEN:  Off the record.

11      (Off the record at 11:09 a.m.)

12      MS. BUFFALANO:  Okay.  So do you want to show us 8.  Mr.

13  Diaz?

14      MR. DIAZ:  It's coming.  It was asking for permissions.

15      MS. BUFFALANO:  Okay.  Thank you.

16      JUDGE GREEN:  Mr. Diaz got bounced, so I'm letting him

17  back in from the waiting room.

18      MS. BUFFALANO:  Okay.  Thank you.  Okay.  So if you want

19  to just scroll down a little bit, Mr. Diaz, so that

20  Mr. Campbell can see the whole --

21      MR. JACKSON:  Objection.  The witness is not -- does not

22  need to be shown this document insofar as he has his -- his

23  recollection has not been exhausted.

24      JUDGE GREEN:  What's the purpose of showing Mr. --

25  Mr. Campbell the -- the document?



1    MS. BUFFALANO:  I just want to get on the record which

2  witness statements he reviewed.

3    JUDGE GREEN:  Okay.  Overruled.

4  Q.  BY MS. BUFFALANO:  Okay.  I'll -- I'll just ask you as we

5  go through then.  Mr. Campbell, have you seen this document

6  before?

7  A.  Yes.

8  Q.  Okay.  And what is this?

9  A.  This is one of the witness statements that we used from --

10  from Paul.

11  Q.  Okay.  And when you say that we used, what do you mean?

12  A.  It was -- it was one of the witness statements that I

13  reviewed in making the decision.

14  Q.  Okay.

15    MS. BUFFALANO:  Can you show us Respondent's Exhibit 9,

16  please.

17  Q.  BY MS. BUFFALANO:  And have you seen this document before?

18  And you can -- Mr. Campbell, just let Mr. Diaz know, like, you

19  know, what you want to see.

20  A.  Yes.  I've seen it.  That's good.

21  Q.  Okay.  What is it?

22  A.  It's another witness statement from Chris Urso that was

23  used in the investigation of the Bryson incident.

24  Q.  Okay.  When you say that was used, what do you mean?

25  A.  I reviewed it for -- before making the determination.


www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    Q.   Okay.

2         MS. BUFFALANO:  And if you could show us Respondent's

3    Exhibit 10, please, Mr. Diaz.

4    Q.   BY MS. BUFFALANO:  Okay.  And have you seen this before?

5    A.   Yes.  This is the witness statement from Dimitra Evans

6    that I reviewed prior to making the Bryson decision.

7    Q.   Okay.  And let's take a look at Respondent's Exhibit 11.

8    A.   Yes.  Again, this is the -- this is another statement that

9    I used from Kaydee prior to making the decision of discipline

10   for Mr. Bryson.

11   Q.   Okay.

12        MS. BUFFALANO:  And can you show us Respondent's Exhibit

13   12.

14        THE WITNESS:  Yes.  This is another witness statement that

15   I used from Maciej that I reviewed before making the discipline

16   decision for Mr. Bryson.

17        MS. BUFFALANO:  Okay.  And can you show us Respondent's

18   Exhibit 13.

19   Q.   BY MS. BUFFALANO:  Have you seen this document before?

20   A.   Yes.  This is the witness statement from Shay (phonetic

21   throughout) that is used -- I mean, I reviewed prior to making

22   the decision on discipline for Mr. Bryson.

23   Q.   Okay.  And Shay is Shaianna Donaldson?

24   A.   Donaldson, yes.  At the time, she was a senior HR at JFK8.

25   Q.   Okay.  And when you say -- so you said a few times before



1   making the decision to terminate Mr. Bryson.  Was that the only

2   thing that you used is witness statement forms?

3   A.   (No audible response)

4   Q.   Well, let me ask you this question because you look

5   confused.  Let me ask it this way.  Before we --

6        MS. BUFFALANO:  -- and you can take this witness statement

7   down, Mr. Diaz.  If -- thank you.

8   Q.   BY MS. BUFFALANO:  What did you -- what did you look at in

9   making the recommendation (indiscernible)?

10  A.   The -- the same documents.

11  Q.   And when you say same documents --

12  A.   I'm sorry.  The same witness statements -- the -- the same

13  precedent cases, Facebook Live videos, looked at the two feeds

14  in front of the building, all of the same documents, videos

15  that were used to make the decision for both Bryson and Evans.

16  Q.   Okay.  So tell me, did you talk to any of these witnesses?

17  We just looked at six witness statements -- five witnesses and

18  then Ms. Evans.  Did you actually speak with any of those

19  witnesses?

20  A.   No.  I did not.

21  Q.   And is that typical?

22  A.   Certainly typical in -- when I'm reviewing.  I don't jump

23  back into the investigation to investigate something myself

24  that -- that someone already -- on the team has already had the

25  conversation with someone.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Q.    Okay.  Okay.  And you testified that you reviewed two --

2    you said two STU documents, one with Mr. Bryson and one with

3    Ms. Evans?

4    A.    Yes.

5         MS. COX:  Objection to the term STU.

6         JUDGE GREEN:  Overruled.

7    Q.    BY MS. BUFFALANO:  Okay.  And let me just ask for the

8    record in case it's not clear:  what is a STU?

9    A.    It's a statement to understand document.

10   Q.    Thank you.  Okay.

11        MS. BUFFALANO:  So Mr. Diaz, if you wouldn't mind showing

12   us Respondent's Exhibit 18.  Thank you.  Okay.  And if you

13   could scroll down to Page 4.

14   Q.    BY MS. BUFFALANO:  Okay.  So have you -- and, Mr.

15   Campbell, let -- just let Mr. Diaz know where -- where to

16   scroll.  This is a two-page document, so I want to -- I'm going

17   to ask you whether you've seen it before, so I want to make

18   sure you're comfortable enough with the document to answer that

19   question.

20   A.    Yeah.  If we can keep scrolling, please.  Is that -- is

21   that the full two pages?  Oh, thank you.

22   Q.    Oh, is it three?  Oh, I apologize.

23   A.    Yeah.  Can we go to the end of this one just for -- okay.

24   Yes.  I've seen this document.

25   Q.    Okay.  And what is this?



Exhibit E, Motion to Try Petition on Hearing Record

1     A.    These are the notes from the seek to understand

2     conversation between Mr. Grabowski and Mr. Bryson.

3     Q.    And what was -- what's your understanding of the bold

4     headings?

5     A.    The bold headings were the questions that Tyler asked

6     Mr. Bryson.

7     Q.    And what is your understanding of what the plain text is?

8     A.    The -- the plain text, if it actually has -- sorry.  I got

9     parentheses.  Using my English right now.  If it actually has

10    quotation marks around it, then my understanding is that it's a

11    direct quote that Tyle is transcribing from Mr. Bryson.  If it

12    does not, then it's primarily Tyler's recap or notes of the

13    conversation from that.

14         MS. COX:  Objection, Your Honor, to foundation.  Firsthand

15    knowledge -- how does he know what Tyler meant when he put

16    quotes around text?

17         JUDGE GREEN:  Okay.  You -- you can ask.  How do you know,

18    Mr. Campbell, what he -- what he meant?

19         THE WITNESS:  One is basically just written English

20    language, but two, it's also a standard, I would say.  It may

21    not be a written standard that I have seen, but certainly that

22    is the standard that -- that we have followed in -- in my seven

23    years looking at Amazon documents.

24         JUDGE GREEN:  Okay.  So that's how you understood it?

25         THE WITNESS:  Yes.



1      JUDGE GREEN:  Okay.

2   Q.   BY MS. BUFFALANO:  And did you talk to Mr. Bryson --

3   A.   No.  I did not.

4   Q.   And is that typical?

5   A.   Yes, that's typical.  I would not typically speak with --

6   with anyone involved in the -- with any witness in the

7   investigation or the claimant at any point.

8   Q.   Okay.

9      MS. BUFFALANO:  Okay.  And if you can show us, Mr. Diaz,

10  Respondent's Exhibit 16.  Oh, I'm sorry.  I meant -- I've

11  got -- I meant 19.  I apologize.

12  Q.   BY MS. BUFFALANO:  Okay.  And again, take a look at this,

13  Mr. Campbell, and enough of it, you know, so that you know what

14  you're looking at.

15  A.   Yes.  Can you just scroll to the end so I can see the end

16  of the document?  Thank you.  Yes.  This is the notes of the

17  seek to understand conversation between Mr. Grabowski and

18  Ms. Evans.

19  Q.   Okay.  And do you know why Mr. Grabowski had a seek to

20  understand with Ms. Evans?

21  A.   Yes.

22  Q.   How do you know?

23  A.   Following the seek to understand with Mr. Bryson, you

24  know, Mr. Bryson brought up claims about Ms. Evans's behavior,

25  and so a natural process of doing our due diligence in the



1    investigation, we went back to Ms. Evans to clarify the --

2    the -- some of the claims that Mr. Bryson had made to make sure

3    that we're hearing both sides of the story.

4    Q.    Okay.  And what's your understanding of the bold headings

5    and the plain text?

6    A.    The -- the bold headings are the questions that Tyler

7    asked Ms. Evans, and the -- the non-bolded text would be one of

8    two things.  If it's in quotations, then it's my understanding

9    that those would be quotes made by Ms. Evans.  If it's

10   around -- or -- and if it's not, then it would be Tyler's notes

11   or him recapping the conversation in his own words.

12   Q.    Okay.  And did you ever talk to Ms. Evans after -- before

13   or after or during the seek to understand?

14   A.    No.  I did not.

15   Q.    Okay.  And I'm going to show you a document that's been

16   marked as Respondent's Exhibit 21.  Have you seen this document

17   before?

18   A.    Yes.

19   Q.    What is it?

20   A.    I asked the HR team to create this document, actually,

21   based on the various witness statements and claims that we had.

22   Not something that we would -- not something that I would

23   normally do; however, in this particular case, all of the

24   witness statements confirm certain allegations that Ms. Evans

25   made.  Others of them confirmed other allegations, and so this


www.escribers.net | 800-257-0885

1    was a way actually just to under -- to -- to track and

2    understand Ms. Evans's allegations and which of the witness

3    statements and/or in this -- the -- in this case, if you see

4    the Facebook Live video on the end, validated her initial

5    claim.

6    Q.    Do you recall what instructions, if any -- well, let me

7    ask you this.  Who -- you said you asked HR to do this?

8    A.    Yes.

9    Q.    So did you give them any instructions; and if so, what

10   were they?

11   A.    Yes.  They were actually to create it exactly as it is,

12   that we should have all of the allegations listed and the names

13   of the witnesses across the top and then check or X mark or

14   something to align that their witness statement aligned with

15   Ms. Evans's statement.

16   Q.    Okay.  And so when I look at -- for example, Dimitra

17   Evans, she's the second column there across the top -- what did

18   you understand that to include?

19   A.    I understood that to include the claims that were made in

20   her witness statement.  There is one claim there, though, that

21   actually she didn't write in her statement, but she stated to

22   Tyler when she and Tyler first start, and I -- I believe that

23   is the use of the C-word.

24   Q.    And how do you know that -- what you're telling us right

25   now?



1    A.    From Tyler -- talking to Tyler.

2    Q.    Okay.  And what about -- if you move over there across the

3    column headings and you get to -- well, let me -- let me --

4    let's just go next to Shannon Donaldson.

5         MS. COX:  Objection.  Judge, I just want to go back to the

6    prior question.  It's double hearsay.  He's testifying to a

7    statement that Ms. Evans made to Mr. Grabowski that

8    Mr. Grabowski made to him.

9         JUDGE GREEN:  Okay.  I'm not taking it for its truth.  I'm

10   just taking -- taking this testimony to the extent it reflects

11   Mr. Campbell's state of mind when the investigation was done.

12   I'm not taking it for the -- the truth that she actually used

13   the C-word.

14   Q.    BY MS. BUFFALANO:  So if you want to take a look, Mr.

15   Campbell, at the next column, Shannon Donaldson.

16   A.    Yes.

17   Q.    What did you understand to be included in terms of the

18   checkmarks?  Like what -- what was reviewed to create this

19   Shannon Donaldson portion of the chart?

20   A.    He -- the -- the instruction was to actually review the

21   witness statements of each of the individuals.

22   Q.    Okay.  And so that's your understanding for

23   Shannon Donaldson, what -- how he created this

24   Shannon Donaldson column?

25        MS. COX:  Objection.  Asked and answered.



1       JUDGE GREEN:  Overruled.

2   Q.   BY MS. BUFFALANO:  You can go ahead and answer.

3   A.   For Shay, yes.

4   Q.   And then for Mr. Urso, same question.

5   A.   The same, for Mr. Urso, for Maciej Curlej, for Kaydee

6   Bertone, and for Paul Chierchio, all of those were from the

7   five witness statements that we reviewed earlier.

8   Q.   Okay.  And then what about Mr. Bryson?

9   A.   The --

10  Q.   Do you know what --

11  A.   I'm sorry.  The Xs and the statement are from Mr. Bryson's

12  seek to understand conversation.

13  Q.   Okay.  And then the last column is validated on Facebook

14  Live broadcast.  What do you understand that column to be

15  capturing?

16  A.   Yeah.  I actually -- that X is regarding myself who viewed

17  the Facebook Live broadcast, both live and then following the

18  incident.  So that's my reflection, honestly, of -- of me

19  stating that -- the comment about -- that she looked like she

20  was on drugs and that someone should test her was validated by

21  Facebook Live.  We utilized Facebook Live primarily almost as

22  another witness statement or as a seek to understand

23  conversation with Mr. Bryson being that that Facebook Live

24  broadcast was in his own words.

25  Q.   Okay.  So I -- let me just unpack that just a little bit.



Exhibit E, Motion to Try Petition on Hearing Record

1    So then who completed the column validated on Facebook Live

2    broadcast, if you know?

3    A.    I don't know who put the X in the box.

4    Q.    Okay.  Okay.  So now -- now let me ask you about the --

5    the Facebook Live video.  You just testified that you saw it

6    live.  What time -- do you remember what time that was?

7    A.    I believe it was about 1:40, 1:45.

8    Q.    How did you know about it, or how did you find out about

9    it?

10   A.    I was alerted when they started -- I was alerted by our

11   public relations team when they started broadcasting.

12   Q.    Okay.  And when you say when they started broadcasting,

13   who do you mean?

14   A.    I -- Facebook.  I know the video was -- or I think -- I

15   believe the live feed was being shot by Jordan Flowers

16   (phonetic throughout).

17   Q.    Okay.  Can you tell us what, if anything, that you saw on

18   that Facebook Live video you considered in making your

19   recommendation to terminate Mr. Bryson?

20   A.    Yes.  When the video started, Mr. Bryson started

21   immediately discussing what had just happened with Ms. Evans

22   and immediately started utilizing a lot of the -- the same --

23   the same terminology that had been -- that we see in the

24   witness statements, which was that Ms. Evans was a drug user,

25   that she had track marks on her arms, that she -- that --



# Exhibit E, Motion to Try Petition on Hearing Record

1 that -- that we -- and as well, his anger because it

2 immediately went into that we drove him to it, or she drove him

3 to it, and that he states over and over again that he cursed

4 her out.  He really cursed her out.  He goes on, on the video

5 as well, and I think it speaks to his frame of mind at the

6 moment talking about all of our associates as scum of the earth

7 and we're hiring scum of the earth.  And then it actually

8 later, I think, played into his integrity.  And what I mean by

9 that is that in the -- in the seek to understand conversation,

10 there was a pointed question about -- about the N-word where he

11 claims in -- in the notes that he would never use that word, he

12 doesn't use that type of language, and yet on the Facebook Live

13 video yet again, he utilizes it multiple times toward the end

14 of the video, adding the word dumb in front of it to a point

15 that -- that his friend actually has to come on and apologize

16 for his behavior.

17    So there was no specific action on the video that he was

18 terminated for, but the video was an important factor listening

19 to his own words about what had just happened.

20 Q. And was there -- okay.  Thank you.

21    All right.  So you indicated that you reviewed two

22 different angles of building footage; is that right?

23 A. Yes.

24 Q. Okay.

25    MS. BUFFALANO:  So can you show us, Mr. Diaz, General



1    Counsel's Exhibit 52?

2         MR. DIAZ:  Just confirming that was 52?

3         MS. BUFFALANO:  Yeah.  It's going to be 52 and 62, if that

4    makes it easier.  Okay.  That one's there.

5         MR. JACKSON:  Objection.  Has this document been produced?

6    I have not seen this document.

7         MS. BUFFALANO:  I don't know what this document is either.

8    I'm going into the SharePoint.  I'm just making sure.  There

9    might be a second one that's labeled 52.

10        MR. JACKSON:  Can we pull this off the screen while --

11        UNIDENTIFIED FEMALE ATTORNEY:  Nicole?

12        MS. BUFFALANO:  Yes?

13        UNIDENTIFIED FEMALE ATTORNEY:  He does not have access to

14   the SharePoint yet.  He only has our exhibits.

15        MS. BUFFALANO:  Okay.  Let's go -- can we go off the

16   record, Judge?

17        JUDGE GREEN:  Off the record.

18        (Off the record at 11:34 a.m.)

19                    **RESUMED DIRECT EXAMINATION**

20   Q.   BY MS. BUFFALANO:  Okay.  So Mr. Campbell, you indicated

21   that you reviewed building footage as part of your

22   investigation.  Can you tell us --

23   A.   Yes.

24   Q.   -- what building footage you reviewed?

25   A.   Yes.  There were -- there two cameras, I believe, in the



1    front of the building, slightly different angles.

2    Q.   Okay.  So Ms. -- Ms. Bagley's (phonetic throughout) going

3    to help us with the exhibits that are on SharePoint.

4        MS. BUFFALANO:  If you can show us Respondent -- or

5    Charging Party -- no, General Counsel's Exhibit 52.

6    Q.   BY MS. BUFFALANO:  Okay.  So Mr. Campbell, do you

7    recognize this video footage?

8    A.   Yes.  This was the video -- this appears to be the video

9    footage that I used -- or reviewed.

10   Q.   Okay.  And this is a two minutes and change video.  How

11   much of the video did you review?  And -- and -- and this is a

12   snippet, so if you could just explain to us sort of what -- how

13   much of the video you reviewed, what you saw on it, so that we

14   can understand how much you say?

15       MS. COX:  Objection, Your Honor.  Leading.  This is, you

16   know, a snippet, a --

17       MS. BUFFALANO:  Do you want me to play it?  I'll play it.

18   I'm just trying to save time, but I'm happy to play it.

19       JUDGE GREEN:  Well, do you want to just ask Mr. Campbell

20   what he found significant about the -- the video to the extent

21   he remembers it?  And then if we have to play it, we can play

22   it.

23       MS. BUFFALANO:  Yes.  But it would also be helpful for him

24   to -- to establish that this is what he saw.

25       JUDGE GREEN:  Okay.  I mean, I think we have that.  I



Exhibit E, Motion to Try Petition on Hearing Record

1   think he's testified that he saw two videos, including --

2   including --

3       MS. BUFFALANO:  Okay.

4       JUDGE GREEN:  -- Street Level 1.

5       MS. BUFFALANO:  All right.  So can you -- Ms. Bagley, can

6   you pull up General Counsel's Exhibit 62?

7   Q.  BY MS. BUFFALANO:  Okay.  And have you seen this before?

8   A.  Yes.

9   Q.  Okay.  And what is this?

10  A.  This is the second video that I reviewed during the

11  investigation of Bryson.

12  Q.  Okay.  And can you tell us what, if anything, you saw on

13  either of these videos, General Counsel's 52 or General

14  Counsel's 62, the two you just saw, the building footage, that

15  you considered in making the recommendation to terminate

16  Mr. Bryson?

17  A.  Yes.  There's not a -- a lot of detail from either video.

18  Of course, there's no -- no sound.  The video that's on the

19  screen right now, you can see the point where they appear to be

20  speaking to each other, but -- and you can see Mr. Bryson

21  utilizing the bullhorn.  But other than that, there -- there's

22  not really anything in this particular video that shows

23  anything.  We do see her retreating into the building.  I

24  believe it's the other video, actually, where you can see

25  Ms. Evans turn back toward Mr. Bryson as she's retreating into



1   the building and kind of take a -- a firm stance, if you will,

2   physically.  But other than that, from the two videos, there

3   was nothing that really added to the story itself.

4   Q.   Okay.  And when you say that you can see her turn back as

5   she's retreating and take a firm stance physically, what did

6   you understand of that, or what did you understand that to

7   mean?

8   A.   When she -- when she turns back around, her -- her -- her

9   body lunges forward, at least the top of her like shoulders

10  kind of stand up.  You can't tell -- and I think that's part of

11  it.  You can't tell whether she is -- you know, he has said

12  something and she's immediately defending herself from kind of

13  the litany in the assault that she was getting at the time, or

14  if she says something back to him.

15  Q.   Okay.  So you testified that you reviewed the Facebook

16  Live video and the General Counsel's 52 and 62, which are the

17  building footage.  Did you review any other video in making

18  your recommendation in this case?

19  A.   No.  I did not.

20  Q.   Did you have any other video depicting the incident --

21  A.   No.  I -- I did not.

22  Q.   Were you aware of the existence of any other video at the

23  time?

24  A.   No.  I was not.

25  Q.   Okay.  And was it strange to you that there wasn't any



Exhibit E, Motion to Try Petition on Hearing Record

1    video from the investigation?

2         MS. COX:  Objection.  Leading.

3         JUDGE GREEN:  Overruled.

4         THE WITNESS:  Not at all.  We don't typically utilize

5    video in any investigation.  We don't search it out from folks.

6    If someone were to bring video forward to us, then we would

7    certainly consider it, but generally we have something similar

8    to the two angles, even if it's inside the building, to review,

9    which does not have sound.  You're kind -- you're relying on

10   body language, and body language is -- is nothing something

11   that we're going to use as a decisive point in any

12   investigation.  It may help to provide, you know, some -- some

13   influence to the story.  You may be able to see some things,

14   but unless there's a full physical altercation, you can't

15   really determine much from any of those.  So we don't -- we

16   don't seek out video.

17        There have been times, I would say, in my career where

18   video is -- is brought to us between two associates where we

19   would utilize it.  But, again, that's -- that's given to us by

20   the associates.

21   Q.   BY MS. BUFFALANO:  Okay.  So based on all of the evidence

22   that you reviewed and we've talked about so far -- so witness

23   statements, STU notes, the Facebook Live video, the facility

24   videos -- what did you conclude happened on April 6th?

25   A.   I concluded -- I concluded that two associates had a --



1    had a verbal altercation in the parking lot.  You know, based

2    on what we know, Ms. Evans disagreed with the stance that

3    Mr. Bryson was taking, but then Mr. Bryson then verbally

4    assaulted her, calling her -- or accusing her of being a drug

5    user, being on drugs, talking about her physical attributes,

6    dark circles under her eyes, track marks on her arms, going on

7    then to -- not bring her family into it, but states she doesn't

8    have a family, that she doesn't have kids, goes -- we also

9    concluded that -- that he called her the B-word, based on his

10   own admission as well as her statement, as well as other

11   others.

12        He probably called her some other things based on witness

13   statements and his own use of vulgar language on the Facebook

14   Live video to the point that even -- even after she retreated,

15   he continued that aggressive behavior and -- and -- and -- and

16   harassed her publicly and then honestly broadcast it on

17   Facebook Live so that the whole world could continue to hear

18   these things about this individual that I -- I assume he didn't

19   know until this moment.

20   Q.   And when you said -- you said he probably called her some

21   other things.

22        JUDGE GREEN:  Let me just -- can you take down the -- the

23   exhibit that's --

24        MS. BUFFALANO:  Okay.

25        JUDGE GREEN:  -- being shared?  Just try to take it down



# Exhibit E, Motion to Try Petition on Hearing Record

1   because I have the witness pinned to that -- that separate

2   screen, so if a -- if a document is up, I can't see the witness

3   in the -- in a smaller box.  Go ahead.  Sorry.

4   Q.   BY MS. BUFFALANO:  So you testified that he probably

5   called her some other things based on the witness statements.

6   What were those other things that he probably called her?

7       MS. COX:  Objection, Your Honor.  This is a hypothetical

8   question.

9       JUDGE GREEN:  No, it's not.  Overruled.

10      THE WITNESS:  I think that the -- the most apparent one is

11   the -- the use of the N-word where, again, in his STU he claims

12   that he would never use that type of word, actually makes a

13   pretty big deal if you look at -- at the notes about he's not

14   going to use that word.  And then at the end of the video, he

15   continues to use that word over and over.  And while Ms. Evans

16   states he used it during the situation, there's only, I

17   believe, another witness that confirms it; however, his own use

18   of the word, again, is -- is what's leading me to say that he

19   probably said that word, if you -- if you will.

20       You know, we -- you look at all of the events and you look

21   at -- at the totality of it and Mr. Bryson's behavior, which

22   started very, very aggressively talking about drug usage and

23   not having a family and continued to use words like the B-word,

24   which we have confirmed -- you know, I -- I would also bring up

25   that in the -- in the STU, he states that she wanted him to



Exhibit E, Motion to Try Petition on Hearing Record

1  call her a dike.  That word never comes up in anything that

2  we've seen, anything that we've heard, nor does she even make

3  that claim, yet Mr. Bryson, even in speaking to HR and -- and

4  being asked questions about the incident, continues to -- to

5  use horrible language and slur words for someone's sexuality.

6  He -- he talks about a girl coming after him, and he's a man,

7  drug usage, family.  It just went on and on and on.

8  Q.    BY MS. BUFFALANO:  Let me ask you.  When you say a girl

9  coming after him and he's a man, what are you referring to?

10  A.    There's a -- there's a statement where he says -- sorry if

11  I'm paraphrasing a bit -- where he makes a comment about

12  he's -- a -- a woman coming after him questioning him.

13  Q.    Do you remember where that's from?

14  A.    I believe it's in the Facebook Live video.

15  Q.    Okay.  And you said that in speaking to HR, he used --

16  he -- he continues to use slur words for Ms. Evans.  What --

17  what does that -- how, if -- if at all, does that impact your

18  recommendation?  What does that tell you?

19        MS. COX:  Objection, Your Honor.  This is compound, vague.

20  He -- he didn't have any discussion with Ms. Evans -- I'm

21  sorry, Mr. Bryson.

22        JUDGE GREEN:  So --

23        MS. BUFFALANO:  I can ask --

24        JUDGE GREEN:  Okay.  Do you want to ask a different

25  question?



Exhibit E, Motion to Try Petition on Hearing Record

1    Q.    BY MS. BUFFALANO:  So what -- you've mentioned that he

2    called Ms. Evans the D-word during his STU with Mr. Grabowski.

3    How, if at all, did that affect your recommendation for

4    termination for Mr. Bryson?

5    A.    Yes.  You know, termination is -- is the last point of

6    corrective action, and if, in any case, where you're

7    considering what is the appropriate discipline, certainly being

8    in that moment to terminate someone's employment is -- is -- is

9    a heavy weight, right.  And the one thing that is so important,

10   I think, is seeing some remorse.  And even when Mr. Bryson got

11   on -- started broadcasting over social media, he shows no

12   remorse for what's just happened.

13        And I think that as we led all the way into that STU,

14   however many days later where he's continuing to bash her,

15   shows that he had no remorse, and just a different form of

16   discipline, if you will, was not going to correct his behavior.

17   And that's really the outcome that -- that I'm always after is

18   what's -- what are you giving someone that's going to correct

19   the behavior?

20        If he had shown some level of remorse in this -- but it

21   just continued from the moment that he engaged her all the way

22   through to broadcast it publicly to who knows how many people,

23   all the way into our conversations.

24        MS. COX:  Your Honor, I'm going to object to this

25   narrative.  This wasn't the question that was asked, and I'm



Exhibit E, Motion to Try Petition on Hearing Record

1    going to move to strike the witness's response.

2        JUDGE GREEN:  Overruled.

3    Q.   BY MS. BUFFALANO:  So you -- and -- and you mentioned that

4    he showed no remorse you said on Facebook Live.  What -- what

5    about the Facebook Live video -- what happened in the Facebook

6    Live video that indicated that he didn't have any remorse?

7        MS. COX:  Objection, Your Honor.  The witness already

8    testified that this Facebook Live wasn't considered in the

9    termination.

10       MS. BUFFALANO:  What?  That's not at all what he

11   testified.

12       JUDGE GREEN:  Yeah.  No.  I didn't hear that.

13       MS. COX:  Well --

14       JUDGE GREEN:  It's overruled.

15       MR. KEARL:  Okay.  I believe the -- the comment was that

16   there was nothing -- that he only used it to corroborate or

17   to -- to assess the --

18       JUDGE GREEN:  Yeah.  I -- no.  I don't think that actually

19   accurately reflects the testimony.  If you want to ask him

20   again, you can ask him.

21       MS. COX:  The testimony was there's nothing on the video

22   that he was terminated for.

23       JUDGE GREEN:  Overruled.  If you -- okay.  If you want

24   to -- if you want to ask the question again, you can ask the

25   question.



1    MS. BUFFALANO:  I think it's clear, so --

2    JUDGE GREEN:  Okay.  Let me -- let me ask the question.

3    Mr. Campbell, did -- was -- your recommendation that

4    Mr. Bryson be discharged, was that based in any way on anything

5    he could be heard saying on the Flowers Facebook Live video?

6    THE WITNESS:  No.

7    JUDGE GREEN:  Okay.  Did the Facebook Live video have any

8    impact on how you saw the other evidence?

9    THE WITNESS:  Yes.

10   JUDGE GREEN:  Okay.  Why don't we continue.

11   MS. BUFFALANO:  Okay.

12   Q.   BY MS. BUFFALANO:  So you testified that -- a couple of

13   questions ago, you said he didn't show any remorse, like on the

14   Facebook Live video, and then you went on to talk about how

15   he -- that -- used the D-word in the STU and how that showed

16   that he didn't have any remorse.  So my question to you is --

17   MS. COX:  Judge Green, I'm going to object to counsel

18   continuously repeating the testimony.  Just ask the question.

19   JUDGE GREEN:  Overruled.

20   Q.   BY MS. BUFFALANO:  So what, if anything -- or what on the

21   Facebook Live video demonstrated, in your view, that -- that

22   Mr. Bryson didn't have any remorse for what happened in the

23   incident?

24   A.   I -- sorry.  I think that when he immediately started in

25   on the video that he was -- he was driven to this, that if we



Exhibit E, Motion to Try Petition on Hearing Record

1    hear anything else, he was immediately trying to get his story

2    out is -- is what it appeared ahead of, anyone understanding

3    exactly what happened, the fact that he continued to rant on

4    the video.  She had already retreated into the building and the

5    event itself was over, but he continued to -- to make the

6    commentary about her personally, about the drug usage, and

7    actually going a step further and stating that -- that Amazon

8    was hiring scum of the earth, at that point, insulting every

9    single associate who was standing there and in that building.

10        But to continue the rant even after he has moved that far

11   away from the building and then to go a step further minutes

12   later and continue to use the words just showed that it -- what

13   he did didn't -- didn't matter to him at that time.

14   Q.   So how about -- after reviewing all of the evidence that

15   you reviewed in this case, did you make a conclusion about

16   Ms. Evans's role in the incident and what she may or may not

17   have done or said?

18   A.   Yes.

19   Q.   Can you tell us about that?

20   A.   Yes.  Ms. Evans -- number one, all of the witness

21   statements when they came forward talk about Mr. Evans -- I'm

22   sorry, Mr. Bryson being the aggressor in the situation.  I

23   think that Ms. Evans admitted to using your mother and having a

24   conversation, so very similarly did Mr. Bryson in looking at

25   the behavior, looking at even the video to help kind of inform



1    it and that body motion, Ms. Bryson engaged -- or I'm sorry,

2    Ms. Evans engaged with Mr. Bryson for sure, but there was no --

3    there was no confirmation of anything other than your mother.

4    Q.    Okay.  So what -- so you had mentioned earlier on your

5    testimony that you looked at other discipline as part of your

6    investigation; is that right?

7    A.    Yes.

8    Q.    Okay.  Can you tell us what you looked at in terms of

9    other discipline?

10   A.    Sure.  I had asked the team to pull for me any -- any

11   examples that we had for discipline, for harassment.  Being

12   that JFK8 had only been open since 2018, it was helpful, but

13   they -- they -- they went back and researched and presented 26

14   different incidents of harassment of some type and the

15   disciplines, and I had all of those into a spreadsheet.

16   Q.    Okay.  And you understood that this was all of the

17   disciplines for what?

18   A.    For harassment.

19         MS. COX:  Objection.  Leading.

20         JUDGE GREEN:  Overruled.

21   Q.    BY MS. BUFFALANO:  Okay.  And what -- can you tell us what

22   was the purpose of looking at this information?

23   A.    Sure.  Based on my own knowledge of Amazon policy, based

24   on past incidents, ultimately, at this point, I knew that the

25   most likely outcome was termination.  I asked for those to be



1   pulled so that I had the precedent of the site how to look at

2   how that had been applied since the site had opened and looking

3   things that potentially move me away from termination to -- to

4   a lesser discipline, if you will, at that point.

5   Q.   Okay.  So I'd like to show you that document now --

6        MS. BUFFALANO:  -- which I think should be Respondent's

7   27, Ms. Bagley.

8   Q.   BY MS. BUFFALANO:  And can you see this Mr. --

9   A.   Yes.

10  Q.   -- Campbell?

11  A.   Yes.

12  Q.   Okay.

13       MS. BUFFALANO:  And can you scroll?

14  Q.   BY MS. BUFFALANO:  And -- and Mr. Campbell, just let   Ms.

15  Bagley know like what you want -- where you want her to go.

16  A.   Sure.  I'm sorry.  Am I -- am I reviewing the whole doc?

17  Q.   I just want you to make sure you know what it is for now.

18  A.   Yes.  I know what this is.

19  Q.   Okay.  And what is this?

20  A.   This is the spreadsheet that the team provided me with

21  comparator incidents, the discipline, and the -- and the

22  details.

23  Q.   And can you tell us what -- at what facility these

24  disciplines came from?

25  A.   JFK8.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q.   Is there any reason that you didn't ask for disciplines at

2   other facilities?

3   A.   Yes.

4        MS. COX:  Objection, Your Honor.  Leading.

5        JUDGE GREEN:  Overruled.

6        THE WITNESS:  Yes.  I don't -- we don't particularly -- we

7   don't start looking for precedent at other sites unless there's

8   no precedent within that site.  As -- as big as the -- as big

9   as our buildings are and the number of people that we employ,

10  JFK8 being up to 6000 -- close to 6000 people at times, trying

11  to understand the precedent that is actually in that site.

12       In this case, we had comparators, so there was no reason

13  to reach out to another building to -- to look for anything.

14  Q.   BY MS. BUFFALANO:  And why would you start that specific

15  site?

16  A.   Because that's the incident -- that -- that is where this

17  incident happened was at JFK8.

18  Q.   And discipline at -- discipline at JFK8 for example, like

19  who would typically be involved in making those decisions at

20  JFK8 for JFK8 discipline?

21  A.   Yeah.  Again, depending on the level of employee, it would

22  be the HR team at the site and the operations team at the site,

23  the LP team at the site.

24  Q.   Okay.  So this -- this document, Respondent's 27, you

25  indicated that this was the comparator document?



Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 1767 of 2171 PageID #: 1919   1916

1    A.    Yes.

2    Q.    Okay.  Do you know who prepared it?

3    A.    I don't specifically know who prepared it.

4    Q.    Who did you -- did you direct it to be prepared?

5    A.    Yes.

6    Q.    Who'd you ask to prepare it?

7    A.    I would have asked Christine Hernandez or Tyler Grabowski.

8    Q.    Okay.  Okay.  So you get this list.  Can you tell us what

9    you do with it?

10   A.    Sure.  Originally, what was presented were 26 different

11   cases.  I started with the column -- I -- I believe it's -- can

12   we -- can -- can we move to the left?  I believe it's the

13   column marked details.  I'm sorry, to the right.  My apologies.

14         Yes.  To the column marked details, and I reviewed --

15   Q.    Is that it, Mr. Campbell?  Just what we're looking at on

16   the screen?  Can you see?  Do you want her to zoom in?

17   A.    It's -- yeah.  It's actually the size of my screen, which

18   is good.  Yes.  There's another column to the right, which I

19   believe is incident details.  Can I see that one as well?  Yes.

20         So I started with the column marked details first.

21   Q.    Okay.  And let the record reflect that that's Column X.

22   A.    Yes.

23   Q.    Okay.  Go -- you can go ahead.

24   A.    And before looking at the column to the right, incident

25   details, or the level of discipline, which I believe is over to



Exhibit E, Motion to Try Petition on Hearing Record

1    the left, or the language that would have been in the document,

2    I just focused on this column, and I read through all 26

3    examples that were provided.  20 of the 26 I eliminated from my

4    consideration really quickly.  All of the other 20 really were

5    more closely aligned with sexual harassment.  There was some

6    sexual inuendo in them or inappropriate touching, jokes of a

7    sexual nature, something of that, so I eliminated those 20 from

8    my consideration, and that left me actually with 6 different

9    incidents to look at.

10   Q.    Okay.  Can you tell us why you eliminated the incidents

11   that were closely aligned with sexual harassment?

12   A.    Yes.  There was -- there was no -- there was nothing in

13   the witness statements, there was nothing in the STUs, there

14   was nothing in the video that we reviewed that would lead me to

15   believe that sexual harassment had anything to do with the

16   Bryson and Evans case.

17   Q.    Well, how do you understand sexual harassment?

18   A.    I understand sexual harassment to be, again, inappropriate

19   touching, an inappropriate sexual proposition from one person

20   to another, a -- a -- a joke that may be of a sexual nature.

21   None of -- none of that was present in what we were discussing.

22   Q.    Okay.  All right.  So you -- can you tell from this chart

23   which of the entries are -- are sexual harassment that you

24   eliminated, and which are the ones -- the six that remained?

25   A.    Yes.  The -- the highlighted cases would be the only cases



1    that I considered.  The ones I didn't highlight, I didn't use.

2    I actually -- I did the highlight in this particular

3    spreadsheet myself -- myself so that I could hide those rows.

4    Q.   Okay.  So can you --

5         MS. COX:  Judge Green, may I have some voir dire on this

6    document?  It wasn't presented to me in -- with highlights, so

7    I just want to ask some questions about that.

8         JUDGE GREEN:  Okay.

9         MS. COX:  You're going to offer it, right, Nicole?

10        MS. BUFFALANO:  Yes.

11        MS. COX:  Okay.

12                   **VOIR DIRE EXAMINATION**

13   Q    BY MS. COX:  So Mr. Campbell, can you tell me when you put

14   the highlights in this document?

15   A.   I don't know the exact date, but it was the date that I

16   first saw it.

17   Q.   Okay.  And that would have been around when?

18   A.   Some -- sometime around April 10th or thereafter.

19        MS. COX:  Can I ask the -- the person who is putting up

20   this document to click a file for me in this document?

21        MS. BAGLEY:  Yes.

22        MS. COX:  Can you also click info?  Okay.

23   Q.   BY MS. COX:  So this document has no metadata, right?

24        JUDGE GREEN:  So do you have any questions regarding

25   the -- the authenticity or -- what are you -- what are you



1    trying to establish?  This sounds like stuff you can get into

2    on cross, and we don't have it being offered yet.

3        MS. COX:  Judge, I just want to understand who created it,

4    when it was created, when it was modified, just general voir

5    dire questions.

6        JUDGE GREEN:  Okay.  Go ahead.

7        MS. COX:  Okay.  Can you click version history for me,

8    please?  Okay.  All right.  I'll go back to the document then.

9    It seems that it's been scrubbed.

10       Can -- can Respondent produce the -- the version with the

11   unredacted metadata for -- metadata that hasn't been removed?

12       MS. BUFFALANO:  Let me ask -- let me ask.  I know we

13   produced this -- I just confirmed that we produced it on the

14   20th with -- in this version.  I know we produced the PDF

15   version much earlier.  But yeah.  Let me find out --

16       MS. COX:  I didn't get this on the 20th.  I got this

17   around May 13th or 14th, and it didn't have any highlights.

18       MS. BUFFALANO:  Okay.  All right.  Let me run that down

19   because I just got a message that it was produced on the 20th,

20   and -- so let me -- we'll -- we'll figure it out.

21       MS. COX:  Okay.  All right.  I'm done -- I'm done, Judge.

22                     **RESUMED DIRECT EXAMINATION**

23   Q    BY MS. BUFFALLANO:

24   Okay.  So Mr. Campbell, why don't you tell me this:  you told

25   us when you think you received it.  Did you -- well, let -- all



Exhibit E, Motion to Try Petition on Hearing Record

1    right.  Let's just walk through where we were, which is you had

2    eliminated 20 cases that you thought aligned with sexual

3    harassment and not what was going on in this case.  What did

4    you do next?

5    A.    I read through the details of all of the incidents, so

6    Column X.

7    Q.    Okay.  And when you say all of the incidents, what do you

8    mean?

9    A.    The six that were remaining.

10   Q.    Okay.  And so was there anything here -- tell me what you

11   learned or what was relevant to you about any of them and any

12   of the six or how they weight into your recommendation, if at

13   all.

14   A.    Sure.  You know, reading through the -- the six incidents

15   that were here, a lot of them described similar incidents

16   between two associates.  None of them I think rose to the level

17   of the use of abusive language that Mr. Bryson did.  After I

18   reviewed the details file, I reviewed the incident details

19   file, and then ultimately, I did look at the discipline.  And

20   in all of them, having similar incidents -- or having similar

21   language usage sometimes or -- or use of inappropriate words,

22   there were I believe four that resulted in termination and two

23   that resulted in a first written warning.

24        I think most notably, when you look at them, the

25   difference is in the way that the language is used.  Where



# Exhibit E, Motion to Try Petition on Hearing Record

1    Mr. Bryson was very direct in his statements about Ms. Evans,

2    talking about her in particular, not to a group of people, not

3    to a general idea, not to being upset by something, but very

4    directed toward her, which is -- is far more similar to -- to

5    where we laid it, you know, with termination previously.  But I

6    think Mr. Bryson's -- the incident with Mr. Bryson is far more

7    extreme than any of the four terminations that we see here.

8         So it validated what I -- what I honestly thought, which

9    was that the -- the correct level of discipline for Mr. Bryson

10   was termination, and then it also led me, I would say to the

11   place, for Ms. Evans to recommend a final written warning.

12   Q.   Can you tell us about that?

13        MS. COX:  Objection.

14   Q.   BY MS. BUFFALANO:  Okay.  Can you tell us what in this

15   analysis you did led you to recommend a final written for

16   Ms. Evans?

17   A.   Yes.  There were -- there were similarities of language in

18   some of them.  You know, again, at this point, all that we had

19   was your mother -- I'm sorry.  Is there some -- is it -- is --

20   Q.   Yeah.

21   A.   Is it going out of focus?  I apologize.

22   Q.   It is --

23   A.   Okay.

24   Q.   -- on my screen.

25        JUDGE GREEN:  It sounds like you're not really testifying



1    based on what's in the document.  It sounds like this is

2    testimony regarding Mr. Campbell's recollection, his decisions,

3    and maybe --

4        MS. BUFFALANO:  I was going to just ask him about like the

5    columns and stuff, but I can try and share it, so if you want

6    to take it down, Ms. Bagley, I'll put it up on -- okay -- when

7    we get there.  Thank you.

8        THE WITNESS:  Thank you.

9    Q.   BY MS. BUFFALANO:  Do you want me to ask the question

10   again, or you -- do you remember?

11   A.   No.  There were -- there were similarities of -- there

12   were similarities of language.  We had established that

13   Ms. Evans utilized the term your mother at that point, and --

14   and probably played a bit of an antagonizing role in the

15   situation, as I stated before, and so that's why I recommended

16   final for Ms. Evans.

17   Q.   All right.

18       MS. BUFFALANO:  All right.  So can we -- would you mind,

19   Judge Green, if we went off the record so I can just find the

20   document and then I can figure out how to share it?

21       JUDGE GREEN:  Off the record.

22       MS. BUFFALANO:  Thank you.

23       (Off the record at 12:23 p.m.)

24                   **RESUMED DIRECT EXAMINATION**

25   Q.   BY MS. BUFFALANO:  Okay.  Can you see --



1    A.    Yes.

2    Q.    -- Respondent's Exhibit 27?

3    A.    Yes.

4    Q.    Okay.  So I wanted to just ask you what -- you -- you

5    asked for this report.  When you received this report, like

6    what do you understand this document to be from, or how -- do

7    you under -- have any understanding about how this document was

8    generated?

9    A.    They -- the team would have pulled this information from

10   Adapt, which is our record of discipline.  But it would have

11   pulled all of these records from Adapt.

12   Q.    Do you have some concept -- have you seen a -- a document

13   that looks like this before, like format-wise?

14         MS. COX:  Objection.  Relevancy.

15         JUDGE GREEN:  Overruled.

16         THE WITNESS:  I don't believe I had in a -- in spreadsheet

17   form.  No.

18   Q.    BY MS. BUFFALANO:  Okay.  So what do you understand -- so

19   I just want to run through the document to make sure that we

20   all understand what it is.  So under employee ID, there is

21   numbers.  What does this column mean?

22   A.    That would be the associate listed in Column B's employee

23   ID number.

24   Q.    Okay.  And then employee name?

25   A.    The employee name would be the person who received the



Exhibit E, Motion to Try Petition on Hearing Record

1    discipline.

2    Q.    Okay.  And employee login?

3    A.    That would be their -- their Amazon login, Amazon email

4    address.

5    Q.    Okay.  Employment status?

6    A.    Their current employment status, whether they're active,

7    terminated.

8    Q.    So you'll see like in Column M it says termination and

9    employment status active.  Do you have any idea why that is?

10   A.    I do not.

11   Q.    Okay.  So like for this person, for example, in Row 2,

12   what do you understand their employment status to be when

13   you're -- when you were reviewing this document back in April

14   2020?

15   A.    That they were terminated.

16   Q.    Okay.  And then there's -- let me see.  Let's get to the

17   stuff that matters.  Under type in Column K, what does that

18   indicate?

19   A.    It's going to talk about the -- the type of disciplines

20   and whether it was for a behavioral incident, a productivity

21   incident, quality incident, attendance, et cetera.

22   Q.    Okay.  And under status, Column L?

23   A.    That would be -- yeah.  That would be that the discipline

24   had been delivered to the associate.

25   Q.    Okay.  And then level, Column M?



1   A.   Level of discipline.

2   Q.   Okay.  And so you understand this to be what was actually

3   issued --

4   A.   Yes.

5   Q.   -- to the associate?

6   A.   Yes.

7        MS. COX:  Objection.  Leading.

8        JUDGE GREEN:  Overruled.

9   Q.   BY MS. BUFFALANO:  Created date?

10       MR. JACKSON:  Objection.  Document speaks for itself on a

11   lot of these?

12       MS. BUFFALANO:  Does it?  Is created date -- created

13   date -- I mean, listen, if you all are satisfied with -- okay.

14       JUDGE GREEN:  What's the created date?

15       THE WITNESS:  I believe created date is the day that the

16   discipline was created.  It was actually inputted in Adapt.

17   Q.   BY MS. BUFFALANO:  Feedback updated date?

18   A.   Feedback updated date is -- is if there was any feedback

19   added or changed about the -- from the original date.

20   Q.   Okay.  And then deliver date?

21   A.   Would be the date that it was communicated.

22   Q.   To whom?

23   A.   I'm sorry.  To the associate.

24   Q.   Okay.  All right.  And then Column W, areas of

25   improvement, what is that column?  Let me know if you want me



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    to make anything bigger or move around or whatever.

 2    A.    Yeah.  Can you just click on Row 2 for me to open up the

 3    entire --

 4    Q.    Yeah.  Do you want me to make this bigger so you can see

 5    the --

 6    A.    I can -- good.  I can see that.

 7    Q.    Okay.

 8    A.    That's actually area of improvement that is listed on

 9    the -- the document that the associates receives, so it's --

10    it's what's expected of them going forward.

11    Q.    Okay.  And you said this is actually on the -- what I'm

12    going to call the feedback form?

13    A.    Yes.

14    Q.    Okay.  And the feedback form is like the document they get

15    that tells them about the discipline?

16    A.    Yes.

17    Q.    All right.  And then what about details in Column X?  What

18    is that?

19    A.    This is also -- it explains the incident that the

20    discipline is for, and it's also on the feedback form.

21    Q.    Okay.  And incident details, is that different than any of

22    the -- the earlier columns?  Apologies.

23    A.    No.  It's -- it's -- it's a repeat generally of the other.

24    Q.    And when you say the other, what do you mean?  And if you

25    don't know, you can say you don't know.  I'm just trying to
```



1   figure out --

2   A.    Yeah.

3   Q.    -- for the record what all the columns are.

4         MS. COX:  Objection, Your Honor.  She shouldn't be telling

5   the witness how to testify.

6         JUDGE GREEN:  Overruled.

7   Q.    BY MS. BUFFALANO:  Do you know what the incident details

8   column is?

9   A.    Not specifically.

10  Q.    Okay.  Okay.  You know, this is really important, figuring

11  out how to stop sharing.  All right.

12        MS. BUFFALANO:  Okay.  So I'm going to move for the

13  admission of Respondent's Exhibit 27.

14        JUDGE GREEN:  Any objection?

15        MS. COX:  Other than Bannon-Mills, no objection.

16        JUDGE GREEN:  All right.  So I'm going to handle it the

17  same way I have before in that I'm going to designate as being

18  offered as a Bannon-Mills objection (indiscernible).

19  **(Respondent Exhibit Number 27 Received into Evidence)**

20  Q.    BY MS. BUFFALANO:  All right.  Mr. Campbell, so now that

21  we've -- we've sort of talked about all the evidence, we've

22  talked about what you looked at in terms of the comparators.

23  So can you tell us why you decided to recommend termination for

24  Mr. Bryson based on your review of the evidence and the

25  investigation and the incident?


www.escribers.net | 800-257-0885

1    A.    Yes.

2          MS. COX:  Objection.  Leading.

3          JUDGE GREEN:  Overruled.

4          THE WITNESS:  I -- I decided to recommend termination for

5    vulgar and abusive -- for harassment.  It was a category two

6    violation based on harassment, for abusive and vulgar language.

7    We had witness statements that all of which confirmed his

8    repeated use of the reference to drugs, her being a druggy,

9    track marks repeatedly.  In addition to the five witness

10   statements, we had that validated by Facebook Live, as well.

11         We had multiple witnesses state that he had used the B-

12   word as well as Mr. Bryson's own admission to calling her that

13   in that statement, and then we had many other references to use

14   of abusive language.  While not all of them were completely in

15   line with a specific word, the case was never about specific

16   words.  The case was about his overall abusive and harassing

17   behavior toward Ms. Evans, which he then, in -- on Facebook

18   Live stated in his own words that he was in a situation, it got

19   out of hand, that she drove him to it, and then he continued to

20   berate her publicly on Facebook Live.

21         Even in the STU, what we found with -- with Mr. Bryson

22   specifically was, again, he admitted to the use of the word B.

23   He took it a step further stating that she wanted him to call

24   her a -- a D-word, which had never come up, and his repeated

25   use of the N-word when he says he would never use that.  That



Exhibit E, Motion to Try Petition on Hearing Record

1    was his defense for not saying it in that situation, which just

2    showed a lack of credibility for Mr. Bryson, and so we

3    terminated.

4        But the termination itself is -- is basically -- well, the

5    termination itself is written on those two or three specific

6    things because we didn't need all the rest of it.  The drug

7    language, the use of the word B, his verbal attacks on her on a

8    megaphone were enough reason without even the rest of the

9    information.

10       As for Ms. Bryson at that point, again, looking at even

11   the video where she showed that she turned around, we had her

12   absolutely admitting to the use of the word your mother.  I

13   think there was one accusation of the use of the F-word, but

14   even the instance where she used the F-word, she used it as a

15   descriptor.  She didn't use it as Mr. Bryson did toward him, if

16   you will.  So I -- at that point, I recommended a final written

17   warning for Ms. -- Ms. Evans's behavior as well.

18   Q.   BY MS. BUFFALANO:  Let me ask you this:  are you aware of

19   any cases that you would consider -- and when I say cases, I

20   mean like, you know, cases involving associate discipline at

21   any of your facilities that you would consider similar to this

22   one?

23   A.   No.

24   Q.   How is it sort of different than the other cases that you

25   see or are aware of?



Exhibit E, Motion to Try Petition on Hearing Record

1  A.    There -- there's probably any number of cases where

2  associates exchange words or may say a curse word or something

3  of that nature, but the differences with this one were a couple

4  of the external elements, the use of social media to broadcast

5  it, the fact that it was in a parking lot and was public.  Most

6  of these incidents happen within our sight where two people say

7  a few words.  But it was also how long this incident went on.

8      In most cases, two associates will -- may share a few

9  words and then walk away from each other or step away, but in

10  this particular incident, you know, it started, and it

11  continued to go for -- for -- for a length of time where

12  Mr. Bryson never stopped his -- his -- his -- his use of

13  language and calling her names and -- and talking about her

14  personally.  Even after she retreated and she went into the

15  building, he continued the behavior.  So the length of time

16  that Mr. Bryson continued this behavior is a definite

17  difference.

18  Q.    Do you know -- do you recall when you made the termination

19  recommendation?

20  A.    The recommendation was made on April 16th.

21  Q.    In 2020, right?

22  A.    I'm sorry.  2020, yes.

23  Q.    That's okay.  I didn't ask.  Okay.  And let me ask you

24  just a couple of questions.  Did the fact that Mr. Bryson

25  participated in an employee discussion with management in a


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    production meeting on March 25th factor into your decision to

2    recommend his termination?

3    A.    Absolutely not.

4          MR. JACKSON:  Asked and answered.

5          JUDGE GREEN:  Overruled.

6          MS. BUFFALANO:  No.  That was --

7    Q.    BY MS. BUFFALANO:  Did the fact that he participated in a

8    demonstration on March 30th factor into your decision to

9    recommend his termination?

10   A.    Absolutely now.

11   Q.    Did the fact that he was participating in a demonstration

12   on April 6th factor into your decision to recommend his

13   termination?

14   A.    Absolutely not.  No.

15   Q.    Sorry.  I didn't hear it.  Give it to me again.

16   A.    No.

17   Q.    Okay.  Did the fact that he was opposing Amazon's COVID-

18   related practices, protocols, or policies weigh into your

19   decision to recommend his termination?

20   A.    No.

21   Q.    And would you have recommended that Mr. Bryson be

22   terminated for his misconduct that you testified here to today

23   even if he hadn't engaged in the March 30th demonstration,

24   April 6th demonstration, or participated in the March 25th

25   meeting?



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. COX:  Objection.  Hypothetical, compound, all of the

2    above.

3    JUDGE GREEN:  Overruled.  This is -- this is an example of

4    the type of testimony that would be relevant if we were

5    agreeing to deal with this on the basis of Burnup & Sims, but

6    we're not there yet, so overruled.

7    Q.   BY MS. BUFFALANO:  Do you remember the question?

8    A.   No.

9    Q.   Okay.  My question is:  would you have recommended that

10   Mr. Bryson be terminated for his misconduct on April 6th, as

11   you've testified about it here today, even if he hadn't

12   participated in the March 30th demonstration and April 6th

13   demonstration, the March 25th meeting, and opposed Amazon's

14   COVID-19 related practice or policies?

15   A.   Yes.  That would still be my recommendation.

16   MS. BUFFALANO:  And if we could take -- Ms. Bagley, are

17   you still here?

18   Okay.  Let me find quickly.  I apologize.  Can you just

19   give me one minute to find this exhibit?  I was not planning on

20   having to do this, otherwise I would be very prepared to be

21   doing it.

22   JUDGE GREEN:  Okay.  Off the record.

23   (Off the record at 12:39 p.m.)

24   MS. BUFFALANO:  Okay.  And can you scroll to page 27,

25   please?  And for the record, I don't know if we were there yet,



Exhibit E, Motion to Try Petition on Hearing Record

```
 1   but we're on General Counsel's Exhibit 8.  Okay.  So if you --
 2   can you just go one more page to the Category 2?
 3                RESUMED DIRECT EXAMINATION
 4   Q.   BY MS. BUFFALANO:  Okay.  So you testified earlier that
 5   Mr. Bryson was terminated for abusive, vulgar, harassing
 6   language; is that right?
 7   A.   Yes.
 8   Q.   Okay.  So you see here -- so we're -- I -- we're on
 9   page  -- what -- 28.  It's Bates number 243 of General
10   Counsel's Exhibit 8.  So can you show us -- and I don't think
11   you have to -- the third bullet down, is that -- is that the --
12   there we go.
13        MS. BUFFALANO:  Thank you, Ms. Bagley.
14   Q.   BY MS. BUFFALANO:  Is that the -- is that there the
15   termination reason?
16   A.   Yes.
17   Q.   Okay.  And so if you look at the top, it says, "Category
18   2, the following work conduct infractions are considered
19   serious and generally result in corrective action," but
20   Mr. Bryson was terminated on a first offense for a Category 2
21   offense; is that right?
22   A.   Yes.
23        MS. COX:  Objection.  Leading.
24        JUDGE GREEN:  Sustained.
25        MS. BUFFALANO:  Okay.
```



1    Q.    BY MS. BUFFALANO:  So this abusive, vulgar, harassing

2    language is -- how is it categorized by Amazon?  Like how is

3    it -- how is it categorized by Amazon?

4    A.    It's categorized as a Category 2 infraction.

5    Q.    Okay.  And there -- is there an alternative?

6    A.    Yes.  So there -- looking at this document, there's a

7    Category 1 and there's a Category 2.  The document is -- is

8    guardrails and a guide to -- to help us decide what the

9    infraction is and also to help determine the corrective action.

10         Category 1, if you look earlier in the document, those

11   things under Category 1 most likely result in termination;

12   however, they don't always result in termination.  And I --

13   many times, we downgrade a Category 1 infraction to be less

14   than termination.

15         Category 2 infractions, as it states, are also considered

16   serious and generally result in corrective action.  They are

17   normally less severe infractions; however, corrective action

18   includes termination.  So depending on the severity, depending

19   on the -- the -- the level of infraction, if you will, a

20   Category 2 often results in termination as well.

21   Q.    Okay.  And can you explain to us how Mr. Bryson used

22   abusive, vulgar, or harassing language within the meaning of

23   this Category 2 policy?

24   A.    Sure.  Mr. Bryson spoke about Ms. Evans, calling her a

25   drug user.  He made references to her physical appearance with



# Exhibit E, Motion to Try Petition on Hearing Record

1   black circles under her eyes, track marks on her arms.  He even

2   went as far as to talk about fentanyl in one of the two as

3   well.  He goes on to state that she has no family and no kids.

4   He continues -- he calls her the B-word in that moment, and he

5   does all of this publicly, in front -- you know, on a lunch

6   break in front of her coworkers, in front of -- of -- of

7   others.  And then he continues to use that abusive and vulgar

8   language to harass her further on Facebook Live.

9       He continues to state those -- some of the same words

10  about her and what she looks like and about her gender.  He

11  goes on later to continue that language with HR in his STU

12  where he makes the reference about her being a -- a -- a D-word

13  or that she wants him to call her a D-word, as well as

14  confirming the B.

15      The -- this was never about the specific words used.  He

16  used a lot of words.  They both used a lot of words, or I

17  wouldn't say she used a lot of words.  She used words, and he

18  used a lot of words.

19      But it was -- it was about the harassing nature of the

20  continuing that line of attack with Ms. Evans over and over

21  again, repeatedly, even after she retreated.

22  Q.   Are you --

23      MS. BUFFALANO:  And you can take this down, Ms. Bagley.

24  Than you.

25  Q.   BY MS. BUFFALANO:  I think it would be helpful to



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record   36

1   understand how you understand harassing in terms of this --

2   this policy, specifically vulgar, harassing, and abusive

3   language.  What does harassing mean in that context?

4   A.    Harassing in that context --

5        MS. COX:  Can I just ask if the witness is looking down

6   reading it -- reading something?  I just see your eyes going --

7        THE WITNESS:  Oh.  I'm sorry.  Certainly.  Do you want to

8   see my desk or anything?

9        MS. COX:  I do.  Okay.

10       THE WITNESS:  Yeah.

11       MS. COX:  Are you -- are -- okay.  Go ahead.

12       THE WITNESS:  Yeah.  No -- no problem.

13  Q.    BY MS. BUFFALANO:  If you want to look down while you

14  think, you can do that.  Just --

15  A.    Sure.  No, no.  Yeah.

16  Q.    -- be sure you're not reading anything.  Thank you.

17  A.    No.

18  Q.    Do you want me to ask you again?

19  A.    I'm sorry.  Harassing in the context of this, I review it

20  as -- again, it was his repeated behavior after she retreated.

21  She tried to take herself out of the situation or was asked to

22  remove herself from the situation, which she did, and he

23  continued.  He continued to bring things up about her

24  personally.  These were not things about work or work

25  performance, people that she works with.  But he personally



1    attacked her.

2    Q.   Thank you.  Are you aware of a report from loss prevention

3    in this case?

4    A.   Yes.

5    Q.   And are you familiar with its recommendations?

6    A.   Yes.

7    Q.   And what are they?

8    A.   The recommendation was to terminate employment.

9    Q.   Can you tell me what weight, if any, that recommendation

10   had in your ultimate decision to recommend termination?

11   A.   None at all.

12   Q.   Why is that?

13   A.   LP is our partner in a lot of situations, and in this

14   particular situation, I was already working with the HR team to

15   investigate the -- the incident that had happened.  So LP has

16   their own set of policies and -- and -- and things that they

17   follow, and so I know that they -- they made that

18   recommendation.  But even -- we -- we didn't take that action

19   when they made that recommendation.  We continued our

20   investigation to get to the result.

21   Q.   Okay.  And is it typical for -- for HR not to take LP's

22   recommendation?

23   A.   I don't know that I would describe it as typical.  We

24   value their partnership, and we value their expertise, as I

25   stated earlier, where it came to risk assessment.  In this



1    case, where we were really dealing with a behavioral incident,

2    that did not get violent or come to workplace violence or any

3    kind of physical interaction, I chose to continue the line of

4    investigation that we were going on for the behavioral incident

5    with the HR team versus staking that recommendation and moving

6    forward with theirs.

7    Q.   Okay.  Moving into a different -- moving on to the next

8    thing --

9         MS. BUFFALANO:  If anybody wants to take a lunch break,

10   this is an okay stopping point.  I've probably got 45 more

11   minutes.

12        JUDGE GREEN:  Okay.  Yeah.  Let's take a lunch break.

13   Let's be back in an hour at 1:50, and please, Mr. Campbell,

14   just same -- same instructions.  Just you can do whatever you

15   want, just don't talk to anybody about the case or your

16   testimony.

17        THE WITNESS:  Yes, sir.

18        JUDGE GREEN:  Okay.  Off the record.

19        (Off the record at 12:50 p.m.)

20        JUDGE GREEN:  And Mr. Campbell, Ms. Buffalano is going to

21   have some more questions for you.

22                   **RESUMED DIRECT EXAMINATION**

23   Q.   BY MS. BUFFALANO:  Mr. Campbell, can you tell us who had

24   responsibility for making the decision to terminate Mr. Bryson?

25   A.   Yes.  The decision was made by Sai Kotha, general manager



1    of JFK8.

2    Q.   Okay.  And without revealing any privileged information,

3    do you -- can you tell us who recommended to Mr. Cotha this

4    discipline?

5    A.   I recommended the discipline.

6    Q.   Okay.  And to your knowledge, did he agree with your

7    recommendation?

8    A.   Yes.  Mr. Cotha aligned with the recommendation, and we

9    moved forward with termination.

10   Q.   And without revealing any privileged information, were you

11   involved in communications with him in which that decision was

12   made?

13   A.   Yes.

14   Q.   Can you tell us anything else about the deliberations on

15   the decision to terminate Mr. Bryson without disclosing any

16   privileged information?

17   A.   I don't -- I don't believe I can.

18   Q.   So let me ask you this:  were there any communications

19   with Mr. Cotha about the deliberations in making the decision

20   to terminate Mr. Bryson that were not -- that didn't involve

21   Amazon legal counsel?

22   A.   Yes.  I would say there were several conversations between

23   myself and Mr. Cotha.

24   Q.   Okay.  And were those conversations at the direction of

25   Amazon legal counsel?  And these are kind of legal conclusions,



1    so let me just -- let me retract that question and ask you this

2    question.

3         After Mr. Cotha agreed with the recommendation to

4    terminate Mr. Bryson, was that the end of sort of the -- the

5    discussion?  Was that the end of the process?

6    A.    No.

7    Q.    What more happened?

8    A.    We -- we communicated our decision to our business

9    partners, such as legal, employee relation -- we reviewed our

10   final decision with legal, employee relations, senior

11   leadership, among others.

12   Q.    Okay.  And why did you do that?

13   A.    Again, the -- the escalation of the case, the -- the

14   details around the case, the -- the -- the -- the media

15   presence at JFK8.  We felt it was important to make sure that

16   we informed everyone of what our decision was.

17   Q.    And without going into the specifics of those privileged

18   communications, what was the outcome of that approval process

19   or informational process?

20   A.    We moved forward with termination.

21   Q.    And did those additional individuals you just

22   identified -- legal, ER, executive leadership -- did they make

23   the decision to terminate Mr. Bryson?

24   A.    No.

25   Q.    And when were they consulted about the decision -- or when



Exhibit E, Motion to Try Petition on Hearing Record

1  were they informed?  I'm sorry.  When were they informed of the

2  decision?

3  A.   They were informed after Sai and I had achieved alignment

4  on April 16th.

5  Q.   Okay.  Now I'm going to show you, hopefully, what has been

6  marked as Respondent's Exhibit 28.

7       MS. BUFFALANO:  So I see, Ms. Bagley, that you're here.

8  If you can do that.

9       MS. BAGLEY:  Yeah.  One moment.

10      MS. BUFFALANO:  Thank you so much.

11  Q.   BY MS. BUFFALANO:  Okay.  So Mr. Campbell, have you seen

12  this document before?

13  A.   Yes.

14  Q.   Okay.  And what is this document?

15  A.   This is the summary of the incident that we put together

16  in order to communicate the outcome.

17  Q.   Okay.  So who prepared this document, if you know?

18  A.   I don't know who specifically started the document, but I

19  finished the document.

20  Q.   Okay.  So you don't know who else worked on it, if anyone?

21  A.   No, not specifically.

22  Q.   Okay.  And can you tell us what the purpose of this

23  document is?

24  A.   Yeah.  This document is a communication tool so that we

25  are all aligned on the events to communicate to the -- to -- to



Exhibit E, Motion to Try Petition on Hearing Record

1    the others the outcome of the investigation and the discipline.

2    Q.   Okay.  Now, if you take a look at this document, you'll

3    see it says -- it -- it -- it gives like a sort of overview of

4    the facts, but it doesn't say, for example, that Mr. Bryson

5    used the N-word.  And I know that you previously testified that

6    he was -- he -- he probably said it, but it doesn't say there

7    here, right; is that right?

8    A.   That's correct.

9    Q.   And why --

10       MS. COX:  Objection.  The document speaks for itself.

11       MS. BUFFALANO:  Okay.  I was just getting to the next

12   question.

13       JUDGE GREEN:  Okay.

14   Q.   BY MS. BUFFALANO:  And why doesn't it say that?

15   A.   It's a summary.  It doesn't provide all of the details,

16   but primarily we only focused for this summary on the -- on

17   the -- on the claims that we were able to validate through

18   witness statements, through an active admission, or through the

19   Facebook Live video.

20   Q.   Okay.  And does that mean that you --

21       MS. COX:  Objection.  Leading.

22       JUDGE GREEN:  We have no question yet.

23       MS. COX:  Okay.

24   Q.   BY MS. BUFFALANO:  Okay.  Does this document -- so -- so

25   this document says what it says obviously.  We've already



1   established that it doesn't say, for example, that Mr. Bryson

2   used the N-word.  Does that mean that you didn't conclude that

3   Mr. Bryson used the N-word?

4   A.    No.  We concluded that he probably used the N-word because

5   the termination was for the holistic event.  For this summary,

6   we chose to be very specific.  And honestly, we didn't need the

7   N-word.  There's enough here based on what was validated

8   through the investigation to move to termination without the

9   other -- without the other facts that -- that were not 100

10  percent aligned.

11  Q.    Okay.  I'll also note that this summary does not indicate

12  that in the STU Mr. Bryson called Ms. Evans a D-word.

13       MS. COX:  Objection, Your Honor.  Counsel's testifying.

14       JUDGE GREEN:  Overruled.

15  Q.    BY MS. BUFFALANO:  Can you tell us why that is?

16  A.    Again, Mr. Bryson stated that to Tyler as part of his STU.

17  We only included things in here from the incident that could be

18  validated.  Even the way that Mr. Bryson stated she wanted him

19  to call her that, we -- it wasn't appropriate to go back and

20  ask Ms. Evans if she thought that and he somehow knew that she

21  thought that.

22  Q.    Okay.  So tell me -- tell me, does that -- does it -- does

23  the fact that it doesn't say Ms. Evans is a D or that

24  Mr. Bryson said that mean that you didn't consider that in

25  making your recommendation for termination?



1  A.    No.   We considered all of the events of the incident.

2  Q.    Okay.   And can you tell me, based just what's on the

3  executive summary, would Mr. Bryson have been terminated based

4  solely on the events as reported in this document?

5        MS. COX:   Objection.   Asked and answered.

6        JUDGE GREEN:   Overruled.

7        THE WITNESS:   Yes.   Mr. Bryson would have been terminated.

8  Q.    BY MS. BUFFALANO:   Okay.   And now I would like --

9        MS. BUFFALANO:   And you can take this down, Ms. Bagley.

10  Thank you.

11  Q.    BY MS. BUFFALANO:   Now I want to focus on the discipline

12  that was issued to Ms. Evans and ask you a few questions.

13  A.    Sure.

14  Q.    So you earlier testified that you made a recommendation

15  with respect to Ms. Evans's discipline; is that right?

16  A.    Yes.

17  Q.    Okay.   And what was your initial recommendation to Ms. --

18  for Ms. Evans?

19  A.    My recommendation was a final written warning.

20  Q.    Okay.   And what was Ms. Evans ultimately issued?

21  A.    She was issued a first written warning.

22  Q.    Okay.   And do you know who made the decision to issue

23  Ms. Evans a first written warning?

24  A.    Yes.

25  Q.    And who was that?



Exhibit E, Motion to Try Petition on Hearing Record

1    A.    I did.

2    Q.    Okay.  And in making your recommendations -- and let's

3    start with -- well, let me withdraw that question.

4         Why did you initially recommend a final written warning?

5    A.    Based on, again, all of the witness statements, the STU

6    documents, the video that we reviewed, and the -- the precedent

7    cases, I -- I thought it was a first written warning based off

8    of the information that I had read.  Also, in looking at --

9    at -- at the harassment cases, the only result that I saw in

10   looking at those were, truthfully, final written warning and

11   termination.

12   Q.    Okay.  Okay.  And did Ms. -- let me ask you this:

13   ultimately, did Ms. Evans violate Amazon policy?

14   A.    Yes.

15   Q.    And what policy?

16   A.    She violated primarily just the -- the use of -- the --

17   the -- the only thing that we held her accountable for was the

18   language that she used -- for using inappropriate language.

19   Q.    Okay.  And specifically, what was the language?

20   A.    The -- she made the comment your mother, and then, again,

21   we have -- and then -- and then, again, we have probably use of

22   the F-word I think at that point.

23   Q.    Okay.  All right.

24        MS. BUFFALANO:  So Ms. Bagley, could you show us General

25   Counsel's Exhibit 8?



1    MS. BAGLEY:  One moment.

2    MS. BUFFALANO:  Thank you.  So can you scroll to page 27?

3  Okay.

4  Q.   BY MS. BUFFALANO:  So is the policy that Ms. Evans

5  violated in the standards of conduct?

6  A.   Yes.

7    THE WITNESS:  Can you keep scrolling, please?  Can you

8  continue to page 28?  Can you scroll back up, please?

9    Right.  I believe we placed it under -- under the similar

10  category to Mr. Bryson.

11  Q.   BY MS. BUFFALANO:  Okay.  And which one's that, just so --

12  A.   Category 2.

13    MS. BUFFALANO:  Can you go -- Ms. Bagley, can you just

14  scroll down?

15    THE WITNESS:  Sorry, Ms. Bagley.  Yeah.  Use of vulgar or

16  harassing language to a supervisor, fellow associate or member.

17  Q.   BY MS. BUFFALANO:  Okay.  Do you remember what her actual

18  feedback form indicated was -- like in your recollection, what

19  did it say, if you can recall?

20  A.   I believe it only -- it only references the use of

21  inappropriate language.

22  Q.   Okay.  Okay.  And -- and so it's your testimony that that

23  comes from the abusive, vulgar, and harassing?

24  A.   It -- yes.  In the same place.

25    MS. COX:  Leading.



1     JUDGE GREEN:  Overruled.

2     Q.   BY MS. BUFFALANO:  Have other employees -- are you aware

3     of other employees that have been disciplined for inappropriate

4     language under the standards of conduct?

5     A.   Not a specific associate.

6     Q.   Okay.  Do other associates -- or have other associates

7     been disciplined for inappropriate language?

8     A.   Yes.

9     Q.   And when those other associates are disciplined for

10    inappropriate language, on the feedback form, what does that

11    look like?  Like what rule is cited?

12    A.   I -- I can't specifically recall what -- what rule is

13    cited.

14    Q.   Okay.  All right.

15         MS. BUFFALANO:  Let's -- can -- can we just show the

16    witness Respondent's Exhibit 26?  Thank you.  Okay.  So if you

17    just scroll down -- okay.

18    Q.   BY MS. BUFFALANO:  So if you look under details of current

19    incident, you'll see that Ms. Evans was issued this first

20    written warning for violating the standards of conduct,

21    inappropriate language, or behavior under Category 2.  Do you

22    see that?

23    A.   Yes.

24    Q.   Okay.  You just looked at Category 2.

25    A.   Yes.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q.   And you have told us sort of where you understand this

2   language to have derived from.  So my question to you is:  have

3   other associates -- are you aware -- not specifically, but are

4   you aware that that, other associates, are disciplined for a

5   Category 2 standards of conduct violation for inappropriate

6   language or behavior?

7   A.   Yes.

8   Q.   Okay.

9        MS. BUFFALANO:  And you can take this down, Ms. Bagley.

10  Thank you.

11  Q.   BY MS. BUFFALANO:  Okay.  So what's the difference between

12  Ms. Evans's -- well, let me ask you this first:  how did you --

13  you've initially recommended a final written warning.  Can you

14  tell us who was responsible for the decision in that -- oh, you

15  already told us that question.  I'm sorry.

16       Can you explain to me how you went from a recommendation

17  of a final written warning to a decision of a first written

18  warning for Ms. Evans?

19  A.   Yes.

20  Q.   Okay.

21  A.   Christine Hernandez, the HRM, came to me following the --

22  the -- the final recommendation of termination and final.  She

23  came to express her disagreement with a final written warning

24  for Ms. Evans.  She thought it was too severe corrective

25  behavior based on the events that we knew them.



1    So Christine and I discussed, and certainly, as the HRM of

2    the site, she is more involved and closer to these types of

3    cases on a day-to-day basis, and her expression was really

4    around two things:  one of which is that we -- we've had other

5    associates that have used phrasing such as your mother.  We

6    would not move to such severe punishment for them.  And also

7    important to note that her use of the F-word, if you will, was

8    not directed toward anyone.  It was mainly used as an

9    adjective, as a describer.  It was used for emphasis on what

10   she was stating at the time.

11        And so Ms. Hernandez actually recommended that that be

12   a -- be a first written warning.  I aligned with the

13   recommendation, and we downgraded to a first.

14        JUDGE GREEN:  Mr. Campbell, while -- while -- just while

15   we're on the subject, could -- could you expand on that use of

16   the F-word?  What was your understanding of Ms. Evans's use of

17   the F-word as an adjective or a describer?

18        THE WITNESS:  I -- I -- yeah.  I would -- I believe in

19   this instance, there was -- I don't think it was confirmed,

20   Judge, at this point where she said I'll -- this F-ing thing,

21   that F-ing thing.  It was used to -- to add emphasis to another

22   word and not -- it wasn't used directly toward Mr. Bryson such

23   as F you.

24        JUDGE GREEN:  Do you know what -- when it came up?  When

25   it came up -- in the process, when did you learn and -- and how

1      did you learn that she made that remark?

2          THE WITNESS:  I don't recall when it came up.  I

3      believe -- yeah.  I don't recall.

4          JUDGE GREEN:  Okay.  Thank you.

5          MS. BUFFALANO:  I just lost -- I think I just lost audio.

6          JUDGE GREEN:  We can hear -- we can hear you.  Can you --

7      you can't hear us?  Oh.  Now you froze.  Let's -- okay.  You're

8      back.

9          MS. BUFFALANO:  Very weird.  Okay.  So I missed after what

10     was your -- when -- when -- you said the F word came up in the

11     process and how.  I missed the answer.

12         JUDGE GREEN:  The answer was he didn't recall.

13         MS. BUFFALANO:  Okay.  Got it.

14     Q.   BY MS. BUFFALANO:  All right.  So is there -- let me --

15     let me ask -- I'm getting some weird internet noises.  Okay.

16         So let me ask you to take a look at Respondent's Exhibit

17     12.  Okay.  This is a -- I don't know what number this is.

18         MS. BUFFALANO:  Ms. Bagley, let me try it.  Oh, you got

19     it?  Okay.  We're having serious technical issues today.

20     Q.   BY MS. BUFFALANO:  Okay.  Can you -- can you see that?

21     And if not, I'll share my screen.  You let me know.

22     A.   Yes.  I can see it.  It's Maciej's statement.  She told --

23     Q.   Okay.

24     A.   She told him to get the F out of here.

25     Q.   Okay.  I was just going to ask you if this reflects --



Exhibit E, Motion to Try Petition on Hearing Record

1    refreshed your recollection.

2    A.    Yes.

3    Q.    Okay.  All right.  And did you --

4          MS. BUFFALANO:  And you can take this down.  Thank you.

5    Q.    BY MS. BUFFALANO:  So did you conclude that Ms. Evans said

6    get the F out of here?

7    A.    We concluded that she probably did say it.

8    Q.    Okay.  And were you comfortable -- so you -- you explained

9    the sort of downgrade, as you described it, from the final

10   written to the written warning.  Did you run that decision sort

11   of back through the decision-making process that you had

12   described earlier for the final written?

13   A.    I did not.

14   Q.    And why not?

15   A.    The -- at that point, the -- the group had aligned to

16   final, so downgrading was not going to change the outcome of

17   the decision.  It wasn't going to change I think anyone's

18   actual -- it would -- would not have changed Sai's approval of

19   the situation.  So there was -- there was no need to run it

20   back by him.

21   Q.    And earlier you indicated that the decision to issue

22   discipline is made by operations; is that right?

23   A.    Yes.

24   Q.    Ultimately, would -- was operations aware of the decision

25   to downgrade from a final written to a written?



Exhibit E, Motion to Try Petition on Hearing Record                    752

1   A.   Yes.   Because operations has to issue the corrective

2   action, and they're the final sign off on it -- on the

3   document.

4   Q.   And when you made the decision to downgrade Ms. Evans's

5   discipline to a written warning, did you consider the fact that

6   she was defending Amazon in the conversation with Bryson or --

7   defending that Amazon should be open.   Let me say that.

8        MS. COX:   Objection.   Your Honor --

9        JUDGE GREEN:   Overruled.   Overruled.

10       THE WITNESS:   No.   I did not.

11  Q.   BY MS. BUFFALANO:   Did you treat her more leniently than

12  you otherwise would because she was taking the position that

13  she was taking on April 6th with Mr. Bryson?

14  A.   No.

15  Q.   What is the difference between Ms. Evans's statement and

16  conduct on April 6th and Mr. Bryson's that resulted in her

17  being issued a first written and Mr.  Bryson being issued a

18  term?

19  A.   Ms. Evans, at least from what we understand, disagreed

20  with Mr. Bryson's opinion.   Certainly, they may have exchanged

21  some words, but then when she was asked to retreat and go in

22  the building, Ms. Evans did so.

23       Mr. Bryson, in response to her -- by the way, Ms. -- and

24  Ms. Evans never personally attacked Mr. Bryson.   There's

25  nowhere that we -- that we recognize that she in any way



1    insulted him or brought up anything about him personally in the

2    statement or in -- in all of their time together in the

3    exchange; however, Mr. Bryson, from the minute that he was

4    engaged, started personally attacking her, going down a path

5    including potential drug usage, track marks, dark circles under

6    her eyes, talking about her appearance, talking about her being

7    scum of the earth, asking where -- where the fentanyl is.  And

8    then even after -- and calling her a B, which we've confirmed.

9         And then even after she retreats, he just continued that

10   behavior, and he continued that behavior all through the social

11   media broadcast and then continued to attack her even into when

12   we were interviewing him sometime later for the investigation.

13   Q.   Okay.  Did you review comparators for Ms. Evans's first

14   written warning?

15   A.   I did not.

16   Q.   And why not?

17   A.   We had reviewed the -- we had reviewed the comparators I

18   think for the some more -- some more severe infractions, and

19   I -- I trust my team and my team's expertise.  And in that

20   case, when Christine explained to me why she felt it was too

21   severe, I -- I -- I aligned with her.

22   Q.   Okay.

23        MS. BUFFALANO:  So can we take just a moment while I just

24   make sure we don't have anything else for this witness?

25        JUDGE GREEN:  Yes.  Off the record.



Exhibit E, Motion to Try Petition on Hearing Record 1937

1    (Off the record at 2:25 p.m.)

2    JUDGE GREEN:  Okay.  So just to sum up, the General

3    Counsel has objected to going forward without certain documents

4    that are -- that are referenced in Footnote 3 of the

5    Respondent's most recent petition to revoke.  They're -- and

6    we're talking about CHIMEs documents.  So there are CHIMEs --

7    they're -- I guess we're talking about the redacted CHIMEs

8    documents that were the subject of my recent order and some

9    additional CHIMEs documents.  And -- and the additional

10   outstanding documents, the Respondent is taking the same

11   position that it -- it includes nonresponsive portions, meaning

12   portions that are not responsive to a subpoena paragraph.

13   MR. MURPHY:  Yes.  Parts of -- yes.  Portions that are not

14   responsive.

15   JUDGE GREEN:  Now -- okay.  So -- but do those include

16   responsive portions?  Have you -- you know, have you redacted

17   those, as well, and -- and produced them or no?

18   MR. MURPHY:  We have not produced them.

19   JUDGE GREEN:  So why not just produce the redacted

20   portions the same as the ones that you produced before?

21   MR. MURPHY:  Well, I -- I -- I guess we're -- we're

22   reluctant to produce them without an agreement that they won't

23   be subject to the same sort of -- of -- of -- of process that

24   we went through, then -- which is subject to the special

25   appeal.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   JUDGE GREEN:  No.  I mean, they would be.  I think they
2   would be subject to the special appeal.  You know, we'll get --
3   we'll get something back from the Board saying either, you
4   know, the original order was right, or they'll say the original
5   order was wrong and the stuff should not -- that that stuff
6   shouldn't remain redacted.  And then these other CHIMEs will be
7   treated the same way.  The -- the -- those CHIMEs will remain
8   redacted, the same as the -- the -- those that are subject to
9   the special appeal.  In other words, you've got basically a
10  test case.  The ones that are -- the -- the ones that I already
11  ruled on.

12      MS. REIBSTEIN:  Your Honor, I haven't heard any valid
13  reason for not having turned over even the redacted CHIMEs
14  because, you know, we may or may not present them to Your Honor
15  for in camera review like we did before.  But there's -- you
16  know, once again, Respondent is deciding for itself what it --

17      JUDGE GREEN:  Well, the Board is going to have their say
18  on this, right.  The Board is going to have their say.  But I
19  guess I don't -- to the extent that the Respondent doesn't
20  have -- doesn't think that the entire CHIMEs are nonresponsive,
21  I'm not sure -- I -- I'm not sure I understand why they
22  wouldn't be produced in redacted form as the same as --

23      MS. REIBSTEIN:  Well, because that's what they've been
24  doing all along, just deciding for themselves what they want to
25  turn over and what they don't --



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1        JUDGE GREEN:  So that --

2        MS. REIBSTEIN:  -- in defiance of your order.

3        MR. MURPHY:  Yeah.  Judge -- Judge, that's -- that's a

4    massive, massive mischaracterization of what we've done.

5    We've -- we -- we've -- we -- we -- we have a dispute about a

6    small number of CHIMEs, and these documents are the subject of

7    the petition -- it's a petition to revoke and also a -- a

8    petition to have you reconsider the -- the relevance

9    determinations that you made at the very outset of the case

10   before any of this evidence came in.  And -- and -- and in the

11   document, we -- we -- we identify the -- the -- the parts of

12   the record in which you said that -- that the -- that -- that

13   the subpoena provisions were enforced because they were

14   relevant to protected concerted activity.  And -- and -- and

15   you know, we --

16       JUDGE GREEN:  Right.  No, I get that.  I understand that.

17   That -- I understand.  So let's just -- let's just for a

18   moment -- I mean, the -- the General Counsel, as far as I can

19   tell, doesn't want to go forward, so we've got a minute.

20       So let's -- let's just assume for the moment that this is

21   a Burnup & Sims case.  You know, the Respondent is saying that

22   it is.  The General Counsel really isn't saying that it isn't.

23   So nobody's actually saying that this is not a Burnup --

24   Burnup -- Burnup & Sims case.

25       And if it is a Burnup & Sims case, as far as I understand,



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   there's -- there is some dispute regarding how that type of

2   evaluation, analysis works, but you have basically three steps.

3        The first is you determine that the -- there's an

4   altercation or misconduct that arises out of or during the

5   protected concerted activity, and we have that as far -- we

6   have that stipulated now.

7        And the second is that the -- the Respondent presents an

8   honest belief that the alleged discriminatee engaged in serious

9   misconduct warranting discharge.  And if that is satisfied,

10  then you go to the third element, which is the General Counsel

11  then must show that either it -- the discriminatee did not

12  actually engage in any misconduct or at least did not engage in

13  such serious misconduct as to lose the protection of the act,

14  right.

15       And the third element is -- that's just going to be the --

16  that's just going to be the videos.  And we know that

17  there's -- we know that -- that -- that Mr. Bryson engaged in

18  an altercation.  It's not going to be that he engaged in -- in

19  no alleged misconduct.  It's going to be whether -- whether he

20  engaged in such serious misconduct that that conduct loses the

21  protection of the act.

22       But that's -- from an evidentiary standpoint, that's just

23  going to be the videos.  As far as I can tell, the only thing

24  we've got left here is the employer's honest belief that

25  Mr. Bryson engaged in such serious misconduct as to warrant



# Exhibit E, Motion to Try Petition on Hearing Record

1    discharge.

2        And so you know, what evidence could that be?  I mean, it

3    can be an email.  It can be an email saying something to the

4    effect of, well, generally we don't discharge people who are

5    engaged in activity outside the plant on their own time.  But

6    in this case, we're making an exception for the protesters

7    because we want to get rid of them.  That's one.

8        And that's -- that -- and that is the bulk as far as I

9    understand it of the subpoenaed documents.  I mean, what's left

10   of the subpoenaed documents, that's the type of evidence that

11   they're designed to look for.

12       Now, 19 -- you know, GC 19 -- GC subpoena number 19 and

13   the same for the -- for the Charging Party, I -- yeah.  I guess

14   that that actually could cover that type of statement.  And so

15   those documents are probably still subject to production.

16       And so, yeah.  I mean, I -- I -- you know, I haven't -- I

17   literally was just reading this again.  You know, I -- we got

18   this this morning.  I haven't really had a lot of time to

19   produce it, but that's my initial reaction is that 19 is still

20   going to be subject -- request 19 is still going to be subject

21   to production.  I have much more doubts about whatever the

22   other one was.  I think it was 27 regarding the appeals.  I

23   really don't see how the appeals are going to be useful.

24       MS. COX:  Judge Green, those were produced.  We have no

25   issue with that --



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay.

2    MS. COX:  -- with those two paragraphs.

3    JUDGE GREEN:  So -- but -- so -- okay.  So now we've got

4    the -- we've got the CHIMEs, and that -- that could arguably

5    contain some -- some statements which are relevant to this

6    analysis even if it's just limited -- limited to Burnup & Sims.

7         Having said that, I mean, you know, I -- I don't know.

8    It -- are -- are those documents covered by your special

9    appeal?  I don't really know.  I guess I don't think so, but

10   why --

11   MS. COX:  Well, Judge, you haven't ruled yet on those

12   documents because they haven't been produced.

13   JUDGE GREEN:  Well, I ruled on documents like that.  I've

14   ruled on the CHIMEs, and I -- and I've rule -- you know, that's

15   the -- that is -- that same reasoning is going to apply to any

16   other CHIMEs that are out there, but it's -- it's going to be

17   the subject to a special appeal.

18   MS. REIBSTEIN:  But, Your Honor -- but, you know, there's

19   like a lot of things up in the air.  If -- my understanding is

20   that in Footnote 3 of Respondent's -- I guess it was like a

21   motion to amend where they attach an -- an argument -- an

22   unrelated argument that we should be precluded from putting on

23   evidence.  It's in that Footnote 3 where other unredacted --

24   other redacted CHIMEs that they have not turned over because

25   they decided that this is a Burnup & Sims --



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Okay.  So --

2    MS. REIBSTEIN:  -- case, and so they're not relevant.  So

3    we -- we -- they haven't even turned those over.

4    JUDGE GREEN:  Let me cut to the chase.  You know, from my

5    perspective, the additional CHIMEs should be redacted in the

6    same way that the original CHIMEs were redacted.  And then --

7    MS. REIBSTEIN:  And handed over to us.

8    JUDGE GREEN:  And then -- yes.  And then -- well, yeah.

9    They should be produced and redacted for them, and then they

10   will all be the subject of the special appeal.

11   MS. REIBSTEIN:  Correct.  That makes sense.  But the first

12   step is that they are -- they're ordering them to turn those

13   over --

14   JUDGE GREEN:  Yeah.

15   MS. REIBSTEIN:  -- as the --

16   JUDGE GREEN:  They should be produced and redacted.

17   MS. REIBSTEIN:  Yes.  Okay.

18   MS. COX:  And not just CHIMEs.  Whatever other documents

19   are being withheld under the same --

20   JUDGE GREEN:  But it's only -- it really only becomes an

21   issue --

22   MS. COX:  Yeah.

23   JUDGE GREEN:  -- with regard to CHIMEs because in almost

24   every other instance you can tell what the complete document

25   is.  The reason why CHIMEs are a problem and -- and probably



www.escribers.net | 800-257-0885

1    why it's worth of a special appeal is because it's -- it's not

2    100 percent clear what the complete document is, and that's --

3    you know, I made my ruling, but the Board -- ultimately, it's

4    the Board that can have the final say.  And -- and the

5    Respondent can go that way.

6        The other stuff, I mean, there shouldn't really be an

7    issue regarding any other documents.  Those are either going to

8    be responsive or -- or not.  Those -- those shouldn't -- we

9    shouldn't be having the same problem with the other documents.

10       And -- and I -- my understanding is that really we

11   don't -- as far as the Respondent understood -- as far as at

12   least the Respondent understood, they removed the redactions

13   from the discipline.

14       MR. JACKSON:  Your Honor, paragraph 3 says that some of

15   those documents are CHIME threads that contain a mix of

16   responsive and nonresponsive information.

17       JUDGE GREEN:  Okay.  Well, I mean -- yeah.  I mean, I

18   think you all understand the reasoning of my order, and I would

19   expect everybody to act accordingly.  I hope if you don't

20   understand it, maybe ask him.

21       MS. REIBSTEIN:  I -- I just would like to clarify.  So

22   there's certain documents referred to in -- in Footnote 3 of

23   Respondent's most recent motion.  Are -- you're ordering

24   Respondent to turn over all of those.

25       JUDGE GREEN:  Yes.



1    MS. REIBSTEIN:  Okay.

2    JUDGE GREEN:  In redacted form.

3    MS. REIBSTEIN:  Okay.

4    MR. MURPHY:  Okay.  So -- just so -- just so I'm clear,

5    Judge, so you're denying our motion to reconsider the -- the --

6    the initial order enforcing paragraph --

7    JUDGE GREEN:  For 19.  For paragraph 19, which is the only

8    one that I have, right?  Yeah.

9    MR. MURPHY:  Yeah.  Well, the -- yeah.  Right.  So

10   there -- there's the problem of trying to get the toothpaste

11   back in the tube at this point, right.  So -- you know, so --

12   so this is where we are at the moment --

13   JUDGE GREEN:  Okay.

14   MR. MURPHY:  -- with documents that have not been produced

15   that -- that we think would have been subject to a different

16   determination by you if we had known -- if we had known then

17   what we know now, okay.

18   JUDGE GREEN:  Yeah.  I -- yeah.  I -- I think that it --

19   it -- that we have significantly narrowed the scope of the

20   litigation, but I think that step -- because I think that

21   the -- the General Counsel is entitled to try to rebut a

22   Respondent showing that it had an honest, good-faith belief

23   that Mr. Bryson engaged in misconduct warranting discharge.

24   MR. MURPHY:  Yeah.  I -- I --

25   JUDGE GREEN:  Okay.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1     MR. MURPHY:  And I -- I don't think Ms. Buffalano or -- or

2     I disagree with that.  And -- and -- and nor are we trying --

3     JUDGE GREEN:  So I think that -- right.  So it was

4     actually not the reason why I initially denied the petition to

5     revoke paragraph 19.  You're right about that.  It's not the

6     reason I initially denied it, but we're in a different posture

7     now, and we're looking at the case differently.  And based on

8     that analysis, I think that arguably, the -- I think that

9     paragraph 19 might produce -- might result in the production of

10    relevant documents.

11    So that's where -- that's where we are.  You know, having

12    said that, I've got to say I was a little surprised that the --

13    that the Respondent was taking such a hard line about the

14    production of these redacted documents.  I don't want to

15    discuss what's in them, but I didn't think -- I was surprised

16    that you're so worried about producing them.

17    MR. MURPHY:  I wouldn't -- I wouldn't say that we're

18    worried.  There's -- there's a couple things going on.  The

19    one -- the one is the, you know, the underlying principle

20    that -- that we just have a disagreement about what -- what a

21    CHIME is.  And -- and --

22    JUDGE GREEN:  Yeah.  Okay.  That's -- that's -- that's

23    legitimate.

24    MR. MURPHY:  Right.

25    JUDGE GREEN:  Right

1        MR. MURPHY:   And -- and --

2        JUDGE GREEN:   Okay.   So the next issue is, you know, the

3    General Counsel, you've got -- you've got Mr. -- Mr. Campbell

4    here.   I would suggest that you do whatever cross you can do.

5    You know, there's no benefit in waiting.   You're -- you're

6    definitely going to have to call him back if you wait.   You

7    might not have to call him back if you don't wait.   You might

8    get the -- you might get these CHIMEs and they might not --

9    they might not warrant any -- any cross-examination.

10        MR. MURPHY:   Yeah.

11        JUDGE GREEN:   There's really no -- really, there's no

12    basis for -- for delaying it on that regard.   If worse comes to

13    worse, is you have -- you have to bring him back.

14        MS. COX:   I understand your position, Judge, but at the

15    same time, we're not talking just about CHIMEs.   Respondent has

16    made clear that there are other redacted documents that have

17    not been produced, whether those are emails --

18        JUDGE GREEN:   Are there?

19        MS. COX:   We don't know.   Whether those are --

20        JUDGE GREEN:   Well, I'm asking.   I'm asking Respondent.

21    Are there?   What else is there other than CHIMEs?

22        MR. MURPHY:   I believe there's a -- a small set of

23    documents that respond to paragraph 19, but -- but aren't -- at

24    least, in -- in our view, responsive to Burnup & Sims.   And

25    that means any part of Burnup & Sims, Your Honor, including the



1    good-faith -- rebutting a good-faith --

2        JUDGE GREEN:  No.  So --

3        MS. COX:  What types of documents?

4        JUDGE GREEN:  Right.  So that's going to have to be

5    produced.  That's going to have to be produced.  I don't -- you

6    know, I still don't think that's a basis for delaying what you

7    can do of cross-examination now.  If you feel that you want

8    time to prepare for cross, you can have some time to prepare

9    for the cross, but there's no reason to stop now.

10       MS. REIBSTEIN:  Your Honor, we've been put in this

11   position throughout the entire, entire proceeding.  You've just

12   ordered that they turn these documents --

13       JUDGE GREEN:  Yeah.  But how were you prejudiced?  There's

14   no -- if worse comes to worse is you have to call him back.

15   Your -- you stated your concern about continuing was that you

16   might have to call him back, but you will definitely have to

17   call him back if you don't go forward now.  Here, you can

18   potentially complete your cross, get the documents, have no

19   additional questions, and not have to call him back.

20       MS. REIBSTEIN:  Well, Respondent could produce the

21   documents that, you know, this -- this afternoon, and -- and

22   then we can determine and -- and resume tomorrow morning.

23   We -- we --

24       JUDGE GREEN:  Okay.  Let's --

25       MS. REIBSTEIN:  It's already 3:00 o'clock.



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1        JUDGE GREEN:  Okay.  Let's talk about --
 2        MS. BUFFALANO:  I don't know if -- if the witness is
 3   available tomorrow.
 4        JUDGE GREEN:  Let's talk about the schedule because I've
 5   got limited availability going forward.  So where are we in
 6   terms of finishing this case?  Like do we have any idea how
 7   much more we have from the Respondent's case?
 8        MR. MURPHY:  Well, I -- I guess we were both -- both
 9   waiting to answer that.  Not -- frankly, not very much, Your
10   Honor.
11        JUDGE GREEN:  Okay.  So -- so what could we do tomorrow if
12   we don't -- if we don't have -- if we don't deal with -- let's
13   go off the record.
14        (Off the record at 2:58 p.m.)
15        JUDGE GREEN:  We'll resume tomorrow at 1:00 p.m.  I'm
16   denying the Respondent's petition to revoke the subpoena ad
17   testificandum with regard to Christine Hernandez and the
18   petition to revoke as it pertains to paragraphs 19 of the
19   General Counsel and the Charging Party's subpoenas.
20        With regard to -- to CHIMEs, at least, it's my direction
21   that the Respondent produce the documents in redacted form the
22   same way they redacted the documents which are going to be the
23   subject of the special appeal.  And they'll -- those --
24   those -- if -- if they're -- to the extent that they're -- you
25   know, we need to deal with them, those -- those documents will
```



www.escribers.net | 800-257-0885

1  be treated the -- the same based on what the Board decides in

2  the special appeal.

3      MS. REIBSTEIN:  And Your Honor, there are additional

4  responsive documents that Mr. Murphy has stated --

5      JUDGE GREEN:  Right.  I mean, to the extent that the -- to

6  the extent the Respondent agrees that certain documents are

7  responsive, those complete documents should be produced without

8  redactions.

9      MS. REIBSTEIN:  And by when, Your Honor?  They have them.

10  They have them.

11      JUDGE GREEN:  As soon as -- right.  As soon as you

12  possible can.  It sounds like they can be -- that can be done

13  in the immediate future, right?

14      MS. REIBSTEIN:  Like before the end of the day.

15      JUDGE GREEN:  I mean, you tell me.  How long will it take?

16      MS. BUFFALANO:  Well, can I ask you a question, Judge?

17      JUDGE GREEN:  Yes.

18      MS. BUFFALANO:  I assume you're asking us.  Sorry.

19      JUDGE GREEN:  Yes.

20      MS. BUFFALANO:  Are you saying that what is responsive is

21  what relates to the good-faith belief --

22      JUDGE GREEN:  Yes.

23      MS. BUFFALANO:  -- that for us --

24      JUDGE GREEN:  Correct.

25      MS. BUFFALANO:  Okay.



1    JUDGE GREEN:  That's correct.

2    MS. REIBSTEIN:  No.  Your -- Your Honor, you're limiting

3    it to -- to --

4    JUDGE GREEN:  No, no.  I'm saying -- I'm saying I'm not --

5    no.  I'm just saying, I'm -- I'm -- I'm not revoking paragraph

6    19 of either subpoena.  Therefore, if a document is responsive

7    to that paragraph, it should be produced.  I don't think there

8    should be any confusion about producing the complete document

9    with regard to anything other than CHIMEs, right.  So if it's

10   an email, you produce the whole email, and that shouldn't be

11   redacted.  To the extent that you're taking a special appeal,

12   you know, and that would cover other -- other CHIMEs, you know,

13   in the same argument.  You know, I assume you're making the

14   argument that CHIMEs, it's -- it's difficult -- you're making

15   the argument that certain portions of CHIMEs are not

16   responsive, and therefore, those not responsive portions can be

17   redacted.  So those CHIMEs can be -- they can be redacted the

18   same as the original ones will, and we'll do whatever the Board

19   tells us to do.

20       But I don't see that we'll be having that same problem

21   with regard to other documents where it's -- it's not unclear

22   or it's clear -- it's clear what is the -- the complete

23   document.

24   MS. REIBSTEIN:  I -- I also want to add -- thank you for

25   clarifying that -- that documents should not be withheld



1    because of Respondent's believe that this is a Burnup & Sims.

2    We're -- we're -- this -- we're litigating --

3        JUDGE GREEN:  Yeah.  The petition -- right.  I mean,

4    the -- Petition 19 has not been revoked.  I mean, subpoena

5    paragraphs 19 have not been revoked.

6        MS. REIBSTEIN:  Okay.  Thank you.

7        MS. BUFFALANO:  Your Honor, you know that paragraph 19

8    relates to other employees and, for example, documents that

9    would establish protected concerted activity.  So there's just

10   a lot in there that is unrelated -- as far as I'm

11   understanding -- to what we're litigating.  So it might be

12   worth a look.  I -- I -- I don't --

13       JUDGE GREEN:  Okay.  You know, I'll look at it again, but,

14   again, I think that to the extent that you're dealing with, you

15   know, documents pertaining to these protesters, which are --

16   which are basically -- what the General Counsel is basically

17   looking for is a -- they're looking for a shot that there's --

18   there's some indication that the Respondent was not honest in

19   its belief that -- that Bryson was, you know, engaged in such

20   serious misconduct as to warrant discharge.  That's -- that's

21   what they're looking for.

22       If you find it, maybe you want to settle, but you know,

23   maybe there won't be anything in there.

24       MR. MURPHY:  That -- that's what -- that's what our

25   money's on.



1    JUDGE GREEN:  Fine.  Does anybody -- I mean, is that

2    confusing?  I'm trying to explain it the best I can.

3        MR. MURPHY:  We -- we understand your position, Judge.

4        JUDGE GREEN:  Okay.  All right.  So unless there's

5    anything else to be done, we're off the record until tomorrow

6    at 1:00.

7        **(Whereupon, the hearing in the above-entitled matter was**

8    **recessed 3:10 p.m. until Tuesday, May 25, 2021 at 1:00 p.m.)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1          **C E R T I F I C A T I O N**

2     This is to certify that the attached proceedings, via Zoom

3     videoconference before the National Labor Relations Board

4     (NLRB), Region 29, Case Number 29-CA-261755, Amazon.com

5     Services, LLC and Gerald Bryson, held at the National Labor

6     Relations Board, Region 29, Two Metro Tech Center North, 5th

7     Floor, Brooklyn, NY 11201, on May 24, 2021, at 10:05 a.m. was

8     held according to the record, and that this is the original,

9     complete, and true and accurate transcript that has been

10    compared to the reporting or recording, accomplished at the

11    hearing, that the exhibit files have been checked for

12    completeness and no exhibits received in evidence or in the

13    rejected exhibit files are missing.

14

15

16

17                                    _____

18                                    BARRINGTON MOXIE
                                      Official Reporter

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services, LLC,           Case No.   29-CA-261755

                    Employer,

and

Gerald Bryson,

                    Petitioner.

_____

_____

Place: Brooklyn, New York (Via Zoom Videoconference)

Dates: May 25, 2021

Pages: 1772 through 1859

Volume: 13

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



Exhibit E, Motion to Try Petition on Hearing Record

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

AMAZON.COM SERVICES, LLC,          Case No.    29-CA-261755

                    Employer,

and

GERALD BRYSON,

                    Petitioner.

The above-entitled matter came on for hearing, via Zoom videoconference, pursuant to notice, before **BENJAMIN GREEN**, Hearing Officer, at the National Labor Relations Board, Region 29, Two Metro Tech Center North, 5th Floor, Brooklyn, NY 11201, on **Monday, May 25, 2021 at 2:39 p.m.**.

Case 1:22-cv-01479-DG-SJB Document 5-1 Filed 03/17/22 Page 1825 of 2171 PageID #: 1971
Exhibit E, Motion to Try Petition on Hearing Record
1873

1                           A P P E A R A N C E S

2  On behalf of the Employer:

3       CHRISTOPHER MURPHY, ESQ.
     JENNIFER MOTT WILLIAMS, ESQ.
4       RICHARD ROSENBLATT, ESQ.
     NICOLE BUFFALANO, ESQ.
5       KELCEY PHILLIPS, ESQ.
     MORGAN, LEWIS & BOCKIUS, LLP
6       300 South Grand Avenue
     22nd Floor
7       Los Angeles, CA 99071
     Tel. (213)612-7443
8       Email christopher.murphy@morganlewis.com
           nicole.buffalano@morganlewis.com
9             kelcey.phillips@morganlewis.com

10       JASON SCHWARTZ, ESQ.
     ZAINAB AHMAD, ESQ.
11       GIBSON, DUNN
     200 Park Avenue
12       New York, NY 10166-0193
     Email zahmad@gibsondunn.com
13

  On behalf of the Petitioner:
14

     FRANKL KEARL, ESQ.
15       MAKE THE ROAD NEW YORK
     161 Port Richmond Avenue
16       Staten Island, NY 10302
     Tel. (929)265-7692
17       Email frank.kearl@maketheroadny.org

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1          <u>I N D E X</u>

2

3     <u>WITNESS</u>          <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>   <u>VOIR DIRE</u>

4     Bradley Campbell           1780

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>E X H I B I T S</u>

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| **General Counsel:** | | |
| GC-114 | 1821 | 1821 |

1                    **P R O C E E D I N G S**

2          JUDGE GREEN:   Okay.   So it is May 25th, 2021, and we're

3    back on the record.   We have Amazon.com Services LLC,

4    29-CA-261755.   Let's see.   Mr. Rosenblatt is joining.   Okay.

5          So we are going to proceed with the cross-examination of

6    Mr. Campbell, but before we do that, just very briefly, I -- I

7    want to address the issue of the Respondent's motion for

8    reconsideration of the petition to revoke the General Counsel

9    and the -- and the Charging Party's subpoena, in particular,

10   Paragraph 19.

11         So I -- I saw that there was a couple of cross emails

12   shortly before we -- we convened for the hearing.   And -- and

13   -- the -- the email that I have from Ms. Buffalano on behalf of

14   the Respondent says, "We have carefully reviewed the additional

15   documents that have not yet been produced that are responsible

16   in any way to the question Amazon held an honest, good-faith

17   belief that Mr. Bryson engaged in serious misconduct during the

18   incident on April 6th, 2020.   We also reviewed for any

19   documents that mentioned, pertained to, or referenced

20   Mr. Bryson at all and confirmed that those are duplicates.

21   With that review, Respondent's production is now complete.   If

22   this does not satisfy the counsel for the acting General

23   Counsel, we intend to take a special appeal to the ALJ's ruling

24   yesterday."

25         And it's my understanding that the -- that that proposal



Exhibit E, Motion to Try Petition on Hearing Record

 1   was not satisfactory to the General Counsel.  And I just wanted

 2   to address this.  I -- I -- I -- you know, I'm basically just

 3   confirming what I said yesterday, but that was a little ragged,

 4   I think.  So I just want to try to make clear what my ruling is

 5   so the Respondent can take a special appeal to it.

 6        So my ruling with regard to subpoena Paragraph 17 -- 19

 7   was I did not revoke Paragraph 19 of the Charging Party and the

 8   General Counsel subpoenas; rather, I determined that those

 9   paragraphs were reasonably calculated to lead to the production

10   of relevant evidence.  Therefore, documents responsive to those

11   requests are subject to production.

12        While the Respondent has freezed its objection to

13   production in terms of responsiveness, as far as I can tell,

14   it's really making an argument that documents responsive to the

15   subpoenas are not relevant, and that is not an argument the

16   Respondent is entitled to make at this time.  That is an

17   argument the Respondent can make if and when the General

18   Counsel or Charging Party receive the subpoenaed documents and

19   attempt to enter some or all of them into evidence.

20        So for that reason, yesterday, I denied the Respondent's

21   motion for reconsideration with regard to Paragraph 19 of the

22   general -- Charging Party's subpoenas, and I hope that

23   clarifies it, and the Respondent can take a special appeal.

24        MS. REIBSTEIN:  Your Honor, I -- I would just like to note

25   that in order to avoid a claim of like not understand what you

# Exhibit E, Motion to Try Petition on Hearing Record

1    said, we discussed this at the end of the day, and I

2    specifically said -- you know, I asked that -- that your --

3    that you were not limiting it, and -- and yet Respondents --

4    Ms. Buffalano's reply was they reviewed -- they reviewed it.

5        JUDGE GREEN:  I understand.  And I don't --

6        MS. REIBSTEIN:  -- and it doesn't pertain to that one

7    little sliver.  So --

8        JUDGE GREEN:  I -- I -- I understand.  But the Respondent

9    is -- I -- correct me if I'm wrong, Ms. Buffalano.  It's not

10   that you misunderstood my order.  It's just that you were

11   taking the special appeal of it.

12       MS. BUFFALANO:  Right.

13       JUDGE GREEN:  Right.  So -- okay.  That's fine.  So we'll

14   -- you know, that'll be out there.  The special appeal will be

15   out there, and we'll wait -- we'll wait to hear from the Board.

16       In the meantime, we have Mr. Campbell here, who has been

17   waiting patiently.  Let me pin you to my screen, and --

18       MS. REIBSTEIN:  Wait, so -- I'm -- I'm sorry, but I'm not

19   clear.  Because Ms. Buffalano phrased her response as, you

20   know, we reviewed it and there are no documents pertaining to

21   whether or not Respondent had a good-faith belief that

22   Mr. Bryson engaged in misconduct, that leaves -- that's one

23   sliver, and it leaves the whole rest of it.  Are there other

24   documents or -- or -- or not because they just -- they just

25   addressed one little sliver, which --



# Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  I don't think there are other documents.  I

2  thought from the email that the Respondent was actually done

3  with their production of subpoenaed records.

4      MS. REIBSTEIN:  Well, that wasn't clear to me because they

5  -- they said that they reviewed the documents to see if there

6  were any that went to that issue.

7      JUDGE GREEN:  Okay.  So you want to --

8      MS. REIBSTEIN:  So that -- that leaves -- that -- that

9  carves out one little sliver of a whole universe of things.

10      MS. BUFFALANO:  Right.  So our -- our position is there

11  are some number of documents left, a very small number of

12  documents left.  There are -- none of those are responsive to

13  what we -- we filed this motion for reconsideration and said

14  please reconsider Paragraph 19 in light of the legal analysis

15  having been narrowed to Burnup & Sims.  Obviously, Judge Green

16  did not --

17      MS. REIBSTEIN:  But that's not the case, though.  You're

18  -- you're using --

19      JUDGE GREEN:  Okay.  So but they're entitled to -- they're

20  entitled to take a special appeal.  They can do that.  So they

21  made a motion for -- for reconsideration.  I denied it.  The --

22  the -- the Respondent's going to take a special appeal.  It's

23  -- they don't have to argue it before me.  They -- they're

24  arguing it before the Board now.

25      MS. REIBSTEIN:  No.  But what's going to happen is they'll



Exhibit E, Motion to Try Petition on Hearing Record

1    argue a special appeal on a very skewed interpretation of what

2    -- of what you ordered.

3         JUDGE GREEN:  And the Board can say no.  The bottom line

4    is -- the bottom line is, as far as I understand, the

5    Respondent is taking a special appeal of my order that the rest

6    of the outstanding subpoena documents be produced, so the Board

7    will either say yes or no.  Okay.

8         All right.  So, Mr. Campbell, recall you're still under

9    oath, and the General Counsel -- the government attorney is

10   going to have some questions for you on cross-examination.

11                       **CROSS-EXAMINATION**

12   Q    BY MS. COX:  Good morning, Mr. Campbell.  How are you

13   today?

14   A    Good morning.  I'm fine.  Thank you.

15   Q    Or good afternoon I should say.  So I want to know if you

16   reviewed any documents before testifying in this hearing.

17   A    Yes.

18   Q    Okay.  And what documents did you review?

19   A    I reviewed all of the witness statements that were used in

20   the Bryson investigation.  I reviewed the executive summary

21   that we showed, the communication device.  I reviewed the STU

22   notes for Ms. Evans and Mr. Bryson.

23   Q    You said communication device?

24   A    I was saying executive summary was the title of the

25   document that we used as a communication tool.


www.escribers.net | 800-257-0885

# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    Okay.  Were there any other documents?  I might have cut

2    you off.  I'm sorry.

3    A    I reviewed some -- some emails.

4    Q    Were they the emails that you were shown yesterday?

5    A    I don't recall the emails I was shown yesterday or exactly

6    which emails I was shown yesterday.

7    Q    Okay.  Do you recall any of the emails that you reviewed?

8    A    Not specifically.

9    Q    Did you meet with anyone to prepare your testimony?

10   A    With the attorneys.

11   Q    By attorneys, you mean whom?

12   A    I met with Nicole.  I -- I met with Chris Murphy.  I met

13   with Liz Hackett (phonetic), Kristen Larusa (phonetic).

14   Q    And were different people present in each of those

15   meetings?

16        MS. BUFFALANO:  Objection to the relevance.

17        JUDGE GREEN:  Why are we doing this?

18        MS. COX:  I just want to understand what Mr. Campbell did

19   in preparation for giving his testimony today and yesterday.

20        JUDGE GREEN:  Okay.

21        MS. BUFFALANO:  Okay.  You didn't ask him about today and

22   yesterday.

23        JUDGE GREEN:  You -- you want to know whether he prepped

24   for -- for direct examination?

25        MS. COX:  Yes.



```
1        JUDGE GREEN:  Okay.  Overruled.

2   Q    BY MS. COX:  So my question was -- my question was:  who

3   was present when you prepared for the hearing?

4   A    So the attorneys that I already listed.  There were

5   additional attorneys.  I do not recall all of their names.

6   Q    And do you recall when you reviewed documents in

7   preparation for your testimony?

8   A    Yes.

9   Q    And when was that?

10  A    Over the course of the two weeks prior to this testimony.

11  Q    Did you review any documents overnight?

12       MS. BUFFALANO:  Objection.  Vague, overnight.

13       JUDGE GREEN:  Okay.  Are you talking about last night?

14       MS. COX:  Yeah.  Between his testimony yesterday and this

15  morning, overnight.

16  Q    BY MS. COX:  Did you review any documents?

17  A    No.

18  Q    Did you discuss your testimony with anyone between

19  yesterday and today?

20  A    No.

21  Q    Okay.  Did you testify yesterday that before April 6th you

22  didn't know who Gerald Bryson was?

23       JUDGE GREEN:  So why don't we just ask the question before

24  April 6th did you know what -- did you know who Mr. Bryson was.

25       MS. COX:  Your Honor, I'm asking him whether that was his
```



1   testimony yesterday.

2       JUDGE GREEN:  Right.  And I'm -- and I'm asking him a

3   different question.

4       THE WITNESS:  Prior to April 6th, I may have seen the name

5   Gerald Bryson, but I was not aware of who he was.

6   Q   BY MS. COX:  And you saw the name of Gerald Bryson in

7   emails, right?

8   A   I don't recall.

9   Q   You saw photos of Gerald Bryson before April 6th, right?

10  A   I don't recall.

11  Q   Okay.  So I'm going to show you a document that was

12  General Counsel's Exhibit 70.  Please let me know when you can

13  see my screen.

14  A   Sure.

15  Q   Can you see my screen?

16  A   Yes.

17  Q   Do you see an email?

18  A   Yes.

19  Q   Okay.  So this is a three-page document.

20  A   Yes.

21  Q   And this is an email from Mr. Gilbert Differ (phonetic) to

22  you and Christine Hernandez, right?

23  A   Yes.

24  Q   And the date on this email is March 31st, 2020, right?

25  A   Yes.



1    Q    So before April 6th, you knew who Gerald Bryson was,

2    right?

3    A    Same as a I stated earlier, I was aware.  I had heard the

4    name.  Clearly looking at this email I had -- I had seen the

5    name.  I wasn't aware of -- I was not aware of Mr. Bryson.

6    Q    Okay.  But you see -- this is him in the photo, right?

7    You know that he's the man on the left here?

8    A    I do not from that photo.

9    Q    Okay.  But it says, "Left to right, Gerald Bryson."  You

10   see that in the email?

11   A    Yes.  I see that.

12   Q    Okay.  So before April 6th, you were tracking employees'

13   protest activity, right?

14   A    No.

15   Q    Well, human resources was tracking employees' protest

16   activity, right?

17   A    Human resources was having conversations with associates

18   to hear their concerns based on protest activity.

19   Q    And you were -- you were having conversations with

20   employees about their protest activity, right?

21   A    No.  I was not.

22   Q    Okay.  All right.  So I'm going to close out this email.

23   You didn't make appointments with employees to discuss their

24   protest activity?

25        MS. BUFFALANO:  Objection.  Relevance.



Exhibit E, Motion to Try Petition on Hearing Record

1   JUDGE GREEN:  What's the relevance?

2   MS. COX:  It goes to Respondent's knowledge of employees'

3   protest activities.

4   JUDGE GREEN:  So we don't need that, right?  That's

5   established.  We -- we know for a fact that the Respondent has

6   admitted that Mr. Bryson engaged in protest activity on April

7   6th.  So why -- why do we need this?

8   MS. COX:  Okay, Judge.  I'll move on.

9   Q    BY MS. COX:  So in -- you -- you testified that you were

10   the senior regional human resources manage in April and March

11   2020, right?

12   A    Yes.

13   Q    And what facilities were you responsible for in April and

14   March of 2020?

15   A    I was responsible for CLT 4 in -- yeah, in Charlotte,

16   North Carolina.  I was responsible for DCA 1 in Sparrows Point,

17   Maryland; DWI 2 in Baltimore, Maryland; EWR 4 in Robbinsville,

18   New Jersey; JFK 8 in New York City; and BL 3 in North Haven,

19   Connecticut.  I was also responsible for RDU 1 in Raleigh,

20   North Carolina, at this time, but I don't believe that the site

21   was open in April of 2020.

22   Q    Okay.  And who did you report directly to in April and

23   March of 2020?

24   A    I reported directly to Rob Joseph (phonetic).

25   Q    And what is Mr. Joseph's title?



1    A    Direct of human resources.

2    Q    Did Mr. Joseph's title change after April and March of

3    2020?

4         MS. BUFFALANO:  Objection.  Relevance.

5         JUDGE GREEN:  What's the relevance?

6         MS. COX:  Judge Green, Mr. Joseph was directly

7    communicated with regarding Mr. Bryson's discharge, and I want

8    to understand Mr. Joseph's role.

9         MS. BUFFALANO:  But you asked for -- about after April of

10   2020, and Mr. --

11        MS. COX:  I have a different title for Mr. Joseph, so.

12        THE WITNESS:  The title may be HR director.

13        MS. BUFFALANO:  Wait.  Mr. Campbell, just wait until the

14   Judge rules.

15        JUDGE GREEN:  Okay.  So overruled.  So you can answer.

16   Q    BY MS. COX:  So did Mr. Joseph's title change after April

17   or March of 2020?

18   A    No.

19   Q    Okay.  And what facilities did Mr. Joseph have

20   responsibilities over?

21        MS. BUFFALANO:  Objection.  Relevance.

22        JUDGE GREEN:  What's the relevance?

23        MS. COX:  Judge Green, I'm -- I am seeking to understand

24   the parties involved in the discharge of Mr. Bryson.

25        JUDGE GREEN:  Sustained.  Sustained.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    BY MS. COX:  And who did Mr. Joseph report to?

 2         MS. BUFFALANO:  Objection to the relevance.

 3         JUDGE GREEN:  Okay.  Overruled.

 4    Q    BY MS. COX:  Who did Mr. Joseph report to?

 5    A    Mr. Joseph reported to Allyson Hoffman, A-L-L-Y-S-O-N

 6    H-O-F-F-M-A-N.

 7    Q    And what's Ms. Hoffman's title?

 8    A    I believe it's director of HR or HR director.

 9    Q    Other than Mr. Joseph, did you report to anyone else?

10    A    No.

11         MS. COX:  Judge Green, can I go off the record a moment?

12         JUDGE GREEN:  Off the record.

13    (Off the record at 3:00 p.m.)

14    Q    BY MS. COX:  So you testified yesterday that when you

15    became aware of the incident between Bryson and Evans you

16    immediately asked Christine Hernandez and Tyler Grabowski to be

17    partnered in, correct?

18    A    Yes.

19    Q    Okay.  And what do you mean when you say partnered in?

20    A    I meant that I wanted the two of them to focus on leading

21    the investigation.

22    Q    Okay.  And who reported to you on the investigation?

23    A    I spoke with both Christine and Tyler.

24    Q    So they both reported to you during the course of the

25    investigation?
```



1     A     Christine reports -- Christine reported directly to me.

Tyler reported directly to her.

2

3     Q     Okay.  And you were onsite on April 6th, correct?

4     A     No.

5     Q     Okay.  Where were you?

6     A     I was at my home.

7     Q     Do you live outside of New York?

8     A     Yes.

9           MS. BUFFALANO:  Objection.  Relevance.

10          JUDGE GREEN:  Yeah.  What's the relevance?

11          MS. COX:  I want to understand where Mr. Campbell was

12    working from during the time of the investigation.

13          JUDGE GREEN:  Sustained.

14    Q     BY MS. COX:  Were you able to access the facility in April

15    2020?

16          MS. BUFFALANO:  Access?

17    Q     BY MS. COX:  Physically, were you able to physically

18    access the facility in April 2020?

19    A     Yes.

20    Q     And did you go onsite in April 2020?

21    A     No.

22    Q     And how did you -- I'm sorry.  Someone from public

23    relations first alerted you about the incident, correct?

24    A     No.

25    Q     Who first alerted you about the incident?



www.escribers.net | 800-257-0885

1    A    Christine Hernandez.

2    Q    And do you recall around what time she first alerted you

3    about the incident?

4    A    I know that the -- the Facebook Live broadcast was -- was

5    between 1:40 and 2:00 o'clock, so it was -- my best guess is

6    between 1:30 and 1:45.

7    Q    And how did Christine Hernandez alert you about the

8    incident?

9    A    I don't recall specifically.

10   Q    You don't recall how she communicated with you about the

11   incident?

12        MS. BUFFALANO:  Asked and answered.

13        JUDGE GREEN:  Overruled.

14        THE WITNESS:  I -- I don't.

15   Q    BY MS. COX:  Was it by email?

16   A    No.

17   Q    Was it by phone?

18   A    It may have been by phone.

19   Q    Was it by CHIME?

20   A    It may have been by CHIME.

21   Q    Okay.  And did you get a separate notification from public

22   relations about the incident?

23   A    Yes.

24   Q    And when did you get that notification?

25   A    The notification from public relations was not



1   specifically about the incident.  It was about the social media

2   broadcast.

3   Q     Okay.  And when did you get that notification?

4   A     Around 1:40, 1:45.

5   Q     And who from public relations contacted you?

6   A     Rachel Leity (phonetic).

7   Q     And what is Ms. Leity's title?

8   A     I don't know her exact title.

9   Q     And how did Ms. Leity communicate with you?

10  A     Through CHIME.

11  Q     And how did -- how did you get access to the Facebook Live

12  video?

13  A     In the CHIME, she sent the link to the active session.

14  Q     Was anyone else included on that CHIME?

15        MS. BUFFALANO:  I'm going to object.  I think we may be

16  moving into privileged communications.  Were there -- were

17  there lawyers on this --

18        THE WITNESS:  Yes.

19        JUDGE GREEN:  On the CHIME?  Those are not in the

20  privilege log, and they've not been produced, so --

21        MS. BUFFALANO:  Right.

22        JUDGE GREEN:  -- the emails I requested adverse inference

23  about this communication to show animus.

24        MR. KEARL:  So do we know what this CHIME is, and do we

25  know whether it was listed on the privilege lot?



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  No.  Can we go off the record, and I can

2    investigate?  Or we can proceed and come back to this at

3    another time.

4    JUDGE GREEN:  Yeah.  Why don't we do that.

5  Q  BY MS. COX:  You're aware that Amazon monitors employees'

6    social media platforms, right?

7  A  No.

8  Q  You're not familiar with the advocacy operation Social

9    Listening Team?

10   MS. BUFFALANO:  Objection to the relevance.

11   JUDGE GREEN:  Overruled.

12   THE WITNESS:  Can you repeat the question?

13  Q  BY MS. COX:  You are familiar with the advocacy operation

14   Social Listening Team, correct?

15  A  I'm not familiar with the name -- with that name of a

16   team.

17  Q  You're familiar with a team that monitors and capture

18   employees' Facebook posts, right?

19  A  Yes.

20  Q  Did anyone from the team that monitors employees' Facebook

21   posts give you any other Facebook posts at any time during the

22   investigation?

23  A  No.

24  Q  And did you share the Jordan Flowers (phonetic) Facebook

25   post with anyone?



1    A    Yes.

2    Q    Who did you share the Facebook Flowers post with?

3    A    I believe I shared it with Rob Joseph and Allyson Hoffman.

4    Q    And how did you share it with Mr. Joseph and Ms. Hoffman?

5         MS. BUFFALANO:  Objection.  Relevance.

6         JUDGE GREEN:  Overruled.

7         MS. BUFFALANO:  Can I just -- these were not -- if -- if

8    this is a Bannon Mills attempt, I don't think these people were

9    on our list of -- of custodians.

10        JUDGE GREEN:  I don't know that it -- yeah.  I don't -- I

11   don't know that it's necessarily related to a Bannon Mills

12   request so much as the identification of -- of documents that

13   could contain certain information.

14        MS. BUFFALANO:  Okay.  But -- but we have produced the

15   Facebook post, so there's no question that we had the Facebook

16   post, so I'm just confused as to why it matters.

17        JUDGE GREEN:  Well, I mean, I'm -- I'm assuming that

18   they're looking for those -- the communications regarding these

19   posts.

20        MS. COX:  And, Judge, I --

21        MS. BUFFALANO:  Okay.  But my point is if those people

22   were not on the custodian list, then they wouldn't have

23   their --

24        JUDGE GREEN:  No.  I know.  But I'm not -- I understand.

25        MS. COX:  I'm not limited to custodian lists.



1       JUDGE GREEN:  Right.

2       MS. COX:  I'm not.

3       JUDGE GREEN:  It's overruled.  Let -- let's proceed.

4   Q   BY MS. COX:  Okay.  So my question was, oh:  how did you

5   share the Facebook post -- Facebook Flowers video with

6   Mr. Joseph and Allyson Hoffman?

7   A   I can't recall.

8   Q   And why did you share the Facebook Jordan Flowers video

9   with Rob Joseph and Allyson Hoffman?

10      MS. BUFFALANO:  Objection.  Relevance.

11      JUDGE GREEN:  What's the relevance?

12      MS. COX:  Judge, I have a right to develop this witness's

13  credibility and get --

14      JUDGE GREEN:  What's the relevance?  What's the relevance?

15      MS. COX:  It's relevant to who was involved in this

16  discharge.

17      JUDGE GREEN:  Okay.  So --

18      MS. BUFFALANO:  You didn't ask him whether they were

19  involved in the discharge, and there's no evidence to suggest

20  that they were.

21      MS. COX:  Well, I can develop these questions.

22      JUDGE GREEN:  Okay.  So --

23      MS. COX:  It may not be -- it may not be --

24      JUDGE GREEN:  So sustained.

25      MR. KEARL:  It also shows animus potentially.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  No.  We're -- we don't need animus in this

2    case.  Listen, people, you might not like it.  I don't really

3    understand why you don't like it, but the fact is that the

4    Respondent's admission did significantly reduce the scope of

5    this proceeding.  To the extent that the Respondent is

6    admitting that Mr. Bryson engaged in protected concerted

7    activity and his altercation with Ms. Evans occurred during the

8    protected activity, for either -- for either analysis, that had

9    the effect of significantly reducing the scope of this -- the

10   scope of this litigation.  And the fact that we have the -- the

11   altercation on tape rendered a great deal of additional

12   evidence -- not irrelevant, just useless.  And so we have a

13   fairly narrow -- we have a barely -- fairly narrow issue before

14   us.  And I would like the parties to try and focus on it.

15   MS. COX:  Judge Green --

16   MS. REIBSTEIN:  Your Honor, they're -- they're -- we have

17   the right to put on a Rightline (phonetic) case and animus.  If

18   you're precluding us, then we'll have to take a special appeal.

19   JUDGE GREEN:  Okay.  Then you take a special appeal.

20   MS. REIBSTEIN:  Because the -- the-- the Burnup and Sims

21   analysis --

22   JUDGE GREEN:  The prima facie -- the -- the prima facie

23   Rightline case is essentially made as a result of the factual

24   admission.  It's -- it's -- it's essentially made.  There is

25   some overlap in Burnup & Sims and Rightline at the second step



1    in the sense that -- to the extent there's an honest belief on

2    the part of the Respondent that -- that misconduct warranted

3    discharge, there is probably some evidentiary overlap with the

4    -- with the Rightline affirmative defense.  But that is where

5    we're at.  That is -- that is really the only thing that's left

6    in light of the evidence that has come in and the Respondent's

7    admission.  And -- and we're simply not going to boob around

8    aimlessly in -- in -- with regard to other evidence that's not

9    in this -- at least in the same ballpark.  We're not.  We're

10   not doing it.

11       You can -- you can take a special appeal.  We've already

12   got one.  I have no problem with special appeals.  But --

13       MS. REIBSTEIN:  I'm -- I'm not clear about what you're --

14       JUDGE GREEN:  Go ahead.  And -- and --

15       MS. REIBSTEIN:  I'm not clear about what you're limiting

16   us to.

17       JUDGE GREEN:  Okay.  Well, you're not -- you're not

18   conducting the -- this questioning.  So do we have another

19   question?  This -- this argument is over.

20       MS. REIBSTEIN:  Well, Your Honor, I'm not clear what

21   you're limiting us to.

22       JUDGE GREEN:  Okay.  I'm not -- I'm not -- there is no

23   objection right now.  There is -- there is only questions at

24   this -- to the extent that there's question, go.  Go ask the

25   questions, and the Respondent will object, and I'll make my



1    rulings.

2         MS. REIBSTEIN:  The other thing is that much of the

3    questioning has to go -- has to do with credibility.

4         JUDGE GREEN:  There is no --

5         MS. REIBSTEIN:  We have the right to impeach this

6    witness's credibility.

7         JUDGE GREEN:  So Ms. -- Ms. Reibstein, to a great extent,

8    my decision is subjected to novo review, except with regard to

9    credibility.  So I'm telling you what I want to hear and what I

10   don't want to hear.  And I -- I don't -- you know, and -- and

11   we're going to continue with the questioning.  The Respondent

12   can object, and we can discuss it from there.

13        MS. COX:  Okay.

14   Q    BY MS. COX:  What time did you share the Facebook video

15   post with Ms. Hoffman and Mr. Joseph?

16        MS. BUFFALANO:  Objection.  Relevance.

17        JUDGE GREEN:  What's the relevance?

18        MS. COX:  Judge Green --

19        JUDGE GREEN:  If you know.  Do you know what the relevance

20   is?

21        MS. COX:  Yes, Judge.  We're developing this witness's

22   credibility.  We're looking for animus.  Animus has not been --

23        JUDGE GREEN:  Okay.  So -- all right.

24        MS. COX:  It's even admitted.

25        JUDGE GREEN:  Sustained.


www.escribers.net | 800-257-0885

1    MR. KEARL:  Judge Green, can I ask a question.  If -- if

2    we proceed along a more narrow Burnup & Sims analysis and

3    there's a subsequent decision that this should have been on

4    Rightline, is my client going to be prejudiced by not having

5    this evidence on the record for a subsequent reevaluation under

6    Rightline?

7        JUDGE GREEN:  It -- it could be remanded.  The -- the --

8    the idea that after nearly three weeks of record testimony this

9    case is going to be remanded for a lack of evidence seems to me

10   extremely unlikely, but, yes, that's a possibility, and you can

11   certainly take special appeals of whatever rulings I make.

12   Q    BY MS. COX:  Mr. Campbell, Amazon was concerned with the

13   publicity around the protest, right?

14       MS. BUFFALANO:  Vague as to concerned.

15       JUDGE GREEN:  Overruled.

16       THE WITNESS:  Can you repeat the question, please?

17   Q    BY MS. COX:  Amazon was concerned with the publicity

18   around the protest, correct?

19   A    I -- I don't think -- I can't answer that yes or no.  I

20   don't think I'm the person that can state that Amazon as an

21   organization was concerned over the publicity.

22   Q    But you testified that Ms. Leity sent you this Facebook

23   video, right?

24   A    Yes.

25   Q    Okay.  And Ms. Leity's job relates to Amazon's public



1    image, correct?

2        MS. BUFFALANO:   Objection.   Foundation.

3    Q    BY MS. COX:   You work with Ms. Leity, correct?

4    A    Yes.

5    Q    So you know what Ms. Leity does for work?

6    A    Yes.

7    Q    Okay.   So my question was:   it's Ms. Leity's job to

8    protect Amazon's public image, correct?

9    A    I can't answer exactly what Rachel's job responsibilities

10   and -- and the specifics of her role are.

11   Q    Ms. Leity is not involved in the discipline of employees,

12   correct?

13   A    Correct.

14   Q    Ms. Leity's job does not involve granting employees

15   vacation, correct?

16   A    Correct.

17   Q    Ms. Leity's job does not involve disciplining employees

18   for time off task, correct?

19   A    Correct.

20   Q    Okay.   So what do you know about Ms. Leity's job?

21   A    My partnership with PR, it's a common occurrence to be

22   sent a -- a -- not a Facebook Live post, but a post, an article

23   from any media outlet that's specifically mentioning JFK 8 or

24   any one of my sites.   It would be just as common to get

25   something in Baltimore or anywhere.   The reason that we have



www.escribers.net | 800-257-0885

1    that relationship is often our associates are highlighted in

2    those articles, our associates are providing information that

3    give me insight into the engagement and the job satisfaction,

4    and several things that -- that I would go back and react on.

5    Q    And in this case, employees were not satisfied with their

6    job, correct?

7    A    If we're -- if we're speaking about the Facebook Live

8    video specifically, I don't know that Mr. Bryson ever discussed

9    his job satisfaction within that video, but he primarily

10   discussed Ms. Evans and personally attacked her and used vulgar

11   language even in the Facebook post and continued to verbally

12   attack all of our associates by a statement that Amazon is

13   hiring scum of the earth.

14   Q    And isn't it also true that Mr. Bryson in the Facebook

15   post said that there were 27 confirmed cases at his job?

16   A    I don't recall the specific number from the Facebook post.

17   Q    Okay.  I will show you the Facebook post.

18        MS. BUFFALANO:  Is the specific number from the Facebook

19   post really relevant?

20        MS. COX:  It's relevant to -- it's relevant to

21   Mr. Bryson's job satisfaction.  He was dissatisfied with his

22   job, and Mr. Campbell --

23        MS. BUFFALANO:  The witness is responding to his idea of

24   what job meant.

25        JUDGE GREEN:  Okay.  Listen, it's -- it's General



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    Counsel's cross.  Go ahead.

2    Q    BY MS. COX:  Before I show you this video, you said that

3    you go back and react on whatever Ms. Leity sends you.  What

4    does that mean?

5         MS. BUFFALANO:  I'm going to object to the relevance.

6         JUDGE GREEN:  Overruled.

7         THE WITNESS:  I mean react by we could go back and work

8    with an associate if something is stated to find out more.  The

9    hugest part of my role is to listen to the voice of the

10   associate, and we have many, many ways to do that through our

11   open-door policy.  So --

12   Q    BY MS. COX:  And that would include employees that are

13   concerned with Amazon's lack of COVID safety, correct?

14   A    Yes.  We can certainly listen to associates if they have

15   concerns about COVID safety -- or did.

16   Q    Okay.  Let me show you -- I believe it's General Counsel's

17   Exhibit 62 that is the Facebook Live photo -- or video, I

18   should say.  No, it's not.

19        Oh.  I'm going to -- I'm going to wait to show you the

20   video.  We'll get there a little bit later when I'm more

21   prepared.  Okay.

22        So -- so you testified that you oversaw the investigation

23   into the April 6th incident, right?

24   A    Yes.

25   Q    And Mr. Grabowski drafted a guide to use in his



Exhibit E, Motion to Try Petition on Hearing Record

1    conversation with Bryson on April 10th, correct?

2    A    Yes.

3    Q    And that guide was a list of questions?

4    A    Yes.

5    Q    And you directed Grabowski to question Bryson, correct?

6    A    Yes.  I asked that Mr. Grabowski handle that conversation

7    himself.

8    Q    So it wasn't Ms. Hernandez that made that direction or

9    gave that direction, correct?

10   A    I don't recall if I said those words specifically to

11   Mr. Grabowski or asked Ms. Hernandez to have him do so.

12   Q    Okay.  And he sent you -- and you -- you -- you reviewed

13   the questions that Mr. Grabowski sent you, correct?

14   A    Yes.

15   Q    You did nota dd to Mr. Grabowski's questions, right?

16   A    I did not add additional questions.

17   Q    You didn't -- you did not delete any questions from Mr.

18   Grabowski's guide, correct?

19   A    I did not delete any questions.

20   Q    And you approved of his questions, correct?

21   A    Yes.

22   Q    And you directed Mr. Grabowski to ask if Gerald Bryson

23   posted anything about the incident on social media, correct?

24   A    I don't recall exactly that -- asking him to -- I -- I

25   asked Tyler -- I asked Tyler via email to remind him of some



1   things.  I don't recall if that was a specific part of it or

2   not.

3   Q    Okay.  I'm showing you what's been entered into evidence

4   as Respondent Exhibit 18.  So do you see my screen?

5   A    Yes.

6   Q    Okay.  And do you see that email in front of you?

7   A    Yes.

8   Q    Okay.  Please read this last sentence, and let me know

9   when you're done.

10  A    Yes.  I'm done.

11  Q    So you directed Mr. Grabowski to ask Bryson if he posted

12  anything about the incident on social media, correct?

13       MS. BUFFALANO:  The document speaks for itself.

14       JUDGE GREEN:  Overruled.

15  Q    BY MS. COX:  You gave Mr. Grabowski that direction,

16  correct?

17  A    Yes.  With the caveat in the email that if he denies the

18  allegation to ask him that question.

19  Q    Okay.  And you gave Mr. Grabowski that instruction to

20  ensure that he would conduct a thorough investigation, correct?

21  A    Yes.

22  Q    And you testified yesterday that Bryson brought up some

23  claims about Evans in his conversation with Mr. Grabowski,

24  correct?

25  A    Yes.



1    Q    And those claims that Bryson brought up are captured in

2    Mr. Grabowski's recap, correct?

3    A    Yes.

4    Q    You also directed Mr. Grabowski -- I want to take one step

5    back with you.  You also directed Mr. Grabowski to make sure to

6    ask Mr. Bryson about each allegation against him, correct?

7    A    Yes.

8    Q    Okay.  Mr. Bryson told Grabowski that Evans was

9    aggressive, correct?

10   A    I don't recall without looking at the document.

11   Q    Okay.  Let me see if you can recall a few others and then

12   I'll show you the document.

13   A    Okay.

14   Q    Mr. Bryson told Grabowski that Evans tried to instigate

15   something, correct?

16   A    I believe that's correct.

17   Q    And Mr. Bryson told Grabowski that Evans said shut the

18   fuck up, correct?

19   A    I believe that's correct.

20   Q    And Mr. Bryson also told Mr. Grabowski that Evans said

21   your mother, correct?

22   A    I believe that's correct.  I'm not sure if their words

23   aligned exactly, but the sentiment around your mother was the

24   same, I believe.

25   Q    Okay.  Let me show you Mr. Grabowski's conversation in the



Exhibit E, Motion to Try Petition on Hearing Record

1    email that I just showed you.

2        JUDGE GREEN:  Is this going to lead to a question that's

3    not confirming what's said in the document?

4        MS. COX:  I'm using it to refresh his recollection, Judge.

5        JUDGE GREEN:  No, I understand.  But we have the document

6    in evidence.  So is -- is at some point this going to lead to a

7    question?

8        MS. COX:  Yes.

9        JUDGE GREEN:  Okay.  Let's move on to it.

10       MS. COX:  Okay.

11   Q    BY MS. COX:  So you testified yesterday that after Bryson

12   brought claims, Grabowski exercised due diligence and went back

13   to Evans, correct?

14   A    Yes.

15   Q    Before speaking with Evans, Grabowski didn't send you a

16   list of questions that would guide his conversation with Evans,

17   correct?

18   A    I don't recall him sending a list of questions.

19   Q    So is it your testimony that he may have sent you a list

20   of questions?

21   A    There was communication between myself and Tyler.  I don't

22   recall if that was via email or via our conversation.

23   Q    Okay.  You didn't ask Mr. Grabowski to send you a list of

24   questions for the conversation with Evans, did you?

25   A    I did not.



1    Q    And you did not direct Grabowski to put each allegation

2    that Bryson made against Evans in a chart, did you?

3    A    I did not.

4    Q    Grabowski didn't ask Evans if she was aggressive, correct?

5    A    I don't recall the specifics without looking at the

6    document.

7    Q    Grabowski did not ask Evans if she tried to instigate

8    something, did he?

9    A    I don't recall the specifics without looking at the

10   document.

11   Q    And he did not ask Evans if she said shut the fuck up,

12   correct?

13   A    I don't recall without looking at the document.

14   Q    Okay.

15        MS. COX:  Judge, may I show him the document?

16        JUDGE GREEN:  Is there some reason why I can't just read

17   the document?  I've already read the document.  Do you have a

18   follow-up question --

19        MS. COX:  Yes, I do.

20        JUDGE GREEN:  -- other than what's in the document?

21        MS. COX:  But, Judge, this goes to his memory.  It goes to

22   credibility.

23        JUDGE GREEN:  No.  It does not.  You're not -- I've told

24   the General Counsel this multiple times.  We are not reading

25   exhibits into evidence.  I'm not interested in that from a



1    credibility perspective.  It's not a memory test of what's in

2    the -- what's in the documents.  We are not doing that.  Okay.

3    So if you have a question -- if you need to -- if you need to

4    draw his attention to something in the document for purposes of

5    asking a question regarding what is not in the document, you

6    may do that.  I don't know how many times I've said this, but

7    this -- that is the way we are going to proceed.

8    Q    BY MS. COX:  You did not tell Grabowski to -- I'll

9    withdraw that.

10        After Grabowski sent you the recap, you did not direct

11   Grabowski to talk to Evans again, did you?

12   A    I'm -- can you ask the question again?

13   Q    Yes.  So after Grabowski sent you the recap of his

14   conversation with Ms. Evans, you did not direct Grabowski to

15   talk to Evans again, did you?

16   A    No.

17   Q    And it's true that no one else from Amazon was

18   interviewing witnesses for this investigation other than

19   Mr. Grabowski, correct?

20   A.   Correct.

21   Q    And no one from human resources spoke to any of the

22   witnesses who gave written statements to confirm or deny

23   Mr. Bryon's account, correct?

24   A    Correct.

25   Q    So you testified yesterday about suspending Bryson's badge



# Exhibit E, Motion to Try Petition on Hearing Record

1   based on the risk that he may come back in to threaten Evans.

2   Do you remember that?

3   A    Yes.

4   Q    You knew that Bryson was scheduled to work on April 8th

5   through April 11th, 2020, correct?

6   A    I was not aware of Mr. Bryson's exact schedule.

7   Q    Okay.  So assuming he was scheduled, Bryson would have

8   been required to show up, correct?

9   A    No.

10  Q    So if an employee is -- is scheduled for work, they're not

11  required to show up to work.  Is that your testimony?

12  A    During this time frame we had lifted our attendance policy

13  due to COVID and safety.  It was one of the things that we put

14  into place in order to make sure that our associates were

15  comfortable coming to work.

16  Q    Okay.  Bryson could have entered the building on any dates

17  whether he was scheduled or not to work if his badge was

18  active, correct?

19  A    Correct.

20  Q    And it's true that Bryson's badge wasn't suspended for six

21  days, correct?

22  A    I don't recall the exact date that the badge was suspended

23  or how long it was suspended before we had the final

24  conversation.

25  Q    So the -- you know that the incident occurred on April



1    6th, 2020, correct?

2    A    Correct.

3    Q    Okay.  And I will show you a document that perhaps will

4    refresh your recollection on the date of the suspension.  And

5    I'm going to show you General Counsel's Exhibit 74.  Please let

6    me know when you see my screen.  Okay.  Do you see my screen?

7    A    Yes.

8    Q    And you see the date on this email -- I'm sorry.  Let me

9    show you the whole email.  So this is an email from

10   Tyler Grabowski on April 10th, 2020, correct?

11   A    Yes.

12   Q    And the title is Suspend Badge Gerald Bryson?

13   A    Yes.

14   Q    And do you see Mr. Churchio's (phonetic) response on April

15   13th, 2020?

16   A    Yes.

17   Q    So Bryson's badge was not -- was not suspended for six

18   days, correct?

19        MS. BUFFALANO:  The document speaks for itself.

20        JUDGE GREEN:  Sustained.

21   Q    BY MS. COX:  So at any point in that six-day period, Mr.

22   Bryson could have entered the building, correct?

23   A    Correct.

24   Q    And that was your -- part of your risk assessment was that

25   he may be a threat and return to the building, correct?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    Correct.

 2    Q    But Amazon did nothing in that six-day period to stop that

 3    threat, right?

 4    A    His badge was -- I mean, his badge was no suspended until

 5    the day that's on the email, as you said.  I also just want to

 6    add, though, we said my -- my risk assessment --

 7    Q    I don't have any question.  I have no question.  I think

 8    you answered.  Thank you.

 9    A    Okay.

10    Q    So you wrote an executive summary of the April 6th

11    incident, correct?

12    A    I did the final edit on a summary.  Yes.

13    Q    And who wrote the initial summary?

14    A    I don't know who started the document.

15    Q    How many versions of this document exist?

16    A    I don't recall.

17    Q    The version that you -- actually, let me -- I'll withdraw

18    that.

19         Okay.  So you based your claims in the executive summary

20    on the notes taken by Mr. Grabowski in the conversation with

21    Bryson, correct?

22    A    I used the notes, the witness statements, and also

23    actually the Facebook Live video was referenced in that

24    document.

25    Q    You wrote that Bryson admitted to escalating the argument,
```



Exhibit E, Motion to Try Petition on Hearing Record

1       correct?

2       A    I would need to see the document to be specific.

3       Q    Okay.  All right.  So I'm showing you what's been marked

4       as General Counsel's Exhibit -- I'm sorry, Exhibit 25.  Do you

5       see my screen?  Oops.  Do you see my screen?

6       A    Yes.

7       Q    Okay.  So I'm drawing your attention to this portion of --

8       of the document.  Do you see that?

9       A    Yes.

10      Q    Isn't it true that Bryson's -- the investigative recap

11      with -- between Grabowski and Bryson does not -- Mr. Bryson

12      does not admit to escalating the -- the argument?

13      A    I would need to look at that document to validate that.

14      Q    Okay.  And I believe it's Respondent 18.  So here are the

15      notes.  Let me know when you want me to scroll, and also please

16      point out to me where Mr. Bryson's admission that he escalated

17      the argument is.

18      A    Can you scroll, please?

19      Q    Yes.

20      A    Can you scroll, please?

21      Q    Yes.

22      A    And can you continue, please?

23      Q    Absolutely.

24      A    Thank you.

25      Q    So this document does not contain any admission by



1    Mr. Bryson that he escalated the argument, correct?

2    A    Can we go back to the other document?

3    Q    I'm asking you about this document at this time.

4    A    This document does not say anywhere that Bryson -- that

5    Bryson admitted that he escalated the situation.

6    Q    Okay.  Thank you.  So I will go back to the other

7    document.  I'm going to go back to the executive summary.  You

8    testified earlier that you don't remember who sent it to you --

9    or who started it, right?  That was your testimony?

10   A    Yes.

11   Q    Might it -- might have it been Christine Hernandez that

12   started the document?

13   A    It may have been.

14   Q    Could it have been Tyler Grabowski that started that

15   document?

16   A    It may have been.

17   Q    And who was likely to send it to you?

18   A    Tyler or Christine.

19   Q    Okay.  Okay.  So I'm showing you the executive summary.

20   Can you see my screen?

21   A    Yes.

22   Q    Okay.  So -- now, in this document, do you see this

23   paragraph here?

24   A    Yes.

25   Q    Please read it to yourself and tell me when you're done.



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A     I'm done.

 2    Q     So legal refers to Kristen Larusa, correct?

 3    A     Yes.

 4    Q     And Ms. Larusa works in New Jersey, correct?

 5          MS. BUFFALANO:  Objection to relevance.  I don't know that

 6    he knows that.

 7          MR. KEARL:  I think you're on -- you're on mute,

 8    Judge Green.

 9          JUDGE GREEN:  So what's the relevance?

10          MS. COX:  Judge Green, these are the people that agreed in

11    the termination of Mr. Bryson.

12          JUDGE GREEN:  Okay.  Why do we care?

13          MS. COX:  Because I have questions about the decisions

14    that were made in regard to Mr. Bryson and Mr. -- Ms. Evans's

15    write up.

16          JUDGE GREEN:  Okay.  So why don't you ask those questions?

17          MS. COX:  Well, Judge, I need to identify who these people

18    are first.  I won't ask where they work if that -- if that'll

19    make you  happy.

20          MS. BUFFALANO:  She asked where she lives.

21          MS. COX:  I did not ask where she lives.  You're not

22    listening.  I asked if she works in New Jersey.

23          MS. BUFFALANO:  Again, how is that relevant?

24          JUDGE GREEN:  Yeah.  I don't see how it's relevant.

25          MS. COX:  Well, she's not assigned to JFK 8, Judge.
```



www.escribers.net | 800-257-0885

 1        JUDGE GREEN:  So what?

 2        MS. COX:  All right.  I'll move on.

 3    Q   BY MS. COX:  So legal also refers to Liz Hackett, correct?

 4    A   Yes.

 5    Q   And you see that the document refers to ER, right?

 6    A   Yes.

 7    Q   And that means employee relations, correct?

 8    A   Yes.

 9    Q   And specifically, this document refers to Elliott Jones

10    (phonetic), correct?

11        MS. BUFFALANO:  The document speaks for itself.

12        MS. COX:  No.  It's not in the document.  I'm asking --

13        MS. BUFFALANO:  You asked him what the document said.

14        MS. COX:  I'm asking --

15        MS. BUFFALANO:  Specifically who this refers to.

16        MS. COX:  No.  I said -- I said specifically --

17    specifically this is referring to Elliott Jones, correct.

18        THE WITNESS:  Yes.

19    Q   BY MS. COX:  And you know that this is also referring to

20    Millie Gutierrez (phonetic), correct?

21    A   Yes.

22    Q   And regional operations here means regional loss

23    prevention manager Gilbert Differ, correct?

24    A   No.

25    Q   Okay.  Who does -- who -- who -- who -- who did you intend



1    to refer to as regional operations here?

2    A    Sai Cotha (phonetic) and Ahnan Mehda (phonetic).

3    Q    I'm sorry.  They're regional operations?

4    A    Yes.

5    Q    okay.

6    A    Sai -- Sai was the general manager of JFK 8 and

7    Ahnan Mehda was the regional director.

8    Q    Okay.  And -- and who does senior ops refer to here?

9    A    Senior ops refers to general manager Sai Cotha.  Reviewing

10   this, I would -- regional operations most likely referred to

11   Ahnan Mehda, senior ops referring to Sai Cotha.

12   Q    Okay.  With regard to legal, was there anyone else

13   involved in the decision to terminate Mr. Bryson?

14   A    No.

15   Q    With regard to employee relations, was there anyone else

16   involved in the decision to terminate Mr. Bryson?

17   A    No.

18   Q    And with regard to regional operations, was anyone else

19   involved in the decision to discipline Mr. Bryson?

20   A    No.

21   Q    With regard to senior operations, was anyone else involved

22   in the decision to terminate Mr. Bryson?

23   A    No.

24   Q    And HR leadership here refers to Tyler Grabowski, correct?

25   A    HR leadership would refer to myself, Christine Hernandez,



1    and -- Christine Hernandez.

2    Q    So you testified that Hernandez suggested that Evans's

3    discipline be reduced, correct?

4    A    Correct.

5    Q    So, in fact, Ms. Hernandez was not in agreement with the

6    decision to issue Evans a final warning, correct?

7    A    I don't recall if Christine had an objection at the point

8    -- at the point that we sent this document for -- for

9    alignment.

10   Q    Well, at the time that this document was sent, she was in

11   agreement, correct?

12   A    I don't recall if she was in agreement or not at the time

13   that this document was sent.

14   Q    But the document says that there was agreement, correct --

15   or alignment, correct?

16   A    Yes.

17   Q    Okay.  And you testified yesterday that after speaking

18   with Christine, you were no longer in alignment, correct?

19   A    Correct.

20   Q    You agree that Evans's use of the word fuck was for

21   emphasis, correct?

22   A    Yes.

23   Q    And that Evans's use of the word fuck was not directed at

24   anyone, correct?

25   A    Yes.



1    Q    Isn't it true that part of your duties were to make

2    recommendations but not final decisions in issuing discipline?

3    A    Yes.

4    Q    And you testified that operations make decisions to issue

5    discipline, correct?

6    A    Yes.

7    Q    And you testified that operations implements those

8    decisions, correct?

9    A    Yes.

10   Q    But in -- but in Evans's case, you and Hernandez reduced

11   her discipline, correct?

12   A    We changed -- we changed our recommendation to a first.

13   An operator would have had to align with that in order to issue

14   it.

15   Q    And who would have that -- which operator might that have

16   been?

17   A    I'm not -- I'm not 100 -- I'm not sure who had the

18   conversation with Ms. Evans.

19   Q    And by operator, who are -- who are you referring to?

20   A    It -- for a -- a Tier 1 associate, the operator could have

21   been her direct supervisor who would have been an area manager,

22   or it could have been someone within that hierarchy in the site

23   that the -- that the area manager reports to.

24   Q    So you and Ms. Hernandez informed an operator of your new

25   recommendation, correct?



1   A    I don't know that Christine informed -- informed someone

2   prior -- well, Ms. -- she would have had to inform someone

3   prior to the -- prior to the conversation for the documentation

4   to be created.  I don't know with -- accurately what

5   Christine's actions were at this point, but I did not have a

6   conversation with an operator.

7   Q    Okay.  So you testified yesterday that there were some

8   things left out of the executive summary, correct?

9   A    The executive summary did not include all of the details

10  of the investigation.

11  Q    Correct.  And you testified that you could only determine

12  that it was probable that Mr. Bryson used the N-word the C-word

13  and made a threat, correct?

14  A    Correct.  With varying degrees of probability on each of

15  those.

16  Q    So your -- your investigation revealed that he may not

17  have engaged in that conduct, correct?

18  A    Our investigation was not specific on certain words or

19  certain phrases that he said or didn't say.  We looked at the

20  entire event from the beginning when he started verbally

21  attacking Ms. Bryson all the way through the process --

22  Q    Mr. --

23  A    -- of the events.

24  Q    -- is it true that the chart that Mr. Grabowski created

25  had specific phrases in it?



# Exhibit E, Motion to Try Petition on Hearing Record

1  A    It did.

2  Q    Okay.  Isn't it also true that Mr. Grabowski asked

3  Mr. Bryson specifically whether he said certain things?

4  A    Yes.

5  Q    Okay.  And you used the word probably yesterday.  You

6  remember that, right?

7  A    Yes.

8  Q    And probably means that it's not certain, correct?

9  A    Yes.

10  Q    Okay.  So I want to show you -- I have not put this in

11  SharePoint, but give me a moment.  I am going to eventually

12  mark this.

13       So, Mr. Campbell, you sent the executive summary for

14  review to Rob Joseph, correct?

15       MS. BUFFALANO:  Objection.  This is -- the communications

16  around what Mr. Campbell did or didn't send to individuals is

17  privileged and is in the privilege.

18       MS. COX:  I haven't asked about the substance of the

19  communications, Judge.

20       MS. BUFFALANO:  You're asking about the attachments, which

21  is just as privileged as the email itself.

22       MS. COX:  I haven't.  I asked if he sent it to Mr. --

23       MS. BUFFALANO:  Exactly.  And whether or not he sent it

24  would be privileged because it would identify the attachment to

25  a privileged email.



www.escribers.net | 800-257-0885

1        MS. COX:  It does not.  I will --

2        MS. BUFFALANO:  When the Judge reviewed the privilege log,

3    he agreed with that position.  We did not have to disclose what

4    attachments went with which privileged document.

5        JUDGE GREEN:  Okay.  So what are you trying to establish

6    here?

7        MS. COX:  I have some questions about this email, Judge.

8        MR. JACKSON:  Okay.  Well -- all right.  Well, why don't

9    you ask the questions and we'll get into the dual objections.

10       MS. COX:  Thank you.

11   Q    BY MS. COX:  So, Mr. Campbell, you -- you sent this email

12   on April 16th at 12:22 p.m. to Rob Joseph, correct?

13   A    Correct.

14   Q    And you see that there is an attachment listed on the

15   email, correct?

16   A    Correct.

17   Q    And it's the executive summary?

18   A    Correct.

19   Q    And Version 2 is -- is attached, correct?

20   A    Yes.  That's what I see.

21   Q    You didn't send Version 1, did you?

22   A    I don't recall if I sent Version 1 to Rob or not.

23   Q    So there was a different version of the executive summary

24   that's different than what you just saw, correct?

25   A    There were draft iterations of the summary.



# Exhibit E, Motion to Try Petition on Hearing Record

1   Q    And how many draft iterations of the summary did you make?

2        MS. BUFFALANO:  Relevance?

3        JUDGE GREEN:  Overruled.

4        THE WITNESS:  I don't recall.

5   Q    BY MS. COX:  Let me go back to Respondent's Exhibit 18.

6   Oops.  I'm sorry.  That's the wrong one.  It's General

7   Counsel's Exhibit 25.

8        You see that executive summary, right?

9   A    Yes.

10  Q    Do you recall what draft iteration this executive summary

11  was?

12  A    I do not.

13  Q    Do you know how many iterations of the executive summary

14  existed?

15  A    I do not.

16  Q    Do you know who created any iteration of the executive

17  summary?

18  A    The final version of the summary I edited and

19  communicated.  Previous versions of that summary I do not

20  recall who started the -- the document.

21  Q    Isn't it true that you copied and pasted this language

22  from the April 10th email that Tyler Grabowski sent you with

23  the list of questions to ask Bryson?

24  A    I don't recall if I copied and pasted directly from that

25  email.



1    Q    Okay.  So you see that this is highlighted here, right?

2    A    Yes.

3    Q    Okay.  And you see that this reads, "These actions will

4    result in separation of employment"?

5    A    Yes.

6    Q    Okay.  And let me just show you the email again.

7         MS. COX:  Oh.  Judge Green, I'm going to move for

8    admission of GC-114.

9         JUDGE GREEN:  Any objection?

10        MS. BUFFALANO:  Is that the Rob Joseph email?

11        MS. COX:  Yes.

12        MS. BUFFALANO:  No objection.

13        JUDGE GREEN:  GC-114 is admitted.

14   **(General Counsel Exhibit 114 Received into Evidence)**

15        MS. COX:  Okay.

16   Q    BY MS. COX:  And I was going to show you again the email

17   that Mr. Grabowski sent you on April 10th.  Okay.  Sorry.

18        I believe -- so this -- this email references the

19   verbiage, but I don't see it here.  Here it is.  Okay.  You see

20   that that's highlighted there, right?

21   A    Yes.

22   Q    Okay.  And you see -- you see that it says, "This feedback

23   has resulted in separation of employment," right?

24   A    Yes.

25   Q    So the two documents are virtually identical with the



1   exception of the change of this word "this feedback," right?

2   MS. BUFFALANO:  Objection.  The documents speak for

3   themselves.

4   JUDGE GREEN:  Sustained.  If you want to ask him whether

5   he recalls cutting and pasting given what you just showed him,

6   you can ask that again.

7   MS. COX:  I will.  Just give me one second.

8   Q    BY MS. COX:  I'm going to show you again General Counsel's

9   Exhibit 25.

10   JUDGE GREEN:  I really don't want to just have him confirm

11   that they're the same.  If you want to ask him whether he

12   recalls what he did, then you can do that.

13   MS. COX:  I asked him, Judge, if he recalled copied --

14   copying and pasting, and I want to show him the two documents.

15   JUDGE GREEN:  No.  I understand.  You just showed him the

16   two documents.  Now you can ask him again, if you want to.

17   We're not here to confirm whether the two documents are the

18   same.

19   MS. COX:  I understand.

20   JUDGE GREEN:  If you want to ask him -- if you want to ask

21   him the question, ask him it again.

22   MS. COX:  Okay.

23   Q    BY MS. COX:  So do you recall copying and pasting directly

24   from Mr. Grabowski's email on April 10th?

25   A    I do not recall cutting -- copying and pasting between the



1    two documents.

2    Q    Okay.  So -- but it may have been someone else; isn't that

3    right?

4    A    Yes.  It could have been someone else.

5    Q    Okay.  And the separation of employment didn't change

6    since April 10th, correct?

7         MS. BUFFALANO:  Objection.  Document speaks for itself.

8         JUDGE GREEN:  I didn't really even understand the

9    question.  What was the question?

10        MS. COX:  That the decision to terminate did not change

11   since April 10th, correct?

12        JUDGE GREEN:  Overruled.

13        THE WITNESS:  The decision did not change.

14   Q    BY MS. COX:  Okay.  So -- okay.  I'm going to move on to a

15   different area.  So I -- I had you read the investigative recap

16   of -- of Grabowski's conversation with Bryson.  Do you remember

17   that?

18   A    Yes.

19   Q    And Mr. Bryson characterized Evans as being aggressive,

20   correct?

21   A    I would need to look at the document again.

22   Q    Okay.

23        MS. BUFFALANO:  We -- we've already done this exact thing.

24        JUDGE GREEN:  Yeah.  Yeah, we have.

25        MS. COX:  He doesn't recall, Judge.



# Exhibit E, Motion to Try Petition on Hearing Record

1     JUDGE GREEN:  I'm not interested -- I'm not interested in

2    what he recalls is -- is in the document.  I'm not interested

3    in it.

4        MS. COX:  Okay.  So you want me to ask him questions about

5    something he's saying he doesn't recall.

6        JUDGE GREEN:  I'm saying that if you -- I don't want you

7    asking him questions about what's in the document.

8        MS. COX:  I'm -- that's not my intention.  I'm going to

9    ask him questions about --

10       JUDGE GREEN:  Okay.  Well, you could have fooled me

11   because you keep doing it.  You've been doing it this whole

12   time.

13       MS. COX:  Okay.  Well, I really don't know what else to

14   tell you, Judge.

15       JUDGE GREEN:  Okay.  Well, then, just don't -- then don't

16   do it.  Then just stop doing it.

17       MS. COX:  But it leads to a question, Judge.

18       JUDGE GREEN:  No.  It actually has not.  It actually has

19   not led to a question.  You -- you have not been -- you have

20   not been drawing his attention to a certain thing in a document

21   for the purpose of asking a different question.

22       MS. COX:  Okay.

23       JUDGE GREEN:  That you have not largely not been doing.

24       MS. COX:  Okay.

25   Q    BY MS. COX:  Okay.  So Mr. Bryson characterized Ms. Evans



www.escribers.net | 800-257-0885

1    as aggressive, and you reviewed surveillance video of the

2    incident for yourself, correct?

3    A    Yes.

4         MS. BUFFALANO:  That's -- hold on.  That was a compound

5    question.

6         JUDGE GREEN:  Okay.  But -- okay.

7         MS. COX:  I mean, you don't want me to ask him the

8    question.

9         JUDGE GREEN:  I -- I don't.  So the question is you -- the

10   next question is:  did you review -- did you review the video.

11        MS. COX:  Yes.  And I'm -- I'm --

12        JUDGE GREEN:  Okay.  So overruled to the extent that

13   that's the question.

14        MS. COX:  Okay.

15        JUDGE GREEN:  So did you -- do you understand the

16   question, Mr. Campbell?

17        THE WITNESS:  Can we repeat the question just so I'm

18   positive?

19        JUDGE GREEN:  Okay.  Go ahead.

20   Q    BY MS. COX:  You reviewed surveillance video of the

21   incident for yourself, correct?

22   A    Correct.

23   Q    And in your testimony yesterday, you couldn't determine

24   whether Ms. Evans's physical motions were defensive or not,

25   correct?



Exhibit E, Motion to Try Petition on Hearing Record

1  A   Correct.

2  Q   Okay.  So I want to show you GC's Exhibit 52.  This is one

3  of the surveillance videos that you reviewed.  Okay.  Okay.

4  Tell me when you can see my screen.

5  A   I can see it.

6  Q   Okay.  All right.  So I'm going to play this video, and

7  I'm going to ask you some questions about it.

8  (Video recording played)

9  Q   Okay.  I stopped it at 1:55.  Is this the video that you

10  reviewed during your -- during the investigation?

11  A   Yes.  I reviewed this video.

12  Q   Okay.  And you see Ms. -- Ms. Evans with her hands up by

13  her head and wide out, right?

14  A   Yes.

15  Q   So isn't it true that her gestures can be seen as

16  confrontational?

17  A   I -- I think that her gesture could be interpreted many

18  ways.

19  Q   And one of those ways being confrontational; isn't that

20  right?

21  A   One of the ways?  Yes.

22  Q   Okay.  And she doesn't appear to be fearful, does she?

23      MS. BUFFALANO:  Objection to the foundation here of what

24  she appears to be.

25      JUDGE GREEN:  Yeah.  So sitting here today, I really don't



1    care what Mr. Campbell thinks about this -- this.  What I'm

2    more interested in is what he thought about it in April of

3    2020.  Maybe that's a way of getting at it.

4        Do you recall, Mr. Campbell, looking at this video and --

5    and thinking that she did not seem fearful in April 2020?

6        THE WITNESS:  I do not remember thinking that she did not

7    seem fearful.

8    Q    BY MS. COX:  Did you note that she walked slowly from her

9    seated position to the point where we're at right now?

10   A    I did not note that.

11   Q    Okay.  You testified yesterday that Bryson -- I'm sorry,

12   that Evans complied with an order to go inside, right?

13   A    Yes.

14   Q    Isn't it true that Ms. Evans finished her cigarette before

15   going inside?

16   A    I -- I don't know if she finished her cigarette or not.

17   Q    Okay.  I'm going to continue playing this video for you.

18   Okay.  I don't know what happened to the video, but in any

19   event, you testified yesterday that Ms. Evans retreated; did

20   you not?

21   A    I did.

22   Q    But that's not consistent with this video, is it?

23   A    Can you rephrase the question?

24   Q    Okay.  Let me show you the video.

25       JUDGE GREEN:  No.  Let's not do that again.  Having seen



1    the video -- you -- you saw the -- you just watched the video.

2    Having seen the video, did -- are you still of the opinion that

3    Ms. Evans retreated, or are you not?

4        THE WITNESS:  I am.

5    Q    BY MS. COX:  But it's -- but it's true that she opened the

6    door and came back out, right?

7    A    That is true.

8    Q    Okay.  And Ms. Evans admitted in her conversation with

9    Mr. Grabowski that she told Bryson to make her shut up during

10   this interaction.  Do you remember that?

11   A    Yes.  I believe that's correct.

12   Q    Okay.  So based on this video and Mr. Grabowski's recap,

13   isn't it true that -- that Evans could be perceived as

14   aggressive?

15       MS. BUFFALANO:  Objection.  Hypothetical.  Based just on

16   two pieces of evidence he looked at in the investigation?

17       JUDGE GREEN:  Okay.  Well, sustained.  You can ask it a

18   different way.

19   Q    BY MS. COX:  In March -- or, I'm sorry.  In April 2020,

20   based on the information you had that Ms. Evans said make me

21   shut up and that she came back out and waved her arms in front

22   of Mr. Bryson, isn't it true that that conduct could be

23   perceived as aggressive?

24   A    No.

25   Q    Okay.  So it's your testimony that none of that conduct



1   taken together could be seen as aggressive?

2       JUDGE GREEN:  Okay.  We just got the answer to that.

3   Mr. Campbell, did you see that conduct as aggressive?

4       THE WITNESS:  I did not.

5       JUDGE GREEN:  Okay.

6   Q    BY MS. COX:  Okay.  And you testified yesterday that

7   Bryson's conduct was different that Evans.  Do you remember

8   that?

9   A    Yes.

10  Q    And you considered that it was different because he made

11  comments on social media, right?

12  A    His behavior was different for more reasons that just

13  social media.

14  Q    But that was one of them, wasn't it?

15  A    That was one of them.  Yes.

16  Q    Okay.  Isn't it true that Bryson appears for -- on

17  Facebook for 90 seconds or less?

18  A    I don't know the exact amount of time that Mr. Bryson

19  appears.

20  Q    Okay.  Isn't it also true that Bryson doesn't speak about

21  the interaction for the full 90 seconds during that social

22  media post?

23  A    That's true that he doesn't speak only about the

24  interaction.

25  Q    Okay.  And it's true that he doesn't identify what shift



Exhibit E, Motion to Try Petition on Hearing Record

1   Ms. Evans worked on, right?

2   A   No.  He doesn't identify what shift she works on.

3   Q   Or what she was wearing?

4   A   He does not identify what she was wearing.

5   Q   Or disseminated any pictures of her?

6   JUDGE GREEN:  Okay.  So why are -- why are we discussing

7   cumulative evidence since we have the video?  You're asking him

8   what's in the video.  We have the video.  You can point out in

9   the brief whatever you want about the video.

10  MS. COX:  Okay, Judge.

11  Q   BY MS. COX:  And you testified that he showed no remorse

12  on Facebook, correct?

13  A   Yes.  I testified that way.

14  Q   And that weighed in favor of your recommendation to

15  terminate, correct?

16  A   Yes.

17  Q   Isn't is true that Grabowski did not ask Bryson if he felt

18  remorse?

19  A   Mr. Grabowski did not ask Mr. Bryson if he felt remorse.

20  Q   And it's true that Amazon doesn't consider an employee's

21  remorse before issuing discipline, correct?

22  A   I'm confused by the question.

23  Q   If an employee shows remorse, it's not a basis to reduce

24  discipline, right?

25  A   It's a -- it's a factor in the recommendation of



Exhibit E, Motion to Try Petition on Hearing Record

1    discipline.

2    Q    And you base your recommendation on what an employee says,

3    right?

4    A    I would -- I base a recommendation on what an employee

5    says as well as witnesses to the incident, what the employee

6    says, whether they admitted it or not, also to their own

7    behavior during the incident, following the incident.

8    Q    Okay.  It was your view that the Facebook video called

9    into question Bryson's integrity, correct?

10   A    Yes.

11   Q    And that's because Bryson used the N-word on Facebook,

12   right?

13   A    His use of the N-word was the opposite of what he had

14   stated in his STU.

15   Q    You understood the difference between Evans using the word

16   fuck for emphasis and directing it towards someone, correct?

17   A    Yes.

18   Q    There's a difference between calling someone the N-word

19   and using it in a sentence; is it not?

20   A    I don't think ever using the N-word is acceptable, period.

21   Q    But you understood that in certain context, as it applied

22   to Ms. Evans, that the context mattered, right?

23   A    I don't understand the question.

24   Q    So you understood when Ms. Evans used inappropriate

25   language that the context mattered, right?



# Exhibit E, Motion to Try Petition on Hearing Record

1   A    Yes.

2   Q    Okay.  But with Mr. Bryson, you did not have the same

3   approach, right?

4   A    Each one of the individuals involved with this, we looked

5   at everything in their behavior, that they said and they did.

6   Ms. Evans absolutely used a word that -- that may be

7   unacceptable, but she did not use it directed toward another

8   individual.

9        The use of the N-word is a completely different level of

10  discrimination regardless of context.

11  Q    Isn't it true that Mr. Bryson used the N-word to describe

12  himself and his coworkers?

13       MS. BUFFALANO:  Objection to timing.  Like ever?

14       JUDGE GREEN:  I think we're talking about in the video.

15       MS. COX:  Yeah.  That's all we're talking about.

16  Q    BY MS. COX:  It's true that Mr. -- it's true that

17  Mr. Bryson did not direct the N-word at Ms. Evans, right?

18  A    Mr. Bryson did not direct the N-word at Ms. Evans.

19  Q    Okay.  And it's also true that on the Facebook Live video,

20  Bryson said that Amazon viewed him and his coworkers as dumb Ns

21  and did not direct -- dumb Ns, right, N-I-G-G-As?

22  A    I -- I -- I believe that's what Mr. Bryson said.  I don't

23  know that it was -- I -- I don't know how to spell exactly what

24  he said, if it was a shortened version of slang.

25  Q    And when you used the word integrity, you referred to



1    Bryson's honesty, right?

2    A    I referred to Bryson's willingness to be completely

3    forthcoming during the investigation.

4    Q    And being forthcoming means being honest, right?

5    A    Yes.

6    Q    Isn't it true that Mr. Bryson admitted to calling

7    Ms. Evans a bitch to Mr. Grabowski?

8    A    I would want to review the document again to validate

9    that.

10   Q    You had no basis for determining that -- I'm sorry.  I'll

11   withdraw that.

12        Isn't it true that Ms. Evans wasn't truthful in her seek

13   to understand?

14   A    I -- I don't -- I -- I don't know that that's true.

15   Q    Well, Ms. Evans never admitted to saying fuck, did she?

16   A    I would want to look at the document to validate that.

17   Q    And there were witness statements attributing the word

18   fuck to Ms. Evans, right?

19   A    I would want to review the witness statement to validate

20   that.

21   Q    You didn't make any determinations about Ms. Evans's

22   integrity, did you?

23   A    In my initial recommendation for a final written warning,

24   as I believe I stated yesterday, there were concerns that she

25   played -- that -- that she participated in the interaction more



1    than she had stated originally.

2    Q    But yesterday, you didn't testify to her lack of

3    integrity, did you?

4        MS. BUFFALANO:  Is what this witness testified yesterday

5    relevant?

6        JUDGE GREEN:  Yeah.  Go ahead.

7        THE WITNESS:  No.

8    Q    BY MS. COX:  And you know that Mr. Bryson specifically

9    denied saying stupid N-I-G-G-E-R, but you didn't ask

10   Mr. Grabowski what Bryson meant when he said because he is

11   black, correct?

12   A    I'm sorry.  Can you ask the question again?

13   Q    Yeah.  So Mr. Bryson told Mr. Grabowski that he did not

14   say stupid N-I-G-G-E-R because he is black.  Do you remember

15   that?

16   A    I -- I -- I don't understand the question.

17   Q    So in the seek to understand conversation with Grabowski,

18   Bryson said he did not say stupid N-I-G-G-E-R because he is

19   black.  Do you remember that?

20   A    No.  Can I see the notes of the STU conversation?

21   Q    Yes.  Okay.  It's this question here.  Let me know when

22   you're done.

23   A    I'm done.

24   Q    Okay.  So you see the portion that says he would not say

25   that as he is black?



Exhibit E, Motion to Try Petition on Hearing Record

1   A    Yes.

2   Q    And you did not ask Grabowski what Bryson meant by that,

3   did you?

4   A    I did not.

5   Q    And you did not direct Grabowski to ask Bryson if he's

6   ever used the N-word, did you?

7   A    I did not.

8   Q    And you never asked Grabowski to -- to ask him the context

9   of if he's ever used the N-word, did you?

10  A    I did not.

11  Q    Okay.

12       MS. COX:  Judge Green, can I go off the record for --

13       JUDGE GREEN:  Off the record.

14  (Off the record at 4:43 p.m.)

15  Q    BY MS. COX:  Mr. Campbell, you testified yesterday that

16  there were six disciplines that were comparable to Bryson's

17  conduct on April 6th.  You remember that, right?

18  A    Yes.

19  Q    And there was an employee was terminated for vulgar and

20  aggressive body language, right?

21  A     If you're talking about the specifics of one of the six, I

22  would need to review the document.

23  Q    Okay.  I'm going to show you the disciplines themselves.

24  I don't know if you've seen them all in this form, but --

25       MS. BUFFALANO:  What are the exhibit numbers?



1    MS. COX:  It's 29(b) and 29(a).  So, Judge Green and

2    counsel, I -- we've uploaded the redacted disciplines there in

3    as one number, and then when -- the ones that we got unredacted

4    disciplines for, we created a (a) or (b) showing other -- the

5    unredacted version and other discipline issue to that same

6    employee.  So you'll see that as you go through SharePoint.

7    Q    BY MS. COX:  Okay.  So this employee is one of the

8    employees that were terminated for utilizing vulgar language

9    and aggressive body language.  Do you see that?

10   A    I see that.

11   Q    Okay.  This same employee received a final warning for

12   saying shut the fuck up and threatening to remove an employee

13   from the dock.  Do you see that?

14   A    I see that.

15   Q    Okay.  There is no indication on these writeups as to

16   whether the employee showed remorse, right?

17   MS. BUFFALANO:  Objection to the relevance of the

18   questions.  I -- I'm not sure what this document --

19   JUDGE GREEN:  Okay.  I mean, I -- I mean, the General

20   Counsel, I suppose, is going to argue that, you know -- make an

21   argument regarding Mr. Bryson's discharge as it relates to

22   whether he showed remorse.  Why can't I just read in the

23   documents whether they contain any reference to remorse?  Why

24   do we have to have Mr. Campbell testify to what's in the

25   documents?



1      MS. COX:  Well, Judge, before asking him questions about

2  the document, I want to show him the document.

3      JUDGE GREEN:  Now, see, I don't want to hear questions

4  about what's in the document, right?  You want to establish

5  from him that there's nothing in the document showing that this

6  person was -- was disciplined because of remorse, right?

7      MS. COX:  Right.

8      JUDGE GREEN:  Okay.  So I can read that in the document.

9  I can read the discipline.  We don't have to have Mr. Campbell

10  confirm it.

11      MS. COX:  Okay.

12  Q    BY MS. COX:  It's true that Amazon can use its discretion

13  to -- to determine what level of corrective action is

14  appropriate for an employee, right?

15  A    Yes.

16  Q    And it's true that Amazon determines which employees'

17  actions can be corrected, right?

18  A    Yes.

19  Q    So in this case, Amazon thought that telling an -- telling

20  another employee to shut the fuck up and making a threat was --

21  was -- this -- this employee could be corrected, right?

22      MS. BUFFALANO:  The document speaks for itself, and

23  there's no foundation for this witness discussing this feedback

24  form.

25      JUDGE GREEN:  Sustained.



Exhibit E, Motion to Try Petition on Hearing Record

1       MS. COX:  Okay.

2    Q    BY MS. COX:  And there are other employees that you looked

3    at as comparators to Bryson, right?

4    A    Yes.

5    Q    And those other employees also had prior disciplines

6    before termination, right?

7    A    I don't know if they did or not.

8    Q    Okay.  So I'll show you another employee who's in the

9    chart, and they're General Counsel's Exhibit 28(a) and 28(b).

10       JUDGE GREEN:  Okay.  Why is this something that you can't

11   just explain to me in the brief?

12       MS. COX:  Well, Judge, he looked at these -- he thought

13   these were comparators, and he did not consider in Bryson's

14   case whether --

15       JUDGE GREEN:  I understand, but why isn't that something

16   you can't just explain in the brief?

17       MS. COX:  Well, Judge, it goes to his credibility --

18       JUDGE GREEN:  No, it doesn't.

19       MS. COX:  Okay.

20       MS. BUFFALANO:  This is also not one of the six, so I feel

21   like it's a little bit --

22       JUDGE GREEN:  Well, that's -- okay.  That -- you know, you

23   can argue over that.  That -- that's not so much an issue.

24   It's just I -- you know, I don't know how many times I have to

25   say it.  I don't want documents just being confirmed.  It's



1    cumulative.  It's unnecessary.  We're on Day 13, I think.  I've

2    actually lost count.  It's a single district case.  We -- we --

3    we've had this same exact issue when you put in these documents

4    to begin with.  I told you not to do it.  I told you not to do

5    it multiple times since, and here we are.  You're doing it

6    again.  I mean, I just -- I'm -- I'm absolutely at a loss.

7          MS. COX:  Okay, Judge.  I'll move for admission of General

8    Counsel 75 through 108.

9          JUDGE GREEN:  Okay.  So what are they?

10         MS. COX:  They're all disparate treatment documents.

11         JUDGE GREEN:  Has the -- has the Respondent viewed them?

12   Do you have any objection?

13         MS. BUFFALANO:  I haven't viewed them.  If they are sort

14   of disciplinary documents we've produced, I have all confidence

15   we wouldn't object to their admission.  I just haven't looked

16   at them yet.  Can we do that tonight?

17         JUDGE GREEN:  Yes.  What was the last number of that

18   exhibit?

19         MS. COX:  This one's already in evidence, I believe,

20   Judge.  This is --

21         JUDGE GREEN:  No.  You gave a -- you gave an exhibit

22   range.  It was 70 --

23         MS. COX:  Oh, 75 to 108.

24         JUDGE GREEN:  Okay.

25   Q    BY MS. COX:  So, Mr. Campbell, you testified that the word



1    dike is horrible language, right?

2    A    Yes.

3    Q    And isn't it true that one of the disciplines in the

4    comparators, an employee was giving a final warning for

5    connecting child molestation to homosexuality?

6    A    I would need to see the -- the -- the list of comparator

7    documents again.

8         MS. BUFFALANO:  Again, I mean, I think it's just -- unless

9    there's any foundation that he has any knowledge of that -- is

10   he just going to be reading and telling you whether something

11   exists in the warning or not?

12        MS. COX:  What was the question?

13        JUDGE GREEN:  I mean, are -- are we again just asking --

14   are we just asking him to read what's in exhibits?

15        MS. COX:  No.  I'm -- I was going to ask him whether there

16   was any indication that that employee was remorseful and

17   whether Amazon terminated --

18        JUDGE GREEN:  Meaning -- meaning what's not in the

19   exhibits.  You want him to confirm what's not in the exhibit.

20        MS. COX:  Amazon does not terminate every employee that

21   says something about homosexuality --

22        JUDGE GREEN:  Understood.  And you can make that argument.

23   But why do we need him to confirm what is or is not in

24   exhibits.

25        MS. COX:  Okay.  Judge Green, I'm going to speak with



www.escribers.net | 800-257-0885

1    regional management, and I'll get back to you on how we're

2    going to proceed.

3        JUDGE GREEN:  Okay.  What else do you have?

4        MS. COX:  The disparate treatment documents.  That's it.

5        JUDGE GREEN:  Okay.  Go ahead.  Off the record.

6    (Off the record at 5:06 p.m.)

7        HEARING OFFICER PARNELL:  Is there going to be any cross

8    from Mr. Kearl?

9        MR. KEARL:  Yes.  I have a very brief cross.  I'm going

10   not email a document to Ms. Cox to upload to SharePoint.

11   Q    BY MR. KEARL:  Mr. Campbell, so you -- you knew about the

12   -- the protest on April 6th as early as the day before on April

13   5th, correct?

14   A    Yes.  We knew there was -- there was likely a protest on

15   April 6th.

16   Q    And how did you learn about that?

17       MS. BUFFALANO:  Objection to the relevance.

18       JUDGE GREEN:  Overruled.

19       THE WITNESS:  I -- I don't recall where I first heard

20   that.

21   Q    BY MR. KEARL:  Okay.  But it's true that you sought legal

22   advice about that protest, correct?

23   A    Yes.

24   Q    Okay.  And is that something that you normally do, seek

25   legal advice about employees the day before they're -- they're



1    planning to come onsite?

2        MS. BUFFALANO:  Objection.  Misstates the evidence and --

3    and assumes facts not in evidence.  He didn't say what the

4    legal advice was, nor would we let him.

5        JUDGE GREEN:  He -- no.  But I think he can -- I think he

6    can answer the question.  Mr. Campbell?  Is that something

7    that's normally done under -- you know, I guess do you want to

8    clarify the circumstances, Mr. Kearl?

9    Q    BY MR. KEARL:  I mean, is it normally done to seek legal

10   advice about the arrival of an employee or potential arrival of

11   employees onsite a day in advance?

12       MS. BUFFALANO:  I can tell -- the question is:  what --

13   you're -- you're assuming a legal advice.  You're saying it's

14   about employees arriving.  But I -- so --

15       JUDGE GREEN:  Is there an objection?

16       MS. BUFFALANO:  Yes.  This is privileged.

17       JUDGE GREEN:  Can you -- can you run this again because I

18   -- I was -- just ask -- ask -- ask the question again.

19       MR. KEARL:  Okay.

20   Q    BY MR. KEARL:  Is it normal for you to seek legal advice

21   about an employee the day before they're scheduled or planning

22   to come onsite?

23       MS. BUFFALANO:  My concern is that you're asking him what

24   the legal advice was about.  You're saying it's about an

25   employee?



1     JUDGE GREEN:  No.  I don't -- I don't think he is.  I also

2  think that --

3     MS. BUFFALANO:  How can he answer that question without

4  admitting that it was about an employee, or if it wasn't,

5  correcting that to say what the advice was about?  By -- by

6  saying it's about -- you sought legal advice about an employee,

7  it -- he has to either say, yes, I sought legal advice about an

8  employee, or no, I sought legal advice about a difference issue

9  related to a demonstration.

10     JUDGE GREEN:  Okay.  I don't think that this is

11  particularly relevant or helpful.

12  Q    BY MR. KEARL:  Was there something special about the April

13  6th protest that spurred you to seek advice on the 5th of

14  April?

15     MS. BUFFALANO:  Again, I have concern about --

16     JUDGE GREEN:  You know what, let's ask the same question.

17  Drop the legal advice.  Was there anything special about what

18  happened on April 6th?  What don't we start with that -- to

19  you?

20     THE WITNESS:  I would often seek legal advice if it's

21  needed, if I think that there are potential legal implications.

22  In this time frame specifically, there was elevated concern

23  about the safety of our associates.  In the middle of a

24  pandemic where we were doing everything that we could at that

25  point to ensure social distancing, to ensure that we were



1    putting in measures day-over-day, so it was a time frame where

2    I sought legal advice often.

3    Q    BY MR. KEARL:   Okay.   So -- so protestors coming to -- to

4    protest these conditions was -- was some -- withdraw that

5    question.

6         And -- and you had made your decision to terminate

7    Mr. Bryson as early as the 10th of April, correct?

8    A    On the 10th of April, there was -- there was not a

9    definitive decision, but yes, when I reviewed the comparators,

10   I was looking at those comparators to -- to try and move away

11   from termination based on policy application, based on my own

12   experience, based on my knowledge I had at that point.   I -- I

13   k new at that point that we were most likely looking at

14   termination of employment for those events.

15   Q    And you knew as early as the 9th of April that that was

16   the case, correct?

17   A    I don't remember the exact date when --

18   Q    You -- you testified yesterday that you requested the

19   comparator documents because you felt like termination was

20   warranted.   And if I tell you that the Excel spreadsheet that

21   was created by Tyler Grabowski that was produced in documents

22   was produced on the 9th of April, would that lead you to

23   believe that as of the 9th of April, termination was the likely

24   outcome of this -- of this matter?

25        MS. BUFFALANO:   Objection.



Exhibit E, Motion to Try Petition on Hearing Record

1     THE WITNESS:  Yes.

2     MS. BUFFALANO:  It's hypothetical.  I mean --

3     JUDGE GREEN:  Well, he can ask him whether he recalls.

4     Q    BY MR. KEARL:  Okay.  So do you recall when you asked for

5     the list of comparators that you thought termination was

6     likely?

7     A    I don't recall the exact date.

8     Q    Okay.  But on the date that you requested the comparators,

9     you knew termination was likely?

10    A    Yes.

11    Q    Okay.  So you knew termination was likely before

12    Mr. Bryson even had the opportunity to tell his side of the

13    story, correct?

14    A    Yes.

15    Q    Okay.  And you knew termination was likely even though

16    there were inconsistencies in the witness statements that you

17    had received that potentially called into question the

18    credibility of those witness statements, correct?

19    A    Yes.

20    Q    Okay.  And in the course of your investigation and your

21    use of these witness statements, did you, at -- at -- at any

22    point inquire or direct anyone to inquire with these witness

23    statements to try to clear up any of those inconsistencies?

24    A    No.

25    Q    So you never did?  Did you ever direct anyone to try to



1    seek out additional witness statements?

2    A    No.

3    Q    Okay.  So you were content with the universe of witness

4    statements you had as of the 9th of April to terminate

5    Mr. Bryson?

6    A    Yes.

7    Q    Isn't it true that the -- isn't it true that the question

8    that was asked to Mr. Bryson -- the series of questions that

9    were asked to Mr. Bryson were written in bold on the email?

10   Those are the questions that Mr. Grabowski asked?

11   A    Yes.

12   Q    Okay.  So if the question was, Gerald, did you call the

13   woman a stupid N-word, and Gerald's answer is, no, I don't

14   speak like that, isn't it possible that that reference was to

15   the fact that he would embellish the use of the N-word with

16   stupid and use it in a pejorative sense?

17   A    Can you ask the question again?

18   Q    Okay.  So the question that Mr. -- Mr. -- I'll -- I'll

19   change the question.  I'll clarify it.

20        The question that Mr. Grabowski asked Mr. Bryson was not

21   do you use the N-word, right?

22   A    I don't know the specific question that Mr. Grabowski

23   asked Mr. Bryson.  The notes reflect the questions that were

24   asked as -- as Tyler put them together.

25   Q    BY MR. KEARL:  So if I were to show you the question --



Exhibit E, Motion to Try Petition on Hearing Record

1    and I apologize.  I don't have the number, but this is -- you

2    recognize this document, right?

3    A    Yes.

4    Q    Okay.  So the question was not do you use the N-word,

5    correct?

6    A    Correct.

7    Q    Okay.  So when you viewed the Facebook Live video and

8    Gerald used the N-word in that video, he was not saying

9    something in contravention of his answer to his question in the

10   STU, correct?

11   A    The answer to the question is correct, but we used the

12   whole situation from beginning to end.

13   Q    Right.

14   A    Not just one particular word and one --

15   Q    I think you answered -- I think --

16   A    -- sentence and how it was used.

17   Q    I think I got the answer I was looking for.  So when you

18   were reviewing the Facebook Live video, did you catch the

19   moment where Gerald Bryson mentioned that he had been cussed

20   out, or the moment that he mentioned that the woman had started

21   the altercation, or the moment that he mentioned the woman had

22   called him a crackhead?  Did any of those pop up on your radar

23   at all?

24   A    I would need to review the video again.  No.  They did not

25   pop up on my radar.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Okay.  So it's fair to say you were just watching that

2   video to try to justify the termination of Mr. Bryson?

3   A    No.

4   Q    Okay.  But you weren't -- you weren't looking for evidence

5   that Ms. Evans had said anything, or evidence that maybe some

6   of the witness statements that you had in testimony might have

7   been incorrect.  You were just looking to try to assess the

8   credibility of Mr. Bryson and validate the charges that were

9   made against Mr. Bryson; is that fair to say?

10  A    No.

11  Q    Okay.  So -- so why then did you not take pause at his

12  mention of the fact that she had cussed him out and started the

13  altercation?

14  A    Both of those -- as I stated about Ms. Evans, we thought

15  it was probable that she played a role in the situation more

16  than she may have been forthcoming about in the initial

17  conversation, and that would include both of those statements

18  that you're referencing from Facebook Live.

19  Q    And none of that lack of, you know, integrity in her

20  statement had any bearing on your decision to actually lighten

21  the -- the discipline that she received from a final written

22  warning to a first written warning, correct?

23  A    Can you ask the question again?

24  Q    Yeah.  So none of the -- none of the -- the -- the -- her

25  lack of candor, let's say, in her communication with you and



Exhibit E, Motion to Try Petition on Hearing Record
1933

1     other members of the HR team through both her STU and her --

2     her written statement, that lack of candor that was clearly

3     corroborated in the Facebook Live video and in the witness

4     statements you had had no bearing on your decision of what

5     ultimate disciplinary action Amazon would take against her.

6     That's right?

7          MS. BUFFALANO:  Misstates the testimony.  Lack of candor?

8     I don't know that anyone has said that.

9          JUDGE GREEN:  Well, I don't know.  Do you understand the

10    question, Mr. Campbell?

11         THE WITNESS:  I don't.

12         JUDGE GREEN:  Okay.

13    Q    BY MR. KEARL:  Okay.  So you said that Mr. Bryson -- part

14    of the reason that he was terminated is because you felt that

15    his integrity was in question because you thought that he had

16    lied in his STU; whereas, when Ms. Evans lied in her STU, she

17    ends up getting a lighter sentence.  Can you -- can you square

18    that for me?

19         MS. BUFFALANO:  Objection.  It misstates his testimony.

20    He never said she lied.

21         JUDGE GREEN:  Well, you can answer it.  If you can answer

22    it, answer the question.

23         THE WITNESS:  All of the same evidence was used.  The same

24    STUs, the same conversations, the same videos were used to make

25    the decision about the application of policy and the discipline



1    for both Mr. Bryson and Ms. Evans.

2    Q    BY MR. KEARL:  Okay.  Is it common occurrence for you to

3    email Dave Clark (phonetic) about disciplinary actions?

4    A    No.

5    Q    Okay.  So when you emailed Dave Clark about the

6    termination of Gerald Bryson, that was out of -- out of the

7    normal course of business?

8    A    Yes.

9    Q    And can you just clarify for me who -- who Dave Clark is?

10   A    Dave Clark is the vice president in -- in the organization

11   in operations.

12   Q    Okay.  And do you interact with him on a daily basis?

13   A    I do not.

14   Q    On a weekly basis?

15   A    I do not.

16   Q    On a monthly basis?

17   A    I do not.

18   Q    Okay.  So it's a rare occurrence for you to reach out to

19   David Clark.  Why then would you reach out to David Clark about

20   Gerald Bryson and his termination?

21       MS. BUFFALANO:  Objection.  So I think we're getting into

22   sort of privileged information.

23       JUDGE GREEN:  No.  It does -- the question is just is --

24   Mr. Campbell's explanation for what he did.  That -- so far, we

25   don't have any -- I don't know.  We don't have any question



1    about what the actual communication was.

2         THE WITNESS:  To communicate our decision.

3    Q    BY MR. KEARL:  To terminate an hourly employee at the JFK

4    8 facility --

5    A    Yes.

6    Q    -- for vulgar -- for vulgar language?

7    A    Specifically for abusive and vulgar language.  Yes.

8    Q    Okay.

9         Mr. Campbell, can you just explain why you chose to -- to

10   contact Mr. Clark on this particular situation as opposed to

11   other circumstances where perhaps you didn't?

12        MS. BUFFALANO:  Okay.  I'm -- I'm going to object because

13   I -- this does get into privileged -- I -- I -- I can -- I know

14   he's having a hard time answering the question because he's not

15   sure what exactly he can share and what he can't.  So,

16   unfortunately, I think --

17        JUDGE GREEN:  I'll retract the question.  Go ahead,

18   Mr. Kearl.

19   Q    BY MR. KEARL:  Okay.  You also emailed Maurine Midgland

20   (phonetic) about the termination of Gerald Bryson on the 13th

21   of April, I believe.  Is that normal course of business to

22   email Maurine Midgland about the termination of an hourly

23   employee for a behavioral issue?

24   A    No.

25   Q    And -- and who is Maurine Midgland?



Exhibit E, Motion to Try Petition on Hearing Record
1938

1   A    I don't know Maurine's current title.  At that time, she

2   was, I believe, vice president of North American customer

3   fulfillment.

4   Q    Okay.  And you also emailed Kelly Cheisman (phonetic).  Is

5   that normal for you to do?

6   A    No.

7   Q    Okay.  And can you tell -- tell us how Kelly Cheisman is?

8   A    Yeah.  I don't know Kelly's exact title, but Kelly is --

9   at the time, I believe, Rachel Leity reported to her as part of

10  the PR team.

11  Q    Okay.  So she was -- she was above Rachel Leity in the PR

12  team?

13  A    Yes.

14  Q    Okay.  So it's fair to say then that Maurine Midgland and

15  -- and Kelly Cheisman are -- are higher up in the organization.

16  And so why did you email them about the termination of

17  Mr. Bryson on --

18       MS. BUFFALANO:  Objection for the same reason, that --

19       JUDGE GREEN:  Okay.  Sustained.

20       MR. KEARL:  Okay.

21  Q    BY MR. KEARL:  But you don't normally --

22  A    Right.

23  Q    -- email the head of PR or -- or -- or Ms. Midgland about

24  terminations.  Is that -- that's fair to say?

25  A    Yes.



1   Q    Okay.  But in this instance you did?

2   A    Yes.

3   Q    And you did on the 13th when it was -- when it was known

4   that you were going to terminate Mr. Bryson?

5        MS. BUFFALANO:  Objection.  These are all in the privilege

6   log, if that's what we want to -- if that's what you want to

7   point to, but I don't want him testifying about his

8   communications with counsel.

9        MR. KEARL:  Okay.  Well, then I'd like to just enter the

10  privilege log into exhibit so that I can speak to it in the

11  brief, so --

12       JUDGE GREEN:  Okay.

13       MR. KEARL:  -- it's Charging Party  Exhibit 9.  It's in

14  the SharePoint I believe.  I'm going to move for -- for

15  admission.

16       JUDGE GREEN:  Objection?

17       MS. BUFFALANO:  I'm just double checking on the answer to

18  that question.

19       MR. KEARL:  And there is one, it was a -- a PDF of an

20  Excel document.  There -- one of the cells is not complete.

21  It's a long list of CCs.  I don't know if you want us to put in

22  a different version that has that complete or not, but --

23       MS. BUFFALANO:  And which -- which line was it?  Bated

24  page?

25       MR. KEARL:  On Page 4.



1    MS. BUFFALANO:  So I'm going to ask for -- we don't have

2    any objection, per se, but I'm going to ask that this be

3    subject to the protective order given that it discusses, you

4    know, counsel and what kind of communications there are --

5    JUDGE GREEN:  Okay.  That's fine.  Yeah.  That's fine.

6    MR. MURPHY:  And that -- and, Judge, Mr. Murphy.  I just

7    got -- I'm kicked out to SharePoint, so I'm going to log back

8    in, if you can give me 30 seconds.

9    JUDGE GREEN:  Okay.

10   MR. MURPHY:  Sorry about that.

11   JUDGE GREEN:  It's the third iteration of the privilege

12   log.

13   MS. BUFFALANO:  I see what you're saying.  I see what

14   you're referring to.

15   MR. KEARL:  And -- and then so far as the document itself,

16   it does not actually have any information about what's

17   privileged.  It just sort of alludes to it.  I'm not sure why

18   it needs to be in the protective order, but --

19   MS. BUFFALANO:  So --

20   JUDGE GREEN:  Yeah.  I mean, it's kind of the purpose of

21   the -- the purpose of the privilege log is you're not

22   disclosing what's privileged.  But okay.  I'll put that in the

23   protective order.

24   MS. BUFFALANO:  Okay.  And -- and --

25   JUDGE GREEN:  Put it under the protective order.



1    MS. BUFFALANO:  -- the idea is that they're not included

2    in the exhibit, so does that need to be under seal?

3    JUDGE GREEN:  Why does it have to be under seal?

4    MS. BUFFALANO:  Well, because we don't want them to be

5    FOIA-able.

6    JUDGE GREEN:  The privilege log.

7    MS. BUFFALANO:  Right.

8    JUDGE GREEN:  Okay.  That's fine.

9    MS. BUFFALANO:  Thank you.

10    MR. KEARL:  Okay.

11   Q    BY MR. KEARL:  At any point, did you search the internet

12   for information about Mr. Bryson in the protests?

13   A    (No audible response)

14   Q    Let me -- let me help out.  Let me --

15   A    I think -- yeah.

16   Q    During the course of your investigation -- or I guess

17   before -- before Mr. Bryson was terminated on the 17th, did you

18   search for information about Mr. Bryson on the internet or

19   about the protests on April 6th?

20   A    I don't recall.

21   Q    Okay.  Did you search social media for information about

22   the protests?

23   A    I don't recall.

24   Q    Okay.  Did you do anything to seek additional information

25   outside of the universe of information that you already had?



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    No.

 2    Q    And were you involved in communication to try to identify

 3    other potential witnesses?

 4    A    No.

 5    Q    Were there conversations to try to identify additional

 6    witnesses?

 7    A    I was not a part of any.

 8    Q    Okay.  And would you have known if one of your

 9    subordinates had been instructed to do that by someone?

10    A    I would -- I would like to think that they would let me

11    know if someone instructed them to do something different on

12    any case where I'm involved.

13    Q    Okay.  And something different meaning looking or a

14    witness?

15    A    Something out of -- something out of line with what we've

16    spoken about.

17    Q    Okay.  So looking for a witness would have been something

18    that they wouldn't come to you for because it was not something

19    that you would do?

20    A    If someone else instructed them to do it is your question

21    asked.

22    Q    Yeah.  Okay.  And, you know, if -- if your -- if your

23    subordinates were -- were instructed to -- well, I guess let me

24    just start with:  were your -- were your subordinates on the HR

25    team tracking worker organizers?
```



Exhibit E, Motion to Try Petition on Hearing Record

1    A    No.

2    Q    If they were, and at someone else's instruction, would you

3    have known about it?

4    A    No.

5    Q    Okay.  And you -- yesterday, you alluded to the fact that

6    the -- the video on Facebook Live was sort of a continuation of

7    harassment, but in the executive summary, you make it very

8    clear that at no point did Mr. Bryson ever identify Ms. Evans,

9    so someone watching the video that -- that was posted online

10   would have no idea who he was referring to; is that correct?

11   A    No.  That's not correct.

12   Q    Okay.  So someone that just watched the Jordan Flowers

13   video would be able to identify Ms. Evans?

14   A    I guess using the word someone is where I am struggling

15   because if someone that was outside that day was watching it,

16   then yes, they would be able to identify it.

17   Q    Okay.  But they would be watching at -- at work then,

18   right?  That would -- that was probably frowned upon to watch

19   Facebook Live while in the facility; is that right?

20   A    I -- during this event it was actually a lunch break, so

21   many of the associates were on lunch.

22   Q    Okay.  So -- so someone that -- so in the universe of

23   people who would potentially be able to identify Dimitra Evans

24   would be associates who were outside during the 90-second

25   altercation who then went inside and watched the Facebook Live



Exhibit E, Motion to Try Petition on Hearing Record

1  video during the two minutes that Mr. Bryson talked about the

2  -- the debate, as he called it?

3      JUDGE GREEN:  Honestly, I really don't think we need this

4  from Mr. Campbell.  We can all make our decisions about --

5  about the video and what -- what people could discern from it.

6      MR. KEARL:  Okay.  Give me just one -- one second here.

7      I don't believe I have any other questions.

8      JUDGE GREEN:  Now, Ms. Buffalano, are you going to have

9  redirect?

10     MS. BUFFALANO:  Not -- not a ton, but unfortunately, I

11  just can't -- I -- I would stay, but I just cannot for --

12     JUDGE GREEN:  Okay.  All right.  So off the record.

13  **(Whereupon, the hearing in the above-entitled matter was**

14  **adjourned at 5:30 p.m. until 9:30 a.m. on May 26, 2021.)**

15

16

17

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1     <u>C E R T I F I C A T I O N</u>

2     This is to certify that the attached proceedings, via Zoom

3     videoconference before the National Labor Relations Board

4     (NLRB), Region 29, Case Number 29-CA-261755, Amazon.com

5     Services, LLC and Gerald Bryson, held at the National Labor

6     Relations Board, Region 29, Two Metro Tech Center North, 5th

7     Floor, Brooklyn, NY 11201, on May 25, 2021, at 2:39 p.m. was

8     held according to the record, and that this is the original,

9     complete, and true and accurate transcript that has been

10    compared to the reporting or recording, accomplished at the

11    hearing, that the exhibit files have been checked for

12    completeness and no exhibits received in evidence or in the

13    rejected exhibit files are missing.

14

15

16

17                                    _____

                                      BARRINGTON MOXIE
18                                    Official Reporter

19

20

21

22

23

24

25



OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services, LLC,          Case No.    29-CA-261755

                        Employer,

and

Gerald Bryson,

                  Petitioner.

_____

_____

Place: Brooklyn, New York (Via Zoom Videoconference)

Dates: May 26, 2021

Pages: 1860 through 1907

Volume: 14

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

| | |
|---|---|
| In the Matter of: | |
| AMAZON.COM SERVICES, LLC, | Case No.   29-CA-261755 |
| Employer, | |
| and | |
| GERALD BRYSON, | |
| Petitioner. | |

The above-entitled matter came on for hearing, via Zoom
videoconference, pursuant to notice, before **BENJAMIN GREEN**,
Hearing Officer, at the National Labor Relations Board, Region
29, Two Metro Tech Center North, 5th Floor, Brooklyn, NY 11201,
on **Monday, May 26, 2021 at 9:33 a.m..**

escribers

www.escribers.net | 800-257-0885

1        A P P E A R A N C E S

2    On behalf of the Employer:

3        CHRISTOPHER MURPHY, ESQ.
         JENNIFER MOTT WILLIAMS, ESQ.
4        RICHARD ROSENBLATT, ESQ.
         NICOLE BUFFALANO, ESQ.
5        KELCEY PHILLIPS, ESQ.
         MORGAN, LEWIS & BOCKIUS, LLP
6        300 South Grand Avenue
         22nd Floor
7        Los Angeles, CA 99071
         Tel. (213)612-7443
8        Email christopher.murphy@morganlewis.com
               nicole.buffalano@morganlewis.com
9              kelcey.phillips@morganlewis.com

10       JASON SCHWARTZ, ESQ.
         ZAINAB AHMAD, ESQ.
11       GIBSON, DUNN
         200 Park Avenue
12       New York, NY 10166-0193
         Email zahmad@gibsondunn.com

13
     On behalf of the Petitioner:
14
         FRANKL KEARL, ESQ.
15       MAKE THE ROAD NEW YORK
         161 Port Richmond Avenue
16       Staten Island, NY 10302
         Tel. (929)265-7692
17       Email frank.kearl@maketheroadny.org

18

19

20

21

22

23

24

25



1

<u>I N D E X</u>

2

3

| **WITNESS** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** | **VOIR DIRE** |
|---|---|---|---|---|---|

4    Bradley Campbell                          1865/1887    1879

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1   **E X H I B I T S**

2

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **Joint:** | | |
| J-1 | 1900 | Not Admitted |
| J-2(a) | 1900 | Not Admitted |
| J-3 | 1901 | Not Admitted |

Exhibit E, Motion to Try Petition on Hearing Record

1           **P R O C E E D I N G S**

2           JUDGE GREEN:  Okay.  So it's my understand that the

3      Respondent has some redirect for Mr. Campbell?

4           MS. BUFFALANO:  Yes.  And I -- do you want me to just

5      quickly tell you, Ms. Cox, about the CHIME with the Facebook

6      Live link?

7           MS. COX:  Yes.

8           MS. BUFFALANO:  So the -- it wasn't actually a CHIME

9      discussion.  It was a CHIME video call, and it was a CHIME

10     video call that was attended by at least one lawyer,

11     Kristen Larusa (phonetic), for the purpose of advising the site

12     and on the demonstration related legal questions, and there is

13     no document because CHIME video comments are not saved.  So

14     like a CHIME is saved, but CHIME video comments don't get

15     recorded anywhere.  It's kind of like when you're on Zoom if

16     you were to make a comment or like on WebEx or Teams; although,

17     Teams has a chat function.  But it's not a chat.  It's a -- so

18     on the right side of the video call there is typing, and that's

19     what it's from.  So there's no documents from the privilege

20     log, and the call itself was privileged.

21          MS. COX:  Okay.

22          MS. BUFFALANO:  Okay.  So I'm going to jump in so we

23     can --

24          JUDGE GREEN:  Yes.

25          MS. BUFFALANO:  Okay.  Okay.



Exhibit E, Motion to Try Petition on Hearing Record

1    **REDIRECT EXAMINATION**

2    Q    BY MS. BUFFALANO:  So, Mr. Campbell, I'm going to ask you

3    some questions this morning about the testimony that you gave

4    yesterday when you were asked questions by Ms. Cox and by

5    Mr. Kearl.

6        So you were asked yesterday some questions about the

7    evidence that you reviewed in the investigation.  Can you just

8    remind us, again, what evidence you reviewed?

9    A    Sure.  I reviewed the five witness statements, the seek to

10   understand notes from a conversation between Tyler Grabowski

11   and Gerald Bryson, the seek to -- the second set was seek to

12   understand notes of a conversation between Tyler Grabowski and

13   Dimitra Evans.  I reviewed two pieces of camera footage from

14   the building security cameras on the front of the building, and

15   I reviewed the Facebook Live broadcast as well.

16   Q    Okay.  Thank you.  And you were asked some questions

17   yesterday about whether Bryson had accused Evans of being

18   aggressive, instigating, and saying shut the F up.  Do you

19   remember those questions?

20   A    Yes.

21   Q    Okay.  And aside from Bryson stating in his seek to

22   understand that Ms. Evans was aggressive, for example, did you

23   have any reason top believe based on the other evidence that

24   you reviewed that Ms. Evans was aggressive during the

25   interaction?



1    A    No.

2    Q    And what evidence that you reviewed related to the

3    incident helped you understand whether Evans was aggressive or

4    not?  What helped you reach that conclusion?

5    A    Right.  Within the witness statements -- well, everyone

6    aligned on the comments made about drug usage.  One other

7    recurring theme in those statements was that Ms. Evans was --

8    was never pointed out as the aggressor or the instigator.

9    Mr. Bryson was always framed in that reference in those witness

10   statements.

11       Again, reviewing the video, you see some physical motion,

12   but I think that that can be interpreted a multitude of ways,

13   so it really didn't conclude that she -- that she was

14   aggressive or threatening Mr. Bryson in any way.

15   Q    Okay.  And you were asked questions about Mr. --

16   Mr. Bryson's response in the STU with Mr. Grabowski about --

17   the question about the use of the N-word.  Do you remember that

18   -- those questions?

19   A    Yes.

20   Q    Okay.

21       MS. BUFFALANO:  So I'm going to ask, Ms. Bagley

22   (phonetic), if you're out here, can you show us Respondent's

23   Exhibit 18?  Thank you.  And then if you scroll down to Page --

24   to the -- where you see the bold headings.  I think it's Page

25   4.  Okay.  And this is the top of the next page.  Okay.  So go



Exhibit E, Motion to Try Petition on Hearing Record

1    down one more page and just -- oh, yeah.  There you go.  Okay.

2    Q    BY MS. BUFFALANO:  And so you see the first bold heading

3    here?

4    A    Yes.

5    Q    And under it, it says -- sorry.  Thank you.

6         And under it, it says, "Gerald stated he would not say

7    this as he is black."  Do you see that?

8    A    Yes.

9    Q    And what did you understand that to mean?

10   A    I understood that to mean that -- that Gerald would --

11   would not have called her the N-word because he, himself, is a

12   black man.

13   Q    Okay.  And can --

14        MS. BUFFALANO:  You can take this down now, Ms. Bagley.

15   Thank you.

16   Q    BY MS. BUFFALANO:  And what would your -- what -- what's

17   your understanding of the bold headings again?

18   A    Those are questions that were asked by Mr. Grabowski.

19   Q    Okay.  Do you have any -- do you know whether

20   Tyler Grabowski read them to Mr. Bryson or whether he showed

21   them to Mr. Bryson?

22   A    I do not know.

23   Q    Okay.  And -- and let me -- so now I'm going to switch

24   topics.  So you had some questions about identifying witnesses

25   to the event.  Do you recall that question -- those questions?



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    Yes.

 2    Q    And in this case, were you involved in identifying

 3    witnesses to the event?

 4    A    No.

 5    Q    Do you know who was?

 6    A    I do not.

 7    Q    And are you typically -- in cases that are escalated to

 8    you, are you typically involved in locating witnesses?

 9    A    I am not.

10    Q    Or identifying witnesses?

11    A    I am not.

12    Q    Do you know who -- in cases that are escalated to you, do

13    you know who typically does identify witnesses?

14    A    It would -- it -- usually, the -- the claimant that comes

15    forward identifies witnesses as well as, you know, witnesses

16    may come up in the -- in the witness statements as well, but

17    it's primarily the function of the site team that's leading the

18    investigation.

19    Q    Okay.  And were you aware of the identities of anyone

20    present at the April 6th incident that wasn't interviewed?

21    A    No.  I am not.

22    Q    And you were also asked some questions about whether or

23    not you searched social media related to this incident.  Do you

24    remember that?

25    A    Yes.
```



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    And you -- you testified that you did not search social

2   media related to this incident, right?

3   A    Yes.

4   Q    And do you typically search -- in cases that are escalated

5   to you, would you typically search social media for additional

6   evidence?

7   A    No.  That is not my role to search social media or the

8   web.  It's for additional evidence or witnesses or anything.

9   Q    Okay.  And you were asked a few questions yesterday about

10  -- I'm going to use this word, but inconsistencies in witness

11  statements.  Do you recall those questions?

12  A    Yes.

13  Q    And in your experience in HR, do witnesses typically

14  recollect events in the same way?

15  A    They do not.  And in this particular instance, looking at

16  the incident that happened, we know that Mr. Bryson was using

17  the bullhorn.  We know that there was -- there was a lot of

18  activity with associates coming in and out of the building due

19  to lunch.  I think that it's -- there was a lot -- there was

20  just a lot of activity in the incident as well, but I would

21  never expect each witness to the incident to have exactly the

22  same recollection or to have heard exactly the same words.

23       Especially if we review the security cameras, you can see

24  Mr. Bryson going -- moving along the crosswalk in the parking

25  lot and even directing the megaphone or, I think, potentially



# Exhibit E, Motion to Try Petition on Hearing Record

1  his voice in different directions.

2  Q    Did you -- did you view the witness statements as

3  inconsistent?

4  A    I did not.

5  Q    And did the witness statements -- the -- the fact that the

6  witnesses didn't recall exactly the same word being used, did

7  that give you any -- any concern about the quality of the

8  investigation that Mr. Grabowski had done?

9  A    It did not I think specifically because there was

10  alignment between at least one witness and Ms. Bryson's account

11  of the events.  Again, we didn't --

12  Q    You mean -- you mean Ms. Evans?

13  A    Ms. Evans, I'm sorry.  Yes.  We didn't include it --

14  Q    That's all right.  We've been here a long time.

15  A    I know.  We didn't include those in that final summary.

16  How -- we only included the things that were -- that were

17  confirmed by multiple witnesses and/or all of them.  But I --

18  you know, again, it goes to show that aligning with the

19  statement, we always had at least one witness that -- that

20  heard the same thing that -- that Ms. Evans heard.

21  Q    Okay.  And you were asked some questions about the

22  Facebook Live video and who would have seen the Facebook Live

23  video.  Do you remember those questions?

24  A    Yes.

25  Q    How many times did you watch the Facebook Live video



1    during your investigation?

2    A    I watched it as it was streaming.  I know I watched it --

3    or portions of it -- two or three additional times during the

4    investigation.

5    Q    And those two or three additional times, how did you

6    access it?

7    A    I accessed it through -- through the link -- through the

8    link.  There was a -- there was an email sent later -- that's a

9    normal PR process -- reviewing mentions, if you will, of

10   Amazon, and I used, I believe, that link at times.

11   Q    Okay.  So the Facebook Live video was available after it

12   was -- went live -- after it went live; is that right?  You

13   were able to access it after it was live?

14   A    Yes.  I believe it was accessed -- I believe it was a link

15   to the -- to the make the -- Make the Road New York webpage

16   where it was posted publicly.

17   Q    Okay.  Okay.  Do you know if it's still there?

18   A    I do not.

19   Q    Okay.  You were asked some questions about the timing of

20   Mr. Bryson's badge suspension.  Do you recall those questions?

21   A    Yes.

22   Q    And do you recall the date when you made that decision to

23   suspend Bryson's badge?

24   A    I don't recall the exact date.  I know it followed the

25   conversation with Mr. Gilbert Differ (phonetic).



1    Q    Okay.  And -- and so -- and that was going to be my next

2    question to you was:  do you know -- you -- you -- you recall a

3    WIN (phonetic) report, right?

4    A    Yes.

5    Q    Do you recall when you had the conversation with

6    Mr. Gilbert Differ vis-a-vi the WIN report?

7         MS. COX:  Objection.  Vague.

8         JUDGE GREEN:  Overruled.

9         MS. BUFFALANO:  Okay.  I'll ask --

10        JUDGE GREEN:  Okay.  You want to ask again?

11   Q    BY MS. BUFFALANO:  Do you recall when -- so you -- do you

12   remember when you get the WIN report?

13   A    I don't remember the date, but I remember --

14   Q    Okay.

15   A    -- receiving it.  Yes.

16   Q    The -- okay.  In the conversation that you had with him

17   about the suspension, was it before or after you saw the WIN

18   report?

19   A    I don't -- I don't recall.

20   Q    Okay.  How long after Mr. Gilbert Differ gave you his

21   recommendation on the suspension did you make the decision to

22   suspend?

23   A    I made the decision in the conversation.

24   Q    Okay.  Okay.  And you were asked some questions on

25   cross-examination about when you formulated your recommendation



1    to terminate Mr. Bryson.  So I'm going to ask you, again, a few

2    questions about that.  So when did you recommend that

3    Mr. Bryson be terminated?

4    A    On April 16th.

5    Q    Okay.  And did you recommend that Mr. Bryson be terminated

6    before April 16th?

7    A    No.

8    Q    And the decision to terminated Mr. Bryson, when was that

9    made?

10   A    On April 16th.

11   Q    And was it made before April 16th?

12   A    No.

13   Q    Okay.  So if you could take a look at --

14        MS. BUFFALANO:  I'm going to ask -- I'm going to ask,

15   Ms. Bagley, if you could pull up Respondent's 18 again.  And

16   then scroll down to the bottom of the first page.  Thank you.

17   Q    BY MS. BUFFALANO:  So you'll see here, Mr. Campbell --

18   about this April 10th email, and he says -- "Let me know your

19   thoughts," is how the paragraph starts.  And the paragraph

20   ends, "I have included potential feedback verbiage if the

21   situation does progress to that point."

22   A    Yes.

23        MS. COX:  Objection, Your Honor.  The document speaks for

24   itself.

25        JUDGE GREEN:  Okay.



1    MS. BUFFALANO:  I'm -- I'm asking a question.

2    JUDGE GREEN:  Oh, good.  Go ahead.

3    MS. BUFFALANO:  That I -- that I know of.

4    Q    BY MS. BUFFALANO:  So my question is:  what does that --

5    what did you understand that to mean?

6    A    Tyler had drafted the potential termination language if we

7    -- if following this STU we were at a point to actually make

8    the recommendation of termination.  At the end of this STU, we

9    were still not at that point because we had additional

10   follow-up with Ms. Evans following this STU with Mr. Bryson.

11   Q    Okay.

12   MS. BUFFALANO:  And you can take this down, Ms. Bagley.

13   Thank you.

14   Q    BY MS. BUFFALANO:  Okay.  So had you decided to recommend

15   termination at this point --

16   A    No.

17   Q    -- the April 10th email from Tyler?

18   A    No.  I had not.

19   Q    And had the decision been made at this point to terminate

20   Mr. Bryson?

21   A    No.  It had not.

22   Q    Okay.  So I'm going to ask you take a look at Exhibit --

23   MS. BUFFALANO:  -- General Counsel's Exhibit 25, Ms.

24   Bagley.  It's a -- well, I won't tell you.  You'll see it.

25   MS. BAGLEY:  25?



Exhibit E, Motion to Try Petition on Hearing Record

1    MS. BUFFALANO:  Yes.  Thank you.

2    MS. BAGLEY:  I'm not seeing a General Counsel 25.

3    MS. BUFFALANO:  Okay.  We also have it in the --

4    MR. MURPHY:  Hold on -- hold on, Nicole.  I know where it

5    is.  Claire (phonetic), it's on the last page of the General

6    Counsel exhibits.  Apologies for breaking in.

7    MS. BUFFALANO:  Thank you.

8    Q    BY MS. BUFFALANO:  Okay.  So yesterday you were asked some

9    questions about versions of this document, so I'm going to ask

10   you some questions about that testimony.

11   Okay.  How many versions -- and I know you testified you

12   didn't know how many versions there were of this document, but

13   how many versions of this document were actually used?  And by

14   that, I mean actually made it beyond the drafter of the

15   document?

16   MS. COX:  Objection.  Vague.

17   JUDGE GREEN:  If you understand the question, you can

18   answer it.

19   Q    BY MS. BUFFALANO:  And if you don't, I can ask it again a

20   different way.  Do you want me to do that?

21   A    Yes.

22   MR. KEARL:  I'll just raise a --

23   MS. BUFFALANO:  Okay.

24   MR. KEARL:  -- a Bannon Mills objection here.  We never

25   received any other copies of this document, so I ask that we



Exhibit E, Motion to Try Petition on Hearing Record

1    curtail this line of questioning.

2        JUDGE GREEN:  Okay.

3    Q    BY MS. BUFFALANO:  So -- here's the question,

4    Mr. Campbell:  how many versions of this document were actually

5    used?

6    A    One.

7    Q    And is it this version, or is it a different version?

8    A    It's this version.

9    Q    Okay.  And I'm going to direct your attention to the

10   fourth line of this document that says, "By his own admission,

11   Bryson escalated the altercation by calling Ms. Evans a B."  Do

12   you see that line?

13   A    I do.

14   Q    Okay.  And can you tell us -- so you said -- it says, "by

15   his own admission," and then goes on.  Can you tell us what is

16   meant by that?

17   A    Yes.

18       MS. COX:  Objection.  Foundation.  He didn't write this

19   document.

20       JUDGE GREEN:  Overruled.

21       THE WITNESS:  Can you point out where the line is again

22   just so I can focus on it?

23       MS. BUFFALANO:  Yeah.  Oh, thank you, Claire.

24       THE WITNESS:  I've got it.  Thank you so much.

25       Yes.  This sentence meant that his admission of calling



Exhibit E, Motion to Try Petition on Hearing Record

1    Ms. Evans a B-word on a bullhorn and accusing her of drug -- of

2    drug use, not his own admission of escalating the altercation.

3    Q    BY MS. BUFFALANO:  Okay.

4    A    It -- it was his actions -- it was his actions of using

5    that word, using a bullhorn, and the accusations of drug use

6    that escalated the situation.

7    Q    Okay.  Thank you.

8         MS. BUFFALANO:  Okay.  And can we, Judge, go off the

9    record for a minute just to make sure that nobody has any

10   additional questions -- or that I don't have any additional

11   questions.

12        JUDGE GREEN:  Off the record.

13   (Off the record at 9:53 a.m.)

14        MS. BUFFALANO:  Respondent does not have any further

15   redirect for Mr. Campbell.

16        JUDGE GREEN:  Okay.  So, Mr. Campbell, I just have a

17   couple of questions for you very briefly.  Am I right that

18   there is an Amazon team that monitors Facebook posts of

19   employees?

20        THE WITNESS:  There is a Facebook team that does monitor

21   social media.  I don't know specifically if -- if -- I -- I --

22   I don't know specifically how they work or what their process

23   is, Judge.

24        JUDGE GREEN:  Okay.  Well, that was going to be my next

25   question, so you -- you answered that.  Do you know whether the



1    team is in public relations?  Are they -- do they fall within

2    the -- the -- the department of public relations?

3        THE WITNESS:  I don't know for sure.

4        JUDGE GREEN:  Okay.  Well, it was -- was it public

5    relations that advised you that Mr. Flowers was doing a

6    Facebook Live broadcast of the protest?

7        THE WITNESS:  Yes.  And in our normal partnership, that's

8    a -- that's a very common occurrence just, again, to be

9    notified of any media, especially if it's pertaining to an

10   individual site, so that I have awareness of that media.

11       JUDGE GREEN:  Okay.  The answer to this is probably you

12   don't know, but I guess I'll ask.  There's been another tape

13   recording, another Facebook Live recording entered into

14   evidence in this case, and it sounds like public relations

15   identified the recording of Mr. Flowers but didn't identify the

16   recording -- the -- the second recording.  Do you have any idea

17   why that would happen, why -- why the company would be able to

18   identify one but wouldn't be able to identify the other?

19       THE WITNESS:  I do not.

20       JUDGE GREEN:  Okay.  All right.  No further questions from

21   me.

22       Anything from the General Counsel?

23       MR. KEARL:  You're on mute.

24       MS. COX:  I said, yes, Judge.  Can I get just five

25   minutes?



```
 1        JUDGE GREEN:  Off the record.

 2    (Off the record at 9:57 a.m.)

 3        JUDGE GREEN:  Back on the record.

 4        MS. COX:  And, Judge, before I begin the recross, I just

 5    want to reiterate that Respondent has failed to produce

 6    documents.  This document that Mr. Campbell just testified to,

 7    the emails from public relations with the Make who -- Make the

 8    Road New York Facebook video link was not produced.  Respondent

 9    has not filed a special appeal.  They've not filed their Bannon

10    Mills motion, and they failed to produce this document, so

11    we're moving for an adverse inference of animus and we are also

12    asking that his testimony be stricken on this matter.

13        MS. BUFFALANO:  There is not -- this -- this document -- I

14    don't -- I probably don't need to tell you this, but this

15    document doesn't exist, so if -- if his recollection is not

16    accurate, then that's what's going on, but there is no such

17    document, so that's why that wasn't produced, and we are filing

18    our special appeal, and we are -- well, listen.  There was a

19    settlement offer made this morning, so it may obviate the need

20    for the rest of the documents we're talking about here.

21        JUDGE GREEN:  Okay.  Well, I'm not ruling on that request

22    right now, so do we have any recross?

23        MS. COX:  Yes.

24                        RECROSS-EXAMINATION

25    Q    BY MS. COX:  Mr. Campbell, you reviewed the surveillance
```



Exhibit E, Motion to Try Petition on Hearing Record

1    video during the investigation, right?

2    A    Yes.

3    Q    And you recall that the surveillance video showed that

4    Mr. Bryson remained in the crosswalk the entire time?

5    A    I would have to look at the video again to validate that.

6    Q    Okay.  I will show you.  Give me one moment.

7         MS. BUFFALANO:  Can't the video show what it shows?

8         JUDGE GREEN:  Yeah.  So --

9         MS. BUFFALANO:  I -- I'm not -- I turn into a pumpkin, so

10   I just -- at 7:45.

11        JUDGE GREEN:  Do we have a -- do we have a need to show

12   him the video, or are you going to have questions, or are you

13   just asking him to confirm what's in the video?

14        MS. COX:  Asking him to confirm what's in the video.

15        JUDGE GREEN:  Okay.  We're not doing that.

16        MS. COX:  Okay.

17   Q    BY MS. COX:  You testified about -- the Judge asked you

18   some questions about the group that monitored employees'

19   Facebook posts.  Do you remember that?

20   A    Yes.

21   Q    Okay.  What interactions do you have with that team?

22   A    None.

23   Q    Have you ever had any interaction during the course of

24   your employment with that team?

25   A    I have not.



Exhibit E, Motion to Try Petition on Hearing Record
1988

1    Q    Do you know the names of any persons that work on that

2    team?

3    A    I do not.

4    Q    And can you just tell me again who was the public

5    relations person that contacted you with the Facebook video?

6    A    Rachel Lighty.  L-I-G-H-T-Y is the last name.

7    Q    Did you deal with anyone else from public relations with

8    regard to the Bryson matter?

9         MS. BUFFALANO:  Objection.  This is beyond the scope of

10   the cross -- or the redirect.

11        MS. COX:  The -- Judge, you asked questions about it.

12        MS. BUFFALANO:  Yeah.  But now we're getting pretty far

13   afield of what the Judge asked.

14        JUDGE GREEN:  What -- what was the question.

15        MS. COX:  Did he deal with anyone else from public

16   relations on the Bryson matter.

17        JUDGE GREEN:  Okay.  Overruled.

18        THE WITNESS:  Kelly Cheisman (phonetic)

19   Q    BY MS. COX:  And was there anyone else?

20   A    No.

21   Q    How do you know that the -- the group that monitors

22   employee Facebook -- Facebook pages exists?

23        MS. BUFFALANO:  Your Honor, is this relevant?

24        JUDGE GREEN:  Okay.  If you know -- overruled.  If you

25   know.  I mean, if you remember.



```
1    THE WITNESS:  I don't know that -- I don't know that
2    Facebook pages are exactly what they're monitoring.  I have
3    seen TikTok videos, for example.  But I --
4    Q   BY MS. COX:  Okay.  Uh-huh.  Go ahead.
5    A   But I don't know that they came directly from that team.
6    Q   And so who did you receive TikTok videos from?
7        JUDGE GREEN:  Okay.  So we don't need to go there.
8        MS. COX:  Well, Judge, he's receiving social media --
9        JUDGE GREEN:  No.  We're not going there.  I've heard
10   enough about that.  But, yeah, I mean, if you want to ask the
11   original question -- Mr. Campbell, you know, obviously, you
12   know that there's a team out there that monitors Facebook
13   posts.  Do you -- do you recall how you -- how you first
14   learned about the team?
15       THE WITNESS:  I do not.
16       JUDGE GREEN:  Okay.  Thank you.
17   Q   BY MS. COX:  Do you -- do you recall the circumstances
18   under which you get employees' social media posts?
19   A   Yes.
20   Q   Okay.  Under what circumstances do you receive employees'
21   social media posts?
22   A   I would receive it from PR in the same manner that I
23   received a video to alert me that the post is out there.
24   Q   And what are you expected to do with that information?
25   A   It -- it -- most often, nothing.
```



www.escribers.net | 800-257-0885

1    MS. COX:  Judge, I believe I had nothing further.

2    JUDGE GREEN:  Mr. Kearl, do you have anything?

3    MR. KEARL:  Yes, I do, Judge.

4    Q    BY MR. KEARL:  So, Mr. Campbell, yesterday you testified

5    that you knew termination was the likely outcome as early as

6    the 9th of April.  Do you recall that?

7    A    Yes.

8    Q    Okay.  And you testified just now that in the STU language

9    that you pre-approved for Mr. Grabowski you also pre-approved

10   termination language for the STU; isn't that correct?

11   A    I did not state that I pre-approved termination language.

12   Q    Okay.  So but you -- you pre-approved the language of

13   Mr. Grabowski's STU; is that correct?

14   A    Yes.

15   Q    Okay.  And in that language was termination language,

16   correct?

17   A    Yes.

18   Q    Okay.  So you approved termination language in it -- in --

19   in anticipation -- or in advance of the STU with Mr. Bryson,

20   correct?

21   A    No.

22   Q    Okay.  So you approved the language, and you approved

23   Mr. Grabowski to carry that on, and you testified that

24   Mr. Grabowski was prepared to issue that termination provided

25   the STU went a certain way.  So -- so you had -- you had -- you



Exhibit E, Motion to Try Petition on Hearing Record

1    were giving him the authorization to make that determination?

2        MS. BUFFALANO:  Objection.  That completely misstates the

3    testimony.

4        JUDGE GREEN:  I think we need that --

5        MS. BUFFALANO:  It does.

6        JUDGE GREEN:  -- broken down a little bit.

7        MR. KEARL:  Okay.

8    Q    BY MR. KEARL:  So the -- the STU language that was

9    approved by you included termination, correct?

10   A    The -- the email that I received included STU language and

11   a draft of the termination language.

12   Q    Right.  And the understanding was that if the STU went a

13   certain way, that termination language would be delivered,

14   correct?

15   A    No.  Not that specific termination language.

16   Q    Okay.  Hold on one second.  I can pull up this document

17   and -- give me one second.  And, again, I apologize.  I don't

18   know the exhibit number, but --

19       JUDGE GREEN:  Is there some reason why you can't just

20   assert in the brief that there's some kind of disparity between

21   Mr. Campbell's testimony and what's in the exhibit?

22       MR. KEARL:  Yes.  Because Mr. Campbell testified this

23   morning that he had not approved any termination until the

24   17th, but in the email exchange he authorizes --

25       JUDGE GREEN:  Okay.  So is that -- is that in the email?



Exhibit E, Motion to Try Petition on Hearing Record

1    Would you be able to argue that from the emails?  Because we've

2    -- we've looked at this document a lot.

3         MR. KEARL:  Okay.  I mean, I -- I do have -- okay.

4    Q    BY MR. KEARL:  So -- so had you approved that termination

5    language with someone from operations in advance of the standup

6    communication or the -- sorry, the seek to understand

7    communication?

8    A    No.  I had not.

9    Q    Okay.  You testified yesterday that you're not a decision

10   maker and that all termination decisions have to go through

11   operations, correct?

12   A    Right.  Which is why I'm saying that I did not approve the

13   termination language that was sent to me in the draft email

14   along with the STU.

15   Q    Okay.  So -- so -- okay.  So when Mr. Grabowski says, "I

16   have included potential feedback verbiage," and that feedback

17   verbiage includes the -- "This feedback has resulted in

18   separation of employment," and your response is, "I think that

19   is good," you're -- you're going to stand by your testimony

20   that you did not authorize Mr. Grabowski to deliver termination

21   language should the STU --

22        MS. BUFFALANO:  I think you have to show him the document.

23   Show him the document.  You can't --

24        MR. KEARL:  Can I show him the document or --

25        MS. BUFFALANO:  You're -- you're trying to trick him.



Exhibit E, Motion to Try Petition on Hearing Record

1       JUDGE GREEN:  I mean, go ahead.  His -- you're just asking

2  him to -- you're just asking him to confirm what's in the

3  document.  This is an argument.  This is an argument you could

4  be making in the brief.

5       MR. KEARL:  Okay.  I mean, I think it goes to the

6  credibility if Mr. Campbell yesterday said --

7       JUDGE GREEN:  You can -- it -- it may, but that's a

8  distinction that you can raise in the brief.  You can say that

9  Mr. Campbell testified to X and them the document says Y.  You

10  can assert that that impacts his credibility.  We don't -- we

11  simply don't -- I can't keep telling you people this.

12       MR. KEARL:  Okay.

13  Q    BY MR. KEARL:  Mr. Campbell, who did you talk with last

14  night and what did you review in anticipation of this -- this

15  conversation we're having this morning?

16  A    I did not speak with anyone outside of my spouse, and I

17  did not speak about this at all.

18  Q    Okay.

19       MR. KEARL:  Can we go off the record for just a -- a

20  couple minutes before I -- I close my --

21       JUDGE GREEN:  Off the record.

22  (Off the record at 10:23 a.m.)

23       HEARING OFFICER PARNELL:  Okay is there any redirect?

24       MS. COX:  No, Judge.

25       MS. BUFFALANO:  Yeah.  I just have a couple --



Exhibit E, Motion to Try Petition on Hearing Record

1     MS. COX:  Oh, sorry.

2     MS. BUFFALANO:  I just have a couple of questions.

3     THE COURT REPORTER:  Can we go back for a second?  I

4     didn't get Mr. -- hold on for a second.

5     MS. BUFFALANO:  Oh, sorry.

6     THE COURT REPORTER:  I didn't get Mr. Kearl's response on

7     the record.

8     MR. KEARL:  Oh.  Okay.  No -- no further questions.

9     THE COURT REPORTER:  Thank you.

10    MR. BOLZ:  Okay.  So from the Respondent?

11    MS. BUFFALANO:  I just a -- a handful of questions.

12                    **REDIRECT EXAMINATION**

13    Q    BY MS. BUFFALANO:  Mr. Campbell, I know you answered this

14    question, but where was this Facebook -- the Flowers Facebook

15    Live video posted?

16    A    I believe it was posted on the Make the Road New York

17    webpage -- home page.

18    Q    Okay.  And Make the Road New York is not an employee

19    Facebook page, right?

20    MR. KEARL:  Objection.  Relevance.

21    JUDGE GREEN:  I don't need this.  This is about

22    Mr. Flowers?

23    MS. BUFFALANO:  Well, you -- you were asking was it -- why

24    he would know about Make the Road New York and not about a

25    personal Facebook page, so I'm just --



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Oh, okay.

2      MS. BUFFALANO:  -- putting into evidence that it wasn't a

3  personal Facebook page.  It was Make the Road New York.

4      JUDGE GREEN:  Okay.  Overruled.

5  Q    BY MS. BUFFALANO:  Are you -- do you actually know what

6  social media posts -- and I mean, do you actually know that PR

7  or there's -- do you actually know that someone is reviewing

8  employees' social media posts?

9  A    No.

10 Q    And are you aware of a -- a team at Amazon that monitors

11 employees' social media posts?

12 A    I'm aware of a team.  I don't -- I believe -- I would stay

13 they -- they monitor social media.  I can't confirm employees'

14 posts.

15 Q    Okay.  Just a couple of questions on a different topic.

16 You were asked questions about the email where you confirmed --

17 between you and Tyler and Christine where you confirmed the

18 questions that Tyle intended to ask in STU, and it included

19 feedback language.  Do you remember that?

20 A    Yes.

21 Q    Okay.  So in your email response to Mr. Grabowski, or at

22 any time before he did the STU with Mr. Bryson, did you approve

23 term language for Mr. Bryson?

24 A    No.

25 Q    Did you authorize Mr. Grabowski to terminate or deliver



www.escribers.net | 800-257-0885

1   the feedback to Mr. Bryson on April 10th if the STU went any

2   particular way?

3   A    No

4       MS. BUFFALANO:  And I'm going to ask, Ms. Bagley, if you

5   can just put up Respondent 18, and this is my last question.

6   And just scroll down to the middle email there,

7   Bradley Campbell, and if you could make it the top so he can

8   see.  Okay.

9   Q    BY MS. BUFFALANO:  So, Mr. Campbell, you'll see here --

10      MR. KEARL:  Objection.  Document speaks for itself.  I

11   wasn't allowed to show --

12      MS. BUFFALANO:  I'm asking him a question about -- I'm

13   asking him a question about what he meant.  It's clear that

14   Mr. Kearl has -- has indicated on the record that he believed

15   what Mr. Campbell meant when he said, "I think that is good,"

16   so I think Mr. Campbell should have the opportunity to say what

17   he -- he meant by that.

18      MR. KEARL:  I was not allowed to ask questions about it

19   and was told to direct that to the papers, and I think that

20   that's appropriate her as well.

21      MS. BUFFALANO:  Well, you weren't asking him about what it

22   meant.  You were just telling him what it said.  I -- I --

23   that's what I understand the Judge's issue to be.

24      JUDGE GREEN:  Yep.  That's what I understood also.  I

25   mean, I don't think it particularly matters what he -- what he



1   meant.  You know, do we care given what's in the document?

2        MS. BUFFALANO:  Well, there's obviously a disagreement

3   about what he meant, so I -- I think it's -- you know,

4   whether --

5        JUDGE GREEN:  Okay.  Overruled.

6        MS. BUFFALANO:  -- or not he meant --

7        JUDGE GREEN:  Overruled.

8   Q    BY MS. BUFFALANO:  So, Mr. Campbell, as you see, you said,

9   "I think that is good."  And take whatever time you need to

10  review the document, but my question to you is: what are you --

11  what did you mean when you said to Mr. Grabowski, "I think that

12  is good"?

13  A    I'm referencing I think that is good to mean that I think

14  the questions that he was proposing for the STU are good.

15  Q    Okay.  Thank you.

16       MS. BUFFALANO:  Can you just give me one -- one minute --

17       JUDGE GREEN:  Off the record.

18       MS. BUFFALANO:  -- off the record.

19  (Off the record at 10:34 a.m.)

20       JUDGE GREEN:  Back on the record.

21       MS. BUFFALANO:  No further questions.

22       JUDGE GREEN:  Okay.  Any recross on that?

23       MS. COX:  No, Judge.

24       JUDGE GREEN:  Kearl -- Mr. Kearl?

25       MR. KEARL:  No.



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1944 of 2171 PageID #: 1891

1    JUDGE GREEN:  Okay, Mr. Campbell.  You're free to go.

2    Thank you very much.

3    THE WITNESS:  Thank you.

4    MS. BUFFALANO:  And -- and thank you all very much for

5    starting early today.  I appreciate it.

6    JUDGE GREEN:  So --

7    MR. MURPHY:  I'm sorry, Your Honor.

8    JUDGE GREEN:  No, go ahead.

9    MR. MURPHY:  Your Honor, Mr. Murphy.  I am going to ask

10   that you adjourn the hearing for the rest of the day for -- for

11   a couple of reasons.  There are a couple of issues that have

12   arisen on our end that -- that relate to our prosecution of the

13   case, and we need to address those with our client.  It's been

14   extremely difficult to do that given the -- the time

15   difference, and the -- and the working hours that we've been

16   putting in, and -- so that -- that would be a -- a tremendous

17   benefit to us.

18   And -- and more importantly, early this morning, we

19   received a -- a -- a furthering of our discussions about the

20   resolution of the case.  We have not had a chance to review

21   that with our client.  I think we're at the point in the case

22   where this is either going to be done or not done.  And -- and

23   we would request that we get a continuance for the rest of the

24   day to address those two -- those two issues, but -- but

25   importantly to rule in or rule out whether we're going to be



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    able to resolve this case in some fashion.

2          MS. COX:  Judge Green --

3          JUDGE GREEN:  Okay.

4          MS. COX:  -- as you know, we strenuously oppose this

5    adjournment request.  We've subpoenaed Ms. Hernandez.  She's

6    obligated to appear today.  The parties can continue their

7    negotiations after Ms. Hernandez's testimony.  If that -- if

8    those negotiations fall apart, we would have waisted all of

9    today.

10          MR. MURPHY:  If --

11          JUDGE GREEN:  So let me ask.  Let just ask a couple of

12    questions.  So I really have very limited availability the next

13    two days.  So --

14          MR. MURPHY:  The next what, Judge?  I didn't hear you.

15          JUDGE GREEN:  The next two days -- the next two days.  So

16    it's not clear to me that if we don't finish today we are in a

17    position to finish at all.  Let me just -- so I -- you know, it

18    sounded like Ms. Buffalano has conflicts next week.  You --

19    you, Mr. Murphy, have conflicts next week.  It's not clear to

20    me that we're going to be able to finish next week, and once we

21    get past the 3rd, we're in a situation where it's not clear

22    when we can reconvene.

23          MR. MURPHY:  Yeah.

24          JUDGE GREEN:  So, you know, I'm -- we have -- if

25    Ms. Hernandez is teed up today, I am depending upon getting



www.escribers.net | 800-257-0885

1    that done.

2         MR. MURPHY:  Yeah.  And -- and, Judge, I just need to

3    clarify one thing.  I think I said yesterday that I was gone on

4    the 4th.  It's actually Friday, the 5th.  So let me just make

5    sure here.

6         Friday, the 4th.  Right.  So I'm -- yeah.  So I'm good

7    through the 3rd.

8         JUDGE GREEN:  So if we're -- you know, I mean, I don't

9    know -- I don't know what -- what conflicts Ms. Buffalano had.

10   She -- I believe she had some conflict.  I did write those

11   somewhere, but I -- I can't really --

12        MR. KEARL:  Judge, I'm available on the 1st and the 3rd

13   and the 31st is a holiday, and the 2nd -- I -- I could be

14   available in the afternoon, but --

15        MS. REIBSTEIN:  Your -- Your Honor, the -- you know, it's

16   10:30.  We were all set to go with Ms. Hernandez.  This could

17   be the end, and it's -- it's difficult to get everyone

18   available on the same days.  Your availability is limited.  We

19   need to finish this.  We really oppose this last-minute --

20        JUDGE GREEN:  Yeah.  It would have been helpful if the --

21   if the General Counsel had agreed to go forward with

22   Mr. Campbell rather than asking for an adjournment at the end

23   of the day, so let's not --

24        MS. REIBSTEIN:  Well, Your Honor --

25        JUDGE GREEN:  Let's not throw stones --



```
 1          MS. REIBSTEIN:  That was a --

 2          JUDGE GREEN:  -- regarding --

 3          MS. REIBSTEIN:  That was at 3:00 o'clock in the

 4     afternoon --

 5          JUDGE GREEN:  Okay.

 6          MS. REIBSTEIN:  -- after a full day of litigation.

 7          JUDGE GREEN:  But -- okay.  I'm simply saying let's try to

 8     be practical about this.

 9          MS. REIBSTEIN:  I am --

10          JUDGE GREEN:  I don't mind -- I don't mind waiting until

11     next week if I'm confident that it can be done next week, but I

12     really do need to be confident that it can be done next week.

13     And right now, I -- I don't -- I'm not.

14          You know, I mean, Mr. Murphy, what -- is there really a

15     problem with -- with putting on Ms. Hernandez now?

16          MR. MURPHY:  Well, Judge, it -- it -- it's -- it's the --

17     it's the point at which whether a case settles or doesn't

18     settle, right?  So it --

19          MS. REIBSTEIN:  It's not close, Mr. Murphy.

20          JUDGE GREEN:  I know, but --

21          MS. REIBSTEIN:  It's not close.

22          MR. MURPHY:  Okay.

23          JUDGE GREEN:  So I -- well, that -- that was going to be

24     my next question --

25          MR. MURPHY:  Yeah.
```



1        JUDGE GREEN:  -- which is --

2        MR. MURPHY:  So, Judge, I don't -- I don't necessarily

3   want to put our settlement positions --

4        JUDGE GREEN:  No, no.  I don't want to hear --

5        MR. MURPHY:  Right.

6        JUDGE GREEN:  I don't want to hear it, but I do want to I

7   guess get some kind of idea from the -- the -- Mr. Kearl where

8   -- where you believe the parties are with regard to --

9        MR. KEARL:  Yeah.  Can we go -- are we -- are we on the

10  record, Judge?

11       JUDGE GREEN:  We can go off the record.

12       THE COURT REPORTER:  We were on the record.  You want to

13  go off?

14       JUDGE GREEN:  Yeah.  Off the record.

15  (Off the record 10:41 a.m.)

16       JUDGE GREEN:  Okay.  So we're adjourning for the day.  We

17  are resuming tomorrow.  We are then going to be resuming on

18  Wednesday, June 2nd, at 1:00, and then proceeding until close.

19  It appears that everybody is hopeful that we should be able to

20  finish up what's left of the witnesses, which is

21  Ms. Christine Hernandez, in that time.

22       MR. JACKSON:  Your Honor, we should note that the General

23  Counsel is not prepared to close without the unredacted CHIMEs.

24       JUDGE GREEN:  Understood.  Yeah.  I -- I understand.  I'm

25  just saying that the -- the -- the witnesses that we have

1    permanently, that -- that will be over.  Nobody has an

2    intention to call any other witnesses at the moment.

3         MR. JACKSON:  I understand.  But the General Counsel may

4    get additional subpoenaed documents, and that might result in

5    -- that might result in the -- the General Counsel wanting to

6    call additional witnesses.

7         JUDGE GREEN:  Let me just do a -- just very briefly a

8    couple of things.  First of all, the Respondent's third amended

9    answer is going to be allowed.  I would like to have in the

10   record -- I don't have it teed up here, but there was

11   essentially a -- I think the Respondent produced -- submitted a

12   memorandum in support along with the motion for reconsideration

13   on the petition to revoke.

14        I'd like to have that in -- in the record just because I

15   think it explains more fully what the Respondent's position is

16   with regard to what's at issue in the case at the -- at the

17   moment.

18        MR. MURPHY:  Can we -- can we do that by -- make that a

19   joint exhibit or --

20        JUDGE GREEN:  Sure.

21        MR. MURPHY:  Because then we can just upload it to

22   SharePoint and --

23        JUDGE GREEN:  Yes.

24        MR. MURPHY:  Okay.

25        JUDGE GREEN:  The -- I -- I -- we have the clip of Ms.



Case 1:22-cv-01479-RG-SJB  Document 5-1  Filed 03/17/22  Page 1950 of 2171 PageID #: 897
Exhibit E, Motion to Try Petition on Hearing Record
2002

1    Valasco's (phonetic) video.  I -- I actually think that -- I

2    think that's helpful.  I actually think that we should put into

3    evidence the entire video.  I understand that the Respondent

4    has admitted that Mr. Bryson engaged in protected protest

5    activity, but I think it's useful just to have that -- the

6    video of that activity to the extent it provides some context

7    to the -- you know, to the altercation that arised during it --

8    arose during it.

9         And lastly --

10        MR. MURPHY:  Excuse me one second.  I apologize.  Sorry.

11        JUDGE GREEN:  Lastly, I would like, if at all possible, to

12   have access to the Respondent's Excel spreadsheets to the

13   extent that they describe the -- any discipline that is in

14   evidence.  We have the discipline.  That's fine.  You know, I

15   -- I -- but I would like to have the Excel spreadsheets to use

16   as a tool.

17        MR. MURPHY:  May -- may I ask a clarifying question?

18        JUDGE GREEN:  Yes.

19        MR. MURPHY:  So do0 you want the spreadsheets to be --

20   because they're not constrained to just the documents that are

21   in the record.  Do you want us to --

22        JUDGE GREEN:  Right.  Yeah.  You should probably pare them

23   down.  I mean, I can do it.  You know, I'm pretty good with

24   Excel.  So you can either -- you can either give me the whole

25   spreadsheet, if you want, but really -- probably would -- would



1    be better is if you just delete the --

2         MR. MURPHY:  Okay.

3         JUDGE GREEN:  -- the entries that are not in evidence.

4         MR. MURPHY:  Okay.

5         THE COURT REPORTER:  Is it going to be an exhibit?

6         JUDGE GREEN:  Yes.

7         MR. MURPHY:  And can we make that a joint one as well so

8    we can just upload it?

9         THE COURT REPORTER:  It's going to be Joint 1.

10        MR. MURPHY:  It would be Joint 2, I think, because the

11   Joint 1 would be the reconsideration motion.

12        THE COURT REPORTER:  Okay.  I have to look at my

13   SharePoint exhibits after it was done --

14        MR. MURPHY:  I'm sorry.

15        MS. COX:  Mr. Murphy, wasn't Respondent working on the

16   joint exhibit for the subpoena issues?

17        MR. MURPHY:  Respondent is working on that.  Yeah.  So --

18        MS. COX:  Okay.  I just want to make sure that that's

19   one --

20        MR. MURPHY:  Yeah.  We -- yeah.  At -- at -- at some point

21   before the record closes, we -- we were going to introduce the

22   -- well, let me just make sure we're all on the same page.  The

23   subpoena, the petition's still revoked, and the respective

24   orders relating to them --

25        MS. COX:  Yes.



1       MR. MURPHY:  -- right?  Is that -- nothing else.

2       MS. COX:  Yes.  But that -- that would be Joint 2,

3  correct?

4       MR. MURPHY:  Okay.  Well -- yeah.  So let's decide what

5  we're going to do.  What -- so what's Joint 1?  I guess the --

6       MS. COX:  You just -- you just said the motion for

7  reconsideration --

8       MR. MURPHY:  Yeah.  But isn't there -- isn't -- aren't the

9  papers in as Joint 1?

10      THE COURT REPORTER:  I don't think it was introduced.

11      MR. MURPHY:  Oh, that's General Counsel 1.  Yeah, yeah,

12  Okay.  My bad.

13      THE COURT REPORTER:  I don't think Joint 1 was introduced

14  because I was looking at what was download on the SharePoint.

15  I didn't --

16      MR. MURPHY:  I got kicked out of SharePoint.  What is

17  Joint 1, sir?

18      THE COURT REPORTER:  I didn't see any -- I -- I haven't

19  heard any mention of Joint 1 since this hearing start, so if

20  you want to introduce it now --

21      MR. MURPHY:  Okay.  So --

22      THE COURT REPORTER:  -- and then we can --

23      MR. MURPHY:  Right.

24      THE COURT REPORTER:  -- it.

25      MR. MURPHY:  So Joint 1 is going to be what, Ms. Cox?



1    MS. COX:  If we go chronologically, it really should be

2    the subpoena.

3    MR. MURPHY:  Okay.

4    MS. COX:  The subpoenas, the petitions to revoke the

5    Judge's orders.

6    **(Joint Exhibit 1 Marked for Identification)**

7    MR. MURPHY:  All right.  Before we move off that, some of

8    the rulings were on the record in the transcript, so can we

9    just put the transcript pages in that relate to that?  We'll

10   show -- we'll show them to you.

11   MS. COX:  Yeah.

12   MR. MURPHY:  All right.  How about Joint 2?

13   MS. COX:  That would be the motion for reconsideration --

14   MR. MURPHY:  Okay.

15   MS. COX:  -- our response.

16   MR. MURPHY:  And -- okay.  We'll -- we'll mark those (a)

17   and (b).

18   MS. COX:  Sure.

19   **(Joint Exhibits 2(a) and 2(b) marked for identification)**

20   MR. MURPHY:  And what's -- what else?

21   THE COURT REPORTER:  Do we want to do this off the record?

22   Do you want to do this off the record and then we can settle

23   it?  We can just --

24   MR. MURPHY:  So J-3 will be the pared down spreadsheet to

25   match the disciplines in the record.  And do you want to see



```
 1    that before we upload it?

 2         MS. COX:  Yes.

 3         MR. MURPHY:  Okay.

 4    (Joint Exhibit 3 Marked for Identification)

 5         MR. MURPHY:  That probably won't come directly from me

 6    because I don't know how to do that.  All right.

 7         MS. COX:  Judge Green, can I go back for a moment to

 8    General Counsel's Exhibit 1?  I included Respondent's second

 9    amended answer on May 17th, and I have two exhibits in the

10    record that are labeled General Counsel's Exhibit 1:  the

11    original formal papers and then the formal papers with the

12    second amended answer.  Do you want me to just delete the

13    original and keep the --

14         JUDGE GREEN:  Yes.

15         MS. COX:  Okay.

16         JUDGE GREEN:  So we just -- so I would imagine that the

17    third amended answer needs to go into the formal papers also.

18         MS. COX:  I'll do that.  And then I'll -- I just didn't

19    want to delete anything without telling anybody what's going on

20    in SharePoint.  Okay.  So I'll include the third amended answer

21    as -- in General Counsel's Exhibit 1.

22         THE COURT REPORTER:  So you're going to send me an updated

23    GC-1?

24         MS. COX:  Yes.  I will, Barry.

25         THE COURT REPORTER:  Okay.  Thanks.
```



1     MS. COX:  One other housekeeping matter.  I was waiting

2     for a stipulation from -- from Respondent on the owner's manual

3     being applied nationwide, and I haven't heard back about that.

4     MR. MURPHY:  And what -- and when did we discuss that?  I

5     -- was that a long time ago?

6     MS. COX:  That was when Mr. Grabowski was called 611(c)

7     and Nicole Buffalano represented that she would get back to me

8     on it.

9     MR. MURPHY:  Okay.  What's the stip you want, Ms. Cox?

10    MS. COX:  That the owner -- the owner's manual and its

11    contents applied nationwide.

12    MR. MURPHY:  All right.  Before I get into an argument

13    about whether it's relevant or not, let me talk about whether

14    we'll stip to it, all right.  Yeah.

15    MS. COX:  Well, she represented that you would stip to it.

16    MR. MURPHY:  Okay.  I'll look at that.

17    MS. COX:  And the Judge precluded us from asking questions

18    about it because --

19    MR. MURPHY:  Well, I don't want to open that door, so let

20    me --

21    MS. COX:  Okay.

22    MR. MURPHY:  -- let me see where we are on that, okay.

23    JUDGE GREEN:  So, Mr. Murphy, the -- the -- the

24    Respondent's response -- opposition to the motion for Bannon

25    Mills remedies, is that on the way/



903

1        MR. MURPHY:  It is, Judge.

2        JUDGE GREEN:  Do you mind if I -- let -- can I ask you

3   some questions about it?  I mean, the answers might be just

4   that's going to be in the document --

5        MR. MURPHY:  Okay.

6        JUDGE GREEN:  -- or that I --

7        MR. MURPHY:  To the extent -- to the extent I -- to the

8   extent I can answer them, I mean, I -- but go ahead.

9        JUDGE GREEN:  Okay.  So does -- does the -- does the

10  Respondent have personal files in the traditional sense as hard

11  -- you know, a hardcopy of a file that's -- that's somewhere

12  for --

13       MR. MURPHY:  No.

14       JUDGE GREEN:  -- each employee?

15       MR. MURPHY:  No.  Like a giant room full of -- like --

16       JUDGE GREEN:  Right.

17       MR. MURPHY:  -- Raiders of the Lost Ark, just thousands

18  and thousands of personnel files?  No.

19       JUDGE GREEN:  Is there -- do you know whether there's an

20  electrical file -- an electronic file for each employee?  Like

21  it's -- you know, there's a -- whatever, an explorer file that

22  says John Smith?

23       MR. MURPHY:  Yeah.  I'm going -- this is going to be

24  address in our --

25       JUDGE GREEN:  Okay.  That's fine.



1    MR. MURPHY:  Yes.  By people who can explain it.

2    JUDGE GREEN:  I -- I don't know if you remember in the

3    General Counsel's motion, there was -- they -- they called it

4    an Exact report -- Exact being the system where investigation

5    documents are kept.

6    MR. MURPHY:  Correct.

7    JUDGE GREEN:  And there was -- they -- they -- they

8    included, I believe it was as Exhibit 8, an Exact report.  And

9    I think one of the -- one of their assertions was that an Exact

10   report was not produced for Mr. Bryson and Ms. Evans.

11   MR. MURPHY:  Yes.

12   JUDGE GREEN:  Do -- do we know whether an Exact report

13   exists for those two people?

14   MR. MURPHY:  We -- we do.  It does not.

15   JUDGE GREEN:  Okay.  And -- and -- and a WIN report for

16   Ms. Evans, do we know whether that exists?

17   MR. MURPHY:  It does -- it does not.  And I believe that

18   Mr. Gilbert Differ testified about that.

19   JUDGE GREEN:  Okay.

20   MR. MURPHY:  But there's no separate WIN report.  Like

21   it's -- the one he did is in the record in a couple formats.

22   There's an electronic format and then an email format.  Ms. Cox

23   may know the numbers off the top of her head, but -- but it --

24   it's in there.

25   JUDGE GREEN:  And in WIN reports for bullying, do we know



Exhibit E, Motion to Try Petition on Hearing Record

1   whether there's any outstanding WIN reports for bullying?

2        MR. MURPHY:  Yeah.  So there was -- I'm -- my recollection

3   is, is that there was two separate requests for WIN reports.

4   For -- for one of the WIN report requests, a -- a small number

5   were identified and produced.  The number that's sticking to my

6   head is three.  We can confirm that.

7        For the other classification of WIN reports, there were

8   none that were responsive.  And I -- I don't -- I can't tell

9   you whether it was the bullying or whatever, but we can -- we

10  can confirm that and -- and -- and let you know.  But for one

11  class, there was none.

12       JUDGE GREEN:  And just -- just last, this issue of -- of

13  whether -- whether the company has to, I guess, access an

14  electronic file -- personnel file in order to obtain

15  discipline, can you tell me how that works again?  Like, how

16  does it work with --

17       MR. MURPHY:  Yeah.

18       JUDGE GREEN:  -- find the discipline?

19       MR. MURPHY:  Yeah.  So that's going to be addressed in our

20  -- in our -- in our --

21       JUDGE GREEN:  Okay.

22       MR. MURPHY:  -- motion as well, and -- and I could give

23  you a --

24       JUDGE GREEN:  that's fine.

25       MR. MURPHY: -- the exact -- yeah.



Exhibit E, Motion to Try Petition on Hearing Record

```
1       JUDGE GREEN:  That's fine.  Okay.  All right.  I just
2   wanted to -- I had those questions, and I just wanted to make
3   sure that they were -- either I got some answers now or they
4   were going to be addressed in the -- in the -- in the written
5   opposition.
6       So that's all I have now unless somebody else has anything
7   that you need to do.
8       MS. COX:  I just want to know, Judge, from Respondent,
9   what date the special appeal will be filed on the document
10  issue.
11      MR. MURPHY:  It's going to be today or -- or tomorrow, and
12  it's -- it's going to be filed as soon as we -- as soon as we
13  can do it.  Hold -- hold on one second.  I -- I just want to
14  make sure.  I may have the answer on the stip there, so hold
15  on.
16      Okay.  Yeah.  So to the extent there was some ambiguity
17  about the stipulation about the nationwide application of the
18  owner's manual, we will stipulate to that.
19      MS. COX:  Thank you.
20      MR. MURPHY:  Okay.
21      JUDGE GREEN:  Okay.  So unless there's anything else, we
22  can go off the record.  Okay.  Off the record.
23  (Whereupon, the hearing in the above-entitled matter was closed
24  at 11:29 a.m.)
25
```



Exhibit E, Motion to Try Petition on Hearing Record

1                    **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings, via Zoom

3    videoconference before the National Labor Relations Board

4    (NLRB), Region 29, Case Number 29-CA-261755, Amazon.com

5    Services, LLC and Gerald Bryson, held at the National Labor

6    Relations Board, Region 29, Two Metro Tech Center North, 5th

7    Floor, Brooklyn, NY 11201, on May 26, 2021, at 2:39 p.m. was

8    held according to the record, and that this is the original,

9    complete, and true and accurate transcript that has been

10   compared to the reporting or recording, accomplished at the

11   hearing, that the exhibit files have been checked for

12   completeness and no exhibits received in evidence or in the

13   rejected exhibit files are missing.

14

15

16

17   _____
                                 BARRINGTON MOXIE
18                               Official Reporter

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services, LLC,          Case No.   29-CA-261755

                        Employer,

and

Gerald Bryson,

                    Petitioner.

_____

_____

Place: Brooklyn, New York (Via Zoom Videoconference)

Dates: May 27, 2021

Pages: 1908 through 2042

Volume: 15

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



Exhibit E, Motion to Try Petition on Hearing Record

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

AMAZON.COM SERVICES, LLC,                  Case No.    29-CA-261755

                     Employer,

and

GERALD BRYSON,

                     Petitioner.

The above-entitled matter came on for hearing, via Zoom
videoconference, pursuant to notice, before **BENJAMIN GREEN**,
Hearing Officer, at the National Labor Relations Board, Region
29, Two Metro Tech Center North, 5th Floor, Brooklyn, NY 11201,
on **Thursday, May 27, 2021 at 9:33 a.m.**.

1                                  **A P P E A R A N C E S**

2        **On behalf of the Employer:**

3              **CHRISTOPHER MURPHY, ESQ.**
               **JENNIFER MOTT WILLIAMS, ESQ.**
4              **RICHARD ROSENBLATT, ESQ.**
               **NICOLE BUFFALANO, ESQ.**
5              **KELCEY PHILLIPS, ESQ.**
               MORGAN, LEWIS & BOCKIUS, LLP
6              300 South Grand Avenue
               22nd Floor
7              Los Angeles, CA 99071
               Tel. (213)612-7443
8              Email christopher.murphy@morganlewis.com
                      nicole.buffalano@morganlewis.com
9                     kelcey.phillips@morganlewis.com

10             **JASON SCHWARTZ, ESQ.**
               **ZAINAB AHMAD, ESQ.**
11             GIBSON, DUNN
               200 Park Avenue
12             New York, NY 10166-0193
               Email zahmad@gibsondunn.com

13
         **On behalf of the Petitioner:**
14
               **FRANKL KEARL, ESQ.**
15             MAKE THE ROAD NEW YORK
               161 Port Richmond Avenue
16             Staten Island, NY 10302
               Tel. (929)265-7692
17             Email frank.kearl@maketheroadny.org

18

19

20

21

22

23

24

25



1                                        <u>I N D E X</u>

2

3     <u>WITNESS</u>              <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>   <u>VOIR DIRE</u>

4     Christine Hernandez    1921    1960,2018             2027        2030

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1                        **E X H I B I T S**

2

3       **EXHIBIT**                        **IDENTIFIED**     **IN EVIDENCE**

4       **General Counsel:**

5          GC-115                             1982              1996

6

7       **Charging Party:**

8          CP-10                              2024              2027

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



# Exhibit E, Motion to Try Petition on Hearing Record

1          P R O C E E D I N G S

2          JUDGE GREEN:  We are on the record on Amazon.com Services

3    LLC 29-CA-261755.  It is May 27th, 2021, and the parties were

4    having an off-the-record discussion regarding the respondent's

5    production of a document, a subpoenaed document.  I guess that

6    production was made today.  And the General Counsel is going to

7    be entering it into evidence, I believe, and so I think the

8    first thing we would do, as it seems to be a subject of much

9    dispute, is to produce the document and let me read it.

10         Is everybody agreed that this is a document that's going

11   to come in?  Is the respondent going to have any objections to

12   the General Counsel putting it in?

13         MR. MURPHY:  So Judge, the -- the document is redacted

14   in -- in a couple of places, but the unredacted part is, you

15   know, clearly relevant and -- and responsive and should be

16   entered.

17         JUDGE GREEN:  Okay.  And the redacted portion, is that,

18   you know, going to be part of -- first of all, did you file a

19   special appeal on the other redacted documents?

20         MR. MURPHY:  It has not been filed yet, Judge.

21         JUDGE GREEN:  Okay.  I -- you know, I'd ask you really --

22   the -- I mean, the longer you -- the longer you wait on that,

23   the more difficult it is to wait on these types of rulings.

24         MR. MURPHY:  We -- we understand, Judge.

25         JUDGE GREEN:  So is this document going to be part of that



1    appeal?

2        MR. MURPHY:  The redacted parts of it, yes.

3        JUDGE GREEN:  Yes.  Okay.  So this is going to be subject

4    to -- so -- okay.  So you decided you want to show me the --

5    the document --

6        MR. MURPHY:  And I -- I should also -- I should also

7    clarify, there's a -- there's a small attorney-client privilege

8    redaction that won't be subject to the --

9        JUDGE GREEN:  All right.  So that's a different matter,

10   right?

11       MR. MURPHY:  Right.

12       MR. JACKSON:  So Your Honor, I just want to state for the

13   record what happened here.  At 9:42, 18 minutes before we were

14   supposed to go on the record with Christine Hernandez,

15   Respondent's counsel sent us a highly relevant document heavily

16   redacted, again, that is clearly responsive to the subpoena.

17       And Your Honor, you have to see the pattern that is

18   emerging here.  Respondent is producing things in drips and

19   drabs strategically for the benefit of its case in clear

20   defiance of your orders and the requirements of the subpoena.

21   Bad faith is evident here in all respects.

22       Now, the General Counsel would like this -- this repeated

23   subpoena noncompliance to result in serious sanctions that Your

24   Honor should impose forthwith.

25       What that should include is that Ms. Hernandez should be



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 1968 of 2171 PageID #: 914
2020

1    precluded about testifying about any matters that relate or

2    touch upon these -- this withheld material.

3        MR. MURPHY:  It's not withheld.

4        MR. JACKSON:  In the event -- in the -- excuse, Mr. --

5    excuse me, sir.  Do not interrupt.

6        JUDGE GREEN:  All right.

7        MR. JACKSON:  Including the events of April 6th and the

8    investigation of Gerald Bryson and -- and Dimitra Evans.  In

9    addition --

10       JUDGE GREEN:  So do you want to --

11       MR. JACKSON:  -- Your Honor should draw an adverse

12   inference -- may I finish, Your Honor?

13       JUDGE GREEN:  No.  Hold on.  So what is the subject

14   matter?  What does -- what does the subject matter relate to?

15       MR. JACKSON:  Your Honor, I -- I -- General Counsel is not

16   in a position yet to determine since we've only had this

17   document for about 18 minutes whether or not we wish to admit

18   it into evidence, but I will share my screen so you can view

19   it.

20       MS. COX:  If I may add, the version of the document that

21   we received is completely different than the virgin that --

22   version that's being produced today.  The version that's being

23   produced --

24       JUDGE GREEN:  Yeah.  Look --

25       MS. COX:  -- today has additional -- additional --



1     MR. MURPHY:  If I -- if I could be heard.  Like all the --

2     all the sinister --

3     JUDGE GREEN:  I understand.  I'd like to -- we are -- we

4     are way, way down in the road in this case, right.  We're

5     trying desperately to get to the end.  I just want to do this

6     in the most efficient way possible.  I -- what I'd like right

7     now is the -- is to see the document.  I -- just I want to know

8     the subject matter so I understand the sanction that's

9     requested given the fact that Ms. Hernandez is the last

10    witness, as far as I know, to testify.

11    MR. JACKSON:  Your Honor, would you like to have a break

12    to review the document?  I can email it to you and the parties.

13    JUDGE GREEN:  Sure.

14    MR. JACKSON:  Okay.  Shall we go off the record?

15    JUDGE GREEN:  You have -- you don't have to email it to

16    Respondent.  They produced it to you, but --

17    MR. JACKSON:  I don't want to have any --

18    JUDGE GREEN:  And -- and Mr. Kearl.

19    MR. MURPHY:  And please, feel free in this case.

20    MR. JACKSON:  All right.  Are we going off the record,

21    Judge?

22    JUDGE GREEN:  Yes.  Off the record.

23    (Off the record at 10:12 a.m.)

24    MR. MURPHY:  Judge, again, I -- I apologize for

25    interrupting, Judge.  I just want to make sure that the



Exhibit E, Motion to Try Petition on Hearing Record

1    redactions that we've -- that are -- that are contained in the

2    document that was just produced would be part of -- subject to

3    the special appeal on the -- the other redactions.  Just

4    clarifying that.

5         JUDGE GREEN:  Yes.  That's -- that's, frankly, up to you.

6         MR. MURPHY:  Okay.  But --

7         JUDGE GREEN:  I mean, I can see why it would fall within

8    the same subject as the other documents that we have dealt with

9    before.

10        MR. JACKSON:  But, Your Honor, I think you are making a

11   ruling.  You're making a ruling that this -- this document is

12   subject to the same ruling that you had on the other redacted

13   CHIMEs from before.

14        JUDGE GREEN:  Yes.

15        MR. JACKSON:  Yes.  So should we --

16        JUDGE GREEN:  Okay.

17        MR. JACKSON:  -- put that on the record?

18        JUDGE GREEN:  Okay.  Yes.  To the extent -- right.  So to

19   the extent that --

20        MR. JACKSON:  Are we on the record, Barry?

21        JUDGE GREEN:  We are, right?

22        THE COURT REPORTER:  Yeah.  We are.  We are.

23        JUDGE GREEN:  Right.  So -- okay.  So it -- it appears to

24   me that this document that's at issue -- we don't have it

25   identified as a particular exhibit -- but this is responsive to



Exhibit E, Motion to Try Petition on Hearing Record

1    the Charging Party and the General Counsel's subpoenas, and

2    nevertheless, it's been redacted to the extent that the

3    respondent believes that the redacted portions are not

4    relevant.

5        It's been my ruling with regard to prior documents that

6    the entire document needs to be produced, and that includes

7    portions that may not specifically be relevant.  It's my

8    understand that the -- that the respondent is taking a special

9    appeal of that ruling with regard to the previous documents

10   that we have discussed and that the respondent is -- is taking

11   a special appeal of this document as the rule in my ruling with

12   regard to this document, as well.

13       MR. MURPHY:  Yeah.  And -- and, Your Honor, just so

14   there's something on the record, may I make a brief proffer of

15   sorts with respect to the nature of the document?

16       JUDGE GREEN:  Yes.

17       MR. MURPHY:  Okay.  Thank you.  So the -- the -- the

18   document that we've been discussing is -- is a OneNote, which I

19   understand is a -- a -- it's like a notebook, and -- and

20   individuals enter information in that in a sequential or serial

21   basis.  And -- and -- and it -- and it's -- it's like a paper

22   notebook, so what's on one page is not responsive to or related

23   to what's on other pages.  So it -- so we view this as even

24   slightly different than the CHIME situation which was

25   previously before you in that -- in that these are -- it --



Exhibit E, Motion to Try Petition on Hearing Record

1    it's not just separate parts of the same -- of -- of -- it --

2    it's not just a linked set of separate conversations, but it's

3    actually separate matters or -- or subject matter on -- in

4    one -- OneNote and another.  And so that -- that forms a

5    separate factual basis for our position on the redactions on

6    this document.

7         JUDGE GREEN:  Well, are you saying that -- that this

8    single document is not actually a single document?

9         MR. MURPHY:  It's a -- it's a OneNote, Judge, so it --

10   it's --

11        JUDGE GREEN:  So there -- there might be confusion.  Okay.

12   That's fine.  I think it's in the same category, from my

13   perspective.

14        MR. MURPHY:  Okay.

15        JUDGE GREEN:  So --

16        MR. MURPHY:  I just wanted to --  yeah.

17        JUDGE GREEN:  My ruling is that -- my ruling is that the

18   redactions, to the extent that they're not based on

19   attorney-client privilege be removed.  That -- that's my

20   ruling, and then you're -- you're going to take a special

21   appeal about --

22        MR. MURPHY:  Understood.  I just wanted to have that

23   distinction in the record.

24        JUDGE GREEN:  Okay.

25        MR. JACKSON:  And Your Honor, for the record, I'd also



# Exhibit E, Motion to Try Petition on Hearing Record

1    like to note that this document is not produced in native

2    format.  We asked immediately upon receipt of the document for

3    it to be produced in native format, and it still has not been.

4    So you know --

5         JUDGE GREEN:  Yeah.

6         MR. JACKSON:  -- Mr. Murphy's -- Mr. Murphy's

7    representations are all well and good for what they're worth,

8    which I don't think is much, but we would like to verify that

9    by looking at the native format to verify when these documents

10   were produced.

11        And in addition, it seems that there's a new

12   classification of documents that may be responsive to our

13   subpoena.  Those should also be searched and produced.  Do you

14   intend to do so, Mr. Murphy?

15        MR. MURPHY:  Well, you know, I -- if -- if whatever I said

16   to you, Mr. Jackson, you probably wouldn't credit, so I -- I --

17   I might just save my words.  But let -- let me say this that

18   when we got the request for the native format, we immediately

19   investigated it, and we -- and we are trying to determine if

20   the document can be produced in native format.  And rest

21   assured, if it can, it will be, as -- as with every other

22   document that you've asked to be produced in native format so

23   far.

24        JUDGE GREEN:  So we have OneNote.  We use that at the

25   Board.  Native format, I -- what is -- okay.  Well, let's not



# Exhibit E, Motion to Try Petition on Hearing Record

1    go there.

2         MR. MURPHY:  Yeah.

3         JUDGE GREEN:  Okay.

4         MR. JACKSON:  Well, just I would like to note for the

5    record that the subpoena production up until this morning

6    included no OneNote documents, and it seems that this might be

7    a new classification of documents that Respondent alleges it

8    had none -- no notice of prior.  We believe that it is

9    incumbent upon them to further comply with the subpoena by

10   searching for and producing other responsive OneNote documents

11   in the -- and in addition to native format.

12        JUDGE GREEN:  Okay.  So that might be an issue that we end

13   up litigating, but for now, we have Ms. Hernandez here, and I

14   do want to see if we can get her on today.

15        So is the respondent calling Ms. Hernandez?

16        MR. MURPHY:  We are, Judge, yeah.

17        JUDGE GREEN:  Okay.

18        Hello, Ms. Hernandez.  Welcome.  Could you raise your

19   right hand?

20   Whereupon,

21                      **CHRISTINE HERNANDEZ**

22   having been duly sworn, was called as a witness herein and was

23   examined and testified, telephonically as follows:

24        MR. MURPHY:  What was that, Judge?

25        JUDGE GREEN:  I don't know.


www.escribers.net | 800-257-0885

1    MS. COX:  It was on corporate counsel.

2    MS. REIBSTEIN:  (Audio interference) young child.

3    JUDGE GREEN:  Okay.  So Ms. Hernandez, could you state and

4    spell your name for the record?

5    THE WITNESS:  Christine Hernandez, C-H-R-I-S-T-I-N-E

6    H-E-R-N-A-N-D-E-Z.

7    JUDGE GREEN:  Okay.  And please, while you're testifying,

8    don't use a handheld device like a phone to communicate with

9    anybody not on this call.  And please, don't refer to any

10   materials other than what might be shown to you by -- through

11   this Zoom program by counsel, unless you're directed to look at

12   something, at which point, you can look at something, okay.

13   THE WITNESS:  Okay.

14   JUDGE GREEN:  All right.  So Mr. Murphy, whenever you're

15   ready.

16   MR. MURPHY:  Okay.

17                    **<u>DIRECT EXAMINATION</u>**

18   Q    BY MR. MURPHY:  Good morning, Ms. Hernandez.  I'll almost

19   certainly end up calling you Christine.  Thanks for coming in

20   today.

21   Ms. Hernandez, do you currently work for

22   Amazonservices.com LLC?

23   A    Yes, I do.

24   Q    Okay.  And what's your current position?

25   A    Employee relations manager.



Exhibit E, Motion to Try Petition on Hearing Record

1    Q    And do you have a officer or a regular work location that

2    you go to?

3    A    I work from home.

4    Q    Okay.  And -- and in your current position, do you have

5    responsibility for certain Amazon locations or certain states

6    or regions or that kind of thing?

7    A    Yes.  My current responsibilities are New York, New

8    Jersey, and Connecticut.

9    Q    Okay.  And how many Amazon facilities within that

10   footprint are you responsible for?

11   A    Seven active buildings that currently exist and three

12   launch buildings that will be launching over the course of the

13   year.

14   Q    Okay.  And how long have you had that job in employee

15   relations?

16   A    I started with the position in September of 2020.

17   Q    And how about before September of 2020.  Did you work for

18   Amazon?

19   A    Yes, I did.

20   Q    And what was your position then?

21   A    I was the human resource manager of JFK8.

22   Q    And what was the period of time in which you had that job?

23   A    March of 2020 to September of 2020.

24   Q    So about six months; is that right?

25   A    About.



1   Q    Okay.  And -- and how about before human resources manager

2   at JFK8.  Did you work for Amazon?

3   A    Yes.

4   Q    And what was your job then?

5   A    I was the human resource manager of LG9 in Edison, New

6   Jersey.

7   Q    And how long did you have that job?

8   A    From March of 2020 -- I'm sorry.  Yeah.  March of 2020,

9   and I started there in August of 2019.

10  Q    Okay.  And how about prior to August of 2019.  Did you

11  work for Amazon?

12  A    Yes, I did.

13  Q    And what was your position at that time?

14  A    I was the senior human resource business partner of JFK8.

15  I launched that building in September of 2018, and I was there

16  through May of 2019.  For May, June, and July, I traveled to

17  three other buildings supporting other HR managers before I

18  started in August in Edison.

19  Q    Okay.  And how about prior to the launch of the JFK8

20  facility.  Did you work for Amazon?

21  A    Yes, I did.

22  Q    And what was your position, and what period of time did

23  you hold it?

24  A    I was the senior human resource business partner in EWR4,

25  which is in Robbinsville, New Jersey, and I was there from July



Exhibit E, Motion to Try Petition on Hearing Record

1    of 2017 through September of 2018.

2    Q    Through September -- I'm sorry, July of '17 through

3    September of '18?

4    A    2018.

5    Q    2018.  And how about before working at EWR4.  Did you work

6    for Amazon?

7    A    Yes.

8    Q    And what was your position, and for what period of time

9    did you hold it?

10   A    I was an operations manager in EWR9, which is in Carteret,

11   New Jersey, and I was there from September of 2016 through July

12   of 2017.

13   Q    And how about prior to working at EWR4.  Did you work for

14   Amazon?

15   A    No.  I did not.

16   Q    Okay.  So I just want to direct your attention to the

17   period of time between March of 2020 and September of 2020 when

18   you were the human resources manager at JFK8, okay?

19   A    Okay.

20   Q    And in -- in particular, were you the human resources

21   manager at JFK8 on April 6th, 2020?

22   A    Yes, I was.

23   Q    Were you at work that day, Christine?

24   A    Yes, I was.

25   Q    And -- and if you recall, was -- I'm sorry.  And if you



Exhibit E, Motion to Try Petition on Hearing Record — 1925

1    recall, was there a protest of any sort that occurred that day?

2    A    Yes, there was.

3    Q    And during the protest, where -- where were you

4    physically?

5    A    I was physically in the general managers conference room

6    in the main office.

7    Q    And were you alone there, or were other people with you?

8    A    I was in the room with other people.

9    Q    Okay.  And who was with you?

10   A    The general manager, senior ops, Sai Kotha, the regional

11   loss prevention manager, Geoffrey Delbert Giffer (sic

12   throughout), and there was one other person in the room.  I

13   just couldn't recall whom.

14   Q    Okay.  Now, the -- the -- the protest that occurred that

15   day, did -- did -- did you personally understand that before

16   the protest occurred that it was going to happen?

17   A    Yes.  I had knowledge of it.

18   Q    Okay.  And what was the source of that knowledge?

19   A    I don't recall.

20   Q    So on -- on -- on April 6th while you were in the general

21   managers conference room, were -- were you able to observe any

22   of the activities that occurred outside of the building either

23   in the parking lot or -- or anywhere else?

24   A    Yes.

25   Q    And how did -- how did you do that?  How did you observe



Exhibit E, Motion to Try Petition on Hearing Record

1    the --

2    A     Using our camera system that we have in all of our

3    buildings.  We had it in the room with us.

4    Q     Okay.  When you say camera, do you mean security video?

5    A     A security video, yes.

6    Q     Okay.  And it -- if you know, was the security video

7    system established before April 6th?

8    A     Oh, yes.

9    Q     And -- and -- and if you know, was it changed or modified

10   in any way to observe what happened on April 6th?

11   A     No.

12   Q     So at -- at -- at some point during the time you spent in

13   the general manager's office in April 6th, did you learn that

14   an altercation of some sort had happened between associates

15   in -- in the parking lot?

16   A     Yes.

17   Q     Why don't you tell me how -- how you learned that.

18   A     Senior operations manager, Maciej Curlej, had called the

19   ops general manager, Sai Kotha, and he notified him of the

20   incident that occurred outside.  When he finished the

21   conversation, Sai Kotha, you know, turned to me in the room and

22   notified me of the situation.

23   Q     Okay.  And -- and what do you recall Mr. Kotha saying to

24   you?

25   A     Summarizing that there was an incident with two associates



www.escribers.net | 800-257-0885

1     outside and that we needed to look into it.

2     Q     Okay.  Did -- did he -- do you recall him giving you any

3     more details at that time?

4     A     Not -- not that I recall.

5     Q     Okay.  And after receiving that notification from Mr.

6     Kotha, what, if anything, did you do?

7     A     I partnered with one of my human resources partner,

8     Tyler Grabowski, and I asked him to verify and to check what

9     happened so that we can figure out what next steps would be.

10    Q     Uh-huh.  And on April 6th, where was Mr. Grabowski?

11    A     He wasn't in the room.

12          MS. COX:  Objection. I'm sorry.

13          JUDGE GREEN:  Sorry.  Is there an objection?

14          MS. COX:  No.  I'll withdraw, Your Honor.

15          THE WITNESS:  I don't know where -- what his location was.

16    Q     BY MR. MURPHY:  Okay.  Was he -- did -- if you know, was

17    he at JFK8?

18    A     Oh, yes.  He was in the building.

19    Q     Okay.  And -- and what -- what you just testified that you

20    told him, how did you relay that to him?

21    A     I -- in person.

22    Q     Okay.  And -- and so -- excuse me -- tell me again, what

23    did -- what did you tell Mr. Grabowski to do?

24    A     I asked him to verify -- that we were just notified of an

25    altercation between two associates outside, so I asked him to


www.escribers.net | 800-257-0885

1    check for me and to see what happened.

2    Q    Okay.  And -- and did he do that?

3    A    Yes, he did.

4    Q    And how do you know that?

5    A    He came back to the office to report out that, yes, in

6    fact, there was an altercation between two associates.

7    Q    Uh-huh.  And -- and -- and what else do you recall him

8    telling you at that time?

9    A    He did tell me who the associates were:  Dimitra Evans and

10   Gerald Bryson.

11   Q    Okay.  And did he give you any -- any further detail at

12   that time about what the nature of the altercation had been?

13   A    Not that I recall.

14   Q    Okay.  And -- and how did you react to the information

15   that Mr. Grabowski related to you?

16   A    Being that there was an altercation, just part of our

17   standard work, then I did tell him that we needed to do an

18   investigation.

19   Q    Okay.  And did Mr. Grabowski do an investigation?

20   A    Yes, he did.

21   Q    Okay.  Why didn't you do that investigation yourself?

22   A    Based on the levels, it would be something that I would

23   delegate as a normal part of our standard work, and it would be

24   something that any human resource business partner would

25   execute.



1    Q    Okay.  And -- and -- and tell me what you understood

2    Mr. Grabowski to do in his investigation.

3    A    To collaborate and figure out and assess who was outside,

4    who would have been a witness to the altercation, and who would

5    have heard what had transpired, and to work with loss

6    prevention, which is what we normally would do to assess who

7    the individuals were.

8    Q    Okay.  And -- and -- and loss prevention, that's Mr.

9    Gilbert-Differ, who you testified had bene in the room -- the

10   general managers conference room with you?

11   A    It could have been him or anyone on his team.

12   Q    Okay.  And -- and while you were in the conference room,

13   did -- did you watch any other video other than the security

14   feeds that you testified about previously?

15   A    Yes.

16        MS. COX:  Objection.  Can I get some foundation, time?

17   I'm sorry.

18        JUDGE GREEN:  Okay.  So we -- we can get into that.

19        MS. COX:  Okay.

20        JUDGE GREEN:  But I think first thing's first, the initial

21   question was appropriate.

22        MS. COX:  Okay.

23        MR. MURPHY:  Sure.

24   Q    BY MR. MURPHY:  Ms. Hernandez, do you -- do you remember

25   the question?



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    No.  Can you repeat the question, please?

 2    Q    Sure.  While you were in the general managers conference

 3    room, did you review any other video other than the security

 4    video you previously testified about?

 5    A    Yes.

 6    Q    And what -- what kind of video was that, if you recall?

 7    A    A Facebook Live video.

 8    Q    And what did the Facebook Live video show?

 9    A    Just what -- people being -- talking on the video and what

10    was going on outside.  I wasn't watching it thoroughly

11    throughout the entire time.  I was multitasking.

12    Q    Okay.  And do you remember who discovered or -- or loaded

13    the -- the Facebook Live video that -- that you were watching?

14    A    No.  I don't recall.

15    Q    And what, if anything, do you remember was shown on the

16    Facebook Live video?

17    A    One of the associates was speaking on the Facebook Live

18    video, Jordan Flowers (phonetic throughout), and also part of a

19    dialogue with Gerald Bryson.

20    Q    Okay.  And do you remember what, if anything, Mr. Bryson

21    said on -- on that Facebook Live video?

22         MS. COX:  Objection, Your Honor.  Can we get some

23    foundation?

24         JUDGE GREEN:  Yeah.  Also -- I mean, foundation, I -- I

25    don't think we need, but do -- do we need this?
```



1    MR. MURPHY:  Okay.

2    JUDGE GREEN:  Can we just -- can we just get her

3    confirmation that she saw it -- and she saw it, and --

4    MR. MURPHY:  Fair enough, Judge.  Yeah.  Okay.

5    Q    BY MR. MURPHY:  Ms. Hernandez --

6    MR. MURPHY:  You know what, Judge, I'm going to pin --

7    give me a minute here so I can pin her to my -- better.

8    Q    BY MR. MURPHY:  Okay.  Now, Ms. Hernandez, while you were

9    in the general manager's office on April 6th, did -- did you

10   watch a -- a Facebook Live video that featured, in part, Gerald

11   Bryson?

12   MS. COX:  Objection.  Asked and answered.

13   JUDGE GREEN:  Overruled.

14   Q    BY MR. MURPHY:  You can answer.

15   A    Yes.

16   Q    Okay.  Thank you.  Okay.  So -- so -- so back to the

17   investigation.  Did you speak with Mr. Grabowski regarding

18   the -- the -- the work that he was doing in connection with his

19   investigation?

20   A    Just to ensure that, you know, as our normal center of

21   work that he understood what the findings needed to be and that

22   he didn't miss anything along the way.  He is an experienced

23   leader, but just to ensure -- this was something different and

24   new for us -- that he was comfortable with doing the

25   factfinding of the information and that how he was going to go



Exhibit E, Motion to Try Petition on Hearing Record

1    about it.  So one was definitely to assess who was outside; and

2    two, working with -- collaboration with loss prevention and to

3    attain seek to understand conversations with anyone who was a

4    witness to it.

5    Q    Okay.  And -- and -- and why don't you briefly explain

6    what a seek to understand conversation is.

7    A    Essentially to have a conversation with any of the

8    witnesses to verify were they physically there, did they hear

9    anything, what did they hear.  And based on those

10   conversations, if we didn't get to verify and assess that,

11   then, yes, we would ask them to write a statement.

12   Q    Okay.  And -- and do you know whether witness statements

13   were obtained in this case?

14   A    Yes.

15   Q    And did you review those in connection with your role in

16   the investigation?

17   A    Yes.

18   Q    And -- and sitting here today, do you remember the names

19   of the people who provided witness statements?

20   A    A few of them.

21   Q    Okay.  Who do you remember gave witness statements?

22   A    Senior operations manager Maciej Curlej, she was the one

23   who notified us to begin with; senior HRA, which is a human

24   resource assistant, Shaianna Donaldson, one of the associates

25   who reported to me; and then -- and of course the -- Dimitra



1    Evans, who was one of the individuals involved; and then Gerald

2    Bryson also I saw later on in the investigation.

3    Q    Okay.  And -- and is it possible that there were other

4    witness statements that were obtained other than the ones that

5    you've just listed?

6    A    Absolutely.

7    Q    Okay.  And -- and did you review the witness statements

8    that were obtained in the investigation?

9    A    Yes, I did.

10   Q    Okay.

11        MR. MURPHY:  And Judge, I -- I -- I -- I -- I'm prepared

12   to have her identify the witness statements and to testify that

13   she -- she reviewed them.  If that's not going to be --

14        JUDGE GREEN:  I mean, I think we already have that.  I

15   just --

16        MR. MURPHY:  Okay.

17        JUDGE GREEN:  -- at this point want to avoid cumulative --

18        MR. MURPHY:  I -- I understand.  Okay.  So with that

19   understanding, I'll -- I'll move forward.

20   Q    BY MR. MURPHY:  Ms. Hernandez, when you reviewed the --

21   the witness statements, were they entirely and internally

22   consistent with one another?

23   A    No, they weren't.  And I didn't expect them to be.  There

24   was a lot going on at the time, and people were on break, and

25   at some point, when did people listen in and -- and were



1   observant to it would vary by individual, and what they were

2   able to ascertain that occurred would be different based on

3   when they listened at what point.

4   Q    Okay.  And did the -- did -- did the differences between

5   the statements cause you to question their credibility or

6   reliability?

7   A    No.  It did not.

8   Q    And -- and -- and explain that for me.

9   A    What people hear and what they understand to be is -- you

10   know, it is their verification of what they heard.  I --

11   there's no way for me to understand what they heard or why

12   would -- it would vary.  It's their opinion, and it's what they

13   heard and what they wrote onto paper, so it wouldn't have any

14   bearing on an opinion of mine whatsoever.  That's -- that's

15   their understanding of the situation, so we take all of it into

16   consideration.

17   Q    Okay.  And did you conduct any interviews of any of the

18   people who gave statements personally?

19   A    No.  I did not.

20   Q    Did you attempt in any way to reconcile whatever

21   variations there were of -- between the statements?

22   A    No.  I did not.

23   Q    Did you instruct Tyler Grabowski to do either of those

24   things?

25   A    No.  I did not.



```
1    Q    Why didn't you do that?

2    A    It wouldn't be something we would -- I would do anyway.

3    It's not part of our practice.  It's someone's statements.

4    That would be doctoring a document.

5    Q    Okay.  And -- and -- and at some point in the

6    investigation process, did you pull or retrieve -- I don't know

7    what word you would use -- comparator information about other

8    employees who might have been involved in similar disciplinary

9    situations at JFK8?

10        MS. COX:  Objection.  Leading.

11        JUDGE GREEN:  Overruled.

12        THE WITNESS:  Yes.  It is part of our practice, especially

13   when we're going to have multiple individuals involved in the

14   reviewing of this investigation to ensure they have an

15   understanding of what past precedent was in the building.  So

16   yes, we did pull.  I had someone pull -- I don't do it myself,

17   so I did delegate that task.

18   Q    BY MR. MURPHY:  Okay.  And -- and do you -- do you recall

19   who you delegated it to?

20   A    No.  I do not.

21   Q    And do you know -- and when -- did you review or receive

22   the comparator information that was pulled at your direction?

23   A    I reviewed it.  I didn't deep bite -- deep dive into it,

24   but I did review.

25   Q    Okay.  And was that information passed on to anyone else,
```



1    if you know?

2    A    Yes.  To regional human resource manager, Bradley

3    Campbell.

4    Q    Okay.  And was Mr. Campbell your direct supervisor at that

5    time?

6    A    At that time, yes.

7    Q    And -- and at that time, would it have been regular or

8    routine for -- for Mr. Campbell to be involved in an

9    investigation occurring at JFK8, for example?

10   A    No.  Not as a norm, but this was a unique situation.

11   Q    Okay.  And what was unique about it?

12   A    There was an altercation outside the building in the

13   middle of a protest.  This was very new in the middle of

14   pandemic as we were learning how to adjust at not only, you

15   know, at Amazon but in the world for us, personally.  So there

16   was a lot of different that made this a unique situation.

17   Q    So -- so after you reviewed the -- the -- the witness

18   statements and -- and obtained the comparator information, what

19   was the -- what was the next step of the investigation?

20        MS. COX:  Objection, Your Honor.  I need a time frame.

21        JUDGE GREEN:  Okay.  Well, we can get to that.

22        MS. COX:  All right.

23        JUDGE GREEN:  Overruled.

24   Q    BY  MR. MURPHY:  Yeah.  So you -- you -- you testified

25   previously that you reviewed the witness statements, right?



1    When -- when did you do that approximately?

2    A    As the course as he was attaining them since I was

3    physically there, I was able to review them as Tyler was having

4    the conversations and he was gathering them.

5    Q    Okay.  And do you remember what date that you would have

6    completed that process by?

7    A    Between the 6th and the 7th.  We started immediately the

8    day of.

9    Q    Okay.  And -- and after you h ad completed the collection

10   and review of the witness statements, what happened next in the

11   investigation?

12   A    Once we reviewed, then we started to develop what would be

13   the seek to understand conversation, which occurred on April

14   10th.

15   Q    Okay.  Did you conduct that seek to understand

16   conversation?

17   A    No.  I did not.

18   Q    Do you know who did?

19   A    Tyler Grabowski.

20   Q    And -- and prior to him having that seek to understand

21   conversation with Mr. Bryson on April 10th, did you interact

22   with him in any way regarding how that conversation would --

23   what would take place?

24   A    Yes, I did.

25   Q    Okay.  And why don't you tell me what you did.



# Exhibit E, Motion to Try Petition on Hearing Record

1  A     So even though he's an experience leader and has done many

2  investigations, I just wanted to make sure that one was

3  comfortable and that we didn't miss certain important questions

4  so that we can attain exactly Gerald Bryson's side of the story

5  based on some of the information we received from the witness

6  statements.  So directly asking did he call her a bitch, did he

7  call her a drug addict, did he say she was on fentanyl, so some

8  of the statements that were made in those statements, wanted to

9  make sure that we asked those direct questions so that he can

10  appropriately answer.

11  Q     Okay.  And -- and besides yourself, was anyone else

12  involved in that preparation process?

13  A     Yes.  After he and I spoke, he emailed that and shared

14  that information with Bradley Campbell for his review as well.

15  Q     Okay.

16      MS. COX:  Objection.  Your Honor, I really do need a

17  place, a time, anyone else present.  I have no idea when this

18  conversation took place.

19      JUDGE GREEN:  That's fine.  I mean, you can get that on

20  cross.  But fine.

21      Ms. Hernandez, first of all, do you recall when the

22  comparator disciplinary records were gathered?

23      THE WITNESS:  It was at some point in the beginning

24  between the 6th and the 7th just so we could have it, not for

25  myself necessarily because I had work in the building, but for



 1    Bradley Campbell's review.  It was in between those two days at

 2    some point.  I don't recall the exact date.  And most of the

 3    conversations with Tyler occurred in the general conference

 4    room since that's where I was.

 5         JUDGE GREEN:  Okay.  Mr. Murphy, do you want to fill in a

 6    couple of dates?

 7         MR. MURPHY:  Sure.

 8    Q    BY MR. MURPHY:  So the -- the -- the conversations that

 9    you -- that you testified to with Mr. Grabowski relating to the

10    seek to understand, when -- when did that occur -- or when did

11    those occur, I should say?

12    A    During the dates of his collection, which was between

13    April 6th and April 7th.

14    Q    Okay.  And -- and the conversations about what the seek to

15    understand, that's -- that's -- that's when that occurred?

16         MS. COX:  Objection.  Leading.

17         JUDGE GREEN:  Overruled.

18         THE WITNESS:  Clarify.

19    Q    BY MR. MURPHY:  Yeah, sure.  The -- so the conversations

20    about the seek to understand, on what dates, or at what times

21    did those occur?

22    A    Okay.  It's in reference to which seek to understand?  All

23    of the -- the --

24    Q    Yeah.  I apologize.  Yeah.  The preparation for the Bryson

25    seek to understand.



```
 1    A     Oh, the Bryson.

 2    Q     Yes.

 3    A     I don't recall the exact date because he was done with the

 4    previous witnesses by the 7th approximately.  I know we did

 5    have the questions for him or his actual seek to understand was

 6    on April 10th.  So if I recall correctly, I believe it was at

 7    some point that day before his conversation.

 8    Q     Okay.  Thank you.  Was anyone else present during --

 9    during the conversations between you and Mr. Grabowski?

10    A     I honestly don't recall is Sai was in the room at that

11    time or anyone else.  We were multitasking.  You know, we still

12    had a business to run, so I don't recall if he was in there or

13    not.

14    Q     Okay.  Thank you.

15          MR. MURPHY:  Is Kelcey Phillips online as well?

16          MS. PHILLIPS:  Yes.  I -- I'm here.

17          MR. MURPHY:  Okay.  All right.  Kelcey, I'm going to ask

18    you to show a -- a -- a few documents in a moment.  Can you do

19    that?

20          MS. PHILLIPS:  Yep.

21          MR. MURPHY:  Okay.  Kelcey, can you load Respondent 18,

22    please?

23          MR. KEARL:  Your Honor, do we need to exhaust her

24    recollection before we get to this part of the process?

25          JUDGE GREEN:  So what are we doing with this?
```



www.escribers.net | 800-257-0885

1    MR. MURPHY:  Yeah.  So I -- I -- I was just -- I -- I -- I

2    wanted to -- the witness to identify she -- well --

3    JUDGE GREEN:  Yeah.  I think she -- I think we -- we got

4    to this portion.  You're basically -- okay.  Overruled.

5    MR. MURPHY:  Yeah.

6    Q   BY MR. MURPHY:  Ms. -- Ms. -- Ms. Hernandez, the -- the --

7    the materials that you described a minute ago regarding the --

8    the Bryson STU, were they ever -- were they ever forwarded to

9    you in an email format?

10    A   Yes, they were.

11    MR. KEARL:  Objection.  Leading.  We've got the document

12    in front of us here.

13    JUDGE GREEN:  Okay.  It's not disputed.  Let's move

14    through it as quickly as we possibly can.

15    MR. MURPHY:  I'm trying, Judge.

16    Q   BY MR. MURPHY:  Ms. Hernandez, can you identify the

17    document that's on the screen?

18    MR. MURPHY:  And actually, if you can, Kelcey, can you

19    blow it up substantially, please?  Thanks.

20    Q   BY MR. MURPHY:  Ms. Hernandez, you want to -- do you want

21    to take a minute and read that, please?

22    THE WITNESS:  Can you shrink it slightly because all of --

23    yeah -- camera views are covering some of it.  Actually, I will

24    move the camera views.  Okay.  Can you go back to the top,

25    please?  Okay.



www.escribers.net | 800-257-0885

1    JUDGE GREEN:  Can I just -- can I just ask.  We have

2    Ms. Hernandez's email in all of these.  Nobody's contesting

3    that she didn't receive and see these documents.  Can we just

4    move through it?

5    THE WITNESS:  Okay.

6    MR. MURPHY:  Okay.

7    Q    BY MR. MURPHY:  Ms. -- Ms. Hernandez, did -- did you

8    receive the -- the document, that -- Respondent's 18?

9    MR. KEARL:  Document speaks for itself.

10   THE WITNESS:  Yes.

11   Q    BY MR. MURPHY:  Okay.

12   JUDGE GREEN:  Overruled.

13   Q    BY MR. MURPHY:  I just want to -- I just want to ask you a

14   question about --

15   MR. MURPHY:  Well, I -- I would like the witness to have

16   an opportunity to review the document, Judge, just briefly.  I

17   do want to ask her a question about the content of it.

18   JUDGE GREEN:  Okay.  Is there something specific?

19   MR. MURPHY:  Yes.  There is, Judge.

20   THE WITNESS:  Can you shrink it?  Thank you.

21   MR. KEARL:  Your Honor, can't he ask his question without

22   having her review the document, and then use the document to --

23   JUDGE GREEN:   Yes.  I mean, why don't you do it.

24   MR. MURPHY:  Okay.

25   Q    BY MR. MURPHY:  Ms. Hernandez, on April 10th when Mr.



1    Grabowski conducted Mr. Bryson's seek to understand

2    conversation, had -- had he been authorized to terminate Mr.

3    Bryson under any circumstances based on the outcome of the seek

4    to understand?

5    A    No.  He had not.

6         MS. COX:  Objection.

7         JUDGE GREEN:  What objection?

8         MS. COX:  Leading.

9         JUDGE GREEN:  Overruled.

10   Q    BY MR. MURPHY:  Ms. Hernandez, on Friday, April 10th,

11   had -- had a decision been made with respect to the level of

12   discipline or accountability that was --

13        MR. KEARL:  (Indiscernible, simultaneous speech) --

14   Q    BY MR. MURPHY:  -- going to be meted out to Mr. Bryson?

15        JUDGE GREEN:  Overruled.

16        THE WITNESS:  No.  There was no decision made at that

17   time.

18   Q    BY MR. MURPHY:  The -- if you know, does -- does this

19   email string contain so-called feedback verbiage that could be

20   utilized to -- to -- to -- to impose discipline?

21   A    Yes.  It was on the document for review, not for the

22   purpose of usage at that time.

23   Q    Okay.  And did Mr. Bryson -- I'm sorry, did Mr. --

24   we've  -- we've had this, but did Mr. Grabowski conduct the

25   seek to understand meeting?



Exhibit E, Motion to Try Petition on Hearing Record

2030

```
1    A    Yes, he did.

2    Q    And did he prepare a report.

3    A    What do you mean a report?

4    Q    A summary or recap of the seek to understand.

5    A    Yes, he did.

6    Q    And did you review that?

7    A    Yes, I did.

8    Q    As a result of the review of that seek to understand --

9    what should I call it, by the way, a recap, a summary?  I mean,

10   what would you call it?

11   A    It would be an investigation summary.

12   Q    Okay.  As a result of the review of that investigation

13   summary, was any further investigation conducted?

14   A    Yes, there was.  Based on a statement from Gerald Bryson,

15   there was something that he reported out, such as a -- I don't

16   remember exactly with quotes, but I believe he had said that

17   Dimitra Evans had told him to shut the fuck up, and that was

18   nowhere in her statement or any of the other statements.  So in

19   fairness to him, we needed to clarify if she said that or not.

20        The second thing that was divulged in our conversation was

21   apparently there was another witness to the altercation that he

22   had mentioned, a female, but he said he could not recollect who

23   it was.

24   Q    Okay.  And --

25   A    So I --
```



1    Q    Oh, I'm sorry.  Go ahead.  Finish your answer.

2    A    I asked Tyler to circle back with Dimitra to verify if she

3    had said that or not.

4    Q    Okay.  And I'll come back to that in a minute, but what --

5    what about the -- Mr. Bryson identifying a witness.  What

6    happened with that?

7    A    So based on him bringing that to our attention, my

8    understanding was Tyler did -- said that he was going to circle

9    back with him to give him some time to think about it, but in

10   the interim, I did tell Tyler, let's see if we can figure out

11   who it is since he did bring that up as another witness so we

12   can identify and have a conversation if we're able to identify

13   who it is.

14   Q    Okay.  And -- and what steps did you take to identify who

15   that person was?

16   A    Trying to look at the -- the camera footage as the event

17   was happening, we did see a person there, but at no point could

18   we identify who it is in order to use our phone tool system,

19   which is a -- a phone tool that has all of our mems, our meme

20   matches with pictures, our hire dates, who our managers, and

21   there was no way to identify who the individual was so that we

22   could have that seek to understand conversation with her.

23   Q    Okay.  You -- you -- you -- I think you referred to some

24   video footage in -- in that answer that --

25   A    Well, we were watching --



1    Q    Okay.

2    A    -- everything outside.

3    Q    Okay.

4         MR. MURPHY:  Kelcey, can you please load General Counsel

5    62?

6         MR. KEARL:  Standing objection, Your Honor.  I -- I

7    believe there needs to be a question before we're going to try

8    to --

9         MR. MURPHY:  Okay.  Fine.  Don't -- don't -- she -- she

10   said -- she identified the video, Judge.

11        JUDGE GREEN:  I think we know what the video is at this

12   point.  That's all I'm interested in hearing is just that this

13   confirms that the videos we have in evidence are the videos she

14   looked at.

15        MR. MURPHY:  Yes.  Okay.

16        JUDGE GREEN:  And I -- by the way, I don't think we have

17   to watch the whole video in order to --

18        MR. MURPHY:  I'm not -- I'm not going to play a second of

19   it, Judge.

20        JUDGE GREEN:  Okay.

21        MR. MURPHY:  Yeah.

22   Q    BY MR. MURPHY:  Do you I -- do you recognize this video

23   feed, Ms. Hernandez?

24   A    Yes.

25   Q    Is -- and -- and is -- is it the video feed that you were



1    referring to a minute ago in your testimony?

2    A    Yes.

3    Q    Okay.

4         MR. MURPHY:   And Kelcey, if you could, put your cursor

5    over the person that's between the two cars carrying the blue

6    sign.

7    Q    BY MR. MURPHY:   Okay.   Do you see that, Ms. Hernandez,

8    where the cursor is?

9    A    Yes.

10   Q    Okay.   Is -- is -- is that the individual that you tried

11   to identify?

12   A    That was the person.

13   Q    Okay.   And were you able to identify that person?

14   A    No.   We were not.

15   Q    So the issue that came up in the Bryson seek to understand

16   about the shut the F up, or frankly I forget what words you

17   used precisely, how -- what -- what -- how was that issue

18   looked into or -- or resolved?

19   A    I asked Tyler to circle back with Dimitra when whatever

20   her next scheduled day was so that we could verify if she said

21   that or not.

22   Q    Okay.   And -- and did that happen?

23   A    Yes.   It happened on April 15th.

24   Q    And did Mr. Grabowski -- did -- did Mr. Grabowski conduct

25   that -- that conversation?



www.escribers.net | 800-257-0885

1    A    Yes, he did.

2         MS. COX:  Objection.  I'm sorry, excuse me, Mr. Murphy.  I

3    just want to -- I know I have a standing Bannon Mills

4    objection, but I do want to repeat it for the record to this

5    line of questioning as it relates to the investigation.

6         JUDGE GREEN:  Right.  So the General Counsel has a Bannon

7    Mills objection to the entire investigation, which would

8    include the entirety of multiple witnesses.

9         MS. COX:  Yes.

10        JUDGE GREEN:  Right.  Okay.

11        MS. COX:  Thank you.

12        JUDGE GREEN:  I understand.  So go ahead.

13        MR. MURPHY:  Okay.  Thank you.  And Kelcey, you can take

14   that down, please.

15   Q    BY MR. MURPHY:  And -- and so -- I -- I think my last

16   question had to do with whether you -- you knew whether

17   Mr. Grabowski had -- can you hear me?

18   A    Now, I hear you.  I couldn't hear you very well.  Sorry.

19   Q    That's all right.  I've been having a little problem with

20   my audio as I hear from time.  Can you hear me okay now?

21   A    Yes.

22   Q    Okay.  Did -- did Mr. Grabowski conduct a -- a second

23   conversation with Ms. Evans on April 15th?

24        MS. COX:  Objection, Your Honor.  It's a second

25   conversation.  She didn't testify to that.



1    Q    BY MR. MURPHY:  Did -- did Mr. Grabowski --

2         MS. COX:  Assuming facts not in evidence.

3         MR. SHENKMAN:  Well --

4    Q    BY MR. MURPHY:  Did -- did -- did Mr. Grabowski conduct --

5    have a conversation with -- with Ms. Evans on April 15th?

6    A    Yes, he did.

7    Q    And did he prepare an investigation summary or some other

8    document recapping that -- that conversation?

9    A    Yes, he did.

10   Q    And did you review that?

11   A    Yes, I did.

12   Q    And what, if anything, did Ms. Evans say about her

13   language and whether she used the term shut the F up in -- in

14   connection with her altercation with Mr. Bryson?

15        MS. COX:  Objection.  The document speaks for itself and

16   hearsay.

17        JUDGE GREEN:  I'm -- no.  He's actually avoiding having

18   her read from the document.

19        MR. MURPHY:  Right.

20        JUDGE GREEN:  This -- this concerns your -- your

21   recollection of the incident of what was communicated to you

22   regarding Ms. Evans' statement.

23        THE WITNESS:  She denied saying it.  She denied using any

24   other curse words.

25   Q    BY MR. MURPHY:  Okay.  And to -- to your recollection or



# Exhibit E, Motion to Try Petition on Hearing Record

1    understand, was -- was that the last active part of the

2    investigation into the -- the altercation on that -- on April

3    6th?

4    A    Yes.

5    Q    And what, if anything, did you do in connection with

6    the -- the altercation and what level of accountability -- by

7    the way, I guess I should say you often use the term

8    accountability to refer to a discipline; is that -- is that

9    right?

10   A    That's correct.

11   Q    Okay.  After the interview with Ms. Evans that you just

12   testified about, what was the -- what was the next stage in

13   the -- in the resolution of what level of accountability would

14   be appropriate for Mr. Bryson and -- and/or Ms. Evans?

15   A    Then we had to deliberate with our key stakeholder, so

16   that conversation involved legal, Kirstin LaRosa, our regional

17   operations manager Anand Mehta (phonetic throughout), our

18   regional operations -- I'm sorry, HR manager, Bradley Campbell,

19   operations senior leader GM Sai Kotha, and myself.

20   Q    Okay.  So with --

21   A    Sorry, and employee relations as well, Milly Gutierrez,

22   Alicia Stonebridge (phonetic throughout).

23   Q    Okay.  Thank you.  Now, I -- I don't want you to tell me

24   about the -- the -- the -- the discussions or the -- or the

25   specifics of the deliberations because counsel was present,



 1    but -- but I would like you to tell me, as a result of those

 2    deliberations, was a decision made as to the level of

 3    accountability for -- for Mr. Bryson and -- and for Ms. Evans?

 4    A    Yes.

 5    Q    And -- and what was the level of accountability for Mr.

 6    Bryson?

 7    A    Termination.

 8    Q    And did you -- I'm -- I'm asking you now personally -- did

 9    you agree with the level of accountability for Mr. Bryson being

10    termination?

11    A    Absolutely.

12    Q    And -- and why did you -- why did you agree with that?

13         MS. COX:  Objection.  Relevance.

14         JUDGE GREEN:  Overruled.

15         THE WITNESS:  The egregious nature and vulgar, abusive,

16    harassing nature in which he spoke to her and how the entire

17    totality events of his behavior occurred including up to

18    calling her several different names -- drug addict, on

19    fentanyl, drug abuser, a bitch and several other things that

20    were in those statements -- the totality of behavior was

21    unacceptable.  And whether that incident happened inside the

22    building or outside was irrelevant.  The outcome would have

23    been the same.

24    Q    BY MR. MURPHY:  Okay.  And -- and what about Ms. Evans.

25    What was the level of -- of accountability that was decided for



Exhibit E, Motion to Try Petition on Hearing Record

```
 1   her?

 2   A    Final written warning.

 3   Q    And did -- did you personally agree with that decision or

 4   Ms. Evans?

 5   A    No, I didn't.

 6   Q    If you didn't agree with it, then how was the decision

 7   to -- to -- to issue a final written warning made?

 8   A    I had what's called, part of our Amazon principles, a

 9   disagreeing commit moment where when there's several

10   individuals involved in a conversation, an incident, whatever

11   the situation may be, and everyone seems to be aligned on the

12   spectrum, and again, depending on what the situation is, I did

13   disagree and commit in the moment based on the consensus of the

14   rest of the individuals in the conversation.

15   Q    Did you subsequently raise your concerns about that level

16   of accountability with anyone?

17   A    Yes, I did.

18   Q    And who --

19        MS. COX:  Judge, I just want to object, again.  This

20   conversation, I have no time frame, no date, no location, who's

21   present.  I'm -- I'm sorry, I can't follow the testimony.

22        MR. MURPHY:  Well, I -- I just asked her about it.

23   I'll  -- I'll -- I'll get to the specifics in a second.

24        MS. COX:  I'm sorry.  You were moving on to a subsequent

25   conversation was my understanding.
```



1       MR. MURPHY:  Oh, okay.  Yeah.  So -- so -- so -- I -- I

2    understand.

3    Q    BY MR. MURPHY:  So the -- the -- the -- the deliberations

4    that you referred to, when did those occur?

5    A    So it was on April 16th.  Sai Kotha and I were in the

6    conference room, as I previously stated, and we had a

7    conference call with the rest of the stakeholders since they

8    were not in the building.

9    Q    Okay.  And -- and then I -- I had -- I had asked you about

10   the -- your -- what do you call it -- disagree and commit

11   moment?  Right, right, right.  So when did you raise your

12   concerns about Ms. Evans' level of accountability with whom --

13   I -- I don't know if you told me who they were or not, but why

14   don't you just, first of all, tell me when you did that, and --

15   and who you raised it with and what you said.

16       MS. COX:  Can we do one at a time, please?  I'm sure.

17       THE WITNESS:  Sure.

18   Q    BY MR. MURPHY:  Just go ahead.  Just go ahead and answer

19   the question, please.

20       MS. COX:  It was a compound question.  You're asking --

21       MR. MURPHY:  The -- the witness understood it perfect.

22       JUDGE GREEN:  I -- overruled.

23       THE WITNESS:  So on April 16th at some point after we were

24   done with the call, I spoke to Sai Kotha and gave him  my

25   assessment of the situation comparing the two individuals of



1     the incident.  And it was absolutely no comparisons on both

2     behaviors at that time where I felt that Dimitra Evans would

3     receive a level one below what Gerald Bryson was receiving when

4     the behaviors were nowhere near the same.

5         So yes, did she deserve some accountability?  Absolutely,

6     without a doubt.  But I felt that a final written warning was

7     not warranted given her behavior and what occurred on that day

8     in comparison to his.  There was no comparisons.  So I felt

9     that a first written warning was accurate.

10        So I went through that information with Sai Kotha first

11    because at the end of the day he is the operations leader, and

12    he needs to have -- buy in on that thought process, whether he

13    feels that is appropriate or not.  And then I did speak to

14    regional human resource manager, Bradley Campbell, who was part

15    of the decision, who I reported to at that time, and I voiced

16    my concerns.

17    Q    BY MR. MURPHY:  And as a result of those conversations,

18    what, if anything, happened to the level of accountability for

19    Ms. Evans?

20    A    It was reduced to a first written warning.

21    Q    And do you know the date on which the accountabilities for

22    Mr. Bryson and -- and Ms. Evans were issued?

23    A    They were both delivered on April 17th.

24    Q    Okay.  And did -- have you seen both of them?

25    A    Yes, I have.



Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 2009 of 2171 PageID #: 955
Exhibit E, Motion to Try Petition on Hearing Record
2081

1    Q    Okay.  And are -- are you familiar with something called

2    the Amazon Owner's Manual?

3    A    Yes.

4    Q    Does that contain certain standards of conduct or -- or

5    work rules?

6    A    Yes, it does.

7    Q    Are you familiar with those?

8    A    Yes.

9    Q    Are -- are -- is -- are you familiar that they're broken

10   into categories?

11   A    Yes.

12   Q    And what -- what are the categories, if you know?

13   A    You have Category 1 and Category 2 infractions.

14   Q    Okay.  And what's --

15   A    Next one's on --

16   Q    I'm sorry.  I'm sorry.  Let me -- go ahead.  I was talking

17   over you.  If you can explain, go ahead.

18   A    A Category 1 infraction is deemed more severe compared to

19   a Category 2 of which either one compared to them, depending on

20   the situation and what we're investigation, either one of them

21   can lead up to and including termination.

22   Q    Okay.  And are -- are you familiar with the standard of

23   conduct violation that Mr. Bryson and/or Ms. -- Ms. Evans were

24   charged with?

25   A    Yes.



1    Q    And do you know what that is?

2    A    Category 2 infractions, vulgar, abusive language.

3    Harassing --

4    Q    That was for both of them?

5    A    That was for both of them.

6    Q    Okay.  You -- you -- you talked a -- a little bit earlier

7    about loss prevention, and -- and -- and I asked you a question

8    or two about it.  What -- what role, if any, did loss

9    prevention have in this -- in the investigation process that

10   you described?

11   A    So as a (indiscernible), we usually do try and partner,

12   depending on what the incident is, with loss prevention.  And

13   at the time, since Geoffrey Gilbert-Differ was there, the

14   regional loss prevention manager, he did -- did the initial

15   assessment and had thought that this was a workplace violence

16   incident.  And in the case, if it is a -- what we called a WPV,

17   workplace violence -- loss prevention would take the lead on

18   the investigation in partnership with human resources.

19        If it's not deemed a workplace violence incident, then HR

20   would continue the lead in the investigation.  During that

21   course of the investigation, as we were collecting the

22   statements and we were doing our normal standard of work,

23   Geoffrey Dibble Gifford did report out using our WIM

24   notification, which is our workplace incident reporting that

25   loss prevention uses, and he did summarize from his point of


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    view the series of events, but then also did deem that it was

2    not a workplace violence incident.

3    Q    Okay.  And -- excuse me one second.

4    A    May I grab a tissue please?

5    Q    Yes.

6    A    Thank you.

7         Thank you.

8    Q    No problem.  Okay.  You were talking about the loss

9    prevention role.  Did -- did -- did loss prevention in this

10   case do an assessment of the altercation involving Mr. Bryson

11   and Ms. Evans?

12   A    Yes, they did.

13   Q    All right.  Do you know who -- who did that -- who did the

14   assessment?

15   A    Our regional operations, Geoffrey Dibble Gifford did it.

16   At that time, we did not have a loss prevention manager in the

17   building.

18   Q    Okay.  And in that assessment, did Mr. Gilbert-Differ make

19   any sort of recommendation regarding accountability for either

20   of the associates?

21        MS. COX:  Objection, Your Honor.  Document speaks for

22   itself.

23        JUDGE GREEN:  We're not talking about what's in the

24   document.  What's your -- Ms. -- Ms. -- no.  Ms. Hernandez,

25   what's your -- what's your recollection of the recommendation?



1        THE WITNESS:  Loss prevention recommended a termination or

2   Gerald Bryson.

3        JUDGE GREEN:  Thank you.

4   Q    BY MR. MURPHY:  And -- and that recommendation, was it --

5   was it binding on human resources, or did it foreclose you in

6   any way from reaching a different conclusion?

7        MS. COX:  Objection.  Leading.

8        JUDGE GREEN:  Overruled.

9        THE WITNESS:  Not at all.

10       MR. MURPHY:  Judge, can I go off the record for a minute,

11   please?

12       JUDGE GREEN:  Yes.  Off the record.

13   (Off the record at 11:27 a.m.)

14                  **RESUMED DIRECT EXAMINATION**

15   Q    BY MR. MURPHY:  Okay.  Ms. -- Ms. -- Ms. Hernandez, at any

16   point in the investigation and deliberation process you just

17   described, did you ever see a document called an executive

18   summary?

19   A    Yes.

20   Q    And -- and do you recall when you saw that?

21   A    After.

22   Q    After what?

23   A    After our deliberations and decisions were made on what

24   the outcomes were going to be for everyone.  It was after.

25   Q    Okay.  And that document, did you play any part in -- in



Exhibit E, Motion to Try Petition on Hearing Record

2003

```
1     its creation?

2     A     No.

3     Q     You didn't draft it or edit or revise it in any way?

4     A     No.

5     Q     Okay.  Does -- does Amazon have a -- a -- a process

6     whereby associates who are disciplined can file an appeal, so

7     to speak?

8     A     Yes, they do.  And there's exceptions to those appeals.

9     Q     Okay.  In this case, was Mr. Bryson eligible to appeal his

10    discipline?

11    A     He was not eligible.

12    Q     Okay.  And -- and why is that, if you know?

13    A     Under the category for the -- the actual infraction of

14    harassment, that is one of the exceptions under the appeals

15    process policy.

16    Q     Okay.

17          MR. MURPHY:  Judge, can I just have one second?

18          JUDGE GREEN:  Yes.  Off the record.

19          MR. MURPHY:  Thank you.

20    (Off the record at 11:33 a.m.)

21          MR. MURPHY:  Thank you, Judge.  Nothing further at this

22    time.

23          JUDGE GREEN:  Okay.  From the General Counsel?

24          MS. COX:  Yes, Judge.  May we get a -- about 30 minutes or

25    so?
```



Exhibit E, Motion to Try Petition on Hearing Record
2066

```
1      JUDGE GREEN:  Okay.  So Ms. Hernandez, we're going to be

2    off the record now for 30 minutes, so we'll be back at, let's

3    say, 12:10.

4      THE WITNESS:  Okay.

5      JUDGE GREEN:  So you can move around, do whatever you

6    want.  You can close your -- you can stop your video.

7      THE WITNESS:  Okay.

8      JUDGE GREEN:  Just don't talk to anybody about your --

9    about the case or your testimony.

10     THE WITNESS:  Okay.

11     JUDGE GREEN:  Okay.  Off the record.

12     THE WITNESS:  Thank you.

13   (Off the record at 11:37 a.m.)

14     JUDGE GREEN:  And Ms. Hernandez, the Government's attorney

15   is going to have some questions for you on cross-examination.

16                      CROSS-EXAMINATION

17   Q    BY MS. COX:  Good morning, Ms. Hernandez -- or good

18   afternoon, I should say.

19   A    Good afternoon.

20   Q    Ms. Hernandez, you testified that you reviewed a

21   surveillance camera on April 6th, 2020, correct?

22   A    Yes.

23   Q    Okay.  And the camera that you reviewed, it didn't have

24   sound, did it?

25   A    No.
```



1    Q    Actually, let me just take a step back with you.  I -- I

2    failed to ask you:  who did you meet with to prepare your

3    testimony yesterday?

4    A    Chris Murphy, Liz Hackett.

5    Q    Anyone else?

6    A    And Z. Ahmad, Milen Dimmerstein (phonetic throughout), and

7    Kirstin LaRosa.

8    Q    And did you review any documents yesterday?

9    A    Yes, some.

10   Q    What documents did you review?

11   A    Documents that are relevant to the investigation from

12   April 6th.

13   Q    Can you give me examples of those documents?

14        MR. MURPHY:  Objection, Your Honor.  It's work product and

15   attorney-client privilege the specific materials that she was

16   showed for preparation.

17        JUDGE GREEN:  Well, to the extent that it's document

18   that -- that were used to refresh her recollection, that is --

19   it's subject to production to the extent I decide that justice

20   requires the party to have those -- those documents.  So why

21   don't we -- why don't we inquire as to why the General Counsel

22   needs them.

23        MS. COX:  Judge, I'm -- she testified that it was

24   documents relevant to the investigation.

25        JUDGE GREEN:  Ms. Hernandez, let -- let me ask you a



1    question.  The documents that -- that -- that you reviewed, did

2    you use them to refresh your recollection of the events that

3    occurred on April -- on April 6th?

4        THE WITNESS:  Not all of them for that purpose.  Some

5    of  -- most of the things I did remember naturally.

6        JUDGE GREEN:  Okay.  So listen, you can -- you can inquire

7    into -- into what documents were -- she used to refresh her

8    recollection during prep.

9        MS. COX:  Okay.

10   Q    BY MS. COX:  Can you tell me which documents that you used

11   to refresh your recollection on the events of April 6th?

12   A    Some of the email correspondence in reference to the

13   summary of the accounts and then the statements from the

14   witnesses.

15   Q    And when you say email correspondence, by and between

16   whom?

17   A    Tyler Grabowski, Bradley Campbell.

18   Q    Did you review any other email communications?

19   A    Loss prevention.

20   Q    You reviewed emails from loss prevention?

21   A    Loss prevention to myself, yeah.

22   Q    And who from loss prevention were copied on those emails?

23       MR. MURPHY:  Objection.  Misstates the testimony.

24       JUDGE GREEN:  Okay.  Do you want to clarify, Ms. Cox?

25   Q    BY MR. MURPHY:  Who from loss prevention was on those



1       emails?

2           JUDGE GREEN:  What's the objection to that?

3           MR. MURPHY:  Well, I -- I -- I mean, Judge, I'm happy to

4       identify the document.  It's in the record.

5           JUDGE GREEN:  Okay.

6           MR. MURPHY:  Yeah.  It's the --

7           JUDGE GREEN:  That would be helpful, you know.

8           MR. MURPHY:  Yeah.

9           JUDGE GREEN:  If we've got a list, then we can --

10          MR. MURPHY:  Yeah.  That -- that document is -- oops --

11      give me one second, Judge.  I've got --

12          MS. COX:  Judge, I'm asking her if she recalls what

13      document --

14          JUDGE GREEN:  We've got -- we've got -- we've got -- these

15      are documents that were used in prep.  They're arguably used to

16      refresh her recollection.  If we skip to the chase, Mr. Murphy

17      was obviously at prep.

18          MR. MURPHY:  Yeah.

19          JUDGE GREEN:  And if he's got a list of them, let's get a

20      list of them.

21          MR. MURPHY:  So yeah.  It was the -- the -- the -- the

22      loss prevention documents Respondent 14.

23          MS. COX:  And what is Respondent 14?

24          MR. MURPHY:  It's that GSOC WIM (phonetic) notification

25      that Mr. Gilbert-Differ testified about.



```
 1        MS. COX:  Was that -- okay.

 2        MR. KEARL:  Care you share the -- the Bate number for that

 3   since I don't have SharePoint access?

 4        MR. MURPHY:  182.

 5        MS. COX:  Okay.

 6   Q    BY MS. COX:  And you mentioned before you met with several

 7   of the attorneys, correct?

 8   A    Yes.

 9   Q    Okay.  And you identified Chris Murphy, Liz Hackett, Z.

10   Ahmad.  Did you mention someone else?

11   A    Kirstin LaRosa.

12   Q    Okay.

13   A    And Mile Dimmerstein.

14   Q    I'm sorry.  Say again.

15   A    And Milen Dimmerstein.

16   Q    Who's Milen Dimmerstein?

17        MR. MURPHY:  An attorney that she prepped with.

18        MS. COX:  I'm asking the witness the question.

19        JUDGE GREEN:  Okay.  So I don't understand why we need

20   this, so let's move through it.

21        MS. COX:  Okay.

22   Q    BY MS. COX:  Ms. Hernandez, the surveillance cameras that

23   you reviewed, were those cameras always in the same room?

24        MR. MURPHY:  Objection to the form.

25        JUDGE GREEN:  What's your -- what's your problem with --
```



1    MR. MURPHY:  The -- the -- there's been no testimony that

2    cameras were in the room, and I don't know what -- I don't know

3    what the question is asking.

4    JUDGE GREEN:  All right.  So you can clarify, Ms. Cox.

5    Q    BY MS. COX:  Was the surveillance footage that you viewed

6    always viewable from the same room?

7    A    I don't understand the question, and what do you mean

8    always in the same room?

9    Q    Before April 6th, was the surveillance footage that you

10   viewed viewable in the room that you were in?

11   MR. MURPHY:  Objection.  There was not testimony that she

12   reviewed anything before April 6th.

13   MS. COX:  It -- I didn't --

14   JUDGE GREEN:  Okay.

15   MS. COX:  I said on April 6th.

16   MR. KEARL:  Also, insofar as this witness has is also

17   called under 611(c), I don't believe that this cross-

18   examination should be limited to this --

19   JUDGE GREEN:  It's not limited to that.  We're just trying

20   to get a -- it's not limited to that.  I think we're just

21   trying to get a question that the witness understands, that she

22   said she really didn't understand the last question.

23   Q    BY MS. COX:  So you testified you reviewed surveillance

24   footage on April 6th, correct?

25   A    We were watching live in the moment the protests.



1  Q    Correct.  And you testified that you were watching live

2  from the general manager's office, correct?

3  A    The general managers conference room.  Yes.

4  Q    Okay.  And my question is: how -- was that surveillance

5  footage always available before April 6th in the manager's

6  office?

7      MR. MURPHY:  Objection.  First of all to relevance, and

8  second to the -- it assumes facts not in evidence.  There was

9  no testimony that she viewed anything before April 6th, and

10  it -- the -- the -- the -- the things that occurred prior to

11  April 6th relating to PCA and animus, Judge, you said are not

12  an issue any further in this case.

13      JUDGE GREEN:  Okay.  I -- I -- I'm going to overrule that,

14  the relevance -- the relevance portion.  But can you ask it

15  again?

16  Q    BY MS. COX:  The surveillance footage that you viewed on

17  April 6th in the managers conference room, was it viewable in

18  the same place before April 6th?

19      MR. MURPHY:  Same objection, Judge.

20      JUDGE GREEN:  Okay.  Overruled.

21      THE WITNESS:  I don't -- I just -- I -- I actually don't

22  know what you're looking for, so I don't know --

23      JUDGE GREEN:  Well, let me ask you -- let me ask, Ms. --

24  Ms. Hernandez.  Are -- did that video feed that you were

25  viewing on April 6th, is that a video feed that you can always



Exhibit E, Motion to Try Petition on Hearing Record                                                              967

1      view from where you were, including before April 6th?

2           THE WITNESS:  So anyone can access the videos -- the

3      camera system for the buildings, just like any of our buildings

4      from the laptops, if you know how to use the system and have

5      access to it.  So you can view it --

6           JUDGE GREEN:  Okay.

7           THE WITNESS:  -- from the laptops or from an office.  It

8      doesn't matter.

9           JUDGE GREEN:  Okay.  Thank you.

10     Q     BY MS. COX:  And that system is the Lanelle (phonetic

11     throughout) system, correct?

12     A     No.

13     Q     What system is it?

14     A     It's called CCTV.

15     Q     Okay.  And there was no windows in the office that you

16     were in -- the managers conference room -- correct?

17     A     There were windows.

18     Q     Okay.  All right.  So before April 6th, it's true that

19     Mr. Gilbert-Differ --

20          MS. COX:  I'll -- I'll Strike that.

21     Q     BY MS. COX:  Before April 6th, you were aware that

22     employees raised COVID concerns at managers meetings, correct?

23          MR. MURPHY:  Objection.  Relevance, Judge.

24          JUDGE GREEN:  What is the relevance of this?

25          MS. COX:  Judge, we've told you time and again that



1    whether this is Bannon Mills -- I'm sorry --

2        JUDGE GREEN:  No.  Sustained.  You want to go there, you

3    can take a special appeal.

4        MR. JACKSON:  Your Honor, can we clarify your ruling on

5    this point, sir?  What is your ruling?

6        JUDGE GREEN:  My -- my ruling is -- is that as far as I

7    can tell, given the respondent's amended answer and admission

8    with regard to the fact that the altercation occurred in the

9    context of protected concerted protests, that this is -- this

10   is a Burnup & Sims case.  General Counsel hasn't been able to

11   articulate any scenario in which it's not a Burnup & Sims case

12   and which it's Wright Line.  But even if it were Wright Line, I

13   don't see how a Wright Line prima facie case wouldn't be

14   established.

15       What you're dealing with really now is the Burnup & Sims

16   second element, which is whether the employer had an honesty

17   belief that Mr. Bryson engaged in misconduct which warranted

18   discharged.  And there -- there's probably some evidentiary

19   overlap between that analysis and the Wright Line affirmative

20   defense.  And so you -- you probably have some overlap in terms

21   of evidence.  But that's -- that's where we're at.

22       And -- and the third -- the third aspect of the Burnup &

23   Sims basically gives the -- the -- the General Counsel a second

24   bite of the apple.  You know, to the extent the respondent can

25   establish they would have discharged Mr. Bryson regardless of

1    his protected concerted activity, or they had an honest belief

2    that he engaged in misconducted that warranted discharged,

3    under Burnup & Sims you get another shot to say, well, it

4    doesn't -- it doesn't matter.  He didn't engage in such serious

5    misconduct as to lose protection in the act.

6        But that -- that third element is just going to be

7    determined by Board members looking at the video and

8    determining whether it's -- whether it's protected or not.  So

9    really what you're left with is the second element of Burnup &

10   Sims and perhaps the affirmative defense of Wright Line.

11       But, frankly, I see no way that this case gets to Wright

12   Line.  And so we've been at this a long time, and I'm -- you

13   know, I've -- I've heard, I've considered where we're at, and I

14   believe that the litigation has been appropriately limited to

15   what I just indicated.  And if you -- if you want to take a

16   special appeal from that, you certainly can.  It looks like

17   we're going to have a -- you know, we're going to have a gap

18   anyway because the respondent's taking a special appeal with

19   the subpoena issue.  You know, if you want to take a -- a

20   special appeal to this, you know, do it now, and therefore, you

21   know, they'll probably both be dealt with in  the same time

22   frame.  And if we have to -- you know, if we have to come back,

23   we can deal with both at the same time.

24       MS. REIBSTEIN:  Your Honor, I have a question that needs

25   some clarification, please.  So the Burnup & Sims, one of the



www.escribers.net | 800-257-0885

1    prongs is, you know, a good-faith belief that Mr. Bryson

2    engaged in conduct -- serious conduct that warranted --

3        JUDGE GREEN:  That -- that is actually -- yeah.  I mean,

4    that is a broad statement of what the -- the second element is.

5    It's a broad statement in terms of allowing evidence to come

6    in.  In this -- no, go ahead.

7        MS. REIBSTEIN:  The -- the -- the problem is like, you

8    know, it's evident from the record that Mr. Bryson engaged in

9    certain conduct.  You know, he called Ms. Evans a -- a bitch

10   and made comments about her -- what -- what appeared to him to

11   be her drug use.

12       So the problem is that, you know -- the -- the -- the

13   question then is that was it serious enough to warrant

14   discharge.  We can't --

15       JUDGE GREEN:  Correct.

16       MS. REIBSTEIN:  We can't litigate serious enough without

17   evidence of, you know, disparate treatment, and you know --

18       JUDGE GREEN:  No.  Yeah.  You know, I'm not saying --

19       MS. REIBSTEIN:  And that I fear -- I fear that that's what

20   you're precluding us from doing.

21       JUDGE GREEN:  No.  I haven't been -- I have not been

22   precluding that.  So that's what I was saying, that this is a

23   pretty broad ((audio interference) of what the second element

24   is, and then I'm saying that it could arguably include stuff

25   like that, like disparate treatment, existing reasons,



1   circumstantial evidence that the employer didn't have an honest

2   belief that it -- that the discharge was warranted.  So I'm

3   allowing all that.

4        MS. REIBSTEIN:  Uh-huh.  Also -- also -- you know, also,

5   what would be relevant to that analysis would be the nature of

6   their investigation that they conducted.

7        JUDGE GREEN:  Yeah.  Absolutely.  I mean, that's the --

8   that's the bulk of it to me.

9        MS. REIBSTEIN:  Yeah.  So just to be clear -- forgive me

10  if I'm being dense, but like what is it that you are precluding

11  us from so that we know what --

12       JUDGE GREEN:  I'm not interested in -- I'm not interested

13  in protected concerted activity that -- that -- I'm really not

14  interested in protected concerted activity being that it

15  occurred because we have an admission that it occurred.

16       MS. REIBSTEIN:  Right.

17       JUDGE GREEN:  I'm not interested in animus regarding it

18  because we're -- we're really past the point where animus is

19  relevant.  Animus is -- is -- it's effectively established

20  by  -- by virtue of -- it's not -- animus is the wrong thing to

21  say.  It -- it's their --

22       MR. MURPHY:  Motivation.

23       JUDGE GREEN:  The respondent is admitting that they

24  discharged Mr. Bryson for conduct he engaged in while he was

25  engaged in protected concerted activity.  So the whole issue of



1    animus is not -- it's not just not relevant under the --

2         MS. REIBSTEIN:  Except for -- except for -- as you -- as

3    you correctly pointed out, there is some overlap.  And -- and

4    the evidence of --

5         JUDGE GREEN:  On the second element.  To the extent that

6    they -- to the extent that the -- the respondent would argue in

7    a Wright Line case that Mr. Bryson would have been discharged

8    regardless of his protected concerted activity, then that's

9    going -- there's overlap between that and the second element of

10   Burnup & Sims.  And that -- that could include things like

11   disparate treatment and shifting reasons.

12        You know, I mean, but -- but -- so that's all -- that's

13   all fair game.

14        MS. REIBSTEIN:  But also, with respect to, you know -- I

15   mean, like so, so severely cutting of anything that touches on

16   protected activity --

17        JUDGE GREEN:  Yeah.  But we --

18        MS. REIBSTEIN:  Well, wait, Your Honor.  Wait.  Let me

19   finish, please.  It -- you know, sometimes like in

20   cross-examination, you know, the cross-examiner has the right

21   to sort of develop testimony and to lead up to something.  And

22   with respect to whether or not there was protected activity,

23   there -- there is some overlap into -- I just lost my train of

24   thought.  I'm sorry.

25        JUDGE GREEN:  Really, I'm willing -- I'm -- I'm making



1    determinations as we go, and the General Counsel's attorney can

2    certainly make an assertion as to why certain things are

3    relevant.  But saying that they're trying to establish

4    protected concerted activity or animus with regard to protected

5    concerted activity, as far as I'm concerned, we're past that.

6    So that's a determination I'm making.  And you can take a

7    special appeal of that.  But that's -- I'm making rulings on

8    that basis.

9         MS. REIBSTEIN:  But so -- so some evidence about -- I

10   don't know -- monitoring --

11        MR. MURPHY:  Judge, Judge, we have -- we have a witness

12   on -- on the stand.

13        JUDGE GREEN:  Yeah.

14        MR. MURPHY:  And --

15        JUDGE GREEN:  Really.

16        MR. MURPHY:  Yeah.

17        JUDGE GREEN:  I mean, we're trying -- yes.  I mean --

18        MR. MURPHY:  And -- and -- and the counsel for the General

19   Counsel now this is their third witness in -- in the last ten

20   minutes.

21        JUDGE GREEN:  I'm trying -- I'm -- maybe I'm talking about

22   it too much, but I'm trying to talk about it in order to -- to

23   compel two parties to narrow the scope of -- of litigation and

24   to get you to understand why what you're asking is not

25   necessary at this stage.  I think we've discussed it.  To the



1    extent that I can explain it, I think I've tried to explain it.

2        MS. REIBSTEIN:  Thank you, Your Honor.

3        JUDGE GREEN:  Okay.

4    Q    BY MS. COX:  Ms. Hernandez, you know Pooja Desai, correct?

5    A    Yes.

6    Q    And in March and April of 2020, she was a catalogue

7    associate, correct?

8    A    I'm sorry, a what associate?

9    Q    Catalogue associate.

10   A    She was my human resource business partner.

11   Q    Does Ms. Desai go by any other names?

12   A    No.

13       MR. MURPHY:  Objection.

14       JUDGE GREEN:  Okay.

15       MS. COX:  What's the objection?

16       JUDGE GREEN:  We got the answer.

17       MS. COX:  Well, Judge, she's not in the organizational

18   chart.

19       JUDGE GREEN:  Okay.  So you got the answer.  The answer

20   was no.  So let's move on.

21   Q    BY MS. COX:  And Ms. Desai reported to you in March and

22   April of 2020, correct?

23   A    Correct.

24   Q    And what were -- what were her duties with respect to --

25   I'll -- I'll withdraw that.



Exhibit E, Motion to Try Petition on Hearing Record

1    So on March 25th, 2020, you -- you directed Ms. Desai --

2    or you gave Ms. Desai the names of the employees that were in

3    the managers meeting, correct?

4    MR. MURPHY:  Objection.  Relevance.

5    JUDGE GREEN:  Overruled.

6    THE WITNESS:  Repeat the question.

7    Q    BY MS. COX:  On March 25th, 2020, you gave Ms. Desai the

8    names of the employees who -- who protested in the managers

9    meetings, correct?

10   A    On March 25th?

11   Q    Yes, 2020.

12   A    In what way did I provide names of individuals who

13   interrupted the production meeting?

14   Q    I'm asking you.  Did you?

15   A    We did some research to find out who they were.

16   Q    Correct.  And what did that research involve?

17   A    We had to look at the cameras in the office to see who the

18   individuals were that interrupted the production meeting since

19   we didn't know who they were.  I didn't know who they were.  It

20   was literally, what, my second, third week back into the

21   building, so I didn't know anyone, so I was not familiar with

22   the associates.  And then utilizing the cameras to see faces,

23   then we used our phone tool system that we used to -- with our

24   badges with pictures, that's how they identify people in the

25   building, their whereabouts, and what buildings they work in



1    and hire dates, so that's how we were able to identify who the

2    individuals were.

3    Q    Okay.  And I'm going to show you a document.  It's General

4    Counsel's Exhibit 66.  Tell -- tell me when you can see my

5    screen.  Okay.  Do you see this document?

6    A    I can see it.  Give me a moment to look.

7    Q    Absolutely.

8         MR. MURPHY:  Could you -- could you show her the top of

9    the document, as well?

10        MS. COX:  Absolutely, if she can read any of it since it's

11   redacted.

12        THE WITNESS:  Okay.

13   Q    BY MS. COX:  And that's March 25th, 2020, correct?

14   A    Correct.

15   Q    Okay.  And you see this highlighted portion that I'm

16   showing you here?

17   A    Correct.

18   Q    So you forwarded a CHIME message that Mr. Gilbert-Differ

19   sent you to Ms. Desai, correct?

20   A    Correct.

21   Q    And Ms. Desai provided you a link to a document, correct?

22   A    It appears.  Yes.

23   Q    And that document contains the list of employees that were

24   raising COVID concerns, correct?

25   A    I don't know what that document is based on looking at



2083

```
 1    that right here.

 2    Q    And Ms. Desai asks you, "Who is Maurine?" correct?  You

 3    see that?

 4         MR. MURPHY:  Objection, Your Honor.  The document speaks

 5    for itself.

 6         JUDGE GREEN:  I -- I --

 7         MS. COX:  -- objection about it, Judge.

 8         JUDGE GREEN:  This concerns the -- your Bannon Mills

 9    motion?

10         MS. COX:  My Bannon-Mills motion?

11         JUDGE GREEN:  Is that why we're dealing with this -- this

12    document?

13         MS. COX:  Well, Judge, I'm -- I'm asking her some

14    questions about this CHIME communication.

15         JUDGE GREEN:  Okay.  That's not an answer.

16         MR. JACKSON:  It is, Judge.

17         JUDGE GREEN:  Then why are we -- why are we doing this?

18         MS. COX:  I have questions about what these -- what these

19    things are, Judge, what -- what's being discussed in this

20    document.

21         JUDGE GREEN:  Okay.  For purposes of fleshing out a Bannon

22    Mills motion.

23         MS. COX:  Well, yes.  This -- this specifically, yes.

24         JUDGE GREEN:  Okay.  Okay.  Go ahead.

25         THE WITNESS:  Can you repeat the question?
```



1    Q    BY MS. COX:  Yes.  I asked you if this -- I -- I told you

2    that this document contains a list of employees' names that

3    raised concerns to managers, correct?

4    A    I don't know what that document is by looking at that link

5    there.

6    Q    And Ms. Desai mentions Maurine.  Do you see that?

7    A    I see it.

8    Q    And she's referring to Maurine Midgley; is she not?

9    A    I don't know based on that question as it's stated right

10   there.

11   Q    So what would help you know what I'm asking you?  Do you

12   need me to rephrase?

13   A    No.  I don't know what -- why this question was proposed.

14   So Maurine could have been anybody.  It could be an associate

15   in the building.  I don't know what it's about.

16   Q    Okay.  Okay.  So you testified earlier that you were aware

17   that there were employees protesting outside of JFK8 on April

18   6th, correct?

19   A    Say that again.

20   Q    You were aware that employees protested outside of JFK8 on

21   April 6th, correct?

22   A    Correct.

23   Q    And what time did you become aware that the protestors

24   were onsite?

25   A    I don't recall.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

2033

1    Q    And how did you become aware that there was protestors

2    onsite?

3    A    I don't recall.

4    Q    You saw protestors and what they were doing, correct?

5    A    Correct.

6    Q    And it's true that you were able to hear what was

7    happening during the protest, correct?

8    A    Correct.

9    Q    How were you able to hear what was happening if the

10   surveillance footage had no audio?

11   A    Based on the previous line of questioning, I did explain

12   that we had the Facebook Live.

13   Q    So all of the comments that you heard are contained on the

14   Facebook Live video.  Is that your testimony?

15   A    No.  Not all of it.

16   Q    Okay.  So other comments that are not on the Facebook Live

17   video, where did you hear those comments from?

18   A    Just based on the statements from the investigation.

19   Q    I'm asking about the protest, not the interaction between

20   Ms. Evans and Mr. Bryson.  So you were able to hear comments at

21   that the protest -- protestors were making on April 6th,

22   correct?

23   A    Some of it, yeah.

24   Q    And how were you able to hear those comments?

25   A    Whatever was being communicated on the Facebook Live.



Exhibit E, Motion to Try Petition on Hearing Record
2063

1    Q    So -- so it's your testimony that the only comments that

2    you heard on April 6th are contained on the Facebook Live

3    video, right?

4    A    To my recollection at this time, yes.

5    Q    Okay.  Isn't it true that you took notes on the April 6th

6    protest?

7    A    Yes.

8    Q    And you took handwritten notes of what you saw and what

9    you heard?

10   A    I used a tool called OneNote that's basically a pad where

11   you can take notes.

12   Q    Did you take notes in any other place?

13   A    No.

14   Q    And the OneNote notes are typewritten, correct?

15   A    Correct.

16   Q    Okay.  Other than OneNote, did you type notes in any other

17   place?

18   A    No.

19        MR. MURPHY:  Objection to the scope of the question.  Are

20   we talking about a particular time?  I'm assuming --

21        MS. COX:  April 6th.

22        MR. MURPHY:  April 6th?

23        MS. COX:  We're talking about April 6th.  Yes.

24   Q    BY MS. COX:  Okay.  And you shared your notes with Milly

25   Gutierrez regarding the April 6th protest, correct?



```
 1    A    Correct.

 2    Q    And Ms. Gutierrez is an employee relations principal,

 3    right?

 4    A    Correct.

 5    Q    And in March and April of 2020, Milly Gutierrez did not

 6    report to JFK8, correct?

 7         MR. MURPHY:  Objection to the form.  By report, do you

 8    mean physically go there?

 9         MS. COX:  Yes.

10    Q    BY MS. COX:  Ms. Gutierrez did not physically work at JFK8

11    in March and April of 2020, correct?

12         MR. MURPHY:  Objection.  Relevance.

13         JUDGE GREEN:  What's the relevance?

14         MS. COX:  The relevance will become apparent, Judge.

15    I'm --

16         JUDGE GREEN:  Yeah.  You don't get to -- you don't get --

17    that's not the way this works.  You -- when I ask you for the

18    relevance, you say the relevance.  If you want to -- if you

19    want to exclude Mr. -- Ms. -- Ms. Hernandez from the hearing

20    room while you explain the relevance, you can ask for that.

21         MS. COX:  Well, it's relevant to who had knowledge of --

22    of activity on April 6th --

23         JUDGE GREEN:  Okay.

24         MS. COX:  -- of Mr. Bryson's activity on --

25         JUDGE GREEN:  Sustained.
```



# Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Q    BY MS. COX:  You were directed to report what was

 2  happening at the April 6th protest to Ms. Gutierrez, correct?

 3    A    Ms. Gutierrez requested my notes.

 4    Q    Did anybody else request your notes?

 5    A    Not that I recall.

 6    Q    Did you send your notes to anyone else?

 7    A    No.

 8    Q    How did you send Ms. Gutierrez your notes?

 9    A    (Indiscernible) at the time.

10    Q    Did you send it in any other manner to Ms. Gutierrez?

11    A    No.

12    Q    Okay.  I want to show you a document.  And this is General

13  Counsel's Exhibit 115.  Unfortunately, I forgot to put it in

14  SharePoint.  I'll do so quickly.  Okay.  It's uploaded.

15       So Ms. Hernandez, let me know when you can see my screen,

16  okay?

17    A    Okay.

18    Q    Okay.  Can you see the document?

19    A    Yes.  Give me one second to look.

20    Q    Sure.

21    A    Okay.

22    Q    These are the notes that you just testified to, correct?

23    A    Correct.

24    Q    I'm going to scroll -- let me know when you want me to

25  stop scrolling.
```



# Exhibit E, Motion to Try Petition on Hearing Record

983

 1   A     Okay.  Okay.

 2   Q     Okay.  So what time zone, do you know, are these messages

 3   in?  Is it Pacific?

 4   A     I think they're in Pacific.  Yeah.

 5   Q     Okay.  So --

 6   A     I'm not 100 percent sure, though.

 7   Q     -- you write Pink next to the name of Gerald Bryson.  You

 8   see that, right?

 9   A     Yes.

10   Q     And that means that you were identifying Mr. Bryson as

11   wearing pink on April 6th, 2020?

12   A     Correct.

13   Q     And do you see where my cursor is here?

14   A     Yes.

15   Q     So you -- on April 6th, you tentatively identified the

16   female protestor with the blue sign as Kelly Rangle (phonetic

17   throughout), right?

18         MR. MURPHY:  Objection, Your Honor.  The document speaks

19   for itself.

20         JUDGE GREEN:  Overruled.  If you know.  If you know what

21   it meant to you.

22         THE WITNESS:  I don't recall what it meant to me.  What I

23   can tell you is that the reason for the notes is to identify

24   who is actually an associate on our property versus making sure

25   that we didn't have any media on our property.



1        MS. COX:  Objection.  Your Honor, I didn't ask -- that

2    wasn't my question.  I mean --

3        MR. MURPHY:  Judge, she asked the question --

4        JUDGE GREEN:  Okay.  Move on to the next question.

5    Q    BY MS. COX:  Tentatively means that you were tentatively

6    identifying the person with the blue sign as Kelly -- Kelly

7    Rangle, correct?

8        MR. MURPHY:  Objection.

9        JUDGE GREEN:  Well, if you -- if you remember, Ms.

10   Hernandez, you can testify to it.

11       THE WITNESS:  I don't recall why I wrote that.

12   Q    BY MS. COX:  And you had information about the protestor

13   with the blue sign, correct?  Do you see my highlighted --

14   A    What do you mean by information?

15   Q    Okay.  So you see DA5715?

16   A    Correct.

17   Q    D means dayshift, correct?

18   A    Correct.

19   Q    A means that she worked the front schedule, right?

20   A    Correct.

21   Q    And the front half schedule means Sunday through

22   Wednesday, right?

23   A    Correct.

24   Q    And you knew that her start time was at 7:15, right?

25   A    Correct.



www.escribers.net | 800-257-0885

1    Q    You also know that her -- this 5 -- this 5 that you see

2    here represents the day on which she was scheduled for

3    mandatory extended time, right?

4    A    When it is scheduled, that would be the day.

5    Q    So you knew that this -- this protestor with the blue sign

6    was scheduled to work mandatory overtime on the fifth day of

7    the week, right?

8    A    That is her schedule.  Yes.

9    Q    And Amazon's workweek is from -- it starts on a Sunday,

10   right?

11   A    Correct.

12   Q    So the fifth day of this protestor with the blue sign's

13   mandatory overtime would have been Thursday, right?

14   A    Correct.

15   Q    And you also knew that she was last onsite on 3/30/20,

16   right?

17   A    Correct.

18   Q    How did you get this information?

19   A    It's what -- that's through our systems for HR.

20   Q    You searched for the systems?  You searched through the

21   systems?

22   A    I personally don't.  My team does.

23   Q    Who on your team provided you this information?

24   A    I don't recall.

25   Q    What systems does HR use to identify -- did they use to



1    identify this protestor?

2    A    To identify?

3    Q    Yes, her --

4    A    Is that what your question is?

5    Q    Yes.

6    A    The protestor, the schedule, what are you asking?

7    Q    The -- the person who tentatively Kelly Rangle, what

8    system did HR use to get this information?

9    A    Well, the schedules are in the systems is in our MyTime,

10   that's our time tracking system where people -- we can see

11   their punches.  If we need to approve their personal time,

12   vacation time, unpaid time.  That's part of the standard work

13   process of HR.

14   Q    Who might have been the person in HR that identified the

15   person with the blue sign?

16       MR. MURPHY:  Objection, Your Honor.  She just testified

17   she didn't recall.

18       JUDGE GREEN:  Sustained.

19   Q    BY MS. COX:  You see PL here, right?

20   A    Correct.

21   Q    And that means parking lot?

22   A    Correct.

23   Q    Okay.  And these numbers that you see here, 8 is the

24   number of people at the start, right?

25   A    Correct.



1    Q    And 9 is the 9th person?

2    A    Possibly.

3    Q    So it's possible that you're referencing that there was a

4    9th person on April 6th, right?

5    A    That is possible.  I don't have an explanation there, so

6    I'm not going to certify that that's what it was.

7    Q    Okay.  And number 10 represents the 10 person on -- 10th

8    person on the site?

9    A    Same response.

10   Q    Can you give it for the record?

11   A    Oh, sorry.  I can't certify that that's what it is since I

12   didn't explain.

13   Q    Okay.  And in this area here, you see that you give a

14   detailed account of -- of what was said at the protest, right?

15   A    Correct.

16   Q    Where did you get that information from?

17   A    I don't recall.

18   Q    Do you recall the process that you undertook to get all

19   this information, people you spoke to, systems you reviewed?

20   A    I don't recall.

21   Q    You're also able to see -- based on your notes, you were

22   able to see what was happening at the bus stop, correct?

23   A    Correct.

24   Q    Is there surveillance camera footage of the bus stop?

25   A    Our cameras go out that far because it's part of the



1    property where we needed to assess if we had associates versus

2    media so they wouldn't come on the property.

3    Q    So you reviewed the surveillance footage that permitted

4    you to see the bus stop?

5    A    I can see from the window.

6    Q    Okay.  Were you also able to see from your window the

7    signs that were carried by the protestors?

8    A    Some.

9    Q    How far is your window from the bus stop?

10   A    I don't know the exact feet, honestly.

11   Q    Over 100, right?

12   A    About.  I don't know the exact amount.  I couldn't tell

13   you.

14   Q    And how many feet is your window from the area in the

15   parking lot where protestors were?

16   A    Well, the building's right on the parking lot property, so

17   they were in the parking lot, so it's right out there.  I mean,

18   you have a window, and then you can see right outside the

19   parking lot.

20   Q    And you were able to see the letters on the -- on the

21   signs, right?

22   A    Some of it, and some through the video as you -- I

23   previously testified that we were watching live in the moment.

24   Q    Okay.  Isn't it true that the day after the April 6th

25   protest you direct Pooja Desai to track Derek and Company



1     (phonetic throughout) every day?

2     A    I direct Pooja to ensure that they were on premises and to

3     find out if they were here using our systems because we needed

4     to have follow-up conversations to address their concerns.

5     Q    But you used the words "Track Derek and Company every

6     day," correct?

7     A    Those were the words that I used.

8     Q    Okay.  Thank you.  And by Derek and Company, you meant the

9     employees that showed up to the protests on April 6th, right?

10    A    No.

11    Q    Well, you consider Derek and Company specifically to

12    Gerald Bryson, Mandi Velasco, Brittany Burns (phonetic

13    throughout), Jay Flowers, and Kelly Rangle, correct?

14    A    Correct.

15    Q    Isn't it true that there were other employees, such as

16    Rena Cummings (phonetic throughout), that -- that also had

17    concerns about -- had COVID-related concerns?

18    A    I don't recall.

19         MR. MURPHY:  Your Honor, I have got to object to the -- to

20    the relevance.  In -- in the -- in the transcript at Page 1078,

21    you said, "Respondent's policies and practices with regard to

22    COVID safety" were not -- "are not at issue in this case.

23    They're not at issue."

24         JUDGE GREEN:  So -- yeah.  They're -- they're not at

25    issue, but I assume that you have some other reason why we're



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 2044 of 2171 PageID #: 2090

1    going into a different group of people.

2        MS. COX:   Judge, she specifically testified that she

3    wanted to speak to these Derek and -- Derek and Company about

4    their concerns, and there were other employees that had

5    concerns also but were not listed amongst --

6        JUDGE GREEN:   Overruled.

7    Q    BY MS. COX:   You wanted Ms. Desai to tell you every day if

8    they were on Amazon's property, correct?

9    A    I wanted her to tell me if they actually showed up for

10   work because during that time we were not -- everyone had --

11   they weren't -- the UPT policy was not in effect, right.   They

12   had unlimited UPT.   So you had many associates at that time

13   that were using that advantage, which is the purpose of it --

14   who were not coming into work.   So based on the several

15   associates -- that I don't recall all of their names, and yes,

16   some of them were the ones that you did name -- those are the

17   individuals we wanted to follow up on to address their

18   concerns, and we can't do that unless they're in the building.

19   So in order for me to know that, I do need to know did they

20   physically come to work.

21   Q    But isn't it also true that you asked specifically that

22   Pooja Desai tell you what they were doing?

23   A    If they were working.   Were they physically on -- on the

24   path, were they -- did they use time?   That's what I mean by

25   what were they doing.   Were they in path, were they working in



1    their stations the way they're supposed to be if they were

2    here, or did they use time, UPT, personal time, whatever the

3    case may be?

4    Q    You did expect that Ms. Desai would report if they were in

5    the parking lot protesting, right?

6    A    No.  I did not.

7    Q    Okay.  All right.  Isn't it true that on April 7th,

8    Mandi Velasco was identified amongst a group of employees as

9    Derek and Company?

10   A    I don't recall.

11   Q    Okay.  Can you see my screen?

12   A    Yes.

13   Q    Okay.  And this is a --

14        MR. MURPHY:  What -- what exhibit is this, please?

15        MS. COX:  GC-67.

16   Q    BY MS. COX:  Can you see the document?

17   A    I do.

18   Q    Okay.  And the date is April 7th, correct?

19   A    Correct.

20   Q    And this is a CHIME between you and Pooja Desai?

21   A    Correct.

22   Q    So Ms. Velasco is amongst a list of employees named Derek

23   and Company, correct?

24   A    Correct.

25   Q    Prior to April 7th, you hadn't received any list of



Exhibit E, Motion to Try Petition on Hearing Record

```
 1   employees -- any list of employees that raised COVID concerns

 2   or photos referencing Mandi Velasco, did you?

 3       MR. MURPHY:  Objection to the form.

 4       JUDGE GREEN:  Do you understand the question, Ms.

 5   Hernandez?

 6       THE WITNESS:  No.

 7   Q   BY MS. COX:  Before April 7th, you hadn't received any

 8   photos referencing Mandi Velasco as being among the groups of

 9   employees raising COVID concerns, correct?

10   A   I don't remember seeing any photos about COVID concerns.

11   Q   Of employees that raise COVID concerns?  You didn't

12   receive any photos?

13   A   No.  About COVID concerns?  Photos from associates about

14   COVID concerns.

15   Q   No.  Photos from managers --

16   A   Right.

17   Q   -- of employees that raised COVID concerns.

18   A   No.

19   Q   You never received photos?  Okay.

20   A   From employees that raised COVID concerns?

21   Q   From managers of employees that raised COVID concerns.

22   A   Not that I recall.

23   Q   Okay.  Ms. -- Ms. Hernandez, can you still see my screen?

24       MR. MURPHY:  Could you identify the exhibit, please?

25       MS. COX:  Yes.  It's General Counsel's Exhibit 70.
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    Q    BY MS. COX:  Ms. Velasco, can you -- can you -- I'm sorry.

2    Ms. Hernandez, can you see my screen?

3    A    Yes.

4    Q    What do you see?

5         MR. MURPHY:  Could you -- could you let her examine the

6    document if she'd like?

7         MS. COX:  I want to make sure she has the right document.

8    Q    BY MS. COX:  Which -- which document is before you?

9    A    Oh.  Now, I don't see anything.

10   Q    Okay.  Well, here we go.  Do you see my screen?

11   A    Okay.  Now, I do.  Give me a second.

12   Q    Sure.

13   A    Okay.

14   Q    Did I scroll too fast?

15   A    A little bit.  Okay.  Okay.

16   Q    Oops.  So on March 31st, 2020, you received photos of

17   employees that raised COVID concerns, correct?

18   A    I received a photo.

19   Q    You received two photos, didn't you?

20   A    Based on what I'm seeing.

21   Q    Okay.  And that's your email address up there, right?

22   A    Correct.

23   Q    And Ms. Velasco is not amongst these employees, correct?

24        MR. MURPHY:  Objection.  The document speaks for itself,

25   and we've already had a lot of testimony about this and



1    who's  -- who's in it and who's not.

2         JUDGE GREEN:  Yeah.  Are we going to get to a question

3    that's, you know, in --

4         MR. MURPHY:  Relevant.

5         MS. COX:  Yes, Judge.

6    Q    BY MS. COX:  So prior to April 7th, Ms. Velasco was not

7    amongst the list of employee names that raised COVID concerns,

8    correct?

9    A    I don't recall.

10   Q    Okay.  So I'm going to show you what's marked -- what's in

11   evidence as General Counsel's Exhibit 71.  Please let me know

12   when you see my screen.  Do you see my screen?

13   A    Yes.  Give me a second.

14   Q    Sure.

15   A    Okay.  Give me one second.

16   Q    Sure.  Oh, sorry.  Tell me once you --

17   A    You can scroll down.

18   Q    Keep going?

19   A    Yep.  Okay.

20   Q    And that's the end.

21   A    Okay.

22   Q    Okay.  So do you now recall that you received a list of

23   employees that raised COVID concerns at the manager's meeting?

24   A    Yes.

25   Q    And do you see that Ms. Velasco was not on this list,



```
 1      correct?

 2      A     Correct.

 3      Q     Okay.  And you also see that on March 27th --

 4            JUDGE GREEN:  Okay.  So let's ask the question now that

 5      you've established that.  Why don't you ask her the question

 6      that you were asking her.

 7      Q     BY MS. COX:  So prior to April 7th, you hadn't received

 8      any list with Mandi Velasco's name on it, did you?

 9      A     Based on what you've presented, I -- it doesn't look like

10      I did.

11            JUDGE GREEN:  Ms. Hernandez, in -- in -- in that -- at

12      that time in early April, given what you've seen now in these

13      documents, did you consider Mandi Velasco to be part of this --

14      Mr. Smalls group or no?

15            THE WITNESS:  I don't know.  I honestly don't recall how

16      she became relevant, to be honest with you, so I wouldn't say

17      part of her -- his or any group.

18      Q     BY MS. COX:  And it's true that on March 27th you gave

19      this list to Ms. Desai to begin tracking these employees,

20      correct?

21      A     The email reflects that it was sent to my entire

22      leadership HR team.

23      Q     Including Ms. Desai.

24      A     Correct.

25      Q     And who's included on this entire HR leadership team --
```



1   JFK8-hrbp@amazon.com?

2   A    So I'm in that alias.  My senior human resource manager,

3   Linda Prisciandaro, Tyler Grabowski, as you know; and Kyle

4   Desai (phonetic), who was another human resource business

5   partner; and Pooja Desai.

6       MR. MURPHY:  Judge, excuse me.  Could -- could I have a

7   short break, please?

8       JUDGE GREEN:  Yes, absolutely.  So let's take five

9   minutes.

10      MR. MURPHY:  That's wonderful.  Thank you.

11      JUDGE GREEN:  Yep.  Okay.  So Ms. Hernandez, same deal.

12  You can -- you know, you can move around, do whatever you want.

13  Just don't talk to anybody about the case.

14      THE WITNESS:  Okay.

15  (Off the record at 1:13 p.m.)

16      MS. COX:  Judge Green, I forgot to move for the admission

17  of General Counsel's 115.

18      JUDGE GREEN:  Any objection?

19      MR. MURPHY:  No, Your Honor.

20      JUDGE GREEN:  GC-115 is admitted.

21  **(General Counsel Exhibit Number 115 Received into Evidence)**

22      MS. COX:  Okay.

23                      <u>**RESUMED CROSS-EXAMINATION**</u>

24  Q   BY MS. COX:  Ms. Hernandez, did you speak anyone -- speak

25  to anyone during the break?


www.escribers.net | 800-257-0885

1   A    I went to the bathroom.

2   Q    Did you speak to anyone?

3   A    No.

4   Q    Okay.  All right.  So I'm going to show you -- I've

5   already showed you this document.  It's General Counsel's

6   Exhibit 67.  Do you see it there on your screen?

7   A    Yes.

8   Q    Okay.  These numbers next to the employee names -- oops --

9   they are badge IDs, correct?

10   A    I'm not sure if it's their badge ID or their ID number.

11   Q    What's the difference?

12   A    We have a badge ID that generates and -- and then there's

13   a login with their login number, which is different, so it --

14   it could be either one.  I don't know by looking at it.

15   Q    Okay.  Okay.  Okay.  So you see -- can you read just these

16   three exchanges?  Let me know when you're done.

17        MR. MURPHY:  Can -- can she review whatever other part of

18   the document may give context?  I -- is it --

19        MS. COX:  I mean --

20        MR. MURPHY:  I don't --

21        MS. COX:  -- heavily redacted.

22        MR. MURPHY:  Okay.  Okay.

23        MS. COX:  I'm hoping if she can --

24        MR. MURPHY:  Okay.

25        MS. COX:  -- make heads or tails, I would love for her to



1    tell me because that's what we want to know, too.

2        MR. MURPHY:  Scintillating --

3        MS. COX:  So --

4        MR. MURPHY:  Scintillating stuff.

5    Q    BY MS. COX:  So this is -- this is -- this is the context,

6    Ms. Hernandez.  "We need to track the five every day.  Are they

7    here using time?  What are they doing?"  You can read it.  Let

8    me know when you're ready.

9    A    I've read it.  It seems like it's my frustration.  I've

10   been --

11   Q    Okay.

12   A    (Indiscernible, simultaneous speech) --

13   Q    I'm just asking you to read it, and then I'll ask you the

14   questions, okay?

15   A    Okay.

16   Q    So let me know when you're done with this portion.

17   A    Okay.  I'm done.

18   Q    Okay.  And now can you read the portions that I'm going to

19   ask you some questions about?  It's -- I'm sorry.

20   A    Okay.

21   Q    You see it, right?

22   A    Uh-huh.

23   Q    And by Shy, you were referring to Shaianna Donaldson,

24   correct?

25   A    Correct.



1    Q    And you informed -- you informed Desai that Shy could work

2    on tracking employees, correct?

3    A    No.  I can't gather that based on that statement.

4    Q    So what -- what -- do you know what this is in response

5    to?

6    A    I don't.

7    Q    Okay.

8    A    I don't recall.

9    Q    Okay.  And let me know when you read the CHIME up until

10   this point, please.

11   A    Okay.  Okay.

12   Q    Okay.  So you told Desai to keep looking for these

13   employees before Lisa Levangowski (phonetic throughout) asked,

14   correct?

15        MR. MURPHY:  Objection.  The document speaks for itself,

16   and I'm not -- she didn't -- I'm not sure -- you said

17   Lisa Levangowski?

18        MS. COX:  Yeah.  I'm -- I'm asking the question, Judge.

19        MR. MURPHY:  Okay.  It's just a new name, but --

20        MS. COX:  Yeah.  We'll get there.

21        JUDGE GREEN:  Okay.  Overruled.  What -- were you asking

22   who -- who Lisa is?

23        MS. COX:  I'm asking if it's Lisa Levangowski.

24        THE WITNESS:  I don't know who that is, so it was Lisa

25   Strobridge, the employee relations manager, who was following



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record
Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 2054 of 2171 PageID #: 2000
2108

1    up with us to see if we were able to --

2         MS. COX:  Thank you.  Thank you.  Thank you.

3    Q    BY MS. COX:  So you were reporting the names that Ms.

4    Desai gave you to Lisa -- you said Strobridge?

5    A    I was reporting to Lisa Strobridge --

6    Q    Strobridge.

7    A    -- if any associates --

8    Q    Thank you.

9    A    -- were available to follow up --

10   Q    Thank you.

11   A    -- on our conversation --

12   Q    Thank you, Ms. Hernandez.  Thank you.

13   A    You asked a question.  Can I finish my response?

14   Q    No.

15        JUDGE GREEN:  Yeah.  Actually, she can.  But I -- I think

16   we're done, so let's -- let's get the next question.

17   Q    BY MS. COX:  What is Ms. Strobridge's title?

18   A    Employee relations manager.

19   Q    And she's based out of Knoxville; isn't that true?

20        MR. MURPHY:  Objection.  Relevance.

21        JUDGE GREEN:  What's the relevance?

22        MS. COX:  It's relevant, Judge, to the -- to the number of

23   people that were tracking employees.

24        JUDGE GREEN:  Okay.  And -- and why do we care about that

25   at this point?



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1        MS. COX:  Well --

 2        JUDGE GREEN:  You think it goes to animus.

 3        MS. COX:  Yes.

 4        JUDGE GREEN:  Okay.  Sustained.

 5        MR. KEARL:  It -- it also goes to the scope of the

 6    investigation.

 7        JUDGE GREEN:  Meaning it's -- it's -- meaning it's

 8    broader?

 9        MR. KEARL:  The -- the number of people involved in the

10    investigation is relevant to the --

11        JUDGE GREEN:  So -- so you think the fact that -- okay.  I

12    mean, that's okay.  You think that the fact that there was a

13    broader investigation suggests that the employer did not have

14    an honest belief that Mr. Bryson engaged in misconduct.

15    That's -- that's going to be your theory?

16        MR. KEARL:  Not exactly that.

17        JUDGE GREEN:  Okay.

18        MR. KEARL:  But -- but the -- I -- I do think that this is

19    not just about animus, but it speaks to the investigation --

20        JUDGE GREEN:  Okay.  I mean, if that's going to be theory,

21    then -- and you want to pursue the theory, then you can do

22    that.

23   Q    BY MS. COX:  So other than Lisa Strobridge, who else did

24    you report these employee names to?

25   A    We -- I followed up with my key stakeholders daily who
```



1    supported JFK8, and she was one of those individuals, and

2    referenced if they were her or not so we could have follow-up

3    conversations.

4    Q     Yes.

5    A     So Bradley Campbell --

6    Q     Okay.  Thank you.

7          MR. MURPHY:  Judge, she keeps cut -- she keeps cutting off

8    the answer that the witness is giving in the -- in response to

9    the question that's asked.

10         THE WITNESS:  How can I respond?

11         MS. COX:  Because she's answering a different question,

12   Judge.

13         THE WITNESS:  I'm not.  It's my answer.  How do you know

14   my answer?

15         MR. MURPHY:  Yeah.  Christine -- yeah.

16         JUDGE GREEN:  So we've got -- that's fine.  We've got a --

17   we've got another question?

18         MS. COX:  My question was who else she was reporting these

19   employee names to.  She started to say Mr. Campbell.

20   Q     BY MS. COX:  Anyone else?

21         JUDGE GREEN:  Do you want --

22         MR. MURPHY:  I think she answered the question, didn't

23   she?

24         JUDGE GREEN:  Do you want to list any more names,

25   Ms. Hernandez, or no?



```
 1        THE WITNESS:  I don't know.  She cut me off, so am I

 2   listing more names or not?

 3        JUDGE GREEN:  Yes.  If you know them.

 4        THE WITNESS:  So Bradley Campbell; obviously, Sai Kotha,

 5   who's the general manager; Anand Mehta, who is the regional

 6   operations manager; Milly Gutierrez, who was the employee

 7   relations principal; and legal, Kirstin LaRosa.

 8   Q    BY MS. COX:  And how did you report these names to --

 9        MR. MURPHY:  Objection.  Calls for privileged information.

10        MS. COX:  I didn't finish the question, Judge.

11        JUDGE GREEN:  Okay.  So continue -- finish the question.

12   Q    BY MS. COX:  How did you report these names to Bradley

13   Campbell?

14        MR. MURPHY:  Objection.  Privilege.

15        JUDGE GREEN:  How -- how is that privileged?

16        MR. MURPHY:  If she's just asking about the -- the means

17   of communication -- email, phone, et cetera -- then I -- then

18   the -- I withdraw the objection, Judge.

19        JUDGE GREEN:  Okay.  So let's start with that.

20        MS. COX:  That was the question, Judge.

21        JUDGE GREEN:  Okay.  Let's start and end with that.

22   Q    BY MS. COX:  How did you --

23        JUDGE GREEN:  And I will.

24   Q    BY MS. COX:  How did you report these names to Mr.

25   Campbell?
```



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    A    On a call.

 2    Q    And how often were you reporting these names to Mr.

 3    Campbell?

 4    A    Daily.  And it wasn't just Mr. Campbell.  Based on your

 5    question, you asked me who did I report this to.  It was to all

 6    the parties that listed previously.

 7    Q    And was it -- each -- each time you reported these

 8    employee names, it was --

 9         MR. MURPHY:  Objection, Judge.  This -- this now goes to

10    the content of the communication.

11         MS. COX:  No.  I'm asking about the form.  Is it always on

12    a call -- that was the question.

13         THE WITNESS:  Call.

14    Q    BY MS. COX:  I'm sorry.  Say again.

15    A    On a call.

16    Q    Was it a conference call each time?

17    A    Yeah.  It was the most productive way to do it.

18    Q    So you had daily conference calls reporting these

19    employees' names, correct?

20    A    To my recollection, yes.

21    Q    And how long did your reporting go on these employee

22    names?

23         JUDGE GREEN:  Okay.  So really, why -- why do we need

24    this?

25         MS. COX:  I'll move on, Judge.  I'll move on.
```



1   Q    BY MS. COX:  Okay.  So I want to draw your attention to --

2   well, I'll let you read the document, and then tell me when

3   you're ready so I can ask you some questions.

4   A    Okay.  You can continue.  Okay.

5   Q    Okay.  So you -- you write, "Yay," in response to the

6   employees not being there, correct?

7   A    I can't -- I don't know if that was response to that or

8   something else.

9   Q    Okay.  And you said, "This might be a good day,

10  hopefully," right?

11  A    I saw that.  Had a lot of catching up to do.  I was very

12  behind.

13  Q    Because you were spending time tracking employees,

14  correct?

15  A    No.

16  Q    Uh-huh.  Okay.  So I want to draw your attention here to

17  Mandi Velasco.

18  A    Okay.

19  Q    And Ms. Desai associated the same schedule as the female

20  protestor with the blue sign to Mandi Velasco, correct?

21  A    No.  It doesn't state that here.

22  Q    Oh.  I'll show you.  Give me a moment.  Do you see my

23  screen?

24  A    Yes.

25  Q    And do you see the -- your notes from April 6th?



1    A    Correct.

2    Q    And you see DA5715?

3    A    Yes.

4    Q    Okay.  And you see that Mandi's -- Mandi Velasco's

5    schedule is DA5715, correct?

6    A    Yes.

7    Q    And Ms. Rangle has a different schedule, right?

8    A    Yes.

9    Q    So on April 7th, you knew that the protestor with the blue

10   sign, Mandi Velasco -- that Mandi Velasco was the same person

11   that was present the day before, right?

12   A    No.

13       MR. MURPHY:  Objection.

14       JUDGE GREEN:  Overruled.  So Ms. Hernandez, I think the

15   question is, given what you've just read, on April 7th, did you

16   understand the person with the blue sign to be Mandi Velasco.

17       THE WITNESS:  No.

18   Q    BY MS. COX:  But you -- you agree that there's only three

19   females on this list, right?

20   A    Yes.

21   Q    Okay.  And those women are Brittany Burns, Kelly Rangle,

22   Mandi Velasco, right?

23   A    Correct.

24   Q    And you -- you did not direct Mr. Grabowski to interview

25   Ms. Velasco, correct?



Exhibit E, Motion to Try Petition on Hearing Record   2113

```
 1    A     Well, I -- I couldn't.  I didn't know who -- who she was
 2    at the time before --
 3    Q     Well, you didn't -- you didn't direct him to interview any
 4    of these women, did you?
 5    A     They weren't part of the witnesses for the investigation,
 6    so --
 7    Q     But they were potential witnesses, correct?
 8    A     Not -- how would I know that?
 9          JUDGE GREEN:  So Ms. Hernandez, just try to listen to the
10    question and answer the question.
11          THE WITNESS:  No.
12          JUDGE GREEN:  Okay.  So the -- the question was:  did you
13    direct Tyler Grabowski to interview any of these three women?
14          THE WITNESS:  No.  They weren't relevant to the
15    investigation.
16          JUDGE GREEN:  Thank you.
17    Q     BY MS. COX:  But you identified Kelly Rangle as being
18    present at the protest on April 6th, correct?
19    A     Where do I identify that?
20    Q     Can you see my screen?
21    A     Correct.
22    Q     You put Kelly Rangle's name as a tentative person present
23    on April 6th, correct?
24    A     Tentative, yes.
25    Q     Now, you know what tentative means, right?
```



1   A    That's what it said there.  That's what I'm reading.

2   That's what you said, so that's what it says.

3   Q    And there's another female that was present on April 6th,

4   right?

5   A    Looks like it.

6   Q    Right.  So it's true that you never asked Mr. Grabowski to

7   follow up with any there of these women who were potential

8   witnesses of the interaction on April 6th, correct?

9   A    No.  I did not ask him.

10  Q    And it would be your job as someone who's collaborating in

11  an investigation to delegate that kind of task, right?

12  A    It would be for me to help Tyler identify.  If he did not

13  identify them as part of the individuals who observed the

14  behavior and the altercation outside, then we would not

15  interview someone who did not observe or hear the altercation

16  outside based on us knowing at that moment who was.

17  Q    But you did not help Tyler identify any of these three

18  women as potential witnesses, correct?

19  A    No.  I didn't help him identify the witnesses at all.

20  Q    Even though you had the information from Ms. Desai as to

21  the women that were present on April 6th, right?

22  A    No.

23  Q    And it's true that no one from HR contacted Mandi Velasco

24  to get her account of what happened between Bryson and Evans,

25  right?



1    A    We didn't know that she was present at that time to have

2    the conversation with her as a witness.

3    Q    But you saw her on surveillance as being the closest to

4    Mr. Bryson and Evans, right?

5    A    No.  Didn't know that was her at that time.

6    Q    But you knew that she -- she -- that -- that that woman on

7    the video could have been one of those three people, didn't

8    you?

9    A    No.  I knew it was a woman.  That's all I knew.

10   Q    Okay.  Here, you identify -- or Ms. Desai identifies

11   Bryson as -- D means dayshift, correct?

12   A    Correct.

13   Q    B means back half, correct?

14   A    Correct.

15   Q    And 3 means his mandatory overtime day was the third day

16   of the week, correct?

17   A    Correct.

18   Q    And he starts at 7:00 a.m.?

19   A    Correct.

20   Q    And for Ms. Rangle, D means dayshift, correct?

21   A    Correct.

22   Q    C means a donut shift, correct?

23   A    Correct.

24   Q    7 means she worked her overtime day on the seventh day,

25   correct?



 1    A    Correct.

 2    Q    And she started at 7:15?

 3    A    Correct.

 4    Q    Okay.  I'm sorry.  Did you want to read this portion

 5    before I move forward?

 6    A    Yes.

 7    Q    Okay.  Let me know when you're done.

 8    A    Go ahead.  Okay.

 9    Q    Okay.  So let me know when you're here.

10    A    Okay.

11    Q    Okay.  So -- so you identified Rena Cummings as an

12    employee that you were not tracking, correct?

13    A    I can't tell based on this.

14    Q    And you see this reference to Bradley, right?

15    A    Correct.

16    Q    You were referencing Bradley Campbell, correct?

17    A    Correct.

18    Q    And you see it says that Bradley gave her a date, right?

19    A    I see it.

20    Q    Okay.  So Mr. Campbell was giving employees appointments

21    to discuss their COVID concerns, correct?

22    A    I don't know what that was for.

23    Q    Okay.  So let me know when you're done reading this

24    portion of the CHIME.

25    A    Okay.



Exhibit E, Motion to Try Petition on Hearing Record

1  Q    So you knew employees that raised COVID concerns by face,

2  correct?

3  A    Eventually.

4  Q    And you knew that because you were present in the morning

5  managers meetings where the employees raised concerns, right?

6  A    Correct.

7  Q    And you see this -- this link here?

8  A    Yes.

9  Q    You were sharing with Ms. Desai photos -- or you were

10  identifying for Ms. Desai the faces of employees that

11  participated in those morning meetings, correct?

12  A    We were trying to identify who they were.

13  Q    Well, you -- you identify her, do you not?  You say --

14  A    Based upon there, yeah.  I said I think.

15  Q    Correct.  Ms. Desai sent a -- a picture of her, right?

16  A    Her phone -- her phone back, yeah.

17  Q    Okay.  Okay.  I'm going to show you one more document.

18  Can you see my screen?

19       MR. MURPHY:  What exhibit is it, please?

20       MS. COX:  General Counsel's 68.

21  Q    BY MS. COX:  Can you see my screen, Ms. Hernandez?

22  A    Yes.

23  Q    Okay.  And this is a CHIME between Aashita Behal, Pooja

24  Desai, and Neha Viswanath, right?

25  A    Yes.



```
 1   Q    And this is April 8th, 2020?

 2   A    Hold on.  The screens are in the way.  Can you move the

 3   document to the left a little bit?  Yeah.  I see it.  I see it.

 4   Q    This is as far as it goes on my screen.

 5   A    I see it.  I got it.

 6   Q    Okay.  Now, who is Aashita Behal?

 7   A    One of the senior human resource assistants.

 8   Q    That was her position in March of April 2020?

 9   A    At that time, yes.

10   Q    And how about Neha Viswanath?

11   A    Viswanath, she was my senior human resource business

12   partner.

13   Q    In March and April 2020, right?

14   A    Correct.

15   Q    Are Ms. Behal and Ms. Viswanath on the JFK8hrbp list

16   serve?

17   A    Neha is since she's a manager.  Ashi (phonetic throughout)

18   is what we called her -- Behal, she was not.  She was on

19   another alias with the rest of the HR team.

20   Q    By alias, you mean list serve?

21   A    It's an email -- email alias.

22   Q    Like a --

23   A    Every site has one.  We have one for each site based on

24   their site name and alias.

25   Q    Okay.  And who did Ms. Behal report to in March and April
```



Exhibit E, Motion to Try Petition on Hearing Record

1    2020?

2    A    I believe it was Neha at that time.

3    Q    And who did Neha report to in March and April of 2020?

4    A    To me.

5    Q    Okay.  So you -- read this some things for me and let me

6    know when --

7         MR. MURPHY:  Could you -- could you let her see the entire

8    document if she'd like to read it?

9         MS. COX:  Absolutely.

10   Q    BY MS. COX:  So let me know when you want me to scroll

11   down.

12   A    Continue.  Stop.  Continue.  Continue.  Continue.

13   Q    That's the end.  Okay.  So you've read this sentence here,

14   right?

15   A    Yes.

16        MR. MURPHY:  Judge, I have -- I have an objection here.  I

17   mean, it doesn't -- having seen the document now, it doesn't

18   appear that Ms. Hernandez is a participant in the CHIME, nor is

19   she mentioned in it, so I think the first issue would be is has

20   she ever seen this before.

21        MS. COX:  Well, Judge --

22        THE WITNESS:  I don't appear to be in the CHIME.

23        MS. COX:  No, you don't.

24        MR. MURPHY:  Yeah.  Just wait for -- wait for a question,

25   Christine, okay?



Exhibit E, Motion to Try Petition on Hearing Record

2020

```
1      MS. COX:  Yeah.  So Judge --

2      JUDGE GREEN:  So --

3      MS. COX:  Go ahead.

4      JUDGE GREEN:  So what do you want to use the document for?

5      MS. COX:  I have a question about this sentence in the

6  CHIME that she would have personal knowledge on because --

7      JUDGE GREEN:  Okay.  So ask the question.

8      MS. COX:  Thank you.  And she -- I'm sorry, Judge.  She

9  also supervised these individuals, as she just testified.

10      JUDGE GREEN:  Okay.  Well, if she knows about it, she can

11  testify to it.  If she doesn't know, she can testify to that.

12  But why don't we get the question.

13      MS. COX:  Sure.

14  Q    BY MS. COX:  So Ms. Hernandez, you see that Pooja Desai

15  asks Ms. Behal, Ms. Viswanath to look into their Lanelles and

16  punches, right?

17  A    Yes.

18  Q    Or Lanelle?

19  A    Lanelles.

20  Q    And Lanelle is a system that tracks employees' pictures,

21  right?

22  A    No.

23  Q    Lanelle is a system that allows you to look at live video,

24  correct?

25  A    No.
```



# Exhibit E, Motion to Try Petition on Hearing Record

```
1    Q    Lanelle is a system that allows you to view recorded

2    video?

3    A    No.

4    Q    Okay.  So what kind of system is Lanelle?

5    A    It's how every single employee in the company is able to

6    access the building in and out with their badge.  It's their

7    Lanelle of the time in and out of the building.

8    Q    So how is Lanelle different from -- or is it different

9    from punches?

10   A    Punches is their actual punches that we would see in their

11   time card when they actually punch in through the time clock.

12   Lanelles are the punches into the building as far as your badge

13   entry by the door.  So you can Lanelle into the building.  It

14   doesn't mean you punched in to work.

15   Q    Okay.

16        MS. COX:  Judge, can I -- I'm sorry.  I do have a few --

17   few other --

18   Q    BY MS. COX:  So Ms. Hernandez, you testified that you

19   viewed the Facebook video, correct?

20   A    I did see it.  Yes.

21   Q    And how did you obtain access to the Facebook video?

22   A    I don't recall.

23   Q    Do you recall who shared the Facebook video with you?

24   A    I don't recall.

25   Q    Did you share the Facebook video with anyone?
```



# Exhibit E, Motion to Try Petition on Hearing Record

1    A    I didn't physically have it, that I recall, so I don't

2    think I would have shared it.

3    Q    Is that a no?

4    A    No.

5    Q    And it's true that there is a -- actually, I'll -- I'll

6    withdraw.

7         Do you have an idea of how you might have obtained access

8    to the Facebook video?

9    A    No, I don't.

10    Q    Or what the process would be to view a live Facebook

11    video?

12         MR. MURPHY:  Objection, Judge.  She's already -- she's

13    already testified that she didn't do it.

14         JUDGE GREEN:  Overruled.

15         MS. COX:  Okay.

16         THE WITNESS:  No.

17    Q    BY MS. COX:  Is there any document that could help you

18    remember how you accessed the Facebook video?

19    A    I don't recall.  I don't think so.  No.

20    Q    And you're aware of a team that -- that -- I'm sorry.

21    You're familiar with a team that monitors employees' social

22    media, right?

23    A    No.

24    Q    In all your years at Amazon, you've never received a

25    social media from anyone regarding an employee?



www.escribers.net | 800-257-0885

1    MR. MURPHY:  Objection to the form of the question, Judge.

2    Anyone?  That would include personal emails that --

3    JUDGE GREEN:  I think it's a confusing question, so could

4    you -- could you rephrase the question?

5    Q    BY MS. COX:  In all your years at Amazon, you've never

6    received a copy of a social media post from managers?

7    A    From managers?  Is that what your question was?

8    Q    Yes.

9    A    No.  Not that I recall.  No.

10   Q    Okay.

11   MS. COX:  At this time, Judge, I -- I just need ten

12   minutes to confer, and I believe I'm done.

13   JUDGE GREEN:  Off the record for ten minutes, so we'll be

14   back at 2:00.

15   (Off the record at 1:48 p.m.)

16                    **RESUMED CROSS-EXAMINATION**

17   Q    BY MS. COX:  Okay.  Ms. Hernandez, can you see my screen?

18   A    Yes.

19   Q    What does LOL mean?

20   A    It's my defense mechanism for the frustration of having to

21   explain it to Pooja.

22   Q    No.  What does it stand for?

23   A    Oh, l -- laugh out loud.

24   Q    Okay.  And LMAO, what does that --

25   MR. MURPHY:  What -- what -- what document is this?



```
1         MS. COX:  GC 67.

2    Q    BY MS. COX:  And LMAO, what does that stand for?

3    A    Laughing my ass off.

4    Q    Okay.  Thank you.

5         MS. COX:  I have no further questions, Judge.

6         JUDGE GREEN:  Okay.  So actually, Mr. Kearl, are you going

7    to have questions?

8         MR. KEARL:  Very, very brief line of questions.

9         JUDGE GREEN:  Okay.

10        MR. KEARL:  And I'm -- I'm happy to continue now, or -- or

11   if you want to break, it -- it's up to you.  But I -- I don't

12   imagine it would take more than five to ten minutes at the

13   most.

14        JUDGE GREEN:  Okay.  Go ahead.

15        MR. KEARL:  Okay.

16                          CROSS-EXAMINATION

17   Q    BY MR. KEARL:  Hello, Ms. Hernandez.  I just have a few

18   questions for you.  So on April 6th, did -- you -- you were not

19   outside watching the protest; is that correct?

20   A    Correct.

21   Q    And yet you're sure that Mr. Bryson is the individual that

22   had the bullhorn during the -- during the altercation on the

23   6th?

24   A    Yes.  Yes.

25   Q    And how are you -- how are you sure of that?
```



# Exhibit E, Motion to Try Petition on Hearing Record

| | | |
|---|---|---|
| 1 | A | Based on his omission from the Facebook Live. |
| 2 | Q | Okay.  So you used the Facebook Live to identify Mr. |

3   Bryson?

| 4 | A | That's one of the forms. |

5   Q    What was the other form that you used -- or any other form

6   that you used to identify him?

7   A    To identify him period, or you're referring to the

8   question of the bullhorn?

9   Q    To -- just to identify him on the day of the protest as

10   Gerald Bryson.

| 11 | A | The video that we were watching live. |
| 12 | Q | The surveillance video? |
| 13 | A | Correct. |

14   Q    Okay.  So you were able to identify him from the

15   surveillance video?

| 16 | A | Uh-huh. |

17   Q    And how were you able to identify Mr. Palmer on that day,

18   the same way?

19        JUDGE GREEN:  I'm sorry.  Just -- Ms. Hernandez, you

20   just -- you have to answer verbally yes.

21        THE WITNESS:  Oh, yeah.  Sorry.  That was a yes --

22        JUDGE GREEN:  Okay.

23        THE WITNESS:  -- to the previously question.  Apologies.

24   Q    BY MR. KEARL:  Okay.  And Mr. Palmer, how did you identify

25   Mr. Palmer as one of the protestors on that day?



Exhibit E, Motion to Try Petition on Hearing Record

1   A     In the same manner.

2   Q     Okay.  And Kelly, how did you identify Kelly as a

3   tentative person that day?

4   A     Any person identified that was concretely identified was

5   in the same manner.

6   Q     Okay.  Do you have other manners for identifying

7   employees?

8   A     Well, using those mechanisms and we look at our phone tool

9   to confirm if that was them or not based on their pictures and

10  their badge photos.

11  Q     And so can you just explain briefly how you used the phone

12  tool to confirm or deny someone's identity?

13  A     We -- it's one of the mechanisms and tolls that everyone

14  uses at Amazon of how you can identify anybody.  So I'm in

15  there.  Every person is in there.  It's our badge photo where

16  you identify your name, your hire date, what building you work

17  in, the shift that you work, what your title is.

18  Q     Right.  I understand that.  My -- my question is more

19  specifically are you just comparing a photograph that you have

20  or video that you have against the badge photo, or is there a

21  different process beyond that?

22  A     In general, that's how we would identify people.

23  Q     Okay.  So are you starting with a list of 5,000 photos and

24  then -- how do you narrow it down to be able to identify

25  someone?



Exhibit E, Motion to Try Petition on Hearing Record

1    A    I don't recall exactly all the steps we took on that day.

2    I don't.

3    Q    Okay.  But are you looking at a list of 5000 photos and

4    removing people who are -- if you're trying to identify someone

5    who's black, are you just X-ing out all the people that are

6    white and then saying all the people who have long hair, all

7    the people -- like what -- is -- is the process -- are -- are

8    you selecting specific individuals and verifying their

9    identity, or are you looking at the entire realm of individuals

10   that work there and using the tool in some way to help you

11   identify them?

12   A    Most likely started with the starting point of one person

13   and then going through what departments within that person.

14   And then you -- yeah.  You go through each manager potentially,

15   just look at it that way.  It depends.  I don't -- I actually

16   don't remember how we went through the process on that specific

17   day.

18   Q    But if you wanted to identify, say, the woman with the

19   blue sign, and you knew that it -- that she was possibly Kelly,

20   would you pull up a photo of Kelly and just compare the photos,

21   or is it a more involved process than that?

22   A    No.  I have to know who I'm looking for, first of all.

23   Q    Right.  But at the end of the day, you're just looking at

24   the badge photo and the image from the video to make the

25   determination, or does the tool actually do something else?



1    A    No.  It doesn't do anything.  It just -- you pull -- you

2    have to punch in a name, or you punch in a manager's name and

3    everyone that reports to them is there, so you can look that

4    way.  It -- it varies.  It -- the tool doesn't do anything

5    itself.  It's just the mechanism of where we house all

6    employees, for lack of a better word.

7    Q    Okay.  So it's like a picture book with names, and you're

8    finding a name and comparing the photo with whatever person

9    you're trying to identify.  Is that a fair explanation of how

10   it works?

11   A    I guess.

12   Q    Okay.  And did -- did anyone else help you identify

13   protestors that day, or did you do all of the identification

14   yourself?

15   A    No.  I didn't it all myself.  It was a collaboration with

16   Geoffrey Dibble Gifford, who was in there monitoring the

17   cameras for us because I don't know how to use the system, and

18   my VPs.  At the time, I don't know who else I delegated that to

19   because I don't recall.  I was there physically in the

20   building, but I physically didn't do searches myself.

21   Q    And your VPs include Tyler Grabowski, Pooja Desai, Shay

22   Donaldson --

23   A    Shay Donaldson was not a business partner.

24   Q    Okay.  Did she report to you?

25   A    She was part of my team.  Didn't report to me directly,



1   no.

2   Q    Yeah.  But she was part of your team.  Okay.  So -- so

3   in -- in the realm of people who could've -- I -- I understand

4   that you don't remember exactly how, but the realm of people

5   who could have possibly helped you identify people on that day

6   are Mr. Gilbert-Differ --

7   A    Uh-huh.

8   Q    -- who does not work in that facility; yourself, who you

9   testified you had not been working there and so you were not

10  familiar with the associates at that time; and people that

11  include Ms. Donaldson, Mr. Grabowski, Ms. Desai, the folks on

12  the CHIME messages we looked at before.  That's the realm of

13  possible people that could have helped you identify on that

14  day.

15  A    And Mahti (phonetic throughout) -- and Mahti who was

16  outside.  He reported to us inside the room, but I don't have a

17  complete recollection.  But as you know, he did report the

18  incident, so he was outside.

19  Q    Okay.  And those are the people that also potentially

20  helped you identify or -- or capture the -- the text on the

21  signs that protestors were carrying?

22  A    Possible.  I don't recall exactly.

23  Q    Okay.  And you're familiar with the social distancing

24  policy.  I'm going to share my screen.  First, I just want to

25  confirm that it's been uploaded to SharePoint.



Exhibit E, Motion to Try Petition on Hearing Record 2024

1    MR. KEARL:  Matt, were you able to put that up for me?

2    MR. JACKSON:  No.  I was not.  Can you email it to me

3  again and I'll do so?

4    MR. KEARL:  Yeah.  Just give me one second.

5    THE WITNESS:  Okay.

6    MR. KEARL:  Okay.  And while he's uploading that, I'm just

7  going to share my screen.  This is Bate number 8217.

8    MR. MURPHY:  Can you wait until it's uploaded in

9  SharePoint so we can all access it?

10    MR. JACKSON:  Just bear with me for one more minute.

11    JUDGE GREEN:  This is going to be what exhibit number?

12    MR. KEARL:  CP-10 I believe is where I am.

13    JUDGE GREEN:  Social distancing policy.

14    MR. JACKSON:  Okay.  It's not up.  Sorry for the delay.

15  **(Charging Party Exhibit Number 10 Marked for Identification)**

16  Q    BY MR. KEARL:  Okay.  So I'm going to go ahead and share

17  my screen, Ms. Hernandez.

18    MR. MURPHY:  Hold on.  Hold on.  Give me a second.

19    MR. KEARL:  You ready?

20    MR. MURPHY:  Go ahead.  Go ahead, Mr. Kearl.  I'm sorry.

21  Q    BY MR. KEARL:  So I'm going to share my screen here.  This

22  is an exhibit I've pre-marked as CP-10.  Can you see my screen?

23  A    Correct.

24  Q    You -- you can see my screen?  Okay.  Great.  So let me

25  know when you want me to scroll down.



```
 1    A    Give me one minute.  Scroll down a little bit.  Okay.

 2    Q    Okay.  And that's the end of the document.

 3    A    So up here it says social distancing policy 4/1/20,

 4    updated 4/2/20.  Can you explain to me what that means?

 5         MR. MURPHY:  Objection, Your Honor.  I don't see the

 6    relevance of the social distancing policy.  It didn't form any

 7    part of the testimony in the case before, and --

 8         JUDGE GREEN:  Why -- why do we need the social distancing

 9    policy?

10         MR. KEARL:  Mr. Palmer was disciplined for social

11    distancing.

12         JUDGE GREEN:  Okay.  So I understand that, and I'm not

13    saying no, but from my perspective, that's no longer useful.

14    So -- but you're saying you've only got a couple of minutes

15    with his.

16         MR. KEARL:  Yeah, I -- this is literally my only question.

17         JUDGE GREEN:  Okay.  Go ahead.

18    Q    BY MR. KEARL:  So can you explain to me what social

19    distancing 4/1/20, updated 4/2/20 means?

20    A    I don't know.  Exactly what it says, social distance

21    policy was 4/1 and updated on 4/2.  I -- I don't know.

22    Q    Okay.  So the document was created on 4/1 and then updated

23    on 4/2.

24         MR. MURPHY:  Objection.  That's not what she said.

25         JUDGE GREEN:  Would you like to clarify, Ms. Hernandez?
```


www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1    THE WITNESS:  I'm reading it as it states, so it says 4/1

2    and was updated on 4/2.  So all I can do is go by explicitly

3    what it states.

4    Q    BY MR. KEARL:  So this social distancing policy is dated

5    4/1 and updated 4/2.

6    A    Correct.

7    Q    Okay.

8         MR. KEARL:  No further questions.

9         JUDGE GREEN:  Okay.  So Mr. Murphy, are you going to have

10   additional questions?

11        MR. MURPHY:  I -- I am going to, Your Honor.  But so --

12   but I'd like to take a short break if that's okay.

13        JUDGE GREEN:  Yes.  So I -- actually, I -- I do need to

14   take -- yeah.  I need to take 15 minutes.  Is that long enough?

15        MR. MURPHY:  2:35, can we do that?

16        JUDGE GREEN:  Yes.

17        MR. MURPHY:  Okay.

18        JUDGE GREEN:  Okay.  So we'll be back at 2:35.

19        MR. MURPHY:  Thanks.

20        JUDGE GREEN:  Off the record.

21   (Off the record at 2:16 p.m.)

22        JUDGE GREEN:  Okay.  So the Charging Party is moving for

23   the admission of CP-10.  Is there any objection?

24        MR. MURPHY:  We have a relevance objection, Judge, but

25   we'll -- we'll -- we'll just argue that.



2133

1    JUDGE GREEN:  Okay.  So CP-10 is admitted.

2    **(Charging Party Exhibit Number 10 Received into Evidence)**

3    JUDGE GREEN:  Okay.  So we've lost Mr. Murphy's video

4    feed, but we can still hear him, so we're going to try and go

5    with that, unless for some reason --

6    MR. MURPHY:  Hold on.  Let me --

7    JUDGE GREEN:  Okay.

8    MR. MURPHY:  Okay.  Yeah.  Let me just give it one last

9    shot.  Let me see if it's -- okay.  The heck with it.  Are

10   we -- are we back on the record?

11   JUDGE GREEN:  Yeah.

12   MR. MURPHY:  Okay.

13                      <u>**REDIRECT EXAMINATION**</u>

14   Q    BY MR. MURPHY:  Hello, again, Christine.  I just have a

15   couple questions for you.

16   MR. MURPHY:  Kelcey Phillips, are you out there, please?

17   MS. PHILLIPS:  I am, yes.

18   MR. MURPHY:  Okay.  Could you put General Counsel 62 back

19   up for a second?

20   MS. PHILLIPS:  Yes.  Give me one moment.

21   Q    BY MR. MURPHY:  Okay.  Ms. Hernandez, can you see that

22   video image on your screen?

23   A    Yes.

24   Q    Okay.

25   MR. MURPHY:  And Kelcey, would you move the cursor around



1    to the same area where you had it before on the person with the

2    blue sign?  Right there.

3    Q    BY MR. MURPHY:  Okay.  Ms. Hernandez, I asked you a couple

4    of questions way back when on your direct about this image

5    and -- and -- and that person.  Do you remember those

6    questions?

7    A    No.

8    Q    Okay.  The -- the -- the person that's --

9         MR. MURPHY:  Could you move the cursor around that person

10   again?  Okay.

11   Q    BY MR. MURPHY:  Do you see that person that the cursor is

12   revolving around there?

13   A    Yes.

14   Q    Okay.  At -- at any point on April 6th or at any point in

15   the investigation, did you know who that person was?

16   A    No.

17   Q    During the course of the investigation, did you ever learn

18   that Mr. Bryson had said that a witness had video of the

19   altercation between he and Ms. Evans?

20   A    During his -- during his investigation where we had the

21   seek to understand, he did say there was a -- a female witness

22   who possibly was there who would have witnessed.  I don't

23   recall --

24   Q    Right.  But did -- did any -- did you learn that he said

25   that that witness had video?



1    A    If I recall, it was in his statement.  I mean, sorry.  If

2    I recall, it was not in his statement.  We just know there was

3    a woman who possibly would have observed, and we needed to know

4    who it was.

5    Q    Okay.  And did Mr. Bryson ever identify that person?

6    A    No.

7    Q    If -- if he had identified that person, what investigative

8    steps, if any, would you have taken?

9         MS. COX:  Objection.  Hypothetical.

10        JUDGE GREEN:  Overruled.

11        THE WITNESS:  If he had identified who the person was,

12   then yes, we would have interviewed her just like anyone else

13   as part of a witness for the investigation.

14   Q    BY MR. MURPHY:  Am I correct that during the course of the

15   investigation that no one -- no one ever advised you that Mandi

16   Velasco had a video of the altercation?

17        MS. COX:  Objection.  Leading.

18        JUDGE GREEN:  Okay.  Sustained.

19        MR. MURPHY:  I'm sorry, Judge.  I didn't hear your ruling.

20        JUDGE GREEN:  Sustained.

21        MR. MURPHY:  Okay.

22   Q    BY MR. MURPHY:  At any point in the investigation, did you

23   learn that Ms. Velasco had a video of the altercation?

24   A    No.

25        MR. MURPHY:  Nothing further, Your Honor.



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

1     JUDGE GREEN:  Okay.  So just to follow-up question on

2     that, Ms. Hernandez, do you recall on -- on -- whether on April

3     6th when you were viewing the video feed whether you could tell

4     whether Ms. Velasco was holding up a phone in front of her?

5     THE WITNESS:  No.

6     JUDGE GREEN:  So meaning that's not something that you

7     saw?

8     THE WITNESS:  No.  Because I couldn't identify or see

9     anything other than a body and a sign.

10    JUDGE GREEN:  Okay.  Thank you.

11    Does the General Counsel have any questions?

12    MS. COX:  I think I have one, Judge.

13    JUDGE GREEN:  Okay.

14    MS. COX:  One moment.

15                    **RECROSS-EXAMINATION**

16    Q    BY MS. COX:  Isn't it true that the person conducting an

17    investigation into employee misconduct is obligated to find

18    witnesses?

19    A    It depends on the situation and what is divulged over the

20    course of the investigation, but we are -- we need to find

21    witnesses, but it depends on how we are able to find those

22    witnesses based on the particular situation.

23    Q    But HR doesn't rely solely on an employee's presentation

24    of witnesses, correct?

25    A    No.



Exhibit E, Motion to Try Petition on Hearing Record

1   Q    Okay.  Thank you.

2        MS. COX:  I don't think I have anything else, Judge.

3        JUDGE GREEN:  Mr. Kearl?

4        MR. KEARL:  Just one question.

5   Q    BY MR. KEARL:  At any point, did you try to identify this

6   witness using the Facebook Live video?

7   A    No.  I recall that -- no.  I don't remember seeing her, so

8   no.

9        MR. KEARL:  No further questions.

10       JUDGE GREEN:  Okay.  So Mr. Murphy, do you have any

11  follow-up on that?

12       MR. MURPHY:  I do not, Judge.

13       JUDGE GREEN:  Okay.  Thank you, Ms. Hernandez.  You're

14  free to go.

15       THE WITNESS:  Oh.  Okay.  Thank you.

16       MR. MURPHY:  Thank you, Christine.

17       JUDGE GREEN:  Okay.  So do we have anything else we have

18  to do today?

19       MS. COX:  Well, Judge, there's one issue that we haven't

20  addressed yet.  Respondent was supposed to file their response

21  to our Bannon Mills motion yesterday, and they did not file a

22  response.  Therefore, it's our -- it's our position that

23  they've waived that opportunity to file a timely opposition.

24       JUDGE GREEN:  Okay.  So Mr. Murphy, did you -- you know, I

25  did mention -- I did mention when we discussed the Bannon Mills



Exhibit E, Motion to Try Petition on Hearing Record

1    motion that I was interested in getting the employer's response

2    the following Wednesday.  What's the status of the position?

3        MR. MURPHY:  I think it's in the final stages of being

4    filed.  I -- I -- I -- I know that the -- well, I suspect it

5    will be filed within an hour or two at the -- at the most,

6    maybe -- maybe a little more, but certainly today.

7        JUDGE GREEN:  Okay.  So I'm not going to reject it.

8        MR. MURPHY:  And -- and, Judge, just so --

9        JUDGE GREEN:  -- as not timely.

10       MR. MURPHY:  Yeah.  And just -- is there going to be a

11   reply from the counsel for the General Counsel, or how are we

12   going to -- I mean, I hope -- I hope there's --

13       JUDGE GREEN:  Unless, you know -- I -- I wasn't

14   anticipating it, but I guess they'll read your opposition.

15       MS. COX:  Correct.

16       MR. MURPHY:  Okay.  The only thing we'd ask -- the only

17   thing we'd ask is if there is a reply that we get a -- a

18   reasonable opportunity to file a sur reply.

19       JUDGE GREEN:  Okay.  I mean, we can deal with all that --

20   you know, we can all deal -- we can deal with all that if it

21   becomes necessary.  I -- I don't even know that we even know

22   the -- the General Counsel wants to file a reply yet.

23       MR. MURPHY:  Understood.

24       JUDGE GREEN:  So there are outstanding exhibits that I

25   have reserved ruling on pending my determination regarding the



1    General Counsel's motion for Bannon Mills remedy -- remedies,

2    and I'm -- I'm -- so that's not going to be resolved yet.  It

3    is possible that we won't have to go back on the record, in

4    which case I would I guess issue an order -- a written order

5    addressing the Bannon Mills motion, and that would include an

6    order with regard to the outstanding exhibits that I -- that I

7    reserved ruling on.

8        If we -- you know, if we end up going back on record, then

9    I can make the ruling on the record.

10       MR. MURPHY:  So -- so, Judge, just to clarify -- it's a

11   little bit weird not being on video, but just -- just to

12   clarify, you -- you're going to rule separately on the Bannon

13   Mills issue outside of the ALJD that you're going to issue.

14       JUDGE GREEN:  I think probably -- yeah.  I think in all

15   likelihood yes.

16       MR. MURPHY:  Okay.

17       JUDGE GREEN:  I'd like to -- I'd like to let the parties

18   know what -- what's in the record or not for purposes of the

19   parties submitting briefs.  I mean, and you can argue.  I mean,

20   no matter what happens, you -- you can make arguments in the

21   briefs that I made a mistake, you know, either by excluding

22   exhibits or including exhibits -- including argue the weight of

23   that evidence.  But I think it'd like to make a ruling before

24   we get to briefs.

25       MS. COX:  Judge Green, can you go back one moment.  I just



1    want to make sure I'm clear.  Did Respondent file an extension

2    of time on the opposition to our Bannon Mills motion?  Because

3    we didn't get one.

4        JUDGE GREEN:  No.  But I'm not -- no.  But I'm telling you

5    I'm not -- I'm not rejecting it on that basis.  I'm not

6    rejecting it on the basis of timeliness.

7        MR. KEARL:  And I -- I -- I have one question as well.

8    There was as subpoena that was served on Make the Road several

9    weeks back, and I filed the petition to revoke, and I got an

10   email from Respondent saying they were going to withdrawal, but

11   I never got confirmation.  Can we --

12       MR. MURPHY:  Yes.  It's -- it's such a hanging thread,

13   Mr. Kearl.  Yeah.  That -- that subpoena was withdrawn

14   consistent with the email that we sent you, so --

15       MR. KEARL:  Okay.  But then that's both the subpoena that

16   was emailed to me and the subpoena that --

17       MR. MURPHY:  Yes.  Yes.  Yes.

18       MS. COX:  I have one other issue, Judge.  So as you know,

19   Respondent was supposed to file a special appeal, and we

20   proceeded without those documents.  I just want to know when

21   that special appeal is going to be filed.  My understanding was

22   yesterday.  We have no idea whether we'll close or not --

23   whether --

24       JUDGE GREEN:  Well, you're not -- right.  I mean, I'm

25   assuming you're not closing until at the earliest we get a



Exhibit E, Motion to Try Petition on Hearing Record

1    response to any special appeal.

2        MS. COX:  Right.  But if they don't file, then --

3        JUDGE GREEN:  Yes.  I -- right.  So Mr. Murphy, do we have

4    a date -- do we have a date?  Do you have at least an estimate?

5        MR. MURPHY:  We -- we -- we -- we -- we spoke briefly

6    about this at the very opening of the hearing, Judge, and --

7    and if you've like me to consult with the folks that are

8    working on that and -- and communicate by email with you and

9    the parties as to when that'll be filed, I'm -- I'm happy to do

10   that.

11       JUDGE GREEN:  Okay.  I -- I don't think we're going to get

12   a very quick turnaround necessarily on that from the Board.  At

13   least -- maybe we will.  Maybe we will, but that's not really

14   my experience.  They're busy.

15       Any-who -- anyway -- as -- as soon as -- as is earthly

16   possible, please file that.

17       MR. MURPHY:  We will.  So are we done with the testimony

18   at this point?

19       JUDGE GREEN:  I believe so.  Am I correct about that?

20       MS. COX:  At this time, yes, Judge.

21       JUDGE GREEN:  Okay.  So unless anybody has anything else,

22   we're -- we're going to be off the record.  And -- and as a

23   practical matter, we're going to be postponed indefinitely

24   until a special appeal is ruled upon by the Board, I think.

25       Am I right that the -- the -- I'm right that the only



www.escribers.net | 800-257-0885

1    documents that are outstanding are documents subject to the --

2    to this expected special appeal.

3        MR. MURPHY:  That's correct, Judge.

4        JUDGE GREEN:  And -- and the General Counsel, having

5    viewed the documents that you've received, do you -- do you

6    have at this point any anticipation that you're going to call

7    additional witnesses?

8        MS. COX:  Judge, I'm -- to be honest, I'm -- I'm

9    uncertain.

10       JUDGE GREEN:  Okay.  Well, if you -- if you -- if you

11   determine that you do want to call additional witness --

12   witnesses, regardless of a determination made on the special

13   appeal, let us know, and we'll have to decide how to schedule

14   that.  And we don't necessarily have to wait until the Board

15   rules on the special appeal for that.

16       MS. COX:  Understood.

17       MR. MURPHY:  Judge, I -- I -- I missed the very end of

18   that, if you wouldn't mind repeating it.  My apologies.

19       JUDGE GREEN:  Just that if the -- if the General Counsel

20   has witnesses that they want to call regarding documents that

21   are not subject to the special appeal, we -- we don't

22   necessarily have to wait until the Board rules on the special

23   appeal to have those witnesses testify.

24       MR. MURPHY:  Okay.  And -- so those would be in the nature

25   of -- of rebuttal witnesses I -- I -- I take it, and that



1  they -- they wouldn't be subject to being recalled again later

2  in the event that the -- the document status changes.

3       JUDGE GREEN:  So I don't think that we're actually in the

4  rebuttal phase.  I think that we're still actually in the

5  General Counsel's reserved case as it pertains to documents

6  that were subpoenaed and were produced, you know, after the

7  General Counsel finished -- finished calling their -- their

8  witnesses.

9       MR. MURPHY:  Okay.  So the -- so -- so witnesses then

10  would be -- witnesses then would be limited to those who would

11  testify about the documents that are part of the disputed --

12       JUDGE GREEN:  And that's -- that -- I know the parties

13  would like to limit in that way, but I'm really not saying that

14  because what it -- it can be -- you know, it's not necessarily

15  just somebody who is going to say, okay, I'm testifying

16  pursuant to these -- about these documents.  The documents

17  could reveal certain information that requires an additional

18  witness.  It's not necessarily based on or about the document.

19  It's just that it raises something.

20       We're -- we're -- bottom line, we're still -- we haven't

21  closed the General Counsel's case, and the General Counsel can

22  call witnesses.  And I'm not saying that it's limited.

23       MR. MURPHY:  Well, -- yeah.  So then just -- just

24  practically then, is -- is -- is -- if that's the procedural

25  posture, is -- is -- is our -- is our case -- are you -- do you



1    consider our case to be closed?

2        JUDGE GREEN:  No.  It is not.

3        MR. MURPHY:  Okay.

4        JUDGE GREEN:  No.  Because you really can't close before

5    the General Counsel.

6        MR. MURPHY:  Tight.  Okay.

7        JUDGE GREEN:  I don't think that that's possible.

8        MR. MURPHY:  Right.  All right.  Understanding how you've

9    described things, I -- I -- I appreciate that.  Thank you.

10       MR. KEARL:  And -- and one other question regarding

11   outstanding documents:  is there going to be any effort by

12   Respondent to search the OneNote system to find other

13   responsive documents?

14       MR. MURPHY:  I don't -- I -- I -- I mean, honestly,

15   Mr. Kearl, until -- as I said, until yesterday, I didn't know

16   what OneNote was.  I don't know that it's a system.  So --

17   and -- and I don't know whether or not anything that would be

18   a -- a "OneNote" has or has not been searched.  So I -- I --

19   we'll  -- we'll looking to that, and -- and -- and we'll let

20   you know.

21       MR. KEARL:  Well, and insofar as Ms. Hernandez was one of

22   the custodians I believe, like this -- I -- I'm just -- I'm

23   curious why this didn't -- wasn't discovered until yesterday,

24   and it calls into question the veracity of the mechanisms --

25       MR. MURPHY:  Let's not -- let's not -- I mean, let's not



1    use the terms like veracity and such, okay, Mr. Kearl.  I mean,

2    we did a massive document --

3         MR. KEARL:  And I didn't mean it in a pejorative sense.

4         MR. MURPHY:  Well, I mean, that's really the only --

5    that's only the kind -- that's the only kind of sense which you

6    carried in that context.  So -- so we'll -- we'll take a look

7    at it, and -- and we'll let you know what --

8         MR. KEARL:  I appreciate the --

9         MR. MURPHY:  -- it is, where it is, et cetera.

10        MR. KEARL:  I appreciate the --

11        MR. MURPHY:  And as soon as we -- as soon as we can.

12        MR. KEARL:  I appreciate -- I appreciate that it's a

13   complicated web of systems and data, but my question is:  now

14   that we know this is a system that contains relevant

15   information, I would like that system to also be searched in

16   the same way to find relevant documents.

17        MR. MURPHY:  Yeah.  I -- as I said, I don't know whether

18   it's a system.  I don't -- I don't know that.  So I -- I don't

19   want to acknowledge something that I'm not clear on.  But, you

20   know, we drafted like almost 5 million separate records, and

21   we'll look into this -- into this -- the -- the status of the

22   OneNote, and we'll let the parties know.

23        MS. COX:  And relatedly, I just want to say, over the last

24   two days we learned of drafts of the executive summary, of the

25   CHIME chat that was produced this morning that we hadn't gotten



www.escribers.net | 800-257-0885

1    before.  And the subpoena covers drafts.  So if there's any

2    outstanding drafts of documents that have been entered into

3    evidence or any documents at all, those should be produced.

4         MR. MURPHY:  Yeah.  So if -- if you're -- if you're

5    talking about drafts of the executive summary, I don't believe

6    that -- there are any that are not privileged.  But I don't

7    know what you're talking about the CHIME -- the CHIME chat.

8    What --

9         MS. COX:  The April 6th CHIME chat that Ms. Hernandez

10   testified to.  You gave us a different version this morning,

11   and that's why we were not -- we were not exactly --

12        MR. MURPHY:  Yeah.  Well, I mean -- yeah.  So you --

13        MS. COX:  We were surprised that you gave us --

14        MR. MURPHY:  Right.

15        MS. COX:  -- a different version that we have never seen

16   before.

17        MR. MURPHY:  Yeah.  So there -- you -- you could have --

18   you have questioned her about that, but you chose not to.

19        MS. COX:  That doesn't -- that doesn't change whether

20   there might be other versions of --

21        MR. MURPHY:  There's not.  There -- there's not.

22        JUDGE GREEN:  Okay.  So we are going off the record.

23   Please just notify -- somebody notify me when the special

24   appeal is -- is taken, and we'll take it from there.

25        MR. MURPHY:  Thank you, Judge.



Exhibit E, Motion to Try Petition on Hearing Record

214

1        JUDGE GREEN:  Okay.  Off the record.

2    **(Whereupon, the hearing in the above-entitled matter was**

3    **adjourned at 3:00 p.m., recommencing at a date to be**

4    **determined.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit E, Motion to Try Petition on Hearing Record

1          <u>C E R T I F I C A T I O N</u>

2     This is to certify that the attached proceedings, via Zoom

3     videoconference before the National Labor Relations Board

4     (NLRB), Region 29, Case Number 29-CA-261755, Amazon.com

5     Services, LLC and Gerald Bryson, held at the National Labor

6     Relations Board, Region 29, Two Metro Tech Center North, 5th

7     Floor, Brooklyn, NY 11201, on May 27, 2021, at 10:08 a.m. was

8     held according to the record, and that this is the original,

9     complete, and true and accurate transcript that has been

10    compared to the reporting or recording, accomplished at the

11    hearing, that the exhibit files have been checked for

12    completeness and no exhibits received in evidence or in the

13    rejected exhibit files are missing.

14

15

16
                              _____
17
                              BARRINGTON MOXIE
18                            Official Reporter

19

20

21

22

23

24

25



OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

Amazon.com Services, LLC,      Case No.   29-CA-261755

                    Employer,

and

Gerald Bryson,

            Charging Party.

_____

_____

Place: Brooklyn, New York (Via Zoom Videoconference)

Dates: December 13, 2021

Pages: 2043 through 2116

Volume: 16

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

Exhibit E, Motion to Try Petition on Hearing Record

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 29

In the Matter of:

AMAZON.COM SERVICES, LLC,            Case No.    29-CA-261755

                 Employer,

and

GERALD BRYSON,

            Charging Party.

The above-entitled matter came on for hearing, via Zoom

videoconference, pursuant to notice, before **BENJAMIN GREEN**,

Administrative Law Judge, at the National Labor Relations

Board, Region 29, Two Metro Tech Court, 5th Floor, Brooklyn,

New York 11201, on **Monday, December 13, 2021, 3:02 p.m.**

Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 2099 of 2171 PageID #: 2144
Exhibit E, Motion to Try Petition on Hearing Record
2131

1                          A P P E A R A N C E S

2    On behalf of the Employer:

3         CHRISTOPHER J. MURPHY, ESQ.
          JENNIFER MOTT WILLIAMS, ESQ.
4         RICHARD G. ROSENBLATT, ESQ.
          NICOLE A. BUFFALANO, ESQ.
5         KELCEY J. PHILLIPS, ESQ.
          MORGAN, LEWIS & BOCKIUS, LLP
6         1701 Market Street
          Philadelphia, PA 19103
7         Tel. (215)963-5601

8         JASON C. SCHWARTZ, ESQ.
          ZAINAB N. AHMAD, ESQ.
9         GIBSON DUNN
          200 Park Avenue
10        New York, NY 10166
          Tel. (202)955-8242

11

12   On behalf of the Charging Party:

13        FRANK KEARL, ESQ.
          MAKE THE ROAD NEW YORK
14        161 Port Richmond Avenue
          Staten Island, NY 10302
          Tel. (929)265-7692
15

16   On behalf of the General Counsel:

17        EVAMARIA COX, ESQ.
          MATTHEW A. JACKSON, ESQ.
18        NANCY K. REIBSTEIN, ESQ.
          NATIONAL LABOR RELATIONS BOARD
19        Two Metro Center North, 5th Floor
          Brooklyn
20        New York, NY 11201
          Tel. (718)765-6172

21

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1                      E X H I B I T S

2

| 3 | EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---------|------------|-------------|
| 4 | **Charging Party:** | | |
| 5 | CP-6 | 2065 | 2067 |
| 6 | CP-9 | 2065 | -- |
| 7 | CP-11 | 2048 | Rejected |
| 8 | CP-12 | 2048 | 2049 |
| 9 | CP-13 | 6 | 2049 |
| 10 | CP-14 | 2048 | 2055 |
| 11 | CP-15 | 2056 | 2057 |
| 12 | CP-16 | 2057 | 2058 |
| 13 | CP-17 | 2058 | 2058 |
| 14 | CP-18 | 2058 | Rejected |
| 15 | CP-20 | 2060 | 2062 |
| 16 | CP-21 | 2060 | 2062 |
| 17 | CP-22 | 2062 | 2083 |
| 18 | CP-23 | 2062 | 2063 |
| 19 | CP-24 | 2098 | 2099 |
| 20 | CP-25 | 2098 | 2099 |
| 21 | | | |
| 22 | **General Counsel:** | | |
| 23 | GC-2 | 2068 | 2073 |
| 24 | GC-22 | 2068 | 2073 |
| 25 | GC-34 | 2068 | 2073 |



Exhibit E, Motion to Try Petition on Hearing Record

| 1  | GC-58              | 2068 | 2073 |
|----|--------------------|------|------|
| 2  | GC-59              | 2068 | 2073 |
| 3  | GC-60              | 2068 | 2073 |
| 4  | GC-61              | 2068 | 2073 |
| 5  | GC-63              | 2068 | 2073 |
| 6  | GC-65              | 2070 | 2073 |
| 7  | GC-66              | 2070 | 2073 |
| 8  | GC-67              | 2070 | 2073 |
| 9  | GC-68              | 2070 | 2073 |
| 10 | GC-69              | 2070 | 2073 |
| 11 | GC-72              | 2070 | 2073 |
| 12 | GC-73              | 2070 | 2073 |
| 13 | GC-116             | 2070 | 2073 |
| 14 | GC-75 through 108  | 2070 | 2073 |
| 15 | GC-117             | 2070 | 2073 |
| 16 | GC-118             | 2070 | 2073 |
| 17 | GC-119             | 2070 | 2073 |
| 18 | GC-120             | 2070 | 2073 |
| 19 | GC-121             | 2070 | 2073 |
| 20 | GC-122             | 2070 | 2073 |
| 21 | GC-123             | 2070 | 2073 |
| 22 | GC-124             | 2070 | 2073 |
| 23 | GC-125             | 2070 | 2073 |
| 24 | GC-126             | 2070 | 2073 |
| 25 | GC-127             | 2070 | 2073 |

Exhibit E, Motion to Try Petition on Hearing Record
2154

| 1 | GC-128 | 2070 | 2073 |
|---|---|---|---|
| 2 | GC-129 | 2067 | 2073 |
| 3 | GC-129(a) | 2071 | 2073 |
| 4 | GC-129(b) | 2071 | 2073 |
| 5 | GC-129(c) | 2073 | 2073 |
| 6 | GC-130 | 2073 | 2073 |
| 7 | GC-131 | 2115 | 2115 |
| 8 | | | |
| 9 | **Respondent:** | | |
| 10 | R-9 through 21 | 2083 | 2083 |
| 11 | R-27 | 2083 | 2083 |
| 12 | R-105 | 2083 | 2083 |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1                   P R O C E E D I N G S

2          JUDGE GREEN:  Okay.  So we are back on the record,

3    hopefully for the last time on December 13th, 2021.  So I have

4    a list of items that we need to get through.  I'm hoping it

5    will take a huge amount of time in the matter of Amazon.com

6    Services, LLC, 29-CA-261755.

7          We can start with the Charging Party exhibits which were

8    referenced in the emails last week.  I understand that the

9    Respondent objects to some of the -- is going to object to some

10   of them.  They are CP-7 through 21, so which ones are the

11   Respond -- is the Respondent objecting to?

12         MR. MURPHY:  So we are objecting to 11, 12, 13.  Now --

13   now -- now -- now, Judge, all of those are news articles or --

14   new -- news articles and a blog post which are similar to the

15   art -- articles that are teed up for consideration by the

16   counsel for the General Counsel.  And -- and -- and it all

17   relates back to a conversation --

18         JUDGE GREEN:  Let me just ask you.  So 11, I get.  Like 11

19   doesn't even rise to the level of -- of secondary evidence.

20         MR. MURPHY:  Right.

21         JUDGE GREEN:  And I'm going to object -- reject CP-11.

22         MR. MURPHY:  Okay.

23         JUDGE GREEN:  But 12, 13, 14, 17, as far as I can tell,

24   they don't say anything that the Respondent isn't saying.  So

25   it's just saying -- it -- it has your explanation for the --



1  the discharge, which seems consistent with your explanation for

2  the discharge.

3      MR. MURPHY:  Right.

4      JUDGE GREEN:  Am I wrong about that?

5      MR. MURPHY:  No, no, you're ri -- you're right about that.

6  You're --

7      JUDGE GREEN:  Okay.

8      MR. MURPHY:  -- you're --

9      JUDGE GREEN:  I mean, yeah.  I -- yeah.  So -- so 12 and

10  13, I'm going to admit.  CP-12 and 13, I'm going to admit.

11  **(Charging Party Exhibit Numbers 12 and 13 Received into**

12  **Evidence)**

13      JUDGE GREEN:  I don't see it does any -- any harm to the

14  Respondent that I understand.  I'm taking it as secondary

15  evidence.

16      MR. MURPHY:  Yeah.  Judge, could I -- could I just be

17  heard for a -- a second.

18      JUDGE GREEN:  Yes.

19      MR. MURPHY:  So there was -- there was a discuss -- there

20  was a discussion.  Unfortunately, I don't know the date of --

21  of the -- of the hearing, but it was on -- started on page --

22  transcript page 1,012 and went through about trans --

23  transcript page 1,020.  And it -- and it had to do with -- was

24  a colloquy about a number of documents that the counsel for the

25  General Counsel want -- wants to admit and -- and -- and the



1    fact that they were going to be admitted for some purpose but

2    not others to -- to -- Ms. Cox indicated, it was just to show

3    that -- just to show that Mr. Bryson had achieved some level of

4    notoriety.  And --

5        JUDGE GREEN:  Yeah.

6        MR. MURPHY:  -- and -- and -- and you had said, well, you

7    know, I'm -- I'm -- I'm going to take another look at them and

8    decide whether they -- how they should come in and whether some

9    redaction is necessary.  And -- and I just wanted to make sure

10   that those were all sort of treated in a consistent fashion

11   because there -- there's the ones that are already in the

12   record.  And then there's a bunch of similar ones that are on

13   the counsel for the General Counsel's list of exhibits.

14       JUDGE GREEN:  So we're not --

15       MS. COX:  If I may --

16       JUDGE GREEN:  -- but we're not --

17       MS. COX:  -- can I just --

18       JUDGE GREEN:  -- I don't -- I don't want to skip, so I'd

19   like to take one thing at a time.  We're not up to the GC's

20   exhibits yet.  I'm just --

21       MR. MURPHY:  Okay.

22       JUDGE GREEN:  -- dealing with the -- with the Charged

23   Party's (sic) exhibits.

24       MR. KEARL:  Your Honor, may I -- may I raise on thing

25   related to Exhibit 11 --



1    JUDGE GREEN:  (Indiscernible, simultaneous speech) --

2    MR. KEARL:  -- Charging Party Exhibit 11?  That document

3    specifically refers to Mr. Bray, "Escalating through the proper

4    channels and by the book.  I'm not at liberty to disclose those

5    discussions, but I made many of the arguments occurring in this

6    essay.  I think I made them to the appropriate people."

7    Insofar as none of that communication was included in privilege

8    logs or produced by the Respondent, I -- I feel like it is

9    appropriate to include that as secondary evidence.

10   Furthermore, he clearly was involved in communications related

11   to the -- the -- the company-wide response.

12   JUDGE GREEN:  Well, let me just -- let me just -- I

13   thought I understood your email to essentially say that it was

14   relevant for its discussion of Mr. Bryson's discharge.  Am I

15   wrong about that?  "The victims weren't abstract entities, but

16   real people.  Here are some of their names, Courtney Bowden,

17   Gerald Bryson, et cetera.  I'm sure it's a coincidence that

18   every one of them is a person of color, a woman or both."  So

19   you're saying that's not the section that you're relying on

20   for -- for this -- that that's not what you want in?

21   MR. KEARL:  I'd like the entire document in.  And I think

22   the document itself is --

23   JUDGE GREEN:  So here's my point.  That -- that's just --

24   that's just speculation.  And frankly, it's not helpful to you

25   because this isn't an EEOC case.  This isn't a Title VII case.



Exhibit E, Motion to Try Petition on Hearing Record

 1    So it's -- I mean, I -- you know, it's not his job to

 2    speculate.  That doesn't rise to the level of evidence.  He's

 3    not purporting to know a fact, even though it might be

 4    secondary.  You know, even though it might be removed somewhat

 5    admissible evidence would be that that would be secondary

 6    evidence.  Are you -- are you saying there's something else in

 7    here that you want in because I didn't see it?

 8         MR. KEARL:  Yeah.  I mean --

 9         JUDGE GREEN:  I've got it open now if you want -- if you

10    want to tell me.

11         MR. KEARL:  Yeah.  I mean, he's basically saying that the

12    termination of the group of workers, including Mr. Bryson, was

13    because of the fact that they were raising COVID-19 concerns

14    and --

15         JUDGE GREEN:  Yeah.

16         MR. KEARL:  -- in engaged in --

17         JUDGE GREEN:  No.

18         MR. KEARL:  -- effective activity and that --

19         JUDGE GREEN:  No.

20         MR. KEARL:  -- he raised his concerns about that in the --

21         JUDGE GREEN:  Okay.

22         MR. KEARL:  -- company.  And when there was no response to

23    that, he subsequently resigned.

24         JUDGE GREEN:  Where did you see that?

25         MR. KEARL:  So at the top of page 2, snap -- "At that



1     point, I snapped.  I escalated through the proper channels."

2         JUDGE GREEN:  Okay.  So you're saying -- okay.  At that

3     point, is -- I don't -- I don't -- I'm not seeing that.

4         MR. MURPHY:  It's at the top -- the very top of the second

5     page of CP-11, it's page 2 of the -- of the -- of the exhibit.

6         JUDGE GREEN:  Oh, I see.  I see.  Okay.  I mean, you're

7     saying that he escalated some com -- some concerns and they

8     weren't addressed?  Listen --

9         MR. KEARL:  Yeah.

10        JUDGE GREEN:  -- I -- I -- I'm not seeing it.  Really, I'm

11    not seeing it.  I'll put it in the rejected exhibit category.

12    **(Charging Party Exhibit Number 11 Rejected)**

13        JUDGE GREEN:  You can argue it further in a brief.  But I

14    just -- I'm not seeing that it is -- is close to being useful.

15        MR. KEARL:  Okay.  I -- I mean, it might be helpful for

16    everyone to know that I have also uploaded to the SharePoint

17    two additional documents, Exhibit 22 and 23.  23 is just a copy

18    of Charging Party's subpoena.  22 is a document that I've put

19    together this morning showing the -- the failure to produce

20    documents pursuant to certain paragraphs and the materially

21    deficient production to other paragraphs, so --

22        MR. MURPHY:  So -- so -- so I've -- I've not seen those.

23    The subpoena -- I have -- I -- I have -- Judge, I have no

24    objection to documents related to the case coming in for the

25    purpose of making the record complete for anyone who's going to

escribers

www.escribers.net | 800-257-0885

1   review, decisions that you make, or -- or the Board may make,

2   whatever the case may be.  So the Charging Party subpoena, the

3   General Counsel subpoena, the -- the petition to revoke

4   documentation, all of that, we -- we have no objection to that

5   for -- for -- in order that the record can be complete.  A

6   compilation by Mr. Kearl -- he -- he can put in his brief.  I

7   mean, it's not in -- it's not evidence.  It's not an exhibit;

8   it was created so.

9        JUDGE GREEN:  What are we -- what -- what exhibits are

10   we -- I'm sorry.  What exhibits are we talking about?  The --

11   the -- is there some reason we need the New York Attorney

12   General's brief?

13        MR. KEARL:  Well, I -- I -- I believe so because this is

14   directly related to the case at hand here.  It's -- it's -- it

15   is protected-concerted activity that began on the 25th.  Amazon

16   created a plan to respond to the protected-concerted activity.

17   The first person that was terminated because of that was

18   Christian Smalls.  The second person that was terminated

19   because of that was Gerald Bryson.  The Attorney General has

20   been engaged in production -- in -- in subpoena requests and

21   things like that that came to light in a recent filing that

22   has -- you know, many documents that are not only --

23        JUDGE GREEN:  Yeah.  Those are documents -- I mean, those

24   might be secondary evidence, but the New York Attorney

25   General's brief does not -- is not -- and the -- and the brief



Case 1:22-cv-01479-DG-SJB   Document 5-1   Filed 03/17/22   Page 2110 of 2171 PageID #: 2055
2102

1    is rejected.  So GC-8 -- I mean, CP-18 is rejected.

2    **(Charging Party Exhibit Number 18 Rejected)**

3       JUDGE GREEN:  I haven't seen 22 and 23, but the remainder,

4    as far as I can tell -- I -- I -- Mr. Murphy, did you say that

5    the remainder are okay with you?

6       MR. MURPHY:  So the doc -- well, do you want to go in

7    order, Judge, and then maybe we --

8       JUDGE GREEN:  Yeah.

9       MR. MURPHY:  -- yeah.

10      JUDGE GREEN:  Right.

11      MR. MURPHY:  Okay.  So -- so you ruled 11 out, rejected --

12      JUDGE GREEN:  Right.

13      MR. MURPHY:  -- exhibit file.  Your -- and -- and -- and

14   of course, you know, we -- we -- we understand you're going to

15   get some of these.  We reserve our right to argue you know,

16   relevance, weight, et cetera.

17      JUDGE GREEN:  Okay.  Yes.

18      MR. MURPHY:  So --

19      JUDGE GREEN:  That goes without saying for everything.

20      MR. MURPHY:  12 is in.  13 is in.  You said you're

21   admitting 14 even though it's transcript of the New York

22   Attorney General case?

23      JUDGE GREEN:  Yes.

24   **(Charging Party Exhibit Number 14 Received into Evidence)**

25      MR. MURPHY:  Okay.  And -- and -- and I'd like to move



1    quickly, but can you tell me why, Judge?  What or -- or --

2    JUDGE GREEN:  That, at least -- I mean, that, at least, is

3    a -- is a statement, right, by an agent of the -- the company?

4    MR. MURPHY:  Okay.  All right.  15 --

5    JUDGE GREEN:  You're told me -- I'm sorry.  For C- -- for

6    CP-15, maybe Mr. Kearl, you can tell me, what's -- what is the

7    significance of the closing sentiment being yellow?

8    MR. KEARL:  Well, I mean, one, I think it shows that they

9    were marking these.  But two, like this document was never

10   produced pursuant to our subpoenas.  It is so clearly

11   responsive and relevant; it was never produced.

12   JUDGE GREEN:  No, no, I'm not saying it's not.  I'm just

13   saying, do you -- okay.  That's fine.  Do you -- do you have

14   some theory as to why yellow is helpful to you --

15   MR. KEARL:  I mean --

16   JUDGE GREEN:  -- from looking at your email, but maybe you

17   don't?

18   MR. KEARL:  Yeah.  I mean, my understanding is that -- is

19   that this is part of the way that they code whether or not

20   someone is a risk --

21   JUDGE GREEN:  Okay.

22   MR. KEARL:  -- in the company.  And there were articles

23   prior to this about this sort of like, you know, stop-light

24   coding.  And so I think it shows that this was responded to --

25   that you know, in -- in -- insofar as, you know, Mr. Smalls and



www.escribers.net | 800-257-0885

1    Mr. Palmer were similarly disciplined for engaging in PCA, this

2    shows that there was sort of a -- a consolidated attempt to

3    respond to all of them in kind.

4        JUDGE GREEN:  Okay.  So I'm admitting 15.  16?

5        MR. MURPHY:  Judge, 15, I mean, if I -- if I could just

6    briefly.  Mr. Kearl's right that this was not produced by us in

7    this case.  And when -- when it -- when it -- when it -- when

8    we learned about it, we -- we -- we looked into what had

9    happened.  And -- and it turns out that the document was

10   collected, but that it wasn't picked up on any of the threshold

11   searches that we -- that we performed.  And -- and it was never

12   flagged for review, so you know, we -- we identify documents

13   through a series of, you know, Smalls, and Bryson, and Palmer

14   and -- and -- and this document just never came up, so it

15   should be admitted.  It should have been produced.

16       JUDGE GREEN:  Okay.  So there' no objection to CP- --

17       MR. MURPHY:  Nope.

18       JUDGE GREEN:  -- -15?

19       MR. MURPHY:  Nope.

20       JUDGE GREEN:  Okay.  So CP-15 is admitted.

21   **(Charging Party Exhibit Number 15 Received into Evidence)**

22       JUDGE GREEN:  Is there any objection to CP-16?

23       MR. MURPHY:  On -- not in the -- not in the way of an

24   objection, Judge.  But CP-16 and General Counsel 66 have --

25   have some overlapping content.  So -- so other than --



1      JUDGE GREEN:  Okay.

2      MR. MURPHY:  -- other than to flag that, we have no

3   objection.

4      JUDGE GREEN:  Okay.  So CP-16 is in.

5   **(Charging Party Exhibit Number 16 Received into Evidence)**

6      JUDGE GREEN:  CP-17, any objection?

7      MR. MURPHY:  So again, no objection, but -- well,

8   strike -- strike that.

9      This document is on our fifth privilege log, which --

10  which we are ready to serve.  It was produced in the New York

11  Attorney General case.  We didn't participate in that review or

12  production process.  And so I have no -- no idea why that was

13  produced.  We have no objection to be it -- to it being

14  produced here, provided that its admission isn't deemed any

15  form of a waiver of the privilege that's been re -- asserted

16  with respect to any other document.

17     JUDGE GREEN:  Okay.  CP-17 is admitted.

18  **(Charging Party Exhibit Number 17 Received into Evidence)**

19     JUDGE GREEN:  CP-18, any objection -- oh, that's already

20  out.

21     MR. MURPHY:  Um-hum.

22     JUDGE GREEN:  That's rejected.

23  **(Charging Party Exhibit Number 18 Rejected)**

24     JUDGE GREEN:  CP-19.

25     MR. MURPHY:  Judge, I think the fourth re -- the fourth



Exhibit E, Motion to Try Petition on Hearing Record

1    privilege log needs to be taken up in the context of the motion

2    to reconsideration on the ruling of the third privilege log.

3        JUDGE GREEN:  Okay.  So it -- well, that's a different

4    issue, but do you have any objection to its admission as

5    opposed to it being subject to a protective order --

6        MR. MURPHY:  Yeah.

7        JUDGE GREEN:  -- being held under seal?

8        MR. MURPHY:  Yeah.  So it -- so it -- the -- the objection

9    is, is that if -- if there's going to be reconsideration of the

10   treatment of -- of CP-9 -- I'm sorry, the third -- the third

11   privilege, CP-9, or General Counsel, and I -- apologies; I

12   forget.  If there's going to be reconsideration of that,

13   then -- then we would argue that the document should be

14   excluded from evidence al -- al -- altogether.  So again, we --

15   we would think that -- because in general, privilege logs

16   aren't in evidence and -- and -- and it's impermissible to draw

17   an inference from a -- a privilege log.  The only inference

18   would be that based on the assertion of the privilege, someone

19   did something or did not do something.  And -- and there's, you

20   know, a -- a lot of case law on -- on the -- on -- on the

21   threshold issue of whether privilege logs are evidence and --

22   and the subsidiary issue of whether or not an adverse inference

23   can be drawn from a privilege log.

24       JUDGE GREEN:  Okay.  So --

25       MR. MURPHY:  I think they need to be dealt with together,

1    Judge.

2        JUDGE GREEN:  Okay.  So leave that and we'll come back to

3    it.  CP-20 and 21 seem like they're about the same thing.

4    They're about this labor-organizing threats statements.

5        MR. MURPHY:  We -- we would have the same objection that

6    we have on -- on all the articles, Judge.

7        JUDGE GREEN:  Okay.  So listen --

8        MR. KEARL:  Your Honor, if I -- if I may just say that

9    also these are important because they define the GIP, which is

10   a document that was produced on December 2nd and does --

11   precluded us from having the opportunity to have someone define

12   GIP, which I think is very relevant to Amazon's response.  So

13   in addition to being you know, potential evidence at animus, I

14   think that the -- the -- the definition of that GIP, global

15   intelligence program, is important for subsequent briefing.

16       JUDGE GREEN:  I'm sorry.  What was the GIP?

17       MR. KEARL:  It's called the -- the global --

18       JUDGE GREEN:  No, I heard that, but what is it?

19       MR. KEARL:  Oh, so it is -- it is the first mention that I

20   have seen of it was in a document that was produced literally

21   on the last page, not -- Bates 9102, as an entity that was

22   going to be tracking social media during the protests and

23   engaged in sort of Amazon's concerted response to the protest

24   activities, which is you know, obviously, very relevant to the

25   case at hand.  But you know, the -- that fact that we did not

Exhibit E, Motion to Try Petition on Hearing Record

```
1    have that document produced in a timely fashion made it

2    difficult or impossible for us to have someone from Respondent

3    come forward to define what GIP is.  So I think that in

4    addition to it showing animus, also, that the fact that it

5    defines and -- and articulates what GIP is and does is relevant

6    for -- for our subsequent briefing.

7         MS. REIBSTEIN:  If I might add, it not only deprived the

8    opportunity to have someone define it, but to -- to -- to

9    question someone about it.

10        JUDGE GREEN:  Okay.

11        MS. COX:  Judge Green, if I may, the GIP --

12        MR. MURPHY:  How many -- how many -- how many people get

13   to speak for the General Counsel, Judge?

14        JUDGE GREEN:  I don't think we're restricting them at the

15   moment.

16        MR. MURPHY:  Yeah?  Okay.

17        JUDGE GREEN:  But it's just a conference call.  We're

18   not -- you know, we're not dealing with a witness with

19   having --

20        MR. MURPHY:  It's just that --

21        JUDGE GREEN:  -- multiple people, you know, objecting and

22   questioning at the same time.  As long as we can keep it civil,

23   and I can hear anybody, everybody, I don't have a huge problem

24   with hearing from whomever.

25        MS. COX:  Judge Green, I just wanted to say that the GIP
```



Exhibit E, Motion to Try Petition on Hearing Record

```
 1    is mentioned in General Counsel's Exhibit 129(c).  I know we

 2    haven't gotten there yet, but that is what Mr. Kearl is

 3    referring to.

 4         JUDGE GREEN:  GIP, okay.  GIP and legal.  So is it the

 5    part -- I -- Mr. Murphy, do you know what GIP is?

 6         MR. MURPHY:  I have no idea --

 7         JUDGE GREEN:  Well --

 8         MR. MURPHY:  -- Judge.

 9         JUDGE GREEN:  -- listen.  So was it before -- I was

10    considering that these two documents before we even got to this

11    issue.  I'm going to admit it.  Frankly, I don't necessarily

12    see that you know, labor threats is all that different than the

13    nonunion philosophy that was referenced in -- of United Site

14    Services of California case, footnote 68.  But it's a different

15    Board and maybe we'll get a different result.  I'm going to

16    apply United Site Services, which it -- it -- it referenced how

17    8(c) is going to be applied.  It's good law and I'm going to

18    apply it.  But you know, maybe the -- the Board will want this

19    information.  So I'm -- I'm going to admit 20 and 21, and we

20    also have this issue of the GIP.

21    (Charging Party Exhibit Numbers 20 and 21 Received into

22    Evidence)

23         JUDGE GREEN:  So 22 and 23 --

24         MR. MURPHY:  I have not seen those, Judge.  I don't --

25    I'm -- I'm not -- I'm not on SharePoint, unfortunately.  So
```



1    if --

2         JUDGE GREEN:  Okay.

3         MR. MURPHY:  -- if -- if one of them is a subpoena, then,

4    as I said, I have no objection to this -- all -- all of the

5    subpoenas and the related submissions coming in to be part of

6    the record for purposes of you know, permit -- permitting

7    review or -- or your consideration.

8         JUDGE GREEN:  So okay.  So G- -- CP-23 does appear to be a

9    subpoena.  So I'm going to admit CP-23.

10   **(Charging Party Exhibit Number 23 Received into Evidence)**

11        MR. MURPHY:  Is that the Charging Party subpoena, Mr.

12   Kearl?

13        MR. KEARL:  It is.  It is.

14        MR. MURPHY:  Okay.

15        MR. KEARL:  It is.  It the -- it's the -- the one that was

16   subject to the special appeal.

17        MR. MURPHY:  Okay.  And what's CP-22?

18        JUDGE GREEN:  What is CP-22 again?

19        MR. KEARL:  The CP-22 outlines the paragraphs of the

20   Charging Party subpoena that have no responsive documents

21   produced and the paragraphs that had you know, a couple of

22   paragraphs produced, and identified documents that we now know

23   exist thanks to the filings in the Attorney General case that I

24   think should have been produced.  It helps show bad faith.  I

25   also have included all of the cover letters and production logs



1        from Respondent, so that in -- in the event that someone wants

2        to do the work that I did, and Government wanted --

3               JUDGE GREEN:  So listen, this is a brief.

4               MR. MURPHY:  Right.

5               JUDGE GREEN:  And you've marked it.  And it doesn't sound

6        like Mr. Murphy really has any particular objection to it being

7        in evidence.  I mean, it's -- it's a brief.

8               MR. MURPHY:  Right.  Just in -- insofar as I'm going to

9        ask for adverse inferences related to the failure to produce

10       documents subsequent to certain paragraphs, I felt that it was

11       important to make that clear on the record.  And if that's not

12       the case, that's fine, but that was my understanding.

13              MR. MURPHY:  Could Mr. -- so Judge, I thought it was a

14       chart or a schedule or something?

15              JUDGE GREEN:  It's -- it's -- I mean, it's basically a --

16       a brief.

17              MR. MURPHY:  Can you -- is it possible to share your

18       screen, Judge, so I can --

19              JUDGE GREEN:  Oh, yeah.  I can.  Yes.  Hold on.  Can you

20       see it?

21              MR. MURPHY:  Yeah, I can.  Yeah.  I mean, this is in the

22       nature of argument, Judge, not --

23              JUDGE GREEN:  It is.

24              MR. KEARL:  -- not in --

25              JUDGE GREEN:  It is.  We don't need this.  We certainly



Exhibit E, Motion to Try Petition on Hearing Record

1    don't need this in the record, but it's a brief.  So you know,

2    I mean, I'm happy to have it.  I'm sure the Respondent's happy

3    to have it ra -- sooner rather than later.

4       MR. MURPHY:  Yeah.  So as long as it -- as long as it's

5    coming in as -- as -- as briefing material rather than --

6       JUDGE GREEN:  Yeah.  All right.  So listen, I'm not going

7    to accept it as evidence.  It'll be rejected as evidence.

8    **(Charging Party Exhibit Number 22 Rejected)**

9       JUDGE GREEN:  But we've all got it and I'm going to read

10   it in full.

11      MR. MURPHY:  Okay.  No --

12      JUDGE GREEN:  And --

13      MR. MURPHY:  Yeah.  No problem there.

14      JUDGE GREEN:  Yeah.  Okay.  So stop share.  So I think

15   that's it for the Charging Party's exhibits.

16      MR. KEARL:  The one thing I wanted to flag.  So

17   Charging -- Charging Party Exhibit 9 and 6 were previously

18   rejected, and I -- I believe that in light of the failure to

19   produce subsequent documents, Charging Party Exhibit 6, which

20   is the Facebook image that has the hashtags from the Mandi

21   Velasco Facebook Live, I would just ask you to reconsider the

22   admission of that document.  There were some documents that

23   were produced in the last batch on December 2nd that I believe

24   the General Counsel has put forward as exhibits that

25   specifically refer to the use of the -- the team monitoring



1   hashtags.  And insofar as that was the case, I believe it's --

2   it's important to have the hashtags that were used in the Mandi

3   Velasco video on record.

4        JUDGE GREEN:  So 9 is the -- is the log, right?

5        MR. KEARL:  Right.  9 is the third log.

6        JUDGE GREEN:  Right.  And 6 is -- okay.

7        MR. MURPHY:  Judge, could you make that a bit bigger

8   perhaps?  Thank you.

9        JUDGE GREEN:  Oh, did I -- I didn't do anything.

10       MR. MURPHY:  I don't know.  I was think -- thinking you

11  had advanced perhaps.

12       JUDGE GREEN:  Oh, no.  Is that any bigger?

13       MR. MURPHY:  No.  But that's -- let me -- that -- that's

14  better.

15       JUDGE GREEN:  Wait.  Is that it?  Did you read --

16       MR. MURPHY:  I think that's a separate document that

17  you're on now.

18       JUDGE GREEN:  Oh, okay.  All right.  So is there any

19  objection to 6?

20       MR. MURPHY:  I mean, it was ruled -- it was ruled out

21  before, Judge, and -- and I -- I think if it's -- and -- and --

22  and it's been out -- it's been ruled out for months, and I --

23  I -- I frankly don't know what -- what -- how it advances the

24  ball in -- in any way.  I mean, we know Mandi Velasco was

25  there; she testified about it.  We have the video that she



1     created, so --

2          JUDGE GREEN:  You're looking at -- when you say hashtag,

3     you're looking at hashtag-JFK8 and hashtag-Stand-up?

4          MR. KEARL:  Yes, Your Honor.  And -- and in the December

5     2nd production, there was communication that I believe the

6     General Counsel has moved to -- to --

7          JUDGE GREEN:  Okay.

8          MR. KEARL:  -- have admitted.

9          JUDGE GREEN:  I -- I don't see anything wrong with

10    admitting it.  I'm going to admit CP-6.

11    **(Charging Party Exhibit Number 6 Received into Evidence)**

12         JUDGE GREEN:  Frankly, I don't remember excluding it.

13    Okay.  So General Counsel exhibits.

14         MS. REIBSTEIN:  Wait.  Your Honor, Mr. Kearl also

15    mentioned CP-9.  (Indiscernible, simultaneous speech) --

16         JUDGE GREEN:  I know.  We're going to deal with all that a

17    bit later.  So GC's exhibits, they largely are just you know,

18    motion materials.

19         MS. COX:  Yes, Judge.

20         JUDGE GREEN:  We've got GC-6- -- 116, which is the

21    redacted OneNote, and we've got 129(a) through (c) among the

22    new things.

23         So let me ask you, Mr. Murphy, do you have any objection

24    to GC-116 and GC-129(a) through (c)?

25         MR. MURPHY:  So we're not going to go in order on these



1   then.

2       JUDGE GREEN:  Well, do you have any objection to the

3   oth -- the doc -- the other documents?

4       MR. MURPHY:  Give me a second here, Judge.

5       JUDGE GREEN:  Yeah.  Okay.  It's just like, Respondents

6   petition to revoke and vote (indiscernible, simultaneous

7   speech) --

8       MR. MURPHY:  Yeah, yeah.  So -- right.  So no objection to

9   20 -- no -- let me just go in order, Judge.  It'll be quick.

10  No objection to 2.  No objection to 22.  No objection to --

11      JUDGE GREEN:  Okay.

12      MR. MURPHY:  -- 34.  No objection to 58, given the way

13  you've handled the other articles and such.  No objection to

14  59, subject to the same analysis.  60, no objection.  61, no

15  objection.  63 is -- I -- I -- I'm not sure -- there was some

16  discussion about playing an -- an excerpt, a couple of minutes

17  of the -- of the video.  And -- and -- and I think that's --

18  and -- and I looked at the record, and it doesn't look as

19  though that any part of this exhibit was ever moved.  So --

20      MS. COX:  So I just -- sorry.  Go ahead.

21      MR. MURPHY:  So my -- my -- my question is, are we -- are

22  we moving the -- and -- and apologies for not recalling, but

23  the two or three or four minutes that Mr. Bryson graced the

24  video, or -- or are we -- or is the General Counsel seeking to

25  admit the entire video?



```
 1          MS. COX:  Judge Green, for purposes of completion, we're
 2    going to admit the entire video.  It was produced pursuant to
 3    the subpoena, but we did narrow down for the parties the
 4    section that was relevant, so that we didn't have to sit
 5    through an hour video.
 6          JUDGE GREEN:  Right.
 7          MR. MURPHY:  Right.  So if -- if we -- if we've narrowed
 8    down the part's that relevant, why -- why -- why -- why put in
 9    the rest?
10          MS. COX:  Because it makes the exhibit complete.
11          JUDGE GREEN:  So let me just ask.  Do you care -- do --
12    do -- what do the parties prefer?  I mean, I'm asking, the GC,
13    I guess, what would you rather the Board have?  Would you
14    rather they have the whole video or would you rather they have
15    the clip?
16          MS. COX:  The whole video, Judge.
17          JUDGE GREEN:  Okay.  Listen, it's -- you know, under the
18    rules of completeness, it goes in.  So -- okay.
19          MR. MURPHY:  Yeah.  Judge, it's -- it's -- it's -- it's --
20    it's an hour or so of Jordan Flowers riffing.
21          JUDGE GREEN:  I -- I -- I understand.  I would prefer
22    personally, to just have the clip, but I -- you know, listen,
23    I'm not familiar with the whole thing.  So listen.  You know,
24    I -- I -- I believe I've got to -- to accept the whole thing.
25    **(General Counsel Exhibit Number 63 Received into Evidence)**
```



Case 1:22-cv-01479-RG-SJB   Document 5-1   Filed 03/17/22   Page 2125 of 2171 PageID #: 2170
Exhibit E, Motion to Try Petition on Hearing Record
2171

1    JUDGE GREEN:  And I'll -- I'll fast forward to whatever

2    you -- you all want me to fast forward to.

3    MR. MURPHY:  Understood.  Okay.  65, no objection.  66, no

4    objection, as I noted.  It's got some overlapping content with

5    CP-16.  67, no objection.  68, no objection.  69, no objection.

6    72, no objection.  73, no objection.  75 to 108, those --

7    that's -- those -- those -- that's a bunch of A&P (phonetic

8    throughout) files or discipline files, so no objection to

9    those.  116, no objection.  117, no objection.  118, no

10   objection.  119, no objection.  120, no objection.  121, at 122

11   is the -- the fourth privilege log and I'd like to hold that

12   for consideration with the third.

13   JUDGE GREEN:  Okay.

14   MR. MURPHY:  123, no objection.  124, no objection.  125,

15   no objection, 126.  You know, I mean, do we need the Board's

16   orders, but okay.  127, no objection.  128, no objection.

17   1- -- 129 is a -- is a cover letter from Ms. Phillips to the

18   General Counsel and the -- the Charging Party.  I -- I don't --

19   I don't see that as evidence or -- or relevant to the facts in

20   dispute in the case.

21   MS. COX:  Judge Green, 129 is relevant to our Bannon-Mills

22   argument.  Respondent withheld documents responsive to

23   paragraph 19 of General Counsel's subpoena.  And the documents

24   produced on December 2nd were responsive to paragraph 11-A.

25   There were no documents responsive to paragraph 19 of our



1   subpoena, and that's what the cover letter shows.  Moreover,

2   paragraph -- the -- the document produced pursuant to paragraph

3   11-A; disciplines related to Mr. -- or I'm sorry, documents

4   related to Mr. Bryson's discipline should have been produced

5   months before.  So in our view, this is the document that

6   establishes that the -- no paragraph 19 documents were

7   produced, and Respondent delayed in producing documents

8   pursuant to paragraph 11-A of General Counsel's first subpoena.

9       JUDGE GREEN:  Sorry.  I'm just looking at it.  Okay.  So

10  I'm going to admit GC Exhibit 129.

11  **(General Counsel Exhibit Number 129 Received into Evidence)**

12      MR. MURPHY:  Okay.  129(a), no objection.  129(b), no

13  objection.

14      MS. COX:  Your Honor, if I may on 129(b), Mr. Kearl asked

15  for the native format of this document.  As you know, the

16  subpoena requires that Respondent produce native formats.  It

17  was not produced to date, and therefore, you see, I've labeled

18  it as undated PDF of Mr. Bryson's termination.  So that's also

19  goes to our Bannon-Mills arguments that Respondent produced

20  documents in bad faith and did not comply with the subpoena.

21      MR. MURPHY:  Judge -- Judge, I -- I mean, I don't know

22  that we're required to produce -- a PDF is an appropriate form

23  to produce.  And I -- I don't know that we're need -- that

24  we're required to produce them in al -- in alternative forms.

25  I mean, this --



1    JUDGE GREEN:  Well, you are if the subpoena asks for it.

2    MS. COX:  I'm sorry.  Can you say again, Judge?

3    JUDGE GREEN:  You are if the subpoena asks for it.

4    MR. MURPHY:  Yea --

5    JUDGE GREEN:  Does the subpoena ask for it in the

6    definitions?  It probably does.  They all do.

7    MS. COX:  It does.  And if I might add, Judge, this script

8    is an iteration of a document that's already in evidence and is

9    undated.  So without the metadata, we can't tell when it was

10   created.  So it would be -- it's highly responsive to the

11   subpoena, a native format of this script that Mr. Grabowski

12   used before terminating Mr. Bryson.

13   JUDGE GREEN:  Okay.

14   MR. MURPHY:  So Judge, the -- Ms. -- Ms. Cox is correct.

15   It -- it -- it's in the -- it's in the record, at least as

16   General Counsel 9, the two middle paragraphs are the -- are the

17   contents of Mr. Bryson's feedback or A&P document.  And -- and

18   Tyler Grabowski testified at length about what he did and when.

19   So -- so there's no mystery here.  If -- if the counsel for the

20   General Counsel is insistent on you know, metadata for these,

21   I -- I can ask the Consilio to provide the metadata documents.

22   JUDGE GREEN:  Okay.  I mean, listen.  That's didn't happen

23   because it was an email that was a while back.  I mean, you

24   know, send an email right now to get the -- get the document.

25   MS. COX:  I mean, I believe that that ship has sailed.



2160

 1    We've been waiting for documents for --

 2        JUDGE GREEN:  I'm -- I'm not saying you're wrong, but

 3    listen, if they want to get it to you, they -- they can get it

 4    to you, and then I'll consider it.  And you can decide whether

 5    to put it in or not and I'll decide what to do on the Bannon-

 6    Mills issue.  There's nothing -- there's no harm in getting it.

 7    There's no harm in getting the documents.

 8        MR. MURPHY:  And General Counsel 29(c) (sic), we have no

 9    objection to that coming in either, Judge.

10        JUDGE GREEN:  Okay.

11        MR. MURPHY:  And wait -- there's one more, 130.  The

12    motion for reconsideration, we have no objection to that,

13    subject to the understanding that our response, which is due on

14    the 15th will be included in the record as well.

15        JUDGE GREEN:  Okay.  And I'm going to hope that the court

16    reporter, who's ever transcribing this will be able to follow

17    that, and all of those documents which you referenced are

18    admitted.

19    **(General Counsel Exhibit Numbers 2, 22, 34, 58, 59, 60, 61, 63,**

20    **65, 66, 67, 68, 69, 72, 73, 75 through 108, 116, 117, 118, 119,**

21    **120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 129(a),**

22    **129(b), 129(c) and 130 Received into Evidence)**

23        THE COURT REPORTER:  Your Honor, I have a question.

24    Mr. -- with regard to, I believe it was 59 and 60, and Mr.

25    Murphy said something like no objection, something to the



1    effect that you know, if it's given the same analysis.  I'm not

2    sure what he meant or if you ruled on that caveat that he

3    imposed.

4         MR. MURPHY:  Well, I didn't impose it.  It -- the -- it

5    was the judge's treatment of the -- of all of those documents,

6    articles and such from page and 1,012 to 1,020 of the

7    transcript, where the question was whether -- we -- we had no

8    objection to them coming in to show that Mr. Bryson had

9    achieved some level of notoriety.  The -- the issue was, I -- I

10   guess, from -- from a perspective of completeness and -- and

11   also with respect to what -- what -- what -- how the non-Bryson

12   aspects of any of those publications would be treated or

13   regarded.  And -- and I think that --

14        JUDGE GREEN:  I know.  That's what I understood those

15   documents to be relevant to.  Are they -- are you saying that

16   they're relevant to something else?

17        MR. MURPHY:  Me?

18        JUDGE GREEN:  No, not you.  The General Counsel.

19        MS. COX:  In my -- my recollection of those -- those

20   articles was -- was that they were being admitted, except that

21   any statements that were considered hearsay were not going to

22   be given weight.  Like, any -- any statements made by

23   Respondent's agents, that was my recollection of those

24   documents.

25        MS. REIBSTEIN:  Except if those hearsay statements pertain



1    to documents for which Respondent didn't produce other

2    documents and they could be used as secondary evidence.

3        JUDGE GREEN:  Okay.  So listen, is this a -- is this a --

4    an academic discussion?  I don't remember there being anything

5    in those articles which was at all damaging.  Am I wrong about

6    that?

7        MS. COX:  No, Judge.

8        JUDGE GREEN:  Meaning -- okay.

9        MR. MURPHY:  Yeah.  I -- I mean, I -- I don't have a -- I

10   don't have a crystal-clear relection -- recollection of each

11   and every one of them, but you're -- you're correct in

12   characterizing how Amazon described its position.

13       JUDGE GREEN:  Right.  So that's -- right.  So listen, I'm

14   going to accept it.  You can try to use it for whatever you

15   want.  But you know, I'm not seeing how those arguments are

16   going to be helpful other than what the General Counsel has

17   already stated the relevance is --

18       MS. COX:  Oh, okay.  Thank you.  I -- so -- so just to

19   clarify then --

20       JUDGE GREEN:  Right.  There's no --

21       MS. COX:  -- you're not limiting --

22       JUDGE GREEN:  -- there isn't --

23       MS. COX:  -- how we can argue the --

24       JUDGE GREEN:  Correct.

25       MS. COX:  Thank you.



Exhibit E, Motion to Try Petition on Hearing Record

1    JUDGE GREEN:  Right.  Okay.  So that, I believe, is the

2    General Counsel's documents other than the privilege logs.

3    MR. JACKSON:  Your Honor, there is something that counsel

4    for the General Counsel would like to address, and it goes back

5    to Charging Party Exhibit 22, which is what you characterized

6    as a brief submitted by Mr. Kearl.

7    JUDGE GREEN:  Yes.

8    MR. JACKSON:  So I think it goes beyond being a mere

9    argumentative brief.  And I think there are factual matters

10   asserted in Mr. Kearl's proposal --

11   JUDGE GREEN:  Yeah.  But is -- is -- is Mr. Kearl -- Mr.

12   Kearl, did you write it?

13   MR. JACKSON:  Yeah.

14   JUDGE GREEN:  I mean, you're not a witness.

15   MR. KEARL:  Well -- but in -- insofar as there are facts

16   about the production and lack of production of documents -- I

17   mean, I understand that you want that to be a briefing, but

18   it -- but when you're looking at, for example, a news article

19   where Amazon says that they terminated Mr. Bryson for

20   intimidation.  And then pursuant to paragraph 4 of my subpoena,

21   asking for all communications related to press statements,

22   there is no communication related to that.  I -- I mean, it

23   goes to like a shifting defense's argument, but it also is,

24   I -- I think, highly relevant to understanding the way that

25   Amazon responded to the -- to the --



 1          JUDGE GREEN:  Well, here's -- here's the --

 2          MR. KEARL:  -- PCA.

 3          JUDGE GREEN:  -- problem, Mr. Kearl, that if you want to

 4     testify, you need to testify and be subject to cross-

 5     examination.  So like, you don't get to just put in a document

 6     in the way of -- in the manner of testimony and say, okay,

 7     that's going to be it.  You know, I'm not subject to any

 8     questioning.  That's not how testimony works.

 9          MR. KEARL:  Right.  And I --

10          JUDGE GREEN:  So --

11          MR. KEARL:  -- I did testify on the first day when Amazon

12     refused to produce documents to me pursuant to the subpoena and

13     I was called and --

14          JUDGE GREEN:  No.  I get that.  I'm not saying you

15     can't -- I'm not saying you can't testify.  You -- you can.

16          MR. KEARL:  Yes.

17          JUDGE GREEN:  But it's not -- I mean, it sounding like

18     you're basically saying, here, take this document in lieu of

19     testimony.  That's what it sounds like you're -- you're doing.

20          MR. KEARL:  Well, my -- I guess my question is, in order

21     to make an adverse inference related to bad-faith failure to

22     produce documents by Respondent, do you need testimony or would

23     the -- the complete production log showing all documents

24     produced to what paragraph they were produced to be sufficient?

25          JUDGE GREEN:  Well, it can be -- so you can have what you



# Exhibit E, Motion to Try Petition on Hearing Record

1   can -- what you can put in is you can put in stipulations, so

2   that the Respondent who produce the documents is then produced

3   documents.  The easiest way is that the attorneys just agree,

4   this is what was produced; this was not -- this is not what was

5   produced.  If you can't do that, then you can use

6   correspondence.  You know, oftentimes, there's a bunch of

7   emails.  It's just kind of -- it's easiest to just dump all the

8   emails in and then you -- you wade through it in the briefing

9   process, in the decision-writing process.  But if you don't

10   have either of those two things, then you need testimony, what

11   you -- like, what you gave.  And you really can't just put in a

12   document and say, okay, well, this is my testimony in the

13   nature of an affidavit.

14       MR. KEARL:  So -- so Charging Party Exhibit 22, the first,

15   I think, eight pages are sort of a -- an evaluation -- a

16   testimony, if you will.  But then every page after that is the

17   complete compendium of production logs and cover letters for

18   every production, identifying all of the specific paragraphs to

19   which documents were responsive.

20       JUDGE GREEN:  Okay.  So I'm not saying no, but the problem

21   is it's a 46-page document.  And you know, it's possible that

22   the Respondent could look at it and just say, here this is all

23   right, we can -- can get a factual stipulation.  But we've --

24   we've all just seen it now.  And it's a 46-page document.

25       MR. MURPHY:  And it's in the nature of a brief, Judge.



1       JUDGE GREEN:  It sounding like maybe it's not.  It

2   sounding like maybe it's not a brief.  It's sounding like maybe

3   its representation regarding what happened.

4       MR. MURPHY:  Right.  But -- but I -- I -- I'm assuming

5   without having seen it, that's it -- well, other than seeing

6   the first page, that -- that it's -- that it refers to various

7   materials that are in the record and makes an argument that we

8   were really, really bad, right?  I mean, that -- that's what it

9   says.

10      MS. REIBSTEIN:  No.  It says -- it says this is what they

11  provided and this what they --

12      JUDGE GREEN:  Right.

13      MS. REIBSTEIN:  -- didn't provide.

14      JUDGE GREEN:  Correct.  So that's what it says, I think,

15  if I'm -- if I'm --

16      MS. REIBSTEIN:  Yeah.

17      JUDGE GREEN:  -- incorrect --

18      MS. REIBSTEIN:  And -- and yeah.  This is what was --

19      JUDGE GREEN:  And --

20      MS. REIBSTEIN:  -- provided; this is what was not.

21  Although, a piece of paper was provided, it was insufficient

22  because it was redacted, so it was in -- insufficient

23  production.  It just says what was turned over in that so --

24      JUDGE GREEN:  So and guess is that from a factual

25  standpoint, it's -- you know, I'm sure it's accurate.  But it's



www.escribers.net | 800-257-0885

```
 1    not -- it's not useful in that manner unless it's a

 2    stipulation.  And what we're really not in a position -- I

 3    mean, I don't think the Respondent's in a position to stipulate

 4    to it now, because we just got it and it's long.

 5         MR. KEARL:  Well, I mean, to be fair, the first eight

 6    pages, the majority of the text is literally the text of the

 7    subpoena itself.  And then the first half of the -- those first

 8    eight pages, it's just these are the paragraphs that did not

 9    have any production.  And then the second half of those eight

10    pages are these are the only documents that were produced

11    pursuant to that.  And then here's additional documents that we

12    know exist based on the production of December 2nd and the

13    filing that the Attorney General had.

14         JUDGE GREEN:  Mr. Murphy, do you have access to email?

15         MR. MURPHY:  I'm sorry, Judge.

16         JUDGE GREEN:  Do you have access to email?

17         MR. MURPHY:  Yeah.  Ms. Phillips emailed the document to

18    me.

19         JUDGE GREEN:  Oh, okay.

20         MR. MURPHY:  I'm just looking at it.

21         JUDGE GREEN:  All right.  I was just about to do that.

22         MR. MURPHY:  Like -- like for example, I'm on page 7 of

23    46.  And -- and I'm just -- this is just the first thing I --

24    among the first things I saw here.  So under paragraph 21, it

25    says, "Respondent failed to produce the following documents
```



1   known to be in existence."  We looked at the -- at the Protest

2   Playbook (phonetic throughout) and the IOC Labor Activity

3   Playbook (phonetic throughout), and determined that they were

4   not responsive to any subpoena request.

5        JUDGE GREEN:  Okay.

6        MR. MURPHY:  All right?  So we're not -- we're not -- this

7   is argument, Judge, right?  So the -- these -- so --

8        JUDGE GREEN:  Okay.  So that's fine.  I mean, that's --

9   that's fine.  That it's --

10        MS. COX:  But, wait.  You didn't --

11        MR. MURPHY:  I mean --

12        MS. COX:  -- disclose that those things existed and said

13   these things exist, but we think they're not relevant, you just

14   like, hid them.

15        MR. MURPHY:  What?

16        JUDGE GREEN:  I'm going to say the bottom line is unless

17   it's a stipulation, it's -- it's not -- it's not going in as

18   testimony.  So you know, the General Counsel and Mr. Kearl, you

19   could decide how you -- how you want to do it.  You know, I

20   mean, I -- I think that it could be argued that this is maybe a

21   summary of voluminous documents and maybe it could be entered

22   into evidence that way.  You know, I think that it would be

23   helpful if it was just the factual documents as opposed to a

24   partial argument.  I haven't looked through the whole thing,

25   but --



1    MR. MURPHY:  Yeah.  Judge -- Judge -- Judge, I -- I think

2    I could expedite, at least, this partially.  The -- the

3    correspondence from Ms. Phillips to the parties, we -- we have

4    no objection to that coming in.

5        JUDGE GREEN:  Okay.

6        MR. MURPHY:  That's -- that's page --

7        MR. KEARL:  9 through the end.

8        MR. MURPHY:  -- 25 to 46.

9        MR. KEARL:  How about paragraph 9, which was the

10   producti -- or I'm sorry, page 9, which was the production log

11   that was -- that was given to us along with documents produced

12   on the 30th of April.

13       MR. MURPHY:  I'll -- I'll tell you what.  If I can -- I --

14   I mean, I just don't know what that is and -- and -- and if we

15   can confirm that -- so what -- what pages are you talking

16   about, Mr. Kearl, 9 --

17       MR. KEARL:  Everything from 9 to the end is just one after

18   the other, either the cover letter or the production log for

19   every single production that I was given.

20       MR. MURPHY:  Yeah.  I mean, that -- again -- again, I -- I

21   can't -- I'm accepting your representation at face value that

22   these are what we produced to you.  I'd -- I'd just like to

23   confirm that.  And if it's confirmed, then -- then we would

24   have no objection to -- hold on.  And actually, if -- if we can

25   go off the record for a second, I could probably talk to Ms.



1    Phillips and -- and get -- cut to the chase right now.

2         JUDGE GREEN:  Okay.  Off the record.

3    (Off the record at 3:51 p.m.)

4         JUDGE GREEN:  Okay.  So we've revised CP-22 to eliminate

5    the first nine pages.  Does somebody want to take a crack at

6    explaining on the record what this is?

7         MR. KEARL:  I'm happy to, Your Honor.  So CP-22, is a

8    collection of 38 pages.  It is all of the production logs and

9    cover letters that identifies specific documents and which

10   paragraphs they are responsive to in the Respondent's

11   production.

12        JUDGE GREEN:  Okay.  So 20-GC -- CP-22 is admitted.

13   **(Charging Party Exhibit Number 22 Received into Evidence)**

14        MR. MURPHY:  No objection.

15        JUDGE GREEN:  Okay.  Okay.  So I have Respondent's

16   exhibits that were objected to on the grounds of Bannon-Mills

17   and in -- my notes indicated that it's R-9 through 21, and 24,

18   27, 105.  I'm -- I'm admitting those.  I -- you know, I'm going

19   to -- I've -- I've been through them a couple of times along

20   with my -- looking at the -- the Bannon-Mills motions and

21   everything.  And I'm -- I'm going to admit it.

22   **(Respondent Exhibit Numbers 9 through 21, 21, 27, and 105**

23   **Received into Evidence)**

24        JUDGE GREEN:  You can in the briefs just say, listen,

25   we're -- we're restating our objection to these documents on



1    Bannon-Mills as indicated on pages 22 to whatever -- 22 to 25

2    of our Bannon Mills motion --

3            MR. MURPHY:  And Judge --

4            JUDGE GREEN:  -- if you want to add something more than

5    that, you can add it.  But I -- for the moment I'm -- I'm

6    admitting R -- those Respondent exhibits.

7            MR. MURPHY:  Judge, would you be so kind as to give me the

8    list again, please?

9            JUDGE GREEN:  So I have 9 to 21, R-24, R-27, and R-105.

10           MR. MURPHY:  Thank you.

11           JUDGE GREEN:  Okay.  So why don't we ju -- address quickly

12   the pro -- the protective order -- the -- the -- the privilege

13   logs.  So as it turns out, the ALJs just happened to have a

14   conference with the FOIA branch of the NLRB.  And we were

15   advised, and I -- I subsequently looked it up, and what they

16   were saying appears to be right, which is that keeping

17   documents under a protective order or under seal does not

18   impact a FOIA request, that -- you know, an ALJ is not

19   empowered to, on behalf of the agency, render documents

20   excepted or immune from a FOIA request.  It's a -- it's a

21   statutory obligation on the Agency which a court can order

22   nonproduction pursuant to FOIA, but an ALJ cannot.  So to the

23   extent that that was a big part of the motion and the

24   objection, that's really moot.

25           MR. MURPHY:  Yeah.  And -- and Judge, we -- we would agree



Exhibit E, Motion to Try Petition on Hearing Record

1     that -- and -- and so I -- I -- I think, though, that what we'd

2     want to make sure we do is that we've identified for FOIA

3     purposes the privilege logs as being covered by privilege --

4     as -- as being nondisclosable under FOIA as a confidential

5     business record.  And I think that's what our -- I think that's

6     what our obligation is.  So all of the privilege logs we would

7     take the position are -- are -- are covered by that.

8          JUDGE GREEN:  So I don't -- I don't make the determination

9     as to whether the Agency is going to disclose documents

10    pursuant to FOIA.  And I -- I don't exactly know how they

11    notify an interested party when a -- when a FOIA request is

12    made.  I would imagine you'd have to get in touch with the FOIA

13    branch and kindly let them know that in the event that they get

14    a FOIA request, here's our position.  But I don't -- you know,

15    I don't have any control over it.

16         MR. MURPHY:  Under -- understood.  We're just --

17         JUDGE GREEN:  Okay.

18         MR. MURPHY:  -- I'm just making it clear on the record

19    that we're --

20         JUDGE GREEN:  Okay.  Oh, okay.  All right.  As far as the

21    protective order, I'm actually inclined to maintain the

22    protective order.  My feeling about it is, is that a privilege

23    log is kind of a necessary evil.  You know, you -- you do get a

24    substantive description of the documents which are privileged.

25    And -- and frankly, we would rather not.  You need it because



Exhibit E, Motion to Try Petition on Hearing Record

1   it -- it wouldn't be viable to litigate a case and deal with

2   the privilege log without -- deal with privileged documents

3   without having a privilege log.  But I actually think that

4   maintaining the protective order for purposes of how it's

5   handled during the proceeding is appropriate.  And so I'm

6   really not inclined to remove that.  I don't think that's going

7   to affect -- I -- I know it's not going to affect whether the

8   documents are subject to disclosure under FOIA, but for

9   purposes of the way the documents are going to be handled in

10  the hearing, I think it's appropriate to say that the -- the

11  attorneys get to exchange it; they get to use it.  You can

12  disclose it to the extent necessary, but otherwise, it should

13  be maintained as protected.

14      MR. MURPHY:  Okay.  And -- and Judge, just to clarify, so

15  that's with respect to the third privilege log, the fourth

16  privilege log, which includes the --

17      JUDGE GREEN:  Yes.

18      MR. MURPHY:  Right.  And -- and then -- and then we have a

19  fifth privilege log, which is -- which is short, but which we

20  can transmit now if that's the -- if -- if that's you're --

21  you're ruling on that.

22      JUDGE GREEN:  Let's identify what those exhibits are.  I

23  know it's CP-9, but I believe we have -- do we have other

24  exhibits?  There is.

25      MS. COX:   Yeah, Judge, Charging Party and I have an



1    overlapping exhibit.  We've -- GC-127 -- I'm sorry.

2        MR. MURPHY:  116?

3        MS. COX:  1- -- yes.

4        MR. MURPHY:  No --

5        MS. REIBSTEIN:  GC- --

6        MR. MURPHY:  My bad.  My bad.  Not that.

7        JUDGE GREEN:  It's 122.

8        MR. MURPHY:  122.

9        JUDGE GREEN:  It's GC-122.  And --

10       MS. COX:  (Indiscernible, simultaneous speech) --

11       JUDGE GREEN:  -- I'm going to admit GC-122.

12       MR. MURPHY:  I'm sorry.

13       JUDGE GREEN:  I'm going to admit GC-122.

14       MR. MURPHY:  Subject to the protective order?

15       JUDGE GREEN:  Correct.

16       MR. KEARL:  Judge Green, can we just go back to the issue

17   of the protective order just shortly.  I just want to raise

18   that nothing on the privilege log is privileged.  I mean, the

19   privilege log --

20       JUDGE GREEN:  That's not exactly true.  That's --

21       MS. COX:  There --

22       JUDGE GREEN:  -- not exactly true.  There is a description

23   of the documents --

24       MS. COX:  But Judge Green, it says the names of people who

25   are publicly known.  These are not --



1       JUDGE GREEN:  Listen, I'm not saying -- right.  I mean,

2   consi -- it's -- it's poss -- listen.  It's conceivable that

3   you could get into a situa -- where you're -- where you're

4   redacting it.  I don't think we really need to go there.  I

5   think it's appropriate.  I -- you know, I think that given that

6   the parties should be able to use the documents without any

7   problem.  And I don't think it's inappropriate to keep the

8   documents under protection.

9       MR. MURPHY:  So how -- how do you want -- how do you want

10  to mark the fifth privilege log, which -- which we can transmit

11  now?

12      MS. COX:  And Judge --

13      JUDGE GREEN:  Let's look at --

14      MS. COX:  -- regarding the fifth privilege log, this is

15  the first time we're hearing of it, and Respondent has

16  repeatedly delayed in producing a privilege log.  To produce

17  one today at this late hour is shocking to me that there's a

18  fifth privilege log.  It should have been produced at the time

19  that the documents were served.

20      JUDGE GREEN:  Okay.  So why -- why are we getting it now?

21      MR. MURPHY:  Because the -- the privilege logs were

22  subject to this dispute regarding whether -- whether they

23  would -- how they would be treated for purposes of the case.

24  And --

25      MS. COX:  No, judge.  The -- the third privilege log was



1    subject to the dispute.  This new --

2        MR. MURPHY:  And -- and the fourth privilege log, and --

3    and of all the privilege logs that contained -- I suppose not

4    the first and the second because there's been no effort to make

5    those exhibits.  But the -- the third, the fourth, and the

6    fifth are -- are all subject to the same analysis.  And --

7    and -- and frankly, we relied to our detriment on the ruling

8    that you made on May 25th about the -- about the nature of the

9    privilege logs.  And so we -- we were going to with -- not

10   produce -- not serve, I should say, the fifth privilege log

11   until the issue was resolved.  And if it's und -- if it's under

12   the protective order, then we're good to go.

13       JUDGE GREEN:  Okay.  Well, it is.

14       MR. MURPHY:  And --

15       JUDGE GREEN:  But --

16       MS. COX:  But Judge --

17       JUDGE GREEN:  But so do -- do you have it -- just have

18   you -- have you provided it to the General Counsel --

19       MR. MURPHY:  Have not, Judge.

20       MS. COX:  Judge Green, these documents were produced

21   December 2nd.  My motion for reconsideration was December 3rd.

22       MR. MURPHY:  Right.

23       MS. COX:  The day the documents were produced, they should

24   have produced the fifth privilege log.

25       MR. MURPHY:  That's -- that's -- that's not the rule.



Exhibit E, Motion to Try Petition on Hearing Record

1        MS. COX:  This wasn't even --

2        MR. MURPHY:  That's not the rule, Judge.

3        MS. COX:  -- in --

4        MR. MURPHY:  That's not the rule.  Yeah.  So -- so --

5        MS. COX:  What is the rule, Mr. Murphy?

6        MR. MURPHY:  It needs to be produced like close in time to

7   the production --

8        MS. COX:  Exactly.

9        MR. MURPHY:  Yes.

10       MS. COX:  It's now --

11       MR. MURPHY:  And on the 3rd --

12       MS. COX:  -- the 13th --

13       MR. MURPHY:  -- and on the 3rd --

14       MS. COX:  -- of December.

15       MR. MURPHY:  -- and on the 3rd, we got your motion for

16   reconsideration.

17       MS. COX:  Ten days ago, and you produced the documents on

18   the 2nd.

19       MR. MURPHY:  Yes.  And we got -- and we got your motion

20   for reconsideration.  And we had relied to our detriment on

21   that ruling with respect to the fourth, and -- and -- and once

22   we -- once we --

23       JUDGE GREEN:  What rules are you talking about -- what is

24   this rule?

25       MR. MURPHY:  I'm sorry, Judge.



1    JUDGE GREEN:  What ruling are you talking about?

2    MR. MURPHY:  So it -- on May 25th, you -- you ruled that

3    the privilege log was subject to the protective order, right?

4    JUDGE GREEN:  I did.

5    MR. MURPHY:  Right.  And then we served the fourth

6    privilege log, right, with -- with the understanding that it

7    would -- it would be treated or dealt with in the same fashion

8    as the third privilege log.

9    JUDGE GREEN:  Right.  But it is.

10   MR. MURPHY:  Right.  And it -- is is now.  It -- it was --

11   it -- it -- that was --

12   MS. COX:  Right.  It was never an issue.  It wasn't

13   admitted into evidence.

14   MR. MURPHY:  The fourth privilege log is -- has just now

15   been --

16   MS. REIBSTEIN:  Exactly, exactly.

17   MR. MURPHY:  Right, exactly.  So we -- we were not going

18   to produce -- if -- if your ruling had been -- to the contrary,

19   Judge, we would have explored our avenues to -- you know, to

20   challenge.

21   JUDGE GREEN:  Listen.  Why don't we try to cut to the

22   chase?  If the General Counsel wants to -- if you want to make

23   a motion, that the privilege has been waived by virtue of the

24   ten-day delay in the production of a privilege log, I mean, you

25   can do that.  But you know, I mean, the more we -- the more we

Exhibit E, Motion to Try Petition on Hearing Record

1    deal with these sort of things, the more it gets delayed,

2    because then that becomes subject to -- let's say I order it

3    produced, you know, best case scenario for you, that's going to

4    become subject to a special appeal.  You know where --

5        MS. REIBSTEIN:  Your Honor, you know what --

6        JUDGE GREEN:  -- that goes.  I mean, listen, you can do

7    whatever you want.  I'm not saying you shouldn't do whatever

8    you want, but that's the options here, as far as I can tell.

9        MS. REIBSTEIN:  It makes one wonder if -- if -- if -- you

10   know, the dragging things out the last minute, it makes one

11   wonder if that's not the strategy.

12       JUDGE GREEN:  Okay.  But -- but as of right now, it looks

13   like the Respondent has no problem with the privilege log going

14   in and it being held up pursuant to a protective order.  And I

15   don't see that that's going to really harm anybody.  It's

16   not -- it hasn't been a five-month delay, am I right; it's been

17   a ten-day delay.

18       MS. REIBSTEIN:  So what was keeping -- so for not -- not

19   providing a privilege log at the time they turned over the

20   document?

21       JUDGE GREEN:  Okay.  But you're -- okay.  I'm not -- all

22   I'm saying is, it's -- it's a fairly dramatic remedy to order

23   the disclosure of privileged documents.  If you want to make

24   a -- if you want to make a motion to that effect, you can do

25   it.  And we'll deal with it.  You know, I mean, you can decide



Exhibit E, Motion to Try Petition on Hearing Record

1    what to do.

2        MS. REIBSTEIN:  Judge Green, I'll stop speaking on this

3    after this point.  But the fact is that Respondent wa -- had

4    been withholding documents since May and knows of these

5    documents since May.  So it's been six months that they could

6    have served this privilege log and didn't.  That is

7    (indiscernible, simultaneous speech).

8        JUDGE GREEN:  Okay.  I haven't seen the privilege log.  So

9    I guess I'm a -- I'm at a little bit of a loss to know exactly

10   what the document is, what subpoena is requested it's in

11   response to, how long it's been withheld.  I don't really know.

12       MR. MURPHY:  Yeah, it's -- it's -- it's -- it's not a

13   rolling log like the other ones were.  It adds a 10 -- 10 or 15

14   documents to the -- to -- to the list of logged documents.

15   Three of them are -- are part of the documents that were

16   produced in the New York Attorney General case, which are --

17   which you admitted here.  So they're somewhere in the

18   neighborhood of ten documents on it, Judge.  And as I said,

19   when the -- the privilege logs in this case have -- have

20   trailed the productions by a bit; that was the situation here.

21   And the day after -- the day after we produced the documents,

22   we got the motion for reconsideration.  And we were not going

23   to produce this -- the fifth privilege log until we had an

24   understanding about how the other privilege logs were going to

25   be treated and so that we could understand what -- what the



Exhibit E, Motion to Try Petition on Hearing Record

 1    implications of that were and what recourse we may have, in the

 2    same fashion that you're suggesting that the counsel for the

 3    General Counsel could file whatever type of motion they'd like.

 4        MS. REIBSTEIN:  Again, if you thought they were privileged

 5    and -- and that a privilege log was appropriate, I -- it makes

 6    no sense to me.  And I really don't understand why you waited

 7    to see how the others were treated.  Those were different

 8    documents, the one -- it has -- one has nothing to do with the

 9    other.  It's like a disingenuous argument.

10        MR. MURPHY:  It's -- it's not.  It has to do with the

11    treatment of the information that's on it and how it can be

12    distributed and how it can be used, truly and simply.

13        MS. REIBSTEIN:  If you thought they were privileged, these

14    particular documents, it would seem to me that you would have

15    put them on a privilege log.  It's independent of anything

16    else.  If you assert --

17        MR. MURPHY:  So Judge, I think --

18        MS. REIBSTEIN:  -- that certain documents are privileged,

19    then make that claim.

20        JUDGE GREEN:  I think we're kind of going around in

21    circles here.  I don't think we're going to come to a

22    resolution regarding that.

23        So next on my list.  I don't think this is going to make

24    the tenor of the discussion any better, but protest play --

25    playbook and IOC labor activity playbook primes group to



1    monitor and for comment, real time.  So let me just ask.  So

2    we -- we know that there's a protest playbook and IOC labor

3    activity playbook, right?

4        MR. MURPHY:  Correct.

5        JUDGE GREEN:  Those exist?

6        MR. MURPHY:  They exist.

7        JUDGE GREEN:  And the Respondent has taken the position

8    that those were not responsive to any subpoena request that's

9    been issued?

10       MR. MURPHY:  That's correct.

11       JUDGE GREEN:  Okay.  So here's the bottom line.  In all

12   likelihood -- I mean, what the -- you know, somebody get issued

13   with a subpoena asking for; if you want it, you can ask for it,

14   specifically.

15       MR. KEARL:  I mean, I would like to.  I would also just

16   say that, like, paragraph 6 and several other paragraphs,

17   documents regarding the nature and scope of the duties,

18   responsibilities, and function of human resources department,

19   including documents distributed to employees regarding the

20   types -- type of concerns, issues, complaints, or reports that

21   they review, investigate, or resolve --

22       JUDGE GREEN:  So let me just stop you.  I read it.  I was

23   reading it.  I was reading the -- the -- your subpoena pretty

24   carefully, and I agree that both the -- the title and the

25   context make it appear as though it is responsive.  But we



1    don't know it's responsive.  We don't know.  So there are

2    basically two options.  One is that you subpoena it, and the

3    other is that I -- I'd look at it in camera.  My problem with

4    looking at it in camera is -- I'd rather not look at documents

5    in camera to the extent -- I don't want to look at documents to

6    the extent that they're not being introduced into evidence as

7    an exhibit.

8        I mean, let me ask you, Mr. Murphy, do you have any

9    objection to the document in camera in order to determine

10   whether it's responsive to an exhibit?

11       MR. MURPHY:  I mean, Judge, subject to what you just said,

12   that you can't unsee it.  Right?

13       JUDGE GREEN:  Right.  So the answer is yes.  So -- so

14   listen, the easiest thing to do is just to subpoena it.  If you

15   want to subpoena it, you could issue a subpoena today.  I mean,

16   I would give you -- I would give you up for the

17   authorization -- well, either the Charging Party or the General

18   Counsel or the both of you people, if you want to issue a

19   subpoena.

20       MR. KEARL:  I would need to talk to my client.  I mean,

21   he's been unemployed for, you know, pushing two years at this

22   point.  And you know, I -- my guess is that Respondent would

23   figure out a way to drag this process out for another four or

24   five months.  So I obviously am interested in seeing those

25   documents, and I obviously believe that they're --



Exhibit E, Motion to Try Petition on Hearing Record

1      JUDGE GREEN:  Oh, you can -- I mean, you can talk to the

2   GC about it and strategize the extent you want.  But you're

3   authorized -- well, the GC and the Charging Party are

4   authorized to issue a subpoena.  Just, if you issue one, please

5   send me the date that it is served and the number.

6      MR. JACKSON:  Your Honor, can you clarify something for

7   the record?  Is Your Honor saying that you are unable to

8   determine whether these documents were responsive to any

9   subpoena?

10      JUDGE GREEN:  Correct.

11      MR. JACKSON:  I see.  Thank you.

12      JUDGE GREEN:  I understand why you think are.  But the

13   only one who's seen it is Mr. Murphy.  And he says that it's

14   not that we don't know we don't know anything different.  The

15   easiest way to deal with it is to issue a subpoena, and then

16   it's definitely responsive.  And then you could deal with it,

17   you know, as you deal with anything else.

18      MS. REIBSTEIN:  Or -- or as you said, Respondent could --

19   you could -- you could undertake an in-camera inspection make

20   a --

21      JUDGE GREEN:  I understand.  But really, that's --

22      MS. REIBSTEIN:  That would be the fastest thing to do.

23      JUDGE GREEN:  Yeah, I don't know, so.  I mean, because,

24   frankly, once I issue an order to -- to it -- I mean, if I

25   issue an order, yeah, it might -- it might shorten it by a --



1    by a few days.  But if I issue an order, that order's going to

2    be subject to a special appeal.  And I'm not saying you

3    shouldn't -- I'm not saying you shouldn't go this way, by

4    issuing this subpoena.  But either way, you're -- you know,

5    you're probably looking at a special appeal.  Listen, I don't

6    make the rules on how the Board works.

7        This isn't district court, I don't have contempt

8    authority.  I -- I don't -- you know, this is not how this --

9    this process works.  But you didn't discuss it.

10       So I was kind of hoping we could close the hearing today,

11   but it's sounding like perhaps we need a day.  I think we do.

12   I mean, unless you tell me that there's nothing more the -- the

13   General Counsel wants to do.

14       MR. KEARL:  Your Honor, I have -- I have two other

15   documents that I would like to admit for -- admit or request

16   that they be admitted.  Both of them are email correspondence.

17   The first is the correspondence between all of us regarding my

18   request for an order to specifically produce documents.  The

19   second is email correspondence, the request for the native

20   format documents.  I'm about to put them into the SharePoint,

21   but there -- there's nothing in there that is not part of the

22   email chain that we've all been a party to.

23       JUDGE GREEN:  Can you please email copy to Mr. Murphy?

24       MR. KEARL:  I can, yes.  Your Honor, I've just uploaded

25   them as CP Exhibit 24 and 25.



1      JUDGE GREEN:  Okay.  So it's 24 and 25.

2      MR. KEARL:  I've just emailed them to Mr. Murphy as well.

3      JUDGE GREEN:  Okay.  So I recall these emails.

4      Mr. Murphy, were you able to get a copy of these?

5      MR. MURPHY:  Yes, I -- I'm looking at them as we speak.

6      Okay.

7      JUDGE GREEN:  Okay.  Is there any objection to CP 24 or

8      25?

9      MR. MURPHY:  No.

10     JUDGE GREEN:  Okay.  So CP 24 and 25 are admitted.

11     **(Charging Party Exhibit Numbers 24 and 25 Received into**

12     **Evidence)**

13     JUDGE GREEN:  Can I just ask the parties to confirm what

14     we know about what has not been produced pursuant to the recent

15     Court order?  So the Board indicated that documents were

16     subject to production and response to subpoena, paragraph 19.

17     And that was both parties, CP subpoena paragraph 4 nonredaction

18     of times in the Mi -- Micr -- Microsoft OneNote redactions.  So

19     can I just ask; we all agree that certain documents have not

20     been produced in response to paragraph 19 of both the Charging

21     Party and the General Counsel subpoenas?

22     MR. MURPHY:  Yes.

23     JUDGE GREEN:  Okay.  And the same question with regard to

24     paragraph 4 of the Charging Party subpoena, there are documents

25     that have not been produced in response to paragraph 4 of the



www.escribers.net | 800-257-0885

Exhibit E, Motion to Try Petition on Hearing Record

```
 1    Charging Party and the --

 2         MR. MURPHY:  Correct.

 3         JUDGE GREEN:  Okay.  And the Microsoft OneNote has not

 4    been unredacted?

 5         MR. MURPHY:  Correct.

 6         JUDGE GREEN:  Okay.  Does anybody have anything else?

 7    That's all I have in my notes with what I wanted to deal with.

 8         MS. REIBSTEIN:  Your Honor, I just would like to confer

 9    with the rest of the GC team, because we -- we had certain,

10    like, agenda items.  So I just want to make sure that we

11    covered everything as well.

12         JUDGE GREEN:  Okay.  Do you want to go in a breakroom?

13         MS. REIBSTEIN:  That would be great.  Thank you.

14         JUDGE GREEN:  Okay.  Hold on.

15         MS. REIBSTEIN:  With Mr. Carl also, please.

16         JUDGE GREEN:  Yeah.

17         MR. MURPHY:  Judge, I'm just going to mute myself out.

18         JUDGE GREEN:  Yeah.  We could --

19         MR. MURPHY:  I'll be back.

20         JUDGE GREEN:  So let's go off the record.

21    (Off the record at 4:27 p.m.)

22         JUDGE GREEN:  Okay.  So we're back on the record and --

23         Okay.  So what is -- what is it that we're dealing with

24    now?

25         MR. KEARL:  So first off, we did just receive the firth
```



Exhibit E, Motion to Try Petition on Hearing Record

1    privilege log.  All of the documents on the privilege log were

2    created -- it looks like they're from March 29th and March

3    30th.  These seem like documents that are responsive to

4    paragraphs that were not subject to the -- to the -- the

5    special appeal.  They were documents that were initially

6    requested in order to produce way, way back, in the early

7    stages of this trial.  Some of these are similar to lines that

8    we find on privilege log 4, communications between various

9    people.  So I guess my question is like, why -- why haven't

10   they waived their rights to put in, for example, an email for

11   the purposes of obtaining legal advice regarding legal issues

12   pertaining to the planned protest on -- here, it says March

13   20th, which I'm assuming is a typo because it's March 30th,

14   2020, that email from -- from the 29th of March?  Like,

15   there's -- there's 11 new correspondences that are very

16   relevant to the animus, determination, and to sort of

17   highlighting how high up the chain Amazon's response to

18   perceived protected activity went before the first protest even

19   happened.

20        So at this point, either the -- the,  you know, counsel

21   for Respondent di -- these documents didn't turn up in their

22   initial sweep through the documents, which is very problematic

23   because these are obviously responsive, or these are documents

24   that they just wanted to pretend it didn't exist until it

25   became clear that we knew that they existed and then they want



Exhibit E, Motion to Try Petition on Hearing Record

1    to do -- create privilege logs.  So either way, it's troubling.

2         But like, I'm just -- I'm curious, why now are we getting

3    the fifth privilege log?  Why weren't these on privilege log 1,

4    2, 3, or 4?

5         MR. MURPHY:  Well, I can't answer the question of when

6    they were identified or whatever.  But if they're privileged,

7    why would -- why would -- why would we hide them?  There's --

8    the ar -- the argument doesn't make sense.  So you know, my

9    understanding is that these were documents that were not

10   produced.  This is the privilege that's related to two things,

11   the documents that weren't produced during the pendency of the

12   special appeal and the supplemental collection that took place

13   over the summer after we discovered those other platforms,

14   OneNote, et cetera, Quip, whatever else they might be.  So

15   that's -- that's the reason.  There's -- there's not -- there's

16   nothing sinister here.  They're -- they're privileged.  So

17   we -- there's nothing -- there's nothing -- there's no

18   advantage or disadvantage to -- you know, to the production of

19   this at the time -- essentially at the time that the production

20   is made.  That's what we've done throughout the case.  We've --

21   we've shared a privilege log at the time that the productions

22   are made.

23        MR. KEARL:  So -- so your argument is that the email Liz

24   Hackett on March 29th for the purposes of obtaining legal

25   advice regarding legal issues --



Exhibit E, Motion to Try Petition on Hearing Record

```
1        MR. MURPHY:  Which one -- which do you -- which one do

2    you --

3        MR. KEARL:  -- is responsive to paragraph 4 of the

4    subpoena and no other paragraph?  Like, I'm just curious.  Like

5    how this isn't -- this is like -- this is the same stuff that's

6    in the first privilege logs.

7        JUDGE GREEN:  Mr. Kearl, what are you referring to?

8        MR. KEARL:  The first line on the first page.

9        MR. MURPHY:  Okay.

10       MR. KEARL:  Under description, email to Liz Hackett for

11   purposes of obtaining legal advice regarding legal issues

12   pertaining to planned protest on, it says March 20th, 2020.

13   I'm assuming that should be March 30th --

14       MR. MURPHY:  Okay.

15       MR. KEARL:  So I'm assuming we're going to get a sixth

16   privilege log at some point soon.  But like, that is that is

17   the kind of document that is all over privilege log 4.  And so

18   my question is like, what is the difference; why -- why are we

19   only now getting this on December 13 when if you knew this

20   document existed in April of 2020?  You would've just put it on

21   a privilege log.

22       MR. MURPHY:  Yeah.  I -- I -- I don't know the answer to

23   that question.  And I agree with you, that if we knew that this

24   existed on whatever that other privilege log was created,

25   there's no reason not to put it on there.
```



1    MR. KEARL:  So then that raises the question of why did

2    you not know this document existed when it is so clearly

3    responsive to the paragraph -- to the subpoenas that were

4    served in March and April of 2020?

5    MR. MURPHY:  I -- I -- I don't know.  I don't know -- I

6    don't know how or when this was collected.  I just don't know

7    that, Mr. Kearl, that the privilege log -- this wa -- this was

8    a document that was identified.  I'm ass -- I'm -- I'm

9    assuming, although I can't represent this is actual fact, that

10   my understanding of the way we -- we created the privilege logs

11   is that they were related to the tranche of documents that we

12   were producing.

13   MS. REIBSTEIN:  Judge Green --

14   MR. KEARL:  And I think that raises a very important thing

15   for the judge to consider when it comes to evaluating whether a

16   good-faith search was done for documents.

17   I mean, the top of page 2, an email from Dave Clark on the

18   29th of March at 6:35 p.m., to Zane Brown for purposes of

19   obtaining legal vice -- advice regarding legal issues

20   pertaining to planned protest on March 30th, 2020.  That seems

21   like the kind of thing that would have been captured by the

22   very first pass through the documents.

23   MS. REIBSTEIN:  And Judge Green, if I might add.  You

24   know, just because an in-house labor counsel is copied on a

25   series of emails before a legal issue has ripened doesn't make



# Exhibit E, Motion to Try Petition on Hearing Record

1    it automatically covered by the the -- the -- the privilege

2    doctrine.  So I even question whether these documents are

3    covered by privilege.  And I agree with Mr. Kearl that if they

4    are, they've been waived at this point because you ordered on

5    March 24th that documents be produced soon hereafter and put in

6    a privilege log, and they were not.  So I agree with Mr. Kearl

7    in his arguments that the search is either not defendant - has

8    been deficient, they waived it, or these are not privileged at

9    all just by virtue of having an in-house counsel copied on

10   them.

11        JUDGE GREEN:  Okay.  So I don't have a copy of the

12   privilege log; where is it?

13        MR. MURPHY:  Hold on.  I'll send it to you now.

14        You guys -- you guys okay if I send it ex parte?

15        MS. REIBSTEIN:  Yeah.

16        MR. KEARL:  Yes.

17        MR. MURPHY:  You should have it momentarily, Judge.

18        JUDGE GREEN:  Okay.

19        MS. REIBSTEIN:  Judge Green, I think at a minimum, these

20   should be reviewed in camera if you're not going to find waiver

21   here.

22        MR. MURPHY:  You have it, Judge?

23        JUDGE GREEN:  Yeah.  I'm just -- I'm looking at it.  You

24   know, it's not -- it's not obviously --

25        Off the record.



1     (Off the record at 4:56 p.m.)

2          JUDGE GREEN:  Okay.  Let's go back on the record.

3          All right.  So basically, the issue here is whether the

4     privilege log, as far as I take it, came in too late.  Mr.

5     Murphy doesn't seem know exactly, you know, why it's coming in

6     late, other than some --

7          MR. MURPHY:  Well, what do you mean by -- Judge, pardon me

8     for interrupting.  But what do you mean by late, right?  It

9     was -- it was produced --

10         JUDGE GREEN:  Saying meaning -- look, as far as I

11    understand the General Counsel's argument, they're basically

12    saying the Respondent was aware that these documents existed in

13    March and didn't produce a privilege log March of -- you know,

14    a long time -- months ago --

15         MR. MURPHY:  The --

16         JUDGE GREEN:   -- and didn't produce the do -- the log

17    until now.

18         MR. MURPHY:  This is our fifth privilege log.  There's --

19    there's no -- I mean, are you setting up a rule that we -- we

20    have to create a privilege lot at -- at the outset of a case

21    and if we --

22         JUDGE GREEN:  No, I mean, you -- obviously, you can't --

23    you can't claim that lo -- that a document is privileged until

24    you find the document.  So the -- yeah, I mean, I don't know

25    that we know why the -- why the log is coming in when the log



1    is coming in.  But this is my understanding of there was -- of

2    the General Counsel's position.

3        MS. REIBSTEIN:  Yes, Judge.  And if they didn't find it in

4    March, then they did not conduct a good-faith research of

5    documents.

6        JUDGE GREEN:  No, I don't know if that could be -- I mean,

7    I don't know that that's facially accurate.

8        MS. REIBSTEIN:  Can Mr. -- can Mr. Murphy tell us when the

9    last trunk of documents were searched?

10       MR. MURPHY:  I can't.

11       MS. REIBSTEIN:  So Judge, how do we establish any basis

12   for when these documents were found if counsel doesn't know?

13       JUDGE GREEN:  That's really up to you.  I mean, that's up

14   to you.  You can make -- you can do things -- you're the --

15   you're the attorneys.  So I really can't tell you how to

16   proceed.  You -- you have various options.  You know, you can

17   just -- you can write a brief that explains that, you know, the

18   privilege could be waived.  Or -- or if not -- I mean, yeah, I

19   mean, that's really the easiest way.  I mean, if you want to --

20   if you want to take the position, that this privilege log is

21   deficient because it hasn't been produced in time, I suppose

22   you could make a motion to that effect, or you could put on a

23   witness to that effect.  I'm not really -- you know, I think

24   you're looking for me to make a determination that the

25   privilege is waived right now, and I'm not in a position to do



# Exhibit E, Motion to Try Petition on Hearing Record

1     that.  I really have to look -- I have to look closely at

2     privilege the privilege log and do some research on the case

3     law.  So I'm not in a position to do that.  I know that there's

4     a belief, for a long time there was at least one decision in

5     the ALJ bench book which suggested that ALJs don't have the

6     authority to find that a waiver -- that the privileges waived.

7     And so I'm not -- I'm not in a position to do it now.

8         MS. REIBSTEIN:  Can Mr. Murphy at least tell us whether he

9     inquired as to when the collection was made?

10        MR. MURPHY:  Mr. Murphy didn't.

11       Mr. -- Mr. Murphy, until these questions are being posed

12     to Mr. Murphy as though he was a witness in this case, until

13     these questions were posed, Mr. Murphy, Mr. Murphy had no

14     reason to believe that he should know that.

15        MS. REIBSTEIN:  Convenient.

16        MR. KEARL:  Right?

17        JUDGE GREEN:  Yeah.  I mean, if you want to -- listen, I'd

18     like us to just to stick on what you would like me to do.  If

19     you want me -- if you want to just make the motion that the

20     privilege is waived, you can make the motion right now.  I

21     mean, I -- I'd have to look.  If you want to do it in writing,

22     you can make the motion in writing.  If you want to call a

23     witness to clarify what happened with regard to the production

24     of these documents, you can do it.  And you can do whatever you

25     want.



Exhibit E, Motion to Try Petition on Hearing Record

1      MR. KEARL:  Well, --

2      JUDGE GREEN:  I'm not in a position to rule on -- rule on

3   it now.

4      MR. KEARL:  Your Honor, can I ask about the third line on

5   the second page?  It's a email correspondence before the PCA on

6   the 30th.  There are no attorneys on the call.  And it appears

7   to be just some VP operations people discussing their

8   response --

9      JUDGE GREEN:  The -- the third line of the second page,

10  11/27, amz-bry_PRIV00200?

11     MR. KEARL:  Yeah.  Unfortunately, there's multiple lines

12  that have that.  But that's the one.  It's an email from Alicia

13  Boler-Davis.  It appears to be --

14     JUDGE GREEN:  So it seems to be a email to gain legal

15  advice from Liz Hackett, Esquire, regarding legal issues

16  pertaining to planned protest on March 30th, 2020.  Is --

17     MR. KEARL:  That --

18     JUDGE GREEN:  would you excuse it?

19     MR. KEARL:  I mean, is that -- it doesn't seem like Ms.

20  Boler Davis is an agent of in-house counsel at that point.  The

21  PCA hasn't even taken place.  They're just sort of discussing

22  their response.  So I mean, I feel like at least in that

23  instance an in-camera review is maybe necessary to determine if

24  it actually is something that should be subject to privilege.

25     JUDGE GREEN:  Yeah, I'll -- listen, if you're making the



1    request that it be -- that I -- that I direct these documents

2    subject to an in-camera review, you could say that.  I'm not

3    going to decide that now.  I have to look.

4         MR. KEARL:  Okay.  Well, I will -- I will request that

5    formally, that these documents be reviewed under camera.

6         JUDGE GREEN:  Okay.

7         MS. REIBSTEIN:  And Judge, I'll make the motion that

8    privilege have been waived on this -- this privilege log.

9         JUDGE GREEN:  Okay.

10        MR. KEARL:  On the matter of the protest playbook and the

11   IOC labor activity playbook, you know, my -- my thinking is

12   that Respondent is probably not going to produce those

13   documents, even if there is a specific subpoena.  And I just

14   wanted to clarify on the record the places that I believe are

15   potentially or would have captured that -- those documents.  I

16   mean, I feel like at this point it behooves no one but Amazon

17   to continue to drag this out indefinitely.

18        MR. MURPHY:  You guys are -- you guys are dragging it out,

19   not me.

20        MR. KEARL:  Huh?

21        MR. MURPHY:  You guys have made all these -- look, this is

22   case is really, really simple.  Mr. Bryson got fired for what

23   he did on April 6.  Either that was appropriate or not

24   appropriate.  This -- this, honestly, guys, is nonsense.  It's

25   all nonsense.  The judge has -- the judge has made that clear



1    over and over --

2        Judge Green, I don't know how many times you said --

3        MS. REIBSTEIN:  The judge hasn't made that clear, Mr.

4    Murphy.  The judge has -- the judge has not made --

5        MR. MURPHY:  Will you let me finish, please?  All the

6    judge has said over and over again --

7        MS. REIBSTEIN:  No.  (Indiscernible, simultaneous

8    speech) --

9        MR. MURPHY:  -- all we really need is the video, right?

10   And all this is collateral nonsense.  So if you guys want to

11   continue to drag this out, you know, be my guest.

12       MS. REIBSTEIN:  Your insinuation that the judge has made

13   any kind of --

14       JUDGE GREEN:  It doesn't matter.  It doesn't matter.

15   All -- all that matters is what -- what -- how we're going to

16   proceed.  So we have this outstanding -- we have the

17   subpoenas -- we have subpoena authorization outstanding.

18       Do you know, Mr. Kearl, whether you -- or -- of the GC, do

19   you know whether you want to issue a subpoena for this do --

20   these documents or no?  Is that something you're going to be

21   thinking about?

22       MR. KEARL:  My -- my position is that those documents have

23   already been suspoe -- subpoenaed, that those documents are --

24   should have been produced already and that any subsequent order

25   on your part to have those documents produced will be met with



1    the same response that we got for the unredacted Chimes, for

2    the OneNote --

3         MR. MURPHY:  Judge, that's not how it works; you know it.

4    Right?  So if Mr. Kearl wants to subpoena those, we'll --

5    we'll -- we'll communicate with our client and -- and -- and

6    come to a determination as to whether it's responsive or not.

7         MS. REIBSTEIN:  You know what; there's no way in -- in --

8    I don't know in what universe a document called Protest

9    Playbook and -- and Labor Activity Playbook, there -- that you

10   guys labeled them that, that that is not responsive to

11   subpoenas that request internal communication about how to

12   Respondent responds to protest activity.  They are -- it could

13   not be more obvious.  You labeled them that.

14        MR. MURPHY:  Yeah, we -- we disagree.  I mean, we looked

15   at paragraph 6 again, just now.  Those documents were the

16   subject of numerous discussions.

17        MS. REIBSTEIN:  Okay.  And look at paragraph 19 and

18   Charging Party paragraph 4 --

19        MR. MURPHY:  Judge, I'm not going to --

20        MS. REIBSTEIN:  -- lines 21 through 26.

21        MR. MURPHY:  -- Judge, I'm not going to -- I'm going to do

22   that.

23        JUDGE GREEN:  You know, really, listen --

24        MR. MURPHY:  I'm not going to do this, Judge.

25        JUDGE GREEN:  But the Gen -- the Respondent -- excuse me.



Exhibit E, Motion to Try Petition on Hearing Record

1    The General Counsel or the Charging Party -- well, really, it's

2    got to be the General Counsel.  Maybe it's the General Counsel

3    at the request of the Charging Party.  You can enforce, right?

4    You can en -- you can enforce.  And as part of that

5    enforcement, you can say, listen, these documents were -- are

6    obviously subject to responsive to the subpoena.  You can do

7    that.  I mean, you can -- you can -- you can do that.  But you

8    know, I'm not -- I'm not -- I'm not a district court judge.  I

9    don't have enforcement authority.  You know, that's --

10   that's -- if you want to go that route, you can go that route.

11        Here's the thing.  It's not going to take you a whole lot

12   of time to issue the subpoena.  I mean, if you issue a subpoena

13   today, it's not like that's not what's going to take the time.

14   What might ultimately take the time is if it's subject --

15   ultimately subject to a special appeal.  So let's say the

16   Respondent filed a petition to revoke.  I -- I -- I deny it.

17   Then that order potentially goes up on special appeal.  If I

18   order that the documents be produced in camera, that is subject

19   to a special appeal.  That's what ultimately will take the time

20   if you're worried about that amount of time.  But -- but maybe

21   you want to do it.  I mean, you know, it's -- it's -- it's

22   entirely -- it depends how much you want this document -- these

23   documents.

24        MR. KEARL:  I mean, I guess my question is, like, our

25   recourse, if they refuse to produce the documents is Federal



1    Court.

2        JUDGE GREEN:  Right?  Any way you slice it, enforcement is

3    done in District court, right?  No matter if -- no matter if --

4    let's say -- let's say I ordered them, whether it's in camera

5    review, just order them to produce it, that's subject to

6    appeal.  I don't have -- I can't lock Mr. Murphy up and ask he

7    start producing the documents.

8        MR. MURPHY:  It wouldn't -- it wouldn't be me, Judge.

9        JUDGE GREEN:  You could -- you know, you do that -- you do

10    that in District Court.

11        Now, maybe you think that this document is obviously

12    responsive to us -- to this subpoena.  And I can understand.

13    Like, I said before, I can understand why -- why you would

14    think that.  Then you could go directly to -- to District Court

15    without issuing another subpoena.  But I don't know why you

16    would that.  I mean, you would just issue -- it'll take a few

17    more days.  I mean, you issue another subpoena, and then you

18    end going enforcement.  Like -- like -- but whatever way you

19    want to slice it, it's going to take time -- it's going to take

20    time.  You know, I can't tell you whether you want to do it or

21    not.

22        You don't have to decide now.  You don't have to decide

23    now, which -- we've got some -- we've got some time to do it.

24    But that's -- I mean, that's the procedure.

25        MS. REIBSTEIN:  Judge Green, I've just uploaded as General



Exhibit E, Motion to Try Petition on Hearing Record 2115

1    Counsel's Exhibit 131, the fifth privilege log that we've been

2    talking about.  And I hereby move for admission of General

3    Counsel 131.

4         JUDGE GREEN:  Okay.  So GC-131, any objection?

5         MR. MURPHY:  Subject to the protective order, no.

6         JUDGE GREEN:  Correct.  So GC-131 is admitted.

7    **(General Counsel Exhibit Number 131 Received into Evidence)**

8         MR. MURPHY:  And -- and I guess since it's now in the

9    record that we would claim that that's confidential business

10   information not subject to disclosure.

11        JUDGE GREEN:  Okay.  All right.  So listen, we're not

12   going to get this done today.  I would imagine that I'm going

13   to end up issuing an order.  I'm going to end up issuing an

14   order, closing the hearing and setting the deadline for filing

15   briefs.  But we've got a couple of things outstanding, which as

16   far as I can tell is these motions on how to deal with the last

17   privilege log and whether this case is going to remain open

18   subject to, you know, an additional subpoena or enforcement

19   proceeding.  Okay.  So why don't we go off the record.

20   **(Whereupon, the hearing in the above-entitled matter was closed**

21   **at 5:10 p.m.)**

22

23

24

25



Exhibit E, Motion to Try Petition on Hearing Record

1       **C E R T I F I C A T I O N**

2       This is to certify that the attached proceedings, via Zoom

3       videoconference before the National Labor Relations Board

4       (NLRB), Region 29, Case Number 29-CA-261755,  Amazon.com

5       Services, LLC and Gerald Bryson, held at the National Labor

6       Relations Board, Region 29, Two Metro Tech Center North, 5th

7       Floor, Brooklyn, New York 11201, on December 13, 2021, at 3:02

8       p.m. was held according to the record, and that this is the

9       original, complete, and true and accurate transcript that has

10      been compared to the reporting or recording, accomplished at

11      the hearing, that the exhibit files have been checked for

12      completeness and no exhibits received in evidence or in the

13      rejected exhibit files are missing.

14

15

16

17                                      _____

18                                      BARRINGTON MOXIE
                                        Official Reporter

19

20

21

22

23

24

25

