| **From:** | Campbell, Bradley [/O=AMAZON/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BCCAMPB3D6] |
| **Sent:** | 4/16/2020 12:22:17 PM |
| **To:** | Joseph, Rob [josephrj@amazon.com] |
| **Attachments:** | Executive Summary_Gerald Bryson_JFK8 Termination v2.docx |

Have a great day —



Bradley Campbell SPHR, SHRM-SCP
Regional Sr. HR Manager – North American Customer Fulfillment
e: bccampb@amazon.com | p: (646) 285-4914

GC Exhibit 114

AMZ-BRX001308

CONFIDENTIAL

**GC EXHIBIT 115**

Earliest item: 2020-04-06
11:01:31

## Chat with "Gutierrez, Milly" <gmilly@amazon.com>...

gmilly@amazon.com & hrnanch@amazon.com

Latest item: 2020-04-06
11:02:15

---

All Parties:  Gutierrez, Milly <gmilly@amazon.com>;    | **Hernandez, Christine <hrnanch@amazon.com>** |

---

### Monday 06 April 2020

**Hernandez, Christine <hrnanch@amazon.com>**

| my notes |

11:01:31

**Hernandez, Christine <hrnanch@amazon.com>**

Monday 4/6/20 (Demonstration) (kicks off with small group of 8 by the AMAZON sign at the start of OB break around 12:05pm)
Media - NY1Spectrum / Helicopter? ABC? /
8 people at the start - not all AA's (looks like 5 are not employees)
Derrik Palmer -- blow horn asking about the number of cases; managers are criminals; managers that wear Safety Vest are a disgrace; lack of security  checks; security we don't check for weapons;  managers being sent home and being kept a secret; quarantined AA's have not been paid; people in the executive office are racist; we ain't dumb N***;
Gerald Bryson -- pink Jayy Flowers --- spoke with the media on camera
Helly Rangel - Blue sign - tentatively (DA5- 7:15) last on site 3/30/20;  Vacation time for today
Female? - (9) (arrived after 12:40pm) with white sign / red & black mask / appears to be AA
Signs "shut down and sanitize" "Treat your workers like customers" "JFK8 How many cases do we have? #Amazonstrike #Shutitdown"  "Billionaires put their wealth over our health close JFK8" "Jeff Bezos has blood on his hands" "Alexa Send us home" "Chris Smalls We stand behind you"
AMAZON Sign on the corner of the PL -- 7  ---5 individuals chanting by the sign (4 are media) the other 2 moved to the front of the building (Derrik and Gerald)
12:15pm --Geoff goes out to address SD with the team (4 in total - 3 identified; 1 not sure);  Derrik was interviewing on a cell phone at the time
12:23pm - Insubordination talking points delivered to Derrik via Geoff
12:40pm -  (10) Smalls arrives at the bus stop; same black sign as last week; speaking to the media
Around 12:55pm -- 6 outside the property are not employees; all have signs and 1 is videoing

11:01:38

**Hernandez, Christine <hrnanch@amazon.com>**

| 1:33 Smalls leaves |

11:02:15

### End Thread

#### Thread Statistics

| Instant Message Count: 3 |

CONFIDENTIAL

GC Exhibit 116

# ATTORNEY-CLIENT PRIVILEGE

[EXTERNAL EMAIL]

CONFIDENTIAL

AMZ-BRY008753

CONFIDENTIAL

GC Exhibit 116



CONFIDENTIAL                    AMZ-BRY008754

**CONFIDENTIAL**                    GC Exhibit 116



==Monday 4/6/20== (Demonstration) (kicks off with small group of 8 by the AMAZON sign at the start of OB break around 12:05pm)

<u>Media</u> - NY1Spectrum / Helicopter?

<u>8 people at the start</u> - not all AA's (looks like 5 are not employees)
Derrik Palmer -- blow horn asking about the number of cases; managers are criminals; managers that wear Safety Vest are a disgrace; lack of security  checks; security we don't check for weapons;  managers being sent home and being kept a secret; quarantined AA's have not been paid; people in the executive office are racist; we ain't dumb N***;
Gerald Bryson -- (out since 3/21/20) pink; spoke to an AA who was coming back from lunch Dimitra Evans; yelling at the another employee in profanity to join them outside; on FB live made fun of her "looking a junkie on fentanyl"; lots of inflammatory statements on FB live.
Jayy Flowers --- (2/27 last punch /3/13 last on site) spoke with the media on camera
Helly Rangel - Blue sign - tentatively (DA5- 7:15) last on site 3/30/20;  Vacation time for today
Female? - (9) (arrived after 12:40pm) with white sign / red & black mask / appears to be AA
Male? - Marcus Reid (not identified)

<u>Signs</u> "shut down and sanitize" "Treat your workers like customers" "JFK8 How many cases do we have? #Amazonstrike #Shutitdown"  "Billionaires put their wealth over our health close JFK8"

"Jeff Bezos has blood on his hands" "Alexa Send us home" "Chris Smalls We stand behind you"

<u>AMAZON Sign on the corner of the Parking Lot</u> -- 7 people  ---5 individuals chanting by the sign (4 are media) the other 2 moved to the front of the building (Derrik and Gerald)

12:15pm --Geoff goes out to address SD with the team (4 in total - 3 identified; 1 not sure); Derrik was interviewing on a cell phone at the time

12:23pm - Insubordination talking points delivered to Derrik via Geoff

12:40pm -  (10) Smalls arrives at the bus stop; same black sign as last week; speaking to the media

12:48pm - Maciej calls Sai to tell him that Gerlad screams at an AA (Dimitra Evans)  walking back from lunch; cursing at her to join them

Around 12:55pm -- 6 outside the property are not employees; all have signs and 1 is videoing

1:34pm - Smalls leaves

2:10pm - Derrik and 2 others leave in his car

2:10pm -- 3 press still on site; NY1

Athena

Make the Road NY

████████████████████████████

CONFIDENTIAL

GC Exhibit 116



CONFIDENTIAL               AMZ-BRY008757

CONFIDENTIAL

GC Exhibit 116

Thank You,

CONFIDENTIAL

AMZ-BRY008758

CONFIDENTIAL

GC Exhibit 116

CONFIDENTIAL

AMZ-BRY008759

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 29

| | | |
|---|---|---|
| AMAZON.COM SERVICES LLC | ) | |
| | ) | |
| | ) | |
| and | ) | Case 29-CA-261755 |
| | ) | |
| GERALD BRYSON, and Individual. | ) | |

**RESPONDENT'S COMBINED PETITION TO REVOKE COUNSEL FOR THE
ACTING GENERAL COUNSEL'S SUBPOENA AD TESTIFICANDUM A-1-1CLMM85
AND MOTION FOR RECONSIDERATION OF CERTAIN ORDERS REGARDING
SUBPOENAS DUCES TECUM**

Pursuant to Section 11(1) of the National Labor Relations Act and Section 102.31(b) of

the Rules and Regulations of the National Labor Relations Board ("NLRB" or "Board"),

Amazon.com Services LLC ("Respondent," "Amazon," or the "Company"), through its

undersigned counsel, petitions to revoke subpoena ad testificandum (A-1-1CLMM85) served

by Counsel for the Acting General Counsel of the Board ("CAGC") upon counsel for Amazon

("CAGC's Third Subpoena") on Monday, May 17, 2021. A copy of the subpoena is attached as

Exhibit 1.

In addition, pursuant to Section 102.25 of the Board's Rules and Regulations, Amazon

seeks reconsideration of certain portions of Administrative Law Judge Benjamin Green's

("Judge Green's") March 24, 2021 written order denying Amazon's petition to revoke the

CAGC's subpoena duces tecum (A-1-1BUGMIX) (Exhibit 2); the April 27, 2021 written order

denying Amazon's petition to revoke the Charging Party's subpoena duces tecum (B-1-

1C9GVF7) (Exhibit 3); and the May 1, 2021 verbal order[1] denying Amazon's petition to

---

[1] Transcript, Volume 4, at 269.  (Relevant portions of the trial transcript are attached as Exhibit 4.)

revoke the CAGC's second subpoena tecum (B-1-1CBQM1N) to the extent that the documents

sought therein are relevant to a determination of (1) whether Mr. Bryson was engaged in

protected concerted activity at the time of his misconduct on April 6, 2020; (2) whether the

Respondent knew that Bryson was engaged in protected concerted activities at the time of his

misconduct on April 6, 2020; and/or (3) Respondent's motivation for terminating Mr. Bryson,

including whether Respondent harbored animus toward Bryson's protected concerted activities.

## **INTRODUCTION**

At the outset of this hearing, the parties disputed the precise nature of Gerald Bryson's

actions on March 25, March 30 and April 6, 2020, and specifically, the precise nature of Mr.

Bryson's actions and statements during an April 6 altercation with a female coworker and whether

the altercation occurred in the course of protected concerted activity. The issues in this case have

narrowed significantly since then due, in significant part, to the introduction into evidence of a

Facebook Live video recorded by CAGC witness Mandi Velasco ("the Velasco video") and other

video evidence showing the April 6, 2020 altercation in its near entirety and in all material ways.

*See* R. Exh. 122.  Further, given that the weight of evidence shows that Mr. Bryson was engaged

in protected concerted activities on March 25, March 30 and at the time of the altercation on April

6, 2020, Amazon filed a Motion for Leave to File a Third Amended Answer on Saturday, May 22,

2021, in which Amazon concedes Mr. Bryson engaged in protected concerted activity on those

dates.

The Respondent's concession in this regard and the revelation that Mr. Bryson was

engaged in protected concerted activity at the time of his altercation with Ms. Evans, confirms

Judge Green's conclusions, stated repeatedly in off-the-record discussions during the hearing and,



GC Exhibit 117

most recently, in his May 19, 2021 Order on CAGC's Motion to Consolidate Cases for Hearing,[2] that the *only* legal standard applicable in this case – or any case in which an employer discharges an employee because of misconduct occurring during the course of protected activity – is the standard enunciated in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964). *Wright Line*, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981), "is inapplicable to cases — like this one — in which the employer has discharged the employee because of alleged misconduct in the course of protected activity. S*hamrock Foods Co.*, 337 N.L.R.B. No. 138, at 1 ; *see Cadbury Beverages*, 160 F.3d at 29 n. 4 (rejecting the applicability of *Wright Line* to such cases); *E.W. Grobbel Sons*, 322 N.L.R.B. 304, 304-05 , (1996) (same), *enforcement denied on other grounds*, 6th Cir. 1998)." *Shamrock Foods Co v. NLRB.*, 346 F.3d 1130, 1136 (D.C. Cir. 2003). In a *Burnup & Sims* case, the employer's "motive is not at issue," and the only question is whether the misconduct actually occurred. *Shamrock Foods Co.*, 337 NLRB 915, 915 (2002), enfd. 346 F.3d 1130 (D.C. Cir. 2003); *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 29 (D.C. Cir. 1998) (holding that ''*Burnup & Sims* explicitly obviates the need to inquire into intent'').

As a result of these developments, testimony and documents related to whether Mr. Bryson was engaged in protected activity at the time of his misconduct on April 6, 2020, whether Respondent knew that he was engaged in those activities, and Respondent's motivation for terminating Mr. Bryson, including whether Respondent harbored animus toward him or those activities, are entirely irrelevant to this case and have no utility in determining whether the CAGC can carry its burden to prove that Respondent violated Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §158(a)(1), by terminating Mr. Bryson on April 17, 2020.

---

[2] *See* Administrative Law Judge's Order on Counsel for the Acting General Counsel's Motion to Consolidate Cases for Hearing, at 2, 4 (May 19, 2021) ("Order Denying Motion to Consolidate").

GC Exhibit 117

It is now undisputed that Mr. Bryson engaged in protected concerted activity at the time of his misconduct on April 6, 2020 and that Amazon knew of Mr. Bryson's activity.  The only remaining question is whether the CAGC can prove that Mr. Bryson did not, in fact, engage in misconduct during the altercation, as alleged by Respondent.

As a result, much of the testimony and evidence in the record currently is irrelevant to a determination in this case and the CAGC's Third Subpoena seeks to adduce additional irrelevant testimony.  Similarly, numerous subpoena requests for documents, enforced when the scope of this case was less well defined, have been rendered irrelevant, unnecessary, and moot by subsequent evidence as described herein, and those subpoena requests should be quashed for the same reason.

For these reasons, Respondent Petitions to revoke the CAGC's Third Subpoena and Moves for reconsideration of ALJ Green's orders enforcing various subpoena paragraphs seeking documents related to issues that have been rendered irrelevant, unnecessary, and moot by the development of the record in this case.

## I.      PETITION TO REVOKE THE CAGC'S THIRD SUBPOENA

The subpoena subject to Petition to Revoke was received via email by counsel for Amazon on Monday, May 17, 2021. By their Third Subpoena, the CAGC seeks to compel the testimony of Amazon Human Resources Manager, Christine Hernandez, who held that position at Amazon's JFK8 Fulfillment Center during the time period relevant to this case.

Section 102.31(b) of the Board's Rules and Regulations requires an Administrative Law Judge ("ALJ") to revoke a subpoena where "the evidence whose production is required does not relate to any matter under investigation or in question in the proceedings."  29 C.F.R. § 102.31(b).  A subpoena must be "for a legitimate purpose" and

"the inquiry in question must be reasonably related to the purpose."  *NLRB v. U.S. Postal Serv.*, 790 F. Supp. 31, 34 (D.D.C. 1992); *see also Drukker Commc'ns, Inc. v. NLRB*, 700 F.2d 727, 730 (D.C. Cir. 1983) ("[T]he statute explicitly permits the quashing of subpoenas … for irrelevance."); *NP Red Rock, LLC*, 28-CA-244484, 2020 WL 7075063 (unpub. Or. Dec. 2, 2020) (affirming ALJ's order revoking General Counsel's subpoenas ad testificandum issued to respondent's two corporate executives where the executives' testimony was not needed to establish a prima facie case and its relevance and probative value to rebutting the employer's defenses was speculative).  In addition, the Board will revoke subpoenas that seek "cumulative or duplicative" information.  *See McDonalds USA, LLC*, 363 NLRB No. 144, slip op. at 2 fn. 2 (2016); *Brinks, Inc.*, 281 NLRB 468, 469 (1986) (citing Federal Rules of Civil Procedure 45(b) and 26(b)).

The information sought by the CAGC's Third Subpoena – testimony from Ms. Hernandez – is not relevant to any matter in question in this proceeding or would serve only to duplicate prior testimony.  Although the CAGC has not explained why the government subpoenaed Ms. Hernandez to testify at this proceeding, at best her testimony would relate either to Tyler Grabowski's investigation (as she was his supervisor during the relevant time period), whether Charging Party Gerald Bryson was engaged in protected concerted activity on March 25, March 30 and at the time of his misconduct on April 6, 2020, and/or Respondent's motivation for terminating the Charging Party and whether Respondent harbored animus toward him or his protected activities.

Regarding Respondent's investigation, Mr. Grabowski, not Ms. Hernandez, conducted the investigation, as Mr. Grabowski ably explained during his detailed testimony on Monday, May 17, 2021.  Exhibit 4, at 148-196.  Any testimony Ms. Hernandez could

provide on this point would be cumulative and duplicative of evidence that is already in the record – including Mr. Grabowski's own testimony.

More importantly, now though, any inquiry into whether Mr. Bryson was engaged in protected activities at the time of his misconduct and whether Respondent was aware of those activities has been rendered moot by Respondent's Motion for Leave to Amend its Second Amended Answer to the Complaint. Any testimony on these issues, therefore, would be irrelevant and would extend an already unnecessarily lengthy trial.

Testimony related to Amazon's motivation for terminating Mr. Bryson, including whether Amazon harbored animus toward his protected activities is similarly irrelevant to the *Burnup & Sims* analysis, the legal analysis applicable in this case. Further, because the Charging Party's misconduct during the April 6 altercation can be analyzed solely on the basis of the Velasco video (R. Exh. 122) and other video evidence in this case, there is no need any fact witness testimony – let alone additional testimony from Ms. Hernandez – related to Respondent's motivation or potential animus toward Mr. Bryson's protected activities.

To the extent that the CAGC intends to adduce evidence of Ms. Hernandez's recollection of the events on April 6, 2020, that evidence is also irrelevant to any issue before Judge Green.  The best evidence of Mr. Bryson's misconduct is the Velasco video, together with other video evidence.  Ms. Hernandez has no first-hand knowledge regarding what happened out in the parking lot on April 6 and there is nothing in the record that suggests she witnessed it.  Nor is there any evidence that she was a decision-maker whose good faith belief matters as to the reasons for Charging Party's termination. As a result, Ms. Hernandez' belief as to what occurred is unnecessary to decide the issues in this case. There

GC Exhibit 117

is, simply, no reason for Ms. Hernandez to be compelled to testify, or for the CAGC to be permitted to subpoena additional witnesses to testify, about matters that are not relevant to the resolution of this case.  It is time to end this single discharge hearing that is unnecessarily continuing into its fourth week.

Ms. Hernandez simply has nothing to add to a record already filled with irrelevant testimony and evidence and Amazon respectfully requests the CAGC's Third Subpoena be revoked in its entirety.

## II.     MOTION FOR RECONSIDERATION OF CERTAIN ORDERS REGARDING SUBPOENAS

For identical reasons, Amazon requests that ALJ Green reconsider his prior rulings on CAGC Subpoena B-1-1BUGMIX Paragraph 19, Charging Party Subpoena  B-1-1C9GVF Paragraphs 19(b) and (c), and CAGC Subpoena B-1-1CBQM1N Paragraph 27 to the extent that those subpoenas sought and Respondent was required to produce documents and information relevant to (i) Mr. Bryson's protected activities, including at the time that he engaged in misconduct on April 6, 2020, (ii) whether Respondent knew of those activities, (iii) Respondent's motivation for Mr. Bryson's termination and (iv) other individuals not named in the Amended Complaint.

All documents produced in response to numerous enforced subpoena requests have been rendered unnecessary and/or irrelevant by the development of the record, particularly the Velasco video and Amazon's concession that Bryson's April 6 altercation with a coworker occurred in the course of otherwise protected concerted activity.

### A.     Identification of Irrelevant and Unnecessary Subpoena Paragraphs

Amazon requests reconsideration of the following subpoena requests and orders:



GC Exhibit 117

CAGC Subpoena B-1-1BUGMIX

19.  For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussion with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:

(a) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings.

(b) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;

(c) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns;

and

(d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.

The ALJ denied Amazon's Petition to Revoke the above subpoena requests by written order dated March 24, 2021.  (Order on Trial Dates and the Respondent's Petition to Partially Revoke Counsel for the Acting General Counsel's Subpoena Duces Tecum, at 5-6 (Mar. 24, 2021) ("March 24 Subpoena Order").)  Specifically, the ALJ ruled that documents responsive to this subpoena request were relevant because they related to "any protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any of that conduct."  *Id.* at 6.



GC Exhibit 117

Charging Party Subpoena B-1-1C9GVF7

19.  For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing, or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers, Human Resources Business Partners, or agents on behalf of employees regarding COVID-19 safety precautions including:

      b.  Internal communications including but not limited to electronic communications, emails, Chime messages or calls, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding media coverage of Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson protesting; [and]

      c.  Internal communications including but not limited to electronic communications, Chime messages or calls, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson participating in protests outside Respondent's JFK8 Facility regarding COVID-19 safety concerns.

The ALJ denied Amazon's Petition to Revoke the above subpoena requests by written order dated April 27, 2021.  (Order on the Respondent's Petition to Revoke Charging Party's Subpoena Duces Tecum B-1-1C9GVF7 and Request for a Protective Order, at 1-2 (Apr. 27, 2021) ("April 27 Subpoena Order").)  The ALJ found subpoena paragraphs 19(b) and (c) were relevant because they sought evidence concerning Amazon's treatment of other employees who were involved in protected concerted activities with Bryson.  *Id.* at 2.  In doing so, the ALJ noted he "share[d] the concern of Respondent's counsel that the scope of this litigation might expand to involve 'mini-trials' (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint," but given the Board's "broad discovery-type standard of relevance" for subpoena requests, the ALJ declined to revoke paragraphs 19(b) and (c) "at this time."  *Id.*


CAGC Subpoena B-1-1CBQM1N

27. (a) Documents in effect during the period of April 17, 2020 through May 31, 2020 reflecting and/or mentioning Respondent's policies regarding employees' option to appeal disciplinary actions taken against them by Respondent, including written warnings, suspensions and discharges.

(b) Documents in effect during the period of April 17, 2020 through May 31, 2020 reflecting and/or mentioning the process by which employees may request to appeal disciplinary actions taken against them by Respondent, including written warnings, suspensions and discharges.

The ALJ orally denied Amazon's Petition to Revoke the above subpoena requests on the record on May 1, 2021.  Exhibit 4, at 269.  These documents relate to animus and not to any other issue before Judge Green.

**B.**     **Argument**[3]

First, ALJ Green should revisit his previous ruling and grant Respondent's Petition to Revoke CAGC Subpoena B-1-1BUGMIX paragraph 19 because the basis for the ALJ's prior denial of Amazon's Petition to Revoke – that paragraph 19 sought relevant evidence regarding "protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any of that conduct" – no longer exists, in light of the video evidence in the record and Amazon's

---

[3]  Amazon has largely completed its production of documents responsive to all three subpoenas. Amazon currently is only aware of a small set of unproduced documents, none of which bear on any of the relevant *Burnup & Sims* issues. Some of those documents are Chime threads that contain a mix of responsive and non-responsive information.  Amazon is prepared to produce those Chimes, but redacted to reveal only that information that responds to a specific request – as it did previously.  If the CAGC and Charging Party are willing to accept such a production without an *in camera* review, Amazon will produce the small amount of remaining *responsive* information (under Judge Green's prior relevance determination) it has collected even though now irrelevant.  That will render this Motion for Reconsideration moot as there will be nothing else to produce.  If, however, the CAGC and Charging Party seek to pry into what are non-responsive, privileged or private electronic conversations, Amazon seeks the revocation of any and all subpoena requests that seek information regarding whether the Charging Party engaged in PCA on April 6 (conceded) and animus (irrelevant), as identified above.



Third Amended Answer, which concedes these allegations. (Draft Third Amended Answer, para. 5(c).)

Second, ALJ Green should revisit his ruling on Respondent's Petition to Revoke Charging Party Subpoena B-1-1C9GVF7 paragraphs 19(b) and (c) and CAGC Subpoena B-1-1CBQM1N paragraph 27 and revoke those paragraphs in their entireties because they all seek evidence limited to potential animus by Respondent against Charging Party as a result of his protected activities. Evidence related to employer motivation, including whether the employer harbored animus toward an individual's protected activities, is irrelevant under a *Burnup & Sims* analysis. *See Shamrock Foods Co.*, 337 NLRB at 915 (finding that in a *Burnup & Sims* case "motive is not at issue"); *Cadbury Beverages*, 160 F.3d at 29 (same). In fact, as ALJ Green noted in denying the CAGC's Motion to Consolidate this case with NLRB Case 19-CA-266977, a case involving the discharge of two entirely separate employees in Seattle, evidence regarding Amazon's treatment of other employees – even to the extent it could theoretically establish anti-union animus – is immaterial to the issues in this case. *See* Consolidation Order, at 4.[4]

---

[4] Moreover, the CAGC's recent unsuccessful effort to consolidate this case with NLRB Case 19-CA-266977 reveals the real purpose of these subpoena requests was not to obtain information relevant to litigating the narrow issues in this case, but rather to inject unrelated issues and claims involving other employees into this litigation. The ALJ previously expressed concerns regarding the scope of the subpoena requests involving employees other than Mr. Bryson, *see* April 27 Subpoena Order, at 2 (expressing concern that "the scope of this litigation might expand to involve 'mini-trials' (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint"); Exhibit 4, at 229 (addressing subpoena requests for information regarding Christian Smalls and Derrick Palmer and stating "I am loathe to effectively have a trial regarding two additional employees"), but at the time denied Respondent's petitions to revoke based on the Board's broad relevance standard for subpoenas. However, the current record in this case and CAGC's failed attempt to consolidate this case with NLRB Case 19-CA-266977 confirms Judge Green's concerns about the expansion of this matter were well-founded, and provides additional support for revoking the subpoena requests relating to other employees' alleged protected concerted activities.



## **CONCLUSION**

For the foregoing reasons, Amazon respectfully requests that CAGC Subpoena A-

1-1CLMM85; CAGC Subpoena B-1-1BUGMIX; Charging Party Subpoena B-1-

1C9GVF7; and CAGC Subpoena B-1-1CBQM1N be revoked as set forth above.


Date: May 24, 2021                    Respectfully submitted,

                                      */s/ Christopher J. Murphy*
                                      Christopher J. Murphy
                                      Morgan, Lewis & Bockius LLP
                                      1701 Market Street
                                      Philadelphia, PA 19103-2921
                                      Phone: +1.215.963.5601
                                      Fax: +1.215.963.5001
                                      christopher.murphy@morganlewis.com

                                      Nicole Buffalano
                                      Morgan, Lewis & Bockius LLP
                                      300 South Grand Avenue, Twenty Second Floor
                                      Los Angeles, CA 90071-3132
                                      Phone: +1.213.612.7443
                                      Fax: +1.213.612.2500
                                      nicole.buffalano@morganlewis.com

                                      *Attorneys for Respondent*
                                      *Amazon.com Services LLC*



## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of Respondent Amazon's Combined Petition to

Revoke Counsel for the Acting General Counsel's Subpoena Ad Testificandum A-1-

1CLMM85 and Motion for Reconsideration of Certain Orders Regarding Subpoenas Duces

Tecum was served on May 24, 2021 via electronic mail upon the following:

Evamaria Cox
Counsel for the Acting General Counsel
National Labor Relations Board, Region 29
Two Metro Tech Center, Suite 5100
Brooklyn, NY 11201
Evamaria.Cox@nlrb.gov

Frank Kearl
Charging Party's Legal Representative
Make the Road New York
161 Port Richmond Ave.
Staten Island, NY 10302
frank.kearl@maketheroadny.org

Date: May 24, 2021

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: +1.202.739.5455
Fax: +1.202.739.3001
kelcey.phillips@morganlewis.com

*Attorney for Respondent*
*Amazon.com Services LLC*

# EXHIBIT 1





UNITED STATES GOVERNMENT
**NATIONAL LABOR RELATIONS BOARD**
REGION 29
Two Metro Tech Center                          Agency Website: www.nlrb.gov
Suite 5100                                     Telephone: (718)330-7713
Brooklyn, NY 11201                             Fax: (718)330-7579

May 17, 2021

**VIA EMAIL & UPS**
Christine Hernandez, Human Resource Manager
Amazon.com Services, LLC
546 Gulf Avenue
Staten Island, NY 10314

Re:     Amazon.com Services LLC (Case No.: 29-CA-261755)

Dear Ms. Hernandez:

Enclosed, please find a *subpoena ad testificandum* requiring your appearance before an Administrative Law Judge of the National Labor Relations Board at a Zoom Videoconference hearing on **May 24, 2021 at 10:00 a.m. and consecutive days thereafter**.

Please be aware that failure to attend the Zoom Videoconference hearing could result in the Agency petitioning the United States District Court for enforcement of the subpoena.  Should you have any questions please contact me at the telephone number below.  Thank you for your assistance in this matter.

Very truly yours,

*/s/ Evamaria Cox*

Evamaria Cox, Board Attorney
Direct No.:  718.765.6172
Evamaria.Cox@nlrb.gov

cc:  Christopher J. Murphy, Esq. (via electronic mail)
     Nicole Buffalano, Esq. (via electronic mail)
     Kelcey Phillips, Esq.  (via electronic mail)

GC Exhibit 117

FORM NLRB-32

## SUBPOENA

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To    Christine Hernandez, Human Resources Manager
      Amazon.com Services, LLC

546 Gulf Avenue                        Staten Island, NY 10314

As requested by    Evamaria Cox, Counsel for General Counsel

whose address is    Two Metro Tech Center, Suite 5100, Brooklyn, NY 11201-3838
                    (Street)           (City)        (State)        (ZIP)

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE    an Administrative Law Judge

                                                         of the National Labor Relations Board

at    Zoom Video Hearing

in the City of    Brooklyn

on    Monday, May 24, 2021                        at    10:00 AM              or any adjourned

or rescheduled date to testify in    Amazon.com Services LLC
                                     29-CA-261755
                                     (Case Name and Number)

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena.  Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing.  If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing.  Prior to a hearing, the petition to revoke should be filed with the Regional Director; during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing.  See Board's Rules and Regulations, 29 C.F.R Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation).  Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

**A-1-1CLMM85**

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at    Brooklyn, NY

Dated:    May 17, 2021

*Lauren McFerran*

**Lauren McFerran, Chairman**

**NOTICE TO WITNESS**. Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed.  A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*  The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  The NLRB will further explain these uses upon request.  Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.

GC Exhibit 117

EXHIBIT 2



GC Exhibit 117

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES
NEW YORK BRANCH OFFICE

**AMAZON.COM SERVICES LLC**

        **and**                                        **Case  29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**

<u>**ORDER ON TRIAL DATES AND THE RESPONDENT'S
PETITION TO  PARTIALLY REVOKE  COUNSEL FOR
THE ACTING GENERAL COUNSEL'S SUBPOENA DUCE TECUM**</u>

       The parties have requested that the trial open as scheduled on March 29, 2021 to trigger the production of subpoenaed documents on a rolling basis and then be postponed for the taking of testimony to begin on May 3, 2021.  That arrangement is acceptable and so ordered.

       The Respondent filed a petition to revoke subpoena duces tecum B-1-1BUGMIX, which Counsel for the Acting General Counsel (CGC) issued on March 1, 2021.  The subpoena issued "[u]nder the seal of the National Labor Relations Board, and by direction of the Board," with the signature of Board Chairman Lauren McFerran affixed thereto.  The Respondent contends in its petition that the Office of the General Counsel has no authority to prosecute the case after former General Counsel Peter B. Robb was removed from office by the President of the United States on January 20, 2021 and subsequently replaced by Acting General Counsel Peter Sung Ohr (AGC).  The Respondent also raises a number of other objections to the subpoena requests.

       The complaint issued on December 22, 2020 and alleges that the Respondent violated Section 8(a)(1) of the Act by unlawfully suspending and discharging Gerald Bryson, an employee at the Respondent's fulfilment center in Staten Island, New York (JFK8 facility).

**<u>Prosecution after the Removal of Former General Counsel Peter B. Robb</u>**

       I reject the Respondent's petition to the extent it asserts that the case cannot be prosecuted because the President improperly removed Robb from the position of General Counsel.  In reaching this conclusion, I do not find it necessary to determine whether Robb was lawfully or unlawfully removed.  Rather, I find that the complaint properly issued when Robb was General Counsel and is subject to prosecution by Regional counsel, including by the use of subpoenas duces tecum.

       Under Section 10(b) of the National Labor Relations Act (Act), the Board, or any agent or agency designated by the Board, has authority to issue complaints.  Under Section 3(d) of the Act, the General Counsel has "final authority, on behalf of the Board, in respect of . . . issuance of complaints . . . and in respect to the prosecution of such complaints before the Board . . .."  Here, the complaint issued while Robb was still General



Counsel and neither the Board nor the AGC have sought to dismiss it.  Accordingly, there is no dispute as to who has ultimate authority to issue the instant complaint.  The complaint properly issued under Robb and is valid.

Under Section 11(1) of the Act, the Board has authority, upon application by a party, to issue subpoenas to such party requiring the production of evidence.  As noted above, the subpoena at issue is affixed with the signature of the Chairman of the Board; not the AGC.  In section 102.31(a) of the Board's rules and regulations, Regional Directors, not the General Counsel, are designated as the agents responsible for issuing subpoenas before a hearing opens.  The General Counsel plays no role in this process and the removal of Robb is irrelevant to the validity of the subpoena in question.

The Respondent has not otherwise established that a properly issued complaint cannot be prosecuted or that a properly issued subpoena cannot be used in the course of that prosecution.  As noted above, although the General Counsel may have "final authority . . . in respect to the prosecution of such complaints before the Board," the AGC has not sought to exercise any such authority in this case and there is no such action for the Respondent to contest.  Further, a General Counsel need not be in place to preside over the prosecution of a complaint which issued before the General Counsel left office.  *NLRB v. Gemalo*, 130 F. Supp 500, 501 (S.D.N.Y 1955) (complaint that issued before a General Counsel resigned could be prosecuted by a staff attorney after the General Counsel position became vacant).  Accordingly, there is no reason a valid complaint cannot be processed by Regional staff even if, currently, there is no validly appointed General Counsel.

**Other Objections to the Subpoena Requests**

The Respondent asserts certain general objections to all the subpoena requests and certain specific objections to individual subpoena requests.  The CGC has agreed to withdraw request numbers 2 to 6 on the basis of a stipulation among the parties that Tyler Grabowski is a statutory supervisor.  Without waiving its general objections, the Respond has also agreed to produce non-privileged documents responsive to request numbers 9 to 15.  I address the remaining subpoena requests (1, 7-8, 16-19) below.[1]

Initially, I note that the Respondent has objected to the production of privileged documents and is not required to produce such materials.  However, the Respondent must describe specific privileged documents in a privilege log provided to the CGC when the record opens on March 29, 2021 or as soon thereafter as is possible.  The privilege log should comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure.

*Request Number 1*

1. **Organizational charts and other documents showing Respondent's managerial structure, hierarchy or chain of command for the Respondent's JFK8 Facility during the period covered by this subpoena [May 1, 2019 through April 30, 2020], including documents that show any changes to the**

---

[1]  To the extent this order does not specifically reference and address certain objections to the subpoena, those objections are rejected.



**reporting protocols and chain of command.**

The CGC seeks this information to determine whether management treated Bryson differently than other employees with regard to misconduct and discipline. On that basis, I find that the request relates to a matter in question and is relevant. I also find that the temporal scope of the request is appropriate.

The Respondent nevertheless contends that the production of responsive documents would be unduly burdensome. The burden of establishing that an administrative subpoena is unduly burdensome is on the subpoenaed party and conclusory assertions are not sufficient to meet that burden. *NLRB v. Carolina Food Processors, Inc.*, 81 F.3d 507 (5th Cir. 1996); *NLRB v. Dutch Boy, Inc.*, 98 LRRM 2396, 2399 (W.D. Okla. 1978) aff'd 606 F.2d 929 (10th Cir. 1979). The subpoenaed party must establish with specificity that production of the subpoenaed documents would cause serious disruption. *EEOC v. Maryland Cup Corporation*, 85 F.2d 471, 477 (1986). The fact that compliance with a subpoena may require the production of bulky, voluminous, or numerous documents is insufficient to establish that it is overly burdensome and does not serve as an excuse for noncompliance. *McGarry v. S.E.C.*, 147 F. 2d 389 (10th Cir. 1945); *NLRB v. United Aircraft Corp.*, 200 F. Supp. 48, 51 (D. Conn. 1961), aff'd mem., 300 F. 2d 442 (2nd Cir. 1962).

Here, the Respondent has not met its burden of establishing with particularity that the production of responsive documents would be unduly burdensome. The Respondent indicates that the request would require it to produce every document related to a managerial or supervisory change at JFK8 facility, but does not attempt to provide a ballpark estimate of the number of documents involved or the time/cost it would take to produce them. Further, as discussed by the parties in a conference call, the CGC may find it sufficient for the Respondent to produce, without more, an organizational chart or charts in effect during the relevant period. Accordingly, I deny the Respondent's petition to revoke subpoena request number 1.

<u>*Request Numbers 7 and 8*</u>

7. **Documents that show the work rules, work guidelines and/or terms and conditions of employment pertaining to employee conduct and/or misconduct applicable to non-supervisory and non-managerial associates employed at Respondent's JFK8 facility at any time during the period covered by this subpoena, including documents showing any changes to the rules, the effective dates of any such changes, and a description or statement of the changes.**

8. **Documents showing that Respondent distributed to its employees, including Gerald Bryson and Dimitra Evans, and that employees (including Bryson and Evans) received Respondent's work rules, work guidelines and/or terms and conditions of employment, including the dates that such rules and policies were received by Bryson and Evans.**

The Respondent asserts that Bryson was discharged for specific misconduct – i.e., making vulgar and derogatory comments towards another employee in violation of Amazon's Standard of Conduct. Thus, without waiving objections, the Respondent has

3


GC Exhibit 117

agreed to "produce the relevant portions from its Owner's Manual and Guide to Employment – January 2019" (i.e., Workplace Harassment and the Standards of Conduct portions of the manual) and documents showing that the manual was distributed to Evans and Bryson.  (Resp. Brf. pp. 8-9)  The CGC seeks the production of the entire manual.

As it appears undisputed that the manual contains relevant standards of conduct, I will order that it be produced in its entirety so the CGC can view those standards in context.  I note that, under Rule 106 of the Federal Rules of Evidence, if a portion of the manual were introduced, an adverse party may require the introduction of any other part that in fairness out to be considered.  In order to determine what portions are subject to introduction pursuant to this rule, the parties should have access to the entire document.

*Requests 16-18*

**16. During the period covered by this subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which the JFK8 Facility is located, for violations of the sections named below of Respondent's Standards of Conduct, for cursing, abusive, profane, harassing, or vulgar language, including on-and-off duty examples, together with the personnel file of each disciplined employee showing other discipline to that employee: (a) Category 1 (b) Category 2.**

**17. During the period covered by the subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which the JFK8 Facility is located, together with the personnel file of each disciplined employee showing other discipline to that employee.**

**18. For the period covered by this subpoena, documents showing investigations conducted by Respondent in connection with disciplinary actions issued above in paragraph 17, including documents that reflect the identities of those who participated in the investigation, the substance of the investigation, and the investigatory findings.**

In its opposition to the petition, the CGC sought to modify these subpoena requests by changing "Regional facilities" to facilities that have "common management" with JFK8.  The General Counsel does not know which facilities are under common management with JFK8 and argues that it is the Respondent's obligation to identify those facilities for purposes of complying with these subpoena requests.

During a conference call, the Respondent identified two facilities in Connecticut as those that are JFK8's Regional facilities.[2]  The Respondent further represented that these three facilities have over 35,000 employees.  The Respondent has not identified facilities under common management with JFK8 and objects to the production of responsive

_____
[2] The General Counsel did not accept this representation as accurate.



GC Exhibit 117

documents for facilities other than JFK8. The Respondent also objects to the production of documents related to employee discipline for conduct that is not analogous to the alleged misconduct which led to the suspension and discharge of Bryson.

I will not grant the petition to the extent it seeks to limit production to documents reflecting the investigation of and discipline for a particular type of misconduct. The General Counsel is entitled to determine which investigatory and disciplinary records are analogous to those of Bryson and need not rely on the Respondent's determination in this regard. However, as discussed during the conference call, the parties should consult regarding the possibility of performing word searches that will target the most relevant documents and be less burdensome.

With regard to geographic scope, although the production of personnel records can be ordered for multiple facilities, such documents are most useful as a means of establishing disparate treatment if personnel decisions are made or approved above the local facility level. See *Savage v. Sara Lee Bakery Group, Inc.*, 2005 WL 8161339 (E.D. Tex. Mar. 30, 2005). Here, it is not clear to what extent, if at all, disciplinary decisions are made or approved at the regional or national level. Further, requests for documents from facilities with "common management" are ambiguous. However, the Respondent has not yet established that the production of documents from JFK8 and its two regional facilities would be excessively burdensome. Accordingly, I will, for now, limit the geographic scope of these subpoena requests to JFK8 and its two regional facilities as identified by the Respondent.[3] However, the parties should be prepared to discuss this issue further when the record opens.

**19. For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:**

**(a) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings.**

**(b) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;**

**(c) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's**

---

[3] The CGC may obtain responsive documents from two facilities other than those identified by the Respondent as regional facilities of JFK8, if desired.



GC Exhibit 117

**supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns;**

**and**

**(d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.**

These requests seek documents regarding any protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any, of that conduct. Thus, the requests seek relevant documents. Further, I do not find the requests to be overly broad in temporal scope. However, the Respondent contends that these requests are unduly burdensome and overly broad to the extent they would require a search and review of documents in the possession of over 75,000 supervisors, manager, and agents. As discussed during the conference call, the parties should consult regarding the possibility of performing word searches that will target relevant documents and be less burdensome.

It is hereby ORDERED that the petition to revoke is denied in part and granted in part, as indicated above.

Dated:      March 24, 2021
New York, New York

*S/ Benjamin W. Green*
_____
Benjamin W. Green
Administrative Law Judge

Served by email as follows:

Nicole A. Buffalano, Esq. (nicole.buffalano@morganlewis.com)

Evamaria Cox, Esq. (Evamaria.cox@nlrb.gov)

Matthew Jackson, Esq. (Matthew.Jackson@nlrb.gov)

Frank Kearl, Esq. (frank.kearl@maketheroadny.org)

Christopher J. Murphy, Esq. (christopher.murphy@morganlewis.com)

Kelcey J. Phillips, Esq. (kelcey.phillips@morganlewis.com)

# EXHIBIT 3


GC Exhibit 117

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES
NEW YORK BRANCH OFFICE**

**AMAZON.COM SERVICES LLC**

       **and**                                       **Case   29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**

<u>**ORDER ON THE RESPONDENT'S PETITION TO REVOKE
CHARGING PARTY'S SUBPOENA DUCE TECUM B-1-1C9GVF7
AND REQUEST FOR A PROTECTIVE ORDER**</u>

The Respondent filed a petition to revoke subpoena duces tecum number B-1-1C9GVF7 (Subpoena), which the Charging Party issued to the Respondent's custodian of records on April 13, 2021.[1]  To the extent the Subpoena is not revoked, the Respondent seeks a protective order for any documents which must be produced.

The complaint alleges that the Respondent violated Section 8(a)(1) of the Act by unlawfully suspending and discharging Charging Party Gerald Bryson because of his protected concerted activities (i.e., protesting the Respondent's failure to provide greater COVID-19 safety protections to employees).

**Petition to Revoke**

The Subpoena seeks a number of documents which have already been subpoenaed (subpoena duces tecum number B-1-1BUGMIX) from the Respondent by Counsel for the Acting General Counsel (CGC).  On March 24, I issued an order largely denying the Respondent's petition to revoke subpoena B-1-1BUGMIX.  The instant petition to revoke is denied to the extent the Subpoena seeks documents which were requested by subpoena B-1-1BUGMIX and those requests were not revoked by my March 24 order.

The petition to revoke Subpoena paragraphs 3, 4, and 5 are denied as documents responsive to those paragraphs may include evidence of animus and (for paragraph 5) disparate treatment.

The Respondent objects to Subpoena paragraphs 11-14, and 19(b) and (c) to the extent they concern certain employees who were openly involved in protected concerted activities with Bryson.  The Respondent asserts that these Subpoena requests do not, as required by the Act, relate to any matter under investigation or in question.  Respondent's counsel also contends that production of these documents will be disproportional to the needs of the case as it will lead to extraneous "mini-trials" regarding the Respondent's treatment of employees not listed in the complaint.  The CGC and Charging Party claim

_____

[1] All dates herein refer to 2021.



that the government's case will be advanced by evidence that the Respondent administered similar discipline to employees, including Bryson, who engaged in the same protected concerted activities.

Evidence concerning an employer's treatment of an alleged discriminatee in comparison to other employees who concertedly engaged in the same protected activity is relevant.  In fact, such evidence may be exculpatory as an employer may defend on the grounds that such nondiscriminatees were known to have engaged in protected concerted activity and, unlike an alleged discriminatee, were subject to no adverse employment action.  Of course, the Respondent has indicated no intent to raise such a defense and I share the concern of Respondent's counsel that the scope of this litigation might expand to involve "mini-trials" (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint.  However, given the Board's broad discovery-type standard of relevance with regard to subpoena requests and its reluctance to quash requests on the grounds that production is bulky and numerous, I will not revoke paragraphs 11-14, and 19(b) and (c) at this time.

With regard to other individual Subpoena requests, I make the following additional rulings:[2]

Subpoena Paragraph 2 – Paragraph 2 shall be limited to policies, procedural, standards, and guidelines, as further described therein, which applied to the JFK8 facility.

Subpoena Paragraph 11 – Paragraph 11 shall be revoked to the extent it seeks documents regarding any transfers or promotions of the named employees.

Subpoena Paragraph 20 – Paragraph 20 shall be limited to organizational charts and other documents, as further described therein, that cover or include the JFK8 facility.

Subpoena Paragraphs 6, 21-24 – Paragraphs 6, 21-24 shall be limited to documents concerning only those members of the Human Resources Department/Team, Loss Prevention Department/Team, Operations Department/Team, Safety Department/Team, and Learning Department/Team who have responsibilities with regard to the JFK8 facility.

**Protective Order**

A protective order with respect to the disclosure of subpoenaed documents may be entered upon good cause and/or to avoid harm.  I will impose a protective order with regard to subpoenaed personnel records (such as employee discipline) of employees other than Bryson.  Counsel for the parties may use subpoenaed personnel records in this proceeding, including the disclosure of such documents to potential witnesses and other

---

[2] To the extent certain paragraphs are not mentioned and specifically limited or revoked, the petition to revoke is denied.



individuals as may be necessary prepare for trial and understand the records.[3]  However, counsel shall not disclose subpoenaed personnel records to other individuals for a different purpose.

It is HEREBY ORDERED that the Respondent's petition to revoke the Subpoena is granted in part and denied in part, as described above, and a protective ordered is entered as described above.

.                              Dated:      April 27, 2021
                                           New York, New York

                                           *S/ Benjamin W. Green*
                                           _____
                                           Benjamin W. Green
                                           Administrative Law Judge

Served by email as follows:

Nicole A. Buffalano, Esq. (nicole.buffalano@morganlewis.com)

Evamaria Cox, Esq. (Evamaria.cox@nlrb.gov)

David Gaston, Esq. (David.Gaston@nlrb.gov)

Matthew Jackson, Esq. (Matthew.Jackson@nlrb.gov)

Frank Kearl, Esq. (frank.kearl@maketheroadny.org)

Christopher J. Murphy, Esq. (christopher.murphy@morganlewis.com)

Kelcey J. Phillips, Esq. (kelcey.phillips@morganlewis.com)

---

[3]  The Respondent has objected to the possible use of subpoenaed records in different legal forums and different legal proceedings.  Presumably, the Respondent objects to the disclosure of documents that are relevant and would be useful to a legal adversary.  I do not believe the Respondent has a particularly strong confidentially interest in preventing the disclosure of such documents earlier than they would normally be disclosed during the normal course of those proceedings.  Accordingly, I do not grant this partial protective order on that basis.  Rather, I grant the partial protective order on the fairly self-evident confidentially interest a nonparty employee would have with regard to personnel records such as discipline.

GC Exhibit 117

# EXHIBIT 4

Case 1:22-cv-01479-DG-SJB   Document 5-8   Filed 03/17/22   Page 38 of 52 PageID #: 3749

Page 145

1    MS. WILLIAMS:  (Audio interference) --

2         RECROSS-EXAMINATION

3  Q   BY MS. WILLIAMS:  Ms. Volk, I just wanted to clarify a

4  couple of things that I think testified about earlier.  I know

5  you mentioned that information is processed in Nuix.  Do search

6  terms typically get run before information is processed in

7  Nuix?

8  A   No, not typically.

9  Q   How long have you been in the e-discovery industry doing

10 this for clients?

11 A   Ten years.

12 Q   And is Amazon the only client that you do this for?

13 A   No.

14 Q   And was there anything about this process, based upon your

15 experience, that seemed abnormal or unusual as far as the

16 processing and searching?

17 A   No.  This is completely typical.

18    MS. WILLIAMS:  Thank you, Your Honor.  We have no other

19 questions of the witness.

20    JUDGE GREEN:  Okay.  And would -- Okay.  So Ms. Cox, what

21 would you like to do now?

22    MS. COX:  I just, I'm not sure that Ms. Volk answered my

23 questions earlier; that seemed to be that there was some

24 confusion.

25         FURTHER REDIRECT EXAMINATION

Page 146

1  Q   BY MS. COX:  So I just want to just make clear that I was

2  asking when she got her initial instructions to conduct the

3  search.

4  A   March 15th.

5  Q   Okay.  When did you put the documents in relativity?

6  A   I do not recall.

7  Q   How many documents did you put in relativity?

8  A   I don't recall off the top of my head.

9  Q   And is there a document that would help refresh your

10 recollection?

11 A   Certainly.

12 Q   What is that document?

13    JUDGE GREEN:  Hold on.  It's not whether it would refresh

14 the recollection, it's just whether there's a document which

15 shows that.

16 Q   BY MS. COX:  Okay.  What is the document?

17 A   Probably a processing export summary.

18    JUDGE GREEN:  Okay.

19 Q   BY MS. COX:  You have it handy?

20 A   I don't.  I can't pull it without being on my GPS.

21    JUDGE GREEN:  Okay.  So I'd -- I'd ask the Respondent to

22 produce that document to the extent, you know, any redacted,

23 that's fine, but produce that document to the General Counsel.

24    MS. COX:  And --

25    MS. WILLIAMS:  Your Honor, would -- would counsel be able,

Page 147

1  or would -- would the Government accept a stipulation as to the

2  number of documents, rather than producing the full processing

3  log?

4  Q   BY MS. COX:  How long is the processing log?

5  A   It is -- it's a pretty detailed log about everything that

6  was processed, probably two, three pages.  I'm -- I'm not sure

7  off the top of my head.

8  Q   We would like the --

9  A   It can be quite -- it could be quite lengthy.

10    MS. COX:  All right.

11    JUDGE GREEN:  Well, let me ask that --

12    MS. COX:  To the incentive, it is not long.  We would like

13 the document produced.

14    JUDGE GREEN:  Okay.

15    MS. WILLIAMS:  And Your Honor, we'd object to the extent

16 we may request the ability to redact that document.

17    JUDGE GREEN:  You do.  You have it.  Yes, you have.

18    MS. COX:  I'm sorry, I don't understand.

19    JUDGE GREEN:  It's going to be redacted to the extent

20 necessary.

21    MS. COX:  Okay.  And the same with the email to Ms. Volk,

22 with the instructions to commence the search.

23 Q   BY MS. COX:  Okay.  Ms. Volk, so when did you get your

24 second instructions after the documents were out of relativity;

25 do you recall?

Page 148

1  A   The second instruction was March 18th.

2  Q   Okay.  And how did you receive that instruction?  Was it

3  by email?  Do you know?

4    MS. COX:  Judge, we'd like that email produced as well,

5  redacted to the extent necessary.

6    JUDGE GREEN:  Okay.  So please produce that as well.

7    MS. COX:  And I believe those are the extent of our

8  questions, Judge.

9    JUDGE GREEN:  Okay.  Thank you very much, Ms. Volt.

10 We're -- you're -- you're free to go.

11    Let's go off the record.

12 (Off the record at 12:48 p.m.)

13    JUDGE GREEN:  And Mr. Grabowski, can you hear me?  Can

14 you -- can you start your video feed?  There you are.  There

15 you are.

16    Okay.  So Ms. Cox, you're calling Mr. -- Mr. Grabowski.

17    Mr. Grabowski -- we're back -- back -- are we back on the

18 record?

19    THE COURT REPORTER:  Yes, we are.

20    JUDGE GREEN:  Okay.  So raise your right hand.

21 Whereupon,

22         TYLER GRABOWSKI

23 having been duly sworn, was called as a witness herein and was

24 examined and testified, telephonically as follows:

25    JUDGE GREEN:  Okay.  Thank you.  And are you alone in the

Case 1:22-cv-01479-DG-SJB   Document 5-8   Filed 03/17/22   Page 39 of 52 PageID #: 3750

1 room?

2    THE WITNESS:  Yes.

3    JUDGE GREEN:  Okay. So please don't communicate with

4 anybody during your testimony by some other device.  And please

5 don't refer to documents that are not shown to you on the

6 screen by counsel, okay?

7    THE WITNESS:  Okay.

8    JUDGE GREEN:  And please state and spell your name for the

9 record.

10    THE WITNESS:  Tyler Grabowski, T-Y-L-E-R

11 G-R-A-B-O-W-S-K-I.

12    JUDGE GREEN:  Okay.  Thank you.  And Ms. Cox is going to

13 have some questions for you.

14    Any time you're ready, Ms. Cox.

15          DIRECT EXAMINATION

16 Q   BY MS. COX:  Good afternoon, Mr. Grabowski.  Thank you for

17 being here today.  Can you please tell us what your occupation

18 is and your title?

19 A   I am a senior human resource business partner at Amazon.

20 Q   And you have been designated by Amazon as custodian of the

21 records for purposes of this hearing, correct?

22 A   Yes.

23 Q   Okay.  And you collected documents responsive to paragraph

24 16 of the subpoena?  Let me show it to you, I'm sorry.  Give me

25 one moment.

1 A   I have it.

2 Q   Okay.  So they do collect documents, responsive to

3 paragraph 16 of the subpoena?

4 A   Yes.

5 Q   Okay.  Who directed you to -- to search for those

6 documents, the disciplines?

7 A   A member of the Amazon legal team.

8 Q   Do you recall the name of the person that requested you to

9 search?

10 A   Yes.

11 Q   What's the name of that person?

12 A   Kristin LaRosa.

13 Q   Do you recall when you were directed to conduct the

14 search?

15 A   It was sometime in the past month.

16 Q   Meaning April 20 -- I'm sorry, April 2021?

17 A   Late March or early April 2021.

18 Q   I'm sorry, you may have said this earlier, but did you

19 collect documents or any other paragraphs responsive to the

20 subpoena?

21 A   So let me take a look at it real quick.  The only sections

22 I've looked at previously were 16 and 17.

23 Q   Okay.  Is that what you're looking at right now is the

24 subpoena?

25 A   Yes.

1 Q   Okay.  And without disclosing any confidentiality, can you

2 tell me what you were told was the purpose of the search?

3 A   I don't remember.

4 Q   What were you told to search for?

5 A   Feedback records from a designated time frame.

6 Q   What do you mean by feedback records?

7 A   So feedback would be any type of documented conversation

8 between a leadership team and an hourly employee.

9 Q   And do you recall when -- on what date you began to search

10 for these documents?

11 A   The -- the same time frame; I think it was late March

12 early -- sometime in the past month, late March, April 2021.

13 Q   Okay.  So Mr. Grabowski, I'm going to ask you moving

14 forward, just to look at whatever documents I put on my screen

15 and --

16 A   Uh-huh.

17 Q   -- if I need you to -- so this way you don't -- I can -- I

18 can see you while you're testifying.  Thank you.  Okay.  So

19 these documents, paragraphs 16, requesting disciplines, where

20 are they normally kept?

21 A   In Adapt.

22 Q   Okay.  What is Adapt.

23 A   An Amazon system for documenting and tracking feedback.

24 Q   And is Adapt an electronic system?

25 A   Yes.

1 Q   And can you tell me, is that the only system that Amazon

2 uses to maintain discipline?

3 A   The documentation, like of the actual feedback, yes.

4 Q   When you say "feedback", are you referring to disciplines?

5 A   Yes.  So the reason I say "feedback" is there is both

6 positive and constructive that are both documented in Adapt.

7 Q   Okay.  Disciplines that are not positive or constructed,

8 are they -- or feedback, are they maintain in a different

9 location?

10 A   No.

11 Q   Okay.  So are you saying that all disciplines are

12 maintained and Adapt?

13 A   For hourly employees, yes.

14 Q   Okay.  Now, can you tell me, what facilities you -- you

15 conducted a search for in response to paragraph 16?

16 A   EWR4, JFK8, and BDL3

17 Q   And do you recall what date you began searching for JFK8

18 disciplines?

19 A   Late March and April of 2021.

20 Q   What about for EWR4?

21 A   That one was more recent.  So sometime in April of 2021.

22 Q   What about BDL3?

23 A   Same as EWR4, April 2021.

24 Q   Give me one second.

25    MS. COX:  Judge, can I go off the record for a moment?

Page 153

1  JUDGE GREEN:  Off the record.
2  (Off the record at 12:58 p.m.)
3        RESUMED DIRECT EXAMINATION
4  Q  BY MS. COX:  I'm sorry.  So you were saying that you
5  more -- more recently began searching for EWR4?
6  A  Yes, that would be in April of 2021.
7  Q  Okay.  Did you use any software to conduct the searches
8  for paragraph 16?
9  A  Adapt.
10  Q  Is Adapt the system that you searched or is it the system
11  that you used to search?
12  A  Adapt has its own reporting built into the website.
13  Q  Can you explain how that works?
14  A  So on the main page, there's a -- option to click
15  reporting on the top.  When you click reporting, it'll bring up
16  a page that has every single time -- it's like a baseline
17  example.  It says -- in the search bar, it says warehouse and
18  then has semicolon and it defaults to this building in Phoenix.
19  I believe that's where the program started but you can then
20  change it to any type of site or multiple sites by putting a
21  comma in between the location.  And then you can select a time
22  frame.  So it either has relative time frames where you can put
23  last day, the last month, last three months, last quarter, last
24  year.  Or you can choose absolute and choose a start and end
25  date.  And then when you click the search bar, it essentially

Page 154

1  brings up a table in the web browser that outlines all of the
2  information in the format that was provided with an option to
3  export it to Excel.
4  Q  Okay.  Now, when you say "website", can you tell me what
5  website you're referring to?
6  A  Adapt.
7  Q  So Adapt is a website and a search tool as well?
8  A  So Adapt is a website where employees have their -- their
9  profiles where any type of disciplinary is documented and in
10  that website is a reporting function.
11  Q  Okay.  So are the disciplines sortable by date range?
12  A  If you export it to Excel, you can filter it and sort it
13  by date.
14  Q  So prior to being exported, can you -- I -- I believe you
15  testified that you can select a time period.  Is that right?
16  A  Oh.  Yes, that is correct.
17  Q  So can you limit the Adapt searches for a one-year period?
18  A  You can select the specific dates, yes.
19  Q  Okay.  But it covers one year?
20  A  Yes.  Or greater --
21  Q  Okay.  I'm sorry.  Say again?
22  A  Or greater or less.  It's --
23  Q  Okay.
24  A  -- really, whatever.
25  Q  Okay.  Is the discipline sortable by type or searchable by

Page 155

1  type of discipline?
2  A  That I'm not sure.
3  Q  Okay.  I can give you example.  For example, behavioral
4  discipline -- like, search only behavioral disciplines versus
5  search only safety disciplines, search only time off past
6  disciplines.  Is that possible, to choose the type of
7  disciplines?
8  A  I have not searched for that, so I'm not sure.
9  Q  Okay.  Can filters be combined to target disciplines by,
10  for example, date, type of facility, and other -- other
11  filters?
12  A  I know that once it's in Excel form, I've filtered it like
13  that before.  But prior to exporting to Excel, I'm not sure.
14  Q  Okay.  Did you use search terms for paragraph 16?
15  A  Paragraph 16 is the same one that we've been talking
16  about?
17  Q  Yeah.  Do you need me to show the document?  I can -- give
18  me one moment and I'll pull it up for you.
19  A  Thank you.
20  Q  Of course.  Okay.  Can you see my screen?
21  A  Yes.
22  Q  Okay.  So I'm talking about paragraph 16.  So just take a
23  minute, read it, let me know when you're done.
24  A  That's good.  I can read it.
25  Q  So did you use search terms for paragraph 16?

Page 156

1  A  Just the warehouse location.
2  Q  Okay.  Do you recall whether you searched for off- and on-
3  duty examples?
4  A  What do you mean by that?
5  Q  So paragraph 16 is asking for disciplines, including on
6  and off-duty examples.
7  A  Uh-huh.
8  Q  And I'm asking if that was part of your search.  You see
9  here?  It says including on and off-duty examples.
10  A  Uh-huh.  The search was conducted for all feedback during
11  its designated time frame for that location.
12  Q  Okay.  Do you recall what the time frame was?
13  A  I believe it was May 1st, 2019 through April 30th, 2020.
14  Q  Okay.  So other than Adapt, is there any other place where
15  employee discipline would be maintained?
16  A  Not for feedback records or conversations.
17  Q  Are there any other management systems that you searched
18  ris -- for paragraph 16 -- document management systems?
19  A  Yes.
20  Q  What were the other systems that you searched?
21  A  Exact.
22  Q  Did you search anything else?
23  A  OnBase.
24  Q  Say again?
25  A  OnBase.

1 Q   OnBase?

2 A   Yes.

3 Q   Okay.  What is Exact?

4 A   An investigation tracking system.  Another website that

5 Amazon uses.

6 Q   It's an investigation tracking system?

7 A   Yes.

8 Q   And what is OnBase?

9 A   It's a system for employee personnel files.

10 Q   Do you recall when you conducted the search on Exact for

11 paragraph 16?

12 A   In the last month.

13 Q   And do your recall when you conducted the search for

14 OnBase for paragraph 16?

15 A   I'm sorry.  Can you please repeat the question?

16 Q   Yeah.  I was asking if you recalled when you conducted the

17 search on the base (sic) system for paragraph 16?

18 A   OnBase?

19 Q   Yeah.  OnBase.

20 A   Okay.  Yeah, it was the same time frame.  In the past

21 month.

22 Q   Can you spell OnBase for me?

23 A   It's one word and it's O-N-B-A-S-E.

24 Q   Okay.  Thank you.  So I want to talk about OnBase a little

25 bit.  Are personnel files stored on OnBase?

1 A   Yes.

2 Q   Okay.  Are dis -- employee disciplinary records -- can

3 they also be found on OnBase -- in OnBase?

4 A   No.

5 Q   Okay.  Can you explain to me how a search on -- on OnBase

6 works?

7 A   So you can go into the system and search an employee ID

8 and either select all employee type -- or like, employment file

9 types or narrow it down based on a specific category and then

10 press search.

11 Q   What are those categories that you can narrow by?

12 A   I wouldn't be able to accurately say all of them.  There

13 is a good number of them.

14 Q   Can you give me examples of some?

15 A   It would be any type of document that an employee signs or

16 acknowledges.  So like, different policies or different things

17 that they're onboarded with, investigative notes, witness

18 statements, drug and alcohol acknowledgement form, termination

19 letters.  Really anything that is a document that the employee

20 would need to sign, acknowledge -- anything regarding their

21 employment or anything that the site would upload.

22 Q   Do employees sign and acknowledge disciplines?

23 A   They have the ability to digitally acknowledge it.

24 Q   And if -- okay.  And if an employee digitally acknowledges

25 a discipline, does it go into OnBase in the personnel file?

1 A   No.

2 Q   Okay.  Can personnel files be sorted by date range in

3 OnBase?

4 A   Within the employee's individual file, yes.

5 Q   What about personnel files generally?

6 A   In OnBase?

7 Q   Yeah.

8 A   So OnBase, you would need to pull individual employees by

9 using their employee ID.

10 Q   Where do you get the employee IDs from?

11 A   It -- it honestly depends.  I mean, there's multiple

12 systems that have employee IDs.

13 Q   So when you conducted the search for paragraph 16, where

14 did you get employee IDs from?

15 A   The Excel spreadsheet that came from Adapt.

16 Q   Okay.  Can you explain to me whether you created search

17 terms for paragraph 16?

18 A   No.

19 Q   So you did not create search terms?

20 A   I searched for warehouse IDs for a certain time frame but

21 that was it.

22 Q   Okay.  So I want to talk a little bit about the -- so

23 are -- I just want to make sure I'm understanding this.  So you

24 searched for all disciplines within a time frame and exported

25 it into an Excel spreadsheet.  Is that what you're saying?

1 A   Correct.

2 Q   Okay.  And then for specific disciplines, were you

3 involved in searching for specific type of disciplines?  For

4 certain types on conduct, is what I'm asking.

5 A   Certain types or like, specific individuals?

6 Q   Spec -- specific types of conduct.  Did you search for,

7 for example, fighting?  Were you involved in searching for

8 specific type of discipline?

9 A   (No audible response).

10 Q   Okay.

11 A   I pulled the feedback history for a specific time frame

12 for those three buildings into an Excel sheet.

13 Q   Okay.  Okay.  So I do want to show you a document, just to

14 get some understanding about a -- a little more about Adapt.

15 So let me just show you -- give me a moment, I'm sorry.  Okay.

16 Can you see my screen?

17 A   Yes.

18 Q   Okay.  This is a -- tell me what this is.

19 A   A feedback document.

20 Q   Okay.  So it's a one-page document, right?  So can you

21 explain --

22        JUDGE GREEN:  Can you see the screen now that you had to

23 put it at greater than arms' length so they could see there was

24 nothing in front of you?  Can -- can you pull it back so you

25 can read?

Page 161

1    THE WITNESS: Can I move my computer closer?
2    JUDGE GREEN: Yeah, if it'd be easier for you. If that's
3  okay with --
4    MS. COX: I'll zoom --
5    JUDGE GREEN: Ms. Cox.
6    MS. COX: I'll zoom in for him so he can see it.
7    THE WITNESS: Thank you.
8    MS. COX: There you go. Can you see now?
9    THE WITNESS: Yes.
10    MS. COX: All right.
11  **Q   BY MS. COX: So can you tell me what this -- what this**
12  **file path means?**
13  A   It's a URL that likely would bring you to this feedback
14  document.
15  **Q   Okay. Are these folders within Adapt?**
16  A   I don't know.
17  **Q   Okay. Give me one second. Sorry. All right. So I have**
18  **another document I want to show you. Okay. Sorry. I'm not**
19  **very good at this. All right. Can you see my screen?**
20  A   Yes.
21  **Q   Okay. So this is some documents that were produced in**
22  **response to paragraph 16. Okay. Can you see it?**
23  A   No. Now I can.
24  **Q   Better? Okay. So let me just start by asking you, when**
25  **you pulled these documents, did it have these -- these black**

Page 162

1  **boxes on it?**
2  A   I didn't pull these documents.
3  **Q   Okay. Are you familiar with -- with these barcodes at the**
4  **bottom of these documents?**
5  A   No.
6  **Q   Okay. Do you know what these barcodes are used for?**
7  A   No.
8  **Q   Okay. Do you know what this file path means?**
9  A   No.
10  **Q   Okay. So just to be clear, you're saying that you didn't**
11  **pull any documents. You only created a report. Am I**
12  **understanding that right?**
13  A   I pulled the Excel report of feedback for the three
14  buildings.
15  **Q   Okay. And then who did you give those reports to?**
16  A   The Amazon legal team and Morgan, Lewis.
17  **Q   Okay. And do you recall when you gave those -- those**
18  **reports to Amazon's legal team?**
19  A   Sometime in the past month.
20  **Q   Do you recall when you gave those reports to Morgan,**
21  **Lewis?**
22  A   Same time frame.
23  **Q   Okay. Do you recall how long it took you to conduct the**
24  **search for JFK8 disciplines?**
25  A   The Adapt Excel file?

Page 163

1  **Q   Yes. How long did it take you to search -- create that**
2  **document?**
3  A   Maybe 15 minutes.
4  **Q   Okay. And what about EWR4? How long did it take you to**
5  **create that Excel spreadsheet?**
6  A   Probably same time frame, 10, 15 minutes.
7  **Q   And what about BDL3? How long did it take you to create**
8  **that Excel spreadsheet?**
9  A   I pulled the EWR4 and the BDL one together from the same
10  file.
11  **Q   Okay. And how long did it take you to create that Excel**
12  **spreadsheet for both of those facilities?**
13  A   About 10 to 15 minutes to get both.
14  **Q   Okay. So I just want to -- for clarification, can you**
15  **tell me if I can search for a discipline without searching a**
16  **personnel file?**
17  A   What do you mean by that?
18  **Q   So does Adapt only contain the disciplines?**
19  A   It would be discipline and then also positive feedback if
20  there's positive coachings in there.
21  **Q   Okay. Does Adapt have anything else in it -- or -- or any**
22  **other types of files maintained in Adapt?**
23  A   No, the --
24    MS. WILLIAMS: I'm going to object to the extent this goes
25  beyond the scope of the requested documents.

Page 164

1    JUDGE GREEN: Overruled. Answer.
2  **Q   BY MS. COX: Mr. -- Mr. Grabowski, I was asking what other**
3  **types of documents are maintained in Adapt, besides positive**
4  **feedback, discipline, and I believe you said co -- coachings?**
5  A   Uh-huh. So coaching would fall under the -- the feedback
6  scope. Adapt is a performance management system.
7  **Q   Okay. Okay. And what's -- I just want to take another**
8  **step back with you because I don't think I'm clear on what**
9  **Exact is. What -- so what's the difference between Exact,**
10  **Adapt, and OnBase?**
11  A   OnBase would be all personnel files. Adapt would be
12  performance management, either feedback, positive, negative,
13  any type of disciplinary action. And Exact is where you would
14  host information related to witness statements, documents,
15  anything collected during the course of an investigation, which
16  then may lead to feedback that would be entered in Adapt.
17  **Q   In Exact or Adapt?**
18  A   Feedback.
19    MS. COX: Oh. I got it. I withdraw. I'm sorry. I got
20  it.
21  **Q   BY MS. COX: Okay. So what do you mean by performance**
22  **management system?**
23  A   It's where any type of, like, feedback -- performance
24  management feedback is located. So both productivity, quality,
25  overall actual performance in an employee's path, as well as

Page 165

1  any behavioral or attendance feedback.
2  **Q   Okay.  Now I want to talk a little bit about these Excel**
3  **spreadsheets that we've been mentioning.  Okay.  So you also**
4  **conducted the search for paragraph 17, right?**
5  A   Can we please pull it up?
6  **Q   Yes.  Give me one moment.**
7  A   Thank you.
8  **Q   Of course.  Okay.  All right.  Can you see paragraph 17?**
9  **I'll zoom it for you.**
10  A   That's perfect where it is.
11  **Q   Okay.  Just take a minute, read it, and let me know when**
12  **you're done.**
13  A   I'm done.
14  **Q   Okay.  So did you conduct the search for paragraph 17**
15  **related to all disciplines for JFK8 and other facilities?**
16  A   Yes, the Excel file.
17  **Q   Okay.  Now -- so did you create that Excel spreadsheet?**
18  A   I exported it right from Adapt.  It exports in that table.
19  **Q   Okay.  So what systems did you search for documents**
20  **responsive to paragraph 17?  I'll -- I'll show you again if you**
21  **need to see it.**
22  A   So we're referring to the actual, like, personnel files or
23  like, documents regarding the feedback, not just the Excel
24  file.
25  **Q   Did you -- I'm asking you what systems you searched for**

Page 166

1  **documents responsive to paragraph 17.**
2  A   Adapt.
3  **Q   Okay.  Did you conduct a search for personnel files?**
4  A   Partially.
5  **Q   What do you mean by partially?**
6  A   Out of a list of names that was provided, split it up
7  between myself and a member of my team.  It was a pretty
8  lengthy time ask.
9  **Q   Okay.  How many personnel files did you search for?**
10  A   I don't remember.
11  **Q   Who was the other person that you split the list up with?**
12  A   Christina Stone.
13  **Q   And who is Christina Stone?**
14  A   A member of my team.
15  **Q   Are you talking about HR?**
16  A   Yes.
17  **Q   Okay.  Do you recall when you conducted the search for**
18  **personnel files -- or partial search for personnel files?**
19  A   In the past month.  So April 2021.
20  **Q   Do you recall what facilities you searched personnel files**
21  **for?**
22  A   Only JFK8.
23  **Q   And what system did you use to search for personnel files**
24  **at JFK8?**
25  A   OnBase and Exact.

Page 167

1  **Q   So -- I'm sorry.  So are you saying that personnel files**
2  **are also maintained on Exact?**
3  A   No, but information leading to disciplinary action could
4  be.
5  **Q   Okay, so did you conduct a search for investigative**
6  **documents responsive to the subpoena, as well?**
7  A   Partially.
8  **Q   Okay.  We'll get back to that.  Okay, so as far as the**
9  **JFK8 search that you did in response to paragraph 17 of the**
10  **subpoena, can you tell me if you created search terms?**
11  A   I did not.
12  **Q   Did you use search terms?**
13  A   No.
14  **Q   Were searched terms given to you at any point?**
15  A   Not that I recall.
16  **Q   Okay, so I'm going to show you an Excel spreadsheet that**
17  **was produced in response to the subpoena.  You just have to**
18  **bear with me again a moment.  But before I get there, can you**
19  **tell me who gave you names to search, personnel files, who gave**
20  **you the names of the personnel files to search for?**
21  A   I don't remember.
22  **Q   Okay, so I'm showing you, now -- hopefully, you'll be able**
23  **to see my screen.  Thank you for being with me.  Okay.  Can you**
24  **see my screen?**
25  A   I -- I can see it; I can't read it.

Page 168

1  **Q   Yeah, let me try to -- okay, so this is a -- an Excel**
2  **spreadsheet.**
3  A   Um-hum.
4  **Q   I'm just going to scroll so you can see how many**
5  **disciplines are on here.  Is this the type of Excel spreadsheet**
6  **that you created in response to paragraph 17?**
7  A   It looks like the same, like, format, the same columns,
8  the same information that would be in there.
9  **Q   Okay.**
10  A   The only difference is the -- top bar is colored gray.
11  **Q   Okay.**
12  A   Which, it just looks like some formatting.
13  **Q   Give me one moment.  I think I'm pulling up the wrong one.**
14  **I'm sorry.  My apologies.  Okay, I think I have the right one**
15  **now.  Yes, okay.  So I'm showing you now the correct Excel**
16  **spreadsheet that is responsive to paragraph 17.  Okay, so you**
17  **can see it says at the bottom -- and if you can't see -- hold**
18  **on.  No, I keep showing you the same one.  I'm sorry.**
19  JUDGE GREEN:  Let me just ask -- I guess this is for Ms.
20  Cox.  The one you're showing now with 1,593 entries --
21  MS. COX:  Yes.
22  JUDGE GREEN:  Is it your understanding that that was the
23  result of a word search and that was not just all of the
24  disciplines at JFK8?
25  MS. COX:  Judge, my understanding is that these

Page 169

1  disciplines are a response to a word search, yes.
2      JUDGE GREEN:  Okay, and that there was -- there was -- was
3  there produced an Excel spreadsheet that just had all of the
4  disciplines at JFK8?.
5      MS. COX:  This is that spreadsheet, yes.
6      JUDGE GREEN:  Okay, and that would be in the several --
7  over 10,000?
8      MS. COX:  No, Judge.
9      JUDGE GREEN:  Okay.  That was not -- there was no
10  production of such a spreadsheet?
11      MS. COX:  No.
12      JUDGE GREEN:  Okay.
13      MS. COX:  I just want to make sure that you all can see
14  this is supposed to say 1,594.  I'm not sure you can see it
15  on -- okay.
16  **Q   BY MS. COX:  All right, so this spreadsheet, you're**
17  **saying, is the same one you provided, and you're saying these**
18  **columns look different to you?  I'll try to zoom it for you.**
19  A   Oh, no, those are the same columns.  I didn't realize that
20  the information was taken out for the employee ID, employee
21  name, employee login.
22  **Q   Okay, so yes, so it says "employee ID, employee status,**
23  **type, manager name, login ID, warehouse, source type", meaning**
24  **behavioral safety, "status level, created date, created by,**
25  **updated by, feedback".  And then, there are these "areas of**

Page 170

1  **development", and "details, incident details, incident date",**
2  **so on and so forth.**
3      **Okay, so Mr. Grabowski, does this spreadsheet look like**
4  **the one that you gave counsel, Morgan, Lewis counsel, aside**
5  **from the two columns missing?**
6  A   It has the same information.
7  **Q   Okay.**
8  A   But it would be hard to say, just based on I don't know
9  how much data is -- is in this, what time frame it's from.  But
10  that is what an Adapt export looks like.
11  **Q   Okay, so this information was extracted from Adapt?**
12  A   Yes.
13  **Q   So to your knowledge, do these individual lines represent**
14  **individual disciplines?**
15  A   Yes.
16  **Q   Okay.  Do you -- do you know or have any reason to believe**
17  **that, other than these two columns, that this -- that this**
18  **spreadsheet might have been edited or altered in any way?**
19  A   It looks like there's three columns.
20  **Q   Right, so aside from these three columns, do you have any**
21  **reason to believe that this spreadsheet might have been edited**
22  **or altered in any way?**
23  A   No.
24  **Q   Okay, so -- so I want you to look at the first entry here.**
25  **And the date is 2019, May 2nd, May 2nd; you see that?**

Page 171

1  A   Yes.
2  **Q   Okay, so I'm going to just do a little search so you can**
3  **see.  It looks like this -- I'm sorry.  I need a minute again.**
4  **This entry is identical to one other entry.  Give me one**
5  **moment.**
6      MS. COX:  Can I just go off the record one moment, Judge?
7      JUDGE GREEN:  Off the record.
8  (Off the record at 1:39 p.m.)
9      JUDGE GREEN:  And not that I want to disrupt Mr. Cox --
10  Ms. Cox's examination.  But I believe Mr. Murphy indicated that
11  he might offer some explanation as to what was done in -- in --
12  with regard to these spreadsheets?
13      MR. MURPHY:  Yes.  Thank you, Judge.  May I?
14      JUDGE GREEN:  Yes.
15      MS. COX:  Judge, may I have the witness testify first, and
16  then Mr. Murphy can provide his explanation after we're done?
17      JUDGE GREEN:  Okay.  Well, is this going to take long, Mr.
18  Murphy?  I mean, I think the purpose of this is to -- is to see
19  if we can short circuit some of the testimony by virtue of
20  stipulation.  So go ahead, Mr. Murphy.
21      MR. MURPHY:  Okay, thank you.  So Tyler those reports --
22  I'm going to call them reports; I don't know the technical
23  term.  He ran those reports with the disciplines from JFK8,
24  EWR4 and BDL3.  He transmitted them to us and -- and to counsel
25  for Amazon.  And -- and in our office, we -- we ran two sets of

Page 172

1  search terms against all of those reports.
2      The -- the -- the first set we used was the paragraph 16
3  terms.  There's seven terms, curse, vulgar abuse, et cetera, in
4  the body of the request itself.  We -- we -- we did that.  I
5  don't recall the numbers specifically, but my recollection is
6  that, with respect to -- with respect to JFK8, it was in the
7  range of 36 or so hits, ballpark.
8      We -- we then -- after conferring with counsel for the
9  General Counsel, they provided us a list of 31 terms to be used
10  for paragraph 17.  And we ran those terms, those 31 terms
11  against the -- the reports from JFK8, EWR4 and BDL3.  And that
12  search, that report, resulted in the 1,593 discipline reports
13  that Ms. Cox was showing to Mr. Grabowski.  He -- he didn't do
14  that work.  We did that internally using support staff here.
15      JUDGE GREEN:  Okay.  Did the -- did the -- did -- the
16  spreadsheet that came to you, did that have -- to Mr. Murphy.
17  Did that have 13,000 disciplines?
18      MR. MURPHY:  Yes.  The original -- the original cut
19  which -- which -- which Tyler described had -- for JFK8, had
20  13,000.  My recollection is that, for EWR4, it was a little bit
21  more than that, and -- and BDL3 was less than that.  I don't
22  remember the specific numbers, but.
23      JUDGE GREEN:  Okay, and so -- oh, so the search -- so the
24  word search, the 31-termed word search, that was for all three
25  facilities or just JFK8?

Page 173

1    MR. MURPHY:  We -- we've done it on all three.  But the
2  document that Mr. Cox was showing Mr. Grabowski, that was for
3  JFK8.
4    JUDGE GREEN:  Okay, and that resulted in 1,594?
5    MR. MURPHY:  3.
6    JUDGE GREEN:  3, okay.  Okay, thank you very much.
7    MR. MURPHY:  Yeah, thank you.
8    MS. COX:  Can I just ask Mr. Murphy when the 30 -- the
9  search for the 32 hits responsive to JFK8 was done, the date?
10    MR. MURPHY:  Boy, I -- I -- I don't know that off the top
11  of my head.  I'm sorry.
12    MS. COX:  Okay.
13  **Q  BY MS. COX:  Mr. Grabowski, did you -- after counsel ran a**
14  **search on the spreadsheet, did you have any role in going and**
15  **looking for those 32 disciplinary forms?**
16  A    I'm not sure if it was -- there was one specific --
17  **Q  Did you collect 32 or 36 discipline forms at any point**
18  **during this last two months?**
19  A    There was a list that was provided to counsel, which, the
20  list was then narrowed and sent back.  Those ones were the
21  documents that I discussed earlier that Christina Stone and I
22  reviewed.
23  **Q  Okay, but those documents that you reviewed, were they**
24  **personnel files or something else?**
25  A    It was the back records from Adapt, and then anything from

Page 174

1  the Exact or personnel files that may have supplemented it.
2  **Q  Okay, so after counsel gave you the list, you conducted**
3  **the search for feedback; when did you conduct the search?**
4  A    In the past month.
5  **Q  Okay, do you recall when you gave a disciplinary, or I'm**
6  **sorry, the feedback documents back to counsel, after you and**
7  **Christina Stone completed your partial search?  Do you recall**
8  **when you gave the -- the results back?**
9  A    It was sometime in the past month, but I don't know the
10  specifics.
11  **Q  Okay.  Did you also provide personnel files to counsel**
12  **after the terms were narrowed?**
13  A    I'm sorry, can you please repeat that?
14  **Q  Yeah.  Did you also provide personnel files to counsel**
15  **after they narrowed those -- those -- narrowed the search?**
16  A    Is that different than the -- the question that was just
17  asked about going through the list?
18  **Q  Yeah, because I asked you about feedback just now, and**
19  **now, I'm asking you about personnel files.  Unless I made an**
20  **error, that's -- that -- that was my intention.  My first**
21  **question was:  after counsel narrowed down the search to 36**
22  **hits, did you provide feedback documents to counsel?**
23  A    So the feedback documents would be what is outlined in the
24  Excel file.
25  **Q  Right.  Did you provide a actual physical or electronic**

Page 175

1  version, a document, a PDF, or something, to counsel?
2  A    I don't believe so.
3  **Q  Okay, what about personnel files that you and Ms. Stone**
4  **searched for?  Did you ever provide the actual personnel file**
5  **to counsel?**
6  A    Yeah, so that's what I thought you were asking the first
7  time; that is what we did.  We took the list and pulled
8  information pertaining to it in our personnel files and then
9  sent it back.
10  **Q  Okay, and you did that within the last month?**
11  A    Yes.
12  **Q  Okay, thank you.  Now, I'll get back to this Excel**
13  **spreadsheet.  So I was showing you the spreadsheet with the**
14  **1,593 disciplines for JFK8, right.  So I was asking you to look**
15  **at this first entry.  Oops, excuse me.**
16    Okay, so this first entry, I told you before, was May 2nd,
17  **2019.  Now, I've filtered this document, and I want you to look**
18  **at line -- let me try to zoom it -- line 500.  If you look at**
19  **the dates, do you see the dates there, May 2nd, 2019?**
20  A    Yes.
21  **Q  Okay.  Do you see this day, too, May 2nd, 2019?**
22  A    Yes.
23  **Q  Okay, so now, look at the -- the body of this.  I'll try**
24  **to give a -- put a little spotlight so you can follow my**
25  **cursor.  Okay, so you see this here?**

Page 176

1  A    Um-hum.
2  **Q  Just take a -- take a second; read it to yourself?**
3  A    Okay.
4  **Q  Okay, so these entries are exactly the same, right?**
5  A    Yes, it appears so.
6  **Q  Okay, but they appear on this spreadsheet as numbers 2 and**
7  **500, right?**
8  A    Yes.
9  **Q  Okay, so I'm going to do the same, so you can take a look**
10  **at it, with the next entry.  This entry is May 7th, 2019.**
11  **Okay, so we have these two, number 353 and 1224; do you see the**
12  **date on this, May 7th --**
13  A    7.
14  **Q  -- 2019.  And then, for this entry, May 7 -- I'm sorry --**
15  **May 7th, 2019.  Now, take a look at the body of this document**
16  **starting here, 4/24/19, and then you can read starting 4/24/19.**
17  **Let me know when you're done.**
18    JUDGE GREEN:  At some point, are we just going to ask
19  why -- why this is the case, why there would be redundant
20  entries?
21    MS. COX:  We will, Your Honor.
22    JUDGE GREEN:  Is there some reason why we need to have him
23  read to document to determine that they're redundant?
24    MS. COX:  I just want to be clear that there's nothing
25  I've done to this document and that -- that these -- these

1 entries are, in fact, duplicates.

2     JUDGE GREEN: Okay. Well, why don't we accept your

3 representation to that effect as true, why don't you ask a

4 question about it?

5     MS. COX: Okay.

6 **Q   BY MS. COX: So Mr. Grabowski, is there any reason why**

7 **these entries would be duplicated on this spreadsheet?**

8 A  I'm not sure.

9     MS. COX: So just so you know, Your Honor, I mean, there

10 are about -- this -- this document has got 45 percent, 35 to 45

11 percent, duplicate entries. So this number of 1,593 is

12 completely inaccurate. It doesn't represent the number of

13 disciplines that Respondent claims are responsive to paragraph

14 17 of the subpoena.

15     JUDGE GREEN: But why do we care?

16     MS. COX: Judge, because Respondent has been asking us to

17 rely on these charts and not accept the underlying --

18     JUDGE GREEN: Yeah, but there's nothing being -- there's

19 nothing being -- not being disclosed here. So I take it that

20 it would not be particularly hard to do data searches and order

21 an Excel spreadsheet so that it's fairly easy to find the --

22 the duplicates. And I don't know how that hurts you, so

23 there's less -- so the -- so the -- the word search has

24 produced less documents. Well, how does that hurt you? The --

25 the -- the word search produced the documents that it produced.

1 I don't understand why that's prejudicial in any way.

2     MS. COX: Well, Judge, because -- because the -- the

3 Respondent's representation that this, the request, is

4 overburdensome and needs to be further narrowed --

5     JUDGE GREEN: Well, but that ship has sailed. We're

6 not -- we're not dealing with -- I've already denied the --

7 the -- the petition to revoke. That's not what we're

8 litigating here. So and I think the parties should understand

9 what we're litigating here. We're not litigating whether the

10 petition -- we're not relitigating the petition to revoke.

11     What we're doing is, we're establishing a record that, in

12 the event of nonproduct -- of nonproduction or incomplete

13 production, I'm -- and -- and pending a potential motion for

14 banning those sanctions, that I'm in a position to rule on

15 that. That's what we're looking at here.

16     MS. COX: Yes, Judge. And I believe that these duplicate

17 entries go to a bad faith search, Judge.

18     JUDGE GREEN: Okay.

19     MS. COX: They're not -- it's not a reasonable inclusion

20 search with 100 percent --

21     JUDGE GREEN: That's fine. I -- that's fine. I do not --

22 I do not agree, respectfully. I -- I don't -- I don't mean

23 to -- to interrupt you, but I don't agree and -- but you can

24 make that argument. You can certainly make that argument, but

25 in the meantime, let's -- let's move on.

1     MS. COX: Okay. Give me one moment, judge. Okay.

2 **Q   BY MS. COX: So, Mr. Grabowski, did you ever deduplicate**

3 **this Excel spreadsheet?**

4 A  No.

5 **Q   Did anyone direct you to deduplicate this Excel**

6 **spreadsheet?**

7 A  No.

8 **Q   Is it possible to retrieve the individual feedback or**

9 **discipline documents without entering a personnel file?**

10 A  If we wanted the individual feedback, we would go employee

11 by employee in Adapt.

12 **Q   So you don't have to access the personnel file to retrieve**

13 **a disciplinary document?**

14 A  The -- like, the documents from the Excel sheet?

15 **Q   Yes, those individual documents, where would you retrieve**

16 **it from?**

17 A  Adapt.

18 **Q   Is it in the personnel file?**

19 A  No.

20     MS. COX: Okay. I don't know if Mr. Gaston has any

21 questions.

22     MR. GASTON: Just one question.

23           DIRECT EXAMINATION

24 **Q   BY MR. GASTON: You mentioned three different systems,**

25 **OnBase, Adapt, and Exact; are those the sum total of the**

1 **systems that would have the personnel information? And I use**

2 **that term in the broadest sense; I don't want to narrow it**

3 **to -- I know it's been a specialized term over the course of**

4 **this examination. Is -- are those the three systems that would**

5 **have personnel information that would be potentially**

6 **responsive?**

7 A  There is honestly so many different systems at Amazon that

8 have employee information; that's why there's specific places

9 for each information.

10 **Q   I see, and based on that statement, could you share how**

11 **you selected three -- these three systems and not any others?**

12 A  So Adapt would be any type of feedback or disciplinary

13 action, which is what we were looking into.

14     And then, Exact would be the system that houses

15 investigative notes that would lead up to different types of

16 disciplinary action, if an investigation was necessary based on

17 the allegation. And then, OnBase is what was used in years

18 prior to Exact being established.

19     So the Exact investigation system is relatively new at

20 Amazon. It has not been there in the entire tenure that I've

21 been employed. And previously, investigative notes or witness

22 statements that would lead up to disciplinary action would be

23 uploaded to an employee's personnel file in OnBase.

24     So in looking for what the exact disciplinary action is

25 and what information would have been compiled in leading up to

Page 181

1 that disciplinary action, those are the systems they would be
2 stored --
3 Q   Okay, and this is for 00 only for hourly employees; did I
4 understand that correctly?
5 A   So Adapt is for hourly employees to -- to document the
6 disciplinary action, yes.
7 Q   Okay, so nonhourly employees are not even part of this
8 landscape that you've set forth?
9 A   They have OnBase and Exact.  Like, they -- they can be
10 tracked in those two systems, but the Adapt system is solely
11 for the purpose of hourly employees.
12    MR. GASTON:  Okay.  That's all I have to now.  Thank you.
13       RESUMED DIRECT EXAMINATION
14 Q   BY MS. COX:  Mr. Grabowski, so as I understand it, you've
15 turned over 30 -- around 30 to 36 disciplines to Respondent
16 counsel, and personnel files; have you turned over any
17 documents -- actual underlying documents responsive for BDL3?
18 A   No.
19 Q   Have you turned over any responsive documents for --
20 sorry, the other one is -- EWR4?
21 A   No.
22    MS. COX:  Okay.  Judge Green, may I just go off the record
23 and consult with counsel --
24    JUDGE GREEN:  You want to go --
25    MS. COX:  In a breakout room?

Page 182

1    JUDGE GREEN:  Okay.  Off the record.
2 (Off the record at 2:08 p.m.)
3    THE COURT REPORTER:  Back on the record.
4       RESUMED DIRECT EXAMINATION
5 Q   BY MS. COX:  Okay, so Mr. Grabowski, you testified earlier
6 that you turned over, sometime this month, 32 or 36 feedback
7 documents and personnel files, along with Ms. Stone, to
8 Respondent counsel.  I just want to ask you a few more
9 questions about that.
10    So the forms from the feedback documents from Adapt can be
11 exported, right?
12 A   They can be exported, like in the Excel format?
13 Q   No, in -- in showing the document itself, the underlying
14 document.
15 A   Yes.
16 Q   Okay, and you did that?
17 A   No.
18 Q   Okay.  So who -- I'm sorry, I don't understand, then, what
19 you did with Ms. Stone.  So who -- who actually exported the
20 documents, not the chart, from -- from Adapt?
21 A   I don't know.
22 Q   Okay.  With regard to the personnel files that and Ms.
23 Stone searched in OnBase -- so did you -- so -- so those
24 personnel files were able to be exported, right?
25 A   Yes.

Page 183

1 Q   Okay.  And you exported tho -- some of those personnel
2 files from JFK8?
3 A   Ms. Stone and I went through both of them.  I don't
4 remember exactly.  So I know that we were looking through the
5 list, and not all feedbacks would have something documented or
6 investigative notes based on what the feedback is, so I -- I
7 can't say for sure if I actually exported all of them.  I know
8 that the two of us started going through the list, but she did
9 compile the majority of it.
10 Q   Did you ex -- did you export any personnel files from
11 onboard -- or OnBase, I'm sorry?
12 A   For this specific request?
13 Q   For JFK -- the 32 to 36 disciplines responsive to
14 paragraph 16 for JFK8.
15 A   I don't remember.
16 Q   Okay.  So do you know if Ms. Stone exported the personnel
17 files from OnBase responsive to paragraph 16?
18 A   Yes.
19 Q   Have you ever -- have you ever exported a personnel file
20 from OnBase in your years of employment?
21 A   Yes, and that's why I can't remember if I did for this
22 specific request just based on the number of requests that come
23 in, but yes, I have.
24 Q   And how long does it take to export a personnel file from
25 OnBase?

Page 184

1 A   I'm sorry.  If you could just give me one second there is
2 a -- all right, sorry about that.
3    MS. COX:  That's okay.  I'll withdraw the question.  I
4 don't have anything else, Judge.
5    JUDGE GREEN:  Okay.  Anything from Mr. Kearl?
6    MR. KEARL:  Yes, Your Honor.
7       CROSS-EXAMINATION
8 Q   BY MR. KEARL:  Mr. Grabowski, do the -- the three systems
9 we've been talking about, the OnBase, Adapt, and Exact systems,
10 do those have data for all seasonal and full-time employees at
11 Amazon?
12 A   Yes.
13 Q   So if I were a -- it wouldn't matter if I was a seasonal
14 employee at Amazon or a full-time employee, any performance
15 documents, feedbacks, investigatory documents would all be
16 captured by those three systems?
17 A   Yes.
18 Q   Is there an appeals process for disciplinary documents at
19 Amazon?
20 A   For certain levels of feedback, yes.
21 Q   And in the event that there is a -- an appeal and a
22 writeup is subsequently removed or changed, how is that
23 reflected in the Adapt system?
24 A   The status would be changed from completed to exempted.
25 Q   And when you ran your reports for these processes, did you

Page 185

1 include -- did you limit your search by completed or exempted
2 in any way?
3 A   I believe it was the first time I ran it was completed,
4 and then I believe the next time I ran it was all inclusive.
5 Q   Okay.  And was that a part of the instructions that you
6 were given initially in running these searches?
7 A   Yes.
8 Q   Okay.  And so just -- just to be clear, so the first time
9 you ran this report and -- and you were get -- there were
10 13,000 results, that was a -- that was a completed-only
11 process; is that correct?
12 A   I don't know how many rows the Excel file had.
13 Q   But the first -- the first time you ran the search was
14 the -- was the only completed and nonexempted?
15 A   Yes.
16 Q   And then the second time you ran the search that was both
17 completed and exempted, what other -- what other changes were
18 there that you made to the search -- the -- the broad terms of
19 the search parameters?
20 A   So the first time the file was pulled, it was all feedback
21 for the JFK location, and then the Excel file was filtered for
22 completed prior to the sending to the team.  The team then
23 asked to broaden the search to not just completed for all
24 feedback, so the raw feedback for JFK every level status was
25 exported and sent.

Page 186

1 Q   Okay.  So -- so -- okay.  And do you remember the -- the
2 approximate dates of these two searches or the amount of time
3 that -- between the two searches that you ran?
4 A   I honestly don't remember.
5 Q   You don't remember.  Okay.  And is there any way to delete
6 disciplinary records such that it would not show up as exempted
7 but would remove the file altogether?
8 A   No.
9 Q   Okay.  And so I -- I -- my understanding is in the Adapt
10 system the feedback that is -- that is recorded are these
11 documents similar to the document that Ms. Cox showed earlier,
12 the -- the supportive feedback document.  Can you tell me a
13 little bit about the kinds of documents that are housed in the
14 Exact and OnBase systems?
15 A   Yeah.  So Exact is for investigative tracking.  So you
16 have the ability to tie employees directly to a case that's
17 created of all levels:  hourly, salary, any type of employee,
18 and note their involvement in the case, whether they're the one
19 that made the allegation or a witness or the person that the
20 claim is against, as then -- as well as any details, and then
21 if there are witness statements collected from parties during
22 the investigation, they would be uploaded to the case, and then
23 with an outcome or the type of feedback, whether it was
24 substantiated or not substantiated, what was delivered or like,
25 what -- what the company would be proceeding with would be

Page 187

1 documented in the Exact case, along with all investigative
2 notes before closing it out.
3     And then in the OnBase system --
4 Q   Before -- before you start OnBase, if you -- if I may
5 interject.  So when you export data from Exact, are you
6 filtering by case number or by employee number or are you able
7 to do both?
8 A   You can search for whichever you prefer.
9 Q   And are you able to similarly limit the search by dates
10 and facilities as you are when it -- within Adapt?
11 A   You might be able to.  I'm not sure.  The only way that
12 I've ever filtered it is by looking for a specific employee by
13 searching their employee ID.
14 Q   Okay.  And in the course of your searches related to the
15 subpoena in question, were you given specific cases to search
16 for or were you given specific employee numbers to search for?
17 A   So it would be the Excel file that was sent back with 30-
18 so-odd names on it with a specific employee, and then as you
19 saw in the Excel file, when you scroll over, it has the details
20 of the incident, so we'd be looking for the specific employee
21 and the situation that was being outlined in the Excel sheet.
22 So if there's a date that the feedback was delivered, we're
23 looking for the investigation that happened that led to that
24 feedback.
25 Q   Okay.  And when you run that search -- so hypothetically,

Page 188

1 if there is an employee that is on that list of 36, if they
2 were involved in a disciplinary action and there was another
3 employee who submitted a witness statement, would that witness
4 statement have been captured in the search that you ran in the
5 Exact system?
6 A   Yes, so if it was pertaining to the same Exact case, which
7 it'd be a case is what would lead to a certain level of
8 feedback or disciplinary action.  So if we're referring to the
9 list that we search for and the outcome was X feedback,
10 anything in that investigation, statements from different
11 employees that led to that situation, would be captured in the
12 same Exact case number, which could also be located by
13 searching any employee that was involved or tied to the case.
14 Q   Okay, so searching for a single employee on a case will --
15 will generate results for all other information related to that
16 same case in Exact?
17 A   If you go into the case number.  So for example, I search
18 my employee ID in the Exact system.  What it's going to do is
19 then come up with a list of Exact case numbers, have a -- like,
20 a column that has case numbers, a column that has the
21 involvement in it, whether it's claimant or witness, and then
22 it has the date the case was created and the status of it, if
23 it's open, closed, and if you click that case, then it will
24 pull up all of the information you're looking for with witness
25 statements, details, outcomes, substantiated, not

Page 189

1  substantiated, and who else was involved.
2  **Q   So when you ran this report, you searched for the name**
3  **of -- or the number of the work -- the employee.  You found the**
4  **date that corresponded with that case number.  You opened that**
5  **case number, and then you exported all of the documents that**
6  **were asa -- that were associated with that case number for the**
7  **32 or 36 cases?**
8  A   So that is the process that Christina followed, yes.
9  **Q   Okay, and what -- what format of outputs was generated by**
10 **Exact from that system?**
11 A   That I'm not sure.
12 **Q   Do you know what kinds of output are able to be exported?**
13 A   Yes.
14 **Q   What kinds of -- what kinds of files are able to be**
15 **exported from that process?**
16 A   So you can export witness statements or you can export a
17 case summary.
18 **Q   Okay.  And -- and -- and are you also able to export an**
19 **Excel document that has all the information, similar to the**
20 **Adapt's reports that you ran in Excel?**
21 A   I don't believe so.
22 **Q   Okay.**
23 A   So the witness statements would export in PDFs and so
24 would the case summary.
25 **Q   And do you have to -- so what -- how long would it take**

Page 190

1  **you to export documents for a single case?**
2  A   It can vary based on employee -- I mean, depends how many
3  cases the employee has to go in and locate it then export it.
4  **Q   Well, but just a single -- so if -- if we were to look up**
5  **your employee ID, let's say there's five cases, we select one**
6  **case, and we export all the documents related to that, how long**
7  **does that process take, roughly?**
8  A   Five, ten minutes.
9  **Q   Okay.  And the -- so let's now shift over to OnBase.  Can**
10 **you tell me a little bit about the kind of documents that are**
11 **housed in the OnBase system?**
12 A   So it's any type of employee personnel documents.  A lot
13 of the most basic stuff ties to when employees are first
14 onboarded.  So you have their terms of employment.  You have
15 policy acknowledgement forms, anything that they had to
16 electronically or digitally sign upon being hired, and then if
17 there's policy updates or different documents that are pushed
18 to them through their employment, they'll have access to what's
19 called their MYDOCS portal, which is essentially their version
20 of OnBase in their employee portal.  They can see all the
21 documents they've acknowledged or signed in their tenure.  If
22 there is a termination letter, it would be in there.  And then
23 this site also has the opportunity to upload documentation
24 pertaining to that employee.  So prior to Amazon creating the
25 Exact system because, as I mentioned earlier, like in my Amazon

Page 191

1  tenure, we didn't -- we haven't always had Exact, so it did
2  come, I would say, probably in the last two years.  Prior to
3  that, witness statements and investigative notes would be
4  uploaded to OnBase.
5  **Q   Were there any -- in your searches related to this**
6  **subpoena, did you perform any searches in the OnBase system?**
7  A   That's where Christina Stone would've looked.
8  **Q   Okay.  And -- and in terms of exporting documents from**
9  **that, is it similar to Exact where you can export the PDF**
10 **documents, but not an Excel document?**
11 A   That is correct.
12 **Q   And how long would it take you to export a single**
13 **employee's records from the OnBase system?**
14 A   I would say similar to Exact, five to ten minutes.  It --
15 it can be longer depending on different factors:  how many
16 times the employee's worked for Amazon, how long the employee's
17 worked for Amazon.  So if an employee gets rehired, they
18 maintain the same employee ID, so if someone gets rehired,
19 you're now looking at duplicate terms of employment,
20 termination summary, acknowledgement of every policy, so the
21 larger the file, the more time it takes to export it.
22 **Q   Okay.  But is it fair to say that the five-to-ten-minute**
23 **range is roughly how long it would take per -- per record?**
24 **Okay.**
25 A   Yes.

Page 192

1  **Q   And -- and remind me, did you say that you -- you did not**
2  **recall the dates that you -- you and your team member performed**
3  **the searches in Exact and OnBase?**
4  A   I would say that it was in within the last month, but I
5  don't remember the specific dates.
6  **Q   Okay.  And you received specific instructions to search**
7  **those databases as well?**
8  A   I don't remember.
9  **Q   Okay.  And just who did -- who -- did you ultimately make**
10 **the decision to -- to identify the relevant database systems**
11 **within Amazon or was that someone else that decided that Adapt,**
12 **OnBase, and Exact were the three?**
13 A   I don't remember.
14 **Q   Okay.  You -- but it might have been you, but it might've**
15 **been somebody else?**
16 A   Yeah, so if, like, I'm looking at in my Amazon knowledge
17 what is relevant and like, where information will be housed
18 relevant to those, like, those are the one -- the three systems
19 that come to mind, but I cannot recall if someone were to --
20 had given me that guidance.
21     MR. KEARL:  Okay.  Okay.  And then, ju -- just one last
22 question.  I -- I ju -- know Judge we spoke about the duplicate
23 information.
24 **Q   BY MR. KEARL:  Are -- it -- you know, in terms of**
25 **exporting documents, have you seen duplicative results being**

Page 193

1  spit out of Adapt while running these searches and exporting
2  them in Excel?
3  A   No.
4      MR. KEARL:  Okay.  And Judge, if I -- if I may also just
5  say that you stated earlier that it was no longer a relevant
6  matter, but as of today, I still have not received any delivery
7  of documents from my last subpoena, which is identical to the
8  subpoena that was served on the 30th of March.  This was served
9  on the 13th.  There was your order on the 15th instructing
10  Respondents to deliver materials that were also responsive to
11  General Counsel's subpoena dated March 1st, and so the -- to --
12  to the extent there still is a petition to revoke that has
13  not been ruled on and to the extent that my client and --
14  and -- you know, his attorney have not actually seen any di --
15  discovery documents, the -- the duplicative nature of -- or
16  the -- the -- the duplicative results and the assertation that
17  the volume of information is so great that information cannot
18  be produced is still -- is still relevant, especially where
19  it -- as concerns the subpoena that -- that I had -- I had
20  served.
21      JUDGE GREEN:  Okay.  So if we have enough time today,
22  we're going to get to that -- that matter, the issue of the
23  Charging Party's outstanding subpoena, so put a pin in that.
24  I -- I still don't think that the duplicates are going to be
25  significant with regard to that petition to revoke, but anyway,

Page 194

1  let -- let's -- let's move on.  So is that your -- is that --
2  are you done, Mr. -- Mr. Kearl?
3      MR. KEARL:  That is the extent of my questions, Your
4  Honor.  Thank you.
5      JUDGE GREEN:  Anything from the Respondent?
6          CROSS-EXAMINATION
7  Q   BY MS. WILLIAMS:  Our thank you for hanging -- hanging
8  through this.  Wanted to make sure I understood a couple of
9  things from you.  So did you pull any personnel files for this
10  matter?
11  A   A Excel file for the three sites, yes, and then for
12  individual employees, I remember I began going through the list
13  with Christina, but I don't remember exactly who pulled what.
14  Q   So you may have pulled some of them, you just didn't pull
15  all of them?
16  A   Yes.  I know for a fact that Christina pulled the majority
17  of them, based on the time of the day the request came in.  She
18  worked on it on a Saturday to finish it off and get me the rest
19  of the documents.
20  Q   And about how long does it take you to -- to download a
21  personnel file?
22  A   Five, ten minutes.
23  Q   And did you pull anything from the Exact system that we
24  talked about earlier?
25  A   Pertaining to this, no.  I think all of the Exact ones

Page 195

1  came from Christina.  I don't think that they're -- I don't
2  recall finding an Exact or having an Exact case for the ones
3  that I searched.
4  Q   Did you, though, search to see if there was anything
5  either in Adapt or Exact to see if there was anything for those
6  individuals?
7  A   Yes.
8  Q   And how long does it typically take to search in Exact to
9  see if there is something for an individual or not?
10  A   I would say searching for it probably similar, like five,
11  ten minutes to go in and then find the information that
12  you're -- you're looking for, and then more time if we're
13  looking to export it, get it to PDF.
14  Q   And I know earlier there was some discussion about whether
15  the status had changed on a discipline.  Did you get counsel
16  everything that showed both statuses in the system?
17  A   Yes.
18  Q   Did you duplicate any information, as far as you were
19  aware, when you pulled information from the Adapt system?
20  A   No.
21  Q   Could there be duplicative information in the Adapt system
22  if, for example, more than one person is receiving discipline
23  for the same incident?
24      MS. COX:  Objection, Your Honor.  Calls for speculation.
25      JUDGE GREEN:  Overruled.

Page 196

1  A   So there could be duplicative information, but it would --
2  not all of the lines would be duplicate because it would be a
3  different employee receiving the feedback.
4  Q   BY MS. WILLIAMS:  So other than the employee, you might
5  have the same description for a disciplinary record?
6      MS. COX:  Objection --
7  A   Yes.
8      MS. COX:  -- Your Honor.  If I'm -- Ju -- Judge,
9  respectfully, if I'm not allowed to put in any evidence of the
10  number of duplicates, I'm -- I just object to Respondent
11  explaining away the duplicates.
12      JUDGE GREEN:  I -- I can tell you I'm -- I'm completely
13  unimpressed by the duplicates as evidence of a problem with
14  regard to compliance with the subpoena.
15      MS. WILLIAMS:  We'll -- we'll -- we'll move on, Your
16  Honor.  Your Honor, if I may have just a brief three minutes to
17  confer with my colleagues, and then I think we'll -- we'll wrap
18  it up.
19      JUDGE GREEN:  Okay, so off the record.
20  (Off the record at 2:48 p.m.)
21      JUDGE GREEN:  Any more questions from the Respondent?
22      MS. WILLIAMS:  No, Your Honor, not at this time.
23      JUDGE GREEN:  Okay.  And any follow up from the General
24  Counsel?
25      MS. COX:  No, Judge.

Page 229

1 those documents for the -- for the trial.
2   But I think that that -- I think that that type of
3 protective order is probably appropriate here.  You know, with
4 regard to 9 through 14, you know -- you know, it's -- it's a
5 broad discovery standard.  And you know, the -- the -- the
6 bottom line is, is that in -- in all -- I mean, I'm -- I'm
7 going to think about it, actually, before I issue the order.
8   But it's hard to say that these documents are not -- are
9 not relevant, although I don't think documents regarding
10 transfers and promotions are relevant.  But the documents are
11 probably relevant within -- you know, within the framework of
12 our standard as it pertains to subpoenaed records.
13   And so I don't know -- you know, I don't really think that
14 I'm in a position to deny that on the grounds of -- of rele --
15 relevance.  I -- I am loathed to effectively have a trial
16 regarding two additional employees.  But you know, with regard
17 to the petition to revoke, that's probably -- comes within
18 the -- within the gamut of -- of relevance, those documents.
19   You know, and I understand that the Respondent has,
20 essentially, made yet -- you know, yet another request for a
21 postponement.  But I'm -- I'm not -- I'm not going to grant
22 that request on the basis of the request for information
23 related to Mr. Smalls and Mr. Palmer.
24   That's where we're at.  I'm going to issue an order, and
25 I'm going to try to issue an order tomorrow.  And I -- you

Page 230

1 know, I would just suggest to you that to the extent you want
2 to do anything on the motion to postpone, try -- you know, if
3 there's a special appeal, try to do it as soon as possible.
4   MR. MURPHY:  And Judge, so assuming you're going to do
5 what you said you're going to do, and -- we proceed on the 3rd,
6 what -- how -- what -- what is your expectation in terms of us
7 producing any documents that -- that -- that might be covered
8 by the subpoena?  And don't forget, the counsel for the General
9 Counsel has -- has a -- I think a 99 paragraph, and some
10 paragraph request, in the queue right behind this.
11   JUDGE GREEN:  So -- okay.  You know, I can address that a
12 little bit.  The petition to revoke, and -- and a request for
13 sanctions for nonproduction are two completely different
14 things.  So we have a broad standard of discovery.  And it's
15 hard -- it's hard to establish the documents are -- are overly
16 broad and burdensome for purposes of subpoena revocation.
17   That doesn't necessarily mean that if the Respondent
18 doesn't show up with the documents that the General Counsel, or
19 subpoenaed -- subpoenaing party is necessarily entitled to some
20 form of sanctions.  You know, there are other factors.  There
21 are -- there's willfulness.  There's whether the search has
22 been reasonable or unreasonable, whether it's in good faith or
23 bad faith, whether there's prejudice.
24   And you know, the -- the General Counsel should be mindful
25 that.  It's not like -- you know, it's not as though if -- if

Page 231

1 the Respondent shows up, and not every document has been
2 produced, that there's necessarily going to be inferences, that
3 there's going to be Bannon-Mills remedies.
4   That's not at all necessarily the case.  We're going to
5 have to deal with that as it moves forward.  And that's
6 something that the General Counsel should consider in
7 determine -- in their determination as to whether they want to
8 go forward.
9   You know, I'm not -- all I can tell you is I haven't --
10 you know, I haven't granted any Bannon-Mills remedies.  And you
11 know, that's something that's -- that's a different issue
12 than -- than the -- the revocation issue, and we'll deal with
13 that as the time comes.  Is there anything else we have to do
14 on the record today?
15   MS. BUFFALANO:  We have one off the record item, but
16 nothing more, nothing more for on the record.
17   MS. COX:  Nothing from the General Counsel.
18   JUDGE GREEN:  All right.  So let's go off the record.
19 (Whereupon, the hearing in the above-entitled matter was
20 recessed at 4:47 p.m. until Monday, May 3, 2021 at 10:00 a.m.)
21
22
23
24
25

Page 232

1       C E R T I F I C A T I O N
2   This is to certify that the attached proceedings, via Zoom
3 videoconference, before the National Labor Relations Board
4 (NLRB), Region 29, Case Number 29-CA-261755, Amazon.com
5 Services LLC and Gerald Bryson, held at the National Labor
6 Relations Board, Region 29, Two Metro Tech Center, 5th Floor,
7 Brooklyn, New York 11201, on April 26, 2021, at 11:04 a.m. was
8 held according to the record, and that this is the original,
9 complete, and true and accurate transcript that has been
10 compared to the reporting or recording, accomplished at the
11 hearing, that the exhibit files have been checked for
12 completeness and no exhibits received in evidence or in the
13 rejected exhibit files are missing.
14
15
16
17
_____
BARRINGTON MOXIE
18
Official Reporter
19
20
21
22
23
24
25

Page 269

1 JUDGE GREEN: Okay. So I -- I -- I've looked at the
2 papers, and -- and as far as I can tell, the -- the remain --
3 the remaining requests are -- are relevant, you know, I -- I --
4 I have a question about paragraphs 1 and 2; 19, 22, 23, 24, and
5 27 appear to me to be relevant and subject to production; 15
6 and 16 seem to be relevant and subject to production, given the
7 document that was attached to the General Counsel's opposition
8 as Exhibit C.
9 For paragraph 17, however, I -- I'm limiting it to docu --
10 at least in -- initially to documents for JFK 8, as opposed to
11 the other two facilities. I think we've learned during the
12 course of this process that the number of documents available
13 at one of these very large facilities is -- is numerous, and
14 you know, disciplinary reports, for example, I have one
15 facility is -- appears to be sufficient for the General
16 Counsel's purposes. I -- I was always skeptical of the --
17 the -- the relevance and usefulness of -- of disciplinary
18 records at the other two facilities. I granted it because of
19 the Board's very broad standard of relevance, and reluctance to
20 squash documents because they -- they are burdensome, but at
21 least for the time being, I -- I'm limiting 17 to JFK 8.
22 With regard to 1 and 2, you know, I -- I just -- I guess I
23 just -- I have a question for the General Counsel, you know.
24 MS. COX: Can you go back one moment, Judge? So you
25 said --

Page 270

1 JUDGE GREEN: Yes.
2 MS. COX: -- 17 is limited to JFK 8; what about 18?
3 JUDGE GREEN: Oh.
4 MS. COX: Did you say both? I didn't -- I didn't hear.
5 JUDGE GREEN: No, I'm not -- J -- JFK 18, that's been
6 produced, right? That -- the cat's out of the bag on that one.
7 So no, I'm not -- we're only -- wait, am I right? What -- what
8 is 18? I'm sorry. Let me look.
9 MS. COX: 18 is the global workplace incident management
10 reports regarding referencing harassment by any employee at
11 JFK.
12 JUDGE GREEN: Yes, I'm sorry. So yes, so 17 and 18 are
13 currently limited. You're right, are currently limited to
14 JFK 8.
15 MS. COX: Okay.
16 JUDGE GREEN: 1 and 2, I -- you know, I'm just trying to
17 understand. When you're trying to -- in these cases, when
18 you're looking at the investigation and who conducted it and
19 who made decisions to, you're often looking at whether there
20 was a rush to judgment, whether you have, you know, no
21 investigation, and somebody who generally doesn't have
22 authority to discipline or discharge. They -- they -- they
23 rush to discharge somebody because there's this knee jerk
24 reaction, negative reaction to protect a concerted activity.
25 It -- you know, the -- the names in the global work --

Page 271

1 workplace incident management reporting template, if I'm
2 correct, those are -- those are just people who received
3 noticed, were -- were designated as people who would see --
4 received notice of what was going on with regard to the
5 discharge. It seems like a lot of people, and I -- I just -- I
6 wondered where the -- where the Region's going with it.
7 MS. COX: Well, Judge, to date, we still don't know who
8 made the decision to terminate Mr. Bryson, and these
9 individuals appear to have been -- participated, consulted, or
10 involved in his discharge.
11 JUDGE GREEN: Okay.
12 MS. COX: And for those reasons --
13 JUDGE GREEN: All right, so listen. I'm going to order
14 the production of 1 and 2 as well.
15 MR. MURPHY: But -- Your Honor?
16 JUDGE GREEN: Yes.
17 MR. MURPHY: If -- I mean, if we need to identify these
18 individuals, we'll do -- if you're ordering us to do that,
19 we'll do it. I suggest that a lot of them are identified on
20 that exhibit to the counsel for the General Counsel's
21 opposition to the petition to revoke.
22 JUDGE GREEN: Well, I mean, it -- it -- I think that
23 the -- the subpoena, as it pertains to those individuals, which
24 is 1 and -- it's really 1 and 2, because 3 and 4 have been
25 withdrawn, and 6 and 7 have already been produced --

Page 272

1 MR. MURPHY: Okay.
2 JUDGE GREEN: -- so it's really 1 and 2.
3 MR. MURPHY: Okay.
4 JUDGE GREEN: And what they're looking for is additional
5 information regarding job duties and the -- the jurisdiction of
6 these individuals with regard to the facility.
7 So I don't know. I -- you know, so --
8 MR. MURPHY: So -- so we'll -- we'll --
9 JUDGE GREEN: And -- I don't know if there is -- if they -- if
10 the General Counsel already has that information; it doesn't
11 sound like they do.
12 MR. MURPHY: Yeah, so you know, we'll -- we'll identify
13 their positions. It's just that -- that the way the request is
14 worded, right, documents that show job duties,
15 responsibilities, I mean, so take for example, Bradley Campbell
16 (phonetic). Documents that show his responsibility or
17 authority, that -- that may be another, like, massive search
18 for anything in --
19 JUDGE GREEN: I understand. So do you have job
20 descriptions? Do you just have a -- do you have a general job
21 description for -- for --
22 MR. MURPHY: To -- to be quite honest, Your Honor, I don't
23 know the answer to that question.
24 JUDGE GREEN: Okay.
25 MR. MURPHY: We'll find that out and report, but -- but