GC Exhibit 119

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 29

AMAZON.COM SERVICES LLC

    **And**                                       **Case No.  29-CA-261755**

GERALD BRYSON, AN INDIVIDUAL


**COUNSEL FOR THE ACTNG GENERAL COUNSEL'S REPLY TO
RESPONDENT'S OPPOSITION TO MOTION FOR *BANNON MILLS* SANCTIONS**


       Counsel for the Acting General Counsel (General Counsel or CAGC) files the instant

reply to Amazon.com Services LLC's (Respondent) opposition to CAGC's Motion for *Bannon*

*Mills* Sanctions (Opposition).


**I.     INTRODUCTION**

       Respondent's Opposition to CAGC's Motion for *Bannon Mills* Sanctions uses the tactic

of personal attacks, hyperbole, exaggeration to try to deflect attention from the plain facts that

establish Respondent's bad faith and defiance of a valid subpoena and the Judge's Orders that

Respondent produce documents.  Respondent makes specious and unsubstantiated claims

regarding the number the of records they collected, how many hours they spent on conducting a

search, and how many pages they produced in response to CAGC's subpoenas, but none of

Respondent's bluster shows that Respondent produced documents in good faith.  Respondent's

rhetoric serves to distract from its conduct in responding to CAGC's subpoena *duces tecum* B-1-

1BUGMIX  which issued on March 1, 2021, including that Respondent's refusal to comply with

the Administrative Law Judge's (ALJ) Orders on several occasions, and its misrepresentations

GC Exhibit 119

about its search and production.

## II.  RESPONDENT'S CONTINUED WITHOLDING OF DOCUMENTS AND MISREPRESNTATIONS WARRANT *BANNON MILLS* SANCTIONS

### a.  Respondent is Still Withholding Documents Long After Your Honor Ordered Respondent to Remove Certain Redactions

On May 20, 2021, ALJ Green ordered Respondent to remove most redactions from certain documents that Judge Green had deemed relevant and producible.  *See* General Counsel Hearing Exhibit 112.  Respondent failed to comply with the order.  In addition, on May 24, 2021, Respondent counsel represented that it would be taking a special appeal to the ALJ's Order "either tonight or tomorrow morning."  Tr. Vol. 1; 1669-1670.  To date, not only has Respondent failed to file a special appeal but Respondent also continues to withhold the documents that the Judge ordered produced unredacted.  Respondent seems to believe that it is exempt from rules, Orders and keeping its word.  Respondent's conduct throughout this proceeding has been the antithesis of good faith. Instead, its tactic has been to withhold documents, decide for itself what it felt like producing and what it felt like hiding, to cause delay in the proceeding and to interfere in CAGC's prosecution of its case.

Respondent's refusal to produce the documents as ordered warrants an adverse inference that Respondent harbored animus toward Charging Party Gerald Bryson's protected activity, the documents would reveal an unlawful scheme to discharge Bryson and that Respondent's defense is pretext.  *See Chromalloy Mining and Materials*, 238 NLRB 688, 691, 696 (1978) (drawing adverse inference because respondent refused to produce the withheld document even after the ALJ reviewed it in camera and concluded that the claimed privilege did not apply), enfd in part

GC Exhibit 119

without reaching issue 620 F.2d 1120, 1128 n. 5 (5th Cir. 1980).

### b. Respondent Failed to Produce Documents Ordered Produced by Your Honor and Refused to Produce Those Documents for *In Camera* Inspection

On May 24, 2021, Respondent filed a Combined Petition to Revoke Counsel for the General Counsel's Subpoena Ad Testificandum A-1-1CLMM85 and Motion for Reconsideration of Certain Orders Regarding Subpoenas Duces Tecum (Motion for Reconsideration). *See* Exhibit A.   Contrary to its representation by email dated May 12, 2021[1] that its document production was "complete" for paragraph 19, in its Motion for Reconsideration, Respondent represented that there was a set of unproduced documents, including Chimes, that it was withholding based on its own assessment that those documents were not relevant to the *Burnup & Simms* analysis.  *See* page 10, fn. 3 of Motion for Reconsideration.  Respondent further specified that it would only produce these documents absent an *in-camera* review.  *See id.*   ALJ Green ordered that that these documents be produced in redacted form.  *See* Tr. Vol. 1; 1761-1762; *see also* Tr. Vol. 1; 1766-1767.

By email dated May 25, 2021, putting itself in the place of the ALJ, Respondent claimed that the documents were not "responsive in any way to the question of whether Amazon held an honest, good faith-belief that Mr. Bryson engaged in serious misconduct."  *See* Exhibit B.  ALJ Green made clear to Respondent his determination that the documents were subject to production.  *See* Tr. Vol. 13; 1777.  To date, Respondent has failed to produce the documents referenced in footnote 3 of the Motion for Reconsideration as ordered, and has also not filed a special appeal related to those documents.  Respondent's refusal to produce the documents as

---

[1] *See e.g.*, Exhibit 9 attached to Counsel for the Acting General Counsel's Motion for *Bannon Mills* Sanctions.

ordered warrants an adverse inference that Respondent harbored animus toward Bryson's protected activity, the documents would reveal an unlawful scheme to discharge Bryson and that Respondent's defense is pretext.  *See Pioneer Hotel & Gambling Hall*, 324 NLRB 918, 920, 927 (1999) (drawing adverse inference in part because respondent refused to permit in-camera inspection of the withheld documents), enfd. in relevant part 182 F.3d 939 (D.C. Cir. 1999); *see also*, *NLRB v. United Aircraft Corporation,* 200 F.Supp. 48, 51 (D. Conn. 1961) (It is usually the information that a respondent seeks to withhold that forms the basis for scrutiny when illegal practices are in question).

c. **Respondent Failed to Make a Good Faith Effort to Gather Documents Responsive to Paragraph 17**

In determining whether sanctions are appropriate, the judge must consider several factors, including those factors that tend to establish whether or not Respondent acted in good faith in adherence to the Board's subpoena process.  *See People's Transportation Service*, 276 NLRB 169, 225, 1985); *see e.g.*, *Sonicraft, Inc.*, 295 NLRB 766 (1989) (Counsel's representations are binding on the client).

i. *Respondent's Failure to Identify and Make Available Lynn Foley Jefferson as a Custodian of Records*

At pages 16-18 of its Opposition, Respondent claims that Morgan Lewis Paralegal Lynn Foley Jefferson was tasked with pulling disciplinary records responsive to Paragraph 17 from OnBase (Respondent's system that maintains personnel files).

Respondent's claims are nothing more than another attempt to conceal its prior misrepresentation that it extracted disciplines from personnel files.  Prior to filing its Opposition,

GC Exhibit 119

Respondent never identified Morgan Lewis Paralegal Ms. Foley as a custodian of records. Respondent made Tyler Grabowski available and specifically identified Mr. Grabowski as the custodian of records for paragraphs 16 and 17 of the Subpoena.  Tr. Vol. 3; 97.   Based on Respondent's representations, CAGC called Mr. Grabowski to give testimony regarding the search and collection of documents responsive to paragraphs 16 and 17.  Mr. Grabowski testified about his knowledge of Respondent's ADAPT and OnBase systems as a current employee.  Mr. Grabowski unambiguously testified that disciplines are *not* maintained in OnBase.  Thus, any claim Respondent is now attempting to make regarding disciplines being maintained in the OnBase system is false.  Grabowski's hearing testimony should be credited over Ms. Foley's declaration.

In addition to its false representation that disciplines are extracted from personnel files, Respondent's failure to identify and make available Ms. Foley prior to the filing of CAGC's Motion for *Bannon Mills* Sanctions establishes that it failed to adhere to the Board's subpoena processes in good faith.

### ii.    *Respondent Repeatedly Misrepresented that it Produced Personnel Files*

At pages 13-14 of Respondent's Opposition, Respondent attempts to explain away its blatant failure to produce 32 personnel files requested by CAGC by pointing out that paragraph 16 of the subpoena does not use the word "complete" to describe the personnel files while paragraph 9 of the subpoena uses the word "complete."

Respondent's argument is just an another one of its ruses.  Contrary to Respondent's misrepresentation in footnote 13 of its Opposition, General Counsel's Hearing Exhibits 11, 15-24, 26-29 and 36 do not represent personnel files; those files are disciplinary files.  *Compare*

GC Exhibit 119

General Counsel's Hearing Exhibits, *with* Exhibit C personnel file(s) for Bryson and Evans. Respondent continues to misrepresent the types of files that it produced to CAGC and ignores that it failed to produce 32 personnel files that were requested.  Respondent produced ADAPT disciplinary files and continues to falsely call those files "personnel files" to substantiate its false claim that it complied with the subpoena.

III.     **RESPONDENT'S CLAIM THAT GENERAL COUNSEL FAILED TO PRODUCE DOCUMENTS**

At pages 9-10 of Respondent's Opposition, Respondent claims that CAGC failed to produce the Facebook live video which was "long in CAGC's possession."  The Respondent essentially claims that it has a right to discovery in Board proceedings.  The Respondent is blatantly wrong.

It is well established that pretrial discovery is not available in Board proceedings. *See Lyman Printing & Finishing Co.*, 183 NLRB 1048, 1053 (1970), *enforced* 437 F.2d 1356 (4th Cir. 1971); *Kenrich Petrochems, Inc. v. NLRB*, 893 F.2d 1468, 1484 (3d Cir. 1990) ("[Neither the [C]onstitution nor the Administrative Procedure Act confer[s] a right to discovery in federal administrative proceedings"), *vacated in part on other grounds*, 907 F.2d 400 (3d Cir. 1990) (en banc).  Other than *Jencks* material, CAGC has no obligation to produce any documents to Respondent.  The Facebook live video does not constitute *Jencks* material. *See Leisure Knoll Assn.*, 327 NLRB 470 n. 1 (1999) (tape recordings and transcripts of conversations between a supervisor and an employee is "not a description of a past event" subject to Section 102.118(e) of the Board's Rules).

Furthermore, Respondent speculates the length of time that CAGC possessed the

Facebook live video.  Respondent has absolutely no basis to make any competent claims regarding the length of time that the CAGC possessed the video. Therefore, Respondent's assertion regarding the Facebook live video is a red herring used to distract from its bad faith.

### IV.   <u>CONCLUSION</u>

Based on the foregoing, CAGC respectfully renews its request for the Specific Relief Requested in its Motion for *Bannon Mills* Sanctions dated May 17, 2021.

Dated:  June 3, 2021

/s/ Evamaria Cox_____
Evamaria Cox
Counsel for the Acting General Counsel
National Labor Relations Board
Region 29
Two MetroTech Center, 5/Fl.
Brooklyn, New York 11201



**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 29**

| | | |
|---|---|---|
| AMAZON.COM SERVICES LLC | ) | |
| | ) | |
| | ) | |
| and | ) | Case 29-CA-261755 |
| | ) | |
| GERALD BRYSON, and Individual. | ) | |

**RESPONDENT'S COMBINED PETITION TO REVOKE COUNSEL FOR THE**
**ACTING GENERAL COUNSEL'S SUBPOENA AD TESTIFICANDUM A-1-1CLMM85**
**AND MOTION FOR RECONSIDERATION OF CERTAIN ORDERS REGARDING**
**SUBPOENAS DUCES TECUM**

Pursuant to Section 11(1) of the National Labor Relations Act and Section 102.31(b) of

the Rules and Regulations of the National Labor Relations Board ("NLRB" or "Board"),

Amazon.com Services LLC ("Respondent," "Amazon," or the "Company"), through its

undersigned counsel, petitions to revoke subpoena ad testificandum (A-1-1CLMM85) served

by Counsel for the Acting General Counsel of the Board ("CAGC") upon counsel for Amazon

("CAGC's Third Subpoena") on Monday, May 17, 2021. A copy of the subpoena is attached as

Exhibit 1.

In addition, pursuant to Section 102.25 of the Board's Rules and Regulations, Amazon

seeks reconsideration of certain portions of Administrative Law Judge Benjamin Green's

("Judge Green's") March 24, 2021 written order denying Amazon's petition to revoke the

CAGC's subpoena duces tecum (A-1-1BUGMIX) (Exhibit 2); the April 27, 2021 written order

denying Amazon's petition to revoke the Charging Party's subpoena duces tecum (B-1-

1C9GVF7) (Exhibit 3); and the May 1, 2021 verbal order[1] denying Amazon's petition to

---

[1] Transcript, Volume 4, at 269.  (Relevant portions of the trial transcript are attached as Exhibit 4.)

GC Exhibit 119

revoke the CAGC's second subpoena tecum (B-1-1CBQM1N) to the extent that the documents

sought therein are relevant to a determination of (1) whether Mr. Bryson was engaged in

protected concerted activity at the time of his misconduct on April 6, 2020; (2) whether the

Respondent knew that Bryson was engaged in protected concerted activities at the time of his

misconduct on April 6, 2020; and/or (3) Respondent's motivation for terminating Mr. Bryson,

including whether Respondent harbored animus toward Bryson's protected concerted activities.

## **INTRODUCTION**

At the outset of this hearing, the parties disputed the precise nature of Gerald Bryson's

actions on March 25, March 30 and April 6, 2020, and specifically, the precise nature of Mr.

Bryson's actions and statements during an April 6 altercation with a female coworker and whether

the altercation occurred in the course of protected concerted activity. The issues in this case have

narrowed significantly since then due, in significant part, to the introduction into evidence of a

Facebook Live video recorded by CAGC witness Mandi Velasco ("the Velasco video") and other

video evidence showing the April 6, 2020 altercation in its near entirety and in all material ways.

*See* R. Exh. 122.  Further, given that the weight of evidence shows that Mr. Bryson was engaged

in protected concerted activities on March 25, March 30 and at the time of the altercation on April

6, 2020, Amazon filed a Motion for Leave to File a Third Amended Answer on Saturday, May 22,

2021, in which Amazon concedes Mr. Bryson engaged in protected concerted activity on those

dates.

The Respondent's concession in this regard and the revelation that Mr. Bryson was

engaged in protected concerted activity at the time of his altercation with Ms. Evans, confirms

Judge Green's conclusions, stated repeatedly in off-the-record discussions during the hearing and,



GC Exhibit 119

most recently, in his May 19, 2021 Order on CAGC's Motion to Consolidate Cases for Hearing,[2]

that the *only* legal standard applicable in this case – or any case in which an employer discharges

an employee because of misconduct occurring during the course of protected activity – is the

standard enunciated in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964). *Wright Line*, 251 N.L.R.B.

1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981), "is inapplicable to cases — like this one —

in which the employer has discharged the employee because of alleged misconduct in the course

of protected activity. S*hamrock Foods Co.*, 337 N.L.R.B. No. 138, at 1 ; *see Cadbury

Beverages*, 160 F.3d at 29 n. 4 (rejecting the applicability of *Wright Line* to such cases); *E.W.

Grobbel Sons*, 322 N.L.R.B. 304, 304-05 , (1996) (same), *enforcement denied on other grounds*,

6th Cir. 1998)." *Shamrock Foods Co v. NLRB.*, 346 F.3d 1130, 1136 (D.C. Cir. 2003). In a

*Burnup & Sims* case, the employer's "motive is not at issue," and the only question is whether the

misconduct actually occurred. *Shamrock Foods Co.*, 337 NLRB 915, 915 (2002), enfd. 346 F.3d

1130 (D.C. Cir. 2003); *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 29 (D.C. Cir. 1998)

(holding that ''*Burnup & Sims* explicitly obviates the need to inquire into intent'').

As a result of these developments, testimony and documents related to whether Mr.

Bryson was engaged in protected activity at the time of his misconduct on April 6, 2020, whether

Respondent knew that he was engaged in those activities, and Respondent's motivation for

terminating Mr. Bryson, including whether Respondent harbored animus toward him or those

activities, are entirely irrelevant to this case and have no utility in determining whether the CAGC

can carry its burden to prove that Respondent violated Section 8(a)(1) of the National Labor

Relations Act, 29 U.S.C. §158(a)(1), by terminating Mr. Bryson on April 17, 2020.

---

[2] *See* Administrative Law Judge's Order on Counsel for the Acting General Counsel's Motion to Consolidate Cases for Hearing, at 2, 4 (May 19, 2021) ("Order Denying Motion to Consolidate").



It is now undisputed that Mr. Bryson engaged in protected concerted activity at the time of his misconduct on April 6, 2020 and that Amazon knew of Mr. Bryson's activity.  The only remaining question is whether the CAGC can prove that Mr. Bryson did not, in fact, engage in misconduct during the altercation, as alleged by Respondent.

As a result, much of the testimony and evidence in the record currently is irrelevant to a determination in this case and the CAGC's Third Subpoena seeks to adduce additional irrelevant testimony.  Similarly, numerous subpoena requests for documents, enforced when the scope of this case was less well defined, have been rendered irrelevant, unnecessary, and moot by subsequent evidence as described herein, and those subpoena requests should be quashed for the same reason.

For these reasons, Respondent Petitions to revoke the CAGC's Third Subpoena and Moves for reconsideration of ALJ Green's orders enforcing various subpoena paragraphs seeking documents related to issues that have been rendered irrelevant, unnecessary, and moot by the development of the record in this case.

## I.   PETITION TO REVOKE THE CAGC'S THIRD SUBPOENA

The subpoena subject to Petition to Revoke was received via email by counsel for Amazon on Monday, May 17, 2021. By their Third Subpoena, the CAGC seeks to compel the testimony of Amazon Human Resources Manager, Christine Hernandez, who held that position at Amazon's JFK8 Fulfillment Center during the time period relevant to this case.

Section 102.31(b) of the Board's Rules and Regulations requires an Administrative Law Judge ("ALJ") to revoke a subpoena where "the evidence whose production is required does not relate to any matter under investigation or in question in the proceedings."  29 C.F.R. § 102.31(b).  A subpoena must be "for a legitimate purpose" and



GC Exhibit 119

"the inquiry in question must be reasonably related to the purpose." *NLRB v. U.S. Postal Serv.*, 790 F. Supp. 31, 34 (D.D.C. 1992); *see also Drukker Commc'ns, Inc. v. NLRB*, 700 F.2d 727, 730 (D.C. Cir. 1983) ("[T]he statute explicitly permits the quashing of subpoenas … for irrelevance."); *NP Red Rock, LLC*, 28-CA-244484, 2020 WL 7075063 (unpub. Or. Dec. 2, 2020) (affirming ALJ's order revoking General Counsel's subpoenas ad testificandum issued to respondent's two corporate executives where the executives' testimony was not needed to establish a prima facie case and its relevance and probative value to rebutting the employer's defenses was speculative).  In addition, the Board will revoke subpoenas that seek "cumulative or duplicative" information.  *See McDonalds USA, LLC*, 363 NLRB No. 144, slip op. at 2 fn. 2 (2016); *Brinks, Inc.*, 281 NLRB 468, 469 (1986) (citing Federal Rules of Civil Procedure 45(b) and 26(b)).

The information sought by the CAGC's Third Subpoena – testimony from Ms. Hernandez – is not relevant to any matter in question in this proceeding or would serve only to duplicate prior testimony.  Although the CAGC has not explained why the government subpoenaed Ms. Hernandez to testify at this proceeding, at best her testimony would relate either to Tyler Grabowski's investigation (as she was his supervisor during the relevant time period), whether Charging Party Gerald Bryson was engaged in protected concerted activity on March 25, March 30 and at the time of his misconduct on April 6, 2020, and/or Respondent's motivation for terminating the Charging Party and whether Respondent harbored animus toward him or his protected activities.

Regarding Respondent's investigation, Mr. Grabowski, not Ms. Hernandez, conducted the investigation, as Mr. Grabowski ably explained during his detailed testimony on Monday, May 17, 2021.  Exhibit 4, at 148-196.  Any testimony Ms. Hernandez could



provide on this point would be cumulative and duplicative of evidence that is already in the record – including Mr. Grabowski's own testimony.

More importantly, now though, any inquiry into whether Mr. Bryson was engaged in protected activities at the time of his misconduct and whether Respondent was aware of those activities has been rendered moot by Respondent's Motion for Leave to Amend its Second Amended Answer to the Complaint. Any testimony on these issues, therefore, would be irrelevant and would extend an already unnecessarily lengthy trial.

Testimony related to Amazon's motivation for terminating Mr. Bryson, including whether Amazon harbored animus toward his protected activities is similarly irrelevant to the *Burnup & Sims* analysis, the legal analysis applicable in this case. Further, because the Charging Party's misconduct during the April 6 altercation can be analyzed solely on the basis of the Velasco video (R. Exh. 122) and other video evidence in this case, there is no need any fact witness testimony – let alone additional testimony from Ms. Hernandez – related to Respondent's motivation or potential animus toward Mr. Bryson's protected activities.

To the extent that the CAGC intends to adduce evidence of Ms. Hernandez's recollection of the events on April 6, 2020, that evidence is also irrelevant to any issue before Judge Green.  The best evidence of Mr. Bryson's misconduct is the Velasco video, together with other video evidence.  Ms. Hernandez has no first-hand knowledge regarding what happened out in the parking lot on April 6 and there is nothing in the record that suggests she witnessed it.  Nor is there any evidence that she was a decision-maker whose good faith belief matters as to the reasons for Charging Party's termination. As a result, Ms. Hernandez' belief as to what occurred is unnecessary to decide the issues in this case. There



GC Exhibit 119

is, simply, no reason for Ms. Hernandez to be compelled to testify, or for the CAGC to be permitted to subpoena additional witnesses to testify, about matters that are not relevant to the resolution of this case.  It is time to end this single discharge hearing that is unnecessarily continuing into its fourth week.

Ms. Hernandez simply has nothing to add to a record already filled with irrelevant testimony and evidence and Amazon respectfully requests the CAGC's Third Subpoena be revoked in its entirety.

## II.   MOTION FOR RECONSIDERATION OF CERTAIN ORDERS REGARDING SUBPOENAS

For identical reasons, Amazon requests that ALJ Green reconsider his prior rulings on CAGC Subpoena B-1-1BUGMIX Paragraph 19, Charging Party Subpoena  B-1-1C9GVF Paragraphs 19(b) and (c), and CAGC Subpoena B-1-1CBQM1N Paragraph 27 to the extent that those subpoenas sought and Respondent was required to produce documents and information relevant to (i) Mr. Bryson's protected activities, including at the time that he engaged in misconduct on April 6, 2020, (ii) whether Respondent knew of those activities, (iii) Respondent's motivation for Mr. Bryson's termination and (iv) other individuals not named in the Amended Complaint.

All documents produced in response to numerous enforced subpoena requests have been rendered unnecessary and/or irrelevant by the development of the record, particularly the Velasco video and Amazon's concession that Bryson's April 6 altercation with a coworker occurred in the course of otherwise protected concerted activity.

### A.      Identification of Irrelevant and Unnecessary Subpoena Paragraphs

Amazon requests reconsideration of the following subpoena requests and orders:



GC Exhibit 119

CAGC Subpoena B-1-1BUGMIX

19.  For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussion with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:

(a) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings.

(b) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;

(c) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns;

and

(d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.

The ALJ denied Amazon's Petition to Revoke the above subpoena requests by written order dated March 24, 2021.  (Order on Trial Dates and the Respondent's Petition to Partially Revoke Counsel for the Acting General Counsel's Subpoena Duces Tecum, at 5-6 (Mar. 24, 2021) ("March 24 Subpoena Order").)  Specifically, the ALJ ruled that documents responsive to this subpoena request were relevant because they related to "any protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any of that conduct." *Id.* at 6.



Charging Party Subpoena B-1-1C9GVF7

    19.  For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing, or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers, Human Resources Business Partners, or agents on behalf of employees regarding COVID-19 safety precautions including:

        b.  Internal communications including but not limited to electronic communications, emails, Chime messages or calls, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding media coverage of Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson protesting; [and]

        c.  Internal communications including but not limited to electronic communications, Chime messages or calls, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson participating in protests outside Respondent's JFK8 Facility regarding COVID-19 safety concerns.

    The ALJ denied Amazon's Petition to Revoke the above subpoena requests by written order dated April 27, 2021.  (Order on the Respondent's Petition to Revoke Charging Party's Subpoena Duces Tecum B-1-1C9GVF7 and Request for a Protective Order, at 1-2 (Apr. 27, 2021) ("April 27 Subpoena Order").)  The ALJ found subpoena paragraphs 19(b) and (c) were relevant because they sought evidence concerning Amazon's treatment of other employees who were involved in protected concerted activities with Bryson.  *Id.* at 2.  In doing so, the ALJ noted he "share[d] the concern of Respondent's counsel that the scope of this litigation might expand to involve 'mini-trials' (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint," but given the Board's "broad discovery-type standard of relevance" for subpoena requests, the ALJ declined to revoke paragraphs 19(b) and (c) "at this time."  *Id.*



GC Exhibit 119

CAGC Subpoena B-1-1CBQM1N

27. (a) Documents in effect during the period of April 17, 2020 through May 31, 2020 reflecting and/or mentioning Respondent's policies regarding employees' option to appeal disciplinary actions taken against them by Respondent, including written warnings, suspensions and discharges.

(b) Documents in effect during the period of April 17, 2020 through May 31, 2020 reflecting and/or mentioning the process by which employees may request to appeal disciplinary actions taken against them by Respondent, including written warnings, suspensions and discharges.

The ALJ orally denied Amazon's Petition to Revoke the above subpoena requests on the record on May 1, 2021. Exhibit 4, at 269. These documents relate to animus and not to any other issue before Judge Green.

**B.     Argument**[3]

First, ALJ Green should revisit his previous ruling and grant Respondent's Petition to Revoke CAGC Subpoena B-1-1BUGMIX paragraph 19 because the basis for the ALJ's prior denial of Amazon's Petition to Revoke – that paragraph 19 sought relevant evidence regarding "protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any of that conduct" – no longer exists, in light of the video evidence in the record and Amazon's

---

[3]  Amazon has largely completed its production of documents responsive to all three subpoenas. Amazon currently is only aware of a small set of unproduced documents, none of which bear on any of the relevant *Burnup & Sims* issues. Some of those documents are Chime threads that contain a mix of responsive and non-responsive information.  Amazon is prepared to produce those Chimes, but redacted to reveal only that information that responds to a specific request – as it did previously.  If the CAGC and Charging Party are willing to accept such a production without an *in camera* review, Amazon will produce the small amount of remaining *responsive* information (under Judge Green's prior relevance determination) it has collected even though now irrelevant.  That will render this Motion for Reconsideration moot as there will be nothing else to produce.  If, however, the CAGC and Charging Party seek to pry into what are non-responsive, privileged or private electronic conversations, Amazon seeks the revocation of any and all subpoena requests that seek information regarding whether the Charging Party engaged in PCA on April 6 (conceded) and animus (irrelevant), as identified above.



Third Amended Answer, which concedes these allegations.  (Draft Third Amended Answer, para. 5(c).)

Second, ALJ Green should revisit his ruling on Respondent's Petition to Revoke Charging Party Subpoena B-1-1C9GVF7 paragraphs 19(b) and (c) and CAGC Subpoena B-1-1CBQM1N paragraph 27 and revoke those paragraphs in their entireties because they all seek evidence limited to potential animus by Respondent against Charging Party as a result of his protected activities.  Evidence related to employer motivation, including whether the employer harbored animus toward an individual's protected activities, is irrelevant under a *Burnup & Sims* analysis. *See Shamrock Foods Co.*, 337 NLRB at 915 (finding that in a *Burnup & Sims* case "motive is not at issue"); *Cadbury Beverages*, 160 F.3d at 29 (same).  In fact, as ALJ Green noted in denying the CAGC's Motion to Consolidate this case with NLRB Case 19-CA-266977, a case involving the discharge of two entirely separate employees in Seattle, evidence regarding Amazon's treatment of other employees – even to the extent it could theoretically establish anti-union animus – is immaterial to the issues in this case.  *See* Consolidation Order, at 4.[4]

---

[4] Moreover, the CAGC's recent unsuccessful effort to consolidate this case with NLRB Case 19-CA-266977 reveals the real purpose of these subpoena requests was not to obtain information relevant to litigating the narrow issues in this case, but rather to inject unrelated issues and claims involving other employees into this litigation. The ALJ previously expressed concerns regarding the scope of the subpoena requests involving employees other than Mr. Bryson, *see* April 27 Subpoena Order, at 2 (expressing concern that "the scope of this litigation might expand to involve 'mini-trials' (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint"); Exhibit 4, at 229 (addressing subpoena requests for information regarding Christian Smalls and Derrick Palmer and stating "I am loathe to effectively have a trial regarding two additional employees"), but at the time denied Respondent's petitions to revoke based on the Board's broad relevance standard for subpoenas.  However, the current record in this case and CAGC's failed attempt to consolidate this case with NLRB Case 19-CA-266977 confirms Judge Green's concerns about the expansion of this matter were well-founded, and provides additional support for revoking the subpoena requests relating to other employees' alleged protected concerted activities.



## **CONCLUSION**

For the foregoing reasons, Amazon respectfully requests that CAGC Subpoena A-1-1CLMM85; CAGC Subpoena B-1-1BUGMIX; Charging Party Subpoena B-1-1C9GVF7; and CAGC Subpoena B-1-1CBQM1N be revoked as set forth above.


Date: May 24, 2021                          Respectfully submitted,

                                            */s/ Christopher J. Murphy*
                                            Christopher J. Murphy
                                            Morgan, Lewis & Bockius LLP
                                            1701 Market Street
                                            Philadelphia, PA 19103-2921
                                            Phone: +1.215.963.5601
                                            Fax: +1.215.963.5001
                                            christopher.murphy@morganlewis.com

                                            Nicole Buffalano
                                            Morgan, Lewis & Bockius LLP
                                            300 South Grand Avenue, Twenty Second Floor
                                            Los Angeles, CA 90071-3132
                                            Phone: +1.213.612.7443
                                            Fax: +1.213.612.2500
                                            nicole.buffalano@morganlewis.com

                                            *Attorneys for Respondent*
                                            *Amazon.com Services LLC*



GC Exhibit 119

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a copy of Respondent Amazon's Combined Petition to

Revoke Counsel for the Acting General Counsel's Subpoena Ad Testificandum A-1-

1CLMM85 and Motion for Reconsideration of Certain Orders Regarding Subpoenas Duces

Tecum was served on May 24, 2021 via electronic mail upon the following:

Evamaria Cox
Counsel for the Acting General Counsel
National Labor Relations Board, Region 29
Two Metro Tech Center, Suite 5100
Brooklyn, NY 11201
Evamaria.Cox@nlrb.gov

Frank Kearl
Charging Party's Legal Representative
Make the Road New York
161 Port Richmond Ave.
Staten Island, NY 10302
frank.kearl@maketheroadny.org

Date: May 24, 2021                    */s/ Kelcey J. Phillips*
Kelcey J. Phillips
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: +1.202.739.5455
Fax: +1.202.739.3001
kelcey.phillips@morganlewis.com

*Attorney for Respondent*
*Amazon.com Services LLC*



GC Exhibit 19

| From: | Buffalano, Nicole |
|---|---|
| To: | Reibstein, Nancy K.; CHRISTOPHER.MURPHY@MORGANLEWIS.COM; Cox, Evamaria; Kelcey Phillips; Green, Benjamin |
| Cc: | Lipin, Nancy; Jackson, Matthew; Frank Kearl |
| Subject: | RE: GC Response to Respondent Motion for Leave to Amend Answer in 29-CA-261755 (Amazon.com Services LLC) |
| Date: | Tuesday, May 25, 2021 12:20:10 PM |

Dear Counsel,

We have carefully reviewed the additional documents that have not yet been produced.  None are responsive in any way to the question of whether Amazon held an honest, good-faith belief that Mr. Bryson engaged in serious misconduct during the incident on April 6, 2020.  We also reviewed for any documents that mention, pertain to, or reference Mr. Bryson at all and have confirmed that those are duplicates.  With that review, Respondent's production is now complete.

If this does not satisfy the Counsel for the Acting General Counsel, we intend to take a special appeal to the ALJ's ruling yesterday.

Respectfully,

**Nicole Buffalano**
**Morgan, Lewis & Bockius LLP**
300 South Grand Avenue, Twenty-Second Floor | Los Angeles, CA 90071-3132
Direct: +1.213.612.7443 | Main: +1.213.612.2500 | Fax: +1.213.612.2501 | Mobile: +1.240.350.8208
nicole.buffalano@morganlewis.com | www.morganlewis.com
Assistant: Lois J. Han | +1.213.612.7407 | lois.han@morganlewis.com

COVID-19 Resources and Updates


Acknowledged by associate on November 14, 2018, 8:50:39 AM - Delivered by Yoffe,Kaylee (kayleey)

# Supportive Feedback Document
# Unpaid Personal Time - Notice





**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** November 14, 2018, 8:50:39 AM

## Summary

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. This is just a friendly reminder: if your UPT balance is depleted past zero and you have no paid personal time available or other approved leave options, as described in the attendance policy, termination of employment will occur. So, please make sure you track your UPT balance and manage your time. If you have questions or need help, just ask!

## Communication History

The following is a summary of your unpaid personal time feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|

## Details of Current Incident/Specific Concerns

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. Your next 20-hour allotment of UPT will be deposited into your UPT bank on: **January 01, 2019**, Current UPT Balance is **9**, As of: **November 14, 2018**

## Associate Comments

**Associate Signature:** Acknowledged by BRYSON,GERALD (BadgeID: 11534134)          **Date:** November 14, 2018, 8:50:39 AM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)          **Date:** November 14, 2018, 8:50:39 AM

GC Exhibit 119

Acknowledged by associate on November 28, 2018, 1:01:32 PM - Delivered by Yoffe,Kaylee (kayleey)



## Supportive Feedback Document
## Quality Trend - Documented Coaching



**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** November 28, 2018, 1:01:32 PM

### Summary

Your recent job performance is not meeting Quality expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

### Communication History

The following is a summary of your quality feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Coaching | 1 | November 14, 2018, 5:00:00 AM |

### Details of Current Incident/Specific Concerns        * Expected DPMO is per error family and not per error type

You have not met Quality expectations 2 out of the last 6 weeks. See the Trend section below for further details.

| Error Family | Error Type | Errors Discovered | Units Processed | Expected DPMO* | Minimum Units | Is Excluded |
|---|---|---|---|---|---|---|
| ICQA | Inaccurate Count | 22 | 2825 | 6000 | 1000 | No |

### Error Listing       * Up to 20 most recent errors shown

| Date | Error Family | Error Type | Details |
|---|---|---|---|
| November 24, 2018, 1:42:37 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-B989S255<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 29.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-B989S255<br>**Expected Quantity**: 28.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 24, 2018, 10:38:47 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B979Y453<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B979Y453<br>**Expected Quantity**: 4.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 24, 2018, 9:42:43 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B463R735<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 19.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B463R735<br>**Expected Quantity**: 20.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 23, 2018, 5:25:45 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B139W139<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 3.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B139W139<br>**Expected Quantity**: 2.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 23, 2018, 12:54:23 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-C755H945<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 15.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-C755H945<br>**Expected Quantity**: 10.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |

GC Exhibit 119

| | | | |
|---|---|---|---|
| November 23, 2018, 12:53:31 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-C364H396<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 15.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-C364H396<br>**Expected Quantity**: 10.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 23, 2018, 12:51:01 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-C307J183<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-C307J183<br>**Expected Quantity**: 10.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 23, 2018, 12:50:45 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-C307J181<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 6.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-C307J181<br>**Expected Quantity**: 12.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 23, 2018, 11:34:00 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-B370X228<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 7.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-B370X228<br>**Expected Quantity**: 15.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 21, 2018, 5:31:00 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-C141A053<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 9.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-C141A053<br>**Expected Quantity**: 7.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 21, 2018, 5:09:25 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-B116Y886<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 17.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-B116Y886<br>**Expected Quantity**: 18.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 21, 2018, 3:42:05 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-B619X755<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-B619X755<br>**Expected Quantity**: 6.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 21, 2018, 3:24:47 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-B664S768<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 9.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-B664S768<br>**Expected Quantity**: 10.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 21, 2018, 2:24:37 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-8-B453Y834<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 9.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-8-B453Y834<br>**Expected Quantity**: 16.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 21, 2018, 2:23:13 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B359Z525<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 0.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B359Z525<br>**Expected Quantity**: 1.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| | | | **Inaccurate**: 1.0<br>**Location Id**: P-6-C728B773 |

AMZ-BRY000010



GC Exhibit 119

| November 21, 2018, 1:47:38 PM | ICQA | Inaccurate Count | **Work Type**: Simple Bin Count<br>**Counted Quantity**: 6.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-C728B773<br>**Expected Quantity**: 7.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
|---|---|---|---|
| November 21, 2018, 1:47:03 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-B285Y217<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 9.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-B285Y217<br>**Expected Quantity**: 10.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 21, 2018, 11:32:08 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-8-B232F059<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 4.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-8-B232F059<br>**Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 21, 2018, 11:22:29 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B329X357<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 1.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B329X357<br>**Expected Quantity**: 2.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| November 21, 2018, 11:00:14 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B640W545<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 9.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B640W545<br>**Expected Quantity**: 12.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |

## Performance Trend

Below is a summary of your past Quality performance.

| Period Start | Unit Processed | Errors Discovered | DPMO | Performance % | Exempted |
|---|---|---|---|---|---|
| November 21, 2018 | 2825 | 22 | 7787.61 | -29.8 | No |
| November 14, 2018 | 3040 | 24 | 7894.73 | -31.58 | Yes |
| November 07, 2018 | 2937 | 41 | 13959.82 | -132.67 | No |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the quality performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your quality performance, and will assist you in addressing any job related barriers that are impacting your ability to meet quality expectations.

## Associate Comments

**Associate Signature:** Acknowledged by BRYSON,GERALD (BadgeID: 11534134)     **Date:** November 28, 2018, 1:01:32 PM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)     **Date:** November 28, 2018, 1:01:32 PM

GC Exhibit 119

Acknowledged by associate on December 06, 2018, 1:54:54 PM - Delivered by Yoffe,Kaylee (kayleey)

# Supportive Feedback Document
# Unpaid Personal Time - Notice





**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** December 06, 2018, 1:54:54 PM

## Summary

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. This is just a friendly reminder: if your UPT balance is depleted past zero and you have no paid personal time available or other approved leave options, as described in the attendance policy, termination of employment will occur. So, please make sure you track your UPT balance and manage your time. If you have questions or need help, just ask!

## Communication History

The following is a summary of your unpaid personal time feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|
| Notice | 1 | November 12, 2018, 12:00:00 AM |

## Details of Current Incident/Specific Concerns

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. Your next 20-hour allotment of UPT will be deposited into your UPT bank on: **January 01, 2019**, Current UPT Balance is **9**, As of: **December 04, 2018**

## Associate Comments

|  |
|--|
|  |

**Associate Signature:** Acknowledged by BRYSON,GERALD (BadgeID: 11534134)          **Date:** December 06, 2018, 1:54:54 PM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)          **Date:** December 06, 2018, 1:54:54 PM

AMZ-BRY000012

GC Exhibit 119

Acknowledged by associate on December 06, 2018, 1:56:20 PM - Delivered by Yoffe,Kaylee (kayleey)



# Supportive Feedback Document
# Productivity - First Written



**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** December 06, 2018, 1:56:20 PM

## Summary

Your recent job performance is not meeting Productivity expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 1 | November 21, 2018 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| IC-QA-CS | SBC - Other SimpleBinCount Total EACH | Level 3 | 15.01 | 4432 | 295.35 | 478 | 61.79 | 68.65 | N |
| IC-QA-CS | SBC - Other SimpleBinCount Total EACH | Level 4 | 26.37 | 7689 | 291.59 | 478 | 61 | 61 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| November 28, 2018, 5:00:00 AM | 12121 | 41 | 293 | 61.29 | 63.78 | N |
| November 21, 2018, 5:00:00 AM | 19996 | 42 | 482 | 100.79 | 115.88 | N |
| November 14, 2018, 5:00:00 AM | 6270 | 15 | 409 | 85.47 | 100.55 | N |
| November 07, 2018, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |
| October 31, 2018, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the productivity performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your productivity performance, and will assist you in addressing any job related barriers that are impacting your ability to meet productivity performance expectations.

## Associate Comments

**Associate Signature:** Acknowledged by BRYSON,GERALD (BadgeID: 11534134)          **Date:** December 06, 2018, 1:56:20 PM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)          **Date:** December 06, 2018, 1:56:20 PM

GC Exhibit 119

Refused to sign by associate on December 13, 2018, 9:18:20 AM - Delivered by Yoffe,Kaylee (kayleey)



# Supportive Feedback Document
# Productivity - Second Written



**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** December 13, 2018, 9:18:20 AM

## Summary

Your recent job performance is not meeting Productivity expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| First Written | 1 | December 05, 2018 |
| Verbal Positive | 1 | November 21, 2018 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| IC-QA-CS | SBC - Other SimpleBinCount Total EACH | Level 4 | 14.95 | 4075 | 272.65 | 478 | 57.04 | 57.04 | N |
| IC-QA-CS | SBC - Other SimpleBinCount Total EACH | Level 5 | 35.72 | 6381 | 178.63 | 478 | 37.37 | 37.37 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| December 05, 2018, 5:00:00 AM | 10456 | 51 | 206 | 43.17 | 43.17 | N |
| November 28, 2018, 5:00:00 AM | 12121 | 41 | 293 | 61.29 | 63.78 | N |
| November 21, 2018, 5:00:00 AM | 19996 | 42 | 482 | 100.79 | 115.88 | N |
| November 14, 2018, 5:00:00 AM | 6270 | 15 | 409 | 85.47 | 100.55 | N |
| November 07, 2018, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |
| October 31, 2018, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the productivity performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your productivity performance, and will assist you in addressing any job related barriers that are impacting your ability to meet productivity performance expectations.

## Associate Comments

|  |
|---|

**Associate Signature:** BRYSON,GERALD REFUSED TO SIGN                    **Date:** December 13, 2018, 9:18:20 AM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)                    **Date:** December 13, 2018, 9:18:20 AM

AMZ-BRY000014

GC Exhibit 119

Refused to sign by associate on December 20, 2018, 4:49:22 PM - Delivered by Yoffe,Kaylee (kayleey)



# Supportive Feedback Document
# Productivity - Final Written



**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** December 20, 2018, 4:49:22 PM

## Summary

Your recent job performance is not meeting Productivity expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| First Written | 1 | December 05, 2018 |
| Verbal Positive | 1 | November 21, 2018 |
| Second Written | 1 | December 12, 2018 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| IC-QA-CS | SBC - Other SimpleBinCount Total Bins | Level 5 | 28.89 | 3307 | 114.48 | 127 | 90.14 | 90.14 | N |
| IC-QA-CS | SBC - Other SimpleBinCount Total EACH | Level 5 | 24.07 | 8939 | 371.31 | 478 | 77.68 | 77.68 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| December 12, 2018, 5:00:00 AM | 12246 | 53 | 231 | 84.48 | 84.48 | N |
| December 05, 2018, 5:00:00 AM | 10456 | 51 | 206 | 43.17 | 43.17 | N |
| November 28, 2018, 5:00:00 AM | 12121 | 41 | 293 | 61.29 | 63.78 | N |
| November 21, 2018, 5:00:00 AM | 19996 | 42 | 482 | 100.79 | 115.88 | N |
| November 14, 2018, 5:00:00 AM | 6270 | 15 | 409 | 85.47 | 100.55 | N |
| November 07, 2018, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the productivity performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your productivity performance, and will assist you in addressing any job related barriers that are impacting your ability to meet productivity performance expectations.

## Associate Comments

**Associate Signature:** BRYSON,GERALD REFUSED TO SIGN                    **Date:** December 20, 2018, 4:49:22 PM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)                    **Date:** December 20, 2018, 4:49:22 PM

AMZ-BRY000015

GC Exhibit 119

AMZ-BRY000016

GC Exhibit 119

Refused to sign by associate on January 11, 2019, 10:35:27 AM - Delivered by Yoffe,Kaylee (kaileey)



# Supportive Feedback Document
# Quality - First Written



**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** January 11, 2019, 10:35:27 AM

## Summary

Your recent job performance is not meeting Quality expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your quality feedback:

| Level | Count | Most Recent |
|---|---|---|
| Documented Coaching | 1 | November 28, 2018, 5:00:00 AM |
| Verbal Coaching | 1 | November 14, 2018, 5:00:00 AM |

## Details of Current Incident/Specific Concerns      * Expected DPMO is per error family and not per error type

| Error Family | Error Type | Errors Discovered | Units Processed | Expected DPMO* | Minimum Units | Is Excluded |
|---|---|---|---|---|---|---|
| ICQA | Inaccurate Count | 34 | 4773 | 6000 | 1000 | No |

## Error Listing      * Up to 20 most recent errors shown

| Date | Error Family | Error Type | Details |
|---|---|---|---|
| January 05, 2019, 5:08:10 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-A054Z573<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 4.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-A054Z573<br>**Expected Quantity**: 3.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 4:49:44 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B273Z755<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 1.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B273Z755<br>**Expected Quantity**: 2.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 4:33:42 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-C192B810<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 3.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-C192B810<br>**Expected Quantity**: 4.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 4:18:26 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B070L645<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 9.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B070L645<br>**Expected Quantity**: 11.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 4:15:01 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-B601X048<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 3.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-B601X048<br>**Expected Quantity**: 4.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |

AMZ-BRY000017

GC Exhibit 119

| | | | |
|---|---|---|---|
| January 05, 2019, 4:00:14 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-B890Y331<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 11.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-B890Y331<br>**Expected Quantity**: 13.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 2:30:51 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B597M977<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 7.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B597M977<br>**Expected Quantity**: 8.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 2:20:58 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-A631Z152<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 3.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-A631Z152<br>**Expected Quantity**: 1.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 2:15:42 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-C929B537<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-C929B537<br>**Expected Quantity**: 7.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 11:18:15 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-8-C517F428<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 6.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-8-C517F428<br>**Expected Quantity**: 7.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 10:36:52 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B689H058<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 9.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B689H058<br>**Expected Quantity**: 10.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 10:31:13 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-B345Y152<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 1.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-B345Y152<br>**Expected Quantity**: 2.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 10:26:16 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-B291T079<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 6.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-B291T079<br>**Expected Quantity**: 12.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 05, 2019, 9:22:29 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-C702B538<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 29.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-C702B538<br>**Expected Quantity**: 30.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 04, 2019, 5:35:50 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-8-B636G603<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 2.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-8-B636G603<br>**Expected Quantity**: 3.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| | | | **Inaccurate**: 1.0<br>**Location Id**: P-5-B724Z021<br>**Work Type**: Simple Bin Count |

AMZ-BRY000018

GC Exhibit 119

| | | | |
|---|---|---|---|
| January 04, 2019, 5:33:29 PM | ICQA | Inaccurate Count | **Counted Quantity**: 7.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B724Z021<br>**Expected Quantity**: 8.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 04, 2019, 4:59:04 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-8-B459D270<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 9.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-8-B459D270<br>**Expected Quantity**: 8.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 04, 2019, 3:30:58 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B423V437<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 3.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B423V437<br>**Expected Quantity**: 4.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 04, 2019, 2:11:05 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-B825F586<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 1.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-B825F586<br>**Expected Quantity**: 9.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 04, 2019, 1:10:16 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-C343B776<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-C343B776<br>**Expected Quantity**: 7.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |

## Performance Trend

Below is a summary of your past Quality performance.

| Period Start | Unit Processed | Errors Discovered | DPMO | Performance % | Exempted |
|---|---|---|---|---|---|
| January 02, 2019 | 4773 | 34 | 7123.4 | -18.73 | No |
| December 26, 2018 | 4163 | 17 | 4083.59 | 31.94 | No |
| December 19, 2018 | 5051 | 17 | 3365.67 | 43.9 | No |
| December 12, 2018 | 5841 | 27 | 4622.49 | 22.95 | No |
| December 05, 2018 | 5287 | 5 | 945.71 | 84.23 | No |
| November 28, 2018 | 4144 | 10 | 2413.12 | 59.78 | No |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the quality performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your quality performance, and will assist you in addressing any job related barriers that are impacting your ability to meet quality expectations.

## Associate Comments

**Associate Signature:** BRYSON,GERALD REFUSED TO SIGN

**Date:** January 11, 2019, 10:35:27 AM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)

**Date:** January 11, 2019, 10:35:27 AM

AMZ-BRY000019

GC Exhibit 119

Refused to sign by associate on January 24, 2019, 12:54:45 PM - Delivered by Yoffe,Kaylee (kayleey)



# Supportive Feedback Document
# Quality - Second Written



**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** January 24, 2019, 12:54:45 PM

## Summary

Your recent job performance is not meeting Quality expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your quality feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Coaching | 1 | November 14, 2018, 5:00:00 AM |
| Verbal Positive | 1 | January 16, 2019, 5:00:00 AM |
| First Written | 1 | January 09, 2019, 5:00:00 AM |
| Documented Coaching | 1 | November 28, 2018, 5:00:00 AM |

## Details of Current Incident/Specific Concerns      * Expected DPMO is per error family and not per error type

| Error Family | Error Type | Errors Discovered | Units Processed | Expected DPMO* | Minimum Units | Is Excluded |
|---|---|---|---|---|---|---|
| ICQA | Inaccurate Count | 15 | 1896 | 6000 | 1000 | No |

## Error Listing      * Up to 20 most recent errors shown

| Date | Error Family | Error Type | Details |
|---|---|---|---|
| January 18, 2019, 5:10:16 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-C122A662<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-C122A662<br>**Expected Quantity**: 3.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 18, 2019, 5:05:16 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-8-C331H148<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 3.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-8-C331H148<br>**Expected Quantity**: 2.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 18, 2019, 5:01:42 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B524Q696<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 34.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B524Q696<br>**Expected Quantity**: 2.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 12:52:46 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-C826B962<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 3.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-C826B962<br>**Expected Quantity**: 2.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 11:59:01 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B217K751<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 65.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B217K751 |

GC Exhibit 119

| | | | |
|---|---|---|---|
| | | | **Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 11:53:22 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-C434B451<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-C434B451<br>**Expected Quantity**: 6.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 11:45:22 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B967Q145<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 2.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B967Q145<br>**Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 11:35:41 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B896S798<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 6.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B896S798<br>**Expected Quantity**: 7.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 11:17:59 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B904H451<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 4.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B904H451<br>**Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 10:36:35 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B264T585<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 6.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B264T585<br>**Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 10:32:16 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-C890G856<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-C890G856<br>**Expected Quantity**: 6.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 10:26:29 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-C578F883<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 7.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-C578F883<br>**Expected Quantity**: 8.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 10:22:33 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-8-B886R965<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 4.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-8-B886R965<br>**Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 9:29:46 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-B011F990<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 4.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-B011F990<br>**Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| January 17, 2019, 8:17:40 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-B247F703<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 4.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-B247F703<br>**Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |

AMZ-BRY000021



GC Exhibit 119

## Performance Trend

Below is a summary of your past Quality performance.

| Period Start | Unit Processed | Errors Discovered | DPMO | Performance % | Exempted |
|---|---|---|---|---|---|
| January 16, 2019 | 1896 | 15 | 7911.39 | -31.86 | No |
| January 09, 2019 | 2900 | 13 | 4482.75 | 25.28 | No |
| January 02, 2019 | 4773 | 34 | 7123.4 | -18.73 | No |
| December 26, 2018 | 4163 | 17 | 4083.59 | 31.94 | No |
| December 19, 2018 | 5051 | 17 | 3365.67 | 43.9 | No |
| December 12, 2018 | 5841 | 27 | 4622.49 | 22.95 | No |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the quality performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your quality performance, and will assist you in addressing any job related barriers that are impacting your ability to meet quality expectations.

## Associate Comments

**Associate Signature:** BRYSON,GERALD REFUSED TO SIGN                    **Date:** January 24, 2019, 12:54:45 PM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)                    **Date:** January 24, 2019, 12:54:45 PM

AMZ-BRY000022

GC Exhibit 119

Acknowledged by associate on January 31, 2019, 8:13:09 AM - Delivered by Yoffe,Kaylee (kaleey)



# Supportive Feedback Document
# Productivity - Documented Positive



**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** January 31, 2019, 8:13:09 AM

## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|
| First Written | 1 | December 05, 2018 |
| Final Written | 1 | December 19, 2018 |
| Second Written | 1 | December 12, 2018 |
| Verbal Positive | 2 | January 16, 2019 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---------|----------|----|-------|-------|-----|----------|-----------|------------|--------------|
| IC-QA-CS | SBC - Other SimpleBinCount Total Bins | Level 5 | 34.72 | 7993 | 230.18 | 127 | 181.25 | 181.25 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|--------------|-----------|--------------|-----|-----------|------------|----------|
| January 23, 2019, 5:00:00 AM | 7993 | 35 | 230 | 181.25 | 181.25 | N |
| January 16, 2019, 5:00:00 AM | 1896 | 11 | 170 | 133.85 | 133.85 | N |
| January 09, 2019, 5:00:00 AM | 2900 | 19 | 149 | 117.41 | 117.41 | N |
| January 02, 2019, 5:00:00 AM | 4773 | 37 | 130 | 102.73 | 102.73 | N |
| December 26, 2018, 5:00:00 AM | 4163 | 32 | 131 | 102.88 | 102.88 | N |
| December 19, 2018, 5:00:00 AM | 3960 | 32 | 125 | 98.38 | 98.38 | N |

## Associate Comments

**Associate Signature:** Acknowledged by BRYSON,GERALD (BadgeID: 11534134)          **Date:** January 31, 2019, 8:13:09 AM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)          **Date:** January 31, 2019, 8:13:09 AM

GC Exhibit 119

Acknowledged by associate on March 13, 2019, 10:34:06 AM - Delivered by Yoffe,Kaylee (kayleey)



# Supportive Feedback Document
# Unpaid Personal Time - Notice



**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** March 13, 2019, 10:34:06 AM

## Summary

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. This is just a friendly reminder: if your UPT balance is depleted past zero and you have no paid personal time available or other approved leave options, as described in the attendance policy, termination of employment will occur. So, please make sure you track your UPT balance and manage your time. If you have questions or need help, just ask!

## Communication History

The following is a summary of your unpaid personal time feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|
| Notice | 2 | December 02, 2018, 12:00:00 AM |

## Details of Current Incident/Specific Concerns

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. Your next 20-hour allotment of UPT will be deposited into your UPT bank on: **April 01, 2019**. Current UPT Balance is **7**, As of: **March 11, 2019**

## Associate Comments

[blank box]

**Associate Signature:** Acknowledged by BRYSON,GERALD (BadgeID: 11534134)          **Date:** March 13, 2019, 10:34:06 AM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)          **Date:** March 13, 2019, 10:34:06 AM

GC Exhibit 119

Acknowledged by associate on May 01, 2019, 3:21:23 PM - Delivered by Yoffe,Kaylee (kayleey)



# Supportive Feedback Document
# Unpaid Personal Time - Notice



**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** May 01, 2019, 3:21:23 PM

## Summary

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. This is just a friendly reminder: if your UPT balance is depleted past zero and you have no paid personal time available or other approved leave options, as described in the attendance policy, termination of employment will occur. So, please make sure you track your UPT balance and manage your time. If you have questions or need help, just ask!

## Communication History

The following is a summary of your unpaid personal time feedback:

| Level | Count | Most Recent |
|---|---|---|
| Notice | 3 | March 11, 2019, 12:00:00 AM |

## Details of Current Incident/Specific Concerns

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. Your next 20-hour allotment of UPT will be deposited into your UPT bank on: **July 01, 2019**, Current UPT Balance is **15**, As of: **May 01, 2019**

## Associate Comments

**Associate Signature:** Acknowledged by BRYSON,GERALD (BadgeID: 11534134)          **Date:** May 01, 2019, 3:21:23 PM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)          **Date:** May 01, 2019, 3:21:23 PM

GC Exhibit 119

Refused to sign by associate on May 09, 2019, 12:03:35 PM - Delivered by Yoffe,Kaylee (kayleey)



# Supportive Feedback Document
# Productivity - First Written

**Associate Name:** BRYSON,GERALD (gbbryso)
**Manager Name:** Yoffe,Kaylee (DB3-0715)
**Created On:** May 09, 2019, 12:03:35 PM



## Summary

Your recent job performance is not meeting Productivity expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Final Written | 1 | December 19, 2018 |
| First Written | 1 | December 05, 2018 |
| Verbal Positive | 10 | April 17, 2019 |
| Second Written | 1 | December 12, 2018 |
| Documented Positive | 1 | January 30, 2019 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| IC-QA-CS | SBC - Other SimpleBinCount Total Bins | Level 5 | 16.89 | 1910 | 113.03 | 130 | 86.95 | 86.95 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| May 01, 2019, 5:00:00 AM | 1910 | 17 | 113 | 86.95 | 86.95 | N |
| April 24, 2019, 5:00:00 AM | 452 | 5 | 83 | 63.92 | 63.92 | Y |
| April 17, 2019, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |
| April 10, 2019, 5:00:00 AM | 2663 | 19 | 141 | 108.7 | 108.7 | N |
| April 03, 2019, 5:00:00 AM | 1791 | 15 | 122 | 93.69 | 93.69 | Y |
| March 27, 2019, 5:00:00 AM | 2544 | 18 | 143 | 109.8 | 109.8 | N |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the productivity performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your productivity performance, and will assist you in addressing any job related barriers that are impacting your ability to meet productivity performance expectations.

## Associate Comments

**Associate Signature:** BRYSON,GERALD REFUSED TO SIGN                           **Date:** May 09, 2019, 12:03:35 PM

**Manager Signature:** Acknowledged by Yoffe,Kaylee (BadgeID: 11193537)          **Date:** May 09, 2019, 12:03:35 PM

GC Exhibit 119

AMZ-BRY000027

GC Exhibit 119

Acknowledged by associate on July 10, 2019, 1:25:48 PM - Delivered by Pryce,Bertram (prycb)



# Supportive Feedback Document
# Productivity - First Written



**Associate Name:** BRYSON,GERALD Joseph (gbbryso)
**Manager Name:** Pryce,Bertram (DB3-0715)
**Created On:** July 10, 2019, 1:25:48 PM

## Summary

Your recent job performance is not meeting Productivity expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 13 | May 29, 2019 |
| First Written | 2 | May 08, 2019 |
| Final Written | 1 | December 19, 2018 |
| Second Written | 1 | December 12, 2018 |
| Documented Positive | 1 | January 30, 2019 |
| Verbal Coaching | 1 | June 19, 2019 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| IC-QA-CS | SBC - Other SimpleBinCount Total Bins | Level 5 | 28.14 | 2378 | 84.48 | 130 | 64.99 | 64.99 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| July 03, 2019, 5:00:00 AM | 2378 | 28 | 84 | 64.99 | 64.99 | N |
| June 26, 2019, 5:00:00 AM | 560 | 7 | 77 | 59.6 | 59.6 | Y |
| June 19, 2019, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |
| June 12, 2019, 5:00:00 AM | 4163 | 34 | 122 | 93.74 | 93.74 | N |
| June 05, 2019, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |
| May 29, 2019, 5:00:00 AM | 871 | 7 | 120 | 92.25 | 92.25 | Y |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the productivity performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your productivity performance, and will assist you in addressing any job related barriers that are impacting your ability to meet productivity performance expectations.

## Associate Comments

**Associate Signature:** Acknowledged by BRYSON,GERALD Joseph (BadgeID: 11534134)     **Date:** July 10, 2019, 1:25:48 PM

GC Exhibit 119

**Manager Signature:** Acknowledged by Pryce,Bertram (BadgeID: 11741041)          **Date:** July 10, 2019, 1:25:48 PM

AMZ-BRY000029



Acknowledged by associate on July 10, 2019, 1:26:26 PM - Delivered by Pryce,Bertram (prycb)

# Supportive Feedback Document
# Quality Trend - Documented Coaching





**Associate Name:** BRYSON,GERALD Joseph (gbbryso)
**Manager Name:** Pryce,Bertram (DB3-0715)
**Created On:** July 10, 2019, 1:26:26 PM

## Summary

Your recent job performance is not meeting Quality expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your quality feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 14 | May 29, 2019, 5:00:00 AM |
| Documented Coaching | 1 | November 28, 2018, 5:00:00 AM |
| First Written | 1 | January 09, 2019, 5:00:00 AM |
| Second Written | 1 | January 23, 2019, 5:00:00 AM |
| Verbal Coaching | 3 | June 19, 2019, 5:00:00 AM |

## Details of Current Incident/Specific Concerns      * Expected DPMO is per error family and not per error type

You have not met Quality expectations 2 out of the last 6 weeks. See the Trend section below for further details.

| Error Family | Error Type | Errors Discovered | Units Processed | Expected DPMO* | Minimum Units | Is Excluded |
|---|---|---|---|---|---|---|
| ICQA | Inaccurate Count | 15 | 2378 | 3000 | 1000 | No |

## Error Listing      * Up to 20 most recent errors shown

| Date | Error Family | Error Type | Details |
|---|---|---|---|
| July 06, 2019, 4:32:26 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-C856B570<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-C856B570<br>**Expected Quantity**: 7.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 06, 2019, 4:26:25 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-B481G823<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 4.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-B481G823<br>**Expected Quantity**: 3.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 06, 2019, 4:25:24 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-9-B576E405<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 4.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-9-B576E405<br>**Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 06, 2019, 2:14:59 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-8-B482V184<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-8-B482V184<br>**Expected Quantity**: 6.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| | | | **Inaccurate**: 1.0<br>**Location Id**: P-6-B612Y303 |

AMZ-BRY000030

GC Exhibit 119

| | | | |
|---|---|---|---|
| July 06, 2019, 1:41:17 PM | ICQA | Inaccurate Count | **Work Type**: Simple Bin Count<br>**Counted Quantity**: 6.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B612Y303<br>**Expected Quantity**: 7.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 05, 2019, 4:44:07 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B678M900<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 3.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B678M900<br>**Expected Quantity**: 4.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 05, 2019, 3:55:11 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-8-B562V089<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 12.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-8-B562V089<br>**Expected Quantity**: 13.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 05, 2019, 3:28:39 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-C020A552<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 1.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-C020A552<br>**Expected Quantity**: 2.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 05, 2019, 11:41:19 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-C288B245<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 5.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-C288B245<br>**Expected Quantity**: 6.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 05, 2019, 9:30:47 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B169M189<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 4.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B169M189<br>**Expected Quantity**: 5.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 05, 2019, 9:15:20 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-C843H084<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 11.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-C843H084<br>**Expected Quantity**: 12.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 05, 2019, 7:58:50 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-6-B547G789<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 2.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-6-B547G789<br>**Expected Quantity**: 1.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 04, 2019, 4:54:10 PM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-7-B973Y301<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 2.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-7-B973Y301<br>**Expected Quantity**: 3.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 04, 2019, 10:20:47 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B942M410<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 6.0<br>**Application Name**: QualityIntelligenceCountDataPipeline<br>**Bin Id**: P-5-B942M410<br>**Expected Quantity**: 4.0<br>**Ignored**: 0.0<br>**Accurate**: 0.0 |
| July 04, 2019, 9:41:14 AM | ICQA | Inaccurate Count | **Inaccurate**: 1.0<br>**Location Id**: P-5-B768F532<br>**Work Type**: Simple Bin Count<br>**Counted Quantity**: 3.0<br>**Application Name**: QualityIntelligenceCountDataPipeline |


GC Exhibit 119

**Bin Id**: P-5-B768F532
**Expected Quantity**: 4.0
**Ignored**: 0.0
**Accurate**: 0.0

## Performance Trend

Below is a summary of your past Quality performance.

| Period Start | Unit Processed | Errors Discovered | DPMO | Performance % | Exempted |
|---|---|---|---|---|---|
| July 03, 2019 | 2378 | 15 | 6307.82 | -110.27 | No |
| June 26, 2019 | 0 | 0 | 0 | 0 | Yes |
| June 19, 2019 | 0 | 0 | 0 | 0 | Yes |
| June 12, 2019 | 4163 | 15 | 3603.17 | -20.11 | No |
| May 29, 2019 | 0 | 0 | 0 | 0 | Yes |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the quality performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your quality performance, and will assist you in addressing any job related barriers that are impacting your ability to meet quality expectations.

## Associate Comments

**Associate Signature:** Acknowledged by BRYSON,GERALD Joseph (BadgeID: 11534134)          **Date:** July 10, 2019, 1:26:26 PM

**Manager Signature:** Acknowledged by Pryce,Bertram (BadgeID: 11741041)          **Date:** July 10, 2019, 1:26:26 PM

GC Exhibit 119

Acknowledged by associate on November 27, 2019, 2:37:24 PM - Delivered by Pryce,Bertram (prycb)

# Supportive Feedback Document
# Unpaid Personal Time - Notice





**Associate Name:** BRYSON,GERALD Joseph (gbbryso)
**Manager Name:** Pryce,Bertram (DB3-0715)
**Created On:** November 27, 2019, 2:37:24 PM

## Summary

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. This is just a friendly reminder: if your UPT balance is depleted past zero and you have no paid personal time available or other approved leave options, as described in the attendance policy, termination of employment will occur. So, please make sure you track your UPT balance and manage your time. If you have questions or need help, just ask!

## Communication History

The following is a summary of your unpaid personal time feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|
| Notice | 3 | April 29, 2019, 12:00:00 AM |

## Details of Current Incident/Specific Concerns

We value you as a team member and appreciate the effort you give to ensure we are the Earth's most customer centric company! As an owner, we want you to be successful. You start your employment with a bank of Unpaid Personal Time (UPT), in addition to paid vacation and personal time. Your UPT bank is refreshed with an additional 20 hours each quarter (up to a maximum of 80 hours). This conversation is to make sure you know where you stand with your bank of UPT and the date your bank will be refreshed. Your next 20-hour allotment of UPT will be deposited into your UPT bank on: **January 01, 2020**, Current UPT Balance is **15**, As of: **November 25, 2019**

## Associate Comments

**Associate Signature:** Acknowledged by BRYSON,GERALD Joseph (BadgeID: 11534134)   **Date:** November 27, 2019, 2:37:24 PM

**Manager Signature:** Acknowledged by Pryce,Bertram (BadgeID: 11741041)   **Date:** November 27, 2019, 2:37:24 PM

AMZ-BRY000033



Refused to sign by associate on April 17, 2020, 12:38:40 PM - Delivered by Sushalskyy,Sergiy (sushalsk)



# Supportive Feedback Document
# Behavioral - Termination

**Associate Name:** BRYSON,GERALD Joseph (gbbryso)
**Manager Name:** Pryce,Bertram (DB3-0700)
**Created On:** April 17, 2020, 12:38:40 PM



## Summary

Your recent job performance is not meeting Behavioral expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations.

## Communication History

The following is a summary of your behavioral feedback:

| Level | Count | Most Recent |
|---|---|---|

## Details of Current Incident/Specific Concerns

The following feedback pertains to Amazon's Standards of Conduct. Abusive, vulgar, or harassing language to a supervisor, fellow associate, or vendor is prohibited and classified as a Category 2 violation of the Standards of Conduct. Harassment is unwanted conduct that affects one's dignity at work. It is personally offensive and creates an intimidating, hostile, degrading, humiliating or offensive work environment. On 4/6/2020, you were reported to be in violation of this policy by making vulgar and derogatory comments towards another employee.

## Areas of Improvement Required by Associate

Amazon is committed to providing a work environment that promotes the health, safety, and productivity of its associates. Associates are expected to treat each other, contractors, customers, and visitors with courtesy and professionalism. Amazon will not tolerate abusive, vulgar, or harassing language or behavior. You are expected to be in compliance with the Standards of Conduct policy at all times while working in the Fulfillment Center. These actions result in separation of employment.

## Associate Comments

I acknowledge that I have been informed of my right to appeal this feedback if I meet all eligibility requirements defined by the Appeals Policy, and that I know where to obtain an appeals packet.

Termination was delivered over the phone. Associate was informed that they will not be able to appeal this decision based on the Amazon policy. Associate refused to sign the document, however requested it to be sent over email.

**Associate Signature:** BRYSON,GERALD Joseph REFUSED TO SIGN                    **Date:** April 17, 2020, 12:38:40 PM

**Manager Signature:** Acknowledged by Sushalskyy,Sergiy (BadgeID: 11196847)                    **Date:** April 17, 2020, 12:38:40 PM

GC Exhibit 119

**Amazon Fulfillment Center and Sort Center Appeals Policy**

**The Appeals Policy**

Amazon recognizes that from time to time an Associate may encounter a problem, question, or complaint that could affect job satisfaction and work performance if left unresolved. Amazon encourages Associates to raise issues directly with their Manager, Leadership, or Human Resources teams using Amazon's Open Door Policy.

Amazon Appeals is a problem solving mechanism for qualified Associates to challenge certain disciplinary actions with which they do not agree. The Appeals program is an extension of Amazon's Open Door policy.

Amazon Appeals gives Associates a means of having their disputes addressed in an effective, timely, and impartial manner when previous non-formal attempts result in an unsatisfactory resolution. The unique characteristic of Amazon Appeals is that at the final step, the Associate may choose to have the dispute reviewed by a **Panel** consisting of three peers and two managers OR by **Senior Site Leadership**.  Senior Site Leadership generally refers to the General Manager, Assistant General Manager, or Site Leader, but in some instances can include other members of Leadership who hold the highest operational position in their building.

**Who is Eligible to Appeal?**

This Policy applies to all regular full-time and part-time hourly Associates employed directly by Amazon (including Seasonal Associates and Associates hired through Workforce Staffing) who have reached ninety (90) days of continuous employment with Amazon as of the date of the action was appealed.  This includes all tiers of hourly Associates and hourly Associates working in support functions except for Associates in Loss Prevention, Human Resources, and Finance. Hourly supervisors who meet all eligibility criteria may appeal to Senior Site Leadership only. Exempt managers, contract workers, and temporary agency staffing employees are not eligible to participate. This Policy does not apply for performance improvement plans (PIP) or in cases where an associate may utilize Pivot to appeal performance management.

**What Is Eligible to Appeal?**
- Final Written Warnings
- Termination of Employment

**What cannot be addressed in an Appeal?**

1. An appeal cannot establish or change policy, practices or rules.
2. An appeal cannot establish or change pay rates, job levels, pay ranges or benefits.
3. An appeal cannot make staffing or promotion decisions.
4. An appeal cannot review cases where Amazon is under legal obligation to act with discipline or employment termination arising out of complaints of discrimination, harassment, retaliation or similar conduct.
5. An appeal cannot review cases of discipline or employment termination arising from violation of Workplace Violence Policy and Drug and Alcohol Abuse Policy as specified in the Owner's Manual.

   If an employee has questions regarding the appeal policy, please direct those questions to the local Human Resource team.

   **Amazon will not tolerate retaliation against anyone brings an Appeal or participates in the Appeals Process as a Panelist, Witness, Facilitator, or in any other capacity. Incidents of retaliation must be reported to HR who will investigate and take appropriate action, up to and including termination of employment.**

AMZ-BRY000035

Acknowledged by icream1962@gmail.com (Gerald Bryan) on 1/13/2015 11:27 AM)





CODE OF BUSINESS CONDUCT & ETHICS

ACKNOWLEDGMENT FORM

**By clicking "Acknowledge" above, I acknowledge that I have access to a copy of Code of Business Conduct and Ethics and FAQs through MyDocs and that I am responsible for reading, understanding, and complying with the Code of Business Conduct and Ethics.**

**By clicking "Acknowledge" above, I also agree** to notify the Legal Department or Amazon's Ethics Line immediately in the event I have reason to believe that any violations of the Code of Business Conduct and Ethics have occurred, including, but not limited to: fraud or improper conduct regarding accounting, auditing, or internal controls over financial reporting.

**I understand that I can raise questions or concerns with my manager, human resources representative, or the Employee Resource Center.**

*Last Updated December 27, 2013*

**AMZ-BRY000036**



**AMAZON DRUG AND ALCOHOL POLICY (AMAZON FCs)**

Associates are Amazon's (the Company) most valuable resource. For that reason, the Company has an interest in ensuring a safe, healthy and efficient working environment for our associates, their co-workers and the customers we serve. The unlawful or improper presence or use of drugs or alcohol in the workplace presents a danger to the health and safety of everyone. For these reasons, we have established the following substance abuse policy.

This policy applies to applicants and all individuals working in Fulfillment Operations, including full- and part-time FC associates, individuals supplied through a vendor, and Amazon employees temporarily assigned to assist in a FC.   Vendor employees must comply with all Company rules on substance abuse while present on Company premises or working for the Company in any way, and may be subject to testing as described in this policy or through the Company-approved substance abuse testing policy administered by the vendor.

**DRUG AND ALCOHOL USE**

Associates are prohibited from reporting to work or working if the Associate uses any illegal or unauthorized substances, which include any drug that is unlawful to use or possess as a matter of federal, state, or local law, any prescription medication used other than as prescribed to the associate, and any substance that operates as an intoxicant or causes impairment when used other than as intended by the manufacturer. Associates are prohibited from reporting to work, or working if impaired by the use of any substance, including prescription medications taken under a doctor's orders and over-the-counter medications bearing warnings about possible impairing effects.

In addition, associates are prohibited from engaging in the illegal manufacture, distribution, sale or possession of drugs, including the misuse of medication, at any time during their employment with Amazon.  Any such illegal conduct suspected of occurring on Company premises or during work time may result in a referral to law enforcement authorities.

Associates are prohibited from reporting to work or working with any alcohol in their systems, and may not consume alcohol during working hours, including meal and break periods. This prohibition includes the use not only of beverages containing alcohol but also over-the-counter medications or products that include alcohol.  The only exception to this rule is that alcohol may be served on the Company premises at authorized Company-sponsored functions or occasions. On such occasions, associates who are of lawful drinking age and who choose to consume alcohol are expected to act responsibly, avoid becoming intoxicated or impaired, do not return to perform any safety-sensitive work after using alcohol, and make plans to avoid driving after drinking alcohol.

**Safe Use of Legal Medications**

Associates are encouraged to use lawful medication prescribed by a physician as directed. However, associates must not work while they use a medication that may affect their ability to work safely.

All Fulfillment Center (FC) Associate positions are considered to be safety sensitive.
Any time an associate uses a medication, it is the associate's responsibility to review dosing directions and warnings regarding potential impairment with their medical provider and/or by reviewing the written information

AMZ-BRY000037



accompanying the medication.  The associate must report any warnings suggesting that the associate should avoid the use of machinery or similar safety precautions, as well as any work restrictions recommended by the associate's health care provider to the site Safety Manager, Human Resources, and the Onsite Medical Representative before starting work so that Amazon may take steps to ensure that the individual is able to perform assigned work safely.   Amazon may make work modifications, reassign, or place an associate on leave while he or she must use a medication that may affect the associate's ability to work safely, at the Company's discretion. If the individual must use the medication for more than a short time, Amazon's Human Resources team may seek additional information from the associate regarding potential reasonable accommodations.


**DISCIPLINE**

Your employment or continued employment with the Company is conditioned upon your full compliance with Amazon's drug and alcohol policies.  Violations of this policy may result in disciplinary action, up to and including termination. At its discretion, or where required by law, Amazon may offer an Associate with a first confirmed positive drug or alcohol test the opportunity to participate in a substance abuse treatment program in lieu of discipline.


**DRUG AND ALCOHOL TESTING**

Amazon may require associates to take drug and/or alcohol tests in the circumstances described below.  Tests may seek the presence of the following classes of drugs, or their metabolites: amphetamines (including methamphetamine, MDMA ("ecstasy"), MDA, MDA); barbiturates (sleep aids, "downers"); benzodiazepines (Klonapin, Xanax); cocaine ("blow," "crack"), marijuana ("weed," "pot") and synthetic marijuana ("spice", K2); opiates and opioids (for example, codeine, heroin, morphine, methadone, oxycodone, hydrocodone), phencylidine (PCP, "angel dust"); propoxyphene; and alcohol.

**Pre-Employment Testing**

Associates will be required to take, and pass, a pre-hire drug test as a condition of employment.  Candidates who fail the drug screen will not be accepted for employment.  (Temporary workers and vendor employees will be required to take and pass a drug test administered by their own employer before being placed in an Amazon FC.) If required by state law, this test will be conducted post-offer but before an associate reports to work.

**<u>Reasonable Suspicion Testing</u>**

Associates may be required to submit to drug and/or alcohol screening whenever the Company has a reasonable suspicion that they are in violation of this policy. Reasonable suspicion may arise from, among other factors, observed suspected use of drugs and/or alcohol, performance decline, attendance or behavioral changes, the Associate's appearance, or an odor of drugs or alcohol that suggest that the associate is using drugs and/or alcohol in violation of this policy. Observations leading to reasonable suspicion determinations may be based upon supervisor observations as well as credible reports from co-workers and third parties and will be made reasonably contemporaneous with the request for a test.



**Post-Accident Testing**

Associates involved in an accident during work, or while operating Company-provided equipment or vehicles, may be required to submit to post-accident testing as part of the investigation.  An "accident" includes an incident in which any person was injured sufficiently that either the individual or Amazon sought professional medical assistance or review at the time of the incident, or in which property damage was incurred.  Post-accident testing may also be required when there is PIT contact or a near-miss incident that did not result in injury or property damage. Only those workers whose actions may have caused or contributed to the accident or incident will be tested.

**Random Testing**

Work in the FC is safety-sensitive.  Therefore, all FC associates are subject to unannounced random drug and/or alcohol testing.   Individuals subject to testing will be chosen from the random testing pool for each location by the Company's third party testing service.

Associates selected for random testing will be notified by the fulfillment center's Onsite Medical Representative or a designated member of the Human Resources or Safety department. An associate who has been notified that he or she has been selected for random testing must proceed immediately to the testing site as instructed.

**Return-to-Work and Follow-Up Testing**

Associates who have sought assistance with substance abuse during the course of their employment (either voluntarily, or, in some jurisdictions, following a first positive test result) may be required to take a return-to-work drug and/or alcohol test and receive a negative result before resuming work.  Because work in the FC is safety-sensitive, follow-up drug and/or alcohol testing may be required to ensure the associate does not resume abusing drugs or alcohol.

**TEST PROCEDURES AND PROTECTIONS**

**Consent**

No alcohol test will be administered, sample collected, or drug test conducted on any sample without the consent of the person being tested.  However, a person's refusal to submit to a proper test will be viewed as noncompliance and will subject the person to disciplinary action, up to and including termination.  A refusal to test includes any behavior designed to obstruct the testing process, including efforts to substitute, adulterate, or dilute specimens, as well as any failure to appear for testing within a reasonable time and failure to cooperate with collection staff.

The Company will pay the costs of all drug and/or alcohol tests it requires of Associates, and Associates will be paid for time spent in the testing process.

**Collection, Chain-of-Custody, Testing Methods**

Drug test samples may include oral fluids, urine, hair, or other specimen.  All drug tests will include a screening test and any initial test that is presumptively positive will be subjected to a confirmation test conducted by a laboratory certified by the U.S. Department of Health and Human Services to perform federal workplace testing.

Updated January, 2017
HR Compliance                                          Amazon Confidential                                          3

AMZ-BRY000039



Breath, saliva, urine and/or blood tests may be used to detect the presence of alcohol. Alcohol screening tests will typically be conducted and, if positive, confirmed by a second test at the collection site.  An alcohol test will be considered positive if it shows the presence of .02 percent or more alcohol in an individual's system. Tests will seek only information about the presence of drugs and alcohol in an individual's specimen, and will not test for any medical condition.

**Notification**

Any individual who tests positive for drugs will be contacted by a Medical Review Officer ("MRO") (a health care professional with an expertise in toxicology) before the result is reported, and offered an opportunity to provide any legitimate reasons he or she may have that would explain the positive drug test. If the individual provides an explanation acceptable to the MRO that the positive drug-test result is due to factors other than the consumption of illegal drugs, the MRO will order the positive test result to be disregarded and will report the test as negative to the Company. Otherwise, the MRO will verify the test as positive and report the result.  The MRO may also advise the Company when an individual's lawful use of medication poses a safety concern.

**Rights to Re-Test and Rebut**

If an associate receives a confirmed positive drug test result, the associate may request a re-test of the remainder of the original sample. The associate's test request must be in writing, directed to the Human Resources Department, and made within 7 days of receiving notice of the positive test result. Amazon will promptly direct the testing laboratory to conduct a confirmatory re-test.

In addition, an Associate who feels that his or her test result is in error may appeal the results of that test by bringing concerns to the attention of the Amazon MRO and/or Human Resources Department.

Requests for re-tests and appeals of test results will not delay any employment action and Amazon may place an individual on leave or fill an open position while awaiting test results.  If the results of a re-test are reported as negative, that result will become the result of record and the Associate will be compensated for any wages lost due to the request for re-test, unless the suspension without pay is justified under another policy.  If the test results are positive, the associate will be subject to discipline, consistent with this Policy.

**Confidentiality**

Individuals will be provided with a copy of the notice of their own test results or may request those results in writing. All records relating to positive test results, drug and alcohol treatment, and Associate medical information shall be kept confidential, and shared within the Company only on a need-to-know basis.  Such records will be kept in secure files separate from personnel files. Test results will not be released outside the Company without the written consent of the tested individual, or as otherwise may be required by law or legal process, or when relevant to a legal, administrative, or grievance action brought against Amazon by the tested individual.

**Accommodation of Associates Seeking Treatment/Rehabilitation**

Amazon encourages associates who may be abusing drugs or alcohol to seek assistance before their work performance suffers, they jeopardize the health and safety of themselves or others, or they are found to have violated this policy. If an associate voluntarily self-identifies as in need of assistance with substance abuse, the Company will not discipline the associate on that basis, but will attempt to assist the associate through referrals

AMZ-BRY000040

GC Exhibit 119

to rehabilitation, appropriate leaves of absence, and workplace accommodations. In general, associates will be referred to the Employee Assistance Program (EAP) for evaluation, counseling, and/or referral to a specialist or to a specific treatment program. (The associate may also contact EAP directly and confidentially.)  In order for an individual's self-identification to be considered voluntary, however, it must occur before the individual has been asked to submit to a drug and/or alcohol test, and before the associate's conduct or performance violates this or another Amazon policy, as a substance abuse condition will neither excuse nor protect an associate from discipline for violating our policies or failing to meet our performance expectations.

Consistent with its equal employment opportunity/non-discrimination policy, the Company maintains a policy of non-discrimination and reasonable accommodation with respect to alcoholics and substance abusers in recovery, and those having a medical history reflecting treatment for substance abuse conditions. The Company's support for treatment and rehabilitation does not obligate the Company to continue to employ any person who violates the Company's drug and alcohol abuse policy or whose job performance is impaired because of substance abuse.

Associates seeking treatment should contact Human Resources or the Leave of Absence and Accommodations (LOAA) team to discuss any necessary leave, benefits during a leave of absence, and other conditions related to the leave.

If the associate is eligible for leave under the Family and Medical Leave Act, any leave for substance abuse treatment may qualify as leave under the FMLA; if so, the provisions of the FMLA policy will also apply.  Associates who self-refer will not be permitted to resume performing safety-sensitive work until the associate has been released by a treatment professional as able to resume work safely and in compliance with this policy.

The Company may require additional periodic drug testing to ensure that the associate is no longer engaging in the illegal use of drugs.  Once having returned to work, the associate is expected to comply fully with this policy.

**State Law, Policy Implementation and Legal Compliance**

Amazon will implement this Policy (and any location-specific variations) in a manner that complies with federal, state, and local law.  If a particular location's laws differ from any provision in this Policy, Amazon will interpret and implement this Policy to comply with those laws. If you have any questions about this Policy and its application, please contact our Human Resources Department.

**A complete copy of the Company's Drug-Free Workplace Program and Supporting Policies will be provided to you at the time of your hire and are also available from the Human Resources Contact.  Any questions about this policy should be directed to Human Resources Contact.**

AMZ-BRY000041



GC Exhibit 119

**<u>ACKNOWLEDGMENT</u>**

I have received a copy of the Amazon FC Drug and Alcohol Policy and if applicable any Supplement to the Policy that applies to my work location.  I have reviewed and understand this Policy and will abide by it.  I acknowledge that if I fail to follow this Policy I may be disqualified from employment with Amazon and/or subject to disciplinary action, up to and including immediate termination.

_____
  Associate (please print)


_____
  Associate (signature)


_____
  Date

Firmwide:140148111.1 034959.2266

AMZ-BRY000042



Dear Dimitra Evans,                                                                                          June 28, 2020

We are pleased to offer you a transfer to JFK8 located at 546 Gulf Ave, Staten Island, NY 10314 with Amazon.com Services LLC.

The details of your NEW position are as follows:

- o  **First Day Onsite:**   7/13/2020
- o  **Manager:**   Thomas Drum
- o  **Department:**   Ship Dock
- o  **Shift:**   DC7-0715 - 07:15AM - 05:45PM Monday, Tuesday, Thursday, Friday
- o  **OT Day:**   Saturday
- o  **Pay Rate:**   $18.70
- o  **Shift Differential:**  $0.00

Your shift and schedule may change in the future based on business need. Please note that accepting an internal transfer may impact your pay.  Amazon.com reserves the right to modify shift times or rotate employees between existing shifts at any time in the company's sole discretion.  We ask and thank you for your continued flexibility.

**General Information**

Please sign this letter if you accept this transfer.  A copy will be kept in your employee file. **Please note by accepting your transfer, you acknowledge that you must remain on your shift for 30 days prior to requesting an internal transfer to another shift, department, or building.**

We look forward to making history with you,

JFK8 HR

ACCEPTANCE

I agree to and accept this position at Amazon.com Services LLC and the terms set forth above.

DocuSigned by:

_____          6/28/2020 _____
FBE4869057D8483...

Signature                                                                          Date

edimitra, ███████

AMZ-BRY000043



GC Exhibit 119

AMXL Protective Footwear Program

**Overview:** On October 1, Amazon's Workplace Health and Safety (WHS) team launched the Amazon Step into Safety program at all AMXL and Traditional Non-sort fulfillment center sites. The program will provide all associates and managers with a $75 Zappos shoe credit to apply toward a wide selection protective footwear on Zappos.com. Zappos is also offering associates 10% off their purchase, with free one or two-day shipping, and free returns.

To enroll, associates can access a customized online Zappos store and sign up using their logins. An Amazon log in ID is required to order the safety shoes. This will be issued to you once the pre-employment process is complete and clears. Once you have your ID and access the site, you can choose from more than 200 styles of protective footwear. Our WHS team worked closely with the Zappos at Work! program to curate a variety of approved protective footwear options that are some of the most durable, comfortable, and attractive styles available. You can choose from a wide selection of styles from brands like New Balance, Puma, Reebok, Sketchers, and more. Enrollment in the program is completely voluntary, and we highly encourage all our AMXL and TNS associates to take advantage of the benefit.

**How to Order: It's easy to sign up:**
1. Visit the ordering site at www.zappos.com/AMXL and sign in with your Zappos account, or create an account.
2. Once signed in, you'll be directed to the Amazon Step into Safety program. Enroll using your first name, last name, and Amazon login ID.
3. You'll then be directed to our custom online store to select your shoes. Shipping to your home is fast and free.
4. That's it! Once you receive your new shoes, wear them to work.

**Frequently Asked Questions:**
1. **Who is eligible to participate?** All US Blue Badge and temporary associates and managers at our TNS FCs and AMXL sites are eligible. Once your pre-employment check clears and you are issued your Amazon log in ID, visit the Zappos ordering website to order your safety shoes (www.zappos.com/AMXL (AMXL sites) or www.zappos.com/AmazonSafety (TNS sites).

2. **How much is the credit and when does it renew each year?** The credit provided to eligible associates is $75.00 annually. The credit is renewed each year on January 1st.

3. **Who do I call if I have a question on this program or need help with the ordering portal?** Zappos.com customer service is available to help you. They can be reached at zapposatwork@zappos.com or by phone 24/7 at 888-492-7767.

4. **How often do I get to order new shoes? Does the shoe credit cover the cost of the shoe? Is Amazon only paying for my first pair?** You will be provided a $75 shoe credit by Amazon annually that will cover the cost of a new pair of shoes.

5. **What if my shoes wear out or get damaged or stolen?** If your shoes wear out due to wear and tear before a year has passed, you will be provided with a new voucher. If the shoes are intentionally damaged or lost, they would need to be replaced at your own expense. If you have this situation, please connect with your manager and HR immediately so we can discuss the situation with you and decide the appropriate course of action based on the specific circumstances.

6. **What happens if I don't use all of my credit?** All unused credit by December 31st of the current year will be forfeited when the $75 annual resets.

7. **Can I order more than one pair or order a more expensive pair of approved protective footwear?** Associates will be provided with a custom on-line store, which only displays approved safety footwear. Some shoes are more expensive than the $75 annual and some shoes are less expensive. You can purchase any of these items. If the shoe is more expensive than the $75, then you will be responsible to pay for the additional amount owed. If the shoe is less expensive than the $75, then you will have money left over (e.g. the balance remaining) that you can apply for additional pair(s) of approved safety footwear.

1

AMZ-BRY000044

GC Exhibit 119



8.  **Can the credit be used on "other" Zappos.com purchases outside of the approved ordering site at zappons.com/AMXL or zappos.com/Amazon Safety?** No, the credit can only be used towards approved safety footwear that is displayed on the Zappos ordering site.

9.  **What if I order shoes through the site but never wear them to work?** Through the Protective Footwear benefit, you are guaranteed a shoe credit regardless of whether or not you wear the shoe to work. However, we highly encourage all our associates to take advantage of the benefit and wear their shoes to work every day. The program was designed as an added safety precaution to protect you.

10. **What if none of the shoes work for me?** Zappos offers a 100% return policy for a full refund within 365 days of purchase if your shoes do not fit. If you're in a situation where you feel none of the styles work for you, please connect with your manager and HR so we can discuss the situation with you and decide the appropriate course of action based.

*Final*

**AMZ-BRY000045**



# Owner's Manual
## And Guide to Employment

AMZ-BRY000046



## WELCOME TO AMAZON!

We're thrilled to have you join us as we work hard, have fun, and make history! We think we've created an exceptional work environment that marries hard-charging intensity with major-league fun. As you get to know the folks at Amazon, you'll discover a group of diverse, world-class associates who treat each other with respect, work together as a team, and act like what they are: true owners of the company.

Our overall mission is simple: we want Amazon.com to be the place where our customers can find, discover, and buy, anything online! Whatever our customers tell us they want, we will find the means to deliver. In doing so, we will create the most customer-centric company in the universe -- a company that customers from all over the globe will recognize, value and trust for both our products and our service. With your help, Amazon will continue to enable people to discover new worlds and create change in a meaningful and lasting way.

Amazon is at the beginning of its history. Already millions of people have shown their faith in our future, through buying from us, through investing in us, and through working with us. Thanks again for joining Amazon and helping us shape the future.

Once again, welcome aboard!


*Jeff Bezos*
Founder & CEO

AMZ-BRY000047



Owner's Manual and Guide to Employment – December 2017

# Table of Contents

Amazon and You ................................................................................................................. 6

    About This Document ...................................................................................................... 6

    Getting Started ................................................................................................................ 7

    What We Can Expect from Each Other ........................................................................... 8

    Open Door Policy and Conflict Resolution ..................................................................... 8

    At-Will Employment ....................................................................................................... 8

    Employment Classifications ............................................................................................ 8

    Working Hours ................................................................................................................ 9

    Attendance and Punctuality ........................................................................................... 9

    Corrective Action .......................................................................................................... 10

    Performance Evaluation ............................................................................................... 10

    Internal Transfers and Promotions .............................................................................. 10

    Dealing with the Public ................................................................................................. 11

    Personnel Information and Records .............................................................................. 11

    Resignation ................................................................................................................... 11

    Pay Periods and Direct Deposit .................................................................................... 12

    Payroll Deductions ....................................................................................................... 12

    Overtime Pay ................................................................................................................ 12

    Travel Time Pay ............................................................................................................ 13

    Holidays ........................................................................................................................ 13

    Additional Paid Time Off .............................................................................................. 13

        Vacation .................................................................................................................. 13

        Paid Personal Time Off ........................................................................................... 14

        Bereavement Time Off ........................................................................................... 14

        Jury and Witness Duty Time Off ............................................................................. 14

        Sick and Safe Time Required Notices ...................................................................... 14

AMZ-BRY000048

Case 1:22-cv-01479-DG-SJB   Document 5-9   Filed 03/17/22   Page 63 of 409 PageID #: 1826


GC Exhibit 119

Leaves of Absence .................................................................................................................... 15

    Benefits during a Leave of Absence .................................................................................... 15

    Family and Medical (FMLA) Leave ..................................................................................... 15

    Medical Leave ..................................................................................................................... 16

    Personal Leave .................................................................................................................... 16

    Military Leave ...................................................................................................................... 16

Alternative Work Arrangements ............................................................................................. 17

    Types of Alternative Work Arrangements ......................................................................... 17

Code of Business Conduct and Ethics ..................................................................................... 18

Confidential Information ......................................................................................................... 19

Cost Efficiency ......................................................................................................................... 19

Purchasing and Spending Authorization ................................................................................. 19

Travel and Entertainment ....................................................................................................... 19

Amazon Rental Vehicle Policy ................................................................................................. 20

Drug and Alcohol Use .............................................................................................................. 20

Employees with Disabilities .................................................................................................... 20

Employment Outside of Amazon ............................................................................................ 21

Employment of Relatives and Friends .................................................................................... 21

Employment References .......................................................................................................... 21

Equal Employment Opportunity ............................................................................................. 21

Health and Safety .................................................................................................................... 21

Safety Programs and Training ................................................................................................. 21

Reporting Accidents and Concerns about Workplace Safety .................................................. 21

Information Security ................................................................................................................ 22

Privacy ..................................................................................................................................... 22

Acceptable Use ........................................................................................................................ 22

    Protecting Data and Securing Access to the Company Network ........................................ 22

Reporting Violations ............................................................................................................... 23

Insider Trading ........................................................................................................................ 23

Physical Security ...................................................................................................................... 24

    Badges and Other Important Information .......................................................................... 24

AMZ-BRY000049

Owner's Manual and Guide to Employment – December 2017

Workplace Emergency Response ................................................................................ 24

Inspections on Company Premises ............................................................................. 24

Solicitation ................................................................................................................... 25

Transitional Work ........................................................................................................ 25

Workplace Harassment ............................................................................................... 25

Anti- Sex Buying Policy ................................................................................................ 26

Sexual Harassment ...................................................................................................... 26

Other Harassment ....................................................................................................... 26

Consensual Relationships ............................................................................................ 26

Responding to Inappropriate Conduct or Possible Incidents of Harassment ............ 27

Standards of Conduct .................................................................................................. 27

AMZ-BRY000050

# Amazon and You

## About This Document

This Owner's Manual and Guide to Employment (the Manual) summarizes Amazon's basic personnel policies and practices and is intended to serve as a resource concerning your employment at Amazon. Other helpful materials and information are distributed during new hire orientation and are made available on the company intranet and from Human Resources.

The Manual is designed to provide you with a brief overview of Amazon's policies, procedures, and benefits. Amazon reserves the right to modify, revoke, suspend, terminate, or change any or all its policies or procedures in whole or in part at any time, with or without notice. This Manual is not intended as a contract and supersedes any previous policy statements, written or oral. As described in the Manual, your employment is not for a fixed term and is "at will," meaning both you and Amazon have the right to end the employment relationship at any time, with or without cause and with or without prior notice or warning.

Unless otherwise stated, the Manual applies to all associates – all regular or temporary full-time and part-time employees – of [Amazon.com](), Inc. and its wholly owned United States subsidiaries (Amazon or the company) with the exception of Alexa.

Some of Amazon's groups or sites may develop their own specific guidelines, policies, and/or procedures that apply only to their associates. These guidelines, policies or procedures supplement the information provided in the Manual. If they supersede the Manual, associates will be advised of that.

Remember that both the HR intranet and the Amazon Owner's Manual are living things. They are changed from time to time to keep pace with what's going on around us.

## Our Leadership Principles

Whether you are an individual contributor or a manager of a large team, you are an Amazon leader. These are our leadership principles, unless you know better ones. Please be a leader.

### Customer Obsession
Leaders start with the customer and work backwards. They work vigorously to earn and keep customer trust. Although leaders pay attention to competitors, they *obsess* over customers.

### Ownership
Leaders are owners. They think long term and don't sacrifice long-term value for short-term results. They act on behalf of the entire company, beyond just their own team. They never say "that's not my job."

### Invent and Simplify
Leaders expect and require innovation and invention from their teams and always find ways to simplify. They are externally aware, look for new ideas from everywhere, and are not limited by "not invented here." As we do new things, we accept that we may be misunderstood for long periods of time.

### Are Right, A Lot
Leaders are right a lot. They have strong judgment and good instincts. They seek diverse perspectives and work to disconfirm their beliefs.

AMZ-BRY000051


GC Exhibit 119

Owner's Manual and Guide to Employment – December 2017

## Learn and Be Curious

Leaders are never done learning and always seek to improve themselves. They are curious about new possibilities and act to explore them.

## Hire and Develop the Best

Leaders raise the performance bar with every hire and promotion. They recognize exceptional talent, and willingly move them throughout the organization. Leaders develop leaders and take seriously their role in coaching others. We work on behalf of our people to invent mechanisms for development like Career Choice.

## Insist on the Highest Standards

Leaders have relentlessly high standards — many people may think these standards are unreasonably high. Leaders are continually raising the bar and drive their teams to deliver high quality products, services and processes. Leaders ensure that defects do not get sent down the line and that problems are fixed so they stay fixed.

## Think Big

Thinking small is a self-fulfilling prophecy. Leaders create and communicate a bold direction that inspires results. They think differently and look around corners for ways to serve customers.

## Bias for Action

Speed matters in business. Many decisions and actions are reversible and do not need extensive study. We value calculated risk taking.

## Frugality

Accomplish more with less. Constraints breed resourcefulness, self-sufficiency, and invention. There are no extra points for growing headcount, budget size, or fixed expense.

## Earn Trust

Leaders listen attentively, speak candidly, and treat others respectfully. They are vocally self-critical, even when doing so is awkward or embarrassing. Leaders do not believe their or their team's body odor smells of perfume. They benchmark themselves and their teams against the best.

## Dive Deep

Leaders operate at all levels, stay connected to the details, audit frequently, and are skeptical when metrics and anecdote differ. No task is beneath them.

## Have Backbone; Disagree and Commit

Leaders are obligated to respectfully challenge decisions when they disagree, even when doing so is uncomfortable or exhausting. Leaders have conviction and are tenacious. They do not compromise for the sake of social cohesion. Once a decision is determined, they commit wholly.

## Deliver Results

Leaders focus on the key inputs for their business and deliver them with the right quality and in a timely fashion. Despite setbacks, they rise to the occasion and never settle.

## Getting Started

New associates will undoubtedly have questions regarding Amazon. We hope that this Manual will satisfy the most frequently asked questions, but please do not hesitate to ask your manager or Human Resources if you have further questions. In Seattle, you may contact the Employee Resource Center. Contact information for your Human Resources Business Partner can be found through the following link on the corporate intranet:

https://contactstool.amazon.com/

AMZ-BRY000052


GC Exhibit 119

## What We Can Expect from Each Other

You've probably figured out by now that this is not an ordinary company, and we have extraordinary people on our team. Accordingly, the company is committed to treating each associate fairly and with respect, and to maintaining an environment of open communication. As an associate, your primary responsibility is to do an outstanding job on your work. The efforts of each person, working individually and as part of the Amazon team, are the means for meeting the overall objectives of the company. We do also expect associates to maintain a high professional standard of behavior and job performance and to adhere to the policies set forth in this Manual.

## Open Door Policy and Conflict Resolution

Amazon believes that candid and constructive communication is essential to the smooth functioning of our workplace and to maintaining an atmosphere of mutual respect. Accordingly, we have an "open door" policy, which means that you are welcome to discuss any suggestion, concern, or other feedback with any member of the company's management. Associates are encouraged to bring their ideas to the attention of management.

The majority of misunderstandings are satisfactorily resolved by a thorough discussion and mutual understanding between the parties involved. In general, it is best to discuss any concerns with your immediate supervisor first. If you are unable to reach a satisfactory resolution with your supervisor or are not comfortable discussing the issue with your supervisor, you are welcome to discuss the matter with the next level of management, with Human Resources, or with any member of senior management. When you bring a concern to Human Resources, it will be reviewed, and if appropriate, action will be taken. Human Resources will communicate with you regarding the outcome.

If you believe that you or another associate has been subject to workplace harassment, pursuant to the provisions of the Workplace Harassment policy in this Manual, you should immediately report this to any manager or member of Human Resources. See the Workplace Harassment policy for more information.

# Employment at Amazon

## At-Will Employment

Employment at Amazon is not for any specified length of time, and both the associate and the company have the right to end the employment relationship at any time, with or without cause and with or without prior notice or warning. Only Amazon's general counsel and chief financial officer have authority to bind the company to policies or agreements that conflict with this policy of at-will employment. Any such exception must be in a written agreement signed by Amazon's general counsel or chief financial officer.

## Employment Classifications

Each position at the company is broadly classified by regularly expected work hours and whether the associate is eligible for overtime pay. These classifications are dictated both by the company's business needs and state and federal wage-hour laws.

Each position falls into one of the following employment types:

AMZ-BRY000053



- Regular full-time: Regular (non-temporary) associate who is regularly expected to work at least 40 hours per week.
- Regular part-time 30+ hours: Regular (non-temporary) associate who is regularly expected to work at least 30, but less than 40, hours per week.
- Regular part-time 20+ hours: Regular (non-temporary) associate who is regularly expected to work at least 20, but less than 30, hours per week.
- Flex associate: Regular (non-temporary) associate who is not regularly expected to work 20 or more hours per week, such as an on-call associate.
- Short-term associate: Hired for employment that is expected to last no more than six months, such as an intern or seasonal associate.

The above employment types only apply to Amazon associates. Outsourced workers such as temporary agency employees placed on assignment at the company, independent contractors, or consultants are not considered Amazon associates.

Associates are also classified as exempt or non-exempt. Non-exempt associates are eligible for overtime pay and are ordinarily paid by the hour and, and exempt associates are not eligible under federal and state laws for overtime pay and are ordinarily paid a salary.

Eligibility for stock-based awards and benefits is based on employment type (such as regular full-time or regular part-time, etc.). Changes to an associate's employment type must be approved the associate's manager and Human Resources.

## Working Hours

Managers are responsible to establish work schedules that accommodate operational priorities, and each associate should be flexible in meeting these priorities. Work schedules for hourly associates may vary from site to site and week by week. This flexibility is critical to Amazon's success as a company. The intense nature of our business and the demands of an e-commerce environment require that associates make a serious commitment of time and energy to Amazon. Salaried associates should clearly understand that they may frequently work extended hours to help the company succeed. Hourly associates may also be required to work varying amounts of overtime, as Amazon's needs require.

Most positions at the company require associates to work full-time. The company recognizes that situations may occur where associates may need to temporarily alter their work schedules in order to better accommodate difficult or demanding periods of their lives, while still meeting the demands of their job. Additionally, associates may sometimes require an alternative work arrangement when medically necessary while recovering from an illness or injury. Towards these ends, Amazon will consider requests for an alternative work arrangement. For further information, please see the Alternative Work Arrangement Policy in this Manual.

Hourly associates must report all hours worked, whether at an Amazon building or off-site. No one may allow or ask any hourly associate to work "off the clock" without being paid. Hourly associates working more than five hours are generally required to take a work-free, unpaid 30-minute meal period. The meal period must start no later than five hours or, in some locations, five-and-a half hours after the associate begins working. Additional meal periods are provided in some circumstances. Hourly associates are required to take a minimum ten-minute paid break for every four hours worked or major fraction thereof. Please check with your manager or Human Resources Business Partner regarding your work schedule. For more information, see the complete U.S. Working Hours Policy for non-exempt/hourly associates: Working Hours (Non-Exempt/Hourly)  Policy.

## Attendance and Punctuality

Regular attendance and punctuality are important parts of your obligations as an Amazon associate. You are to work the hours scheduled by your manager. If you are going to be absent or late to work, we expect to

9

hear from you before the start of your workday. Please be aware that unsatisfactory attendance may be a basis for disciplinary action, up to and including dismissal.

Individual sites or departments may establish specific guidelines for attendance and punctuality, based on the needs of the business. If your site or department has specific guidelines, your manager or Human Resources will review them with you, and it is expected that you will abide by them throughout your employment in that department.

In the event that we have not heard from you for three (3) consecutive workdays, you will be considered to have resigned from your employment.

## Corrective Action

To ensure orderly operations and provide the best possible environment, Amazon expects associates to follow rules and exhibit conduct that will protect the interests and safety of all associates and the organization. The appendix to the Owner's Manual includes the Standards of Conduct, a list of examples of infractions that may result in corrective action, up to and including termination of employment. The Standards of Conduct are only guidelines. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace, and the Standards of Conduct is not intended to be all-inclusive or exhaustive. Abiding by the Standards of Conduct is necessary but is not sufficient for continued and successful employment at Amazon. The bar is much higher, and associates are expected to perform at a very high level in serving our customers. As an at-will employer, Amazon reserves the right in all circumstances to apply any level of corrective action as appropriate, up to and including immediate termination of employment, without prior corrective action or notice for conduct in either category or for conduct not described in the Standards of Conduct.

## Performance Evaluation

Managers and associates are strongly encouraged to discuss job performance and goals on an informal and frequent basis. Formal performance evaluations are typically conducted on an annual basis. Amazon or individual sites or departments may establish more frequent performance review periods. Performance evaluations become a part of your personnel file and may be used for future employment decisions and consideration such as transfers, promotions, compensation decisions, training, salary reviews, and corrective action.

## Internal Transfers and Promotions

Employees may apply for a voluntary internal transfer at any time. Employees who are not currently meeting performance standards must obtain manager approval before interviewing. More information regarding the Internal Transfer process is available from your Human Resources Business Partner or on the intranet at: Job Transfers

At Amazon, we have two types of promotions: Career Development and Open Position. A Career Development Promotion occurs when there is an increase in an associate's current job level within the same job family (for example, a move from Financial Analyst to Sr. Financial Analyst). For an associate to be promoted, the manager (1) must justify the business need for that position to be one job level above the associate's current level; and (2) must show that the associate has demonstrated the skills and competencies needed to assume the responsibilities of the new position. Career Development Promotions are reviewed on a calendared cycle.

An Open Position Promotion can occur when an associate applies and is hired into an approved, budgeted, and posted position that is one job level higher than the associate's current level. All associates must use the Internal Transfer Process to apply. More information regarding the Promotion process is available from your Human Resources Business Partner or on the intranet at:

Promotions

AMZ-BRY000055



Associates who are transferred or promoted to a new position sometimes receive a compensation adjustment to a level that is appropriate for the new position. A position change may also affect certain benefits (such as vacation accrual and benefit premiums), trading window restrictions, pay periods, and future pay increases or additional stock-based award grants.

## Dealing with the Public

To ensure that Amazon follows all rules applying to a public company regarding disclosure of information, the company has designated certain associates to represent the company to the public. No other associate should speak with media representatives on Amazon's behalf , even to answer apparently innocuous questions. Press inquiries and requests for interviews or public appearances by Amazon should be forwarded to the Strategic Communications department at 206-266-7180 (or x6-7180 when dialing internally). Financial inquiries should be directed to the Investor Relations department at 206-266-2171 (or x6-2171 when dialing internally) or ir@amazon.com. It is extremely important that all questions directed to Amazon are forwarded to one of the above departments, who are the company's only designated spokespeople.

Associates must always comply with Amazon's Confidential Information policy (see below in this Owner's Manual) by not revealing, confirming, or discussing confidential information without authorization. Nothing in the Owner's Manual prohibits non-supervisory employees' communications about wages, hours, or working conditions.

## Personnel Information and Records

The company maintains personnel records in personnel files, in payroll, and in several other forms (information stored electronically, etc.). The information the company maintains is needed by the company in conducting its business or is required by federal, state, or local laws.

Personal Information: Human Resources should be notified promptly of any changes in name, residential address, home telephone number, marital status, name of beneficiary, or dependents listed on your insurance policy, number of dependents for withholding tax purposes, or person to notify in case of an emergency. Most associates can make changes to this information by using our PeopleSoft self-service option located on the intranet at:

PeoplePortal

Associates who do not have access to the self-service option in PeopleSoft should notify Human Resources with such changes. Additionally, your manager will be provided with your home telephone number in the event he or she needs to contact you for business purposes.

Personnel files: Human Resources will maintain your personnel file. Your personnel file ordinarily will be made available to your manager and others with a need to know, such as a hiring manager if you apply for a new position internally. You may review your personnel file periodically, upon giving written request with reasonable notice to Human Resources. Personnel files are company property and may not be removed from company property. If you believe that certain materials in your personnel file are irrelevant, inaccurate, or obsolete, you may informally request their removal by speaking with HR or submit a written statement that may be included in your personnel file. You may also request copies of specific documents in your file. Seattle employees can contact the Employee Resource Center to schedule a time to review their file.

## Resignation

If you decide to resign from your employment at Amazon, we request that you provide at least two (2) weeks' notice. This will give your manager the opportunity to adjust his or her plans with the least amount of interruption to company work schedules. We encourage associates who resign voluntarily to submit such resignation in writing, with the reason for resigning and the effective date stated.

AMZ-BRY000056



# Compensation

## Compensation

Hiring, retaining, and motivating talented, versatile, and driven associates are critical success factors for Amazon. Towards this end, Amazon seeks to compensate associates relative to the nature and extent of their contribution to the company's success, their responsibility and commitment to the company, and their skill level, all as measured in the context of market comparables. Amazon views all forms of rewards provided to associates, including cash compensation, equity compensation, health, and other benefits, as part of its total compensation package. If the company does well, associates will be well rewarded through their equity compensation, which is an important component of compensation over the long term.

In determining compensation for our associates, the company strives to attract and retain the best associates, reinforce ownership, emphasize performance and potential as a basis for rewards, recognize the need for global and flexible compensation approaches, and to filter our compensation decisions through our core values. Amazon's compensation philosophy is available from your Human Resources Business Partner or on the intranet at:

[Compensation]

## Pay Periods and Direct Deposit

Hourly associates are paid every other Friday. Hourly associates' workweek starts at 12 a.m. Sunday and ends at 11:59 p.m. Saturday. Salaried associates are paid either monthly or biweekly; however, in some locations, the pay frequency may vary. More information regarding hourly and salaried payroll periods is available from your Human Resources Business Partner or on the intranet at:

[Getting Paid in the U.S. FAQ]

Direct deposit of your paycheck into your bank account is available and encouraged. It is a fast, safe, and dependable way to put your money in the bank and, best of all, it is completely free. Your paycheck will be deposited into your bank account automatically every pay period. If interested, please fill out the appropriate form, which is available from your Human Resources Business Partner or through Employee Self-Service at:

https://portal.adp.com/public/index.htm

## Payroll Deductions

Amazon is legally required to take certain deductions from every associate's compensation, including federal income taxes, state and local income taxes (where applicable), Social Security, and other mandatory withholdings. Associates are required to complete and change, as appropriate, a W-4 form indicating the number of allowances claimed for tax withholding purposes. In some cases Amazon may be required by law to make other deductions, such as garnishment and child support. The company will also deduct amounts authorized by an associate in accordance with the associate's benefit elections. Finally, at termination of employment, Amazon may also deduct from associates' last paychecks (where permissible) for items owed to the company, including but not limited to corporate credit card debt, negative vacation balance, lost equipment, or money owed to the company. If you have questions regarding payroll deductions, please contact your Human Resources Business Partner.

## Overtime Pay

AMZ-BRY000057


GC Exhibit 119

Only associates who do not qualify as exempt under federal or state law are eligible for overtime pay. Overtime must be approved in advance and will be paid at the rate of one and one-half times the associate's regular hourly rate of pay for all hours worked in excess of 40 hours during a workweek. Vacation, personal/sick, holiday, or other paid time off hours are not considered "hours worked" in the calculation of overtime pay.

## Travel Time Pay

From time to time, employees may be required to travel for work purposes. Non-exempt employees who are required to travel for work purposes are eligible for paid travel time in certain circumstances, consistent with applicable state and federal wage and hour laws. Travel time will be paid at the employee's regular hourly rate and will be used in overtime calculations. Non-exempt employees should refer to the Working Hours (Non-Exempt/Hourly) Policy for detailed information.

Exempt employees are not separately compensated for time spent traveling for business. More information regarding travel time pay is available from your HR Business Partner.

# Benefits

Amazon offers a comprehensive benefits package, subject to eligibility requirements. The company reserves the right to alter, amend, or terminate the benefits it provides at any time, at the sole discretion of the company, with or without advance notice.

For more information about your benefits, visit the Benefits Enrollment Tool. From an Amazon computer or network, go to benefits.amazon.com. From any other computer or network, go to amazon.ehr.com. You can also call the Benefits Service Center with questions at 1-866-644-2696. The Benefits Enrollment Tool will be ready for you to view about three days after your start date.

## Holidays

Information about Amazon holidays is found here. All U.S. employees can review each individual holiday policy on the U.S. Employment Policies & Guidelines page on Inside Amazon, here.

Please contact the Employee Resource Center (ERC) if you have questions.

You can review your time off balances by accessing ADP at mypay.amazon.com when on the Amazon network or portal.adp.com from any computer outside of the network.

## Additional Paid Time Off

### Vacation

Amazon believes that associates should earn and take vacation on a regular basis for their personal well-being and continued high performance. All regular associates working 20 or more hours per week accrue vacation during each pay period. Accrued vacation may be carried over from year to year up to 160 hours. There may be some limited exceptions for subsidiaries with legacy policies. Managers must approve vacation in advance.

For non-FC/CS employees working in California, and all A100 and Goodreads employees, please refer to the CA PTO policy. Employees working at Fulfillment Centers or in Call Center Operations are excluded from CA PTO.

13

AMZ-BRY000058

Paid Personal Time Off

Amazon will provide all regular associates who are expected to work more than 20 hours per week with paid personal time, to be used in the event of illness or other personal business. All regular associates who are expected to work 20 or more hours per week accrue paid personal time during each pay period, up to a maximum. The maximum amount is equal to the annual accrual corresponding to the associate's scheduled work hours. Accrued paid personal time off may not be carried over from year to year. Associates will lose their remaining paid personal time hours on December 31. In California, paid time off carries over per local law.

Some policies that apply only to Operations, FC or CS sites also exist. Check with your local HR team for other site-specific policies and processes or if you have any questions about any policies at Amazon.

For non-FC/CS employees working in California, and all A100 and Goodreads employees, please refer to the CA PTO policy. Employees working at Fulfillment Centers or in Call Center Operations are excluded from CA PTO.

Bereavement Time Off

Amazon provides associates up to three days of paid time off to attend a funeral or grieve if an associate suffers a death of an immediate family member. Immediate family members include your spouse, domestic partner, children (including step and foster children), parents (including step and foster parents), parents-in-law, grandparents, brothers and sisters (including step siblings), or special circumstances outside these relationships.

Jury and Witness Duty Time Off

Amazon provides up to ten (10) additional days of paid time off to associates if they are required to serve on a jury or are subpoenaed as a witness in a civil or criminal court case if they provide advance notice of their scheduled appearance date and a copy of the summons to serve as a witness or juror. Any paid time off provided under this policy is in addition to the paid time off regularly accrued by eligible employees.

Sick and Safe Time Required Notices

City of Saint Paul Earned Sick and Safe Time Ordinance (ESST). This ordinance requires employers to provide employees working in Saint Paul with paid leave that can be used for sick time (an employee or family member's medical or mental condition or preventive care) and safe time (reasons related to domestic violence, sexual assault, stalking, school closures due to inclement weather or public safety issues, for an employee or an employee's family member). Employers must grant at least 1 hour of sick/safe time per 30 hours worked in Saint Paul. Employees can accrue up to 48 hours per year and save unused time and carry over up to 80 unused hour per year. Accrual must begin on the 1st day of employment, and employees may start using sick/safe time after 90 days of employment. Employees must work 80 hours in Saint Paul to be eligible. Amazon may require an employee to provide written certification form a health care provider if use of sick/safe leave will exceed three days. Retaliation against employees for exercising any sick/safe leave rights is illegal. An employee who believes any of these rights have been violated may file a complaint in court and/or with the City of Saint Paul Department of Human Rights and Equal Economic Opportunity Labor Standards Unit. Contact options: 651-266-8900 | laborstandards@stpaul.gov | www.stpau.gov/esst | 15 W. Kellogg Blvd, Suite 280, Saint Paul, MN 55102.

City of Minneapolis Sick and Safe Time Ordinance. This ordinance requires employers to provide employees working in Minneapolis with paid leave that can be used for (a) a medical or mental health condition; (b) to seek services for domestic abuse, sexual assault, or stalking; (c) close of an employee's pace of business for public health reasons; (d) needs related to health, mental health, or physical safety of a child, spouse, domestic partner, parent, grandparent, or member of household; (e)unexpected closure of a family member's school or place of care, including for inclement weather. Employers may require advance notice as soon as practicable (but not more than 7 days), and reasonable explanation of need. Upon request, the

AMZ-BRY000059



employer must provide information stating the employee's then-current amount of accrued sick and safe time and used sick and safe time. An employee who believes any of these rights have been violated may file a report with the City of Minneapolis Labor Standards Enforcement Division. Contact options: 350 S. Fifth St., Rm. 239, Minneapolis, MN 55415 | Call 311 | www.minneapolismn.gov/sicktimeinfo.

A complete overview of all the paid time off policies, including copies of each entire policy, is available from your Human Resources Business Partner or on the intranet at:

Paid Time Off Policies

## Leaves of Absence

Amazon recognizes that situations will arise that may require associates to be absent from work for extended periods of time. The company offers a variety of leaves of absences summarized below. An associate must apply for and Human Resources (or designated representative, i.e., MyLeave Services) must approve any leave request before it is authorized.

A complete overview of all the leave of absence policies, including copies of each entire policy and complete information on the effect of each type of leave on benefits and compensation, is available from your Human Resources representative, the Employee Resource Center or on the intranet at:

Leave of Absence Policies

### Benefits during a Leave of Absence

Associates do not accrue vacation, holiday, or personal days while on an unpaid leave of absence, unless required by regulation. Associates also will not be provided an annual grant of paid personal time if their leave of absence occurs when such grants are made. Rather, associates will be provided their regular paid personal time grant upon their return to active work. Medical insurance coverage will typically remain in effect during the leave, although the associate may be required to pay the employee portion of the premium, the entire premium amount, or become subject to COBRA coverage, depending on the type and duration of leave. Each complete leave policy provides information as to the effect of the leave on each type of benefit.

### Family and Medical (FMLA) Leave

Eligible associates may qualify for a leave of absence under the Family and Medical Leave Act (FMLA). Amazon provides eligible associates who are unable to work due to the reasons listed below up to 12 work weeks of unpaid, job-protected leave in a 12-month period:

- birth and care of your newborn child or adoption/foster care placement of a child in your custody;
- your own serious health condition including sickness or disability associated with pregnancy and/or childbirth;
- to care for your spouse, qualified domestic partner, child, qualified child of a qualified domestic partner, or parent with a serious health condition;
- for qualifying exigencies arising out of the fact that your spouse, qualified domestic partner, child, qualified child of a qualified domestic partner, or parent is on active duty or called to active duty as a member of the U.S. National Guard or Reserves in support of a contingency operation.
- In addition, eligible associates may qualify for up to a total of 26 work weeks of unpaid, job-protected leave during a single 12-month period to care for:
- your spouse, qualified domestic partner, child, qualified child of a qualified domestic partner, parent, or next of kin who is a current member of the U.S. Armed Forces, including the National Guard or Reserves, with a serious injury or illness incurred in the line of duty.

During your FMLA leave, you will receive health insurance benefits. Intermittent leave or a reduced work schedule is also available if it is medically necessary because of your or your family member's serious health condition or for military exigency leave.

AMZ-BRY000060



GC Exhibit 119

Owner's Manual and Guide to Employment – December 2017

You may review the FMLA policy and your Rights And Responsibilities Under FMLA here:

Leave of Absence Policies

Medical Leave

If you are unable to work because of a medical condition affecting you and are not eligible for or have exhausted your leave entitlement under the Family and Medical Leave Act (FMLA), you may be eligible for a medical leave of absence. If you haven't received health benefits coverage for your medical condition during a prior FMLA leave, you're eligible to receive health insurance benefits until the end of the month following 12 weeks of leave.

Personal Leave

When you need time off, you ordinarily are expected to use paid personal time and vacation. Amazon may provide you an unpaid personal leave of absence when you need extended time off for personal reasons not covered under FMLA or medical leave. Prior to the start of your personal leave, you may elect to apply any or all of your accrued, unused vacation or paid personal time. Your manager or Human Resources representative also must approve any personal leave, and the company reserves the right to decline any request.

Military Leave

Amazon provides a military leave of absence to associates for military service, for training, and for examinations to determine an associate's fitness for military service in the regular Armed Forces, the Armed Forces Reserves, the National Guard, and the Commissioned Corps of the Public Health Service.

AMZ-BRY000061



# Company Personnel Policies

This section details some important company policies that concern your employment at Amazon. These policies help to define and clarify the company's expectation of you, and they help associates know what to expect from the company. If you have any questions about the policies presented in this handbook or about other employment policies, please feel free to contact the Human Resources department.

## Alternative Work Arrangements

In considering any request for an alternative work arrangement, the company must balance the need to achieve business priorities and objectives with an associate's need to balance personal responsibilities and work demands. In general, an alternative work arrangement is a privilege that may be granted under appropriate circumstances to associates in good standing and whose job responsibilities are suited to such an arrangement. Amazon will evaluate requests for alternative work arrangements on a case-by-case basis and retains discretion to change or discontinue such arrangements at any time. If approved, an associate's compensation, benefits, and other stock-based awards may be affected.

### Types of Alternative Work Arrangements

The following are types of alternative work arrangements that Amazon may consider for an associate. Except for part-time work arrangements, these alternative work arrangements do not change the associates' job expectations or the amount of time an associate is expected to contribute to his or her work for Amazon. Associates on any alternative work arrangement may still be required to work additional hours and work during scheduled time off as necessary to meet business objectives.

- Flextime: An arrangement that permits managers and associates to agree to starting and quitting times within guidelines established by department management. Regardless of the associate's flextime schedule, the associate must be present during department designated "core" hours. An example of such an arrangement would be when an associate regularly works 6 a.m.-3:30 p.m.
- Compressed workweek: An arrangement that allows associates to compress their regular working hours into fewer work days by working longer days for part of the workweek, in exchange for shorter days and/or days off each workweek.
- Telecommuting: An arrangement that allows an associate to work from home or an alternate work site, for all or part of the scheduled workweek, through a formal written agreement with their manager. See Amazon's Telecommuting policy for more information.
- Part-Time Work Arrangement: An arrangement that allows an associate to voluntarily work less than a full-time schedule. See Amazon's part-time work arrangements policy for more information.

The company may determine that some positions, departments, or sites may not be eligible to participate in alternative work arrangements unless it involves a reasonable accommodation of a disability or work-related injury or illness. For instance, alternative work arrangements are generally not available for positions in fulfillment or customer service centers unless it is medically necessary or requested by the company. Check with your Human Resources representative to determine if any alternative work arrangements are available for your position, department, or site.

Because telecommuting and part-time work arrangements typically involve more logistical planning and consideration, each of these alternative work arrangements are described in greater detail in their own policy statement. Flextime and compressed workweeks are described more fully in the Alternative Work Arrangement Policy, which is available from your Human Resources representative or on the intranet at:

Alternative Work Policy

17

AMZ-BRY000062



## Code of Business Conduct and Ethics

In performing their job duties, Amazon employees should always act lawfully, ethically, and in the best interests of Amazon. To help employees understand and apply these principles, Amazon has developed the Code of Business Conduct and Ethics (the "Code of Conduct") which sets out basic guiding principles for all employees. All employees are expected to review the Code of Conduct and comply with its provisions.

Employees who a) have a question about the application of the Code of Conduct, b) believe that a violation of the Code of Conduct has or is about to occur, or c) are in doubt about how to properly act in a particular situation should promptly discuss the issue with their manager, anyone in their management chain or the Legal Department at (206) 266-1742. Employees may also raise questions or report suspected violations through the Amazon Ethics Line. Calls to the Ethics Line are answered by an independent third party and may be anonymous upon request. The Amazon Ethics Line may be accessed by dialing:

| Country | Ethics Line Number |
|---|---|
| Australia | 1-800-088-054 |
| Brazil | 0800-892-1581 |
| Canada | 877-781-2416 |
| China (Beijing) | 10-800-711-0538 |
| China (Outside | 10-800-110-0523 |
| Costa Rica | 888-402-9003 |
| Finland | 0800-91-5573 |
| Germany | 0800 589 4314 |
| Hong Kong | 800-933-699 |
| India | 000 800 440 2115 |
| Italy | 800-788 2784 |
| Japan | 800-7465 7465 |
| Singapore | 800-110-1567 |
| Luxembourg | 00 800 7465 7465 |
| Republic of Ireland | 800-7465 7465 |
| South Africa | 0800-980-054 |
| Spain | 900 814 521 |
| Sweden | 201 605 949 |
| United States | 877 781 2416 |
| United Kingdom | 800-7465 7465 |

In the following countries, dial the Direct Access Number to connect with the AT&T network, then dial the Ethics Line Number.

| Country | Direct Access | Ethics Line |
|---|---|---|
| Egypt (Cairo) | 2510-0200 | 800-505-2951 |
| Egypt (Outside Cairo) | 02-2510-0200 | 800-505-2951 |
| Morocco | 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 | 800-505-2951 |
| Romania | 0808-03-4288 | 800-505-2591 |

More information, including the entire Code of Business Conduct and Ethics, is available from your Human Resources representative and at the following links on the intranet:

AMZ-BRY000063



GC Exhibit 119

- Code of Business Conduct and Ethics
- Code of Conduct Frequently Asked Questions
- Gift Reporting Guidelines
- Gift Reporting Form

## Confidential Information

Customer information and proprietary information concerning the business of Amazon must be protected. Such confidential information or data is not to be discussed within the company or outside, except as the normal course of business makes necessary. Confidential information includes information about new products and services, transactions, financial data, ordering and shipping techniques, volume of shipments, lists of customers or suppliers, and any other proprietary information acquired through your employment with Amazon. The complete Confidential Information Guidelines and Policy is available from your Human Resources representative or on the intranet at:

Confidential Information and NDA Guidelines Policy

As a condition of your employment, you are required to sign an employee confidentiality agreement on or before your first day of employment. If, for some reason, you have not yet signed this agreement, please let your Human Resources representative know so that they may provide you with one to sign. This agreement grants Amazon exclusive rights to all proprietary information and inventions developed as a result of your employment with Amazon; requires you to maintain confidentiality of proprietary information; and restricts may restrict your ability to engage in competitive activities for 18 months after you discontinue employment with Amazon.

In some circumstances, the disclosure of employee information can create security or competitive risks. For these reasons, confidential employee information must be maintained with appropriate confidentiality. However, nothing in this policy prohibits non-supervisory employees' communications about their own or their coworkers' wages, hours, or working conditions. For more information, see:

Confidential Employee Information FAQ

## Cost Efficiency

One important factor in our long-term success will be our ability to keep costs low. Accordingly, we have developed guidelines for general spending and for travel and entertainment.

## Purchasing and Spending Authorization

All associates should understand and contribute to the company's philosophy of spending money carefully and wisely. Spending should be done conservatively, with the overall goal of spending money only in order to increase the value to our customers. Associates should plan ahead as much as possible, and purchases should be approved in advance of being made. The complete Purchase and Spending Authorization policy is available from your Human Resources representative or on the intranet at:

Purchase and Spending Authorization Policy

## Travel and Entertainment

Upon approval, associates will be reimbursed for reasonable travel, entertainment, and other expenses incurred in connection with company business. With manager approval, corporate credit cards may be issued to full-time regular associates strictly for business and travel purposes. Any associate who will travel or entertain for business purposes should review the complete Travel and Entertainment policy, which is available from your Human Resources representative or on the intranet at:

AMZ-BRY000064



# Amazon Rental Vehicle Policy

The following is intended for all employees while driving in vehicles rented for use on behalf of Amazon. Renters must adhere to the conditions below and any violation of this policy may result in corrective action, up to and including termination of employment.

- ☐ Rental vehicles should be procured through Carlson Wagonlit with one of Amazon's preferred vendors: National/Enterprise or Avis.
- ☐ When operating a rental vehicle, Amazon employees are expected to behave as a reasonable person would under the same or similar circumstances.
- ☐ Vehicle operators must comply with Amazon's Drug & Alcohol Policy and all applicable laws when operating rental vehicles.
- ☐ Negligence or improper conduct leading to damage of the rental vehicles is prohibited. All vehicles must be maintained in accordance with the rental agencies' requirements.
- ☐ Any vehicle accident/injury must be reported immediately to Corporate Risk Management regardless of severity.
- ☐ Possession of dangerous or unauthorized materials, such as explosives or firearms, is prohibited.
- ☐ Drivers must be approved Amazonian business renters. Drivers are responsible for ensuring that all passengers act in accordance with this Rental Vehicle Policy for Amazon business or personal use.

Please reference the following Inside pages to understand Amazon's rental car and corporate travel policies.

- ☐ Rental Car
- ☐ Corporate Travel Policy

Use this Notice of Loss form for reporting an auto accident.

## Drug and Alcohol Use

Being under the influence of alcohol while at work or while engaged in work-related activities is prohibited. Alcohol may be served on company premises or at work-related events only when authorized by management. On such occasions, associates are expected to act responsibly, drink alcohol only in reasonable quantities, and make plans to avoid driving after drinking alcohol. The use or possession of illegal drugs or inappropriate use of prescription drugs while at work or engaged in work-related activities is also prohibited. Violation of this policy may lead to discipline, up to and including termination. Some departments, organizations, or sites may establish more detailed drug and alcohol policies, including policies pre-employment or other drug and alcohol testing. Some departments, organizations, or sites may prohibit alcohol at all company functions. Check with your Human Resources representative for local drug and alcohol policies.

## Employees with Disabilities

Amazon complies with the Americans with Disabilities Act and applicable state and local laws prohibiting discrimination in employment based on a person's physical, mental or sensory disability. All employment practices, employment decisions, and activities are conducted on a non-discriminatory basis. Amazon also will provide reasonable accommodation for qualified individuals with a disability where medically necessary to perform one's job, except in cases in which the reasonable accommodation would create an undue hardship or a health or safety risk would exist.

If you have a disability that affects your ability to perform your job and you feel you need an accommodation, please contact your manager or Human Resources Business Partner. Amazon will work with you to determine

AMZ-BRY000065


GC Exhibit 119

if a reasonable accommodation is necessary and appropriate. The company may request medical certification to verify the existence of a disability or work restrictions, to identify potential reasonable accommodations, or to determine any safety or health risks. In addition, Amazon may contact your healthcare provider(s) in appropriate situations. Amazon will treat information regarding your medical conditions and restrictions as confidential, except to the extent your manager or other individuals need to know about your medical situation to help with the reasonable accommodation process.

## Employment Outside of Amazon

Amazon does not allow outside employment without written approval from your manager. Holding another job may adversely affect job performance, efficiency, and/or attendance. If an associate finds it necessary to seek outside employment, the associate must discuss this matter with his or her manager and gain written approval from a department vice president or fulfillment center general manager. Failure to obtain written approval to hold outside employment may be grounds for discipline, up to and including termination of employment. If approval is granted and your manager later determines that your outside employment conflicts with your performance or company interests, you will be requested to stop such activity immediately as a condition of continued employment. Some sites may permit outside employment for hourly associates during low volume cycles or as business interests dictate.

## Employment of Relatives and Friends

Although preferential treatment in employment of relatives and friends is not permitted, we do encourage associates to refer qualified applicants for any open positions. To minimize the potential for actual or perceived conflicts, Amazon does prohibit direct or indirect supervisory relationships between relatives, except in unusual circumstances.

## Employment References

It is Amazon's policy to provide prospective employers with only the dates of employment and positions held by former associates. An associate may also request that Amazon provide additional information regarding his or her work performance to prospective employers who request such information. Any associate who requests additional information beyond dates of employment and positions held must sign the authorization form attached to the policy before any information will be communicated to a prospective employer. Managers who receive requests for an employment reference must first confirm with Human Resources that an authorization form has been signed by the associate before providing a reference. The complete Employment Reference Policy and authorization form is available from your Human Resources representative or on the intranet at:

[Employment References](Employment References)

## Equal Employment Opportunity

Amazon firmly believes in equal employment opportunity for all and the importance of each associate as an individual. It is the policy of Amazon that there will be no discrimination against any associate or applicant for employment on the basis of race, religion, creed, color, national origin, citizenship, marital status, sex, age, sexual orientation, gender identity, veteran status, political ideology, ancestry, the presence of any physical, sensory, or mental disabilities, or other legally protected status. This policy pertains to all personnel-related activities, including selection, hiring, benefits, work schedules, promotions, demotions, transfers, recruiting, advertising, reductions-in-force, terminations, and all forms of compensation and training. A strong commitment by each associate is necessary to ensure equal employment opportunity for all.

Any associate who believes that he or she has been discriminated against or has suffered from harassment or retaliation for reporting discrimination or harassment should report it to his or her manager, or to any member of management at Amazon, or to Human Resources. Upon receipt of the complaint, the company will conduct a prompt investigation and will take appropriate corrective action as may be warranted.

AMZ-BRY000066



Amazon will not tolerate or permit any associate to suffer retaliation of any kind or to suffer any adverse employment action as a result of reporting an unlawful discrimination or harassment claim. Amazon will not discharge or in any other manner discriminate against employees or applicants because they have inquired about, discussed, or disclosed their own pay or the pay of another employee or applicant. However, employees who have access to the compensation information of other employees or applicants as a part of their essential job functions cannot disclose the pay of other employees or applicants to individuals who do not otherwise have access to compensation information, unless the disclosure is (a) in response to a formal complaint or charge, (b) in furtherance of an investigation, proceeding, hearing, or action, including an investigation conducted by the employer, or (c) consistent with the contractor's legal duty to furnish information.

## Health and Safety

Amazon places a high value on the health and safety of its associates. As part of its commitment to providing a safe workplace for all associates, Amazon complies with all applicable regulations and has adopted a core safety policy that no task is so important that an associate must violate a safety rule or put themselves at risk of injury or illness in order to get it done. Ensuring a healthy and safe work environment is a responsibility that must be shared equally by each associate. Associates are encouraged to actively participate in identifying ways to maintain a safe and healthy workplace. All managers are responsible for the safety of their associates and are expected to monitor the workplace for unsafe conditions, procedures, or behaviors and take prompt action to eliminate any hazards.

## Safety Programs and Training

Amazon has developed an extensive safety program that is regularly reviewed and improved. During their orientation, associates receive important information about safety procedures as appropriate for their site. Business groups or separate sites may develop and publish safety procedures, guidelines, or rules specific to their operations or site. The safety policy for our fulfillment centers, for instance, is available from your Human Resources representative or on the intranet at:

[Safety, Health, & Environmental Policies](#)

Where appropriate, Amazon also provides regularly scheduled safety training that provides guidelines on safe work practices to minimize workplace hazards. Associates are expected to be aware and comply with general safety guidelines, as well as the policies and procedures that pertain to each work site, and to use safe equipment, proper protective equipment, and the proper tools that are appropriate for each job.

## Reporting Accidents and Concerns about Workplace Safety

Associates are responsible to and should immediately report any accidents or unsafe work practices to their immediate manager, Safety manager, Human Resources, or any member of Global Security. In the event of a work-related accident that results in injury or illness, associates must immediately notify their manager, Human Resources, and Global Security. Such reports are necessary to comply with federal and state laws and to initiate insurance and workers' compensation benefits coverage for the associate's medical expenses and lost salary. Associates will be required to complete an "Employee Report of Incident" form and sign a copy of their "Supervisors Incident Investigation Report of Injury" form. These forms are available from your Human Resources representative or on the intranet at:

[Accident Reports](#)

No retaliation of any kind will be permitted or tolerated against an associate for making a workers' compensation claim or reporting unsafe work practices. If associates believe that they have been retaliated against, they should report this immediately to their manager or to their Human Resources Business Partner.

AMZ-BRY000067



For more information regarding work place injuries, including state specifics, please follow the link below:

Workers' Compensation Information

## Information Security

This is a summary of the Amazon Information Security Policy that sets forth the rules that associates must abide by as a condition of being provided access to the company's technology and information assets. The complete Information Security Policy and related policy documents address a wide variety of important, practical issues, including the use of instant messaging and handheld devices, protecting your passwords and the company's network, and other information security issues. You are strongly encouraged to review the complete Information Security Policy, which is available from your Human Resources representative or on the intranet at:

https://policy.amazon.com

General Security Questions

Policy Specific Questions

## Privacy

All email correspondence and other computer files created, stored, or transmitted on the company systems and all traffic generated on the company's network is the property of the company. While we will attempt to respect an associate's privacy, company management may access or monitor files, keystrokes, network traffic, and communication channels as circumstances warrant. Associates are expected to exercise discretion and good judgment and to demonstrate respect for each other's privacy and for company confidential information. Associates should not access any data beyond what they need to get their job done. Access to data other than that in one's own home directory or a shared department directory should be performed only with the explicit permission of the owner of that directory or when instructed by a manager. Similarly, associates should not sign up for any business-related list whose content is not appropriate for their job.

## Acceptable Use

The company provides some associates with computers and computer accounts for work-related purposes to perform job duties and to assist in intra-company communication. A computer account gives you access to the company's computer and email systems, as well as access to the Internet. Associates may only access the company network from centrally-managed (through "SMS" or "cmf") computers that comply with the *Desktop/Laptop Security Policy* (see: https://infosec.amazon.com/?ComputingDevices). As a condition of this access, associates are expected to respect the obligations and responsibilities associated with having a company computer account. Associates are also responsible for ensuring that electronic communication is effective, ethical, and lawful. The use of abusive, offensive, or profane language is prohibited. Fraudulent and obscene messages, or harassment of any kind, are also prohibited. Please keep in mind that associates' activity on the Internet reflects on the company.

Protecting Data and Securing Access to the Company Network

Users are responsible for taking all steps to protect information and secure access to the company network, including the following:

- ☐ Passwords and Accounts

  - ○ You are responsible for keeping your password private. Don't disclose your passwords to anybody.

AMZ-BRY000068



**GC Exhibit 119**

Owner's Manual and Guide to Employment – December 2017

- o  Don't share your account (e.g., don't allow others use of your account).

- Email and Sharing

  - o  Never forward your email outside of the company (e.g., using a forward setting).

  - o  Never store any company data on a computer system outside the administrative control of Amazon (e.g., your home home computer). Certain applications (including POP e-mail clients, etc.) store data locally and thus must not be used on personal, non-Amazon-issued computers.

- Computing Devices and Network Access

  - o  Any new connection or change to the company network (the data network that connects all our locations) must be approved by both Information Security (https://sword.amazon.com) and Network Engineering (network-eng@amazon.com).

  - o  Never connect an unauthorized modem, wireless card or other network device to any Amazon computer or network.

  - o  Never download and install unauthorized software (including Java applets and ActiveX controls) on your system. Note: While there is not a single list of authorized software for all users, for the majority of users is recommended to only install software that is approved by IT Support (deskside@amazon.com).

- Customer Data and Security

  - o  Never circulate customer information in electronic form other than by customer or order id. If you escalate a problem, refer to order nnn-nnnnnnn-nnnnnnn or to customer number nnnnnnn rather than to the purchase of "Item" by customer "CustomerName."

  - o  Always report unusual patterns in systems or network performance immediately (either to your department escalation point or to the IT operators at (206) 266-2187).

  - o  Always report a suspected security compromise immediately (see https://w.amazon.com/index.php/Infosec#ReportanInformationSecurityIncident)

## Reporting Violations

Violations of the Information Security Policy must always be reported through a secure ticket to Information Security.

Violations should never be discussed with anyone outside Legal and Information Security unless approved by one of them.

Secure Ticket to Information Security

## Insider Trading

Because Amazon is a public company, we are subject to a number of legal requirements, including a prohibition on insider trading. Federal law prohibits any of the company's employees, directors, or consultant's associates, directors, or consultants from trading in Amazon securities based on material, nonpublic information. This means that if you have material information that has not been disclosed to the public by the company, you may not buy, sell, or enter into any other type of transaction involving any Amazon securities, including Amazon common stock. You may not give material nonpublic information to friends or family members or to any other third parties. Nor may you advise friends or family members or any other third parties to trade based on material nonpublic information. Certain associates and members of their households are also prohibited from trading in Amazon securities during certain periods each quarter, generally beginning

30

AMZ-BRY000069



Owner's Manual and Guide to Employment – December 2017

on the first day of the last month of the company's fiscal quarter and ending on the third day following the quarterly earnings announcement. In addition, there may be other periods that associates are prohibited from trading that the company will announce from time to time. Certain associates are also required to pre-clear all transactions involving Amazon securities with the legal department.

In addition to being against our policy, insider trading is against the law. The federal penalties for insider trading include large fines and jail time. Every associate should review and become familiar with Amazon's complete Insider Trading policy, which is available from your Human Resources representative or on the intranet at:

Insider Trading Guidelines

## Physical Security

### Badges and Other Important Information

Associates and other outsourced employees (contractors, vendors, etc.) must wear their ID/access badges in a visible manner at all times on company property and at company events. Visitors must check in with Security or Reception, be issued a visitor badge that should be worn in a visible manner, and be escorted while on company property. If associates see someone on company property without appropriate identification, they should either alert Security or ask the individual to show their identification.

Associates should also safeguard their access cards, codes, keys, passwords, computers, and other valuable property and equipment. Associates should not circumvent ordinary security systems or procedures and should report vulnerabilities to Amazon's security systems. It is the responsibility of each Amazon associate to adhere to all physical Security policies, procedures, processes and instructions given by a member of the Security staff in order to safeguard the relationship of trust with customers and employees alike. Other specific expectations regarding security are available from your Human Resources representative or on the intranet at:
http://globalsecurity.amazon.com/

You are encouraged to review these and other security policies relevant to your workspace at:
http://policy.amazon.com/

## Workplace Emergency Response

Associates are expected to treat each other, contractors, customers, and visitors with courtesy and professionalism. Amazon will not tolerate violence, threats of violence, or other intentional or reckless conduct by anyone that harms or threatens the safety of associates or others. Any associate who observes or experiences conduct that violates this policy or any situation that has a potential risk of workplace violence, should immediately report it to a manager, Human Resources, Safety manager, or any member of Global Security. Global Security can be contacted 24-hours a day by calling (206) 740-SAFE (7233) or visit the Business Assurance Center  page on Inside Amazon. Emergencies and imminent threats of harm should be reported immediately to the police or other emergency personnel by dialing 911.

The complete Workplace Emergency Response policy is available from your Human Resources representative or on the intranet at:

Workplace Emergency Response

## Inspections on Company Premises

To provide a safe workplace and to protect associate and company property, the company reserves the right to conduct a search of any area on company premises. This includes an associate's office, workspace, or locker. The Company also reserves the right to inspect personal articles carried to or from Company premises.

AMZ-BRY000070


GC Exhibit 119

Owner's Manual and Guide to Employment – December 2017

These articles may be accessed by authorized personnel of the Company, who may enter your office, workspace, or locker in order to do so. Typically, the Company will conduct searches on Company premises when it receives a report of or suspects a violation of the Company's Standards of Conduct. However, the Company reserves the right to inspect for any purpose. The Company also may use various electronic detection devices, such as walk-through or hand-held metal detectors. Refusal to permit the company to conduct the searches identified in this section may lead to disciplinary action, up to and including termination of employment.

## Solicitation

The orderly and efficient operation of Amazon's business requires certain restrictions on solicitation of associates and the distribution of materials or information on company property. This includes solicitation via company bulletin boards or email or through other electronic communication media.

The following activities are prohibited:

- Solicitation of any kind by associates on company property during working time;
- Distribution of literature or materials of any type or description (other than as necessary in the course of your job) by associates in working areas at any time; and
- Solicitation of any type on company premises at any time by non-associates.

Examples of prohibited solicitation include the sale of merchandise, products, or services (except as allowed on forsale@Amazon alias), soliciting for financial contributions, memberships, subscriptions, and signatures on petitions, or distributing advertisements or other commercial materials.

The only exceptions to this policy are communications for company-sponsored activities or benefits, or for company-approved charitable causes, or other specific exceptions formally approved by the company. All communications under these exceptions must also have prior approval of Human Resources. Violation of this policy may result in immediate disciplinary action, up to and including termination of employment.

## Transitional Work

In the event you are temporarily unable to perform your job due to a work-related injury or occupational disease, we hope to assist you in obtaining proper treatment and returning you to your regular job as soon as possible. If you are unable to immediately return to your regular job, we will attempt to return you to temporary transitional work if it is consistent with your medical restrictions and consistent with Amazon's business needs. This policy outlines the procedures for notifying the Company concerning your condition to assist in your return to work. By this joint effort, Amazon hopes to help associates recover at a rapid rate, retain productive value, and reduce unnecessary medical costs. The complete Transitional Work Policy is available from your Human Resources representative or on the intranet at:

Transitional Work Policy

## Workplace Harassment

At Amazon, we believe that our associates should be treated with respect and dignity. Therefore, we will not tolerate inappropriate conduct, including discriminatory harassment, of any kind based on race, religion, creed, color, national origin, citizenship, marital status, sex, age, sexual orientation, gender identity, veteran status, political ideology, ancestry, or the presence of any physical, sensory, or mental disabilities, or other legally protected status.

Conduct prohibited by this policy is unacceptable in the workplace and in any work-related setting outside of the workplace, such as during business trips, business meetings, or business-related social events. This policy applies to the conduct of all Amazon associates as well to the conduct by or toward non-employees involved in our business, such as subcontractors, consultants, clients, customers or vendors. This policy is intended to be consistent with federal and state laws prohibiting discriminatory harassment in the workplace.

AMZ-BRY000071



## Anti-Sex Buying Policy

It is against Amazon's policy for any employee or Contingent Worker to engage in any sex buying activities of any kind in Amazon's workplace or in any work-related setting outside of the workplace, such as during business trips, business meetings or business-related social events. It likewise is prohibited to engage in sex buying activities in using any company property, equipment or software (including, without limitation, company credit cards, expense accounts, buildings, parking lots, grounds, computers, storage devices, websites, social media channels, networks, vehicles, and phones). This prohibition applies regardless of whether the activity is legal or tolerated in a particular jurisdiction, foreign or domestic.

## Sexual Harassment

One type of harassment prohibited by this policy is sexual harassment. Sexual harassment generally consists of unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when (1) submission to or rejection of such conduct is the basis for employment decisions affecting an applicant or associate; or (2) such conduct has the purpose or effect of creating a sexually offensive, hostile, or intimidating work environment that interferes with an individual's ability to perform the job.

Examples of sexual harassment include, but are not limited to:

- requests or demands of sexual favors in exchange for favorable or preferential treatment;
- sexual jokes or use of sexually explicit language;
- unwelcome or unwanted physical contact;
- sexually degrading words used to describe an individual;
- sexual comments injected into business communications;
- the communication of sexually offensive material via electronic mail or voice mail;
- graphic verbal comments about an individual's body;
- physical or verbal abuse of a sexual nature;
- unwelcome sexual flirtations, advances, or propositions; and
- downloading, circulating, or displaying in the workplace, sexually suggestive objects and/or pictures, including such material from the Internet.

## Other Harassment

Workplace harassment prohibited under this policy is not limited to sexual harassment. Statements or actions that offend or demean an individual based on his/her race, religion, creed, color, national origin, citizenship, marital status, age, sexual orientation, gender identity, veteran status, political ideology, ancestry, or the presence of any physical, sensory, or mental disabilities are also inappropriate and are strictly prohibited.

## Work-Related Exposure to Potentially Offensive Materials

In many areas of our business, we create, market and distribute products and programming that is adult themed, sexually explicit, or includes images and speech related to personal characteristics such as race, religion, sexual orientation, gender, gender identity, national origin, disability, and age. Associates may be exposed to materials that some may consider offensive. While this exposure is often unavoidable in our work environment, harassing conduct directed at someone because of any protected personal characteristic is strictly prohibited. Associates should discuss any concerns about the nature of our business or their work environment with their supervisor, a department manager, or Human Resources.

## Consensual Relationships

At times, consensual, romantic and/or sexual relationships between co-workers may occur. When such a relationship is between an associate who has supervisory authority and one who does not, an actual or perceived conflict of interest may exist. Therefore, these situations should be avoided. If such relationships arise, they will be considered carefully by Amazon, and appropriate action will be taken. Such action may

AMZ-BRY000072

include a change in the responsibilities of the individuals involved, re-assignment or transfer of location within the Company, or termination of employment.

Additional information for the Fulfillment Center and Customer Service location is available here:

[Consensual Relationship Policy](#)

## Responding to Inappropriate Conduct or Possible Incidents of Harassment

All associates, regardless of position, are responsible for ensuring that our workplace is free from offensive behavior and harassment. Associates who observe or experience inappropriate or harassing conduct in the workplace by anyone, including supervisors, coworkers, customers, or visitors, may advise the offender that their behavior is unwelcome and request that it stop. In addition, associates who encounter such behavior should report it immediately to their supervisor, to a department manager, or to a Human Resources Business Partner. It is important that associates feel comfortable reporting such incidents; therefore, no retaliation of any kind will be permitted or tolerated against an associate for reporting a suspected incident of harassment. If associates believe that they have been retaliated against for making a good faith complaint of harassment or discrimination, they should report this immediately to their supervisor, a department manager or to a Human Resources Business Partner. You can locate your appropriate Human Resources Business Partner through the following link on the intranet:

[https://contactstool.amazon.com/](https://contactstool.amazon.com/)

Amazon will promptly investigate any reports of workplace harassment or inappropriate conduct and will enforce appropriate disciplinary action where necessary. To the extent possible, the associate's privacy, and that of any witnesses, as well as of the alleged harasser, will be protected against disclosure, except as necessary to conduct the investigation.

Prompt, corrective action will be taken when appropriate. This action may include disciplinary action such as a warning, reprimand, reassignment, temporary suspension with or without pay, or termination of employment, as Amazon believes appropriate under the circumstances. False complaints of harassment, discrimination, or retaliation that are not made in good faith may be the subject of similar appropriate disciplinary action.

# Appendix - Standards of Conduct

## Standards of Conduct

The Standards of Conduct are a list of examples of infractions that may result in corrective action, up to and including termination of employment. The Standards of Conduct are only guidelines. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace, and the Standards of Conduct is not intended to be all-inclusive or exhaustive. As an at-will employer, Amazon reserves the right in all circumstances to apply any level of corrective action as appropriate, up to and including immediate termination of employment, without prior corrective action or notice for conduct in either category or for conduct not described in the Standards of Conduct. Employment with Amazon is at the mutual consent of Amazon and the associate, and either party may terminate that relationship at any time, with or without cause, and with or without advance notice.

Category 1

The following work conduct infractions are regarded as extremely serious, and termination of employment may result following one offense:

- ☐ Disrespect or rudeness to an Amazon customer
- ☐ Theft or inappropriate removal or possession of property

AMZ-BRY000073



GC Exhibit 119

Owner's Manual and Guide to Employment – December 2017

- Assaulting, threatening, intimidating, coercing, or interfering with supervisors or fellow associates
- Making unauthorized statements on behalf of the company to the press or in any public forum (as only the company's authorized spokespersons may make authorized statements)
- Use or possession of dangerous or unauthorized materials such as hazardous chemicals or explosives, or use or possession of firearms, knives, explosive devices of any kind, or weapons of any kind
- Violation of the company's Health and Safety policy including possession, distribution, sale, transfer, or use of alcohol or illegal drugs in the workplace, while on duty or on breaks, or while operating employer-owned or leased vehicles or equipment
- Fighting or threatening violence in the workplace
- Gross misconduct
- Gross negligence
- Sexual or other unlawful or unwelcome harassment
- Making, publishing, or repeating knowingly or maliciously false statements concerning an associate, the company, or its products
- Discriminating against a fellow associate or prospective associate on the basis of race, religion, creed, color, national origin, citizenship, marital status, sex, age, sexual orientation, gender identity[1], veteran status, political ideology, ancestry, or the presence of any physical, sensory, or mental disabilities or other legally protected status
- Negligence or improper conduct leading to damage of employer-owned, employer-leased, or customer-owned property
- Insubordination or intentional disregard of instructions
- Falsification of personnel or other company documents/records, including employment application
- Unauthorized removal of company documents
- Unauthorized disclosure of business "secrets" or confidential information
- Intentionally making entries on another associate's time card/sheet, or falsely altering a timekeeping document
- Leaving company premises without permission during assigned work hours (unpaid meal periods are not "work hours" for purposes of this policy)
- Failure to fully cooperate with company investigations (except for questions regarding labor organizations or protected concerted activity)
- Violation of safety policies, procedures, standards, regulations, or laws
- Creating a hazardous or dangerous situation
- Engaging in any conduct that places the health and safety of any person at risk
- Violation of personnel policies
- Violation of security policies, procedures, processes, or instructions
- Violation of the Anti-Sex Buying Policy.

Category 2

The following work conduct infractions are considered serious and generally result in corrective action:

- Unauthorized absence, excessive absenteeism, or any absence without notice
- Failure to carry out a work assignment in an efficient, responsible, and acceptable manner
- Abusive, vulgar, or harassing language to a supervisor, fellow associate, or vendor
- Failure to adhere to starting time, quitting time, or break time policies, or wasting time
- Unauthorized use, misuse, or abuse of equipment, products, material, or property belonging to other associates, belonging to the company, or in the company's custody
- Leaving a company-assigned work area during scheduled working hours without permission
- Violations of the no-solicitation, no-distribution policy
- Creating or contributing to disorderly or unsanitary conditions
- Failing to report or remedy any unsafe conditions, procedures, or behaviors
- Failure to immediately report an accident/injury, regardless of severity, when it occurs on company property, or while performing company business

---

[1]  Updated on 12.30.08 (EEO, Workplace Harassment, Other Harassment, Category 1 discrimination)

AMZ-BRY000074

Acknowledged by icream1962@gmail.com (Gerald Bryson) on 10/23/2018 8:00:31 PM)



## POLICIES AND PROCEDURES ACKNOWLEDGMENT FORM – NAFC

**By clicking "Acknowledge" above, I acknowledge that I have access to copies of the following selected policies through MyDocs and that I am responsible for reading, understanding, and complying with these polices.**

- The Owner's Manual and Guide to Employment
- Leave of Absence (LOA)
- U.S. Background Check Policy
- Insider Trading Guidelines and FAQs

**By clicking "Acknowledge" above, I also understand that I am responsible for compliance with all Amazon Policies, which are available online at Inside Amazon > English > Employment > US Policies. These policies include, but are not limited to:**

- **Attendance Policy – US Fulfillment Center**
- **Cell Phone Use Policy**
- **Dress and Grooming Standards**
- **Holiday Pay Guidelines**
- **Holiday Blackout**
- **Overtime Policy**
- **Standards of Conduct**

I further acknowledge that Amazon may change, rescind, or add to any policies, benefits, procedures, or practices from time to time at its sole and absolute discretion, with or without prior notice.  I agree that this document is not intended to be an express or implied contract; rather, it is a general statement of Amazon's policies.  I understand and agree that my employment at Amazon is at will and may be terminated by either me or Amazon at any time for any reason, with or without cause, and with or without prior notice or warning.

**I understand that I can raise questions or concerns with my manager, human resources representative, or the Employee Resource Center.**

Acknowledged by jcream1962@gmail.com (Gerald Bryan on 10/23/2018 7:59:37 PM)



GC Exhibit 119



### WORKING HOURS POLICY
### ACKNOWLEDGMENT FORM

**By clicking "Acknowledge" above, I acknowledge that I have access to a copy of the** <u>Working Hours (Non-Exempt/Hourly) Policy</u> **through MyDocs and that I am responsible for reading, understanding, and complying with the Working Hours Policy.**

- If I am an *hourly employee*, I am responsible for reporting all hours worked; taking a work free unpaid 30 minute meal period; and taking paid rest breaks.  I understand that no one may allow or ask me to perform work "off the clock" without being paid.

- If I am a *salaried employee*, I understand that I may not allow or ask any hourly employee to perform work "off the clock" without being paid.  This includes, but is not limited to, not interrupting meal periods or rest breaks with work related matters.  I will not falsify or incorrectly report time worked for an hourly employee or advise an hourly employee to do so.

**By clicking "Acknowledge" above, I also agree** to notify a human resources representative, my supervisor, any other manager, the Legal Department, or <u>Amazon's Ethics Line</u> immediately in the event I have reason to believe that any violation of the Working Hours Policy occurred.

**I understand that I can raise questions or concerns with my manager, human resources representative, or the Employee Resource Center.**

*Last Updated December 27, 2013*
**AMZ-BRY000076**

GC Exhibit 119



AMZ-BRY000077



GC Exhibit 119

**Code of Business Conduct and Ethics**

In performing their job duties, Amazon.com employees should always act lawfully, ethically, and in the best interests of Amazon.com. This Code of Business Conduct and Ethics (the "Code of Conduct") sets out basic guiding principles. Employees who are unsure whether their conduct or the conduct of their coworkers complies with the Code of Conduct should contact their manager or the Legal Department. Employees may also report any suspected noncompliance as provided in the Legal Department's reporting guidelines.

 Employees must follow applicable laws, rules and regulations at all times. Employees with questions about the applicability or interpretation of any law, rule or regulation, should contact the Legal Department.

**Compliance with Laws, Rules and Regulations**

In performing their job duties, employees are expected to use their judgment to act, at all times and in all ways, in the best interests of Amazon.com. A "conflict of interest" exists when an employee's personal interest interferes with the best interests of Amazon.com. For example, a conflict of interest may occur when an employee or a family member receives a personal benefit as a result of the employee's position with Amazon.com. A conflict of interest may also arise from an employee's business or personal relationship with a customer, supplier, competitor, business partner, or other employee, if that relationship impairs the employee's objective business judgment.

**Conflicts of Interest**

Because an employee's receipt of gifts or services could create a conflict of interest, the Legal Department will develop and maintain guidelines for disclosure of gifts or services received from customers, suppliers, competitors or business partners.

Employees should attempt to avoid conflicts of interest and employees who believe a conflict of interest may exist should promptly notify the Legal Department. The Legal Department will consider the facts and circumstances of the situation to decide whether corrective or mitigating action is appropriate.

**Insider Trading**

Federal and state laws prohibit trading in securities by persons who have material information that is not generally known or available to the public.

Employees of the Company may not a) trade in stock or other securities while in possession of material nonpublic information or b) pass on material nonpublic information to others without express authorization by the Company or recommend to others that they trade in stock or other securities based on material nonpublic information.

The Company has adopted guidelines designed to implement this policy. All employees are expected to review and follow the Amazon.com Insider Trading Guidelines. Certain employees must comply with trading windows and/or preclearance requirements when they trade Amazon.com securities.



**Discrimination and Harassment**

Amazon.com provides equal opportunity in all aspects of employment and will not tolerate any illegal discrimination or harassment of any kind. For more information, see the Amazon.com policies on Equal Employment Opportunity and Workplace Harassment in the Amazon.com Owner's Manual

**Health & Safety**

Amazon.com provides a clean, safe and healthy work environment. Each employee has responsibility for maintaining a safe and healthy workplace by following safety and health rules and practices and reporting accidents, injuries and unsafe conditions, procedures, or behaviors.

Violence and threatening behavior are not permitted. Employees must report to work in a condition to perform their duties, free from the influence of illegal drugs or alcohol.

**Price Fixing**

Employees may not discuss prices or make any formal or informal agreement with any competitor regarding prices, discounts, business terms, or the market segments and channels in which the Company competes, where the purpose or result of such discussion or agreement would be inconsistent with applicable antitrust laws. If you have any questions about this section or the applicable antitrust laws, please contact the Legal Department.

**Bribery, Payments to Government Personnel**

Employees may not bribe anyone for any reason, whether in dealings with governments or the private sector.  The U.S. Foreign Corrupt Practices Act, and similar laws in other countries, prohibit offering or giving anything of value, directly or indirectly, to government officials in order to obtain or retain business. Employees may not make illegal payments to government officials themselves or through a third party. Employees who are conducting business with the government officials of any country must contact the Legal Department for guidance on the law governing payments and gifts to governmental officials.

**Recordkeeping, Reporting, and Financial Integrity**

Amazon.com's books, records, accounts and financial statements must be maintained in appropriate detail, must properly reflect the Company's transactions and must conform both to applicable law and to the Company's system of internal controls. Further, Amazon.com's public financial reports must contain full, fair, accurate, timely and understandable disclosure as required by law. The Company's financial, accounting and legal groups are responsible for procedures designed to assure proper internal and disclosure controls, and all employees should cooperate with these procedures.

**Questions: Reporting Violations**

AMZ-BRY000079



Employees should speak with anyone in their management chain or the Legal Department when they have a question about the application of the Code of Conduct or when in doubt about how to properly act in a particular situation.

The Amazon.com Legal Department has developed and maintains reporting guidelines for employees who wish to report violations of the Code of Conduct. These guidelines include information on making reports to the Legal Department and to an independent third party. Please see the reporting guidelines for information and instructions.

Amazon.com will not allow retaliation against an employee for reporting misconduct by others in good faith. Employees must cooperate in internal investigations of potential or alleged misconduct.

Employees who violate the Code of Conduct will be subject to disciplinary action up to and including discharge.

**Periodic Certification**

The Legal Department will designate certain employees who, based on their level of responsibility or the nature of their work, will be required to certify periodically that they have read, understand and complied with the Code of Conduct.

**Board of Directors**

With respect to their service on behalf of the Company, Amazon.com's Board of Directors must comply with the relevant provisions of this Code of Conduct, including conflicts of interest, insider trading and compliance with all applicable laws, rules and regulations.

**Waivers**

Waivers of this Code of Conduct may be made only in a manner permitted by law.

AMZ-BRY000080

Acknowledged by jcream1963@gmail.com (Gerald Bryan on 10/23/2018 7:57:40 PM)


GC Exhibit 119

# Computer Use Policy

Amazon provides some associates with computers and computer accounts to assist in the performance of job duties and to assist in intra-company communication. A computer account gives you access to Amazon's computer and email systems, as well as access to the Internet. As a condition of this access, you are expected to respect the obligations and responsibilities associated with having an Amazon computer account. In addition to your own good judgment and common sense; the following will serve as general guidelines for appropriate use of your Amazon.com computer account and the company's computers.

These guidelines apply to all computer use, including email, world wide web access, and other Internal access (including electronic bulletin boards); to both personal and business use; and to both internal and external correspondence.

General computer system access has been provided for work-related purposes. While it is understood that associates may occasionally use their Amazon computer account for personal use, such personal use should be limited to non-working hours and should not interfere with an associate's job duties or productivity; and as always, such use should not be undertaken with the expectation of privacy.

Your manager is responsible for ensuring that you are included in the appropriate business-related email distribution lists, as required by your job duties. While you are able to sign up for other lists of general interest (such as yumyum), please do not sign up for any business related list whose content is not appropriate for your job. Please ask your manager if you have any questions regarding which lists are appropriate for subscription.

Associates should generally refrain from sending email to the group distribution list Amazon or other general lists such as dawson or downtown unless directed by a manager. In particular, do not send personal messages, such as messages regarding items for sale or items sought, to any email list other than one intended specifically for such purpose (such as for sale)

All email correspondence and other computer files created, stored, or transmitted on the company's systems are the property of Amazon. While we will attempt to respect an associate's privacy, Amazon management or Human Resources may access or monitor these files if circumstances warrant.

Associates are responsible for ensuring that electronic communication is effective, ethical and lawful. The use of abusive, offensive, or profane language is prohibited. Fraudulent and obscene messages, or harassment of any kind, are also prohibited. Please keep in mind that your activity on the Internet reflects on Amazon.

Associates are expected to exercise discretion and good judgment and to demonstrate respect for each other's privacy and for company confidential information. Access to directories other than your own home directory or a shared directory for your department should be performed only with the explicit permission of the owner of that directory or when instructed by a manager.

Associates are expected to help protect the security of all files on the company's computer system. In particular, you should keep your passwords private, and you should not allow anyone outside of the company to have access to your computer account.

I have read and understand this policy.

**AMZ-BRY000081**



**AMAZON.COM, INC.**

**CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT**

This Confidentiality and Invention Assignment Agreement ("**Agreement**") is made by and between Amazon.com, Inc., a Delaware corporation, and _____ ("**Employee**").

**RECITALS**

**A.** Employee enters into this Agreement in connection with Employee's acceptance of employment with Amazon.com, Inc. or its subsidiary or affiliate, and any future employment with Amazon.com, Inc. or another of its subsidiaries or affiliates (depending on the circumstances, each an "**Employer**");

**B.** As used in this Agreement, "**Amazon**" means Amazon.com, Inc. and any entity that controls, is controlled by, or is under common control with Amazon.com, Inc., including without limitation its subsidiaries and affiliates;

**C.** Employee's acceptance of this Agreement is an express condition of Employee's employment with Employer, and is made by Employee in consideration of such employment, including the compensation, benefits and confidential information provided now and in the future to Employee by Employer, which Employee acknowledges are of significant benefit to Employee; and

**D.** Employee's continued employment with Employer is expressly conditioned on Employee's good faith agreement to comply with this Agreement.

**AGREEMENTS**

In consideration of the above Recitals, which are incorporated herein, the promises and covenants below, and other valuable consideration, the receipt and adequacy of which is acknowledged, the parties agree as follows:

**1.   TERM.** This Agreement, including Sections 3, 4, and 5, contains obligations that apply during Employee's employment and for specified periods after the date Employee's employment ends ("**Separation Date**"), regardless of the reason for separation or whether it was voluntary or involuntary.

**2.   ATTENTION AND EFFORT.** During employment, Employee will devote Employee's time, ability, attention, and effort to furthering Amazon's best interests and will consult and comply with the Amazon Outside Activities policy for Employee's business or division as it pertains to engaging in outside work.

**3.   CONFIDENTIAL INFORMATION.**

**3.1 Confidentiality and Confidential Information.** Employee will obtain, receive, or gain access to Confidential Information (as defined below) in connection with Employee's work for Amazon. During employment and at all times thereafter, Employee will hold all Confidential Information in strictest confidence and will not acquire, use, publish, disclose, or communicate any Confidential Information except as required in connection with Employee's work without the prior written approval of an authorized officer of Amazon. For purposes of this Agreement, "**Confidential Information**" means proprietary or confidential information of Amazon in whatever form, tangible or intangible, whether or not marked or otherwise designated as confidential, that is not otherwise generally known to the public, relating or pertaining to Amazon's business, projects, products, customers, suppliers, inventions, or trade secrets, including but not limited to: business and financial information; Amazon techniques, technology, practices, operations, and methods of conducting business; information technology systems and operations; algorithms, software, and other computer code; published and unpublished know-how, whether patented or unpatented; information concerning the identities of Amazon's business partners and clients or potential business partners and clients, including names, addresses, and contact information; customer information, including prices paid, buying history and habits, needs, and the methods of fulfilling those needs; supplier names, addresses, and pricing; and Amazon pricing policies, marketing strategies, research projects or developments, products, legal affairs, and future plans relating to any aspect of Amazon's present or anticipated businesses. Nothing in this Agreement

US CIAA (1269844) NE
Updated February 2017

AMZ-BRY000082



prohibits non-supervisory employees' communications about their own or their coworkers' wages, hours or working conditions.

**3.2 Prevention of Unauthorized Release of Confidential Information.**  Employee will take reasonable measures to prevent unauthorized persons or entities from obtaining, receiving, or gaining access to any Confidential Information in Employee's possession or control.

Nothing prohibits Employee from reporting an event that he or she reasonably believes is a legal violation to a law-enforcement agency (such as the Securities and Exchange Commission, Equal Employment Opportunity Commission, or Department of Labor), or from cooperating in an agency investigation.   Employee acknowledges that he or she has received notice under the 2016 Defend Trade Secrets Act.  First, that he or she will not be held criminally or civilly liable under Federal or State trade secret law for disclosing a trade secret either in confidence to a Federal, State, or Local government official or to an attorney for the purpose of reporting or investigating a suspected legal violation, or under seal in a lawsuit or other court proceeding.  And, second, that an individual who pursues a lawsuit for unlawful retaliation against his or her employer for reporting a suspected legal violation may disclose the trade secret to his or her attorney and use the trade secret information in the court proceeding, provided any document containing the trade secret is filed under seal and is not disclosed unless permitted by court order.

**3.3 Confidential Information of Third Parties.** Employee will preserve as confidential any information that Employee learns or obtains from a third party or relating to a third party (such as a client, customer, affiliate, partner, or vendor) that is not readily available to the public or that Amazon is obligated to treat as confidential, and Employee will treat such information as Confidential Information.

**3.4 Return of Confidential Documents.** On the Separation Date, or at any time otherwise requested by Amazon, Employee will immediately return all Confidential Information and other things belonging to Amazon, including tools, equipment, devices, or other property, and all documents, records, notebooks, and tangible articles containing or embodying any Confidential Information, including any copies (whether stored in paper, electronic, magnetic, or other form) then in Employee's possession or control, whether prepared by Employee or others.

**4. RESTRICTIVE COVENANTS.**

**4.1 Non-Solicitation.** During employment and for 18 months after the Separation Date, Employee will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant): (a) accept or solicit business from any Customer of any product or service that Employee worked on or supported, or about which Employee obtained or received Confidential Information; or (b) encourage any Customer or Business Partner to cease doing business with Amazon or to terminate or limit an existing relationship or arrangement with Amazon. For purposes of this Agreement, "**Customer**" means any individual or entity that was a customer or client of Amazon during Employee's employment, or with which Amazon engaged in discussions before the Separation Date related to the possibility that such party might become a customer or client of Amazon, and "**Business Partner**" means any individual or entity with which, before the Separation Date, Amazon was involved in any business arrangement or engaged in discussions regarding the possibility of entering into such an arrangement.

**4.2 Non-Interference.** During employment and for 12 months after the Separation Date, Employee will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant): (a) solicit or otherwise encourage any employee, contractor, or consultant of Amazon ("**Amazon Personnel**") to terminate any employment or contractual relationship with Amazon; (b) disclose information to any other individual or entity about Amazon Personnel that could be used to solicit or otherwise encourage Amazon Personnel to form new business relationships with that or another individual or entity; or (c) otherwise interfere with the performance by current or former Amazon Personnel of their obligations or responsibilities to Amazon. Nothing in this Section 4.3 restricts Employee from exercising rights protected under the National Labor Relations Act.

US CIAA (1269844) NE
Updated February 2017

AMZ-BRY000083

DocuSign Envelope ID: 535EAA72-9445-4806-AF55-866C23F3AGA7



5. **INTELLECTUAL PROPERTY.**

  5.1 **Copyrights.** All copyrightable works prepared by Employee within the scope of employment are works made for hire. Employer will own all rights under copyright in and to such works, and Employer will be considered the author of such works. If and to the extent that any such works are deemed not to constitute a work made for hire, and with respect to any other works that Employee prepares during working hours or using Amazon resources, Employee hereby irrevocably assigns to Employer all right, title, and interest in and to such work. To the extent any of Employee's rights in such works, including any moral rights, are not capable of assignment under applicable law, Employee hereby irrevocably and unconditionally waives all enforcement of those rights to the maximum extent permitted under applicable law.

  5.2 **Inventions.** Employee will make prompt and full written disclosure to Employer, and hereby irrevocably assigns exclusively to Employer, all of Employee's rights, title, and interest in and to any and all inventions, discoveries, designs, developments, concepts, techniques, procedures, algorithms, products, improvements, business plans, and trade secrets (collectively, "**Inventions**") that Employee solely or jointly may conceive, develop, reduce to practice, or otherwise produce during Employee's employment.

  5.3 **NOTICE Regarding Inventions.** Any provision in this Agreement requiring Employee to assign rights in Inventions does not and will not apply to any Invention for which no equipment, supplies, facilities, or trade secret information of Employer was used and that was developed entirely on Employee's own time, unless (a) the Invention relates (i) directly to the business of Employer, or (ii) to Employer's actual or demonstrably anticipated research or development, or (b) the Invention results from any work performed by Employee for Employer. This **NOTICE Regarding Inventions** will be interpreted in a manner that complies with applicable state law.

  5.4 **Prior Inventions.** As to any Invention in which Employee has an interest at any time, if Employee uses or incorporates such an Invention in any released or unreleased Amazon product, service, program, process, development, or work in progress, or if Employee permits Amazon so to use or incorporate such an Invention, or if such an Invention pertains to Amazon business, Employee irrevocably grants (to the extent Employee has authority to do so) a perpetual, royalty-free, fully paid up, worldwide license to exercise any and all rights with respect to such Invention, including without limitation the right to protect, make, have made, import, use, and sell that Invention without restriction and the right to sublicense those rights to others (with the right to grant further sublicenses). This license will be exclusive, subject only to any preexisting non-exclusive licenses or other pre-existing rights not subject to Employee's control.

  5.5 **Assistance.** Employee will execute all documents and take all other actions reasonably requested by Amazon in order to carry out and confirm the assignments contemplated by this Agreement, including without limitation applications for patents, registered designs, certificates of authorship, and other instruments or intellectual property protections appropriate to protect and enforce intellectual property rights throughout the world. If Employee fails to execute, acknowledge, verify, or deliver any such document reasonably requested by Amazon, Employee irrevocably appoints Amazon and its authorized officers and agents as Employee's agent and attorney-in-fact to act in Employee's place to execute, acknowledge, verify, and deliver any such document on Employee's behalf. Employee's obligations under this Section 5.5 apply during employment and at all times thereafter.

6. **DISCLOSURE OF RESTRICTIONS.** Employee will disclose and provide a true and correct copy of this Agreement to any prospective new employer, business partner, or investor BEFORE accepting employment or engaging in any business venture. Employee authorizes Amazon to provide a copy of this Agreement to any new or prospective employer, business partner, or investor of Employee.

7. **GENERAL PROVISIONS.**

  7.1 **Third Party Beneficiaries.** All Amazon entities, including without limitation Employer, are intended third party beneficiaries of Employee's covenants and promises in this Agreement, and have enforceable rights and remedies under this Agreement.

**AMZ-BRY000084**

**7.2 Waiver.** No waiver of any right or obligation under this Agreement will be valid unless in writing and signed by an authorized officer of Amazon. No waiver by Amazon of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by Amazon of any right or obligation under this Agreement will be construed as a waiver of any other right or obligation. Amazon will not be required to give prior notice to enforce strict adherence to all terms of this Agreement.

**7.3 Governing Law and Jurisdiction.** This Agreement will be governed by and construed in accordance with the laws of the State of Washington, excluding its choice of law provisions. Each party irrevocably consents to exclusive jurisdiction and venue in the state and federal courts located in King County, Washington with respect to any action, claim, or proceeding arising out of or in connection with this Agreement, with the exception of requests for temporary or preliminary injunctive relief, which may be sought in any appropriate court with jurisdiction, but only if such relief could not be issued and made immediately binding against the party sought to be enjoined by the state and federal courts located in King County, Washington.

**7.4 Remedies.** Any breach of this Agreement may cause Amazon irreparable harm for which there is no adequate remedy at law.  As a result, Amazon will be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order, or other equitable relief in favor of itself, without the necessity of posting a bond, restraining Employee from committing or continuing to commit any such violation. Any right to obtain an injunction, restraining order, or other equitable relief under this Agreement will not be considered a waiver of any right to assert any other remedy Amazon may have at law or in equity. Nothing in this Agreement will limit the remedies available to Amazon. The restrictions in this Agreement are independent of any other provision of this Agreement and will be enforceable whether or not Employee may have or purport to have any claim against Amazon.

**7.5 Modification of Restrictions; Severability.** Should a court of competent jurisdiction find that any provision of this Agreement, or compliance by any of the parties with any provision of this Agreement, is unlawful or unenforceable, such provision will be treated as narrowed to the extent required to make it lawful and enforceable. If such modification is not possible, the unlawful or unenforceable provision will be severed from the Agreement and the remaining provisions will remain in full force and effect to the maximum extent consistent with applicable law. If Employee breaches any post-employment obligations to Amazon set forth in Section 4 of this Agreement, the applicable duration of such obligation will be extended by a period of no less than the duration of the breaching conduct. This Agreement should be interpreted in a way that provides the maximum protection to Amazon's Confidential Information and other business interests, and should not be interpreted against any party as its drafter.

**7.6 Survival of Covenants.** The covenants and promises contained in Sections 3 through 7 of this Agreement will survive after the Separation Date.

**7.7 Assignment.** This Agreement will bind and inure to the benefit of Employee and Amazon, and their respective heirs, legal representatives, and permitted successors and assigns. The covenants and promises of Employee under this Agreement are unique and personal. Accordingly, Employee may not assign any of Employee's rights or duties under this Agreement. Amazon.com, Inc. may assign this Agreement, without notice to Employee. Employee consents to such assignment and agrees and acknowledges that all terms and conditions of this Agreement will remain in effect after any such assignment.

**7.8 Entire Agreement.** This Agreement contains the entire understanding between Employee and Amazon with respect to the subject matter of this Agreement, and there are no representations, warranties, promises, or undertakings other than those contained in this Agreement. No modification of or amendment to this Agreement (except by a court under Section 7.5) will be effective unless in writing and signed by both Employee and an authorized officer of Amazon.

**7.9 Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be treated as an original, but all of which taken together will be treated as one and the same instrument.

US CIAA (1269844) NE
Updated February 2017

AMZ-BRY000085



8. **EMPLOYEE REPRESENTATIONS REGARDING EXISTING OBLIGATIONS.** Employee represents and certifies as follows: (a) Employee is not in possession or control of any document or other tangible thing that in any way constitutes confidential, proprietary, or trade secret information of any third party (including any former employer); (b) Employee is not subject to a non-competition agreement that precludes Employee's work for Amazon; (c) Employee has identified all confidentiality, proprietary information, non-solicitation, or similar agreements or obligations Employee has with any third party, and Employee will not violate any such agreements or obligations in the course of Employee's work for Amazon; and (d) Employee will not use or disclose any tangible or intangible information that constitutes a trade secret of any third party (including any former employer) in the course of Employee's employment, except pursuant to written authorization to do so (e.g., a technology license between Amazon and the third party).

9. **EMPLOYEE HAS READ AND UNDERSTOOD THE TERMS OF THIS AGREEMENT; RIGHT TO SEPARATE COUNSEL.** Employee acknowledges with execution of this Agreement that: (a) Employee has carefully read all of this Agreement's terms and agrees they are necessary for the reasonable protection of the business of Employer and Amazon; (b) Employer has been induced to employ Employee by Employee's representation that Employee will abide by and be bound by each of the covenants and restraints in this Agreement; and (c) each and every covenant and restraint in this Agreement is reasonable. Employee acknowledges that Employee has been advised by Amazon that Employee is entitled to have this Agreement reviewed by counsel of Employee's choice, and has either done so or elected to forgo such right.

HAVING READ AND FULLY UNDERSTOOD THIS AGREEMENT, a copy of which has been provided to Employee, the parties execute this Agreement.

**AMAZON.COM, INC.**                                    **EMPLOYEE**

Signature  *Beth Galetti*              Signature: *Gerald Bryson*
                                                      46467340FAE248E...

Name:  Beth Galetti                    Name: Gerald Bryson

Title:  Vice President, Human Resources    Date: 10/23/2018

US CIAA (1269844) NE
Updated February 2017

AMZ-BRY000086

DocuSign Envelope ID: 5A58345E-99E4-4F40-ABF4-98A6144201BC



**AMAZON.COM, INC.**

**CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT**

This Confidentiality and Invention Assignment Agreement ("**Agreement**") is made by and between Amazon.com, Inc., a Delaware corporation, and _____ ("**Employee**").

## RECITALS

**A.** Employee enters into this Agreement in connection with Employee's acceptance of employment with Amazon.com, Inc. or its subsidiary or affiliate, and any future employment with Amazon.com, Inc. or another of its subsidiaries or affiliates (depending on the circumstances, each an "**Employer**");

**B.** As used in this Agreement, "**Amazon**" means Amazon.com, Inc. and any entity that controls, is controlled by, or is under common control with Amazon.com, Inc., including without limitation its subsidiaries and affiliates;

**C.** Employee's acceptance of this Agreement is an express condition of Employee's employment with Employer, and is made by Employee in consideration of such employment, including the compensation, benefits and confidential information provided now and in the future to Employee by Employer, which Employee acknowledges are of significant benefit to Employee; and

**D.** Employee's continued employment with Employer is expressly conditioned on Employee's good faith agreement to comply with this Agreement.

## AGREEMENTS

In consideration of the above Recitals, which are incorporated herein, the promises and covenants below, and other valuable consideration, the receipt and adequacy of which is acknowledged, the parties agree as follows:

**1. TERM.** This Agreement, including Sections 3, 4, and 5, contains obligations that apply during Employee's employment and for specified periods after the date Employee's employment ends ("**Separation Date**"), regardless of the reason for separation or whether it was voluntary or involuntary.

**2. ATTENTION AND EFFORT.** During employment, Employee will devote Employee's time, ability, attention, and effort to furthering Amazon's best interests and will consult and comply with the Amazon Outside Activities policy for Employee's business or division as it pertains to engaging in outside work.

**3. CONFIDENTIAL INFORMATION.**

**3.1 Confidentiality and Confidential Information.** Employee will obtain, receive, or gain access to Confidential Information (as defined below) in connection with Employee's work for Amazon. During employment and at all times thereafter, Employee will hold all Confidential Information in strictest confidence and will not acquire, use, publish, disclose, or communicate any Confidential Information except as required in connection with Employee's work without the prior written approval of an authorized officer of Amazon. For purposes of this Agreement, "**Confidential Information**" means proprietary or confidential information of Amazon in whatever form, tangible or intangible, whether or not marked or otherwise designated as confidential, that is not otherwise generally known to the public, relating or pertaining to Amazon's business, projects, products, customers, suppliers, inventions, or trade secrets, including but not limited to: business and financial information; Amazon techniques, technology, practices, operations, and methods of conducting business; information technology systems and operations; algorithms, software, and other computer code; published and unpublished know-how, whether patented or unpatented; information concerning the identities of Amazon's business partners and clients or potential business partners and clients, including names, addresses, and contact information; customer information, including prices paid, buying history and habits, needs, and the methods of fulfilling those needs; supplier names, addresses, and pricing; and Amazon pricing policies, marketing strategies, research projects or developments, products, legal affairs, and future plans relating to any aspect of Amazon's present or anticipated businesses. Nothing in this Agreement

AMZ-BRY000087

prohibits non-supervisory employees' communications about their own or their coworkers' wages, hours or working conditions.

**3.2 Prevention of Unauthorized Release of Confidential Information.** Employee will take reasonable measures to prevent unauthorized persons or entities from obtaining, receiving, or gaining access to any Confidential Information in Employee's possession or control.

Nothing prohibits Employee from reporting an event that he or she reasonably believes is a legal violation to a law-enforcement agency (such as the Securities and Exchange Commission, Equal Employment Opportunity Commission, or Department of Labor), or from cooperating in an agency investigation. Employee acknowledges that he or she has received notice under the 2016 Defend Trade Secrets Act. First, that he or she will not be held criminally or civilly liable under Federal or State trade secret law for disclosing a trade secret either in confidence to a Federal, State, or Local government official or to an attorney for the purpose of reporting or investigating a suspected legal violation, or under seal in a lawsuit or other court proceeding. And, second, that an individual who pursues a lawsuit for unlawful retaliation against his or her employer for reporting a suspected legal violation may disclose the trade secret to his or her attorney and use the trade secret information in the court proceeding, provided any document containing the trade secret is filed under seal and is not disclosed unless permitted by court order.

**3.3 Confidential Information of Third Parties.** Employee will preserve as confidential any information that Employee learns or obtains from a third party or relating to a third party (such as a client, customer, affiliate, partner, or vendor) that is not readily available to the public or that Amazon is obligated to treat as confidential, and Employee will treat such information as Confidential Information.

**3.4 Return of Confidential Documents.** On the Separation Date, or at any time otherwise requested by Amazon, Employee will immediately return all Confidential Information and other things belonging to Amazon, including tools, equipment, devices, or other property, and all documents, records, notebooks, and tangible articles containing or embodying any Confidential Information, including any copies (whether stored in paper, electronic, magnetic, or other form) then in Employee's possession or control, whether prepared by Employee or others.

**4. RESTRICTIVE COVENANTS.**

**4.1 Non-Solicitation.** During employment and for 18 months after the Separation Date, Employee will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant): (a) accept or solicit business from any Customer of any product or service that Employee worked on or supported, or about which Employee obtained or received Confidential Information; or (b) encourage any Customer or Business Partner to cease doing business with Amazon or to terminate or limit an existing relationship or arrangement with Amazon. For purposes of this Agreement, "**Customer**" means any individual or entity that was a customer or client of Amazon during Employee's employment, or with which Amazon engaged in discussions before the Separation Date related to the possibility that such party might become a customer or client of Amazon, and "**Business Partner**" means any individual or entity with which, before the Separation Date, Amazon was involved in any business arrangement or engaged in discussions regarding the possibility of entering into such an arrangement.

**4.2 Non-Interference.** During employment and for 12 months after the Separation Date, Employee will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant): (a) solicit or otherwise encourage any employee, contractor, or consultant of Amazon ("**Amazon Personnel**") to terminate any employment or contractual relationship with Amazon; (b) disclose information to any other individual or entity about Amazon Personnel that could be used to solicit or otherwise encourage Amazon Personnel to form new business relationships with that or another individual or entity; or (c) otherwise interfere with the performance by current or former Amazon Personnel of their obligations or responsibilities to Amazon. Nothing in this Section 4.3 restricts Employee from exercising rights protected under the National Labor Relations Act.

US CIAA (1269844) NE
Updated February 2017

AMZ-BRY000088



**5.   INTELLECTUAL PROPERTY.**

   **5.1 Copyrights.** All copyrightable works prepared by Employee within the scope of employment are works made for hire. Employer will own all rights under copyright in and to such works, and Employer will be considered the author of such works. If and to the extent that any such works are deemed not to constitute a work made for hire, and with respect to any other works that Employee prepares during working hours or using Amazon resources, Employee hereby irrevocably assigns to Employer all right, title, and interest in and to such work. To the extent any of Employee's rights in such works, including any moral rights, are not capable of assignment under applicable law, Employee hereby irrevocably and unconditionally waives all enforcement of those rights to the maximum extent permitted under applicable law.

   **5.2 Inventions.** Employee will make prompt and full written disclosure to Employer, and hereby irrevocably assigns exclusively to Employer, all of Employee's rights, title, and interest in and to any and all inventions, discoveries, designs, developments, concepts, techniques, procedures, algorithms, products, improvements, business plans, and trade secrets (collectively, "**Inventions**") that Employee solely or jointly may conceive, develop, reduce to practice, or otherwise produce during Employee's employment.

   **5.3 NOTICE Regarding Inventions.** Any provision in this Agreement requiring Employee to assign rights in Inventions does not and will not apply to any Invention for which no equipment, supplies, facilities, or trade secret information of Employer was used and that was developed entirely on Employee's own time, unless (a) the Invention relates (i) directly to the business of Employer, or (ii) to Employer's actual or demonstrably anticipated research or development, or (b) the Invention results from any work performed by Employee for Employer. This **NOTICE Regarding Inventions** will be interpreted in a manner that complies with applicable state law.

   **5.4 Prior Inventions.** As to any Invention in which Employee has an interest at any time, if Employee uses or incorporates such an Invention in any released or unreleased Amazon product, service, program, process, development, or work in progress, or if Employee permits Amazon so to use or incorporate such an Invention, or if such an Invention pertains to Amazon business, Employee irrevocably grants (to the extent Employee has authority to do so) a perpetual, royalty-free, fully paid up, worldwide license to exercise any and all rights with respect to such Invention, including without limitation the right to protect, make, have made, import, use, and sell that Invention without restriction and the right to sublicense those rights to others (with the right to grant further sublicenses). This license will be exclusive, subject only to any preexisting non-exclusive licenses or other pre-existing rights not subject to Employee's control.

   **5.5 Assistance.** Employee will execute all documents and take all other actions reasonably requested by Amazon in order to carry out and confirm the assignments contemplated by this Agreement, including without limitation applications for patents, registered designs, certificates of authorship, and other instruments or intellectual property protections appropriate to protect and enforce intellectual property rights throughout the world. If Employee fails to execute, acknowledge, verify, or deliver any such document reasonably requested by Amazon, Employee irrevocably appoints Amazon and its authorized officers and agents as Employee's agent and attorney-in-fact to act in Employee's place to execute, acknowledge, verify, and deliver any such document on Employee's behalf. Employee's obligations under this Section 5.5 apply during employment and at all times thereafter.

**6.   DISCLOSURE OF RESTRICTIONS.** Employee will disclose and provide a true and correct copy of this Agreement to any prospective new employer, business partner, or investor BEFORE accepting employment or engaging in any business venture. Employee authorizes Amazon to provide a copy of this Agreement to any new or prospective employer, business partner, or investor of Employee.

**7.   GENERAL PROVISIONS.**

   **7.1 Third Party Beneficiaries.** All Amazon entities, including without limitation Employer, are intended third party beneficiaries of Employee's covenants and promises in this Agreement, and have enforceable rights and remedies under this Agreement.

US CIAA (1269844) NE
Updated February 2017

AMZ-BRY000089

DocuSign Envelope ID: 5A58345E-69E4-4E40-ABF4-98A6144201BC



**7.2 Waiver.** No waiver of any right or obligation under this Agreement will be valid unless in writing and signed by an authorized officer of Amazon. No waiver by Amazon of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by Amazon of any right or obligation under this Agreement will be construed as a waiver of any other right or obligation. Amazon will not be required to give prior notice to enforce strict adherence to all terms of this Agreement.

**7.3 Governing Law and Jurisdiction.** This Agreement will be governed by and construed in accordance with the laws of the State of Washington, excluding its choice of law provisions. Each party irrevocably consents to exclusive jurisdiction and venue in the state and federal courts located in King County, Washington with respect to any action, claim, or proceeding arising out of or in connection with this Agreement, with the exception of requests for temporary or preliminary injunctive relief, which may be sought in any appropriate court with jurisdiction, but only if such relief could not be issued and made immediately binding against the party sought to be enjoined by the state and federal courts located in King County, Washington.

**7.4 Remedies.** Any breach of this Agreement may cause Amazon irreparable harm for which there is no adequate remedy at law.  As a result, Amazon will be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order, or other equitable relief in favor of itself, without the necessity of posting a bond, restraining Employee from committing or continuing to commit any such violation. Any right to obtain an injunction, restraining order, or other equitable relief under this Agreement will not be considered a waiver of any right to assert any other remedy Amazon may have at law or in equity. Nothing in this Agreement will limit the remedies available to Amazon. The restrictions in this Agreement are independent of any other provision of this Agreement and will be enforceable whether or not Employee may have or purport to have any claim against Amazon.

**7.5 Modification of Restrictions; Severability.** Should a court of competent jurisdiction find that any provision of this Agreement, or compliance by any of the parties with any provision of this Agreement, is unlawful or unenforceable, such provision will be treated as narrowed to the extent required to make it lawful and enforceable. If such modification is not possible, the unlawful or unenforceable provision will be severed from the Agreement and the remaining provisions will remain in full force and effect to the maximum extent consistent with applicable law. If Employee breaches any post-employment obligations to Amazon set forth in Section 4 of this Agreement, the applicable duration of such obligation will be extended by a period of no less than the duration of the breaching conduct. This Agreement should be interpreted in a way that provides the maximum protection to Amazon's Confidential Information and other business interests, and should not be interpreted against any party as its drafter.

**7.6 Survival of Covenants.** The covenants and promises contained in Sections 3 through 7 of this Agreement will survive after the Separation Date.

**7.7 Assignment.** This Agreement will bind and inure to the benefit of Employee and Amazon, and their respective heirs, legal representatives, and permitted successors and assigns. The covenants and promises of Employee under this Agreement are unique and personal. Accordingly, Employee may not assign any of Employee's rights or duties under this Agreement. Amazon.com, Inc. may assign this Agreement, without notice to Employee. Employee consents to such assignment and agrees and acknowledges that all terms and conditions of this Agreement will remain in effect after any such assignment.

**7.8 Entire Agreement.** This Agreement contains the entire understanding between Employee and Amazon with respect to the subject matter of this Agreement, and there are no representations, warranties, promises, or undertakings other than those contained in this Agreement. No modification of or amendment to this Agreement (except by a court under Section 7.5) will be effective unless in writing and signed by both Employee and an authorized officer of Amazon.

**7.9 Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be treated as an original, but all of which taken together will be treated as one and the same instrument.

US CIAA (1269844) NE
Updated February 2017

AMZ-BRY000090



8. **EMPLOYEE REPRESENTATIONS REGARDING EXISTING OBLIGATIONS.** Employee represents and certifies as follows: (a) Employee is not in possession or control of any document or other tangible thing that in any way constitutes confidential, proprietary, or trade secret information of any third party (including any former employer); (b) Employee is not subject to a non-competition agreement that precludes Employee's work for Amazon; (c) Employee has identified all confidentiality, proprietary information, non-solicitation, or similar agreements or obligations Employee has with any third party, and Employee will not violate any such agreements or obligations in the course of Employee's work for Amazon; and (d) Employee will not use or disclose any tangible or intangible information that constitutes a trade secret of any third party (including any former employer) in the course of Employee's employment, except pursuant to written authorization to do so (e.g., a technology license between Amazon and the third party).

9. **EMPLOYEE HAS READ AND UNDERSTOOD THE TERMS OF THIS AGREEMENT; RIGHT TO SEPARATE COUNSEL.** Employee acknowledges with execution of this Agreement that: (a) Employee has carefully read all of this Agreement's terms and agrees they are necessary for the reasonable protection of the business of Employer and Amazon; (b) Employer has been induced to employ Employee by Employee's representation that Employee will abide by and be bound by each of the covenants and restraints in this Agreement; and (c) each and every covenant and restraint in this Agreement is reasonable. Employee acknowledges that Employee has been advised by Amazon that Employee is entitled to have this Agreement reviewed by counsel of Employee's choice, and has either done so or elected to forgo such right.

HAVING READ AND FULLY UNDERSTOOD THIS AGREEMENT, a copy of which has been provided to Employee, the parties execute this Agreement.

**AMAZON.COM, INC.**                                          **EMPLOYEE**

Signature  *Beth Galetti*                    Signature: *Dimitra Evans*

Name:  Beth Galetti                          Name: Dimitra Evans

Title:  Vice President, Human Resources      Date: 10/25/2018

US CIAA (1269844) NE
Updated February 2017

AMZ-BRY000091

GC Exhibit 119



AMZ-BRY000092

# GC Exhibit 119

# Employee Information Form



## Biographical Details **Details**

* Legal First Name: Dimitra
Legal Middle Name:
* Legal Last Name: Evans
Legal Name Suffix: ⌄

Preferred First Name: Dimitra
Preferred Last Name: Evans
* Date of Birth: ▇▇▇▇

## National ID **Details**

* Social Security
Number: •••••••••

## Home Address

**Please do not enter a P.O. Box as your home address.**
**IMPORTANT: Your home address may impact how you are taxed for payroll.**

* Home Address Line 1: ▇▇▇▇▇▇▇
Home Address Line 2:

* Home City: ▇▇▇
* Home State: ⌄
Home County:
* Home Postal Code: ▇▇
* Home Country: USA

## Mailing Address (If different from home) **Details**

Mailing Address Line 1: ▇▇▇▇▇▇▇
Mailing Address Line 2:

Mailing City: ▇▇
Mailing State: ⌄
Mailing Country: United States ⌄
Mailing Postal Code: ▇▇

## Phone **Details**

Mobile: ▇▇▇
Preferred ◉
Home: ○

## E-Mail Address

* Email: michellehorton23@gmail.com

## Emergency Contact

* **Primary Contact**
* Contact Name: Michelle Horton
* Relationship: Spouse ⌄
* Contact Number: ▇▇▇

**Secondary Contact (Optional)**
Contact Name: Vivian Evans
Relationship: Parent ⌄
Contact Number: ▇▇▇

# Voluntary Self-Identification

## Gender/Race/Ethnic Background

### Voluntary Equal Opportunity Self-Identification Form

Amazon values all forms of diversity and is subject to certain nondiscrimination and affirmative action recordkeeping and reporting requirements which require us to invite candidates and employees to voluntarily self-identify their gender and race/ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of

AMZ-BRY000093

applicable federal laws, executive orders, and regulations, including those which require the information to be summarized and reported to the Federal Government for civil rights enforcement purposes. If you choose not to self-identify your gender or race/ethnicity at this time, the federal government requires us to determine this information for employees by visual survey and/or other available information.

**\* What is your Gender? (please check one only)**    ◉ Female    ○ Male    ○ I choose not to self-identify

**\* What is your race/ethnic background? (please check one only)**

| | | |
|---|---|---|
| ○ | American Indian/Alaskan Native (not Hispanic or Latino) | Persons having origins in any of the original peoples of North and South America, (including Central America), and who maintain tribal affiliation or community attachment. |
| ○ | Asian (not Hispanic or Latino) | Persons having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent; including for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand and Vietnam. |
| ○ | Black/African American (not Hispanic or Latino) | Persons having origins in any of the Black racial groups of Africa. |
| ○ | Hispanic/Latino | Persons of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race. |
| ○ | Native Hawaiian/Other Pacific Islander (not Hispanic or Latino) | Persons having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands. |
| ◉ | White (not Hispanic or Latino) | Persons having origins in any of the original peoples of Europe, the Middle East or North Africa. |
| ○ | Two or more Races (not Hispanic or Latino) | Non-Hispanic persons who identify with more than one of the following five races: (1) White, (2) Black, (3) Asian, (4) Native Hawaiian/Other Pacific Islander, (5) American Indian/Alaska Native. |
| ○ | I choose not to self-identify | |

## Veteran Status

## Voluntary Self-Identification of Veteran Status

At Amazon, thousands of veterans and military spouses are driving innovation and raising the bar on customer experience. On a daily basis, those with military backgrounds are able to apply their knowledge, skills, and leadership abilities in a wide variety of careers - influencing change across the globe. For these reasons, we are actively pursuing the hiring of veterans and military spouses.

To help us track our progress, we encourage you to disclose your status as a veteran (a currently serving or former member of the U.S. Armed Forces) or military spouse, below. Providing this information is **completely voluntary** and refusing to provide it will not subject you to any adverse treatment.

**\* Are you a veteran?**
○ Yes    ◉ No    ○ I choose not to self-identify

**\* Are you a military spouse?**
○ Yes    ◉ No    ○ I choose not to self-identify

Amazon is a Federal Government contractor subject to the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended by the Jobs for Veterans Act of 2002, 38 U.S.C. 4212 (VEVRAA), which requires Government contractors to take affirmative action to employ and advance in employment: (1) disabled veterans; (2) recently separated veterans; (3) active duty wartime or campaign badge veterans; and (4) Armed Forces service medal veterans. The following invitation to self-identify your protected veteran status is made pursuant to Section 4212. Disclosure of this information is **completely voluntary** and refusing to provide it will not subject you to any adverse treatment.

A "**protected veteran**" is any of the following:

1. **Disabled Veteran:** a veteran of the U.S. military, ground, naval or air service who is entitled to compensation (or who but for the receipt of military retired pay would be entitled to compensation) under laws administered by the

AMZ-BRY000094

Secretary of Veterans Affairs; or a person who was discharged or released from active duty because of a service-connected disability.

2. **Recently Separated Veteran:** any veteran during the three-year period beginning on the date of such veteran's discharge or release from active duty in the U.S. military, ground, naval, or air service.

3. **Active Duty Wartime or Campaign Badge Veteran:** a veteran who served on active duty in the U.S. military, ground, naval or air service during a war, or in a campaign or expedition for which a campaign badge has been authorized under the laws administered by the Department of Defense.

4. **Armed Forces Service Medal Veteran:** a veteran who, while serving on active duty in the U.S. military, ground, naval or air service, participated in a United States military operation for which an Armed Forces service medal was awarded pursuant to Executive Order 12985.

\* If you believe you belong to <u>any</u> of the categories of protected veterans listed above, please indicate by checking the appropriate box below.

- ○ Yes, I believe one or more of the above categories apply to me.
- ◉ No, I do not believe one or more of the categories apply to me.
- ○ I choose not to self-identify

---

## VOLUNTARY SELF-IDENTIFICATION OF DISABILITY

OMB Control Number: 1250-0005
Expires: 1/31/2020

### Why are you being asked to complete this form?

Because we do business with the government, we must reach out to, hire, and provide equal opportunity to qualified people with disabilities.[i] To help us measure how well we are doing, we are asking you to tell us if you have a disability or if you ever had a disability. Completing this form is voluntary, but we hope that you will choose to fill it out. If you are applying for a job, any answer you give will be kept private and will not be used against you in any way.

If you already work for us, your answer will not be used against you in any way. Because a person may become disabled at any time, we are required to ask all of our employees to update their information every five years. You may voluntarily self-identify as having a disability on this form without fear of any punishment because you did not identify as having a disability earlier.

### How do I know if I have a disability?

You are considered to have a disability if you have a physical or mental impairment or medical condition that substantially limits a major life activity, or if you have a history or record of such an impairment or medical condition.

Disabilities include, but are not limited to:

- Blindness
- Deafness
- Cancer
- Diabetes
- Epilepsy

- Autism
- Cerebral palsy
- HIV/AIDS
- Schizophrenia
- Muscular dystrophy

- Bipolar disorder
- Major depression
- Multiple sclerosis (MS)
- Missing limbs or partially missing limbs

- Post-traumatic stress disorder (PTSD)
- Obsessive compulsive disorder
- Impairments requiring the use of a wheelchair
- Intellectual disability (previously called mental retardation)

\* **Please check one of the boxes below:**

- ○ YES, I HAVE A DISABILITY (OR PREVIOUSLY HAD A DISABILITY)
- ◉ NO, I DON'T HAVE A DISABILITY
- ○ I DON'T WISH TO ANSWER

| Dimitra Evans | 10/25/2018 11:56:48 PM |
|---|---|
| Your Name | Date |

AMZ-BRY000095

file:///C:/Users/MP094814/Documents/Amazon/Bryson/Client Documents/Personnel Files/Dimitra Evans/Work Docs/Employee Information Form - Em...  3/4

**Reasonable Accommodation Notice**

Federal law requires employers to provide reasonable accommodation to qualified individuals with disabilities. Please tell us if you require a reasonable accommodation to apply for a job or to perform your job. Examples of reasonable accommodation include making a change to the application process or work procedures, providing documents in an alternate format, using a sign language interpreter, or using specialized equipment.

[i]Section 503 of the Rehabilitation Act of 1973, as amended. For more information about this form or the equal employment obligations of Federal contractors, visit the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) website at www.dol.gov/ofccp.

PUBLIC BURDEN STATEMENT: According to the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. This survey should take about 5 minutes to complete.

**By clicking "Submit" you affirm that the above information is accurate and true.**

AMZ-BRY000096

# Employee Information Form



## Biographical Details Details

* Legal First Name: Gerald    Legal Middle Name: Joseph
* Legal Last Name: Bryson    Legal Name Suffix: III
Preferred First Name: Gerald    Preferred Last Name: Bryson
* Date of Birth: ▮

## National ID Details Details

* Social Security Number: ▮

* Confirm Social Security Number:

## Home Address

Please do not enter a P.O. Box as your home address.
IMPORTANT: Your home address may impact how you are taxed for payroll.

* ▮
Home Address Line 2: ▮
* Home City: ▮    * Home State:
Home County:    * Home Postal Code: ▮
* Home Country: USA

## Mailing Address (If different from home) Details

Mailing Address Line 1:
Mailing Address Line 2:

Mailing City:    Mailing State:
Mailing Country:    Mailing Postal Code:

## Phone Details

                                    Preferred
Mobile:    ⦿
Home:    ○

## E-Mail Address

* Email: jcream1963@gmail.com

## Emergency Contact

* **Primary Contact**    **Secondary Contact (Optional)**
* Contact Name:    Contact Name:
* Relationship:    Relationship:
* Contact Number:    Contact Number:

# Voluntary Self-Identification

AMZ-BRY000097

Case 1:22-cv-01479-DG-SJB   Document 5-9   Filed 03/17/22   Page 112 of 409 PageID #: 3875

## Gender/Race/Ethnic Background

# Voluntary Equal Opportunity Self-Identification Form

Amazon values all forms of diversity and is subject to certain nondiscrimination and affirmative action recordkeeping and reporting requirements which require us to invite candidates and employees to voluntarily self-identify their gender and race/ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable federal laws, executive orders, and regulations, including those which require the information to be summarized and reported to the Federal Government for civil rights enforcement purposes. If you choose not to self-identify your gender or race/ethnicity at this time, the federal government requires us to determine this information for employees by visual survey and/or other available information.

**\* What is your Gender? (please check one only)**   ○ Female   ○ Male   ○ I choose not to self-identify

**\* What is your race/ethnic background? (please check one only)**

| | | |
|---|---|---|
| ○ | American Indian/Alaskan Native (not Hispanic or Latino) | Persons having origins in any of the original peoples of North and South America, (including Central America), and who maintain tribal affiliation or community attachment. |
| ○ | Asian (not Hispanic or Latino) | Persons having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent; including for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand and Vietnam. |
| ○ | Black/African American (not Hispanic or Latino) | Persons having origins in any of the Black racial groups of Africa. |
| ○ | Hispanic/Latino | Persons of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race. |
| ○ | Native Hawaiian/Other Pacific Islander (not Hispanic or Latino) | Persons having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands. |
| ○ | White (not Hispanic or Latino) | Persons having origins in any of the original peoples of Europe, the Middle East or North Africa. |
| ○ | Two or more Races (not Hispanic or Latino) | Non-Hispanic persons who identify with more than one of the following five races: (1) White, (2) Black, (3) Asian, (4) Native Hawaiian/Other Pacific Islander, (5) American Indian/Alaska Native. |
| ○ | I choose not to self-identify | |

## Veteran Status

# Voluntary Self-Identification of Veteran Status

At Amazon, thousands of veterans and military spouses are driving innovation and raising the bar on customer experience. On a daily basis, those with military backgrounds are able to apply their knowledge, skills, and leadership abilities in a wide variety of careers - influencing change across the globe. For these reasons, we are actively pursuing the hiring of veterans and military spouses.

To help us track our progress, we encourage you to disclose your status as a veteran (a currently serving or former member of the U.S. Armed Forces) or military spouse, below. Providing this information is **completely voluntary** and refusing to provide it will not subject you to any adverse treatment.

**\* Are you a veteran?**
○ Yes   ○ No   ○ I choose not to self-identify

**\* Are you a military spouse?**
○ Yes   ○ No   ○ I choose not to self-identify

Amazon is a Federal Government contractor subject to the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended by the Jobs for Veterans Act of 2002, 38 U.S.C. 4212 (VEVRAA), which requires Government contractors to take affirmative action to employ and advance in employment: (1) disabled veterans; (2) recently separated veterans; (3) active duty wartime or campaign badge veterans; and (4) Armed Forces service medal veterans. The following invitation to self-

Case 1:22-cv-01479-DG-SJB   Document 5-9   Filed 03/17/22   Page 113 of 409 PageID #: 3876

GC Exhibit 119

identify your protected veteran status is made pursuant to Section 4212. Disclosure of this information is **completely voluntary** and refusing to provide it will not subject you to any adverse treatment.

A "**protected veteran**" is any of the following:

1. **Disabled Veteran:** a veteran of the U.S. military, ground, naval or air service who is entitled to compensation (or who but for the receipt of military retired pay would be entitled to compensation) under laws administered by the Secretary of Veterans Affairs; or a person who was discharged or released from active duty because of a service-connected disability.

2. **Recently Separated Veteran:** any veteran during the three-year period beginning on the date of such veteran's discharge or release from active duty in the U.S. military, ground, naval, or air service.

3. **Active Duty Wartime or Campaign Badge Veteran:** a veteran who served on active duty in the U.S. military, ground, naval or air service during a war, or in a campaign or expedition for which a campaign badge has been authorized under the laws administered by the Department of Defense.

4. **Armed Forces Service Medal Veteran:** a veteran who, while serving on active duty in the U.S. military, ground, naval or air service, participated in a United States military operation for which an Armed Forces service medal was awarded pursuant to Executive Order 12985.

\* If you believe you belong to <u>**any**</u> of the categories of protected veterans listed above, please indicate by checking the appropriate box below.

    ○ Yes, I believe one or more of the above categories apply to me.
    ○ No, I do not believe one or more of the categories apply to me.
    ○ I choose not to self-identify

## VOLUNTARY SELF-IDENTIFICATION OF DISABILITY

OMB Control Number: 1250-0005
Expires: 1/31/2020

### Why are you being asked to complete this form?

Because we do business with the government, we must reach out to, hire, and provide equal opportunity to qualified people with disabilities.[i] To help us measure how well we are doing, we are asking you to tell us if you have a disability or if you ever had a disability. Completing this form is voluntary, but we hope that you will choose to fill it out. If you are applying for a job, any answer you give will be kept private and will not be used against you in any way.

If you already work for us, your answer will not be used against you in any way. Because a person may become disabled at any time, we are required to ask all of our employees to update their information every five years. You may voluntarily self-identify as having a disability on this form without fear of any punishment because you did not identify as having a disability earlier.

### How do I know if I have a disability?

You are considered to have a disability if you have a physical or mental impairment or medical condition that substantially limits a major life activity, or if you have a history or record of such an impairment or medical condition.

Disabilities include, but are not limited to:

| | |
|---|---|
| • Blindness | • Autism |
| • Deafness | • Cerebral palsy |
| • Cancer | • HIV/AIDS |
| • Diabetes | • Schizophrenia |
| • Epilepsy | • Muscular dystrophy |

| | |
|---|---|
| • Bipolar disorder | • Post-traumatic stress disorder (PTSD) |
| • Major depression | • Obsessive compulsive disorder |
| • Multiple sclerosis (MS) | • Impairments requiring the use of a wheelchair |
| • Missing limbs or partially missing limbs | • Intellectual disability (previously called mental retardation) |

**\* <u>Please check one of the boxes below:</u>**

○ YES, I HAVE A DISABILITY (OR PREVIOUSLY HAD A DISABILITY)

○ NO, I DON'T HAVE A DISABILITY

AMZ-BRY000099

Case 1:22-cv-01479-DG-SJB   Document 5-9   Filed 03/17/22   Page 114 of 409 PageID #: 3877

GC Exhibit 119

○ I DON'T WISH TO ANSWER

_____               _____
Your Name                                          Date

**Reasonable Accommodation Notice**

Federal law requires employers to provide reasonable accommodation to qualified individuals with disabilities. Please tell us if you require a reasonable accommodation to apply for a job or to perform your job. Examples of reasonable accommodation include making a change to the application process or work procedures, providing documents in an alternate format, using a sign language interpreter, or using specialized equipment.

[i]Section 503 of the Rehabilitation Act of 1973, as amended. For more information about this form or the equal employment obligations of Federal contractors, visit the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) website at www.dol.gov/ofccp.

PUBLIC BURDEN STATEMENT: According to the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. This survey should take about 5 minutes to complete.

**By clicking "Submit" you affirm that the above information is accurate and true.**

AMZ-BRY000100



# AMAZON.COM, INC.

## INSIDER TRADING GUIDELINES
### January 2016

---

> **Please read these Insider Trading Guidelines carefully and make sure you understand them.  If you have any questions, please contact the Amazon.com Legal Department.**

### The Need for Guidelines

Federal and state laws prohibit buying, selling, or making other transfers of securities by persons who have material information that is not generally known or available to the public.  This activity is generally known as "insider trading."  These laws also prohibit persons with material nonpublic information from disclosing this information to others who then trade.  As a result, the Amazon.com Insider Trading Policy contained in Amazon.com's Code of Business Conduct and Ethics prohibits you from trading in the stock or other securities of any company, including Amazon.com, when you have material nonpublic information about that company.  These guidelines apply equally to employees (including short-term employees), outside directors, temporary workers, consultants, and independent contractors.  These guidelines also apply to all persons living in your household, including family members and persons unrelated to you.  You are responsible for ensuring that you and others living in your household do not violate federal or state securities laws, the Amazon.com Insider Trading Policy, or these guidelines.

### Covered Transactions

"Trading" includes purchases, sales and gifts of stocks, bonds, debentures, options, puts, calls, and other securities.  Trading also includes transactions in Amazon.com securities contributed to your account in the Amazon.com 401(k) plan and sales of stock you acquire by exercising employee stock options or vesting in employee restricted stock units, as well as entering into or amending a Rule 10b5-1 trading plan to trade Amazon.com securities in the future (for more information about trading plans, click here).  Trading includes both trades in the public market, such as the Nasdaq or other securities exchanges, and privately-arranged transactions.  Making and changing "sell-all" or tax elections are also transactions covered by the Insider Trading Policy.

### Covered Securities

The prohibition on insider trading is not limited to trading in Amazon.com securities.  It includes trading in the securities of other companies, such as:

- Amazon.com's customers, suppliers, or strategic partners;

- Companies in which Amazon.com has invested; and

AMZ-BRY000101



- Firms with which Amazon.com may be negotiating a major transaction, such as an acquisition, investment, or sale.

Remember that even if the information is not material to Amazon.com, it may nevertheless be material to another company.

## Tipping

You may not pass on material nonpublic information without express authorization by Amazon.com or recommend to others that they trade in stock or other securities based on material nonpublic information. "Tipping," which is the practice of disclosing material nonpublic information to others who then trade, violates the securities laws and can result in the same civil and criminal penalties that apply to insider trading. These laws and penalties apply even if you do not receive any money or derive any benefit from trades made by persons to whom you passed material nonpublic information.

## Material Nonpublic Information

**Material Information**. Information is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to buy, hold, or sell a security. Information that you could expect to affect the price of the security is likely material. Both positive and negative information can be material. Common examples of information that may be material include:

- Projections of future earnings or losses or changes in such projections.

- Actual earnings or losses.

- A pending or prospective joint venture, merger, acquisition, tender offer, or financing.

- A significant sale or purchase of assets.

- A significant new business or strategic relationship or a material change in, or the loss of, such a relationship.

- The gain or loss of, or material change in, a material contract, or the gain or loss of a material customer or supplier.

- The development or release of a major new product or service.

- Changes in a previously announced schedule for the development or release of a major new product or service.

- Changes in senior management, other major personnel changes (including layoffs or reorganizations), or labor negotiations.

- A dividend, stock split, securities repurchase, or securities offering.

AMZ-BRY000102

GC Exhibit 119

- Financial liquidity problems.

- Significant changes in pricing or discount policies.

- The development or implementation of significant strategic responses to competitors' actions.

**Nonpublic Information**.  Nonpublic information is information that is not generally known or available to the public.  Usually, information can be considered available to the public when:

- It has been released to the public through appropriate channels, e.g., by means of a press release or a widely disseminated statement from a senior officer, and

- Enough time has elapsed to permit the investment market to absorb and evaluate the information.

## Trading Windows

The Legal Department will from time to time identify persons who are allowed to trade Amazon.com securities <u>only</u> during the trading window.  For a current description of people subject to the trading window, click <u>here</u>.  Prior to the beginning of each trading window, the Legal Department will provide all employees with a description of those employees who are subject to the trading window.

Trading windows are pre-announced and generally begin on the third business day after each release of quarterly earnings and extend until the end of the second month of each quarter.  Even during this trading window period, you still may not trade if you have material nonpublic information about Amazon.com.  Even if you are not subject to the trading window, you are encouraged to restrict your trading to the trading window periods.

## Trading Preclearance

The Legal Department will from time to time identify persons who must contact the Legal Department to obtain prior approval for any transaction in Amazon.com securities.  For a current description of people subject to preclearance, click <u>here</u>.  If you are subject to preclearance, prior to the beginning of each trading window, the Legal Department will notify you of this fact.  Although this preclearance requirement does not apply to a transaction that consists only of a stock option exercise, it does apply to sales of stock acquired upon the exercise of a stock option, including same-day sales and cashless exercises.

If you are precleared by the Legal Department, you may trade in the securities within a limited period of time after receiving permission, usually two to five business days, as stated in the communication from the Legal Department preclearing you.  Of course, if you acquire material nonpublic information concerning Amazon.com during that time, you may not effect the transaction even if you were precleared.  If you do not complete the transaction for any reason within the prescribed period, you must obtain preclearance again before proceeding.

**AMZ-BRY000103**



If the Legal Department advises you that you are not precleared, then you may not effect any trades in the securities under any circumstances, and you must not inform anyone within or outside of Amazon.com of the restriction.  In addition, from time to time the Legal Department may advise you that no trading will be permitted until further notice.  In that case you may not disclose such restriction to anyone within or outside Amazon.com.

**Speculative Transactions and Hedging**

The Legal Department must preclear any speculative transaction or hedge involving Amazon.com securities, such as trades in puts or calls and purchasing on margin.  The Legal Department will generally consider approving such a transaction only if:

- It is a protective trade in puts, calls, or similar instruments to hedge an existing investment in Amazon.com securities.

- It is initiated during a trading window if you are restricted to trading only during the trading window, and

- It settles automatically, with no discretion by any party as to the timing or manner of settlement, at least six months later.

You may never enter into any speculative transaction or hedge when you are in possession of material nonpublic information. Any employee entering into such a transaction will be subject to both the trading window and preclearance until the transaction settles.

**Personal Responsibility; Assistance**

You should remember that you bear the ultimate responsibility for adhering to these guidelines and avoiding improper trading.  You must use your best judgment.  **If you violate these guidelines, we may take disciplinary action against you, including dismissal for cause.  If you have any questions about the Insider Trading Policy or these guidelines, you should seek additional guidance from the Legal Department.**



GC Exhibit 119

**Persons Subject to the Trading Window**

**January 2016**

The following persons (and persons who share their home) are subject to the trading window:

- The members of the Board of Directors and any consultant to the Board of Directors.

- Officers of Amazon.com, Inc. and their administrative assistants.

- All employees Level 8 and above for purposes of Amazon.com's compensation administration program (or any similar level in any new ranking scheme).

- All employees in the chain of individuals who ultimately report to the Chief Financial Officer, except non-director level employees who are primarily engaged in accounts payable, accounts receivable, and other functions unrelated to finance or financial planning, accounting, tax, or investor relations.

- All employees in the Legal Department (including Protective Services).

- All employees in the Public Policy Department.

- All employees in the Information Security (InfoSEC) Department.

- All employees subject to preclearance.

- Any employee:

  - who receives or has access (through a named account or otherwise) or has the ability to grant himself or herself access to one or more of the following:
    - ACB,
    - data warehouse (through DSS, ETL Manager, Cognos, SQL or otherwise),
    - the General Ledger of Oracle Financial,
    - DSS,
    - ETL Manager,
    - Cognos Reporting or Cognos Planning,
    - Essbase revenue cubes or Essbase planning cubes,
    - the Contribution Profit Tool,
    - WebLab Analyst,
    - the Weekly Business Review website,
    - the Global Financial Reporting website,
    - the Sales and Operations Planning website,
    - Worldwide, US or international daily sales flash, as well as blackberry sales flash,

AMZ-BRY000105

- Weekly business review package,
- Weekly scorecard,
- Weekly or monthly measurement package,
- Weekly current estimate,
- Global Payments Services metrics deck,
- Area conversion reports,
- Daily revenue reports,
- Tech scorecard,
- Oracle monthly financial statements,
- the bad debt deck,
- CDB,
- GFS DataMart
- Web Analytics:  Daily/Weekly Orders and Feature Analyzer,
- Spartan Analytics,
- Broadway,
- the CFO's quarterly management report,
- Fortune,
- the Merchant Feed Applications (MFA) Ops tool,
- the Consumer FP&A Operating Profit Per Unit (OPPU) report, or
- the Rocket Cloud Calculator (RC2).

- Additional employees who have been notified in writing by the Legal Department.

**Persons Subject to Preclearance**

**January 2016**

The following persons are subject to preclearance with respect to their transactions in Amazon.com securities, as well as transactions by persons who share their home:

- The Board of Directors and any consultants to the Board of Directors.

- Officers of Amazon.com, Inc. and their administrative assistants.

- All members of the Legal Department.

- All members of the Public Policy Department.

- All members of the Investor Relations Department.

- All members of the Treasury Department, except employees who are primarily engaged in Risk Management.

- All employees at the Director level or above who are in the PR Department.

- Additional employees who have been notified in writing by the Legal Department.



**INSIDER TRADING Q&A**

**January 2016**

Below are some questions and responses regarding the application of the Amazon.com Insider Trading Policy (the "policy") and the Company's Insider Trading Guidelines (the "guidelines"). If you have any questions about how the policy or guidelines might apply to you in a particular situation, please email **stockpolicy@amazon.com**.

### What is "insider trading"?

Insider Trading is using **material information** that is **not known to the general public** to gain an advantage in trading (that is, buying, selling, or otherwise dealing in) the securities of a company.

### What is material nonpublic information?

**Material information**. Information is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to buy, hold, or sell a security. Information that you could expect to affect the price of the security is likely material. Both positive and negative information can be material. There is no exception for transactions that may seem necessary or justifiable for independent reasons, such as the need to raise money for an emergency expenditure. Common examples of information that may be material include:

- Projections of future earnings or losses or changes in such projections.

- Actual earnings or losses.

- A pending or prospective joint venture, merger, acquisition, tender offer, or financing.

- A significant sale or purchase of assets.

- A significant new business or strategic relationship or a material change in, or the loss of, such a relationship.

- The gain or loss of, or material change in, a material contract, or the gain or loss of a material customer or supplier.

- The development or release of a major new product or service.

- Changes in a previously announced schedule for the development or release of a major new product or service.



- Changes in senior management, other major personnel changes (including layoffs or reorganizations) or labor negotiations.

- A dividend, stock split, securities repurchase, or securities offering.

- Financial liquidity problems.

- Significant changes in pricing or discount policies.

- The development or implementation of significant strategic responses to competitors' actions.

Both positive and negative information can be material. Federal and state investigators will scrutinize a questionable trade after the fact with the benefit of hindsight, so you should always err on the side of deciding that the information is material and not trade. If you have questions regarding specific information, please contact the Legal Department.

**Nonpublic information**. Nonpublic information is information that is not generally known or available to the public. Usually, information can be considered available to the public when:

- It has been released to the public through appropriate channels, e.g., by means of a press release or a widely disseminated statement from a senior officer, and

- Enough time has elapsed to permit the investment market to absorb and evaluate the information.

We all must maintain the confidentiality of Company information for competitive, security, and other business reasons, as well as to comply with securities laws.

All information you learn about Amazon.com or its business plans is potentially nonpublic information until we publicly disclose it. You should treat this information as confidential and proprietary to Amazon.com. You may not disclose it to others, such as relatives, friends, or business or social acquaintances.

Also, legal rules govern the timing and nature of our disclosure of material information to outsiders or the public. Violation of these rules could result in substantial liability for you, Amazon.com, and its management. For this reason, we permit only specifically designated representatives of Amazon.com to discuss the Company and its affiliates with the news media, securities analysts, and investors. If you receive inquiries of this type, you should refer them to our Investor Relations or Public Relations Department.

### What if I trade in puts and calls but not directly in the stock of the Company?

Any kind of transaction concerning the Company's securities is subject to the policy. The insider trading laws cover not only direct trades in the securities of a company, but also

trades in instruments whose value is dependent to some degree upon those securities, such as puts, calls, warrants, and other types of option securities. Such instruments are known as "derivative securities." A "put" is an option to sell by the holder -- a put option gives the holder of the put the right to cause, upon exercise, the writer of the put to buy stock. A "call" is an option to buy by the holder -- a call option gives the holder of the call the right to cause, upon exercise, the writer of the call to sell stock.  There are many variations in the duration, exercisability, and other terms of these instruments. A trade by any employee in derivative securities must be cleared in advance with the Legal Department, regardless of whether that employee is otherwise subject to preclearance or to the trading window, even if that employee is not in possession of material nonpublic information. Any employee entering into such a transaction will be subject to both the trading window and preclearance until the transaction settles.

**What if I may have inside information, but that information isn't what is motivating me to make the trade?**

Your motivation will likely be irrelevant if your trade is scrutinized by federal and state securities regulators and prosecutors. If it appears possible that you traded on the basis of inside information, you are at risk of receiving the full penalties for a violation of the insider trading laws.

**What if I pass on inside information to a relative or acquaintance and they make a trade that benefits them but not me?**

Passing on inside information about a company to others who then trade the securities of that company is called "tipping" and you may be found to be just as liable as the person to whom you gave the information for a violation of the insider trading laws, even if you did not profit from the trade yourself.

**What are the personal consequences of trading on inside information?**

The consequences include monetary penalties in the form of civil fines of up to three times the profit gained or loss avoided by the trade and criminal fines of up to $5,000,000, as well as criminal sentences of up to 20 years in prison. The Company may take disciplinary action, including dismissal for cause.

**Why does the Company care if I violate the insider trading laws?**

When employees of a company engage in insider trading, it typically is prominently reported in the media. Unfavorable press of this kind could harm our reputation and our business. In addition, the Company has a duty to take steps to reduce the likelihood that persons associated with the Company will violate the insider trading laws. Under certain circumstances, the Company itself may face liability for civil fines of up to the greater of $1,525,000 and three times the amount of the profit gained or loss avoided as a result of the unlawful trade.



GC Exhibit 119

**Why does the Company have the policy and guidelines?**

Like most public companies, the Company has adopted the policy, which is part of its Code of Business Conduct and Ethics. The Securities and Exchange Commission expects every public company to adopt and enforce such a policy. The Company also publishes guidelines to inform and educate employees and others about federal and state insider trading laws and to establish rules of behavior (like preclearance and trading windows) to promote compliance with those laws.

**Who is covered by the policy?**

The policy applies to all members of the Company's Board of Directors, and all employees (including short-term employees), temporary workers, consultants, and independent contractors. Further, all of the restrictions in the policy and guidelines also apply to people who share the same household with the people listed above. This includes family members who share a home with an employee, as well as any unrelated people who also live in the home.

**How does the insider trading policy restrict my family members and others who share my home?**

Amazon.com's insider trading policy applies to persons who share your home (whether related to you or not) to the same extent that it applies to you.

**How does the insider trading policy apply to me if I am an employee, temporary worker, consultant, or independent contractor of Zappos.com, Inc.?**

The insider trading policy applies to all employees (including short-term employees), temporary workers, consultants, and independent contractors of Zappos.com, Inc., as well as all people who share their household. Under the policy, the following persons, (and persons who share their home) are subject to the trading window: (1) Tony Hsieh, Fred Mossler, and employees who directly report to them; (2) employees in the Accounting and Finance departments, except employees in these departments who are primarily engaged in accounts payable, accounts receivable or other functions unrelated to finance or financial planning, accounting, or tax; (3) all members of the Legal Department; and (4) persons who receive or have access to the Amazon reports or systems described under the heading "Persons Subject to the Trading Window" in the Insider Trading Guidelines. In addition, Tony Hsieh, Fred Mossler, all members of the Zappos, Inc. Legal Department, and additional employees notified in writing by the Legal Department (as well as persons who share their household) are subject to preclearance before initiating transactions in Amazon.com securities.

**How does the insider trading policy apply to me if I am an employee, temporary worker, consultant, or independent contractor of Quidsi, Inc.?**


AMZ-BRY000111



The insider trading policy applies to all employees (including short-term employees), temporary workers, consultants, and independent contractors of Quidsi, Inc., as well as all people who share their household. Under the policy, the following persons (and persons who share their home) are subject to the trading window:  (1) all employees Level 8 and above for purposes of Amazon.com's compensation administration program; (2) employees in the Accounting and Finance departments, except employees in these departments who are primarily engaged in accounts payable, accounts receivable, payroll or other functions unrelated to finance or financial planning, accounting, or tax; (3) all members of the Legal Department;  (4) persons who receive or have access to the Amazon reports or systems described under the heading "Persons Subject to the Trading Window" in the Insider Trading Guidelines; and (5) all employees subject to preclearance.  In addition, all members of the Quidsi, Inc. Legal Department and additional employees notified in writing by the Legal Department (as well as persons who share their household) are subject to preclearance before initiating transactions in Amazon.com securities.

**How does the insider trading policy apply to me if I am an employee, temporary worker, consultant, or independent contractor of Amazon Robotics LLC (formerly known as Kiva Systems LLC)?**

The insider trading policy applies to all employees (including short-term employees), temporary workers, consultants, and independent contractors of Amazon Robotics LLC, as well as all people who share their household. Under the policy, the following persons (and persons who share their home) are subject to the trading window: (1) Michael Mountz, Joseph Quinlivan, and employees who directly report to them; (2) all employees Level 8 and above for purposes of Amazon.com's compensation administration program; (3) employees in the Accounting and Finance departments, except employees in these departments who are primarily engaged in accounts payable, accounts receivable, payroll or other functions unrelated to finance or financial planning, accounting, or tax; (4) all members of the Legal Department; and (5) persons who receive or have access to the Amazon reports or systems described under the heading "Persons Subject to the Trading Window" in the Insider Trading Guidelines.  In addition, Michael Mountz, Joseph Quinlivan, all members of the Amazon Robotics LLC Legal Department, and additional employees notified in writing by the Legal Department  (as well as persons who share their household) are subject to preclearance before initiating transactions in Amazon.com securities.

**How does the insider trading policy apply to me if I am an employee, temporary worker, consultant, or independent contractor of Twitch Interactive, Inc.?**

The insider trading policy applies to all employees (including short-term employees), temporary workers, consultants and independent contractors of Twitch Interactive, Inc., as well as all people who share their household. Under the policy, the following persons (and persons who share their home) are subject to the trading window:  (1) Emmett Shear, Elizabeth Baker, and Shirin Keen, and employees who directly report to them; (2) all employees Level 8 and above for purposes of Amazon.com's compensation administration program; (3) employees in the Accounting and Finance departments, except employees in these departments who are



primarily engaged in accounts payable, accounts receivable, payroll or other functions unrelated to finance or financial planning, accounting, or tax; (4) all members of the Legal Department; and (5) persons who receive or have access to the Amazon reports or systems described under the heading "Persons Subject to the Trading Window" in the Insider Trading Guidelines.  In addition, Emmett Shear, Elizabeth Baker, and Shirin Keen, all members of the Twitch Interactive, Inc. Legal Department, and additional employees notified in writing by the Legal Department (as well as persons who share their household) are subject to preclearance before initiating transactions in Amazon.com securities.

**How does the insider trading policy apply to me if I am an employee, temporary worker, consultant, or independent contractor of Elemental Technologies, Inc.?**

The insider trading policy applies to all employees (including short-term employees), temporary workers, consultants and independent contractors of Elemental Technologies, Inc., as well as all people who share their household. Under the policy, the following persons (and persons who share their home) are subject to the trading window: (1) Samuel Blackman, John Ewert, Brian Lewis, Dan Marshall, and Keith Wymbs; (2) all employees Level 8 and above for purposes of Amazon.com's compensation administration program; (3) employees in the Accounting and Finance departments, except employees in these departments who are primarily engaged in accounts payable, accounts receivable, payroll or other functions unrelated to finance or financial planning, accounting, or tax; (4) all members of the Legal Department; and (5) persons who receive or have access to the Amazon reports or systems described under the heading "Persons Subject to the Trading Window" in the Insider Trading Guidelines.  In addition, Samuel Blackman, all members of the Elemental Technologies, Inc. Legal Department, and additional employees notified in writing by the Legal Department (as well as persons who share their household) are subject to preclearance before initiating transactions in Amazon.com securities.

**Does the policy cover transactions in shares I owned before I arrived at Amazon.com?**

The restrictions on trading in Amazon.com securities apply to any and all securities of the Company that you own or control or derive an economic benefit from, no matter how, when, or from whom you acquired them.

**What transactions are covered by the policy?**

The policy covers, among other things, the sale of shares received upon vesting of Amazon.com restricted stock units ("RSUs").  The policy does not cover the exercise of Amazon.com stock options granted to you by the Company but does cover the sale of the shares you receive from the Company following an exercise of a stock option (including shares sold in same-day sales and cashless option exercises).  While the policy does not cover contributions by the Company of Amazon.com securities to your 401(k) account in connection with the employer-match program, it does cover subsequent transactions pursuant to your instructions involving those shares.  The policy also applies when entering into or amending a

trading plan to trade Amazon.com securities in the future (for more information about trading plans, click here).  Finally, the policy also covers all other securities of the Company, including derivatives, like puts, calls, and hedging instruments, regardless of who may issue or "write" those derivatives.

### How does the policy apply to making or changing a "sell-all" election?

Making or changing a "sell-all" election, meaning that all RSUs vesting for a given grant will automatically be sold on the vest date, is subject to the same restrictions as apply to trading.  For example, if you are subject to the trading window, you may make or change such election only during the trading window, and if you are subject to preclearance, any such election or change would require preclearance.  You must not make or change this election while in possession of material nonpublic information.

### How does the policy apply to RSU shares sold to pay taxes?

Generally, the vesting of RSUs results in the recognition of income by you and is a taxable event.  On each vest date the Company must collect from you enough cash to cover the minimum tax withholding obligation that arises on that date.  By accepting your RSU award, you are directing the broker to sell on your behalf on each vest date enough of your vested shares to pay the minimum tax withholding.  Although the trading window and preclearance requirements do not apply to such tax withholding sales, any change in such direction, such as increasing the number of shares to be sold to cover the taxes or canceling a previous election to deliver cash instead of selling shares to cover the taxes, is subject to the insider trading policy, including the trading windows and preclearance.  You may make such changes only when you do not have material nonpublic information, during an open trading window if you are restricted to the trading window, and only with preclearance from the Legal Department if you are subject to preclearance.

### How does the policy apply to shares in my 401(k) account?

The contribution of shares by the Company to your 401(k) account in connection with the employer-match program is not subject to the policy because it is not a transaction by you and you do not have control over the timing.  However, if you give an instruction to sell your 401(k) employer-match shares, including by reallocating your investment percentages such that a sale of these shares occurs, you are subject to the policy.  You may take such action only when you do not have material nonpublic information, during an open trading window if you are restricted to the trading window and only with preclearance from the Legal Department if you are subject to preclearance.

### Does the policy apply to my investments in mutual funds and other managed investment portfolios that hold Amazon.com securities?

The policy does not apply to trading in shares of mutual funds and managed investment portfolios that hold Amazon.com securities if: (1) you do not control the investment decisions on individual stocks within the fund or portfolio, and (2) Amazon.com securities do not



represent a substantial portion of the assets of the fund or portfolio. If you are looking to invest in a fund or portfolio that is heavily weighted with Amazon.com stock, please email stockpolicy@amazon.com.

### What is a trading window and why is it necessary?

A trading window is a specified time period during a quarter when individuals with access to certain sources of financial information are permitted to trade in the Company's securities. The trading window is an important tool to help ensure that employees and people who share their home do not possess material nonpublic information when they trade in the Company's securities. One significant piece of information about the Company's overall condition and performance is the Company's quarterly financial results. As a quarter progresses, more financial information about the quarter is available internally and the overall performance for the quarter becomes easier to predict. Employees who have access to this information have an advantage not enjoyed by the general investing public.

### Who is subject to the trading windows?

For a current description of people subject to the trading window, click here. Prior to the beginning of each trading window, the Legal Department will provide all employees with a description of people subject to the trading window.

Your ability to trade may also be restricted if the Legal Department determines that you may be aware of specific nonpublic information. If you are ever restricted for this reason, you will receive notice of that fact.

**Regardless of your trading window status, any trade in derivative securities, such as puts, calls, and other hedging instruments, and any purchase of Amazon.com securities on margin, must be precleared in advance with the Legal Department, whether or not you are subject to preclearance.**

### If I am subject to the trading window because of my access to certain financial information, are there steps that I can take to become exempt from the trading window?

If you are subject to the trading window only because you have access to certain databases and reports and you want to relinquish such access, you may do so by first obtaining your manager's approval and then terminating your access and/or sending an "unsubscribe" email to the person who manages the distribution of the applicable reports. You will not be able to trade outside future trading windows unless you terminate your access to the applicable databases and reports before a trading window closes. For example, if you have not terminated your access by May 31, you will not be able to trade after the trading window closes on May 31 but you would be able to do so after the next trading window closes if you continue to not have access through the next window close.

### When are the trading windows?





Generally, the trading window will open three business days after the public announcement of quarterly financial results, although the opening of a trading window can be delayed because of significant activities involving the Company that have not been publicly announced. The trading window generally closes at the end of the last trading day of the second month of the current quarter; however, it is possible that once opened the trading window could be closed due to major events affecting the Company which have not been publicly disclosed. There are four anticipated trading windows per year:

- Late January/early February through the last trading day of February.
- Late April/early May through the last trading day of May.
- Late July/early August through the last trading day of August.
- Late October/early November through the last day of November.

An email or other communication is sent Company-wide to announce the opening and the closing of each trading window.

**Is a transaction executed during a trading window but settled in the ordinary course after the trading window closes a violation of the policy?**

Although securities transactions generally are settled three trading days after the transaction is executed, the relevant date for determining whether the transaction occurred during the window is the date when you initiated the sale and not the date of settlement.

**What is "preclearance" and why is it necessary?**

Like the trading window, preclearance is a tool to help ensure that employees do not possess material nonpublic information when they (or people who share their homes) engage in a trade in the Company's securities, even during an otherwise open trading window. While the trading window guards against trades by those who have knowledge of the Company's quarterly financial performance, the preclearance process is intended to address trading by those who have information about activities and events, such as material acquisitions, significant new product launches, major financings, and other events that may be unrelated to the quarterly results.

**Who must have their trades precleared?**

For a current description of persons subject to preclearance, click here.  If you are subject to preclearance, you will receive a communication from the Legal Department notifying you of this fact prior to the beginning of each trading window.

You may also be required to preclear your trades in Amazon.com securities for a limited period of time if the Legal Department requires it as a result of the Company's business or activities. You will receive notification from the Legal Department if you are required to preclear for this reason.



**How do I obtain preclearance?**

To request preclearance visit http://preclearance.amazon.com (Amazon network access is required) *during an open trading window* and complete the online form.  After submitting your request, you will receive an automatic email reply either approving the request or noting follow up steps.  If you *do not* have Amazon network access or are requesting preclearance for a gift transaction during a closed trading window, preclearance may be requested by sending an e-mail to preclearance@amazon.com.  In your email: (1) describe the nature of the transaction (e.g., cashless option exercise, sale of vested RSU shares, adoption of trading plan, gift, etc.), (2) state the number of shares to be sold, acquired or transferred, if applicable, and (3) indicate whether or not you have material nonpublic information about the Company.  If you are uncertain whether information that you possess is material and/or nonpublic, please contact a member of Legal Department by telephone to discuss any potentially material nonpublic information (see the FAQ entitled "Who should I contact if I have a specific question about the insider trading policy and don't want to send an email?").

If you are precleared to trade, you will receive an email stating the preclearance period (which is usually 2 to 5 business days). If you do not conclude your transaction during the preclearance period, you must request preclearance again.

**Can I exercise my employee stock options during a closed trading window?**

The cash exercise of an employee stock option, where the exercise price is paid to the Company and all of the shares underlying the exercised option are kept by the employee, can be done at any time, whether or not the employee is restricted to the trading windows or preclearance.  This is because a cash option exercise is a private transaction solely between the Company and the employee, and does not involve a transaction in the public market or with third parties.  However, if you are restricted to the trading windows, you may not during a closed trading window, exercise an employee stock option by means of a same-day sale or cashless exercise, where some or all of the shares underlying the option are sold to pay costs related to the exercise and to provide cash to the optionee.  If you are subject to preclearance, a same-day sale or cashless exercise of an option also must be precleared.

**Does a hedge of my position in Amazon.com stock come under the policy?**

Hedging is a way to protect the value of your shares or unexercised or unvested stock-based awards from the volatility of the market. Hedging is generally accomplished by the acquisition of derivative securities (puts, calls or options) which limit the potential downside losses and upside gains. Because hedging involves the purchase or sale of securities whose value is dependent on the value of Amazon.com securities, hedging can only be done at times when you are permitted to buy and sell Amazon.com securities under the policy and guidelines. The Legal Department generally will consider approving a hedge that settles no earlier than six months from the date it is put in place and the time and method of settlement (i.e., whether settlement is made in cash, shares or some pre-determined combination of cash and shares) is irrevocably established when the hedge is initiated. All hedging activity and other speculative



GC Exhibit 119

trading by every employee must be cleared in advance with the Legal Department. Any employee entering into such a transaction will be subject to both the trading window and preclearance until the transaction settles.

**What if I have pledged Amazon.com stock to secure a margin loan, and I receive a margin call from the lender?**

When issuing a margin call, the lender usually gives you the choice of:

- Paying down the loan balance,

- Providing additional collateral, or

- Relinquishing some of the pledged shares for sale by the lender to reduce the loan balance.

You may not cause or permit any of your Amazon.com shares to be sold to satisfy a margin call if you are subject to the trading window and it is closed, or if you have material nonpublic information about the Company. For this reason, you are urged to be cautious and conservative when taking loans secured by the Company's securities.

**Does anything prevent me from trading in the securities of companies with which Amazon.com does business?**

The restriction on "insider trading" is not limited to trading in Amazon.com securities. If you have material nonpublic information about any company, the law, as well as the policy and guidelines, prohibit you from trading in securities of that company. This includes securities of customers, suppliers, strategic partners, companies in which Amazon.com has invested, and firms with which Amazon.com may be negotiating a major transaction, such as an acquisition, investment, or sale. Remember that even if the information is not material to Amazon.com, it may be material to the other company.

**Can I gift shares of Amazon.com securities?**

Yes, but please contact the Legal Department if you wish to make a gift of Amazon.com securities and you are subject to the trading window or preclearance.  If you are subject to the trading window, you must make gifts of Amazon.com securities only during the trading window unless you can make certain legal representations concerning the gifted shares.

**Am I subject to the Insider Trading Policy after I leave Amazon.com?**

Once you are no longer an employee, temporary worker, consultant, independent contractor, or member of the Board of Directors, you will cease to be subject to the Amazon.com Insider Trading Policy.  However, you will still be subject to the laws that



prohibit insider trading, and, if you possess material nonpublic information about Amazon.com, you should not trade in Amazon.com securities.

**Who should I contact if I have a specific question about the insider trading policy and don't want to send an email?**

You may contact either of the following persons with questions on the insider trading policy: Gavin McCraley ((206) 266-0614) or Sheri Carpenter ((206) 266-6339).



## MEAL PERIOD WAIVER AGREEMENT

**Name: Dimitra Evans**                                      **Date: 3/10/2021**

As an hourly associate, you are legally entitled to an uninterrupted, unpaid, and duty-free meal period when you work shifts of a qualifying length.

Sometimes, however, either for operational reasons or because of your personal wishes, you want a meal period to begin late, be shortened, or skipped. This document is an opportunity for you to waive a meal period in such circumstances.

As you consider your choices below, please keep in mind that even if you agree to this waiver, either you or Amazon may at any time insist that you take full meal periods on time, and Amazon generally does expect associates to take full meal periods on time. Therefore, even if you agree to this waiver, you can expect to take your full meal periods most of the time.

Understanding that I am entitled to unpaid, duty-free meal period(s):

○ **I agree to waive** my duty-free meal periods. I am entering this waiver freely and voluntarily in all respects. I understand that I may at any time take a full, duty-free meal period as scheduled or provided by law. No supervisor or manager can require me to delay, shorten or skip a duty-free meal period or retaliate against me for declining to do so.

○ **I do not agree to waive** my meal periods. I understand that I will be expected to take each full meal period as scheduled or provided by law.

I understand that I may at any time revoke this waiver for all future meal periods by contacting HR and providing my revocation in writing. I understand that if I revoke the waiver for future meal periods that I will be expected to take each full meal period as scheduled or provided by law. I understand that there will be no retaliation against me if I decide not to sign the waiver or to revoke the waiver.

**AMZ-BRY000120**



GC Exhibit 119

ISLAND MUSCULOSKELETAL CARE MD PC

129 FRANKLIN AVE
GARDEN CITY
NY 11530

100 1/2 JAMAICA AVE
RICHMOND HILL
NY 11420

3550 OCEAN AVE
OCEANSIDE NY
NY 11572

347 E EASTCHESTER ROAD      VALLEY
BRONX
NY 10461

1993 DEER PARK AVE
DEER PARK NY 11729

485 N. OCEAN AVE
PATCHOGUE NY 11772

20 GRAND AVE SUITE A
BALDWIN NY 11702

**4/3/19**

THIS IS TO CERTIFY THAT  **Evans Dimitra A**

& UNDER MY CARE/TREATMENT FOR ▓▓▓▓▓▓▓▓▓

____ PATIENT WAS LAST SEEN ON  **4/3/19**

_____ RECEIVED TREATMENT TODAY

_____ IS TOTALLY DISABLED AT THIS TIME

_____ IS PARTIALLY DISABLED AT THIS TIME

_____ CAN RETURN TO FULL DUTY WORK ON_____

_____ CAN RETURN TO LIGHT DUTY WORK ON_____

_____ PATIENT MAY PARTICIPATE IN ALL GYM/ACTIVITIES

_____ PATIENT MAY NOT PARTICIPATE IN ALL GYM/ACTIVTIES

NEXT APPOINTMENT:_____ **4/17/19**

ADDITIONAL NEEDS:

_____ USE OF ELEVATOR IN SCHOOL

_____ ALLOW EXTRA TIME TO EACH CLASS

_____ CRUTCHES/WHEELCHAIR FOR AMBULATION

_____ STUDENT TO OBTAIN EXTRA SET OF TEXTBOOKS

SPECIFIC INSTRUCTIONS:_____
_____
_____

DOCTORS SIGNATURE:_____

☐ Dr. Brett Silverman
NPI _____

☐ Dr. Michael Trepeta
NPI _____

☐ Dr. Gus Katsigiorgis
NPI 1033104554

☑ Dr. Nabil Farah
NPI 160001196

☐ Dr. Kanwarpaul Grewal
NPI 134440702

☐ Dr. Steven Goodman
NPI 1477550285

☐ Dr. Robert Drazic
NPI 1316050001

☐ Dr. Paul kubiak
NPI _____

☐ Dr. Robert Hecht
NPI 1609168129

☐ Dr. Elizabeth Matthew
NPI 14475 21337

AMZ-BRY000121

GC Exhibit 119

Worker's Compensation Appointment Attendance

Verification for Time Off

**Name:** Evans, Dimitra

**Login:**

**Clock Out:** _____ **Clock In:** _____ **Total Time:** _____

**Date:** _____ **Time:** _____

Appointment Type (circle one):

Initial WC Evaluation          Physical Therapy

Follow-UP          Other

**Location of Appointment:** _____

For each appointment this card must be completed. The following needs to be completed by office staff at your appointment:

**Arrival Time:** 11:00 **Departure Time:** _____

**Office Staff Signature/Title:** E. Perz



# New York Sexual Harassment Information Sheet (Addendum for New York Employees Only)

The State of New York requires that employers provide certain information to their employees explaining the federal, state, and city remedies and the complaint process available for complaints of sexual harassment.

Amazon strongly urges the reporting of all incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position, so that an effective, impartial, and thorough investigation can be conducted promptly and discreetly, and effective remedial action can be taken when appropriate, including in some circumstances with respect to supervisory and managerial employees who knowingly allow harassment to continue. Complaints will be accepted verbally or in writing.  One option for reporting discrimination, harassment, or retaliation is to complete the Discrimination/Harassment/Retaliation Complaint Form and provide it to your Human Resources Business Partner. You are not required to use this form to file a complaint. However, you should read and be aware of Amazon's procedures regarding Responding to Inappropriate Conduct or Possible Incidents of Harassment, outlined in Amazon's Workplace Harassment Policy, whether you choose to use this form or not.

Amazon.com will promptly investigate any reports of workplace harassment or inappropriate conduct and will enforce appropriate disciplinary action where necessary.

Sexual harassment can violate federal law (Title VII of the Civil Rights Act of 1964), state law (the New Yok State Human Rights Law), and applicable local laws (including the New York City Human Rights Law). Employees who believe that they have been subjected to sexual harassment may raise their concerns with:

- Amazon's internal dispute resolution process;
- Federal, state or local agencies, including the United States Equal Employment Opportunity Commission (EEOC), the New York State Division of Human Rights (DHR), or the New York City Commission on Human Rights; or
- Raise a claim in an appropriate court.

Depending on the circumstances, remedies for victims of sexual harassment under federal, state, and local law may include a requirement that your employer take action to stop the harassment, or redress the damage caused, including paying monetary damages and attorney's fees.



GC Exhibit 119

# Discrimination/Harassment/Retaliation Complaint Form

Amazon's Workplace Harassment policy provides procedures to report prohibited conduct. One option for reporting discrimination, harassment, or retaliation is to complete this form and provide it to your Human Resources Business Partner. You are not required to use this form to file a complaint. However, you should read and be aware of Amazon's procedures regarding Responding to Inappropriate Conduct or Possible Incidents of Harassment as outlined in the Workplace Harassment policy, whether you choose to use this form or not.

Victims and/or witnesses should report discrimination, harassment, and retaliation. Regardless of your experience with the discrimination, harassment or retaliation, it is important to be as specific as possible in your complaint so Amazon can fully investigate the conduct and take prompt corrective action, as necessary. Include all known information about the complaint, including the identity of any witnesses with knowledge of the allegations or offenses, and any other known evidence related to the complaint. You are not limited to the space provided. You are encouraged to attach any additional materials that may assist in investigating the claim.

To investigate the complaint, we may need to interview you, those subject to the alleged discrimination, harassment, or retaliation (if not yourself), the alleged offender(s), and any known witnesses. However, the investigation will be kept confidential to the extent permitted by law and make clear that unauthorized disclosures could result in disciplinary action. All individuals involved in the investigation will be reminded that Amazon's Workplace Harassment Policy prohibits any retaliation or adverse action against any employee making a report of alleged harassment, discrimination, or other improper workplace conduct in good faith, or who cooperates in the investigation of such reports.

**Your Name:**

_____

**Your Supervisor or Manager Name:**

_____

**Today's Date:**

_____

**Incident Time (if a single incident):**

_____

**Your Title:**

_____

**Your Supervisor or Manager Title:**

_____

**Incident Date/Period of Ongoing Incidents:**

_____

**Incident Location (if a single incident):**

_____

AMZ-BRY000124

GC Exhibit 119

Identify the individual(s) subject to the alleged discrimination, harassment, or retaliation:

_____
_____
_____
_____
_____

Identify the individual(s) who participated in discrimination, harassment, or retaliation:

_____
_____
_____
_____
_____

Identify (to the best of your knowledge) when the discrimination, harassment, or retaliation occurred. If it occurred over a period of time or continues to occur, identify that period of time:

_____
_____
_____
_____
_____

Identify why you believe the discrimination, harassment, or retaliation occurred:

_____
_____
_____
_____
_____

Describe the discrimination, harassment, or retaliation incident(s) in detail (attach additional sheets of paper if necessary):

_____
_____
_____
_____
_____
_____
_____
_____

AMZ-BRY000125



GC Exhibit 119

Has anyone else witnessed the alleged conduct? To the best of your knowledge, please identify those individuals and describe their scope of knowledge of the alleged conduct:

_____
_____
_____
_____
_____
_____

Are you aware of any other evidence of the alleged conduct (for example, documents, emails, videotapes, audiotapes, or other records or materials that substantiate your complaint)? To the best of your knowledge, please identify and describe any and all existing evidence and attach any and all existing evidence in your possession to this complaint:

_____
_____
_____
_____
_____
_____

Did you take any action to try to stop the alleged conduct? If so, please describe the action you took and what resulted:

_____
_____
_____
_____
_____

Have you previously reported or complained about the alleged conduct or any other discrimination, harassment or retaliation while employed at the Company? If so, please identify the person you reported the conduct to, the date of the report and the resolution:

_____
_____
_____
_____
_____

How would you like to see the situation resolved?

_____
_____
_____
_____

AMZ-BRY000126

GC Exhibit 119

I acknowledge that I have read and understand the above information. I certify that to the best of my knowledge, the information I have provided on this form is accurate. I am willing to fully cooperate in this investigation.

Your Signature:                                                    Date:

_____                    _____

Signature of Human Resources Business Partner           Date:
Receiving Complaint:

                                                                   _____

_____

AMZ-BRY000127

Acknowledged by jcream1983@gmail.com (Gerald Bryson on 11/13/2019 8:10:51 AM)


GC Exhibit 119

# PAID PERSONAL TIME for Internal Temporary Solutions Employees

**By clicking "Acknowledge above", I acknowledge that I have read and understand the Policy below and that I am responsible for complying with this policy.**

**I understand that this policy may be subject to change, and that if I require further information about this policy, I can raise questions with my human resources representative.**

## DESCRIPTION
Amazon.com provides all Internal Temporary Solutions associates with paid personal time, to be used in the event of illness or other personal business.  Paid personal time is accrued based on the associate's actual work hours.

## POLICY

### Paid Personal Time Accrual
Associates will be granted 5 hours of personal time after every 320 hours worked. Associates are eligible to use their personal time once the accrual has been recorded on their paycheck.

### Requesting and Reporting Use of Paid Personal Time
To the extent possible, you should schedule paid personal days in advance in order to assist your manager in planning.  Personal time is used to provide pay for time off from your scheduled work hours.  Personal time will not be paid for worked hours.  Your manager must approve your use of paid personal time.  Some departments do not allow the
use of paid personal time during specific time periods.  You should check with your manager and Human Resources to determine if you are permitted to use paid personal time at a particular time and whether your department has implemented any particular method of securing approval for time off.

Personal time taken unexpectedly due to illness/injury must be reported on the date the personal time is being used.  When you call-in to report your absence personal time should be requested.

Personal time may be used in one-minute increments.  You are responsible to report to the seasonal staffing team when you take paid personal time by either requesting it in advance of the absence or calling on the day of the absence/illness to report the use of personal time.  Failure to report when you've taken paid personal time could subject you to discipline, up to and including termination.  When paid personal time is reported, that amount is deducted from your paid personal time bank.  The amount of paid personal time available normally is displayed on your pay stub.  You can also check your paid personal time online.by using a designated "self-service" MyTime clock located in various locations through the facility.

### Paid Personal Carry Over
You may carry over any accrued, unused paid personal time from year to year.

### Paid Personal Time Advances
Paid personal time advances are not allowed under the policy.  Associates are not permitted to "borrow" against the future accruals of paid personal time.  There is no "negative" balance for paid personal time.

### Termination of Employment
Paid personal time may not be used to extend your termination date.  Your termination date is your last day of continuous, active employment on behalf of the company.  When your employment ends, you will not be paid for any accrued, unused paid personal time.  Should you be rehired by the company, any balance previously forfeited will not be credited back to your new paid personal time bank.

AMZ_BRY000128



# Pay Information Notice

The details below reflect your pay information as of 10/26/2018.

## Employer Details

| | | | |
|---|---|---|---|
| **Employer Name** | Amazon.com Services, Inc. | **Doing Business As** | Amazon.com Services, Inc. |
| **Legal Entity Address** | 1200 12th Ave South Suite 1200 Seattle, WA 98144 | **Mailing Address** | PO Box 81226 Seattle WA 98108-1226 USA |
| **Phone Number** | 1-888-892-7180 | | |

## Wage Information

| | | | |
|---|---|---|---|
| **Employee's Pay Rate:** | $17.50 per hour | **Regular Payday:** | Weekly Friday |
| **Pay Basis:** | Hourly | **Hours of Employment:** | Full-Time (40 hours) |
| **Tip Policy:** | None | | |
| **Overtime Eligibility:** | Non-Exempt | | |

**Overtime Rate:** $26.25 per hour (this must be 1 ½ times the worker's regular rate).

## Other Compensation

Please refer to your offer letter for additional forms of compensation for which you may be eligible.

I have informed my employer what my primary language is and:
**Check One**
- ● I have been given this notice in English because it is my primary language
- ○ I am requesting this notice in _____, as it is my primary language. HR will be notified to provide a copy of the notification in my primary language.
- ○ I have been given this pay notice in English only, because the Department of Labor does not yet offer a pay notice form in my primary language.

If you have any question about this notice, please contact the ERC at 888-892-7180.


GC Exhibit 119

## Pay Information Notice

The details below reflect your pay information as of 9/1/2020.

### Employer Details

| | | | |
|---|---|---|---|
| **Employer Name** | | **Doing Business As** | Amazon.com Services LLC |
| **Legal Entity Address** | 410 Terry Avenue North Seattle, 98109-5210 | **Mailing Address** | PO Box 81226 Seattle WA 98108-1226 USA |
| **Phone Number** | 1-888-892-7180 | | |

### Wage Information

| | | | |
|---|---|---|---|
| **Employee's Pay Rate:** | $18.7 per hour | **Regular Payday:** | Weekly Friday |
| **Pay Basis:** | Hourly | **Hours of Employment:** | Full-Time (40 hours) |
| **Tip Policy:** | None | | |
| **Overtime Eligibility:** | Non-Exempt | | |

**Overtime Rate:**   $28.05 per hour (this must be 1 ½ times the worker's regular rate).

### Other Compensation

Please refer to your offer letter for additional forms of compensation for which you may be eligible.

I have informed my employer what my primary language is and:
**Check One**

☐ I have been given this notice in English because it is my primary language

☐ I am requesting this notice in [                    ▼] , as it is my primary language. HR will be notified to provide a copy of the notification in my primary language.

☐ I have been given this pay notice in English only, because the Department of Labor does not yet offer a pay notice form in my primary language.

If you have any question about this notice, please contact the ERC at 888-892-7180.

**AMZ-BRY000130**



Direct Deposit Form

# GC Exhibit 119

## Payroll Direct Deposit Form



* Do you consent to the use of pay card for your last paycheck?  ○ Yes  ● No

ⓘ *Please review the Cardholder Agreement, Fee Schedule, and Privacy Policy for more information.*

**Bank Account** **Details**

**Account #1**

* Account Type: Checking ⌄         * Account Number: •••••••••

* Routing Number: •••••••••         * Confirm Account Number: •••••••••

* Confirm Routing Number: •••••••••         * Full/Partial: Full ⌄

☑ *By Selecting this check box and clicking submit you have agreed to the following statement: I authorize my employer, or its service/payroll provider, and the specified bank to deposit my net pay or portion thereof, as indicated, into my account each pay date. If funds to which I am not entitled are deposited into my account, I authorize my employer, or its service/payroll provider, to direct the bank to return said funds to my employer, or its service/payroll provider. I understand that my deposit may not be credited to my account until 5:00 PM on the pay date indicated on the check voucher. I understand that it is my responsibility to ensure that my wages are being deposited correctly into my account each pay date.*

**AMZ-BRY000131**

 GC Exhibit 119



4/19/2020

Gerald Bryson



Dear Gerald (EEID: 103899737):

This letter confirms that the date of involuntary termination of your employment with Amazon.com Services LLC is April 18, 2020.

You have executed a Confidentiality and Invention Assignment Agreement with the Company.  You are reminded that certain provisions of the agreement survive the termination of your employment with the Company and remain in full force and effect. Your agreement is available for review in the MyDocs portal for 90 calendar days after the end of your employment.

We wish you the best in your future endeavors.

Sincerely,
Amazon Human Resources

  

GC Exhibit 119



P.O. BOX 81226, SEATTLE, WA, 98108-1226

10/20/2018

Amazon.com Services, Inc.
410 Terry Ave N.
Seattle, WA 98109
Employee Resource Center:  (888) 892-7180

Gerald Joseph Bryson



Dear Gerald:

On behalf of Amazon.com Services, Inc. (the "Company"), I am very pleased to offer you the position of Fulfillment Associate. This letter clarifies and confirms the terms of your employment with the Company.

**Start Date and Compensation**

Unless we mutually agree otherwise in writing, you will commence employment on October 21, 2018 ("Start Date").  Your salary will be $16.50 per hour, ($34,320.00 annualized based on 2,080 hours per year) and a $0.00 per hour Shift Differential ($0.00 annualized based on 2,080 hours per year), payable Weekly (Friday) in accordance with the Company's standard payroll practice and subject to applicable withholding taxes. You will be eligible for overtime pay in accordance with applicable laws.

**Restricted Stock Unit Award**

Subject to approval by the Board of Directors of Amazon.com, Inc., you will be granted a restricted stock unit award with respect to 1 shares of Amazon.com, Inc. common stock. Subject to your continued employment with the Company, this award will vest and convert into shares of common stock on the 15th day of the month in which you reach your second anniversary of employment.

Your award will be documented by delivery to you of a Restricted Stock Unit Award Agreement specifying the terms and conditions of the award. You will be eligible for a restricted stock unit grant, based on your performance, in calendar year 2019. Ordinarily this process occurs each April.

**Department, Manager and Shift**

Department: 1299070 JFK8 USA FC Support
Manager: Kaylee Yoffe
Shift Pattern:

Your shift or schedule may change in the future. Based on business need, Amazon.com Services, Inc. reserves the right to modify shift times or rotate employees between existing shifts at any time in the company's sole discretion. Peak schedule information will be posted when it becomes available.

**Shift Information**

Employees who work in Fulfillment Centers are expected to be open to working a variety of shifts. Most buildings, for instance, have night and weekend shifts, and many of our day shifts include one weekend day as part of the regular schedule. We do our best to match shifts with personal preference, but we reserve the right to assign employees to shifts and schedules based on business needs. All employees may be required to work overtime or on holidays, especially during our busy seasons.

**Variable Compensation Pay (VCP)**

If you work in a fulfillment center you may be eligible for Variable Pay, a bonus based upon personal and site performance criteria at your location.

**Benefits**

During the term of your employment, you will be entitled to 401(k), health and welfare, vacation, and other benefits as may be offered by the Company from time to time, subject to eligibility and other terms and conditions stated in the governing documents. Generally you are eligible to enroll in our 401(k) and major medical plans as of the date you start employment, with access to our enrollment system about three business days after your start date. Please refer to the enclosed documents for more information.

**Preemployment Screening**

This offer is contingent on the successful completion of a background check and drug test.

**Employment at Will**

If you accept our offer of employment, you will be an employee-at-will, meaning that either you or the Company may terminate our relationship at any time for any reason, with or without cause. Any statements to the contrary that may have been made to you, or that may be made to you, by the Company, its agents, or representatives are superseded by this offer letter.

**Confidentiality and Invention Assignment Agreement**

As a condition of your employment, you must sign the enclosed Confidentiality and Invention Assignment Agreement (the "Agreement"). The Company's willingness to grant you the restricted stock unit award referred to above is based in significant part on your commitment to fulfill the obligations specified in the Agreement. Please review the Agreement carefully and, if appropriate, have your attorney review it as well.

**Employment Eligibility**





AMZ-BRY000134

DocuSign Envelope ID: 535EAA72-014F-4BDC-8FE5-866C33E3ACA7
Case 1:22-cv-01479-DG-SJB Document 5-9 Filed 03/17/22 Page 148 of 409 PageID #: 3912

GC Exhibit 19

To comply with immigration laws, you must provide the Company with evidence of your identity and eligibility for employment in the United States no later than three (3) business days after your date of hire. If you are in visa status, you also must provide new or renewed evidence of your eligibility for employment immediately prior to or upon expiration of your visa authorization.

## Additional Provisions

If you accept this offer, the terms described in this letter will be the initial terms of your employment, and this letter supersedes any previous discussions or offers. Any additions to or modifications to this offer must be in writing and signed by you and an officer of the Company.

**This offer and all terms of employment stated in this letter will expire ten calendar days from the date of this letter.**

Gerald, we are very excited about the possibility of you joining us. I hope that you will accept this offer and look forward to a productive and mutually beneficial working relationship. Please let me know if I can answer any questions for you about any of the matters outlined in this letter.

Sincerely,

Kaylee Yoffe
Manager II, Operations

## ACCEPTANCE

I accept employment with Amazon.com Services, Inc. under the terms set forth in this letter.

DocuSigned by:

*Gerald Bryson*

46497340FAE248E

Signature

10/23/2018

Date

Gerald Joseph Bryson





AMZ-BRY000135

Acknowledged by michellebodey23@gmail.com (Display Error) on 4/03/2018 1:27:31 PM


GC Exhibit 119

### The Amazon Security Awareness Checklist for Fulfillment Center Employees

The continued success of Amazon depends on our customers trusting that we will not lose their personal information which is considered **Critical and Confidential Data** under Amazon's Information Security Policy. This document helps Fulfillment Center Associates understand their responsibilities when it comes to keeping customer data secure.

- A written-down password can be found by someone and used without your consent. Lock your passwords in a drawer or keep them on your person.
- Sequential passwords (1111, abcd, qwerty) or personally-identifiable passwords (name, nickname, family names) are easy to hack. To be secure, passwords should have eight characters. Use letters, numbers, and some symbols.
- Sharing your passwords defeats the purpose of having passwords. While we're all looking for ways to make work easier, someone committing a crime by using your password makes you responsible.
- Logging in for other people distorts who is performing transactions and can lead to shared responsibility.
- Shred all Critical and Highly Confidential Data. Identity thieves dumpster-dive to obtain customer credentials.

| Critical Data | Highly Confidential Data |
|---|---|
| <ul><li>Credit card numbers</li><li>Gift messages</li><li>Customer bank account numbers</li><li>Multiple customers order history</li><li>Customer subscriptions</li><li>Customer Social Security Number, or National ID Number</li></ul> | <ul><li>Vendor or seller bank account numbers</li><li>Claim codes</li><li>Customer 9-digit (Zip + 4) postal code, or foreign equivalent</li></ul> |

Victims of **social engineering** use flawed reasoning to trust individuals, and that misplaced trust can be used to get information from you. Avoid being a victim. Do not discuss Amazon information with strangers in the parking lot or elsewhere. Be aware of your surroundings when discussing work projects, such as in a restaurant or bar.

Many believe the following myths:

- ➤ **I'm not technical, so information security doesn't apply to me**. Security is essential at every level of the company. Attacks and security breaches are not confined to technical environments and computer systems.
- ➤ **Someone else takes care of security at Amazon**. Amazon's success is a joint effort from all employees. Therefore it is your responsibility to keep the data you handle secure. Shred customer data.
- ➤ **I don't have access to anything an attacker would want**. You would be amazed by what attackers would want! Every Amazon employee has access to valuable information. Attackers are waiting for you to mishandle it!

By reading this document and clicking acknowledge above, you confirm understanding that security is our shared responsibility at Amazon. If you have any questions about how you can follow these best practices, or if you feel you've been a victim of social engineering please contact your HR Representative who will work with you to contact https://phishing.amazon.com/.



## U.S. Working Hours (Non-Exempt/Hourly) Policy

**Intended Audience:** Hourly Employees & Managers of Hourly Employees & HR
**Last Revised:** June 5, 2015

**PURPOSE:**

We all work hard to make Amazon the Earth's most customer centric company and it is important to be fully and accurately compensated for all of our hard work.

This policy generally defines what constitutes paid working time for hourly (non-exempt) associates in situations that frequently arise.  For situational questions or concerns, associates should contact their manager or HR representative.

All associates are responsible for checking the accuracy and completeness of their own time records and must not misrepresent hours worked either by overstating or understating the actual hours worked.  Falsifying time records is a serious matter and may subject associates and/or managers to disciplinary action, up to and including termination.

### On This Page

MEAL PERIODS & REST BREAKS

TRAVEL TIME

"OFF-THE-CLOCK" WORK NOT ALLOWED

OFF-SITE WORK

WORKING FROM HOME

ON-CALL TIME

SHOW-UP PAY

**MEAL PERIOD AND REST BREAKS**

Your safety and wellness is important to Amazon.  Working hard also includes taking appropriate meal periods and rest breaks.  Amazon provides the following unpaid meal periods and paid rest breaks depending on your shift and in accordance with federal and state law.  All hourly associates are expected to take these meal periods and rest breaks.

**Meal Periods** – All associates working greater than five hours are required to take a work-free 30-minute meal period.  In accordance with state law, associates working less than a six (6) hour shift may be permitted to waive their meal period with management approval.  Associates should contact their manager or HR representative for site specific information.

AMZ-BRY000137


GC Exhibit 119

The meal period for associates working in **California, Illinois, Kentucky, New Hampshire, Oregon, and Washington State** must start no later than five (5) hours into the associate's shift.

> *Example:* An associate working in Kentucky clocks-in and starts working at 7:00 am. The meal period must start no later than 12:00 pm.

The meal period for associates working in **all other states** must start no later than five and a half (5.5) hours into an associate's shift.

> *Example:* An associate working in Pennsylvania clocks-in and starts working at 7:00 am. The meal period must start no later than 12:30 pm.

Meal periods are not paid and not counted towards hours worked. During meal periods, associates must not perform any work. Associates are required to record the start and end time of each meal period. For facilities equipped with time-clocks, associates are required to punch-in at the start and end time of each meal period. During the meal period, associates who work from an Amazon site are free to leave the worksite; however, break rooms are provided at most Amazon locations.

An associate's meal period must not be interrupted, delayed or missed except for exceptional circumstances. In the event a meal period is interrupted, delayed or missed, associates must consult with their manager or HR representative.

Some associates may be required to take a longer meal period and/or a second meal period, depending on the length of the associate's shift and in accordance with state law. Associates should contact their manager or HR representative for site specific information.

**On-Duty Meal Period** – An on-duty paid meal period is only permitted when an associate is prevented from being relieved of all duty based on the necessary job duties, such as a data technician stationed alone at a remote site. Associates may not take an on-duty meal period unless required and approved by management. Associates must record all on-duty meal periods as time worked.

**Rest Breaks** – Amazon provides all associates a minimum ten (10) minute break for every four (4) hours worked, or major fraction thereof. These rest breaks are paid and associates should not clock in or out for them. Rest breaks should not be skipped or cut short. Associates may not waive their right to required rest breaks. Should business or personal needs require an adjustment to a rest break, associates must consult with their manager or HR representative to reschedule their rest break(s).

**Nursing Mother's Break** – Amazon recognizes that nursing mothers may need additional, reasonable break time to express breast milk in a private space. Where possible, associates should use their regularly scheduled paid rest breaks and unpaid meal period time for this purpose. However, if additional time is needed, associates will be provided with additional unpaid break time. Associates should contact their manager or HR representative for additional information on designated facilities and the scheduling of additional reasonable break time, if needed.

AMZ-BRY000138



**TRAVEL TIME**

Hourly associates may be asked to travel for work purposes from time to time.  The following principles apply in determining whether time spent in travel is paid time:

<u>Home To Work</u> – The time an associate spends commuting to and from home on regular workdays is not counted as hours worked.  However, if an associate is required to <u>perform work while traveling</u>, then the time spent performing such work must always be reported as working time.

> ***Example #1:***  Michael leaves his house at 8:00 am and arrives at work to start his workday at 9:00 am.  Michael will not be paid for the 1 hour of commuting time and the calculation of his work hours will begin at 9:00 am.

> ***Example #2:***  Michelle takes a ferry to and from work each morning leaving at 7:00 am and arriving at 8:00 am to start her workday.  One day, she was asked to call in for a meeting with her manager during the hour she was on the ferry.  Michelle will be compensated for the one hour she spent on the conference call as she was engaged in a work-related activity.

<u>Travel Away From Regular Worksite</u> – When associates travel for business, they will be compensated for all time associated with travel.

> **Example #3**:  Sara's regular work schedule is 8:00 am to 5:00 pm.  She took a flight at 6:00 pm to attend a business meeting and her flight landed at 10:00 pm.  She will be compensated for the 4 hours she spent on the plane, even though it occurred outside her normal business hours.

> <u>Leaving from Home</u>:  If associates travel away from their regular worksite and leave from home, the time they would normally spend commuting from home to their normal work location will not be counted toward hours worked.

> <u>Leaving from Amazon Facility</u>:  If associates travel away from their regular worksite, and leave from and return to an Amazon Facility, they will be paid for the total time traveled.

> ***Example #4:***  Michelle typically commutes 30 minutes to work and is scheduled to work from 8:00 am to 5:00 pm.  One day, she is asked to drive to another city for a training session.  She leaves at 6:00 am and drives for two hours, arriving at the out-of-town location at 8:00 am.  The training session ends at 5:00 pm and she spends two hours driving home.  In addition to her regular work day, Michelle should record 3.0 hours of travel time (that is, 2.0 hours each way minus normal commute time = 1.5 hours of travel time each way).

Travel time starts when the associate leaves (minus normal commuting time if applicable) until the time they reach their destination, such as a hotel or meeting location.  This time includes any time checking in at the airport, waiting for delayed flights, sitting on a plane, bus, train, or being delayed due to something outside of the associate's control.

All associates are responsible for correctly reporting all travel time.  When an associate travels between two or more time zones, the time zone associated with the point of departure should be used to track time.  Travel time will be paid at the associate's regular hourly rate and will be included in hours worked



for proper overtime calculations.  Where possible, business travel should occur within regularly scheduled work hours.

Time spent taking a break from travel in order to sleep  or engage in purely personal pursuits not connected with traveling or making necessary travel connections (such as, for example, spending an extra day in a city before the start or following the conclusion of a conference in order to sightsee), is not compensable.  In addition, meal periods taken while traveling are not hours worked as long as the associate is relieved of all work duties and the meal period is at least 30 minutes in length.

All associates must review travel arrangements with their manager prior to departure and/or reservations being made.   Travel arrangements must comply with Amazon's Travel Policy.

**"OFF-THE-CLOCK" WORK NOT ALLOWED**

Hourly associates are responsible for reporting ALL hours worked, whether at an Amazon building or off-site.  No one may allow or ask any associate to perform work "off the clock" without being paid.  If an associate feels that he or she is being pressured in any way to do so, the associate must inform an HR representative or report the conduct through the open door policy (which can be found in the Owner's Manual and Guide to Employment).

**OFF-SITE WORK**

Hourly associates who are regularly scheduled to work at an Amazon site should not perform work off-site unless required or approved by management.  Such work time may include training programs, meetings, work related communications via cell phone, or work performed on laptops or other electronic devices.  Failure to accurately report all off-site working time may subject managers and/or associates to corrective action.

**WORKING FROM HOME**

Hourly associates who work from home are responsible for reporting ALL hours worked, whether from their home workspace or for training/activities at an Amazon site.  No one may allow or ask any associate to perform work "off the clock" without being paid.  Associates who are regularly scheduled to work from an approved home workspace may not perform work at any other location unless required or approved by management.

**ON-CALL TIME**

The on-call policy ensures that the after-hours needs of Amazon are met in a reliable and timely way.  Hourly associates may be required to serve in a dedicated "on-call" capacity in which they are not required to be at any specific location and can use the time effectively for their own purposes, but must be available by telephone, pager or other electronic device for designated periods of time.  Prior to any associate serving in a dedicated "on-call" capacity, the reasonable expectations (including response time) of the associate must be communicated by management to the associate.

If called upon to work, associates will be paid their regular hourly rate (or overtime rate if applicable) and hours worked will be determined as follows:

AMZ-BRY000140



- If associates work off-site for 15 minutes or less, they will be paid for and should report 15 minutes of working time
- If associates work off-site for longer than 15 minutes, they will be paid for all time actually worked
- If associates are called upon to report to an Amazon facility to work, they will be paid a minimum of two hours of time plus any time worked beyond that.

***Example #1:*** While serving in a dedicated on-call capacity, Juan received a phone call from his manager.  The phone conversation lasted 10 minutes in length.  Even though Juan only worked for 10 minutes, he should report 15 minutes.  However, only the first 10 minutes must count towards hours worked when determining whether overtime is due.

***Example #2:*** While serving in a dedicated on-call capacity, Jared received a phone call to report to an Amazon facility to work.  He arrived to work at the facility at 6:30 pm and left at 7:00 pm.  Even though Jared only worked for 30 minutes, he will be paid for two hours.  However, only the first 30 minutes must count towards hours worked when determining whether overtime is due.

***Example #3:*** While serving in a dedicated on-call capacity, Diane received a phone call to report to an Amazon facility to work.  She arrived to work at the facility at 6:30 pm and left at 9:00 pm.  Diane will be paid for two and a half hours, all of which will count towards hours worked when determining whether overtime is due.

When called upon to work, associates must be able to work in accordance with Amazon's Code of Business Conduct and Ethics.

**SHOW-UP PAY**

Two-hours of "show-up pay" is paid when hourly associates are required to report to work but are involuntarily sent home for lack of work or other similar reason when less than two-hours is worked.  Show-up pay when no work is performed is not included in total hours worked for overtime calculations.

***Example #1:*** Susan was scheduled to work from 6:00 am to 4:30 pm.  Susan arrived at work at 6:00 am but, due to lack of work, she was involuntarily sent home at 7:00 am.  Even though Susan only worked one hour, she will be paid for two hours.  However, only the first hour must count towards hours worked when determining whether overtime is due.

In accordance with state law, some associates may be subject to stricter show-up pay requirements.  Associates should contact their manager or HR representative for site specific information.

AMZ-BRY000141



GC Exhibit 119

Acknowledged by jcream1963@gmail.com (Gerald Bryson on 11/13/2018 8:10:58 AM)

Using your Amazon Access/ID Badge

Your Amazon badge serves as both an access card to unlock doors and an ID card.

To open doors, hold the card up to the reader by the door. A green light will flash 3 times indicating that access has been granted and the door will unlock. If you receive a single green flash or just a red light your card is not working and you should contact reception or security.

Your Access/ID card:

- Must be worn at all times while in any Amazon facility.
- Must be worn in a conspicuous place on the front of your body between your shoulders and waist.
- Must not be loaned to anyone.
- Must not be used to allow another person to enter access-controlled areas – e.g. letting someone in that does not have access or does not want to swipe their badge (tailgaters).
- If lost, stolen, or damaged, must be reported to reception or security immediately.
- Must not have any additional holes punched in it due to the potential to damage internal components.

Your Amazon badge is Amazon property and must be returned upon request or separation from the company.

By clicking acknowledge above, I acknowledge that I am responsible for reimbursing Amazon for the replacement cost of company access card/ID badges and landlord-owned building access cards issued to me should they become lost or destroyed. I authorize and acknowledge that Amazon will deduct from my paycheck the full cost of replacing those cards/badges.

AMZ-BRY000142



# GC Exhibit 119

# W-4 Tax Information

## Tax Withholding

Complete the Federal tax withholding form below. Click Submit Form to record your changes.

To obtain further instructions or use the withholding worksheet, click W-4 Calculator and you will be directed to the Internal Revenue withholding assistance website.

If you are a non-resident alien, please review notice 1392 Supplemental Form W-4 Instructions for Non-Resident Alien.

Are you or your spouse a Non-Resident Alien?   No ○   Yes ○

---

Form **W-4**
Department of the Treasury
Internal Revenue Service

## Employee's Withholding Allowance Certificate

▶ Whether you're entitled to claim a certain number of allowances or exemption from withholding is subject to review by the IRS. Your employer may be required to send a copy of this form to the IRS.

OMB No. 1545-0074

**2018**

| 1  Your first name and middle initial | Last name | 2  Your social security number |
|---|---|---|
| Dimitra | Evans | On File |

| Home address (number and street or rural route) | 3 ☐ Single ☐ Married ☐ Married, but withhold at higher Single rate. |
|---|---|
| ▓▓▓ | Note: If married filing separately, check "Married, but withhold at higher Single rate." |
| City or town, state, and ZIP code | 4  If your last name differs from that shown on your social security card, |
| ▓▓▓ | check here. You must call 800-772-1213 for a replacement card.  ▶ ☐ |

| 5 | Total number of allowances you're claiming (from the applicable worksheet on the following pages) . . . | 5 | 0 |
|---|---|---|---|
| 6 | Additional amount, if any, you want withheld from each paycheck . . . . . . . . . . | 6 | $ 0 |
| 7 | I claim exemption from withholding for 2018, and I certify that I meet **both** of the following conditions for exemption. | | |

• Last year I had a right to a refund of **all** federal income tax withheld because I had **no** tax liability, **and**
• This year I expect a refund of **all** federal income tax withheld because I expect to have **no** tax liability.
If you meet both conditions, write "Exempt" here . . . . . . . . . . . . . . . . ▶ | 7 |

Under penalties of perjury, I declare that I have examined this certificate and, to the best of my knowledge and belief, it is true, correct, and complete.

**Employee's signature**
(This form is not valid unless you sign it.) ▶   **Dimitra S. Evans**

**Date** ▶ 10/25/2018

AMZ-BRY000143



## WORKPLACE HARASSMENT & EQUAL EMPLOYMENT OPPORTUNITY POLICY
### ACKNOWLEDGMENT FORM

**By clicking "Acknowledge" above, I acknowledge that I have access to a copy of the Workplace Harassment & Equal Employment Opportunity Policy through MyDocs and that I am responsible for reading, understanding, and complying with both policies.**

**By clicking "Acknowledge" above, I also understand the following:**

- I understand that Amazon is an equal opportunity affirmative action employer, and that discrimination or harassment against any employee or applicant for employment on the basis of race, religion, creed, color, national origin, citizenship, marital status, sex, age, sexual orientation, gender identity, veteran status, political ideology, ancestry, the presence of any physical, sensory, or mental disabilities, or other legally protected status will not be tolerated. This policy pertains to all personnel-related activities, including selection, hiring, benefits, work schedules, promotions, demotions, transfers, recruiting, advertising, reductions-in-force, terminations, and all forms of compensation and training.  A strong commitment by each employee is necessary to ensure equal employment opportunity for all.
- I understand that if I have any concerns that I am being subjected to any form of discrimination, harassment or retaliation in violation of Amazon's policies, I should immediately bring this to the attention of a human resources representative, my supervisor, any other manager, the Legal Department, or I should call Amazon's Ethics Line through which I can raise an anonymous complaint at any time.
- I understand that I am required to complete training in the first two months of my employment on the Workplace Harassment policy as a condition of my continued employment.

**I understand that I can raise questions or concerns with my manager, human resources representative, or the Employee Resource Center.**

**AMZ-BRY000144**

Acknowledged by michellebadoe23@gmail.com (Display Exam) on 4/05/2018 1:45:27 PM.



POLICIES AND PROCEDURES ACKNOWLEDGMENT FORM – NAFC

**By clicking "Acknowledge" above, I acknowledge that I have access to copies of the following selected policies through MyDocs and that I am responsible for reading, understanding, and complying with these polices.**

- The Owner's Manual and Guide to Employment
- Leave of Absence (LOA)
- U.S. Background Check Policy
- Insider Trading Guidelines and FAQs

**By clicking "Acknowledge" above, I also understand that I am responsible for compliance with all Amazon Policies, which are available online at Inside Amazon > English > Employment > US Policies. These policies include, but are not limited to:**

- **Attendance Policy – US Fulfillment Center**
- **Cell Phone Use Policy**
- **Dress and Grooming Standards**
- **Holiday Pay Guidelines**
- **Holiday Blackout**
- **Overtime Policy**
- **Standards of Conduct**

I further acknowledge that Amazon may change, rescind, or add to any policies, benefits, procedures, or practices from time to time at its sole and absolute discretion, with or without prior notice.  I agree that this document is not intended to be an express or implied contract; rather, it is a general statement of Amazon's policies.  I understand and agree that my employment at Amazon is at will and may be terminated by either me or Amazon at any time for any reason, with or without cause, and with or without prior notice or warning.

**I understand that I can raise questions or concerns with my manager, human resources representative, or the Employee Resource Center.**

Acknowledged by michellebodgo23@gmail.com (Display Error) on 40332018 1:45:05 PM

GC Exhibit 119



WORKING HOURS POLICY
ACKNOWLEDGMENT FORM

**By clicking "Acknowledge" above, I acknowledge that I have access to a copy of the <u>Working Hours (Non-Exempt/Hourly) Policy</u> through MyDocs and that I am responsible for reading, understanding, and complying with the Working Hours Policy.**

- If I am an *hourly employee*, I am responsible for reporting all hours worked; taking a work free unpaid 30 minute meal period; and taking paid rest breaks. I understand that no one may allow or ask me to perform work "off the clock" without being paid.

- If I am a *salaried employee*, I understand that I may not allow or ask any hourly employee to perform work "off the clock" without being paid. This includes, but is not limited to, not interrupting meal periods or rest breaks with work related matters. I will not falsify or incorrectly report time worked for an hourly employee or advise an hourly employee to do so.

**By clicking "Acknowledge" above, I also agree** to notify a human resources representative, my supervisor, any other manager, the Legal Department, or <u>Amazon's Ethics Line</u> immediately in the event I have reason to believe that any violation of the Working Hours Policy occurred.

**I understand that I can raise questions or concerns with my manager, human resources representative, or the Employee Resource Center.**

Acknowledged by jcream1963@gmail.com (Gerald Bryson on 11/13/2018 3:12:01 AM)

GC Exhibit 119



## Workplace Harassment & Equal Employment Opportunity Policy
## Acknowledgment Form

**By clicking "Acknowledge" above, I acknowledge that I have access to a copy of the Workplace Harassment & Equal Employment Opportunity Policy through MyDocs and that I am responsible for reading, understanding, and complying with both policies.**

**By clicking "Acknowledge" above, I also understand the following:**

- I understand that Amazon is an equal opportunity affirmative action employer, and that discrimination or harassment against any employee or applicant for employment on the basis of race, religion, creed, color, national origin, citizenship, marital status, sex, age, sexual orientation, gender identity, veteran status, political ideology, ancestry, the presence of any physical, sensory, or mental disabilities, or other legally protected status will not be tolerated. This policy pertains to all personnel-related activities, including selection, hiring, benefits, work schedules, promotions, demotions, transfers, recruiting, advertising, reductions-in-force, terminations, and all forms of compensation and training.  A strong commitment by each employee is necessary to ensure equal employment opportunity for all.
- I understand that if I have any concerns that I am being subjected to any form of discrimination, harassment or retaliation in violation of Amazon's policies, I should immediately bring this to the attention of a human resources representative, my supervisor, any other manager, the Legal Department, or I should call Amazon's Ethics Line through which I can raise an anonymous complaint at any time.
- I understand that I am required to complete training in the first two months of my employment on the Workplace Harassment policy as a condition of my continued employment.

**I understand that I can raise questions or concerns with my manager, human resources representative, or the Employee Resource Center.**

GC Exhibit 119

Acknowledged by associate on April 17, 2020, 5:18:59 PM - Delivered by Lyerly,Sherman (lyerls)



# Supportive Feedback Document
# Behavioral - First Written



**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Chen,Calvin (DC1-0730)
**Created On:** April 17, 2020, 5:18:59 PM

## Summary

Your recent job performance is not meeting Behavioral expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your behavioral feedback:

| Level | Count | Most Recent |
| --- | --- | --- |

## Details of Current Incident/Specific Concerns

The following feedback pertains to Amazon's Standards of Conduct. These behaviors are violations of Amazon's Standards of Conduct policy, &quot;Inappropriate Language or Behavior&quot; and is considered a Category 2 violation of the Standards of Conduct. It was found that you used inappropriate language while engaging another employee in the parking lot on 4/6/20.

## Areas of Improvement Required by Associate

The Standards of Conduct strive to establish a collaborative, non-hostile work environment. The acts of inappropriate behavior creates a hostile atmosphere and may offend others. You are expected to be in compliance with the Standards of Conduct policy at all times while working in the Fulfillment Center. Continued violation of this policy may result in further corrective action, up to and including termination.

## Associate Comments

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)        **Date:** April 17, 2020, 5:18:59 PM

**Manager Signature:** Acknowledged by Lyerly,Sherman (BadgeID: 11682239)        **Date:** April 17, 2020, 5:18:59 PM

AMZ-BRY000148

GC Exhibit 119

Acknowledged by associate on January 05, 2019, 7:06:57 PM - Delivered by Howell,Nicole (howenico)

# Supportive Feedback Document
# Job Performance - Documented Positive



**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** January 05, 2019, 7:06:57 PM



## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|

## Details of Current Incident/Specific Concerns

This AA won a sort competition in AFE2 on 1/4/19 from 14:00 to 15:00.

## Associate Comments

<br><br><br><br><br>

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)    **Date:** January 05, 2019, 7:06:57 PM

**Manager Signature:** Acknowledged by Howell,Nicole (BadgeID: 12313265)    **Date:** January 05, 2019, 7:06:57 PM

AMZ-BRY000149

GC Exhibit 119

Acknowledged by associate on January 05, 2019, 7:06:52 PM - Delivered by Howell,Nicole (howenico)

# Supportive Feedback Document
# Job Performance - Documented Positive





**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** January 05, 2019, 7:06:52 PM

## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|

## Details of Current Incident/Specific Concerns

This AA won a sort competition in AFE2 on 1/4/19 from 13:00 to 14:00.

## Associate Comments

|  |
|--|
|  |

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)     **Date:** January 05, 2019, 7:06:52 PM

**Manager Signature:** Acknowledged by Howell,Nicole (BadgeID: 12313265)     **Date:** January 05, 2019, 7:06:52 PM

GC Exhibit 119

Acknowledged by associate on January 24, 2019, 11:34:19 AM - Delivered by Makary,Ramy (ramakary)



# Supportive Feedback Document
# Productivity - Documented Positive



**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** January 24, 2019, 11:34:19 AM

## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 3 | January 16, 2019 |
| Documented Positive | 10 | January 09, 2019 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| Chuting | Scan Verify AFE 2 ItemPacked Medium EACH | Level 4 | 0.1 | 24 | 238.02 | 145 | 164.15 | 164.15 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Small EACH | Level 4 | 0.27 | 62 | 232.26 | 150 | 154.84 | 154.84 | N |
| Sort-Flow | AFE 2 Rebin ItemRebinned Total EACH | Level 5 | 18.91 | 11040 | 583.68 | 350 | 166.77 | 166.77 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| January 16, 2019, 5:00:00 AM | 11040 | 19 | 584 | 166.77 | 166.77 | N |
| January 09, 2019, 5:00:00 AM | 21696 | 40 | 541 | 154.61 | 154.61 | N |
| January 02, 2019, 5:00:00 AM | 21329 | 38 | 561 | 160.31 | 160.31 | N |
| December 26, 2018, 5:00:00 AM | 5029 | 14 | 354 | 142.18 | 142.18 | N |
| December 19, 2018, 5:00:00 AM | 13739 | 26 | 524 | 149.69 | 149.69 | N |
| December 12, 2018, 5:00:00 AM | 25531 | 56 | 452 | 147.23 | 150.44 | N |

## Associate Comments

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** January 24, 2019, 11:34:19 AM

**Manager Signature:** Acknowledged by Makary,Ramy (BadgeID: 0356942)          **Date:** January 24, 2019, 11:34:19 AM

GC Exhibit 119

Acknowledged by associate on January 09, 2019, 4:45:31 PM - Delivered by Howell,Nicole (howenico)

# Supportive Feedback Document
# Productivity - Documented Positive





**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** January 09, 2019, 4:45:31 PM

## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Documented Positive | 8 | January 05, 2019 |
| Verbal Positive | 2 | December 19, 2018 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| Sort-Flow | AFE 2 Rebin ItemRebinned Total EACH | Level 5 | 38.01 | 21329 | 561.07 | 350 | 160.31 | 160.31 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| January 02, 2019, 5:00:00 AM | 21329 | 38 | 561 | 160.31 | 160.31 | N |
| December 26, 2018, 5:00:00 AM | 5029 | 14 | 354 | 142.18 | 142.18 | N |
| December 19, 2018, 5:00:00 AM | 13739 | 26 | 524 | 149.69 | 149.69 | N |
| December 12, 2018, 5:00:00 AM | 25531 | 56 | 452 | 147.23 | 150.44 | N |
| December 05, 2018, 5:00:00 AM | 24059 | 45 | 540 | 154.4 | 173.79 | N |
| November 28, 2018, 5:00:00 AM | 13140 | 27 | 486 | 211.38 | 248.68 | N |

## Associate Comments

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** January 09, 2019, 4:45:31 PM

**Manager Signature:** Acknowledged by Howell,Nicole (BadgeID: 12313265)          **Date:** January 09, 2019, 4:45:31 PM

AMZ-BRY000152

GC Exhibit 119

Acknowledged by associate on December 13, 2018, 10:54:46 AM - Delivered by Makary,Ramy (ramakary)

# Supportive Feedback Document
# Productivity - Documented Positive





**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** December 13, 2018, 10:54:46 AM

## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 1 | November 28, 2018 |
| Documented Positive | 6 | December 05, 2018 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| Chuting | Scan Verify AFE 2 ItemPacked Medium EACH | Level 3 | 2.03 | 461 | 227.47 | 145 | 156.87 | 174.3 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Small EACH | Level 3 | 2.49 | 499 | 200.78 | 150 | 133.85 | 148.73 | N |
| Sort-Flow | AFE 2 Rebin ItemRebinned Total EACH | Level 2 | 9.7 | 5319 | 548.19 | 350 | 156.63 | 184.27 | N |
| Sort-Flow | AFE 2 Rebin ItemRebinned Total EACH | Level 3 | 34.82 | 18740 | 538.23 | 350 | 153.78 | 170.87 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| December 05, 2018, 5:00:00 AM | 24059 | 45 | 540 | 154.4 | 173.79 | N |
| November 28, 2018, 5:00:00 AM | 13140 | 27 | 486 | 211.38 | 248.68 | N |
| November 21, 2018, 5:00:00 AM | 2230 | 10 | 225 | 122.29 | 135.87 | N |
| November 14, 2018, 5:00:00 AM | 4956 | 23 | 216 | 117.66 | 132.77 | N |
| November 07, 2018, 5:00:00 AM | 5164 | 25 | 210 | 114.01 | 134.13 | N |
| October 31, 2018, 5:00:00 AM | 3218 | 15 | 221 | 120.47 | 141.73 | N |

## Associate Comments

|  |
|---|
|  |

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** December 13, 2018, 10:54:46 AM

**Manager Signature:** Acknowledged by Makary,Ramy (BadgeID: 0356942)          **Date:** December 13, 2018, 10:54:46 AM

GC Exhibit 119

Acknowledged by associate on December 07, 2018, 10:02:05 AM - Delivered by Makary,Ramy (ramakary)



# Supportive Feedback Document
# Productivity - Documented Positive



**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** December 07, 2018, 10:02:05 AM

## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 1 | November 28, 2018 |
| Documented Positive | 4 | November 22, 2018 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| Chuting | Scan Verify AFE 2 ItemPacked Medium EACH | Level 3 | 0.33 | 38 | 115.25 | 178 | 64.75 | 71.94 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Small EACH | Level 3 | 0.29 | 31 | 105.78 | 189 | 55.97 | 62.19 | N |
| Sort-Flow | AFE 2 Rebin ItemRebinned Total EACH | Level 1 | 18.78 | 9081 | 483.57 | 230 | 210.25 | 300.35 | N |
| Sort-Flow | AFE 2 Rebin ItemRebinned Total EACH | Level 2 | 27.03 | 13140 | 486.17 | 230 | 211.38 | 248.68 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| November 28, 2018, 5:00:00 AM | 13140 | 27 | 486 | 211.38 | 248.68 | N |
| November 21, 2018, 5:00:00 AM | 2230 | 10 | 225 | 122.29 | 135.87 | N |
| November 14, 2018, 5:00:00 AM | 4956 | 23 | 216 | 117.66 | 132.77 | N |
| November 07, 2018, 5:00:00 AM | 5164 | 25 | 210 | 114.01 | 134.13 | N |
| October 31, 2018, 5:00:00 AM | 3218 | 15 | 221 | 120.47 | 141.73 | N |
| October 24, 2018, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |

## Associate Comments

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** December 07, 2018, 10:02:05 AM

**Manager Signature:** Acknowledged by Makary,Ramy (BadgeID: 0356942)          **Date:** December 07, 2018, 10:02:05 AM

AMZ-BRY000154



GC Exhibit 119

Acknowledged by associate on November 27, 2018, 11:09:30 AM - Delivered by Makary,Ramy (ramakary)



# Supportive Feedback Document
# Productivity - Documented Positive



**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** November 27, 2018, 11:09:30 AM

## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Documented Positive | 2 | November 14, 2018 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| Chuting | Scan Verify AFE 2 ItemPacked Medium EACH | Level 2 | 3.88 | 658 | 169.42 | 178 | 95.18 | 111.97 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Medium EACH | Level 3 | 6.85 | 1704 | 248.83 | 178 | 139.79 | 155.32 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Small EACH | Level 2 | 4.06 | 652 | 160.51 | 189 | 84.93 | 99.92 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Small EACH | Level 3 | 8.15 | 1942 | 238.31 | 189 | 126.09 | 140.1 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| November 14, 2018, 5:00:00 AM | 4956 | 23 | 216 | 117.66 | 132.77 | N |
| November 07, 2018, 5:00:00 AM | 5164 | 25 | 210 | 114.01 | 134.13 | N |
| October 31, 2018, 5:00:00 AM | 3218 | 15 | 221 | 120.47 | 141.73 | N |
| October 24, 2018, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |

## Associate Comments

|  |
|---|
|  |

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** November 27, 2018, 11:09:30 AM

**Manager Signature:** Acknowledged by Makary,Ramy (BadgeID: 0356942)          **Date:** November 27, 2018, 11:09:30 AM

GC Exhibit 119

Acknowledged by associate on November 15, 2018, 3:55:04 PM - Delivered by Makary,Ramy (ramakary)

# Supportive Feedback Document
# Productivity - Documented Positive





**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** November 15, 2018, 3:55:04 PM

## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Documented Positive | 1 | November 07, 2018 |

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---|---|---|---|---|---|---|---|---|---|
| Chuting | Scan Verify AFE 2 ItemPacked Medium EACH | Level 2 | 11.22 | 2371 | 211.33 | 178 | 118.73 | 139.68 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Small EACH | Level 2 | 13.43 | 2793 | 208.03 | 189 | 110.07 | 129.49 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|---|---|---|---|---|---|---|
| November 07, 2018, 5:00:00 AM | 5164 | 25 | 210 | 114.01 | 134.13 | N |
| October 31, 2018, 5:00:00 AM | 3218 | 15 | 221 | 120.47 | 141.73 | N |
| October 24, 2018, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |

## Associate Comments

|  |
|---|
|  |

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** November 15, 2018, 3:55:04 PM

**Manager Signature:** Acknowledged by Makary,Ramy (BadgeID: 0356942)          **Date:** November 15, 2018, 3:55:04 PM

GC Exhibit 119

Acknowledged by associate on November 08, 2018, 4:25:13 PM - Delivered by Makary,Ramy (ramakary)

# Supportive Feedback Document
# Productivity - Documented Positive





**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** November 08, 2018, 4:25:13 PM

## Summary

Your recent job performance has met or exceeded Productivity expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|

## Details of Current Incident/Specific Concerns

| Process | Function | LC | Hours | Units | UPH | Expected | % to Goal | % to Curve | Was Borrowed |
|---------|----------|-----|-------|-------|-----|----------|-----------|------------|--------------|
| Chuting | Scan Verify AFE 2 ItemPacked Medium EACH | Level 1 | 13.42 | 2657 | 197.96 | 178 | 111.21 | 158.88 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Medium EACH | Level 2 | 6.49 | 1456 | 224.19 | 178 | 125.95 | 148.18 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Small EACH | Level 1 | 15.36 | 3122 | 203.32 | 189 | 107.58 | 153.68 | N |
| Chuting | Scan Verify AFE 2 ItemPacked Small EACH | Level 2 | 8.03 | 1762 | 219.31 | 189 | 116.04 | 136.52 | N |

## Performance Trend

Below is a summary of your past Productivity performance.

| Period Start | Unit Count | Hours Worked | UPH | % to Goal | % to Curve | Exempted |
|--------------|-----------|--------------|-----|-----------|------------|----------|
| October 31, 2018, 5:00:00 AM | 3218 | 15 | 221 | 120.47 | 141.73 | N |
| October 24, 2018, 5:00:00 AM | 0 | 0 | 0 | 0 | 0 | Y |

## Associate Comments

|  |
|--|
|  |

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** November 08, 2018, 4:25:13 PM

**Manager Signature:** Acknowledged by Makary,Ramy (BadgeID: 0356942)          **Date:** November 08, 2018, 4:25:13 PM

GC Exhibit 119

Acknowledged by associate on January 29, 2019, 7:58:51 PM - Delivered by Howell,Nicole (howenico)



# Supportive Feedback Document
# Productivity Single Day - Documented
# Positive



**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Howell,Nicole (DC1-0715)
**Created On:** January 29, 2019, 7:58:51 PM

## Summary

Your recent job performance has met or exceeded Productivity Single Day expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Documented Positive | 11 | January 23, 2019 |
| Verbal Positive | 3 | January 16, 2019 |

## Details of Current Incident/Specific Concerns

This AA won a sort competition on 1/26/19.

## Associate Comments

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** January 29, 2019, 7:58:51 PM

**Manager Signature:** Acknowledged by Howell,Nicole (BadgeID: 12313265)          **Date:** January 29, 2019, 7:58:51 PM

AMZ-BRY000158

GC Exhibit 119

Acknowledged by associate on January 09, 2019, 5:20:04 PM - Delivered by Howell,Nicole (howenico)



# Supportive Feedback Document
# Productivity Single Day - Documented Positive



**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** January 09, 2019, 5:20:04 PM

## Summary

Your recent job performance has met or exceeded Productivity Single Day expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 2 | December 19, 2018 |
| Documented Positive | 9 | January 09, 2019 |

## Details of Current Incident/Specific Concerns

This AA won a sort competition in AFE2 on 1/9/19.

## Associate Comments

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** January 09, 2019, 5:20:04 PM

**Manager Signature:** Acknowledged by Howell,Nicole (BadgeID: 12313265)          **Date:** January 09, 2019, 5:20:04 PM

GC Exhibit 119

Acknowledged by associate on January 05, 2019, 7:07:01 PM - Delivered by Howell,Nicole (howenico)



# Supportive Feedback Document
## Productivity Single Day - Documented Positive



**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** January 05, 2019, 7:07:01 PM

### Summary

Your recent job performance has met or exceeded Productivity Single Day expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

### Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 2 | December 19, 2018 |
| Documented Positive | 7 | December 12, 2018 |

### Details of Current Incident/Specific Concerns

This AA won a sort competition in AFE2 on 1/3/19 from12:40 to 3PM.

### Associate Comments

|  |
|---|
|  |

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)     **Date:** January 05, 2019, 7:07:01 PM

**Manager Signature:** Acknowledged by Howell,Nicole (BadgeID: 12313265)     **Date:** January 05, 2019, 7:07:01 PM

GC Exhibit 119

Acknowledged by associate on December 05, 2018, 10:40:08 AM - Delivered by Howell,Nicole (howenico)



# Supportive Feedback Document
## Productivity Single Day - Documented Positive

**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** December 05, 2018, 10:40:08 AM



## Summary

Your recent job performance has met or exceeded Productivity Single Day expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 1 | November 28, 2018 |
| Documented Positive | 4 | November 22, 2018 |

## Details of Current Incident/Specific Concerns

This AA won a sort competition!

## Associate Comments

|  |
|---|
|  |

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** December 05, 2018, 10:40:08 AM

**Manager Signature:** Acknowledged by Howell,Nicole (BadgeID: 12313265)          **Date:** December 05, 2018, 10:40:08 AM

GC Exhibit 119

Acknowledged by associate on November 22, 2018, 12:42:26 PM - Delivered by Howell,Nicole (howenico)



# Supportive Feedback Document
# Productivity Single Day - Documented Positive

**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Makary,Ramy (DC1-0715)
**Created On:** November 22, 2018, 12:42:26 PM



## Summary

Your recent job performance has met or exceeded Productivity Single Day expectations. Your manager and Amazon.com would like to take a moment to recognize your performance and thank you for your hard work.

## Communication History

The following is a summary of your productivity feedback:

| Level | Count | Most Recent |
|---|---|---|
| Documented Positive | 2 | November 14, 2018 |

## Details of Current Incident/Specific Concerns

AA won first place in a pack competition.

## Associate Comments

|  |
|---|
|  |

**Associate Signature:** Acknowledged by Evans,Dimitra (BadgeID: 11975067)          **Date:** November 22, 2018, 12:42:26 PM

**Manager Signature:** Acknowledged by Howell,Nicole (BadgeID: 12313265)          **Date:** November 22, 2018, 12:42:26 PM

AMZ-BRY000162



GC Exhibit 119

Refused to sign by associate on May 10, 2019, 3:51:55 PM - Delivered by Huynh,Lena (lenahuyn)



# Supportive Feedback Document
# Quality - First Written



**Associate Name:** Evans,Dimitra (edimitra)
**Manager Name:** Huynh,Lena (DC1-0715)
**Created On:** May 10, 2019, 3:51:55 PM

## Summary

Your recent job performance is not meeting Quality expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your quality feedback:

| Level | Count | Most Recent |
|---|---|---|
| Verbal Positive | 1 | May 01, 2019, 5:00:00 AM |

## Details of Current Incident/Specific Concerns     * Expected DPMO is per error family and not per error type

| Error Family | Error Type | Errors Discovered | Units Processed | Expected DPMO* | Minimum Units | Is Excluded |
|---|---|---|---|---|---|---|
| Pick | Wrong Adjustment | 4 | 15893 | 200 | 1000 | No |

## Error Listing     * Up to 20 most recent errors shown

| Date | Error Family | Error Type | Details |
|---|---|---|---|
| May 03, 2019, 3:22:10 PM | Pick | Wrong Adjustment | **Location Id:** P-8-B084F235<br>**Fc Sku:** X001XT3CEJ<br>**Application Name:** AFTWatsonService<br>**Found Location List:** [P-8-B084F235] |
| May 03, 2019, 9:14:44 AM | Pick | Wrong Adjustment | **Location Id:** P-8-B631V596<br>**Fc Sku:** X0020KBWRT<br>**Application Name:** AFTWatsonService<br>**Found Location List:** [P-8-B631V596] |
| May 02, 2019, 8:51:29 AM | Pick | Wrong Adjustment | **Location Id:** P-6-C960G088<br>**Fc Sku:** X0023T6ZR9<br>**Application Name:** AFTWatsonService<br>**Found Location List:** [P-6-C960G088] |
| April 29, 2019, 1:06:10 PM | Pick | Wrong Adjustment | **Location Id:** P-6-C375E385<br>**Fc Sku:** X0022RL6CV<br>**Application Name:** AFTWatsonService<br>**Found Location List:** [P-6-C375E385] |

## Performance Trend

Below is a summary of your past Quality performance.

| Period Start | Unit Processed | Errors Discovered | DPMO | Performance % | Exempted |
|---|---|---|---|---|---|
| May 01, 2019 | 15893 | 4 | 251.68 | -25.85 | No |
| April 24, 2019 | 11007 | 2 | 181.7 | 9.14 | No |

## Areas of Improvement Required by Associate

You are expected to meet 100% of the quality performance expectation. Please note that If an associate receives a 2nd final or a total of 6 documented counseling write-ups in a rolling 12 months, their employment will end. We are committed to assisting you in improving your quality performance, and will assist you in addressing any job related barriers that are impacting your ability to meet quality expectations.

## Associate Comments

went over missing out process and number of shorts. AA does not believe they had any mistakes and plans to go back to pack

AMZ-BRY000163

GC Exhibit 119

**Associate Signature:** Evans,Dimitra REFUSED TO SIGN                    **Date:** May 10, 2019, 3:51:55 PM

**Manager Signature:** Acknowledged by Huynh,Lena (BadgeID: 11049375)                    **Date:** May 10, 2019, 3:51:55 PM

AMZ-BRY000164

Acknowledged by michellebodeo23@gmail.com (Display Expiry on 4/03/2018 1:33:26 PM)



GC Exhibit 119

Using your Amazon Access/ID Badge

Your Amazon badge serves as both an access card to unlock doors and an ID card.

To open doors, hold the card up to the reader by the door. A green light will flash 3 times indicating that access has been granted and the door will unlock. If you receive a single green flash or just a red light your card is not working and you should contact reception or security.

Your Access/ID card:

- Must be worn at all times while in any Amazon facility.
- Must be worn in a conspicuous place on the front of your body between your shoulders and waist.
- Must not be loaned to anyone.
- Must not be used to allow another person to enter access-controlled areas – e.g. letting someone in that does not have access or does not want to swipe their badge (tailgaters).
- If lost, stolen, or damaged, must be reported to reception or security immediately.
- Must not have any additional holes punched in it due to the potential to damage internal components.

Your Amazon badge is Amazon property and must be returned upon request or separation from the company.

By clicking acknowledge above, I acknowledge that I am responsible for reimbursing Amazon for the replacement cost of company access card/ID badges and landlord-owned building access cards issued to me should they become lost or destroyed. I authorize and acknowledge that Amazon will deduct from my paycheck the full cost of replacing those cards/badges.

AMZ-BRY000165



GC Exhibit 120

# UNITED STATES OF AMERICA
## BEFORE THE NATIONAL LABOR RELATIONS BOARD

AMAZON.COM SERVICES LLC            )
                                   )
                                   )
                 and               )          Case 29-CA-261755
                                   )
GERALD BRYSON, and Individual.     )

### RESPONDENT'S REQUEST FOR SPECIAL PERMISSION TO APPEAL THE ADMINISTRATIVE LAW JUDGE'S ORDERS DENYING RESPONDENT'S MOTION FOR RECONSIDERATION, REFUSING TO REVOKE CHARGING PARTY SUBPOENA B-1-1C9GVF PARAGRAPH 4, AND REQUIRING RESPONDENT TO UNREDACT CERTAIN DOCUMENTS

Pursuant to Section 102.26 of the National Labor Relations Board's Rules and Regulations, Respondent Amazon.com Services LLC ("Respondent," "Amazon," or the "Company") seeks special permission to appeal four orders issued by Administrative Law Judge Benjamin Green:

(1) the ALJ's Order on the record on May 24 and 25, 2021 denying Respondent's Motion for Reconsideration of the ALJ's prior ruling denying Respondent's Petition to Revoke (a) Counsel for the General Counsel ("CAGC") Subpoena B-1-1BUGMIX Paragraph 19, and (b) Charging Party Subpoena B-1-1C9GVF Paragraph 19 to the extent they seek documents related to matters that are not at issue in this case ("Subpoena Reconsideration Order");

(2) the ALJ's Order on the record on May 24, 2021 refusing to revoke Charging Party Subpoena B-1-1C9GVF Paragraph 4 to the extent it seeks documents related to matters that are not at issue in this case ("Subpoena Clarification Order");



GC Exhibit 120

(3) the ALJ's May 20, 2021 written Order directing Amazon to remove redactions from

copies of five Amazon "Chime" messages that Amazon produced in response to the

subpoena requests identified above ("Chime Redaction Order"); and

(4) the ALJ's May 27, 2021 Order on the record directing Amazon to remove redactions

from a copy of a Microsoft OneNote (electronic notebook) file that Amazon produced in

response to the subpoena requests identified above ("OneNote Redaction Order").

The relevant transcript pages reflecting the ALJ's May 24, 25, and 27, 2021 Orders on the record

are attached as Exhibit A to Respondent's Appeal of the ALJ's Orders Denying Respondent's

Motions for Reconsideration, Refusing to Revoke Charging Party Subpoena B-1-1C9GVF

Paragraph 4, and Requiring Respondent to Unredact Certain Documents ("Appeal"), which is

being filed simultaneously.[1]   The ALJ's May 20, 2021 Chime Redaction Order is attached as

Exhibit B to the Appeal.

The sole issue in this case is whether Respondent terminated a single employee – Gerald

Bryson – from Respondent's JFK8 facility in Staten Island, New York in violation of Section

8(a)(1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §158(a)(1), for

unleashing a verbal attack over a bullhorn on a co-worker, calling her, among other things, a

"gutter bitch" and a "drug addict," and stating that Amazon hires the "scum of the earth."  The

facts in this case are straightforward, the legal issues are not novel or complex, and it does not

require massive subpoena requests covering upwards of 170 sub-parts.

---

[1] The ALJ's May 24, 25, and 27, 2021 Orders were on the record.  Amazon filed its Request for Special Permission to Appeal and the accompanying Appeal promptly upon receipt of the relevant transcripts.  The ALJ has left the record open so that the CAGC and the Charging Party may continue to present additional evidence and testimony in the event that any additional documents provide avenues for additional questioning or witnesses consistent with the narrow issue left in this case.



GC Exhibit 120

Respondent's Request and Appeal are supported by good cause for two main reasons.

First, the ALJ's Subpoena Reconsideration Order, Subpoena Clarification Order, and Redaction Orders are contrary to the National Labor Relations Act's ("NLRA" or "Act") requirement that subpoenas must seek evidence related to a "matter under investigation or in question in the proceedings."  NLRA, Sec. 11(1).  The evidence sought by CAGC Subpoena B-1-1BUGMIX Paragraph 19 and Charging Party Subpoena B-1-1C9GVF Paragraphs 4 and 19 is irrelevant to any matter remaining at issue in this case.  Respondent already has been forced to undertake a large-scale production of over 8,750 documents responsive to CAGC Subpoena B-1-1BUGMIX and Charging Party Subpoena B-1-1C9GVF (as well as documents responsive to a second subpoenas duces tecum issued by the CAGC), including documents responsive to Paragraphs 19 and 4.  This production included thousands of hours dedicated to the collection, search, and review of 4.9 million records, within a 12-week timeframe.  At this point in the litigation, however, it is neither necessary nor appropriate for Respondent to produce additional documents responsive to these requests, which seek evidence related to a determination of (1) whether Bryson was engaged in protected concerted activity at the time of his misconduct on April 6, 2020; (2) whether the Respondent knew Bryson was engaged in protected concerted activities at the time of his misconduct on April 6, 2020; and/or (3) Respondent's motivation for terminating Bryson, including whether Respondent's harbored animus toward Bryson's protected concerted activities.   These issues are not in dispute.

At the time the ALJ *initially* ruled on Respondents' Petitions to Revoke the CAGC's and Charging Party's subpoenas in March and April, these issues were disputed by the parties. However, as a result of recent developments in this case – including the introduction of previously undisclosed evidence of video recordings within the CAGC's possession which



GC Exhibit 120

showed Bryson's April 6 misconduct in all material ways and Respondent's subsequent

concession in its Third Amended Answer that Bryson engaged in protected concerted activity on

April 6 – those issues are now either undisputed or irrelevant to the sole remaining question

under the applicable legal standard set forth in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964):

Respondent's good faith belief that Bryson engaged in the misconduct for which he was

terminated.  Therefore the evidence sought by CAGC Subpoena B-1-1BUGMIX Paragraph 19

and Charging Party Subpoena B-1-1C9GVF Paragraphs 4 and 19 is irrelevant and unnecessary to

decide the issues in this case, and the ALJ erred in denying Respondent's Motion for

Reconsideration and in refusing to revoke Charging Party Subpoena Paragraph 4 for this reason.

Second, the ALJ's Redaction Orders (which ordered Respondent to produce partially

unredacted versions of five Chime[2] message threads and a OneNote file it had produced in

response to CAGC Subpoena B-1-1BUGMIX Paragraph 19 and Charging Party Subpoena B-1-

1C9GVF Paragraphs 4 and 19) are contrary to applicable legal principles  and are based on a

fundamental misunderstanding of the technologies at issue.  Respondent appropriately redacted

the Chime message threads and OneNote file to reveal only that information responsive to a

specific subpoena request, and Respondent should not be required to produce unredacted

versions now.[3]  The ALJ's Redaction Orders relied on a single case that involved only a party's

redactions based solely on relevance, and failed to cite any cases addressing redactions based on

non-responsiveness or address applicable case law holding such redactions are appropriate.

---

[2] A Chime is an Amazon proprietary electronic messaging platform, one component of which is a form of instant message between two or more individuals.  In those messages, individuals typically communicate on a variety of topics throughout the course of the conversation – many of which last entire days or even weeks or months.

[3] As explained in more detail in Respondent's Appeal, because of the nature of Chime messages, the five threads Respondent produced contained a mix of responsive and non-responsive material (such as what time one of the participants ate dinner, or what they ate for breakfast).  Similarly, a OneNote file is a digital notebook that may contain notes related to a single responsive topic, with the remainder of the notebook being non-responsive.



In addition, the ALJ erroneously treated the Chime threads and OneNote file as similar to single-subject emails or documents.  As explained in more detail in Respondent's Appeal, Chime messages and OneNote notes are akin to multiple separate documents that are stored in proximity to each other.  No legal precedent requires a party to produce non-responsive and/or irrelevant documents simply because they are stored in proximity to responsive documents.  The ALJ's Redaction Orders are at odds with applicable case law, including at least one district court case specifically permitting responsiveness- and relevance-based redactions to OneNote files.

While the ALJ stated the redacted material could contain "additional information that may be useful in the case," (Appeal, Exh. B, at 1), Respondent's redaction of nonresponsive material was consistent with both Fed.R.Civ.P. 34 and relevant case law, and the ALJ exceeded his authority by effectively rewriting the CAGC's and Charging Party's subpoenas so that they covered the redacted material.  Moreover, the ALJ's finding is also factually incorrect.  The Chime threads and OneNote file (including the redacted material) are irrelevant to any of the remaining narrow issues in this case – that is, whether Respondent had a good faith belief that Bryson engaged in the misconduct for which he was terminated.  Thus, Respondent's redactions were appropriate for this reason as well.  Respondent has *already* produced the responsive, non-privileged portions of those documents.  Respondent should not be forced to produce unrelated, non-responsive conversations just because they appear in the same Chime message or OneNote file, which can extend for days, weeks, months, or even years.

Respondent will be harmed if it must continue handing over documents that have no relevance to the remaining questions at issue, in contravention of the NLRA and applicable case law.  Not only would this impose a completely unnecessary burden on Respondent, who has already expended a significant amount of time and resources on this single alleged



discriminatee case, but a number of the remaining documents that have not yet been produced

also include Chime message threads which, like the five threads already produced, contain a

mix of responsive and non-responsive material.  This already lengthy proceeding will be

needlessly delayed even further if Respondent is obligated to produce additional documents or

there are even more witnesses needed to go over matters not in dispute or otherwise wholly

irrelevant.[4]  Additionally, Respondent will be harmed if it is forced to disclose non-responsive

and private conversations and notes, particularly given the ALJ's denial of Respondent's

request for a protective order that would prevent these documents from being disclosed or used

outside this proceeding, with no corresponding value to any of the parties given the irrelevance

and non-responsiveness of the information sought.  This harm cannot be remedied by filing

exceptions after the trial.

     For these reasons, and as discussed in more detail in its Appeal, which is being filed

simultaneously, Respondent respectfully requests the Board grant its Request for Special

Permission to Appeal.


Date: June 5, 2021                Respectfully submitted,

                                  */s/ Christopher J. Murphy*
                                  Christopher J. Murphy
                                  Morgan, Lewis & Bockius LLP
                                  1701 Market Street
                                  Philadelphia, PA 19103-2921
                                  Phone: +1.215.963.5601
                                  Fax: +1.215.963.5001
                                  christopher.murphy@morganlewis.com

                                  Nicole Buffalano
                                  Morgan, Lewis & Bockius LLP
                                  300 South Grand Avenue, Twenty Second Floor

---

[4] This case already has had 15 days of hearing and Respondent has produced over 8,750 pages of documents in this single alleged discriminatee case.



GC Exhibit 120

Los Angeles, CA 90071-3132
Phone: +1.213.612.7443
Fax: +1.213.612.2500
nicole.buffalano@morganlewis.com

*Attorneys for Respondent*
*Amazon.com Services LLC*

7



GC Exhibit 120

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of Respondent Amazon's Request for Special

Permission to Appeal the Administrative Law Judge's Orders Denying Respondent's Motion

for Reconsideration, Refusing to Revoke Charging Party Subpoena B-1-1C9GVF Paragraph 4,

and Requiring Respondent to Unredact Certain Documents was served on June 5, 2021 via

electronic mail upon the following:

> Evamaria Cox
> Counsel for the Acting General Counsel
> National Labor Relations Board, Region 29
> Two Metro Tech Center, Suite 5100
> Brooklyn, NY 11201
> Evamaria.Cox@nlrb.gov

> Frank Kearl
> Charging Party's Legal Representative
> Make the Road New York
> 161 Port Richmond Ave.
> Staten Island, NY 10302
> frank.kearl@maketheroadny.org

> Judge Benjamin Green
> National Labor Relations Board Administrative Law Judge
> National Labor Relations Board Division of Judges
> 26 Federal Plaza, 41st Floor, Suite 41-120
> New York, NY 10278
> Benjamin.Green@nlrb.gov

Date: June 5, 2021                              */s/ Lauren Emery*
                                                Lauren Emery
                                                Morgan, Lewis & Bockius LLP
                                                1111 Pennsylvania Avenue, NW
                                                Washington, DC 20004
                                                Phone: +1.202.739.5203
                                                Fax: +1.202.739.3001
                                                lauren.emery@morganlewis.com

                                                *Attorney for Respondent*
                                                *Amazon.com Services LLC*

8



GC Exhibit 121

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | | |
|---|---|---|
| AMAZON.COM SERVICES LLC | ) | |
| | ) | |
| | ) | |
| and | ) | Case 29-CA-261755 |
| | ) | |
| GERALD BRYSON, and Individual. | ) | |

**RESPONDENT'S APPEAL OF THE ADMINISTRATIVE LAW JUDGE'S ORDERS
DENYING RESPONDENT'S MOTIONS FOR RECONSIDERATION, REFUSING TO
REVOKE CHARGING PARTY SUBPOENA B-1-1C9GVF PARAGRAPH 4, AND
REQUIRING RESPONDENT TO UNREDACT CERTAIN DOCUMENTS**

Pursuant to Section 102.26 of the National Labor Relations Board's Rules and

Regulations, Respondent Amazon.com Services LLC ("Respondent," "Amazon," or the

"Company") appeals four Orders issued by Administrative Law Judge Benjamin Green:

(1) the ALJ's Order on the record on May 24 and 25, 2021 denying Respondent's Motion

for Reconsideration of the ALJ's prior Order denying Respondent's Petitions to Revoke

(a) Counsel for the General Counsel ("CAGC") Subpoena B-1-1BUGMIX Paragraph 19,

and (b) Charging Party Subpoena B-1-1C9GVF Paragraph, 19 to the extent they seek

documents related to matters that are not at issue in this case ("Subpoena Reconsideration

Order") (Transcript, at 1757:7-1758:21, 1766:15-19, 1777:6-23) (relevant transcript

pages are attached as Exhibit A);

(2) the ALJ's Order on the record on May 24, 2021 refusing to revoke Charging Party

Subpoena B-1-1C9GVF Paragraph 4 to the extent it seeks documents related to matters

that are not at issue in this case ("Subpoena Clarification Order") (Exhibit A, at 1753:2-

1755:6, 1761:21-23);



GC Exhibit 121

(3) the ALJ's May 20, 2021 written Order directing Amazon to remove redactions from copies of five Amazon "Chime" messages[1] that Amazon produced in response to the subpoena requests identified above ("Chime Redaction Order") (attached as Exhibit B); and

(4) the ALJ's May 27, 2021 Order on the record directing Amazon to remove redactions from a Microsoft OneNote file (which is the equivalent of an electronic journal or notebook), which would require Respondent to produce separate and distinct notes not responsive to any subpoena request ("OneNote Redaction Order") (Exhibit A, at 1916:23-1918:20).[2]

As explained in more detail below, Respondent respectfully requests the Board grant its Request for Special Permission to Appeal and reverse (1) the ALJ's May 24 and 25, 2021 Subpoena Reconsideration Order; (2) the ALJ's May 24, 2021 Subpoena Clarification Order ; (3) the ALJ's May 20, 2021 Chime Redaction Order; and (4) the ALJ's May 27, 2021 OneNote Redaction Order.

## **INTRODUCTION**

The sole issue in this case is whether Respondent terminated a single employee – Gerald Bryson – from Respondent's JFK8 facility in Staten Island, New York in violation of Section 8(a)(1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §158(a)(1), for unleashing a verbal attack on a co-worker over a bullhorn, calling her, among other things, a

---

[1] As explained further below, Amazon's Chime messaging system is a form of instant messaging like Skype, WhatsApp, and Google Chat that often goes on for long strings, frequently covering lengthy periods of time, often several days, if not weeks or months, in duration.  A Chime message thread, unlike an email, often contains many disparate topics until the user deletes the thread (if they ever do).

[2] The ALJ's May 24, 25, and 27, 2021 Orders were on the record.  Amazon filed its Request for Special Permission to Appeal and the accompanying Appeal promptly upon receipt of the relevant transcripts.  The ALJ has left the record open so that the CAGC and the Charging Party may continue to present additional evidence and testimony in the event that any additional documents provide avenues for additional questioning or witnesses consistent with the narrow issue left in this case.



"gutter bitch" and a "drug addict," and stating that Amazon hires the "scum of the earth." The facts in this case are straightforward, the legal issues are not novel or complex, and it does not require massive subpoena requests covering upwards of 170 sub-parts. To date, Amazon has produced over 8,750 pages of documents to the Charging Party and CAGC. At this point, enough is enough.

At the outset of the hearing in this case, the parties disputed the precise nature of Bryson's actions on March 25, March 30, and April 6, 2020. More specifically, the precise nature of Bryson's actions and statements during the above-referenced April 6, 2020 verbal attack upon a female coworker (Dimitra Evans) and whether the attack occurred in the course of protected concerted activity remained in dispute. Since then, the issues in this case have narrowed significantly, however, due primarily to the introduction into evidence of a Facebook Live video recorded by CAGC witness Mandi Velasco ("the Velasco video") and other video evidence showing the April 6, 2020 altercation in all material ways. *See* Exhibit C.[3] That evidence, as noted above, establishes Bryson verbally attacked Evans in a manner that no employer – or the NLRB – should tolerate.[4] Subsequently, Respondent filed a Motion for Leave to File a Third Amended Answer on May 22, 2021, in which it conceded Bryson had engaged in protected concerted activity on March 25 and March 30, and on April 6 at the same time as he verbally attacked his female coworker. *See* Exhibit D (Complaint, CAGC's Notice of Intent to Amend Complaint and Notice of Hearing); Exhibit A, at 8:8-9 (ALJ's March 29, 2021 oral ruling on the

---

[3] Exhibit C consists of a .mp4 file of the Velasco video that was introduced into evidence at the hearing as R. Exh. 122. Due to its large size (249 MB), Exhibit C cannot be submitted via NLRB E-Filing, and will be provided separately.

[4] As it turns out, the CAGC acknowledged off the record that they knew all along that Ms. Velasco had taken a video of the altercation. In fact, the CAGC had a copy of this inculpatory video evidence proving Bryson did precisely that for which Amazon terminated his employment. In the face of this evidence, the CAGC's continued insistence on forcing Amazon to produce more and more irrelevant and non-responsive evidence is even more unjustified and inexplicable.


GC Exhibit 121

record granting amendment); and E (Respondent's Third Amended Answer).  The ALJ granted

that Motion on the record on May 27, 2021.  Exhibit A, at 1896:8-9.

Respondent's concession in this regard coupled with the video evidence that Bryson was

engaged in protected concerted activity at the time he unleashed his verbal attack upon Evans,

confirms Judge Green's conclusions, stated repeatedly in on and off-the-record discussions during

the hearing and in his May 19, 2021 Order on CAGC's Motion to Consolidate Cases for Hearing

("Order Denying Motion to Consolidate") that the *only* legal standard applicable in this case is the

standard enunciated in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964).  *See* Exhibit A, at 1756:20-

1758:1, 1794:1-14; Exhibit F, at 2, 4.  As the U.S. Court of Appeals for the D.C. Circuit has

explained, the employer's motive is irrelevant in such cases:

> *Wright Line*, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981), "is
> inapplicable to cases — like this one — in which the employer has discharged the employee
> because of alleged misconduct in the course of protected activity.  *Shamrock Foods Co.*,
> 337 NLRB No 138, at 1 (2002); *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 29 fn. 4
> (D.C. Cir. 1998) (rejecting the applicability of *Wright Line* to such cases); *E.W. Grobbel
> Sons*, 322 NLRB 304, 304-305 (1996) (same), enforcement denied on other grounds, 149
> F.3d 1183 (6th Cir. 1998).  In such cases, *Burnup & Sims* makes clear that the employer's
> "motive is not at issue," and that the only question is whether the misconduct actually
> occurred.  *Shamrock Foods*, 337 NLRB No. 138, at 1; *Cadbury Beverages*, 160 F.3d at 29
> (holding that ''*Burnup & Sims* explicitly obviates the need to inquire into intent'').

*Shamrock Foods Co. v. NLRB*, 346 F.3d 1130, 1136 (D.C. Cir. 2003).  In a *Burnup & Sims* case,

the only question is whether the employee did, in fact, engage in the misconduct for which the

employee was terminated.  *See id.* at 1133.  If the employer establishes its honest, good faith

belief that the employee was guilty of the misconduct, the burden shifts to the General Counsel

to show the misconduct did not occur.  *Id.* at 1134 (citations omitted).

Because it is now undisputed that Bryson was engaged in protected concerted activity at

the time of his misconduct on April 6, 2020 and that Amazon knew of Bryson's activity when it

occurred, the only remaining question under the applicable *Burnup & Sims* analysis is whether



GC Exhibit 121

Respondent had a good faith belief that Bryson engaged in in serious misconduct during the attack (there is no dispute that the misconduct did in fact occur, in light of the video evidence in the record).  Conversely, evidence related to whether Bryson was engaged in protected activity at the time of his misconduct on April 6, 2020, whether Respondent knew that he was engaged in that activity, and Respondent's motivation for terminating Bryson, including whether Respondent harbored animus toward him or his activity, no longer bears any relevance to whether the CAGC can establish Respondent violated Section 8(a)(1) of the Act by terminating Bryson.

As a result, and as the ALJ has noted, much of the evidence in the record is now irrelevant to deciding this case.  The remaining documents at issue in this Appeal are now irrelevant as well, and it is neither necessary nor appropriate for Respondent to produce them.  The remaining documents would be responsive to CAGC Subpoena Paragraph 19 and Charging Party Subpoena Paragraphs 4, which seek evidence related to (i) Bryson's protected concerted activities; (ii) whether Respondent knew of those activities; and (iii) whether it harbored animus toward Bryson or other individuals not named in the Amended Complaint for engaging in protected concerted activities.  But none of these issues are relevant to the legal analysis now applicable this case: whether Respondent held a good faith, honest belief that Bryson engaged in the very conduct that is now borne out in video recordings in the record, including the Velasco video.  The remaining documents at issue in this Appeal are not relevant to the question of Respondent's good faith belief, nor has Respondent identified any additional evidence relevant to this question.  Amazon respectfully requests the Board reverse the ALJ's Orders compelling it to produce additional irrelevant evidence.

Alternatively, even if the Board were to deny Respondent's Appeal of the ALJ's Orders requiring the production of wholly irrelevant information that the ALJ already concluded will not



GC Exhibit 121

be relevant to his consideration of the case, Amazon requests the Board overrule the ALJ's Orders requiring the production of unredacted versions of certain OneNote notes and Chime messages[5] that are entirely non-responsive to any subpoena.  Amazon has already produced the responsive portions of the five Chime messages at issue (which, again, are responsive to subpoena requests that are no longer relevant).  It also has produced the responsive portions of the OneNote file.  The evidence already in the record is more than sufficient to address the question of whether Amazon violated the Act when it terminated Bryson for verbally attacking a coworker.  There is simply nothing to be added by ordering the production of additional documents or unredacted versions of documents already produced that are irrelevant to the remaining disputed issues in this case.

In ordering Respondent to produce unredacted versions of the Chime threads and OneNote files, the ALJ did not disagree that the redacted information is non-responsive, but based his Orders on an overly broad and incorrect understanding of the applicable legal principles and technologies at issue.  The ALJ cited a single federal district court case from the District of Minnesota, *Bartholomew v. Avalon Cap. Grp., Inc.*, 278 F.R.D. 441, 452 (D. Minn. 2011), where the court concluded that a party's redactions *based solely on relevance* were improper.  *Bartholomew* did not address redactions related to *non-responsive* portions of communications, which numerous courts regularly permit.  The ALJ in this case failed to mention, much less reconcile, this case law in ordering Respondent to produce unredacted Chime messages and OneNote notes.  The ALJ also failed to address the split of authority in the courts regarding

---

[5] Chime is an Amazon proprietary electronic messaging platform, one component of which is a form of instant message between two or more individuals.  In those messages, individuals typically communicate on a variety of topics throughout the course of the conversation – many of which last entire days or even weeks or months.

relevance-based redactions or adequately explain his decision to rely on *Bartholomew*, as opposed

to authority from numerous other jurisdictions permitting parties to redact irrelevant information.

Further, the ALJ's application of *Bartholomew* to the Chime message threads and

OneNote files here demonstrates a fundamental misunderstanding of these technologies.  As

explained in more detail below, Chime messages and OneNote notes are completely different

from single-subject emails or other single-subject documents and are more akin to multiple

separate documents.  The court's decision in *Bartholomew* did not address redactions of Chime

threads, OneNote files, or similar technology, and the ALJ's Redaction Orders are at odds with

case law permitting redactions where a "document" encompasses multiple separate subjects,

including at least one district court case specifically permitting redactions to OneNote files.

I.      **The ALJ Erred in Failing to Revoke CAGC Subpoena B-1-1BUGMIX Paragraph
        19 and Charging Party Subpoena B-1-1C9GVF7 Paragraphs 4 and 19.**

NLRA Section 11(1) and Section 102.31(b) of the Board's Rules and Regulations require

the Board to revoke a subpoena where "the evidence whose production is required does not

relate to any matter under investigation or in question in the proceedings."  A subpoena must be

"for a legitimate purpose" and "the inquiry in question must be reasonably related to the

purpose."  *NLRB v. U.S. Postal Serv.*, 790 F. Supp. 31, 34 (D.D.C. 1992); *see also Drukker

Commc'ns, Inc. v. NLRB*, 700 F.2d 727, 730 (D.C. Cir. 1983) ("[T]he statute explicitly permits

the quashing of subpoenas … for irrelevance.").  The Board will revoke subpoena requests that

do not relate to the legal issues in dispute or where they related to facts that are undisputed.

*Michigan Laborers District Council*, 368 NLRB No. 18, slip op. at 1 fn. 2 (2019) (affirming

revocation of subpoena where the evidence sought was cumulative and aimed at establishing

facts that were not in dispute); *NP Red Rock, LLC*, 28-CA-244484, 2020 WL 7075063 (unpub.

Or. Dec. 2, 2020) (revoking General Counsel's subpoenas ad testificandum issued to



GC Exhibit 121

respondent's two corporate executives where the executives' testimony was not needed to establish a prima facie case and its relevance and probative value to rebutting the employer's defenses was speculative).

CAGC Subpoena B-1-1BUGMIX Paragraph 19 and Charging Party Subpoena B-1-1C9GVF7 Paragraphs 4 and 19 do not seek any information that is relevant to any remaining disputed issue in this proceeding. Specifically, CAGC Subpoena B-1-1BUGMIX Paragraph 19 seeks:

> 19. For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussion with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:
>
> > (a) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings.
> >
> > (b) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;
> >
> > (c) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns;
> >
> > and
> >
> > (d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.

Charging Party Subpoena B-1-1C9GVF7 Paragraphs 4 and 19 seek:

> 4. Documents (including but not limited to memorandums, handwritten notes, written personnel statements, and communications between Respondent's managers, supervisors,



agents, and Human Resources Business Partners) regarding press requests, media coverage, social media posts, videos, and publicity related to the protest activities that took place at Respondent's JFK8 Facility on March 30, 2020 and April 6, 2020.

\*   \*   \*

19.  For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing, or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers, Human Resources Business Partners, or agents on behalf of employees regarding COVID-19 safety precautions including:

> b.    Internal communications including but not limited to electronic communications, emails, Chime messages or calls, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding media coverage of Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson protesting; [and]

> c.    Internal communications including but not limited to electronic communications, Chime messages or calls, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson participating in protests outside Respondent's JFK8 Facility regarding COVID-19 safety concerns.

Copies of CAGC Subpoena B-1-1BUGMIX and Charging Party Subpoena B-1-C9GVF7 are attached as Exhibits G and H.

Respondent filed a Petition to Revoke CAGC Subpoena B-1-1BUGMIX on March 8, 2021 (Exhibit I).  The ALJ denied that Petition by written order dated March 24, 2021 (Exhibit J).  In denying Respondent's Petition to Revoke, Judge Green found CAGC Subpoena Paragraph 19 sought relevant documents related to "any protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any of that conduct."  *Id.*, at 6.

Respondent filed a Petition to Revoke Charging Party Subpoena B-1-1C9GVF7 on April 20, 2021 (Exhibit K).  The ALJ denied that Petition by written order dated April 27, 2021 (Exhibit L).  Judge Green found Charging Party Subpoena Paragraph 4 was relevant because responsive documents "may include evidence of animus," and that Paragraph 19 was relevant



because it sought evidence concerning Amazon's treatment of other employees who were involved in protected concerted activities with Bryson. *Id.*, at 1-2.  Regarding Paragraph 19, Judge Green noted he "share[d] the concern of Respondent's counsel that the scope of this litigation might expand to involve 'mini-trials' (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint." *Id.*, at 2.  Nonetheless, citing the Board's "broad discovery-type standard of relevance" for subpoena requests, the ALJ declined to revoke the request "at this time." *Id.*

On May 24, 2021, Respondent filed a Motion for Reconsideration of the ALJ's Orders denying the Petitions to Revoke, on the ground that the basis for the ALJ's ruling no longer applied because the parties no longer disputed Bryson's protected concerted activity or Respondent's knowledge of it.  Exhibit M.  Therefore, *Burnup & Sims* was the only applicable legal analysis and the issue of Respondent's animus was irrelevant. *Id.*  Judge Green orally denied Respondent's motion on the record on May 24 and 25, indicating the documents sought in Paragraphs 19 of the CAGC's and Charging Party's subpoenas might be relevant to the narrower question of whether Respondent had an honest, good-faith belief that Bryson engaged in misconduct.  Exhibit A, at 1762:18-23, 1766:15-19, 1777:20-23.  For the same reason, Respondent sought clarification from the ALJ on May 24, 2021 regarding its obligation to produce documents responsive to other subpoena requests rendered irrelevant by the video evidence in the record and Respondent's admissions in its Third Amended Complaint – in particular, Charging Party Subpoena Paragraph 4, which seeks entirely irrelevant (and cumulative) public relations documents.  The ALJ, however, declined to revoke Paragraph 4. Exh. A, at 1753:2-1755:6, 1761:21-23.



GC Exhibit 121

The ALJ erred in failing to revoke CAGC Subpoena B-1-1BUGMIX Paragraph 19 and Charging Party Subpoena Paragraphs 4 and 19 in their entireties for two reasons.

First, any further inquiry into whether Bryson was engaged in protected activities and whether Respondent was aware of those activities has been rendered unnecessary and/or irrelevant by the development of the record, particularly the Velasco video and Respondent's Third Amended Answer, which concedes these allegations.  Any unproduced documents related to these issues, therefore, would cause Respondent further unnecessary discovery burdens. Respondent already has been required to dedicate thousands of hours in its production of over 8,750 pages of documents, which were culled from an initial collection by Respondent of 4.9 million records.[6]  The vast majority of these materials are utterly irrelevant in light of the Velasco video (of which the CAGC has been aware even before issuing the complaint in this case) and, tellingly, the CAGC has introduced only a small fraction of the documents produced by Respondent into evidence.

Second, Respondent's motivation for terminating Bryson, including whether or not Respondent harbored animus toward his protected activities and Respondent's treatment of other individuals engaged in protected concerted activity at or about the same time is irrelevant to the *Burnup & Sims* analysis applicable in this case.  *See Shamrock Foods Co.*, 337 NLRB 915, 915 (2002) (finding that in a *Burnup & Sims* case "motive is not at issue"), enfd. 346 F.3d 1130 (D.C. Cir. 2003); *Cadbury Beverages*, 160 F.3d at 29 (same).  In fact, as the ALJ noted in his Order denying the CAGC's Motion to Consolidate this case with NLRB Case 19-CA-266977 (a

---

[6] The only two NLRB cases Respondent is aware of in recent history that involved similarly expansive subpoena requests and production are *McDonald's USA, LLC*, Case No. 02-CA-093893 et al., which involved unfair labor practice charges brought against 30 separate franchisee employers and allegations of joint employer status, and *CNN America, Inc.*, Case No. 05-CA-31828, which also involved joint employer allegations and numerous unfair labor practice charges.  This case – involving a single discharge allegation at a single location – is not even remotely comparable.



GC Exhibit 121

case involving the discharge of two Amazon employees in Seattle who worked in different business unit and under different management), evidence regarding alleged animus is immaterial to the issues in this case.  *See* Exhibit F, at 4.  Because the Charging Party's misconduct during the April 6 altercation can be analyzed solely on the basis of the video evidence, there is no need for even more production pertaining to Respondent's alleged motivation or potential animus toward Bryson's protected activities.  For these reasons, the ALJ's Subpoena Reconsideration and Subpoena Clarification Orders should be reversed.[7]

## II.     The ALJ Erred in Ordering Respondent to Produce Unredacted Versions of the Chime Message Threads and OneNote File.

### A.      Chime Threads and OneNote Notes Contain a Mixture of Separate and Distinct Topics, Some of Which May Be Responsive but Most of Which are Not.

Chime message threads are not single-subject communications – they are akin to "instant messages" (like Skype messaging, WhatsApp, Google Chat, and other instant messaging services), and can go on for many hours, an entire day, weeks, or even longer.  Chimes, like other types of instant messages, are effectively running conversations covering many different topics, some of which might be responsive to a subpoena request, but most of which are not.

OneNote is an electronic notebook.  Users can open a OneNote file and repeatedly use it, as one would use a paper notebook, for running notes about anything they might choose to record on any topic.  Users have the option of organizing their notes into different "tabs" and "pages," but OneNote does not automatically group notes by topic, so even a single OneNote "page" may contain multiple notes on any number of topics.

---

[7]  Not only do the remaining questions in this single alleged discriminatee case involve narrow issues for which no further evidence is needed, but the Respondent has already produced **over 8,750 pages of materials and three videos** over 15 days of hearing.  The CAGC and Charging Party can offer no reasoned justification for why they need more, especially when Amazon already has explained that it is not withholding any documents that pertain to whether it held a good faith, honest belief that Bryson engaged in the conduct that the video evidence now confirms.

GC Exhibit 121

Unlike single-subject emails or traditional paper documents, which inherently tend to relate to a single overall topic, Chime messages and OneNote notes can contain disparate and unrelated content within the same thread or file.  Chime and OneNote files are more analogous to an individual's entire email account, or a physical filing cabinet, in that much of the information they contain may be completely unrelated to a specific subpoena request.

Given the nature of Chime messages threads, the five threads Respondent produced in response to the CAGC's and Charging Party's subpoenas contained a mix of responsive material and non-responsive material (including, for example, discussions about what time one participant ate dinner and another's calls with a realtor, as well as other business-related matters having zero relevance to this case).  *See* Exhibit N (redacted versions).  Respondent appropriately redacted the non-responsive content relating to private conversations from the five messages it produced.  Similarly, Amazon redacted non-responsive portions of the OneNote file before producing it (*see* Exhibit O), which is the same thing it would have done if the notes were in an old-fashioned paper notebook.

**B.    The ALJ Erred in Directing Respondent to Unredact Five Chime Messages and the OneNote File.**

Respondent has *already* produced the responsive portions of the Chime threads and OneNote file.  The redacted portions of the Chime threads contain non-responsive, private conversations, and there is no reason for Respondent to produce them.  Similarly, the OneNote file contains notes related to a number of separate and distinct topics, the redacted portions of which are not responsive to any subpoena request.

Nonetheless, after the CAGC and Charging Party objected, the ALJ ordered Respondent to produce the five Chime message with additional portions unredacted (Exhibit B, at 1-2) and to produce the unredacted OneNote file in its entirety (Exhibit A, at 1916:23-1918:20).



Similarly, the ALJ's Chime Redaction Order states Respondent is required to "produce complete documents responsive to all subpoena requests that have not been revoked, including any nonresponsive irrelevant information within those documents." Exhibit B, at 1.

The ALJ's Chime Redaction Order and OneNote Redaction Order (collectively, "Redaction Orders") are improper and should be reversed for two reasons. First, the ALJ erred in ordering Respondent to unredact and produce nonresponsive information. Respondent's redaction of nonresponsive material is consistent with both Fed.R.Civ.P. 34 and relevant case law. Further, the ALJ overstepped his authority by effectively rewriting the CAGC's and Charging Party's subpoenas to require the production of more documents than the subpoenas requested. Second, the ALJ erred in ordering Respondent to unredact and produce irrelevant information. The redacted material is irrelevant to the few questions at issue in this case, and therefore the ALJ erred in requiring Respondent to produce it for this additional reason as well.

## 1.     Respondent Properly Redacted Non-Responsive Information.

In ordering Respondent to unredact additional portions of the messages, the ALJ did <u>not</u> hold those portions were responsive to the subpoenas in question (because they were not). In fact, the ALJ did not even evaluate "the relevance or responsiveness of each message." Exhibit, B, at 1. Instead, the ALJ essentially adopted a *per se* rule prohibiting redactions of nonresponsive and/or irrelevant information, and stated he was "liberally order[ing]" Respondent to unredact Chimes to the extent they might contain "additional information that may be useful in the case." *Id.* In other words, the ALJ effectively rewrote the CAGC's and Charging Party's subpoenas *sua sponte* to add a catch-all phrase – even where not contained anywhere in a subpoena request – for "useful" information. Later, at the hearing on May 27, the ALJ applied this same faulty rationale in ordering Amazon to produce an entire OneNote file,



despite Amazon's counsel's representation that the other topics addressed in the OneNote file

were separate and distinct from the topic addressed in the notes Amazon disclosed and without

even conducting an *in camera* review of the notes to assess their responsiveness.  Exhibit A, at

1916:23-1918:20.

The ALJ's Orders requiring Respondent to unredact non-responsive materials from

produced materials contravene both Fed.R.Civ.P. 34 and relevant case law, all of which the ALJ

ignored.  *See e.g.*, *Dean v. Shell Pipeline Co*., No. 19-137-BAJ-RLB, 2020 WL 2813521, *6-7

(M.D. La. May 29, 2020) (accepting party's representations that redacted communications are

non-responsive and declining to order the production of unredacted communications); *Louis

Vuitton Malletier v. Texas Intern. Partnership*, No. H-10-2821, 2012 WL 5954673, *6 (S.D.

Tex. May 14, 2012) (declining to review documents including redactions of nonresponsive

information "because the descriptions provided by Louis Vuitton reveal that the information is .

. . nonresponsive"); *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 222 (N.D. Ill. 2013)

("Withholding and redacting documents that are non-responsive to Defendants' document

requests is appropriate."); *Paris Presents Inc. v. Lifestyle Prods., LLC*, No. 16-CV-07802, 2017

WL 11541168, *4 (N.D. Ill. June 28, 2017) (product information redactions); *Dixon v. Bank of

Am., N.A.*, No. 19-80022, 2019 WL 4805964, *2-3 (S.D. Fla. Oct. 1, 2019) (loan data

redactions); *Steve Madden, Ltd. v. Jasmin Larian, LLC*, No. 18-CV-2043, 2019 WL 3940112,

*3-4 (S.D.N.Y. July 8, 2019) (redactions proper); *CV Restoration, LLC v. Diversified Shafts

Sols., LLC*, No. 8:17-mc-00020, 2017 WL 2123562, *4 (M.D. Fla. May 16, 2017) (allowing

redactions); *Tillman v. Ally Fin. Inc*., No. 2:16-cv-313, 2017 WL 73382, *7 (M.D. Fla. Jan. 6,

2017).



In ordering Respondent to unredact some (but not all) additional portions of the Chime messages, the ALJ erroneously relied on a single federal district court case from the District of Minnesota, *Bartholomew v. Avalon Cap. Grp., Inc.*, 278 F.R.D. 441, 452 (D. Minn. 2011), where the court ordered a party to produce unredacted versions of documents that had previously been produced with redactions based solely on relevance.  *See id.* at 451-452 (ordering production of "documents" without redactions and stating that "if one part of a document is relevant then the entire document is relevant for the purposes of Fed.R.Civ.P. 34," because "irrelevant information within a document that contains relevant information may be highly useful to providing context for relevant information").[8]  *Bartholomew* did not address the issue of redactions based on responsiveness, and thus has no bearing on Respondent's ability to redact non-responsive information from Chime threads and OneNote files.  The ALJ completely failed to acknowledge or address the legal precedent discussed above, that permits a party to redact nonresponsive information, even when contained within the same document as responsive information.

Further, even if *Bartholomew* applies to the redaction of nonresponsive information, the ALJ still erred by essentially concluding that redactions of documents for non-responsiveness (and/or irrelevance) are *per se* improper.  *See, e.g.*, *Saint-Gobain Ceramics & Plastics, Inc. v. II-VI, Inc.*, No. 5:18-CV-01798-CAS, 2019 WL 1460619, *2 (C.D. Cal. Feb. 1, 2019) (rejecting plaintiff's argument that "'redactions of documents for non-responsiveness are *per se* improper,' which is refuted by cases by courts across the country that have allowed for unilateral redactions in appropriate cases") (citations omitted).  Instead, the ALJ should have

---

[8] In *Bartholomew*, there was a protective order in the case, which the court noted "could be used to limit the dissemination of any confidential information."  278 F.R.D. at 452.  In this case, by contrast, the ALJ in this case issued a limited protected order that applies to personnel records only.  *See* Exh. L, at 2-3.



considered whether Respondent's redactions were appropriate under the "specific circumstances of [this] case." *See id.* at *3.

Here, Respondent's redactions were appropriate under the circumstances, in particular the specific technology involved.  The ALJ improperly analyzed Chime threads and OneNote files as a single, unitary "document" containing both responsive and nonresponsive content; however, they are more akin to multiple separate documents, some of which may be responsive and some of which may not be.  Given the nature of the Chime and OneNote technologies, redacting non-responsive messages and notes does not interfere with a reviewer understanding the context of the other responsive messages and notes.  *See id.* at *3 (in evaluating whether redactions are appropriate, courts may consider the scope and type of the redactions, including whether the redactions prohibit the reviewer from understanding the context of responsive information).

At least one court has addressed this issue with respect to OneNote files specifically, holding a OneNote file can be properly redacted based on the unique nature of these recordings:

> Files from apps like OneNote, Evernote, etc., are vastly different from an individual email. A OneNote file may contain various types of documents and/or notes addressing numerous issues organized only by the purview of the individual controlling the OneNote file. Where "irrelevant information within a document that contains relevant information may be highly useful to providing context for the relevant information," such a holding does not necessarily ring true for OneNote files where multiple documents and notes related to numerous issues could be contained in a single file.

*In re Onglyza (Saxagliptin) and Kombiglyze XR (Saxagliptin and Metformin) Products Liability Litigation*, No. 5:18-MD-2809-KKC, 2020 WL 4912294, *5 (E.D. Ky. Aug. 19, 2020).  Instead, redacting irrelevant information from a OneNote file (or Chime message) is "akin to opening a general filing cabinet and only producing the files that are relevant" to the litigation.  *Id.* (quotation omitted).  *See also Gates v. Rohm & Haas Co.*, No. 06-1743, 2007 WL 295416, *1


GC Exhibit 121

n.1 (Jan. 29, 2007) (permitting redactions of non-responsive material in notebooks and noting "the redaction option remains, in the Court's view, a viable technique for managing the time and expense of the discovery process in many document-intensive cases"); *Texas Brine Co. v. Dow Chemical Co.*, No. 15-1102, 2018 WL 655692, *8 (E.D. La. Feb. 1, 2018) (finding redaction of irrelevant/non-responsive rows in a chart was appropriate because it was "equivalent to producing only the relevant portions of a larger document," and "[t]he fact that all pages of the document happen to be included in one spreadsheet, rather than a different spreadsheet for each [topic], does not amount to a selective redaction of irrelevant information" and noting the court had previously approved withholding irrelevant portions of an individual's notebook).

The same principles apply to Chime message threads, which are also analogous to "a general filing cabinet" in that they typically contain numerous messages related to several separate issues in a single thread. No one could reasonably suggest Respondent, for example, is required to turn over the entire contents of every email account or filing cabinet that contains a relevant email or document; the same considerations apply to Chime message threads and OneNote files. Just as Respondent was under no obligation to produce single-subject emails not responsive to specific subpoena requests, Respondent had no obligation to produce non-responsive Chime messages or OneNote notes on irrelevant topics simply because they were included in such communications that contained some responsive information. Respondent's production of portions of Chime message threads and OneNote files is appropriate if a discrete, responsive topic is produced, even if other nonresponsive topics are redacted. Respondent appropriately produced the Chime messages and a OneNote file with redactions that revealed only those topics that were responsive to a specific request. The ALJ's failure to properly



analyze Respondent's redactions in the context of the specific technologies at issue by itself

warrants reversal of the Redaction Orders.

The ALJ's improper attempt to rewrite the CAGC's and Charging Party's subpoenas

further supports reversal.  Apparently recognizing the redacted information was nonresponsive,

the ALJ nonetheless stated Respondent is required to produce it because the information "may

be useful in the case."  Exhibit B, at 1.  However, it is not the ALJ's province to rewrite

subpoena requests because a party does not ask for everything that the ALJ thinks might be

"useful in the case."[9]  *See, e.g.*, *Frieri v. Sysco Corp.*, No. 3:16-cv-01432-JLS-NLS, 2017 WL

3387713, \*3-4 (S.D. Cal. Aug. 4, 2017) (court could not rewrite plaintiff's discovery requests or

compel defendant to provide a response to information "not requested or encompassed" within

the plaintiff's requests); *Tomanovich v. Glen*, No. 01-1247, 2002 WL 1858795, \*6 (Aug. 13,

2002) (declining to rewrite discovery request to seek information that was not requested by its

plain terms); *Devlin v. Transportation Commc'ns Int'l Union*, No. 95-Civ-0742(JFK)(JCF),

2000 WL 249286, at \*2 (S.D.N.Y. Mar. 6, 2000) (court "decline[d] to rewrite the plaintiffs'

subpoenas for them" to seek relevant information); *In re Midland Credit Management, Inc.,*

*Telephone Consumer Protection Act Litigation*, No. 11-md-2286-MMA-DD, 2020 WL

4569174, \*5 (S.D. Cal. Aug. 7, 2020) ("It is not for the Court … to rewrite so substantially a

request for production."); *Lillywhite v. AECOM*, No. C18-1840-JCC, 2020 WL 4501596, at \*4

(W.D. Wash. Aug. 5, 2020) (court declined to modify subpoenas because it could not do so

"without effectively rewriting them"); *Gentry v. Maggie Valley Resort Mgmt., LLC*, No. 1:13-

CV-108, 2014 WL 949871, at \*1 (W.D.N.C. Mar. 11, 2014) (rejecting parties' request to

rewrite subpoenas to render them valid and enforceable); *see also Payless ShoeSource*

---

[9] Not to mention a subpoena request for "information that may be useful in the case" would unquestionably be overly broad.

19



GC Exhibit 121

*Worldwide, Inc. v. Target Corp.*, No. 05-4023-JAR, 2008 WL 11381845, *2 (D. Kan. July 28, 2008) (refusing to permit party to rewrite document requests they never sought in the first instance).

Respondent is not required to produce information that is not responsive to specific requests set forth in the CAGC's and Charging Party's subpoenas, whether or not the ALJ thinks that they "may be useful." The ALJ erred in effectively rewriting the subpoenas to encompass additional, non-responsive information. Therefore, the Redaction Orders should be reversed for this additional reason as well.

### 2.    Respondent Properly Redacted Irrelevant Information.

The ALJ's conclusion that the additional unredacted information "may be useful" is also itself flawed because Respondent produced the five Chime message threads and OneNote file in response to CAGC Subpoena Paragraph 19 and Charging Party Subpoena Paragraphs 4 and 19, which as previously discussed, seek documents that no longer relate to disputed facts or legal elements at issue in this case.[10]

In any event, even if CAGC and Charging Party Subpoena Paragraph 19 or Charging Party Subpoena Paragraph 4 could be said to seek any information relevant to the remaining narrow issues in this case (which they do not), the ALJ still erred in requiring Respondent to produce the irrelevant information Respondent had redacted. In ordering Respondent to unredact some (but not all) additional portions of the Chime messages, the ALJ again erred in adopting an essentially *per se* rule that all relevance-based redactions are improper, failing to

---

[10] As noted above, in denying Respondent's Motion for Reconsideration, Judge Green indicated he believed the documents requested in Charging Party Subpoena Paragraph 19 potentially could be relevant to the narrower question of whether Respondent had an honest, good faith belief that Bryson engaged in misconduct. Exhibit A, at 1757:7-1758:21, 1766:15-19, 1777:6-23. However, none of the Chime messages or the OneNote notes – or any of the remaining unproduced documents for that matter – relate to Respondent's good faith belief about Bryson's April 6 misconduct and therefore are not relevant to this narrow issue.



mention or address the split of authority in the courts on this question. *See Delaware Display Group LLC v. Lenovo Group Ltd.*, No. 13-2108-RGA, 2016 WL 720977, *6 n.11 (D. Del. Feb. 23, 2016) (citing cases). Numerous courts have held parties can appropriately redact non-responsive and/or irrelevant information. *See, e.g.*, *Schiller v. City of New York*, No. 04-Civ-7922(KMK)(JCF) et al., 2006 WL 3592547, *7-8 (S.D.N.Y. Dec. 7, 2006) (upholding redaction of portions of meeting minutes not relevant to issues in case); *Spano v. Boeing Co.*, No. 3:06-cv-00743-DRH-DGW, 2008 WL 1774460, *2-3 (S.D. Ill. Apr. 16, 2008) (redaction of information on retirement plans other than specific plan at issue in case was appropriate); *Beauchem v. Rockford Products Corp.*, No. 01-C-50134, 2002 WL 1870050, *2 (N.D. Ill. Aug. 13, 2002) (redaction appropriate based on relevance); *cf. ArcelorMittal Cleveland Inc. v. Jewell Coke Co.*, No. 1:10-CV-00362, 2010 WL 5230862, at *2–3 (N.D.Ohio Dec. 16, 2010) (holding redaction is not permitted under Fed.R.Civ.P. 34); *Beverage Distribs., Inc. v. Miller Brewing Co.*, No. 2:08-cv-827 et al., 2010 WL 1727640, at *4 (S.D.Ohio Apr. 28, 2010) (same); *Medtronic Sofamor Danek, Inc. v. Michelson*, No. 01-2373-GV, 2002 WL 33003691, at *4–5 (W.D.Tenn. Jan. 30, 2002) (same).

Moreover, even under cases prohibiting relevance-based redactions, Respondent's redactions were appropriate here. Again, the ALJ failed to properly consider the nature of the Chime and OneNote technologies, which are not akin to single-subject documents where irrelevant material might provide context for relevant material, but rather are more analogous to a general filing cabinet containing relevant and irrelevant files. A non-responsive Chime message or OneNote file, whether typed minutes, hours, days, months, or years apart does not provide useful context for a separate responsive message on a different subject. This is



GC Exhibit 121

illustrated by the example below of Chime messages the ALJ ordered Respondent to unredact and produce:[11]

- **March 25, 2020 Amazon Chime Message Between Desai Pooja and Christine Hernandez (AMZ-BRY008002 - AMZ-BRY008007):**

| Jones, Elliott <ottjones@amazon.com> | |
|---|---|
| I do need to eat dinner at some point, but otherwise I'm open :) | 14:31:19 |
| Strobridge, Lisa <lisastro@amazon.com> | |
| when do you normally have dinner? | 14:31:11 |

Respondent redacted these non-responsive and irrelevant messages before producing the responsive portions of the Chime thread. *See* Exhibit N(1). As this example illustrates, Respondent's redactions of the highlighted messages was appropriate, did not withhold responsive information, and should be permitted.[12] And while this is an extreme and obvious example of entirely irrelevant and non-responsive banter, the same can be said of other irrelevant electronic dialogue that is more focused on business and employee matters that do not respond to the particular requests in a subpoena and have nothing to do with the remaining issues in this case, the ALJ's observation that they "may be useful" notwithstanding. Neither *Bartholomew* (cited by the judge), Fed.R.Civ.P. 34, nor other cases require a party to produce non-responsive documents simply because they are stored in proximity to responsive documents.

Here, none of the previously redacted parts of the Chime messages and OneNote file at issue are relevant to the CAGC's or Charging Party's subpoena requests, or any of the limited remaining issues in this single-discriminatee case in which Respondent has already produced

---

[11] In providing this example, Respondent does not waive its right to challenge the ALJ's Chime Redaction Order or OneNote Redaction Order.

[12] As noted, Respondent previously provided unredacted copies of the Chime message threads to the ALJ for an *in camera* review. If the Board would like to review unredacted versions of the Chime threads and/or the OneNote files, Respondent can provide copies to the Board for *in camera* review pursuant to an appropriate protective order.

GC Exhibit 121

over 8,750 pages of material and 15 days of hearing have already been held.  There is no reason Respondent should be required to produce additional irrelevant private electronic information. At some point, there are "ultimate and necessary boundaries" to Respondent's production obligations.  *See Boeing*, 2008 WL 1774460, at *2 (finding redactions were appropriate where the information redacted was not relevant to the issues in the case) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).  Because the ALJ has failed to apply adequate boundaries to the subpoena requests in this case, Respondent respectfully requests the Board reverse the ALJ's Redaction Orders for the reasons discussed above.

## **CONCLUSION**

For the foregoing reasons, Respondent respectfully requests the Board grant Respondent's Request for Special Permission to Appeal, and reverse (1) he ALJ's May 24 and 25, 2021 Subpoena Reconsideration Order; (2) the ALJ's May 24, 2021 Subpoena Clarification Order ; (3) the ALJ's May 20, 2021 Chime Redaction Order; and (4) the ALJ's May 27, 2021 OneNote Redaction Order.

Date: June 5, 2021                              Respectfully submitted,

*/s/ Christopher J. Murphy*
Christopher J. Murphy
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Phone: +1.215.963.5601
Fax: +1.215.963.5001
christopher.murphy@morganlewis.com

Nicole Buffalano
Morgan, Lewis & Bockius LLP
300 South Grand Avenue, Twenty Second Floor
Los Angeles, CA 90071-3132
Phone: +1.213.612.7443
Fax: +1.213.612.2500



GC Exhibit 121

nicole.buffalano@morganlewis.com

*Attorneys for Respondent*
*Amazon.com Services LLC*



GC Exhibit 121

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of Respondent Amazon's Appeal of the

Administrative Law Judge's Orders Denying Respondent's Motion for Reconsideration,

Refusing to Revoke Charging Party Subpoena B-1-1C9GVF Paragraph 4, and Requiring

Respondent to Unredact Certain Documents was served on June 5, 2021 via electronic mail

upon the following:

Evamaria Cox
Counsel for the Acting General Counsel
National Labor Relations Board, Region 29
Two Metro Tech Center, Suite 5100
Brooklyn, NY 11201
Evamaria.Cox@nlrb.gov

Frank Kearl
Charging Party's Legal Representative
Make the Road New York
161 Port Richmond Ave.
Staten Island, NY 10302
frank.kearl@maketheroadny.org

Judge Benjamin Green
National Labor Relations Board Administrative Law Judge
National Labor Relations Board Division of Judges
26 Federal Plaza, 41st Floor, Suite 41-120
New York, NY 10278
Benjamin.Green@nlrb.gov

Date: June 5, 2021

*/s/ Lauren Emery*
Lauren Emery
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: +1.202.739.5203
Fax: +1.202.739.3001
lauren.emery@morganlewis.com

*Attorney for Respondent*
*Amazon.com Services LLC*

GC Exhibit 121

# EXHIBIT A

GC Exhibit 121

5

1    MS. LAROSA:  Good morning, this is Kristin LaRosa, counsel
2    for Amazon.
3    JUDGE GREEN:  Okay.  Thank you very much.  And -- and
4    Ms. Phillips, not -- not making an appearance?
5    MR. MURPHY:  My apologies, yeah.
6    MS. PHILLIPS:  Kelcey Phillips, with the Respondents,
7    Washington, D.C. office of Morgan, Lewis, and Bockius.
8    JUDGE GREEN:  Okay.  Great.  Thank you.  Okay.  And it
9    looks like we have the formal papers prepared.  I saw them -- I
10   saw them online.  It was informed by an opportunity in -- in
11   formal papers?
12   MR. MURPHY:  Be -- before we begin, Judge, there's some
13   other nonparties.  Can we just know who -- who they -- who they
14   are, and in particular there's a telephone number that's dialed
15   in?
16   JUDGE GREEN:  And so that is probably the court reporter,
17   correct?
18   THE COURT REPORTER:  That's correct, Judge.
19   JUDGE GREEN:  Okay.  So that's the back-up telephone for
20   the court reporter, and she also has -- is dialing in through
21   the computer.  So let's see who we got here.  Now, these are
22   not appearances, but we have -- we have Chris Smith, who we --
23   I believe we already talked with.  Grace Astra (phonetic), who
24   is from The New York Times, Leah Say (phonetic); do we know
25   Ms. Say is?



6

1    MS. SAY:  Yes, this is Leah.  I'm with Amazon.
2    JUDGE GREEN:  Okay.  Great.  It looks like we have -- hold
3    on -- Peter Landell (phonetic).
4    MR. LANDELL:  Yeah, I'm from the New York State Attorney
5    General's Office, just here to sit in.
6    JUDGE GREEN:  Okay.  Great.  Okay.  And that is the whole
7    group.
8    The order -- has Respondent had an opportunity view the
9    formal papers?
10   MR. MURPHY:  Yeah.  I'm --
11   JUDGE GREEN:  Okay.  Okay.  And would the -- would the
12   General Counsel like to introduce GC-1?
13   MS. COX:  Yes, Your Honor.  I've shown a copy of the
14   formal papers to the Respondent and to the Charging Party.  And
15   at this time, I'm for admission of Board Exhibit -- General
16   Counsel's Exhibit GC-1(a) through GC-1(j), which is the formal
17   papers and index describing the formal papers.
18   JUDGE GREEN:  Any objection?
19   MS. BUFFALANO:  No objection.
20   JUDGE GREEN:  Okay.  So GC-1 is admitted.
21   **(General Counsel Exhibit Number 1(a) through 1(j) Received into**
22   **Evidence)**
23   JUDGE GREEN:  Now, aside from subpoena matters, do we have
24   any other preliminary matters that we have to deal with?
25   MS. COX:  Yes, Your Honor.



7

1    JUDGE GREEN:  Okay.
2    MS. COX:  I'm going to need to amend the complaint.
3    JUDGE GREEN:  Okay.
4    MS. COX:  So pursuant to Section 102.17 of the rules and
5    regulations of the National Labor Relations Board, to amend the
6    complaint, paragraph 5, as set forth in the notice of intent to
7    amend, the complaint and notice of intent to amend are General
8    Counsel's Exhibit GC-1(d) and -- and GC-1(i), respectively.
9    I'm moving to amend the complaint to read 5(a), on or about
10   March 25th, 2020, during Respondent's morning manager's
11   meeting, Bryson engaged in protected concerted activity by
12   advocating with a group of coworkers for greater COVID-19
13   protections, and by raising concerns about potential COVID-19
14   exposure.
15   5(b), on or about March 30th, 2020, during a demonstration
16   at the JFK8 facility, Bryson engaged in protected, concerted
17   activity by protesting with coworkers.  Respondent's failure to
18   provide greater COVID-19 safety protection -- protections to
19   employees.
20   5(c), on or about April 6th, 2020, during a demonstration
21   at the JFK8 facility, Bryson engaged in protected, concerted
22   activity by protesting the coworkers.  Respondent's failure to
23   provide greater COVID-19 safety protection to employees.
24   JUDGE GREEN:  Okay.  I take it that the Respondent has had
25   an opportunity to view that notice and intend to amend the



8

1    complaint?
2    MR. MURPHY:  Yeah.
3    JUDGE GREEN:  Okay.  And any objection to the amendment?
4    MS. BUFFALANO:  No objection.
5    JUDGE GREEN:  Okay.  And I take it, Mr. Kearl, you have no
6    objection?
7    MR. KEARL:  No objection, Your Honor.
8    JUDGE GREEN:  Okay.  Thank you very much.  So the complaint
9    is so amended.
10   Anything else, Ms. Cox?
11   MS. COX:  Respondents agreed to amend paragraph 4 of the
12   answer to admit Mr. Grabowski as a supervisor and agent of
13   Respondent.
14   MR. MURPHY:  Yeah.  So -- so Judge, if I if I may, Ms. Cox
15   is correct, we would be amending -- we would be amending
16   paragraph 4 of the complaint to -- to admit that Tyler
17   Grabowski was a supervisor for purposes of Section 2(11) of the
18   Act and an agent of the Respondent for purposes of Section
19   2(13) of the Act.
20   JUDGE GREEN:  Okay.
21   MR. MURPHY:  We can't hear you.
22   JUDGE GREEN:  Can you hear me now?
23   MR. MURPHY:  Yes.
24   JUDGE GREEN:  Okay.  All right, very good.
25   MR. MURPHY:  So the answer is so amended.  We -- we -- can





Page 1753

1  insulted him or brought up anything about him personally in the
2  statement or in -- in all of their time together in the
3  exchange; however, Mr. Bryson, from the minute that he was
4  engaged, started personally attacking her, going down a path
5  including potential drug usage, track marks, dark circles under
6  her eyes, talking about her appearance, talking about her being
7  scum of the earth, asking where -- where the fentanyl is. And
8  then even after -- and calling her a B, which we've confirmed.
9      And then even after she retreats, he just continued that
10 behavior, and he continued that behavior all through the social
11 media broadcast and then continued to attack her even into when
12 we were interviewing him sometime later for the investigation.
13 **Q. Okay. Did you review comparators for Ms. Evans's first**
14 **written warning?**
15 A.  I did not.
16 **Q. And why not?**
17 A.  We had reviewed the -- we had reviewed the comparators I
18 think for the some more -- some more severe infractions, and
19 I -- I trust my team and my team's expertise. And in that
20 case, when Christine explained to me why she felt it was too
21 severe, I -- I -- I aligned with her.
22 **Q. Okay.**
23     MS. BUFFALANO:  So can we take just a moment while I just
24 make sure we don't have anything else for this witness?
25     JUDGE GREEN:  Yes.  Off the record.

Page 1754

1      (Off the record at 2:25 p.m.)
2      JUDGE GREEN:  Okay.  So just to sum up, the General
3  Counsel has objected to going forward without certain documents
4  that are -- that are referenced in Footnote 3 of the
5  Respondent's most recent petition to revoke.  They're -- and
6  we're talking about CHIMEs documents.  So there are CHIMEs --
7  they're -- I guess we're talking about the redacted CHIMEs
8  documents that were the subject of my recent order and some
9  additional CHIMEs documents.  And -- and the additional
10 outstanding documents, the Respondent is taking the same
11 position that it -- it includes nonresponsive portions, meaning
12 portions that are not responsive to a subpoena paragraph.
13     MR. MURPHY:  Yes.  Parts of -- yes.  Portions that are not
14 responsive.
15     JUDGE GREEN:  Now -- okay.  So -- but do those include
16 responsive portions?  Have you -- you know, have you redacted
17 those, as well, and -- and produced them or no?
18     MR. MURPHY:  We have not produced them.
19     JUDGE GREEN:  So why not just produce the redacted
20 portions the same as the ones that you produced before?
21     MR. MURPHY:  Well, I -- I -- I guess we're -- we're
22 reluctant to produce them without an agreement that they won't
23 be subject to the same sort of -- of -- of -- of process that
24 we went through, then -- which is subject to the special
25 appeal.

Page 1755

1      JUDGE GREEN:  No.  I mean, they would be.  I think they
2  would be subject to the special appeal.  You know, we'll get --
3  we'll get something back from the Board saying either, you
4  know, the original order was right, or they'll say the original
5  order was wrong and the stuff should not -- that that stuff
6  shouldn't remain redacted.  And then these other CHIMEs will be
7  treated the same way.  The -- the -- those CHIMEs will remain
8  redacted, the same as the -- the -- those that are subject to
9  the special appeal.  In other words, you've got basically a
10 test case.  The ones that are -- the -- the ones that I already
11 ruled on.
12     MS. REIBSTEIN:  Your Honor, I haven't heard any valid
13 reason for not having turned over even the redacted CHIMEs
14 because, you know, we may or may not present them to Your Honor
15 for in camera review like we did before.  But there's -- you
16 know, once again, Respondent is deciding for itself what it --
17     JUDGE GREEN:  Well, the Board is going to have their say
18 on this, right.  The Board is going to have their say.  But I
19 guess I don't -- to the extent that the Respondent doesn't
20 have -- doesn't think that the entire CHIMEs are nonresponsive,
21 I'm not sure -- I -- I'm not sure I understand why they
22 wouldn't be produced in redacted form as the same as --
23     MS. REIBSTEIN:  Well, because that's what they've been
24 doing all along, just deciding for themselves what they want to
25 turn over and what they don't --

Page 1756

1      JUDGE GREEN:  So that --
2      MS. REIBSTEIN:  -- in defiance of your order.
3      MR. MURPHY:  Yeah.  Judge -- Judge, that's -- that's a
4  massive, massive mischaracterization of what we've done.
5  We've -- we -- we've -- we -- we -- we have a dispute about a
6  small number of CHIMEs, and these documents are the subject of
7  the petition -- it's a petition to revoke and also a -- a
8  petition to have you reconsider the -- the relevance
9  determinations that you made at the very outset of the case
10 before any of this evidence came in.  And -- and -- and in the
11 document, we -- we -- we identify the -- the -- the parts of
12 the record in which you said that -- that the -- that -- that
13 the subpoena provisions were enforced because they were
14 relevant to protected concerted activity.  And -- and -- and
15 you know, we --
16     JUDGE GREEN:  Right.  No, I get that.  I understand that.
17 That -- I understand.  So let's just -- let's just for a
18 moment -- I mean, the -- the General Counsel, as far as I can
19 tell, doesn't want to go forward, so we've got a massive
20     So let's -- let's just assume for the moment that this is
21 a Burnup & Sims case.  You know, the Respondent is saying that
22 it is.  The General Counsel really isn't saying that it isn't.
23 So nobody's actually saying that this is not a Burnup --
24 Burnup -- Burnup & Sims case.
25     And if it is a Burnup & Sims case, as far as I understand,



Page 1757

1  there's -- there is some dispute regarding how that type of
2  evaluation, analysis works, but you have basically three steps.
3      The first is you determine that the -- there's an
4  altercation or misconduct that arises out of or during the
5  protected concerted activity, and we have that as far -- we
6  have that stipulated now.
7      And the second is that the -- the Respondent presents an
8  honest belief that the alleged discriminatee engaged in serious
9  misconduct warranting discharge.  And if that is satisfied,
10  then you go to the third element, which is the General Counsel
11  then must show that either it -- the discriminatee did not
12  actually engage in any misconduct or at least did not engage in
13  such serious misconduct as to lose the protection of the act,
14  right.
15      And the third element is -- that's just going to be the --
16  that's just going to be the videos.  And we know that
17  there's -- we know that -- that -- that Mr. Bryson engaged in
18  an altercation.  It's not going to be that he engaged in -- in
19  no alleged misconduct.  It's going to be whether -- whether he
20  engaged in such serious misconduct that that conduct loses the
21  protection of the act.
22      But that's -- from an evidentiary standpoint, that's just
23  going to be the videos.  As far as I can tell, the only thing
24  we've got left here is the employer's honest belief that
25  Mr. Bryson engaged in such serious misconduct as to warrant

Page 1758

1  discharge.
2      And so you know, what evidence could that be?  I mean, it
3  can be an email.  It can be an email saying something to the
4  effect of, well, generally we don't discharge people who are
5  engaged in activity outside the plant on their own time.  But
6  in this case, we're making an exception for the protesters
7  because we want to get rid of them.  That's one.
8      And that's -- that -- and that is the bulk as far as I
9  understand it of the subpoenaed documents.  I mean, what's left
10  of the subpoenaed documents, that's the type of evidence that
11  they're designed to look for.
12      Now, 19 -- you know, GC 19 -- GC subpoena number 19 and
13  the same for the -- for the Charging Party, I -- yeah.  I guess
14  that that actually could cover that type of statement.  And so
15  those documents are probably still subject to production.
16      And so, yeah.  I mean, I -- I -- you know, I haven't -- I
17  literally was just reading this again.  You know, I -- we got
18  this this morning.  I haven't really had a lot of time to
19  produce it, but that's my initial reaction is that 19 is still
20  going to be subject -- request 19 is still going to be subject
21  to production.  I have much more doubts about whatever the
22  other one was.  I think it was 27 regarding the appeals.  I
23  really don't see how the appeals are going to be useful.
24      MS. COX:  Judge Green, those were produced.  We have no
25  issue with that --

Page 1759

1      JUDGE GREEN:  Okay.
2      MS. COX:  -- with those two paragraphs.
3      JUDGE GREEN:  So -- but -- so -- okay.  So now we've got
4  the -- we've got the CHIMEs, and that -- that could arguably
5  contain some -- some statements which are relevant to this
6  analysis even if it's just limited -- limited to Burnup & Sims.
7      Having said that, I mean, you know, I -- I don't know.
8  It -- are -- are those documents covered by your special
9  appeal?  I don't really know.  I guess I don't think so, but
10  why --
11      MS. COX:  Well, Judge, you haven't ruled yet on those
12  documents because they haven't been produced.
13      JUDGE GREEN:  Well, I ruled on documents like that.  I've
14  ruled on the CHIMEs, and I -- and I've rule -- you know, that's
15  the -- that is -- that same reasoning is going to apply to any
16  other CHIMEs that are out there, but it's -- it's going to be
17  the subject of a special appeal.
18      MS. REIBSTEIN:  But, Your Honor -- but, you know, there's
19  like a lot of things up in the air.  If -- my understanding is
20  that in Footnote 3 of Respondent's -- I guess it was like a
21  motion to amend where they attach an -- an argument -- an
22  unrelated argument that we should be precluded from putting on
23  evidence.  It's in that Footnote 3 where other unredacted --
24  other redacted CHIMEs that they have not turned over because
25  they decided that this is a Burnup & Sims --

Page 1760

1      JUDGE GREEN:  Okay.  So --
2      MS. REIBSTEIN:  -- case, and so they're not relevant.  So
3  we -- we -- they haven't even turned those over.
4      JUDGE GREEN:  Let me cut to the chase.  You know, from my
5  perspective, the additional CHIMEs should be redacted in the
6  same way that the original CHIMEs were redacted.  And then --
7      MS. REIBSTEIN:  And handed over to us.
8      JUDGE GREEN:  And then -- yes.  And then -- well, yeah.
9  They should be produced and redacted for them, and then they
10  will all be the subject of the special appeal.
11      MS. REIBSTEIN:  Correct.  That makes sense.  But the first
12  step is that they are -- they're ordering them to turn those
13  over --
14      JUDGE GREEN:  Yeah.
15      MS. REIBSTEIN:  -- as the --
16      JUDGE GREEN:  They should be produced and redacted.
17      MS. REIBSTEIN:  Yes.  Okay.
18      MS. COX:  And not just CHIMEs.  Whatever other documents
19  are being withheld under the same --
20      JUDGE GREEN:  But it's only -- it really only becomes an
21  issue --
22      MS. COX:  Yeah.
23      JUDGE GREEN:  -- with regard to CHIMEs because in almost
24  every other instance you can tell what the complete document
25  is.  The reason why CHIMEs are a problem and -- and probably



GC Exhibit 121

1761..1764

Page 1761

1 why it's worth of a special appeal is because it's -- it's not
2 100 percent clear what the complete document is, and that's --
3 you know, I made my ruling, but the Board -- ultimately, it's
4 the Board that can have the final say. And -- and the
5 Respondent can go that way.
6      The other stuff, I mean, there shouldn't really be an
7 issue regarding any other documents. Those are either going to
8 be responsive or -- or not. Those -- those shouldn't -- we
9 shouldn't be having the same problem with the other documents.
10      And -- and I -- my understanding is that really we
11 don't -- as far as the Respondent understood -- as far as at
12 least the Respondent understood, they removed the redactions
13 from the discipline.
14      MR. JACKSON: Your Honor, paragraph 3 says that some of
15 those documents are CHIME threads that contain a mix of
16 responsive and nonresponsive information.
17      JUDGE GREEN: Okay. Well, I mean -- yeah. I mean, I
18 think you all understand the reasoning of my order, and I would
19 expect everybody to act accordingly. I hope if you don't
20 understand it, maybe ask him.
21      MS. REIBSTEIN: I -- I just would like to clarify. So
22 there's certain documents referred to in -- in Footnote 3 of
23 Respondent's most recent motion. Are -- you're ordering
24 Respondent to turn over all of those.
25      JUDGE GREEN: Yes.

Page 1762

1      MS. REIBSTEIN: Okay.
2      JUDGE GREEN: In redacted form.
3      MS. REIBSTEIN: Okay.
4      MR. MURPHY: Okay. So -- just so -- just so I'm clear,
5 Judge, so you're denying our motion to reconsider the -- the --
6 the initial order enforcing paragraph --
7      JUDGE GREEN: For 19. For paragraph 19, which is the only
8 one that I have, right? Yeah.
9      MR. MURPHY: Yeah. Well, the -- yeah. Right. So
10 there -- there's the problem of trying to get the toothpaste
11 back in the tube at this point, right. So -- you know, so --
12 so this is where we are at the moment --
13      JUDGE GREEN: Okay.
14      MR. MURPHY: -- with documents that have not been produced
15 that -- that we think would have been subject to a different
16 determination by you if we had known -- if we had known then
17 what we know now, okay.
18      JUDGE GREEN: Yeah. I -- yeah. I -- I think that it --
19 it -- that we have significantly narrowed the scope of the
20 litigation, but I think that step -- because I think that
21 the -- the General Counsel is entitled to try to rebut a
22 Respondent showing that it had an honest, good-faith belief
23 that Mr. Bryson engaged in misconduct warranting discharge.
24      MR. MURPHY: Yeah. I -- I --
25      JUDGE GREEN: Okay.

Page 1763

1      MR. MURPHY: And I -- I don't think Ms. Buffalano or -- or
2 I disagree with that. And -- and -- and nor are we trying --
3      JUDGE GREEN: So I think that -- right. So it was
4 actually not the reason why I initially denied the petition to
5 revoke paragraph 19. You're right about that. It's not the
6 reason I initially denied it, but we're in a different posture
7 now, and we're looking at the case differently. And based on
8 that analysis, I think that arguably, the -- I think that
9 paragraph 19 might produce -- might result in the production of
10 relevant documents.
11      So that's where -- that's where we are. You know, having
12 said that, I've got to say I was a little surprised that the --
13 that the Respondent was taking such a hard line about the
14 production of these redacted documents. I don't want to
15 discuss what's in them, but I didn't think -- I was surprised
16 that you're so worried about producing them.
17      MR. MURPHY: I wouldn't -- I wouldn't say that we're
18 worried. There's -- there's a couple things going on. The
19 one -- the one is the, you know, the underlying principle
20 that -- that we just have a disagreement about what -- what a
21 CHIME is. And -- and --
22      JUDGE GREEN: Yeah. Okay. That's -- that's -- that's
23 legitimate.
24      MR. MURPHY: Right.
25      JUDGE GREEN: Right

Page 1764

1      MR. MURPHY: And -- and --
2      JUDGE GREEN: So the next issue is, you know, the
3 General Counsel, you've got -- you've got Mr. -- Mr. Campbell
4 here. I would suggest that you do whatever cross you can do.
5 You know, there's no benefit in waiting. You're -- you're
6 definitely going to have to call him back if you wait. You
7 might not have to call him back if you don't wait. You might
8 get the -- you might get these CHIMEs and they might not --
9 they might not warrant any -- any cross-examination.
10      MR. MURPHY: Yeah.
11      JUDGE GREEN: There's really no -- really, there's no
12 basis for -- for delaying it on that regard. If worse comes to
13 worse, is you have -- you have to bring him back.
14      MS. COX: I understand your position, Judge, but at the
15 same time, we're not talking just about CHIMEs. Respondent has
16 made clear that there are other redacted documents that have
17 not been produced, whether those are emails --
18      JUDGE GREEN: Are there?
19      MS. COX: We don't know. Whether those are --
20      JUDGE GREEN: Well, I'm asking. I'm asking Respondent.
21 Are there? What else is there other than CHIMEs?
22      MR. MURPHY: I believe there's a -- a small set of
23 documents that respond to paragraph 19, but -- but aren't -- at
24 least, in -- in our view, responsive to Burnup & Sims. And
25 that means any part of Burnup & Sims, Your Honor, including the



Page 1765

1  good-faith -- rebutting a good-faith --

2     JUDGE GREEN:  No.  So --

3     MS. COX:  What types of documents?

4     JUDGE GREEN:  Right.  So that's going to have to be

5  produced.  That's going to have to be produced.  I don't -- you

6  know, I still don't think that's a basis for delaying what you

7  can do of cross-examination now.  If you feel that you want

8  time to prepare for cross, you can have some time to prepare

9  for the cross, but there's no reason to stop now.

10     MS. REIBSTEIN:  Your Honor, we've been put in this

11  position throughout the entire, entire proceeding.  You've just

12  ordered that they turn these documents --

13     JUDGE GREEN:  Yeah.  But how were you prejudiced?  There's

14  no -- if worse comes to worse is you have to call him back.

15  Your -- you stated your concern about continuing was that you

16  might have to call him back, but you will definitely have to

17  call him back if you don't go forward now.  Here, you can

18  potentially complete your cross, get the documents, have no

19  additional questions, and not have to call him back.

20     MS. REIBSTEIN:  Well, Respondent could produce the

21  documents that, you know, this -- this afternoon, and -- and

22  then we can determine and -- and resume tomorrow morning.

23  We -- we --

24     JUDGE GREEN:  Okay.  Let's --

25     MS. REIBSTEIN:  It's already 3:00 o'clock.

Page 1766

1     JUDGE GREEN:  Okay.  Let's talk about --

2     MS. BUFFALANO:  I don't know if -- if the witness is

3  available tomorrow.

4     JUDGE GREEN:  Let's talk about the schedule because I've

5  got limited availability going forward.  So where are we in

6  terms of finishing this case?  Like do we have any idea how

7  much more we have from the Respondent's case?

8     MR. MURPHY:  Well, I -- I guess we were both -- both

9  waiting to answer that.  Not -- frankly, not very much, Your

10  Honor.

11     JUDGE GREEN:  Okay.  So -- so what could we do tomorrow if

12  we don't -- if we don't have -- if we don't deal with -- let's

13  go off the record.

14     (Off the record at 2:58 p.m.)

15     JUDGE GREEN:  We'll resume tomorrow at 1:00 p.m.  I'm

16  denying the Respondent's petition to revoke the subpoena ad

17  testificandum with regard to Christine Hernandez and the

18  petition to revoke as it pertains to paragraphs 19 of the

19  General Counsel and the Charging Party's subpoenas.

20     With regard to -- to CHIMEs, at least, it's my direction

21  that the Respondent produce the documents in redacted form the

22  same way they redacted the documents which are going to be the

23  subject of the special appeal.  And they'll -- those --

24  those -- if -- if they're -- to the extent that they're -- you

25  know, we need to deal with them, those -- those documents will

Page 1767

1  be treated the -- the same based on what the Board decides in

2  the special appeal.

3     MS. REIBSTEIN:  And Your Honor, there are additional

4  responsive documents that Mr. Murphy has stated --

5     JUDGE GREEN:  Right.  I mean, to the extent that the -- to

6  the extent the Respondent agrees that certain documents are

7  responsive, those complete documents should be produced without

8  redactions.

9     MS. REIBSTEIN:  And by when, Your Honor?  They have them.

10  They have them.

11     JUDGE GREEN:  As soon as -- right.  As soon as you

12  possible can.  It sounds like they can be -- that can be done

13  in the immediate future, right?

14     MS. REIBSTEIN:  Like before the end of the day.

15     JUDGE GREEN:  I mean, you tell me.  How long will it take?

16     MS. BUFFALANO:  Well, can I ask you a question, Judge?

17     JUDGE GREEN:  Yes.

18     MS. BUFFALANO:  I assume you're asking us.  Sorry.

19     JUDGE GREEN:  Yes.

20     MS. BUFFALANO:  Are you saying that what is responsive is

21  what relates to the good-faith belief --

22     JUDGE GREEN:  Yes.

23     MS. BUFFALANO:  -- that for us --

24     JUDGE GREEN:  Correct.

25     MS. BUFFALANO:  Okay.

Page 1768

1     JUDGE GREEN:  That's correct.

2     MS. REIBSTEIN:  No.  Your -- Your Honor, you're limiting

3  it to -- to --

4     JUDGE GREEN:  No, no.  I'm saying -- I'm saying I'm not --

5  no.  I'm just saying, I'm -- I'm -- I'm not revoking paragraph

6  19 of either subpoena.  Therefore, if a document is responsive

7  to that paragraph, it should be produced.  I don't think there

8  should be any confusion about producing the complete document

9  with regard to anything other than CHIMEs, right.  So if it's

10  an email, you produce the whole email, and that shouldn't be

11  redacted.  To the extent that you're taking a special appeal,

12  you know, and that would cover other -- other CHIMEs, you know,

13  in the same argument.  You know, I assume you're making the

14  argument that CHIMEs, it's -- it's difficult -- you're making

15  the argument that certain portions of CHIMEs are not

16  responsive, and therefore, those not responsive portions can be

17  redacted.  So those CHIMEs can be -- they can be redacted the

18  same as the original ones will, and we'll do whatever the Board

19  tells us to do.

20     But I don't see that we'll be having that same problem

21  with regard to other documents where it's -- it's not unclear

22  or it's clear -- it's clear what is the -- the complete

23  document.

24     MS. REIBSTEIN:  I -- I also want to add -- thank you for

25  clarifying that -- that documents should not be withheld

Page 1776

1    P R O C E E D I N G S
2       JUDGE GREEN:  Okay.  So it is May 25th, 2021, and we're
3    back on the record.  We have Amazon.com Services LLC,
4    29-CA-261755.  Let's see.  Mr. Rosenblatt is joining.  Okay.
5       So we are going to proceed with the cross-examination of
6    Mr. Campbell, but before we do that, just very briefly, I -- I
7    want to address the issue of the Respondent's motion for
8    reconsideration of the petition to revoke the General Counsel
9    and the -- and the Charging Party's subpoena, in particular,
10   Paragraph 19.
11      So I -- I saw that there was a couple of cross emails
12   shortly before we convened for the hearing.  And -- and
13   -- the -- the email that I have from Ms. Buffalano on behalf of
14   the Respondent says, "We have carefully reviewed the additional
15   documents that have not yet been produced that are responsible
16   in any way to the question Amazon held an honest, good-faith
17   belief that Mr. Bryson engaged in serious misconduct during the
18   incident on April 6th, 2020.  We also reviewed for any
19   documents that mentioned, pertained to, or referenced
20   Mr. Bryson at all and confirmed that those are duplicates.
21   With that review, Respondent's production is now complete.  If
22   this does not satisfy the counsel for the acting General
23   Counsel, we intend to take a special appeal to the ALJ's ruling
24   yesterday."
25      And it's my understanding that the -- that that proposal

Page 1777

1    was not satisfactory to the General Counsel.  And I just wanted
2    to address this.  I -- I -- I -- you know, I'm basically just
3    confirming what I said yesterday, but that was a little ragged,
4    I think.  So I just want to try to make clear what my ruling is
5    so the Respondent can take a special appeal to it.
6       So my ruling with regard to subpoena Paragraph 17 -- 19
7    was I did not revoke Paragraph 19 of the Charging Party and the
8    General Counsel subpoenas; rather, I determined that those
9    paragraphs were reasonably calculated to lead to the production
10   of relevant evidence.  Therefore, documents responsive to those
11   requests are subject to production.
12      While the Respondent has freezed its objection to
13   production in terms of responsiveness, as far as I can tell,
14   it's really making an argument that documents responsive to the
15   subpoenas are not relevant, and that is not an argument the
16   Respondent is entitled to make at this time.  That is an
17   argument the Respondent can make if and when the General
18   Counsel or Charging Party receive the subpoenaed documents and
19   attempt to enter some or all of them into evidence.
20      So for that reason, yesterday, I denied the Respondent's
21   motion for reconsideration with regard to Paragraph 19 of the
22   general -- Charging Party's subpoenas, and I hope that
23   clarifies it, and the Respondent can take a special appeal.
24      MS. REIBSTEIN:  Your Honor, I -- I would just like to note
25   that in order to avoid a claim of like not understand what you

Page 1778

1    said, we discussed this at the end of the day, and I
2    specifically said -- you know, I asked that -- that your --
3    that you were not limiting it, and -- and yet Respondents --
4    Ms. Buffalano's reply was they reviewed -- they reviewed it.
5       JUDGE GREEN:  I understand.  And I don't --
6       MS. REIBSTEIN:  -- and it doesn't pertain to that one
7    little sliver.  So --
8       JUDGE GREEN:  I -- I -- I understand.  But the Respondent
9    is -- I -- correct me if I'm wrong, Ms. Buffalano.  It's not
10   that you misunderstood my order.  It's just that you were
11   taking the special appeal of it.
12      MS. BUFFALANO:  Right.
13      JUDGE GREEN:  Right.  So -- okay.  That's fine.  So we'll
14   -- you know, that'll be out there.  The special appeal will be
15   out there, and we'll wait -- we'll wait to hear from the Board.
16      In the meantime, we have Mr. Campbell here, who has been
17   waiting patiently.  Let me pin you to my screen, and --
18      MS. REIBSTEIN:  Wait, so -- I'm -- I'm sorry, but I'm not
19   clear.  Because Ms. Buffalano phrased her response as, you
20   know, we reviewed it and there are no documents pertaining to
21   whether or not Respondent had a good-faith belief that
22   Mr. Bryson engaged in misconduct, that leaves -- that's one
23   sliver, and it leaves the whole rest of it.  Are there other
24   documents or -- or -- or not because they just -- they just
25   addressed one little sliver, which --

Page 1779

1       JUDGE GREEN:  I don't think there are other documents.  I
2    thought from the email that the Respondent was actually done
3    with their production of subpoenaed records.
4       MS. REIBSTEIN:  Well, that wasn't clear to me because they
5    -- they said that they reviewed the documents to see if there
6    were any that went to that issue.
7       JUDGE GREEN:  Okay.  So you want to --
8       MS. REIBSTEIN:  So that -- that leaves -- that -- that
9    carves out one little sliver of a whole universe of things.
10      MS. BUFFALANO:  Right.  So our -- our position is there
11   are some number of documents left, a very small number of
12   documents left.  There are -- none of those are responsive to
13   what we -- we filed this motion for reconsideration and said
14   please reconsider Paragraph 19 in light of the legal analysis
15   having been narrowed to Burnup & Sims.  Obviously, Judge Green
16   did not --
17      MS. REIBSTEIN:  But that's not the case, though.  You're
18   -- you're using --
19      JUDGE GREEN:  Okay.  So but they're entitled to -- they're
20   entitled to take a special appeal.  They can do that.  So they
21   made a motion for -- for reconsideration.  I denied it.  The --
22   the -- the Respondent's going to take a special appeal.  It's
23   -- they don't have to argue it before me.  They -- they're
24   arguing it before the Board now.
25      MS. REIBSTEIN:  No.  But what's going to happen is they'll



Page 1792

1 A   Yes.

2 Q   Who did you share the Facebook Flowers post with?

3 A   I believe I shared it with Rob Joseph and Allyson Hoffman.

4 Q   And how did you share it with Mr. Joseph and Ms. Hoffman?

5   MS. BUFFALANO: Objection. Relevance.

6   JUDGE GREEN: Overruled.

7   MS. BUFFALANO: Can I just -- these were not -- if -- if

8 this is a Bannon Mills attempt, I don't think these people were

9 on our list of -- of custodians.

10   JUDGE GREEN: I don't know that it -- yeah. I don't -- I

11 don't know that it's necessarily related to a Bannon Mills

12 request so much as the identification of -- of documents that

13 could contain certain information.

14   MS. BUFFALANO: Okay. But -- but we have produced the

15 Facebook post, so there's no question that we had the Facebook

16 post, so I'm just confused as to why it matters.

17   JUDGE GREEN: Well, I mean, I'm -- I'm assuming that

18 they're looking for those -- the communications regarding these

19 posts.

20   MS. COX: And, Judge, I --

21   MS. BUFFALANO: Okay. But my point is if those people

22 were not on the custodian list, then they wouldn't have

23 their --

24   JUDGE GREEN: No. I know. But I'm not -- I understand.

25   MS. COX: I'm not limited to custodian lists.

Page 1793

1   JUDGE GREEN: Right.

2   MS. COX: I'm not.

3   JUDGE GREEN: It's overruled. Let -- let's proceed.

4 Q   BY MS. COX: Okay. So my question was, oh: how did you

5 share the Facebook post -- Facebook Flowers video with

6 Mr. Joseph and Allyson Hoffman?

7 A   I can't recall.

8 Q   And why did you share the Facebook Jordan Flowers video

9 with Rob Joseph and Allyson Hoffman?

10   MS. BUFFALANO: Objection. Relevance.

11   JUDGE GREEN: What's the relevance?

12   MS. COX: Judge, I have a right to develop this witness's

13 credibility and get --

14   JUDGE GREEN: What's the relevance? What's the relevance?

15   MS. COX: It's relevant to who was involved in this

16 discharge.

17   JUDGE GREEN: Okay. So --

18   MS. BUFFALANO: You didn't ask him whether they were

19 involved in the discharge, and there's no evidence to suggest

20 that they were.

21   MS. COX: Well, I can develop these questions.

22   JUDGE GREEN: Okay. So --

23   MS. COX: It may not be -- it may not be --

24   JUDGE GREEN: So sustained.

25   MR. KEARL: It also shows animus potentially.

Page 1794

1   JUDGE GREEN: No. We're -- we don't need animus in this

2 case. Listen, people, you might not like it. I don't really

3 understand why you don't like it, but the fact is that the

4 Respondent's admission did significantly reduce the scope of

5 this proceeding. To the extent that the Respondent is

6 admitting that Mr. Bryson engaged in protected concerted

7 activity and his altercation with Ms. Evans occurred during the

8 protected activity, for either -- for either analysis, that had

9 the effect of significantly reducing the scope of this -- the

10 scope of this litigation. And the fact that we have the -- the

11 altercation on tape rendered a great deal of additional

12 evidence -- not irrelevant, just useless. And so we have a

13 fairly narrow -- we have a barely -- fairly narrow issue before

14 us. And I would like the parties to try and focus on it.

15   MS. COX: Judge Green --

16   MS. REIBSTEIN: Your Honor, they're -- they're -- we have

17 the right to put on a Rightline (phonetic) case and animus. If

18 you're precluding us, then we'll have to take a special appeal.

19   JUDGE GREEN: Okay. Then you take a special appeal.

20   MS. REIBSTEIN: Because the -- the-- the Burnup and Sims

21 analysis --

22   JUDGE GREEN: The prima facie -- the -- the prima facie

23 Rightline case is essentially made as a result of the factual

24 admission. It's -- it's -- it's essentially made. There is

25 some overlap in Burnup & Sims and Rightline at the second step

Page 1795

1 in the sense that -- to the extent there's an honest belief on

2 the part of the Respondent that -- that misconduct warranted

3 discharge, there is some evidentiary overlap with the

4 -- with the Rightline affirmative defense. But that is where

5 we're at. That is -- that is really the only thing that's left

6 in light of the evidence that has come in and the Respondent's

7 admission. And -- and we're simply not going to boob around

8 aimlessly in -- in -- with regard to other evidence that's not

9 in this -- at least in the same ballpark. We're not. We're

10 not doing it.

11   You can -- you can take a special appeal. We've already

12 got one. I have no problem with special appeals. But --

13   MS. REIBSTEIN: I'm -- I'm not clear about what you're --

14   JUDGE GREEN: Go ahead. And -- and --

15   MS. REIBSTEIN: I'm not clear about what you're limiting

16 us to.

17   JUDGE GREEN: Okay. Well, you're not -- you're not

18 conducting the -- this questioning. So do we have another

19 question? This argument is over.

20   MS. REIBSTEIN: Well, Your Honor, I'm not clear what

21 you're limiting us to.

22   JUDGE GREEN: Okay. I'm not -- I'm not -- there is no

23 objection right now. There is -- there is only questions at

24 this -- to the extent that there's question, go. Go ask the

25 questions, and the Respondent will object, and I'll make my



Page 1896

1  permanently, that -- that will be over.  Nobody has an
2  intention to call any other witnesses at the moment.
3      MR. JACKSON:  I understand.  But the General Counsel may
4  get additional subpoenaed documents, and that might result in
5  -- that might result in the -- the General Counsel wanting to
6  call additional witnesses.
7      JUDGE GREEN:  Let me just do a -- just very briefly a
8  couple of things.  First of all, the Respondent's third amended
9  answer is going to be allowed.  I would like to have in the
10  record -- I don't have it teed up here, but there was
11  essentially a -- I think the Respondent produced -- submitted a
12  memorandum in support along with the motion for reconsideration
13  on the petition to revoke.
14      I'd like to have that in -- in the record just because I
15  think it explains more fully what the Respondent's position is
16  with regard to what's at issue in the case at the -- at the
17  moment.
18      MR. MURPHY:  Can we -- can we do that by -- make that a
19  joint exhibit or --
20      JUDGE GREEN:  Sure.
21      MR. MURPHY:  Because then we can just upload it to
22  SharePoint and --
23      JUDGE GREEN:  Yes.
24      MR. MURPHY:  Okay.
25      JUDGE GREEN:  The -- I -- I -- we have the clip of Ms.

Page 1897

1  Valasco's (phonetic) video.  I -- I actually think that -- I
2  think that's helpful.  I actually think that we should put into
3  evidence the entire video.  I understand that the Respondent
4  has admitted that Mr. Bryson engaged in protected protest
5  activity, but I think it's useful just to have that -- the
6  video of that activity to the extent it provides some context
7  to the -- you know, to the altercation that arised during it --
8  arose during it.
9      And lastly --
10      MR. MURPHY:  Excuse me one second.  I apologize.  Sorry.
11      JUDGE GREEN:  Lastly, I would like, if at all possible, to
12  have access to the Respondent's Excel spreadsheets to the
13  extent that they describe the -- any discipline that is in
14  evidence.  We have the discipline.  That's fine.  You know, I
15  -- I -- but I would like to have the Excel spreadsheets to use
16  as a tool.
17      MR. MURPHY:  May -- may I ask a clarifying question?
18      JUDGE GREEN:  Yes.
19      MR. MURPHY:  So do0 you want the spreadsheets to be --
20  because they're not constrained to just the documents that are
21  in the record.  Do you want us to --
22      JUDGE GREEN:  Right.  Yeah.  You should probably pare them
23  down.  I mean, I can do it.  You know, I'm pretty good with
24  Excel.  So you can either -- you can either give me the whole
25  spreadsheet, if you want, but really -- probably would -- would

Page 1898

1  be better is if you just delete the --
2      MR. MURPHY:  Okay.
3      JUDGE GREEN:  -- the entries that are not in evidence.
4      MR. MURPHY:  Okay.
5      THE COURT REPORTER:  Is it going to be an exhibit?
6      JUDGE GREEN:  Yes.
7      MR. MURPHY:  And can we make that a joint one as well so
8  we can just upload it?
9      THE COURT REPORTER:  It's going to be Joint 1.
10      MR. MURPHY:  It would be Joint 2, I think, because the
11  Joint 1 would be the reconsideration motion.
12      THE COURT REPORTER:  Okay.  I have to look at my
13  SharePoint exhibits after it was done --
14      MR. MURPHY:  I'm sorry.
15      MS. COX:  Mr. Murphy, wasn't Respondent working on the
16  joint exhibit for the subpoena issues?
17      MR. MURPHY:  Respondent is working on that.  Yeah.  So --
18      MS. COX:  Okay.  I just want to make sure that that's
19  one --
20      MR. MURPHY:  Yeah.  We -- yeah.  At -- at -- at some point
21  before the record closes, we -- we were going to introduce the
22  -- well, let me just make sure we're all on the same page.  The
23  subpoena, the petition's still revoked, and the respective
24  orders relating to them --
25      MS. COX:  Yes.

Page 1899

1      MR. MURPHY:  -- right?  Is that -- nothing else.
2      MS. COX:  Yes.  But that -- that would be Joint 2,
3  correct?
4      MR. MURPHY:  Okay.  Well -- yeah.  So let's decide what
5  we're going to do.  What -- so what's Joint 1?  I guess the --
6      MS. COX:  You just -- you just said the motion for
7  reconsideration --
8      MR. MURPHY:  Yeah.  But isn't there -- isn't -- aren't the
9  papers in as Joint 1?
10      THE COURT REPORTER:  I don't think it was introduced.
11      MR. MURPHY:  Oh, that's General Counsel 1.  Yeah, yeah,
12  Okay.  My bad.
13      THE COURT REPORTER:  I don't think Joint 1 was introduced
14  because I was looking at what was download on the SharePoint.
15  I didn't --
16      MR. MURPHY:  I got kicked out of SharePoint.  What is
17  Joint 1, sir?
18      THE COURT REPORTER:  I didn't see any -- I -- I haven't
19  heard any mention of Joint 1 since this hearing start, so if
20  you want to introduce it now --
21      MR. MURPHY:  Okay.  So --
22      THE COURT REPORTER:  -- and then we can --
23      MR. MURPHY:  Right.
24      THE COURT REPORTER:  -- it.
25      MR. MURPHY:  So Joint 1 is going to be what, Ms. Cox?



Page 1916

1 redactions that we've -- that are -- that are contained in the
2 document that was just produced would be part of -- subject to
3 the special appeal on the -- the other redactions. Just
4 clarifying that.
5     JUDGE GREEN: Yes. That's -- that's, frankly, up to you.
6     MR. MURPHY: Okay. But --
7     JUDGE GREEN: I mean, I can see why it would fall within
8 the same subject as the other documents that we have dealt with
9 before.
10     MR. JACKSON: But, Your Honor, I think you are making a
11 ruling. You're making a ruling that this -- this document is
12 subject to the same ruling that you had on the other redacted
13 CHIMEs from before.
14     JUDGE GREEN: Yes.
15     MR. JACKSON: Yes. So should we --
16     JUDGE GREEN: Okay.
17     MR. JACKSON: -- put that on the record?
18     JUDGE GREEN: Okay. Yes. To the extent -- right. So to
19 the extent that --
20     MR. JACKSON: Are we on the record, Barry?
21     JUDGE GREEN: We are, right?
22     THE COURT REPORTER: Yeah. We are. We are.
23     JUDGE GREEN: Right. So -- okay. So it -- it appears to
24 me that this document that's at issue -- we don't have it
25 identified as a particular exhibit -- but this is responsive to

Page 1917

1 the Charging Party and the General Counsel's subpoenas, and
2 nevertheless, it's been redacted to the extent that the
3 respondent believes that the redacted portions are not
4 relevant.
5     It's been my ruling with regard to prior documents that
6 the entire document needs to be produced, and that includes
7 portions that may not specifically be relevant. It's my
8 understand that the -- that the respondent is taking a special
9 appeal of that ruling with regard to the previous documents
10 that we have discussed and that the respondent is -- is taking
11 a special appeal of this document as the rule in my ruling with
12 regard to this document, as well.
13     MR. MURPHY: Yeah. And -- and, Your Honor, just so
14 there's something on the record, may I make a brief proffer of
15 sorts with respect to the nature of the document?
16     JUDGE GREEN: Yes.
17     MR. MURPHY: Okay. Thank you. So the -- the -- the
18 document that we've been discussing is -- is a OneNote, which I
19 understand is a -- a -- it's like a notebook, and -- and
20 individuals enter information in that in a sequential or serial
21 basis. And -- and -- and it -- and it's -- it's like a paper
22 notebook, so what's on one page is not responsive to or related
23 to what's on other pages. So it -- so we view this as even
24 slightly different than the CHIME situation which was
25 previously before you in that -- in that these are -- it --

Page 1918

1 it's not just separate parts of the same -- of -- of -- it --
2 it's not just a linked set of separate conversations, but it's
3 actually separate matters or -- or subject matter on -- in
4 one -- OneNote and another. And so that -- that forms a
5 separate factual basis for our position on the redactions on
6 this document.
7     JUDGE GREEN: Well, are you saying that -- that this
8 single document is not actually a single document?
9     MR. MURPHY: It's a -- it's a OneNote, Judge, so it --
10 it's --
11     JUDGE GREEN: So there -- there might be confusion. Okay.
12 That's fine. I think it's in the same category, from my
13 perspective.
14     MR. MURPHY: Okay.
15     MR. MURPHY: So --
16     MR. MURPHY: I just wanted to -- yeah.
17     JUDGE GREEN: My ruling is that -- my ruling is that the
18 redactions, to the extent that they're not based on
19 attorney-client privilege be removed. That -- that's my
20 ruling, and then you're -- you're going to take a special
21 appeal about --
22     MR. MURPHY: Understood. I just wanted to have that
23 distinction in the record.
24     JUDGE GREEN: Okay.
25     MR. JACKSON: And Your Honor, for the record, I'd also

Page 1919

1 like to note that this document is not produced in native
2 format. We asked immediately upon receipt of the document for
3 it to be produced in native format, and it still has not been.
4 So you know --
5     JUDGE GREEN: Yeah.
6     MR. JACKSON: -- Mr. Murphy's -- Mr. Murphy's
7 representations are all well and good for what they're worth,
8 which I don't think is much, but we would like to verify that
9 by looking at the native format to verify when these documents
10 were produced.
11     And in addition, it seems that there's a new
12 classification of documents that may be responsive to our
13 subpoena. Those should also be searched and produced. Do you
14 intend to do so, Mr. Murphy.
15     MR. MURPHY: Well, you know, I -- if -- if whatever I said
16 to you, Mr. Jackson, you probably wouldn't credit, so I -- I --
17 I might just save my words. But let -- let me say this that
18 when we got the request for the native format, we immediately
19 investigated it, and we -- and we are trying to determine if
20 the document can be produced in native format. And rest
21 assured, if it can, it will be, as -- as with every other
22 document that you've asked to be produced in native format so
23 far.
24     JUDGE GREEN: So we have OneNote. We use that at the
25 Board. Native format, I -- what is -- okay. Well, let's not

GC Exhibit 121

# EXHIBIT B


GC Exhibit 121

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES
NEW YORK BRANCH OFFICE


**AMAZON.COM SERVICES LLC**

      **and**                                        **Case   29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**


## ORDER ON REDACTION OF SUBPOENAED DOCUMENTS
## AFER IN CAMERA INSPECTION

      In compliance with my May 19, 2021 order, the Respondent submitted unredacted versions of General Counsel Exhibits 65-69 (Amazon Chime chat threads) to me for in camera inspection.

      A subpoenaed party must produce complete documents responsive to all subpoena requests that have not been revoked, including any nonresponsive irrelevant information within those documents. *Bartholomew v. Avalon Cap. Grp., Inc.*, 278 F.R.D. 441, 451–52 (D. Minn. 2011).  This is particularly important when the nonresponsive information provides context, concerns subject matter at issue in the case, and/or could lead to the identification of additional relevant materials.

      As noted in my May 19 order, it can be difficult to determine to what extent texts threads or instant message chats are complete documents.  It could be argued that the "document" or conversation should be defined as all messages that were sent on the day a significant event occurred.  While I have not used such a broad bright line approach, I have not evaluated the relevance or responsiveness of each message individually out of context. Thus, to the extent partially responsive threads contain additional information that may be useful in the case, I have liberally ordered that redactions be removed as follows:

1) General Counsel Exhibits 68 and 69 shall be produced without any redactions.

2) General Counsel Exhibit 65 shall be produced without redactions for messages from 17:00:51 to the end of the thread (18:00:59).  Messages from 06:04:27 to 13:45:30 may remain redacted.

3) General Counsel Exhibit 66 shall be produced without redactions, except the messages from 14:33:51 to 14:37:49.  The messages from 14:33:51 to 14:37:49 may remain redacted.

4) General Counsel Exhibit 67 shall be produced without redactions for messages from 6:34:24 to 6:49:23.  Messages in the remainder of the thread may remain redacted.



GC Exhibit 121

It is HEREBY ORDERED that the Respondent shall produce General Counsel Exhibits 65 to 69 in the form described above no later than May 21, 2021, at 1 p.m.

.                                      Dated:          May 20, 2021
                                                       New York, New York

                                                       *S/ Benjamin W. Green*

                                                       _____
                                                       Benjamin W. Green
                                                       Administrative Law Judge

Served by email as follows:

Zainab N. Ahmad, Esq. (Zahmad@gibsondunn.com)

Nicole A. Buffalano, Esq. (nicole.buffalano@morganlewis.com)

Evamaria Cox, Esq. (Evamaria.Cox@nlrb.gov)

David Gaston, Esq. (David.Gaston@nlrb.gov)

Matthew Jackson, Esq. (Matthew.Jackson@nlrb.gov)

Frank Kearl, Esq. (frank.kearl@maketheroadny.org)

Christopher J. Murphy, Esq. (christopher.murphy@morganlewis.com)

Kelcey J. Phillips, Esq. (kelcey.phillips@morganlewis.com)

Nancy Reibstein, Esq. (Nancy.Reibstein@nlrb.gov)

Richard Rosenblatt, Esq. (richard.rosenblatt@morganlewis.com)

Jason Schwartz, Esq. (jschwartz@gibsondunn.com)

Jennifer Mott Williams, Esq. (jennifer.williams@morganlewis.com)



# EXHIBIT C


GC Exhibit 121

*Exhibit C is a .mp4 video file and will be provided separately.  (Due to its large size (249 MB), Respondent is unable to submit Exhibit C via NLRB E-Filing.)*

GC Exhibit 121

# EXHIBIT D

GC Exhibit 121

FORM NLRB 4338
(6-90)

# UNITED STATES OF AMERICA
## BEFORE THE NATIONAL LABOR RELATIONS BOARD
### REGION 29

**AMAZON.COM SERVICES LLC**

    **And**                                   **Case No.  29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**

## COMPLAINT AND NOTICE OF HEARING

This Complaint and Notice of Hearing is based on a charge filed by Gerald Bryson (Bryson or the Charging Party).  It is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules and Regulations of the National Labor Relations Board (the Board) and alleges that Amazon.com Services LLC (Respondent) has violated the Act as described below.

1.      The charge in this proceeding was filed by the Charging Party on June 17, 2020, and a copy was served on Respondent by U.S. mail on June 17, 2020.

2.      (a)      At all material times, Respondent, a Delaware limited liability company with a Fulfillment Center in Staten Island, New York (JFK8 Facility) has been engaged in providing online retail sales throughout the United States.

      (b)      During the past twelve-month period, which period is representative of its operations in general, Respondent, in conducting its business operations described above in subparagraph 2(a), derived gross revenues in excess of $500,000 and purchased and received at its JFK8 Facility goods valued in excess of $5,000 directly from points outside the State of New York.

3.      At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

GC Exhibit 121

4.      At all material times, Tyler Grabowski held the position of Respondent's Human Resources

Business Partner and has been a supervisor of Respondent within the meaning of Section 2(11) of

the Act and an agent of Respondent within the meaning of Section 2(13) of the Act.

5.      On or about April 6, 2020, during a demonstration at the JFK8 Facility, Bryson engaged

in protected concerted activity by protesting Respondent's failure to provide greater COVID-19

safety protections to employees.

6.      (a)      On or about April 10, 2020, Respondent suspended Bryson.

        (b)      On or about April 17, 2020, Respondent discharged Bryson.

        (c)      Since on or about April 10, 2020, Respondent has failed and refused to reinstate, or

offer to reinstate, Bryson to his former position of employment.

7.      Respondent engaged in the conduct described above in paragraph 6 because Bryson

engaged in the conduct described above in paragraph 5, and to discourage employees from

engaging in these or other concerted activities.

8.      By the conduct described above in paragraphs 6 and 7, Respondent has been interfering

with, restraining and coercing employees in the exercise of the rights guaranteed in Section 7 of

the Act in violation of Section 8(a)(1) of the Act.

9.      The unfair labor practices of Respondent described above affect commerce within the

meaning of Section 2(6) and (7) of the Act.

        As part of the remedy for the unfair labor practices alleged above in paragraphs 6 and 7,

the General Counsel seeks an Order requiring Respondent to submit to the Regional Director a

copy of the IRS form W-2 reflecting backpay paid to Gerald Bryson.

        The General Counsel also seeks, as part of the remedy for the allegations in paragraphs 6

and 7, an Order requiring Respondent to physically post and to electronically distribute the Notice

GC Exhibit 121

to Employees by Respondent's intranet application "Amazon A to Z" and by its "JFK8 inSites" e-mail, in Spanish in addition to English.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the Complaint.  The answer must be **received by this office on or before January 5, 2021 or postmarked on or before January 4, 2021**.  Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website.   To file electronically, go to www.nlrb.gov, click on **E-File Documents,** enter the NLRB Case Number, and follow the detailed instructions.  Responsibility for the receipt and usability of the answer rests exclusively upon the sender.  Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented.  See Section 102.21.  If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within

GC Exhibit 121

three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission.  If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the Complaint are true.

Any request for an extension of time to file an answer must, pursuant to Sections 102.22 and 102.2 of the Board's Rules and Regulations, be filed electronically by the close of business on **January 5, 2021.** The request should be in writing and addressed to the Regional Director of Region 29.

<u>**NOTICE OF HEARING**</u>

PLEASE TAKE NOTICE THAT on **March 29, 2021**, **at 9:30 AM,** and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board by videoconference, or in a manner and at a location otherwise ordered by the Administrative Law Judge.  At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this Complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated:  December 22, 2020

KATHY DREW-KING
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 29
Two Metro Tech Center
Suite 5100
Brooklyn, NY 11201-3838

GC Exhibit 121

Attachments



# UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD
### NOTICE

Case 29-CA-261755

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties.  On the contrary, it is the policy of this office to encourage voluntary adjustments.  The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.  However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated.  Postponements **will not be granted** unless good and sufficient grounds are shown **and** the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds must be set forth in **detail**;

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5) Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Ross H. Friedman , Counsel for Commonwealth
  Edison Company
Morgan, Lewis & Bockius LLP
77 W Wacker Dr Fl 5
Chicago, IL 60601-1671

Amazon.com Services LLC
546 Gulf Ave
Staten Island, NY 10314

Gerald Bryson
1950 Clove Rd.
Apt. 543
Staten Island, NY 10304

Frank Kearl , Staff Attorney
Make the Road New York
161 Port Richmond Ave.
Staten Island, NY 10302



# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative.** If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement.** The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I.      BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:** If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:** One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II.     DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations. Please note in particular the following:

- **Witnesses and Evidence:** At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits: Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered in evidence.** If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not



submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**:  An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation.  Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval.  Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion.  If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:**  You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing.  Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**:  Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ.  The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.    AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations.  Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:**  If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred.  You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request.  You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:**  In due course, the ALJ will prepare and file with the Board a decision in this matter.  Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision.  The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**:  The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections.  A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.



GC Exhibit 121

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 29**

**AMAZON.COM SERVICES LLC**

    **And**                                               **Case No.  29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**

**NOTICE OF INTENT TO AMEND**
**COMPLAINT AND NOTICE OF HEARING**

**PLEASE TAKE NOTICE** that at the commencement of the hearing in Case No. 29-CA-261755 on March 29, 2021 at 10:00 a.m. before an Administrative Law Judge of the National Labor Relations Board, or as soon thereafter as counsel can be heard, Counsel for the Acting General Counsel will move to amend the Complaint and Notice of Hearing (the Complaint) as set forth below.

      **1)**   **Existing paragraph 5 of the Complaint is now modified as follows.**

5.      (a)     On or about March 25, 2020, during Respondent's morning managers meeting, Bryson engaged in protected concerted activity by advocating, with a group of coworkers, for greater COVID-19 protections and by raising concerns about potential COVID-19 exposure.

             (b)     On or about March 30, 2020, during a demonstration at the JFK8 Facility, Bryson engaged in protected concerted activity by protesting with coworkers Respondent's failure to provide greater COVID-19 safety protections to employees.



GC Exhibit 121

(c)     On or about April 6, 2020, during a demonstration at the JFK8 Facility, Bryson engaged in protected concerted activity by protesting with coworkers Respondent's failure to provide greater COVID-19 safety protections to employees.


Dated:  March 23, 2021

*/s/ Evamaria Cox*_____
Evamaria Cox
Counsel for the Acting General Counsel
National Labor Relations Board
Region 29
Two MetroTech Center, 5/Fl.
Brooklyn, New York 11201



GC Exhibit 121

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 29**

**AMAZON.COM SERVICES LLC**

     **and**                                        **Case No. 29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**

 **CERTIFICATE OF SERVICE:   NOTICE OF INTENT TO AMEND**

I certify that on March 23, 2021, I served the above-entitled document(s) as noted below, upon the following persons:

**By electronic mail:**

Christopher J. Murphy, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2901
christopher.murphy@morganlewis.com

Benjamin W. Green, ALJ
NLRB New York Division of Judges
26 Federal Plaza, 41st Floor, Suite 41-120
New York, NY 10278
Benjamin.Green@nlrb.gov

Nicole Buffalano, Esq.
Morgan, Lewis & Bockius, LLP
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071
nicole.buffalano@morganlewis.com

Frank Kearl, Esq.
Make the Road New York
161 Port Richmond Ave.
Staten Island, NY 10302
frank.kearl@maketheroadny.org

Kelcey Phillips, Esq.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave., NW,
Washington, DC 20004
kelcey.phillips@morganlewis.com

                                       */s/ Evamaria Cox*
                                       Evamaria Cox
                                       Counsel for the Acting General Counsel
                                       National Labor Relations Board, Region 29
                                       Two MetroTech Center, 5/Fl.
                                       Brooklyn, New York 11201



# EXHIBIT E



**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 29**

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| AMAZON.COM SERVICES LLC | ) | |
| | ) | |
| and | ) | Case 29-CA-261755 |
| | ) | |
| GERALD BRYSON | ) | |
| An Individual. | ) | |
| _____ | ) | |

**<u>RESPONDENT'S MOTION FOR LEAVE TO AMEND ITS SECOND AMENDED
ANSWER TO THE COUNSEL FOR THE ACTING GENERAL COUNSEL'S
AMENDED COMPLAINT</u>**

Pursuant to Section 102.23 of the National Labor Relations Board's Rules and

Regulations, Amazon.com Services LLC ("Respondent," "Amazon" or the "Company"), through

its undersigned counsel, hereby moves to amend its Second Amended Answer to the Amended

Complaint.

1.  Under Section 102.23 of the Board's Rules, a respondent may amend its answer after

the hearing has opened is "in the discretion of the [ALJ] or the Board."  For the following

reasons, Respondent's Motion to Amend should be granted.

2.  On December 22, 2020, the Counsel for the Acting General Counsel ("CAGC") filed

the original Complaint, which alleged, in part, that on or about April 6, 2020, Charging Party

Gerald Bryson "during a demonstration at the JFK8 Facility, Bryson engaged in protected

concerted activity by protesting Respondent's failure to provide greater COVID-19 safety

precautions to employees."  On January 5, 2021, Respondent filed an Answer to the Complaint

denying that Bryson engaged in protected concerted activity.

3.  On March 23, the CAGC moved to amend paragraph 5 of the original Complaint on

the record to allege that Bryson similarly engaged in protected concerted activity on March 25

and 30, 2020.  On April 6, Respondent filed a second amended answer, admitting that Bryson



GC Exhibit 121

had engaged in the conduct alleged, but denying the legal conclusion that such activity constituted protected concerted activity.

4.   Since testimony opened on May 3, 2021 and based on the evidence presented to date, Respondent acknowledges that the CAGC has presented evidence that the conduct alleged in paragraph 5 of the Amended Complaint constitutes protected concerted activity by Bryson. Therefore, Respondent moves to amend paragraph 5 of its Second Amended Answer to fully admit the allegations of that paragraph.  A draft of Respondent's Third Amended Answer, containing the amended paragraph 5, is attached hereto as Exhibit A.

5.   Good cause exists for granting this Motion.  Respondent and the CAGC share an interest in a timely resolution of this case and admitting to this conduct will streamline the litigation of the case.  *See, e.g., Swing Staging Inc.*, 251 NLRB 563, 564 (1980) (no factual issues remained to be litigated following Respondent's motion to amend its answer during the hearing).  Moreover, given the ALJ's strong indication that the *Burnup & Sims*[1] analysis applies here, presentation of evidence regarding, or protracted litigation over, the issue of protected concerted activity and animus will be unnecessary and unwarranted.

6.   Further, Respondent's Motion is timely and will not cause prejudice to the CAGC. The instant motion comes before the end of both the CAGC's and Respondent's cases in chief. Cf. *Oak Harbor Freight Lines, Inc.*, 358 NLRB 328, 332 n. 2 (2012), reaffd. 361 NLRB 884 (2014) (denying motion to allege an additional affirmative defense that was offered after the case had been fully litigated).

---

[1] *NLRB v. Burnup & Sims*, 379 U.S. 21, 23 (1964) (the Board will find a violation of the Act where "the discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct").



GC Exhibit 121

For the foregoing reasons, Respondent respectfully requests that the ALJ grant its Motion

for Leave to Amend Its Second Amended Answer to the Counsel for the Acting General

Counsel's Amended Complaint.


Date: May 22, 2021                    Respectfully submitted,

                                       */s/ Nicole Buffalano*


                                        Nicole Buffalano
                                        Morgan, Lewis & Bockius LLP
                                        300 South Grand Avenue
                                        Twenty-Second Floor
                                        Los Angeles, CA  90071-3132
                                        Phone: +1.213.612.7443
                                        Fax: +1.213.612.2501
                                        Email: nicole.buffalano@morganlewis.com

                                        Christopher J. Murphy
                                        Morgan, Lewis & Bockius LLP
                                        1701 Market Street
                                        Philadelphia, PA  19103-2921
                                        Phone: +1.215.963.5601
                                        Fax: +1.215.963.5001
                                        Email: christopher.murphy@morganlewis.com

                                        Kelcey J. Phillips
                                        Morgan, Lewis & Bockius LLP
                                        1111 Pennsylvania Avenue, NW
                                        Washington, DC  20004
                                        Phone: +1.202.739.5455
                                        Fax: +1.202.739.3001
                                        Email: kelcey.phillips@morganlewis.com

                                        *Attorneys for Respondent*
                                        *Amazon.com Services LLC*



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Motion was served this 22nd day of

May, 2021 via electronic mail upon the following:


Evamaria Cox
Counsel for the Acting General Counsel
National Labor Relations Board, Region 29
Two Metro Tech Center, Suite 5100
Brooklyn, NY 11201
Evamaria.Cox@nlrb.gov

Frank Kearl
Charging Party's Legal Representative
Make the Road New York
161 Port Richmond Ave.
Staten Island, NY 10302
frank.kearl@maketheroadny.org


*/s/ Kelcey J. Phillips*   Dated: May 22, 2021

Kelcey J. Phillips
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004
Phone: +1.202.739.5455
Fax: +1.202.739.3001
Email: kelcey.phillips@morganlewis.com

*Attorney for Respondent*
*Amazon.com Services LLC*

GC Exhibit 121

# EXHIBIT A



GC Exhibit 121

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 29**

_____
                                         )
AMAZON.COM SERVICES LLC        )
                                         )
              and               )        Case 29-CA-261755
                                         )
GERALD BRYSON                )
     An Individual.            )
_____)

**RESPONDENT'S THIRD AMENDED ANSWER**

Pursuant to Sections 102.20, 102.21, and 102.23 of the National Labor Relations Board's Rules and Regulations, Amazon.com Services LLC ("Respondent," "Amazon" or the "Company"), through its undersigned counsel, files this Amended Answer to the Complaint ("Complaint") according to the Complaint's numbered paragraphs. To the extent that the Complaint's introduction contains allegations and legal conclusions, they are denied.

1.        Respondent is without knowledge as to the allegations in this paragraph of the Complaint.

2.      (a)    Admitted.

         (b)    Admitted.

3.      Admitted.

4.      Admitted.

5.      (a)    Admitted.

         (b)    Admitted.

         (c)    Admitted.

6.      (a)    Admitted.

         (b)    Admitted.

         (c)    Denied.



GC Exhibit 121

7.      Denied.

8.      This paragraph states a legal conclusion for which no answer is required.  To the extent a response is required, the allegations are denied.

9.      This paragraph states a legal conclusion for which no answer is required.  To the extent a response is required, the allegations are denied.

Any and all remaining allegations contained in the Complaint are denied.


## SEPARATE DEFENSES

Respondent asserts the following separate defenses to the Complaint without conceding that it bears the burden of proof as to any of them:

1.      The Complaint fails to state a claim upon which relief can be granted.

2.      Respondent has been denied due process of law.

3.      The position of the Agency and the issuance of Complaint are not substantially justified.

4.      The Complaint is barred inasmuch as the Charging Party failed to properly serve the charge on the Respondent as required by Section 102.14(a) of the Board's Rules and Regulations.

5.      Some or all of the allegations of the Complaint are barred in whole or in part because such allegations were not within the scope of the allegations made in any underlying unfair labor practice charge(s).

6.      Some or all of the allegations of the Complaint are barred in whole or in part by the applicable limitations period under Section 10(b) of the National Labor Relations Act.

7.      The Acting General Counsel has no authority to prosecute the Complaint based on the premature and improper removal of General Counsel Peter Robb on January 20, 2021.

2

GC Exhibit 121

Pursuant to Section 3(d) of the Act, the General Counsel is appointed "for a term of four years" and has the "final authority . . . in respect of the prosecution of such complaints before the Board." General Counsel Peter Robb's improper removal and replacement, before his four-year term ended on or about November 15, 2021, renders prosecution of the Complaint *ultra vires*.

WHEREFORE, Respondent Amazon.com Services LLC requests that the Complaint and Notice of Hearing be dismissed, with prejudice.

Date: May 22, 2021                              Respectfully submitted,

                                               */s/ Nicole Buffalano*

                                                Nicole Buffalano
                                                Morgan, Lewis & Bockius LLP
                                                300 South Grand Avenue
                                                Twenty-Second Floor
                                                Los Angeles, CA  90071-3132
                                                Phone: +1.213.612.7443
                                                Fax: +1.213.612.2501
                                                Email: nicole.buffalano@morganlewis.com

                                                Christopher J. Murphy
                                                Morgan, Lewis & Bockius LLP
                                                1701 Market Street
                                                Philadelphia, PA  19103-2921
                                                Phone: +1.215.963.5601
                                                Fax: +1.215.963.5001
                                                Email: christopher.murphy@morganlewis.com

                                                Kelcey J. Phillips
                                                Morgan, Lewis & Bockius LLP
                                                1111 Pennsylvania Avenue, NW
                                                Washington, DC  20004
                                                Phone: +1.202.739.5455
                                                Fax: +1.202.739.3001
                                                Email: kelcey.phillips@morganlewis.com

                                                *Attorneys for Respondent*
                                                *Amazon.com Services LLC*



GC Exhibit 121

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Second Amended Answer was served

this 22nd day of May, 2021 via electronic mail upon the following:

Evamaria Cox
Counsel for the Acting General Counsel
National Labor Relations Board, Region 29
Two Metro Tech Center, Suite 5100
Brooklyn, NY 11201
Evamaria.Cox@nlrb.gov

Frank Kearl
Charging Party's Legal Representative
Make the Road New York
161 Port Richmond Ave.
Staten Island, NY 10302
frank.kearl@maketheroadny.org

*/s/ Kelcey J. Phillips*   Dated: May 22, 2021

Kelcey J. Phillips
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004
Phone: +1.202.739.5455
Fax: +1.202.739.3001
Email: kelcey.phillips@morganlewis.com

*Attorney for Respondent*
*Amazon.com Services LLC*

EXHIBIT F


GC Exhibit 121

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**DIVISION OF JUDGES**
**NEW YORK BRANCH OFFICE**

**AMAZON.COM SERVICES LLC**

      **and**                                                **Case   29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**

<u>**ORDER ON COUNSEL FOR THE ACTING GENERAL COUNSEL'S**</u>
<u>**MOTION TO CONSOLIDATE CASES FOR HEARING**</u>

        On May 17, 2021,[1] Counsel for the Acting General Counsel (CAGC) filed a motion to consolidate cases 29-CA-261755 and 19-CA-266977 for hearing.[2]  In the alternative, should the motion be denied, the CACG requests that the Seattle case be set for hearing before me seriatum with the New York case.  The Respondent opposes the motion to consolidate and, for reasons stated below, I will deny it.[3]

        The complaint in the New York case alleges that the Respondent violated Section 8(a)(1) of the National Labor Relations Act (the Act) by unlawfully suspending and discharging Charging Party Gerald Bryson because of his protected concerted activities (i.e., protesting the Respondent's failure to provide greater COVID-19 safety protections to employees).  Bryson was suspended with pay on April 10, 2020 and discharged on April 17, 2020.

        The New York case has been tried before me by Zoom video conference on April 12, 19, 26, May 3, 4, 5, 10, 11, 13, 14, and 17.  The General Counsel has called eight witnesses who testified from April 26 to May 11, but has refused to close its case in chief because certain subpoenaed documents are still outstanding.  Nevertheless, the Respondent proceeded with its defense and has called two witnesses who testified from May 13 to May 17.

---

[1]  All dates herein refer to 2021, unless stated otherwise.

[2]  Case 29-CA-261755 is referred to herein as the New York case and case 19-CA-266977 is referred to herein as the Seattle case.

[3]  The presiding judge in one case does not have authority to assign himself the trial in a different unconsolidated case and I cannot act upon the CAGC's request that the Seattle case be set for hearing before me.  Further, as noted below, the two cases do not appear to involve overlapping credibility disputes and the assignment of a New York judge to hear a Seattle case, given the different time zones, appears problematic.



GC Exhibit 121

The undisputed evidence in the New York case has established that Bryson was among a group of employees who protested outside the Respondent's Staten Island, New York fulfillment center on April 6, 2020 and demanded that the facility be temporarily closed due to COVID-19 safety concerns.  The record contains a video clip in which Bryson, while protesting and speaking through a megaphone, can be heard stating, "shut it down."  An employee onlooker responded by stating, "Ain't gonna shut it down.  It's the only fucking job open so appreciate it."  (R. Exh. 122)  Bryson and the employee onlooker proceeded to engage in a verbal altercation which lasted over 3 minutes.  The Respondent admits that its understanding of this altercation was a reason for its suspension and discharge of Bryson.

As reflected in the record, I have discussed with the parties the possibility that the applicable standard for determining whether Bryson's suspension and discharge were unlawful is the standard set forth in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964).  The *Burnup & Sims* standard applies to an employer's perception of employee "misconduct arising out of a protected activity . . . ."  379 U.S. at 23.  Since the misconduct arises in the course of protected activity, the General Counsel's burden of proof does not require an independent showing of anti-union animus or otherwise "depend on the existence of anti-union bias."  Id.

On May 14, the Regional Director of Region 19 issued a complaint alleging that the Respondent violated Section 8(a)(1) of the Act by, on April 10, 2020, discharging Maren Costa and Emily Cunningham because of their protected concerted activities in support of fulfillment center employees throughout the United States, and specifically in support of the Respondent's employees' protected concerted efforts to persuade the Respondent to provide greater COVID-19 safety protections in their warehouses during the outbreak on the COVID-19 pandemic.  The complaint further alleges that, by discharging Costa and Cunningham, the Respondent enforced its facially neutral External Communications and Solicitation policies selectively and disparately in order to restrict employees from engaging in protected concerted activities.

On May 17, the CAGC filed the instant motion to consolidate cases for hearing and therein contended as follows:

The protected concerted activity in both cases involves a nationwide campaign by Respondent's employees to secure safer working conditions for Amazon's warehouse employees, regardless of location.  Respondent's response to these activities on both coasts was taken within the same week and in the same matter, with bi-coast suspension/discharges on April 10 and 17, 2020.

The CAGC further contends that, "given that the protected concerted activity on behalf of the warehouse workers is the same, relitigation would be necessary, and a far longer delay, with the potential for inconsistent rulings, would result if consolidation is not granted."

2



Citing *Jefferson Chemical, Inc.*, 200 NLRB 992, fn. 3 (1993) and *Payton Packing Co.*, 129 NLRB 1358, 1360 (19861), the CAGC notes that the Board generally disfavors piecemeal litigation.  However, the CAGC also cites cases in which the General Counsel was not barred from separately trying a new complaint that would delay the disposition of marginally related allegations in an existing complaint that was already being litigated. *Frontier Hotel and Casino*, 324 NLRB 1225 (1997); *Harrison Steel Castings. Co.*, 255 NLRB 1426, 1426-1427 (1981).  Here, as discussed below, the Seattle case does not appear to be significantly interrelated with the New York case and consolidation would delay disposition of the latter.  Further, the Respondent opposes the instant motion to consolidate and has not stated any intention to raise a defense to the Seattle case on the basis of *Jefferson Chemical* and *Payton Packing.*

In support of its motion, the CAGC also cites *DHSC, LLC*, 364 NLRB No. 66 (2016), in which the Board rejected the special appeal of a judge's denial of a General Counsel motion to consolidate.  The Board noted in *DHSC* that it "generally favors the consolidation of closely related allegations concerning the same parties where practicable," but recognized that other factors may render consolidation inappropriate.  Id.  Those factors include the "relationship between the current and new allegations, the likelihood of delay if consolidation is granted, the risk that matters litigated would have to be relitigated in a second proceeding, and the potential for conserving resources if the cases were consolidated."  Id.  In rejecting the General Counsel's appeal, the Board found reasonable the judge's determination that the cases "were not sufficiently intertwined" and "could be effectively litigated separately" without the delay that consolidation would cause.  Id.  The same conclusion is appropriate here.

Upon my review of the instant motion, I questioned Regional counsel regarding the relationship between the two cases.  It is my understanding that the New York and Seattle cases have little in the way interrelated facts.  The alleged discriminatees may have engaged in similar protected concerted activity and been discharged in the same time period.  However, the evidence will not apparently show that the alleged discriminatees acted in concert with each other or that the Respondent made a single decision to collectively discharge all three employees.  Perhaps more importantly, Regional counsel did not anticipate that the events of one case will have any impact upon the resolution of credibility disputes in the other (which, if so, would require the same judge to hear both matters).  Rather, it appears that the two cases could be tried independently of each other and will not require any significant duplication in the litigation of common facts.[4]

---

[4]  Even if the Board ultimately determines that the facts and findings in one case are relevant to the other case, it would not be precluding from relying on the same simply because the cases are not formally consolidated.  See e.g., *RAV Truck & Trailer Repairs, Inc.*, 36 NLRB No. 36, fn. 2 (2020).  In *RAV Truck & Trailer Repairs, Inc.*, the Board relied for its findings of an unlawful plant closure on the unfair labor practices in a related but unconsolidated case, *Concrete Express of NY, LLC*, 02-CA-220381 et al. (Feb. 28, 2020) (unpublished auto-adopt).  Upon appeal of the Board's decision in *RAV Truck & Trailer Repairs, Inc.*, the D.C. Circuit Court of Appeals remanded the case to the Board for a more detailed explanation of this finding.  *RAV Truck & Trailer Repairs, Inc. v. NLRB*, 2021 WL 1878170, at *9 (D.C. Cir. May 11, 2021).  However, the circuit court did not state that the Board abused its discretion by relying on its findings in *Concrete Express of NY* to support its decision in *RAV Truck & Trailer Repairs, Inc.*



GC Exhibit 121

Indeed, the legal framework of the New York case may render irrelevant any events in Seattle.  Regional counsel represented that the Seattle discharges may establish anti-union animus relevant to the New York discharge.  However, a strong argument can be made that the New York discharge must be analyzed under *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964) and that standard requires no independent showing of animus.

In addition to being unnecessary, consolidation of the two cases is not practical.  The trial of the New York case has already proceeded for 11 days on the record and is nearly complete.  The defendant has already begun putting on its defense and has done so without the benefit of and ability to prepare for the Seattle complaint.  Finally, the prospect of trying a case by Zoom video conference with a judge on one coast and the parties on the other, given the different time zones, poses logistical challenges which have not been addressed by the CAGC.

In light of the foregoing, I find that the proposed consolidation is not appropriate, and it is HEREBY ORDERED that the Respondent's motion to consolidate cases for hearing is denied.

.                               Dated:       May 19, 2021
                                             New York, New York

                                             *S/ Benjamin W. Green*
                                             _____
                                             Benjamin W. Green
                                             Administrative Law Judge

Served by email as follows:

Zainab N. Ahmad, Esq. (Zahmad@gibsondunn.com)

Nicole A. Buffalano, Esq. (nicole.buffalano@morganlewis.com)

Evamaria Cox, Esq. (Evamaria.Cox@nlrb.gov)

Elizabeth H. DeVleming, Esq. (Elizabeth.DeVleming@nlrb.gov)

David Gaston, Esq. (David.Gaston@nlrb.gov)

Matthew Jackson, Esq. (Matthew.Jackson@nlrb.gov)

Frank Kearl, Esq. (frank.kearl@maketheroadny.org)

Christopher J. Murphy, Esq. (christopher.murphy@morganlewis.com)

Kelcey J. Phillips, Esq. (kelcey.phillips@morganlewis.com)



GC Exhibit 121

Nancy Reibstein, Esq. (Nancy.Reibstein@nlrb.gov)

Richard Rosenblatt, Esq. (richard.rosenblatt@morganlewis.com)

Jennifer Mott Williams, Esq. (jennifer.williams@morganlewis.com)



GC Exhibit 121

# EXHIBIT G

GC Exhibit 121



**UNITED STATES GOVERNMENT**
## NATIONAL LABOR RELATIONS BOARD
REGION 29
Two Metro Tech Center                           Agency Website: www.nlrb.gov
Suite 5100                                      Telephone: (718)330-7713
Brooklyn, NY 11201                              Fax: (718)330-7579

March 1, 2021

<u>**Via Email**</u>
Christopher J. Murphy, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2901

Nicole Buffalano, Esq.
Morgan, Lewis & Bockius, LLP
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071

Kelcey Phillips, Esq.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave., NW,
Washington, DC 20004

Re:     Amazon.com Services LLC (Case No.: 29-CA-261755)

Dear Mr. Murphy, Ms. Buffalano, and Ms. Phillips:

Enclosed please find a *subpoena duces tecum* for records relevant to the above-referenced matter which has been served in connection with a trial scheduled for March 29, 2021. Enclosed you will also find a *subpoena ad testificandum* for the testimony of the Custodian of the Records. In the interest of expediting the trial of the case and avoiding unnecessary delay, I suggest that, prior to March 29, 2021, we agree to discuss, at some mutually agreeable time, the documents involved.

If this proposal meets with your approval, please call me so that we can agree upon a mutually convenient time to discuss. Should you have any questions regarding the subpoenas, please do not hesitate to contact me.

Very truly yours,

*/s/ Evamaria Cox*

Evamaria Cox, Board Attorney
Direct No.:  718.765.6172
Evamaria.Cox@nlrb.gov

GC Exhibit 121



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD
REGION 29
Two Metro Tech Center                           Agency Website: www.nlrb.gov
Suite 5100                                      Telephone: (718)330-7713
Brooklyn, NY 11201                              Fax: (718)330-7579

March 1, 2021

**<u>Via Regular & UPS mail</u>**
Custodian of Records
Amazon.com Services, LLC
546 Gulf Avenue
Staten Island, NY 10314

Re:     Amazon.com Services LLC (Case No.: 29-CA-261755)

Dear Custodian of the Records:

Enclosed, please find a *subpoena duces tecum* for records relevant to the above-referenced matter and a *subpoena ad testificandum* requiring your appearance before an Administrative Law Judge of the National Labor Relations Board at a Zoom Videoconference hearing on **March 29, 2021 at 9:30 a.m. and consecutive days thereafter**.

Please be aware that failure to attend the Zoom Videoconference hearing could result in the Agency petitioning the United States District Court for enforcement of the subpoena.  Should you have any questions please contact me at the telephone number below.  Thank you for your assistance in this matter.

Very truly yours,

*/s/ Evamaria Cox*

Evamaria Cox, Board Attorney
Direct No.:  718.765.6172
Evamaria.Cox@nlrb.gov

cc:  Christopher J. Murphy, Esq. (via electronic mail)
     Nicole Buffalano, Esq. (via electronic mail)
     Kelcey Phillips, Esq.  (via electronic mail)

GC Exhibit 121

FORM NLRB-32

## SUBPOENA

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To: Custodian of Records
    Amazon.com Services, LLC
    546 Gulf Avenue
    Staten Island, NY 10314

As requested by    Evamaria Cox, Counsel for General Counsel

whose address is    Two Metro Tech Center, Suite 5100, Brooklyn, NY 11201-3838
                    (Street)              (City)        (State)           (ZIP)

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE    an Administrative Law Judge

                                                of the National Labor Relations Board

at    A Zoom Video Hearing

in the City of    Brooklyn, NY

on    Monday, March 29, 2021                            at    9:30 AM         or any adjourned

                        Amazon.com Services LLC
or rescheduled date to testify in    29-CA-261755
                                    (Case Name and Number)

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena. Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing. If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing. Prior to a hearing, the petition to revoke should be filed with the Regional Director; during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing. See Board's Rules and Regulations, 29 C.F.R Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation). Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

A-1-1BUGP0N

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at    Brooklyn, NY

Dated:    March 01, 2021

*Lauren McFerran*

Lauren McFerran, Chairman

**NOTICE TO WITNESS**. Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed. A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.

GC Exhibit 121

FORM NLRB-31

## SUBPOENA DUCES TECUM

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To: Custodian of Records
    Amazon.com Services, LLC
    546 Gulf Avenue
    Staten Island, NY 10314

As requested by    Evamaria Cox, Counsel for General Counsel

whose address is    Two Metro Tech Center, Suite 5100, Brooklyn, NY 11201-3838
                  (Street)           (City)          (State)    (ZIP)

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE    an Administrative Law Judge

of the National Labor Relations Board

at    A Zoom Video Hearing

in the City of    Brooklyn, NY

on    Monday, March 29, 2021      at    9:30 AM      or any adjourned

or rescheduled date to testify in    Amazon.com Services LLC
                                     29-CA-261755
                                     (Case Name and Number)

And you are hereby required to bring with you and produce at said time and place the following books, records, correspondence, and documents:

### SEE ATTACHMENT

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena. Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing. If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing. Prior to a hearing, the petition to revoke should be filed with the Regional Director; during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing. See Board's Rules and Regulations, 29 C.F.R. Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation). Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

**B-1-1BUGMIX**

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at    Brooklyn, NY

Dated:      March 01, 2021

*Lauren McFerran*
Lauren McFerran, Chairman

**NOTICE TO WITNESS**. Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed. A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.



GC Exhibit 121

Re:  Amazon.com Services LLC
    Case No. 29-CA-261755
**Subpoena Number: B-1-1BUGMIX**

<u>**ATTACHMENT**</u>

**DEFINITIONS AND INSTRUCTIONS**

a.   "Document" means any existing printed, typewritten or otherwise recorded material of whatever character, records stored on computer or electronically, records kept on microfiche or written by hand or produced by hand and graphic material, including without limitation, checks, cancelled checks, computer hard drives, discs and/or files and all data contained therein, computer printouts, E-mail communications and records, any marginal or "post-it" or "sticky pad" comments appearing on or with documents, licenses, files, letters, facsimile transmissions, memoranda, telegrams, minutes, notes, contracts, agreements, transcripts, diaries, appointment books, reports, records, payroll records, books, lists, logs, worksheets, ledgers, summaries of records of telephone conversations, summaries of records of personal conversations, interviews, meetings, accountants' or bookkeepers' work papers, records of meetings or conference reports, drafts, work papers, calendars, interoffice communications, financial statements, inventories, news reports, periodicals, press releases, graphs, charts, advertisements, statements, affidavits, photographs, negatives, slides, disks, reels, microfilm, audio or video tapes and any duplicate copies of any such material in the possession of, control of, or available to the subpoenaed party, or any agent, representative or other person acting in cooperation with, in concert with or on behalf of the subpoenaed party.

b.   "Respondent" means Amazon.com Services LLC.

c.   "Respondent's JFK8 Facility" means the fulfillment center located at 546 Gulf Avenue, Staten Island, NY 10314.

d.   "Charging Party" means Gerald Bryson.

e.   "Person" or "persons" means natural persons, corporations, limited liability companies, partnerships, sole proprietorships, associations, organizations, trusts, joint ventures, groups of natural persons or other organizations, or any other kind of entity.

f.   "Period covered by this subpoena" means the period from May 1, 2019 through April 30, 2020 and the subpoena seeks only documents from that period unless another period is specified.  This subpoena request is continuing in character and if additional responsive documents come to your attention after the date of production, such documents must be promptly produced.

g.   Any copies of documents that are different in any way from the original, such as by interlineation, receipt stamp, notation, or indication of copies sent or received, are considered original documents and must be produced separately from the originals.



Re:  **Amazon.com Services LLC**
    Case No. 29-CA-261755

h.  If any document covered by this subpoena contains codes or classifications, all documents explaining or defining the codes or classifications used in the document must also be produced.

i.  Electronically stored information should be produced in the form or forms in which it is ordinarily maintained or in a reasonably usable form or forms. Execution of this subpoena requires a reasonable search of the ESI of all individuals ("custodians") who are most likely to possess information covered by the subpoena.

j.  For all searches of ESI, records should be maintained documenting each "custodian" whose ESI was searched and all hardware and software systems searched.  Records should also include who was responsible for the search and the search methodology used including, but not limited to, search terms and software tools.

k.  All documents produced pursuant to this subpoena should be presented as they are kept in the usual course of business or organized by the subpoena paragraph to which the document or set of documents is responsive.  Labels referring to that subpoena paragraph are to be affixed to each document or set of documents.

l.  This subpoena applies to documents in your possession, custody, or control of Respondent, as well as your present or former agents, attorneys, accountants, advisors, investigators, and any other persons or companies directly or indirectly employed by or connected with you.  You are required to conduct a reasonable and diligent search for all requested records within your possession, custody or control and to affirmatively advise Counsel for the General Counsel if no responsive evidence exists.

m.  If a claim of privilege is made as to any document which is the subject of this subpoena, a claim of privilege must be expressly made and you must describe the nature of the withheld document, communication, or tangible thing in a manner that, without revealing information itself privileged or protected, will enable an assessment of the claim to be made.

n.  As to any documents not produced in compliance with this subpoena on any ground or if any document requested was, through inadvertence or otherwise, destroyed or is no longer in your possession, please state:

      1.  the author;
      2.  the recipient;
      3.  the name of each person to whom the original or a copy was sent;
      4.  the date of the document;
      5.  the subject matter of the document; and
      6.  the circumstances under which the document was destroyed, withheld or is no longer in your possession.



GC Exhibit 121

**Re: Amazon.com Services LLC**
    Case No. 29-CA-261755


o.   This request seeks production of all documents described, including all drafts and
     non-identical or distribution copies.

p.   This request seeks production of responsive documents in their entirety, without
     abbreviation, redaction, deletion or expurgation.

q.   When used in this subpoena, the term "documents regarding" means all documents
     that, in whole or in part, discuss, describe, mention, pertain to, reflect, refer to or
     relate to the subpoenaed item.

r.   Unless otherwise stated, this subpoena does not supersede, revoke or cancel any other
     subpoena(s) previously issued in this proceeding.

Re:  Amazon.com Services LLC
Case No. 29-CA-261755

# DOCUMENTS TO BE PRODUCED

1.  Organizational charts and other documents showing Respondent's managerial structure, hierarchy or chain of command for the Respondent's JFK 8 Facility during the period covered by this subpoena, including documents that show any changes to the reporting protocols and chain of command.

2.  Job descriptions, job postings, appraisals, and other documents showing the job duties or job authority for the positions held by Tyler Grabowski at any time during the period covered by this subpoena.

3.  Documents showing all wages, benefits, health insurance, pension or retirement plans and other compensation paid to Tyler Grabowski at any time during the period covered by this subpoena.

4.  The complete personnel and employment files (excluding medical records but including documents showing dates of employment, job titles, job duties, dates of job titles, rates of pay, corrective action and discipline) of Tyler Grabowski.

5.  Documents as will show all involvement or participation, including but not limited to recommendations, by **Tyler Grabowski** in the following actions concerning employees at Respondent's JFK8 Facility: (a) hiring; (b) transferring; (c) suspending; (d) laying off; (e) recalling; (f) promoting; (g) discharging; (h) assigning work; (i) rewarding; (j) disciplining; (k) scheduling or granting time off;  (l) assigning overtime; (m) training; (n) directing work; (o) evaluating work; and (p) adjusting grievances.

6.  Documents showing the nature and scope of the duties, responsibilities, and function of the Human Resources Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that Human Resources reviews, investigates, and/or resolves.

7.  Documents that show the work rules, work guidelines and/or terms and conditions of employment pertaining to employee conduct and/or misconduct applicable to non-supervisory and non-managerial associates employed at Respondent's JFK8 facility at any time during the period covered by this subpoena, including documents showing any changes to the rules, the effective dates of any such changes, and a description or statement of the changes.

8.  Documents showing that Respondent distributed to its employees, including Gerald Bryson and Dimitra Evans, and that employees (including Bryson and Evans) received Respondent's work rules, work guidelines and/or terms and conditions of employment, including the dates that such rules and policies were received by Bryson and Evans.

9.  The complete personnel file(s) excluding confidential medical records for:
    (a)   Gerald Bryson



GC Exhibit 121

Re:  Amazon.com Services LLC
        Case No. 29-CA-261755

    (b)   Dimitra Evans

10. Documents memorializing the exact words used by or conduct engaged in by Gerald Bryson on April 6, 2020 which resulted in Respondent issuing the discipline set forth below:
    (a)  Gerald Bryson discharge                April 17, 2020

11. Documents reflecting any disciplinary actions, including discharges, suspensions, memorialization of oral warnings, written warnings, transfers, and demotions, taken against the employees set forth below at any point during their employment with Respondent.
    (a)   Gerald Bryson

    (b)   Dimitra Evans

12. Documents (including but not limited to human resource memorandums, handwritten notes, investigation reports, written personnel statements, written communication with witnesses, communications between Respondent's supervisors and agents) showing investigations conducted by Respondent, including documents showing the identities of those who participated in the investigations, the substance of the investigations, and the investigatory findings, regarding the following employees for their conduct on April 6, 2020:
    (a)   Gerald Bryson

    (b)   Dimitra Evans

13. Those documents, including but not limited to notes memorializing conversations, electronic communication, emails, text messages, videos, photographs, memoranda, digital and/or written recordings of personnel statements, (i) considered by Respondent and (ii) relied upon by Respondent in issuing the discipline set forth below:
    (a) Gerald Bryson suspension             April 10, 2020
    (b) Gerald Bryson discharge              April 17, 2020
    (c) Dimitra Evans written warning        April 17, 2020

14. Documents, including but not limited to memoranda, notes memorializing conversations, electronic communication, emails, text messages and internal communications, by, between and among Respondent's managers, supervisors and agents discussing or pertaining to Respondent's deliberations regarding whether to issue discipline and if so, the type of discipline, to the following employees for their conduct on April 6, 2020:
    (a)   Gerald Bryson

    (b)   Dimitra Evans

15. Such electronic documents (including but not limited to video recordings, social media posts, emails, text messages, audio recordings, and photographs) showing or describing the April 6, 2020 incident underlying the disciplines set forth below, including documents or notes



Re:  **Amazon.com Services LLC**
Case No. 29-CA-261755

reflecting the circumstances and dates under which such recordings, social media posts, emails, text messages, audio recordings, and photographs were accessed, obtained and maintained.

    (a) Gerald Bryson discharge                      April 17, 2020

    (b) Dimitra Evans written warning          April 17, 2020

16. During the period covered by this subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK 8 Facility and at its Regional facilities within which the JFK 8 Facility is located, for violations of the sections named below of Respondent's Standards of Conduct, for cursing, abusive, profane, harassing, or vulgar language, including on-and-off duty examples, together with the personnel file of each disciplined employee showing other discipline to that employee:

    (a)     Category 1

    (b)     Category 2

17. During the period covered by the subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK 8 Facility and at its Regional facilities within which the JFK 8 Facility is located, together with the personnel file of each disciplined employee showing other discipline to that employee.

18. For the period covered by this subpoena, documents showing investigations conducted by Respondent in connection with disciplinary actions issued above in paragraph 17, including documents that reflect the identities of those who participated in the investigation, the substance of the investigation, and the investigatory findings.

19. For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:

    (a) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings;

    (b) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;

    (c) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns; and

GC Exhibit 121

**Re:  Amazon.com Services LLC**
    Case No. 29-CA-261755

(d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.



# EXHIBIT H

GC Exhibit 121



April 13, 2021

**<u>Via Email</u>**
Christopher J. Murphy, Esq.
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103

Nicole Buffalano, Esq.
Morgan, Lewis & Bockius LLP
300 South Grand Ave., 22nd Fl.
Los Angeles, CA 90071

Kelcey Phillips, Esq.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave. NW
Washington D.C. 20004

Re: Amazon.com Services LLC (Case No. 29-CA-261755)

Dear Mr. Murphy, Ms. Buffalano, and Ms. Phillips:

Enclosed find a subpoena *duces tecum* for records and information relevant to NLRB case no.
29-CA-261755.  If you have any questions, please contact me by phone or email.

Sincerely,

Frank Kearl, Esq.

Staff Attorney
Make the Road NY
frank.kearl@maketheroadny.org
(929) 265-7692

**BROOKLYN**
301 GROVE STREET
BROOKLYN, NY 11237
718 418 7690

**QUEENS**
92-10 ROOSEVELT AVENUE
JACKSON HEIGHTS, NY 11372
718 565 8500

**STATEN ISLAND**
161 PORT RICHMOND AVENUE
STATEN ISLAND, NY 10302
718 727 1222

**LONG ISLAND**
1090 SUFFOLK AVENUE
BRENTWOOD, NY 11717
631 231 2220

**WESTCHESTER**
46 WALLER AVENUE
WHITE PLAINS, NY 10605
914 948 8466

**WWW.MAKETHEROADNY.ORG**

GC Exhibit 121



April 13, 2021

**<u>Via Email and Registered Mail</u>**
Custodian of Records
Amazon.com Services LLC
546 Gulf Ave.
Staten Island, NY 10314

Re: Amazon.com Services LLC (Case No. 29-CA-261755)

Dear Custodian of Records:

Enclosed find a subpoena *duces tecum* for records and information relevant to NLRB case no.
29-CA-261755. If you have any questions, please contact me by phone or email.

Sincerely,

Frank Kearl, Esq.

Staff Attorney
Make the Road NY
frank.kearl@maketheroadny.org
(929) 265-7692

cc:    Christopher J. Murphy, Esq. (via email)
       Nicole Buffalano, Esq. (via email)
       Kelcey Phillips, Esq. (via email)

**BROOKLYN**
301 GROVE STREET
BROOKLYN, NY 11237
718 418 7690

**QUEENS**
92-10 ROOSEVELT AVENUE
JACKSON HEIGHTS, NY 11372
718 565 8500

**STATEN ISLAND**
161 PORT RICHMOND AVENUE
STATEN ISLAND, NY 10302
718 727 1222

**LONG ISLAND**
1090 SUFFOLK AVENUE
BRENTWOOD, NY 11717
631 231 2220

**WESTCHESTER**
46 WALLER AVENUE
WHITE PLAINS, NY 10605
914 948 8466

**WWW.MAKETHEROADNY.ORG**

FORM NLRB-31



## SUBPOENA DUCES TECUM

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To     Custodian of Records, Amazon.com Services, LLC, 546 Gulf Ave., Staten Island, NY 10314

As requested by    Frank Kearl, Esq

whose address is     161 Port Richmond Ave., Staten Island, NY 10302

            (Street)            (City)          (State)     (ZIP)

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE    Administrative Law Judge

                                                              of the National Labor Relations Board

at    Zoom Video Hearing

in the City of    Brooklyn, NY

on    Monday, May 3, 2021                at    10:00 a.m.    or any adjourned

or rescheduled date to testify in    Amazon.com Services LLC
29-CA-261755

                                (Case Name and Number)

And you are hereby required to bring with you and produce at said time and place the following books, records, correspondence, and documents:

### SEE ATTACHMENT

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena.  Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing.  If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing.  Prior to a hearing, the petition to revoke should be filed with the Regional Director; during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing.  See Board's Rules and Regulations, 29 C.F.R Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation).  Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

**B-1-1C9GVF7**

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at   Brooklyn, NY

Dated:     April 13, 2021



*Lauren McFerran*

**Lauren McFerran, Chairman**

**NOTICE TO WITNESS**. Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed.  A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*  The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  The NLRB will further explain these uses upon request.  Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.

GC Exhibit 121

Case 29-CA-261755

B-1-1C9GVF7

**RETURN OF SERVICE**

I certify that, being a person over 18 years of age, I duly served a copy of this subpoena

☐ by person
☒ by certified mail
☐ by registered mail
☐ by telegraph
(Check method used.) ☐ by leaving copy at principal office or place of business at

_____

_____

on the named person on

APRIL 13, 2021
(Month, day, and year)

FRANK KEARL
(Name of person making service)

COUNSEL FOR CHARGING PARTY
(Official title, if any)

**CERTIFICATION OF SERVICE**

I certify that named person was in attendance as a witness at

1130 BEDFORD AVE., BROOKLYN, NY 11216

on APRIL 13, 2021
(Month, day or days, and year)

CAITLIN CRAGGS
(Name of person certifying)

_____
(Official title)



Re:    Amazon.com Services LLC
Case No. 29-CA-261755

Subpoena Number: B-1-1C9GVF7

## <u>ATTACHMENT</u>

## DEFINITIONS AND INSTRUCTIONS

A.    "Document" means any existing printed, typewritten or otherwise recorded material of whatever character, records stored on computer or electronically, records kept on microfiche or written by hand or produced by hand and graphic material, including without limitation, checks, cancelled checks, computer hard drives, discs and/or files and all data contained therein, computer printouts, E-mail communications and records, internal messages on "Chime" or any other text messaging programs, postings and drafts of postings on bulletin boards or digital messaging boards including the Voice of Associates ("VOA") system, any marginal or "post-it" or "sticky pad" comments appearing on or with documents, licenses, files, letters, facsimile transmissions, memoranda, telegrams, minutes, notes, contracts, agreements, transcripts, diaries, appointment books, reports, records, payroll records, books, lists, logs, worksheets, ledgers, summaries of records or telephone conversations, summaries of records of personal conversations, interviews, meetings, accountants' or bookkeepers' work papers, records of meetings or conference reports, drafts, work papers, calendars, interoffice communications, financial statements, inventories, news reports, periodicals, press releases, graphs, charts, advertisements, statements, affidavits, photographs, negatives, slides, disks, reels, microfilm, audio or video tapes and any duplicate copies of any such material in the possession of, control of, or available to the subpoenaed party, or any agent, representative or other person acting on cooperation with, in concert with or on behalf of the subpoenaed party.

B.    "Respondent" means Amazon.com Services LLC.

C.    "Respondent's JFK8 Facility" means Respondent's fulfillment center located at 546 Gulf Avenue, Staten Island, NY 10314.

D.    "Charging Parting" means Gerald Bryson.

E.    "Person" or "persons" means natural persons, corporations, limited liability companies, partnerships, sole proprietorships, associations, organizations, trusts, joint ventures, groups of natural persons or other organizations, or any other kind of entity.

F.    "Period covered by this subpoena" means the period from May 1, 2019 through April 30, 2020 and the subpoena seeks only documents from that period unless another period is specified. This subpoena request is continuing in character and if additional responsive documents come to your attention after the date of production, such documents must be promptly produced.

G.    "Policy" or "Policies" means each rule, procedure, or directive, formal or informal, and each common understanding or course of conduct which was recognized as such by Respondent's present or former officers, agents, employees or other Persons acting or purporting to act on Respondent's behalf, which was in effect at any time during the period



Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

covered by this subpoena and which includes any change of Policy. Policies expressly include any manual, guideline, rule, work instruction, or similar Document reflecting Respondent's Policies.

H.      Any copies of documents that are different in any way from the original, such as by interlineation, receipt stamp, notation, or indication of copies sent or received, are considered original documents and must be produced separately from the originals.

I.      If any document covered by this subpoena contains codes or classifications, all documents explaining or defining the codes or classifications used in the document must also be produced.

J.      Electronically stored information ("ESI") should be produced in the form or forms in which it is ordinarily maintained or in a reasonably usable form or forms (such as text-searchable PDF documents). Execution of this subpoena requires a reasonable search of the ESI of all individuals ("custodians") who are most likely to possess information covered by this subpoena.

K.      For all searches of ESI, records should be maintained documenting each custodian whose ESI was searched and all hardware and software systems searched. Records should also include who was responsible for the search and the search methodology used including, but not limited to, search terms and software tools.

L.      All documents produced pursuant to this subpoena should be presented as they are kept in the usual course of business or organized by the subpoena paragraph to which the document or set of documents is responsive. Labels referring to that subpoena paragraph are to be affixed to each document or set of documents.

M.      This subpoena applies to documents in your possession, custody, or control of Respondent, as well as your present or former agents, attorneys, accountants, advisors, investigators, and any other persons or companies directly or indirectly employed by or connected with you. You are required to conduct a reasonable and diligent search for all requested records within your possession, custody or control and to affirmatively advise Counsel for Charging Party if no responsive evidence exists.

N.      If a claim of privilege is made as to any document which is the subject of this subpoena, a claim of privilege must be expressly made and you must describe the nature of the withheld document, communication, or tangible thing in a manner that, without revealing information itself privileged or protected, will enable an assessment of the claim to be made.

O.      As to any documents not produced in compliance with this subpoena on any ground or if any document requested was, through inadvertence or otherwise, destroyed or is no longer in your possession, please state:

        a.      the author;
        b.      the recipient;
        c.      the name of each person to whom the original or copy was sent;

- 2 -



Re:    Amazon.com Services LLC
       Case No. 29-CA-261755

      d.   the date of the document;

      e.   the subject matter of the document; and

      f.   the circumstances under which the document was destroyed, withheld, or is no longer in your possession.

P.   This request seeks production of all documents described, including all drafts and non-identical or distribution copies.

Q.   This request seeks production of responsive documents in their entirety, without abbreviation, redaction, deletion, or expurgation.

R.   When used in this subpoena, the term "documents regarding" means all documents that, in whole or part, discuss, describe, mention, pertain to, reflect, refer to, or relate to the subpoenaed item.



Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

## DOCUMENTS TO BE PRODUCED

1. Organizational charts and other documents showing Respondent's managerial structure, hierarchy or chain of command for Respondent's JFK8 Facility during the period covered by this subpoena, including documents that show any changes to the reporting protocols and chain of command.

2. Documents (including but not limited to training materials, manuals, guidelines, cheat sheets, process flow charts, pre-drafted form language, and user support documentation) regarding Policies, procedural standards, and guidelines for Respondent's managers, supervisors, and Human Resources Business Partners related to receiving employee complaints, investigating, reporting, processing, and documenting potential employee misconduct, and taking disciplinary actions including verbal warnings, verbal or written coaching, verbal or written write-ups, suspensions, and/or terminations.

3. For the time period from March 25, 2020 to April 6, 2020, any documents (including but not limited to notes memorializing conversations, electronic communication, Chime messages or calls, emails, text messages, videos, photographs, memoranda, digital and/or written recordings of personnel statements) regarding communication between Respondent's supervisors, managers, Human Resources Business Partners, or agents and Metro One Loss Prevention Services Group and/or any other third-party security services company, detective agency, or intelligence agency contracted by Respondent concerning, reporting on, or anticipating protests outside Respondent's JFK8 Facility.

4. Documents (including but not limited to memorandums, handwritten notes, written personnel statements, and communications between Respondent's managers, supervisors, agents, and Human Resources Business Partners) regarding press requests, media coverage, social media posts, videos, and publicity related to the protest activities that took place at Respondent's JFK8 Facility on March 30, 2020 and April 6, 2020.

5. Documents, including Discrimination/Harassment/Retaliation Complaint forms, submitted to managers, supervisors, or Human Resources Business Partners by any persons alleging discrimination, harassment, or retaliation at Respondent's JFK8 Facility on April 6, 2020.

6. Documents regarding the nature and scope of the duties, responsibilities, and function of the Human Resources Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that Human Resources reviews, investigates, and/or resolves.

7. Documents that show the Policies, work rules, work guidelines and/or terms and conditions of employment pertaining to employee conduct and/or misconduct applicable to non-supervisory and non-managerial associates employed at Respondent's JFK8 Facility at any time during the period covered by this subpoena, including documents showing any changes to the rules, the effective dates of any such changes, and a description or statement of the changes.

8. Documents showing that Respondent distributed to its employees, including Gerald Bryson



Re:   Amazon.com Services LLC
      Case No. 29-CA-261755

and Dimitra Evans, and that employees (including Bryson and Evans) received Respondent's Policies, work rules, work guidelines and/or terms and conditions of employment, including the dates that such rules and policies were received by Bryson and Evans.

9.  The complete personnel file(s) excluding confidential medical records for:

    a.   Gerald Bryson
    b.   Dimitra Evans
    c.   Derrick Palmer
    d.   Christian Smalls

10. Documents memorializing the exact words used by, or conduct engaged in by, Gerald Bryson on April 6, 2020, which resulted in Respondent discharging Gerald Bryson in April 2020.

11. Documents regarding any transfers, promotions, or disciplinary actions including discharges, suspensions, memorialization of oral warnings, written warnings, transfers, and demotions taken against the employees set forth below at any point during their employment with Respondent.

    a.   Gerald Bryson
    b.   Dimitra Evans
    c.   Derrick Palmer
    d.   Christian Smalls

12. Documents (including but not limited to human resource memorandums, handwritten notes, investigation reports, written personnel statements, written communication with witnesses, communications between Respondent's supervisors and agents) regarding investigations conducted by Respondent, including documents showing the identities of those who participated in the investigations, the substance of the investigations, and the investigatory findings, regarding the following employees for their conduct between March 25, 2020 and April 6, 2020:

    a.   Gerald Bryson
    b.   Dimitra Evans
    c.   Derrick Palmer
    d.   Christian Smalls

13. Those documents, including but not limited to notes memorializing conversations, electronic communication, Chime messages or calls, emails, text messages, videos, photographs, memoranda, digital and/or written recordings of personnel statements, (i) considered by Respondent and (ii) relied upon by Respondent in issuing the discipline set forth below:

    a.   Christian Smalls termination on March 30, 2020;
    b.   Gerald Bryson suspension on April 10, 2020;
    c.   Derrick Palmer written warning on April 10, 2020;
    d.   Gerald Bryson discharge on April 17, 2020; and
    e.   Dimitra Evans written warning on April 17, 2020.



GC Exhibit 121

Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

14. Documents, including but not limited to memoranda, notes memorializing conversations, electronic communication, Chime messages or calls, emails, text messages and internal communications, by, between, and among Respondent's managers, supervisors, Human Resources Business Partners, and agents discussing or pertaining to Respondent's deliberations regarding whether to issue discipline, and if so, the type of discipline, to the following employees for their conduct between March 25, 2020 and April 6, 2020:

    a.    Gerald Bryson
    b.    Dimitra Evans
    c.    Derrick Palmer
    d.    Christian Smalls

15. Such electronic documents (including but not limited to video recordings, social media posts, emails, Chime messages or calls, text messages, audio recordings, websites, and photographs) showing or describing the April 6, 2020 incident underlying the disciplinary actions set forth below, including documents or notes reflecting the circumstances and dates under which such recordings, social media posts, emails, text messages, audio recordings, websites, and photographs were accessed, obtained, and maintained.

    a.    Gerald Bryson discharge on April 17, 2020
    b.    Dimitra Evans written warning on April 17, 2020

16. During the period covered by this subpoena, documents showing disciplinary actions, including discharges suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which Respondent's JFK8 Facility is located, for violations of the sections named below of Respondent's Standards of Conduct, for cursing, abusive, profane, harassing, or vulgar language, including on-and-off duty examples, together with the personnel file of each disciplined employee showing other discipline to that employee:

    a.    Category 1
    b.    Category 2

17. During the period covered by the subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which Respondent's JFK8 Facility is located, together with the personnel file of each disciplined employee showing other discipline to that employee.

18. For the period covered by this subpoena, documents showing investigations conducted by Respondent in connection with disciplinary actions issued above in paragraph 17, including documents that reflect the identities of those who participated in the investigation, the substance of the investigation, and the investigatory findings.

19. For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing, or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers, Human Resources Business Partners, or agents on behalf of employees regarding COVID-19 safety precautions including:



Re:   Amazon.com Services LLC
Case No. 29-CA-261755

    a.   Internal communications including but not limited to electronic communications, Chime messages or calls, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's supervisors, and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings;

    b.   Internal communications including but not limited to electronic communications, emails, Chime messages or calls, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding media coverage of Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson protesting;

    c.   Internal communications including but not limited to electronic communications, Chime messages or calls, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson participating in protests outside Respondent's JFK8 Facility regarding COVID-19 safety concerns; and

    d.   Documents mentioning, discussing, or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers and/or employees likely to oppose the protests.

20. Organizational charts and other documents showing Respondent's regional management structure, hierarchy or chain of command for any of Respondent's departments that participate in disciplinary investigations or disciplinary actions (including Human Resources, Operations, Loss Prevention, Learning, and Safety) during the period covered by this subpoena, including documents that show any changes to the reporting protocols and chain of command.

21. Documents regarding the nature and scope of the duties, responsibilities, and function of the Loss Prevention Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that the Loss Prevention Department/Team reviews, investigates, and/or resolves.

22. Documents regarding the nature and scope of the duties, responsibilities, and function of the Operations Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that the Operations Department/Team reviews, investigates, and/or resolves.

23. Documents regarding the nature and scope of the duties, responsibilities, and function of the Safety Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that the Safety Department/Team reviews, investigates, and/or resolves.

24. Documents regarding the nature and scope of the duties, responsibilities, and function of the Learning Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that the Learning Department/Team reviews, investigates, and/or resolves.



GC Exhibit 121

**UNITED STATES POSTAL SERVICE**

**POSTAL MONEY ORDER**

Serial Number: 27415512358
Year, Month, Day: 2021-04-13
Post Office: 103021
U.S. Dollars and Cents: $40.00

Forty Dollars and 00/100 ********************

Amount

Pay to: AMAZON.COM SERVICES LLC     Clerk. 67

Address: 546 GULF AVE.     From: FRANK KEARL, ESQ.

STATEN ISLAND, NY 10314     Address: 161 PORT RICHMOND AVE.

Memo: TO CUSTODIAN OF RECORDS     STATEN ISLAND, NY 10302
RE: CASE NO. 29-CA-261755

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑈000000800 2⑈     274155 12358⑈


GC Exhibit 121

# EXHIBIT I



GC Exhibit 121

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES
NEW YORK BRANCH OFFICE

AMAZON.COM SERVICES LLC

        and                                               Case   29-CA-261755

GERALD BRYSON, AN INDIVIDUAL

ORDER ON TRIAL DATES AND THE RESPONDENT'S
PETITION TO  PARTIALLY REVOKE  COUNSEL FOR
THE ACTING GENERAL COUNSEL'S SUBPOENA DUCE TECUM

        The parties have requested that the trial open as scheduled on March 29,
2021 to trigger the production of subpoenaed documents on a rolling basis and then
be postponed for the taking of testimony to begin on May 3, 2021.  That
arrangement is acceptable and so ordered.

        The Respondent filed a petition to revoke subpoena duces tecum B-1-1BUGMIX,
which Counsel for the Acting General Counsel (CGC) issued on March 1, 2021.  The
subpoena issued "[u]nder the seal of the National Labor Relations Board, and by direction
of the Board," with the signature of Board Chairman Lauren McFerran affixed thereto.  The
Respondent contends in its petition that the Office of the General Counsel has no authority
to prosecute the case after former General Counsel Peter B. Robb was removed from
office by the President of the United States on January 20, 2021 and subsequently
replaced by Acting General Counsel Peter Sung Ohr (AGC).  The Respondent also raises
a number of other objections to the subpoena requests.

        The complaint issued on December 22, 2020 and alleges that the Respondent
violated Section 8(a)(1) of the Act by unlawfully suspending and discharging Gerald
Bryson, an employee at the Respondent's fulfilment center in Staten Island, New York
(JFK8 facility).

**Prosecution after the Removal of Former General Counsel Peter B. Robb**

        I reject the Respondent's petition to the extent it asserts that the case cannot be
prosecuted because the President improperly removed Robb from the position of General
Counsel.  In reaching this conclusion, I do not find it necessary to determine whether Robb
was lawfully or unlawfully removed.  Rather, I find that the complaint properly issued when
Robb was General Counsel and is subject to prosecution by Regional counsel, including
by the use of subpoenas duces tecum.

        Under Section 10(b) of the National Labor Relations Act (Act), the Board, or any
agent or agency designated by the Board, has authority to issue complaints.  Under
Section 3(d) of the Act, the General Counsel has "final authority, on behalf of the Board, in
respect of . . . issuance of complaints . . . and in respect to the prosecution of such
complaints before the Board . . .."  Here, the complaint issued while Robb was still General



GC Exhibit 121

Counsel and neither the Board nor the AGC have sought to dismiss it.  Accordingly, there is no dispute as to who has ultimate authority to issue the instant complaint.  The complaint properly issued under Robb and is valid.

Under Section 11(1) of the Act, the Board has authority, upon application by a party, to issue subpoenas to such party requiring the production of evidence.  As noted above, the subpoena at issue is affixed with the signature of the Chairman of the Board; not the AGC.  In section 102.31(a) of the Board's rules and regulations, Regional Directors, not the General Counsel, are designated as the agents responsible for issuing subpoenas before a hearing opens.  The General Counsel plays no role in this process and the removal of Robb is irrelevant to the validity of the subpoena in question.

The Respondent has not otherwise established that a properly issued complaint cannot be prosecuted or that a properly issued subpoena cannot be used in the course of that prosecution.  As noted above, although the General Counsel may have "final authority . . . in respect to the prosecution of such complaints before the Board," the AGC has not sought to exercise any such authority in this case and there is no such action for the Respondent to contest.  Further, a General Counsel need not be in place to preside over the prosecution of a complaint which issued before the General Counsel left office.  *NLRB v. Gemalo*, 130 F. Supp 500, 501 (S.D.N.Y 1955) (complaint that issued before a General Counsel resigned could be prosecuted by a staff attorney after the General Counsel position became vacant).  Accordingly, there is no reason a valid complaint cannot be processed by Regional staff even if, currently, there is no validly appointed General Counsel.

## Other Objections to the Subpoena Requests

The Respondent asserts certain general objections to all the subpoena requests and certain specific objections to individual subpoena requests.  The CGC has agreed to withdraw request numbers 2 to 6 on the basis of a stipulation among the parties that Tyler Grabowski is a statutory supervisor.  Without waiving its general objections, the Respond has also agreed to produce non-privileged documents responsive to request numbers 9 to 15.  I address the remaining subpoena requests (1, 7-8, 16-19) below.[1]

Initially, I note that the Respondent has objected to the production of privileged documents and is not required to produce such materials.  However, the Respondent must describe specific privileged documents in a privilege log provided to the CGC when the record opens on March 29, 2021 or as soon thereafter as is possible.  The privilege log should comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure.

*Request Number 1*

1. **Organizational charts and other documents showing Respondent's managerial structure, hierarchy or chain of command for the Respondent's JFK8 Facility during the period covered by this subpoena [May 1, 2019 through April 30, 2020], including documents that show any changes to the**

---

[1]  To the extent this order does not specifically reference and address certain objections to the subpoena, those objections are rejected.

GC Exhibit 121

**reporting protocols and chain of command.**

The CGC seeks this information to determine whether management treated Bryson differently than other employees with regard to misconduct and discipline. On that basis, I find that the request relates to a matter in question and is relevant. I also find that the temporal scope of the request is appropriate.

The Respondent nevertheless contends that the production of responsive documents would be unduly burdensome. The burden of establishing that an administrative subpoena is unduly burdensome is on the subpoenaed party and conclusory assertions are not sufficient to meet that burden. *NLRB v. Carolina Food Processors, Inc.*, 81 F.3d 507 (5th Cir. 1996); *NLRB v. Dutch Boy, Inc.*, 98 LRRM 2396, 2399 (W.D. Okla. 1978) aff'd 606 F.2d 929 (10th Cir. 1979). The subpoenaed party must establish with specificity that production of the subpoenaed documents would cause serious disruption. *EEOC v. Maryland Cup Corporation*, 85 F.2d 471, 477 (1986). The fact that compliance with a subpoena may require the production of bulky, voluminous, or numerous documents is insufficient to establish that it is overly burdensome and does not serve as an excuse for noncompliance. *McGarry v. S.E.C.*, 147 F. 2d 389 (10th Cir. 1945); *NLRB v. United Aircraft Corp.*, 200 F. Supp. 48, 51 (D. Conn. 1961), aff'd mem., 300 F. 2d 442 (2nd Cir. 1962).

Here, the Respondent has not met its burden of establishing with particularity that the production of responsive documents would be unduly burdensome. The Respondent indicates that the request would require it to produce every document related to a managerial or supervisory change at JFK8 facility, but does not attempt to provide a ballpark estimate of the number of documents involved or the time/cost it would take to produce them. Further, as discussed by the parties in a conference call, the CGC may find it sufficient for the Respondent to produce, without more, an organizational chart or charts in effect during the relevant period. Accordingly, I deny the Respondent's petition to revoke subpoena request number 1.

### *Request Numbers 7 and 8*

7. **Documents that show the work rules, work guidelines and/or terms and conditions of employment pertaining to employee conduct and/or misconduct applicable to non-supervisory and non-managerial associates employed at Respondent's JFK8 facility at any time during the period covered by this subpoena, including documents showing any changes to the rules, the effective dates of any such changes, and a description or statement of the changes.**

8. **Documents showing that Respondent distributed to its employees, including Gerald Bryson and Dimitra Evans, and that employees (including Bryson and Evans) received Respondent's work rules, work guidelines and/or terms and conditions of employment, including the dates that such rules and policies were received by Bryson and Evans.**

The Respondent asserts that Bryson was discharged for specific misconduct – i.e., making vulgar and derogatory comments towards another employee in violation of Amazon's Standard of Conduct. Thus, without waiving objections, the Respondent has



agreed to "produce the relevant portions from its Owner's Manual and Guide to Employment – January 2019" (i.e., Workplace Harassment and the Standards of Conduct portions of the manual) and documents showing that the manual was distributed to Evans and Bryson.  (Resp. Brf. pp. 8-9)  The CGC seeks the production of the entire manual.

As it appears undisputed that the manual contains relevant standards of conduct, I will order that it be produced in its entirety so the CGC can view those standards in context.  I note that, under Rule 106 of the Federal Rules of Evidence, if a portion of the manual were introduced, an adverse party may require the introduction of any other part that in fairness out to be considered.  In order to determine what portions are subject to introduction pursuant to this rule, the parties should have access to the entire document.

*Requests 16-18*

**16. During the period covered by this subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which the JFK8 Facility is located, for violations of the sections named below of Respondent's Standards of Conduct, for cursing, abusive, profane, harassing, or vulgar language, including on-and-off duty examples, together with the personnel file of each disciplined employee showing other discipline to that employee: (a) Category 1 (b) Category 2.**

**17. During the period covered by the subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which the JFK8 Facility is located, together with the personnel file of each disciplined employee showing other discipline to that employee.**

**18. For the period covered by this subpoena, documents showing investigations conducted by Respondent in connection with disciplinary actions issued above in paragraph 17, including documents that reflect the identities of those who participated in the investigation, the substance of the investigation, and the investigatory findings.**

In its opposition to the petition, the CGC sought to modify these subpoena requests by changing "Regional facilities" to facilities that have "common management" with JFK8. The General Counsel does not know which facilities are under common management with JFK8 and argues that it is the Respondent's obligation to identify those facilities for purposes of complying with these subpoena requests.

During a conference call, the Respondent identified two facilities in Connecticut as those that are JFK8's Regional facilities.[2]  The Respondent further represented that these three facilities have over 35,000 employees.  The Respondent has not identified facilities under common management with JFK8 and objects to the production of responsive

---

[2]  The General Counsel did not accept this representation as accurate.



GC Exhibit 121

documents for facilities other than JFK8.  The Respondent also objects to the production of documents related to employee discipline for conduct that is not analogous to the alleged misconduct which led to the suspension and discharge of Bryson.

I will not grant the petition to the extent it seeks to limit production to documents reflecting the investigation of and discipline for a particular type of misconduct.  The General Counsel is entitled to determine which investigatory and disciplinary records are analogous to those of Bryson and need not rely on the Respondent's determination in this regard.  However, as discussed during the conference call, the parties should consult regarding the possibility of performing word searches that will target the most relevant documents and be less burdensome.

With regard to geographic scope, although the production of personnel records can be ordered for multiple facilities, such documents are most useful as a means of establishing disparate treatment if personnel decisions are made or approved above the local facility level.  See *Savage v. Sara Lee Bakery Group, Inc.*, 2005 WL 8161339 (E.D. Tex. Mar. 30, 2005).  Here, it is not clear to what extent, if at all, disciplinary decisions are made or approved at the regional or national level.  Further, requests for documents from facilities with "common management" are ambiguous.  However, the Respondent has not yet established that the production of documents from JFK8 and its two regional facilities would be excessively burdensome.  Accordingly, I will, for now, limit the geographic scope of these subpoena requests to JFK8 and its two regional facilities as identified by the Respondent.[3]  However, the parties should be prepared to discuss this issue further when the record opens.

**19. For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:**

**(a) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings.**

**(b) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;**

**(c) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's**

---

[3] The CGC may obtain responsive documents from two facilities other than those identified by the Respondent as regional facilities of JFK8, if desired.



GC Exhibit 121

**supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns;**

**and**

**(d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.**

These requests seek documents regarding any protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any, of that conduct. Thus, the requests seek relevant documents. Further, I do not find the requests to be overly broad in temporal scope. However, the Respondent contends that these requests are unduly burdensome and overly broad to the extent they would require a search and review of documents in the possession of over 75,000 supervisors, manager, and agents. As discussed during the conference call, the parties should consult regarding the possibility of performing word searches that will target relevant documents and be less burdensome.

It is hereby ORDERED that the petition to revoke is denied in part and granted in part, as indicated above.

Dated:      March 24, 2021
              New York, New York


                            *S/ Benjamin W. Green*
                  _____
                            Benjamin W. Green
                            Administrative Law Judge

Served by email as follows:

Nicole A. Buffalano, Esq. (nicole.buffalano@morganlewis.com)

Evamaria Cox, Esq. (Evamaria.cox@nlrb.gov)

Matthew Jackson, Esq. (Matthew.Jackson@nlrb.gov)

Frank Kearl, Esq. (frank.kearl@maketheroadny.org)

Christopher J. Murphy, Esq. (christopher.murphy@morganlewis.com)

Kelcey J. Phillips, Esq. (kelcey.phillips@morganlewis.com)



# EXHIBIT J



GC Exhibit 121

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES
NEW YORK BRANCH OFFICE

**AMAZON.COM SERVICES LLC**

       **and**                                     **Case   29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**

**ORDER ON TRIAL DATES AND THE RESPONDENT'S
PETITION TO  PARTIALLY REVOKE  COUNSEL FOR
THE ACTING GENERAL COUNSEL'S SUBPOENA DUCE TECUM**

The parties have requested that the trial open as scheduled on March 29, 2021 to trigger the production of subpoenaed documents on a rolling basis and then be postponed for the taking of testimony to begin on May 3, 2021.  That arrangement is acceptable and so ordered.

The Respondent filed a petition to revoke subpoena duces tecum B-1-1BUGMIX, which Counsel for the Acting General Counsel (CGC) issued on March 1, 2021.  The subpoena issued "[u]nder the seal of the National Labor Relations Board, and by direction of the Board," with the signature of Board Chairman Lauren McFerran affixed thereto.  The Respondent contends in its petition that the Office of the General Counsel has no authority to prosecute the case after former General Counsel Peter B. Robb was removed from office by the President of the United States on January 20, 2021 and subsequently replaced by Acting General Counsel Peter Sung Ohr (AGC).  The Respondent also raises a number of other objections to the subpoena requests.

The complaint issued on December 22, 2020 and alleges that the Respondent violated Section 8(a)(1) of the Act by unlawfully suspending and discharging Gerald Bryson, an employee at the Respondent's fulfilment center in Staten Island, New York (JFK8 facility).

**Prosecution after the Removal of Former General Counsel Peter B. Robb**

I reject the Respondent's petition to the extent it asserts that the case cannot be prosecuted because the President improperly removed Robb from the position of General Counsel.  In reaching this conclusion, I do not find it necessary to determine whether Robb was lawfully or unlawfully removed.  Rather, I find that the complaint properly issued when Robb was General Counsel and is subject to prosecution by Regional counsel, including by the use of subpoenas duces tecum.

Under Section 10(b) of the National Labor Relations Act (Act), the Board, or any agent or agency designated by the Board, has authority to issue complaints.  Under Section 3(d) of the Act, the General Counsel has "final authority, on behalf of the Board, in respect of . . . issuance of complaints . . . and in respect to the prosecution of such complaints before the Board . . .."  Here, the complaint issued while Robb was still General



GC Exhibit 121

Counsel and neither the Board nor the AGC have sought to dismiss it.  Accordingly, there is no dispute as to who has ultimate authority to issue the instant complaint.  The complaint properly issued under Robb and is valid.

Under Section 11(1) of the Act, the Board has authority, upon application by a party, to issue subpoenas to such party requiring the production of evidence.  As noted above, the subpoena at issue is affixed with the signature of the Chairman of the Board; not the AGC.  In section 102.31(a) of the Board's rules and regulations, Regional Directors, not the General Counsel, are designated as the agents responsible for issuing subpoenas before a hearing opens.  The General Counsel plays no role in this process and the removal of Robb is irrelevant to the validity of the subpoena in question.

The Respondent has not otherwise established that a properly issued complaint cannot be prosecuted or that a properly issued subpoena cannot be used in the course of that prosecution.  As noted above, although the General Counsel may have "final authority . . . in respect to the prosecution of such complaints before the Board," the AGC has not sought to exercise any such authority in this case and there is no such action for the Respondent to contest.  Further, a General Counsel need not be in place to preside over the prosecution of a complaint which issued before the General Counsel left office.  *NLRB v. Gemalo*, 130 F. Supp 500, 501 (S.D.N.Y 1955) (complaint that issued before a General Counsel resigned could be prosecuted by a staff attorney after the General Counsel position became vacant).  Accordingly, there is no reason a valid complaint cannot be processed by Regional staff even if, currently, there is no validly appointed General Counsel.

**Other Objections to the Subpoena Requests**

The Respondent asserts certain general objections to all the subpoena requests and certain specific objections to individual subpoena requests.  The CGC has agreed to withdraw request numbers 2 to 6 on the basis of a stipulation among the parties that Tyler Grabowski is a statutory supervisor.  Without waiving its general objections, the Respond has also agreed to produce non-privileged documents responsive to request numbers 9 to 15.  I address the remaining subpoena requests (1, 7-8, 16-19) below.[1]

Initially, I note that the Respondent has objected to the production of privileged documents and is not required to produce such materials.  However, the Respondent must describe specific privileged documents in a privilege log provided to the CGC when the record opens on March 29, 2021 or as soon thereafter as is possible.  The privilege log should comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure.

*Request Number 1*

1. **Organizational charts and other documents showing Respondent's managerial structure, hierarchy or chain of command for the Respondent's JFK8 Facility during the period covered by this subpoena [May 1, 2019 through April 30, 2020], including documents that show any changes to the**

---

[1]  To the extent this order does not specifically reference and address certain objections to the subpoena, those objections are rejected.



GC Exhibit 121

**reporting protocols and chain of command.**

The CGC seeks this information to determine whether management treated Bryson differently than other employees with regard to misconduct and discipline. On that basis, I find that the request relates to a matter in question and is relevant. I also find that the temporal scope of the request is appropriate.

The Respondent nevertheless contends that the production of responsive documents would be unduly burdensome. The burden of establishing that an administrative subpoena is unduly burdensome is on the subpoenaed party and conclusory assertions are not sufficient to meet that burden. *NLRB v. Carolina Food Processors, Inc.*, 81 F.3d 507 (5th Cir. 1996); *NLRB v. Dutch Boy, Inc.*, 98 LRRM 2396, 2399 (W.D. Okla. 1978) aff'd 606 F.2d 929 (10th Cir. 1979). The subpoenaed party must establish with specificity that production of the subpoenaed documents would cause serious disruption. *EEOC v. Maryland Cup Corporation*, 85 F.2d 471, 477 (1986). The fact that compliance with a subpoena may require the production of bulky, voluminous, or numerous documents is insufficient to establish that it is overly burdensome and does not serve as an excuse for noncompliance. *McGarry v. S.E.C.*, 147 F. 2d 389 (10th Cir. 1945); *NLRB v. United Aircraft Corp.*, 200 F. Supp. 48, 51 (D. Conn. 1961), aff'd mem., 300 F. 2d 442 (2nd Cir. 1962).

Here, the Respondent has not met its burden of establishing with particularity that the production of responsive documents would be unduly burdensome. The Respondent indicates that the request would require it to produce every document related to a managerial or supervisory change at JFK8 facility, but does not attempt to provide a ballpark estimate of the number of documents involved or the time/cost it would take to produce them. Further, as discussed by the parties in a conference call, the CGC may find it sufficient for the Respondent to produce, without more, an organizational chart or charts in effect during the relevant period. Accordingly, I deny the Respondent's petition to revoke subpoena request number 1.

*Request Numbers 7 and 8*

7. **Documents that show the work rules, work guidelines and/or terms and conditions of employment pertaining to employee conduct and/or misconduct applicable to non-supervisory and non-managerial associates employed at Respondent's JFK8 facility at any time during the period covered by this subpoena, including documents showing any changes to the rules, the effective dates of any such changes, and a description or statement of the changes.**

8. **Documents showing that Respondent distributed to its employees, including Gerald Bryson and Dimitra Evans, and that employees (including Bryson and Evans) received Respondent's work rules, work guidelines and/or terms and conditions of employment, including the dates that such rules and policies were received by Bryson and Evans.**

The Respondent asserts that Bryson was discharged for specific misconduct – i.e., making vulgar and derogatory comments towards another employee in violation of Amazon's Standard of Conduct. Thus, without waiving objections, the Respondent has



agreed to "produce the relevant portions from its Owner's Manual and Guide to Employment – January 2019" (i.e., Workplace Harassment and the Standards of Conduct portions of the manual) and documents showing that the manual was distributed to Evans and Bryson.  (Resp. Brf. pp. 8-9)  The CGC seeks the production of the entire manual.

As it appears undisputed that the manual contains relevant standards of conduct, I will order that it be produced in its entirety so the CGC can view those standards in context.  I note that, under Rule 106 of the Federal Rules of Evidence, if a portion of the manual were introduced, an adverse party may require the introduction of any other part that in fairness out to be considered.  In order to determine what portions are subject to introduction pursuant to this rule, the parties should have access to the entire document.

*Requests 16-18*

**16. During the period covered by this subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which the JFK8 Facility is located, for violations of the sections named below of Respondent's Standards of Conduct, for cursing, abusive, profane, harassing, or vulgar language, including on-and-off duty examples, together with the personnel file of each disciplined employee showing other discipline to that employee: (a) Category 1 (b) Category 2.**

**17. During the period covered by the subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which the JFK8 Facility is located, together with the personnel file of each disciplined employee showing other discipline to that employee.**

**18. For the period covered by this subpoena, documents showing investigations conducted by Respondent in connection with disciplinary actions issued above in paragraph 17, including documents that reflect the identities of those who participated in the investigation, the substance of the investigation, and the investigatory findings.**

In its opposition to the petition, the CGC sought to modify these subpoena requests by changing "Regional facilities" to facilities that have "common management" with JFK8.  The General Counsel does not know which facilities are under common management with JFK8 and argues that it is the Respondent's obligation to identify those facilities for purposes of complying with these subpoena requests.

During a conference call, the Respondent identified two facilities in Connecticut as those that are JFK8's Regional facilities.[2]  The Respondent further represented that these three facilities have over 35,000 employees.  The Respondent has not identified facilities under common management with JFK8 and objects to the production of responsive

---

[2]  The General Counsel did not accept this representation as accurate.

4



documents for facilities other than JFK8.  The Respondent also objects to the production of documents related to employee discipline for conduct that is not analogous to the alleged misconduct which led to the suspension and discharge of Bryson.

I will not grant the petition to the extent it seeks to limit production to documents reflecting the investigation of and discipline for a particular type of misconduct.  The General Counsel is entitled to determine which investigatory and disciplinary records are analogous to those of Bryson and need not rely on the Respondent's determination in this regard.  However, as discussed during the conference call, the parties should consult regarding the possibility of performing word searches that will target the most relevant documents and be less burdensome.

With regard to geographic scope, although the production of personnel records can be ordered for multiple facilities, such documents are most useful as a means of establishing disparate treatment if personnel decisions are made or approved above the local facility level.  See *Savage v. Sara Lee Bakery Group, Inc.*, 2005 WL 8161339 (E.D. Tex. Mar. 30, 2005).  Here, it is not clear to what extent, if at all, disciplinary decisions are made or approved at the regional or national level.  Further, requests for documents from facilities with "common management" are ambiguous.  However, the Respondent has not yet established that the production of documents from JFK8 and its two regional facilities would be excessively burdensome.  Accordingly, I will, for now, limit the geographic scope of these subpoena requests to JFK8 and its two regional facilities as identified by the Respondent.[3]  However, the parties should be prepared to discuss this issue further when the record opens.

19. **For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:**

(a) **Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings.**

(b) **Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;**

(c) **Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's**

---

[3] The CGC may obtain responsive documents from two facilities other than those identified by the Respondent as regional facilities of JFK8, if desired.


GC Exhibit 121

**supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns;**

**and**

**(d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.**

These requests seek documents regarding any protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any, of that conduct.  Thus, the requests seek relevant documents.  Further, I do not find the requests to be overly broad in temporal scope.  However, the Respondent contends that these requests are unduly burdensome and overly broad to the extent they would require a search and review of documents in the possession of over 75,000 supervisors, manager, and agents.  As discussed during the conference call, the parties should consult regarding the possibility of performing word searches that will target relevant documents and be less burdensome.

It is hereby ORDERED that the petition to revoke is denied in part and granted in part, as indicated above.

Dated:          March 24, 2021
New York, New York

*S/ Benjamin W. Green*
_____
Benjamin W. Green
Administrative Law Judge

Served by email as follows:

Nicole A. Buffalano, Esq. (nicole.buffalano@morganlewis.com)

Evamaria Cox, Esq. (Evamaria.cox@nlrb.gov)

Matthew Jackson, Esq. (Matthew.Jackson@nlrb.gov)

Frank Kearl, Esq. (frank.kearl@maketheroadny.org)

Christopher J. Murphy, Esq. (christopher.murphy@morganlewis.com)

Kelcey J. Phillips, Esq. (kelcey.phillips@morganlewis.com)

# EXHIBIT K



GC Exhibit 121

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 29**

AMAZON.COM SERVICES LLC,              )
                                                        )
                        and                          )              Case 29-CA-261755
                                                        )
GERALD BRYSON, an Individual.     )


<u>**RESPONDENT'S PETITION TO REVOKE**</u>
<u>**CHARGING PARTY'S SECOND TRIAL SUBPOENA IN ITS ENTIRETY OR IN PART**</u>

Pursuant to Section 11(1) of the National Labor Relations Act and Section 102.31(b) of

the Rules and Regulations of the National Labor Relations Board ("NLRB" or "Board"),

Amazon.com Services LLC ("Respondent," "Amazon" or the "Company"), through its

undersigned counsel, petitions to revoke the *subpoena duces tecum* (B-1-1C9GVF7) (the

"Subpoena") served by Frank Kearl—Staff Attorney at Make the Road NY, and counsel for

Gerald Bryson ("Bryson" or the "Charging Party")—upon counsel for Amazon on April 13,

2021.  A copy of the subpoena, and related documents, is attached as <u>**Exhibit 1**</u>.  For the

following reasons, Amazon respectfully requests that the Administrative Law Judge ("ALJ")

grant this Petition to Revoke ("Petition").

<u>**INTRODUCTION**</u>

This Petition is submitted following the Regional Director of Region 29 of the NLRB's

issuance on December 22, 2020 of a Complaint and Notice of Hearing (the "Complaint").  The

subpoena underlying this petition was received via email by counsel for Amazon on Tuesday,

March 30, 2021. This Petition is timely filed within five business days after the date of service of

the subpoena, as required by Section 102.31(b) of the Board's Rules and Regulations.

1



GC Exhibit 121

In Part I of this Petition, Amazon establishes that the subpoena must, respectfully, be revoked in whole or part for the reasons stated in its Petition to Revoke the Charging Party's first subpoena (B-1-1C4SK15).  To preserve the arguments raised in that Petition and in the interest of brevity and avoiding repetition, rather than reproducing the arguments already well expressed in that Petition, Amazon instead incorporates by reference Sections II—V of its Petition to Revoke the Charging Party's first subpoena.[1]

In Part II, Amazon establishes that Subpoena requests 5, 9, 11-14 and 19(b) and (c) specifically should be revoked because those requests relate to claims and legal theories not alleged in the Amended Complaint or even within the Board's jurisdiction, for use by the Charging Party and/or his counsel in various other litigation proceedings initiated against Amazon.

In Part III, Amazon explores further the Charging Party and/or his counsel's ulterior motive to exploit the subpoena power of the Board, by seeking the production of documents not relevant to the limited claim at issue here, or for use in these proceedings, but rather for use in unrelated, non-Board litigation matters adverse to Amazon, in which counsel for the Charging Party concurrently represents adverse litigants.

In Part IV, Amazon argues that in the event that any part of the Charging Party's subpoena is enforced, notwithstanding the range of legal and jurisdictional arguments against enforcement, the document production and use of any produced responsive documents must be governed by an appropriate Protective Order, requiring that any produced documents (i) must be limited to use in these proceedings, (ii) must not be disclosed to any person other than the Charging Party or his counsel unless they are entered into the trial record of this case, and (iii)

---

[1] This Petition to Revoke was e-filed with the Board on April 6, 2021.



must, at the conclusion of the trial, be returned to Amazon or destroyed (with proof of such

destruction, via certification or otherwise).

## <u>ARGUMENT</u>

**I.**     **<u>The Subpoena Should Be Revoked in Whole Or Part For The Reasons Stated In</u>**
**<u>Respondent's Petition To Revoke The Charging Party's First Subpoena.</u>**

The ALJ has said that Respondent should not expect him to revoke subpoena

requests that he did not revoke in connection with the litigation over the appropriateness of

the CAGC's two subpoenas (B-1-1BUGMIX and A-1-1BUGP0N).  *See* E-mail from

Administrative Law Judge Benjamin W. Green to Parties (Apr. 14, 2021) ("To the extent

CP subpoena B-1-1C9GVF7 seeks the same documents as GC subpoena B-1-1BUGMIX,

we can reasonably anticipate that those documents will not be revoked and the Respondent

should be prepared to produce them to both the GC and the Charging Party.").  Given the

ALJ's apparent prejudgment of those issues, and in an effort to avoid repetition and

duplication, Amazon incorporates by reference its various objections to the production of

documents requested in both the CAGC and Charging Party subpoenas.

**II.**     **<u>The Subpoena Should Be Revoked In Part Because The Charging Party Seeks</u>**
**<u>Information Regarding Individuals Or Legal Theories Not Encompassed By</u>**
**<u>The Amended Complaint.</u>**

Subpoena paragraphs 5, 9, 11-14 and 19(b) and (c) are each improper and

immaterial to the issues of this case. Accordingly, production of those documents is not

appropriate.

Paragraph 5 of the subpoena seeks the production of "Discrimination/Harassment/

Retaliation Complaint Forms."  Yet, there is no complaint allegation relating to the filing or

processing of any such form.  Rather, the Amended Complaint alleges only that Amazon

discharged a single discriminatee in violation of Section 8(a)(1).  As such, none of the

GC Exhibit 121

requested forms is relevant here, and by seeking to compel their production, the Charging

Party is, by extension, impermissibly seeking to expand the scope of this matter well

beyond the confines of the complaint allegations.[2]

Paragraphs 9, 11-14 and 19(b) and (c) seek information regarding individuals not

named in the Amended Complaint and on whose behalf Counsel for the Acting General

Counsel ("CAGC") has not alleged a violation of the Act.  Paragraphs 9 and 11-14 seek

information relating to Christian Smalls and Derrick Palmer, while paragraph 19(b) and (c)

seeks information on behalf of Messrs. Smalls and Palmer and Jordan Flowers.

Accordingly, production is not required.

Context reinforces these conclusions.  Indeed, despite serving a comprehensive

subpoena on Amazon several weeks ago, the CAGC did not seek the production of documents

relating to Messrs. Smalls, Palmer or Flowers.  Nor did she seek documents relating to

---

[2] Section 102.31(b) of the Board's Rules and Regulations states, in relevant part, the following:

> The Administrative Law Judge or the Board, as the case may be, ***will revoke the subpoena if in their opinion the evidence whose production is required does not relate to any matter under investigation or in question in the proceedings*** or the subpoena does not describe with sufficient particularity the evidence whose production is required, or if for any other reason sufficient in law the subpoena is otherwise invalid.

29 C.F.R. § 102.31(b) (emphasis added). To be enforced, a subpoena must be "for a legitimate purpose, the inquiry in question must be reasonably related to the purpose, and the demand for information must not be overly broad, indefinite or otherwise unreasonable." *NLRB v. U.S. Postal Serv.*, 790 F. Supp. 31, 34 (D.D.C. 1992); *see also Drukker Commc'ns, Inc. v. NLRB*, 700 F.2d 727, 730 (D.C. Cir. 1983) ("Although the statute explicitly permits the quashing of subpoenas only for irrelevance or lack of particularity, it does not explicitly exclude other grounds . . . ."). The Board's own Casehandling Manual advises that subpoenas should be "drafted as narrowly and specifically as is practicable." NLRB Casehandling Manual, Part 1, § 11776.

The Board's law is clear that is the General Counsel, not the Charging party, controls the theory of the case. *Zurn/N.E.P.C.O.*, 329 NLRB 484, 484 (1999).("[I]t is well established that the General Counsel's theory of the case is controlling, and that a charging party cannot enlarge upon or change the General Counsel's theory."); *Kimtruss Corp.*, 305 NLRB 710, 711 (1991) ("It is settled that a charging party cannot enlarge upon or change the General Counsel's theory."); *Roadway Express, Inc*, 355 NLRB 197, 201 n.16 (2010) ("The General Counsel controls the theory of the case, which the charging party is powerless to enlarge upon or otherwise change.") *enforced*, 427 F. App'x 838 (11th Cir. 2011) (per curiam); *In re Raley's*, 337 NLRB 719 (2002). ("It is well established that the General Counsel's theory of the case is controlling, and that a charging party cannot enlarge upon or change that theory.")



GC Exhibit 121

potential discrimination claims under other federal or state laws not at issue here, or otherwise within the Board's jurisdiction.

Last night at 7:07 pm and with the hearing fast approaching, the CAGC submitted another expansive subpoena request, pursuing, for the first time, production of documents related to Messrs. Smalls and Palmer. The CAGC's abrupt assertion that these documents are sufficiently relevant to require production does not make them so. Evidently, until yesterday, having already submitted a comprehensive subpoena request that was litigated extensively by the parties, the CAGC likewise did not consider any of the documents sought by the Charging Party here to be at all relevant to its case.

The charge in this case was filed almost 10 months ago. Only the Charging Party's name appeared on the charge, and in it, he alleged only violations of the Act occurring on or about April 10, 2020 and April 17, 2020. After a six-month investigation, the original Complaint issued on December 22, 2020, with no mention of Messrs. Smalls, Palmer or Flowers, or potential discrimination claims under other federal or state laws. Three months later, on March 23, 2021, the CAGC gave notice of her intention to amend the original Complaint to add allegations related to the Charging Party's activities on March 25, 2020 and March 30, 2020. Again, there was no mention of those individuals or matters about which the Charging Party seeks document production here, in a belated and improper effort to go outside of the scope of the complaint allegations and inject those individuals and matters into this case. During the parties' extended conference calls with the ALJ and on the record at the opening of the hearing of March 29, 2021 and again on April 19, 2021, the CAGC again made no mention of requiring the documents sought through the Charging Party's subpoena. Clearly, these documents are irrelevant and immaterial to the factual or legal predicates of the CAGC's case.



As such, the identified subpoena paragraphs must, respectfully, be quashed.  To conclude otherwise would be to allow the Charging Party to exploit the Board's subpoena power in order to mine for documents that might be relevant to concurrent litigation pending in other forums, over allegations and claims that are not only not at issue here, but not within the Board's jurisdiction.

    None of the Charging Party's prior filed responses to Amazon's objections to his first subpoena carry any water here.  Initially, the Charging Party concedes, as he must, that "this case concerns the suspension and termination of a single worker," Charging Party's Opp. to Respondent's Petition to Revoke, Apr. 13, 2021, pg. 6, and that the Board's subpoena power extends only to "matter[s] under investigation or in question."  29 U.S.C. § 161(1).  Nevertheless, he proceeds to suggest that the requested documents ought to be ordered produced by the ALJ, yet cites only to cases examining the scope of the EEOC's subpoena power.

    The Charging Party's conclusory assertion that "Respondent's response to the protected Section 7 actions of Flowers, Palmer, and Smalls could help illuminate the General Counsel's allegations in the Amended Complaint" is not overcome by his admission that "this case concerns the suspension and termination of a single worker," such that nothing else is under investigation or in question here.  Therefore, the information requested in paragraphs 9, 11-14 and 19(b) and (c) is at best smoke and mirrors not at all factually or legally relevant to the Charging Party's termination.  At worst, it is an obvious and transparent attempt to abuse the Board's subpoena procedure in order to collect documents that might be relevant to pending claims elsewhere.  Accordingly, requests for information relating to Flowers, Palmer, and Smalls should be denied, as they are not, by the Charging Party's own indirect admission, under investigation or in question here.


GC Exhibit 121

The Charging Party's plain attempt to use the subpoena process as a discovery tool for use in legal and administrative proceedings pending elsewhere against Amazon is not made permissible by the Charging Party's assertion that the requested documents may circumstantially establish Amazon's animus toward the Charging Party.  This is a red herring.  Anti-union animus cannot be inferred from the implication of allegations of animus or hostility in cases where no unfair labor practice charges have been filed, or where claims have been filed in other forums asserting claims under non-Board law.  Nor is it reason to allow and invite expansion of the scope of the matter beyond the narrow allegations in the Complaint.

III.   **The Subpoena Should Be Revoked In Part Because The Charging Party Seeks Information For Use In Non-Board Matters Adverse to Amazon.**

Messrs. Smalls and Palmer both have federal court lawsuits pending against Amazon. *Christian Smalls, on his own behalf and on behalf of class of similarly situated African American and Latina/o workers vs. Amazon.com Services, LLC*, Case No. 1:20-cv-5492-RPK-RLM (E.D.N.Y.); *Derrick Palmer, Kendia Mesidor, Benita Rouse, Alexander Rouse, Barbara Chandler, Luis Pellot-Chandler and Deasahni Bernard v. Amazon.com, Inc. and Amazon.com Services LLC*, Case No. 1:20-cv-2468-BMC (E.D.N.Y.).  Mr. Flowers has filed a charge of discrimination with the US EEOC.

Given the nature of their separate and unrelated claims against Amazon, and the fact that the documents sought here do not at all relate to CAGC claims in the Amended Complaint, the only reasonable conclusion to reach is that the Charging Party is seeking production of the documents for ulterior use in pursuit of claims elsewhere.  Of course, Amazon should not be subjected to improper "back door" discovery processes, whereby the Board's subpoena power is exploited to obtain information not relevant to any claim pending



GC Exhibit 121

before the ALJ.  As such, paragraphs 9, 11-14 and 19(b), (c)); (b) of the Charging Party's

subpoena should be revoked.

**IV.**   **Enforcement Of Any Part Of The Subpoena Must Be Conditioned On The Entry Of An Appropriate Protective Order.**

To the extent that the subpoena is enforced in part or whole notwithstanding that the

requested documents are immaterial to the limited issues alleged in the Complaint, the document

production and use of any produced responsive documents must be governed by an appropriate

Protective Order, requiring that any produced documents must be disclosed only to the Charging

Party and his counsel, limited to use in these proceedings, and these proceedings only.

Otherwise, unless entered into the trial record of this case, any produced documents must not be

disclosed to any other person.  Further, at the conclusion of the trial, any produced documents by

Amazon must be returned to Amazon or destroyed (with proof of such destruction, via

certification or otherwise).

None of the Charging Party's arguments against entry of a reasonable Protective Order,

which would not at all undermine the Charging Party's ability to use any produced responsive

documents in the context of these proceedings, have merit.  It would, of course, preclude the

Charging Party from using those documents in proceedings elsewhere.  In that regard, the

Charging Party's objection to the requested Protective Order is a signal of his and his counsel's

intentions.  If the Charging Party had no plans to use or disclose any documents or information

produced here for any purpose other than use in these proceedings, there are otherwise no

legitimate, case-specific arguments against entry of that Order.  Unsurprisingly, the Charging

Party has offered none.

Instead, in an effort to distract from the issue core to the request for a protective order,

Amazon's concerns about document misuse, the Charging Party offers bare legal citations and



conclusory assertions.  Nevertheless, Amazon's concerns about document misuse are well-steeped in Board and court precedent.  Indeed, courts have found good cause to issue protective orders in similar contexts to warrant ordering one here to prevent the Charging Party from improperly using a Board trial subpoena to obtain documents for use in unrelated, non-Board cases.  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978) ("In deciding whether a request comes within the discovery rules, a court is not required to blind itself to the purpose for which a party seeks information. Thus, when the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied."); *Midland-Ross Corp. v. United Steelworkers of America*, 83 F.R.D. 426, 427 (W.D. Pa. 1979) ("[T]he court may deny discovery requests if the . . . information is sought for use in a different proceeding or context . . . .").

Here, Amazon's concerns about document misuse are reinforced by the Charging Party's objection to the requested Protective Order, which will not at all jeopardize or compromise its ability to use produced responsive documents in these proceedings.  The only specific concern expressed in the Charging Party's response to Amazon's initial Petition to Revoke is that "any protective order should not be so broad as to prevent counsel for the Charging Party from disclosing information to discriminatee Bryson."  Charging Party's Opp., pg. 14.  Yet Amazon is requesting no such limitation.  Instead, the requested Protective Order, which would apply both to counsel for the Charging Party and the Charging Party, would prohibit use of produced responsive documents in unrelated, non-Board cases, disclosure of those materials to any other person and require destruction of any produced documents at the conclusion of these proceedings.  Nothing more.



## **CONCLUSION**

For the foregoing reasons, Amazon respectfully requests that the Charging Party

subpoena be revoked as set forth above.

Date: April 20, 2021                           Respectfully submitted,

*/s/ Christopher J. Murphy*
Christopher J. Murphy
Senior Attorney
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Phone: +1.215.963.5601
Fax: +1.215.963.5001
christopher.murphy@morganlewis.com

*Attorney for Respondent*
*Amazon.com Services LLC*



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of Respondent Amazon's Petition To Revoke

Charging Party's Trial Subpoena In Its Entirety Or In Part was served on April 20, 2021 via

electronic mail upon the following:

Frank Kearl, Esq.<br>
Staff Attorney<br>
Make the Road New York<br>
161 Port Richmond Ave.<br>
Staten Island, NY 10302<br>
frank.kearl@maketheroadny.org

Date: April 20, 2021

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips
Associate
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: +1.202.739.5455
Fax: +1.202.739.3001
kelcey.phillips@morganlewis.com

*Attorney for Respondent*
*Amazon.com Services LLC*

GC Exhibit 121

# EXHIBIT 1

GC Exhibit 121



April 13, 2021

**<u>Via Email</u>**
Christopher J. Murphy, Esq.
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103

Nicole Buffalano, Esq.
Morgan, Lewis & Bockius LLP
300 South Grand Ave., 22nd Fl.
Los Angeles, CA 90071

Kelcey Phillips, Esq.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave. NW
Washington D.C. 20004

Re: Amazon.com Services LLC (Case No. 29-CA-261755)

Dear Mr. Murphy, Ms. Buffalano, and Ms. Phillips:

Enclosed find a subpoena *duces tecum* for records and information relevant to NLRB case no.
29-CA-261755.  If you have any questions, please contact me by phone or email.

Sincerely,

Frank Kearl, Esq.

Staff Attorney
Make the Road NY
frank.kearl@maketheroadny.org
(929) 265-7692

**BROOKLYN**
301 GROVE STREET
BROOKLYN, NY 11237
718 418 7690

**QUEENS**
92-10 ROOSEVELT AVENUE
JACKSON HEIGHTS, NY 11372
718 565 8500

**STATEN ISLAND**
161 PORT RICHMOND AVENUE
STATEN ISLAND, NY 10302
718 727 1222

**LONG ISLAND**
1090 SUFFOLK AVENUE
BRENTWOOD, NY 11717
631 231 2220

**WESTCHESTER**
46 WALLER AVENUE
WHITE PLAINS, NY 10605
914 948 8466

**WWW.MAKETHEROADNY.ORG**

GC Exhibit 121



April 13, 2021

**<u>Via Email and Registered Mail</u>**
Custodian of Records
Amazon.com Services LLC
546 Gulf Ave.
Staten Island, NY 10314

Re: Amazon.com Services LLC (Case No. 29-CA-261755)

Dear Custodian of Records:

Enclosed find a subpoena *duces tecum* for records and information relevant to NLRB case no. 29-CA-261755. If you have any questions, please contact me by phone or email.

Sincerely,

Frank Kearl, Esq.

Staff Attorney
Make the Road NY
frank.kearl@maketheroadny.org
(929) 265-7692

cc:     Christopher J. Murphy, Esq. (via email)
        Nicole Buffalano, Esq. (via email)
        Kelcey Phillips, Esq. (via email)

**BROOKLYN**
301 GROVE STREET
BROOKLYN, NY 11237
718 418 7690

**QUEENS**
92-10 ROOSEVELT AVENUE
JACKSON HEIGHTS, NY 11372
718 565 8500

**STATEN ISLAND**
161 PORT RICHMOND AVENUE
STATEN ISLAND, NY 10302
718 727 1222

**LONG ISLAND**
1090 SUFFOLK AVENUE
BRENTWOOD, NY 11717
631 231 2220

**WESTCHESTER**
46 WALLER AVENUE
WHITE PLAINS, NY 10605
914 948 8466

**WWW.MAKETHEROADNY.ORG**

FORM NLRB-31

## SUBPOENA DUCES TECUM

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To _Custodian of Records, Amazon.com Services, LLC, 546 Gulf Ave., Staten Island, NY 10314_

As requested by _Frank Kearl, Esq_

whose address is _161 Port Richmond Ave., Staten Island, NY 10302_

| (Street) | (City) | (State) | (ZIP) |

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE _Administrative Law Judge_

of the National Labor Relations Board

at _Zoom Video Hearing_

in the City of _Brooklyn, NY_

on _Monday, May 3, 2021_ at _10:00 a.m._ or any adjourned

or rescheduled date to testify in _Amazon.com Services LLC 29-CA-261755_

(Case Name and Number)

And you are hereby required to bring with you and produce at said time and place the following books, records, correspondence, and documents:

### SEE ATTACHMENT

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena. Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing. If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing. Prior to a hearing, the petition to revoke should be filed with the Regional Director; during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing. See Board's Rules and Regulations, 29 C.F.R Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation). Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

**B-1-1C9GVF7**

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at _Brooklyn, NY_

Dated: _April 13, 2021_

_Lauren McFerran_

**Lauren McFerran, Chairman**

**NOTICE TO WITNESS**. Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed. A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.

GC Exhibit 121

Case 29-CA-261755

B-1-1C9GVF7

### RETURN OF SERVICE

I certify that, being a person over 18 years of age, I duly served a copy of this subpoena

☐ by person

☒ by certified mail

☐ by registered mail

☐ by telegraph

(Check method used.)

☐ by leaving copy at principal office or place of business at

_____

_____

_____

on the named person on

APRIL 13, 2021

(Month, day, and year)

FRANK KEARL

(Name of person making service)

COUNSEL FOR CHARGING PARTY

(Official title, if any)

### CERTIFICATION OF SERVICE

I certify that named person was in attendance as a witness at

1130 BEDFORD AVE., BROOKLYN, NY 11216

on APRIL 13, 2021

(Month, day or days, and year)

CAITLIN CRAGGS

(Name of person certifying)

_____

(Official title)



Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

        Subpoena Number: B-1-1C9GVF7

## ATTACHMENT

## DEFINITIONS AND INSTRUCTIONS

A.   "Document" means any existing printed, typewritten or otherwise recorded material of whatever character, records stored on computer or electronically, records kept on microfiche or written by hand or produced by hand and graphic material, including without limitation, checks, cancelled checks, computer hard drives, discs and/or files and all data contained therein, computer printouts, E-mail communications and records, internal messages on "Chime" or any other text messaging programs, postings and drafts of postings on bulletin boards or digital messaging boards including the Voice of Associates ("VOA") system, any marginal or "post-it" or "sticky pad" comments appearing on or with documents, licenses, files, letters, facsimile transmissions, memoranda, telegrams, minutes, notes, contracts, agreements, transcripts, diaries, appointment books, reports, records, payroll records, books, lists, logs, worksheets, ledgers, summaries of records or telephone conversations, summaries of records of personal conversations, interviews, meetings, accountants' or bookkeepers' work papers, records of meetings or conference reports, drafts, work papers, calendars, interoffice communications, financial statements, inventories, news reports, periodicals, press releases, graphs, charts, advertisements, statements, affidavits, photographs, negatives, slides, disks, reels, microfilm, audio or video tapes and any duplicate copies of any such material in the possession of, control of, or available to the subpoenaed party, or any agent, representative or other person acting on cooperation with, in concert with or on behalf of the subpoenaed party.

B.   "Respondent" means Amazon.com Services LLC.

C.    "Respondent's JFK8 Facility" means Respondent's fulfillment center located at 546 Gulf Avenue, Staten Island, NY 10314.

D.   "Charging Parting" means Gerald Bryson.

E.   "Person" or "persons" means natural persons, corporations, limited liability companies, partnerships, sole proprietorships, associations, organizations, trusts, joint ventures, groups of natural persons or other organizations, or any other kind of entity.

F.   "Period covered by this subpoena" means the period from May 1, 2019 through April 30, 2020 and the subpoena seeks only documents from that period unless another period is specified. This subpoena request is continuing in character and if additional responsive documents come to your attention after the date of production, such documents must be promptly produced.

G.   "Policy" or "Policies" means each rule, procedure, or directive, formal or informal, and each common understanding or course of conduct which was recognized as such by Respondent's present or former officers, agents, employees or other Persons acting or purporting to act on Respondent's behalf, which was in effect at any time during the period

- 1 -



Re:    Amazon.com Services LLC
       Case No. 29-CA-261755

covered by this subpoena and which includes any change of Policy. Policies expressly include any manual, guideline, rule, work instruction, or similar Document reflecting Respondent's Policies.

H.   Any copies of documents that are different in any way from the original, such as by interlineation, receipt stamp, notation, or indication of copies sent or received, are considered original documents and must be produced separately from the originals.

I.   If any document covered by this subpoena contains codes or classifications, all documents explaining or defining the codes or classifications used in the document must also be produced.

J.   Electronically stored information ("ESI") should be produced in the form or forms in which it is ordinarily maintained or in a reasonably usable form or forms (such as text-searchable PDF documents). Execution of this subpoena requires a reasonable search of the ESI of all individuals ("custodians") who are most likely to possess information covered by this subpoena.

K.   For all searches of ESI, records should be maintained documenting each custodian whose ESI was searched and all hardware and software systems searched. Records should also include who was responsible for the search and the search methodology used including, but not limited to, search terms and software tools.

L.   All documents produced pursuant to this subpoena should be presented as they are kept in the usual course of business or organized by the subpoena paragraph to which the document or set of documents is responsive. Labels referring to that subpoena paragraph are to be affixed to each document or set of documents.

M.   This subpoena applies to documents in your possession, custody, or control of Respondent, as well as your present or former agents, attorneys, accountants, advisors, investigators, and any other persons or companies directly or indirectly employed by or connected with you. You are required to conduct a reasonable and diligent search for all requested records within your possession, custody or control and to affirmatively advise Counsel for Charging Party if no responsive evidence exists.

N.   If a claim of privilege is made as to any document which is the subject of this subpoena, a claim of privilege must be expressly made and you must describe the nature of the withheld document, communication, or tangible thing in a manner that, without revealing information itself privileged or protected, will enable an assessment of the claim to be made.

O.   As to any documents not produced in compliance with this subpoena on any ground or if any document requested was, through inadvertence or otherwise, destroyed or is no longer in your possession, please state:

     a.   the author;
     b.   the recipient;
     c.   the name of each person to whom the original or copy was sent;



Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

     d.   the date of the document;

     e.   the subject matter of the document; and

     f.   the circumstances under which the document was destroyed, withheld, or is no longer in your possession.

P.    This request seeks production of all documents described, including all drafts and non-identical or distribution copies.

Q.    This request seeks production of responsive documents in their entirety, without abbreviation, redaction, deletion, or expurgation.

R.    When used in this subpoena, the term "documents regarding" means all documents that, in whole or part, discuss, describe, mention, pertain to, reflect, refer to, or relate to the subpoenaed item.

GC Exhibit 121

Re:    Amazon.com Services LLC
       Case No. 29-CA-261755

## DOCUMENTS TO BE PRODUCED

1. Organizational charts and other documents showing Respondent's managerial structure, hierarchy or chain of command for Respondent's JFK8 Facility during the period covered by this subpoena, including documents that show any changes to the reporting protocols and chain of command.

2. Documents (including but not limited to training materials, manuals, guidelines, cheat sheets, process flow charts, pre-drafted form language, and user support documentation) regarding Policies, procedural standards, and guidelines for Respondent's managers, supervisors, and Human Resources Business Partners related to receiving employee complaints, investigating, reporting, processing, and documenting potential employee misconduct, and taking disciplinary actions including verbal warnings, verbal or written coaching, verbal or written write-ups, suspensions, and/or terminations.

3. For the time period from March 25, 2020 to April 6, 2020, any documents (including but not limited to notes memorializing conversations, electronic communication, Chime messages or calls, emails, text messages, videos, photographs, memoranda, digital and/or written recordings of personnel statements) regarding communication between Respondent's supervisors, managers, Human Resources Business Partners, or agents and Metro One Loss Prevention Services Group and/or any other third-party security services company, detective agency, or intelligence agency contracted by Respondent concerning, reporting on, or anticipating protests outside Respondent's JFK8 Facility.

4. Documents (including but not limited to memorandums, handwritten notes, written personnel statements, and communications between Respondent's managers, supervisors, agents, and Human Resources Business Partners) regarding press requests, media coverage, social media posts, videos, and publicity related to the protest activities that took place at Respondent's JFK8 Facility on March 30, 2020 and April 6, 2020.

5. Documents, including Discrimination/Harassment/Retaliation Complaint forms, submitted to managers, supervisors, or Human Resources Business Partners by any persons alleging discrimination, harassment, or retaliation at Respondent's JFK8 Facility on April 6, 2020.

6. Documents regarding the nature and scope of the duties, responsibilities, and function of the Human Resources Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that Human Resources reviews, investigates, and/or resolves.

7. Documents that show the Policies, work rules, work guidelines and/or terms and conditions of employment pertaining to employee conduct and/or misconduct applicable to non-supervisory and non-managerial associates employed at Respondent's JFK8 Facility at any time during the period covered by this subpoena, including documents showing any changes to the rules, the effective dates of any such changes, and a description or statement of the changes.

8. Documents showing that Respondent distributed to its employees, including Gerald Bryson



GC Exhibit 121

Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

and Dimitra Evans, and that employees (including Bryson and Evans) received Respondent's Policies, work rules, work guidelines and/or terms and conditions of employment, including the dates that such rules and policies were received by Bryson and Evans.

9.  The complete personnel file(s) excluding confidential medical records for:

    a.  Gerald Bryson
    b.  Dimitra Evans
    c.  Derrick Palmer
    d.  Christian Smalls

10. Documents memorializing the exact words used by, or conduct engaged in by, Gerald Bryson on April 6, 2020, which resulted in Respondent discharging Gerald Bryson in April 2020.

11. Documents regarding any transfers, promotions, or disciplinary actions including discharges, suspensions, memorialization of oral warnings, written warnings, transfers, and demotions taken against the employees set forth below at any point during their employment with Respondent.

    a.  Gerald Bryson
    b.  Dimitra Evans
    c.  Derrick Palmer
    d.  Christian Smalls

12. Documents (including but not limited to human resource memorandums, handwritten notes, investigation reports, written personnel statements, written communication with witnesses, communications between Respondent's supervisors and agents) regarding investigations conducted by Respondent, including documents showing the identities of those who participated in the investigations, the substance of the investigations, and the investigatory findings, regarding the following employees for their conduct between March 25, 2020 and April 6, 2020:

    a.  Gerald Bryson
    b.  Dimitra Evans
    c.  Derrick Palmer
    d.  Christian Smalls

13. Those documents, including but not limited to notes memorializing conversations, electronic communication, Chime messages or calls, emails, text messages, videos, photographs, memoranda, digital and/or written recordings of personnel statements, (i) considered by Respondent and (ii) relied upon by Respondent in issuing the discipline set forth below:

    a.  Christian Smalls termination on March 30, 2020;
    b.  Gerald Bryson suspension on April 10, 2020;
    c.  Derrick Palmer written warning on April 10, 2020;
    d.  Gerald Bryson discharge on April 17, 2020; and
    e.  Dimitra Evans written warning on April 17, 2020.



Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

14. Documents, including but not limited to memoranda, notes memorializing conversations, electronic communication, Chime messages or calls, emails, text messages and internal communications, by, between, and among Respondent's managers, supervisors, Human Resources Business Partners, and agents discussing or pertaining to Respondent's deliberations regarding whether to issue discipline, and if so, the type of discipline, to the following employees for their conduct between March 25, 2020 and April 6, 2020:

    a.    Gerald Bryson
    b.    Dimitra Evans
    c.    Derrick Palmer
    d.    Christian Smalls

15. Such electronic documents (including but not limited to video recordings, social media posts, emails, Chime messages or calls, text messages, audio recordings, websites, and photographs) showing or describing the April 6, 2020 incident underlying the disciplinary actions set forth below, including documents or notes reflecting the circumstances and dates under which such recordings, social media posts, emails, text messages, audio recordings, websites, and photographs were accessed, obtained, and maintained.

    a.    Gerald Bryson discharge on April 17, 2020
    b.    Dimitra Evans written warning on April 17, 2020

16. During the period covered by this subpoena, documents showing disciplinary actions, including discharges suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which Respondent's JFK8 Facility is located, for violations of the sections named below of Respondent's Standards of Conduct, for cursing, abusive, profane, harassing, or vulgar language, including on-and-off duty examples, together with the personnel file of each disciplined employee showing other discipline to that employee:

    a.    Category 1
    b.    Category 2

17. During the period covered by the subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which Respondent's JFK8 Facility is located, together with the personnel file of each disciplined employee showing other discipline to that employee.

18. For the period covered by this subpoena, documents showing investigations conducted by Respondent in connection with disciplinary actions issued above in paragraph 17, including documents that reflect the identities of those who participated in the investigation, the substance of the investigation, and the investigatory findings.

19. For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing, or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers, Human Resources Business Partners, or agents on behalf of employees regarding COVID-19 safety precautions including:

- 6 -



GC Exhibit 121

Re:    Amazon.com Services LLC
       Case No. 29-CA-261755

   a.  Internal communications including but not limited to electronic communications,
       Chime messages or calls, emails, text messages, notes, meeting minutes, meeting
       handouts, and investigative reports by, between, and among Respondent's
       supervisors, and/or agents regarding Bryson raising COVID-19 safety concerns at
       Respondent management meetings;
   b.  Internal communications including but not limited to electronic communications,
       emails, Chime messages or calls, text messages, notes, meeting minutes, meeting
       handouts, and investigative reports by, between, and among Respondent's
       managers, supervisors, and/or agents regarding media coverage of Christian
       Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson protesting;
   c.  Internal communications including but not limited to electronic communications,
       Chime messages or calls, emails, text messages, notes, meeting minutes, meeting
       handouts, and investigative reports by, between, and among Respondent's
       managers, supervisors, and/or agents regarding Christian Smalls, Derrick Palmer,
       Jordan Flowers, and/or Bryson participating in protests outside Respondent's
       JFK8 Facility regarding COVID-19 safety concerns; and
   d.  Documents mentioning, discussing, or pertaining to employee sentiment
       regarding greater COVID-19 safety precautions, including but not limited to lists
       identifying likely or possible protest supporters or organizers and/or employees
       likely to oppose the protests.

20. Organizational charts and other documents showing Respondent's regional management
    structure, hierarchy or chain of command for any of Respondent's departments that
    participate in disciplinary investigations or disciplinary actions (including Human Resources,
    Operations, Loss Prevention, Learning, and Safety) during the period covered by this
    subpoena, including documents that show any changes to the reporting protocols and chain of
    command.

21. Documents regarding the nature and scope of the duties, responsibilities, and function of the
    Loss Prevention Department/Team, including documents distributed to employees regarding
    the type of concerns, issues, complaints, or reports that the Loss Prevention
    Department/Team reviews, investigates, and/or resolves.

22. Documents regarding the nature and scope of the duties, responsibilities, and function of the
    Operations Department/Team, including documents distributed to employees regarding the
    type of concerns, issues, complaints, or reports that the Operations Department/Team
    reviews, investigates, and/or resolves.

23. Documents regarding the nature and scope of the duties, responsibilities, and function of the
    Safety Department/Team, including documents distributed to employees regarding the type
    of concerns, issues, complaints, or reports that the Safety Department/Team reviews,
    investigates, and/or resolves.

24. Documents regarding the nature and scope of the duties, responsibilities, and function of the
    Learning Department/Team, including documents distributed to employees regarding the
    type of concerns, issues, complaints, or reports that the Learning Department/Team reviews,
    investigates, and/or resolves.

GC Exhibit 121



**POSTAL MONEY ORDER**

Serial Number     Year, Month, Day    Post Office     U.S. Dollars and Cents

27415512358     2021-04-13    103021     **$40.00**

Forty Dollars and 00/100 *************************

Amount

Pay to AMAZON.COM SERVICES LLC     Clerk. 67

Address 546 GULF AVE.     From FRANK KEARL, ESQ.

STATEN ISLAND, NY 10314   Address 161 PORT RICHMOND AVE.

Memo TO CUSTODIAN OF RECORDS         STATEN ISLAND, NY 10302
RE: CASE NO. 29-CA-261755

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑆000000800 2⑆     27415512358⑈

GC Exhibit 121

# EXHIBIT L



GC Exhibit 121

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**DIVISION OF JUDGES**
**NEW YORK BRANCH OFFICE**

**AMAZON.COM SERVICES LLC**

        **and**                                  **Case   29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**

<u>**ORDER ON THE RESPONDENT'S PETITION TO REVOKE**</u>
<u>**CHARGING PARTY'S SUBPOENA DUCE TECUM B-1-1C9GVF7**</u>
<u>**AND REQUEST FOR A PROTECTIVE ORDER**</u>

The Respondent filed a petition to revoke subpoena duces tecum number B-1-1C9GVF7 (Subpoena), which the Charging Party issued to the Respondent's custodian of records on April 13, 2021.[1]  To the extent the Subpoena is not revoked, the Respondent seeks a protective order for any documents which must be produced.

The complaint alleges that the Respondent violated Section 8(a)(1) of the Act by unlawfully suspending and discharging Charging Party Gerald Bryson because of his protected concerted activities (i.e., protesting the Respondent's failure to provide greater COVID-19 safety protections to employees).

**Petition to Revoke**

The Subpoena seeks a number of documents which have already been subpoenaed (subpoena duces tecum number B-1-1BUGMIX) from the Respondent by Counsel for the Acting General Counsel (CGC).  On March 24, I issued an order largely denying the Respondent's petition to revoke subpoena B-1-1BUGMIX.  The instant petition to revoke is denied to the extent the Subpoena seeks documents which were requested by subpoena B-1-1BUGMIX and those requests were not revoked by my March 24 order.

The petition to revoke Subpoena paragraphs 3, 4, and 5 are denied as documents responsive to those paragraphs may include evidence of animus and (for paragraph 5) disparate treatment.

The Respondent objects to Subpoena paragraphs 11-14, and 19(b) and (c) to the extent they concern certain employees who were openly involved in protected concerted activities with Bryson.  The Respondent asserts that these Subpoena requests do not, as required by the Act, relate to any matter under investigation or in question.  Respondent's counsel also contends that production of these documents will be disproportional to the needs of the case as it will lead to extraneous "mini-trials" regarding the Respondent's treatment of employees not listed in the complaint.  The CGC and Charging Party claim

---

[1] All dates herein refer to 2021.



that the government's case will be advanced by evidence that the Respondent administered similar discipline to employees, including Bryson, who engaged in the same protected concerted activities.

Evidence concerning an employer's treatment of an alleged discriminatee in comparison to other employees who concertedly engaged in the same protected activity is relevant. In fact, such evidence may be exculpatory as an employer may defend on the grounds that such nondiscriminatees were known to have engaged in protected concerted activity and, unlike an alleged discriminatee, were subject to no adverse employment action. Of course, the Respondent has indicated no intent to raise such a defense and I share the concern of Respondent's counsel that the scope of this litigation might expand to involve "mini-trials" (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint. However, given the Board's broad discovery-type standard of relevance with regard to subpoena requests and its reluctance to quash requests on the grounds that production is bulky and numerous, I will not revoke paragraphs 11-14, and 19(b) and (c) at this time.

With regard to other individual Subpoena requests, I make the following additional rulings:[2]

Subpoena Paragraph 2 – Paragraph 2 shall be limited to policies, procedural, standards, and guidelines, as further described therein, which applied to the JFK8 facility.

Subpoena Paragraph 11 – Paragraph 11 shall be revoked to the extent it seeks documents regarding any transfers or promotions of the named employees.

Subpoena Paragraph 20 – Paragraph 20 shall be limited to organizational charts and other documents, as further described therein, that cover or include the JFK8 facility.

Subpoena Paragraphs 6, 21-24 – Paragraphs 6, 21-24 shall be limited to documents concerning only those members of the Human Resources Department/Team, Loss Prevention Department/Team, Operations Department/Team, Safety Department/Team, and Learning Department/Team who have responsibilities with regard to the JFK8 facility.

**<u>Protective Order</u>**

A protective order with respect to the disclosure of subpoenaed documents may be entered upon good cause and/or to avoid harm. I will impose a protective order with regard to subpoenaed personnel records (such as employee discipline) of employees other than Bryson. Counsel for the parties may use subpoenaed personnel records in this proceeding, including the disclosure of such documents to potential witnesses and other

---

[2] To the extent certain paragraphs are not mentioned and specifically limited or revoked, the petition to revoke is denied.



GC Exhibit 121

individuals as may be necessary prepare for trial and understand the records.[3]  However, counsel shall not disclose subpoenaed personnel records to other individuals for a different purpose.

It is HEREBY ORDERED that the Respondent's petition to revoke the Subpoena is granted in part and denied in part, as described above, and a protective ordered is entered as described above.

.                          Dated:        April 27, 2021
                                         New York, New York

                                         *S/ Benjamin W. Green*
                          _____
                                         Benjamin W. Green
                                         Administrative Law Judge

Served by email as follows:

Nicole A. Buffalano, Esq. (nicole.buffalano@morganlewis.com)

Evamaria Cox, Esq. (Evamaria.cox@nlrb.gov)

David Gaston, Esq. (David.Gaston@nlrb.gov)

Matthew Jackson, Esq. (Matthew.Jackson@nlrb.gov)

Frank Kearl, Esq. (frank.kearl@maketheroadny.org)

Christopher J. Murphy, Esq. (christopher.murphy@morganlewis.com)

Kelcey J. Phillips, Esq. (kelcey.phillips@morganlewis.com)

---

[3]  The Respondent has objected to the possible use of subpoenaed records in different legal forums and different legal proceedings.  Presumably, the Respondent objects to the disclosure of documents that are relevant and would be useful to a legal adversary.  I do not believe the Respondent has a particularly strong confidentially interest in preventing the disclosure of such documents earlier than they would normally be disclosed during the normal course of those proceedings.  Accordingly, I do not grant this partial protective order on that basis.  Rather, I grant the partial protective order on the fairly self-evident confidentially interest a nonparty employee would have with regard to personnel records such as discipline.



# EXHIBIT M



GC Exhibit 121

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 29**

AMAZON.COM SERVICES LLC      )
                                               )
                                             )
          and                        )         Case 29-CA-261755
                                               )
GERALD BRYSON, and Individual.   )

**RESPONDENT'S COMBINED PETITION TO REVOKE COUNSEL FOR THE
ACTING GENERAL COUNSEL'S SUBPOENA AD TESTIFICANDUM A-1-1CLMM85
AND MOTION FOR RECONSIDERATION OF CERTAIN ORDERS REGARDING
SUBPOENAS DUCES TECUM**

Pursuant to Section 11(1) of the National Labor Relations Act and Section 102.31(b) of

the Rules and Regulations of the National Labor Relations Board ("NLRB" or "Board"),

Amazon.com Services LLC ("Respondent," "Amazon," or the "Company"), through its

undersigned counsel, petitions to revoke subpoena ad testificandum (A-1-1CLMM85) served

by Counsel for the Acting General Counsel of the Board ("CAGC") upon counsel for Amazon

("CAGC's Third Subpoena") on Monday, May 17, 2021. A copy of the subpoena is attached as

Exhibit 1.

In addition, pursuant to Section 102.25 of the Board's Rules and Regulations, Amazon

seeks reconsideration of certain portions of Administrative Law Judge Benjamin Green's

("Judge Green's") March 24, 2021 written order denying Amazon's petition to revoke the

CAGC's subpoena duces tecum (A-1-1BUGMIX) (Exhibit 2); the April 27, 2021 written order

denying Amazon's petition to revoke the Charging Party's subpoena duces tecum (B-1-

1C9GVF7) (Exhibit 3); and the May 1, 2021 verbal order[1] denying Amazon's petition to

---

[1] Transcript, Volume 4, at 269.  (Relevant portions of the trial transcript are attached as Exhibit 4.)


revoke the CAGC's second subpoena tecum (B-1-1CBQM1N) to the extent that the documents

sought therein are relevant to a determination of (1) whether Mr. Bryson was engaged in

protected concerted activity at the time of his misconduct on April 6, 2020; (2) whether the

Respondent knew that Bryson was engaged in protected concerted activities at the time of his

misconduct on April 6, 2020; and/or (3) Respondent's motivation for terminating Mr. Bryson,

including whether Respondent harbored animus toward Bryson's protected concerted activities.

## **INTRODUCTION**

At the outset of this hearing, the parties disputed the precise nature of Gerald Bryson's

actions on March 25, March 30 and April 6, 2020, and specifically, the precise nature of Mr.

Bryson's actions and statements during an April 6 altercation with a female coworker and whether

the altercation occurred in the course of protected concerted activity. The issues in this case have

narrowed significantly since then due, in significant part, to the introduction into evidence of a

Facebook Live video recorded by CAGC witness Mandi Velasco ("the Velasco video") and other

video evidence showing the April 6, 2020 altercation in its near entirety and in all material ways.

*See* R. Exh. 122.  Further, given that the weight of evidence shows that Mr. Bryson was engaged

in protected concerted activities on March 25, March 30 and at the time of the altercation on April

6, 2020, Amazon filed a Motion for Leave to File a Third Amended Answer on Saturday, May 22,

2021, in which Amazon concedes Mr. Bryson engaged in protected concerted activity on those

dates.

The Respondent's concession in this regard and the revelation that Mr. Bryson was

engaged in protected concerted activity at the time of his altercation with Ms. Evans, confirms

Judge Green's conclusions, stated repeatedly in off-the-record discussions during the hearing and,



GC Exhibit 121

most recently, in his May 19, 2021 Order on CAGC's Motion to Consolidate Cases for Hearing,[2] that the *only* legal standard applicable in this case – or any case in which an employer discharges an employee because of misconduct occurring during the course of protected activity – is the standard enunciated in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964). *Wright Line*, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981), "is inapplicable to cases — like this one — in which the employer has discharged the employee because of alleged misconduct in the course of protected activity. S*hamrock Foods Co.*, 337 N.L.R.B. No. 138, at 1 ; *see Cadbury Beverages*, 160 F.3d at 29 n. 4 (rejecting the applicability of *Wright Line* to such cases); *E.W. Grobbel Sons*, 322 N.L.R.B. 304, 304-05 , (1996) (same), *enforcement denied on other grounds*, 6th Cir. 1998)." *Shamrock Foods Co v. NLRB.*, 346 F.3d 1130, 1136 (D.C. Cir. 2003). In a *Burnup & Sims* case, the employer's "motive is not at issue," and the only question is whether the misconduct actually occurred. *Shamrock Foods Co.*, 337 NLRB 915, 915 (2002), enfd. 346 F.3d 1130 (D.C. Cir. 2003); *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 29 (D.C. Cir. 1998) (holding that ''*Burnup & Sims* explicitly obviates the need to inquire into intent'').

As a result of these developments, testimony and documents related to whether Mr. Bryson was engaged in protected activity at the time of his misconduct on April 6, 2020, whether Respondent knew that he was engaged in those activities, and Respondent's motivation for terminating Mr. Bryson, including whether Respondent harbored animus toward him or those activities, are entirely irrelevant to this case and have no utility in determining whether the CAGC can carry its burden to prove that Respondent violated Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §158(a)(1), by terminating Mr. Bryson on April 17, 2020.

---

[2] *See* Administrative Law Judge's Order on Counsel for the Acting General Counsel's Motion to Consolidate Cases for Hearing, at 2, 4 (May 19, 2021) ("Order Denying Motion to Consolidate").



GC Exhibit 121

It is now undisputed that Mr. Bryson engaged in protected concerted activity at the time of his misconduct on April 6, 2020 and that Amazon knew of Mr. Bryson's activity.  The only remaining question is whether the CAGC can prove that Mr. Bryson did not, in fact, engage in misconduct during the altercation, as alleged by Respondent.

As a result, much of the testimony and evidence in the record currently is irrelevant to a determination in this case and the CAGC's Third Subpoena seeks to adduce additional irrelevant testimony.  Similarly, numerous subpoena requests for documents, enforced when the scope of this case was less well defined, have been rendered irrelevant, unnecessary, and moot by subsequent evidence as described herein, and those subpoena requests should be quashed for the same reason.

For these reasons, Respondent Petitions to revoke the CAGC's Third Subpoena and Moves for reconsideration of ALJ Green's orders enforcing various subpoena paragraphs seeking documents related to issues that have been rendered irrelevant, unnecessary, and moot by the development of the record in this case.

## I.      PETITION TO REVOKE THE CAGC'S THIRD SUBPOENA

The subpoena subject to Petition to Revoke was received via email by counsel for Amazon on Monday, May 17, 2021. By their Third Subpoena, the CAGC seeks to compel the testimony of Amazon Human Resources Manager, Christine Hernandez, who held that position at Amazon's JFK8 Fulfillment Center during the time period relevant to this case.

Section 102.31(b) of the Board's Rules and Regulations requires an Administrative Law Judge ("ALJ") to revoke a subpoena where "the evidence whose production is required does not relate to any matter under investigation or in question in the proceedings."  29 C.F.R. § 102.31(b).  A subpoena must be "for a legitimate purpose" and


GC Exhibit 121

"the inquiry in question must be reasonably related to the purpose." *NLRB v. U.S. Postal Serv.*, 790 F. Supp. 31, 34 (D.D.C. 1992); *see also Drukker Commc'ns, Inc. v. NLRB*, 700 F.2d 727, 730 (D.C. Cir. 1983) ("[T]he statute explicitly permits the quashing of subpoenas … for irrelevance."); *NP Red Rock, LLC*, 28-CA-244484, 2020 WL 7075063 (unpub. Or. Dec. 2, 2020) (affirming ALJ's order revoking General Counsel's subpoenas ad testificandum issued to respondent's two corporate executives where the executives' testimony was not needed to establish a prima facie case and its relevance and probative value to rebutting the employer's defenses was speculative).  In addition, the Board will revoke subpoenas that seek "cumulative or duplicative" information.  *See McDonalds USA, LLC*, 363 NLRB No. 144, slip op. at 2 fn. 2 (2016); *Brinks, Inc.*, 281 NLRB 468, 469 (1986) (citing Federal Rules of Civil Procedure 45(b) and 26(b)).

The information sought by the CAGC's Third Subpoena – testimony from Ms. Hernandez – is not relevant to any matter in question in this proceeding or would serve only to duplicate prior testimony.  Although the CAGC has not explained why the government subpoenaed Ms. Hernandez to testify at this proceeding, at best her testimony would relate either to Tyler Grabowski's investigation (as she was his supervisor during the relevant time period), whether Charging Party Gerald Bryson was engaged in protected concerted activity on March 25, March 30 and at the time of his misconduct on April 6, 2020, and/or Respondent's motivation for terminating the Charging Party and whether Respondent harbored animus toward him or his protected activities.

Regarding Respondent's investigation, Mr. Grabowski, not Ms. Hernandez, conducted the investigation, as Mr. Grabowski ably explained during his detailed testimony on Monday, May 17, 2021.  Exhibit 4, at 148-196.  Any testimony Ms. Hernandez could



GC Exhibit 121

provide on this point would be cumulative and duplicative of evidence that is already in the record – including Mr. Grabowski's own testimony.

More importantly, now though, any inquiry into whether Mr. Bryson was engaged in protected activities at the time of his misconduct and whether Respondent was aware of those activities has been rendered moot by Respondent's Motion for Leave to Amend its Second Amended Answer to the Complaint. Any testimony on these issues, therefore, would be irrelevant and would extend an already unnecessarily lengthy trial.

Testimony related to Amazon's motivation for terminating Mr. Bryson, including whether Amazon harbored animus toward his protected activities is similarly irrelevant to the *Burnup & Sims* analysis, the legal analysis applicable in this case. Further, because the Charging Party's misconduct during the April 6 altercation can be analyzed solely on the basis of the Velasco video (R. Exh. 122) and other video evidence in this case, there is no need any fact witness testimony – let alone additional testimony from Ms. Hernandez – related to Respondent's motivation or potential animus toward Mr. Bryson's protected activities.

To the extent that the CAGC intends to adduce evidence of Ms. Hernandez's recollection of the events on April 6, 2020, that evidence is also irrelevant to any issue before Judge Green.  The best evidence of Mr. Bryson's misconduct is the Velasco video, together with other video evidence.  Ms. Hernandez has no first-hand knowledge regarding what happened out in the parking lot on April 6 and there is nothing in the record that suggests she witnessed it.  Nor is there any evidence that she was a decision-maker whose good faith belief matters as to the reasons for Charging Party's termination. As a result, Ms. Hernandez' belief as to what occurred is unnecessary to decide the issues in this case. There



GC Exhibit 121

is, simply, no reason for Ms. Hernandez to be compelled to testify, or for the CAGC to be permitted to subpoena additional witnesses to testify, about matters that are not relevant to the resolution of this case.  It is time to end this single discharge hearing that is unnecessarily continuing into its fourth week.

Ms. Hernandez simply has nothing to add to a record already filled with irrelevant testimony and evidence and Amazon respectfully requests the CAGC's Third Subpoena be revoked in its entirety.

## II.   MOTION FOR RECONSIDERATION OF CERTAIN ORDERS REGARDING SUBPOENAS

For identical reasons, Amazon requests that ALJ Green reconsider his prior rulings on CAGC Subpoena B-1-1BUGMIX Paragraph 19, Charging Party Subpoena  B-1-1C9GVF Paragraphs 19(b) and (c), and CAGC Subpoena B-1-1CBQM1N Paragraph 27 to the extent that those subpoenas sought and Respondent was required to produce documents and information relevant to (i) Mr. Bryson's protected activities, including at the time that he engaged in misconduct on April 6, 2020, (ii) whether Respondent knew of those activities, (iii) Respondent's motivation for Mr. Bryson's termination and (iv) other individuals not named in the Amended Complaint.

All documents produced in response to numerous enforced subpoena requests have been rendered unnecessary and/or irrelevant by the development of the record, particularly the Velasco video and Amazon's concession that Bryson's April 6 altercation with a coworker occurred in the course of otherwise protected concerted activity.

### A.   Identification of Irrelevant and Unnecessary Subpoena Paragraphs

Amazon requests reconsideration of the following subpoena requests and orders:



GC Exhibit 121

CAGC Subpoena B-1-1BUGMIX

19.  For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussion with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:

(a) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings.

(b) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;

(c) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns;

and

(d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.

The ALJ denied Amazon's Petition to Revoke the above subpoena requests by written order dated March 24, 2021.  (Order on Trial Dates and the Respondent's Petition to Partially Revoke Counsel for the Acting General Counsel's Subpoena Duces Tecum, at 5-6 (Mar. 24, 2021) ("March 24 Subpoena Order").)  Specifically, the ALJ ruled that documents responsive to this subpoena request were relevant because they related to "any protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any of that conduct."  *Id.* at 6.



Charging Party Subpoena B-1-1C9GVF7

19. For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing, or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers, Human Resources Business Partners, or agents on behalf of employees regarding COVID-19 safety precautions including:

b. Internal communications including but not limited to electronic communications, emails, Chime messages or calls, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding media coverage of Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson protesting; [and]

c. Internal communications including but not limited to electronic communications, Chime messages or calls, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson participating in protests outside Respondent's JFK8 Facility regarding COVID-19 safety concerns.

The ALJ denied Amazon's Petition to Revoke the above subpoena requests by written order dated April 27, 2021. (Order on the Respondent's Petition to Revoke Charging Party's Subpoena Duces Tecum B-1-1C9GVF7 and Request for a Protective Order, at 1-2 (Apr. 27, 2021) ("April 27 Subpoena Order").) The ALJ found subpoena paragraphs 19(b) and (c) were relevant because they sought evidence concerning Amazon's treatment of other employees who were involved in protected concerted activities with Bryson. *Id.* at 2. In doing so, the ALJ noted he "share[d] the concern of Respondent's counsel that the scope of this litigation might expand to involve 'mini-trials' (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint," but given the Board's "broad discovery-type standard of relevance" for subpoena requests, the ALJ declined to revoke paragraphs 19(b) and (c) "at this time." *Id.*



GC Exhibit 121

CAGC Subpoena B-1-1CBQM1N

27. (a) Documents in effect during the period of April 17, 2020 through May 31, 2020 reflecting and/or mentioning Respondent's policies regarding employees' option to appeal disciplinary actions taken against them by Respondent, including written warnings, suspensions and discharges.

(b) Documents in effect during the period of April 17, 2020 through May 31, 2020 reflecting and/or mentioning the process by which employees may request to appeal disciplinary actions taken against them by Respondent, including written warnings, suspensions and discharges.

The ALJ orally denied Amazon's Petition to Revoke the above subpoena requests on the record on May 1, 2021.  Exhibit 4, at 269.  These documents relate to animus and not to any other issue before Judge Green.

**B.**     **Argument**[3]

First, ALJ Green should revisit his previous ruling and grant Respondent's Petition to Revoke CAGC Subpoena B-1-1BUGMIX paragraph 19 because the basis for the ALJ's prior denial of Amazon's Petition to Revoke – that paragraph 19 sought relevant evidence regarding "protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any of that conduct" – no longer exists, in light of the video evidence in the record and Amazon's

---

[3] Amazon has largely completed its production of documents responsive to all three subpoenas. Amazon currently is only aware of a small set of unproduced documents, none of which bear on any of the relevant *Burnup & Sims* issues. Some of those documents are Chime threads that contain a mix of responsive and non-responsive information.  Amazon is prepared to produce those Chimes, but redacted to reveal only that information that responds to a specific request – as it did previously.  If the CAGC and Charging Party are willing to accept such a production without an *in camera* review, Amazon will produce the small amount of remaining *responsive* information (under Judge Green's prior relevance determination) it has collected even though now irrelevant.  That will render this Motion for Reconsideration moot as there will be nothing else to produce.  If, however, the CAGC and Charging Party seek to pry into what are non-responsive, privileged or private electronic conversations, Amazon seeks the revocation of any and all subpoena requests that seek information regarding whether the Charging Party engaged in PCA on April 6 (conceded) and animus (irrelevant), as identified above.

Case 1:22-cv-01479-DG-SJB   Document 5-9   Filed 03/17/22   Page 335 of 409 PageID #: 4098

GC Exhibit 121

Third Amended Answer, which concedes these allegations.  (Draft Third Amended Answer, para. 5(c).)

Second, ALJ Green should revisit his ruling on Respondent's Petition to Revoke Charging Party Subpoena B-1-1C9GVF7 paragraphs 19(b) and (c) and CAGC Subpoena B-1-1CBQM1N paragraph 27 and revoke those paragraphs in their entireties because they all seek evidence limited to potential animus by Respondent against Charging Party as a result of his protected activities.  Evidence related to employer motivation, including whether the employer harbored animus toward an individual's protected activities, is irrelevant under a *Burnup & Sims* analysis. *See Shamrock Foods Co.*, 337 NLRB at 915 (finding that in a *Burnup & Sims* case "motive is not at issue"); *Cadbury Beverages*, 160 F.3d at 29 (same).  In fact, as ALJ Green noted in denying the CAGC's Motion to Consolidate this case with NLRB Case 19-CA-266977, a case involving the discharge of two entirely separate employees in Seattle, evidence regarding Amazon's treatment of other employees – even to the extent it could theoretically establish anti-union animus – is immaterial to the issues in this case.  *See* Consolidation Order, at 4.[4]

---

[4] Moreover, the CAGC's recent unsuccessful effort to consolidate this case with NLRB Case 19-CA-266977 reveals the real purpose of these subpoena requests was not to obtain information relevant to litigating the narrow issues in this case, but rather to inject unrelated issues and claims involving other employees into this litigation. The ALJ previously expressed concerns regarding the scope of the subpoena requests involving employees other than Mr. Bryson, *see* April 27 Subpoena Order, at 2 (expressing concern that "the scope of this litigation might expand to involve 'mini-trials' (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint"); Exhibit 4, at 229 (addressing subpoena requests for information regarding Christian Smalls and Derrick Palmer and stating "I am loathe to effectively have a trial regarding two additional employees"), but at the time denied Respondent's petitions to revoke based on the Board's broad relevance standard for subpoenas.  However, the current record in this case and CAGC's failed attempt to consolidate this case with NLRB Case 19-CA-266977 confirms Judge Green's concerns about the expansion of this matter were well-founded, and provides additional support for revoking the subpoena requests relating to other employees' alleged protected concerted activities.



## CONCLUSION

For the foregoing reasons, Amazon respectfully requests that CAGC Subpoena A-1-1CLMM85; CAGC Subpoena B-1-1BUGMIX; Charging Party Subpoena B-1-1C9GVF7; and CAGC Subpoena B-1-1CBQM1N be revoked as set forth above.


Date: May 24, 2021                    Respectfully submitted,

                                      */s/ Christopher J. Murphy*
                                      Christopher J. Murphy
                                      Morgan, Lewis & Bockius LLP
                                      1701 Market Street
                                      Philadelphia, PA 19103-2921
                                      Phone: +1.215.963.5601
                                      Fax: +1.215.963.5001
                                      christopher.murphy@morganlewis.com

                                      Nicole Buffalano
                                      Morgan, Lewis & Bockius LLP
                                      300 South Grand Avenue, Twenty Second Floor
                                      Los Angeles, CA 90071-3132
                                      Phone: +1.213.612.7443
                                      Fax: +1.213.612.2500
                                      nicole.buffalano@morganlewis.com

                                      *Attorneys for Respondent*
                                      *Amazon.com Services LLC*


GC Exhibit 121

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of Respondent Amazon's Combined Petition to

Revoke Counsel for the Acting General Counsel's Subpoena Ad Testificandum A-1-

1CLMM85 and Motion for Reconsideration of Certain Orders Regarding Subpoenas Duces

Tecum was served on May 24, 2021 via electronic mail upon the following:

> Evamaria Cox
> Counsel for the Acting General Counsel
> National Labor Relations Board, Region 29
> Two Metro Tech Center, Suite 5100
> Brooklyn, NY 11201
> Evamaria.Cox@nlrb.gov
>
> Frank Kearl
> Charging Party's Legal Representative
> Make the Road New York
> 161 Port Richmond Ave.
> Staten Island, NY 10302
> frank.kearl@maketheroadny.org

Date: May 24, 2021

/s/ Kelcey J. Phillips
Kelcey J. Phillips
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: +1.202.739.5455
Fax: +1.202.739.3001
kelcey.phillips@morganlewis.com

Attorney for Respondent
Amazon.com Services LLC

GC Exhibit 121

# EXHIBIT 1



GC Exhibit 121



UNITED STATES GOVERNMENT
**NATIONAL LABOR RELATIONS BOARD**
REGION 29
Two Metro Tech Center                              Agency Website: www.nlrb.gov
Suite 5100                                         Telephone: (718)330-7713
Brooklyn, NY 11201                                 Fax: (718)330-7579

May 17, 2021

**<u>VIA EMAIL & UPS</u>**
Christine Hernandez, Human Resource Manager
Amazon.com Services, LLC
546 Gulf Avenue
Staten Island, NY 10314

Re:      Amazon.com Services LLC (Case No.: 29-CA-261755)

Dear Ms. Hernandez:

Enclosed, please find a *subpoena ad testificandum* requiring your appearance before an Administrative Law Judge of the National Labor Relations Board at a Zoom Videoconference hearing on **May 24, 2021 at 10:00 a.m. and consecutive days thereafter**.

Please be aware that failure to attend the Zoom Videoconference hearing could result in the Agency petitioning the United States District Court for enforcement of the subpoena.  Should you have any questions please contact me at the telephone number below.  Thank you for your assistance in this matter.

Very truly yours,

*/s/ Evamaria Cox*

Evamaria Cox, Board Attorney
Direct No.:  718.765.6172
Evamaria.Cox@nlrb.gov

cc:  Christopher J. Murphy, Esq. (via electronic mail)
     Nicole Buffalano, Esq. (via electronic mail)
     Kelcey Phillips, Esq.  (via electronic mail)

FORM NLRB-32

GC Exhibit 121

## SUBPOENA

_____

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To    Christine Hernandez, Human Resources Manager
Amazon.com Services, LLC

546 Gulf Avenue               Staten Island, NY 10314

As requested by    Evamaria Cox, Counsel for General Counsel

whose address is    Two Metro Tech Center, Suite 5100, Brooklyn, NY 11201-3838
                      (Street)           (City)     (State)      (ZIP)

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE   an Administrative Law Judge

                                                of the National Labor Relations Board

at   Zoom Video Hearing

in the City of   Brooklyn

on  Monday, May 24, 2021             at   10:00 AM     or any adjourned

or rescheduled date to testify in   Amazon.com Services LLC
                             29-CA-261755
                                 (Case Name and Number)

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena.  Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing.  If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing.  Prior to a hearing, the petition to revoke should be filed with the Regional Director; during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing. See Board's Rules and Regulations, 29 C.F.R Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation).  Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

**A-1-1CLMM85**

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at  Brooklyn, NY

Dated:   May 17, 2021

*Lauren McFerran*
**Lauren McFerran, Chairman**

**NOTICE TO WITNESS**. Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed.  A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*  The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  The NLRB will further explain these uses upon request.  Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.


GC Exhibit 121

EXHIBIT 2



GC Exhibit 121

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES
NEW YORK BRANCH OFFICE

AMAZON.COM SERVICES LLC

        **and**                                        Case   29-CA-261755

GERALD BRYSON, AN INDIVIDUAL

### ORDER ON TRIAL DATES AND THE RESPONDENT'S PETITION TO  PARTIALLY REVOKE  COUNSEL FOR THE ACTING GENERAL COUNSEL'S SUBPOENA DUCE TECUM

        The parties have requested that the trial open as scheduled on March 29, 2021 to trigger the production of subpoenaed documents on a rolling basis and then be postponed for the taking of testimony to begin on May 3, 2021.  That arrangement is acceptable and so ordered.

        The Respondent filed a petition to revoke subpoena duces tecum B-1-1BUGMIX, which Counsel for the Acting General Counsel (CGC) issued on March 1, 2021.  The subpoena issued "[u]nder the seal of the National Labor Relations Board, and by direction of the Board," with the signature of Board Chairman Lauren McFerran affixed thereto.  The Respondent contends in its petition that the Office of the General Counsel has no authority to prosecute the case after former General Counsel Peter B. Robb was removed from office by the President of the United States on January 20, 2021 and subsequently replaced by Acting General Counsel Peter Sung Ohr (AGC).  The Respondent also raises a number of other objections to the subpoena requests.

        The complaint issued on December 22, 2020 and alleges that the Respondent violated Section 8(a)(1) of the Act by unlawfully suspending and discharging Gerald Bryson, an employee at the Respondent's fulfilment center in Staten Island, New York (JFK8 facility).

### Prosecution after the Removal of Former General Counsel Peter B. Robb

        I reject the Respondent's petition to the extent it asserts that the case cannot be prosecuted because the President improperly removed Robb from the position of General Counsel.  In reaching this conclusion, I do not find it necessary to determine whether Robb was lawfully or unlawfully removed.  Rather, I find that the complaint properly issued when Robb was General Counsel and is subject to prosecution by Regional counsel, including by the use of subpoenas duces tecum.

        Under Section 10(b) of the National Labor Relations Act (Act), the Board, or any agent or agency designated by the Board, has authority to issue complaints.  Under Section 3(d) of the Act, the General Counsel has "final authority, on behalf of the Board, in respect of . . . issuance of complaints . . . and in respect to the prosecution of such complaints before the Board . . .."  Here, the complaint issued while Robb was still General



Counsel and neither the Board nor the AGC have sought to dismiss it.  Accordingly, there is no dispute as to who has ultimate authority to issue the instant complaint.  The complaint properly issued under Robb and is valid.

Under Section 11(1) of the Act, the Board has authority, upon application by a party, to issue subpoenas to such party requiring the production of evidence.  As noted above, the subpoena at issue is affixed with the signature of the Chairman of the Board; not the AGC.  In section 102.31(a) of the Board's rules and regulations, Regional Directors, not the General Counsel, are designated as the agents responsible for issuing subpoenas before a hearing opens.  The General Counsel plays no role in this process and the removal of Robb is irrelevant to the validity of the subpoena in question.

The Respondent has not otherwise established that a properly issued complaint cannot be prosecuted or that a properly issued subpoena cannot be used in the course of that prosecution.  As noted above, although the General Counsel may have "final authority . . . in respect to the prosecution of such complaints before the Board," the AGC has not sought to exercise any such authority in this case and there is no such action for the Respondent to contest.  Further, a General Counsel need not be in place to preside over the prosecution of a complaint which issued before the General Counsel left office.  *NLRB v. Gemalo*, 130 F. Supp 500, 501 (S.D.N.Y 1955) (complaint that issued before a General Counsel resigned could be prosecuted by a staff attorney after the General Counsel position became vacant).  Accordingly, there is no reason a valid complaint cannot be processed by Regional staff even if, currently, there is no validly appointed General Counsel.

**Other Objections to the Subpoena Requests**

The Respondent asserts certain general objections to all the subpoena requests and certain specific objections to individual subpoena requests.  The CGC has agreed to withdraw request numbers 2 to 6 on the basis of a stipulation among the parties that Tyler Grabowski is a statutory supervisor.  Without waiving its general objections, the Respond has also agreed to produce non-privileged documents responsive to request numbers 9 to 15.  I address the remaining subpoena requests (1, 7-8, 16-19) below.[1]

Initially, I note that the Respondent has objected to the production of privileged documents and is not required to produce such materials.  However, the Respondent must describe specific privileged documents in a privilege log provided to the CGC when the record opens on March 29, 2021 or as soon thereafter as is possible.  The privilege log should comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure.

*Request Number 1*

1. **Organizational charts and other documents showing Respondent's managerial structure, hierarchy or chain of command for the Respondent's JFK8 Facility during the period covered by this subpoena [May 1, 2019 through April 30, 2020], including documents that show any changes to the**

---

[1] To the extent this order does not specifically reference and address certain objections to the subpoena, those objections are rejected.

2



GC Exhibit 121

**reporting protocols and chain of command.**

The CGC seeks this information to determine whether management treated Bryson differently than other employees with regard to misconduct and discipline. On that basis, I find that the request relates to a matter in question and is relevant. I also find that the temporal scope of the request is appropriate.

The Respondent nevertheless contends that the production of responsive documents would be unduly burdensome. The burden of establishing that an administrative subpoena is unduly burdensome is on the subpoenaed party and conclusory assertions are not sufficient to meet that burden. *NLRB v. Carolina Food Processors, Inc.*, 81 F.3d 507 (5th Cir. 1996); *NLRB v. Dutch Boy, Inc.*, 98 LRRM 2396, 2399 (W.D. Okla. 1978) aff'd 606 F.2d 929 (10th Cir. 1979). The subpoenaed party must establish with specificity that production of the subpoenaed documents would cause serious disruption. *EEOC v. Maryland Cup Corporation*, 85 F.2d 471, 477 (1986). The fact that compliance with a subpoena may require the production of bulky, voluminous, or numerous documents is insufficient to establish that it is overly burdensome and does not serve as an excuse for noncompliance. *McGarry v. S.E.C.*, 147 F. 2d 389 (10th Cir. 1945); *NLRB v. United Aircraft Corp.*, 200 F. Supp. 48, 51 (D. Conn. 1961), aff'd mem., 300 F. 2d 442 (2nd Cir. 1962).

Here, the Respondent has not met its burden of establishing with particularity that the production of responsive documents would be unduly burdensome. The Respondent indicates that the request would require it to produce every document related to a managerial or supervisory change at JFK8 facility, but does not attempt to provide a ballpark estimate of the number of documents involved or the time/cost it would take to produce them. Further, as discussed by the parties in a conference call, the CGC may find it sufficient for the Respondent to produce, without more, an organizational chart or charts in effect during the relevant period. Accordingly, I deny the Respondent's petition to revoke subpoena request number 1.

### *Request Numbers 7 and 8*

7. **Documents that show the work rules, work guidelines and/or terms and conditions of employment pertaining to employee conduct and/or misconduct applicable to non-supervisory and non-managerial associates employed at Respondent's JFK8 facility at any time during the period covered by this subpoena, including documents showing any changes to the rules, the effective dates of any such changes, and a description or statement of the changes.**

8. **Documents showing that Respondent distributed to its employees, including Gerald Bryson and Dimitra Evans, and that employees (including Bryson and Evans) received Respondent's work rules, work guidelines and/or terms and conditions of employment, including the dates that such rules and policies were received by Bryson and Evans.**

The Respondent asserts that Bryson was discharged for specific misconduct – i.e., making vulgar and derogatory comments towards another employee in violation of Amazon's Standard of Conduct. Thus, without waiving objections, the Respondent has



GC Exhibit 121

agreed to "produce the relevant portions from its Owner's Manual and Guide to Employment – January 2019" (i.e., Workplace Harassment and the Standards of Conduct portions of the manual) and documents showing that the manual was distributed to Evans and Bryson.  (Resp. Brf. pp. 8-9)  The CGC seeks the production of the entire manual.

As it appears undisputed that the manual contains relevant standards of conduct, I will order that it be produced in its entirety so the CGC can view those standards in context.  I note that, under Rule 106 of the Federal Rules of Evidence, if a portion of the manual were introduced, an adverse party may require the introduction of any other part that in fairness out to be considered.  In order to determine what portions are subject to introduction pursuant to this rule, the parties should have access to the entire document.

*Requests 16-18*

**16. During the period covered by this subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which the JFK8 Facility is located, for violations of the sections named below of Respondent's Standards of Conduct, for cursing, abusive, profane, harassing, or vulgar language, including on-and-off duty examples, together with the personnel file of each disciplined employee showing other discipline to that employee: (a) Category 1 (b) Category 2.**

**17. During the period covered by the subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which the JFK8 Facility is located, together with the personnel file of each disciplined employee showing other discipline to that employee.**

**18. For the period covered by this subpoena, documents showing investigations conducted by Respondent in connection with disciplinary actions issued above in paragraph 17, including documents that reflect the identities of those who participated in the investigation, the substance of the investigation, and the investigatory findings.**

In its opposition to the petition, the CGC sought to modify these subpoena requests by changing "Regional facilities" to facilities that have "common management" with JFK8.  The General Counsel does not know which facilities are under common management with JFK8 and argues that it is the Respondent's obligation to identify those facilities for purposes of complying with these subpoena requests.

During a conference call, the Respondent identified two facilities in Connecticut as those that are JFK8's Regional facilities.[2]  The Respondent further represented that these three facilities have over 35,000 employees.  The Respondent has not identified facilities under common management with JFK8 and objects to the production of responsive

---

[2] The General Counsel did not accept this representation as accurate.

4



GC Exhibit 121

documents for facilities other than JFK8.  The Respondent also objects to the production of documents related to employee discipline for conduct that is not analogous to the alleged misconduct which led to the suspension and discharge of Bryson.

I will not grant the petition to the extent it seeks to limit production to documents reflecting the investigation of and discipline for a particular type of misconduct.  The General Counsel is entitled to determine which investigatory and disciplinary records are analogous to those of Bryson and need not rely on the Respondent's determination in this regard.  However, as discussed during the conference call, the parties should consult regarding the possibility of performing word searches that will target the most relevant documents and be less burdensome.

With regard to geographic scope, although the production of personnel records can be ordered for multiple facilities, such documents are most useful as a means of establishing disparate treatment if personnel decisions are made or approved above the local facility level.  See *Savage v. Sara Lee Bakery Group, Inc.*, 2005 WL 8161339 (E.D. Tex. Mar. 30, 2005).  Here, it is not clear to what extent, if at all, disciplinary decisions are made or approved at the regional or national level.  Further, requests for documents from facilities with "common management" are ambiguous.  However, the Respondent has not yet established that the production of documents from JFK8 and its two regional facilities would be excessively burdensome.  Accordingly, I will, for now, limit the geographic scope of these subpoena requests to JFK8 and its two regional facilities as identified by the Respondent.[3]  However, the parties should be prepared to discuss this issue further when the record opens.

19. **For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:**

   (a) **Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings.**

   (b) **Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;**

   (c) **Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's**

---

[3]  The CGC may obtain responsive documents from two facilities other than those identified by the Respondent as regional facilities of JFK8, if desired.


GC Exhibit 121

**supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns;**

**and**

**(d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.**

These requests seek documents regarding any protected concerted activity engaged in by Bryson and the Respondent's knowledge, if any, of that conduct.  Thus, the requests seek relevant documents.  Further, I do not find the requests to be overly broad in temporal scope.  However, the Respondent contends that these requests are unduly burdensome and overly broad to the extent they would require a search and review of documents in the possession of over 75,000 supervisors, manager, and agents.  As discussed during the conference call, the parties should consult regarding the possibility of performing word searches that will target relevant documents and be less burdensome.

It is hereby ORDERED that the petition to revoke is denied in part and granted in part, as indicated above.

Dated:          March 24, 2021
                New York, New York

*S/ Benjamin W. Green*
_____
                Benjamin W. Green
                Administrative Law Judge

Served by email as follows:

Nicole A. Buffalano, Esq. (nicole.buffalano@morganlewis.com)

Evamaria Cox, Esq. (Evamaria.cox@nlrb.gov)

Matthew Jackson, Esq. (Matthew.Jackson@nlrb.gov)

Frank Kearl, Esq. (frank.kearl@maketheroadny.org)

Christopher J. Murphy, Esq. (christopher.murphy@morganlewis.com)

Kelcey J. Phillips, Esq. (kelcey.phillips@morganlewis.com)

GC Exhibit 121

# EXHIBIT 3



GC Exhibit 121

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES
NEW YORK BRANCH OFFICE**

**AMAZON.COM SERVICES LLC**

      **and**                                             **Case  29-CA-261755**

**GERALD BRYSON, AN INDIVIDUAL**

### ORDER ON THE RESPONDENT'S PETITION TO REVOKE CHARGING PARTY'S SUBPOENA DUCE TECUM B-1-1C9GVF7 AND REQUEST FOR A PROTECTIVE ORDER

        The Respondent filed a petition to revoke subpoena duces tecum number B-1-1C9GVF7 (Subpoena), which the Charging Party issued to the Respondent's custodian of records on April 13, 2021.[1]  To the extent the Subpoena is not revoked, the Respondent seeks a protective order for any documents which must be produced.

        The complaint alleges that the Respondent violated Section 8(a)(1) of the Act by unlawfully suspending and discharging Charging Party Gerald Bryson because of his protected concerted activities (i.e., protesting the Respondent's failure to provide greater COVID-19 safety protections to employees).

**Petition to Revoke**

        The Subpoena seeks a number of documents which have already been subpoenaed (subpoena duces tecum number B-1-1BUGMIX) from the Respondent by Counsel for the Acting General Counsel (CGC).  On March 24, I issued an order largely denying the Respondent's petition to revoke subpoena B-1-1BUGMIX.  The instant petition to revoke is denied to the extent the Subpoena seeks documents which were requested by subpoena B-1-1BUGMIX and those requests were not revoked by my March 24 order.

        The petition to revoke Subpoena paragraphs 3, 4, and 5 are denied as documents responsive to those paragraphs may include evidence of animus and (for paragraph 5) disparate treatment.

        The Respondent objects to Subpoena paragraphs 11-14, and 19(b) and (c) to the extent they concern certain employees who were openly involved in protected concerted activities with Bryson.  The Respondent asserts that these Subpoena requests do not, as required by the Act, relate to any matter under investigation or in question.  Respondent's counsel also contends that production of these documents will be disproportional to the needs of the case as it will lead to extraneous "mini-trials" regarding the Respondent's treatment of employees not listed in the complaint.  The CGC and Charging Party claim

---

[1] All dates herein refer to 2021.



that the government's case will be advanced by evidence that the Respondent administered similar discipline to employees, including Bryson, who engaged in the same protected concerted activities.

Evidence concerning an employer's treatment of an alleged discriminatee in comparison to other employees who concertedly engaged in the same protected activity is relevant. In fact, such evidence may be exculpatory as an employer may defend on the grounds that such nondiscriminatees were known to have engaged in protected concerted activity and, unlike an alleged discriminatee, were subject to no adverse employment action. Of course, the Respondent has indicated no intent to raise such a defense and I share the concern of Respondent's counsel that the scope of this litigation might expand to involve "mini-trials" (if not full blown *Wright Line* inquiries) regarding adverse employment actions not listed in the complaint. However, given the Board's broad discovery-type standard of relevance with regard to subpoena requests and its reluctance to quash requests on the grounds that production is bulky and numerous, I will not revoke paragraphs 11-14, and 19(b) and (c) at this time.

With regard to other individual Subpoena requests, I make the following additional rulings:[2]

Subpoena Paragraph 2 – Paragraph 2 shall be limited to policies, procedural, standards, and guidelines, as further described therein, which applied to the JFK8 facility.

Subpoena Paragraph 11 – Paragraph 11 shall be revoked to the extent it seeks documents regarding any transfers or promotions of the named employees.

Subpoena Paragraph 20 – Paragraph 20 shall be limited to organizational charts and other documents, as further described therein, that cover or include the JFK8 facility.

Subpoena Paragraphs 6, 21-24 – Paragraphs 6, 21-24 shall be limited to documents concerning only those members of the Human Resources Department/Team, Loss Prevention Department/Team, Operations Department/Team, Safety Department/Team, and Learning Department/Team who have responsibilities with regard to the JFK8 facility.

**Protective Order**

A protective order with respect to the disclosure of subpoenaed documents may be entered upon good cause and/or to avoid harm. I will impose a protective order with regard to subpoenaed personnel records (such as employee discipline) of employees other than Bryson. Counsel for the parties may use subpoenaed personnel records in this proceeding, including the disclosure of such documents to potential witnesses and other

---

[2] To the extent certain paragraphs are not mentioned and specifically limited or revoked, the petition to revoke is denied.



individuals as may be necessary prepare for trial and understand the records.[3]  However, counsel shall not disclose subpoenaed personnel records to other individuals for a different purpose.

It is HEREBY ORDERED that the Respondent's petition to revoke the Subpoena is granted in part and denied in part, as described above, and a protective ordered is entered as described above.

.                                  Dated:        April 27, 2021
                                                 New York, New York

                                                 *S/ Benjamin W. Green*
                                   _____
                                                 Benjamin W. Green
                                                 Administrative Law Judge

Served by email as follows:

Nicole A. Buffalano, Esq. (nicole.buffalano@morganlewis.com)

Evamaria Cox, Esq. (Evamaria.cox@nlrb.gov)

David Gaston, Esq. (David.Gaston@nlrb.gov)

Matthew Jackson, Esq. (Matthew.Jackson@nlrb.gov)

Frank Kearl, Esq. (frank.kearl@maketheroadny.org)

Christopher J. Murphy, Esq. (christopher.murphy@morganlewis.com)

Kelcey J. Phillips, Esq. (kelcey.phillips@morganlewis.com)

---

[3]  The Respondent has objected to the possible use of subpoenaed records in different legal forums and different legal proceedings.  Presumably, the Respondent objects to the disclosure of documents that are relevant and would be useful to a legal adversary.  I do not believe the Respondent has a particularly strong confidentially interest in preventing the disclosure of such documents earlier than they would normally be disclosed during the normal course of those proceedings.  Accordingly, I do not grant this partial protective order on that basis.  Rather, I grant the partial protective order on the fairly self-evident confidentially interest a nonparty employee would have with regard to personnel records such as discipline.

GC Exhibit 121

# EXHIBIT 4

Page 145

1    MS. WILLIAMS:  (Audio interference) --
2        RECROSS-EXAMINATION
3    Q    BY MS. WILLIAMS:  Ms. Volk, I just wanted to clarify a
4    couple of things that I think testified about earlier.  I know
5    you mentioned that information is processed in Nuix.  Do search
6    terms typically get run before information is processed in
7    Nuix?
8    A    No, not typically.
9    Q    How long have you been in the e-discovery industry doing
10   this for clients?
11   A    Ten years.
12   Q    And is Amazon the only client that you do this for?
13   A    No.
14   Q    And was there anything about this process, based upon your
15   experience, that seemed abnormal or unusual as far as the
16   processing and searching?
17   A    No.  This is completely typical.
18       MS. WILLIAMS:  Thank you, Your Honor.  We have no other
19   questions of the witness.
20       JUDGE GREEN:  Okay.  And would -- Okay.  So Ms. Cox, what
21   would you like to do now?
22       MS. COX:  I just, I'm not sure that Ms. Volk answered my
23   questions earlier; that seemed to be that there was some
24   confusion.
25       FURTHER REDIRECT EXAMINATION

Page 146

1    Q    BY MS. COX:  So I just want to just make clear that I was
2    asking when she got her initial instructions to conduct the
3    search.
4    A    March 15th.
5    Q    Okay.  When did you put the documents in relativity?
6    A    I do not recall.
7    Q    How many documents did you put in relativity?
8    A    I don't recall off the top of my head.
9    Q    And is there a document that would help refresh your
10   recollection?
11   A    Certainly.
12   Q    What is that document?
13       JUDGE GREEN:  Hold on.  It's not whether it would refresh
14   the recollection, it's just whether there's a document which
15   shows that.
16   Q    BY MS. COX:  Okay.  What is the document?
17   A    Probably a processing export summary.
18       JUDGE GREEN:  Okay.
19   Q    BY MS. COX:  You have it handy?
20   A    I don't.  I can't pull it without being on my GPS.
21       JUDGE GREEN:  Okay.  So I'd -- I'd ask the Respondent to
22   produce that document to the extent, you know, any redacted,
23   that's fine, but produce that document to the General Counsel.
24       MS. COX:  And --
25       MS. WILLIAMS:  Your Honor, would -- would counsel be able,

Page 147

1    or would -- would the Government accept a stipulation as to the
2    number of documents, rather than producing the full processing
3    log?
4    Q    BY MS. COX:  How long is the processing log?
5    A    It is -- it's a pretty detailed log about everything that
6    was processed, probably two, three pages.  I'm -- I'm not sure
7    off the top of my head.
8    Q    We would like the --
9    A    It can be quite -- it could be quite lengthy.
10       MS. COX:  All right.
11       JUDGE GREEN:  Well, let me ask that --
12       MS. COX:  To the incentive, it is not long.  We would like
13   the document produced.
14       JUDGE GREEN:  Okay.
15       MS. WILLIAMS:  And Your Honor, we'd object to the extent
16   we may request the ability to redact that document.
17       JUDGE GREEN:  You do.  You have it.  Yes, you have.
18       MS. COX:  I'm sorry, I don't understand.
19       JUDGE GREEN:  It's going to be redacted to the extent
20   necessary.
21       MS. COX:  Okay.  And the same with the email to Ms. Volk,
22   with the instructions to commence the search.
23   Q    BY MS. COX:  Okay.  Ms. Volk, so when did you get your
24   second instructions after the documents were out of relativity;
25   do you recall?

Page 148

1    A    The second instruction was March 18th.
2    Q    Okay.  And how did you receive that instruction?  Was it
3    by email?  Do you know?
4        MS. COX:  Judge, we'd like that email produced as well,
5    redacted to the extent necessary.  So please produce that as well.
6        JUDGE GREEN:  Okay.  So please produce that as well.
7        MS. COX:  And I believe those are the extent of our
8    questions, Judge.
9        JUDGE GREEN:  Okay.  Thank you very much, Ms. Volt.
10   We're -- you're -- you're free to go.
11       Let's go off the record.
12   (Off the record at 12:48 p.m.)
13       JUDGE GREEN:  And Mr. Grabowski, can you hear me?  Can
14   you -- can you start your video feed?  There you are.  There
15   you are.
16       Okay.  So Ms. Cox, you're calling Mr. -- Mr. Grabowski.
17       Mr. Grabowski -- we're back -- back -- are we back on the
18   record?
19       THE COURT REPORTER:  Yes, we are.
20       JUDGE GREEN:  Okay.  So raise your right hand.
21   Whereupon,
22       TYLER GRABOWSKI
23   having been duly sworn, was called as a witness herein and was
24   examined and testified, telephonically as follows:
25       JUDGE GREEN:  Okay.  Thank you.  And are you alone in the

Page 149

1  room?
2      THE WITNESS:  Yes.
3      JUDGE GREEN:  Okay. So please don't communicate with
4  anybody during your testimony by some other device.  And please
5  don't refer to documents that are not shown to you on the
6  screen by counsel, okay?
7      THE WITNESS:  Okay.
8      JUDGE GREEN:  And please state and spell your name for the
9  record.
10     THE WITNESS:  Tyler Grabowski, T-Y-L-E-R
11  G-R-A-B-O-W-S-K-I.
12     JUDGE GREEN:  Okay.  Thank you.  And Ms. Cox is going to
13  have some questions for you.
14     Any time you're ready, Ms. Cox.
15         DIRECT EXAMINATION
16  Q   BY MS. COX:  Good afternoon, Mr. Grabowski.  Thank you for
17  being here today.  Can you please tell us what your occupation
18  is and your title?
19  A   I am a senior human resource business partner at Amazon.
20  Q   And you have been designated by Amazon as custodian of the
21  records for purposes of this hearing, correct?
22  A   Yes.
23  Q   Okay.  And you collected documents responsive to paragraph
24  16 of the subpoena?  Let me show it to you, I'm sorry.  Give me
25  one moment.

Page 150

1  A   I have it.
2  Q   Okay.  So they do collect documents, responsive to
3  paragraph 16 of the subpoena?
4  A   Yes.
5  Q   Okay.  Who directed you to -- to search for those
6  documents, the disciplines?
7  A   A member of the Amazon legal team.
8  Q   Do you recall the name of the person that requested you to
9  search?
10  A   Yes.
11  Q   What's the name of that person?
12  A   Kristin LaRosa.
13  Q   Do you recall when you were directed to conduct the
14  search?
15  A   It was sometime in the past month.
16  Q   Meaning April 20 -- I'm sorry, April 2021?
17  A   Late March or early April 2021.
18  Q   I'm sorry, you may have said this earlier, but did you
19  collect documents or any other paragraphs responsive to the
20  subpoena?
21  A   So let me take a look at it real quick.  The only sections
22  I've looked at previously were 16 and 17.
23  Q   Okay.  Is that what you're looking at right now is the
24  subpoena?
25  A   Yes.

Page 151

1  Q   Okay.  And without disclosing any confidentiality, can you
2  tell me what you were told was the purpose of the search?
3  A   I don't remember.
4  Q   What were you told to search for?
5  A   Feedback records from a designated time frame.
6  Q   What do you mean by feedback records?
7  A   So feedback would be any type of documented conversation
8  between a leadership team and an hourly employee.
9  Q   And do you recall when -- on what date you began to search
10  for these documents?
11  A   The -- the same time frame; I think it was late March
12  early -- sometime in the past month, late March, April 2021.
13  Q   Okay.  So Mr. Grabowski, I'm going to ask you moving
14  forward, just to look at whatever documents I put on my screen
15  and --
16  A   Uh-huh.
17  Q   -- if I need you to -- so this way you don't -- I can -- I
18  can see you while you're testifying.  Thank you.  Okay.  So
19  these documents, paragraphs 16, requesting disciplines, where
20  are they normally kept?
21  A   In Adapt.
22  Q   Okay.  What is Adapt?
23  A   An Amazon system for documenting and tracking feedback.
24  Q   And is Adapt an electronic system?
25  A   Yes.

Page 152

1  Q   And can you tell me, is that the only system that Amazon
2  uses to maintain discipline?
3  A   The documentation, like of the actual feedback, yes.
4  Q   When you say "feedback", are you referring to disciplines?
5  A   Yes.  So the reason I say "feedback" is there is both
6  positive and constructive that are both documented in Adapt.
7  Q   Okay.  Disciplines that are not positive or constructed,
8  are they -- or feedback, are they maintain in a different
9  location?
10  A   No.
11  Q   Okay.  So are you saying that all disciplines are
12  maintained and Adapt?
13  A   For hourly employees, yes.
14  Q   Okay.  Now, can you tell me, what facilities you -- you
15  conducted a search for in response to paragraph 16?
16  A   EWR4, JFK8, and BDL3
17  Q   And do you recall what date you began searching for JFK8
18  disciplines?
19  A   Late March and April of 2021.
20  Q   What about for EWR4?
21  A   That one was more recent.  So sometime in April of 2021.
22  Q   What about BDL3?
23  A   Same as EWR4, April 2021.
24  Q   Give me one second.
25      MS. COX:  Judge, can I go off the record for a moment?

Page 153

1    JUDGE GREEN:  Off the record.
2    (Off the record at 12:58 p.m.)
3         RESUMED DIRECT EXAMINATION
4  Q   BY MS. COX:  I'm sorry.  So you were saying that you
5  more -- more recently began searching for EWR4?
6  A   Yes, that would be in April of 2021.
7  Q   Okay.  Did you use any software to conduct the searches
8  for paragraph 16?
9  A   Adapt.
10  Q   Is Adapt the system that you searched or is it the system
11  that you used to search?
12  A   Adapt has its own reporting built into the website.
13  Q   Can you explain how that works?
14  A   So on the main page, there's a -- option to click
15  reporting on the top.  When you click reporting, it'll bring up
16  a page that has every single time -- it's like a baseline
17  example.  It says -- in the search bar, it says warehouse and
18  then has semicolon and it defaults to this building in Phoenix.
19  I believe that's where the program started but you can then
20  change it to any type of site or multiple sites by putting a
21  comma in between the location.  And then you can select a time
22  frame.  So it either has relative time frames where you can put
23  last day, the last month, last three months, last quarter, last
24  year.  Or you can choose absolute and choose a start and end
25  date.  And then when you click the search bar, it essentially

Page 154

1  brings up a table in the web browser that outlines all of the
2  information in the format that was provided with an option to
3  export it to Excel.
4  Q   Okay.  Now, when you say "website", can you tell me what
5  website you're referring to?
6  A   Adapt.
7  Q   So Adapt is a website and a search tool as well?
8  A   So Adapt is a website where employees have their -- their
9  profiles where any type of disciplinary is documented and in
10  that website is a reporting function.
11  Q   Okay.  So are the disciplines sortable by date range?
12  A   If you export it to Excel, you can filter it and sort it
13  by date.
14  Q   So prior to being exported, can you -- I -- I believe you
15  testified that you can select a time period.  Is that right?
16  A   Oh.  Yes, that is correct.
17  Q   So can you limit the Adapt searches for a one-year period?
18  A   You can select the specific dates, yes.
19  Q   Okay.  But it covers one year?
20  A   Yes.  Or greater --
21  Q   Okay.  I'm sorry.  Say again?
22  A   Or greater or less.  It's --
23  Q   Okay.
24  A   -- really, whatever.
25  Q   Okay.  Is the discipline sortable by type or searchable by

Page 155

1  type of discipline?
2  A   That I'm not sure.
3  Q   Okay.  I can give you example.  For example, behavioral
4  discipline -- like, search only behavioral disciplines versus
5  search only safety disciplines, search only time off past
6  disciplines.  Is that possible, to choose the type of
7  disciplines?
8  A   I have not searched for that, so I'm not sure.
9  Q   Okay.  Can filters be combined to target disciplines by,
10  for example, date, type of facility, and other -- other
11  filters?
12  A   I know that once it's in Excel form, I've filtered it like
13  that before.  But prior to exporting to Excel, I'm not sure.
14  Q   Okay.  Did you use search terms for paragraph 16?
15  A   Paragraph 16 is the same one that we've been talking
16  about?
17  Q   Yeah.  Do you need me to show the document?  I can -- give
18  me one moment and I'll pull it up for you.
19  A   Thank you.
20  Q   Of course.  Okay.  Can you see my screen?
21  A   Yes.
22  Q   Okay.  So I'm talking about paragraph 16.  So just take a
23  minute, read it, let me know when you're done.
24  A   That's good.  I can read it.
25  Q   So did you use search terms for paragraph 16?

Page 156

1  A   Just the warehouse location.
2  Q   Okay.  Do you recall whether you searched for off- and on-
3  duty examples?
4  A   What do you mean by that?
5  Q   So paragraph 16 is asking for disciplines, including on
6  and off-duty examples.
7  A   Uh-huh.
8  Q   And I'm asking if that was part of your search.  You see
9  here?  It says including on and off-duty examples.
10  A   Uh-huh.  The search was conducted for all feedback during
11  its designated time frame for that location.
12  Q   Okay.  Do you recall what the time frame was?
13  A   I believe it was May 1st, 2019 through April 30th, 2020.
14  Q   Okay.  So other than Adapt, is there any other place where
15  employee discipline would be maintained?
16  A   Not for feedback records or conversations.
17  Q   Are there any other management systems that you searched
18  ris -- for paragraph 16 -- document management systems?
19  A   Yes.
20  Q   What were the other systems that you searched?
21  A   Exact.
22  Q   Did you search anything else?
23  A   OnBase.
24  Q   Say again?
25  A   OnBase.

1 Q  OnBase?

2 A  Yes.

3 Q  Okay.  What is Exact?

4 A  An investigation tracking system.  Another website that

5 Amazon uses.

6 Q  It's an investigation tracking system?

7 A  Yes.

8 Q  And what is OnBase?

9 A  It's a system for employee personnel files.

10 Q  Do you recall when you conducted the search on Exact for

11 paragraph 16?

12 A  In the last month.

13 Q  And do your recall when you conducted the search for

14 OnBase for paragraph 16?

15 A  I'm sorry.  Can you please repeat the question?

16 Q  Yeah.  I was asking if you recalled when you conducted the

17 search on the base (sic) system for paragraph 16?

18 A  OnBase?

19 Q  Yeah.  OnBase.

20 A  Okay.  Yeah, it was the same time frame.  In the past

21 month.

22 Q  Can you spell OnBase for me?

23 A  It's one word and it's O-N-B-A-S-E.

24 Q  Okay.  Thank you.  So I want to talk about OnBase a little

25 bit.  Are personnel files stored on OnBase?

1 A  Yes.

2 Q  Okay.  Are dis -- employee disciplinary records -- can

3 they also be found on OnBase -- in OnBase?

4 A  No.

5 Q  Okay.  Can you explain to me how a search on -- on OnBase

6 works?

7 A  So you can go into the system and search an employee ID

8 and either select all employee type -- or like, employment file

9 types or narrow it down based on a specific category and then

10 press search.

11 Q  What are those categories that you can narrow by?

12 A  I wouldn't be able to accurately say all of them.  There

13 is a good number of them.

14 Q  Can you give me examples of some?

15 A  It would be any type of document that an employee signs or

16 acknowledges.  So like, different policies or different things

17 that they're onboarded with, investigative notes, witness

18 statements, drug and alcohol acknowledgement form, termination

19 letters.  Really anything that is a document that the employee

20 would need to sign, acknowledge -- anything regarding their

21 employment or anything that the site would upload.

22 Q  Do employees sign and acknowledge disciplines?

23 A  They have the ability to digitally acknowledge it.

24 Q  And if -- okay.  And if an employee digitally acknowledges

25 a discipline, does it go into OnBase in the personnel file?

1 A  No.

2 Q  Okay.  Can personnel files be sorted by date range in

3 OnBase?

4 A  Within the employee's individual file, yes.

5 Q  What about personnel files generally?

6 A  In OnBase?

7 Q  Yeah.

8 A  So OnBase, you would need to pull individual employees by

9 using their employee ID.

10 Q  Where do you get the employee IDs from?

11 A  It -- it honestly depends.  I mean, there's multiple

12 systems that have employee IDs.

13 Q  So when you conducted the search for paragraph 16, where

14 did you get employee IDs from?

15 A  The Excel spreadsheet that came from Adapt.

16 Q  Okay.  Can you explain to me whether you created search

17 terms for paragraph 16?

18 A  No.

19 Q  So you did not create search terms?

20 A  I searched for warehouse IDs for a certain time frame but

21 that was it.

22 Q  Okay.  So I want to talk a little bit about the -- so

23 are -- I just want to make sure I'm understanding this.  So you

24 searched for all disciplines within a time frame and exported

25 it into an Excel spreadsheet.  Is that what you're saying?

1 A  Correct.

2 Q  Okay.  And then for specific disciplines, were you

3 involved in searching for specific type of disciplines?  For

4 certain types on conduct, is what I'm asking.

5 A  Certain types or like, specific individuals?

6 Q  Spec -- specific types of conduct.  Did you search for,

7 for example, fighting?  Were you involved in searching for

8 specific type of discipline?

9 A  (No audible response).

10 Q  Okay.

11 A  I pulled the feedback history for a specific time frame

12 for those three buildings into an Excel sheet.

13 Q  Okay.  Okay.  So I do want to show you a document, just to

14 get some understanding about a -- a little more about Adapt.

15 So let me just show you -- give me a moment, I'm sorry.  Okay.

16 Can you see my screen?

17 A  Yes.

18 Q  Okay.  This is a -- tell me what this is.

19 A  A feedback document.

20 Q  Okay.  So it's a one-page document, right?  So can you

21 explain --

22    JUDGE GREEN:  Can you see the screen now that you had to

23 put it at greater than arms' length so they could see there was

24 nothing in front of you?  Can -- can you pull it back so you

25 can read?

Page 161

1    THE WITNESS: Can I move my computer closer?
2    JUDGE GREEN: Yeah, if it'd be easier for you. If that's
3  okay with --
4    MS. COX: I'll zoom --
5    JUDGE GREEN: Ms. Cox.
6    MS. COX: I'll zoom in for him so he can see it.
7    THE WITNESS: Thank you.
8    MS. COX: There you go. Can you see now?
9    THE WITNESS: Yes.
10    MS. COX: All right.
11  Q   BY MS. COX: So can you tell me what this -- what this
12  file path means?
13  A   It's a URL that likely would bring you to this feedback
14  document.
15  Q   Okay. Are these folders within Adapt?
16  A   I don't know.
17  Q   Okay. Give me one second. Sorry. All right. So I have
18  another document I want to show you. Okay. Sorry. I'm not
19  very good at this. All right. Can you see my screen?
20  A   Yes.
21  Q   Okay. So this is some documents that were produced in
22  response to paragraph 16. Okay. Can you see it?
23  A   No. Now I can.
24  Q   Better? Okay. So let me just start by asking you, when
25  you pulled these documents, did it have these -- these black

Page 162

1  boxes on it?
2  A   I didn't pull these documents.
3  Q   Okay. Are you familiar with -- with these barcodes at the
4  bottom of these documents?
5  A   No.
6  Q   Okay. Do you know what these barcodes are used for?
7  A   No.
8  Q   Okay. Do you know what this file path means?
9  A   No.
10  Q   Okay. So just to be clear, you're saying that you didn't
11  pull any documents. You only created a report. Am I
12  understanding that right?
13  A   I pulled the Excel report of feedback for the three
14  buildings.
15  Q   Okay. And then who did you give those reports to?
16  A   The Amazon legal team and Morgan, Lewis.
17  Q   Okay. And do you recall when you gave those -- those
18  reports to Amazon's legal team?
19  A   Sometime in the past month.
20  Q   Do you recall when you gave those reports to Morgan,
21  Lewis?
22  A   Same time frame.
23  Q   Okay. Do you recall how long it took you to conduct the
24  search for JFK8 disciplines?
25  A   The Adapt Excel file?

Page 163

1  Q   Yes. How long did it take you to search -- create that
2  document?
3  A   Maybe 15 minutes.
4  Q   Okay. And what about EWR4? How long did it take you to
5  create that Excel spreadsheet?
6  A   Probably same time frame, 10, 15 minutes.
7  Q   And what about BDL3? How long did it take you to create
8  that Excel spreadsheet?
9  A   I pulled the EWR4 and the BDL one together from the same
10  file.
11  Q   Okay. And how long did it take you to create that Excel
12  spreadsheet for both of those facilities?
13  A   About 10 to 15 minutes to get both.
14  Q   Okay. So I just want to -- for clarification, can you
15  tell me if I can search for a discipline without searching a
16  personnel file?
17  A   What do you mean by that?
18  Q   So does Adapt only contain the disciplines?
19  A   It would be discipline and then also positive feedback if
20  there's positive coachings in there.
21  Q   Okay. Does Adapt have anything else in it -- or -- any
22  other types of files maintained in Adapt?
23  A   No, the --
24    MS. WILLIAMS: I'm going to object to the extent this goes
25  beyond the scope of the requested documents.

Page 164

1    JUDGE GREEN: Overruled. Answer.
2  Q   BY MS. COX: Mr. -- Mr. Grabowski, I was asking what other
3  types of documents are maintained in Adapt, besides positive
4  feedback, discipline, and I believe you said co -- coachings?
5  A   Uh-huh. So coaching would fall under the -- the feedback
6  scope. Adapt is a performance management system.
7  Q   Okay. Okay. And what's -- I just want to take another
8  step back with you because I don't think I'm clear on what
9  Exact is. What -- so what's the difference between Exact,
10  Adapt, and OnBase?
11  A   OnBase would be all personnel files. Adapt would be
12  performance management, either feedback, positive, negative,
13  any type of disciplinary action. And Exact is where you would
14  host information related to witness statements, documents,
15  anything collected during the course of an investigation, which
16  then may lead to feedback that would be entered in Adapt.
17  Q   In Exact or Adapt?
18  A   Feedback.
19    MS. COX: Oh. I got it. I withdraw. I'm sorry. I got
20  it.
21  Q   BY MS. COX: Okay. So what do you mean by performance
22  management system?
23  A   It's where any type of, like, feedback -- performance
24  management feedback is located. So both productivity, quality,
25  overall actual performance in an employee's path, as well as

Page 165

1  any behavioral or attendance feedback.
2  Q  Okay. Now I want to talk a little bit about these Excel
3  spreadsheets that we've been mentioning. Okay. So you also
4  conducted the search for paragraph 17, right?
5  A  Can we please pull it up?
6  Q  Yes. Give me one moment.
7  A  Thank you.
8  Q  Of course. Okay. All right. Can you see paragraph 17?
9  I'll zoom it for you.
10  A  That's perfect where it is.
11  Q  Okay. Just take a minute, read it, and let me know when
12  you're done.
13  A  I'm done.
14  Q  Okay. So did you conduct the search for paragraph 17
15  related to all disciplines for JFK8 and other facilities?
16  A  Yes, the Excel file.
17  Q  Okay. Now -- so did you create that Excel spreadsheet?
18  A  I exported it right from Adapt. It exports in that table.
19  Q  Okay. So what systems did you search for documents
20  responsive to paragraph 17? I'll -- I'll show you again if you
21  need to see it.
22  A  So we're referring to the actual, like, personnel files or
23  like, documents regarding the feedback, not just the Excel
24  file.
25  Q  Did you -- I'm asking you what systems you searched for

Page 166

1  documents responsive to paragraph 17.
2  A  Adapt.
3  Q  Okay. Did you conduct a search for personnel files?
4  A  Partially.
5  Q  What do you mean by partially?
6  A  Out of a list of names that was provided, split it up
7  between myself and a member of my team. It was a pretty
8  lengthy time ask.
9  Q  Okay. How many personnel files did you search for?
10  A  I don't remember.
11  Q  Who was the other person that you split the list up with?
12  A  Christina Stone.
13  Q  And who is Christina Stone?
14  A  A member of my team.
15  Q  Are you talking about HR?
16  A  Yes.
17  Q  Okay. Do you recall when you conducted the search for
18  personnel files -- or partial search for personnel files?
19  A  In the past month. So April 2021.
20  Q  Do you recall what facilities you searched personnel files
21  for?
22  A  Only JFK8.
23  Q  And what system did you use to search for personnel files
24  at JFK8?
25  A  OnBase and Exact.

Page 167

1  Q  So -- I'm sorry. So are you saying that personnel files
2  are also maintained on Exact?
3  A  No, but information leading to disciplinary action could
4  be.
5  Q  Okay, so did you conduct a search for investigative
6  documents responsive to the subpoena, as well?
7  A  Partially.
8  Q  Okay. We'll get back to that. Okay, so as far as the
9  JFK8 search that you did in response to paragraph 17 of the
10  subpoena, can you tell me if you created search terms?
11  A  I did not.
12  Q  Did you use search terms?
13  A  No.
14  Q  Were searched terms given to you at any point?
15  A  Not that I recall.
16  Q  Okay, so I'm going to show you an Excel spreadsheet that
17  was produced in response to the subpoena. You just have to
18  bear with me again a moment. But before I get there, can you
19  tell me who gave you names to search, personnel files, who gave
20  you the names of the personnel files to search for?
21  A  I don't remember.
22  Q  Okay, so I'm showing you, now -- hopefully, you'll be able
23  to see my screen. Thank you for being with me. Okay. Can you
24  see my screen?
25  A  I -- I can see it; I can't read it.

Page 168

1  Q  Yeah, let me try to -- okay, so this is a -- an Excel
2  spreadsheet.
3  A  Um-hum.
4  Q  I'm just going to scroll so you can see how many
5  disciplines are on here. Is this the type of Excel spreadsheet
6  that you created in response to paragraph 17?
7  A  It looks like the same, like, format, the same columns,
8  the same information that would be in there.
9  Q  Okay.
10  A  The only difference is the -- top bar is colored gray.
11  Q  Okay.
12  A  Which, it just looks like some formatting.
13  Q  Give me one moment. I think I'm pulling up the wrong one.
14  I'm sorry. My apologies. Okay, I think I have the right one
15  now. Yes, okay. So I'm showing you now the correct Excel
16  spreadsheet that is responsive to paragraph 17. Okay, so you
17  can see it says at the bottom -- and if you can't see -- hold
18  on. No, I keep showing you the same one. I'm sorry.
19      JUDGE GREEN: Let me just ask -- I guess this is for Ms.
20  Cox. The one you're showing now with 1,593 entries --
21      MS. COX: Yes.
22      JUDGE GREEN: Is it your understanding that that was the
23  result of a word search and that was not just all of the
24  disciplines at JFK8?
25      MS. COX: Judge, my understanding is that these

Page 169

1  disciplines are a response to a word search, yes.
2      JUDGE GREEN:  Okay, and that there was -- there was -- was
3  there produced an Excel spreadsheet that just had all of the
4  disciplines at JFK8?.
5      MS. COX:  This is that spreadsheet, yes.
6      JUDGE GREEN:  Okay, and that would be in the several --
7  over 10,000?
8      MS. COX:  No, Judge.
9      JUDGE GREEN:  Okay.  That was not -- there was no
10  production of such a spreadsheet?
11     MS. COX:  No.
12     JUDGE GREEN:  Okay.
13     MS. COX:  I just want to make sure that you all can see
14  this is supposed to say 1,594.  I'm not sure you can see it
15  on -- okay.
16  **Q  BY MS. COX:  All right, so this spreadsheet, you're**
17  **saying, is the same one you provided, and you're saying these**
18  **columns look different to you?  I'll try to zoom it for you.**
19  A  Oh, no, those are the same columns.  I didn't realize that
20  the information was taken out for the employee ID, employee
21  name, employee login.
22  **Q  Okay, so yes, so it says "employee ID, employee status,**
23  **type, manager name, login ID, warehouse, source type", meaning**
24  **behavioral safety, "status level, created date, created by,**
25  **updated by, feedback".  And then, there are these "areas of**

Page 170

1  **development", and "details, incident details, incident date",**
2  **so on and so forth.**
3      **Okay, so Mr. Grabowski, does this spreadsheet look like**
4  **the one that you gave counsel, Morgan, Lewis counsel, aside**
5  **from the two columns missing?**
6  A  It has the same information.
7  **Q  Okay.**
8  A  But it would be hard to say, just based on I don't know
9  how much data is -- is in this, what time frame it's from.  But
10  that is what an Adapt export looks like.
11  **Q  Okay, so this information was extracted from Adapt?**
12  A  Yes.
13  **Q  So to your knowledge, do these individual lines represent**
14  **individual disciplines?**
15  A  Yes.
16  **Q  Okay.  Do you -- do you know or have any reason to believe**
17  **that, other than these two columns, that this -- that this**
18  **spreadsheet might have been edited or altered in any way?**
19  A  It looks like there's three columns.
20  **Q  Right, so aside from these three columns, do you have any**
21  **reason to believe that this spreadsheet might have been edited**
22  **or altered in any way?**
23  A  No.
24  **Q  Okay, so -- so I want you to look at the first entry here.**
25  **And the date is 2019, May 2nd, May 2nd; you see that?**

Page 171

1  A  Yes.
2  **Q  Okay, so I'm going to just do a little search so you can**
3  **see.  It looks like this -- I'm sorry.  I need a minute again.**
4  **This entry is identical to one other entry.  Give me one**
5  **moment.**
6      MS. COX:  Can I just go off the record one moment, Judge?
7      JUDGE GREEN:  Off the record.
8  (Off the record at 1:39 p.m.)
9      JUDGE GREEN:  And not that I want to disrupt Mr. Cox --
10  Ms. Cox's examination.  But I believe Mr. Murphy indicated that
11  he might offer some explanation as to what was done in -- in --
12  with regard to these spreadsheets?
13     MR. MURPHY:  Yes.  Thank you, Judge.  May I?
14     JUDGE GREEN:  Yes.
15     MS. COX:  Judge, may I have the witness testify first, and
16  then Mr. Murphy can provide his explanation after we're done?
17     JUDGE GREEN:  Okay.  Well, is this going to take long, Mr.
18  Murphy?  I mean, I think the purpose of this is -- is to see
19  if we can short circuit some of the testimony by virtue of
20  stipulation.  So go ahead, Mr. Murphy.
21     MR. MURPHY:  Okay, thank you.  So Tyler those reports --
22  I'm going to call them reports; I don't know the technical
23  term.  He ran those reports with the disciplines from JFK8,
24  EWR4 and BDL3.  He transmitted them to us and -- and to counsel
25  for Amazon.  And -- and in our office, we -- we ran two sets of

Page 172

1  search terms against all of those reports.
2      The -- the -- the first set we used was the paragraph 16
3  terms.  There's seven terms, curse, vulgar abuse, et cetera, in
4  the body of the request itself.  We -- we -- we did that.  I
5  don't recall the numbers specifically, but my recollection is
6  that, with respect to -- with respect to JFK8, it was in the
7  range of 36 or so hits, ballpark.
8      We -- we then -- after conferring with counsel for the
9  General Counsel, they provided us a list of 31 terms to be used
10  for paragraph 17.  And we ran those terms, those 31 terms
11  against the -- the reports from JFK8, EWR4 and BDL3.  And that
12  search, that report, resulted in the 1,593 discipline reports
13  that Ms. Cox was showing to Mr. Grabowski.  He -- he didn't do
14  that work.  We did that internally using support staff here.
15     JUDGE GREEN:  Okay.  Did the -- did the -- did -- the
16  spreadsheet that came to you, did that have -- to Mr. Murphy.
17  Did that have 13,000 disciplines?
18     MR. MURPHY:  Yes.  The original -- the original cut
19  which -- which -- which Tyler described had -- for JFK8, had
20  13,000.  My recollection is that, for EWR4, it was a little bit
21  more than that, and -- and BDL3 was less than that.  I don't
22  remember the specific numbers, but.
23     JUDGE GREEN:  Okay, and so -- oh, so the search -- so the
24  word search, the 31-termed word search, that was for all three
25  facilities or just JFK8?

Page 173

1    MR. MURPHY:  We -- we've done it on all three.  But the
2  document that Mr. Cox was showing Mr. Grabowski, that was for
3  JFK8.
4    JUDGE GREEN:  Okay, and that resulted in 1,594?
5    MR. MURPHY:  3.
6    JUDGE GREEN:  3, okay.  Okay, thank you very much.
7    MR. MURPHY:  Yeah, thank you.
8    MS. COX:  Can I just ask Mr. Murphy when the 30 -- the
9  search for the 32 hits responsive to JFK8 was done, the date?
10    MR. MURPHY:  Boy, I -- I -- I don't know that off the top
11  of my head.  I'm sorry.
12    MS. COX:  Okay.
13  **Q   BY MS. COX:  Mr. Grabowski, did you -- after counsel ran a**
14  **search on the spreadsheet, did you have any role in going and**
15  **looking for those 32 disciplinary forms?**
16  A   I'm not sure if it was -- there was one specific --
17  **Q   Did you collect 32 or 36 discipline forms at any point**
18  **during this last three months?**
19  A   There was a list that was provided to counsel, which, the
20  list was then narrowed and sent back.  Those ones were the
21  documents that I discussed earlier that Christina Stone and I
22  reviewed.
23  **Q   Okay, but those documents that you reviewed, were they**
24  **personnel files or something else?**
25  A   It was the back records from Adapt, and then anything from

Page 174

1  the Exact or personnel files that may have supplemented it.
2  **Q   Okay, so after counsel gave you the list, you conducted**
3  **the search for feedback; when did you conduct the search?**
4  A   In the past month.
5  **Q   Okay, do you recall when you gave a disciplinary, or I'm**
6  **sorry, the feedback documents back to counsel, after you and**
7  **Christina Stone completed your partial search?  Do you recall**
8  **when you gave the -- the results back?**
9  A   It was sometime in the past month, but I don't know the
10  specifics.
11  **Q   Okay.  Did you also provide personnel files to counsel**
12  **after the terms were narrowed?**
13  A   I'm sorry, can you please repeat that?
14  **Q   Yeah.  Did you also provide personnel files to counsel**
15  **after they narrowed those -- those -- narrowed the search?**
16  A   Is that different than the -- the question that was just
17  asked about going through the list?
18  **Q   Yeah, because I asked you about feedback just now, and**
19  **now, I'm asking you about personnel files.  Unless I made an**
20  **error, that's -- that -- that was my intention.  My first**
21  **question was:  after counsel narrowed down the search to 36**
22  **hits, did you provide feedback documents to counsel?**
23  A   So the feedback documents would be what is outlined in the
24  Excel file.
25  **Q   Right.  Did you provide a actual physical or electronic**

Page 175

1  **version, a document, a PDF, or something, to counsel?**
2  A   I don't believe so.
3  **Q   Okay, what about personnel files that you and Ms. Stone**
4  **searched for?  Did you ever provide the actual personnel file**
5  **to counsel?**
6  A   Yeah, so that's what I thought you were asking the first
7  time; that is what we did.  We took the list and pulled
8  information pertaining to it in our personnel files and then
9  sent it back.
10  **Q   Okay, and you did that within the last month?**
11  A   Yes.
12  **Q   Okay, thank you.  Now, I'll get back to this Excel**
13  **spreadsheet.  So I was showing you the spreadsheet with the**
14  **1,593 disciplines for JFK8, right.  So I was asking you to look**
15  **at this first entry.  Oops, excuse me.**
16    Okay, so this first entry, I told you before, was May 2nd,
17  **2019.  Now, I've filtered this document, and I want you to look**
18  **at line -- let me try to zoom it -- line 500.  If you look at**
19  **the dates, do you see the dates there, May 2nd, 2019?**
20  A   Yes.
21  **Q   Okay.  Do you see this day, too, May 2nd, 2019?**
22  A   Yes.
23  **Q   Okay, so now, look at the -- body of this.  I'll try**
24  **to give a -- put a little spotlight so you can follow my**
25  **cursor.  Okay, so you see this here?**

Page 176

1  A   Um-hum.
2  **Q   Just take a -- take a second; read it to yourself?**
3  A   Okay.
4  **Q   Okay, so these entries are exactly the same, right?**
5  A   Yes, it appears so.
6  **Q   Okay, but they appear on this spreadsheet as numbers 2 and**
7  **500, right?**
8  A   Yes.
9  **Q   Okay, so I'm going to do the same, so you can take a look**
10  **at it, with the next entry.  This entry is May 7th, 2019.**
11  **Okay, so we have these two, number 353 and 1224; do you see the**
12  **date on this, May 7th --**
13  A   7.
14  **Q   -- 2019.  And then, for this entry, May 7 -- I'm sorry --**
15  **May 7th, 2019.  Now, take a look at the body of this document**
16  **starting here, 4/24/19, and then you can read starting 4/24/19.**
17  **Let me know when you're done.**
18    JUDGE GREEN:  At some point, are we just going to ask
19  why -- why this is the case, why there would be redundant
20  entries?
21    MS. COX:  We will, Your Honor.
22    JUDGE GREEN:  Is there some reason why we need to have him
23  read to document to determine that they're redundant?
24    MS. COX:  I just want to be clear that there's nothing
25  I've done to this document and that -- that these -- these

1   entries are, in fact, duplicates.

2       JUDGE GREEN:  Okay.  Well, why don't we accept your

3   representation to that effect as true, why don't you ask a

4   question about it?

5       MS. COX:  Okay.

6   **Q   BY MS. COX:  So Mr. Grabowski, is there any reason why**

7   **these entries would be duplicated on this spreadsheet?**

8   A   I'm not sure.

9       MS. COX:  So just so you know, Your Honor, I mean, there

10  are about -- this -- this document has got 45 percent, 35 to 45

11  percent, duplicate entries.  So this number of 1,593 is

12  completely inaccurate.  It doesn't represent the number of

13  disciplines that Respondent claims are responsive to paragraph

14  17 of the subpoena.

15      JUDGE GREEN:  But why do we care?

16      MS. COX:  Judge, because Respondent has been asking us to

17  rely on these charts and not accept the underlying --

18      JUDGE GREEN:  Yeah, but there's nothing being -- there's

19  nothing being -- not being disclosed here.  So I take it that

20  it would not be particularly hard to do data searches and order

21  an Excel spreadsheet so that it's fairly easy to find the --

22  the duplicates.  And I don't know how that hurts you, so

23  there's less -- so the -- so the -- the word search has

24  produced less documents.  Well, how does that hurt you?  The --

25  the -- the word search produced the documents that it produced.

1   I don't understand why that's prejudicial in any way.

2       MS. COX:  Well, Judge, because -- because the -- the

3   Respondent's representation that this, the request, is

4   overburdensome and needs to be further narrowed --

5       JUDGE GREEN:  Well, but that ship has sailed.  We're

6   not -- we're not dealing with -- I've already denied the --

7   the -- the petition to revoke.  That's not what we're

8   litigating here.  So and I think the parties should understand

9   what we're litigating here.  We're not litigating whether the

10  petition -- we're not relitigating the petition to revoke.

11      What we're doing is, we're establishing a record that, in

12  the event of nonproduct -- of nonproduction or incomplete

13  production, I'm -- and -- and pending a potential motion for

14  banning those sanctions, that I'm in a position to rule on

15  that.  That's what we're looking at here.

16      MS. COX:  Yes, Judge.  And I believe that these duplicate

17  entries go to a bad faith search, Judge.

18      JUDGE GREEN:  Okay.

19      MS. COX:  We're not -- it's not a reasonable inclusion

20  search with 100 percent --

21      JUDGE GREEN:  That's fine.  I -- that's fine.  I do not --

22  I do not agree, respectfully.  I -- I don't -- I don't mean

23  to -- to interrupt you, but I don't agree and -- but you can

24  make that argument.  You can certainly make that argument, but

25  in the meantime, let's -- let's move on.

1       MS. COX:  Okay.  Give me one moment, judge.  Okay.

2   **Q   BY MS. COX:  So, Mr. Grabowski, did you ever deduplicate**

3   **this Excel spreadsheet?**

4   A   No.

5   **Q   Did anyone direct you to deduplicate this Excel**

6   **spreadsheet?**

7   A   No.

8   **Q   Is it possible to retrieve the individual feedback or**

9   **discipline documents without entering a personnel file?**

10  A   If we wanted the individual feedback, we would go employee

11  by employee in Adapt.

12  **Q   So you don't have to access the personnel file to retrieve**

13  **a disciplinary document?**

14  A   The -- like, the documents from the Excel sheet?

15  **Q   Yes, those individual documents, where would you retrieve**

16  **it from?**

17  A   Adapt.

18  **Q   Is it in the personnel file?**

19  A   No.

20      MS. COX:  Okay.  I don't know if Mr. Gaston has any

21  questions.

22      MR. GASTON:  Just one question.

23          DIRECT EXAMINATION

24  **Q   BY MR. GASTON:  You mentioned three different systems,**

25  **OnBase, Adapt, and Exact; are those the sum total of**

1   **systems that would have the personnel information?  And I use**

2   **that term in the broadest sense; I don't want to narrow it**

3   **to -- I know it's been a specialized term over the course of**

4   **this examination.  Is -- are those the three systems that would**

5   **have personnel information that would be potentially**

6   **responsive?**

7   A   There is honestly so many different systems at Amazon that

8   have employee information; that's why there's specific places

9   for each information.

10  **Q   I see, and based on that statement, could you share how**

11  **you selected three -- these three systems and not any others?**

12  A   So Adapt would be any type of feedback or disciplinary

13  action, which is what we were looking into.

14      And then, Exact would be the system that houses

15  investigative notes that would lead up to different types of

16  disciplinary action, if an investigation was necessary based on

17  the allegation.  And then, OnBase is what was used in years

18  prior to Exact being established.

19      So the Exact investigation system is relatively new at

20  Amazon.  It has not been there in the entire tenure that I've

21  been employed.  And previously, investigative notes or witness

22  statements that would lead up to disciplinary action would be

23  uploaded to an employee's personnel file in OnBase.

24      So in looking for what the exact disciplinary action is

25  and what information would have been compiled in leading up to

Page 181

1 that disciplinary action, those are the systems they would be
2 stored --
3 **Q   Okay, and this is for 00 only for hourly employees; did I**
4 **understand that correctly?**
5 A   So Adapt is for hourly employees to -- to document the
6 disciplinary action, yes.
7 **Q   Okay, so nonhourly employees are not even part of this**
8 **landscape that you've set forth?**
9 A   They have OnBase and Exact.  Like, they -- they can be
10 tracked in those two systems, but the Adapt system is solely
11 for the purpose of hourly employees.
12 MR. GASTON:  Okay.  That's all I have to now.  Thank you.
13 RESUMED DIRECT EXAMINATION
14 **Q   BY MS. COX:  Mr. Grabowski, so as I understand it, you've**
15 **turned over 30 -- around 30 to 36 disciplines to Respondent**
16 **counsel, and personnel files; have you turned over any**
17 **documents -- actual underlying documents responsive for BDL3?**
18 A   No.
19 **Q   Have you turned over any responsive documents for --**
20 **sorry, the other one is -- EWR4?**
21 A   No.
22 MS. COX:  Okay.  Judge Green, may I just go off the record
23 and consult with counsel --
24 JUDGE GREEN:  You want to go --
25 MS. COX:  In a breakout room?

Page 182

1 JUDGE GREEN:  Okay.  Off the record.
2 (Off the record at 2:08 p.m.)
3 THE COURT REPORTER:  Back on the record.
4 RESUMED DIRECT EXAMINATION
5 **Q   BY MS. COX:  Okay, so Mr. Grabowski, you testified earlier**
6 **that you turned over, sometime this month, 32 or 36 feedback**
7 **documents and personnel files, along with Ms. Stone, to**
8 **Respondent counsel.  I just want to ask you a few more**
9 **questions about that.**
10 **So the forms from the feedback documents from Adapt can be**
11 **exported, right?**
12 A   They can be exported, like in the Excel format?
13 **Q   No, in -- in showing the document itself, the underlying**
14 **document.**
15 A   Yes.
16 **Q   Okay, and you did that?**
17 A   No.
18 **Q   Okay.  So who -- I'm sorry, I don't understand, then, what**
19 **you did with Ms. Stone.  So who -- who actually exported the**
20 **documents, not the chart, from -- from Adapt?**
21 A   I don't know.
22 **Q   Okay.  With regard to the personnel files that and Ms.**
23 **Stone searched in OnBase -- so did you -- so -- so those**
24 **personnel files were able to be exported, right?**
25 A   Yes.

Page 183

1 **Q   Okay.  And you exported tho -- some of those personnel**
2 **files from JFK8?**
3 A   Ms. Stone and I went through both of them.  I don't
4 remember exactly.  So I know that we were looking through the
5 list, and not all feedbacks would have something documented or
6 investigative notes based on what the feedback is, so I -- I
7 can't say for sure if I actually exported all of them.  I know
8 that the two of us started going through the list, but she did
9 compile the majority of it.
10 **Q   Did you ex -- did you export any personnel files from**
11 **onboard -- or OnBase, I'm sorry?**
12 A   For this specific request?
13 **Q   For JFK -- the 32 to 36 disciplines responsive to**
14 **paragraph 16 for JFK8.**
15 A   I don't remember.
16 **Q   Okay.  So do you know if Ms. Stone exported the personnel**
17 **files from OnBase responsive to paragraph 16?**
18 A   Yes.
19 **Q   Have you ever -- have you ever exported a personnel file**
20 **from OnBase in your years of employment?**
21 A   Yes, and that's why I can't remember if I did for this
22 specific request just based on the number of requests that come
23 in, but yes, I have.
24 **Q   And how long does it take to export a personnel file from**
25 **OnBase?**

Page 184

1 A   I'm sorry.  If you could just give me one second there is
2 a -- all right, sorry about that.
3 MS. COX:  That's okay.  I'll withdraw the question.  I
4 don't have anything else, Judge.
5 JUDGE GREEN:  Okay.  Anything from Mr. Kearl?
6 MR. KEARL:  Yes, Your Honor.
7 CROSS-EXAMINATION
8 **Q   BY MR. KEARL:  Mr. Grabowski, do the -- the three systems**
9 **we've been talking about, the OnBase, Adapt, and Exact systems,**
10 **do those have data for all seasonal and full-time employees at**
11 **Amazon?**
12 A   Yes.
13 **Q   So if I were a -- it wouldn't matter if I was a seasonal**
14 **employee at Amazon or a full-time employee, any performance**
15 **documents, feedbacks, investigatory documents would all be**
16 **captured by those three systems?**
17 A   Yes.
18 **Q   Is there an appeals process for disciplinary documents at**
19 **Amazon?**
20 A   For certain levels of feedback, yes.
21 **Q   And in the event that there is a -- an appeal and a**
22 **writeup is subsequently removed or changed, how is that**
23 **reflected in the Adapt system?**
24 A   The status would be changed from completed to exempted.
25 **Q   And when you ran your reports for these processes, did you**

1 include -- did you limit your search by completed or exempted
2 in any way?
3 A  I believe it was the first time I ran it was completed,
4 and then I believe the next time I ran it was all inclusive.
5 Q  Okay.  And was that a part of the instructions that you
6 were given initially in running these searches?
7 A  Yes.
8 Q  Okay.  And so just -- just to be clear, so the first time
9 you ran this report and -- and you were get -- there were
10 13,000 results, that was a -- that was a completed-only
11 process; is that correct?
12 A  I don't know how many rows the Excel file had.
13 Q  But the first -- the first time you ran the search was
14 the -- was the only completed and nonexempted?
15 A  Yes.
16 Q  And then the second time you ran the search that was both
17 completed and exempted, what other -- what other changes were
18 there that you made to the search -- the -- the broad terms of
19 the search parameters?
20 A  So the first time the file was pulled, it was all feedback
21 for the JFK location, and then the Excel file was filtered for
22 completed prior to the sending to the team.  The team then
23 asked to broaden the search to not just completed for all
24 feedback, so the raw feedback for JFK every level status was
25 exported and sent.

1 Q  Okay.  So -- so -- okay.  And do you remember the -- the
2 approximate dates of these two searches or the amount of time
3 that -- between the two searches that you ran?
4 A  I honestly don't remember.
5 Q  You don't remember.  Okay.  And is there any way to delete
6 disciplinary records such that it would not show up as exempted
7 but would remove the file altogether?
8 A  No.
9 Q  Okay.  And so I -- I -- my understanding is in the Adapt
10 system the feedback that is -- that is recorded are these
11 documents similar to the document that Ms. Cox showed earlier,
12 the -- the supportive feedback document.  Can you tell me a
13 little bit about the kinds of documents that are housed in the
14 Exact and OnBase systems?
15 A  Yeah.  So Exact is for investigative tracking.  So you
16 have the ability to tie employees directly to a case that's
17 created of all levels:  hourly, salary, any type of employee,
18 and note their involvement in the case, whether they're the one
19 that made the allegation or a witness or the person that the
20 claim is against, as then -- as well as any details, and then
21 if there are witness statements collected from parties during
22 the investigation, they would be uploaded to the case, and then
23 with an outcome or the type of feedback, whether it was
24 substantiated or not substantiated, what was delivered or like,
25 what -- what the company would be proceeding with would be

1 documented in the Exact case, along with all investigative
2 notes before closing it out.
3     And then in the OnBase system --
4 Q  Before -- before you start OnBase, if you -- if I may
5 interject.  So when you export data from Exact, are you
6 filtering by case number or by employee number or are you able
7 to do both?
8 A  You can search for whichever you prefer.
9 Q  And are you able to similarly limit the search by dates
10 and facilities as you are when it -- within Adapt?
11 A  You might be able to.  I'm not sure.  The only way that
12 I've ever filtered it is by looking for a specific employee by
13 searching their employee ID.
14 Q  Okay.  And in the course of your searches related to the
15 subpoena in question, were you given specific cases to search
16 for or were you given specific employee numbers to search for?
17 A  So it would be the Excel file that was sent back with 30-
18 so-odd names on it with a specific employee, and then as you
19 saw in the Excel file, when you scroll over, it has the details
20 of the incident, so we'd be looking for the specific employee
21 and the situation that was being outlined in the Excel sheet.
22 So if there's a date that the feedback was delivered, we're
23 looking for the investigation that happened that led to that
24 feedback.
25 Q  Okay.  And when you run that search -- so hypothetically,

1 if there is an employee that is on that list of 36, if they
2 were involved in a disciplinary action and there was another
3 employee who submitted a witness statement, would that witness
4 statement have been captured in the search that you ran in the
5 Exact system?
6 A  Yes, so if it was pertaining to the same Exact case, which
7 it'd be a case is what would lead to a certain level of
8 feedback or disciplinary action.  So if we're referring to the
9 list that we search for and the outcome was X feedback,
10 anything in that investigation, statements from different
11 employees that led to that situation, would be captured in the
12 same Exact case number, which could also be located by
13 searching any employee that was involved or tied to the case.
14 Q  Okay, so searching for a single employee on a case will --
15 will generate results for all other information related to that
16 same case in Exact?
17 A  If you go into the case number.  So for example, I search
18 my employee ID in the Exact system.  What it's going to do is
19 then come up with a list of Exact case numbers, have a -- like,
20 a column that has case numbers, a column that has the
21 involvement in it, whether it's claimant or witness, and then
22 it has the date the case was created and the status of it, if
23 it's open, closed, and if you click that case, then it will
24 pull up all of the information you're looking for with witness
25 statements, details, outcomes, substantiated, not

1  substantiated, and who else was involved.
2  Q   So when you ran this report, you searched for the name
3  of -- or the number of the work -- the employee.  You found the
4  date that corresponded with that case number.  You opened that
5  case number, and then you exported all of the documents that
6  were asa -- that were associated with that case number for the
7  32 or 36 cases?
8  A   So that is the process that Christina followed, yes.
9  Q   Okay, and what -- what format of outputs was generated by
10  Exact from that system?
11  A   That I'm not sure.
12  Q   Do you know what kinds of output are able to be exported?
13  A   Yes.
14  Q   What kinds of -- what kinds of files are able to be
15  exported from that process?
16  A   So you can export witness statements or you can export a
17  case summary.
18  Q   Okay.  And -- and -- and are you also able to export an
19  Excel document that has all the information, similar to the
20  Adapt's reports that you ran in Excel?
21  A   I don't believe so.
22  Q   Okay.
23  A   So the witness statements would export in PDFs and so
24  would the case summary.
25  Q   And do you have to -- so what -- how long would it take

1  you to export documents for a single case?
2  A   It can vary based on employee -- I mean, depends how many
3  cases the employee has to go in and locate it then export it.
4  Q   Well, but just a single -- so if -- if we were to look up
5  your employee ID, let's say there's five cases, we select one
6  case, and we export all the documents related to that, how long
7  does that process take, roughly?
8  A   Five, ten minutes.
9  Q   Okay.  And the -- so let's now shift over to OnBase.  Can
10  you tell me a little bit about the kind of documents that are
11  housed in the OnBase system?
12  A   So it's any type of employee personnel documents.  A lot
13  of the most basic stuff ties to when employees are first
14  onboarded.  So you have their terms of employment.  You have
15  policy acknowledgement forms, anything that they had to
16  electronically or digitally sign upon being hired, and then if
17  there's policy updates or different documents that are pushed
18  to them through their employment, they'll have access to what's
19  called their MYDOCS portal, which is essentially their version
20  of OnBase in their employee portal.  They can see all the
21  documents they've acknowledged or signed in their tenure.  If
22  there is a termination letter, it would be in there.  And then
23  this site also has the opportunity to upload documentation
24  pertaining to that employee.  So prior to Amazon creating the
25  Exact system because, as I mentioned earlier, like in my Amazon

1  tenure, we didn't -- we haven't always had Exact, so it did
2  come, I would say, probably in the last two years.  Prior to
3  that, witness statements and investigative notes would be
4  uploaded to OnBase.
5  Q   Were there any -- in your searches related to this
6  subpoena, did you perform any searches in the OnBase system?
7  A   That's where Christina Stone would've looked.
8  Q   Okay.  And -- and in terms of exporting documents from
9  that, is it similar to Exact where you can export the PDF
10  documents, but not an Excel document?
11  A   That is correct.
12  Q   And how long would it take you to export a single
13  employee's records from the OnBase system?
14  A   I would say similar to Exact, five to ten minutes.  It --
15  it can be longer depending on different factors:  how many
16  times the employee's worked for Amazon, how long the employee's
17  worked for Amazon.  So if an employee gets rehired, they
18  maintain the same employee ID, so if someone gets rehired,
19  you're now looking at duplicate terms of employment,
20  termination summary, acknowledgement of every policy, so the
21  larger the file, the more time it takes to export it.
22  Q   Okay.  But is it fair to say that the five-to-ten-minute
23  range is roughly how long it would take per -- per record?
24  Okay.
25  A   Yes.

1  Q   And -- and remind me, did you say that you -- you did not
2  recall the dates that you -- you and your team member performed
3  the searches in Exact and OnBase?
4  A   I would say that it was in within the last month, but I
5  don't remember the specific dates.
6  Q   Okay.  And you received specific instructions to search
7  those databases as well?
8  A   I don't remember.
9  Q   Okay.  And just who did -- who -- did you ultimately make
10  the decision to -- to identify the relevant database systems
11  within Amazon or was that someone else that decided that Adapt,
12  OnBase, and Exact were the three?
13  A   I don't remember.
14  Q   Okay.  You -- but it might have been you, but it might've
15  been somebody else?
16  A   Yeah, so if, like, I'm looking at in my Amazon knowledge
17  what is relevant and like, where information will be housed
18  relevant to those, like, those are the one -- the three systems
19  that come to mind, but I cannot recall if someone were to --
20  had given me that guidance.
21     MR. KEARL:  Okay.  Okay.  And then, ju -- just one last
22  question.  I -- I ju -- know Judge we spoke about the duplicate
23  information.
24  Q   BY MR. KEARL:  Are -- it -- you know, in terms of
25  exporting documents, have you seen duplicative results being

Page 193

1  spit out of Adapt while running these searches and exporting
2  them in Excel?
3  A   No.
4      MR. KEARL:  Okay.  And Judge, if I -- if I may also just
5  say that you stated earlier that it was no longer a relevant
6  matter, but as of today, I still have not received any delivery
7  of documents from my last subpoena, which is identical to the
8  subpoena that was served on the 30th of March.  This was served
9  on the 13th.  There was your order on the 15th instructing
10  Respondents to deliver materials that were also responsive to
11  General Counsel's subpoena dated March 1st, and so the -- to --
12  to the extent that there still is a petition to revoke that has
13  not been ruled on and to the extent that my client and --
14  and -- you know, his attorney have not actually seen any di --
15  discovery documents, the -- the duplicative nature of -- or
16  the -- the -- the duplicative results and the assertation that
17  the volume of information is so great that information cannot
18  be produced is still -- is still relevant, especially where
19  it -- as concerns the subpoena that -- that I had -- I had
20  served.
21      JUDGE GREEN:  Okay.  So if we have enough time today,
22  we're going to get to that -- that matter, the issue of the
23  Charging Party's outstanding subpoena, so put a pin in that.
24  I -- I still don't think that the duplicates are going to be
25  significant with regard to that petition to revoke, but anyway,

Page 194

1  let -- let's -- let's move on.  So is that your -- is that --
2  are you done, Mr. -- Mr. Kearl?
3      MR. KEARL:  That is the extent of my questions, Your
4  Honor.  Thank you.
5      JUDGE GREEN:  Anything from the Respondent?
6      CROSS-EXAMINATION
7  Q   BY MS. WILLIAMS:  Our thank you for hanging -- hanging
8  through this.  Wanted to make sure I understood a couple of
9  things from you.  So did you pull any personnel files for this
10  matter?
11  A   A Excel file for the three sites, yes, and then for
12  individual employees, I remember I began going through the list
13  with Christina, but I don't remember exactly who pulled what.
14  Q   So you may have pulled some of them, you just didn't pull
15  all of them?
16  A   Yes.  I know for a fact that Christina pulled the majority
17  of them, based on the time of the day the request came in.  She
18  worked on it on a Saturday to finish it off and get me the rest
19  of the documents.
20  Q   And about how long does it take you to -- to download a
21  personnel file?
22  A   Five, ten minutes.
23  Q   And did you pull anything from the Exact system that we
24  talked about earlier?
25  A   Pertaining to this, no.  I think all of the Exact ones

Page 195

1  came from Christina.  I don't think that they're -- I don't
2  recall finding an Exact or having an Exact case for the ones
3  that I searched.
4  Q   Did you, though, search to see if there was anything
5  either in Adapt or Exact to see if there was anything for those
6  individuals?
7  A   Yes.
8  Q   And how long does it typically take to search in Exact to
9  see if there is something for an individual or not?
10  A   I would say searching for it probably similar, like five,
11  ten minutes to go in and then find the information that
12  you're -- you're looking for, and then more time if we're
13  looking to export it, get it to PDF.
14  Q   And I know earlier there was some discussion about whether
15  the status had changed on a discipline.  Did you pull counsel
16  everything that showed both statuses in the system?
17  A   Yes.
18  Q   Did you duplicate any information, as far as you were
19  aware, when you pulled information from the Adapt system?
20  A   No.
21  Q   Could there be duplicative information in the Adapt system
22  if, for example, more than one person is receiving discipline
23  for the same incident?
24      MS. COX:  Objection, Your Honor.  Calls for speculation.
25      JUDGE GREEN:  Overruled.

Page 196

1  A   So there could be duplicative information, but it would --
2  not all of the lines would be duplicate because it would be a
3  different employee receiving the feedback.
4  Q   BY MS. WILLIAMS:  So other than the employee, you might
5  have the same description for a disciplinary record?
6      MS. COX:  Objection --
7  A   Yes.
8      MS. COX:  -- Your Honor.  If I'm -- Ju -- Judge,
9  respectfully, if I'm not allowed to put in any evidence of the
10  number of duplicates, I'm -- I just object to Respondent
11  explaining away the duplicates.
12      JUDGE GREEN:  I -- I can tell you I'm -- I'm completely
13  unimpressed by the duplicates as evidence of a problem with
14  regard to compliance with the subpoena.
15      MS. WILLIAMS:  We'll -- we'll -- we'll move on, Your
16  Honor.  Your Honor, if I may have just a brief three minutes to
17  confer with my colleagues, and then I think we'll -- we'll wrap
18  it up.
19      JUDGE GREEN:  Okay, so off the record.
20  (Off the record at 2:48 p.m.)
21      JUDGE GREEN:  Any more questions from the Respondent?
22      MS. WILLIAMS:  No, Your Honor, not at this time.
23      JUDGE GREEN:  Okay.  And any follow up from the General
24  Counsel?
25      MS. COX:  No, Judge.

Page 229

1 those documents for the -- for the trial.
2     But I think that that -- I think that that type of
3 protective order is probably appropriate here.  You know, with
4 regard to 9 through 14, you know -- you know, it's -- it's a
5 broad discovery standard.  And you know, the -- the -- the
6 bottom line is, is that in -- in all -- I mean, I'm -- I'm
7 going to think about it, actually, before I issue the order.
8     But it's hard to say that these documents are not -- are
9 not relevant, although I don't think documents regarding
10 transfers and promotions are relevant.  But the documents are
11 probably relevant within -- you know, within the framework of
12 our standard as it pertains to subpoenaed records.
13     And so I don't know -- you know, I don't really think that
14 I'm in a position to deny that on the grounds of -- of rele --
15 relevance.  I -- I am loathed to effectively have a trial
16 regarding two additional employees.  But you know, with regard
17 to the petition to revoke, that's probably -- comes within
18 the -- within the gamut of -- of relevance, those documents.
19     You know, and I understand that the Respondent has,
20 essentially, made yet -- you know, yet another request for a
21 postponement.  But I'm -- I'm not -- I'm not going to grant
22 that request on the basis of the request for information
23 related to Mr. Smalls and Mr. Palmer.
24     That's where we're at.  I'm going to issue an order, and
25 I'm going to try to issue an order tomorrow.  And I -- you

Page 230

1 know, I would just suggest to you that to the extent you want
2 to do anything on the motion to postpone, try -- you know, if
3 there's a special appeal, try to do it as soon as possible.
4     MR. MURPHY:  And Judge, so assuming you're going to do
5 what you said you're going to do, and -- we proceed on the 3rd,
6 what -- how -- what -- what is your expectation in terms of us
7 producing any documents that -- that -- that might be covered
8 by the subpoena?  And don't forget, the counsel for the General
9 Counsel has -- has a -- I think a 99 paragraph, and some
10 paragraph request, in the queue right behind this.
11     JUDGE GREEN:  So -- okay.  You know, I can address that a
12 little bit.  The petition to revoke, and -- and a request for
13 sanctions for nonproduction are two completely different
14 things.  So we have a broad standard of discovery.  And it's
15 hard -- it's hard to establish the documents are -- are overly
16 broad and burdensome for purposes of subpoena revocation.
17     That doesn't necessarily mean that if the Respondent
18 doesn't show up with the documents that the General Counsel, or
19 subpoenaed -- subpoenaing party is necessarily entitled to some
20 form of sanctions.  You know, there are other factors.  There
21 are -- there's willfulness.  There's whether the search has
22 been reasonable or unreasonable, whether it's in good faith or
23 bad faith, whether there's prejudice.
24     And you know, the -- the General Counsel should be mindful
25 that.  It's not like -- you know, it's not as though if -- if

Page 231

1 the Respondent shows up, and not every document has been
2 produced, that there's necessarily going to be inferences, that
3 there's going to be Bannon-Mills remedies.
4     That's not at all necessarily the case.  We're going to
5 have to deal with that as it moves forward.  And that's
6 something that the General Counsel should consider in
7 determine -- in their determination as to whether they want to
8 go forward.
9     You know, I'm not -- all I can tell you is I haven't --
10 you know, I haven't granted any Bannon-Mills remedies.  And you
11 know, that's something that's -- that's a different issue
12 than -- than the -- the revocation issue, and we'll deal with
13 that as the time comes.  Is there anything else we have to do
14 on the record today?
15     MS. BUFFALANO:  We have one off the record item, but
16 nothing more, nothing more for on the record.
17     MS. COX:  Nothing from the General Counsel.
18     JUDGE GREEN:  All right.  So let's go off the record.
19 (Whereupon, the hearing in the above-entitled matter was
20 recessed at 4:47 p.m. until Monday, May 3, 2021 at 10:00 a.m.)
21
22
23
24
25

Page 232

1         C E R T I F I C A T I O N
2  This is to certify that the attached proceedings, via Zoom
3  videoconference, before the National Labor Relations Board
4  (NLRB), Region 29, Case Number 29-CA-261755, Amazon.com
5  Services LLC and Gerald Bryson, held at the National Labor
6  Relations Board, Region 29, Two Metro Tech Center, 5th Floor,
7  Brooklyn, New York 11201, on April 26, 2021, at 11:04 a.m. was
8  held according to the record, and that this is the original,
9  complete, and true and accurate transcript that has been
10 compared to the reporting or recording, accomplished at the
11 hearing, that the exhibit files have been checked for
12 completeness and no exhibits received in evidence or in the
13 rejected exhibit files are missing.
14
15
16
17
   _____
   BARRINGTON MOXIE
18
   Official Reporter
19
20
21
22
23
24
25

Page 269

1    JUDGE GREEN:  Okay.  So I -- I -- I've looked at the
2  papers, and -- and as far as I can tell, the -- the remain --
3  the remaining requests are -- are relevant, you know, I -- I --
4  I have a question about paragraphs 1 and 2; 19, 22, 23, 24, and
5  27 appear to me to be relevant and subject to production; 15
6  and 16 seem to be relevant and subject to production, given the
7  document that was attached to the General Counsel's opposition
8  as Exhibit C.
9    For paragraph 17, however, I -- I'm limiting it to docu --
10  at least in -- initially to documents for JFK 8, as opposed to
11  the other two facilities.  I think we've learned during the
12  course of this process that the number of documents available
13  at one of these very large facilities is -- is numerous, and
14  you know, disciplinary reports, for example, I have one
15  facility is -- appears to be sufficient for the General
16  Counsel's purposes.  I -- I was always skeptical of the --
17  the -- the relevance and usefulness of -- of disciplinary
18  records at the other two facilities.  I granted it because of
19  the Board's very broad standard of relevance, and reluctance to
20  squash documents because they -- they are burdensome, but at
21  least for the time being, I -- I'm limiting 17 to JFK 8.
22    With regard to 1 and 2, you know, I -- I just -- I guess I
23  just -- I have a question for the General Counsel, you know.
24    MS. COX:  Can you go back one moment, Judge?  So you
25  said --

Page 270

1    JUDGE GREEN:  Yes.
2    MS. COX:  -- 17 is limited to JFK 8; what about 18?
3    JUDGE GREEN:  Oh.
4    MS. COX:  Did you say both?  I didn't -- I didn't hear.
5    JUDGE GREEN:  No, I'm not -- J -- JFK 18, that's been
6  produced, right?  That -- the cat's out of the bag on that one.
7  So no, I'm not -- we're only -- wait, am I right?  What -- what
8  is 18?  I'm sorry.  Let me look.
9    MS. COX:  18 is the global workplace incident management
10  reports regarding referencing harassment by any employee at
11  JFK.
12    JUDGE GREEN:  Yes, I'm sorry.  So yes, so 17 and 18 are
13  currently limited.  You're right, are currently limited to
14  JFK 8.
15    MS. COX:  Okay.
16    JUDGE GREEN:  1 and 2, I -- you know, I'm just trying to
17  understand.  When you're trying to -- in these cases, when
18  you're looking at the investigation and who conducted it and
19  who made decisions to, you're often looking at whether there
20  was a rush to judgment, whether you have, you know, no
21  investigation, and somebody who generally doesn't have
22  authority to discipline or discharge.  They -- they -- they
23  rush to discharge somebody because there's this knee jerk
24  reaction, negative reaction to protect a concerted activity.
25  It -- you know, the -- the names in the global work --

Page 271

1  workplace incident management reporting template, if I'm
2  correct, those are -- those are just people who received
3  noticed, were -- were designated as people who would see --
4  received notice of what was going on with regard to the
5  discharge.  It seems like a lot of people, and I -- I just -- I
6  wondered where the -- where the Region's going with it.
7    MS. COX:  Well, Judge, to date, we still don't know who
8  made the decision to terminate Mr. Bryson, and these
9  individuals appear to have been -- participated, consulted, or
10  involved in his discharge.
11    JUDGE GREEN:  Okay.
12    MS. COX:  And for those reasons --
13    JUDGE GREEN:  All right, so listen.  I'm going to order
14  the production of 1 and 2 as well.
15    MR. MURPHY:  But -- Your Honor?
16    JUDGE GREEN:  Yes.
17    MR. MURPHY:  If -- I mean, if we need to identify these
18  individuals, we'll do -- if you're ordering us to do that,
19  we'll do it.  I suggest that a lot of them are identified on
20  that exhibit to the counsel for the General Counsel's
21  opposition to the petition to revoke.
22    JUDGE GREEN:  Well, I mean, it -- it -- I think that
23  the -- the subpoena, as it pertains to those individuals, which
24  is 1 and -- it's really 1 and 2, because 3 and 4 have been
25  withdrawn, and 6 and 7 have already been produced --

Page 272

1    MR. MURPHY:  Okay.
2    JUDGE GREEN:  -- so it's really 1 and 2.
3    MR. MURPHY:  Okay.
4    JUDGE GREEN:  And what they're looking for is additional
5  information regarding job duties and the -- the jurisdiction of
6  these individuals with regard to the facility.
7    So I don't know.  I -- you know, so --
8    MR. MURPHY:  So -- so we'll -- we'll --
9    JUDGE GREEN:  And I don't know if there is -- if they -- if
10  the General Counsel already has that information; it doesn't
11  sound like they do.
12    MR. MURPHY:  Yeah, so you know, we'll -- we'll identify
13  their positions.  It's just that -- that the way the request is
14  worded, right, documents that show job duties,
15  responsibilities, I mean, so take for example, Bradley Campbell
16  (phonetic).  Documents that show his responsibility or
17  authority, that -- that may be another, like, massive search
18  for anything in --
19    JUDGE GREEN:  I understand.  So do you have job
20  descriptions?  Do you just have a -- do you have a general job
21  description for -- for --
22    MR. MURPHY:  To -- to be quite honest, Your Honor, I don't
23  know the answer to that question.
24    JUDGE GREEN:  Okay.
25    MR. MURPHY:  We'll find that out and report, but -- but

# EXHIBIT N



# EXHIBIT N(1)

*March 30, 2020 Amazon Chime Message Between Tyler Grabowski and Christine Hernandez*
*(AMZ-BRY007980 - AMZ-BRY007983)*

CONFIDENTIAL

GC Exhibit 121

# Chat with "Hernandez, Christine" <hrnanch@amazon....

grabtyle@amazon.com & hrnanch@amazon.com

Earliest item: 2020-03-30 06:04:27
Latest item: 2020-03-30 18:00:59

All Parties: **Grabowski, Tyler <grabtyle@amazon.com>;**
Hernandez, Christine <hrnanch@amazon.com>

### Monday 30 March 2020

**Grabowski, Tyler <grabtyle@amazon.com>**

📎 photo-1.jpg

CONFIDENTIAL

AMZ-BRY007980

**CONFIDENTIAL**          GC Exhibit 121



09:46:29

**CONFIDENTIAL**          GC Exhibit 121

CONFIDENTIAL

GC Exhibit 121

Advanced Message Review Conversational Threads



**End Thread**

**Thread Statistics**

Instant Message Count: 35

# EXHIBIT N(2)

*March 25, 2020 Amazon Chime Message Between Pooja Desai and Christine Hernandez*
*(AMZ-BRY007984 - AMZ-BRY007987)*



# EXHIBIT N(2)

*March 25, 2020 Amazon Chime Message Between Pooja Desai and Christine Hernandez*
*(AMZ-BRY007984 - AMZ-BRY007987)*

CONFIDENTIAL

GC Exhibit 121

Earliest item: 2020-03-25
08:44:31

## Chat with "Desai, Pooja" <poodesai@amazon.com> ...

hrnanch@amazon.com & poodesai@amazon.com

Latest item: 2020-03-25
15:11:16

All Parties:  Desai, Pooja <poodesai@amazon.com>;  | **Hernandez, Christine <hrnanch@amazon.com>** |

**Wednesday 25 March 2020**

**Hernandez, Christine <hrnanch@amazon.com>**

| [March 25, 2020, 12:09 PM] Gilbert-Differ, Geoff: 1.    Christian Smalls (csmal) 2.    Ashley Maisonet (maisoash) 3.    Angelique DeGracia (addegrac) 4.    Jazel Bispham (bispj) 5.    Rechard Newman (recharn) 6.    Derrick Palmer (depalmer) 7.    Guiselle Diaz (guisdiaz) 8.    Gerald Bryson III (gbbryso) | 09:25:41 |

**Desai, Pooja <poodesai@amazon.com>**

wait who is maureen                                                                    09:35:10

**CONFIDENTIAL**

Advanced Message Review_Conversation Thread as

Desai, Pooja <poodesai@amazon.com>

https://amazon.awsapps.com/workdocs/index.html#/document/425faf6003fb05ad69627e64273
62fb77055c388a30ce14085ff0028fea1a93e

09:41:23

CONFIDENTIAL

GC Exhibit 12



CONFIDENTIAL          GC Exhibit 121

Advanced Message Review Conversation Threads

**End Thread**

**Thread Statistics**

Instant Message Count: 43



GC Exhibit 121

# EXHIBIT N(3)

*April 7, 2020 Amazon Chime Message Between Pooja Desai and Christine Hernandez
(AMZ-BRY007988 - AMZ-BRY007997)*

CONFIDENTIAL

# GC Exhibit 121

Earliest item: 2020-04-07
05:58:07

Latest item: 2020-04-07
15:18:24

## Chat with "Desai, Pooja" <poodesai@amazon.com>...

hrnanch@amazon.com & poodesai@amazon.com

All Parties:  Desai, Pooja <poodesai@amazon.com>;   **Hernandez, Christine <hrnanch@amazon.com>**

**Tuesday 07 April 2020**

**CONFIDENTIAL**

GC Exhibit 121



**CONFIDENTIAL**                                    **AMZ-BRY007989**

**CONFIDENTIAL**

**Hernandez, Christine <hrnanch@amazon.com>**

> we need to track the 5 everyday --- are they here? using time? what are they doing lol          06:19:06

**Desai, Pooja <poodesai@amazon.com>**

whos 5                                                                                              06:19:13

**Desai, Pooja <poodesai@amazon.com>**

i check 4                                                                                           06:19:21

**Hernandez, Christine <hrnanch@amazon.com>**

> Derrik and company                                                                                06:19:23

**Desai, Pooja <poodesai@amazon.com>**

Gerald bryson (103899737) Not here Derrick palmer (100689710) Not here
Mandi Velasco (103787112) Not here Brittany Burns (102081560) Not here        06:19:38

**Desai, Pooja <poodesai@amazon.com>**

ohhh jayyy flowers?                                                    06:19:44

**Hernandez, Christine <hrnanch@amazon.com>**

| helly |
|---|

06:19:48

**Hernandez, Christine <hrnanch@amazon.com>**

| and yes Jayy |
|---|

06:20:00

**Desai, Pooja <poodesai@amazon.com>**

No jay                                                                 06:21:50

**Hernandez, Christine <hrnanch@amazon.com>**

| No Jay as in he's not here? |
|---|

06:22:41

CONFIDENTIAL    GC Exhibit 121

**Hernandez, Christine <hrnanch@amazon.com>**

Shai can work on that                                                          06:22:47

**Desai, Pooja <poodesai@amazon.com>**

No Helly either                                                               06:22:51

**Hernandez, Christine <hrnanch@amazon.com>**

not here?                                                                     06:22:59

**Desai, Pooja <poodesai@amazon.com>**

no                                                                           06:23:05

**Hernandez, Christine <hrnanch@amazon.com>**

k                                                                            06:23:11

**Hernandez, Christine <hrnanch@amazon.com>**

keep looking before Lisa asks lmao                                            06:23:19

**Desai, Pooja <poodesai@amazon.com>**

i already did                                                                 06:23:24

**Desai, Pooja <poodesai@amazon.com>**

i sent you                                                                    06:23:28

**Hernandez, Christine <hrnanch@amazon.com>**

all of them>                                                                  06:23:31

**Hernandez, Christine <hrnanch@amazon.com>**

so zero are here                                                              06:23:37

**Hernandez, Christine <hrnanch@amazon.com>**

lol                                                                          06:23:42

**Desai, Pooja <poodesai@amazon.com>**

Gerald bryson (103899737) Not here Derrick palmer (100689710) Not here
Mandi Velasco (103787112) Not here Brittany Burns (102081560) Not here         06:24:58
Jayy Flowers (103724577) Not here Helly Rangel (103536719) Not here

**Hernandez, Christine <hrnanch@amazon.com>**

yayyy                                                                        06:25:05

**Hernandez, Christine <hrnanch@amazon.com>**

might be a good day hopefully                                                 06:25:11

CONFIDENTIAL                                    AMZ-BRY007993

CONFIDENTIAL    GC Exhibit 121

**Hernandez, Christine <hrnanch@amazon.com>**

lmao                                                                              06:25:12

**Hernandez, Christine <hrnanch@amazon.com>**

I need to catch up                                                                06:25:21

**Desai, Pooja <poodesai@amazon.com>**

Gerald Bryson (103899737) Not here - DB3-0700
Derrick Palmer (100689710) Not here - DB3-0715
Mandi Velasco (103787112) Not here - DA5-0715                                      06:28:25
Brittany Burns (102081560) Not here - DA5-0615 Jayy Flowers (103724577) Not here - DB2-0715
Helly Rangel (103536719) Not here - DC7-0715

**Desai, Pooja <poodesai@amazon.com>**

Sorry just throwing this in so i dont forget                                       06:28:32

**Hernandez, Christine <hrnanch@amazon.com>**

thank you!                                                                        06:29:27

**Hernandez, Christine <hrnanch@amazon.com>**

what's her name>                                                                  06:31:14

**Desai, Pooja <poodesai@amazon.com>**

not tracking                                                                      06:31:28

**Desai, Pooja <poodesai@amazon.com>**

Advanced Message Review_Conversation Threads

**CONFIDENTIAL**                    GC Exhibit 121

giselle diaz                                                                    06:31:39

**Hernandez, Christine <hrnanch@amazon.com>**

what the other one --- the first one she mentioned that Bradley gave her the date    06:32:31

**Desai, Pooja <poodesai@amazon.com>**

rina cummings?                                                                  06:32:55

**Hernandez, Christine <hrnanch@amazon.com>**

yess                                                                            06:33:07

**Desai, Pooja <poodesai@amazon.com>**

she's the vision impaired from another protest                                  06:33:07

**Desai, Pooja <poodesai@amazon.com>**

the actual big protest                                                          06:33:10

**Desai, Pooja <poodesai@amazon.com>**

her we are tracking                                                             06:33:15

**Hernandez, Christine <hrnanch@amazon.com>**

and that Giselle chick I don't see                                              06:33:20

**Desai, Pooja <poodesai@amazon.com>**

https://phonetool.amazon.com/users/guisdiaz                                     06:33:33

**Hernandez, Christine <hrnanch@amazon.com>**

ohhhh heerrr                                                                    06:33:46

**Hernandez, Christine <hrnanch@amazon.com>**

she was in the office I think one of the mornings                               06:34:01

CONFIDENTIAL

GC Exhibit 121

CONFIDENTIAL

GC Exhibit 121

Advanced Message Review_Conversation Thread

**End Thread**

**Thread Statistics**

Instant Message Count: 143

# EXHIBIT N(4)

*April 8, 2020 Amazon Chime Message Between*
*Pooja Desai, Aashita Behal, and Neha Viswanath*
*(AMZ-BRY007999 - AMZ-BRY008001)*

CONFIDENTIAL

GC Exhibit 121

## Chat with "Desai, Pooja" <poodesai@amazon.com> an...

aashbeha@amazon.com & nehavisw@amazon.com & poodesai@amazon.com

Earliest item: 2020-04-08 05:20:14

Latest item: 2020-04-08 06:24:12

---

All Parties:  Behal, Aashita <aashbeha@amazon.com>;   Desai, Pooja <poodesai@amazon.com>;

Viswanath, Neha <nehavisw@amazon.com>

---

### Wednesday 08 April 2020

**Desai, Pooja <poodesai@amazon.com>**

Morning ladies!!                                                                                  05:20:14

**Desai, Pooja <poodesai@amazon.com>**

Aashi haha you know what I'm about to ask. Can you pleaseeee look into their lenels/punches?
Gerald Bryson (103899737) Not here - DB3-0700
Derrick Palmer (100689710) Not here - DB3-0715                                                    05:20:43
Mandi Velasco (103787112) Not here - DA5-0715
Brittany Burns (102081560) Not here - DA5-0615 Jayy Flowers (103724577) Not here - DB2-0715
Helly Rangel (103536719) Not here - DC7-0715

**Behal, Aashita <aashbeha@amazon.com>**

yesssss lol                                                                                       05:41:04

**Behal, Aashita <aashbeha@amazon.com>**

are these the people that were there on the intial protest?                                       05:44:29

**Behal, Aashita <aashbeha@amazon.com>**

were they asked to not come to site?                                                              05:44:35

**Behal, Aashita <aashbeha@amazon.com>**

if so on what basis?                                                                              05:44:46

**Desai, Pooja <poodesai@amazon.com>**

So they're allowed onsite                                                                         05:45:18

**Viswanath, Neha <nehavisw@amazon.com>**

none were asked to not come on site.. we are trying to see if they are here so we can engage
them since most of them have not been here in a while                                             05:45:20

**Desai, Pooja <poodesai@amazon.com>**

There were a few who got a little mean and crazy and need to be spoken with                        05:45:46

**Behal, Aashita <aashbeha@amazon.com>**

whose speaking to them? ER?                                                                        05:46:00

**Behal, Aashita <aashbeha@amazon.com>**

CONFIDENTIAL                                    AMZ-BRY007999

Gerald Bryson (103899737) Still Not here - DB3-0700

**Desai, Pooja <poodesai@amazon.com>**

"Still" not here 😂                                                    05:46:35

**Desai, Pooja <poodesai@amazon.com>**

Legit what we spend hours discussing                                  05:47:06

**Behal, Aashita <aashbeha@amazon.com>**

would you mind sharing with me what you guys discuss and how we engage with them?   05:47:34

**Behal, Aashita <aashbeha@amazon.com>**

Derrick Palmer (100689710) Still Not here - DB3-0715                   05:47:47

**Behal, Aashita <aashbeha@amazon.com>**

Mandi Velasco (103787112) Still Not here - DA5-0715                    05:48:35

**Behal, Aashita <aashbeha@amazon.com>**

Brittany Burns (102081560) Still Not here - DA5-0615                   05:49:08

**Behal, Aashita <aashbeha@amazon.com>**

Jayy Flowers (103724577) Still Not here - DB2-0715                     05:52:12

**Behal, Aashita <aashbeha@amazon.com>**

Helly Rangel (103536719) Still Not here - DC7-0715                     05:52:50

GC Exhibit 121

**CONFIDENTIAL**

**End Thread**

**Thread Statistics**

Instant Message Count: 27



GC Exhibit 121

# EXHIBIT N(5)

*March 25, 2020 Amazon Chime Message Between Desai Pooja and Christine Hernandez*
*(AMZ-BRY008002 - AMZ-BRY008007)*

CONFIDENTIAL

# GC Exhibit 121

Earliest item: 2020-03-25 06:11:03

Latest item: 2020-03-25 17:20:36

## Chat with "Jones, Elliott" <ottjones@amazon.com> and...

gmilly@amazon.com & lisastro@amazon.com & ottjones@amazon.com

All Parties:  Strobridge, Lisa <lisastro@amazon.com>;   Jones, Elliott <ottjones@amazon.com>;

Gutierrez, Milly <gmilly@amazon.com>



**Wednesday 25 March 2020**

CONFIDENTIAL

GC Exhibit 121

Advanced Message Review_Conversation Thread as

**Gutierrez, Milly <gmilly@amazon.com>**

Christian Smalls (csmal) 2.    Ashley Maisonet (maisoash) 3.    Angelique DeGracia (addegrac)
4.    Jazel Bispham (bispj) 5.    Rechard Newman (recharn) 6.    Derrick Palmer (depalmer)
7.    Guiselle Diaz (guisdiaz) 8.    Gerald Bryson III (gbbryso)                    09:10:31

**Gutierrez, Milly <gmilly@amazon.com>**

Can you make sure you capture the AAs not trusting ABM cleaning                    09:20:52

CONFIDENTIAL                                                                    AMZ-BRY008005

CONFIDENTIAL

GC Exhibit 121

Advanced Message Review_Conversation mode as...

**Gutierrez, Milly <gmilly@amazon.com>**

[March 25, 2020, 11:48 AM] Lighty, Rachael: CNN: Rita Cummings, a worker at the Staten Island    09:49:07

facility, told CNN Business she felt a lack of control about the situation, saying few are washing
their hands and that "nobody is really coming around to ask people if they're OK, if they're
feeling sick. I feel like they're not as proactive as they should be."

**Strobridge, Lisa <lisastro@amazon.com>**

mother. eff.    09:49:24

**Strobridge, Lisa <lisastro@amazon.com>**

how in the hell does she know no ones washing their hands...that is such bullshit    09:50:05

**Strobridge, Lisa <lisastro@amazon.com>**

sorry...that was frustrated venting    09:54:51

**Gutierrez, Milly <gmilly@amazon.com>**

why are you sorry    09:55:05

**Gutierrez, Milly <gmilly@amazon.com>**

it's so frustrating that Rina has only worked 3 days    09:55:21

**Strobridge, Lisa <lisastro@amazon.com>**

yep...im more frustrated with media running with these statements with literally zero commons    09:56:14
sense fact checking

**Strobridge, Lisa <lisastro@amazon.com>**

and they are major news outlets, and all it does is amp up fear and paranoia    09:56:39

CONFIDENTIAL    AMZ-BRY008004

CONFIDENTIAL   GC Exhibit 121



CONFIDENTIAL

Advanced Message Review_Conversation Thread

CONFIDENTIAL                    GC Exhibit 121



                    AMZ-BRY008006
https://relmtp003.consilio.com/Relativity/Case/Document/Review.aspx?AppID=8794921&ArtifactID=2251753&profilerMode=View&ArtifactTypeID=10#

**End Thread**

**Thread Statistics**

Instant Message Count: 71

GC Exhibit 121

# EXHIBIT O

**CONFIDENTIAL**   GC Exhibit 121

# ATTORNEY-CLIENT PRIVILEGE

[EXTERNAL EMAIL]

**CONFIDENTIAL**                    AMZ-BRY008753

CONFIDENTIAL GC Exhibit 121



CONFIDENTIAL AMZ-BRY008754

**CONFIDENTIAL**

# GC Exhibit 121



==Monday 4/6/20== (Demonstration) (kicks off with small group of 8 by the AMAZON sign at the start of OB break around 12:05pm)

<u>Media</u> - NY1Spectrum / Helicopter?

<u>8 people at the start</u> - not all AA's (looks like 5 are not employees)
Derrik Palmer -- blow horn asking about the number of cases; managers are criminals; managers that wear Safety Vest are a disgrace; lack of security  checks; security we don't check for weapons;  managers being sent home and being kept a secret; quarantined AA's have not been paid; people in the executive office are racist; we ain't dumb N***;
Gerald Bryson -- (out since 3/21/20) pink; spoke to an AA who was coming back from lunch Dimitra Evans; yelling at the another employee in profanity to join them outside; on FB live made fun of her "looking a junkie on fentanyl"; lots of inflammatory statements on FB live.
Jayy Flowers --- (2/27 last punch /3/13 last on site) spoke with the media on camera
Helly Rangel - Blue sign - tentatively (DA5- 7:15) last on site 3/30/20;  Vacation time for today
Female? - (9) (arrived after 12:40pm) with white sign / red & black mask / appears to be AA
Male? - Marcus Reid (not identified)

CONFIDENTIAL



GC Exhibit 121

Signs "shut down and sanitize" "Treat your workers like customers" "JFK8 How many cases do we have? #Amazonstrike #Shutitdown"  "Billionaires put their wealth over our health close JFK8"
"Jeff Bezos has blood on his hands" "Alexa Send us home" "Chris Smalls We stand behind you"

AMAZON Sign on the corner of the Parking Lot -- 7 people  ---5 individuals chanting by the sign (4 are media) the other 2 moved to the front of the building (Derrik and Gerald)

12:15pm --Geoff goes out to address SD with the team (4 in total - 3 identified; 1 not sure); Derrik was interviewing on a cell phone at the time
12:23pm - Insubordination talking points delivered to Derrik via Geoff
12:40pm -  (10) Smalls arrives at the bus stop; same black sign as last week; speaking to the media
12:48pm - Maciej calls Sai to tell him that Gerlad screams at an AA (Dimitra Evans)  walking back from lunch; cursing at her to join them
Around 12:55pm -- 6 outside the property are not employees; all have signs and 1 is videoing
1:34pm - Smalls leaves
2:10pm - Derrik and 2 others leave in his car
2:10pm -- 3 press still on site; NY1

Athena
Make the Road NY

CONFIDENTIAL                    AMZ-BRY008756

CONFIDENTIAL   GC Exhibit 121

CONFIDENTIAL                    AMZ-BRY008757

CONFIDENTIAL

GC Exhibit 121

Thank You,

CONFIDENTIAL         AMZ-BRY008758

CONFIDENTIAL            GC Exhibit 121

CONFIDENTIAL            AMZ-BRY008759