# EXHIBIT F(iii)

**CP Exhibit 1**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DERRICK PALMER, KENDIA MESIDOR, BENITA ROUSE, ALEXANDER ROUSE, BARBARA CHANDLER, and LUIS PELLOT-CHANDLER, | |
| Plaintiffs | COMPLAINT |
| v. | |
| AMAZON.COM, INC. and AMAZON.COM SERVICES, LLC, | |
| Defendants. | |

## INTRODUCTION

1.      Defendants Amazon.com, Inc. and Amazon.com Services LLC (together, "Amazon") operate the JFK8 "fulfillment center" in Staten Island. The JFK8 facility is a small city that runs twenty-four hours a day, seven days a week and has a footprint of more than fourteen football fields. It employs thousands of workers, many of whom are people of color who travel hours every day by public transportation to work ten- to eleven-hour shifts for low wages fulfilling Amazon orders for customers across the East Coast.

2.      This case is about Amazon's failures to comply with New York law and state and federal public health guidance during the COVID-19 pandemic at the JFK8 facility.

3.      Amazon's failures have already caused injury and death to workers and family members of workers. At least one JFK8 worker has died from COVID-19, and there are rumors of additional deaths among JFK8 workers. Workers have brought the virus home to family members, some of whom have also tragically died.

4.      Plaintiff Barbara Chandler, for example, contracted the virus that causes COVID-19 in March at the JFK8 facility from workers who were explicitly or implicitly

encouraged to continue attending work and prevented from adequately washing their hands or sanitizing their workstations.

5.     Chandler brought the virus home to her family and less than a month later, she awoke to find her cousin with whom she lived dead in their bathroom, after he had become ill with COVID-19 symptoms. As explained further below, Chandler was eligible for and requested paid quarantine leave under New York law, which requires employers like Amazon to promptly issue quarantine pay to workers so that no one feels pressured to attend work when they may be sick. Despite everything she had been through, Amazon failed to pay Chandler her quarantine leave in the next pay period as required. And after weeks of delay, Amazon ultimately compensated Chandler for only a portion of the quarantine leave pay to which she was entitled.

6.     Aside from Chandler's claim to backpay for quarantine leave, Plaintiffs in this case do not seek damages for past harm. All they seek is an order requiring Amazon to comply with public health guidance to prevent more harm in the future.

7.     This harm is not theoretical. Workers at JFK8 continue to contract COVID-19. As recently as this past weekend, JFK8 workers received a message from Amazon announcing "additional" newly confirmed cases in the facility. As New Yorkers consider a gradual return to normalcy, JFK8 workers and their families live with the very real threat of infection every day.

8.     Although Amazon has sought to create a façade of compliance by, for example, providing fulfillment center employees with masks, the company has also relied on purposeful miscommunication with workers, sloppy contact tracing, and the culture of workplace fear it has instilled at JFK8 to ensure it can maintain productivity while reducing costs, even if that means workers come to work sick and cannot engage in proper hygiene, sanitizing, or social distancing while at work in order to stay healthy.

9.     Amazon is not a small business doing its best under uncertain guidance, and Amazon is not helpless to prevent injury and death caused by virus spread occurring within its facility. Amazon is one of the wealthiest companies in the world, and it uses cutting-edge technology to monitor its workers at JFK8, choreographing their locations within the facility by algorithm and using hand-held scanners and smartphone applications to record their movements and track, on a minute-by-minute basis, whether they are working or are "off task."

10.     In an effort to maintain its labor force levels and production, Amazon has exerted iron-fisted control over efforts to stem the spread of the virus among workers at JFK8.  Amazon tells workers they should contact Amazon's onsite clinic if they have symptoms, contact Amazon Human Resources for guidance as to whether they should quarantine, avoid telling others if they become infected and rely on Amazon to perform contact tracing, and continue to work at dizzying speeds, even if doing so prevents them from socially distancing, washing their hands, and sanitizing their work spaces.

11.     Amazon controls its workers and undermines its workers' efforts to protect themselves and their coworkers from the virus that causes COVID-19 through a culture of workplace fear reinforced by constant technological supervision, retaliation against those who speak out, and the threat of automatic and immediate job loss in a job market where it may be impossible to find work elsewhere.

12.     Although Amazon's revenue has ballooned during the pandemic, the company has managed to minimize costs. But the costs Amazon saves are borne by the public, and the risks are most profound for workers and their families, like Plaintiff Barbara Chandler and her cousin. Most New Yorkers have remained safe by complying with the state's stay-at-home order, but for JFK8 workers and their families, home has been a place of danger.

# **PARTIES**

13.     Plaintiff Derrick Palmer, a resident of New Jersey, is a Warehouse Associate, Process Guide and Picking Master in the Pick, Count, Floor-Health department at JFK8. He has worked for Amazon since July 2015 and has worked in the JFK8 facility since it opened in October 2018. In his role as a Picking Master he picks customer orders, repeatedly touching items that have been touched by other workers at JFK8. His role as a Process Guide requires regular and close interaction with around 40 other warehouse associates.

14.     Plaintiff Kendia Mesidor, a resident of New Jersey, lives with and is in a relationship with Derrick Palmer. She is anemic and at heightened risk of infection. Her potential exposure to the virus through Palmer's work at JFK8 has already caused Mesidor trauma. Mesidor's elderly father died on May 15, 2020; due to her concerns that she could be a carrier of the virus because of living with someone who works at JFK8, Mesidor was only able to see her father once during his final months. Mesidor's last visit with her father took place through a window days before he died.

15.     Plaintiff Benita Rouse, a resident of New York, is a Problem Solver in the inbound department at JFK8. She has worked for Amazon since March 2017 and has worked in the JFK8 facility since it opened in October 2018. In her role as a Problem Solver, she assesses whether damaged items can be re-sold, which entails touching items that have been handled by other workers at JFK8. Her role as a Problem Solver also requires regular and close interaction with her team, as they all use the same equipment and fixtures to process and dispose of products.

16.     Plaintiff Alexander Rouse, a 32-year-old resident of New York, lives with and is the only child of Benita Rouse. During the pandemic, he has followed the stay-at-home order in

New York City, only leaving their small apartment about once per week to get groceries. His primary potential exposure to the virus that causes COVID-19 is through his mother, Benita Rouse.

17.     Plaintiff Barbara Chandler, a resident of New York, is a Process Assistant in the Pick, Count, and Floor-Health department at JFK8. She has worked for Amazon since February 2017 and has worked in the JFK8 facility since it opened in October 2018. In her role as a Process Assistant, she helps manage, supervise, and coach a team of about 50 people, frequently interacting closely with workers at JFK8 to ensure they are performing their tasks up to Amazon's standards and to help them solve problems in the workplace.

18.     Chandler tested positive for COVID-19 in March 2020, and several members of her household subsequently became sick, including her cousin who died on April 7, 2020 after experiencing COVID-19 symptoms.

19.     Plaintiff Luis Pellot-Chandler, a resident of New York, lives with and is the oldest child of Barbara Chandler. During the pandemic, he has followed the stay-at-home order in New York City, but after his mother contracted COVID-19, he got sick and experienced symptoms of COVID-19.

20.     Defendant Amazon.com Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.

21.     Defendant Amazon.com Services LLC is a wholly owned subsidiary of Amazon.com Inc.  Amazon.com Services LLC is a Delaware limited liability corporation with its principal place of business in Seattle, Washington.

22.     Amazon is the world's largest internet company by revenue, and, with approximately 840,000 employees, the second-biggest private employer in the United States. Amazon operates the JFK8 facility in Staten Island, New York.

## **JURISDICTION**

23.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity).

24.     Plaintiffs' claims arise under the laws of the United States because the question of whether Amazon's conduct violates state law involves interpreting federal rules and guidance, including guidance from the Centers for Disease Control and Prevention.

25.     This Court has diversity jurisdiction because Plaintiffs are residents of New York and New Jersey and Defendants are Delaware corporations with their principal places of business in Seattle, Washington.

26.     Furthermore, the cost to Amazon of implementing the injunctive relief requested below, including the costs necessitated by providing prompt information about, and payment of, COVID-19 quarantine leave, providing additional "time off task" to facilitate handwashing and sanitizing of workstations, developing and implementing a plan for disinfecting areas of the facility used by infected workers, and developing and implementing a contact-tracing protocol, is in excess of $75,000.00.

27.     Venue is proper pursuant to 28 U.S.C. § 1391 in the Eastern District of New York because the acts and omissions that are the subject of this action all occurred in the Eastern District of New York.

## FACTUAL ALLEGATIONS

**The Current COVID-19 Pandemic**

28.     COVID-19 is an infectious respiratory disease caused by a novel coronavirus.

29.     COVID-19 can result in serious, long-term health complications and has resulted in over 100,000 reported deaths in the United States to date. Among these serious health complications, COVID-19 can cause inflammation in the lungs, clogging the air sacs in the lungs, limiting the body's oxygen supply and blood clots, organ failure, intestinal damage, heart inflammation, problems with the liver, neurological malfunction, and acute kidney disease.

30.     Some populations are especially vulnerable to the consequences of COVID-19, including individuals 65 years and older, people living in a nursing home or long-term care facility, and others of all ages with underlying medical conditions, such as people with lung disease, asthma, heart conditions, severe obesity, diabetes, kidney disease, or liver disease and people who are immunocompromised.

31.     Some conditions that can cause compromised immunity include cancer treatment, smoking, bone marrow or organ transplantation, immunodeficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids, and other immune weakening medications.

32.     The novel coronavirus that causes COVID-19 is also highly contagious.

33.     COVID-19 appears to spread easily and sustainably across the world through "community spread."

34.     Community spread means that people have been infected with the virus in an area, including some who are not sure how or where they became infected.

35.     The virus spreads mainly person to person, primarily through respiratory droplets produced when an infected person coughs or sneezes.

36.     Spread is more likely when people are in close contact with one another (within about 6 feet for longer than 15 minutes).

37.     The virus can be spread even by people who are "asymptomatic," meaning they carry the active virus in their body but never develop any symptoms; "pre-symptomatic," meaning they have been infected and are incubating the virus but don't yet show symptoms; or very mildly symptomatic, meaning they feel unwell but continuing to come in close contact with others.

38.     Recent research from the CDC suggests that a single person with COVID-19 is likely to infect five or six other individuals absent aggressive social distancing practices.

39.     The best way to prevent illness is to avoid being exposed to this virus.

**New York's Response to the COVID-19 Pandemic**

40.     New York's first confirmed case of COVID-19 was announced on March 1, 2020.

41.     In the following weeks, New York became the global epicenter of the pandemic, with over 380,000 cases and 30,000 deaths to date. Officials estimate there are many more unconfirmed cases of the virus that resulted in many additional deaths.

42.     In addition to illness and death on a massive scale, the New York economy has been hard-hit by the pandemic. At the end of April, an estimated 1.2 million New Yorkers—27 percent of all private-sector workers—were estimated to be jobless.

43.     On March 20, 2020, Governor Andrew Cuomo issued the "New York State On PAUSE" Executive Order ("NYSOP").

44.     Under NYSOP, effective 8:00 p.m. on March 22, 2020, all non-essential businesses in the state were closed. NYSOP permits "Essential Businesses," defined as those

providing products or services that are required to maintain the health, safety, and welfare of the citizens of New York State, to stay open.

45.     Amazon is an "Essential Business."

46.     All Essential Businesses must continue to comply with the guidance and directives for maintaining a clean and safe work environment issued by the New York State Department of Health.

47.     One of the other early steps that New York State took to protect the public was to ensure that essential workers and others had access to paid sick leave when they had to quarantine pursuant to state law because they had contracted or been exposed to the virus and experienced symptoms.

48.     This protection has been an essential feature of New York's public health policy because it ensures that workers, including the millions of essential workers in New York State who do not have the savings to lose the income they make from work, are not encouraged to leave their homes and expose their coworkers by continuing to work.

49.     Under New York's paid quarantine leave protection,[1] workers are guaranteed job protection and financial compensation if they become subject to a mandatory or precautionary order of quarantine or isolation issued by the New York State Department of Health, local board of health, or any government entity duly authorized to issue such order due to COVID-19.

50.     Under New York law, a worker subject to quarantine leave must be paid for quarantine leave in the next pay period so that no one is encouraged to work outside of the home when sick.

---

[1] New Paid Leave for COVID-19, https://paidfamilyleave.ny.gov/COVID19.

51.     In recent weeks, New York has begun a phased reopening of previously closed

businesses under the New York Forward plan. As part of this plan, the state has provided

detailed industry-specific guidance for businesses that are reopening, as well as those, like

Amazon, that were deemed essential and continued their operations during NYSOP. These

guidelines are described as "minimum requirements"[2] that businesses must follow to remain

open, and include the following:

a.    Operate at no more than 50-percent occupancy as reflected on the
      facility's Certificate of Occupancy, except that if more workers are needed
      to continue safe operations, then additional mitigation measures must be
      taken;

b.    Implement policies to minimize sharing of objects and touching of shared
      surfaces, and when sharing of objects or touching of shared surfaces
      cannot be avoided, require that workers wash or sanitize their hands before
      and after use;

c.    Provide hand washing stations and supplies (including warm water, soap
      and paper towels) for employee use;

d.    Stagger shifts and breaks to minimize opportunities for congestion in
      hallways, break rooms, bathrooms, etc., and stagger scheduled tasks so
      that multiple teams are not working in the same area at the same time;

---

[2] Interim Guidance for the Wholesale Trade Sector During the COVID-19,
https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/WholesaleTradeMasterGui
dance.pdf.

e.    Ensure that workstations are cleaned and sanitized between shifts and that shared tools and equipment are cleaned and sanitized before a different worker uses them;

f.    If a person working on site tests positive for COVID-19, disinfect all portions of the facility to which that person had access, waiting 24 hours where possible to begin the disinfection process and closing those parts of the facility undergoing disinfection until the process is complete;

g.    Conduct regular, ongoing cleaning of the entire facility, giving particular attention to frequently touched surfaces and high-risk areas where many workers are present, and keep a log of all cleaning activities;

h.    If cleaning products are provided to workers to clean their own workstations, allocate time during shifts for this cleaning to be conducted;

i.    Conduct health screenings of all people entering the facility including asking if they have experienced symptoms of COVID-19 or been in contact with someone who has tested positive for the disease in the past 14 days, and keep a log of all responses to these questions to facilitate contact tracing efforts;

j.    Cooperate with local health departments if someone at the facility is diagnosed with COVID-19 by providing a list of all workers and visitors who entered the facility within 48 hours of the time the infected person was diagnosed or began experiencing symptoms, whichever was earlier.

**The Centers for Disease Control Response to the COVID-19 Pandemic**

52.    In response to the COVID-19 crisis, the CDC published guidance for employers and employees, including Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19).

53.    The purpose of the guidance is to "help prevent workplace exposures to COVID-19, in non-healthcare settings" and to "provide[] planning considerations for community spread of COVID-19." *Id.*

54.    The following is a summary of some of these guidelines:

a.    Employees who have symptoms should stay home and employers should develop flexible leave policies to allow employees to stay home, particularly by creating non-punitive sick leave policies;

b.    Employers should not require a positive COVID-19 test or a healthcare provider's note for employees to take sick leave;

c.    Sick employees should not return to work except in consultation with independent health care providers and state and local health departments;

d.    Employers should reduce face-to-face contact between employees;

e.    Employers should take steps to reduce transmission at the workplace by reassigning work tasks to maintain social distance of six-feet, staggering shifts, or allowing telework;

f.    Employers should establish policies to minimize spread through a workplace by identifying workers who have likely been exposed to the disease, including in some cases through contact tracing that requires a review of close contacts over the 48 hours before symptoms of the disease emerged;

g.      Employees should be encouraged to wash their hands and employers
should facilitate this by providing hand washing stations;

h.      Employers should provide tissues;

i.      Employers should increase ventilation rates; and

j.      Employers should develop plans to clean high touch areas with an EPA-
approved cleaning agent.

**Amazon Fails to Follow Minimum Public Health Standards to Prevent Transmission of COVID-19 at JFK8**

55.     During NYSOP, Amazon has kept JFK8 open as an essential business.

56.     JFK8 is a building that occupies approximately 840,000 square feet and is located in the Bloomfield neighborhood on the west shore of Staten Island.

57.     On average there are approximately 3,500 workers at JFK8. During peak seasons, which include months leading up to Christmas and the time around Amazon Prime Day in July, the workforce swells to approximately 5,000 workers.

58.     The workforce at Amazon has similarly swelled during the COVID-19 pandemic. Amazon has said it hired 175,000 new workers in April.

59.     At JFK8, many of the new workers are temporary workers hired to meet increased demands during the pandemic.

60.     Full-time JFK8 workers typically work 10.5-hour or 10.75-hour shifts, four days per week.

61.     During peak seasons these workers are expected to work "mandatory extra time" shifts, or "MET," of an additional 10-hour shift each week.

62.     Amazon has required some workers to work "mandatory extra time" because of increased demands during the pandemic.

63.     For example, on March 18, 2020 Amazon sent a text message to workers at JFK8 with a "reminder that All departments will be on MET For the week of March 22nd" and encouraged workers to come in to work because customers were relying on them more than ever.

64.     JFK8 also employs part-time workers who typically work 10-hour shifts, 3 days per week as well as flex-shift workers and variable-shift workers who have individualized schedules based on their availability.

65.     Because of JFK8's somewhat remote location, many workers take multiple forms of public transit to get to work. Those workers who do not have their own cars typically take public transit in New York City to the Staten Island Ferry and then board a city bus, the S40 or the S90, from the St. George Terminal to the facility.

66.     Although the S40 and S90 are used by JFK8 workers, they are public busses and other city residents can and do use them frequently.

67.     Because of the pandemic, the S90 express route has been suspended and service on the S40 has been significantly reduced.

68.     JFK8 workers and other City residents crowd onto the S40, often filling busses to capacity and leaving passengers to wait for the next bus.

69.     As a result, JFK8 workers who rely on public transit must often wait longer than usual for the bus and may arrive late to the facility.

70.     Around March 24, 2020, workers at JFK8 began raising concerns about Amazon's failure to take steps to ensure their safety.

71.     Specifically, workers were concerned that management was withholding information about positive cases in the facility, refusing to shut down the facility for a deep sanitization as had been done in other Amazon facilities with positive cases, failing to implement

and enforce policies to allow for adequate social distancing, and failing to improve access to leave for workers who were sick, who had family members who were sick, or who believed they had been exposed to someone with COVID-19.

72.     Amazon has disciplined several workers who spoke out about health and safety concerns at JFK8, including Plaintiff Derrick Palmer.

73.     Upon information and belief, as of June 2, 2020, there have been at least 44 confirmed cases of COVID-19 at JFK8.

74.     Upon information and belief, as of June 2, 2020, at least one, and possibly more, JFK8 workers have died of COVID-19-related causes.

75.     As of June 2, 2020, at least 4 family members or others who share living space with JFK8 workers have become infected with COVID-19, including three children and one cousin of Plaintiff Barbara Chandler. At least one of these individuals died.

**Amazon Discourages Workers from Taking Quarantine Leave and Does Not Promptly Pay Workers for Quarantine Leave as Required by New York Law**

76.     New York State law is abundantly clear: paid sick leave for workers is essential to preserve the public health during this pandemic.

77.     If workers feel pressure, whether explicit pressure from their employers or implicit economic pressure, to continue coming to work even when they may have the virus that causes COVID-19, the public health will suffer.

78.     Clearly communicating with workers about access to leave, promptly providing them with that leave, and promptly paying them for that leave is essential to protect the public health.

79.     Although Amazon purports to comply with New York quarantine leave law, it fails to abide by either the letter or the spirit of that law by obfuscating and miscommunicating with workers regarding the availability of leave.

80.     Amazon also fails to promptly pay workers when they stay home from work consistent with New York quarantine leave laws.

81.     Access to prompt, full payment for quarantine leave is essential to ensuring that workers can, consistent with the purposes of New York law, remain safely at home if they are or may be sick, confident that their income will not suffer as a result. That is a public health imperative.

82.     The potential availability of other forms of leave for Amazon workers does not absolve Amazon of its responsibility to make quarantine leave easily accessible.

83.     Many categories of paid and unpaid leave at Amazon are only accessible to workers who have formally applied to Amazon for such leave.

84.     Leave made available to workers at the employer's discretion is insufficient to mitigate the public health consequences of not providing adequate leave, particularly for low-wage workers in workplaces where workers fear retaliation for seeking leave.

85.     Some JFK8 workers may be entitled to some amount of automatic unpaid leave or "UPT," which accrues at 20 hours per quarter.

86.     Amazon deducts a full hour of UPT each time a JFK8 worker is more than five minutes late to work.

87.     This is true even if their lateness is due to public transportation problems, which have frequently occurred due to limited public transit during the pandemic.

88.     Furthermore, once a worker loses all his or her accrued UPT, he or she can be automatically fired for arriving late to work, even by a minute.

89.     The critical importance of UPT, and the potential consequences of running out of it, mean that workers fear running out of UPT for matters that cannot be controlled, like public transportation delays.

90.     As a result, workers are fearful of using up their UPT and guard it closely.

91.     Due to the COVID-19 pandemic, Amazon provided JFK8 workers with unlimited UPT for a period of time that included part of March and all of April 2020.

92.     Amazon recognized that this policy was essential to ensuring workers would feel safe staying home from work when they were sick.

93.     In May 2020, Amazon reinstated its usual limits on UPT.

94.     Since then, workers have struggled once again to retain their UPT and therefore feel increased pressure to attend work while sick or when they believe they were exposed to a COVID-19 positive individual.

95.     Because of the risks of unemployment, especially now, when the unemployment rate is higher than at any time since the 1930s, Amazon's unpaid leave policy is insufficient to reassure workers that they can miss work because of illness or exposure to illness.

96.      Workers at the JFK8 facility are also entitled to up to 48 hours of paid leave over the course of a year (called Paid Time Off or "PTO"), but which accrues at a gradual rate of one hour for every thirty hours of work in accordance with New York City paid sick leave laws.

97.     The amount of paid leave JFK8 workers are entitled to is inadequate to encourage workers to take sufficient leave when they are experiencing symptoms of COVID-19 or have

been exposed to the virus that causes COVID-19, particularly because of how slowly it accrues and the fact that many of Amazon's newer workers have access to little or no PTO.

98.     Amazon's punitive policies regarding unpaid leave further exacerbate the problem of the amount of paid leave being inadequate. Workers hesitate to use their city-mandated paid sick leave when they are sick because they are fearful that they may need to use it if, for example, they are late for work and unpaid leave is not available or during "blackout" periods when they are not entitled to use discretionary leave time.

99.     Amazon's unwillingness to provide easily accessible leave for workers who believe they may be infected with COVID-19 encourages workers to come to work when they are sick, exacerbating spread of the virus in the facility and beyond.

100.    Moreover, when a worker at JFK8 reports to a supervisor that he or she may be experiencing symptoms of COVID-19, the supervisor urges that worker to contact "Amcare," Amazon's in-house clinic.

101.    Amcare purports to provide medical care to Amazon workers experiencing injury or illness.

102.    Amcare has come under considerable scrutiny for purporting to provide medical care without being licensed to do so.

103.    As recently as 2019, Amazon received a "hazard letter" from the Occupational Health and Safety Administration regarding a nearby fulfillment center's Amcare facility, which also purported to provide medical care but did not receive sufficient oversight or supervision from a licensed physician.

104.    Amcare has encouraged workers to return to work notwithstanding the presence of injuries or illnesses that Amcare is not licensed to treat.

105.    Some workers have asked Amcare about COVID-19 and possible exposure at the facility, and Amcare has told them not to worry.

106.    On at least one occasion, a worker attempted to continue working after having visited Amcare and complaining of symptoms.

107.    When workers at the JFK8 facility appear to have symptoms of COVID-19 or believe they have come into close contact with the virus, Amazon requires them to communicate with Amazon's human resources team before they stay home pursuant to New York's quarantine laws.

108.    Because of Amazon's byzantine protocols related to quarantine leave and its retaliation against workers who speak out about workplace safety and COVID-19, many Amazon workers are confused about the process and fearful about what will happen if they pursue quarantine leave.

109.    Even when workers do affirmatively seek out information from Amazon about whether they should quarantine and whether they will be able to access paid quarantine leave, Amazon is slow to respond, causing workers to attend work even when they may be sick.

110.    For example, in May 2020, Plaintiff Benita Rouse heard from a co-worker with whom she had close contact at work for several days that he had tested positive for COVID-19.

111.    Rouse was concerned by her close contact with someone who had the virus but did not believe she could access quarantine leave without first speaking to Amazon's human resources department.

112.    Other leave available to Rouse, including unpaid leave, is dwindling, and she was fearful of using it knowing that she would likely need it someday to avoid discipline by Amazon.

113.    The day after learning of their co-worker's diagnosis, Rouse and another

co-worker who had also been in close contact with the COVID-19 positive individual attended

work and spoke to someone in Amazon's human resources office.

114.    The human resources employee told Rouse to go home and said that the human

resources employee could not make the decision herself but that someone who "gets paid more"

than her would call Rouse about whether she could access quarantine leave under New York law.

115.    Rouse did not receive a follow-up call to inform her whether to go to work.

116.    Fearing they would be terminated if they failed to show up for work but also not

wanting to further spread the virus in a workplace that had already lost workers to COVID-19,

Rouse and her co-worker repeatedly called Amazon human resources in an attempt to find some

clarity.

117.    Ultimately, for fear of being disciplined, Rouse's coworker attended work without

a definitive answer from Amazon.

118.    When Rouse finally reached a friend's day shift manager via "Chime," Amazon's

in-house messaging system, she was told that she should be patient because "contact tracing

takes some time."

119.    Then, five minutes later, the manager told Rouse that she could return to work

that day.  A few hours later, the same manager asked Rouse to inform her co-worker that they

could return to work.

120.    No one from Amazon asked Rouse if she had experienced any symptoms of

COVID-19 before authorizing her to return to work.

121.    Even when Amazon workers unquestionably qualify for paid quarantine leave and decide not to attend work, Amazon makes it difficult for them to obtain their state-required paid leave for their quarantine.

122.    When Barbara Chandler was worried that she might have contracted COVID-19 at the facility, she was fearful of missing work and of using precious time off. Chandler ultimately used some of her available unpaid time ("UPT") to take time off work.

123.    Days later, Chandler learned over the phone that she had tested positive for the virus after calling the clinic where she was tested a few days earlier.

124.    Chandler promptly sent Chime messages to human resources staff letting them know about her positive test.

125.    Shortly thereafter, Chandler received a phone call from an Amazon supervisor requesting that she provide proof of the positive test before he would "escalate" the matter to Amazon HR for the purposes of providing her with quarantine leave pay.

126.    As soon as Chandler was able to receive proof of her positive test later that evening, she sent it via Chime to the Amazon supervisor.

127.    As part of the purported process of receiving quarantine pay, Amazon's Employee Resource Center ("ERC") completed leave documents with Chandler by phone, and she received a "decision notification" from ERC several days later that authorized her leave under Federal FMLA, Amazon's Medical Leave of Absence, and Amazon's Short Term Disability policies.

128.    Amazon did not inform Chandler that she qualified for New York's COVID-19 paid sick leave, under which she was entitled to full pay during her quarantine.

129.    As of June 2, 2020, Barbara Chandler has only received 56 hours of full pay for her more than two weeks of quarantine, even though those benefits are supposed to be paid out to workers in the next pay period.

130.    Amazon paid part of the remainder of Chandler's COVID-19 quarantine pay as "Short Term Disability" at 60 percent her regular rate.

**Amazon Prevents Workers from Engaging in Basic Hygiene Tasks and Social Distancing**

131.    Amazon uses real-time tracking of employee activity on scanner devices that workers use to scan items, bins, and packages, in order to track whether workers at JFK8 are "on task" or "off task" for every minute of work.

132.    During every minute of each shift, including the two paid rest breaks, Amazon tracks—down to the minute—whether the worker is actively engaged in work based on whether they perform a task in that minute and aggregates a total time off task ("TOT") for each worker every day.

133.    If a worker has more than 30 total minutes of TOT in a shift, other than their paid break time, they receive a written warning.

134.    If a worker has more than 60 total minutes of TOT in a shift, other than their paid break time, they receive a final written warning.

135.    If a worker reaches 120 minutes of TOT in a shift, other than their paid break time, Amazon automatically terminates them.

136.    Although supervisors are authorized to re-code TOT for certain activities (like visiting Amcare) so that it does not count against the worker, supervisors cannot waive TOT for bathroom breaks, including trips to the bathroom for handwashing purposes.

137.    In addition, Amazon monitors workers to assess whether they are scanning items quickly enough.

138.    Typically, Amazon expects workers at JFK8 in the pick department to pick a total of 400 items per hour.

139.    In the count department, workers are expected to count 750 items per hour in simple bin count, 320 items per hour in simple record count, and 175 items per hour in cycle count.

140.    Workers who are not able to maintain Amazon's set rates are given verbal warnings and workers who consistently underperform compared to Amazon's rates are disciplined with write-ups or termination.

141.    Amazon does not automatically provide its warehouse workers with real-time information about how much TOT they have accrued over the course of their shift or about how fast they are picking or counting items.

142.    Many workers learn about their TOT or rate only when they are subject to discipline for not working fast enough or taking too much time away from their workstations.

143.    Therefore, these workers are unaware of how close they may be to hitting a TOT or rate-based disciplinary benchmark.

144.    Because of these time pressures and the absence of information about pace of work and TOT, Amazon warehouse workers are forced to work at a frenzied pace.

145.    Amazon's TOT and rate policies are oppressive and dangerous, even absent a pandemic.

146.     Based on a sample of records from Amazon facilities around the country, the
National Employment Law Project and a coalition of workers' rights organizations determined
that the Total Recordable Injury Rate at Amazon facilities in 2018 was 10.76 per 100 workers.

147.     This is three times as high as the injury rate across all private employers (2.8
recordable injuries per 100 workers) and more than twice as high as the injury rate in the
notoriously hazardous general warehousing industry (5.2 recordable injuries per 100 workers).

148.     The National Council for Occupational Safety and Health (NCOSH) included
Amazon on its "dirty dozen" list of especially unsafe workplaces in 2019. NCOSH reported that
Amazon workers "labor at a relentless pace, with constant monitoring of their activities. This
high stress environment leads to physical and emotional ailments—but reports indicate that the
company does not provide adequate support to those suffering on-the-job injuries."

149.     In the context of the COVID-19 pandemic, the relentless pace of work at Amazon
facilities becomes even more dangerous because the TOT and rate policies discourage workers
from leaving their workstations to wash their hands and from taking the time to wipe down their
workstations.

150.     This is particularly true because of the size of JFK8. A bathroom or handwashing
station can easily be a 7-minute walk, each way, from a worker's workstation.

151.     Although Amazon has provided some additional hand sanitizing stations for
workers, there are insufficient handwashing supplies or facilities near workstations.

152.     For most workers, however, the only place that they can wash their hands is the
bathroom, which could mean 15 minutes or more of TOT and a significant decrease in their rate.

153. If the bathroom is already occupied when a worker arrives, waiting longer for the bathroom to be vacated, as social distancing guidelines recommend, results in even more TOT and a further decrease in their rate.

154. Even when Amazon provides wipes to clean workstations, some workers, including the Plaintiffs employed by Amazon, fear taking the time to clean their stations for fear it will result in a writeup for TOT or rate issues.

155. Amazon has not provided workers with additional time between breaks to wash their hands or clean their workstations while they are working.

156. In fact, Process Assistants, who have the authority to waive TOT for certain reasons, are not allowed to waive TOT for bathroom trips, even if workers are trying to wash their hands to protect themselves from the spread of COVID-19 in the facility.

157. The rush to avoid TOT and maintain Amazon's rates while working also impedes social distancing.

158. Workers often find themselves rushing through the facility, which makes it difficult for them to spread out in hallways or, when they are able to use the bathroom or are required to access other cramped spaces, to allow other workers to leave before they enter.

159. These time constraints exert particularly harsh pressures over workers now because Amazon has hired a substantial number of temporary "seasonal" workers to staff its JFK8 warehouse during the pandemic.

160. These temporary "seasonal" workers, many of whom have been laid off from other jobs, are helping Amazon to meet increased demands cheaply and filling in for dozens of workers who have contracted COVID-19 while working at Amazon or who are in quarantine as a result of exposure to coworkers who have contracted COVID-19.

161.     These temporary "seasonal" workers have even less familiarity with Amazon requirements regarding TOT and rate but are just as fearful of losing their jobs.

162.     These temporary "seasonal" workers are thus more likely to rush through tasks and when moving through the facility and less likely to take even modest time away from their work to wash their hands.

**Amazon Takes Responsibility for Contact Tracing, But Fails to Comply with the Basic Requirements of Contact Tracing**

163.     Amazon informs workers that it engages in contact tracing.

164.     Amazon even suggests that its own contact tracing—as opposed to the judgment of the local public health offices—should determine whether a worker is eligible for quarantine leave.

165.     Amazon purports to perform contact tracing through and with the aid of its immense surveillance system, which uses cameras and other technology to track workers' locations during workdays.

166.     Amazon has told workers that its contact tracing consists entirely of reviewing surveillance footage to monitor the workplace contacts of workers diagnosed with COVID-19.

167.     Amazon claims it uses this information—and only this information—to identify workers who came into close contact with an infected worker during the final shift that the worker was in the facility before leaving due to infection.

168.     Amazon does not interview infected workers to identify colleagues they believe may have been exposed to the virus at JFK8.

169.     Amazon discourages workers who have tested positive for COVID-19 from informing coworkers they have tested positive and that others may be at risk.

170.     These practices fall short of, and in some cases are directly contrary to, proper
protocols for contact tracing.

171.     According to CDC guidance, the entity performing contact tracing should inform
all people who have come into close contact with an infected person within the 48 hours before
the infected person experienced symptoms.

172.     According to New York requirements, employers must cooperate with local
health departments if someone at the facility is diagnosed with COVID-19 by providing a list of
all workers and visitors who entered the facility within 48 hours of the time the infected person
was diagnosed or began experiencing symptoms, whichever was earlier, so that proper contact
tracing can be performed.

173.     Instead of cooperating fully with local health authorities, however, Amazon
appears to be attempting to perform contact tracing on its own.

174.     A health advisory published by the New York State Health Department on March
31, 2020, mandated that essential workers who had been exposed to a person with a confirmed or
suspected case of COVID-19 would only be permitted to continue working if they remained
asymptomatic, quarantined while at home, underwent symptom checks upon entering the
workplace each day, and self-monitored for symptoms (including checking their temperature
every 12 hours) while at home.[3]

175.     Amazon does not ask workers who have reported exposure to an individual with
COVID-19 whether they have any symptoms.

---

[3]

https://coronavirus.health.ny.gov/system/files/documents/2020/04/doh_covid19_essentialperson
nelreturntowork_rev2_033120.pdf.

176.    Amazon also does not instruct these workers on how to monitor their health at home, to quarantine when not at work, or to seek medical advice.

177.    In an effort to maintain labor force levels, even when many workers are or may be infected with COVID-19, Amazon is not performing contact tracing consistently with CDC and/or New York State guidance.

**Amazon Does Not Properly Sanitize High-Touch Services or Clean Areas that Have Been Touched by Someone Who Has Been Diagnosed with the Virus**

178.    Sanitizing and cleaning are especially important in a facility like JFK8, where thousands of workers may be touching the same surfaces on any given day and where many workers have already contracted COVID-19.

179.    The CDC currently recommends that businesses routinely disinfect all surfaces.

180.    For surfaces that have been touched by someone who has contracted COVID-19, the CDC recommends that businesses prevent others from touching those surfaces for at least 24 hours before thoroughly disinfecting the surfaces with an EPA-approved disinfecting agent.

181.    Amazon sometimes provides workers at the JFK8 facility with access to tissues and disinfectant but does not provide those workers with extra time to clean surfaces.

182.    Because of their strict work-pace requirements, which have not been adjusted during the pandemic, workers do not have sufficient time to clean their own workspaces.

183.    Amazon does not provide a consistent or reliable supply of hand sanitizer or disinfecting wipes. Workers at the JFK8 facility have at times even resorted to searching the area where damaged products are stored to try to find cleaning supplies.

184.    Additionally, although dozens of workers at the facility have already contracted COVID-19, Amazon has not prevented other workers from touching any surfaces touched by

someone who has contracted the virus within the prior 24 hours and has not made efforts to adequately sanitize those surfaces.

**COUNT I:** **PUBLIC NUISANCE AND DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201**

**(BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

185.    Amazon's failure to comply with minimum basic health and safety standards at the JFK8 facility, including the CDC guidelines and other minimum public health standards necessary to stop the spread of COVID-19, is causing, or is reasonably certain to cause, community spread of the disease.

186.    This community spread is not, has not been, and will not be limited to JFK8. Infected workers will go home to interact with their families and with other members of the public as they undertake their day-to-day activities, like grocery shopping and using public transportation.

187.    Increased community spread at JFK8 will cause increased community spread within the five boroughs of New York City, the State of New York, the State of New Jersey, and potentially other states as well.

188.    This community spread will result in disease and possibly death. It will also stress healthcare resources and cause financial harm.

189.    Amazon's current policies and practices constitute a public nuisance because they unreasonably interfere with the common public right to public health.

190.    This public nuisance causes special harm to Plaintiffs Chandler, Palmer and Benita Rouse (the "Employee Plaintiffs") because they are directly exposed to the dangerous working conditions at JFK8 caused by Amazon's policies and failures to meet its minimum duties to its employees.

191.     The Employee Plaintiffs also experience special harm flowing from their fear of contracting COVID-19 and infecting a family member. The Employee Plaintiffs experience emotional distress flowing from their knowledge that their work—which they cannot do remotely and which they need to sustain their families—may expose their loved ones to a deadly virus.

192.     This public nuisance causes special harm to Plaintiffs Pellott-Chandler, Mesidor and Alexander Rouse (the "Family Plaintiffs") because sharing homes with the Employee Plaintiffs heightens their risk of contracting the virus and creates a different kind of risk than the public generally experiences because the Family Plaintiffs are at substantial risk of contracting COVID-19 even if they remain at home and comply with all social distancing and other public health directives.

193.     This risk is different in degree and kind from the public generally. Whereas the public generally can protect themselves from the virus by staying home, the Family Plaintiffs are at risk inside their own homes because of the exposure Amazon causes to Employee Plaintiffs.

194.     Amazon's public nuisance also causes special harm to the Family Plaintiffs because they experience anxiety about contracting COVID-19 as a result of their family members' work at JFK8.

195.     Plaintiffs therefore request a declaration that Amazon's policies and practices at JFK8 constitute a public nuisance and request injunctive relief to abate the nuisance.

**COUNT II:** **BREACH OF DUTY TO PROTECT HEALTH AND SAFETY OF EMPLOYEES AS REQUIRED BY NEW YORK LABOR LAW § 200 AND DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201**

**(BY EMPLOYEE PLAINTIFFS AGAINST ALL DEFENDANTS)**

196.    Pursuant to New York Labor Law § 200, Amazon must provide reasonable and adequate protection to the lives, health, and safety of all persons employed at or lawfully frequenting JFK8.

197.    By failing to adopt and adhere to policies designed to protect the health and safety of its workforce during the COVID-19 crisis, Amazon breached this duty.

198.    Employee Plaintiffs and other workers at JFK8 have already been harmed as a result of this breach, including emotional harm and in some cases pecuniary harm and physical harm associated with the COVID-19 infection.

199.    The Employee Plaintiffs are also likely to experience future harm if Amazon does not immediately satisfy its duty to protect employees' health and safety as a matter of New York law.

200.    The Employee Plaintiffs request a declaration that these workplace safety duties are being breached and request injunctive relief to ameliorate the breach.

**COUNT III:  FAILURE TO TIMELY PAY EARNED WAGES UNDER N.Y. LAB. LAW § 191**
**(PLAINTIFF BARBARA CHANDLER AGAINST ALL DEFENDANTS)**

201.    Plaintiff Chandler is an employee of Defendants.

202.    Defendants employ Chandler.

203.    Chandler is engaged in manual labor pursuant to N.Y. Lab. Law § 191.

204.    Pursuant to New York law, COVID-19 quarantine leave pay is earned wages that must be paid out as wages during the next pay period.

205.   Defendants failed to pay Chandler her earned wages for COVID-19 quarantine leave on a timely basis.

## **PLAINTIFFS DO NOT DEMAND A JURY TRIAL**

## **PRAYER FOR RELIEF**

206.   Plaintiffs respectfully request an Order from this Court:

a.   Entering judgment for Plaintiffs and against Defendants;

b.   Declaring that Amazon's failure to implement appropriate worker protections during the COVID-19 crisis constitutes a public nuisance under New York law and a violation of the right to a safe workplace under New York law.

c.   Entering preliminary and final injunctive relief to protect the workers and community from transmission, including but not limited to:

   i.   Communicate clearly with workers that if they are experiencing symptoms of COVID-19 or otherwise may be subject to a quarantine they should consult a physician or public health professional and not attend work, that they will not face any adverse employment consequences for taking quarantine leave, and that they will be paid on their next paycheck for taking quarantine leave;

   ii.   Pay workers for quarantine leave on their next paycheck;

   iii.   Cease the policy of "docking" workers' Unpaid Time Off ("UPT") balances as a disciplinary sanction, so that if a worker is more than five minutes late, they will lose only those minutes of UPT from their accumulated total, not a full hour;

iv.    Excuse tardiness related to MTA reductions in service from UPT deductions so that workers will not be penalized for public transportation-related delays;

v.    Allow an extra 20 hours of UPT per quarter for the remainder of 2020;

vi.    Consistent with CDC guidance, allow workers immediate access to all 48 hours of PTO, even if they have not yet accrued all 48 hours based on their amount of time working at Amazon, for the remainder of 2020;

vii.    Communicate these leave policies clearly to all workers, including on internet sites that workers can access when not at the facility, and emphasize that there will be no adverse job consequences for taking such leave;

viii.    Communicate to workers in multiple modalities that if they have concerns about experiencing COVID-19 symptoms, they should consult a doctor or public health official, not Amcare;

ix.    Grant an additional 30 minutes of Time Off Task ("TOT") per day without penalty to allow workers sufficient time to wash their hands and sanitize their workstations;

x.    Provide real-time information to workers about TOT and their rate in any given shift;

xi.    Implement policies for closing off sections of the facility, or the entire facility if necessary, to allow for disinfection of areas exposed to an infected individual in accordance with NYS and CDC guidance; and

    xii.    Either a) delegate all contact tracing responsibilities to the local health department or another independent, trained professional without relying on its own surveillance footage to determine which workers have been in contact with one another or, if Amazon continues to perform contact tracing itself, then b) conform those efforts to CDC guidance for contact tracing, such as interviewing the infected individual about others they have been in touch with, accounting for their activities in the 48 hours before diagnosis or onset of symptoms, and following up with all identified contacts of the infected individual to inform them of their exposure and inquire if they are experiencing symptoms.

d.   Damages including compensatory damages, statutory penalties, and other available relief for Plaintiff Barbara Chandler arising from unpaid wages and late payment of wages arising from failure to pay New York quarantine leave in a prompt manner.

Dated: June 3, 2020                By: /s/ Juno Turner
New York, NY

                                      Juno Turner
                                      David H. Seligman*
                                      Valerie Collins*
                                      Towards Justice
                                      1410 High Street, Suite 300
                                      Denver, CO 80218
                                      Tel: (720) 441-2236
                                      juno@towardsjustice.org
                                      david@towardsjustice.org
                                      valerie@towardsjustice.org

Sienna Fontaine
Elizabeth Jordan
Frank Rankin Kearl*
Make the Road New York
92-10 Roosevelt Avenue
Jackson Heights, NY 11372
Tel: (718) 565-8500 x4425
elizabeth.joynesjordan@maketheroadny.org
frank.kearl@maketheroadny.org
sienna.fontaine@maketheroadny.org

Karla Gilbride*
Stephanie K. Glaberson*
Public Justice
1620 L. St, NW, Suite 630
Washington, DC 20036
Tel: (202) 797-8600
kgilbride@publicjustice.net
sglaberson@publicjustice.net

Beth Ellen Terrell*
Toby J. Marshall*
Amanda M. Steiner
Blythe H. Chandler*
Terrell Marshall Law Group PLLC
936 N. 34th Street, Suite 300
Seattle, Washington 98103
Tel: (206) 816-6603
bterrell@terrellmarshall.com
tmarshall@terrellmarshall.com
asteiner@terrellmarshall.com
bchandler@terrellmarshall.com

Attorneys for Plaintiffs

*application for admission or to appear *pro hac vice* forthcoming

**CP Exhibit 2**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

|  |  |
| --- | --- |
| DERRICK PALMER, KENDIA MESIDOR, BENITA ROUSE, ALEXANDER ROUSE, BARBARA CHANDLER, and LUIS PELLOT-CHANDLER, <br><br> Plaintiffs <br><br><br> v. <br><br> AMAZON.COM, INC. and AMAZON.COM SERVICES LLC, <br><br> Defendants. | DECLARATION OF DERRICK PALMER |

I, Derrick Palmer, hereby declare as follows:

1.      I have worked for Amazon.com Services LLC ("Amazon") since on or around July 24, 2015. I have worked at the JFK8 warehouse facility in Staten Island, New York ("JFK8") since October 2018. Previously, I worked for Amazon at its facility in Robbinsville Township, New Jersey from July 2015 until Amazon transferred me to JFK8 in October 2018.

2.      JFK8 is an 840,000 square foot sortable fulfillment center operated by Amazon where products are received and sorted, and customer orders are picked, packed, and shipped out to Amazon sortation centers, delivery stations, and eventually Amazon customers.

1

3.     I work as a Warehouse Associate, Picking Master, Process Guide and Ambassador in the Pick, Count, Floor-Health (PCF) department at JFK8. I currently earn $19.45 per hour. For a little over two months, until June 1, 2020, Amazon had been paying me an additional $2 per hour in "hazard pay" for working during the pandemic.

4.     As a Picking Master, I pick customer orders. This entails checking inventory and touching items that have been touched by other people.

5.     I also am regularly and closely interacting with the roughly 40 members of my team in my role as a Process Guide where I staff, coach and advise other warehouse associates in my department.

6.     As an Ambassador, I train new Associates and re-train experienced associates on how to do their jobs.

7.     From the end of March through the present, I have worked ten and a half hour shifts at the JFK8 warehouse two or three days a week.

8.     On March 24, 2020, I learned from another coworker that a JFK8 employee had tested positive for COVID-19. My coworker told me that managers informed him that they were not planning to notify all the workers in the facility about the positive case, but would tell anyone who needed to know.

9.     I was first notified by Amazon of a positive case in JFK8 in a text message I received on the morning of March 30, 2020. This message said that this particular worker was last in JFK8 on March 24, 2020.

10.     Since March 30, 2020 I have received more than 20 text messages from Amazon alerting me to additional cases of COVID-19 in the facility and to my knowledge, dozens of workers at JFK8 have been out sick with symptoms of COVID-19 to date.

11.     As recently as May 30, 2020, I received a text message from Amazon indicating that there were "additional confirmed cases of COVID-19 at JFK8."

12.     To my knowledge, at least 2 workers at the JFK8 warehouse have died from COVID-19.

13.     To my knowledge, at least 4 household members of a JFK8 worker infected with COVID-19 have also contracted the virus.

**Amazon's Inadequate Response to the COVID-19 Pandemic**

14.     I am afraid for my health and safety, as well as the health and safety of people I am in contact with, and the larger community because of the way in which Amazon is managing the warehouse in response to COVID-19.

15.     Despite the huge number of workers passing through the facility on a daily basis, Amazon took little in the way of precautions during the early weeks of the pandemic.

16.     Although we have always had access to work gloves in the facility, Amazon did not provide latex gloves until on or around the week of April 3, 2020, when latex gloves were placed in a bin at the front of the facility, without any instructions as to when or how they should be worn.

17.     Initially, Amazon did not provide masks to its workers and only recommended that workers wear "a facemask of some kind" during their shifts. Amazon claimed that it did have limited quantities of masks, but I was never able to secure a mask from Amazon until the week of April 6, 2020, when it provided masks at the front of the building for all workers.

3

18.     Amazon did not have a mandatory mask policy until the middle of April, and even then, it was not consistently enforced. I still see workers without masks covering their mouths or noses on a daily basis.

19.     For example, on May 20, 2020, I witnessed a worker in the pick department at JFK8 who was working without a mask for at least 5 hours and on June 3, 2020 I saw a worker that was allowed into the building without a mask.

20.     To my knowledge, Amazon did not make significant changes to its sanitation procedures in March, despite the increasing number of COVID-19 cases in New York City.

21.     Throughout March, parts of the facility that are used by many Amazon employees, such as the bathrooms, were not cleaned more frequently. During my time at JFK8, the conditions in the bathrooms have ranged from unclean to disgusting, and it was not until May that I noticed improved sanitation in the bathrooms.

22.     The facility operates 24 hours a day, 7 days a week, and there is no down-time for substantial cleaning of the facility between shifts. Over the last two months, Amazon has gradually increased its cleaning of the break rooms and the cafeteria at the warehouse, but as far as I can tell they are using roughly the same sized cleaning staff as they did before the pandemic.

23.     To my knowledge, Amazon still does not routinely clean employee work stations, which are used by multiple workers over the course of each day. Instead, Amazon provides disinfecting wipes for employees to use, but provides no instruction on how to best use the wipes.

24.     The disinfecting wipes containers are empty at many stations.

25.     Sometime in April 2020, hand sanitizer stations were placed in JFK8. Very quickly the hand sanitizer ran out in these stations and Amazon has not been able to keep them filled. I have repeatedly gone to a hand sanitizer station only to find it empty.

26.     Through the month of March, Amazon had not made any significant changes to the cafeteria or the break rooms to maintain social distancing. Workers were unable to maintain the recommended six-foot social distancing while in the cafeteria and long lines for the microwaves, vending machines, and food vendors were common. Some managers would attempt to tell workers to remain six feet away from one another, but it was virtually impossible to do so in the space.

27.     In early April, Amazon began using zip ties to regulate the number and location of the chairs in the cafeteria. Amazon removed some tables from the cafeteria and break rooms and moved them to places throughout the facility to try to encourage social distancing. I have observed that few workers use those tables during their breaks, as many of them are close to loud machinery and conveyor belts which operate throughout the breaks.

28.     Amazon also removed about half of the microwaves from the cafeteria, but employees are still often close to each other while waiting in line for an available microwave and the machines are not cleaned between uses.

29.     Restrooms and hallways at JFK8 are very crowded. This is particularly true at the start and end of the shift in the hallway where we clock in and clock out and go through the turnstiles.

30.     On March 31, 2020, Amazon informed workers that they would begin checking all workers' temperatures prior to their shifts. However, these checks are inconsistent and do not appear effective.

31.     For example, on April 3, 2020 I entered the facility at around 8:30 a.m. and did not have my temperature checked. Nearly three hours later, after going on a break and interacting with many of my co-workers, I received a message on the computer at my station informing me that I would need to get my temperature checked.

32.     Currently, Amazon is using a camera system that supposedly checks workers' temperatures, but as of today I have never seen a worker pulled out of line for having a fever and we don't even stop walking as we enter the building.

33.     Amazon has never asked me any health screening questions about COVID-19 symptoms or about my contact with someone who has tested positive for COVID-19.

34.     My shifts at JFK8 last 10 ½ hours with one unpaid 30-minute break for lunch and two 20-minute paid breaks. I work during the day shift at the facility, Wednesdays through Saturdays, from 7:15 a.m. until 5:45 p.m. There are no breaks between shifts and there is usually additional congestion near the front of the building at the end of shifts with arriving and departing workers in the same space.

35.     Normally, I am scheduled to work four shifts a week, but during busy times Amazon institutes a policy called mandatory extra time ("MET") when workers are expected to work five shifts each week. Sometimes during MET, the length of shifts is increased to 11 hours.

36.     During two weeks in March, Amazon instituted MET due to the increased customer demand and the number of workers who were not in the facility due to the

DocuSign Envelope ID: 4B8B4490-4523-4814-8958-502B0D620995

pandemic. On March 18, 2020, I received a text message from Amazon reminding me that I would be on MET for the week of March 22, 2020. Amazon told me that "more than ever our customers are relying on us." Amazon told me to "report ALL absences" so there would be "no issues." I felt additional pressure to come into work during MET.

37.    It was not until on or around the last week of March 2020 that Amazon began staggering break times to try to limit the number of people in the cafeteria and the break rooms. To my knowledge, it was not until on or around May 1, 2020 that Amazon shifted my start time, breaking my shift into three groups so that instead of all starting and ending our shifts at the same time, our start times are staggered by 15-minute increments.

38.    For example, my schedule was changed from 7:15 a.m. until 5:45 p.m. to 7 a.m. until 5:30 p.m.

39.    But even with this staggered schedule, I am in close quarters with approximately 30 other workers at crowded times during my shift when it begins.

**Amazon's "Unpaid Time" Policy**

40.    In addition to providing workers with paid time off ("PTO") which accrues at a rate of 1 hour of PTO for every 30 hours worked, up to 48 hours a year, Amazon provides us with unpaid time ("UPT") that we can use to excuse us from a shift or part of a shift. Every quarter, Amazon gives us 20 hours of UPT and we can check our PTO and UPT balances in the Amazon A to Z app.

41.    If we need to miss a shift or part of a shift, we can apply any existing PTO we have to the missed hours. Amazon also will deduct time from our UPT balance if we

miss or are late to a shift. For example, if I am 6 minutes late to a shift, Amazon will deduct one hour from my UPT.

42.      It is also important to maintain a balance of UPT because if your UPT gets below zero that is grounds for automatic termination. I know many workers who have lost their jobs because of a UPT balance of less than zero.

43.      In early March, Amazon introduced a new unlimited UPT policy whereby workers could take UPT at any time, in any amount, and not face any disciplinary actions.

44.      I occasionally used the unlimited UPT to limit my shifts during the months of March and April because I was worried about contracting COVID-19 at JFK8 and was worried about bringing COVID-19 home to my partner, Kendia Mesidor.

45.      I also used my unlimited UPT to self-stagger my start times so that I would be able to arrive to work after the morning rush.

46.      I know many workers who used the unlimited UPT to reduce their working hours because they were afraid for their own safety coming to a facility they believed was a vector for the spread of COVID-19. I also know workers who used the unlimited UPT to stay home because they were worried about bringing COVID-19 home from JFK8 and spreading it to people in their household.

47.      On April 24, 2020, I got a text message from Amazon informing me that the unlimited UPT policy would be ending on May 1, 2020 and that the original UPT policy would come back into effect. Many workers were upset at this news, but on May 1, 2020 Amazon reinstated the old UPT policy and workers were forced to come to work or face termination if they did not have sufficient PTO or UPT to stay home.

48. After Amazon ended its unlimited UPT policy on May 1, 2020, there have been a lot more workers coming into the facility, so social distancing has become more difficult to maintain.

**Amazon's "Time off Task" Policy**

49. Amazon monitors the amount of time that I and other workers spend on and off task. I use a handheld scanner to do my job when I'm counting items, and a stationary scanner when I'm picking items, and Amazon uses software to monitor the degree to which the scanners are active. When I am working as a picker or a counter, every minute of my shift, except for my three daily breaks, is coded as "on task" or "off task" based on whether or not I have actively scanned items during those 60 seconds.

50. The minutes in which I have not scanned any items are collectively called my time off task ("TOT") and throughout the day Amazon adds up all my TOT. I am unable to see the amount of TOT I have accrued during a day while I am working and I am often anxious if I have technical problems with my equipment, need to use the bathroom, need to speak to a supervisor, or need to rest, because I am worried about accruing too much TOT.

51. I regularly have to run back to my station at the end of breaks and begin scanning to avoid getting TOT, and this makes it difficult to maintain safe social distancing.

52. Every day I see coworkers having to rush back to their stations at the end of breaks to avoid getting TOT.

53. If my TOT reaches 30 minutes in a day, not including paid breaks, I will get a written warning. If my TOT reaches one hour in a day, not including paid breaks, I will

get a final warning. If my TOT reaches two hours in a day, not including paid breaks, Amazon will terminate me.

54.     If a manager or Process Assistant decides they want to, they can waive some of my TOT for certain things that happen during my shift, but I know the general rule is that bathroom breaks, even breaks to go wash my hands to protect myself from COVID-19, will not be waived.

55.     If a worker gets four written warnings, the fourth warning becomes their final written warning.

56.     Any warnings or write-ups given to a worker with a final written warning will result in termination.

57.     I know many people who have had disciplinary action taken against them, or have been fired, because of TOT. My partner Kendia, who used to work at JFK8, was almost fired because of the TOT policy.

58.     During the pandemic, I have been reluctant to take additional steps to wash my hands more frequently or to thoroughly clean my work station at the beginning or end of my shift, because I fear that time not spent working would count as TOT that could lead to discipline or termination.

59.     Amazon has not provided any additional breaks for us to wash our hands or notified me of changes to their TOT policy to allow for more hand washing breaks or time for cleaning my workstation.

**Amazon's Rate Requirements**

60.      Amazon monitors the rate of work that I perform as a counter or picker, counted as the number of seconds per unit picked or units per hour. For example, I am asked to pick 400 items every hour. I am required to pick and count thousands of items every shift.

61.      If I am unable to meet the rate that has been set, Amazon's system will automatically generate warnings and potentially termination for working slower than the set rate.

62.      If a worker gets four written warnings, the fourth warning becomes their final written warning.

63.      Any warnings or write-ups given to a worker with a final written warning will result in termination.

64.      I know many people, especially older workers, who have had disciplinary action taken against them, or have been fired, because of failure to hit Amazon's rate requirements.

65.      Although I am a hard worker, and my speed has increased over the nearly five years that I have worked for Amazon, I am still focused on maintaining a fast-enough rate.

66.      Amazon also will push harder during peak times such as the weeks leading up to Christmas and the weeks around Amazon Prime Day to try to get us to work even faster. Managers go around to the pick stations throughout the day telling workers that they need to hit even faster rates.

67.     Amazon has maintained very high rates during the pandemic due to an increased number of orders and because there were so many workers who were not coming into JFK8 to work.

68.     I have been worried to take breaks to wash my hands or clean my work station because I am worried that my rate will drop too low and I will face disciplinary consequences including write-ups or termination.

**Amazon's Failure to Alert Workers Exposed to COVID-19**

69.     I believe Amazon has not taken sufficient steps to alert workers that they may have been exposed to COVID-19 at JFK8.

70.     I have experienced this failure firsthand. I live in Elizabeth, New Jersey. I typically ride to work with my former co-worker Christian Smalls. On March 24, 2020, Christian Smalls told me that he learned from a manager that there was a worker who tested positive in the facility.

71.     Christian Smalls and I left the facility early that day because we were worried about the risk of contracting COVID-19 and because we were angry that Amazon was keeping information from workers and refusing to take affirmative steps to protect us.

72.     On March 26 and 27, 2020, Christian Smalls and I raised our concerns about workplace safety with the general manager of JFK8, the head of Human Resources ("HR") at JFK8, and other high-level managers. We asked them to shut down the facility for a deep cleaning, as Amazon had done in another facility in Queens, but were told that they were waiting to hear from the regional managers.

DocuSign Envelope ID: 4B8B4490-4523-4841-8958-502B0D620995

73.     While we were in JFK8 on March 26, Christian Smalls told me that he got a text message from a friend and colleague who was one of my supervisors. She said that she had tested positive for COVID-19. She was last in the facility on March 24 and was showing symptoms that day. I had worked closely with her during the prior week while serving as her Process Guide. I had regularly been within six feet of her for extended periods of time in the course of my job duties.

74.     After learning about the additional case in the facility, Christian Smalls and I spoke with several people from Amazon's HR department about the fact that we had been in close contact with her recently and said that we believed we needed to be quarantined. The HR managers told us that Amazon would be reviewing footage to determine if we met the standards for their quarantine policy and refused to put us on quarantine.

75.     On March 28, 2020, Christian told me that Zachary Marc, a Senior Operations Manager, had placed Christian on quarantine due to his contact with my supervisor Barbara Chandler.

76.     That day, I asked Marc if that meant that I would need to go on quarantine too, because I had also been in close contact with the employee who tested positive, but Marc said it was "just Smalls." I asked Marc if I needed to be on quarantine because I had been in close contact with Christian, and he said that I would need to wait to see if I heard from HR directly. Marc then walked Christian and me out of the building and Marc told Christian that he needed to leave JFK8.

77.     Even though I rode in a car to work every day with Christian Smalls and was in close contact with another worker who tested positive, Amazon never informed me or contacted me about potential exposure to COVID-19.

DocuSign Envelope ID: 4B8B4490-4523-4841-8958-502B0D620995

Case 4:20-cv-02408-BMC Document 5-13 Filed 03/17/22 Page 50 of 280 PageID #: 4560
Case 1:20-cv-02408-BMC Document 5-13 Filed 06/03/20 Page 15 of 178 PageID #: 108

78.     On April 1, 2020, when I went to JFK8 for work, I went to the HR safety
desk and told the woman working there that I had been in close contact with someone in
the facility who tested positive. She left the table for a little while to confer with someone
and when she returned she said that I had to leave the facility but would have to wait to
hear from HR about quarantine.

79.     I went out to my car and waited in the parking lot for about 15 minutes and
then received a phone call from Tyler Grabowski, a manager from HR at JFK8. Grabowski
explained to me that I would not receive quarantine due to exposure in JFK8 unless
someone from Amazon reviewed surveillance footage and determined that I was in close
contact with someone who tested positive.

80.     I immediately went back into the facility, and straight to the HR office, to
continue my conversation with Grabowski. He reiterated Amazon's policy that I could only
get quarantine for close contact with someone in the facility who tested positive if Amazon
determined I had met their threshold of close contact on the last day the COVID-positive
person was in the facility. I explained that I had recently been in close contact with the
person who tested positive, but Grabowski said that I would have to wait to see if I was
contacted by HR following a review of the footage. Neither Grabowski nor anyone else
from Amazon asked me any questions about the degree of contact I had with my infected
supervisor.

**Retaliation and Intimidation**

81.     I believe that many workers are afraid that Amazon will fire them, which
leads them to come to work even when they feel ill or have been exposed to sick people.

14

Workers are too worried about losing their jobs to raise concerns about Amazon's practices.

82.     For example, Amazon regularly disciplines workers who speak out. I believe Amazon disciplined me for speaking out about my concerns.

83.     During the week of March 23, 2020, I began speaking up about the problems with Amazon's response to the COVID-19 pandemic and expressed my concern for my health and safety and that of my coworkers and my community.

84.     On March 30, 2020, I participated in a protest about Amazon's failure to implement adequate health and safety precautions to protect workers in the warehouse. On that day I never clocked in to work and I never entered the facility. I stayed in the parking lot and engaged in a safe, peaceful protest of Amazon's failure to protect its workers from COVID-19 by refusing to shut down the facility for a deep cleaning, for failing to provide personal protective equipment such as masks and gloves, and for failing to change its policies to allow workers to protect their health and safety on the job.

85.     During the protest on March 30, 2020 I spoke to multiple press outlets about the dangers of working in the JFK8 facility due to Amazon's failure to protect its workers. I gave video interviews for both Spectrum News NY1 and NY PIX 11.

86.     On April 6, 2020, I again participated in a protest about Amazon's failure to implement adequate health and safety precautions to protect workers in the warehouse. On that day, I never clocked in to work and I never entered the facility. I stayed in the parking lot and engaged in a safe, peaceful protest of Amazon's failure to protect its workers from COVID-19 by refusing to shut down the facility for a deep cleaning, for

failing to provide personal protective equipment such as masks and gloves, and for failing to change its policies to allow workers to protect their health and safety on the job.

87.     On April 10, 2020 in the middle of my shift, I was called into the HR office where Grabowski and Marc were waiting for me. They informed me that I was receiving a final written warning for violating Amazon's social distancing policy on March 30, 2020. A final written warning means that any subsequent infraction, however minor, will result in termination.

88.     I explained that I did not clock in on March 30, 2020 and had never entered the building, but Marc said that I had violated the policy and would be terminated. I asked him what the policy was and he said he would print it out for me along with my final written warning. After he spent about 10 minutes typing something on his computer, he came back with a document that explained the social distancing policy for within the facility. The policy had no penalties or consequences for violation.

89.     Additionally, the final written warning had a date stamp that said it had been created that day, April 10, 2020, at 10:46 a.m. which was less than 10 minutes before I was called into their office.

90.     I believe that I was retaliated against and given a final written warning because of my public criticism of Amazon's response to the COVID-19 crisis, because I was involved in organizing workers at JFK8, and because I spoke to the press about Amazon's failure to protect its workers.

91.     Many workers, including myself, are fearful of losing our jobs, especially during this pandemic when businesses are closed and unemployment is at record high levels.

DocuSign Envelope ID: 4B8B4490-4533-4841-8958-502B0D620995
Case 1:20-cv-02408-BMC   Document 5-13   Filed 03/17/22   Page 53 of 280 PageID #: 4563
Case 1:20-cv-02408-BMC   Document 6-3   Filed 06/03/20   Page 17 of 17 PageID #: 114

92.     I fear what will happen to me if Amazon finds out I am participating in this lawsuit. I cannot afford to lose my job.

93.     However, I am more fearful of the risks Amazon is creating for me and my partner, co-workers, friends, family and neighbors in New Jersey and New York City. I fear the risk of getting sick from COVID-19 at JFK8 due to the close contact I am forced to have with other workers. And I experience constant anxiety about infecting my partner, who I live with.

94.     Thus, despite my fears of Amazon's reaction, I chose to be a Plaintiff in this case to protect myself and others.


I declare under penalty of perjury that the foregoing is true and correct.

Executed in Elizabeth, NY.

DocuSigned by:

1B82D9A0A43F4B8...

Derrick Palmer
_____

6/3/2020
_____
Dated

17

**CP Exhibit 3**

 News

# Leaked Amazon Memo Details Plan to Smear Fired Warehouse Organizer: 'He's Not Smart or Articulate'

Written notes from the meeting, attended by CEO Jeff Bezos, detail Amazon's strategy to fight union organizing, as well as efforts to obtain COVID-19 tests and protective masks for workers.

PB  By [Paul Blest](#)

April 2, 2020, 3:46pm   

Leaked Amazon Memo Details Plan to Smear Fired Warehouse Organizer He's Not Smart or Articulate



Leaked notes from an internal meeting of Amazon leadership obtained by VICE News reveal company executives discussed a plan to smear fired warehouse employee Christian Smalls, calling him "not smart or articulate" as part of a PR strategy to make him "the face of the entire union/organizing movement."

"He's not smart, or articulate, and to the extent the press wants to focus on us versus him, we will be in a much stronger PR position than simply explaining for the umpteenth time how we're trying to protect workers," wrote Amazon General Counsel David Zapolsky in notes from the meeting forwarded widely in the company.

ADVERTISEMENT

Leaked Amazon Memo Details Plan to Smear Fired Warehouse Organizer He's Not Smart or Articulate

The discussion took place at a daily meeting, which included CEO Jeff Bezos, to update each other on the coronavirus situation. Amazon SVP of Global Corporate Affairs Jay Carney <u>described the purpose to CNN on Sunday:</u> "We go over the update on what's happening around the world with our employees and with our customers and our businesses. We also spend a significant amount of time just brainstorming about what else we can do" about COVID-19.

Zapolsky's notes also detailed Amazon's efforts to buy millions of protective masks to protect its workers from the coronavirus, as well as an effort to begin producing and selling its own masks. So far, the company has secured at least 10 million masks for "our operations guys," with 25 million more coming from a supplier in the next two weeks, Zapolsky wrote.

Amazon <u>fired the warehouse worker Smalls on Monday,</u> after he led a walkout of a number of employees at a Staten Island distribution warehouse. Amazon says he was fired for violating a company-imposed 14-day quarantine after he came into contact with an employee who tested positive for the coronavirus.

Smalls says the employee who tested positive came into contact with many other workers for longer periods of time before her test came back. He claims he was singled out after pleading with management to sanitize the warehouse and be more transparent about the number of workers who were sick.

Leaked Amazon Memo Details Plan to Smear Fired Warehouse Organizer: He's Not Smart or Articulate

Zapolsky's notes from the meeting detail Amazon's plan to deal with a wave of bad press and calls for investigations from elected officials following the firing of Smalls. They also show top Amazon brass wanted to make Smalls the focus of its narrative when questioned about worker safety.

"We should spend the first part of our response strongly laying out the case for why the organizer's conduct was immoral, unacceptable, and arguably illegal, in detail, and only then follow with our usual talking points about worker safety," Zapolsky wrote. "Make him the most interesting part of the story, and if possible make him the face of the entire union/organizing movement."

They discussed encouraging Amazon executives to use Smalls to discredit the wider labor movement at Amazon. Employees at the warehouse, known as JFK8, launched an effort to unionize in 2018.

In his notes, Zapolsky wrote that there was "general agreement" on this point among the other attendees of the meeting. (Zapolsky's notes also mention SVP of worldwide operations and customer service Dave Clark and SVP of human resources Beth Galetti.)

In a statement to VICE News, Zapolsky said his "comments were personal and emotional."

Leaked Amazon Memo Details Plan to Smear Fired Warehouse Organizer; He's Not Smart or Articulate

and safety of other Amazonians by repeatedly returning to the premises after having been warned to quarantine himself after exposure to virus Covid-19," he said. "I let my emotions draft my words and get the better of me."

---

ADVERTISEMENT

---

The notes also reference Amazon's concerns about the coronavirus pandemic's impact on the economy, and its own efforts to ramp up testing and lab capacity both within the company and around the country. They discussed the benefits of testing all employees, even asymptomatic ones.

"That can have benefits both for the system and for our employees," Zapolsky wrote. "Every test we do is incremental and is one less test that existing resources have to do."

Amazon also weighed ways to generate a PR win from their mask stockpile with "different and bold" ways of giving away surplus masks to hospitals and independent grocers. "If we can get masks in quantity it's a fantastic gift if we donate strategically," Zapolsky wrote.

"Another idea for giving masks away — give 1,000 masks to every police station in the country," Zapolsky wrote, adding this "reminds folks it's not just medical workers who need these."

Leaked Amazon Memo Details Plan to Smear Fired Warehouse Organizer as Not Smart or Articulate

"There are ways of making FDA approved surgical and other masks from fabric and we're working with those manufacturers as well," Zapolsky's notes said.

The consensus at the meeting was that the CDC would be recommending everyone wear masks if not for the lack of supply. "CDC's hesitancy to recommend masks has been to manage supply (though that's a bad reason to sacrifice scientific integrity)," Zapolsky wrote.

Amazon has also begun efforts to to produce masks itself. While the company has a "line of sight" on a supply of N95 masks, the notes said, Amazon is "starting to put together internal efforts" for mask production, though this is described as "more of a nine month type project."

Zapolsky's notes imply the company's attempts to purchase N95 masks from China fell through. "China has deemed N95 masks as 'strategic,'" Zapolsky wrote. "They're keeping them for optionality. They also want to use them for 'diplomacy.' The masks in China that we thought we had probably got redirected by profiteers."

---

News

**Amazon Fired the Warehouse Worker Who Organized a Walkout Over Coronavirus**

PAUL BLEST

03.31.20

---

*Cover: Amazon employees hold a protest and walkout over conditions at the company's Staten Island distribution facility on March 30, 2020 in New York City. (Photo: by Spencer Platt/Getty Images)*

**CP Exhibit 4**



**Amazon**

🕐 This article is more than **1 year old**

# Amazon execs labeled fired worker 'not smart or articulate' in leaked PR notes

**Julia Carrie Wong**

🐦 **@juliacarriew**

Thu 2 Apr 2020 19.47 EDT

Amazon executives denigrated a fired warehouse worker as "not smart or articulate" in a meeting with Jeff Bezos, according to a leaked memo obtained by Vice News.

Chris Smalls, who had worked for Amazon for five years, was fired shortly after he helped organize a work stoppage at the company's warehouse on Staten Island, New York, in protest over a lack of protective gear and hazard pay for employees. Amazon claims it fired Smalls for "violating social distancing guidelines and putting the safety of others at risk".

Amazon execs labeled fired worker 'not smart or articulate' in leaked memo | Amazon | The Guardian

Amazon's general counsel, David Zapolsky, in notes from a meeting of top executives obtained by Vice, wrote: "He's not smart, or articulate, and to the extent the press wants to focus on us versus him, we will be in a much stronger PR position than simply explaining for the umpteenth time how we're trying to protect workers."

The meeting is held daily to brief Bezos, the chief executive, on issues related to the coronavirus pandemic. Jay Carney, Amazon's senior vice-president of corporate affairs, described it on CNN as a "brainstorming" meeting.



▲ Chris Smalls, center, wears a bandana while leading workers in a protest at Amazon's fulfillment center in Staten Island on Monday. Photograph: Bebeto Matthews/AP

Zapolsky added: "We should spend the first part of our response strongly laying out the case for why the organizer's conduct was immoral, unacceptable, and arguably illegal, in detail, and only then follow with our usual talking points about worker safety.

"Make him the most interesting part of the story, and if possible make him the face of the entire union/organizing movement."

Smalls' termination has drawn widespread condemnation from labor supporters and politicians, including the New York City mayor, Bill de Blasio, and Bernie Sanders, who called the firing "disgraceful". Retaliation against workers for engaging in collective action related to their working conditions is illegal under federal law.

Amazon execs labeled fired worker 'not smart or articulate' in leaked memo | Amazon | The Guardian

**Bernie Sanders** ✔
@BernieSanders

It's disgraceful that Amazon, which is owned by the richest man in the world, is not only failing to protect its workers but has now fired a worker for protesting dangerous conditions. I stand with Chris and all Amazon workers fighting for their safety.

---

**CPD Action** @CPDAction

Today, Amazon worker #ChrisSmalls helped lead an Amazon walkout for lack of COVID19 compliance that put workers, customers and New York in danger

Today, Chris Smalls was shamefully fired by the wealthiest man in the world @JeffBezos #AmazonStrike

Sign

actionnetwork.org/letters/tell-g...

---

6:18 PM · Mar 31, 2020

♡ 40.4K     ⚡ See the latest COVID-19 information on Twitter

Writing in the Guardian on Thursday, Smalls said he thought he was "targeted" by Amazon because he had received media attention for organizing the protest. He also alleged that Amazon failed to disclose a worker's illness to the rest of the workforce , prompting him to contact public health officials and eventually organize the demonstration.

Amazon execs labeled fired worker 'not smart or articulate' in leaked memo | Technology | The Guardian

"I am getting calls from Amazon workers across the country and they all want to stage walk-outs, too," Smalls wrote. "We are starting a revolution and people around the country support us."

Amazon says it asked Smalls to remain home for 14 days after he had "close contact" with another worker who was diagnosed with Covid-19, and that by attending the protest he was putting other employees at risk.

The company has continued to push this narrative on Twitter, with Carney, a former press secretary for Barack Obama who joined Amazon in 2015, engaging in back-and-forth about the issue with Sanders and others.



On Wednesday evening, Carney decried "folks on Twitter who respond to facts and ideas they don't like with ad hominem vitriol".

Zapolsky, the Amazon executive who called Smalls "not smart or articulate", released a statement following publication of the remarks, which read: "My comments were personal and emotional. I was frustrated and upset that an Amazon employee would endanger the health and safety of other Amazonians by repeatedly returning to the

Amazon execs labeled fired worker 'not smart, articulate' in leaked PR memo | Amazon | The Guardian

premises after having been warned to quarantine himself after exposure to virus Covid-19. I let my emotions draft my words and get the better of me."

Dania Rajendra, the director of Athena, a coalition of labor and community groups campaigning against Amazon, decried the memo.

She said in a statement: "Hundreds of Amazon workers are telling the public about the risk Amazon poses to their health, their families and the communities they live in - and we've got Amazon execs, working from home, trying to fix the PR problem instead of the public health problem.

"Amazon top brass chose tired, racist insinuations and snarky tweets. A better choice would be to make a plan that takes worker and public health seriously."

Smalls released a statement responding to the leaked memo Thursday evening.

"Amazon wants to make this about me, but whether Jeff Bezos likes it or not, this is about Amazon workers - and their families - everywhere," he said. "Instead of protecting workers and the communities in which they work, however, Amazon seems to be more interested in managing its image … This is not about me. This is about all of us."

---

… we have a small favour to ask. You've read 24 articles in the last year. And you're not alone; through these turbulent and challenging times, millions rely on the Guardian for independent journalism that stands for truth and integrity. Readers chose to support us financially more than 1.5 million times in 2020, joining existing supporters in 180 countries.

With your help, we will continue to provide high-impact reporting that can counter misinformation and offer an authoritative, trustworthy source of news for everyone. With no shareholders or billionaire owner, we set our own agenda and provide truth-seeking journalism that's free from commercial and political influence. When it's never mattered more, we can investigate and challenge without fear or favour.

Unlike many others, we have maintained our choice: to keep Guardian journalism open for all readers, regardless of where they live or what they can afford to pay. We do this because we believe in information equality, where everyone deserves to read accurate news and thoughtful analysis. Greater numbers of people are staying well-informed on world events, and being inspired to take meaningful action.

We aim to offer readers a comprehensive, international perspective on critical events shaping our world - from the Black Lives Matter movement, to the new American

# CP EXHIBIT 6

Sign Up

Email or Phone

Password

Forgot account?

Log In



-59:20

 **Mandi Velasco** was live.
April 6, 2020 ·

#JFK8 #StandUp

4.4K Views

31 Likes   112 Comments   49 Shares

Share

### Video Transcript

English (US) · Español · Português (Brasil) ·
Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices ·
Cookies · More
Facebook © 2021

## See more of Mandi Velasco on Facebook

Log In     or     Create New Account

CONFIDENTIAL

**CP Exhibit 7**





Conducting Effective Investigations

CONFIDENTIAL

# Learning Objectives

➤ Understand the importance of conducting **timely and objective investigations** through

➤ Understand your **role and responsibilities** as the investigator in conducting and **documenting investigations**

➤ Apply interview techniques to be able to conduct and effective investigation and **comfortably make determinations**.



Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion

Amazon Confidential

CONFIDENTIAL

# Disclaimer

This presentation is based on the laws of the United States. Contact your local regional counsel for legal guidance for your own jurisdiction.



| Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion |

Amazon Confidential

CONFIDENTIAL

# Why do we investigate?

➢ To **GATHER THE FACTS** so that we can determine what happened in a particular situation and whether an Amazon Policy, or standard procedure has been violated; **ultimately allowing for a sound conclusion**.

➢ Minimizes risk of lawsuits and liability and taking disciplinary actions against a wrongly-accused employee and ensures fairness to all employees.

➢ **ASSOCIATE EXPERIENCE**: Inspecting defects in the employee experience, whether a policy violation was found or not, allows us to **identify and correct root cause issues to improve our workplace.**



Amazon Confidential

CONFIDENTIAL

# When do we investigate?

*"Amazon will promptly investigate any reports of workplace harassment <u>or inappropriate conduct </u>and will enforce appropriate disciplinary action where necessary."*

**-*Amazon Owner's Manual***

➤ Don't rush, but once we're on notice, we need to investigate and take prompt, effective remedial action.

➤ **Do we investigate offsite misconduct?**

   • Allegations of misconduct that happen outside the Amazon property should not be ignored or shrugged off as something that does not concern Amazon.

➤ **Always remember to take partners when necessary!**



Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion

Amazon Confidential

CONFIDENTIAL                                                    AMZ-BRY008102

CONFIDENTIAL

# What is the role of the Investigator?

➢ To be an objective, neutral fact finder who collects relevant facts

- Keep an open mind and go out of your way to hear complaints

- Be prompt in hearing concerns and information from involved parties

- Consider if the investigation reflects care, thoroughness and objectivity

- Avoid making promises about conclusion or outcomes

➢ **KEYPOINT**: As the investigator, **you must be aware of and disrupt your unconscious biases**. The process should be driven by gathering evidence to FIND the outcome, not to support your perceived conclusion.



Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion

Amazon Confidential

CONFIDENTIAL

# Case Intake

CONFIDENTIAL

# Case Intake

➤ Case Intake begins when a complaint is received. The person taking the complaint should **gather the 5 W's**:

- Who was involved?
- What happened?
- When did the event occur?
- Where did the event occur?
- Why did it happen?

➤ DO NOT
- Make legal conclusions – i.e. to determine if discrimination, harassment or retaliation occurred

Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion

Amazon Confidential

CONFIDENTIAL                                        AMZ-BRY008105

CONFIDENTIAL

# We are approached at our workstation…





1. What are the allegations?  What facts do we have so far?

2. Who are the individuals involved and what are their roles within Amazon?

Introduction ▸ Intake ▸ Prepare ▸ Interview ▸ Analyze ▸ Resolve ▸ Close ▸ Conclusion

Amazon Confidential

CONFIDENTIAL

# Prepare

CONFIDENTIAL

# Take 8

Take a moment to consider what your next steps will be given the information you have to conduct an effective investigation.

➢ Confirm Issue Categories and identify the Factual Allegations indicated in the complaint on Exact.

➢ Add all appropriate parties to the investigation to ensure you get the support and guidance needed.

➢ Gather relevant documentation to add additional information to the investigation should support determinations made.



Amazon Confidential

CONFIDENTIAL

# Interview

CONFIDENTIAL

# Interview Preparation

The interview stage is a critical step to clarify issues, gather facts, understand the story, and cross-check evidence and facts.

- Use the information you gather during your preparation to **create an Interview Outline and Questions.**
- Have your list of "must get answered" questions at the ready *before* the first interview.
- Determine a list of interviewees, and create a strategic order to interview involved parties.

➢ The answers you receive from all the pre-planned questions may provoke **<u>additional</u>** questions.  You will likely need to deviate from your original questions and you should **ask additional follow-up questions**.



Introduction  >  Intake  >  Prepare  >  **Interview**  >  Analyze  >  Resolve  >  Close  >  Conclusion

Amazon Confidential

   AMZ-BRY008110

CONFIDENTIAL

# Interview Techniques: *Outlining Investigation Standards*

➢ **Instill Confidence**
  - Show your **concern and commitment** to resolving the issue in a timely manner, but do distinguish your role as a fair and impartial investigator.

➢ **Set Expectations**
  - **Amazon expects that employees will cooperate**, be honest, and not interfere with, impede, or undermine the investigation.

➢ **Gain Cooperation**
  - Provide truthful answers to questions and provide any information that will help **earn trust**, including answering questions after the initial interview.

➢ **Discuss Confidentiality and Non-Retaliation**
  - Explain that the investigation will be conducted as confidentially as possible; however, complete confidentiality cannot be guaranteed.

Introduction › Intake › Prepare › **Interview** › Analyze › Resolve › Close › Conclusion

Amazon Confidential

CONFIDENTIAL                                                      AMZ-BRY008111

CONFIDENTIAL

# Confidentiality

**Is it a request, or is it an instruction?**

The EEOC & NLRB has taken the position that non-supervisory co-workers who are complaining about discrimination, harassment, retaliation, etc. **DO have the right to talk to each other about their complaints.**



**Emphasize that Amazon expects the following:**

- cooperation of associates in conducting the investigation

- associates participating in the investigation to be honest and candid

- associates will not interfere with, impede, or undermine the investigation

**Amazon strictly prohibits harassment or retaliation against the complainant or witness.**

| Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion |

Amazon Confidential

CONFIDENTIAL

# Interview Techniques: *Asking Effective Questions*

➢ Begin with broad, open-ended questions that encourage a narrative answer

➢ Try to not ask compound questions and keep it to one question at a time

➢ **Follow up with narrower and more specific questions to get details**

➢ **If the interviewee gets off track, remind them where they were chronologically**

➢ **Confront inconsistencies in the interview**

➢ **Ask for specific examples when the interviewee is vague or evasive**

➢ Ask the tough questions - *at the end or if/when it naturally comes up*

➢ Avoid asking leading questions

➢ Seek to understand motivation & desired outcome of the investigation

Introduction ▷ Intake ▷ Prepare ▷ **Interview** ▷ Analyze ▷ Resolve ▷ Close ▷ Conclusion

Amazon Confidential

CONFIDENTIAL

# We scheduled time with Alex to talk…





Introduction > Intake > Prepare > **Interview** > Analyze > Resolve > Close > Conclusion

Amazon Confidential

CONFIDENTIAL

AMZ-BRY008114

CONFIDENTIAL

# Interview Techniques: *Noting Key Differences*

➢ **Confidentiality vs. Anonymity**
- Witness privacy will be protected unless necessary to conduct the investigation
- Do not make promises, but recognize concerns of retaliation
- Check with Legal or ER if you believe disclosure may be inappropriate

➢ **Demonstrate Empathy NOT Sympathy**
- Hold off on giving advice
- Avoid showing pity
- Don't assume! Validate their frustrations, but ask questions!



Introduction | Intake | Prepare | **Interview** | Analyze | Resolve | Close | Conclusion

Amazon Confidential

CONFIDENTIAL

# Interview Techniques: *Is there ANYTHING else left?*

➢ Ask to **identify other witnesses** who may have relevant knowledge

- Did you discuss these allegations with anyone before?  Who? When? What?

- If there is delay in reporting, why?

- What if complainant refuses to identify other witnesses?  Discipline?  Or something else?

➢ **Ask complainant if there are documents** that he or she believes support the allegations

- Did he/she take notes?  Emails?  Instant messages? Texts?

➢ End interview with general invitation to provide any other information. **Leave door open and stay in touch**, especially if investigation is taking time

| Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion |
|---|---|---|---|---|---|---|---|

Amazon Confidential

CONFIDENTIAL

# We receive a call from Alex…



Alex calls you.  Alex says their spiritual advisor talked to them and has now found the inner strength to tell you the truth about Aiden.  Alex also says that they feel terrified to be in the same building as Aiden. You agree to speak with Alex later that day.

Let's see what Alex has to tell us…



| Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion |

CONFIDENTIAL

CONFIDENTIAL

# Follow-up Interviews Are Okay!

➢ **Investigations are not one-shot exercises.**

➢ It's common to need to follow up once new information is received or to clarify, and that's okay.

➢ **Address contradictions**
  • Give witness a chance to respond to the contradictory evidence



Introduction | Intake | Prepare | **Interview** | Analyze | Resolve | Close | Conclusion

Amazon Confidential

CONFIDENTIAL

# We find a photograph...

When you arrive the next morning to continue your investigation, you find an envelope on the conference room table containing recently taken Instagram photos of Alex and Aiden.  Alex is smiling while they are hugging each other.  Written across one of the photos is, "Don't let Sam and Alex get away with ruining Aiden's career!!"



Introduction  >  Intake  >  Prepare  >  **Interview**  >  Analyze  >  Resolve  >  Close  >  Conclusion

Amazon Confidential

CONFIDENTIAL

# Investigations in the Age of Social Media



- Do not demand that employees provide passwords or provide access to their social media sites

- Do not demand that employees "friend" you so you can obtain access to their social media sites

- However, employees are free to share with you information from their social media sites

- And you are allowed to consider Social Media in investigations; for example viewing a public account

Introduction > Intake > Prepare > **Interview** > Analyze > Resolve > Close > Conclusion

Amazon Confidential

CONFIDENTIAL

# We schedule time to talk with Aiden…





| Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion |

Amazon Confidential

CONFIDENTIAL

# Dealing with Contradictions

➢ If allegations are denied, ask what may be motivating the witness → *"Why do you think Alex is making these allegations?"*

➢ Advise on the potential consequences of failing to cooperate, lying, or withholding information

➢ Give the alleged party enough opportunity to address allegations, but be prepared to have more than one interview or call

➢ **Have documents (or undisputed facts, if available) on hand to address contradictions effectively.** *Interview them last!*



Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion

Amazon Confidential

CONFIDENTIAL

# Sam comes to us with additional information…



Introduction › Intake › Prepare › **Interview** › Analyze › Resolve › Close › Conclusion

CONFIDENTIAL

# We go to speak with Casey…





Introduction › Intake › Prepare › **Interview** › Analyze › Resolve › Close › Conclusion

Amazon Confidential

CONFIDENTIAL

# Analyze

CONFIDENTIAL

# Analyze: Evaluate Facts and Credibility

➤ Evaluate facts.  *What was confirmed? Where did you get different or contradicting accounts?*

➤ **Evaluate credibility**.

➤ Which version of events is supported by a preponderance of evidence?

➤ *A lack of a third-party or "neutral" witness alone does not mean the complaint should be considered unsubstantiated*



Introduction  Intake  Prepare  Interview  **Analyze**  Resolve  Close  Conclusion

Amazon Confidential

CONFIDENTIAL

# Credibility Determinations

➢ **Plausibility** – Whose story makes the most sense?  **Could the employees involved have heard and seen what they claimed to have witnessed?**  Should they have heard and seen things they did not admit?

➢ **Source of Information** – **Did the witness see or hear the event directly?** the witness report firsthand knowledge, or rely on statements from othe employees or rumors?



➢ **Detail** – How general or specific was each person's statement?  **Were details supported by other evidence?**  Did the employee who is the subject of the concern deny each allegation or only generally?

| Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion |

CONFIDENTIAL

CONFIDENTIAL

# Credibility Determinations

➢ **<u>Corroboration and Conflicting Testimony</u>** – What witnesses or documents support each side of the story?  **Any evidence contradict?**  If there are conflicts, are they over minor or significant issues?

➢ **<u>Contradictions</u>** – **Was each person's story consistent throughout your questioning or on a second telling?**  Did any of the witnesses contradict themselves?  If so, did the change involve a minor issue or a matter of substance?

➢ **<u>Demeanor</u>** – How did the witnesses act during the interview?  Did they appear to be telling the truth or lying?  **Did the employee who is the subject of the concern have a strong reaction or none at all?**  Did the complaining employee seem genuinely upset?  Were any witnesses' reactions unusual based on their ordinary demeanors?



Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion

Amazon Confidential

CONFIDENTIAL

# Credibility Determinations

➤ **<u>Omissions</u>** – **Did anyone leave out important information?**  Is there a reasonable explanation for the omission?

➤ **<u>Prior incidents</u>** – Does the **alleged offender have a documented history** of this type of misconduct?  Has the **complainant made previous complaints**? Any other incidents between them?

➤ **<u>Motive</u>** – Does anyone have a **motive to lie** about, exaggerate, or deny the incident?  Any **history between the employees** involved that affects their credibility?  Any **witnesses have a special loyalty – or grudge** – against anyone involved in the incident?



Introduction  >  Intake  >  Prepare  >  Interview  >  Analyze  >  Resolve  >  Close  >  Conclusion

Amazon Confidential

CONFIDENTIAL

AMZ-BRY008129

CONFIDENTIAL

# Drafting the Report

➢ An investigation report is intended to **provide a summary overview** of the investigation findings on whether or not any policies were violated and **can be used as a key tool for legal defense**.

➢ HR should document the nature of the complaint, the steps taken to investigate, and the key findings and recommendations flowing from the investigation.

➢ Elements of a well-written investigation report
  - Always assume that **your are writing for a third party**
  - Clarity is key. Be consistent. Be clear about the sequence of events. Stay factual.
  - Use good grammar: Active voice, **third-person objective point of view**, and past tense.
  - Acronyms and abbreviations are okay.
  - **No slang, idioms, or colloquialisms**.
  - Re-read before you submit.



Introduction → Intake → Prepare → Interview → **Analyze** → Resolve → Close → Conclusion

Amazon Confidential

CONFIDENTIAL

AMZ-BRY008130

CONFIDENTIAL

# Drafting the Report: Be Precise

## Not Precise

➢ Kate was often tardy.

➢ Lisa complained that she was sexually harassed by Harold

## Precise

➢ Kate was more than 30 minutes late on three occasions in March (or better – give the dates).

➢ Lisa complained that her supervisor asked her out on a date three times.

➢ Lisa complained that Harold stared at her and made comments about her clothing; for example, Martha said Harold told her he liked how "tight she wore" her jeans.

Introduction ⟩ Intake ⟩ Prepare ⟩ Interview ⟩ **Analyze** ⟩ Resolve ⟩ Close ⟩ Conclusion

Amazon Confidential

**CONFIDENTIAL**

# Drafting the Report: Don't Make Legal Conclusions

## Legal Conclusion

➢ John's flu was a disabling condition.

➢ Sally was harassed by Joe's comments

➢ Jim admitted that he called Joe a "mullet" which is a racially derogatory term.

➢ Sue harassed Karyn because of her disability by not allowing Karyn time off and giving her excessive assignments.

## Investigatory Conclusion

➢ John had the flu and was very ill.

➢ The investigation made it clear that Sally did not appreciate Joe's comments about women being better at certain high stress jobs than men.  She said she felt harassed.

➢ Jim explained that he had grown up referring to stupid people as "mullets" which he thought was a type of lazy fish.  Joe says that the term "mullet" is a racially derogatory term.  It was inappropriate for Jim to call Joe a mullet, whatever the term meant to him.

➢ The investigation substantiated that Sue would not allow Karyn time off and gave Karyn excessive assignments, even though Karyn had told Sue that she was feeling ill and could not shake her cold.

Introduction ⟩ Intake ⟩ Prepare ⟩ Interview ⟩ **Analyze** ⟩ Resolve ⟩ Close ⟩ Conclusion

Amazon Confidential

CONFIDENTIAL

# Analyze: Decide When to Stop



**Is there enough information to make findings with confidence?**

- Play **devil's advocate** and try to poke holes in your own investigation

- Ask whether a **jury or the EEOC** would have expected you do to anything else?

- Did you interview every witnessed named by the accused and complainant?
  - Focus on disputed facts that are important to resolve to be able to make findings on key issues – immaterial allegations may not need to be closed off
  - If there is enough evidence for undisputed facts, there may not be a need to further interview or gather more evidence. **Spend your time on closing gaps on disputed facts.**

- Should you re-interview any of the witnesses?

Introduction ⟩ Intake ⟩ Prepare ⟩ Interview ⟩ **Analyze** ⟩ Resolve ⟩ Close ⟩ Conclusion

Amazon Confidential

CONFIDENTIAL

**Slide 36**

**A13**   Suggest to change the title to "Analyze: Decide when to stop". Using the word closing may cause confusion among the learners since this is not the last step of the investigation process
Author, 9/24/2018

**A14**   Change completed
Author, 9/26/2018

CONFIDENTIAL

# Resolve

CONFIDENTIAL

AMZ-BRY008135

CONFIDENTIAL

# Resolve: Review Findings with your HRBP

**Review your Final Investigation Report with your HRBP**, and legal partner (if necessary). It is critical to ensure the following:

✓ Alignment on the findings of the investigation

✓ Agreement on corrective action recommendations

✓ Coordinate meeting with the Subject's leader(s) to review case findings *(if needed)*

✓ Determine who will provide support and guidance in delivering corrective action *(if needed)*

✓ Once complete, update the Exact case file

| Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion |

Amazon Confidential

# Resolve: Close with the Subject

➢ **Substantiated Allegations** requiring corrective action, should be delivered by the Manager with HR support during a scheduled in person meeting.

> ➢ All parties involved in delivering feedback should be knowledgeable about investigative findings, and how to answer questions posed.
>
> ➢ Depending on the nature of the investigation, phone calls may be required to deliver feedback. In this case, the associate should be paid for their time.

➢ **Unsubstantiated Allegations** still require a follow up, where a phone call or quick on the floor touch base from the Investigator may be sufficient.

➢ All **corrective action MUST be documented on ADAPT**, and either *acknowledged* or *refused to sign* by the associate.

> ➢ Any other documents should be added to the employee personnel file via <u>OnBase</u> and Exact.



Introduction  |  Intake  |  Prepare  |  Interview  |  Analyze  |  Resolve  |  Close  |  Conclusion

Amazon Confidential

CONFIDENTIAL

# Resolve: Close with the Complainant

**The Complainant should be assured that Amazon takes complaints seriously and informed of the results of the investigation including:**

➢ The findings of the investigation and what action, if any, is being implemented **is not appropriate to disclose** to the complaining employee
- "[Subject] will be disciplined" will suffice.
- Exercise good judgment in deciding whether to discuss the matter with others.

➢ Amazon's non-retaliation policy

➢ Who to notify if any further inappropriate conduct by the employee accused of misconduct or anyone else is observed

➢ **Unsubstantiated allegations should be mitigated with mediation between the Complainant and Subject to resolve conflicts that led to the complaint.**



Introduction | Intake | Prepare | Interview | Analyze | Resolve | Close | Conclusion

Amazon Confidential

CONFIDENTIAL                                           AMZ-BRY008138

CONFIDENTIAL

# Close

**CONFIDENTIAL**

# Close and Finalize the Investigation File

➢ Retain the Final Investigation File in **Exact**
- Communications from the complaining employee or any other interviewees.
- Communications from HR to applicable employees involved
- Your interview notes and any other documentation you relied on
- Correspondence regarding the investigation to others
- The Final Investigation Summary report

➢ Close the case in **Exact**

➢ **Remember, it is important to take the time during the investigative process to properly document and record-keep. If the investigation were to further escalate, you will have set yourself up to have concrete investigative findings to provide.**



Introduction  >  Intake  >  Prepare  >  Interview  >  Analyze  >  Resolve  >  **Close**  >  Conclusion

Amazon Confidential

CONFIDENTIAL

# Follow-up

Investigators should **maintain complete files of their investigations**.  Other follow-up below may or may not be handled by the investigator (may be business unit and/or HR).

➤ Follow-up with the complainant. Any recurring/new problems?

➤ Managers of the accused should monitor interactions post-complaint

➤ Document substantiated outcome in the accused's personnel file

➤ Monitor, follow-up and document that all post-investigation actions have been completed



Introduction   Intake   Prepare   Interview   Analyze   Resolve   **Close**   Conclusion

Amazon Confidential

CONFIDENTIAL                                    AMZ-BRY008141

**CONFIDENTIAL**

# Resources

➤ SHERPA – Labor and Employment- **http://lesherpa.corp.amazon.com/**

- Reasonable Accommodations

- Service Animals

- Investigations

- PIT Accommodations

- Responding to Subpoenas and Law Enforcement Requests

- Religious Accommodations

➤ HR Investigation Toolkit

- HR Guide to Conducting Investigations

- Exact User Guide

Introduction ⟩ Intake ⟩ Prepare ⟩ Interview ⟩ Analyze ⟩ Resolve ⟩ Close ⟩ **Conclusion**

**CONFIDENTIAL**                                    **AMZ-BRY008142**

CONFIDENTIAL



# Questions?

AMZ-BRY008143

**CP Exhibit 8**                    **CONFIDENTIAL**

| | |
|---|---|
| **From**: | Strobridge, Lisa [/O=AMAZON/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LISASTROA95] |
| **Sent**: | 4/6/2020 2:28:56 PM |
| **To**: | Mehta, Anand [meha@amazon.com]; Campbell, Bradley [bccampb@amazon.com]; Kotha, Sai [saichak@amazon.com]; Hernandez, Christine [hrnanch@amazon.com]; Lighty, Rachael [raclig@amazon.com]; Gutierrez, Milly [gmilly@amazon.com]; Sciurba, Stephanie [sciurba@amazon.com]; Jones, Elliott [ottjones@amazon.com]; Weishalla, Traci [weishall@amazon.com]; LaRosa, Kristin [klarosa@amazon.com]; Gilbert-Differ, Geoff [ggeoffr@amazon.com]; Viswanath, Neha [nehavisw@amazon.com]; Tunis, Jeremy [jertunis@amazon.com]; Cleland, Jeff [clelandj@amazon.com]; Grabowski, Tyler [grabtyle@amazon.com]; Desai, Pooja [poodesai@amazon.com] |
| **CC**: | meet@chime.aws; pin+1925589463@chime.aws |
| **Subject**: | JFK8 touch base |
| **Location**: | chime |
| **Start**: | 4/7/2020 6:00:00 AM |
| **End**: | 4/7/2020 7:00:00 AM |
| **Show Time As**: | Tentative |

| | |
|---|---|
| **Required Attendees**: | Mehta, Anand; Campbell, Bradley; Kotha, Sai; Hernandez, Christine; Lighty, Rachael; Gutierrez, Milly; Sciurba, Stephanie (sciurba@amazon.com); Jones, Elliott; Weishalla, Traci; LaRosa, Kristin; Gilbert-Differ, Geoff; Viswanath, Neha; Tunis, Jeremy; Cleland, Jeff; Grabowski, Tyler; Desai, Pooja |
| **Optional Attendees**: | meet@chime.aws; pin+1925589463@chime.aws |

---------- Amazon Chime Meeting Information ----------

You have been invited to an online meeting, powered by Amazon Chime.

1. Click to join the meeting:

https://chime.aws/1925589463

Meeting ID: 1925 58 9463

2. You can use your computer's microphone and speakers; however, a headset is recommended. Or, call in using your phone:

United States Toll-Free: +1 855-552-4463
Meeting ID: 1925 58 9463

One-click Mobile Dial-in (United States Toll-Free): +1 855-552-4463,,,1925589463#

United States (1): +1 206-462-5569
International: https://chime.aws/dialinnumbers/

Dial-in attendees must enter *7 to mute or unmute themselves.

3. To connect from an in-room video system, use one of the following Amazon Chime bridges:

SIP video system: 1925589463@meet.chime.in or meet.chime.in
or
H.323 system: 13.248.147.139 or 76.223.18.152

**CONFIDENTIAL**

If prompted enter the Meeting ID: 1925589463#


---------- End of Amazon Chime Meeting Information ---------

# CP Exhibit 9

Amazon.com Services LLC's Third Privilege Log
Amazon.com Services LLC and Bradley Bryson , Case No. 29-CA-261755

| Date Sent | Bates Label | From | To | CC | BCC | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 4/5/2020 9:16 a.m. | AMZ-BRY_PRIV000002 to AMZ-BRY_PRIV000005 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/5/2020 9:28 a.m. | AMZ-BRY_PRIV000001 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson  (Director, Worldwide Operations); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/5/2020 12:31 p.m. | AMZ-BRY_PRIV000001 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/5/2020 1:47 p.m. | AMZ-BRY_PRIV000001 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/5/2020 1:58 p.m. | AMZ-BRY_PRIV000001 | Rob Joseph (HR Director, NACF Director, Human Resources) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources) | None | Email to Liz Hackett, Esq. and Rob Joseph for purposes of obtaining legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/7/2020 2:30 p.m. | AMZ-BRY_PRIV000006 to AMZ-BRY_PRIV000016 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Kristin LaRosa, Esq. (Corporate Counsel) | None | Email to Liz Hackett, Esq. with attachments for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000009 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000010 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000011 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000012 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000013 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000014 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000015 to AMZ-BRY_PRIV000016 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/6/2020 7:46 p.m. | AMZ-BRY_PRIV000017 | Elliott Jones (Employee Relations Manager, North American Fullfillment Centers) | Kristin LaRosa, Esq. (Corporate Counsel); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | None | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice related to possible protected concerted activity. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log

*Amazon.com Services LLC and Gerald Bryson* , Case No. 29-CA-261755

| Date | Bates | Author | Recipient | CC | BCC | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 4/7/2020 8:42 a.m. | AMZ-BRY_PRIV000017 to AMZ-BRY_PRIV000020 | Elliott Jones (Employee Relations Manager, North American Fullfillment Centers) | Kristin LaRosa, Esq. (Corporate Counsel); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | None | Email to Kristin LaRosa, Esq. with attachment for purposes of obtaining legal advice regarding possible protected concerted activity. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000018 to AMZ-BRY_PRIV000020 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/9/2020 8:45 a.m. | AMZ-BRY_PRIV000022 to AMZ-BRY_PRIV000024 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email to Liz Hackett, Esq.  for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/9/2020 8:59 a.m. | AMZ-BRY_PRIV000022 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/9/2020 12:37 a.m. | AMZ-BRY_PRIV000022 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, North American Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/9/2020 10:39 a.m. | AMZ-BRY_PRIV000021 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email to Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 1:56 p.m. | AMZ-BRY_PRIV000021 | Kristin LaRosa, Esq. (Corporate Counsel) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | None | Email from Kristin LaRosa, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
*Amazon.com Services LLC and Gerald Bryson*, Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/9/2020 2:06 p.m. | AMZ-BRY_PRIV000021 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel) | None | None | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/10/2020 3:53 p.m. | AMZ-BRY_PRIV000027 to AMZ-BRY_PRIV000030 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Rachael Lighty (Regional Ops PR Manager) | None | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/10/2020 6:27 p.m. | AMZ-BRY_PRIV000026 to AMZ-BRY_PRIV000027 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Rachael Lighty (Regional Ops PR Manager) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding the decision to terminate the employment of G. Bryson and discipline of D. Evans and direction from counsel to seek approval from executives and to determine whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/11/2020 3:55 p.m. | AMZ-BRY_PRIV000026 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Kristin LaRosa, Esq. (Corporate Counsel); Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email to K. Cheeseman, copying Kristin LaRosa, Esq. and Liz Hackett, Esq., for purposes of gathering information necessary for the provision of legal advice regarding communications about the discipline of G. Bryson. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
*Amazon.com Services LLC and Gerald Bryson* , Case No. 29-CA-261755

| Date | Priv No. | Author | To | CC | | Description | | Privilege |
|---|---|---|---|---|---|---|---|---|
| 4/11/2020 5:58 p.m. | AMZ-BRY_PRIV000026 | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | (Corporate Counsel); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Rachael Lighty (Regional Ops PR Manager); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR | | None | Email to Kristin LaRosa, Esq. and others for purposes of gathering information necessary for the provision of legal advice regarding communications about the discipline of G. Bryson. | None | ATTORNEY-CLIENT |
| 4/13/2020 2:29 p.m. | AMZ-BRY_PRIV000026 | Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Kristin LaRosa, Esq. (Corporate Counsel); Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager) | None | Email to B. Campbell and K. Cheeseman, copying Kristin LaRosa, Esq. and Liz Hackett, Esq.,for purposes of gathering information necessary for the provision of legal advice regarding the decision to terminate G. Bryson. | None | ATTORNEY-CLIENT |
| 4/13/2020 11:37 a.m. | AMZ-BRY_PRIV000025 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Kristin LaRosa, Esq. (Corporate Counsel); Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, North American Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager) | None | Email to M. Midgley and K. Cheeseman, copying Kristin LaRosa, Esq. and Liz Hackett, Esq., for purposes of gathering information necessary for the provision of legal advice regarding the decision to terminate employment of G. Bryson. | None | ATTORNEY-CLIENT |
| 4/14/2020 1:00 p.m. | AMZ-BRY_PRIV000025 | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | Kristin LaRosa, Esq. (Corporate Counsel); Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager) | None | Email to M. Midgley, K. Cheeseman, and K. Cheeseman copying Kristin LaRosa, Esq. and Liz Hackett, Esq., for purposes of gathering information necessary for the provision of legal advice regarding the decision to terminate employment of G. Bryson. | None | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
*Amazon.com Services LLC and Gerald Bryson*, Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/16/2020 3:42 p.m. | AMZ-BRY_PRIV000031 to AMZ-BRY_PRIV000033 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel) | Anand Mehta (Director, Operations); Sai Kotha (General Manager, Operations); Christine Hernandez (HR Manager, NACF); Rachael Lighty (Regional Ops PR Manager); Milly Gutierrez (Principal, Employee Relations, Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. with attachment for puporses of obtaining legal advice regarding finalization of communication to executives to obtain approval of decision to discipline G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000032 to AMZ-BRY_PRIV000033 | N/A | N/A | N/A | N/A | Attachment accompanying email directed by in-house counsel Kristin LaRosa, Esq. that reflects legal advice. | ATTORNEY-CLIENT |
| 4/16/2020 7:27 p.m. | AMZ-BRY_PRIV000034 to AMZ-BRY_PRIV000035 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel) | Rachael Lighty (Regional Ops PR Manager); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Rob Joseph (HR Director, NACF Director, Human Resources); Christine Hernandez (HR Manager, NACF); Sai Kotha (General Manager, Operations) | None | Email to Kristin LaRosa, Esq. with attachment for purposes of obtaining legal advice regarding communication to executives to obtain approval of decision to discipline G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000035 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/16/2020 8:38 p.m. | AMZ-BRY_PRIV000036 to AMZ-BRY_PRIV000039 | Rachael Lighty (Regional Ops PR Manager) | Kristin LaRosa, Esq. (Corporate Counsel) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Heather Knox (Director, NA Ops PR); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. with attachment for purposes of obtaining legal advice regarding potential statement about G. Bryson discipline. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000039 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/17/2020 8:28 a.m. | AMZ-BRY_PRIV000040 to AMZ-BRY_PRIV000041 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Tyler Grabowski (Human Resources Business Partner) | Payal Desai (Sr HR Business Partner, NACF); Christine Hernandez (HR Manager, NACF); Neha Viswanath (Sr HR Business Partner, NACF) | None | Email to Kristin LaRosa, Esq. and T. Grabowski regarding legal advice regarding communication of discipline to G. Bryson. | ATTORNEY-CLIENT |
| 4/17/2020 2:49 p.m. | AMZ-BRY_PRIV000040 to AMZ-BRY_PRIV000045 | Tyler Grabowski (Human Resources Business Partner) | Kristin LaRosa, Esq. (Corporate Counsel); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Payal Desai (Sr HR Business Partner, NACF); Christine Hernandez (HR Manager, NACF); Neha Viswanath (Sr HR Business Partner, NACF) | None | Email to Kristin LaRosa, Esq. and B. Campbell with attachments for purposes of obtaining legal advice following the communication of decision to terminate employment of G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000042 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000043 to AMZ-BRY_PRIV000044 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000045 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/17/2020 6:05 p.m. | AMZ-BRY_PRIV000046 to AMZ-BRY_PRIV000049 | Rachael Lighty (Regional Ops PR Manager) | Kristin LaRosa, Esq. (Corporate Counsel); Drew Herdener (VP, Global Corporate and Operations Communications) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Heather Knox (Director, NA Ops PR); Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. and D. Herdener with attachment for purposes of gathering information necessary for the provision of legal advice regarding communications about termination of employment G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000049 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
*Amazon.com Services LLC and Gerald Bryson* , Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/16/2020 3:42 p.m. | AMZ-BRY_PRIV000050 to AMZ-BRY_PRIV000051 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Dave Clark (SVP Worldwide Operations) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Bradley Campbell to Dave Clark (SVP, WW Operations, SVP Operations) with attachment at the direction of Amazon in-house counsel, Liz Hackett, Esq., containing legal advice and for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000051 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/16/2020 3:54 p.m. | AMZ-BRY_PRIV000052 | Dave Clark (SVP, WW Operations, SVP Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campell made at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000049 | N/A | N/A | N/A | N/A | Attachment accompanying email directed by in-house counsel Liz Hackett. | ATTORNEY-CLIENT |
| 4/16/2020 3:58 p.m. | AMZ-BRY_PRIV000052 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Dave Clark (SVP, WW Operations, SVP Operations) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Bradley Campbell to Dave Clark (SVP, WW Operations, SVP Operations) made at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 4:00 p.m. | AMZ-BRY_PRIV000052 | Dave Clark (SVP, WW Operations, SVP Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campell at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 3:50 p.m. | AMZ-BRY_PRIV000053 | Dave Clark (SVP, WW Operations, SVP Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campell at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 3:53 p.m. | AMZ-BRY_PRIV000053 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Dave Clark (SVP, WW Operations, SVP Operations) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Bradley Campbell to Dave Clark (SVP, WW Operations, SVP Operations) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 3:58 p.m. | AMZ-BRY_PRIV000054 | Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) | Dave Clark (SVP, WW Operations, SVP Operations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Alicia Davis to Dave Clark (SVP, WW Operations, SVP Operations) and Bradley Campbell at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
Amazon.com Services LLC and Gerald Bryson , Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/16/2020 3:59 p.m. | AMZ-BRY_PRIV000054 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Dave Clark (SVP, WW Operations, SVP Operations); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Email from Bradley Campbell to Dave Clark (SVP, WW Operations, SVP Operations) and Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | None | ATTORNEY-CLIENT |
| 4/16/2020 4:00 p.m. | AMZ-BRY_PRIV000054 | Dave Clark (SVP, WW Operations, SVP Operations) | Dave Clark (SVP, WW Operations, SVP Operations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campbell and Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | None | ATTORNEY-CLIENT |
| N/A | AMZ-BRY001309 | N/A | N/A | N/A | Attachment accompanying email directed by in-house counsel Kristin LaRosa, Esq. that reflects legal advice. | N/A | ATTORNEY-CLIENT |
| 4/29/2020 5:19 p.m. | AMZ-BRY001374 | Tyler Grabowski (Human Resources Business Partner) | Rachael Lighty (Regional Ops PR Manager); | Kristin LaRosa, Esq. (Corporate Counsel); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Christine Hernandez (HR Manager, NACF) | Email to Rachael Lighty, copying Kristin LaRosa, Esq., for purposes of gathering information necessary for the provision of legal advice regarding the termination of G. Bryson's employment | None | ATTORNEY-CLIENT |
| 4/5/2020 2:20 a.m. | AMZ-BRY_PRIV000056 to AMZ-BRY_PRIV000059 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel) | Anand Mehta (Director, Operations) | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice regarding scheduled protest activities on April 6th and prior protest activities. | None | ATTORNEY-CLIENT |
| 4/9/2020 1:42 p.m. | AMZ-BRY_PRIV000061 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson and D. Evans. | None | ATTORNEY-CLIENT |
| 4/9/2020 3:15 p.m. | AMZ-BRY_PRIV000061 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding possible discipline of G. Bryson and D. Evans. | None | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
*Amazon.com Services LLC and Gerald Bryson , Case No. 29-CA-261755*

| Date | Bates | From | To | CC | BCC | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 4/9/2020 3:27 p.m. | AMZ-BRY_PRIV000060 to AMZ-BRY_PRIV000061 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 5:15 p.m. | AMZ-BRY_PRIV000060 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | None | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 5:27 p.m. | AMZ-BRY_PRIV000060 | Ryan Smith (Director, NACF AR Operations, Director, Regional Operations) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | None | Email to Liz Hackett, Esq. and Bradley Campbell for purposes of obtaining legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 5:32 p.m. | AMZ-BRY_PRIV000060 | Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations) | Kristin LaRosa, Esq. (Corporate Counsel); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email to Liz Hackett, Esq. and others for purposes of obtaining legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 8:52 a.m. | AMZ-BRY_PRIV000065 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations) | None | None | Email from Bradley Campbell to Ryan Smith and Anand Mehta at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/9/2020 8:57 a.m. | AMZ-BRY_PRIV000065 | Ryan Smith (Director, NACF AR Operations, Director, Regional Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Anand Mehta (Director, Operations) | None | None | Email from Ryan Smith to Bradley Campbell and Anand Mehta at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
Amazon.com Services LLC and Gerald Bryson , Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/14/2020 8:26 a.m. | AMZ-BRY_PRIV000066 to AMZ-BRY_PRIV000164 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and Shannon Wilson with attachments for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000068 to AMZ-BRY_PRIV000076 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000077 to AMZ-BRY_PRIV000087 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000088 to AMZ-BRY_PRIV000091 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000092 to AMZ-BRY_PRIV000164 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/15/2020 6:08 a.m. | AMZ-BRY_PRIV000165 to AMZ-BRY_PRIV000182 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Henry Darcie (VP, HR - WW Operations, VP Human Resources) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email to Liz Hackett, Esq. and Henry Darcie with attachments for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000171 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000172 to AMZ-BRY_PRIV000173 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000174 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000175 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000176 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000177 to AMZ-BRY_PRIV000178 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000179 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000180 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000181 to AMZ-BRY_PRIV000182 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/15/2020 9:46 p.m. | AMZ-BRY_PRIV000183 | Henry Darcie (VP, HR - WW Operations, VP Human Resources) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and others for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/16/2020 2:47 a.m. | AMZ-BRY_PRIV000183 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Henry Darcie (VP, HR - WW Operations, VP Human Resources) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email to Henry Darcie, copying Liz Hackett, Esq. and Kristin LaRosa, Esq., for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
Amazon.com Services LLC and Gerald Bryson , Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/16/2020 12:03 p.m. | AMZ_BRY_PRIV000189 to AMZ-BRY_PRIV000190 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and Shannon Wilson for purposes of obtaining legal advice regarding the possible termination of G. Bryson's employment. | ATTORNEY-CLIENT |
| 4/16/2020 12:57 p.m. | AMZ-BRY_PRIV000189 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Joshua Teeter (Director, Human Resources);  Rob Joseph (HR Director, NACF Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and others for purposes of obtaining legal advice regarding possible termination of G. Bryson's employment. | ATTORNEY-CLIENT |
| 4/16/2020 3:35 p.m. | AMZ-BRY_PRIV000189 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Joshua Teeter (Director, Human Resources);  Rob Joseph (HR Director, NACF Director, Human Resources); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and others with attachment for purposes of obtaining legal advice regarding possible termination of G. Bryson's employment. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000191 to AMZ-BRY_PRIV000192 | N/A | N/A | N/A | N/A | Attachment accompanying email directed by in-house counsel Liz Hackett, Esq. that reflects legal advice. | ATTORNEY-CLIENT |
| 4/16/2020 3:50 p.m. | AMZ_BRY_PRIV000193 | Dave Clark (SVP, WW Operations, SVP Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campbell and Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 3:54 p.m. | AMZ_BRY_PRIV000193 | Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) | Dave Clark (SVP, WW Operations, SVP Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | None | Email from Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
*Amazon.com Services LLC and Gerald Bryson*, Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/18/2020 2:59 p.m. | AMZ-BRY_PRIV000193 | Dave Clark (SVP, WW Operations, SVP Operations) | Dave Clark (SVP, WW Operations, SVP Operations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/18/2020 3:58 p.m. | AMZ-BRY_PRIV000193 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | None | Email from Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | |
| 4/17/2020 3:30 p.m. | AMZ-BRY_PRIV000195 | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Kristin LaRosa, Esq. (Corporate Counsel); Rachael Lighty (Regional Ops PR Manager) | Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Heather Knox (Director, NA Ops PR); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice regarding potential statement about G. Bryson discipline. | ATTORNEY-CLIENT |
| 4/17/2020 3:34 p.m. | AMZ-BRY_PRIV000195 | Rachael Lighty (Regional Ops PR Manager) | Kristin LaRosa, Esq. (Corporate Counsel); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Heather Knox (Director, NA Ops PR); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice regarding potential statement about G. Bryson discipline. | ATTORNEY-CLIENT |
| 4/17/2020 6:09 p.m. | AMZ-BRY_PRIV000198 | Drew Herdener (VP, Global Corporate and Operations Communications) | Kristin LaRosa, Esq. (Corporate Counsel); Rachael Lighty (Regional Ops PR Manager) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Heather Knox (Director, NA Ops PR); Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. and R. Lighty for purposes of gathering information necessary for the provision of legal advice regarding communications about termination of employment G. Bryson. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Third Privilege Log
*Amazon.com Services LLC and Gerald Bryson* , Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/17/2020 6:09 p.m. | AMZ-BRY_PRIV000198 | Rachael Lighty (Regional Ops PR Manager) | Drew Herdener (VP, Global Corporate and Operations Communications); Kristin LaRosa, Esq. (Corporate Counsel); Rachael Lighty (Regional Ops PR Manager) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Heather Knox (Director, NA Ops PR); Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. and D. Lighty for purposes of gathering information necessary for the provision of legal advice regarding communications about termination of employment G. Bryson. | ATTORNEY-CLIENT |
| 9/9/2019 | AMZ-BRY008013 to AMZ-BRY008015 | Linda Prisciando | Ethics Escalation Line | N/A | N/A | Information reflecting legal advice from Lauren Howard, Esq. (Corporate Counsel) regarding potential discipline of Aaron West. | ATTORNEY-CLIENT |
| 9/17/2019 | AMZ-BRY008021 to AMZ-BRY008022 | Linda Prisciando | Ethics Escalation Line | N/A | N/A | Information reflecting legal advice from Lauren Howard, Esq. (Corporate Counsel) regarding potential discipline of Aaron West. | ATTORNEY-CLIENT |

CONFIDENTIAL

Social Distancing Policy
4/1/20; updated 4/2/20

1  Social Distancing Policy
2
3  During this unprecedented time, ensuring the safety and health of our employees is more important than ever. Social
4  distancing continues to be advised by the CDC as one of the key precautions everyone needs to be taking both inside
5  and outside of the work environment. This is why it is so important that the social distancing requirements we've put
6  into place must be communicated, adhered to, and enforced by everyone within our facilities at all times. As
7  employees, you have the responsibility to report violations and immediately notify a member of leadership or Human
8  Resources.
9
10  Reactive FAQ
11
12  **What should I do if I see someone not following the mandatory Social Distancing policy?**
13  Please report the individual to ANY manager or HR team member immediately. The individual will be approached and
14  informed that they are not following the social distancing policy, and asked to do what is required to comply. Sites
15  leaders may use expedited performance management for social distancing two-step process of final warning and
16  termination on second documented case.
17
18  **How are employees informed about the requirements?**
19  Social Distancing Policy requirements are posted throughout the facility, e.g. poster, digital slides, etc., and can be
20  reviewed with any manager of HR team member, if there are questions.
21
22  **What if a violation isn't reported?**
23  Site leadership or HR will speak directly with the employee to discuss why they had concerns escalating the violation.
24  All employees have the responsibility to report violations and failing to do so will result in corrective action. We all
25  are responsible for ensuring the safety and health of our team is our top priority.
26
27  **Is the Social Distancing Policy eligible for appeal?**
28  No, this falls out of scope for the appeals policy. We have a legal obligation to act and protect the safety of our
29  employees when individuals refuse to engage in social distancing during this pandemic.
30

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 127 of 280 PageID #: 4637

# CP Exhibit 11
# Bye, Amazon

Search [                              ]

May 1ˢᵗ was my last day as a VP and Distinguished Engineer at Amazon Web Services, after five years and five months of rewarding fun. I quit in dismay at Amazon firing whistleblowers who were making noise about warehouse employees frightened of Covid-19.

What with big-tech salaries and share vestings, this will probably cost me over a million (pre-tax) dollars, not to mention the best job I've ever had, working with awfully good people. So I'm pretty blue.

What happened · Last year, Amazonians on the tech side banded together as [Amazon Employees for Climate Justice](#) (AECJ), first coming to the world's notice with an [open letter](#) promoting a shareholders' resolution calling for dramatic action and leadership from Amazon on the global climate emergency. I was one of its 8,702 signatories. [¶](#)

While the resolution got a lot of votes, it didn't pass. Four months later, 3,000 Amazon tech workers from around the world [joined in the Global Climate Strike walkout](#). The day before the walkout, Amazon announced [a large-scale plan](#) aimed at making the company part of the climate-crisis solution. It's not as though the activists were acknowledged by their employer for being forward-thinking; in fact, leaders were [threatened with dismissal](#).

Fast-forward to the Covid-19 era. Stories surfaced of unrest in Amazon warehouses, workers raising alarms about being uninformed, unprotected, and frightened. Official statements claimed every possible safety precaution was being taken. Then a worker organizing for better safety conditions was fired, and [brutally insensitive remark](#)s appeared in leaked executive meeting notes where the focus was on defending Amazon "talking points".

Warehouse workers reached out to AECJ for support. They responded by internally promoting [a petition](#) and organizing a video call for Thursday April 16 featuring warehouse workers from around the world, with guest activist [Naomi Klein](#). An announcement sent to internal mailing lists on Friday April 10th was apparently the flashpoint. Emily Cunningham and Maren Costa, two visible AECJ leaders, were fired on the spot that day. The justifications were laughable; it was clear to any reasonable observer that they were turfed for whistleblowing.

Management could have objected to the event, or demanded that outsiders be excluded, or that leadership be represented, or any number of other things; there was plenty of time. Instead, they just fired the activists.

Snap! · At that point I snapped. VPs shouldn't go publicly rogue, so I escalated through the proper channels and by the book. I'm not at liberty to disclose those discussions, but I made many of the arguments appearing in this essay. I think I made them to the appropriate people. ¶

That done, remaining an Amazon VP would have meant, in effect, signing off on actions I despised. So I resigned.

The victims weren't abstract entities but real people; here are some of their names: Courtney Bowden, Gerald Bryson, Maren Costa, Emily Cunningham, Bashir Mohammed, and Chris Smalls.

I'm sure it's a coincidence that every one of them is a person of color, a woman, or both. Right?

Let's give one of those names a voice. Bashir Mohamed said "They fired me to make others scared." Do you disagree?

*[There used to be a list of adjectives here, but voices I respect told me it was mean-spirited and I decided it didn't add anything so I took it out.]*

What about the warehouses? · It's a matter of fact that workers are saying they're at risk in the warehouses. I don't think the media's done a terribly good job of telling their stories. I went to the video chat that got Maren and Emily fired, and found listening to them moving. You can listen too if you'd like. Up on YouTube is another full-day videochat; it's nine hours long, but there's a table of contents, you can decide whether you want to hear people from Poland, Germany, France, or multiple places in the USA. Here's more reportage from the NY Times. ¶

It's not just workers who are upset. Here are Attorneys-general from 14 states speaking out. Here's the New York State Attorney-general with more detailed complaints. Here's Amazon losing in French courts, twice.

On the other hand, Amazon's messaging has been urgent that they are prioritizing this issue and putting massive efforts into warehouse safety. I actually believe this: I have heard detailed descriptions from people I trust of the intense work and huge investments. Good for them; and let's grant that you don't turn a supertanker on a dime.

But I believe the worker testimony too. And at the end of the day, the big problem isn't the specifics of Covid-19 response. It's that Amazon treats the humans in the warehouses as fungible units of pick-and-pack potential. Only that's not just Amazon, it's how 21st-century capitalism is done.

Amazon is exceptionally well-managed and has demonstrated great skill at spotting opportunities and building repeatable processes for exploiting them. It has a corresponding lack of vision about the human costs of the relentless growth and accumulation of wealth and power. If we don't like certain

things Amazon is doing, we need to put legal guardrails in place to stop those things. We don't need to invent anything new; a combination of antitrust and living-wage and worker-empowerment legislation, rigorously enforced, offers a clear path forward.

Don't say it can't be done, because France is doing it.

Poison · Firing whistleblowers isn't just a side-effect of macroeconomic forces, nor is it intrinsic to the function of free markets. It's evidence of a vein of toxicity running through the company culture. I choose neither to serve nor drink that poison. ¶

What about AWS? · Amazon Web Services (the "Cloud Computing" arm of the company), where I worked, is a different story. It treats its workers humanely, strives for work/life balance, struggles to move the diversity needle (and mostly fails, but so does everyone else), and is by and large an ethical organization. I genuinely admire its leadership. ¶

Of course, its workers have power. The average pay is very high, and anyone who's unhappy can walk across the street and get another job paying the same or better.

Spot a pattern? · At the end of the day, it's all about power balances. The warehouse workers are weak and getting weaker, what with mass unemployment and (in the US) job-linked health insurance. So they're gonna get treated like crap, because capitalism. Any plausible solution has to start with increasing their collective strength. ¶

What's next? · For me? I don't know, genuinely haven't taken time to think about it. I'm sad, but I'm breathing more freely. ¶

---

Comments on this fragment are closed.

**Updated: 2020/05/04**

---

# Contributions

Comment feed for ongoing:🔊

From: Maren Costa (May 04 2020, at 00:07)

Thank you Tim. Please keep in touch!

[link]

From: Letu (May 04 2020, at 00:20)

**The New York Times**   https://www.nytimes.com/2020/05/07/technology/amazon-coronavirus-whistleblowers.html

# CP Exhibit 12
## *Senators Want to Know if Amazon Retaliated Against Whistle-Blowers*

Democratic senators sent a letter to the company asking for more details after it fired four employees who raised health concerns about its warehouses.

By Kate Conger

Published May 7, 2020   Updated May 11, 2020

Democratic senators on Thursday questioned whether Amazon retaliated against whistle-blowers when it fired four employees who raised concerns about the spread of coronavirus in the company's warehouses.

In a letter sent to Amazon, Senator Elizabeth Warren, a frequent critic of the e-commerce giant, and eight other senators asked Amazon to provide more information about its policies for firing employees.

"In order to understand how the termination of employees that raised concerns about health and safety conditions did not constitute retaliation for whistle-blowing, we are requesting information about Amazon's policies regarding grounds for employee discipline and termination," the letter said.

The letter was also signed by Bernie Sanders, an independent who caucuses with the Democrats, as well as Cory Booker, Sherrod Brown, Kirsten Gillibrand, Edward J. Markey, Richard Blumenthal, Kamala Harris and Tammy Baldwin. It asked Amazon if it tracked unionization efforts in its warehouses and whether it tracked employees who participated in protests or spoke to the news media.

The letter increased pressure on Amazon and its chief executive, Jeff Bezos, who has been called to testify before Congress in an antitrust investigation and has been a frequent target for criticism from President Trump. A number of senators and representatives have already written to Mr. Bezos expressing concern about warehouse safety.

An Amazon spokeswoman said: "These individuals were not terminated for talking publicly about working conditions or safety but, rather, for violating — often repeatedly — policies, such as intimidation, physical distancing and more."

She added that while Amazon supported employees' right to criticize or protest working conditions, "that does not come with blanket immunity against any and all internal policies."

"We look forward to explaining in more detail in our response to the senators' letter," the spokeswoman said.

Cases of the coronavirus have been reported in more than 100 Amazon warehouses, and several workers have died. State and local officials in Kentucky and New Jersey have asked Amazon to close facilities where workers have fallen sick.

Despite the sophistication of Amazon's vast e-commerce business, it depends on warehouse workers to keep shipments flowing, and many of those workers fear their warehouses are contaminated by the coronavirus.

Mr. Bezos said during a call with Amazon investors last week that the company expected to spend $4 billion on safety measures and other expenses related to the coronavirus during the current quarter.

In March, Amazon fired Chris Smalls, a worker in its Staten Island facility who had organized a protest to demand stronger safety protocols there. Amazon said Mr. Smalls had violated a quarantine order to attend the protest.

In an email to other Amazon executives, the company's top lawyer, David Zapolsky, called Mr. Smalls "not smart or articulate." Mr. Zapolsky, who also suggested that Amazon portray Mr. Smalls as the leader of a movement to unionize Amazon workers, apologized for the remarks after they were published by Vice News.

Two weeks later, Amazon fired two designers, Maren Costa and Emily Cunningham. Ms. Costa and Ms. Cunningham had pressed the company to reduce its carbon footprint, and had announced an internal event for warehouse workers to speak to tech employees about their workplace conditions shortly before they were fired. Amazon said the two employees had repeatedly violated corporate policies.

"Warehouse workers have been under incredible threat," Ms. Cunningham said in an interview Wednesday evening. "We wanted to give space for warehouse workers to be able to talk openly and honestly about the conditions they were facing and why they felt so unsafe."

Case 1:22-cv-01479-DG-SJB   Document 15-13   Filed 03/17/23   Page 131 of 280 PageID #: 4641

In late April, Amazon fired Bashir Mohamed, a warehouse worker in Shakopee, Minn. Mr. Mohamed said he had raised concerns about workers' inability to remain socially distant inside the warehouse. Amazon said Mr. Mohamed had violated several policies, including one that required workers to follow social distancing guidelines.

# CP Exhibit 13

BUSINESS NEWS

## Fired, interrogated, disciplined: Amazon warehouse organizers allege year of retaliation

The number of charges filed with the National Labor Relations Board accusing Amazon of interfering with workers' right to organize more than tripled during the pandemic.



—  Jonathan Bailey filed a charge with the National Labor Relations Board accusing Amazon of retaliating against him for protected activities.  Victor J. Blue / for NBC News

March 30, 2021, 4:30 AM EDT

**By Olivia Solon and April Glaser**

The day after Jonathan Bailey organized a walkout over Covid-19 concerns at an Amazon warehouse in Queens, New York, he was, he said, "detained" during his lunch break by a

Case 1:22-cv-01479-DG-SJB Document 5-13 Filed 03/17/22 Page 133 of 290 PageID #: 4643

manager in a black camouflage vest who introduced himself as ex-FBI.

Bailey, who co-founded Amazonians United, a network of Amazon workers fighting for better pay and working conditions, was ushered to a side office and interrogated for 90 minutes, according to testimony filed to the National Labor Relations Board, or NLRB.

The manager asked exactly what Bailey had said or done to get his fellow workers to join the walkout. When Bailey declined to explain, the manager shifted his tone. He told Bailey that some people "felt hurt" by what he did and that it "might be seen as harassment," Bailey said.

"It was already a pretty intense conversation. But it became very clear they were trying to intimidate me," Bailey said. "Being accused of harassment is a very dangerous thing."

A week later, Bailey received a formal write-up for harassment, although his managers would not tell him whom he had allegedly harassed, nor what he had allegedly said or done, according to his NLRB testimony.



Alabama workers begin vote that could create first Amazon union in U.S.

Bailey, who still works for Amazon, believes that was part of a corporate strategy to silence organizers, and in May 2020 he filed a charge against Amazon to the NLRB alleging that the

company had violated labor law by retaliating against him for protected, concerted activities. The board found merit to the allegations and filed a federal complaint against Amazon.

This month, a year after Bailey staged the walkout, Amazon settled. Under the terms of the settlement, Amazon was required to post a notice to employees, on physical bulletin boards and via email, reminding them of their right to organize.

**Sponsored Stories**                                                                by Taboola

L THINGS AUTO | SEARCH ADS

w Volkswagen's Finally On Sale

AIKIN ANALYTICS

all Street legend warns "A strange day is coming"

NOVIA

e Best Face Mask for Air Travel in 2022

MBAS

erino Wool Socks That Keep Feet Comfy In Every Season



The New York Times

From investigation.

**Print and digital:**
**50% off for the first year.**
**Special offer.**

VIEW OFFER



— A handful of workers, including Jonathan Bailey, said allegations made against them by Amazon seem to play into racist stereotypes of Black men as angry or aggressive.   Victor J. Blue / for NBC News

"Amazon will work to destroy your character and try to keep you from talking about what's actually going on," Bailey said. "And it's all so that Jeff Bezos can make more dollars."

Bailey's complaint is one of at least 37 charges filed to the NLRB against Amazon, America's second-largest employer, across 20 cities since February 2020, when news of the pandemic began to spread, according to an analysis of NLRB filings by NBC News. These complaints accuse the company of interfering with workers' rights to organize or form a union. That's more than triple the number of cases of this kind filed to the agency about Amazon in 2019 and six times the number filed in 2018.

For comparison, Walmart, America's largest employer, has had eight such charges since February 2020. The meat-processing giant JBS, whose workers have been fighting for better working conditions throughout the pandemic, including staging protests, had nine.

The number of similar charges filed against Amazon over the last year has become significant enough that the NLRB is considering whether the "meritorious allegations warrant a consolidated effort between the regions," NLRB spokesman Nelson Carrasco said. Typically NLRB charges are investigated by one of 26 regional offices. But in rare instances the board combines cases into a consolidated complaint, as it has done with Walmart and McDonald's, if it believes there is a pattern emerging at a company.

Amazon declined to comment on the increase in NLRB charges.

Labor experts said that the surge in such charges reflects a dramatic increase in organizing among a small but vocal portion of Amazon's 500,000 warehouse workers across North America during a coronavirus-led boom in online retail, leading to record sales and an almost 200 percent increase in profits for Amazon.

Workers have been coming together to demand better working conditions – including through solidarity campaigns, strikes, protests and walkouts – at warehouses across the United States, including in Chicago; New York; Minneapolis; Iowa City, Iowa; Sacramento and the Inland Empire of California; Salem, Oregon; and King of Prussia, Pennsylvania.

—— People in New York City protest in support of Amazon workers in Alabama on March 4.
Emaz / VIEW press / Corbis via Getty Images

As worker activism gains momentum, so, too, has Amazon's effort to counter it with anti-union propaganda, firing key organizers, surveilling employees and hiring Pinkertons to gather intelligence on warehouse workers.

NBC News interviewed more than two dozen Amazon warehouse workers, nine of whom said they had been fired, disciplined or retaliated against for protected activity and three of whom filed NLRB complaints since the pandemic began. They allege that Amazon has in some cases selectively enforced its policies on issues such as social distancing, vulgar language and insubordination to target those speaking up for worker rights. A handful of workers, including Bailey, said that allegations made against them by Amazon seemingly play into racist stereotypes of Black men being angry or aggressive.

"We have zero tolerance for racism or retaliation of any kind, and in many cases these complaints come from individuals who acted inappropriately toward co-workers and were

terminated as a result," said an Amazon spokeswoman, Leah Seay. "We work hard to make sure our teams feel supported, and will always stand by our decision to take action if someone makes their colleagues feel threatened or excluded."

But labor historians note just how significant this fight is for the future of employees at one of the world's fastest growing companies.

"There is a David versus Goliath aspect to this. Workers getting paid $15 per hour are going up against one of the world's most powerful corporations owned by the world's richest man," said John Logan, director of labor and employment studies at San Francisco State University. "Having a union would be a disaster for Amazon, so it's pulling out all the stops to prevent workers from organizing."

## Selective enforcement

The highest-profile organizing campaign is in Bessemer, Alabama, where 5,800 workers are in the midst of a precedent-setting vote to form a union. There, Amazon is waging what labor experts like Logan describe as a classic and well-funded union-busting campaign. Workers described how Amazon required them to attend mandatory meetings to hear why the union was not, in Amazon's view, beneficial for workers. The warehouse is filled with banners and signs encouraging workers to vote against the union and the company set up a website and hashtag, #DoItWithoutDues, to warn them about union fees.

"They are doing everything they can to try to convince the people to 'Vote no,'" said Darryl Richardson, an Amazon employee in Bessemer who is organizing with the union drive. "There are signs right over the men's stall, so when you use the bathroom it's right there face to face."

—    A demonstrator wears a mask that reads "Power To The Workers" during a Retail, Wholesale and Department Store Union protest outside the Amazon BHM1 Fulfillment Center in Bessemer, Ala., on Feb. 7.
Elijah Nouvelage / Bloomberg via Getty Images

Seay, the Amazon spokeswoman, said that it was important for employees to understand the facts of joining a union.

Case 1:22-cv-01479-DG-SJB Document 5-13 Filed 03/17/22 Page 138 of 280 PageID #: 4648

Amazon's anti-union campaign states that union members would have to pay $500 a year in dues with no guarantee of better pay. Economic research indicates that collective bargaining unions generally raise pay for both union and nonunion members. "Amazon fears the union because of the leverage it can have to organize strikes that could cripple the business," said Michael Pachter, an analyst at Wedbush Securities, a Los Angeles-based investment firm, noting that Amazon's efficient customer service is critical to the company's success.

If unions negotiate better pay and benefits, it would increase Amazon's operating expenses and reduce profit, Pachter added.

Seay said Amazon hosts "regular information sessions for all employees, which include an opportunity for employees to ask questions."

"If the union vote passes," she added, "it will impact everyone at the site, and it's important all associates understand what that means for them and their day-to-day life working at Amazon."

The company offers a $15-an-hour starting wage, benefits and a clean working environment for its employees, a spokesperson said.

Elsewhere, the company's crackdown on organizing has been more insidious, say workers and labor experts.

"They made up stupid reasons to get rid of each of us," said Courtney Bowden, who was fired from her warehouse job in King of Prussia, Pennsylvania, last March after advocating for sick pay for part-time workers. According to her complaint filed to the NLRB, management at her warehouse targeted her by "selectively and disparately" enforcing rules around how workers should wear their hair and later fired her for an altercation with a co-worker.

In November, the NLRB determined that, following an investigation, it found merit to the allegations that Amazon had illegally retaliated against Bowden, according to public records first obtained by BuzzFeed. Bowden withdrew her NLRB charge late March after reaching a private settlement with Amazon.

"If what they set out to do is shut down organizing, I think they are doing a good job right now," Bowden said. "But when you take out some people there will always be someone else later down the line."

John Hopkins, an organizer who worked at a warehouse in San Leandro, California, agreed. Amazon suspended Hopkins for three months starting in early May 2020 for violating a relatively new social-distancing rule forbidding workers to stay on site for longer than 15 minutes after

their shift ended. In the months before his suspension, Hopkins had been distributing pamphlets about union organizing to co-workers after becoming concerned about the company's handling of the pandemic. Hopkins, 34, was worried about the risk of exposure to the virus at work, particularly since he lives with his stepfather and brother and both are cancer survivors.

—— Amazonians United is a network of Amazon workers fighting for better pay and working conditions.
Victor J. Blue / for NBC News

The pamphlets he had been leaving kept disappearing from the break room and notice boards, and nobody in human resources would explain why, Hopkins said. On May 1, he filed a complaint with the NLRB against Amazon, noting that other flyers, such as job postings for third-party delivery companies, were allowed. That night, he clocked out in solidarity with a sick-out protest held by essential workers in the United States, but stayed in the break room to talk to co-workers about organizing. Management asked him to leave, which he did after arguing that it was protected activity. He was suspended the next day.

"It seemed like a very disproportionate punishment," Hopkins said. "I felt like they isolated me so I couldn't get other workers rallied on my side. But they pretended they didn't see the connection between my union organizing and my suspension."

While the NLRB initially dismissed Hopkins' case, it is revisiting it as part of the agency's larger investigation into Amazon's alleged retaliation.

## Increasing surveillance

Labor experts say that Amazon warehouses are also designed to detect and squash organizing through surveillance technology, including the scanners workers use to track the rate at which they sort and pack items, mandatory daily worker surveys, and AI-powered camera systems to detect social-distancing violations.

"Amazon controls workers' bodies and movement in such minute ways, ostensibly to track productivity, that people cannot have any purpose in the workplace except for to produce," said Veena Dubal, a law professor at the University of California, Hastings, whose research focuses on law, technology and gig work. "It's inherently union busting."

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 140 of 280 PageID #: 4650

She noted that surveillance and intense pressure on workers to meet productivity targets make it "easy to pin a termination on one of the thousands of rules workers have to abide by."

## Recommended

BUSINESS NEWS

**Santa Clauses are coming to town — and they've been brushing up on their skills**

U.S. NEWS

**Debt collectors can use social media to reach borrowers**

Amazon spokeswoman Seay said that scanners were for tracking "inventory, not people," and that data collected from the mandatory surveys are used to make improvements to employees' work experience.

Senior warehouse staff are also trained to inform higher-ups if they hear workers discussing organizing, said Enesha Yurchak, a former onsite medical representative at a fulfillment center in Salem, Oregon.

"I remember one of my supervisors came up to me and said if you ever hear the word 'union' please let us know right away," she said. "I asked what was going to happen to them and he said, 'Don't quote me on this but they are going to get fired.'"

Amazon denied that senior staff were trained to keep an eye out for organizers.

"We respect our employees' right to join, form or not to join a labor union or other lawful organization of their own selection, without fear of retaliation, intimidation or harassment," Seay said.

Yurchak, whose job was to provide first aid to injured warehouse workers, sued Amazon last May after she was terminated for "insubordination." In her complaint she alleged that she had repeatedly raised concerns about workplace safety violations related to the pandemic, including lack of PPE and deep-cleaning at the facility as well as feeling pressured to return to work while she was on medical leave. In court filings Amazon said Yurchak was fired after refusing to sanitize worker harnesses.

# Emerging patterns

The apparent pattern of firing, suspending or disciplining organizers has played out nationwide.

Chris Smalls, who worked at a warehouse in Staten Island, New York, organized a walkout on March 30, 2020, to protest the lack of Covid-19 protections for warehouse workers. He and other workers, including Gerald Bryson and Derrick Palmer, held signs outside the building with messages such as "Treat your workers like your customers" and "Alexa, send us home."



—— Gerald Bryson protests conditions at Amazon's Staten Island distribution facility in New York City on March 30, 2020.  Spencer Platt / Getty Images file

Amazon fired or disciplined all three of them in the following weeks.

Amazon said it fired Smalls on the day of the protest for violating a 14-day quarantine after coming into contact with an employee who tested positive for Covid-19. Smalls said lots of other workers were in contact with the same employee for longer time periods. But he was singled out

for asking management to sanitize the warehouse and be more transparent about positive Covid cases.

A week later, on Monday, April 6, Palmer, Bryson and the recently fired Smalls attended a second protest outside the facility.

Bryson, who joined the protest on his day off, was fired two weeks later for violating Amazon's "vulgar language" policy after a two-minute interaction with another employee who disagreed with the protest. According to a statement submitted to the NLRB, reviewed by NBC News, the woman repeatedly told him to "get the f--- out of here" and told him in "racially charged language" to "go back to where you came from, go back to the Bronx." Bryson initially responded by telling the woman he was protesting for her, too. But, according to the NLRB filing, as her insults escalated he called her a "bitch" before walking away.

"I am a renegade, a rebel. If you stomp on my foot, I will let you know and expect an apology," Bryson said. "But I have never been aggressive to a male or female."

Like Jonathan Bailey from the Queens warehouse, Bryson believes his race played a part in his firing. Both men are Black.

"The person they backed made racial comments towards me. But that person kept their job and I was fired – while protesting on my day off," he said.

Seay of Amazon said the company had "zero tolerance for racism or retaliation of any kind."

In June 2020, Bryson filed an unfair labor practice charge to the NLRB, alleging that Amazon illegally retaliated against him for organizing. The NLRB investigated and determined in December that the complaint had merit. Bryson is awaiting a hearing before an NLRB judge.



Case 1:22-cv-01479-DG-SJB Document 5-13 Filed 03/17/22 Page 143 of 280 PageID #: 4653



— Gerald Bryson filed an unfair labor practice charge with the NLRB in June alleging that Amazon illegally retaliated against him for organizing.  Victor J. Blue / for NBC News

An Amazon spokesperson said that Bryson was "witnessed by other employees bullying and intimidating a female associate" and that the company looked forward to "sharing the facts on this case."

Palmer, who helped organize both protests, also faced disciplinary action for violating Amazon's social-distancing rules. On April 10, 2020, the same day Bryson was suspended, he says he was given a "final write-up," typically reserved for a third rule violation, without receiving any previous write-ups.

"They were attempting to find any little thing they could get me on to fire me," he said. "But they found out I had an attorney and fell back from that because they got a lot of scrutiny for firing Chris."

In February, New York Attorney General Letitia James sued Amazon for failing to protect workers at warehouses in Staten Island and Queens and accused the company of illegally retaliating

Case 1:22-cv-01479-DG-SJB Document 5-13 Filed 03/17/22 Page 144 of 280 PageID #: 4654

against workers who complained.

Amazon spokesperson Kelly Nantel said that the AG's filing did not present an "accurate picture of Amazon's industry-leading response to the pandemic."

Brett Daniels, 28, who was let go in January from his job at Amazon's warehouse in Chandler, Arizona, said that managers would "hush" him when speaking about workplace issues and organizing. He described coming back from a November 2020 protest in Seattle, organized by the Congress of Essential Workers, a worker advocacy group created by Chris Smalls after he was fired. He said he was approached by a manager he'd never spoken to before.

"He said, 'Brett, right?' and told me I had been pinged on the cameras for breaking social-distancing rules because someone else had entered my bubble," Daniels said. "I think they were letting me know they were watching me."

## Taking notice

The firings triggered a wave of solidarity from some of Amazon's corporate employees, including user experience designers Emily Cunningham and Maren Costa, who publicly advocated for warehouse workers via their Twitter accounts.

Cunningham and Costa were both fired last April 13 for what Amazon described to The Washington Post as "repeated violations of internal policies."

Two weeks later, Tim Bray, a vice president at Amazon Web Services resigned, writing in a blog post that the justification Amazon gave for firing Cunningham and Costa was "laughable."

"The Covid pandemic has cast a very harsh light on the stark inequality of power and wealth that are a feature of 21st century capitalism," Bray said in an interview. "With Covid, the penalty for the working class might be death. You had to go to the warehouse while white collar workers stayed at home. It's not terribly surprising that labor sentiments have been strengthened over the last year."

This week, all eyes are on Bessemer, Alabama, where union ballots are being counted.

"It's been a great shot in the arm for workers around the world who want to organize not only at Amazon, but other industries," said Christy Hoffman, general secretary of UNI Global Union, which has created a worldwide alliance of unions organizing Amazon workers in 22 countries.

"If they can win in Alabama, we can do it anywhere," she said of the workers. "If they don't win, it doesn't mean it's over. It means there's more work to do."

CORRECTION (March 31, 2021, 3:54 p.m.) A previous version of this article misstated the status of Courtney Bowden's NLRB claim against Amazon. She withdrew it on March 24 after reaching a private settlement with Amazon. She does not have a hearing scheduled with an NLRB judge this year.

## Get the Morning Rundown

Get a head start on the morning's top stories.

| Enter your email | SIGN UP |

THIS SITE IS PROTECTED BY RECAPTCHA
PRIVACY POLICY | TERMS OF SERVICE

Olivia Solon

Olivia Solon is a senior reporter on the tech investigations team for NBC News.

April Glaser

April Glaser is a reporter on the tech investigations team for NBC News in San Francisco.

Cyrus Farivar and Michela Moscufo contributed.

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 146 of 280 PageID #: 4656

# CP Exhibit 14

1

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NEW YORK:  TRIAL TERM PART 42

3    - - - - - - - - - - - - - - - - - - - - - - - - - - X

4    PEOPLE OF THE STATE OF NEW YORK,
     by LETITIA JAMES, Attorney General
5    for the State of New York,

6                              Plaintiff,

7         – against –

8    AMAZON.COM INC., AMAZON.COM SALES, INC.
     and AMAZON.COM SERVICES LLC,
9
                             Defendants.
10
     - - - - - - - - - - - - - - - - - - - - - - - - - - X
11   Index No. 450362/2021

12                         July 14, 2021
                           Microsoft Teams Proceeding
13
     B E F O R E:   THE HONORABLE NANCY M. BANNON, Justice
14
     A P P E A R A N C E S:
15
     LETITIA JAMES, ESQ.
16   Office of the New York State Attorney General
     28 Liberty Street
17   New York, New York 10005
     BY:  KAREN CACACE, ESQ.
18        ROYA AGHANORI, ESQ.
          ELIZABETH KOO, ESQ.
19
     GIBSON, DUNN & CRUTCHER LLP
20   Attorneys at Law
     1050 Connecticut Avenue, N.W.
21   Washington, D.C. 20036
     BY:  JASON C. SCHWARTZ, ESQ.
22        LUCAS C. TOWNSEND, ESQ.

23

24

25              (Appearances continued on next page.)

tav

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 147 of 280 PageID #: 4657

15

Proceedings

1    to stay --

2              THE COURT:  Mr. Palmer is still an employee

3    currently?

4              MR. SCHWARTZ:  That's correct, Mr. Palmer still

5    works for Amazon.  He just received a warning which is now

6    expired.  So, among other reasons, his case is now

7    essentially moot, but Mr. Smalls was terminated.

8              The facts of both of their discipline are

9    essentially laid out on the face of the attorney general's

10   complaint.  So both of them in the worst month of the

11   pandemic, in March of 2020, Mr. Smalls was exposed to a

12   co-worker who had the COVID-19 virus.  He was ordered by

13   Amazon to quarantine and was paid to stay home.  They paid

14   him to stay home on quarantine.

15             He admits, and the attorney general admits, that

16   instead of staying home, Mr. Smalls went back to the JFK8

17   worksite and participated in a demonstration in the parking

18   lot.  He was fired because he ignored the order of

19   quarantine, he had violated social distancing, and he had

20   put his co-workers at risk.

21             It's amazing to me, your Honor, that the attorney

22   general is now here in this court saying Amazon didn't do

23   enough to enforce social distancing, and at the same time

24   saying, hey, you shouldn't have fired the guy who not only

25   failed to social distance, but when you paid him to stay

Case 1:22-cv-01479-DG-SJB  Document 5-13  Filed 03/17/22  Page 148 of 280 PageID #: 4658

16

Proceedings

1    home he instead came to the worksite and exposed all of his

2    co-workers to the deadly virus in March of 2020.

3         That's all on the face of the complaint, your

4    Honor, and then Mr. Palmer repeatedly came to protest

5    meetings as described by the attorney general where he and

6    co-workers would meet with management to express their

7    concerns about COVID-19 safety.  In doing so he repeatedly

8    violated social distancing requirements.  They all jammed

9    together in the same room for these meetings.

10        And, again, on the face of the complaint, the

11   Attorney General says this, that the guy received a final

12   written warning for repeated violations of social

13   distancing, yet they would like you to reach the implausible

14   conclusion that they were retaliated against for their

15   safety complaints.  Let me explain why I think that fails at

16   the motion to dismiss, your Honor.

17        First of foremost, all four counts of the

18   retaliation claims are subject to preemption under the

19   National Labor Relations Act.  So the United States Supreme

20   Court in the Garmon case held that when something is even

21   arguably within the jurisdiction of the National Labor

22   Relations Board, the state court jurisdiction must yield, it

23   is not an option, the state court must yield so that the

24   NLRB in the first instance can exercise its jurisdiction

25   unimpeded.

Case 1:22-cv-01479-DG-SJB  Document 5-13  Filed 03/17/22  Page 149 of 280 PageID #:
4659

17

Proceedings

1          Here, in fact, Attorney General James knows that,

2     and you can see this in the record.  Her very first press

3     release and tweet about this matter, and you can see this at

4     docket number 47, she actually said, "I call on the National

5     Labor Relations Board to investigate the firing of

6     Mr. Smalls."  She knew this was within the National Labor

7     Relations Board's jurisdiction, and of course it is.

8          We have also submitted to the Court that there is

9     a case currently pending before the National Labor Relations

10    Board that is about the exact same thing.  This isn't even a

11    hypothetical.  There's a co-worker of Mr. Smalls and Mr.

12    Palmer named Mr. Bryson who participated in the very same

13    safety demonstrations and who filed a charge with the

14    National Labor Relations Board saying he was retaliated

15    against for engaging in this protected activity.  His case

16    was tried before an administrative law judge of the National

17    Labor Relations Board.  The NLRB issued subpoenas calling

18    for information about Mr. Smalls' and Mr. Palmer's

19    circumstances.  Mr. Palmer actually testified about his

20    circumstances at that hearing.

21         The NLRB judge found that the circumstances of

22    those two gentlemen, Mr. Smalls and Mr. Palmer, were

23    directly relevant because they engaged in the very same

24    protected activity and they have the very same allegation,

25    that they were retaliated against as a result of their

18

Proceedings

1       safety complaints.

2               On those facts there is no way that the attorney

3       general can proceed in this court without interfering with

4       the exclusive preemptive jurisdiction of the National Labor

5       Relations Board, and so I would suggest, your Honor, that

6       the Court should yield in accordance with the precedent of

7       the United States Supreme Court, of the federal courts and

8       also of the First Department that requires in these

9       circumstances that you yield respectfully to the NLRB.

10              The attorney general raises a couple arguments in

11      response to that.  One, she says that this is within what's

12      call the "local interest exception" to Garmon preemption,

13      that means there's something uniquely local that would allow

14      local or state authorities to pursue the case, and generally

15      where you see that, your Honor, and you see this in the

16      cases that are cited, is where there is some act of physical

17      violence so, of course, the local authorities can intervene

18      even if it's on the picket line when there's an act of

19      physical violence or something of that nature sometimes

20      referred to as a disruption of public order.  The attorney

21      general would like to take those words and contort them

22      beyond all definition and say that COVID is somehow a

23      disruption to the public order.  That's not what those cases

24      mean, and we know that Attorney General James knows that

25      this is not --

tav

## CP Exhibit 15

# Main Office Gathering Notes

| | Conversation Owner (Name, Title) | AA Name | AA Login | Conversation Notes | Closing Sentiment (R/Y/G) |
|---|---|---|---|---|---|
| 1 | Sai Kotha (GM) & Christine Hernandez (HRM) | Christian Smalls | csmal | 9AM Walk-in Participant: Christian was representing all the associates who were in the office, and was prepared with an introduction. "We have confirmed case at JFK8, and we haven't closed to do the deep-clean. March 12, was the date when AA was last here, and this was the same date when JFK8 conducted Affinity-Fair meeting, and that the AA in the FC are at risk. JFK8 should do the right thing and shut-down". Chrisitne Hernandez later followed up with Christian Smalls, and he understood there is a process in place and was appreciative of the follow-up. | Green |
| 2 | Sai Kotha (GM) | ███████ | ██████ | 9AM Walk-in Participant Group sentiment is that the site knew | Yellow |

|   |                     |   |   | about this information is delaying sharing updates. They believe the AA is a picker, and every item picked must be contaminated; therefore, the entire site is at risk of carrying COVID. Finally, they believe the building has a responsibility to shut down and consider the impact to its employees and families. |        |
|---|---------------------|---|---|---|--------|
| 3 | Sai Kotha (GM)      | ■ | ■ | 9AM Walk-in Participant Group sentiment is that the site knew about this information is delaying sharing updates. They believe the AA is a picker, and every item picked must be contaminated; therefore, the entire site is at risk of carrying COVID. Finally, they believe the building has a responsibility to shut down and consider the impact to its employees and families. | Yellow |
| 4 | Sai Kotha (GM)      | ■ | ■ | 9AM Walk-in Participant Group sentiment is that the site knew about this | Yellow |

Confidential Treatment Requested by Amazon.com Inc.

| | | | | information is delaying sharing updates. They believe the AA is a picker, and every item picked must be contaminated; therefore, the entire site is at risk of carrying COVID. Finally, they believe the building has a responsibility to shut down and consider the impact to its employees and families. | |
|---|---|---|---|---|---|
| 5 | Sai Kotha (GM) | ■■■■■ | ■■■■ | 9AM Walk-in Participant Group sentiment is that the site knew about this information is delaying sharing updates. They believe the AA is a picker, and every item picked must be contaminated; therefore, the entire site is at risk of carrying COVID. Finally, they believe the building has a responsibility to shut down and consider the impact to its employees and families. | Yellow |
| 6 | Sai Kotha (GM) | Derrick Palmer | depalmer | 9AM Walk-in Participant: Derrick was concerned that JFK8 is not following CDC guidelines. He | Red |

Confidential Treatment Requested by Amazon.com Inc.

| | | | | claims "we" called the CDC, and confirmed JFK8 doesn't meet the standards. He asked if people had kids, and know what it feels like to want to keep your family safe. Overall, Derrik felt the site needs to be shut down and cleaned. | |
|---|---|---|---|---|---|
| 7 | Sai Kotha (GM) | ▇▇▇ | ▇▇▇ | 9AM Walk-in Participant Group sentiment is that the site knew about this information is delaying sharing updates. They believe the AA is a picker, and every item picked must be contaminated; therefore, the entire site is at risk of carrying COVID. Finally, they believe the building has a responsibility to shut down and consider the impact to its employees and families. | Yellow |
| 8 | Sai Kotha (GM) | Gerald Bryson III | gbbryso | 9AM Walk-in Participant Group sentiment is that the site knew about this information is delaying sharing updates. They believe the AA is a picker, and every | Yellow |

Confidential Treatment Requested by Amazon.com Inc.

| | | | | item picked must be contaminated; therefore, the entire site is at risk of carrying COVID. Finally, they believe the building has a responsibility to shut down and consider the impact to its employees and families. | |
|---|---|---|---|---|---|
| 9 | Pooja Desai (HRBP) & Zach Marc (SOM) | ■■■■ | ■■■■ | ■■■ was agitated and frustrated that the site hasn't shut down. He does not feel the site is taking enough precautions to keep employees and their families safe. Talking points on site actions were discussed by HRBP & SOM. He says Amazon has a responsibility to shut down, and the AMZL location in Queens had to finally shut down when associates protested. He suggested the same would happen at JFK8. | Red |

Confidential Treatment Requested by Amazon.com Inc.

AMZ_NYAG_JFK8_00002584

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 156 of 280 PageID #: 4666

# CP Exhibit 16

Christine... I know I don't need to tell you. But come on.

1) Not being in the building = suspending badge. Which to most would mean not past lenels.

2) They were social distancing as requested.

3) It was a peaceful protest. His right to organize is protected.

4) There were no unsolicited group gatherings. They were all off the clock waiting to speak to the GM as per open door policy. And waited patiently.

| | | |
|---|---|---|
| 2020-03-30T18:33:14.790Z | poodesai@amazon.com | 5) This is going to perceived as retaliation. |
| | | they want it to happen NOW and are coming up with a back up plan for in case they come back for the next |
| 2020-03-30T18:23:01.098Z | poodesai@amazon.com | break |
| 2020-03-30T18:22:40.148Z | poodesai@amazon.com | legit bradley/payal working on term verbiage |
| 2020-03-30T18:21:09.883Z | hrnanch@amazon.com | ok what did I really miss |
| 2020-03-30T17:13:39.173Z | poodesai@amazon.com | *linkie |
| 2020-03-30T17:13:35.486Z | poodesai@amazon.com | also can you send us the livestream linie |
| 2020-03-30T17:11:42.862Z | poodesai@amazon.com | please leave? |
| | | wait did someone talk to smalls saying hey parking lot |
| 2020-03-30T17:11:34.491Z | poodesai@amazon.com | counts as amazon property |
| 2020-03-29T20:24:38.087Z | hrnanch@amazon.com | we need the wiki |
| | | |
| 2020-03-29T20:24:12.307Z | poodesai@amazon.com | We need to find put what his convo was with zach |
| 2020-03-29T20:22:53.234Z | hrnanch@amazon.com | still not a good look |
| 2020-03-29T20:22:25.570Z | poodesai@amazon.com | Then maybe term or final like this lady is sayong |
| 2020-03-29T20:22:05.081Z | poodesai@amazon.com | But it should be an stu |
| | | |
| | | Though |
| | | We cannot approach smalls with a term mentality. If his |
| 2020-03-29T20:22:01.350Z | poodesai@amazon.com | badge is suspended he cannot come in |
| 2020-03-29T20:21:38.217Z | poodesai@amazon.com | Okay nvm. Idt this is an issue lol |

Confidential Treatment Requested by Amazon.com Inc.
AMZ_NYAG_JFK8_00002817

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 157 of 280 PageID #: 4667

|  |  | I think if we put an override in advance and no alarm sounds (idk how that works) it would look bad |
| 2020-03-29T20:17:17.032Z | poodesai@amazon.com |  |
| 2020-03-29T20:16:52.890Z | poodesai@amazon.com | This is crazy |
|  |  | like I don't want to be in their shoes making these decisions |
| 2020-03-29T20:13:27.939Z | hrnanch@amazon.com |  |
| 2020-03-29T20:09:35.460Z | hrnanch@amazon.com | I don't know even what to say |
| 2020-03-29T20:01:56.773Z | hrnanch@amazon.com | sent invite also |
| 2020-03-29T20:01:48.835Z | hrnanch@amazon.com | : 7718 10 1484 |
| 2020-03-29T20:00:56.363Z | poodesai@amazon.com | Hi can you fwd me the bridge for the er call |
| 2020-03-29T15:50:08.594Z | hrnanch@amazon.com | Hi just saw this |
| 2020-03-27T17:06:05.346Z | hrnanch@amazon.com | thx |
| 2020-03-27T17:06:01.472Z | poodesai@amazon.com | yep diana is on it! |
| 2020-03-27T17:05:20.901Z | hrnanch@amazon.com |  I need the dates of these hours  ex: week of 3/8 |
| 2020-03-27T16:56:51.304Z | hrnanch@amazon.com | what was his coding for days not worked? |
|  |  | [March 27, 2020, 12:48 PM] Chern, Diana: ooking rn |
|  |  | [March 27, 2020, 12:49 PM] Chern, Diana: This week he only worked about 4.5 hours. Last week he only worked a little under 10 hours |
|  |  | [March 27, 2020, 12:50 PM] Chern, Diana: So Week 1 of march about 40 hours, week 2 or march about 30. week 3 - 20, etc |
|  |  | [March 27, 2020, 12:50 PM] Chern, Diana: Steady |
| 2020-03-27T16:56:20.939Z | poodesai@amazon.com | decrease in hours worked from March 1st till now. |
| 2020-03-27T16:36:48.155Z | hrnanch@amazon.com | he stated that he did not get paid in a month |
| 2020-03-27T16:36:29.502Z | hrnanch@amazon.com | that's fine |
| 2020-03-27T16:36:23.565Z | poodesai@amazon.com | Why what are we looking for |
| 2020-03-27T16:36:17.758Z | poodesai@amazon.com | I will get someone to check |
| 2020-03-27T16:35:24.441Z | hrnanch@amazon.com | Christian |
| 2020-03-27T16:34:48.012Z | hrnanch@amazon.com | look into his time? |
| 2020-03-27T16:34:32.461Z | hrnanch@amazon.com | hey |
| 2020-03-27T15:44:33.482Z | hrnanch@amazon.com | I think it will be perceived as such |

Confidential Treatment Requested by Amazon.com Inc.

AMZ_NYAG_JFK8_00002818

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 158 of 280 PageID #: 4668

| | | |
|---|---|---|
| 2020-03-27T15:44:22.436Z | hrnanch@amazon.com | can you hear him |
| | | are we sureeeeeee thats not going to perceived and |
| 2020-03-27T15:21:43.664Z | poodesai@amazon.com | considered retaliation? |
| 2020-03-26T21:32:47.676Z | poodesai@amazon.com | kk thanks <3 |
| 2020-03-26T21:32:42.498Z | hrnanch@amazon.com | Iâ€™m looking now |
| 2020-03-26T21:32:36.579Z | poodesai@amazon.com | where the list at |
| 2020-03-26T19:47:15.301Z | hrnanch@amazon.com | I don't have that list ðŸ˜„ |
| 2020-03-26T19:46:51.791Z | hrnanch@amazon.com | from today? |
| 2020-03-26T19:46:41.915Z | hrnanch@amazon.com | lmao |
| 2020-03-26T19:46:39.491Z | hrnanch@amazon.com | lmo |
| | | do we know who was involved and what was said for |
| 2020-03-26T19:44:07.113Z | poodesai@amazon.com | zachs mini baby protest? |
| 2020-03-26T19:41:57.447Z | poodesai@amazon.com | are we still tracking the list of protest assocaites |
| 2020-03-25T16:45:11.328Z | poodesai@amazon.com | or separate conversation? |
| 2020-03-25T16:45:06.090Z | poodesai@amazon.com | she was at the 9am protest |
| 2020-03-25T16:44:31.998Z | hrnanch@amazon.com | |
| 2020-03-25T16:42:39.988Z | poodesai@amazon.com | |
| 2020-03-25T16:42:32.960Z | poodesai@amazon.com | |
| 2020-03-25T16:41:23.175Z | poodesai@amazon.com | |
| 2020-03-25T16:35:10.125Z | poodesai@amazon.com | wait who is maureen |
| | | [March 25, 2020, 12:09 PM] Gilbert-Differ, Geoff: |
| | | 1.Christian Smalls (csmal) |
| | | 2.Ashley Maisonet (maisoash) |
| | | 3.Angelique DeGracia (addegrac) |
| | | 4.Jazel Bispham (bispj) |
| | | 5.Rechard Newman (recharn) |
| | | 6.Derrick Palmer (depalmer) |
| | | 7.Guiselle Diaz (guisdiaz) |
| 2020-03-25T16:25:41.154Z | hrnanch@amazon.com | 8.Gerald Bryson III (gbbryso) |

Confidential Treatment Requested by Amazon.com Inc.

AMZ_NYAG_JFK8_00002819

**CP Exhibit 17**

| | |
|---|---|
| **From**: | Hernandez, Christine [/O=AMAZON/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1B2D7C58E2B54C258D18DA9C773ACA8D-HRNANCH] |
| **Sent**: | 3/30/2020 1:15:54 PM |
| **To**: | Marc, Zachary [zachmarc@amazon.com]; Grabowski, Tyler [grabtyle@amazon.com] |
| **Subject**: | FW: Approved Termination Text for Small |
| **Attachments**: | Smalls term.docx |

You need to read this exactly how it's written. Do not deviate or allow time for questions.

**Christine Hernandez**
HR Manager | JFK8
546 Gulf Ave Staten Island, NY 10314
Email: hrnanch@amazon.com



---

**From:** Campbell, Bradley <bccampb@amazon.com>
**Sent:** Monday, March 30, 2020 3:57 PM
**To:** Hernandez, Christine <hrnanch@amazon.com>; Kotha, Sai <saichak@amazon.com>
**Cc:** Mehta, Anand <meha@amazon.com>; Joseph, Rob <josephrj@amazon.com>; Hoffman, Allyson <allyh@amazon.com>; Smith, Ryan <smryan@amazon.com>; Hughes, Erin <hugheser@amazon.com>; Gutierrez, Milly <gmilly@amazon.com>
**Subject:** Approved Termination Text for Small

Christine and Sai:

Attached is the approved language for the termination of Christian Smalls.  We should read this verbatim followed by our standard protocol for termination including final pay, benefits, etc.  This has been reviewed and approved by Ops, Legal, HR, ER, and PR.  We need to call him ASAP and when complete, please recap the conversation and confirmation in an email back to his group.

Thank you.  Let me know if there are any questions.

Have a great day –



Bradley Campbell SPHR, SHRM-SCP
**Regional Sr. HR Manager – North American Customer Fulfillment**
e: bccampb@amazon.com | p: (646) 285-4914

Confidential Treatment Requested by Amazon.com Inc.
AMZ_NYAG_JFK8_00001342

FILED: NEW YORK COUNTY CLERK 11/30/2021 03:30 PM
INDEX NO. 450362/2021
NYSCEF DOC. NO. 228
RECEIVED NYSCEF: 11/30/2021

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 160 of 280 PageID #:
4670

Amazon has a responsibility to ensure the safety of all associates, leaders, and visitors on our property. On March 28, 2020, the SR Operations Manager Zachary Marc instructed you to remain out of work for 14 days on a paid leave – from March 24 to April 7due to having had close contact with another Amazon associate with a confirmed case of COVID-19. Other Amazon associates determined to have had close contact with the diagnosed individual were provided the same instruction.  Despite clear guidance to remain out of work with pay until April 7, 2020, you came onsite today, March 30, 2020, potentially putting Amazon employees and others at risk. In addition, on March 27, 2020 you were coached by SR leaders Sai Kotha and Christine Hernandez to comply with the Social Distancing requirements by remaining 6 FT apart from others at all times. Despite this coaching, and your quarantine status, on March 30, 2020 you repeatedly, intentionally violated Amazon's social distancing requirements, failing to maintain 6FT of distance from others.

At this time, based on your violation of  Amazon's Standards of Conduct and behavioral expectations, your employment will end effective immediately.

Confidential Treatment Requested by Amazon.com Inc.

# CP Exhibit 18

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------- X
THE PEOPLE OF THE STATE OF NEW YORK by
LETITIA JAMES, Attorney General of the State of New
York,

|  |  |
|---|---|
| | Index No. 450362 / 2021 |
| Plaintiff, | Justice Nancy M. Bannon |
| | Motion Sequence No. 08 |

-against-

AMAZON.COM INC., AMAZON.COM SALES, INC., and
AMAZON.COM SERVICES LLC,

Defendants.
---------------------------------------------------------------------- X


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Table of Contents…………..………………………………………………………………………ii

Table of Authorities……………………………………………………………………..iv

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF FACTS .......................................................................... 2

   A.   AMAZON EMPLOYEES REMAIN AT RISK OF COVID-19 ............................ 2

   B.   AMAZON FAILS TO TAKE REASONABLE PRECAUTIONS AND HAS SCALED BACK ITS
ALREADY INADEQUATE COVID-19 PROTOCOLS ........................................... 3

     1.   Amazon's Monitoring of Productivity Fails to Allow Time for Cleaning, Hygiene, And
Social Distancing .................................................................................. 3

     2.   Amazon Fails to Clean and Disinfect After Confirmed COVID-19 Cases Are
Identified ............................................................................................... 5

     3.   Amazon Fails to Employ Proper Contact Tracing Protocols ........................... 6

     4.   Amazon Has Rescinded Its Already Inadequate COVID-19 Protocols ............. 6

     5.   Amazon's Peak Season Increases Threats to Worker Safety ........................... 7

     6.   Employees Are Afraid to Complain about Unsafe Practices Because Amazon Has
Retaliated Against Workers Who Do ........................................................ 8

       a.   Workers Do Not Feel Safe at JFK8 But Are Afraid to Complain ............... 8

       b.   Amazon Retaliated Against Smalls ................................................. 8

III.  ARGUMENT ............................................................................................. 11

   A.   PRELIMINARY INJUNCTION STANDARD .................................................. 11

   B.   THE STATE IS LIKELY TO SUCCEED ON THE MERITS ............................... 11

     1.   Amazon Fails to Provide a Safe Workplace .................................................. 11

       a.   Amazon's Productivity Monitoring Fails to Give Employees Time for Cleaning,
Hygiene, and Social Distancing ...................................................... 12

       b.   Amazon Does Not Employ Proper Cleaning and Disinfection Protocols When There
Are Confirmed Cases ................................................................... 14

       c.   Amazon's Contact Tracing Protocols Are Inadequate .............................. 15

       d.   Amazon's Recent Removal of Already Inadequate COVID-19 Protocols Makes
Social Distancing Even Less Feasible ............................................... 16

   C.   AMAZON UNLAWFULLY RETALIATED AGAINST CHRISTIAN SMALLS IN VIOLATION OF
LABOR LAW § 215 AND § 740 ................................................................ 17

     2.   Legal Standard ............................................................................... 17

     3.   Smalls Complained About Health and Safety Violations and Amazon Retaliated........ 18

   D.   AMAZON WORKERS AND THE STATE OF NEW YORK WILL SUFFER IMMINENT AND
IRREPARABLE HARM WITHOUT IMMEDIATE ACTION ................................... 20

4.    Irreparable Harm on Labor Law § 200 Claim ................................................................. 20

5.    Irreparable Harm on the § 215 and § 740 Claims ........................................................ 21

E.    THE BALANCE OF EQUITIES WEIGHS IN PLAINTIFF'S FAVOR .............................................. 21

IV.   CONCLUSION ................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barbes Rest. Inc. v. ASRR Suzer 218, LLC*,
   140 A.D.3d 430 (1st Dep't 2016) .......................................................................22

*Basank v. Decker*,
   449 F. Supp 3d 205 (S.D.N.Y. 2020)...................................................................20

*Bocelli Ristorante Inc. v. Cuomo*,
   70 Misc. 3d 722 (N.Y. Sup. Ct. Richmond Cty. 2020)........................................22

*Copantitla v. Fiskardo Estiatorio, Inc.*,
   788 F. Supp. 2d 253 (S.D.N.Y. 2011)..................................................................17

*Ehlinger v. Bd. of Educ.*,
   465 N.Y.S.2d 378 (4th Dep't 1983) .....................................................................12

*Fisher v. City of New York*,
   No. 452069/2020, 2021 WL 240542 (N.Y. Sup. Ct. N.Y. Cty. Jan. 25, 2021) ......20

*Goldfarb v. Town of Ramapo*,
   89 N.Y.S.3d 307 (2d Dep't 2018).......................................................................11

*Holt v. Cont. Group, Inc.*,
   708 F.2d 87 (2d Cir. 1983)..................................................................................21

*In re Holden v. Zucker*,
   No. 801592/2021, 2021 WL 2395292 (N.Y. Sup. Ct. Bronx Cty. Mar. 30,
   2021) ....................................................................................................................20

*Inc. Vil. of Babylon v. John Anthony's Water Cafe, Inc.*,
   137 A.D.2d 792 (2d Dep't 1988).........................................................................22

*Jacobson v. Massachusetts*,
   197 U.S. 11 (1905)...............................................................................................21

*Kingston v. Int'l Bus. Machines Corp.*,
   187 A.D.3d 578 (1st Dep't 2020) ........................................................................17

*Koullias v. Farm*,
   798 N.Y.S.2d 877 (N.Y. Sup. Ct. Kings Cty. 2005)............................................12

*Lin v. Great Rose Fashion, Inc.*,
   No. 08-CV-4778(NGG)(RLM), 2009 WL 1544749 (E.D.N.Y. June 3, 2009) ......21

*Monroe v. City of New York,*
    414 N.Y.S.2d 718 (2d Dep't 1979)...........................................................12

*People ex rel. Bennett v. Laman,*
    277 N.Y. 368 (1938) ...............................................................................22

*People v. Apple Health & Sports Clubs,*
    174 A.D.2d 438 (1st Dep't 1991) ...........................................................11

*Rivera v. AffinEco LLC,*
    2018 WL 2084152 (S.D.N.Y. Mar. 26, 2018) .........................................18

*Romang v. Welsbach Elec. Corp.,*
    852 N.Y.S.2d 144 (2d Dep't 2008)..........................................................12

*Schmidt-Sarosi v. Offs. for Fertility & Reprod. Med., P.C.,*
    195 A.D.3d 479 (1st Dep't 2021) ......................................................17, 19

*Stagliano v. Herkimer Cent. Sch. Dist.,*
    151 F. Supp. 3d 264 (N.D.N.Y. 2015) ....................................................21

*State v. Terry Buick, Inc.,*
    520 N.Y.S.2d 497 (N.Y. Sup. Ct. Dutchess Cty. 1987)...........................11

*Terrell v. Terrell,*
    279 A.D.2d 301 (1st Dep't 2001) ...........................................................11

*Villarin v. Rabbi Haskel Lookstein Sch.,*
    96 A.D.3d 1 (1st Dep't 2012) .................................................................18

## STATE STATUTES

N.Y. Executive Law § 63(12)...............................................................11, 20

N.Y. Labor Law
    § 200.........................................................................11, 12, 13, 19, 20
    § 215................................................................................................17, 21
    § 740................................................................................................17, 18

## FEDERAL REGULATIONS

*COVID–19 Vaccination and Testing; Emergency Temporary Standard,*
    86 Fed. Reg. 61402 (Nov. 5, 2021).........................................................13

## RULES

C.P.L.R. § 6301....................................................................................11

## I.        <u>INTRODUCTION</u>

The State brings this motion to protect Amazon workers who overcome their fears of the COVID-19 virus to report to work at a facility that runs 24 hours a day, seven days a week, and houses more than 5,000 workers at a time.  Amazon profits from their work while failing to take adequate and reasonable measures to protect them from the devastating risk of coronavirus transmission inside that facility, and punishing workers who express concerns.  The State now seeks preliminary injunctive relief because Amazon is rolling back its already inadequate public health measures and acting as if the pandemic is over when the risk of virus transmission is increasing, and a new variant threatens to cause even higher rates of transmission, illness, and death.  While case rates, hospitalizations, and deaths rise, Amazon rescinds protections and packs in more workers for its holiday rush.  Amazon's ongoing—and worsening—failure to protect workers must be halted.

The Attorney General therefore requests that the Court appoint a monitor to oversee implementation of certain public health precautions at Amazon's JFK8 facility, including requiring Amazon to modify productivity monitoring policies to permit time for cleaning, hygiene, and social distancing; requiring Amazon to adopt policies for adequate cleaning and disinfection after infected workers have been present in the facility; and requiring Amazon to institute proper contact tracing protocols, including identifying and notifying close contacts.  The Attorney General also requests that this Court order Amazon to offer interim reinstatement to Christian Smalls, an employee who Amazon fired after he complained about deficiencies in Amazon's COVID-19 safety practices, and require Amazon to notify employees that they have the right to complain to Amazon, the Attorney General, or any other government agency of violations of health and safety requirements.

1

## II. <u>STATEMENT OF FACTS</u>

### A. <u>Amazon Employees Remain at Risk of COVID-19</u>

Since March 2020, the COVID-19 pandemic has caused 1,157,375 reported cases and 34,808 deaths in New York City.[1]  New York City currently experiences 1,211 new cases and at least seven deaths per day.[2]  The federal Centers for Disease Control ("CDC") categorizes Richmond County, where Amazon's JFK8 fulfillment center ("JFK8") is located, as having a "high" community transmission risk and recommends that "Everyone in Richmond County, New York should wear a mask in public, indoor settings."  Affidavit of David Michaels ("Michaels Aff.") ¶ 8.[3]  While vaccinated individuals run far less risk than the unvaccinated, the virus may be spread by and to both the vaccinated and unvaccinated, and immunity wanes with time for vaccinated individuals.  *See* Michaels Aff. ¶¶ 6–7.  In part due to the extremely infectious Delta variant, other parts of the country and Europe—even where vaccination rates are higher than in New York City—have seen dramatic spikes in COVID-19 cases.  *See* Michaels Aff., ¶ 9.  Public health officials are concerned that the increased travel and inside gatherings associated with the holiday season and colder weather will increase transmission.  *Id*.  The latest strain, the Omicron variant, adds still more risk of increased transmission, as recognized by Governor Hochul's November 26, 2021 announcement of a Disaster Emergency.  *See* Michaels Aff., ¶¶ 10–11.

---

[1] *See* Affirmation of Julie R. Ulmet ("Ulmet Aff."), Ex. A, *COVID-19: Data, Trends and Totals*, New York City Department of Health and Mental Hygiene ("NYCDOH"), https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page#top (last updated Nov. 29, 2021).

[2] *See* Ulmet Aff., Ex. B, *COVID-19: Latest Data*, NYCDOH, https://www1.nyc.gov/site/doh/covid/covid-19-data.page (last updated Nov. 29, 2021). *See also* Michaels Aff., ¶ 5.

[3] David Michaels, PhD MPH, served as Assistant Secretary of Labor for the Occupational Safety and Health Administration ("OSHA") from 2009–2017, the longest serving administrator in OSHA's history.  *See* Michaels Aff. ¶ 1.

2

For Amazon workers, this alarming forecast coincides with the period of longer work hours and increased hiring associated with the holiday shopping season.  *See* Section II.B.5, *infra*.  Strikingly, Amazon is simultaneously rolling back public health precautions at JFK8.  *See id.*  Recently, Amazon made JFK8 "mask-optional" for vaccinated workers, but Amazon does not enforce masking among the unvaccinated.  Amazon has also eliminated enforcement of social distancing and certain measures that had facilitated social distancing.  These rollbacks compound the existing risks JFK8 workers face: productivity monitoring fails to permit adequate opportunities for social distancing, hygiene, and sanitation; Amazon fails to close, clean, and disinfect areas where an infected worker was present; and Amazon fails to identify and notify workers of potential contacts with infected coworkers.  Workers are fearful of complaining about these deficiencies as they are keenly aware of Amazon's retaliation against workers who complained about COVID-19 risks earlier in the pandemic.

## B. Amazon Fails to Take Reasonable Precautions and Has Scaled Back Its Already Inadequate COVID-19 Protocols

### 1. Amazon's Monitoring of Productivity Fails to Allow Time for Cleaning, Hygiene, And Social Distancing

Amazon tracks employees' productivity, work units completed per hour, and "time off task" ("TOT"), the total minutes a worker is not actively working during a shift.  Amazon also leads workers to believe they must meet a "fast start" standard upon clocking in.  *See* Affidavit of Derrick Palmer ("Palmer Aff.") ¶ 46.  Managers have reprimanded workers for working "too slow" and directed them to "speed up" to avoid discipline.  *See* Palmer Aff. ¶ 37; *see also* Affidavit of Natalie Monarrez ("Monarrez Aff.") ¶ 9.  Amazon disciplines for low productivity or excess TOT and workers fear such discipline.   *See* Affidavit of Tristian Martinez ("Martinez Aff.") ¶¶ 24–26; Palmer Aff. ¶¶ 24–27, 32–33, 38–39.  Workers cannot view these metrics

3

themselves, and thus constantly fear that they are at risk of discipline. *See* Martinez Aff. ¶¶ 25–27, 30; Palmer Aff. ¶¶ 25, 29, 33.

Although Amazon temporarily paused productivity-related discipline in 2020,[4] it has returned to both tracking and disciplining workers, which deters personal protective measures such as cleaning and disinfecting workstations, washing hands, and social distancing, because time spent on these measures negatively impacts productivity rates and TOT, and could expose workers to discipline. *See* Martinez Aff. ¶¶ 10, 25, 32; Palmer Aff. ¶¶ 24–27, 32, 38; Monarrez Aff. ¶ 13.

With respect to cleaning, Amazon's COVID-19 policies explicitly provide,



*See* Ulmet Aff., Ex. C

. However, Amazon does not provide flexibility in productivity and TOT metrics to account for time spent cleaning and disinfecting workstations. *See* Martinez Aff. ¶ 33; Palmer Aff. ¶ 46. Some workers arrive early to clean their workstations before their shift, but managers have directed workers to "start working" instead of cleaning their workstations. *See* Monarrez Aff. ¶ 8. Workers do not have quick access to cleaning supplies, which can take several minutes to locate. *See* Martinez Aff. ¶ 33; Palmer Aff. ¶ 45. Fear of productivity or TOT discipline leaves workers afraid to clean and disinfect even when other workers enter their workstations, or they are required to switch workstations mid-shift. *See* Martinez Aff. ¶¶ 32–33; Palmer Aff. ¶¶ 41, 49–52.

---

[4] See Ulmet Aff., Ex. U (Fitzgerald Supp. Declaration, ¶ 2).

With respect to hygiene, it can take ten or more minutes to go to the nearest restroom.  *See* Palmer Aff. ¶ 42; Monarrez Aff. ¶ 13.  Workers are careful to limit time spent hand-washing because it will negatively impact productivity rates and TOT.  *See* Martinez Aff. ¶ 32; Monarrez Aff. ¶ 13; Palmer Aff. ¶ 41.

Productivity tracking also inhibits workers' ability to social distance because on the frequent occasions when a coworker enters another's workstation to fix machinery, reload and organize supplies, and offer other assistance, workers must continue working to avoid negative productivity rates or TOT.  *See* Martinez Aff. ¶ 36–37; Palmer Aff. ¶¶ 49–52; Monarrez Aff. ¶ 5.

Workers are aware that they are essentially forced to compete as to productivity, and can be disciplined for being in the bottom 3–5% of rates in their department.  *See* Martinez Aff. ¶¶ 28, 31; Palmer Aff. ¶ 31.  Productivity or TOT discipline may have a negative impact on advancement within Amazon and can ultimately lead to termination.  *See* Martinez Aff. ¶¶ 25–26, 28; Palmer Aff. ¶¶ 25–26, 31–32, 36.

## 2. Amazon Fails to Clean and Disinfect After Confirmed COVID-19 Cases Are Identified

Amazon fails to close off, clean, and disinfect workstations and adjacent areas after an infected person has been present in the facility.  *See* Monarrez Aff. ¶¶ 7, 11; Martinez Aff. ¶¶ 7, 10; Palmer Aff. ¶ 48.  Since at least early-2021, workers have not observed any workstation closed for cleaning, *see* Monarrez Aff. ¶ 11; Martinez Aff. ¶ 34; Palmer Aff. ¶ 48, despite Amazon reporting no fewer than ██ confirmed COVID cases from January 1 through October 31, 2021.  *See* Ulmet Aff., Ex. D (███████████).  ███████████████████

███████████████████████████████████████████████████████

███████████ .[5]

### 3.        Amazon Fails to Employ Proper Contact Tracing Protocols

Amazon inadequately tracks, contact traces, and notifies workers of confirmed COVID-19 cases.  *See* Affidavit of Jazmin Escobar ("Escobar Aff.") ¶¶ 5, 8, 10–11; Martinez Aff. ¶¶ 6–7, 10, 44; Monarrez Aff. ¶ 17.  When workers alert Amazon that they have tested positive for SARS-CoV-2, Amazon does not conduct interviews to identify or alert affected coworkers.  *See* Escobar Aff. ¶¶ 5, 8.  While workers receive notifications about positive cases almost daily, these notifications do not include information about what department the infected employee worked in, whether any given employee was a close contact, or other information that would help workers evaluate whether they are at risk.  *See* Monarrez Aff. ¶ 17; Escobar Aff. ¶ 11. Workers report informing Amazon that they are close contacts of coworkers who have tested positive, and on multiple occasions Amazon has dismissed these concerns. *See* Monarrez Aff. ¶ 12; Martinez Aff. ¶ 44.

### 4.        Amazon Has Rescinded Its Already Inadequate COVID-19 Protocols

Early in the pandemic, Amazon implemented certain strategies to enable social distancing, such as ████████████ social distancing barriers in shared areas, limiting two-way traffic, ██████████████ , ███████████████ , and staggering shifts and break times.  *See* Ulmet Aff., Ex. E (█████████████████████████████████████ ████████████████████████████████ ; Palmer Aff., ¶¶ 7, 15, 19, 54; Martinez Aff., ¶¶ 14–15.  However, Amazon has rolled back many of these measures.

---

[5] *See* Ulmet Aff., Ex. C (██████████████████████████ ).

On July 7, 2021, Amazon informed workers that it would return to many pre-pandemic practices.  *See* Palmer Aff., ¶ 7.  Since then, Amazon has gradually eliminated distancing enforcement and temperature screenings, removed social distancing barriers, reverted to two-way walkways, closed off most exits, de-staggered shift and break times, reduced break times, restored breakrooms and locker rooms to full capacity, and resumed gatherings in the JFK8 "stand-up" area, where large groups of workers cluster together to discuss assignments.  *See* Martinez Aff. ¶¶ 14–18, 20–22; Palmer Aff. ¶¶ 7, 14–23, 53–54; Ulmet Aff. Ex. S (photo of late-October 2021 gathering in stand-up area).  These changes create crowding and prevent workers from keeping a safe social distance, thereby increasing the risk of virus transmission.  *See* Martinez Aff. ¶¶ 10, 16–23; Palmer Aff. ¶¶ 12, 14, 17–18.

**5.      Amazon's Peak Season Increases Threats to Worker Safety**

Amazon has just entered its peak season, which spans the holiday season from Thanksgiving to Christmas.  *See* Martinez Aff. ¶ 4; Palmer Aff. ¶ 4.  During this season, the workforce at JFK8 increases substantially, *see* Martinez Aff. ¶ 13; Palmer Aff. ¶ 13; Monarrez Aff. ¶ 16; all workers are required to perform mandatory overtime,[6] and Amazon prohibits workers from taking vacation, *see* Palmer Aff. ¶ 4.  Together, these measures maximize the number of employees in the facility at any moment.

Amazon has already hired peak season workers at JFK8, and with the influx of new workers, it becomes even more difficult to engage in proper health and safety precautions.  *See* Martinez Aff. ¶¶ 5, 16, 22; Monarrez Aff. ¶ 16.  There is additional crowding in common areas and bathrooms, long crowded lines to enter and exit the building, and workers spend longer

---

[6] Mandatory overtime shifts require workers to increase their hours from a 40-hour work week to a 50-plus hour work week.  *See* Martinez Aff. ¶¶ 3–4; Palmer Aff. ¶¶ 3–4.

hours inside the facility. *See* Monarrez Aff. ¶ 16; Martinez Aff. ¶¶ 16–22.  Workers fear working in these conditions alongside coworkers who may not be vaccinated, may not use face coverings, or may be infected.  *See id.*

### 6.   Employees Are Afraid to Complain about Unsafe Practices Because Amazon Has Retaliated Against Workers Who Do

#### a.   Workers Do Not Feel Safe at JFK8 But Are Afraid to Complain

As safety conditions worsen, JFK8 workers are afraid to share their concerns with Amazon directly or with government agencies.  *See* Affidavit of Christian Smalls ("Smalls Aff.") ¶ 19; Martinez Aff. ¶¶ 9, 11; Monarrez Aff. ¶ 18.  Workers are particularly aware of Amazon's firing of employee Christian Smalls last year.  *See* Martinez Aff. ¶ 9; Monarrez Aff. ¶ 18.  Employees know that Amazon fired Smalls—a long-time employee with a history of positive job performance and promotions—after he complained about Amazon's deficient COVID-19 health and safety practices early in the pandemic.  *See* Martinez Aff. ¶ 9; Monarrez Aff. ¶ 18; Smalls ¶¶ 2, 6–16.  Consequently, although workers do not feel safe, they are afraid of complaining and jeopardizing their own employment.  *See* Martinez Aff. ¶¶ 9–11; Monarrez ¶ 18; Palmer Aff. ¶¶ 41, 49, 51–52; Smalls Aff. ¶ 19.

#### b.   Amazon Retaliated Against Smalls

During the week of March 22, 2020, Smalls, a Process Assistant to whom forty employees reported, led coworkers in communicating concerns that, first, Amazon should close JFK8 to conduct proper cleaning and disinfection consistent with public health guidance and, second, that Amazon was failing to adequately identify and notify workers exposed to infected

coworkers.  *See* Smalls Aff. ¶¶ 9, 11; Palmer Aff. ¶ 57; Martinez Aff. ¶ 7.[7]  Smalls notified Amazon managers that he and other workers had contacted the CDC and complained that Amazon was not following CDC protocols.  *See* Smalls Aff. ¶ 10; Palmer Aff. ¶ 58.[8]

On March 26, Smalls and employee Derrick Palmer told Amazon that they had been in close contact with an infected coworker and that they should be quarantined.  Amazon did not direct them to go home or quarantine, nor ask any questions.  Instead, Amazon merely responded that it would review surveillance videos to determine if they met the standards for quarantine. *See* Smalls Aff. ¶ 13.

During the afternoon of March 27, Human Resources ("HR") Manager Christine Hernandez and her associate Pooja Desai were already discussing "perceived . . . retaliation" of Smalls, who they expected would be fired on March 30 for violating a quarantine order by participating in a planned employee protest.[9]  However, it was not until hours later that Hernandez received notification that video surveillance identified Smalls as a close contact of an infected worker, and the following day, March 28, that Senior Operations Manager Zachary

---

[7] *See also* Ulmet Aff., Ex. F (Amazon notes summarizing conversations with General Manager Sai Kotha and HR Manager Christine Hernandez reflect that Smalls spoke on behalf of assembled coworkers, complained that JFK8 should "close[] to do the deep-clean" at AMZ_NYAG_JFK8_00002580); Ex. G, (internal chat document transcribed Smalls's complaint that "this building needs to be closed and sanitized").  Documents showing Amazon's internal chats ("Chime chats") are printed in reverse-chronological order.

[8] *See also* Ulmet Aff. Ex. F (Amazon notes reference employees stating that they contacted the CDC at AMZ_NYAG_JFK8_00002582-2583); Ex. H (Chime chat document reflects that Smalls and other employees told a security guard "they were waiting for CDC at 10" and Amazon managers were "monitoring" those employees at AMZ_NYAG_JFK8_00003467).

[9] Ulmet Aff., Ex. I (Chime chat between Hernandez ("hrnanch") and Desai ("poodesai") ("Hernandez/Desai Chime") dated March 27, 2020 at AMZ_NYAG_JFK8_00002818-2819, Desai: "are we sureeeeeee [sic] thats [sic] not going to perceived and considered retaliation?"; Hernandez: "I think it will be perceived as such").  During their March 27 chat, Desai anticipated that Amazon would issue Smalls a directive to quarantine, and that he would violate it by attending a protest.  *See* Ulmet Aff., Ex. J, Desai Transcript p. 159.

Marc informed Smalls that Amazon was placing him on quarantine.  *See* Smalls Aff. ¶ 14.  And

finally, it was not until March 30 that Smalls entered Amazon's parking lot to participate in a

protest.  *See id.* ¶ 15.

On March 29, one day before the planned protest and Smalls's discharge, Desai

communicated to Hernandez (who ignored the caution) that Smalls should receive a "seek to

understand" conversation[10] and a final written warning before termination.[11]  On March 30,

Amazon employees, including Smalls, participated in a protest outside JFK8 to complain about

Amazon's health and safety practices.  *See* Smalls Aff. ¶ 15; Palmer Aff. ¶ 60.  That evening,

Marc informed Smalls that he was fired for violating the quarantine order and social distancing

requirements during the protest.[12]  Marc was given a termination script "reviewed and approved

by Ops, Legal, HR, ER, and PR," and was instructed not to "deviate or allow time for

questions."[13]

The day of Smalls's discharge, Desai messaged Hernandez that Smalls's firing did not

seem justified, noting that Amazon had not communicated to Smalls that the quarantine order

included the parking lot, and that suspending an employee badge would suggest to most people

---

[10] "Seek to understand" is Amazon's term for a conversation in which an employee can identify any information Amazon should take into consideration prior to issuing discipline.  *See* Smalls Aff. ¶ 17.

[11]  See Ulmet Aff., Ex. I (Hernandez/Desai Chime dated March 29, 2020 at AMZ_NYAG_JFK8_00002817).

[12] *See* Smalls Aff. ¶ 16; Ulmet Aff., Ex. K (Smalls's Termination Document).  During the protest, Smalls was in the parking lot of JFK8 and adjacent sidewalk and did not enter the facility.  At no point did Amazon ask him to leave or communicate concerns about health risks he was supposedly posing.  *See id.*  And when Marc informed Smalls that he was place on quarantine, he suspended Smalls' employee badge but did not explain what the directive entailed, including whether the order included Amazon property outside JFK8's security gates such as the parking lot.  *See* Smalls Aff. ¶ 14.

[13] See Ulmet Aff., Ex. L (March 30, 2020, email).

that the employee could not pass the facility's security gates.[14]  She concluded, "this is going to [be] perceived as retaliation"; Hernandez agreed.[15]

### III. ARGUMENT

#### A.  Preliminary Injunction Standard

To obtain a preliminary injunction, a party must typically establish (1) a likelihood of success on the merits, (2) irreparable injury absent an injunction, and (3) that the equities balance in her favor.  *Goldfarb v. Town of Ramapo*, 89 N.Y.S.3d 307, 308 (2d Dep't 2018); *see also* C.P.L.R. § 6301.  Where, as here, the State seeks a preliminary injunction pursuant to Executive Law § 63(12), it is unnecessary to show irreparable injury and the State need only show the other two factors.  *People v. Apple Health & Sports Clubs*, 174 A.D.2d 438, 438–39 (1st Dep't 1991); *see also State v. Terry Buick, Inc.*, 520 N.Y.S.2d 497, 500 (N.Y. Sup. Ct. Dutchess Cty. 1987). "[A]s to the likelihood of success on the merits, a *prima facie* showing of a right to relief is sufficient; actual proof of the case should be left to further court proceedings."  *Terrell v. Terrell*, 279 A.D.2d 301, 303 (1st Dep't 2001).

#### B.  The State Is Likely to Succeed on The Merits

##### 1.  Amazon Fails to Provide a Safe Workplace

Labor Law § 200(1) requires employers "to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein."  The statute "codifies the

---

[14] *See* Ulmet Aff., Ex. I (Hernandez/Desai Chime dated March 30, 2020 at AMZ_NYAG_JFK8_00002816–2817; Desai's message highlights that Smalls had not entered the JFK8 facility on March 30, Amazon had only communicated to him that his badge was suspended, which to most people would "mean not past lenels;" and Smalls had engaged in social distancing during his discussions with JFK8 managers).  (Amazon's security gates, which permit entry by employee badge, are referred to as "lenels," *see* Ulmet Aff., Ex. J (Desai Tr., 146:3)).

[15] *See* Ulmet Aff., Ex. I (Hernandez/Desai Chime dated March 30, 2020 at AMZ_NYAG_JFK8_00002816–2817).

11

common-law duty . . . to provide employees with a safe place to work." *Romang v. Welsbach Elec. Corp.*, 852 N.Y.S.2d 144, 145 (2d Dep't 2008).  An employer is required to "use reasonable care commensurate with the hazard to be apprehended and to maintain his premises in such a condition that those who go there . . . shall not unnecessarily or unreasonably be exposed to danger." *Monroe v. City of New York*, 414 N.Y.S.2d 718, 722 (2d Dep't 1979); *see also Koullias v. Farm*, 798 N.Y.S.2d 877, 878 (N.Y. Sup. Ct. Kings Cty. 2005) ("duty of care 'measured by whatever public safety requires'") (citation omitted).

Here, the State is likely to succeed on the merits of its § 200 claim because Amazon has repeatedly and persistently failed to provide a reasonably safe workplace during the pandemic, a hazard requiring a high degree of care.  Current public health guidance indicates minimums for "reasonable and adequate protection" under § 200.  *See Ehlinger v. Bd. of Educ.*, 465 N.Y.S.2d 378, 379–80 (4th Dep't 1983) (guidelines properly considered by jury).  Amazon unreasonably failed to follow these minimum guidelines, including reasonable measures to limit transmission of the virus through adequate social distancing; allowing workers sufficient time to take protective measures such as washing hands and cleaning workstations; closing and cleaning areas of the facility where infected workers were present; and identifying and notifying workers who may have had contact with infected coworkers.  Injunctive relief is necessary because Amazon's peak season and recent rollbacks add dangers while the risk of infection rises.

### a. *Amazon's Productivity Monitoring Fails to Give Employees Time for Cleaning, Hygiene, and Social Distancing*

CDC guidance, which informs what is reasonable under § 200, recommends frequent cleaning and disinfection of shared spaces "[i]f the space is a high traffic area, with a large

number of people."[16]  N.Y. Department of Health ("DOH") guidance adds that high risk areas and frequently touched surfaces must be cleaned and disinfected twice daily, and shared equipment or workstations must be cleaned and disinfected between uses.[17]  The Occupational Safety and Health Administration ("OSHA") recommends workers "practice good personal hygiene and wash [their] hands often," and also continues to recommend implementing physical distancing (at least 6 feet) in all communal work areas for unvaccinated and otherwise at-risk workers.[18]  The DOH (implementing CDC Interim Public Health Recommendations for Fully Vaccinated People) likewise strongly recommend social distancing in indoor settings where vaccination status of individuals is unknown.[19]

---

[16] *See* Ulmet Aff., Ex. M, *COVID-19, Cleaning Your Facility: Every Day and When Someone Is Sick*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcommunity%2Forganizations%2Fcleaning-disinfection.html (last updated Nov. 15, 2021)).

[17] *See* Ulmet Aff., Ex. N, *Public and Private Facilities Cleaning and Disinfection Guidance*, DOH, 2–3 (May 10, 2021), https://coronavirus.health.ny.gov/system/files/documents/2021/05/cleaning-and-disinfection-guidance-for-public-and-privatefacilities_051021.pdf.

[18] *See* Ulmet Aff., Ex. O, *Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace*, OSHA, https://www.osha.gov/coronavirus/safework (last updated June 10, 2021).  Because OSHA's guidance is not a standard, it can inform the "reasonable and adequate" prong of the Labor Law § 200 analysis without raising preemption or primary jurisdiction issues.  The currently-stayed "COVID–19 Vaccination and Testing; Emergency Temporary Standard," 86 Fed. Reg. 61402 (Nov. 5, 2021) (the "November ETS"), set minimum vaccination and testing requirements for employers without addressing the social distancing, cleaning, and contact tracing practices at issue in this action.  The negligible impact of the November ETS on Amazon's preemption and primary jurisdiction arguments is addressed in Plaintiff's Motion to Dismiss Defendants' Counterclaims and Affirmative Defenses (Docket No. 184).

[19] See Ulmet Aff., Ex. P, New York State, *Reopening New York: Implementing CDC Guidance*, https://www.governor.ny.gov/sites/default/files/2021-05/NYS_CDCGuidance_Summary.pdf (last accessed Nov. 29, 2021).

Yet as discussed in Point II(B) above, Amazon's productivity and TOT monitoring deters workers from taking proper personal protective measures, such as cleaning and disinfecting workstations, hand-washing, and social distancing.  *See* Martinez Aff. ¶¶ 25–33, 37; Palmer Aff. ¶¶ 24–27, 29–33, 41, 49–52; Monarrez Aff. ¶ 13.  Workers are afraid to spend time on these measures for fear of discipline, including job loss.  *See* Martinez Aff. ¶ 41; Palmer Aff. ¶¶ 36–40.

### b. *Amazon Does Not Employ Proper Cleaning and Disinfection Protocols When There Are Confirmed Cases*

CDC guidance provides, "[i]f there has been a sick person or someone who tested positive for COVID-19 in your facility within the last 24 hours, you should clean and disinfect the spaces they occupied.  Close off areas used by the person who is sick and do not use those areas until after cleaning and disinfecting" and "[w]ait as long as possible (at least several hours) before you clean and disinfect."[20]  The DOH also invokes these guidelines.[21]



.  However, this policy is inadequate because the CDC guidance[22] requires areas to be closed for at least several hours before cleaning when there is a confirmed COVID-19 case, 

.[23]  JFK8 workers have not seen any areas closed for cleaning

---

[20] *See* Ulmet Aff., Ex M, *COVID-19*, *Cleaning Your Facility: Every Day and When Someone Is Sick*, CDC.

[21] *See* Ulmet Aff., Ex. N, *Public and Private Facilities Cleaning and Disinfection Guidance,* DOH.

[22] *See* Ulmet Aff., Ex. M, *COVID-19*, *Cleaning Your Facility: Every Day and When Someone Is Sick*, CDC.

[23] As noted earlier, Amazon's policy instructs ███████████████████████████████████████ .  *See* Ulmet Aff., Ex. C ( ██████████████████████████████████████ ).

despite near-daily notification of confirmed COVID cases.[24]  *See* Monarrez Aff. ¶¶ 7, 11; Martinez Aff. ¶¶ 10, 34; Palmer Aff. ¶¶ 47–48.

### c.  *Amazon's Contact Tracing Protocols Are Inadequate*

OSHA encourages employers to "instruct . . .  unvaccinated workers who have had close contact with someone who tested positive for SARS-CoV-2 … to stay home from work," and recommends that even fully vaccinated people who have a known exposure to someone with suspected or confirmed COVID-19 should take precautions including testing and masking.[25] The CDC recommends that employers provide "identification of potential people exposed to COVID-19 who worked in the same area and on the same shift."[26]  Although Amazon purports to conduct "contact tracing," and has a "contact tracing" protocol, its procedures are deficient, and evidence suggests that Amazon fails to follow its own procedures.  *See* Ulmet Aff., Ex. C ███████████████████████████████████.  Employees rely on Amazon to provide information sufficient to determine whether they have had close contact with infected coworkers, but as discussed in Point II(B)(3) above, Amazon fails to adequately track cases, contact trace, and notify workers.

---

[24] Amazon has yet to produce information regarding enhanced cleanings that took place as a result of confirmed cases at the facility from November 1, 2020 to the present.  However, out of 173 confirmed cases from March 1, 2020 to October 31, 2020 at JFK8, only six enhanced cleanings were performed.  Those consisted of cleaning the associate's and immediately adjacent workstations. *See* Ulmet Aff., Ex. T (Fitzgerald Declaration, ¶ 32).

[25] *See* Ulmet Aff., Ex. O, *Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace,* OSHA.  *See also* footnote 18, *supra*.

[26] *See* Ulmet Aff., Ex. Q, *Case Investigation and Contact Tracing in Non-healthcare Workplaces: Information for Employers*, CDC https://www.cdc.gov/coronavirus/2019-ncov/community/contact-tracing-nonhealthcare-workplaces.html (last updated Oct. 20, 2021).

      ***d.   Amazon's Recent Removal of Already Inadequate COVID-19 Protocols Makes Social Distancing Even Less Feasible***

As noted, OSHA continues to recommend that employers "[i]mplement physical distancing for unvaccinated and otherwise at-risk workers in all communal work areas."[27]  And in May 2021, the DOH adopted and implemented CDC guidance for most businesses, requiring social distancing and masks indoors for unvaccinated individuals.[28]  Yet as discussed in Point II(B)(4) above, after implementing certain protective measures to enable social distancing early in the pandemic, Amazon informed JFK8 employees in July 2021 that it would return to its pre-pandemic practices, and since then has gradually eliminated its already inadequate COVID-19 protocols by eliminating social distancing enforcement, removing certain social distancing barriers, reverting to two-directional walkways, and de-staggering shifts and breaks.

As discussed in Point II(B)(4), these changes create crowding and prevent workers from keeping a safe distance, thereby increasing the chance of virus transmission.  Adequate distancing is also impossible at lengthy "stand up" meetings with managers and when workers inevitably enter each other's workstations throughout the day.  These changes coincide with the seasonal influx of new hires and increased work-hours, discussed in Point II(B)(5), heightening the already unreasonable danger of virus transmission.

---

[27] *See* Ulmet Aff., Ex. O, *Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace,* OSHA.  *See also* footnote 18, *supra.*

[28] *See* Ulmet Aff., Ex. P, *Reopening New York: Implementing CDC Guidance.*

**C.** **Amazon Unlawfully Retaliated Against Christian Smalls in Violation of Labor Law § 215 and § 740**

**2.** **Legal Standard**

Labor Law § 215 states that an employer may not discharge or in any other manner retaliate against any employee for complaining to "his or her employer . . . or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter [the Labor Law];" and that the worker "need not make explicit reference to any section or provision of this chapter to trigger the protections of this section." *See*, *e.g.*, *Kingston v. Int'l Bus. Machines Corp.*, 187 A.D.3d 578 (1st Dep't 2020) (complaint to employer concerning wage law violation was protected conduct).

To establish a prima facie case under § 215, a plaintiff must plead that "she made a complaint about the employer's violation of the law and, as a result, was terminated . . . or subjected to an adverse employment action[,]" whereupon "the burden of production shifts to the employer to demonstrate that a 'legitimate, nondiscriminatory reason' existed for its action." *Copantitla v. Fiskardo Estiatorio, Inc*., 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011) (citations omitted). The plaintiff can counter that reason with evidence that the explanation is pretextual. *Id*. Retaliatory animus and close temporal proximity between a complaint and adverse action are indicia of a causal connection and pretext. *See*, *e.g.*, *Schmidt-Sarosi v. Offs. for Fertility & Reprod. Med., P.C.*, 195 A.D.3d 479, 481 (1st Dep't 2021) (termination four weeks after a complaint).

Additionally, Labor Law § 740 prohibits retaliatory action against an employee who "discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety" (Labor Law § 740(2)(a))

17

or "objects to, or refuses to participate in any such activity, policy or practice" (Labor Law § 740(2)(c)). The elements of a § 740(2)(a) complaint include that the employee (1) disclosed or threatened to disclose the illegal practice to a supervisor or public body, (2) the practice was actually illegal, and (3) the violation "presented a substantial and specific danger to the public…. In addition, a plaintiff must demonstrate a causal nexus—*i.e.*, that the adverse employment action was taken 'because' of his disclosure or threatened disclosure[.]" *Rivera v. AffinEco LLC*, 2018 WL 2084152, at *3 (S.D.N.Y. Mar. 26, 2018).  The same standard applies under § 740(2)(c) except that the first element is that the employee objected to or refused to participate in the illegal practice. *See Villarin v. Rabbi Haskel Lookstein Sch.*, 96 A.D.3d 1, 8 (1st Dep't 2012) (Labor Law § 740(2)(c)).

### 3.    Smalls Complained About Health and Safety Violations and Amazon Retaliated

The State is likely to succeed on its claim that Amazon unlawfully retaliated against Smalls under Labor Law § 215 and § 740.  Smalls complained of health and safety conditions which he correctly believed to be illegal.  *See* Smalls Aff. ¶ 7.  He complained to the media and to senior management at JFK8, made it known to Amazon that he had contacted the CDC, and was a highly visible symbol of worker objection to unlawful working conditions at JFK8 because of his speeches to Amazon officials the week of March 22 as well as before and during the March 30 walkout.[29]  Such complaints, disclosures, and objections are protected under § 215(1)(a), § 740(2)(a), and § 740(2)(c), and Smalls' prominence among those who complained gave Amazon's retaliatory message devastating impact.

---

[29] *Id.*, ¶¶ 8-12; Palmer Aff. ¶ 57-58; Martinez Aff. ¶7; *See also* Ulmet Aff., Ex. F (Notes); Ex. G (Desai Chime); Ex. H (Gilbert-Differ Chime).

At the time of Smalls's complaints, Amazon was violating Labor Law § 200 by: (1) failing to conduct proper cleaning, disinfection and ventilation of the JFK8 facility upon a confirmed COVID-19 case,[30] and (2) failing to adequately identify and notify workers exposed to infected coworkers.[31]   Failure to mitigate transmission of COVID-19 during a pandemic presented a substantial and specific danger to the public, satisfying the second element of a § 740 claim.   Amazon fired Smalls within days of his open complaints to management, where he told them he contacted the CDC and complained that JFK8 was not following CDC protocols by failing to close the facility for cleaning.   *See* Smalls Aff. ¶ 15; Ulmet Aff., Ex. K (Smalls's termination document).   The timing of Smalls' firing—immediately following his complaints to Amazon managers about Amazon's failure to protect its workers and within days of notifying Amazon managers that he had complained about its practices to the CDC—is sufficient to establish a causal connection between his protected activity and the firing.   *See Schmidt-Sarosi*, 195 A.D.3d at 481.

There is also substantial evidence, discussed in Point II(B)(6) above, that Amazon's purported reason for firing Smalls—that he violated a quarantine directive and social distancing policy—is a pretext for retaliation.   Smalls was a long-tenured employee with a history of promotions and good work performance.   Amazon, however, fired him without engaging in any

---

[30] CDC guidance issued on March 8, 2020 recommended employers "close off areas used by the ill persons and wait as long as practical before beginning cleaning and disinfection to minimize potential for exposure to respiratory droplets. Open outside doors and windows to increase air circulation in the area. If possible, wait up to 24 hours before beginning cleaning and disinfection." *See* Ulmet Aff., Ex. R, *COVID-19 Environmental Cleaning and Disinfection Recommendations,* CDC, https://web.archive.org/web/20200309030609/https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last updated March 6, 2020).

[31] Amazon's contact tracing protocol for JFK8 did not contain an interview component (*see* Ulmet Aff. Ex. V, Section 3.2 (3.2(a))), and Amazon managers dismissed efforts to self-report potential contacts. *See* Smalls Aff. ¶ 13.

progressive discipline, which was troubling to even Amazon's HR employees.  *See* Smalls Aff. ¶ 14.[32]  Indeed, Hernandez and Desai discussed Smalls' imminent discharge for violating a quarantine order, which they predicted would be "perceived as retaliation," before Smalls was even given the order.[33]

### D. <u>Amazon Workers and the State of New York Will Suffer Imminent and Irreparable Harm Without Immediate Action</u>

While the State need not adduce evidence of irreparable harm to obtain an injunction under Executive Law § 63(12), evidence readily shows irreparable harm if Amazon's practices are not enjoined.  Because Executive Law § 63(12) grants the Attorney General the power to apply to the Supreme Court for an order enjoining fraudulent or illegal acts, "[t]he irreparable injury to be enjoined is an injury to the public," not an injury to any individual or entity.  *Terry Buick*, 137 Misc. 2d at 294.

#### 4. Irreparable Harm on Labor Law § 200 Claim

New York courts have found it "universally accepted that people working and living together are at exponentially heightened risk for contracting COVID-19, a virus that can cause long-term health complications and death."  *In re Holden v. Zucker*, No. 801592/2021, 2021 WL 2395292 at *9 (N.Y. Sup. Ct. Bronx Cty. Mar. 30, 2021).  New York courts have specifically recognized the threat of COVID-19 illness as irreparable harm.  *Fisher v. City of New York*, No. 452069/2020, 2021 WL 240542 at *7 (N.Y. Sup. Ct. N.Y. Cty. Jan. 25, 2021); *see also Basank v. Decker*, 449 F. Supp 3d 205, 210-213 (S.D.N.Y. 2020).  Here, irreparable harm is demonstrated by the threat of increased illness and death caused by COVID-19 (*see* Point II(A) *supra* and

---

[32] *See also* Ulmet Aff., Ex. I (Hernandez/Desai Chime at AMZ_NYAG_JFK8_00002816–2817).

[33] *See* Ulmet Aff., Ex I (Hernandez/Desai Chime at AMZ_NYAG_JFK8_00002819).

Michaels Aff.) due to transmission of the virus that could have been prevented but for Amazon's inadequate and dwindling precautions (*see* Point II(B)).

### 5. Irreparable Harm on the § 215 and § 740 Claims

Similarly, Amazon's unlawful firing of Smalls continues to intimidate employees who fear that complaints about health and safety conditions could jeopardize their livelihoods, and are thus chilled from exercising their protected Labor Law rights.  Retaliatory discharge "carries with it the distinct risk that other employees may be deterred from protecting their rights[.]" *Holt v. Cont. Group, Inc.*, 708 F.2d 87, 91 (2d Cir. 1983).  Interim reinstatement is appropriate under Labor Law § 215 where evidence shows that an employer's "retaliatory actions have caused irreparable harm by chilling the exercise of worker rights." *Lin v. Great Rose Fashion, Inc.*, No. 08-CV-4778(NGG)(RLM), 2009 WL 1544749, at *21 (E.D.N.Y. June 3, 2009); *see also Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264, 273–74 (N.D.N.Y. 2015) (granting interim reinstatement to a plaintiff alleging retaliation for complaining of violations of the Family and Medical Leave Act, because other workers seeking leave to care for family workers might be chilled).  In *Stagliano*, the court found that "weakened enforcement… can *itself* be irreparable harm".  *Id.*  Similarly, here Amazon's retaliatory firing of Smalls has resulted in chilling Amazon workers' protected rights, leading to decreased safety complaints, both of which constitute irreparable harm.

### E. The Balance of Equities Weighs in Plaintiff's Favor

The balance of equities weighs in the State's favor.  The State has a fundamental interest in protecting the health and safety of New Yorkers. The State Constitution (Article XVII, § 3) provides that "protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made by the state."  Indeed, *Jacobson v.*

*Massachusetts*, 197 U.S. 11, 29 (1905), recognized that "in every well-ordered society charged with the duty of conserving the safety of its members[,] the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."

To balance the equities, a court must inquire into whether threatened injury to the plaintiff is more burdensome than the harm an injunction will cause the defendant. *See Barbes Rest. Inc. v. ASRR Suzer 218, LLC*, 140 A.D.3d 430 (1st Dep't 2016); *see also Bocelli Ristorante Inc. v. Cuomo*, 70 Misc. 3d 722, 733 (N.Y. Sup. Ct. Richmond Cty. 2020) (holding that the State's interest in fighting COVID is at least as significant as the interruption of business). Courts may "restrain acts which are dangerous to human life, detrimental to the public health and occasion great public inconvenience and damage." *Inc. Vil. of Babylon v. John Anthony's Water Cafe, Inc.*, 137 A.D.2d 792, 795 (2d Dep't 1988) (citation omitted); *see also People ex rel. Bennett v. Laman*, 277 N.Y. 368, 381 (1938) (injunction proper where "real danger is threatened to the public health by the conduct of the defendant" and "irreparable damage to the health of individuals is likely to result"). Here, Amazon's inadequate COVID-19 prevention measures place its workers and other New Yorkers at risk of exacerbation of the pandemic, and the State's interest in protecting the public health outweighs Amazon's interest in maximizing profits.

## IV.  <u>CONCLUSION</u>

For these reasons, the Court should order Amazon to:

1) Modify productivity and TOT policies to permit time for cleaning, hygiene, and social distancing, and communicate this to employees;
2) Adopt policies for adequate cleaning and disinfection after workers infected with the SARS-CoV-2 virus have been present in the facility;
3) Use proper contact tracing protocols, including interviews and timely notification to close contacts;
4) Appoint a Court-approved monitor to oversee implementation of these changes and make additional recommendations as appropriate;

5) Offer reinstatement to Christian Smalls pending the outcome of this litigation; and
6) Communicate to employees that they have the right to complain to Amazon, the Attorney General, or any other government agency of violations of Labor Law, including violations of COVID-19 related health and safety requirements;

and grant such other relief as is appropriate.

Dated: November 30, 2021

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Julie R. Ulmet*

KAREN CACACE
   *Chief of Labor Bureau*
JULIE R. ULMET
   *Deputy Chief of Labor Bureau*

ROYA AGHANORI
KRISTEN FERGUSON
FIONA J. KAYE
ELIZABETH KOO
SETH KUPFERBERG
JEREMY PFETSCH
   *Assistant Attorneys General*

Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8681
Julie.Ulmet@ag.ny.gov

*Attorneys for the State of New York*

**ATTORNEY CERTIFICATION PURSUANT TO UNIFORM RULE 202.8-b**

I, Julie R. Ulmet, an attorney duly admitted to practice law in the courts of the State of New York, hereby certify that this Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction complies with the word count limit set forth in Rule 202.8-b of the Uniform Civil Rules for the Supreme Court and the County Court because it contains 6819 words, excluding the parts exempted by Rule 202.8-b.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this affirmation.

Dated: November 30, 2021                              /s/ *Julie R. Ulmet*_____

                                                                    Julie R.  Ulmet

Amazon.com Services LLC's Fourth Privilege Log
*Amazon.com Services LLC and Bradly Bryson* , Case No. 29-CA-261755

# CP Exhibit 19

| Date Sent | Bates Label | From | To | CC | BCC | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 4/5/2020 9:16 a.m. | AMZ-BRY_PRIV000002 to AMZ-BRY_PRIV000005 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/5/2020 9:28 a.m. | AMZ-BRY_PRIV000001 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (Director, Worldwide Operations); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/5/2020 12:31 p.m. | AMZ-BRY_PRIV000001 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/5/2020 1:47 p.m. | AMZ-BRY_PRIV000001 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/5/2020 1:58 p.m. | AMZ-BRY_PRIV000001 | Rob Joseph (HR Director, NACF Director, Human Resources) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources) | None | Email to Liz Hackett, Esq. and Rob Joseph for purposes of obtaining legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/7/2020 2:30 p.m. | AMZ-BRY_PRIV000006 to AMZ-BRY_PRIV000016 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Kristin LaRosa, Esq. (Corporate Counsel) | None | Email to Liz Hackett, Esq. with attachments for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000009 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000010 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000011 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000012 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000013 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000014 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000015 to AMZ-BRY_PRIV000016 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/6/2020 7:46 p.m. | AMZ-BRY_PRIV000017 | Elliott Jones (Employee Relations Manager, North American Fullfillment Centers) | Kristin LaRosa, Esq. (Corporate Counsel); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | None | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice related to possible protected concerted activity. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
*Amazon.com Services LLC and Gerald Bryson* , Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/7/2020 8:42 a.m. | AMZ-BRY_PRIV000017 to AMZ-BRY_PRIV000020 | Elliott Jones (Employee Relations Manager, North American Fullfillment Centers) | Kristin LaRosa, Esq. (Corporate Counsel); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | None | Email to Kristin LaRosa, Esq. with attachment for purposes of obtaining legal advice regarding possible protected concerted activity. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000018 to AMZ-BRY_PRIV000020 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/9/2020 8:45 a.m. | AMZ-BRY_PRIV000022 to AMZ_PRIV000024 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email to Liz Hackett, Esq.  for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/9/2020 8:59 a.m. | AMZ-BRY_PRIV000022 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/9/2020 12:37 a.m. | AMZ-BRY_PRIV000022 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, North American Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/9/2020 10:39 a.m. | AMZ-BRY_PRIV000021 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email to Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 1:56 p.m. | AMZ-BRY_PRIV000021 | Kristin LaRosa, Esq. (Corporate Counsel) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | None | Email from Kristin LaRosa, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
*Amazon.com Services LLC and Gerald Bryson*, Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/9/2020 2:06 p.m. | AMZ-BRY_PRIV000021 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel) | None | None | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/10/2020 3:53 p.m. | AMZ-BRY_PRIV000027 to AMZ-BRY_PRIV000030 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Rachael Lighty (Regional Ops PR Manager) | None | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/10/2020 6:27 p.m. | AMZ-BRY_PRIV000026 to AMZ-BRY_PRIV000027 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Rachael Lighty (Regional Ops PR Manager) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding the decision to terminate the employment of G. Bryson and discipline of D. Evans and direction from counsel to seek approval from executives and to determine whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/11/2020 3:55 p.m. | AMZ-BRY_PRIV000026 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Kristin LaRosa, Esq. (Corporate Counsel); Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email to K. Cheeseman, copying Kristin LaRosa, Esq. and Liz Hackett, Esq., for purposes of gathering information necessary for the provision of legal advice regarding communications about the discipline of G. Bryson. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
*Amazon.com Services LLC and Gerald Bryson* , Case No. 29-CA-261755

| Date | Bates | From | To | CC | BCC | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 4/11/2020 5:58 p.m. | AMZ-BRY_PRIV000026 | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | (Corporate Counsel); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Rachael Lighty (Regional Ops PR Manager); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR | None | None | Email to Kristin LaRosa, Esq. and others for purposes of gathering information necessary for the provision of legal advice regarding communications about the discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/13/2020 2:29 p.m. | AMZ-BRY_PRIV000026 | Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | Kristin LaRosa, Esq. (Corporate Counsel); Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager) | None | None | Email to B. Campbell and K. Cheeseman, copying Kristin LaRosa, Esq. and Liz Hackett, Esq., for purposes of gathering information necessary for the provision of legal advice regarding the decision to terminate G. Bryson. | ATTORNEY-CLIENT |
| 4/13/2020 11:37 a.m. | AMZ-BRY_PRIV000025 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Kristin LaRosa, Esq. (Corporate Counsel); Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, North American Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager) | None | Email to M. Midgley and K. Cheeseman, copying Kristin LaRosa, Esq. and Liz Hackett, Esq., for purposes of gathering information necessary for the provision of legal advice regarding the decision to terminate employment of G. Bryson. | ATTORNEY-CLIENT |
| 4/14/2020 1:00 p.m. | AMZ-BRY_PRIV000025 | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | Kristin LaRosa, Esq. (Corporate Counsel); Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager) | None | Email to M. Midgley, K. Cheeseman, and K. Cheeseman copying Kristin LaRosa, Esq. and Liz Hackett, Esq., for purposes of gathering information necessary for the provision of legal advice regarding the decision to terminate employment of G. Bryson. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
*Amazon.com Services LLC and Gerald Bryson* , Case No. 29-CA-261755

| Date | Document | Author | Recipient | CC | | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 4/16/2020 3:42 p.m. | AMZ-BRY_PRIV000031 to AMZ-BRY_PRIV000033 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel) | Anand Mehta (Director, Operations); Sai Kotha (General Manager, Operations); Christine Hernandez (HR Manager, NACF); Rachael Lighty (Regional Ops PR Manager); Milly Gutierrez (Principal, Employee Relations, Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. with attachment for puposes of obtaining legal advice regarding finalization of communication to executives to obtain approval of decision to discipline G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000032 to AMZ-BRY_PRIV000033 | N/A | N/A | N/A | N/A | Attachment accompanying email directed by in-house counsel Kristin LaRosa, Esq. that reflects legal advice. | ATTORNEY-CLIENT |
| 4/16/2020 7:27 p.m. | AMZ-BRY_PRIV000034 to AMZ-BRY_PRIV000035 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel) | Rachael Lighty (Regional Ops PR Manager); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Rob Joseph (HR Director, NACF Director, Human Resources); Christine Hernandez (HR Manager, NACF); Sai Kotha (General Manager, Operations) | None | Email to Kristin LaRosa, Esq. with attachment for purposes of obtaining legal advice regarding communication to executives to obtain approval of decision to discipline G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000035 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/16/2020 8:38 p.m. | AMZ-BRY_PRIV000036 to AMZ-BRY_PRIV000039 | Rachael Lighty (Regional Ops PR Manager) | Kristin LaRosa, Esq. (Corporate Counsel) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Heather Knox (Director, NA Ops PR); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. with attachment for purposes of obtaining legal advice regarding potential statement about G. Bryson discipline. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000039 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/17/2020 8:28 a.m. | AMZ-BRY_PRIV000040 to AMZ-BRY_PRIV000041 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Tyler Grabowski (Human Resources Business Partner) | Payal Desai (Sr HR Business Partner, NACF); Christine Hernandez (HR Manager, NACF); Neha Viswanath (Sr HR Business Partner, NACF) | None | Email to Kristin LaRosa, Esq. and T. Grabowski regarding legal advice regarding communication of discipline to G. Bryson. | ATTORNEY-CLIENT |
| 4/17/2020 2:49 p.m. | AMZ-BRY_PRIV000040 to AMZ-BRY_PRIV000045 | Tyler Grabowski (Human Resources Business Partner) | Kristin LaRosa, Esq. (Corporate Counsel); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Payal Desai (Sr HR Business Partner, NACF); Christine Hernandez (HR Manager, NACF); Neha Viswanath (Sr HR Business Partner, NACF) | None | Email to Kristin LaRosa, Esq. and B. Campbell with attachments for purposes of obtaining legal advice following the communication of decision to terminate employment of G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000042 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000043 to AMZ-BRY_PRIV000044 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000045 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/17/2020 6:05 p.m. | AMZ-BRY_PRIV000046 to AMZ-BRY_PRIV000049 | Rachael Lighty (Regional Ops PR Manager) | Kristin LaRosa, Esq. (Corporate Counsel); Drew Herdener (VP, Global Corporate and Operations Communications) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Heather Knox (Director, NA Ops PR); Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. and D. Herdener with attachment for purposes of gathering information necessary for the provision of legal advice regarding communications about termination of employment G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000049 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
Amazon.com Services LLC and Gerald Bryson , Case No. 29-CA-261755

| Date | Bates | From | To | CC | BCC | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 4/16/2020 3:42 p.m. | AMZ-BRY_PRIV000050 to AMZ-BRY_PRIV000051 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Dave Clark (SVP Worldwide Operations) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Bradley Campbell to Dave Clark (SVP, WW Operations, SVP Operations) with attachment at the direction of Amazon in-house counsel, Liz Hackett, Esq., containing legal advice and for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000051 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/16/2020 3:54 p.m. | AMZ-BRY_PRIV000052 | Dave Clark (SVP, WW Operations, SVP Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campell made at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000049 | N/A | N/A | N/A | N/A | Attachment accompanying email directed by in-house counsel Liz Hackett. | ATTORNEY-CLIENT |
| 4/16/2020 3:58 p.m. | AMZ-BRY_PRIV000052 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Dave Clark (SVP, WW Operations, SVP Operations) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Bradley Campbell to Dave Clark (SVP, WW Operations, SVP Operations) made at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 4:00 p.m. | AMZ-BRY_PRIV000052 | Dave Clark (SVP, WW Operations, SVP Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campell at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 3:50 p.m. | AMZ-BRY_PRIV000053 | Dave Clark (SVP, WW Operations, SVP Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campell at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 3:53 p.m. | AMZ-BRY_PRIV000053 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Dave Clark (SVP, WW Operations, SVP Operations) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Bradley Campbell to Dave Clark (SVP, WW Operations, SVP Operations) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 3:58 p.m. | AMZ-BRY_PRIV000054 | Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) | Dave Clark (SVP, WW Operations, SVP Operations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Alicia Davis to Dave Clark (SVP, WW Operations, SVP Operations) and Bradley Campbell at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
Amazon.com Services LLC and Gerald Bryson , Case No. 29-CA-261755

| Date/Time | Bates | From | To | CC | Privilege | Description | Privilege Type |
|---|---|---|---|---|---|---|---|
| 4/16/2020 3:59 p.m. | AMZ-BRY_PRIV000054 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Dave Clark (SVP, WW Operations, SVP Operations); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Bradley Campbell to Dave Clark (SVP, WW Operations, SVP Operations) and Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 4:00 p.m. | AMZ-BRY_PRIV000054 | Dave Clark (SVP, WW Operations, SVP Operations) | Dave Clark (SVP, WW Operations, SVP Operations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campbell and Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY001309 | N/A | N/A | N/A | N/A | Attachment accompanying email directed by in-house counsel Kristin LaRosa, Esq. that reflects legal advice. | ATTORNEY-CLIENT |
| 4/29/2020 5:19 p.m. | AMZ-BRY001374 | Tyler Grabowski (Human Resources Business Partner) | Rachael Lighty (Regional Ops PR Manager); | Kristin LaRosa, Esq. (Corporate Counsel); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Christine Hernandez (HR Manager, NACF) | None | Email to Rachael Lighty, copying Kristin LaRosa, Esq., for purposes of gathering information necessary for the provision of legal advice regarding the termination of G. Bryson's employment | ATTORNEY-CLIENT |
| 4/5/2020 2:20 a.m. | AMZ-BRY_PRIV000056 to AMZ-BRY_PRIV000059 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel) | Anand Mehta (Director, Operations) | None | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice regarding scheduled protest activities on April 6th and prior protest activities. | ATTORNEY-CLIENT |
| 4/9/2020 1:42 p.m. | AMZ-BRY_PRIV000061 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 3:15 p.m. | AMZ-BRY_PRIV000061 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | None | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding possible discipline of D. Bryson and D. Evans. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
*Amazon.com Services LLC and Gerald Bryson* , Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/9/2020 3:27 p.m. | AMZ-BRY_PRIV000060 to AMZ-BRY_PRIV000061 | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | None | Email from Liz Hackett, Esq. for purposes of providing legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 5:15 p.m. | AMZ-BRY_PRIV000060 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment) | Kristin LaRosa, Esq. (Corporate Counsel); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | None | Email to Liz Hackett, Esq. for purposes of obtaining legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 5:27 p.m. | AMZ-BRY_PRIV000060 | Ryan Smith (Director, NACF AR Operations, Director, Regional Operations) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Kristin LaRosa, Esq. (Corporate Counsel); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | None | Email to Liz Hackett, Esq. and Bradley Campbell for purposes of obtaining legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 5:32 p.m. | AMZ-BRY_PRIV000060 | Maureen Midgley (VP NACF, WW RE & BT, VP Operations - International) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Ryan Smith (Director, NACF AR Operations, Director, Regional Operations) | Kristin LaRosa, Esq. (Corporate Counsel); Anand Mehta (Director, Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources); Rachael Lighty (Regional Ops PR Manager); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email to Liz Hackett, Esq. and others for purposes of obtaining legal advice regarding possible discipline of G. Bryson and D. Evans. | ATTORNEY-CLIENT |
| 4/9/2020 8:52 a.m. | AMZ-BRY_PRIV000065 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Ryan Smith (Director, NACF AR Operations, Director, Regional Operations); Anand Mehta (Director, Operations) | None | None | Email from Bradley Campbell to Ryan Smith and Anand Mehta at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/9/2020 8:57 a.m. | AMZ-BRY_PRIV000065 | Ryan Smith (Director, NACF AR Operations, Director, Regional Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Anand Mehta (Director, Operations) | None | None | Email from Ryan Smith to Bradley Campbell and Anand Mehta at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
*Amazon.com Services LLC and Gerald Bryson* , Case No. 29-CA-261755

| Date | Bates | Author | Recipients | CC | BCC | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 4/14/2020 8:26 a.m. | AMZ-BRY_PRIV000066 to AMZ-BRY_PRIV000164 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and Shannon Wilson with attachments for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000068 to AMZ-BRY_PRIV000076 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000077 to AMZ-BRY_PRIV000087 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000088 to AMZ-BRY_PRIV000091 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000092 to AMZ-BRY_PRIV000164 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/15/2020 6:08 a.m. | AMZ-BRY_PRIV000165 to AMZ-BRY_PRIV000182 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Henry Darcie (VP, HR - WW Operations, VP Human Resources) | Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email to Liz Hackett, Esq. and Henry Darcie with attachments for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000171 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000172 to AMZ-BRY_PRIV000173 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000174 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000175 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000176 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000177 to AMZ-BRY_PRIV000178 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000179 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000180 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000181 to AMZ-BRY_PRIV000182 | N/A | N/A | N/A | N/A | Attachment accompanying email for purposes of obtaining legal advice. | ATTORNEY-CLIENT |
| 4/15/2020 9:46 p.m. | AMZ-BRY_PRIV000183 | Henry Darcie (VP, HR - WW Operations, VP Human Resources) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and others for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |
| 4/16/2020 2:47 a.m. | AMZ-BRY_PRIV000183 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Henry Darcie (VP, HR - WW Operations, VP Human Resources) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Kristin LaRosa, Esq. (Corporate Counsel); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Allyson Hoffman (Director, Human Resources); Rob Joseph (HR Director, NACF Director, Human Resources) | None | Email to Henry Darcie, copying Liz Hackett, Esq. and Kristin LaRosa, Esq., for purposes of obtaining legal advice regarding possible discipline of G. Bryson. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
Amazon.com Services LLC and Gerald Bryson , Case No. 29-CA-261755

| Date | Bates | From | To | CC | BCC | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 4/16/2020 12:03 p.m. | AMZ_BRY_PRIV000189 to AMZ-BRY_PRIV000190 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and Shannon Wilson for purposes of obtaining legal advice regarding the possible termination of G. Bryson's employment. | ATTORNEY-CLIENT |
| 4/16/2020 12:57 p.m. | AMZ-BRY_PRIV000189 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Joshua Teeter (Director, Human Resources);  Rob Joseph (HR Director, NACF Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and others for purposes of obtaining legal advice regarding possible termination of G. Bryson's employment. | ATTORNEY-CLIENT |
| 4/16/2020 3:35 p.m. | AMZ-BRY_PRIV000189 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Liz Hackett, Esq. (Associate General Counsel, Labor & Employment); Joshua Teeter (Director, Human Resources);  Rob Joseph (HR Director, NACF Director, Human Resources); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources) | None | None | Email to Liz Hackett, Esq. and others with attachment for purposes of obtaining legal advice regarding possible termination of G. Bryson's employment. | ATTORNEY-CLIENT |
| N/A | AMZ-BRY_PRIV000191 to AMZ-BRY_PRIV000192 | N/A | N/A | N/A | N/A | Attachment accompanying email directed by in-house counsel Liz Hackett, Esq. that reflects legal advice. | ATTORNEY-CLIENT |
| 4/16/2020 3:50 p.m. | AMZ_BRY_PRIV000193 | Dave Clark (SVP, WW Operations, SVP Operations) | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) to Bradley Campbell and Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/16/2020 3:54 p.m. | AMZ_BRY_PRIV000193 | Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) | Dave Clark (SVP, WW Operations, SVP Operations); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | None | Email from Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
*Amazon.com Services LLC and Gerald Bryson*, Case No. 29-CA-261755

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/18/2020 2:59 p.m. | AMZ-BRY_PRIV000193 | Dave Clark (SVP, WW Operations, SVP Operations) | Dave Clark (SVP, WW Operations, SVP Operations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist); Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | None | Email from Dave Clark (SVP, WW Operations, SVP Operations) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | ATTORNEY-CLIENT |
| 4/18/2020 3:58 p.m. | AMZ-BRY_PRIV000193 | Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | Shannon Wilson (HR Director, WW Ops. - Director, Human Resources); Henry Darcie (VP, HR - WW Operations, VP Human Resources); Allyson Hoffman (Director, Human Resources); Alicia Boler Davis (VP-Global Customer Fulfillment, VP Operations - International); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | None | None | Email from Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) at the direction of Amazon in-house counsel, Liz Hackett, Esq., for the purpose of determining whether executives approved of decision and whether they had questions that required further legal advice regarding the recommended decision. | |
| 4/17/2020 3:30 p.m. | AMZ-BRY_PRIV000195 | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Kristin LaRosa, Esq. (Corporate Counsel); Rachael Lighty (Regional Ops PR Manager) | Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Heather Knox (Director, NA Ops PR); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice regarding potential statement about G. Bryson discipline. | ATTORNEY-CLIENT |
| 4/17/2020 3:34 p.m. | AMZ-BRY_PRIV000195 | Rachael Lighty (Regional Ops PR Manager) | Kristin LaRosa, Esq. (Corporate Counsel); Kelly Cheeseman (Director, WW Ops External, Director, Public Relations) | Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Heather Knox (Director, NA Ops PR); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. for purposes of obtaining legal advice regarding potential statement about G. Bryson discipline. | ATTORNEY-CLIENT |
| 4/17/2020 6:09 p.m. | AMZ-BRY_PRIV000198 | Drew Herdener (VP, Global Corporate and Operations Communications) | Kristin LaRosa, Esq. (Corporate Counsel); Rachael Lighty (Regional Ops PR Manager) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Heather Knox (Director, NA Ops PR); Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Lisa Levandowski (Sr PR Manager, Operations, Sr Mgr, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. and R. Lighty for purposes of gathering information necessary for the provision of legal advice regarding communications about termination of employment G. Bryson. | ATTORNEY-CLIENT |

Amazon.com Services LLC's Fourth Privilege Log
*Amazon.com Services LLC and Gerald Bryson , Case No. 29-CA-261755*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/17/2020 6:09 p.m. | AMZ-BRY_PRIV000198 | Rachael Lighty (Regional Ops PR Manager) | Drew Herdener (VP, Global Corporate and Operations Communications); Kristin LaRosa, Esq. (Corporate Counsel); Rachael Lighty (Regional Ops PR Manager) | Kelly Cheeseman (Director, WW Ops External, Director, Public Relations); Heather Knox (Director, NA Ops PR); Kristen Kish (Sr. Comm Mgr, Transportation, Sr Mgr, Public Relations); Lisa Levandowski (Sr PR Manager, Operations, Sr PR Manager, Public Relations); Bradley Campbell (Regional Sr HRM, NACF Sr Mgr, HR Generalist) | None | Email to Kristin LaRosa, Esq. and D. Lighty for purposes of gathering information necessary for the provision of legal advice regarding communications about termination of employment G. Bryson. | ATTORNEY-CLIENT |
| 9/9/2019 | AMZ-BRY008013 to AMZ-BRY008015 | Linda Prisciando | Ethics Escalation Line | N/A | N/A | Information reflecting legal advice from Lauren Howard, Esq. (Corporate Counsel) regarding potential discipline of Aaron West. | ATTORNEY-CLIENT |
| 9/17/2019 | AMZ-BRY008021 to AMZ-BRY008022 | Linda Prisciando | Ethics Escalation Line | N/A | N/A | Information reflecting legal advice from Lauren Howard, Esq. (Corporate Counsel) regarding potential discipline of Aaron West. | ATTORNEY-CLIENT |
| 5/26/2021 7:33 a.m. | AMZ-BRY008753 | Christine Hernandez (HR Manager, NACF) | Christopher Murphy (Amazon outside counsel) | None | None | Attorney-client communication between client (Christine Hernandez) to Christopher Murphy, Esq. (Amazon outside counsel) regarding NLRB hearing and document response. | ATTORNEY-CLIENT ATTORNEY WORK PRODUCT |

**CP Exhibit 20**

Amazon seeks intelligence analyst to track 'labor organizing threats'

12/10/21, 2:28 PM



SIGN IN

Search quotes, news & videos

MARKETS   BUSINESS   INVESTING   TECH   POLITICS   CNBC TV   WATCHLIST   MAKE IT   USA   PRO   ● WATCH LIVE



TECH

# Amazon deletes job listings for analysts to track 'labor organizing threats' following public outcry

PUBLISHED TUE, SEP 1 2020•1:36 PM EDT | UPDATED TUE, SEP 1 2020•3:31 PM EDT


Annie Palmer
@ANNIERPALMER

SHARE      

**KEY POINTS**

- Amazon posted, and later removed, two job listings for intelligence analysts that would be charged with tracking "labor organizing threats" and other "sensitive topics."

- An Amazon spokesperson told CNBC in a statement that the listings were "not an accurate description of the role."

- The company has faced widespread criticism over its labor practices before and during the coronavirus pandemic.

**TV**

**Power Lunch**

WATCH LIVE ▶

UP NEXT | **Closing Bell**
3:00 PM ET

Listen

Amazon seeks intelligence analyst to track 'labor organizing threats'                                            12/10/21, 2:28 PM



**Amazon workers at Amazon's Staten Island warehouse strike in demand that the facility be shut down and cleaned after one staffer tested positive for the coronavirus on March 30, 2020 in New York.**

*Angela Weiss | AFP | Getty Images*

[Amazon](#) was looking to hire two intelligence analysts charged with tracking "labor organizing threats" inside the company, which drew criticism from activists and news outlets and caused it to take down the job listings on Tuesday.

The company recently posted job listings for a senior intelligence analyst and an intelligence analyst, both based in Phoenix, Arizona, that would be part of its Global Security Operations' Global Intelligence Program, according to the posting. The analysts would be charged with gathering information on any internal and external threats to Amazon and reporting the data to leaders across the organization.

Among the types of intelligence they might gather are "sensitive topics that are highly confidential, including labor organizing threats against the

## TRENDING NOW



**WHO says omicron variant could change the course of the Covid pandemic**

Amazon seeks intelligence analyst to track 'labor organizing threats'                    12/10/21, 2:28 PM

company," "funding and activities connected to corporate campaigns (internal and external) against Amazon," as well as briefings on "dynamic situations" including protests, geopolitical crises and other topics "sensitive to human resources and employee relations."



Amazon recently posted two job listings for senior intelligence analysts charged with tracking "labor organizing threats," among other "sensitive topics."

The job listings drew widespread scrutiny from worker rights groups and other critics, including Stacy Mitchell, a co-director of the Institute for Local Self-Reliance, who has spoken out about Amazon's labor practices and testified in front of lawmakers last year about its market power.

[Stacy Mitchell tweet](#)

By the early afternoon, Amazon took down both job listings from its website. An Amazon spokesperson told CNBC in a statement: "The job post was not an accurate description of the role — it was made in



**New CDC data shows first-known omicron patient in U.S. had symptoms starting Nov. 15**



**New York Gov. Kathy Hochul imposes statewide mask mandate amid spread of omicron Covid variant**



**Peloton selloff continues as 'Sex and the City' reboot adds to exercise company's image issues**



**Instacart president Carolyn Everson announces departure just three months after she started**

Sponsored Links by Taboola

**FROM THE WEB**

**New York Check Out 5 Stocks To Watch As America...**
Zacks Investment Research

**Handmade in Switzerland: 24**

slow-watches.com

error and has since been corrected."

The spokesperson did not say what was incorrect about the job descriptions, which had been on Amazon's open jobs site for at least a few days.

Amazon's labor practices have been in focus before and during the coronavirus pandemic. Beginning in March, tensions developed between Amazon and warehouse workers, with employees claiming the company hasn't done enough to protect them from catching the coronavirus.

The company drew further criticism after, in April, it fired three employees who were outspoken critics of its labor practices. Amazon said it fired the employees after they violated internal policies.

Prior to the pandemic, it faced criticism from politicians and employees over a pay disparity between warehouse workers and corporate employees. Amazon later announced it would raise the minimum wage for all U.S. employees to $15. Last year, warehouse workers also held protests during Amazon's annual Prime Day shopping event to shed light on concerns around working conditions and wage practices.

Dania Rajendra, director of Athena, a labor and activist coalition, called the now-deleted job listings "disturbing" and said the positions are proof that Amazon is "targeting" workers for speaking out.

"This job description is proof that Amazon intends to

continue on this course," Rajendra said. "The public deserves to know whether Amazon will continue to fill these positions, even if they're no longer publicly posted."

Watch: <u>How Amazon fends off unions as more workers hold protests</u>



**VIDEO**   19:16

## How Amazon fends off unions as labor rights groups rally workers to protest

### Power Lunch

UP NEXT | **Closing Bell** 3:00 PM ET



WATCH LIVE

Amazon has been hiring spies for years, job postings data shows | The Business of Business                                  12/16/21, 2:31 PM

# CP Exhibit 21



TECH

**B2** The Business of Business    TECHNOLOGY    MARKETS    INNOVATION    PEOPLE    FEATURES    VIDEOS    OUTCASTS

# Amazon has been hiring spies for years, job postings data shows

Over the years, job postings show a company increasingly determined to surveil its workforce and stop organized labor efforts.

 HENRY ENGLERT, JULIA GRAY                   9.8.20   9:30 AM

**DATASETS IN THIS ARTICLE —**

[Job Listings](#)

**Amazon ($NASDAQ:AMZN)**

Last week, [journalists were made aware](#) of troubling job postings on Amazon's website. One posting called for an "Intelligence Analyst" to work with Amazon's Global Intelligence Program, based just outside of Phoenix, Arizona.

"Analysts must be capable of engaging and informing L7+ ER Principals (attorney stakeholders) on sensitive

**RECOMMENDED**



**What the BadgerDAO theft can teach crypto investors about protecting themselves from hackers**

Amazon has been hiring spies for years, job postings data shows | The Business of Business        12/10/21, 2:31 PM



Job Listings Data



topics that are highly confidential, including labor organizing threats against the company, establish and track funding and activities connected to corporate campaigns (internal and external) against Amazon, and provide sophisticated analysis on these topics," the since-deleted listing read.

While working America struggles with the pandemic and increasing economic precarity, Amazon put out a notice that it was looking for someone to make things even tougher on its workforce.

Most people who pay attention to workers' rights issues are aware of this dynamic. Big companies make a point of spying on their workers as a means to neutralize union threats. However, what seems to have shocked the media on this occasion is how openly Amazon has admitted its goal.

OUTCASTS



**Are you a YouTuber, a TikToker, a musician or a writer? Here's why you're going to love Web3**

INNOVATION





**What is Riverside.fm — the video podcasting app used by Gary Vee, Hillary Clinton and Kara Swisher**

TECH



**China is trying to rein in Big Tech. Here are 5 things you need to know.**

TECH





Amazon has been hiring spies for years, job postings data shows | The Business of Business    12/10/21, 2:31 PM





**Here's what we know about Mastodon, the open-source software Trump is accused of plagiarizing**

INNOVATION



**Crypto created overnight millionaires this year — now they need to start thinking about the tax bill**

MARKETS

L7 refers to the seventh rung of Amazon's corporate ladder, on which Jeff Bezos is L12. ER stands for employee relations, Amazon's version of human resources. Thus, the job's stated purview is informing Amazon's mid-to-high level human resources management about union activity (among other things), so that such activity can be dealt with before it becomes a threat to the Big Tech giant's bottom line.

## Amazon's surveillance network

This public posting is the latest escalation in Amazon's spying campaign against its workers. Already this week, multiple stories broke about Amazon snooping on their staff members' social media pages. According to Vice, the company has been using a monitoring tool to compile reports on drivers' online posts. The

tool sorts posts into categories, such as complaints about "poor working conditions," links to negative media coverage, or hints of "any strike or protest against Amazon."

This strategy went into practice as Amazon warehouse workers and delivery drivers all over the world organized to improve working conditions under COVID. Over the last few months, strikes and protests against Amazon have broken out in Spain, Italy, California, Minnesota, Illinois, and New York. In response, the company has fired at least five workers for organizing and attempted to shut down a virtual event meant for warehouse workers to air their grievances.

But who exactly is carrying out this spying operation? The recent job posting gives us a keyhole view.

The post gestures to an extensive network, an organization made up of analysts, lawyers, L7+ employee resources managers, L6-10 "stakeholders" (managers, directors, and strategic partners), and low-level "loss prevention" workers (security guards). Many of them report in some way to a Global Security Operations (GSO) or Global Intelligence Program (GIP). This operation's growth is reflected in Amazon's growing number of job titles with "GSO" or "GIP" in the description.

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 211 of 280 PageID #: 4721

### GSO and GIP Amazon Job Postings





Source: Thinknum Alternative Data

In 2018, there were only seven job openings featuring the terms "GSO" or "GIP." That figure has ballooned to **46** at the time of writing. This only accounts for Amazon's actual online postings, and it should be assumed many more people fill such posts each time they are announced. Additionally, these job figures do not account for the team of Amazon engineers who have recently "integrated security cameras with sophisticated artificial intelligence" to monitor and track employee movements. Video surveillance, anti-union messaging, and internal corporate espionage are all being expanded. Top this all off with demeaning physical spot checks at the end of each day, where "loss prevention" coordinators search warehouse employees to make sure they aren't stealing goods, an invasive process that often prolongs the workday.

An August report by Open Markets claimed that "veterans of the security industry are astonished by the extent of Amazon's practices. One retail security veteran

stated he had 'never heard of anything' quite like Amazon's practices." That veteran clearly hasn't done his research on the security practices of 19th century robber barons. Amazon's process is strikingly similar to how mining companies hired Pinkertons and goon squads to surveil workers, forcing miners to shower out in the open and submit to invasive searches to prevent them from stealing pieces of gold or promoting labor-friendly messaging.

Crucially, the Pinkertons didn't have the use of computers. They could have only dreamed of the tech Amazon is putting into practice against its workers. We should remember that, among other monitoring techniques,  Whole Foods has built a 'heat map' tool specifically for tracking unionization threats, as Business Insider reported in April. Amazon, having already revolutionized workplace surveillance, continues to grow its network in all manner of ways.

## The history of the Amazon "Intelligence Analyst"

Thinknum's job postings dataset, which catalogs old job postings even after they are taken down or edited, provides some interesting context for the Intelligence Analyst position. Our records show that the first time an explicitly anti-labor job posting appeared was in March 2020. The position description references the threat of "organized labor," "activist groups," and "hostile political leaders." Of course, this coincides with widespread COVID-19 panic, as businesses were coming to terms with lockdown measures. At this crucial time, Amazon was looking to curtail its union threats through intelligence.

Another 2020 job posting for a "Senior Intelligence Analyst" called for an individual to "compile and provide assessments for use in court filings, up to and including restraining orders against activist groups." While Amazon removed the posting this week and claimed it went against their standards, it has been up for months. Of course, Amazon's real issue with the posting was the media backlash it provoked.

Other job listings, dating back to at least 2018, make reference to "hostile political leaders." This almost surely refers to domestic leaders, as politicians like Senator Bernie Sanders, who in 2018 bullied Amazon into paying workers a minimum of $15 an hour, loom large in Amazon's collective conscience.

*"The Intelligence Analyst (Watch Officer) role will support Amazon's operational customers and leadership through providing 24×7 by 365 geopolitical analysis and contextualization of potential impact to Amazon's operations." - 2019 Amazon Job Posting*

An interesting difference: In 2018 and 2019, the critical

phrase "Watch Officer" appears in multiple "Intelligence Analyst" listings. This can clue us in onto what type of work intelligent analysts have been doing, and what fields they are being recruited from.

Watch Officer is a term common in the US intelligence community, referring to an agent that gathers and reports information about the activities of domestic groups and the governments of foreign countries to protect the interests and security of the United States. Amazon's use of this spook terminology makes sense, given that big companies like Amazon (and Google and Coca Cola and Walmart) tend to hire government-trained agents for their corporate intelligence roles. It's an open call for people who worked with the FBI (which has put AWS in charge of three data centers and is piloting Amazon's Rekognition facial matching program), the CIA (which has contracted Amazon to build secure cloud storage), US Army Intelligence, and other intelligence organizations to use their skills against Amazon workers.

Amazon dropped "Watch Officer" from its wording in early 2020, perhaps realizing the connotation. But to see how intertwined Amazon remains with government spies, you can simply scroll this list on LinkedIn and click any profile. Picking at random, we find a lead manager of Amazon's Global Security Operations Center named Nathan Nguyen. Nguyen's previous work experience was in the US Army as a Sr. Intelligence Analyst, where he was tasked to "mobilize, deploy, and support multiple government agencies in high-threat environments."

Appreciating these qualities, Amazon hired him way back in 2013. Among other things, Ngyuen claims to have used his Army experience to help design how

Amazon's GSO Center functioned.

## What's next?

While this increasingly hostile and government-sponsored work environment has drawn scrutiny from the National Labor Relations Board and other regulatory groups, the wheels of justice turn slowly. Cases are slowly reviewed, while Amazon continues to target its workers with an increasingly advanced operation.

Amazon will likely respond to this round of media outrage by cleaning up its language. As the company dropped "Watch Officer" from its lexicon, so will it find defter ways to bring more intelligence analysts into the fold and build out spying operations. Sometimes a different title makes all the difference to the media, but that doesn't change the fact that Amazon has been employing spies for years.

Bezos has committed a barbarous amount of time and money to surveillance efforts, directing resources to tech-assisted, government-trained union busting. Based on the costs of that investment, he obviously thinks this is a fight he will win.

Workers' advocacy organizations have been sounding the alarm for years, and should continue to do so. Athena, a coalition of groups that organize against Amazon's excesses, denounced the practices in a statement:

"Let's not wait to see how Amazon will attempt to subvert our democracy next. Public officials must start reining in Amazon's power now. And since Monday is Labor Day, let's remember that Pinkertons and 'goon

Case 1:22-cv-01479-DG-SJB   Document 5-13   Filed 03/17/22   Page 216 of 280 PageID #: 4726

squads' didn't stop communities around coal mines or auto plants or sugar plantations from organizing for real democracy in past centuries - and these 'intelligence analysts' won't stop us now."

*Amazon did not immediately respond to requests for comment.*

**About the Data:**

Thinknum tracks companies using the information they post online, jobs, social and web traffic, product sales, and app ratings, and creates data sets that measure factors like hiring, revenue, and foot traffic. Data sets may not be fully comprehensive (they only account for what is available on the web), but they can be used to gauge performance factors like staffing and sales.

FOLLOW JULIA GRAY ON TWITTER LINHEDIN

# SIGN UP FOR OUR NEWSLETTER

Start your day off with our weekly digest.

Email*

# Respondent's 4/30/21 Production

| Bates Number | Responsive Paragraph |
|---|---|
| AMZ-BRY000001 - AMZ-BRY000007 | WITHHELD |
| AMZ-BRY000008 - AMZ-BRY000034 | 9(a), 11(a) |
| AMZ-BRY000035 | 9(a) and 9(b) |
| AMZ-BRY000036 | 8, 9(a) |
| AMZ-BRY000037 - AMZ-BRY000042 | 7, 9(a) and (b) |
| AMZ-BRY000043 | 9(b) |
| AMZ-BRY000044 - AMZ-BRY000045 | 9(b) |
| AMZ-BRY000046 - AMZ-BRY000074 | 7, 9(a) and (b) |
| AMZ-BRY000075 | 8, 9(a) |
| AMZ-BRY000076 | 8, 9(a) |
| AMZ-BRY000077 | 9(a) |
| AMZ-BRY000078 - AMZ-BRY000080 | 7, 9(a) and (b) |
| AMZ-BRY000081 | 8, 9(a) |
| AMZ-BRY000082 - AMZ-BRY000086 | 8, 9(a) |
| AMZ-BRY000087 - AMZ-BRY000091 | 8, 9(b) |
| AMZ-BRY000092 | 9(b) |
| AMZ-BRY000093 - AMZ-BRY000096 | 9(b) |
| AMZ-BRY000097 - AMZ-BRY000100 | 9(a) |
| AMZ-BRY000101 - AMZ-BRY000119 | 7, 9(a) and (b) |
| AMZ-BRY000120 | 9(b) |
| AMZ-BRY000121 - AMZ-BRY000122 | 9(b) |
| AMZ-BRY000123 - AMZ-BRY000127 | 7, 9(a) and (b) |
| AMZ-BRY000128 | 8, 9(b) |
| AMZ-BRY000129 | 9(b) |
| AMZ-BRY000130 | 9(b) |
| AMZ-BRY000131 | 9(b) |
| AMZ-BRY000132 | 9(a), 11(a) |
| AMZ-BRY000133 - AMZ-BRY000135 | 9(b) |
| AMZ-BRY000136 | 8, 9(b) |
| AMZ-BRY000137 - AMZ-BRY000141 | 9(a) and 9(b) |
| AMZ-BRY000142 | 8, 9(a) |
| AMZ-BRY000143 | 9(b) |
| AMZ-BRY000144 | 8, 9(b) |
| AMZ-BRY000145 | 8, 9(b) |
| AMZ-BRY000146 | 8, 9(b) |
| AMZ-BRY000147 | 8, 9(a) |
| AMZ-BRY000148 - AMZ-BRY000164 | 9(b), 11(b) |
| AMZ-BRY000165 | 9(b) |
| AMZ-BRY000166 - AMZ-BRY000168 | 9(b) |
| AMZ-BRY000169 | WITHHELD |
| AMZ-BRY000170 - AMZ-BRY000171 | WITHHELD |
| AMZ-BRY000172 | WITHHELD |
| AMZ-BRY000173 | WITHHELD |
| AMZ-BRY000174 | WITHHELD |
| AMZ-BRY000175 | WITHHELD |
| AMZ-BRY000176 - AMZ-BRY000177 | WITHHELD |

CP 22

| AMZ-BRY000178 | WITHHELD |
|---|---|
| AMZ-BRY000179 - AMZ-BRY000181 | WITHHELD |
| AMZ-BRY000182 - AMZ-BRY000183 | WITHHELD |
| AMZ-BRY000184 | WITHHELD |
| AMZ-BRY000185 | WITHHELD |
| AMZ-BRY000186 | WITHHELD |
| AMZ-BRY000187 | WITHHELD |
| AMZ-BRY000188 - AMZ-BRY000197 | 13(d) |
| AMZ-BRY000198 - AMZ-BRY000213 | 16 |
| AMZ-BRY000214 - AMZ-BRY000215 | WITHHELD |
| AMZ-BRY000216 - AMZ-BRY000243 | WITHHELD |
| AMZ-BRY000244 - AMZ-BRY000264 | 16 |
| AMZ-BRY000265 - AMZ-BRY000327 | 16 |
| AMZ-BRY000328 - AMZ-BRY000415 | 17 |
| AMZ-BRY000416 - AMZ-BRY000461 | 16 |
| AMZ-BRY000462 - AMZ-BRY000481 | 16 |
| AMZ-BRY000482 - AMZ-BRY000500 | 16 |
| AMZ-BRY000501 - AMZ-BRY000530 | 16 |
| AMZ-BRY000531 - AMZ-BRY000551 | 16 |
| AMZ-BRY000552 - AMZ-BRY000569 | 16 |
| AMZ-BRY000570 - AMZ-BRY000611 | 16 |
| AMZ-BRY000612 - AMZ-BRY000634 | 16 |
| AMZ-BRY000635 - AMZ-BRY000739 | 16 |
| AMZ-BRY000740 - AMZ-BRY000751 | 16 |
| AMZ-BRY000752 - AMZ-BRY000782 | 16 |
| AMZ-BRY000783 - AMZBRY000796 | 16 |
| AMZ-BRY000797 - AMZ-BRY000817 | 16 |
| AMZ-BRY000818 - AMZ-BRY000843 | 16 |
| AMZ-BRY000844 - AMZ-BRY000862 | 16 |
| AMZ-BRY000863 - AMZ-BRY000904 | 16 |
| AMZ-BRY000905 - AMZ-BRY000929 | 16 |
| AMZ-BRY000930 - AMZ-BRY000951 | 16 |
| AMZ-BRY000952 - AMZ-BRY000973 | 16 |
| AM-BRY000974 - AMZ-BRY000998 | 16 |
| AMZ-BRY000999 - AMZ-BRY001036 | 16 |
| AMZ-BRY001037 - AMZ-BRY001076 | 16 |
| AMZ-BRY001077 - AMZ-BRY001093 | 16 |
| AMZ-BRY001094 - AMZ-BRY001108 | 16 |
| AMZ-BRY001109 - AMZ-BRY001143 | 16 |
| AMZ-BRY001144 - AMZ-BRY001201 | 16 |
| AMZ-BRY001202 - AMZ-BRY001214 | 16 |
| AMZ-BRY001215 - AMZ-BRY001226 | 16 |
| AMZ-BRY001227 - AMZ-BRY001242 | 16 |
| AMZ-BRY001243 - AMZ-BRY001260 | 16 |
| AMZ-BRY001261 - AMZ-BRY001272 | 16 |
| AMZ-BRY001273 - AMZ-BRY001307 | 16 |
| AMZ-BRY001308 | WITHHELD |

CONFIDENTIAL

CP 22

| | |
|---|---|
| AMZ-BRY001309 | WITHHELD |
| AMZ-BRY001310 | WITHHELD |
| AMZ-BRY001311 - AMZ-BRY001312 | WITHHELD |
| AMZ-BRY001313 - AMZ-BRY001316 | WITHHELD |
| AMZ-BRY001317 - AMZ-BRY001321 | WITHHELD |
| AMZ-BRY001322 - AMZ-BRY001323 | WITHHELD |
| AMZ-BRY001324 - AMZ-BRY001335 | WITHHELD |
| AMZ-BRY001336 - AMZ-BRY001338 | WITHHELD |
| AMZ-BRY001339 - AMZ-BRY001341 | WITHHELD |
| AMZ-BRY001342 - AMZ-BRY001343 | WITHHELD |
| AMZ-BRY001344 | WITHHELD |
| AMZ-BRY001345 | WITHHELD |
| AMZ-BRY001346 - AMZ-BRY001348 | WITHHELD |
| AMZ-BRY001349 | WITHHELD |
| AMZ-BRY001350 | WITHHELD |
| AMZ-BRY001351 - AMZ-BRY001352 | WITHHELD |
| AMZ-BRY001353 | WITHHELD |
| AMZ-BRY001354 | WITHHELD |
| AMZ-BRY001355 - AMZ-BRY001356 | WITHHELD |
| AMZ-BRY001357 - AMZ-BRY001358 | WITHHELD |
| AMZ-BRY001359 | WITHHELD |
| AMZ-BRY001360 | WITHHELD |
| AMZ-BRY001361 | WITHHELD |
| AMZ-BRY001362 | WITHHELD |
| AMZ-BRY001363 | WITHHELD |
| AMZ-BRY001364 | WITHHELD |
| AMZ-BRY001365 | WITHHELD |
| AMZ-BRY001366 - AMZ-BRY001367 | WITHHELD |
| AMZ-BRY001368 - AMZ-BRY001369 | WITHHELD |
| AMZ-BRY001370 - AMZ-BRY001372 | WITHHELD |
| AMZ-BRY001373 | WITHHELD |
| AMZ-BRY001374 | WITHHELD |
| AMZ-BRY001375 | WITHHELD |
| AMZ-BRY001376 | WITHHELD |
| AMZ-BRY001377 - AMZ-BRY001379 | WITHHELD |
| AMZ-BRY001380 - AMZ-BRY001383 | WITHHELD |
| AMZ-BRY001384 | 17 |
| AMZ-BRY001385 | 17 |
| AMZ-BRY001386 | 17 |
| AMZ-BRY001387 | WITHHELD |
| AMZ-BRY001388 | WITHHELD |
| AMZ-BRY001389 | 17 |
| AMZ-BRY001390 - AMZ-BRY001393 | 13(d) |
| AMZ-BRY001394 - AMZ-BRY001395 | 13(d) |
| AMZ-BRY001396 - AMZ-BRY001397 | 13(d) |
| AMZ-BRY001398 - AMZ-BRY001430 | 13(d) |
| AMZ-BRY001431 - AMZ-BRY001457 | 13(d) |

CP 22

| | |
|---|---|
| AMZ-BRY001458 - AMZ-BRY001461 | 13(d) |
| AMZ-BRY001462 - AMZ-BRY001467 | 13(d) |
| AMZ-BRY001468 - AMZ-BRY001469 | 13(d) |
| | |
| | |
| | |
| | |



# Respondent's 5/2/21 Production

| Bates Number | Responsive Paragraph |
|---|---|
| AMZ-BRY001470 - AMZ-BRY001511 | 16 (EWR4) |
| AMZ-BRY001512 - AMZ-BRY001530 | 16 (EWR4) |
| AMZ-BRY001531 - AMZ-BRY001537 | 16 (EWR4) |
| AMZ-BRY001538 - AMZ-BRY001596 | 16 (EWR4) |
| AMZ-BRY001597 - AMZ-BRY001620 | 16 (EWR4) |
| AMZ-BRY001621 - AMZ-BRY001674 | 16 (EWR4) |
| AMZ-BRY001675 - AMZ-BRY001712 | 16 (EWR4) |
| AMZ-BRY001713 - AMZ-BRY001800 | 16 (EWR4) |
| AMZ-BRY001801 - AMZ-BRY001836 | 16 (EWR4) |
| AMZ-BRY001837 - AMZ-BRY001922 | 16 (EWR4) |
| AMZ-BRY001923 | WITHHELD |
| AMZ-BRY001924 | WITHHELD |
| AMZ-BRY001925 | WITHHELD |
| AMZ-BRY001926 | WITHHELD |
| AMZ-BRY001927 | WITHHELD |
| AMZ-BRY001928 | WITHHELD |
| AMZ-BRY001929 - AMZ-BRY001943 | 16 (EWR4) |
| AMZ-BRY001944 - AMZ-BRY002031 | 16 (EWR4) |
| AMZ-BRY002032 - AMZ-BRY002045 | 16 (EWR4) |
| AMZ-BRY002046 - AMZ-BRY002101 | 16 (EWR4) |
| AMZ-BRY002102 - AMZ-BRY002185 | 16 (EWR4) |
| AMZ-BRY002186 - AMZ-BRY002199 | 16 (EWR4) |
| AMZ-BRY002200 - AMZ-BRY002219 | 16 (EWR4) |
| AMZ-BRY002220 - AMZ-BRY002317 | 16 (EWR4) |
| AMZ-BRY002318 - AMZ-BRY002339 | 16 (EWR4) |
| AMZ-BRY002340 - AMZ-BRY002447 | 16 (EWR4) |
| AMZ-BRY002448 - AMZ-BRY002501 | 16 (EWR4) |
| AMZ-BRY002502 - AMZ-BRY002523 | 16 (EWR4) |
| AMZ-BRY002524 - AMZ-BRY002548 | 16 (EWR4) |
| AMZ-BRY002549 - AMZ-BRY002573 | 16 (EWR4) |
| AMZ-BRY002574 - AMZ-BRY002595 | 16 (EWR4) |
| AMZ-BRY002596 - AMZ-BRY002609 | 16 (EWR4) |
| AMZ-BRY002610 - AMZ-BRY002661 | 16 (EWR4) |
| AMZ-BRY002662 - AMZ-BRY002705 | 16 (EWR4) |
| AMZ-BRY002706 - AMZ-BRY002759 | 16 (EWR4) |
| AMZ-BRY002760 - AMZ-BRY002859 | 16 (EWR4) |
| AMZ-BRY002860 - AMZ-BRY002905 | 16 (EWR4) |
| AMZ-BRY002906 - AMZ-BRY002957 | 16 (EWR4) |
| AMZ-BRY002958 - AMZ-BRY003016 | 16 (EWR4) |
| AMZ-BRY003017 - AMZ-BRY003024 | 16 (EWR4) |
| AMZ-BRY003025 - AMZ-BRY003104 | 16 (EWR4) |
| AMZ-BRY003105 - AMZ-BRY003182 | 16 (EWR4) |
| AMZ-BRY003183 - AMZ-BRY003228 | 16 (EWR4) |
| AMZ-BRY003229 - AMZ-BRY003301 | 16 (EWR4) |
| AMZ-BRY003302 - AMZ-BRY003463 | 16 (EWR4) |
| AMZ-BRY003465 - AMZ-BRY003609 | 16 (EWR4) |

**CONFIDENTIAL**

| | |
|---|---|
| AMZ-BRY003610 - AMZ-BRY003611 | 16 (BDL3) |
| AMZ-BRY003612 - AMZ-BRY003614 | 16 (BDL3) |
| AMZ-BRY003615 - AMZ-BRY003629 | 16 (BDL3) |
| AMZ-BRY003630 - AMZ-BRY003650 | 16 (BDL3) |
| AMZ-BRY003651 - AMZ-BRY003659 | 16 (BDL3) |
| AMZ-BRY003660 - AMZ-BRY003678 | 16 (BDL3) |
| AMZ-BRY003679 - AMZ-BRY003683 | 16 (BDL3) |
| AMZ-BRY003864 - AMZ-BRY003687 | 16 (BDL3) |

**CONFIDENTIAL**

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**CONFIDENTIAL**

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**CONFIDENTIAL**

|  |  |
|--|--|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

# Respondent's 5/3/21 Production

| Bates Number | Responsive Paragraph |
|---|---|
| AMZ-BRY003688 - AMZ-BRY003699 | 16 (BDL3) |
| AMZ-BRY003700 - AMZ-BRY003701 | 16 (BDL3) |
| AMZ-BRY003702 - AMZ-BRY003712 | 16 (BDL3) |
| AMZ-BRY003713 - AMZ-BRY003723 | 16 (BDL3) |
| AMZ-BRY003724 - AMZ-BRY003733 | 16 (BDL3) |
| AMZ-BRY003734 - AMZ-BRY003749 | 16 (BDL3) |
| AMZ-BRY003750 - AMZ-BRY003763 | 16 (BDL3) |
| AMZ-BRY003764 - AMZ-BRY003768 | 16 (BDL3) |
| AMZ-BRY003769 - AMZ-BRY003775 | 16 (BDL3) |
| AMZ-BRY003776 - AMZ-BRY003795 | 16 (BDL3) |
| AMZ-BRY003796 - AMZ-BRY003801 | 16 (BDL3) |
| AMZ-BRY003802 - AMZ-BRY003804 | 16 (BDL3) |
| AMZ-BRY003805 - AMZ-BRY003820 | 16 (BDL3) |
| AMZ-BRY003821 - AMZ-BRY003829 | 16 (BDL3) |
| AMZ-BRY003830 - AMZ-BRY003834 | 16 (BDL3) |
| AMZ-BRY003835 - AMZ-BRY003851 | 16 (BDL3) |
| AMZ-BRY003852 - AMZ-BRY003870 | 16 (EWR4) |
| AMZ-BRY003871 - AMZ-BRY003878 | 16 (EWR4) |
| AMZ-BRY003879 - AMZ-BRY003922 | 16 (EWR4) |
| AMZ-BRY003923 - AMZ-BRY003956 | 16 (EWR4) |
| AMZ-BRY003957 - AMZ-BRY004030 | 16 (EWR4) |
| AMZ-BRY004031 - AMZ-BRY004055 | 16 (EWR4) |
| AMZ-BRY004056 - AMZ-BRY004063 | 16 (EWR4) |
| AMZ-BRY004064 - AMZ-BRY004142 | 9(c), 11(c) |
| AMZ-BRY004143 - AMZ-BRY004175 | 9(d), 11(d) |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CP 22

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CP 22

CP 22

CP 22

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CP 22

| Bates Number | Responsive Paragraph |
|---|---|
| AMZ-BRY000001 - AMZ-BRY000007 | 1 |
| AMZ-BRY000169 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY000170 - AMZ-BRY000171 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY000172 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY000173 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY000174 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY000175 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY000176 - AMZ-BRY000177 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY000178 | 10, 12(a), 13(d) |
| AMZ-BRY000179 - AMZ-BRY000181 | 12(a) |
| AMZ-BRY000182 - AMZ-BRY000183 | 12(a) |
| AMZ-BRY000184 | 12(a), 14(a) |
| AMZ-BRY000185 | 12(a), (b), 13(b), (d) (e) |
| AMZ-BRY000186 | 12(a), (b), 13(b), (d) (e) |
| AMZ-BRY000187 | 12(a), (b), 13(b), (d) (e), 15(a) |
| AMZ-BRY000214 - AMZ-BRY000215 | 1 |
| AMZ-BRY000216 - AMZ-BRY000243 | 7 |
| AMZ-BRY001308 | 14(a) |
| AMZ-BRY001309 | WITHHELD |
| AMZ-BRY001310 | 12(a), (b) |
| AMZ-BRY001311 - AMZ-BRY001312 | 18 |
| AMZ-BRY001313 - AMZ-BRY001316 | 18 |
| AMZ-BRY001317 - AMZ-BRY001321 | 18 |
| AMZ-BRY001322 - AMZ-BRY001323 | 18 |
| AMZ-BRY001324 - AMZ-BRY001335 | 18 |
| AMZ-BRY001336 - AMZ-BRY001338 | 18 |
| AMZ-BRY001339 - AMZ-BRY001341 | 12(a) |
| AMZ-BRY001342 - AMZ-BRY001343 | 10, 12(a), 13(d) |
| AMZ-BRY001344 | 13(b), (d) |
| AMZ-BRY001345 | 11(a) |
| AMZ-BRY001346 - AMZ-BRY001348 | 12(b) |
| AMZ-BRY001349 | 10, 12(b), 13(d), (e) |
| AMZ-BRY001350 | 11(a) |
| AMZ-BRY001351 - AMZ-BRY001352 | 11(a) |
| AMZ-BRY001353 | 10, 12(a), (b) |
| AMZ-BRY001354 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001355 - AMZ-BRY001356 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001357 - AMZ-BRY001358 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001359 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001360 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001361 | 10, 12(a), (b) |
| AMZ-BRY001362 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001363 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001364 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001365 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001366 - AMZ-BRY001367 | 10, 12(a), (b), 13(b), (d), (e) |

| | |
|---|---|
| AMZ-BRY001368 - AMZ-BRY001369 | 10, 12(a), (b), 13(b), (d), (e) |
| AMZ-BRY001370 - AMZ-BRY001372 | 12(a), (b) |
| AMZ-BRY001373 | 10, 12(b), 13(d), (e) |
| AMZ-BRY001374 | WITHHELD |
| AMZ-BRY001375 | 11(a) |
| AMZ-BRY001376 | 11(a) |
| AMZ-BRY001377 - AMZ-BRY001379 | 11(a) |
| AMZ-BRY001380 - AMZ-BRY001383 | 11(a) |
| AMZ-BRY001387 | 15(a), (b) |
| AMZ-BRY001388 | 15(a), (b) |

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 4, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:     Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates Stamp number "AMZ-BRY004064" through "AMZ-BRY005525," which are being produced in response to the Counsel for the Acting General Counsel's subpoena *duces tecum*.  **Please note**, we are withdrawing the documents previously produced on May 3, 2021, Bates stamped AMZ-BRY004064 – AMZ-BRY004142 and AMZ-BRY004143 – AMZ-BRY004175, and replacing them with documents Bates stamped AMZ-BRY005414 – AMZ-BRY005492 and AMZ-BRY005493 – AMZ-BRY005525, respectively.  The replacements are identical in nature, just with updated Bates stamps. Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

- **Paragraphs 9(c), 11(c)**
  - AMZ-BRY005414 – AMZ-BRY005492
- **Paragraphs 9(d), 11(d)**
  - AMZ-BRY005493 – AMZ-BRY005525
- **Paragraph 16 (EWR4):**
  - AMZ-BRY004498 - AMZ-BRY004627
  - AMZ-BRY004628 - AMZ-BRY004719
  - AMZ-BRY004720 - AMZ-BRY004812
  - AMZ-BRY004813 - AMZ-BRY004978
  - AMZ-BRY004979 - AMZ-BRY005050
  - AMZ-BRY005051 - AMZ-BRY005076
  - AMZ-BRY005077 - AMZ-BRY005110
  - AMZ-BRY005111 - AMZ-BRY005210
  - AMZ-BRY005211 - AMZ-BRY005318
  - AMZ-BRY005319 - AMZ-BRY005320
  - AMZ-BRY005321 - AMZ-BRY005391
  - AMZ-BRY005392 - AMZ-BRY005042
  - AMZ-BRY005403 - AMZ-BRY005413

**Morgan, Lewis & Bockius** LLP

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States

**T** +1.202.739.3000
**F** +1.202.739.3001

CP 22

May 4, 2021
Page 2

- **Paragraph 17 (JFK8)**
    o AMZ-BRY004064 - AMZ-BRY004093
    o AMZ-BRY004094 - AMZ-BRY004097
    o AMZ-BRY004098 - AMZ-BRY004107
    o AMZ-BRY004108 - AMZ-BRY004115
    o AMZ-BRY004116 - AMZ-BRY004125
    o AMZ-BRY004126 - AMZ-BRY004134
    o AMZ-BRY004135 - AMZ-BRY004145
    o AMZ-BRY004146 - AMZ-BRY004147
    o AMZ-BRY004158 - AMZ-BRY004166
    o AMZ-BRY004167 - AMZ-BRY004172
    o AMZ-BRY004173 - AMZ-BRY004174
    o AMZ-BRY004175 - AMZ-BRY004201
    o AMZ-BRY004202 - AMZ-BRY004203
    o AMZ-BRY004204 - AMZ-BRY004205
    o AMZ-BRY004206 - AMZ-BRY004229
    o AMZ-BRY004230 - AMZ-BRY004232
    o AMZ-BRY004233 - AMZ-BRY004244
    o AMZ-BRY004245 - AMZ-BRY004249
    o AMZ-BRY004250 - AMZ-BRY004254
    o AMZ-BRY004255 - AMZ-BRY004260
    o AMZ-BRY004261 - AMZ-BRY004265
    o AMZ-BRY004266 - AMZ-BRY004270
    o AMZ-BRY004271 - AMZ-BRY004275
    o AMZ-BRY004276 - AMZ-BRY004277
    o AMZ-BRY004278 - AMZ-BRY004281
    o AMZ-BRY004282 - AMZ-BRY004285
    o AMZ-BRY004286 - AMZ-BRY004294
    o AMZ-BRY004295 - AMZ-BRY004305
    o AMZ-BRY004306 - AMZ-BRY004307
    o AMZ-BRY004308 - AMZ-BRY004314
    o AMZ-BRY004315 - AMZ-BRY004333
    o AMZ-BRY004334
    o AMZ-BRY004335 - AMZ-BRY004341
    o AMZ-BRY004342 - AMZ-BRY004346
    o AMZ-BRY004347 - AMZ-BRY004350
    o AMZ-BRY004351 - AMZ-BRY004360
    o AMZ-BRY004361 - AMZ-BRY004362
    o AMZ-BRY004363 - AMZ-BRY004366
    o AMZ-BRY004367 - AMZ-BRY004378
    o AMZ-BRY004379 - AMZ-BRY004382
    o AMZ-BRY004383 - AMZ-BRY004390
    o AMZ-BRY004391 - AMZ-BRY004414
    o AMZ-BRY004415 - AMZ-BRY004431
    o AMZ-BRY004432 - AMZ-BRY004440
    o AMZ-BRY004441 - AMZ-BRY004448
    o AMZ-BRY004449 - AMZ-BRY004467
    o AMZ-BRY004468 - AMZ-BRY004469
    o AMZ-BRY004470 - AMZ-BRY004471
    o AMZ-BRY004472 - AMZ-BRY004487
    o AMZ-BRY004488 - AMZ-BRY004495

CP 22

May 4, 2021
Page 3

- o   AMZ-BRY004496 - AMZ-BRY004497

Please contact me should you have any questions.
Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 5, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:      Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates Stamp number "AMZ-BRY005581" through "AMZ-BRY005993," which are being produced in response to the Counsel for the Acting General Counsel's subpoena *duces tecum*. Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

- **Paragraphs 9(c)**
  - o   AMZ-BRY005581 - AMZ-BRY005794
- **Paragraphs 9(d)**
  - o   AMZ-BRY005795 - AMZ-BRY005993

Please contact me should you have any questions.
Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

**Morgan, Lewis & Bockius** LLP

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States

**T** +1.202.739.3000
**F** +1.202.739.3001

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 7, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:     Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates Stamp number "AMZ-BRY006593" through "AMZ-BRY006842," which are being produced in response to the Charging Party's subpoena *duces tecum* B-1-1C9GVF7. Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

- **Paragraph 18 (JFK8)**
  - AMZ-BRY006593 - AMZ-BRY006596
  - AMZ-BRY006597 - AMZ-BRY006602
  - AMZ-BRY006603
  - AMZ-BRY006604 - AMZ-BRY006607
  - AMZ-BRY006608 - AMZ-BRY006648
  - AMZ-BRY006649 - AMZ-BRY006667
  - AMZ-BRY006668 - AMZ-BRY006676
  - AMZ-BRY006677 - AMZ-BRY006686
  - AMZ-BRY006687 - AMZ-BRY006690
  - AMZ-BRY006691 - AMZ-BRY006711
  - AMZ-BRY006712 - AMZ-BRY006717
  - AMZ-BRY006718 - AMZ-BRY006734
  - AMZ-BRY006735
  - AMZ-BRY006736 - AMZ-BRY006783
  - AMZ-BRY006784 - AMZ-BRY006811
  - AMZ-BRY006812 - AMZ-BRY006822
  - AMZ-BRY006823 - AMZ-BRY006842

Please contact me should you have any questions.
Sincerely,

**Morgan, Lewis & Bockius** LLP

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States

**T** +1.202.739.3000
**F** +1.202.739.3001

CP 22

May 7, 2021
Page 2

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 8, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:     Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates Stamp number "AMZ-BRY006916" through "AMZ-BRY007721," which are being produced in response to the Charging Party's subpoena *duces tecum* B-1-1C9GVF7. Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

- **Paragraph 18 (BDL3)**
  - AMZ-BRY006916 - AMZ-BRY006935
  - AMZ-BRY006936 - AMZ-BRY006948
  - AMZ-BRY006949 - AMZ-BRY006955
  - AMZ-BRY006956 - AMZ-BRY007050
  - AMZ-BRY007051 - AMZ-BRY007091
  - AMZ-BRY007092 - AMZ-BRY007126
  - AMZ-BRY007127 - AMZ-BRY007146
  - AMZ-BRY007147 - AMZ-BRY007163
  - AMZ-BRY007164 - AMZ-BRY007199
  - AMZ-BRY007200 - AMZ-BRY007260
  - AMZ-BRY007261 - AMZ-BRY007287
  - AMZ-BRY007288 - AMZ-BRY007299
  - AMZ-BRY007300 - AMZ-BRY007333
  - AMZ-BRY007334 - AMZ-BRY007385
  - AMZ-BRY007386 - AMZ-BRY007437
  - AMZ-BRY007438 - AMZ-BRY007489
  - AMZ-BRY007499 - AMZ-BRY007503
  - AMZ-BRY007504 - AMZ-BRY007545
  - AMZ-BRY007546 - AMZ-BRY007565
  - AMZ-BRY007566 - AMZ-BRY007577

**Morgan, Lewis & Bockius** LLP

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States

**T** +1.202.739.3000
**F** +1.202.739.3001

CP 22

May 8, 2021
Page 2

- **Paragraph 18 (EWR4)**
  - AMZ-BRY007578 - AMZ-BRY007579
  - AMZ-BRY007580 - AMZ-BRY007583
  - AMZ-BRY007584 - AMZ-BRY007589
  - AMZ-BRY007590 - AMZ-BRY007594
  - AMZ-BRY007595 - AMZ-BRY007600
  - AMZ-BRY007601 - AMZ-BRY007620
  - AMZ-BRY007621 - AMZ-BRY007622
  - AMZ-BRY007623 - AMZ-BRY007642
  - AMZ-BRY007643 - AMZ-BRY007644
  - AMZ-BRY007645 - AMZ-BRY007666
  - AMZ-BRY007667 - AMZ-BRY007674
  - AMZ-BRY007675 - AMZ-BRY007677
  - AMZ-BRY007678
  - AMZ-BRY007679 - AMZ-BRY007686
  - AMZ-BRY007687 - AMZ-BRY007688
  - AMZ-BRY007689 - AMZ-BRY007693
  - AMZ-BRY007694 - AMZ-BRY007707
  - AMZ-BRY007708 - AMZ-BRY007721

Please contact me should you have any questions.
Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 9, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:     Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates Stamp number "AMZ-BRY007746" through "AMZ-BRY007971," which are being produced in response to the Charging Party's subpoena *duces tecum* B-1-1C9GVF7. Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

- **Paragraph 18 (EWR4)**
    - AMZ-BRY007746 - AMZ-BRY007749
    - AMZ-BRY007750 - AMZ-BRY007753
    - AMZ-BRY007754 - AMZ-BRY007758
    - AMZ-BRY007759 - AMZ-BRY007760
    - AMZ-BRY007761
    - AMZ-BRY007762 - AMZ-BRY007765
    - AMZ-BRY007766 - AMZ-BRY007771
    - AMZ-BRY007772 - AMZ-BRY007777
    - AMZ-BRY007778
    - AMZ-BRY007779 - AMZ-BRY007781
    - AMZ-BRY007782 - AMZ-BRY007785
    - AMZ-BRY007786 - AMZ-BRY007787
    - AMZ-BRY007788 - AMZ-BRY007794
    - AMZ-BRY007795
    - AMZ-BRY007796 - AMZ-BRY007799

- **Paragraph 18 (BDL3)**
    - AMZ-BRY007800 - AMZ-BRY007812
    - AMZ-BRY007813 - AMZ-BRY007825
    - AMZ-BRY007826 - AMZ-BRY007848
    - AMZ-BRY007849 - AMZ-BRY007868

**Morgan, Lewis & Bockius** LLP

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States          **T** +1.202.739.3000
                       **F** +1.202.739.3001

CP 22

May 9, 2021
Page 2

- **<u>Paragraph 18 (JFK8)</u>**
  - AMZ-BRY007869 - AMZ-BRY007942
  - AMZ-BRY007943 - AMZ-BRY007971

Please contact me should you have any questions.
Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 12, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:      Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates Stamp number "AMZ-BRY007973" through "AMZ-BRY008027," which are being produced in response to the Charging Party's subpoena *duces tecum* B-1-1C9GVF7.  Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

Additionally, the documents produced herewith, bearing Bates labels "AMZ-BRY000416" to "AMZ-BRY006592," have been designated "confidential" and should be treated accordingly.  These documents are being produced subject to the Board's April 27, 2021 Protective Order.  These documents are also exempt from mandatory disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. §§ 552(b)(4) and (b)(6), and disclosure is prohibited under 18 U.S.C. § 1905.

- **Paragraph 10 -** AMZ-BRY008008 - AMZ-BRY008009
- **Paragraph 11(a)** - AMZ-BRY008010
- **Paragraph 12 (a), (b)**
    - AMZ-BRY007973 - AMZ-BRY007974
    - AMZ-BRY008008 - AMZ-BRY008009
- **Paragraph 15** - AMZ-BRY008028 - AMZ-BRY008029
- **Paragraph 18**
    - AMZ-BRY008011 - AMZ-BRY008018
    - AMZ-BRY008019 - AMZ-BRY008025
- **Paragraph 19(b)**
    - AMZ-BRY007998
    - AMZ-BRY008025 - AMZ-BRY008026
    - AMZ-BRY008027
- **Paragraph 19(c)**
    - AMZ-BRY007975 - AMZ-BRY007976
    - AMZ-BRY007977 - AMZ-BRY007979

**Morgan, Lewis & Bockius** LLP

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States
**T** +1.202.739.3000
**F** +1.202.739.3001

CP 22

May 12, 2021
Page 2

- AMZ-BRY007998
- **Paragraph 19(d)**
  - AMZ-BRY007975 - AMZ-BRY007976
  - AMZ-BRY007977 - AMZ-BRY007979
  - AMZ-BRY007980 - AMZ-BRY007983
  - AMZ-BRY007984 - AMZ-BRY007987
  - AMZ-BRY007988 - AMZ-BRY007997
  - AMZ-BRY007999 - AMZ-BRY008001
  - AMZ-BRY008002 - AMZ-BRY008007

Please contact me should you have any questions.
Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 13, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:     Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates Stamp number "AMZ-BRY005548" through "AMZ-BRY005555," and "AMZ-BRY005559" through "AMZ-BRY005580," which are being produced in response to the Charging Party's subpoena *duces tecum* B-1-1C9GVF7.  Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

Additionally, the documents produced herewith, bearing Bates labels "AMZ-BRY007722" to "AMZ-BRY007745," have been designated "confidential" and should be treated accordingly.  These documents are being produced subject to the Board's April 27, 2021 Protective Order.  These documents are also exempt from mandatory disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. §§ 552(b)(4) and (b)(6), and disclosure is prohibited under 18 U.S.C. § 1905.

- **Paragraph 6**
  - AMZ-BRY005548 - AMZ-BRY005549
  - AMZ-BRY005552 - AMZ-BRY005553
  - AMZ-BRY005559 - AMZ-BRY005560
- **Paragraph 7**
  - AMZ-BRY005567
  - AMZ-BRY005568 - AMZ-BRY005574
  - AMZ-BRY005575 - AMZ-BRY005576
  - AMZ-BRY005577 - AMZ-BRY005580
- **Paragraph 21**
  - AMZ-BRY005550 - AMZ-BRY005551
  - AMZ-BRY005554 - AMZ-BRY005555
- **Paragraph 22**
  - AMZ-BRY005561 - AMZ-BRY005562
  - AMZ-BRY005563 - AMZ-BRY005564
  - AMZ-BRY005565 - AMZ-BRY005566

**Morgan, Lewis & Bockius** LLP

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States

**T** +1.202.739.3000
**F** +1.202.739.3001

CP 22

May 13, 2021
Page 2


Please contact me should you have any questions.
Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 13, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:     Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates Stamp number "AMZ-BRY008093" through "AMZ-BRY008097," which are being produced in response to the Charging Party's subpoena *duces tecum* B-1-1C9VF7.  Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

Additionally, the documents produced herewith, bearing Bates labels "AMZ-BRY008093" to "AMZ-BRY008097," have been designated "confidential" and should be treated accordingly.  These documents are being produced subject to the Board's April 27, 2021 Protective Order.  These documents are also exempt from mandatory disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. §§ 552(b)(4) and (b)(6), and disclosure is prohibited under 18 U.S.C. § 1905.

- **Paragraph 2**
    - AMZ-BRY008093
    - AMZ-BRY008094 - AMZ-BRY008097

Please contact me should you have any questions.
Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

**Morgan, Lewis & Bockius LLP**

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States

**T** +1.202.739.3000
**F** +1.202.739.3001

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 14, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:      Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates Stamp number "AMZ-BRY008098" through "AMZ-BRY008201," which are being produced in response to the Charging Party's subpoena *duces tecum* B-1-1C9GVF7.  Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

Additionally, the documents produced herewith, bearing Bates labels "AMZ-BRY008098" to "AMZ-BRY008184," have been designated "confidential" and should be treated accordingly.  These documents are being produced subject to the Board's April 27, 2021 Protective Order.  These documents are also exempt from mandatory disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. §§ 552(b)(4) and (b)(6), and disclosure is prohibited under 18 U.S.C. § 1905.

- **Paragraph 2**
    - AMZ-BRY008098 - AMZ-BRY008143
    - AMZ-BRY008144 - AMZ-BRY008184
- **Paragraph 6**
    - AMZ-BRY008098 - AMZ-BRY008143
    - AMZ-BRY008144 - AMZ-BRY008184
- **Paragraph 23**
    - AMZ-BRY008185 - AMZ-BRY008187
    - AMZ-BRY008188 - AMZ-BRY008191
    - AMZ-BRY008192 - AMZ-BRY008195
    - AMZ-BRY008196 - AMZ-BRY008197
    - AMZ-BRY008198 - AMZ-BRY008201

Please contact me should you have any questions.

**Morgan, Lewis & Bockius LLP**

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States

**T** +1.202.739.3000
**F** +1.202.739.3001

CP 22

May 14, 2021
Page 2

Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

May 24, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:     Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter.  This letter serves as a supplement to our May 20, 2021 production of documents bearing Bates Stamp number "AMZ-BRY008202" through "AMZ-BRY008752," which are being produced in response to the Counsel for the Acting General Counsel's subpoena *duces tecum* B-1-1BUGMIX and Charging Party's subpoena *duces tecum* -1-1C9GVF7.  Further, below is a listing that identifies the subpoena paragraph to which each produced document is responsive.

Additionally, the documents produced herewith, bearing Bates labels "AMZ-BRY008202" to "AMZ-BRY008216," have been designated "confidential" and should be treated accordingly.  These documents are being produced subject to the Board's April 27, 2021 Protective Order.  These documents are also exempt from mandatory disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. §§ 552(b)(4) and (b)(6), and disclosure is prohibited under 18 U.S.C. § 1905.

- **Paragraph 7 – B-1-1BUGMIX**
  - AMZ-BRY008217
- **Paragraph 18 – B-1-1BUGMIX**
  - AMZ-BRY008202 - AMZ-BRY008216
- **Paragraph 19(b) – B-1-1BUGMIX**
  - AMZ-BRY008726 - AMZ-BRY0008727
- **Paragraphs 4, 19(b) – B-1-1C9GVF7**
  - AMZ-BRY008218 - AMZ-BRY008219
  - AMZ-BRY008220 -AMZ-BRY008221
  - AMZ-BRY008222 - AMZ-BRY008225
  - AMZ-BRY008226 - AMZ-BRY008230
  - AMZ-BRY008231 - AMZ-BRY008237
  - AMZ-BRY008238 - AMZ-BRY008240
  - AMZ-BRY008241 - AMZ-BRY008243
  - AMZ-BRY008244 - AMZ-BRY008245

**Morgan, Lewis & Bockius** LLP

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States
☎ +1.202.739.3000
🖷 +1.202.739.3001

CP 22

May 24, 2021
Page 2

- AMZ-BRY008246 - AMZ-BRY008247
- AMZ-BRY008248
- AMZ-BRY008249 - AMZ-BRY008250
- AMZ-BRY008251 - AMZ-BRY008253
- AMZ-BRY008254 - AMZ-BRY008258
- AMZ-BRY008259 - AMZ-BRY008261
- AMZ-BRY008262 - AMZ-BRY008264
- AMZ-BRY008265 - AMZ-BRY008268
- AMZ-BRY008269 - AMZ-BRY008274
- AMZ-BRY008275 - AMZ-BRY008280
- AMZ-BRY008281 - AMZ-BRY008282
- AMZ-BRY008283 - AMZ-BRY008288
- AMZ-BRY008289 - AMZ-BRY008293
- AMZ-BRY008294 - AMZ-BRY008296
- AMZ-BRY008297 - AMZ-BRY008301
- AMZ-BRY008302 - AMZ-BRY008306
- AMZ-BRY008307 - AMZ-BRY008312
- AMZ-BRY008313 - AMZ-BRY008315
- AMZ-BRY008316 - AMZ-BRY008318
- AMZ-BRY008319 - AMZ-BRY008321
- AMZ-BRY008322 - AMZ-BRY008323
- AMZ-BRY008324 - AMZ-BRY008326
- AMZ-BRY008327 - AMZ-BRY008328
- AMZ-BRY008329 - AMZ-BRY008331
- AMZ-BRY008332 - AMZ-BRY008338
- AMZ-BRY008339 - AMZ-BRY008343
- AMZ-BRY008344 - AMZ-BRY008345
- AMZ-BRY008346 - AMZ-BRY008352
- AMZ-BRY008353 - AMZ-BRY008355
- AMZ-BRY008356 - AMZ-BRY008361
- AMZ-BRY008362 - AMZ-BRY008367
- AMZ-BRY008368 - AMZ-BRY008371
- AMZ-BRY008372 - AMZ-BRY008375
- AMZ-BRY008376 - AMZ-BRY008379
- AMZ-BRY008380 - AMZ-BRY008381
- AMZ-BRY008382 - AMZ-BRY008385
- AMZ-BRY008386 - AMZ-BRY008389
- AMZ-BRY008390 - AMZ-BRY008394
- AMZ-BRY008395 - AMZ-BRY008397
- AMZ-BRY008398 - AMZ-BRY008400
- AMZ-BRY008401 - AMZ-BRY008403
- AMZ-BRY008404 - AMZ-BRY008406
- AMZ-BRY008407 - AMZ-BRY008409
- AMZ-BRY008410 - AMZ-BRY008411
- AMZ-BRY008412 - AMZ-BRY008419
- AMZ-BRY008420 - AMZ-BRY008426
- AMZ-BRY008427 - AMZ-BRY008432
- AMZ-BRY008433 - AMZ-BRY008437
- AMZ-BRY008438 - AMZ-BRY008442
- AMZ-BRY008443 - AMZ-BRY008445
- AMZ-BRY008446 - AMZ-BRY008450

CP 22

May 24, 2021
Page 3

- AMZ-BRY008451 - AMZ-BRY008453
- AMZ-BRY008454 - AMZ-BRY008458
- AMZ-BRY008459 - AMZ-BRY008462
- AMZ-BRY008463 - AMZ-BRY008465
- AMZ-BRY008466 - AMZ-BRY008470
- AMZ-BRY008471 - AMZ-BRY008472
- AMZ-BRY008473 - AMZ-BRY008476
- AMZ-BRY008477 - AMZ-BRY008479
- AMZ-BRY008480 - AMZ-BRY008482
- AMZ-BRY008483 - AMZ-BRY008484
- AMZ-BRY008485 - AMZ-BRY008486
- AMZ-BRY008487 - AMZ-BRY008490
- AMZ-BRY008491 - AMZ-BRY008492
- AMZ-BRY008493 - AMZ-BRY008494
- AMZ-BRY008495 - AMZ-BRY008496
- AMZ-BRY008497 - AMZ-BRY008501
- AMZ-BRY008502 - AMZ-BRY008505
- AMZ-BRY008506 - AMZ-BRY008507
- AMZ-BRY008508 - AMZ-BRY008510
- AMZ-BRY008511 - AMZ-BRY008512
- AMZ-BRY008513 - AMZ-BRY008514
- AMZ-BRY008515 - AMZ-BRY008522
- AMZ-BRY008523 - AMZ-BRY008524
- AMZ-BRY008525 - AMZ-BRY008526
- AMZ-BRY008527 - AMZ-BRY008528
- AMZ-BRY008529 - AMZ-BRY008530
- AMZ-BRY008531
- AMZ-BRY008532 - AMZ-BRY008536
- AMZ-BRY008537 - AMZ-BRY008541
- AMZ-BRY008542 - AMZ-BRY008546
- AMZ-BRY008547 - AMZ-BRY008549
- AMZ-BRY008550
- AMZ-BRY008551 - AMZ-BRY008552
- AMZ-BRY008553- AMZ-BRY008554
- AMZ-BRY008555 - AMZ-BRY008557
- AMZ-BRY008558 - AMZ-BRY008560
- AMZ-BRY008561 - AMZ-BRY008565
- AMZ-BRY008566 - AMZ-BRY008568
- AMZ-BRY008569 - AMZ-BRY008570
- AMZ-BRY008571 - AMZ-BRY008573
- AMZ-BRY008574 - AMZ-BRY008577
- AMZ-BRY008578 - AMZ-BRY008579
- AMZ-BRY008580 - AMZ-BRY008582
- AMZ-BRY008583 - AMZ-BRY008585
- AMZ-BRY008586 - AMZ-BRY008588
- AMZ-BRY008589 - AMZ-BRY008591
- AMZ-BRY008592 - AMZ-BRY008593
- AMZ-BRY008594 - AMZ-BRY008595
- AMZ-BRY008596 - AMZ-BRY008597
- AMZ-BRY008598 - AMZ-BRY008599
- AMZ-BRY008600 - AMZ-BRY008601

CP 22

May 24, 2021
Page 4

- o   AMZ-BRY008602 - AMZ-BRY008603
- o   AMZ-BRY008604 - AMZ-BRY008605
- o   AMZ-BRY008606 - AMZ-BRY008607
- o   AMZ-BRY008608
- o   AMZ-BRY008609 - AMZ-BRY008613
- o   AMZ-BRY008614
- o   AMZ-BRY008615 - AMZ-BRY008617
- o   AMZ-BRY008618 - AMZ-BRY008630
- o   AMZ-BRY008631 - AMZ-BRY008635
- o   AMZ-BRY008636 - AMZ-BRY008637
- o   AMZ-BRY008638 - AMZ-BRY008639
- o   AMZ-BRY008640 - AMZ-BRY008642
- o   AMZ-BRY008643 - AMZ-BRY008644
- o   AMZ-BRY008645 - AMZ-BRY008646
- o   AMZ-BRY008647 - AMZ-BRY008648
- o   AMZ-BRY008649 - AMZ-BRY008650
- o   AMZ-BRY008651
- o   AMZ-BRY008652
- o   AMZ-BRY008653 - AMZ-BRY008658
- o   AMZ-BRY008659 - AMZ-BRY008678
- o   AMZ-BRY008679 - AMZ-BRY008682
- o   AMZ-BRY008683 - AMZ-BRY008688
- o   AMZ-BRY008689 - AMZ-BRY008690
- o   AMZ-BRY008691 - AMZ-BRY008692
- o   AMZ-BRY008693
- o   AMZ-BRY008694 - AMZ-BRY008703
- o   AMZ-BRY008704 - AMZ-BRY008705
- o   AMZ-BRY008706 - AMZ-BRY008725
- o   AMZ-BRY008726 - AMZ-BRY0008727
- o   AMZ-BRY008728 - AMZ-BRY008734
- o   AMZ-BRY008735
- o   AMZ-BRY008736 - AMZ-BRY008750
- o   AMZ-BRY008751 - AMZ-BRY008752

Please contact me should you have any questions.


Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.

CP 22

# Morgan Lewis

**Kelcey J. Phillips**
Associate
+1.202.739.5455
kelcey.phillips@morganlewis.com

December 2, 2021

**Via Secure File Transfer**
Frank Kearl
Staff Attorney
Make the Road New York
161 Port Richmond Avenue
Staten Island, NY 10302

Re:      Amazon.com Services LLC Case 29-CA-261755

Dear Mr. Kearl:

As you know, this firm represents Amazon.com Services LLC in the above-referenced matter. Attached hereto please find documents bearing Bates stamp number "AMZ-BRY008760" through "AMZ-BRY009102," which are being produced in response to the Counsel for the General Counsel's subpoena *duces tecum* B-1-1BUGMIX and Charging Party's subpoena *duces tecum* B-1-1C9GVF7.

All of the enclosed documents are responsive to Paragraph 4 of the Charging Party's subpoena *duces tecum* unless otherwise identified below.

- **Paragraph 11(a) – B-1-1BUGMIX; B-1-1C9GVF7**
  - AMZ-BRY008849
- **Paragraph 11(d) – B-1-1C9GVF7**
  - AMZ-BRY008839 – AMZ-BRY008848

Please contact me should you have any questions.


Sincerely,

*/s/ Kelcey J. Phillips*
Kelcey J. Phillips

cc: Nicole Buffalano, Esq.
Christopher J. Murphy, Esq.
Jennifer Mott Williams, Esq.
Matthew Jackson, Esq.

**Morgan, Lewis & Bockius LLP**

1111 Pennsylvania Avenue, NW
Washington, DC  20004
United States

**T** +1.202.739.3000
**F** +1.202.739.3001

CP 22



April 13, 2021

<u>**Via Email**</u>
Christopher J. Murphy, Esq.
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103

Nicole Buffalano, Esq.
Morgan, Lewis & Bockius LLP
300 South Grand Ave., 22nd Fl.
Los Angeles, CA 90071

Kelcey Phillips, Esq.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave. NW
Washington D.C. 20004

Re: Amazon.com Services LLC (Case No. 29-CA-261755)

Dear Mr. Murphy, Ms. Buffalano, and Ms. Phillips:

Enclosed find a subpoena *duces tecum* for records and information relevant to NLRB case no.
29-CA-261755.  If you have any questions, please contact me by phone or email.

Sincerely,

Frank Kearl, Esq.

Staff Attorney
Make the Road NY
frank.kearl@maketheroadny.org
(929) 265-7692

| **BROOKLYN** | **QUEENS** | **STATEN ISLAND** | **LONG ISLAND** | **WESTCHESTER** |
|---|---|---|---|---|
| 301 GROVE STREET | 92-10 ROOSEVELT AVENUE | 161 PORT RICHMOND AVENUE | 1090 SUFFOLK AVENUE | 46 WALLER AVENUE |
| BROOKLYN, NY 11237 | JACKSON HEIGHTS, NY 11372 | STATEN ISLAND, NY 10302 | BRENTWOOD, NY 11717 | WHITE PLAINS, NY 10605 |
| 718 418 7690 | 718 565 8500 | 718 727 1222 | 631 231 2220 | 914 948 8466 |

WWW.MAKETHEROADNY.ORG



April 13, 2021

**<u>Via Email and Registered Mail</u>**
Custodian of Records
Amazon.com Services LLC
546 Gulf Ave.
Staten Island, NY 10314

Re: Amazon.com Services LLC (Case No. 29-CA-261755)

Dear Custodian of Records:

Enclosed find a subpoena *duces tecum* for records and information relevant to NLRB case no. 29-CA-261755. If you have any questions, please contact me by phone or email.

Sincerely,

Frank Kearl, Esq.

Staff Attorney
Make the Road NY
frank.kearl@maketheroadny.org
(929) 265-7692

cc:    Christopher J. Murphy, Esq. (via email)
       Nicole Buffalano, Esq. (via email)
       Kelcey Phillips, Esq. (via email)

**BROOKLYN**
301 GROVE STREET
BROOKLYN, NY 11237
718 418 7690

**QUEENS**
92-10 ROOSEVELT AVENUE
JACKSON HEIGHTS, NY 11372
718 565 8500

**STATEN ISLAND**
161 PORT RICHMOND AVENUE
STATEN ISLAND, NY 10302
718 727 1222

**LONG ISLAND**
1090 SUFFOLK AVENUE
BRENTWOOD, NY 11717
631 231 2220

**WESTCHESTER**
46 WALLER AVENUE
WHITE PLAINS, NY 10605
914 948 8466

**WWW.MAKETHEROADNY.ORG**

FORM NLRB-31

## SUBPOENA DUCES TECUM

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To      Custodian of Records, Amazon.com Services, LLC, 546 Gulf Ave., Staten Island, NY 10314

As requested by    Frank Kearl, Esq

whose address is      161 Port Richmond Ave., Staten Island, NY 10302

    (Street)                    (City)                    (State)        (ZIP)

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE      Administrative Law Judge

of the National Labor Relations Board

at    Zoom Video Hearing

in the City of    Brooklyn, NY

on    Monday, May 3, 2021                                    at    10:00 a.m.        or any adjourned

                                    Amazon.com Services LLC
or rescheduled date to testify in    29-CA-261755

                    (Case Name and Number)

And you are hereby required to bring with you and produce at said time and place the following books, records, correspondence, and documents:

SEE ATTACHMENT

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena.  Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing.  If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing.  Prior to a hearing, the petition to revoke should be filed with the Regional Director; during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing.  See Board's Rules and Regulations, 29 C.F.R Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation).  Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

**B-1-1C9GVF7**

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at   Brooklyn, NY

Dated:      April 13, 2021

*Lauren McFerran*

**Lauren McFerran, Chairman**

**NOTICE TO WITNESS**. Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed.  A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*.  The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  The NLRB will further explain these uses upon request.  Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.

Case 29-CA-261755

B-1-1C9GVF7

**RETURN OF SERVICE**

I certify that, being a person over 18 years of age, I duly served a copy of this subpoena

☐ by person

☒ by certified mail

☐ by registered mail

☐ by telegraph

(Check method used.)

☐ by leaving copy at principal office or place of business at

_____

_____

_____

on the named person on

APRIL 13, 2021

(Month, day, and year)

FRANK KEARL

(Name of person making service)

COUNSEL FOR CHARGING PARTY

(Official title, if any)

**CERTIFICATION OF SERVICE**

I certify that named person was in attendance as a witness at

1130 BEDFORD AVE. BROOKLYN, NY 11216

on APRIL 13, 2021

(Month, day or days, and year)

CAITLIN CRAGGS

(Name of person certifying)

_____

(Official title)

Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

        Subpoena Number: B-1-1C9GVF7

## <u>ATTACHMENT</u>

## DEFINITIONS AND INSTRUCTIONS

A.   "Document" means any existing printed, typewritten or otherwise recorded material of whatever character, records stored on computer or electronically, records kept on microfiche or written by hand or produced by hand and graphic material, including without limitation, checks, cancelled checks, computer hard drives, discs and/or files and all data contained therein, computer printouts, E-mail communications and records, internal messages on "Chime" or any other text messaging programs, postings and drafts of postings on bulletin boards or digital messaging boards including the Voice of Associates ("VOA") system, any marginal or "post-it" or "sticky pad" comments appearing on or with documents, licenses, files, letters, facsimile transmissions, memoranda, telegrams, minutes, notes, contracts, agreements, transcripts, diaries, appointment books, reports, records, payroll records, books, lists, logs, worksheets, ledgers, summaries of records or telephone conversations, summaries of records of personal conversations, interviews, meetings, accountants' or bookkeepers' work papers, records of meetings or conference reports, drafts, work papers, calendars, interoffice communications, financial statements, inventories, news reports, periodicals, press releases, graphs, charts, advertisements, statements, affidavits, photographs, negatives, slides, disks, reels, microfilm, audio or video tapes and any duplicate copies of any such material in the possession of, control of, or available to the subpoenaed party, or any agent, representative or other person acting on cooperation with, in concert with or on behalf of the subpoenaed party.

B.   "Respondent" means Amazon.com Services LLC.

C.   "Respondent's JFK8 Facility" means Respondent's fulfillment center located at 546 Gulf Avenue, Staten Island, NY 10314.

D.   "Charging Parting" means Gerald Bryson.

E.   "Person" or "persons" means natural persons, corporations, limited liability companies, partnerships, sole proprietorships, associations, organizations, trusts, joint ventures, groups of natural persons or other organizations, or any other kind of entity.

F.   "Period covered by this subpoena" means the period from May 1, 2019 through April 30, 2020 and the subpoena seeks only documents from that period unless another period is specified. This subpoena request is continuing in character and if additional responsive documents come to your attention after the date of production, such documents must be promptly produced.

G.   "Policy" or "Policies" means each rule, procedure, or directive, formal or informal, and each common understanding or course of conduct which was recognized as such by Respondent's present or former officers, agents, employees or other Persons acting or purporting to act on Respondent's behalf, which was in effect at any time during the period

Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

covered by this subpoena and which includes any change of Policy. Policies expressly include any manual, guideline, rule, work instruction, or similar Document reflecting Respondent's Policies.

H.  Any copies of documents that are different in any way from the original, such as by interlineation, receipt stamp, notation, or indication of copies sent or received, are considered original documents and must be produced separately from the originals.

I.  If any document covered by this subpoena contains codes or classifications, all documents explaining or defining the codes or classifications used in the document must also be produced.

J.  Electronically stored information ("ESI") should be produced in the form or forms in which it is ordinarily maintained or in a reasonably usable form or forms (such as text-searchable PDF documents). Execution of this subpoena requires a reasonable search of the ESI of all individuals ("custodians") who are most likely to possess information covered by this subpoena.

K.  For all searches of ESI, records should be maintained documenting each custodian whose ESI was searched and all hardware and software systems searched. Records should also include who was responsible for the search and the search methodology used including, but not limited to, search terms and software tools.

L.  All documents produced pursuant to this subpoena should be presented as they are kept in the usual course of business or organized by the subpoena paragraph to which the document or set of documents is responsive. Labels referring to that subpoena paragraph are to be affixed to each document or set of documents.

M.  This subpoena applies to documents in your possession, custody, or control of Respondent, as well as your present or former agents, attorneys, accountants, advisors, investigators, and any other persons or companies directly or indirectly employed by or connected with you. You are required to conduct a reasonable and diligent search for all requested records within your possession, custody or control and to affirmatively advise Counsel for Charging Party if no responsive evidence exists.

N.  If a claim of privilege is made as to any document which is the subject of this subpoena, a claim of privilege must be expressly made and you must describe the nature of the withheld document, communication, or tangible thing in a manner that, without revealing information itself privileged or protected, will enable an assessment of the claim to be made.

O.  As to any documents not produced in compliance with this subpoena on any ground or if any document requested was, through inadvertence or otherwise, destroyed or is no longer in your possession, please state:

    a.   the author;
    b.   the recipient;
    c.   the name of each person to whom the original or copy was sent;

Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

      d.   the date of the document;

      e.   the subject matter of the document; and

      f.   the circumstances under which the document was destroyed, withheld, or is no longer in your possession.

P.    This request seeks production of all documents described, including all drafts and non-identical or distribution copies.

Q.    This request seeks production of responsive documents in their entirety, without abbreviation, redaction, deletion, or expurgation.

R.    When used in this subpoena, the term "documents regarding" means all documents that, in whole or part, discuss, describe, mention, pertain to, reflect, refer to, or relate to the subpoenaed item.

Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

## DOCUMENTS TO BE PRODUCED

1.  Organizational charts and other documents showing Respondent's managerial structure, hierarchy or chain of command for Respondent's JFK8 Facility during the period covered by this subpoena, including documents that show any changes to the reporting protocols and chain of command.

2.  Documents (including but not limited to training materials, manuals, guidelines, cheat sheets, process flow charts, pre-drafted form language, and user support documentation) regarding Policies, procedural standards, and guidelines for Respondent's managers, supervisors, and Human Resources Business Partners related to receiving employee complaints, investigating, reporting, processing, and documenting potential employee misconduct, and taking disciplinary actions including verbal warnings, verbal or written coaching, verbal or written write-ups, suspensions, and/or terminations.

3.  For the time period from March 25, 2020 to April 6, 2020, any documents (including but not limited to notes memorializing conversations, electronic communication, Chime messages or calls, emails, text messages, videos, photographs, memoranda, digital and/or written recordings of personnel statements) regarding communication between Respondent's supervisors, managers, Human Resources Business Partners, or agents and Metro One Loss Prevention Services Group and/or any other third-party security services company, detective agency, or intelligence agency contracted by Respondent concerning, reporting on, or anticipating protests outside Respondent's JFK8 Facility.

4.  Documents (including but not limited to memorandums, handwritten notes, written personnel statements, and communications between Respondent's managers, supervisors, agents, and Human Resources Business Partners) regarding press requests, media coverage, social media posts, videos, and publicity related to the protest activities that took place at Respondent's JFK8 Facility on March 30, 2020 and April 6, 2020.

5.  Documents, including Discrimination/Harassment/Retaliation Complaint forms, submitted to managers, supervisors, or Human Resources Business Partners by any persons alleging discrimination, harassment, or retaliation at Respondent's JFK8 Facility on April 6, 2020.

6.  Documents regarding the nature and scope of the duties, responsibilities, and function of the Human Resources Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that Human Resources reviews, investigates, and/or resolves.

7.  Documents that show the Policies, work rules, work guidelines and/or terms and conditions of employment pertaining to employee conduct and/or misconduct applicable to non-supervisory and non-managerial associates employed at Respondent's JFK8 Facility at any time during the period covered by this subpoena, including documents showing any changes to the rules, the effective dates of any such changes, and a description or statement of the changes.

8.  Documents showing that Respondent distributed to its employees, including Gerald Bryson

Re:       Amazon.com Services LLC
          Case No. 29-CA-261755

and Dimitra Evans, and that employees (including Bryson and Evans) received Respondent's Policies, work rules, work guidelines and/or terms and conditions of employment, including the dates that such rules and policies were received by Bryson and Evans.

9.  The complete personnel file(s) excluding confidential medical records for:

     a.   Gerald Bryson
     b.   Dimitra Evans
     c.   Derrick Palmer
     d.   Christian Smalls

10. Documents memorializing the exact words used by, or conduct engaged in by, Gerald Bryson on April 6, 2020, which resulted in Respondent discharging Gerald Bryson in April 2020.

11. Documents regarding any transfers, promotions, or disciplinary actions including discharges, suspensions, memorialization of oral warnings, written warnings, transfers, and demotions taken against the employees set forth below at any point during their employment with Respondent.

     a.   Gerald Bryson
     b.   Dimitra Evans
     c.   Derrick Palmer
     d.   Christian Smalls

12. Documents (including but not limited to human resource memorandums, handwritten notes, investigation reports, written personnel statements, written communication with witnesses, communications between Respondent's supervisors and agents) regarding investigations conducted by Respondent, including documents showing the identities of those who participated in the investigations, the substance of the investigations, and the investigatory findings, regarding the following employees for their conduct between March 25, 2020 and April 6, 2020:

     a.   Gerald Bryson
     b.   Dimitra Evans
     c.   Derrick Palmer
     d.   Christian Smalls

13. Those documents, including but not limited to notes memorializing conversations, electronic communication, Chime messages or calls, emails, text messages, videos, photographs, memoranda, digital and/or written recordings of personnel statements, (i) considered by Respondent and (ii) relied upon by Respondent in issuing the discipline set forth below:

     a.   Christian Smalls termination on March 30, 2020;
     b.   Gerald Bryson suspension on April 10, 2020;
     c.   Derrick Palmer written warning on April 10, 2020;
     d.   Gerald Bryson discharge on April 17, 2020; and
     e.   Dimitra Evans written warning on April 17, 2020.

Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

14. Documents, including but not limited to memoranda, notes memorializing conversations, electronic communication, Chime messages or calls, emails, text messages and internal communications, by, between, and among Respondent's managers, supervisors, Human Resources Business Partners, and agents discussing or pertaining to Respondent's deliberations regarding whether to issue discipline, and if so, the type of discipline, to the following employees for their conduct between March 25, 2020 and April 6, 2020:

      a.    Gerald Bryson
      b.    Dimitra Evans
      c.    Derrick Palmer
      d.    Christian Smalls

15. Such electronic documents (including but not limited to video recordings, social media posts, emails, Chime messages or calls, text messages, audio recordings, websites, and photographs) showing or describing the April 6, 2020 incident underlying the disciplinary actions set forth below, including documents or notes reflecting the circumstances and dates under which such recordings, social media posts, emails, text messages, audio recordings, websites, and photographs were accessed, obtained, and maintained.

      a.    Gerald Bryson discharge on April 17, 2020
      b.    Dimitra Evans written warning on April 17, 2020

16. During the period covered by this subpoena, documents showing disciplinary actions, including discharges suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which Respondent's JFK8 Facility is located, for violations of the sections named below of Respondent's Standards of Conduct, for cursing, abusive, profane, harassing, or vulgar language, including on-and-off duty examples, together with the personnel file of each disciplined employee showing other discipline to that employee:

      a.    Category 1
      b.    Category 2

17. During the period covered by the subpoena, documents showing disciplinary actions, including discharges, suspensions, written and oral warnings, issued to employees at Respondent's JFK8 Facility and at its Regional facilities within which Respondent's JFK8 Facility is located, together with the personnel file of each disciplined employee showing other discipline to that employee.

18. For the period covered by this subpoena, documents showing investigations conducted by Respondent in connection with disciplinary actions issued above in paragraph 17, including documents that reflect the identities of those who participated in the investigation, the substance of the investigation, and the investigatory findings.

19. For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing, or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers, Human Resources Business Partners, or agents on behalf of employees regarding COVID-19 safety precautions including:

Re:     Amazon.com Services LLC
        Case No. 29-CA-261755

     a.   Internal communications including but not limited to electronic communications, Chime messages or calls, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's supervisors, and/or agents regarding Bryson raising COVID-19 safety concerns at Respondent management meetings;

     b.   Internal communications including but not limited to electronic communications, emails, Chime messages or calls, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding media coverage of Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson protesting;

     c.   Internal communications including but not limited to electronic communications, Chime messages or calls, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between, and among Respondent's managers, supervisors, and/or agents regarding Christian Smalls, Derrick Palmer, Jordan Flowers, and/or Bryson participating in protests outside Respondent's JFK8 Facility regarding COVID-19 safety concerns; and

     d.   Documents mentioning, discussing, or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers and/or employees likely to oppose the protests.

20. Organizational charts and other documents showing Respondent's regional management structure, hierarchy or chain of command for any of Respondent's departments that participate in disciplinary investigations or disciplinary actions (including Human Resources, Operations, Loss Prevention, Learning, and Safety) during the period covered by this subpoena, including documents that show any changes to the reporting protocols and chain of command.

21. Documents regarding the nature and scope of the duties, responsibilities, and function of the Loss Prevention Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that the Loss Prevention Department/Team reviews, investigates, and/or resolves.

22. Documents regarding the nature and scope of the duties, responsibilities, and function of the Operations Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that the Operations Department/Team reviews, investigates, and/or resolves.

23. Documents regarding the nature and scope of the duties, responsibilities, and function of the Safety Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that the Safety Department/Team reviews, investigates, and/or resolves.

24. Documents regarding the nature and scope of the duties, responsibilities, and function of the Learning Department/Team, including documents distributed to employees regarding the type of concerns, issues, complaints, or reports that the Learning Department/Team reviews, investigates, and/or resolves.



UNITED STATES POSTAL SERVICE

**POSTAL MONEY ORDER**

Serial Number

27415512358

Year, Month, Day 2021-04-13   Post Office 103021

$40.00 U.S. Dollars and Cents

Forty Dollars and 00/100 ***************************

Amount

Pay to AMAZON.COM SERVICES LLC                    Clerk 67

Address 546 GULF AVE.          From FRANK KEARL, ESQ.

STATEN ISLAND, NY 10314   Address 161 PORT RICHMOND AVE.

Memo TO CUSTODIAN OF RECORDS       STATEN ISLAND, NY 10302
RE: CASE NO. 29-CA-261755

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑆000000800 2⑆   27415512358⑈



| From: | Green, Benjamin |
|---|---|
| To: | frank.kearl@maketheroadny.org; Cox, Evamaria; Jackson, Matthew; Reibstein, Nancy K.; Lipin, Nancy; CHRISTOPHER.MURPHY@MORGANLEWIS.COM; nicole.buffalano@morganlewis.com; Kelcey Phillips; Rosenblatt, Richard G.; Williams, Jennifer Mott |
| Subject: | RE: Demand for Documents in 29-CA-261755 (Amazon.com Services LLC) |
| Date: | Wednesday, December 8, 2021 1:58:19 PM |

Mr. Kearl,

If certain documents are responsive to a subpoena request and the request was not revoked by my order or an order of the Board, those document are subject to production.  No additional order to that effect is necessary.  During the conference call on December 13, I would like to confirm on the record which subpoena requests have responsive unproduced documents outstanding.  For any issue regarding the enforcement of a subpoena in U.S. District Court, you should talk to the Region.

Benjamin W. Green
NLRB-ALJ
New York Division of Judges

---

**From:** Frank Kearl <frank.kearl@maketheroadny.org>
**Sent:** Wednesday, December 8, 2021 1:24 PM
**To:** Green, Benjamin <Benjamin.Green@nlrb.gov>
**Cc:** Cox, Evamaria <Evamaria.Cox@nlrb.gov>; Jackson, Matthew <Matthew.Jackson@nlrb.gov>; Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>; Lipin, Nancy <Nancy.Lipin@nlrb.gov>; CHRISTOPHER.MURPHY@MORGANLEWIS.COM; nicole.buffalano@morganlewis.com; Kelcey Phillips <kelcey.phillips@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>; Williams, Jennifer Mott <jennifer.williams@morganlewis.com>
**Subject:** Demand for Documents in 29-CA-261755 (Amazon.com Services LLC)

Judge Green,

At 6:54 p.m. on December 2, 2021, Respondents produced an additional 343 pages of documents. The last three pages of this production, AMZ-BRY009100-009102, consist of an email between members of Amazon's Employee Relations management team concerning Amazon's "Protest Support" on March 30, 2020, along with an attached "Run of Show - JFK8 - 3.30.20_updated.doc" file. These documents have already been marked as GC 129(c) and Counsel for the General Counsel moved to admit them on Monday.

Respondent's cover letter accompanying the December 2nd production claims this document is responsive to paragraph 4 of the Charging Party's subpoena, but it is clearly also responsive to paragraphs 2, 3, 12, and 19(c) and (d) of the Charging Party's subpoena - none of which were the subject of Amazon's special appeal. The last paragraph of this document additionally mentions Amazon using "established Chime groups to monitor [the protest activities on March 30, 2020] and for comment in real time" as well as the use of the "Protest Playbook and IOC Labor Activity Playbook" for responding to the protest.



It is appalling that at the final hour Respondent would quietly reveal the existence of further unproduced documents and communications, especially ones that are clearly responsive to the subpoenas served on them in March and April. These are not tangentially or hypothetically related to the case, they are literally the playbooks which guided Amazon's response to Mr. Bryson's PCA as well as Amazon management's play-by-play commentary. Notably, none of these documents or communications appear in any of Respondent's four privilege logs.

I request that you order the immediate production of the "established Chime group" messages, the Protest Playbook, and the IOC Labor Activity playbook referred to in the "Run of Show - JFK8 - 3.30.20_updated.doc" file. Furthermore, I request that you order the immediate production of AMZ-BRY008849, AMZ-BRY008907-8911, and AMZ-BRY009101-9102 in their native formats, which I also requested from Respondent on the night of December 2, 2021.

Beyond Mr. Bryson's case, there is a serious public interest in demanding these documents be produced. Amazon will likely become the largest employer in America in 2022, and allowing such egregious and contumacious behavior to go unchecked sends a message to all their employees that Amazon workers effectively have no rights under the Act which can be protected.

Thank you for your consideration,
Frank

--
Frank Kearl, Esq.
Staff Attorney
Make the Road New York
161 Port Richmond Ave.
Staten Island, NY 10302
t:  718.727.1222 x 3401
c:  929.265.7692

pronouns: he, him, él



| | |
|---|---|
| **From:** | Frank Kearl |
| **To:** | Reibstein, Nancy K. |
| **Cc:** | Kelcey Phillips; CHRISTOPHER.MURPHY@MORGANLEWIS.COM; Green, Benjamin; Cox, Evamaria; zahmad@gibsondunn.com; nicole.buffalano@morganlewis.com; Gaston, David; Jackson, Matthew; Rosenblatt, Richard G.; jschwartz@gibsondunn.com; Williams, Jennifer Mott |
| **Subject:** | Re: Amazon.com Services LLC, 29-CA-261755 |
| **Date:** | Thursday, December 2, 2021 8:04:13 PM |

Additionally, please provide AMZ-BRY008849, AMZ-BRY008907-8911, and AMZ-BRY009101-9102 in their native formats.

On Thu, Dec 2, 2021 at 7:14 PM Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov> wrote:

> Also, although you failed to state so in your email, it is clear that Respondent continues to refuse to provide documents for many subpoenaed paragraphs.
>
>
> Please itemize the subpoenaed paragraphs for which Respondent continues to refuse to provide documents.
>
>
> Thank you,
>
> **Nancy Reibstein** | Regional Attorney
>
> United States Government
>
> National Labor Relations Board
>
> Region 29
>
> Two MetroTech Center, Suite 5100
>
> Brooklyn, NY   11201
>
> T:  718.765.6155 | C:  202.375.9408

**From:** Reibstein, Nancy K.
**Sent:** Thursday, December 2, 2021 7:11 PM
**To:** Phillips, Kelcey J. <kelcey.phillips@morganlewis.com>;
CHRISTOPHER.MURPHY@MORGANLEWIS.COM; frank.kearl@maketheroadny.org;
Green, Benjamin <Benjamin.Green@nlrb.gov>
**Cc:** Cox, Evamaria <Evamaria.Cox@nlrb.gov>; zahmad@gibsondunn.com;



nicole.buffalano@morganlewis.com; Gaston, David <David.Gaston@nlrb.gov>; Jackson, Matthew <Matthew.Jackson@nlrb.gov>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; Williams, Jennifer Mott <jennifer.williams@morganlewis.com>
**Subject:** RE: Amazon.com Services LLC, 29-CA-261755

Kelcey,

As the subpoena instructions require, please state which documents are responsive to which paragraphs for CGC's Subpoena B-1-1BUGMIX and for Charging Party's subpoena B-1-1C9GVF7.

Please provide that information immediately, as this submission is, again, past the Judge's deadline.

---

**From:** Phillips, Kelcey J. <kelcey.phillips@morganlewis.com>
**Sent:** Thursday, December 2, 2021 6:55 PM
**To:** CHRISTOPHER.MURPHY@MORGANLEWIS.COM; frank.kearl@maketheroadny.org; Green, Benjamin <Benjamin.Green@nlrb.gov>
**Cc:** Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>; Cox, Evamaria <Evamaria.Cox@nlrb.gov>; zahmad@gibsondunn.com; nicole.buffalano@morganlewis.com; Gaston, David <David.Gaston@nlrb.gov>; Jackson, Matthew <Matthew.Jackson@nlrb.gov>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; Williams, Jennifer Mott <jennifer.williams@morganlewis.com>
**Subject:** RE: Amazon.com Services LLC, 29-CA-261755

Counsel,

We have just sent, via Morgan Lewis' secure file transfer system, documents responsive to Counsel for the General Counsel's subpoena B-1-1BUGMIX and the Charging Party's subpoena B-1-1C9GVF7.

Please let us know if you have any trouble accessing or opening the documents.



Thanks,

**Kelcey J. Phillips\***

**Morgan, Lewis & Bockius LLP**

1111 Pennsylvania Avenue, NW | Washington, DC 20004-2541

Direct: +1.202.739.5455 | Main: +1.202.739.3000 | Fax: +1.202.739.3001 | Mobile: +1.323.376.3589

kelcey.phillips@morganlewis.com | www.morganlewis.com

Assistant: Denise Ann Soo Hoo | +1.202.373.6616 | denise.soohoo@morganlewis.com

\*Admitted in California only; Practice supervised by DC Bar members

---

**From:** Murphy, Christopher J. <christopher.murphy@morganlewis.com>
**Sent:** Thursday, December 2, 2021 4:57 PM
**To:** Frank Kearl <frank.kearl@maketheroadny.org>; Green, Benjamin <Benjamin.Green@nlrb.gov>
**Cc:** Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>; Cox, Evamaria <Evamaria.Cox@nlrb.gov>; zahmad@gibsondunn.com; Buffalano, Nicole <nicole.buffalano@morganlewis.com>; Gaston, David <David.Gaston@nlrb.gov>; Jackson, Matthew <Matthew.Jackson@nlrb.gov>; Phillips, Kelcey J. <kelcey.phillips@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; Williams, Jennifer Mott <jennifer.williams@morganlewis.com>
**Subject:** RE: Amazon.com Services LLC, 29-CA-261755

Dear Judge Green and Counsel:

We have encountered a technical issue with our production scheduled to be delivered by 5:00 pm tonight.  We are endeavoring to meet that deadline.  If we cannot, we are confident that we will be able to make the production by no later than 7:00 pm tonight.

*Chris*

**Christopher J. Murphy**

**Morgan, Lewis & Bockius LLP**

1701 Market Street | Philadelphia, PA 19103-2921



Direct: +1.215.963.5601 | Cell: +1.267.307.1024 | Main: +1.215.963.5000 | Fax: +1.215.963.5001

christopher.murphy@morganlewis.com | www.morganlewis.com

Assistant: Rose Ruoff | +1.215.963.5099 | rose.ruoff@morganlewis.com

---

**From:** Frank Kearl <frank.kearl@maketheroadny.org>
**Sent:** Monday, November 29, 2021 4:06 PM
**To:** Green, Benjamin <Benjamin.Green@nlrb.gov>
**Cc:** Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>; Murphy, Christopher J. <christopher.murphy@morganlewis.com>; Cox, Evamaria <Evamaria.Cox@nlrb.gov>; zahmad@gibsondunn.com; Buffalano, Nicole <nicole.buffalano@morganlewis.com>; Gaston, David <David.Gaston@nlrb.gov>; Jackson, Matthew <Matthew.Jackson@nlrb.gov>; Phillips, Kelcey J. <kelcey.phillips@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; Williams, Jennifer Mott <jennifer.williams@morganlewis.com>
**Subject:** Re: Amazon.com Services LLC, 29-CA-261755


[EXTERNAL EMAIL]

Dear Judge Green,


Amazon has now wilfully missed your deadline and has indicated it has no intention of producing any documents in advance of our call tomorrow. This means that we will be unable to proceed with scheduling subsequent hearing dates and the case will remain mired in this Amazon-created delay that has consumed the last 6 months. Mr. Murphy claims there are pending evidentiary issues, but the only outstanding question is whether Amazon will suffer any consequences for its continued recalcitrance.


I second the Counsel for the General Counsel's request for adverse inferences as well as all other available evidentiary sanctions. I am preparing a list of specific requests which I would like to discuss on our call tomorrow. Without a stern rebuke of this contumacious behavior, Amazon will continue to abuse your time, hide relevant evidence, and evade liability for its unlawful activities. Mr. Bryson lost his job because of Amazon's illegal retaliation nearly 600 days ago. At this point he deserves an expeditious resolution to his case.


Sincerely,

Frank Kearl



On Fri, Nov 19, 2021 at 2:23 PM Green, Benjamin <Benjamin.Green@nlrb.gov> wrote:

Counsel,

I presume that, after several months, the Respondent is in a position to produce outstanding subpoenaed documents without delay.  Currently, we have no reason to believe that the Respondent will refuse to do so.  For the sake of efficiency, I expect the documents to be produced before Thanksgiving so the GC/CP can review them in advance of the November 30 conference call and give us some indication as to whether additional hearing dates will be necessary.  I would like to schedule additional dates, if necessary, on the call. If the Respondent refuses to produce some or all of the documents in question, we can discuss that on the conference call as well.

Thank you,

Benjamin W. Green, ALJ

---

**From:** Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>
**Sent:** Friday, November 19, 2021 1:45 PM
**To:** Green, Benjamin <Benjamin.Green@nlrb.gov>; CHRISTOPHER.MURPHY@MORGANLEWIS.COM; frank.kearl@maketheroadny.org; Cox, Evamaria <Evamaria.Cox@nlrb.gov>
**Cc:** zahmad@gibsondunn.com; nicole.buffalano@morganlewis.com; Gaston, David <David.Gaston@nlrb.gov>; Jackson, Matthew <Matthew.Jackson@nlrb.gov>; Kelcey Phillips <kelcey.phillips@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; Williams, Jennifer Mott <jennifer.williams@morganlewis.com>
**Subject:** RE: Amazon.com Services LLC, 29-CA-261755

Dear Judge Green,

Thank you for scheduling the meeting to discuss the status of this case.

On May 20, 2021, you Ordered Respondent to produce certain unredacted documents.  On June 4, 2021, Respondent filed a special appeal to your Order. Today, the Board denied Respondent's Special Appeal.   Importantly, the Board has Ordered Respondent to produce all documents that are the subject of Respondent's special appeal.



While there are matters to discuss regarding wrapping up this litigation, Respondent's obligation to produce the disputed documents forthwith is clear and unambiguous.  At this point, there are no issues regarding whether Respondent must produce the documents;  the Board has upheld your ruling and had Ordered their production.  In light of the Board's Order and the over five-month delay in this proceeding awaiting the Board's Order, there is no valid basis for further delay in Respondent's production of the documents, which  it already has in its possession.

To ensure that our November 30th meeting is efficient and productive, Amazon should be directed to produce the documents to Counsel for the General Counsel immediately, which will enable General Counsel to be prepared to discuss your stated purpose of the meeting, namely the status of the case and how to proceed.  For example, General Counsel will be in a position to tell you on November 30th whether we need to call additional witnesses, whether to seek admission of the documents without the need to call witnesses or whether General Counsel will seek enforcement or move for an adverse inference and other evidentiary sanctions should Respondent refuse to comply with the Board's Order.   To wait an additional 11 days until November 30th to begin to discuss when Amazon must produce the Board-ordered documents  will serve no valid purpose and will only cause additional unnecessary delay.  Mr. Bryson, who was fired over a year and a half ago, deserves a resolution in this case.

Based on the above and pursuant to the Board's Order, Counsel for the General Counsel requests that you direct Amazon to produce the documents at issue immediately.

Thank you very much,

**Nancy Reibstein** | Regional Attorney

United States Government

National Labor Relations Board

Region 29

Two MetroTech Center, Suite 5100

Brooklyn, NY   11201

T:  718.765.6155 │ C:  202.375.9408

CP Exhibit 25

**From:** Green, Benjamin <Benjamin.Green@nlrb.gov>
**Sent:** Friday, November 19, 2021 11:55 AM
**To:** CHRISTOPHER.MURPHY@MORGANLEWIS.COM;
frank.kearl@maketheroadny.org; Cox, Evamaria <Evamaria.Cox@nlrb.gov>
**Cc:** Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>; zahmad@gibsondunn.com;
nicole.buffalano@morganlewis.com; Gaston, David <David.Gaston@nlrb.gov>; Jackson,
Matthew <Matthew.Jackson@nlrb.gov>; Kelcey Phillips
<kelcey.phillips@morganlewis.com>; Rosenblatt, Richard G.
<richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; Williams, Jennifer
Mott <jennifer.williams@morganlewis.com>
**Subject:** RE: Amazon.com Services LLC, 29-CA-261755

We can schedule the conference call for November 30 at 1 p.m. I will send out a Zoom
invitation.

Thank you.

**From:** Murphy, Christopher J. <christopher.murphy@morganlewis.com>
**Sent:** Friday, November 19, 2021 11:45 AM
**To:** frank.kearl@maketheroadny.org; Cox, Evamaria <Evamaria.Cox@nlrb.gov>
**Cc:** Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>; Green, Benjamin
<Benjamin.Green@nlrb.gov>; zahmad@gibsondunn.com;
nicole.buffalano@morganlewis.com; Gaston, David <David.Gaston@nlrb.gov>; Jackson,
Matthew <Matthew.Jackson@nlrb.gov>; Kelcey Phillips
<kelcey.phillips@morganlewis.com>; Rosenblatt, Richard G.
<richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; Williams, Jennifer
Mott <jennifer.williams@morganlewis.com>
**Subject:** RE: Amazon.com Services LLC, 29-CA-261755

Judge Green:



We can be available on 11/30/21 as well.


Thank you.


*Chris*

**Christopher J. Murphy**

**Morgan, Lewis & Bockius LLP**

1701 Market Street | Philadelphia, PA 19103-2921

Direct: +1.215.963.5601 | Cell: +1.267.307.1024 | Main: +1.215.963.5000 | Fax: +1.215.963.5001

christopher.murphy@morganlewis.com | www.morganlewis.com

Assistant: Rose Ruoff | +1.215.963.5099 | rose.ruoff@morganlewis.com

---

**From:** Frank Kearl <frank.kearl@maketheroadny.org>
**Sent:** Friday, November 19, 2021 11:39 AM
**To:** Cox, Evamaria <Evamaria.Cox@nlrb.gov>
**Cc:** Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>; Green, Benjamin <Benjamin.Green@nlrb.gov>; zahmad@gibsondunn.com; Buffalano, Nicole <nicole.buffalano@morganlewis.com>; Gaston, David <David.Gaston@nlrb.gov>; Jackson, Matthew <Matthew.Jackson@nlrb.gov>; Murphy, Christopher J. <christopher.murphy@morganlewis.com>; Phillips, Kelcey J. <kelcey.phillips@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; Williams, Jennifer Mott <jennifer.williams@morganlewis.com>
**Subject:** Re: Amazon.com Services LLC, 29-CA-261755


[EXTERNAL EMAIL]

Good morning Judge Green,


I can also be available at any time on November 22 or November 30.


Thank you,



Frank

On Fri, Nov 19, 2021 at 11:03 AM Cox, Evamaria <Evamaria.Cox@nlrb.gov> wrote:

Good morning Judge Green,

I am available on November 22nd and November 30th at any time.

Thank you,
Evamaria Cox

**From:** Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>
**Sent:** Friday, November 19, 2021 11:00 AM
**To:** Green, Benjamin <Benjamin.Green@nlrb.gov>; zahmad@gibsondunn.com; nicole.buffalano@morganlewis.com; Cox, Evamaria <Evamaria.Cox@nlrb.gov>; Gaston, David <David.Gaston@nlrb.gov>; Jackson, Matthew <Matthew.Jackson@nlrb.gov>; frank.kearl@maketheroadny.org; CHRISTOPHER.MURPHY@MORGANLEWIS.COM; Kelcey Phillips <kelcey.phillips@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; jennifer.williams@morganlewis.com
**Subject:** RE: Amazon.com Services LLC, 29-CA-261755

Good morning, Judge Green.

I am available on November 22nd and 30th.

Thank you,

**Nancy Reibstein** | Regional Attorney

United States Government

National Labor Relations Board



Region 29

Two MetroTech Center, Suite 5100

Brooklyn, NY  11201

T:  718.765.6155 │ C:  202.375.9408

---

**From:** Green, Benjamin <Benjamin.Green@nlrb.gov>
**Sent:** Friday, November 19, 2021 10:54 AM
**To:** zahmad@gibsondunn.com; nicole.buffalano@morganlewis.com; Cox, Evamaria <Evamaria.Cox@nlrb.gov>; Gaston, David <David.Gaston@nlrb.gov>; Jackson, Matthew <Matthew.Jackson@nlrb.gov>; frank.kearl@maketheroadny.org; CHRISTOPHER.MURPHY@MORGANLEWIS.COM; Kelcey Phillips <kelcey.phillips@morganlewis.com>; Reibstein, Nancy K. <Nancy.Reibstein@nlrb.gov>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>; jschwartz@gibsondunn.com; jennifer.williams@morganlewis.com
**Subject:** Amazon.com Services LLC, 29-CA-261755

Counsel,

Since we have received an order from the Board on the Respondent's special appeal, I would like to schedule a conference call to discuss the status of the case and how we will move forward.  I am available on November 22,  November 29, and November 30. Please email me your availability on those dates.

Thank you,

Benjamin W. Green

NLRB-ALJ

New York Division of Judges

--



Frank Kearl, Esq.

Staff Attorney

Make the Road New York

161 Port Richmond Ave.

Staten Island, NY 10302

t:  718.727.1222 x 3401

c:  929.265.7692

pronouns: he, him, él

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

--

Frank Kearl, Esq.

Staff Attorney

Make the Road New York

161 Port Richmond Ave.

Staten Island, NY 10302

t:  718.727.1222 x 3401

c:  929.265.7692

pronouns: he, him, él

--
Frank Kearl, Esq.

CP Exhibit 25

Staff Attorney
Make the Road New York
161 Port Richmond Ave.
Staten Island, NY 10302
t:   718.727.1222 x 3401
c:   929.265.7692
pronouns: he, him, él