# ENCLOSURE

JD(NY)-05-22
Staten Island, NY

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**DIVISION OF JUDGES**
**NEW YORK BRANCH OFFICE**

**AMAZON.COM SERVICES LLC**

     **and**                                   **Case No. 29-CA-261755**

**GERALD BRYSON, An Individual**

*Evamaria Cox, Esq.*, *Matthew A. Jackson, Esq.*,
*Nancy K. Reibstein, Esq., David Gaston, Esq.*,
    for the General Counsel
*Nicole A. Buffalano, Esq.*,
(Morgan, Lewis & Bockius, LLP, Los Angeles, CA),
*Christopher J. Murphy, Esq., Jennifer Mott Williams,*
*Richard G. Rosenblatt, Kelcey J. Phillips, Esq.*
(Morgan, Lewis & Bockius, LLP, Philadelphia, PA),
*Jason C. Schwartz, Esq.*, *Zainab N. Ahmad, Esq.*
(Gibson, Dunn & Crutcher LLP, New York, NY)
    for the Respondent.
*Frank Kearl, Esq.* (Make the Road New York),
    for the Charging Party.

**DECISION**

**STATEMENT OF THE CASE**

BENJAMIN W. GREEN, Administrative Law Judge.  This case arises out of employee concerns and protests regarding the Respondent's COVID-19 safety measures at its Staten Island facility.  The complaint alleges that the Respondent violated Section 8(a)(1) of the Act by suspending and discharging Gerald Bryson because of his protected concerted activities.

Bryson and his coworkers collectively met with management regarding their safety concerns and then protested outside the facility on their own time to convince the Respondent to close the facility for disinfection and cleaning.  The Respondent does not deny that Bryson's participation in this activity was both protected and concerted.  On April 6, 2020,[1] during a protected concerted protest, Bryson told a safety officer "to shut it down."  Coworker Dimitra Evans was present on a break and said, "ain't gonna shut it down.  It's the only fucking job open so appreciate it."  An argument ensued.  A video recording of that argument was entered into evidence.[2]  (R. Exh. 122)  A manager witnessed the argument and the Respondent initiated an investigation.  The Respondent ultimately suspended Bryson on April 10 and discharged him on April 17.  The Respondent issued only a first written warning to Evans on April  17.

---

[1]  All dates herein refer to 2020 unless stated otherwise.

[2]  The video was transcribed by me to the best of my ability and the transcription is attached hereto as "Appendix B."  The transcription does not always capture the proper sequence of the employees' statements because they often spoke simultaneously.  However, transcript entries include a video time range where the employees spoke over each other.

The Charging Party filed the charge in this case on June 17.  The Regional Director for Region 29 issued the complaint on December 22, which alleged that Bryson engaged in
5  protected concerted protest activity on April 6.  The Respondent filed an answer to the complaint on January 5, 2021 and an amended answer on February 24, 2021.  The Respondent denied in these answers that Bryson engaged in protected concerted activity.  On March 23, 2021, the Regional Director issued a notice of intent to amend the complaint by adding allegations that, on March 25 and 30, Bryson engaged in additional protected concerted activity when he and
10  coworkers met with managers regarding COVID protections.  The case was tried on April 12, 19, 26, May 3-5, 10, 11, 13, 14, 17, 24-27, and December 13 2021.  On May 22, 2021, the Respondent moved to amend its answer to admit that Bryson engaged in all the protected concerted activities alleged in the complaint.  I allowed the amendments.

15  The Respondent contends that this case should be analyzed under *N.L.R.B. v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964), while the General Counsel contends that, as a result of the Board's recent decision in *General Motors LLC*, 369 NLRB No. 127 (2020), the case should be analyzed under *Wright Line,* 251 NLRB 1083 (1980) enfd. 662 F.2d 899 (1st Cir. 1981) cert. denied 455 U.S. 989 (1982).  I have analyzed the case under both standards and find that the
20  Respondent violated Section 8(a)(1) of the Act by discharging Bryson because of his protected concerted activity.[3]

On the entire record, including my observation of the demeanor of the witnesses, and after considering the post-hearing briefs filed by the General Counsel, the Respondent, and the
25  Charging Party, I render these

### FINDINGS OF FACT[4]

### JURISDICTION

30  The Respondent admits that it satisfies the commerce requirements for jurisdiction and has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.  Accordingly, I find that this dispute affects commerce and the Board has jurisdiction pursuant to Section 10(a) of the Act.

---

[3]  I do not rule herein on the allegation that the Respondent unlawfully suspended Bryson.  The Respondent suspended Bryson's work badge on April 10 and thereby denied him access to the facility.  However, a badge suspension is not a disciplinary action and employees are paid when their badges are suspended.  Between March 28 and April 10, Bryson was out of work on unlimited unpaid leave which the Respondent made available to employees at the start of the pandemic.  Thus, Bryson actually began being paid when his badge was suspended on April 10.  A finding that the Respondent unlawfully suspended Bryson on April 10 would add little to the remedy of my finding that he was unlawfully discharged on April 17.  (Tr. 1264, 1300, 1485)

[4]  The Findings of Fact are a compilation of credible testimony and other evidence, as well as logical inferences drawn therefrom.  In assessing credibility, I rely upon witness demeanor.  I also consider the context of witness' testimony, the quality of their recollection, testimonial consistency, the presence or absence of corroboration, the weight of the respective evidence, established or admitted facts, inherent probabilities, and reasonable inferences that may be drawn from the record as a whole.  See *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001) (citing *Shen Automotive Dealership Group*, 321 NLRB 586, 589 (1996)), enfd. sub nom., 56 Fed. Appx. 516 (D.C. Cir. 2003).

ALLEGED UNFAIR LABOR PRACTICES

**Bryson's Protected Activity, Alleged Misconduct, and Discharge**

5

The Respondent operates a fulfillment center in Staten Island, New York which is designated as JFK8.  Bryson was hired to work at JFK8 in September 2018.  (Tr. 986, 1923)  Bryson worked with employees Christian Smalls and Derrick Palmer.  (Tr. 634, 991-992)  The Respondent contracts with Metro One Security to provide security services at JFK8.  (Tr. 1261)

10  Metro One security officers are not employed by the Respondent.  (Tr. 1215)

In March 2020, the COVID pandemic began in earnest and Amazon employees were deemed essential workers.  (Tr. 613)  However, Smalls, Palmer, and Bryson (collectively the "Smalls group"), among other employees, had safety concerns regarding the Respondent's

15  COVID protocols, including the cleaning and disinfection of equipment.  At the time, little was known for certain about COVID or how transmission could best be avoided.  (Tr. 609-611, 1002)

On March 25, the Smalls group were among employees who approached certain managers, including General Manager Sai Kotha and Human Resources Manager Christine

20  Hernandez, regarding COVID safety concerns.  The employees were off the clock on unpaid time.   During this meeting, Smalls told management, "you guys need to . . . clean the facility and shut it down until you figure out the proper way to keep everyone safe."  (Tr. 648)  The employees obtained this idea after reading in the news that the Respondent closed a facility in Queens for cleaning.  Managers asked the employees to wait in the cafeteria for a response.

25  After waiting in the cafeteria for several hours, a manager entered and told the employees the company was already doing "everything we can."  (Tr. 645-648, 651-653, 995-1002)

On March 30, employees, including the Smalls group, engaged in a protest in the JFK8 parking lot to demand, among other things, that the facility be temporarily closed for cleaning.

30  Employee protestors were off the clock on unpaid time.  (Tr. 661-662, 1006-1007, 1059)

After the protest ended on March 30, the Respondent apparently terminated Smalls for violating a quarantine directive and social distancing policy.  (C.P. Exhs. 3-4)  Smalls' discharge was preceded by a Chime[5] messaging chat between Hernandez and human resource business

35  partner Payal Desai.  (G.C. Exh. 7) (C.P. Exh. 16)  On March 29, Desai stated in a Chime message, "[w]e cannot approach [S]malls with a term mentality.  If his badge is suspended he cannot come in[.]"  Desai further stated, "[t]hen maybe term or final like this lady is saying."  The next day, March 30, Desai continued the Chime chat and asked, "please leave?  Wait did someone talk to Smalls saying hey parking lot counts as amazon property[?]"  Ultimately, Desai

40  reached the following conclusions and Hernandez did not disagree (C.P. Exh. 16):

**Desai:**  Christine…. I know I don't need to tell you.  But come on.
1) Not being in the building = suspending badge.  Which to most would mean not past lenels.
45  2) They were social distancing as requested.
3) It was a peaceful protest.  His right to organize is protected.
4) There were no unsolicited group gatherings.  They were all off the clock waiting to speak to the GM as per open door policy.  And waited patiently.

---

[5] Chime is a communication tool used by the Respondent's staff which includes instant messaging chats, video calling, voice calling, and file sharing.  (Tr. 115-116)

5)   This is going to be perceived as retaliation.

On April 6, a small group of employees (10 or fewer) including Palmer, Bryson, and
Mandi Velasco participated in another protest in the JFK8 parking lot to demand, among other
things, that JFK8 be closed for cleaning.  Again, the employees protested on their own time.
(G.C. Exh. 129(a))  (Tr. 1022)  Bryson and Velasco protested together in the same location.
Bryson carried a white sign and used a megaphone to state concerns while Velasco held a blue
sign and used her phone to stream the event by Facebook Live.  As noted above, during this
protest, Bryson told a safety officer "to shut it down."  Coworker Dimitra Evans was present on a
break and said, "ain't gonna shut it down.  It's the only fucking job open so appreciate it."  This
led to an argument which was recorded by Velasco.  (R. Exh. 122) (Appendix B, infra)

Following this argument, Bryson walked to another location in the parking lot where
employee Jordan Flowers was also streaming to Facebook Live.  (G.C. Exh. 63)  Flowers asked
Bryson to speak on the video and he did.  Bryson talked about, among other things, employee
efforts to have JFK8 closed for cleaning and his argument with Evans.[6]

Senior Operations Manager Maciej Curlej reported to Kotha that he witnessed an
argument between two employees in the parking lot.  Kotha talked to Hernandez and suggested
that human resources investigate the incident.  An investigation was conducted by Human
Resources Business Partner Tyler Grabowski and Loss Prevention Manager Geoffrey Gilbert-
Differ.  Hernandez also learned of Flowers' Facebook Live stream and began watching it.
Regional Senior Human Resources Manager Bradley Campbell testified that Hernandez advised
him of the incident and he asked to participate in the investigation.  The Respondent's
investigation was initiated by management and was not a result of any complaint by Bryson or
Evans.  (Tr. 1593, 1677-1678, 1926-1927)

On the same day the argument took place, April 6, the Respondent quickly identified
Bryson and Evans as the two employees involved.  Grabowski spoke with Evans and she
referred him to three other employee witnesses.  Gilbert-Differ reviewed two soundless video
recordings of the incident and identified a fourth witness.  (G.C. Exhs. 52, 62)  After speaking
with Evans and the five witnesses (including Curlej), Grabowski asked them to provide written
statements.  (Tr. 1209-2011, 1218-1219, 1449-1473, 1926-1928) (R. Exhs. 8-13)

The witness' statements referenced cursing and antagonistic comments by Bryson, but
not Evans, and were not entirely accurate.  (R. Exhs. 8-13)  A Metro One security officer
incorrectly stated that "[a]t no time did [Evans] become confrontational towards Mr. Bryson" and
"[a]t no time did Ms. Evans become aggressive towards Mr. Bryson nor engaged in name calling
or made any derogatory statements toward Mr. Bryson."  (R. Exh. 8)  Another Metro One
security officer correctly stated that Evans told Bryson to "make me shut up," but incorrectly
claimed that Bryson told Evans to "come here and I'll make you."  (R. Exh. 11)  An employee
witness spoke only of "one associate screaming at another" and not both employees screaming
at each other.  (R. Exh. 9)  Evans incorrectly claimed that Bryson called her the N-word.  (R.
Exh. 10)  Likewise, Curlej incorrectly claimed that Bryson called Evans the N-word and the C-
word.  (Tr. 12)  A human resources team member incorrectly claimed that Evans "quickly went
inside the building following the protestor's remarks."[7]  (R. Exh. 13)

---

[6]  The video was transcribed by me to the best of my ability and the transcription is attached
hereto as "Appendix C."

[7]  I find it implausible that six individuals would view the argument and coincidentally provide
these one-sided, exaggerated accounts unless such accounts were solicited from them.

On April 6 and 7, the Respondent identified Bryson, Palmer, Velasco, Flowers, Brittany Burns, and Helly Rangel among "10 or fewer people" who engaged in protests in the parking lot. (G.G. Exhs. 67-68, 129(a))  At trial, Gilbert-Differ testified that the Respondent tried but failed to
5    identify and interview the employee with the blue sign as the person closest and best situated to hear the argument.  (Tr. 1338,1390, 1399-1400)  Gilbert-Differ further testified that the Respondent generally seeks to obtain as much evidence as possible in harassment investigations, including by interviews of potential witnesses.  (Tr. 1337)  On April 6, Hernandez wrote in a Chime message, "Helly Rangel – Blue sign – tentatively (DA5-7:15) last on site 3/30/20)."  (G.C. Exh. 115)  DA5-
10   7:15 refers to the employee's schedule.  However, Rangel did not work a DA5-07:15 schedule and neither did female protester Burns.  Rangle worked a DC7-7:15 schedule and Burns worked a DA5-06:15 schedule.  Among the female protestors, only Velasco worked a DA5-07:15 schedule.  (Tr. 1990-1991, 2005-2007, 2019-2020)

15       In an April 7 email, Grabowski sent Campbell the witness statements he had collected and summarized the April 6 incident as follows (R. Exh. 17):

According to Dimitra Evans(edimitra), she was outside smoking a cigarette on
         her break while there were protestors making comments about how Amazon
20       should close down.  Dimitra made a comment speaking positive about Amazon
         stating that it allowed associates the opportunity to continue working and earning
         a check.  One of the protestors Gerald Bryson(gbbryso) appeared angered by
         what Dimitra had said and began making inappropriate and vulgar remarks at the
         associate.  The situation then got to the point at which General told Dimitra to
25       shut up, to which she responded to him "make me".  Dimitra then claims Gerald
         said "come over here and I will make you shut up".

The statement allegedly made by Gerald toward Dimitra bout "making her shut
         up" is included in Dimitra and Kaydee's statements.  The other witnesses heard
30       the vulgar comments but did not recall hearing the alleged threat.

On about April 10, Gilbert-Differ prepared a Global Workplace Incident Management (WIM) Reporting Template regarding the events of April 6.  (R. Exh. 15)  The WIM report identified the proximity of the event as "On Site" and the category as "Bullying." Gilbert-Differ's
35   summary of the incident stated as follows (R. Exh. 15):

On April 6, at approximately 1330hrs, Sr. Operations Manager (SOM) Maciej
         informed me, Regional Loss Prevention Manager Geoff Gilbert-Differ of an
         incident which occurred at approximately 1250hrs at JFK8.  It was reported that
40       POI had used abusive, harassing and bullying language towards VICTIM.  POI
         was at the time engaged in a protest in the parking lot, outside the front entrance
         of JFK8.  Victim was on lunch break in the parking lot at the time of the event.

I conducted video review of this incident, which showed Victim sitting on a curb
45       observing POI and one other individual engaging protest with signs.  POI was
         using a bull horn.  An apparent verbal interaction between POI and Victim
         occurred.  Victim was observed initially interacting with POI from a seated
         position on the curb, with POI responding using their bull horn, approximately 20
         feet apart.  Victim stood up and walked from camera left-right on camera 1600,
50       before proceeding to the main entrance.  On camera 1886 Victim can be seen
         reacting to something apparently shouted by POI.  Victim and POI again had a
         verbal exchange, before victim entered JFK8 via the main entrance.

JD(NY)-05-22

I reviewed statements from Victim, SOM Curlej, Sr. Human Resources Assistant (SHRA) Shaianna Donaldson, Process Assistant (PA) Christopher Urso, Metro One Security Supervisor Kaydee Bertone and Metro One Security Manager Paul Chierchio.  All reported hearing POI verbally abusing Victim.  Words reported as used by POI included racially abusive words, comments about Victim's physical appearance, references to Victim being a drug abuser and sexual terms of abuse.

I reviewed a capture of a Facebook live video showing POI, apparently just after the event, in which POI refers to an "argument" they had with Victim who POI referred to as a "plant".  POI talked of this getting "out of hand" and of "being pushed to the limit and having "no choice".  POI referred to Amazon hiring "the scum of the earth", "junkies", referring to an associate, believed to be Victim, who "looked like [GENDER IDENTIFIER REMOVED] was on fentanyl or something else".  POI described language used consistent Victim's account of the exchange.  POI also used physical descriptions consistent with abusive terms witnessed during the event with Victim.

POI's badge has been suspended pending further investigation.

In the WIM report, under "Recommended Next Steps," Gilbert-Difer recommended a "seek-to-understand"[8] interview and termination as follows (R. Exh. 18):

Seek to Understand to be conducted by site HR together with site Loss Prevention team.  Following review of available evidence, Loss Prevention recommends termination of employment for POI for bullying and harassment of victim, in violation of GSO Management-Workplace Incident Management Standard.

At trial, Gilbert-Differ testified that Bryson's comments on the Jordan Flowers Facebook Live video contributed to his discharge recommendation.  Gilbert-Differ testified that Bryson referred to Evans as a company "plant" or "corporate stooge," a "junkie," and the "scum of the earth."  Gilbert-Differ also testified that Bryson did not show any remorse for the argument and objected to Bryson's repeated use of the "N-word," which Flowers appeared to apologize for.[9] (Tr. 1243-1246)

Meanwhile, on April 10, Grabowski emailed Campbell and Hernandez questions he intended to ask Bryson in a seek-to-understand interview that day.  Grabowski also included "potential feedback verbiage" as follows (R. Exh. 18):

---

[8]  A "seek-to-understand" interview is a conversation with an employee to obtain all the facts and information regarding an incident.  (Tr. 482-485)  Managers sometimes used "STU" as shorthand for a "seek-to-understand" interview.  (Tr. 1503) (R. Exh. 18)

[9]  Bryson referred to leaked notes of a meeting attended by Jeff Bezos, at which, Smalls was described by the Respondent's General Counsel as not intelligent.  (C.P. Exh. 3-4)  (Tr. 962-964) Bryson twice indicated that Amazon was going to make Smalls seem like a "dumb [N-word]" (using the actual word) so "this will be over."  Bryson admitted that "not intelligent" was the words used by management and "not [the N-word] so much."  (G.C. Exh. 63, Time Range [54:24-55:55:38]) (Appendix C, infra).

6

**Details of Incident**
The following feedback pertains to Amazon's Standard of Conduct.  Abusive,
vulgar, or harassing language to a supervisor, fellow associate, or vender is
5       prohibited and classified as a Category 2 violation of the Standards of Conduct.
Harassment is unwanted conduct that affects one's dignity at work.  It is
personally offensive and creates an intimidating, hostile, degrading, humiliating
or offensive work environment.  On 4/6/2020, you were reported to be in violation
of this policy by making vulgar and derogatory comments toward another
10      employee.

**Areas of Improvement**
Amazon is committed to providing a work environment that promotes the health,
safety, and productivity of its associates.  Associates are expected to treat each
15      other, contractors, customers, and visitors with courtesy and professionalism.
Amazon will not tolerate Abusive, vulgar, or harassing language or behavior.
You are expected to be in compliance with Standards of Conduct policy at all
times while working in the Fulfilment Center.  This feedback has result in
separation of employment.
20

        On April 10, Grabowski interviewed Bryson by phone with operations team member
Zachary Marc and loss prevention specialist Henry Carbajal on the call.  Grabowski took
contemporaneous notes and those notes were entered into evidence.  (R. Exh. 19)  Bryson and
Grabowski both testified about the conversation.  (Tr. 1062-1066, 1129-1130, 1488-1500)  Their
25      accounts of the conversation were not dramatically different.  However, Bryson testified that he
informed Grabowski that Evans told him to "Go back to the Bronx," while Grabowski denied that
Bryson made any reference to a racial comment.[10]

        Grabowski testified that he followed up with Evans to discuss certain information Bryson
30      provided during his interview.  (Tr. 1507-1512) (R. Exhs. 19-20)  According to Grabowski's notes
of the interview, Evans "denie[d] saying anything inappropriately when engaging Gerald (No
curse words or derogatory statement)."  Evans admitted only that she responded to one
comment by saying "your mother" and flipped Bryson off in response to another comment.
Evans also claimed that Bryson said, "I'm going to make you shut up."  (R. Exh. 19)  The
35      Respondent did not follow up with any witnesses other than Evans.  (Tr. 1397-1399, 1845-1846)

        Meanwhile, human resources compiled a group of 26 employee disciplines involving
incidents believed to be similar to the April 6 incident.  (Tr. 1716) (R. Exh. 27)  The record
contains an "Executive Summary" which described those "26 cases at JFK8 where similar
40      bullying or harassing behavior resulted in . . . a final written warning or termination."  (G.C. Exh.
25)  The summary also stated that, "[c]onsidering the precedent set by these 26 cases, there are
six similar in nature where demeaning words are used that are not of a sexual nature. Four of
those resulted in termination and two resulted in a FWW."  The summary concluded that, "[w]hile

---

        [10] I credit Bryson over Grabowski.  Evans did, in fact, tell Bryson to "Go back to where you came
from.  Go back to the Bronx."  Evans made the comment early in the argument when the employees
began insulting each other and Bryson clearly took exception to the remark.  It is unlikely that Bryson
would fail to convey such a prominent remark to which he had a strong reaction.  Further, as noted
above, the evidence indicates that Grabowski solicited witness statements that referenced Bryson's
offensive language while ignoring such language by Evans.  Accordingly, it is likely that Grabowski
also disregarded such comments by Evans to the extent they were communicated to him by Bryson.

the NRLA may protect the protest activity that Bryson engaged in, he loses that protection due to this behavior."

5    The Respondent has an "Owner's Manual and Guide to Employment" with "Standards of Conduct." (G.C. Exh. 8, p. 27-28) The "Standards of Conduct are a list of examples of infractions that may result in corrective action, up to and including termination of employment." (G.C. Exh. 8) These infractions are grouped into categories 1 and 2. Category 1 infractions "are regarded as extremely serious, and termination of employment may result[.]" Category 2 infractions "are considered serious, and generally result in corrective action[.]" (G.C. Exh. 8)

10

At trial, Campbell testified that he reached the following conclusions regarding the incident on April 6 (Tr. 1705-1706):

15    I concluded that two associates had a -- verbal altercation in the parking lot. You know, based on what we know, Ms. Evans disagreed with the stance that Mr. Bryson was taking, but then Mr. Bryson then verbally assaulted her, calling her -- or accusing her of being a drug user, being on drugs, talking about her physical attributes, dark circles under her eyes, track marks on her arms, going on then to -- not bring her family into it, but states she doesn't have a family, that she
20    doesn't have kids, goes -- we also concluded that -- that he called her the B-word, based on his own admission as well as her statement, as well as other others. He probably called her some other things based on witness statements and his own use of vulgar language on the Facebook Live video to the point that even -- even after she retreated, he continued that aggressive behavior and --
25    and -- and -- and harassed her publicly and then honestly broadcast it on Facebook Live so that the whole world could continue to hear these things about this individual that I -- I assume he did know until this moment.

When asked what "other things [Bryson] probably called [Evans]," Campbell responded,
30    "the most apparent one is . . . the use of the N-word." (Tr. 1707) In fact, Bryson did not call Evans the N-word. (G.C. Exh. 63) (R. Exh. 122) (Appendix B & C, infra)

On April 17, the Respondent issued a first written warning to Evans for the April 6 argument with Bryson. The warning described the incident as follows (G.C. Exh. 10):
35
The following feedback pertains to Amazon's Standards of Conduct. These behaviors are violations of Amazon's Standards of Conduct policy, . . . Inappropriate Language or Behavior . . . ; and is considered a Category 2 violation of the Standards of Conduct. It was found that you used inappropriate
40    language while engaging another employee in the parking lot on 4/6/20.

On April 17, the Respondent terminated Bryson for the April 6 argument with Evans. The termination notice describes the details of the incident as follows (G.C. Exh. 9):

45    The following feedback pertains to Amazon's Standards of Conduct. Abusive, vulgar, or harassing language to a supervisor, fellow associate, or vendor is prohibited and classified as a Category 2 violation of the Standards of Conduct. Harassment is unwanted conduct that affects one's dignity at work. It is personally offensive and creates an intimidating, hostile, degrading, humiliating or offensive work environment.
50    On 4/6/2020, you were reported to be in violation of this policy by making vulgar and derogatory comments towards another employee.

8

JD(NY)-05-22

On direct examination, Gilbert-Differ was asked to explain why Bryson engaged in harassment but Evans did not.  Gilbert-Differ testified that Bryson engaged in harassment because it was "repeated behaviors or continuing behavior."  (Tr. 1273-1274)  When asked what was repeated and continuing about the incident, Gilbert-Differ explained that the "determination
5    was based on the length of this event, two-and-a-half minutes, as best we could tell, largely, you know, instigated and led by Mr. Bryson." (Tr. 1274-1275)  Upon subsequent questioning by me, Gilbert-Differ claimed that Bryson's conduct was continuous because he also talked about the argument "to a potentially global audience through social media."  (Tr. 1414)

10    **Discipline of other Employees**

A number of disciplinary records issued to employees other than Bryson were entered into evidence.  These records contain discipline less than discharge issued to employees for conduct that involved inappropriate language and/or which the Respondent characterized as
15    creating a hostile work environment.  The records also contain discipline less than discharge for conduct more threatening than that of Bryson or which involved physical touching.  These disciplinary records include the following:

 (G.C. Exh. 26)  - First written warning for "bumping past a fellow associate" while calling
20    the associate a "bitch" and telling her to "shut the fuck up."

(G.C. Exh. 11) - Final written warning for category 1 security infraction of bringing a weapon to work.

25    (G.C. Exh. 39(a)) – First written warning for sexual contact without consent.

(G.C. Exh. 43(a)) - First written warning where employee told an area manager she wanted to "rip off her mouth" and "punch her."

30     (G.C. Exh. 45(b)) - Final written warning for raising an elbow and hitting another employee.

(G.C. Exh. 47(a)) - First written warning for telling a manager "fuck management this is bullshit," then "curs[ing] multiple times" while sticking his "middle fingers up toward the manager
35    and at the camera."  During a subsequent seek-to-understand interview, the employee stuck his "middle fingers up at the camera and said this is fucking bullshit and wrong."

(G.C. Exh.  75(a)) – First written warning for "using inappropriate and profane language towards another associate in a manner that created a hostile work environment."
40

(G.C. Exh. 77) - First written warning for cursing at a manager "multiple times."

(G.C. Exh. 79) - Final written warning for "using curse words and creating hostile work environment" in "using inappropriate language while talking to another associate."
45

(G.C. Exh. 81) - Final written warning for category 1 violation of yelling at an employee; calling her a "little girl," calling her a "bitch," and saying "you got me fucked up messing with the wrong person."

50    (G.C. Exhs. 83(a), 84(a)) - Two employees issued final written warnings for calling another employee a "bitch and whore several times."

(G.C. Exh. 85) - Final written warning for physically blocking another employee from walking and calling her a "stupid bitch."

5    (G.C. Exh. 85) – Final written warning for "verbal threats" to another employee.  (G.C. Exh. 87)

(G.C. Exh. 92) - First written warning for refusing a manager's request and "displaying aggressive behavior" in screaming "you are a nobody, get out of here, you don't mean anything to me" before walking away.

10   (G.C. Exh. 104) - Final written warning for engaging in a "work place violence incident."

(G.C. Exh. 105) - Final written warning for "threaten[ing]" an employee "to see him outside . . . which falls under Amazon Workplace Violence standard of conduct."

15   (G.C. Exh. 108(a) & (b)) – Final written warning for threatening another employee.

As noted above, the Respondent has terminated employees for misconduct it deemed similar to Bryson's argument with Evans.  (R. Exh. 27)  Further, the record contains discipline
20   (but not terminations) for conduct which occurred in breakrooms. (G.C. Exhs. 26, 83, 84, 105)  It is not clear whether these breakroom disciplines were issued to employees who were on paid or unpaid time.  The record does not appear to contain any discipline issued to employees for misconduct outside the facility.

25   **Subpoenas and Evidentiary Sanctions**

The General Counsel and Charging Party issued subpoenas duces tecum to the Respondent in advance of the trial.  At trial, the parties spent a great deal of time arguing over whether the Respondent complied with the subpoenas.  The General Counsel and Charging
30   Party requested evidentiary sanctions for the Respondent's alleged non-compliance with the subpoenas while the Respondent opposed these requests.  In particular, the Respondent objected to the production of documents responsive to paragraph 19 of the subpoenas and the imposition of sanctions for its failure to produce all documents responsive thereto.  Paragraph 19 of the General Counsel's subpoena requested the following documents:[11]
35

19.  For the time period from March 1, 2020 to April 30, 2020, documents mentioning, discussing or pertaining to the Charging Party's discussions with employees or discussions with Respondent's supervisors, managers or agents on behalf of employees regarding COVID-19 safety precautions including:
40

(a) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson raising COVID-19 safety concerns at
45   Respondent management meetings;

(b) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting

---

[11]  Paragraph 19 of the Charging Party's subpoena is similar to paragraph 19 of the General Counsel's subpoena except it refers to the activity of Bryson, Smalls, Palmer, and Flowers.

handouts, and investigative reports by, between and among Respondent's managers, supervisors and/or agents regarding media coverage of Bryson protesting;

5      (c) Internal communications including but not limited to electronic communications, emails, text messages, notes, meeting minutes, meeting handouts, and investigative reports by, between and among Respondent's supervisors and/or agents regarding Bryson's participation in protests outside of Respondent's JFK8 Facility regarding COVID-19 safety concerns; and

10     (d) Documents mentioning, discussing or pertaining to employee sentiment regarding greater COVID-19 safety precautions, including but not limited to lists identifying likely or possible protest supporters or organizers.

15     In a written order prior to trial and again on the record, I ordered the Respondent to produce documents responsive to subpoena paragraphs 19. In the process, I discussed with the parties whether *Burnup & Sims* (discussed below) was the proper legal standard in this case and the elements of that standard. The parties were advised that, if the appropriate standard were determined to be *Burnup & Sims*, the second element requires the Respondent to show it

20     had an honest, good-faith belief that Bryson engaged in serious misconduct warranting discharge. The Respondent was further advised that the General Counsel and Charging Party were looking for documents responsive to paragraph 19 which might rebut any claim by the Respondent that it had such an honest, good-faith belief. In particular, the Respondent was advised that such evidence might include a managerial communication indicating that employees are not normally discharged for activity outside the facility on their own free time.

25     (Tr. 1757-1758, 1762-1769, 1776-1778)

       The Respondent filed with the Board a special appeal of my order directing the production of documents responsive to subpoena paragraphs 19. On November 18, the Board

30     rejected the Respondent's special appeal. (G.C. Exh. 128) Nevertheless, the Respondent admittedly refused to produce to the General Counsel and Charging Party all documents responsive to subpoena paragraphs 19. (Tr. 2099)

       On December 27, 2021, I issued an order summarizing the parties' dispute regarding

35     subpoena paragraphs 19 and the Respondent's failure to comply with a Board order directing the production of those documents. I also found that the Respondent did not produce a timely privilege log for privileged documents responsive to subpoena paragraphs 19. I determined that evidentiary sanctions for subpoena non-compliance were appropriate. *McCallister Towing & Transportation*, 341 NLRB 394 (2004); *San Luis Trucking*, 352 NLRB 211 (2008). However, I

40     left it to the parties to address in their briefs what the specific sanctions should or should not be.

## ANALYSIS

       The General Counsel contends that the Respondent violated Section 8(a)(1) of the Act

45     by discharging Bryson because of his protected concerted activity. The Respondent contends that it lawfully discharged Bryson for comments he made during the argument with Evans and on the Flowers Facebook Live video. As noted above, the Respondent takes the position that this case must be analyzed under *N.L.R.B. v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964), while the CGC asserts that, pursuant to the Board's recent decision in *General Motors LLC*, 369 NLRB

50     No. 127 (2020), the proper analysis is *Wright Line,* 251 NLRB 1083 (1980). Below, I analyze the case under both standards and find that the Respondent violated Section 8(a)(1) of the Act by discharging Bryson because of his protected concerted activity.

### *N.L.R.B. v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964)

In *N.L.R.B. v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964), the Supreme Court held that an
5  employer unlawfully discharged two employees for soliciting union membership from another
employee even though the employer had a good-faith but mistaken belief that the
discriminatees made threats against company property in the process.  This seminal case
stands for the proposition that an employer's discharge of an employee for alleged misconduct
in the context of protected activity will be evaluated on the basis of the employee's actual
10  conduct and not the employer's good-faith misperception of the same.

The Supreme Court also indicated that, where "an employee is discharged for
misconduct arising out of a protected activity," a violation "does not necessarily depend on the
existence of an anti-union bias."  Id. at 23.  The court explained that it would "weaken or
15  destroy" Section 7 rights and "protected activity acquires a precarious status if innocent
employees can be discharged while engaging in it, even though the employer acts in good
faith."  Id.  Thus, under *Burnup & Sims*, the General Counsel need not make an independent
showing of animus where an employer discharges an employee for misconduct arising out of
protected activity.  See also *Aqua-Aston Hospitality, Inc.*, 365 NLRB No. 53 (2017) ("the
20  existence or lack of unlawful animus is not relevant" under *Burnup & Sims*).  However, the
Supreme Court conceded that "quite different considerations might apply" where alleged
misconduct is "wholly disassociated from [§] 7 activities . . .."  Id. at 24.

Ultimately, the Supreme Court outlined the following circumstances in which an
25  employer will be found to have violated the Act (Id. at 23):

In sum, [§] 8(a)(1) is violated if it is shown that the discharged employee was at
the time engaged in a protected activity, that the employer knew it was such, that
the basis of the discharge was an alleged act of misconduct in the course of that
30      activity, and that the employee was not, in fact, guilty of that misconduct.

### The *Wright Line* and *Burnup & Sims* Standards following the Board's Decision in *General Motors*, 369 NLRB No. 127 (2020)

35  Under *Wright Line*, the Board has used a two-step burden shifting analysis where an
employee engaged in misconduct disassociated from Section 7 activity.  The General Counsel's
initial burden of establishing a prima facie case was recently described by the Board in
*Wismettac Asian Foods, Inc.*, 371 NLRB No. 9 (2021) as follows:

40      [T]he General Counsel has the initial burden of establishing, by a preponderance
of the evidence, that [the employee's] protected activity was a motivating factor in
the decision to issue the [adverse employment action].  The elements commonly
required to support the General Counsel's initial burden [are] (1) union or other
protected activity by the employee, (2) employer knowledge of that activity, and
45      (3) antiunion animus, or animus against protected activity, on the part of the
employer.  The evidence of animus or hostility must be sufficient to establish a
causal relationship between the employee's protected activity and the employer's
adverse action against the employee.  *Tschiggfrie Properties, Ltd.*, 368 NLRB
No. 120, slip op. at 6-8 (2019).
50
Once the General Counsel establishes a prima facie case, the burden shifts to the
employer "to demonstrate that the same action would have taken place even in the absence of

the protected conduct." *Wright Line*, supra, at 1089.  If the Respondent's stated reason for discharging an employee is found to be pretextual and the true motivation is the employee's protected activity, a *Wright Line* "mixed-motive" defense is not available.  *Parkview Lounge, LLC*, 366 NLRB No. 71 (2018); *K-Air Corp.*, 360 NLRB 143, 144 (2014).

5

The *Wright Line* analysis effectively requires that we identify each employee activity which motivated the alleged unlawful employment decision and place each one in a box – the protected activity box or the unprotected misconduct box.  If we identify only protected activity as a motivating factor, a violation is found.  If we identify only unprotected misconduct as a motiving
10  factor, a violation is not found.  If we identify both protected and unprotected activities as significant motivating factors, the employer must prove it would have discharged the employee for the unprotected misconduct alone (regardless of any additional unlawful motive).

As a practical matter, the *Wright Line* analysis can be difficult when it is not clear in
15  which box to place certain activity (as some conduct may appear to be both protected and unprotected).  For example, in a grievance meeting, an employee would engage in protected activity by respectfully rejecting an employer's settlement offer, but may not be protected for disrespectfully rejecting that offer.  There is no difference in the meaning conveyed by the phrases "no thank you" and "shove it up your ass."  See *General Motors LLC*, 369 NLRB No. 127
20  (2020).[12]  However, the former is protected while the latter, arguably, is not.  Id.

The Board has used a three-step burden shifting analysis to evaluate cases which fall within the scope of the Supreme Court's *Burnup & Sims* decision.  The General Counsel must initially establish that an employee was discharged for alleged misconduct which occurred in the
25  course of protected activity.  *Pepsi-Cola Co.*, 330 NLRB 474 (2000); *Taylor Motors, Inc.*, 365 NLRB No. 21 (2017) remanded for decision in 366 NLRB No. 69 (2018).  Once this burden is satisfied, the employer must show that it had an honest, good-faith belief that the employee engaged in serious misconduct.  *Pepsi-Cola Co.*, supra, at 474; *Nestle USA, Inc.*, 370 NLRB No. 53, fn. 2 (2020).  Once the employer establishes that it had such a belief, the burden shifts back
30  to the General Counsel to show that the misconduct did not in fact occur.  Id.  Alternatively, at least before the Board's decision in *General Motors*, the General Counsel could show that the employee's conduct was not "sufficiently opprobrious to deprive [the employee] of the Act's protection." *Taylor Motors, Inc.*, supra, slip op. 1, fn. 5.

35  In *General Motors*, the Board identified and overruled cases in which it previously "found that an employer violates the Act by disciplining an employee based on abus[ive] conduct 'that is part of the res gestae' of Section 7 activity, unless evidence shows that the abusive conduct was severe enough to lose the employee the Act's protection."  369 NLRB No. 127, slip op. 6 (overruling cases including *Atlantic Steele Co.*, 245 NLRB 814 (1979)).  In those overruled
40  cases, the Board evaluated an employee's conduct to determine, in light of past precedent, whether the protected activity was so marred by misconduct as to lose the protection of the Act.  However, the Board determined in *General Motors* that such cases would now be evaluated under *Wright Line*.  Thus, a *Wright Line* affirmative defense will turn on the specific policies and practices of a particular employer and whether the employer would have discharged the

---

[12]  In *General Motors LLC*, 369 NLRB No. 127 (2020), the alleged discriminatee was an employee and union committeeperson who had certain verbal altercations with managers.  In one exchange regarding overtime coverage for employees away on cross-training, the employee said he did not "give a fuck about your cross-training," that "we're not going to do any fuckin' cross-training if you're going to be acting that way," and the manager could "shove it up [his] fuckin' ass."  Id.  The Board remanded the case to the judge for consideration under *Wright Line*.

JD(NY)-05-22

employee for the misconduct alone, regardless of any protected activity.  The Board recognized
in *General Motors*, supra, slip op. 10, fn. 27, that nothing in the decision may be read as in
conflict with binding Supreme Court precedent in *Burnup & Sims*.

5          The second step of the *Burnup & Sims* standard does not implicate *General Motors*, but
requires clarification as to the manner in which I intend to apply it.  At the second step, when we
speak of a "good-faith" belief, *Nestle USA, Inc.*, 370 NLRB No. 53, fn. 2 (2020), it means an
employer may not shield itself from learning of an employee's actual misconduct in an act of
willful blindness.  Further, when we speak of "serious misconduct, " *Pepsi-Cola Co.*, 330 NLRB
10         474, 474 (2000), it means misconduct "warranting discharge."  The analytical framework would
make little sense if an employer could successfully defend against a discriminatory discharge
allegation even though it did not actually possess an honest, good-faith belief that the employee
engaged in a dischargeable offense.  If this were so, an employee accused of misconduct in the
context of protected activity would have less protection than employees accused of misconduct
15         in a context disassociated from such activity.

           The Respondent contends that it need only establish at step two that Bryson engaged in
some sort of misconduct and, then, the burden shifts back to the General Counsel to prove that
Bryson did not actually engage in serious misconduct warranting discharge.  However, I believe
20         this approach is inconsistent with the Board's treatment of discharge cases under *Wright Line*.
In *Wright Line*, once the General Counsel establishes a prima facie case, the *employer* must
prove that the employee's misconduct, alone, warranted discharge.  A benefit of this approach is
that the employer is most familiar with its own disciplinary policies and practices.

25         The third step of the *Burnup & Sims* analysis potentially implicates *General Motors*.  In
*Taylor Motors*, the Board noted that the General Counsel may satisfy its third step burden by
establishing that the employee's conduct was not "sufficiently opprobrious to deprive [the
employee] of the Act's protection."  366 NLRB No. 69, slip op. 1, fn. 5 (2018).  This is the type of
analysis rejected by the Board in *General Motors*.  However, the *Burnup & Sims* standard can
30         still be applied in a manner that is consistent with *General Motors* by determining whether the
employee actually engaged in serious misconduct warranting discharge under the particular
policies and practices of that employer.  That is, the Board will no longer evaluate the
employee's misconduct and make its own determination, in accordance with past precedent,
whether it was so offensive as to lose the protection of the Act.  Thus, the *Burnup & Sims*
35         analysis should be applied as follows:

           1)  The General Counsel must prove that an employee was discharged for alleged
               misconduct which arises in the course of protected activity.
           2)  The burden shifts to the Respondent to prove it had an honest, good-faith belief that
40             the employee engaged in serious misconduct warranting discharge.
           3)  The burden shifts back to the General Counsel to prove:
               a)  The employee did not engage in such misconduct, or
               b)  Considering the policies and practices of the particular employer, the employee's
                   conduct was not so serious as to warrant discharge.

45
*Pepsi-Cola Co.*, 330 NLRB 474 (2000); *Taylor Motors, Inc.*, 365 NLRB No. 21 (2017); *Nestle
USA, Inc.*, 370 NLRB No. 53, fn. 2 (2020).

**Bryson's Protected Activity**

50         The Respondent does not deny that Bryson and other employees were engaged in
protected concerted activity when they raised certain COVID related safety concerns to the

14

attention of management and protested outside the facility.  However, the Respondent does not admit that Bryson's argument with Evans and comments on the Jordan Facebook Live video were, at least in part, protected concerted activity.

5         Employees have a Section 7 right to discuss their safety concerns and what should be done about them.  See *St. Paul Park Refining Co., LLC*, 366 NLRB No. 83, fn. 3 (2018).  Employees also have a Section 7 right to discuss the availability of work and pay.  See *Healthy Minds, Inc.*, 371 NLRB No. 6 (2021).  Employees need not always agree and tempers may flare on subjects as important as employee safety during a deadly pandemic and the potential closure

10    of a facility.  Nevertheless, employees must be allowed to exchange opinions in contemplation of a proposed course of action for their mutual aid and protection.  Id.  It would be difficult for employees to decide upon a course of action if they cannot first debate the topic.  The employee exchange at the heart of this case began as follows:

15        Bryson:  Mr. Safety man.  Mr. Safety man.  You hear me.  I'm talking to you.  Y'all was out here the other day ready to do something to Chris.  It was all good then.  You know.  [Unintelligible.]  You need to shut it down.

        Evans:  Ain't gonna shut it down.  It's the only fucking job open so appreciate it.

20        Bryson (2:02-2:05):  We don't have to appreciate something where you can bring something home to your family.

25        Evans  (2:04-2:09):  So then just go home.  Go home.  You want… no one is gonna listen to you so just go home.

        Bryson (2:09-2:10):  Where you at?  Where you at?

        Evans (2:10-2:12):  Where you at?  Show your face.

30        Bryson:  Where you at?  I'm right here.  You see me.

        Evans:  No.

35        Evans:  Looking right at you, sir.

        Bryson:  Where?

40        Bryson:  You don't have to sit over you don't gotta say nothing.   Where you come from?

        Evans:  Where you come from?

45        Bryson:  What is this your first job?  Must be your first job because you sold your soul for $2.

        Until this point in the conversation, at the very least, Bryson and Evans were engaged in protected concerted activity rather than unprotected misconduct.[13]  Thereafter, the conversation

---

[13]  It is equally obvious to me that portions of Bryson's comments on the Flowers Facebook Live video also constituted protected concerted activity.

quickly deteriorated into name calling initiated by Bryson and returned in kind by Evans. However, even as the employees insulted each other, Bryson continued to talk about workplace safety and Evans continued to talk about employees making money.  At one point, Bryson said, "You got any kids you are gonna bring it home to them?  Nah, you ain't got no kids.  You
5   probably barely got a house.  You look like you sleep in the gutter, so."  Later in the argument, Evans said, "Bye douche bag.  Bye.  Bye felicia.  Bye. Bye.  I'm making money you ain't."  And as the Respondent concedes, the entire exchange occurred in the context of Bryson's protected concerted protest activity to convince the Respondent to improve its response to the pandemic.

10   ***Burnup & Sims* Analysis**

The Respondent has requested a *Burnup & Sims* analysis and I agree that it is appropriate since the Respondent accused Bryson of misconduct arising in the course of protected concerted activity.  The elements of the three-step *Burnup & Sims* analysis are
15   described above and applied below.

*Step 1*

The argument between Bryson and Evans occurred while Bryson was engaged in
20   protected concerted protest activity to compel the Respondent to shut the facility down for cleaning.  Bryson's argument with Evans and his comments on the Flowers video were also at least partially protected and concerted.  The Respondent has claimed that it discharged Bryson for this activity.  The Respondent does not defend against a violation at the first step of the *Burnup & Sims* analysis and the General Counsel's burden at that step is satisfied.

25   *Step 2*

The burden then shifts to the Respondent to prove it had an honest, good-faith belief that Bryson engaged in serious misconduct warranting discharge.  The Respondent has failed to
30   satisfy this burden.  The Respondent's refusal to comply with a Board order directing it to produce subpoenaed documents relevant to this issue requires an adverse inference that the Respondent had no such honest and good-faith belief.  At hearing, the Respondent was specifically told that subpoenas sought documents which might rebut the Respondent's claim that it had an honest and good-faith belief regarding the severity of Bryson's misconduct.
35   Nevertheless, the Respondent refused to produce all documents responsive to the subpoenas and failed to produce a timely privilege log.  Since we do not know what the undisclosed documents would show, I must infer that they would not support the Respondent's case.  In essence, the Respondent's refusal to comply with the subpoenas has effectively negated its ability to litigate its own defense.  *Bannon Mills*, 146 NLRB 611, 614, fn. 4, 633-634 (1964).
40
An inference is particularly appropriate here because the evidence suggests that the production of documents responsive to subpoena paragraphs 19 may have yielded admissions that the Respondent did not believe Bryson engaged in misconduct warranting discharge.  On March 29 and 30, Desai and Hernandez had a Chime discussion regarding whether Smalls
45   engaged in misconduct warranting discharge.  Desai stated, "[w]e cannot approach [S]malls with a term mentality."  Ultimately, Desai reached the following conclusions:

**Desai:**  Christine…. I know I don't need to tell you.  But come on.
1) Not being in the building = suspending badge.  Which to most would mean
50       not past lenels.
2) They were social distancing as requested.
3) It was a peaceful protest.  His right to organize is protected.

16

4)  There were no unsolicited group gatherings.  They were all off the clock
    waiting to speak to the GM as per open door policy.  And waited patiently.
5)  This is going to be perceived as retaliation.

5          This lends credence to the possibility that the human resources department discussed
by Chime the conduct of Bryson in the same way they discussed the conduct of Smalls.  A copy
of such a discussion may have yielded an admission that the Respondent did not believe
Bryson engaged in dischargeable misconduct by arguing with Evans outside the facility on his
own time regarding matters of serious consequence to both employees.  Absent the documents
10    themselves, I must infer the same.

        Beyond this adverse inference, record evidence supports a finding of a violation at step
two.  Although the exchange between Desai and Hernandez concerned Smalls and not Bryson,
it demonstrated that the human resources department looked skeptically upon the discharge of
15    an employee exercising his right to engage in a non-violent "peaceful protest" while "off the
clock" and "not . . . in the building."  Although Desai was not alleged to be a supervisor or agent
of the Respondent, she was a human resources business partner with whom Hernandez
consulted regarding discipline.  Hernandez did not disagree with Desai's conclusions.  Further,
since the Respondent failed to produce subpoenaed records which may have demonstrated
20    what management actually thought of Bryson's conduct outside the facility and off the clock, it is
appropriate to rely upon secondary evidence such as the conclusions of a non-supervisory
human resources business partner regarding the same.  *Shamrock Foods Co.*, 366 NLRB No.
117, slip op. 1, fn. 1, and 24, fn. 61 (2018); *Roofers Local 30 (Associated Builders and
Contractors, Inc.*), 227 NLRB 1444, 1449 (1977).
25

        The discipline of other employees also indicates that the Respondent did not possess an
honest, good-faith belief that Bryson engaged in misconduct warranting discharge.  Consistent
with the opinion of human resources, disciplinary records entered into evidence do not indicate
that the Respondent has ever disciplined or discharged an employee for conduct outside the
30    facility and off the clock.  The Respondent identified 26 comparator disciplinary actions, but
even some of those did not result in termination.  Further, the General Counsel introduced
several additional disciplines short of discharge which were issued to employees for conduct
similar to or worse than the conduct of Bryson.

35        The evidence also failed to indicate that the Respondent conducted a good-faith
investigation of the April 6 incident.  Gilbert-Differ testified that the Respondent tried but failed to
identify the protester with the blue sign who was near Bryson and Evans when the argument
took place.  That protester was Velasco.  Gilbert-Differ's testimony in this regard is not credible.
The Respondent identified three female protestors, including Velasco, and could easily have
40    interviewed them all.  Further, the Respondent identified the protester with the blue sign as an
employee with the schedule of DA5-7:15.  Velasco was the only female protester with such a
schedule.  This should have narrowed the identity of the person holding the blue sign from three
employees to one.  The Respondent, it appears, preferred not to obtain information from
someone who was protesting with Bryson even though that person was likely in the best
45    position to explain what happened.  An employer cannot manufacture the loss of an employee's
Section 7 protection by engaging in an ostrich-like, head in the ground, investigation that seeks
to avoid evidence which might disclose information mitigating the employee's misconduct.  Such
an investigation does not yield a "good-faith" belief that the employee engaged in misconduct

warranting discharge.[14]  *Aqua-Aston Hospitality*, 365 NLRB No. 53 (2017).

The Respondent's failure to conduct a good-faith investigation is also evidenced by the fact that two managers prepared discharge language before Bryson was interviewed regarding the incident.  I agree with the General Counsel's assertion that the Respondent rushed to judgement and was more concerned about justifying the discharge of Bryson than conducting a good-faith investigation to determine what actually occurred.  *Aqua-Aston Hospitality, LLC*, 365 NLRB No. 53 (2017) (no good-faith belief that employee engaged in misconduct where managers focused on conduct the other employee "denied complaining about").

Similarly, the Respondent's desire to seize upon an opportunity to discharge Bryson can be gleaned from the fact that it solicited a complaint from Evans (Evans did not approach management) and solicited evidence regarding Bryson's misconduct while largely disregarding the role Evans played in the argument.  This, too, undermines the Respondent's claim that it had an honest, good-faith belief that Bryson engaged in misconduct warranting discharge.

Finally, the Respondent's contemporaneous description of the incident demonstrated an inability to distinguish between Bryson's conduct and the conduct of Evans.  Both employees committed category 2 violations which, according to the Respondent's Standards of Conduct, "generally result in corrective action" (while category 1 violations "are regarded as extremely serious, and termination of employment may result").  The Respondent  also failed to credibly explain why Bryson engaged in "repeated or continuous harassment."  Gilbert-Differ testified that the "determination was based on the length of this event, two-and-a-half minutes, as best we could tell, largely, you know, instigated and led by Mr. Bryson."  However, Bryson's misconduct was limited to a single argument and was no more "repeated" or "continuous" than the conduct of Evans.[15]  Further, Gilbert-Differ admitted that Evans initiated the altercation by "disagree[ing] with the stance that Mr. Bryson was taking."  The Respondent's inability to distinguish between the employees' misconduct suggests that the Respondent did not believe Bryson's conduct was worse than the conduct of Evans' (and Evans was not discharged).

Based upon the foregoing, I find a violation at step two of the *Burnup & Sims* standard without engaging in an analysis prohibited by *General Motors* (that is, I do not determine whether Bryson engaged in misconduct so offensive as to lose the protection of the Act).

*Step 3*

Even if I were to find that the Respondent had an honest, good-faith belief that Bryson engaged in misconduct warranting discharge, the evidence indicates that Bryson did not, in fact,

---

[14]  The Respondent asserts that the General Counsel "cannot plausibly argue that Amazon did not have a good-faith belief that Bryson engaged in misconduct because it failed to interview Velasco during its investigation" since Grabowski providing him plenty of time to do so.  R. Brief p. 21, fn. 32. Grabowski testified that Bryson mentioned "there was another female associate that was with him in the parking lot" and offered to identify her, but later reported that he could not.  (Tr. 1492-1493) Although the Respondent did not have Bryson's help, the Respondent was in a position to identify Velasco as the witness best situated to view the incident and could have done so if it wanted to obtain an accurate account of the argument.

[15]  At trial, Campbell relied on Bryson's comments during the Flowers Facebook Live video as a basis for his determination that Bryson should be discharged.  However, Bryson's termination notice refers only to comments Bryson made "towards another employee."  (G.C. Exh. 9)  Bryson's comments on the video stream were not made toward another employee.

engage in dischargeable misconduct under the Respondent's policies and practices.  Here, the Respondent discharged Bryson and not Evans because he was perceived to be the employee who instigated the argument and later threatened Evans when she asked him whether he would make her shut up.  Grabowski attributed to Bryson the statement, "come over here and I will
5    make you shut up," which he later characterized as a threat.  Gilbert-Dilfer described Evans in his summary of the incident as the "victim," discussed only the comments made by Bryson (not by Evans), and noted that certain witnesses accused Bryson of using racially abusive words and the "C" word.  Campbell found it offensive that, in his opinion, Bryson effectively called Evans a "corporate stooge" and the "N-word."
10
       However, we know from *Burnup & Sims* that Bryson must ultimately be evaluated on the basis of his actual conduct and not the Respondent's perception of the same.  Bryson did not initiate the argument with Evans, threaten her, or call anyone the N- or C-word.  In a Facebook Live stream to a voluntary audience and no employee in particular, Bryson characterized leaked
15   management comments as portraying Smalls as a "dumb [N-word]."  If any racial comments were directed at a particular employee, it was the comment that Bryson "go back to where you came from.  Go back to the Bronx."[16]  Evans made this comment and Evans was not discharged.  Bryson did not call Evans a "corporate stooge," but instead speculated that the company sent a "plant" to argue with him.
20
       Considering only what Bryson actually did, the evidence does not establish that he engaged in conduct warranting discharge under the Respondent's policies and practices.  The Respondent classified Bryson's misconduct as a category 2 offense which "generally results in corrective action."  The Respondent did not articulate a meaningful distinction between the
25   category 2 violations of Bryson and Evans, and Evans was not discharged.  The Respondent's human resources department was skeptical of the discharge of an employee involved in a "peaceful protest" while "off the clock" and "not . . . in the building."  It is, therefore, not surprising that the record contains no evidence that an employee was disciplined or discharged for conduct outside the building and off the clock.  Rather, disciplinary records indicate that
30   employees have received discipline less than discharge for conduct similar to or worse than the conduct of Bryson.  I find this evidence sufficient to establish that Bryson did not engage in misconduct warranting discharge under the Respondent's policies and practices.  Accordingly, if I did not find a violation at step two of the *Burnup & Sims* analysis, I would find a violation at step three.
35
### *Wright Line* Analysis

       Having analyzed this case under *Burnup & Sims* as requested by the Respondent, I will make quick work of the *Wright Line* analysis since the Respondent did not evaluate the case
40   under that standard and it is redundant.  The *Wright Line* elements are described above.

       The Respondent admits it was aware of Bryson's protected concerted activity.  Further, the Supreme Court established in *Burnup & Sims*  that, where "an employee is discharged for misconduct arising out of a protected activity," a violation "does not necessarily depend on the
45   existence of an anti-union bias."  379 U.S. at 23.  The *Wright Line* elements of animus and nexus are therefore satisfied as the Respondent admits that Bryson's alleged misconduct arose out of his protected concerted activity.  The General Counsel need not make an independent showing that the Respondent discharged Bryson as a result of animus.

---

       [16]  Bryson could reasonably construe the comment as racial since he is African-American and might question why, other than his race, someone would assume he is from the Bronx.

Regardless, I find that the General Counsel did establish that the Respondent's discharge of Bryson was a result of animus toward his protected concerted activity.  Inferences of animus and nexus are appropriate since the Respondent refused to produce documents in response to subpoena paragraphs 19 which may have disclosed the same.

The record also contains considerable evidence that the Respondent's stated reason for discharging Bryson was mere pretext for its true discriminatory motive.  *Lucky Cab Co.*, 360 NLRB 271, 274 (2014).  In *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, slip op. 8 (2019), the Board noted that discriminatory motivation can be proved by circumstantial evidence.  The Respondent's rush to judgement and skewed investigation designed to blame only Bryson for the April 6 argument provides such circumstantial evidence that the Respondent wanted to discharge Bryson for his protected concerted activity instead of fairly evaluating the incident.  The Respondent solicited only evidence of Bryson's role in the argument (while ignoring the role of Evans) and crafted discharge verbiage before speaking with him.  See  *Lucky Cab Co.*, 360 NLRB at 274 (pretext found where employer "prepared termination . . . prior to the discharge interviews with the discriminatees"); *Grove Manufacturing Co.*, 196 NLRB 280, 287 (1972) (pretext found where employer conducted investigation in "slanted nature" and "spoke only to supervisors, and to employees who had an 'adverse experience' with [discriminatee]").  The Respondent also failed to interview the protestor closest and best situated to describe the event.  See *Wendt Corp.*, 369 NLRB No. 135, slip op. 2, fn. 8 (2020) (pretext where employer's failure to conduct interviews "suggest[ed] a determination to avoid discovering potentially mitigating circumstances").

Evidence of disparate treatment provides additional circumstantial evidence of pretext and supports a finding of causation based on animus.  The Respondent did not terminate Evans even though the Respondent failed to explain why her conduct was meaningfully different than the conduct of Bryson.  The Respondent's standards of conduct generally call for corrective action for category 2 conduct of the kind engaged in by Bryson and Evans.  The Respondent's human resources department looked skeptically upon such activity as a legitimate basis for discharge.  Disciplinary records do not indicate that the Respondent has ever discharged an employee for conduct outside the facility on unpaid time.  Disciplinary records also show that employees have received discipline short of discharge for conduct similar to or worse than the conduct of Bryson.  *Lucky Cab Co.*, 360 NLRB at 274.

Finally, the Respondent cannot establish a *Wright Line* defense that it would have discharged Bryson regardless of his protected concerted activity.  The evidence indicates that the Respondent's stated reason for discharging Bryson was a pretext for his protected concerted activity.  Thus, a "mixed motive" *Wright Line* defense is not available.  *Parkview Lounge, LLC*, 366 NLRB No. 71 (2018); *K-Air Corp.*, 360 NLRB 143, 144 (2014).

Based upon my analysis of this case under *Burnup & Sims* and *Wright Line*, I find that the Respondent violated Section 8(a)(1) of the Act by discharging Bryson because of his protected concerted activity.

CONCLUSIONS OF LAW

1.      The Respondent, Amazon.com Services LLC, is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2.      The Respondent, on April 17, 2020, violated Section 8(a)(1) of the Act by discharging Gerald Bryson because of his protected concerted activity.

3.      The unfair labor practice committed by the Respondents affect commerce within the meaning of Section 2(6) and (7) of the Act.

5                                    THE REMEDY

Having found that the Respondent, Amazon.com Services LLC, engaged in an unfair labor practice, I shall order the Respondent to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

10

The Respondent, having unlawfully discharged Gerald Bryson because of his protected concerted activity, must offer him reinstatement to his former job or if that job no longer exists, to a substantially equivalent position without prejudice to his seniority or any other rights or privileges he enjoyed.

15

The Respondent shall make Bryson whole for any loss of earnings and other benefits resulting from his discriminatory discharge.  The make whole remedy shall be computed in accordance with *F.W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River*
20  *Medical Center*, 356 NLRB 6 (2010).  In accordance with *King Scoopers, Inc.*, 364 NLRB No. 93 (2016), the Respondent shall compensate Bryson for his search-for-work and interim employment expenses regardless of whether those expenses exceed interim earnings.  Search-for-work and interim employment expenses shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, and compounded daily as
25  prescribed in *Kentucky River Medical Center*, supra.  In accordance with *Don Chavas, LLC*, 361 NLRB No. 10 (2014), the Respondent shall compensate Bryson for the adverse tax consequences, if any, of receiving a lump sum backpay award, and, in accordance with *AdvoServ of New Jersey, Inc.*, 363 NLRB No. 143 (2016), the Respondent shall, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, file with the
30  Regional Director for Region 29 a report allocating backpay to the appropriate calendar year. The Regional Director will then assume responsibility for transmission of the report to the Social Security Administration at the appropriate time and in the appropriate manner.  In addition, pursuant to *Cascades Containerboard Packaging*, 370 NLRB No. 76 (2021), the Respondent will file with the Regional Director of Region 29 a copy of Bryson's W-2 form reflecting the
35  backpay award.

In addition, the Respondent will be required to remove from its files any reference to the unlawful discharge of Bryson.  The Respondent shall then notify Bryson in writing that his unlawful discharge will not be used against him in any way.
40

The Respondent will be ordered to post, in English and Spanish, the notice attached hereto as "Appendix A."

On these findings of fact and conclusions of law, and on the entire record, I issue the
45  following recommended[17]

---

[17] If no exceptions are filed as provided by Section 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Section 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

JD(NY)-05-22

**ORDER**

The Respondent, Amazon.com Services LLC, Staten Island, New York, its officers, agents, successors, and assigns, shall

5       1.     Cease and desist from

(a) Discharging employees because of their protected concerted activity.

(b) In any like or related manner interfering, restraining, or coercing employees in
10 the exercise of the rights guaranteed them by Section 7 of the Act.

      2.     Take the following affirmative action necessary to effectuate the policies of the
Act.

15     (a)     Within 14 days from the date of this Order, offer Gerald Bryson reinstatement to his former position or, if his position no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

    (b)     Make Bryson whole for any loss of earnings and other benefits resulting from the
20 discrimination against him in the manner set forth in the remedy section of this decision.

    (c)     Compensate Bryson for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director of Region 29, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the
25 backpay award to the appropriate calendar year(s).

    (d)     Within 14 days from the date of this order, remove from its files any reference to the unlawful discharge of Bryson, and within 3 days thereafter, notify Bryson in writing that this has been done and that the discharge will not be used against him in any way.
30

    (e)     Within 21 days of the date the amount of backpay is fixed by agreement, or Board order, or such additional time as the Regional Director may allow for good cause shown, file with the Regional Director for Region 29 a copy of Bryson's corresponding W-2 form reflecting the backpay award.
35

    (f)     Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such
40 records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

    (g)     Within 14 days after service by the Region, post at its Staten Island, New York facility, in English and Spanish, copies of the attached notice marked "Appendix A." Copies of
45 the notice, on forms provided by the Regional Director for Region 29, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic
50 means, if the Respondent customarily communicates with its employees by such means.

JD(NY)-05-22

Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, copies of the notice
5   to all current employees and former employees employed by the Respondent at any time since April 17, 2021.

(h)     Within 21 days after service by the Region, file with the Regional Director for Region 29 a sworn certification of a responsible official on a form provided by the Region
10   attesting to the steps that the Respondent has taken to comply.

Dated:  Washington, D.C., April 18, 2022.

Benjamin W. Green
15   Administrative Law Judge

**APPENDIX A**

**NOTICE TO EMPLOYEES**

**POSTED BY ORDER OF THE NATIONAL LABOR RELATIONS BOARD**

**An Agency of the United States Government**

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

**WE WILL NOT** discharge or otherwise discriminate against employees for engaging protected concerted activity.

**WE WILL NOT** in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them by Section 7 of the National Labor Relations Act.

**WE WILL** offer Gerald Bryson full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

**WE WILL** make Gerald Bryson whole for any loss of earnings and other benefits resulting from his discharge, less any net interim earnings, plus interest and **WE WILL** also make Gerald Bryson whole for reasonable search-for-work and interim employment expenses, plus interest.

**WE WILL** compensate Gerald Bryson for the adverse tax consequences, if any, of receiving a lump-sum backpay award and **WE WILL** file with the Regional Director for Region 29, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

**WE WILL** file with the Regional Director for Region 29 a copy of Gerald Bryson's corresponding W-2 form reflecting the backpay award.

**WE WILL** remove from our files any reference to the unlawful discharge of Gerald Bryson, and **WE WILL**, within 3 days thereafter, notify him in writing that this has been done and that his discharge will not be used against him in any way.

<u>**Amazon.com Services LLC**</u>
(Employer)

Dated: _____   By: _____

(Representative)          (Title)

i

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below.  You may also obtain information from the Board's website: www.nlrb.gov

100 Myrtle Avenue, Brooklyn, NY 11201-4201
(718) 330-7713, Hours: 9:00 a.m. to 5:30 p.m.

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/02-CA-261755 or by using the QR code below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER (212) 264-0300.

APPENDIX B

**TRANSCRIPT OF BRYSON-EVANS ARGUMENT ON VELASCO FACEBOOK LIVE VIDEO**
**R. Exh. 122**

5

Bryson:  Mr. Safety man.  Mr. Safety man.  You hear me.  I'm talking to you.  Y'all was out here the other day ready to do something to Chris.  It was all good then.  You know.  [Unintelligible.]  You need to shut it down.

10   Evans:  Ain't gonna shut it down.  It's the only fucking job open so appreciate it.

Bryson (2:02-2:05):  We don't have to appreciate something where you can bring something home to your family.

15   Evans  (2:04-2:09):   So then just go home.  Go home.  You want… no one is gonna listen to you so just go home.

Bryson (2:09-2:10):  Where you at?  Where you at?

20   Evans (2:10-2:12):  Where you at?  Show your face.

Bryson:  Where you at?  I'm right here.  You see me.

Evans:  No.

25
Evans:  Looking right at you, sir.

Bryson:  Where?

30   Bryson:  You don't have to sit over you don't gotta say nothing.  Where you come from?

Evans:  Where you come from?

Bryson:  What is this your first job?  Must be your first job because you sold your soul for $2.

35
Bryson (2:28-2:33):  You sold your soul for $2. $2 bitch.

Evans (2:27-2:35):  This is gonna be your last job.  This is gonna be your last job.  Your last job.  It's gonna be your last job, ho.

40
Bryson:  Your mother's a ho.

Evans:  Go back to where you came from.  Go back to the Bronx.

45   Bryson (2:39-2:43:  Go back to the Bronx.  I'm from right here.  I'm sorry.  Sorry gutter bitch.

Evans (2:40-2:43):  You go.  You go.  You go.

Evans (2:44-2:48):  Ahh, just like your mama.  You want to bring it, I'll bring it on too.

50
Bryson (2:48-2:55):  I'm out here for you, cause you can't fight for yourself, your too stupid as anyone can see right here.

i

Evans:  Awwww.

Bryson:  Ignorant and stupid.

5

Evans [2:56-3:02]:  Awwww.  You're the one who's ignorant and stupid, you're the only one out here with a [unintelligible].  Nobody's listening to you.

Bryson [2:57-2:59]:  Awwww.  Awwww.

10

Bryson:  You got any kids you are gonna bring it home to them?  Nah,  you ain't got no kids.  You probably barely got a house.  You look like you sleep in the gutter, so.

Evans:  Your [unintelligible].

15

Bryson:  We not gonna pay that no mind no more.  Gutter bitch.  Bye.

Evans [3:12-3:28]:  Bye douche bag.  Bye.  Bye Felicia.  Bye.  Bye.  I'm making money you ain't.  I'm making money you ain't.  [Unintelligible.]

20

Bryson [3:13-5:02]:  When you get a family and you care about somebody then you came back and talk. Take your crack head ass somewhere else. You look like a crack head.  Everybody's hiring crackheads, they're that desperate.  They put a crackhead out here to start.  They're that desperate.  Look at her.  Obviously.  Go light that pipe sweetheart.  Don't worry we'll still be here for sure.  You can look at you and tell you on something.  You got a lot of nerve sitting up

25   there, where the track marks at? Where the Fentanyl at? Figures a crack ho would have something to say.  That's what they got cause they hiring people, they ain't screening them right.  They just letting anybody work here now.  So now we got queen of the slums working here talking shit.  Get off the Fentanyl baby girl.

30

([4:37]- Evans starts walking toward the entrance of the facility.)

Bryson [4:37-4:50]:   Look at her she ain't high.  [laughter]  They ain't even screening for drugs evidently no more look at what they letting in the building.  Ohhhhh.  Ohhhh, look at you.

35

Evans [4:43-4:53]:  You smoke that crack.  You smoke that crack.  You smoke that crack.  You smoke that crack.

Bryson[4:52-4:56]:  You high right now.  Safety man. Do your job, test that woman.

40

Evans [4:56-4:58]:  Go ahead ain't nobody gonna listen to you.

Bryson [4:57-5:07]:  I know.  Cause they hiring anybody.   You damn [unintellige] sitting up there with track marks in your arm, I know that much.  You better shut up.

45

Evans:  Make me.

Bryson:  Gonna make nothing.

50   Evans [5:10-5:15]:  You gonna make me shut up?  You gonna make me shut up?  You gonna make me shut up?

Bryson [5:13-5:28]:  I don't have to make you shut up.  You need to shut up.  You're running around with track marks on you.  Alright, look at your eyes.  Look at your eye cylinders they are both dark.  You are on something.  You need to leave.  Safety man, you need to check her.

5    ([5:27]: Evans Enters the facility)

APPENDIX C

**TRANSCRIPT OF BRYSON COMMENTS ON FLOWERS FACEBOOK LIVE VIDEO**
**G.C. Exh. 63**

5

Bryson [49:00-50:36]:  What's up y'all. I'm out here, we are fighting just to get this place closed down and sanitized, you know.  They got 27 confirmed with the virus in there.  They are sending them home.  They're telling them that they are gonna quarantine them for 14 days at home, they can stay home they'll get paid.  Nobody is getting paid.  Nothing.

10  People are just home sitting with the virus, they're not getting anything out of this.  And these people here.  We're trying to make them understand that these people don't… that Jeff Bezos does not care about any of us.  He does not care about any of us.  Anytime this place could be open.  And they are not telling you when they're hiring you that there's cases.  They are telling you the following day.  You know. There's just a lot going on here.

15  I'm kind of overwhelmed right now because I actually got into a debate. I think they sent out a plant, you know, to start an argument with me, and it got a little out of hand.  And, you know, and I mean, if that does come up, trust and believe, you know, they – they push me to the limit and I had no choice. I didn't want to take that route but it looks to me like Amazon is now hiring, definitely hiring the scum of the earth. They're hiring what looks to be

20  junkies and stuff like that, cause the girl that came out to say something to me, she looked like she was on fentanyl and something else. And that's what they sent at me. She says oh, this place is open. We need this place to work, you know. Evidently, she has no family or no other concerns. She's got black rings under her eyes. Amazon does stoop that low. So that's what we're dealing with right now.

25

Flowers [50:37-5:30]:  You heard him.  You heard the message.  I'm behind him.  You here that, right.  You see they are hiring anybody.  They need workers.  They need workers.  All of y'all need workers in a time of crisis like this.  The customer is important, but your employees come first.  In a sense like this . . . the employees come before the customers.

30  But like OSHA said, the customers always right but treat your employees like customers. It's like that.  It's a shame.  You guys go can always inbox me and I'll tell you what is going on.  I'll tell you any advice.  Anything I need.  I'll answer y'all.  But it's a shame.  We shouldn't have to fight for this.  We shouldn't have to fight for something like this.  Look, you know how it is.  . . .  Yo Gerry you going to your car?

35

Bryson [51:30-51:41]:   No, I'm just going over there.  You need to be over there with them. Give them support, bro.  Cause I can't be…   I really cursed that girl out.  She cursed at me and I cursed her out you know.

40  Flowers [51:41-51:44]:  I'm supposed to be doing an interview right now.  I gotta sit in your car for a few minutes.

Bryson [51:45-51:54]:  Well go ahead.  Like I feel kind of…  you know she got me off point.

45  Flowers [51:54-51:57]:  Don't worry, yo.  We got the National Labor Relations Board behind us.  The National Labor Relations Board behind us.

Bryson [51:59-52:08]:  Yea but she called me a [unintelligible].  She challenged me like…. You gonna challenge a man out here like… ain't nobody calling [unintelligible]… fucking

50  crackhead…

i

(Extended comments by Flowers regarding meeting in which, according to Flowers, Amazon and Jeff Bezos "bashed" Chris Smalls as "an uneducated black man." Flowers said, "there should be nothing racial about what we're doing." Ultimately, Flowers asked Bryson, "Jeff Bezos brought race into this, right?")

5

Bryson [54:24-55:55:38]: Yes he did. The plan was, when they couldn't deal with my…our leader that started this movement, Christian, they decided in a Board meeting that was leaked out to us that they were gonna make him seem like a dumb [N-word]. They were just going to make him seem like he was a crazy old dumb [N-word]. He's not intelligent. That's exactly the

10 words they used. Not [N-word] part so much but they were going to let him seem like you know he was less intelligent black person so that's what they're saying. In so many words, in translation, we are gonna make him look like a dumb [N-word] and that'll be that. You know and this will be over with. So this is the type of person we are dealing with. Jeff Bezos is a monster. Alright. Everybody that thinks he's out there, you know, and he's a good guy. And you see he's

15 a monster. Anybody that does something like this and doesn't care about the people that are making you billions. There's something wrong. There's definitely something wrong. As far as I know I'm a leader. I can tell you I've been in leadership positions, you know, you can get flies, gnats, and mosquitos with honey, you can get them to do what you want, you know what I'm saying? Be nice to them. We're not getting that. We're not getting that.

20

Flowers [55:33-55:56]: You hear it. You hear it. Actually Also… Also…. After this live too… I'm gonna post it in this chat. I'm gonna post it in this group. I'm gonna post what Jeff Bezos said. You heard what he said. Even though he shouldn't be going off like that. Excuse his French. You know what I'm saying. Excuse his French. But I'm going to post it in the group. I'm . . .

25

Bryson [55:55-55:59]: I got one more thing to say. I just want to make this real clear . . .

Flowers [55:59]: Ok he got one more message to y'all.

30 Bryson [56:00-56:31]: I got one more message. When we started this. All we asked for was, close down the facility. Give it a good thorough cleaning. And we'll come back to work. Their answer and reply at that time was. . . yea we're thinking about doing that but we are probably going to close it down for two weeks and you guys will get paid. That slid out the door. They started mandating people. During a pandemic, you are mandated to come to work. This is

35 what we're dealing with. This is the type of person we're dealing with.

Flowers [56:30-56:37]: Hold on hold on. Look at that truck. COVID inside. You never know. It's COVID inside this prime truck. You never know.

40 Bryson [56:31-56:42]; Going to spread the news. Get the word out. That's what we doing.

Flowers: [56:41-56:50] Spread it to the world. Spread it to the world. That's all prime is. [Unintelligible] Guess what. The box has got COVID.

45 Bryson [56:50-57:40]: As far as I know, our Amazon on Staten Island just so everybody knows, incorporates three states, and that would be, New York, New Jersey, and Connecticut. Alright, that's how far we got people coming down to come to work here. Now, two or three states, you're spreading the disease back to three states. People coming here getting it and taking it to their home states, respectfully, this is a cesspool. It needs to be shut down. It needs to be taken

50 care of. It needs to be cleaned up and thoroughly cleaned before we can come back to work. And being that we don't want to catch it. You know, we can't come to work, we are not getting

ii

paid.  So it's like come and catch the disease, or you're not getting paid.  I ought not to get paid if that's it, I'm not taking this home to my family.

Flowers [57:36-58:10]: I'll let you know now too.  If you guys support us too.  After this.  Anything. Anything. #JFK8strike.  Use that hashtag.  #JFK8strike.  Support our protestors.
5     Support me.  Support Jerry.  Support Christian Smalls, the face, our leader.  Support that man who lost his job fighting for his workers.  Support Derrick.  Support my team.  My team will be notified of all the love you've been sending me.  I send it to my team.

Bryson [58:14-58:30]  :  Also they can fire me, give them my personal notes too.  Personal
10    addressed too, man.  [Unintelligible].  Tell them Gerald Bryson at Facebook.  [Unintelligible].  Tell them yours.