**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

KATHY DREW KING, Regional Director
of Region 29 of the National Labor Relations
Board, for and on behalf of the NATIONAL
LABOR RELATIONS BOARD

                    Petitioner

v.

AMAZON.COM SERVICES LLC

                    Respondent

22--CV--01479

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMENDED PETITION FOR TEMPORARY INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT

Matthew A. Jackson
Evamaria Cox
National Labor Relations Board
Two MetroTech Center, Suite 5100
Brooklyn, NY 11201

ATTORNEYS FOR PETITIONER

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ……………………………………………………  i

TABLE OF AUTHORITIES ……………………………………………… ii

I.      STATEMENT OF THE CASE …………………………………… 1

II.     LEGAL STANDARDS FOR INJUNCTIVE RELIEF …………………………… 2

        A.  The "Reasonable Cause" Standard ………………………………… 3

        B.  The "Just and Proper" Standard ………………………………… 4

III.    STATEMENT OF FACTS …………………………………………… 4

        A.  Bryson and Coworkers Concertedly Raise Health and Safety Concerns to
            Management; Managers Respond by Monitoring Employees ………………… 5

        B.  Bryson and Coworkers Plan a Public Walk-Out; Amazon Escalates its
            Adverse Response to Worker Organizing ……………………………….. 6

        C.  Bryson Leads an April 6 Protest and Is Provoked into a Verbal Altercation
            with a Co-Worker …………………………………………………… 6

        D.  Amazon Seized on the April 6 Verbal Altercation to Discharge Bryson After
            Conducting a Sham Investigation, Ignoring Highly Relevant Evidence ………. 8

        E.  Amazon Treated Bryson More Harshly as Compared to Evans and Other
            Employees ………………………………………………………… 9

        F.  Bryson's Termination Negatively Impacts Employees' Willingness to Engage
            in Union Activity …………………………………………………… 10

IV.     THE RECORD, INCLUDING THE ALJ DECISION, ESTABLISHES STRONG
        CAUSE TO BELIEVE RESPONDENT DISCHARGED BRYSON IN
        VIOLATION OF SECTION 8(a)(1) OF THE ACT ………………………… 12

V.      A TEMPORARY INJUNCTION IS JUST AND PROPER ……………………… 15

        A.  Bryson's Discharge Had a Negative Impact on ALU's Organizing Campaign
            and Interfered with ALU Obtaining its Legitimate, Uncoerced Level of
            Support …………………………………………………………… 16

        B.  Bryson's Continued Absence From the Workplace Threatens ALU's Status
            and Ability to Bargain Effectively for a First Contract, If Certified …..……… 17

VI.     CONCLUSION ……………………………………………………… 25

**TABLE OF AUTHORITIES**

**Page**

<u>**Cases**</u>

*Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575 (2d Cir. 1988) ………………………… 19

*Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744 (9th Cir. 1988) ……………………………. 16

*Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226 (6th Cir. 2003) ………………………….. 12, 20

*American Crane Corp.*, 326 NLRB 1401 (1998) …………………………………………… 14

*Angle v. Sacks*, 382 F.2d 655 (10th Cir. 1967) …………………………………………… 19

*Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367 (11th Cir. 1992) …………………………….. 24

*Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445 (1st Cir. 1990) ………………… 18, 19

*Asseo v. Pan Am. Grain Co.*, 805 F.2d 23 (1st Cir. 1986) ………………………………….. 19, 25

*Bantek West, Inc.*, 344 NLRB 886 (2005) …………………………………………………… 14

*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001) ……………………….. 12, 19

*Blyer v. Domsey Trading Corp.*, 1991 WL 150817 (E.D.N.Y. 1991) ……………………… 23

*Blyer v. One Stop Kosher Supermarket, Inc.*, 720 F. Supp. 2d 221 (E.D.N.Y. 2010) ………… 2

*Blyer v. P & W Elec., Inc.*, 141 F. Supp. 2d 326 (E.D.N.Y. 2001) ……………………………. 16

*Calatrello v. Gen. Die Casters, Inc.*, 2011 WL 446685 (N.D. Ohio 2011) …………………… 23

*Chester v. Grane Healthcare Co.*, 666 F.3d 87 (3d Cir. 2011) ………………………………. 18

*Crawford v. Environmental Waste Disposal, Inc.*, 568 F. Supp. 22 (N.D. Ill. 1983) …………. 23

*Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union, I.L.G.W.U.*, 494 F.2d 1230 (2d Cir. 1974) ……………………………………………………………………… 3

*Donelson Packing Co., Inc.*, 220 NLRB 1043 (1975) …………………………………… 15

*Drew-King v. Deep Distribs. of Greater NY, Inc.*, 194 F. Supp. 3d 191 (E.D.N.Y. 2016) ………………………………………………………………….. 16, 22, 23

*Duffy Tool & Stamping, L.L.C. v. NLRB*, 233 F.3d 995 (7th Cir. 2000) ……………………… 18

*Electrolux Home Products*, 368 NLRB No. 34 (2019) ……………………………………... 13

*Embassy Vacation Resorts*, 340 NLRB 846 (2003) ……………………………………… 13

*Fernbach v. Sprain Brook Manor Rehab*, *LLC*, 91 F. Supp. 3d 531 (S.D.N.Y. 2015) ………… 23

*Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011) ……………………………………. 16, 23

ii

*Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221 (6th Cir. 1993) ……………………………18, 19

*Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147 (D. Mass. 1983) …………………………….. 3, 23

*Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F. Supp. 2d 1201 (E.D. Cal. 2010) …….. 23

*Gottfried v. Frankel*, 818 F.2d 485 (6th Cir. 1987) ………………………………………… 23

*Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243 (3d Cir. 1998) …………………………… 24

*Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360 (2d Cir. 2001) …………………… 2-4, 13

*Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029 (W.D. Tenn. 2011) …………. 23

*Hubbel v. Patrish LLC*, 903 F. Supp. 2d 813 (E.D. Mo. 2012) ………………………………... 25

*Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345 (3d Cir. 1969) ……………………………….. 15

*Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*, 426 F.2d 1243 (D.C. Cir. 1970) ………………………………………………………………………………………… 18

*K & M Electronics*, 283 NLRB 279 (1987) ……………………………………………………. 15

*Kaynard v. Mego Corp.,* 633 F.2d 1026 (2d Cir. 1980) ………………………………………. 3, 4

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047 (2d Cir. 1980) ………………………….. 2-4, 16

*Kreisberg v. HealthBridge Management, LLC*, 732 F.3d 131 (2d Cir. 2013) ……………….. 2, 4

*La Gloria Oil and Gas Co.*, 337 NLRB 1120 (2002) …………………………………………… 15

*Lindsey v. Shamrock Cartage, Inc.*, 2018 WL 6528432 (S.D. Ohio 2018) ………………... 20, 23

*Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566 (7th Cir. 2011) ……………………………... 21

*Lineback v. Spurlino Materials, LLC*, 546 F.3d 491 (7th Cir. 2008) …………………………... 20

*Mattina v. Kingsbridge Heights Rehabilitation and Care Center*, 329 F. App'x 319, (2d. Cir. 2009) ………………………………………………………………………………………… 2

*Maram v. Universidad Interamericana de P.R., Inc.*, 722 F.2d 953 (1st Cir. 1983) ………….. 24

*McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237 (2d Cir. 1962) ……………………………………………………………………………… 3

*Medic One, Inc.*, 331 NLRB 464, 475 (2000) ……………………………………………… 13

*Metropolitan Transportation Services, Inc.*, 351 NLRB 657 (2007) ……………………… 13, 14

*Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994) ………………………………… 16

*Moore-Duncan v. Horizon House Developmental Servs.*, 155 F. Supp. 2d 390 (E.D. Pa. 2001) …………………………………………………………………………………… 18

*Morio v. North American Soccer League*, 632 F.2d 217 (2d Cir. 1980) ………………………... 4

*Muffley v. Spartan Mining Co.*, 570 F.3d 534 (4th Cir. 2009) ………………………………… 24

*Naomi Knitting Plant*, 328 NLRB 1279 (1999) ………………………………………………... 15

*NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964) ……………………………………………… 15

*NLRB v. C & C Plywood Corp.*, 385 U.S. 421 (1967) ………………………………………….. 20

*NLRB v. Caval Tool Div.*, 262 F.3d 184 (2d Cir. 2001) ……………………………………… 15, 21

*NLRB v. City Disposal Sys. Inc.,* 465 U.S. 822 (1984) ………………………………………… 15

*NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559 (7th Cir. 1996) ……………………... 3, 16, 18, 19, 21

*NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208 (2d Cir. 1980) ………………………………… 19

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) ……………………………….... 15, 21

*NLRB v. Ona Corp.*, 605 F. Supp. 874 (N.D. Ala. 1985) ……………………………………… 22

*NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983) …………………………… 13

*NLRB v. Washington Aluminum Co.*, 370 U.S. 9 (1962) ……………………………………… 15

*Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176 (D. Haw. 2010) ………………………………… 23

*Overstreet v. Albertson's LLC*, 868 F. Supp. 2d 1182 (D.N.M. 2012) ………………………… 25

*Overstreet v. El Paso Disposal, LLC*, 652 F.3d 844 (5th Cir. 2010) ………………………… 19, 24

*Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918 (D. Ariz. 2014) …………………… 23

*Ozburn-Hessey Logistics, LLC*, 357 NLRB 1632 (2011) ……………………………………... 14, 23

*Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874 (3d Cir. 1990) ………………………………… 16, 20

*Paulsen v. PrimeFlight Aviation Servs., Inc.*, 718 F. App'x 42 (2d Cir. 2017) ……………….... 23

*Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462 (2d Cir. 2014) …………………... 3

*Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335 (E.D.N.Y. 2012) ……….. 24

*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177 (1941) …………………………………………... 25

*Pye v. Excel Case Ready*, 238 F.3d 69 (1st Cir. 2001) ……………………………… 16, 21, 25

*Radio Officers' Union of Com. Telegraphers Union, AFL v. NLRB*, 347 U.S. 17 (1954) ……... 21

*Roure Bertrand Dupont, Inc.,* 271 NLRB 443 (1984) ………………………………………… 13

*Rubin v. Vista Del Sol Health Servs., Inc.*, 2015 WL 306292 (C.D. Cal. 2015) ……………… 15

*Rubin v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058 (C.D. Cal. 2015) …………… 24

*Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962 (6th Cir. 2001) ………… 16, 19, 21

*Seeler v. The Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1975) ………………………… 2-4, 12-13

*Shamrock Foods Co.*, 366 NLRB No. 107 (2018) ………………………………………... 14

*Sharp v. Webco Indus., Inc.*, 225 F.3d 1130 (10th Cir. 2000) …………………………… 16

*Silverman v. J.R.L. Food Corp. d/b/a Key Food*, 196 F.3d 334 (2d Cir. 1999) ………….. 2, 3, 13

*Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054
(2d Cir. 1995) ……………………………………………………………………… 3, 4

*Silverman v. Whittall & Shon, Inc.*, 1986 WL 15735 (S.D.N.Y. 1986) ………………….. 21

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011) ………………………… 18, 22

*United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767 (9th Cir. 2017) …………………... 23

*Walsh v. Mountain View Care and Rehabilitation Center, LLC*, 2019 WL 2865891
(M.D. Pa. 2019) …………………………………………………………………….. 23

*Williamhouse of California, Inc.*, 317 NLRB 699 (1995) ………………………………... 13

*Wright Line*, 251 NLRB 1083 (1980) …………………………………………………… 13, 14

**Statutes**

29 U.S.C. § 157 ……………………………………………………………………… 15

29 U.S.C. § 158(a)(1) ……………………………………………………………… 1, passim

29 U.S.C. § 160(j) ……………………………………………………………….. 2, passim

**Legislative History**

S. Rep. No. 105, 80th Cong., 1st Sess. (1947) ……………………………………… 2

## I.      STATEMENT OF THE CASE

Petitioner files this Amended Petition under Section 10(j) of the National Labor Relations Act, as amended (the Act). 29 U.S.C. § 160(j) seeking temporary relief against Respondent Amazon.com Services LLC (Respondent or Amazon) pending disposition of this matter before the National Labor Relations Board (Board), based on a Complaint and Notice of Hearing in Case No. 29-CA-261755, alleging that Respondent is engaging in unfair labor practices under Section 8(a)(1) of the Act. (29 U.S.C. § 158(a)(1)).[1] After an administrative hearing before an Administrative Law Judge (ALJ) of the Board, the ALJ found that Amazon discharged Gerald Bryson in violation of Section 8(a)(1).  Respondent has appealed the ALJ's decision, and the appeal is pending before the Board.

Immediately upon learning that Bryson was a leader among a group of employees at Amazon's JFK8 warehouse who sought to secure life-or-death safety protections amid the emerging COVID-19 pandemic, Amazon began to watch Bryson's every move and then set the stage for a sham termination in retaliation for his protected concerted activities. The knowledge and impact of Bryson's termination looms large in the minds of warehouse employees. Although enough employees signed authorization cards to support the processing of a petition for an election, and a majority of employees who voted in the election chose the Amazon Labor Union as their representative, numerous employees are afraid to *openly* support the ALU, citing Bryson's termination. Absent interim relief, Amazon will achieve its unlawful goal, through illegal means, of crushing employees' Section 7 rights to engage in protected concerted activities and openly support a union of their choosing. Amazon's egregious unlawful conduct and the unfolding of

---

[1] Under Section 8(a)(1), it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights under Section 7 of the Act, 29 U.S.C. § 157, which grants employees the right to engage in union or other concerted activity "for mutual aid and protection."

subsequent events necessitates interim relief to preserve employees' rights, to effectuate the Congressional policies of the Act[2] and to prevent remedial failure.

## II.    LEGAL STANDARDS FOR INJUNCTIVE RELIEF

Section 10(j) of the Act[3] authorizes United States district courts to grant preliminary injunctions pending the Board's resolution of unfair-labor-practice proceedings, which Congress recognized are often protracted. Congress intended Section 10(j) to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation,[4] recognizing that absent interim relief, an employer could accomplish its unlawful objective before being placed under any legal restraint, rendering a final Board order ineffectual.[5],

To resolve a 10(j) petition, a district court in the Second Circuit considers only two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act and whether preliminary injunctive relief is "just and proper."[6]

---

[2] See *Blyer v. One Stop Kosher Supermarket, Inc.*, 720 F. Supp. 2d 221, 225 (E.D.N.Y. 2010)

[3] Section 10(j) (29 U.S.C. § 160(j)) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

[4] See, e.g., *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 37-38 (2d Cir. 1975).

[5] See *Kreisberg v. HealthBridge Management, LLC*, 732 F.3d 131, 143 (2d Cir. 2013); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler*, 517 F.2d at 38 (citing S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted at I *Legislative History of the Labor Management Relations Act of 1947* 414, 433 (Government Printing Office 1985)).

[6] See, e.g., *Kreisberg*, 732 F.3d at 141-142; *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 365 (2d Cir. 2001); *Silverman v. J.R.L. Food Corp. d/b/a Key Food*, 196 F.3d 334, 335 (2d Cir. 1999). See also *Mattina v. Kingsbridge Heights Rehabilitation and Care Center*, 329 F. App'x 319, 321 (2d. Cir. 2009).

## A.    The "Reasonable Cause" Standard

Petitioner's "determinations regarding 'reasonable cause' receive significant deference."[7] In determining whether there is reasonable cause to believe that the Act has been violated, the District Court may not decide the merits of the case.[8][9]   The District Court should not resolve contested factual issues or attempt to resolve witness' credibility issues.[10]. Instead, Petitioner's version of the facts "should be given the benefit of the doubt"[11] and, together with the inferences therefrom, "should be sustained if within the range of rationality."[12]

Similarly, on questions of law, the District Court should be hospitable to Petitioner's views, however novel[13] and should sustain Petitioner's legal position, "unless the [district] court is convinced that it is wrong."[14] Moreover, an administrative law judge's decision in the underlying administrative case finding the alleged violations also warrants deference by the court, as it strongly bolsters the requisite "reasonable cause to believe" that the Board will ultimately find a violation.[15]

---

[7] *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 469 (2d Cir. 2014)

[8] See *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1032-1033 (2d Cir. 1980).

[9] *Mego Corp.*, 633 F.2d at 1033, quoting *McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237, 242 n. 17 (2d Cir. 1962).

[10] *Palby Lingerie, Inc.*, 625 F.2d at 1051-1052, n. 5. See also *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1570, 1571 (7th Cir. 1996); *Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1150-51 n. 2 (D. Mass. 1983), affd. per curiam 725 F.2d 664 (1st Cir. 1983).

[11] *Seeler*, 517 F.2d at 37.

[12] *Mego Corp.*), 633 F.2d at 1031.

[13] *Mego Corp.*, 633 F.2d at 1031, quoting *Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union, I.L.G.W.U.)*, 494 F.2d 1230, 1245 (2d Cir. 1974).

[14] *Palby Lingerie, Inc.*, 625 F.2d at 1051. Accord: *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995) ("appropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed"); *Hoffman*, 247 F.3d at 365.

[15] *J.R.L. Food Corp.*, 196 F.3d at 335, 337 (court abused its discretion in not granting "appropriate deference" to the ALJ's findings); *Seeler*, 517 F.2d at 37 n. 7 (ALJ decision bolstered reasonable cause findings).

### B.    The "Just and Proper" Standard

The Second Circuit has recognized that Section 10(j) is among those "legislative provisions calling for equitable relief to prevent violations of a statute" and courts should grant interim relief thereunder "in accordance with traditional equity practice, 'as conditioned by the necessities of public interest which Congress has sought to protect.'"[16] Section 10(j) relief is warranted where serious and pervasive unfair labor practices threaten to render the Board's processes "totally ineffective" by precluding a meaningful final remedy,[17] or where interim relief is the only effective means to preserve or restore the status quo as it existed before the onset of the violations,[18] or where the passage of time might otherwise allow the Respondent to accomplish its unlawful objective before being placed under any legal restraint.[19]

## III.    STATEMENT OF FACTS

Bryson began working at Amazon's JFK8 fulfillment center in Staten Island, New York in October 2018. During the entire course of his employment, Bryson did not receive any discipline. Tr. 986, 990, 1923.

By late March 2020, New York City was the epicenter of the COVID-19 pandemic. Most businesses in New York City closed because of the rise in COVID cases. Amazon's massive JFK8 facility, however, remained open.  Despite the grave health risks Amazon employees faced while working at the height of the pandemic, Amazon did not provide its employees with face masks or other personal protective equipment such as gloves, face shields, or eye coverings, hand sanitizer,

---

[16] *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980), quoting *Seeler*, 517 F.2d at 39-40.

[17] *Mego Corp.*, 633 F.2d at 1034, discussing *Seeler*, 517 F.2d at 37-38.

[18] *Seeler*, 517 F.2d at 38.

[19] *Palby Lingerie, Inc.*, 625 F.2d at 1055; Accord: *Kreisberg*, 732 F.3d at 143; *Hoffman*, 247 F.3d at 368 (Section 10(j) relief "is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo"); *Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. at 255.

or disinfecting wipes. Tr. 620-22, 625-26. Amazon did not upgrade its air filtration system, did not deep clean the facility and made no significant changes for appropriate cleaning of JFK8. Tr. 631-32.  Amazon was alone in its "business as usual" response to the novel virus raging through the City. Fearful for their health and safety and that of their families, JFK8 employees turned to one another to find ways to mitigate the unsafe working conditions and questioned whether, without changes, they should be at work at all. Tr. 633-34.

### A. Bryson and Coworkers Concertedly Raise Health and Safety Concerns to Management; Managers Respond by Monitoring Employees

On March 25, 2020, Bryson and a few coworkers led a group of employees into the general manager's office at JFK8 to protest Amazon's failure to take measures to protect employees from COVID-19 at work. ALJD 3; Tr. 997-99, 647. General Manager Sai Kotha, and Human Resource (HR) Manager Christine Hernandez were among the managers present. Tr. 648, 999-1000, 486. Employees protested working without proper protection, including masks. Tr. 648, 1000-1001. They requested that Amazon temporarily shut down the JFK8 facility for proper cleaning, as Amazon had done for another NYC facility. Tr. 648. Kotha and Bryson directly addressed each other; Kotha dismissed employees' concerns, but said he would have a response that afternoon. Tr. 649, 650, 1002.

Several employees went to the cafeteria to wait for Amazon's response to employees' concerns, as Kotha had promised. Tr. 652. Hours later, an unnamed manager arrived and stated that Amazon was doing everything that it could and that Amazon's regional managers refused to shut down the facility for cleaning.  No reason or explanation was offered to the employees. Tr. 652-53.

While failing to address the employees' concerns, Amazon immediately set out to identify and track the employees who interrupted the managers' meeting on March 25. HR Manager Hernandez admits that Amazon reviewed its surveillance cameras and used a photo tool system

with employees' pictures to identify each employee protester. Tr. 1975. In an email sent just hours after employees entered the managers' office, Amazon's "Loss Prevention" Specialist, Steffen Steudte circulated employees' names, including Bryson, and their respective log-in information to Kotha, Hernandez, Regional Loss Prevention Manager Geoff Gilbert-Differ, and Regional Public Relations Representative[20] Rachel Lighty, among other company officials at the local level and beyond. GC Ex. 71; Tr. 455.

### B. Bryson and Coworkers Plan a Public Walk-Out; Amazon Escalates its Adverse Response to Worker Organizing

Dissatisfied with management's cavalier response to employees' concerns, Bryson and others organized a larger-scale public protest on March 30, 2020, to demand that Amazon provide employees with protective equipment and shut down JFK8 for proper cleaning. Tr. 661-62, 1006, 1059. Bryson's primary role in the March 30 protest was to speak to the media. Tr. 671-72. Bryson was pictured and quoted in various news publications and appeared on the television broadcast of at least one local news outlet covering the protest. Tr. 672, 1009-10. See e.g., GC Exs. 54, 56, 57, 58, 59, 60, 61.

Immediately after the March 30 walk-out, Amazon fired employee Christian Smalls, who, up until that time, had been leading the employee protest movement. Tr. 672.  After Smalls' termination, Bryson became the employees' de facto leader of the protest movement, thanks to Bryson's widespread media coverage during the March 30 protest. Tr. 1023, 1025.

### C. Bryson Leads an April 6 Protest and Is Provoked into a Verbal Altercation with a Co-Worker

Bryson and other employees planned their next protest for April 6, 2020, to continue to press their shared COVID-19 safety concerns and to protest Amazon's retaliatory discharge of

---

[20] In Amazon's "run of show" document related to the March 30 Walk-out, Lighty is identified as working for Regional Public Relations.  GC Ex. 129(c).

Smalls. ALJD 4; Tr. 686-87. During the event, Bryson, using a bullhorn, and co-worker Mandi Velasco protested together on a laddered pathway in the parking lot about 75 to 100 feet from the main entrance to the JFK8 facility. Tr. 860, 1025, 1029. With his bullhorn, Bryson expressed concerns about infections rates and the need to clean JFK8. Tr. 1029-30. Velasco filmed and broadcast  video of the protest via Facebook Live. Tr. 914; see also, R Ex. 122. Velasco added the social media hashtags "#JFK8" and "#StandUp" to the video. CP Ex. 6; Tr. 960.

While Bryson was protesting, he heard a woman, whom he could not see, shout at him, "Why don't you get the fuck out of here."[21] Tr. 1030. Bryson ignored this initial jeer. A moment later, Bryson heard the same voice call out, "They ain't going to shut it down! This is the only fucking job open, so appreciate it!" Tr. 1030, 875. Bryson responded, "We don't have to appreciate something where we could bring something home to our families." Tr. 1031. The woman responded, "Go home! Just go home!" and "No one is going to listen to you so just go home." R Ex. 122. Bryson then located the woman who was heckling him– Dimitra Evans, a warehouse worker at JFK8 who was on her break at the time – and the two employees proceeded to argue. Evans escalated the conflict with a racially charged comment, telling Bryson, who is Black, to "Go back where you came from! Go back to the Bronx!" R Ex. 122; ALJD 7, n.10. Bryson was stunned and "devastated" by Evans' racist attack. Tr. 1034. Bryson replied, "Go back the Bronx? I'm from right here, gutter bitch!" *Id*. The two employees continued to mutually trade insults. *Id*. Although Bryson made some distasteful statements, Evans was unfazed, responding in equally distasteful and even hostile terms. At one point, Evans tried to escalate to a physical conflict, saying "if you want to bring it, I'll bring it," which Bryson brushed off. R Ex. 122. Bryson and Velasco both understood the remark "bring it" as to invitation for a physical fight. Tr. 890-91, 1040. Later during the exchange, Evans again tried to

---

[21] Bryson consistently testified on direct and cross examination that Evans' initial statement saying, "Why don't you get the fuck out of here?" was not captured by the audio recording from Velasco's video, even though Bryson heard it.  Tr. 1160, 1163.

incite violence, taunting Bryson to "make me shut up." R Ex. 122. Bryson understood that when Evans said, "make me shut up," she was provoking him into a physical fight. Tr. 1039. The argument ended after Evans went inside the facility and stopped engaging with Bryson. GC Ex. 52.

### D. Amazon Seized on the April 6 Verbal Altercation to Discharge Bryson After Conducting a Sham Investigation, Ignoring Highly Relevant Evidence

Evans did not report the incident to Amazon or complain about Bryson; instead she returned to work and carried on with her day. Tr. 1449. Amazon managers, including Hernandez Differ, instructed HR Business Partner Tyler Grabowski to get a statement from Evans and gather other evidence against Bryson. Tr. 1450.

Grabowski got statements from Evans and four witnesses who claimed to have seen the interaction between her and Bryson. Tr. 1457, 1463-1465, 1468; R Exs. 9, 11, 12, 13. Gilbert-Differ also requested and received a witness statement from Security Supervisor Paul Chierchio. GC Ex. 72; R Ex. 8. The witness statements Amazon collected were one-sided and result oriented, referencing cursing and antagonistic comments by Bryson, but not by Evans, and were riddled with inaccuracies and inconsistencies.  Amazon did not attempt to resolve blatant inconsistencies. Tr. 1845-46. Reviewing this evidence, the administrative law judge found it "implausible that six individuals would view the argument and coincidentally provide these one-sided, exaggerated accounts unless such accounts were solicited from them [by Amazon]." ALJD 4, n. 7.

Critically, Amazon did not seek witness statements from witnesses whose account of events would undermine its scheme to fabricate a pretext to fire Bryson. Amazon did not interview Bryson's fellow protester, Mandi Velasco, who was the closest witness and who recorded the entire exchange using her cell phone - even though HR Manager Hernandez had identified Velasco as the protester standing with Bryson. ALJD 17. Further, even though the evidence conclusively established that Amazon engaged in extensive monitoring of its employees' social media activity, Amazon claimed that it did not know of Velasco's video, which was publicly posted to Facebook

with the hashtag label "#JFK8" so that anyone searching for content about JFK8 would easily find it. CP Ex. 6; Tr. 960. For these reasons, the ALJ likened Amazon's investigation in this case to "an ostrich-like, head in the ground, investigation that seeks to avoid evidence which might disclose information mitigating the employee's misconduct." ALJD 17.

The ALJ further found that Amazon's "investigation" of the argument was a sham, relying on conclusive evidence showing that Amazon had decided to fire Bryson even before it provided him the chance to present his account of the argument. ALJD 18. Thus, the ALJ determined that "Respondent rushed to judgement and was more concerned about justifying the discharge of Bryson than conducting a good-faith investigation to determine what actually occurred." *Id*.

On April 17, 2020, Amazon notified Bryson that he had been discharged. The termination notice stated that Bryson was fired because he committed a "Category 2" violation of company policy by making "vulgar and derogatory comments towards another employee." GC Ex. 9. In contrast, despite having concluded the Evans had committed a "Category 2" violation by using "inappropriate language" during the argument, Amazon issued Evans a mere first written warning. ALJD 8; GC Ex. 10. The ALJ found that the evidence establishes no meaningful difference between Bryson's and Evans' conduct that could justify their vastly disparate punishments, concluding that "Respondent did not believe Bryson's conduct was worse than the conduct of Evans' (and Evans was not discharged)." ALJD 18.

## A. Amazon Treated Bryson More Harshly as Compared to Evans and Other Employees

The record further establishes that Amazon treated Bryson far more harshly than it did other employees, turning a blind eye to employees who engaged in egregious misconduct. but were not terminated. Indeed, Respondent routinely declined to terminate employees for engaging in egregious verbal attacks, physical assaults, and/or threats of violence against employees and supervisors. At JFK8, Amazon did not fire and issued only final written warnings to employees

9

who brought weapons to work (GC Ex. 11(a)), threatened to "rip off [a manager's] mouth" (GC Ex. 43(a)), threw boxes at a co-worker while hurling a profane insult (GC Ex. 82), and engaged in sexual harassment, including making sexual jokes or using sexually explicit language (GC Ex. 35(a); GC 16(a)). Amazon issued a mere *first* written warning for bumping past another employee in the cafeteria, calling the employee a "bitch" [22] and telling her to "shut the fuck up." GC Ex. 26(a).  In firing Bryson, Amazon also violated its progressive discipline policy. Tr. 479. Amazon summarily fired Bryson, even though he did not have any prior discipline (Tr. 990), while other employees received warnings before Amazon fired them.

### B.  Bryson's Termination Negatively Impacts Employees' Willingness to Engage in Union Activity

After being terminated, Bryson remained active in organizing. Bryson, along with Smalls and Palmer, founded the Congress of Essential Workers (TCOEW). Palmer Aff. ¶7.[23] TCOEW engaged in general strikes in support of other essential workers outside of JFK8, including the Amazon workers fighting for a union in Bessemer, Alabama. Palmer Aff. ¶7.

Bryson's termination was and continues to be widely known because Bryson was a central figure in the protests in March and April 2020, was popular among co-workers at JFK8 and has a deep connection with the Staten Island community. (Smalls Aff. ¶3).

Around April 20, 2021, about a year after Bryson's termination, Bryson helped form the Amazon Labor Union (ALU or the Union), and he continues to hold a leadership position with the

---

[22] The record is replete with instances where employees have used the word "bitch" and not been terminated. *See e.g.*, GC Ex. 38 (referring to another employee as "skinny little bitch"); GC Ex. 81 (yelling "little girl", "bitch" and saying "you got me fucked up messing with the wrong person."); GC 85 (blocking an employee's path and calling her "stupid bitch"); GC Ex. 90 (calling co-worker a bitch); GC Ex. 98 ("referring to a group of coworkers as "bitter old bitches"); GC Ex. 99(b) (called other employee "bitch"); GC 100 (using the word "bitch" on several occasions).

[23] The sworn affidavits of Respondent's former employees Gerald Bryson and Christians Smalls, and Respondent's current employees Derrick Palmer and Tristan Martinez are attached to the Motion to Try Petition for Temporary Injunction on the Administrative Record and are identified as Exhibit G. G(i) (Bryson Aff.idavit); G(ii) (Palmer Affidavit); G(iii) (Martinez Affidavit); and G(iv) (Smalls Affidavit)). They are referenced herein as "[Name] Aff. ¶[X]."

Union. Smalls Aff. ¶1, Bryson Aff. ¶2; Palmer Aff. ¶7 and remains active in the ALU. Bryson Aff. ¶3, 4, Smalls Aff. ¶4, 5. At its inception, the ALU set up a tent and table next to a bus stop outside of the JFK8 parking lot to distribute Union literature and authorization cards for employees to complete to get a union representation election, as well as ALU-branded t-shirts and masks. Palmer Aff. ¶9, Bryson Aff. ¶3, Martinez Aff. ¶11, 13. Bryson has been present at the tent almost every day since April 2021, talking to employees and encouraging them to support the Union. Bryson Aff. ¶3, 4, Smalls Aff.¶4, 5.

Since the founding of the ALU, Bryson and other Union organizers have been forced to repeatedly convince employees that it is safe to sign an authorization card showing support for the Union. Bryson Aff. ¶9, Martinez Aff. ¶13. Despite the Union's encouragement to wear the t-shirts and masks, many employees refused to wear them because they were afraid of being fired like Bryson.  Palmer Aff. ¶9, ¶21.

While the Union has made important strides, employee support constantly ebbs and flows due to Amazon's retaliatory tactics against worker organizing, with Bryson's termination looming over the Union's efforts and chilling employees' willingness to freely support the Union or protest unsafe work conditions. On December 22, 2021, the ALU filed an election petition seeking to represent JFK8 hourly employees. Smalls Aff. ¶2; see also Exhibit D, Petition for Temporary Injunction. Even as the March 2022 election approached, the ALU efforts to organize employees continued to be hampered by employee fears connected to Bryson's termination and the lack of a remedy to date.  Smalls stated that employees still talk about Bryson's discharge and have expressed their fear of supporting the Union because Amazon illegally fired Bryson but has not been required to reinstate him while the administrative legal proceedings before the Board slogs on. Smalls Aff. ¶4, Bryson Aff. ¶7. Losing faith in the Board's remedial efficacy, as recently as mid-February 2022, employees expressed skepticism about the Union because Bryson still had not

been reinstated. Bryson Aff. ¶12. Smalls opines that reinstating Bryson would have a monumental impact on employees' willingness to openly exercise their Section 7 rights to support the Union. Smalls Aff. ¶6.

Amazon has challenged the election results and its objections are being litigated. As the Union's win is not final, it is even more imperative that Bryson be reinstated to show the Union's legitimacy and to allow the Union the opportunity to maintain its level of support through the challenge process if there is to be any chance of a level playing field between Amazon and the nascent Union when they bargain for an initial collective bargaining agreement.

## IV. THE RECORD, INCLUDING THE ALJ DECISION, ESTABLISHES STRONG CAUSE TO BELIEVE RESPONDENT DISCHARGED BRYSON IN VIOLATION OF SECTION 8(a)(1) OF THE ACT

The ALJ's findings and legal conclusions in the underlying administrative case supply "a useful benchmark" against which to weigh the strength of Petitioner's theories of violation.[24] The "preponderance of the evidence" standard applied by the ALJ is a higher burden of proof than the "reasonable cause" test. Therefore, it is appropriate for courts to rely on the ALJ's findings and conclusions in evaluating whether Petitioner has made the requisite showing of reasonable cause.[25] Indeed, the ALJ's findings and conclusions that Amazon committed the alleged violations by unlawfully discharging Bryson "are part of the record and cannot be ignored,"[26] and they strongly support the Petitioner's reasonable cause to believe that Amazon violated the Act.[27]

---

[24] *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001).

[25] See *Francisco Foods*, 276 F.3d at 288 (applying "likelihood of success" injunction standard); *see also Seeler*, 517 F.2d at 37 n.7; *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 238 (6th Cir. 2003).

[26] *J.R.L. Food Corp.*, 196 F.3d at 335, 337-38 (district court abused its discretion in ignoring ALJ's findings and concluding that there was no reasonable cause to believe that the employer violated the Act).

[27] *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 367 (2d Cir. 2001); *J.R.L. Food Corp.*, 196 F.3d at 337-38; *Seeler*, 517 F.2d at 37, n.7.

Specifically, the ALJ concluded that Amazon unlawfully discharged Bryson for his protected concerted activity under the Board's traditional *Wright Line*[28] analysis.  To establish a *prima facie* case of discrimination under *Wright Line*, Petitioner must first demonstrate that: 1) Bryson was engaged in protected activity; 2) Amazon was aware of this activity; and 3) Amazon harbored animus against that activity sufficient to infer that the Bryson's protected activity was a substantial or motivating factor behind Amazon's decision to take the adverse employment action.[29] Proof of discriminatory motivation may be inferred from either direct or circumstantial evidence of animus, including, among other things, evidence establishing disparate treatment, the close timing of the discharge to the  protected activity, and the failure to conduct an adequate investigation into Bryson's alleged misconduct.[30]  Once a prima facie case of discrimination has been established, the burden then shifts to Amazon, who must prove, as an affirmative defense, that it would have taken the same adverse action against Bryson even absent his protected conduct.[31]

There is no dispute that Bryson engaged in protected protest activities and that Amazon knew of it. ALJD 19. The totality of Amazon's conduct, including its admission that Bryson was fired for his concerted activity and its refusal to produce subpoenaed documents relating to its reasons for the discharge, establish animus. ALJD 19-20. That Respondent's animus toward Bryson's protected activities motivated its decision to fire him is properly inferred from Amazon's

---

[28] *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399-403 (1983).

[29] See *Electrolux Home Products*, 368 NLRB No. 34, slip op. at 3 (2019); *Embassy Vacation Resorts*, 340 NLRB 846, 848 (2003); *Medic One, Inc.*, 331 NLRB 464, 475 (2000).

[30] *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. at 400;  *Williamhouse of California, Inc.,* 317 NLRB 699, 715 (1995) (citing *Roure Bertrand Dupont, Inc.,* 271 NLRB 443 (1984)).

[30] *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. at 400;  *Williamhouse of California, Inc.,* 317 NLRB 699, 715 (1995) (citing *Roure Bertrand Dupont, Inc.,* 271 NLRB 443 (1984)).

[31] *Id.*

disparate treatment of Bryson relative to Evans and other employees with whom Amazon was more lenient, as well as its sham investigation of the incident between Bryson and Evans. The ALJ relied on considerable record evidence establishing that Amazon failed to conduct a good-faith investigation into the incident underlying Bryson's discharge. Upon review of the video of the argument and witness testimony, the ALJ concluded that Amazon solicited and obtained "one-sided, exaggerated accounts" of the incident. ALJD 4 n. 7. The ALJ concluded that Amazon's "rush to judgement and skewed investigation" of the altercation established Amazon's discriminatory motive. ALJD 20. The ALJ also relied on overwhelming evidence of disparate treatment, finding that "[d]isciplinary records do not indicate that the Respondent has ever discharged an employee for conduct outside the facility on unpaid time. Disciplinary records also show that employees have received discipline short of discharge for conduct similar to or worse than the conduct of Bryson." *Id.*  The ALJ correctly found that this evidence establishes that "Respondent's stated reason for discharging Bryson was mere pretext for its true discriminatory motive." ALJD 19-20.  Because Amazon's purported basis for its decision to terminate Bryson amounts to nothing more than pretext, Respondent cannot meet its burden under *Wright Line*,[32] and the Board will likely affirm the ALJ's finding of a violation under this theory. Accordingly,

---

[32] See *Metropolitan Transportation Services, Inc.*, 351 NLRB 657, 659 (2007) (where it is shown that the employer's proffered reasons for an adverse employment action are pretextual, the employer "fails by definition to show that it would have taken the same action for those reasons, absent the protected conduct"); see also, *Shamrock Foods Co.*, 366 NLRB No. 107, slip. op. at 13 (2018) (citing *American Crane Corp.*, 326 NLRB 1401, 1414 (1998) (failure to interview key witnesses during investigation is evidence of unlawful motive); see also *Ozburn-Hessey Logistics, LLC*, 357 NLRB 1632, 1648 (2011) (quoting *Bantek West, Inc.*, 344 NLRB 886, 895 (2005) ("failure to conduct a meaningful investigation or to give the employee [who is the subject of the investigation] an opportunity to explain are clear indicia of discriminatory intent"); *K & M Electronics*, 283 NLRB 279, 292 fn. 45 (1987); *Donelson Packing Co., Inc.*, 220 NLRB 1043, 1052 (1975) (disparate treatment of other employees involved in the same incident that formed the basis of another employee's discharge establishes pretext); *Naomi Knitting Plant*, 328 NLRB 1279, 1283 (1999) (failure to discipline other employees for conduct similar to that cited as basis for discharge establishes unlawful motive); *La Gloria Oil and Gas Co.*, 337 NLRB 1120, 1124 (2002) (evidence of disparate treatment establishes pretext).

the ALJ's well-supported Decision establishes strong cause to believe that Amazon's discharge of Bryson violated Section 8(a)(1).[33]

## V.     A TEMPORARY INJUNCTION IS JUST AND PROPER

The "policy of the Act [is] to protect the right of workers to act together to better their working conditions."[34] Congress sought "to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer" regarding their employment terms.[35] To that end, Congress granted employees the right to engage in "concerted activities" for the purpose of "mutual aid or protection."[36] The ability to engage in concerted action "without restraint or coercion by their employer" is a "fundamental right."[37] In this case, without immediate injunctive relief, Respondent's illegal actions will severely damage employees' willingness to act in concert, to continue supporting the Union through the election challenge process and the potential collective bargaining process, and will undermine the Union's status in employees' eyes. Absent an injunction, Amazon's misconduct will irreparably harm the national policy protecting workers' right to band together and will seriously undermine the Board's remedial power. In short, Amazon will frustrate the intent of Congress and forever benefit from its illegal conduct.

---

[33] The ALJ also found, in the alternative, that Bryson's discharge was unlawful under *N.L.R.B. v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964), because Amazon failed to establish that it had a good-faith belief that Bryson's conduct was a dischargeable offense. ALJD pp. 16-19. Therefore, there is strong cause to believe that Amazon violated Section 8(a)(1) even under this alternative theory.

[34] *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14 (1962).

[35] *NLRB v. City Disposal Sys. Inc.,* 465 U.S. 822, 835 (1984).

[36] 29 U.S.C. § 157.

[37] *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937). *See also NLRB v. Caval Tool Div.*, 262 F.3d 184, 188 (2d Cir. 2001) (the Act prohibits employer retaliation from destroying "employee initiative aimed at bettering terms of employment and working conditions.") (quoting *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1347 (3d Cir. 1969)).

Many Courts of Appeals, including the Second Circuit, have recognized that the discharge of employee activists may effectively thwart Section 7-protected employee activity absent interim relief.[38] The U.S. District Court for the Eastern District of New York has held that an injunction is warranted to avoid the irreparable harm to Section 7 rights threatened by such discharges.[39] Indeed, interim reinstatement is routinely granted as part of Section 10(j) injunctive relief to prevent the chilling effect that otherwise takes hold.[40]

Bryson's interim reinstatement is necessary to protect employees' willingness to engage in and support protected concerted activities like the protests for which Amazon fired Bryson. Moreover, because the recent union-organizing campaign resulted in an election victory for the Union, his interim reinstatement is now necessary to prevent the adverse impact his continued absence has on the Union's ability to maintain support and bargain effectively for a first contract.

### A. Bryson's Discharge Had a Negative Impact on ALU's Organizing Campaign and Interfered with ALU Obtaining its Legitimate, Uncoerced Level of Support

Throughout the organizing campaign, Bryson and other organizers often had to convince employees that it was safe to sign an authorization card. According to core ALU organizer Tristian Martinez and ALU vice president Derrick Palmer, employees refused to wear ALU-branded t-shirts and masks because they were afraid of being fired like Bryson. According to Palmer, beginning in May 2021, employees routinely admitted being afraid to support the Union because

---

[38] See *Palby Lingerie, Inc.*, 625 F.2d at 1053; *Pye v. Excel Case Ready*, 238 F.3d 69, 74–75 (1st Cir. 2001); *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th Cir. 2001); *Electro-Voice, Inc.*, 83 F.3d at 1572–73; *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988), *overruled on other grounds by Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994); *Sharp v. Webco Indus., Inc.*, 225 F.3d 1130, 1135 (10th Cir. 2000).

[39] See *Drew-King v. Deep Distribs. of Greater NY, Inc.*, 194 F. Supp. 3d 191, 201 (E.D.N.Y. 2016) ("Offers of reinstatement serve to reassure other employees that their rights are not illusory." (internal quotations omitted)); *Blyer v. P & W Elec., Inc.*, 141 F. Supp. 2d 326, 330–31 (E.D.N.Y. 2001) (failure to reinstate unlawfully terminated employees "will chill, if not destroy" employee interest and participation in collective action).

[40] See *Frankl v. HTH Corp. (Frankl I)*, 650 F.3d 1334, 1363 (9th Cir. 2011) (fear of retaliation is "exactly the 'irreparable harm' contemplated by § 10(j)") (quoting *Pye*, 238 F.3d at 74); *Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 878–79, 881 (3d Cir. 1990) (chilling effect of retaliation against activists cannot be undone by eventual Board order).

they thought they would meet the same fate as Bryson. Although Bryson has remained active in organizing efforts and those efforts progressed to an election, Bryson's termination continues to have a present chilling effect on employees' interest in and willingness to openly, freely and without coercion engage in protected concerted activities and supporting the ALU. According to ALU president Christian Smalls, employees *still* talk about Bryson's discharge, and it continues to have a negative effect on Amazon employees and their willingness to support the Union. Many employees expressed to Smalls their fear because Bryson was terminated and is still out of work. Smalls avers that reinstating Bryson would have a monumental impact on employees' willingness to freely engage in protected activity. Importantly, Bryson recounted a conversation in mid-February 2022 with employees who expressed deep skepticism about the strength and efficacy of Union because he still had not been reinstated. Without Bryson's immediate interim reinstatement, employee confidence and support in the Union and willingness to stand by the union during the challenge process will die, thereby depriving employees of the right and benefits of the union representation that they voted for.

### B. Bryson's Continued Absence from the Workplace Threatens ALU's Status and Ability to Bargain Effectively for a First Contract, If Certified

Despite the continued chilling impact of Amazon's unlawful conduct on some employees, in March 2022, the ALU won the election.But the Union's election victory – which is under Amazon's challenge - in no way lessens the necessity for injunctive relief. Employees voted anonymously pursuant to a secret-ballot election. The Union's victory only establishes employees' genuine but anonymous support for the Union at the time of the tally of ballots; however, it is not necessarily indicative of employees' ability to freely and *openly* support the Union moving forward with the collective-bargaining process.  Moreover, employees' Section 7 rights do not end with the right to form a union. Instead, the right extends to the period *after* a union has won the support of employees, including the right to participate in employee advocacy, whether related directly to

the union or not, in the collective-bargaining process, in the enforcement of a collective-bargaining agreement, voicing desired changes to the agreement, etc. Thus, the statutory right to join and assist the Union cover activities that inevitably occur after the Union has won – the right to engage in protected activity in support of the Union without retaliation, to bargain collectively, and to advocate for the Union's bargaining positions. These are the rights that are still precarious and at risk of grave harm.

Specifically, Bryson's discharge and continued absence from work threatens to undermine the collective bargaining process by diminishing employee support for the Union over time. Employee support is vital to a union's ability to bargain effectively.[41] Without Bryson's reinstatement at a time when the nascent Union is most vulnerable, employees will lose confidence in the Union. With the erosion of support, the Union has no leverage and is "hard-pressed to secure improvements in wages and benefits at the bargaining table"[42] and will not have the support it needs to bargain effectively,[43] and may ultimately be ousted by disaffected employees or forced

---

[41] *See Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir. 1990) (recognizing that erosion of employee support jeopardizes union's ability to represent employees); *accord Chester v. Grane Healthcare Co.*, 666 F.3d 87, 102–03 (3d Cir. 2011); *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226–27 (6th Cir. 1993); *Electro-Voice, Inc.*, 83 F.3d at 1573; *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1193 (9th Cir. 2011); *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970).

[42] *Moore-Duncan v. Horizon House Developmental Servs.*, 155 F. Supp. 2d 390, 396 (E.D. Pa. 2001); *see also Duffy Tool & Stamping, L.L.C. v. NLRB*, 233 F.3d 995, 998 (7th Cir. 2000) ("By undermining support for the union, the employer positions himself to stiffen his demands … knowing that if the process breaks down the union may be unable to muster enough votes to call a strike.").

[43] *See, e.g., Centro Medico*, 900 F.2d at 454; *Overstreet v. El Paso Disposal, LLC*, 652 F.3d 844, 856-57 (5th Cir. 2010).

to disclaim representation.[44] Amazon will succeed in permanently frustrating the employees'

decision to choose ALU representation, and the Board's order will be an "empty formality."[45]

The termination of a visible employee activist like Bryson can create a leadership void

sufficient to derail the concerted activities and the Union's bargaining position and progression

towards a first contract.[46] Additionally, the remaining employees will often refrain from engaging

in Section 7 activity for fear of also losing their jobs.[47] Multiple Courts of Appeals have endorsed

inferences of irreparable harm based on the unlawful discharges themselves.[48]

That risk of irreparable harm to the Union's status and ability to bargain effectively in the

future is particularly acute here, where the ALU's election victory is currently under challenge

and, if certified, will be a newly-established union bargaining for a first contract.[49] The deterrent

---

[44] *See Frye*, 10 F.3d at 1226–27 ("employee support would erode to such an extent that the Union could no longer represent those employees," rendering a final Board remedy "ineffective") (quoting *Centro Medico*, 900 F.2d at 454); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 27 (1st Cir. 1986) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.").

[45] *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967)

[46] See, e.g., *Schaub*, 250 F.3d at 971 (without reinstatement of discriminatee, "there would be no one at the company organizing"); *Electro-Voice*, 83 F.3d at 1573 (organizers' "absence deprives the employees of the leadership they once enjoyed").

[47] See *Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 576 (2d Cir. 1988) (employees are "certain to be discouraged" from engaging in protected activity "if they reasonably believe it will cost them their jobs."); *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212–13 (2d Cir. 1980) (discharge of activists "remain in [employees'] memories for a long period"); *Electro-Voice*, 83 F.3d at 1573 ("[T]he employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them.").

[48] See *Frankl I*, 650 F.3d at 1363 ("likelihood of success" in proving discriminatory discharge of activists during organizing drive "largely establishes" likely irreparable harm, absent unusual circumstances); *Angle*, 382 F.2d at 660 (independent evidence of irreparable harm not required because illegal discharges during an organizing campaign "operate predictably to destroy or severely inhibit employee interest in union representation, and activity toward that end"). *Cf. Francisco Foods, Inc.*, 276 F.3d at 297–98 (interim instatement of employees illegally refused hire just and proper even where "the Director chose not to make an independent case on irreparable harm").

[49] *See Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 373 (11th Cir. 1992) (bargaining units are "highly susceptible to management misconduct" where union was recently certified and employees are bargaining for first contract); *accord Pascarell*, 904 F.2d at 880–81; *Ahearn*, 351 F.3d at 239; *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500–01 (7th Cir. 2008); *Lindsey v. Shamrock Cartage, Inc.*, 2018 WL 6528432, at *5 (S.D. Ohio 2018) ("in its infancy and bargaining for a first contract, the Union is particularly susceptible to harm if [the discharged activist] is not reinstated").

effect of Bryson's continued absence threatens the Union's ability to maintain support through the resolution of the challenged-election process, and consequently the Union's ability to bargain effectively for a first contract.[50]

Given Bryson's leadership among employees in early protected concerted activities, his continued absence from the workplace absent an injunction also threatens the employees' ongoing concerted efforts aside from union organizing, including those surrounding workplace safety that intensified with the COVID-19 pandemic. Indeed, Respondent rolled back hard-earned COVID-19 safety protocols put in place because of Bryson and other employees' collective efforts, even as the pandemic marches on with more contagious viral variants. Employees' will be cowed in the exercise of their Section 7 rights and will be unwilling to now protest Amazon's removal of COVID protections, fearing that they will suffer the same fate as Bryson and that the Union and the NLRB will not be able to protect their rights.

"[I]n the labor field, as in few others, time is crucially important in obtaining relief."[51] A final Board reinstatement order cannot revive employee interest in concerted action because it will not come until years after the discharge[52]—too late to erase its chilling effect.[53] By that time, the remaining employees will have seen that workers who "attempted to exercise rights protected by the Act had been discharged" and waited for "years to have their rights vindicated."[54] No worker

---

[50] *See, e.g., Ahearn v. Jackson Hospital Corp.*, 351 F.3d at 239 (interim reinstatement of illegally discharged employees under Section 10(j) just and proper to allow union to effectively bargain for a first contact, as the bargaining unit in that context is "highly susceptible to management misconduct").

[51] *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).

[52] See, e.g., *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011) (noting the "notoriously glacial" pace of Board proceedings).

[53] See *Pye*, 238 F.3d at 75 (unremedied interference with organizing effort "would make the Board's remedial process ineffective simply because it is not immediate"); *Electro-Voice*, 83 F.3d at 1573 ("As time passes, . . . the spark to organize is extinguished.").

[54] *Silverman v. Whittall & Shon, Inc.*, 1986 WL 15735, at *1 (S.D.N.Y. 1986).

in their "right mind" will participate in a concerted campaign.[55] This is exactly the type of irreparable harm Section 10(j) is designed to address.[56] Without injunctive relief. Amazon will succeed in permanently frustrating the employees' right to concertedly act for mutual aid and protection and to be represented by a union of their choosing.[57] The Board's order will be an "empty formality."[58]

Interim reinstatement offers the best chance of avoiding this unjust result.[59] Because fear of retaliation may completely extinguish employee willingness to engage in acts of concerted mutual aid and protection by the time a Board order issues, interim reinstatement is necessary now to erase the chill before it is too late to prevent remedial failure.[60] It will mitigate the chilling effect on employee self-organization by sending an affirmative signal that the Board and the courts will *timely* protect employees if they face retaliation for protected concerted activity.[61] Indeed, although

---

[55] *Silverman*, 1986 WL 15735, at *1.

[56] *Pye*, 238 F.3d at 75.

[57] See *Caval Tool*, 262 F.3d at 188 (to "protect concerted activities in full bloom, protection must necessarily be extended to intended, contemplated or even referred to group action, lest employer retaliation destroy the bud of employee initiative aimed at bettering terms of employment and working conditions."). *Cf. Radio Officers' Union of Com. Telegraphers Union, AFL v. NLRB*, 347 U.S. 17, 40 (1954) (the "policy of the Act is to insulate employees' jobs from their organizational rights"); *Jones & Laughlin*, 301 U.S. at 34 ("collective action would be a mockery if representation were made futile by interference").

[58] *Angle*, 382 F.2d at 660.

[59] *Id.* at 661 (interim reinstatement is "best visible means" of rectifying chill of protected activity).

[60] See *Pye*, 238 F.3d at 75 (interim reinstatement of five employee organizers held just and proper); *Kaynard*, 625 F.2d at 1053 (interim reinstatement of two employee activists just and proper); *Schaub*, 250 F.3d at 971 (one employee organizer); *Aguayo*, 853 F.2d at 746, 749 (eleven members of organizing committee); *Angle*, 382 F.2d at 660–61 (four employee organizers); *Perez*, 2019 WL 2076793, at *5 (interim reinstatement of ten protected concerted strikers); *Barker*, 2007 WL 1771513, at *1 (ordering immediate reinstatement of 20 protected concerted strikers pending appeal); *Drew-King*, 194 F. Supp. 3d at 202 (ordering interim reinstatement of five discriminatees).

[61] See *Sharp*, 225 F.3d at 1135 (interim reinstatement "reasonably necessary to preserve the ultimate remedial power of the Board"); *Murphy v. NCRNC, LLC*, 474 F. Supp. 3d 542, 561 (N.D.N.Y. 2020) (ordering interim reinstatement of activists, noting "'[w]ithout timely interim relief, [the Employer's] illegal actions will irreparably harm … the employees' right to choose union representation . . . [The Employer] will forever benefit from its illegal conduct.'"); *NLRB v. Ona Corp.*, 605 F. Supp. 874, 886 (N.D. Ala. 1985) (interim reinstatement of single discriminatee in large unit will send "affirmative signal"). *Cf. Kaynard*, 625 F.2d at 1053 (reinstatement of "active and open" supporters just and proper to avoid "serious adverse impact on employee interest").

many employees have observed that Bryson is still present and active in the ALU, they are acutely aware that he is not currently employed despite the passage of time and a pending Board case, and they take that as a sign that they will not be timely protected if they are retaliated against. Bryson still desires reinstatement and will continue to assist with ALU's organizing and bargaining efforts. Reinstatement is particularly important here because in the time since his termination, employees formed the ALU and voted for it to represent them, yet are still waiting for the fruits of that election victory and for collective bargaining to begin. Seeing Bryson timely reinstated will send a signal to current employees at JFK8, as well as employees at other Staten Island warehouses, where the Union is currently organizing, that they need not fear openly supporting the ALU or otherwise engaging in protected concerted activities because their rights will be effectively upheld.  Bryson is a key figure and his reinstatement will empower the nascent Union to level the playing field during first contract bargaining and further protected concerted activity in support of the Union's bargaining goals.[62] His reinstatement will also aid the ongoing campaigns at Respondent's other Staten Island facilities.

The other requested relief is also just and proper. The employees will not feel free to exercise their statutory rights absent interim rescission of the discriminatory termination of Bryson.[63] A cease-and-desist order is "a standard part of a [Section] 10(j) preliminary

---

[62] See *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1193 (9th Cir. 2011) (employee support is necessary for a union "to bargain effectively").

[63] See e.g., *Walsh v. Mountain View Care and Rehabilitation Center, LLC*, 2019 WL 2865891 *1-2 (M.D. Pa. July 2, 2019) (interim rescission of discriminatory suspension); *Shamrock Cartage, Inc.*, 2018 WL 6528432, at *5 (S.D. Ohio 2018) (suspension); *Blyer v. Domsey Trading Corp.*, 1991 WL 150817, at *2 (E.D.N.Y. 1991) (interim rescission of warnings and other discriminatory discipline); *Crawford v. Environmental Waste Disposal, Inc.*, 568 F. Supp. 22, 27–28 (N.D. Ill. 1983) (warnings); *Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1155 (D. Mass. 1983) (same), *affirmed mem.*, 725 F.2d 664 (1st Cir. 1983).

injunction."[64] Reading of the district court's order in front of the employees and a representative of the Board is an "effective but *moderate* way to let in a warming wind of information and, more important, reassurance."[65] Relatedly, posting the order during the pendency of the administrative proceedings will further inform and reassure employees of their rights.[66]

The passage of time does not obviate the need for injunctive relief, especially given that employees are still waiting to reap the fruits of recently electing the ALU as their representative and Bryson's role in the Union. First, the passage of time does not itself determine the propriety of injunctive relief. Many courts have noted that delay is significant only if the harm has occurred and the parties cannot be returned to the status quo, such that a final Board order is likely to be as effective as interim relief.[67] Here, a final Board order could be years away. The passage of time has not yet "so weakened the Union that even interim relief could not salvage it."[68] Of course, as explained above, without interim relief, by the time the Board acts, employee support for the Union will have eroded, the Union's strength likely will have irreparably diminished and protected concerted action may be forever chilled.

---

[64] *Paulsen v. PrimeFlight Aviation Servs., Inc.*, 718 F. App'x 42, 45 (2d Cir. 2017) (summary order); see also, e.g., *Drew-King*, 194 F. Supp. 3d at 202; *Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1052 (W.D. Tenn. 2011) (cease-and-desist order appropriate "to prevent irreparable chilling of support for the Union among employees and to protect the NLRB's remedial powers.").

[65] *United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767, 788–89 (9th Cir. 2017) (emphasis in original); see also *Drew-King*, 194 F. Supp. 3d at 202; *Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1206–07 (D. Haw. 2010) (ordering reading of court order), *aff'd sub nom. Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011); *Fernbach v. Sprain Brook Manor Rehab, LLC*, 91 F. Supp. 3d 531, 550 (S.D.N.Y. 2015); *Rubin v. Vista Del Sol Health Servs., Inc.*, 2015 WL 306292, at *2 (C.D. Cal. 2015); *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 932 (D. Ariz. 2014); *Calatrello v. Gen. Die Casters, Inc.*, 2011 WL 446685, at *8 (N.D. Ohio 2011); *Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F. Supp. 2d 1201, 1218 (E.D. Cal. 2010).

[66] See, e.g., *Drew-King*, 194 F. Supp. 3d at 202; *Hooks*, 775 F. Supp. 2d at 1054 (ordering posting).

[67] See *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987); *Aguayo*, 853 F.2d at 750.

[68] *Arlook*, 952 F.2d at 374.

Further, courts have recognized that the Board "cannot operate overnight," but rather "should have time to investigate and deliberate" before seeking injunctive relief.[69] Here, there was no undue administrative delay in the processing of the case. Complaint issued a few months after Bryson filed the unfair-labor-practice charge. Delays in completing the administrative trial were due to the Employer's obstinate failure to provide subpoenaed documents.[70] Most critically, the need for Bryson's interim reinstatement did not ripen until his early protected concerted activity evolved into the ALU organizing campaign and he continued to play a leadership role with the Union.[71] Additionally, with the growth of support for the ALU, Amazon relaunched its efforts to stifle protected concerted activity. Finally, despite the passage of nearly two years since Bryson's discharge, this delay is not unprecedented in Section 10(j) proceedings.[72] In these circumstances, the passage of time has not obviated the need for the injunction. Injunctive relief remains appropriate because it can restore the lawful status quo and more effectively protect employees' statutory rights than a Board order in due course.

---

[69] *Maram v. Universidad Interamericana de P.R., Inc.*, 722 F.2d 953, 960 (1st Cir. 1983).

[70] See *Fernbach*, 91 F. Supp. 3d at 546 ("courts should consider how much of the delay is attributable to the time necessary for the [government] to investigate the charges and to the litigation tactics of the respondents," and even assuming the government delayed, it would be inappropriate to punish workers). *Rubin v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1104–05 (C.D. Cal. 2015) (failure to comply with subpoenas mitigated delay).

[71] See *Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 361 (E.D.N.Y. 2012) (14-month delay did not render injunctive relief inappropriate or ineffective where urgent need for injunctive relief arose only when employees lost benefits and factors justifying just and proper analysis were not diminished by delay).

[72] See, e.g., *Frankl I*, 650 F.3d at 1363–65 (granting relief where Section 10(j) petition was filed almost three years after the first unfair-labor-practice charge); *Bloedorn*, 276 F.3d at 299–300 (injunction ordered on appeal even though more than two years had passed since the violation; interim relief remained "a vital means of preserving the Board's ultimate ability to provide meaningful redress for the wrongs alleged.")  See also, *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) (19 months between initial complaint and 10(j) petition); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544–45 (4th Cir. 2009) (18 months between issuance of complaint and request for 10(j) relief); *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 248–49 (3d Cir. 1998) (14 months between issuance of complaint and 10(j) petition); *Vista Del Sol Health Servs.*, 80 F. Supp. 3d at 1104–06 (1-year delay between initial charge filing and 10(j) petition did not undercut continued need for injunctive relief where employees continued to fear employer retaliation); *Overstreet v. Albertson's LLC*, 868 F. Supp. 2d 1182, 1191–92 (D.N.M. 2012) (one year delay by Board did not nullify effectiveness of injunctive relief; courts should afford Board leniency to delay filing 10(j) petition because Board deference built into Act's statutory scheme).

24

In sum, interim relief will vindicate the employees' statutory right to engage in concerted activity for mutual aid and protection and preserve the Board's remedial power.[73] In addition, it will serve the public interest by effectuating the will of Congress and ensuring that the Employer's unfair labor practices do not permanently succeed.[74]

## VI.   CONCLUSION

Based on the points and authorities discussed herein, Petitioner respectfully asks the Court to issue a temporary injunction as prayed for in the Petition for Temporary Injunction Under Section 10(j) of the Act.

Dated on July 8, 2022.

_/s/ Evamaria Cox_
Matthew A. Jackson
Evamaria Cox
National Labor Relations Board
Two MetroTech Center, Suite 5100
Brooklyn, NY 11201
Telephone: (718) 765-6172
Email: Matthew.Jackson@nlrb.gov
Email: Evamaria.Cox@nlrb.gov

---

[73] Interim relief will pose little harm to the Employer, who will receive the experienced services of the employee and will retain its managerial right to impose lawful discipline. See *Pye*, 238 F.3d at 75; *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 182 (1941) ("Protection of the workers' right to self-organization does not curtail the appropriate sphere of managerial freedom; it furthers the wholesome conduct of business enterprise."). In fact, interim reinstatement helps reduce the Employer's ultimate financial liability because it cuts off any continued accrual of backpay. See *Hubbel v. Patrish LLC*, 903 F. Supp. 2d 813, 818 (E.D. Mo. 2012). In addition, in the event the Employer has hired an employee to replace the discriminatee, it is well-settled that the Section 7 rights of discriminatees to interim reinstatement under Section 10(j) outweigh the job rights of their replacements. See *Aguayo*, 853 F.2d at 750.

[74] See *Frankl I*, 650 F.3d at 1365 ("In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed . . . ."); *Pan Am. Grain Co.*, 805 F.2d at 28 ("[T]he public has an interest in ensuring that the purposes of the Act be furthered.").