# EXHIBIT A

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
Kathy Drew-King, Regional Director of
Region 29 of the National Labor Relations
Board for and on behalf of the National
Labor Relations Board,

                 Petitioner,

       -against-      Case No.:
                       1:22-CV-01479

Amazon.Com Services LLC,

                 Respondent.
----------------------------------------x

        VIDEOTAPED DEPOSITION of GERALD J.

BRYSON, taken by the Respondent, pursuant to

Federal Rule of Civil Procedure 30, held at the

offices of Morgan, Lewis & Bockius, LLP,

101 Park Avenue, New York, New York 10178, on

May 23rd, 2022, at 10:12 a.m., before Daniel A.

Joseph, Shorthand Reporter and Notary Public in

and for the State of New York.

*********************************************

              Magna Legal Services

                 (866)624-6221

                www.MagnaLS.com



Page 2

```
1
2   APPEARANCES:
3
4   NATIONAL LABOR RELATIONS BOARD, REGION 29
        Attorneys for Petitioner
        Kathy Drew-King, Regional Director of
5       Region 29 of the National Labor
        Relations Board for and on behalf of
6       the National Labor Relations Board
        2 Metro Tech Center, Suite 5100
7       Brooklyn, New York 11201
8   BY:   EVAMARIA COX, ESQ.
9
10  MORGAN, LEWIS & BOCKIUS, LLP
        Attorneys for Respondent
11      Amazon.Com Services LLC
        1701 Market Street
12      Philadelphia, Pennsylvania 19103
13  BY:   RICHARD G. ROSENBLATT, ESQ.
14
15
    MAKE THE ROAD NEW YORK
16      Attorneys for GERALD J. BRYSON,
        TRISTAN MARTINEZ, AND DERRICK PALMER
17      301 Grove Street
        Brooklyn, New York 11237
18
    BY:   FRANK KEARL, ESQ.
19
20  ALSO PRESENT:
21  Christopher J. Murphy, Esq., Morgan, Lewis &
    Bockius, LLP  (Remote attendance)
22
    Nancy K. Reibstein, Esq., National Labor
23  Relations Board, Region 29  (Remote attendance)
24  Eric Nolan; Magna Legal Services, Videographer
25
```

Page 3

```
1
2       STIPULATIONS
3
4       IT IS HEREBY STIPULATED AND AGREED by
5   and between the attorneys for the respective
6   parties herein, that filing, sealing, and
7   certification be and the same are hereby
8   waived.
9       IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to the form of
11  the question shall be reserved to the time of
12  the trial.
13      IT IS FURTHER STIPULATED AND AGREED
14  that the within deposition may be signed and
15  sworn to before any officer authorized to
16  administer an oath, with the same force and
17  effect as if signed and sworn to before The
18  Court.
19
20
21
22
23
24
25
```

Page 4

```
1
2       VIDEOGRAPHER:  Good morning.  We
3   are now on the video record.  This begins
4   videotape of media unit number 1 of the
5   deposition of Mr. Gerald J. Bryson, in the
6   matter of National Labor Relations Board,
7   Kathy Drew-King, et al. versus Amazon.com,
8   filed in the United States District Court
9   for the Eastern District of New York, with
10  a case index file docket number of
11  1:22-CV-01479.
12      Today is Monday, May 23rd, 2022.
13  The time on the video monitor is now
14  10:12 a.m.  This deposition is being taken
15  at the offices of Morgan, Lewis, 101 Park
16  Avenue, New York, New York, and is being
17  taken at the request of Morgan, Lewis.
18      I'm the videographer today, Eric
19  Nolan, with Magna Legal Services, and
20  today's court reporter is Daniel Joseph,
21  also with Magna.
22      Will counsel and parties present
23  and anyone attending remotely via the
24  teleconference, please enter their
25  appearance at this time for the parties
```

Page 5

```
1
2   you represent for the video record.
3       MR. ROSENBLATT:  Richard G.
4   Rosenblatt of Morgan, Lewis & Bockius, on
5   behalf of Defendant Amazon.  On the phone
6   is Christopher J. Murphy, also of Morgan,
7   Lewis on behalf of Amazon.
8       MR. KEARL:  Frank Kearl, Make the
9   Road New York, representing the witness,
10  Gerald Bryson.
11      MS. COX:  Evamaria Cox of the
12  National Labor Relations Board, on behalf
13  of Kathy Drew-King.  And participating by
14  phone is Nancy Reibstein and Matthew
15  Jackson.
16      VIDEOGRAPHER:  Thank you.  Court
17  Reporter, Daniel Joseph, would you please
18  swear in the witness at this time, after
19  which we may proceed?  Time on the video
20  monitor: 10:13 a.m.
21  G E R A L D   J.   B R Y S O N, the witness
22  herein, having been first duly sworn by a
23  Notary Public of the State of New York, was
24  examined and testified as follows:
25  Q.    State your name for the record, please.
```



2  (Pages 2 to 5)

G. BRYSON

1
2    A.    I'm a sergeant-at-arms.
3    Q.    Okay.  So you're not -- you don't have
4    a --
5    A.    I'm an organizer, but -- we are all
6    organizers.
7    Q.    Okay.
8    A.    But what do you mean?  I'm not sure what
9    you're asking me, sir.
10   Q.    I just wanted to know if you had a title
11   related to the organization --
12   A.    I'm sergeant-at-arms of the ALU.
13   Q.    Okay.  There are other people who were
14   designated as "lead organizers," correct?
15   A.    Organizers.  It wasn't a "lead."  I don't
16   know what you're saying.  I don't know what
17   you're referring to.
18   Q.    So if one of the other witnesses
19   said there were people who were designated as
20   "lead organizers," you don't know that to be
21   true, correct, one way or the other?
22   A.    One way or the other.
23   Q.    Okay.  Now, am I correct that -- well,
24   strike that.
25         When did you start engaging in organizing

G. BRYSON

1
2    activity on behalf of the ALU?
3    A.    I'm one of the founders of the ALU.
4    Q.    Okay.
5    A.    Me, Christian Smalls, Derrick Palmer,
6    Jordan Flowers, we founded the ALU.
7    Q.    Right.  Is there a document that says you
8    are a founder?
9    A.    It doesn't have to be.
10   Q.    Okay.  I didn't mean --
11   A.    I was -- it doesn't have to be a document.
12   I founded -- I'm one of the founders of -- you're
13   talking to one of the founders of the ALU,
14   seriously.
15   Q.    Okay.  Sir, I understand that there may
16   not be a requirement to have it in writing.  That
17   wasn't my question.
18         My question was:  Is there a document that
19   identifies the founders?
20   A.    I'm not sure.  Maybe there is; maybe there
21   isn't.
22   Q.    Okay.  Though -- although my original
23   question was:  When did the -- when did you start
24   engaging in organizing activity?
25         And maybe -- do you understand what I mean

G. BRYSON

1
2    by "organizing activity"?
3    A.    Yeah.  Day 1.
4    Q.    Okay.  And "Day 1" is what day?
5    A.    Back in May, when we came out there and
6    started getting signatures and organizing.
7    Q.    So, May of 2021, correct?
8    A.    2021, yeah.
9    Q.    Okay.
10   A.    Yes, sir.
11   Q.    And that was about a little over a year
12   following the termination of your employment,
13   correct?
14   A.    It's been a little over a year from what?
15   Q.    From the termination of your employment in
16   April of 2020, correct?
17   A.    April of 2020 was what?  Say it -- excuse
18   me.  Repeat the question for me, please.
19   Q.    Absolutely.
20   A.    I'm -- I'm not hearing you right.
21   Q.    That's fine.
22         You started organizing on behalf of ALU at
23   JFK8 a little more than a year after your
24   termination from employment, correct?
25   A.    More -- more or less.

G. BRYSON

1
2    Q.    Okay.  When you say on Day 1 you started
3    organizing, could you describe for me what your
4    activities were on that Day 1 -- your organizing
5    activities?
6    A.    Basically, from ALU's standpoint, you're
7    talking?  I'm not sure what you're talking.  You
8    do realize that we have two organizations.
9    Q.    I do.  I'm talking right now about the
10   ALU.
11   A.    Okay.
12   Q.    Okay.  And I'm not talking about the
13   TCOEW.
14   A.    Well, I'm a founder of both.
15   Q.    Okay.  Let's focus, for the moment, on the
16   ALU --
17   A.    Okay.
18   Q.    -- and your organizing activities with
19   respect to that.
20   A.    Yes.
21   Q.    Just so to avoid any confusion, when we
22   were talking before about the Day 1 of organizing
23   activities --
24   A.    Yeah.
25   Q.    -- and you said "May of 2021," are you



Page 50

G. BRYSON

1    knowledge.
2    Q.    Did -- did you have any conversations with
3    anybody about what might be effective means to
4    organize workers?
5    A.    I'm sure I have, but I can't recall one
6    single person that I can focus on.  And -- I
7    mean, I'm just being honest.
8    Q.    Yeah, I appreciate your honesty.  So did
9    you meet with any --
10   How about Seth Goldstein?  Do you know
11   him?
12   A.    Of course.
13   Q.    Did he give any guidance, instructions,
14   training, whatever term you want to use, with
15   regard to --
16   A.    No, he didn't give us any --
17        MR. KEARL:  Objection:  Privileged.
18        And insofar as Mr. Goldstein might have
19        been representing Mr. Bryson, I don't want
20        him to answer questions that would
21        infringe on his attorney-client privilege.
22        MR. ROSENBLATT:  Yeah, of course.
23   BY MR. ROSENBLATT:
24   Q.    Again, I'm just going to remind you

Page 51

G. BRYSON

1    to -- and I know there's going to be times where
2    you're just going to -- you're going to be eager
3    to answer something or say something.  Just make
4    it easier on the court reporter.  Just wait for a
5    moment until I'm done.  Okay?
6        So, Mr. Goldstein.  Did you ever sign a
7    letter of representation where he was
8    representing you as your lawyer?
9    A.    Not that I -- I don't recall that.
10   Q.    Okay.  And he doesn't work for Make the
11   Road New York, right?
12   A.    No.
13   Q.    All right.  So did Mr. Goldstein provide
14   you with any guidance, instructions, training --
15   A.    No.
16   Q.    -- sorry, on how to go about organizing?
17   A.    No.
18   Q.    Okay.  Did anybody from the National Labor
19   Relations Board discuss with you how to go about
20   organizing?
21   A.    Definitely not.
22   Q.    Okay.  Do you have an understanding as to
23   what your rights were?
24   A.    According to --

Page 52

G. BRYSON

1        MR. KEARL:  Objection:  Form.
2    Q.    Your rights during the organizing
3    campaign.
4    A.    So my rights.  So --
5    Q.    What you --
6    A.    Begging your pardon.  Could you be a
7    little more specific on what you're talking
8    about -- the rights?
9    Q.    Sure.  Were you aware of what, if any,
10   legal rights you had as an organizer?
11   A.    Yeah, pretty much.  I mean, you know, we
12   know what we could do and what we couldn't do.
13   Q.    And how did you learn about that?
14   A.    I don't know.  I'm not sure.  It's not
15   a -- I could say this to answer that question,
16   sir.  I'm being honest.  It's not as hard as you
17   think, or you're making it sound.
18   Q.    Okay.  And again, I appreciate your
19   honesty --
20        MR. KEARL:  I'm sorry.  Is there
21        any way we can -- this thing keeps
22        flashing.  Is there any way we can turn it
23        off or make it stop -- it's just --
24        MR. ROSENBLATT:  As long

Page 53

G. BRYSON

1    as the -- I don't think the witness is
2    seeing it.
3        MR. KEARL:  Okay.
4        MR. ROSENBLATT:  And the answer is,
5    I don't know, so.
6    BY MR. ROSENBLATT:
7    Q.    By the way, you said you had handed out
8    hundreds of t-shirts.
9    A.    Yes, sir.
10   Q.    And you ended up having to get a resupply
11   of them?
12   A.    Oh, we just resupply them anyway.
13   Q.    Okay.  Okay.  And how about lanyards?
14   Hundreds of lanyards?
15   A.    Yes.
16   Q.    And did you have to get a new supply of
17   lanyards because you ran out of them?
18   A.    I don't recall that.
19   Q.    All right.  And did you see people around
20   the facility other than organizers wearing ALU
21   t-shirts?
22   A.    Yes.
23   Q.    How about ALU lanyards?
24   A.    Yes.



G. BRYSON

1
2  Q.    And when did you start seeing that?
3  A.    As soon as we gave them out.
4  Q.    All right.  Did you see people put on the
5  t-shirts when you handed them to them?
6  A.    Yes.
7  Q.    Did you see the people put on the lanyards
8  when you handed them to them?
9  A.    Yes.
10  Q.    Did you see them wearing them into the
11  facility?
12  A.    Yes.
13  Q.    Both the t-shirts and the lanyards?
14  A.    Yes.
15  Q.    Did anybody tell you that they were afraid
16  to take a t-shirt?
17  A.    Not that I know of.
18  Q.    Did anybody tell you that they were afraid
19  to take a lanyard?
20  A.    Not that I know of.
21  Q.    Did anybody tell you that they were afraid
22  to put on a t-shirt?
23  A.    I've heard.  It didn't happen to me, so
24  much personally, with a t-shirt.  It happened
25  other ways, but I've heard of people that were a

G. BRYSON

1
2  little scared.  There were people that were
3  scared -- scared of Amazon, scared of being
4  terminated.  Let's get that straight.
5  Q.    Okay.  My question to you, though, is:
6  Did anybody tell you that they were afraid to
7  wear the t-shirt, or are you saying you just
8  heard from others that people were afraid of
9  Amazon?
10  A.    Nobody told me specifically about a
11  t-shirt.  They've told me other things.
12  Q.    What are -- let's focus on that, then.
13       When you say other people have told you
14  about other things, who were the people who told
15  you about other things?
16  A.    Numerous.
17  Q.    Okay.  But who?  Can you identify people?
18  A.    Oh, I can't identify anybody right now.
19  Q.    Are you telling me that you can't identify
20  them because you cannot remember or because you
21  won't identify them?
22  A.    A little bit of both.
23  Q.    Okay.  So how many people told you things
24  that led you to conclude that they were afraid of
25  Amazon?

G. BRYSON

1
2  A.    Quite a few.
3  Q.    Okay.  Can you give any -- can you give me
4  a number?
5  A.    I can't give you an exact number, but it
6  was a few people.
7  Q.    And you define "few" as two or three?
8  A.    No, definitely not.
9  Q.    Three or four?
10  A.    You want to try, like, 50-100.
11  Q.    Okay.
12  A.    I mean, you know, there's a little patch
13  of people that were very scared of Amazon.
14  Q.    Are you telling me that each of those
15  persons spoke to you, or that -- are those people
16  that you have heard from others may have been
17  fearful of Amazon?
18  A.    Oh, a lot of people spoke to me.
19  Q.    Okay.  But are you saying -- what I'm
20  trying to drill down on right now, Mr. Bryson, is
21  how many people with whom you spoke, not about
22  whom you are aware.  Okay?  So let's focus on
23  with whom you spoke.
24  A.    Okay.
25  Q.    Okay.  How many people, give or take, did

G. BRYSON

1
2  you speak with who expressed to you that they
3  were fearful of Amazon?
4  A.    Quite a few.
5  Q.    Okay.  And how do you define "quite a
6  few"?
7  A.    I can't give you a number, sir.  It's been
8  quite a few, seriously.  I don't want to tell you
9  50, 100.  I don't know.  But when you have groups
10  of people that feel like that, you tend not to
11  count.  You tend to try to help them.
12  Q.    All right.  Were these people that you
13  spoke with in a group or individual
14  conversations?
15  A.    Sometimes groups, sometimes individuals.
16  Q.    Okay.  Can you identify one person?
17  A.    I'm not going to identify one person.  I
18  can identify what -- everybody knows me there.
19  Okay?  I'm from Staten Island, born, bred,
20  raised.
21  Q.    Okay.  But not everybody who works there
22  is from Staten Island, right?
23  A.    No, but majority of people -- you've got
24  to understand, when you're a character like I am,
25  you're pretty much noticed.

MAGNA▶
LEGAL SERVICES

G. BRYSON

1
2     Q.     You can go ahead and answer.
3     A.     He went before.
4     Q.     Okay.  So aside from Mr. Flowers,
5     Mr. Palmer, Mr. Spence, and Mr. Daniels were
6     actively employed at JFK8, correct?
7     A.     I'm not sure about that.  I'm not really
8     sure about that.
9     Q.     Well, at some -- okay.  Mr. Daniels, at
10    some point -- let's exclude him for a second.
11    A.     Okay.
12    Q.     Mr. Palmer and Mr. Spence were actively
13    employed as of Day 1, correct?
14    A.     That -- I'm not sure about that.
15    Q.     What aren't you sure about?
16    A.     I'm not sure about Mr. Spence, if -- when
17    his employment actually started.
18    Q.     Okay.  Fair enough.
19    A.     That's -- that's -- that's why.
20    Q.     Okay.
21    A.     It wasn't -- it wasn't Mr. Daniels.  It
22    was Mr. Spence.
23    Q.     Okay.  Got me.
24           So, was Mr. Spence involved in organizing
25    activities prior to his employment with Amazon?

G. BRYSON

1
2     A.     Yeah.
3     Q.     Okay.  So he was outside at the tent
4     before he became an Amazon employee, is what
5     you're saying?
6     A.     I'm not sure exactly when.  I don't want
7     to state on that.  But, you know --
8     Q.     Okay.
9     A.     It's roughly around the same time, so I
10    don't want to tell you yes and no when -- I'd
11    rather not answer that.
12    Q.     Okay.  Did the number of organizers who
13    were talking to workers and trying to get them to
14    sign cards increase over time?
15    A.     Yes.
16    Q.     And who else began organizing at the bus
17    stop or --
18    A.     Every -- every Amazon member.  I mean, out
19    of our members, you know, like us, we all -- we
20    all organized.  It's not one that's just
21    set -- it doesn't matter what your title is.
22    When we all go out there, a la our president,
23    Christian Smalls, rain, snow, sleet, earthquakes,
24    that's what we did.
25    Q.     Okay.

G. BRYSON

1
2     A.     We organized.
3     Q.     So as -- as you got people more engaged,
4     they became organizers as well, right?
5     A.     Yes.
6     Q.     And so, was there an expectation that when
7     they were in the facility and on breaks, they
8     would talk to people about joining the union?
9     A.     (No response given.)
10           MR. KEARL:  Objection:  Form.
11    Q.     Correct?
12    A.     Will you repeat that, please?
13    Q.     Sure.  I'll -- I'll even try to rephrase
14    it, make it a little bit more eloquent.
15           Was the expectation as you signed up
16    active workers in the ALU's cause that
17    they -- when they were in the building, that they
18    would be talking to other workers to get them to
19    sign cards?
20    A.     Yes, yes.
21    Q.     Okay.  You -- at some point, you basically
22    had an army of organizers, right?
23    A.     Yes.
24           MR. KEARL:  Objection:  Form.
25    Q.     Inside and outside the facility, right?

G. BRYSON

1
2     A.     Yes.
3     Q.     And did the -- as folks signed up, would
4     any of them receive any guidance or training or
5     instructions on how to organize?
6     A.     No.
7     Q.     Did Mr. Flowers continue to organize?
8     A.     Yes.
9     Q.     Would he be at the tent organizing?
10    A.     Yes.
11    Q.     All right.  Did your responsibilities as
12    an organizer change in any way over the course of
13    the campaign?
14    A.     I'm not sure what you mean.
15    Q.     Well, did you have -- as of Day 1, did you
16    have -- did you have a certain set of
17    responsibilities, and then as of, say, day 50,
18    you were doing something different on a daily
19    basis?
20    A.     No.
21    Q.     You mentioned that there were some
22    organizers who might have even gotten more cards
23    signed than did you.  Who -- who were they?
24           MR. KEARL:  Objection:  Relevance.
25           MR. ROSENBLATT:  You can object to

G. BRYSON
1
2  A.    I don't recall on that.
3  Q.    Did you recall how many that the ALU
4  thought were needed to get an election?
5         MR. KEARL: Objection: Form.
6  A.    I don't recall.
7  Q.    But there was discussion about it; you
8  just don't recall the number, right?
9         MR. KEARL: Objection: Form.
10 A.    Yes.
11 Q.    So, at some point in time, you knew there
12 was a number?
13 A.    Yes.
14 Q.    And was that number shared with you by
15 Mr. Smalls, as the leader of the organization?
16 A.    (No response given.)
17        MR. KEARL: Objection: Form.
18 Q.    Yes?
19 A.    Yes.
20 Q.    And was that shared during a Zoom call, in
21 person? Do you recall?
22        MR. KEARL: Objection: Form.
23 A.    It was shared before Zoom calls. We knew
24 what we were -- what we were -- you know, we
25 pretty much talked, but I just don't recall the

G. BRYSON
1
2  numbers or anything that you were saying.
3  Q.    Okay. That's fair. And you became aware
4  at some point, did you not, that the number of
5  cards that were provided to the NLRB proved
6  insufficient to have an election the first time,
7  right?
8  A.    (No response given.)
9         MS. COX: Objection to form.
10 Q.    You can go ahead and answer.
11 A.    Yeah.
12 Q.    And at that point in time, when you
13 realized that you needed more cards, did you
14 understand how many more cards were needed to get
15 an election?
16        MR. KEARL: Objection: Form.
17 A.    Did I understand how many -- that's not
18 how we did it.
19 Q.    Okay. My question, sir, is -- I'm not
20 asking you what you did.
21 A.    Yeah.
22 Q.    Okay. Just let me finish.
23 A.    I understand.
24 Q.    The first petition for election was
25 withdrawn, right?

G. BRYSON
1
2  A.    (Non-verbal response.)
3  Q.    Correct? You just have to answer.
4  A.    Yes.
5  Q.    And at that point, the ALU decided it was
6  going to file a second petition as soon as it
7  could, right?
8         MR. KEARL: Objection: Form.
9  A.    Yes.
10 Q.    And it knew that it needed a certain
11 number of cards in order to get that second
12 petition granted, right? That you could have an
13 election?
14 A.    (Non-verbal response.)
15        MR. KEARL: Objection.
16 Q.    Yes?
17 A.    Yes.
18 Q.    And whether you recall it at this moment
19 or not, did you know at the time how many cards
20 would be needed?
21 A.    No.
22 Q.    Okay. How -- do you know how it was
23 determined when to file the second petition for
24 election?
25 A.    I don't recall the exact date, no.

G. BRYSON
1
2  Q.    I said -- I didn't ask you the date. I
3  asked you, do you know how it was determined when
4  you could file it?
5         MR. KEARL: Objection: Form.
6  A.    I don't understand that questioning, that
7  line.
8  Q.    At a certain point, you all filed a second
9  petition, right?
10 A.    Yes.
11 Q.    Right. And when you filed that second
12 petition, you thought you had enough cards,
13 right?
14 A.    We knew we had enough cards.
15 Q.    How did you know?
16 A.    (Non-verbal response.)
17        MR. KEARL: Objection to form.
18 Q.    How did you know?
19 A.    I was waiting for you to ask that.
20 Q.    Okay.
21 A.    We never stopped getting cards when we
22 took the first one. We was still collecting.
23 Q.    Okay. But you just said --
24        MR. ROSENBLATT: Actually, can --
25 A.    We was still collecting cards while we

G. BRYSON

1
2   were there at the National Labor Board with the
3   first time. We never stopped having our
4   organizers stop collecting cards. They were
5   still getting -- we was still getting signatures
6   while we were out there.
7   Q.   Okay. So how did you know that you had
8   enough cards to file the second petition?
9         MR. KEARL: Objection: Form.
10  A.   I guess we -- how did I know? How did we
11  know, or how did I know?
12  Q.   Well, let's start with how you knew.
13  A.   Because we never started collecting cards.
14  Again, while we were filing -- regardless of
15  whether we filed or not, I just want you to
16  understand, organizers were still collecting
17  cards.
18  Q.   Understood. First petition gets
19  withdrawn.
20  A.   Still collecting cards.
21  Q.   Still collecting cards.
22       When -- strike that.
23       You filed the second petition, but how did
24  you know that you had enough cards at that moment
25  to meet the threshold that the National Labor

G. BRYSON

1
2   Relations Board has to allow that election to
3   proceed?
4         MR. KEARL: Objection: Form.
5   A.   I think you're going to have to ask
6   Mr. Smalls that question.
7   Q.   Okay. Did Mr. Smalls tell you how many
8   you needed?
9   A.   He knew how many we needed.
10  Q.   Did he tell you?
11  A.   He told me, but I don't recollect the
12  amounts.
13  Q.   I'm not asking you the number. But he did
14  tell you that he knew the number that was needed,
15  right?
16  A.   He didn't tell me he knew the number that
17  was needed. All I remember is we were still
18  collecting cards, and we had more than enough.
19  Q.   Okay. And prior to the filing of the
20  second petition in December, were there
21  discussions about whether or not the ALU had
22  successfully collected enough cards to get the
23  election?
24        MR. KEARL: Objection: Form.
25  A.   Prior to the filing of the second --

G. BRYSON

1
2   Q.   Right.
3   A.   Yeah, we knew we had enough the second
4   time, if that's what you're asking. We never
5   stopped collecting.
6   Q.   That's exactly what I'm asking. And how
7   did you know that that time, you had enough?
8   A.   We have a leader. You're going to have to
9   question him.
10  Q.   Okay. But I want to know how you -- what
11  you understood.
12  A.   My leader said we had enough. I did not
13  question him.
14  Q.   All right. And whether you questioned him
15  or not, I'm not interested right now in what you
16  questioned him; I'm asking what he said.
17  A.   I don't recall. We don't operate like
18  that. We just knew we had enough.
19  Q.   So, you're saying it was Mr. Smalls who
20  told you that "we have enough, and we're going to
21  file the second petition," right?
22        MR. KEARL: Objection to form.
23  A.   Again, nobody has told me. We just knew.
24  I don't recollect all the time how I actually
25  know these things. We -- there's a bunch of us,

G. BRYSON

1
2   okay? I'm not going to put that only on the
3   'prez,' all right? But we knew. As a whole, we
4   knew.
5   Q.   Did you -- did you meet anybody from the
6   National Labor Relations Board -- well, strike
7   that.
8        Prior to filing of the second petition in
9   December, had you had discussions with anybody
10  from the National Labor Relations Board about
11  seeking a 10(j) injunction in federal court?
12  A.   I spoke with my lawyer.
13  Q.   Okay. Prior to the second petition being
14  filed, correct?
15  A.   Prior -- I'm not sure. It's all around
16  the same time. I'm not sure about that stuff.
17  Q.   All right. Were you aware that the
18  National Labor Relations Board representatives
19  had obtained affidavits from other Amazon workers
20  to support a 10(j) injunction back in November?
21        MS. COX: Objection to form.
22  A.   I'm not clear on that, sir.
23  Q.   Okay. Are you aware that Mr. Palmer
24  signed an affidavit in support of a 10(j)
25  injunction in November?

**MAGNA** ▶
LEGAL SERVICES

Page 110

```
1              G. BRYSON
2    A.   I can't recall.  I don't know.
3    Q.   All right.  Was it -- were you aware prior
4    to the NLRB filing its 10(j) action that
5    Mr. Palmer had signed an affidavit for you?
6         MR. KEARL:  Objection to form.
7         MS. COX:  Objection to form.
8    A.   I don't know anything about Mr. Palmer
9    signing anything.  I don't know.  We don't talk
10   about stuff like that.  Okay?
11   Q.   So there's been no discussion between you
12   and Mr. Palmer --
13   A.   No.
14   Q.   -- about the NLRB trying to get you
15   reinstated by way of a 10(j) injunction?
16        MR. KEARL:  Objection:  Form.
17   A.   There's been no talk.  As of right now,
18   the 10(j) and all that stuff made my whole case
19   public knowledge.  Now, do I talk to him now?
20   No.  I haven't talked to him about this.  Okay?
21   Q.   When you say "this," what are you
22   referring to?
23   A.   This.  This whole thing, we haven't
24   talked.  Okay?
25   Q.   You said that when the NLRB filed its
```

Page 111

```
1              G. BRYSON
2    10(j) injunction, your whole case became public
3    knowledge.  What do you mean by that?
4    A.   I mean, from the other case, it became
5    public knowledge.  That means anybody can open up
6    my records, which reporters and everybody else
7    have.
8    Q.   Did you -- were you aware that the ALU had
9    posted a tweet saying that you had gotten your
10   job back?
11        MR. KEARL:  Objection:  Form.
12   A.   I wasn't aware.
13   Q.   No?  Were you aware that Mr. Smalls
14   tweeted that you had gotten your job -- you had
15   been reinstated?
16   A.   I wasn't aware of that.  When it --
17   Q.   I'm sorry.  Go ahead.
18   A.   I'm just going to say I wasn't aware of
19   that, but it's all public knowledge once I was
20   reinstated or once it was a determination.
21   Everybody knows about it.  So yeah, I mean, as
22   far as this goes, nobody knows.  You know what
23   I'm saying?  I haven't talked to anybody.
24        It's -- it's -- you know, like, you keep
25   on asking me about Mr. Palmer; I understand that,
```

Page 112

```
1              G. BRYSON
2    but I haven't talked to him about this.
3    Q.   Now, but what you said was when the NLRB
4    filed for the 10(j) injunction, everybody knew
5    about it at that time, right?
6    A.   Once it was public knowledge, yes.
7    Q.   Okay.  And that included, to your
8    knowledge, workers at the Amazon facility, JFK8?
9    A.   Public knowledge.
10   Q.   Right.  And are you aware that workers at
11   JFK8 had become aware that the NLRB had filed an
12   injunction -- for an injunction seeking your
13   reinstatement for employment prior to the union
14   election taking place?
15   A.   No.  I don't know nothing about that.
16   Q.   Okay.  Did anybody -- were you out --
17        Were you at the site prior to, say, the
18   week prior to the union election, continuing the
19   organizing activities?
20        MR. KEARL:  Objection:  Form.
21   A.   Was I at the site continuing -- yeah, I
22   was -- I was -- I was still organizing, if that's
23   what you mean.  Yeah.
24   Q.   That's exactly what I mean.  And so you
25   continued during the week leading up to the union
```

Page 113

```
1              G. BRYSON
2    election to meet with workers to persuade them to
3    vote for the union?
4         MR. KEARL:  Objection:  Form.
5    A.   Yeah.
6    Q.   And did you have any discussions with any
7    of those workers about the NLRB's efforts to
8    reinstate you to work?
9    A.   All the way up to the election date?
10   Q.   After -- from the time that the NLRB --
11   A.   Same question, just twisted around.  Okay.
12   Q.   Okay.  Let me finish because
13   you -- apparently, you don't understand my
14   question.
15   A.   No, because you're saying the same thing
16   over, sir.  I mean, like, come on.
17   Q.   Okay.  Okay.  But it's a different
18   question, sir.
19        So, from the time that the NLRB filed its
20   petition for a Section 10(j) injunction to the
21   time of the election, did you meet with any
22   workers who discussed with you the NLRB's efforts
23   to get your job back?
24   A.   NLRB did not -- you just phrased the same
25   shit that we was saying for the last ten minutes.
```

MAGNA▶
LEGAL SERVICES

Page 118

G. BRYSON

1
2    A.    Yes, sir.
3    Q.    Okay.  You remember you're under oath?
4    A.    Yes, sir.
5    Q.    Okay.  And you understand it's -- it
6    requires you to testify truthfully, correct?
7    A.    Yes, sir.
8    Q.    Okay.  You mentioned that the ALU
9    continued to collect authorization cards after
10   filing its first petition in October of 2021.  Do
11   you recall that testimony?
12   A.    Yes.
13   Q.    Why did the ALU continue to collect cards
14   even though it had filed the first petition?
15   A.    For just what happened:  Not being -- not
16   having enough the first time.  Just to make sure,
17   I mean, our leader, Christian, decided that we
18   would stop just in case of any problems.
19   Q.    Were you aware of concerns that there
20   might be problems with the first filing?
21   A.    It wasn't -- it wasn't so much of being
22   aware of concerns.  It was being -- it was being
23   ready for anything.
24   Q.    Okay.  You also mentioned that there were,
25   like, 8,000 employees at the facility, right?

Page 119

G. BRYSON

1
2    A.    (No response given.)
3          MR. KEARL:  Objection:  Form.
4    Q.    You remember that testimony, right?
5    A.    Yes.
6    Q.    And you understood that there was around
7    8,000 employees at the time of the filing of the
8    first petition?
9    A.    Yes.
10   Q.    As of the time of the filing of the first
11   petition, did you understand that the ALU needed
12   30 percent of that 8,000 employees roughly?
13   A.    Yes.
14   Q.    And when you filed that petition, did the
15   ALU think that it had 30 percent of 8,000 of the
16   employees?
17          MR. KEARL:  Objection:  Form.
18   A.    Yeah.  I think we were under the
19   impression that we had enough.
20   Q.    Okay.  My question was:  Did you think
21   that you had 30 percent of approximately 8,000
22   employees?
23   A.    Do I think -- did I?
24   Q.    Were you aware at the time that the ALU
25   believed that it had 30 percent of 8,000

Page 120

G. BRYSON

1
2    employees?
3          MR. KEARL:  Objection:  Form.
4    A.    Yeah.
5    Q.    So, your understanding was that the ALU
6    believed it had 30 percent of 8,000 employees
7    before filing its first petition, correct?
8          MR. KEARL:  Objection:  Form.
9    A.    More or less.
10   Q.    Okay.  Now, between the filing of the
11   first petition and the filing of the second
12   petition in December of 2021, did the pace of
13   collection of authorization cards stay relatively
14   the same as it had prior to the filing of the
15   first petition?
16   A.    More or less.
17   Q.    Okay.  There was no drastic upswing or
18   downswing between the October filing and the
19   December filing?
20   A.    It wasn't nothing drastic.
21   Q.    Okay.  So the circumstances really hadn't
22   changed, right?
23          MR. KEARL:  Objection:  Form.
24          Calls for a legal conclusion.
25   A.    I wouldn't say they -- the

Page 121

G. BRYSON

1
2    circumstances -- the circumstances were pretty
3    much the same except for the few that I mentioned
4    to you earlier in testimony about the few people
5    that were scared of Amazon.
6    Q.    Oh, okay.
7    A.    Yeah, but mostly, yeah.  More or less, we
8    collected cards like we usually do.
9    Q.    Okay.  And when did the ALU stop
10   collecting cards?
11   A.    After the second -- after the second time
12   that we went to the National Labor Board.
13   Q.    Was it after you went to the Board or
14   after the parties stipulated to an election if
15   you know what that means?
16   A.    Yeah, when they stipulated to an election,
17   we stopped collecting signatures.
18   Q.    Okay.  So you continued to collect after
19   filing the second petition until the union
20   election was scheduled?
21          MR. KEARL:  Objection:  Form.
22   A.    We continued to collect -- yeah, we
23   collected -- we collected cards up until the
24   time, some of us.
25   Q.    Up until what time?

MAGNA ▶
LEGAL SERVICES

Page 150

G. BRYSON

1
2  Q.    Was it common knowledge that it had been
3  filed or that it was going to be filed?
4          MR. KEARL:  Objection:  Form.
5  A.    I don't remember.  It had been filed when
6  I was asked.  I didn't talk about my case before
7  it was public knowledge.
8  Q.    Do you have any recollection of reviewing
9  any documents to help refresh your recollection
10  as you prepared or reviewed this affidavit?
11         MR. KEARL:  Objection:  Privileged.
12     I'm going to instruct my client not to
13     answer insofar as there were documents or
14     conversations that he had with his court
15     attorney.
16  A.    Not answering.
17  Q.    Mr. Bryson, did you review any documents
18  that refreshed your recollection that helped you
19  prepare this affidavit?
20         MR. KEARL:  Objection:  Privileged.
21     I'm going to instruct my client to answer
22     "yes" or "no."
23  A.    Speak again.
24  Q.    Sure.  Did you review any documents that
25  refreshed your recollection and furthered your

Page 151

G. BRYSON

1
2  ability to provide this affidavit?
3  A.    No.
4  Q.    Like, today, there's a lot of things you
5  didn't remember.  And I assume it's because
6  you've been having a very busy two years, right?
7  A.    (Non-verbal response.)
8  Q.    So, in February of 2022, you might've
9  needed to have your recollection refreshed about
10  certain facts, right?
11  A.    (No response given.)
12         MR. KEARL:  Objection:  Form.
13  Q.    Or are you saying that in February 2022,
14  you had, you know, perfect recollection of all of
15  the facts that were put into this affidavit?
16         MR. KEARL:  Objection:  Form.
17         MS. COX:  Objection as to form.
18         MR. KEARL:  Compound.
19  A.    Yeah, that's a -- you're going to have to
20  divide those up.
21  Q.    I think --
22  A.    You kind of twisted that up for me.
23  Q.    All right.
24  A.    And I'm not going to answer it if you're
25  going to leave it like that.

Page 152

G. BRYSON

1
2         MR. ROSENBLATT:  Okay.  As I said,
3     no speaking objections.
4  Q.    So, today you've told me that -- that the
5  last two years have been tough and a long two
6  years, and so, you don't remember everything,
7  right?
8  A.    Correct.
9  Q.    Okay.  Well, just a few months ago was
10  when you signed this affidavit, right?
11  A.    Correct.
12  Q.    And my question, sir, is you put five
13  pages worth of facts in here.
14  A.    (Non-verbal response.)
15         MR. KEARL:  Objection:  Form.
16  Q.    And my question to you is:  Did you look
17  at any documents to help refresh your
18  recollection as to any of the facts that were put
19  into this affidavit?
20  A.    Oh, not that I recall of.  I -- I pretty
21  much remember what happened.  I -- only thing
22  I've looked at in the -- is the affidavit.
23  Q.    Got you.  So your recollection, in
24  February '22 of all the facts that are in here,
25  was crystal-clear, and you didn't need to refresh

Page 153

G. BRYSON

1
2  your recollection?
3  A.    No, I'm pretty sure I refreshed my memory
4  several times.  And not -- like I said, it's been
5  two years.  There's no way I remember everything
6  spot on.  I got a lot on my plate right now.
7  Q.    Right.  So is there anything you did to
8  refresh your recollection that helped you prepare
9  this affidavit that's been marked as Bryson
10  Exhibit 1?
11         MR. KEARL:  Objection:  Privileged.
12     I'm going to instruct my client to answer
13     "yes" or "no."
14  A.    Yeah.
15  Q.    What did you look at?
16  A.    Yeah, a look, and I talked with my lawyer.
17  Q.    Okay.
18  A.    And we go over things.
19  Q.    And your conversations with your lawyer
20  refreshed your recollection?
21         MR. KEARL:  Objection:  Privileged.
22     I'm going to instruct my client to answer
23     "yes" or "no."
24  A.    Say that question again.
25  Q.    Sure.  Did your conversations with your

MAGNA ▶
LEGAL SERVICES

Page 198

```
1              G. BRYSON
2   A.    Oh, I've had plenty of conversations.
3   Q.    How many?
4   A.    I don't have a name. I don't count. Did
5   you count how many cars were in front of you when
6   you came to work this morning?
7   Q.    How many conversations? I didn't file a
8   federal court affidavit.
9   A.    It doesn't matter. I don't know how many.
10  I don't know. I don't know. It's been quite a
11  few. I am -- people knew I got fired.
12  Q.    Yeah.
13  A.    Like I said, whether you want to believe
14  it or not, I am pretty popular. But, you know, I
15  think you could tell by the way we were talking
16  earlier; I just am a character. And I know a lot
17  of people, and a lot of people know me. And they
18  were -- they were there when I got fired for
19  nothing, all right, for protesting.
20       And they -- yes, people have asked. Will
21  I give you names? No, I'm not going to give you
22  names. That's -- it's about Gerald Bryson here,
23  not about Tim, John, John, and Joe over there.
24  No.
25       MR. KEARL: Can we take a break for
```

Page 199

```
1              G. BRYSON
2   a couple of minutes?
3   A.    I'm not giving up any names.
4        MR. ROSENBLATT: If you're going to
5   instruct him to answer the question, then
6   we can take a break. I'm not sure what
7   otherwise the purpose of the break would
8   be.
9        MR. KEARL: I'm going to talk to
10  him about what potential protections there
11  are available that we're going to try to
12  seek so that Amazon doesn't continue to
13  fire the organizers.
14       MR. ROSENBLATT: What does
15  that have to do --
16       MR. KEARL: Mr. Bryson --
17       MR. ROSENBLATT: What does that
18  have to do with the question?
19       MR. KEARL: Because you're asking
20  him to name names of people he had
21  organizing conversations with about his
22  own termination, and he's afraid to give
23  you those names because he's afraid that
24  Amazon is just going to turn around and
25  fire them.
```

Page 200

```
1              G. BRYSON
2        MR. ROSENBLATT: For having
3   listened to him?
4        MR. KEARL: Yes.
5        WITNESS: They do.
6        MR. ROSENBLATT: For not saying a
7   single word?
8        MR. KEARL: Yeah.
9        MR. ROSENBLATT: I'm not asking
10  what they said. I don't want to know what
11  they said.
12       MR. KEARL: Amazon fires pregnant
13  women for using the bathroom. He is
14  worried about --
15  A.    I'm not going to give you a name. The
16  people you're working for are terrible. I'm just
17  going -- we could take a break if you want.
18  Q.    I'm not ready to take a break.
19  A.    Oh, okay. Well --
20  Q.    Unless -- unless you feel like you need a
21  break, then we'll go forward.
22  A.    With all due respect, I don't want to give
23  any names. You can ask me anything you want, but
24  I'm not going to give you any names.
25  Q.    Of even people you spoke to?
```

Page 201

```
1              G. BRYSON
2   A.    It doesn't matter. I'm not giving you any
3   names; I'm sorry, but I'm not. That's how
4   ruthless they are.
5   Q.    Is that why you didn't give
6   Mandy Velasco's name to Tyler Grabowski when he
7   interviewed you?
8   A.    Exactly.
9   Q.    Okay. So you knew Mandy Velasco's name
10  when he asked you who was filling it, right?
11  A.    (No response given.)
12       MR. KEARL: Objection: Form.
13       Objection: Relevance.
14  Q.    Right? Am I correct?
15  A.    I'm not going there. We're going to go
16  back to Mandy Velasco? Yes, I know Mandy
17  Velasco.
18  Q.    And -- and you knew her when you were
19  meeting with Tyler Grabowski, right?
20  A.    Yes.
21       MR. KEARL: Objection: Form.
22       MR. ROSENBLATT: You got that?
23       COURT REPORTER: Yes (sotto voce).
24  A.    Did I know her? She was part of the
25  protest. And if -- you know, being that you got
```

MAGNA
LEGAL SERVICES

Page 210

G. BRYSON

1
2  know their full names because we don't have the
3  badges that say your full name.  So if you ask me
4  "Jim," I don't know Jim's last name.  If you ask
5  me Steve, I don't know Steve's last name.
6  Q.    But you said you're very popular in --
7  A.    Yeah.
8  Q.    -- Staten Island.
9  A.    Yeah.
10  Q.    Do you know the names of any person,
11  whether from Staten Island or outside of
12  Staten Island, with whom you had a conversation
13  about your termination?
14  A.    Yeah, but I can't recall the names right
15  now seriously.
16  Q.    Can you give me one name?
17  A.    I can't recall their full name right now.
18  That's --
19  Q.    Can you remember a partial name?
20  A.    Okay.  Let's think.  Maybe I should look
21  on my Instagram; it'll probably tell me the full
22  names you want to know.  Yeah, I've had full --
23  I've had conversations with different people, but
24  I don't remember any particular person's name
25  right now at this time and date, and that is the

Page 211

G. BRYSON

1
2  truth.
3       Like, you want me to go zooming through a
4  memory, like, where a lot of people have asked me
5  this question.  Like, you want me to specify just
6  one person.
7  Q.    No, I'm just seeing if you can remember
8  even one is what I'm asking you.
9  A.    I can remember faces.  I don't remember --
10  there's -- you know, it's kind of -- I'm sure
11  you've been in a crowd before and you don't
12  remember everybody's name or -- at the time or
13  whatever.  I mean, it's not like -- it's not so.
14  Q.    So the answer to my question is you
15  cannot, at this time, remember even a single
16  person with whom you had a conversation --
17  A.    I can --
18       COURT REPORTER:  Let me have the
19       question again.  I didn't hear the
20       question.
21  Q.    So my question is --
22  A.    I can --
23  Q.    Please let me please finish.
24       Can you remember, at this time, the
25  identity of even a single person with whom you

Page 212

G. BRYSON

1
2  had a conversation about your termination as
3  referred to in Paragraph 5 of your affidavit?
4       MR. KEARL:  Objection: Form.
5  A.    Yeah, by face.
6  Q.    Okay.  But you can't remember names,
7  right?
8  A.    I can't remember their full names because
9  they don't give us full names on badges.  And,
10  yes, I am known.  A lot of people know me before
11  I know them.
12  Q.    Okay.  So continuing on Paragraph 5.  If
13  you look, the fourth line down, where it starts
14  with, "However, I do recall that from the start
15  of the ALU campaign, many workers asked me about
16  when I was coming to work."
17       Do you see that?
18  A.    "Coming back."  Yes.
19  Q.    I'm sorry, "coming back to work."
20       Can you identify a single person who asked
21  you that question?
22  A.    I'm not -- I -- I -- I can't identify a
23  single person when there's multiple people asking
24  me that.  Like, my own -- my own team has asked
25  me that.  Okay?  I mean, a lot of people have

Page 213

G. BRYSON

1
2  asked me that.
3  Q.    Well, the people on your team are people
4  that presumably you know without looking at their
5  badge, right?
6  A.    (No response given.)
7       MR. KEARL:  Objection.
8  Q.    You know their first and last name, right?
9       So who on your team asked you that
10  question?
11  A.    I had a lot of people ask me that question
12  from Connor to Brett to a lot of them, "Are you
13  coming back?  When you coming back?"
14  Q.    Were Connor and Brett on your team?
15  A.    What do you mean?
16       MR. KEARL:  Objection: Form.
17  A.    Yeah, they're ALU, my team.
18  Q.    Okay.  When you refer to your team --
19  A.    I'm talking about the union.
20  Q.    Okay.  You're not talking about the --
21  your team that worked on the Pick, Count floor?
22  A.    The Pick, Count floor?
23  Q.    Yeah.
24  A.    Oh, yeah.  There's plenty.  I just don't
25  really want to give out names.  There's



Page 214

G. BRYSON

1  old-timers that's in there right now that are
2  old-timers that's in there right now that are
3  ambassadors that have been waiting for me to come
4  back for an answer.  I just don't like to do
5  that, especially with some people that are
6  getting ready to just call it a wrap at Amazon
7  and retire.  I don't feel the need to do that.
8  But, yes, they are there, and, yes, they have
9  asked.
10  Q.    Okay.  Can you give me one name, subject
11  to our agreement that it be subject to attorneys'
12  eyes only?
13  A.    Oh, I'll give you a name.  I'm not giving
14  you a full name because I don't really know her
15  full name, even though it's on my IG probably.
16  Sandy -- Sandra.  Okay?  That's somebody that
17  works in the building.
18       You want others that worked in the
19  building that want to know?  What?  One-namers,
20  is that what you're dealing with?
21  Q.    Right now, what did Sandra ask you?
22  A.    What do you mean what'd she asked me?  She
23  asked me when I'm coming back.  They know that
24  I -- they know that I -- they know that I was
25  fired unjustly.  They asked me when am I coming

Page 215

G. BRYSON

1  back.  They know I'm a fighter.  They knew I was
2  going to fight it.
3  going to fight it.
4  Q.    Okay.  When did she ask you that?
5  A.    When did she ask me that?  Last time I saw
6  her was just before JFK8's election date -- when
7  the tent was outside.
8  Q.    Okay.  And do you know whether -- did
9  Sandra express to you that she was afraid about
10  getting fired?
11  A.    Sandra has been there so long, I think
12  she's waiting to see how it plays out, you know?
13  She's, like, one of those people that spent a lot
14  of time with Amazon; we're talking about more
15  than four years -- five years.  And she was a
16  long time -- she's a long-timer there.  And I
17  think the people that were long-time, they wait
18  to see how it plays out.  You know, they're not
19  ready to risk everything that they've done for
20  years, you know, and they're not from the state
21  of New York.  So they're are not pretty
22  well-vised in unions.
23  Q.    So was -- do you know -- did you ever see
24  Sandra wearing an ALU t-shirt?
25  A.    No, not that I can recall.

Page 216

G. BRYSON

1  Q.    Okay.  She might have, right?
2  Q.    Okay.  She might have, right?
3  A.    Maybe.  I don't know.
4  Q.    Do you have any reason to believe that she
5  wouldn't wear an ALU t-shirt?
6  A.    I -- I don't know.
7  Q.    Do you have any reason --
8  A.    I don't know Sandra like that to make that
9  judgment.
10  Q.    So -- so, you don't know whether she was
11  afraid herself of being terminated, correct?
12  A.    I think she was.  She was leery.  She
13  did -- she -- she was leery.  She was waiting to
14  find out what -- you know, people were waiting to
15  see what was going to happen at that time period
16  with the election.  So, yeah, she was probably
17  skeptical.
18  Q.    She was probably skeptical.  Tell me all
19  factual basis you have that she was probably
20  skeptical.
21       MR. KEARL:  Objection:  Form.
22  A.    She asked questions.  That's only -- when
23  you ask certain questions -- don't ask what the
24  questions were -- but I know she was kind of
25  skeptical, you know?  And I don't blame her

Page 217

G. BRYSON

1  because, you know, she had put in so much time
2  because, you know, she had put in so much time
3  there I guess, you know, she wanted it.  They all
4  want it.  They all know that Amazon is modern day
5  slavery, but, you know, she probably was -- you
6  know, watching to see what happened.
7       A lot of people sat back to see what we're
8  going to do before they made a decision.
9  Q.    And you don't know what her decision was,
10  right?
11  A.    No, I didn't ask her.
12  Q.    All right.  And as far as you know, she
13  could have voted for the union, right?
14       MR. KEARL:  Objection:  Form.
15  A.    I don't know what she voted.  I don't even
16  know if she voted because I didn't ask her.
17  Q.    Okay.  All right.  Is there anybody else
18  other than Sandra that you recall?
19  A.    I recall a few people.  There was three
20  people with Sandra, one whom worked in the
21  building; I forgot her name, and she knows me
22  from Day 1, too.
23       (Reporter clarification.)
24  A.    There were three women together.  Yeah,
25  there were two other women with her.  All -- all



Page 218

G. BRYSON

1
2  three, old-timers, been there.  I -- I know -- I
3  know -- I know them, too.  I just can't remember
4  their names.  But they were interested in the
5  same things.  They wanted to know how we're
6  making out.  I was there to place my vote.
7  Q.    And you say -- so that was sometime after
8  March 25th, correct?
9  A.    It was the day of the election for JFK8,
10  the first day.
11  Q.    All right.  Okay.  So on March 25th, is
12  when you had this conversation?
13  A.    I don't recall.
14  Q.    If you -- if you --
15  A.    I don't remember the date.
16  Q.    Okay.
17  A.    That's what I'm saying.  Like, I just know
18  I was there.  I -- I wasn't there on a -- I
19  wasn't there to vote the first day, but I
20  was around.  But when I voted, she was there.
21  Q.    Sandra was there?
22  A.    They were all -- the three of them were
23  there walking down the crossway as I came out
24  from making my vote.
25  Q.    Okay.

Page 219

G. BRYSON

1
2  A.    Grabbed me up, hugged all over me.
3  Q.    They -- they hugged all over you?  What do
4  you mean?
5  A.    I told you, I'm popular there, bro.
6  Women, they -- they hugged all over me, kisses,
7  hugs, three people.
8  Q.    Right, but were you inside the building?
9  A.    No, outside the building.  Remember --
10  Q.    Outside the tent?
11  A.    Yes.  I was -- I already had walked away
12  from the tent.
13  Q.    Okay.  Do you know where they were
14  walk -- were they walking to the tent?
15  A.    No, they were on the outside on -- on the
16  walkway by -- by the building.  They were around
17  the -- they were by the building.  They were, you
18  know, probably, on their break.  I don't know if
19  they voted yet.  I didn't ask them that because
20  we were so happy to see each other; it was like,
21  "Aaah (indicating)."
22  Q.    So, they didn't appear to be afraid of
23  being seen with you, right?
24        MR. KEARL:  Objection:  Form.
25  A.    I don't know what -- I don't -- afraid to

Page 220

G. BRYSON

1
2  be with me?  Well, I guess not.  They hugged me.
3  No, I don't think they were afraid like that.
4  I do -- I do know this.  I do remember this.
5  Another time, I had saw Sandy, same person, and
6  she said -- we were out there one night, and I --
7  and she said to me, "Oh, I don't know.  Can I
8  even be next to you?"  Because she didn't make up
9  her mind.  Like I said, she was 'lurky.'  She was
10  'lurky' about, you know, what was going to go on
11  with this.
12        You know, Amazon has fired people for
13  talking union.  Amazon is still firing people
14  right now while we're having this deposition for
15  things -- for the same type of stuff in there.
16  Q.    So the other two people who were with
17  Sandy that you spoke to on the day of the -- the
18  first day of the election, were either of --
19        MS. COX:  Objection to form.
20  Q.    -- them --
21  A.    First day of the election.
22  Q.    You said that the -- you saw --
23  A.    I --
24  Q.    Let me clarify.  You testified that on the
25  day you voted --

Page 221

G. BRYSON

1
2  A.    I was there.
3  Q.    Please let me finish.
4        That on the first day of the election, you
5  were there --
6  A.    Yeah.
7  Q.    -- and you saw these three women,
8  including Sandra, right?
9  A.    Yeah.
10  Q.    Okay.  And can I represent to you that the
11  election started on March 25th?
12  A.    Yeah.
13  Q.    And if that representation is correct,
14  this conversation with them took place on
15  March 25th, right?
16  A.    First day I saw them.  I didn't vote the
17  first day.  I voted two days later, I think.
18  They were there again.  All right?  That's when I
19  actually talked to them.
20  Q.    Okay.  So two days after the first day?
21  A.    March 27th?
22  Q.    That would be -- by my math, yes, that
23  would be it.
24        Were the other -- do you know the names of
25  the other two women that were present?



Page 222

G. BRYSON

1
2    A.    I -- I -- I can't remember their names,
3    especially that little funny one.  No, I don't.
4    Q.    Okay.  Did either of those women -- were
5    either of those women wearing an ALU t-shirt?
6    A.    No, not that I recall.
7    Q.    Were either of them wearing an ALU
8    lanyard?
9    A.    Not that I recall.
10   Q.    Okay.  But you don't remember, right?
11   A.    Not that I recall; I don't.  That is true
12   fact, but I think I would've noticed at the same
13   time.
14   Q.    Okay.  Did you ever give Sandra a t-shirt?
15   A.    No.
16   Q.    When she was at the tent talking to you,
17   did you offer her a t-shirt?
18   A.    I didn't see her at the tent.  I saw her
19   across the street from the -- the voting tent was
20   on the same side as JFK8 building.  I saw her
21   down the walkway towards HR.  Her and her friends
22   were standing there.  I talked to them as I
23   walked away from the voting tent to where HR is.
24   They were standing there.
25   Q.    Okay.  My question wasn't clear then.

Page 223

G. BRYSON

1
2          At one point, you said that you had seen
3    Sandra.
4    A.    Yeah.
5    Q.    And she made a comment to you, "can I even
6    be seen talking to you" --
7    A.    Oh, that was before the vote.
8    Q.    Right.  Right.
9    A.    That's what I was saying.  Yeah.
10   Q.    Right.  And was that at the tent?
11   A.    No -- at my tent you're talking about?
12   Q.    Yeah.
13   A.    No.  I just said -- when I mentioned that,
14   I said that was a time -- that was a time before
15   the actual vote that I saw; it was raining.  She
16   said to me, "could I even be seen with you?"
17   Q.    And where did you see her that day?  Where
18   was --
19   A.    By JFK8.
20   Q.    At the -- by the facility or -- so not at
21   the bus stop?
22   A.    No, by the facility.  I was in my car.
23   Q.    Got you.  All right.  If you look at
24   paragraph 6 of your affidavit --
25   A.    Yeah.

Page 224

G. BRYSON

1
2    Q.    -- you stated that "Over the course of the
3    campaign, I have had conversations and sometimes,
4    arguments with "smart aleck" people."
5          Do you see that?
6    A.    Yes.
7    Q.    Okay.  Who were -- can you identify any of
8    the so-called "smart alecks"?
9    A.    Yeah, I can identify them.  I don't know
10   them like that, but it was like Amazon had plants
11   in their base there.  This guy came up.  He was
12   tattooed out.  You could tell he just came
13   straight out of prison.  And you're going to tell
14   me about "unions ain't needed and the last time
15   about" -- he heard about unions was when Jimmy
16   Hoffa was killed, so I had to explain to him
17   about unions.
18   Q.    And you did so, right?
19   A.    Yes, sir.
20   Q.    And what makes him a smart aleck?  Because
21   he didn't agree with you?
22   A.    Well, he was being smart when he came up
23   with that Jimmy Hoffa thing, okay?  You know, we
24   all know that Jimmy Hoffa was killed, all right?
25   So, yeah, it was a smart-aleck remark, you know,

Page 225

G. BRYSON

1
2    what he -- the way he said it.  But I sat there
3    and took my time with him and, you know, kind of
4    'brung' him up to speed.  But it's due to the
5    fact, whether you -- you know, it's -- want to
6    hear this on not, it's because Amazon hires
7    anybody.
8    Q.    You think there's something wrong with
9    Amazon hiring people who have been in jail?
10   A.    (No response given.)
11              MR. KEARL:  Objection:  Form.
12              Objection:  Relevance.
13   Q.    Do you think there's something wrong with
14   Amazon giving people a second chance after they
15   get out of jail?
16              MR. KEARL:  Objection:  Form.
17   A.    Let me put it like this --
18   Q.    Just answer my question.
19   A.    I'm trying to.
20   Q.    It's kind of like a yes or no.
21   A.    No.
22   Q.    No?
23   A.    It's a little more complicated than that.
24   Q.    Okay.
25   A.    All right?  No, because I am a -- I'm a



Page 250

G. BRYSON

1
2  Q.    Okay.  But you don't know whether or not
3  they voted, correct?
4  A.    Correct.
5  Q.    And you say, "I saw my old trainer and a
6  few other ladies I had worked with."  Do you know
7  who those other ladies were?
8  A.    Yes, I know one of them, and one is new.
9  Q.    Okay.  So there were two other women.  And
10 who was the woman that you had worked with that
11 you knew?
12 A.    I don't remember her name that time, but
13 they're buddies.  I would say that.
14 Q.    I'm sorry.  Who's buddies?
15 A.    Her and Sandra are buddies.
16 Q.    Okay.
17 A.    Yeah, along that line.
18 Q.    All right.
19 A.    She'd probably kill me if she knew I
20 didn't know her name right now.
21 Q.    Okay.  Let's look at paragraph 9.  You
22 say, "I recall that there have been a few workers
23 that only half-way filled out the authorization
24 cards."  Do you see that?
25 A.    Yes.

Page 251

G. BRYSON

1
2  Q.    When you say "a few" there, how many is a
3  few, or roughly how many?
4  A.    I -- I couldn't -- I couldn't -- sir, I
5  have no number for that.
6  Q.    Right.  But common parlance is "a few" is
7  around three.  Does that seem about right?
8  A.    No, you better take a few compared to
9  3,000.  You know what I mean?  I don't have any
10 honest answer on that.
11 Q.    Okay.
12 A.    When I said "a few," that's just the way I
13 put it.  But, you know, when you're dealing with
14 a large number, that's a few.
15 Q.    But you said that of those few people who
16 only partially filled out the authorization card,
17 most of the time, you eventually got them to fill
18 out the entire card, right?
19 A.    Yes, I have done that.  I have seen people
20 that I know that I basically in my card pile,
21 "Aye, yo, you didn't fill this all the way out."
22 And I might see them passing back by; we're at
23 the bus stop.  "Aye, yo, you, man, you only gave
24 me some; you didn't sign."  "Oh, okay."
25 (Indicating.)

Page 252

G. BRYSON

1
2  Q.    Okay.  When you say "oh, okay," then they
3  signed it, is what you mean, right?
4  A.    Yeah.
5  Q.    You were just making -- just for the
6  record, you were making a gesture of someone
7  signing the card, right?
8  A.    For the record, yes; I'm saying that I
9  talked to them like:
10       "Hey, you didn't give me a full fill-out
11 here."
12       "Oh, I didn't?"
13       "Oh, yeah.  I need the date.  I need your
14 phone number, and I need your signature."
15       "Oh, okay."
16 Q.    And they would do it?
17 A.    Yeah.
18 Q.    Okay.  All right.  In paragraph -- strike
19 that.
20       Going back to paragraph 9, these
21 conversations, just to be clear about
22 partially-signed authorization cards, you don't
23 have any notes or memos about -- or other
24 communications identifying --
25 A.    No, sir.

Page 253

G. BRYSON

1
2  Q.    -- people who had partially-signed cards,
3  right?
4  A.    No, sir.
5  Q.    Did you -- when you would review the
6  cards, would you do that on a daily basis before
7  turning the cards in?  Would you review them to
8  make sure they were fully signed or fully
9  completed?
10       MR. KEARL:  Objection to form.
11 A.    I wouldn't, personally.  Some -- unless I
12 caught it in my own -- you know, whatever I had
13 then of -- Connor Spence would get all the cards
14 at that point.  So if he knew who it was, he
15 might, you know.  But we've had some cards when
16 we were counting that weren't filled out
17 properly.
18 Q.    Right.  But then you'd -- if they hadn't
19 been filled out properly, you would -- if you saw
20 the person, you would go back to them and ask
21 them to fill it?
22 A.    If we knew who that person was.
23 Q.    Right.
24 A.    I mean, you don't -- I mean, if you see
25 "Michael Thompson" on a card, there could be ten



Page 266

G. BRYSON

1
2    I can get back in, it would, you know -- before
3    the election, I mean, that was just the ALU guys
4    talking, not lawyers.  Yeah, if I could get back
5    in there, yeah, it would've been a better
6    turnout.
7    Q.    So, without lawyers present, some of the
8    ALU guys talked about how if you could get
9    reinstated, it might be of help to the efforts to
10   win the election, right?
11         MR. KEARL:  Objection:  Form.
12   A.    Yeah, once it was public.
13   Q.    Okay.  Right.
14   A.    Yeah.
15   Q.    So, it was important for it to be public
16   that, you know that the Board was seeking your
17   reinstatement, right?
18         MS. COX:  Objection:  Form.
19   A.    No, it was public because it was public
20   knowledge.  Once -- believe it or not, once this
21   case was made public knowledge, everybody and
22   their grandmother dug into it.  I'm not even
23   lying to you.  There's people that come in the
24   street, "I was watching that.  You know, I
25   watched that video.  I saw that."  Like...

Page 267

G. BRYSON

1
2    Q.    What video are you referring to?
3    A.    I'm talking about the video that started
4    this whole thing.  The one where Amazon had
5    charges and said I called the girl the N-word,
6    and, you know, all that stuff.  And that video --
7    I had a video that showed that none of that
8    happened.
9    Q.    Yeah, by the way, speaking of that video,
10   you knew that that video existed when Tyler
11   Grabowski spoke to you, right?
12   A.    (No response given.)
13         MR. KEARL:  Objection:  Form.
14   Q.    Yes or no?
15   A.    Did I know the video existed?
16   Q.    Yeah.
17   A.    Yeah.
18   Q.    Okay.  Now --
19   A.    I'm the one that asked for her to make
20   sure it was taped.
21   Q.    Okay.  And why did you ask for it to be
22   taped?
23   A.    Because I'm smart like that, and I know
24   when somebody's up to something, Spidey-Senses,
25   you might call them.

Page 268

G. BRYSON

1
2    Q.    Okay.  So you wanted that to protect you?
3    A.    Yes, sir.  Protect us.
4    Q.    Right.  Nonetheless, you didn't tell Tyler
5    Grabowski that the video was something that you
6    had access to, right?
7         MS. COX:  Objection to form.
8         MR. KEARL:  Objection:  Form.
9    A.    Yeah, I can answer that.  Tyler Grabowski
10   didn't ask for a video, so whatever he said in
11   his testimony wasn't true.  What he asked me was,
12   on the phone, what he asked me was, "who else
13   were there?"  I told him there was somebody else
14   that saw it.  And I -- and he said, "well, what's
15   their name?"  And no, I did not give their name.
16   And he -- and I said, "there might even be a
17   video."  I even hinted to him, all right?
18        But no, it wasn't where he said, "was
19   that, you know, the girl's name standing next to
20   you?"  He didn't say none of that.
21   Q.    So, let me ask you this question:  Did you
22   get a chance to watch the video before your
23   termination from employment?
24         MR. KEARL:  Objection:  Form.
25   A.    Pardon?

Page 269

G. BRYSON

1
2    Q.    Did you watch the video prior to the time
3    that you were terminated from employment?
4    A.    Yeah, I'm sure I did.
5    Q.    And --
6    A.    When -- they had put me on suspension by
7    Friday.  So I'm sure I looked at the video.
8    Q.    Right.  And then -- but you never went
9    back to Tyler or anybody at Amazon to let them
10   know that there was this video that existed,
11   right?
12         MS. COX:  Objection:  Form.
13   A.    No, I was not going to tell Tyler and them
14   because Mandy would've been fired the next day.
15   Q.    Right.  So this documentation that you
16   thought was intended to protect you, you didn't
17   share with Amazon?
18         MS. COX:  Objection:  Form.
19   A.    Nope.
20   Q.    I'm Just trying to remember.  Going back
21   to your affidavit.  Mr. Bryson, you testified
22   that you had a conversation with Sandra and some
23   of the other women when you -- on the day that
24   you voted, correct?
25   A.    (Non-verbal response.)

Page 302

G. BRYSON

1
2    Q.    Okay.
3    A.    -- our chairwoman.
4    Q.    Right.  And can you -- to her right,
5    there's somebody.  Can you determine who that is?
6    A.    No, unless you want me to walk up there to
7    the screen and take a closer view.  You -- I
8    mean, seriously, I can't tell from here who that
9    is.
10          MR. KEARL:  Objection:  Form.
11   A.    I know the first -- Michelle -- that --
12   after Michelle, that's Brett.  After Brett,
13   that's Jason.  After Jason, that's Angie.  I
14   can't see who the other two guys back there are
15   for sure.
16   Q.    Okay.
17   A.    I'm thinking that head looks like Tristan,
18   but I'd have to -- you'd have to move it up a
19   little bit more for me to be certain.
20   Q.    All right.  Let's see.
21          (Bryson Exhibit 5 being played.)
22   BY MR. ROSENBLATT:
23   Q.    It's starting again.
24          Actually, if you look at second "1,"
25   there's a big flier up taped to a wall or --

Page 303

G. BRYSON

1
2    A.    Yes.
3    Q.    -- or clear window that says "wearing the
4    shirt is not a crime," right?  Do you see that?
5    A.    Yes.
6    Q.    Okay.  And it says, "wear your ALU shirts
7    every Wednesday and Thursday with pride."  Do you
8    see that?
9    A.    Yes.
10   Q.    Was there -- did -- did people tend to
11   wear their shirts on Wednesday and Thursday as
12   suggested by the ALU --
13          MR. KEARL:  Objection:  Form.
14          MS. COX:  Objection to form.
15   Q.    -- the ALU shirts?
16   A.    I didn't take place -- to be honest with
17   you, sir, direct answer, total truth, I didn't
18   take place in the planning of that.  So I can't
19   tell you anything about that.
20   Q.    So, you don't know?
21   A.    Yeah.  We have other organizers that do
22   stuff.  They don't wait to listen -- hear from
23   me.
24   Q.    All right.  So -- so, the answer to my
25   question was "I don't know," right?

Page 304

G. BRYSON

1
2    A.    Yes.
3    Q.    Just bear with me one second to stop
4    sharing here.
5          All right.  Now, you obviously are aware
6    that the administrative law judge entered an
7    order directing your reinstatement, correct?
8    A.    Correct.
9    Q.    And that got a lot of press, right?
10   A.    Yes.
11   Q.    Have people congratulated you on that
12   order?
13   A.    Yes.
14   Q.    People who work at JFK8?
15   A.    Yes.
16   Q.    People at LDJ5?
17   A.    Yes.
18   Q.    Would you say that it's pretty well-known
19   at this point that there was such an order
20   entered?
21          MR. KEARL:  Objection:  Form.
22   A.    Yes.
23   Q.    All right.  Now, you testified that you
24   had been terminated on or about April 17th,
25   right?

Page 305

G. BRYSON

1
2    A.    Yes.
3    Q.    Have you had any other jobs aside from
4    that which you do with the ALU since then?
5          MS. COX:  Objection:  Form.
6    A.    Do I -- I do a -- I do --
7          I'm a hustler, man.  I just make it work.
8    Q.    But have you had any other jobs?
9    A.    No.
10   Q.    Have you applied for any other jobs?
11          MS. COX:  Objection:  Form.
12          MR. KEARL:  Objection:  Form.
13   A.    I didn't have to apply for jobs.  I'm an
14   industrial construction worker by trade.  I can
15   work any time I want, but I have a nine-year-old
16   son that goes to school here.
17   Q.    Have you done any industrial construction
18   work since your termination from Amazon?
19   A.    I couldn't go.  I'd have to leave this
20   state; I could be on the water; I could be in St.
21   Thomas.
22   Q.    Okay.
23   A.    Wherever the work is.  And I know plenty
24   of companies, but I have a nine-year-old, just to
25   clarify that.  I can't pull him out of school and

MAGNA ▶
LEGAL SERVICES

Page 306

```
1              G. BRYSON
2    take him across country or to another land.
3    Q.    Did you apply for any jobs at any other
4    warehouses?
5    A.    No.
6    Q.    Did you apply for any other jobs?
7              MS. COX: Objection: Form.
8              MR. KEARL: Objection: Form.
9    A.    Did I apply for any other jobs?  Yeah, I
10   could have took an electrical job, but I didn't
11   take it at the time because the pandemic was
12   racing through the system, and I didn't know
13   whether I -- I couldn't bring it home to my
14   grandsons and my son.
15   Q.    When was that?
16   A.    When it --
17             MR. KEARL: Objection: Form.
18   A.    The pandemic first started, and we got --
19   and that was why I protested.  I had an infant
20   grandson.  And then my -- my son and my other
21   grandson are the same age.  So I had three kids
22   there, my son and his wife, and I wasn't willing
23   to bring it home to my babies.
24   Q.    Okay.  So, my only question, though,
25   was -- you said that you could have gotten -- I
```

Page 307

```
1              G. BRYSON
2    think you referred to it as an electrical job.  I
3    didn't get the full name of the job.
4    A.    The pand- -- I didn't give you the full
5    name because when it was offered, the pandemic
6    was racing.  I still had funds saved.  Like I
7    said, I was an industrial construction worker.
8    I'm an instrumentation fitter and an apprentice,
9    electrical.  I've managed, before I came to
10   Amazon, to accumulate my own.
11   Q.    Okay.  So -- so, under the circumstances,
12   aside from this electrical job that you declined,
13   did you not seek any other positions because you
14   had money saved up?
15             MR. KEARL: Objection: Form.
16   A.    It wasn't because I had money saved up,
17   sir.  It was because my -- my son and his part of
18   the family, they moved out.  Okay?  So there was
19   nobody to watch my son, who was only nine and
20   goes to work between 8:00 and 2:00 -- I mean,
21   goes to school between 8:00 and 2:00.  I wouldn't
22   be able to get -- I had no babysitters, no
23   nothing.  I wouldn't be able to get a full eight
24   to ten hours in there anywhere without racing to
25   go get my son or things like that.
```

Page 308

```
1              G. BRYSON
2    Q.    So, if your employment had not been
3    terminated, would you have had to have resigned
4    to ensure that you were providing adequate care
5    for your son?
6              MR. KEARL: Objection: Form.
7    A.    Just the whole -- I think that we need to
8    (indicating) this.  Before my son came up -- my
9    nine-year-old was given to me by his mother
10   before the pandemic actually started.  Before
11   then, I was free.  I was up here.  When something
12   went wrong, family situation, he was given to me
13   to take care of, and that happened during the
14   pandemic.  Before that, I wasn't strapped down,
15   if that's what you're thinking.  Only since the
16   pandemic with my son I've been strapped down.
17   Q.    All right.  Since you've been, your term,
18   not mine, "strapped down" --
19   A.    Yeah.
20   Q.    -- since then, your -- you've had
21   responsibilities for caring for your son except
22   for when he was down in South Carolina, correct?
23   A.    Correct.
24   Q.    Okay.  Would those responsibilities that
25   you have for your son have interfered with your
```

Page 309

```
1              G. BRYSON
2    ability to continue working for Amazon?
3              MR. KEARL: Objection.
4    Q.    So, how would you -- let me ask it
5    differently.
6    A.    No.
7    Q.    How would you have been able to care for
8    your son during the pandemic while continuing to
9    work at Amazon?
10   A.    I had -- okay.  How would I be -- I had a
11   daughter-in-law that was home for two years.  She
12   had a baby one year.  She was home for the
13   pandemic, working from home.  I -- pretty much,
14   that's the way it was going.  So I could work at
15   Amazon.  There was always somebody home with the
16   kids, but things change over times, and right
17   now, they've changed.
18   Q.    All right.  And so, when your son and
19   daughter-in-law moved out, did you have anybody
20   available to provide care for your son --
21   A.    No.
22   Q.    -- your younger son?
23             MR. KEARL: Objection: Form.
24             MS. COX: Objection to form.
25   Q.    No?
```



Page 310

```
1              G. BRYSON
2    A.   No, I'm the only -- I am a single parent.
3    I take care of my son.
4    Q.    Okay.  And after your son and
5    daughter-in-law and grandson had moved out --
6    A.   "Grandsons" had moved out.
7    Q.    Grandsons, I'm sorry -- you -- how would
8    you have worked for Amazon while still caring for
9    your son, your younger -- your nine-year-old son?
10              MR. KEARL:  Objection: Form.
11              MS. COX:  Objection to form.
12    A.   I wasn't going to be working for Amazon;
13    they had terminated me already.  I mean, I don't
14    understand.
15    Q.    All right.  But you wouldn't have been
16    able to work for Amazon while caring for your
17    son, correct?
18              MR. KEARL:  Objection: Form.
19              MS. COX:  Objection to form.
20    A.   I would've been able to.  I have a --
21    Q.    Okay.  So --
22    A.   Why?  Because I still have a
23    daughter-in-law that's -- would've done it from a
24    certain point.  But, I mean, it is my son.  I'm
25    not going to unload him on her every week or
```

Page 311

```
1              G. BRYSON
2    every day.  That's not fair to her with two kids.
3    Q.    And if your daughter-in-law could have
4    watched him, why haven't you applied for
5    warehouse jobs -- other -- other warehouse jobs
6    in or around Staten Island?
7    A.   Well, 'cause I just told you --
8              MR. KEARL:  Objection: Form.
9    A.   -- that's torture to my daughter-in-law,
10    who has a -- has a nine-year-old and a baby.
11    That's not fair to her.
12    Q.    Okay.
13    A.   I mean, she would do whatever I could ask
14    if it was mandatory for me to ask.  But like I
15    said, I was an industrial construction worker.  I
16    had quite a bit saved.  I used up my own money
17    these last two years.  I didn't ask for anybody's
18    help.
19    Q.    Do you recall that on -- on April 6th,
20    2020, when -- the day that the incident occurred
21    when you -- that led to your termination, that
22    you also appeared on the Facebook Live video that
23    was broadcast by Jordan Flowers?
24    A.   I sure do.
25              MS. COX:  Objection: Form.
```

Page 312

```
1              G. BRYSON
2    Q.    Do you recall Jordan Flowers stating that
3    we, "got the NLRB behind us"?
4              MS. COX:  Objection: Form.
5    A.   I never heard that part.  I don't know --
6    he was doing his own broadcast 'till I came over
7    there, so...
8    Q.    You don't remember him saying to you --
9    A.   No.
10    Q.    -- "Don't worry.  We've got the NLRB
11    behind us," right?
12    A.   No, I don't -- he might -- I don't know
13    what was said.  All right?  I wasn't there when
14    Jordan started his broadcast.  I came in the
15    middle of his broadcast after arguing with the
16    girl.
17    Q.    All right.  So, just for the record, "the
18    girl" being Dimitra Evans, correct?
19    A.   Yes.
20              MR. ROSENBLATT:  Can we go off the
21    record?
22              MR. KEARL:  Yeah.
23              MR. ROSENBLATT:  Just need a few
24    minutes to figure out --
25              VIDEOGRAPHER:  The time is 4:26.
```

Page 313

```
1              G. BRYSON
2    This is the end of media unit number 10.
3    Going off the video record.
4              (Whereupon, a discussion was held
5    off the record.)
6              VIDEOGRAPHER:  The time is 4:33.
7    Start of media unit 11.  Back on the video
8    record.
9              MR. ROSENBLATT:  Thank you.  We
10    have nothing further today, subject to the
11    right to recall depending upon -- subject
12    to potential revisitation of some of the
13    instructions not to testify -- to that
14    answer pertinent.  But for today, we're
15    done.  Is that okay?
16              MR. KEARL:  Yes, that's fine.
17              MR. ROSENBLATT:  Very good.
18              (Continued on next page to
19    accommodate jurat.)
20
21
22
23
24
25
```

MAGNA
LEGAL SERVICES

Page 314

1          G. BRYSON
2      VIDEOGRAPHER:  The time is
3   4:34 p.m.  This is the end of media unit
4   number 11 and the end of today's video
5   deposition here of Gerald J. Bryson, here
6   in New York, New York, for the NLRB versus
7   Amazon.  Thank you, everyone.
8          (Time noted:  4:34 p.m.)
9      _____
10          GERALD J. BRYSON
11
12   Subscribed and sworn to before me
13   this      day of         2022.
14
15   _____
16          Notary Public
17
18
19
20
21
22
23
24
25

Page 315

1
2              I N D E X
3
4   WITNESS          EXAMINATION BY       PAGE
5   Gerald J.        Mr. Rosenblatt     6
6   Bryson
7              EXHIBITS
8   BRYSON          DESCRIPTION        PAGE
9
10  Exhibit 1       Gerald Bryson's     127
                    Affidavit
11  Exhibit 2       Common Interest     165
                    Agreement
12
13  Exhibit 3       TikTok Video        288
14  Exhibit 4       TikTok Video        291
15  Exhibit 5       TikTok Video        298
16
17
18
19
20
21
22
23
24
25

Page 316

1
2          C E R T I F I C A T E
3
4      I, DANIEL A. JOSEPH, hereby certify
5   that the Deposition of GERALD J. BRYSON was
6   held before me on the 23rd day of May, 2022,
7   that said witness was duly sworn before the
8   commencement of his testimony; that the
9   testimony was taken stenographically by myself
10  and then transcribed by myself; that the party
11  was represented by counsel as appears herein;
12      That the within transcript is a true
13  record of the Deposition of said witness;
14      That I am not connected by blood or
15  marriage with any of the parties; that I am not
16  interested directly or indirectly in the
17  outcome of this matter; that I am not in the
18  employ of any of the counsel.
19      IN WITNESS WHEREOF, I have hereunto set
20  my hand this 23rd day of May, 2022.
21
22  _____
23          DANIEL A. JOSEPH
24
25

