**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Kathy Drew-King, Regional Director of Region 29 of the National Labor Relations Board for and on behalf of the National Labor Relations Board, | No. 1:22-cv-01479 |
| *Petitioner*, | District Judge Diane Gujarati |
| v. | Magistrate Judge Sanket J. Bulsara |
| Amazon.com Services LLC, | **ORAL ARGUMENT REQUESTED** |
| *Respondent*. | |

**RESPONDENT AMAZON.COM SERVICES LLC'S BRIEF IN OPPOSITION
TO PETITIONER'S AMENDED PETITION FOR A SECTION 10(j) INJUNCTION**

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1

II.   RELEVANT FACTS ....................................................................................... 4

      A.    In April 2020, Amazon Terminated Bryson's Employment For Cause .................. 4

      B.    In April 2021, The ALU Formed And Steadily Built Support ................................ 8

      C.    In March 2022, Right Before The JFK8 Election, The Board Commenced
            This Action Claiming Bryson's Immediate Reinstatement Was Necessary
            To Give The Union A Fair Shot At The Election.................................................... 11

      D.    The ALU Received The Most Votes Cast At The JFK8 Election ......................... 13

      E.    The Proceedings Before The Board Are Ongoing ................................................ 15

III.  ARGUMENT .................................................................................................... 15

      A.    The Court Should Dismiss The Petition For Lack Of Subject-Matter
            Jurisdiction Because Bryson Asserts ██████████████████ .............. 15

      B.    The Board Fails To Carry Its Burden To Demonstrate That
            The Extraordinary Relief It Seeks Is "Just And Proper" ......................................... 18

      C.    The Board Also Fails To Demonstrate "Reasonable Cause"................................... 23

IV.   CONCLUSION.................................................................................................. 24

## **TABLE OF AUTHORITIES**

**Cases**

*Abbey's Transp. Servs. v. NLRB*,
    837 F.2d 575 (2d Cir. 1988)..................................................................................20

*Aguayo v. Tomco Carburetor Co.*,
    853 F.2d 744 (9th Cir. 1988) ...............................................................................19

*Boire v. Pilot Freight Carriers, Inc.*,
    515 F.2d 1185 (5th Cir. 1975) .............................................................................21

*City of New York v. Mickalis Pawn Shop*,
    645 F.3d 114 (2d Cir. 2011).................................................................................17

*First Nat'l Maint. Corp. v. NLRB*,
    452 U.S. 666 (1981).............................................................................................22

*H.K. Porter Co. v. NLRB*,
    397 U.S. 99 (1970)...............................................................................................22

*Harrell v. Ridgewood Health Care Ctr.*,
    154 F. Supp. 3d 1258 (N.D. Ala. 2015)...............................................................21

*Henderson v. Bluefield Hosp. Co.*,
    208 F. Supp. 3d 763 (S.D.W. Va. 2016) .............................................................18

*Kaynard v. MMIC, Inc.*,
    1983 WL 2104 (E.D.N.Y. 1983)..........................................................................17

*Kaynard v. Palby Lingerie, Inc.*,
    625 F.2d 1047 (2d Cir. 1980)..............................................................................20

*Kendellen v. Interstate Waste Servs.*,
    2007 WL 121435 (D.N.J. 2007) ..........................................................................21

*Kobell v. Suburban Lines*,
    731 F.2d 1076 (3d Cir. 1984)..............................................................................21

*Kreisberg v. HealthBridge Mgmt.*,
    732 F.3d 131 (2d Cir. 2013).................................................................................15

*Mattina v. Ardsley Bus Corp.*,
    711 F. Supp. 2d 314 (S.D.N.Y. 2010)..................................................................18

*Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*,
    397 F.3d 77 (2d Cir. 2005)..................................................................................16

*McDermott v. Veritas Health Servs.*,
   2011 WL 2693922 (C.D. Cal. 2011)....................................................21

*NLRB v. Burnup & Sims, Inc.*,
   379 U.S. 21 (1964)............................................................................23

*NLRB v. Electro-Voice, Inc.*,
   83 F.3d 1559 (7th Cir. 1996) ............................................................19

*NLRB v. Hartman & Tyner, Inc.*,
   714 F.3d 1244 (11th Cir. 2013) .........................................................21

*NLRB v. Jamaica Towing, Inc.*,
   632 F.2d 208 (2d Cir. 1980)...............................................................20

*Ohr v. Arlington Metals Corp.*,
   148 F. Supp. 3d 659 (N.D. Ill. 2015) .................................................21

*Pascarell v. Vibra Screw*,
   904 F.2d 874 (3d Cir. 1990)...............................................................21

*Paulsen v. Remington Lodging & Hosp., LLC*,
   773 F.3d 462 (2d Cir. 2014)...............................................................18

*Peregrine Myanmar Ltd. v. Segal*,
   89 F.3d 41 (2d Cir. 1996)...................................................................17

*Pye v. Excel Case Ready*,
   238 F.3d 69 (1st Cir. 2001)...........................................................19, 20

*Scalia v. Angelica Textile Servs.*,
   803 F. App'x 543 (2d Cir. 2020) .......................................................16

*Schaub v. W. Mich. Plumbing & Heating, Inc.*,
   250 F.3d 962 (6th Cir. 2001) .............................................................20

*Seller v. H.G. Page & Sons, Inc.*,
   540 F. Supp. 77 (S.D.N.Y. 1982) ......................................................21

*Sharp v. Webco Indus.*,
   225 F.3d 1130 (10th Cir. 2000) .........................................................19

*Silverman v. 40-41 Realty Assocs.*,
   668 F.2d 678 (2d Cir. 1982)...............................................................23

*Silverman v. MLB Players Relations Comm.*,
   880 F. Supp. 246 (S.D.N.Y. 1995) ....................................................18

*Timmins v. Narricot Indus., L.P.*,
  360 F. App'x 419 (4th Cir. 2010) ............................................................16

**Regulatory Cases**

*Fresenius Mfg.*,
  352 NLRB 679 (2008) ...........................................................................2, 22

*Gen. Shoe Corp.*,
  77 NLRB 124 (1948) ...............................................................................22

*GM, LLC*,
  369 NLRB 127 (2020) .............................................................................22

*Ideal Elec. & Mfg.*,
  134 NLRB 1275 (1961) ...........................................................................22

*Wright Line, Inc.*,
  251 NLRB 1083 (1980) ...........................................................................24

**Statutes**

29 U.S.C. § 160(c) ......................................................................................22

29 U.S.C. §160(j) ..............................................................................1, 15, 18

**Other Authority**

29 C.F.R. § 102.46(b)(1) ............................................................................15

## I.      INTRODUCTION

Respondent Amazon.com Services LLC ("Amazon") terminated Gerald Bryson's employment well over two years ago, on ***April 17, 2020***, for cause.  Bryson publicly, viciously, and profanely berated a female coworker over a bullhorn and social media broadcasts on April 6, 2020, after she dared to disagree with his advocacy that Amazon should close its JFK8 facility in the early days of the COVID-19 pandemic.  It is undisputed—and was captured on a video that is available and posted on social media pages to this day—that Bryson unleashed a stream of verbal abuse on his female co-worker, calling her a "gutter bitch," a "crack ho," a "crackhead," a fentanyl addict, "queen of the slums," and "ignorant and stupid," among other defamatory insults.

The General Counsel of the National Labor Relations Board and Petitioner Kathy Drew-King ("Petitioner") believe Bryson's outrageous behavior should be tolerated in the modern workplace.  Accordingly, they have pursued a complaint via the Board's unfair labor practice ("ULP") procedures on his behalf, seeking his reinstatement.  Over the course of 23 months, Petitioner: (i) investigated Bryson's June 17, 2020 ULP charge; (ii) filed an administrative complaint on December 22, 2020 alleging Amazon terminated Bryson because of his advocacy; (iii) prosecuted the Complaint over 16 hearing days between March 29 and December 13, 2021; (iv) permitted the hearing record to close on December 13, 2021; and (v) filed a post-hearing brief with the ALJ on March 4, 2022.  Not once during these 23 months did Petitioner indicate that injunctive relief pursuant to Section 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §160(j), was a consideration.  Not once during these 23 months did Petitioner assert, question, or even suggest that such relief was necessary to protect employees' rights.

Rather, Petitioner did not commence this action for extraordinary relief pursuant to Section 10(j) until ***March 17, 2022—a full 23 months after Bryson's termination***.  This filing— inexplicably late by all internal agency guidance—came ***just 8 days before the ALU's***

1

*representation election at JFK8*.  Petitioner conceded in its initial papers and arguments before this Court that it intended to bolster the ALU's prospects of success in that election.  ECF No. 7 at 38 ("Given the upcoming election, the employees' organizing efforts . . . will suffer unless Bryson is immediately reinstated"); ECF No. 12 ("Petitioner seeks injunctive relief in this case in order to reinforce employees' right to engage in protected concerted activity and union activity in advance of this election.").  These are striking admissions given that Petitioner is duty bound to remain neutral in all union representation elections.  *See, e.g.*, *Fresenius Mfg.*, 352 NLRB 679, 682 (2008) (the Board "must maintain and protect the integrity and neutrality of its election procedures").[1]

Now that Petitioner's objectionable conduct in filing the petition days before the election has served its purpose, and the preliminary vote tally indicates that the Amazon Labor Union ("ALU" or "Union") received over 2,600 votes,[2] Petitioner has changed its tune.  Indeed, *after* Bryson was terminated, the ALU formed and generated enough support to secure an election at JFK8; the Union claims to be organizing at additional Amazon locations; and its leaders have *met with the President at the White House*.  Petitioner would have the Court ignore all of this and find that unless Bryson is immediately reinstated, Amazon associates "will inevitably conclude that the Board cannot effectively protect their rights . . . to engage in protected concerted activities with coworkers to improve their terms and conditions of employment, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, or to refrain from any and all such activities."  ECF No. 44 ("Am. Pet.") ¶ 9.  Which is to say, instead of attempting to tip an election in the Union's favor, Petitioner has shifted to supporting the Union as

---

[1]     The Board made sure its filing received extensive press coverage—releasing pro-union statements to various outlets—all in time to bolster the Union's chances of election success.

[2]     Amazon has filed objections to the conduct of the election at JFK8, including objections based on the filing of this action.  The objections were transferred to another Regional Director, who ordered an evidentiary hearing on all of them.  That proceeding is ongoing.

it defends against the pending legal objections and as it seeks to compel Amazon to begin collective bargaining.  Section 10(j) was not intended to be used by the Board as an instrument to favor one side in an organizational campaign.

All of the foregoing aside, the Board's bid for a Section 10(j) injunction is legally and factually deficient for several reasons.  *First*, the Board's request for an injunction ordering Bryson's reinstatement is moot.  While the JFK8 election proves that Amazon's termination of Bryson did not negatively impact the Union's organizing at JFK8, let alone "nip it in the bud" (a touchstone for Section 10(j) relief), Bryson, ████████████████████████████████████ ████████████████████████████████████████████████████.  A reinstatement order would be an ineffective, academic exercise akin to an advisory opinion.  The Court should therefore dismiss the petition for lack of subject-matter jurisdiction.

*Second*, the Board has failed to prove that the extraordinary remedy of a Section 10(j) injunction is "just and proper."  That standard requires the Board to prove that an injunction is necessary to prevent irreparable harm to union-organizing efforts.  At a minimum, then, the "just and proper" standard demands proof of harm to union-organizing activities and proof that the alleged unlawful practice caused that harm.  As noted, the recent election and the ALU's expanded organizing efforts preclude a finding that Bryson's termination harmed organizing activities.

The Board speculates that support for the ALU might dissipate in the future.  Absent from the Board's submission, however, is any proof.  Since the JFK8 election, the Union has garnered massive media attention and public support.  The Board's speculation that without Bryson's reinstatement the ALU will falter finds no support in the record.

The Board also lacks any evidence of a causal connection between Bryson's firing and its speculation that the Union's support will decline in the future.  Bryson's termination occurred a

year before the ALU even formed, and the record shows the Union has grown steadily since then. The Board's assertions that Bryson's absence from JFK8 affects associates' willingness to support the Union are simply not credible. *See, e.g.*, Board Br. 17 ("Without Bryson's immediate interim reinstatement, employee confidence and support in the Union and willingness to stand by the union during the challenge process will die, thereby depriving employees of the right and benefits of the union representation that they voted for.").

*Finally*, the Board fails to carry its burden to demonstrate "reasonable cause" to find that an unlawful labor practice occurred. The Board insists that the Court blindly defer to the ALJ's decision—a decision that is not final and to which Amazon has lodged exceptions. Most importantly for present purposes, the ALJ's decision turns on a novel interpretation and application of established law, and it is settled that the Court owes no deference to the agency in that circumstance. The ALJ's new standards, tailor-made to rule against Amazon in this case, are untenable, and they cannot be reasonable cause to believe an unfair labor practice occurred.

For these reasons and others, discussed below, the Court should deny the petition.

## II.   RELEVANT FACTS

### A.   In April 2020, Amazon Terminated Bryson's Employment For Cause.

Gerald Bryson worked at JFK8, a Fulfillment Center that receives and sorts packages and ships assorted products sold on Amazon.com. Tr. 986, 1923.[3] In April 2020, Amazon employed about 5,000 associates at JFK8, Tr. 596, which, like many businesses providing essential services to the community, remained operational in the early days of the pandemic. The Board's unsupported claim that Amazon adopted a cavalier, "'business as usual' response" to COVID-19

---

[3]    The transcripts from the administrative hearing pertaining to Bryson's ULP charge are at ECF No. 5-1 (Exhibit E).

is inflammatory and offensive to the Amazon personnel who made significant efforts to create and maintain a safe working environment for thousands of essential workers at Amazon's facilities, as well as the hundreds of millions of customers that Amazon was able to serve by providing access to basic needs during the most challenging months of the pandemic.

A small group of associates, including Bryson, protested against Amazon's decision to keep JFK8 open during the pandemic. During one such protest, held in the facility's parking lot on April 6, 2020, Bryson used a bullhorn to convey his demand—which was protected concerted activity under the NLRA—that the facility be shut down and that associates be paid during the shutdown. Tr. 692, 858, 874, 1124, 1029–30. A fellow employee, Dimitra Evans, spoke up to disagree that the facility should be shut down—which was equally protected conduct. Unhappy that Evans would have the audacity to express a contrary view, Bryson unleashed a vile, unrelenting, and sexist verbal assault via his bullhorn—which was *not* protected conduct.

Although Amazon did not have the benefit of it at the time, the entirety of this incident was caught on video by another protestor, Mandi Velasco. Amazon was unable to ascertain Velasco's identity at the time. Bryson, however, knew Velasco was recording his words and broadcasting the incident via Facebook Live. Tr. 1090–91. To keep the video recorded by Velasco hidden, however, Bryson lied to Amazon during its investigation of the incident, as he has since admitted under oath. Bryson claimed he did not know who Velasco was, obstructing Amazon's investigation. Tr. 874; Ex. A[4] at 201:18–20.[5]

---

[4] All cited exhibits are filed with the accompanying Declaration of Christopher J. Murphy.

[5] Despite Bryson's admission that he lied to conceal Velasco's identity or that she had a video of the incident, the ALJ concluded that Amazon did not want to find the video and buried its "head in the ground." ALJ Decision, ECF No. 35-1 ("ALJD") at 17. That doesn't make sense. The video doesn't vindicate Bryson. If it did, the Board assuredly would have submitted it in support of its case on his behalf. It didn't. The Board hid the video because it proves that Bryson engaged in the misconduct for which he was discharged. So, while Bryson and the Board's

More troubling is that the Board also knew about the video and also concealed the video's existence from Amazon throughout the entire administrative investigation by the Region and well into the ALJ hearing.  Because the video is so problematic for its case, the Board did not identify the video as an exhibit for the hearing.  And when conducting direct examinations of Bryson and Velasco, the Board assiduously avoided asking any questions that would reveal that Velasco had recorded the incident.  Tr. 858, 975, 1028.  Amazon first learned that the video existed during cross-examination of Velasco, Tr. 913, and even then, the Board refused to provide Amazon a copy, telling Amazon to go find it for itself, Tr. 916–19.  Unsurprisingly, the Board also neglected to provide this Court with a copy of the video, so Amazon submitted the video to the Court on March 21 and does so again with this brief.  *See* Ex. B.

As the video proved, Evans disagreed with Bryson's demand that the facility be shut down. Shouting through his bullhorn, Bryson responded by calling Evans a "$2 bitch," a "gutter bitch" who "probably barely got a house" and said "[you] look like you sleep in the gutter."  ALJD App'x B at i–ii.[6]  He yelled that Evans's "mother's a ho," and that Evans is "ignorant and stupid."  *Id.* Bryson then unloaded with repeated spurious claims that Evans was a drug user and was high while at work:

> When you get a family and you care about somebody then you came back and talk. ***Take your crack head ass somewhere else.*** You look like a ***crack head.*** [Amazon]'s[7] hiring ***crackheads***, they're that desperate. They put a ***crackhead*** out here to start. They're that desperate***. Look at her.*** Obviously. ***Go light that pipe sweetheart.*** Don't worry we'll still be here for sure. ***You can look at you and tell you on something.*** You got a lot of nerve sitting up there***, where the track marks at? Where the Fentanyl at? Figures a crack ho would have something to say.***

---

motives for concealing the video are obvious, Amazon lacked any rational reason to purposefully avoid finding it.  The ALJ also ignored Amazon's efforts to identify Velasco.  Instead, the ALJ excused Bryson's lies and blamed Amazon for believing them.

[6]     The ALJ prepared an unofficial and incomplete transcript of the Velasco Video at Appendix B to his decision.

[7]     The ALJ's transcript erroneously states: "Everybody's hiring crackheads."  *See* Ex. B.

> That's what they got cause they hiring people, they ain't screening them right.  They just letting anybody work here now.  ***So now we got queen of the slums working here talking shit.  Get off the Fentanyl baby girl.***

*Id.* at ii (emphases added); *see also id.* ("You damn [unintelligible] sitting up there with track marks in your arm, I know that much."); *id.* at iii ("You need to shut up. You're running around with track marks on you.  Alright, look at your eyes.").

The Board's assertion in its brief to this Court that Bryson's attack "ended after Evans went inside the facility and stopped engaging with Bryson," Board Br. 8, is demonstrably incorrect.  Not content to let his tirade end, as Evans was walking back into the building, Bryson specifically directed his comments about Evans *to security guards, co-workers, and other onlookers* by the entrance, using his bullhorn: "Look at you, you high right now! Safety man, do your job, test that woman!" ALJD App'x B at ii–iii.  Next, upon being relieved of his bullhorn by a fellow protestor, Bryson participated in another Facebook Live video, this one hosted by protestor Jordan Flowers, after Evans had returned inside the building.  Tr. 1042, 1146.  Bryson used that forum to reiterate and amplify his hateful and misogynistic attack on Evans:

> I'm kind of overwhelmed right now because I actually got into a debate.  ***I think they sent out a plant, you know, to start an argument with me, and it got a little out of hand.  And, you know, and I mean, if that does come up, trust and believe, you know, they – they push me to the limit and I had no choice.***  I didn't want to take that route.  But it looks to me like Amazon is now hiring, definitely hiring the ***scum of the earth***.  They're hiring what looks to be ***junkies*** and stuff like that because the girl that came out to say something to me, she ***looked like she was on fentanyl and something else***.  And that's what they sent at me.  She says oh, this place is open.  We need this place to work, you know.  Evidently, ***she has no family*** or no other concern.  She's got ***black rings under her eyes***.

ALJD App'x C at i (emphases added).

Bryson did not stop there: "I really cursed that girl out.  She cursed me—at me and I cursed her out"; "I feel kinda, (inaudible) it got me off point.  I called her a ***bitch and everything*** bro."

Ex. C at 51:37–57 (emphasis added).[8]  Presciently, Flowers assured Bryson that he did not have to worry about his attack on Evans because: "Don't worry, yo.  We got the National Labor Relations Board behind us.  The National Labor Relations Board behind us."[9]  ALJD App'x C at i.  Bryson's misogynist response was: "yeah, but she called me a bunch of names and she challenged me like *you gonna challenge a man out here like you*—ain't nobody calling (inaudible) *fucking crackhead*."  Ex. C at 51:59–52:07 (emphases added); *see* Tr. 1147.

That same day, Amazon learned of Bryson's confrontation with Evans and promptly commenced an investigation.  Tr. 1238, 1926–27, 1930.  Amazon interviewed Bryson, who admitted to using the bullhorn to call Evans a "bitch" and accuse her, repeatedly, of abusing illegal drugs, but he denied directing other slurs toward her.  Tr. 1492–94; ECF No. 5-11 at #4372–76.  Amazon's investigation took approximately ten days.  Although Bryson hid the video proof of the incident, after conducting numerous interviews, reviewing comparator cases, and elevating the case to the Regional Senior HR Manager, Amazon terminated Bryson's employment on April 17, 2020 because of his misconduct.  *See* Tr. 1479, 1514–1517, 1676, 1738–39.

### B.    In April 2021, The ALU Formed And Steadily Built Support.

The ALU formed in April 2021—a year after Bryson's termination.  Bryson's role with the Union is unclear.  Bryson is not and never has been an elected Union officer.  ECF No. 27 ¶¶ 17–22.  Bryson claims ███████████████, Ex. A at 39:10–14, and that ████████ ████████ *id.* at 38:2.  ALU President Christian Smalls testified that ██████████████ ███████████████████████████████████████████ Ex. D at 196:13– 197:19.  The Union's constitution and bylaws did not identify any official position called "Lead

---

[8]     Where the ALJ's transcript of the Flowers Video (Appendix C to his decision) is incomplete, Amazon cites the Flowers Video (Ex. C) directly.

[9]     In hindsight, this is seemingly a revelation.

Organizer" or "Sergeant-at-Arms." Ex. E.[10] The ALU has since confirmed that Bryson did *not* hold any position in the ALU during the organizing campaign. Ex. F at 4305. The ALU's Vice President of Membership testified that Bryson's "sergeant-at-arms" position was given to him *after the JFK8 election* in "recognition of his contributions as a wrongfully terminated worker organizer." *Id.* at 4291–92, 4305–06.

Bryson also claims he is "popular" at JFK8. ECF No. 5-14 ¶ 12. Still, Bryson ██████████ ████████████████████████████████████████████████. Ex. A at 211:3–212:11. And Smalls testified that Bryson "typically will have to explain" to associates "*who he is* and why he is out there organizing," including "*that he was fired* by Amazon." ECF No. 5-17 ¶ 4 (emphases added).

Whatever Bryson's role or popularity, and irrespective of whether and to what extent Bryson participated in the ALU's organizing efforts, the ALU professes to have gained support, not lost it, since Bryson's termination. ████████████████████████████████████████ ██████████████████████. Ex. G at 69:20–24. ████████████████████████ ████████████████████████████████████████. Ex. A at 84:15–85:5. ██████████ ████████████████████████████████████████████. Ex. G at 86:4–24. ██████████ ████████████████████████████████████████████████. Ex. A at 53:20–54:20. ████████████████████████████████████████████████ ██████████. Ex. G at 135:24–136:12; Ex. H at 157:7–17. ████████████████ ████████████████████████████████████████. Ex. G at 161:14–162:9.

The Union filed its first petition for a representation election at JFK8 in October 2021 but withdrew it in November 2021 because it had not yet met the Board's threshold of 30% of

---

[10] ████████████████████████████████████████████████████████████████ ████████████████████████. *See* Ex. D at 197:22–199:21.

employee support necessary to conduct an election.  Am. Pet. ¶ 8(c).[11]  ALU organizers pressed

on and did not stop or slow the collection of signed authorization cards.  Ex. A at 101:21–102:6.

By December 2021, just eight months after forming, Region 29 decided that the ALU had enough

support for a second election petition.  Am. Pet. ¶ 8(d).  On February 17, 2022, the Regional

Director approved a stipulated election agreement, setting the election for late March 2022.  *Id.*

Once that agreement was signed, the ALU stopped collecting authorization cards and

focused its efforts on the scheduled election.  Ex. A at 121:9–17.  The Union engaged in high-

profile organizing activity within JFK8.  For example, in a February 5, 2022 TikTok post, the

Union bragged: "okay now we're taking over breakrooms 😂 #occupyamazon #alu."  Ex. J.

Smalls likewise posted about the ALU "occupying the Breakroom" with video proof:



Ex. K.  This type of public organizing within JFK8 occurred frequently.  Other ALU TikTok

---

[11]     The ALU doesn't contend that this was for a lack of support, but because of turnover at
JFK8.  *See, e.g.*, Ex. I (ALU tweet" "the turnover was the barrier").

videos show breakroom organizing at JFK8, including right before the election, on March 9, 2022[12] and March 25, 2022.[13]  *See also* Ex. A at 53:20–54:20 (Bryson testifying that ███████████ ████████████████████████████████████████████████████████████████████████████).

One ALU organizer, Pasquale Cioffi, even bragged at a press conference that he personally flipped 400 to 500 "nos" to "yeses" in just a few weeks.  Ex. D at 250:13–251:13; Ex. F at 4949–50.

**C.    In March 2022, Right Before The JFK8 Election, The Board Commenced This Action Claiming Bryson's Immediate Reinstatement Was Necessary To Give The Union A Fair Shot At The Election.**

The Board investigated and issued a complaint on Bryson's charge on December 21, 2020. Am. Pet. ¶ 4.  During the investigatory stage of the case, the Board never once raised the possibility that Bryson's case warranted Section 10(j) consideration.  Nor did the Board seek Amazon's position on Section 10(j) relief as Regional Offices are directed to do if the case is considered potentially appropriate for such relief.  *See* Ex. L § 10310.1 ("Whenever the issues in a charge reveal that interim relief may be warranted, the Regional Office should notify all parties that it will examine possible 10(j) relief *as part of the investigation of the charge and should invite the parties to submit evidence and argument* relevant to the 10(j) consideration.") (emphasis added). Nonetheless, on March 17, 2022, ***638 days after Bryson filed his charge***, the Board filed this Section 10(j) injunction action.  *See* ECF No. 1.

The Board filed its petition a mere 8 days before the voting at the JFK8 election was set to begin.[14]  While it now denies any ulterior motive in filing when it did, at the time the Board wasted

---

[12]    https://www.TikTok.com/@Amazonlaborunion/video/7071707612470873386

[13]    https://www.TikTok.com/@Amazonlaborunion/video/7078437248949161259

[14]    In fact, on August 19, 2021, the Board's General Counsel issued a memorandum emphasizing the importance of timely seeking Section 10(j) relief.  Ex. M.  Notwithstanding this directive, which came a full seven months before the Board filed its petition in this case, the Board waited until 8 days before the JFK8 election to seek Section 10(j) relief.

no time launching a media blitz to ensure widespread knowledge of its Section 10(j) filing.  On

the day of the filing, the Board issued to numerous media outlets statements that were transparently

supportive of the ALU's election effort.  *See, e.g.*, Ex. N (Mar. 17, 2022 New York Times article

quoting statement from Petitioner: "No matter how large the employer, it is important for workers

to know their rights—particularly during a union election—and that the NLRB will vociferously

defend them."); Ex. O (Mar. 17, 2022 *The Verge* article quoting same statement).  Bryson testified

███████████████████████████████████████████████████████████████

██████████████████████████████████████████.  Ex. A at 112:3–6; *see also id.* at

110:18–111:7 (████████████████████████████████████████████

████████████████████████████████████████████████); *id.* at 150:6–

7 (████████████████████████████████████); *id.* at 266:20–22 (████████████

██████████████████████████████████████████).

     For its part, the ALU was quick to capitalize on the Board's filing, publicly misrepresenting

that the filing of the petition with this Court caused Bryson's immediate reinstatement:



Ex. P.

The tardiness of this action is especially apparent when juxtaposed with the Board's policies and practices for processing Section 10(j) cases.  The Board's General Counsel has repeatedly stressed the importance of identifying and processing Section 10(j) cases without delay. *See, e.g.*, Ex. Y ("[I]t is incumbent upon the Agency to consider seeking Section 10(j) injunctions immediately after determining that workers have been subject to threats or other coercive conduct during an organizing campaign, before an employer follows through on its threats or coercion when it becomes more challenging to fully erase the chilling impact on organizing activity.").  A full 638 days elapsed between the filing of Bryson's charge and the Board's commencement of this Section 10(j) proceeding—a period *404 days longer than average*.  ECF No. 27 ¶¶ 4–13; ECF No. 27-1.  The Board does not even attempt to offer a legitimate explanation for why it needed more than a year of additional time to seek Section 10(j) relief in this case.

### D.    The ALU Received The Most Votes Cast At The JFK8 Election.

The election was held as scheduled.  Am. Pet. ¶ 8(d).  Based on a tally completed on April 1, 2022, the Board determined that the ALU received the most votes.  *Id.* ¶ 8(e).  The ALU declared a "decisive victory."  Ex. Q.  No matter how Amazon's objections to the election are resolved, no one from the Union has claimed—beyond contrivances for this case—that Bryson's termination more than two years ago has chilled Union support or thwarted the Union's success.

Quite the contrary.  Union leaders have repeatedly boasted about the *increase* in union support and activity leading up to the election.  The ALU's interim vice president, Derrick Palmer, raved about his success as an organizer inside JFK8 during "The Daily," a *New York Times* podcast: "Every day I would be talking to workers.  Every single day they will either sign the card inside the building.  Or if they didn't sign the card inside, I'd go out there, talk to Chris [Smalls].  *And, you know, it worked.*"  Ex. R at 14 (emphasis added).  As noted, an ALU organizer told the press that he flipped 400–500 votes in the Union's favor just before the election.  Ex. D at 250:13–

251:13; Ex. F at 4949–50 *see also* Ex. A at 251:15–252:17 (Bryson testifying that ████████

████████████████████████████).  And on CNBC, Smalls said he had "no doubt"

the ALU would win the election.[15]  *Accord* ECF No. 5-17 ¶ 2 ("I believe that the Union will win

that [JFK8] election because Union agents have been outside the facility connecting with Amazon

employees on a daily basis, and we have been steadily building support among the employees.").

There is no evidence that the Union's support has diminished since the election, let alone

due to Bryson's April, 2020 termination.  Since the election, the Union has gained national

notoriety.  Smalls met with President Biden, Vice President Harris, Secretary of Labor Walsh, and

Senator Sanders.  Ex. S; Ex. D at 283:14–287:19.  Earlier this month, Smalls announced that the

ALU was moving from "working out of a SUV/apartment" to new offices:



Ex. T.  Finally, the ALU just recently boasted about new organizing efforts in Albany, New York,

---

15    https://www.youtube.com/watch?v=qB17cIfYPr0

and Kentucky.  *See* Ex. U.

**E.      The Proceedings Before The Board Are Ongoing.**

Bryson's ULP charge was tried before an ALJ over 16 non-consecutive days between March and December 2021.  Am. Pet. 44 ¶ 5.  The ALJ issued his decision shortly after the Board commenced this action.  Although the propriety of Bryson's conduct on April 6, 2020 was the key issue in the case, the ALJ inexplicably failed to examine Bryson's actions in any detail, focusing almost exclusively on *Evans's* conduct.  The ALJ failed to even mention the slurs that Bryson continually hurled at Evans.  Instead, the ALJ relegated those pejoratives to self-prepared (and incomplete and inaccurate) transcripts of the Velasco and Flowers videos.

Amazon filed exceptions to the ALJ's decision on May 31, 2022.  *See* Exs. V, W.  The Region's answering brief was due 14 days later, on June 14, 2022.  29 C.F.R. § 102.46(b)(1).  Despite claiming here that it needs urgent relief, ***the Region requested and obtained a 6-week extension*** of that deadline, to July 26, 2022, delaying the final Board decision.  Ex. X.

**III.      ARGUMENT**

A Section 10(j) injunction is "an extraordinary remedy."  *Kreisberg v. HealthBridge Mgmt.*, 732 F.3d 131, 141 (2d Cir. 2013).  To obtain that extraordinary remedy, the Board must demonstrate both that the relief requested is "just and proper" and that there is "reasonable cause" to believe unfair labor practices have been committed.  *Id.*; *see* 29 U.S.C. § 160(j).  As explained below, not only has the Board failed to carry its burden on both fronts, but the Board's requests also are moot.  The Court should deny the request for injunction.

**A.      The Court Should Dismiss The Petition For Lack Of Subject-Matter Jurisdiction Because Bryson Asserts ██████████████████████████.**

Section 10(j) vests the Court with *statutory* jurisdiction over this proceeding, but the Court's subject-matter jurisdiction is still limited by Article III's "case" or "controversy"

requirement.  *See, e.g.*, *Timmins v. Narricot Indus., L.P.*, 360 F. App'x 419, 422 (4th Cir. 2010).

That means, "at all times, the dispute before the court must be real and live, not feigned, academic,

or conjectural." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005).

When "it is impossible to grant any effectual relief," the Court "must dismiss the case" as moot

"rather than issue an advisory opinion." *Scalia v. Angelica Textile Servs.*, 803 F. App'x 543, 543

(2d Cir. 2020).

The Board's request for Bryson's immediate, interim reinstatement pending the Board's

final resolution of his charge, Am. Pet. at 7 ¶ 2(a), is moot because Bryson has testified



. Ex. A at 305:3–306:14.

. *Id.* at 308:11–14.

. *Id.* at 308:10–16.  Bryson

testified that

. *Id.* at 307:16–25.

*Id.* at 309:7–16.

. *Id.* 309:18–310:3.  Bryson admits

. *Id.* at 307:11–25, 311:3–11.[16]

Thus, the Board's assertion that "Bryson still *desires* reinstatement," Board Br. 22

(emphasis added), is contradicted by                          . On this record,

an injunction compelling Bryson's reinstatement would therefore be ineffectual, academic, and

---

[16]   Bryson also declared that

. Ex. A at 307:6–10.

merely advisory.  Which is to say, the request for reinstatement is moot and must be rejected for lack of subject-matter jurisdiction.  *See, e.g.*, *Kaynard v. MMIC, Inc.*, 1983 WL 2104, at *2 (E.D.N.Y. 1983) (holding request for Section 10(j) injunction ordering reinstatement moot because the complaining party had rejected an offer of reinstatement).

Without jurisdiction to order reinstatement, the remainder of the relief the Board requests is meaningless.  Bryson's actual return to work is the *only* form of relief the Board even contends is necessary to prevent irreparable harm.  *See, e.g.*, Board Br. 22 ("Seeing Bryson timely reinstated will send a signal to current employees at JFK8, as well as employees at other State Island warehouses . . . ."); *id.* at 17 ("Without Bryson's immediate interim reinstatement, employee confidence and support in the Union and willingness to stand by the union during the challenge process will die . . . .").  Indeed, nearly all of the other relief sought is derivative of an order requiring Bryson's reinstatement, including interim rescission and expungement of the termination from Bryson's employment record so as not be used against him in the future, Am. Pet. at 7 ¶ 2(b); posting, distribution, and reading of the reinstatement order, *id.* at 8 ¶ 2(c); and a report to the Court regarding compliance with the reinstatement order, *id.* at 8 ¶ 2(d).  The Court therefore lacks jurisdiction to order these forms of relief for the same reasons.

That leaves the Board's overly broad and vague request for an order barring Amazon from discharging, interfering with, restraining, or coercing employees for engaging in protected concerted activity.  *Id.* at 7 ¶ 1.  That, of course, is unnecessary because federal labor law already imposes precisely those requirements.  And, for that reason, the requested injunction could not properly issue, for "an injunction must be more specific than a simple command that the defendant obey the law" in order to satisfy Federal Rule of Civil Procedure 65(d).  *City of New York v. Mickalis Pawn Shop*, 645 F.3d 114, 144 (2d Cir. 2011); *accord Peregrine Myanmar Ltd. v. Segal*,

89 F.3d 41, 51 (2d Cir. 1996).

In short, it is impossible for the Court to order effective or meaningful relief. This proceeding is therefore moot and should be dismissed for lack of subject-matter jurisdiction.

**B.      The Board Fails To Carry Its Burden To Demonstrate That The Extraordinary Relief It Seeks Is "Just And Proper."**

By statute, a Section 10(j) injunction may not issue unless it is "just and proper," 29 U.S.C. § 160(j)—a stringent standard that demands an immediate injunction be *necessary* to prevent irreparable harm or to preserve the status quo," *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 469 (2d Cir. 2014) (emphasis added); *accord Silverman v. MLB Players Relations Comm.*, 880 F. Supp. 246, 255 (S.D.N.Y. 1995) (Sotomayor, J.), *aff'd*, 67 F.2d 1054 (2d Cir. 1995).[17]  The relevant harm is "harm to organizational efforts."  *Remington Lodging*, 773 F.3d at 469.  Thus, the extraordinary Section 10(j) injunction remedy is not "just and proper" unless it is necessary to prevent serious harm to union organizing.

Proof of the requisite irreparable harm to organizing requires, at the very least, evidence of such harm *and* evidence of a causal connection between the harm and the alleged unlawful activity. *See, e.g.*, *Mattina v. Ardsley Bus Corp.*, 711 F. Supp. 2d 314, 327 (S.D.N.Y. 2010) (injunction warranted where there is a "causal connection between Respondent's practices and the employee disaffection"); *Henderson v. Bluefield Hosp. Co.*, 208 F. Supp. 3d 763, 771 (S.D.W. Va. 2016) (denying Section 10(j) injunction where the Board failed to prove union support was waning and "the causation between decreasing employee support" and the alleged unlawful practice was

---

[17]      Here, it is not possible to "preserve the status quo," *i.e.* restore the status quo ante, because, as discussed, Bryson concedes ██████████████████████.  *See, e.g.*, *Remington Lodging*, 773 F.3d at 470–71 (where "[n]othing indicates that the . . . employees would return if an injunction were issued" an injunction is "not 'just and proper'" because it cannot "restore the status quo as it existed prior to the unfair labor practices").

"purely speculative").  The record does not reflect any such evidence.

Now that the ALU has obtained more votes in the challenged election tally, the Board appears to abandon its asserted pre-election theory.  Instead, the Board now advances the purely speculative contention that Bryson's continued absence from the workplace will cause an "erosion of support" for the "nascent" ALU while it defends against Amazon's objections and looks to move toward collective bargaining.  Board Br. 17–18; *see id.* at 12 ("Amazon has challenged the election results and its objections are being litigated.  As the Union's win is not final, it is even more imperative that Bryson be reinstated to show the Union's legitimacy and to allow the Union the opportunity to maintain its level of support through the challenge process if there is to be any chance of a level playing field between Amazon and the nascent Union when they bargain for an initial collective bargaining agreement.").  The Board, however, lacks *any evidence whatsoever* to suggest that there has been or likely will be any erosion in ALU support.  The Board merely speculates that Union support *could* decline.  That speculation is belied by the record.  At no point in the ALU's short history has there been evidence of declining support, and in any event, the Board identifies none.  Indeed, the ALU is now organizing at additional facilities.  *See, e.g.*, Ex. U.

Unlike this case, in the cases the Board relies on there was actual evidence of significant diminution in union support and activity.  *See, e.g.*, *Pye v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001) ("The unionization effort has ground to a halt."); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1572 (7th Cir. 1996) ("[T]he union effort has ground to a halt."); *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988) ("[T]he union's organizational program . . . ended . . . ."), *overruled on other grounds by Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994); *Sharp v. Webco Indus.*, 225 F.3d 1130, 1136 (10th Cir. 2000) (discussing "the Union's sagging organizational campaign").  Indeed, in light of the recent JFK8 election and the national

spotlight on the ALU, including Smalls's highly publicized meeting in the Oval Office with President Biden and Vice President Harris, the Board's speculation about dampening of support for the ALU simply strains credulity.

Nor is there any logic to the Board's contention that Bryson's April 2020 termination—a full year before the ALU even formed—might be the cause of some hypothetical future decline in ALU support.  The Board does not cite a single case where a court found that the termination of an employee long before union activity began could provide a basis for Section 10(j) relief to prevent supposed chilling of union activity, let alone long after a representation election in which the union received a majority of ballots cast.  Unsurprisingly, the Board's Section 10(j) reinstatement cases involve terminations of actual union activists *contemporaneous with their union activity*.  *See, e.g.*, *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir. 1980) (discharged employees "were active and open union supporters" at the time of termination); *Pye*, 238 F.3d at 75 (same); *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 213 (2d Cir. 1980) ("discharge of union adherents"); *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th Cir. 2001) (employee discharged "after he joined a union"); *see also Abbey's Transp. Servs. v. NLRB*, 837 F.2d 575, 576 (2d Cir. 1988) ("[T]he Board and the courts must carefully scrutinize dismissals during union organizing drives.").

Ultimately, the Board relies on nothing more than hearsay—testimony that Bryson or other witnesses spoke with unidentified Amazon associates said they were skeptical of the Union because Bryson had been fired, nearly two years earlier, before the Union was formed.  If that's true, it is irrelevant.  Neither Bryson nor anyone else was able to testify as to whether ████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████.  Ex. A at 214:21–222:15.  Moreover,

Bryson testified that ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████ *Id.*

at 110:18–111:7, 150:6–7.

The Board's own conduct further demonstrates that Section 10(j) relief is not necessary to

prevent irreparable harm and is instead in furtherance of an improper objective.  The Board waited

until March 2022—nearly two years after Bryson was fired and 638 days after he filed the charge

in the underlying proceeding—to petition for Bryson's immediate, interim reinstatement.  *See,*

*e.g.*, *Seller v. H.G. Page & Sons, Inc.*, 540 F. Supp. 77, 79 (S.D.N.Y. 1982) ("Although Congress

specifically noted that some interim relief may be necessary because of 'the relatively slow

procedure of the Board hearing,' this [Section 10(j)] remedy does not apply where the Board itself

does not treat the ongoing violations with urgency.").  Petitioner's extreme delay in this case is

"evidence that interim injunctive relief is not truly necessary."  *Kendellen v. Interstate Waste*

*Servs.*, 2007 WL 121435, at *5 (D.N.J. 2007); *accord Pascarell v. Vibra Screw*, 904 F.2d 874,

881–82 (3d Cir. 1990) ("[U]ndue delay reduces the Board's credibility in arguing that an injunction

is absolutely necessary.").[18]

The Board's contention that it felt "the need for Bryson's interim reinstatement did not

_____

[18]     *See Harrell v. Ridgewood Health Care Ctr.*, 154 F. Supp. 3d 1258, 1275 (N.D. Ala. 2015)
(1-year delay shows injunction unnecessary); *Ohr v. Arlington Metals Corp.*, 148 F. Supp. 3d 659,
673–74 (N.D. Ill. 2015) (same, 15-month delay); *NLRB v. Hartman & Tyner, Inc*., 714 F.3d 1244,
1249 (11th Cir. 2013) (same, 4-month delay); *McDermott v. Veritas Health Servs.*, 2011 WL
2693922, at *5 (C.D. Cal. 2011) (same, 1-year delay); *Boire v. Pilot Freight Carriers, Inc.*,
515 F.2d 1185, 1193 (5th Cir. 1975) (3-month delay makes it "questionable whether an order of
reinstatement would be any more effective than a final Board order at this point"); *Kobell v.
Suburban Lines*, 731 F.2d 1076, 1092 (3d Cir. 1984) ("[T]he district court may legitimately think
it suspicious that the party who asks to preserve the status quo through interim injunctive relief has
allowed the status quo to change through unexplained delay."); *Seller*, 540 F. Supp. at 79 ("The
Board's inaction in this case is the most compelling evidence against the need for intervention by
this court," in a case were "[i]t took nearly four months for the Board to request injunctive relief").

ripen until his early protected concerted activity evolved into the ALU organizing campaign and he continued to play a leadership role with the Union," Board Br. 24, defies reason.  There is no evidence that Bryson's protests "evolved into the ALU organizing campaign" or that he had "a leadership role" in the ALU.  More to the point, if the Board truly believed Bryson's reinstatement was integral to protect employee rights during the ALU's organizing campaign, it would have sought his reinstatement sooner, sometime in 2021—perhaps after its November 2021 rejection of the first ALU petition for lack of support—rather than strategically waiting until the eve of the JFK8 election in March 2022.[19]

The timing of the Board's filing—right before the JFK8 election—bespeaks unreasonable delay and an improper attempt to sway the election in the ALU's favor.  The NLRA "is not intended to serve *either* party's individual interest, but to foster in a neutral manner a system in which the conflict between these interests may be resolved."  *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 680–81 (1981).  It is essential for the Board to remain neutral and preserve the "laboratory conditions" that govern union elections.  *Gen. Shoe Corp.*, 77 NLRB 124, 127 (1948); *see Fresenius Mfg.*, 352 NLRB at 682 (the Board "must maintain and protect the integrity and neutrality of its election procedures").  Board neutrality and restraint are most imperative "during the crucial period before an election."  *Ideal Elec. & Mfg.*, 134 NLRB 1275, 1277 (1961); *cf. H.K. Porter Co. v. NLRB*, 397 U.S. 99, 107–08 (1970) ("[T]he Board acts to oversee and referee the process of collective bargaining, leaving the results of the contest to . . . the parties.").[20]

---

[19]   The Board's false assertion that "Amazon relaunched its efforts to stifle protected concerted activity," Board Br. 24, is not supported by any evidence.

[20]   The requirement of Board neutrality is deeply engrained in the NLRA.  Section 10(c), for example, divests the Board of jurisdiction to require reinstatement of employees discharged for cause, 29 U.S.C. § 160(c), like Bryson, *see, e.g.*, *GM, LLC*, 369 NLRB 127, slip op. 8 (2020) ("[a]busive speech and conduct," like a "profane ad hominem attack" not protected by NLRA).

The Board disregarded all of this when it filed for a Section 10(j) injunction just before the election, launched an aggressive publicity campaign about the filing, and fought to promote the ALU's interests by seeking reinstatement of an employee terminated for cause a year before the ALU came into existence.  The Board has acknowledged this improper motivation throughout this proceeding.  Indeed, the Board sought to seal the non-party deposition testimony given in the case, arguing that limitations on disclosure were necessary to protect "the Amazon Labor Union's interests and ability to organize."  ECF No. 41 ¶ 14.  Promoting and protecting the interests of the ALU is not part of Petitioner's statutory mandate.  Section 10(j) relief here is not just or proper.

### C.     The Board Also Fails To Demonstrate "Reasonable Cause."

On "reasonable cause," the Board merely urges the Court to defer to the ALJ's decision without scrutiny.  The ALJ's decision, currently on appeal, is not only rife with error, but it relies on novel modifications of the controlling legal standards that the ALJ appears to have fashioned just for this case.  This Court owes no deference to such a "novel and unprecedented application" of controlling law.  *Silverman v. 40-41 Realty Assocs.*, 668 F.2d 678, 681 (2d Cir. 1982).

Specifically, the ALJ modified the controlling standard of *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964), beyond all recognition.  An employer's burden is typically satisfied by demonstrating an honest belief that the employee engaged in the conduct for which he was terminated.  *Id.* at 22.  But the ALJ heightened that burden by requiring Amazon to also show that Bryson's undisputed misconduct was sufficiently "serious" to warrant discharge.  The ALJ also lessened the General Counsel's burden.  Under *Burnup*, the General Counsel can prevail only by showing that the employer's good-faith belief was wrong—a showing made impossible by the Velasco video.  *Id.*  But the ALJ added a new means for the General Counsel to prevail—by demonstrating that, based on comparators, the misconduct was not so serious as to merit discharge.

The ALJ's decision is otherwise plagued with legal and factual error.  For example:

- The ALJ purported to also apply *Wright Line, Inc.*, 251 NLRB 1083 (1980), in the alternative, despite having repeatedly and correctly ruled at trial that this case would *not* be decided under *Wright Line*, but rather under *Burnup*.

- Lacking evidence necessary to rule in the General Counsel's favor, the ALJ drew an unprecedented and wholly unwarranted adverse inference based on Amazon's partial production in response to 1 of more than 100 document requests.

- The ALJ ignored Bryson's patently outrageous misconduct and focused almost exclusively on what the ALJ believed was Evans's misconduct.

- The ALJ ignored Bryson's sworn admissions about lying to Amazon to conceal the video and found Bryson's version of events more credible than that of Amazon's investigators.

*See* Exs. V, W.

It is both unnecessary and inappropriate to defer to the ALJ's conclusions in these circumstances.  Without such blind deference, the Board has failed to show "reasonable cause." The petition should be denied for this reason, as well.

## IV.    CONCLUSION

It is confounding that the Board is attempting to force Amazon to bring Bryson back to the workplace, potentially to expose others who might dare to disagree with him over terms and conditions of employment to the same type of retaliatory, abusive, misogynistic, and vicious assault.  It is even more confounding that the Board would continue to proceed with this litigation when Bryson himself testified in his deposition that ████████████████████████ ████.  Accordingly, Amazon respectfully submits that this Court should reject the Board's abuse of its statutory authority and decline to enter the extraordinary relief it seeks here.  In short, the Court should dismiss the petition and should award Amazon its fees and costs.

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

Dated: July 22, 2022

s/ Christopher J. Murphy
Christopher J. Murphy (*pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
Phone: 215-963-5000
Fax: 215-963-5001
christopher.murphy@morganlewis.com

Richard G. Rosenblatt (*pro hac vice*)
502 Carnegie Center
Princeton, NJ 08540
Phone: 609-919-6600
Fax: 608-919-6701
richard.rosenblatt@morganlewis.com

Kelcey J. Phillips (*pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: 202-739-3000
Fax: 202-739-3001
kelcey.phillips@morganlewis.com

Douglas T. Schwarz
101 Park Avenue
New York, NY 10178
Phone: 212-309-6000
Fax: 212-309-6001
douglas.schwarz@morganlewis.com

*Attorneys for Respondent*